UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) |
| Plaintiff, | ) ) Civil Action No. |
| v. | ) ) 18-CV-5587 |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, | ) ) ) ) ) |
| Defendants. | ) ) ) |

# COMPLAINT

Plaintiff U.S. Securities and Exchange Commission ("SEC") alleges as follows:

1. The SEC brings this action to halt an ongoing Ponzi scheme. Since at least 2010, Defendants Jerome and Shaun Cohen, through their companies, Defendants Equitybuild, Inc. and Equitybuild Finance, LLC, have raised at least $135 million from more than 900 investors. Defendants raised these funds by falsely promising investors safe investments, secured by income-producing real estate, that generated returns of 12% to 20%. Most of the real estate promoted to investors were residential properties in underdeveloped areas on the South Side of Chicago.

2. Defendants defrauded their investors in multiple ways. For instance, Defendants hid from investors that they skimmed 15% to 30% off each investment by taking undisclosed fees. In many cases they did this by telling investors that the properties being purchased cost substantially more than what Defendants actually paid for them. This meant that investors were not only overcharged, but the real estate supposedly securing their investments was worth much less than what Defendants told investors.

3. Beyond the exaggerated property valuations and undisclosed fees, Defendants falsely told investors that their impressive returns would be generated by profitable real estate. Contrary to Defendants' claims, Defendants sustained heavy losses and the properties they pitched to investors failed to earn anywhere near enough to pay the promised double-digit returns. As a result, Defendants' investment program devolved into a Ponzi scheme: Defendants could only pay earlier investors by raising funds from unwitting new investors.

4. Rather than disclosing their financial problems, to keep the scheme afloat the Defendants continued to solicit investors with offers of safe investments and outsized returns.

5. Defendants later changed their business model by offering investments in pooled investment funds, again promising double-digit returns generated by income-producing real estate. But Defendants concealed from new investors that most of the properties supposedly being acquired and renovated by new investor proceeds were the very same properties "securing" the investments of earlier investors. Defendants also hid from the new investors that, rather than be deployed to develop real estate, significant amounts of their money would be used to make Ponzi payments to earlier investors.

6. As for the earlier investors, Defendants forced them to restructure their investments by pushing back the timeframes for repayment, swapping investors' supposedly secured investments for new unsecured instruments, and by transferring title of the properties purportedly securing the investments into special purpose entities owned by Defendant Jerome Cohen.

7. On the brink of their scheme collapsing, Defendants recently started coming clean about their financial distress and inability to repay investors through revenue-producing real estate. But Defendants limited these disclosures only to earlier investors whose interest payments Defendants could no longer afford to make. Despite these partial disclosures, Defendants continue

to raise funds from new investors by concealing their dire financial condition while promising "guaranteed" returns and annual interest payments as high as 17%. This lawsuit seeks to stop Defendants' scheme.

## JURISDICTION AND VENUE

8. The SEC brings this action under Securities Act of 1933 ("Securities Act") Section 20(b) [15 U.S.C. §77t(b)] and Securities Exchange Act of 1934 ("Exchange Act") Sections 21(d) and (e) [15 U.S.C. §§78u(d) and 78u(e)].

9. This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

10. Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Many of the acts, practices, and courses of business constituting the violations alleged herein have occurred within the Northern District of Illinois.

11. Nearly all of the securities described herein involved real estate investments in Chicago. Defendants operate an office in Chicago and used investor funds to purchase, renovate, and develop Chicago residential properties. Defendants also offered and sold the securities described herein to investors in the Northern District of Illinois.

12. Defendants directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein, and will continue to do so unless enjoined.

## DEFENDANTS

13. **Equitybuild, Inc.** is a Florida corporation, with an office in Chicago. Since at least 2010, Equitybuild, Inc. ("Equitybuild") has solicited investments promising returns generated by the purchase, renovation, and development of real estate in Chicago.

14. **Equitybuild Finance, LLC**, formerly known as Hard Money Company, LLC, is a Delaware limited liability company wholly owned by Equitybuild. Since at least 2010, Equitybuild Finance, LLC ("Equitybuild Finance") has solicited investments promising returns generated by the purchase, renovation, and development of real estate in Chicago.

15. **Jerome H. Cohen**, age 63, is a resident of Naples, Florida. Jerome Cohen founded Equitybuild and Equitybuild Finance. He is the CEO and President of Equitybuild. Along with his son Shaun, Jerome Cohen controlled Equitybuild and Equitybuild Finance, including controlling their operations, the content of the representations made to investors described herein, and transactions to and from their bank accounts.

16. **Shaun D. Cohen**, age 39, is a resident of New York, New York. He is the President and sole officer of Equitybuild Finance and the Vice President of Equitybuild. Along with his father, Shaun Cohen controlled Equitybuild and Equitybuild Finance, including controlling their operations, the content of the representations made to investors described herein, and transactions to and from their bank accounts.

## FACTS

17. Since 2010, Defendants Equitybuild, Equitybuild Finance, Jerome Cohen and Shaun Cohen (collectively, "Defendants") have raised at least $135 million by selling securities to more than 900 investors throughout the United States.

18. None of the securities or securities offerings described herein was registered with the SEC.

19. While the mechanics of the investments changed over time, Defendants offered and sold securities by promising to pool investor funds to purchase, renovate, or develop real estate properties, primarily in underdeveloped areas on the South Side of Chicago.

**Phase 1: The Private Mortgage Notes**

20. By 2010, Defendants had begun offering and selling promissory notes (the "Notes") to investors.

21. The parties to the Notes were: (a) the "borrower," which was usually Equitybuild, and (b) the investors, each of which the Notes described as a "lender."

22. The Notes provided for interest rates ranging from 12% to 20%, with investors receiving higher interest rates for investing greater amounts of money.

23. The terms of the Notes ranged from six to 24 months. At the end of the Notes' terms, Defendants offered investors the option of, instead of returning investors' principal, rolling over the principal into a new Note. Many investors availed themselves of this option.

24. Each Note referenced a specific real estate property, which investor funds would purportedly be pooled to purchase, renovate, and/or develop. Each Note represented that the Note was secured by a fractional interest in a mortgage in the identified property.

25. However, per the investment forms Defendants drafted, the investors assigned to Equitybuild Finance, as the "Collateral Agent," all of their rights and powers under the Notes and mortgages. Defendants thus structured the mortgages to be typically entered between: (a) Equitybuild, an affiliate entity, or, in some case, a third-party purchaser; and (b) the investors "care of" Equitybuild Finance.

26. Jerome Cohen signed the Notes and mortgages on behalf of Equitybuild (or its affiliates). Shaun Cohen, having been delegated the ability to do so by the investors, signed the Notes on behalf of Equitybuild Finance.

**Defendants Promoted the Notes as Profitable and Safe Investments Secured by Real Estate**

27. Defendants utilized a variety of promotional methods to solicit investments in the Notes. These included Equitybuild's website, emails to prospective investors, a call center and salespeople, in-person presentations, social media, and Google advertising.

28. As part of their marketing efforts, Equitybuild and Equitybuild Finance also issued and distributed to investors promotional booklets referred to as "white papers."

29. The salespeople Defendants used to solicit investors received commissions based on the amounts of investments they obtained. These salespeople ultimately reported to Shaun Cohen, who instructed them to bring in at least $50,000 in new investments each day.

30. Defendants' promotional materials touted the Notes as "low risk" investments that were secured by real estate. For instance, in one white paper, Defendants described how "Equitybuild is ushering in a new era by making real estate investing more secure and reliable than ever." The same white paper describes Equitybuild's "Three Guarantees," which included promises that Equitybuild would compensate investors for any deficiencies in the real estate's operating income and declines in property values.

31. In another white paper, Equitybuild Finance assured investors that if the mortgage ever goes into default, investors could simply sell the property in a quick sale and get their money out of the investment.

32. Defendants also sought to downplay the risk of investing by describing their purportedly successful track record. Marketing emails frequently touted the fact that "EquityBuild has Never Defaulted on a Loan and has Zero Foreclosures," and had a "perfect payment track record." Equitybuild's website and white papers similarly claimed that it was

6

able to achieve "Operational Mastery" due to a "proprietary econometric model" that successfully identifies undervalued properties.

33. Defendants paired their assurances of low risk investments with the lure of "consistently" delivering "double-digit returns." Defendants touted how their "investors receive impressive, double-digit returns that roll in month after month, regular as clockwork, but require absolutely no ongoing effort on their part."

34. Defendants told investors that their double-digit returns would be generated through third-party purchasers, who would use the investor-funded mortgages to purchase the properties securing the Notes. Defendants told investors that these third-party purchasers borrow on shorter terms and at higher rates than purchasers using traditional mortgages, allowing Equitybuild and Equitybuild Finance to generate "high returns that beat the stock market."

35. Defendants told investors that Equitybuild and Equitybuild Finance earned their profits from the third party purchasers, but not from the investors. To that end, Defendants told investors that Equitybuild and Equitybuild Finance retained as profits the difference between the mortgage payments received from the third party purchases and the interest payments made to the Note investors.

36. Reinforcing the safety and profitability of the Notes, Defendants' marketing emails claimed that these third-party purchasers were "qualified" borrowers with "A-grade" credit. Defendants also represented that the properties collateralizing investors' Notes would generate "more than enough revenue to cover the borrower's note payments as well as all of the property's operating expenses, and still return positive cash flow."

7

**In Reality, Defendants Charged the Note Investors Heavy Undisclosed Fees, Purchased Poorly Performing Real Estate, and Began Operating a Ponzi Scheme**

37. Defendants' representations that they made money by keeping the difference between the mortgage payments of third-party purchasers and the Note investors' interest payments were false and misleading. Contrary to these representations, and concealed from investors, Defendants kept 15% to 30% of the Note investors' investments as undisclosed fees.

38. Defendants kept these fees hidden by telling investors that the properties securing their Notes were worth significantly more than the actual cost of the properties. Specifically, the offering memoranda Defendants provided to Note investors listed a "purchase price" or "sale price" for each property that was inflated, on average, by more than 47%. This meant Defendants collected far more money from investors than what they told investors was necessary to acquire the properties securing each Note.

39. Jerome and Shaun Cohen used these secret fees to fund their personal living expenses, and to keep the scheme going by making Ponzi-style payments to earlier investors.

40. The inflated purchase prices presented to investors also meant that the investments were far riskier than Defendants led investors to believe. Indeed, the Notes were not, as Defendants claimed, "fully" or "100%" secured by real estate at the price disclosed to investors. Rather, to the extent they were secured at all, the Notes were only secured by the actual, and much smaller, value of the properties.

41. Beyond the undisclosed fees, Defendants deceived investors by falsely representing that the properties securing the Notes were profitable investments that generated positive cash flows.

42. In reality, and unknown to investors, many of properties securing the Notes performed quite poorly, with monthly expenses far exceeding their revenues. This meant that few, if any, of the properties generated enough revenues to fund the investors' interest payments.

43. Despite Defendants' claims of successful real estate investments, Equitybuild's internal financial statements, which were not shared with investors, revealed a net loss for 2015 of $12 million.

44. Contrary to Defendants' representations, investors' interest payments were not funded by third-party buyers' mortgage payments. Rather than selling the properties to third-party purchasers, Equitybuild owned most of properties securing the Notes. And by 2015, Defendants no longer even tried to find third-party buyers.

45. With the properties failing to generate sufficient income, Defendants began operating the Notes offering as a Ponzi scheme, using new investor funds to pay earlier investors' interest payments. From January 2015 through February 2017, investors received approximately $14.5 million in interest payments. During that same period, the revenue earned from properties' rental income and third party buyers' monthly payments amounted to only $3.8 million. Defendants never told investors that they were relying on fresh investor funds, rather than income-producing properties, in order to finance the interest payments.

46. Given the poor performance of many of their properties, Defendants' claim of having "zero foreclosures" was also misleading. Indeed, even in the event of a default by the borrower, it would have been impossible for investors to foreclose.

47. This is because, as part of the Note investments, investors delegated to Equitybuild Finance all of their powers under the Notes and mortgages, including the power to foreclose. And, even absent that delegation, there was no practical way for investors to

foreclose, since there were multiple investors on each property and Defendants did not provide investors with the other investors' contact information.

48. Similarly misleading were Defendants' representations that they had never defaulted on a loan. Defendants routinely extended the payback terms on investors' Notes, often for years. Defendants forced investors to either agree to these extensions or be placed on a "buyout list" and wait for Defendants to find another investor willing to buy out the original investment. As of June 2018, Defendants had approximately $3 million worth of investments on the buyout list.

49. Defendants also forced approximately 100 investors to accept unsecured promissory notes in lieu of their original "secured" Notes. Nevertheless, Defendants continued to offer securities to new investors without disclosing that previous investors had been compelled to extend their payback terms, been placed on the buyout list, or had their secured Notes switched to unsecured notes.

50. And, despite touting Defendants' successful track record and "Operational Mastery," Defendants failed to disclose to investors that Jerome and Shaun Cohen had each previously filed for bankruptcy.

51. Nor did Defendants actually employ an "econometric model" to select properties, as the offering materials represented. Unbeknownst to investors, and as Jerome Cohen acknowledged to SEC investigators, the "econometric model" represented to investors was merely some "back of the envelope" calculations and selecting real estate was not a "core competency" of Defendants.

**Phase 2: Defendants Begin Offering Investments in Real Estate Funds**

52. In 2017, Jerome and Shaun Cohen began making changes to the business model they presented to investors. But while the mechanics of the investments changed, the fraud continued.

53. At that time, rather than offering promissory notes, they began offering investments in real estate "funds." To date, Defendants have offered a total of over $70 million in investments in at least seven different funds. Defendants told investors in these funds that Defendants would pool investor proceeds to purchase and renovate real estate, again primarily on the South Side of Chicago.

54. With names like "Chicago Capital Fund," and "South Side Development Fund," Defendants continued to promise investors double-digit returns. These fund offerings remain ongoing, with one fund offering 17% returns for 24 months, and another offering 14% returns in as short as six months. One fund promises "guaranteed" returns.

55. As was the case with the Notes, the funds' offering materials tout the profitably of the investment, while failing to disclose Defendants' poor performance record, precarious financial condition, and operation of a Ponzi scheme.

56. For instance, Defendants failed to disclose to the fund investors that, rather than being deployed to purchase or renovate real estate, Defendants used significant portions of fund investor money to repay earlier Note investors.

57. Defendants also concealed from investors that many of the properties that make up these new funds are the very same properties that purportedly secured prior investors' Notes. Without prior disclosure to the Note investors, Defendants transferred title of properties purportedly securing the Notes to special purpose entities owned by Jerome Cohen.

58. While the funds' offering materials list the properties the funds intend to acquire, they fail to mention that the Defendants acquired those buildings in the course of the earlier Note offerings and that the properties supposedly served to secure the prior Note investments.

59. While touting the profitability of the funds, the funds' offering materials also fail to disclose Defendants' inability to repay earlier investors. According to Equitybuild's records,

11

as of late 2017, investors in more than 1,200 Notes had not been repaid their principal, totaling almost $75 million in delinquent payments. Defendants concealed this fact and also their inability to make earlier investors whole. Demonstrating the unlikelihood that Defendants can repay investors, as of May 31, 2018, Equitybuild and Equitybuild Finance had less than $100,000 in their bank accounts.

**The Fraud Continues: Even on the Brink of Collapse, Defendants Continue to Solicit Investors by Offering Outsized Returns and Hiding Their Severe Financial Problems**

60. Defendants recently started coming clean about their failed investments and dire financial condition – but only to earlier investors and not to prospective investors from whom Defendants continue to solicit fresh investments.

61. In May and June of 2018, Defendants disclosed to earlier investors that they were unable to continue making interest payments on the Notes and that they were in the process of unilaterally changing the terms of investors' investments.

62. At that time, Shaun Cohen emailed prior investors that Equitybuild had accumulated a "debt load that is not sustainable" and that continuing to pay investor interest payments "would lead to an inevitable disaster that would put your investment at risk of significant loss." Shaun Cohen further wrote that Equitybuild had "no choice but to restructure and reduce the debt burden" by unilaterally converting investors' Notes or unsecured promissory notes to equity positions in one of the funds.

63. In early August 2018, Equitybuild emailed a video recording of Shaun Cohen to Note investors. On the recording, Shaun Cohen: (a) states that Equitybuild's properties are "negatively cash flowing," (b) acknowledges that investor interest payments have stopped and that principal has not been returned, (c) discloses that Equitybuild had funded investor interest payments using "fee income" from later investors, but that fees charged to later investors could

12

no longer satisfy the interest payments to earlier investors, (d) warns investors not to file lawsuits against Equitybuild, (e) states that investors will not receive payments until Equitybuild's rental income exceeds its expenses, and (f) advises that Equitybuild was cutting staff down to a "skeleton crew" and would not be able to respond to investor inquiries.

64. While making these stark admissions to earlier investors, Defendants provide no such warning to the unwitting investors to whom they currently offer fund securities. Instead, Defendants continue to raise new money, promising "guaranteed" returns and annual interest payments as high as 17% – all while hiding Defendants' severe financial problems and the fact that they told earlier investors they could no longer make their interest payments.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5
### (Against All Defendants)

65. Paragraphs 1 through 64 are realleged and incorporated by reference.

66. As more fully described in paragraphs 1 through 64, Defendants, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

67. As described in more detail in paragraphs 1 through 64 above Defendants each acted with scienter in that they knowingly or recklessly made the material misrepresentations and omissions and engaged in the fraudulent scheme identified above.

13

68. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT II

**Aiding and Abetting Violations of Section 10(b) of the Exchange Act
and Exchange Act Rule 10b-5(b)
(Against Defendants Jerome Cohen and Shaun Cohen)**

69. Paragraphs 1 through 64 are realleged and incorporated by reference.

70. Defendants Equitybuild and Equitybuild Finance, in connection with the purchase or sale of securities, by the use of any means or instrumentalities of interstate commerce or by the use of the mails, directly or indirectly, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

71. Defendants Jerome Cohen and Shaun Cohen knowingly or recklessly provided substantial assistance to Defendants Equitybuild and Equitybuild Finance in the commission of these violations.

72. Defendants Jerome Cohen, Shaun Cohen, Equitybuild and Equitybuild Finance acted with scienter and/or recklessly.

73. By reason of the foregoing, Equitybuild and Equitybuild Finance violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], and Jerome Cohen and Shaun Cohen are liable for aiding and abetting those violations pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## COUNT III

### Control Person Liability Under Section 20(a) of the Exchange Act
### (Against Jerome Cohen and Shaun Cohen)

74. Paragraphs 1 through 64 are realleged and incorporated by reference as though fully set forth herein.

75. Jerome Cohen and Shaun Cohen (a) directly or indirectly controlled Defendants Equitybuild and Equitybuild Finance, (b) possessed the power and ability to control Defendants Equitybuild and Equitybuild Finance as to their violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and (c) were culpable participants in Defendants Equitybuild's and Equitybuild Finance's violations of the Exchange Act, including by knowingly or recklessly authorizing and causing Equitybuild and Equitybuild Finance to make the false and misleading representations and omissions described herein and use investor proceeds in the manner described herein.

76. By reason of the foregoing, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Jerome Cohen and Shaun Cohen are jointly and severally liable with, and to the same extent as, Defendants Equitybuild and Equitybuild Finance for their violations of the Exchange Act as stated above in Count I.

## COUNT IV

### Violations of Section 17(a) of the Securities Act
### (Against All Defendants)

77. Paragraphs 1 through 64 are realleged and incorporated by reference as though fully set forth herein.

78. By engaging in the conduct described in paragraphs 1 through 64 above, Defendants, in the offer and sale of securities, by the use of the means and instruments of interstate commerce, directly or indirectly:

   a. employed devices, schemes and artifices to defraud;
   b. obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and
   c. engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

79. Defendants intentionally, recklessly, and negligently engaged in the conduct described above.

80. By reason of the foregoing, Defendants violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## COUNT V

### Violations of Section 5(a) and 5(c) of the Securities Act
### (Against All Defendants)

81. Paragraphs 1 through 64 above are realleged and incorporated herein by reference.

82. By their conduct, Defendants directly or indirectly: (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; and (iii) made use of any means or instruments of transportation or communication in interstate commerce or of the

16

mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

83. By reason of the foregoing, Defendants have violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

### RELIEF REQUESTED

**WHEREFORE,** the SEC respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the violations charged and alleged herein.

### II.

Enter an Order of Permanent Injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder.

### III.

Issue an Order requiring Defendants, on a joint and several basis, to disgorge the ill-gotten gains received as a result of the violations alleged in this Complaint, including prejudgment interest.

**IV.**

With regard to the Defendants' violative acts, practices and courses of business set forth herein, issue an Order imposing upon Defendants appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**V.**

Retain jurisdiction of this action in accordance with the principals of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VI.**

Grant such other relief as this Court deems appropriate.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC hereby requests a trial by jury.

Respectfully Submitted,

Dated: August 15, 2018

/s/ Benjamin J. Hanauer
Benjamin J. Hanauer (hanauerb@sec.gov)
Ariella Guardi (guardia@sec.gov)
Timothy J. Stockwell (stockwellt@sec.gov)
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Phone: (312) 353-7390
Facsimile: (312) 353-7398
Attorneys for Plaintiff
U.S. Securities and Exchange Commission