**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) | |
| **Plaintiff,** | ) ) | **Civil Action No.** |
| **v.** | ) ) | **18-CV-5587** |
| **EQUITYBUILD, INC., EQUITYBUILD FINANCE LLC, JEROME H. COHEN, and SHAUN D. COHEN,** | ) ) ) ) ) | |
| **Defendants.** | ) ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS**
**EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**
**TO PREVENT VIOLATIONS OF THE FEDERAL SECURITIES LAWS,**
**TO APPOINT A RECEIVER, AND PROVIDE FOR OTHER ANCILLARY RELIEF**

Plaintiff U.S. Securities and Exchange Commission ("SEC") respectfully submits this memorandum in support of its emergency motion for a temporary restraining order, the appointment of a receiver, and other relief. The SEC's motion seeks to halt an ongoing Ponzi scheme and offering fraud, involving Chicago real estate, that has raised more than $135 million from more than 900 investors. The Defendants raised these funds by falsely promising investors safe investments, secured by income-producing real estate, that generated returns of 12% to 20%.

Defendants' scheme is on the verge of collapse, yet they continue to solicit funds from unwitting investors. Despite recently informing *prior* investors that their investments are unprofitable and that Defendants can no longer afford to repay them, Defendants continue to lure *new* investors with promises of "guaranteed" returns and interest payments as high as 17%.

Accordingly, and for the reasons discussed below, the Court should enter a TRO to halt Defendants' fraud. The Court should also appoint a receiver to protect the real estate investments and endeavor to compensate the defrauded investors.

## INTRODUCTION

Since at least 2010, the Defendants have sold more than $135 million in securities to investors throughout the United States. Defendants initially lured investors with promissory notes offering double-digit returns secured by profitable real estate, primarily located in underdeveloped areas on Chicago's South Side. To the detriment of their investors, Defendants' real estate investment program devolved into a Ponzi scheme.

Defendants defrauded their investors in a variety of ways. For instance, Defendants secretly skimmed 15% to 30% off each investment by taking undisclosed fees. In many cases they did this by telling investors the properties being purchased cost substantially more than what Defendants actually paid for them. This meant that investors were not only overcharged, but the real estate supposedly securing their investments was worth much less than what Defendants told them.

Beyond the exaggerated property valuations and undisclosed fees, Defendants falsely told investors that their impressive returns would be generated by profitable real estate. Contrary to Defendants' claims, Defendants sustained heavy losses and the properties they pitched to investors failed to earn anywhere near enough to pay the double-digit returns promised to investors. As a result, Defendants could only pay earlier investors by raising funds from unwitting new investors.

Rather than disclosing their financial problems, to keep the scheme afloat Defendants continued to solicit investors with promises of safe investments and outsized returns.

Defendants later changed their business model by offering investments in pooled investment funds, again promising double-digit returns generated by profitable real estate. But Defendants concealed that most of the properties supposedly being acquired with new investor proceeds were the very same properties "securing" earlier investors' notes. Defendants also hid that they used significant investor funds to make Ponzi-style payments to earlier investors. As for the earlier investors, Defendants forced them to restructure their investments by pushing back their repayment dates, swapping their supposedly secured notes for new unsecured instruments, and by transferring title of the properties purportedly securing the investments into LLCs owned by Defendant Jerome Cohen.

On the brink of their scheme collapsing, Defendants recently started coming clean about their financial distress and inability to repay investors through revenue-producing real estate. But Defendants limited these disclosures only to earlier investors whose interest payments Defendants can no longer afford to make. Despite these partial disclosures, Defendants continue to raise funds from new investors by concealing their dire financial condition while promising "guaranteed" returns and annual interest payments as high as 17%.

The SEC seeks to stop Defendants' scheme. The SEC also seeks the appointment of a receiver to remove Defendants' control over investors' funds, secure the real estate and other assets obtained with investor proceeds, and ultimately recompense the defrauded investors.

## **FACTUAL BACKGROUND**

### **A.    The Defendants**

Equitybuild, Inc. ("Equitybuild") is a Florida corporation with an office in Chicago. (Declaration of Ann Tushaus, filed herewith ("Tushaus Dec."), ¶¶ 6-7). Equitybuild owns

Equitybuild Finance, LLC ("Equitybuild Finance"). (*Id.*, ¶ 6). Jerome Cohen founded both Equitybuild and Equitybuild Finance and is Equitybuild's CEO and President. (*Id.*, ¶ 8). His son, Shaun Cohen, is Equitybuild's Vice President and Equitybuild Finance's President and sole officer. (*Id.*). In these positions, Jerome and Shaun Cohen controlled Equitybuild and Equitybuild Finance, including controlling the companies' operations, the content of the representations made to investors, and transactions to and from their bank accounts. (*Id.*, ¶ 9).

Since 2010, Equitybuild, Equitybuild Finance, Jerome Cohen and Shaun Cohen (collectively, "Defendants") have raised at least $135 million by selling securities to more than 900 investors throughout the United States. (Tushaus Dec., ¶ 11). None of those securities or securities offerings was registered with the SEC. (*Id.*, ¶ 12).

**B.      Defendants Initially Offered Private Mortgage Notes to Investors**

By 2010, Defendants began offering and selling promissory notes (the "Notes"). (Tushaus Dec., ¶ 10). The parties to the Notes were: (a) the "borrower," who was usually Equitybuild; and (b) the investors, each of who the Notes described as a "lender." (*Id*., ¶ 16). The Notes provided for interest rates ranging from 12% to 20%, with investors receiving higher rates for investing greater amounts of money. (*Id.*, ¶ 14). The terms of the Notes ranged from six to 24 months. (*Id.*) At the end of the Notes' terms, rather than receiving their principal, many investors availed themselves of the option of rolling over their principal into a new Note. (*Id*., ¶ 15).

Each Note referenced a specific property – which Equitybuild would purportedly purchase and renovate using pooled investor funds – and represented the Note was secured by a fractional interest in a mortgage on the identified property. (Tushaus Dec., ¶ 17). As part of the investment, the investors assigned to Equitybuild Finance, as the "Collateral Agent," all of their rights and

powers under the Notes and mortgages. (*Id.*, ¶ 18). Defendants thus structured the mortgages to be typically between: (a) Equitybuild, an affiliate entity, or, in some cases, a third-party purchaser; and (b) the investors "care of" Equitybuild Finance. (*Id.*). Jerome Cohen signed the Notes and mortgages on behalf of Equitybuild (or its affiliates), while Shaun Cohen, having been delegated the ability to do so by the investors, signed on behalf of Equitybuild Finance. (*Id.*, ¶ 19).

To solicit investments in the Notes, Defendants utilized promotional methods including Equitybuild's website, emails to prospective investors, a call center and salespeople, in-person presentations, social media, and Google advertising. (Tushaus Dec., ¶ 20). Defendants also issued and distributed to investors promotional booklets referred to as "white papers." (*Id.*, ¶ 21). Defendants paid their salespeople commissions based on the amount of investments they obtained. (*Id.*, ¶ 22). These salespeople reported to Shaun Cohen, who instructed them to bring in at least $50,000 in new investments each day. (*Id.*, ¶ 23).

## C. Defendants Promoted the Notes as Profitable, Safe, and Secured by Real Estate

Defendants' promotional materials touted the Notes as "low risk" investments that were secured by real estate. (Tushaus Dec., ¶ 24). For instance, one white paper describes how "Equitybuild is ushering in a new era by making real estate investing more secure and reliable than ever." (*Id.*, ¶ 26). The same white paper touts "Equitybuild's Three Guarantees," which included promises that Equitybuild would compensate investors for any deficiencies in the real estate's operating income and declines in property values. (*Id.*). In another white paper, Equitybuild Finance assured investors that if the mortgage ever goes into default, investors could simply sell the property in a quick sale and get their money out of the investment. (*Id.*, ¶ 27).

Defendants also sought to downplay the risk by describing their purportedly successful track record. Marketing emails touted that "EquityBuild has Never Defaulted on a Loan and has Zero Foreclosures," and had a "perfect payment track record." (*Id.*, ¶ 29). Equitybuild's website and white papers similarly claimed it achieved "Operational Mastery" due to a "proprietary econometric model" that successfully identifies undervalued properties. (*Id.*, ¶ 26, 30).

Defendants paired their assurances of low risk investments with the lure of "consistently" delivering "double-digit returns." (Tushaus Dec., ¶ 27). Defendants claimed "investors receive impressive, double-digit returns that roll in month after month, regular as clockwork, but require absolutely no ongoing effort on their part." (*Id.*, ¶ 26). Defendants told investors their double-digit returns would be generated through third-party purchasers, who would use the investor-funded mortgages to purchase the properties securing the Notes. (*Id.*, ¶¶ 31-34). Defendants stated that these third-party purchasers borrow on shorter terms and at higher rates than buyers using traditional mortgages, generating "high returns that beat the stock market." (*Id.*, ¶ 32).

Defendants told investors they earned their profits from the third-party buyers. To that end, Defendants represented that Equitybuild and Equitybuild Finance retained as profits the difference between the mortgage payments received from the third party purchasers and the interest payments made to the Note investors. (Tushaus Dec., ¶¶ 33-34).

Reinforcing the safety and profitability of the Notes, Defendants' marketing emails claimed their third-party purchasers were "qualified" borrowers with "A-grade" credit. (Tushaus Dec., ¶ 31). Defendants also represented that the properties collateralizing the Notes would generate "more than enough revenue to cover the borrower's note payments as well as all of the property's operating expenses, and still return positive cash flow." (*Id.*, ¶ 35).

**D.      In Reality, Defendants Charged the Note Investors Heavy Undisclosed Fees, Purchased Poorly Performing Real Estate, and Began Operating a Ponzi Scheme**

Defendants concealed that they kept 15% to 30% of the Note investments as undisclosed fees. (Tushaus Dec., ¶ 36). Defendants kept these fees hidden by telling investors that the properties securing their Notes were worth significantly more than they actually cost. (*Id.*, ¶ 37). Specifically, offering memoranda provided to investors listed a "purchase price" or "sale price" for each property that was inflated, on average, by more than 47%. (*Id.*). This meant Defendants collected far more money from investors than what investors believed was necessary to acquire the properties securing each Note. Jerome and Shaun Cohen used these secret fees to fund their personal living expenses, and to keep the scheme going by making Ponzi-style payments to earlier investors. (*Id.*, ¶ 38).

The inflated purchase prices also meant the investments were far riskier than Defendants led investors to believe. Indeed, the Notes were not, as Defendants claimed, "fully" or "100%" secured by real estate at the price disclosed to investors. (Tushaus Dec., ¶¶ 25, 32). Rather, the Notes were secured, at best, by the actual and much smaller value of the properties. (*Id.*, ¶ 37).

Beyond the undisclosed fees, Defendants falsely represented that the properties securing the Notes were profitable investments that generated positive cash flows. (Tushaus Dec., ¶ 35). In reality, and unknown to investors, many of the properties securing the Notes performed quite poorly, with monthly expenses far exceeding their revenues. (*Id.*, ¶¶ 39-40). This meant that few, if any, of the properties generated enough revenues to fund the investors' interest payments. (*Id.*). Investors were similarly unaware that Equitybuild's internal financial statements showed a net loss for 2015 of $12 million. (*Id.*, ¶ 41).

Defendants also lied by telling investors that their interest payments were funded by third-party buyers' mortgage payments. (Tushaus Dec., ¶¶ 31-34). In reality, Equitybuild owned most of the properties securing the Notes. (*Id*., ¶ 42). And by 2015, Defendants no longer even tried to find third-party buyers. (*Id*.).

The Notes offering became a Ponzi scheme, using new investor funds to pay earlier investors. From January 2015 through February 2017, investors received approximately $14.5 million in interest payments. (Tushaus Dec., ¶ 43). During that same period, the properties generated only $3.8 million in rental income and third party buyers' monthly payments. (*Id*.). Defendants never told investors that they were relying on fresh investor funds, rather than income-producing properties, to finance the interest payments. (*Id*., ¶ 44).

Given the poor performance of many of their properties, Defendants' claim of having "zero foreclosures" was also misleading. (Tushaus Dec., ¶ 29). Indeed, even in the event of a default by the borrower, it would have been impossible for investors to foreclose. This is because investors delegated to Equitybuild Finance all their powers under the Notes and mortgages, including the power to foreclose. (*Id*., ¶ 18). And, even absent that delegation, there was no practical way for investors to foreclose, since there were multiple investors on each property and Defendants did not share the other investors' contact information. (*Id*., ¶¶ 17, 45).

Defendants' claims of never defaulting on a loan similarly misled investors. Defendants routinely extended the payback terms on investors' Notes, often for years. (Tushaus Dec., ¶ 46). Defendants forced investors to either agree to the extensions or be placed on a "buyout list" and wait for Defendants to find another investor willing to buy out the original investment. (*Id*., ¶ 48). By June 2018, Defendants had $3 million in investments on the buyout list. (*Id*.). Defendants also

made approximately 100 investors accept unsecured promissory notes in lieu of their original "secured" Notes. (*Id.*, ¶ 49). Nevertheless, Defendants continued to offer securities without disclosing that previous investors had been compelled to extend their payback terms, been placed on the buyout list, or had their secured Notes switched to unsecured notes. (*Id.*, ¶ 50).

Defendants also misrepresented their histories and expertise. For instance, despite touting their successful track record and "Operational Mastery," Defendants failed to tell investors that Jerome and Shaun Cohen had each previously filed for bankruptcy. (Tushaus Dec., ¶ 51). Nor did Defendants actually employ an "econometric model" to select properties, as the offering materials represented. (*Id.*, ¶ 30). Unbeknownst to investors, Jerome Cohen acknowledged to SEC investigators that the "econometric model" was merely some "back of the envelope" calculations and that selecting real estate was not a "core competency" of Defendants. (*Id.*, ¶ 52).

**E.      Defendants Later Begin Offering Investments in Real Estate Funds**

In 2017, Jerome and Shaun Cohen began making changes to the business model they presented to investors, by offering investments in real estate "funds." (Tushaus Dec., ¶ 53). Defendants have since offered a total of over $70 million in investments in at least seven different funds. (*Id.*, ¶ 54). Defendants told investors that these funds would pool investor proceeds to purchase and renovate real estate, again primarily on the South Side of Chicago. (*Id.*, ¶ 55). With names like "Chicago Capital Fund," and "South Side Development Fund," Defendants continued to promise investors double digit returns. (*Id.*, ¶¶ 54-55). These fund offerings remain ongoing, with one fund offering 17% returns for 24 months, and another offering 14% returns in as short as six months. (*Id.*, ¶¶ 56-57). One fund promises "guaranteed" returns. (*Id.*, ¶ 56).

While the mechanics of the investments changed, the fraud continued. As was the case with the Notes, the funds' offering materials fail to disclose Defendants' poor performance record, precarious financial condition, or Ponzi-style payments. (Tushaus Dec., ¶¶ 58-60). Indeed, rather than being deployed to purchase or renovate real estate, Defendants used significant amounts of fund investor money to repay earlier Note investors. (*Id.*, ¶¶ 58-59).

Defendants also concealed that many of the properties supposedly being acquired with new investor proceeds were the same properties "securing" investors' Notes. (Tushaus Dec., ¶ 59). Without telling the Note investors, Defendants transferred title of properties securing the Notes to LLCs owned by Jerome Cohen. (*Id.*). While the offering materials list the properties the funds intend to acquire, they fail to mention that Defendants acquired those buildings in the course of the earlier Note offerings and that the properties supposedly served to secure the Notes. (*Id.*).

While touting the funds' profitability, the offering materials also fail to disclose Defendants' inability to repay earlier investors. (Tushaus Dec., ¶ 60). As of late 2017, investors in more than 1,200 Notes had not been repaid their principal, totaling almost $75 million in overdue payments. (*Id.*, ¶ 47). These investors will likely remain unpaid. As of May 31, 2018, Equitybuild and Equitybuild Finance had only $75,000 in their bank accounts. (*Id.*, ¶ 61).

**F.      Defendants' Fraud is Ongoing**

Defendants are currently seeking to raise money by offering investments in the funds. (Tushaus Dec., ¶ 57). Unbeknownst to prospective investors, in May and June of 2018, Defendants disclosed to earlier Note investors that they were unable to continue making interest payments and were in the process of unilaterally changing the terms of the Notes. (*Id.*, ¶¶ 63-68). At that time, Shaun Cohen emailed Note investors that Equitybuild had accumulated a "debt load that is

not sustainable" and that continuing to pay investors "would lead to an inevitable disaster that would put your investment at risk of significant loss." (*Id.*, ¶¶ 64-65). He added that Equitybuild had "no choice but to restructure and reduce the debt burden" by unilaterally converting investors' Notes to equity positions in one of the funds. (*Id.*, ¶ 65).

On August 6, 2018, Equitybuild emailed a video recording of Shaun Cohen to Note investors. (Tushaus Dec., ¶ 69). On the recording, Shaun Cohen: (a) states that Equitybuild's properties are "negatively cash flowing," (b) acknowledges that investor interest payments have stopped and that principal has not been returned, (c) discloses that Equitybuild had funded investor interest payments using "fee income" from later investors, but that fees charged to later investors could no longer satisfy the interest payments to earlier investors, (d) warns investors not to file lawsuits against Equitybuild, (e) states that investors will not receive payments until Equitybuild's rental income exceeds its expenses, and (f) advises that Equitybuild was cutting staff down to a "skeleton crew" and would not be able to respond to investor inquiries. (*Id.*).

While partially coming clean to earlier investors, Defendants provide no such warning to the unwitting investors to whom they currently offer securities. Instead, Defendants continue to raise new funds, promising "guaranteed" returns and annual interest payments as high as 17% – all while hiding Defendants' severe financial problems and the fact that they told earlier investors they could no longer make their interest payments. (Tushaus Dec., ¶¶ 56, 57, 68, 69).

## ARGUMENT

**I.      The Court Should Temporarily Restrain and Preliminarily Enjoin
Defendants from Further Violations of the Federal Securities Laws**

After a "proper showing" by the SEC, a "temporary injunction or restraining order shall be granted." 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d).  "The use of the word 'shall' indicates Congress's clear preference for preliminary injunction relief, where a credible allegation of a violation is made." *SEC v. Bravata*, 2009 WL 2245649, *4 (E.D. Mich. 2009).

To meet this standard, the SEC must show a "justifiable basis for believing, derived from reasonable inquiry and other credible information, that such a state of facts probably existed as reasonably would lead the SEC to believe that the defendants were engaged in violations of the statutes involved."  *SEC v. Householder*, 2002 WL 1466812, *5 (N.D. Ill. July 8, 2002) (quotations omitted).

Thus, to obtain a TRO or preliminary injunction, the SEC need only show "likelihood of success as to (a) current violations and (b) a risk of repetition."  *SEC v. Hollnagel*, 503 F. Supp. 2d 1054, 1058 (N.D. Ill. 2007); *see also SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982).  In assessing likelihood of repetition, courts look to factors such "as the gravity of harm caused by the offense; the extent of the defendant's participation and his degree of scienter; the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve him in such transactions."  *Holschuh* at 144.

Unlike private litigants, the SEC does not need to prove the risk of irreparable injury, or establish the unavailability of other remedies, or establish that the balance of equities favor its position. *See, e.g., SEC v. Unifund SAL*, 910 F.2d 1028, 1036 (2d Cir. 1990).

### A.    Defendants Violated the Securities Laws' Antifraud Provisions

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit any person, in connection with the purchase or sale of any security, from, directly or indirectly: (1) employing any device, scheme or artifice to defraud; (2) making an untrue statement of material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) engaging in any act, practice, or course of business that operates as a fraud or deceit upon any person. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  Section 17(a) of the Securities Act prohibits the same conduct in the offer or sale of a security. 15 U.S.C. § 77q(a); *SEC v. Ustian*, 229 F. Supp. 3d 739, 764 (N.D. Ill. 2017) ("Courts use 'identical' standards for determining liability under §§ 17(a) and 10(b)").


To establish a violation the SEC must show that defendant "(1) made a misstatement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities." *Ustian* at 764-65 (citations omitted); *see also McConville v. SEC*, 465 F.3d 780, 786 (7th Cir. 2006).  A misstatement/omission is material if there is "substantial likelihood [that it] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  The SEC may additionally prove a 10(b) violation by establishing a defendant engaged in a fraudulent scheme. *Ustian* at 774.  Moreover, unlike the Section 10(b) and 17(a)(1) charges, the Section 17(a)(2) and (3) claims do not require a showing of scienter, and can be proven by a showing of negligence. *Aaron v. SEC*, 446 U.S. 680, 695-96 (1980); *Ustian*, 229 F. Supp. 3d at 765.

13

Here, Defendants violated the antifraud provisions in a variety of ways. They took undisclosed fees of 15% to 30%. They inflated the value of the properties supposedly securing the Notes by an average of more than 47%. They touted the profitability of the real estate but concealed their financial problems and the fact that the properties could not support the double-digit returns promised to investors. And they operated a Ponzi scheme by using new investor money to repay earlier investors. Any reasonable investor would consider these facts material.

Defendants acted with scienter. They knew they were taking undisclosed fees and using new investor money to repay earlier investors, yet they provided investors the offering materials containing the misstatements and omissions described above. Shaun Cohen's scienter is perhaps best evidenced by his recent admissions to earlier investors who are no longer being paid. Yet he hides these facts from the prospective investors Defendants currently lure with promises of "guaranteed" double digit returns. And Jerome Cohen's scienter is shown by the stark lesson he sought to impart to son: "always, if possible, use other people's money." (Tushaus Dec., ¶ 70).

### B. Defendants Violated the Securities Laws' Registration Provisions

Under Section 5(a) of the Securities Act, it is unlawful for any person, directly or indirectly, to sell securities through the use of any means or instrumentalities of transportation or communication in interstate commerce or of the mails unless the transaction is the subject of an effective registration statement. 15 U.S.C. § 77e(a). Section 5(c) provides a similar prohibition for offers to sell a security unless a registration statement has been filed. 15 U.S.C. § 77e(c).

"A prima facie violation of Section 5 arises if it is established that the defendant directly or indirectly sold or offered to sell securities, there was no registration statement in effect as to the securities, and the sale was made through interstate facilities or the mails." *SEC v. Randy*, 38

F. Supp. 2d 657, 667 (N.D. Ill. 1999).  Once the SEC establishes a prima facie violation, the defendant assumes the burden of proving that the securities qualify for a registration exemption. *Id.*; *SEC v. Ralston-Purina Co.*, 346 U.S. 119, 126 (1953).  Scienter is not required to prove a violation of Section 5.  *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004); *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 859-60 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1348 (2d Cir. 1998).

Here, Defendants offered and sold securities to hundreds of investors throughout the United States, yet did not register those securities or offerings.  (Tushaus Dec., ¶¶ 11-12).  Accordingly, the SEC has made a prima facie showing that Defendants violated Section 5.

### C. Absent Injunctive Relief, Defendants' Violations Will Continue

Having established Defendants violated the securities laws, to obtain an injunction the SEC "need only show that there is a reasonable likelihood of future violations."  *Holschuh*, 694 F.2d at 144.  Here, each of the *Holschuh* factors used to assess that likelihood support the imposition of a TRO and preliminary injunction against violations of the securities laws.  *Id.*

As discussed above, Defendants acted with a high degree of scienter.  And the gravity of harm caused by their fraud was profound.  As of late 2017, Defendants owed investors on 1,200 Notes more than $75 million.  (Tushaus Dec., ¶ 47).  Given Defendants' precarious finances, the prospect of repayment for these investors – let alone more recent investors – is slim.  Jerome and Shaun Cohen were the central players in the scheme, and controlled the entities used to defraud investors.  Defendants' violations have gone unabated for many years, and will continue to do so absent an injunction.  Indeed, by virtue of Defendants' customary business activities, their fraudulent securities offering remains ongoing.  Rather than recognize their own culpability or provide assurances against future violations, Defendants currently prey on unwitting investors.

15

### D.      A Conduct Based Injunction is Necessary to Protect the Public

The SEC also seeks a TRO and preliminary injunction enjoining Defendants from soliciting new investors or accepting additional funds from existing investors.  In similar SEC enforcement actions involving offering frauds, courts have entered conduct-based injunctions similar to the one the SEC is requesting here. *See*, *e.g., SEC v. Veros Partners,* Case No. 15-cv-659, Docket No. 12 (S.D. Ind. Apr. 23, 2015); *SEC v. Borland*, Case No. 18-cv-4352, Docket No. 7 (S.D.N.Y. May 16, 2018); *SEC v. Liu*, 2016 WL 3679389, *2 (C.D. Cal. July 11, 2016); *SEC v. Holzhueter*, Case No. 15-cv-45, Docket No. 20 (W.D. Wis. Jan. 28, 2015); *SEC v. Johnson*, Case No. 15-cv-299, Docket No. 10 (D. Colo. Feb. 12, 2015).  A conduct-based injunction is likewise needed here to explicitly prevent Defendants from selling securities to new investors who would almost certainly sustain the total loss of their investment.

## II.      <u>The Court Should Appoint a Receiver and Impose Other Ancillary Relief</u>

### A.      A Receiver is Necessary and Appropriate

The Court should appoint a receiver over Defendants.  Courts regularly appoint receivers to manage corporate assets when there has been fraud and mismanagement and a receiver is necessary to identify, marshal, preserve, and protect the assets.  *SEC v. Enter. Trust Co.*, 559 F.3d 649, 650 (7th Cir. 2009); *SEC v. Homa*, 514 F.3d 661, 665 (7th Cir. 2008); *SEC v. Keller Corp.*, 323 F.2d 397, 403 (7th Cir. 1963); *SEC v. Goyal*, Case No. 14-cv-3900, Docket No. 17 (N.D. Ill. June 6, 2014); *SEC v. Hollinger Int'l, Inc.*, 2004 WL 1125904, *7 (N.D. Ill. May 19, 2004).  As the Seventh Circuit held in affirming a receiver's appointment:

> The prima facie showing of fraud and mismanagement, absent insolvency, is
> enough to call into play the equitable powers of the court. It is hardly conceivable
> that the trial court should have permitted those who were enjoined from fraudulent
> misconduct to continue in control of [the corporate defendant's] affairs for the

> benefit of those shown to have been defrauded. In such cases the appointment of a
> trustee-receiver becomes a necessary implementation of injunctive relief.

*Keller Corp.* at 403.

It is also appropriate to appoint a receiver over the assets of an individual defendant, to marshal fraudulently obtained investor proceeds controlled by the defendant. *See, e.g., SEC v. Goyal*, Docket No. 17; *SEC v. Huber*, Case No. 09-cv-6068 (N.D. Ill.) Docket No. 22; *SEC v. Roth*, Case No. 11-cv-2079 (C.D. Ill.), Docket No. 31; *SEC v. Beckman*, 2011 U.S. Dist. LEXIS 23187 (D. Minn. Mar. 8, 2011).

This case calls out for the appointment of a receiver. Defendants raised more than $135 million by defrauding investors in a real estate investment scheme. A receiver is necessary to marshal and preserve assets to allow for the maximum possible recovery for investors. The SEC believes that significant assets exist that could be used to satisfy Defendants' disgorgement obligations and fund an eventual distribution to investors, most notably the large portfolio of Chicago real estate Defendants accumulated using investor funds. In light of their misconduct, Defendants cannot be trusted to continue to manage these properties or to liquidate them or other assets for their victims' benefit. The timely imposition of a receiver is necessary to secure and inventory Defendants' assets to ensure the maximum recovery for the defrauded investors.

The SEC recommends the Court appoint Kevin B. Duff as receiver in this matter. Mr. Duff is a partner at Rachlis, Duff, Adler, Peel & Kaplan, a Chicago-based commercial litigation firm with substantial experience in real-estate matters. He is the President-Elect and a director of the National Association of Federal Equity Receivers. He has ably served as the receiver in two other Ponzi scheme cases in this district: *SEC v. Goyal* and *SEC v. Huber*. He also served as the receiver for another civil matter in this district involving allegations of securities fraud,

*Friedhopfer v. Dachman*, No. 10-cv-6162.  In these receiverships, Mr. Duff and his firm have

demonstrated an ability to efficiently and effectively locate and liquidate assets for the benefit of

investor-victims.  Per Mr. Duff's proposal, he will engage the services of his law firm, which is

willing to provide services in connection with its engagement at reduced rates which the SEC

considers to be reasonable under the circumstances.

### B.       If the Court Does Not Appoint a Receiver, an Asset Freeze is Necessary

The SEC believes the appointment of a receiver over Defendants would obviate the need

for an asset freeze order, which courts often impose to prevent waste and dissipation of assets

and to ensure the availability of funds for restitution and disgorgement.  *See, e.g., SEC v. Manor*

*Nursing Centers, Inc.*, 458 F.2d 1082, 1104-06 (2d Cir. 1972); *see also SEC v. Infinity Grp. Co.*,

212 F.3d 180, 197 (3d Cir. 2000) (the purpose of a freeze is to "preserve the status quo by

preventing dissipation and diversion of assets."); *CFTC v. Kimberlynn Creek Ranch, Inc.*, 276

F.3d 187 (4th Cir. 2002).[1]

However, should the Court decline to appoint a receiver, it should freeze Defendants'

assets.  Absent the appointment of a receiver over all of Defendants' assets, a freeze is necessary

to prevent Defendants' further dissipation of assets that could be used to compensate their

victims.  Such dissipation of assets is not speculative.  Defendants have already done so by

transferring title of properties securing the Notes to LLCs owned by Jerome Cohen, and are

currently attempting to sell or encumber the properties they purchased with the proceeds of their

fraud.  (Tushaus Dec., ¶¶ 59, 69).  Faced with the prospects of a defendant dissipating assets,

---

[1]  Courts recognize that a disgorgement order for ill-gotten gains – like the one sought in this
case – will often be rendered meaningless unless an asset freeze is imposed before the entry of

courts in this district, at the TRO stage, have regularly imposed asset freezes. *See, e.g., SEC v. Davis*, Case No. 17-cv-9224, Docket No. 13 (N.D. Ill. Dec. 22, 2017); *SEC v. Garcia*, Case No. 10-cv-5268, Docket No. 11 (N.D. Ill. Aug. 20, 2010); *SEC v. All Know Holdings, Ltd.*, Case No. 11-cv-8605, Docket No. 12 (N.D. Ill. Dec. 5, 2011); *SEC v. Rungruangnavarat*, Case No. 13-cv-4172, Docket No. 9 (N.D. Ill. June 5, 2013).

The standards for ordering an asset freeze are less strict than for imposing other injunctive relief. To obtain an asset freeze, the SEC must establish only that it is likely to succeed on the merits, and need not show risk of irreparable injury (unlike a private litigant) or likelihood of a future violation. *SEC v. Cavanagh*, 155 F.3d 129, 132, 136 (2d Cir. 1998). As discussed above, the SEC has demonstrated both that Defendants have violated the securities laws and are likely to continue doing should the Court not intervene.

### C. The Court Should Order an Accounting

The equitable remedy of a sworn accounting is frequently imposed to provide an accurate measure of unjust enrichment and a defendant's current financial resources. *See*, *e.g.*, *Manor Nursing Ctrs.*, 458 F.2d at 1105; *Householder*, 2002 WL 1466812 at *8; *SEC v. Quan*, 2011 WL 1667985, *9 (D. Minn. May 3, 2011); *SEC v. Oxford Capital Sec., Inc.*, 794 F. Supp. 104, 105-06 (S.D.N.Y. 1992). A prompt and complete accounting will assist in determining what assets remain and where they are located. Thus, an accounting remedy is needed here to determine the disposition of funds that Defendants misappropriated through their fraudulent conduct and the assets available to satisfy any final judgment the Court might enter against each Defendant.

---

final judgment. *See, e.g., Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1347 (2d Cir. 1974); *see also SEC v. Gen. Refractories Co.*, 400 F. Supp. 1248, 1259 (D.D.C. 1975).

### D. The Court Should Enter a Document Preservation Order and Allow for Expedited Discovery

Finally, the SEC seeks an order preventing the alteration or destruction of documents and other potential evidence. A document preservation order would protect the integrity of the proceeding and promote the truth-seeking function of litigation. *See, e.g.*, *SEC v. ABS Manager, LLC*, 2013 WL 1164413, at *4 (S.D. Cal. Mar. 20, 2013) (granting motion prohibiting the destruction and requiring the preservation of documents); *SEC v. Rungruangnavarat*, Case No. 13-cv-4172, Docket No. 9 (N.D. Ill. June 5, 2013) (same). The Court should likewise authorize expedited discovery under Fed. R. Civ. P. 30(a), 33(a) and 34(b), to allow the SEC to supplement its motion for a preliminary injunction. *See Rungruangnavarat*, Docket No. 9, at 7. Expedited discovery enables the SEC to act quickly to obtain bank and other records necessary to identify and preserve investor assets. Expedited discovery will also facilitate the presentation of a more complete evidentiary record and sharpen and focus the issues that must be decided by the Court at the preliminary injunction hearing.

### <u>CONCLUSION</u>

For the above reasons, the SEC respectfully requests that the Court issue a temporary restraining order and conduct-based injunction, appoint a receiver (or in the alternative, freeze Defendants' assets), order an accounting, direct the preservation of documents and allow expedited discovery, and grant such other ancillary relief as the Court deems just and proper.

Respectfully Submitted,

Dated: August 15, 2018                     /s/ Benjamin J. Hanauer
                                                  Benjamin J. Hanauer (hanauerb@sec.gov)
Ariella Guardi (guardia@sec.gov)
Timothy J. Stockwell (stockwellt@sec.gov)
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Phone:  (312) 353-7390
Facsimile: (312) 353-7398
Attorneys for Plaintiff
U.S. Securities and Exchange Commission