UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> EQUITYBUILD, INC., EQUITYBUILD FINANCE LLC, JEROME COHEN, and SHAUN COHEN, <br><br> Defendants. | Civil Action No. <br><br> 18-CV- |

### DECLARATION OF ANN TUSHAUS IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER TO PREVENT VIOLATIONS OF THE FEDERAL SECURITIES LAWS, TO APPOINT A RECEIVER, AND PROVIDE FOR OTHER ANCILLARY RELIEF

I, Ann Tushaus, declare under penalty of perjury, in accordance with 28 U.S.C. §1746, as follows:

1. This declaration is submitted in support of Plaintiff United States Securities and Exchange Commission's ("SEC" or "Commission") Emergency Motion for a Temporary Restraining Order to Prevent Violations of the Federal Securities Laws, to Appoint a Receiver, and Provide for Other Ancillary Relief.

2. I am employed as a Staff Accountant in the Division of Enforcement by the SEC's Chicago Regional Office, located at 175 West Jackson Boulevard, Suite 1450, Chicago, Illinois 60604. I have been employed by the Commission since 2007. I have been a registered Certified Public Accountant in good standing in the state of Illinois since 2004.

3. My duties with the Commission include participating in fact-finding inquiries and

1

investigations to determine whether the federal securities laws have been, are presently, or are about to be violated, and assisting in the Commission's litigation of securities laws violations. As part of my job, I routinely obtain and analyze bank records and other financial records typically maintained at financial institutions.

4. In connection with the Commission's investigation captioned *In re Rebuilding America LLC*, C-08374 (the "Investigation"), I have been asked to review and summarize certain bank records and financial transactions. Specifically, I have reviewed:

   a) bank records of Equitybuild, Inc. ("Equitybuild") which records included, but were not limited to: account opening documents, bank signatory forms, canceled checks, monthly statements, deposits, debit and credit memoranda, and wire transfer advices;

   b) bank records of Equitybuild Finance, LLC ("Equitybuild Finance") which records included, but were not limited to: account opening documents, bank signatory forms, canceled checks, monthly statements, deposits, debit and credit memoranda, and wire transfer advices;

   c) bank records of Jerome Cohen and Shaun Cohen which records included, but were not limited to: account opening documents, bank signatory forms, canceled checks, monthly statements, deposits, debit and credit memoranda, and wire transfer advices;

   d) bank records of affiliate entities of Equitybuild, Equitybuild Finance, Jerome Cohen, and/or Shaun Cohen which records included, but were not limited to: account opening documents, bank signatory forms, canceled checks, monthly statements, deposits, debit and credit memoranda, and wire transfer advices;

      e) documents produced to the Commission by Equitybuild, Equitybuild Finance, Jerome Cohen, Shaun Cohen, and their affiliate entities, including offering materials and internal records tracking the investments described herein;

      f) other documents obtained by the SEC staff in the course of the Investigation, including materials provided by investors, property managers, and a public relations firm retained by Defendants; and

      g) records of interviews and transcripts of testimonies conducted by the Commission's staff, including interviews and testimonies in which I personally participated.

5. Based upon the materials listed in paragraph 4 above and my participation in the Investigation, I am informed and believe and, therefore, state the information set forth below.

6. I have reviewed a Certificate filed by Equitybuild, Equitybuild Finance, Jerome Cohen, and Shaun Cohen (collectively, "Defendants") in litigation captioned *Markwell v. Equitybuild, Inc.*, Case No. 4:18-cv-1274 (S.D. Tex.), Docket No. 10. In that Certificate, Defendants certify that: (a) Equitybuild is a Florida corporation; (b) Equitybuild Finance is a Delaware limited liability company; (c) Equitybuild is the sole member of Equitybuild Finance; (d) Jerome Cohen is Equitybuild's sole shareholder and President; and (e) Shaun Cohen is Equitybuild's Vice President.

7. I participated in testimonies of the multiple Equitybuild employees who testified that Equitybuild has an office in Chicago.

8. I reviewed the testimony transcript of Jerome Cohen, who testified that he founded Equitybuild and Equitybuild Finance, and is Equitybuild's CEO. Jerome Cohen also testified that Shaun Cohen is President and the sole officer of Equitybuild Finance.

9. Based on my participation in the Investigation and review of the documents described above in Paragraph 4, it is my understanding that Jerome and Shaun Cohen control Equitybuild and Equitybuild Finance, including controlling the companies' operations, the content of the representations made to investors, and transactions to and from their bank accounts.

10. I reviewed the testimony transcript of Shaun Cohen, who testified that by 2010, Defendants had begun offering and selling promissory notes (the "Notes") to investors.

11. In the course of the Investigation, Defendants produced a spreadsheet purportedly listing their investors and the amount of their investments. According to that spreadsheet, Defendants sold securities to more than 900 investors throughout the United States, including investors located in the Northern District of Illinois, who invested at least $135 million with Defendants.

12. When an issuer registers its securities or offerings, confirming that the registration occurred typically entails a routine search of SEC systems. After performing such a search, I found no record indicating that Equitybuild or Equitybuild Finance registered their securities or securities offerings with the SEC prior to the filing of this lawsuit.

13. In the course of the Investigation, I reviewed copies of Notes produced by Defendants or otherwise obtained by the SEC. A copy of one such Note is attached hereto as Exhibit 1.

14. My review of the Notes and other materials obtained by the SEC indicates that the Notes provided for interest rates ranging from 12% to 20%, with investors receiving higher interest rates for investing greater amounts of money. My review further indicates that the terms of the Notes ranged from six to 24 months.

15. According to the spreadsheet produced by Defendants referenced above, at the end of the Notes' terms, rather than receiving their principal, many investors rolled over their principal into a new Note.

16. My review of the Notes indicates that the parties to the Notes were: (a) the "borrower," which was usually Equitybuild, and (b) the investors, each of which the Notes described as a "lender."

17. My review of the Notes and related offering materials provided to investors indicates that each Note referenced a specific real estate property which investor funds would purportedly be pooled to purchase and renovate. Each Note also represented that the Note was secured by a fractional interest in a mortgage in the identified property.

18. My review of the Notes and agreements investors executed as part of their investments indicates the investors assigned to Equitybuild Finance, as the "Collateral Agent," all of their rights and powers under the Notes and mortgages. A copy of one such agreement is attached hereto as Exhibit 2. My review further indicates that Defendants structured the mortgages purportedly securing the Notes to be typically entered between: (a) Equitybuild, an affiliate entity, or, in some cases, a third-party purchaser; and (b) the investors "care of" Equitybuild Finance.

19. My review of the Notes indicates that Jerome Cohen generally signed the Notes and mortgages on behalf of Equitybuild (or its affiliates), while Shaun Cohen, having been delegated the ability to do so by the investors, generally signed the Notes on behalf of Equitybuild Finance.

20. Shaun Cohen and other Equitybuild personnel testified that to solicit investments in the Notes, Defendants utilized promotional methods including Equitybuild's website, emails to prospective investors, a call center and salespeople, in-person presentations, social media, and Google advertising.

5

21. Jerome Cohen testified that, as part of their promotional efforts, Equitybuild and Equitybuild Finance also issued and distributed to investors promotional booklets referred to as "white papers." Copies of three such white papers are attached hereto as Exhibits 3, 4 and 5.

22. Shaun Cohen testified that Equitybuild's salespeople reported to him. I reviewed Equitybuild employment agreements which state that the salespeople's compensation includes commissions from the sale of Notes to investors.

23. The SEC obtained recordings of Shaun Cohen training Equitybuild's salespeople. On certain of those recordings, Shaun Cohen instructs the salespeople to generate at least $50,000 of new investments each day.

24. I have reviewed promotional materials Defendants provided to investors which describe the Note investments as "low risk." Copies of such documents are attached hereto as Exhibits 3 (p. 5), 4 (p. 6), and 5 (p. 12).

25. Shaun Cohen testified that Defendants' public relations firm was on the distribution list for mass emails sent to investors, such that the emails received by the firm would have also gone to investors. I have reviewed promotional materials Defendants provided to Note investors which represent that the investments were "secured" or "backed" by real estate. Copies of such documents are attached hereto as Exhibits 4 (p. 4), 6 (p. 3), 7 (p. 4), and 8 (p. 2). I also reviewed emails in which Shaun Cohen represents to investors that "All EquityBuild Finance private mortgage notes are 100% secured by real estate." Copies of those emails are attached as Exhibits 6 (p. 3) and 8 (p. 3).

26. I have reviewed a white paper provided to investors which states: "Equitybuild is ushering in a new era by making real estate investing more secure and reliable than ever." See Ex. 3, p. 4. That same white paper describes "Equitybuild's Three Guarantees," including representations

6

that Equitybuild would compensate investors for any deficiencies in the real estate's operating income and declines in property values. *Id.* at 7. That white paper repeatedly references Equitybuild's "unparalleled operational mastery." *Id.* at 4, 7. That white paper additionally states: "Our investors receive impressive, double-digit returns that roll in month after month, regular as clockwork, but require absolutely no ongoing effort on their part. On the most fundamental level, this is an ideal path to passive income." *Id.* at 4.

27. I have reviewed another white paper provided to investors which states: "Private mortgages…are, in our opinion, much safer than paper investments because they are secured by real property. If the mortgage ever goes into default, private mortgage lenders simply sell the property in a quick sale and get their money out of the investment." See Ex. 4, p. 4. That white paper additionally states that Equitybuild and Equitybuild Finance "consistently deliver double-digit returns." Ex. 4, p. 8.

28. I have reviewed an email that Shaun Cohen sent to prospective investors which stated that Equitybuild had a "literally PERFECT payment track record." A copy of that email is attached as Exhibit 9.

29. I have reviewed multiple emails that Shaun Cohen sent to prospective investors which stated that "Equitybuild has Never Defaulted on a Loan and has Zero Foreclosures." Examples of such emails are attached as Exhibits 10 (p. 4) and 11 (p. 3).

30. I have reviewed Equitybuild's website, which states that Jerome Cohen is the "Creator of EquityBuild's proprietary econometric model that identifies undervalued and outperforming markets." A copy of a screenshot of that website, visited on August 7, 2018, is attached as Exhibit 12 (p. 8). Equitybuild's website further references Equitybuild's "Operational Mastery," which the website describes as "maximiz[ing] returns and minimiz[ing] risk at

7

every step" and "only invest[ing] in a property if we can confirm it will generate high satisfactory profits." *Id.*, p. 5.

31. I have reviewed a marketing email in which Equitybuild claims that all of its third-party purchasers were "qualified" borrowers with "A-grade" credit. A copy of that email is attached as Exhibit 13 (pp. 3, 5).

32. I reviewed another white paper provided to investors which describes how Equitybuild Finance generates high returns by issuing private mortgages to third party buyers. A copy of that white paper is attached as Exhibit 14. That white paper states that the third property purchasers borrow on shorter terms and at higher rates than purchasers using traditional mortgages, and that Equitybuild Finance produces "High Returns That Beat the Stock Market." *Id.* at 6. That white paper also describes the Notes as "fully secured instruments." *Id.* at 3.

33. Based on my participation in the Investigation and review of the documents described above in Paragraph 4, it is my understanding that Equitybuild and Equitybuild Finance told investors that they earned their profits from the third party purchasers, but not from the investors.

34. I reviewed another document, which represents to investors that Equitybuild makes money by retaining as profits the difference between the mortgage payments received from the third party purchasers and the interest payments made to the Note investors. A copy of that document is attached as Exhibit 13.

35. I reviewed emails Shaun Cohen sent to prospective investors in which he represented that the properties collateralizing the investors' Notes would generate "more than enough revenue to cover the borrower's note payments [and] all of the property's operating expenses, and still return positive cash flow." Copies of those emails are attached as Exhibits 15 (p. 3), 16 (p. 3), and 17 (p. 3). Also, in a white paper, Equitybuild describes how it "has learned to structure

deals so they generate positive free cash flow after mortgage and all operating expenses are paid." Ex. 3, p. 6.

36. Shawn Cohen and another Equitybuild employee testified that Equitybuild retained 15% to 30% of the Note investors' investments as fees. Prior to 2017, the offering materials did not disclose to Note investors that Defendants would take 15% to 30% of their investments as fees.

37. I reviewed offering memoranda provided to the Note investors which typically listed a "sale price" or "purchase price" for the property purportedly securing the Note. For approximately 52 such properties, I compared the total sale/purchase prices listed in the offering memoranda with the total sale prices listed on either closing documents obtained by the SEC or on publicly available internet real estate search sites. My analysis shows that the total of the sale/purchase prices listed in the offering memoranda is 47% more than the total of the actual sale prices shown on the closing documents or real estate search sites.

38. My review and analysis of Defendants' bank records shows that Equitybuild and Equitybuild Finance used proceeds of the investments described herein to make interest and principal payments to investors. My review and analysis also shows investor proceeds were used to make payments to Jerome Cohen, Shaun Cohen, and LLCs they own and control. Specifically, from September 1, 2013 to May 2018, Jerome Cohen and Shaun Cohen each received approximately $1.5 million as a result of the investments described herein. Jerome Cohen received these funds through transfers from Equitybuild bank accounts to accounts in his name and the name of a company he owns and controls called Tikkun Holdings LLC. Shaun Cohen received his money through transfers from Equitybuild bank accounts to accounts in his name and the name of a company he owns and controls called 3400 Newkirk

9

LLC. The bank records reflect that Jerome Cohen and Shaun Cohen used the money to pay for living expenses.

39. Jerome Cohen testified that the real estate purchased with investor proceeds, in the aggregate, does not generate enough revenue to cover the properties' operating expenses and the payments due to investors.

40. I also reviewed and analyzed monthly owner statements produced by the property managers Defendants used to manage 40 of the properties purchased with investor funds. I analyzed the owner statements, which do not take into account interest payments due to investors, to determine the monthly net loss or net income for the properties. I then included in my analysis the monthly interest payments owed to investors, based on the terms of the Notes. When I took into account these monthly interest payments, the 40 properties yielded an average monthly net loss of $23,385. Moreover, none of the 40 properties had an average monthly net income once interest payments were included. Even excluding the interest payments, my analysis shows that 17 of the 40 properties sustained average monthly net losses, before interest to investors were taken into account.

41. I also reviewed Equitybuild's 2015 financial statements, which show that in 2015 Equitybuild's net loss was $11,963,944. I have seen no evidence that Defendants shared this information with investors.

42. Jerome Cohen testified that while Equitybuild initially sold properties acquired with investor proceeds to third-party buyers, by 2014 Equitybuild itself owned nearly all of the buildings acquired with investor funds. I also reviewed a draft letter to the SEC Shaun Cohen wrote in which he acknowledges that by 2015 Equitybuild was no longer utilizing third-party buyers.

43. My review and analysis of Equitybuild's bank records indicates that from January 2015 through February 2017, investors received approximately $14.5 million in interest payments from Equitybuild. My analysis indicates that during the same period, the money transferred to Equitybuild from property managers and third-party buyers' monthly payments amounted to only $3.8 million. Based on this analysis, it appears that Equitybuild used investor proceeds to make investor interest payments.

44. I am unaware of Defendants, in the course of the Notes offering, informing investors that their interest payments were being funded by investor proceeds.

45. I am unaware of Defendants providing investors with the contact information of the other investors who invested in the same property.

46. I reviewed Extension Agreements produced by Defendants. The Extension Agreements indicate that Equitybuild routinely extended the maturity date on investors' Notes, often for years. Equitybuild's sales manager testified that for the vast majority of investments, Equitybuild had to extend the maturity date.

47. I reviewed the spreadsheet Defendants produced purportedly listing Equitybuild's investors and the amount of their investments. That spreadsheet indicates that as of October 2017 there were investors in more than 1,200 Notes with outstanding principal totaling more than $75 million.

48. Shaun Cohen testified that investors who did not agree to extend their investments were placed on a "buyout list" where Defendants would look for new investors to buy out the original investors. Defendants produced the buyout list to the SEC, which reflects that as of June 2018 Equitybuild had approximately $3 million worth of investments waiting to be bought out.

11

49. Shaun Cohen testified that Equitybuild converted the investments of certain Note investors into unsecured promissory notes. I reviewed the spreadsheet Defendants produced purportedly listing their investors and the amount of their investments. That spreadsheet indicates that approximately 100 investors had their original note converted into unsecured promissory notes.

50. I am unaware of Defendants informing new prospective investors that previous investors had been compelled to extend their Notes' maturity dates, been placed on the buyout list, or had their secured Notes switched to unsecured notes.

51. Court records reflect that in 1994 Jerome Cohen filed for bankruptcy. See *In re Jerry H. Cohen*, Case No. 9:94-bk-09013-ALP (M.D. Fla 1994). Court records further reflect that in 2010 Shaun Cohen filed for bankruptcy. See *In re Shaun D. Cohen*, Case No. 9:10-bk-06615-ALP (M.D. Fla. 2010). I am not aware of Defendants disclosing these bankruptcy filings to prospective investors.

52. Jerome Cohen testified that the proprietary econometric model referenced in Equitybuild's offering materials actually consisted of "back of the envelope type of calculations." He also testified that selecting real estate was not a "core competency" of Defendants. I am not aware of Defendants disclosing these facts to investors.

53. Jerome Cohen testified that in early 2017, he and Shaun Cohen began making changes to the business model they presented to investors, by offering investments in real estate "funds."

54. I have reviewed the private placement memoranda ("PPMs") for seven of these funds, which are the "Chicago Capital Fund I," "Chicago Capital Fund II," "Southside Development Fund 1," "Southside Development Fund 4," "Southside Development Fund 6," "Southside

Development Fund 8," and "Hybrid Capital Fund." The PPMs reflect that in those seven offerings, beginning in May 2017, Defendants attempted to raise more than $70 million.

55. The PPMs generally represent that Defendants would pool investor proceeds to purchase and renovate real estate, primarily on the South Side of Chicago. The PPMs for five of the seven funds represent that investors will receive double-digit annual returns, with the other two funds offering 8% returns. The PPMs describe the investments as "securities."

56. The PPM for the Chicago Capital Fund II offers 17% annual returns for 24 months. The PPM for the Southside Development Fund 8 offers 14% annual returns for six months. The Southside Development Fund 8 PPM describes those 14% returns as a "Guaranteed Dividend."

57. I visited Equitybuild's website on approximately August 8, 2018. The website describes the following funds as currently being offered: Southside Development Fund 7, Southside Development Fund 8, Chicago Capital Fund I, Chicago Capital Fund II, and Equitybuild Hybrid Fund. A copy of this portion of the website is attached as Exhibit 18.

58. Jerome Cohen testified that Equitybuild uses certain proceeds of the fund offerings to make interest payments to prior Note investors. The PPMs include a section detailing how investor proceeds will be used, including the purchase and renovation of real estate, but do not disclose that investor proceeds will be used to repay earlier Note investors.

59. Based on my review of the Notes and the PPMs, it appears that many of the properties described in the PPMs as real estate that investor funds will be used to acquire and renovate are the same properties that purportedly secured the Notes. The PPMs do not disclose the fact that the properties were acquired by and secured prior investments. The PPMs also state that the title of the properties was transferred to special purpose entity LLCs owned by

13

Jerome Cohen. I am unaware of Defendants apprising Note investors before transferring the title of the properties supposedly securing their investments.

60. The PPMs also do not disclose that earlier Note investors had not been repaid, the number of delinquent Notes, or the amount of the delinquent Note payments.

61. My review of the bank records described above indicates that as of May 31, 2018, Equitybuild and Equitybuild Finance cumulatively had approximately $75,000 in their bank accounts. The PPMs do not disclose this to prospective investors.

62. In the course of the Investigation, the SEC received declarations from Note investors Hans Blumberg, Debbie Lasley, and Reymone Randall. Copies of those declarations are attached as Exhibits 19 (Blumberg), 20 (Lasley), and 21 (Randall).

63. Ms. Lasley's declaration reflects that on May 24, 2018, Shaun Cohen emailed Ms. Lasley to inform her that Equitybuild had refinanced her investment and that her Note investment would be restructured into an investment in one of the funds. Ex. 20, ¶ 22.

64. Ms. Lasley's declaration further reflects that on June 4, 2018, Equitybuild emailed Ms. Lasley to inform her that Equitybuild had taken on a "debt load that is not sustainable" and that continuing to pay investor interest payments "would lead to an inevitable disaster that would put your investment at risk of significant loss." Ex. 20, ¶ 25. The email further stated that Equitybuild would convert her Note investment into an equity investment and would be unable to make her scheduled interest payment. (*Id.*)

65. Mr. Randall's declaration reflects that on May 24, Equitybuild emailed Mr. Randall to inform him that Equitybuild had taken on a "debt load that is not sustainable" and that continuing to pay investor interest payments "would lead to an inevitable disaster that would

14

put your investment at risk of significant loss." Ex. 21, ¶ 22. The email further stated that Equitybuild has "no choice but to restructure and reduce the debt burden," and that it was reducing Mr. Randall's monthly interest payment from 16% to 6%. *Id.*, ¶¶ 10, 22.

66. Mr. Blumberg's declaration reflects that on June 26, 2018, Equitybuild emailed Mr. Blumberg "to acknowledge that we recognize your payment is late." The email continued: "The delay in your payment is related to project specific circumstances that we are diligently working to clarify and remedy." Ex. 19, ¶ 20.

67. The declaration further reflects that on June 27, 2018, Shaun Cohen emailed Mr. Blumberg to inform him of the "need to restructure [Blumberg's] investment." Ex. 19, ¶ 21.

68. I am unaware of Defendants informing prospective fund investors of the recent above-described disclosures made to Mr. Blumberg, Ms. Lasley, and Mr. Randall.

69. As part of its investigation, the SEC obtained a video recording that Equitybuild emailed to Note investors on August 6, 2018. I have watched that recording. On the recording, Shaun Cohen: (a) states that Equitybuild's properties are "negatively cash flowing," (b) acknowledges that investor interest payments have stopped and that principal has not been returned, (c) discloses that Equitybuild had funded investor interest payments using "fee income" from later investors, but that the fee income could no longer satisfy the interest payments, (d) warns investors not to file lawsuits against Equitybuild because doing so would hinder the ongoing efforts to sell or refinance the properties acquired with investor funds, (e) states that investors will not receive payments until Equitybuild's rental income exceeds its expenses, and (f) advises that Equitybuild was cutting staff down to a "skeleton crew" and would not be able to respond to investor inquiries. I am unaware of Defendants making these disclosures to prospective fund investors.

15

70. In the course of the Investigation, the SEC obtained an email from Jerome Cohen to Shaun Cohen, in which Jerome Cohen writes: "Actually, the lesson I learned was be very careful and always, if possible, use other people's money." A copy of that email is attached as Exhibit 22.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15, 2018

                                                 */s/ Ann Tushaus*
                                                 ANN TUSHAUS