# EXHIBIT

# 19

## <u>DECLARATION OF HANS BLUMBERG</u>

1. My name is Hans Blumberg. I am 61 years old and currently live in Brooksville, Florida. I have personal knowledge of the facts described in this declaration.

2. I have a high school education, spent approximately 25 years working an operator at a company that manufactured industrial adhesives. I retired early due to my health.

3. After deciding to retire, I began looking for safe investment vehicles. In an online search, I came across EquityBuild.

4. I researched EquityBuild for approximately one year prior to investing. During that time, I did online research and spoke to representatives from the company.

5. Among other people, I spoke to Shaun Cohen. I estimate that I first spoke with Shaun Cohen in mid-2013. I was nervous about investing, but Shaun Cohen reassured me that EquityBuild had never had a foreclosure. He said the investment was safe and that I could not lose money, because my investment would be secured by a property. Shaun Cohen also told me that he was not allowed to say that the investment was guaranteed, but then went on to tell me that the investment was in fact guaranteed.

6. Based on the information I received from EquityBuild representatives, I was told that no one had ever lost money on an EquityBuild investment, EquityBuild had made 700 transactions without any foreclosures, EquityBuild had always paid interest on time, and it had never defaulted.

7. No one from EquityBuild ever told me that EquityBuild would take a fee from my investment. In considering whether to invest, it would have been important for me to know the amount of fees EquityBuild charged.

8.  I ultimately decided to invest with EquityBuild.  Specifically, I decided to invest in a deal with a 20% return.  The information I received from EquityBuild suggested that the returns would be generated by building and selling a single-family home in Chicago.

9.  The property securing my investment was a vacant lot located at 431 East 42nd Place in Chicago.  I ended up investing $125,000 through a promissory note, a copy of which is attached here as **Exhibit A.**

10. I understood, based on information from EquityBuild, that there was at least one other investor who had also invested in the same property, and that all the investors would have first lien protection for our pro rata share of the investment.  I took this to mean that all the investors could use the property as collateral, and that if there were any issues, we would be able to foreclose on the property.

11. I made my investment using a self-directed IRA through iPlanGroup.  Shaun Cohen directed me to iPlanGroup.  The funds came from my 401K retirement savings.

12. Before investing, EquityBuild representatives told me that I would receive monthly updates on the property.  I did not receive monthly updates.

13. Approximately eight months later, after my investment came due, I did not receive my principal or my interest.  Instead, EquityBuild requested, and I agreed to, two extensions, which delayed the date for the return of my funds.

14. After these delays, I spoke to Shaun Cohen and John Allred.  Allred told me that none of the investors involved with my investment were receiving their funds, because there had been a problem with the contractor involved in the project.

15. I was not satisfied with Allred's explanation. At the time, my wife was sick with cancer, and I was concerned that I would not receive my money back. I continued to call EquityBuild until Shaun Cohen and John Allred agreed to participate in a conference call with me. During that call, I demanded my principal back. I also said that I would be willing to forfeit my accrued interest (approximately $40,000) if EquityBuild would just return my principal.

16. After the conference call, EquityBuild paid me my principal by paying me $31,250 per month for four months, from November 2015 through February 2016.

17. Although I agreed orally to forgo my interest, I never signed any document agreeing to do so.

18. I was not an accredited investor at the time I made my investment with EquityBuild.

19. During and after my investment with EquityBuild, I received numerous emails from EquityBuild advertising new investments. Some examples of emails I received are attached here as **Exhibits B** and **C**.

20. On June 26, 2018, I received an email from EquityBuild. The email read that EquityBuild "acknowledge[d] that we recognize your payment is late," and explained that "[t]he delay in your payment is related to project specific circumstances." I no longer had any investments with EquityBuild at that time. A copy of that email is attached here as **Exhibit D**.

21. The next day, I received another email from EquityBuild, informing me that there was a need to restructure my investment. That email is attached as **Exhibit E**.

I declare under penalty of perjury that the foregoing is true and correct. Executed on

8 - 2- 2018 in Brooksville, Florida.

Hans Blumberg

4

# EXHIBIT A

| THE LENDERS<br>The persons listed on<br><u>Exhibit A</u> to this Note<br>c/o HARD MONEY<br>COMPANY, LLC<br>5068 West Plano Pkwy. #300<br>Plano, TX 75093 | THE BORROWER<br>EQUITYBUILD, INC.<br>1083 N. Collier Blvd. #132<br>Marco Island, FL 34145 | COMMERCIAL<br>**FLAT RATE**<br>NON-RECOURSE<br>PROMISSORY NOTE<br>With Balloon Payment<br>Illinois |
| --- | --- | --- |

| Annual Interest Rate | Principal | Funding Date | Maturity Date | Loan Number |
| --- | --- | --- | --- | --- |
| 15%<br>For 8 Months | $291,580 | 02/28/2014 | 10/28/2014 | N/A |

FOR VALUE RECEIVED, EquityBuild, Inc., a Florida corporation (the "Borrower"), promises to pay the persons listed on <u>Exhibit A</u> hereto (each, a "Lender" and collectively, the "Lenders") in the manner set forth in Section 1 below the aggregate principal sum of **TWO HUNDRED NINETY-ONE THOUSAND FIVE HUNDRED EIGHTY and 00/100 DOLLARS ($291,580.00)**, together with interest from the above date at the interest rate of **FIFTEEN PERCENT (15%)** per annum (the "Interest Rate") on the unpaid principal balance until paid (the "Loan").

Anything in this Commercial Flat Rate Non-Recourse Promissory Note (this "Note") contrary notwithstanding, the entire unpaid balance of the principal sum and all unpaid interest accrued thereon shall, unless sooner paid, be and become due and payable on **10/28/2014** ("Maturity Date").

1.      **Application of Payments**.  All payments on this Note shall be made in lawful money of the United States of America and shall be applied first to any late charges due hereunder, second to the payment of accrued but unpaid interest and the remainder to the reduction of principal.  The Borrower shall make all payments when due, without set-offs of any nature and shall pay each Lender (to an account directed by the Collateral Agent (as defined below)) the ratable share of such payouts based on each Lender's percentage of the Loan set forth on <u>Exhibit A</u> hereto.

2.      **Security; Collateral Agent**.  To secure the payment and performance of obligations incurred under this Note, this Note shall be secured by and subject to the terms of a

2382244.1.

1.

Mortgage (the "Mortgage") which encumbers real property and improvements located at **431 E 42nd Pl. Chicago, IL 60653** (the "Property") to be granted in favor of Hard Money Company, LLC or its successor, as collateral agent for the ratable benefit of the Lenders (the "Collateral Agent"); for the purpose of purchasing the Property, all pursuant to the terms that certain Collateral Agency and Servicing Agreement dated as of even date herewith by and among the Collateral Agent and the Lenders (the "CA Agreement"). Both this Note and the Mortgage are given in consideration of a loan of even date herewith in the amount of the principal sum advanced by the Lenders to the Borrower. Pursuant to the terms of the CA Agreement, the Lenders have irrevocably delegated their rights under this Note to the Collateral Agent and as such the Collateral Agent shall have authority to act on behalf of the Lenders hereunder where such action is required or permitted. Other than pursuant to the terms of the Mortgage, this Note is without recourse under <u>any</u> circumstances to the assets of the Borrower.

3. **Events of Default**. An Event of Default will occur under this Note in the event that the Borrower:

(a) Fails to make any payment of principal and/or interest or any other sum due hereunder when the same is due pursuant to the terms of this Note;

(b) Applies for or consents to the appointment of a receiver, trustee or liquidator of the Borrower or of all or a substantial part of its assets;

(c) Files a voluntary petition in bankruptcy, whether by the Federal Bankruptcy Act or any similar State statute, or admits in writing its inability to pay its debts as they come due;

(d) Makes an assignment for the benefit of creditors;

(e) Files a petition or an answer seeking a reorganization or an arrangement with creditors or seeking to take advantage of any insolvency law;

(f) Performs any other act of bankruptcy;

(g) Files an answer admitting the material allegations of a petition filed against the Borrower in any bankruptcy, reorganization or insolvency proceeding;

(h) Permits the entry of any order, judgment or decree by any court of competent jurisdiction adjudicating the Borrower a bankrupt or an insolvent or approving a receiver, trustee or liquidator of the Borrower or of all or a substantial part of its assets; or there otherwise commences with respect to the Borrower or any of its assets any proceeding under any bankruptcy, reorganization, arrangement, insolvency, readjustment, receivership or like law or

statute, and if the order, judgment, decree or proceeding continues unstayed for any period of sixty (60) consecutive days, or continues in effect for more than ten (10) days after any stay thereof;

        (i)    Fails to perform or violates any obligations or covenants under the terms of this Note or the Mortgage;

        (j)    Defaults under the terms of any note, mortgage, deed of trust, security instrument, or any other loan documents or written agreements for any other loans secured by the Property;

        (k)    Fails to keep an insurance policy in place on the Property with the Collateral Agent as the mortgagee and/or as the loss payee including its successor and/or assigns; or

        (l)    Fails to keep property taxes current on the Property.

    4.    **Rights of the Lenders On Event of Default**.  Upon the occurrence of an Event of Default as set forth herein, or in the event of the breach of any covenant or obligation contained in the herein referred to Mortgage on the part of the undersigned to be kept, observed or performed, the Collateral Agent on behalf of the Lenders, at its sole and absolute discretion, may exercise one or more of the following remedies without notice or demand (except as required by law):

        (a)    Declare the entire unpaid balance of principal of this Note, along with accrued and unpaid interest thereon and all other charges, costs and expenses, provided for herein and in the Mortgage immediately due and payable;

        (b)    Collect the outstanding obligations of the Borrower with or without judicial process;

        (c)    Take possession of any collateral in any manner permitted by law;

        (d)    Require the Borrower to deliver and make available to the Collateral Agent on behalf of the Lenders any collateral at a place reasonably convenient to the Borrower and the Collateral Agent;

        (e)    Sell, lease or otherwise dispose of any collateral and collect any deficiency balance with or without resorting to legal process;

        (f)    Assume any and all mortgages/deeds of trust in existence at the time of default on all collateral securing the Loan; or

3.

(g)      Exercise all other rights available to the Lenders or the Collateral Agent under any other written agreement or applicable law.

At any time an Event of Default shall have occurred and be continuing and/or after maturity of the Loan, including maturity upon acceleration, the unpaid principal balance, all accrued and unpaid interest and all other amounts payable under the Note shall bear interest at the Default Rate (as defined below).   The unpaid principal balance shall continue to bear interest after the Maturity Date at the Default Rate until and including the date on which it is paid in full.   Interest under this Note shall be computed on the basis of a 360-day year consisting of twelve 30-day months.

(a)      The Lenders' remedies in this Section are in addition to any available at common law and nothing in this Section shall impair any right which they have under this Note, or at law or in equity, to accelerate the debt on the occurrence of any other Event of Default, whether or not relating to this Note.   The Lenders' rights or remedies as provided in this Note shall be cumulative and concurrent and may be pursued singly, successively, or together against the Borrower, at the Collateral Agent's sole and absolute discretion.   The Borrower shall pay to the Collateral Agent on the Collateral Agent's demand the amount of all expenses incurred by the Collateral Agent or the Lenders (a) in enforcing the Lenders' rights under this Note or the Mortgage, or (b) as the result of a default by the Borrower under this Note or the Mortgage, including but not limited to the cost of collecting any amount owed hereunder, and any reasonable attorney's fees.   The failure by the Collateral Agent to exercise any of its options contained herein shall not constitute a waiver of the right to exercise such option in the event of any subsequent default.   Notwithstanding anything to the contrary stated herein, Lenders agree that for payment of this Note it will look solely to the Property given to secure the payment of this Note (or the proceeds from the sale thereof), and no other assets of the Borrower shall be subject to levy, execution or other enforcement procedure for the satisfaction of the remedies of Lenders, or for any payment required to be made under this Note.

5.      **Costs and Expenses**.   To the extent permitted by law, the Borrower agrees to pay any and all reasonable fees and costs, including, but not limited to, fees and costs of attorneys and other agents (including without limitation paralegals, clerks and consultants) which are incurred by the Collateral Agent or the Lenders in collecting any amount due or enforcing any right or remedy under this Note or Mortgage, whether or not suit is brought, including, but not limited to, all fees and costs incurred on appeal, in bankruptcy, and for post-judgment collection actions.

6.      **Forbearance**.   The Collateral Agent shall not by any act or omission to act be deemed to waive any of its rights or remedies hereunder unless such waiver is in writing and signed by the Collateral Agent on behalf of the Lenders and then only to the extent specifically set

forth therein. A waiver on one occasion shall not be construed as continuing or as a bar to or waiver of such right or remedy on any other occasion. All remedies conferred upon the Collateral Agent on behalf of the Lenders by this Note or any other instrument or agreement connected herewith or related hereto shall be cumulative and none is exclusive, and such remedies may be exercised concurrently or consecutively at the Collateral Agent's option.

7.    **Modification and Waiver**.  The Borrower waives valuation and appraisement, presentment and demand for payment, notice of intent to accelerate maturity, notice of acceleration of maturity, protest or notice of protest and nonpayment, bringing of suit and diligence in taking any action to collect any sums owing hereunder or in proceeding against any of the rights and properties securing payment hereof, and trial by jury in any litigation arising out of, relating to, or connected with this Note or any instrument given as security hereof.

8.    **Voluntary and Involuntary Prepayments**.

(a)    A prepayment premium shall be payable in connection with any prepayment made under this Note as provided below:

(i)    The Borrower may voluntarily prepay all of the unpaid principal balance of this Note on a Business Day designated as the date for such prepayment in a Notice from the Borrower to the Collateral Agent given at least 10 days prior to the date of such prepayment.  Such prepayment shall be made by paying (A) the amount of principal being prepaid, (B) all accrued interest, (C) all other sums due the Lenders at the time of such prepayment, and (D) the prepayment premium calculated pursuant to Section 8(d) of this Note. For purposes of this Note, a "Business Day" means any day other than a Saturday, Sunday or any other day on which banks in the State of Illinois are not open for business.

(ii)    Upon the Collateral Agent's exercise of any right of acceleration under this Note, the Borrower shall pay to the Lenders in accordance with Section 1 above, in addition to the entire unpaid principal balance of this Note outstanding at the time of the acceleration, (A) all accrued interest, (B) and all other sums due the Lenders, and (C) the prepayment premium calculated pursuant to Section 8(d) of this Note, to the extent such prepayment premium does not exceed the maximum rate permitted by applicable law.

(b)    The Borrower recognizes that any prepayment of the unpaid principal balance of this Note, whether voluntary or involuntary or resulting from a default by the Borrower, will result in the Lenders' incurring loss, including reinvestment loss, additional expense and frustration or impairment of the Lenders' ability to meet their respective commitments to third parties. The Borrower agrees that it is extremely difficult and impractical to ascertain the extent of such damages.    The Borrower therefore acknowledges and agrees that the formula for

2382244.1.

calculating prepayment premiums set forth in Section 8(d) represents a reasonable estimate of the damages the Lender will incur because of a prepayment.

        (c)      The Borrower further acknowledges that the prepayment premium provisions of this Note are a material part of the consideration for the Loan.

        (d)      <u>Prepayment Premium; Liquidated Damages</u>.  If the Borrower prepays the entire principal amount of the Loan prior to the Maturity Date, the Borrower shall pay to the Lenders (in accordance with Section 1 above) at the time of such prepayment, liquidated damages as a prepayment premium in an amount equal to: (i) seven and one half of a percent (7.5%) of the principal amount of the Loan if the prepayment is made prior to the date that is thirty (30) days following the date hereof ("Month 1"); (ii) six and twenty-five one hundredths of a percent (6.25%) of the principal amount of the Loan if the prepayment is made on or after the end of Month 1 but prior to the date that is sixty (60) days following the date hereof ("Month 2"); (iii) five percent (5.0%) of the principal amount of the Loan if the prepayment is made on or after the end of Month 2 but prior to the date that is ninety (90) days following the date hereof ("Month 3"); (iv) three and seventy-five one hundredths of a percent (3.75%) of the principal amount of the Loan if the prepayment is made on or after the end of Month 3 but prior to the date that is one hundred twenty (120) days following the date hereof ("Month 4"); (v) two and one half of a percent (2.5%) of the principal amount of the Loan if the prepayment is made on or after the end of Month 4 but prior to the date that is one hundred fifty (150) days following the date hereof ("Month 5"); and (vi) one and twenty-five one hundredths of a percent (1.25%) of the principal amount of the Loan if the prepayment is made on or after the end of Month 5 but prior to the Maturity Date.

        9.      **Default Rate**.  So long as (a) payment under this Note remains past due for thirty (30) days or more (including upon the Maturity Date) or (b) any other Event of Default has occurred and is continuing, interest under this Note shall accrue on the unpaid principal balance from the earlier of the due date of such payment or the occurrence of such other Event of Default, as applicable, at a rate (the "Default Rate") equal to the lesser of seven (7) percentage points above the rate stated in the first paragraph of this Note or the maximum interest rate which may be collected from the Borrower under applicable law.

        10.      **Loan Charges/Maximum Rate Permitted By Law**.  This Note shall not be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law.  If any applicable law limiting the amount of interest or other charges permitted to be collected from the Borrower in connection with the Loan is interpreted so that any interest violates that law, and the Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation.  The amounts, if any,

previously paid to the Lenders in excess of the permitted amounts shall be applied by the Lenders to reduce the unpaid principal balance of this Note. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from the Borrower has been violated, all indebtedness that constitutes interest, as well as all other charges made in connection with the indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of this Note.

11.    **Waiver of Jury Trial**. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF, OR IN ANY WAY PERTAINING TO, THIS NOTE OR ANY MORTGAGE/DEED OF TRUST ARISING FROM THIS NOTE. THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY THE BORROWER AND THE COLLATERAL AGENT ON BEHALF OF THE LENDERS, AND THE BORROWER AND THE COLLATERAL AGENT ON BEHALF OF THE LENDERS EACH HEREBY REPRESENTS TO THE OTHER THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.

12.    **Notices**. Any Notice or other communication required, permitted or desirable under the terms of this Note shall be sufficiently given if sent to each party as follows:

The Collateral Agent on behalf of the Lenders:

> **HARD MONEY COMPANY, LLC**
> 5068 WEST PLANO PKWY. #300
> PLANO, TX 75093
> Fax: 239-244-8666
> Email: shaun.d.cohen@gmail.com

The Borrower:    **EQUITYBUILD, INC.**
> 1083 N. COLLIER BLVD. #132
> MARCO ISLAND, FL 34145
> Fax: 202-204-8423
> Email: jerry@equitybuild.com

Any notice, demand, consent, approval, request or other communication or document to be given hereunder to a party hereto shall be (a) in writing, and (b) deemed to have been given (i)

on the 3rd business day after being sent as certified or registered mail in the United States mails, postage prepaid, return receipt requested, or (ii) on the next business day after being deposited (with instructions to deliver it on that business day) with a reputable overnight courier service, or (iii) (if the party's receipt thereof is acknowledged in writing) on being sent by telefax or another means of immediate electronic communication, in each case to the party's address set forth above or any other address in the United States of America which it designates from time-to-time by notice to each other party hereto, or (iv) (if the party's receipt thereof is acknowledged in writing) on being given by hand or other actual delivery to the party.

13. **Entire Agreement**. The terms and conditions of this Note together with the terms and conditions of the Mortgage which is incorporated herein by reference as if set forth fully herein contain the entire understanding between the Borrower and the Collateral Agent on behalf of the Lenders with respect the indebtedness evidenced hereby. Such understanding may not be modified, amended or terminated except in a written document duly executed by the Borrower and the Collateral Agent on behalf of the Lenders.

14. **Binding Obligation**. This Note shall be binding upon the heirs, successors and assigns of the Borrower and the Collateral Agent.

15. **Governing Law**. This Note is delivered and made in, and shall be construed pursuant to the laws of the State of Illinois. Unless applicable law provides otherwise, the parties hereto consent to the jurisdiction and venue of any court of competent jurisdiction located in Cook County, Illinois.

16. **Construction**. As used herein, Person means a natural person, trustee, corporation, partnership, limited liability company or other legal entity, and all references made (a) in the neuter, masculine or feminine gender shall be deemed made in all genders, (b) in the singular or plural number shall also be deemed made in the plural or singular number, and (c) to any Section, subsection, paragraph or subparagraph shall, unless therein expressly indicated to the contrary, be deemed made to that part of this Note. The headings of those parts are provided only for convenience of reference, and shall not be considered in construing their contents. Each document referred to herein as being attached hereto as an exhibit or otherwise designated herein as an exhibit hereto shall be a part hereof.

17. **Assignment**. The Borrower agrees not to assign any of the Borrower's rights, remedies or obligations described in this Note without the prior written consent of the Collateral Agent, which consent may be withheld by the Collateral Agent in its sole discretion. The Borrower agrees that the Collateral Agent is entitled to assign some or all of its rights and remedies described in this Note without notice to or the prior consent of the Borrower.

431 E 42nd Pl  Exhibit

| Lender Name | Percentage of Ownership | Principal Amount |
|---|---|---|
| Michael Alden Schankman | 17.15% | $50,000 |
| Horizon Family Investments, LLC | 15.98% | $46,580 |
| iPlan Group, LLC FBO Hans Blumberg IRA | 42.87% | $125,000 |
| Frank and Ardelis Endrei | 6.86% | $20,000 |
| Alan Schankman | 17.15% | $50,000 |

# EXHIBIT B



To view this email as a web page, go here.



EquityBuild Finance LLC.®
877-978-1916

A New Source of Income

*Targeting Safe,*
*Superior,*
*Double-Digit Returns*

# Congratulations
# to 20 Savvy EBF Investors!

# Deal Closed
# 6801 S. East End Ave.

██████ — 20 savvy investors turned to EquityBuild Finance to lock in spectacular, monthly returns for a term of 18 months.

These smart people invested a total of $1,374,714 in an EBF private mortgage note that funded the purchase of a 15-unit apartment building located at 6801 S. East End Avenue in Chicago. In return, they will receive 11-15% APR!

- New EBF investor *Michael J* invested $100,000 and will receive 11% APR, plus 1.5 points in bonuses.
- *Steven B's* investment of $20,000 will return 12% APR.
- *Brett B* invested $5,000 and will also receive 12% APR.
- *May A* invested $84,500 and will be paid 14.5% APR.
- *Shailesh T's* investment of $100,000 will earn him 14.5% APR.
- *James T* invested $352,714 and will receive a 15% APR return, plus bonuses totaling 2 additional points.
- New client *Wayne L's* share for $110,000 will return 14.5% APR.
- Another new EBF investor, *Janice N* invested $50,000 and will receive 14% APR, paid monthly for the next 18 months.
- *Alexandre G* invested $105,000 which will return 13% APR, plus 1.5 points in bonuses.
- *James C's* $50,000 investment will earn 14% APR.
- New client *Keith R* invested $80,000 and will receive 14% APR.
- *Ted and Patricia G's* investments in the note total $37,500 and will generate 14% APR returns.
- *Steve T* invested $25,000 and will receive 14% APR.
- *Peter N* invested $30,000 which will return 15% APR to him.
- *Dennis H's* $34,840 investment in this note will earn 14% APR.
- *Mary Ann H* invested $15,160 and will also receive 14% APR.
- New EBF investor *Michael H* invested $50,000 and will receive 14% APR in monthly returns.
- *Joe M* invested $25,000 and will receive 14% APR.
- Another new client, *Anant T* invested $50,000 and will receive 14.5% APR.

These individuals saw an opportunity to lock in a great rate of return, and quickly moved to take advantage of it.

EquityBuild Finance has new private mortgage note opportunities opening all the time. Call us today at **(877) 978-1916**, and join the long list of satisfied EBF investors.

Never Forget, when it comes to performance and security:

### EquityBuild has had Zero Foreclosures on 700+ Deals Closed!

Call **877-978-1916** or look here to find out more.

**Thank you,**

Shaun Cohen, M.A., Economics
President
EquityBuild Finance, LLC
info@equitybuildfinance.com
Tel: (877) 978-1916
Fax: (239) 244-8666

This is not a specific offering, an offer to sell securities or an invitation for offers to purchase securities. Securities may only be sold by exemption or registration. Incentive applies to accredited investors only.

This email was sent to: ▮▮▮▮▮▮▮

This email was sent by: EquityBuild Finance LLC
5068 W Plano Pkwy, #300 Plano, TX 75093

We respect your right to privacy - view our policy

Manage Subscriptions | Update Profile | Unsubscribe

Powered by
marketing cloud

# EXHIBIT C



**From:** Hans Blumberg ███████████████
**Date:** July 7, 2017 at 7:05:03 PM CDT
███████████████████
**Subject: Fwd: Hans, Please accept this challenge from me**

FYI

---------- Forwarded message ----------
From: **Shaun Cohen** <cohen.shaun@equitybuildfinance.com>
Date: Fri, Jul 7, 2017 at 3:49 PM
Subject: Hans, Please accept this challenge from me
To: ███████████████████

Hans,

Toward the end of this email you will see my challenge but please read through the rest for context.

I'm sure you have heard about our equity models, and at this point, you have already thought about whether equity investing is right for you.

You may even have convinced yourself it is not for you.

If that is the case, then this email IS for you. I'm going to begin with a story...

A large percentage of you know John Allred at some level. John works in our customer service department and maintains a few accounts from his time as a Relationship Manager.

What some of you may not know is that he is a rather large investor with us. John lives in Oklahoma, only about 3 hours from where I live (just outside of Dallas), and he came to have lunch with me and our COO, Ron Bol, a few weeks back.

Early in the conversation, it became quite clear that he was not a fan of the equity model at all. He said we would have issues with other investors who are in a similar boat to him.

Now, I had a challenge in front of me. John, an investor, customer service rep and relationship manager, does not believe in the model I have become convinced is the greatest thing since air conditioning (I prefer that cliche to sliced bread).

So, we began to discuss his concerns with the model. I'll spare you the details, but in a day or two, he converted close to half of his debt holdings to equity positions. And, I believe that number grew after John had a subsequent conversation with Ron.

I'm telling you this story for one reason and one reason only...

There is ONLY one reason to choose a debt investment over an equity investment, and that is ONLY if you NEED the cash flow at the level the debt investment produces.

Other than this one specific situation... Regardless of age, risk tolerance, marital status, employment status, etc... An equity investment is far superior to a debt investment!

Everyone invests to achieve two goals. One goal is to deliver cash flow. The other goal is to build a nest egg. That's it...

There is nothing else an investment can produce beyond cash flow and accrual of wealth.

Since that's the case, every investment should be measured on the appropriate allocation of its cash flow versus nest egg building. Each strategy will be specific to your own lifestyle; however, it is important to remember that any cash flow taken now will sacrifice the "nest to egg" building for the future.

Basic rule... Cash flow should only be taken if it is needed.

If you are employed, have no intention of retiring and your income level supports your lifestyle, then you should want zero cash flow from your investments.

Most of us have already bought into this philosophy when we use an IRA to invest, but for some reason our thinking changes when we invest with cash.

Let's pretend you are still working and have no intention of retiring yet, but your lifestyle expenses outpace your income. The appropriate response is to calculate your monthly cash flow need, which is the difference between your income and your expenses, and allocate your investments in such a way to generate just enough cash flow to support your lifestyle.

If you generate even a dollar more in cash flow then you need then, in most cases, you are handing over more money than you should to the government. That is robbing your nest egg of its ability to grow as fast as possible.

Let me use my 95-year-old grandfather, Mort, as an example. He is clearly retired and at an age where he is thinking about the inheritance he will leave my mother, uncle, me, etc.

Even in his situation... The answer is the same. All stages of life require proper investment thinking and asset allocation.

In his case, the thinking is not about what he can do for himself right now.  It is only about what he can do to build his nest egg as quickly as possible - leaving the largest inheritance possible.

He should have almost no debt investments and as much equity as possible.

Even though those equity investments may (unfortunately) outlive him, those investments can be transferred to his estate and continue their powerful growth for his heirs.

Let's shift gears for a minute...

If you say to me that the timeline in an equity investment is too long or the leverage component is too risky, then that might be ture for that specific equity and your specific situation.

Regardless of the objection, there is always a correct investment for every situation. In most cases, that would likely include a different style of equity fund.

I can almost always think of a solution where equity ends up being superior to debt.

While you still may be unconvinced, I invite you to a dialogue with me.

I want to hear the reasons why you believe it is not the right fit for you.

I promise to be open-minded, but I will be a tough nut to crack.

I hold firm to the belief that it is illogical and counter-productive to choose debt in favor of equity (unless you need every penny of the cash flow being generated from the debt investment).

Having said that, I am not an obstinate person and will listen quite acutely to your argument.

Yesterday at 1:00 CT... I held a webinar for the equity model (the link to the recording is below).

Ron was also there joining in the discussion. There was a live Q&A session at the end, and I welcomed everyone to challenge me there. Whatever wasn't addressed for you in the webinar or Q&A, I welcome you to bring to me personally.

Please accept my challenge.

My father and I began this company to help the every man and every woman build wealth as quickly as possible, and that is still our mission today.

Here's to your success!

Here is the info for the webinar: https://attendee.gotowebinar.com/recording/3747088732297852162

---

Thank you,

Shaun Cohen
info@equitybuildfinance.com
(877) 978-1916

EquityBuild   5068 W. Plano Pkwy, #300   Plano  TX   75093   USA

Update your email preferences to choose the types of emails you receive.

Unsubscribe from all future emails

# EXHIBIT D



---------- Forwarded message ----------
From: **EquityBuild Inc.** <info@equitybuild.com>
Date: Tue, Jun 26, 2018 at 6:21 PM
Subject: Important Information Regarding Your Payment
To:



---

This message is to acknowledge that we recognize your payment is late. The delay in your payment is related to project specific circumstances that we are diligently working to clarify and remedy.

In the coming days you will be hearing from a member of our team who will provide you with more detail on the nature of the issues and the impact that those issues have had on the delay in your payment.

Someone will absolutely be calling you as soon as they have the relevant details.

We sincerely apologize for the delay and thank you in advance for your patience.

---

Sincerely,

EquityBuild Inc.

info@equitybuild.com

**(877) 978-1869**

The information contained herein was obtained from sources deemed reliable. However, EquityBuild makes no guarantees, warranties or representations as to the completeness or accuracy of this information. This is not an offer to purchase or sell any securities. Any such offer can be made only by transmitting to any prospective investor a Confidential Private Placement Memorandum or other document intended to give a prospective investor all relevant information in order to make an informed decision about an investment. All such information should be considered carefully by any prospective investor before making any investment.



EquityBuild   5068 W. Plano Pkwy, #300   Plano  TX   75093   USA

You received this email because you are subscribed to Current Client Updates from EquityBuild .

Update your email preferences to choose the types of emails you receive.

Unsubscribe from all future emails

# EXHIBIT E



---------- Forwarded message ----------
From: **Shaun Cohen** <cohen.shaun@equitybuild.com>
Date: Wed, Jun 27, 2018 at 7:58 PM
Subject: Hans, Urgent: re: Your EquityBuild Investment
To:



---

Hans,

If you are receiving this message then you are an investor on an affected project or projects to which this email pertains. Yesterday you received an email from the company letting you know that our team members would be reaching out to you. This email serves as further explanation so that you may have a deeper understanding prior to hearing from one of our team members.

There are a few factors that contributed to a need to restructure your investment in an effort to continue to both deliver a return on your investment and also a timely return of capital. Three years ago we were defrauded by a real estate vendor that we partnered with and the value of that impact is at least $12mm. We filed a lawsuit against the vendor and the principals. Since both the vendor and its principals have filed for bankruptcy it is clear that we will receive no restitution. This experience was the catalyst for our bringing in house all components necessary to move the business forward which included the hiring of an in house underwriter, director of operations, asset manager, construction manager and bringing in third party resources that included property managers, contractors and

local counsel while developing relationships with the City Departments divorced of the vendor that we had engaged with that failed to meet all of the requirements necessary to maintain a positive relationship with them.

Additionally, our underwriting assumptions for the completion of each project varied anywhere from 9-24 months. Due to other market factors outside of our control, both construction and lease up activity in the affected buildings have taken longer than what the underwriting model assumed. Lastly, changes in the Fannie Mae and Freddie Mac guidelines have had an impact on our ability to refinance the properties within the timeline originally projected. There were multiple changes but the most notable were (1) that their minimum loan amount on a multi-family commercial property grew to $1mm and (2) that the required ownership time in order to refinance using the appraised value grew from simply 90 days at 90% occupancy to 24 months ownership plus most recent 90 days operating at 90% occupancy. Fannie and Freddie set the standard the majority of lenders follow. Each of the changes that these lenders imposed required an adjustment be made to our buying and underwriting processes and we made those adjustments in response We have developed very strong relationships with city officials and also with agency lenders (Freddie and Fannie).

Additionally, because of our activity in the market we have become one of the go to buyers for undermanaged or underperforming assets in the marketplace and have grown the portfolio to over 90 buildings comprised of nearly 1600 units representing a value of well over $100,000,000. The buildings remain on a pathway toward the required capital improvements and the stabilization of the rental income in order to realize the highest possible value.

The submarkets of the South Side of Chicago in which we focus have seen a large uptick in both private and public investment.  Projects such as the Obama Library and the Jackson Park golf course amongst others have helped drive values faster than we had predicted. The city itself is seeing an increase in the median income level and a surge in construction projects. With 57 cranes in the sky, Chicago boasts the largest number of large construction projects in the country.

In conclusion, Chicago is seeing increased growth and the sub-markets that you are invested in are seeing increases in asset values. Much of the delays we have experienced in the affected properties have been from elements beyond our control and that we could not have foreseen. As a result, a restructuring of your investment will allow us to continue to offer excellent returns as well as a timely return of your principal.

With respect to the options that will be made available, we are refining both debt and equity options that will be presented when you talk to our team member. Each option will detail the return expectations, the exit strategy and the return of capital timeline. The primary objective is to have the return of capital be as soon as it humanly possible.

**Please note, we fully understand you will have questions and over the coming days our team members will be calling each and every one you to discuss how your particular project or projects have been affected and what investment options we are offering, Our team members will have the information that pertains to your particular project or projects and will be able to answer your questions.**

**As an additional convenience, you will be receiving an email over the coming few days from one of our team members offering you access to their calendar which**

you can use to set an appointment that best suits your schedule.

If, after reading this or speaking to one of our team members you continue to have questions, we have set up a unique email address at **questions@equitybuild.com** and we ask you to please direct any questions to that address. We will work to answer your questions in a timely manner.

Finally, if you do not set an appointment, one of our team members will be calling you to review restructured investment options with you so that we move on to delivering the result anticipated by the restructuring.

Thank you for your loyalty and understanding.

Sincerely,

Shaun Cohen
Vice President
EquityBuild Inc.
info@equitybuild.com
(877) 978-1869

The information contained herein was obtained from sources deemed reliable. However, EquityBuild makes no guarantees, warranties or representations as to the completeness or accuracy of this information. This is not an offer to purchase or sell any securities. Any such offer can be made only by transmitting to any prospective investor a Confidential Private Placement Memorandum or other document intended to give a prospective investor all relevant information in order to make an informed decision about an investment. All such information should be considered carefully by any prospective investor before making any investment.



EquityBuild   5068 W. Plano Pkwy, #300   Plano  TX   75093   USA

You received this email because you are subscribed to Current Client Updates from EquityBuild .

Update your email preferences to choose the types of emails you receive.

Unsubscribe from all future emails