EXHIBIT

20

## DECLARATION OF DEBBIE LASLEY

1. My name is Debbie Lasley. I am 67 years old and live in *Sacramento* California. I have personal knowledge of the facts described in this declaration.

2. My late husband and I used to own a storage-facility business. We sold the business and I am now retired.

3. After my husband passed away, I began to explore investing in order to earn some income. I believe I learned about Equitybuild from an email that I received.

4. Prior to deciding to invest in Equitybuild, I communicated with several Equitybuild employees: Shaun Cohen, Kira Golden, and Elizabeth Kammerer. These individuals provided me with information regarding Equitybuild. Among other things, they sent me a video about Equitybuild featuring William Shatner.

5. I was told by Equitybuild that my money would be invested in real estate and that I would have a "first lien" position on the property in which I chose to invest. I took that to mean that my investment would be secure. I assumed, based on what Shaun Cohen, Golden and Kammerer told me, that if Equitybuild defaulted, I could simply foreclose on the property and recoup my principal. I was not told that if I wanted to foreclose, I would have to somehow join together with other investors on the mortgage in order to do so.

6. In addition, Equitybuild's representative, Kammerer, told me that no Equitybuild investments had ever lost money.

7. At no time did Equitybuild disclose to me that they would be taking fees out of the funds that I invested with Equitybuild. To the contrary, based on what Equitybuild personnel

told me, I believed that all of my money was going toward purchasing and renovating properties, so that they could be sold for a profit.

8. At no time did Equitybuild disclose to me that any portion of the funds I invested with Equitybuild could be used to pay interest payments to other Equitybuild investors. If I had known that, it would have made a difference to me.

9. Prior to investing, I told Kammerer that I could not afford to lose my investment. Equitybuild did not ask for – and I did not provide – information about my finances.

## The Bingham Investment

10. I first invested with Equitybuild on December 30, 2014. I invested $55,000. In return, I received a promissory note, which set forth the terms of my investment. The note was secured by a property in Houston, Texas at 1102 Bingham. A copy of the promissory note is attached here as Exhibit A.

11. I understood that I was buying out another investor's position on the Bingham property. I was not told why the previous investor wanted to be bought out. I was not told that there were any issues with the Bingham property.

12. I never received any interest payments on my Bingham investment.

13. My principal payment for the Bingham investment became due in June of 2015. I was told that I could not get my principal or any interest because there had been a problem with the contractor who was supposed to develop the property.

14. I asked for my principal back, because it was due to me under the terms of the note. I was told that I could only be repaid if another investor agreed to "buy out" my position

2

on the Bingham property. Equitybuild personnel told me that I was put on a "buyout list" in June of 2015, but I was not bought out.

15. Later, an Equitybuild representative named John Allred told me that he was confident the Bingham property would sell, and that I would be repaid my principal. Based on those representations, I agreed to be taken off of the "buyout list."

16. Around January of 2018, Equitybuild converted my Bingham note into an unsecured promissory note. I was told that this was the best thing for me to do if I needed my funds back. Under the terms of the unsecured promissory note, I was to receive about $2,700 per month (8% on my principal amount plus unpaid interest) until my money was repaid. I received three payments, and then the payments stopped.

## The 64th Street Investment

17. I invested additional funds with Equitybuild a few months after my original investment, and before any principal had come due. This second investment was in February of 2015. It was for a property located at 2736 W. 64th Street, in Chicago. I invested $50,000 on a note, which provided for interest payments, paid monthly, and a return of my principal at the end of the term. A copy of this note is attached here as Exhibit B.

18. I was told by Equitybuild that my investment was to be used to purchase and rehabilitate a property located on West 64th Street in Chicago, Illinois. I was told that the investment was a "very low risk scenario."

19. I received monthly interest payments of $500 for my West 64th Street investment. My principal was due in March 2017. I did not receive my principal.

3

20. I requested a buyout for my 64th Street investment on April 6, 2017. At that time, John Allred told me that Equitybuild was no longer doing buy outs and that there was nothing he could do at that time. Allred explained that Equitybuild was in the process of putting a number of its properties into funds, and once the funds were fully funded, the original investors could be paid out.

21. Around June of 2017, I placed a notice on a website, "Bigger Pockets" regarding my experience investing with Equitybuild. Soon afterward, Shawn Cohen called me and asked me to remove my posting. He also gave me his word that I would get my principal back form my 64th Street investment within 90-120 days.

## RECENT DEVELOPMENTS

22. On May 24, 2018, I received an e-mail from Shaun Cohen notifying me that Equitybuild was changing the terms of my investment. He said that Equitybuild had refinanced the 64th Street property, but had only received enough money to partially repay investors. I had a choice to either place my original principal balance into an equity fund, or to put a smaller amount, i.e., my "pro-rata" share of a 28% partial payout into a different fund. A copy of this email is attached here as Exhibit C.

23. I am very confused about what Equitybuild has done. I do not understand how Equitybuild could sell interest in this property, or refinance, or transfer title, without notifying me.

24. I never consented to refinance of the 64th Street property. I never consented to transferring title of the 64th Street property. And I never consented to a restructuring of my investment.

4

25. On June 4th, I received an email from Equitybuild explaining that, due to some issues back in 2014 and 2015 with one of its vendors – G-Slow – Equitybuild had taken on a "debt load that is not sustainable" and that continuing to pay investors' interest "would lead to an inevitable disaster." So, Equitybuild was converting my investment into equity. Further, Equitybuild would not be making my scheduled interest payment. A copy of this email is attached here as Exhibit D.

26. Currently, I have Stage 4 Chronic Kidney Disease. I count on the returns from my Equitybuild investments for my medical expenses.

I declare under penalty of perjury that the foregoing is true and correct. Executed on 7-27-18 in SACRAMENTO, CA

_____
Debbie Lasley

5

# EXHIBIT A

DocuSign Envelope ID: 29579908-9D22-4480-B4B5-07DC7A880D19

| THE LENDERS<br>The persons listed on<br>**Exhibit A** to this Note<br>c/o HARD MONEY<br>COMPANY, LLC<br>d/b/a Venture Hard Money<br>Capital, LLC<br>5068 West Plano Pkwy. #300<br>Plano, TX 75093 | THE BORROWER<br>EQUITYBUILD, INC.<br>1083 N Collier Blvd. #132<br>Marco Island, FL 34145<br>d/b/a EB Equitybuild Capital, Inc | COMMERCIAL<br>**FLAT RATE**<br>NON-RECOURSE<br>PROMISSORY NOTE<br>With Balloon Payment<br>Texas |
| --- | --- | --- |

| Annual Interest Rate | Principal | Funding Date | Maturity Date | Loan Number |
| --- | --- | --- | --- | --- |
| 15%<br>For 8 Months | $1,663,053 | March 21, 2014 | November 21, 2014 | N/A |

FOR VALUE RECEIVED, EquityBuild, Inc., a Florida corporation d/b/a EB Equitybuild Capital, Inc. (the "Borrower"), promises to pay the persons listed on Exhibit A hereto (each, a "Lender" and collectively, the "Lenders") in the manner set forth in Section 1 below the aggregate principal sum of **ONE MILLION SIX HUNDRED SIXTY THREE THOUSAND FIFTY THREE and 00/100 DOLLARS** (**$1,663,053.00**), together with interest from the above date at the interest rate of **FIFTEEN PERCENT** (**15.0%**) per annum (the "Interest Rate") on the unpaid principal balance until paid (the "Loan").

Anything in this Commercial Flat Rate Non-Recourse Promissory Note (this "Note") contrary notwithstanding, the entire unpaid balance of the principal sum and all unpaid interest accrued thereon shall, unless sooner paid, be and become due and payable on November 21, 2014 ("Maturity Date") unless extended pursuant to Section 6 below.

1.      **Application of Payments**.  All payments on this Note shall be made in lawful money of the United States of America and shall be applied first to any late charges due hereunder, second to the payment of accrued but unpaid interest and the remainder to the reduction of principal.  The Borrower shall make all payments when due, without set-offs of any nature and shall pay each Lender (to an account directed by the Collateral Agent (as defined below)) the ratable share of such payouts based on each Lender's percentage of the Loan set forth on Exhibit A hereto.

DocuSign Envelope ID: 2957990B-9D22-412C-B4B5-07DC7A8B8D19

2.      **Security; Collateral Agent**.  This Note, to the extent of the full face amount hereof, evidences the indebtedness of the Borrower to the Lenders by virtue of monies loaned to the Borrower at the Borrower's special instance and request, and the payment hereof is secured the lien created in a Deed of Trust (With Security Agreement and Assignment of Rents) of even date herewith to Shaun Cohen, TRUSTEE, covering 1102 Bingham Street, Houston, Texas 77007 (the "Property"), as collateral agent for the ratable benefit of the Lenders (the "Collateral Agent"); for the purpose of purchasing the Property, all pursuant to the terms that certain Collateral Agency and Servicing Agreement dated as of even date herewith by and among the Collateral Agent and the Lenders (the "CA Agreement").  Both this Note and the Deed are given in consideration of a loan of even date herewith in the amount of the principal sum advanced by the Lenders to the Borrower.  Pursuant to the terms of the CA Agreement, the Lenders have irrevocably delegated their rights under this Note to the Collateral Agent and as such the Collateral Agent shall have authority to act on behalf of the Lenders hereunder where such action is required or permitted.  Other than pursuant to the terms of the Deed, this Note is without recourse under <u>any</u> circumstances to the assets of the Borrower.

3.      **Events of Default**.  An Event of Default will occur under this Note in the event that the Borrower:

(a)     Fails to make any payment of principal and/or interest or any other sum due hereunder when the same is due pursuant to the terms of this Note;

(b)     Applies for or consents to the appointment of a receiver, trustee or liquidator of the Borrower or of all or a substantial part of its assets;

(c)     Files a voluntary petition in bankruptcy, whether by the Federal Bankruptcy Act or any similar State statute, or admits in writing its inability to pay its debts as they come due;

(d)     Makes an assignment for the benefit of creditors;

(e)     Files a petition or an answer seeking a reorganization or an arrangement with creditors or seeking to take advantage of any insolvency law;

(f)     Performs any other act of bankruptcy;

(g)     Files an answer admitting the material allegations of a petition filed against the Borrower in any bankruptcy, reorganization or insolvency proceeding;

(h)     Permits the entry of any order, judgment or decree by any court of competent jurisdiction adjudicating the Borrower a bankrupt or an insolvent or approving a

DocuSign Envelope ID: 39570903-0D22-442C-B4B5-07DC7A8B9D43

receiver, trustee or liquidator of the Borrower or of all or a substantial part of its assets; or there otherwise commences with respect to the Borrower or any of its assets any proceeding under any bankruptcy, reorganization, arrangement, insolvency, readjustment, receivership or like law or statute, and if the order, judgment, decree or proceeding continues unstayed for any period of sixty (60) consecutive days, or continues in effect for more than ten (10) days after any stay thereof;

(i) Fails to perform or violates any obligations or covenants under the terms of this Note or the Deed;

(j) Defaults under the terms of any note, mortgage, deed of trust, security instrument, or any other loan documents or written agreements for any other loans secured by the Property;

(k) Fails to keep an insurance policy in place on the Property with the Collateral Agent as the mortgagee and/or as the loss payee including its successor and/or assigns; or

(l) Fails to keep property taxes current on the Property.

4. **Rights of the Lenders On Event of Default**.  Upon the occurrence of an Event of Default as set forth herein, or in the event of the breach of any covenant or obligation contained in the herein referred to Deed on the part of the undersigned to be kept, observed or performed, the Collateral Agent on behalf of the Lenders, at its sole and absolute discretion, may exercise one or more of the following remedies without notice or demand (except as required by law):

(a) Declare the entire unpaid balance of principal of this Note, along with accrued and unpaid interest thereon and all other charges, costs and expenses, provided for herein and in the Deed immediately due and payable;

(b) Collect the outstanding obligations of the Borrower with or without judicial process;

(c) Take possession of any collateral in any manner permitted by law;

(d) Require the Borrower to deliver and make available to the Collateral Agent on behalf of the Lenders any collateral at a place reasonably convenient to the Borrower and the Collateral Agent;

(e) Sell, lease or otherwise dispose of any collateral and collect any deficiency balance with or without resorting to legal process;

DocuSign Envelope ID: 39579908-0D22-442C-B4B5-07DC7A8B9D43

(f)  Assume any and all mortgages/deeds of trust in existence at the time of default on all collateral securing the Loan; or

(g)  Exercise all other rights available to the Lenders or the Collateral Agent under any other written agreement or applicable law.

At any time an Event of Default shall have occurred and be continuing and/or after maturity of the Loan, including maturity upon acceleration, the unpaid principal balance, all accrued and unpaid interest and all other amounts payable under the Note shall bear interest at the Default Rate (as defined below).  The unpaid principal balance shall continue to bear interest after the Maturity Date at the Default Rate until and including the date on which it is paid in full. Interest under this Note shall be computed on the basis of a 360-day year consisting of twelve 30-day months.

The Lenders' remedies in this Section are in addition to any available at common law and nothing in this Section shall impair any right which they have under this Note, or at law or in equity, to accelerate the debt on the occurrence of any other Event of Default, whether or not relating to this Note.  The Lenders' rights or remedies as provided in this Note shall be cumulative and concurrent and may be pursued singly, successively, or together against the Borrower, at the Collateral Agent's sole and absolute discretion.  The Borrower shall pay to the Collateral Agent on the Collateral Agent's demand the amount of all expenses incurred by the Collateral Agent or the Lenders (a) in enforcing the Lenders' rights under this Note or the Deed, or (b) as the result of a default by the Borrower under this Note or the Deed, including but not limited to the cost of collecting any amount owed hereunder, and any reasonable attorney's fees.  The failure by the Collateral Agent to exercise any of its options contained herein shall not constitute a waiver of the right to exercise such option in the event of any subsequent default.  Notwithstanding anything to the contrary stated herein, Lenders agree that for payment of this Note it will look solely to the Property given to secure the payment of this Note (or the proceeds from the sale thereof), and no other assets of the Borrower shall be subject to levy, execution or other enforcement procedure for the satisfaction of the remedies of Lenders, or for any payment required to be made under this Note.

5.  **Costs and Expenses**.  To the extent permitted by law, the Borrower agrees to pay any and all reasonable fees and costs, including, but not limited to, fees and costs of attorneys and other agents (including without limitation paralegals, clerks and consultants) which are incurred by the Collateral Agent or the Lenders in collecting any amount due or enforcing any right or remedy under this Note or the Deed, whether or not suit is brought, including, but not limited to, all fees and costs incurred on appeal, in bankruptcy, and for post-judgment collection actions.

DocuSign Envelope ID: 39570901-80D22-442C-B4B5-07DC7A889D43

6.      **Extensions**.  The Borrower shall have the right, upon ten (10) days written notice to the Collateral Agent prior to the Maturity Date or the end of any Extension Month (as defined below), to elect to extend the Maturity Date (or any Extension Month), by one (1) month (each an "Extension Month") provided, however, that the Borrower may only elect to extend the Maturity Date by a maximum of one (1) Extension Months (or until the nine (9) month anniversary of the date of this Note.  The interest rate and other terms of this Note shall remain the same during any Extension Month.

7.      **Forbearance**.  The Collateral Agent shall not by any act or omission to act be deemed to waive any of its rights or remedies hereunder unless such waiver is in writing and signed by the Collateral Agent on behalf of the Lenders and then only to the extent specifically set forth therein.  A waiver on one occasion shall not be construed as continuing or as a bar to or waiver of such right or remedy on any other occasion.  All remedies conferred upon the Collateral Agent on behalf of the Lenders by this Note or any other instrument or agreement connected herewith or related hereto shall be cumulative and none is exclusive, and such remedies may be exercised concurrently or consecutively at the Collateral Agent's option.

8.      **Modification and Waiver**.  The Borrower waives valuation and appraisement, presentment and demand for payment, notice of intent to accelerate maturity, notice of acceleration of maturity, protest or notice of protest and nonpayment, bringing of suit and diligence in taking any action to collect any sums owing hereunder or in proceeding against any of the rights and properties securing payment hereof, and trial by jury in any litigation arising out of, relating to, or connected with this Note or any instrument given as security hereof.

9.      **Voluntary and Involuntary Prepayments**.

(a)      A prepayment shall be payable in connection with any prepayment made under this Note as provided below:

(i)      The Borrower may voluntarily prepay all of the unpaid principal balance of this Note on a Business Day designated as the date for such prepayment in a Notice from the Borrower to the Collateral Agent given at least 10 days prior to the date of such prepayment.  Such prepayment shall be made by paying (A) the amount of principal being prepaid, (B) all accrued interest, and (C) all other sums due the Lenders at the time of such prepayment.  For purposes of this Note, a "Business Day" means any day other than a Saturday, Sunday or any other day on which banks in the State of Texas are not open for business.

(ii)      Upon the Collateral Agent's exercise of any right of acceleration under this Note, the Borrower shall pay to the Lenders in accordance with Section 1 above, in addition to the entire unpaid principal balance of this Note outstanding at the time of the

DocuSign Envelope ID: 39579DD8-0D22-442C-B4B5-07DC7A8B9D43

acceleration, (A) all accrued interest and (B) all other sums due the Lenders to the extent such sums do not exceed the maximum rate permitted by applicable law.

(b)  The Borrower recognizes that any prepayment of the unpaid principal balance of this Note, whether voluntary or involuntary or resulting from a default by the Borrower, will result in the Lenders' incurring loss, including reinvestment loss, additional expense and frustration or impairment of the Lenders' ability to meet their respective commitments to third parties.  The Borrower agrees that it is extremely difficult and impractical to ascertain the extent of such damages.

10.  **Default Rate**.  So long as (a) payment under this Note remains past due for thirty (30) days or more (including upon the Maturity Date) or (b) any other Event of Default has occurred and is continuing, interest under this Note shall accrue on the unpaid principal balance from the earlier of the due date of such payment or the occurrence of such other Event of Default, as applicable, at a rate (the "Default Rate") equal to the lesser of seven (7) percentage points above the rate stated in the first paragraph of this Note or the maximum interest rate which may be collected from the Borrower under applicable law.

11.  **Loan Charges/Maximum Rate Permitted By Law**.  This Note shall not be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law.  If any applicable law limiting the amount of interest or other charges permitted to be collected from the Borrower in connection with the Loan is interpreted so that any interest violates that law, and the Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation.  The amounts, if any, previously paid to the Lenders in excess of the permitted amounts shall be applied by the Lenders to reduce the unpaid principal balance of this Note.  For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from the Borrower has been violated, all indebtedness that constitutes interest, as well as all other charges made in connection with the indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of this Note.

12.  **Waiver of Jury Trial**.  THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF, OR IN ANY WAY PERTAINING TO, THIS NOTE OR ANY MORTGAGE/DEED OF TRUST ARISING FROM THIS NOTE.  THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS.  THIS WAIVER IS KNOWINGLY, WILLINGLY AND

VOLUNTARILY MADE BY THE BORROWER AND THE COLLATERAL AGENT ON BEHALF OF THE LENDERS, AND THE BORROWER AND THE COLLATERAL AGENT ON BEHALF OF THE LENDERS EACH HEREBY REPRESENTS TO THE OTHER THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.

13. **Notices**. Any Notice or other communication required, permitted or desirable under the terms of this Note shall be sufficiently given if sent to each party as follows:

The Collateral Agent on behalf of the Lenders:

**HARD MONEY COMPANY, LLC**
5068 WEST PLANO PKWY. #300
PLANO, TX 75093
Fax: 239-244-8666
Email: shaun.d.cohen@gmail.com

The Borrower:  **EQUITYBUILD, INC.**
1083 N. COLLIER BLVD. #132
MARCO ISLAND, TX 34145
Fax: 202-204-8423
Email: jerry@equitybuild.com

Any notice, demand, consent, approval, request or other communication or document to be given hereunder to a party hereto shall be (a) in writing, and (b) deemed to have been given (i) on the 3rd business day after being sent as certified or registered mail in the United States mails, postage prepaid, return receipt requested, or (ii) on the next business day after being deposited (with instructions to deliver it on that business day) with a reputable overnight courier service, or (iii) (if the party's receipt thereof is acknowledged in writing) on being sent by telefax or another means of immediate electronic communication, in each case to the party's address set forth above or any other address in the United States of America which it designates from time-to-time by notice to each other party hereto, or (iv) (if the party's receipt thereof is acknowledged in writing) on being given by hand or other actual delivery to the party.

14. **Entire Agreement**. The terms and conditions of this Note together with the terms and conditions of the Deed which is incorporated herein by reference as if set forth fully herein contain the entire understanding between the Borrower and the Collateral Agent on behalf of the Lenders with respect the indebtedness evidenced hereby. Such understanding may not be

DocuSign Envelope ID: 39570908-0D22-442C-B4B5-07DC7A8B9D43

modified, amended or terminated except in a written document duly executed by the Borrower and the Collateral Agent on behalf of the Lenders.

15.     **Binding Obligation**.  This Note shall be binding upon the heirs, successors and assigns of the Borrower and the Collateral Agent.

16.     **Governing Law**.  This Note is delivered and made in, and shall be construed pursuant to the laws of the State of Texas. Unless applicable law provides otherwise, the parties hereto consent to the jurisdiction and venue of any court of competent jurisdiction located in Collin County, Texas.

17.     **Construction**.   As used herein, Person means a natural person, trustee, corporation, partnership, limited liability company or other legal entity, and all references made (a) in the neuter, masculine or feminine gender shall be deemed made in all genders, (b) in the singular or plural number shall also be deemed made in the plural or singular number, and (c) to any Section, subsection, paragraph or subparagraph shall, unless therein expressly indicated to the contrary, be deemed made to that part of this Note.  The headings of those parts are provided only for convenience of reference, and shall not be considered in construing their contents.  Each document referred to herein as being attached hereto as an exhibit or otherwise designated herein as an exhibit hereto shall be a part hereof.

18.     **Assignment**.  The Borrower agrees not to assign any of the Borrower's rights, remedies or obligations described in this Note without the prior written consent of the Collateral Agent, which consent may be withheld by the Collateral Agent in its sole discretion.   The Borrower agrees that the Collateral Agent is entitled to assign some or all of its rights and remedies described in this Note without notice to or the prior consent of the Borrower.

19.     **Commercial Purpose**.  It is expressly stipulated, warranted and agreed that the loan evidenced by this Note and any related loan document is a "commercial loan" under applicable State or Federal law, and all proceeds shall be used for business, commercial or investment purposes and expressly not for personal, family or household purposes.

20.     **Arbitration**.  If arbitration has been agreed to, the Borrower(s) and the Collateral Agent on behalf of the Lenders have entered into a separate Arbitration Agreement on this date, the terms of which are incorporated herein and made a part hereof by reference.

21.     **Consent To Relief From Automatic Stay**.  The Borrower hereby agrees that if any of them shall (a) file with any bankruptcy court of competent jurisdiction or be the subject of any petition under Title 11 of the U.S. Code, as amended; (b) be the subject of any order for relief issued under such Title 11 of the U.S. Code, as amended; (c) file or be the subject of any petition

DocuSign Envelope ID: 3957990B-0D22-442C-B4B5-07DC7A898D43

seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors; (d) seek, consent to or acquiesce in the appointment of any trustee, receiver, conservator or liquidator; or (e) be the subject of any order, judgment or decree entered by any court of competent jurisdiction approving a petition filed against the Borrower for any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or relief for debtors, the Collateral Agent on behalf of the Lenders shall thereupon be entitled to relief from any automatic stay imposed by Section 362 of Title 11 of the U.S. Code, as amended, or from any other stay or suspension of remedies imposed in any other manner with respect to the exercise of the rights and remedies otherwise available to the Collateral Agent on behalf of the Lenders under this Note or any related loan document.

*[Remainder of page intentionally left blank; next page is signature page.]*

DATED: _____

EQUITYBUILD, INC. d/b/a EB Equitybuild Capital, Inc.

By: _____
    Name:
    Title:

STATE OF _____, COUNTY OF _____:    ss:

On this _____ day of _____ , 20 ____, before me, a notary public, personally appeared _____. To me known (or proved to me on the basis of satisfactory evidence) to be the person(s) who executed the foregoing instrument and acknowledged the same for the purpose therein contained and in my presence signed and sealed the same.

_____
NOTARY PUBLIC

My Comm. Expires:_____

COLLATERAL AGENT:

Agreed and accepted on _____ __, 2014:

HARD MONEY COMPANY, LLC d/b/a Venture Hard Money Capital, LLC, as collateral Agent on behalf of the Lenders

By: _____
    Name:
    Title:

[Signature Page to Commercial Flat Rate Non-Recourse Promissory Note]

# EXHIBIT B

<table>
<tr><td><u>LENDER</u><br>The persons listed on<br><u>Exhibit A</u> to the Note<br>C/O EQUITYBUILD FINANCE, LLC<br>5068 WEST PLANO PKWY #300<br>PLANO, TX 75093</td><td><u>BORROWER</u><br>EQUITYBUILD, INC.<br>1083 N COLLIER BLVD. #132<br>MARCO ISLAND, FL 34145</td></tr>
</table>

**COMMERCIAL FLAT RATE PROMISSORY NOTE**
**With Balloon Payment**
**Illinois**

| Interest Rate | Principal | Funding Date | Maturity Date | Loan Number |
|---|---|---|---|---|
| 15%<br>For 24 Months | $740,000 | 02/23/2015 | 03/01/2017 | N/A |

THIS LOAN IS PAYABLE IN FULL ON OR BEFORE THE "MATURITY DATE" LISTED HEREIN. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND ANY UNPAID INTEREST, AND FEES AND COSTS, THEN DUE TO THE LENDER. **LENDER IS UNDER NO OBLIGATION TO REFINANCE, EXTEND OR MODIFY THE LOAN AT THAT TIME.** YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER (WHICH MAY OR MAY NOT BE THE LENDER YOU HAVE THIS LOAN WITH), WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER. FOR VALUE RECEIVED, the undersigned Borrower(s), Maker(s) and/or Guarantor(s) (hereinafter the "Borrower") promises to pay **The persons listed on <u>Exhibit A</u> to this Note C/O EquityBuild Finance, LLC** (hereinafter collectively referred to as the "Holder" or "Lender"), at **5068 West Plano Pkwy. #300 Plano, TX 75093**, the principal sum of **SEVEN HUNDRED FORTY THOUSAND and 00/100 DOLLARS ($740,000.00)**, together with interest from the above date at the interest rate of **FIFTEEN PERCENT (15.0%)** per annum on the unpaid principal balance until paid. The principal of this Note, plus accrued interest at the rate aforesaid, shall be due and payable in **TWENTY-FIVE (25)** installments as follows:

  a)  ONE (1) interest payment in the amount of **TWO THOUSAND FOUR HUNDRED SIXTY-SIX and 67/100 DOLLARS ($2,466.67)**, beginning on or before **FEBRUARY 18, 2015**; and

  b)  TWENTY-THREE (23) equal and consecutive interest only payments in the amount of **NINE THOUSAND TWO HUNDRED FIFTY and 00/100 DOLLARS ($9,250.00)**, beginning on or before  **APRIL 01, 2015** and continuing each and every month thereafter; and

  c)  One (1) final balloon payment on or before **MARCH 01, 2017**, at which time the entire principal balance, together with accrued but unpaid interest thereon, and any costs and expenses, shall be due and payable.

Anything in this Note contrary notwithstanding, the entire unpaid balance of the principal sum and all unpaid interest accrued thereon shall, unless sooner paid, be and become due and payable on **MARCH 01, 2017** ("Maturity Date").

  1.     **Application of Payments**. All payments on this Note shall be made in lawful money of the United States of America and shall be applied first to any late charges due hereunder, second to the payment of accrued but

Borrower's Initials: 

unpaid interest and the remainder to the reduction of principal. The Borrower shall make all payments when due, without set-offs of any nature.

2.    **Late Charge/Dishonored Check.** There shall be a grace period of five (5) days for any payment due under this Note. The Borrower shall pay a late charge of 5% of the monthly payment amount, or $50.00, whichever is greater, if such payment is received by Lender after the grace period. If the Maturity Date of the Note has expired the late fee will be at the rate of 1.5% per month plus the face amount of the Note.

In the event any check given by Borrower to Lender as a payment on this Note is dishonored, or in the event there are insufficient funds in Borrower's designated account to cover any preauthorized monthly debit from Borrower's checking account, then, without limiting any other charges or remedies, Borrower shall pay to Lender a processing fee of $50.00 (but not more than the maximum amount allowed by law) for each such event.

3.    **Security**. To secure the payment and performance of obligations incurred under this Note, this Note shall be secured by and subject to the terms of a Mortgage of even date herewith from the Borrower which encumbers real property and improvements located at

**2736 W 64th St., Chicago, IL 60629**, and the maturity hereof is subject to acceleration as therein set forth. Both this Note and the Mortgage are given in consideration of a loan of even date herewith in the amount of the principal sum by the Lender to the Borrower.

In addition to the property described above, Borrower grants Lender a security interest in all of Borrower's right, title and interest in all monies and instruments of Borrower that are now or in the future in Lender's custody or control.

4.    **Events of Default**. An Event of Default will occur under this Note in the event that Borrower any guarantor or any other third party pledging collateral to secure this Note:

a.    Fails to make any payment of principal and/or interest or any other sum due hereunder when the same is due pursuant to the terms of this Note;

b.    If Borrower, guarantor or such third party:

  i.    Applies for or consents to the appointment of a receiver, trustee or liquidator of Borrower, guarantor or such third party or of all or a substantial part of its assets;

  ii.    Files a voluntary petition in bankruptcy, whether by the Federal Bankruptcy Act or any similar State stature, or admits in writing its inability to pay its debts as they come due;

  iii.    Makes an assignment for the benefit of creditors;

  iv.    Files a petition or an answer seeking a reorganization or an arrangement with creditors or seeking to take advantage of any insolvency law;

  v.    Performs any other act of bankruptcy; or

  vi.    Files an answer admitting the material allegations of a petition filed against Borrower, guarantor or such third party in any bankruptcy, reorganization or insolvency proceeding; or

c.    Permits the entry of any order, judgment or decree by any court of competent jurisdiction adjudicating Borrower, guarantor or such third party a bankrupt or an insolvent, or approving a receiver, trustee or liquidator of Borrower, guarantor or such third party or of all or a substantial part of its assets; or

d.    There otherwise commences with respect to Borrower, guarantor or such third party or any of its assets any proceeding under any bankruptcy, reorganization, arrangement, insolvency, readjustment, receivership or like law or statute, and if the order, judgment, decree or proceeding continues unstayed for any period of 60 consecutive days, or continues in effect for more than 10 days after any stay thereof.

e.    Fails to perform or violates any obligations or covenants under the terms of this Note or any Mortgages or any additional loan documents or any other present or future written agreements regarding this Note or any other indebtedness or obligations between Borrower, guarantor or such third party and Lender;

f.    Defaults under the terms of any note, mortgage, security instrument, or any other loan documents or written agreements for any other loans secured by the property representing the collateral for this Note;

g.     Permits the entry of any judgment or lien, or the issuance of any execution, levy, attachment or garnishment proceedings against Borrower, guarantor or such third party;

h.     Sells or otherwise conveys any property which constitutes security or collateral for the payment of this Note without the prior written consent of the Lender and/or the destruction, loss or damage to such collateral in any material respect and/or the seizure, condemnation or confiscation of the collateral;

i.     Provides or causes to be provided any false or misleading signature or representation to be provided to Lender;

j.     Has a garnishment, judgment, tax levy, attachment or lien entered or served against Borrower, any guarantor, or any third party pledging collateral to secure this Note or any of their property;

k.     Dies, becomes legally incompetent, is dissolved or terminated, or ceases to operate its business;

l.     Fails to provide Lender evidence of satisfactory financial condition;

m.     Has a majority of its outstanding voting securities sold, transferred or conveyed to any person or entity other than any person or entity that has the majority ownership as of the date of the execution of this Note;

n.     Causes Lender to deem itself insecure due to a significant decline in the value of any real or personal property securing payment of this Note, or Lender, in good faith believes the prospect of payment or performance is impaired;

o.     Fails to keep an insurance policy in place on the subject property being used as collateral for this loan with Lender as the mortgagee and/or as the loss payee including its successor and/or assigns;

p.     Fails to keep property taxes current on property used as security for this Note.

5.    **Rights of Lender On Event of Default**. In the Event of Default as set forth herein, or in the event of the breach of any covenant or obligation contained in the herein referred to Mortgage or Loan Documents on the part of the undersigned to be kept, observed or performed, the Lender, at its sole and absolute discretion, may exercise one or more of the following remedies without notice or demand (except as required by law):

a.     Declare the entire unpaid balance of principal of this Note, along with accrued and unpaid interest thereon and all other charges, costs and expenses, provided for herein and in the Mortgage immediately due and payable. Such acceleration shall be automatic and immediate in the Event of Default is a filing under the Bankruptcy Code;

b.     Collect the outstanding obligations of Borrower with or without judicial process;

c.     Cease making advances under this Note or any other agreement between Borrower and Lender;

d.     Take possession of any collateral in any manner permitted by law;

e.     require Borrower to deliver and make available to Lender any collateral at a place reasonably convenient to Borrower and Lender;

f.     Sell, lease or otherwise dispose of any collateral and collect any deficiency balance with or without resorting to legal process;

g.     Assume any and all mortgages/deeds of trust in existence at the time of default on all collateral securing loans made to Borrower;

h.     Set-off Borrower's obligations against any amounts due to Borrower including, but not limited to, monies and instruments, maintained with Lender; and

i.     Exercise all other rights available to Lender under any other written agreement or applicable law.

At any time an Event of Default shall have occurred and be continuing and/or after maturity of the Loan, including maturity upon acceleration, the unpaid principal balance, all accrued and unpaid interest and all other amounts payable under the Note shall bear interest at the "Default Rate" set forth in this Note. The unpaid principal balance shall continue to bear interest after the Maturity Date at the Default Rate set forth in this Note until and including the date on which it is paid in full. Any regularly scheduled monthly installment of interest that is received by Lender before the date it is due shall be deemed to have been received on the due date solely for the purpose of calculating interest due. Any accrued interest remaining past due for 30 days or more shall be added to and become part of the unpaid principal balance and shall bear interest at the rate or rates specified in this Note, and any reference herein to "accrued interest" shall refer to accrued interest which has not become part of the unpaid principal balance. Interest under this Note shall

Borrower's Initials: 

be computed on the basis of a 360-day year consisting of twelve 30-day months. Borrower shall make all payments of principal and interest under this Note without relief from valuation and appraisement laws.

Lender's remedies in this Section are in addition to any available at common law and nothing in this Section shall impair any right which the Holder has under this Note, or at law or in equity, to accelerate the debt on the occurrence of any other Event of Default, whether or not relating to this Note. Lender's rights or remedies as provided in this Note shall be cumulative and concurrent and may be pursued singly, successively, or together against Borrower or any guarantor or third party (without first having to proceed against Borrower), at Lender's sole and absolute discretion. Borrower shall pay to Lender on Lender's demand the amount of all expenses incurred by Lender (a) in enforcing it's rights under this Note, or (b) as the result of a default by Borrower under this Note, including but not limited to the cost of collecting any amount owed hereunder, and any reasonable attorney's fees. The failure by Lender to exercise any of its options contained herein shall not constitute a waiver of the right to exercise such option in the event of any subsequent default.

6.    **Costs and Expenses.** To the extent permitted by law, Borrower agrees to pay any and all reasonable fees and costs, including, but not limited to, fees and costs of attorneys and other agents (including without limitation paralegals, clerks and consultants), whether or not such attorney or agent is an employee of Lender, which are incurred by Lender in collecting any amount due or enforcing any right or remedy under this Note, whether or not suit is brought, including, but not limited to, all fees and costs incurred on appeal, in bankruptcy, and for post-judgment collection actions. Said collection fees shall be in the minimum amount of Fifteen Percent (15%) of the amount of the judgment as collected (or, if collected without judgment, a minimum fee of Fifteen Percent (15%) of the amount collected), which attorney's fee shall not be diminished by any other fees, costs or damages, but in no event shall the attorney's fees be less than $3,000.00.

7.    **Extensions.** The Borrower shall remain liable for the payment of this Note, including interest, notwithstanding any extension or extensions of time of payment or any indulgence of any kind or nature that the Lender may grant or permit any subsequent owner of the encumbered property, whether with or without notice to the Borrower and the Borrower hereby expressly waives such notice.

8.    **Confessed Judgment.** UPON ANY DEFAULT BY THE BORROWER AS SET FORTH IN THIS NOTE, AND TO THE EXTENT PERMITTED BY LAW, THE BORROWER HEREBY AUTHORIZES ANY ATTORNEY AT LAW TO APPEAR FOR THE BORROWER IN ANY COURT OF COMPETENT JURISDICTION AND WAIVE THE ISSUANCE AND SERVICE OF PROCESS AND CONFESS A JUDGMENT AGAINST THE BORROWER IN FAVOR OF THE LENDER FOR SUCH AMOUNTS AS MAY THEN APPEAR TO BE UNPAID HEREON TOGETHER WITH COSTS, EXPENSES AND ATTORNEY'S FEES IN THE MINIMUM AMOUNT OF FIFTEEN PERCENT (15%) OF THE AMOUNT DUE FOR COLLECTION (BUT IN NO EVENT SHALL SUCH FEES BE LESS THAN $3000.00), AND TO RELEASE ALL PROCEDURAL ERRORS AND WAIVE ALL RIGHTS OF APPEAL. IF THE CONFESSION OF JUDGMENT ABOVE PROVIDED FOR IS AUTHORIZED OR RECOGNIZED BY THE LAW OF THE JURISDICTION CONTROLLING BUT SUCH LAW REQUIRES SPECIAL FORMALITIES AND PROCEDURE, THEN THE SAID ATTORNEY IS EMPOWERED TO EXECUTE THE NECESSARY FORM AND COMPLY WITH SUCH SPECIAL PROCEDURES. THIS POWER OF CONFESSION OF JUDGMENT SHALL NOT BE EXHAUSTED BY ANY ONE OR MORE EXERCISES, AND THE POWER SHALL CONTINUE UNDIMINISHED AND MAY BE EXERCIED FROM TIME TO TIME AS OFTEN AS LENDER SHALL ELECT UNTIL ALL AMOUNTS PAYABLE TO LENDER UNDER THIS NOTE SHALL HAVE BEEN PAID IN FULL.

9.    **Forbearance.** The Lender shall not by any act or omission to act be deemed to waive any of its rights or remedies hereunder unless such waiver is in writing and signed by the Lender and then only to the extent specifically set forth therein. A waiver on one occasion shall not be construed as continuing or as a bar to or waiver of such right or remedy on any other occasion. All remedies conferred upon the Lender by this Note or any other instrument or agreement connected herewith or related hereto shall be cumulative and none is exclusive, and such remedies may be exercised concurrently or consecutively at the Lender's option.

10.    **Modification and Waiver.** Borrower and/or every person at any time liable for the payment of the debt evidenced hereby, waives the exercise of all exemption rights which it holds at law or in equity concerning to the debt evidenced by this Note whether under state constitution, homestead laws or otherwise. Borrower and any endorsers or guarantors hereof severally waive valuation and appraisement, presentment and demand for payment, notice of intent

Borrower's Initials: 

to accelerate maturity, notice of acceleration of maturity, protest or notice of protest and nonpayment, bringing of suit and diligence in taking any action to collect any sums owing hereunder or in proceeding against any of the rights and properties securing payment hereof, and trial by jury in any litigation arising out of, relating to, or connected with this Note or any instrument given as security hereof.

From time to time, without affecting Borrower's obligation to pay any sums due under this Note and perform Borrower's covenants herein, without affecting the obligations of any endorser hereto or guarantor hereof, without giving notice to or obtaining the consent of Borrower or any endorser hereto or guarantor hereof, and without liability on the part of the Holder, Holder may, acting it its sole and absolute discretion, extend the Maturity Date or any other time for payment of interest hereon and/or principal hereof, reduce the payments hereunder, release anyone liable under this Note accept a renewal of this Note, modify the terms and time of payment of this Note, join in any extension or subordination or exercise any option or election hereunder, modify the rate of interest or period of amortization or principal due date of this Note, or exercise any option or election hereunder. No one or more such actions shall constitute a novation.

11.   **Voluntary and Involuntary Prepayments.**

(a)     A prepayment premium shall be payable in connection with any prepayment made under this Note as provided below:

(i)     Borrower may voluntarily prepay all of the unpaid principal balance of this Note on a Business Day designated as the date for such prepayment in a Notice from Borrower to Lender given at least 30 days prior to the date of such prepayment. Such prepayment shall be made by paying (A) the amount of principal being prepaid, (B) all accrued interest, (C) all other sums due Lender at the time of such prepayment, and (D) the prepayment premium calculated pursuant to Section 11(f) of this Note. For purposes of this Note, a **"Business Day"** means any day other than a Saturday, Sunday or any other day on which Lender is not open for business. For all purposes including the accrual of interest, but excluding the determination of the prepayment date under Section 11(f) of this Note, any prepayment received by Lender on any day other than the last calendar day of the month shall be deemed to have been received on the last calendar day of such month.

(ii)     Borrower may voluntarily prepay less than all of the unpaid principal balance of this Note (a **"Partial Prepayment"**) at any time. Upon delivery of the Partial Prepayment, a prepayment premium calculated pursuant to Section 11(f) of this Note, based on the amount being prepaid, shall be due and payable to Lender upon demand.

(iii)     Upon Lender's exercise of any right of acceleration under this Note, Borrower shall pay to Lender, in addition to the entire unpaid principal balance of this Note outstanding at the time of the acceleration, (A) all accrued interest, (B) and all other sums due Lender, and (C) the prepayment premium calculated pursuant to Section 11(f) of this Note, to the extent such prepayment premium does not exceed the maximum rate permitted by applicable law.

(iv)     Any application by Lender of any proceeds of collateral or other security to the repayment of any portion of the unpaid principal balance of this Note prior to the Maturity Date and in the absence of acceleration shall be deemed to be a partial prepayment by Borrower, requiring the payment to Lender by Borrower of a prepayment premium. The amount of any such partial prepayment shall be computed so as to provide to Lender a prepayment premium computed pursuant to Section 11(f) of this Note without Borrower having to pay out-of-pocket any additional amounts.

(b)     Notwithstanding the provisions of Section 11(a), no prepayment premium shall be payable with respect to (A) any prepayment made after the expiration of the Prepayment Premium Period (as defined in Section 11(f) of this Note), or (B) any prepayment occurring as a result of the application of any insurance proceeds or condemnation award under the Security Instrument.

(c)     Any permitted or required prepayment of less than the unpaid principal balance of this Note shall not extend or postpone the due date of any subsequent monthly installments or change the amount of such installments, unless Lender agrees otherwise in writing.

(d)     Borrower recognizes that any prepayment of the unpaid principal balance of this Note, whether voluntary or involuntary or resulting from a default by Borrower, will result in Lender's incurring loss, including reinvestment loss, additional expense and frustration or impairment of Lender's ability to meet its commitments to third parties. Borrower agrees to pay to Lender upon demand damages for the detriment caused by any prepayment, and agrees that it is extremely difficult and impractical to ascertain the extent of such damages. Borrower therefore acknowledges and agrees that the formula for calculating prepayment premiums set forth in Section 11(f) represents a reasonable estimate of the damages Lender will incur because of a prepayment.

IL: Commercial Flat Rate Promissory Note

Borrower's Initials: 

(e)     Borrower further acknowledges that the prepayment premium provisions of this Note are a material part of the consideration for the Loan, and acknowledges that the terms of this Note are in other respects more favorable to Borrower as a result of the Borrower's voluntary agreement to the prepayment premium provisions.

(f)     Any prepayment premium payable under this Section 11 shall be computed as follows:

(i)     If the prepayment is made between the date of the initial funding of the loan evidenced by this Note and the last day of **February 10, 2015**, the prepayment premium shall be the interest at the Note rate herein that would be earned on full loan amount for the balance of the Prepayment Premium Period.

(ii)     If the prepayment is made after the expiration of the Prepayment Premium Period, there shall be no prepayment premium due.

12.     **Default Rate.** So long as (a) any monthly installment under this Note remains past due for thirty (30) days or more or (b) any other Event of Default has occurred and is continuing, interest under this Note shall accrue on the unpaid principal balance from the earlier of the due date of the first unpaid monthly installment or the occurrence of such other Event of Default, as applicable, at a rate (the "**Default Rate**") equal to the lesser of **seven (7)** percentage points above the rate stated in the first paragraph of this Note or the maximum interest rate which may be collected from Borrower under applicable law. If the unpaid principal balance and all accrued interest are not paid in full on the Maturity Date, the unpaid principal balance and all accrued interest shall bear interest from the Maturity Date at the Default Rate. Borrower acknowledges that (a) its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Loan, (b) during the time that any monthly installment under this Note is delinquent for thirty (30) days or more, Lender will incur additional costs and expenses arising from its loss of the use of the money due and from the adverse impact on Lender's ability to meet its other obligations and to take advantage of other investment opportunities; and (c) it is extremely difficult and impractical to determine those additional costs and expenses. Borrower also acknowledges that, during the time that any monthly installment under this Note is delinquent for thirty (30) days or more or any other Event of Default has occurred and is continuing, Lender's risk of nonpayment of this Note will be materially increased and Lender is entitled to be compensated for such increased risk. Borrower agrees that the increase in the rate of interest payable under this Note to the Default Rate represents a fair and reasonable estimate, taking into account all circumstances existing on the date of this Note, of the additional costs and expenses Lender will incur by reason of the Borrower's delinquent payment and the additional compensation Lender is entitled to receive for the increased risks of nonpayment associated with a delinquent loan. During any period that the Default Rate is in effect the additional interest accruing over and above the rate stated in the first paragraph of this Note shall be immediately due and payable in addition to the regularly scheduled principal and interest payments. Lender shall impose the Default Rate without any notice requirement to Borrower, guarantor or any third party pledging collateral as security for this Note.

13.     **Loan Charges/Maximum Rate Permitted By Law.** Neither this Note nor any of the other Loan Documents shall be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law. If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any other Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of this Note. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note. If Lender reasonably determines that the interest rate (together with all other charges or payments that may be deemed interest) stipulated under this Note is or may be usurious or otherwise limited by law, the unpaid balance of this Note, with accrued interest at the highest rate permitted to be charged by stipulation in writing between Lender and Borrower, at the option of Lender, shall immediately become due and payable.

14.     **Waiver of Jury Trial.** THE BORROWER WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF, OR IN ANY WAY PERTAINING TO, THIS NOTE OR ANY DEED OF TRUST/MORTGAGE ARISING FROM THIS NOTE. THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY

Borrower's Initials: 

OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY THE BORROWER, AND THE BORROWER HEREBY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.

15. **Notices**. Any Notice or other communication required, permitted or desirable under the terms of this Note shall be sufficiently given if sent to each party as follows:

Lender: The persons listed on <u>Exhibit A</u> to this Note
C/O EquityBuild Finance, LLC
5068 West Plano Pkwy, #300
Plano, Texas 75093
Fax: 239-244-8666
Email: shaun.d.cohen@gmail.com

Borrower: EquityBuild, Inc.
1083 N Collier Blvd. #132
Marco Island, FL 34145
Fax: 202-204-8423
Email: jerry@equitybuild.com

Any notice, demand, consent, approval, request or other communication or document to be given hereunder to a party hereto shall be (a) in writing, and (d) deemed to have been given (i) on the 3rd business day after being sent as certified or registered mail in the United States mails, postage prepaid, return receipt requested, or (ii) on the next business day after being deposited (with instructions to deliver it on that business day) with a reputable overnight courier service, or (iii) (if the party's receipt thereof is acknowledged in writing) on being sent by telefax or another means of immediate electronic communication, in each case to the party's address set forth above or any other address in the United States of America which it designates from time-to-time by notice to each other party hereto, or (iv) (if the party's receipt thereof is acknowledged in writing) on being given by hand or other actual delivery to the party.

16. **Entire Agreement/Severability.** The terms and conditions of this Note together with the terms and conditions of the Mortgages which are incorporated herein by reference as if set forth fully herein contain the entire understanding between the Borrower and Lender with respect the indebtedness evidenced hereby. Such understanding may not be modified, amended or terminated except in a written document duly executed by Borrower and Lender. In the event that any one or more of the provisions set forth in this Note or any accompanying Arbitration Agreement is determined by law to be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired hereby, and each provision in this Note shall be construed liberally in favor of Lender to the fullest extent of the law.

17. **Joint and Several Liability/Credit Reporting**. The liability of the undersigned, as well as any endorsers and/or guarantor(s), shall be both joint and several. This Note shall be binding upon the heirs, successors and assigns of Borrower and Lender. Information concerning this Note may be reported to credit reporting agencies and will be made available when requested by proper legal process.

18. **Governing Law.** This Note is delivered and made in, and shall be construed pursuant to the laws of the State of Illinois Unless applicable law provides otherwise, Borrower consents to the jurisdiction and venue of any court of competent jurisdiction located in **Cook County**, Illinois.

19. **Construction**. As used herein, Person means a natural person, trustee, corporation, partnership, limited liability company or other legal entity, and all references made (a) in the neuter, masculine or feminine gender shall be deemed made in all genders, (b) in the singular or plural number shall also be deemed made in the plural or singular number, and (c) to any Section, subsection, paragraph or subparagraph shall, unless therein expressly indicated to the contrary, be deemed made to that part of the Note. The headings of those parts are provided only for convenience of reference, and shall not be considered in construing their contents. Each document referred to herein

IL: Commercial Flat Rate Promissory Note

7

Borrower's Initials:

as being attached hereto as an exhibit or otherwise designated herein as an exhibit hereto shall be a part hereof.

20.     **Time of Essence**. Time shall be of the essence of this Note, but (other than as to payment of principal and/or interest) if the last day for a Person to exercise a right or perform a duty hereunder is a Saturday, Sunday or statutory holiday, it shall have until the next day other than such a day to do so.

21.     **Assignment**. Borrower agrees not to assign any of Borrower's rights, remedies or obligations described in this Note without the prior written consent of Lender, which consent may be withheld by Lender in its sole discretion. Borrower agrees that Lender is entitled to assign some or all of its rights and remedies described in this Note without notice to or the prior consent of Borrower.

22.     **Commercial Purpose.** It is expressly stipulated, warranted and agreed that the loan evidenced by this Note and any Loan Documents is a "commercial loan" under applicable State or Federal law, and all proceeds shall be used for business, commercial or investment purposes and expressly not for personal, family or household purposes.

23.     **Extension**. Intentionally omitted.

24.     **Arbitration**. If arbitration has been agreed to, Borrower(s) and Lender have entered into a separate Arbitration Agreement on this date, the terms of which are incorporated herein and made a part hereof by reference.

25.     **Contingency Funds**. Intentionally omitted.

26.     **Demand Feature**. Intentionally omitted.

27.     **Consent To Relief From Automatic Stay**. Borrower hereby agrees that if any of them shall (i) file with any bankruptcy court of competent jurisdiction or be the subject of any petition under Title 11 of the U.S. Code, as amended; (ii) be the subject of any order for relief issued under such Title 11 of the U.S. Code, as amended; (iii) file or be the subject of any petition seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors; (iv) seek, consent to or acquiesce in the appointment of any trustee, receiver, conservator or liquidator; (v) be the subject of any order, judgment or decree entered by any court of competent jurisdiction approving a petition filed against Borrower for any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or relief for debtors, Lender shall thereupon be entitled to relief from any automatic stay imposed by Section 362 of Title 11 of the U.S. Code, as amended, or from any other stay or suspension of remedies imposed in any other manner with respect to the exercise of the rights and remedies otherwise available to Lender under the Loan Documents.

28.     **Financial Information**. Borrower will at all times keep proper books of record and account in which full, true and correct entries shall be made in accordance with generally accepted accounting principles and will deliver to Lender, within ninety (90) days after the end of each fiscal year of Borrower, a copy of the annual financial statements of Borrower relating to such fiscal year, such statement to include (i) the balance sheet of Borrower as at the end of such fiscal year (ii) the related income statement, statement of retained earnings and statement of cash flow of Borrower for such fiscal year, prepared by such certified public accountants as may be reasonably satisfactory to Lender. Borrower also agrees to deliver to Lender within fifteen (15) days after filing same, a copy of Borrower's income tax returns and also, from time to time, such other financial information with respect to Borrower as Lender may request.

---

**THE PERSONS SIGNING BELOW ACKNOWLEDGE THAT THEY HAVE BEEN GIVEN AMPLE OPPORTUNITY TO READ THIS AGREEMENT AND SEEK INDEPENDENT LEGAL COUNSEL AND ACKNOWLEDGE THEY HAVE COMPLETELY READ AND UNDERSTAND AND AGREE TO THE TERMS AND CONDITIONS OF THIS NOTE AND THE ACCOMPANYING ARBITRATION AGREEMENT (IF APPLICABLE), AND FURTHER ACKNOWLEDGE RECEIPT OF AN EXACT COPY OF THIS NOTE AND THE ARBITRATION AGREEMENT.**

DATED: 2-23-15

BORROWER(S):

_____ (SEAL)

JERRY COHEN, President

STATE OF ___Florida___, COUNTY OF ___Lee___ :    ss:

On this 23rd day of ___February___, 20 18, before me, a notary public, personally appeared _____ Jerry Cohen _____, to me known (or proved to me on the basis of satisfactory evidence) to be the person(s) who executed the foregoing instrument and acknowledged the same for the purpose therein contained and in my presence signed and sealed the same.

___Jessica Ann Baier___
NOTARY PUBLIC

My Comm. Expires: July 26, 2017

NOTARY PUBLIC
STATE OF FLORIDA
(407) 398-0153

JESSICA ANN BAIER
MY COMMISSION #FF019714
EXPIRES July 26, 2017
FloridaNotaryService.com

IL: Commercial Flat Rate Promissory Note                     Borrower's Initials: _____

| Lender Name | Principal Amount | Percentage of Loan |
|---|---|---|
| Mark Young | $50,000 | 6.76% |
| 1839 Fund I, LLC | $25,000 | 3.38% |
| John Sullivan | $57,000 | 7.70% |
| Sunshine Bliss, LLC | $25,000 | 3.38% |
| Paul S. Applefield, DDS, 401K Plan Paul S. Applefield, Trustee | $30,000 | 4.05% |
| Applefield Family Trust Dated July 25, 1997 Paul S. Applefield and Robin Kahn Applefield, Trustees | $20,000 | 2.70% |
| Daniel J. Martineau | $50,000 | 6.76% |
| Debbie Elizabeth Lasley | $50,000 | 6.76% |
| Arbor Ventures Overseas Limited LLC | $10,000 | 1.35% |
| Equity Trust Company Custodian FBO Albert Ruffin IRA | $50,000 | 6.76% |
| The Anchor Group LLC | $30,000 | 4.05% |
| Arthur L and Dinah F Bertrand | $100,000 | 13.51% |
| Hongjun Li and Sheyu Zhou | $93,000 | 12.57% |
| iPlan Group Agent for Custodian FBO Leah Kalish IRA | $70,000 | 9.46% |
| Robert Guiney | $50,000 | 6.76% |
| Edge Investments, LLC | $30,000 | 4.05% |

# EXHIBIT C



---------- Original Message ----------
From: John Allred <jallred@equitybuild.com>
To: DEBBIE LASLEY ██████████████
Date: May 29, 2018 at 1:12 PM
Subject: Re: Re: Important Liberty Refinance Update

2736 W. 64th was part of a (17) property tranche refi that we originally tried to close in March. We failed to secure a full refi due to a deficient occupancy level required by the commercial lender (90%). Rather than just slapping yet other extension on all these notes, we thought clients would prefer to receive some pro-rata portion of their original investment much sooner than later and so EB took out a partial bridge loan to provide a 27.87% partial payout of principal. The remaining balance can either stay in a lending structure against the entire tranche (mezzanine fund), or go into an ownership position against the entire tranche (equity fund). Here's a recording Shaun made about this.

http://resources.equitybuild.com/refi-update

**john b. allred**
Chief Client Advocate

EquityBuild Inc. &
EquityBuild Finance, LLC

tel  +1.918.286.7992

jallred@equitybuild.com
http://EquityBuild.com | http://EquityBuildFinance.com





On Tue, May 29, 2018 at 2:53 PM, DEBBIE LASLEY ████████████████ wrote:

Hello John,

I sent the reply below to Shaun and have had no answers yet. I realize we just had a long weekend and hope to hear from one of you soon in regards to the email from Shaun below about the Liberty Properties.

I look forward to hearing from you soon.


Thank you,

Debbie Lasley

---------- Original Message ----------
From: DEBBIE LASLEY <████████████>
To: cohen.shaun@equitybuild.com
Date: May 25, 2018 at 1:08 PM
Subject: Re: Important Liberty Refinance Update

**Hello Shaun,**


**Thank you for this update. This all sounds great, but I am still very confused about the offerings and how they relate to my 64th Street loan. What is the pro-rata share vs the remaining principal balance? What are the Liberty properties? Was my loan included in part of this refinance? If so, do I have the option to get my principal back from the proceeds of the refinance? I have $50,000 invested in 64th St. in Chicago since 2/6/15.**


**I look forward to your reply.**


**Thank you,**

**Debbie Lasley**



On May 24, 2018 at 2:22 PM Shaun Cohen <
cohen.shaun@equitybuild.com> wrote:

Dear, Debbie,

First, I want to thank you for choosing EquityBuild as your investment partner; your patronage is truly valued.

As you are aware, we recently underwent a refinance with Liberty. The expected proceeds were reduced at the closing table due to additional lender holdbacks and unexpected, additional expenses. As a result, our docs team canceled all the sent document set packages and will need to send them again.

This refinance was trying for all of us and before we send out the replacement documents we wanted to offer something new to all of you. As a token of appreciation for your continued patience and trust we are offering a bonus for your funds as outlined below in the bullet points. Below will be a short description of the products referenced in the bullet points. You can also click on the relevant links to see a more detailed description of those products.

- Invest 100% of your original principal balance (inclusive of both the pro-rata share and the remaining balance) in the following:

  - South Side Development Fund 7 (the Liberty properties' equity fund) and receive 3 points on all dollars

- Invest the pro-rata dollars in the Mezzanine loan and receive 2 points on only the pro-rata dollars
- Invest the pro-rata dollars in one of our currently marketed products (The Hybrid Capital Fund and South Side Development 8) then you will receive 1 point on only the pro-rata dollars
- Invest the remaining principal balance in SSDF 7 and the pro-rata share in either the Mezzanine loan or one of our currently marketed funds and receive 3 points on the dollars going into SSDF 7 and the respective point structure based on the last two bullet points on the pro-rata dollars

Now, let's look at the actual products that are referenced in the bullet points:

SSDF 7 (the equity in the Liberty properties) - This is a $16.9mm fund that has an IRR of just under 20% and a 54% return of capital by the 12th month and another 51% return of capital by the 36th month leaving only 5% to be returned in the following year. What is key to remember in an equity fund is that the lion's share of the return comes from the sale of the buildings which is taxed at the long term capital gains rate which means less of the return goes to the government than in investments that are taxed at the ordinary income rate like debt.

Mezzanine - This is a loan against the entity that holds the 17 properties in the Liberty portfolio. The interest rate is whatever you were earning on the property in which you held a position in the Liberty portfolio. Since this is debt it is taxed at the ordinary income rate like any other debt position.

SSDF 8 - This is a preferred equity position with the preferred rate guaranteed at 14%. The term is 6 months.

Hybrid Capital Fund - This is a very different offering that is only for accredited investors unlike the previous three options. The investment unit is comprised of both debt and equity positions on the same properties which provide security on all fronts. The rate on the debt side is 10.375% APR with a return of capital by the 18th month and the preferred

rate on the equity side is also 10.375% with an IRR of 26.93% a return of capital at the 36th month.

Debbie, I want to make sure you walk away with the option that works best for you. Tell me a good time we can discuss the details or take a quick second to set up a time with one of my Relationship Managers below.



I appreciate the opportunity we've had to service your investment needs and look forward to continued opportunities to help you meet your financial goals.

To our partnership and your continued prosperity!

Sincerely,

Shaun Cohen
President
EquityBuild Inc.
info@equitybuild.com
**(877) 978-1869**

The information contained herein was obtained from sources deeded reliable. However, EquityBuild makes no guarantees, warranties or representations as to the completeness or accuracy of this information. This is not an offer to purchase or sell any securities. Any such offer can be made only by transmitting to any prospective investor a Confidential Private Placement Memorandum or other document intended to give a prospective investor all relevant information in order to make an informed decision about an investment. All such information should be considered carefully by any prospective investor before making any investment.





EquityBuild   5068 W. Plano Pkwy. #300   Plano, TX   75093   USA

You received this email because you are subscribed to 'New/Updated Projects' Subscription from EquityBuild .

Update your email preferences to choose the types of emails you receive.

Unsubscribe from all future emails

# EXHIBIT D



On June 4, 2018 at 4:52 PM EquityBuild Updates < updates@equitybuild.com> wrote:



As many of you know and have experienced, we were faced with an existential question around four years ago and opted to protect our clients rather than succumb to the tidal wave coming at us. To give further color to my previous statement as both a reminder to those that have been through the experience with us and for insight to those that were not here then, I will elaborate and tell a bit of the story.

When we began the concept behind this company in 2005 and then the company itself in 2006, we were a sales and marketing company specializing in turn-key investment properties. We did not have the fulfillment or financing sides of the business in-house; instead, we worked with vendors and managed them to a productive end.

Nothing changed in the model other than the type of investment property we were selling until 2010 when the financing part of the business began as a response to the collapse of the market in 2008-2009, which lead to a tightening of the capital markets.

And, again, there was no further change to the model until the middle of 2015 when we made the decision I referenced above in response to a fulfillment vendor having defrauded us of many millions of dollars. Some of you may have grown weary of the name G-Slow but that name is an important part of our history and their fraud was a defining event of our company's trajectory.

G-Slow was chosen as our sole fulfillment partner in Chicago after much research and deliberation. In the early years, the relationship was a solid one with G-Slow being comprised of two partners, one of whom was one the country's most successful Re-Max agents and the other that had 46 years of construction management experience with a portfolio of over $800mm in managed projects across the country and for companies such as Sprint, WalMart, Home Depot, etc. Neither of these individuals was new to the fulfillment business and both came with a stellar track record.

The relationship began at the end of 2011 and lasted for almost exactly three years. Towards the end of 2014 we began seeing contractor's liens appear on properties for which we had paid G-Slow for a renovation but for which they did not pay the contractor as evidenced by the liens. The fact that they weren't paying contractors was not discovered prior to the liens because each property was inspected by a professional that was under contract with us and G-Slow was filing waivers of liens for the work which

turned out to be fraudulent. That was the beginning of the end of the relationship but also the beginning of a lengthy discovery process to determine the financial impact of all of the deceit. That discovery process is still on-going and now totaling over $12mm. If you care to read the lawsuit you can click here. As a side note, since filing, we have not updated the amounts by which were damaged because they both filed for bankruptcy and there is nothing to recover.

It was then, at the end of 2015, that we were faced with the question as to whether or not we should file for bankruptcy and just tell everyone we were sorry but that we couldn't handle the mountain that we needed to climb. We decided to persevere and committed ourselves to making our lenders whole by devoting the majority of our profits and shrinking the gap over time so that we could shield our clients and honor our original commitments to them.

Following the decision to press on, we were then faced with the reality that we had no fulfillment process and no fulfillment vendor yet still, we must continue on. The response was to bring all underwriting, buying, construction management and asset management in-house. The immediate challenge we were faced with was that our process for each of these elements had been driven by the G-Slow process and so we then needed to start from scratch. We hired a Director of Operations, an internal Underwriter, a Construction Manager and an Asset Manager. To aid in effective underwriting and asset management, we also subscribed to highly regarded third party sources such as CoStar, Trepp and others. Starting from zero we embarked on a path of continuous improvement that continues through today. It was not until around the very end of 2016 that each of the processes listed above was completely divorced of G-Slow jading and functioning soundly in their own merit. It took time to develop the highly effective processes that we have today but they were, in fact, successfully created. And, where we sit today we are the most complete and competent company from a process perspective than we have ever been.

In the paragraph just before the last I stated that it has always been our mission to make our clients whole by devoting the majority of our profits to bridging the gap caused by the G-Slow fraud. We've been able to do exactly that until now. Our ability to pay the high rates you were accustomed to was based on the way we underwrote and bought assets through the end of 2016. Each was bought and underwritten with an understanding of the timeline required to stabilize an asset and optimize its income and the high interest rate was funded for that timeline. When a project timeline was extended beyond what our underwriting allowed for, we needed to fund the high rate out of current revenue. One of the significant impacts of the G-Slow fraud was that it dramatically extended the timeline on many projects. The cumulative impact of that is a debt load that is not sustainable and continuing to pay it out of current revenue would lead to an inevitable disaster that would put your investment at risk of significant loss. In order to avoid that inevitable disaster and return your capital in full and deliver a return on these projects, we have no choice but to restructure and reduce the debt burden. We have done all we can to avoid having to take this step but avoiding it is no longer an option. Continuing to make the interest payments at this point will be at the expense of being able to exit the properties in any reasonable timeline and thereby deliver your return of capital.

As a first step to assuring we get you the best possible outcome in the shortest time possible, we require your investment structure be converted to equity. We will not be able to issue you the regularly scheduled interest payment, however, that payment will be added to your principal balance that we convert to equity. A natural question will be why we waited until today to send this message and the answer is that we were trying every which way to avoid sending it at all and have exhausted all possible alternatives. We are working on the construct of an equity fund that will be suitable for you. The ultimate goal is to have you in an equity investment that will return your capital in the shortest possible timeline and perform better than if you had stayed as a debt holder. Both the nominal rate and the post-tax rate are expected to be an improvement over where you sit today. We have been modeling and will continue to model until we get the right model created. We will have the model finished and in your hands by June 15th.

Thank you for your loyalty and understanding.

Sincerely,

EquityBuild Inc.
updates@equitybuild.com
**(877) 978-1869**

The information contained herein was obtained from sources deemed reliable. However, EquityBuild makes no guarantees, warranties or representations as to the completeness or accuracy of this information. This is not an offer to purchase or sell any securities. Any such offer can be made only by transmitting to any prospective investor a Confidential Private Placement Memorandum or other document intended to give a prospective investor all relevant information in order to make an informed decision about an investment. All such information should be considered

carefully by any prospective investor before making any investment.



EquityBuild   5068 W. Plano Pkwy, #300   Plano  TX   75093   USA

You received this email because you are subscribed to Current Client Updates from EquityBuild .

Update your email preferences to choose the types of emails you receive.

Unsubscribe from all future emails