UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES and EXCHANGE COMMISSION, | ) ) ) | No. 18 CV 5587 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Magistrate Judge Young B. Kim |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, | ) ) ) ) ) | |
| Defendants. | ) ) | August 27, 2019 |

**MEMORANDUM REPORT and RECOMMENDATION**

Before the court is the Receiver's motion to amend the receivership order to identify and include specific receivership assets, namely a single-family home located at 1050 8th Avenue North in Naples, Florida ("the Naples Property") and a joint checking account ending in 3641 ("3641 Account"). Both assets are registered to Defendant Jerome Cohen ("Cohen") and his wife, Patricia Cohen. For the following reasons, the court reports and recommends that Cohen be sanctioned for failing to comply with this court's orders and that the Receiver's motion be granted:

**Background**

On August 15, 2018, the United States Securities and Exchange Commission ("SEC") filed a complaint against Defendants alleging that they were operating a Ponzi scheme. (R. 1, Compl. ¶ 1.) According to the SEC, Defendants fraudulently

induced more than 900 investors to invest at least $135 million in residential properties in Chicago's South Side. (Id. ¶¶ 1-2.)

Shortly after the SEC filed the complaint, the court entered an order taking "exclusive jurisdiction and possession" of all assets of Defendants and their affiliates, including 3400 Newkirk, LLC and Tikkun Holdings, LLC ("Tikkun"). (R. 16, Receivership Order ¶ 1.) The Receivership Order authorizes the Receiver to "use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Defendants, including, but not limited to, monies, funds . . . lands, premises . . . and other assets," ("Receivership Assets"). (Id. ¶ 8(A).) The order further grants the Receiver the power to "take custody, control, and possession of all Receivership Assets." (Id. ¶ 8(B).)

The Receiver now moves to amend the Receivership Order to identify two assets—the 3641 Account and the Naples Property—that he believes were funded with monies from the EquityBuild Defendants and their affiliates ("Investor Monies"). (R. 265, Receiver's Mot. at 1-2 & Ex. 2, Fish Aff. ¶¶ 6-7 & Exs. A-C.) Cohen objects and argues that funds from an account owned by Tikkun ("Tikkun Account"), which were not Investor Monies, were used to pay for the Naples Property and, therefore, the property cannot be considered a Receivership Asset. (R. 301, Cohen's Resp. at 2-4.) Cohen also asserts that the Florida homestead exemption precludes a forced sale or imposition of a lien on the property. (Id. at 5.) Cohen did not address the 3641 Account in his opposition.

In support of his motion, the Receiver submitted a wire detail, showing that on August 25, 2015, EquityBuild transferred $134,279.07 to pay the down payment on the Naples Property, (R. 265, Receiver's Mot., Ex. 1, Wire Detail), and an affidavit from accountant Bernard Fish, who attested that Cohen used funds in the 3641 Account to make monthly mortgage payments totaling $153,504.02, repair and expense payments of $86,322.40, pool construction payments of $12,273.45, and utility payments of $1,026.70 for the Naples Property, (id., Ex. 2, Fish Aff. ¶¶ 11-13, 15). According to Fish, Cohen also directed Tikkun to pay $45,108.65 to a pool construction company and an additional $9,675 for home expenses relating to the Naples Property. (Id., Ex. 2, Fish Aff. ¶ 13.)

On May 8, 2019, this court scheduled a hearing on the Receiver's motion to obtain additional information about the funds referenced in the motion and the opposition. (R. 357.) At the motion hearing on July 10, 2019, the Receiver (through the SEC) offered the testimony of Ann Tushaus, a Senior Accountant with the SEC's Division of Enforcement. (July 10, 2019 Tr. ("Hearing Tr.") at 6.) Tushaus testified that "the vast majority" of money deposited into the 3641 Account and used to purchase the Naples Property came from Investor Monies tied directly to Defendants' Ponzi scheme. (Id. at 13, 48-49.) To support her testimony, Tushaus relied upon financial records, including productions by various banks, the EquityBuild Defendants, Tikkun, and 3400 Newkirk, as well as summaries she prepared from those records. (Id. at 8-9 & Exs. 8, 16-24; see also R. 392, Exs. 1-7.) Using Exhibit No. 19, Tushaus explained that of about $111 million deposited into

the EquityBuild Defendants' accounts between 2012 and 2018, about $103 million came from investors. (Id. at 13.) The EquityBuild Defendants returned only about $25 million to investors, according to Tushaus. (Id. at 13-14.)

Turning to Exhibit No. 8, Tushaus testified that Cohen transferred $134,279.07 from an EquityBuild, Inc. account on August 25, 2015, to make a down payment on the Naples Property. (Id. at 14-15 & Ex. 8.) One week before the down payment was made, the 3641 Account had a balance of $13,184.51. (Id. at 18 & Ex. 17 at 17.) On October 6, 2015, the same account held a balance of only $423.90. (Id. at 19 & Ex. 17 at 18.) Thus, Cohen did not have sufficient funds in the 3641 Account to satisfy the down payment for the Naples Property. (Id. at 18-19.)

Based upon Exhibit No. 18, which shows transactions in the 3641 Account, Tushaus testified that the EquityBuild Defendants deposited a net amount of more than $1.9 million, or "almost 95 percent" of all deposits, into the 3641 Account.[1] (Id. at 21, 22, 25, 27 & Ex. 18, Schedule A at 1-13.) Funds from the 3641 Account were used to pay for at least $70,668.43 in improvements to the Naples Property from August 11, 2016, through March 5, 2018.[2] (Id. at 25 & Ex. 18, Schedule B.) Additionally, Tushaus testified that $141,761.31 from the 3641 Account was used to

---

[1] Patricia Cohen contributed $1,568 to the 3641 Account. (Hearing Tr. at 21 & Ex. 18.)

[2] Tushaus testified that she determined which payments were used to improve the Naples Property by examining payee names and memo descriptions listed in 3641 Account statements and then researching landscaping, fencing, and roofing companies listed in those statements to ensure they were located in the Naples area. (Hearing Tr. at 23-24 & Ex. 18, Schedule B.)

pay the mortgage on the Naples Property.[3] (Id. at 27 & Ex. 18, Schedule C at 1-3.) The ultimate sources of the funds used for these payments were the EquityBuild Defendants. (Id. at 25, 27 & Ex. 18.)

Next, Tushaus testified regarding Exhibit Nos. 20 and 24, showing a schedule of transactions and account balances in the Tikkun Account from May 29, 2013, to August 31, 2015, and August 13, 2013, to April 8, 2014, respectively. (Id. at 28-29, 34-35 & Exs. 20, 24.) Whereas Cohen argued that Tikkun "was formed in 2013 for the purpose of participating in a joint venture" and that the Tikkun Account held non-Investor Monies that were used to pay for the Naples Property, (R. 356, Cohen's Surreply at 3), Tushaus explained that the "joint venture" was Rebuilding America LLC, consisting of three companies: two owned by the Cohen Defendants (Tikkun and 3400 Newkirk) and the third owned by George Slowinski, a named defendant in another SEC action involving an alleged real estate fraud scheme, (Hearing Tr. at 29-32 & Ex. 16).[4] Furthermore, Tushaus explained that despite deposits of $640,183 into the Tikkun Account by Rebuilding America from August 13, 2013, to April 8, 2014, (id. at 34, 35 & Ex. 24), the balance in that account was down to only about $36,011 by December 2, 2014, well before the purchase of the Naples Property, (id. at 35-37 & Ex. 20 at 5).

---

[3] Tushaus testified that she determined which payments were used to pay the mortgage for the Naples Property by examining payee names and the frequency of payments. (Hearing Tr. at 26 & Ex. 18, Schedule C.)

[4] The court does not rely on any allegations relating to Slowinski for purposes of this report and recommendation.

Focusing on transactions in the Tikkun Account from May 29, 2013, to August 31, 2015, as set forth in Exhibit No. 21, Tushaus testified that a number of payments from Tikkun to the EquityBuild Defendants were to buy out an investor's position, not for reimbursements. (Id. at 37, 38 & Ex. 21, Schedule A.) And to the extent that funds from the EquityBuild Defendants were used to repay Tikkun, Tushaus identified situations in which investor money was deposited into an EquityBuild account, then deposited into another EquityBuild account, only to be transferred back into the Tikkun Account as repayments, with these transactions frequently occurring on the same day. (Id. at 42-45 & Ex. 21, Schedules B-1 to B-7.) In each instance, the source of funds for the repayment was Investor Monies. (Id.)

Turning to the period from September 1, 2015, to May 30, 2018, Tushaus testified that Rebuilding America made no deposits into the Tikkun Account, while at the same time EquityBuild used Investor Monies to pay back its loans from Tikkun or to buy out an investor's position. (Id. at 46-47 & Exs. 22, 23, Schedules A, B.) Tushaus also traced funds from the Tikkun Account that were used to pay expenses for the Naples Property.[5] (Id. at 47-48 & Ex. 23, Schedule C.)

In summary, the EquityBuild Defendants—and thus, their investors—were the primary source of funds for the 3641 Account and Naples Property. (Id. at 48-49.) Tushaus further explained that to the extent that Tikkun Account funds were loaned to the EquityBuild Defendants, they did not make enough money from rental

---

[5] Tushaus testified that she determined which payments were used to pay home expenses for the Naples Property by examining payee names and memo descriptions listed in 3641 Account statements. (Hearing Tr. at 48 & Ex. 23, Schedule C.)

6

income or interest to repay the Tikkun loans, so Investor Monies must have been used for repayments. (Id. at 49.)

## Analysis

The Receiver argues that the 3641 Account and Naples Property "unequivocally" qualify as Receivership Assets, (R. 321, Receiver's Reply at 1), and must be identified as such so that they may "be marshaled by the Receiver and subsequently made available for the benefit of Defendants' victims and creditors following a claims process," (R. 265, Receiver's Mot. at 6). As an initial matter, although Cohen submitted a written response and surreply in opposition to the pending motion, (R. 301, Cohen's Resp.; R. 356, Cohen's Surreply), he did not appear at the July 10, 2019 hearing, or at the August 14, 2019 hearing, despite court orders requiring his personal appearance. Nor did Cohen show good cause for his repeated failures to appear or to contest any testimony offered by the Receiver in support of the motion.

The court provided Cohen an opportunity to provide his own testimony, witnesses, and exhibits at a hearing to oppose the current motion. To be sure, on May 8, 2019, the court scheduled the motion hearing for July 10, 2019, and ordered the Receiver and Cohen to file a list of witnesses and exhibits by May 31, 2019. (R. 357.) Cohen disregarded the court's order and failed to submit such a list, resulting in the first strike against him.

After Cohen failed to submit his required list, on June 1, 2019, the court ordered Cohen to appear "in person" at the July 10, 2019 hearing. (R. 393.) Cohen

7

then waited until June 12, 2019, to move to extend the date for him to file his witness and exhibit list and to continue the hearing. (R. 409, Cohen's Mot.) The court granted Cohen's request to extend the date for him to submit his list, and provided him until June 26, 2019, but denied the request to continue the hearing, ordering that "the July 10, 2019 hearing will proceed as scheduled." (R. 413.) Cohen filed his list on June 26, 2019, identifying 11 witnesses and 24 exhibits. (R. 424, Cohen's List.) On July 2, 2019, Cohen filed a motion to continue the hearing, (R. 432, Cohen's Mot.), but he did not appear to present his request, (R. 445). As a result, the court denied Cohen's motion and reiterated that the hearing "will proceed as scheduled on July 10, 2019." (R. 445.) Despite court orders, Cohen did not appear at the scheduled motion hearing. Nor did he provide the court notice that he would not appear or offer a showing of good cause, resulting in the second strike against him.

After the hearing, the court ordered Cohen to explain in writing why he did not appear in person as ordered. (R. 448.) Cohen submitted an explanation, but it did not amount to good cause. (R. 454.) Even so, on July 17, 2019, the court provided Cohen another opportunity to appear in person to answer questions on the record and under oath—and specifically allowed him to select a date between August 1 and 15, 2019, on which to appear. (Id.) The court stated that sanctions would be imposed if Cohen failed to comply. (Id.) Cohen responded that he would "choose August 13th, 14th, or 15th to appear," (R. 456, Cohen's Resp. at 1), and the court ordered Cohen to appear on August 14, 2019, (R. 457). Notably Cohen did not raise any concerns about his ability to appear for the hearing on the date he selected.

8

Less than an hour before the scheduled hearing on August 14, 2019, Cohen informed the court that he was "unable to attend the hearing scheduled for today," alleging "health issues" and financial difficulty without providing any evidence, resulting in the third strike against him. (R. 473, Cohen's Resp. at 1.) The court found Cohen's explanation to be "disingenuous" and "lacking in sufficient details to lend any credibility" and noted that it would consider Cohen's failure to comply when ruling on the pending motion. (R. 475.) Thereafter, Cohen filed a "reply" acknowledging that he "ch[]ose the date for the hearing of 8/14 on July 23 and knew his financial circumstance clearly" but alleging that he lacked financial means to attend the hearing and "[a]bout 3 weeks prior to the hearing," suffered an "autoimmune challenge, in the form of severely swollen and painful hands and hips." (R. 480, Cohen's Reply at 1-1.) Cohen offered no physician's note or other evidence showing good cause for notifying the court an hour before the hearing that he would not appear, on the date that he himself had selected three weeks earlier. Not only that, Cohen did not indicate where he was residing at the time and what he needed in order to appear in court. Accordingly, the court recommends that Cohen be sanctioned for failing to comply with this court's orders without good cause by finding that he has forfeited his opposition to the Receiver's motion and by construing the hearing evidence in the Receiver's favor.

Regardless of whether the court adopts the proposed sanction, Cohen's opposition fails because the uncontested evidence offered by the Receiver demonstrates that the Naples Property and 3641 Account qualify as Receivership

9

Assets. With respect to the 3641 Account, Cohen makes no objection to the account being identified and included as a Receivership Asset. (See R. 301, Cohen's Resp. at 1-5.) His failure to challenge the Receiver's motion as it applies to the 3641 Account results in a waiver of any such argument. *See Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 595 (7th Cir. 2017) ("Failure to respond to an argument generally results in waiver."). In any event, Cohen has offered no evidence suggesting that any portion of the 3641 Account is off limits from the Receiver's collection efforts. Nor could he given the evidence that the Receiver has provided, supported by affidavits from Fish and testimony by Tushaus, showing that the funds in the 3641 Account originated from deposits by EquityBuild and its affiliates. (R. 321, Receiver's Reply at 1; R. 265, Receiver's Mot. at 3 & Ex. 2, Fish Aff. ¶¶ 9-10 & n.2; Hearing Tr. at 13, 48-49 & Ex. 18, Schedule A at 1-13.) The court therefore recommends that the Receiver's motion be granted as to the 3641 Account, which as of February 25, 2019, had a balance of $61,141.19. (R. 265, Receiver's Mot. at 6.)

As to the Naples Property, Cohen argues that the property was purchased, and expenses and improvements were paid, with non-Investor Monies, and the Florida homestead exemption protects the Naples Property. (See R. 301, Cohen's Resp. at 1-5.) Cohen points to funds deposited by third parties into the Tikkun Account, which were then used for the alleged benefit of the Naples Property, and argues that those funds did not constitute Investor Monies. (Id. at 2-3.) In particular, Cohen claims that he wired $134,279.07 of non-Investor Monies from the Tikkun Account into an EquityBuild, Inc. account for the down payment for the

10

Naples Property. (Id. at 2.) Cohen further contends that the Tikkun Account contained between $700,000 to $800,000 before mid-2014, and that those funds are not part of this action, rendering him eligible for the Florida homestead exemption at least as to any non-Investor Monies used for the Naples Property. (Id. at 2-3 (representing that "Tikkun had an opening bank balance of $715,000 on 6/1/2014").)

The court finds Cohen's arguments unconvincing. The undisputed evidence shows that Investor Monies in fact were used to purchase, maintain, and improve the Naples Property. Indeed, even taking as true Cohen's argument that the $715,000 in the Tikkun Account as of June 1, 2014, consisted solely of non-Investor Monies, (id. at 2-3), by December 2, 2014, that account held only about $36,011, which was not a sufficient amount for the $134,279.07 down payment made on August 25, 2015, as Tushaus testified, (Hearing Tr. at 35-36 & Ex. 20 at 5). Nor was the balance in the 3641 Account—$13,184.51 one week before the down payment was made on the Naples Property—sufficient to cover the down payment. (Id. at 18 & Ex. 17 at 17.)

After the down payment was made, most of the funds used for the Naples Property came from the 3641 Account, which primarily was funded by the EquityBuild Defendants. (Id. at 21, 22, 25-27 & Ex. 18, Schedules B, C.) And the deposits into the EquityBuild Defendants' accounts were from Investor Monies. (Id. at 13 & Ex. 19.) Funds from the Tikkun Account also were used to pay for expenses for the Naples Property. (Id. at 36, 47-48 & Ex. 23, Schedule C.) By this time—after December 2, 2014, the Tikkun Account essentially held nothing but funds from the

11

EquityBuild Defendants, or Investor Monies. (Id. at 46-47, Exs. 22, 23, Schedules A-B.)

Cohen nonetheless argues that Tikkun Account funds used for the Naples Property are "Tikkun's uncontested assets" because Tikkun loaned the EquityBuild Defendants money, which those entities later repaid. (R. 356, Cohen's Surreply at 3-4.) In other words, Cohen argues that money taken from the Tikkun Account, washed through the EquityBuild Defendants' accounts, and subsequently repaid to the Tikkun Account, can somehow remain untainted. Cohen offers no evidence or authority to support his argument. The court therefore is not inclined to treat funds used to further a fraudulent scheme as "clean," particularly when the Receiver presents compelling evidence tracing the alleged repayments to Investor Monies. (Hearing Tr. at 37-49 & Ex. 21, Schedules A, B-1 to B-7.)

Having reviewed the evidence presented, the court rejects Cohen's claim that the Florida homestead exemption applies here. Article X, section 4(a) of the Florida Constitution exempts a homestead from "forced sale under process of any court" and precludes any "judgment, decree or execution" from attaching a lien thereon. *In re Fin. Federated Title & Trust, Inc.*, 347 F.3d 880, 886 (11 Cir. 2003). The homestead exemption serves to "protect[] the family home" but "is not to be so liberally construed as to make it an instrument of fraud or imposition upon creditors." *Id.* As the Supreme Court of Florida has instructed, the homestead exemption "cannot be employed as a shield and defense after fraudulently imposing on others." *Jones v. Carpenter*, 106 So. 127, 130 (Fla. 1925); *see also Palm Beach Sav. & Loan Ass'n v.*

*Fishbein*, 619 So.2d 267, 270 (Fla. 1993) ("Where equity demands it this Court has not hesitated to permit equitable liens to be imposed on homesteads beyond the literal language of Article X, Section 4.").

At the hearing, Tushaus methodically traced the funds used to purchase, maintain, and improve the Naples Property. She based her uncontested testimony on reliable sources in the form of financial records from banks and the EquityBuild Defendants and their affiliates, including Tikkun and 3400 Newkirk. (Hearing Tr. at 8, 9.) And she provided a clear path showing that the funds used for the Naples Property came from Investor Monies tied to Cohen's Ponzi scheme. (Id. at 13, 48-49.) In such a case, the homestead exemption does not bar a sale of the property because "a homestead cannot be employed as an instrumentality of fraud." *In re Fin. Federated*, 347 F.3d at 887 (citing *Craven v. Hartley*, 135 So. 899 (Fla. 1931)); *see also SEC v. Kirkland*, No. 6:06-CV-183, 2008 WL 1787234, at *1, *4-5 (M.D. Fla. April 11, 2008) (authorizing a receiver to proceed with the sale of an alleged homestead where there was a direct link between fraudulent activity connected with a Ponzi scheme and the use of those proceeds to purchase and maintain a defendant's home). To be sure, even Patricia Cohen cannot argue that a "lack of knowledge or involvement" in Cohen's Ponzi scheme "exonerates" her and renders her eligible for the homestead exemption. *In re Fin. Federated*, 347 F.3d at 890 ("A lack of knowledge on the part of the person asserting the homestead exception does not change [the court's] analysis, as it is the fraudulent nature of the funds which is of

13

utmost importance."). Thus, the homestead exemption does not apply here. *Kirkland*, No. 6:06-CV-183, 2008 WL 1787234, at *1.

In a last-ditch effort to recover some funds from the Naples Property, Cohen argues that he is entitled to the equity in the home, which derived "largely from market changes." (R. 301, Cohen's Resp. at 4.) Cohen cites no authority in support of this argument. But what Cohen essentially asks is to reap the benefits of a profitable transaction made "with the fruits of fraudulent activity." *See In re Fin. Federated*, 347 F.3d at 888. Given that the funds used to purchase the Naples Property have been traced to his fraud, the court does not recommend granting Cohen a windfall by giving him the equity in the Naples Property. After all, Cohen has already benefitted from the use of the property since 2015 for free. *See In re Fin. Federated*, 347 F.3d at 886 n.5. Accordingly, the court recommends that the Receiver's motion also be granted as to the Naples Property.

## Conclusion

For the foregoing reasons, the court reports and recommends that: (1) Cohen be sanctioned for failing to comply with this court's orders by deeming his opposition to have been forfeited and by construing the evidence in the Receiver's favor; (2) the motion be granted as to the 3641 Account; and (3) the motion be granted as to the Naples Property. All interested parties have 14 days from being served with a copy of this Report and Recommendation to file objections thereto. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object in a timely manner constitutes a

waiver of the right to appeal. *Tumminaro v. Astrue*, 671 F.3d 629, 633 (7th Cir. 2011).

                **ENTER:**

                _____
                **Young B. Kim**
                **United States Magistrate Judge**