UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

        Civil Action No. 18-cv-5587

Plaintiff,

        Hon. John Z. Lee

v.

        Magistrate Judge Young B. Kim

EQUITYBUILD, INC.,
EQUITYBUILD FINANCE, LLC,
JEROME H. COHEN, and
SHAUN D. COHEN, Defendants.
_____/

**OBJECTION OF LIBERTY EBCP, LLC TO
MINUTE ENTRY DATED AUGUST 19, 2019 (R 483) REGARDING
MOTION OF LIBERTY EBCP, LLC RELATED TO CREDIT BID
PROCEDURES AND OBJECTION TO 24 HOUR CREDIT BID DEADLINE**

Liberty EBCP, LLC ("Liberty"), by its counsel, Jaffe, Raitt, Heuer & Weiss, P.C. files this *Objection of Liberty EBCP, LLC to Minute Entry Dated August 19, 2019 (R 483) Regarding Motion of Liberty EBCP, LLC Related to Credit Bid Procedures and Objection to 24 Hour Credit Bid Deadline* ("Objection"), and in support thereof, states as follows:

**INTRODUCTION**

Liberty is seeking review of Magistrate Judge Young B. Kim's Minute Entry, dated August 19, 2019 (R 483) (the "August 19, 2019 Minute Entry"), granting in part and denying in part, the *Motion of Liberty EBCP, LLC Related to Credit Bid Procedures and Objection to 24 Hour Credit Bid Deadline* (R 481) ("Liberty's Credit Bid Modification Motion"). Liberty asserts that the information requested in Liberty's Credit Bid Modification Motion was reasonably necessary to advance the sale and credit bid process and should be approved by this Court on the

1

basis that its disclosure was contemplated by the parties or if necessary, should be required as a modification to the proposed bidding procedures.

## **BACKGROUND**

As this Court is aware, Liberty and the other institutional lenders have been at odds with the Receiver over the right to credit bid and the timing for submission of credit bids related to the sale of receivership properties. While Liberty reached a tentative agreement with the Receiver confirming the right to credit bid, the specifics of the mechanics of credit bid submissions were not fully set forth, even in Liberty's interim resolution of the same with the Receiver ("Liberty's Interim Resolution"). Further, the other institutional lenders have not yet signed on to Liberty's Interim Resolution and have requested that they not be required to credit bid prior to their lien positions having been verified.[1] The other lenders' objection to Magistrate Judge Kim's May 2, 2019 Order and May 22, 2019 Order is set for hearing before this Court on September 25, 2019. Therefore the proposed bid procedures to be utilized by the Receiver are still subject to the final review of this Court.

Notwithstanding the lack of finality of the proposed bidding procedures, the Receiver has proceeded to market various receivership properties for sale, subject to the liens of Liberty and of the other institutional lenders, utilizing Liberty's Interim Resolution as the gospel on how credit bidding is to proceed. The Receiver notified Liberty and certain of the other institutional lenders of the highest bids received on certain of the properties (the "August 14 Properties"), on Thursday, August 15, 2019 and demanded that Liberty and the other institutional lenders deliver

---

[1] For a detailed discussion of the procedural history and status related to the credit bid procedure litigation, see the *Notification of Liberty EBCP, LLC Regarding Notification of Docket Entry (R 458) Setting Hearing on Pending Objections to May 2, 2019 and May 22, 2019 Orders* (R 463) (the "Liberty Notice").

a notification within 24 hours (by end of day on Friday, August 16, 2019) whether they would place a credit bid higher than that of the highest sealed bid received. No version of the proposed bidding procedures, in any version (including the Liberty Interim Resolution), addressed the timing for submission of credit bids. The deadline was self-created by the Receiver. Nor did the Liberty Interim Resolution address a multitude of other issues, related to the information flow which would pass between the Receiver, on the one hand, and Liberty and the other lenders, on the other, related to the sale process and therefore, related and relevant to the credit bid process.[2]

Certain of the other institution lenders filed their *Emergency Motion for Extension of Deadline to Submit Credit Bids Set by Receiver's Real Estate Broker* (R 478) late afternoon on August 16, 2019, seeking an extension of the 24-hour deadline (the "Other Lenders' Objection to the 24-Hour Deadline") and obtained a setting for the following Monday morning, August 19, 2019, before Magistrate Judge Kim.

Liberty filed Liberty's Credit Bid Modification Motion early on the morning of August 19, 2019, about two and a half hours prior to the scheduled setting on the Other Lenders' Objection to the 24-Hour Deadline. Liberty set Liberty's Credit Bid Modification Motion for hearing on Thursday, August 22, 2019, a date on which Liberty and the other institutional lenders were scheduled to, and in fact, appeared before Magistrate Judge Kim on another matter. Liberty's primary counsel chose this date, as Liberty's primary counsel was out of the country from August 17, 2019 through August 21, 2019 and could not personally attend the August 19, 2019 setting on the Other Lenders' Objection to the 24-Hour Deadline. Further, Liberty's local

---

[2] It is without dispute that none of the lenders, in any way, have waived their rights to object to any proposed sale of assets by the Receiver. This was confirmed by Magistrate Judge Kim at the August 19, 2019 setting. See the Transcript of the August 19, 2019 setting, **Exhibit A** attached hereto, Pages 46, Line 25 and Page 47, Lines 1-4.

counsel's office was effectively closed on August 19, 2019 due to the death of one of its partners. Primary counsel for Liberty, however, made contact with Magistrate Judge Kim's clerk and an accommodation was made to permit Liberty's primary counsel to listen in on the August 19, 2019 hearing on the Other Lenders' Objection to the 24-Hour Deadline.

On August 19, 2019, Magistrate Judge Kim heard argument on the Other Lenders' Objection to the 24-Hour Deadline and then, although having announced at the commencement of the hearing (at least as interpreted by Liberty's counsel) that Liberty's Credit Bid Modification Motion would not be addressed at the August 19, 2019 hearing[3], later requested that Liberty argue Liberty's Credit Bid Modification Motion, which it did. Liberty obviously felt disadvantaged by the logistics imposed and also believes that Magistrate Judge Kim did not fully understand the context of the relief sought in Liberty's Credit Bid Modification Motion. Liberty is therefore seeking a review of Liberty's Credit Bid Modification Motion, pursuant to Fed. R. Civ. P. 72(b) and 28 U.S.C. §636(b)(1).

## LIBERTY'S CREDIT BID MODIFICATION MOTION

The Liberty Interim Resolution was as follows:

Special Rules Regarding Credit Bids: A lender claiming a secured interest in property subject to the Court's approved bid process (a "Credit Bid Lender") is advised that it will be required to pay, at closing, all closing costs approved by the Court, which may, subject to the Court's ruling, include, but not be limited to, title insurance premiums, applicable transfer taxes, the survey invoice, property management fees accrued through the closing, due and unpaid real estate taxes, escrow fees, brokerage commissions, unpaid utilities, title commitment update fees, gap insurance premiums, State of Illinois policy fees, extended coverage premiums, the costs of closing protection coverage, all other expenses required to be paid by the Seller at closing, all amounts advanced for the benefit of the Property which are required to be reimbursed and/or any amount required to discharge any Receiver's lien. **Each Credit Bid Lender shall use the Purchase and Sale Agreement to convey its offer (modifying such form and/or adding one or more riders as to make clear the terms of the offer), and shall submit along with its offer an explanation regarding the computation of the alleged payoff amount as of the date of submission of the credit**

---

[3] See **Exhibit A**, Page 4, Line 25 and Page 5, Lines 1-2.

> **bid (specifically itemizing principal, contract interest, default rate interest, fees, penalties, or other charges) if the credit bid includes an amount other than a portion of the principal then due to the Credit Bid Lender.** A Credit Bid Lender must provide its request to be informed of the highest bid and to participate as a Credit Bid Lender to Broker, no later than the date for offers set forth in Paragraph 2. By requesting such information, a Credit Bid Lender is not obligated to make a credit bid. If such request has been made, **the Receiver and/or Broker will advise the Credit Bid Lender as to the amount of the highest offer received after completion of the process set forth in Paragraph 2**. **The Receiver will then allow the Credit Bid Lender to submit a credit bid, to Broker, which must be at least 2% higher than the highest offer the Receiver has received through the bid process.** If a credit bid is submitted, the Receiver shall offer other bidders the opportunity to improve their bids, provided such new bids exceed the credit bid by at least 2%. The process will continue until either the Credit Bid Lender does not submit a credit bid above the highest offer received or another bidder does not outbid the highest credit bid. In the event that a Credit Bid Lender is selected as the winning bidder, the Credit Bid Lender will be required under certain circumstances established by the Receivership Court, as a condition of closing, to post an irrevocable letter of credit in the amount of the bid (minus any and all Court approved sale-related expenses) or such other amount as the Receivership Court shall determine, with time being of the essence. **Additional details governing the terms and conditions of credit bids, including a good-faith estimate of the Seller's expenses at closing, will be made available by the Receiver upon request.** A Credit Bid Lender shall not be required to acquire title to the property subject to the credit bid in its own name, but, instead, in its discretion, shall have the right to assign its right to title pursuant to the credit bid to a third party, related or unrelated, prior to or in conjunction with any closing.

*Certain Lenders Submission in Furtherance of Their Consolidated Motion to Amend May 2, 2019 Memorandum and Order* (R 430-1) (emphasis added).

Relevant to this dispute, as highlighted above, the Liberty Interim Resolution contemplated the following:

a.   Any credit bid would have to be in the form of a full Purchase and Sale Agreement, modified to reflect the credit bid terms.

b.   No time limit was specified for the submission of credit bids.

c.   Delivery of a good-faith estimate of the Seller's expenses at closing was a condition precedent to the submission of a credit bid (the "Good-Faith Estimate").

d.   Additional details governing the terms and conditions of credit bids will be made available by the Receiver upon request.

5

Upon receipt of the 24-hour notification from the Receiver to submit its credit bids, Liberty requested the following information from the Receiver:

1. A copy of the winning bidder's Asset Purchase Agreement, as to each of the August 14 Properties. Liberty, if it places a credit bid, needs to know what it is bidding against and it needs to know the terms and conditions of the selected highest offer, in order to evaluate it as a stand-alone bid.

2. The "additional details governing the terms and conditions of credit bids, including a good faith estimate of the Seller's expenses at closing" which, per the bidding procedures "will be made available by the Receiver upon request."

3. When and where was the sale of each of the August 14 Properties published?

4. When and how were each of the August 14 Properties marketed—through what means and portals; were direct contacts made and if so, to who and in what way; were any targeted solicitations made, etc.?

5. When did each of the means and portals for marketing go live or otherwise communicated?

6. How many people visited the due diligence room as to each of the August 14 Properties? How many bidders conducted site visits as to each of the August 14 Properties?

7. What offers were received on each of the August 14 Properties—who were the bidders and in what dollar amounts?

8. How was the highest and best offer determined for each of the August 14 Properties? Did any of the August 14 Properties have a bid in dollar amount higher than the bid accepted? If so, what were the disqualifying terms of the higher offer?

9. What efforts were made, if any, to circle back with other bidders, to top the selected bid? How did that process occur and when? Were all lower bidders given the chance to better their offers, after submission? If not, why not?

10. What relationship, if any, do each of the proposed successful bidders have, if any, to a Receivership Defendant or one of the property management companies.

See email exchange between Liberty's counsel and the Receiver's counsel, attached hereto as **Exhibit B**.

The Receiver refused to provide any of the requested information, so Liberty took its request to Magistrate Judge Kim, through the filing of Liberty's Credit Bid Modification Motion. As noted, Magistrate Judge Kim heard the arguments of Liberty, but summarily overruled them, without explanation, other than to extend the deadline for the submission of credit bids until after the Good-Faith Estimate was provided. See **Exhibit A**.

Liberty's request for information was consistent with, and not in contravention of the Liberty Interim Resolution and, therefore, should be approved by this Court.

As to item 1 of Liberty's email, requiring that the Receiver share with Liberty the Purchase and Sale Agreement of the highest bidder, against which Liberty was to place a credit bid, it was assumed, now incorrectly, that the Purchase and Sale Agreement would be shared, to make sure Liberty's credit bid matched the terms of the otherwise highest offer, other than as to price. As noted at oral argument on August 19, 2019, Liberty assumed it would be required to bid apples to apples and not apples to oranges against an unknown Purchase and Sale Agreement. Liberty was unaware of whether seller concessions were provided, how rent pro-rations were to be calculated and whether other material terms not directly related to the gross dollar bid amount but impacting the net proceeds to be received were contained in the highest sealed bid. Liberty committed to bid two percent higher, if it was to credit bid, but the only variable was the two percent increment.

Requiring Liberty to bid under a Purchase and Sale Agreement different from that of the otherwise successful bidder was not contemplated. It had been assumed, incorrectly, that the Receiver would be forthcoming with this basic information or that it would be provided as part of the Liberty Interim Resolution, which required the Receiver to provide "additional details

governing the terms and conditions of credit bids."[4] Therefore, Liberty requested that it be provided with the Purchase and Sale Agreement of the otherwise successful bidder, first to understand the full financial details and closing adjustments of such an offer and if necessary, to craft its credit bid Purchase and Sale Agreement to match that of the otherwise highest bidder. Liberty is seeking this Court's review of Magistrate Judge Kim's denial of that request. To the extent it is not a component of the "additional details governing the terms and conditions of credit bids" Liberty is requesting that it be added to the bid procedures as condition precedent to the delivery of a credit bid.

As to item 2, requesting the Good-Faith Estimate of closing costs, as a condition precedent to the placement of a credit bid, Magistrate Judge Kim granted that relief and therefore, no objection is posed herein to that portion of Magistrate Judge Kim's ruling.

As to items 3-10, the Receiver's sale process related to the August 14 Properties has been a black box to Liberty and this Court. If exposure of the August 14 Properties to the marketplace was exhausted, that is one thing. If not fully exposed, that is something else. What Liberty does know is that the total marketing process was not more than four weeks and based on the rigidity of the broker and property managers in permitting Liberty to engage in its site visits, Liberty can only assume that other bidders were met with the same resistance.[5] At face value, Liberty believes that a not more than four week marketing process for distressed commercial real estate properties

---

[4] Liberty assumed such issues could be worked out on an informal basis, but this turned out not to be the case.

[5] Liberty, based in California, was advised a given property would only be available for inspection on a given date. One of the days was not available to Liberty and the structure would have required Liberty to inspect the properties over a three-day period. Only after repeated email demands by Liberty and a threat to bring the matter to the attention of this Court was the schedule modified to accommodate Liberty's unavailability on the specific Tuesday date.

could not have maximized the properties' exposure to the marketplace. The Receiver believed otherwise, in having recommended the bids received for acceptance.

In evaluating whether to credit bid, it is material to Liberty to understand the actual marketing process and amount of bidder interest in each of Liberty's properties. By what means were the properties marketed? Over what period of time? How many people accessed the due diligence room on each property? How many people conducted site visits on a given property? What offers were received on each of the August 14 Properties—who were the bidders and in what dollar amounts? How was the highest and best offer determined for each of the properties? Did any of the properties have a bid in a dollar amount higher than the bid accepted? If so, what were the disqualifying terms of the higher offer? What efforts were made, if any, to circle back with other bidders, to top the selected bid? How did that process occur and when? Were all lower bidders given the chance to better their offers, after submission? If not, why not? What relationship, if any, do each of the proposed successful bidders have, if any, to a Receivership Defendant or one of the property management companies?

If 20 offers were received on a given property, that is different than a single offer having been received, for example, from an insider property manager.[6] If the properties were marketed for one week versus one year, that is a material fact.

The concept of a credit bid is to ensure that a property is not sold for less than fair market value. *Morgan v. Bleiden,* 107 F. 2d 133 (8th Cir. 1939) (the reason for the right to credit bid is to protect "against the risk that [a lender's] collateral will be sold at a depressed price.")

---

[6] See the *Objection of Liberty EBCP, LLC to Memorandum Opinion and Order Dated May 2, 2019* (R 359) and the *Objection of Liberty EBCP, LLC to Memorandum Opinion and Order Dated May 22, 2019* (R 398), wherein Liberty describes in detail why insider property managers should not be permitted to participate in the Receiver's sale process.

Each of the foregoing questions is directly relevant to Liberty's credit bid determination. Even if Liberty does not credit bid, each of the foregoing will also be directly relevant to the Court's determination of whether to accept the recommended bids of the Receiver. The goal is to maximize the value of each property sold. To do so, disclosure of this material information is needed by all parties and this Court.

Liberty's request for this information had never been addressed by the Court. In negotiating the bid procedures, Liberty had requested the opportunity to review the bids and meet and confer with the Receiver **prior** to the winning bids having been selected. As part of its compromise with the Receiver, Liberty did not insist on this prior right to meet and confer, as logical and productive as that would have been to the sale process (and which occurs regularly in the bankruptcy context). However, Liberty in no way previously asserted or waived its right to review the winning bids, the winning purchase agreements or any of the circumstances related to the solicitation and submission of bids. Liberty knew that the full terms and conditions of each sale would be brought before the Court for approval. What Liberty did not anticipate is that the Receiver would refuse to provide that information, prior to setting a date for the receipt of credit bids. So this issue is ripe for determination by this Court.

Liberty believes that its request for information (items 3 through 10 of its email) falls within the scope of the catch all contained in the Liberty Interim Resolution that "additional details governing the terms and conditions of credit bids will be made available by the Receiver upon request." Liberty did not believe that it would be required to set forth in the bid procedures, chapter and verse, every single disclosure related to the bid process on its properties or that the Receiver would somehow deem that information proprietary, including the offer against which Liberty would be required to credit bid. To the extent items 3 through 10 do not fit squarely within this

agreed upon catch all phrase, Liberty is requesting an amendment to the Liberty Interim Resolution, to require the delivery of this information prior to Liberty being compelled to submit a credit bid for a given property.

Quite simply, Liberty should not be required to credit bid without knowing the extent of market exposure to its properties. Liberty is in no way trying to delay its credit bid determination. To the contrary, Liberty is trying to expedite its informed determination whether to credit bid, which is directly tied to the extent to which Liberty's properties were properly exposed to the marketplace.

It appears from **Exhibit A** that the sole basis for Magistrate Judge Kim's refusal to address items 3-10 was Magistrate Judge Kim's decision to hold Liberty to the terms of the Liberty Interim Resolution. *See*, **Exhibit A**, Pages 2-4.[7] On **Exhibit A**, Page 46, Line 12, Liberty's counsel attempted to communicate to Magistrate Judge Kim that Liberty believed the requested information fell within the scope of the phrase "additional details governing the terms and conditions of credit bids will be made available by the Receiver upon request" or alternatively, that the Liberty Interim Resolution be amended to include a requirement for the delivery of items 3-10. However, Liberty was cut off in being able to make that request.[8]

Overall, this proceeding could use a bit of a secrecy reset. Despite the requirements of 28 U.S.C. §2001(a) and (b), which require either a public sale of property by a receiver on the courthouse steps or a private sale, based on three appraisals, the Receiver has been permitted to proceed under a third, statutorily unauthorized process, using sealed bids with no appraisal

---

[7] This reaction was a bit surprising, as it was Liberty who has been commended for successfully negotiating the Liberty Interim Resolution with the Receiver.

[8] As noted, Liberty had no time to prepare for oral argument, was operating remotely out of the country and did not have the benefit of being before the Court for the oral argument.

requirement or public sale process. Compounding the lack of openness of the process is the permitted right of insider property managers, who control the site visit process and make recommendations on capital expenditures (possibly on properties they intend to bid on), to place bids on properties, apparently with no court restrictions whatsoever. If sales were to occur on the courthouse steps, disclosure of competing bids would be for all to see, and credit bidders would know what they are bidding against. Property managers, whose role is to maximize value, should not, at the same time, be permitted to seek to profit individually by bidding, especially if they are aware of a lack of competing interest in a given property. Therefore, it is based on the deviation from the statutory requirements for receivership sales that the parties have been forced to craft rules as they proceed through the process and request additional clarity, to assure that the process is open and fair. Liberty and the other lenders requested, as part of the bid process, that the Receiver meet and confer with them in evaluating the bids, as a check and balance on the sale process and the property managers' conduct. The Receiver refused. Now, neither the highest bid nor the sale procedure history is proposed to be shared.

      The realization must be made that in order for there to be open and frank discussions among Liberty, the other lenders and the Receiver, as has been recommended by the Court and requested to no avail by Liberty and the other lenders, there must be an open sharing of information. Requiring a secured lender to potentially credit bid against a single insider offer, without any context relating to the overall marketing process or the terms of the offer is the antithesis of what a federal court receivership sale process should require. Further, Liberty submits that if a competing investor creditor made the same request of the Receiver, there would have been no hesitation in providing the requested information.

Nothing being requested by Liberty in items 3-10 is information that will not have to come before the Court, at the time the Receiver seeks approval of the sale of a given property. Advancing the timeline for the review of this information will only expedite the sale process and assist the parties in hopefully reaching a resolution in making the credit bid determinations. A review of the record in this case bears out that the bulk of the disputes have centered on a refusal of the Receiver to share material information with the Liberty and the other lenders.

Wherefore, Liberty requests that this Court grant the relief requested in Liberty's Credit Bid Modification Motion or such other relief as this Court deems equitable and just.

Respectfully Submitted,

/s/ Jay L. Welford

Jay L. Welford (P34471)
Jaffe, Raitt, Heuer & Weiss, P.C.
27777 Franklin Rd., Ste. 2500
Southfield, MI 48034
(248) 351-3000
jwelford@jaffelaw.com
*Counsel for Liberty EBCP, LLC*

Date: August 29, 2019

## **CERTIFICATE OF SERVICE**

      I hereby certify that on August 29, 2019, I provided service of the foregoing *Objection of Liberty EBCP, LLC to Minute Entry Dated August 19, 2019 (R 483) Regarding Motion of Liberty EBCP, LLC Related to Credit Bid Procedures and Objection to 24 Hour Credit Bid Deadline*, via ECF filing to all counsel of record, and on August 30, 2019, via electronic mail or U.S. mail to the following individuals and entities:

Jerome and Patricia Cohen
1050 8th Avenue N.
Naples, FL 34102
jerryc@reagan.com
*Defendant*

First Bank
Client Contact Center
600 James S. McDonnell Blvd.
St. Louis, MO 63042

                                  /s/ Jay L. Welford

                                  Jay L. Welford (P34471)
                                  Jaffe, Raitt, Heuer & Weiss, P.C.
                                  27777 Franklin Rd., Ste. 2500
                                  Southfield, MI 48034
                                  (248) 351-3000
                                  jwelford@jaffelaw.com
                                  *Counsel for Liberty EBCP, LLC*