UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN <br><br> Defendants. | Case No. 1:18-cv-5587 <br><br> Hon. John Z. Lee <br><br> Magistrate Judge Young B. Kim |

**OBJECTIONS OF CERTAIN MORTGAGEES TO RECEIVER'S SECOND INTERIM APPLICATION AND MOTION FOR COURT APPROVAL OF PAYMENT OF FEES AND EXPENSES OF RECEIVER AND RECEIVER'S RETAINED PROFESSIONALS**

The following mortgagees (collectively, "Mortgagees", and each individually a "Mortgagee") respectfully submit this Objection ("Objection") to the Receiver's *Second* Interim Application and Motion for Court Approval of Payment of Fees and Expenses of Receiver and Receiver's Retained Professionals ("Second Fee Application") [Dkt. 487][1]: (1) UBS AG; (2) Citibank N.A., as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2018-SB48; (3) U.S. Bank National Association, as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2017-SB30; (4) U.S. Bank National Association, as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2017-SB41; (5) U.S. Bank National Association, as Trustee for the Registered Holders of J.P. Morgan Chase Commercial

---

[1] The Mortgagees filed their Objection to the Receiver's First Interim Application and Motion for Court Approval of Payment of Fees and Expenses of Receiver and Receiver's Retained Professionals [Dkt. 438] on July 3, 2019 (the "First Fee Objection"). The Court has scheduled a hearing for September 25, 2019 on the First Fee Objection and the Receiver's First Interim Application and Motion for Court Approval of Payment of Fees and Expenses of Receiver and Receiver's Retained Professionals [Dkt. 411] (the "First Fee Application").

Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2018-SB50; (6) Wilmington Trust, National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Trust 2014-LC16, Commercial Mortgage Pass-Through Certificates, Series 2014-LC16; (7) Federal National Mortgage Association ("Fannie Mae"); (8) Federal Home Loan Mortgage Corporation ("Freddie Mac"); (9) BMO Harris Bank N.A.; and (10) BC57, LLC. In support of the Objections, the Mortgagees state as follows:

## INTRODUCTION

On August 15, 2018, the U.S. Securities and Exchange Commission filed a securities fraud complaint against EquityBuild, Inc., Equitybuild Finance, LLC, Jerome Cohen, and Shaun Cohen (collectively, "Receivership Defendants"). On August 17, 2018, the Court appointed Kevin B. Duff as the equity receiver ("Receiver") over the estates of the Receivership Defendants ("Receivership Estate").

The Second Fee Application suffers from many of the same ailments as the First Fee Application. Notably, this Second Fee Application seeks interim approval of fees incurred **more than one year ago**. Despite this Court's order appointing the Receiver ("Receiver Order") and directing the Receiver to file quarterly fee applications (*see* Receiver Order at ¶70), the Receiver elected to wait nearly nine months after his appointment to file his First Fee Application - in clear derogation and violation of the Receiver Order. Indeed, the First Fee Application only covered the first forty-five (45) days (August 17, 2018 through September 30, 2018), inevitably causing all subsequent fee applications, like this *Second* Fee Application, to be grossly overdue. Such dereliction of duties is inexcusable, particularly given the express provisions of this Court's order.

Moreover, consistent with the First Fee Application, the Second Fee Application underscores the insolvency of these estates and confirms that this receivership should not be continued. The Second Fee Application also continues to ignore established law and prior Court

2

orders requiring the Receiver to restore rents to the Mortgagees and other creditors. Finally, the Second Fee Application is replete with billing deficiencies, which seriously draw into question whether the services provided were "actual and necessary."

## ARGUMENT

**I.     THE RECEIVERSHIP ESTATE IS INSOLVENT.**

The Court should withhold interim approval of the Second Fee Application because the Receiver's own applications confirm that this receivership estate is insolvent. As courts in this circuit have explained, the interim of approval of fees is, by no means, a "rubber stamp" process. Rather, interim fee awards are, by their nature, "discretionary and subject to reexamination and adjustment during the course of the case." *See, e.g., In re Taxman Clothing Co.*, 49 F.3d 310, 314 (7th Cir. 1995); *In re Eckert*, 414 B.R. 404, 409 (Bankr. N.D. Ill. 2009). "An increasing attitude in the bankruptcy community is that if the time is actually expended, the applicant is entitled to receive all fees requested. All professionals must be disabused of this fallacious notion." *Id.* (quoting *In re Chas. A. Stevens & Co.*, 105 B.R. 866, 870-71 (Bankr. N.D. Ill. 1989)).

A careful examination of fees is thus warranted in every case, but none more so than in one that is teetering on administrative insolvency. As the United States Court of Appeals for the Seventh Circuit demonstrated in *Taxman*, professional fees can become subject to disgorgement, if the efforts required (and the fees associated with those efforts) outweigh the potential for recovery to the estate. 49 F.3d at 316.

This is particularly the case when the "economics of the estate" suggest the estate may be administratively insolvent. For instance, in *Eckert*, the United States Bankruptcy Court for the Northern District of Illinois awarded less than half of the fees the chapter 7 trustee requested, citing the "economics of the case." 414 B.R. at 414. Noting that "what had been realized" by the chapter 7 trustee's (and his professional's) work was grossly disproportionate to more than $300,000 in

professional fees, the court awarded only $140,000 in interim fees. *Id.* The court specifically observed that the trustee's fees were objectionable in light of the fact that the cash on hand was inadequate to pay all administrative expenses claims *and* a dividend to unsecured creditors. *Id.*; *see also In re Kids Creed Partners, L.P.*, 235 B.R. 871, 873 (Bankr. N.D. Ill. 1999) (with the exception of compelling circumstances, professional fees in an administratively insolvent estate are subject to disgorgement).

Here, the fees are patently disproportionate to what the Receiver and his professionals have recovered. As was the case with the First Fee Application, the Second Fee Application seeks exorbitant fees for a mere quarter's worth of work. The Second Fee Application requests approval of a total of $550,477.59 in fees, $120,471.00 of which goes to the Receiver personally and $392,385.09 of which goes to the Receiver's law firm. Combined with the fees sought in just the first 45 days of this case ($413,289.44), the Receiver incurred nearly **$1 million in fees in the first 135 days**. During that same time period, as of December 31, 2018, the Receiver had **less than 1/3** of that amount ($307,357.37) of cash on hand. (*See* Second Fee App. at 10 (a).) This averages out to the Receiver incurring $7,192.30 in fees each day for the first 134 days of his Receivership.

Further, in the Receiver's July 31, 2019 Fourth Status Report, the Receiver disclosed "approximate" professional fees for the first quarter of 2019 (January, 2019 to March 31, 2019) of $603,730.47. These fees consist of $114,478.00 in Receiver fees, $466,550.80 in legal fees ($464,742.80 of which were from the Receiver's law firm), and $22,701.67 in accountant fees. For this 89 day period the Receiver spent, on average of $6,783.49 per day on professional fees. [Dkt. 467] Therefore, the Receiver incurred on average, $6,997.76 per day of legal fees and costs through March 31, 2019, which fees and costs are coming out of the amounts due the secured and unsecured claimants in Estate which the Receiver admitted back in October 2018, was insolvent. Such fees are

4

excessive and not necessary, and therefore should not be approved. *In re Wildman,* 72 B.R. 700, 707 (Bankr. N.D. Ill. 1987). While these numbers are staggering, remarkably, they are only the amounts incurred for the first 224 days of the Receivership. The actual amount of professional fees the Receiver has incurred as of September 2019 are substantially higher. In clear violation of the Court's orders, the Receiver has not yet provided estimated or actual fees after March 31, 2019 despite the Order requires the Receiver to seek approval of professional fees within 45 days after the close of each calendar quarter. [Dkt. 16 ¶ 70).

The Receiver may point to the $864,600.60 of cash on hand currently set forth the Standardized Fund Accounting (the "SFA") Report (the "SFA Balance") in order to reassure this Court and the estate's creditors that there will be enough to pay all administrative expense claims and a dividend to unsecured creditors. However, with only 1.5 quarters of fees and expenses accounted for—the total for which already exceeds the SFA Balance—it is reasonable to surmise that the total amount of fees and expenses through the current date would dwarf the SFA Balance. Moreover, as evidenced by the Second Fee Application itself, the funds currently on deposit in the SFA consist largely of the sale proceeds from the properties identified in the Second Fee Application (*see* Second Fee App. at 9). Those sale proceeds may be encumbered by the liens of secured parties. More importantly, those sale proceeds should be earmarked to restore the $767,192.75 in funds to certain properties that the Receiver diverted from real estate encumbered by the Mortgagee's liens. (see Memorandum Opinion and Order p. 9 [Dkt 223.])—before they are used to satisfy the fees and expenses of the estate's professionals. Basic arithmetic confirms that there will be nothing left for unsecured creditors or secured creditors in this case if the Receiver continues to run up fees and expenses at the rate that has been accounted for, to date.

The Receiver has not demonstrated that his efforts are adding measureable value to the estate. Whether the Receiver is adding value should be the paramount issue that is resolved before

5

4848-2929-7827.1

the receivership proceeds any further. *S.E.C. v. Maditon Real Estate Grp., LLC*, 647 F. Supp .2d 1271, 1275 (D. Utah 2009) ("[A] receivership must be monitored to ensure it is still serving the function for which it was created."). Where the receiver adds no value to an estate, the receiver's fees should be denied or substantially reduced. In re Superior Beverage/Glass Container, 133 F.R.D. 119, 126 (N.D. Ill. 1990) ("What is left for the class, after fees have been awarded, is always a paramount consideration. The size of the settlement necessarily suggests upper (and lower) limits on permissible fees, in a common fund case, no matter how many hours were logged. That is axiomatic. Hours are not rewarded simply because they were toiled. They are rewarded, consistent with the common fund theory, because they brought benefit to the class."). Despite the $7,000 per day in fees and that the case has been pending for over a year, the Receiver has not made any showing that his services have added sufficient value to the estate to justify his fees.

Based on just two fee applications, it is clear that the estate is not deriving enough money to pay administrative expense claims *and* some dividend to unsecured creditors. Thus, this Court should consider if the purposes for which this receivership has been filed can still be achieved. *S.E.C. v. Madison Real Estate Grp., LLC*, 647 F. Supp. 2d 1271, 1275 (D. Utah 2009) ("[A] receivership must be monitored to ensure it is still serving the function for which it was created."). The Second Fee Application illustrates that the majority of any "equity" in the Receivership Estate will be depleted by the Receiver and his professionals' fees, leaving little remaining equity to compensate the parties for whom the receivership was commenced. Moreover, the sale of real property, the predominate asset of the Receivership Estate, will generate little to no equity for the Receivership Estate because the majority of these assets are encumbered by mortgages that must be satisfied. Accordingly, the Court should deny approval of the Second Fee Application.

**II. THE RECEIVER MUST RESTORE RENTS TO THE CREDITORS PRIOR TO RECEIVING COMPENSATION AND SHOULD BE REQUIRED TO MAKE PRINCIPAL AND INTEREST PAYMENTS BEFORE BEING COMPENSATED.**

4848-2929-7827.1

The Second Fee Application improperly seeks to prime the Mortgagees' security interests by depleting funds that should be earmarked for the restoration of rents. On February 13, 2019, the Court ordered the Receiver to restore to the Mortgagees monies diverted from the Mortgagees' properties to the Receiver's general operating account. *See* Memorandum Opinion and Order, p. 9 [Dkt. 223] (the "Rent Restoration Order"). To date, the Receiver has not restored any monies as required by the Rent Restoration Order. As this Court has properly held, the Receiver takes property subject to all liens, and neither the Receiver nor the Court has the authority to extinguish a creditor's pre-existing state law security interest. *See* Memorandum Report and Recommendation [Dkt. 311] (stating "a court does not have the authority to extinguish a creditor's pre-existing state law security interest" and clarifying the issue by stating "[t]o be sure, a receiver appointed by the federal court takes property subject to all liens, properties, or privileges existing or accruing under the laws of the state.") (internal citation omitted); *See also* Magistrate Kim's Memorandum Opinion and Order, pp. 9-10 [Dkt. 352] (reaffirming the foregoing rulings). Payment of the fees and expenses requested in the Second Fee Application allows the Receiver to effectively trump the Mortgagees' security interests by putting the Receiver and his professionals in a preferred lien position.

Allowing payment of the Receiver's fees now, without restoration of the rents or even the payment of principal and interest payments where sufficient rents are available, would allow the Receiver to take a preferred and senior position to the Mortgagees' securities interests. Such an outcome is contrary to both this Court's prior rulings and law. *See Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 625 (6th Cir. 2003) (a receiver "stands in the shoes" of the receivership defendants and "acquires no greater rights in the property" than the receivership defendants.); *S.E.C. v. Credit Bankcorp, Ltd.*, 386 F.3d 438 (2d Cir. 2004) (stating a receiver "takes the property subject to all liens, priorities, or privileges existing or accruing under the laws of the state."); *see also Marshall v. People of New York*, 254 U.S. 380, 385 (1920).

The rents must be restored before payment is made to the Receiver and his professionals because the Receiver is subject to the Mortgagees' security interest and this Court has previously ordered the Receiver to restore these rents. Accordingly, the Second Fee Applications should be denied until such time as the Receiver fully complies with this Court's Rent Restoration Order.

### III. THE SECOND FEE APPLICATION FAILS TO COMPLY WITH THE RECEIVER ORDER AND THE BILLING INSTRUCTIONS.

#### A. The Second Fee Application Is Not Timely.

The Order Appointing Receiver [Dkt. 16] ("Receiver Order") **mandates** that the Receiver file *quarterly* fee applications. The reasoning underlying this requirement is simple: quarterly submissions provide the Court and the estate's creditors the ability to ensure that spending does not outpace recoveries. Here, the Receiver seeks interim approval of fees incurred nearly **one year ago**. Moreover, the Second Fee Application evidences precisely the danger quarterly submissions were designed to guard against—breakneck and unchecked depletion of estate resources. The Receiver's repeated disregard for court orders and statutory requirements cannot be countenanced and the Second Fee Application should be denied.

#### B. The Second Fee Application Fails To Follow Billing Instructions.

The parties further object to the extent efforts by professionals are unreasonable, duplicative or provide no appreciable value to the Receivership Estate. Under Local Rule 66.1, receivership estates are to be administered similarly to bankruptcy cases. In bankruptcy cases, courts evaluate whether the services provided were "actual and necessary." *See, In re Wildman*, 72 B.R. 700, 707 (Bankr. N.D. Ill. 1987). Professionals retained by a bankruptcy estate (and, by extrapolation, a receivership estate) should avoid routinely recording time under .2 hours for things like phone calls and reviewing emails. *Id.* at 708-9. "Attorneys should work independently, without the incessant 'conferring' that so often forms a major part of many fee petitions." *Id.* at 709. Similarly, "[s]enior partner rates will be paid only for work that warrants the attention of a senior partner," and "non-

8

legal work performed by a lawyer which should have been performed by less costly non-legal employees should command a lesser rate." *Id.*

Here, as was the case in the First Fee Application, the billing statements attached as exhibits to the Second Fee Application demonstrate numerous instances in which the Receivership Estate was charged for .1 hours of telephone calls and email correspondence, duplicative efforts, work that could and should have been performed by staff (i.e., overhead), or substantial time in "office conferences" with inadequate detail regarding their contents. The following are just examples of the types of time entries that courts have cautioned against:

- The Receiver himself recorded 92 internal "office conferences" for just *one month* (October 2018), with no less than 7 such internal office conferences in *one day*.

- Numerous RDAPK professionals routinely charged the Receivership Estate for .1-.2 hours of correspondence, emails, internal conferences, and phone calls.

    - On October 1, 2018, Ania Watychowicz charged the Receivership Estate a total of .5 hours to review emails, make phone calls, and meet with other RDAPK professionals—each activity taking .1 hour. (*See* RDAPK's Oct. 2018 Billing Stmt. at 4.)

    - On October 10, 2018, Ms. Waychowicz charged the estate .1 hour to listen to a voicemail. (*See* RDAPK's Oct. 2018 Billing Stmt. at 34.)

    - On October 25, 2018, Ms. Waychowicz also charged the estate .1 hour to scan a check. (*See* RDAPK's Oct. 2018 Billing Stmt. at 3.)

- The Second Fee Application continues to seek reimbursement for tasks that should have been performed by assistants or staff (at no charge).

    - On October 9, 2018, Ania Watychowicz charged the Receivership Estate to scan and save documents. (*See* RDAPK's Oct. 2018 Billing Stmt. at 33.)

    - On October 2, 2018, Kathleen Pritchard charged the Receivership Estate 1.1 hours to record checks into an electronic ledger. (*See* RDAPK's Oct. 2018 Billing Stmt. at 2.)

- In addition to charging the Receivership Estate for hundreds tasks that took 6 minutes or less, the Second Fee Application includes numerous time entries that provide inadequate description from which the Court can assess whether they were "actual and necessary":

9

- On October 1, 2018, Nicole Mirjanich charged the Receivership Estate .4 hours to "draft email to SEC." No other detail regarding the nature of this email is provided. (*See* RDAPK's Oct. 2018 Billing Stmt. at 3.)

- On October 9, 2018, Michael Rachlis charged the Receivership Estate .8 hours for "[c]onferences with listing agent, K. Duff and A. Porter" without any further description of what the conference was for. (*See* RDAPK's Oct. 2018 Billing Stmt. at 13.)

- On October 17, 2018, Ellen Duff charged the Receivership Estate 1.3 hours for a "[c]all with real estate advisors" without providing any description of the nature of that call. (*See* RDAPK's Oct. 2018 Billing Stmt. at 15.)

The Mortgagees did not expend resources conducting a comprehensive review of the Billing Statements. The deficiencies noted above were identified after a review of just *a few weeks* of time entries. These issues seriously draw into question whether all of the services described in the Second Fee Application were, in fact, "actual and necessary" for the Receivership Estate.

## **CONCLUSION**

In sum, the Mortgagees object to the Second Fee Application for the reasons set forth herein and request that: (a) the receivership be dissolved because it is grossly insolvent as evidenced by the accrued fees; (b) the Receiver be directed to abandon non-performing properties; (c) the monies diverted from the Mortgagees' properties be restored before payment of any of the fees in the Second Fee Application and that the mortgages receive principal and interest payments before any payment to professionals in the Second Fee Application, as the Receiver has made no legal showing for any kind of priming lien; (d) duplicative and unreasonable entries that provide no value to the estate are reduced; and (e) the Receiver be compelled to file all outstanding fee applications within the next 60 days.

4848-2929-7827.1

Dated: September 9, 2019                                   Respectfully submitted,

 /s/ James M. Crowley                                       /s/ Jill L. Nicholson
James M. Crowley                                           Jill Nicholson (jnicholson@foley.com)
(jcrowley@plunkettcooney.com)                              Andrew T. McClain (amcclain@foley.com)
Plunkett Cooney, PC                                        Foley & Lardner LLP
221 N. LaSalle Street, Ste. 1550                           321 N. Clark St., Ste. 2800
Chicago, IL 60601                                          Chicago, IL 60654
Ph: (312) 970-3410                                         Ph: (312) 832-4500
Fax: (248) 901-4040                                        Fax: (312) 644-7528
*Counsel for UBS AG*                                       *Counsel for Citibank N.A., as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2018-SB48; U.S. Bank National Association, as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2017-SB30; U.S. Bank National Association, as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2017-SB41; U.S. Bank National Association, as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2018-SB50; Wilmington Trust, National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Trust 2014-LC16, Commercial Mortgage Pass-Through Certificates, Series 2014-LC16; and Fannie Mae*

 /s/ Mark Landman
 Mark Landman (mlandman@lcbf.com)
 Landman Corsi Ballaine & Ford P.C.
 120 Broadway, 27th Floor
 New York, NY 10271
 Ph: (212) 238-4800
 Fax: (212) 238-4848
 *Counsel for Freddie Mac*

 /s/ James P. Sullivan
James P. Sullivan (jsulliva@chapman.com)
Chapman and Cutler LLP
111 West Monroe Street
Chicago, IL 60603
Ph: (312)845-3445
Fax: (312)516-1445
*Counsel for BMO Harris Bank N.A.*

 /s/ Joseph R. Sgroi
Joseph R. Sgroi (jsgroi@honigman.com)
Scott B. Kitei (skitei@honigman.com)
Honigman LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
Ph: (313) 465-7570
Fax: (313) 465-7571
 *Counsel for BC57, LLC*

11

4848-2929-7827.1