**EXHIBIT A**

## PURCHASE & SALE AGREEMENT

This Purchase & Sale Agreement ("Agreement") is made by and between the court-appointed federal equity receiver for SSDF5 Portfolio 1, LLC ("Seller") pursuant to that certain Order Appointing Receiver entered August 17, 2018 (Dkt. 16), as supplemented by that certain Order entered March 14, 2019 (Dkt. 290), in the case captioned *United States Securities and Exchange Commission v. EquityBuild, Inc., et al.*, United States District Court for the Northern District of Illinois, Eastern Division, Civil Action No. 1:18-cv-05587 (the "SEC Action"), and

_Southside Property Group LLC_ ("Buyer")

for the purchase and sale of that certain real property and all fixtures, equipment, and personal property appurtenant thereto (the "Property") located at 7625-33 South East End Avenue, Chicago, Illinois 60649 and legally described as follows:

THE NORTH 6.00 FEET OF LOT 36, AND ALL OF LOTS 37, 38, 39 AND 40 IN BLOCK 11 IN JAMES STINSON'S SUBDIVISION OF EAST GRAND CROSSING IN THE SOUTHWEST QUARTER OF SECTION 25, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Permanent Index No. 20-25-310-008-0000

\*       \*       \*

### TERMS AND CONDITIONS

The Seller agrees to sell the Property, and the Buyer agrees to purchase the Property, on the following terms and conditions:

1. **Purchase Price**. The purchase price for the Property shall be $ _1,250,000_ (the "Purchase Price"). The Buyer shall pay the Purchase Price as follows:

    a.     An earnest money deposit (the "Earnest Money") in an amount equal to ten percent (10%) of the Purchase Price within three (3) business days following the date of acceptance of the Agreement by the Seller (the "Acceptance Date").

    b.     The balance of the Purchase Price, subject to any applicable credits and prorations, at Closing.

*[Note: If the Buyer desires to enter into this Agreement subject to a financing contingency, then Rider A should be completed. Otherwise, Rider A should be left blank.]*

*[Note: If the Buyer purports to hold a mortgage interest in the Property and tenders this Agreement in connection with a credit bid, then Rider B should be completed. Otherwise, Rider B should be left blank.]*

2.      **Earnest Money**. The Earnest Money shall be held by First American Title Company ("First American Title") in a segregated escrow account. In connection with said Earnest Money deposit, the Buyer shall execute and deliver to the Seller a copy of that certain strict joint order escrow agreement in the form attached hereto as Exhibit A.

3.      **Court Approval**. As soon as practicable after the Acceptance Date, the Seller shall move before the Honorable John Z. Lee or any judge sitting in his stead or to whom he has made a referral in the SEC Action (the "Receivership Court") for approval of the sale of the Property pursuant to this Agreement. In the event that the Receivership Court does not issue the requisite approval, then the Agreement shall become null and void and all Earnest Money shall be promptly refunded to the Buyer.

4.      **Escrow Closing**. This sale shall be closed through an escrow with First American Title in accordance with the general provisions of the usual form of deed and money escrow agreement then furnished and in use by said title company. Payment of the Purchase Price and delivery of the receiver's deed shall be made through the escrow. The cost of the escrow shall be divided equally between the Buyer and the Seller unless the Buyer acquires the Property with financing, in which event that portion of the cost of the escrow relating to the financing shall be borne by the Buyer. Unless otherwise specified herein, all other closing costs shall be paid in accordance with custom for apartment investment sales transactions in Cook County, Illinois.

5.      **Irrevocable Offer**. This Agreement when executed by the Buyer and delivered to the Seller shall constitute an irrevocable offer to purchase the Property until _9/13/19_ (the "Offer Expiration Date"). In the event that the offer is not accepted by the Seller before the Offer Expiration Date, then the offer shall be deemed withdrawn.

6.      **Personal Property**. At Closing, the Seller shall tender to the Buyer a bill of sale for the personal property appurtenant to the Property (the "Personal Property") warranting only that Seller is the absolute owner of said Personalty, that said Personalty is free and clear of all liens, charges, and encumbrances, and that the Seller has the full right, power, and authority to sell said Personalty and to deliver the bill of sale. The Seller shall neither make nor adopt any warranty whatsoever with respect to the Personal Property and shall specifically disclaim any implied warranty of merchantability or fitness for a particular purpose. The price of the Personal Property shall be included in the Purchase Price, and the Buyer agrees to accept all such Personal Property in "as is" condition.

7.      **The Closing Date**. The closing shall be held on a date (the "Closing Date") to be designated by the Seller after the Receivership Court approves the sale of the Property pursuant to this Agreement, provided, however, that the Buyer shall be entitled to five business days' advance Notice of the Closing Date.

8.      **Conveyance of Title**. At Closing, the Seller shall convey title to the Property by a recordable form receiver's deed subject only to (a) general real estate taxes not yet due and payable at the time of Closing; (b) covenants, conditions, restrictions, or building lines and

easements of record, if any; (c) public and utility easements; (d) applicable zoning and building laws and ordinances; (f) acts done by or suffered through Buyer or anyone claiming by, through, or under Buyer; (g) governmental actions or proceedings concerning or affecting the Property; and (h) encroachments of a minor nature, if any, that can be insured over at closing (the "Permitted Exceptions"). The Seller agrees to surrender possession of the Property at the time of Closing.

9.      **Commitment For Title Insurance**. Within ten (10) business days after the Acceptance Date, the Seller shall deliver to the Buyer evidence of merchantable title by delivering a commitment for title insurance with extended coverage from First American Title in the amount of the Purchase Price with a commitment date not earlier than July 1, 2019, subject only to general exceptions, the Permitted Exceptions, and exceptions pertaining to liens or encumbrances of a definite and ascertainable amount which may be removed by the payment of money by Seller, endorsed over by First American Title at the Seller's sole expense, or which will be extinguished by order of the Receivership Court. Such title commitment shall be conclusive evidence of good and merchantable title, subject only to the foregoing exceptions. If the commitment for title insurance discloses title exceptions other than the general exceptions, Permitted Exceptions, exceptions waivable through the payment of money or the issuance of an endorsement, or exceptions to be extinguished by Receivership Court order, the Seller shall have thirty (30) calendar days from the Closing Date to cure, or insure over, the unpermitted exceptions and the Closing shall be postponed until said unpermitted exceptions are cured or insured over. If the Seller fails to timely secure the removal of the unpermitted exceptions or obtain an endorsement insuring over the unpermitted exceptions, the Purchaser may terminate this Contract with a full refund of Earnest Money upon Notice to the Seller within ten (10) business days after the expiration of the thirty (30) day period. In such event, this Agreement shall become null and void and neither party shall thereafter have any rights against the other, and the Seller may not be held liable for direct, indirect, incidental, or consequential damages.

10.      **Survey**. At least five (5) business days prior to the Closing Date, the Seller shall provide the Buyer with a survey by a licensed land surveyor dated not more than six months prior to the date of Closing, indicating the present location of all improvements. If the Buyer or the Buyer's mortgagee desires a more recent or extensive survey, the survey shall be obtained at the Buyer's expense.

11.      **Assignment And Assumption Of Leases**. At Closing, the Seller shall deliver to the Buyer, and the Seller and Buyer shall execute, an assignment and assumption of leases (in the form attached hereto as Exhibit B) pursuant to which the Seller shall convey all right, title, and interest in and to any leases in effect at the Property to the Buyer, and the Buyer shall agree to assume all of the Seller's obligations under said leases.

12.      **Prorations**. Prepaid service contracts and other similar items shall be credited ratably at Closing. Any and all rents collected from or on behalf of tenants until the date of the Closing shall be applied by the Seller first to past due balances and then to currently scheduled monthly rent. Each tenant's scheduled monthly rent shall then be prorated for the month of Closing. To

the extent that any tenant has paid all rent through and including the month prior to the Closing, then all additional rent received from such tenant shall be applied by the Seller first to rent for the period between the first day of the month in which the Closing occurs and the date of the Closing, and the balance of said rent, if any, shall be paid to the Buyer. Any and all rents that remain delinquent as of the Closing Date shall belong to the Buyer upon collection. Notwithstanding the foregoing, real estate taxes associated with the ownership of the Property shall be prorated as of the Closing Date based on 105% of the most recently ascertainable tax bill.

13.    **Inspection Period**. The Buyer acknowledges that it was afforded the opportunity to conduct a limited tour of the Property prior to submitting its offer. Within three (3) calendar days following the Acceptance Date, the Seller shall produce the following documents to the Buyer (the "Due Diligence Materials"):

     a.    *Current Rent Roll*. A current rent roll for the Property generated by the management company.

     b.    *Utility Bills*. Copies of all utility bills relating to the Property, to the extent available, for the twelve calendar months preceding the month of the Acceptance Date.

     c.    *Leases*. Copies of all existing leases affecting the Property.

     d.    *Profit & Loss Statement*. A current trailing twelve-month profit and loss statement reflecting all categories of operating income and expenses associated with the Property, as generated by the management company.

     e.    *Litigation Documents*. Copies of documents, including notices of violation, orders, judgments, and other pleadings, pertaining to any known litigation or proceedings currently affecting the Property.

In addition, the Seller shall allow the Buyer reasonable access to the Property for twenty days from and after the Acceptance Date (the "Inspection Period") for the purpose of conducting an inspection of the major structural and mechanical components of the Property. A major structural or mechanical component shall be deemed to be in acceptable operating condition if it substantially performs the function for which it is intended, regardless of age, and does not pose a threat to health or safety. In the event that the Buyer possesses sound evidence that any major structural or mechanical component of the Property does not substantially perform the function for which it is intended, then the Buyer shall have the right to terminate this Agreement upon the delivery of Notice to the Seller on or before the conclusion of the Inspection Period, such notice to be accompanied by the relevant pages of an inspection report prepared by a licensed or certified inspector and identifying the defect justifying the termination. Upon receipt by the Seller of the notice of termination, this Agreement shall be considered null and void and the parties shall be discharged of any and all obligations hereunder (except those obligations which survive termination) and First American Title shall

release the Earnest Money to the Buyer. In the event that the Buyer does not terminate the Agreement on or prior to the conclusion of the Inspection Period, the Property shall be considered accepted by the Buyer and the Earnest Money shall thereafter be non-refundable. In connection with its inspection of the Property, the Buyer shall keep the Property free and clear of liens, shall indemnify and hold Seller harmless from any and all liability, loss, cost, damage, or expense relating to its inspection of the Property, and shall repair any and all damage arising from the inspection. These obligations shall survive termination of the Agreement.

14.     **Entry Into Or Renewal Of Contracts & Material Changes**. Following the expiration of the Inspection Period, the Seller shall not without the prior written consent of the Buyer, said consent not to be unreasonably withheld, conditioned, or delayed, enter into or renew any service contract or lease affecting or concerning the Property. In addition, the Seller shall not make any material changes to the Property, perform or engage in any act, or enter into any agreement that materially changes the value of the Property or the rights of the Buyer relating to the Property.

15.     **Material Destruction**. Risk of loss to the Property shall be borne by the Seller until title has been conveyed to Buyer. If, prior to Closing, a material portion of the Property shall be destroyed or materially damaged by fire or other casualty, then the Seller shall provide prompt notice of said fire or other casualty to the Buyer and this Agreement shall thereafter, at the option of the Buyer, exercised by Notice to the Seller within five (5) business days after receipt of notice of such material damage, be null and void, and all Earnest Money shall be refunded to the Buyer. Failure of the Buyer to provide timely notice shall constitute a waiver of the right to terminate.

16.     **Condition Of Property**. The Buyer understands and agrees that the Property is being sold "as is" and "with all faults" and that neither the Seller nor any agent or attorney of the Seller, makes, or has made, any representation or warranty as to the physical condition or value of the Property or its suitability for the Buyer's intended use. The Seller has no obligation to repair or correct any alleged patent or latent defect at the Property, or to compensate the Buyer for any such defect, and, upon closing, the Buyer waives, releases, acquits, and forever discharges the Seller, and all of the Seller's agents and attorneys, to the maximum extent permitted by law, from any and all claims, actions, causes or action, demands, rights, liabilities, losses, damages, costs, or expenses, direct or indirect, known or unknown, foreseen or unforeseen, that it now has or which may arise in the future on account of or in any way arising from or relating to any alleged patent or latent defect at the Property.

17.     **Buyer Default**. The Buyer and Seller agree that it would be difficult to ascertain the actual damages to be suffered by the Seller in the event of a default by the Buyer and that the amount of the Earnest Money deposited by the Buyer hereunder constitutes the parties' reasonable estimate of the Seller's damages in the event of the Buyer's default, and that upon any such default not caused by the Seller, the Seller shall be entitled to retain the Earnest

Money as liquidated damages, which shall constitute the Seller's sole and exclusive remedy in law or at equity in connection with said default.

18.     **Seller Default**. In the event that the Seller shall fail to sell, transfer, and assign the Property to Purchaser in violation of the terms of this Agreement and/or fail to perform any other material obligation of Seller hereunder, then the Buyer may give Notice to the Seller specifying the nature of the default. The Seller shall thereafter have five (5) business days from receipt of said Notice, but in no event beyond the Closing Date, within which to cure the alleged default. If the Seller fails to cure the default within the cure period, then the Buyer shall be entitled to the return of all Earnest Money and (a) to declare the Agreement null and void and sue for reasonable out-of-pocket expenses incurred in connection with this Agreement prior to the alleged default or (b) to sue for specific performance, the parties recognizing that the Property is unique and that the Buyer otherwise lacks an adequate remedy at law. In the latter event, the Buyer is advised that Section VIII of the Order Appointing Receiver entered in the SEC Action enjoins the filing or prosecution of all civil proceedings against the Receiver, in his capacity as Receiver, until further order of the court.

19.     **Representations and Warranties**. As a material inducement to the Buyer to enter into this Agreement, the Seller hereby makes the following representations and warranties, each of which shall remain true and correct as of the Closing Date:

      a.    The Seller has the full right, power, and authority to convey the Property to the Buyer as provided in this Agreement and to carry out its obligations hereunder. In addition, the individual executing this Agreement on behalf of the Seller has the legal right, power, and authority to bind the Seller to the terms hereof.

      b.    The Seller will not take any action affecting title to the Property following the Acceptance Date.

      c.    To the best of the Seller's knowledge, there are no actions, investigations, suits, or proceedings, pending or threatened, that affect the Property, or the ownership or operation thereof, other than the SEC Action and the following:

            *[None.]*

      d.    To the best of the Seller's knowledge, the Property is not in violation, nor has been under investigation for violation, of any federal, state, or local law, ordinance, or regulation regulating environmental conditions in, at, on, under, or about the Property, including but not limited to, soil and groundwater conditions.

20.     **Notices**. All notices required or permitted under this Agreement shall be in writing and served by registered or certified United States mail, return receipt requested; nationally recognized overnight mail courier (signature required); or electronic mail (evidenced by

competent and authentic proof of transmission). Any notices given to the Seller shall be delivered to the Seller's counsel, at the following physical or e-mail addresses:

> Andrew E. Porter
> Porter Law Office
> 853 North Elston Avenue
> Chicago, Illinois 60614
> andrew@andrewporterlaw.com

> Michael Rachlis
> Rachlis Duff Peel & Kaplan LLC
> 542 South Dearborn, Suite 900
> Chicago, Illinois 60605
> mrachlis@rdaplaw.net

Any such notices or demands given to the Buyer shall be delivered to the Buyer's counsel, at the following address physical or e-mail addresses:



David Resnick

DResnick@RSPlaw.com

312-456-0376

21. **Like-Kind Exchange**. The Seller agrees to cooperate if the Buyer elects to acquire the Property as part of a like-kind exchange under Section 1031 of the Internal Revenue Code. The Buyer's contemplated exchange shall not impose upon the Seller any additional liability or financial obligation, and the Buyer agrees to hold the Seller harmless from any liability that might arise from such exchange. This Agreement is neither subject to nor contingent upon the Buyer's ability to dispose of its exchange property or to effectuate an exchange. In the event any exchange contemplated by the Buyer should fail to occur, for whatever reason, the sale of the Property shall nonetheless be consummated as provided herein.

22. **Real Estate Agents**. Purchaser represents and warrants that, other than Seller's Agent and Buyer's Agent, if any, no other putative real estate agent or broker was involved in submitting, showing, marketing, or selling the Property to the Buyer, and the Buyer agrees to indemnify and hold Seller, and its successors and assigns, harmless from and against any and all liability, loss, damages, cost, or expense, including reasonable attorneys' fees, arising from or relating to any claim for a commission, fee, or other form of payment or compensation asserted by a putative real estate agent or broker purporting to have procured the Buyer in connection with this Agreement.

23.     **Foreign Investor Disclosure**. The Seller and the Buyer agree to execute and deliver any instrument, affidavit, or statement, and to perform any act reasonably necessary to carry out the provisions of the Foreign Investment in Real Property Tax Act and regulations promulgated thereunder. The Seller represents that the Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code.

24.     **Merger**. This Agreement expresses the entire agreement of the parties and supersedes any and all previous agreements or understandings between them with regard to the Property. There are no other understandings, oral or written, which in any way alter or enlarge the terms of this Agreement, and there are no warranties or representations of any nature whatsoever, either express or implied, except as set forth herein. This Agreement may be modified only by a written instrument signed by the party to be charged.

25.     **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

*       *       *

The undersigned Buyer hereby offers and agrees to purchase the Property upon the terms and conditions stated herein as of this _14th_ day of August, 2019. In addition, the individual signing below on behalf of the Buyer represents and warrants that s/he is authorized to execute this Agreement on behalf of the Buyer.

**Buyer**

Southside Property Group LLC

765 E. 69th Place

Chicago IL 60637

_____

By: _____

Its: Managing Member

**Buyer's Agent**

_____

_____

N/A

_____

**Seller**

KEVIN B. DUFF,
FEDERAL EQUITY RECEIVER FOR
SSDF5 PORTFOLIO 1 LLC

Rachlis Duff Peel & Kaplan LLC
542 South Dearborn Street, Suite 900
Chicago, Illinois 60605
(312) 733-3390

_____ Receiver

Acceptance Date: 9/6/2019

**Seller's Agent**

Jeffrey Baasch
SVN Chicago Commercial
940 West Adams Street, Suite 200
Chicago, Illinois 60607
(312) 676-1866

9

## RIDER A

_____ If the Buyer desires that the terms and provisions of this Rider be incorporated into the Purchase And Sale Agreement to which it is annexed, please initial this paragraph.

*      *      *

This Agreement is contingent upon the Buyer securing, no later than 21 days following the Acceptance Date (the "Financing Contingency Deadline"), a firm written mortgage commitment for a fixed or adjustable rate mortgage from an established multifamily residential mortgage lender in the amount of $_____, at an interest rate (or initial interest rate if an adjustable rate mortgage) not to exceed %_____per annum, amortized over _____ years, payable monthly, with a loan origination fee not to exceed %_____, plus appraisal and credit report fees, if any. If the Buyer is unable to secure a firm written mortgage commitment as described herein within the referenced time period, then the Buyer may terminate this Agreement with a full refund of Earnest Money by providing notice to the Seller prior to the expiration of the Financing Contingency Deadline. If the Buyer does not provide the requisite notice to the Seller as provided herein, then the Buyer shall be deemed to have waived this financing contingency, and this Agreement shall remain in full force and effect.

N/A

**RIDER B**

_____ If the Buyer purports to hold a mortgage interest in the Property and tenders the Purchase And Sale Agreement to which this rider is annexed (the "Agreement") in connection with the submission of a credit bid, please initial this paragraph and provide the information and supply any additional terms and conditions to the Agreement, or modifications to the Agreement, as requested herein. Any such terms and conditions shall supersede any contrary or conflicting terms and conditions set forth in the Agreement itself.

\*      \*      \*

The Buyer consists of the following mortgagee or mortgagees purporting to hold a perfected and unreleased security interest in the Property:

N/A

_[Using additional sheets, please indicate, for each mortgagee identified above, the total unpaid balance due under the promissory note secured by the corresponding mortgage and itemize each component of the current alleged loan balance, including, but not limited to, principal, interest, default rate interest, late fees, service fees, liquidation fees, protective advances, and other charges.]_

The Purchase Price shall be the amount of the credit bid submitted by the Buyer, and any requirement to make an earnest money deposit is deleted. Payment of the Purchase Price shall not be made through the escrow at closing.

In addition, the Buyer shall pay all closing costs approved by the Court, which may, subject to the Court's ruling, include, but not be limited to, owner's title insurance premiums, applicable transfer taxes, the survey invoice, property management fees accrued through the closing, due and unpaid real estate taxes, escrow fees, brokerage commissions, unpaid utilities, title commitment update fees, gap insurance premiums, State of Illinois policy fees, extended coverage premiums, the costs of closing protection coverage for the Seller, all other expenses required to be paid by the Seller at closing, all amounts advanced for the benefit of the Property which are required to be reimbursed and/or any amount required to discharge any Receiver's lien.

*[Using additional sheets, set forth any other terms and conditions to be included in the Agreement, or any modifications to the Agreement, and to which your credit bid shall remain subject.]*

**EXHIBIT A**



**First American**
**Title Insurance Company**

## STRICT JOINT ORDER ESCROW AGREEMENT

**Open Date:** _____  **Expected Release Date:** _____  **Escrow Number:** 2986622

**Property Address:** 7625-33 South East End Avenue, Chicago, Illinois 60649

**Deposit Amount: $** _____  **Purpose:** ☒ Earnest Money  ☐ Repairs: _____
**Document(s) Held** _____   ☐ Tax Escrow  ☐ Other: _____

The above is hereby deposited with First American Title Insurance Company, as Escrowee (hereinafter referred to as the Escrowee) pursuant to this Strict Joint Order Escrow Agreement (hereinafter referred to as the Agreement). Said deposit shall be released and delivered by the Escrowee only upon the joint written order of the undersigned or their respective legal representatives or assigns.

Escrowee is hereby expressly authorized to disregard, in its sole discretion, any and all notices or warnings given by any other person or corporation, but the Escrowee is hereby expressly authorized to regard and to comply with and obey any and all orders, judgments or decrees entered or issued by any court with or without jurisdiction, and in case the Escrowee obeys or complies with any such order, judgment or decree of any court it shall not be liable to any party hereto or any other person, firm or corporation by reason of such compliance, notwithstanding any such order, judgment or decree being entered without jurisdiction or being subsequently reversed, modified, annulled, set aside or vacated. In case of any suit or proceeding regarding the Agreement, to which the Escrowee is or may at any time become a party, it shall have a lien on the contents hereof for any and all costs, and reasonable attorneys' fees, whether such attorneys shall be regularly retained or specially employed, and any other expenses which it may have incurred or become liable for on account thereof, and it shall be entitled to reimburse itself therefore out of said deposit, and the undersigned agree to pay the Escrowee upon demand all such costs, fees and expenses so incurred, to the extent the funds deposited hereunder shall be insufficient to allow for such reimbursement.

In no case shall the above mentioned deposits be surrendered except on an order signed by the parties hereto, their respective legal representatives or assigns, or order of court as aforesaid.

Interest, income or other benefits, if any, earned or derived from the funds deposited shall belong to the Escrowee. The Escrowee may deposit all funds received hereunder to one or more of its general accounts. The Escrowee shall be under no duty to invest or reinvest any funds, at any time, held by it pursuant to the terms of the Agreement.

Unless otherwise tendered, the Escrowee is authorized to pay an Escrow Fee in the amount of $300.00, and thereafter a Maintenance Fee in the amount of $200.00 (charged per annum beginning one year following the date of the Agreement) from the funds deposited in this escrow. The Escrowee also reserves the right to add applicable administration fees at its discretion.

| **Purchaser:** | | **Seller:** | Kevin B. Duff, as Federal Equity Receiver for SSDF5 Portfolio 1 LLC |
|---|---|---|---|
| Signed: | *[signature]* | Signed: | *[signature]* Receiver |
| Print Name: | KEVIN NUGENT / Southside Property Group LLC | Print Name: | Rachlis Duff Peel & Kaplan LLC |
| Address: | 765 E. 69th Place | Address: | 542 South Dearborn, Suite 900 |
| | Chicago IL 60637 | | Chicago, Illinois 60605 |
| Email: | KEVIN NUGENT @ WPDmanagement.com | Email: | kduff@rdaplaw.net |
| Primary Phone: | 773-908-9762 | Primary Phone: | (312) 733-3390 |
| Alternate Phone: | | Alternate Phone: | |

**Primary Contact (if other than above):** _____

Accepted: First American Title Insurance Company, Escrowee    By: _____

27775 Diehl Road, Ste 200, Warrenville, IL 60555
T E L 877-295-4328 · F A X 866-525-5530
titleindemnity.warrenville.il@firstam.com

**EXHIBIT B**

**<u>Assignment And Assumption Of Leases</u>**

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Kevin B. Duff, as court-appointed federal equity receiver for SSDF5 Portfolio 1, LLC ("Seller") pursuant to that certain Order Appointing Receiver entered August 17, 2018 (Dkt. 16), as supplemented by that certain Order entered March 14, 2019 (Dkt. 290), in the case captioned *United States Securities and Exchange Commission v. EquityBuild, Inc., et al.*, United States District Court for the Northern District of Illinois, Eastern Division, Civil Action No. 1:18-cv-05587 ("Assignor"), hereby irrevocably grants, assigns, transfers, conveys, and sets over to [TBD] ("Assignee"), a _____, all of Assignor's right, title, and interest in and to the leases (collectively, the "Leases") attached hereto.

Assignee hereby assumes all of the obligations imposed upon the Assignor under the Leases which accrue from and after the date hereof. This Assignment is made without any express or implied representation or warranty, except to the extent provided in that certain Purchase And Sale Agreement, accepted by the Seller on August ___, 2019, by and between Assignor and Assignee.

This Assignment shall be governed by and construed in accordance with the laws of the State of Illinois.

IN WITNESS WHEREOF, the parties have executed this Assignment And Assumption Of Leases as of this ___ day of _____, 2019.

**ASSIGNOR:**

Kevin B. Duff, Federal Equity Receiver for
SSDF5 Portfolio 1, LLC

_____

**ASSIGNEE:**

[TBD] Southside Property Group LLC

By: _____

Name: KEVIN NUGENT

Title: Managing Member

**EXHIBIT B**

## PURCHASE & SALE AGREEMENT

This Purchase & Sale Agreement ("Agreement") is made by and between the court-appointed federal equity receiver for SSDF5 Portfolio 1, LLC ("Seller") pursuant to that certain Order Appointing Receiver entered August 17, 2018 (Dkt. 16), as supplemented by that certain Order entered March 14, 2019 (Dkt. 290), in the case captioned *United States Securities and Exchange Commission v. EquityBuild, Inc., et al.*, United States District Court for the Northern District of Illinois, Eastern Division, Civil Action No. 1:18-cv-05587 (the "SEC Action"), and

_Southside Property Group LLC_ ("Buyer")

for the purchase and sale of that certain real property and all fixtures, equipment, and personal property appurtenant thereto (the "Property") located at 7635-43 South East End Avenue, Chicago, Illinois 60649 and legally described as follows:

THE NORTH 14 FEET OF LOT 32, AND ALL OF LOTS 33, 34, 35 AND 36 (EXCEPT THE NORTH 6 FEET THEREOF) IN BLOCK 11 IN JAMES STINSON'S SUBDIVISION OF EAST GRAND CROSSING IN THE SOUTHWEST QUARTER OF SECTION 25, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Permanent Index No. 20-25-310-009-0000

\*       \*       \*

### TERMS AND CONDITIONS

The Seller agrees to sell the Property, and the Buyer agrees to purchase the Property, on the following terms and conditions:

1.   **Purchase Price**. The purchase price for the Property shall be $ _1,170,000_ (the "Purchase Price"). The Buyer shall pay the Purchase Price as follows:

   a.      An earnest money deposit (the "Earnest Money") in an amount equal to ten percent (10%) of the Purchase Price within three (3) business days following the date of acceptance of the Agreement by the Seller (the "Acceptance Date").

   b.      The balance of the Purchase Price, subject to any applicable credits and prorations, at Closing.

*[Note: If the Buyer desires to enter into this Agreement subject to a financing contingency, then Rider A should be completed. Otherwise, Rider A should be left blank.]*

*[Note: If the Buyer purports to hold a mortgage interest in the Property and tenders this Agreement in connection with a credit bid, then Rider B should be completed. Otherwise, Rider B should be left blank.]*

2.     **Earnest Money**. The Earnest Money shall be held by First American Title Company ("First American Title") in a segregated escrow account. In connection with said Earnest Money deposit, the Buyer shall execute and deliver to the Seller a copy of that certain strict joint order escrow agreement in the form attached hereto as Exhibit A.

3.     **Court Approval**. As soon as practicable after the Acceptance Date, the Seller shall move before the Honorable John Z. Lee or any judge sitting in his stead or to whom he has made a referral in the SEC Action (the "Receivership Court") for approval of the sale of the Property pursuant to this Agreement. In the event that the Receivership Court does not issue the requisite approval, then the Agreement shall become null and void and all Earnest Money shall be promptly refunded to the Buyer.

4.     **Escrow Closing**. This sale shall be closed through an escrow with First American Title in accordance with the general provisions of the usual form of deed and money escrow agreement then furnished and in use by said title company. Payment of the Purchase Price and delivery of the receiver's deed shall be made through the escrow. The cost of the escrow shall be divided equally between the Buyer and the Seller unless the Buyer acquires the Property with financing, in which event that portion of the cost of the escrow relating to the financing shall be borne by the Buyer. Unless otherwise specified herein, all other closing costs shall be paid in accordance with custom for apartment investment sales transactions in Cook County, Illinois.

5.     **Irrevocable Offer**. This Agreement when executed by the Buyer and delivered to the Seller shall constitute an irrevocable offer to purchase the Property until _9/13/19_ (the "Offer Expiration Date"). In the event that the offer is not accepted by the Seller before the Offer Expiration Date, then the offer shall be deemed withdrawn.

6.     **Personal Property**. At Closing, the Seller shall tender to the Buyer a bill of sale for the personal property appurtenant to the Property (the "Personal Property") warranting only that Seller is the absolute owner of said Personalty, that said Personalty is free and clear of all liens, charges, and encumbrances, and that the Seller has the full right, power, and authority to sell said Personalty and to deliver the bill of sale. The Seller shall neither make nor adopt any warranty whatsoever with respect to the Personal Property and shall specifically disclaim any implied warranty of merchantability or fitness for a particular purpose. The price of the Personal Property shall be included in the Purchase Price, and the Buyer agrees to accept all such Personal Property in "as is" condition.

7.     **The Closing Date**. The closing shall be held on a date (the "Closing Date") to be designated by the Seller after the Receivership Court approves the sale of the Property pursuant to this Agreement, provided, however, that the Buyer shall be entitled to five business days' advance Notice of the Closing Date.

8.     **Conveyance of Title**. At Closing, the Seller shall convey title to the Property by a recordable form receiver's deed subject only to (a) general real estate taxes not yet due and payable at the time of Closing; (b) covenants, conditions, restrictions, or building lines and

easements of record, if any; (c) public and utility easements; (d) applicable zoning and building laws and ordinances; (f) acts done by or suffered through Buyer or anyone claiming by, through, or under Buyer; (g) governmental actions or proceedings concerning or affecting the Property; and (h) encroachments of a minor nature, if any, that can be insured over at closing (the "Permitted Exceptions"). The Seller agrees to surrender possession of the Property at the time of Closing.

9.      **Commitment For Title Insurance**. Within ten (10) business days after the Acceptance Date, the Seller shall deliver to the Buyer evidence of merchantable title by delivering a commitment for title insurance with extended coverage from First American Title in the amount of the Purchase Price with a commitment date not earlier than July 1, 2019, subject only to general exceptions, the Permitted Exceptions, and exceptions pertaining to liens or encumbrances of a definite and ascertainable amount which may be removed by the payment of money by Seller, endorsed over by First American Title at the Seller's sole expense, or which will be extinguished by order of the Receivership Court. Such title commitment shall be conclusive evidence of good and merchantable title, subject only to the foregoing exceptions. If the commitment for title insurance discloses title exceptions other than the general exceptions, Permitted Exceptions, exceptions waivable through the payment of money or the issuance of an endorsement, or exceptions to be extinguished by Receivership Court order, the Seller shall have thirty (30) calendar days from the Closing Date to cure, or insure over, the unpermitted exceptions and the Closing shall be postponed until said unpermitted exceptions are cured or insured over. If the Seller fails to timely secure the removal of the unpermitted exceptions or obtain an endorsement insuring over the unpermitted exceptions, the Purchaser may terminate this Contract with a full refund of Earnest Money upon Notice to the Seller within ten (10) business days after the expiration of the thirty (30) day period. In such event, this Agreement shall become null and void and neither party shall thereafter have any rights against the other, and the Seller may not be held liable for direct, indirect, incidental, or consequential damages.

10.      **Survey**. At least five (5) business days prior to the Closing Date, the Seller shall provide the Buyer with a survey by a licensed land surveyor dated not more than six months prior to the date of Closing, indicating the present location of all improvements. If the Buyer or the Buyer's mortgagee desires a more recent or extensive survey, the survey shall be obtained at the Buyer's expense.

11.      **Assignment And Assumption Of Leases**. At Closing, the Seller shall deliver to the Buyer, and the Seller and Buyer shall execute, an assignment and assumption of leases (in the form attached hereto as Exhibit B) pursuant to which the Seller shall convey all right, title, and interest in and to any leases in effect at the Property to the Buyer, and the Buyer shall agree to assume all of the Seller's obligations under said leases.

12.      **Prorations**. Prepaid service contracts and other similar items shall be credited ratably at Closing. Any and all rents collected from or on behalf of tenants until the date of the Closing shall be applied by the Seller first to past due balances and then to currently scheduled monthly rent. Each tenant's scheduled monthly rent shall then be prorated for the month of Closing. To

the extent that any tenant has paid all rent through and including the month prior to the Closing, then all additional rent received from such tenant shall be applied by the Seller first to rent for the period between the first day of the month in which the Closing occurs and the date of the Closing, and the balance of said rent, if any, shall be paid to the Buyer. Any and all rents that remain delinquent as of the Closing Date shall belong to the Buyer upon collection. Notwithstanding the foregoing, real estate taxes associated with the ownership of the Property shall be prorated as of the Closing Date based on 105% of the most recently ascertainable tax bill.

13.     **Inspection Period**. The Buyer acknowledges that it was afforded the opportunity to conduct a limited tour of the Property prior to submitting its offer. Within three (3) calendar days following the Acceptance Date, the Seller shall produce the following documents to the Buyer (the "Due Diligence Materials"):

   a.     *Current Rent Roll*. A current rent roll for the Property generated by the management company.

   b.     *Utility Bills*. Copies of all utility bills relating to the Property, to the extent available, for the twelve calendar months preceding the month of the Acceptance Date.

   c.     *Leases*. Copies of all existing leases affecting the Property.

   d.     *Profit & Loss Statement*. A current trailing twelve-month profit and loss statement reflecting all categories of operating income and expenses associated with the Property, as generated by the management company.

   e.     *Litigation Documents*. Copies of documents, including notices of violation, orders, judgments, and other pleadings, pertaining to any known litigation or proceedings currently affecting the Property.

In addition, the Seller shall allow the Buyer reasonable access to the Property for twenty days from and after the Acceptance Date (the "Inspection Period") for the purpose of conducting an inspection of the major structural and mechanical components of the Property. A major structural or mechanical component shall be deemed to be in acceptable operating condition if it substantially performs the function for which it is intended, regardless of age, and does not pose a threat to health or safety. In the event that the Buyer possesses sound evidence that any major structural or mechanical component of the Property does not substantially perform the function for which it is intended, then the Buyer shall have the right to terminate this Agreement upon the delivery of Notice to the Seller on or before the conclusion of the Inspection Period, such notice to be accompanied by the relevant pages of an inspection report prepared by a licensed or certified inspector and identifying the defect justifying the termination. Upon receipt by the Seller of the notice of termination, this Agreement shall be considered null and void and the parties shall be discharged of any and all obligations hereunder (except those obligations which survive termination) and First American Title shall

release the Earnest Money to the Buyer. In the event that the Buyer does not terminate the Agreement on or prior to the conclusion of the Inspection Period, the Property shall be considered accepted by the Buyer and the Earnest Money shall thereafter be non-refundable. In connection with its inspection of the Property, the Buyer shall keep the Property free and clear of liens, shall indemnify and hold Seller harmless from any and all liability, loss, cost, damage, or expense relating to its inspection of the Property, and shall repair any and all damage arising from the inspection. These obligations shall survive termination of the Agreement.

14.     **Entry Into Or Renewal Of Contracts & Material Changes**. Following the expiration of the Inspection Period, the Seller shall not without the prior written consent of the Buyer, said consent not to be unreasonably withheld, conditioned, or delayed, enter into or renew any service contract or lease affecting or concerning the Property. In addition, the Seller shall not make any material changes to the Property, perform or engage in any act, or enter into any agreement that materially changes the value of the Property or the rights of the Buyer relating to the Property.

15.     **Material Destruction**. Risk of loss to the Property shall be borne by the Seller until title has been conveyed to Buyer. If, prior to Closing, a material portion of the Property shall be destroyed or materially damaged by fire or other casualty, then the Seller shall provide prompt notice of said fire or other casualty to the Buyer and this Agreement shall thereafter, at the option of the Buyer, exercised by Notice to the Seller within five (5) business days after receipt of notice of such material damage, be null and void, and all Earnest Money shall be refunded to the Buyer. Failure of the Buyer to provide timely notice shall constitute a waiver of the right to terminate.

16.     **Condition Of Property**. The Buyer understands and agrees that the Property is being sold "as is" and "with all faults" and that neither the Seller nor any agent or attorney of the Seller, makes, or has made, any representation or warranty as to the physical condition or value of the Property or its suitability for the Buyer's intended use. The Seller has no obligation to repair or correct any alleged patent or latent defect at the Property, or to compensate the Buyer for any such defect, and, upon closing, the Buyer waives, releases, acquits, and forever discharges the Seller, and all of the Seller's agents and attorneys, to the maximum extent permitted by law, from any and all claims, actions, causes or action, demands, rights, liabilities, losses, damages, costs, or expenses, direct or indirect, known or unknown, foreseen or unforeseen, that it now has or which may arise in the future on account of or in any way arising from or relating to any alleged patent or latent defect at the Property.

17.     **Buyer Default**. The Buyer and Seller agree that it would be difficult to ascertain the actual damages to be suffered by the Seller in the event of a default by the Buyer and that the amount of the Earnest Money deposited by the Buyer hereunder constitutes the parties' reasonable estimate of the Seller's damages in the event of the Buyer's default, and that upon any such default not caused by the Seller, the Seller shall be entitled to retain the Earnest

Money as liquidated damages, which shall constitute the Seller's sole and exclusive remedy in law or at equity in connection with said default.

18.     **Seller Default**. In the event that the Seller shall fail to sell, transfer, and assign the Property to Purchaser in violation of the terms of this Agreement and/or fail to perform any other material obligation of Seller hereunder, then the Buyer may give Notice to the Seller specifying the nature of the default. The Seller shall thereafter have five (5) business days from receipt of said Notice, but in no event beyond the Closing Date, within which to cure the alleged default. If the Seller fails to cure the default within the cure period, then the Buyer shall be entitled to the return of all Earnest Money and (a) to declare the Agreement null and void and sue for reasonable out-of-pocket expenses incurred in connection with this Agreement prior to the alleged default or (b) to sue for specific performance, the parties recognizing that the Property is unique and that the Buyer otherwise lacks an adequate remedy at law. In the latter event, the Buyer is advised that Section VIII of the Order Appointing Receiver entered in the SEC Action enjoins the filing or prosecution of all civil proceedings against the Receiver, in his capacity as Receiver, until further order of the court.

19.     **Representations and Warranties**. As a material inducement to the Buyer to enter into this Agreement, the Seller hereby makes the following representations and warranties, each of which shall remain true and correct as of the Closing Date:

   a.     The Seller has the full right, power, and authority to convey the Property to the Buyer as provided in this Agreement and to carry out its obligations hereunder. In addition, the individual executing this Agreement on behalf of the Seller has the legal right, power, and authority to bind the Seller to the terms hereof.

   b.     The Seller will not take any action affecting title to the Property following the Acceptance Date.

   c.     To the best of the Seller's knowledge, there are no actions, investigations, suits, or proceedings, pending or threatened, that affect the Property, or the ownership or operation thereof, other than the SEC Action and the following:

          *[None.]*

   d.     To the best of the Seller's knowledge, the Property is not in violation, nor has been under investigation for violation, of any federal, state, or local law, ordinance, or regulation regulating environmental conditions in, at, on, under, or about the Property, including but not limited to, soil and groundwater conditions.

20.     **Notices**. All notices required or permitted under this Agreement shall be in writing and served by registered or certified United States mail, return receipt requested; nationally recognized overnight mail courier (signature required); or electronic mail (evidenced by

6

competent and authentic proof of transmission). Any notices given to the Seller shall be delivered to the Seller's counsel, at the following physical or e-mail addresses:

> Andrew E. Porter
> Porter Law Office
> 853 North Elston Avenue
> Chicago, Illinois 60614
> *andrew@andrewporterlaw.com*
>
> Michael Rachlis
> Rachlis Duff Peel & Kaplan LLC
> 542 South Dearborn, Suite 900
> Chicago, Illinois 60605
> *mrachlis@rdaplaw.net*

Any such notices or demands given to the Buyer shall be delivered to the Buyer's counsel, at the following address physical or e-mail addresses:



21.    **Like-Kind Exchange**. The Seller agrees to cooperate if the Buyer elects to acquire the Property as part of a like-kind exchange under Section 1031 of the Internal Revenue Code. The Buyer's contemplated exchange shall not impose upon the Seller any additional liability or financial obligation, and the Buyer agrees to hold the Seller harmless from any liability that might arise from such exchange. This Agreement is neither subject to nor contingent upon the Buyer's ability to dispose of its exchange property or to effectuate an exchange. In the event any exchange contemplated by the Buyer should fail to occur, for whatever reason, the sale of the Property shall nonetheless be consummated as provided herein.

22.    **Real Estate Agents**. Purchaser represents and warrants that, other than Seller's Agent and Buyer's Agent, if any, no other putative real estate agent or broker was involved in submitting, showing, marketing, or selling the Property to the Buyer, and the Buyer agrees to indemnify and hold Seller, and its successors and assigns, harmless from and against any and all liability, loss, damages, cost, or expense, including reasonable attorneys' fees, arising from or relating to any claim for a commission, fee, or other form of payment or compensation asserted by a putative real estate agent or broker purporting to have procured the Buyer in connection with this Agreement.

23.     **Foreign Investor Disclosure**. The Seller and the Buyer agree to execute and deliver any instrument, affidavit, or statement, and to perform any act reasonably necessary to carry out the provisions of the Foreign Investment in Real Property Tax Act and regulations promulgated thereunder. The Seller represents that the Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code.

24.     **Merger**. This Agreement expresses the entire agreement of the parties and supersedes any and all previous agreements or understandings between them with regard to the Property. There are no other understandings, oral or written, which in any way alter or enlarge the terms of this Agreement, and there are no warranties or representations of any nature whatsoever, either express or implied, except as set forth herein. This Agreement may be modified only by a written instrument signed by the party to be charged.

25.     **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

*          *          *

The undersigned Buyer hereby offers and agrees to purchase the Property upon the terms and conditions stated herein as of this _14th_ day of August, 2019. In addition, the individual signing below on behalf of the Buyer represents and warrants that s/he is authorized to execute this Agreement on behalf of the Buyer.

**Buyer**

Southside Property Group LLC

765 E. 69ᵀᴴ Place

Chicago IL 60637

By: _____

Its: Managing Member

**Seller**

KEVIN B. DUFF,
FEDERAL EQUITY RECEIVER FOR
SSDF5 PORTFOLIO 1 LLC

Rachlis Duff Peel & Kaplan LLC
542 South Dearborn Street, Suite 900
Chicago, Illinois 60605
(312) 733-3390

_____, Receiver

Acceptance Date: 9/6/2019

**Buyer's Agent**



N/A

**Seller's Agent**

Jeffrey Baasch
SVN Chicago Commercial
940 West Adams Street, Suite 200
Chicago, Illinois 60607
(312) 676-1866

9

## RIDER A

_____ If the Buyer desires that the terms and provisions of this Rider be incorporated into the Purchase And Sale Agreement to which it is annexed, please initial this paragraph.

\*          \*          \*

This Agreement is contingent upon the Buyer securing, no later than 21 days following the

Acceptance Date (the "Financing Contingency Deadline"), a firm written mortgage commitment

for a fixed or adjustable rate mortgage from an established multifamily residential mortgage

lender in the amount of $_____, at an interest rate (or initial interest rate if an adjustable

rate mortgage) not to exceed %_____ per annum, amortized over _____ years, payable monthly,

with a loan origination fee not to exceed %_____, plus appraisal and credit report fees, if any. If

the Buyer is unable to secure a firm written mortgage commitment as described herein within

the referenced time period, then the Buyer may terminate this Agreement with a full refund of

Earnest Money by providing notice to the Seller prior to the expiration of the Financing

Contingency Deadline. If the Buyer does not provide the requisite notice to the Seller as

provided herein, then the Buyer shall be deemed to have waived this financing contingency,

and this Agreement shall remain in full force and effect.

## RIDER B

_____ If the Buyer purports to hold a mortgage interest in the Property and tenders the Purchase And Sale Agreement to which this rider is annexed (the "Agreement") in connection with the submission of a credit bid, please initial this paragraph and provide the information and supply any additional terms and conditions to the Agreement, or modifications to the Agreement, as requested herein. Any such terms and conditions shall supersede any contrary or conflicting terms and conditions set forth in the Agreement itself.

*     *     *

The Buyer consists of the following mortgagee or mortgagees purporting to hold a perfected and unreleased security interest in the Property:

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

*[Using additional sheets, please indicate, for each mortgagee identified above, the total unpaid balance due under the promissory note secured by the corresponding mortgage and itemize each component of the current alleged loan balance, including, but not limited to, principal, interest, default rate interest, late fees, service fees, liquidation fees, protective advances, and other charges.]*

The Purchase Price shall be the amount of the credit bid submitted by the Buyer, and any requirement to make an earnest money deposit is deleted. Payment of the Purchase Price shall not be made through the escrow at closing.

In addition, the Buyer shall pay all closing costs approved by the Court, which may, subject to the Court's ruling, include, but not be limited to, owner's title insurance premiums, applicable transfer taxes, the survey invoice, property management fees accrued through the closing, due and unpaid real estate taxes, escrow fees, brokerage commissions, unpaid utilities, title commitment update fees, gap insurance premiums, State of Illinois policy fees, extended coverage premiums, the costs of closing protection coverage for the Seller, all other expenses required to be paid by the Seller at closing, all amounts advanced for the benefit of the Property which are required to be reimbursed and/or any amount required to discharge any Receiver's lien.

*[Using additional sheets, set forth any other terms and conditions to be included in the Agreement, or any modifications to the Agreement, and to which your credit bid shall remain subject.]*

**EXHIBIT A**



**First American**
**Title Insurance Company**

## STRICT JOINT ORDER ESCROW AGREEMENT

**Open Date:** _____  **Expected Release Date:** _____  **Escrow Number:** 2986630

**Property Address:** 7635-43 South East End Avenue, Chicago, Illinois 60649

**Deposit Amount: $** _____  **Purpose:** [X] Earnest Money  [ ] Repairs: _____
**Document(s) Held** _____  [ ] Tax Escrow  [ ] Other: _____

The above is hereby deposited with First American Title Insurance Company, as Escrowee (hereinafter referred to as the Escrowee) pursuant to this Strict Joint Order Escrow Agreement (hereinafter referred to as the Agreement). Said deposit shall be released and delivered by the Escrowee only upon the joint written order of the undersigned or their respective legal representatives or assigns.

Escrowee is hereby expressly authorized to disregard, in its sole discretion, any and all notices or warnings given by any other person or corporation, but the Escrowee is hereby expressly authorized to regard and to comply with and obey any and all orders, judgments or decrees entered or issued by any court with or without jurisdiction, and in case the Escrowee obeys or complies with any such order, judgment or decree of any court it shall not be liable to any party hereto or any other person, firm or corporation by reason of such compliance, notwithstanding any such order, judgment or decree being entered without jurisdiction or being subsequently reversed, modified, annulled, set aside or vacated. In case of any suit or proceeding regarding the Agreement, to which the Escrowee is or may at any time become a party, it shall have a lien on the contents hereof for any and all costs, and reasonable attorneys' fees, whether such attorneys shall be regularly retained or specially employed, and any other expenses which it may have incurred or become liable for on account thereof, and it shall be entitled to reimburse itself therefore out of said deposit, and the undersigned agree to pay the Escrowee upon demand all such costs, fees and expenses so incurred, to the extent the funds deposited hereunder shall be insufficient to allow for such reimbursement.

In no case shall the above mentioned deposits be surrendered except on an order signed by the parties hereto, their respective legal representatives or assigns, or order of court as aforesaid.

Interest, income or other benefits, if any, earned or derived from the funds deposited shall belong to the Escrowee. The Escrowee may deposit all funds received hereunder to one or more of its general accounts. The Escrowee shall be under no duty to invest or reinvest any funds, at any time, held by it pursuant to the terms of the Agreement.

Unless otherwise tendered, the Escrowee is authorized to pay an Escrow Fee in the amount of $300.00, and thereafter a Maintenance Fee in the amount of $200.00 (charged per annum beginning one year following the date of the Agreement) from the funds deposited in this escrow. The Escrowee also reserves the right to add applicable administration fees at its discretion.

| | | |
|---|---|---|
| **Purchaser:** | **Seller:** | Kevin B. Duff, as Federal Equity Receiver for SSDF5 Portfolio 1, LLC |
| Signed: | Signed: | |
| Print Name: KEVIN NUGENT / Southside Property Group | Print Name: | Rachlis Duff Peel & Kaplan LLC |
| Address: 765 E. 69th Street Chicago IL 60637 | Address: | 542 South Dearborn, Suite 900 Chicago, Illinois 60605 |
| Email: KevinNugent@WPDmanagement.com | Email: | kduff@rdaplaw.net |
| Primary Phone: 773-908-9762 | Primary Phone: | (312) 733-3390 |
| Alternate Phone: | Alternate Phone: | |

**Primary Contact (if other than above):** _____

Accepted: First American Title Insurance Company, Escrowee     By: _____

27775 Diehl Road, Ste 200, Warrenville, IL 60555
*T E L* 877-295-4328 · *F A X* 866-525-5530
*titleindemnity.warrenville.il@firstam.com*

EXHIBIT B

## Assignment And Assumption Of Leases

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Kevin B. Duff, as court-appointed federal equity receiver for SSDF5 Portfolio 1, LLC ("Seller") pursuant to that certain Order Appointing Receiver entered August 17, 2018 (Dkt. 16), as supplemented by that certain Order entered March 14, 2019 (Dkt. 290), in the case captioned *United States Securities and Exchange Commission v. EquityBuild, Inc., et al.*, United States District Court for the Northern District of Illinois, Eastern Division, Civil Action No. 1:18-cv-05587 ("Assignor"), hereby irrevocably grants, assigns, transfers, conveys, and sets over to [TBD] ("Assignee"), a _____, all of Assignor's right, title, and interest in and to the leases (collectively, the "Leases") attached hereto.

Assignee hereby assumes all of the obligations imposed upon the Assignor under the Leases which accrue from and after the date hereof. This Assignment is made without any express or implied representation or warranty, except to the extent provided in that certain Purchase And Sale Agreement, accepted by the Seller on August ___, 2019, by and between Assignor and Assignee.

This Assignment shall be governed by and construed in accordance with the laws of the State of Illinois.

IN WITNESS WHEREOF, the parties have executed this Assignment And Assumption Of Leases as of this ___ day of _____, 2019.

ASSIGNOR:

Kevin B. Duff, Federal Equity Receiver for
SSDF5 Portfolio 1, LLC

_____

ASSIGNEE:

[TBD] Southside Property Group LLC

By: _____

Name: KEVIN NUGENT

Title: Managing Member

**EXHIBIT C**

**PURCHASE & SALE AGREEMENT**

This Purchase & Sale Agreement ("Agreement") is made by and between the court-appointed federal equity receiver for SSDF5 Portfolio 1, LLC ("Seller") pursuant to that certain Order Appointing Receiver entered August 17, 2018 (Dkt. 16), as supplemented by that certain Order entered March 14, 2019 (Dkt. 290), in the case captioned *United States Securities and Exchange Commission v. EquityBuild, Inc., et al.*, United States District Court for the Northern District of Illinois, Eastern Division, Civil Action No. 1:18-cv-05587 (the "SEC Action"), and

_Southside Property Group LLC_ ("Buyer")

for the purchase and sale of that certain real property and all fixtures, equipment, and personal property appurtenant thereto (the "Property") located at 7750-58 South Muskegon Avenue | 2818-2836 South 78th Street, Chicago, Illinois 60649 and legally described as follows:

LOT 132 IN DIVISION 2 IN WESTFALLS SUBDIVISION OF 208 ACRES BEING THE EAST HALF OF THE SOUTHWEST QUARTER AND THE SOUTHEAST FRACTIONAL QUARTER OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Permanent Index No. 21-30-400-034-0000

\*　　　\*　　　\*

***TERMS AND CONDITIONS***

The Seller agrees to sell the Property, and the Buyer agrees to purchase the Property, on the following terms and conditions:

1.      **Purchase Price**. The purchase price for the Property shall be $ _700,000_ (the "Purchase Price"). The Buyer shall pay the Purchase Price as follows:

        a.      An earnest money deposit (the "Earnest Money") in an amount equal to ten percent (10%) of the Purchase Price within three (3) business days following the date of acceptance of the Agreement by the Seller (the "Acceptance Date").

        b.      The balance of the Purchase Price, subject to any applicable credits and prorations, at Closing.

*[Note: If the Buyer desires to enter into this Agreement subject to a financing contingency, then Rider A should be completed. Otherwise, Rider A should be left blank.]*

*[Note: If the Buyer purports to hold a mortgage interest in the Property and tenders this Agreement in connection with a credit bid, then Rider B should be completed. Otherwise, Rider B should be left blank.]*

1

2. **Earnest Money**. The Earnest Money shall be held by First American Title Company ("First American Title") in a segregated escrow account. In connection with said Earnest Money deposit, the Buyer shall execute and deliver to the Seller a copy of that certain strict joint order escrow agreement in the form attached hereto as Exhibit A.

3. **Court Approval**. As soon as practicable after the Acceptance Date, the Seller shall move before the Honorable John Z. Lee or any judge sitting in his stead or to whom he has made a referral in the SEC Action (the "Receivership Court") for approval of the sale of the Property pursuant to this Agreement. In the event that the Receivership Court does not issue the requisite approval, then the Agreement shall become null and void and all Earnest Money shall be promptly refunded to the Buyer.

4. **Escrow Closing**. This sale shall be closed through an escrow with First American Title in accordance with the general provisions of the usual form of deed and money escrow agreement then furnished and in use by said title company. Payment of the Purchase Price and delivery of the receiver's deed shall be made through the escrow. The cost of the escrow shall be divided equally between the Buyer and Seller unless the Buyer acquires the Property with financing, in which event that portion of the cost of the escrow relating to the financing shall be borne by the Buyer. Unless otherwise specified herein, all other closing costs shall be paid in accordance with custom for apartment investment sales transactions in Cook County, Illinois.

5. **Irrevocable Offer**. This Agreement when executed by the Buyer and delivered to the Seller shall constitute an irrevocable offer to purchase the Property until ___9/13/19___ (the "Offer Expiration Date"). In the event that the offer is not accepted by the Seller before the Offer Expiration Date, then the offer shall be deemed withdrawn.

6. **Personal Property**. At Closing, the Seller shall tender to the Buyer a bill of sale for the personal property appurtenant to the Property (the "Personal Property") warranting only that Seller is the absolute owner of said Personalty, that said Personalty is free and clear of all liens, charges, and encumbrances, and that the Seller has the full right, power, and authority to sell said Personalty and to deliver the bill of sale. The Seller shall neither make nor adopt any warranty whatsoever with respect to the Personal Property and shall specifically disclaim any implied warranty of merchantability or fitness for a particular purpose. The price of the Personal Property shall be included in the Purchase Price, and the Buyer agrees to accept all such Personal Property in "as is" condition.

7. **The Closing Date**. The closing shall be held on a date (the "Closing Date") to be designated by the Seller after the Receivership Court approves the sale of the Property pursuant to this Agreement, provided, however, that the Buyer shall be entitled to five business days' advance Notice of the Closing Date.

8. **Conveyance of Title**. At Closing, the Seller shall convey title to the Property by a recordable form receiver's deed subject only to (a) general real estate taxes not yet due and payable at the time of Closing; (b) covenants, conditions, restrictions, or building lines and

2

easements of record, if any; (c) public and utility easements; (d) applicable zoning and building laws and ordinances; (f) acts done by or suffered through Buyer or anyone claiming by, through, or under Buyer; (g) governmental actions or proceedings concerning or affecting the Property; and (h) encroachments of a minor nature, if any, that can be insured over at closing (the "Permitted Exceptions"). The Seller agrees to surrender possession of the Property at the time of Closing.

9.  **Commitment For Title Insurance**. Within ten (10) business days after the Acceptance Date, the Seller shall deliver to the Buyer evidence of merchantable title by delivering a commitment for title insurance with extended coverage from First American Title in the amount of the Purchase Price with a commitment date not earlier than July 1, 2019, subject only to general exceptions, the Permitted Exceptions, and exceptions pertaining to liens or encumbrances of a definite and ascertainable amount which may be removed by the payment of money by Seller, endorsed over by First American Title at the Seller's sole expense, or which will be extinguished by order of the Receivership Court. Such title commitment shall be conclusive evidence of good and merchantable title, subject only to the foregoing exceptions. If the commitment for title insurance discloses title exceptions other than the general exceptions, Permitted Exceptions, exceptions waivable through the payment of money or the issuance of an endorsement, or exceptions to be extinguished by Receivership Court order, the Seller shall have thirty (30) calendar days from the Closing Date to cure, or insure over, the unpermitted exceptions and the Closing shall be postponed until said unpermitted exceptions are cured or insured over. If the Seller fails to timely secure the removal of the unpermitted exceptions or obtain an endorsement insuring over the unpermitted exceptions, the Purchaser may terminate this Contract with a full refund of Earnest Money upon Notice to the Seller within ten (10) business days after the expiration of the thirty (30) day period. In such event, this Agreement shall become null and void and neither party shall thereafter have any rights against the other, and the Seller may not be held liable for direct, indirect, incidental, or consequential damages.

10.  **Survey**. At least five (5) business days prior to the Closing Date, the Seller shall provide the Buyer with a survey by a licensed land surveyor dated not more than six months prior to the date of Closing, indicating the present location of all improvements. If the Buyer or the Buyer's mortgagee desires a more recent or extensive survey, the survey shall be obtained at the Buyer's expense.

11.  **Assignment And Assumption Of Leases**. At Closing, the Seller shall deliver to the Buyer, and the Seller and Buyer shall execute, an assignment and assumption of leases (in the form attached hereto as Exhibit B) pursuant to which the Seller shall convey all right, title, and interest in and to any leases in effect at the Property to the Buyer, and the Buyer shall agree to assume all of the Seller's obligations under said leases.

12.  **Prorations**. Prepaid service contracts and other similar items shall be credited ratably at Closing. Any and all rents collected from or on behalf of tenants until the date of the Closing shall be applied by the Seller first to past due balances and then to currently scheduled monthly rent. Each tenant's scheduled monthly rent shall then be prorated for the month of Closing. To

the extent that any tenant has paid all rent through and including the month prior to the Closing, then all additional rent received from such tenant shall be applied by the Seller first to rent for the period between the first day of the month in which the Closing occurs and the date of the Closing, and the balance of said rent, if any, shall be paid to the Buyer. Any and all rents that remain delinquent as of the Closing Date shall belong to the Buyer upon collection. Notwithstanding the foregoing, real estate taxes associated with the ownership of the Property shall be prorated as of the Closing Date based on 105% of the most recently ascertainable tax bill.

13.  **Inspection Period**. The Buyer acknowledges that it was afforded the opportunity to conduct a limited tour of the Property prior to submitting its offer. Within three (3) calendar days following the Acceptance Date, the Seller shall produce the following documents to the Buyer (the "Due Diligence Materials"):

   a.   *Current Rent Roll*. A current rent roll for the Property generated by the management company.

   b.   *Utility Bills*. Copies of all utility bills relating to the Property, to the extent available, for the twelve calendar months preceding the month of the Acceptance Date.

   c.   *Leases*. Copies of all existing leases affecting the Property.

   d.   *Profit & Loss Statement*. A current trailing twelve-month profit and loss statement reflecting all categories of operating income and expenses associated with the Property, as generated by the management company.

   e.   *Litigation Documents*. Copies of documents, including notices of violation, orders, judgments, and other pleadings, pertaining to any known litigation or proceedings currently affecting the Property.

In addition, the Seller shall allow the Buyer reasonable access to the Property for twenty days from and after the Acceptance Date (the "Inspection Period") for the purpose of conducting an inspection of the major structural and mechanical components of the Property. A major structural or mechanical component shall be deemed to be in acceptable operating condition if it substantially performs the function for which it is intended, regardless of age, and does not pose a threat to health or safety. In the event that the Buyer possesses sound evidence that any major structural or mechanical component of the Property does not substantially perform the function for which it is intended, then the Buyer shall have the right to terminate this Agreement upon the delivery of Notice to the Seller on or before the conclusion of the Inspection Period, such notice to be accompanied by the relevant pages of an inspection report prepared by a licensed or certified inspector and identifying the defect justifying the termination. Upon receipt by the Seller of the notice of termination, this Agreement shall be considered null and void and the parties shall be discharged of any and all obligations hereunder (except those obligations which survive termination) and First American Title shall

release the Earnest Money to the Buyer. In the event that the Buyer does not terminate the Agreement on or prior to the conclusion of the Inspection Period, the Property shall be considered accepted by the Buyer and the Earnest Money shall thereafter be non-refundable. In connection with its inspection of the Property, the Buyer shall keep the Property free and clear of liens, shall indemnify and hold Seller harmless from any and all liability, loss, cost, damage, or expense relating to its inspection of the Property, and shall repair any and all damage arising from the inspection. These obligations shall survive termination of the Agreement.

14. **Entry Into Or Renewal Of Contracts & Material Changes**. Following the expiration of the Inspection Period, the Seller shall not without the prior written consent of the Buyer, said consent not to be unreasonably withheld, conditioned, or delayed, enter into or renew any service contract or lease affecting or concerning the Property. In addition, the Seller shall not make any material changes to the Property, perform or engage in any act, or enter into any agreement that materially changes the value of the Property or the rights of the Buyer relating to the Property.

15. **Material Destruction**. Risk of loss to the Property shall be borne by the Seller until title has been conveyed to Buyer. If, prior to Closing, a material portion of the Property shall be destroyed or materially damaged by fire or other casualty, then the Seller shall provide prompt notice of said fire or other casualty to the Buyer and this Agreement shall thereafter, at the option of the Buyer, exercised by Notice to the Seller within five (5) business days after receipt of notice of such material damage, be null and void, and all Earnest Money shall be refunded to the Buyer. Failure of the Buyer to provide timely notice shall constitute a waiver of the right to terminate.

16. **Condition Of Property**. The Buyer understands and agrees that the Property is being sold "as is" and "with all faults" and that neither the Seller nor any agent or attorney of the Seller, makes, or has made, any representation or warranty as to the physical condition or value of the Property or its suitability for the Buyer's intended use. The Seller has no obligation to repair or correct any alleged patent or latent defect at the Property, or to compensate the Buyer for any such defect, and, upon closing, the Buyer waives, releases, acquits, and forever discharges the Seller, and all of the Seller's agents and attorneys, to the maximum extent permitted by law, from any and all claims, actions, causes or action, demands, rights, liabilities, losses, damages, costs, or expenses, direct or indirect, known or unknown, foreseen or unforeseen, that it now has or which may arise in the future on account of or in any way arising from or relating to any alleged patent or latent defect at the Property.

17. **Buyer Default**. The Buyer and Seller agree that it would be difficult to ascertain the actual damages to be suffered by the Seller in the event of a default by the Buyer and that the amount of the Earnest Money deposited by the Buyer hereunder constitutes the parties' reasonable estimate of the Seller's damages in the event of the Buyer's default, and that upon any such default not caused by the Seller, the Seller shall be entitled to retain the Earnest

Money as liquidated damages, which shall constitute the Seller's sole and exclusive remedy in law or at equity in connection with said default.

18.     **Seller Default**. In the event that the Seller shall fail to sell, transfer, and assign the Property to Purchaser in violation of the terms of this Agreement and/or fail to perform any other material obligation of Seller hereunder, then the Buyer may give Notice to the Seller specifying the nature of the default. The Seller shall thereafter have five (5) business days from receipt of said Notice, but in no event beyond the Closing Date, within which to cure the alleged default. If the Seller fails to cure the default within the cure period, then the Buyer shall be entitled to the return of all Earnest Money and (a) to declare the Agreement null and void and sue for reasonable out-of-pocket expenses incurred in connection with this Agreement prior to the alleged default or (b) to sue for specific performance, the parties recognizing that the Property is unique and that the Buyer otherwise lacks an adequate remedy at law. In the latter event, the Buyer is advised that Section VIII of the Order Appointing Receiver entered in the SEC Action enjoins the filing or prosecution of all civil proceedings against the Receiver, in his capacity as Receiver, until further order of the court.

19.     **Representations and Warranties**. As a material inducement to the Buyer to enter into this Agreement, the Seller hereby makes the following representations and warranties, each of which shall remain true and correct as of the Closing Date:

     a.    The Seller has the full right, power, and authority to convey the Property to the Buyer as provided in this Agreement and to carry out its obligations hereunder. In addition, the individual executing this Agreement on behalf of the Seller has the legal right, power, and authority to bind the Seller to the terms hereof.

     b.    The Seller will not take any action affecting title to the Property following the Acceptance Date.

     c.    To the best of the Seller's knowledge, there are no actions, investigations, suits, or proceedings, pending or threatened, that affect the Property, or the ownership or operation thereof, other than the SEC Action and the following:

             *[None.]*

     d.    To the best of the Seller's knowledge, the Property is not in violation, nor has been under investigation for violation, of any federal, state, or local law, ordinance, or regulation regulating environmental conditions in, at, on, under, or about the Property, including but not limited to, soil and groundwater conditions.

20.     **Notices**. All notices required or permitted under this Agreement shall be in writing and served by registered or certified United States mail, return receipt requested; nationally recognized overnight mail courier (signature required); or electronic mail (evidenced by

competent and authentic proof of transmission). Any notices given to the Seller shall be delivered to the Seller's counsel, at the following physical or e-mail addresses:

Andrew E. Porter
Porter Law Office
853 North Elston Avenue
Chicago, Illinois 60614
*andrew@andrewporterlaw.com*

Michael Rachlis
Rachlis Duff Peel & Kaplan LLC
542 South Dearborn, Suite 900
Chicago, Illinois 60605
*mrachlis@rdaplaw.net*

Any such notices or demands given to the Buyer shall be delivered to the Buyer's counsel, at the following address physical or e-mail addresses:

*David Resnick*

*Robbins Salomon Patt Ltd*

*DResnick@RSPlaw.com*

_____

21.     **Like-Kind Exchange**. The Seller agrees to cooperate if the Buyer elects to acquire the Property as part of a like-kind exchange under Section 1031 of the Internal Revenue Code. The Buyer's contemplated exchange shall not impose upon the Seller any additional liability or financial obligation, and the Buyer agrees to hold the Seller harmless from any liability that might arise from such exchange. This Agreement is neither subject to nor contingent upon the Buyer's ability to dispose of its exchange property or to effectuate an exchange. In the event any exchange contemplated by the Buyer should fail to occur, for whatever reason, the sale of the Property shall nonetheless be consummated as provided herein.

22.     **Real Estate Agents**. Purchaser represents and warrants that, other than Seller's Agent and Buyer's Agent, if any, no other putative real estate agent or broker was involved in submitting, showing, marketing, or selling the Property to the Buyer, and the Buyer agrees to indemnify and hold Seller, and its successors and assigns, harmless from and against any and all liability, loss, damages, cost, or expense, including reasonable attorneys' fees, arising from or relating to any claim for a commission, fee, or other form of payment or compensation asserted by a putative real estate agent or broker purporting to have procured the Buyer in connection with this Agreement.

7

23.   **Foreign Investor Disclosure**. The Seller and the Buyer agree to execute and deliver any instrument, affidavit, or statement, and to perform any act reasonably necessary to carry out the provisions of the Foreign Investment in Real Property Tax Act and regulations promulgated thereunder. The Seller represents that the Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code.

24.   **Merger**. This Agreement expresses the entire agreement of the parties and supersedes any and all previous agreements or understandings between them with regard to the Property. There are no other understandings, oral or written, which in any way alter or enlarge the terms of this Agreement, and there are no warranties or representations of any nature whatsoever, either express or implied, except as set forth herein. This Agreement may be modified only by a written instrument signed by the party to be charged.

25.   **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

*          *          *

The undersigned Buyer hereby offers and agrees to purchase the Property upon the terms and conditions stated herein as of this _16th_ day of August, 2019. In addition, the individual signing below on behalf of the Buyer represents and warrants that s/he is authorized to execute this Agreement on behalf of the Buyer.

**Buyer**

Southside Property Group LLC

7515 E. 69th Place

Chicago IL 60637

By: _____

Its: Manager

**Buyer's Agent**

N/A

**Seller**

KEVIN B. DUFF,
FEDERAL EQUITY RECEIVER FOR
SSDF5 PORTFOLIO 1 LLC

Rachlis Duff Peel & Kaplan LLC
542 South Dearborn Street, Suite 900
Chicago, Illinois 60605
(312) 733-3390

K-BDM, Receiver

**Acceptance Date:** 9/6/2019

**Seller's Agent**

Jeffrey Baasch
SVN Chicago Commercial
940 West Adams Street, Suite 200
Chicago, Illinois 60607
(312) 676-1866

9

## RIDER A

_____ If the Buyer desires that the terms and provisions of this Rider be incorporated into the Purchase And Sale Agreement to which it is annexed, please initial this paragraph.

*       *       *

This Agreement is contingent upon the Buyer securing, no later than 21 days following the Acceptance Date (the "Financing Contingency Deadline"), a firm written mortgage commitment for a fixed or adjustable rate mortgage from an established multifamily residential mortgage lender in the amount of $_____, at an interest rate (or initial interest rate if an adjustable rate mortgage) not to exceed %_____per annum, amortized over _____ years, payable monthly, with a loan origination fee not to exceed %_____, plus appraisal and credit report fees, if any. If the Buyer is unable to secure a firm written mortgage commitment as described herein within the referenced time period, then the Buyer may terminate this Agreement with a full refund of Earnest Money by providing notice to the Seller prior to the expiration of the Financing Contingency Deadline. If the Buyer does not provide the requisite notice to the Seller as provided herein, then the Buyer shall be deemed to have waived this financing contingency, and this Agreement shall remain in full force and effect.

N/A

## RIDER B

_____ If the Buyer purports to hold a mortgage interest in the Property and tenders the Purchase And Sale Agreement to which this rider is annexed (the "Agreement") in connection with the submission of a credit bid, please initial this paragraph and provide the information and supply any additional terms and conditions to the Agreement, or modifications to the Agreement, as requested herein. Any such terms and conditions shall supersede any contrary or conflicting terms and conditions set forth in the Agreement itself.

\*          \*          \*

The Buyer consists of the following mortgagee or mortgagees purporting to hold a perfected and unreleased security interest in the Property:

N/A

_[Using additional sheets, please indicate, for each mortgagee identified above, the total unpaid balance due under the promissory note secured by the corresponding mortgage and itemize each component of the current alleged loan balance, including, but not limited to, principal, interest, default rate interest, late fees, service fees, liquidation fees, protective advances, and other charges.]_

The Purchase Price shall be the amount of the credit bid submitted by the Buyer, and any requirement to make an earnest money deposit is deleted. Payment of the Purchase Price shall not be made through the escrow at closing.

In addition, the Buyer shall pay all closing costs approved by the Court, which may, subject to the Court's ruling, include, but not be limited to, owner's title insurance premiums, applicable transfer taxes, the survey invoice, property management fees accrued through the closing, due and unpaid real estate taxes, escrow fees, brokerage commissions, unpaid utilities, title commitment update fees, gap insurance premiums, State of Illinois policy fees, extended coverage premiums, the costs of closing protection coverage for the Seller, all other expenses required to be paid by the Seller at closing, all amounts advanced for the benefit of the Property which are required to be reimbursed and/or any amount required to discharge any Receiver's lien.

*[Using additional sheets, set forth any other terms and conditions to be included in the Agreement, or any modifications to the Agreement, and to which your credit bid shall remain subject.]*

**EXHIBIT A**



**First American**
**Title Insurance Company**

### STRICT JOINT ORDER ESCROW AGREEMENT

Open Date: _____    Expected Release Date: _____    Escrow Number: 2986636

Property Address: 7750-58 South Muskegon Avenue

Deposit Amount: $ _____    Purpose: ☑ Earnest Money    ☐ Repairs: _____
Document(s) Held _____    ☐ Tax Escrow    ☐ Other: _____

The above is hereby deposited with First American Title Insurance Company, as Escrowee (hereinafter referred to as the Escrowee) pursuant to this Strict Joint Order Escrow Agreement (hereinafter referred to as the Agreement). Said deposit shall be released and delivered by the Escrowee only upon the joint written order of the undersigned or their respective legal representatives or assigns.

Escrowee is hereby expressly authorized to disregard, in its sole discretion, any and all notices or warnings given by any other person or corporation, but the Escrowee is hereby expressly authorized to regard and to comply with and obey any and all orders, judgments or decrees entered or issued by any court with or without jurisdiction, and in case the Escrowee obeys or complies with any such order, judgment or decree of any court it shall not be liable to any party hereto or any other person, firm or corporation by reason of such compliance, notwithstanding any such order, judgment or decree being entered without jurisdiction or being subsequently reversed, modified, annulled, set aside or vacated. In case of any suit or proceeding regarding the Agreement, to which the Escrowee is or may at any time become a party, it shall have a lien on the contents hereof for any and all costs, and reasonable attorneys' fees, whether such attorneys shall be regularly retained or specially employed, and any other expenses which it may have incurred or become liable for on account thereof, and it shall be entitled to reimburse itself therefore out of said deposit, and the undersigned agree to pay the Escrowee upon demand all such costs, fees and expenses so incurred, to the extent the funds deposited hereunder shall be insufficient to allow for such reimbursement.

In no case shall the above mentioned deposits be surrendered except on an order signed by the parties hereto, their respective legal representatives or assigns, or order of court as aforesaid.

Interest, income or other benefits, if any, earned or derived from the funds deposited shall belong to the Escrowee. The Escrowee may deposit all funds received hereunder to one or more of its general accounts. The Escrowee shall be under no duty to invest or reinvest any funds, at any time, held by it pursuant to the terms of the Agreement.

Unless otherwise tendered, the Escrowee is authorized to pay an Escrow Fee in the amount of $300.00, and thereafter a Maintenance Fee in the amount of $200.00 (charged per annum beginning one year following the date of the Agreement) from the funds deposited in this escrow. The Escrowee also reserves the right to add applicable administration fees at its discretion.

| Purchaser: | | Seller: | Kevin B. Duff, as Federal Equity Receiver |
|---|---|---|---|
| Signed: | | Signed: | for SSDF5 Portfolio 1, LLC |
| Print Name: | Southside Property Group LLC | Print Name: | _Receiver_ |
| | | | Rachlis Duff Peel & Kaplan LLC |
| Address: | 765 E. 69th Place | Address: | 542 South Dearborn, Suite 900 |
| | Chicago, IL 60637 | | Chicago, Illinois 60605 |
| Email: | KevinNugent@wpdmanagement.com | Email: | kduff@rdaplaw.net |
| Primary Phone: | 773-908-9762 | Primary Phone: | (312) 733-3390 |
| Alternate Phone: | _____ | Alternate Phone: | _____ |

Primary Contact (if other than above): _____

Accepted: First American Title Insurance Company, Escrowee    By: _____

27775 Diehl Road, Ste 200, Warrenville, IL 60555    66202
T E L 877-295-4328 · F A X 866-525-5530
titleindemnity.warrenville.il@firstam.com

**EXHIBIT B**

## Assignment And Assumption Of Leases

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Kevin B. Duff, as court-appointed federal equity receiver for SSDF5 Portfolio 1, LLC ("Seller") pursuant to that certain Order Appointing Receiver entered August 17, 2018 (Dkt. 16), as supplemented by that certain Order entered March 14, 2019 (Dkt. 290), in the case captioned *United States Securities and Exchange Commission v. EquityBuild, Inc., et al.*, United States District Court for the Northern District of Illinois, Eastern Division, Civil Action No. 1:18-cv-05587 ("Assignor"), hereby irrevocably grants, assigns, transfers, conveys, and sets over to [TBD] ("Assignee"), a _____, all of Assignor's right, title, and interest in and to the leases (collectively, the "Leases") attached hereto.

Assignee hereby assumes all of the obligations imposed upon the Assignor under the Leases which accrue from and after the date hereof. This Assignment is made without any express or implied representation or warranty, except to the extent provided in that certain Purchase And Sale Agreement, accepted by the Seller on August ___, 2019, by and between Assignor and Assignee.

This Assignment shall be governed by and construed in accordance with the laws of the State of Illinois.

IN WITNESS WHEREOF, the parties have executed this Assignment And Assumption Of Leases as of this ___ day of _____, 2019.

ASSIGNOR:

Kevin B. Duff, Federal Equity Receiver for
SSDF5 Portfolio 1, LLC

_____

ASSIGNEE:

*[TBD]*

By:_____

Name: _____

Title: _____

**EXHIBIT D**

## PURCHASE & SALE AGREEMENT

This Purchase & Sale Agreement ("Agreement") is made by and between the court-appointed federal equity receiver for SSDF7 Portfolio 1, LLC ("Seller") pursuant to that certain Order Appointing Receiver entered August 17, 2018 (Dkt. 16), as supplemented by that certain Order entered March 14, 2019 (Dkt. 290), in the case captioned *United States Securities and Exchange Commission v. EquityBuild, Inc., et al.*, United States District Court for the Northern District of Illinois, Eastern Division, Civil Action No. 1:18-cv-05587 (the "SEC Action"), and

_Southside Property Group LLC_ ("Buyer")

for the purchase and sale of that certain real property and all fixtures, equipment, and personal property appurtenant thereto (the "Property") located at 7748-7752 South Essex Avenue | 2450-52 East 78th Street, Chicago, Illinois 60649 and legally described as follows:

LOT 16, 17 AND 18, IN BLOCK 11, IN SOUTH SHORE PARK, BEING A SUBDIVISION OF THE WEST HALF OF THE SOUTHWEST QUARTER (EXCEPT STREETS) OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Permanent Index No. 21-30-319-029

\*    \*    \*

### TERMS AND CONDITIONS

The Seller agrees to sell the Property, and the Buyer agrees to purchase the Property, on the following terms and conditions:

1.  **Purchase Price**. The purchase price for the Property shall be $ _1,350,000_ (the "Purchase Price"). The Buyer shall pay the Purchase Price as follows:

    a.    An earnest money deposit (the "Earnest Money") in an amount equal to ten percent (10%) of the Purchase Price within three (3) business days following the date of acceptance of the Agreement by the Seller (the "Acceptance Date").

    b.    The balance of the Purchase Price, subject to any applicable credits and prorations, at Closing.

*[Note: If the Buyer desires to enter into this Agreement subject to a financing contingency, then Rider A should be completed. Otherwise, Rider A should be left blank.]*

*[Note: If the Buyer purports to hold a mortgage interest in the Property and tenders this Agreement in connection with a credit bid, then Rider B should be completed. Otherwise, Rider B should be left blank.]*

I

scan to cmp-!

2.     **Earnest Money**. The Earnest Money shall be held by First American Title Company ("First American Title") in a segregated escrow account. In connection with said Earnest Money deposit, the Buyer shall execute and deliver to the Seller a copy of that certain strict joint order escrow agreement in the form attached hereto as Exhibit A.

3.     **Court Approval**. As soon as practicable after the Acceptance Date, the Seller shall move before the Honorable John Z. Lee or any judge sitting in his stead or to whom he has made a referral in the SEC Action (the "Receivership Court") for approval of the sale of the Property pursuant to this Agreement. In the event that the Receivership Court does not issue the requisite approval, then the Agreement shall become null and void and all Earnest Money shall be promptly refunded to the Buyer.

4.     **Escrow Closing**. This sale shall be closed through an escrow with First American Title in accordance with the general provisions of the usual form of deed and money escrow agreement then furnished and in use by said title company. Payment of the Purchase Price and delivery of the receiver's deed shall be made through the escrow. The cost of the escrow shall be divided equally between the Buyer and the Seller unless the Buyer acquires the Property with financing, in which event that portion of the cost of the escrow relating to the financing shall be borne by the Buyer. Unless otherwise specified herein, all other closing costs shall be paid in accordance with custom for apartment investment sales transactions in Cook County, Illinois.

5.     **Irrevocable Offer**. This Agreement when executed by the Buyer and delivered to the Seller shall constitute an irrevocable offer to purchase the Property until ~~8/28/19~~ 10/17/2019 (the "Offer Expiration Date"). In the event that the offer is not accepted by the Seller before the Offer Expiration Date, then the offer shall be deemed withdrawn.

KD
KJN

6.     **Personal Property**. At Closing, the Seller shall tender to the Buyer a bill of sale for the personal property appurtenant to the Property (the "Personal Property") warranting only that Seller is the absolute owner of said Personalty, that said Personalty is free and clear of all liens, charges, and encumbrances, and that the Seller has the full right, power, and authority to sell said Personalty and to deliver the bill of sale. The Seller shall neither make nor adopt any warranty whatsoever with respect to the Personal Property and shall specifically disclaim any implied warranty of merchantability or fitness for a particular purpose. The price of the Personal Property shall be included in the Purchase Price, and the Buyer agrees to accept all such Personal Property in "as is" condition.

7.     **The Closing Date**. The closing shall be held on a date (the "Closing Date") to be designated by the Seller after the Receivership Court approves the sale of the Property pursuant to this Agreement, provided, however, that the Buyer shall be entitled to five business days' advance Notice of the Closing Date.

8.     **Conveyance of Title**. At Closing, the Seller shall convey title to the Property by a recordable form receiver's deed subject only to (a) general real estate taxes not yet due and payable at the time of Closing; (b) covenants, conditions, restrictions, or building lines and

easements of record, if any; (c) public and utility easements; (d) applicable zoning and building laws and ordinances; (f) acts done by or suffered through Buyer or anyone claiming by, through, or under Buyer; (g) governmental actions or proceedings concerning or affecting the Property; and (h) encroachments of a minor nature, if any, that can be insured over at closing (the "Permitted Exceptions"). The Seller agrees to surrender possession of the Property at the time of Closing.

9.  **Commitment For Title Insurance**. Within ten (10) business days after the Acceptance Date, the Seller shall deliver to the Buyer evidence of merchantable title by delivering a commitment for title insurance with extended coverage from First American Title in the amount of the Purchase Price with a commitment date not earlier than July 1, 2019, subject only to general exceptions, the Permitted Exceptions, and exceptions pertaining to liens or encumbrances of a definite and ascertainable amount which may be removed by the payment of money by Seller, endorsed over by First American Title at the Seller's sole expense, or which will be extinguished by order of the Receivership Court. Such title commitment shall be conclusive evidence of good and merchantable title, subject only to the foregoing exceptions. If the commitment for title insurance discloses title exceptions other than the general exceptions, Permitted Exceptions, exceptions waivable through the payment of money or the issuance of an endorsement, or exceptions to be extinguished by Receivership Court order, the Seller shall have thirty (30) calendar days from the Closing Date to cure, or insure over, the unpermitted exceptions and the Closing shall be postponed until said unpermitted exceptions are cured or insured over. If the Seller fails to timely secure the removal of the unpermitted exceptions or obtain an endorsement insuring over the unpermitted exceptions, the Purchaser may terminate this Contract with a full refund of Earnest Money upon Notice to the Seller within ten (10) business days after the expiration of the thirty (30) day period. In such event, this Agreement shall become null and void and neither party shall thereafter have any rights against the other, and the Seller may not be held liable for direct, indirect, incidental, or consequential damages.

10. **Survey**. At least five (5) business days prior to the Closing Date, the Seller shall provide the Buyer with a survey by a licensed land surveyor dated not more than six months prior to the date of Closing, indicating the present location of all improvements. If the Buyer or the Buyer's mortgagee desires a more recent or extensive survey, the survey shall be obtained at the Buyer's expense.

11. **Assignment And Assumption Of Leases**. At Closing, the Seller shall deliver to the Buyer, and the Seller and Buyer shall execute, an assignment and assumption of leases (in the form attached hereto as Exhibit B) pursuant to which the Seller shall convey all right, title, and interest in and to any leases in effect at the Property to the Buyer, and the Buyer shall agree to assume all of the Seller's obligations under said leases.

12. **Prorations**. Prepaid service contracts and other similar items shall be credited ratably at Closing. Any and all rents collected from or on behalf of tenants until the date of the Closing shall be applied by the Seller first to past due balances and then to currently scheduled monthly rent. Each tenant's scheduled monthly rent shall then be prorated for the month of Closing. To

the extent that any tenant has paid all rent through and including the month prior to the Closing, then all additional rent received from such tenant shall be applied by the Seller first to rent for the period between the first day of the month in which the Closing occurs and the date of the Closing, and the balance of said rent, if any, shall be paid to the Buyer. Any and all rents that remain delinquent as of the Closing Date shall belong to the Buyer upon collection. Notwithstanding the foregoing, real estate taxes associated with the ownership of the Property shall be prorated as of the Closing Date based on 105% of the most recently ascertainable tax bill.

13.     **Inspection Period.** The Buyer acknowledges that it was afforded the opportunity to conduct a limited tour of the Property prior to submitting its offer. Within three (3) calendar days following the Acceptance Date, the Seller shall produce the following documents to the Buyer (the "Due Diligence Materials"):

   a.     *Current Rent Roll.* A current rent roll for the Property generated by the management company.

   b.     *Utility Bills.* Copies of all utility bills relating to the Property, to the extent available, for the twelve calendar months preceding the month of the Acceptance Date.

   c.     *Leases.* Copies of all existing leases affecting the Property.

   d.     *Profit & Loss Statement.* A current trailing twelve-month profit and loss statement reflecting all categories of operating income and expenses associated with the Property, as generated by the management company.

   e.     *Litigation Documents.* Copies of documents, including notices of violation, orders, judgments, and other pleadings, pertaining to any known litigation or proceedings currently affecting the Property.

In addition, the Seller shall allow the Buyer reasonable access to the Property for twenty days from and after the Acceptance Date (the "Inspection Period") for the purpose of conducting an inspection of the major structural and mechanical components of the Property. A major structural or mechanical component shall be deemed to be in acceptable operating condition if it substantially performs the function for which it is intended, regardless of age, and does not pose a threat to health or safety. In the event that the Buyer possesses sound evidence that any major structural or mechanical component of the Property does not substantially perform the function for which it is intended, then the Buyer shall have the right to terminate this Agreement upon the delivery of Notice to the Seller on or before the conclusion of the Inspection Period, such notice to be accompanied by the relevant pages of an inspection report prepared by a licensed or certified inspector and identifying the defect justifying the termination. Upon receipt by the Seller of the notice of termination, this Agreement shall be considered null and void and the parties shall be discharged of any and all obligations hereunder (except those obligations which survive termination) and First American Title shall

release the Earnest Money to the Buyer. In the event that the Buyer does not terminate the Agreement on or prior to the conclusion of the Inspection Period, the Property shall be considered accepted by the Buyer and the Earnest Money shall thereafter be non-refundable. In connection with its inspection of the Property, the Buyer shall keep the Property free and clear of liens, shall indemnify and hold Seller harmless from any and all liability, loss, cost, damage, or expense relating to its inspection of the Property, and shall repair any and all damage arising from the inspection. These obligations shall survive termination of the Agreement.

14.     **Entry Into Or Renewal Of Contracts & Material Changes**. Following the expiration of the Inspection Period, the Seller shall not without the prior written consent of the Buyer, said consent not to be unreasonably withheld, conditioned, or delayed, enter into or renew any service contract or lease affecting or concerning the Property. In addition, the Seller shall not make any material changes to the Property, perform or engage in any act, or enter into any agreement that materially changes the value of the Property or the rights of the Buyer relating to the Property.

15.     **Material Destruction**. Risk of loss to the Property shall be borne by the Seller until title has been conveyed to Buyer. If, prior to Closing, a material portion of the Property shall be destroyed or materially damaged by fire or other casualty, then the Seller shall provide prompt notice of said fire or other casualty to the Buyer and this Agreement shall thereafter, at the option of the Buyer, exercised by Notice to the Seller within five (5) business days after receipt of notice of such material damage, be null and void, and all Earnest Money shall be refunded to the Buyer. Failure of the Buyer to provide timely notice shall constitute a waiver of the right to terminate.

16.     **Condition Of Property**. The Buyer understands and agrees that the Property is being sold "as is" and "with all faults" and that neither the Seller nor any agent or attorney of the Seller, makes, or has made, any representation or warranty as to the physical condition or value of the Property or its suitability for the Buyer's intended use. The Seller has no obligation to repair or correct any alleged patent or latent defect at the Property, or to compensate the Buyer for any such defect, and, upon closing, the Buyer waives, releases, acquits, and forever discharges the Seller, and all of the Seller's agents and attorneys, to the maximum extent permitted by law, from any and all claims, actions, causes or action, demands, rights, liabilities, losses, damages, costs, or expenses, direct or indirect, known or unknown, foreseen or unforeseen, that it now has or which may arise in the future on account of or in any way arising from or relating to any alleged patent or latent defect at the Property.

17.     **Buyer Default**. The Buyer and Seller agree that it would be difficult to ascertain the actual damages to be suffered by the Seller in the event of a default by the Buyer and that the amount of the Earnest Money deposited by the Buyer hereunder constitutes the parties' reasonable estimate of the Seller's damages in the event of the Buyer's default, and that upon any such default not caused by the Seller, the Seller shall be entitled to retain the Earnest

Money as liquidated damages, which shall constitute the Seller's sole and exclusive remedy in law or at equity in connection with said default.

18.     **Seller Default**. In the event that the Seller shall fail to sell, transfer, and assign the Property to Purchaser in violation of the terms of this Agreement and/or fail to perform any other material obligation of Seller hereunder, then the Buyer may give Notice to the Seller specifying the nature of the default. The Seller shall thereafter have five (5) business days from receipt of said Notice, but in no event beyond the Closing Date, within which to cure the alleged default. If the Seller fails to cure the default within the cure period, then the Buyer shall be entitled to the return of all Earnest Money and (a) to declare the Agreement null and void and sue for reasonable out-of-pocket expenses incurred in connection with this Agreement prior to the alleged default or (b) to sue for specific performance, the parties recognizing that the Property is unique and that the Buyer otherwise lacks an adequate remedy at law. In the latter event, the Buyer is advised that Section VIII of the Order Appointing Receiver entered in the SEC Action enjoins the filing or prosecution of all civil proceedings against the Receiver, in his capacity as Receiver, until further order of the court.

19.     **Representations and Warranties**. As a material inducement to the Buyer to enter into this Agreement, the Seller hereby makes the following representations and warranties, each of which shall remain true and correct as of the Closing Date:

   a.     The Seller has the full right, power, and authority to convey the Property to the Buyer as provided in this Agreement and to carry out its obligations hereunder. In addition, the individual executing this Agreement on behalf of the Seller has the legal right, power, and authority to bind the Seller to the terms hereof.

   b.     The Seller will not take any action affecting title to the Property following the Acceptance Date.

   c.     To the best of the Seller's knowledge, there are no actions, investigations, suits, or proceedings, pending or threatened, that affect the Property, or the ownership or operation thereof, other than the SEC Action and the following:

           *City of Chicago v. EquityBuild, Inc., Department of Administrative Hearings, Docket No. 18BT03589A.*

   d.     To the best of the Seller's knowledge, the Property is not in violation, nor has been under investigation for violation, of any federal, state, or local law, ordinance, or regulation regulating environmental conditions in, at, on, under, or about the Property, including but not limited to, soil and groundwater conditions.

20.     **Notices**. All notices required or permitted under this Agreement shall be in writing and served by registered or certified United States mail, return receipt requested; nationally recognized overnight mail courier (signature required); or electronic mail (evidenced by

6

competent and authentic proof of transmission). Any notices given to the Seller shall be delivered to the Seller's counsel, at the following physical or e-mail addresses:

> Andrew E. Porter
> Porter Law Office
> 853 North Elston Avenue
> Chicago, Illinois 60614
> andrew@andrewporterlaw.com

> Michael Rachlis
> Rachlis Duff Peel & Kaplan LLC
> 542 South Dearborn, Suite 900
> Chicago, Illinois 60605
> mrachlis@rdaplaw.net

Any such notices or demands given to the Buyer shall be delivered to the Buyer's counsel, at the following address physical or e-mail addresses:

> David Resnick
> Robbins, Salomon, & Patt Ltd.
> DResnick@rsplaw.com
> 312-456-0376

21.     **Like-Kind Exchange.** The Seller agrees to cooperate if the Buyer elects to acquire the Property as part of a like-kind exchange under Section 1031 of the Internal Revenue Code. The Buyer's contemplated exchange shall not impose upon the Seller any additional liability or financial obligation, and the Buyer agrees to hold the Seller harmless from any liability that might arise from such exchange. This Agreement is neither subject to nor contingent upon the Buyer's ability to dispose of its exchange property or to effectuate an exchange. In the event any exchange contemplated by the Buyer should fail to occur, for whatever reason, the sale of the Property shall nonetheless be consummated as provided herein.

22.     **Real Estate Agents.** Purchaser represents and warrants that, other than Seller's Agent and Buyer's Agent, if any, no other putative real estate agent or broker was involved in submitting, showing, marketing, or selling the Property to the Buyer, and the Buyer agrees to indemnify and hold Seller, and its successors and assigns, harmless from and against any and all liability, loss, damages, cost, or expense, including reasonable attorneys' fees, arising from or relating to any claim for a commission, fee, or other form of payment or compensation asserted by a putative real estate agent or broker purporting to have procured the Buyer in connection with this Agreement.

7

23.     Foreign Investor Disclosure. The Seller and the Buyer agree to execute and deliver any instrument, affidavit, or statement, and to perform any act reasonably necessary to carry out the provisions of the Foreign Investment in Real Property Tax Act and regulations promulgated thereunder. The Seller represents that the Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code.

24.     Merger. This Agreement expresses the entire agreement of the parties and supersedes any and all previous agreements or understandings between them with regard to the Property. There are no other understandings, oral or written, which in any way alter or enlarge the terms of this Agreement, and there are no warranties or representations of any nature whatsoever, either express or implied, except as set forth herein. This Agreement may be modified only by a written instrument signed by the party to be charged.

25.     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

*     *     *

The undersigned Buyer hereby offers and agrees to purchase the Property upon the terms and conditions stated herein as of this _14th_ day of August, 2019. In addition, the individual signing below on behalf of the Buyer represents and warrants that s/he is authorized to execute this Agreement on behalf of the Buyer.

**Buyer**

Southside Property Group LLC

765 E. 69th Place

Chicago IL 60637

By: _____

Its: Managing Member

**Buyer's Agent**

N/A

**Seller**

KEVIN B. DUFF,
FEDERAL EQUITY RECEIVER FOR
SSDF7 PORTFOLIO 1 LLC

Rachlis Duff Peel & Kaplan LLC
542 South Dearborn Street, Suite 900
Chicago, Illinois 60605
(312) 733-3390

_____

Acceptance Date: 10/14/19

**Seller's Agent**

Jeffrey Baasch
SVN Chicago Commercial
940 West Adams Street, Suite 200
Chicago, Illinois 60607
(312) 676-1866

9

## RIDER A

_____ If the Buyer desires that the terms and provisions of this Rider be incorporated into the Purchase And Sale Agreement to which it is annexed, please initial this paragraph.

*    *    *

This Agreement is contingent upon the Buyer securing, no later than 21 days following the

Acceptance Date (the "Financing Contingency Deadline"), a firm written mortgage commitment

for a fixed or adjustable rate mortgage from an established multifamily residential mortgage

lender in the amount of $_____, at an interest rate (or initial interest rate if an adjustable

rate mortgage) not to exceed %_____ per annum, amortized over _____ years, payable monthly,

with a loan origination fee not to exceed %_____, plus appraisal and credit report fees, if any. If

the Buyer is unable to secure a firm written mortgage commitment as described herein within

the referenced time period, then the Buyer may terminate this Agreement with a full refund of

Earnest Money by providing notice to the Seller prior to the expiration of the Financing

Contingency Deadline. If the Buyer does not provide the requisite notice to the Seller as

provided herein, then the Buyer shall be deemed to have waived this financing contingency,

and this Agreement shall remain in full force and effect.

N/A

## RIDER B

_____ If the Buyer purports to hold a mortgage interest in the Property and tenders the Purchase And Sale Agreement to which this rider is annexed (the "Agreement") in connection with the submission of a credit bid, please initial this paragraph and provide the information and supply any additional terms and conditions to the Agreement, or modifications to the Agreement, as requested herein. Any such terms and conditions shall supersede any contrary or conflicting terms and conditions set forth in the Agreement itself.

\*      \*      \*

The Buyer consists of the following mortgagee or mortgagees purporting to hold a perfected and unreleased security interest in the Property:

N/A

*[Using additional sheets, please indicate, for each mortgagee identified above, the total unpaid balance due under the promissory note secured by the corresponding mortgage and itemize each component of the current alleged loan balance, including, but not limited to, principal, interest, default rate interest, late fees, service fees, liquidation fees, protective advances, and other charges.]*

The Purchase Price shall be the amount of the credit bid submitted by the Buyer, and any requirement to make an earnest money deposit is deleted. Payment of the Purchase Price shall not be made through the escrow at closing.

In addition, the Buyer shall pay all closing costs approved by the Court, which may, subject to the Court's ruling, include, but not be limited to, owner's title insurance premiums, applicable transfer taxes, the survey invoice, property management fees accrued through the closing, due and unpaid real estate taxes, escrow fees, brokerage commissions, unpaid utilities, title commitment update fees, gap insurance premiums, State of Illinois policy fees, extended coverage premiums, the costs of closing protection coverage for the Seller, all other expenses required to be paid by the Seller at closing, all amounts advanced for the benefit of the Property which are required to be reimbursed and/or any amount required to discharge any Receiver's lien.

*[Using additional sheets, set forth any other terms and conditions to be included in the Agreement, or any modifications to the Agreement, and to which your credit bid shall remain subject.]*

**EXHIBIT A**



*First American*
*Title Insurance Company*

## STRICT JOINT ORDER ESCROW AGREEMENT

**Open Date:** _____    **Expected Release Date:** _____    **Escrow Number:** _2986651_

**Property Address:** _7748-50 South Essex, Chicago, Illinois 60649_

**Deposit Amount: $** _____    **Purpose:** ☒ Earnest Money    ☐ Repairs: _____
**Document(s) Held** _____         ☐ Tax Escrow    ☐ Other: _____

The above is hereby deposited with First American Title Insurance Company, as Escrowee (hereinafter referred to as the Escrowee) pursuant to this Strict Joint Order Escrow Agreement (hereinafter referred to as the Agreement). Said deposit shall be released and delivered by the Escrowee only upon the joint written order of the undersigned or their respective legal representatives or assigns.

Escrowee is hereby expressly authorized to disregard, in its sole discretion, any and all notices or warnings given by any other person or corporation, but the Escrowee is hereby expressly authorized to regard and to comply with and obey any and all orders, judgments or decrees entered or issued by any court with or without jurisdiction, and in case the Escrowee obeys or complies with any such order, judgment or decree of any court it shall not be liable to any party hereto or any other person, firm or corporation by reason of such compliance, notwithstanding any such order, judgment or decree being entered without jurisdiction or being subsequently reversed, modified, annulled, set aside or vacated. In case of any suit or proceeding regarding the Agreement, to which the Escrowee is or may at any time become a party, it shall have a lien on the contents hereof for any and all costs, and reasonable attorneys' fees, whether such attorneys shall be regularly retained or specially employed, and any other expenses which it may have incurred or become liable for on account thereof, and it shall be entitled to reimburse itself therefore out of said deposit, and the undersigned agree to pay the Escrowee upon demand all such costs, fees and expenses so incurred, to the extent the funds deposited hereunder shall be insufficient to allow for such reimbursement.

In no case shall the above mentioned deposits be surrendered except on an order signed by the parties hereto, their respective legal representatives or assigns, or order of court as aforesaid.

Interest, income or other benefits, if any, earned or derived from the funds deposited shall belong to the Escrowee. The Escrowee may deposit all funds received hereunder to one or more of its general accounts. The Escrowee shall be under no duty to invest or reinvest any funds, at any time, held by it pursuant to the terms of the Agreement.

Unless otherwise tendered, the Escrowee is authorized to pay an Escrow Fee in the amount of $300.00, and thereafter a Maintenance Fee in the amount of $200.00 (charged per annum beginning one year following the date of the Agreement) from the funds deposited in this escrow. The Escrowee also reserves the right to add applicable administration fees at its discretion.

**Purchaser:**
Signed: _A_____

Print Name: _Kevin Nugent, Southside Property Group_

Address: _765 E. 69th Pl_
_Chicago IL 60637_

Email: _Kevin.Nugento WPDmanagement.com_

Primary Phone: _773-908-9762_

Alternate Phone: _____

**Seller:**
Kevin B. Duff, as Federal Equity Receiver
for SSDF7 Portfolio 1, LLC

Signed: _____

Print Name: Rachlis Duff Peel & Kaplan LLC
542 South Dearborn, Suite 900

Address: Chicago, Illinois 60605

Email: kduff@rdaplaw.net

Primary Phone: (312) 733-3390

Alternate Phone: _____

**Primary Contact (if other than above):** _____

Accepted: First American Title Insurance Company, Escrowee    **By:** _____

27775 Diehl Road, Ste 200, Warrenville, IL 60555
*T E L* 877-295-4328 · *F A X* 866-525-5530
*titleindemnity.warrenville.il@firstam.com*

**EXHIBIT B**

**Assignment And Assumption Of Leases**

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Kevin B. Duff, as court-appointed federal equity receiver for SSDF7 Portfolio 1, LLC ("Seller") pursuant to that certain Order Appointing Receiver entered August 17, 2018 (Dkt. 16), as supplemented by that certain Order entered March 14, 2019 (Dkt. 290), in the case captioned *United States Securities and Exchange Commission v. EquityBuild, Inc., et al.*, United States District Court for the Northern District of Illinois, Eastern Division, Civil Action No. 1:18-cv-05587 ("Assignor"), hereby irrevocably grants, assigns, transfers, conveys, and sets over to [TBD] ("Assignee"), a _____, all of Assignor's right, title, and interest in and to the leases (collectively, the "Leases") attached hereto.

Assignee hereby assumes all of the obligations imposed upon the Assignor under the Leases which accrue from and after the date hereof. This Assignment is made without any express or implied representation or warranty, except to the extent provided in that certain Purchase And Sale Agreement, accepted by the Seller on August ___, 2019, by and between Assignor and Assignee.

This Assignment shall be governed by and construed in accordance with the laws of the State of Illinois.

IN WITNESS WHEREOF, the parties have executed this Assignment And Assumption Of Leases as of this ___ day of _____, 2019.

**ASSIGNOR:**

Kevin B. Duff, Federal Equity Receiver for
SSDF7 Portfolio 1, LLC

_____

**ASSIGNEE:**

[TBD]

By: _____

Name: _KEVIN Nugent_

Title: _Managing Member_

**EXHIBIT E**

**Illinois Anti-Predatory Lending Database Program**

**Certificate of Exemption**



**Report Mortgage Fraud
844-768-1713**



Doc# 1727219056 Fee $74.00

RHSP FEE:$9.00 RPRF FEE: $1.00
KAREN A.YARBROUGH
COOK COUNTY RECORDER OF DEEDS
DATE: 09/29/2017 03:44 PM PG: 1 OF 19

The property identified as:     **PIN:** 20-25-119-001-0000

**Address:**
**Street:**  7201 S. Constance Avenue
**Street line 2:**
**City:** Chicago          **State:** IL          **ZIP Code:** 60649

**Lender:** BC57, LLC

**Borrower:** SSDF5 Portfolio 1 LLC

**Loan / Mortgage Amount:** $5,328,433.43

This property is located within the program area and is exempt from the requirements of 765 ILCS 77/70 et seq. because it is commercial property.

Near North National Title
222 N. LaSalle
Chicago, IL 60601

**Certificate number:** 4EAA813A-FD4E-4096-AAEA-24BDC4B42586          **Execution date:** 9/29/2017

Licensed to Popov Insilby Cook County Recorder of Deeds

Prepared by and after recording return to:

Lowell D. Salesin, Esq.
Honigman Miller Schwartz and Cohn LLP
39400 Woodward Avenue, Suite 101
Bloomfield Hills, Michigan 48304
248.566.8540

_____[Space Above This Line is for Recording Information]_____

## MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT
## AND FIXTURE FILING

THIS MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING ("Mortgage") is made effective September __27th__, 2017, by SSDF5 PORTFOLIO 1 LLC, an Illinois limited liability company, whose address is 180 N. Stetson, Suite 3500, Chicago, Illinois 60601 ("Mortgagor"), in favor of BC57, LLC, a Michigan limited liability company, of 280 North Old Woodward Avenue, Suite 104, Birmingham, Michigan 48009 ("Lender").

**THIS MORTGAGE SECURES ONE OR MORE PROMISSORY NOTES THAT DO OR MAY PROVIDE FOR A VARIABLE RATE OF INTEREST.**

### GRANTING CLAUSE

To secure the Indebtedness (as hereinafter defined) and as security for the purposes stated elsewhere in this Mortgage, the Mortgagor irrevocably MORTGAGES AND WARRANTS, grants, conveys, assigns, transfers and hypothecates to the Lender, its successors and assigns, the following described properties, rights, interests and privileges (collectively, the "Mortgaged Property"):

A.      The parcel(s) of real estate commonly known as 7625-7633 S. East Ave., 7635-7643 S. East End Ave., 7750-7752 S. Muskegon Avenue, 7201 S. Constance Avenue, and 7836 S. Shore Drive, located in Chicago, Cook County, Illinois 60649, as more particularly described in Schedule A attached to this Mortgage ("Real Estate");

B.      All buildings, structures, fixtures and improvements now located, or subsequently constructed or placed upon the Real Estate, including, without limit, all building materials and building equipment located on the Real Estate;

C.      All machinery, apparatus, equipment, utility systems, appliances, fittings, fixtures, supplies, goods, and articles of personal property of every kind and nature located or subsequently located on the Real Estate and all attachments, accessions and replacements (individually and collectively, "Equipment"), and all of the right, title and interest of the Mortgagor in and to any Equipment which may be subjected to any title retention or security agreement superior in lien to the lien of this Mortgage. All Equipment being part and parcel of the Mortgaged

255112673

Property and appropriated to the use of the Real Estate and, whether affixed or not, unless the Lender shall otherwise elect, deemed to be real estate and mortgaged under this Mortgage;

D. All easements, rights-of-way, licenses, privileges and appurtenances relating to the Real Estate;

E. All rents, issues, profits, revenues, proceeds, accounts and general intangibles arising from the Real Estate or relating to any business conducted by the Mortgagor on the Real Estate, or under present or future leases, reservation and/or purchase agreements, land contracts, licenses or otherwise, all of which are specifically assigned and transferred to the Lender;

F. All right, title and interest of the Mortgagor in and to the land lying in the bed of any street, road, avenue, alley or walkway, opened or proposed or vacated, adjoining the Real Estate; and

G. Any and all awards or payments, including, without limit, interest on any awards or payments, and the right to receive them, which may be made with respect to the Mortgaged Property as a result of: the exercise of the right of eminent domain; the alteration of the grade of any street; any loss of or damage to any building or other improvement on the Real Estate; any other injury to or decrease in the value of the Mortgaged Property; any refund due on account of the payment of real estate taxes, assessments or other charges levied against or imposed upon the Mortgaged Property; or any refund of utility deposits or right to any tenant deposit.

## INDEBTEDNESS SECURED BY THIS MORTGAGE

This Mortgage is made to secure all of the following (individually and collectively, the "Indebtedness"):

I. Payment of Five Million Three Hundred Twenty-Eight Thousand Four Hundred Thirty-Three and 43/100 ($5,328,433.43) Dollars, together with interest, costs and all other sums payable on that amount, to be paid according to the $5,328,433.43 Promissory Note dated on even date herewith made by Mortgagor payable to Lender and all extensions, renewals, modifications, substitutions or replacements (collectively, the "Note") and the Loan Agreement dated on even date herewith made by and between Mortgagor and Lender and all amendments, modifications, renewals, substitutions or replacements thereof (collectively, the "Loan Agreement") and any other note(s), guaranty(ies), loan agreement(s), indemnity agreement(s) or other evidence(s) of indebtedness to Lender made as of the date of this Mortgage by the Mortgagor and any and all extensions, renewals, modifications, substitutions or replacements thereof. This reference to a particular dollar amount does not in any way limit the dollar amount secured by this Mortgage.

II. The payment of any and all amounts of any kind now owing or later to become due to the Lender from the Mortgagor during the term of this Mortgage, however created or arising, whether under the obligations specified above or under any other existing or future instrument or agreement between the Mortgagor and the Lender, or otherwise, and whether direct, indirect, primary, secondary, fixed, contingent, joint or several, due or to become due, together with interest, costs and all other sums on that amount and including, without limit, all present and future indebtedness or obligations of third parties to the Lender which is guaranteed by the Mortgagor, and the present or future indebtedness originally owing by the Mortgagor, to third parties and assigned by third parties to the Lender, and any and all renewals, extensions, modifications, substitutions or replacements of any of them.

III. Payment of $2,776,576.95 together with interest, costs and all other sums payable on that amount pursuant to that certain Promissory Note dated December 15, 2016 and made by 4611-17 S Drexel LLC, an Illinois limited liability company in favor of Lender (as amended and/or restated from time to time, "Affiliate Note").

IV. The performance of the covenants and obligations of Mortgagor due or to become due to the Lender, including, without limit, those due under this Mortgage, and the repayment of all sums expended by the Lender in connection with performance of those covenants and obligations and the enforcement of this Mortgage.

This Mortgage secures the payment of the entire Indebtedness secured hereby; provided, however, that the total amount secured by this Mortgage (excluding interest, costs, expenses, charges, fees, protective advances and indemnification obligations, all of any type or nature) shall not exceed an amount equal to 200% of the face amount of the Note.

MORTGAGE
Page 2

25511267.3

## COVENANTS AND AGREEMENTS

1.  **COVENANTS AND WARRANTIES**. The Mortgagor covenants and warrants to the Lender, as long as the Indebtedness remains outstanding, as follows:

1.1  **Authority; No Conflict**. The Mortgagor has the power and authority to execute, deliver and perform its obligations under this Mortgage. The execution, delivery and performance of this Mortgage by the Mortgagor does not, and will not violate or conflict with any provision of its organizational or charter documents or any agreement, court order or consent decree to which the Mortgagor is a party or by which the Mortgagor may be bound.

1.2  **Title to Mortgaged Property**. The Mortgagor is the owner and is lawfully seized and possessed of the Mortgaged Property. The Mortgagor has good right, full power and authority to mortgage the Mortgaged Property to Lender in accordance with the terms of this Mortgage. The Mortgaged Property is and shall remain free and clear of any liens and encumbrances save and except as may be set forth on Schedule B in that certain marked up commitment for title insurance issued by Near North National Title LLC, as agent for Chicago Title Insurance Company, Commitment No. IL-1706750 delivered to Lender concurrent with the execution hereof. The Mortgagor shall pay when due all obligations which, if unpaid, may become a lien on the Mortgaged Property or which are secured by a lien on the Mortgaged Property with the Lender's consent.

1.3  **Payment of Indebtedness**. The Mortgagor will pay and perform the Indebtedness when due, whether by maturity, acceleration or otherwise.

1.4  **Maintenance of Mortgaged Property; Maintenance Reserve Account; and Waste**.

1.4.1  The Mortgagor shall preserve and maintain the Mortgaged Property in good repair, working order and condition, excepting ordinary wear and tear, shall replace any Equipment which requires replacement, shall procure all necessary utility services, and shall not commit or permit the commission of waste against the Mortgaged Property. The Mortgagor shall promptly protect, repair, replace or rebuild any part of the Mortgaged Property that is damaged or destroyed by fire or other casualty, or that may be affected by any eminent domain or condemnation proceedings.

1.4.2  In addition to reserve requirements, if any, set forth in the Loan Agreement, in this Mortgage or any other document entered into in connection herewith, if the Lender determines that the Mortgagor is not maintaining the Mortgaged Property as required herein, in addition to all of the Lender's other remedies, the Lender may require the Mortgagor to pay into a non-interest bearing reserve account ("Maintenance Reserve Account") an amount estimated by the Lender to be sufficient to enable the Mortgagor to maintain the Mortgaged Property. If required by the Lender, such amount shall be payable in monthly installments (payable in addition to any other sums due under the Indebtedness) subject to adjustment, up or down, annually on the anniversary of the date hereof by the Lender at the Lender's sole discretion. The Maintenance Reserve Account shall be under the Lender's sole control and shall be additional security for the Indebtedness. The Lender shall make disbursements from the Maintenance Reserve Account for maintenance of the Mortgaged Property, or as otherwise provided by this Mortgage, at the Lender's sole discretion.

1.4.3  Failure, refusal or neglect of the Mortgagor to comply with subsection 1.4.1 or to pay any taxes or assessment or any utility rates levied, assessed or imposed upon the Mortgaged Property, and/or nonpayment of any premiums for insurance, shall constitute waste, and shall entitle the Lender to exercise the remedies provided in this Mortgage, as well as those afforded by law.

1.5  **Payment of Taxes; Discharge of Liens**. The Mortgagor shall pay to the Lender, in advance on the tenth day of each month, a pro rata portion (as determined by the Lender in accordance with the terms of the Loan Agreement and this Mortgage) of all Imposition(s) levied, assessed or existing on the Mortgaged Property. In the event that sufficient funds have been deposited with the Lender to cover the amount of these Imposition(s) when they become due and payable, the Lender shall pay them subject to Mortgagor's satisfaction of the conditions set

forth in Section 4 of the Loan Agreement. In the event that sufficient funds have not been deposited to cover the amount of these Imposition(s) at least thirty (30) days prior to the time when they become due and payable, the Mortgagor shall immediately pay the amount of the deficiency to the Lender. The Lender shall not be required to keep a separate account or to pay the Mortgagor any interest on the funds held by the Lender for the payment of the Imposition(s) pursuant to this Section 1.5 or for the payment of insurance premiums under Section 1.7 below, or on any other funds deposited with the Lender in connection with this Mortgage. The funds on deposit with the Lender are further security for the Indebtedness and if an Event of Default occurs under this Mortgage, any funds remaining on deposit with the Lender may be applied against the Indebtedness at any time after the Event of Default occurs, and without notice to the Mortgagor.

1.6    **Sale or Transfer of Mortgaged Property**.  Without the prior written consent of the Lender, except as permitted in the Loan Agreement, the Mortgagor will not (i) sell, assign, transfer or encumber all or any interest in the Mortgaged Property or (ii) enter into any agreement or grant an option for such purpose, or (iii) permit or suffer any change in the ownership of the Mortgagor.  In the event ownership of the Mortgaged Property, or any part, becomes vested in any person(s) other than the Mortgagor, the Lender may deal with and may enter into any contract or agreement with the successor(s) in interest with reference to this Mortgage in the same manner as with the Mortgagor, without discharging or otherwise affecting the lien of this Mortgage or the Mortgagor's obligations under this Mortgage.

1.7    **Insurance**.

1.7.1    The Mortgagor shall keep the buildings and all other improvements on the Mortgaged Property insured for the benefit of the Lender against fire and other hazards and risks, including, without limit, vandalism and malicious mischief, as the Lender may require and shall further provide flood insurance (if the Mortgaged Property is situated in an area which is considered a flood risk area by the United States Department of Housing and Urban Development, and for which flood insurance is available under the National Flood Insurance Act of 1968, as amended), loss of rents insurance, public liability and product liability insurance and any other insurance as the Lender may reasonably require from time to time. All insurance shall be in amounts and in forms and with companies satisfactory to the Lender, and in the case of fire and extended coverage (or builder's risk) insurance shall not be for less than 100% of the full insurable value of the Mortgaged Property.  The Mortgagor shall deliver to the Lender the policies evidencing the required insurance with premiums fully paid for one year in advance, and with standard mortgagee clauses (making all losses payable to the Lender). Renewals of the required insurance (together with evidence of premium prepayment for one (1) year in advance) shall be delivered to the Lender at least ten (10) days before the expiration of any existing policies. All policies and renewals shall provide that they may not be canceled or amended without giving the Lender thirty (30) days prior written notice of cancellation or amendment.  The foregoing insurance requirements are in addition to those contained in the Loan Agreement and in the event of any conflict or inconsistency in the insurance requirements herein or in the Loan Agreement, the requirements move favorable to the Lender, as determined by the Lender, in its sole and absolute discretion, shall apply.

1.7.2    Should the Mortgagor fail to insure or fail to pay the premiums on any required insurance or fail to deliver the policies or renewals as provided above, the Lender may have the insurance issued or renewed (and pay the premiums on it for the account of the Mortgagor) in amounts and with companies and at premiums as the Lender deems appropriate.  If the Lender elects to have insurance issued or renewed to insure the Lender's interest, the Lender shall have no duty or obligation of any kind to also insure the Mortgagor's interest or to notify the Mortgagor of the Lender's actions. Any sums paid by the Lender for insurance, as provided above, shall be a lien upon the Mortgaged Property, added to the amount secured by this Mortgage, and payable immediately by the Mortgagor to the Lender, with interest on those sums at the highest rate charged by the Lender on any of the Indebtedness (but not to exceed the maximum interest rate permitted by law).

1.7.3    In the event of loss or damage, the proceeds of all required insurance shall be paid to the Lender. No loss or damage shall itself reduce the Indebtedness. The Lender or any of its employees is each

MORTGAGE
Page 4

25511267.3

irrevocably appointed attorney-in-fact for the Mortgagor and is authorized to adjust and compromise each loss without the consent of the Mortgagor, to collect, receive and receipt for the insurance proceeds in the name of the Lender and the Mortgagor and to endorse the Mortgagor's name upon any check in payment of the loss. The proceeds shall be applied first toward reimbursement of all costs and expenses of the Lender in collecting the proceeds (including, without limit, court costs and reasonable attorneys' fees), and then toward payment of the Indebtedness or any portion of it, whether or not then due or payable and in whatever order of maturity as the Lender may elect, or the Lender, at its option, may consent to the application of the insurance proceeds, or any part of them, to the repair or rebuilding of the Mortgaged Property. If the Lender elects to allow the use of insurance proceeds to restore or repair the Mortgaged Property, the Mortgagor and the Lender shall enter into a written agreement satisfactory to the Lender providing for the terms under which the insurance proceeds shall be released. Application of proceeds by the Lender toward later maturing installments of the Indebtedness shall not excuse the Mortgagor from making the regularly scheduled installment payments nor shall such application extend or reduce the amount of any of these payments.

1.7.4    In the event of a foreclosure of this Mortgage, or the giving of a deed in lieu of foreclosure, the purchaser or grantee of the Mortgaged Property shall succeed to all of the rights of the Mortgagor under the insurance policies including, without limit, any right to unearned premiums and to receive the proceeds.

1.7.5    The Mortgagor shall pay to the Lender, in advance on the tenth day of each month, a pro rata portion of the annual premiums due (as estimated by the Lender in accordance with the terms of the Loan Agreement and this Mortgage) on the required insurance. In the event that sufficient funds have been deposited with the Lender to cover the amount of the insurance premiums when the premiums become due and payable, the Lender shall pay the premiums subject to Mortgagor's satisfaction of the other conditions set forth in Section 4 of the Loan Agreement. In the event that sufficient funds have not been deposited with the Lender to pay the insurance premiums at least thirty (30) days prior to the time when they become due and payable, the Mortgagor shall immediately pay the amount of the deficiency to the Lender.

1.7.6    The foregoing requirements regarding insurance are in addition to any other similar requirements in any other document entered into by Mortgagor in connection with the Indebtedness and in the event of any conflict in such requirements the requirement(s) more favorable to Lender (determined by Lender in its sole and absolute discretion) shall govern and be applicable.

1.8    **Compliance With Law and Other Matters**.  The Mortgagor will comply with all federal, state and local laws, ordinances, rules, regulations and restrictions relating to the ownership, use, occupancy and operation of the Mortgaged Property and will not permit the use of the Mortgaged Property for unlawful purposes. Further, the Mortgagor will comply with, perform the Mortgagor's obligations under, and enforce the obligations of all other parties to all building and use restrictions, ground leases, leases, reservation and/or purchase agreements, condominium documents and/or other instruments, as applicable, affecting or relating to the use and/or occupancy of the Mortgaged Property.

1.9    **No Removal of Improvements**.  Without the prior written consent of the Lender, the Mortgagor will not remove, demolish or materially alter or add to any building, structure or other improvement forming part of the Mortgaged Property nor otherwise reduce the value or usefulness of the Mortgaged Property, except as otherwise permitted in the Loan Agreement.

1.10    **Recording**.  The Mortgagor will cause this Mortgage, any supplemental mortgage and any financing and continuation statements required by the applicable Uniform Commercial Code to be recorded and filed at the Mortgagor's expense in such manner and in such place as may, in the Lender's opinion, be necessary or proper.

1.11    **Additional Assurances**.  The Mortgagor will execute and deliver additional instruments and take additional actions as Lender may reasonably request to carry out the terms and conditions of this Mortgage.

1.12    **Books and Records; Inspection Rights**.  The Mortgagor will at all times maintain accurate and complete books and records, and copies of all building and use restrictions, ground leases, leases, reservation and/or

MORTGAGE
Page 5

25511267.3

purchase agreements, condominium documents, contracts and/or other instruments with respect to the Mortgaged Property. The Lender may inspect and make copies of those books and records and any other data relating to the Mortgaged Property. The Lender may inspect and test the Mortgaged Property at such reasonable times as Lender shall determine, and the Mortgagor will permit the Lender and its representatives and inspectors all necessary access to the Mortgaged Property. The Mortgagor will promptly provide to the Lender reports concerning the income, expenses and financial and other conditions of the Mortgaged Property as may be required from time to time by the Lender as more particularly set forth in the Loan Agreement.

1.13    **Environmental Representation, Warranty and Indemnification**.    Notwithstanding anything in this Mortgage to the contrary, the Mortgagor represents, covenants and warrants to the Lender as follows:

1.13.1    For the purpose of this Section the following terms shall have the given meanings:

1.13.1.1    "Relevant Environmental Laws" shall mean all applicable federal, state and local laws, rules, regulations, orders, judicial determinations and decisions or determinations by any judicial, legislative or executive body of any governmental or quasi-governmental entity, whether in the past, the present or the future, with respect to: (i) the installation, existence or removal of, or exposure to, Asbestos on the Mortgaged Property; (ii) the existence on, discharge from, or removal from the Mortgaged Property of Hazardous Materials; and/or (iii) the effects on the environment of the Mortgaged Property or of any activity now, previously, or hereafter conducted on the Mortgaged Property.

1.13.1.2    "Asbestos" shall have the meanings provided under the Relevant Environmental Laws, and shall include, without limited, asbestos fibers and friable asbestos, as such terms are defined under the Relevant Environmental Laws.

1.13.1.3    "Hazardous Materials" shall mean any of the following (as defined by the Relevant Environmental Laws): solid wastes; toxic or hazardous substances, wastes, or contaminants, including, without limit, polychlorinated biphenyls, paint containing lead, and urea formaldehyde foam insulation; and discharges of sewage or effluent.

1.13.2    At all times since Mortgagor has acquired any interest or rights in the Mortgaged Property, whether through lease, land contract, deed or otherwise and, to Mortgagor's knowledge, after due inquiry, at all times prior to Mortgagor's acquisition of such interest or rights in the Mortgaged Property: there are no and have been no violations of the Relevant Environmental Laws at the Mortgaged Property and no consent orders have been entered with respect to the Mortgaged Property; there are no and have been no Hazardous Materials or Asbestos either at, upon, under or within, or released, discharged or emitted at or from, the Mortgaged Property; no Hazardous Materials or Asbestos have released, emitted or otherwise become present at the Mortgaged Property from neighboring land; and no Hazardous Materials or Asbestos have been removed from the Mortgaged Property, except in compliance with the Relevant Environmental Laws.

1.13.3    The Mortgagor, after due inquiry, is not aware of any claims of litigation, and has not received any communication, concerning the presence or possible presence of Hazardous Materials or Asbestos at the Mortgaged Property or concerning any violation or alleged violation of the Relevant Environmental Laws respecting the Mortgaged Property. The Mortgagor shall promptly notify the Lender of any such claims and shall furnish the Lender with a copy of any such communications received after the date of this Mortgage.

1.13.4    The Mortgagor shall ensure that the Mortgaged Property complies in all respects with the Relevant Environmental Laws, shall notify Lender promptly and in reasonable detail in the event that the Mortgagor becomes aware of the presence of Hazardous Materials or Asbestos or a violation of the Relevant Environmental Laws at the Mortgaged Property, and shall conduct all required clean-up, closure or other remediation of any condition necessary to maintain compliance with the Relevant Environmental Laws.

1.13.5  Should the Mortgagor use or permit the Mortgaged Property to be used or maintained so as to subject the Mortgagor, the Lender or the use of the Mortgaged Property to a claim of violation of the Relevant Environmental Laws (unless contested in good faith by appropriate proceedings satisfactory to the Lender), the Mortgagor shall immediately remedy and fully cure, at its own cost and expense, any conditions arising therefrom.

1.13.6  The Mortgagor shall pay immediately when due the cost of compliance with the Relevant Environmental Laws. Further, the Mortgagor shall keep the Mortgaged Property free of any lien imposed pursuant to the Relevant Environmental Laws.

1.13.7  In the event that the Mortgagor fails to comply with any of the requirements of this Section 1.13, after notice to the Mortgagor and the earlier of the expiration of any applicable cure period under this Mortgage or the expiration of the cure period permitted under the Relevant Environmental Laws, if any, the Lender may exercise its right to do one or more of the following:  (i) elect that such failure constitutes a default under this Mortgage; and/or (ii) take any and all actions, at the Mortgagor's expense, that the Lender deems necessary or desirable to cure such failure of compliance.  Any costs incurred the Lender pursuant to this Section 1.13, shall become immediately due and payable without notice and with interest thereon at a rate equal to the highest interest rate charged on the Indebtedness (but not to exceed the maximum interest rate permitted by law), and such amount, including interest, shall, if incurred prior to the foreclosure of this Mortgage or the delivery of a deed in lieu of foreclosure, be added to amounts owing under the Indebtedness and shall be secured by this Mortgage.

1.13.8  The Lender shall not be liable for and the Mortgagor shall immediately pay to and indemnify, defend and hold the Lender harmless from and against, all loss, cost, liability, damage and expense (including, without limit, attorneys' fees and costs incurred in the investigation, defense and settlement of claims) that the Lender may suffer or incur (as holder of this Mortgage, as mortgagee in possession or as successor in interest to the Mortgagor as owner of the Mortgaged Property by virtue of foreclosure or acceptance of a deed in lieu of foreclosure) as a result of or in connection in any way with the Mortgagor's failure to comply with the terms and provisions of this Section 1.13.

1.13.9  The provisions of this Section 1.13 shall survive the repayment of the Indebtedness and the performance of all duties and obligations related thereto, the foreclosure of this Mortgage, the delivery of a deed in lieu of foreclosure and/or the discharge of this Mortgage.

1.13.10  The provisions of this Section 1.13 are in addition to any similar provisions in any other documentation evidencing, securing or governing the Indebtedness, including, but not limited to, any environmental indemnification agreement executed in connection with the Indebtedness ("Indemnity"), and in the event of any conflict or inconsistency between the terms and conditions hereof and the Indemnity, the document containing the terms and conditions more favorable to Lender, as determined by Lender, in its sole and absolute discretion, shall be given priority and shall apply.

1.14    **Reporting Requirements**.  The Mortgagor shall certify and furnish to the Lender, in form and detail satisfactory to the Lender those financial reports of the Mortgagor as required pursuant to the Loan Agreement.

2.      **APPLICATION OF CONDEMNATION AWARDS**.

2.1    **Condemnation Award**.  Any eminent domain or condemnation proceeds shall be paid directly to the Lender and applied toward reimbursement of all the Lender's costs and expenses incurred in connection with collecting the award (including, without limit, court costs and reasonable attorneys' fees), and the balance applied upon the Indebtedness whether or not then due or payable in whatever manner the Lender deems advisable. Application by the Lender of any condemnation award or portion of it toward the last maturing installments of the Indebtedness shall not excuse the Mortgagor from making the regularly scheduled payments nor extend or reduce the amount of these payments.

2.2    **Appointment of Lender**.  The Lender or any of its employees is each irrevocably appointed attorney-in-fact for the Mortgagor and is authorized to receive, receipt for, discharge and satisfy any condemnation

25511267.3

award or judgment, whether joint or several, on behalf of the Mortgagor, the Mortgagor's legal representatives, successors and assigns; provided, however, that the Lender shall not be liable for failure to collect any condemnation award.

3.     **ADDITIONAL SECURITY**.

3.1     **Security Interest in Personal Property**.  The Mortgagor grants the Lender a security interest in any present and future Equipment, fixtures, accounts, general intangibles, instruments, and other personal property included within the definition of Mortgaged Property.  The Mortgagor agrees, upon request of the Lender, to promptly furnish a list of personal property owned by the Mortgagor and subject to this Mortgage and, upon request by the Lender, to immediately execute, deliver and/or file any mortgage and any amendments to this Mortgage, any separate security agreement and any financing statements to include specifically this list of personal property. The Lender or any of its employees is each irrevocably appointed attorney-in-fact and is authorized to execute, deliver and/or file any mortgage and any amendments to this Mortgage, any separate security agreement and any financing statements to include specifically the personal property described above.

3.2     **Licenses and Permits**.  As additional security for the Indebtedness, the Mortgagor assigns to the Lender all of the Mortgagor's rights and interest in all licenses or permits affecting the Mortgaged Property.  This assignment shall not impose upon the Lender any obligations with respect to any license or permit. The Mortgagor shall not cancel or amend any of the licenses or permits assigned (nor permit any of them to terminate if they are necessary or desirable for the operation of the Mortgaged Property) without first obtaining the written approval of the Lender.

3.3     **Contracts**.  As additional security for payment of the Indebtedness, the Mortgagor assigns to and grants the Lender a security interest in all existing and future agreements and contracts for the design, development, improvement, construction, maintenance, alteration, repair, testing, operation and management of the Mortgaged Property.

3.4     **Deposits and Accounts**.  As additional security for the payment of the Indebtedness and performance of this Mortgage, the Mortgagor grants a security interest to the Lender in all deposits or other accounts with the Lender.

3.5     **Assignment of Rents and Leases**.

3.5.1     As additional security for the payment of the Indebtedness and performance of this Mortgage, the Mortgagor assigns to the Lender all of the Mortgagor's right, title and interest in and to all existing and future written and oral leases and occupancy agreements covering the Mortgaged Property or any part of it (collectively, the "Leases") (but without an assumption by the Lender of liabilities of the Mortgagor under any of these Leases or occupancy agreements by virtue of this assignment), and the Mortgagor assigns to the Lender the leases, rents, issues and profits of the Mortgaged Property and any guaranties of any of the Leases. This is a present and absolute assignment, not an assignment for security purposes only, and Lender's right to the Leases, rents, issues and profits is not contingent, upon and may be exercised without, possession of the Mortgaged Property.

3.5.2     At least annually, and more frequently if requested by the Lender or required by the terms of the Loan Agreement, the Mortgagor shall provide the Lender with a certified rent roll and such other information regarding the Leases as the Lender may reasonably require.

3.5.3     Subject to the license granted in the Assignment (hereinafter defined) to Mortgagor ("License") to collect and retain the rents, issues and profits as they become due and payable, upon an Event of Default, such License shall be automatically revoked and Lender may receive and collect the rents, issues and profits personally, or through a receiver, so long as the Event of Default exists and during the pendency of any foreclosure proceedings and during any redemption period. The Mortgagor consents to the appointment of a receiver.

3.5.4     The Lender shall at no time have any obligation whatever to attempt to collect rents or other amounts from any tenant of the Mortgaged Property. Further, the Lender shall have no obligation to

MORTGAGE
Page 8

25511267.3

enforce any other obligations owed by any tenant of the Mortgaged Property. No action taken by the Lender under this Mortgage shall make the Lender a "mortgagee in possession."

3.5.5 The Mortgagor shall not collect advance rent under any of the Leases in excess of one month (other than as a security deposit) and the Lender shall not be bound by any prepayment made or received in violation of this prohibition.

3.5.6 At the option of the Lender, this Mortgage shall become subordinate, in whole or in part (but not with respect to priority as to insurance proceeds or any condemnation award) to any or all Leases upon the execution and recording by the Lender of an affidavit to that effect.

3.5.7 The Mortgagor shall timely perform the obligations under the Leases and not permit or suffer any event or condition which gives any tenant a right to cancel, terminate, or assert any defense or offset under any of the Leases. Mortgagor shall cause each tenant under the Lease to deliver estoppel certificates and subordination agreements in form satisfactory to Lender, upon request.

3.5.8 Without the Lender's prior written consent, the Mortgagor shall not modify or amend or enter into any Leases (except for residential leases on the standard form approved by Lender subject to the conditions set forth in the Loan Agreement).

3.5.9 The provisions of this Section 3.5 are in addition to any similar provisions in any documentation evidencing, securing or governing the Indebtedness, including, but not limited to, that certain Assignment of Leases and Rents executed by Mortgagor in favor of Lender concurrently herewith (the "Assignment"), and in the event of any conflict or inconsistency between the terms and conditions hereof and the Assignment, the document containing the terms and conditions more favorable to Lender, as determined by Lender, in its sole and absolute discretion, shall be given priority and shall apply.

3.5.10 The foregoing assignment shall not cause Lender to be: (a) a mortgagee in possession; (b) responsible or liable for the control, care, management or repair of the Mortgaged Property or for performing any of the terms, agreements, undertakings, obligations, representations, warranties, covenants and conditions of the Leases; (c) responsible or liable for any waste committed on the Mortgaged Property by the tenants under any of the Leases or any other parties, for any dangerous or defective condition of the Mortgaged Property, or for any negligence in the management, upkeep, repair or control of the Mortgaged Property resulting in loss or injury or death to any tenant, licensee, employee, invitee or other person; (d) responsible for or under any duty to produce rents or profits; or (e) directly or indirectly liable to Mortgagor or any other person as a consequence of the exercise or failure to exercise any of the rights, remedies or powers granted to Lender hereunder or to perform or discharge any obligation, duty or liability of Mortgagor arising under the Leases.

3.5.11 So long as the License is in effect, Mortgagor shall indemnify and hold Lender harmless from and against any and all liability, loss, cost, damage or expense which Lender incurs under or by reason of the foregoing assignment, or for any action taken by Lender hereunder in accordance with the terms hereof, or by reason of or in defense of any and all claims and demands whatsoever which are asserted against Lender arising out of the Leases. In the event Lender incurs any such liability, loss, cost, damage or expense, the amount thereof together with all attorneys' fees and interest thereon at the default rate of interest as set forth in the Note shall be payable by Mortgagor to Lender, within 10 days after demand by Lender, and shall be secured by this Mortgage, provided that Mortgagor shall have no duty or liability hereunder to indemnify and hold Lender harmless from matters resulting from the willful misconduct or gross negligence of Lender.

4.  **EVENTS OF DEFAULT AND REMEDIES**.

4.1 **Events of Default**. Any of the following events shall, for purposes of this Mortgage, constitute an "Event of Default":

4.1.1 Any amount owing on part of the Indebtedness is not paid when due whether by maturity, acceleration or otherwise.

MORTGAGE
Page 9

25511267.3

4.1.2    Any failure to comply with, or breach of, any of the terms, provisions, warranties or covenants of this Mortgage, or any other agreement or instrument which is part of the Indebtedness, any guaranty of any of the Indebtedness, or any other agreement or commitment between the Mortgagor or any guarantor and the Lender.

4.1.3    The occurrence of an Event of Default, as such term is defined in the Loan Agreement.

4.2    **Remedies Upon Event of Default**.  Upon the occurrence of any Event of Default, the Lender shall have the following rights, power and authority:

4.2.1    With or without notice, declare all or part of the Indebtedness immediately due and payable.

4.2.2    Demand that the Mortgagor immediately surrender the possession of the Mortgaged Property to the Lender and the Mortgagor consents to the Lender taking possession of the Mortgaged Property and the books and records relating to the Mortgaged Property.

4.2.3    Commence and maintain an action or actions in any court of competent jurisdiction to foreclose this Mortgage or to obtain specific enforcement of the covenants of Mortgagor hereunder, and Mortgagor agrees that such covenants shall be specifically enforceable by injunction or any other appropriate equitable remedy and that for the purposes of any suit brought under this subparagraph, Mortgagor waives the defense of laches and any applicable statute of limitations.  Commencement of such an action shall be deemed a declaration of acceleration pursuant to clause 4.2.1 above.

4.2.4    Enter upon, possess, manage and operate the Property or any part thereof.

4.2.5    Collect and receive all payments, rents, profits and other amounts that are due or shall subsequently become due under the terms of any leases, land contract, or other agreements by which the Mortgagor is leasing or selling the Mortgaged Property or any interest in the Mortgaged Property.  The Lender may also exercise any other rights or remedy of the Mortgagor under any or any lease, land contract or other agreement, and the costs and expenses thereof shall be for the account and expense of the Mortgagor.  However, the Lender shall have no obligation to make any demand or inquiry as to the nature of sufficiency of any payment received or to present or file any claim or take any other action to collect or enforce the payment of any amounts to which the Lender may become entitled under this Mortgage.  Similarly, the Lender shall not be liable for any of the Mortgagor's obligations under any such lease, land contract or other agreement.

4.2.6    Exercise all rights, remedies and privileges afforded a "secured party" under Article 9 of the Illinois Uniform Commercial Code.  Require the Mortgagor to assemble the personal property subject to this Mortgage and make it available to the Lender at a place to be designated by the Lender which is reasonably convenient to both parties.  Collect all accounts receivable, take possession of the personal property with or without demand and with or without process of law, and sell and dispose of it and distribute the proceeds according to law.  For these purposes, the Mortgagor agrees that any requirement of reasonable notice, if any, shall be met if the Lender sends notice to the Mortgagor at least five (5) days prior to the date of sale, disposition or other event giving rise to the required notice.

4.2.7    With or without notice, and without releasing Mortgagor from the Indebtedness, and without becoming a mortgagee in possession, cure any breach or Event of Default of Mortgagor and, in connection therewith, to enter upon the Mortgaged Property and do such acts and things as Lender deems necessary or desirable to protect the security hereof, including, without limitation: (i) to appear in and defend any action or proceeding purporting to affect the security of this Mortgage or the rights or powers of Lender under this Mortgage; (ii) to pay, purchase, contest or compromise any encumbrance, charge, lien or claim of lien which, in the sole judgment of Lender, is or may be senior in priority to this Mortgage, the judgment of Lender being conclusive as between the parties hereto; (iii) to obtain insurance and  to pay any premiums or charges with respect to insurance required to be carried under this Mortgage; (iv) to employ counsel, accountants, contractors and other appropriate; (iv) to inspect, repair, protect or preserve the Mortgaged Property; (v) to investigate or test for the presence of any Hazardous Materials; and/or (vi) to

25511267.3

appraise the Mortgaged Property. All of the Lender's expenditures for these purposes shall be part of the Indebtedness and shall bear interest at the highest rate applicable to any of the Indebtedness.

4.2.8 Pursue any other available remedy at law or equity to enforce the payment of the Indebtedness.

Upon sale of the Mortgaged Property at any foreclosure, Lender may credit bid (as determined by Lender in its sole and absolute discretion) all or any portion of the Indebtedness. In determining such credit bid, Lender may, but is not obligated to, take into account all or any of the following: (i) appraisals of the Mortgaged Property as such appraisals may be discounted or adjusted by Lender in its sole and absolute underwriting discretion; (ii) expenses and costs incurred by Lender with respect to the Mortgaged Property prior to foreclosure; (iii) expenses and costs which Lender anticipates will be incurred with respect to the Mortgaged Property after foreclosure, but prior to resale, including, without limitation, the costs of any structural reports, hazardous waste reports or any remediation costs related thereto; (iv) anticipated discounts upon resale of the Mortgaged Property as a distressed or foreclosed property; and (v) such other factors or matters that Lender deems appropriate. In regard to the above, Mortgagor acknowledges and agrees that: (w) Lender is not required to use any or all of the foregoing factors to determine the amount of its credit bid; (x) this paragraph does not impose upon Lender any additional obligations that are not imposed by law at the time the credit bid is made; (y) the amount of Lender's credit bid need not have any relation to any loan-to-value ratios specified in the Loan Documents or previously discussed between Mortgagor and Lender; and (z) Lender's credit bid may be higher or lower than any appraised value of the Mortgaged Property.

4.3 **Remedies Generally**.

4.3.1 All remedies provided for in Section 4.2 shall be available to the extent not prohibited by law. Each remedy shall be cumulative and additional to any other remedy of the Lender at law, in equity or by statute. No delay or omission to exercise any right or power accruing upon any default or Event of Default shall impair any such right or power or shall be construed to be a waiver of, or acquiescence in, any such default or Event of Default.

4.3.2 The Lender may waive any Event of Default and may rescind any declaration of maturity of payments on the Indebtedness. In case of such waiver or rescission the Mortgagor and the Lender shall be restored to their respective former positions and rights under this Mortgage. Any waiver by the Lender of any default or Event of Default shall be in writing and shall be limited to the particular default waived and shall not be deemed to waive any other default.

4.3.3 The Lender may release the obligation of any person liable for any of the Indebtedness and may extend time for payment or otherwise modify any terms of any of the Indebtedness without notice to or consent of the Mortgagor or any other person and without impairing the lien or priority of lien of this Mortgage.

4.4 **Receivers**. Upon an Event of Default and commencement of foreclosure proceedings to enforce the rights of the Lender under this Mortgage, the Lender shall be entitled to the appointment of a receiver or receivers of the Mortgaged Property and of the rents, issues and profits of the Mortgaged Property, pending such proceedings.

4.5 **Application of Proceeds**. Any proceeds received by the Lender from the exercise of remedies pursuant to Section 4.2 of this Mortgage shall be applied as follows:

4.5.1 First, to pay all costs and expenses incidental to the leasing, foreclosure, sale or other disposition of the Mortgaged Property. These costs and expenses shall include, without limit, reasonable compensation to the Lender, its agents and attorneys and any taxes and assessments or other liens and encumbrances prior to the lien of this Mortgage.

25511267.3

4.5.2    Second, to all sums expended or incurred by the Lender directly or indirectly in carrying out any term, covenant or agreement under this Mortgage or any related document, together with interest as provided in this Mortgage.

4.5.3    Third, to the payment of the Indebtedness. If the proceeds are insufficient to fully pay the Indebtedness, then application shall be made first to late charges and interest accrued and unpaid, then to any applicable prepayment premiums, then to unpaid fees and other charges, and then to the outstanding principal balance.

4.5.4    Fourth, any surplus remaining shall be paid to the Mortgagor or to whomsoever may be lawfully entitled.

4.6    **Marshalling**.  In the event of foreclosure of this Mortgage or the enforcement by the Lender of any other rights and remedies under this Mortgage, the Mortgagor waives any right in respect to marshalling of assets which secure the Indebtedness or to require the Lender to pursue its remedies against any other assets or any other party which may be liable for any of the Indebtedness.

4.7    **Further Actions**.  Promptly upon the request of the Lender, the Mortgagor shall execute, acknowledge and deliver any and all further conveyances, documents, mortgages and assurances, and do or cause to be done all further acts as the Lender may require to confirm and protect the lien of this Mortgage or otherwise to accomplish the purposes of this Mortgage.

4.8    **Attorneys Fees**.  Any reference in this Mortgage to attorneys' fees shall refer to fees, charges, costs and expenses of in-house and outside attorneys and paralegals, whether or not a suit or proceeding is instituted, and whether incurred at the trial court level, on appeal, in a bankruptcy, administrative or probate proceeding, in consultation with counsel, or otherwise. All costs, expenses and fees of any nature for which the Mortgagor is obligated to reimburse or indemnify the Lender are part of the Indebtedness secured by this Mortgage and are payable upon demand, unless expressly provided otherwise, with interest until repaid at the highest rate charged on any of the Indebtedness (but not to exceed the maximum rate permitted by law).

4.9    **Mortgagor Waivers**.

4.9.1    Except to the extent contrary to law, Mortgagor agrees that upon the occurrence and during the continuation of an Event of Default, Mortgagor will not at any time insist upon or plead or in any manner whatsoever claim the benefit of any valuation, stay, extension, or exemption law now or hereafter in force, in order to prevent or hinder the enforcement or foreclosure of this Mortgage or the absolute sale of the Mortgaged Property or the possession thereof by any purchaser at any sale made pursuant to any provision hereof, or pursuant to the decree of any court of competent jurisdiction; but Mortgagor, for Mortgagor and all who may claim through or under Mortgagor, so far as Mortgagor or those claiming through or under Mortgagor now or hereafter lawfully may, hereby waives upon the occurrence and during the continuation of an Event of Default the benefit of all such laws. If any law now or hereafter in force referred to in this paragraph of which the parties or their successors might take advantage despite the provisions hereof, shall hereafter be repealed or cease to be in force, such law shall not thereafter be deemed to constitute any part of the contract herein contained or to preclude the operation or application of the provisions of this paragraph, to the extent not prohibited by law.

4.9.2    In the event of the commencement of judicial proceedings to foreclose this Mortgage, Mortgagor, on behalf of Mortgagor, its successors and assigns, and each and every person or entity they may legally bind acquiring any interest in or title to the Mortgaged Property subsequent to the date of this Mortgage, to the extent permitted by applicable law, agrees that when sale is had under any decree of foreclosure of this Mortgage, upon confirmation of such sale, the officer making such sale, or his successor in office, shall be and is authorized immediately to execute and deliver to any purchaser at such sale a deed conveying the Mortgaged Property, showing the amount paid therefor, or if purchased by the person in whose favor the order or decree is entered, the amount of his bid therefor.

MORTGAGE
Page 12

25511267.3

4.10 **Illinois Mortgage Foreclosure Law.** It is the intention of Mortgagor and Lender that the enforcement of the terms and provisions of this Mortgage shall be accomplished in accordance with the Illinois Mortgage Foreclosure Law (the "Act"), 735 ILCS 5/15-1101 et seq., and with respect to such Act, Mortgagor agrees and covenants that:

4.10.1 Lender shall have the benefit of all of the provisions of the Act, including all amendments thereto which may become effective from time to time after the date hereof. In the event any provision of the Act which is specifically referred to herein may be repealed, Lender shall have the benefit of such provision as most recently existing prior to such repeal, as though the same were incorporated herein by express reference. If any provision in this Mortgage shall be inconsistent with any provision of the Act, provisions of the Act shall take precedence over the provisions of this Mortgage, but shall not invalidate or render unenforceable any other provision of this Mortgage that can be construed in a manner consistent with the Act. If any provision of this Mortgage shall grant to Lender (including Lender acting as a mortgagee-in-possession) or a receiver appointed pursuant to this Article 4 any powers, rights or remedies prior to, upon or following the occurrence of an Event of Default which are more limited than the powers, rights or remedies that would otherwise be vested in Lender or in such receiver under the Act in the absence of said provision, Lender and such receiver shall be vested with the powers, rights and remedies granted in the Act to the full extent permitted by law. Without limiting the generality of the foregoing, all expenses incurred by Lender which are of the type referred to in Section 5/15-1510 or 5/15-1512 of the Act, whether incurred before or after any decree or judgment of foreclosure, and whether or not enumerated specifically in this Mortgage, shall be added to the indebtedness secured hereby and/or by the judgment of foreclosure.

4.10.2 Wherever provision is made in this Mortgage or the Loan Agreement for insurance policies to bear mortgage clauses or other loss payable clauses or endorsements in favor of Lender, or to confer authority upon Lender to settle or participate in the settlement of losses under policies of insurance or to hold and disburse or otherwise control the use of insurance proceeds, from and after the entry of judgment of foreclosure, all such rights and powers of Lender shall continue in Lender as judgment creditor or mortgagee until confirmation of sale.

4.10.3 In addition to any provision of this Mortgage authorizing Lender to take or be placed in possession of the Mortgaged Property, or for the appointment of a receiver, Lender shall have the right, in accordance with Sections 15-1701 and 15-1702 of the Act, to be placed in the possession of the Mortgaged Property or at its request to have a receiver appointed, and such receiver, or Lender, if and when placed in possession, shall have, in addition to any other powers provided in this Mortgage, all rights, powers, immunities, and duties and provisions for in Sections 15-1701, 15-1702 and 15-1703 of the Act.

4.10.4 Mortgagor acknowledges that the Mortgaged Property does not constitute agricultural real estate, as said term is defined in Section 15-1201 of the Act or residential real estate as defined in Section 15-1219 of the Act.

4.10.5 Mortgagor hereby expressly waives any and all rights of reinstatement and redemption, if any, under any order or decree of foreclosure of this Mortgage, on its own behalf and on behalf of each and every person, it being the intent hereof that any and all such rights of reinstatement and redemption of Mortgagor and of all other persons are and shall be deemed to be hereby waived to the full extent permitted by the provisions of Section 5/15-1601 of the Act or other applicable law or replacement statutes. Mortgagor hereby expressly waives, to the full extent permitted by law, the benefits of all present and future valuation, appraisement, homestead, exemption, stay, redemption and moratorium laws under any state or federal law.

4.10.6 All advances, disbursements and expenditures made by Lender in accordance with the terms of this Mortgage or the other Loan Documents, either before and during a foreclosure, and before and after judgment of foreclosure therein, and at any time prior to sale of the Mortgaged Property, and, where applicable, after sale of the Mortgaged Property, and during the pendency of any related proceedings, in addition to those otherwise authorized by the Act, shall have the benefit of all applicable provisions of the Act.

25511267.3

5.    **MISCELLANEOUS**.

5.1    **Governing Law**.  This Mortgage shall be construed in accordance with the laws of the State of Illinois without regard to conflict of law principles.

5.2    **Successors and Assigns**.  This Mortgage shall be binding upon the successors and assigns of the Mortgagor including, without limit, any debtor in possession or trustee in bankruptcy for the Mortgagor, and the rights and privileges of the Lender under this Mortgage shall inure to the benefit of its successors and assigns.  This shall not be deemed a consent by the Lender to a conveyance by the Mortgagor of all or any part of the Mortgaged Property or of any ownership interest in the Mortgagor.

5.3    **Notices**.  Notice from one party to another relating to this Mortgage shall be deemed effective if made in accordance with the notice requirements set forth in the Loan Agreement.

5.4    **Entire Agreement; Amendments**.  This Mortgage and any agreement to which it refers state all rights and obligations of the parties and supersede all other agreements (oral or written) with respect to the lien granted by this Mortgage.  Any amendment of this Mortgage shall be in writing and shall require the signature of the Mortgagor and the Lender.  Any waiver or consent to departure from strict compliance with this Mortgage must be in writing and signed by the Lender.

5.5    **Partial Invalidity**.  The invalidity or unenforceability of any provision of this Mortgage shall not affect the validity or enforceability of the remaining provisions of this Mortgage.

5.6    **Inspections**.  Any inspection, audit, appraisal or examination by the Lender or its agents of the Mortgaged Property or of information or documents pertaining to the Mortgaged Property is for the sole purpose of protecting the Lender's interests under this Mortgage and is not for the benefit or protection of the Mortgagor or any third party.

5.7    **Joint and Several Liability**.  In the event that more than one person or entity executes this Mortgage, the obligations of each person or entity shall be joint and several.

5.8    **Automatic Reinstatement**.  Notwithstanding any prior revocation, termination, surrender or discharge of this Mortgage, the effectiveness of this Mortgage shall automatically continue or be reinstated, as the case may be, in the event that:

5.8.1    Any payment received or credit given by the Lender in respect of the Indebtedness is returned, disgorged or rescinded as a preference, impermissible setoff, fraudulent conveyance, diversion of trust funds, or otherwise under any applicable state or federal law, including, without limit, laws pertaining to bankruptcy or insolvency, in which case this Mortgage shall be enforceable as if the returned, disgorged or rescinded payment or credit had not been received or given, whether or not the Lender relied upon this payment or credit or changed its position as a consequence of it.

5.8.2    Any liability is imposed, or sought to be imposed, against the Lender relating to the environmental condition of, or the presence of Hazardous Materials on, in or about the Real Estate, whether this condition is known or unknown, now exists or subsequently arises (excluding only conditions which arise after any acquisition by the Lender of any such property, by foreclosure, in lieu of foreclosure or otherwise, to the extent due to the wrongful acts or omissions of the Lender), in which case this Mortgage shall be enforceable to the extent of all liability, costs and expenses (including without limit reasonable attorneys fees) incurred by the Lender as the direct or indirect result of any environmental condition or Hazardous Materials.

5.8.3    In the event of continuation or reinstatement of this Mortgage, Mortgagor agrees upon demand by the Lender to execute and deliver to the Lender those documents which the Lender determines are appropriate to further evidence (in the public records or otherwise) this continuation or reinstatement, although the failure of the Mortgagor to do so shall not affect in any way the reinstatement or continuation.  If Mortgagor does not execute and deliver to the Lender upon demand such documents, the Lender and each officer of the Mortgage is irrevocably appointed (which appointment is coupled with an interest) the

MORTGAGE
Page 14

25511267.3

true and lawful attorney of the Mortgagor (with full power of substitution) to execute and deliver such documents in the name and on behalf of the Mortgagor.

5.9    **WAIVER OF JURY TRIAL.** MORTGAGOR HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER THIS MORTGAGE, INCLUDING, WITHOUT LIMITATION, ANY PRESENT OR FUTURE MODIFICATION HEREOF OR THEREOF OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF MORTGAGOR AND LENDER OR ANY OF THEM WITH RESPECT TO THIS MORTGAGE (AS NOW OR HEREAFTER MODIFIED) OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION IS NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND MORTGAGOR HEREBY AGREES AND CONSENTS THAT LENDER MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF MORTGAGOR TO THE WAIVER OF ANY RIGHT MORTGAGOR MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

5.10    **Utilities**. Mortgagor shall pay or cause to be paid when due any and all charges for utilities, whether public or private, with respect to the Mortgaged Property or any part thereof, and all license fees, rents or other charges for the use of any appurtenance to the Mortgaged Property.

5.11    **Liens**. Other than Permitted Encumbrances (as defined in the Loan Agreement) the Mortgaged Property shall be kept free and clear of all liens and encumbrances of every nature or description, including, without limitation, liens and encumbrances arising from past due taxes or assessments and from charges for labor, materials, supplies or services.

6.    **SPECIAL PROVISIONS**. In the event of any inconsistencies between the terms and conditions of this Article 6 and the terms and conditions of this Mortgage, the terms and conditions of this Article 6 shall control and be binding.

6.1    **Collateral Protection Act**. Pursuant to the terms of the Illinois Collateral Protection Act, 815 ILCS 180/1 et seq., Mortgagor acknowledges that is hereby notified that unless Mortgagor provides Lender with evidence of the insurance coverage required by the Loan Documents, Lender may purchase insurance at Mortgagor's expense to protect Lender's interests in the Real Estate or any portion thereof, which insurance may, but need not, protect the interests of Mortgagor. The coverage purchased by Lender may not pay any claim made by Mortgagor or any claim made against Mortgagor in connection with the Real Estate or any portion thereof. Mortgagor may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Mortgagor has obtained the insurance as required hereunder. If Lender purchases insurance, Mortgagor will be responsible for the costs of such insurance, including interest and any other charges imposed in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to the total obligation secured by this Mortgage. The costs of such insurance may be greater than the cost of insurance Mortgagor may be able to obtain for itself.

6.2    **Subordination of Property Manager's Lien**. Any property management agreement for the Real Estate or any portion thereof entered into hereafter with a property manager shall contain a provision whereby the property manager agrees that any and all lien rights, including without limitation mechanics lien rights, that the property manager or anyone claiming by, through or under the property manager may have in the Real Estate or any portion thereof shall be subject and subordinate to the lien of this Mortgage and shall provide that Lender may terminate such agreement at any time after the occurrence of an Event of Default hereunder. Such property management agreement or a short form thereof, at Lender's request, shall be recorded with the County Recorder of the county where the applicable Real Estate is located. In addition, if the property management agreement in existence as of the date hereof does not contain a subordination provision, Mortgagor shall cause the property manager under such agreement to enter into a subordination of the management agreement with Lender, in recordable form and otherwise acceptable to Lender, whereby such property manager subordinates present and

MORTGAGE
Page 15

25511267.3

future lien rights and those of any party claiming by, through or under such property manager to the lien of this Mortgage.

6.3    **Merger**.  No merger shall occur as a result of Lender's acquiring any other estate in, or any other lien on, the Real Estate unless Lender consents to a merger in writing.

6.4    **No Commencement**.  As of the date of this Mortgage, Mortgagor represents and warrants that no steps to commence new construction on the Real Estate, including steps to clear or otherwise prepare the Real Estate for construction thereon or the delivery of material for use in construction of the Improvements, have been taken. No contract for services or materials for improvements to any portion of the Real Estate shall be entered into prior to the recording of this Mortgage.

6.5    **Fixture Filing**.  This Mortgage constitutes a "fixture filing" for the purposes of Chapter 9 of the Illinois Uniform Commercial Code.  This Mortgage shall also be effective as a financing statement covering as-extracted collateral and is to be filed for record in the real estate records of the county where the Property is situated.  All or part of the Mortgaged Property are or are to become fixtures; information concerning the security interest herein granted may be obtained at the addresses set forth on the first page hereof.  For purposes of the security interest herein granted, the address of Debtor (Mortgagor) and of the Secured Party (Lender) are set forth in this Mortgage.  A description of the land which relates to the fixtures is set forth in Schedule A attached hereto. Mortgagor is the record owner of such land.

6.6    **Future Advance; Protective Advances.**    Lender is obligated under the terms of the Loan Agreement to make advances as provided therein, and Mortgagor acknowledges and intends that all such advances, including future advances whenever hereafter made, shall be a lien from the time this Mortgage is recorded, as provided in Section 5/15-1302(b)(1) of the Act (defined below). Mortgagor covenants and agrees that this Mortgage shall secure the payment of the Indebtedness and other advances made pursuant to the terms and provisions of the Loan Agreement, whether such Indebtedness and advances are made as of the date hereof or at any time in the future, and whether such future advances are obligatory or are to be made at the option of Lender or otherwise (but not Indebtedness or advances made more than 20 years after the date hereof), to the same extent as if such future advances were made on the date of the execution of this Mortgage and although there may be no advances made at the time of the execution of this Mortgage and although there may be no other Indebtedness outstanding at the time any advance is made. The lien of this Mortgage shall be valid as to all Indebtedness, including future advances, from the time of its filing of record in the office of the Recorder of Deeds of the County in which the Real Estate is located. This Mortgage shall be valid and shall have priority over all subsequent liens and encumbrances, including statutory liens, except taxes and assessments levied on the Mortgaged Property. All advances, disbursements and expenditure made or incurred by Lender before and during a foreclosure, and before and after judgment of foreclosure, and at any time prior to sale, and, where applicable, after sale, and during the pendency of any related proceedings, for the following purposes, in addition to those otherwise authorized by the Security Instrument or the Loan Agreement or by the Act (collectively "Mortgage Protective Advances"), shall have the benefit of all applicable provisions of the Act. All Mortgage Protective Advances shall be so much additional indebtedness secured by this Mortgage, and shall become immediately due and payable without notice and with interest thereon from the date of this advance until paid at the rate of interest payable after default under the terms of the Loan Agreement. This Mortgage shall be a lien for all Mortgage Protective Advances as to subsequent purchasers and judgment creditors from the time this Security Instrument is recorded pursuant to Subsection (b)(5) of Section 5/15-1302 of the Act.

[SIGNATURE PAGE FOLLOWS]

MORTGAGE
Page 16

25511267.3

This Mortgage is dated and effective on the date stated above.

**MORTGAGOR:**

SSDF5 Portfolio 1 LLC, an Illinois limited liability company

By:     SSDF5 Holdco 1 LLC,
        a Delaware limited liability company
Its:    Managing Member

                                I Holdings
        By:     South Shore Property ~~Holdings~~ LLC,
                a Delaware limited liability company
        Its:    Manager

                By: _____
                    Jerome H. Cohen
                Its:    Managing Member

STATE OF Florida )
                 ) SS.
COUNTY OF Collier )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, **DOES HEREBY CERTIFY** that Jerome H. Cohen, the Managing Member of South Shore Property LLC, a Delaware limited liability company, the Manager of SSDF5 Holdco 1 LLC, a Delaware limited liability company, the Managing Member of SSDF5 Portfolio 1 LLC, an Illinois limited liability company, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument as such manager, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his own free and voluntary act and as the free and voluntary act of said limited liability company, for the uses and purposes therein set forth.

**GIVEN** under my hand and notarial seal this 25th day of September, 2017.

※ I Holdings

*[SEAL]*

MICHELLE AZ ESTES
Commission #FF138624
My Commission Expires
February 15, 2019

_____
Michelle Az Estes
Notary Public

Identity verified by
⊙ Produced Driver's License
○ Produced Passport
○ Personally Known
○ Other: _____

SIGNATURE PAGE TO MORTGAGE

## SCHEDULE A

THIS ADDENDUM IS ATTACHED TO AND MADE A PART OF THE CERTAIN MORTGAGE EXECUTED BY SSDF5 PORTFOLIO 1 LLC, AN ILLINOIS LIMITED LIABILITY COMPANY, IN FAVOR OF BC57, LLC, A MICHIGAN LIMITED LIABILITY COMPANY.

All that certain real property located in the County of Cook, State of Illinois, described as follows:

Parcel 1:

Lots 13 and 14 (except south 6 inches thereof) in Christopher Columbus Addition To Jackson Park, a subdivision of the East 1/2 of the Northwest 1/4 of Section 25, Township 38 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois.

Parcel 2:

The North 6.00 feet of Lot 36, and all of Lots 37, 38, 39 and 40 in Block 11 in James Stinson's Subdivision of East Grand Crossing in the Southwest quarter of Section 25, Township 38 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois.

Parcel 3:

The North 14 feet of Lot 32 and all of Lots 33, 34, 35 and 36 (except the north 6 feet thereof) Block 11 in James Stinson's Subdivision of East Grand Crossing in the Southwest 1/4 of Section 25, Township 38 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois.

Parcel 4:

Lot 132 in Division 2 in Westall Subdivision of 208 acres being the East 1/2 of the Southwest 1/4 and the Southeast fractional 1/4 of Section 30 Township 38 North Range 15, East of the Third Principal Meridian in Cook County, Illinois.

Parcel 5:

The Easterly 120 feet of Lot 114, in Division One of Westfalls Subdivision of 208 acres, being the East Half of the Southwest Quarter and the Southeast fractional Quarter of Section 30, Township 38 North, Range 15 East of the Third Principal Meridian, in Cook County, Illinois.

Tax Numbers:
20-25-119-001-0000 (Affects Parcel 1)
20-25-310-008-0000 and 20-25-310-009-0000 (Affects Parcels 2 and 3)
21-30-400-034-0000 (Affects Parcel 4)
21-30-414-040-0000 (Affects Parcel 5)

Commonly known as 7201 S. Constance Avenue ("Parcel 1"); 7625-7633 S. East End Ave. ("Parcel 2"); 7635-7643 S. East End Ave. ("Parcel 3"); 7750-7752 S. Muskegon Avenue ("Parcel 4"); and 7836 S. Shore Drive ("Parcel 5"), all located in Chicago, Illinois 60649.

MORTGAGE
A-1

25511267.3

**EXHIBIT F**

# Illinois Anti-Predatory Lending Database Program

## Certificate of Exemption



**Report Mortgage Fraud**
**844-768-1713**

```
*1812734048*
Doc# 1812734048 Fee $100.00
RHSP FEE:$9.00 RPRF FEE: $1.00
KAREN A.YARBROUGH
COOK COUNTY RECORDER OF DEEDS
DATE: 05/07/2018 10:38 AM PG: 1 OF 32
```

The property identified as:     PIN: 20-03-302-002-0000

**Address:**
**Street:**    4317-19 S Michigan Ave

**Street line 2:**
**City:** Chicago      **State:** IL      **ZIP Code:** 60653

**Lender:** Liberty EBCP, LLC

**Borrower:** SSDF7 Portfolio 1 LLC

**Loan / Mortgage Amount:** $9,200,000.00

This property is located within the program area and is exempt from the requirements of 765 ILCS 77/70 et seq. because it is not owner-occupied.

#1890659 - 1890668
Old Republic Title
9601 Southwest Highway
Oak Lawn, IL 60453

4 of 6

**Certificate number:** FB6DF695-99FE-4C9D-B910-E41BDAC42B59      **Execution date:** 5/2/2018

PREPARED BY AND AFTER
RECORDING RETURN TO:

Jaffe, Raitt, Heuer & Weiss, PC
27777 Franklin, Suite 2500
Southfield, Michigan 48334
Attention: Eric Novetsky, Esq.

## MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

by

**SSDF7 PORTFOLIO 1 LLC,**
an Illinois limited liability company
**("Mortgagor")**

to

**LIBERTY EBCP, LLC,**
a Delaware limited liability company
**("Mortgagee")**

**ATTENTION: COUNTY CLERK - THIS MORTGAGE COVERS GOODS THAT ARE OR ARE TO BECOME FIXTURES ON THE REAL PROPERTY DESCRIBED HEREIN AND IS TO BE FILED FOR RECORD IN THE RECORDS WHERE MORTGAGES ON REAL ESTATE ARE RECORDED. ADDITIONALLY, THIS MORTGAGE SHOULD BE APPROPRIATELY INDEXED, NOT ONLY AS A MORTGAGE, BUT ALSO AS A FIXTURE FILING COVERING GOODS THAT ARE OR ARE TO BECOME FIXTURES ON THE REAL PROPERTY DESCRIBED HEREIN. THE MAILING ADDRESSES OF THE MORTGAGOR (DEBTOR) AND MORTGAGEE (SECURED PARTY) ARE SET FORTH IN THIS MORTGAGE.**

-1-

MORTGAGE, ASSIGNMENT OF LEASES AND RENTS,
SECURITY AGREEMENT AND FIXTURE FILING

This MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING (this "**Mortgage**") is made and effective as of the ___2nd___ day of May, 2018, SSDF7 PORTFOLIO 1 LLC, an Illinois limited liability company ("**Mortgagor**"), having an address at 1414 E. 62nd Pl, Chicago, IL 60637, for the benefit of LIBERTY EBCP, LLC, a Delaware limited liability company (together with its successors and assigns, "**Mortgagee**"), having an address at 1500 JFK Boulevard, Suite 250, Philadelphia, Pennsylvania 19102.

W I T N E S S E T H:

WHEREAS, Mortgagor is the fee owner of that certain land located (consisting of 10 parcels) in the County of Cook, State of Illinois and being more fully described, respectively, in Exhibit A attached hereto (the "**Land**");

WHEREAS, this Mortgage is given in connection with a term loan in the principal sum of NINE MILLION TWO HUNDRED THOUSAND AND NO/100 DOLLARS ($9,200,000) (the "**Loan**") made by Mortgagee to Mortgagor pursuant to that certain Term Loan Agreement dated as of the date hereof (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**") and evidenced by a certain Secured Promissory Note in the principal amount of the Loan, dated the date hereof made by Mortgagor to Mortgagee (such note, as the same may be amended, restated, replaced, supplemented, consolidated, severed or otherwise modified from time to time, being hereinafter referred to as the "**Note**");

WHEREAS, Mortgagor desires to secure the payment of the Debt (as hereinafter defined) and the performance of all of its obligations under the Note, the Loan Agreement and the other Loan Documents (as hereinafter defined); and

WHEREAS, this Mortgage is given pursuant to the Loan Agreement, and payment, fulfillment, and performance by Mortgagor of its obligations thereunder and under the other Loan Documents are secured hereby, and each and every term and provision of the Loan Agreement and the Note, including the rights, remedies, obligations, covenants, conditions, agreements, indemnities, representations and warranties of the parties therein, are hereby incorporated by reference herein as though set forth in full and shall be considered a part of this Mortgage; (the Loan Agreement, the Note, this Mortgage, that certain additional Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing of even date herewith made by Mortgagor in favor of Mortgagee, those two certain Assignment of Leases and Rents of even date herewith made by Mortgagor in favor of Mortgagee (collectively, the "**Assignment of Leases**") and all other documents evidencing or securing the Debt or delivered in connection with the making of the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, are hereinafter referred to collectively as the "**Loan Documents**").

NOW THEREFORE, in consideration of the making of the Loan by Mortgagee to Mortgagor and the covenants, agreements, representations and warranties set forth in this Mortgage, Mortgagor intending to be legally bound:

# ARTICLE 1

## GRANTS OF SECURITY

Section 1.1    Property Mortgaged. Mortgagor does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey to Mortgagee and its successors and assigns (to the extent assignable) all of Mortgagor's right, title and interest to the following property, rights, interests and estates now owned, or hereafter acquired by Mortgagor (collectively, the "**Property**"):

(a)    Land. The Land;

(b)    Additional Land. All additional lands, estates and development rights hereafter acquired by Mortgagor for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Mortgage;

(c)    Improvements. The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (collectively, the "**Improvements**");

(d)    Easements. All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Mortgagor of, in and to the Land and the Improvements, and every part and parcel thereof, with the appurtenances thereto;

(e)    Equipment. All "equipment," as such term is defined in Article 9 of the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Property is located (the "**Uniform Commercial Code**"), now owned or hereafter acquired by Mortgagor, which is used at or in connection with the Improvements or the Land or is located thereon or therein (including, but not limited to, all machinery, equipment, furnishings, and electronic data-processing and other office equipment now owned or hereafter acquired by Mortgagor and any and all additions, substitutions and replacements of any of the foregoing), together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto (collectively, the "**Equipment**"). Notwithstanding the foregoing, Equipment shall not include any property belonging to tenants under Leases except to the extent that Mortgagor shall have any right or interest therein;

(f)    Fixtures. All Equipment now owned, or the ownership of which is hereafter acquired, by Mortgagor which is so related to the Land and Improvements forming part of the Property that it is deemed fixtures or real property under the law of the particular state in which the Equipment is located, including, without limitation, all building or construction materials intended for construction, reconstruction, alteration or repair of or installation on the Property, construction equipment, appliances, machinery, plant equipment, fittings, apparatuses, fixtures and other items now or hereafter attached to, installed in or used in connection with (temporarily or permanently) any of the Improvements or the Land, including, but not limited to, engines, devices for the operation of pumps, pipes, plumbing, cleaning, call and sprinkler systems, fire extinguishing apparatuses and equipment, heating, ventilating, plumbing,

-2-

laundry, incinerating, electrical, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, pollution control equipment, security systems, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and water, gas, electrical, storm and sanitary sewer facilities, utility lines and equipment (whether owned individually or jointly with others, and, if owned jointly, to the extent of Mortgagor's interest therein) and all other utilities whether or not situated in easements, all water tanks, water supply, water power sites, fuel stations, fuel tanks, fuel supply, and all other structures, together with all accessions, appurtenances, additions, replacements, betterments and substitutions for any of the foregoing and the proceeds thereof (collectively, the "**Fixtures**"). Notwithstanding the foregoing, Fixtures shall not include any property which tenants are entitled to remove pursuant to Leases except to the extent that Mortgagor shall have any right or interest therein;

(g)     Personal Property. All right, title, and interest of Mortgagor in (i) the property and interests in the property described in Exhibit B attached hereto and incorporated herein by reference, (ii) all other personal property now or hereafter owned by Mortgagor whether or not located on or used in connection with the Land or the Improvements, (iii) all other rights and interests of Mortgagor now or hereafter held in personal property whether or not located on or used in connection with the Land or the Improvements, (iv) all personal property and rights and interests in personal property of similar type or kind hereafter acquired by Mortgagor, (v) all right, title and interest of Mortgagor in and to any personal property which may be subject to any security interests, as defined in the Uniform Commercial Code, superior in lien to the lien of this Mortgage and (vi) all proceeds of the foregoing (such personal property and proceeds, collectively, the "**Personal Property**"). Notwithstanding the foregoing, Personal Property shall not include any property belonging to tenants under Leases except to the extent that Mortgagor shall have any right or interest therein;

(h)     Leases and Rents. All leases and other agreements affecting the use, enjoyment or occupancy of the Land and the Improvements heretofore or hereafter entered into, whether before or after the filing by or against Mortgagor of any petition for relief under 11 U.S.C. §101 et seq., as the same may be amended from time to time (the "**Bankruptcy Code**") (collectively, the "**Leases**") and all right, title and interest of Mortgagor, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, revenues, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Land and the Improvements whether paid or accruing before or after the filing by or against Mortgagor of any petition for relief under the Bankruptcy Code (collectively, the "**Rents**") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Obligations;

(i)     Condemnation Awards. All awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

(j)     Insurance Proceeds. All proceeds in respect of the Property under any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(k)     Tax Certiorari. All refunds, rebates or credits in connection with reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction;

-3-

(l)  Rights.  The right, in the name and on behalf of Mortgagor, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Mortgagee in the Property;

(m)  Agreements.  All agreements (including, without limitation, all management agreements), contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any improvements or respecting any business or activity conducted on the Land and any part thereof and all right, title and interest of Mortgagor therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Mortgagor thereunder;

(n)  Trademarks.  All tradenames, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property;

(o)  Proceeds.  All proceeds of any of the foregoing, including, without limitation, proceeds of insurance and condemnation awards, whether cash, liquidation or other claims or otherwise; and

(p)  Other Rights.  Any and all other rights of Mortgagor in and to the items set forth in Subsections (a) through (o) above.

AND without limiting any of the other provisions of this Mortgage, to the extent permitted by applicable law, Mortgagor expressly grants to Mortgagee, as secured party, a security interest in the portion of the Property which is or may be subject to the provisions of the Uniform Commercial Code which are applicable to secured transactions; it being understood and agreed that the Improvements and Fixtures are part and parcel of the Land (the Land, the Improvements and the Fixtures collectively referred to as the "**Real Property**") appropriated to the use thereof and, whether affixed or annexed to the Real Property or not, shall for the purposes of this Mortgage be deemed conclusively to be real estate and mortgaged hereby.

Section 1.2  Assignment of Rents.  Mortgagor hereby absolutely and unconditionally assigns to Mortgagee all of Mortgagor's right, title and interest in and to all current and future Leases and Rents; it being intended by Mortgagor that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.  Nevertheless, subject to the terms of the Assignment of Leases and Section 7.1(h) of this Mortgage, Mortgagee grants to Mortgagor a revocable license to collect, receive, use and enjoy the Rents.  Mortgagor shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Debt, for use in the payment of such sums.

Section 1.3  Security Agreement.  This Mortgage is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code.  The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Mortgagor in the Property.  By executing and delivering this Mortgage, Mortgagor hereby grants to Mortgagee, as security for the Obligations (hereinafter defined), a security interest in the Fixtures, the Equipment, the Personal Property and other property constituting the Property to the full extent that the Fixtures, the Equipment, the Personal Property and such other property may be subject to the Uniform Commercial Code (said portion of the Property so subject to the Uniform Commercial Code being called the "**Collateral**").  If an Event of Default shall occur and be continuing, Mortgagee, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code,

-4-

including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof, and to take such other measures as Mortgagee may deem necessary for the care, protection and preservation of the Collateral. Upon request or demand of Mortgagee after the occurrence and during the continuance of an Event of Default, Mortgagor shall, at its expense, assemble the Collateral or cause the Collateral to be assembled and make it available to Mortgagee at a convenient place (at the Land if tangible property) reasonably acceptable to Mortgagee. Mortgagor shall pay to Mortgagee on demand any and all expenses, including reasonable legal expenses and attorneys' fees, incurred or paid by Mortgagee in protecting its interest in the Collateral and in enforcing its rights hereunder with respect to the Collateral after the occurrence and during the continuance of an Event of Default. Any notice of sale, disposition or other intended action by Mortgagee with respect to the Collateral sent to Mortgagor in accordance with the provisions hereof at least ten (10) days prior to such action, shall, except as otherwise provided by applicable law, constitute reasonable notice to Mortgagor. The proceeds of any disposition of the Collateral, or any part thereof, may, except as otherwise required by applicable law, be applied by Mortgagee to the payment of the Debt in such priority and proportions as Mortgagee in its discretion shall deem proper. The principal place of business of Mortgagor (Debtor) is as set forth on page one hereof and the address of Mortgagee (Secured Party) is as set forth on page one hereof.

Section 1.4 _Fixture Filing_. From the date of its recording, this Mortgage shall be effective as a fixture financing statement within the purview of Section 9-502(b) of the Illinois Uniform Commercial Code (as amended from time to time) with respect to the Property and the goods described herein, which goods are or are to become fixtures related to the Property. The addresses of Mortgagor (Debtor) and Mortgagee (Secured Party) are set forth below. This Mortgage is to be filed for recording with the Recorder of Deeds of the county or the counties where the Property is located. For this purpose, the following information is set forth.

(a)  Name and Address of Debtor:

SSDF7 Portfolio 1 LLC
1414 E. 62ND Pl., Chicago, IL 60637

(b)  Name and Address of Secured Party:

Liberty EBCP, LLC
1500 JFK Boulevard, Suite 250, Philadelphia, PA 19102

(c)  This document covers goods which are or are to become fixtures.

(d)  Debtor is the record owner of the Land.

(e)  Debtor's chief executive office is located in the State of Illinois.

(f)  Debtor's state of formation is Illinois.

(g)  Debtor's exact legal name is as set forth in the first paragraph of this Mortgage.

(h)  Debtor's organizational identification number is 06839975.

(i)  Debtor agrees that:

-5-

(i)    Where Property is in possession of a third party, Mortgagor will join with Mortgagee in notifying the third party of Mortgagee's interest and obtaining an acknowledgment from the third party that it is holding the Property for the benefit of Mortgagee;

(ii)    Mortgagor will cooperate with Mortgagee in obtaining control with respect to Property consisting of: deposit accounts, investment property, letter of credit rights and electronic chattel paper; and

(iii)    Until the Indebtedness is paid in full, Mortgagor will not change the state where it is located or change its company name without giving Mortgagee at least thirty (30) days prior written notice in each instance.

Section 1.5    Pledges of Monies Held.    Mortgagor hereby pledges to Mortgagee any and all monies now or hereafter held by Mortgagee or on behalf of Mortgagee in connection with the Loan, including, without limitation, any sums deposited in the Collateral Account and Net Proceeds, as additional security for the Obligations until expended or applied as provided in this Mortgage.

CONDITIONS TO GRANT

TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Mortgagee and its successors and assigns, forever;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Mortgagor shall well and truly pay to Mortgagee the Debt at the time and in the manner provided in the Note, the Loan Agreement and this Mortgage, shall well and truly perform the Other Obligations as set forth in this Mortgage and shall well and truly abide by and comply with each and every covenant and condition set forth herein and in the Note, the Loan Agreement and the other Loan Documents, these presents and the estate hereby granted shall cease, terminate and be void; provided, however, that Mortgagor's obligation to indemnify and hold harmless Mortgagee pursuant to the provisions hereof and the other Loan Documents shall survive any such payment or release.

ARTICLE 2

DEBT AND OBLIGATIONS SECURED

Section 2.1    Debt. This Mortgage and the grants, assignments and transfers made in Article 1 are given for the purpose of securing the Loan, with interest thereon based on the terms of the Note and the Loan Agreement (the "**Debt**").

Section 2.2    Other Obligations. This Mortgage and the grants, assignments and transfers made in Article 1 are also given for the purpose of securing the following (the "**Other Obligations**"):

(a)    the performance of all other obligations of Mortgagor contained herein;

(b)    the performance of each obligation of Mortgagor contained in the Loan Agreement and any other Loan Document; and

-6-

(c)    the performance of each obligation of Mortgagor contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note, the Loan Agreement or any other Loan Document.

Section 2.3    Debt and Other Obligations. Mortgagor's obligations for the payment of the Debt and the performance of the Other Obligations shall be referred to collectively herein as the "**Obligations**."

## ARTICLE 3

## MORTGAGOR COVENANTS

Mortgagor covenants and agrees that:

Section 3.1    Payment of Debt. Mortgagor will pay the Debt at the time and in the manner provided in the Loan Agreement, the Note and this Mortgage.

Section 3.2    Incorporation by Reference. All the covenants, conditions and agreements contained in (a) the Loan Agreement, (b) the Note and (c) all and any of the other Loan Documents, are hereby made a part of this Mortgage to the same extent and with the same force as if fully set forth herein.

Section 3.3    Insurance. Mortgagor shall obtain and maintain, or cause to be maintained, in full force and effect at all times insurance with respect to Mortgagor and the Property as required pursuant to the Loan Agreement.

Section 3.4    Maintenance of Property. Mortgagor shall cause the Property to be maintained in a good and safe condition and repair. The Improvements, the Fixtures, the Equipment and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Fixtures, the Equipment or the Personal Property, tenant finish and refurbishment of the Improvements) without the consent of Mortgagee. Mortgagor shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any Casualty or become damaged, worn or dilapidated or which may be affected by any Condemnation, and shall complete and pay for any structure at any time in the process of construction or repair on the Land.

Section 3.5    Waste. Mortgagor shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or allow the cancellation of any Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Property or the security of this Mortgage. Mortgagor will not, without the prior written consent of Mortgagee, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Land, regardless of the depth thereof or the method of mining or extraction thereof.

Section 3.6    Payment for Labor and Materials.

(a)    Mortgagor will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials (collectively, "**Labor and Material Costs**") incurred in connection with the Property and never permit to exist beyond the due date thereof in respect of the Property or any part thereof any lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or

-7-

additional lien or security interest other than the liens or security interests hereof except for the Permitted Encumbrances.

(b)    After prior written notice to Mortgagee, Mortgagor, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any of the Labor and Material Costs, provided that (i) no Event of Default has occurred and is continuing under the Loan Agreement, the Note, this Mortgage or any of the other Loan Documents, (ii) Mortgagor is permitted to do so under the provisions of any other mortgage, deed of trust or deed to secure debt affecting the Property, (iii) such proceeding shall suspend the collection of the Labor and Material Costs from Mortgagor and from the Property or Mortgagor shall have paid all of the Labor and Material Costs under protest, (iv) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Mortgagor is subject and shall not constitute a default thereunder, (v) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost, and (vi) Mortgagor shall have furnished the security as may be required in the proceeding, or as may be reasonably requested by Mortgagee to insure the payment of any contested Labor and Material Costs, together with all interest and penalties thereon.

Section 3.7    Performance of Other Agreements. Mortgagor shall observe and perform each and every term, covenant and provision to be observed or performed by Mortgagor pursuant to the Loan Agreement, any other Loan Document and any other agreement or recorded instrument affecting or pertaining to the Property and any amendments, modifications or changes thereto.

Section 3.8    Change of Name, Identity or Structure.  Mortgagor shall not change Mortgagor's name, identity (including its trade name or names) or, if not an individual, Mortgagor's corporate, partnership or other structure without first (a) notifying Mortgagee of such change in writing at least thirty (30) days prior to the effective date of such change, (b) taking all action required by Mortgagee for the purpose of perfecting or protecting the lien and security interest of Mortgagee and (c) in the case of a change in Mortgagor's structure, without first obtaining the prior written consent of Mortgagee. Mortgagor shall promptly notify Mortgagee in writing of any change in its organizational identification number.  If Mortgagor does not now have an organizational identification number and later obtains one, Mortgagor shall promptly notify Mortgagee in writing of such organizational identification number. Mortgagor shall execute and deliver to Mortgagee, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Mortgagee to establish or maintain the validity, perfection and priority of the security interest granted herein.  At the request of Mortgagee, Mortgagor shall execute a certificate in form satisfactory to Mortgagee listing the trade names under which Mortgagor intends to operate the Property, and representing and warranting that Mortgagor does business under no other trade name with respect to the Property.

**ARTICLE 4**

**OBLIGATIONS AND RELIANCES**

Section 4.1    Relationship of Mortgagor and Mortgagee.  The relationship between Mortgagor, on the one hand, and Mortgagee, on the other, is solely that of debtor and creditor, and Mortgagee has no fiduciary or other special relationship with Mortgagor, and no term or condition of any of the Loan Agreement, the Note, this Mortgage and the other Loan Documents shall be construed so as to deem the relationship between Mortgagor, on the one hand, and Mortgagee, on the other, to be other than that of debtor and creditor.

-8-

Section 4.2    No Reliance on Mortgagee. The general partners, members, principals and (if Mortgagor is a trust) beneficial owners of Mortgagor, as applicable, are experienced in the ownership and operation of properties similar to the Property, and Mortgagor and Mortgagee are relying solely upon such expertise and business plan in connection with the ownership and operation of the Property. Mortgagor is not relying on Mortgagee's expertise, business acumen or advice in connection with the Property.

Section 4.3    No Mortgagee Obligations.

(a)    Notwithstanding the provisions of Subsections 1.1(h) and (m) or Section 1.2, Mortgagee is not undertaking the performance of (i) any obligations under the Leases; or (ii) any obligations with respect to such agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents.

(b)    By accepting or approving anything required to be observed, performed or fulfilled or to be given to Mortgagee pursuant to this Mortgage, the Loan Agreement, the Note or the other Loan Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Mortgagee shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Mortgagee.

Section 4.4    Reliance. Mortgagor recognizes and acknowledges that in accepting the Loan Agreement, the Note, this Mortgage and the other Loan Documents, Mortgagee is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth in Section 8 of the Loan Agreement without any obligation to investigate the Property and notwithstanding any investigation of the Property by Mortgagee; that such reliance existed on the part of Mortgagee prior to the date hereof, that the warranties and representations are a material inducement to Mortgagee in making the Loan; and that Mortgagee would not be willing to make the Loan and accept this Mortgage in the absence of the warranties and representations as set forth in Section 8 of the Loan Agreement.

## ARTICLE 5

## FURTHER ASSURANCES

Section 5.1    Recording of Mortgage, etc. Mortgagor forthwith upon the execution and delivery of this Mortgage and thereafter, from time to time, will cause this Mortgage and any of the other Loan Documents creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Mortgagee in, the Property. Mortgagor will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, this Mortgage, the other Loan Documents, any note or mortgage supplemental hereto, any security instrument with respect to the Property and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Mortgage, any deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by law so to do.

Section 5.2    Further Acts, etc.   Mortgagor will, at the cost of Mortgagor, and without expense to Mortgagee, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as Mortgagee shall, from time to time, reasonably require, for the better conveying, assigning or transferring unto Mortgagee the property and rights hereby mortgaged, deeded, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Mortgagor may be or may hereafter become bound to convey or assign to Mortgagee, or for carrying out the intention or facilitating the performance of the terms of this Mortgage or for filing, registering or recording this Mortgage, or for complying with all Legal Requirements relating to Mortgagor's grant of this Mortgage to Mortgagee. Mortgagor, on demand, will execute and deliver, and in the event it shall fail to so execute and deliver, hereby authorizes Mortgagee to execute in the name of Mortgagor or without the signature of Mortgagor to the extent Mortgagee may lawfully do so, one or more financing statements (including, without limitation, initial financing statements and amendments thereto and continuation statements) with or without the signature of Mortgagor as authorized by applicable law, to evidence more effectively the security interest of Mortgagee in the Property. Mortgagor also ratifies its authorization for Mortgagee to have filed any like initial financing statements, amendments thereto and continuation statements, if filed prior to the date of this Mortgage. Mortgagor grants to Mortgagee an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Mortgagee at law and in equity, including without limitation such rights and remedies available to Mortgagee pursuant to this Section 5.2. To the extent not prohibited by applicable law, Mortgagor hereby ratifies all acts Mortgagee has lawfully done in the past or shall lawfully do or cause to be done in the future by virtue of such power of attorney.

Section 5.3    Changes in Tax, Debt, Credit and Documentary Stamp Laws.

(a)    If any law is enacted or adopted or amended after the date of this Mortgage which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Mortgagee's interest in the Property, Mortgagor will pay the tax, with interest and penalties thereon, if any. If Mortgagee is advised by counsel chosen by it that the payment of tax by Mortgagor would be unlawful or taxable to Mortgagee or unenforceable or provide the basis for a defense of usury then Mortgagee shall have the option by written notice of not less than one hundred twenty (120) days to declare the Debt immediately due and payable.

(b)    Mortgagor will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of this Mortgage or the Debt. If such claim, credit or deduction shall be required by law, Mortgagee shall have the option by written notice of not less than one hundred twenty (120) days to declare the Debt immediately due and payable.

(c)    If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, this Mortgage, or any of the other Loan Documents or impose any other tax or charge on the same, Mortgagor will pay for the same, with interest and penalties thereon, if any.

Section 5.4    Splitting of Mortgage    This Mortgage and the Note shall, at any time until the same shall be fully paid and satisfied, at the sole election of Mortgagee, be split or divided into two or more Notes and two or more security instruments, each of which shall cover all or a portion of the Property to be more particularly described therein. To that end, Mortgagor, upon written request of Mortgagee, shall execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered by the then owner of the Property, to Mortgagee and/or its designee or designees substitute Notes and security instruments in

-10-

such principal amounts, aggregating not more than the then unpaid principal amount of the Note, and containing terms, provisions and clauses similar to those contained herein and in the Note, and such other documents and instruments as may be required by Mortgagee.

Section 5.5    Replacement Documents.  Upon receipt of an affidavit of an officer of Mortgagee as to the loss, theft, destruction or mutilation of the Note or any other Loan Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other Loan Document, Mortgagor will issue, in lieu thereof, a replacement Note or other Loan Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Document in the same principal amount thereof and otherwise of like tenor.

## ARTICLE 6

## DUE ON SALE/ENCUMBRANCE

Section 6.1    Mortgagee Reliance.  Mortgagor acknowledges that Mortgagee has examined and relied on the experience of Mortgagor and its general partners, members, principals and (if Mortgagor is a trust) beneficial owners, as applicable, in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Mortgagor's ownership of the Property as a means of maintaining the value of the Property as security for repayment of the Debt and the performance of the Other Obligations. Mortgagor acknowledges that Mortgagee has a valid interest in maintaining the value of the Property so as to ensure that, should Mortgagor default in the repayment of the Debt or the performance of the Other Obligations, Mortgagee can recover the Debt by a sale of the Property.

Section 6.2    No Transfer.  Mortgagor shall not permit or suffer any Transfer to occur, unless permitted by the Loan Agreement or unless Mortgagee shall consent thereto in writing.

Section 6.3    Mortgagee's Rights.  Without obligating Mortgagee to grant any consent under Section 6.2 hereof which Mortgagee may grant or withhold in its sole discretion, Mortgagee reserves the right to condition the consent required hereunder upon: (a) a modification of the terms hereof and of the Loan Agreement, the Note or the other Loan Documents; (b) an assumption of the Loan Agreement, the Note, this Mortgage and the other Loan Documents as so modified by the proposed transferee; (c) payment of all of Mortgagee's expenses incurred in connection with such transfer; (d) Reserved; (e) Reserved; (f) Reserved; (g) the delivery of evidence satisfactory to Mortgagee that the single purpose nature and bankruptcy remoteness of Mortgagor, its shareholders, partners or members, as the case may be, following such transfers are in accordance with the Loan Documents; (h) the proposed transferee's ability to satisfy Mortgagee's then-current underwriting standards; or (i) such other conditions as Mortgagee shall determine in its reasonable discretion to be in the interest of Mortgagee, including, without limitation, the creditworthiness, reputation and qualifications of the transferee with respect to the Loan and the Property. Mortgagee shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Transfer without Mortgagee's consent.  This provision shall apply to every Transfer, other than any Transfer permitted pursuant to the Loan Agreement, regardless of whether voluntary or not, or whether or not Mortgagee has consented to any previous Transfer.

## ARTICLE 7

## RIGHTS AND REMEDIES UPON DEFAULT

Section 7.1    Remedies.  Upon the occurrence and during the continuance of any Event of Default, Mortgagor agrees that Mortgagee may take such action, without notice or demand, as it deems

-11-

advisable to protect and enforce its rights against Mortgagor and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Mortgagee may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Mortgagee:

(a)     declare the entire unpaid Debt to be immediately due and payable;

(b)     institute proceedings, judicial or otherwise, for the complete foreclosure of this Mortgage under any applicable provision of law, in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(c)     with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Mortgage for the portion of the Debt then due and payable, subject to the continuing lien and security interest of this Mortgage for the balance of the Debt not then due, unimpaired and without loss of priority;

(d)     sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Mortgagor therein and rights of redemption thereof, pursuant to foreclosure or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(e)     institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note, the Loan Agreement or in the other Loan Documents;

(f)     recover judgment on the Note either before, during or after any proceedings for the enforcement of this Mortgage or the other Loan Documents;

(g)     right to the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Mortgagor, any guarantor, indemnitor with respect to the Loan or of any Person liable for the payment of the Debt; further, irrespective whether either before or after declaring the unpaid principal of the Note to be due and payable, and Mortgagor hereby consents to the appointment of such receiver or receivers, trustee, liquidator or conservator of the Property, as applicable;

(h)     the license granted to Mortgagor under Section 1.2 hereof shall automatically be revoked and Mortgagee may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Mortgagor and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Mortgagor and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Mortgagor agrees to surrender possession of the Property and of such books, records and accounts to Mortgagee upon demand, and thereupon Mortgagee may: (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (ii) complete any construction on the Property in such manner and form as Mortgagee deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Property; (iv) exercise all rights and powers of Mortgagor with respect to the Property, whether in the name of Mortgagor or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (v) require Mortgagor to pay monthly in advance to Mortgagee, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Mortgagor;

(vi) require Mortgagor to vacate and surrender possession of the Property to Mortgagee or to such receiver and, in default thereof, Mortgagor may be evicted by summary proceedings or otherwise; and (vii) apply the receipts from the Property to the payment of the Debt, in such order, priority and proportions as Mortgagee shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, Other Charges, insurance and other expenses in connection with the Property, as well as just and reasonable compensation for the services of Mortgagee, its counsel, agents and employees;

        (i)      exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (i) the right to take possession of the Fixtures, the Equipment and the Personal Property, or any part thereof, and to take such other measures as Mortgagee may deem necessary for the care, protection and preservation of the Fixtures, the Equipment and the Personal Property, and (ii) request Mortgagor at its expense to assemble the Fixtures, the Equipment and the Personal Property and make it available to Mortgagee at a convenient place acceptable to Mortgagee. Any notice of sale, disposition or other intended action by Mortgagee with respect to the Fixtures, the Equipment and/or the Personal Property sent to Mortgagor in accordance with the provisions hereof at least ten (10) days prior to such action, shall constitute commercially reasonable notice to Mortgagor;

        (j)      apply any sums then deposited or held in escrow or otherwise by or on behalf of Mortgagee in accordance with the terms of the Loan Agreement, this Mortgage or any other Loan Document to the payment of the following items in any order in its uncontrolled discretion:

           (i)      Taxes and Other Charges;

           (ii)     Insurance Premiums;

           (iii)    interest on the unpaid principal balance of the Note;

           (iv)    amortization of the unpaid principal balance of the Note; and/or

           (v)    all other sums payable pursuant to the Note, the Loan Agreement, this Mortgage and the other Loan Documents, including without limitation advances made by Mortgagee pursuant to the terms of this Mortgage;

        (k)     pursue such other remedies as Mortgagee may have under applicable law;

        (l)     apply the undisbursed balance of any Net Proceeds Deficiency deposit, together with interest thereon, to the payment of the Debt in such order, priority and proportions as Mortgagee shall deem to be appropriate in its discretion; and/or

        (m)   Intentionally omitted.

In the event of a sale, by foreclosure or otherwise, of less than all of Property, this Mortgage shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority.

        Section 7.2    Application of Proceeds. The purchase money, proceeds and avails of any disposition of the Property, and or any part thereof, or any other sums collected by Mortgagee pursuant to the Note, this Mortgage or the other Loan Documents may be applied by Mortgagee to the payment of the Debt in such priority and proportions as Mortgagee in its discretion shall deem proper.

-13-

Section 7.3    Right to Cure Defaults.  Upon the occurrence and during the continuance of any Event of Default or if Mortgagor fails to make any payment or to do any act as herein provided, Mortgagee may, but without any obligation to do so and without notice to or demand on Mortgagor and without releasing Mortgagor from any obligation hereunder, make or do the same in such manner and to such extent as Mortgagee may deem necessary to protect the security hereof. Mortgagee is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose this Mortgage or collect the Debt, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest as provided in this Section 7.3, shall constitute a portion of the Debt and shall be due and payable to Mortgagee upon demand. All such costs and expenses incurred by Mortgagee in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate, for the period after notice from Mortgagee that such cost or expense was incurred to the date of payment to Mortgagee. All such costs and expenses incurred by Mortgagee together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by this Mortgage and the other Loan Documents and shall be immediately due and payable upon demand by Mortgagee therefor.

Section 7.4    Actions and Proceedings.  Mortgagee has the right to appear in and defend any action or proceeding brought with respect to the Property and to bring any action or proceeding, in the name and on behalf of Mortgagor, which Mortgagee, in its discretion, decides should be brought to protect its interest in the Property.

Section 7.5    Recovery of Sums Required to Be Paid.  Mortgagee shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Mortgagee thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Mortgagor existing at the time such earlier action was commenced.

Section 7.6    Examination of Books and Records.  At reasonable times and upon reasonable notice, Mortgagee, its agents, accountants and attorneys shall have the right to examine the records, books, management and other papers of Mortgagor which reflect upon its financial condition, at the Property or at any office regularly maintained by Mortgagor where the books and records are located. Mortgagee and its agents shall have the right to make copies and extracts from the foregoing records and other papers.  In addition, at reasonable times and upon reasonable notice, Mortgagee, its agents, accountants and attorneys shall have the right to examine and audit the books and records of Mortgagor pertaining to the income, expenses and operation of the Property during reasonable business hours at any office of Mortgagor where the books and records are located.  This Section 7.6 shall apply throughout the term of the Note and without regard to whether an Event of Default has occurred or is continuing.

Section 7.7    Other Rights, etc.

(a)    The failure of Mortgagee to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Mortgage. Mortgagor shall not be relieved of Mortgagor's obligations hereunder by reason of (i) the failure of Mortgagee to comply with any request of Mortgagor or any guarantor or indemnitor with respect to the Loan to take any action to foreclose this Mortgage or otherwise enforce any of the provisions hereof or of the Note or the other Loan Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any Person liable for the Debt or any portion thereof, or (iii) any agreement or stipulation by Mortgagee extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Mortgage or the other Loan Documents.

-14-

(b)      It is agreed that the risk of loss or damage to the Property is on Mortgagor, and Mortgagee shall have no liability whatsoever for decline in value of the Property, for failure to maintain the Policies, or for failure to determine whether insurance in force is adequate as to the amount of risks insured. Possession by Mortgagee shall not be deemed an election of judicial relief, if any such possession is requested or obtained, with respect to any Property or collateral not in Mortgagee's possession.

(c)      Mortgagee may resort for the payment of the Debt to any other security held by Mortgagee in such order and manner as Mortgagee, in its discretion, may elect. Mortgagee may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Mortgagee thereafter to foreclose this Mortgage. The rights of Mortgagee under this Mortgage shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Mortgagee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Mortgagee shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

Section 7.8      Right to Release Any Portion of the Property. Mortgagee may release any portion of the Property for such consideration as Mortgagee may require without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Mortgage, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Mortgagee for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Mortgagee may require without being accountable for so doing to any other lienholder. This Mortgage shall continue as a lien and security interest in the remaining portion of the Property.

Section 7.9      Violation of Laws. If the Property is not in material compliance with Legal Requirements, Mortgagee may impose additional requirements upon Mortgagor in connection herewith including, without limitation, monetary reserves or financial equivalents.

Section 7.10      Recourse and Choice of Remedies. Notwithstanding any other provision of this Mortgage or the Loan Agreement, Mortgagee is entitled to enforce the obligations of Mortgagor contained in Sections 9.2 and 9.3 herein without first resorting to or exhausting any security or collateral and without first having recourse to the Note or any of the Property, through foreclosure or acceptance of a deed in lieu of foreclosure or otherwise, and in the event Mortgagee commences a foreclosure action against the Property, Mortgagee is entitled to pursue a deficiency judgment with respect to such obligations against Mortgagor with respect to the Loan. The provisions of Sections 9.2 and 9.3 herein and are exceptions to any non-recourse or exculpation provisions in the Loan Agreement, the Note, this Mortgage or the other Loan Documents, and Mortgagor and any guarantor or indemnitor with respect to the Loan are fully and personally liable for the obligations pursuant to Sections 9.2 and 9.3 herein. The liability of Mortgagor with respect to the Loan pursuant to Sections 9.2 and 9.3 herein is not limited to the original principal amount of the Note. Notwithstanding the foregoing, nothing herein shall inhibit or prevent Mortgagee from foreclosing or exercising any other rights and remedies pursuant to the Loan Agreement, the Note, this Mortgage and the other Loan Documents, whether simultaneously with foreclosure proceedings or in any other sequence. A separate action or actions may be brought and prosecuted against Mortgagor pursuant to Sections 9.2 and 9.3 herein, whether or not action is brought against any other Person or whether or not any other Person is joined in the action or actions. In addition, Mortgagee shall have the right but not the obligation to join and participate in, as a party if it so elects, any administrative or judicial proceedings or actions initiated in connection with any matter addressed in the ADA and Environmental Indemnity.

Section 7.11      Right of Entry. Upon reasonable notice to Mortgagor, Mortgagee and its agents shall have the right to enter and inspect the Property at all reasonable times.

-15-

## ARTICLE 8

### INTENTIONALLY OMITTED

## ARTICLE 9

### INDEMNIFICATION

Section 9.1    Intentionally Omitted.

Section 9.2    Mortgage and/or Intangible Tax.  Mortgagor shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of this Mortgage, the Note or any of the other Loan Documents, but excluding any income, franchise or other similar taxes.

Section 9.3    ERISA Indemnification.  Mortgagor shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Mortgagee's sole discretion) that Mortgagee may incur, directly or indirectly, as a result of a default under Sections 8.19 and 9.4 of the Loan Agreement.

Section 9.4    Intentionally Omitted.

Section 9.5    Duty to Defend; Attorneys' Fees and Other Fees and Expenses.  Upon written request by any Indemnified Party, Mortgagor shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties.  Notwithstanding the foregoing, if the defendants in any such claim or proceeding include both Mortgagor and any Indemnified Party and Mortgagor and such Indemnified Party shall have reasonably concluded that there are any legal defenses available to it and/or other Indemnified Parties that are different from or additional to those available to Mortgagor, such Indemnified Party shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such Indemnified Party, provided that no compromise or settlement shall be entered without Mortgagor's consent, which consent shall not be unreasonably withheld.  Upon demand, Mortgagor shall pay or, in the sole and absolute discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

## ARTICLE 10

### WAIVERS

Section 10.1    Waiver of Counterclaim.  To the extent permitted by applicable law, Mortgagor hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Mortgagee arising out of or in any way connected with this Mortgage, the Loan Agreement, the Note, any of the other Loan Documents, or the Obligations.

-16-

Section 10.2    Marshalling and Other Matters. To the extent permitted by applicable law, Mortgagor hereby waives the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Mortgagor hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Mortgage on behalf of Mortgagor, and on behalf of each and every Person acquiring any interest in or title to the Property subsequent to the date of this Mortgage and on behalf of all Persons to the extent permitted by applicable law.

Section 10.3    Waiver of Notice. To the extent permitted by applicable law, Mortgagor shall not be entitled to any notices of any nature whatsoever from Mortgagee except with respect to matters for which this Mortgage specifically and expressly provides for the giving of notice by Mortgagee to Mortgagor and except with respect to matters for which Mortgagee is required by applicable law to give notice, and Mortgagor hereby expressly waives the right to receive any notice from Mortgagee with respect to any matter for which this Mortgage does not specifically and expressly provide for the giving of notice by Mortgagee to Mortgagor.

Section 10.4    Waiver of Statute of Limitations. To the extent permitted by applicable law, Mortgagor hereby expressly waives and releases to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its Other Obligations.

Section 10.5    Survival. The indemnifications made pursuant to Sections 9.2, 9.3 and 9.5 herein shall continue indefinitely in full force and effect and shall survive and shall in no way be impaired by: any satisfaction or other termination of this Mortgage, any assignment or other transfer of all or any portion of this Mortgage or Mortgagee's interest in the Property (but, in such case, shall benefit both Indemnified Parties and any assignee or transferee), any exercise of Mortgagee's rights and remedies pursuant hereto including but not limited to foreclosure or acceptance of a deed in lieu of foreclosure, any exercise of any rights and remedies pursuant to the Loan Agreement, the Note or any of the other Loan Documents, any transfer of all or any portion of the Property (whether by Mortgagor or by Mortgagee following foreclosure or acceptance of a deed in lieu of foreclosure or at any other time), any amendment to this Mortgage, the Loan Agreement, the Note or the other Loan Documents, and any act or omission that might otherwise be construed as a release or discharge of Mortgagor from the obligations pursuant hereto.

## ARTICLE 11

### INTENTIONALLY OMITTED

## ARTICLE 12

### NOTICES

Section 12.1    Notices. All notices or other written communications hereunder shall be delivered in accordance with Section 15.1 of the Loan Agreement.

## ARTICLE 13

### APPLICABLE LAW

Section 13.1    GOVERNING LAW; WAIVER OF JURY TRIAL.

-17-

(A)    THIS MORTGAGE WAS NEGOTIATED IN THE COMMONWEALTH OF PENNSYLVANIA, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY GRANTOR IN THE COMMONWEALTH OF PENNSYLVANIA, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE COMMONWEALTH OF PENNSYLVANIA, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THE MORTGAGE, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE LAND IS LOCATED (ILLINOIS). TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS MORTGAGE, THE NOTE AND/OR THE OTHER LOAN DOCUMENTS. IN THE EVENT THAT ANY PROVISION OF THIS MORTGAGE OR ANY OTHER LOAN DOCUMENT CONFLICTS WITH APPLICABLE LAW, SUCH CONFLICT SHALL NOT AFFECT OTHER PROVISIONS OF MORTGAGE OR THE APPLICABLE LOAN DOCUMENT WHICH CAN BE GIVEN EFFECT WITHOUT THE CONFLICTING PROVISIONS, AND TO THIS END THE PROVISIONS OF THIS MORTGAGE AND THE OTHER LOAN DOCUMENTS ARE DECLARED TO BE SEVERABLE.

(B)    TO THE FULLEST EXTENT PERMITTED BY LAW, MORTGAGOR AND MORTGAGEE HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION RELATING TO THE LOAN AND/OR THE LOAN DOCUMENTS.

Section 13.2    Usury Laws. Notwithstanding anything to the contrary, (a) all agreements and communications between Mortgagor and Mortgagee are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Mortgagee shall never exceed the maximum lawful rate or amount, (b) in calculating whether any interest exceeds the lawful maximum, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Mortgagor to Mortgagee, and (c) if through any contingency or event, Mortgagee receives or is deemed to receive interest in excess of the lawful maximum, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding indebtedness of Mortgagor to Mortgagee, or if there is no such indebtedness, shall immediately be returned to Mortgagor.

Section 13.3    Provisions Subject to Applicable Law. All rights, powers and remedies provided in this Mortgage may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Mortgage invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable law. If any term of this Mortgage or any application thereof shall be invalid or unenforceable, the remainder of this Mortgage and any other application of the term shall not be affected thereby.

-18-

Section 13.4     Intentionally Omitted.

Section 13.5     Business Purpose

Mortgagor warrants that this Mortgage is delivered in connection with a business or commercial loan transaction.

Section 13.6     Intentionally Omitted.

## ARTICLE 14

## DEFINITIONS

Section 14.1     Definitions.   All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Mortgage may be used interchangeably in singular or plural form, and the word "**Mortgagor**" shall mean "each Mortgagor and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "**Mortgagee**" shall mean "Mortgagee and any successor under the Loan Agreement," the word "**Note**" shall mean "the Note and any other evidence of indebtedness secured by this Mortgage," the word "**Property**" shall include any portion of the Property and any interest therein, and the phrases "**attorneys' fees**", "**legal fees**" and "**counsel fees**" shall include any and all attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Mortgagee in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder.

## ARTICLE 15

## MISCELLANEOUS PROVISIONS

Section 15.1     No Oral Change.   This Mortgage and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Mortgagor or Mortgagee, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Section 15.2     Successors and Assigns.   The provisions hereof shall be binding upon and shall inure to the benefit of the Mortgagor, its successors and assigns (including without limitation subsequent owners of the Property or the leasehold estate of the Property or any part thereof); shall be binding upon and shall inure to the benefit of Mortgagee, its successors and assigns and any future holder of the Note hereby secured, and any successors or assigns of any future holder of the Note. In the event the ownership of the Property or any leasehold estate that may be covered by this Mortgage, becomes vested in a person other than Mortgagor, Mortgagee may, without notice to Mortgagor, deal with such successor or successors in interest with reference to this instrument and the debt hereby secured in the same manner, as with the Mortgagor, and may alter the interest rate and/or alter or extend the terms of payment of the debt secured hereby without notice to Mortgagor and such action shall in no way affect the liability of Mortgagor hereunder or under the Note hereby secured or the lien or priority of this Mortgage with respect to any part of the Property covered hereby.

Section 15.3     Secondary Market

-19-

(a)     Transfer of Loan. Mortgagee may, at any time, without notice to or the consent of Mortgagor (i) sell, transfer or assign the Loan (or any portion thereof) and the Loan Documents, and any or all servicing rights with respect thereto, (ii) sell or grant participations in the Loan ("**Participations**") or (ii) securitize the Loan or any portion thereof in one or more pooled asset securitizations (the transactions referred to in clauses (i), (ii) and (iii) shall herein be referred to collectively as "Secondary Market Transactions" and the transactions referred to in clause (iii) shall herein be referred to as a "Securitization". Any certificates, notes or other securities issued in connection with a Securitization shall be referred to herein as "Securities". In connection with any Secondary Market Transaction, Mortgagee may forward to each purchaser, transferee, assignee, servicer, trustee, participant, or investor in such Secondary Market Transactions (collectively, the "Investor" or any rating agency rating such Secondary Market Transaction (each, a "**Rating Agency**") and each prospective Investor, and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Mortgagee now has or may hereafter acquire relating to the debt secured hereby and to Mortgagor, any Guarantor, and the Property, whether furnished by Mortgagor, any Guarantor, any Property, or otherwise, as Mortgagee determines necessary or desirable. Mortgagor irrevocably waives any and all rights it may have under applicable laws to prohibit such disclosure, including but not limited to any right of privacy. Mortgagor shall be responsible for the payment of all costs and expenses of any servicer chosen by Mortgagee to service the Loan. Mortgagor, at Mortgagor's expense, only for its own costs in cooperating (but not for Mortgagee's costs) including without limitation, Mortgagor's legal fees in connection with any of the following, agrees to cooperate with all reasonable requests of Mortgagee in connection with any of the foregoing including, without limitation, executing any financing statements or other documents deemed necessary by Mortgagee or its transferee to create, perfect or preserve the rights and interest to be acquired by such transferee, provide any updated financial information with appropriate verification through auditors letters, deliver a negative assurances letter with respect to such sections as Mortgagor is responsible pursuant to Section 15.3(c) hereof) only if the Securities being offered are in a Rule 144A offering or a registered public offering, revised organizational documents and counsel opinions satisfactory to the Rating Agencies, executed amendments to the Loan Documents, and review information regarding Mortgagor, any Guarantor, and the Property contained in a preliminary or final private placement memorandum, prospectus, prospectus supplements or other disclosure document, providing a mortgagor estoppel certificate and such other information about Mortgagor, any Guarantor or the Property as Mortgagee may reasonably require for Mortgagee's offering materials; provided, however, in each instance of a modification of, or amendment to, the Loan and Loan Documents or splitting or severing all or any portion of the Loan, Mortgagee shall comply with this Section 15 and no such modification or amendment shall change the stated maturity date of the Loan or any other material term of the Loan.

(b)     Dissemination of Information. Mortgagor acknowledges that Mortgagee may provide to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, ownership, purchase, or participation of the Loan, or any Secondary Market Transaction including, without limitation, any Rating Agency and any entity maintaining databases on the underwriting and performance of commercial mortgage loans, any and all information which Mortgagee now has or may hereafter acquire relating to the Loan, the Property, Mortgagor or any Guarantor, as Mortgagee determines necessary or desirable and that such information may be included in disclosure documents in connection with a Secondary Market Transaction, including, without limitation, a prospectus, prospectus supplement, offering memorandum, private placement memorandum or similar document (each, a "**Disclosure Document**") and also may be included in any filing with the Securities and Exchange Commission pursuant to the Securities Act or the Securities Exchange Act. To the fullest extent permitted under applicable law, Mortgagor irrevocably waives all rights, if any, to prohibit such disclosure, including, without limitation, any right of privacy.

(c)     Secondary Market Transaction. Mortgagor and each Guarantor agrees to provide in connection with each Disclosure Document, an indemnification certificate: (i) certifying that the

-20-

information contained in the sections describing Mortgagor, any Guarantor and the Property set forth in such Disclosure Document has carefully been examined, and that, to such indemnitor's knowledge, such sections do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; (ii) indemnifying Mortgagee (and for purposes of this Section 15.3(c), Mortgagee shall include its officers and directors) that (1) has filed the registration statement, if any, relating to the Secondary Market Transaction and/or (2) which is acting as issuer, depositor, sponsor and/or a similar capacity with respect to the Secondary Market Transaction (any person described in (1) or (2), an "**Issuer Person**"), and each director and officer of any Issuer Person, and each person who controls any Issuer Person with the meaning of Section 15 of the Securities Act or Section 20 of the Securities Exchange Act (collectively, "**Issuer Group**"), for any losses to which Mortgagee or the Issuer Group may become subject insofar as the losses arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in such sections necessary in order to make the statements in such sections or in light of the circumstances under which they were made, not misleading (collectively, "**Securities Liabilities**"); and (iii) agreeing to reimburse Mortgagee and the Issuer Group for any legal or other expenses reasonably incurred by Mortgagee and the Issuer Group in investigating or defending the Securities Liabilities; provided, however, that indemnitor will be liable under clauses (ii) or (iii) above only to the extent that such Securities Liabilities arise out of, or are based upon, any such untrue statement or omission made therein in reliance upon, and in conformity with, information furnished to Mortgagee or any member of the Issuer Group by or on behalf of Mortgagor or a Guarantor in connection with the preparation of the Disclosure Documents or in connection with the underwriting of the Loan, including, without limitation, financial statements of Mortgagor or any Guarantor, and operating statements, rent rolls, environmental site assessment reports and property condition reports with respect to the Property. This indemnity is in addition to any liability which Mortgagor may otherwise have and shall be effective whether or not an indemnification certificate described above is provided and shall be applicable based on information previously provided by or on behalf of Mortgagor or a Guarantor if the indemnification certificate is not provided.

Section 15.4    Inapplicable Provisions. If any term, covenant or condition of the Loan Agreement, the Note or this Mortgage is held to be invalid, illegal or unenforceable in any respect, the Loan Agreement, the Note and this Mortgage shall be construed without such provision.

Section 15.5    Headings, etc. The headings and captions of various Sections of this Mortgage are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

Section 15.6    Number and Gender/Joint and Several. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa. If Mortgagor consists of more than one Person, all representations, warranties, covenants, obligations and liabilities of each such Person hereunder shall be joint and several. A default hereunder by any such Person shall be deemed a default by all such Persons and Mortgagor. With respect to the definition of "Mortgagor", except where the context otherwise provides, (i) any representations contained herein of Mortgagor shall be applicable to each Mortgagor, (ii) any affirmative covenants contained herein shall be deemed to be covenants of each Mortgagor and shall require performance by all Mortgagors, (iii) any negative covenants contained herein shall be deemed to be covenants of each Mortgagor, and shall be breached if any Mortgagor fails to comply therewith, (iv) the occurrence of any Event of Default with respect to any Mortgagor shall be deemed to be an Event of Default hereunder, and (v) any Debt and/or Other Obligations of Mortgagor shall be deemed to include any Debt and/or Other Obligations of the Mortgagor, or any Debt and/or Other Obligations of any one of them. The representations, warranties and covenants contained herein shall be read to apply to the individual Persons comprising Mortgagor when the context so requires, but a breach of any such

-21-

representation, warranty or covenant or a breach of any obligation under this Mortgage shall be deemed a breach by all such Persons and Mortgagor, entitling Mortgagee to exercise all of their rights and remedies under this Mortgage and under applicable law.

Section 15.7    Subrogation.  If any or all of the proceeds of the Note have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Mortgagee shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Mortgagee and are merged with the lien and security interest created herein as cumulative security for the repayment of the Debt, the performance and discharge of Mortgagor's obligations hereunder, under the Loan Agreement, the Note and the other Loan Documents and the performance and discharge of the Other Obligations.

Section 15.8    Entire Agreement.  The Note, the Loan Agreement, this Mortgage and the other Loan Documents constitute the entire understanding and agreement between Mortgagor and Mortgagee with respect to the transactions arising in connection with the Debt and supersede all prior written or oral understandings and agreements between Mortgagor and Mortgagee with respect thereto. Mortgagor hereby acknowledges that, except as incorporated in writing in the Note, the Loan Agreement, this Mortgage and the other Loan Documents, there are not, and were not, and no Persons are or were authorized by Mortgagee to make any representations, understandings, stipulations, agreements or promises, oral or written, with respect to the transaction which is the subject of the Note, the Loan Agreement, this Mortgage and the other Loan Documents.

Section 15.9    Limitation on Mortgagee's Responsibility.  No provision of this Mortgage shall operate to place any obligation or liability for the control, care, management or repair of the Property upon Mortgagee, nor shall it operate to make Mortgagee responsible or liable for any waste committed on the Property by the tenants or any other Person, or for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or stranger.  Nothing herein contained shall be construed as constituting Mortgagee a "mortgagee in possession."

Section 15.10    Loan Agreement.  This Mortgage is made pursuant to the Loan Agreement and is subject to all of the provisions of the Loan Agreement including, without limitation, the provisions thereof entitling Mortgagee to declare the entire indebtedness secured hereby to be immediately due and payable, all of which provisions are incorporated herein with the same force and with like effect as if they were fully set forth herein at length and made a part hereof.

Section 15.11    Intentionally Omitted.

Section 15.12    Receipt of Mortgage.

MORTGAGOR CERTIFIES AND ACKNOWLEDGES THAT IT HAS RECEIVED A TRUE AND CORRECT COPY OF THIS MORTGAGE WITHOUT CHARGE.

-22-

## ARTICLE 16

### STATE-SPECIFIC PROVISIONS

Section 16.1    Inconsistencies. In the event of any inconsistencies between the terms and conditions of this Article 16 and the other provisions of this Mortgage, the terms and conditions of this Article 16 shall control and be binding.

Section 16.2    Compliance with Illinois Mortgage Foreclosure Law.

(a)    In the event that any provision in this Mortgage shall be inconsistent with any provisions of the Illinois Mortgage Foreclosure Law, 735 ILCS 5/15-1101 *et. seq.* (as amended from time to time the "IMF Law"), the provision of the IMF Law shall take precedence over the provisions of this Mortgage, but shall not invalidate or render unenforceable any other provision of this Mortgage that can be construed in a manner consistent with the IMF Law.

(b)    Mortgagor and Mortgagee shall have the benefit of all of the provisions of the IMF Law, including all amendments thereto which may become effective from time to time after the date hereof. In the event any provision of the IMF Law which is specifically referred to herein may be repealed, Mortgagee shall have the benefit of such provision as most recently existing prior to such repeal, as though the same were incorporated herein by express reference.

(c)    If any provision of this Mortgage shall grant to Mortgagee any rights or remedies upon default of Mortgagor which are more limited than the rights that would otherwise be vested in Mortgagee under the IMF Law in the absence of said provision, Mortgagee shall be vested with the rights granted in the IMF Law to the full extent not prohibited by law.

(d)    In addition to any provision of this Mortgage authorizing Mortgagee to take or be placed in possession of the Property, or for the appointment of a receiver, Mortgagee shall have the right, in accordance with Sections 15-1701 and 15-1702 of the IMF Law, to be placed in possession of the Property or at its request to have a receiver appointed, and such receiver, or Mortgagee, if and when placed in possession, shall have, in addition to any other powers provided in this Mortgage, all rights, powers, immunities and duties as provided for in Sections 15-1701, 15-1703 and 15-1704 of the IMF Law.

Section 16.3    Waiver of Right of Redemption and Other Rights. To the full extent permitted by law, Mortgagor agrees that it will not at any time or in any manner whatsoever take any advantage of any stay, exemption or extension law or any so-called "Moratorium Law" now or at any time hereafter in force, nor take any advantage of any law now or hereafter in force providing for the valuation or appraisement of the Property, or any part thereof, prior to any sale thereof to be made pursuant to any provisions herein contained, or to any decree, judgment or order of any court of competent jurisdiction; or after such sale, claim or exercise any rights under any statute now or hereafter in force to redeem the Property so sold, or any part thereof, or relating to the marshalling thereof, upon foreclosure sale or other enforcement hereof. To the full extent permitted by law, Mortgagor hereby expressly waives any and all rights it may have to require that the Property be sold as separate tracts or units in the event of foreclosure. To the full extent permitted by law, Mortgagor hereby expressly waives any and all rights of redemption and reinstatement under the IMF Law, on its own behalf, on behalf of all persons claiming or having an interest (direct or indirect) by, through or under Mortgagor and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date hereof, it being the intent hereof that any and all such rights of redemption of Mortgagor and such other persons are and shall be deemed to be hereby waived to the full extent permitted by applicable law. To the full extent permitted by law, Mortgagor agrees that it will not, by invoking or utilizing any applicable law or laws or otherwise, hinder, delay or impede

-23-

the exercise of any right, power or remedy herein or otherwise granted or delegated to Mortgagee, but will permit the exercise of every such right, power and remedy as though no such law or laws have been or will have been made or enacted. To the full extent permitted by law, Mortgagor hereby agrees that no action for the enforcement of the lien or any provision hereof shall be subject to any defense which would not be good and valid in an action at law upon the Note. Mortgagor acknowledges that the Property does not constitute agricultural real estate as defined in Section 5/15-1201 of the IMF Law or residential real estate as defined in Section 5/15-1219 of the IMF Law.

Section 16.4    Use of Proceeds. Mortgagor represents and warrants to Mortgagee (i) that the proceeds of the Note secured by this Mortgage will be used for the purposes specified in 815 ILCS 205/4(1)(l) (or any substitute, amended or replacement statute), and that the indebtedness secured hereby constitutes a business loan to a business entity which comes within the purview of said 815 ILCS 205/4(1)(l), and (ii) that the Loan evidenced by the Note is an exempted transaction under the Truth In Lending Act, 15 U.S.C. §1601 *et seq.*

Section 16.5    Interest Laws. It being the intention of Mortgagee and Mortgagor to comply with the laws of the State of Illinois, it is agreed that notwithstanding any provision to the contrary in the Note, this Mortgage or any of the other Loan Documents, no such provision shall require the payment or permit the collection of any amount ("**Excess Interest**") in excess of the maximum amount of interest permitted by law to be charged for the use or detention, or the forbearance in the collection, of all or any portion of the indebtedness evidenced by the Note. If any Excess Interest is provided for, or is adjudicated to be provided for, in the Note, this Mortgage or any of the other Loan Documents, then in such event: (a) the provisions of this **Section 16.5** shall govern and control; (b) neither Mortgagor nor any other party obligated under the terms of the Note or any of the other Loan Documents shall be obligated to pay any Excess Interest; (c) any Excess Interest that Mortgagee may have received hereunder shall, at the option of Mortgagee, be (i) applied as a credit against the then-unpaid principal balance under the Note, accrued and unpaid interest thereon not to exceed the maximum amount permitted by law, or both, (ii) refunded to the payor thereof, or (iii) any combination of the foregoing; (d) the Interest Rate (as that term is defined in the Note) shall be subject to automatic reduction to the maximum lawful contract rate allowed under the applicable usury laws of the aforesaid State, and the Note, this Mortgage and the other Loan Documents shall be deemed to be automatically reformed and modified to reflect such reduction in the Interest Rate; and (e) neither Mortgagor nor any other party obligated under the terms of the Note or any of the other Loan Documents shall have any action against Mortgagee for any damages whatsoever arising out of the payment or collection of any Excess Interest.

Section 16.6    Other Amounts Secured; Maximum Indebtedness. Mortgagor acknowledges and agrees that this Mortgage secures the entire principal amount of the Note and interest accrued thereon, regardless of whether any or all of the loan proceeds are disbursed on or after the date hereof, and regardless of whether the outstanding principal is repaid in whole or part or are future advances made at a later date, any and all litigation and other expenses and any other amounts as provided herein or in any of the other Loan Documents, including, without limitation, the payment of any and all loan commissions, service charges, liquidated damages, expenses and advances due to or paid or incurred by Mortgagee in connection with the Loan, all in accordance with the loan commitment issued in connection with this transaction and the Loan Documents. Notwithstanding anything in this Mortgage to the contrary, under no circumstances shall the maximum principal indebtedness secured hereby exceed EIGHTEEN MILLION FOUR HUNDRED THOUSAND AND NO/100 DOLLARS ($18,400,000), plus interest thereon and any disbursements made for the payment of taxes, special assessments, or insurance on the Property, with interest on such disbursements. It is agreed that any future advances made by Mortgagee for the benefit of Mortgagor from time to time under this Mortgage or the other Loan Documents and whether or not such advances are obligatory or are made at the option of Mortgagee, made at any time from and after the date of this Mortgage, and all interest accruing thereon, shall be equally secured by this

-24-

Mortgage and shall have the same priority as all amounts, if any, advanced as of the date hereof and shall be subject to all of the terms and provisions of this Mortgage. This Mortgage shall be valid and have priority to the extent of the full amount of the indebtedness secured hereby over all subsequent liens and encumbrances, including statutory liens, excepting solely taxes and assessments levied on the Property given priority by law.

Section 16.7     Adjustable Mortgage Loan Provisions.  The Note which this Mortgage secures is an adjustable note on which the interest rate may be adjusted from time to time in accordance with the terms and provisions set forth in the Note.

Section 16.8     Deed of Trust.  If title to the Property or any part thereof is now or hereafter becomes vested in a trustee, any prohibition or restriction contained herein against the creation of any lien on the Property shall be construed as a similar prohibition or restriction against the creation of any lien on or security interest in the beneficial interest of such trust.

Section 16.9     Collateral Protection Act.  Unless Mortgagor provides Mortgagee with evidence of the insurance required by this Mortgage or any other Loan Document, Mortgagee may purchase insurance at Mortgagor's expense to protect Mortgagee's interest in the Property or any other collateral for the indebtedness secured hereby. This insurance may, but need not, protect Mortgagor's interests. The coverage Mortgagee purchases may not pay any claim that Mortgagor makes or any claim that is made against Mortgagor in connection with the Property or any other collateral for the indebtedness secured hereby. Mortgagor may later cancel any insurance purchased by Mortgagee, but only after providing Mortgagee with evidence that Mortgagor has obtained insurance as required under this Mortgage or any other Loan Document. If Mortgagee purchases insurance for the Property or any other collateral for the indebtedness secured hereby, Mortgagor shall be responsible for the costs of that insurance, including interest in any other charges that Mortgagee may lawfully impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to the indebtedness secured hereby. The costs of the insurance may be more than the cost of insurance that Mortgagor may be able to obtain on its own. For purposes of the Illinois Collateral Protection Act, 815 ILCS 180/1 *et. seq.*, Mortgagor hereby acknowledges Mortgagee's right pursuant to this paragraph to obtain collateral protection insurance.

Section 16.10    Rights of Tenants.  Mortgagor shall have the right and option to commence a civil action to foreclose this Mortgage and to obtain a decree of foreclosure and sale subject to the rights of any tenant or tenants of the Property having an interest in the Property prior to that of Mortgagee. The failure to join any such tenant or tenants of the Property as party defendant or defendants in any such civil action or the failure of any decree of foreclosure and sale to foreclose their rights shall not be asserted by Mortgagor as a defense in any civil action instituted to collect the Obligations, or any part thereof or any deficiency remaining unpaid after foreclosure and sale of the Property, any statue or rule of law at any time existing to the contrary notwithstanding.

[Remainder of page intentionally left blank]

-25-

MORTGAGOR ACKNOWLEDGES THAT IT HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS MORTGAGE INCLUDING, WITHOUT LIMITATION, THE WAIVER OF JURY TRIAL AND HAS BEEN ADVISED BY COUNSEL AS NECESSARY OR APPROPRIATE.

IN WITNESS WHEREOF, this Mortgage has been executed by Mortgagor as of the day and year first above written.

**MORTGAGOR:**

SSDF7 PORTFOLIO 1 LLC,
an Illinois limited liability company

By:    SSDF7 HOLDCO 1 LLC,
      a Delaware limited liability company,
      its Managing Member

By:    South Shore Property Holdings LLC,
      a Delaware limited liability company,
      its Managing Manager

By:    _____
      Jerome H. Cohen
Its:   Managing Member

STATE OF Florida_____, COUNTY OF manatee_____. SS.:

Personally appeared before me, the undersigned, a Notary Public for the state and county aforesaid, JEROME H. COHEN, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged that he executed the within instrument for the purposes therein contained, and who further acknowledged that he is the Managing Member of SOUTH SHORE PROPERTY HOLDINGS LLC, a Delaware limited liability company, which is the Managing Manager of SSDF7 HOLDCO 1 LLC, a Delaware limited liability company which is the Managing Member of SSDF7 PORTFOLIO 1 LLC, an Illinois limited liability company ("Borrower"), and is authorized to execute this instrument on behalf of Borrower.

Given under my hand and notarial seal, this 25 day of April_____, 2018.



_____
Notary Public

My commission expires August 17, 2021

JESSICA BAIER
MY COMMISSION # GG135506
EXPIRES August 17, 2021

Signature Page to Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing - II

## EXHIBIT A

## LEGAL DESCRIPTION

### SITE NO. 8
**4317-19 S. MICHIGAN AVENUE, CHICAGO, ILLINOIS 60653 / PIN# 20-03-302-002-0000**

LOT 7 IN BLOCK 1 IN L. W. STONE'S SUBDIVISION OF THE EAST 20 ACRES OF THE NORTH 30 ACRES OF THE WEST ½ OF THE SOUTHWEST 1/4 OF SECTION 3, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

### SITE NO. 9
**2736-2744 W. 64TH STREET, CHICAGO, ILLINOIS 60629 / PIN# 19-24-200-029-0000**

LOT 15 (EXCEPT THE NORTH 10 FEET THEREOF) IN MOREAU AND DE JONG'S RESUBDIVISION OF LOTS 30 TO 48 INCLUSIVE IN BLOCK 16 IN AVONDALE ADDITION TO CHICAGO, BEING A SUBDIVISION OF THE WEST ½ OF THE NORTHEAST 1/4 OF SECTION 24, TOWNSHIP 38 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

### SITE NO. 10
**2453 E. 75TH STREET/7508 S. ESSEX AVENUE, CHICAGO, IL 60649 / PIN# 21-30-301-030-0000**

LOT 1 AND THE EAST 18.00 FEET OF LOT 2 IN BLOCK 3 IN SOUTH SHORE PARK, BEING A SUBDIVISION OF THE WEST ½ OF THE SOUTHWEST ¼ OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

### SITE NO. 11
**7701-03 S. ESSEX AVENUE, CHICAGO, ILLINOIS 60649 / PIN# 21-30-320-001-0000**

LOT 36 AND THE NORTH 2.41 FEET OF LOT 35 IN BLOCK 10 IN SOUTH SHORE PARK, A SUBDIVISION OF THE WEST ½ OF THE SOUTHWEST ¼ OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

### SITE NO. 12
**7748-52 S. ESSEX AVENUE, CHICAGO, ILLINOIS 60649 / PIN# 21-30-319-029-0000**

LOTS 16, 17 AND 18, IN BLOCK 11, IN SOUTH SHORE PARK, BEING A SUBDIVISION OF THE WEST HALF OF THE SOUTHWEST QUARTER (EXCEPT STREETS) OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Exhibit A

**SITE NO. 13**
**816-22 E. MARQUETTE ROAD, CHICAGO, ILLINOIS 60637 / PIN# 20-23-112-028-0000**

LOT 12 IN BLOCK 8 IN WOODLAWN RIDGE SUBDIVISION OF THE SOUTH ½ OF THE NORTHWEST ¼ OF SECTION 23, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

**SITE NO. 14**
**7957-59 S. MARQUETTE AVENUE, CHICAGO, ILLINOIS 60617 / PIN# 21-31-106-024-0000**

LOTS 29 AND 30 IN THE SUBDIVISION OF BLOCK 6 OF CIRCUIT COURT PARTITION OF THE NORTHWEST ¼ OF THE NORTHEAST ¼ AND THE NORTHEAST ¼ OF THE NORTHWEST ¼ OF SECTION 31 TOWNSHIP 38 NORTH RANGE 15 EAST OF THE THIRD PRINCIPAL MERIDIAN IN COOK COUNTY, ILLINOIS.

**SITE NO. 15**
**7600 S. KINGSTON AVENUE, CHICAGO, ILLINOIS 60649 / PIN# 21-30-309-030-0000**

LOTS 1, 2 AND 3, IN BLOCK 7, IN SOUTH SHORE PARK, BEING A SUBDIVISION OF THE WEST HALF OF THE SOUTHWEST QUARTER (EXCEPT STREETS) OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

**SITE NO. 16**
**7656 S. KINGSTON AVENUE, CHICAGO, ILLINOIS 60649 / PIN# 21-30-309-026-0000**

LOT 18 IN BLOCK 7 IN SOUTH SHORE PARK, BEING SUBDIVISION OF THE WEST 1/2 OF THE SOUTHWEST ¼ IN SECTION 30, TOWNSHIP 38 NORTH, RANGE 15 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

**SITE NO. 17**
**8201 S. KINGSTON AVENUE, CHICAGO, IL 60617 / PIN# 21-31-126-001-0000**

LOT 38 (EXCEPT THE SOUTH 28 AND ONE HALF FEET THEREOF) AND ALL OF LOTS 39 AND 40 IN BLOCK 4 IN THE SUBDIVISION OF LOTS 1 TO 10, BOTH INCLUSIVE, IN CHARLES RINGER'S SOUTH SHORE ADDITION, BEING A SUBDIVISION OF THE EAST ½ OF THE SOUTHWEST ¼ OF THE NORTHWEST ¼ OF SECTION 31, TOWNSHIP 38 NORTH, RANGE 15 EAST OF THE THIRD PRINCIPAL MERIDIAN (EXCEPT THE SOUTH 33 FEET THEREOF TAKEN FOR WIDENING EAST 83RD STREET) IN COOK COUNTY, ILLINOIS.

Exhibit A

## EXHIBIT B

### DESCRIPTION OF PERSONAL PROPERTY

(a)     All personal property (including, without limitation, all goods, supplies, equipment, furniture, furnishings, fixtures, machinery, inventory, and construction materials and software embedded in any of the foregoing) in which Mortgagor now or hereafter acquires an interest or right, which is now or hereafter located on or affixed to the Land or the Improvements or used or useful in the operation, use, or occupancy thereof or the construction of any Improvements thereon, together with any interest of Mortgagor in and to personal property which is leased or subject to any superior security interest, and all books, records, leases and other agreements, documents, and instruments of whatever kind or character, relating to the Land, Improvements, or such personal property;

(b)     All fees, income, rents, issues, profits, earnings, receipts, royalties, and revenues which, after the date hereof and while any portion of the Obligations remains unpaid or unperformed, may accrue from such personal property or any part thereof or from the Land, the Improvements or any other part of the Property, or which may be received or receivable by Mortgagor from any hiring, using, letting, leasing, subhiring, subletting, subleasing, occupancy, operation, or use thereof;

(c)     All of Mortgagor's present and future rights to receive payments of money, services, or property, including, without limitation, rights to all deposits from tenants of the Land or Improvements, sums deposited in the Collateral Account, chattel paper (whether tangible or electronic) notes, drafts, contract rights, instruments, general intangibles, as presently or hereafter in effect, and principal, interest and payments due on account of goods sold or leased, services rendered, loans made or credit extended, together with title to or interest in all agreements, documents, and instruments, evidencing, securing or guarantying the same;

(d)     All other intangible property (and related software) and rights relating to the Land, the Improvements, the personal property described in Paragraph (a) above or the operation, occupancy, or use thereof, including, without limitation, all governmental and non- governmental permits, licenses, and approvals relating to construction on or operation, occupancy, or use of the Land or Improvements, all names under or by which the Land or Improvements may at any time be operated or known, all rights to carry on business under any such names, or any variant thereof, all trade names and trademarks, servicemarks, logos and copyrights, relating in any way to the Land or the Improvements, and all good will and software in any way relating to the Land or the Improvements;

(e)     All as-extracted collateral produced from or allocated to the Land, including, without limitation, oil, gas, and other hydrocarbons and other minerals.

(f)     Mortgagor's rights under all insurance policies covering the Land (including, but not limited to, title insurance policies), the Improvements, the Personal Property, and the other parts of the Property and any and all proceeds, loss payments, and premium refunds payable regarding the same;

(g)     All reserves, deferred payments, deposits, refunds, cost savings, and payments of any kind relating to the construction of any Improvements on the Land;

(h)     All water stock relating to the Land;

(i)     All causes of action, claims, compensation, and recoveries for any damage to, destruction of, or condemnation or taking of the Land, the Improvements, the Personal Property, or any other part of the Property, or for any conveyance in lieu thereof, whether direct or consequential, or for any damage or

injury to the Land, the Improvements, the Personal Property, or any other part of the Property, or for any loss or diminution in value of the Premises, the Improvements, the Personal Property, or any other part of the Property;

(j)     All architectural, structural, mechanical, and engineering plans and specifications prepared for construction of Improvements or extraction of minerals or gravel from the Premises and all studies, data, and drawings related thereto; and also all contracts and agreements of the Mortgagor relating to the aforesaid plans and specifications or to the aforesaid studies, data, and drawings or to the construction of Improvements on or extraction of minerals or gravel from the Land;

(k)     All commercial tort claims Mortgagor now has or hereafter acquires relating to the properties, rights, titles, and interests referred to in this Exhibit B or elsewhere in the Mortgage to which this Exhibit B is attached;

(l)     All letter of credit rights (whether or not the letter of credit is evidenced by a writing) Mortgagor now has or hereafter requires relating to the properties, rights, titles and interest referred to in the Mortgage to which this Exhibit B is attached;

(m)     All proceeds from sale or disposition of any of the aforesaid collateral and all supporting obligations ancillary thereto or arising in any way in connection therewith;

(n)     All Mortgagor's rights in proceeds of the Loan evidenced by the Note;

(o)     All of Mortgagor's rights in any and all warranties and guaranties with respect to any goods, materials, supplies, chattels, fixtures, equipment, machinery, building materials, and work in progress attached to or placed in or on any part of the Land, or used in connection with any construction on the Land;

(p)     All of Mortgagor's rights to and under any purchase agreements, including, without limitation, any deposits paid to Mortgagor pursuant to such purchase agreements; and

(q)     All of Mortgagor's rights in all plans, specifications, plats, agreements, assessments, reports, and surveys related to the Premises.

As used in this Exhibit B the terms "Land", "Loan Agreement", "Obligations", "Note", "Property", "Improvements", and "Personal Property" shall have the meanings set forth in the Mortgage to which this Exhibit B is attached.

Exhibit B

**EXHIBIT G**

# Illinois Anti-Predatory
# Lending Database
# Program

## Certificate of Exemption



Doc#: 1602156229 Fee: $52.00
RHSP Fee:$9.00 RPRF Fee: $1.00
Karen A.Yarbrough
Cook County Recorder of Deeds
Date: 01/21/2016 02:29 PM Pg: 1 of 8

**Report Mortgage Fraud**
**800-532-8785**

The property identified as:      PIN: 20-25-310-008-0000

**Address:**
**Street:**      7625 S East End
**Street line 2:**
**City:** Chicago      **State:** IL      **ZIP Code:** 60649

**Lender:** The Persons Listed on Exhibit A to the Mortgage c/o EquityBuild Finance, LLC

**Borrower:** EquityBuild, Inc

**Loan / Mortgage Amount:** $1,605,749.00

This property is located within the program area and is exempt from the requirements of 765 ILCS 77/70 et seq. because it is not owner-occupied.

**Certificate number:** E62AC738-1D7B-4C55-8FE1-5AEBE1BC1338      **Execution date:** 10/29/2015

Mail To:

*Equity Build Finance*
*5068 W. Plano Pkwy, #300*
*Plano, TX 75093*

_____[The Above Space For Recorder's Use Only]_____

## MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on October 29th, 2015. The mortgagor is EquityBuild, Inc. ("Borrower").

This Security Instrument is given to The Persons Listed on <u>Exhibit A</u> to the Mortgage C/O EquityBuild Finance, LLC whose address is 5068 West Plano Pkwy. #300 Plano, TX 75093 ("Lender").

Borrower owes Lender the principal sum of One Million Six Hundred Five Thousand Seven Hundred Forty-Nine and 00/100 Dollars (U.S. $1,605,749.00). This debt is evidenced by Borrower's note dated the same date as this Security Instrument (Mortgage), which provides for a final payment of the full debt, if not paid earlier, due and payable November 1st, 2017. This Security Instrument secures to Lender:
(a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extension and modifications; (b) the payment of all other sums, with interest advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in COOK County, Illinois:

PIN: 20-25-310-008-0000

which has the address of 7625 S East End, Chicago, IL 60649 ("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents, royalties, mineral, oil and gas rights and profits, water rights and stock and all fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANT. Borrower and Lender covenant and agree as follows:

1. Payment of Principal and Interest; Prepayment and Late Charges. Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. Hazard Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration and repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 19 the property is acquired by Lender, Borrower's rights to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of sums secured by this Security Instrument immediately prior to the acquisition.

3. Preservation and Maintenance of Property; Leaseholds. Borrower shall not destroy, damage or substantially change the Property, allow the Property to deteriorate or commit waste. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease, and if Borrower acquires fee title to the Property, the leasehold and fee title shall not merge unless Lender agrees to the merger in writing.

4. Protection of Lender's Rights in the Property; Mortgage Insurance. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees, and entering on the Property to make repairs. Although Lender may take action under this paragraph 4, Lender does not have to do so.

5. Successor and Assigns Bound; Joint and Several Liability; Co-signers. The covenants and agreements of this Security Interest shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 9. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey the Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forebear or make any accommodations with regard to the terms of this Security Instrument or the Note without the Borrower's consent.

6. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

7. Governing Law; Severability. This Security Instrument shall be governed by federal law and the law of jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

8. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

9. Transfer of the Property or a beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

10. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

11. **Assignment of Rents and Leases.** As additional security for the payment of the Indebtedness, Mortgagor assigns and transfers to Mortgagee, pursuant to 1953 PA 210, as amended by 1966 PA 151 (MCLA 554.231 et seq., MSA 26.1137(1) et seq.), all the rents, profits, and income under all leases, occupancy agreements, or arrangements upon or affecting the Premises (including any extensions or amendments) now in existence or coming into existence during the period this Mortgage is in effect. This assignment shall run with the land and be good and valid as against Mortgagor and those claiming under or through Mortgagor. This assignment shall continue to be operative during foreclosure or any other proceedings to enforce this Mortgage. If a foreclosure sale results in a deficiency, this assignment shall stand as security during the redemption period for the payment of the deficiency. This assignment is given only as collateral security and shall not be construed as obligating Mortgagee to perform any of the covenants or undertakings required to be performed by Mortgagor in any leases. In the event of default in any of the terms or covenants of this Mortgage, Mortgagee shall be entitled to all of the rights and benefits of MCLA 554.231-.233, MSA 26.1137(1)-(3), and 1966 PA 151, and Mortgagee shall be entitled to collect the rents and income from the Premises, to rent or lease the Premises on the terms that it may deem best, and to maintain proceedings to recover rents or possession of the Premises from any tenant or trespasser. Mortgagee shall be entitled to enter the Premises for the purpose of delivering notices or other communications to the tenants and occupants. Mortgagee shall have no liability to Mortgagor as a result of those acts. Mortgagee may deliver all of the notices and communications by ordinary first-class U.S. mail. If Mortgagor obstructs Mortgagee in its efforts to collect the rents and income from the Premises or unreasonably refuses or neglects to assist Mortgagee in collecting the rent and income, Mortgagee shall be entitled to appoint a receiver for the Premises and the income, rents, and profits, with powers that the court making the appointment may confer. Mortgagor shall at no time collect advance rent in excess of one month under any lease pertaining to the Premises, and Mortgagee shall not be bound by any rent prepayment made or received in violation of this paragraph. Mortgagee shall not have any obligation to collect rent or to enforce any other obligations of any tenant or occupant of the Premises to Mortgagor. No action taken by Mortgagee under this paragraph shall cause Mortgagee to become a "mortgagee in possession."

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

BORROWER: EquityBuild, Inc.

_____ (SEAL)
Jerry Cohen, President

_____[Space Below This Line For Acknowledgement]_____

STATE OF FLORIDA, Manatee _____ County ss:

I hereby certify that on this day, before me, an officer duly authorized in the state aforesaid and in the county aforesaid to take acknowledgements, personally appeared Jerry Cohen, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he/she executed the same for the purpose therein expressed.

WITNESS my hand and official seal in the county and state aforesaid this 29 day of October , 20 15 .

My Commission expires: July 26, 2017

{Seal}

Notary Public

JESSICA ANN BAIER
MY COMMISSION #FF019714
EXPIRES July 26, 2017
FloridaNotaryService.com
(407) 398-0153

**Exhibit A**

| Lender Name | Principal Amount | Percentage of Loan |
|---|---|---|
| Brad & Linda Lutz | $397,836 | 24.78% |
| Asians Investing in Real Estate, LLC | $50,000 | 3.11% |
| Self-Directed IRA Services Inc. FBO David Geldart | $107,362 | 6.69% |
| iPlanGroup Agent for Custodian FBO Lorenzo Jaquias IRA | $50,000 | 3.11% |
| Edge Investments, LLC | $176,226 | 10.97% |
| KKW Investments, LLC | $75,000 | 4.67% |
| Peter P Nuspl | $217,100 | 13.52% |
| Pittman Gold, LLC | $150,000 | 9.34% |
| Steve Bald | $50,000 | 3.11% |
| iPlanGroup Agent for Custodian FBO Jacqueline Rowe IRA | $200,000 | 12.46% |
| Michael James Guilford and Nancy Richard-Guilford, jointly with right of survivorship | $92,561 | 5.76% |
| Knickerbocker, LLC | $39,664 | 2.47% |

The North 6 feet of Lot 36 and all of Lots 37 to 40 in Block 11 in James Stinson's
Subdivision of East Grand Crossing in the Southwest 1/4 of Section 25, Township 38
North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois

**EXHIBIT H**



Doc# 1727219061 Fee $40.00

RHSP FEE:$9.00 RPRF FEE: $1.00
KAREN A. YARBROUGH
COOK COUNTY RECORDER OF DEEDS
DATE: 09/29/2017 03:47 PM  PG: 1 OF 2

# RELEASE DEED

CAUTION: Consult a lawyer before using or acting under this form. *Neither the publisher nor the seller of this form makes any warranty with respect thereto, including any warranty of merchantability or fitness for a particular purpose.*

Know all men by these presents, that **EQUITYBUILD, INC.** for and in consideration of TEN DOLLARS ($10.00) and for other good and valuable considerations, the receipt of which is hereby confessed, does hereby remise, convey, release and quit-claims unto **EQUITYBUILD FINANCE, LLC** of the County of **COLLIN**, State of **TEXAS**, all rights, title, interest, claim or demand whatsoever he/she may have acquired in, through or by a certain Mortgage bearing the date of **02/21/2014** Recorded in the Recorder's Office of **COOK** County in the State of Illinois, on **10/29/2015** as Document Number **1602156229** , the premises therein described, situated in the County of **COOK** and the State of Illinois as follows, to-wit:

See attached Legal Description

(PIN):          **20-25-310-008-0000**

Commonly Known as:     **7625 S East End, Chicago, IL**

_____ Manager
**EQUITYBUILD FINANCE, LLC**

State of: _New York_

County of: _New York_

I, the undersigned, a Notary Public in and for said County in the State aforesaid Do Certify that, _Shaun David Cohen_ , personally known to me have signed and delivered the said instrument as his/her free and voluntary act for the uses and purposes therein set forth.

Given under my hand and Notarial Seal on _9/18_ 20_17_

> JEROME M TAYLOR
> Notary Public, State of New York
> Registration #01TA6328106
> Qualified In New York County
> Commission Expires July 27, 2019

FOR THE PROTECTION OF THE OWNER, THIS RELEASE NEEDS TO BE FILED WITH THE RECORDER OF DEEDS IN WHOSE OFFICE THE MORTGAGE OR DEED OF TRUST WAS FILED.

MAIL TO

Near North National Title
222 N. LaSalle
Chicago, IL 60601



## Legal Description

of premises commonly known as **7625 S East End. Chicago, IL 60649**

The North 6.00 feet of Lot 36, and all of Lots 37 to 40 in Block 11 in James Stinson's Subdivision of East Grand Crossing in the Southwest quarter of Section 25, Township 38 North, range 15, East of the third principal meridian, in Cook county, Illinois.

PERMANENT TAX NUMBER: **20-25-310-008-0000**

COOK COUNTY
RECORDER OF DEEDS

Prepared by and Mail to:
EquityBuild Finance, LLC
5068 W. Plano Road, #300
Plano, TX 75093

COOK COUNTY
RECORDER OF DEEDS

**EXHIBIT I**

STATE OF ILLINOIS    )
                     ) SS
COUNTY OF COOK       )



Doc# 1811519134 Fee $40.00

RHSP FEE:$9.00 RPRF FEE: $1.00
KAREN A.YARBROUGH
COOK COUNTY RECORDER OF DEEDS
DATE: 04/25/2018 03:13 PM PG: 1 OF 1

## COMMERCIAL REAL ESTATE PROPERTY MANAGER'S CLAIM FOR LIEN

Notice is hereby given that <u>Chicago Real Estate Resources Inc.</u>, Commercial Real Estate Property Manager, located in Chicago, County of Cook, State of Illinois, hereby files a claim for a Property Management lien on the property described as follows:

THE NORTH 6.00 FEET OF LOT 36 AND ALL LOTS 37, 38, 39 AND 40 IN BLOCK 11 IN JAMES STINSON'S SUBDIVISION OF EAST GRAND CROSSING IN THE SOUTHWEST QUARTER OF SECTION 25, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS

Commonly known as:          7625-33 S East End Avenue. Chicago, IL

P.I.N.:                      20-25-310-008-0000

The Owner(s) of said premises is <u>SSDF5 Portfolio 1 LLC</u>. (hereinafter referred to as "owner") of Cook County, Illinois.

The amount of said lien is Fifteen Thousand Seven Hundred and Twenty Two Dollars and Sixty Five cents ($15,722.65).

Real Estate Management Company: Chicago Real Estate Resources Inc.

I, Eric Janssen, being duly sworn on oath, state that I have read this Commercial Real Estate Property Manager's Claim for Lien, and know the contents thereof, and believe the same to be true and accurate to the best of my knowledge.

By: _Kelly Napolitano_          By: _____

Kelly Napolitano                Eric Janssen, President
on April 23rd, 2018             Chicago Real Estate Resources
Notary Public, Cook County, Illinois    932 W. Grace St, Chicago, IL 60613

KELLY NAPOLITANO
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
September 23, 2019

Prepared by Andrew Werner

BM

Licensed to Proprietary Provision by Cook County Recorder of Deeds

**EXHIBIT J**

| First American  Commitment | ALTA Commitment for Title Insurance  ISSUED BY  **First American Title Insurance Company**  File No: 2986622 |
|---|---|

## COMMITMENT FOR TITLE INSURANCE

### Issued By

## *FIRST AMERICAN TITLE INSURANCE COMPANY*

### NOTICE

**IMPORTANT-READ CAREFULLY:** THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES. ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE. THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

### COMMITMENT TO ISSUE POLICY

Subject to the Notice; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and the Commitment Conditions, *First American Title Insurance Company*, a Nebraska Corporation (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment. This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Policy Amount and the name of the Proposed Insured.

If all of the Schedule B, Part I-Requirements have not been met within six months after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

**First American Title Insurance Company**

Dennis J. Gilmore  
President

Jeffrey S. Robinson  
Secretary

**If this jacket was created electronically, it constitutes an original document.**

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 50000317 (4-24-18) | Page 1 of 10 | ALTA Commitment for Title Insurance (8-1-16)  Illinois |
|---|---|---|

**1. DEFINITIONS**
    (a) "Knowledge" or "Known": Actual or imputed knowledge, but not constructive notice imparted by the Public Records.
    (b) "Land": The land described in Schedule A and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.
    (c) "Mortgage": A mortgage, deed of trust, or other security instrument, including one evidenced by electronic means authorized by law.
    (d) "Policy": Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.
    (e) "Proposed Insured": Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.
    (f) "Proposed Policy Amount": Each dollar amount specified in Schedule A as the Proposed Policy Amount of each Policy to be issued pursuant to this Commitment.
    (g) "Public Records": Records established under state statutes at the Commitment Date for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge.
    (h) "Title": The estate or interest described in Schedule A.

**2.** If all of the Schedule B, Part I—Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.

**3.** The Company's liability and obligation is limited by and this Commitment is not valid without:
    (a) the Notice;
    (b) the Commitment to Issue Policy;
    (c) the Commitment Conditions;
    (d) Schedule A;
    (e) Schedule B, Part I—Requirements;
    (f) Schedule B, Part II—Exceptions; and
    (g) a counter-signature by the company or its issuing agent that may be in electronic form.

**4. COMPANY'S RIGHT TO AMEND**
The Company may amend this Commitment at any time. If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5. The Company shall not be liable for any other amendment to this Commitment.

**5. LIMITATIONS OF LIABILITY**
    (a) The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended Commitment, resulting from the Proposed Insured's good faith reliance to:
        (i) comply with the Schedule B, Part I—Requirements;
        (ii) eliminate, with the Company's written consent, any Schedule B, Part II—Exceptions; or
        (iii) acquire the Title or create the Mortgage covered by this Commitment.
    (b) The Company shall not be liable under Commitment Condition 5(a) if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.
    (c) The Company will only have liability under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.
    (d) The Company's liability shall not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and described in Commitment Conditions 5(a)(i) through 5(a)(iii) or the Proposed Policy Amount.
    (e) The Company shall not be liable for the content of the Transaction Identification Data, if any.
    (f) In no event shall the Company be obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I—Requirements have been met to the satisfaction of the Company.
    (g) In any event, the Company's liability is limited by the terms and provisions of the Policy.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

6. **LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT**
   (a) Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.
   (b) Any claim must be based in contract and must be restricted solely to the terms and provisions of this Commitment.
   (c) Until the Policy is issued, this Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.
   (d) The deletion or modification of any Schedule B, Part II—Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.
   (e) Any amendment or endorsement to this Commitment must be in writing and authenticated by a person authorized by the Company.
   (f) When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

7. **IF THIS COMMITMENT HAS BEEN ISSUED BY AN ISSUING AGENT**
   The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies. The issuing agent is not the Company's agent for the purpose of providing closing or settlement services.

8. **PRO-FORMA POLICY**
   The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide. A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

9. **ARBITRATION**
   The Policy contains an arbitration clause. All arbitrable matters when the Proposed Policy Amount is $2,000,000 or less shall be arbitrated at the option of either the Company or the Proposed Insured as the exclusive remedy of the parties. A Proposed Insured may review a copy of the arbitration rules at http://www.alta.org/arbitration.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



| | ALTA Commitment for Title Insurance |
|---|---|
| **Schedule A** | ISSUED BY |
| | **First American Title Insurance Company** |
| | File No: 2986622 |

**Transaction Identification Data for reference only:**

First American Title Insurance Company - Metro Commercial Title e-mail: cmcc.il@firstam.com
Center
27775 Diehl Rd, Warrenville, IL 60555    Escrow e-mail: figures.il@firstam.com
Phone : (866)563-7707    Customer Reference:
Commitment No.: 2986622
Property Address: 7625-33 South East End Avenue, Chicago,
IL 60649
Revision Date:

## SCHEDULE A

1. Commitment Date: July 31, 2019 8:00 AM

2. Policies to be issued:

   (a)    ALTA® Owner's Policy
          Proposed Insured: To Be Determined
          Proposed Policy Amount: $1,000.00

   (b)    ALTA® Loan Policy
          Proposed Insured: To Be Determined, its successors and/or assigns as defined in the
          Conditions of the policy, as their interests may appear.
          Proposed Policy Amount: $1,000.00

3. The estate or interest in the Land described or referred to in this Commitment is

   **Fee simple**

4. The Title is, at the Commitment Date, vested in: SSDF5 Portfolio 1 LLC, an Illinois limited liability
   company

5. The Land is described as follows:
   SEE EXHIBIT A ATTACHED HERETO AND MADE A PART HEREOF

*First American Title Insurance Company*

**By:**    *Patricia E. Weinstein*

    **Authorized Countersignature**

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| | ALTA Commitment for Title Insurance |
|---|---|
| *First American* | ISSUED BY |
| **Schedule BI & BII** | **First American Title Insurance Company** |
| | File No: 2986622 |

Commitment No.: 2986622

## SCHEDULE B, PART I

### Requirements

All of the following Requirements must be met:

1.  The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land. The Company may then make additional Requirements or Exceptions.

2.  Pay the agreed amount for the estate or interest to be insured.

3.  Pay the premiums, fees, and charges for the Policy to the Company.

4.  Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records.

## SCHEDULE B, PART II

### Exceptions

THIS COMMITMENT DOES NOT REPUBLISH ANY COVENANT, CONDITION, RESTRICTION, OR LIMITATION CONTAINED IN ANY DOCUMENT REFERRED TO IN THIS COMMITMENT TO THE EXTENT THAT THE SPECIFIC COVENANT, CONDITION, RESTRICTION, OR LIMITATION VIOLATES STATE OR FEDERAL LAW BASED ON RACE, COLOR, RELIGION, SEX, SEXUAL ORIENTATION, GENDER IDENTITY, HANDICAP, FAMILIAL STATUS, OR NATIONAL ORIGIN.

The Policy will not insure against loss or damage resulting from the terms and provisions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| | ALTA Commitment for Title Insurance |
|---|---|
| First American | ISSUED BY |
| **Schedule BI & BII (Cont.)** | **First American Title Insurance Company** |
| | File No: 2986622 |

Commitment No.: 2986622

### SCHEDULE B, PART II

### Exceptions (Continued)

1. Rights or claims of parties in possession not shown by the public records.

2. Easements or claims of easements, not shown by Public Records.

3. Any encroachments, encumbrance, violation, variation, or adverse circumstance affecting Title that would be disclosed by an accurate survey of the Land pursuant to the "Minimum Standards of Practice," 68 Ill. Admin Code, Sec. 1270.56(b)(6)(P) for residential property or the ALTA/NSPS land title survey standards for commercial/industrial property.

4. Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.

5. Taxes, or special assessments, if any, not shown as existing liens by the Public Records.

6. Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I-Requirements are met.

**NOTE: THE LAND SUBJECT TO THIS COMMITMENT LIES WITHIN THE BOUNDARIES OF COOK COUNTY, KANE COUNTY, PEORIA COUNTY, OR WILL COUNTY ILLINOIS AND IS SUBJECT TO THE PREDATORY LENDING DATABASE PROGRAM (765 ILCS 77/70 ET SEQ) EFFECTIVE JULY 1, 2008 AS TO COOK COUNTY. THE PREDATORY LENDING DATABASE PROGRAM HAS BEEN EXPANDED TO INCLUDE KANE, PEORIA AND WILL COUNTIES AS TO ALL MORTGAGE APPLICATIONS MADE OR TAKEN ON OR AFTER THE EXPANSION INCEPTION DATE OF JULY 1, 2010. VALID CERTIFICATES OF COMPLIANCE OR EXEMPTION ISSUED IN CONFORMITY WITH THE ACT MUST BE OBTAINED AT TIME OF CLOSING IN ORDER TO RECORD ANY MORTGAGE. FOR ADDITIONAL INFORMATION, GO TO WWW.IDFPR.COM, THE DIVISION OF BANKING.**

7. General taxes and assessments for the year 2019 and subsequent years which are not yet due and payable.

   Tax identification no.: 20-25-310-008-0000 (Vol. 263)

**Note for informational purposes 2018 taxes:**

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

1st Installment in the amount of $13,553.86 with a status of PAID. (Due Date March 01, 2019)
2nd Installment in the amount of $13,605.52 with a status of PAID. (Due Date August 01, 2019)

Note: If applicable, an original tax bill must be presented if taxes are to be paid at time of closing.

8.  Trust Deed dated August 13, 1998 and recorded September 16, 1998 as document no. 98827782 in the amount of $1,694,985.00 made by First National Bank of Evergreen Park, as trustee u/t/a dtd 7/16/98 and known as Trust No. 16068 to Chicago Title and Trust Company, Trustee.

    We find no release of record for aforesaid trust deed. Upon the recording of a properly executed release deed of said instrument or upon receipt of a hold harmless letter from the prior title insurance company's underwriter, this exception will be waived or insured over. In lieu thereof, we must be furnished with satisfactory evidence that said indebtedness is paid in full.

    (Affects the land and other property)

9.  Mortgage recorded January 21, 2016 as document 1602156229 made by EquityBuild, Inc. to Brad Lutz and Linda Lutz, as to an undivided 24.78% interest; Asians Investing in Real Estate, LLC, as to and undivided 3.11% interest; Self-Directed IRA Services Inc. FBO David Geldart, as to an undivided 6.69% interest; iPlanGroup Agent for Custodian FBO Lorenzo Jaquias IRA, as to an undivided 3.11% interest; Edge Investments, LLC, as to an undivided 10.97% interest; KKW Investments, LLC, as to an undivided 4.67% interest; Peter P. Nuspl, as to an undivided 13.52% interest; Pittman Gold, LLC, as to an undivided 9.34% interest; Steve Bald, as to an undivided 3.11% interest; iPlanGroup Agent for Custodian FBO Jacqueline Rowe IRA, as to an undivided 12.46% interest; Michael James Guilford and Nancy Richard-Guilford, as to an undivided 5.76% interest; and Knickerbocker, LLC, as to an undivided 2.47% interest, to secure a note in the originally stated principal amount of $1,605,749.00, and to the terms and conditions thereof.

    Note: Purported release recorded as document no. 1727219061 by EquityBuild, Inc. who has no apparent interest in said instrument.

10. Mortgage recorded September 29, 2017 as document 1727219056 made by SSDF5 Portfolio 1 LLC to BC57, LLC, to secure a note in the originally stated principal amount of $5,328,433.43, and to the terms and conditions thereof.

    **Note: We will require that the original recorded mortgage, the note secured thereby, and the release deed be presented at the time of closing.**

    (Affects the land and other property)

11. Assignment of Rents made by SSDF5 Portfolio 1 LLC to BC57, LLC recorded September 29, 2017 as document 1727219057.

    (Affects the land and other property)

12. Financing statement evidencing an indebtedness from SSDF5 Portfolio 1 LLC, debtor, to BC57, LLC, secured party, filed on September 29, 2017 as number 1727219058.

    (Affects the land and other property)

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

LLC to BC57, LLC, to secure a note in the originally stated principal amount of $5,328,433.43, and to
the terms and conditions thereof.

**Note: We will require that the original recorded corrective mortgage, the note secured
thereby, and the release deed be presented at the time of closing.**

(Affects the land and other property)

14.    Corrective Assignment of Rents made by SSDF5 Portfolio 1 LLC to BC57, LLC recorded October 4,
2017 as document 1727715136.

(Affects the land and other property)

15.    City of Chicago Municipal Code violations as disclosed by Recording of Findings, Decision and Order
recorded August 4, 2009 as document 0921605279.

16.    City of Chicago Municipal Code violations as disclosed by Recording of Findings, Decision and Order
recorded August 13, 2009 as document 0922526081.

17.    City of Chicago Municipal Code violations as disclosed by Recording of Findings, Decision and Order
recorded September 21, 2009 as document 0926411090.

18.    Claim for statutory lien in the amount of $3,358.14 plus statutory interest recorded November 9,
2009 as document 0931333113 by City of Chicago Department of Water Management against subject
property.

19.    Claim for property management lien in the amount of $15,722.65 plus interest recorded April 25,
2018 as document 1811519134 by Chicago Real Estate Resources Inc. against subject property.

20.    Proceeding pending in the United States District Court, Northern District of Illinois, Eastern Division,
Case No. 18-CV-5587, by U.S. Securities and Exchange Commission vs. Equitybuild, Inc., et al.

Note: A complete examination of said proceeding has not been made.

Note: We should be furnished a final waiver for possible liens in favor of the receiver, if any,
appointed in said proceedings.

21.    Order appointing receiver, entered August 17, 2018, in the proceedings by the United States District
Court Northern District of Illinois Eastern Division, case no. 18-CV-05587 appointing Kevin V. Duff, of
the firm Rachlis Duff Adler Peel & Kaplan, LLC, as federal equity receiver, authorizing the receiver to
locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all
necessary and reasonable actions to cause the sale or lease of all real property in the Receivership
Estate, either at public or private sale, on terms and in the manner the Receiver deems most
beneficial to the Receivership Estate, and the terms and conditions contained therein.

Note: We should be furnished the order approving this sale.

22.    Terms, powers, provisions and limitations of the Limited Liability Company Operating Agreement
under which title to the land is held.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not
valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part
II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses
are prohibited. Reprinted under license from the American Land Title Association.

23. Evidence that Articles of Organization have been filed with the Secretary of State of Illinois should be furnished for the following Limited Liability Company: SSDF5 Portfolio 1 LLC

24. The Operating Agreement for SSDF5 Portfolio 1 LLC, a Limited Liability Company, together with all amendments thereto, should be furnished and this commitment is subject to such further exceptions, if any, as may then be deemed necessary.

25. We should be furnished evidence that no event of dissolution has occurred for SSDF5 Portfolio 1 LLC, a Limited Liability Company.

26. Any lien, or right to a lien in favor of a property manager employed to manage the land. Note: we should be furnished either (a) an affidavit from the owner indicating that there is no property manager employed; or (b) a final lien waiver from the property manager acting on behalf of the owner.

27. Existing unrecorded leases, if any, and rights of parties in possession under such unrecorded leases.

28. It appears that the land described herein lies within the municipal boundaries of Chicago, please contact the municipality for any requirements which must be complied with prior to closing. The municipal phone number may be found at www.firstam.com/title/il under Products and Resources, then Forms and Documents, then Municipal Transfer Stamp Requirements.

29. Relative to the deletion of Standard Exceptions 1 through 6, we should be furnished the following:

   a) A current survey of the land, properly certified to the Company, made in accordance with (i) the accuracy requirements of a survey pursuant to the 'Minimum Standard Detail Requirements for Land Title Surveys' Jointly Established and Adopted by the American Land Title Association and National Society of Professional Surveyors (NSPS) February 23, 2016; and (ii) the Laws of the State of Illinois.
   b) A properly executed ALTA 2006 Loan and Extended Coverage Statement.

30. Building setback line(s) as shown on the plat of subdivision.
    (Affects the West 20 feet)

31. Note: The Extended Coverage Endorsement, deleting Standard Exceptions 1 through 6, will be considered for approval upon receipt and review of the requirements referenced herein.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

Case: 1:18-cv-05587 Document #: 583-1 Filed: 11/20/19 Page 146 of 250 PageID #:8904

| First American | **ALTA Commitment for Title Insurance** |
| | ISSUED BY |
| **Exhibit A** | **First American Title Insurance Company** |
| | File No: 2986622 |

Commitment File No.: 2986622

The Land referred to herein below is situated in the County of Cook, State of IL, and is described as follows:

The North 6.00 feet of Lot 36, and all of Lots 37 to 40 in Block 11 in James Stinson's Subdivision of East Grand Crossing in the Southwest Quarter of Section 25, Township 38 North, Range 14, East of The Third Principal Meridian, in Cook County, Illinois.

Note: For informational purposes only, the land is known as :

7625-33 South East End Avenue
Chicago, IL 60649

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 50000317 (4-24-18) | Page 10 of 10 | ALTA Commitment for Title Insurance (8-1-16) Illinois |

**EXHIBIT K**

# Illinois Anti-Predatory Lending Database Program

## Certificate of Exemption



Doc#: 1602156231 Fee: $52.00
RHSP Fee:$9.00 RPRF Fee: $1.00
Karen A.Yarbrough
Cook County Recorder of Deeds
Date: 01/21/2016 02:30 PM Pg: 1 of 8

**Report Mortgage Fraud**
**800-532-8785**

The property identified as:      **PIN:** 20-25-310-009-0000

**Address:**
**Street:**          7635 S. East End
**Street line 2:**
**City:** Chicago          **State:** IL          **ZIP Code:** 60649

**Lender:** The Persons Listed on Exhibit A to the Mortgage c/o EquityBuild Finance, LLC

**Borrower:** EquityBuild, Inc

**Loan / Mortgage Amount:** $1,703,649.00

This property is located within the program area and is exempt from the requirements of 765 ILCS 77/70 et seq. because it is not owner-occupied.

**Certificate number:** 928D33C0-C615-4D96-9B22-7240BC0F695A          **Execution date:** 10/29/2015

Mail To:

*Equity Build Finance*
*5068 W. Plano Pkwy, #300*
*Plano, TX 75093*

_____[The Above Space For Recorder's Use Only]_____

## MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on October 29th, 2015. The mortgagor is EquityBuild, Inc. ("Borrower").

This Security Instrument is given to The Persons Listed on <u>Exhibit A</u> to the Mortgage C/O EquityBuild Finance, LLC whose address is 5068 West Plano Pkwy. #300 Plano, TX 75093 ("Lender").

Borrower owes Lender the principal sum of One Million Seven Hundred Three Thousand Six Hundred Forty-Nine and 00/100 Dollars (U.S. $1,703,649.00). This debt is evidenced by Borrower's note dated the same date as this Security Instrument (Mortgage), which provides for a final payment of the full debt, if not paid earlier, due and payable November 1st, 2017. This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extension and modifications; (b) the payment of all other sums, with interest advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in COOK County, Illinois:

PIN: 20-25-310-009-0000

which has the address of 7635 S East End, Chicago, IL 60649 ("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents, royalties, mineral, oil and gas rights and profits, water rights and stock and all fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANT. Borrower and Lender covenant and agree as follows:

1. Payment of Principal and Interest; Prepayment and Late Charges. Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. Hazard Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration and repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 19 the property is acquired by Lender, Borrower's rights to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of sums secured by this Security Instrument immediately prior to the acquisition.

3. Preservation and Maintenance of Property; Leaseholds. Borrower shall not destroy, damage or substantially change the Property, allow the Property to deteriorate or commit waste. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease, and if Borrower acquires fee title to the Property, the leasehold and fee title shall not merge unless Lender agrees to the merger in writing.

4. Protection of Lender's Rights in the Property; Mortgage Insurance. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees, and entering on the Property to make repairs. Although Lender may take action under this paragraph 4, Lender does not have to do so.

5. Successor and Assigns Bound; Joint and Several Liability; Co-signers. The covenants and agreements of this Security Interest shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 9. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey the Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forebear or make any accommodations with regard to the terms of this Security Instrument or the Note without the Borrower's consent.

6. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

7. Governing Law; Severability. This Security Instrument shall be governed by federal law and the law of jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

8. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

9. Transfer of the Property or a beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

10. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

11. Assignment of Rents and Leases. As additional security for the payment of the Indebtedness, Mortgagor assigns and transfers to Mortgagee, pursuant to 1953 PA 210, as amended by 1966 PA 151 (MCLA 554.231 et seq., MSA 26.1137(1) et seq.), all the rents, profits, and income under all leases, occupancy agreements, or arrangements upon or affecting the Premises (including any extensions or amendments) now in existence or coming into existence during the period this Mortgage is in effect. This assignment shall run with the land and be good and valid as against Mortgagor and those claiming under or through Mortgagor. This assignment shall continue to be operative during foreclosure or any other proceedings to enforce this Mortgage. If a foreclosure sale results in a deficiency, this assignment shall stand as security during the redemption period for the payment of the deficiency. This assignment is given only as collateral security and shall not be construed as obligating Mortgagee to perform any of the covenants or undertakings required to be performed by Mortgagor in any leases. In the event of default in any of the terms or covenants of this Mortgage, Mortgagee shall be entitled to all of the rights and benefits of MCLA 554.231-.233, MSA 26.1137(1)-(3), and 1966 PA 151, and Mortgagee shall be entitled to collect the rents and income from the Premises, to rent or lease the Premises on the terms that it may deem best, and to maintain proceedings to recover rents or possession of the Premises from any tenant or trespasser. Mortgagee shall be entitled to enter the Premises for the purpose of delivering notices or other communications to the tenants and occupants. Mortgagee shall have no liability to Mortgagor as a result of those acts. Mortgagee may deliver all of the notices and communications by ordinary first-class U.S. mail. If Mortgagor obstructs Mortgagee in its efforts to collect the rents and income from the Premises or unreasonably refuses or neglects to assist Mortgagee in collecting the rent and income, Mortgagee shall be entitled to appoint a receiver for the Premises and the income, rents, and profits, with powers that the court making the appointment may confer. Mortgagor shall at no time collect advance rent in excess of one month under any lease pertaining to the Premises, and Mortgagee shall not be bound by any rent prepayment made or received in violation of this paragraph. Mortgagee shall not have any obligation to collect rent or to enforce any other obligations of any tenant or occupant of the Premises to Mortgagor. No action taken by Mortgagee under this paragraph shall cause Mortgagee to become a "mortgagee in possession."

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

BORROWER: EquityBuild, Inc.

_____(SEAL)
Jerry Cohen, President

_____ [Space Below This Line For Acknowledgement]_____

STATE OF FLORIDA, Manatee_____ County ss:

     I hereby certify that on this day, before me, an officer duly authorized in the state aforesaid and in the county aforesaid to take acknowledgements, personally appeared Jerry Cohen, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he/she executed the same for the purpose therein expressed.

     WITNESS my hand and official seal in the county and state aforesaid this 29th day of October_____, 2015.

My Commission expires: July 26, 2017

    {Seal}

_Jessica Ann Baier_____
Notary Public

JESSICA ANN BAIER
MY COMMISSION #FF019714
EXPIRES July 26, 2017
(407) 398-0153    FloridaNotaryService.com

**Exhibit A**

| Lender Name | Principal Amount | Percentage of Loan |
|---|---|---|
| Leah Matthews | $72,029 | 4.23% |
| Michael James Guilford and Nancy Richard-Guilford, jointly with right of survivorship | $57,439 | 3.37% |
| iPlanGroup Agent for Custodian FBO Laura Dirnberger IRA | $10,000 | 0.59% |
| Equity Trust Company Custodian FBO Dorothy Marie Baker IRA | $10,000 | 0.59% |
| Paul N. Wilmesmeier | $50,000 | 2.93% |
| Robert Guiney | $18,097 | 1.06% |
| Equity Trust Company Custodian FBO Nagaraja R Rao IRA | $110,000 | 6.46% |
| John E. Bloxham | $50,000 | 2.93% |
| Asians Investing in Real Estate, LLC | $25,000 | 1.47% |
| Tiger Chang Investments, LLC | $25,000 | 1.47% |
| CAMA SDIRA LLC FBO Frank Starosciak IRA | $16,904 | 0.99% |
| Self-Directed IRA Services Inc. FBO James Clements | $20,000 | 1.17% |
| Manoj Donthineni | $43,914 | 2.58% |
| Carolyn Ucker | $25,000 | 1.47% |
| Self-Directed IRA Services Inc. FBO David Geldart | $11,938 | 0.70% |
| QCH Investment Trust | $50,000 | 2.93% |
| Total Return Income Fund, LLC | $520,000 | 30.52% |
| The Income Fund, LLC | $80,000 | 4.70% |
| Umbrella Investment Partners, LLC | $12,883 | 0.76% |
| GRB Properties LLC | $42,029 | 2.47% |
| Jeffry M. Edwards | $50,000 | 2.93% |
| Cecilia Wolff | $25,000 | 1.47% |
| Trey Hopkins | $100,000 | 5.87% |
| iPlanGroup Agent for Custodian FBO Winnie Quick IRA | $11,000 | 0.65% |
| Arthur L and Dinah F Bertrand | $217,448 | 12.76% |
| iPlanGroup Agent for Custodian FBO Timothy J. Goree IRA | $50,000 | 2.93% |

The North 14 feet of Lot 32 and all of Lots 33, 34, 35 and 36 (except the North 6 feet thereof) in Block 11 in James Stinson's Subdivision of East Grand Crossing in the Southwest 1/4 of Section 25, Township 38 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois

**EXHIBIT L**

# RELEASE DEED

CAUTION: Consult a lawyer before using or acting under this form. *Neither the publisher nor the seller of this form makes any warranty with respect thereto, including any warranty of merchantability or fitness for a particular purpose.*



```
Doc# 1727219062 Fee $40.00

RHSP FEE:$9.00 RPRF FEE: $1.00
KAREN A.YARBROUGH
COOK COUNTY RECORDER OF DEEDS
DATE: 09/29/2017 03:48 PM  PG: 1 OF 2
```

Know all men by these presents, that **EQUITYBUILD, INC.** for and in consideration of TEN DOLLARS ($10.00) and for other good and valuable considerations, the receipt of which is hereby confessed, does hereby remise, convey, release and quit-claims unto **EQUITYBUILD FINANCE, LLC** of the County of **COLLIN**, State of **TEXAS**, all rights, title, interest, claim or demand whatsoever he/she may have acquired in, through or by a certain Mortgage bearing the date of **02/21/2014** Recorded in the Recorder's Office of **COOK** County in the State of Illinois, on **10/29/2015** as Document Number **1602156231** , the premises therein described, situated in the County of **COOK** and the State of Illinois as follows, to-wit:

See attached Legal Description

(PIN):      **20-25-310-009-0000**
Commonly Known as:      **7635 S East End, Chicago, IL**

_____ Manager
**EQUITYBUILD FINANCE, LLC**

State of: New York
County of: New York

I, the undersigned, a Notary Public in and for said County in the State aforesaid Do Certify that, Shaun David Cohen , personally known to me have signed and delivered the said instrument as his/her free and voluntary act for the uses and purposes therein set forth.

Given under my hand and Notarial Seal on 9 19 20 17

> JEROME M TAYLOR
> Notary Public, State of New York
> Registration #01TA6328106
> Qualified In New York County
> Commission Expires July 27, 2019

FOR THE PROTECTION OF THE OWNER, THIS RELEASE NEEDS TO BE FILED WITH THE RECORDER OF DEEDS IN WHOSE OFFICE THE MORTGAGE OR DEED OF TRUST WAS FILED.

Licensed to PropertyInfo by Cook County Recorder of Deeds

## Legal Description

of premises commonly known as **7635 S East End. Chicago, IL 60649**

The North 14 feet of Lot 32, and all of Lots 33, 34, 35 and 36 (except the North 6 feet thereof) in Block 11 in James Stinson's Subdivision of East Grand Crossing in the Southwest quarter of Section 25, Township 38 North, range 15, East of the third principal meridian, in Cook county, Illinois.

PERMANENT TAX NUMBER: **20-25-310-009-0000**

COOK COUNTY
RECORDER OF DEEDS

Prepared by and Mail to:
EquityBuild Finance, LLC
5068 W. Plano Road, #300
Plano, TX 75093

COOK COUNTY
RECORDER OF DEEDS

**EXHIBIT M**

STATE OF ILLINOIS      )
                         ) SS
COUNTY OF COOK     )

Doc# 1811519133 Fee $40.00

RHSP FEE:$9.00 RPRF FEE: $1.00
KAREN A.YARBROUGH
COOK COUNTY RECORDER OF DEEDS
DATE: 04/25/2018 03:13 PM  PG:  1 OF 1

## COMMERCIAL REAL ESTATE PROPERTY MANAGER'S CLAIM FOR LIEN

Notice is hereby given that <u>Chicago Real Estate Resources Inc.</u>, Commercial Real Estate Property Manager, located in Chicago, County of Cook, State of Illinois, hereby files a claim for a Property Management lien on the property described as follows:

THE NORTH 14 FEET OF LOT 32 AND ALL OF LOTS 33, 34, 35 AND 36 (EXCEPT THE NORTH 6 FEET THEREOF) BLOCK 11 IN JAMES STINSON'S SUBDIVISION OF EAST GRAND CROSSING IN THE SOUTHWEST ¼ OF SECTION 25, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS

     Commonly known as:          7635-43 S East End Avenue. Chicago, IL

     P.I.N.:                     20-25-310-009-0000

The Owner(s) of said premises is <u>SSDF5 Portfolio 1 LLC.</u> (hereinafter referred to as "owner") of Cook County, Illinois.

The amount of said lien is Six Thousand Seven Hundred and Eighty Eight Dollars and Two cents ($6,788.02).

Real Estate Management Company: Chicago Real Estate Resources Inc.

I, Eric Janssen, being duly sworn on oath, state that I have read this Commercial Real Estate Property Manager's Claim for Lien, and know the contents thereof, and believe the same to be true and accurate to the best of my knowledge.

By: _____
Kelly Napolitano
on April 23rd, 2018
Notary Public, Cook County, Illinois

By: _____
Eric Janssen, President
Chicago Real Estate Resources
932 W. Grace St, Chicago, IL 60613

KELLY NAPOLITANO
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
September 23, 2019

prepared by Andrew Werner

**EXHIBIT N**

STATE OF ILLINOIS ) )
) SS
COUNTY OF COOK )



Doc# 1823945053 Fee $32.00

RHSP FEE:$9.00 RPRF FEE: $1.00
KAREN A.YARBROUGH
COOK COUNTY RECORDER OF DEEDS
DATE: 08/27/2018 02:45 PM PG: 1 OF 1

## Mechanic's Lien

Notice is hereby given that Jan Kobylarczyk of JK Electron Inc., licensed electrician, located in Chicago, County of Cook, State of Illinois, hereby files a claim for a Mechanic's lien for furnished work of improvement upon real property described as follows:

THE NORTH 14 FEET OF LOT 32 AND ALL OF LOTS 33, 34, 35 AND 36 (EXCEPT THE NORTH 6 FEET THEREOF) BLOCK 11 IN JAMES STINSON'S SUBDIVISION OF EAST GRAND CROSSING IN THE SOUTHWEST ¼ OF SECTION 25, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS

Commonly known as: 7635-43 S East End Avenue. Chicago, IL

P.I.N.: 20-25-310-009-0000

The Owner(s) of said premises is SSDF5 Portfolio 1 LLC. (hereinafter referred to as "owner") of Cook County, Illinois.

After deducting all just credits and offsets for claimant's work and material, claimant is due the sum of $13,250.00 together with interest thereon at the rate of 0% annum from 7/24/18.

Claimant performing work at the request of Chicago Real Estate Resources, Inc. (Property Manager)

I, Jan Kobylarczyk, being duly sworn on oath, state that I have read this Mechanic's Claim for Lien, and know the contents thereof, and believe the same to be true and accurate to the best of my knowledge.

By: _____

Richard M. Krzysztofiak
on August 24th, 2018
Notary Public, Cook County, Illinois

By: _____

Jan Kobylarczyk, President
JK Electron, Inc.
7848 W 80th St. Bridgeview, IL 60455

RICHARD M KRZYSZTOFIAK
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
April 29, 2021

CCRD REVIEW

Prepared by Andrew Wamser

**EXHIBIT O**

| First American **Commitment** | **ALTA Commitment for Title Insurance**<br><br>ISSUED BY<br><br>**First American Title Insurance Company**<br><br>File No: 2986630 |
| --- | --- |

## COMMITMENT FOR TITLE INSURANCE

### Issued By

## *FIRST AMERICAN TITLE INSURANCE COMPANY*

### NOTICE

**IMPORTANT-READ CAREFULLY:** THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES. ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE. THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

### COMMITMENT TO ISSUE POLICY

Subject to the Notice; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and the Commitment Conditions, *First American Title Insurance Company*, a Nebraska Corporation (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment. This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Policy Amount and the name of the Proposed Insured.

If all of the Schedule B, Part I-Requirements have not been met within six months after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

**First American Title Insurance Company**

*Dennis J. Gilmore*
Dennis J. Gilmore
President

*Jeffrey S. Robinson*
Jeffrey S. Robinson
Secretary

**If this jacket was created electronically, it constitutes an original document.**

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 50000317 (4-24-18) | Page 1 of 11 | ALTA Commitment for Title Insurance (8-1-16)<br>Illinois |
| --- | --- | --- |

COMMITMENT CONDITIONS

**1. DEFINITIONS**
   (a) "Knowledge" or "Known": Actual or imputed knowledge, but not constructive notice imparted by the Public Records.
   (b) "Land": The land described in Schedule A and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.
   (c) "Mortgage": A mortgage, deed of trust, or other security instrument, including one evidenced by electronic means authorized by law.
   (d) "Policy": Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.
   (e) "Proposed Insured": Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.
   (f) "Proposed Policy Amount": Each dollar amount specified in Schedule A as the Proposed Policy Amount of each Policy to be issued pursuant to this Commitment.
   (g) "Public Records": Records established under state statutes at the Commitment Date for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge.
   (h) "Title": The estate or interest described in Schedule A.

**2.** If all of the Schedule B, Part I—Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.

**3.** The Company's liability and obligation is limited by and this Commitment is not valid without:
   (a) the Notice;
   (b) the Commitment to Issue Policy;
   (c) the Commitment Conditions;
   (d) Schedule A;
   (e) Schedule B, Part I—Requirements;
   (f) Schedule B, Part II—Exceptions; and
   (g) a counter-signature by the company or its issuing agent that may be in electronic form.

**4. COMPANY'S RIGHT TO AMEND**
   The Company may amend this Commitment at any time. If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5. The Company shall not be liable for any other amendment to this Commitment.

**5. LIMITATIONS OF LIABILITY**
   (a) The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended Commitment, resulting from the Proposed Insured's good faith reliance to:
      (i) comply with the Schedule B, Part I—Requirements;
      (ii) eliminate, with the Company's written consent, any Schedule B, Part II—Exceptions; or
      (iii) acquire the Title or create the Mortgage covered by this Commitment.
   (b) The Company shall not be liable under Commitment Condition 5(a) if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.
   (c) The Company will only have liability under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.
   (d) The Company's liability shall not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and described in Commitment Conditions 5(a)(i) through 5(a)(iii) or the Proposed Policy Amount.
   (e) The Company shall not be liable for the content of the Transaction Identification Data, if any.
   (f) In no event shall the Company be obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I—Requirements have been met to the satisfaction of the Company.
   (g) In any event, the Company's liability is limited by the terms and provisions of the Policy.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

**6. LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT**

   (a) Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.

   (b) Any claim must be based in contract and must be restricted solely to the terms and provisions of this Commitment.

   (c) Until the Policy is issued, this Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.

   (d) The deletion or modification of any Schedule B, Part II—Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.

   (e) Any amendment or endorsement to this Commitment must be in writing and authenticated by a person authorized by the Company.

   (f) When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

**7. IF THIS COMMITMENT HAS BEEN ISSUED BY AN ISSUING AGENT**

The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies. The issuing agent is not the Company's agent for the purpose of providing closing or settlement services.

**8. PRO-FORMA POLICY**

The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide. A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

**9. ARBITRATION**

The Policy contains an arbitration clause. All arbitrable matters when the Proposed Policy Amount is $2,000,000 or less shall be arbitrated at the option of either the Company or the Proposed Insured as the exclusive remedy of the parties. A Proposed Insured may review a copy of the arbitration rules at http://www.alta.org/arbitration.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



| | ALTA Commitment for Title Insurance |
|---|---|
| **Schedule A** | ISSUED BY<br><br>**First American Title Insurance Company**<br><br>File No: 2986630 |

**Transaction Identification Data for reference only:**

First American Title Insurance Company - Metro Commercial Title e-mail: cmcc.il@firstam.com
Center
27775 Diehl Rd, Warrenville, IL 60555          Escrow e-mail: figures.il@firstam.com
Phone : (866)563-7707                          Customer Reference:
Commitment No.: 2986630
Property Address: 7635-43 South East End Avenue, Chicago,
IL 60649
Revision Date:

### SCHEDULE A

1.  Commitment Date: July 31, 2019 8:00 AM

2.   Policies to be issued:

    (a)    ALTA® Owner's Policy
           Proposed Insured: To Be Determined
           Proposed Policy Amount: $1,000.00

    (b)    ALTA® Loan Policy
           Proposed Insured: To Be Determined, its successors and/or assigns as defined in the
           Conditions of the policy, as their interests may appear.
           Proposed Policy Amount: $1,000.00

3.  The estate or interest in the Land described or referred to in this Commitment is

    **Fee simple**

4.  The Title is, at the Commitment Date, vested in: SSDF5 Portfolio 1 LLC, an Illinois limited liability
    company

5.  The Land is described as follows:
    SEE EXHIBIT A ATTACHED HERETO AND MADE A PART HEREOF

*First American Title Insurance Company*

By:   *Patricia E. Weinstein*

   **Authorized Countersignature**

---

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

**First American**

# Schedule BI & BII

ALTA Commitment for Title Insurance

ISSUED BY

**First American Title Insurance Company**

File No: 2986630

Commitment No.: 2986630

## SCHEDULE B, PART I

### Requirements

All of the following Requirements must be met:

1. The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land. The Company may then make additional Requirements or Exceptions.

2. Pay the agreed amount for the estate or interest to be insured.

3. Pay the premiums, fees, and charges for the Policy to the Company.

4. Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records.

## SCHEDULE B, PART II

### Exceptions

THIS COMMITMENT DOES NOT REPUBLISH ANY COVENANT, CONDITION, RESTRICTION, OR LIMITATION CONTAINED IN ANY DOCUMENT REFERRED TO IN THIS COMMITMENT TO THE EXTENT THAT THE SPECIFIC COVENANT, CONDITION, RESTRICTION, OR LIMITATION VIOLATES STATE OR FEDERAL LAW BASED ON RACE, COLOR, RELIGION, SEX, SEXUAL ORIENTATION, GENDER IDENTITY, HANDICAP, FAMILIAL STATUS, OR NATIONAL ORIGIN.

The Policy will not insure against loss or damage resulting from the terms and provisions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| First American | ALTA Commitment for Title Insurance |
|---|---|
| **Schedule BI & BII (Cont.)** | ISSUED BY<br>**First American Title Insurance Company**<br>File No: 2986630 |

Commitment No.: 2986630

## SCHEDULE B, PART II

### Exceptions (Continued)

1. Rights or claims of parties in possession not shown by the public records.

2. Easements or claims of easements, not shown by Public Records.

3. Any encroachments, encumbrance, violation, variation, or adverse circumstance affecting Title that would be disclosed by an accurate survey of the Land pursuant to the "Minimum Standards of Practice," 68 Ill. Admin Code, Sec. 1270.56(b)(6)(P) for residential property or the ALTA/NSPS land title survey standards for commercial/industrial property.

4. Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.

5. Taxes, or special assessments, if any, not shown as existing liens by the Public Records.

6. Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I-Requirements are met.

**NOTE: THE LAND SUBJECT TO THIS COMMITMENT LIES WITHIN THE BOUNDARIES OF COOK COUNTY, KANE COUNTY, PEORIA COUNTY, OR WILL COUNTY ILLINOIS AND IS SUBJECT TO THE PREDATORY LENDING DATABASE PROGRAM (765 ILCS 77/70 ET SEQ) EFFECTIVE JULY 1, 2008 AS TO COOK COUNTY. THE PREDATORY LENDING DATABASE PROGRAM HAS BEEN EXPANDED TO INCLUDE KANE, PEORIA AND WILL COUNTIES AS TO ALL MORTGAGE APPLICATIONS MADE OR TAKEN ON OR AFTER THE EXPANSION INCEPTION DATE OF JULY 1, 2010. VALID CERTIFICATES OF COMPLIANCE OR EXEMPTION ISSUED IN CONFORMITY WITH THE ACT MUST BE OBTAINED AT TIME OF CLOSING IN ORDER TO RECORD ANY MORTGAGE. FOR ADDITIONAL INFORMATION, GO TO WWW.IDFPR.COM, THE DIVISION OF BANKING.**

7. General taxes and assessments for the year 2019 and subsequent years which are not yet due and payable.

   Tax identification no.: 20-25-310-009-0000 (Vol. 263)

   **Note for informational purposes 2018 taxes:**

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

1st Installment in the amount of $3,655.15 with a status of PAID. (Due Date March 01, 2019)
2nd Installment in the amount of $10,898.23 with a status of PAID. (Due Date August 01, 2019)

Note: If applicable, an original tax bill must be presented if taxes are to be paid at time of closing.

8. Trust Deed dated August 13, 1998 and recorded September 16, 1998 as document no. 98827782 in the amount of $1,694,985.00 made by First National Bank of Evergreen Park, as trustee u/t/a dtd 7/16/98 and known as Trust No. 16068 to Chicago Title and Trust Company, Trustee.

   (Affects the land and other property)

   We find no release of record for aforesaid trust deed. Upon the recording of a properly executed release deed of said instrument or upon receipt of a hold harmless letter from the prior title insurance company's underwriter, this exception will be waived or insured over. In lieu thereof, we must be furnished with satisfactory evidence that said indebtedness is paid in full.

9. Mortgage recorded January 21, 2016 as document 1602156231 made by EquityBuild, Inc. to Leah Matthews, as to an undivided 4.23% interest, Michael James Guilford and Nancy Richard-Guilford, as to an undivided 3.37% interest, iPlanGroup Agent for Custodian FBO Laura Dirnberger IRA, as to an undivided 0.59% interest, Equity Trust Company Custodian FBO Dorothy Marie Baker IRA, as to an undivided 0.59% interest, Paul N. Wilmesmeier, as to an undivided 2.93% interest, Robert Guiney, as to an undivided 1.06% interest, Equity Trust Company Custodian FBO Nagaraja R Rao IRA, as to an undivided 6.46% interest, John E. Bloxham, as to an undivided 2.93% interest, Asians Investing in Real Estate, LLC, as to an undivided 1.47% interest, Tiger Chang Investments, LLC, as to an undivided 1.47% interest, CAMA SDIRA LLC FBO Frank Starosciak IRA, as to an undivided 0.99% interest, Self-Directed IRA Services Inc. FBO James Clements, as to an undivided 1.17% interest, Manoj Donthineni, as to an undivided 2.58% interest, Carolyn Ucker, as to an undivided 1.47% interest, Self-Directed IRA Services Inc. FBO David Geldart, as to an undivided 0.70% interest, QCH Investment Trust, as to an undivided 2.93% interest, Total Return Income Fund, LLC, as to an undivided 30.52% interest, The Income Fund, LLC, as to an undivided 4.70% interest, Umbrella Investment Partners, LLC, as to an undivided 0.76% interest, GRB Properties LLC, as to an undivided 2.47% interest, Jeffry M. Edwards, as to an undivided 2.93% interest, Cecilia Wolff, as to an undivided 1.47% interest, Trey Hopkins, as to an undivided 5.87% interest, iPlanGroup Agent for Custodian FBO Winnie Quick IRA, as to an undivided 0.65% interest, Arthur L. Bertrand and Dinah F. Bertrand, as to an undivided 12.76% interest, iPlanGroup Agent for Custodian FBO Timothy J. Goree IRA, as to an undivided 2.93% interest, to secure a note in the originally stated principal amount of $1,703,649.00, and to the terms and conditions thereof.

   Note: Purported release recorded as document no. 1727219062 by EquityBuild, Inc. who has no apparent interest in said instrument.

10. Mortgage recorded September 29, 2017 as document 1727219056 made by SSDF5 Portfolio 1 LLC to BC57, LLC, to secure a note in the originally stated principal amount of $5,328,433.43, and to the terms and conditions thereof.

    (Affects the land and other property)

    **Note: We will require that the original recorded mortgage, the note secured thereby, and the release deed be presented at the time of closing.**

11. Assignment of Rents made by SSDF5 Portfolio 1 LLC to BC57, LLC recorded September 29, 2017 as document 1727219057.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

(Affects the land and other property)

12.   Financing statement evidencing an indebtedness from SSDF5 Portfolio 1 LLC, debtor, to BC57, LLC, secured party, filed on September 29, 2017 as number 1727219058.

(Affects the land and other property)

13.   Corrective Mortgage recorded October 04, 2017 as document 1727715135 made by SSDF5 Portfolio 1 LLC to BC57, LLC, to secure a note in the originally stated principal amount of $5,328,433.43, and to the terms and conditions thereof.

(Affects the land and other property)

**Note: We will require that the original recorded mortgage, the note secured thereby, and the release deed be presented at the time of closing.**

14.   Corrective Assignment of Rents made by SSDF5 Portfolio 1 LLC to BC57, LLC recorded October 04, 2017 as document 1727715136.

(Affects the land and other property)

15.   Claim for statutory lien in the amount of $3,289.96, plus statutory interest recorded November 09, 2009 as document 0931333079 by City of Chicago Department of Water Management against subject property.

16.   Claim for property management lien in the amount of $6,788.02, plus interest recorded April 25, 2018 as document 1811519133 by Chicago Real Estate Resources, Inc. against subject property.

17.   Claim for mechanic's lien in the amount of $13,250.00, plus interest  recorded August 27, 2018 as document 1823945053 by JK Electron Inc. against subject property.

18.   City of Chicago Municipal Code violations as disclosed by Recording of Findings, Decision and Order recorded August 17, 2011 as document 1122933215.

19.   Proceeding pending in the United States District Court, Northern District of Illinois, Eastern Division, Case No. 18-CV-5587, by U.S. Securities and Exchange Commission vs. Equitybuild, Inc., et al.

Note: A complete examination of said proceeding has not been made.

Note: We should be furnished a final waiver for possible liens in favor of the receiver, if any, appointed in said proceedings.

20.   Order appointing receiver, entered August 17, 2018, in the proceedings by the United States District Court Northern District of Illinois Eastern Division, case no. 18-CV-05587 appointing Kevin V. Duff, of the firm Rachlis Duff Adler Peel & Kaplan, LLC, as federal equity receiver, authorizing the receiver to locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership Estate, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and the terms and conditions contained therein.

Note: We should be furnished the order approving this sale.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

21. Terms, powers, provisions and limitations of the Limited Liability Company Operating Agreement under which title to the land is held.

22. Evidence that Articles of Organization have been filed with the Secretary of State of Illinois should be furnished for the following Limited Liability Company: SSDF5 Portfolio 1 LLC

23. The Operating Agreement for SSDF5 Portfolio 1 LLC, a Limited Liability Company, together with all amendments thereto, should be furnished and this commitment is subject to such further exceptions, if any, as may then be deemed necessary.

24. We should be furnished evidence that no event of dissolution has occurred for SSDF5 Portfolio 1 LLC, a Limited Liability Company.

25. Upon a conveyance or mortgage of the land, a certified copy of proper resolutions passed by the authorized representative(s) of EquityBuild, Inc. authorizing the execution of the deed of conveyance or mortgage should be furnished.

26. We should be furnished with a certificate of Good Standing from the Florida Secretary of State for EquityBuild, Inc., a Corporation of Florida.

27. The proof of authority of EquityBuild, Inc. to do business in Illinois should be produced, and in default thereof, our owner's policy will contain the following exception: consequences, if any, which may result because of the failure of the party in title to the estate or interest in the land described in Schedule A to comply with the applicable 'doing business' laws of the State of Illinois.

28. Any lien, or right to a lien in favor of a property manager employed to manage the land. Note: we should be furnished either (a) an affidavit from the owner indicating that there is no property manager employed; or (b) a final lien waiver from the property manager acting on behalf of the owner.

29. Existing unrecorded leases, if any, and rights of parties in possession under such unrecorded leases.

30. Satisfactory evidence should be furnished of the payment in full of the cost of furnishing services, labor and materials in connection with any rehab or new construction improvements made on the land within two years of the date of this commitment. This evidence should consist of sworn contractors' and subcontractors' affidavits together with all necessary waivers of lien.
   By reason of: Recorded mechanics lien claim

   Note: Waivers must be submitted to our office at least 24 hours prior to closing for review. No waivers will be examined at the time of closing.

   For clearance regarding new construction on this file, please contact the Construction Escrow Department.

31. It appears that the land described herein lies within the municipal boundaries of Chicago, please contact the municipality for any requirements which must be complied with prior to closing. The municipal phone number may be found at www.firstam.com/title/il under Products and Resources, then Forms and Documents, then Municipal Transfer Stamp Requirements.

32. Relative to the deletion of Standard Exceptions 1 through 6, we should be furnished the following:

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

a) A current survey of the land, properly certified to the Company, made in accordance with (i) the accuracy requirements of a survey pursuant to the 'Minimum Standard Detail Requirements for Land Title Surveys' Jointly Established and Adopted by the American Land Title Association and National Society of Professional Surveyors (NSPS) February 23, 2016; and (ii) the Laws of the State of Illinois.

b) A properly executed ALTA 2006 Loan and Extended Coverage Statement.

33.    Building setback line(s) as shown on the plat of subdivision.
(Affects the West 20 feet)

34.    Note: The Extended Coverage Endorsement, deleting Standard Exceptions 1 through 6, will be considered for approval upon receipt and review of the requirements referenced herein.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| First American | **ALTA Commitment for Title Insurance** |
|---|---|
| **Exhibit A** | ISSUED BY<br><br>**First American Title Insurance Company**<br><br>File No: 2986630 |

Commitment File No.: 2986630

The Land referred to herein below is situated in the County of Cook, State of IL, and is described as follows:

The North 14 feet of Lot 32 and all of Lots 33, 34, 35 and 36 (except the North 6 feet thereof) Block 11 in James Stinson's Subdivision of East Grand Crossing in the Southwest Quarter of Section 25, Township 38 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois.

Note: For informational purposes only, the land is known as :

7635-43 South East End Avenue
Chicago, IL 60649

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 50000317 (4-24-18) | Page 11 of 11 | ALTA Commitment for Title Insurance (8-1-16)<br>Illinois |
|---|---|---|

**EXHIBIT P**

# Illinois Anti-Predatory Lending Database Program

## Certificate of Exemption



Doc#: 1501656187 Fee: $52.00
RHSP Fee:$9.00 RPRF Fee: $1.00
Karen A. Yarbrough
Cook County Recorder of Deeds
Date: 01/16/2015 03:13 PM Pg: 1 of 8

**Report Mortgage Fraud**
**800-532-8785**

---

The property identified as: **PIN:** 21-30-400-034-0000

**Address:**
**Street:** 7752 S. Muskegon Ave
**Street line 2:**
**City:** Chicago          **State:** IL          **ZIP Code:** 60649

**Lender:** The Persons Listed on Exhibit A to the Mortgage c/o Hard Money Company LLC

**Borrower:** EquityBuild, Inc.

**Loan / Mortgage Amount:** $2,250,000.00

This property is located within the program area and is exempt from the requirements of 765 ILCS 77/70 et seq. because it is not owner-occupied.

**Certificate number:** 940EBDCA-8054-464E-A6F5-68282BAAC141          **Execution date:** 12/30/2014

PTS 1328647
Mail To: Hard Money Company
5068 W. Plano Pkwy
Ste. 300
Plano, TX 75093 [The Above Space For Recorder's Use Only]_____

## MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on December 30th, 2014. The mortgagor is EquityBuild, Inc. ("Borrower").

This Security Instrument is given to The Persons Listed on Exhibit A to the Mortgage C/O Hard Money Company, LLC whose address is 5068 West Plano Pkwy. #300 Plano, TX 75093 ("Lender").

Borrower owes Lender the principal sum of Two Million Two Hundred Fifty Thousand and 00/100 Dollars (U.S. $2,250,000.00). This debt is evidenced by Borrower's note dated the same date as this Security Instrument, which provides for a final payment of the full debt, if not paid earlier, due and payable January 1st, 2017. This Security Instrument secures to Lender:
(a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extension and modifications; (b) the payment of all other sums, with interest advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in COOK County, Illinois:

PIN: 21-30-400-034-0000

which has the address of 7752 S Muskegon Ave. Chicago, IL 60649 ("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents, royalties, mineral, oil and gas rights and profits, water rights and stock and all fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANT. Borrower and Lender covenant and agree as follows:

1. Payment of Principal and Interest; Prepayment and Late Charges. Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. Hazard Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration and repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 19 the property is acquired by Lender, Borrower's rights to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of sums secured by this Security Instrument immediately prior to the acquisition.

3. Preservation and Maintenance of Property; Leaseholds. Borrower shall not destroy, damage or substantially change the Property, allow the Property to deteriorate or commit waste. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease, and if Borrower acquires fee title to the Property, the leasehold and fee title shall not merge unless Lender agrees to the merger in writing.

4. Protection of Lender's Rights in the Property; Mortgage Insurance. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees, and entering on the Property to make repairs. Although Lender may take action under this paragraph 4, Lender does not have to do so.

5. Successor and Assigns Bound; Joint and Several Liability; Co-signers. The covenants and agreements of this Security Interest shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 9. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey the Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forebear or make any accommodations with regard to the terms of this Security Instrument or the Note without the Borrower's consent.

6. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

7. Governing Law; Severability. This Security Instrument shall be governed by federal law and the law of jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

8. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

9. Transfer of the Property or a beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

10. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

11. Assignment of Rents and Leases. As additional security for the payment of the Indebtedness, Mortgagor assigns and transfers to Mortgagee, pursuant to 1953 PA 210, as amended by 1966 PA 151 (MCLA 554.231 et seq., MSA 26.1137(1) et seq.), all the rents, profits, and income under all leases, occupancy agreements, or arrangements upon or affecting the Premises (including any extensions or amendments) now in existence or coming into existence during the period this Mortgage is in effect. This assignment shall run with the land and be good and valid as against Mortgagor and those claiming under or through Mortgagor. This assignment shall continue to be operative during foreclosure or any other proceedings to enforce this Mortgage. If a foreclosure sale results in a deficiency, this assignment shall stand as security during the redemption period for the payment of the deficiency. This assignment is given only as collateral security and shall not be construed as obligating Mortgagee to perform any of the covenants or undertakings required to be performed by Mortgagor in any leases.In the event of default in any of the terms or covenants of this Mortgage, Mortgagee shall be entitled to all of the rights and benefits of MCLA 554.231-.233, MSA 26.1137(1)-(3), and 1966 PA 151, and Mortgagee shall be entitled to collect the rents and income from the Premises, to rent or lease the Premises on the terms that it may deem best, and to maintain proceedings to recover rents or possession of the Premises from any tenant or trespasser.Mortgagee shall be entitled to enter the Premises for the purpose of delivering notices or other communications to the tenants and occupants. Mortgagee shall have no liability to Mortgagor as a result of those acts. Mortgagee may deliver all of the notices and communications by ordinary first-class U.S. mail.If Mortgagor obstructs Mortgagee in its efforts to collect the rents and income from the Premises or unreasonably refuses or neglects to assist Mortgagee in collecting the rent and income, Mortgagee shall be entitled to appoint a receiver for the Premises and the income, rents, and profits, with powers that the court making the appointment may confer. Mortgagor shall at no time collect advance rent in excess of one month under any lease pertaining to the Premises, and Mortgagee shall not be bound by any rent prepayment made or received in violation of this paragraph. Mortgagee shall not have any obligation to collect rent or to enforce any other obligations of any tenant or occupant of the Premises to Mortgagor. No action taken by Mortgagee under this paragraph shall cause Mortgagee to become a "mortgagee in possession."

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____ (SEAL)
Jerry Cohen, BORROWER

_____[Space Below This Line For Acknowledgement]_____

STATE OF FLORIDA, _Lee_____ County ss:

I hereby certify that on this day, before me, an officer duly authorized in the state aforesaid and  in the county aforesaid to take acknowledgements, personally appeared <u>Jerry Cohen</u>, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he/she executed the same for the purpose therein expressed.

WITNESS my hand and official seal in the county and state aforesaid this 22 day of December, 2014.

My Commission expires:

{Seal}

Notary Public

JESSICA ANN BAIER
MY COMMISSION #FF019714
EXPIRES July 26, 2017
(407) 398-0153    FloridaNotaryService.com

**Exhibit A**

| Lender Name | Principal Amount | Percentage of Loan |
|---|---|---|
| Equity Trust Company Custodian FBO Henry D. Gallucci beneficiary of DCD Victoria E. Gallucci IRA 2.67% Undivided interest | $60,000 | 2.67% undivided interest |
| Equity Trust Company Custodian FBO Gavin Maher CESA | $15,000 | 0.67% undivided interest |
| Equity Trust Company Custodian FBO Travis Maher CESA | $10,000 | 0.44% undivided interest |
| Equity Trust Company Custodian FBO Avery Maher CESA | $11,000 | 0.49% undivided interest |

**EXHIBIT A**

Commitment Number:   1328647

LOT 132 IN DIVISION 2 IN WESTALL SUBDIVISION OF 208 ACRES BEING THE EAST 1/2 OF THE
SOUTHWEST 1/4 AND THE SOUTH EAST FRACTIONAL 1/4 OF SECTION 30 TOWNSHIP 39 NORTH
RANGE 15 EAST OF THE THIRD PRINCIPAL MERIDIAN IN COOK COUNTY, ILLINOIS

21-30-400-034-0000
7752 S. MUSKEGON AVE. CHICAGO IL

PRIMARY TITLE SERVICES, LLC
8833 GROSS POINT ROAD #205 - SKOKIE, IL 60077-1859
(P) 847-677-8833 (F) 847-673-8833
A Policy Issuing Agent for
FIRST AMERICAN TITLE INSURANCE COMPANY

Commitment
Exhibit A                                                                                    (1328647.PFD/1328647/18)

**EXHIBIT Q**

# RELEASE DEED

CAUTION: Consult a lawyer before using or acting under this form. *Neither the publisher nor the seller of this form makes any warranty with respect thereto, including any warranty of merchantability or fitness for a particular purpose.*



Doc# 1727219060 Fee $40.00

RHSP FEE:$9.00 RPRF FEE: $1.00

KAREN A.YARBROUGH

COOK COUNTY RECORDER OF DEEDS

DATE: 09/29/2017 03:47 PM PG: 1 OF 2

Know all men by these presents, that **EQUITYBUILD, INC.** for and in consideration of TEN DOLLARS ($10.00) and for other good and valuable considerations, the receipt of which is hereby confessed, does hereby remise, convey, release and quit-claims unto **EQUITYBUILD FINANCE, LLC** of the County of **COLLIN**, State of **TEXAS**, all rights, title, interest, claim or demand whatsoever he/she may have acquired in, through or by a certain Mortgage bearing the date of **12/30/2014** Recorded in the Recorder's Office of **COOK** County in the State of Illinois, on **01/16/2015** as Document Number **1501656187** , the premises therein described, situated in the County of **COOK** and the State of Illinois as follows, to-wit:

See attached Legal Description

(PIN):  **21-30-400-034-0000**

Commonly Known as:  **7752 S Muskegon Avenue, Chicago, IL**

_____ Manager _____

**EQUITYBUILD FINANCE, LLC**

State of: New York

County of: New York

I, the undersigned, a Notary Public in and for said County in the State aforesaid Do Certify that, Shaun David Cohen , personally known to me have signed and delivered the said instrument as his/her free and voluntary act for the uses and purposes therein set forth.

Given under my hand and Notarial Seal on 9/18 20 17

JEROME M TAYLOR
Notary Public, State of New York
Registration #01TA6328106
Qualified In New York County
Commission Expires July 27, 2019

FOR THE PROTECTION OF THE OWNER, THIS RELEASE NEEDS TO BE FILED WITH THE RECORDER OF DEEDS IN WHOSE OFFICE THE MORTGAGE OR DEED OF TRUST WAS FILED.

MAIL TO:

Near North National Title
222 N. LaSalle
Chicago, IL 60601

# Legal Description

of premises commonly known as **7752 S Muskegon Ave. Chicago, IL 60649**

Lot 132 in Division 2 in Westall Subdivision of 208 Acres being the East 1/2 of the Southwest 1/4 and the Southeast Fractional 1/4 of Section 30, Township 38 North, range 15, East of the third principal meridian, in Cook county, Illinois.

PERMANENT TAX NUMBER: **21-30-400-034-0000**

COOK COUNTY
RECORDER OF DEEDS

Prepared by and Mail to:
EquityBuild Finance, LLC
5068 W. Plano Road, #300
Plano, TX 75093

COOK COUNTY
RECORDER OF DEEDS

**EXHIBIT R**

| First American  *First American*  **Commitment** | ALTA Commitment for Title Insurance  ISSUED BY  **First American Title Insurance Company**  File No: 2986636 |
|---|---|

## COMMITMENT FOR TITLE INSURANCE

### Issued By

### *FIRST AMERICAN TITLE INSURANCE COMPANY*

### NOTICE

**IMPORTANT-READ CAREFULLY:** THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES. ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE. THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

### COMMITMENT TO ISSUE POLICY

Subject to the Notice; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and the Commitment Conditions, ***First American Title Insurance Company***, a Nebraska Corporation (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment. This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Policy Amount and the name of the Proposed Insured.

If all of the Schedule B, Part I-Requirements have not been met within six months after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

**First American Title Insurance Company**

*[signature]*

Dennis J. Gilmore
President

*[signature]*

Jeffrey S. Robinson
Secretary

**If this jacket was created electronically, it constitutes an original document.**

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 50000317 (4-24-18) | Page 1 of 11 | ALTA Commitment for Title Insurance (8-1-16)  Illinois |
|---|---|---|

**COMMITMENT CONDITIONS**

**1. DEFINITIONS**
   (a) "Knowledge" or "Known": Actual or imputed knowledge, but not constructive notice imparted by the Public Records.
   (b) "Land": The land described in Schedule A and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.
   (c) "Mortgage": A mortgage, deed of trust, or other security instrument, including one evidenced by electronic means authorized by law.
   (d) "Policy": Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.
   (e) "Proposed Insured": Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.
   (f) "Proposed Policy Amount": Each dollar amount specified in Schedule A as the Proposed Policy Amount of each Policy to be issued pursuant to this Commitment.
   (g) "Public Records": Records established under state statutes at the Commitment Date for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge.
   (h) "Title": The estate or interest described in Schedule A.

**2.** If all of the Schedule B, Part I—Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.

**3.** The Company's liability and obligation is limited by and this Commitment is not valid without:
   (a) the Notice;
   (b) the Commitment to Issue Policy;
   (c) the Commitment Conditions;
   (d) Schedule A;
   (e) Schedule B, Part I—Requirements;
   (f) Schedule B, Part II—Exceptions; and
   (g) a counter-signature by the company or its issuing agent that may be in electronic form.

**4. COMPANY'S RIGHT TO AMEND**
The Company may amend this Commitment at any time. If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5. The Company shall not be liable for any other amendment to this Commitment.

**5. LIMITATIONS OF LIABILITY**
   (a) The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended Commitment, resulting from the Proposed Insured's good faith reliance to:
      (i) comply with the Schedule B, Part I—Requirements;
      (ii) eliminate, with the Company's written consent, any Schedule B, Part II—Exceptions; or
      (iii) acquire the Title or create the Mortgage covered by this Commitment.
   (b) The Company shall not be liable under Commitment Condition 5(a) if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.
   (c) The Company will only have liability under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.
   (d) The Company's liability shall not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and described in Commitment Conditions 5(a)(i) through 5(a)(iii) or the Proposed Policy Amount.
   (e) The Company shall not be liable for the content of the Transaction Identification Data, if any.
   (f) In no event shall the Company be obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I—Requirements have been met to the satisfaction of the Company.
   (g) In any event, the Company's liability is limited by the terms and provisions of the Policy.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

6. **LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT**

(a) Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.

(b) Any claim must be based in contract and must be restricted solely to the terms and provisions of this Commitment.

(c) Until the Policy is issued, this Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.

(d) The deletion or modification of any Schedule B, Part II—Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.

(e) Any amendment or endorsement to this Commitment must be in writing and authenticated by a person authorized by the Company.

(f) When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

7. **IF THIS COMMITMENT HAS BEEN ISSUED BY AN ISSUING AGENT**

The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies. The issuing agent is not the Company's agent for the purpose of providing closing or settlement services.

8. **PRO-FORMA POLICY**

The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide. A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

9. **ARBITRATION**

The Policy contains an arbitration clause. All arbitrable matters when the Proposed Policy Amount is $2,000,000 or less shall be arbitrated at the option of either the Company or the Proposed Insured as the exclusive remedy of the parties. A Proposed Insured may review a copy of the arbitration rules at http://www.alta.org/arbitration.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

Case: 1:18-cv-05587 Document #: 583-1 Filed: 11/20/19 Page 191 of 250 PageID #:8904



| | **ALTA Commitment for Title Insurance** |
|---|---|
| **First American** | ISSUED BY |
| **Schedule A** | **First American Title Insurance Company** |
| | File No: 2986636 |

**Transaction Identification Data for reference only:**

First American Title Insurance Company - Metro Commercial Title e-mail: cmcc.il@firstam.com
Center
27775 Diehl Rd, Warrenville, IL 60555          Escrow e-mail: figures.il@firstam.com
Phone : (866)563-7707                          Customer Reference:
Commitment No.: 2986636
Property Address: 7750-58 S Muskegon Avenue, Chicago, IL
60649
Revision Date:

## SCHEDULE A

1.  Commitment Date: August 05, 2019 8:00 AM

2.  Policies to be issued:

    (a)   ALTA® Owner's Policy
          Proposed Insured: To Be Determined
          Proposed Policy Amount: $1,000.00

    (b)   ALTA® Loan Policy
          Proposed Insured: Lender To Be Determined, its successors and/or assigns as defined in the
          Conditions of the policy, as their interests may appear.
          Proposed Policy Amount: $1,000.00

3.  The estate or interest in the Land described or referred to in this Commitment is

    **Fee Simple**

4.  The Title is, at the Commitment Date, vested in: SSDF5 Portfolio 1 LLC, an Illinois limited liability
    company

5.  The Land is described as follows:
    SEE EXHIBIT A ATTACHED HERETO AND MADE A PART HEREOF

*First American Title Insurance Company*

**By:** *Patricia E. Weinstein*

**Authorized Countersignature**

---

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| | ALTA Commitment for Title Insurance |
|---|---|
| First American **Schedule BI & BII** | ISSUED BY **First American Title Insurance Company** File No: 2986636 |

Commitment No.: 2986636

## SCHEDULE B, PART I

### Requirements

All of the following Requirements must be met:

1.  The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land. The Company may then make additional Requirements or Exceptions.

2.  Pay the agreed amount for the estate or interest to be insured.

3.  Pay the premiums, fees, and charges for the Policy to the Company.

4.  Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records.

## SCHEDULE B, PART II

### Exceptions

THIS COMMITMENT DOES NOT REPUBLISH ANY COVENANT, CONDITION, RESTRICTION, OR LIMITATION CONTAINED IN ANY DOCUMENT REFERRED TO IN THIS COMMITMENT TO THE EXTENT THAT THE SPECIFIC COVENANT, CONDITION, RESTRICTION, OR LIMITATION VIOLATES STATE OR FEDERAL LAW BASED ON RACE, COLOR, RELIGION, SEX, SEXUAL ORIENTATION, GENDER IDENTITY, HANDICAP, FAMILIAL STATUS, OR NATIONAL ORIGIN.

The Policy will not insure against loss or damage resulting from the terms and provisions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| | |
|---|---|
| **First American** **Schedule BI & BII (Cont.)** | ALTA Commitment for Title Insurance ISSUED BY **First American Title Insurance Company** File No: 2986636 |

Commitment No.: 2986636

## SCHEDULE B, PART II

### Exceptions (Continued)

1. Rights or claims of parties in possession not shown by the public records.

2. Easements or claims of easements, not shown by Public Records.

3. Any encroachments, encumbrance, violation, variation, or adverse circumstance affecting Title that would be disclosed by an accurate survey of the Land pursuant to the "Minimum Standards of Practice," 68 Ill. Admin Code, Sec. 1270.56(b)(6)(P) for residential property or the ALTA/NSPS land title survey standards for commercial/industrial property.

4. Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.

5. Taxes, or special assessments, if any, not shown as existing liens by the Public Records.

6. Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I-Requirements are met.

**NOTE: THE LAND SUBJECT TO THIS COMMITMENT LIES WITHIN THE BOUNDARIES OF COOK COUNTY, KANE COUNTY, PEORIA COUNTY, OR WILL COUNTY ILLINOIS AND IS SUBJECT TO THE PREDATORY LENDING DATABASE PROGRAM (765 ILCS 77/70 ET SEQ) EFFECTIVE JULY 1, 2008 AS TO COOK COUNTY. THE PREDATORY LENDING DATABASE PROGRAM HAS BEEN EXPANDED TO INCLUDE KANE, PEORIA AND WILL COUNTIES AS TO ALL MORTGAGE APPLICATIONS MADE OR TAKEN ON OR AFTER THE EXPANSION INCEPTION DATE OF JULY 1, 2010. VALID CERTIFICATES OF COMPLIANCE OR EXEMPTION ISSUED IN CONFORMITY WITH THE ACT MUST BE OBTAINED AT TIME OF CLOSING IN ORDER TO RECORD ANY MORTGAGE. FOR ADDITIONAL INFORMATION, GO TO WWW.IDFPR.COM, THE DIVISION OF BANKING.**

7. General taxes and assessments for the year 2018, 2019 and subsequent years which are not yet due and payable.

   Tax identification no.: 21-30-400-034-0000 (Vol. 275)

   **Note for informational purposes 2018 taxes:**

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

1st Installment in the amount of $7,922.26 with a status of DELINQUENT. (Due Date 03/01/2019)
2nd Installment in the amount of $13,442.25 with a status of DELINQUENT. (Due Date 08/01/2019 )

Note: If applicable, an original tax bill must be presented if taxes are to be paid at time of closing.

8.  Mortgage recorded May 6, 2003 as document no. 0312603067 made by Chicago Title Land Trust Company, as trustee under Trust Agreement dated October 16, 1986, and known as Trust No. 1089134 to Charter One Bank, N.A., to secure a note in the originally stated principal amount of $3,000,000.00, and to the terms and conditions thereof.

We find no release of record for aforesaid mortgage. Upon the recording of a properly executed release deed of said instrument or upon receipt of a hold harmless letter from the prior title insurance company's underwriter, this exception will be waived or insured over. In lieu thereof, we must be furnished with satisfactory evidence that said indebtedness is paid in full.

9.  Assignment of Rents made by Chicago Title Land Trust Company, as trustee under Trust Agreement dated October 16, 1986 and known as Trust No. 1089134, and Mack Parham and Mary Parham to Charter One Bank, N.A. recorded May 6, 2003 as document no. 0312803068.

10. Mortgage recorded January 16, 2015 as document no. 1501656187, and re-recorded as document no. 1504856045 made by EquityBuild, Inc. to Mark E. Young, as to an undivided 4.44% interest; The Kingdom Trust Company, Custodian, FBO Louis Duane Velez, Account #7422686172, as to an undivided 4.44% interest; The Edward Falkowitz Living Trust, as to an undivided 4.93% interest; TFG Retirement Trust, as to an undivided 2.04% interest; Paul Wilmesmeier, as to an undivided 2.22% interest; Terry L. Merrill & Sheryl R. Merrill, as to an undivided 2.22% interest; Walter Akita, as to an undivided 2.22% interest; Alton P. Motes Trust UTA 12-15-11, as to an undivided 1.91% interest; American Estate & Trust LC FBO Robert Mennella, as to an undivided 2.22% interest; Steven and Linda Lipshultz, as to an undivided 4.44% interest; Mark Mouty, as to an undivided 2.22% interest; The Income Fund, LLC, as to an undivided 6.67% interest; Quest IRA, Inc. FBO Francis Webb IRA #1437711, as to an undivided 2.22% interest; Penny Adams, as to an undivided 3.33% interest; Daniel J Martineau, as to an undivided 4.44% interest; Equity Trust Company Custodian FBO Henry D. Gallucci beneficiary of DCD Victoria E. Gallucci IRA, as to an undivided 2.67% interest; Equity Trust Company Custodian FBO Gavin Maher CESA, as to an undivided 0.67% interest; Equity Trust Company Custodian FBO Travis Maher CESA, as to an undivided 0.44% interest; Equity Trust Company Custodian FBO Avery Maher CESA, as to an undivided 0.49% interest; Christopher Maher, as to an undivided 0.62% interest; Christopher Wilson and Brittny Niosi, as to an undivided 2.22% interest; Self Directed IRA Services, Inc., Custodian FBO Ping Liu IRA, as to an undivided 2.22% interest; Scott E. Pammer, as to an undivided 3.11% interest; Jeremy Hemphill, as to an undivided 2.22% interest; The Celia Tong Revocable Living Trust, dated December 22, 2011, as to an undivided 1.11% interest; iPlanGroup Agent for Custodian FBO Ed Bancroft IRA, as to an undivided 0.89% interest; Donald J and April L. Wegrzyn, as to an undivided 2.22% interest; Fraser Realty Investments, LLC, as to an undivided 4.44% interest; Hillside Fund, LLC, as to an undivided 5.55% interest; Matthew T. Boyd, as to an undivided 2.22% interest; H Derrick, LLC, as to an undivided 4.44% interest; Arthur L and Dinah F Bertrand, as to an undivided 4.44% interest; The Anchor Group LLC, as to an undivided 1.11% interest; Gary Burnham Solo 401K Trust, as to an undivided 4.44% interest; Deborah Mullica, as to an undivided 3.66% interest and John Wysocki, as to an undivided 0.79% interest, to secure a note in the originally stated principal amount of $2,250,000.00, and to the terms and conditions thereof.

Note: Purported release recorded as document no. 1727219060 by EquityBuild, Inc who has no apparent interest in said instrument.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

NOTE: Said assignment does not include the document number(s) for the instrument(s) which are to be assigned.

12.    Purported assignment of of Partial Interest in Mortgage recorded as document no. 1728613041.

NOTE: Said assignment does not include the document number(s) for the instrument(s) which are to be assigned.

13.    Purported assignment of Partial Interest in Mortgage recorded as document no. 1728613042.

NOTE: Said assignment does not include the document number(s) for the instrument(s) which are to be assigned.

14.    Purported assignment of Partial Interest in Mortgage recorded as document no. 1728613043.

NOTE: Said assignment does not include the document number(s) for the instrument(s) which are to be assigned.

15.    Purported assignment of Partial Interest in Mortgage recorded as document no. 1728613044.

NOTE: Said assignment does not include the document number(s) for the instrument(s) which are to be assigned.

16.    Purported assignment of Partial Interest in Mortgage recorded as document no. 1728613045.

NOTE: Said assignment does not include the document number(s) for the instrument(s) which are to be assigned.

17.    Mortgage recorded September 29, 2017 as document no. 1727219056 made by SSDF5 Portfolio 1 LLC to BC57, LLC, to secure a note in the originally stated principal amount of $5,328,433.43, and to the terms and conditions thereof.

**Note: We will require that the original recorded mortgage, the note secured thereby, and the release deed be presented at the time of closing.**

(Affects the land and other property)

18.    Assignment of Rents made by SSDF5 Portfolio 1 LLC to BC57, LLC recorded September 29, 2017 as document no. 1727219057.

(Affects the land and other property)

19.    Financing statement evidencing an indebtedness from SSDF5 Portfolio 1 LLC, debtor, to BC57, LLC, secured party, filed on September 29, 2017 as number 1727219058.

(Affects the land and other property)

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 50000317 (4-24-18) | Page 8 of 11 | ALTA Commitment for Title Insurance (8-1-16) Illinois |

Case: 1:18-cv-05587 Document #: 583-1 Filed: 11/20/19 Page 196 of 250 PageID #:8904

LLC to BC57, LLC, to secure a note in the originally stated principal amount of $5,328,433.43, and to the terms and conditions thereof.

**Note: We will require that the original recorded mortgage, the note secured thereby, and the release deed be presented at the time of closing.**

(Affects the land and other property)

21. Corrective Assignment of Rents made by SSDF5 Portfolio 1 LLC to BC57, LLC recorded October 4, 2017 as document no. 1727715136.

(Affects the land and other property)

22. Proceeding pending in the United States District Court, Northern District of Illinois, Eastern Division, Case No. 18-CV-5587, by U.S. Securities and Exchange Commission vs.Equitybuild, Inc., et al .

Note: A complete examination of said proceeding has not been made.

Note: We should be furnished a final waiver for possible liens in favor of the receiver, if any, appointed in said proceedings.

23. Order appointing receiver, entered August 17, 2018, in the proceedings by the United States District Court Northern District of Illinois Eastern Division, case no. 18-CV-05587 appointing Kevin V. Duff, of the firm Rachlis Duff Adler Peel & Kaplan, LLC, as federal equity receiver, authorizing the receiver to locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership Estate, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and the terms and conditions contained therein.

Note: We should be furnished the order approving this sale.

24. Terms, powers, provisions and limitations of the Limited Liability Company Operating Agreement under which title to the land is held.

25. Evidence that Articles of Organization have been filed with the Secretary of State of Illinois should be furnished for the following Limited Liability Company: SSDF5 Portfolio 1 LLC

26. The Operating Agreement for SSDF5 Portfolio 1 LLC, a Limited Liability Company, together with all amendments thereto, should be furnished and this commitment is subject to such further exceptions, if any, as may then be deemed necessary.

27. We should be furnished evidence that no event of dissolution has occurred for SSDF5 Portfolio 1 LLC, a Limited Liability Company.

28. Any lien, or right to a lien in favor of a property manager employed to manage the land. Note: we should be furnished either (a) an affidavit from the owner indicating that there is no property manager employed; or (b) a final lien waiver from the property manager acting on behalf of the owner.

29. Existing unrecorded leases, if any, and rights of parties in possession under such unrecorded leases.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

30. It appears that the land described herein lies within the municipal boundaries of Chicago, please contact the municipality for any requirements which must be complied with prior to closing. The municipal phone number may be found at www.firstam.com/title/il under Products and Resources, then Forms and Documents, then Municipal Transfer Stamp Requirements.

31. Relative to the deletion of Standard Exceptions 1 through 6, we should be furnished the following:

   a) A current survey of the land, properly certified to the Company, made in accordance with (i) the accuracy requirements of a survey pursuant to the 'Minimum Standard Detail Requirements for Land Title Surveys' Jointly Established and Adopted by the American Land Title Association and National Society of Professional Surveyors (NSPS) February 23, 2016; and (ii) the Laws of the State of Illinois.
   b) A properly executed ALTA 2006 Loan and Extended Coverage Statement.

32. Note: The Extended Coverage Endorsement, deleting Standard Exceptions 1 through 6, will be considered for approval upon receipt and review of the requirements referenced herein.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| First American | ALTA Commitment for Title Insurance |
| | ISSUED BY |
| **Exhibit A** | **First American Title Insurance Company** |
| | File No: 2986636 |

Commitment File No.: 2986636

The Land referred to herein below is situated in the County of Cook, State of IL, and is described as follows:

Lot 132, in Division 2, in Westfalls Subdivision of 208 acres being the East half of the Southwest quarter and Southeast fractional quarter of Section 30, Township 38 North, Range 15 East of the Third Principal Meridian, in Cook County, Illinois.

Note: For informational purposes only, the land is known as :

7750-58 S Muskegon Avenue
Chicago, IL 60649

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 50000317 (4-24-18) | Page 11 of 11 | ALTA Commitment for Title Insurance (8-1-16) |
| | | Illinois |

**EXHIBIT S**

# Illinois Anti-Predatory Lending Database Program

## Certificate of Exemption

Doc#: 1613150106 Fee: $54.00
RHSP Fee:$9.00 RPRF Fee: $1.00
Karen A.Yarbrough
Cook County Recorder of Deeds
Date: 05/10/2016 02:08 PM Pg: 1 of 9

**Report Mortgage Fraud**
**800-532-8785**

The property identified as:    **PIN:** 21-30-319-029-0000

**Address:**
**Street:**    7748-52 S. Essex Ave
**Street line 2:**
**City:** Chicago    **State:** IL    **ZIP Code:** 60649

**Lender:** The Persons Listed on Exhibit A to the Mortgage c/o EquityBuild Finance, LLC

**Borrower:** EquityBuild, Inc.

**Loan / Mortgage Amount:** $2,750,000.00

This property is located within the program area and is exempt from the requirements of 765 ILCS 77/70 et seq. because it is not owner-occupied.

**Certificate number:** 8FB754B9-BEAB-4133-A559-1E228F841B6C     **Execution date:** 2/29/2016

Mail To:

*Equity Build Finance LLC*
*5068 W. Plano Pkwy, #300*
*Plano, TX 75093*
_____[The Above Space For Recorder's Use Only]_____

## MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on February 29th, 2016. The mortgagor is EquityBuild, Inc. ("Borrower").

This Security Instrument is given to The Persons Listed on Exhibit A to the Mortgage C/O EquityBuild Finance, LLC whose address is 5068 West Plano Pkwy. #300 Plano, TX 75093 ("Lender").

Borrower owes Lender the principal sum of Two Million Seven Hundred Fifty Thousand and 00/100 Dollars (U.S. $2,750,000.00). This debt is evidenced by Borrower's note dated the same date as this Security Instrument (Mortgage), which provides for a final payment of the full debt, if not paid earlier, due and payable September 1st, 2017. This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extension and modifications; (b) the payment of all other sums, with interest advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in COOK County, Illinois:

PIN: 21-30-319-029-0000

which has the address of 7748-52 S Essex Ave., Chicago, IL 60649("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents, royalties, mineral, oil and gas rights and profits, water rights and stock and all fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANT. Borrower and Lender covenant and agree as follows:

1. Payment of Principal and Interest; Prepayment and Late Charges. Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. Hazard Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration and repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 19 the property is acquired by Lender, Borrower's rights to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of sums secured by this Security Instrument immediately prior to the acquisition.

3. Preservation and Maintenance of Property; Leaseholds. Borrower shall not destroy, damage or substantially change the Property, allow the Property to deteriorate or commit waste. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease, and if Borrower acquires fee title to the Property, the leasehold and fee title shall not merge unless Lender agrees to the merger in writing.

4. Protection of Lender's Rights in the Property; Mortgage Insurance. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees, and entering on the Property to make repairs. Although Lender may take action under this paragraph 4, Lender does not have to do so.

5. Successor and Assigns Bound; Joint and Several Liability; Co-signers. The covenants and agreements of this Security Interest shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 9. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey the Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forebear or make any accommodations with regard to the terms of this Security Instrument or the Note without the Borrower's consent.

6. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

7. Governing Law; Severability. This Security Instrument shall be governed by federal law and the law of jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

8. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

9. Transfer of the Property or a beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

10. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

11. **Assignment of Rents and Leases.** As additional security for the payment of the Indebtedness, Mortgagor assigns and transfers to Mortgagee, pursuant to 1953 PA 210, as amended by 1966 PA 151 (MCLA 554.231 et seq., MSA 26.1137(1) et seq.), all the rents, profits, and income under all leases, occupancy agreements, or arrangements upon or affecting the Premises (including any extensions or amendments) now in existence or coming into existence during the period this Mortgage is in effect. This assignment shall run with the land and be good and valid as against Mortgagor and those claiming under or through Mortgagor. This assignment shall continue to be operative during foreclosure or any other proceedings to enforce this Mortgage. If a foreclosure sale results in a deficiency, this assignment shall stand as security during the redemption period for the payment of the deficiency. This assignment is given only as collateral security and shall not be construed as obligating Mortgagee to perform any of the covenants or undertakings required to be performed by Mortgagor in any leases. In the event of default in any of the terms or covenants of this Mortgage, Mortgagee shall be entitled to all of the rights and benefits of MCLA 554.231-.233, MSA 26.1137(1)-(3), and 1966 PA 151, and Mortgagee shall be entitled to collect the rents and income from the Premises, to rent or lease the Premises on the terms that it may deem best, and to maintain proceedings to recover rents or possession of the Premises from any tenant or trespasser. Mortgagee shall be entitled to enter the Premises for the purpose of delivering notices or other communications to the tenants and occupants. Mortgagee shall have no liability to Mortgagor as a result of those acts. Mortgagee may deliver all of the notices and communications by ordinary first-class U.S. mail. If Mortgagor obstructs Mortgagee in its efforts to collect the rents and income from the Premises or unreasonably refuses or neglects to assist Mortgagee in collecting the rent and income, Mortgagee shall be entitled to appoint a receiver for the Premises and the income, rents, and profits, with powers that the court making the appointment may confer. Mortgagor shall at no time collect advance rent in excess of one month under any lease pertaining to the Premises, and Mortgagee shall not be bound by any rent prepayment made or received in violation of this paragraph. Mortgagee shall not have any obligation to collect rent or to enforce any other obligations of any tenant or occupant of the Premises to Mortgagor. No action taken by Mortgagee under this paragraph shall cause Mortgagee to become a "mortgagee in possession."

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

BORROWER: EquityBuild, Inc.

_____(SEAL)
Jerry Cohen, President

_____[Space Below This Line For Acknowledgement]_____

1613150106 Page: 6 of 9

STATE OF FLORIDA, _Manatee_____ County ss:

I hereby certify that on this day, before me, an officer duly authorized in the state aforesaid and in the county aforesaid to take acknowledgements, personally appeared <u>Jerry Cohen</u>, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he/she executed the same for the purpose therein expressed.

WITNESS my hand and official seal in the county and state aforesaid this _29th_ day of _February____, 20_16_.

My Commission expires: _July 26, 2017_

{Seal}

_Jessica Ann Baier_____
Notary Public

JESSICA ANN BAIER
MY COMMISSION #FF019714
EXPIRES July 26, 2017
(407) 398-0153   FloridaNotaryService.com

## Exhibit A

| Lender Name | Principal Amount | Percentage of Loan |
|---|---|---|
| Kyle Jacobs | $65,000 | 2.36% |
| LMJ Sales, Inc. | $45,000 | 1.63% |
| Equity Trust Company Custodian FBO Julie Elaine Fogle IRA | $50,000 | 1.82% |
| Cecilia Wolff | $15,000 | 0.55% |
| CM Group, LLC | $25,000 | 0.91% |
| Lola S. Cooper | $110,000 | 4.00% |
| Francisco Fernandez | $50,000 | 1.82% |
| Michael Prokop | $50,000 | 1.82% |
| 2nd City Solo 401k Trust | $20,000 | 0.73% |
| Summit Trust Company, Trustee David R Theil MD PS PL Profit Sharing Keogh FBO David R Theil Plan Administer. | $31,000 | 1.13% |
| Applefield Family Trust | $30,000 | 1.09% |
| Paul S. Applefield DDS 401k PLAN | $20,000 | 0.73% |
| Paul N. Wilmesmeier | $75,000 | 2.73% |
| Phyllis Harte | $20,000 | 0.73% |
| Quest IRA, Inc. FBO Steven K. Chennappan IRA # 17293-31 | $18,000 | 0.65% |
| Heidi Liu | $50,000 | 1.82% |
| Cheryl L Pammer | $40,950 | 1.49% |
| Liwen Zhao | $128,000 | 4.65% |
| iPlanGroup Agent for Custodian FBO Liwen Zhao IRA | $28,000 | 1.02% |
| John Witzigreuter | $50,000 | 1.82% |

| | | |
|---|---|---|
| The Entrust Group Inc. fbo Marjorie Jean Sexton IRA# 7230013060 | $3,000 | 0.11% |
| Equity Trust Company, Custodian FBO Richard L Braddock IRA | $50,000 | 1.82% |
| iPlanGroup Agent For Custodian FBO Ken Jorgensen IRA | $121,506 | 4.42% |
| Calvin L. Goad II & Leisa A. Goad JTWROS | $300,000 | 10.91% |
| Quest IRA, Inc. FBO Nandini S. Chennappan IRA # 18476-11 | $5,500 | 0.20% |
| iPlanGroup Agent for Custodian FBO Gerry Recamara IRA | $55,000 | 2.00% |
| NEHASRI LTD | $25,000 | 0.91% |
| Rene Hribal | $180,000 | 6.55% |
| Asians Investing in Real Estate LLC | $130,000 | 4.73% |
| Mark Young | $30,000 | 1.09% |
| Tim Sharp | $100,000 | 3.64% |
| Michael & Gretchen Grant JTWROS | $210,000 | 7.64% |
| Blessing Strategies, LLC | $7,000 | 0.25% |
| Larry W. White | $50,000 | 1.82% |
| CAMA Plan F.B.O Judith D. Ferrara, Roth IRA | $250,000 | 9.09% |
| Petra Zoeller | $70,000 | 2.55% |
| Self-Directed IRA Services Inc. FBO James Clements | $50,000 | 1.82% |
| Pittman Gold, LLC | $12,044 | 0.44% |
| Shelton Family Trust | $30,000 | 1.09% |
| Ranell Durgan | $50,000 | 1.82% |
| EquityBuild, Inc. | $70,000 | 2.50% |

Lots 16, 17 and 18 in Block 11 in South Shore Park, being a subdivision of the West 1/2 of the Southwest 1/4 (except streets) in Section 30, Township 38 North, Range 15, East of the Third Principal Meridian, in Cook County, Illinois

**EXHIBIT T**

# RELEASE DEED

CAUTION: Consult a lawyer before using or acting under this form. *Neither the publisher nor the seller of this form makes any warranty with respect thereto, including any warranty of merchantability or fitness for a particular purpose.*

#1890663

Old Republic Title
9601 Southwest Highway
Oak Lawn, IL 60453

18 2



Doc# 1812744019 Fee $40.00

RHSP FEE:$9.00 RPRF FEE: $1.00
KAREN A.YARBROUGH
COOK COUNTY RECORDER OF DEEDS
DATE: 05/07/2018 11:02 AM PG: 1 OF 2

Know all men by these presents, that **EQUITYBUILD FINANCE, LLC** for and in consideration of TEN DOLLARS ($10.00) and for other good and valuable considerations, the receipt of which is hereby confessed, does hereby remise, convey, release and quit-claims unto **EQUITYBUILD, INC.** of the County of Collier, State of Florida, all rights, title, interest, claim or demand whatsoever he/she may have acquired in, through or by a certain Mortgage bearing the date of **02/29/2016** Recorded in the Recorder's Office of **COOK** County in the State of Illinois, on **05/10/2016** as Document Number **1613150106**, the premises therein described, situated in the County of **COOK** and the State of Illinois as follows, to-wit:

See attached Legal Description

(PIN):                      21-30-319-029-0000
Commonly Known as:    7748-52 S Essex Avenue, Chicago, IL

EQUITYBUILD FINANCE, LLC

State of: New York
County of: New York

I, the undersigned, a Notary Public in and for said County in the State aforesaid Do Certify that, **Shaun Cohen, President of EquityBuild Finance, LLC,** personally known to me have signed and delivered the said instrument as his/her free and voluntary act for the uses and purposes therein set forth.

Given under my hand and Notarial Seal on April 12 2018

MILUSKA RIOS
Notary Public - State of New York
No. 01RI6301526
Qualified in Bronx County
My Commission Expires April 14, 2019

S Y
P 2
S N
SC Y
INT

FOR THE PROTECTION OF THE OWNER, THIS RELEASE NEEDS TO BE FILED WITH THE RECORDER OF DEEDS IN WHOSE OFFICE THE MORTGAGE OR DEED OF TRUST WAS FILED.

# Legal Description

of premises commonly known as **7748-52 S Essex Avenue, Chicago, IL**

**LOTS 16, 17 AND 18 IN BLOCK 11 IN SOUTH SHORE PARK, BEING A SUBDIVISION OF THE WEST 1/2 OF THE SOUTHWEST 1/4 (EXCEPT STREETS) OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15, EAST OF THE THIRD PRINCIPAL MERIDIAN, COOK COUNTY, ILLINOIS.**

PERMANENT TAX NUMBER: **21-30-319-029-0000**

Prepared by and Mail to:
EquityBuild Finance, LLC
5068 W. Plano Road, #300
Plano, TX  75093

**EXHIBIT U**

*1822706115*

Doc# 1822706115 Fee $62.00

RHSP FEE:$9.00 RPRF FEE: $1.00
KAREN A.YARBROUGH
COOK COUNTY RECORDER OF DEEDS
DATE: 08/15/2018 12:22 PM PG: 1 OF 4

**Lis Pendens Notice**

(Rev. 2/09/04)
**CCG N066**

IN THE CIRCUIT COURT OF
COOK COUNTY, ILLINOIS

MICHIGAN SHORE APARTMENTS LLC

Plaintiff

EQUITYBUILD, INC., SSDF7 PORTFOLIO LLC, LIBERTY EBCP LLC

Defendant

No. 2018-CH-09098

**LIS PENDENS NOTICE**

I, the undersigned, do hereby certify that the above entitled cause was filed in the Circuit Court of Cook County on the 19th day of July 2018 and is now pending in the Court and that the property affected by the cause is described as follows:

See Property Descriptions attached as Exhibit A

in Cook County, Illinois.

Atty. No.: 14516
Name: Cary G. Schiff & Associates
Atty. for: Plaintiff
Address: 134 N. LaSalle, Suite 1740
City/State/Zip: Chicago, IL 60602
Telephone: (312) 419-1130

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

CCRD REVIEW

## Exhibit A

**Property 1**:

LOTS 26 AND 27 IN BLOCK 1 IN JOHN BAIN'S SUBDIVISION OF THE EAST 1/2 OF THE EAST 1/2 OF THE NORTHWEST 1/4 OF SECTION 24, TOWNSHIP 38 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Permanent Real Estate Index Number(s): 19-24-107-037-0000

Address(es) of Real Estate: 6356 S. CALIFORNIA AVENUE, CHICAGO, ILLINOIS 60629

**Property 2**:

LOTS 28 AND 29 IN BLOCK 1 IN AVONDALE, A SUBDIVISION OS THE WEST 1/4 OF THE NORTHEAST 1/4 OF SECTION 24, TOWNSHIP 38 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Permanent Real Estate Index Number(s): 19-24-203-023-0000

Address(es) of Real Estate: 6357 S. TALMAN AVENUE, CHICAGO, ILLINOIS 60629

**Property 3**:

LOT 13 (EXCEPT THE SOUTH 22 FEET THEREOF) AND LOT 14 (EXCEPT THE NORTH 8 FEET THEREOF) IN BLOCK 15 IN JACKSON PARK HIGHLANDS, IN THE EAST HALF OF THE SOUTHWEST QUARTER OF SECTION 24, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Permanent Real Estate Index Number(s): 20-24-328-011-0000

Address(es) of Real Estate: 7051 S. BENNETT AVENUE, CHICAGO, ILLINOIS 60649

**Property 4**:

LOT 5 (EXCEPT THE SOUTH 8 FEET THEREOF) IN BLOCK 11 IN PRESCOTT'S SUBDIVISION OF THE EAST HALF OF THE NORTHWEST QUARTER OF SECTION 27, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Permanent Real Estate Index Number(s): 20-27-122-027-0000

Address(es) of Real Estate: 7442 S. CALUMET AVENUE, CHICAGO, ILLINOIS 60619

**Property 5**:

LOTS 14 AND 15 IN BLOCK 10 IN JOHN G. SHORTALL TRUSTEES SUBDIVISION OF THE NORTH 1/2 OF THE NORTHEAST 1/4 OF SECTION 26, TOWNSHIP 38 NORTH, RANGE 14, EAST OF TI.IE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Lis Pendens Notice
MICHIGAN SHORE APARTMENTS LLC v. EQUITYBUILD, INC., SSDF7 PORTFOLIO LLC,
LIBERTY EBCP LLC
2018-CH-09098

Permanent Real Estate Index Number(s): 20-26-210-001-0000

Address(es) of Real Estate: 7201 S. DORCHESTER AVENUE, CHICAGO, ILLINOIS 60619 and/or 1401 E. 72ND ST., CHICAGO, ILLINOIS

**Property 6**:

THE SOUTH 1/2 OF LOT 10 IN DIVISION 2 OF WESTFALL'S SUBDIVISION OF 208 ACRES, BEING THE EAST 1/2 OF THE SOUTHWEST 1/4 AND THE SOUTHEAST FRACTIONAL 1/4 OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Permanent Real Estate Index Number(s): 21-30-304-020-0000

Address(es) of Real Estate: 7546 S. SAGINAW AVENUE, CHICAGO, ILLINOIS 60649

**Property 7**:

LOT 7 IN BLOCK 1 IN L. W. STONE'S SUBDIVISION OF THE EAST 20 ACRES OF THE NORTH 30 ACRES OF THE WEST 1/2 OF THE SOUTHWEST 1/4 OF SECTION 3, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Permanent Real Estate Index Number(s): 20-03-302-002-0000

Address(es) of Real Estate: 4317-19 S. MICHIGAN AVENUE, CHICAGO, ILLINOIS 60653

**Property 8**:

LOT 15 (EXCEPT THE NORTH 10 FEET THEREOF) IN MOREAU AND DE JONG'S RESUBDIVISION OF LOTS 30 TO 48 INCLUSIVE IN BLOCK 16 IN AVONDALE ADDITION TO CHICAGO, BEING A SUBDIVISION OF THE WEST 1/2 OF THE NORTHEAST 1/4 OF SECTION 24, TOWNSHIP 38 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Permanent Real Estate Index Number(s): 19-24-200-029-0000

Address(es)'of Real Estate: 2736-2744 W. 64TH STREET, CHICAGO, ILLINOIS 60629

**Property 9**:

LOT 1 AND THE EAST 18.OO FEET OF LOT 2 IN BLOCK 3 IN SOUTH SHORE PARK, BEING A SUBDIVISION OF THE WEST 1/2 OF THE SOUTHWEST 1/4 OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Permanent Real Estate Index Number(s): 21-30-301-030-0000

Address(es) of Real Estate: 2453 E.75TH STREET/7508 S. ESSEX AVENUE, CHICAGO, IL 60649

Lis Pendens Notice
MICHIGAN SHORE APARTMENTS LLC v. EQUITYBUILD, INC., SSDF7 PORTFOLIO LLC, LIBERTY EBCP LLC
2018-CH-09098

**Property 10**:

LOTS 16, 17 AND 18, IN BLOCK 11, IN SOUTH SHORE PARK, BEING A SUBDIVISION OF THE WEST HALF OF THE SOUTHWEST QUARTER (EXCEPT STREETS) OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Permanent Real Estate Index Number(s): 21-30-319-029-0000

Address(es) of Real Estate: 7748-52 S. ESSEX AVENUE, CHICAGO, ILLINOIS 60649

Lis Pendens Notice
MICHIGAN SHORE APARTMENTS LLC v. EQUITYBUILD, INC., SSDF7 PORTFOLIO LLC, LIBERTY EBCP LLC
2018-CH-09098

**EXHIBIT V**

Return Date: No return date scheduled
Hearing Date: 11/29/2018 10:00 AM - 10:00 AM
Courtroom Number: 2601
Location: District 1 Court
    Cook County, IL

FILED
7/19/2018 4:32 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH09098

FILED DATE: 7/19/2018 4:32 PM  2018CH09098

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| MICHIGAN SHORE APARTMENTS LLC, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) Case No.:     **2018CH09098** |
| EQUITYBUILD, INC., | ) |
| SSDF7 PORTFOLIO 1 LLC, | ) |
| LIBERTY EBCP LLC, | ) |
| | ) |
| *Defendants.* | ) |

## <u>VERIFIED COMPLAINT TO SET ASIDE FRAUDULENT TRANSFERS & FOR</u>
## <u>INJUNCTIVE RELIEF</u>

Plaintiff, MICHIGAN SHORE APARTMENTS LLC (hereinafter "MSA") by its undersigned counsel, CARY G. SCHIFF & ASSOCIATES, hereby files the following Verified Complaint to Set Aside Fraudulent Transfers & For Injunctive Relief against Defendants EQUITYBUILD, INC., SSDF7 PORTFOLIO 1 LLC, and LIBERTY EBCP LLC, and pleads as follows:

## <u>NATURE OF THE CASE</u>

On March 20, 2018, MSA filed a Complaint against EquityBuild, Inc., and other defendants, based upon fraud, breach of fiduciary duty, breach of contract, legal malpractice, and declaratory judgment relating to MSA's July 2015 purchase of an apartment building located at 7616-7624 S. Phillips Avenue, Chicago, Illinois. (Case No. 2018-CH-03665, Circuit Court of Cook County, Chancery Division). Approximately six weeks after MSA filed its suit, on May 7, 2018, EquityBuild transferred fourteen real estate properties to a newly formed entity, SSDF7 Portfolio 1 LLC, in transactions exempted from real estate transfer taxes. The SSDF7 entity is also under the control of EquityBuild's President, Jerry Cohen, a named defendant in Case No.

FILED DATE: 7/19/2018 4:32 PM   2018CH09098

2018-CH-03665. This suit asks the Court to set aside EquityBuild's May 7, 2018 transfers and to enter injunctive relief pursuant to the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1, *et seq.*

## THE PARTIES & JURISDICTION

1.    MICHIGAN SHORE APARTMENTS LLC ("MSA") is an Illinois limited liability company. Marlen Junck was a founding member and manager of MSA, who died on February 1, 2018.

2.    EQUITYBUILD, INC., ("EB") is a Florida corporation.  Its president is Jerry Cohen, of Marco Island, Florida.  EB engages in continuous and substantial business in Illinois, including numerous real estate transactions in Chicago, Illinois, and Cook County, Illinois, during the time period of this Complaint.

3.    SSDF7 PORTFOLIO 1 LLC, ("SSDF7") is an Illinois limited liability company, with its principal place of business located at 1414 E. 62nd Place, Chicago, Illinois 60637. SSDF7's manager is SSDF7 Holdco 1 LLC, a Delaware limited liability company, with its principal place of business also located at 1414 E. 62nd Place, Chicago, Illinois. SSDF7 Holdco 1 LLC's manager is South Shore Property Holdings LLC, a Delaware limited liability company. South Shore Property Holdings LLC's managing member is Jerry Cohen, of Marco Island, Florida. SSDF7 Portfolio 1 LLC is authorized to do business or acquire and hold title to real estate in Illinois and has been a party to numerous real estate transactions in Chicago, Illinois, and Cook County, Illinois, during the time period of the Complaint.

4.    LIBERTY EBCP LLC ("Liberty") is a Delaware limited liability company, with its address located at 1500 JFK Boulevard, Suite 250, Philadelphia, Pennsylvania.

FILED DATE: 7/19/2018 4:32 PM   2018CH09098

## FACTS

5.  EB is a limited liability company that offers a proprietary system (the "EquityBuild System") for investing in real estate.

6.  On March 20, 2018, MSA filed suit against EB, its President, Jerry Cohen, and other defendants, based upon fraud, breach of contract, breach of fiduciary duties, civil conspiracy, and other related claims, in the Circuit Court of Cook County, Chancery Division, Case No. 2018-CH-03665. (Copy of March 20, 2018 Complaint attached hereto as Exhibit A).

7.  On April 4, 2018, the Sheriff of Cook County served EB with the Summons and Complaint in Case No. 2018-CH-03665. Pursuant to the Summons and Illinois Supreme Court Rule 181(a), EB had thirty days after the date of service, until May 4, 2018, to respond to the Complaint.

8.  EB failed to file a timely response to the Complaint, and MSA moved for default in Case No. 2018-CH-03665, on May 14, 2018. Following the Motion for Default, EB filed its Appearance on May 23, 2018.

9.  On May 7, 2018, while in default of its obligation to respond to the Complaint in Case No. 2018-CH-03665, EB transferred fourteen (14) real estate properties all located in Chicago, via warranty deed, to SSDF7. All of the transfers were purportedly exempt from real estate transfer taxes. State and local laws require real estate transfer taxes to be paid where properties are transferred pursuant to an arm's length transaction for consideration in excess of $100.00. EB did not receive reasonably equivalent value in exchange for the transfers to SSDF7.

10. The properties transferred by EB to SSDF7 on May 7, 2018, are the following:

    a.  6356 S. California, Chicago, Illinois (PIN 19-24-107-037-0000);

    b.  6357 S. Talman Ave., Chicago, Illinois (PIN 19-24-203-023-0000);

FILED DATE: 7/19/2018 4:32 PM    2018CH09098

    c.   <u>7051 S. Bennett Ave., Chicago, Illinois</u> (PIN 20-24-328-011-0000);

    d.   <u>7442 S. Calumet Ave., Chicago, Illinois</u> (PIN 20-27-122-027-0000);

    e.   <u>1401 E. 72nd St., Chicago, Illinois</u> (PIN 20-26-210-001-0000);

    f.   <u>7546 S. Saginaw Ave., Chicago, Illinois</u> (PIN 21-30-304-020-0000);

    g.   <u>4319 S. Michigan Ave., Chicago, Illinois</u> (PIN 20-03-302-002-0000);

    h.   <u>2736 W. 64th St., Chicago, Illinois</u> (PIN 19-24-200-029-0000);

    i.   <u>7508 S. Essex Ave., Chicago, Illinois</u> (PIN 21-30-301-030-0000);

    j.   <u>7748-52 S. Essex Ave., Chicago, Illinois</u> (PIN 21-30-319-029-0000);

    k.   <u>816-22 E. Marquette Rd., Chicago, Illinois</u> (PIN 20-23-112-028-0000);

    l.   <u>7656 S. Kingston Ave., Chicago, Illinois</u> (PIN 21-30-309-030-0000);

    m.   <u>8201 S. Kingston Ave., Chicago, Illinois</u> (PIN 21-31-126-001-0000);

    n.   <u>8326-8352 S. Ellis Ave., Chicago, Illinois</u> (PIN 20-35-303-097-0000).

(Copies of May 7, 2018 Warranty Deeds attached hereto as <u>Group Exhibit B</u>).

11.    EB acquired the above fourteen properties between January 2015 and February 2017 from various sellers, for total consideration in excess of $12.6 million.

12.    Within weeks of being served with MSA's lawsuit seeking damages for fraud and other causes of action, EB transferred the fourteen properties listed above to a newly-created entity, SSDF7, that shares common ownership and control with EB. Jerry Cohen is the President of EB, and he is a managing member of an LLC that is the manager of SSDF7's manager.

13.    On May 7, 2018, after EB transferred the above fourteen properties to SSDF7, SSDF7 entered into Mortgages and Assignments of Leases with Liberty. (Copies of Mortgages and Assignment of Leases attached as <u>Exhibits C & D</u>).

## COUNT I – ACTION TO SET ASIDE FRAUDULENT TRANSFERS – FRAUD IN FACT

## (740 ILCS 160/5) (Against All Defendants)

14.     Plaintiff hereby incorporates by reference the allegations contained in the Paragraphs above.

15.     740 ILCS 160/5(a), of the Illinois Uniform Fraudulent Transfer Act ("IUFTA,") provides, "[A] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor..."

16.     Pursuant to 740 ILCS 160/5(b), in determining whether a debtor acted with "actual intent" as described in section 5(a), a court may give consideration, among others, to eleven enumerated factors, including whether:

     (1) The transfer or obligation was to an insider;

     (2) The debtor retained possession or control of the property transferred after the transfer;

     (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

     (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

     (9) The debtor was insolvent or became insolvent shortly after a the transfer was made or the obligation incurred.

740 ILCS 160/5(b).

FILED DATE: 7/19/2018 4:32 PM   2018CH09098

FILED DATE: 7/19/2018 4:32 PM   2018CH09098

17.     MSA is considered a creditor for purposes of the Illinois Uniform Fraudulent Transfer Act. 740 ILCS 160/2(d) defines a "creditor" as any "person who has a claim, including a claim for past-due child support."

18.     MSA's pending lawsuit against EB constitutes a "claim" pursuant to 740 ILCS 160/2(c). A "claim" means a right to payment, whether or not the right is reduced to judgment.

19.     EB is a "debtor" pursuant to the Illinois Uniform Fraudulent Transfer Act. 740 ILCS 160/2(f) defines a "debtor" as "a person who is liable on a claim."

20.     The transfers of assets made by EB to SSDF7 on May 7, 2018 were made with actual intent to hinder, delay, or defraud MSA:

a.  The transfers were made to an insider of EB. Jerry Cohen is the President of EB, and he is a managing member of a manager of a manager of SSDF7. Jerry Cohen holds decision-making authority over both EB and SSDF7;

b.  EB and/or Jerry Cohen, President of EB, retained control over the properties it transferred to SSDF7. EB advertises and solicits "investments" in the properties transferred to SSDF7 on EB's website;

c.  Before the transfer was made, EB had been sued and served with summons and complaint, in Case No. 2018-CH-03665. Jerry Cohen had been personally served and was aware of the pending suit;

d.  EB did not receive reasonably equivalent value in exchange for the transfers of the fourteen properties. EB did not receive consideration in excess of $100.00 for the properties it transferred. The transactions did not take place at arm's length, and SSDF7 did not act in good faith.

21. EB's May 7, 2018 transfers to SSDF7 therefore constitute fraudulent conveyances under the IUFTA.

22. On information and belief, EB was insolvent as of May 7, 2018, for purposes of the IUFTA. On information and belief, the sum of EB's debts as of May 7, 2018 is greater than its assets at a fair valuation. On information and belief, EB is generally not paying its debts as they become due.

23. The IUFTA, in 740 ILCS 160/8(a), provides that in an action for relief against a transfer under the IUFTA, a creditor may obtain:

(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

(2) An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by the Code of Civil Procedure;

(3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure,

(A) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

(B) Appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

(C) Any other relief the circumstances may require.

WHEREFORE, pursuant to Count I of its Complaint, Plaintiff prays that this Court enter an order avoiding the May 7, 2018 transfers of EQUITYBUILD, INC., to SSDF7 PORTFOLIO 1

LLC, to the extent necessary to satisfy Plaintiff MICHIGAN SHORE APARTMENTS LLC's claim against EQUITYBUILD, INC.; in the alternative, permitting an attachment or other provisional remedy against the assets transferred by EQUITYBUILD, INC., on May 7, 2018, in accordance with the procedure prescribed by the Code of Civil Procedure; granting Plaintiff interests and rights in the assets transferred on May 7, 2018, that are superior to those of LIBERTY EBCP LLC; for an injunction against further disposition by SSDF7 PORTFOLIO 1 LLC and/or LIBERTY EBCP LLC, of any of the assets transferred by EQUITYBUILD, INC., on May 7, 2018; appointing a receiver to take charge of the assets transferred by EQUITYBUILD, INC., on May 7, 2018; awarding Plaintiff its attorney's fees and costs; and for other and further relief as the Court shall deem just and proper.

## COUNT II – ACTION TO SET ASIDE FRAUDULENT TRANSFERS – FRAUD IN LAW
### (740 ILCS 160/6(a)) (Against All Defendants)

24.     Plaintiff hereby incorporates by reference the allegations contained in the Paragraphs above.

25.     Pursuant to 740 ILCS 160/6(a), a transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at that time or became insolvent as a result of the transfer.

26.     MSA's claim against EB arose before EB made the May 7, 2018 transfers to SSDF7.

27.     EB did not receive a reasonably equivalent value in exchange for its May 7, 2018 property transfers to SSDF7.

FILED DATE: 7/19/2018 4:32 PM   2018CH09098

FILED DATE: 7/19/2018 4:32 PM   2018CH09098

28.    On information and belief, EB was insolvent and/or became insolvent as a result of the May 7, 2018 transfers to SSDF7.

29.    The IUFTA, in 740 ILCS 160/8(a), provides that in an action for relief against a transfer under the IUFTA, a creditor may obtain:

(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

(2) An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by the Code of Civil Procedure;

(3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure,

(A) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

(B) Appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

(C) Any other relief the circumstances may require.

WHEREFORE, pursuant to Count II of its Complaint, Plaintiff prays that this Court enter an order avoiding the May 7, 2018 transfers of EQUITYBUILD, INC., to SSDF7 PORTFOLIO 1 LLC, to the extent necessary to satisfy Plaintiff MICHIGAN SHORE APARTMENTS LLC's claim against EQUITYBUILD, INC.; in the alternative, permitting an attachment or other provisional remedy against the assets transferred by EQUITYBUILD, INC., on May 7, 2018, in accordance with the procedure prescribed by the Code of Civil Procedure; granting Plaintiff

FILED DATE: 7/19/2018 4:32 PM   2018CH09098

interests and rights in the assets transferred on May 7, 2018, that are superior to those of LIBERTY

EBCP LLC; for an injunction against further disposition by SSDF7 PORTFOLIO 1 LLC and/or

LIBERTY EBCP LLC, of any of the assets transferred by EQUITYBUILD, INC., on May 7, 2018;

appointing a receiver to take charge of the assets transferred by EQUITYBUILD, INC., on May 7,

2018; awarding Plaintiff its attorney's fees and costs; and for other and further relief as the Court

shall deem just and proper.

Dated: July 19, 2018                   Respectfully Submitted,

                                       MICHIGAN SHORE APARTMENTS LLC,

                                       By:    /s/ Cary G. Schiff
                                       One of Plaintiff's Attorneys

Cary G. Schiff (ARDC #6192697)
Christopher R. Johnson (ARDC # 6304827)
Cary G. Schiff & Associates
134 N. LaSalle St., Ste. 1740
Chicago, IL 60602
Telephone:    (312) 419-1130
caryschiff@cgschifflaw.com
Attorney No.: 14516

FILED DATE: 7/19/2018 4:32 PM 2018CH09098

## VERIFICATION

Under the penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned, being duly authorized certifies that the statements set forth in the **Verified Complaint to Set Aside Fraudulent Transfers & For Injunctive Relief** are true and correct, except as to the matters stated therein to be on information and belief, and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true and correct.

GEORGE CHERIAN, Member,
MICHIGAN SHORE
APARTMENTS, LLC

**EXHIBIT W**

| **First American** **Commitment** | ALTA Commitment for Title Insurance |
| --- | --- |
| | ISSUED BY |
| | **First American Title Insurance Company** |
| | File No: 2986651 |

## COMMITMENT FOR TITLE INSURANCE

### Issued By

### *FIRST AMERICAN TITLE INSURANCE COMPANY*

#### NOTICE

**IMPORTANT-READ CAREFULLY:** THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES. ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE. THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

#### COMMITMENT TO ISSUE POLICY

Subject to the Notice; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and the Commitment Conditions, *First American Title Insurance Company*, a Nebraska Corporation (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment. This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Policy Amount and the name of the Proposed Insured.

If all of the Schedule B, Part I-Requirements have not been met within six months after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

**First American Title Insurance Company**

Dennis J. Gilmore
President

Jeffrey S. Robinson
Secretary

**If this jacket was created electronically, it constitutes an original document.**

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 50000317 (4-24-18) | Page 1 of 10 | ALTA Commitment for Title Insurance (8-1-16) Illinois |
| --- | --- | --- |

**COMMITMENT CONDITIONS**

**1. DEFINITIONS**
 (a) "Knowledge" or "Known": Actual or imputed knowledge, but not constructive notice imparted by the Public Records.
 (b) "Land": The land described in Schedule A and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.
 (c) "Mortgage": A mortgage, deed of trust, or other security instrument, including one evidenced by electronic means authorized by law.
 (d) "Policy": Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.
 (e) "Proposed Insured": Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.
 (f) "Proposed Policy Amount": Each dollar amount specified in Schedule A as the Proposed Policy Amount of each Policy to be issued pursuant to this Commitment.
 (g) "Public Records": Records established under state statutes at the Commitment Date for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge.
 (h) "Title": The estate or interest described in Schedule A.

**2.** If all of the Schedule B, Part I—Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.

**3.** The Company's liability and obligation is limited by and this Commitment is not valid without:
 (a) the Notice;
 (b) the Commitment to Issue Policy;
 (c) the Commitment Conditions;
 (d) Schedule A;
 (e) Schedule B, Part I—Requirements;
 (f) Schedule B, Part II—Exceptions; and
 (g) a counter-signature by the company or its issuing agent that may be in electronic form.

**4. COMPANY'S RIGHT TO AMEND**
The Company may amend this Commitment at any time. If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5. The Company shall not be liable for any other amendment to this Commitment.

**5. LIMITATIONS OF LIABILITY**
 (a) The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended Commitment, resulting from the Proposed Insured's good faith reliance to:
  (i) comply with the Schedule B, Part I—Requirements;
  (ii) eliminate, with the Company's written consent, any Schedule B, Part II—Exceptions; or
  (iii) acquire the Title or create the Mortgage covered by this Commitment.
 (b) The Company shall not be liable under Commitment Condition 5(a) if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.
 (c) The Company will only have liability under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.
 (d) The Company's liability shall not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and described in Commitment Conditions 5(a)(i) through 5(a)(iii) or the Proposed Policy Amount.
 (e) The Company shall not be liable for the content of the Transaction Identification Data, if any.
 (f) In no event shall the Company be obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I—Requirements have been met to the satisfaction of the Company.
 (g) In any event, the Company's liability is limited by the terms and provisions of the Policy.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

6. **LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT**
   (a) Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.
   (b) Any claim must be based in contract and must be restricted solely to the terms and provisions of this Commitment.
   (c) Until the Policy is issued, this Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.
   (d) The deletion or modification of any Schedule B, Part II—Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.
   (e) Any amendment or endorsement to this Commitment must be in writing and authenticated by a person authorized by the Company.
   (f) When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

7. **IF THIS COMMITMENT HAS BEEN ISSUED BY AN ISSUING AGENT**
   The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies. The issuing agent is not the Company's agent for the purpose of providing closing or settlement services.

8. **PRO-FORMA POLICY**
   The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide. A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

9. **ARBITRATION**
   The Policy contains an arbitration clause. All arbitrable matters when the Proposed Policy Amount is $2,000,000 or less shall be arbitrated at the option of either the Company or the Proposed Insured as the exclusive remedy of the parties. A Proposed Insured may review a copy of the arbitration rules at http://www.alta.org/arbitration.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



| | ALTA Commitment for Title Insurance |
|---|---|
| **First American** | ISSUED BY |
| **Schedule A** | **First American Title Insurance Company** |
| | File No: 2986651 |

**Transaction Identification Data for reference only:**

First American Title Insurance Company - Metro Commercial Title e-mail: cmcc.il@firstam.com
Center
27775 Diehl Rd, Warrenville, IL 60555          Escrow e-mail: figures.il@firstam.com
Phone : (866)563-7707                          Customer Reference:
Commitment No.: 2986651
Property Address: 7748-50 South Essex Avenue, Chicago, IL
60649
Revision Date:

**SCHEDULE A**

1. Commitment Date: July 26, 2019 8:00 AM

2. Policies to be issued:

   (a)  ALTA® Owner's Policy
        Proposed Insured: Southside Property Group LLC
        Proposed Policy Amount: $1,350,000.00

   (b)  ALTA® Loan Policy
        Proposed Insured: To Be Determined, its successors and/or assigns as defined in the
        Conditions of the policy, as their interests may appear.
        Proposed Policy Amount: $1,000.00

3. The estate or interest in the Land described or referred to in this Commitment is

   **Fee simple**

4. The Title is, at the Commitment Date, vested in: SSDF7 Portfolio 1 LLC, an Illinois limited liability
   company

5. The Land is described as follows:
   SEE EXHIBIT A ATTACHED HERETO AND MADE A PART HEREOF

*First American Title Insurance Company*

**By:**   *Patricia E. Weinstein*

       **Authorized Countersignature**

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 50000317 (4-24-18) | Page 4 of 10 | ALTA Commitment for Title Insurance (8-1-16) |
|---|---|---|
| | | Illinois |

| First American | **Schedule BI & BII** | ALTA Commitment for Title Insurance |
| --- | --- | --- |
| | | ISSUED BY |
| | | **First American Title Insurance Company** |
| | | File No: 2986651 |

Commitment No.: 2986651

## SCHEDULE B, PART I

### Requirements

All of the following Requirements must be met:

1. The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land. The Company may then make additional Requirements or Exceptions.

2. Pay the agreed amount for the estate or interest to be insured.

3. Pay the premiums, fees, and charges for the Policy to the Company.

4. Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records.

## SCHEDULE B, PART II

### Exceptions

THIS COMMITMENT DOES NOT REPUBLISH ANY COVENANT, CONDITION, RESTRICTION, OR LIMITATION CONTAINED IN ANY DOCUMENT REFERRED TO IN THIS COMMITMENT TO THE EXTENT THAT THE SPECIFIC COVENANT, CONDITION, RESTRICTION, OR LIMITATION VIOLATES STATE OR FEDERAL LAW BASED ON RACE, COLOR, RELIGION, SEX, SEXUAL ORIENTATION, GENDER IDENTITY, HANDICAP, FAMILIAL STATUS, OR NATIONAL ORIGIN.

The Policy will not insure against loss or damage resulting from the terms and provisions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 50000317 (4-24-18) | Page 5 of 10 | ALTA Commitment for Title Insurance (8-1-16) Illinois |
| --- | --- | --- |

| | ALTA Commitment for Title Insurance |
|---|---|
| **First American** | ISSUED BY |
| **Schedule BI & BII (Cont.)** | **First American Title Insurance Company** |
| | File No: 2986651 |

Commitment No.: 2986651

## SCHEDULE B, PART II

### Exceptions (Continued)

1. Rights or claims of parties in possession not shown by the public records.

2. Easements or claims of easements, not shown by Public Records.

3. Any encroachments, encumbrance, violation, variation, or adverse circumstance affecting Title that would be disclosed by an accurate survey of the Land pursuant to the "Minimum Standards of Practice," 68 Ill. Admin Code, Sec. 1270.56(b)(6)(P) for residential property or the ALTA/NSPS land title survey standards for commercial/industrial property.

4. Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.

5. Taxes, or special assessments, if any, not shown as existing liens by the Public Records.

6. Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I-Requirements are met.

**NOTE: THE LAND SUBJECT TO THIS COMMITMENT LIES WITHIN THE BOUNDARIES OF COOK COUNTY, KANE COUNTY, PEORIA COUNTY, OR WILL COUNTY ILLINOIS AND IS SUBJECT TO THE PREDATORY LENDING DATABASE PROGRAM (765 ILCS 77/70 ET SEQ) EFFECTIVE JULY 1, 2008 AS TO COOK COUNTY. THE PREDATORY LENDING DATABASE PROGRAM HAS BEEN EXPANDED TO INCLUDE KANE, PEORIA AND WILL COUNTIES AS TO ALL MORTGAGE APPLICATIONS MADE OR TAKEN ON OR AFTER THE EXPANSION INCEPTION DATE OF JULY 1, 2010. VALID CERTIFICATES OF COMPLIANCE OR EXEMPTION ISSUED IN CONFORMITY WITH THE ACT MUST BE OBTAINED AT TIME OF CLOSING IN ORDER TO RECORD ANY MORTGAGE. FOR ADDITIONAL INFORMATION, GO TO WWW.IDFPR.COM, THE DIVISION OF BANKING.**

7. General taxes and assessments for the year 2018, 2019 and subsequent years which are not yet due and payable.

   Tax identification no.: 21-30-319-029-0000 (Vol. 274)

   **Note for informational purposes 2018 taxes:**

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

1st Installment in the amount of $7,343.34 with a status of DELINQUENT. (Due Date March 01, 2019)

2nd Installment in the amount of $14,552.42 with a status of DUE. (Due Date August 01, 2019)

Note: If applicable, an original tax bill must be presented if taxes are to be paid at time of closing.

8.  Mortgage recorded May 10, 2016 as document 1613150106 made by EquityBuild, Inc. to Kyle Jacobs, as to an undivided 2.36% interest; LMJ Sales, Inc., as to an undivided 1.63% interest; Equity Trust Company Custodian FBO Julie Elaine Fogle IRA, as to an undivided 1.82% interest; Cecilia Wolff, as to an undivided 0.55% interest; CM Group, LLC, as to an undivided 0.91% interest; Lola S. Cooper, as to an undivided 4.00% interest; Francisco Fernandez, as to an undivided 1.82% interest; Michael Prokop, as to an undivided 1.82% interest; 2nd City Solo 401K Trust, as to an undivided 0.73% interest; Summit Trust Company, Trustee David R. Theil MD PS PL Profit Sharing Keogh FBO David R. Theil Plan Administer, as to an undivided 1.13% interest; Applefield Family Trust, as to an undivided 1.09% interest; Paul S. Applefield DDS 401k Plan, as to an undivided 0.73% interest; Paul N. Wilmesmeier, as to an undivided 2.73% interest; Phyllis Harte, as to an undivided 0.73% interest; Quest IRA, Inc. FBO Steven K. Chennappan IRA # 17293-31, as to an undivided 0.65% interest; Heidi Liu, as to an undivided 1.82% interest; Cheryl L. Pammer, as to an undivided 1.49% interest; Liwen Zhao, as to an undivided 4.65% interest; iPlanGroup Agent for Custodian FBO Liwen Zhao IRA, as to an undivided 1.02% interest; John Witzigreuter, as to an undivided 1.82% interest; The Entrust Group Inc. fbo Marjorie Jean Sexton IRA# 7230013060, as to an undivided 0.11% interest; Equity Trust Company, Custodian FBO Richard L. Braddock IRA, as to an undivided 1.82% interest; iPlanGroup Agent For Custodian FBO Ken Jorgensen IRA, as to an undivided 4.42% interest; Calvin L. Goad II and Leisa A. Goad JTWROS, as to an undivided 10.91% interest; Quest IRA, Inc. FBO Nandini S. Chennappan IRA # 18476-11, as to an undivided 0.20% interest; iPlanGroup Agent for Custodian FBO Gerry Recamara IRA, as to an undivided 2.00% interest; NEHASRI LTD, as to an undivided 0.91% interest; Rene Hribal, as to an undivided 6.55% interest; Asians Investing in Real Estate LLC, as to an undivided 4.73% interest; Mark Young, as to an undivided 1.09% interest; Tim Sharp, as to an undivided 3.64% interest; Michael Grant and Gretchen Grant JTWROS, as to an undivided 7.64% interest; Blessing Strategies, LLC, as to an undivided 0.25% interest; Larry W. White, as to an undivided 1.82% interest; CAMA Plan F.B.O Judith D. Ferrara, Roth IRA, as to an undivided 9.09% interest; Petra Zoeller, as to an undivided 2.55% interest; Self-Directed IRA Services Inc. FBO James Clements, as to an undivided 1.82% interest; Pittman Gold, LLC, as to an undivided 0.44% interest; Shelton Family Trust, as to an undivided 1.09% interest; Ranell Durgan, as to an undivided 1.82% interest; and EquityBuild, Inc., as to an undivided 2.50% interest, to secure a note in the originally stated principal amount of $2,750,000.00, and to the terms and conditions thereof.

Note: Purported release recorded as document no. 1812744019 by EquityBuild Finance, LLC who has no apparent interest in said instrument.

Release recorded as document 1812744020 which release the partial interest of The Entrust Group FBO Daniel Mathews IRA Acct #51-01005 in said mortgage.

9.  Purported assignment of Assignment of Partial Interest in Mortgage recorded as document no. 1728613037.

NOTE: Said assignment does not include the document number(s) for the instrument(s) which are to be assigned.

10. Mortgage recorded May 7, 2018 as document 1812734048 made by SSDF7 Portfolio 1 LLC to Liberty EBCP, LLC, to secure a note in the originally stated principal amount of $18,400,000.00, and to the terms and conditions thereof.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

**Note: We will require that the original recorded mortgage, the note secured thereby, and the release deed be presented at the time of closing.**

(Affects the land and other property)

11.     Assignment of Rents made by SSDF7 Portfolio 1 LLC to Liberty EBCP, LLC recorded May 7, 2018 as document 1812734049.

        (Affects the land and other property)

12.     Financing statement evidencing an indebtedness from SSDF7 Portfolio 1 LLC, debtor, to Liberty EBCP, LLC, secured party, filed on May 7, 2018 as number 1812734050.

        (Affects the land and other property)

13.     Proceeding pending in an injunction case in the Circuit Court of Cook County, Illinois, Case No. 2018-CH-09098, by Michigan Shore Apartments LLC vs. Equitybuild, Inc., SSDF7 Portfolio LLC, and Liberty EBCP LLC.

        Note: Lis Pendens Notice recorded as document 1822706115.

        Note: A complete examination of said proceeding has not been made.

        Note: We should be furnished a final waiver for possible liens in favor of the receiver, if any, appointed in said proceedings.

        (Affects the land and other property)

14.     Proceeding pending in the United States District Court, Northern District of Illinois, Eastern Division, Case No. 18-CV-5587, by U.S. Securities and Exchange Commission vs. Equitybuild, Inc., et al.

        Note: A complete examination of said proceeding has not been made.

        Note: We should be furnished a final waiver for possible liens in favor of the receiver, if any, appointed in said proceedings.

15.     Order appointing receiver, entered August 17, 2018, in the proceedings by the United States District Court Northern District of Illinois Eastern Division, case no. 18-CV-05587 appointing Kevin V. Duff, of the firm Rachlis Duff Adler Peel & Kaplan, LLC, as federal equity receiver, authorizing the receiver to locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership Estate, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and the terms and conditions contained therein.

        Note: We should be furnished the order approving this sale.

16.     Terms, powers, provisions and limitations of the Limited Liability Company Operating Agreement under which title to the land is held.

17.     Evidence that Articles of Organization have been filed with the Secretary of State of Illinois should be furnished for the following Limited Liability Company: SSDF7 Portfolio 1 LLC

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

The Operating Agreement for SSDF7 Portfolio 1 LLC, a Limited Liability Company, together with all amendments thereto, should be furnished and this commitment is subject to such further exceptions, if any, as may then be deemed necessary.

19.   We should be furnished evidence that no event of dissolution has occurred for SSDF7 Portfolio 1 LLC, a Limited Liability Company.

20.   Any lien, or right to a lien in favor of a property manager employed to manage the land. Note: we should be furnished either (a) an affidavit from the owner indicating that there is no property manager employed; or (b) a final lien waiver from the property manager acting on behalf of the owner.

21.   Existing unrecorded leases, if any, and rights of parties in possession under such unrecorded leases.

22.   It appears that the land described herein lies within the municipal boundaries of Chicago, please contact the municipality for any requirements which must be complied with prior to closing. The municipal phone number may be found at www.firstam.com/title/il under Products and Resources, then Forms and Documents, then Municipal Transfer Stamp Requirements.

23.   Relative to the deletion of Standard Exceptions 1 through 6, we should be furnished the following:

   a) A current survey of the land, properly certified to the Company, made in accordance with (i) the accuracy requirements of a survey pursuant to the 'Minimum Standard Detail Requirements for Land Title Surveys' Jointly Established and Adopted by the American Land Title Association and National Society of Professional Surveyors (NSPS) February 23, 2016; and (ii) the Laws of the State of Illinois.
   b) A properly executed ALTA 2006 Loan and Extended Coverage Statement.

24.   Building setback line(s) as shown on the plat of subdivision recored as document 8089481.
(Affects the Easterly 10 feet)

25.   Note shown on the the plat of subdivision, as follows: "No building shall be erected on any of the lots fronting on the streets affected by the building line shown on this plat, whose street wall is nearer to the front street line than ten feet, street wall shall be deemed that wall or part of a wall of a building or that part of the wall of a porch or other structure nearest to and most nearly parallel with the street, extending more than 4 feet 6 inches above the finished grade, with the same exceptions as are contained in Section 22, Paragraph (H) of the Chicago Zoning Ordinance passed by the City Council of Chicago, April 5th, 1923."

26.   Note: The Extended Coverage Endorsement, deleting Standard Exceptions 1 through 6, will be considered for approval upon receipt and review of the requirements referenced herein.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

**First American**

**Exhibit A**

ALTA Commitment for Title Insurance

ISSUED BY

**First American Title Insurance Company**

File No: 2986651

Commitment File No.: 2986651

The Land referred to herein below is situated in the County of Cook, State of IL, and is described as follows:

Lots 16, 17 and 18, in Block 11, in South Shore Park, being a subdivision of the West Half of the Southwest Quarter (except streets) of Section 30, Township 38 North, Range 15 East of the Third Principal Meridian, in Cook County, Illinois.

Note: For informational purposes only, the land is known as :

7748-50 South Essex Avenue
Chicago, IL 60649

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 50000317 (4-24-18) | Page 10 of 10 | ALTA Commitment for Title Insurance (8-1-16) Illinois |
|---|---|---|

**EXHIBIT X**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** ) ) ) | |
| ) **Plaintiff,** ) | **Civil Action No. 18-CV-5587** |
| **v.** ) ) | |
| **EQUITYBUILD, INC.,** ) **EQUITYBUILD FINANCE, LLC,** ) **JEROME H. COHEN, and** ) **SHAUN D. COHEN,** ) ) | **Hon. John Z. Lee** **Magistrate Judge Young B. Kim** |
| **Defendants.** ) ) | |

**ORDER GRANTING RECEIVER'S FOURTH MOTION FOR**
**APPROVAL OF THE SALE OF CERTAIN REAL ESTATE AND AVOIDANCE**
**OF CERTAIN MORTGAGES, LIENS, CLAIMS, AND ENCUMBRANCES**

WHEREAS, this Court took exclusive jurisdiction and possession of the assets of

EquityBuild, Inc. ("EquityBuild"), EquityBuild Finance, LLC ("EquityBuild Finance"), their

affiliates, and the affiliate entities of Defendants Jerome Cohen and Shaun Cohen (collectively,

the "Receivership Defendants") by Order Appointing Receiver, dated August 17, 2018 ("Order

Appointing Receiver") (Dkt. No. 16);

WHEREAS, by Order dated March 14, 2019, this Court identified SSDF5 Portfolio 1

LLC ("SSDF5 Portfolio 1") and SSDF7 Portfolio 1 LLC ("SSDF7 Portfolio 1") as additional

Receivership Defendants;

WHEREAS, SSDF5 Portfolio 1 is the owner of record of the real estate located at 7625-

33 South East End Avenue in Chicago, Illinois ("7625-33 South East End"), the property located

at 7635-43 South East End Avenue in Chicago, Illinois ("7635-43 South East End"), and the

property located at 7750-58 South Muskegon Avenue in Chicago, Illinois ("7750-58 South

Muskegon"), whose commonly known addresses, permanent index numbers, and legal descriptions are contained on Tab A hereto;

WHEREAS, SSDF7 Portfolio 1 is the owner of record of the real estate located at 7748-52 South Essex in Chicago, Illinois ("7748-52 South Essex"), whose commonly known address, permanent index number, and legal description is also contained on Tab A hereto;

WHEREAS, the Court finds that the sales prices reflected in the Purchase And Sale Agreements that the Receiver has accepted for the conveyances of 7625-33 South East End, 7635-43 South East End, 7750-58 South Muskegon, and 7748-52 South Essex (collectively, the "Properties") are consistent with the fair market value of the Properties;

WHEREAS, Kevin B. Duff, as receiver ("Receiver") for the Receivership Defendants, has filed a Fourth Motion For Approval Of The Sale Of Certain Real Estate And The Avoidance Of Certain Mortgages, Liens, Claims, And Encumbrances (the "Motion"); and

WHEREAS, the Court finds that Receiver has given fair, adequate, and sufficient notice to all interested parties, including all mortgagees affected by the Motion.

NOW, THEREFORE, it is hereby ORDERED that:

1.      The Receiver's Motion is GRANTED.

2.      The Receiver is authorized to sell the real property and improvements at 7625-33 South East End free and clear of:

        a.      that certain Mortgage recorded January 21, 2016 as Document No. 1602156229 made by EquityBuild, Inc. to Brad Lutz and Linda Lutz, as to an undivided 24.78% interest; Asians Investing in Real Estate, LLC, as to and undivided 3.11% interest; Self-Directed IRA Services Inc. FBO David Geldart, as to an undivided 6.69% interest; iPlanGroup Agent for Custodian FBO Lorenzo Jaquias IRA, as to an undivided 3.11% interest; Edge Investments, LLC, as to an undivided 10.97% interest;

KKW Investments, LLC, as to an undivided 4.67% interest; Peter P. Nuspl, as to an undivided 13.52% interest; Pittman Gold, LLC, as to an undivided 9.34% interest; Steve Bald, as to an undivided 3.11% interest; iPlanGroup Agent for Custodian FBO Jacqueline Rowe IRA, as to an undivided 12.46% interest; Michael James Guilford and Nancy Richard-Guilford, as to an undivided 5.76% interest; and Knickerbocker, LLC, as to an undivided 2.47% interest, to secure a note in the originally stated principal amount of $1,605,749.00, and to the terms and conditions thereof;

b.      that certain Mortgage recorded September 29, 2017, as Document No. 1727219056 made by SSDF5 Portfolio 1 to BC57, LLC ("BC57"), to secure a note in the originally stated principal amount of $5,328,433.43, and to the terms and conditions thereof;

c.      that certain Assignment of Rents made by SSDF5 Portfolio 1 to BC57, recorded September 29, 2017 as Document No. 1727219057;

d.      that certain Financing Statement evidencing an indebtedness from SSDF5 Portfolio 1 to BC57, filed on September 29, 2017 as Document No. 1727219058;

e.      that certain Corrective Mortgage recorded October 4, 2017 as Document No. 1727715135 made by SSDF5 Portfolio 1 to BC57, to secure a note in the originally stated principal amount of $5,328,433.43, and to the terms and conditions thereof;

f.      that certain Corrective Assignment of Rents made by SSDF5 Portfolio 1 to BC57, recorded October 4, 2017 as Document No. 1727715136; and

g.      that certain claim for a property management lien in the amount of $15,722.65 plus interest recorded April 25, 2018 as Document No. 1811519134 by Chicago Real Estate Resources Inc.

3.     The Receiver is authorized to sell the real property and improvements at <u>7635-43</u> <u>South East End</u> free and clear of:

a.     that certain Mortgage recorded January 21, 2016 as Document No. 1602156231 made by EquityBuild, Inc. to Leah Matthews, as to an undivided 4.23% interest, Michael James Guilford and Nancy Richard-Guilford, as to an undivided 3.37% interest, iPlanGroup Agent for Custodian FBO Laura Dirnberger IRA, as to an undivided 0.59% interest, Equity Trust Company Custodian FBO Dorothy Marie Baker IRA, as to an undivided 0.59% interest, Paul N. Wilmesmeier, as to an undivided 2.93% interest, Robert Guiney, as to an undivided 1.06% interest, Equity Trust Company Custodian FBO Nagaraja R Rao IRA, as to an undivided 6.46% interest, John E. Bloxham, as to an undivided 2.93% interest, Asians Investing in Real Estate, LLC, as to an undivided 1.47% interest, Tiger Chang Investments, LLC, as to an undivided 1.47% interest, CAMA SDIRA LLC FBO Frank Starosciak IRA, as to an undivided 0.99% interest, Self-Directed IRA Services Inc. FBO James Clements, as to an undivided 1.17% interest, Manoj Donthineni, as to an undivided 2.58% interest, Carolyn Ucker, as to an undivided 1.47% interest, Self-Directed IRA Services Inc. FBO David Geldart, as to an undivided 0.70% interest, QCH Investment Trust, as to an undivided 2.93% interest, Total Return Income Fund, LLC, as to an undivided 30.52% interest, The Income Fund, LLC, as to an undivided 4.70% interest, Umbrella Investment Partners, LLC, as to an undivided 0.76% interest, GRB Properties LLC, as to an undivided 2.47% interest, Jeffry M. Edwards, as to an undivided 2.93% interest, Cecilia Wolff, as to an undivided 1.47% interest, Trey Hopkins, as to an undivided 5.87% interest, iPlanGroup Agent for Custodian FBO Winnie Quick IRA, as to an undivided 0.65% interest, Arthur L. Bertrand and Dinah F. Bertrand, as to an undivided 12.76% interest, iPlanGroup Agent for Custodian FBO Timothy J. Goree IRA, as to an

undivided 2.93% interest, to secure a note in the originally stated principal amount of $1,703,649.00, and to the terms and conditions thereof.

     b.     that certain Mortgage recorded September 29, 2017, as Document No. 1727219056 made by SSDF5 Portfolio 1 to BC57 to secure a note in the originally stated principal amount of $5,328,433.43, and to the terms and conditions thereof;

     c.     that certain Assignment of Rents made by SSDF5 Portfolio 1 to BC57, recorded September 29, 2017 as Document No. 1727219057;

     d.     that certain Financing Statement evidencing an indebtedness from SSDF5 Portfolio 1 to BC57, filed on September 29, 2017 as Document No. 1727219058;

     e.     that certain Corrective Mortgage recorded October 4, 2017 as Document No. 1727715135 made by SSDF5 Portfolio 1 to BC57, to secure a note in the originally stated principal amount of $5,328,433.43, and to the terms and conditions thereof;

     f.     that certain Corrective Assignment of Rents made by SSDF5 Portfolio 1 to BC57, recorded October 4, 2017 as Document No. 1727715136;

     g.     that certain claim for a property management lien in the amount of $6,788.02 plus interest recorded April 25, 2018 as Document No. 1811519133 by Chicago Real Estate Resources Inc., and

     h.     that certain claim for a mechanic's lien in the amount of $13,250.00, plus interest recorded August 27, 2018 as Document No. 1823945053 by JK Electron Inc.

     4.     The Receiver is authorized to sell the real property and improvements at 7750-58 South Muskegon free and clear of:

     a.     that certain Mortgage recorded January 16, 2015 as Document No. 1501656187, and re-recorded as Document No. 1504856045 made by EquityBuild, Inc. to Mark E. Young, as to an undivided 4.44% interest; The Kingdom Trust Company,

Custodian, FBO Louis Duane Velez, Account #7422686172, as to an undivided 4.44% interest; The Edward Falkowitz Living Trust, as to an undivided 4.93% interest; TFG Retirement Trust, as to an undivided 2.04% interest; Paul Wilmesmeier, as to an undivided 2.22% interest; Terry L. Merrill & Sheryl R. Merrill, as to an undivided 2.22% interest; Walter Akita, as to an undivided 2.22% interest; Alton P. Motes Trust UTA 12-15-11, as to an undivided 1.91% interest; American Estate & Trust LC FBO Robert Mennella, as to an undivided 2.22% interest; Steven and Linda Lipshultz, as to an undivided 4.44% interest; Mark Mouty, as to an undivided 2.22% interest; The Income Fund, LLC, as to an undivided 6.67% interest; Quest IRA, Inc. FBO Francis Webb IRA #1437711, as to an undivided 2.22% interest; Penny Adams, as to an undivided 3.33% interest; Daniel J Martineau, as to an undivided 4.44% interest; Equity Trust Company Custodian FBO Henry D. Gallucci beneficiary of DCD Victoria E. Gallucci IRA, as to an undivided 2.67% interest; Equity Trust Company Custodian FBO Gavin Maher CESA, as to an undivided 0.67% interest; Equity Trust Company Custodian FBO Travis Maher CESA, as to an undivided 0.44% interest; Equity Trust Company Custodian FBO Avery Maher CESA, as to an undivided 0.49% interest; Christopher Maher, as to an undivided 0.62% interest; Christopher Wilson and Brittny Niosi, as to an undivided 2.22% interest; Self Directed IRA Services, Inc., Custodian FBO Ping Liu IRA, as to an undivided 2.22% interest; Scott E. Pammer, as to an undivided 3.11% interest; Jeremy Hemphill, as to an undivided 2.22% interest; The Celia Tong Revocable Living Trust, dated December 22, 2011, as to an undivided 1.11% interest; iPlanGroup Agent for Custodian FBO Ed Bancroft IRA, as to an undivided 0.89% interest; Donald J and April L. Wegrzyn, as to an undivided 2.22% interest; Fraser Realty Investments, LLC, as to an undivided 4.44% interest; Hillside Fund, LLC, as to an undivided 5.55% interest; Matthew T. Boyd, as to an undivided 2.22%

6

interest; H Derrick, LLC, as to an undivided 4.44% interest; Arthur L and Dinah F Bertrand, as to an undivided 4.44% interest; The Anchor Group LLC, as to an undivided 1.11% interest; Gary Burnham Solo 401K Trust, as to an undivided 4.44% interest; Deborah Mullica, as to an undivided 3.66% interest and John Wysocki, as to an undivided 0.79% interest, to secure a note in the originally stated principal amount of $2,250,000.00, and to the terms and conditions thereof;

      b.     those certain Assignments Of Partial Interest In Mortgage recorded as Document Nos. 1728613040, 1728613041, 1728613042, 1728613043, 1728613044, and 1728613045;

      c.     that certain Mortgage recorded September 29, 2017, as Document No. 1727219056 made by SSDF5 Portfolio 1 to BC57 to secure a note in the originally stated principal amount of $5,328,433.43, and to the terms and conditions thereof;

      d.     that certain Assignment of Rents made by SSDF5 Portfolio 1 to BC57, recorded September 29, 2017 as Document No. 1727219057;

      e.     that certain Financing Statement evidencing an indebtedness from SSDF5 Portfolio 1 to BC57, filed on September 29, 2017 as Document No. 1727219058;

      f.     that certain Corrective Mortgage recorded October 4, 2017 as Document No. 1727715135 made by SSDF5 Portfolio 1 to BC57, to secure a note in the originally stated principal amount of $5,328,433.43, and to the terms and conditions thereof; and

      g.     that certain Corrective Assignment of Rents made by SSDF5 Portfolio 1 to BC57, recorded October 4, 2017 as Document No. 1727715136;

     5.     The Receiver is authorized to sell the real property and improvements at <u>7748-52 South Essex</u> free and clear of:

a. that certain Mortgage recorded May 10, 2016 as Document No. 1613150106 made by EquityBuild, Inc. to Kyle Jacobs, as to an undivided 2.36% interest; LMJ Sales, Inc., as to an undivided 1.63% interest; Equity Trust Company Custodian FBO Julie Elaine Fogle IRA, as to an undivided 1.82% interest; Cecilia Wolff, as to an undivided 0.55% interest; CM Group, LLC, as to an undivided 0.91% interest; Lola S. Cooper, as to an undivided 4.00% interest; Francisco Fernandez, as to an undivided 1.82% interest; Michael Prokop, as to an undivided 1.82% interest; 2nd City Solo 401K Trust, as to an undivided 0.73% interest; Summit Trust Company, Trustee David R. Theil MD PS PL Profit Sharing Keogh FBO David R. Theil Plan Administer, as to an undivided 1.13% interest; Applefield Family Trust, as to an undivided 1.09% interest; Paul S. Applefield DDS 401k Plan, as to an undivided 0.73% interest; Paul N. Wilmesmeier, as to an undivided 2.73% interest; Phyllis Harte, as to an undivided 0.73% interest; Quest IRA, Inc. FBO Steven K. Chennappan IRA # 17293-31, as to an undivided 0.65% interest; Heidi Liu, as to an undivided 1.82% interest; Cheryl L. Pammer, as to an undivided 1.49% interest; Liwen Zhao, as to an undivided 4.65% interest; iPlanGroup Agent for Custodian FBO Liwen Zhao IRA, as to an undivided 1.02% interest; John Witzigreuter, as to an undivided 1.82% interest; The Entrust Group Inc. fbo Marjorie Jean Sexton IRA# 7230013060, as to an undivided 0.11% interest; Equity Trust Company, Custodian FBO Richard L. Braddock IRA, as to an undivided 1.82% interest; iPlanGroup Agent For Custodian FBO Ken Jorgensen IRA, as to an undivided 4.42% interest; Calvin L. Goad II and Leisa A. Goad JTWROS, as to an undivided 10.91% interest; Quest IRA, Inc. FBO Nandini S. Chennappan IRA # 18476-11, as to an undivided 0.20% interest; iPlanGroup Agent for Custodian FBO Gerry Recamara IRA, as to an undivided 2.00% interest; NEHASRI LTD, as to an undivided 0.91% interest; Rene Hribal, as to an undivided 6.55%

interest; Asians Investing in Real Estate LLC, as to an undivided 4.73% interest; Mark Young, as to an undivided 1.09% interest; Tim Sharp, as to an undivided 3.64% interest; Michael Grant and Gretchen Grant JTWROS, as to an undivided 7.64% interest; Blessing Strategies, LLC, as to an undivided 0.25% interest; Larry W. White, as to an undivided 1.82% interest; CAMA Plan F.B.O Judith D. Ferrara, Roth IRA, as to an undivided 9.09% interest; Petra Zoeller, as to an undivided 2.55% interest; Self-Directed IRA Services Inc. FBO James Clements, as to an undivided 1.82% interest; Pittman Gold, LLC, as to an undivided 0.44% interest; Shelton Family Trust, as to an undivided 1.09% interest; Ranell Durgan, as to an undivided 1.82% interest; and EquityBuild, Inc., as to an undivided 2.50% interest, to secure a note in the originally stated principal amount of $2,750,000.00, and to the terms and conditions thereof;

b. that certain Assignment Of Partial Interest In Mortgage recorded as Document No. 1728613037;

c. that certain Mortgage recorded May 7, 2018 as Document 1812734048 made by SSDF7 Portfolio 1 to Liberty EBCP, LLC ("Liberty EBCP"), to secure a note in the originally stated principal amount of $18,400,000.00, and to the terms and conditions thereof;

d. that certain Assignment of Rents made by SSDF7 Portfolio 1 to Liberty EBCP, recorded May 7, 2018 as Document No. 1812734049; and

e. that certain Financing Statement evidencing an indebtedness from SSDF7 Portfolio 1 to Liberty EBCP, filed May 7, 2018 as Document No. 1812734050.

6. The Receiver is hereby vested with full power and authority to execute any and all closing documents associated with the conveyances of the Properties, including, but not limited to, deeds, bills of sale, affidavits of title, and settlement statements.

7.     The proceeds from the sales of the Properties shall be held by the Receiver in separate subaccounts for which the Receiver shall maintain an accounting as to all sums deposited therein, and shall not be available for operating expenses of the Receivership nor for any other expense or distribution, absent further order of Court.

Entered:

_____

The Honorable John Z. Lee

Date:_____