**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES SECURITIES<br>AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 18-cv-5587 |
| | ) |
| v. | ) Hon. John Z. Lee |
| | ) |
| EQUITYBUILD, INC., EQUITYBUILD<br>FINANCE, LLC, JEROME H. COHEN,<br>and SHAUN D. COHEN, | ) Magistrate Judge Young B. Kim |
| | ) |
| Defendants. | ) |

**RECEIVER'S FIFTH INTERIM APPLICATION AND MOTION**
**FOR COURT APPROVAL OF PAYMENT OF FEES AND EXPENSES**
**OF RECEIVER AND RECEIVER'S RETAINED PROFESSIONALS**

Kevin B. Duff, as the receiver ("Receiver") for the Estate of Defendants EquityBuild, Inc.,

EquityBuild Finance, LLC, their affiliates, and the affiliate entities of Defendants Jerome Cohen

and Shaun Cohen as defined in the Order Appointing Receiver (Docket No. 16) (collectively, the

"Receivership Defendants"), and pursuant to the powers vested in him by Order of this Court

entered on August 17, 2018, now respectfully submits this Fifth Interim Application

("Application") and moves this Court for an order approving payment of the fees and expenses of

the Receiver, the Receiver's counsel, Rachlis Duff Peel & Kaplan, LLC ("RDPK"), the Receiver's

accountant BrookWeiner, LLC ("BrookWeiner"), the Receiver's forensic consultant,

Prometheum, and the Receiver's claims vendor Axos Fiduciary Services ("Axos") from the

Receivership Estate operating account. In support of his Application and Motion, the Receiver

states as follows:

## I.      BACKGROUND

1.      On August 15, 2018, the United States Securities and Exchange Commission ("SEC") filed a civil Complaint against Jerome Cohen, Shaun Cohen, EquityBuild Inc., and EquityBuild Finance LLC (collectively the "Defendants") alleging violations of federal securities laws, along with a motion for entry of an asset freeze, permanent injunction, and other ancillary relief.  (Docket Nos. 1 & 3, respectively)

2.      In their Complaint against the Defendants, the SEC alleged violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5, Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), Sections 5(a) and 5(c) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77e(a) and (c), and Section 17(a) of the Securities Act, 15 U.S.C. §§77q(a)q.  (Docket No. 1)

3.      The Complaint further alleged that the Defendants operated a Ponzi-scheme that raised at least $135 million from more than 900 investors by, among other things, making untrue statements of material fact in connection with the sale of promissory notes allegedly secured by residential real estate primarily located on the south side of Chicago.  (*Id.* ¶¶ 1-7, 17, 20-51)

4.      On August 28, 2018, the Court entered a judgment against defendants Jerome Cohen and Shaun Cohen which, among other things, enjoined future violations of federal securities laws.  (Docket No. 40)

5.      In connection with its civil action, the SEC sought and obtained Court approval for the appointment of a Receiver, and on August 17, 2018, this Court entered an Order Appointing Receiver.  (Docket No. 16)

6.      Under the Order Appointing Receiver, the Receiver was authorized to engage and employ persons and entities in his discretion to assist him in carrying out the duties and responsibilities set forth in the Order. (*Id.*, Order Appointing Receiver, ¶ 54)

7.      Accordingly, the Receiver retained RDAPK as special counsel, and, on August 20, 2018, the Court entered an Order approving RDAPK's rates. (Docket No. 19)  On August 23, 2018, the Receiver retained BrookWeiner and Whitley Penn to provide accounting services and to perform tax and related work regarding the assets of the Receivership Defendants, and, on August 28, 2018, the Court entered an Order approving BrookWeiner's and Whitley Penn's rates. (Docket No. 39)  On August 31, 2018, the Receiver retained Prometheum to access and preserve data within EquityBuild's cloud-based storage systems and provide related IT services, and, on September 6, 2018, the Court entered an order approving Prometheum's rates. (Docket No. 56)

8.      Pursuant to the Order Appointing Receiver, the Receiver and his retained personnel are entitled to "reasonable compensation and expense reimbursement" from the Receivership Estates, as described in the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the "Billing Instructions") agreed to by the Receiver. (Docket No. 16, ¶ 69)

## II.     FIFTH INTERIM APPLICATION

9.      Pursuant to the Billing Instructions, the Receiver provides the following information regarding the application:

a.      The Application covers the period from July 1, 2019 through September 30, 2019;

b.      As set forth above, this Court appointed the Receiver on August 17, 2018. The Receiver retained RDAPK as special counsel on August 17, 2018, and RDAPK

commenced services to the Receiver that same day. Shortly thereafter, on August 20, 2018, the Court entered an order approving RDAPK's rates. The Receiver retained BrookWeiner and Whitley Penn as accountants on August 23, 2018, and they commenced services to the Receiver that same day. Shortly thereafter, on August 28, 2018, the Court entered an Order approving BrookWeiner's and Whitley Penn's rates. The Receiver retained Prometheum as forensic consultant on August 31, 2018, and they commenced services to the Receiver that same day. Shortly thereafter, on September 6, 2018, the Court entered an order approving Prometheum's rates.

      c.     The names and hourly rates of all professionals for RDPK and BrookWeiner, as well as Prometheum's hourly rates are attached as **<u>Exhibit A</u>**.

      d.     This is the Receiver's fifth interim application. The first interim application was submitted on June 12, 2019. (Docket No. 411) The second interim application was submitted on August 21, 2019. (Docket No. 487) Objections were filed and a hearing on the first and second fee applications was held on October 8, 2019. (Docket No. 541) For the reasons stated on the record during that hearing, the Court granted the Receiver's first and second interim applications and motions for court approval of fees. (Docket Nos. 546-47) The Receiver's third interim application was submitted on November 1, 2019. (Docket No. 569) The Receiver's fourth interim application was submitted on November 15, 2019. (Docket No. 576) Objections were filed (Docket Nos. 581 & 595) and the Receiver will be filing a reply on December 20, 2019. The Court has not yet ruled on the Receiver's third or fourth interim applications.

III.    **Case Status**

10.     Pursuant to the Billing Instructions, the Receiver provides the following information regarding the status of the case, and activities performed specifically for the period covered by this Application.

a.      The Receiver's Standardized Fund Accounting Report ("SFAR") for the Third Quarter 2019 is attached as **<u>Exhibit B</u>**.  The SFAR sets forth the funds received and disbursed from the Receivership estate during this reporting period.  As reported in the SFAR, the amount of cash on hand as of September 30, 2019 was $687,049.96.[1]  The information reflected in the SFAR was based on records and information currently available to the Receiver. The Receiver and his advisors are continuing with their evaluation and analysis.

b.      Upon his appointment, the Receiver began making efforts to determine the nature, location, and value of all property interests of the Receivership Defendants, including monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, choses in action, rights and other assets, together with all profits, interest, or other income attributable thereto, which the Receivership Defendants owned, possessed, retained a beneficial interest in, or controlled directly or indirectly.  In furtherance of such, the Receiver took, *inter alia*, the following actions:

i.      <u>Identification and Preservation of Assets</u>

During the third quarter of 2019, the Receiver's primary focus was and continues to be the preservation, operation, maintenance, and sale of the real estate properties within the Receivership

---

[1] The amount of cash on hand in the Receiver's Account as of December 20, 2019 was $1,305,507.46   This figure includes $105,870.94 corresponding to two amounts still under investigation.  (*See* Docket No. 348, at 24)

Estate.  As previously stated, during the third quarter of 2019, the Receiver, in connection with his counsel, asset manager/real estate broker, and property managers, continued working to improve understanding and planning for cash flow needs for underperforming properties, and controlling expenditures where possible.  To that end, the Receiver and his counsel communicated regularly with property managers relating to necessary expenditures for properties requiring approval by the Receiver (and in some cases, requiring funds from the Receiver), and other operational questions. The Receiver and his retained professionals also reviewed monthly financial reporting, analyzed the cash position of the Estate, and communicated regularly with the real estate broker regarding prioritization of expenses and repairs on the properties.  As stated in the second and third quarter status reports, the Receiver made significant payments for 2018 property taxes during the third quarter of 2019.  (*See* Docket No. 467 at 4 and Exhibit 2 & Docket No. 567 at 3)

During the third quarter of 2019, the Receiver also worked to ensure that the two existing property management companies remained in place and that all health, life, and safety issues at the properties were addressed expeditiously.  He worked closely with the property managers to develop improved procedures to monitor repairs, expenses, and property finances designed to protect the properties and their financial position.  He also worked with the property managers to develop and implement new financial reporting to support the Receiver in fulfilling his obligations, including with respect to expenses, collections, use of funds, and financial reporting.  Additionally, the property managers assisted the Receiver in the defense of a thicket of administrative and housing court actions alleging building code violations of widely varying levels of severity filed by the City of Chicago.  To that end, during the third quarter 2019, the Receiver and his counsel continued to work closely with the City's corporation counsel for each department (circuit court, buildings, and streets and sanitation) to address all open building code violations, to address life

6

and safety issues, and to preserve the respective properties. The Receiver's counsel appeared on City of Chicago related matters on nine occasions during the third quarter 2019. As of September 30, 2019, there were approximately 23 known open code violations involving City of Chicago matters.

During this time period, there were nine known City of Chicago municipal housing court matters. Issues raised in these matters included but are not limited to:

- As stated in previous status reports, one porch replacement was completed and passed inspection at 2453 E. 75th. Following actions of the Receiver, his counsel, and the property manager, this housing court action was dismissed by the court without prejudice on July 18, 2019.

- The Receiver, in connection with the property managers, worked to replace a California-style porch at 8107 S. Ellis that passed inspection during the third quarter of 2019.

- For the property at 7110 S. Cornell, the Receiver authorized installation of scaffolding to protect the sidewalk and pedestrians, which remains in place. The Receiver also authorized installation of a new water tank during the third quarter 2019.

- For the property at 7300 S. Saint Lawrence, the Receiver authorized repair of loose bricks pursuant to a May 2, 2019 housing court order.

Additionally, during the third quarter of 2019, the Receiver achieved dismissal of ten administrative proceedings filed by the City of Chicago Buildings Department, twelve administrative proceedings filed by the Department of Streets and Sanitation, and one administrative proceeding filed by the Department of Water Debt.

ii.    <u>Property Sales</u>

During the first quarter 2019, the Receiver moved for judicial approval of a sealed-bid public sale of a second tranche of properties. (Docket No. 228) The second sales tranche consisted of twelve properties. During the second quarter 2019, the Receiver filed three more motions for Court approval to list 15 additional properties for sale. (Docket Nos. 325, 327, and 329) Following

numerous objections and hearings on these motions (*see, e.g.,* Docket Nos. 232, 235, 240, 333, 365, and 370), the Court issued rulings on these motions in the second quarter 2019. Following additional objections filed by lenders and hearings before the Court, and following a series of discussions, Liberty and the Receiver agreed upon certain credit bid procedures, which were later accepted by Magistrate Judge Kim as he overruled other objections pursued by the other institutional lenders. (*See* Docket Nos. 352, 359, 362, 363, 382, 398, 415, 455, 447, 483, 502, 504 505, 540) The Receiver subsequently implemented these procedures regarding credit bids in his sales process.

In July 2019, the Receiver listed the properties below for sale. Notice was published in a paper of general circulation on July 19, July 26, August 2, and August 9, 2019 for which the call for offer date was August 14, 2019:

- 638-40 N. Avers Avenue, Chicago, IL 60624
- 4520-26 S. Drexel Blvd, Chicago, IL 60653
- 6751-57 S Merrill Avenue, Chicago, IL 60649
- 6949-59 S. Merrill Avenue, Chicago, IL 60649
- 7109-19 S Calumet Avenue, Chicago, IL 60619
- 7110-16 S Cornell Avenue, Chicago, IL 60649
- 7450 S Luella Avenue, Chicago, IL 60649
- 7546 S Saginaw Avenue, Chicago, IL 60649
- 7600 S Kingston Avenue, Chicago, IL 60649
- 7625-33 S East End Avenue, Chicago, IL 60649
- 7635-43 S East End Avenue, Chicago, IL 60649
- 7656 S Kingston Avenue, Chicago, IL 60649
- 7748-50 S Essex Avenue, Chicago, IL 60649
- 7749 S Yates Boulevard, Chicago, IL 60649
- 7750-58 S Muskegon Avenue, Chicago, IL 60649
- 8201 S Kingston Avenue, Chicago, IL 60617
- 8326-58 S Ellis Avenue, Chicago, IL 60619

On September 13, 2019, the Receiver moved for Court approval to sell the following properties free and clear of all mortgages, liens, claims, and encumbrances (Docket No. 524):

- 2909-19 E. 78 Street, Chicago, IL 60649

- 701 S. 5th Avenue / 414 Walnut, Maywood, IL 60153
- 3030 E. 79th Street, Chicago, IL 60649
- 7301-09 S. Stewart Avenue, Chicago, IL 60621
- 5955 S. Sacramento Avenue, Chicago, IL 60629
- 6001 S. Sacramento Avenue, Chicago, IL 60629
- 7834-44 S. Ellis Avenue, Chicago, IL 60649
- 7026-42 S. Cornell Avenue, Chicago, IL 60649

In connection with these anticipated sales, the Receiver and his retained professionals worked to prepare for these closings, which included but was not limited to conducting title examinations, obtaining and making due diligence documents available to potential purchasers, communicating with potential purchasers and the title company, and preparing closing documents.[2]

On September 13, 2019, the Receiver filed a motion to sell the property at 1102 Bingham Street, Houston, TX 77007. (Docket No. 522) This motion was granted in the fourth quarter of 2019.

iii.    Financial Reporting and Rents Restoration

During the third quarter of 2019, the Receiver continued to provide institutional lenders with monthly accounting reports relating to rents from each property as required by the February 13, 2019 Order. (Docket No. 223) Through the third quarter of 2019, the Receiver sent monthly reports with respect to 89 properties to lenders' counsel for the periods ended March 31, 2019, April 30, 2019, May 31, 2019, June 30, 2019, July 31, 2019, and August 31, 2019. Reports for each property include, for each month beginning in August 2018: (a) information about net operating income based upon reporting from the respective property managers, (b) information about expenditures made by the Receiver for the benefit of the property (primarily for insurance,

---

[2] The Receiver closed on the following properties in November 2019: (i) 7301 S Stewart; (ii) 7834 S Ellis; (iii) 5955 S Sacramento; (iv) 6001 S Sacramento; (v) 7026 S Cornell; (vi) 3030 E 79th and; (vii) 2909 E 78th.

real estate taxes, and funds sent to the property manager to cover expenses not covered by net operating income from the property), and (c) amounts from net rental income distributed from the property to the Receiver or to other properties, amounts contributed to the property by the Receivership and by other properties, and a calculation of the amount (if any) of rentals remaining to be restored to the property under the February 13, 2019 Order. Each report is sent with a detailed explanation of the contents of the related report and the calculation of rentals to be restored. A summary of the information contained in these reports is attached as an exhibit to a motion filed by the Receiver regarding the use of sales proceeds for rent restoration. (Docket No. 460) Beginning with the period ending August 31, 2019 (for which reports were sent on October 25, 2019), for properties where no rent restoration is due, the final line item on the report reflects an amount that has been expended for the benefit of the property from sources other than operating income on that property.

During the third quarter of 2019, the Receiver continued to analyze sources of funds available for restoration of rents to affected properties. As of September 30, 2019, the Receiver had restored $233,628.30 of the total amount to be restored (which was $767,192.75 as of February 28, 2019). On July 25, 2019, the Receiver filed a motion seeking to use $54,102.21 in funds from a sold property (6160 S. King Drive) to restore rent (Docket No. 460), which this Court granted. (Docket No. 494) A proportionate share of this amount was transferred to the accounts for each property to which rent restoration was due during September 2019, except for the transfer of $5,014.79 to the account for one property, which occurred during the fourth quarter of 2019.

Also during the third quarter of 2019, the Receiver and his retained professionals maintained regular contact with the institutional lenders to share material information relating to the properties, including information relating to marketing sales of certain properties, as well as to

respond to myriad inquiries (typically, daily) including questions regarding financial reporting, property access for inspections, status of city violations, evidence of insurance, and other matters relating to the management and financial and physical condition of the various properties. As with the investors, the Receiver attempted to streamline and reduce communications in an effort to strike a reasonable and appropriate balance between cost effectiveness and responsiveness.

      iv.   <u>Other Receivership Assets</u>

As previously reported, during the first quarter 2019, the Receiver and his retained accountant conducted a forensic accounting and tracing analysis with respect to a single-family home in Naples, FL, determined the asset was funded with investor funds, and filed a motion to amend the Order Appointing Receiver to expressly identify and include specific Receivership Assets, asserting therein that the Naples property and a bank account in the name of Jerome Cohen and his spouse are Receivership Assets. (Docket No. 265) Cohen challenged the Receiver's position that the Naples, Florida property is a Receivership Asset. (Docket Nos. 301 and 356) During the second and third quarters of 2019, the Defendants also approached the Receiver seeking settlement negotiations, both generally and with respect to the Naples property. The Receiver conducted limited negotiations with an aim to place the Receivership Estate in the best financial position. Ultimately, the Receiver concluded that proceeding with the motion was in the best interest of the Receivership Estate. To that end, following briefing on this motion and preparation for an evidentiary hearing during the second and third quarters of 2019, the Receiver and his counsel participated in an evidentiary hearing with respect to these assets at the beginning of the third quarter of 2019. During the third quarter of 2019, Magistrate Judge Kim issued a report and recommendation granting the Receiver's motion and finding that the Naples Property and a bank

account in the name of Jerome Cohen and his spouse account are Receivership Assets. (Docket No. 492)

During the third quarter 2019, the Receiver and his retained professionals also continued investigating previously referenced non-Illinois properties as Receivership Assets that have or may have been purchased with EquityBuild investor funds. (*See, e.g.*, Docket No. 567 at 9-10)

v.     Open Litigation

During the third quarter of 2019, this Court lifted the automatic stay of litigation in the matter captioned *Barnes v. EquityBuild, et al.,* Case No. 19 L 7852, Circuit Court of Cook County, Law Division. (Docket No. 517, Notification of Docket Entry) This Order provided, among other things, that the stay was lifted and allowed plaintiff to proceed in a limited fashion against EquityBuild, Inc. and Paper Street Realty LLC, only to the extent of the amount of available insurance coverage (if any). As part of the agreement reached, plaintiff, as well her attorneys and/or representatives, waived her claims against the Receivership Estate for any amount in excess of applicable insurance coverage and agreed not to file any claim as part of the claims process in this action. (*Id*.)

During the third quarter 2019, the Receiver – working with his counsel and EquityBuild's counsel – completed written discovery responses in the matter captioned *Watson, et al. v. EquityBuild, Inc., et al.,* Case No. 2017 L 1320, Circuit Court of Cook County, Law Division.

vi.     Notice of Appointment of Receiver

During the third quarter of 2019, the Receiver continued his efforts to notify all necessary and relevant individuals and entities of the appointment and to protect and preserve the assets of the Receivership Estate. To that end, as they are identified, the Receiver continues to deliver notices to individuals or entities which have been identified as potentially having possession of the

12

property, business, books, records, or accounts of the Receivership Defendants, or who may have retained, managed, held, insured, or encumbered, or had otherwise been involved with any of the assets of the Receivership Defendants.

vii.    Investor Communications

As previously indicated, the Receiver is continuously updating his list of known investors in the Receivership Defendants' fraudulent offerings.  To ease the burden and provide basic information, therefore, the Receiver established a web page (*http://rdaplaw.net/receivership-for-equitybuild*) for investors and other interested parties to obtain information and certain court filings related to the Receivership estate, which remains in place today and continues to be best and most cost-effective mean of providing information regarding the status of this action. During the third quarter of 2019, the Receiver, in connection with Prometheum, revised the manner in which pleadings are organized and presented on the Receivership web site to make it easier for investors and others to locate pleadings in key areas of interest, including for status reports, property sales, claims process, and court orders.

Also, during the third quarter of 2019, the Receiver received and responded to hundreds of emails and voicemails from investors and others.  He and his staff responded to these communications in as timely and practicable a way as possible.

viii.    Control of Receivership Property and Records

During the third quarter 2019, the Receiver continued efforts to locate and preserve all EquityBuild property and records.  The Receiver, working with Prometheum, maintained three platforms of records and data during the third quarter of 2019.

ix.    Securing Bank and Investment Accounts

13

During the third quarter 2019, the Receiver notified, contacted, and conferred with the banks and other financial institutions that the Receiver was able to identify as having custody or control of any funds, accounts, or other assets held by, in the name of, or for the benefit of, directly or indirectly, any and all of the Receivership Defendants.

x.  Factual Investigation

During the third quarter 2019, the Receiver and his retained professionals continued to review and analyze the following: (i) documents and correspondence sent to or received from the EquityBuild principals, to whose email accounts the Receiver has access; (ii) bank records from EquityBuild and its affiliate entities; (iii) EquityBuild documents (largely stored in cloud-based and other electronic media, plus a limited number of hard copy records); (iv) available underlying transaction documents received to date from former Chicago-based EquityBuild counsel; and (v) files produced by former EquityBuild counsel, accountants, and employees.

xi.  Tax Issues

BrookWeiner was retained to perform accounting, tax, and related work regarding assets of the Receivership Defendants such as the accounting for ongoing business operations of the Receivership Defendants. During the third quarter of 2019, BrookWeiner compiled monthly property statements and property spreadsheets, worked to close payroll tax accounts with various states, and assisted with cash flow analysis matters. They also assisted the Receiver with his analysis of financial records, with respect to without limitation the Naples property and bank account that was the subject of a motion (referenced above) filed by the Receiver.

xii.  Accounts Established by Receiver for the Benefit of the Receivership Estate

The Receiver established custodial accounts at a federally insured financial institution to hold all cash equivalent Receivership property. The interest-bearing checking account is used by

the Receiver to collect liquid assets of the estate and to pay the portfolio-related and administrative expenses. For each property encumbered by secured debt that has sold, the Receiver also subsequently established an interest-bearing savings account for the purpose of depositing and holding funds until such time as the Court orders otherwise and for ultimate distribution, following a claims process and upon Court approval, to the creditors of the Estate, including the defrauded investors. (Docket Nos. 230, 311, 344 & 346)

xiii.    Creditors and Claims Against the Receivership Estate

During the second quarter of 2019, Judge Kim granted the Receiver's motion for entry of an order approving a claims process and establishing a claims bar date of July 1, 2019. (Docket No. 349) The Receiver and his staff received approximately 834 e-mails sent to the dedicated claims e-mail account and sent approximately 705 e-mails from this account as of September 30, 2019.

As previously reported, more than 2,000 claims were submitted through the claims portal or received by either mail or email on or before July 1, 2019. (Docket No. 468 at 4) The Receiver also granted extensions of the bar date to ten claimants and granted requests from certain institutional lenders to submit complete documentation after the July 1, 2019 bar date. (Docket No. 468 at 4) The Court also extended the date and set a final bar date of December 31, 2019. (Docket No. 574)

During the third quarter of 2019, the Receiver and his retained professionals began analyzing and working with the more than 2,000 claims submissions in connection with filing status reports on claims on August 1, 2019 (Docket No. 468), August 15, 2019 (Docket No. 477), and October 15, 2019 (Docket No. 548) all of which were posted to the Receiver's webpage. In his first report on claims, the Receiver: (i) detailed efforts to provide notice of the claims process

15

and information regarding his communications with stakeholders prior to the Bar Date; (ii) preliminarily identified those liens that are not in dispute or contested by either the Receiver or competing liens; and (iii) preliminarily identified issues that will need to be addressed during the claims process based on an initial review of claims submissions. (Docket No. 468) In his second report on claims, the Receiver: (i) identified contested liens and a preliminary explanation for the dispute; (ii) challenges and other issues faced thus far in analyzing claims submissions; and (iii) a process for addressing those challenges as the process continues. (Docket No. 477) In connection with the third report on claims, the Receiver and his retained professionals reviewed each claim form and included information for each property such as the names of the entities and individuals submitting claims and preliminary information as to the amount of each claim. (Docket No. 548)

During the third and fourth quarter of 2019, Axos Fiduciary Services generated spreadsheets with claims data and provided these spreadsheets to the Receiver, and also assisted in uploading claims submissions received in hard copy to the claims database.

Moreover, during the third quarter of 2019, the Receiver identified and provided notice of the claims process to 22 additional potential claimants and granted them 40 calendar days submit a claim, with the latest such date being November 20, 2019. (Docket No. 548; *see also* Docket No. 349) The Receiver became aware of these individuals through the following efforts: The Receiver compiled a list of all mortgagees and others on title for all 116 properties presently believed to be within the Receivership Estate. The Receiver then compared the list to the Receiver's list of potential claimants to whom notice of the claims process had been previously provided. For any potential claimants to whom notice had not previously been sent, the Receiver determined if any nevertheless had submitted a claim (and found that a few had submitted a claim). This effort was complicated by the fact that, in many instances, entity names rather than individuals

are listed on title, which in some instances made it difficult to identify a contact person for purposes of providing notice. Following this effort, the Receiver identified 22 individuals or entities and has attempted to provide them notice of the claims process as described above. In an effort to ensure that notice has been provided to all potential claimants, the Receiver also reviewed the names of nearly 1,100 individuals and entities listed in EquityBuild's records to compare them against the notice list. Following that review, the Receiver confirmed that notice of the claims process was sent to all of those individuals and entities.

        c.     All known Receivership Property is identified and described in the Master Asset List attached hereto as **<u>Exhibit C.</u>** The Master Asset List identifies 53 checking accounts in the names of the affiliates and affiliate entities included as Receivership Defendants, reflecting a total amount transferred to the Receiver's account of $105,870.94. Of these funds, $30,820.87 came from an account in the name of 1632 Shirley LLC, which relates to the Mississippi properties discussed earlier. The amount transferred to the Receiver also reflects $75,050.00 that EquityBuild received from an investor; the funds were wired prior to the appointment of the Receiver and cleared after the appointment. (*See* Docket No. 258, at 21)

        d.     The Master Asset List does not include assets and potentially recoverable assets for which the Receiver is still evaluating the value, potential value, and/or ownership interests. The Receiver is in the process of evaluating certain other types of assets that may be recoverable by the Receivership Estate, including, but not limited to, charitable donations, loans, gifts, settlements for which payment has not yet been received, and other property given to family members, former employees, and others.

        e.     *See also* Receiver's Fifth Status Report (Third Quarter 2019) for additional information. (Docket No. 567)

## V.    BILLING ADDRESSED IN THIS APPLICATION[3]

11.    Pursuant to the Billing Instructions, the Receiver provides the following information regarding current billing:

a.    <u>Total Compensation and Expenses Requested</u>.

    i.    In connection with his duties, the Receiver respectfully requests compensation for services rendered, totaling $90,948.00 for the period of this Application. A copy of the Receiver's invoices for July – September are attached as **<u>Exhibit D.</u>**

    ii.    In connection with the legal services provided to the Receiver by RDPK, the Receiver respectfully requests compensation for services rendered, along with reimbursement of expenses, totaling $374,583.42 for the period of this Application. A copy of RDPK's invoices for July – September are attached as **<u>Exhibit E.</u>**

    iii.    In connection with the accounting provided to the Receiver by BrookWeiner, the Receiver respectfully requests compensation for services rendered, along with reimbursement of expenses, totaling $14,273.50 for the period of this Application. A copy of BrookWeiner's invoice is attached as **<u>Exhibit F.</u>**

    iv.    In connection with the accounting provided to the Receiver by Prometheum, the Receiver respectfully requests compensation for services rendered, along with

---

[3] After filing the Receiver's third and fourth interim fee applications (Docket Nos. 569 & 576), the Receiver identified two errors that will be corrected when payment is made, assuming the Court grants the fee applications. In the third application, there was a duplicate entry for Kathy Pritchard for 0.4 hours on March 19, 2019 in the Tax Issues billing category. (Docket No. 569 at 206) Additionally, Receiver's counsel Andrew Porter received $15,200 as agency fees for the title examination work performed in connection with the closing of the first tranche of property sales during the second quarter of 2019. (Docket No. 230 at 13) The Receiver will reduce the amount due to RDPK for the first and second quarters of 2019 by these amounts, respectfully.

reimbursement of expenses, totaling $2,007.50 for the period of this Application. A copy of Prometheum's invoice is attached as **Exhibit G.**

v.  In connection with the claims services provided to the Receiver by Axos Fiduciary Services, the Receiver respectfully requests compensation for services rendered, along with reimbursement of expenses, totaling $3,282.50 for the period of this application. A copy of Axos Fiduciary Services' invoice for July – October is attached as **Exhibit H.**

b.  <u>Source of Funds for Requested Compensation and Expenses</u>. The Receiver requests that the above compensation and expenses be paid from the Receiver's operating account. The amount of cash on hand in the Receiver's Account as of December 20, 2019 was approximately $1,305,507.46. Assuming the Court grants the third and fourth fee applications, there will be approximately $232,483.78 in the Receiver's operating account after payment is made to the Receiver's professionals according to the amounts sought in the respective fee applications, not accounting for future income or expenses in the interim. For example, these figures do not include any funds from other sources, any amounts that the Receiver may recover through claims he is evaluating, investigating, and expecting to bring, and do not include funds from the sale of the Naples Property (for which the Receiver filed a motion to approve a private sale (Docket No. 589)) Further, the Receiver expects to close on one property in the first quarter of 2020 and from that sale, presently expects approximately $850,000 will be transferred to the Receiver's operating account. Additionally, as of September 30, 2019, the Receiver anticipates additional funds of at least $1,459,140.20 (corresponding to amounts paid from the Receiver's account for the benefit

of other properties) will be restored to the Receiver's account after the properties that have received the benefit of funds from the Receiver's account have been sold.

c.  <u>Fifth Application for Payment of Professional Fees and Expenses</u>.  This is the Receiver's fifth application.

d.  <u>Summary of Activity</u>.  A "Summary of Activity," providing the total hours billed and the amount of billing for each person who billed time during the Application period (July 1, 2019 through September 30, 2019) can be found at the end of the Receiver's invoice (Exhibit D) and RDPK's invoice (Exhibit E) and on the first page of BrookWeiner's invoice (Exhibit F).

## V.  CONCLUSION

WHEREFORE, the Receiver respectfully requests that the Court approve the Receiver's Fourth Interim Fee Application and enter an Order as follows:

a.  finding the fees and expenses of the Receiver and Receiver's retained professionals, Rachlis Duff Peel & Kaplan LLC, BrookWeiner, LLC, Prometheum, and Axos Fiduciary Services as described in Exhibits D-H respectively, to be reasonable and necessary to the Receivership;

b.  approving the Receiver's payment of such fees and expenses to the Receiver and to Receiver's retained professionals from the Receivership Estate as described and recommended herein; and

c.  granting the Receiver all other relief which this Court deems just and proper.

Dated:  December 20, 2019          Kevin B. Duff, Receiver

                         By:    /s/     Michael Rachlis             

                                Michael Rachlis
                                Nicole Mirjanich
                                Rachlis Duff & Peel, LLC
                                542 South Dearborn Street, Suite 900
                                Chicago, IL 60605
                                Phone (312) 733-3950; Fax (312) 733-3952
                                mrachlis@rdaplaw.net
                                nm@rdaplaw.net

## RECEIVER'S CERTIFICATION

1.      Pursuant to the Billing Instructions, the Receiver certifies as follows regarding the

Receiver's Fifth Interim Application and Motion for Court Approval of Payment of Fees and

Expenses of Receiver and Receiver's Retained Professionals:

a.      The Receiver has read the foregoing Application and Motion.

b.      To the best of the Receiver's knowledge, information and belief formed after reasonable inquiry, the Application and Motion and all fees and expenses therein are true and accurate and comply with the Billing Instructions (with any exceptions specifically noted in this Certification, Application, and Motion);

c.      All fees contained in the Application and Motion are based on the rates listed in the Fee Schedule attached hereto as Exhibit A, and such fees are reasonable, necessary, and commensurate with the skill and experience required for the activity performed;

d.      The Application and Motion does not include in the amount for which reimbursement is sought, the amortization of the cost of any investment, equipment, or capital outlay (except to the extent any such amortization is included within the permitted allowable amounts set forth herein);

e.      In seeking reimbursement for a service which the Receiver or the Receiver's Retained Professionals justifiably purchased or contracted for from a third party (such as copying, imaging, bulk mail, messenger service, overnight courier, computerized research, or title and lien searches), reimbursement is requested only for the amount billed to the Receiver or Receiver's Retained Professionals by the third-party vendor and paid by the Receiver or Receiver's Retained Professionals to such vendor.  If such services were performed by the Receiver or Receiver's Retained Professionals, the Receiver certifies that no profit has been made on such reimbursable service.

2.      On December 17, 2019, the Receiver provided to Mr. Benjamin Hanauer, of the

SEC, a complete draft copy of this Application and Motion, together with all exhibits and relevant

billing statements in a format specified by the SEC.

       /s/ Kevin B. Duff
      Kevin B. Duff, Receiver
      EquityBuild, Inc., et al.
      c/o Rachlis Duff & Peel, LLC
      542 S. Dearborn Street, Suite 900
      Chicago, IL  60605
      (312) 733-3390 - kduff@rdaplaw.net