UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 1:18-cv-5587 |
| v. | |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, | Hon. John Z. Lee |
| Defendants. | |

**MOTION TO STAY MARKETING AND SALE OF PROPERTIES**

The following mortgagees (collectively, "Mortgagees", and each individually a "Mortgagee") respectfully submit this Motion ("Motion") to stay the sale of certain real property sales subject to the Order ("Order") [Dkt. 676] granting the Receiver's Consolidated Sixth Motion for Court Approval of the Process for Public Sale of Real Estate by Sealed Bid, Fifth Motion for Approval of the Sale of Certain Real Estate and for the Avoidance of Certain Mortgages, Liens, Claims, and Encumbrances, and Motion to Amend the August 17, 2018 Order Appointing Receiver ("Consolidated Motion") [Dkt. 618]: (1) Citibank N.A., as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2018-SB48; (2) Federal National Mortgage Association ("Fannie Mae"); (3) Federal Home Loan Mortgage Corporation ("Freddie Mac"); (4) UBS AG; (5) BC57, LLC; and (6) Liberty EBCP, LLC ("Liberty"). In support of the Motion, the Mortgagees state as follows:

1

## OVERVIEW

The United States and the world economy is facing a global pandemic and the worst economic conditions since the Second World War. The State of Illinois and the City of Chicago have among the most robust and expansive shelter in place orders in the United States. The citizens of Illinois have been under a shelter in place order since March 20, 2020 with a current end date of May 30, 2020. *See* Executive Order 2020-32.[1] It is anticipated that certain requirements of this order will be extended beyond May 30. As the Court is aware, non-essential business and operations have ceased. The State of Illinois has 96,485 confirmed cases of COVID-19 with 4,234 deaths as of May 18, 2020. In fact, the City of Chicago (where these properties are located) has its own shelter in place order which impacts the sale and marketing of the properties. *See* Order of the Commissioner of Health of the City of Chicago, No. 2020-3 – Amended and Re-Issued (May 1, 2020). Indeed, Cook County, Illinois has more COVID-19 cases than the entire state of Texas. The effect of COVID-19 is so pervasive that other courts in jurisdictions with far fewer COVID-19 cases are staying real property sales in light of this pernicious pandemic. *See Mohr v. MLB Sub I, LLC*, No. CV 16-00493 ACK-WRP, 2020 WL 1861657, at *13 (D. Haw. Apr. 13, 2020). Similarly, Fannie Mae and Freddie Mac, as the largest providers of residential mortgages in the United States, have extended their moratorium on foreclosures through June 2020, recognizing both the health and fiscal impact of the pandemic. American Bankruptcy Institute, *Fannie, Freddie Extend Moratorium on Foreclosures Through June*

---

[1] On March 20, 2020, Illinois Governor JB Pritzker entered an unprecedented Executive Order 2020-10 ("Shelter in Place Order") ordering all individuals living in the State of Illinois to stay at home and avoid leaving their homes, with the exception of certain individuals. The Shelter in Place Order was originally effective March 21 through April 7, 2020. Governor Pritzker has twice extended the Shelter in Place Order, which is now effective through May 30, 2020.

https://www.abi.org/newsroom/bankruptcy-headlines/fannie-freddie-extend-moratorium-on-foreclosures-through-june (May 18, 2020).

The Northern District of Illinois, equally recognizing the pandemic and its related health risks and repercussions has extended filing and order deadlines no less than three times. *See* Amended General Order 20-0012, Second Amended General Order 20-0012, and Third Amended General Order 20-0012. The latest order extended deadlines an additional 28 days for a total of 77 days. Indeed, many hearings across the country have been done "virtually" without in-person contact. Dani Kass, *Fed. Circ. Ends In-Person Oral Arguments Indefinitely*, https://www.law360.com/articles/1274618 (May 18, 2020); Katie Pohlman, *Texas Court Holds First Jury Trial Via Zoom In Insurance Feud*, https://www.law360.com/articles/1274097/texas-court-holds-first-jury-trial-via-zoom-in-insurance-feud (May 18, 2020).

Despite these grim economic and social conditions, the Receiver has plowed ahead marketing commercial real estate properties for sale in a fire sale situation. Perhaps the most egregious is that the marketing period, which ends June 3, 2020, runs almost exclusively during the current Illinois shelter in place period.[2]

For obvious reasons, these fire sale efforts are problematic:

- The properties at issue are multi-family properties, meaning they are apartment complexes occupied by residential tenants. As such, showing occupied units during a sale period as is required and customary is not an option. In fact, the Receiver's marketing material states only vacant units and common areas will be available for viewing.

---

[2] The current period ends May 30, 2020. If Illinois' order is extended, which is likely, then the marketing period will occur exclusively during an unprecedented shelter in place period.

3

- This is unlike other types of commercial real estate such as office space or other asset classes that remain largely unoccupied.

- Showing these properties is a known health risk and is impermissible under the shelter in place order as viewing the properties does not appear to constitute an essential activity or business. *See* Executive Order 2020-32 (ordering all Illinois residents to stay at home except as expressly allowed under the order).

- The Receiver's admitted goal is to liquidate these properties as quickly as possible. The Receiver's actions and strategy are in stark contrast to his duty to act and sell real properties "***with due regard to the realization of the true and proper value of such real property,***" particularly where some of these properties are sufficiently cash flowing.— *See* Order Appointing Receiver, ¶38 [Dkt. 16].

- Indeed, the Receiver had to accept "back up" bids (that is, another way of saying "lower bids") for other properties that were listed for sale due to the lack of liquidity and available financing to winning bidders.[3]

- It makes little sense for the Receiver to sell and market properties that have zero benefit to the estate. The Receiver is simply amassing fees to liquidate assets which will generate NO recoveries for anyone in this case – whether it be lenders, investors, or unsecured creditors. The only parties who benefit is the Receiver and his law firm who generate fees by selling properties with no value to the estate.

- No chapter 7 trustee in bankruptcy would "administer" assets with no value to the estate. It makes zero sense for the Receiver to be doing this here, absent consent

---

[3] The Receiver notified counsel for the secured lenders for three separate properties stating the accepted highest bidder of the properties could no longer close because the bidder's lender instituted a moratorium on issuing new loans due to COVID-19. The Receiver intends to accept the next highest bid, resulting in a substantial decrease in purchase price.

4828-6778-4636.4

from the interested stakeholders, which he does not have. *See S.E.C. v. Madison Real Estate Group, LLC*, 647 F. Supp. 2d 1271, 1284-85 (D. Utah 2009) (stating receiver should abandon properties that are valued less than the amounts owed to secured parties or will not generate any benefit to the estate).

As such, the Mortgagees file this Motion seeking to stay the sale of certain properties until such time as (i) nationwide restrictions on the economy have eased; (ii) economic restrictions for the State of Illinois and the City of Chicago have eased to allow for the proper marketing and showing of these properties, (iii) commercial real estate values begin to stabilize, and (iv) liquidity and financing return to the market.

## FACTUAL BACKGROUND

### I. Consolidated Sale Motion and Current Status

On January 24, 2020, the Receiver filed the Consolidated Motion seeking approval to market and list for sale 36 multifamily properties. Consolidated Motion, ¶11. The Mortgagees have security interests in certain of the Properties subject to the Consolidated Motion. On February 27, 2020, the Mortgagees filed objections to the Consolidated Motion in order to protect their security interests and to object to certain of the Receiver's proposed processes and procedures. *See* Objections of Certain Mortgagees to Receiver's Consolidated Sixth Motion for Court Approval of the Process for Public Sale of Real Estate by Sealed Bid, Fifth Motion for Approval of the Sale of Certain Real Estate and for the Avoidance of Certain Mortgages, Liens, Claims, and Encumbrances, and Motion to Amend the August 17, 2018 Order Appointing Receiver ("Objections") [Dkt. 628].

In light of the global pandemic and public emergency caused by COVID- 19, Chief Judge Rebecca Pallmeyer entered Amended General Order 20-0012 on March 16, 2020 extending all

4828-6778-4636.4

deadlines 21 days and striking all civil hearings, trials, and settlement conferences through April 3, 2020. Since March 16, 2020, Chief Judge Pallmeyer has entered two additional general orders extending all deadlines for a total of 77 days and striking civil hearings, trials, and settlement conferences through May 29, 2020.

On March 17, 2020, the Receiver filed his Motion for Partial Relief from Amended General Order 20-0012 in Re: Coronavirus COVID-19 Public Emergency ("COVID-19 Motion") [Dkt. 663] requesting an immediate ruling on the Consolidated Motion. The basis of the COVID-19 Motion, as claimed by the Receiver, is that he must liquidate these properties as soon as possible. *See* COVID-19 Motion, p. 5. The motion also summarily states, without any support or explanation, "all interested parties would benefit from expeditious disposition of the Consolidated Motion." *Id.*

The Mortgagees filed a Motion for Hearing requesting the Court stay ruling on the Consolidated Motion and grant the parties a hearing on the Consolidated Motion. On March 31, 2020, the Court entered a Minute Order [Dkt. 677] denying the Motion for Hearing and granting the Consolidated Motion. *See*, Order [Dkt. 676].

The Court stated, "[T]he Court concludes that, given the entirety of the circumstances, the Receiver's plan to market and sell the properties listed in the consolidated motion is still sensible notwithstanding the COVID-19 crisis." The Court's ruling was based on the facts and circumstances *known as of March 31, 2020*. The facts and circumstances have become considerably more dire since the entry of the order on March 31, 2020 and the gravity of the situation as predicted by the Mortgagees has become all too apparent. By way of example, as of March 31, 2020, the total deaths due to COVID-19 were 2,398 nationwide. World Health Organization, *Coronavirus Disease 2019 (COVID-19) Situation Report – 71* (March 31, 2020).

4828-6778-4636.4

This number has increased 3,535% in the U.S. since the Court's ruling to a total of 87,180 as of May 18, 2020. World Health Organization, *Coronavirus Disease (COVID-19) Situation Report – 119* (May 18, 2020). Moreover, when the Court issued its original ruling, Illinois' shelter in place order was set to expire April 7, 2020 (a mere week after the Court's ruling), but as we have seen since the Court's March 31 ruling, the order has been extended several times and many of its requirements will likely be extended beyond May 30, 2020. Gregory Pratt, John Byrne, and Dan Petrella, *Mayor Lori Lightfoot lays out 'five-star' plan for reopening Chicago following coronavirus pandemic disruptions*, https://www.chicagotribune.com/coronavirus/ct-coronavirus-chicago-reopening-lightfoot-20200508-ztpnouwexrcvfdfcr2yccbc53a-story.html (May 8, 2020).

**II.      Marketing and Sale of the Properties**

On May 4, 2020, the Receiver's real estate broker notified the Mortgagees certain properties subject to the Consolidated Motion were now listed for sale with a call for bid date of June 3, 2020. The properties listed for sale and subject to the objecting Mortgagees' security interests include:

- 6250 S. Mozart, Chicago, Illinois;
- 1131 E. 79th Place, Chicago, Illinois;
- 3074 Cheltenham Place (alternate Address: 7836 S. South Shore)
- 7201 S. Constance Ave. (alternate Address: 1825-31 E. 72nd St.)
- 7051 Bennett, Chicago, Illinois
- 7957 Marquette, Chicago, Illinois
- 6357 Talman, Chicago, Illinois
- 7201 Dorchester, Chicago, Illinois
- 2736 W. 64th, Chicago, Illinois

7

- 6356 S. California, Chicago, Illinois
- 6558 S. Vernon, Chicago, IL
- 5618 S Martin Luther King Drive, Chicago IL

(collectively, the "Properties").

The list price for these properties are substantially below appraised amounts:

- For example, 6250 S. Mozart has a list price of $850,000, against an appraised, "as-is" value of $1,370,000, equaling 63% of appraisal. 7051 Bennett is listed at 46% of appraisal, 7957 Marquette is listed at 41% of appraisal, 6357 Talman is listed at 57% of appraisal, 7201 Dorchester is listed at 57% of appraisal, 2736 W 64th is listed at 53% of appraisal and 6356 S. Carolina is listed at 61% of appraisal. 6558 S. Vernon, Chicago Illinois has a list price of $450,000.00, while a December 2018 appraisal of this property reflected an "as is" value of $1,100,000.00. The property at 5618 S. Martin Luther King Drive, Chicago Illinois has a list price of $625,000.00, while a December 2018 appraisal of this property reflected an "as is" value of $1,020,000.00.

The Mortgagees requested an explanation from the broker and Receiver's counsel as to why the properties were listed at such low amounts and requested the broker increase the list prices. The broker responded trying to justifying the list prices based on his experience and stating "Ultimately, the market will price the asset and in our opinion, the more interest in the property generates competition and maximizes the sales price." The broker further stated "The majority of the properties that we have marketed to-date have gone under contract at or above asking price."[4]

---

[4] The Receiver's most recent sale approval motion [Dkt 690] shows this strategy is flawed. Of the nine properties subject to that motion, six will be sold for less than then list price, some with purchase prices at nearly half the list price, and two properties will be sold at the ask price.

4828-6778-4636.4

Liberty pressed for additional clarification to this vague response, which was never answered. It stated: "You haven't answered the question. What has changed to lower the starting prices so dramatically, per unit? What impact will these listings have on others listed at higher per unit prices that are otherwise comparable. It is easy to say this is what we think, but pricing is based on fact, not thought. If not based on the appraisals, then what assumptions in the appraisals were modified and in what way to arrive at the listing prices. Is this based on post-Covid closed sales (are there even any)? What actual metrics were used to arrive at the drastically lower listing prices? It's great to say that properties sold at or above list historically. Those properties were priced much closer to appraisal. Having these list at prices so far below appraisal does not translate into competing bids way above listing price. So the listing prices, if they are true to historic sales, will set the benchmark too low."

The parties are entitled to a response to these questions, as the fire sale prices will materially affect every property subject to sale by the Receiver.

III.     **COVID-19 Pandemic**

Beginning in January 2020, COVID-19 began spreading in the United States. Since January, the coronavirus has spread across the country causing catastrophic economic and social damage. As of May 14, 2020, a record 36.5 million Americans filed for unemployment in just an eight-week period. Sarah Chaney & Gwynn Guilford, *Nearly Three Million Sought Jobless Benefits Last Week*, https://www.wsj.com/articles/unemployment-benefits-weekly-jobless-claims-coronavirus-05-14-2020-11589410374 (last updated May 14, 2020). The economic impact has been so great the United States Congress passed an unprecedented $2 trillion coronavirus economic stimulus bill and a proposed second stimulus bill totaling $3 trillion is currently under consideration.

4828-6778-4636.4

On March 16, 2020, the White House issued national guidelines to help reduce the spread of the virus, including the use of "social distancing." Social distancing requires individuals to avoid public places, avoid gathering in groups, and to remain at least six feet from any other individual. In early March, citizens began voluntarily staying home, avoiding public places, and altering their way of life. COVID-19 is present in all 50 states, with some states, including Illinois being categorized as a "hot spot" due to the high number of confirm cases. As noted, there have been over 87,180 deaths in the United States with over 1,400,000 Americans being infected with the disease. World Health Organization, *Coronavirus Disease (COVID-19) Situation Report – 119*. Cities and states such as Chicago and Illinois have effectively shut down.

The extraordinary nationwide restrictions have caused the economy to screech to a halt. The Federal Reserve Chairman Jerome Powell stated, "The scope and speed of this downturn are without modern precedent, significantly worse than any recession since World War II." Nick Timiraos, *Powell Says Washington Will Need to Spend More to Battle Downturn*, https://www.wsj.com/articles/powell-says-washington-will-need-to-spend-more-to-battle-downturn-11589374832?mod=searchresults&page=2&pos=10 (last updated May 13, 2020). Businesses have either shut down completely or severely scaled back operations and it is estimated that over forty million people have lost their jobs or have been furloughed or laid off. The threat of COVID-19 is so great that some companies have told their employees they can remain at home indefinitely. Brian Heater, *Twitter Says Staff Can Continue Working From Home Permanently*, (May 12, 2020, 12:53 p.m.) https://techcrunch.com/2020/05/12/twitter-says-staff-can-continue-working-from-home-permanently/. To put it lightly, COVID-19 has upended the entire country's economy and social functioning.

Despite the apparent and obvious impact on the economy and the restrictions on movement

of citizens nationwide, the Receiver moved forward with marketing the properties for sale. Perhaps most egregiously, the marketing period (May 4 through June 3, 2020) occurs almost exclusively during the effective period (currently through May 30, 2020) of Governor Pritzker's Shelter in Place Order and Mayor Lightfoot's orders—meaning any person intending to view the property or travel to the area would be in violation of the Governor's order or other shelter in place orders.

To further exacerbate the issue, banks have substantially scaled back issuing new loans and have tightened lending standards. Matthew C. Klein, *Banks are Tightening Lending Standards Like It was 2008 Again* (May 7, 2020), https://www.barrons.com/articles/banks-are-tightening-lending-standards-like-it-was-2008-again-51588881348. Indeed, the COVID-19 liquidity crisis has already caused prior committed buyers of properties to cancel their purchase contracts with the Receivers. This adverse outcome directly prejudices the Mortgagees, investors, and unsecured creditors.

## ARGUMENT

This Court should exercise its equitable powers and order a stay of the marketing and sales of the Properties until such time as the State of Illinois and the City of Chicago allow for the proper marketing and showing of these properties and as real estate values begin to stabilize, and liquidity and financing return to the market. The Receiver's fire sale efforts during one of the greatest economic down turns and recent pandemics the world has seen certainly does not maximize – much less even generate – any value for the estate and will substantially prejudice all interested parties, including the investors and Mortgagees. Nor does it comport with the Order Appointing Receiver requiring the Receiver to sell real estate "with due regard to the realization of the true and proper value of such real property." Order Appointing Receiver, ¶38 [Dkt. 16]

4828-6778-4636.4

I. **Legal Standard**

This Court is entitled to take judicial notice of the current state of the local, national, and global economy for purposes of considering the Motion. *Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*, No. 08-C-797, 2010 WL 1287058, at *11 (E.D. Wis. Mar. 30, 2010); *Air Line Pilots Ass'n Int'l v. Spirit Airlines, Inc.*, No. 08-CV-13785, 2009 WL 1803236, at *14 (E.D. Mich. June 18, 2009). The Mortgagees request that this Court exercise its equitable authority and stay the marketing and sale of the Properties. *Thomas v. City of Evanston*, 636 F. Supp. 587, 590 (N.D. Ill. 1986) (stating a court has equitable powers to stay a prior order). A court's ability to issue stays "is inherent in the power of a court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Shakman v. Democratic Org. of Cook Cty.*, No. 69 C 2145, 2005 WL 693242, at *2 (N.D. Ill. Mar. 24, 2005), *vacated and remanded* 2005 WL 3076724 (7th Cir. 2005) (internal quotations omitted). A court should consider the "traditional" factors of whether to issue a stay, such as irreparable injury absent a stay; however, since the "traditional" factors "contemplate individualized consideration in each case, other factors may be considered by a court if the facts and circumstances of the case warrant it." *Shakman*, 2005 WL 693242, at *2.

II. **Selling the Properties in the Current Economic Environment Will Not Maximize – or Even Generate – Value for the Receivership Estate.**

As an initial matter, the Receiver's pre-COVID-19 marketing and sale strategy has not maximized value. The Receiver's most recent motion to approve sales [Dkt 690] shows that six of the nine properties under contract will close for prices less than the list price—***with some purchase prices at nearly half the list price***. Marketing the Properties in the current economic environment and "allowing the market" to "price the asset" (as the Receiver and Broker suggest doing) will only exacerbate the Receivership Estate's deficit and will result in substantial losses

12

for the estate and all interested parties.

Recent examples are more than telling. The property 7110 S. Cornell Avenue, Chicago, Illinois ("7110 S. Cornell") was part of the Consolidated Motion. The Receiver obtained Court approval to close on the sale of this property for a purchase price of $1,240,000. Following Court approval, the buyer terminated the sale contract because its lender instituted a 90-day moratorium on loans due to the current economic environment. The Receiver intends to move forward with accepting a new purchase contract with a purchase price of $900,000 (**a $340,000 price reduction**). This severe reduction substantially prejudices the party holding a security interest on the property because the sale will generate significantly less sale proceeds and will not cover any secured creditor's debt.

Similarly, 7600 S. Kingston was under contract for $1,870,000 and the Receiver is proposing to sell it to the next highest bidder for $1,530,000, a $340,000 drop in proceeds (an 18.18% decrease); 7626 S. Kingston was under contract for $510,000 and the Receiver is proposing to sell it to the next highest bidder for $320,000, a $190,000 drop in proceeds (a 37.25% decrease). The Receiver intends to accept the next highest bids, resulting in a substantial decrease in the purchase prices. These properties are fully encumbered by investor and Mortgagee liens, causing a loss only to the constituents the Receiver has been engaged to protect.

Likewise, the list price of 6250 S. Mozart ($850,000) is nearly half the appraised value of the property ($1,370,000). The Receiver's proposed strategy of "allowing the market" to "price the asset" will not maximize value. A recent example exemplifies this issue. The property at 7450 South Luella, Chicago, Illinois was marketed for sale by the Receiver in April 2019 for $450,000.00 (which matched the creditor's December 2018 appraised value for the property). The Receiver accepted an offer of $278,000.00 for the Luella property which was approved by the

13

Court over objection of creditors asserting lien interest in the property. The Receiver could not confirm whether he made a counter-offer to the proposed purchaser of the Luella property or whether the Receiver discussed with the broker remarketing the Luella property to obtain an offer closer to the marketing value. Instead, it appears the Receiver intends to allow the market to set the price even if that means accepting offers which are 65% of the marketing price or appraised value.

Given the current economic conditions, bids for these commercial properties (many which are being listed for significantly less than fair market value) will likely be less than the marketing price. What's worse is there is no evidence the Receiver will remarket or try a different marketing approach in an effort to sell these properties at a price closer to their appraised value, in violation of the Receiver's obligations under the Order Appointing Receiver. Lower purchase prices result in lower net sale proceeds resulting in lower amounts paid to Equitybuild investors or the Mortgagees. Put simply, the Receiver's rush to sell these properties will not maximize the value for the estate. No party wins with the Receiver's current strategy – except for the Receiver and his law firm. At the very least, the Receiver must provide evidence that to the parties and to the Court that the cash flow from these properties are less than the cost to operate these properties (excluding, of course, the Receiver's nearly $4,000 in fees each day). And to the extent a property may not be cash flowing (*even though the Receiver has not made a single principal and interest payment in 21 months*), why the property is being managed in such a way as it is not cash flowing. Interestingly and disturbingly, the Receiver has once again failed to file timely fee applications or reports explaining his activities. As the Court is aware, this is not the first time this has happened and the Court was required to set new deadlines for the Receiver's compliance. This unfortunate course of conduct in not following this Court's orders regarding transparency and timeliness of

14

reporting is patently unacceptable and is in clear derogation of the Receiver's fiduciary duties to the parties and is without respect for this Court's rules and orders.

This Court should stay the marketing and sales until the commercial real estate market shows signs of recovery. In fact, other courts have issued this exact ruling. In *Mohr v. MLB Sub I, LLC*, the court entered a judgment of foreclosure in favor of the secured lender, but stayed the lender's right to sell the property due to the COVID-19 pandemic. In recognizing the dire and unusual circumstances, the court held:

> **In view of the ongoing COVID-19 pandemic, the government shutdown and stay-at-home order, the common-law duty to obtain the best price for the property** as enunciated in *Hungate v. Law Office of David B. Rosen*, 139 Haw, 394, 408, 391 P.2d 1, 15 (2017), **and the fact that the real estate market is inactive and Hawai'i has temporarily halted evictions, the Court finds that it would be inequitable and not in the interest of either party to proceed with the foreclosure sale under the existing conditions**. The Court thus finds and so orders that the Commissioner may not commence any actions to foreclose on the Mohrs' property until further ordered by this Court. **Either party may petition the Court to authorize proceeding with the sale when it appears that the foregoing conditions have ended and the real estate market is once again active; and the other party will have an opportunity to respond**.

No. CV 16-00493 ACK-WRP, 2020 WL 1861657, at *13 (D. Haw. Apr. 13, 2020). The exact same principles apply here. The Receiver has a similar duty to maximize recovery, Illinois is subject to the Shelter in Place Order, and the real estate market is substantially depressed. Rushing to sell these properties at such deep discounts violates the Receiver's duties and will not benefit any party. Therefore, the Mortgagees respectfully request the Court stay the marketing and sale of the Properties.

III. **The Marketing and Sale Process is Rendered Illusory by the Current Economic Environment.**

Illinois' current Shelter in Place Order requires all individuals to remain at home except

15

for those expressly exempt. Nearly every state in America has a similar restriction in effect. This fact alone will severely restrict, if not prohibit, any interested buyer from viewing and inspecting the Properties. In fact, any marketing and showing of occupied units – which is customary and in fact required for buyers – places tenants at unacceptable health risks and will not be allowed. Moreover, lenders have substantially scaled back issuing loans, or as seen above, have stopped making loans entirely. *See* Matthew C. Klein, *Banks are Tightening Lending Standards Like It was 2008 Again*. How is a sufficient buyer pool supposed to be generated when the buyers are unable to obtain financing and unable to visit and inspect the Properties? The simple answer is it cannot. Moving forward with marketing the Properties is irresponsible, ineffective, and will not maximize value. This Court should exercise its equitable authority and stay the marketing and sales of the Properties for a reasonable period after economic and social restrictions have lifted to allow the real estate market to stabilize so the Receiver can market and sell these properties at amounts closer to their appraised values.

Any argument by the Receiver that the Mortgagees and institutional lenders are to blame for the Properties being sold in the current economic environmental is disingenuous and simply wrong. To the contrary, the Receiver only has himself to blame. As the Receiver points out in his Reply in support of the Consolidated Motion (Dkt. 651), the marketing and sales process proposed in the Consolidated Motion is the same process approved by the Court on five separate occasions, the earliest being November 21, **2018**. **Despite the Receiver's process being approved in November 2018 – 18 months ago – he delayed marketing these Properties for sale until May 2020**. The Mortgagees have no authority or ability to sell the Properties, absent the Court's relief from the Receiver Order. That authority lies exclusively with the Receiver under the Receiver Order. Therefore, any delay in marketing these properties and the resulting depressed purchase

16

prices rests squarely on the Receiver's shoulders. The Mortgagees and all other interested parties should not be prejudiced by the Receiver's ineffectiveness in conducting this receivership.

### REQUEST FOR TELEPHONIC HEARING

The Mortgagees respectfully request a telephonic hearing on this Motion on May 27, 2020 consistent with the Third Amended General Order 20-0012. The Third Amended General Order stays all hearings until after June 1, 2020, absent special request and a need. Exigent circumstances exist for the Court to hold a telephonic hearing before June 1, 2020 because the call for bid date is June 3. As stated above, allowing the marketing and sale of these properties in the current economic environment will substantially prejudice the Mortgagees and all interested parties. Additionally, the Honorable Judge Lee is unavailable for hearings June 2-4 and does not hear motions on Mondays (June 1). Therefore, the Mortgagees respectfully request a hearing on May 27, 2020.

### CONCLUSION

In sum, the Mortgagees request this Court exercise is equitable powers and stay the marketing and sale of the Properties until such time as (i) nationwide restrictions on the economy have eased; (ii) economic restrictions for the State of Illinois and the City of Chicago have eased to allow for the proper marketing and showing of these properties, (iii) commercial real estate values begin to stabilize, and (iv) liquidity and financing return to the market. Certainly a bid call due date of June 3, 2020, in this environment, cannot possibly be justified.

Dated: May 22, 2020            Respectfully submitted,

| | |
|---|---|
| /s/ James M. Crowley | /s/ Jill Nicholson |
| James M. Crowley (jcrowley@plunkettcooney.com) Plunkett Cooney, PC 221 N. LaSalle Street, Ste. 1550 Chicago, IL 60601 Ph: (312) 970-3410 Fax: (248) 901-4040 *Counsel for UBS AG* | Jill Nicholson (jnicholson@foley.com) Andrew T. McClain (amcclain@foley.com) Foley & Lardner LLP 321 N. Clark St., Ste. 3000 Chicago, IL 60654 Ph: (312) 832-4500 Fax: (312) 644-7528 *Counsel for Citibank N.A., as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2018-SB48; and Fannie Mae* |
| /s/ Mark Landman | |
| Mark Landman (mlandman@lcbf.com) Landman Corsi Ballaine & Ford P.C. 120 Broadway, 27th Floor New York, NY 10271 Ph: (212) 238-4800 Fax: (212) 238-4848 *Counsel for Freddie Mac* | /s/ Jay Welford Jay Welford (jwelford@jaffelaw.com) 27777 Franklin Rd., Suite 2500 Southfield, MI 48034 Ph: (248)351-3000 *Counsel for Liberty EBCP, LLC* |
| /s/ David Hart | |
| David Hart (dhart@maddinhauser.com) Maddin, Hauser, Roth & Heller, P.C. 28400 Northwestern Highway Suite 200-Essex Centre Southfield MI 48034 *Counsel for BC57, LLC* | |

4828-6778-4636.4