**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | ) | **Civil Action No. 18-CV-5587** |
| **Plaintiff,** | ) | **Hon. John Z. Lee** |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| **EQUITYBUILD, INC., et al.,** | ) | |
| **Defendants.** | ) | |

**RECEIVER'S COMBINED RESPONSE TO OBJECTIONS TO FIFTH AND SIXTH FEE APPLICATIONS**

## I. BACKGROUND

Certain institutional lenders have objected (Docket Nos. 617 & 648) to the Receiver's fifth and sixth fee applications (Docket Nos. 608 & 626), encompassing services rendered between July 1, 2019, and December 31, 2019. During this period, the Receiver made significant progress developing the claims process and conveying properties through public sale auctions, as described in the Receiver's five comprehensive status reports (Docket Nos. 467, 468, 477, 548 & 567), painstaking efforts that the objectors ignore. Consistent with his role as a federal equity receiver and the duties he has been ordered to perform by the Court, the Receiver and his retained professionals have worked diligently to present and implement a fair and equitable process for resolving the claims being legitimately asserted by hundreds of competing interested parties, despite criticism and rebuke by the objectors.

The objectors, however, address only their own interests and eschew any notion that the claims process must accommodate and protect the interests of all competing claimants, and they ostensibly refuse to acknowledge the work that the Receiver has undertaken to manage a portfolio of more than a hundred real estate properties to maximize the value of those assets for the benefit

of the claimants who may ultimately realize those values. They seem oblivious to the fact that the Receiver has invested considerable effort implementing and reporting on a process that benefits all claimants, including institutional lenders, ordinary lenders, lien claimants, equity investors, and other assorted creditors. No matter how these parties ultimately fare in the adjudication of their claims, they will all have been accorded a full and fair opportunity to assert them. (*See* Docket No. 638, at 24-25)

During the third and fourth quarter of 2019, the Receiver accepted over 2,000 claims submissions; conducted initial reviews of those claims; prepared and filed three status reports regarding those claims; prepared a preliminary report listing nearly a thousand claimants and their claim amounts; and preliminarily identified at least 116 properties potentially subject to secured and often competing claims, including claims associated with cross-collateralized loans. In addition, the Receiver has devoted substantial time and attention to analyzing the nature of the claims, considering the timing and prioritization of claims, clearly articulating the litany of issues to be presented to the Court, and developing and recommending a methodology for claims distributions.

The Receiver has also spent significant time protecting, preserving, and enhancing the properties under his control, as well as developing the most economically feasible plan for disposing of those assets in a non-distressed context. He has worked tirelessly on sequencing the sales in such fashion as to minimize operating losses and maximize sales proceeds. Meanwhile, his efforts have been obstructed at every conceivable juncture by virtue of repeated objections asserted by certain institutional lenders. Despite the hindrances to progress created by these objections, by the end of 2019, the Receiver had closed on the sales of 22 properties sold for purchase prices totaling $18,933,000 and generating net closing proceeds of $16,285,831.36. In

addition, the Receiver had entered into contracts to sell an additional 14 properties for $20,462,000.

Moreover, while a consolidated motion to market and sell 36 properties and to confirm the sales of 12 more was not filed until January 24, 2020 (Docket No. 618), the Receiver and his retained professionals spent significant time crafting that motion which involved carefully and meticulously analyzing title commitments on each of those properties, assembling all the publicly-recorded documentation supporting all special exceptions identified on those commitments, and, for the edification of all potentially interested claimants and the satisfaction of the title insurer, thoroughly reciting the relevant details of each and every EquityBuild transaction that resulted in each of the competing encumbrances, thus providing all potentially interested parties with a clear explanation of how the defendants executed their scheme at ground level. Despite those efforts, additional objections (which were overruled) were filed.

During these months, the Receiver also delivered hundreds of financial reports to the institutional lenders, including, but not limited to, monthly operating profit and loss statements for each of the properties. The Receiver also arranged for property inspections for the lenders both in connection with their requests to inspect their collateral and in connection with the marketing and sale of properties on which they expressed an interest in credit bidding.

In addition, the Receiver and his professionals continue to receive and respond to thousands of e-mail inquiries from all classes of claimants, including the institutional lenders. The Receiver has also sent hundreds of e-mails to the investor-lenders, providing them with notices of proceedings and associated deadlines, sending them copies of key motions and pleadings, and informing them about the nature and progress of the Receivership, the claims process, and sundry other issues. The Receiver and his team have developed and continue to refine answers to

frequently asked questions so that responses to investors and others can be handled in a timely and efficient manner.

From the inception of the Receivership, the Receiver has maintained and regularly updated a web site which posts the substantive pleadings of the Receivership for the benefit of all interested stakeholders. The Receiver has worked to improve the presentation and organization of information on the Receivership web site to make it easier to locate pleadings in key areas of interest, including for status reports, property sales, claims process matters, and court orders.

Each of the foregoing efforts, and all other essential functions performed by the Receiver and his retained professionals are described in great detail in the 320 pages of invoices submitted in connection with the fifth and sixth fee applications.

## II. LEGAL STANDARD

The Court has identified the applicable law in connection with the Receiver's prior fee applications.

> "In securities law receiverships, . . . the awarding of fees rests in the district judge's discretion, which will not be disturbed unless he has abused it." *S.E.C. v. First Secs. Co. of Chi.*, 528 F.2d 449, 451 (7th Cir 1976). "[T]he court may consider all of the factors involved in a particular receivership in determining an appropriate fee." *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994). In making this determination, courts consider that the benefits provided by a receivership "may take more subtle forms than a bare increase in monetary value." *Id.* (quoting *S.E.C. v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992)). Accordingly, "[e]ven though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation." *Id.* (quoting *Elliott*, 953 F. 2d at 1577). And courts also look to the position of the SEC, which is given "great weight" in determining whether fees should be awarded. *First Secs. Co.*, 528 F.2d at 451 (citation omitted).

(Docket No. 614, at 2)[1] *See also SEC v. Byers*, 590 F. Supp. 2d 637, 644 (S.D.N.Y. 2008) ("A receiver appointed by a court who reasonably and diligently discharges his duties is entitled to be fairly compensated for services rendered and expenses incurred."); *Drilling & Exploration Corp. v. Webster*, 69 F.2d 416, 418 (9th Cir. 1934) (same); *SEC v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) (same).

The latest objections to the Receiver's fifth and sixth fee applications largely repeat their objections to the Receiver's earlier fee applications, and these objections have already been overruled. (Docket Nos. 541, 546, 547 & 614) As the Court has repeatedly determined:

- "there is a significant need for the Receivership Assets to be managed by a neutral party until an orderly claims process is concluded;"
- "the receiver's efforts have benefitted and will benefit the Receivership Estate;"
- "the Receiver and his legal professionals have devoted significant resources responding to various motions, objections, and inquiries made by lenders, with these efforts increasing the amount of fees the Receiver is reasonably entitled to;" and

[1] The objectors cite *In re Taxman Clothing Co.*, 49 F.3d 310, 314 (7th Cir. 1995), for the proposition that professional fees can become subject to disgorgement if the efforts required (and the fees associated with those efforts) outweigh the potential for recovery to the estate. But *Taxman* also considers whether the Receiver has conferred a benefit on the estate and its claimants. Here, as in *Elliott*, the benefits that the Receiver has brought include, but are not limited to, preserving, administering, maximizing the value of, and orderly selling the assets of the Estate and implementing and administering a claims process that affords all potentially interested parties, including hundreds of ordinary lenders, the opportunity to establish a priority secured interest in a judicially efficient process. Further, *Taxman* is distinguishable on the basis that its focus was on the relative benefit to the estate of pursuing preference claims in relation to the cost of doing so. Whereas here, the vast majority of the Receiver's fees and expenses are the result of efforts to preserve and liquidate the assets of the Estate and implement and administer a claims process, which are necessary irrespective of whether or not the Receiver can successfully increase the amount of funds in the Estate. The question then, is whether the Receiver's fees and expenses in preserving and liquidating the assets of the Estate and implementing and administering a claims process are reasonable. (*See also* Docket No. 527, at 4-5 & n.2)

- the efforts of the Receiver and his legal professionals "have been delayed in part by time spent responding to various motions and objections made by the lenders."

(Docket No. 614, at 3)

## III. DISCUSSION

### A. The Objectors Disregard The Complexity Of This Action And The Need For A Receiver.

The objecting lenders persist in refusing to recognize the magnitude and complexity of the receivership estate or their own role in obstructing the pace of the Receiver's mission and driving up legal fees. They reliably object to virtually every motion (typically by seeking to relitigate issues already decided), delay the marketing and sales process, sidetrack the Receiver from matters of pressing importance, ratchet up the cost and expense of administering the estate (to the detriment of hundreds of defrauded investors), and, then, with no appreciation for the irony, complain about the allegedly slow pace of the proceeding, as well as the size of the Receiver's fee petitions.

This is not a typical foreclosure case involving a single secured lender. This is a receivership involving a company that operated an enormous Ponzi scheme in violation of federal securities law and which kept its operation afloat by (1) siphoning funds from the accounts of performing properties to pay debt service, property taxes, insurance, and other costs incurred in connection with non-performing properties and (2) deploying funds raised from hundreds of "mom and pop" investors in connection with allegedly new acquisitions in order to stave off defaults on institutional loans. EquityBuild was not legitimately paying all the debt service to the institutional lenders; the investors were.

To complicate matters, the defendants raised the money they needed to keep the Ponzi scheme afloat by at times granting its investor-lenders mortgages against particular properties and then, in many instances, surreptitiously released those mortgages without the investor-lenders'

knowledge or authorization in order to pave the way for new loans from institutional lenders, or, in other words, to borrow against the same properties twice. The end result was a thicket of competing claims between hundreds of investor-lenders, institutional lenders, lienors, and other assorted claimants against nearly 120 separate real properties. A federal receivership is the most efficient vehicle for adjudicating the claims asserted by the victims of the Ponzi scheme, and, in that vein, the Receiver has invested substantial time and effort implementing a claims process that will afford every potential claimant the opportunity to submit documentation and information pertaining to its claim(s), to discover information relating to directly competing claims, and to obtain a fair resolution.

Nevertheless, the objectors reflexively argue, without mentioning or acknowledging the Receiver's Motion for Approval of Process for Resolution of Disputed Claims (Docket No. 638), that "little progress has been made on developing an orderly claims process and distribution plan." (Docket No. 648, at 3) (*See supra* at 2.)

**B. A Receiver Is Needed Despite The Financial Constraints Of The Receivership.**

The objectors invoke the possibility that there will not be sufficient general assets to cover the expenses of the receivership, a scenario that may ultimately prove true. The cost associated with preserving, managing, and selling the properties and implementing a claims process is substantial, and made all the more difficult by the ceaseless objections and delays created by the objectors, as well as by the impact of COVID-19 on the real estate market. But the sacking of the Receiver will not eliminate the need to maintain and sell the hundreds of properties subsumed within the receivership estate, nor relieve the Court from implementing a full and fair claims process. The institutional lenders, having failed to persuade the Court that bankruptcy is preferable to receivership, are now collaterally attacking the Court's decision by attempting to starve the Receiver out of business. (Docket No. 597)

In fact, the Receiver has accomplished an overwhelming amount of work on this case by employing a lean staff that has worked with remarkable efficiency to accomplish tasks that could easily keep the entire litigation department at a national law firm busy for years. Moreover, in 2019, the Receiver and his firm achieved a reduction in fees and billing rates each quarter, amounting to a 41% decrease in fees and a 15% decrease in average billing rate between the first quarter and the fourth quarter. Notably, the fee applications at issue encompass the second half of 2019, in which the best economies were achieved.




**C. <u>The Receiver's Bills Are Accurate And Fair, And No Tasks Were Double-Billed.</u>**

The objectors assert that there is "evidence of duplicative billing," although they do not identify a single such instance, nor identify any instance where a professional billed time for work when it was unreasonable for that work to have been performed. "A party objecting to a fee application may not do so based on the general proposition that the fee sought is simply too much." *FTC v. Capital Acquisitions & Mgmt. Corp.*, 2005 WL 3676529, *4 (N.D. Ill. Aug. 26, 2005) (citing *In re Hunt's Health Care*, 161 B.R. at 982; *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 570 (7th Cir. 1992) ("a gestalt reaction that there was too much [time spent or that fees are excessive]

... isn't good enough")). Rather, "[t]he objector must, at some point, identify any allegedly improper, insufficient, or excessive entries and direct the court's attention to them." *Id.* There also is a fallacy underlying an argument of such overbreadth – to wit, that lawyers should never work together or communicate with one another and that, when they do so, only the time of one of the participants should be billed. On the contrary, a failure to strategically collaborate and share knowledge would itself lead to a duplication of effort and billing. The argument also wrongly presumes that the Receiver has not carefully reviewed the bills to eliminate time that should not have been charged.

No time reflected in the Receiver's and his counsel's invoices has been double-billed. Separate charges for professionals working together are reflected in the bills only when both professionals have substantively contributed to the work; and the time incurred by professionals collaborating on any activity has been reduced or written-off unless each professional separately made a substantive contribution to the work described.

The time invoices submitted by the Receiver and his counsel were prepared in good faith and accurately describe substantive professional work performed for the estate. The Receiver and his advisors consciously avoided recording time corresponding to work that does not require professional skill, experience, or judgment. Given the sheer totality of the tasks some of the Receiver's tasks perform in a single day, perhaps a handful of time entries do not adequately convey the substance of the work performed. As the fee application itself notes, however, no billing system is perfect, but the invoices submitted were prepared in good faith and with great care.

**D. The Court Should Approve Payment Of The Fees And Expenses Of The Receiver And His Retained Professionals.**

The Receiver anticipates that there are or will be sufficient funds to pay the Receiver and his retained professionals from monies that have been or will be recovered, net proceeds from the sales of unencumbered properties, net equity from the sale of encumbered properties, and funds returned to the Receiver's account from the sales proceeds of properties that received cash infusions to preserve and maintain them during periods when their operating income alone could not sustain them. Cash on hand in the Receiver's accounts totaled $366,523.54 as of May 31, 2020. The Receiver recently closed the sale of a property in May 2020 from which the Receiver presently expects in excess of $1,200,000 in equity. Additionally, the Receiver anticipates that in excess of $1,900,000 will be restored to the Receiver's account after properties that have received the benefit of cash infusions from the Receiver's account through the course of the receivership have been sold. This includes approximately $800,000 from currently available escrowed funds from the sale of sixteen properties (totaling $26 million in net proceeds), for which the Receiver plans to file a motion in the coming weeks. In addition, because of future uncertainties regarding sources of funds along with concerns for equity and fairness to all claimants, the Receiver has requested a receiver's lien in connection with the pending claims process motion, which makes clear that the Court has the authority to order in an appropriate case such as this. (*See* Docket No. 638, at 21-25) The above figures do not include any amounts that the Receiver may recover through claims he is investigating, and may pursue, against third parties.

**E. A Hold-Back of Fees Is Not Warranted.**

The objectors' repeated and conclusory contention that the Receiver should not be paid until a distribution plan is in place and that this Court should hold back 20% of all fees fails to "explain[] what therein is unreasonable or, at least, what would be reasonable under the

circumstances [and,] [a]bsent such evidence …, the opposition fails." *FTC v. Capital Acquisitions & Mgmt. Corp.*, 2005 WL 3676529, *4 (N.D. Ill. Aug. 26, 2005) (citation omitted). The Order Appointing Receiver does provide for the Court to hold back fees under the circumstances advanced by the lenders. Nor have the objectors cited any case law that mandates suspending payment to a receiver while he is conferring a benefit to a receivership estate. Indeed, their arguments ignore that the Receiver and his legal professionals are providing a 25-29% discount on rates and have achieved significant efficiencies as this matter has progressed (as shown above). Moreover, since the inception of this receivership, the period between the time that the Receiver's services have been rendered and the time that payment for those services was made has been substantial, at times exceeding a year. In fact, the Receiver has not yet reimbursed himself and his counsel for the fees associated with the work performed during the second quarter of 2019, which fees have already been approved by the Court.

Moreover, contrary to the objectors' conclusory and unsupported arguments, the SEC has previously supported and approved, and continues to support and approve, the Receiver's fee applications. (*See, e.g.*, Docket No. 526, 606 & 622) "In securities law receiverships, the position of the Securities and Exchange Commission in regard to the awarding of fees will be given great weight." *First Securities Co.*, 528 F.2d at 451 (citing *Fifth Avenue Coach Lines*, 364 F. Supp. at 1222). (*See also* Docket No. 607, Ex. 1, October 8, 2019 Tr. 6:12-15) Further, this Court has already found that the Receiver's efforts have benefitted the estate and will continue to benefit the estate, thus justifying reasonable compensation for the Receiver and his retained professionals. (*See, e.g.*, Docket No. 614, at 3)

## IV. CONCLUSION

For the foregoing reasons, the Receiver respectfully requests that the Court exercise its discretion to (i) approve the Receiver's fifth and sixth fee applications and payment of all fees and expenses described therein out of the funds in the Receiver's account, including as to any such future funds that come into the Receiver's account, and (ii) for such other relief as the Court deems equitable and just.

Dated: June 2, 2020

Kevin B. Duff, Receiver

By: /s/ Michael Rachlis

Michael Rachlis
Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Phone (312) 733-3950; Fax (312) 733-3952
mrachlis@rdaplaw.net

**CERTIFICATE OF SERVICE**

I hereby certify that on June 2, 2020 I provided service of the foregoing Receiver's Combined Response To Objections To Fifth And Sixth Fee Applications, via ECF filing to all counsel of record, and via electronic mail to Defendant Jerome Cohen at jerryc@reagan.com.

By: /s/ Michael Rachlis

Michael Rachlis
Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Phone (312) 733-3950; Fax (312) 733-3952
mrachlis@rdaplaw.net