UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, <br><br> Defendants. | Case No. 1:18-cv-5587 <br><br> Hon. John Z. Lee |

**OBJECTION OF LIBERTY EBCP, LLC TO RECEIVER'S
EIGHTH MOTION TO CONFIRM THE SALE OF CERTAIN
REAL ESTATE AND FOR THE AVOIDANCE OF CERTAIN
MORTGAGES, LIENS, CLAIMS, AND ENCUMBRANCES**

Liberty EBCP, LLC ("Liberty") hereby objects to the Receiver's Eighth Motion to Confirm the Sale of Certain Real Estate and for the Avoidance of Certain Mortgages, Liens, Claims, and Encumbrances [Dkt. 712] (the "Motion"), for the following reasons.

Liberty holds recorded mortgages against two of the three properties subject to the Motion, specifically the properties located at 7600-10 South Kingston, Chicago, Illinois ("7600-10 South Kingston") and 7656-58 South Kingston Avenue, Chicago, Illinois ("7656-58 South Kingston").

As set forth in the Motion, the Receiver originally accepted an offer for 7600-10 South Kingston, in the amount of $1,870,000 submitted by Ventus Holdings, LLC ("Ventus") [Motion, ¶27] and an offer for 7656-58 South Kingston, in the amount of $510,000, also from Ventus [Motion, ¶¶36, 37].

Ventus, however, provided notification that it was unable to close, based on a delay in its ability to obtain funding from its lender, due to delays related to Covid-19 [Motion, ¶29, 39].

1

As a result, the Receiver, rather than placing the properties back on the market, proceeded to accept the next highest bids previously received for the properties. The next highest bid for 7600-10 South Kingston had been submitted by Southside Property Group, LLC ("Southside"), at a price of $1,530,000 [Motion ¶¶26, 30]. The Receiver, in the Motion, is seeking approval of Southside's backup offer, representing a $340,000 reduction over what Ventus had offered to pay.

As to 7656-58 South Kingston, the next highest offer was for $300,000, but that backup bidder evidently refused to move forward and instead, Southside agreed to pay $320,000, representing a $190,000 reduction over what Ventus had offered to pay [Motion ¶41].[1] The Receiver, in the Motion, is seeking approval of Southside's offer.

Subsequent to the filing of the Motion, Ventus filed the Motion of Ventus Holdings, LLC to Intervene [Dkt. 721] (the "Ventus Intervention Motion"), stating that Ventus has since secured replacement financing for its purchase of 7600-10 South Kingston and for 7656-58 South Kingston, at its original offering prices. Ventus seeks to intervene and file its Objection of Intervenor, Ventus Holdings, LLC to Receiver's Eighth Motion to Confirm Sale of Certain Real Estate (the "Ventus Objection).

Liberty supports the granting of the Ventus Intervention Motion and supports the Ventus Objection. In the Ventus Objection, Ventus states that Ventus will be ready, willing and able to close on its purchases of 7600-10 South Kingston and 7656-58 South Kingston, at the original contractual prices agreed upon with the Receiver, without any reduction in price (Ventus Objection ¶6).

---

[1] It does not appear that the Receiver ever "went to market" after Ventus attempted to terminate its purchase obligations. It is assumed Southside learned of the availability of 7656-58 South Kingston when interacting as backup bidder for 7600-10 South Kingston.

4885098.v1

Permitting Ventus to proceed on its purchases will enhance the receivership estate. As to 7600-10 South Kingston, $340,000 more than what Southside has offered will be received. As to 7656-58 South Kingston, $190,000 more than what Southside has offered will be received. In total, sales to Ventus rather than to Southside will result in $530,000 of additional proceeds to Liberty or other lien holders on these two specific properties, a 23% enhancement in value over Southside's offers.

**I.** ***The Receivership Order and the Sealed Bid Public Sale of Real Estate Terms and Conditions dictate that the Ventus offers should be considered.***

This Court has already ruled that the Receiver's duty to act and sell real properties is to be undertaken "*with due regard to the realization of the true and proper value of such real property*" (*Order Appointing Receiver* [Dkt. 16] ¶38) (emphasis added).

Nothing in the approved Sealed Bid Public Sale of Real Estate Terms and Conditions (the "Terms and Conditions") preclude the Receiver from seeking Court approval of the Ventus offers. Instead, they require it.

First, there is no process, other than Court approval, by which the Receiver becomes duty bound to sell, to a given party who has submitted, or even executed, along with the Receiver, an asset purchase agreement. The Terms and Conditions state that "[t]he Closing shall remain subject to the approval of the Receivership Court" (Terms and Conditions ¶10(a)). Likewise "[t]he closing shall be held within fifteen (15) days *after* the Receivership Court grants the Receiver's motion to approve the sale" (Terms and Conditions ¶9) (emphasis added). Clearly, Court approval is a condition precedent to any obligation to close arising against the receivership estate.

Second, the Receiver has the right to postpone or cancel any sale. Implicit in this is the ability to cast away an offer for a higher and better offer received prior to Court approval having been obtained: "[t]he Seller and the Broker reserve the right, in their sole and absolute discretion,

3

to postpone or cancel the Sealed-Bid Public Sale of Real Estate with or without notice" (Terms and Conditions ¶10(b)).

Third, additional and unlimited rounds of bidding are permitted: "[a]lthough bidders are encouraged to submit their best offer, at the Seller's sole discretion, a best and final round or rounds may be conducted. In that event, the Seller will select the most competitive bids and the corresponding bidders will be invited to participate in the best and final round or rounds to be conducted by the Broker. The best and final bidding process will be conducted by telephone and email" (Terms and Conditions ¶3). Certainly, Ventus, if not invited to bid after the bids of Southside were received, should have been invited to bid and now has the admitted ability to now bid, based on its change in circumstance, and the Receiver should be obligated to pursue the higher Ventus bids, subject to any higher offers being submitted by Southside or any other third party.

Fourth, the Terms and Conditions in no way create a legal obligation on the Receiver, until Court approval has actually been granted: "[t]hese terms and conditions do not create any legal obligation on the part of the Seller or the Broker. If the sale fails to comply with any of these terms and conditions for any reason, the Seller and the Broker shall have no liability to any unsuccessful bidder" (Terms and Conditions ¶10(c)). Therefore, there can be no liability imposed on the Receiver in seeking to maximize the return to the estate by pursuing the Ventus offers, and any higher offers than those now posed by Ventus, to conclusion.

In *Roth v. Hood*, 106 F.2d 616 (6th Cir., 1939), the comptroller was liquidating a piece of real property owned by a then defunct bank. A bid was received and an asset purchase agreement was executed. The sale required the approval of both the Comptroller of the Currency and a local court of competent jurisdiction. The Comptroller of the Currency approved the sale. When the sale came on for hearing before the court, another bidder appeared and agreed to pay a higher

4885098.v1

price. The court adjourned the hearing and permitted the comptroller to proceed with the higher offer. The disgruntled lower bidder challenged the sale. The Court held that it was appropriate for the lower court to adjourn the sale, to permit the higher offer to be pursued. Finding no finality with respect to the asset purchase agreement alone, the Court held:

> The bidder to whom property has been knocked down at a public auction conducted by the receiver of a national bank where the sale is held precedent to the order of a court of record of competent jurisdiction does not acquire rights which have the same legal protection as those acquired at private or judicial sales. Until an order is first obtained, the sale is no sense judicial or legal. The accepted bidder occupies the position of a continuing offerer for the property which the court, in the exercise of its discretion, may direct the receiver to accept or may order the sale on other terms or conditions. It follows that appellant may not question the action of the court in rejecting his offer for the property. *Armstong v. Woolley*, 5 Cir., 89 F. 2d 295.

106 F. 2d 618.

Finally, any argument by the Receiver that permitting a higher bid will chill future bidding is without merit. First, all bidders were aware that their bids were not "final" until approved by the Court. Nothing has been chilled. All bidders have been subject to the same rules. Second, in balancing the equities of a hypothetical chilling of future bids versus a real, demonstrable $540,000 benefit to Liberty and other creditors claiming an interest on its two properties and a total benefit of $945,200 among the creditors claiming an interest in the three properties subject to the Motion, dictates that an almost million-dollar bird in the hand must prevail over an unproven hypothetical.

Accordingly, the Court should permit the Ventus offers to be deemed the highest and best offers, subject to any higher or better offers being submitted by Southside or any other third party.

**II.** ***Covid-19 is a justifiable reason to permit the Ventus offers to be considered.***

As various parties have advised this Court (*See, e.g. Motion to Stay Marketing and Sale of Properties* [Dkt. 694]) (the "Motion to Stay"), the Covid-19 Pandemic has had a profound impact on the economic and social fabric of our society over the last 120 days. The City of Chicago has

5

been especially hard hit, being one of the epicenters of the initial outbreak. The fact that Ventus had issues with its original lender should not be a surprise to anyone living in the current environment. In the Motion to Stay, the Lenders urged the Court to permit a more robust and extended marketing period for the remaining properties, including for the very reason we are now confronted--a delay in the lending community, in acting on a portfolio loan to Ventus. Certainly, the creditors of this receivership estate should not be prejudiced by a pandemic caused delay in Ventus obtaining its required financing to close on its property sales. To impose a $530,000 reduction in proceeds realizable by Liberty and other persons who claim an interest in 7600-10 South Kingston and 5676-78 South Kingston, based on a pandemic induced delay, with no prejudice but only benefit to the receivership estate, would be unjust and inequitable.

> **III.** *If the sales to Southside are approved to the exclusion of Ventus, then the deposits provided by Ventus should be ordered held for the benefit of the creditors claiming an interest in the proceeds of the sales of 7600-10 South Kingston and 7656-58 South Kingston.*

If the Court somehow determines that the sale of the properties should be authorized to Southside and not to Ventus, then the 10% non-refundable deposits, currently being held by the title company and posted by Ventus, should be retained and disbursed as additional proceeds resulting from the sale of 7600-10 South Kingston and 7656-58 South Kingston. The Receiver has agreed to this concept and Liberty and the Receiver have agreed[2] to the inclusion in the sale order, related to the sale of these properties, the following language:

> If the earnest money deposited by Ventus Merrill LLC and Ventus Holdings LLC into strict joint order escrow at First American Title Insurance Company in connection with the Purchase And Sale Agreements they entered into relating to the Properties is ultimately turned over to the Receiver, as a result of judicial order or otherwise, then such earnest monies shall be deposited into the corresponding segregated subaccounts maintained by the Receiver with respect to such Properties and treated for all purposes thereafter as proceeds from the sales of those Properties.

---

[2] This agreement was reached prior to learning of the Ventus Intervention Motion.

6

4885098.v1

## **CONCLUSION**

Liberty requests that the sales to Southside not be approved and instead that the sales to Ventus be approved, subject to any higher or better offers being submitted by Southside or another third party. Alternatively, if the sales to Southside are approved, the deposits given by Ventus should be held for the benefit of Liberty and any other creditors claiming an interest in the proceeds of sale of 7600-10 South Kingston and 5676-78 South Kingston.

Dated: July 2, 2020

Respectfully submitted,

/s/ Jay L. Welford
Jay L. Welford (P34471)
Jaffe, Raitt, Heuer & Weiss, P.C.
27777 Franklin Rd., Ste. 2500
Southfield, MI 48034
Ph: 248-351-3000
Fax: 248-351-3082
jwelford@jaffelaw.com
*Attorneys for Liberty EBCP, LLC*