**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

**v.**

**EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN,**

**Defendants.**

**Civil Action No. 18-cv-5587**

**Judge John Z. Lee**

**Magistrate Judge Young B. Kim**

**CONSENT TO MOTION OF VENTUS HOLDINGS, LLC, PIONEER ACQUISITIONS, LLC, AND SOUTHSIDE PROPERTY GROUP, LLC TO INTERVENE, REPLY IN SUPPORT OF EIGHTH MOTION TO CONFIRM THE SALE OF CERTAIN REAL ESTATE AND FOR THE AVOIDANCE OF CERTAIN MORTGAGES, LIENS, CLAIMS, AND ENCUMBRANCES, AND MOTION FOR ORDER DIRECTING RELEASE OF EARNEST MONIES TO RECEIVER**

Kevin B. Duff, as receiver ("Receiver") for the Estate of Defendants EquityBuild, Inc. ("EquityBuild"), EquityBuild Finance, LLC ("EquityBuild Finance"), their affiliates, and the affiliate entities of Defendants Jerome Cohen and Shaun Cohen (collectively, the "Receivership Defendants"), respectfully files this Consent To Motion Of Ventus Holdings, LLC, Pioneer Acquisitions, LLC, And Southside Property Group, LLC To Intervene And Reply In Support Of Eighth Motion To Confirm The Sale Of Certain Real Estate And For The Avoidance Of Certain Mortgages, Liens, Claims, And Encumbrances, And Motion For Order Directing Release Of Earnest Monies To Receiver.

## Preliminary Statement

In October 2019, the Receiver accepted contracts to sell three properties to Ventus Holdings, LLC, specifically, 7600-10 South Kingston for $1,870,000, 7656 South Kingston for

$510,000, and 7110-16 South Cornell for $1,240,000. In December 2019, the Receiver accepted a contract to sell 6949-59 South Merrill to Ventus Merrill LLC for $1,935,200. (Ventus Merrill LLC and Ventus Holdings LLC are collectively referred to herein as "Ventus.") This Court entered an Order confirming the sale of 6949-59 South Merrill on February 21, 2020 (Dkt. 633) and an Order confirming the sales of 7600-10 South Kingston, 7656 South Kingston, and 7110-16 South Cornell on April 1, 2020 (Dkt. 680).

By letter dated April 20, 2020, Ventus informed counsel for the Receiver that it was unable to secure acquisition financing, that it could no longer raise the required equity from its investors, and that it "[could not] proceed with the acquisition of [the four] properties." (*See* Exhibit A hereto.) As evidence of its predicament, it tendered a copy of the letter it received from its prospective lender, who indicated that it was "unable to provide financing" because the pandemic "introduced much uncertainty regarding rent projections and valuations leading to the [loan] committee's ultimate decision not to proceed." *Id.* Accordingly, Ventus requested the return of its $555,520 in earnest money deposits (representing ten percent of the total purchase prices of the four properties). Ventus observed that it was "quite unfortunate that we could not complete these transactions," but expressed an interest in working with the Receiver again "when circumstances permit."

In light of Ventus' unequivocal pronouncement that it could not consummate the four transactions, counsel for the Receiver issued a default letter (*see* Exhibit B) and attempted to secure the next best bids obtained during the auction process. With respect to 7600-10 South Kingston, the next best bid, in the amount of $1,530,000, had been submitted by Southside Property Group LLC ("Southside Property Group"), and Southside Property Group agreed to honor that offer. With respect to 7656 South Kingston, the next best bid had been submitted by a prospective purchaser who originally offered $505,100, but who now indicated that it would only pay $300,000 for the

property. Accordingly, the Receiver solicited an offer from Southside Property Group, which submitted a $320,000 bid. The Receiver subsequently provided the putatively secured institutional lender, Liberty EBCP ("Liberty"), the opportunity to submit credit bids in connection with both 7600-10 South Kingston and 7656 South Kingston, but it declined to do so, as a result of which the Receiver accepted the purchase and sale contracts submitted by Southside Property Group on May 8, 2020. With respect to 6949-59 South Merrill, the Receiver returned to the next best bidder, Pioneer Acquisitions, LLC ("Pioneer Acquisitions"), which originally offered to purchase the property for $1,829,000, but now lowered that offer to $1,520,000. The Receiver subsequently provided the putatively secured institutional lender, Thorofare Asset Based Lending REIT Fund IV, LLC ("Thorofare"), an opportunity to credit bid, but it, too, declined to do so. As a result, the Receiver accepted the purchase and sale contract submitted by Pioneer Acquisitions. Thus, the Receiver accepted contracts to sell 7600-10 South Kingston, 7656 South Kingston, and 6949-59 South Merrill for $945,200 less than Ventus previously agreed to pay for them, prior to its default.

On June 11, 2020, the Receiver moved to confirm the sales of the three properties (Dkt. 712). The following day, the Court ordered objections to the Receiver's motion filed by July 2, 2020 (Dkt. 714). On June 22, 2020, however, Ventus moved to intervene and file a memorandum in opposition to the Receiver's motion (Dkt. 721), as a result of which, on June 24, 2020, this Court ordered the Receiver both to respond to the motion to intervene and to address the issues raised in the opposition on or before July 8, 2020 (Dkt. 723). On July 2, 2020, however, Liberty and Thorofare each filed memoranda in opposition to the Receiver's motion to confirm the sales (Dkts. 728, 730). In addition, Southside Property Group and Pioneer Acquisitions have now filed their own motions to intervene and for leave to submit memoranda supporting the Receiver's motion (Dkts. 732, 734).

In Paragraph 4 of its motion to intervene, Ventus indicates that, "[a]t some point in time," the parties will need to address the disposition of its earnest money, which totaled $431,520 with respect to the three properties at issue. Similarly, in Section III of its memorandum in opposition to the Receiver's motion to confirm the sales, Liberty argues that, in the event the Receiver's motion is granted, the Court should rule that the earnest monies deposited by Ventus should be "retained and disbursed as additional proceeds" from the sales of the underlying properties. Indeed, as Liberty notes, the Receiver already agreed that he would not object to the inclusion of additional language in a confirmation order mandating that, in the event the earnest monies are ultimately turned over to the Receiver, they should be treated as proceeds from the sales of the corresponding properties.

Meanwhile, Ventus' earnest money is currently held in property-specific escrow accounts at First American Title Insurance Company pursuant to Strict Joint Order Escrow Agreements ("SJO Agreements") between Ventus and the Receiver. Forms of those SJO Agreements were attached as Exhibit A to the purchase and sale contracts relating to each property (which, in turn, were attached as Exhibits 5, 13, and 22 to the Receiver's motion). As these SJO Agreements indicate, once the buyer's funds are deposited into strict joint order escrow, they will not be released by escrowee unless and until the parties execute a joint order agreeing upon their disposition or a court of competent jurisdiction issues an order directing their disbursement.

## Argument

### I. The Receiver Does Not Oppose The Motions To Intervene.

The Receiver does not oppose the motions of Ventus, Southside Property Group, Pioneer Acquisitions to intervene under Federal Rule Of Civil Procedure 24(a)(2), which requires a court to permit intervention by anyone who, on timely motion, "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may

as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." In this case, each prospective intervenor unquestionably possesses a "direct and substantial" interest in the outcome of the motion because, depending on the outcome of the Court's ruling on the motion to confirm, each could either see (1) the current contracts approved, as a result of which and Ventus would stand to lose $431,520 in earnest money or (2) the original contracts reinstated, with Ventus applying the earnest money toward the purchase prices. *See, e.g., Lake Investors Development Group, Inc. v. Egidi Development Group,* 715 F. 2d 1256, 1259 (7th Cir. 1983) (noting that a party with a "direct and substantial" interest in the transaction should be permitted to intervene as of right).

Although granting the motions to intervene triggers Ventus' objections to the Receiver's motion to confirm, it also places each of the intervenors before the Court and paves the way for a judicial resolution regarding the disposition of the Ventus earnest money in the event that the Court grants the Receiver's motion.

## II. The Court Should Neither Defeat The Reasonable Expectations Of The Prospective New Purchasers Nor Disrupt The Finality Of The Sales Process.

Ventus informed the Receiver in no certain terms on April 20, 2020, that it could not close on the sales of the properties under contract because it was unable to either obtain financing or raise equity. Its correspondence left no room for doubt: It declared its own anticipatory breach of the contracts with unwavering certainty. Nowhere in its letter did it request more time to explore alternative sources of capital or encourage the Receiver to await the safe conclusion of the pandemic or the return of stability to the real estate markets. Instead, it demanded the return of its earnest money.

Accordingly, the Receiver attempted to cover as best he could by soliciting and accepting the next best bids available, albeit at lower prices: Whereas Ventus previously committed to purchase the three properties for $4,315,200, the Receiver wound up with new contracts totaling

$3,370,000, representing a 22% decrease in value. Although this equated to a loss of $945,200 in sales proceeds, the Receiver was cognizant that, in view of Ventus' conceded default, the corresponding earnest money deposits would be subject to recovery as liquidated damages and thus reduce the loss to $513,680 (or from 22% to 12%, given that the earnest money deposits equaled ten percent of the original purchase prices). Indeed, if the earnest money is ultimately disbursed to the Receiver, the loss occasioned by the default on the original contract to sell <u>7600 South Kingston</u> will decrease from $340,000 to $153,000, the loss occasioned by the default on the original contract to sell <u>7656 South Kingston</u> would decrease from $190,000 to $139,000, and the loss occasioned by the default on the original contract to sell <u>6949-59 South Merrill</u> would decrease from $415,000 to $221,680.

Courts have consistently warned against setting aside transactions and disrupting the reasonable expectations of bidders, given the impairment of public confidence in the sales process that ensues from a lack of finality. For example, in *In re Gil-Bern Industries, Inc.,* 526 F. 2d 627, 628 (1st Cir. 1975), the court held that it was an abuse of discretion to set aside a sale merely because a higher offer was received after the bidding deadline and that, in the long run, such a practice would be "penny wise and pound foolish" because creditors would suffer if "unpredictability discouraged bidders altogether" or at least "encourage[d] low formal bids." *Id.* at 629. Similarly, in *In re Food Barn Stores, Inc.,* 107 F. 3d 558, 565 (8th Cir. 1997), the court noted that, "[a]t some point, such as when the court actually enters an order approving the sale, expectations become sufficiently crystallized so as to render it improper to frustrate anticipated results except in the limited circumstances where there is a grossly inadequate price or fraud in the conduct of the proceedings." *Id.*

The Seventh Circuit echoed the reasoning in *Food Barn*, holding that a court's discretion to entertain and approve an "upset bid" in order to maximize the value of an estate "diminishes as

the sale comes closer to becoming a fait accompli and as the expectations of the participants solidify." *Corporate Assets, Inc. v. Paloian,* 368 F. 3d 761, 768 (7th Cir. 2004). In *Corporate Assets*, as in *Food Barn* and *Gil-Bern*, the confirmation hearing was held virtually on the heels of the auction. Moreover, in *Corporate Assets*, the auction process was marred by confusion over the rules because the debtor failed to inform all bidders that a critical provision contained in the form purchase agreement (and detrimental to the buyer) had been deleted just prior to the auction. As a result, one of the participants increased its bid the following day upon belatedly receiving the new information. To complicate matters, an attorney representing the debtor, responding to a question posed just prior to the commencement of the auction, refused to rule out the possibility that someone could "walk into court" two days later at the confirmation hearing and present a higher bid that the court would accept.

Applying the approach approved in *Corporate Assets,* there is no basis to set aside the contracts that the Receiver accepted from Southside Property Group and Pioneer Acquisitions. First and foremost, this was not an asset sale in which the confirmation hearing occurred within a few days after the auction. The Receiver solicited and obtained the most competitive back-up bids available in the wake of a default and signed purchase and sale agreements in which the bidders were afforded, and availed themselves of, the right to conduct due diligence inspections, and then invested time and energy raising capital and preparing to close on a sale of real property, which typically requires at least thirty days of advance preparation. Every day that passed after these contracts were signed, the prospective purchasers' expectations and the "gravity of finality" steadily increased. Indeed, these purchasers' contracts were accepted on May 8, yet the motion to intervene and set aside the sales was not filed until June 22, more than six weeks later.

Moreover, the Receiver has a far greater interest than the *Corporate Assets* debtor in promoting and preserving confidence in the judicial sales process. In *Corporate Assets,* the debtor

held a "one off" sale of personalty to a geographically disparate set of buyers pursuant to an auction process marred by confusion before moving to confirm the sale only three days later. Here, the Receiver is selling dozens of properties in consecutive tranches to a relatively intimate and readily identifiable community of real estate investors who have been informed that the winning bidders will be selected on a date certain and with unmistakable finality. This group of repeatedly interested investors will be keenly aware of the outcome of this motion. If the Court were to set aside the proposed sales based merely on the representations of the defaulting buyer, six weeks after new contracts were secured, that it had now lined up financing and was able to close (which may be an accurate statement of present intention, but which may not ultimately prove true), investors in future auctions will be incented to submit lower bids, wait until the Receiver accepts a contract and moves to confirm the sale, and then tender an incrementally higher offer just before the judicial confirmation deadline, knowing that the precedent for entertaining late bids has already been established and that the estate's creditors may even support the effort. [Docket No. 537, Baasch Declaration, ¶ 22-26]

Moreover, while a judicial sale may be set aside upon a showing that the initial bids were "grossly inadequate" or that the original bidding was "tainted by fraud or some other irregularity," those are not the circumstances here. *See Corporate Assets,* 368 F. 3d at 768; *Food Barn,* 107 F.3d at 564 ("Typically, a court will reopen bidding, and thereby upset the results of a properly conducted judicial auction, only if 'there was fraud, unfairness or mistake in the conduct of the sale . . . or . . . the price brought at the sale was so grossly inadequate as to shock the conscience of the court.'") (citing *In re Stanley Eng'g Corp.*, 164 F. 2d 316, 318 (3d Cir. 1947), *cert. denied*, 332 U.S. 847 (1948)).

The Receiver acknowledges that, in absolute terms, decreased proceeds of $153,000, $139,000, and $221,680 are not insignificant, but as the courts have recognized, other factors merit

consideration. First, the Receiver cannot predict the future. He remains under intense pressure to sell all the properties in the receivership estate and administer a claims process that could conceivably return at least some cash to hundreds of defrauded victims who desperately seek to recoup as much of their investments as possible, as soon as possible. Upon receipt of Ventus' termination letter, the Receiver could not know whether waiting to remarket the properties would yield better purchase prices, particularly as these properties continue to generate net operating losses, given the possibility of dips in values ensuing from further damage to the economy due to prolonged shutdowns or other local or global uncertainties. Nor could there be any certainty that Ventus' new lender would ultimately fund the acquisitions by the time it completed a full due diligence analysis, which is how we got to this point in the first place. The Receiver does not enjoy the luxury of being able to cease all sales activity indefinitely while attempting to "outguess" the real estate market and wait again for a lender who submitted term sheets to Ventus to complete its underwriting. Accordingly, there is no basis for concluding that the current sale prices, while lower than the initial sale prices, are grossly inadequate, unconscionable, or otherwise tainted by fraud or irregularity, nor has Ventus or the two objecting lenders even made such a showing.

Furthermore, the Receiver did not contravene the mandate expressed in Paragraph 38 of the Order Appointing Receiver (Dkt. 16) that he "take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership Estate . . . , on terms and in the manner the Receiver deems most beneficial . . . and with due regard to the realization of the true and proper value of such real property." As discussed above, numerous issues must be considered when assessing the Receiver's business judgment in connection with the "tak[ing] [of] all necessary and reasonable actions" relative to the sale of real property. Additionally, although the defaulting purchaser has offered to supply a term sheet evidencing its ability to finance the acquisitions, a term sheet from an ostensibly committed lender does not assure a successful closing, as lenders

notoriously wait until the eleventh-hour before issuing a "clear to close." As just noted, this is what happened the first time. Should the Receiver agree to jettison the new contracts and reinstate the defaulted transactions, he might end up with more defaults several months down the road, in a potentially less forgiving market.

## III. If The Court Grants The Receiver's Motion To Confirm The Sales, It Should Also Set A Briefing Schedule In Connection With The Parties' Dispute Over The Disposition Of The Earnest Money.

With Ventus noting that the disposition of the earnest money is an issue imminently to be litigated, with the Receiver ready to litigate it, and with Liberty anxious to secure an order that would treat that earnest money as sales proceeds (assuming the Court overrules its objection to the Receiver's motion), there is no reason to delay addressing that issue. In that vein, the Receiver hereby moves for the resolution of this dispute.

The April 20, 2020 letter from Ventus unequivocally states that it will not be proceeding with three transactions at issue. (See Exhibit A.) The purchase and sale agreements provide that the Receiver is entitled to retain all earnest money as liquidated damages, and as his sole and exclusive remedy in the event of a default, as follows:

> **Buyer Default**. The Buyer and Seller agree that it would be difficult to ascertain the actual damages to be suffered by the Seller in the event of a default by the Buyer and that the amount of the Earnest Money deposited by the Buyer hereunder constitutes the parties' reasonable estimate of the Seller's damages in the event of the Buyer's default, and that upon any such default not caused by the Seller, the Seller shall be entitled to retain the Earnest Money as liquidated damages, which shall constitute the Seller's sole and exclusive remedy in law or at equity in connection with said default.

*See* Docket No. 712, Ex. 5, ¶ 17 (6949 South Merrill); Ex. 13, ¶ 17 (7600 South Kingston); Ex. 22, ¶ 17 (7656 South Kingston).

Accordingly, the Receiver respectfully requests that the Court set a briefing schedule allowing Ventus to respond to the motion herein for a judicial declaration that the escrowed earnest

monies be released to the Receiver. Although only Ventus Holdings moved to intervene, Ventus Merrill entered into the original contract to purchase 6949-59 South Merrill. Thus, the Receiver suggests that the order setting the briefing schedule grant Ventus Merrill leave to intervene.

WHEREFORE, the Receiver respectfully requests that this Court: *(i)* grant the Eighth Motion To Confirm The Sale Of Certain Real Estate And For The Avoidance Of Certain Mortgages, Liens, Claims, And Encumbrances, with such sales to be free and clear of the specified mortgages, liens, claims, and encumbrances, and with all such mortgages, liens, claims, and encumbrances attaching to the sales proceeds with the same force, validity, status, and effect, if any, as they had against the properties being sold; *(ii)* grant Ventus Holdings, LLC and Ventus Merrill, LLC leave to intervene; *(iii)* enter an order directing that the earnest money deposited by Ventus Holdings, LLC and Ventus Merrill, LLC in connection with its prospective purchase of 7600-10 South Kingston, 7656 South Kingston, and 6949-59 South Merrill be disbursed to the Receiver, deposited by the Receiver into the corresponding property sub-accounts, and treated as sales proceeds; and *(iv)* grant such other and further relief as the Court deems just and equitable.

Dated: July 8, 2020

Kevin B. Duff, Receiver

By: /s/ Michael Rachlis

Michael Rachlis
Jodi Rosen Wine
Rachlis Duff & Peel LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Phone (312) 733-3950; Fax (312) 733-3952
*mrachlis@rdaplaw.net*
*jwine@rdaplaw.net*

**EXHIBIT A**

MICHAEL B. ELMAN & ASSOCIATES, LTD.

10 SOUTH LASALLE STREET
SUITE 1420
CHICAGO, ILLINOIS 60603-1078

MICHAEL B. ELMAN
mbelaw100@aol.com

TELEPHONE (312) 541-0903
FAX NO. (844) 269-6884

ZACHARY D. ELMAN
zachelman@gmail.com

April 20, 2020

VIA EMAIL
Mr. Andrew Porter
Porter Law Office
853 N. Elston Ave.
Chicago, Illinois 60642

**Re: 7600 S. Kingston**
**7656 S. Kingston**
**7110 S. Cornell**
**6949 S. Merrill**

Dear Andrew:

Due to the unforeseen circumstances caused by the pandemic, the buyer's lender has elected not to provide financing in connection with these transactions. A copy of the lender's correspondence is attached. In addition, because of economic circumstances, my client's investors also no longer intend to proceed with the acquisition of these properties. Accordingly due to these unforeseen circumstances, my client cannot proceed and seeks the seller's approval to release the buyer's earnest money deposit held in a strict joint order escrow account at First American Title Insurance Company in the amount of $555,520.00.

It is quite unfortunate that we could not complete these transactions and Ventus looks forward to working with the seller again the future when circumstances permit. Kindly discuss this correspondence with your client and the courtesy of a prompt reply is appreciated. Thank you for your anticipated cooperation.

Very truly yours,

*Michael B. Elman*

MICHAEL B. ELMAN
MBE:gj

cc: Ventus Holdings, LLC

CIC Community Investment Corporation
222 South Riverside Plaza, Suite 380
Chicago, Illinois 60606-6109
312.258.0070 | cicchicago.com

April 15, 2020

Ventus Holdings LLC
10 S. La Salle St.
Ste. 1420
Chicago, IL 60603

Dear Mr. Elman and Mr. Perez,

After much deliberation, we regret to inform you that we are unable to provide financing for the following buildings:

7656 S Kingston Ave
7110 S Cornell Ave
7600 S Kingston Ave
6949 S Merrill Ave

Please be assured this is not due to our assessment of you as borrowers, but is a direct response to the Covid-19 pandemic. Having reviewed your financial statements and portfolio performance as well as the financials, appraisals and rent collections of the subject properties, we were very confident these would be approved by our loan committee. Unfortunately, Covid-19 introduced much uncertainty regarding rent projections and valuations leading to the committee's ultimate decision not to proceed.

We appreciate your understanding during this unprecedented time and hope to work with you again in the future. Please do not hesitate to reach out with any questions.

Sincerely,

Jack Crane
Senior Vice President, Director of Lending

**EXHIBIT B**

Porter Law Office
853 North Elston Avenue
Chicago, Illinois 60642
(312) 433-0568
andrew@andrewporterlaw.com

April 24, 2020

**By E-Mail/.pdf**
Michael B. Elman, Esq.
Michael B. Elman & Associates, Ltd
10 S. LaSalle Street, Suite 1420
Chicago, IL 60603
*mbelman@mbelmanlaw.com*

Re: Purchase And Sale Agreement between Kevin B. Duff, as Federal Equity Receiver for SSPH 6951 S Merrill LLC, and Ventus Merrill LLC
***6949-57 South Merrill Avenue, Chicago, IL 60649***

Purchase And Sale Agreement between Kevin B. Duff, as Federal Equity Receiver for SSDF1 7110 S Cornell LLC, and Ventus Holdings LLC
***7110-16 South Cornell Avenue, Chicago, IL 60649***

Purchase And Sale Agreement between Kevin B. Duff, as Federal Equity Receiver for SSDF7 Portfolio 1 LLC, and Ventus Holdings LLC
***7600-10 South Kingston Avenue, Chicago, IL 60649***

Purchase And Sale Agreement between Kevin B. Duff, as Federal Equity Receiver for SSDF7 Portfolio 1 LLC, and Ventus Holdings LLC
***7656-58 South Kingston Avenue, Chicago, IL 60649***

Dear Mr. Elman:

As you are undoubtedly aware, your clients, Ventus Merrill LLC and Ventus Holdings LLC, are unable to consummate the closings of the referenced properties on the dates designated by the sellers pursuant to Paragraph 7 of the referenced Purchase And Sale Agreements. Accordingly, the sellers are invoking a default under, and hereby terminating, each of the contracts, reserving all rights to pursue the recovery of the earnest money deposits.

Very truly yours,

Andrew Eliot Porter

**CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2020, I electronically filed the foregoing **Consent To Motion Of Ventus Holdings, LLC, Pioneer Acquisitions, LLC, And Southside Property Group, LLC To Intervene, Reply In Support Of Eighth Motion To Confirm The Sale Of Certain Real Estate And For The Avoidance Of Certain Mortgages, Liens, Claims, And Encumbrances, And Motion For Order Directing Release Of Earnest Monies To Receiver** with the Clerk of the United States District Court for the Northern District of Illinois, using the CM/ECF system. A copy of the foregoing was served upon counsel of record via the CM/ECF system.

I further certify that I caused a true and correct copy of the foregoing to be served upon the following individuals or entities by electronic mail:

- Defendant Jerome Cohen (jerryc@reagan.com);
- All known EquityBuild investors; and
- All known individuals or entities that submitted a proof of claim in this action (sent to the e-mail address each claimant provided on the claim form).

I further certify that the foregoing will be posted to the Receivership webpage at: http://rdaplaw.net/receivership-for-equitybuild

/s/ Michael Rachlis

Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Phone (312) 733-3950
Fax (312) 733-3952
mrachlis@rdaplaw.net