# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ) ) ) |  |
| Plaintiff, ) ) | Civil Action No. 18-cv-5587 |
| v. ) ) | Hon. John Z. Lee |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, ) ) ) ) | Magistrate Judge Young B. Kim |
| Defendants. ) ) ) |  |

## RECEIVER'S SEVENTH INTERIM APPLICATION AND MOTION FOR COURT APPROVAL OF PAYMENT OF FEES AND EXPENSES OF RECEIVER AND RECEIVER'S RETAINED PROFESSIONALS

Kevin B. Duff, as the receiver ("Receiver") for the Estate of Defendants EquityBuild, Inc., EquityBuild Finance, LLC, their affiliates, and the affiliate entities of Defendants Jerome Cohen and Shaun Cohen, as defined in the Order Appointing Receiver entered August 17, 2018 (Docket No. 16), as supplemented by Order entered March 14, 2019 (Docket No. 290) and Order entered February 21, 2020 (Docket No. 634) (collectively, the "Receivership Defendants"), and pursuant to the powers vested in him by Order of this Court, respectfully submits this Seventh Interim Application ("Application") and moves this Court for an order approving payment of the fees and expenses of the Receiver, the Receiver's counsel, Rachlis Duff & Peel, LLC ("RDP"), the Receiver's accountant BrookWeiner, LLC ("BrookWeiner"), the Receiver's claims vendor Axos Fiduciary Services ("Axos"), the Receiver's forensic IT consultant, Prometheum, and the Receiver's Texas counsel, the Kraus Law Firm, from the Receivership Estate operating account. In support of his Application and Motion, the Receiver states as follows:

1

## I.    BACKGROUND

1.    On August 15, 2018, the United States Securities and Exchange Commission ("SEC") filed a civil Complaint against Jerome Cohen, Shaun Cohen, EquityBuild Inc., and EquityBuild Finance LLC (collectively the "Defendants") alleging violations of federal securities laws, along with a motion for entry of an asset freeze, permanent injunction, and other ancillary relief.  (Docket Nos. 1 & 3, respectively)

2.    In their Complaint against the Defendants, the SEC alleged violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5, Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), Sections 5(a) and 5(c) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77e(a) and (c), and Section 17(a) of the Securities Act, 15 U.S.C. §§77q(a)q.  (Docket No. 1)

3.    The Complaint further alleged that the Defendants operated a Ponzi-scheme that raised at least $135 million from more than 900 investors by, among other things, making untrue statements of material fact in connection with the sale of promissory notes allegedly secured by residential real estate primarily located on the south side of Chicago.  (*Id.* ¶¶ 1-7, 17, 20-51)

4.    On August 28, 2018, the Court entered a judgment against defendants Jerome Cohen and Shaun Cohen which, among other things, enjoined future violations of federal securities laws.  (Docket No. 40)

5.    In connection with its civil action, the SEC sought and obtained Court approval for the appointment of a Receiver, and on August 17, 2018, this Court entered an Order Appointing Receiver.  (Docket No. 16)

6.     Under the Order Appointing Receiver, the Receiver was authorized to engage and employ persons and entities in his discretion to assist him in carrying out the duties and responsibilities set forth in the Order.  (*Id.*, Order Appointing Receiver, ¶ 54)

7.     Accordingly, the Receiver retained Rachlis Duff Adler Peel & Kaplan, LLC ("RDAPK")[1] as special counsel, and, on August 20, 2018, the Court entered an Order approving RDAPK's rates.  (Docket No. 19)  On August 23, 2018, the Receiver retained BrookWeiner and Whitley Penn to provide accounting services and to perform tax and related work regarding the assets of the Receivership Defendants, and, on August 28, 2018, the Court entered an Order approving BrookWeiner's and Whitley Penn's rates.  (Docket No. 39)  On August 31, 2018, the Receiver retained Prometheum to access and preserve data within EquityBuild's cloud-based storage systems and provide related IT services, and, on September 6, 2018, the Court entered an order approving Prometheum's rates.  (Docket No. 56).

8.     Pursuant to the Order Appointing Receiver, the Receiver and his retained personnel are entitled to "reasonable compensation and expense reimbursement" from the Receivership Estate, as described in the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the "Billing Instructions") agreed to by the Receiver. (Docket No. 16, ¶ 69)

## II. SEVENTH INTERIM APPLICATION

9.     Pursuant to the Billing Instructions, the Receiver provides the following information regarding the application:

      a.     The Application covers the period from January 1, 2020 through March 31, 2020;

---

[1] As of October 1, 2019, the firm changed its name to Rachlis Duff & Peel, LLC ("RDP").

b.      The names and hourly rates of all professionals for RDP, BrookWeiner, and the Kraus Law Firm, as well as Axos' and Prometheum's hourly rates are attached as **Exhibit A**.

c.      This is the Receiver's seventh interim application.   The first interim application was submitted on June 12, 2019 (Docket No. 411). The second interim application was submitted on August 21, 2019 (Docket No. 487).  Objections were filed and a hearing on the first and second fee applications was held on October 8, 2019 (Docket No. 541). For the reasons stated on the record during that hearing, the Court granted the Receiver's first and second interim applications and motions for court approval of fees (Docket Nos. 546-47). The Receiver's third interim application was submitted on November 1, 2019 (Docket No. 569). The Receiver's fourth interim application was submitted on November 15, 2019 (Docket No. 576).  Objections were filed (Docket Nos. 581 & 595), and the Court granted the Receiver's third and fourth interim applications and motions for court approval of fees on January 7, 2020 (Docket No. 614).   The fifth interim application was filed on December 20, 2019 (Docket No. 608), and the sixth interim application was filed on February 14, 2020 (Docket No. 626).  Objections were filed (Docket Nos. 617 & 648), the Receiver's response to both sets of objections was filed on June 2, 2020, and on June 9, 2020 the Court granted the Receiver's fifth and sixth interim applications.

## III.   CASE STATUS

10.    Pursuant to the Billing Instructions, the Receiver provides the following information regarding the status of the case, and activities performed specifically for the period covered by this Application.

a.     The Receiver's Standardized Fund Accounting Report ("SFAR") for the First Quarter 2020 is attached as **Exhibit B**.  The SFAR sets forth the funds received and disbursed from the Receivership estate during this reporting period.  As reported in the SFAR, the amount of cash on hand as of March 31, 2020 was $335,196.50, exclusive of the proceeds from the sale of the Naples property and $50,000 in earnest money recovered from a title company.  The information reflected in the SFAR was based on records and information currently available to the Receiver. The Receiver and his advisors are continuing with their evaluation and analysis.

b.     Upon his appointment, the Receiver began making efforts to determine the nature, location, and value of all property interests of the Receivership Defendants, including monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, choses in action, rights and other assets, together with all profits, interest, or other income attributable thereto, which the Receivership Defendants owned, possessed, retained a beneficial interest in, or controlled directly or indirectly.  In furtherance of such, the Receiver took, *inter alia*, the following actions:

i.    Identification and Preservation of Assets

During the First Quarter 2020, one of the Receiver's primary focuses continued to be the preservation, operation, maintenance, and sale of the nearly 100 real estate properties within the Receivership Estate.  The Receiver, in connection with his counsel, asset manager/real estate broker, and property managers, continued working to improve understanding and planning for cash flow needs for underperforming properties, and controlling expenditures where possible.  To that end, the Receiver and his counsel communicated regularly with property managers relating to necessary expenditures for properties requiring approval by the Receiver (and in some cases,

requiring funds from the Receiver), and other operational questions. The Receiver and his retained professionals also reviewed monthly financial reporting, analyzed the cash position of the Estate, and communicated regularly with the real estate broker regarding prioritization of expenses and repairs on the properties. The Receiver made significant payments for 2018 property taxes during the First Quarter 2020, as set forth in Exhibit 1 to Receiver's Seventh Status Report (Docket No. 698).

During the First Quarter 2020, the Receiver worked closely with the two existing property management companies to ensure that all health, life, and safety issues at the properties were addressed expeditiously, and to monitor repairs, inspections, expenses, and property finances designed to preserve the properties and protect their financial position. During the First Quarter 2020, fires occurred at the properties at 7210 S. Vernon and 7749 S. Yates. The Receiver, his retained professionals, and the property managers all worked expeditiously to, without limitation, put measures in place to secure the properties and prevent further damage following the fires, communicate with the insurance broker regarding the fires, and negotiate with the buyer under contract to purchase 7749 S. Yates regarding a credit to account for the fire damage.

The Receiver also worked with an adjuster to pursue a claim in connection with a fire that had occurred in November 2019 at 638 N. Avers, including gathering and providing information to the adjuster, and providing available information to counsel for the institutional lender relating to the property.

Additionally, the property managers assisted the Receiver in the defense of City of Chicago administrative and housing court actions alleging building code violations of widely varying levels of severity. During the quarter, the Receiver's counsel became aware of 26 new notices of violation issued by various departments of City of Chicago, and continued to work closely with

6

the City's corporation counsel for each department (circuit court, buildings, and streets and sanitation) to address all open building code violations. The Receiver's counsel appeared on City of Chicago related matters on twelve occasions during the First Quarter 2020, and achieved dismissal of 23 administrative proceedings filed by the City of Chicago during the same period. As of March 16, 2020, when the City stopped hearing administrative proceedings due to the COVID-19 pandemic, there remained 25 known open code violations involving City of Chicago matters. The Receiver achieved dismissal of one of these matters after the administrative courts were shut down through email communications with the City of Chicago Department of Law.

ii.  <u>Property Sales</u>

During the First Quarter 2020, the Receiver filed a sixth motion for leave to market and solicit bids for 36 multifamily properties (Docket No. 618) and responded to the objections of certain institutional lenders (Docket No. 651) as well as a further motion attempting to delay the Court's ruling indefinitely and stay all further efforts to sell the remaining properties subsumed within the motion in light of the COVID-19 pandemic. (Docket No. 670).

During the quarter, the Receiver advertised the public sale of the following properties for four consecutive weeks between February 27 and March 19, and set March 31, 2020 as the deadline to submit offers:

- 7300-04 South St. Lawrence Avenue, Chicago, Illinois 60706
- 7760 South Coles Avenue, Chicago, Illinois 60649
- 8000 South Justine Street, Chicago, Illinois 60620
- 8107-09 South Ellis Avenue, Chicago, Illinois 60619
- 8209 South Ellis Avenue, Chicago, Illinois 60619
- 8214-16 South Ingleside Avenue, Chicago, Illinois 60619
- 1700-08 West Juneway Terrace, Chicago, Illinois 60626
- 5450-52 South Indiana Avenue, Chicago, Illinois 60615
- 6437-41 South Kenwood Avenue, Chicago, Illinois 60637
- 11117-11119 South Longwood Drive, Chicago, Illinois 60643

During the First Quarter 2020, the Receiver also filed a seventh motion seeking approval to list for sale a portfolio of the following 37 single-family residences that contain four dwelling units or less (Docket No. 645):

- 1017 West 102nd Street, Chicago, IL 60643
- 1516 East 85th Place, Chicago, IL 60619
- 2136 W 83rd Street, Chicago, IL 60620
- 417 Oglesby Avenue, Chicago, IL 60409
- 7922 S Luella Avenue, Chicago, IL 60617
- 7925 S Kingston Avenue, Chicago, IL 60617
- 7933 S Kingston Avenue, Chicago, IL 60617
- 8030 S Marquette Avenue, Chicago, IL 60617
- 8104 S Kingston Avenue, Chicago, IL 60617
- 8403 S Aberdeen Street, Chicago, IL 60620
- 8405 S Marquette Avenue, Chicago, IL 60617
- 8529 S Rhodes Avenue, Chicago, IL 60619
- 8800 S Ada Street, Chicago, IL 60620
- 9212 S Parnell Avenue, Chicago, IL 60620
- 10012 S LaSalle Avenue, Chicago, IL 60628
- 11318 S Church Street, Chicago, IL 60643
- 3213 S Throop Street, Chicago, IL 60608
- 3723 W 68th Place, Chicago, IL 60629
- 406 E 87th Place, Chicago, IL 60619
- 61 E 92nd Street, Chicago, IL 60619
- 6554 S Rhodes Avenue, Chicago, IL 60637
- 6825 S Indiana Avenue, Chicago, IL 60637
- 7210 S Vernon Avenue, Chicago, IL 60619
- 7712 S Euclid Avenue, Chicago, IL 60649
- 7953 S Woodlawn Avenue, Chicago, IL 60619
- 8107 S Kingston Avenue, Chicago, IL 60617
- 8346 S Constance Avenue, Chicago, IL 60617
- 8432 S Essex Avenue, Chicago, IL 60617
- 8517 S Vernon Avenue, Chicago, IL 60619
- 2129 W 71st Street, Chicago, IL 60636
- 9610 S Woodlawn Avenue, Chicago, IL 60628
- 5437 S Laflin Street, Chicago, IL 60609
- 6759 S Indiana Avenue, Chicago, IL 60637
- 1401 W 109th Place, Chicago, IL 60643
- 310 E 50th Street, Chicago, IL 60615
- 6807 S Indiana Avenue, Chicago, IL 60637
- 1414-18 E 62nd Place, Chicago, IL 60637

Additionally, after the Court overruled Defendants' objections to the sale of the property in Naples, Florida (Docket No. 612), the Receiver worked with Florida counsel, Roetzel & Andress, to prepare and enter a contract for the sale of the property, clear title, address issues arising from a home inspection, and prepare closing documents. The Receiver moved for confirmation of the sale on March 6, 2020 (Docket No. 649).[2]

### iii. Financial Reporting and Rents Restoration

During the First Quarter 2020, the Receiver continued to provide institutional lenders with monthly accounting relating to rents generated by, and expenses incurred in connection with, the 89 properties on which they assert liens. To that end, monthly reports were sent to lenders' counsel during the first quarter covering the periods October, November and December 2019. The Receiver and his counsel additionally generated monthly reports for properties not encumbered by institutional debt during this period. Reports for each property include the following information: (a) net operating income, (b) expenditures made by the Receiver for the benefit of the property (primarily for insurance, real estate taxes, and funds sent to the property manager to cover expenses not payable through operating income), (c) net income distributed to the Receiver or to other property accounts from which funds were previously borrowed, and (d) a computation of the amount (if any) of rentals remaining to be restored to the property pursuant to the February 13, 2019 Order. (Docket No. 223) Each report also includes a computation of the cumulative amount (if any) reimbursable from each property, representing the amount that has been expended for the benefit of the property from sources other than its operating income.

---

[2] During the Second Quarter 2020, the Court granted the motion to confirm the sale of the Naples property on April 2, 2020 (Docket No. 683) and the closing occurred on April 24, 2020.

Each report is sent with a detailed explanation of the contents of the related report and the calculation of rentals to be restored. A summary of the information contained in these reports is attached as an exhibit to a motion filed by the Receiver regarding the use of sales proceeds for rent restoration. (Docket No. 460). For properties where no rent restoration is due, the final line item on the report reflects an amount that has been expended for the benefit of the property from sources other than operating income on that property.

During the First Quarter 2020, the Receiver continued to analyze sources of funds available for restoration of rents to affected properties. The Receiver had reduced the total amount to be restored from $767,192.75 as of February 28, 2019 to $415,099.79 as of February 29, 2020 (reporting for the month of March 2020 has not been finalized).[3]

iv. Open Litigation

During the First Quarter 2020, the Receiver – working with his counsel and counsel for WPD Management counsel – finalized the settlement, release, and dismissal of the matter captioned *Hudson v. WPD Management, et al.,* Case No. 19 M1 40154, Circuit Court of Cook County, First Municipal Division.

During the quarter, the Receiver—working with his counsel and insurance counsel—completed written discovery in the matter captioned *Barnes v. EquityBuild, et al.*, Case No. 19 L 7852, Circuit Court of Cook County. The Plaintiff's deposition has not been scheduled due to the interruptions caused by the COVID-19 outbreak.

---

[3] The Receiver's Sixth Fee Application, filed February 14, 2020, estimated that approximately $404,000 remained to be restored as of December 31, 2019. This figure has since been corrected to $445,717.06.

Discovery was proceeding in the matter captioned *Byrd v. EquityBuild et al.*, Case No. 18 L 1993, Circuit Court of Cook County, but scheduled depositions did not proceed due to witness unavailability and the COVID-19 outbreak.

The Kraus Law Firm has provided limited legal services to extend the stay entered in the matter of *Markwell v. EquityBuild, Inc.*, Case No. 2018-13722, pending in the 165th Judicial District, Harris County, Texas. The Receiver requests that the Court approve compensation for legal services provided by the Kraus Law Firm in August, 2019 and January 2020 in connection with two motions to abate required to enforce this Court's stay of the litigation.

v. Notice of Appointment of Receiver

During the First Quarter 2020, the Receiver continued his efforts to notify all necessary and relevant individuals and entities of the appointment and to protect and preserve the assets of the Receivership Estate. To that end, as they are identified, the Receiver continues to deliver notices to individuals or entities which have been identified as potentially having possession of the property, business, books, records, or accounts of the Receivership Defendants, or who may have retained, managed, held, insured, or encumbered, or had otherwise been involved with any of the assets of the Receivership Defendants.

vi. Control of Receivership Property and Records

During the First Quarter 2020, the Receiver continued efforts to locate and preserve all EquityBuild property and records. The Receiver maintained three platforms of records and data during the First Quarter 2020.

vii. Securing Bank and Investment Accounts

During the First Quarter 2020, the Receiver notified, contacted, and conferred with the banks and other financial institutions that the Receiver was able to identify as having custody or

11

control of any funds, accounts, or other assets held by, in the name of, or for the benefit of, directly or indirectly, any and all of the Receivership Defendants.

### viii.  Factual Investigation

During the First Quarter 2020, the Receiver and his retained professionals continued to review and analyze the following: (i) documents and correspondence sent to or received from the EquityBuild principals, to whose email accounts the Receiver has access; (ii) bank records from EquityBuild and its affiliate entities; (iii) EquityBuild documents (largely stored in cloud-based and other electronic media, plus a limited number of hard copy records); (iv) available underlying transaction documents received to date from former Chicago-based EquityBuild counsel; and (v) files produced by former EquityBuild counsel, accountants, and employees.

### ix.  Tax Issues

BrookWeiner was retained to perform accounting, tax, and related work regarding assets of the Receivership Defendants such as the accounting for ongoing business operations of the Receivership Defendants.  During the First Quarter 2020, BrookWeiner compiled monthly property statements and property spreadsheets and assisted with cash flow analysis matters.

### x.  Accounts Established by Receiver for the Benefit of the Receivership Estate

The Receiver established custodial accounts at a federally insured financial institution to hold all cash equivalent Receivership property.  The interest-bearing checking accounts are used by the Receiver to collect liquid assets of the estate and to pay the portfolio-related and administrative expenses.  For each property encumbered by secured debt that has sold, the Receiver also has established an interest-bearing separate account for the purpose of depositing and holding funds until such time as the Court orders otherwise and for ultimate distribution, following a claims

process and upon Court approval, to the creditors of the Estate, including the defrauded investors. (Docket Nos. 230, 311, 344 & 346)

xi.  Creditors and Claims Against the Receivership Estate

During the First Quarter 2020, the Receiver and his retained professionals continued analyzing and working with the approximately 2400 claims submitted by the December 31, 2019 claims submission deadline.  During this period, the Receiver and his retained professionals manually reviewed numerous claim forms and updated the information contained in the exhibit that preliminarily identified on a property-by-property basis the following: (i) claimant name, (ii) total amount claimed, (iii) claimant category, and (iv) the amount loaned or invested in the particular property (where it could be determined from the face of the claim form).

During the quarter, the Receiver and his counsel prepared and filed a Motion for Approval of Process for Resolution of Disputed Claims (Docket No. 638), which proposed a process to resolve the claims against properties with both investor lender and institutional debt. Briefing on this motion was extended as a result of the COVID-19 pandemic, and the motion remains pending.

Through the First Quarter 2020 and beyond, the Receiver has continued to work on the accuracy and completeness of its records regarding submitted claims.  Because the claims vendor was unable to automatically extract data correctly from the claim forms in many instances—for example where investors rolled proceeds into new investments—the Receiver, his counsel, and his claims vendor have worked diligently to improve the accuracy and completeness of these records.

As previously indicated, the Receiver is continuously updating his list of known claimants and updating them on the developments in this matter.  To ease the burden and provide basic information, therefore, the Receiver established a web page (*http://rdaplaw.net/receivership-for-equitybuild*) for claimants and other interested parties to obtain information and certain court

13

filings related to the Receivership estate, which remains in place today and continues to be best and most cost-effective mean of providing information regarding the status of this action.

Also, during the First Quarter 2020, the Receiver received and responded to hundreds of emails and voicemails from investors and others, many if not most of which related to the claims submitted against properties in the Receivership Estate, as well as claims against equity funds created by the Defendants and claims against properties that that appear to have been sold or otherwise disposed of prior to the establishment of the Receivership. He and his staff responded to these numerous communications in as timely and practicable a way as possible.

During the First Quarter 2020, the Receiver, his counsel and claims portal vendor continued working to organize the claim forms and supporting documentation that claimants have submitted to the Receiver on a property-by-property basis, so that once a claims process and confidentiality order are approved by the Court, digital links for the transfer of claims and supporting documentation from other claimants can be provided to each claimant on a property-by-property basis consistent with Court orders.

The identification and compilation of claims submitted in this matter has been complex and time-consuming due to the unique circumstances and facts in this case. For example, it appears that in many instances anticipated proceeds of investor-lender loans rolled into new offerings rather than being paid off at maturity. It also appears that in some circumstances the mortgages securing loans may have been released without investor-lenders' knowledge or consent, allowing the Defendants to refinance the properties with new loans without retiring the existing loans. Moreover, some investor-lenders may have been induced to exchange secured loans for unsecured loans or equity positions through false representations. Additionally, claims against many properties are complicated by cross-collateralized mortgages.

14

The claims process has been further complicated by, among other things: (i) improperly completed proofs of claim, (ii) claims relating to properties that were conveyed to third parties prior to the establishment of the Receivership; and (iii) claims lacking reference to properties, or relating solely to what appear to be equity investment vehicles. As a result of these and the previously described challenges, a large portion of the Receiver's and his counsel's time during the First Quarter 2020 was devoted to ensuring the accuracy of the records relating to each of the myriad claims submitted in this matter, refining and correcting the Receiver's master claims spreadsheet to inform all interested parties of the nature and volume of the claims submitted in these proceedings, and responding to claimant inquiries regarding the same.

Additionally, during the First Quarter 2020, the Receiver continued to evaluate potential tax implications relating to entities in the Receivership Estate, the disposition of assets (including but not limited to the sale of real estate), and the claims process. (Docket No. 477 at 9)

a.      All known Receivership Property is identified and described in the Master Asset List attached hereto as **Exhibit C.** The Master Asset List identifies 53 checking accounts in the names of the affiliates and affiliate entities included as Receivership Defendants, reflecting a total amount transferred to the Receiver's account of $105,870.94. Of these funds, $30,820.87 came from an account in the name of 1632 Shirley LLC, which relates to the Mississippi properties discussed earlier. The amount transferred to the Receiver also reflects $75,050.00 that EquityBuild received from an investor; the funds were wired prior to the appointment of the Receiver and cleared after the appointment. (*See* Docket No. 258, at 21)

b.      The Master Asset List does not include assets and potentially recoverable assets for which the Receiver is still evaluating the value, potential value, and/or ownership

15

interests. The Receiver is in the process of evaluating certain other types of assets that may be recoverable by the Receivership Estate, including, but not limited to, charitable donations, loans, gifts, settlements for which payment has not yet been received, and other property given to family members, former employees, and others.

c.    *See also* Receiver's Seventh Status Report (First Quarter 2020) for additional information.  (Docket No. 698)

## IV.    BILLING ADDRESSED IN THIS APPLICATION

11.    Pursuant to the Billing Instructions, the Receiver provides the following information regarding current billing:

a.    <u>Total Compensation and Expenses Requested</u>.

i.    In connection with his duties, the Receiver respectfully requests compensation for services rendered, totaling $79,092 for the period of this Application.  A copy of the Receiver's invoices for January – March, 2020 are attached as **Exhibit D.**

ii.    In connection with the legal services provided to the Receiver by RDP, the Receiver respectfully requests compensation for services rendered, along with reimbursement of expenses, totaling $277,478.16 for the period of this Application.  A copy of RDP's invoices for January - March 2020 are attached as **Exhibit E.**  Additionally, Receiver's counsel Andrew Porter received $6,102.25 as agency fees for the title examination work performed in connection with the closing of properties during the First Quarter 2020.  The Receiver will reduce the amount due to RDP for the First Quarter 2020 by this amount.

iii.    In connection with the accounting provided to the Receiver by BrookWeiner, the Receiver respectfully requests compensation for services rendered, along with reimbursement of expenses, totaling $6,975.50 for the period of this Application. Copies of BrookWeiner's invoices for January, February and March, 2020, are attached as **Exhibit F.**

iv.    In connection with the database services provided to the receiver by Axos, the Receiver respectfully requests compensation for services rendered, along with reimbursement of expenses, totaling $3,031.25 for the period of this Application. A copy of Axos' invoice is attached as **Exhibit G.**

v.    In connection with the IT services provided to the Receiver by Prometheum, the Receiver respectfully requests compensation for services rendered, along with reimbursement of expenses, totaling $577.50 for the period of this Application. A copy of Prometheum's invoice is attached as **Exhibit H.**

vi.    In connection with legal services provided to the Receiver by the Kraus Law Firm in Texas, the Receiver respectfully requests compensation for services rendered, along with reimbursement of expenses, totaling $1,050.00 for the period of this Application. A copy of the Kraus Law Firm's invoice for unreimbursed time billed in August 2019 and March 2020 is attached as **Exhibit I.**

b.    <u>Source of Funds for Requested Compensation and Expenses</u>. The Receiver requests that the above compensation and expenses be paid from the Receiver's operating account to the extent there are sufficient funds now or in the future. To the extent funds

are insufficient, Receiver has requested that the Court establish a receiver's lien in order that receivership property may be used to compensate the Receiver and his counsel for their work establishing and implementing a process to address the more than 2,400 claims submitted in this case.

        c.    <u>Seventh Application for Payment of Professional Fees and Expenses</u>.  This is the Receiver's seventh application.

        d.    <u>Summary of Activity</u>.  A "Summary of Activity," providing the total hours billed and the amount of billing for each person who billed time during the Application period (January 1, 2020 through March 31, 2020) can be found at the end of the Receiver's invoices (Exhibit D) and RDP's invoices (Exhibit E) and on the first page of the BrookWeiner and Axos invoices (Exhibits F and G).

## V.      REQUEST FOR RECEVER'S LIEN

12.    As this Receivership proceeds, it becomes increasingly clear that the primary beneficiaries of the Receiver's efforts are and will be the claimants who receive funds from the real estate properties that the Receiver has worked to preserve, maintain, improve, and liquidate following the claims process that the Receiver has worked to implement.  At the same time, if a receiver's lien is not allowed to address administrative expenses, there is a diminishing likelihood that there will be sufficient funds to pay the Receiver and his retained professionals from monies that have been or will be recovered, net equity from the sale of properties, and funds returned to the Receiver's account from the sales proceeds of properties that received cash infusions to preserve, maintain, and improve them during periods when their operating income alone could not sustain them.  Indeed, there is a distinct possibility that the sources of potential cash described above will not be sufficient to cover the fees for Receiver and his professionals and other

Receivership expenses, including those fees set forth in this motion. As a result, the Receiver requests that the Court grant a lien on the estate assets and their proceeds to ensure that the costs of the receivership will not be borne solely by unsecured claimants.

The Court retains broad discretion to determine the duties of the Receiver and the manner in which the costs of the estate will be paid. It is well-established that "the district court has authority to impose a lien on the property in a receivership to satisfy the receivership expenses." *Gaskill v. Gordon*, 27 F.3d 248, 251 (7th Cir. 1994). This is because a "[r]eceivership is an equitable remedy, and the district court may, in its discretion, determine who shall be charged with the costs of the receivership." *Id.* Moreover, "[a]s a general rule, the expenses and fees of a receivership are a charge upon the property administered." *Id.* (citing *Atlantic Trust Co. v. Chapman*, 208 U.S. 360, 375-76 (1908)). In addition, "[r]eceivers can displace even *prior* security interests in receivership property in some circumstances." *Duff v. Central Sleep Diagnostics, LLC*, 801 F.3d 833, 842 (7th Cir. 2015) (citing *Gaskill*; emphasis in original). For example, "[c]ourts in equity have allowed liens for receivership expenses to take priority over secured creditors interests in the property when the receiver's acts have benefitted the property." *Gaskill*, 27 F.3d at 251 (citing with approval *SEC v. Elliott*, 953 F.2d 1560, 1576-77 (11th Cir. 1992)). "This district court's award of a receiver's compensation is ... firmly within its discretion, ... and the court may consider all of the factors involved in a particular receivership in determining an appropriate fee." *Gaskill*, 27 F.3d at 253 (citations omitted); *see also Elliott*, 953 F. 2d at 1576 ("The district court appointing the receiver has discretion over who will pay the costs of the receiver.").

The substantial cost of preserving, managing, and disposing of the real estate assets, of opposing the unrelenting objections asserted by the institutional lenders, and navigating through the impact of the COVID-19 pandemic, precludes any certainty regarding the ability of the

receivership to cover its expenses. Accordingly, these costs ought to be allocated in accordance with equitable and sound principles. From a policy standpoint, the federal courts should have the ability to choose qualified receivers who can skillfully and cost-effectively navigate the challenges posed by the work, and, by the same token, potential receivers willing to accept these challenges should be fairly compensated. A receivership of this magnitude and complexity cannot be undertaken if the receiver and his or her professionals are not compensated on an interim and continuing basis. Certainty regarding the allocation of responsibility for receivership fees and expenses will also enable the Receiver and the Court to ascertain the appropriateness of interim distributions to claimants as priority determinations are made.

A receiver's lien that allows for administrative expenses to be paid from operating income generated by properties or from the sales of those properties is particularly fair because it provides payment from those sources who have directly and substantially benefitted from the efforts to preserve and maintain those properties. Absent the imposition of a receiver's lien to ensure that the costs of preserving and selling the properties, and the costs of implementing a claims process relating to those properties, are paid from the operating income generated by the properties themselves or from their sales proceeds, the unsecured claimants are left to bear virtually the entire economic burden of a process that disproportionately (and perhaps exclusively) benefits the secured creditors. Such a result would ignore the fact that a large portion of the expenses that have been incurred relate to and are for the benefit of the secured lenders and the properties that secure such obligations.

From practical, policy, and equitable standpoints, therefore, the Court should confirm a Receiver's lien against certain assets of the receivership estate, including the 116 properties within the Estate and the proceeds from the sale of those assets, in order to pay costs of the Receiver and

his retained professionals that were incurred for the benefit of those properties and their competing claimants.[4]

Allocating costs in a receivership like this one is extremely challenging. Much of the Receiver's efforts stretch across the properties, benefiting them and the claimants directly and indirectly. For example, certain efforts like selling the properties, working with property managers, preparing financial reports, and renewing insurance (to name a few) have been undertaken to some degree for each of the properties in the portfolio. But precisely how much such efforts directly relate to each property varies from task to task. For instance, if professional time is needed to evaluate and communicate with the property manager relating to a significant repair to a particular property, then it may be easy to identify the property in the timekeeper's description. Similarly, if counsel is preparing for and attending the closing of a particular property, then allocating that time to a specific property will be easier. However, there are many examples of receivership work that are of clear benefit to the claimants but are difficult to closely track on a property by property basis. For example, the Receiver and his staff respond daily to communications from claimants and their counsel, answering their questions and providing them information. Occasionally, those communications relate to specific properties, but more frequently they come from claimants whose interests spread across multiple properties. Notably, in this receivership, a lender who has only one claim against one property is the exception. A more typical example of this type of work is responding to an inquiry from a claimant who has asserted claims against several properties, where the issue is not specific to any one of the properties. And a typical day sees the receivership team performing dozens of these types of tasks.

---

[4] The Receiver has already requested that the Court confirm a receiver's lien in connection with the claims process. (Docket No. 638, ¶¶ 53-57; Docket No. 720, at 14-20)

As another example, when it comes to property sales efforts, it is often impractical to allocate time to specific properties because some work will relate to the overall sales process while other work will relate to groups of properties of varying sizes. For example, such work might relate to properties that have a common claimant lender, or are part of the same marketing tranche, or have a common property manager. Even in instances where it might be possible to identify groups of properties benefiting from the same professional work, it might not be equitable to allocate billing entries according to individual properties or groups of properties because such an allocation may ignore, for example, efficiencies that are achieved over time or Court rulings that provide guidance or procedure as the action progresses. On the other hand, failing to allocate may be unfair to other claimants or properties if there is particular stakeholder who is more actively engaged with respect to a particular set of properties.

Further, under the circumstances and facts of this matter, it would not be fair for fees and expenses to rest either primarily on the shoulders of unsecured claimants, nor to pay for professional services at the beginning of the receivership from such fees (without regard to allocation) but later professional services according to an allocation methodology. Consistency and fairness require that such an allocation be calculated from the beginning of the receivership.

With nearly 1,000 claimants who are mostly *not* similarly situated and over 100 unique properties, dividing and tracking most professional time strictly by property is neither practical nor realistic. As such, the Receiver proposes allocating all receivership fees and expenses for the Receiver and the retained professionals from the beginning of the receivership in the following manner:

> i. **First, allocate by property.** For time entries or expenses that identify, reference, or relate directly to a property, allocating those fees and expenses to that property.

For time entries or expenses that identify, reference, or relate directly to multiple properties, the fees or expenses should be divided among those properties pro rata (*e.g.,* if there are three properties, then divided by three). The Receiver and the Retained Professionals have used and will continue to use reasonable efforts to attempt to identify particular properties that are the focus of their efforts in their billing records.

ii. **Second, do not allocate certain billing categories.** The Receiver and the Retained Professionals record and organize fees and expenses according to the SEC Billing Guidelines, which typically include the following categories: Accounting; Asset Analysis & Recovery; Asset Disposition; Business Operations; Case Administration; Claims; Corporate Finance; Distribution; Employees; Investor Communications; Status Reports; and Tax Issues. The Receiver recommends that the time in the categories for Accounting,[5] Employees, and Tax Issues *not* be allocated to the properties unless the time entries identify, reference, or relate directly to a particular property or properties.

iii. **Third, do not allocate third-party claims by the Receiver.** The Receiver recommends that fees in the Asset Analysis & Recovery category that are related to third-party claims brought or potential claims evaluated by the Receiver not be allocated to any property. The basis for not allocating such fees to the properties is that the recovery would be unsecured funds and thus not allocated to the properties in a manner that would benefit the secured claimants.

---

[5] Accounting, here, relates to receivership accounting and not accounting that is principally related to the properties or an allocated billing category.

iv. **Fourth, allocate all remaining fees and expenses to the properties as a percentage of their gross sales prices**, once that value is determined for each. For example, if there were three properties in the Estate that had been sold for $600,000, $300,000, and $100,000, respectively; and the amount of the fees (not otherwise specifically allocated to any of the properties) was $20,000, then the first property would be responsible for $12,000, the second for $6,000, and the third for $2,000.

Following the sale of all the properties, the Receiver proposes to submit a spreadsheet to the Court, in connection with his quarterly fee applications, which shows the allocation of fees and expenses according to the proposed methodology on a property-by-property basis. The Receiver expects that all of the properties will have been sold by the end of 2020. Thus, with that assumption, the Receiver would plan to submit an allocation spreadsheet for fees and expenses through the end of 2020 as part of the fee application for the fourth quarter of 2020. The Receiver anticipates that the allocation of fees and expenses in the manner proposed will be a very substantial undertaking. If the assumptions about timing are not accurate, or not feasible, the Receiver would report on the same to the Court in the fee applications, as they are submitted.

In connection with the allocation spreadsheet, the Receiver will also provide a schedule for each property that reflects the property-specific fees and expenses that identify, reference, or relate directly to each property from the beginning of the receivership through the most recent quarter. Each schedule will show for each property: (a) the amount of fees and expenses specifically allocated to it; (b) the amount of fees and expenses allocated to it as its proportionate share of the remaining fees and expenses (that have not been specifically allocated to a particular property) for each fee application; (c) a running total of fees and expenses from the beginning of the receivership; and (d) the percentage of its total fees and expense in relation to its gross sales price.

The Receiver believes the foregoing methodology is reasonable and equitable given the facts, circumstances, and practical challenges of the receivership. Consistent with this approach, the Receiver requests a lien against each property to be paid on a first priority basis before all other liens on the properties to ensure that all Court-approved fees and expenses of the Receiver and the Retained Professionals are paid in accordance with the foregoing proposed methodology.

## V.     CONCLUSION

WHEREFORE, the Receiver respectfully requests that the Court approve the Receiver's Seventh Interim Fee Application and enter an Order as follows:

a.        finding the fees and expenses of the Receiver and Receiver's retained professionals, Rachlis Duff & Peel LLC, BrookWeiner, LLC, Axos Financial Services, Prometheum, and the Kraus Law Firm, as described in Exhibits D-I, respectively, to be reasonable and necessary to the Receivership;

b.        granting the Receiver and his retained professional a first priority administrative lien against each of the real estate properties in the Receivership Estate and their sales proceeds for payment of fees and costs;

c.        approve the proposed allocation and payment methodology with respect to a Receiver's lien for all fees and expenses of the Receivership Estate as described and recommended in this fee application;

d.        approving the Receiver's payment of such fees and expenses to the Receiver and to Receiver's retained professionals from sales proceeds for each of the properties in the Receivership Estate as described and recommended in this fee application; and

e.        granting the Receiver all other relief which this Court deems just and proper.

Dated:  July 28, 2020          Kevin B. Duff, Receiver

By:    /s/     Michael Rachlis                

Michael Rachlis
Jodi Rosen Wine
Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Phone (312) 733-3950; Fax (312) 733-3952
mrachlis@rdaplaw.net
jwine@rdaplaw.net

## **RECEIVER'S CERTIFICATION**

1.     Pursuant to the Billing Instructions, the Receiver certifies as follows regarding the

Receiver's Seventh Interim Application and Motion for Court Approval of Payment of Fees and

Expenses of Receiver and Receiver's Retained Professionals:

a.     The Receiver has read the foregoing Application and Motion.

b.     To the best of the Receiver's knowledge, information and belief formed after reasonable inquiry, the Application and Motion and all fees and expenses therein are true and accurate and comply with the Billing Instructions (with any exceptions specifically noted in this Certification, Application, and Motion);

c.     All fees contained in the Application and Motion are based on the rates listed in the Fee Schedule attached hereto as Exhibit A, and such fees are reasonable, necessary, and commensurate with the skill and experience required for the activity performed;

d.     The Application and Motion does not include in the amount for which reimbursement is sought, the amortization of the cost of any investment, equipment, or capital outlay (except to the extent any such amortization is included within the permitted allowable amounts set forth herein);

e.     In seeking reimbursement for a service which the Receiver or the Receiver's Retained Professionals justifiably purchased or contracted for from a third party (such as copying, imaging, bulk mail, messenger service, overnight courier, computerized research, or title and lien searches), reimbursement is requested only for the amount billed to the Receiver or Receiver's Retained Professionals by the third-party vendor and paid by the Receiver or Receiver's Retained Professionals to such vendor. If such services were performed by the Receiver or Receiver's Retained Professionals, the Receiver certifies that no profit has been made on such reimbursable service.

2.     On July 23, 2020, the Receiver provided to Mr. Benjamin Hanauer, of the SEC, a

complete draft copy of this Application and Motion, together with all exhibits and relevant billing

statements in a format specified by the SEC.

_____/s/ Kevin B. Duff_____
Kevin B. Duff, Receiver
EquityBuild, Inc., et al.
c/o Rachlis Duff & Peel, LLC
542 S. Dearborn Street, Suite 900
Chicago, IL  60605
(312) 733-3390 - kduff@rdaplaw.net
