<pre>
 1                   IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3
    UNITED STATES SECURITIES AND      )  Docket No. 18 C 5587
 4  EXCHANGE COMMISSION,              )
                                      )
 5                     Plaintiffs,    )
                                      )
 6              vs.                   )
                                      )
 7  EQUITYBUILD, INC., EQUITYBUILD    )
    FINANCE, LLC, JEROME H. COHEN,    )
 8  AND SHAUN D. COHEN,               )  Chicago, Illinois
                                      )  August 13, 2020
 9                     Defendants.    )  2:00 o'clock p.m.

10
              TRANSCRIPT OF PROCEEDINGS - TELEPHONIC STATUS
11                  BEFORE THE HONORABLE JOHN Z. LEE

12
    TELEPHONIC APPEARANCES:
13

14  For the Plaintiff:        U.S. SECURITIES & EXCHANGE
                                 COMMISSION
15                            BY:  MR. BENJAMIN J. HANAUER
                                   MR. TIMOTHY J. STOCKWELL
16                            175 W. Jackson Blvd., Suite 900
                              Chicago, Illinois  60604
17

18  For the Receiver:         RACHLIS, DUFF, PEEL & KAPLAN, LLC
                              BY:  MR. MICHAEL RACHLIS
19                                 MS. JODI ROSEN WINE
                              542 South Dearborn, Suite 900
20                            Chicago, Illinois  60605

21
    Federal Home Loan Mortgage DYKEMA GOSSETT, PLLC
22  Corporation, Wilmington    BY:  MR. MICHAEL A. GILMAN
    Trust, Citibank, Federal   10 South Wacker Drive, Suite 2300
23  National Mortgage Assoc.,  Chicago, Illinois  60606
    U.S. Bank, Sabal TL,
24  Midland Loan Svcs., BC57,
    and UBS AG:

25
</pre>

```
 1   APPEARANCES (Cont'd):

 2
     For Midland Loan Svcs.,      STAHL, COWEN, CROWLEY, ADDIS, LLC
 3   Thorofare Asset Based        BY:  MR. RONALD A. DAMASHEK
     Lending, Liberty EBCP,       55 West Monroe Street, Suite 1200
 4   And Citibank:                Chicago, Illinois  60603

 5
     For Midland Servicing:       AKERMAN, LLP
 6                                BY:  MR. MICHAEL D. NAPOLI
                                  2001 Ross Avenue, Suite 3600
 7                                Dallas, Texas  75201

 8
     For BMO Harris:              STINSON, LLP
 9                                BY:  MR. SCOTT B. MUELLER
                                  7707 Forsyth Boulevard, Suite 1100
10                                St. Louis, Missouri  63105

11
     Also Present:                MR. KEVIN B. DUFF, Receiver
12

13   Court Reporter:              MR. JOSEPH RICKHOFF
                                  Official Court Reporter
14                                219 S. Dearborn St., Suite 2128
                                  Chicago, Illinois  60604
15                                (312) 435-5562

16
                    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
17
                          PROCEEDINGS RECORDED BY
18                       MECHANICAL STENOGRAPHY
                    TRANSCRIPT PRODUCED BY COMPUTER
19

20

21

22

23

24

25
```

1          (Proceedings had via telephone conference:)

2               THE CLERK:  Case 18 CV 5587, United States Securities

3     and Exchange Commission vs. Equitybuild.

4               THE COURT:  Good afternoon.

5               Will the attorneys representing the SEC identify

6     themselves, please.

7               MR. HANAUER:  Good afternoon, your Honor, this is Ben

8     Hanauer and Tim Stockwell for the SEC.

9               THE COURT:  Good afternoon.

10              Will the attorneys representing the receiver identify

11    themselves, please.

12              MR. RACHLIS:  Good afternoon, your Honor, Michael

13    Rachlis, R-a-c-h-l-i-s, along with Jody Rosen Wine, on behalf

14    of the receiver.  Kevin Duff, the receiver, is also on the

15    line.

16              THE COURT:  All right.

17              Now, starting with the attorneys representing the

18    institutional lenders who are going to be leading the charge

19    in this hearing, could you identify yourselves, please.

20              MR. DAMASHEK:  Ron Damashek for Citibank; Midland

21    Loan Servicers, division of PNC Bank; Thorofare Asset Based

22    Lending; and, Liberty EBCP.

23              Judge, I will be addressing the role of the receiver

24    in recommending priority to the Court, which was one of the

25    items you asked to be addressed today.

1          THE COURT:  Thank you.

2          MR. GILMAN:  Your Honor, this is Michael Gilman.  I

3   will be addressing the issue of standard discovery that we

4   discussed at the last session.  I represent a dozen of the

5   mortgagees.

6          THE COURT:  Okay.

7          MR. NAPOLI:  Your Honor, this is Michael Napoli.  I

8   also represent Midland Servicing.  I will be addressing the

9   issues related to the document database and the protective

10  order.

11         THE COURT:  Okay.

12         Anyone else?

13         MR. MUELLER:  Yes, your Honor, good afternoon.  This

14  is Scott Mueller, and I represent BMO Harris, as well as

15  Midland.  And I am going to be calling in regarding the issue

16  -- we filed a motion to intervene on behalf of the lenders,

17  and I'll be addressing that.

18         THE COURT:  Anyone else who wishes to enter their

19  appearance on the record today?

20     (No response.)

21         THE COURT:  All right.  Very well.

22         To the extent that anyone is going to be making a

23  statement today, again, if you could please identify

24  yourselves for the record, please.  And if you're representing

25  a lender, another party that hasn't been introduced as of now,

1   if you could, the first time you speak, in addition to

2   identifying yourself by name, identify the party that you are

3   representing here.

4           First of all, with regard to the motion to intervene,

5   Mr. Mueller, I'm a bit -- I guess, a bit flummoxed at its

6   filing.  And I guess I wanted to, first of all, see if there

7   is any objection to the motion by the SEC or the receiver in

8   this case.

9           MR. HANAUER:  Good afternoon, your Honor, this is Ben

10  Hanauer for the SEC.

11          We object to the motion and would be happy to state

12  our reasons why, if the Court prefers.

13          THE COURT:  Yes, please do.

14          MR. HANAUER:  Thank you, your Honor.

15          Frankly, we oppose the motion.  First and foremost,

16  it's unnecessary.  We don't challenge any of the claimants'

17  rights to seek relief for an appellate court if they're

18  unhappy with any of the Court's rulings.  And I don't think

19  the receiver feels that any of the claimants would be

20  constrained from appealing absent an intervention.

21          I note that nearly all the cases that the SEC cited

22  in its brief, the SEC cases at the Seventh Circuit where there

23  are fights between various classes of claimants, I don't

24  believe there is an intervention necessary in those cases

25  either.  Certainly, we would never take the position in a case

1    that -- in this case -- that a claimant couldn't appeal on the

2    ground that there was no intervention.

3         I'd also note that it could be unwieldy if

4    intervention was allowed because then all the other claimants

5    -- and I think we're over around a thousand -- would feel

6    compelled to do so, and that would certainly burden the record

7    and the docket in this case.

8         And, finally, I would just note that the request is

9    untimely.  The claimants -- or the lenders have been in this

10   game for almost two years now and never felt the need to

11   intervene.  And we don't think it was necessary when they

12   first came into the case, and we don't think it's necessary

13   now.

14        Thank you.

15        THE COURT:  Thank you.

16        Mr. Rachlis, anything to add?

17        MR. RACHLIS:  We agree with -- we do object, and we

18   agree with the SEC's counsel's recitation of the reasons for

19   that objection.

20        THE COURT:  All right.

21        And, so, if any of the claimants were to file an

22   appeal at the end of these proceedings, the receiver would not

23   object based upon, say, standing grounds and the fact that

24   they didn't -- haven't formally intervened here before me; is

25   that correct, Mr. Rachlis?

1          MR. RACHLIS:  Yes, absolutely.

2          And we read the Seventh Circuit cases consistent with

3     what Mr. Hanauer had indicated.  A party that's aggrieved by a

4     ruling of the Court or some determination where they believe

5     they were -- that they think they were entitled to more, we

6     would -- we certainly would think they would have the right to

7     appeal that to the Seventh Circuit; and, we certainly would

8     not be objecting on standing ground or the failure to

9     intervene as a result.

10         So, yeah, we certainly agree with your Honor there.

11         THE COURT:  Okay.

12         So, Mr. Mueller, given those positions stated on the

13    record, again, I was a little puzzled by the filing of the

14    motion.  What prompted its filing?

15         MR. MUELLER:  Thanks, Judge.  This is Scott Mueller

16    again.

17         I certainly appreciate the SEC and the receiver's

18    position.  I don't think there's a lot of controversy on this

19    level about our ability, given the Enterprise holding, to

20    proceed and have appealability if there's any aggrieved ruling

21    based on our interest -- the lenders' interest -- in the

22    subject matter.

23         However, out of an abundance of caution and given the

24    fact that the Seventh Circuit discrepancy slight overlap of

25    Enterprise and First Choice, we just want to make the record

1   clear in the substance over form that if a new party were to

2   look at this from a Seventh Circuit perspective on appeal,

3   that there's no room for someone to see the fact that there

4   was no intervention, that we were not a party of record below

5   and use that for some kind of procedural hang-up or technical

6   issue down the line.  We thought that we would try to nip it

7   in the bud, if we could.  And, again, I don't think there's a

8   lot of controversy about how that would play out.

9          So, that's the general theme of why we brought the

10  motion:  That the lenders felt that it was necessary to clean

11  up the record to a certain degree, and to establish that we

12  were indeed a party that had no issues with case law hindering

13  the ability to appeal a ruling to the Seventh Circuit.

14         THE COURT:  Well, based upon my understanding of

15  Seventh Circuit law, and having heard the arguments from -- or

16  based upon the concession of the SEC and the receiver, that if

17  any of the claimants were to appeal the decisions in this

18  case, that they would not object to that appeal based on

19  either standing grounds, the fact that the individual or party

20  was not a party to the underlying action, I'm going to deny

21  the motion.

22         I just think that it does raise -- it creates a lot

23  of unnecessary procedural barriers, I think, because then I

24  think the SEC is right, Mr. Hanauer is right, that other

25  claimants would feel like they would need to intervene and

1    would feel that if they didn't, then there would be some sort

2    of assumption made as to their positions in this case, which

3    would not be accurate.  And I just don't think it's necessary.

4           And, so, for those reasons, the motion to intervene

5    is denied.

6           Now, let's talk about the other issues that we

7    discussed at the last telephone conference, the first one

8    being let's talk about the standard discovery and how that is

9    going.

10          Mr. Gilman, can you address that, please?

11          MR. GILMAN:  Yes, I can, your Honor.  Michael Gilman

12   here.

13          We did draft standard discovery and sent a draft to

14   the receivership -- receiver -- last Friday.  Late afternoon

15   -- late morning I received a response to that submission, as

16   well as the receiver's proposal for additional discovery below

17   that would be directed toward the mortgagees.  I actually

18   haven't had a chance to review it all, but I can report that

19   we're in the process of, you know, agreeing -- trying to agree

20   upon standard discovery that could be issued in this matter.

21          THE COURT:  Okay.

22          So, the parties are making progress along that front?

23          MR. GILMAN:  Correct.

24          THE COURT:  Do you --

25          MR. RACHLIS:  This is Michael Rac- --

1          THE COURT:  Mr. Gilman, do you and Mr. Rachlis have

2     an estimate as to how much longer you think it will take for

3     the parties to come to an agreement as to the standardized

4     discovery?

5          I know, Mr. Gilman, you just got the response, but do

6     you have any sense?  Can you give me a ballpark, do you think?

7          MR. GILMAN:  Well, I know I'll review them and

8     respond by mid-next week.  And, then, I'm not sure how long it

9     will take for the receiver to then respond.  But I don't

10    expect a long turnaround.

11         THE COURT:  Okay.

12         Mr. Rachlis, anything to add?

13         MR. RACHLIS:  Yes, your Honor.

14         I certainly agree that we are working on making

15    progress on that front.  We are, you know, attempting to

16    collect the ideas and -- for this from any stakeholder.  We

17    received items from the SEC.  And, so, our role here is

18    certainly to try and collect those, evaluate them based on all

19    the information in the proof of claims, which itself provides

20    quite a bit of discovery.  And, so, we do want to

21    definitely -- we think we're working on that.

22         And, so, to take -- when we receive that, we did want

23    to provide our comments in light of those issues, in light of

24    what's transpired to this point in time.  And, so, I think

25    what we've provided to Mr. Gilman, I think, is an effort to do

1   so, as well as to provide other information on, basically,

2   what would be -- the form would be two standard requests, if

3   you will.  One that would go to the investor lenders, and then

4   the other would go to the institutional lenders -- that's sort

5   of the way this is breaking out -- and thinks that makes

6   sense.  So, we're making progress along those lines.

7          I think if we have that information by the middle of

8   next week, we certainly should be able to turn that around

9   within the week and gather any other comments or information

10  from those stakeholders that, you know, wish to comment on

11  that.  So, that way we can get -- we certainly can continue to

12  move that along along that time frame.

13         THE COURT:  Okay.

14         I would like to encourage the parties to see if they

15  can come to an agreement on the standard discovery within the

16  next 30 days.  So, if there are any disputes -- which I hope

17  there won't be, but if there are -- then we can just kind

18  of -- we can talk about it and we'll go from there.

19         I appreciate the parties are making some progress.

20  But I do want to light a fire under the parties a little bit,

21  and let's see if we can get try to get it done in the next 30

22  days.

23         MR. HANAUER:  Your Honor, this is Ben Hanauer for the

24  SEC.  May I quickly be heard on this issue?

25         THE COURT:  Yes.

1            MR. HANAUER:  Thank you, your Honor.

2            As the Court advised the last hearing, the SEC has

3    tried to play a limited role in the standard discovery.  I

4    have not personally dialogued with any of the institutional

5    lenders, but I have seen the requests that they proposed.  And

6    I think there's an issue brewing that as long -- that it could

7    help to get some of the Court's guidance on on the front end,

8    so that we don't have to fight about these disputes over the

9    next 30 days.

10           And the issue is this:  What the lenders sent over

11   looks -- is very consistent with what you would see for

12   discovery in a sophisticated commercial dispute.  But I'm

13   afraid that it is not appropriate for the investors in this

14   case, many of whom lack sophistication in a legal sense and

15   are going to be unrepresented.

16           And, so, my comment -- which I asked the receiver to

17   transmit to the lenders -- is whether we can try and make the

18   discovery to the investors -- the standard discovery -- in

19   more simplistic, layman's, non-legalese terms, just so they

20   can have a better shot at answering it in a meaningful way and

21   not suffer prejudice if their responses are not up to snuff

22   with what we would expect from sophisticated litigators.

23           So, to the extent the Court agrees that we -- it

24   would make sense to use more simplistic, layman's language as

25   opposed to standard discovery language for the investors'

1    standard discovery, I think that, if the Court agreed,

2    guidance like that on the front end could be helpful and save

3    us a lot of disputes going forward.

4          MR. GILMAN:  Your Honor, Michael Gilman here.

5          We actually did try to use as simple language as

6    possible because we understand that some of the investors may

7    not be represented and may -- whatever.  But in the process,

8    we want to make sure that the investors know what we're

9    looking for, and that's why we drafted the way we did.  But

10    we're willing to make them as simple as possible, provided

11    that it gives sufficient guidance to the investors so they

12    know what we're looking for and can respond.

13          My concern is if it's too simple, they may not

14    understand that certain documents are part of our request or

15    certain answers are part of our request.

16          So, we do want to keep it simple.  We wanted to avoid

17    legalese.  But we also want to make sure that the investors

18    understand what information we're looking for.

19          MR. RACHLIS:  Your Honor, this is Michael Rachlis.

20          We did convey in our communication this morning those

21    concerns and ideas, as well as issues of avoiding duplication

22    from information that's already been provided, which also can

23    be daunting for anybody receiving that type of request.  So,

24    we have attempted to convey those concerns, attempted to try

25    and pare down some of these items that we had received.  And I

1  think it is -- those are very valid concerns that the SEC and

2  we've tried to share, as well.

3         THE COURT:  Well, it seems like everyone is in

4  agreement that they should try to be as simple and

5  straightforward as possible, and I would encourage the parties

6  to keep on looking along those fronts.

7         You know, one of my kids just graduated high school,

8  and I think a good rule of thumb is if a high school student

9  can understand it, well, then that probably is kind of the

10  right standard to kind of think about:  High school or college

11  person without any legal training.

12         So, the simpler the better.  But I also understand

13  that you can't be too broad because you need to identify the

14  documents that you're looking for.

15         So, again, try your best to see if you can come to

16  some agreements.  And I'm glad the parties are thinking about

17  this and working together.  But I just want to try to get it

18  done in the next 30 days so we can get this process moving.

19         All right.  So, let's talk about the Equitybuild

20  documents and the document database, please.

21         Mr. Napoli, are you going to address that?

22         MR. NAPOLI:  Yes, your Honor.  This is Michael

23  Napoli, and I represent the Midland Servicing entities.

24         Let me give you a quick where we are.  We've been

25  working with the receiver to identify what documents we would

1  like and what documents are reasonably available.  The

2  receiver has provided us with several document inventories.

3  We've used that information to solicit proposals from various

4  vendors, all of which have come in.

5        So, the issues that are open for the lenders are

6  basically two.  One, we need to identify the appropriate

7  vendor.  And that's a cost-plus service level consideration.

8  And I hope that we can get to that within the next week or so.

9        The second issue -- and it's an issue that's both

10  among the lenders and with the receiver, and that is

11  appropriate allocation of costs.  Obviously, all of the

12  institutional lenders are going to be using the database.

13  And, you know, we will figure out a way to share costs, given

14  the number of lenders involved and the presence of the

15  insurance companies, which you may have noticed Midland has

16  three.  Those negotiations may be a little bit complicated,

17  just given the number of parties.

18        The second issue, which your Honor raised at the last

19  hearing, was:  To what extent and what's the proposal for

20  trying to share some of this information with the receiver and

21  with the investors?

22        And, you know, with respect to the receiver, our view

23  is that the receiver should most likely pay the same share

24  that the lenders themselves are paying, however that's

25  ultimately determined.

1        With respect to the investors, you know, we would

2   like some guidance on that from your Honor.  In some cases,

3   depending on the vendors, it may well be that there is a

4   significant or at least an out-of-pocket cost for broadening

5   the availability of the database to other people.  For most of

6   these vendors, there are a limited number of seats that are

7   available.  Additional seats are available, but, you know,

8   there is a monthly cost for that.

9        So, that's where we are.  I think we should be able

10  to get -- we should be able to get a lender -- I'm sorry, a

11  vendor picked within the next few weeks.  We should be able to

12  decide on cost allocation over that same period of time.  Once

13  that's done, there will be a time period to actually get the

14  documents.  Most of the documents are in a readily accessible

15  form.  So, we should be able to get those within a matter of

16  days once we push go and agree to the financing and all the

17  other terms.

18        There are a few that are more difficult because

19  they're controlled actually by third parties, either in terms

20  -- and we're going to have to work with them and their

21  financial and technical considerations, that I don't have a

22  good handle on how long that will take to resolve.  And, then,

23  you know, once you get everything loaded, then there's a

24  culling process to get it to something that's useful.

25        So, that's where we're at, your Honor.  Happy to

1    answer any questions that you might have.

2         THE COURT:  No.  Thank you very much.

3         So, at this point, I take it that -- well, we don't

4    have a estimate as to, for example, per subscriber, like for

5    non-institutional claimants making -- like how much it would

6    cost to get a subscription, monthly or otherwise, to access

7    that database if another claimant wanted to do so.

8         So, at this point in time, do you have any estimate

9    as to what the costs of that might be?

10        MR. NAPOLI:  If we're strictly talking -- and it

11   varies by vendor, your Honor.  For some vendors, there won't

12   be a charge.  But they cost a lot more in terms of a flat fee.

13   Other vendors will charge -- we've been told they charge --

14   maybe as little as $125 per seat per month.  For other

15   vendors, they have not given us that level of detail.

16        So, there's a lot of moving parts, your Honor.

17        THE COURT:  Right.

18        MR. NAPOLI:  I suspect, your Honor, it's going to be

19   some charge.  I don't think it will be free.

20        THE COURT:  Okay.

21        I understand that there are a lot of moving pieces

22   and you're looking at various competing bids and within the

23   bids different pieces are kind of dependent upon one another.

24        At this point, does the receiver or the SEC have

25   anything that they would like to add regarding this topic?

1          MS. ROSEN WINE:  Your Honor, this is Jody Rosen Wine

2     here for the receiver.

3          THE COURT:  I'm sorry, who?

4          MS. ROSEN WINE:  Jody Rosen Wine.

5          THE COURT:  Yes.  Hello.

6          MS. ROSEN WINE:  Thank you.

7          So, I've been involved in conversations with counsel

8     for the lenders, as well as some of the vendors that have been

9     suggested; and, frankly, it's a bit of a surprise right now to

10    hear that they're going to require the receiver to share the

11    cost because that's not been the discussions that we've had to

12    this point.

13         The understanding from the last hearing and up until

14    right now was that the cost was going to be borne by the

15    institutional lenders.  If the receiver is going to be

16    required to pay -- it sounds like they're proposing now half

17    -- that would only be possible through the imposition of a

18    receiver's lien --

19         THE COURT REPORTER:  Ms. Rosen Wine, can you repeat

20    that, please.  I'm having a hard time hearing you.  This is

21    the reporter.

22         MS. ROSEN WINE:  Yes, I'm sorry.  At what point --

23         I'm saying that if the receiver is going to be

24    required to pay a share or even half of the database charge,

25    that there would have to be a receiver's lien imposed to have

1   the funds to pay that charge.  I know that issue is before you

2   in other contexts, but I just wanted to mention that it would

3   be relevant to this, as well.

4        Additionally, the question that you asked about the

5   additional fee for the investor lenders and other users to

6   access the database, my understanding from at least some of

7   the vendors we've talked to is that there's unlimited users

8   available.  So, that could be addressed in that manner.  But

9   we do think it's important that everyone has access to these

10  documents and not just the institutional lenders.

11        THE COURT:  It seems to me that with regard to access

12  to documents, as I said previously, that if there's an

13  incremental cost to the database for providing access to a

14  particular claimant, then it seems reasonable to have some

15  sort of charge for that access.

16        Now, it obviously would depend upon what the charge

17  is, but $125 per month to access the database -- and I know

18  that we're just kind of throwing out numbers here, but

19  something in that realm, to me, does not sound unreasonable

20  for -- if a claimant wants to get into the Equitybuild

21  documents, they can pay the $125 and they can access to their

22  heart's content for a month, or longer if they want to pay

23  more.  But that amount of money doesn't seem to me cost

24  prohibitive, given the amount of funds that we're dealing with

25  here.

1          The problem of allowing -- I mean, the issue with

2    unlimited access is, of course, as Mr. Napoli mentioned, that

3    that might just have the vendor just increase its upfront

4    costs to provide that.  And given the fact that we don't know

5    how many claimants would even want to bother looking at that

6    database, it seems to me that having a unlimited version, if

7    it means that's going to be substantially more expensive, is

8    not particularly appealing if there are options where a

9    claimant who wants to access it can pay a modest amount to do

10   so, claimants who don't care don't have to pay, and the

11   upfront costs would be lower theoretically if such a fee

12   schedule was practical.

13          But, again, I'm not saying anything that I think that

14   anyone would necessarily disagree with or the parties would be

15   surprised at.  You know, I think that because I've made it

16   clear that to the extent that the lenders aren't going to be

17   using the documents during the claims process or that they're

18   going to use it but are not going to be using it to support

19   good-faith arguments or meritorious arguments, I think I made

20   it clear that the lenders are the people that want -- the

21   parties that want -- access to these documents will bear the

22   cost of processing and accessing the Equitybuild documents.

23   And I'm not going to let them, under those circumstances,

24   shift the costs later on to any portion of the receivership

25   estate.

1          So, the lenders have -- I'm sure they're thinking

2     they have to be economical and careful as they pick these

3     vendors, given those limitations.  And, so, given that, I

4     don't think that a subscription-based program is at all

5     unreasonable, again, assuming that it's a modest charge, given

6     the amounts that we're dealing with.

7          So, at this point in time, Mr. Napoli, do you think

8     that -- it seems like you kind of have a sense and have

9     narrowed the universe of potential vendors.  And I know you

10    have to do a bit more legwork to kind of finalize everything.

11    But do you think that you'd be in a position 30 days from now

12    to actually have some numbers on the table that you can

13    provide?

14         MR. NAPOLI:  Yes, your Honor.  I'm hoping to have a

15    vendor picked.

16         And I just want to clarify, I think, what you're

17    saying.  Our understanding is -- of your Honor's direction at

18    the last status conference was, basically, that if we think

19    the documents are necessary and we want them, we have to pay

20    to obtain access to them, which is what -- which is where

21    we're -- which is what we're going along.  I mean --

22         THE COURT:  Yes.

23         MR. NAPOLI:  -- from our view, you know, if the

24    receiver doesn't want access to them, the receiver wouldn't be

25    expected to pay a portion.  And it wouldn't be 50 percent.  It

1   would be -- you know, if there's ten lenders, it would be

2   divided ten ways.  The receiver would be an eleventh, is what

3   we're thinking.  And those percentages I just made up, your

4   Honor.

5          THE COURT:  Right, right.  No, I understand.

6          That's exactly right.

7          MR. NAPOLI:  Yeah, I mean, I -- I mean, it's -- we

8   just view that the receiver is in a slightly different

9   position than the individual claimants in terms of a fair

10  allocation of cost for this project.

11         THE COURT:  Right.  Okay.

12         Well, I look forward to seeing kind of a more

13  concrete proposal in the next -- proposal to me -- in the next

14  30 days.

15         Thank you, Mr. Napoli, for all the work that you've

16  done so far, as well as Ms. Rosen Wine.  Thank you for your

17  input, as well.

18         All right.  One of the things -- well, I guess the

19  next thing on the list is talking about the role of the

20  receiver.

21         And, Mr. Damashek, you said you would address that

22  issue.

23         I've looked at some of the -- I've looked at the

24  submissions of the parties with regard to that issue.  And,

25  so, let me hear from you at this time, please.

1          MR. DAMASHEK:   Thank you, Judge.   Ron Damashek.

2          What we have here is a priority dispute, which is

3   governed by state law.   This is not a situation where we're

4   looking at equity or fairness.   We're looking at things such

5   as what was recorded when?   Is somebody a BFP?   Is a mortgage

6   holder obligated to release its lien when its loan servicer

7   issues a payoff and a payoff is made in accordance with that

8   payoff letter?

9          Those are all issues of state law.   Those are all

10  issues for the Court to determine.   And they're not the type

11  of decisions or recommendations that you need a receiver for

12  and that are the subject of the cases cited in the brief,

13  where the receiver is looking at equitable determinations

14  among a class or classes of claims.

15         These are state law decisions normally, typically,

16  decided by courts, and they're not something that a receiver

17  is or should be involved with.   The receiver is responsible

18  for managing the assets of the estate, collecting those

19  assets, challenging claims against the estate.

20         And, so, by all means, if the receiver believes that

21  anybody's lien is invalid and is not a proper lien against an

22  asset of the estate, then the receiver should have the right

23  to challenge that.   But when there are two competing claimants

24  who both assert liens, who both assert priorities, then it's

25  up to those litigants to present their case to the Court and

1    for the Court to decide those issues.  And there is no need

2    for the receiver to have any role in that process, especially

3    in a receivership like this where the receivership,

4    essentially, is under water.

5           These are not assets that any unsecured creditor is

6    going to receive a penny from; and, therefore, the receiver

7    shouldn't be playing any role, expending any resources or

8    asserting a receiver's lien against the assets when it's

9    really a private dispute between parties that should

10   adjudicate that.

11          And it's not only the concept of what's involved and

12   who should be deciding it, but we're also talking about a

13   situation where the receiver has asserted or may assert

14   fraudulent transfer claims against parties.  Obviously, there

15   have been battles to date between the receiver and the

16   mortgagees here.  And, so, there really is an adversarial

17   role.  The receiver and the mortgagees have been adversarial

18   to date.

19          The receiver indicates that he will be a litigant

20   challenging, as fraudulent transfers or otherwise, certain

21   claims.  And in that context, the receiver cannot be an

22   impartial party because he's litigating against us or at least

23   against some of us.  And he should not at the same time being

24   in a position of making recommendations as to who as between

25   two parties has lien priority against an asset of the estate,

1   which will afford no benefit to the estate.

2           And that really puts him in a conflict situation as

3   to us; conflict situation as between the lien claimants

4   because he's supposed to be impartial as to those lien

5   claimants.  And, again, if -- it's not an issue of

6   impartiality if he says my claim is invalid.  But it is a

7   situation where if he's coming in and saying, well, somebody

8   else's claim is prior to yours, that is not treating us

9   equally.  It's coming in, essentially, supporting a position

10  of somebody else.

11          And this Court certainly is well-equipped to address

12  those issues.  There's a structure where the magistrate judge

13  is available to assist the Court if the workload is too great.

14  I, frankly, don't anticipate it to be too great because really

15  what we're dealing in any given context as we set up with

16  these tranches is claim that investor lenders' mortgage has

17  priority or mortgagee's claim has priority.  There's going to

18  be a focused decision.  And that's exactly what this Court

19  does every day.  It's exactly what the magistrate judge does

20  every day.

21          And just frankly, the Court does not need the

22  receiver to be coming in and making determinations or

23  recommending determinations of items which are a matter of

24  law, which litigants normally assert; which we certainly are

25  in a position to assert; and, which the investors are in a

1  position to assert, as well.  Whether they want to do it

2  individually, whether they want to pool their resources and do

3  it collectively, they have that ability.  And it's not the

4  receiver's role.

5       THE COURT:  So, Mr. Damashek, let me ask you this:

6  There are cases where the receiver -- where the court -- a

7  court has held or couple of courts have held that the receiver

8  does have a role in how the estate should be equitably

9  distributed.  And I wondered in what types of cases you think

10  a receiver may assume a role in assisting the Court in the

11  manner that an estate is distributed amongst different

12  claimants.

13       MR. DAMASHEK:  Well, the key issue, Judge, is just

14  what you said, which was the equitable issue.  If we look at

15  some of the cases that are out there, we might have a

16  situation where there are several classes, exactly the same

17  type of investment and maybe one person redeemed their

18  investment first and got their funds back as compared to

19  somebody else who didn't and it was sort of a race to the

20  courthouse situation.  And in that context, the court said,

21  you know, that is an equitable situation; that is a fairness

22  situation.

23       I am not aware of any cases, nor do I believe any

24  have been cited, where the court, essentially, transfers some

25  or all of the responsibility for making the legal

1    determination as to a matter of priority under state law.

2    That's really what we're dealing with here.

3         So, if you have within a class that you need to

4    determine, okay, how do we treat similarly situated parties

5    the same or differently, those are the kind of cases where the

6    receiver did play a role in making -- or assisting the Court

7    in saying, okay, we have Class A, Class B, Class C; here's how

8    we should treat all the creditors in Class A, and we should

9    have Class A before Class B for this reason.

10        But they're equitable reasons.  They're fairness

11   reasons.  They're not the legal determination as a matter of

12   state law that my lien is prior to or subordinate to another

13   lien claimant.

14        THE COURT:  Okay.  Thank you.

15        Let me hear from the receiver, please.

16        MR. RACHLIS:  Thank you, your Honor.  This is Michael

17   Rachlis.

18        I think there is a definite misconception of where --

19   what our role is.  There's never been any indication -- and

20   I'm talking about sort of like everyday tasks and things of

21   that nature.  There has not been any assignment that the

22   receiver has asked the Court or the Court has given to the

23   receiver to make determinations of law or anything of that

24   nature.  And that is certainly not what the claims process

25   entails in terms of the role of the receiver.  That always --

1    the final decisions lie with the Court, and the cases are

2    legion and that's just sort of common sense.

3           But the receiver, as an arm of the Court here, is

4    responsible for administering the claims process for the

5    Court, for the stakeholders and ultimately recommending a

6    distribution plan.  And within that context, there are -- the

7    everyday tasks that the receiver does can involve taking an

8    adverse position to a claimant.  That does not make for a

9    conflict of any sort.  It just means that the receiver is

10   playing the role that it's been designated to do in its

11   recommendations.  I mean, it could do that in terms of an

12   amount that has been requested by a claimant where they say

13   that they're entitled to a hundred thousand dollars and the

14   receiver says -- recommends that $25,000 be provided.  That's

15   not -- that is adverse to the interest of that claimant.  It

16   does not create a conflict such that the receiver has no role

17   to play.

18          I think the logical conclusion of the arguments that

19   we're hearing would be there would be no -- the receiver could

20   never do anything because the receiver will ultimately -- when

21   it provides a distribution plan will -- there is going to be

22   claims that will not be happy across the board and, therefore,

23   could argue, as in other cases we've seen, that say, well,

24   they're adverse and they've been in conflict, so the whole

25   thing needs to be thrown out because they've taken -- because

1   they've been adverse to me but yet are still participating in

2   this process.

3           So, I don't think -- I think that ignores what the

4   actual role of the receiver is and, certainly, I think, does

5   not give fair credit to what the Court will ultimately be

6   doing in the process that's been proposed.

7           As to the issue of priority, the logic remains the

8   same.  The receiver here is not determining priority

9   ultimately.  The Court will do so.  But as courts have done in

10  the past that have appointed receivers, the receiver has had

11  roles to play in terms of those issues.  I mean, the Elliott

12  case is an example where that has occurred, where you have the

13  receiver making -- the receiver actually is engaged in

14  questions of priority and who has priority and who does not,

15  and the court ultimately made a decision.  They made their own

16  recommendations, fought that out, the court made a decision,

17  determination as to who had priority and that -- and there the

18  law sat.

19          We're not really looking -- the process that's been

20  proposed here does not provide anything different.  And I

21  think it's important what we heard about the fact that there

22  are these issues on in- -- there are issues about looking at

23  the amounts of the claims, looking at the validity of the

24  claim.  And the validity of the claims can affect priority.

25  And, of course, I don't think it's contested -- even I think

1   Mr. Damashek recognizes -- that that is a role that the

2   receiver would play undisputedly.

3           So, it seems to me that the role of the receiver --

4   the receiver in its -- theoretically, in what it's supposed to

5   be doing day in and day out and as part of the claims

6   administration process, has a role to play in terms of making

7   recommendations that does not supplant the role of the Court.

8           And I think that -- and the fact that those can be

9   adverse to a party does not make a conflict.  It just means

10  that the receiver is doing its job, and whether it be in the

11  Huber decision from the Seventh Circuit, where the Court

12  approved of a distribution plan over the objections of a dozen

13  or so investors who were disappointed with the methodology

14  that was ultimately approved by the district court in that

15  context; or, whether it be in the Fleet Diagnostics case where

16  there were actually priority disputes that were ongoing --

17  they were a little bit different, but there were priority

18  disputes between the receiver and the litigant that went toe

19  to toe in dealing with those issues, which the Court had no

20  problem with.  And, ultimately, the district court judge and

21  ultimately the appellate court affirmed the resolution of

22  those issues.

23          I think that these are just part and parcel of what

24  the receiver is doing.  And these ultimately are going to boil

25  down to recommendations.  You're going to have the

 1   recommendations about the validity of the claim; there are

 2   going to be recommendations about the amount of the claim;

 3   and, there are going to be recommendations about the

 4   classifications of those claims, all ultimately taking the

 5   full benefit of the receiver's work and effort through the

 6   time period since almost two years ago at this time, which is

 7   a benefit for the Court and for the claimants if there's an

 8   efficiency points to it.

 9           And, ultimately, it seems that the key element of it

10   all is that it is not the receiver that is making these

11   determinations, but is acting consistent with its role and,

12   ultimately, it will be the Court, through the process that we

13   have submitted, that's going to resolve those disputes per

14   tranche.

15           So, I think those are very consistent with what

16   receivers do and should be doing here.

17           THE COURT:  Okay.

18           MR. DAMASHEK:  Judge, may I respond?

19           THE COURT:  Mr. Damashek.

20           MR. DAMASHEK:  Yeah, sure.  Thank you.

21           MR. HANAUER:  Can the SEC be heard, your Honor?

22           MR. DAMASHEK:  I'm sorry.

23           THE COURT:  Mr. Hanauer, I'll give you a couple of

24   minutes, tops.  Go ahead.

25           MR. HANAUER:  Okay.  Thank you, your Honor.

1          I just want to respond to what Mr. Damashek said at

2   the very start of his presentation, which is that we're not

3   dealing with equity here.  Respectfully, your Honor,

4   Mr. Damashek is dead wrong on that point.  I don't think

5   there's any genuine dispute that the nature of this proceeding

6   and the receivership is equitable.

7          And along those lines, equity requires some level of

8   protection for the victimized investors in this case.  And,

9   really, I thought that's what was at the heart of the Court's

10  guidance after the three in-chambers conferences that we had,

11  where the lenders were demanding independent declaratory

12  judgment actions and the receiver and the SEC were advocating

13  for the approach that the Court, at the end of those three

14  conferences, said we should go explore.

15         I think, as Mr. Rachlis said, this is entirely

16  consistent with a long line of Seventh Circuit cases in SEC

17  receiverships where the receiver is, by doing his job, is

18  evaluating claims between competing classes of claimants.  And

19  that happens regularly.  And it doesn't put the receiver in an

20  impermissible position where the receiver has to simply act

21  objectively as an officer -- and as an officer of the court

22  making recommendations on how the receiver sees the facts and

23  the law in this case.

24         And, then, responding --

25         THE COURT:  Mr. Hanauer --

1          MR. HANAUER:  Yes.

2          THE COURT:  -- let me ask you this:  For the

3    individual investors, what is the median amount of investment?

4          MR. HANAUER:  I do not -- I apologize, your Honor.  I

5    do not have that information.  I can't give you an accurate

6    number there.  But it's my understanding that it's less than

7    $10,000.

8          THE COURT:  That the median is less than $10,000?

9          MS. ROSEN WINE:  Your Honor --

10         MR. HANAUER:  I --

11         MS. ROSEN WINE:  -- this is Jody Rosen Wine for the

12   receiver.

13         I just -- I would dispute that that's the median

14   amount.  I think it's much higher than that.  I mean, there

15   are certainly claimants that have claims in the -- less than

16   10,000, but they're the minority.  I think many are five-

17   digit and six-digit figures.

18         MR. HANAUER:  And, your Honor, I will absolutely

19   defer to the receiver on this.  And I wasn't trying to -- and

20   that's why I pre-phrased it with I don't have that

21   information.

22         But I think it's safe to -- I know from reviewing the

23   claims chart that there are certainly claims of less than

24   $10,000.  And I think we described in our briefing why we

25   don't believe that -- why we do believe that there are a large

1  number of investors that do not have high dollar-amount

2  claims.

3       THE COURT:  I would like --

4       MR. HANAUER:  The usual --

5       THE COURT:  -- from the -- hold on.

6       From the receiver, I would like to know -- I would

7  like to have some information regarding the distribution of

8  the amounts of individual investors.  So, whether it's -- you

9  can give me -- a bell graph chart would be helpful or some

10 sort of distribution analysis -- so I know not only the total

11 number of individual investors, but approximately what that

12 distribution is.

13      MR. RACHLIS:  Okay.

14      MR. MARCUS:  Your Honor?  Your Honor, hi, this is

15 Dave Marcus.  I'm calling you from New York City.  I'm --

16      THE COURT REPORTER:  Can you please speak up,

17 counsel.  I can't hear you.

18      MR. MARCUS:  Yeah.

19      This is David Marcus.  I'm calling you from New York

20 City, Judge Lee.  And I just want to say I'm one of the major

21 investors; also one of the most active people involved here.

22      I want to say first, to support what Ben Hanauer said

23 about that this should be a lot more -- I'm a layman.  I'm not

24 a lawyer.  There's so much legalese here.  Most of the

25 investors wouldn't know anything what's going on here.

1        UNIDENTIFIED SPEAKER:  Well, John, my idiot

2   co-counsel, set me up for it because I'm the youngest.  That's

3   why.

4        THE COURT REPORTER:  I'm sorry --

5        THE COURT:  Hold on.  Hold on.

6        THE COURT REPORTER:  -- who is that speaking?

7        MR. MARCUS:  Wait, wait a -- hold on.  Wait a second.

8        I invested $1,370,000.  To say that the av- -- the

9   median is 10,000 is absolutely ridiculous.  It is --

10        THE COURT:  Mr. Marcus, I think that that's why I'm

11   going to wait to get the information from the receiver.  Okay?

12        MR. MARCUS:  I know half a dozen people that have

13   invested a million dollars or more, and I know people who have

14   invested 400, 700,000.  10,000 is absolutely ridiculous.

15        And I just want to say this is a case that's -- when

16   I invested in the Equitybuild properties, I invested as --

17   because I thought I was in first position.  I never signed

18   away my rights to the properties.  I don't know what happened.

19   I now find out later, months after I -- you know, after it was

20   shut down that there were lenders involved.  I know nothing

21   about lenders.  And I should be -- this was a criminal act

22   done by the Cohens.  And I have to pay for it and all that

23   stuff?  I have to be punished for that?

24        I did not -- like I say, I did not -- sign away my

25   rights.  And I believe that the lenders -- and I'll say this

1   right now -- shouldn't get a penny at my expense.  Not one

2   penny.  Now, I will fight --

3          THE COURT:  Mr. Marcus, Mr. Marcus, I'm going to cut

4   you off now.  Thank you very much.

5          All right.  So, Mr. Damashek, anything else with

6   regard to the role of the receiver in this case; and, if so,

7   please keep it brief.

8          MR. DAMASHEK:  I will, Judge.

9          Just briefly, Mr. Rachlis is incorrect when he says

10  that Elliott was a priority determination case.  If you look

11  at Elliott, what the court did there was it determined the

12  validity -- I'm sorry, what the receiver litigated was the

13  validity of claims.  And, again, we've indicated that if a

14  receiver says a claim is invalid -- so it is not a valid claim

15  against an asset of the estate -- by all means, have him come

16  in and do that.  That's what was done in Elliott.  That was a

17  consideration.  There was no litigation by the receiver, no

18  determination by the receiver as to is this one prior to that

19  one?

20         And, so, I think, again, the receiver's role has got

21  to be limited to challenges to assets against the estate, not

22  challenges between claimants.

23         And the point I was trying to make earlier was that,

24  you know, whether it's Mr. Marcus, whether it's his six

25  connections, whether it's other people, it's their

1   responsibility to come in and litigate the validity -- I'm

2   sorry, the priority -- of claims between themselves and the

3   lenders.  And that's just simply not the receiver's role.

4           From my vantage point, we can all look through it.

5   We all understand what the receiver is trying to do, what the

6   SEC is trying to do.  But as a practical matter, you don't

7   need the receiver to come in and say, Judge, here's all the

8   evidence on the issue of priority.  It's my job and it's

9   opposing counsel's job to do that, and then the Court can make

10  its determination.

11          THE COURT:  All right.  Thank you.

12          So, I'll take that issue under advisement, but I

13  appreciate the argument today.

14          Is there anything else that I need to address today?

15          What I'm going to do is I'm going to set another

16  status date by telephone conference about 30 days out, so that

17  more progress can be made with regard to the standard

18  discovery list, as well as the bids on the Equitybuild

19  document database.

20          Is there anything else that I need to address today?

21          Let me hear from the receiver.

22          MR. RACHLIS:  Your Honor, thank you.  Michael Rachlis

23  on behalf of the receiver.

24          We do have a motion that was filed to approve

25  counsel -- additional counsel -- on certain claims that we

 1    noticed for today.  There was no -- the SEC is not objecting

 2    to that.  And we'd like to get that resolved today, if we can.

 3            THE COURT:  I haven't taken a look at it yet.  So,

 4    I'll take a look at it.

 5            MR. RACHLIS:  Terrific.

 6            The only other issue -- and I think that Mr. Napoli

 7    had perhaps referenced it -- on the protective order, we are

 8    still working -- we have exchanged drafts on a protective

 9    order and there are -- there's one small point that still

10    needs to be addressed, although it's an important point

11    involving one provision that we -- that the SEC has indicated

12    needs to be included.  Prior discussions on this issue before,

13    we did have that agreement -- at least we understood there was

14    an agreement that that was in place.  But we recognize that

15    that issue does need to be resolved.

16            So, I don't know what more we could do that on that

17    today, but I did want the Court to be aware that that

18    protective order issue, we are working on it and we'll need --

19    and that will be probably brought before you shortly, as well.

20            THE COURT:  Okay.

21            Anything from the SEC?

22            MR. HANAUER:  No.  Thank you, your Honor.

23            THE COURT:  All right.

24            Anything from the lenders?

25            MR. DAMASHEK:  I guess not, Judge.

1          THE COURT:  Anything from anyone else on the call?

2          MR. MARCUS:  Yes, your Honor.  This is David Marcus

3    again.

4          I would like to know if I could get -- if you would

5    help me out with a list of the -- my fellow investors,

6    900-plus.  I only know about a dozen of them.  If you could

7    help me so I could get a list so we could organize.  Because

8    right now this is so lopsided with the lenders, and they have

9    lawyers on retainer and all that stuff.  And we are like on

10   outside looking in.  We're like -- we're like we're

11   stepchildren here.

12         And if there was a way that you could either tell the

13   receiver or the SEC attorney, they could send out an e-mail

14   and they can have my e-mail.  I would like to organize all the

15   other investors and see what we could do.  I would love to

16   have your help in this.

17         THE COURT:  Mr. Marcus, what I would suggest is you

18   contact counsel for the SEC, Mr. Hanauer, and counsel for the

19   receiver, Mr. Rachlis, with --

20         MR. MARCUS:  I've done that.

21         THE COURT:  -- those requests.

22         MR. MARCUS:  I've done that.  That's why I'm

23   approaching you, your Honor.  Because they were not able to

24   help me.

25         And the bottom line -- I mean, I can get all the

1    names, but I don't have their e-mails, the contact

2    information.  If they could send out e-mails to all the

3    investors and they could have my e-mail and my phone number,

4    you know, that would be helpful to me.  Because right now I

5    feel there are a lot of people here -- we are suffering

6    tremendously.  The investors --

7            THE COURT:  Mr. Marcus, did they tell you why you

8    couldn't get that information or they just haven't responded?

9            MR. MARCUS:  They just said they could not give it to

10   me.  All I could get is the names, which I have anyhow.  It's

11   on record.  But they said they could not help me with that.

12   And I asked Mr. Hanauer and I asked -- and Kevin Duff.

13   Mr. Hanauer said there was nothing he could do.  I asked him

14   several times.

15           So, if there's a way -- now, I don't need to have all

16   of their -- only people who want to respond to the e-mail that

17   the SEC attorney would send out or the receiver.  They can

18   contact me.  I'm more than willing to take all the time that's

19   necessary.  They can give me their e-mail address, their phone

20   number.  I will be more than happy to talk to any investor I

21   can, and so that we can -- I can get some kind of a consensus

22   on this, Judge.

23           You know, I was there last year and I --

24           THE COURT:  Mr. Marcus, hold on for a second, okay?

25           Mr. Hanauer?

1          MR. HANAUER:  Yes, your Honor.

2          THE COURT:  Are you familiar with what Mr. Marcus is

3     talking about?

4          MR. HANAUER:  Yes, your Honor.  He has requested of

5     me that I provide him the contact information of the other

6     investors in this case.  And, unfortunately, the SEC simply --

7     we don't share the names of victims with members of the

8     public, even if it is another victim.

9          I will point out, though, that it's --

10          MR. MARCUS:  I'm not --

11          THE COURT:  Mr. Marcus --

12          MR. HANAUER:  Excuse me.  Excuse me.

13          THE COURT:  Mr. Marcus, please don't interrupt

14     people, okay?  Let Mr. Hanauer finish.

15          MR. MARCUS:  Okay.

16          MR. HANAUER:  I will point out, your Honor, that in

17     the claims process, it's my understanding that the receiver

18     will be providing contact information for the -- all the

19     investors in a particular tranche.  So, hopefully that could

20     go a long way to addressing Mr. Marcus' concerns.

21          But, again, absent a court order, I'm just not in a

22     position to disclose victim contact information, and I think I

23     don't need to get into all the reasons for why not.

24          MR. MARCUS:  Well, Judge --

25          THE COURT:  Hold on, Mr. Marcus.  Hold on.

1          And, so, Mr. Hanauer, can you provide me generally

2    what the reasons for why not?

3          MR. HANAUER:  Yeah.  Well, these are -- like any

4    other violation of the law, these investors are victims and

5    have suffered tremendously.  In many cases, their life savings

6    have been gone.  And while Mr. Marcus has certainly been very

7    out front and very comfortable coming forward and trying to

8    contact people, it's my experience that -- dealing with

9    investor victims -- that a large number of them don't want to

10   be contacted and don't want to be bothered, either by the

11   press or plaintiffs' lawyers or other people like that.  And

12   for that reason, we simply -- we do not provide non-public

13   information relating to our case's investigation, which is

14   precisely the type of information Mr. Marcus wants.  We don't

15   do that.

16         If there's a court order, that's a whole nother

17   kettle of fish; and, obviously, we'll abide by the Court.  But

18   under SEC guidance, I am prohibited from sharing non-public

19   information relating to my cases.  And, unfortunately, victim

20   contact information is very much that sort of non-public

21   information that I am not allowed to disclose to the public.

22         THE COURT:  Okay.

23         MR. MARCUS:  Judge, may I respond?

24         THE COURT:  Briefly, please.

25         MR. MARCUS:  Yeah, I'll make it short.

1          I asked Mr. Hanauer and also Mr. Duff, I said,

2    listen, you don't have to -- I don't want the contact

3    information.  Some people may not want to be contacted.  All

4    I'm asking for is they send out an e-mail that I am willing --

5    they can have my contact information, my e-mail address and my

6    phone number, and if anyone wants to call me about this case,

7    I'm more than willing to talk to them about it.

8          I don't want Ben Hanauer to give me the names and the

9    contact information.  If he can't do it, that's fine.  Just

10   tell -- just e-mail a bulk e-mail to all the investors, your

11   Honor, and say that David Marcus is here; he wants to know if

12   anyone is interested in the case.  I'll keep them updated.

13   I'll tell them what's going on.

14         There may be some investors who are not interested.

15   That can happen.  Some of them are so depressed, you know, I'm

16   surprised that there haven't been any suicide attempts at this

17   point.  I'm serious about that.  Life savings.  My life

18   savings down the drain.  And I know two or three other people,

19   their life savings.

20         So, the bottom line to that is I don't want Mr. --

21   and I told him specifically.  I don't want him to give me the

22   names and contact information.  I would like the e-mails sent

23   out on my behalf and say, listen, anyone that is interested,

24   contact David Marcus, New York City, my e-mail address and my

25   phone.  And they are welcome to call me or not.  And that's

1   all I'm asking for, your Honor.

2          THE COURT:  Mr. Hanauer, final word.

3          MR. HANAUER:  Again, your Honor, if the Court is

4   inclined to do what Mr. Marcus asks, I would simply ask that

5   it not be the SEC that sends out his contact information.  I

6   simply don't even have some sort of mass distribution list

7   that could go to all the investors.  But I would note I think

8   the receiver does because I understand he communicates to

9   investors that way.  So, if the Court is inclined to follow

10  Mr. Marcus' request that his contact information would be

11  shared with others, I think that's probably the best vehicle

12  for it.

13         MR. MARCUS:  Thank you.

14         THE COURT:  Mr. Rachlis, what are your thoughts?

15         MR. RACHLIS:  Your Honor, we field, you know, a lot

16  of calls from investors who value their privacy.  And even,

17  you know, even in the status reports that we've filed, we've

18  received, for lack of a better term, blowback, you know, that

19  there's too much information and people are sensitive.  So, we

20  are sensitive to those issues.

21         What we thought would be a viable solution to the

22  types of issues that Mr. Marcus is raising is that the contact

23  information that he's looking for will be available per

24  tranche.  So, really the interested parties that he is

25  thinking about, you know, in dealing with -- you know, so, the

1   investments that he's made for prop- -- in the same properties

2   that he's made them, he would -- at the time that those

3   tranches, would be basically up, he would have that

4   information each time the tranche would be called for.  So,

5   that information would certainly be available through those

6   means without question.

7           So, I think that that is a solution -- at least a

8   solution -- to the issue that he's raising here.

9           THE COURT:  All right.

10          Let me think about it.  I'll think about it, Mr.

11  Marcus.

12          MR. MARCUS:  Thank you, Judge Lee.  I appreciate

13  that.  Thank you very much for the consideration.

14          THE COURT:  So, I'm going to set this case for

15  further status on -- I'm just looking at my calendar here --

16  on September 23rd at 1:30, and it will be by telephone

17  conference just like today.

18          At that point, I'd like to get more information with

19  regard to how -- with regard to the document database, as well

20  as the standard discovery set.  And I will issue my ruling

21  either before then or at that time with regard to what I

22  believe is the proper role of the receiver in this case.

23          MR. RACHLIS:  Okay.

24          THE COURT:  Thank you very much.

25          MR. RACHLIS:  Thank you, your Honor.

1          MR. DAMASHEK:  Thank you, your Honor.

2          MR. MARCUS:  Thank you, your Honor.

3                    *    *    *    *    *

4

5    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

6

7

     /s/ Joseph Rickhoff                    August 21, 2020
8    Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25