UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

      Plaintiff,

      v.

EQUITYBUILD, INC., EQUITYBUILD
FINANCE, LLC, JEROME H. COHEN, and
SHAUN D. COHEN,

      Defendants.

Case No. 1:18-cv-5587

Hon. John Z. Lee

## MORTGAGEES' RESPONSE TO RECEIVER'S SEVENTH INTERIM APPLICATION AND MOTION FOR COURT APPROVAL OF PAYMENT OF FEES AND EXPENSES OF RECEIVER AND RECEIVER'S RETAINED PROFESSIONALS

The Mortgagees[1] object to the Receiver's Seventh Interim Fee Application and Motion

for Court Approval of Payment of Fees and Expenses of Receiver and Receiver's Retained

---

[1] The Mortgagees are Freddie Mac; Citibank N.A., as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2018-SB48; U.S. Bank National Association, as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2017-SB30; U.S. Bank National Association, as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2017-SB41; U.S. Bank National Association, as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2018-SB50; Wilmington Trust, National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Trust 2014-LC16, Commercial Mortgage Pass-Through Certificates, Series 2014-LC16; Wilmington Trust, National Association, as Trustee for the benefit of the registered holders of UBS Commercial Mortgage Trust 2017-C1, Commercial Mortgage Pass-Through Certificates, Series 2017-C1; Federal National Mortgage Association ("Fannie Mae"); BMO Harris Bank N.A.; Midland Loan Services, a Division of PNC Bank, National Association; Midland Loan Services, a Division of PNC Bank, N.A. as servicer for Colony American Finance 2015-1; Midland Loan Services, a Division of PNC Bank, N.A. as servicer for Wilmington Trust, N.A., as Trustee for the Registered Holders of Corevest American Finance 2017-2 Trust, Mortgage Pass-Through Certificates, Series 2017-2; Midland Loan Services, a Division of PNC Bank, N.A. as servicer for Wilmington Trust, N.A., as Trustee for the Benefit of Corevest American Finance 2017-1 Trust Mortgage Pass-Through Certificates; BC57, LLC; UBS AG; Thorofare Asset Based Lending REIT Fund IV, LLC; and Liberty EBCP, LLC.; Direct Lending Partner LLC (successor to Arena DLP Lender LLC and DLP Lending Fund LLC)

Professionals ( the "7th Fee Application"), and specifically request that this Court deny the Receiver's request for a blanket super priority lien for administrative expenses on properties encumbered by their mortgages to the extent that the Receiver (a) fails to show that these properties and the secured creditors benefitted from his efforts in administering the Estate of Defendants EquityBuild, Inc., EquityBuild Finance, LLC, and their affiliates (the "Estate"), and (b) fails to provide an acceptable basis to surcharge his administration expenses among the properties. As indicated below, not only should the Court question the propriety of another interim award at this time, but even if such an award is made, the Estate's lack of resources to pay the cost of the receivership does not warrant the imposition of its costs on the Mortgagees absent a showing that the Mortgagees benefitted from the Receiver's efforts. *See Bank of Commerce & Trust Co. v. Hood,* 65 F.2d 281, 283 (5th Cir. 1933) (even if a fund comprised of the proceeds of the general unsecured assets may be exhausted by the receivership charges against it, the secured creditors still cannot be charged those expenses if the charges did not benefit the secured creditors).

I.   **Introduction**.

In his 7th Fee Application, the Receiver requests a super priority lien against all of the Estate's real properties, or the proceeds from their sale, ahead of the interests of all secured creditors ("Request"). [Dkt. 755], pp. 18-25. The Receiver makes this Request because, after reassuring the Court that the sale proceeds from unsecured assets of the Estate would suffice to pay for his services and provide a recovery to the unsecured creditors and incurring millions of dollars in fees, the Receiver finally agrees with what the Mortgagees' have been saying all along – this is a no asset case and the Estate lacks equity to pay him and his retained professionals.

2

Because the Estate lacks the resources to pay the receivership costs, the Receiver now requests that the Court require the secured creditors to pay Estate administration costs and fees by imposing a priority receiver's lien without showing the benefit they received. The Receiver's request is many days late and millions of dollars short.

Early in this case, the Receiver could have valued the Estate's commercial real estate, considered the competing mortgage liens asserted against it, determined that there was little or no equity available to pay for his services, let alone to provide a recovery for unsecured claimants, and advised the Court of those findings. Under such circumstances, the Receiver should have abandoned the real estate, or at least the underwater properties that could not even support their operating expenses (including debt servicing and real estate tax obligations) because the Estate could not benefit. *See Standard Brass Corp. v. Farmers Nat'l Bank*, 388 F.2d 86, 89 (7th Cir. 1967) ("To take jurisdiction of the encumbered property in which there was obviously no equity for the bankrupt estate and to sell it free of lien over the objections of the lienor with the result only of subjecting it to costs of administration was an abuse of discretion.")

However, the Receiver followed a different path, expending Estate resources without benefit to the Estate, and resisting the secured claimants' requests to allow them to foreclose and adjudicate the competing lien priority claims. The Receiver now seeks to assert an after-the-fact, ever-increasing blanket lien on the secured creditors' collateral. He further proposes to spend more of the proceeds of their collateral by litigating and advising the Court on their private lien priority disputes, which this Court is more than well-equipped to resolve without his input.[2]

---

[2] The Mortgagees previously filed Mortgagees' Response to Receiver's Motion for Approval of Process of Resolution of Disputed Claims [Dkt. 708], in which, among other things, they objected to the Receiver's interjecting himself in the proposed claims resolution process (pp. 15-20) and request for a priority lien for "administering" the proposed claims resolution process (pp. 21-22).

3

The Receiver proposes to do this by allocating a substantial portion of his fees and costs among the secured properties, irrespective of whether those charges benefitted specific properties or the creditors. (Request, p. 22.) Indeed, the Receiver admits that in many cases he cannot show that his actions benefitted a particular property or creditor. (Request, pp. 21-22). And, many of the incurred fees clearly did not benefit and of the properties, such as resisting the Mortgagees "unrelenting objections," speaking and corresponding with disgruntled investors, general investigation, and general (not property specific) accounting. Further, any charges related to the Estate's unencumbered properties and general creditors certainly do not benefit the secured creditors and cannot be assessed against them.

The Receiver's admissions and the undeniable facts doom the Receiver's Request because a receiver may be granted a priority lien only in the case of actual, not hypothetical, benefits to a particular creditor. No such evidence has been presented here. At best, the Receiver's Request is premature and should be denied.

## II.  The Evolution of the Receiver's Lien Claim

### 1.  The Receiver Has Consistently Advised the Court that the Estate is Solvent

The Mortgagees advised the Court as early as November 13, 2018, three months after the commencement of this action, that the Estate likely was administratively insolvent. *See* Reply In Support of Motion of Creditor Federal Home Loan Mortgage Corporation Concerning Rents Collected by the Equity Receiver [Dkt. 140], pp. 2, 14, 17. The Receiver initially and repeatedly disputed the Mortgagees' contention, assuring the Court that the proceeds from unencumbered properties and other subsequent properties would provide ample funds to pay for his services and provide a recovery to the unsecured creditors. *See* Receiver's Combined Response to Objections to Fee Applications [Dkt. 527], pp. 4-6, 16; Receiver's Combined Response to Objections to Fee

4

Applications [Dkt. 607], pp. 3-4; Receiver's Combined Response to Objections to Fifth and

Sixth Fee Applications [Dkt. 703], p. 10; Transcript of October 8, 2019 Proceedings at 6-7.

### 2.  The Receiver Now Admits That The Estate Is Insolvent

Now, millions of dollars in fees later, the Receiver finally has acknowledged that the

Estate is insolvent.  *See* Receiver's Seventh Interim Application and Motion for Court Approval

of Payment of Fees and Expenses of Receiver and Receiver's Retained Professionals [Dkt. 755],

pp. 18-25; Receiver's Eighth Status Report [Dkt. 757], pp. 22-23.  This admission comes only

after the Receiver and his counsel have spent over $7,000.00 a day to administer an insolvent

estate for which no recoveries will be made to unsecured creditors and where the Receiver is

demanding discounted payoffs to secured creditors.  *See* Objections of Certain Mortgagees to

Receiver's First Interim Application and Motion for Court Approval of Payment of Fees and

Expenses of Receiver and Receiver's Retained Professionals [Dkt. 438]; Objections of Certain

Mortgagees to Receiver's Second Interim Application and Motion for Court Approval of

Payment of Fees and Expenses of Receiver and Receiver's Retained Professionals [Dkt. 509];

Objections of Certain Mortgagees to Receiver's Third Interim Application and Motion for Court

Approval of Payment of Fees and Expenses of Receiver and Receiver's Retained Professionals

[Dkt. 581]; *contra* Receiver's Seventh Interim Application and Motion for Court Approval of

Payment of Fees and Expenses of Receiver and Receiver's Retained Professionals [Dkt. 755],

pp. 18-25 (wherein the Receiver concedes unsecured creditors will likely receive no

distributions).

In fact, the Estate is so grossly insolvent that the Receiver recently made multiple

requests to allow him to surcharge and/or place a first priority lien on the lenders' collateral

(ahead of both the Mortgagees' and Investor Lenders' security interests) to pay himself and his

counsel before providing any recoveries to any creditors. *See* Receiver's Motion for Approval of Process for Resolution of Disputed Claims [Dkt. 638], pp. 13-14; Combined Response to Objections to Fifth and Sixth Fee Applications [Dkt. 703], p. 10; Seventh Interim Fee Application [Dkt. 755], pp. 18-25; and Eighth Status Report [Dkt. 757], pp. 22-23.

This is not surprising given that the Receivership properties are mortgaged to the hilt and the Receiver and his counsel have incurred $3,261,017.54 in fees through March 31, 2020. *See* Seventh Interim Fee Application [Dkt. 755]. Compare this to the Receiver's cash on hand as of June 30, 2020, which was only $258,592.90, and a total of $1,249,837.09 in unpaid fees and expenses for all professionals approved by the Court but not yet paid because the Receiver lacks the funds to pay them. Receiver's Eighth Status Report [Dkt. 757], p. 16. The Receiver and his counsel have accrued *additional* fees in the four-month period since March 31, 2020 in an undetermined amount, and have yet to submit a fee application for that work.

### III.  The Receiver Holds Estate Assets Subject to the Creditors' Liens.

Like bankruptcy proceedings, receivership proceedings are remedial collective proceedings that provide an efficient forum in which a court can process the competing rights of numerous creditors and other parties in interest. An important hallmark of both bankruptcy and receivership proceedings is that a debtor's property and the various claims against it are taken as they are found:

> Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law. Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.

*Butner v. United States*, 440 U.S. 48, 54-55 (1979).

6

Thus, the Receiver "takes the property subject to all liens, priorities, or privileges existing or accruing under the laws of the state." *Madison Real Estate Grp., LLC*, 647 F. Supp. 2d at 1277 (emphasis added); *S.E.C. v. Credit Bankcorp, Ltd.*, 386 F.3d 438 (2d Cir. 2004; *see also Marshall v. People of New York*, 254 U.S. 380, 385 (1920). This Court agreed with this principle when ruling on the Rents Motion and most recently in its Memorandum Report and Recommendation [Dkt. 311]. *See SEC v. EquityBuild, Inc.*, No. 18 CV 5587, 2019 WL 587414, *3 (N.D. Ill. Feb. 13, 2019) (Magistrate Kim's Memorandum Opinion and Order [DKT. 223] citing with favor the *Madison* decision for proposition that "the rights of receivers can be no greater than those of their predecessors in title."); *see also* Memorandum Report and Recommendation, pp. 7-8 [Dkt. 311] (stating "a court does not have the authority to extinguish a creditor's pre-existing state law security interest" and clarifying the issue by stating "[t]o be sure, a receiver appointed by the federal court takes property subject to all liens, properties, or privileges existing or accruing under the laws of the state.") (internal citation omitted); *See also* Magistrate Kim's Memorandum Opinion and Order, pp. 9-10 [Dkt. 352] ("Opinion and Order") (reaffirming the foregoing rulings).

## IV.    The Receiver Cannot Prime the Secured Creditors To the Extent His Administration of the Estate Did Not Benefit the Secured Creditors.

### A.    A Priming Lien Requires Proof Of Benefit To A Secured Creditor.

The Receiver recognizes that the decision in *Gaskill v. Gordon*, 27 F.3d 248, 251 (7th Cir. 1994), stated the law regarding receivership liens, relying on that court's statement that a court "has the authority to impose a lien on the property in a receivership to satisfy the receivership expenses." Request, p. 19. He also acknowledges that the right of a court to impose a surcharge lien is limited, again citing to *Gaskill*: "[c]ourts in equity have allowed liens for receivership expenses to take priority over secured creditors interests in the property **when the receiver's**

7

**acts have benefitted the property"** (emphasis added). Request, p. 19. The Receiver ignores, however, that the *Gaskill* court further emphasized that, under Illinois law, "a receiver's lien may be a superior lien on mortgaged property, **so long as the receivership benefited the property** and the mortgagee acquiesced in, or failed to object to, the receivership" (emphasis added). 27 F. 3d at 251. No doubt exists that the Mortgagees have not acquiesced in, and certainly are not benefitting from, his actions.

The *Gaskill* case is just one of many cases requiring, as a predicate to the imposition of a surcharge, a showing of a benefit to the creditor to be surcharged from the actions of a receiver. *See, e.g. Bank of Commerce & Trust Co. v. Hood*, 65 F.2d 281, 283 (5th Cir. 1933) (a fund comprised of the proceeds of the sale of mortgaged property is liable only for such service and expense as pertained specially to the mortgaged property and its preservation and sale). Thus, secured creditors are not liable for the receiver's time spent on activities adverse to them because "these activities benefited the unsecured creditors." *SEC v. Elliott*, 953 F.2d 1560, 1578 (11th Cir. 1992). "These adverse activities include time the Receiver spent opposing their claims to be secured, their objections to administrative fees, and their appeal to this Court." *Id*. It would also include the Receiver's time addressing the Mortgagees' "unrelenting objections."

The *Elliott* court relied upon *South County Sandy & Gravel Co., Inc. v. Bituminous Pavers Co.*, 108 R.I. 239 (R.I. Sup. Ct. 1971), in which the receiver requested that the court authorize the payment of administrative expenses out of funds collected on accounts receivable that were subject to the secured parties' security interest. The court refused to allow the receiver a fee for contesting the validity of the security interest in the accounts receivable. In addition, the court held that there was insufficient evidence to determine whether encumbered property of the secured creditor could be charged with costs of administering the receivership estate where

8

"under no conceivable theory was [the] secured position in any way benefited or advantaged by the receivers' antagonism, and it would be a harsh and manifestly unjust rule which in such circumstances would require the trust company to pay reparations to the receivers for their unsuccessful attempt to cut down its contractual rights." *Id.* at 246.

In *U.S. v. FDIC*, 899 F. Supp. 50 (D.R.I. 1995), the United States brought a claim against the secured creditors and the state court receiver to recover capital gains taxes generated by the receiver's sale of collateral owned by a defunct corporation. The court held that because the capital gains taxes were not for the benefit of the secured creditors, they could not be paid from the proceeds of the sale of the collateral. As Rhode Island state law did not provide any specific statutory provisions to determine whether an operating expense of a receivership may be deducted from the proceeds of a secured creditor's collateral, the court relied on various provisions of the Bankruptcy Code – Sections 506(c), 507(a)(1) and 503(b) – which provide that, in the absence of a direct benefit to the secured creditor, such expenses could not be deducted from the proceeds of their collateral. 899 F. Supp. at 55-56. Further, even though the creditor consented to or acquiesced in the receivership, the receiver could not recover his expenses from the proceeds of the creditor's collateral because the sale of the assets is conducted independent of the creditors under the authority of the court and for the interest of the general creditors, not on the authority of the secured creditors and for their particular interests. *Id*. at 56.

These bankruptcy principles are particularly relevant here because the Receiver's actions are governed by LR 66.1, which states that the "the administration of estates by receivers or other officers shall be similar to that in bankruptcy cases. . . ." *Accord*, *U.S. v. FDIC*, 899 F. Supp. 50, 54 (D. R.I. 1995) ("[w]hen determining whether a surcharge is appropriate in a receivership proceeding, courts look to bankruptcy law for guidance"). Section 506(c) of the

Bankruptcy Code, consistent with the above quoted common law, statutorily permits a surcharge to be imposed only for the "reasonable necessary costs and expenses of preserving or disposing of, such property **to the extent of any benefit to the holder of such claim**" (emphasis added). In *MW Capital Funding, Inc. v. Magnum Health and Rehab of Monroe, LLC*, 2019 WL 3451221 (E.D. MI 2019) (a receivership involving a request for surcharge for Medicaid overpayments), the Court summarized the surcharge standard as follows:

> "To satisfy the benefit test of section 506(c), [the debtor] must establish in quantifiable terms that it expended funds directly to protect and preserve the collateral." *Cascade Hydraulics*, 815 F. 2d at 548. In addition, recovery "is limited to the extent that the secured creditor benefitted from the services. Section 506(c) is not intended as a substitute for the recovery of administrative expenses normally the responsibility of the debtor's estate." *Id.* (citation omitted). "Typical costs allowed by courts include 'appraisal fees, auctioneer fees, moving expenses, maintenance and repair costs, and advertising costs.' These costs are justified because they are expended to protect or preserve the property." *FDIC*, 899 F. Supp. at 55.

*Id.* *5. Therefore, the law is clear that unless a tangible benefit to a secured lender can be demonstrated, surcharge of the costs related to the administration of a claims process adverse to that secured creditor cannot occur.

### B. The Receiver's Administration of the Estate Burdened the Properties.

The record here does not show that the Receiver's administration of the Estate benefitted the secured creditors or the properties encumbered by their mortgages. Properties have not been abandoned, claim objections and lien avoidance actions have not been filed, and lien priority issues have not been adjudicated. Moreover, some secured creditors have been required to make protective advances to pay real estate taxes where their collateral could not fund that obligatory payment, and none of their debt service has been paid. Where is the benefit in that?

First, the Receiver has held hostage and potentially subjected to Receivership costs properties where no priority disputes exist. These include (1) properties encumbered by

mortgages granted to Mortgagees prior to any Receivership Defendant or Investor Lender acquiring any interest in the property, which mortgages the Receivership Defendant expressly assumed,[3] (2) properties encumbered by mortgages recorded prior to any Investor Lender acquired an interest in the property,[4] (3) properties not encumbered by a mortgage of any Investor Lender,[5] (4) properties encumbered by Mortgages that secure loans that paid off a prior Institutional Lender who does not assert any claim,[6] and (5) properties that have no competing claims as shown on the Receiver's table of claims submitted to Receiver on properties encumbered by Mortgagees' mortgages.[7] Now, the Receiver seeks to impose on these properties the costs of the Receivership administration.

Second, even where the Receiver asserts that priority disputes exist because a written release of a pre-existing mortgage was not authorized or provided,[8] interest and real estate taxes continue to accrue as those claims languish in this Court at the request of the Receiver even

---

[3] For example, the properties located at 1139 E 79th Place and 5001 S. Drexel were encumbered by mortgages granted by an owner unaffiliated with any Receivership Defendant, which mortgage one of the Receivership Defendants assumed when it acquired the property. [See Declaration of Michael Gilman, ¶¶ 3-6, attached as Exhibit 1.] No dispute can exist that the Receivership Defendant who acquired the property and any Investor Lender who acquired a subsequent interest took their interests subject to the assumed mortgage.

[4] For example, the properties located at 7749-59 S Yates, 5450 S. Indiana, and 1700-1708 W. Juneway were encumbered by mortgages before any Investor Lender acquired the property. See Declaration of Michael Gilman, ¶¶ 7-12.]

[5] For example, the properties located at 7110 South Cornell Avenue, 6749-54 S. Merrill Ave., 7304 S Saint Lawrence Ave. are not encumbered by an Investor Lender mortgage. See Declaration of Michael Gilman, ¶¶ 13-15.]

[6] See, for example, the property located at 4520-26 S. Drexel Blvd. See Declaration of Michael Gilman, ¶ 16.]

[7] See Amended Exhibit 1, Receiver's Notice of Filing Amended Exhibits 1 and 3 to Receiver's Motion for Approval of Process for Resolution of Disputed Claims. [Dkt. 693]

[8] See Receiver's Motion for Approval of Process for Resolution of Disputed Claims. [Dkt. 638], ¶6.

though the Estate will not receive a penny from them. Moreover, although the SEC and the Receiver have asserted that lien avoidance actions may exist, no such claims have been asserted.

Third, over 21 months ago, the Mortgagees objected to the Receiver's use of rents earned on one property to pay the expenses on another because it dissipated secured interests, and requested that the Receiver abandon these properties because there will be no benefit to the Estate. *See* Reply In Support of Motion of Creditor Federal Home Loan Mortgage Corporation ("Freddie Mac") Concerning Rents Collected by the Equity Receiver [Dkt. 140], p. 16-18, 23. Instead, the Receiver proceeded to infuse Estate assets into, and sell, these underwater properties. These efforts generated no benefit for the Estate or the secured creditors, instead creating a burden on them.

Fourth, the Receiver resisted the Mortgagees' efforts to: (a) address lien priority disputes in this Court without further delay, as they are threshold determinations in the case[9] [Dkt. 115], p. 12; (b) foreclose their mortgages and name competing lien claimants as defendants in State court to promptly and efficiently resolve priority disputes and dispose of the properties, without incurring unnecessary administrative expenses in this insolvent Estate [*see, e.g.,*Dkt. 115], p. 9; (c) transfer this case to the bankruptcy court for the Northern District of Illinois for a more efficient administration and for oversight by the Office of the United States Trustee[10] [Dkt. 564];

---

[9] *See* Certain Mortgagees' (I) Response to Motion for Entry of and Order (1) Establishing Claims Bar Date; (2) Finding That the Receiver Gave Fair, Adequate, and Sufficient Notice to All Interested Parties and (3) Approving Proof of Claim Form and Summary Procedures and (II) Cross Motion to Set Discovery Schedule and Hearing on Lien Priority on an Expedited Basis and for Related Relief [Dkt. 285]; *see also*, Reply In Support of Motion of Creditor Federal Home Loan Mortgage Corporation Concerning Rents Collected by the Equity Receiver [Dkt. 140].

[10] *See* Motion of Certain Lenders for Leave to Permit Bankruptcy Cases for Receivership Entities [Dkt. 538], p. 8.

and (d) pursue declaratory judgment actions as an efficient and streamlined vehicle to address lien priority [*see, e.g.,* Dkt.638]

In fact, the Receiver not only resisted the Mortgagees' requests, but took the exact opposite approach of a chapter 7 bankruptcy trustee who will not administer or sell assets where there will be no recovery other than for secured creditors. In those cases, the chapter 7 trustee abandons those assets that are "under water" – which is exactly the case here. Moreover, a bankruptcy trustee will call a chapter 7 case a "no asset" case when there is no recovery for unsecured creditors. Under such circumstances, the trustee does not incur further expenses because there is no recovery available to the estate. One must question why that did not happen here a very long time ago.

Equitybuild is a "no asset" case. For instance, as indicated in a recent Motion filed by Fannie Mae and Citibank[11], the commercial real estate located 6250 S. Mozart Avenue, Chicago, Illinois (the "Citibank Property") is subject to liens far in excess of its value:

| Citibank Property | |
|---|---|
| Citibank as Trustee Lien (as of June 28, 2019) | $1,461,176.83 |
| Other Investor Claimed Lien[12] | $2,684,539.00 |
| Proposed Sale Proceeds | ($831,324.00) |
| **Shortfall** | **$1,908,254.83** |

Given the magnitude of the shortfall, there is no reason that the Receiver should have spent any time or Receivership resources on this or any similar underwater asset of the Estate. Instead, the

---

[11] Certain Mortgagees' Objection To Receiver's (1) Second Motion For Restoration Of Funds Expended For The Benefit Of Other Properties; And (2) Ninth Motion To Confirm The Sale Of Certain Real Estate And For The Avoidance Of Certain Mortgages, Claims, Liens, And Encumbrances [Dkt. 769], p. 15.

[12] Note this chart does not even include all of the investor liens asserted against the property, only the largest investor lien. *See* Receiver's Eighth Status Report [Dkt. 757], Ex. 8.

creditors who assert interests in it should have been allowed to pursue their claims free and clear of the burdens of this Receivership.  Moreover, once a receivership property that lacks equity is sold, a receiver should do no more than hold the sales proceeds subject to the Court's adjudication of the secured creditors rights in them, as there can be no possible benefit to the estate from his further involvement.

As the District Court for the District of Utah noted in an SEC receivership almost identical to the case before this Court, "Indeed, "[a] receivership is only a means to reach some legitimate end sought through the exercise of the power of a court of equity. It is not an end in itself. Consequently, a receivership must be monitored to ensure it is still serving the function for which it was created." *S.E.C. v. Madison Real Estate Grp., LLC*, 647 F. Supp. 2d 1271, 1275 (D. Utah 2009).

The Mortgagees have repeatedly questioned the efficiency and efficacy of the Receiver administering lien priority hearings while continuing to incur crushing fees and expenses for himself and his law firm. *See e.g.,* Objections of Certain Mortgagees to Receiver's Second Interim Application and Motion for Court Approval of Payment of Fees and Expenses of Receiver and Receiver's Retained Professionals [Dkt. 509], pp. 3-5; Motion of Certain Lenders for Leave to Permit Bankruptcy Cases for Receivership Entities [Dkt. 538], p. 8; Mortgagees' Response to Receiver's Motion for Approval of Process of Resolution of Disputed Claims [Dkt. 708], pp. 18-19.  Yet, here we are, over two years after commencement of the case, and the Receiver continues to interject himself in the lien priority dispute resolution process [Dkt. 638] even though the Mortgagees have established that his actions provide no benefit to the Estate [Dkt. 708], and no procedures have been approved to address lien priority disputes.

C.      **The Receiver Administered the Estate to Benefit the Investor Lenders.**

14

Curiously, the Receiver complains that his expenses are attributable, in part, to "opposing the unrelenting objections asserted by the institutional lenders." (Request, p. 19.) The Mortgagees made these so-called "unrelenting objections" to protect and advance their property rights and salvage value from their collateral before the Receiver wasted it in this no asset case. In contrast, the Receiver's resistance to the Mortgagees' objections created the circumstances upon which he now seeks to rely to surcharge their collateral to the detriment of all who claim a lien on the properties, including the Investor Lenders for whom he consistently advocates.

It is clear that there really is only one explanation for the Receiver's decision not to abandon Receivership Estate assets and to insert himself in private lien priority disputes that exceed the value of the collateral and no specific objections or challenges have been asserted to defeat any particular lien claim. Despite his protestations to the contrary, the Receiver wants to make sure that the lien claims of the Investor Lenders are heard. But, that could have been done in State foreclosure or Federal bankruptcy court, especially since the advancement of one creditor's lien priority over another is the responsibility of private litigants, not of a Receiver whose only duty is to benefit the Estate. *SEC v. Schooler*, 2015 WL 1510949, *3, No. 3:12–cv–2164–GPC–JMA (S.D. Cal. March 4, 2015).

**V.** **The Receiver has Not Established a Proper Basis to Surcharge the Properties**.

The Mortgagees understand that certain fees, if properly supported, could be chargeable against specific properties in a receivership. The Receiver, however, has not presented any accounting of the benefit received by each property that he proposes to surcharge based on each service allegedly provided by him. And, with respect to many expenses he seeks to recover from the secured creditors' collateral, he has not shown that his efforts benefitted that collateral. Indeed, the Receiver admits that he cannot show such benefits with respect to particular

properties. Request, pp. 21-22. Rather, the Receiver admits that he seeks to impose the costs and fees incurred in administering the Estate upon secured creditors and properties irrespective of whether those efforts benefitted that particular property or creditor. (Request p. 22.)

Compare the Receiver's current Rent Restoration Motion [Dkt. 749], which provides a penny by penny accounting of the benefit allegedly received by each property that the Receiver proposes to surcharge. Such a motion allows the parties to dispute, and the court to determine, the propriety and reasonableness of the surcharge as to each charged property. Other than to request additional information on the proposed charges, no mortgagee has objected. The same cannot be said to be true of the 7th Fee Application.

These omissions (which are admitted by the Receiver) defeat the Receiver's Request because the law provides that any lien must be based on services that actually benefitted the lenders and their secured property. General assertions that a secured creditor benefitted from the operation of a business are insufficient. *In re Cascade Hydraulics & Utility Service, Inc.,* 815 F.2d 546, 548 (1987). Further, a party seeking a surcharge 'does not satisfy [his or] her burden of proof by suggesting hypothetical benefits." *MW Capital Funding, supra,* *6. Instead, the Receiver must show what time and services the Receiver and his counsel devoted to the secured collateral and what part of their expenses benefitted it. *See Bank of Commerce & Trust Co. v. Hood*, 65 F.2d 281, 284 (5th Cir. 1933) (the court rejected as arbitrary an allocation based upon ratio of the value of the secured creditor's fund and unsecured creditor's fund).

The Receiver fails to show a proper allocation of the Receivership expenses. The court in *SEC v. Elliott*, 953 F.2d 1560 (11th Cir. 1992), made clear that the Receiver cannot avoid his responsibility to allocate his time and prove the benefits of the receivership to each secured creditor before burdening them with the costs of the receivership as he seeks to do here. In

particular, in *Elliot*, the receiver proposed, and the district court ordered, the "secured creditors to pay the lesser of 10% of the value of the securities or 10% of the gross proceeds from the sale of the securities" as a means of reimbursing the receiver for his receivership work  *Id*. at 1576. This figure was premised on the fact that the secured claimants represented approximately 10% of the total number of filed claims and an even greater portion of the gross proceeds.  *Id*. at 1577-78.

The Court of Appeals rejected this approach, ruling as follows:

> We hold that merely counting heads is not an equitable way to divide the burden of the receivership. Secured creditors should only be charged for the benefit they actually receive. That their claims represented a large portion of the gross proceeds does not necessarily mean the Receiver spent an equally proportionate amount of time on their claims.

*Id*. at 1578.  Similarly, "A mere burden in record keeping is not a sufficient reason for requiring creditors to pay for work that did not benefit them." *Id*.  At a minimum, an "earnest effort [must] be made to devise a method of allocating the actual costs of the receivership to specific assets." *Id*.

The Receiver's proposal that fees and expenses be allocated as a percentage of their gross sales proceeds runs afoul of *Elliot.* No nexus exits between the sales price of a property and the costs and expenses incurred by the Receiver.

**VI.    The Receiver's Request is Premature.**

The Receiver fails to show that the costs and expenses he seeks to impose on the secured creditors benefitted the secured creditors,  or provide a  valid basis to apportion those costs and expenses.  At best, the Receiver's request is premature, as it seeks an advisory opinion that is not ripe for adjudication by this Court. The only way to determine if the Receiver's efforts benefited a particular property is to require the Receiver to furnish a detailed accounting of his efforts as they pertain to each property and to examine the results of the Receiver's work after it occurs. Then, the Court can evaluate any request for a surcharge

based on the nature and extent of the actual benefit. To award fees in advance would be purely speculative, without a basis in fact.

## VII. The Receiver's Blanket Lien Request is Against Public Policy

In a last ditch effort to assert his lien, the Receiver claims that public policy supports his Request, stating: "From a policy standpoint, the federal courts should have the ability to choose qualified receivers who can skillfully and cost-effectively navigate the challenges posed by the work, and, by the same token, potential receivers willing to accept these challenges should be fairly compensated." Request, p. 20. In essence, the Receiver questions whether anyone would be willing to become a receiver if he was not sure if he would be paid.

The Receiver is asking the wrong questions. As set forth above, the law is clear – the Receiver's only role is to act for the benefit of the Estate and he cannot surcharge prior liens absent a benefit to the lien holders or their collateral. The questions, therefore, are why is the Receiver spending time and money on private lien priority disputes that can provide no benefit to the Estate and whether this or any receiver should have a reasonable expectation of getting compensated from Estate assets, let alone a secured creditor's collateral, for such wasteful behavior.

## V. The Court Should Withhold Approval of the Request for Payment of Fees and Expenses until a Proposed Distribution Plan is Approved.

As the foregoing evidences, and as the Receiver admits, this Estate is insolvent. The Court should withhold approval of the Seventh Fee Application until the Receiver files with the Court a proposed plan of distribution for the Estate and that plan is approved. As courts in this circuit have explained, interim fee awards are, by their nature, "discretionary and subject to reexamination and adjustment during the course of the case." *See, e.g., In re Taxman Clothing Co.*, 49 F.3d 310, 314 (7th Cir. 1995); *In re Eckert*, 414 B.R. 404, 409 (Bankr. N.D. Ill. 2009). Thus, just because prior fee applications have been approved, does not mean that all future fee applications must also be

18

approved. As the United States Court of Appeals for the Seventh Circuit demonstrated in *Taxman*, professional fees can become subject to disgorgement, if the efforts required (and the fees associated with those efforts) outweigh the potential for recovery to the estate. 49 F.3d at 316. It is apparent this principle applies to this case.

### A. The Receiver's Fees and Costs are Not Moderate or Reasonable and Have Caused the Estate to Become Insolvent.

As the Receiver admits, the Estate does not have enough funds to pay his expenses. In fact, there are $1,249,837.09 in *approved* fees that are unpaid because the Estate lacks sufficient funds. Now the Receiver requests an additional $374,306.66 in fees and expenses to be added to this already massive deficit. The bleeding must stop.

Courts reviewing fee applications for receivers and their professionals apply the "rule of moderation." *S.E.C. v. Byers*, 590 F. Supp. 2d 637, 645 (S.D.N.Y. 2008). Receivers and their professionals are only entitled to moderate compensation and ruling courts should "avoid even the appearance of a windfall." *Id*. (internal citation omitted). Moreover, the rule of moderation is especially important when hundreds of victims have been defrauded and will only recover a fraction of their losses. *Id*.

Similarly, receivers and their professionals are only entitled to fair and *reasonable* fees and costs. In determining whether fees and costs are reasonable, courts should consider "economy of administration, the burden that the estate may safely be able to bear, the amount of time required, although not necessarily expended, and the overall value of the services to the estate." *In re Imperial '400' Nat'l, Inc.*, 432 F.2d 232, 237 (3d Cir. 1970).

The fees requested by the Receiver to date are anything but moderate and reasonable and have directly caused this Estate to become insolvent resulting in the Receiver's request for an improper receiver's lien. The Seventh Fee Application requests a total of $374,306.66 in fees

and expenses for 91 days. The Receiver has requested approval of a total of $3,261,017.54 in

fees. This Court has approved $2,886,710.88 in fees and costs without a single reduction in fees

or holdback (representing all fees and costs requested in the first, second, third, fourth, fifth and

sixth interim fee applications). Of these approved fees, $1,249,837.09 are unpaid because the

Receiver lacks sufficient funds to make these payments. Receiver's Eighth Status Report [Dkt.

757], p. 16. In other words, the Estate is insolvent and there will be no funds to paid unsecured

creditors, yet the Receiver inexplicably continues to pile on fees.

| Fee Application | Fees & Costs Requested | Fees & Costs Approved | Holdback Amount |
|---|---|---|---|
| First Interim Fee Application (08/17/18 – 09/30/18) | $413,298.44 | $413,298.44 | $0.00 |
| Second Interim Fee Application (10/1/18 – 12/31/18) | $553,968.43 | $553,968.43 | $0.00 |
| Third Interim Fee Application (01/1/19 – 03/31/19) | $547,767.04 | $547,767.04 | $0.00 |
| Fourth Interim Fee Application (04/1/19 – 06/30/19) | $525,256.64 | $525,256.64 | $0.00 |
| Fifth Interim Fee Application (07/1/19 – 09/30/19) | $485,094.92 | $485,094.92 | $0.00 |
| Sixth Interim Fee Application | $361,325.41 | $361,325.41 | $0.00 |

| | | | |
|---|---|---|---|
| (10/1/19-12/31/19) | | | |
| Seventh Interim Fee Application (1/1/20-3/31/20) | $374,306.66 | - | $0.00 |
| **TOTAL** | $3,261,017.54 | $2,886,710.88 | $0.00 |

This amount also does not take into account the extremely high operating costs of the Estate or payment of unpaid property taxes.

Previously, the Receiver pointed to the portfolio of real property he holds as evidence of potential recoveries and as justification to continue to pay his own fees and expenses. (*See* Sixth Fee Application, ¶11(b). This has been the Receiver's modus operandi throughout the entire case. The estate lacks sufficient funds to pay the Receiver's fees at the time of application so the Receiver points to potential future recoveries as justification for his fees. Then, at a later date, when there is additional cash on hand, he pays himself and his professionals resulting in the dwindling of the cash on hand to a fraction of the beginning balance. Unfortunately for all parties involved, the well has run dry and the Receiver knows it. Now, he seeks to pay himself from fully secured properties, which as shown above is unlawful. The Mortgagees have pointed this out numerous times in prior filings, yet the Receiver refused to heed the warnings. *See, e.g.,* Objections to Sixth Interim Fee Application [Dkt. 648], p. 6-8.

The "primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court for the benefit of creditors." *U.S. Commodity Futures Trading Com'n v. Lake Shore Asset Mgmt. Ltd.*, Case No. 07 C 3598, 2010 WL 960362, at *6 (March 15, 2010) (quoting *SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986)). Based on seven fee applications, it is clear that the Estate is not deriving enough money to pay administrative expense claims *and* some dividend to unsecured creditors. Thus, this Court should consider if the

purposes for which this receivership has been filed can still be achieved. *S.E.C. v. Madison Real Estate Grp., LLC*, 647 F. Supp. 2d 1271, 1275 (D. Utah 2009) ("[A] receivership must be monitored to ensure it is still serving the function for which it was created.").

VI.  **The Seventh Fee Application Should be Subject to a 20% Holdback**

If the Court approves the Seventh Fee Application, then it should require at least a 20% holdback.[13]  The purpose of holdback provisions are to "moderate potentially excessive interim allowances and to incentivize timely resolution." *S.E.C. v. Lauer*, No. 03-80612-CIV, 2016 WL 3225180, at *2 (S.D. Fla. Mar. 31, 2016).  Courts will frequently "withhold a portion of the requested interim fees because until the case is concluded the court may not be able to accurately determine the 'reasonable' value of the services for which the allowance of interim compensation is sought." *S.E.C. v. Small Bus. Capital Corp.*, No. 5:12-CV-03237 EJD, 2013 WL 2146605, at *2 (N.D. Cal. May 15, 2013).  Moreover, courts will withhold a portion of interim fee applications because "it is simply too early to tell *to the extent to which* [the receiver's] efforts will benefit the receivership estate." *Byers*, 590 F. Supp. 2d at 648.  By withholding a portion of the fees, the court helps to "ensur[e] that the Receiver's efforts benefit the investors and the receivership estate is this Court's primary concern when awarding interim compensation…." *Small Bus. Capital Corp.*, No. 5:12-CV-03237 EJD, 2013 WL 2146605, at *3.  Moreover, the Court is entitled to both reduce fees by an across-the-board percentage and withhold a holdback percentage. *See Capital Cove Bancorp LLC*, No. SACV15980JLSJCX, 2016 WL 6078324, at *3 (reducing the interim fees by an across-the-board reduction of 3.6% and withholding 30% of the total interim fees).

---

[13] The Mortgagees are not offering the "holdback" as a compromise, but believe it is necessary and appropriate if the Court otherwise approves the Seventh Fee Application."

The insolvency of the Estate justifies—even perhaps requires—a 20% or more holdback of fees. Indeed, the SEC's Billing Instructions for Receivers in Civil Actions Commenced by the United States Securities and Exchange Commission expressly allows holdbacks, if requested by the SEC. SEC Billing Instructions for Receivers in Civil Actions Commenced, *available at* https://www.sec.gov/oiea/Article/billinginstructions.pdf. Given the undeniable insolvency of the Estate, it is puzzling the SEC has not requested a holdback. Notwithstanding, this Court should exercise its discretion and require a holdback.

As illustrated above, the Receiver's efforts have not benefitted the creditors of the Estate. In fact, his efforts have harmed the creditors. Consistent with *Small Bus. Capital Corp.*, at a minimum, this Court should withhold a portion of the fees until such time the court can accurately determine the reasonable value of the Receiver's services.

As this Court has previously noted, the number of claims and the size of this receivership estate present uniquely challenging issues to the Receiver and his professionals. However, the Estate's insolvency, coupled with the staggering amount of fees indicate that it would be even more appropriate to put a hold on any further disbursements until some plan of action is proposed.

Specifically, before any further fees are approved by this Court, the Receiver should be required to set forth a projection of unencumbered receipts yet to be collected (if any), from which the unpaid fees of the Receivership Estate and the claims of unsecured creditors are to be paid. Without this information, the Court is not able to determine the reasonableness of the overall fees being sought in this case, in relation to the expected distribution to unsecured creditors.

## VII. Conclusion.

The Receiver's fees, which approximate $7,000 a day, cannot prime the Mortgagees' security interests as the Receiver has utterly failed to establish how they benefitted the properties

over what could have been achieved in a foreclosure or bankruptcy proceeding, as requested by the Mortgagees. To the contrary, these expenses should have been avoided by comparing the amounts of the competing liens against the value of the secured properties, which would have led to only one conclusion -- that one of the liens ultimately will have priority over the other, but nothing will be left for the Estate. As such, the Receiver should have preserved the Estate's limited assets, rather than exhausting those resources on issues that do not benefit it, and certainly cannot surcharge the secured creditors' collateral for such misguided efforts.

Furthermore, regardless of its determination on the Receiver's request for a super priority lien, the Court should withhold approval of the Seventh Fee Application until such time as the Receiver has filed with the Court a plan for distribution for the receivership estate and until the Court has the opportunity to thoroughly review the Seventh Fee Application. Alternatively, the Court should reduce the Receiver's and his professionals' fees to a reasonable and moderate amount and withhold 20% pursuant to this Court's order appointing the Receiver.

Dated:  August 28, 2020

Respectfully submitted,

/s/ Michael Gilman
Michael Gilman (6182779
(mgilman@dykema.com)
Dykema Gossett PLLC
10 S. Wacker Drive, Suite 2300
Chicago, Illinois 60606
(312) 627-5675
*Counsel for Federal Home Loan Mortgage*
*Corporation Wilmington Trust, National*
*Association, as Trustee for the Registered Holders*
*of Wells Fargo Commercial Mortgage Trust*
*2014-LC16, Commercial Mortgage Pass-Through*
*Certificates, Series 2014-LC16; Wilmington Trust,*
*National Association, as Trustee for the*
*Registered Holders of UBS Commercial Mortgage*
*Trust 2017-C1,Commercial Mortgage Pass-*
*Through Certificates, Series 2017-C1; Citibank*
*N.A., as Trustee for the Registered Holders of*
*Wells Fargo Commercial Mortgage Securities,*
*Inc., Multifamily Mortgage Pass-Through*
*Certificates, Series 2018-SB48; Federal National*
*Mortgage Association; U.S. Bank National*
*Association, as Trustee for the registered Holders*
*of J.P. Morgan Chase Commercial Mortgage*
*Securities Corp., Multifamily Mortgage Pass-*
*Through Certificates, Series 2017-SB41;U.S.*
*Bank National Association, as Trustee for the*
*registered Holders of J.P. Morgan Chase*
*Commercial Mortgage Securities Corp.,*
*Multifamily Mortgage Pass-Through Certificates,*
*Series 2018-SB50;U.S. Bank National*
*Association, as Trustee for the registered Holders*
*of J.P. Morgan Chase Commercial Mortgage*
*Securities Corp., Multifamily Mortgage Pass-*
*Through Certificates, Series 2017-SB30 Sabal*
*TL1 LLC; Midland Loan Services, a Division of*
*PNC Bank, N.A. as servicer for Wilmington Trust,*
*N.A., as Trustee for the Benefit of Corevest*
*American Finance 2017-1 Trust Mortgage Pass-*
*Through Certificates; Midland Loan Services, a*
*Division of PNC Bank, N.A. as servicer for*
*Wilmington Trust, N.A., as Trustee for the*
*Registered Holders of Corevest American Finance*
*2017-2 Trust, Mortgage Pass-Through*
*Certificates, Series 20172; BC57, LLC; UBS AG*

/s/ Jill L. Nicholson
Jill L. Nicholson (jnicholson@foley.com)
Andrew T. McClain (amcclain@foley.com)
Foley & Lardner LLP
321 N. Clark St., Ste. 3000
Chicago, IL 60654
Ph: (312) 832-4500
Fax: (312) 644-7528
*Counsel for Citibank N.A., as Trustee for
the Registered Holders of Wells Fargo
Commercial Mortgage Securities, Inc.,
Multifamily Mortgage Pass-Through
Certificates, Series 2018-SB48; U.S. Bank
National Association, as Trustee for the
Registered Holders of J.P. Morgan Chase
Commercial Mortgage Securities Corp.,
Multifamily Mortgage Pass-Through
Certificates, Series 2017-SB30; U.S. Bank
National Association, as Trustee for the
Registered Holders of J.P. Morgan Chase
Commercial Mortgage Securities Corp.,
Multifamily Mortgage Pass-Through
Certificates, Series 2017-SB41; U.S. Bank
National Association, as Trustee for the
Registered Holders of J.P. Morgan Chase
Commercial Mortgage Securities Corp.,
Multifamily Mortgage Pass-Through
Certificates, Series 2018-SB50; Wilmington
Trust, National Association, as Trustee for
the Registered Holders of Wells Fargo
Commercial Mortgage Trust 2014-LC16,
Commercial Mortgage Pass-Through
Certificates, Series 2014-LC16; Federal National
Mortgage Association; and Sabal TL1, LLC*

/s/ Mark Landman
Mark Landman
(mlandman@lcbf.com)
Landman Corsi Ballaine & Ford P.C.
120 Broadway, 13th Floor
New York, NY 10271
Ph: (212) 238-4800 Fax: (212) 238-4848
*Counsel for Freddie Mac*

/s/ Ronald A. Damashek
Ronald Damashek
(rdamashek@stahlcowen.com)
Stahl Cowen Crowley Addis LLC
55 West Monroe Street – Suite 1200
Chicago, Illinois 60603
PH: (312) 377-7858
Fax: (312) 423-8160
*Counsel for Citibank N.A., as Trustee for
the Registered Holders of Wells Fargo
Commercial Mortgage Securities, Inc.,
Multifamily Mortgage Pass-Through
Certificates, Series 2018-SB14;
Midland Loan Services, a Division of PNC
Bank, National Association;Thorofare Asset
Based Lending REIT Fund IV, LLC; and
Liberty EBCP, LLC*

/s/ James M. Crowley
James M. Crowley
(jcrowley@plunkettcooney.com)
Plunkett Cooney, PC
221 N. LaSalle Street, Ste. 1550
Chicago, IL 60601
Ph: (312) 970-3410
Fax: (248) 901-4040
*Counsel for UBS AG*

/s/ Thomas B. Fullerton
Thomas B. Fullerton
(thomas.fullerton@akerman.com)
Akerman LLP
71 S. Wacker Drive, 47th Floor
Chicago, IL 60606
Ph: (312) 634-5700
Fax: (312) 424-1900
*Counsel for Midland Loan Services,
a Division of PNC Bank, National Association*

/s/ Michael Gilman
Michael Gilman (6182779
(mgilman@dykema.com)
Dykema Gossett PLLC
10 S. Wacker Drive
Suite 2300
Chicago, Illinois 60606
(312) 627-5675
*Counsel for Federal Home Loan Mortgage
Corporation Wilmington Trust, National
Association, as Trustee for the Registered Holders
of Wells Fargo Commercial Mortgage Trust 2014-
LC16, Commercial Mortgage Pass-Through
Certificates, Series 2014-LC16; Wilmington Trust,
National Association, as Trustee for the Registered
Holders of UBS Commercial Mortgage Trust 2017-
C1,Commercial Mortgage Pass-Through
Certificates, Series 2017-C1; Citibank N.A., as
Trustee for the Registered Holders of Wells Fargo
Commercial Mortgage Securities, Inc., Multifamily
Mortgage Pass-Through Certificates, Series 2018-
SB48; Federal National Mortgage Association;
U.S. Bank National Association, as Trustee for the
registered Holders of J.P. Morgan Chase
Commercial Mortgage Securities Corp.,
Multifamily Mortgage Pass-Through Certificates,
Series 2017-SB41;U.S. Bank National Association,
as Trustee for the registered Holders of J.P.
Morgan Chase Commercial Mortgage Securities
Corp., Multifamily Mortgage Pass-Through
Certificates, Series 2018-SB50;U.S. Bank National
Association, as Trustee for the registered Holders
of J.P. Morgan Chase Commercial Mortgage
Securities Corp., Multifamily Mortgage Pass-
Through Certificates, Series 2017-SB30 Sabal TL1
LLC; Midland Loan Services, a Division of PNC
Bank, N.A. as servicer for Wilmington Trust, N.A.,
as Trustee for the Benefit of Corevest American
Finance 2017-1 Trust Mortgage Pass-Through
Certificates; Midland Loan Services, a Division of
PNC Bank, N.A. as servicer for Wilmington Trust,
N.A., as Trustee for the Registered Holders of
Corevest American Finance 2017-2 Trust,
Mortgage Pass-Through Certificates, Series 2017-
2; BC57, LLC; UBS AG*

/s/ James P. Sullivan
James P. Sullivan
jsulliva@chapman.com
Chapman and Cutler LLP
111 West Monroe Street
Chicago, IL 60603
Ph: (312) 845-3445 Fax: (312) 516-1445
*Counsel for BMO Harris Bank N.A.*

/s/Scott Mueller
Scott B. Mueller, #6294642
(Scott.Mueller@stinson.com)
7700 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
Phone: (314) 863-0800
Fax: (314) 259-3931
*Attorneys for BMO Harris Bank, N.A., and
Midland Loan Services, a division of PNC Bank,
NA, acting under authority designated by Colony
American Finance Lender, LLC, assignee
Wilmington Trust, N.A. as Trustee for the benefit of
registered holder of Colony American Finance
2015-1*

/s/ David Hart
David Hart
(dhart@maddinhauser.com)
Maddin, Hauser, Roth & Heller, P.C.
28400 Northwestern Highway
Suite 200-Essex Centre
Southfield MI 48034
Phone: (248) 827-1884
Fax: (248) 359-6184
*Counsel for BC57, LLC*

/s/ Jay Welford
Jay Welford
(jwelford@jaffelaw.com)
27777 Franklin Rd., Suite 2500
Southfield, MI 48034
Ph: (248) 351-3000
*Counsel for Liberty EBCP, LLC*

/s/ Jason J. DeJonker
Jason J. DeJonker (6272128)
Jessica D. Pedersen (6327432)
(jason.dejonker@bclplaw.com)
(jessica.pedersen@bclplaw.com)
BRYAN CAVE LEIGHTON PAISNER LLP
161 N. Clark Street, Suite 4300
Chicago, IL 60601
(312) 602-5000
*Counsel for Direct Lending Partner LLC*
*(successor to Arena DLP Lender LLC and DLP*
*Lending Fund LLC)*


/s/William J. Serritella, Jr.
William Serritella, Jr.
/s/ Zachary R. Clark
Zachary R. Clark
(wserritella@taftlaw.com)
(zclark@taftlaw.com)
Taft
111 E. Wacker Drive, Suite 2800
Chicago, Illinois 60601-3713
Tel: 312.527.4000
Counsel for *Thorofare Asset Based Lending*
*REIT Fund IV, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2020, I caused the foregoing **MORTGAGEES'
RESPONSE TO RECEIVER'S SEVENTH INTERIM APPLICATION AND MOTION
FOR COURT APPROVAL OF PAYMENT OF FEES AND EXPENSES OF RECEIVER
AND RECEIVER'S RETAINED PROFESSIONALS** to be electronically filed with the Clerk
of Court through the Court's CM/ECF system, which sent electronic notification of such filing to
all parties of record.

/s/ Michael A. Gilman

097077.000109 4813-9898-1321.1