# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>v.<br><br>EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN,<br><br>        Defendants. | Civil Action No. 18-cv-5587<br><br>Hon. John Z. Lee<br><br>Magistrate Judge Young B. Kim |

## RECEIVER'S EIGHTH INTERIM APPLICATION AND MOTION FOR COURT APPROVAL OF PAYMENT OF FEES AND EXPENSES OF RECEIVER AND RECEIVER'S RETAINED PROFESSIONALS

Kevin B. Duff, as the receiver ("Receiver") for the Estate of Defendants EquityBuild, Inc., EquityBuild Finance, LLC, their affiliates, and the affiliate entities of Defendants Jerome Cohen and Shaun Cohen, as defined in the Order Appointing Receiver entered August 17, 2018 (Docket No. 16), as supplemented by Order entered March 14, 2019 (Docket No. 290) and Order entered February 21, 2020 (Docket No. 634) (collectively, the "Receivership Defendants"), and pursuant to the powers vested in him by Order of this Court, respectfully submits this Eighth Interim Application ("Application") for the Second Quarter of 2020, and moves this Court for an order approving payment of the fees and expenses of the Receiver, the Receiver's counsel, Rachlis Duff & Peel, LLC ("RDP"), the Receiver's accountant BrookWeiner, LLC ("BrookWeiner"), the Receiver's claims vendor Axos Fiduciary Services ("Axos"), and the Receiver's forensic IT consultant, Prometheum, from the Receivership Estate operating account. In support of his Application and Motion, the Receiver states as follows:

1

## I.      BACKGROUND

1.      On August 15, 2018, the United States Securities and Exchange Commission ("SEC") filed a civil Complaint against Jerome Cohen, Shaun Cohen, EquityBuild Inc., and EquityBuild Finance LLC (collectively the "Defendants") alleging violations of federal securities laws, along with a motion for entry of an asset freeze, permanent injunction, and other ancillary relief.  (Docket Nos. 1 & 3, respectively)

2.      In their Complaint against the Defendants, the SEC alleged violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5, Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), Sections 5(a) and 5(c) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77e(a) and (c), and Section 17(a) of the Securities Act, 15 U.S.C. §§77q(a)q.  (Docket No. 1)

3.      The Complaint further alleged that the Defendants operated a Ponzi-scheme that raised at least $135 million from more than 900 investors by, among other things, making untrue statements of material fact in connection with the sale of promissory notes allegedly secured by residential real estate primarily located on the south side of Chicago.  (*Id.* ¶¶ 1-7, 17, 20-51)

4.      On August 28, 2018, the Court entered a judgment against defendants Jerome Cohen and Shaun Cohen which, among other things, enjoined future violations of federal securities laws.  (Docket No. 40)

5.      In connection with its civil action, the SEC sought and obtained Court approval for the appointment of a Receiver, and on August 17, 2018, this Court entered an Order Appointing Receiver.  (Docket No. 16)

6.      Under the Order Appointing Receiver, the Receiver was authorized to engage and employ persons and entities in his discretion to assist him in carrying out the duties and responsibilities set forth in the Order.  (*Id.*, Order Appointing Receiver, ¶ 54)

7.      Accordingly, the Receiver retained Rachlis Duff Adler Peel & Kaplan, LLC ("RDAPK")[1] as special counsel, and, on August 20, 2018, the Court entered an Order approving RDAPK's rates.  (Docket No. 19)  On August 23, 2018, the Receiver retained BrookWeiner to provide accounting services and to perform tax and related work regarding the assets of the Receivership Defendants, and, on August 28, 2018, the Court entered an Order approving BrookWeiner's rates.  (Docket No. 39)  On August 31, 2018, the Receiver retained Prometheum to access and preserve data within EquityBuild's cloud-based storage systems and provide related IT services, and, on September 6, 2018, the Court entered an order approving Prometheum's rates. (Docket No. 56).

8.      Pursuant to the Order Appointing Receiver, the Receiver and his retained personnel are entitled to "reasonable compensation and expense reimbursement" from the Receivership Estate, as described in the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the "Billing Instructions") agreed to by the Receiver. (Docket No. 16, ¶ 69)

## II. EIGHTH INTERIM APPLICATION

9.      Pursuant to the Billing Instructions, the Receiver provides the following information regarding the application:

    a.      The Application covers the period from April 1, 2020 through June 30, 2020;

---

[1] As of October 1, 2019, the firm changed its name to Rachlis Duff & Peel, LLC ("RDP").

      b.    The names and hourly rates of all professionals for RDP and BrookWeiner, as well as Axos' and Prometheum's hourly rates, are attached as **<u>Exhibit A.</u>**

      c.    This is the Receiver's eighth interim application.  The dates and amounts of the Receiver's prior interim fee applications, the orders and amounts allowed, and the amounts paid and unpaid, are attached hereto as **Exhibit B.**

## III.    CASE STATUS

10.    Pursuant to the Billing Instructions, the Receiver provides the following information regarding the status of the case, and activities performed specifically for the period covered by this Application.

      a.    The Receiver's Standardized Fund Accounting Report ("SFAR") for the Second Quarter 2020 is attached as **<u>Exhibit C.</u>**  The SFAR sets forth the funds received and disbursed from the Receivership estate during this reporting period.  As reported in the SFAR, the amount of cash on hand as of June 30, 2020 was $258,592.90.  The information reflected in the SFAR was based on records and information currently available to the Receiver. The Receiver and his advisors are continuing with their evaluation and analysis.

      b.    Upon his appointment, the Receiver began making efforts to determine the nature, location, and value of all property interests of the Receivership Defendants, including monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, choses in action, rights and other assets, together with all profits, interest, or other income attributable thereto, which the Receivership Defendants owned, possessed, retained a beneficial interest in, or controlled directly or indirectly, and to preserve and maintain those assets.  In furtherance of such, the Receiver took, *inter alia*, the following actions:

i.   Identification and Preservation of Assets

During the Second Quarter 2020, one of the Receiver's primary focuses continued to be the preservation, operation, maintenance, and sale of the 93 real estate properties remaining in the Receivership Estate at the beginning of the quarter.  The Receiver, in connection with his counsel, asset manager/real estate broker, and property managers, continued working to improve understanding and planning for cash flow needs for underperforming properties, and controlling expenditures where possible.  To that end, the Receiver and his counsel communicated regularly with property managers relating to necessary expenditures for properties requiring approval by the Receiver (and in some cases, requiring funds from the Receiver), and other operational questions. The Receiver and his retained professionals also reviewed monthly financial reporting, analyzed the cash position of the Estate, and communicated regularly with the real estate broker regarding prioritization of expenses and repairs on the properties.

During the Second Quarter 2020, the Receiver worked closely with the two existing property management companies to ensure that all health, life, and safety issues at the properties were addressed expeditiously, and to monitor repairs, inspections, expenses, and property finances designed to preserve the properties and protect their financial position.

The Receiver continued working with an adjuster to pursue claims for property and business interruption losses in connection with a fire that had occurred in November 2019 at 638 N. Avers, including gathering and providing information to the adjuster, and providing available information to counsel for the institutional lender relating to the property.

Additionally, the Receiver, with the assistance of counsel and the property managers worked to address open building code violations of widely varying levels of severity.   City of Chicago administrative and housing court actions did not go forward during the quarter due to the

pandemic, and no new notices of violations issued by various departments of City of Chicago were received. As of March 16, 2020, when the City stopped hearing administrative proceedings due to the COVID-19 pandemic, there remained 25 known open code violations involving City of Chicago matters, and five of those were resolved during the quarter pursuant to the payment of fines. The Receiver achieved dismissal of another of these matters after the administrative courts were shut down through email communications with the City of Chicago Department of Law.

   ii. <u>Property Sales</u>

   On April 1, 2020, the Court granted the Receiver's Fifth Motion for Approval of the Sale of Certain Real Estate (Docket No. 680), confirming the sales of the following properties:

- 7600-10 South Kingston, Chicago, IL 60649
- 7546-48 South Saginaw, Chicago, IL 60649
- 7656-58 South Kingston, Chicago, IL 60649
- 8201 South Kingston, Chicago, IL 60617
- 8326-58 South Ellis, Chicago, IL 60619
- 4520-26 South Drexel, Chicago, IL 60653
- 7450 South Luella, Chicago, IL 60649
- 6749-59 South Merrill, Chicago, IL 60649
- 7110-16 South Cornell, Chicago, IL 60649
- 7109-19 South Calumet, Chicago, IL 60619

   On April 2, 2020, the Court granted the Receiver's Sixth Motion for Approval of the Sale of Certain Real Estate, authorizing the sale of the estate property in Naples, Florida, which was closed on April 24, 2020**.**

   During the Second Quarter 2020, the Receiver entered into Purchase and Sale Agreements and on May 11, 2020, moved to confirm the sales of the following properties (Docket No. 690):

- 7300-04 South St. Lawrence Avenue, Chicago, Illinois 60706
- 7760 South Coles Avenue, Chicago, Illinois 60649
- 8000 South Justine Street, Chicago, Illinois 60620
- 8107-09 South Ellis Avenue, Chicago, Illinois 60619
- 8209 South Ellis Avenue, Chicago, Illinois 60619
- 8214-16 South Ingleside Avenue, Chicago, Illinois 60619
- 5450-52 South Indiana Avenue, Chicago, Illinois 60615

- 6437-41 South Kenwood Avenue, Chicago, Illinois 60637
- 11117-11119 South Longwood Drive, Chicago, Illinois 60643

No objections were filed and the Court granted the motion on June 10, 2020 (Docket No. 711).

In May 2020, the Receiver listed the following properties for sale, advertising (along with other promotional efforts) the properties for public bid for four consecutive weeks between May 6 and May 27, 2020, with a June 3, 2020 deadline for the submission of offers:

- 6250 South Mozart Street, Chicago, Illinois 60629
- 2736-44 West 64th Street, Chicago, Illinois 60629
- 6355-59 South Talman Avenue, Chicago, Illinois 60629
- 6356 South California Avenue, Chicago, Illinois 60629
- 7051 South Bennett Avenue, Chicago, Illinois 60629
- 7201-07 South Dorchester Avenue, Chicago, Illinois 60619
- 7508 South Essex Avenue, Chicago, Illinois 60649
- 7953-59 South Marquette Road, Chicago, Illinois 60617
- 5618-20 South Martin Luther King Drive, Chicago, Illinois 60637
- 6558 South Vernon Avenue, Chicago, Illinois 60637
- 3074 East Cheltenham Place, Chicago, Illinois 60649
- 7201 South Constance Avenue, Chicago, Illinois 60649
- 1131-41 East 79th Place, Chicago, Illinois 60619

On May 22, 2020, certain institutional lenders sought a stay the sale of these properties in light of the COVID-19 crisis (Docket No. 694). The Receiver responded on June 1, 2020 (Docket No. 699), the SEC responded on June 2, 2020 (Docket No. 702), and the Court denied the motion to stay on June 3, 2020 (Docket No. 704).

On April 2, 2020, the Court granted Receiver's Seventh Motion For Court Approval Of The Process For Public Sale Of Real Property By Sealed Bid, seeking approval to list the following portfolio of 37 single-family residences containing four dwelling units or less (Docket No. 682):

- 1017 West 102nd Street, Chicago, IL 60643
- 1516 East 85th Place, Chicago, IL 60619
- 2136 W 83rd Street, Chicago, IL 60620
- 417 Oglesby Avenue, Chicago, IL 60409

7

- 7922 S Luella Avenue, Chicago, IL 60617
- 7925 S Kingston Avenue, Chicago, IL 60617
- 7933 S Kingston Avenue, Chicago, IL 60617
- 8030 S Marquette Avenue, Chicago, IL 60617
- 8104 S Kingston Avenue, Chicago, IL 60617
- 8403 S Aberdeen Street, Chicago, IL 60620
- 8405 S Marquette Avenue, Chicago, IL 60617
- 8529 S Rhodes Avenue, Chicago, IL 60619
- 8800 S Ada Street, Chicago, IL 60620
- 9212 S Parnell Avenue, Chicago, IL 60620
- 10012 S LaSalle Avenue, Chicago, IL 60628
- 11318 S Church Street, Chicago, IL 60643
- 3213 S Throop Street, Chicago, IL 60608
- 3723 W 68th Place, Chicago, IL 60629
- 406 E 87th Place, Chicago, IL 60619
- 61 E 92nd Street, Chicago, IL 60619
- 6554 S Rhodes Avenue, Chicago, IL 60637
- 6825 S Indiana Avenue, Chicago, IL 60637
- 7210 S Vernon Avenue, Chicago, IL 60619
- 7712 S Euclid Avenue, Chicago, IL 60649
- 7953 S Woodlawn Avenue, Chicago, IL 60619
- 8107 S Kingston Avenue, Chicago, IL 60617
- 8346 S Constance Avenue, Chicago, IL 60617
- 8432 S Essex Avenue, Chicago, IL 60617
- 8517 S Vernon Avenue, Chicago, IL 60619
- 2129 W 71st Street, Chicago, IL 60636
- 9610 S Woodlawn Avenue, Chicago, IL 60628
- 5437 S Laflin Street, Chicago, IL 60609
- 6759 S Indiana Avenue, Chicago, IL 60637
- 1401 W 109th Place, Chicago, IL 60643
- 310 E 50th Street, Chicago, IL 60615
- 6807 S Indiana Avenue, Chicago, IL 60637
- 1414-18 E 62nd Place, Chicago, IL 60637

Following an extensive document and data collection process, the retention of a nationally-recognized property inspection service, and the assembly of property reports, bids, and cost estimates associated with recommended repairs, the Receiver created due diligence folders for each of these single-family residence properties and notified its Arizona-based broker that it was ready to commence the marketing of the portfolio. Accordingly, the public listing and active marketing of the single-family residence portfolio is likely to occur within the next two weeks.

On May 11, 2020, the Receiver filed his Eighth Motion for Approval of the Process for the Public Sale of Vacant Land by Public Bid (Docket No. 690), seeking authorization to list a vacant parcel of land at:

- 431 East 42nd Place, Chicago IL 60653.

No objections were filed and the Court granted the motion on June 10, 2020 (Docket No. 711). The Court's order also authorized Receiver to pay a municipal judgment from the proceeds of the sale of the property located at 7026-42 S. Cornell Ave, Chicago IL 60649 and this judgment was paid out of that account on June 11, 2020.

On June 11, 2020, the Receiver filed his Eighth Motion to Confirm the Sale of Certain Real Estate (Docket No. 712).

- 7600-10 South Kingston, Chicago IL 60649
- 7656-58 South Kingston, Chicago IL 60649
- 6949-59 South Merrill Ave, Chicago IL 60649

Objections to this motion filed by institutional lenders and intervenors were fully briefed as of July 17 (see Docket Nos. 728, 730, 739, 746, 747, 748), and the Court has indicated that it will rule on the papers (Docket No. 743).

The Receiver and his retained professionals closed the sales of the following 17 receivership properties during the Second Quarter 2020, generating aggregate net proceeds in the amount of $14,744,346:

1. 7749 S. Yates (closed 4/22/2020)
2. 1050 8th Ave, Naples (closed 4/24/2020)
3. 6749-59 S. Merrill (closed 4/28/2020)
4. 7450 S. Luella (closed 5/7/2020)
5. 7546-48 S. Saginaw (closed 5/13/2020)
6. 8201 S. Kingston (closed 5/21/2020)
7. 4520 S. Drexel (closed 5/21/2020)
8. 8326-32 S Ellis Avenue (closed 6/11/2020)
9. 8334-40 S Ellis Avenue (closed 6/11/2020)
10. 8342-50 S Ellis Avenue (closed 6/11/2020)

11. 8352-58 S Ellis Avenue (closed 6/11/2020)
12. 5450 S. Indiana Avenue (closed 6/25/2020)
13. 6437 S. Kenwood Avenue (closed 6/25/2020)
14. 7760 S. Coles (closed 6/26/2020)
15. 8000 S. Justine (closed 6/26/2020)
16. 8107 S. Ellis (closed 6/30/2020)
17. 8214 S. Ingleside (closed 6/30/2020)

### iii.   Financial Reporting and Rents Restoration

During the Second Quarter 2020, the Receiver continued to provide institutional lenders with monthly accounting relating to rents generated by, and expenses incurred in connection with, the 89 properties on which they assert liens. To that end, monthly reports have been sent to lenders' counsel covering the periods January through April 2020.   The Receiver and his retained professionals additionally generated monthly reports for properties not encumbered by institutional debt during this period.  Reports for each property include the following information: (a) net operating income, (b) expenditures made by the Receiver for the benefit of the property (primarily for insurance, real estate taxes, and funds sent to the property manager to cover expenses not payable through operating income), (c) net income distributed to the Receiver or to other property accounts from which funds were previously borrowed, and (d) a computation of the amount (if any) of rentals remaining to be restored to the property pursuant to the February 13, 2019 Order. (Docket No. 223)  Each report also includes a computation of the cumulative amount (if any) reimbursable from each property, representing the amount that has been expended for the benefit of the property from sources other than its operating income.

Each report is sent with a detailed explanation of the contents of the related report and the calculation of rentals to be restored.  Examples of these reports were attached as exhibits 3-26 to a motion filed by the Receiver regarding the use of sales proceeds for rent restoration.  (Docket No. 749).  For properties where no rent restoration is due, the final line item on the report reflects

an amount that has been expended for the benefit of the property from sources other than operating income on that property.

During the Second Quarter 2020, the Receiver continued to analyze sources of funds available for restoration of rents to affected properties. The Receiver had reduced the total amount to be restored from $767,192.75 as of February 28, 2019 to $367,791.19 as of April 30, 2020.[2]

iv. Open Litigation

During the Second Quarter 2020, a mediation was held in the matter captioned *Foley v. EquityBuild, Inc.,* Case No. 16 L 8903, Circuit Court of Cook County, and a settlement for the amount of the insurance policy was reached with EquityBuild. The settlement agreement was subsequently executed, and the Receiver anticipates the case will be dismissed in the Third Quarter 2020.

The matter captioned *Barnes v. EquityBuild, et al.*, Case No. 19 L 7852, Circuit Court of Cook County, is very close to settlement and, accordingly, depositions were not re-scheduled following the interruption caused by the COVID-19 outbreak. The Receiver and his retained counsel anticipate the resolution of the matter pursuant to settlement will be finalized in the third quarter of 2020.

Discovery is proceeding in the matter captioned *Byrd v. EquityBuild et al.*, Case No. 18 L 1993, Circuit Court of Cook County, with several additional depositions to be completed in the third- or fourth-quarter of 2020. The September 2020 trial date has been continued by agreement, due to delays occasioned by witness unavailability and the COVID-19 outbreak.

---

[2] If the pending motion filed by the Receiver regarding the use of sales proceeds for rent restoration (Docket No. 749) is granted, the remaining amount of $367,791.19 will be restored in full.

The stay entered in the matter of *Markwell v. EquityBuild, Inc.*, Case No. 2018-13722, pending in the 165th Judicial District, Harris County, Texas has been extended.

### v. Notice of Appointment of Receiver

During the Second Quarter 2020, the Receiver continued his efforts to notify all necessary and relevant individuals and entities of the appointment and to protect and preserve the assets of the Receivership Estate. To that end, as they are identified, the Receiver continues to deliver notices to individuals or entities which have been identified as potentially having possession of the property, business, books, records, or accounts of the Receivership Defendants, or who may have retained, managed, held, insured, or encumbered, or had otherwise been involved with any of the assets of the Receivership Defendants.

### vi. Control of Receivership Property and Records

During the Second Quarter 2020, the Receiver continued efforts to locate and preserve all EquityBuild property and records. The Receiver maintained two platforms of records and data during the Second Quarter 2020.

### vii. Factual Investigation

During the Second Quarter 2020, the Receiver and his retained professionals continued to review and analyze the following: (i) documents and correspondence sent to or received from the EquityBuild principals, to whose email accounts the Receiver has access; (ii) bank records from EquityBuild and its affiliate entities; (iii) EquityBuild documents (largely stored in cloud-based and other electronic media, plus a limited number of hard copy records); (iv) available underlying transaction documents received to date from former Chicago-based EquityBuild counsel; and (v) files produced by former EquityBuild counsel, accountants, and employees.

viii. <u>Tax Issues</u>

Whitley Penn was retained to continue its work in preparation of 2016 and 2017 tax returns for Receivership entities for which returns were not previously filed. During the Second Quarter 2020, the Receiver and his staff worked to gather information requested by Whitley Penn in connection with those efforts.

BrookWeiner was retained to perform accounting, tax, and related work regarding assets of the Receivership Defendants such as the accounting for ongoing business operations of the Receivership Defendants. During the Second Quarter 2020, BrookWeiner compiled monthly property statements and property spreadsheets and assisted with cash flow analysis matters.

ix. <u>Accounts Established by Receiver for the Benefit of the Receivership Estate</u>

The Receiver established custodial accounts at a federally insured financial institution to hold all cash equivalent Receivership property. The interest-bearing checking accounts are used by the Receiver to collect liquid assets of the estate and to pay the portfolio-related and administrative expenses. For each property encumbered by secured debt that has sold, the Receiver also has established a separate interest-bearing account for the purpose of depositing and holding funds until such time as the Court orders otherwise and for ultimate distribution, following a claims process and upon Court approval, to the creditors of the Estate, including the defrauded investors. (Docket Nos. 230, 311, 344 & 346)

c. <u>Creditors and Claims Against the Receivership Estate</u>

During the Second Quarter 2020, the Receiver and his retained professionals continued analyzing and working with the approximately 2400 claims submitted by the December 31, 2019 claims submission deadline. During this period, the Receiver and his retained professionals manually reviewed numerous claim forms in an effort to improve the accuracy and completeness

of the exhibit that preliminarily identified on a property-by-property basis the following: (i) claimant name, (ii) total amount claimed, (iii) claimant category, and (iv) the amount loaned or invested in the particular property (where it could be determined from the face of the claim form). This review was largely completed by mid-May and resulted in numerous updates to the records maintained by the Receiver's claims vendor, Axos. This work which was reasonable, necessary, and beneficial to the receivership estate, and resulted in the creation of a comprehensive exhibit (the "Master Claims Exhibit"), which was submitted with the Receiver's Second Quarter 2020 Status Report. (Docket No. 757 at Ex. 8). This work has also allowed the Receiver's claims vendor to organize, on a property-by-property basis, the claim forms and supporting documentation that claimants have submitted to the Receiver, so that once a claims process and confidentiality order are approved by the Court, digital links for the transfer of claims and supporting documentation from other claimants can be provided to each claimant on a property-by-property basis consistent with Court orders.

The identification and compilation of claims submitted in this matter has been complex and time-consuming due to the unique circumstances and facts in this case. For example, it appears that in many instances anticipated proceeds of investor-lender loans rolled into new offerings rather than being paid off at maturity. It also appears that in some circumstances the mortgages securing loans may have been released without investor-lenders' knowledge or consent, allowing the Defendants to refinance the properties with new loans without retiring the existing loans. Moreover, some investor-lenders may have been induced to exchange secured loans for unsecured loans or equity positions through false representations. Additionally, claims against many properties are complicated by cross-collateralized mortgages.

The claims process has been further complicated by, among other things: (i) improperly completed proofs of claim, (ii) claims relating to properties that were conveyed to third parties prior to the establishment of the Receivership; and (iii) claims lacking reference to properties, or relating solely to what appear to be equity investment vehicles. As a result of these and the previously described challenges, a large portion of the Receiver's and his counsel's time during the Second Quarter 2020 was devoted to ensuring the accuracy of the records relating to each of the myriad claims submitted in this matter, refining and correcting the Receiver's master claims spreadsheet to inform all interested parties of the nature and volume of the claims submitted in these proceedings, and responding to claimant inquiries regarding the same.

As previously indicated, the Receiver is continuously updating his list of known claimants and updating all claimants on the developments in this matter. To ease the burden and provide basic information, therefore, the Receiver established a web page (*http://rdaplaw.net/receivership-for-equitybuild*) for claimants and other interested parties to obtain information and certain court filings related to the Receivership estate, which remains in place today and continues to be best and most cost-effective mean of providing information regarding the status of this action.

Also, during the Second Quarter 2020, the Receiver received and responded to hundreds of emails and voicemails from investors and others, many if not most of which related to the claims submitted against properties in the Receivership Estate, as well as claims against equity funds created by the Defendants and claims against properties that that appear to have been sold or otherwise disposed of prior to the establishment of the Receivership. He and his staff responded to these numerous communications in as timely and practicable a way as possible.

15

Additionally, during the Second Quarter 2020, the Receiver continued to evaluate potential tax implications relating to entities in the Receivership Estate, the disposition of assets (including but not limited to the sale of real estate), and the claims process. (Docket No. 477 at 9)

d.  Assets in Receivership Estate

All known Receivership Property is identified and described in the Master Asset List attached hereto as **Exhibit D.**  The Master Asset List identifies 56 checking accounts in the names of the affiliates and affiliate entities included as Receivership Defendants, reflecting a total amount transferred to the Receiver's account of $128,936.37.   (*See also* Docket No. 258 at 21, and Docket No. 348 at 23-24, for additional information relating to these funds.)

The Master Asset List does not include funds received or recovered after June 30, 2020. Nor does it include potentially recoverable assets for which the Receiver is still evaluating the value, potential value, and/or ownership interests.  The Receiver is in the process of evaluating certain other types of assets that may be recoverable by the Receivership Estate, including, but not limited to, charitable donations, loans, gifts, settlements for which payment has not yet been received, and *other* property transferred to family members, former employees, and others.

e.  *See also* Receiver's Eighth Status Report (Second Quarter 2020) for additional information.  (Docket No. 757)

## IV.  BILLING ADDRESSED IN THIS APPLICATION

11.   Pursuant to the Billing Instructions, the Receiver provides the following information regarding current billing:

a.   Total Compensation and Expenses Requested.

i.   In connection with his duties, the Receiver respectfully requests compensation for services rendered, totaling $98,982.00 for the period of

this Application. A copy of the Receiver's invoices for April - June, 2020 are attached as **Exhibit E.**

ii. In connection with the legal services provided to the Receiver by RDP, the Receiver respectfully requests compensation for services rendered, along with reimbursement of expenses, totaling $378,388.47 for the period of this Application. A copy of RDP's invoices for April – June, 2020 are attached as **Exhibit F.** Additionally, Receiver's counsel Andrew Porter received $37,578.00 as agency fees for the title examination work performed in connection with the closing of properties during the Second Quarter 2020. The Receiver will reduce the amount due to RDP for the Second Quarter 2020 by this amount.

iii. In connection with the accounting provided to the Receiver by BrookWeiner, the Receiver respectfully requests compensation for services rendered, along with reimbursement of expenses, totaling $7,067.50 for the period of this Application. Copies of BrookWeiner's invoices for April, May and June, 2020, are attached as **Exhibit G.**

iv. In connection with the database services provided to the receiver by Axos, the Receiver respectfully requests compensation for services rendered, along with reimbursement of expenses, totaling $ 4,507.50 for the period of this Application. A copy of Axos' invoice is attached as **Exhibit H.**

v. In connection with the IT services provided to the Receiver by Prometheum, the Receiver respectfully requests compensation for services rendered, along with reimbursement of expenses, totaling $577.50 for the period of

17

this Application.  A copy of Prometheum's invoice is attached as **Exhibit I.**

b.  <u>Source of Funds for Requested Compensation and Expenses</u>.  The Receiver requests that the above compensation and expenses be paid from the Receiver's operating account to the extent there are sufficient funds now or in the future.  To the extent funds are insufficient, Receiver has requested that the Court establish a receiver's lien in order that receivership property may be used to compensate the Receiver and his counsel for their work establishing and implementing a process to address the more than 2,400 claims submitted in this case.

c.  <u>Eighth Application for Payment of Professional Fees and Expenses</u>.  This is the Receiver's eighth interim application.

d.  <u>Summary of Activity</u>.  A "Summary of Activity," providing the total hours billed and the amount of billing for each person who billed time during the Application period (April 1, 2020 through June 30, 2020) can be found at the end of the Receiver's invoices (Exhibit E) and RDP's invoices (Exhibit F) and on the first page of the BrookWeiner and Axos invoices (Exhibits G and H).

**V.      REQUEST FOR RECEIVER'S LIEN**

12.      As this Receivership proceeds, it becomes increasingly clear that the primary beneficiaries of the Receiver's efforts are and will be the claimants who receive funds from the real estate properties that the Receiver has worked to preserve, maintain, improve, and liquidate following the claims process that the Receiver has worked to implement.  At the same time, if  a receiver's lien is not allowed to address administrative expenses, there is a diminishing likelihood that there will be sufficient funds to pay the Receiver and his retained professionals from monies

that have been or will be recovered, net equity from the sale of properties, and funds returned to the Receiver's account from the sales proceeds of properties that received cash infusions to preserve, maintain, and improve them during periods when their operating income alone could not sustain them. Indeed, there is a distinct possibility that the sources of potential cash described above will not be sufficient to cover the fees for Receiver and his professionals and other Receivership expenses, including those fees set forth in this motion. As a result, the Receiver requests that the Court grant a lien on the estate assets and their proceeds to ensure that the costs of the receivership will not be borne solely by unsecured claimants.

The Court retains broad discretion to determine the duties of the Receiver and the manner in which the costs of the estate will be paid. It is well-established that "the district court has authority to impose a lien on the property in a receivership to satisfy the receivership expenses." *Gaskill v. Gordon*, 27 F.3d 248, 251 (7th Cir. 1994). This is because a "[r]eceivership is an equitable remedy, and the district court may, in its discretion, determine who shall be charged with the costs of the receivership." *Id.* Moreover, "[a]s a general rule, the expenses and fees of a receivership are a charge upon the property administered." *Id.* (citing *Atlantic Trust Co. v. Chapman*, 208 U.S. 360, 375-76 (1908)). In addition, "[r]eceivers can displace even *prior* security interests in receivership property in some circumstances." *Duff v. Central Sleep Diagnostics, LLC*, 801 F.3d 833, 842 (7th Cir. 2015) (citing *Gaskill*; emphasis in original). For example, "[c]ourts in equity have allowed liens for receivership expenses to take priority over secured creditors interests in the property when the receiver's acts have benefitted the property." *Gaskill*, 27 F.3d at 251 (citing with approval *SEC v. Elliott*, 953 F.2d 1560, 1576-77 (11th Cir. 1992)). "This district court's award of a receiver's compensation is ... firmly within its discretion, ... and the court may consider all of the factors involved in a particular receivership in determining an appropriate fee."

*Gaskill*, 27 F.3d at 253 (citations omitted); *see also Elliott*, 953 F. 2d at 1576 ("The district court appointing the receiver has discretion over who will pay the costs of the receiver.").

The substantial cost of preserving, managing, and disposing of the real estate assets, of opposing the unrelenting objections asserted by the institutional lenders, and navigating through the impact of the COVID-19 pandemic, precludes any certainty regarding the ability of the receivership to cover its expenses. Accordingly, these costs ought to be allocated in accordance with equitable and sound principles. From a policy standpoint, the federal courts should have the ability to choose qualified receivers who can skillfully and cost-effectively navigate the challenges posed by the work, and, by the same token, potential receivers willing to accept these challenges should be fairly compensated. A receivership of this magnitude and complexity cannot be undertaken if the receiver and his or her professionals are not compensated on an interim and continuing basis. Certainty regarding the allocation of responsibility for receivership fees and expenses will also enable the Receiver and the Court to ascertain the appropriateness of interim distributions to claimants as priority determinations are made.

A receiver's lien that allows for administrative expenses to be paid from operating income generated by properties or from the sales of those properties is particularly fair because it provides payment from those sources who have directly and substantially benefitted from the efforts to preserve and maintain those properties. Absent the imposition of a receiver's lien to ensure that the costs of preserving and selling the properties, and the costs of implementing a claims process relating to those properties, are paid from the operating income generated by the properties themselves or from their sales proceeds, the unsecured claimants are left to bear virtually the entire economic burden of a process that disproportionately (and perhaps exclusively) benefits the secured creditors. Such a result would ignore the fact that a large portion of the expenses that have

20

been incurred relate to and are for the benefit of the secured lenders and the properties that secure such obligations.

From practical, policy, and equitable standpoints, therefore, the Court should confirm a Receiver's lien against certain assets of the receivership estate, including the 116 properties within the Estate and the proceeds from the sale of those assets, in order to pay costs of the Receiver and his retained professionals that were incurred for the benefit of those properties and their competing claimants.[3]

Allocating costs in a receivership like this one is extremely challenging. Much of the Receiver's efforts stretch across the properties, benefiting them and the claimants directly and indirectly. For example, certain efforts like selling the properties, working with property managers, preparing financial reports, and renewing insurance (to name a few) have been undertaken to some degree for each of the properties in the portfolio. But precisely how much such efforts directly relate to each property varies from task to task. For instance, if professional time is needed to evaluate and communicate with the property manager relating to a significant repair to a particular property, then it may be easy to identify the property in the timekeeper's description. Similarly, if counsel is preparing for and attending the closing of a particular property, then allocating that time to a specific property will be easier. However, there are many examples of receivership work that are of clear benefit to the claimants but are difficult to closely track on a property by property basis. For example, the Receiver and his staff respond daily to communications from claimants and their counsel, answering their questions and providing them information. Occasionally, those communications relate to specific properties, but more

---

[3] The Receiver has already requested that the Court confirm a receiver's lien in connection with the claims process, (Docket No. 638, ¶¶ 53-57; Docket No. 720, at 14-20), and as part of his Seventh Interim Application (Docket No. 755).

frequently they come from claimants whose interests spread across multiple properties. Notably, in this receivership, a lender who has only one claim against one property is the exception. A more typical example of this type of work is responding to an inquiry from a claimant who has asserted claims against several properties, where the issue is not specific to any one of the properties. And a typical day sees the receivership team performing dozens of these types of tasks.

As another example, when it comes to property sales efforts, it is often impractical to allocate time to specific properties because some work will relate to the overall sales process while other work will relate to groups of properties of varying sizes. For example, such work might relate to properties that have a common claimant lender, or are part of the same marketing tranche, or have a common property manager. Even in instances where it might be possible to identify groups of properties benefiting from the same professional work, it might not be equitable to allocate billing entries according to individual properties or groups of properties because such an allocation may ignore, for example, efficiencies that are achieved over time or Court rulings that provide guidance or procedure as the action progresses. On the other hand, failing to allocate may be unfair to other claimants or properties if there is particular stakeholder who is more actively engaged with respect to a particular set of properties.

Further, under the circumstances and facts of this matter, it would not be fair for fees and expenses to rest either primarily on the shoulders of unsecured claimants, nor to pay for professional services at the beginning of the receivership from such fees (without regard to allocation) but later professional services according to an allocation methodology. Consistency and fairness require that such an allocation be calculated from the beginning of the receivership.

With nearly 1,000 claimants who are mostly *not* similarly situated and over 100 unique properties, dividing and tracking most professional time strictly by property is neither practical nor

realistic. As such, and consistent with his proposal in the Seventh Interim Application (Docket No. 755), the Receiver proposes allocating all receivership fees and expenses for the Receiver and the retained professionals from the beginning of the receivership in the following manner:

i. **First, allocate by property.** For time entries or expenses that identify, reference, or relate directly to a property, allocating those fees and expenses to that property. For time entries or expenses that identify, reference, or relate directly to multiple properties, the fees or expenses should be divided among those properties pro rata (*e.g.,* if there are three properties, then divided by three). The Receiver and the Retained Professionals have used and will continue to use reasonable efforts to attempt to identify particular properties that are the focus of their efforts in their billing records.

ii. **Second, do not allocate certain billing categories.** The Receiver and the Retained Professionals record and organize fees and expenses according to the SEC Billing Guidelines, which typically include the following categories: Accounting; Asset Analysis & Recovery; Asset Disposition; Business Operations; Case Administration; Claims; Corporate Finance; Distribution; Employees; Investor Communications; Status Reports; and Tax Issues. The Receiver recommends that the time in the categories for Accounting,[4] Employees, and Tax Issues *not* be allocated to the properties unless the time entries identify, reference, or relate directly to a particular property or properties.

---

[4] Accounting, here, relates to receivership accounting and not accounting that is principally related to the properties or an allocated billing category.

iii. **Third, do not allocate third-party claims by the Receiver.** The Receiver recommends that fees in the Asset Analysis & Recovery category that are related to third-party claims brought or potential claims evaluated by the Receiver not be allocated to any property. The basis for not allocating such fees to the properties is that the recovery would be unsecured funds and thus not allocated to the properties in a manner that would benefit the secured claimants.

iv. **Fourth, allocate all remaining fees and expenses to the properties as a percentage of their gross sales prices**, once that value is determined for each. For example, if there were three properties in the Estate that had been sold for $600,000, $300,000, and $100,000, respectively; and the amount of the fees (not otherwise specifically allocated to any of the properties) was $20,000, then the first property would be responsible for $12,000, the second for $6,000, and the third for $2,000.

Following the sale of all the properties, the Receiver proposes to submit a spreadsheet to the Court, in connection with his quarterly fee applications, which shows the allocation of fees and expenses according to the proposed methodology on a property-by-property basis. The Receiver expects that all of the properties will have been sold by the end of 2020. Thus, with that assumption, the Receiver would plan to submit an allocation spreadsheet for fees and expenses through the end of 2020 as part of the fee application for the fourth quarter of 2020. The Receiver anticipates that the allocation of fees and expenses in the manner proposed will be a very substantial undertaking. If the assumptions about timing are not accurate, or not feasible, the Receiver would report on the same to the Court in the fee applications, as they are submitted.

In connection with the allocation spreadsheet, the Receiver will also provide a schedule for each property that reflects the property-specific fees and expenses that identify, reference, or relate

directly to each property from the beginning of the receivership through the most recent quarter. Each schedule will show for each property: (a) the amount of fees and expenses specifically allocated to it; (b) the amount of fees and expenses allocated to it as its proportionate share of the remaining fees and expenses (that have not been specifically allocated to a particular property) for each fee application; (c) a running total of fees and expenses from the beginning of the receivership; and (d) the percentage of its total fees and expense in relation to its gross sales price.

The Receiver believes the foregoing methodology is reasonable and equitable given the facts, circumstances, and practical challenges of the receivership. Consistent with this approach, the Receiver requests a lien against each property to be paid on a first priority basis before all other liens on the properties to ensure that all Court-approved fees and expenses of the Receiver and the Retained Professionals are paid in accordance with the foregoing proposed methodology.

## V.     CONCLUSION

WHEREFORE, the Receiver respectfully requests that the Court approve the Receiver's Seventh Interim Fee Application and enter an Order as follows:

a.      finding the fees and expenses of the Receiver and Receiver's retained professionals, Rachlis Duff & Peel LLC, BrookWeiner, LLC, Axos Financial Services, and Prometheum, as described in Exhibits E-I, respectively, to be reasonable and necessary to the Receivership;

b.      granting the Receiver and his retained professional a first priority administrative lien against each of the real estate properties in the Receivership Estate and their sales proceeds for payment of fees and costs;

c.      approve the proposed allocation and payment methodology with respect to a Receiver's lien for all fees and expenses of the Receivership Estate as described and recommended in this fee application;

d.      approving the Receiver's payment of such fees and expenses to the Receiver and to Receiver's retained professionals from sales proceeds for each of the properties in the Receivership Estate as described and recommended in this fee application; and

e.      granting the Receiver all other relief which this Court deems just and proper.

Dated:  August 28, 2020                          Kevin B. Duff, Receiver


By:      /s/      Michael Rachlis

Michael Rachlis
Jodi Rosen Wine
Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Phone (312) 733-3950; Fax (312) 733-3952
mrachlis@rdaplaw.net
jwine@rdaplaw.net

## RECEIVER'S CERTIFICATION

1.      Pursuant to the Billing Instructions, the Receiver certifies as follows regarding the

Receiver's Seventh Interim Application and Motion for Court Approval of Payment of Fees and

Expenses of Receiver and Receiver's Retained Professionals:

a.      The Receiver has read the foregoing Application and Motion.

b.      To the best of the Receiver's knowledge, information and belief formed after reasonable inquiry, the Application and Motion and all fees and expenses therein are true and accurate and comply with the Billing Instructions (with any exceptions specifically noted in this Certification, Application, and Motion);

c.      All fees contained in the Application and Motion are based on the rates listed in the Fee Schedule attached hereto as Exhibit A, and such fees are reasonable, necessary, and commensurate with the skill and experience required for the activity performed;

d.      The Application and Motion does not include in the amount for which reimbursement is sought, the amortization of the cost of any investment, equipment, or capital outlay (except to the extent any such amortization is included within the permitted allowable amounts set forth herein);

e.      In seeking reimbursement for a service which the Receiver or the Receiver's Retained Professionals justifiably purchased or contracted for from a third party (such as copying, imaging, bulk mail, messenger service, overnight courier, computerized research, or title and lien searches), reimbursement is requested only for the amount billed to the Receiver or Receiver's Retained Professionals by the third-party vendor and paid by the Receiver or Receiver's Retained Professionals to such vendor.  If such services were performed by the Receiver or Receiver's Retained Professionals, the Receiver certifies that no profit has been made on such reimbursable service.

2.      On August 26, 2020, the Receiver provided to Mr. Benjamin Hanauer, of the SEC,

a complete draft copy of this Application and Motion, together with all exhibits and relevant billing

statements in a format specified by the SEC.

                                                /s/ Kevin B. Duff
                                           Kevin B. Duff, Receiver
                                           EquityBuild, Inc., et al.
                                           c/o Rachlis Duff & Peel, LLC
                                           542 S. Dearborn Street, Suite 900
                                           Chicago, IL  60605
                                           (312) 733-3390 - kduff@rdaplaw.net