UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, ) ) ) ) | |
| Plaintiff, ) ) | Civil Action No. 18-CV-5587 |
| v. ) ) | Judge John Z. Lee |
| EQUITYBUILD, INC., *et al.*, ) ) | Magistrate Judge Young B. Kim |
| Defendants. ) ) | |

## SEC'S REPLY IN SUPPORT OF RECEIVER'S SEVENTH FEE APPLICATION

The SEC hereby supports the Receiver's Seventh Fee Application (ECF No. 755). The SEC confirms that it has reviewed the Receiver's invoices, they substantially comply with the SEC's billing guidelines, and the SEC approves of their payment. The SEC additionally incorporates its arguments in support of the Receiver's earlier fee applications. (*See* ECF Nos. 526, 606, 622, 705). For these reasons, and those stated below, the Court should grant the Receiver's fee application.

**A. The Receiver Has Performed Valuable Services that Benefit the Estate**

Throughout this case, the Receiver has performed valuable services for the benefit of various constituencies, including investors, other creditors (including the institutional lenders), residential tenants, and the Court. In granting the Receiver's prior fee application, the Court continued to recognize the Receiver's important work and the need for that work to continue:

> the Court once again reaffirms both that there is a significant need for the Receivership Assets to be managed by a neutral party until an orderly claims process is concluded, and that the Receiver's efforts *have benefitted and will continue to benefit* the Receivership Estate

(ECF No. 710, p. 3 (citing ECF No. 614, p. 3) (emphasis added)). The Court likewise observed that a receiver is entitled to compensation even in situations where the receiver's work leads to a decline in the value of the estate. (ECF No. 710, p. 2 (quoting *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994))). Even the lenders have acknowledged that the Receiver and his attorneys "are entitled to fair, reasonable, and moderate compensation." (ECF No. 648, p. 2).

### B. The Lenders Have Significantly Slowed the Receiver's Work While Increasing His Expenses

At every step, the institutional lenders have attempted to thwart the Receiver's efforts to fulfil his Court-appointed mandates of liquidating real estate and administering an orderly claims process. While complaining that the Receiver has "held hostage" to his real estate (ECF No. 777, p. 10), the lenders refuse to acknowledge their own role in slowing the Receiver's work and increasing his expenses. In less than two years, the lenders have filed ***more than fifty*** substantive motions, objections, and appeals that were adversarial to the Receiver. (*See, e.g.*, ECF Nos. 90, 101, 109, 142, 143, 147, 148, 150, 151, 153, 154, 232, 233, 235, 240, 280, 282, 285, 331, 333, 334, 339, 342, 359, 362, 365, 398, 404, 414, 438, 440, 442, 455, 478, 481, 485, 502, 509, 511, 538, 581, 595, 617, 628, 648, 668, 694, 708, 724, 728, 766, 769, 777, 792).

The lenders' filings have forced the Receiver to spend large sums on professional fees such as legal research, drafting responsive filings, and preparing for adversarial court hearings. This money would have been better served being returned to the receivership's creditors, be they victimized investors or the lenders themselves. Compounding the effects of the lenders' overly litigious conduct, their voluminous filings have sharply slowed the Receiver's efforts to sell his properties and implement the claims process. Despite blaming the Receiver for holding "hostage" the properties in his portfolio, it is the lenders who bear the responsibility for any

2

delay. Indeed, absent the two years of lender obstruction, the Receiver would almost certainly have completed his property sales and distributed proceeds to claimants.

The Receiver and SEC are not alone in observing the institutional lenders' detrimental impact on the Receiver's work and expenses. The Court has similarly recognized that while the Receiver "has met the Court's deadlines," "certain delays in this case can be attributed to the Receiver's need to respond to various motions and objections made by lenders." (ECF No. 710, p. 4). Relatedly, the Court has noted that "the Receiver and his legal professionals have devoted significant resources responding to various motions, objections, and inquiries made by lenders, with these efforts increasing the amount of fees the Receiver is reasonably entitled to." (*Id.*, p. 3; ECF No. 614, p. 3).

Since the Court granted the Receiver's last fee petition, the lenders have filed even more objections to the Receiver's efforts to sell properties and implement the claims process. (*See, e.g.*, ECF Nos. 724, 728, 769). The Court should continue to evaluate the objections to the Receiver's fee petitions in the context of the lenders' unrelenting and ongoing filings which have slowed the Receiver, distracted him from his core work, and sharply added to his expenses.

**C. A Receiver's Lien is Warranted**

Beyond rehashing the same objections they have lodged throughout this case, the lenders' primary objection is that the Receiver cannot assert a lien that trumps any mortgages held by them or the victimized investors. But the lenders acknowledge that a court may appropriately "impose a lien on property in a receivership to satisfy the receivership expenses" and "in its discretion, determine who shall be charged with the costs of the receivership." *Gaskill*, 27 F.3d at 251 (prioritizing receiver expenses over secured lienholders).[1]

---

[1] Twenty years after deciding *Gaskill*, the Seventh Circuit reaffirmed this core holding in a case involving the same Receiver as in this action. *Duff v. Central Sleep Diagnostics, LLC*, 801 F.3d

3

Citing *Gaskill*, the lenders argue that a receiver's lien cannot be imposed here because the Receiver's work has not benefitted them. (ECF No. 777, pp. 7-8). But under *Gaskill*, the relevant inquiry is whether a receiver benefitted the subject *property*, as opposed to one of its creditors. *Gaskill,* 27 F.3d at 251 ("Courts in equity have allowed liens for receivership expenses to take priority over secured creditors interests in the property when the receiver's acts have benefited *the property*.") (emphasis added).

Here, the Court has repeatedly affirmed that the Receiver's work has "benefitted and will continue to benefit the Receivership Estate." (*See, e.g.,* ECF No. 710, p. 3; ECF 614, p. 3). In doing so, the Court has continued to approve expenses for the Receiver's work: (a) maintaining, marketing, and liquidating his properties; (b) representing those properties in adverse litigation; (c) bringing new assets into the Receivership; and (d) designing and implementing a claims and priority-determination process by which property sales proceeds will be distributed to senior secured claimants.

Consistent with the Court's approval of these expenses, one could imagine the detriment caused without a receiver to handle the fallout from the Cohens' massive Ponzi scheme. Indeed, absent the Receiver's efforts, there would be no one to manage a large portfolio of residential real estate, ensure the health and safety of its residents, prepare the properties for sale, and manage a process whereby claims are evaluated in an orderly fashion.[2] Because the Receiver has continued to benefit the estate, he is entitled to compensation under *Gaskill*.

---

833, 842 (7th Cir. 2015) ("Receivers can displace even *prior* security interests in receivership property in some circumstances.") (emphasis in original).

[2] It is telling that this outcome, where the properties are abandoned and the victimized investors would be left to fight the well-financed lenders in foreclosure or declaratory judgment actions, is the one that the lenders have repeatedly sought and the Court has wisely avoided.

The lenders counter that the Receiver's legal expenses responding to their more than fifty objections, motions, and other filings did not benefit the Receiver's real estate. But the Court has overruled nearly all of the lenders' objections and denied their motions in allowing the Receiver's property sales and proposed claims process to proceed. Given the Court's repeated affirmation of the Receiver's conduct, the Receiver should not be penalized for successful legal work fending off unmeritorious objections and motions.[3]

On the other hand, the lenders fail to answer the basic question of who should pay for the recurring legal work that they themselves have thrust upon the Receiver. Indeed, denying the Receiver payment for *responding* to litigious efforts against him would provide a roadmap for any well-financed party to oppose a receivership: simply bombard the receiver with litigation with the threat that the receiver cannot be compensated for defending himself. The Court should not countenance such a tactic or allow it to become precedent for future equitable receiverships.[4]

The lenders' argument that the Receiver should not be paid for his legal expenses for responding to their voluminous filings also ignores the realities of the lien procedures the Receiver seeks to implement. Under the Receiver's proposal, the only claimants that would pay for his work would be those the Court ultimately finds to have priority. Thus, only the "winners"

---

[3] For instance, the lenders seek to fault the Receiver (and deny him payment) for "interject[ing] himself in the lien priority dispute resolution process" and "want[ing] to make sure that the lien claims of the Investor Lenders are heard." (ECF No. 777, pp. 14, 15). Despite the lenders' criticisms of the Receiver's objectives, that Court has repeatedly voiced approval for the Receiver administering an orderly claims process where all claimants, including the victimized investors, receive due process.

[4] The lenders argue that compensating the Receiver for legal work the lenders required him to perform is bad public policy. But, as the SEC has repeatedly noted, the opposite is true. Denying the Receiver's fee petition would inhibit the SEC's ability to recruit well-qualified receivers, who would be unwilling to volunteer for lengthy and resource-intensive assignments with the prospect of not being compensated. It would also reward the lenders, and future creditors, for obstructionist and overly litigious conduct.

of the process, be they the lenders or investors, will be required to remit a portion of the property sales proceeds to the Receiver. The "losers" will not pay the Receiver anything. *See, e.g., SEC v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) ("Although the prevailing secured claimant had to fight the Receiver's opposition to his claim, he reaped benefits when the Receiver defeated competing claims. By combatting competing claims, the Receiver became his ally. We find that, with these type of activities, the Receiver conferred a benefit on the secured creditors and merits fees from their collateral.").[5]

### D. The Lenders' Remaining Objections Continue to Be Unavailing

The lenders' remaining objections are simply reiterations of arguments repeatedly rejected by the Court. For instance, the lenders claim that the Receiver's fees are excessive. In response to an identical earlier argument, the Court observed that the lenders have been unable to establish that the Receiver's fees are in any way unreasonable. (ECF No. 710, pp. 3-4). In this fee petition, the Receiver seeks payments for the exact same type of work the Court found to be reasonable, appropriate, and beneficial to the estate: managing and selling properties, administering the claims process, and "responding to various motions, objections, and inquiries made by the lenders." (*Id.*).[6]

Further evidencing the reasonableness of the Receiver's fee application, his quarterly expenses were lower than all but one other period, the one covered by the prior fee petition. (ECF No. 777, pp. 20-21). But that prior fee petition, which the Court found to evidence the

---

[5] Even in instances where institutional lenders are found to have priority, equitable principles support them bearing some of the burden of forcing the Receiver to respond to so many unmeritorious objections and motions.

[6] During the period at issue in the Receiver's Seventh Fee petition, the Receiver was forced to address at least four substantive objections or motions made by the lenders. (*See* ECF Nos. 617, 628, 648, and 668).

Receiver making "substantial reductions in his fees and billing rates" (ECF No. 710, p. 3), was only $13,000 lower than the current petition. Just as the Receiver's fees were reasonable for the prior period, so too are his similar fees reasonable for this period.

Next, the lenders' request for a 20% holdback is an identical argument to one repeatedly rejected by the Court. (*See, e.g.*, ECF No. 710, p. 4). Again, a holdback is not necessary given that the Receiver is providing at least a 25% discount from his standard fees. (ECF No. 703, p. 11). Moreover, the Receiver has determined to withhold payment of a significant amount of approved fees to address liquidity issues. (ECF No. 757, p. 22). This self-imposed delay in payment further militates against an additional holdback.

Finally, the Receiver's solvency issues the lenders cite in opposition to his fee petition have apparently improved. To that end, the Receiver has advised that, following the Court's ruling on his rent restoration motion (ECF No. 796) and the May 2020 sale of property with significant equity, in excess of $2 million in unencumbered funds will soon be available to the Receiver. The Receiver has further advised that these funds are not the subject of any lien or priority dispute, and will be available to pay the Receiver's general expenses, including his professional fees.

### E. Conclusion

The Receiver seeks compensation for work he performed and directed, using his reasonable business judgment, that benefitted the Receivership Estate. His bills reflect his efforts to both fulfill his Court-imposed mandates and to respond to voluminous motions and objections by the institutional lenders. Accordingly, the Court should allow the Receiver to be paid for his efforts, and to continue working for the benefit of the victimized investors and other creditors.

Dated: September 21, 2020                    Respectfully submitted,

   /s/ Benjamin Hanauer
Benjamin J. Hanauer (hanauerb@sec.gov)
Timothy J. Stockwell (stockwellt@sec.gov)
U.S. Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Phone: (312) 353-7390
Facsimile: (312) 353-7398

CERTIFICATE OF SERVICE

      I hereby certify that I provided service of the foregoing Reply, via ECF filing, to all counsel of record and Defendant Shaun Cohen, on September 21, 2020. I further certify that I caused the foregoing Response to be served on Defendant Jerome Cohen, via email at jerryc@reagan.com.

      /s/ Benjamin Hanauer
Benjamin J. Hanauer
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Phone: (312) 353-7390
Facsimile: (312) 353-7398

One of the Attorneys for Plaintiff