```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3
      UNITED STATES SECURITIES AND   ) Docket No. 18 C 5587
 4    EXCHANGE COMMISSION,           )
                                     )
 5                    Plaintiffs,    )
                                     )
 6            vs.                    )
                                     )
 7    EQUITYBUILD, INC., EQUITYBUILD )
      FINANCE, LLC, JEROME H. COHEN, )
 8    AND SHAUN D. COHEN,            ) Chicago, Illinois
                                     ) October 27, 2020
 9                    Defendants.    ) 1:30 o'clock p.m.

10
              TRANSCRIPT OF PROCEEDINGS - TELEPHONIC STATUS
11                BEFORE THE HONORABLE JOHN Z. LEE

12
      TELEPHONIC APPEARANCES:
13

14    For the Plaintiff:        U.S. SECURITIES & EXCHANGE
                                    COMMISSION
15                              BY:  MR. BENJAMIN J. HANAUER
                                     MR. TIMOTHY J. STOCKWELL
16                              175 W. Jackson Blvd., Suite 900
                                Chicago, Illinois  60604
17

18    For the Receiver:         RACHLIS, DUFF, PEEL & KAPLAN, LLC
                                BY:  MR. MICHAEL RACHLIS
19                                   MS. JODI ROSEN WINE
                                542 South Dearborn, Suite 900
20                              Chicago, Illinois  60605

21
      Federal Home Loan Mortgage DYKEMA GOSSETT, PLLC
22    Corporation, Wilmington   BY:  MR. MICHAEL A. GILMAN
      Trust, Citibank, Federal  10 South Wacker Drive, Suite 2300
23    National Mortgage Assoc.,  Chicago, Illinois  60606
      U.S. Bank, Sabal TL,
24    Midland Loan Svcs., BC57,
      and UBS AG:,
25
```

```
 1    TELEPHONIC APPEARANCES (Cont'd):

 2
      For Midland Loan Svcs.,      STAHL, COWEN, CROWLEY, ADDIS, LLC
 3    Thorofare Asset Based        BY:  MR. RONALD A. DAMASHEK
      Lending, Liberty EBCP,       55 West Monroe Street, Suite 1200
 4    And Citibank:                Chicago, Illinois  60603

 5
      For Capital Investors,       GARDINER, KOCH & WEISBERG
 6    Capital Partners,            BY:  MS. MICHELLE M. LaGROTTA
      6951 S. Merrill I, LLC,      53 W. Jackson Blvd., Suite 950
 7    5001 S. Drexel Blvd. Fund    Chicago, Illinois  60604
      II, LLC:
 8

 9    For BMO Harris and           STINSON LLP
      Colony Midland:              BY:  MR. SCOTT B. MUELLER
10                                 7700 Forsyth Blvd., Suite 1100
                                   St. Louis, Missouri  63105
11

12    For Annie Chang and a        LABATON SUCHAROW
      Class of Investors:          MR. ROSS KAMHI
13                                 BY:  MR. ROSS KAMHI
                                   140 BROADWAY
14                                 New York, New York  10005

15
      Also Present:                MR. KEVIN B. DUFF, Receiver
16                                 MR. DAVID MARCUS
                                   MS. SHEREE GRAVELY
17                                 MR. ALAN GRAVELY
                                   MR. JOEL FEINGOLD
18                                 MR. PAT DeSANTIS
                                   MR. FRANCISCO FERNANDEZ
19                                 MS. KATHY TALMAN
                                   MR. JOHN BLOXHAM
20                                 MR. CARL DeKLOTZ
                                   MR. CHRISTOPHER MORA
21                                 MR. JEAN-MARC CABROL
                                   MR. MANUEL CADAVAL
22                                 MS. SUSAN KALISIAK
                                   MS. VIRGINIA LIEBLEIN
23                                 MR. ALAN SCHANKMAN
                                   MR. MICHAEL SCHANKMAN
24

25
```

```
 1    TELEPHONIC APPEARANCES (Cont'd):

 2
      Court Reporter:              MR. JOSEPH RICKHOFF
 3                                 Official Court Reporter
                                   219 S. Dearborn St., Suite 2128
 4                                 Chicago, Illinois  60604
                                   (312) 435-5562
 5
                       *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
 6
                               PROCEEDINGS RECORDED BY
 7                              MECHANICAL STENOGRAPHY
                           TRANSCRIPT PRODUCED BY COMPUTER
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1            (Proceedings had via telephone conference:)

2              THE CLERK:  Case 18 CV 5587, United States Securities

3      and Exchange Commission vs. Equitybuild.

4              THE COURT:  All right.  First of all, let's start

5      with the attorneys representing the SEC in this case.

6              MR. HANAUER:  Good afternoon, your Honor, Ben Hanauer

7      and Tim Stockwell for the SEC.

8              THE COURT:  Good afternoon.

9              Now let's proceed with the attorneys who are

10     representing the receiver.

11             MR. RACHLIS:  Good afternoon, your Honor, Michael

12     Rachlis and Jodi Rosen Wine on behalf of the receiver.  Kevin

13     Duff, the receiver, is also on the line, as well.

14             THE COURT:  Good afternoon.

15             Now let's proceed to the attorneys who filed, on

16     behalf of multiple mortgagee lenders, the mortgagees' proposal

17     for access to Equitybuild documents, starting with Mr.

18     Damashek.

19             MR. DAMASHEK:  Good afternoon, Judge, Ron Damashek on

20     behalf of several of the mortgagees:  Citibank as a trustee,

21     Thorofare, Midland, and Liberty EBCP.

22             And I will be addressing primarily the issues of --

23     the open issues before the Court, as distinct from the

24     discovery issues, which Mr. Gilman will be addressing.

25             THE COURT:  Okay.

1          Also, the other signator to the motion was Mr.

2    Mueller.

3          Mr. Mueller, are you with us?

4          MR. MUELLER:  I am, your Honor.

5          THE COURT:  Okay.

6          Can you please state your full name.

7          MR. MUELLER:  Yes.  This is Scott Brian Mueller with

8    Stinson, LLP, in St. Louis.  I represent BMO Harris and Colony

9    Midland.

10          THE COURT:  Very good.

11          And, Mr. Gilman, you are on the phone with us, yes?

12          MR. GILMAN:  Yes, your Honor.

13          Good afternoon.  Michael Gilman.  I represent 13 -- I

14    believe around 13 -- of the mortgagee lenders.

15          THE COURT:  Okay.  Good afternoon.

16          Now, I know there are a number of other attorneys who

17    are on the call.  If anyone wishes to note their appearance

18    for the call, can you please go ahead and identify yourself by

19    name, the firm and the clients that you are representing.

20          MR. MARCUS:  Good afternoon, Judge Lee.  This is Dave

21    Marcus calling you from New York City.  I'm an Equitybuild

22    investor.

23          Thank you.

24          MS. GRAVELY:  Yes, my name is Sheree Gravely and my

25    husband Alan Gravely.  And we are Equitybuild investors, as

1   well.

2          MR. FEINGOLD:  Joel Feingold, Equitybuild investor.

3          MR. DeSANTIS:  Pat DeSantis, Equitybuild investor.

4          MR. FERNANDEZ:  Francisco Fernandez, Equitybuild

5   Investor.

6          THE COURT:  Hold on for a second.  The last person,

7   can you repeat your name?

8          MR. FERNANDEZ:  Francisco Fernandez, Equitybuild

9   investor.

10         MS. TALMAN:  Kathy Talman, Equitybuild investor.

11         MR. BLOXHAM:  Call-in John Bloxham, Equitybuild

12  investor.

13         MS. LaGROTTA:  Michelle LaGrotta with Gardiner, Koch,

14  Weisberg & Wrona on behalf of Equitybuild investor Capital

15  Investments.

16         MR. DeKLOTZ:  Carl DeKlotz, Equitybuild investor.

17         MR. MORA:  Christopher Mora, Equitybuild investor.

18         MS. CABROL:  Jean-Marc Cabrol, Equitybuild investor.

19         MR. CADAVAL:  Manuel Cadaval, Equitybuild investor.

20         THE COURT:  Sir, how do you spell your last name?

21         MR. CADAVAL:  C-a-d-a-v-a-l.

22         MR. KAMHI:  Ross --

23         MS. KALISIAK:  Susan Kalisiak --

24         MR. KAMHI:  -- Kamhi -- go ahead.

25         MS. KALISIAK:  Sorry.

1          Susan Kalisiak, Equitybuild investor.

2          MR. KAMHI:  Ross Kamhi of Labaton Sucharow

3     representing Equitybuild investor Annie Chang and a class of

4     Equitybuild investors.

5          MS. LIEBLEIN:  Virginia Lieblein, Equitybuild

6     investor.

7          THE COURT:  Anyone else?

8          MR. CADAVAL:  Manuel Cadaval also representing

9     Cadaval Investment Trust.

10          THE COURT:  All right.

11          So, the first thing I wanted to address was the

12     mortgagee's proposal for access to Equitybuild documents.

13     That's Document 812 on our docket.  The receiver has filed a

14     response.

15          So, Mr. Damashek, for the -- a couple of questions

16     about the proposal.  First of all, you proposed a six-month

17     period of time when whoever wants to subscribe and have access

18     to the documents can go ahead and search documents in exchange

19     for a one-time fee -- initiation fee -- and then a monthly

20     fee.  I believe the one-time access fee is $300 per user, and

21     there's a $400 monthly access fee.

22          The quote, the project cost estimate provided by

23     CloudNine, is for a 12-month period; is that correct?  And,

24     so, would the six-month period be half that amount?

25          MR. GILMAN:  Your Honor, this is Michael Gilman.

1    I'll be addressing that question.

2         THE COURT:  Okay.

3         MR. GILMAN:  Right, the proposal was based on a

4    12-month period and based on a certain volume of documents.

5    When those variables change, the ultimate price will change.

6    So, if the -- if it's open for six months, that should reduce

7    the cost by 50 percent.

8         THE COURT:  Okay.

9         MR. GILMAN:  There are some upfront costs, but

10   generally speaking, that will reduce the cost by around 50

11   percent.

12        THE COURT:  That will reduce the cost of setting it

13   up, but the subscription cost would be the same?

14        MR. GILMAN:  Correct, the subscription cost would be

15   the same.

16        THE COURT:  Okay.

17        And the one-time access fee would be the same?

18        MR. GILMAN:  Correct.  Correct.

19        THE COURT:  All right.

20        MR. GILMAN:  Now, investors can share an access.

21   They can share a password, if you will.  They won't have the

22   confidentiality that would be provided if they individually

23   paid the access fee and the monthly fee.  But if they want to

24   share an account, if you will, they can do that and save --

25   and share the costs.

1        THE COURT:  What do you mean by confidentiality?  In

2  other words, they -- if you have your own account, you know

3  what searches you did and what documents you saved from those

4  searches; but, if you're not worried about other people having

5  that information, then you can share your account -- your

6  access -- with other investors?

7        MR. GILMAN:  That's my understanding, your Honor,

8  correct.

9        THE COURT:  Okay.

10        So, let's talk about the -- and, then, as part of the

11  proposal, the mortgagees propose that the receiver bear 25

12  percent of whatever the final setup cost is; is that correct?

13        MR. GILMAN:  Correct.

14        THE COURT:  And that 25 percent will differ depending

15  upon how long the, for lack of a better word, the open period

16  is.  So, if it's for 12 months, it would be estimated

17  $184,000.  It would be 25 percent of that.  Or if it's six

18  months, it would be 25 percent of half of that?

19        MR. GILMAN:  Correct.  It would be based on the cost,

20  right.

21        THE COURT:  Okay.

22        MR. GILMAN:  Which would be based on how long the

23  database is kept open.

24        THE COURT:  All right.

25        So, let me hear from the receiver, please.

1        MR. RACHLIS:  Of course we had a few issues, your

2  Honor, that you had seen in our brief response of concerns.

3        Again, I'm sorry, this is Michael Rachlis on behalf

4  of the receiver.

5        In terms of the cost, starting there, the 25 percent

6  figure struck us as much different than anything we had

7  previously been -- or understood might be a cost.  At some

8  point, there was discussion about the same amount -- $125,

9  $300 a month -- something akin to what it sounds like is being

10  proposed for a claimant to go in and view the documents.

11        And, so, the numbers here -- and even those numbers

12  here are higher than had been discussed for the claimants.

13  But the 25 percent number is significantly higher in that

14  regard.

15        And it's also -- it appears to be -- as far as we

16  understand, that 25 percent that would be borne by the

17  receivership would likely be the highest proportion paid by

18  any party because, as we understand, the cost would be split

19  among the various institutional investors, which there are ten

20  or so of those entities, which would basically take -- you

21  know, they'd be splitting that one-tenth each ostensibly,

22  leaving the largest portion on this whole project to be borne

23  by the receivership.

24        So, this on a cost basis, there are some concerns

25  that were raised that are different and unique from what we

1   had previously been advised of or understood.  And we

2   certainly wanted to explore ways that can -- that number on

3   its own should go down.  I don't think 25 percent is the right

4   figure, given what other parties here may be spending.

5           But even beyond that, we're not familiar with

6   CloudNine.  We have not participated in any of the discussions

7   associated with that platform.  And, so, if there are ways --

8   we need to learn more about that, particularly if anywhere

9   near the amount, we are going to end up -- if that were

10  ultimately what the Court were to decide, that amount would

11  put us as bearing the largest cost.

12          So, whether it's, you know, equal to others or not,

13  there's a lot that we still don't know and we'd like to know

14  before delving into that type of commitment and project.  And,

15  so -- and that would also allow us to figure out if there are

16  ways to perhaps lower the cost for all participants in the

17  receivership, which we haven't had that opportunity to do to

18  this point.

19          So, in terms of timing, we did have concerns about

20  the six-month proposal.  And there's -- they're varied.  And

21  there's a -- they sort of upend in many respects what is

22  currently being proposed.  And I say that because, as your

23  Honor knows, this is -- the proposal for handling the claims

24  process is to be done by tranche.  The discovery that we've

25  been discussing is by tranche.  And the idea of not having the

1   library open to all claimants during each time that their

2   tranche would be up -- in other words, for what would likely

3   be a period well beyond the six months -- could be problematic

4   for claimants.  Claimants who aren't -- who wouldn't have

5   their tranches up right now may not be in a position to enter

6   into the library.  They may not know --

7          THE COURT:  Mr. Rachlis, why --

8          MR. RACHLIS:  Yes.

9          THE COURT:  -- is that?

10         I mean, given the fact that they submitted all their

11  claims, what sort of information would they not have before

12  their properties were at issue during the claims process?

13         MR. RACHLIS:  Well, the sense I would have is that

14  they have not -- with their tranche not being up, they are not

15  going to have the -- all of the other claims -- right now put

16  it -- we have to put it in context to some degree.  The

17  information that they wouldn't have would be -- that is sort

18  of being baked into the process that is before the Court, they

19  won't have all the other claims that go to their properties or

20  that involve the property that would be part of the tranche.

21  Those claims are not currently -- they would be sent -- once

22  their tranche is up, there would be a link that will provide

23  that information to each claimant.

24         They won't have standard -- the other type of

25  standard discovery that the Court has contemplated.  So, it is

1    in that context, if they are trying to locate information -- I

2    don't -- I mean, there may be information that a claimant

3    doesn't have complete on its own claim, but they certainly

4    won't have complete information on other people's claims.

5    That won't be available.

6         And, so, I mean, just putting it in a more standard

7    litigation context, they may not know what to look for, you

8    know, at the time, until their tranche is up, until they have

9    information that they are -- have at least had the opportunity

10   to evaluate and then go into the library for purposes of

11   trying to look and see or dig for information that they may

12   find relevant.

13        So, it is -- it's both by timing in terms of looking

14   at this as a tranche-by-tranche decision making, as well as

15   access to, you know, other information that they would -- they

16   are going to have access to as part of the claims process.

17   Some claimants may just not be in a position to have the

18   knowledge or really as much incentive really to get in there

19   and deal with things until their tranche is up.

20        And, so, the six-month window does upend what is

21   currently sort of being considered right now.  I mean, there

22   is -- the process where we go tranche by tranche would be

23   impacted.  And it's unclear as to -- the impacts could be

24   significant.  There will be disruption.  I'm not exactly clear

25   as to how then those claimants who would be digging into the

```
 1   library and wish to dig into their --
 2              THE COURT:  So, Mr. Rachlis --
 3              MR. RACHLIS:  -- how they have information --
 4              THE COURT:  Mr. Rachlis, what is --
 5              MR. RACHLIS:  Yes.
 6              THE COURT:  -- the alternative you're proposing,
 7   then?
 8              MR. RACHLIS:  Well --
 9              THE COURT:  We're trying to balance the -- first of
10   all, I gave the receivership plenty of time to try to figure
11   out a workable solution for dealing with the Equitybuild
12   documents.  That's what we're talking about here, are the
13   Equitybuild documents.
14              MR. RACHLIS:  We are.
15              THE COURT:  And after months, the receiver couldn't
16   come up with a viable alternative that would be economically
17   feasible, given what we're envisioning.  Here -- so, we're
18   balancing the costs of that access with the ability of the
19   claimants, including the receiver, to try to evaluate those
20   documents.
21              Now, it seems to me that -- well, first of all, all
22   the claims have been submitted.  So, we have -- within the
23   universe of claims, we have information as to all of the
24   claims that would be impacted by a particular -- that would
25   relate to a particular property, right?
```

1          MR. RACHLIS:  Yes.

2          THE COURT:  And if all of that information is

3   provided, then a claimant would -- let's say at the beginning

4   of the process or whenever this database is made available,

5   then the claimant would have the ability to search the

6   database by the property name, for example, and just to look

7   at all the documents that were submitted as part -- or that

8   may relate to him or herself and the other claimants with

9   regard to that particular property.

10          It seems to me that that is one way -- Mr. Gilman's

11  proposal is one way -- of trying to deal with that issue on a

12  somewhat cost-effective basis.

13          MR. RACHLIS:  There will be issues.  And if we're--

14  assuming that we continue on working tranche by tranche, there

15  will be claimants, undoubtedly, that will have need to get

16  back into -- or at least will argue to the Court, I believe,

17  that there would be a need to get back into a library in order

18  to get information that they either weren't aware of, didn't

19  have -- or just didn't know that they would need, even though

20  they would have had access pursuant to that.  And having a

21  library come down at a certain limited time period may impact

22  them.  That is a concern.

23          Yes, I don't disagree that there is -- having access

24  for some period of time does provide the ability to get some

25  things.  But I do think that there's going to be issues that

1    arise per tranche that would impact the decision making of the

2    litigants in that tranche in terms of information that they

3    may believe that they need they may not have had as much

4    thought about when their tranche was not up or based on

5    information that they get during the tranche.

6              THE COURT:  Okay.

7              MR. RACHLIS:  And at that point in time -- I'm sorry.

8              THE COURT:  So, Mr. Rachlis, once the database is

9    ready to be made available for searching, at that point or by

10   that time, would the receiver be able to file a breakdown of

11   each property and the claimants that are asserting a claim as

12   to each property at issue?

13             MR. RACHLIS:  So, just names of claimants --

14             THE COURT:  Yes.

15             MR. RACHLIS:  -- per property?

16             MR. MARCUS:  Judge Lee, this is Dave Marcus.  I'm

17   calling you from New York City.  I believe that --

18             THE COURT:  Mr. Marcus, it's not your turn to talk

19   yet.  Okay?

20             MR. MARCUS:  Okay.  I'll talk --

21             THE COURT:  I'm trying to get answers to my

22   questions, sir.

23             MR. MARCUS:  Okay.

24             THE COURT:  Mr. Rachlis, go ahead.

25             MR. RACHLIS:  I'm sorry, your Honor.  You're looking

1   for a -- some type of disclosure that would have the names of

2   the claimants per property, for every property that is going

3   to be subject to a -- to having their claims resolved?

4          THE COURT:  Right.  So, it would be just a list of

5   properties and all the claims that were filed with regard to

6   each property.

7          MR. RACHLIS:  If it's just a list, I would think that

8   the answer is yes.  I mean, if this is just saying, you know,

9   property X and then every claim -- the name of a claimant as

10  to property X, and then property Y, names of claimants for

11  that property --

12         THE COURT:  The names of the claimants and the amount

13  that they're claiming.

14         MR. RACHLIS:  Yes.  I think that the answer there

15  would be we should be able to do that.  Yes, I think that

16  that's right.

17         MS. WINE:  Your Honor, if I might interject.

18         MR. RACHLIS:  Oh, sorry.

19         MS. WINE:  This is Jodi Wine also for the receiver.

20         This information has already been provided.  We

21  provided it with status reports, et cetera.  Spreadsheets that

22  has all that information.  The last couple status reports, we

23  did that sorted by claimant names because we thought that was

24  more useful for the claimants; but it's easy to sort that by

25  property to give the information that you're asking for.

1          THE COURT:  All right.  Very good.

2          So, Mr. Gilman, Mr. Rachlis does raise an interesting

3   point with regard to whether or not access to the database is

4   better left for the claimants during the time that the

5   particular tranche comes up for resolution as part of the

6   claims process.  I'm assuming you've thought about that.

7          MR. GILMAN:  We have, your Honor.  The problem with

8   that is that some of these tranches may not be heard for a

9   year, two, three years from now, and meanwhile the database

10  will be sitting there pretty much unused.

11         But let me go back.  I mean, we start a tranche.  The

12  folks that are involved in that tranche will use the database.

13  And once they get their documents, it will be sitting there

14  unused for -- until the next tranche starts; and, then, it

15  will start up again being activated, people using it for a

16  month or so; then it will be down again, not being used until

17  the next tranche begins.  Meanwhile, we're paying a monthly

18  charge to keep the tranche -- I mean, I'm sorry, to keep the

19  database operating.  We're trying to avoid that cost when

20  it's, you know -- avoiding paying for services not being used.

21         THE COURT:  Right.  Okay.

22         The other thing that the receiver raised, a concern

23  they raised, is whether or not there are any kind of hidden

24  costs that aren't -- weren't considered as part of the overall

25  estimate.

1    MR. GILMAN:  I'm not sure of any hidden costs.  I

2  understand -- I've read the proposal.  I think all the costs

3  are set forth there.  But the receiver can -- or the attorneys

4  can speak to the CloudNine representatives and have their

5  questions answered.

6    THE COURT:  Okay.

7    MR. GILMAN:  My understanding is that what's set

8  forth in the proposal is the proposal.  But I can't speak for

9  CloudNine.  I can't represent what their thought process is.

10  I'm just basing it on what the proposal says and my

11  understanding based on conversations with them.

12    MR. RACHLIS:  Your Honor --

13    THE COURT:  Hold on for a second, Mr. Rachlis.

14    MR. RACHLIS:  I'm sorry.

15    THE COURT:  I'm not done.

16    MR. RACHLIS:  I'm sorry.  Okay.

17    THE COURT:  Also, Mr. Gilman, so to the extent that

18  you are at liberty to say, with regard to the costs on the

19  side of the mortgagees -- mortgagee claimants -- is the

20  agreement to share those costs pro rata or is there a

21  particular cost allocation that was negotiated amongst the

22  different parties?

23    MR. GILMAN:  It wasn't -- there's not precise

24  negotiation among the parties.  The reason we propose that the

25  receiver share 25 percent of the cost is that the receiver is

```
 1    going to be involved in every tranche and, therefore,

 2    theoretically has a 50 percent interest, if you will,

 3    throughout the course of the resolution of all these claims.

 4            Each mortgagee is only going to have an interest in

 5    the tranche where its property is at issue.  And, therefore,

 6    they shouldn't -- you know, you can't divvy up the cost per

 7    party because the receiver has an interest in every tranche,

 8    whereas each mortgagee has an interest in only one or maybe

 9    two tranches.

10            THE COURT:  And how many --

11            MR. GILMAN:  I don't know exactly, but --

12            THE COURT:  How many mortgagee claimants are there?

13            MR. GILMAN:  I think there's around 80.  I believe

14    there's around 80.

15            MR. DAMASHEK:  Judge, this is Ron Damashek.  I

16    believe Mr. Gilman may be talking about the number of

17    properties --

18            MR. GILMAN:  Oh, you're right.

19            MR. DAMASHEK:  -- being around 80.

20            Right?

21            MR. GILMAN:  You're right.

22            MR. DAMASHEK:  About -- okay.

23            MR. GILMAN:  There's probably around maybe 20, 25

24    mortgagees.

25            THE COURT:  All right.
```

 1          MR. GILMAN:  Maybe 20.  Maybe 20.

 2          THE COURT:  Okay.

 3          So, I take it, Mr. Rachlis, that it would be helpful

 4   for you to talk with CloudNine to figure out what the bases

 5   for some of their estimates are?

 6          MR. RACHLIS:  Yes, your Honor.  That's exactly what I

 7   was -- and I apologize.  I thought there was a break in the

 8   questioning.

 9          But, yes, I did want to say exactly that.  It would

10   be helpful to understand more of that, as well as understand

11   where, if possible, there could be play in either numbers or

12   in timing or in anything.  We are -- unlike some of the other

13   vendors that we've jointly spoken with -- you know,

14   representatives of the receivership and the institutional

15   lenders -- this one was not part of that.

16          THE COURT:  Mr. Marcus, did you have something to add

17   to the discussion?

18          MR. MARCUS:  Yeah.  Thank you very much, Judge.

19          I just want to say, you know, this is almost like a

20   foreign language to me.  You know, I'm a layman.  Most of the

21   investors are laymen.  This is a lot of legal kind of talk.  I

22   don't know what the tranche is.  Does that mean the three

23   properties that I invested in?

24          And, by the way, when you told me to stop talking, I

25   was going to tell you I have listened -- we've had it for the

1   past year, I've had it of every single investor in any one of

2   my three buildings exactly what they invested in, the amounts.

3   So, I know all three of my buildings, every single investor

4   and how much they put in.  So, that's number one.

5           Is that considered a tranche, my three buildings, or

6   not?  I don't understand -- and when disbursing the money and

7   all that stuff, when there's talk about disbursing the money,

8   is this going to be a pool that's disbursed or is it going to

9   be each individual investor's tranche, what they invested in?

10  I don't understand what the tranche is and how that affects

11  me.

12          And why would I be looking to documents?  I have

13  everything I need to know in my case.  Why would I be

14  spending -- would I be spending money?  Would the receiver be

15  spending money on my behalf?  How does that work?  I don't

16  understand.

17          A lot of -- you know, you have investors here who

18  don't know what the hell this is all about.  They have no

19  idea.  And I tell you, this must be simplified so people know.

20  I'm sure there are people on this call that don't know what a

21  tranche is and all this stuff, you know.  I just heard about

22  it just recently.

23          So, what I'm trying to tell you is that we want --

24  the investors here, they want a seat on the table.

25          Now, I must also tell you, your Honor -- and I waited

1   this long to tell you that -- remember last call you allowed

2   me to send out the e-mails to the investors -- the 900

3   investors.  And what happened then was I sent an e-mail to the

4   receiver exactly what my purpose was and that you okayed it,

5   so that it would be -- so I could pool the resources and

6   information with other investors.  And, also, they put down

7   here, receiver -- that was Mr. Duff and Mr. Rachlis -- they

8   put down the three properties I invested in.

9          Now, what happened was this served to minimize the

10  response I got from that.  Why?  Because, first of all, it

11  didn't explain the purpose of my -- of the e-mail.  So, they

12  didn't see that.  They deleted that sentence out.  And second

13  of all, they put the three properties on and I had investors

14  call me and say, listen, I didn't invest in the same

15  properties you did; can I still work with you?  And I said, of

16  course.

17         So, what happened is they did that purposely, to

18  delete a sentence that was the key sentence why I'm involved

19  and the purpose of sending out these e-mails.  I had people

20  that didn't know what this was all about.

21         THE COURT:  Mr. Marcus, first of all, with regard to

22  the e-mails, now is not the time to deal with that issue.  If

23  you want to go ahead and file something or send an e-mail,

24  send a letter to me --

25         MR. MARCUS:  Can I send you a letter?

1          THE COURT:  -- attaching -- that's fine.  You can

2  send me a letter.  I will then -- you can send me a letter

3  attaching the e-mail, okay?  And then --

4          MR. MARCUS:  Can I ask you one thing, your Honor,

5  before I forget?  And I don't want to monopolize this.  But do

6  you think it is possible -- because this seems to be 99.9

7  percent of all the attention and consideration is going to

8  these institutional lenders, their heavy-duty lawyers that

9  they have on retainer and all this stuff, and there's no seat

10  at the table for the investors.  I'm glad there are a whole

11  bunch now on this call.

12          But what I'd like to know is if it's possible, do you

13  think it would be a good idea to have a call maybe once every

14  month or two -- it's up to you -- with just the investors only

15  so you could get --

16          UNIDENTIFIED SPEAKER:  Great idea.  Great idea.

17          THE COURT:  I don't know who said "great idea," but,

18  Mr. Marcus, because these are open proceedings, I have to

19  include everyone.  I just can't meet with only certain groups

20  of people, okay?  So --

21          MR. FEINGOLD:  Joel Feingold.  Briefly --

22          THE COURT:  -- Mr. Marcus --

23          MR. FEINGOLD:  -- if I may --

24          THE COURT:  Mr. Marcus --

25          MR. MARCUS:  Yes.

1    THE COURT:  -- if what you're saying is that maybe we

2    should have -- if you think we should have more frequent

3    status calls, I will take that into consideration.  Okay?

4    MR. MARCUS:  Well, that would be a good thing.  And

5    also if I --

6    THE COURT:  Mr. Marcus, hold on for a second.

7    So, I'm going to move on now.  Then we can come

8    around at the end of the hearing, okay?

9    MR. MARCUS:  Okay.

10   MR. FEINGOLD:  May I hop in just a tail end for 30

11   seconds, your Honor?  Joel Feingold.

12   THE COURT:  Not at the moment, please.  Just hold

13   onto that thought, and we'll deal with it at the end.  Okay?

14   Because I have a litany of things I want to go through today

15   before I can open up and get some -- see if other people have

16   other input.  Okay?  Hold onto that thought.

17   So, for the benefit of the investors who are on the

18   line, basically, what I am instituting is -- when you have a

19   particular property, say Property A, there are various people

20   that have claims, who have invested or loaned money to

21   Equitybuild with regard to that particular property.

22   Now, as far as how much -- so, a property will have,

23   say, ten claimants.  Just picking a number out of the air.

24   The question, then, is what is the priority of those

25   claimants?  Because there may not be sufficient funds from

1   Property A to divvy up amongst all the claimants to make all

2   of the claimants whole.  And that is a dispute that -- and,

3   so, we have a hundred-plus properties.

4           And, so, the way I am going to resolve those disputes

5   -- which we call by shorthand priority disputes -- is that we

6   are grouping properties together and then trying to resolve

7   those priority disputes with regard to groups of properties in

8   a group of properties.  And what we call that group of

9   properties, for lack of a better word, is a tranche.  Okay?

10          So, a tranche is -- the first tranche would be a

11  group of properties that would be subject to a resolution

12  process that I will put down in clear orders so everyone

13  understands what's going on.  And the claimants could ask each

14  other questions by sending interrogatories and document

15  requests, which we'll get to today, with regard to those

16  properties; and, then, they will submit to me their -- a

17  written -- in written form their position as to why they think

18  their claim should have high priority with regard to any

19  proceeds related to that property.

20          Now, Mr. Marcus is right that you have documents

21  related to your own investments or loans, and you have -- you

22  may have -- information with regard to other people that

23  invested monies or otherwise loaned monies to those particular

24  properties.

25          There is also a whole nother universe of collection

1  of documents, that we have called the Equitybuild documents,

2  that are documents that the SEC collected as part of its

3  investigation that belonged to Equitybuild.  These are

4  internal e-mails or e-mails from Equitybuild personnel with

5  other investors and other people in the outside world as well,

6  as well as internal documents.

7       So, the question was how are we going to provide

8  access to those documents?  Because most of those documents

9  are in electronic form.  And to try to -- to find a solution

10  to that, the mortgagee investors and receiver have tried

11  mightily to find a vendor that could process those electronic

12  documents, put them in searchable form, so that claimants who

13  want to search those Equitybuild documents for any documents

14  that would be relevant to their particular claim could do so

15  at -- after paying a reasonable charge.

16       The cost to set up this database with this particular

17  vendor that's recommended by the mortgagee claimants,

18  CloudNine, is what we've been talking about.  That is, to keep

19  that database open for 12 months would be about $184,000.  For

20  six months, it would be approximately $92,000.

21       Those overall costs would be borne, the mortgagees

22  propose, 75 percent by the mortgagee claimants, 25 percent by

23  the receiver.  If the receiver believes otherwise -- now, for

24  each of the individual claimants, you would -- if you wanted

25  to get access to it -- perhaps you don't, but if you wanted to

1   get access to those documents and search the database for any

2   relevant documents to your claims -- you would pay a one-time

3   $300 fee, as well as a $400 monthly fee for access.

4          And, as Mr. Gilman said, if you were working with

5   other investors, you can pool your resources together to,

6   basically, as Mr. Gilman said, share a username and password

7   to search that database during the time the database is open

8   based upon your subscription.

9          So, that's kind of the overall framework of what's

10  going on, to address Mr. Marcus' question about kind of what

11  we're all talking about here.

12         So, with regard to the CloudNine proposal, here are

13  my thoughts.  I will give the receiver a short amount of

14  time -- 14 days -- to talk to CloudNine, if you want, and to

15  kind of vet the proposal.  But the way I see it, I think that

16  Mr. Gilman's proposal of a six-month period where claimants

17  and the receiver can search the database is a reasonable idea.

18  I think so long as the receiver provides a list of properties

19  and identify the claimants and the amounts claimed for each

20  property before the database is open to the claimants should

21  provide any claimants who want to search the database enough

22  of an idea of what to search for.

23         I understand Mr. Rachlis's concern that, well,

24  perhaps after the six months is over and the database is no

25  longer maintained, perhaps a particular claimant's property

1    may not come up for 12 months from now, say.  And, so, the

2    database would no longer be available.  The claimant has

3    already done his or her search, but now realizes that there

4    may be other documents that the claimant might want.

5            And to that, I would say that to keep the database

6    available for the duration of the claims resolution process

7    would be cost prohibitive.

8            And, again, I am trying to balance the need for the

9    documents and the availability of everyone to access the

10   documents with the overall cost that such access would force

11   upon the parties and the claimants that want to pay for such

12   access.

13           So, as a general matter, I believe that the proposal

14   of six months is perfectly reasonable and appropriate.  With

15   regard to cost allocation, I do understand Mr. Gilman's point

16   that the receiver is -- the receiver has requested that, and I

17   have agreed, the receiver can make a recommendation to the

18   Court with regard to claims priorities for each of the

19   properties at issue.  I think that that would mean that the

20   receiver's reliance upon the database would be greater than

21   pretty much any of the claimants -- individual claimants --

22   that are involved here in this case.

23           And, so, I do think the receiver -- it's reasonable

24   for the receiver to pay more than the pro rata division, to

25   the extent that that's how the mortgagee claimants decide to

1    divide up the cost of constructing and maintaining the

2    database.  But the number that I think is reasonable, rather

3    than a quarter or 25 percent, is 20 percent.

4            Furthermore, if the estimate is $92,000 for the six

5    months, I'm going to -- so that there's -- what I'm going to

6    do is I'm going to cap the receiver's expense at 20 percent of

7    92,000 for the six months.  So, if there are any additives, if

8    there are any, quote-unquote, hidden costs the receiver is

9    concerned about, the receiver knows exactly the greatest

10   amount that the receiver would have to pay as part of this

11   database project.

12           So, those are my thoughts with regard to the

13   e-discovery vendor.  Overall, I really commend Mr. Gilman and

14   Mr. Damashek and their colleagues for coming up with the

15   proposal.  I think it's a decent plan, at least from what I

16   see.  And if the receiver has any additional concerns after

17   they have an opportunity to vet the proposal with CloudNine,

18   the receiver can submit something to the Court with the

19   receiver's concern.

20           MR. RACHLIS:  Very good, your Honor.

21           THE COURT:  Now, Mr. Gilman, anything else on that

22   matter?

23           MR. GILMAN:  I think you've covered it, your Honor.

24           The only thing I could suggest is perhaps we should

25   have a conference call with counsel for the mortgagees and

1    counsel for the receiver with CloudNine.  So, that way we are

2    kind of all on the same, you know, base, same -- we all know

3    what's being represented and stated.

4              THE COURT:  However you want to do it, that's fine.

5              MR. GILMAN:  Okay.  Very good.

6              THE COURT:  Now, turning now, then, to the standard

7    discovery requests.

8              So, in the status report, the receiver and the

9    mortgagee claimants submitted their proposed standard

10   discovery requests.

11             Now, Mr. Marcus, for your sake and for the sake of

12   the other investors who are listening, these are requests for

13   information and requests for documents that any and all of the

14   claimants have to respond to for the properties for which they

15   have submitted claims.

16             And, so, this standard discovery process makes it

17   easier.  Rather than each investor -- who perhaps, as you say,

18   Mr. Marcus, you may not have any legal experience in this

19   area; you might not know what to ask or what to seek from any

20   of the other claimants -- it provides kind of a standardized

21   form that will go out to all the different -- all the

22   claimants for all the properties.  Okay?

23             So, I am looking at Exhibit 3 of Document 807, which

24   is the redline version of the discovery requests.  All right?

25   And I'm just basically going to go through the document line

 1  by line.

 2          Mr. Rachlis, are you ready?

 3          MR. RACHLIS:  Yes.

 4          THE COURT:  Mr. Gilman, are you ready?

 5          MS. WINE:  Your Honor, this is Jodi Wine.  If I could

 6  just interject for one moment.  This is Jodi Wine.

 7          Rather than going line by line through Exhibit 3, I

 8  did speak with Mr. Gilman today; and we're in agreement that

 9  the preamble and the instructions have a lot of redlining that

10  we can work out.  It's really not substantive differences.

11          And the issues that are identified in the motion,

12  which relate to the definitions, the only part of the

13  instructions specifically identified is where the discovery

14  materials will be sent.  We can focus on those two issues for

15  all of the definitions and instructions.

16          THE COURT:  Okay.  Then, Ms. Wine, can I ask you

17  something?  Why didn't you and Mr. Damashek and Mr. Gilman

18  have the discussion before submitting Exhibit 3 to the Court?

19          MS. WINE:  Your Honor, we had a lot of discussions.

20  We worked out a lot of details.

21          THE COURT:  You understand how this could be rather

22  frustrating to me, given the fact that what I want the parties

23  to present to me are their disputes and I want the parties to

24  make sure that they have talked it over with one another and

25  come to agreement as much as they can before you submit your

1    disputes to me.

2           MS. WINE:  Your Honor, we did try very hard to

3    outline in the motion what the specific disputes are.  And if

4    we can just focus on the ones that are addressed in the

5    motion, then I think we'll all be on the same page.

6           THE COURT:  Okay.

7           So, what was the purpose, then, of Exhibit 3?

8           MR. RACHLIS:  Exhibit 3 --

9           MS. WINE:  The purpose was --

10          MR. RACHLIS:  Go ahead, Jodi.

11          MS. WINE:  You know, we gave you Exhibits 1 and 2

12   which were the competing versions, and just thought it might

13   be helpful to the Court to see a comparison.

14          THE COURT:  And, so, you and Mr. Gilman now have

15   decided at this point that you can work out a lot of your

16   differences with regard to the redlining on Exhibit 3?

17          MR. RACHLIS:  Judge --

18          MS. WINE:  Correct, other than the points that are

19   specifically raised in the motion.

20          MR. GILMAN:  Your Honor, if I may, this is Michael

21   Gilman.

22          There is -- we spoke about this this afternoon that,

23   for example, there was -- whether you use the word

24   "interrogatory" or "question."  And that's more, obviously,

25   form over substance.  Those are things that aren't really at

 1   issue.

 2          The ones -- the issues are what's set forth in the

 3   motion itself.

 4          THE COURT:  No, I understand that.  I was just going

 5   to resolve everything.

 6          All right.  So, that's fine.

 7          In the future, to the extent that you have disputes

 8   that you all can resolve amongst yourselves, it would be much

 9   appreciated if you did so before presenting them to me for

10   resolution if you have not exhausted your abilities to come to

11   an agreement on those disputes.

12          MS. WINE:  Your Honor, this is Jodi Wine.  If you

13   have gone through and are prepared to address them on a

14   line-by-line basis, I think that's fine.  We're just trying to

15   save you from the burden of doing so.

16          THE COURT:  I will hold onto my line-by-line comments

17   and see what you all come up with.

18          So, central repository.  That was one of my

19   questions, with regard to the central repository:  To whom the

20   various discovery requests and responses need be sent.

21          Mr. Gilman?

22          MR. GILMAN:  Yes, your Honor.  It's our position that

23   the discovery -- for each tranche of discovery responses

24   should be sent to the mortgagee investor -- mortgagee that's

25   involved from that perspective.  They can also be sent to the

1   receiver, and the receiver can distribute them however he

2   wants to.  But we believe that we should be a direct recipient

3   of the responses to discovery.

4           THE COURT:  And what about this drop box system?

5           MR. GILMAN:  I don't know that's really even

6   necessary.  I think that it's just easier to send it to an

7   e-mail address for the mortgagee -- or counsel for the

8   mortgagee.

9           THE COURT:  Okay.

10          MR. GILMAN:  Things might get too complicated using a

11  drop box.

12          THE COURT:  Ms. Wine?

13          MS. WINE:  Your Honor, we're just concerned that the

14  more complicated we make the instructions, the more it will

15  get confusion amongst the claimants.  If there's one e-mail

16  address to send it to -- sometimes there will be too big a

17  volume to send an e-mail and we'll have to send out a link so

18  the documents can be uploaded to like an FTP transfer site.

19  And I don't think claimants will necessarily know who they

20  should ask that of.

21          Sometimes claimants need to mail their documents.

22  And having to make two copies and mail them to two different

23  places just makes everything more complicated.  We thought if

24  there was one place to e-mail, one place to mail, all the

25  documents could end up in the same database, and that way they

 1   could go to the claimants that had claims against the

 2   properties.

 3           THE COURT:  Mr. Gilman, what are your concerns about

 4   that?

 5           MR. GILMAN:  Well, first of all, as in any other

 6   discovery, the litigant should have a right to direct

 7   responses, as opposed to having them go through the receiver.

 8   And the receiver -- I'm not, you know -- there's going to be a

 9   delay with the receiver reviewing them.  I'm not sure what the

10   review process will entail.  I just believe that it's a better

11   resolution to have direct contact between the litigants, if

12   you will, as opposed to going through the receiver.

13           THE COURT:  What about the concern about documents

14   being too voluminous for e-mailing?

15           MR. GILMAN:  If a response contains documents that

16   are too voluminous, the e-mail can so indicate and we can

17   arrangements for them to be received some other means, either

18   through a drop box or some other means.  But that would be

19   only in the instance where the volume of the responses is too

20   great for the e-mail server.

21           THE COURT:  So, for example, if there are ten

22   claimants, say, to a property, you want the claimant to send

23   out the responses to all nine other claimants?

24           MR. GILMAN:  From my per- -- from our perspective, we

25   believe that the claimant should send his responses to us, as

1  well as the receiver.  And, then, if the receiver wants to

2  take on the task or the burden of distributing it to all the

3  other claimants, that's fine.  But from our position, we're

4  just more concerned that we have a direct response from the

5  claimants.

6          THE COURT:  I take it that when you respond, you're

7  going to send -- you would send a copy to all of the other

8  different claimants.

9          MR. GILMAN:  Yes, we would.

10          THE COURT:  Okay.

11          And, so, Ms. Wine, how would this work, then?  Each

12  claimant would send documents to an e-mail the receiver sets

13  up?

14          MS. WINE:  Yes, your Honor.  We already have a e-mail

15  dedicated to this Equitybuild receiver group for claims, and

16  they could send them to that e-mail.  That way all of the

17  claimants would get them at the same time, rather than the

18  institutional lenders getting them first and the investor

19  lenders getting them next.

20          The receiver's not going to do any review of these

21  documents before distributing them.  We could get them to the

22  vendor, who is then going to send out links so that claimants

23  can download the documents; and, then, they could all have

24  access at the same time.

25          THE COURT:  Okay.

1          With regard to that, I think that the receiver's

2    proposal makes sense.  I think to the extent we can make it as

3    easy as possible and as least -- as understandable as

4    possible, I think it would be better for the entire process so

5    there's no mistake about who got what when.

6          And, so, I agree with the receiver's proposal that

7    responses to interrogatories and document requests should be

8    sent to a centralized location; the e-mail set up by the

9    receiver; and, then, the receiver then will expeditiously send

10   -- forward that to all of the claimants that are involved in

11   that particular tranche.

12         Next was with regard to the dates of relevant

13   documents, right?

14         MR. RACHLIS:  Your Honor --

15         MS. WINE:  Your Honor -- sorry.

16         This is Jodi Wine.

17         We did still have a dispute about the definitions.

18         THE COURT:  Okay.  So, talk to me about it.

19         MS. WINE:  I believe -- yeah, I believe the dates of

20   the document is an issue related to the institutional lenders'

21   discovery.  The standard discovery requests to the

22   institutional lenders.  The definitions revolve -- concern the

23   standard discovery requests to the investor lenders.

24   (Brief pause.)

25         MS. WINE:  I'll go on.

1          The dispute involves the institutional lenders' draft

2     has some very convoluted and complicated definitions.  I think

3     that it's very well-explained if you look at Definition No. 7,

4     which is the definition of interest.  The interest -- the word

5     interest means any claim --

6          THE COURT:  Ms. Wine, you know what?  Ms. Wine, let's

7     do this.  Let's start with Exhibit 3, okay?

8          MS. WINE:  Okay.

9          THE COURT:  We'll just go through it and I will

10    just -- I address all of these issues in my review.

11          So, Exhibit 3, first page, starts, "To:  Equitybuild

12    Claimant."

13          Third full paragraph, starting "All investors in this

14    tranche," okay?

15          I think Mr. Marcus's concern regarding the word

16    "tranche" is a good one.  So, I think the word "tranche"

17    should be changed to something akin to "group of properties"

18    or "the group of properties in dispute."  I like "group of

19    properties."  And that change should be made globally.

20          Next paragraph, starting with "The discovery requests

21    include."  I don't like "interrogatories."  I think "to answer

22    questions" is enough.  And, so, I'm going to strike that

23    phrase "which are called interrogatories."

24          Next paragraph, starting "You are required."  "A

25    written answer to all the questions asked," I think is fine.

1  So, it should read, "You are required to provide a copy of all

2  the requested documents and a written answer to all of the

3  questions asked."

4        The next paragraph that was stricken, we're going to

5  keep it.

6        Page 2, top of the page:  "You also have the ability

7  to ask written questions."  So, that will be a global change.

8  Rather than "interrogatories," I'm going to keep "written

9  questions."

10       Next paragraph:  "The Court, however, has ordered

11 that in addition to these questions and document requests, a

12 claimant may not ask more than --" a number of questions "--

13 and may not request more than _____ number of categories of

14 documents."

15       Going to instructions.  "By date, you must --"

16 whatever the date is "-- you must e-mail your answers to the

17 questions and any additional documents you have not already

18 submitted to the receiver at equitybuildreceiver@rdaplaw.net."

19       Next paragraph, starting "We understand."  "We

20 understand that you have already submitted a proof of claim

21 form and supporting documentation.  There is no need for you

22 to furnish again --" so, all of those changes in that

23 paragraph are fine.

24       The only thing I would change is that in the fifth

25 line of that paragraph says, "your proof of claim.  Therefore

1     you --" instead of "will need to," I think it should be "must"

2     "-- you must review the proof of claim you submitted to

3     determine whether you furnished all the documents that you are

4     requested to produce in the discovery requests.  If there are

5     documents or information that you did not furnish, you need to

6     do so now."

7          So, those strikeouts in the last two lines of that

8     paragraph will be kept.

9          Going on:  "You need to produce them now.  If you

10    determine that you've previously furnished all of the

11    documents in your proof of claim, you may answer the request

12    that you have confirmed that you already submitted the

13    requested documents."  So, those changes are fine.

14         With regard to the third full paragraph on Page 3,

15    the strikeout is -- the first strikeout is -- fine.

16         The second sentence:  "You are required to answer all

17    of the questions that are contained in this document under

18    oath.  A verification form is located at the end of this

19    document."

20         Next paragraph.  It should read, "When you respond to

21    a particular question, please number each response to indicate

22    the question that you are answering."

23         I'll repeat that.  "When you respond to a particular

24    question, please number each response to indicate the question

25    that you are answering."

 1          Next paragraph:  "If you have confirmed that you
 2    already furnished all the information sought by a question, in
 3    your proof of claim submission, you can answer the question by
 4    stating --" and then I'm going to get rid of "that you have
 5    confirmed that" "-- by stating that you already submitted the
 6    requested information."

 7          Next paragraph.  I'm going to get rid of the last
 8    sentence that was added.  So, the paragraph will read:  "After
 9    you have sent your responses to these discovery requests, you
10    must supplement your responses or correct your responses if
11    you learn that your responses were incomplete or incorrect."

12          Definitions.  Second full paragraph:  "An Equitybuild
13    asset is any real or personal property in which Equitybuild or
14    an Equitybuild affiliate has or had an ownership interest,
15    such as the properties in this group of properties," and
16    getting rid of "tranche."  I'm going to get rid -- and I'm
17    going to kick out the last section that was added to that.

18          Next.  "Mortgage means a document recorded against a
19    property in this group of properties that secures repayment of
20    a loan or an investment."  That is fine.

21          Next.  "Mortgage loan means a loan or investment that
22    is secured by a mortgage on a property in this group of
23    properties."  That, too, is fine.

24          "Loan means a loan or investment that is not secured
25    by a mortgage."  That, too, is fine.

1          I don't think that those terms are too complicated

2     for an individual investor.  People on their own deal with

3     mortgages, mortgage loans all the time.

4          The next one, "You or your means."  That's fine.

5          The next paragraph, definition of interest.  Okay.

6     So, interest will be so defined.  This is what it will say:

7     "Interest means any claim you assert to or in an Equitybuild

8     asset in this tranche.  This interest could include, for

9     example, a cash -- a direct cash investment or an investment

10    in the form of a mortgage, mortgage loan or loan related to an

11    Equitybuild asset in this group of properties."

12         I think that that definition is also reasonably

13    understandable to a layperson.

14         Skipping down two more paragraphs, original

15    transaction.  "Original transaction means a transaction in

16    which you acquired a claim of ownership or other interest in

17    an Equitybuild asset --" I think it's "or affiliate," right?

18    Is it "asset of affiliate"?

19         Mr. Gilman, should that be an "or"?

20         MS. WINE:  Yes, your Honor.  This is Jodi Wine.

21         MR. GILMAN:  Yes, your Honor.

22         MS. WINE:  I believe it should an "or."

23         MR. GILMAN:  Yeah.

24         THE COURT:  Do we need the "affiliate" there?

25         MS. WINE:  Your Honor, I believe we need that because

1    some of the investors have membership interests in LLCs.

2              THE COURT:  Got it.  Okay.  Thank you.

3              Next, definition of a rollover transaction:  "A

4    rollover transaction means a situation where you had --" let's

5    see "-- where you had an interest in an Equitybuild asset or

6    affiliate that was changed or converted, in whole or in part,

7    to an ownership or other interest in another Equitybuild asset

8    or affiliate."  Just keep that consistent.

9              "A rollover transaction occurred, for example, if you

10   had an Interest --" capital I "-- in a Mortgage --" capital

11   M "-- on an Equitybuild asset and, instead of receiving a cash

12   distribution, you received an Interest --" capital I "-- in

13   another Equitybuild asset or affiliate."

14             Requests for documents.  I'm going to keep the first

15   introductory paragraph, "To the extent you have not already

16   provided."

17             "1.  All documents you received from Equitybuild

18   related to each original transaction and each rollover

19   transaction involving a property in this group of properties

20   in which you have or had an interest."

21             Going to the next page, Page 5.  2, I think the use

22   of -- I think the changes in 2 are fine.

23             3, I think the changes in 3 are fine.

24             4, the two "involvings" close to each other are a bit

25   confusing.  So, let's change that to read, "All documents

1  relating to any rollover transaction of your interest

2  involving any property in this group of properties to a

3  different Equitybuild asset, regardless of whether the

4  Equitybuild asset is included in this group of properties."

5  And I used "group of properties," but if the parties

6  want to come up with some other word that's better

7  understandable than tranche, I would be fine with that.

8  A change to "Note" is also fine.

9  "5. All documents regarding the payments you made or

10  other valuable consideration you gave for your interest with

11  Equitybuild."

12  6, the changes are fine.

13  7, purported refinancing or payoff.  I'm not sure

14  what that's designed to get at.

15  MR. GILMAN:  Your Honor, I believe that -- I mean,

16  the intent is that we don't know the nature of the

17  communications between Equitybuild and the investors and what

18  they were told or not told.  So, we're trying to be

19  all-inclusive by saying actual or any sort of purported refi's

20  they may have been told about that was or was not an actual

21  refinance.

22  THE COURT:  I guess the -- I think the "purported"

23  just confuses things.  And I think it raises an inference that

24  documents are not relevant to the particular claims process.

25  So, I'm going to get rid of "or purportedly" but keep the

1   other changes in 7.

2          The changes to 8 are fine.

3          The changes to 9 --

4          MR. GILMAN:  Judge --

5          THE COURT:  -- are fine.

6          MR. GILMAN:  I'm sorry to interrupt, your Honor, but

7   for No. 7, could we change "purported" to "proposed"?

8          THE COURT:  Proposed by whom?

9          MR. GILMAN:  By an Equitybuild --

10         THE COURT:  And why is the proposal of it relevant

11  to -- would that be relevant to -- the priority determination?

12         MR. GILMAN:  It goes to the notice that was given to

13  the investor lenders that it was going to be a refinance, that

14  they were aware there was going to be a refinance.

15         THE COURT:  Okay.  That's fine.  I proposed -- I

16  understand.  So, I can agree with "actual or proposed."

17         MR. GILMAN:  Thank you.

18         THE COURT:  As I said, 8 as added is fine.

19         9 as added is fine.

20         10 as added is fine.

21         11 as added is fine.

22         Mr. Gilman, I must confess I don't know what 12

23  means.

24         MR. GILMAN:  Well, the intent, your Honor, is that --

25  our position is that -- the inquiry is whether the investor

1    lenders had notice that Equitybuild was collecting payments on

2    loans.  And we -- and because all the other interrogatories

3    and document production requests focus only on properties in

4    this tranche or group of properties, if you will, we wanted to

5    expand it for this document production request to include

6    other properties, as well.  Because that would show the

7    knowledge or the ratification or the acquiescence of investor

8    lender in Equitybuild collecting payments.

9         If that's not clear -- if the language is not

10   clear -- we can, you know, obviously make it clearer.  But

11   that's the intent of the request.

12        THE COURT:  Ms. Wine, what is the receiver's view?

13        MS. WINE:  Your Honor, we also agree that the

14   language is not at all clear, and it's very hard to know what

15   that request is requesting.

16        THE COURT:  Mr. Gilman, it might be helpful to break

17   that up into two different requests.  Because I think you're

18   trying to get information about collections by Equitybuild

19   from investors and then payments to investors, right?

20        I guess I'm not -- yeah, I'm kind of at a loss as to

21   exactly what it is you're trying to get at.

22        So, anyway, so as drafted, I'm not going to include

23   it; but if there's something that you want to propose that you

24   want to discuss with the receiver, you can do so.

25        MR. GILMAN:  Okay.  Thank you.

1    THE COURT:  Turning to interrogatories, with regard

2    to Interrogatory 1, it should read, "Was the claimant name

3    identified in your proof of claim the actual entity that made

4    the investment in or mortgage loan or loan to --" I like "a

5    property in the" whatever the other term for "tranche" is

6    going to be.  "A property in this group."  I would strike "an

7    Equitybuild asset or affiliate" at that point.

8         "If not, please identify the name of the individual

9    entity that made the investment or provided the mortgage loan

10   or loan."

11        The change to 2 is fine.

12        The change to 3 is fine.

13        For 4, again, "For each property in this tranche --"

14   whatever term it's going to be" -- in which you claim an

15   Interest --" capital I "-- state the amount that you paid for

16   the Interest --" capital I "-- or had consideration given for

17   the Interest --" capital I "-- the date that you paid or gave

18   consideration for the Interest --" capital I "-- and to whom

19   you paid this money or the consideration."

20        "5.  For each property in this group in which you

21   claim any Interest --" capital I "-- state whether you or

22   anyone on your behalf, received any payments, distributions or

23   other form of return on your investment or Interest --"

24   capital I "-- and state the amounts, the date and from whom

25   you received the payment distribution or return on your

1    investment or Interest," capital I.

2        "No. 6.  For each property --" and then the rest of

3    the changes are fine.

4        Similarly with 7, "You had a property," and the rest

5    of the changes are fine.

6        Similarly for 8, "For each property," and the rest of

7    the changes are fine.

8        "9.  Do you claim an interest in a property in this

9    group based upon one or more mortgage loans or loans?"  I

10    think that interrogatory is fine.

11        Interrogatory 10 looks fine.

12        Changes to 11 are fine.

13        So, on 12, "Describe all efforts you or anyone acting

14    on your behalf made before making your investment for your

15    interest or in a mortgage loan or Equitybuild asset --"

16        I guess the wording of that is a bit confusing.

17        MR. GILMAN:  Your Honor, the intent is to, in

18    essence, determine the due diligence of an investor --

19        THE COURT:  Right.

20        MR. GILMAN:  -- before he or she made an investment.

21        THE COURT:  Can you just say, "Describe all efforts

22    you or anyone acting on your behalf made before making your

23    investment"?

24        MR. GILMAN:  Well, in particular, determine there was

25    a mortgage -- other mortgage on the property.  That directly

1    goes to the issue of priorities.

2         THE COURT:  Right.

3         So, "Describe all efforts you or anyone acting on

4    your behalf made before making your investment in the property

5    to determine if there were any other mortgages on the same

6    property in this group."

7         Would that be sufficient?

8         MR. GILMAN:  I believe so.

9         THE COURT:  Okay.

10        MR. GILMAN:  I'll put pen to paper, but I believe so.

11        MR. HANAUER:  Excuse me, your Honor, this is Ben

12   Hanauer for the SEC.  May I briefly address this one?

13        THE COURT:  Yes.

14        MR. HANAUER:  Thank you.

15        I'm just a little concerned because the very nature

16   of the investments was that the investors would be pooling

17   their investments on a single mortgage where each investor had

18   a fractional interest in that mortgage.  So, if we're going to

19   adopt this one, maybe just some sort of clarifying language to

20   mean another mortgage beyond the one that any investor was

21   sharing with the other investors.

22        THE COURT:  Okay.  I think that that's captured by --

23        MR. GILMAN:  If I may respond.  There won't --

24        THE COURT:  Hold on.

25        MR. GILMAN:  The fractional value won't be another

1    mortgage on the property when they're -- I mean, from an

2    Equitybuild -- the mortgage that counsel is talking about

3    won't exist at the time they were making their investment if

4    they were pooling all their resources to grant the loan to get

5    a mortgage.

6         UNIDENTIFIED SPEAKER:  This is correct --

7         THE COURT:  Hold on for a second.

8         I think that the interrogatory says "if there were

9    any other mortgages on the same property in this tranche."

10        So, Mr. Hanauer, I understand your concern, but I

11   think that's sufficiently addressed in the wording of the

12   interrogatory.

13        All right.

14        MR. FEINGOLD:  Quick --

15        THE COURT:  Interrogatory No. 13 --

16        MR. FEINGOLD:  A point of clarification on that same

17   topic is, are the institutional investors --

18        THE COURT:  Who is this?

19        MR. FEINGOLD:  -- asked this same question?

20        Joel Feingold.

21        THE COURT:  Hold on.  Who is speaking?

22        MR. FEINGOLD:  Joel Feingold.

23        Quick point of clarification.

24        THE COURT:  Yes.

25        MR. FEINGOLD:  Is the -- are the institutional

1    investors asked this same question on the due diligence that

2    they have done once they invest?

3              THE COURT:  Yes.  These are --

4              MR. FEINGOLD:  Or before.

5              THE COURT:  -- to all the claimants.

6              MR. FEINGOLD:  Thank you, sir.

7              THE COURT:  "13.  For each property in this tranche

8    --" or group "-- for which you assert an interest, state

9    whether you believe that your interest is secured or unsecured

10   and the facts and documents that support your claim."

11             Wouldn't the documents they provide, Mr. Gilman, be

12   sufficient to determine as a matter of law whether their

13   interest is secured or unsecured?

14             Why ask people who may not be lawyers, you know, to

15   answer this question?  Isn't that going to be something that I

16   can determine just from the documentary information?

17             MR. GILMAN:  I think the documents would obviously

18   be -- would be primary source and very important.  But the

19   question -- the interrogatory aims at understanding what

20   they're relying upon because there may be something out there

21   that we just don't know about that they're relying upon to try

22   to sustain a claim that it's a secured interest.  And because

23   this is discovery, we kind of -- we would like to know their

24   position with respect to why they claim their interest is

25   secured.

1           THE COURT:  What is the receiver's view about this?

2           MS. WINE:  Your Honor, this is Jodi Wine.

3           The proofs of claim forms ask each investor whether

4  their investment was secured or unsecured.  So, that's

5  information that's already been requested.

6           THE COURT:  Okay.

7           All right.  I'm going to take out 13.  I don't think

8  it adds much.  I just think that it particularly asks

9  individual claimants who may not be represented or have a

10  legal background a difficult question, that we can determine

11  from -- mainly from -- the documents themselves.

12           14 and 15 are fine, except "Equitybuild assets"

13  should be changed to "property."

14           Mr. Gilman, is 17 duplicative of the prior requests?

15           MS. WINE:  Your Honor, this is Jodi Wine.

16           We believe that it is.

17           And, then, also 14 and 15, can I address those

18  briefly?

19           THE COURT:  Yes.

20           MS. WINE:  These discovery requests will be answered

21  before the whole claims process is gone through.  And we're

22  concerned that the individual claimants don't have that

23  information, that they don't know what other claims against

24  the properties there are.  So, it seems premature to ask that

25  question as a contention interrogatory, that that information

1    is better provided in the position statements after the

2    discovery period.

3           MR. GILMAN:  If I may respond, your Honor?

4           THE COURT:  Yes.

5           MR. GILMAN:  I believe that by the time the investors

6    receive these interrogatories, document production requests,

7    they will have the framing report -- I believe that's what

8    it's called -- which will identify all of the claims that are

9    being made against the property.  At least they know who the

10   claimants are.  If they can't answer the interrogatory, then

11   that's how they answer the interrogatory, that they don't have

12   that information at this time.

13          But I think we -- the mortgagees have a right to at

14   least know what their position is with respect to their

15   interest relative to all the other claimants in the property.

16          THE COURT:  Okay.

17          On this issue, I agree with the mortgagees.  I think

18   that 14, 15 are appropriate interrogatories.  And to the

19   extent it needs to be supplemented or if discovery changes the

20   answer, then that can be laid out in their position papers.

21          MR. GILMAN:  And, then, your Honor, with respect to

22   your question on No. 17, the difference is that this

23   interrogatory focuses -- or includes properties that are not

24   in this tranche.  And this goes with the concept I discussed

25   earlier that -- whether the investors knew that Equitybuild

1  would be collecting payments on their loans and whether they

2  acquiesced in that process --

3          THE COURT:  Right.

4          MR. GILMAN:  -- and thereby authorized them to

5  collect payments on their loans.

6          THE COURT:  Right.  But I think that 17, if it isn't

7  duplicative, substantially overlaps with what you're trying to

8  get at in Question No. 12.

9          And, so, what I would suggest, Mr. Gilman, is why

10  don't you think -- why don't you come up with something for

11  the receiver and the SEC to look at that addresses those

12  particular issues.  I think as drafted, 17, like 12, is just

13  too convoluted and difficult to understand.

14          MR. GILMAN:  Okay.

15          THE COURT:  Okay?

16          MR. GILMAN:  Okay.

17          THE COURT:  All right.  So --

18          MR. HANAUER:  Excuse me, your Honor.  This is Ben

19  Hanauer.  Can I have a quick word on Nos. 14 and 15?

20          THE COURT:  Yes.

21          MR. HANAUER:  I understand where the Court's coming

22  from in allowing those interrogatories.  I would just ask,

23  looking a couple steps down in the process, that the investors

24  not be held to those responses in the same way a represented

25  party would be in normal litigation as binding admissions in

1    the sense that -- you know, I originally told the lenders I

2    think investors may have a hard time articulating answers to

3    some of these questions, especially if they don't know the

4    full details of why the institutional lenders are claiming

5    interest in the property.  I just don't want investors -- that

6    held against them if they're not able to articulate at the

7    contention interrogatory stage why a lender's mortgage, they

8    believe, is invalid.

9           THE COURT:  I understand, Mr. Hanauer.  And I agree

10   with that.  I mean, I think it's all going to come down to the

11   final position papers.

12          MR. HANAUER:  Thank you, your Honor.

13          THE COURT:  All right.

14          Ms. Wine, I think there are a couple of other kind of

15   more global issues that need to be addressed, right, with

16   regard to privilege and the relevant timing or scope of the

17   document requests and interrogatories that are at issue?

18          MR. RACHLIS:  Your Honor, this is Michael Rachlis.

19          You're correct.  And those dealt with Exhibit 4,

20   which is the standard discovery to the institutional lenders

21   that I was going to be prepared to address the Court's

22   questions or inquiries.

23          THE COURT:  Okay.

24          MR. RACHLIS:  So, there are two -- you're right,

25   there are two issues, your Honor.  As to that standard set of

 1   discovery, one issue involves time period.  And the -- because

 2   the crux of the dispute involves whether or not an August

 3   15th, 2018, date, which is the date that the receiver -- I'm

 4   sorry, that the SEC had filed its action against the

 5   defendants, that's the key date that the institutional lenders

 6   are suggesting the demarkation point such that no documents

 7   after that date that were exchanged between the -- for

 8   example -- well, that's a demarkation date, period.  That's a

 9   time period.  The suggestion being that there's no relevant

10   documents that would somehow be non-privileged that would

11   have -- that exist post August of -- 15th of 2018.  And it's

12   -- so, we -- there's disagreement that that somehow creates a

13   date that there would be no documents that would be available

14   that would need to be reviewed.

15          I understand there's a little subset to that point;

16   namely, that -- issues about, you know, logging communications

17   between attorneys and things of that nature, given the fact

18   that the action was instituted that point of time.  But this

19   -- that can be more easily addressed.  We tried to address

20   that by suggesting that there should be a focus perhaps on

21   communications between non-attorneys that occurred, that

22   should be really -- that we show -- we don't believe would be

23   -- should be subject to such a wooden time frame.

24          And that's particularly true here, where there would

25   be -- you know, the title companies, for example.  They are

1   business actors.  They act in the ordinary course of business.

2   It certainly would be expected that there would be

3   communications between non-attorneys that may be there that

4   are not privileged.  Indeed even communication between

5   attorneys may fall into that category.  Proofs of claims

6   certainly can well be non-privileged communications.  Denials

7   of coverage, I don't know that that necessarily is a

8   privileged communication.

9          So, we are working with that time period

10  understanding that there is a desire not to log every piece

11  of -- you know, every piece of correspondence that occurred

12  subsequent, you know, to the August 15th date.

13         Like I said, we tried to at least -- we certainly

14  understand that and wanted to, you know, at least carve out a

15  balance.  And we think that looking, at a minimum, at the

16  communications between -- that would involve non-attorneys

17  would be one appropriate way of considering that, given that

18  August 15th date is now, you know, more than two years out.

19         And the second issue deals with claims of privilege

20  associated with coverage-related documentation from a third

21  party, which is the title carrier, to their insureds looking

22  for -- dealing with issues of coverage here.  We think that

23  this is a complicated question, but one that I think is

24  certainly important because those communications will likely

25  involve or may involve communications that deal with the

1   diligence issues, dealing with questions about what was known

2   about various other mortgagees at the time that the sales and

3   purchases were -- or, I'm sorry, the mortgagees were being --

4   mortgages were being put in place.

5            So, broadly stated, those are the two questions that

6   are kind of global that impact the standard discovery to the

7   institutional lenders.

8            MR. GILMAN:  Your Honor, if I may respond?  Michael

9   Gilman.

10           THE COURT:  Yes, go ahead, please.

11           MR. GILMAN:  Okay, yes.

12           So, Request No. 5 focuses on communications with the

13  title company.  And the date that we believe should be the bar

14  date is the date that the action was filed because that's the

15  date when -- the earliest date, I suppose, when -- there would

16  be a -- arguably -- a claim that would be -- could be --

17  submitted to the title company under the title policy.  If

18  it's just the submission of a claim, you know -- a claim

19  letter -- then I don't see what the relevance is.  All the

20  mortgagee is submitting to the title company is there's this

21  dispute, this pending action that challenges our interest in

22  the property; and you, title insurer, should take over --

23  defend and indemnify if there's a loss.

24           So, there wouldn't be any relevance in those

25  documents.

1          Any substantive communications after the claim was

2    submitted would all be with respect to the process of the

3    insured, in essence, delegating to the title company the

4    defense of the claim.  That's what happens with -- where the

5    title company takes over a defense.  And those would be

6    privileged communications -- well, starting off with the

7    attorney-client privilege -- because the purpose of the title

8    company providing a defense is to, in essence, retain counsel

9    to defend the insured.  And that's part of the process.

10         So, the communications would be to facilitate that

11   process.  Even though the title person may not be an attorney,

12   the whole purpose of the communication and expectations are

13   that that -- those communica- -- those conversations,

14   communications, whatever, would be transmitted to counsel.

15         So, I believe that's protected by the attorney-client

16   privilege, which also dovetails into the insurer/insured

17   privilege, which is kind of an extension of the

18   attorney-client privilege.

19         And, then, along with that would be the joint

20   interest purpose because both the title company -- defense,

21   I'm sorry, privilege.  Because both the title company and the

22   insured have a common interest in defending against the claims

23   to title.

24         So, we believe that all those communications, once

25   the action was filed, would fall under one of those privileges

1  and, therefore, shouldn't be discoverable.  So, that's why we

2  want to have a cutoff, if you will, for the documents that are

3  subject to production.

4          MR. RACHLIS:  May I respond, briefly, your Honor?

5      (Brief pause.)

6          MR. RACHLIS:  Hello?

7          THE COURT:  Hello.  I'm sorry, Mr. Rachlis.  I was --

8  I realized that I wasn't connected.

9          So, what I was going to say is -- what I was saying

10  is that I recognize the sensitivity of this issue, and,

11  Mr. Rachlis, I also understand your point or at least

12  appreciate your point that the scope of this privilege that

13  Mr. Gilman articulated is not exactly the clearest privilege

14  as described under Illinois law.

15          I think that actually, with regard to this issue, it

16  would be helpful for me to have some additional briefing.

17  And, so, what I would propose is that the way to tee it up is

18  for the mortgagee claimants to file a motion for protective

19  order, and I'll give you 14 days to file it.  I don't think it

20  needs to be any more than ten pages.  I'll give the receiver

21  14 days thereafter for a response, again limited to ten pages.

22  And, then, I'll rule on it at the next status hearing, which

23  I'm going to set for mid-December.

24          MR. RACHLIS:  That's fine, your Honor.

25          THE COURT:  Mr. Rachlis, are there any other open

1    issues with regard to discovery?

2         MR. RACHLIS:  I don't believe so, but I want to look

3    through my notes very quickly here.  And I'll also ask

4    Ms. Rosen Wine if there are anything that she sees on either

5    the institutional lender side or the investor lender side.

6       (Brief pause.)

7         THE COURT:  Ms. Rosen Wine, anything?

8         MS. WINE:  Your Honor, the only thing that I'm (audio

9    transmission interrupted) is how the six-month period that the

10   Equitybuild documents will be available will dovetail with

11   these discovery requests.  We've been talking about doing them

12   by group.  And if they're not going to all happen at the same

13   time, it seems that some of them will be happening after the

14   Equitybuild documents are no longer available.

15        THE COURT:  Right.  And, so, I think that's fine.  I

16   think so long as people -- the claimants -- know the identity

17   of the other claimants and the amounts that the other

18   claimants are claiming with regard to the properties in which

19   they invested, I think that's sufficient guidance for

20   claimants to search the Equitybuild document database to the

21   extent they want to.

22        And the way I envision it is all claimants will be

23   sent a notice as to how that will proceed, when the dates --

24   six-month period in which the database will be available,

25   right?  And they will provide access for it.

1          Mr. Gilman, I assume that after a search, the

2     particular user can download or print out the documents that

3     they want, right?

4          MR. GILMAN:  That's my understanding, yes, your

5     Honor.

6          THE COURT:  Yes, okay.

7          MS. WINE:  Your Honor, one other point of

8     clarification.  Because you've mentioned that the claimants

9     will be notified of the amount that other investors claim

10    against the property.

11         THE COURT:  Yes.

12         MS. WINE:  I just want to be clear that the

13    information we have is the total amount that each investor is

14    claiming and then the amount that they claim they invested in

15    each property.  That may or may not be the same as the amount

16    they're claiming they're owed on that property.

17         THE COURT:  Okay.  Thank you for that clarification.

18         MR. RACHLIS:  Your Honor --

19         THE COURT:  Mr. Gilman, is there anything else with

20    discovery?

21         MR. GILMAN:  No, your Honor.  I think we've covered

22    everything.

23         THE COURT:  Mr. Rachlis, anything else?

24         MR. RACHLIS:  No.  I was going to say I think we've

25    covered the open items.

```
 1              THE COURT:  Mr. Hanauer?
 2              MR. HANAUER:  No, thank you, your Honor.
 3              THE COURT:  Okay.
 4              Why don't we take a five-minute break before we deal
 5    with a couple of other issues before we complete.  Okay?
 6              MR. RACHLIS:  Okay.
 7              THE COURT:  So, it is approximately 3:45, 3:47.
 8    We'll take a five-minute break, and we will start again in
 9    five minutes.
10              Thank you.
11         (Brief recess.)
12              THE COURT:  This is Judge Lee.  I am back.
13              Is there anything else today that I can address?
14              I know there are a couple of other pending motions
15    that have recently been fully briefed.
16              Is there anything else that I can address for the
17    receiver today?
18              MR. DeSANTIS:  Yeah, I would like to address to him
19    why --
20              THE COURT:  Hold on.  Hold on, please.  I'm
21    addressing first the receiver.
22              Mr. Rachlis, Ms. Rosen Wine, anything else?
23              MR. RACHLIS:  In terms of -- I mean, your Honor --
24    no.  I mean, your Honor knows there are a few motions that are
25    still pending.  So, there's nothing today that I'm aware of
```

1    that needs to be addressed.

2         THE COURT:  Okay.

3         What about Mr. Gilman?  Mr. Gilman, did you have

4    anything further on behalf of the mortgagee claimants?

5         MR. DAMASHEK:  Judge, Ron Damashek.  Just a couple of

6    quick things.

7         On our open issue list, I think you addressed several

8    of them through recent court rulings.  I know we still have

9    out there sort of the bigger issue on the disputed claims

10   process and the details associated with that.  But one of the

11   things that came to mind as you went through the discovery

12   process and the discussion about the list of persons who have

13   claims against various properties, et cetera, was the issue of

14   proofs of claim and the timing of dissemination of the proofs

15   of claim.  Just the concept being that we're looking now

16   towards this Equitybuild electronic discovery process going

17   forward more than likely in the first six months of the

18   proceeding.

19        And I think that the original concept, if I'm not

20   mistaken, by the receiver was to make proofs of claim

21   available for the first group in the tranche.  And I think

22   conceptually it makes sense to have the proofs of claim

23   available on Day One to all parties so that to the extent

24   we're going to be doing the electronic discovery, we would

25   also have the proofs of claim available to everybody so that

1    they could review them.

2         And, again, there's no real reason not to have that

3    information available so that we can get a head start on the

4    process; and, then, if and when we get to the second tranche,

5    we don't have to start up all over again.

6         So, I don't know if the Court has addressed that or

7    would like to address that at this time or save that for a

8    future date.

9         THE COURT:  Well, I mean, if your concern is that you

10   won't have the proof of claims and not enough information for

11   each of the claimants within the six-month period of your

12   review of Equitybuild documents.  I mean, that's something

13   that Mr. Gilman and you and the other counsel must have

14   thought of when you proposed a six-month period.  We're simply

15   not going to have all -- get through all of the disputed

16   properties within six months.

17        MR. DAMASHEK:  Oh, no.  I'm sorry.  I may have said

18   something that led you to believe otherwise.

19        I'm not asking the Court to adjudicate all the claims

20   in the first six months.  My only point was that the proofs of

21   claim for all claimants, just like the electronic discovery

22   from Equitybuild documents, would be available on Day One so

23   that when we're doing our electronic discovery, for instance,

24   we will also have the proof of claim available so that we

25   don't necessarily need to duplicate efforts.  Because a lot of

1   the information will be in the proofs of claim, and then we

2   can guide our electronic discovery based upon that.

3          But I'm certainly not suggesting that we're

4   adjudicating all the claims in six months or trying to change

5   the tranche part process that the Court has approved.  It's

6   more just availability of proofs of claim.

7          THE COURT:  Mr. Rachlis, how --

8          MS. WINE:  Your Honor --

9          THE COURT:  I'm sorry.  Ms. Rosen Wine, you're

10  addressing this issue, then.

11          I guess the question is whether or not the receiver

12  would be able to provide proofs of claims at the onset of the

13  period when the Equitybuild database would be made available.

14          MS. WINE:  So, our February 28th motion to approve

15  the claim process did have a proposal for a vendor to provide

16  these materials to the different claimants.  It's not

17  something that can happen all at once.  So, it's going to be a

18  rolling process.  If we are going to do it, you know, before

19  the Equitybuild documents, then we would need that vendor

20  approved shortly so that that process could be put in motion

21  and, you know, may be able to be concluded within the couple

22  months before this database would launch.

23          THE COURT:  Okay.

24          So, what you're saying is that given enough notice,

25  you would be able to -- the receiver would be available to

1    provide people with that group of claim information before the

2    Equitybuild database is opened up?

3            MS. WINE:  I think so.  It would take a period of

4    time, but I think it's going to take a period of time to get

5    this in place.

6            MR. RACHLIS:  I think, your Honor -- this is Michael

7    Rachlis.

8            One of the issues that I'm a little uncertain about

9    is I know that there are limitations on the number of links --

10   -- tranche limitations.  That was part of the --

11           THE COURT:  Right.

12           MR. RACHLIS:  -- good pricing that was associated

13   with Avalon dealt with a number of -- limited number of --

14   links over a period of time.  And, so, that is the concern

15   that we would have.

16           That's why the reference to rolling would have to

17   incorporate sort of that type of understanding that there

18   would not be the ability to just punch one button and have

19   2,000 claims, you know, distributed per -- you know, per -- I

20   don't want to use the word "tranche" -- per group of

21   properties, if you will.  That will not -- that's not what

22   Avalon can do.

23           But if there is -- there would have to be quite a bit

24   of time built in to allow the number of -- you know, to allow

25   that rolling of the links in order for us to be -- comply with

1   the, you know, link minimum -- you know, the link maximums and

2   the cost structure. So, those are the kind of logistical

3   limitations.

4         THE COURT: In fact, I think that that's one of the

5   things -- one of the reasons why we decided to go with this

6   kind of tranche structure was so that -- the thinking was that

7   as a group of properties were up for adjudication, the links

8   would be provided to everyone at or around that time.

9         MR. RACHLIS: That is correct, your Honor.

10        THE COURT: Right.

11        So, Mr. Damashek, again, I think it's not going to be

12   a perfect process, but it seems to me that to the extent that

13   the receiver can provide the name of the claimant and the

14   amounts that they're claiming with regard to each property,

15   that's what you're going to have when you start searching the

16   database.

17        MR. DAMASHEK: Judge, is there a way that we can

18   address this further, either now or by a brief submission on

19   this issue? Because, respectfully, I recognize the tranche

20   system for analyzing claims, but you're also saying -- let's

21   say the first tranche is going to take six to nine months.

22   Then I don't even -- and I'm not in the first tranche. I

23   don't even get to see the proofs of claim related to my

24   property for six to nine months.

25        So, that's the issue I'm addressing. I'm not

1  creating a burden on anybody else to go through a litigation

2  process.  All I'm saying is I have a property or the person in

3  the seventh tranche or tenth tranche, they have a property,

4  and they want to get that document, get an understanding of

5  what the claims are out there and not have to wait down the

6  road.

7          So, if I may have leave to at least submit something

8  to the Court --

9          UNIDENTIFIED SPEAKER:  Sorry, are you there?

10          THE COURT:  Mr. Damashek --

11          MR. DAMASHEK:  I'm sorry --

12          THE COURT:  -- there is just so much paper in this

13  case and I think, in some respects, kind of needless paper.

14          What I would suggest you do is why don't you visit

15  this issue with the receiver and see exactly kind of how much

16  time the receiver thinks it will take to provide the -- given

17  the technical limitations -- provide the proof of claims

18  documents that have been submitted to the receiver; and, if

19  there's an issue, we can address it at that time.  Okay?

20          MR. DAMASHEK:  Fair enough, Judge.  I appreciate that

21  approach.

22          THE COURT:  All right.  So --

23          MR. DAMASHEK:  I only had one -- Judge, Ron Damashek

24  again.  I only had one other issue I wanted to just get a

25  clarification on.

1      I know that the Court's rulings that were issued

2 either yesterday or today dealing with a couple of the

3 receiver's motions and the receiver's lien issue have been

4 made.  I've read those.  I just wanted to touch base in terms

5 of whether the receiver's lien issue with respect to the

6 electronic discovery is still an open issue.  I know that we

7 filed our pleading on the electronic discovery.  The receiver

8 filed a response in which it mentioned the issue of potential

9 need for a lien on that issue.

10      So, I wanted to see if that remained an open issue;

11 and, if so, how the Court would want to address that.

12      THE COURT:  I guess, in my mind, it's all part and

13 parcel of the same process.  That is, to the extent that the

14 receiver has to expend monies as part of the Equitybuild

15 document database, it would be part of the receiver's lien.

16      MR. DAMASHEK:  Okay.  I understand your ruling in

17 that regard.

18      THE COURT:  So, at this point in time, are there any

19 individual investors that would like to take a position with

20 regard to the claim resolution process?

21      MR. MARCUS:  Yes, your Honor.

22      MR. FEINGOLD:  Yes.

23      MR. MARCUS:  Dave Marcus --

24      MR. FEINGOLD:  Yes, your Honor.

25      MR. MARCUS:  -- here.

```
 1              You talk, Joel.  You can talk first.  I'll talk after
 2    you.
 3              MR. FEINGOLD:  Okay.
 4              Yeah --
 5              THE COURT:  First of all, can you --
 6              MR. FEINGOLD:  Sorry, doing three --
 7              THE COURT:  -- state your name, please.
 8              MR. FEINGOLD:  Joel Feingold.
 9              THE COURT:  Okay.  Go ahead.
10              MR. FEINGOLD:  Couple of quick things.  My first
11    call.  Sorry, doing three things.  But catching my breath
12    here.
13              It does seem that an awful lot of attention, time and
14    energy is given to the institutional investors, who do have
15    the attorneys, when, in fact, the private, the first investors
16    were the ones that were defrauded.  They were the ones why the
17    SEC filed originally; and, in my mind, they should be the ones
18    that are given priority since, as best we can tell, their
19    names were forged.  We were never, most of us -- as far as I
20    know, none of us -- were -- ever gave up first lien position.
21    I currently have three first-position liens that I never
22    signed or gave away that first position.
23              And, so, therefore, the institutional investors, who
24    came in after us, I get it; you know, in some degree they were
25    defrauded, too.  But they should have done a title search.
```

1    They should have exhausted that title search.

2           And, therefore, I would just like to see -- from what

3    I see, we are not getting the same representation.  And I just

4    heard somebody like early in the conversation -- and I'll

5    finish up briefly -- early in this phone call, it was asked,

6    well, how many investors are there?  And there are like 20.

7    Well, like, it was all about the 20 institutional.  What about

8    the 900 private investors?  You know, they weren't even

9    mentioned at that first.

10          And, number two, I also heard that, well, yeah, it's

11   going to be another year or two before we get through all the

12   tranches or the groups of properties.  I mean, this has been

13   two years already.  The money is being chewed up.  God bless

14   the receiver.  I get it.  Everybody involved.  But there has

15   to be a way to streamline this.

16          Thank you for the opportunity to speak, your Honor.

17          THE COURT:  Thank you.

18          MR. MARCUS:  Your Honor --

19          MR. A. SCHANKMAN:  I'd like to speak.

20          UNIDENTIFIED SPEAKER:  Hello?  Hello?

21          MR. A. SCHANKMAN:  Yeah, Alan Schankman.  I'm an

22   investor.

23          And the receivers have received more than $2 million

24   already.  The investors, the small guys who have their private

25   money basically wiped out -- some of us are senior citizens,

1    can never earn that back again -- we're not being represented.

2    We're not being discussed here.  You know, all they're doing

3    is a lot of legal talk between lawyers who are running up huge

4    fees and talking about how long this is going to be extended.

5         It took us a lot of work and effort to submit all

6    those documents, what was it, a year-and-a-half ago, almost

7    two years ago.  And now I -- (audio transmission interrupted)

8    -- this is over my head, of course, by design naturally.  Now

9    you're asking us to do this whole thing all over again.  And

10   in the end, unless you're a big institution or a very wealthy

11   person with a high-powered lawyer and you can spend hundreds

12   of thousands or a million dollars on fees -- (audio

13   transmission interrupted) -- out of this.  That's basically

14   the message I got from you people today.

15        And the thing is if the receiver is receiving all

16   this money, shouldn't some of the funds coming in from the

17   sale of the few buildings that they're selling, some of that

18   be distributed among the investors who actually lost the

19   money?  The bulk of the money in Equitybuild is from the

20   investors.  It's not from So-and-So's Bank or So-and-So's--

21   you know, whatever it is.

22        The other thing I'm very unclear about, I -- (audio

23   transmission interrupted).

24        THE COURT REPORTER:  Excuse me, sir.  Sir, your audio

25   is breaking up.  Can you please start over.  Your audio keeps

1   breaking up.

2          MR. SCHANKMAN:  Well, you know, I'm on a cell phone.

3   Sorry about that, but --

4          What I'm saying is earlier, Mr. Marcus said that why

5   can't the Judge have a meeting with the investors since what

6   we hear today had nothing to do with the investors; it's all

7   about the institutions.  And his Honor said that, well, these

8   are open proceedings, legal, everybody involved has to have a

9   right.  But then, when the big lenders said they want to have

10  a private meeting with the receivers, that was granted.

11         Now, you have to remember the receivers are charging

12  a lot of money for every minute that they're on the telephone.

13  And that money is coming out of funds that would or should

14  be -- (audio transmission interrupted) -- de facto paying the

15  receivers to talk to the big lenders who essentially are

16  trying, I think, to cut us out of everything -- cut the rest

17  of us out.  I don't think we're being protected here.

18         And I think what's going to happen in three or four

19  years, whatever, when this is settled, they're going to tell

20  us that there's, you know, a tenth of a penny on the dollar

21  that we can refund to you; you know, resubmit your claims.

22  That's where I'm coming from.

23         You know, thank you for my time.  Thank you for

24  listening to my rant.  I don't know if it's going to do any

25  good or not, but that's my rant tonight.

1          MR. M. SCHANKMAN:  And, so, I would like to add one

2    thing just --

3          THE COURT:  Who is this?

4          MR. M. SCHANKMAN:  -- based off this conversation.

5          This is Michael Schankman.

6          Based on this conversation, we are not equity

7    investors; we're victims.  And I really want to make that

8    clear.  And I wonder and I ask everybody, as well, where is

9    the criminal case here?

10         And going back to the receiver, it's very clear that

11   the money is going to go straight into legal bills.  And the

12   independent private investors, which is all of us victims,

13   should be getting some money back at all.  Because it's just

14   like what Alan just said.  It seems like all the money is

15   going to be lost.  It just keeps on going and independent

16   victims are not being protected.

17         And we lost a lot.  It totally -- it really, really

18   harmed my personal life, my professional life.  It's not

19   funny.  We're not big businesses.  We're independent people

20   that were conned and were victims.

21         So, I want to make sure that's very clear.

22         THE COURT:  Thank you.

23         MR. MARCUS:  Your Honor, this is Dave Marcus.  I just

24   want to say one thing.  That several months after the SEC took

25   over on August 15th, 2018, I called the courthouse to find out

 1    what position my properties were.  And the clerk told me --

 2    and when I get a chance to go to Chicago, I will get the

 3    documentation.  The clerk told me I was in first position on

 4    all three of my properties.

 5         So, I don't know where the hell the mortgagee lenders

 6    came in.  They weren't in my properties.  So, I don't know

 7    what the hell is going on here.  Where did they all come

 8    about?

 9         Now, if they came about because of something that was

10    forged or because they defrauded the investors and they came

11    in because Shaun Cohen decided to forge the signatures and

12    then send the form to the lenders and tell them that we

13    relinquished our first position and that now he can get a

14    loan -- and, listen, we got hurt the first time because we may

15    not have done the due diligence done for ourselves.  So, we've

16    been punished.

17         Now I'm telling you that, your Honor, that the

18    mortgagee lenders, if they didn't do their diligence with

19    their heavy-duty lawyers that they have on monthly retainer,

20    if they didn't do it, they should not get rewarded and they

21    should not get -- and say they get a seat at the table and we

22    are outsiders.

23         So -- and what I'm also saying about that is if, your

24    Honor, if you don't want to have a separate session just for

25    the investors, I'll tell you what.  Let's do a session, the

 1    investors then.  They'll be our topics.  And you can let the
 2    other lenders sit and listen in as we're doing, as we did this
 3    past hour-and-a-half.  And I think -- past two hours actually.
 4    So, basically, I tell you this is an imbalance, unfair
 5    situation.
 6           And, then, the other thing which I've been getting
 7    responses for -- and, by the way, I will send you a certified
 8    letter in the next woke week or two to tell you some things
 9    that would take too much time right now.
10           The other thing, too, is I have had several investors
11    say to me, what about the criminal acts or something like
12    that?  Why are the Cohens scot-free?  How come no one is
13    bringing criminal charges against the Cohens?  How is that
14    possible nowadays?  You know, now I don't have an answer for
15    that.  And maybe, your Honor, you do.
16           But so far, the way it looks is they're going to go
17    scot-free.  I only want two things out of this, your Honor.
18    Judge Lee, I want to see if I can get some money, what little
19    money I can get out of this.  And the second thing is I'd like
20    a sense of justice.  There's no justice so far.  It's been a
21    travesty of justice.  The Cohens are living better than a lot
22    of the investors that they ripped off, you know.  And this is
23    a total shame.  You have the father in Israel living pretty
24    well, and you have the son who lives in my city on the west
25    side of Manhattan living very well, much better than I can

1   live.  And, so, I have to find out why they haven't been

2   charged in a crime -- a double crime.  First --

3           THE COURT:  Mr. Marcus, Mr. Marcus, that's not a

4   question that I can answer.  The criminal case -- I do not

5   have any jurisdiction over a criminal case.  A criminal case

6   hasn't been presented to me.  If you have questions about

7   that, those questions should be directed to the governmental

8   authorities.

9           Is there anyone else that wishes to make a statement?

10          MR. MARCUS:  Judge Lee, are you allowed to refer this

11  case to --

12          THE COURT:  Mr. Marcus, Mr. Marcus, so the purpose of

13  today's hearing, while I appreciate all of the input, is so

14  that we can -- so that I can craft a fair process where I can

15  adjudicate all of the different positions of all of the claims

16  and the liens.  Okay?  So, what we -- and all of that --

17          MR. MARCUS:  Okay.  Can I ask --

18          THE COURT:  Mr. Marcus, I'm not talking to you.  I'm

19  talking to everyone else, okay?  And I'm talking to you, too,

20  sir.

21          So, that's the purpose of today's hearing.  That's

22  what we've been doing for the several months, is trying to

23  figure out how to go about this process to make it as open and

24  as accessible as possible.  And there are some parties here,

25  there are even investors here who have counsel.  And there are

1    -- individual investors.  And there are mortgage investors

2    that also have counsel.  And I'm trying to come up with a

3    process where everyone can set forth their positions to the

4    Court and where I can adjudicate the relative positions of

5    everyone with regard to the properties at issue.

6              MR. FEINGOLD:  Great.  Quick follow-up.

7              MR. MARCUS:  Can I ask a question --

8              MR. FEINGOLD:  Dave, if I may, just a quick one.

9              On the point of reference with attorneys -- Joel

10   Feingold with one quick follow-up -- your Honor, do you

11   suggest and do you think it's beneficial for each investor,

12   the individual investors, to have an attorney?

13             THE COURT:  Mr. Feingold, I can't answer that

14   question for you.  You have to decide whether or not -- you

15   have to decide in your particular situation and the amount of

16   claim at issue here, whether you -- whether it would be

17   advantageous for you to obtain counsel or whether it would be

18   advantageous for you and other investors to pool your

19   resources together to obtain counsel to litigate or to assert

20   your own interests.  But that's not a question that I can

21   answer for you, sir.

22             MR. FEINGOLD:  But given the proceedings and how

23   they're unfolding, I maybe could surmise that the latter of

24   pooling interests and getting a position like the

25   institutional investors have with very high-powered attorneys,

1  they seem to be getting a lot more attention.  So, maybe we

2  would have that same at least playing field if we also had a

3  similar high-powered attorney to step in.

4         THE COURT:  I would say this.  It's certainly

5  something that you should consider.

6         MR. FEINGOLD:  Thank you.  Thank you, your Honor.

7         MR. MARCUS:  Your Honor, Dave Marcus again.

8         On the electronic thing that you're talking about,

9  would that mean that each investor would have to pay $300 each

10 month for six months?

11        THE COURT:  I think, Mr. Marcus, it was made clear

12 that or investors can pool their resources and share accounts.

13        MR. MARCUS:  Well, could we have like 900 of the

14 investors being charged a dollar each and then we have it for

15 everyone?  So, this way no one --

16        THE COURT:  Mr. Marcus, that's something that I would

17 leave to you and the other individual investors.  Okay?

18        MR. MARCUS:  Okay.

19        THE COURT:  All right.

20        At this point, I'm going to conclude these hearings.

21 I'm going to set another status date for December 17th at 2:00

22 p.m.  The next one I think I'm going to try to do by video

23 using Microsoft Teams.  And, so, I think the way I'm going to

24 do it is I'm going to have a docket order that will indicate

25 that.  We'll provide a call-in number.  But we'll say that for

1    those who want to participate via video, that they should

2    contact the receiver -- Mr. Rachlis and Ms. Rosen Wine, if you

3    can kind of oversee this -- that they should contact the

4    receiver at least 24 hours before the hearing.  And what we'll

5    do is my courtroom deputy will send the receiver with the

6    appropriate link -- Microsoft Teams link -- and any individual

7    investor who wishes to participate in the video conference can

8    contact the receiver to get that link.  Otherwise, they can

9    call in via the telephone conference information provided in

10   the docket.

11            All right.  Thank you very much.

12                      *      *      *      *      *

13

14   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
15

16
     /s/ Joseph Rickhoff                     November 24, 2020
17   Official Court Reporter

18

19

20

21

22

23

24

25