**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) | |
| Plaintiff, | ) ) | **Civil Action No. 18-cv-5587** |
| v. | ) ) | **Hon. John Z. Lee** |
| **EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN,** | ) ) ) ) | **Magistrate Judge Young B. Kim** |
| Defendants. | ) ) ) | |

**RECEIVER'S MOTION FOR APPROVAL TO PAY CERTAIN PREVIOUSLY APPROVED FEES AND COSTS AND FOR INTERIM PAYMENT OF CONTINUING CLAIMS PROCESS FEES AND COSTS PURSUANT TO RECEIVER'S LIEN**

Michael Rachlis
Jodi Rosen Wine
Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Phone (312) 733-3950; Fax (312) 733-3952
mrachlis@rdaplaw.net
jwine@rdaplaw.net

*Counsel for Receiver Kevin B. Duff*

The Court's Receiver, Kevin B. Duff, moves and respectfully requests the Court's approval to pay certain previously approved fees and expenses, as well as certain continuing fees and expenses incurred in connection with the Court's claims process, out of the proceeds of the sales of real estate properties in the Estate. In particular, the Receiver requests that the Court approve payment of previously approved receivership fees and expenses associated with (1) the preservation, management, and sale of the assets, and (2) the Receiver's efforts developing the process by which the priority of disputed claims will be determined. Additionally, going forward, the Receiver requests that the Court approve payment of certain fees and expenses incurred in connection with the claims process for each group (or tranche) of properties that are before the Court for claims review and determination, as described below. Allowing payment for such previously-approved fees and expenses, as well as for certain ongoing fees and expenses in connection with the claims process in this action, is essential for the Receiver and his retained professionals to continue providing services for the benefit of the claimants in the claims process.

I.     **Background**

Throughout this litigation, in approving the Receiver's fee petitions, the Court has consistently found that "the receiver's efforts have benefitted and will continue to benefit the Receivership Estate." (*E.g.,* Dkt. No. 824, at 3) Examples of the Receiver's work that benefitted the Estate and its claimant-creditors include:

Preservation and Management of the Real Estate Assets. The Court has repeatedly found "a significant need for the Receivership Assets to be managed by a neutral party until an orderly claims process is concluded." (*E.g., id.*) Since August 2018, the Receiver and his retained professionals have managed the 116 real estate assets of the Estate to maintain and preserve the properties for the benefit of the claimants and ensure safe and adequate housing for the tenants (including many in governmental housing programs). Those efforts have included, for example,

1

establishing control of the properties, working with the property managers, analyzing the physical state and financial condition of the assets, repairing and improving the properties to ensure their safety, responding to litigation and third-party claims, paying real estate taxes, limiting and approving expenses and otherwise managing the property's finances, obtaining, managing, and renewing insurance coverage, preparing and sharing financial reports with various lenders and others, communicating with City officials, mitigating criminal activity, improving security, abating dangerous conditions and nuisances, and addressing various issues with respect to tenants. The details of these extensive efforts are reflected in the Receiver's fee applications and in approximately 1,824 pages of invoices submitted by the Receiver (largely included in the billing categories of "Asset Disposition" and "Business Operations"), as well as the various status reports and other pleadings that have been submitted in this action.[1]

Disposition of the Estate's Real Estate Assets. To maximize the Estate's real estate assets for distribution to the claimants and eliminate the costs and risks from holding the properties pending determination of claimants' interests in those real estate assets, the Receiver has followed the liquidation plan filed with the Court on November 26, 2018 (Docket No. 166). Consistent with that plan, the Receiver has obtained and will continue to seek Court approval of both the process for the sale and the contract for the sale of each of the real estate assets of the Estate.[2]

The Receiver has worked efficiently to maximize funds from the sales of these real estate assets for eventual distribution to claimants.[3] The Receiver's efforts have included seeking and obtaining Court approval for the marketing and selling of the properties, working with real estate professionals, negotiating with purchasers, preparing and executing agreements and other sale

[1] See, e.g., Dkt. Nos. 411, 487, 569, 576, 608, 626, 755, 778, 885, 945.
[2] See, e.g., Dkt. Nos. 164, 346, 378, 352, 382, 545, 571, 616, 633, 635, 680, 681, 682, 683, 715, 717, 789, 802, 825, 825, 841, 842, 910.
[3] See, e.g., Dkt. Nos. 757 (at 2-10, 12, 17-22), 790, 791, 798; see also Dkt. Nos. 749, 790, 809.

documents, preparing closing documents, coordinating with property managers, buyers' counsel, title companies, tenants, municipalities, banks, and various others, communicating with lenders and other interested parties, and sundry related activities.[4]   To date, the Receiver has sold 67 properties, resulting in $50,604,827.05 aggregate net proceeds deposited in separate accounts.  The Receiver expects the remaining property sales to raise more than $15,000,000 in additional net sales proceeds. In approving fees for these activities, the Court has found them to be beneficial.

Implementation of the Claims Process.   Consistent with the goal of distributing the liquidated assets to claimants, and pursuant to the Court's instructions, the Receiver has worked diligently to implement a claims process that benefits all claimants by bringing all interested parties before the Court and providing them a full and fair opportunity to assert their claims.[5]  An orderly claims process is essential to identify the claimants, the amount and nature of their claims, and the issues that require resolution as a precursor to making distributions to the appropriate claimants.  This is particularly true in this action where the defendants' fraud created purposeful confusion and obfuscation with respect to the real estate assets, their valuation, and the secured or unsecured nature of many claimants' interests.  As the Court has recognized, an orderly claims process which will benefit all stakeholders is essential to this action.  (*E.g.,* Dkt. No. 824, at 3)

In that regard, the Receiver designed and implemented a Court-approved process to gather all claims.  (*See* Dkt. Nos. 241, 349)  The Receiver organized the claims information, retained and worked with vendors, and provided information to the Court and claimants.[6]  The Receiver also

---

[4] The details of these efforts are reflected in the Receiver's fee applications and submitted invoices (largely included in the "Asset Disposition" billing category), as well as the various status reports and other pleadings that have been submitted in this action.  *See, e.g.,* Dkt. Nos. 130, 228, 230, 325, 327, 329, 524, 579, 583, 603, 618, 645, 690, 712, 749, 809, 902; *see also, e.g.,* note 1 (including invoices submitted with fee applications with time for Asset Disposition billing category).

[5] *See, e.g.,* Dkt. Nos. 241, 302, 385, 520, 638 (at 24-25), 693, 698, 720, 745, 757, 798, 799, 805, 807, 839.

[6] *See, e.g.,* Dkt. No. 468, 477, 548, 567, 624, 698, 757, 839.

has worked with the Court, counsel for the institutional lender claimants, certain investor claimants' counsel, and the SEC to develop and propose a process for addressing claims against each of the properties.[7]  The Receiver developed a process for summary determination of claimants' interests in a cost-effective and orderly manner, incorporating fair notice, an opportunity for discovery, and an opportunity to be heard.  (Dkt. No. 638, 4-8)  To accomplish these tasks, the Receiver has also collaborated with counsel for the institutional lenders and for certain of the investors, and the SEC, in preparing and proposing a document repository, a protective order, a process for distribution of claim forms and supporting documentation, standard written discovery, and various joint submissions for the Court.[8]  Each of these efforts has been designed to primarily benefit the lienholders in the various properties.

In order to keep the Court and the claimants apprised of the progress of the receivership and the court proceedings, information relating to the claims and claims process, and related financial information for the properties, the Receiver has prepared and provided quarterly status reports, periodic claims status reports, and various financial reports.[9]  The Receiver has worked efficiently and effectively to communicate with the institutional lenders, investors, and other stakeholders, particularly with respect to the Estate's real estate assets, disposition of assets, claims, and the claims process.

Effect of Delays and Objections.  Absent a steady stream of institutional lender objections, the implementation of the Receiver's liquidation plan, submitted at the outset of this receivership, would have resulted in the sales of all properties in the Estate more than a year ago.  Those

---

[7] *See, e.g.,* Dkt. Nos. 799, 911, 928.

[8] The details of these efforts are reflected in the Receiver's fee applications and submitted invoices (largely included in the "Claims" billing category), as well as the various status reports and other pleadings that have been submitted in this action. *See, e.g.,* Dkt. Nos. 799, 805, 807, 917, 940, 941; *see also, e.g.,* note 1 *supra* (including invoices submitted with fee applications with time for Claims billing category).

[9] *See, e.g.,* Dkt. Nos. 107, 258, 348, 467, 468, 477, 548, 567, 624, 698, 749, 757, 839, 930.

repetitive objections and efforts to stop the Receiver's sale efforts has caused considerable delays and expense, with commensurate impacts on liquidity and other concerns. Indeed, the oppositional efforts have resulted in substantial increases to the fees and costs of the Receiver and his retained professionals and have prevented more cost-effective efforts to preserve and maintain the properties and implement a claims process. The Court has accurately noted that "the Receiver and his legal professionals have devoted significant resources responding to various motions, objections, and inquiries made by lenders, with these efforts increasing the amount of fees the Receiver is reasonably entitled to" and the efforts of the Receiver and his legal professionals "have been delayed in part by time spent responding to various motions and objections made by the lenders." (*E.g.,* Dkt. No. 710, at 4)

Burden on the Receiver and the Retained Professionals. To date, the Receiver and his retained professionals have devoted more than 15,000 hours toward this receivership. This action has commanded significant time and resources of the Receiver and the attorneys and staff of his law firm. In an effort to manage the Estate's liquidity, the Receiver determined not to pay most of the approved fees and expenses since the first quarter of 2019. This has posed a significant hardship for the Receiver and the professionals working with him, with all due respect to the significant hardship that the Cohens' scheme has placed on most of the claimants.

As the Court is aware, and the Receiver has consistently reported, this receivership has been challenged by a lack of liquidity since its inception. Early on, the Receiver identified certain estate assets that were expected to provide revenue to compensate the Receiver and his professionals. However, as this matter continued and evolved, it became apparent that certain properties previously believed to be unencumbered will need to be addressed during the claims process. As a result, the Receiver has limited the use of funds from the sale of those properties, as

the Receiver believes it is prudent to maintain some degree of liquidity in the Receivership until all of its liabilities have been ascertained and covered. Also, the Receiver's original projections were based on his ability to liquidate the properties of the Estate by the end of 2019 and complete a review of claims by mid to late 2020. Without belaboring the point, the litigiousness of this matter has prevented the realization of these reasonable expectations.

In order to ensure that the Receiver and his professionals can continue their work, the outstanding fees and expenses that have been approved but are unpaid must be addressed before the conclusion of the claims resolution process. The same is true for certain future fees and costs. Indeed, going forward, the claims process will require substantial additional effort for the benefit of the claimants, including distributing the claims forms and supporting documentation to claimants, working with vendors to establish the EquityBuild documents database and with counsel for claimants to cull the EquityBuild documents to those most likely to be relevant to the issues before the Court, facilitating implementation of the claims dispute resolution process, responding to claimant inquiries regarding the claims process, preparing framing reports for each group of properties, reviewing claimants' position papers and submitting the same to the Court (per the joint claims process outline), participating in claims-related discovery, making priority recommendations to the Court, participating in evidentiary hearings, and developing and proposing a distribution plan to the Court. All of the foregoing work is fundamental and necessary to an orderly claims process and will primarily benefit the lienholder claimants.[10] It is essential that the Receiver and the retained professionals be fairly compensated for this work as the claims process progresses rather than waiting until the end of the claims process for any compensation.

---

[10] Notably, as the remaining properties are sold, the fees and expenses relating to the preservation, management, and disposition of those assets will steadily diminish and then end by the middle of 2021. This is expected to coincide with ramping up efforts on the claims process.

## II.    Legal Standard

As the Court has previously noted, "[i]n securities law receiverships, … the awarding of fees rests in the district judge's discretion, which will not be disturbed unless he has abused it." (*E.g.,* Dkt. No. 824, at 2 (quoting *SEC. v. First Secs. Co.*, 528 F.2d 449, 451 (7th Cir 1976))). "[T]he court may consider all of the factors involved in a particular receivership in determining an appropriate fee." *Id.* (quoting *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994)). "A receiver appointed by a court who reasonably and diligently discharges his duties is entitled to be fairly compensated for services rendered and expenses incurred." *SEC v. Byers*, 590 F. Supp. 2d 637, 644 (S.D.N.Y. 2008)); *Drilling & Exploration Corp. v. Webster*, 69 F.2d 416, 418 (9th Cir. 1934) (same); *SEC v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) (same).

As has been clear from the outset of this action, there has been an essential need for a neutral party to control, preserve, and manage the real estate assets of the Receivership Estate. (Dkt. Nos. 1 & 3)  The Court has agreed, finding "a significant need for the Receivership Assets to be managed by a neutral party until an orderly claims process is concluded."  (*E.g.,* Dkt. No. 824, at 3)  Once the Court appointed the Receiver, the properties came under the Court's control.[11] The properties remain under the Court's control until the Court determines how to properly dispose of them.  Here, the Court has approved the sale of the properties in order to benefit the claimants who are entitled to their proceeds. The Receiver has served and will continue to serve at the Court's pleasure as a neutral fiduciary to oversee the properties and other assets of the Receivership Estate.

---

[11] *See, e.g., Atlantic Trust Co. v. Chapman*, 208 U.S. 360, 370 (1908) ("Immediately upon ... appointment ... of the receiver, the property passed into the custody of the law, and thenceforward its administration was wholly under the control of the court by its officer or creature, the receiver."); *Booth v. Clark*, 58 U.S. 322, 331 (1854) ("It is the court itself which has the care of the property in dispute."); *see also, e.g., In re Teknek, LLC*, 343 B.R. 850, 874-75 (Bankr. N.D. Ill. 2006) ("As an officer, agent, and fiduciary of the court, the Illinois equity receiver is appointed as a court agent to administer property for the benefit of all parties so that the property might be preserved for the party ultimately entitled thereto in the pending, primary civil proceeding.") (citations omitted).

The Court has broad discretion to determine the Receiver's duties and the manner in which the receivership costs will be paid. Here, the Court has already granted a receiver's lien on the properties of the Estate, finding that it is reasonable and appropriate. *See* Dkt. No. 824, at 5; *see also Gaskill*, 27 F.3d at 251 ("the district court has authority to impose a lien on the property in a receivership to satisfy the receivership expenses" and "in its discretion, determine who shall be charged with the costs of the receivership"). The Court also has the discretion to allow the receiver's lien "to take priority over secured creditors interests in the property when the receiver's acts have benefitted the property." *Id.* (citing with approval *Elliott*, 953 F.2d at 1576-77 (same)).

The law is clear that the Court has the discretion to compensate a receiver to preserve and liquidate assets while the Court determines who is entitled to their proceeds. *See Gaskill v. Gordon*, 27 F.3d at 251 ("As a general rule, the expenses and fees of a receivership are a charge upon the property administered.") (citing *Atlantic Trust Co. v. Chapman*, 208 U.S. 360, 375-76 (1908)); Clark on Receivers, § 673 (3d ed. 1959) ("The costs and expenses of a receivership are primarily those incurred by the court in performing its duty of preserving the assets of the defendant so that these assets or their proceeds if sold will be available to meet the valid demands of the litigants and other creditors of the defendant. The costs and expenses of preserving, administering and realizing the property or fund must primarily be paid out of the property or fund."). "The court *in equity* may award the receiver *fees from property securing a claim* if the receiver's acts have benefitted that property." *Elliott*, 953 F.2d at 1576 (citing *Bank of Commerce & Trust Co. v. Hood*, 65 F.2d 218, 283 (5th Cir. 1933); *S. Cnty. Sand & Gravel Co.,* 108 R.I. 239, 274 (1971); *In re Loop Hospital Partnership*, 50 B.R. 565, 571 (Bankr. N.D. Ill. 1985) (noting that the *court's equitable powers permit it to grant fees* to a bankruptcy trustee); Clark on Receivers, §

641 ("property which is benefited by the receivership should bear its share of the costs and expenses of the receivership including receiver's fees")).[12]

In determining such a benefit, courts may consider benefits that "take more subtle forms than a bare increase in monetary value." *Gaskill*, 27 F.3d at 251 (quoting *Elliott*, 953 F.2d at 1577). Accordingly, "[e]ven though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation." *Id.* (quoting *Elliott*, 953 F. 2d at 1577). And courts also look to the position of the SEC, which is given "great weight" in determining whether fees should be awarded. *First Secs. Co.*, 528 F.2d at 451 (citation omitted).

The Court also may allow payment of fees and expenses during the pendency of a receivership. "An award of interim fees is appropriate 'where both the magnitude and the protracted nature of a case impose economic hardships on professionals rendering services to the estate.'" *SEC v. Capital Cove Bancorp LLC*, NO. SACV 15-980, 2016 WL 6078324, at *2 (C.D. Cal. June 29, 2016) (citing *SEC v. Small Bus. Capital Corp.*, No. 5:12-CV-03237 EJD, 2013 WL 2146605, at *2 (N.D. Cal. May 15, 2013)). "In determining the reasonableness of the fees and costs requested, the court should consider the "economy of administration, the burden that the estate may safely be able to bear, the amount of time required, although not necessarily expended, and the overall value of the services to the estate." *Id.* (citing *In re Imperial '400' Nat'l, Inc.*, 432 F.2d 232, 237 (3d Cir. 1970)).

---

[12] Even the authorities routinely cited by the institutional lenders hold that it is appropriate the Court to compensate a receiver out of the proceeds of secured property if the receiver has benefited that property, including by preserving, managing, and selling it. *E.g.*, Dkt. No. 907, at 4-5; *see also, e.g., In re Orchid Island Hotels, Inc.*, 18 B.R. 926, 934 (Bankr. D. Haw. 1982) ("[W]here the costs of administration actually benefit the lien interest, these costs will be paid before the secured creditors' claims are satisfied. … This exception includes the sale of property in which proceeds are chargeable with costs reasonably incurred in the preservation of the property.") (citations omitted).

Efforts to preserve, maintain, and liquidate properties and assist the Court with the claims process are of particular import and benefit to the properties and the claimants when and where, like here, (a) there are competing allegedly secured claims that the Court must sort out prior to any distribution, turnover, or other remedy or result, (b) the defendants' fraud propagated and perpetuated confusion and uncertainty over those allegedly competing secured interests, and (c) the properties are subject to special circumstances because they house low-income tenants and are subject to continuing costs and risks. "The obligations and expenses which the court creates in its administration of the property are necessarily burdens on the property taken possession of, and this, irrespective of the question who may be the ultimate owner, or who may have the preferred lien, or who may invoke the receivership. The appointing court pledges its good faith that all duly authorized obligations incurred during the receivership shall be paid." Clark on Receivers, § 673.

**III.    Determination at this juncture of priority of the receiver's lien and allowing for the payment pursuant to such lien of previously approved administrative fees and costs is essential for an orderly process moving forward and continued administration of the receivership estate.**

While the fees and costs of the Receiver and the retained professionals have been consistently approved, the vast majority have not been paid.  The Court previously indicated it would determine the priority of the receiver's lien for payment of such fees and expenses against the properties in connection with the claims process.  Determination of this issue is essential at this time both for fees already approved (discussed in this section) and for certain fees that will be incurred during the claims resolution process (discussed in Section IV, *infra*).

The unpaid approved fees to date (through June 2020), for time within the billing categories accounted for in the allocation methodology approved by the Court, total $2,003,815.20.[13]  This

---

[13] The Receiver and his retained professionals have provided services at substantially discounted rates throughout the Receivership.  (*See, e.g.,* Dkt. No. 885, Ex. A)

amount includes fees allocated to the sold properties in specific billing categories relating to the preservation, management and disposition of assets (discussed in Section III A, *infra*), and to the implementation of a claims process and the communication and dissemination of information for the benefit of the claimants (discussed in Section III B, *infra*). (Dkt. Nos. 800, 824) As noted above, the Receiver is currently holding in excess of $50,000,000 in separate accounts corresponding to the sold properties. Accordingly, the Receiver requests Court approval to draw amounts to pay the previously approved amounts from the billing categories for Asset Disposition, Business Operations and Claims Administration out of the funds held in the separate accounts for the sold properties. As further noted below, the Receiver is preparing schedules that allocate previously-approved fees to specific properties in accordance with the approved allocation methodology and summarize the amount to be drawn from each of the accounts held for the specific properties. The Receiver will submit those schedules to the Court as soon as practicable, so as not to delay the Court's consideration of the relief requested.[14]

Allowing these amounts to be drawn now is fair, equitable, and consistent with applicable law, as the properties and claimants have already received the benefit of these efforts. Payment of the compensation requested from the available funds is consistent with the receivership compensation approved in *Elliott* and *Gaskill*, as such payment is being made directly from the collateral that ultimately will be distributed to the claimant who will have most benefitted from those efforts, namely the claimant who has successfully established first secured priority status through the claims resolution process. *See Elliott*, 953 F.2d at 1577 (even a prevailing secured who litigates with a receiver benefits from the receiver's efforts with respect to competing claims).

---

[14] Going forward, as additional fee applications are ruled upon by the Court, the Receiver intends to account for draws as part of his quarterly fee applications by submitting additional schedules prepared according to the approved allocation methodology. *See* Dkt. No. 824, at 5; Dkt. No. 755, at 22-24.

Payment now is also essential to enable the Receiver and his retained professionals to continue their work for the benefit of the claimants as this matter proceeds. *See SEC v. Capital Cove Bancorp LLC*, NO. SACV 15-980, 2016 WL 6078324, at *2 (C.D. Cal. June 29, 2016) ("An award of interim fees is appropriate 'where both the magnitude and the protracted nature of a case impose economic hardships on professionals rendering services to the estate.'"). Finally, the SEC has approved the Receiver's efforts at each step, has approved of the Receiver's fees and expenses without exception, and has indicated it supports the relief sought by this motion. (*See* Dkt. Nos. 526, 606, 705, 797, 803, 922)

**A. The Court should allow the Receiver to pay already approved fees and costs associated with preserving, managing, and selling the properties from the proceeds of the sales of those properties.**

The lien for previously approved fees and expenses should allow for immediate payment of the costs associated with the already determined benefits provided to each of the properties by preserving, managing, and selling them in a manner consistent with the Receiver's liquidation plan. The Court has already approved the fees and expenses, found them to be reasonable and beneficial, and approved the methodology for allocating them to properties. *See Elliott*, 953 F.2d at 1576 (and citations therein), referenced *supra* at p. 9; *see also, e.g.,* Dkt. No. 824, at 2, 5. The invoices already describe the fees in the Asset Disposition and Business Operations billing categories, where time corresponding to preserving, managing, and selling the properties was primarily recorded.[15] The Receiver also is preparing schedules for the amounts allocated to the

---

[15] The Receiver will update the allocation schedules to improve their accuracy, as needed. Should any reconciliation or restoration be due to any property as a result of any material errors or improvements in the allocation of fees and expenses, the Receiver expects to reflect such issues in the schedules. The Receiver encourages any claimant who identifies any error in the schedules to bring it to the Receiver's attention so that he may address it and determine whether changes are necessary.

properties, in accordance with the approved methodology. That work entails the analysis of nearly 1,700 pages of invoices and over 20,000 billing entries, and will be provided as soon as possible.

The Receiver's efforts to preserve, manage and sell properties in the Receivership Estate – which have concluded for the properties that have been sold – eliminated waste, destruction, and dissipation of these assets. The Receiver has segregated the sales proceeds in separate accounts until the Court determines who is entitled to the funds, which currently exceeds $50,000,000 in the aggregate and which the Receiver anticipates will ultimately exceed $65,000,000 in net sales proceeds.[16] The secured claimants whom the Court determines are entitled to these funds will be the primary beneficiaries of the Receiver's efforts, and will thereby have appropriately paid for such benefits through the use of these segregated funds. Conversely, the claimants who are not found to have priority will not be responsible for such payments.

**B. The Court should allow the Receiver to pay previously approved fees and costs associated with establishment and implementation of the claims process from the proceeds of the sales of those properties**.

The Receiver further requests that the Court approve the payment of previously approved fees related to the establishment and implementation of the claims process, out of the proceeds of sales across all properties. As noted above, the Court has already approved the fees and expenses, found them to be reasonable and beneficial, and approved the methodology for allocating them to properties. The invoices already submitted describe the fee and expenses under the Claims billing category, where time corresponding to establishing and implementing an orderly claims process was primarily recorded. Additionally, the Receiver is preparing schedules showing the amounts attributed to each property in accordance with the approved allocation methodology.

---

[16] The amount held for each sold property is reflected in schedules that the Receiver has submitted with his quarterly status reports. (*See, e.g.,* Dkt. No. 930, Ex. 2)

The Receiver's efforts to establish and implement a claims process have benefited and will primarily benefit the secured priority lienholders in the various properties, especially as it will allow them to identify allegedly competing claims and participate in a summary process to determine their interests in the properties. Again, only the prevailing claimants will be impacted by payment of the fees. Such fees have not only been previously approved, but are similarly part of the approved allocation methodology presented with the original receiver lien request.

## IV.   An orderly claims process requires payment of interim administrative fees and costs for certain claims work performed during the process.

Pursuant to the Court's directives, the Receiver's work to implement the claims process and assist the Court in the determination of which claimants are entitled to the funds realized from the sales of the properties is continuing. These efforts will include continued work on the administration of the claims process, distribution of claims forms and the establishment of the document library, creating framing reports, and performing the work necessary to review, address, and make recommendations to the Court with respect to all claims submitted by the claimants, including hundreds of competing secured interests in the assets of the Receivership Estate, and ultimately creating interim and final distribution plans. All of these efforts will involve a significant amount of time and effort, which will inure to the benefit of the claimants whom the Court determines are entitled to the sale proceeds.

Under these circumstances, it is appropriate that the Receiver and his professionals be fairly compensated for their reasonable fees and expenses associated with such work on an interim basis from the collateral held for the successful claimants, so as to ensure that they are able to continue to administer the ongoing claims process. To be clear, the Receiver will not seek recovery through the interim petitions for all activities. For example, the Receiver recognizes that claimants may challenge activities such as work performed to pursue fraudulent conveyance claims. Those

14

activities will *not* be included in the interim application for fees, but will be included in the final application, at which point the claimants will have the ability to submit an objection and basis for such opposition. Separately, as reflected in the attached proposed order (Exhibit 1), the Receiver outlines a process for approval of fees and expenses for work performed for each group of properties, including a holdback of twenty percent of its awarded interim fees (not expenses) into a separate account pending the Court's final approval of fees for the tranche.

Importantly, the Court has also approved the fees and expenses of other vendors brought in to facilitate the claims process, including Axos, Avalon, and CloudNine, for activities demanded by claimants and for the benefit of claimants in the claim resolution process. Those vendors can only be paid for their services if the Court allows interim payments out of the sales proceeds of liquidated assets. There is no reason to treat those vendors differently from the Receiver or the retained professionals who will provide services in connection with the claims process.

Consistent with these circumstances and the law discussed above, the Receiver proposes the process set forth in Exhibit 1 for summary determination and approval of fees and expenses for interim payment from the proceeds of the sales of the properties in the tranche before the Court (or pursuant to any letter of credit posted in lieu of payment at sale).

## V. Conclusion

For these reasons, the Receiver respectfully requests that the Court exercise its discretion to (i) approve payment of the previously approved fees and expenses out of the funds held in the separate accounts for the properties, or against any letter of credit issued for a property transferred to a credit bidding lender, consistent with the approved allocation methodology, and (ii) approve of the process for interim payments for work performed during the claims resolution process as set forth in Exhibit 1, and (iii) for such other relief as the Court deems equitable and just.

Dated:  February 23, 2021                     Kevin B. Duff, Receiver

                                    By:     /s/      Michael Rachlis

                                            Michael Rachlis
                                            Jodi Rosen Wine
                                            Rachlis Duff & Peel, LLC
                                            542 South Dearborn Street, Suite 900
                                            Chicago, IL 60605
                                            Phone (312) 733-3950; Fax (312) 733-3952
                                            mrachlis@rdaplaw.net
                                            jwine@rdaplaw.net

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 23, 2021, I electronically filed the foregoing **Notice** and

**Receiver's Motion for Approval to Pay Certain Previously Approved Fees and Costs and for**

**Interim Payment of Continuing Claims Process Fees and Costs Pursuant to Receiver's Lien**

with the Clerk of the United States District Court for the Northern District of Illinois, using the

CM/ECF system.  Copies of the foregoing pleadings were served upon counsel of record via the

CM/ECF system.

I further certify that I caused true and correct copy of the foregoing **Motion** to be served

upon the following individuals or entities by electronic mail:

- All known EquityBuild investors; and

- All known individuals or entities that submitted a proof of claim in this action (sent
   to the e-mail address each claimant provided on the claim form).

I further certify that the **Motion** will be posted to the Receivership webpage at:

http://rdaplaw.net/receivership-for-equitybuild

/s/ Michael Rachlis

Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Phone  (312) 733-3950
Fax     (312) 733-3952
mrachlis@rdaplaw.net

17

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 18-cv-5587 |
| v. | ) ) | Hon. John Z. Lee |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, | ) ) ) ) | Magistrate Judge Young B. Kim |
| Defendants. | ) ) ) | |

**[PROPOSED] ORDER RELATING TO INTERIM PAYMENT OF**
**RECEIVER'S CLAIMS PROCESS FEES AND EXPENSES**

WHEREAS, on February 23, 2021, the Receiver filed a Motion for Approval to Pay Certain Previously Approved Fees and Costs and for Interim Payment of Continuing Claims Process Fees and Costs Pursuant to Receiver's Lien (Dkt. No. _____);

NOW, THEREFORE, it is hereby ORDERED:

(1)     Within 21 days following the end of the second month following entry of the Court's order initiating the claims process for the tranche and within 21 days of the end of every other month (*i.e.,* each alternating month) thereafter, the Receiver shall file and serve by email upon each claimant in the tranche a summary fee application.

(2)     The Receiver shall allocate fees and expenses, to the extent reasonably possible, among the properties in the tranche using the allocation methodology previously approved by the Court (*see* Dkt. No. 824).

2

(3)     Each of the Receiver's summary fee applications for the tranche shall include a copy of the invoices for fees and expenses the Receiver and his retained professionals incurred in the administration of each tranche, together with a short summary of the nature of the work performed and specifying the amount of fees and expenses for which interim payment from the proceeds of sale held for the properties in the tranche is sought.

(4)     The summary fee applications shall specify the date by which objections are due and the Court's ruling date, consistent with these summary procedures.

(5)     Time permitting, the Receiver is encouraged to provide the SEC with a copy of the invoices in advance of filing the summary fee application and shall state in the summary fee application whether the SEC has reviewed the application and whether the SEC has objected to any of the fees and expenses set forth in the invoices.

(6)     Within 14 days following service of the Receiver's summary fee application, any claimant in the tranche and the SEC may submit to the Court any support for or objections to the Receiver's summary fee application.

(7)     As soon thereafter as it is able, the Court will issue an order authorizing the Receiver to pay any approved amount of the fees and expenses set forth in the summary fee application using the funds held for each property and according to the allocation set forth in the summary fee application.

(8)     Twenty percent (20%) of all fees (but not expenses) approved for payment according to the foregoing summary approval process shall be held back and segregated in a separate account held by the Receiver, pending the Receiver's submission of a final fee application in connection with each tranche and the Court's determination of whether such

held-back fees ought to be paid to the Receiver and his retained professionals or returned to the segregated property accounts for distribution according such other orders as the Court may enter with respect to the claims process or otherwise.

(9)     Within 42 days following the Court's rulings on lien priority between the claimants and any avoidance actions, or such other final order with respect to all claims in the tranche, the Receiver shall submit with his interim distribution plan a final fee application for the tranche, with respect to fees and expenses that have not already been paid to the Receiver or his retained professionals.  The final fee application for the tranche shall:

    a.    specify the amount the fees and expenses for which payment is sought, supported by invoices that follow the SEC's billing guidelines;

    b.    allocate the fees and expenses among the properties in the tranche in a manner consistent with the allocation methodology that the Court has previously approved;

    c.    describe in detail the costs and benefits associated with the claims process for the tranche and/or the properties in the tranche; and

    d.    describe the basis for paying such fees and expenses on a priority basis before other liens.

(10)     Within 14 days following service of the Receiver's final fee application for the tranche, any claimant in the tranche and the SEC may submit any support for or objections to the Receiver's final fee application to the Court.

(11)     Within 14 days following the date on which objections to the Receiver's final fee application are due, the Receiver and the SEC may file a reply to any objections.

(12)     There shall be no further response, reply, or other filing without leave of Court.

(13)     As soon thereafter as it is able, the Court will issue an order authorizing the Receiver to pay the approved amount of the fees and expenses set forth in the final fee application using the held back amount and the balance of the funds held for each property, if necessary, or from any letter of credit posted in lieu of payment at sale.  If the Court determines that any of the held back amount ought to be returned to the separate accounts for the properties, then it shall be returned consistent with the allocation methodology unless otherwise ordered by the Court.

(14)     Any amounts sought by the Receiver and the retained professionals in connection with the foregoing process that are not approved for payment in connection with the claims process shall be without prejudice to whether the Receiver may seek approval in connection with a subsequent quarterly fee application.

Entered:

_____
The Honorable John Z. Lee

Date:_____

.

.