# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 18-cv-5587 |
| v. | ) ) | Hon. John Z. Lee |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, | ) ) ) ) | Magistrate Judge Young B. Kim |
| Defendants. | ) ) | |

## RECEIVER'S REPLY IN SUPPORT OF MOTION FOR APPROVAL TO PAY CERTAIN PREVIOUSLY APPROVED FEES AND COSTS AND FOR INTERIM PAYMENT OF CONTINUING CLAIMS PROCESS FEES AND COSTS PURSUANT TO RECEIVER'S LIEN

Michael Rachlis
Jodi Rosen Wine
Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Phone (312) 733-3950; Fax (312) 733-3952
mrachlis@rdaplaw.net
jwine@rdaplaw.net

*Counsel for Receiver Kevin B. Duff*

The objections of the institutional lenders sidestep fundamental issues in this receivership and the Receiver's motion to approve payment. The Court ordered the Receiver to preserve, maintain, and liquidate the properties while the Court determines the rights and interests in the properties and their sale proceeds. The Receiver has done so purposefully, for the benefit of the claimants, and with the Court's approval. He has eliminated ongoing costs and risk by selling the properties and segregating the sales proceeds for eventual distribution. The Court also ordered the Receiver to submit a claims resolution process to sort through claims against the assets of the estate. Again, the Receiver has done so deliberately, for the benefit of the claimants, and with the Court's approval. There are over 2,000 claims, by more than 900 claimants, against more than 100 properties, owned by 35 separate receivership entities, and resulting from the Cohens' scheme to obfuscate claimant lenders' interests in the properties. The objectors submitted their claims subject to the exclusive jurisdiction of this Court. This Court has the discretion to determine how to manage the claims process, to order and fashion the manner in which the Receiver carries out his duties, and to approve compensation for the Receiver, including on a priority basis from the collateral that is subject to the objectors' secured claims.

## I.      The Objectors Misstate and Misapply the Legal Standard.

The objectors misstate and misapply the standard for determining when receivership costs may be paid before secured claims. They portray the issue as a matter of their discretion, *i.e.,* whether they acquiesced to the receivership. According to their argument, if they did not acquiesce to the receivership, then a receiver's lien cannot take priority over their lien. But *Gaskill v. Gordon* shows both by its language and analysis that whether to allow a receiver's lien to take priority over a mortgagee's lien is a matter for the Court's discretion, not the mortgagee's, and the issue turns on whether the Receiver's acts have provided a benefit. *See Gaskill v. Gordon*, 27 F.3d 248, 251,

1

253 (7th Cir. 1994) ("Courts in equity have allowed liens for receivership expenses to take priority over secured creditors interests in the property when the receiver's acts have benefited the property."); *SEC v. Elliott*, 953 F.2d 1560, 1576-77 (11th Cir. 1992); Clark on Receivers § 641. If the objectors' reading of *Gaskill* was accurate, then the Seventh Circuit would have simply reversed the district court's decision to allow the receiver's lien to displace the mortgagee's prior mortgage. But that is not what happened in *Gaskill*. The Seventh Circuit did not overrule the district court's determination on the priority of the receiver's lien – despite the fact that the mortgagee, Southmark, had objected to the receivership. *Gaskill*, 27 F.3d at 253; *see also* Dkt. 720, at 14-16. Instead, the Seventh Circuit focused on the benefit provided by the receiver.

Even the authorities cited by the objectors (the same ones they have routinely cited in prior motions and objections) hold that it is appropriate for a receiver to be paid from the proceeds of secured property if the receiver has provided a benefit. Beyond that, those cases remain distinguishable from this case. For example, the expenses at issue in those cases were "Medicaid liabilities" (*MW Capital Funding, Inc. v. Magnum Health and Rehab of Monroe LLC*, No. 16-14459, 2019 WL 3451221, at *6 (E.D. Mich. July 31, 2019)) and "capital gains taxes" (*U.S. v. FDIC*, 809 F. Supp. 50, 56 (D. R.I. 1995)), respectively, neither of which benefited the creditors. Here, by contrast, the Receiver's fees are for work to preserve, maintain, and sell the properties and implement a claims process so that the claimants may recover the assets for which they have a legitimate claim and priority. Unlike the liabilities at issue in *MW Capital* and *FDIC*, the Receiver's actions here have benefited the claimants, constituting efforts *not to reduce* the funds available to creditors *but rather to maximize* funds available for distribution to creditors. In short, the Receiver's costs here were incurred to benefit the claimants.

The law is clear that the Court has the discretion to appoint a receiver, and compensate a receiver to preserve, maintain, and liquidate assets while the Court determines who is entitled to the proceeds.  (*E.g.,* Receiver's Combined Response, Dkt. 800, at 3-4)  This is of particular import, and beneficial to the properties and the claimants, where the properties are subject to continuing costs and risks, like here.  (*Id.*)  None of the cases cited by the objectors is to the contrary; and none of the cases they cite involved a priority dispute between competing allegedly secured claimants that required a receiver to preserve, maintain, and liquidate assets while the court determined and implemented the process by which the disputes between the claimants would be resolved.[1]

The objectors also point to Section 506(c) of the Bankruptcy Code for support.  They acknowledge that a receiver may recover "the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim" from secured property, on a priority basis and before any secured claimant.  (Response, Dkt. 961, at 3)  And they argue that "ordinary administrative expenses that are attributable to the general operation and dissolution of an estate in bankruptcy" are not recoverable from secured property. (*Id.*)  But they misapply those concepts.  Here, the Receiver is seeking costs and expenses for

---

[1] *See also, e.g., Bank of Commerce & Trust Co. v. Hood*, 65 F.2d 281, 284 (5th Cir. 1933) (finding certain administrative expenses not chargeable against fund from sale of mortgaged property where there was "no uncertainty or complication or issue of any sort about [the mortgage foreclosure]," but finding receiver was entitled to be reimbursed from the mortgage fund for other fees); *S. Cnty. Sand & Gravel Co. v. Bituminous Pavers Co.*, 108 R.I. 239, 246 (1971) (finding "no doubt" that there may be circumstances in which receiver's fees should take priority over sole secured creditor's interest, and remanding for further hearing and completion of record); *In re Cascade Hydraulics & Utility Service, Inc.*, 815 F.2d 546, 548 (9th Cir. 1987) (distinguishable on the grounds that the debtor only suggested hypothetical benefits from operation of the business, as well as the fact that the District Court did not consider the reasonableness and necessity of the administrative expenses; the court also ruled it is appropriate to allow payment of administrative expenses from the proceeds of secured collateral *when incurred primarily for the benefit of the secured creditor or when the secured creditor caused the expense*) (emphasis added).

preserving, or disposing of, the properties because those efforts have benefited the claimants.[2] Thus, if anything, Section 506(c) supports approving the Receiver's request for such costs and expenses, as reflected in particular in the Asset Disposition and Business Operations billing categories, which include the billing entries that describe extensive work to preserve, manage, and liquidate the properties.

In addition, the objectors wrongly presuppose that the Court lacks discretion to give weight to the SEC's position on awarding fees in an SEC receivership. The applicable case law shows that the Court has discretion with respect to the awarding of fees, even where secured interests are involved. *See, e.g., Gaskill*, 27 F.3d at 251, 253; *Elliott*, 953 F.2d at 1576-77. Given that discretion, there is no question that federal courts can and do give the SEC's position great weight. (*See* Receiver's Motion, Dkt. 947, at 9) The objectors cite no authority to the contrary.

## II. The Receiver's efforts have benefited the properties and the claimants.

The objectors' assertion that the Receiver has not shown his efforts benefited the properties or them (Response, Dkt. 961, at 4) disregards the Receiver's discussion of those many and varied efforts and benefits, including without limitation the more than $50 million preserved in segregated bank accounts, the dozens of record cites further describing and supporting the beneficial nature of the Receiver's efforts, the 1,824 pages of invoices arranged by billing category describing in detail the work of the Receiver and his retained professionals, the many consistent statements of the SEC that it supports the Receiver's requests, and rulings by this Court that the Receiver's

---

[2] The Receiver's motion does not seek costs for general administration of the receivership. In fact, the motion expressly excludes from the relief sought fees in the billing categories of Case Administration, Accounting, Asset Analysis and Recovery, Corporate Finance, Employees, and Taxes. Even though a number of the tasks in those categories are properly covered by the receiver's lien, the Receiver proposes excluding them at this time to allow the Court to focus on tasks in three billing categories (Asset Disposition, Business Operations, and Claims Administration). The limitation to these three billing categories for purposes of approving this interim payment results in the exclusion for purposes of the present motion of over 5,600 task descriptions from previously approved invoices.

efforts have benefited the properties and the claimants. (Receiver's Motion, Dkt. 947, at 2-5 & nn.1-9)[3] Not only do the objectors eschew the extensive record, but they fail to offer anything in opposition. They also simply ignore that the Receiver's motion only seeks fees for work to maximize funds and make them available to creditors who have legitimate claims and priority.

The objectors repeat previous arguments about abandonment[4], foreclosure, and bankruptcy. (Response, Dkt. 961, at 5-6, 8-10) They complain that the Receiver has resisted those efforts, but they fail to acknowledge that in each instance the Receiver advocated for due process for all claimants and the Court rejected the objectors' arguments and made clear that a claims process should be implemented to ensure that all stakeholders receive due process.[5] In opposing

---

[3] For example, sales process motions and the invoices recite the marketing and sales efforts, extensive and comprehensive title and document history work, and substantial work to accomplish closings of the sales (*see, e.g., Dkt.* 618, 809, 967; *see also* Receiver's Motion, Dkt. 947, at 2 nn.2-4); quarterly status reports and the invoices describe efforts to manage more than 100 properties, address health and safety issues, oversee significant repairs and improvements, pay real estate taxes, and litigate dozens of state court actions involving the properties (*see, e.g.,* Dkt. 258 (at 17-18), 467 (at 2-7), 839 (at 8-9, 11-12); *see also* Motion, Dkt. 947, at 2 n.1); motions, joint status reports, invoices, and briefs show work done to propose, create, and implement a claims process that is unique to this action and caters to, among others, the objecting lenders' requests and interests (Dkt. 241, 280, 282, 285, 300, 302, 468, 477, 520, 548, 638, 693, 708, 718, 720, 724, 744, 751, 785, 798, 799, 806, 807, 812, 814, 817, 818, 822, 823, 828, 849, 866, 884, 911, 928, 938, 940, 941, 949, 953, and 972).

[4] In support of their abandonment argument, the objectors reference the property at 6250 S. Mozart Avenue as an example. (Dkt. 961, at 5) But they ignore that early on the Receiver pointed out that Freddie Mac's loan on 6250 S. Mozart and four other properties "appear secured by mortgages that sit behind prior investor-lenders mortgages that have never been released." (Dkt. 115, at 4 & n.3) Thus, rather than supporting the notion that the property should have been abandoned to the institutional lender, the disputes over that property underscore the need for the claims process the Court has approved, where such issues can be resolved.

[5] *See, e.g.,* Dkt. 527, Ex. 1, 4/23/19 Tr. at 7-14, 32-36, 49; Dkt. 344 (granting Receiver's motion over abandonment argument); *see also* 2/13/2019 Order, Dkt. 223, at 8-9 & n.3 ("the claims process should be implemented to ensure that investors and lenders receive due process") (citations omitted) (not appealed by the institutional lenders); *see also* Dkt. 960, at 4; Dkt. 790 (at 6-11); Dkt. 800, at 6-7; Dkt. 474, at 5; Dkt. 527, Ex. 1, 4/23/19 Tr. at 14:3-16 ("priority determinations must take place in the course of an 'orderly claims process'"); Dkt. 514, Ex. 1, at 10 ("This is not a foreclosure situation. … We are doing what we can to balance the interest of everyone involved."); Dkt. 540, at 5-6 (same); *see also* Dkt. 223, at 9 n.3 ("the court agrees with the Receiver that priority determinations should not be rendered until a claims process has been approved and implemented") (*see also, e.g.,* Dkt. 564, at 2-3 ("The receivership provides the best, most efficient opportunity to evaluate the claims of all of the stakeholders….."); 12/9/2019 Order, Dkt. 597 ("[T]he Court is not persuaded that modifying the receiver order to encourage or require transferring this

---

5

efforts to undermine, fracture, delay, or allow certain claimants to place their interests ahead of others' interests in the claims process, the Receiver has acted at the Court's direction to implement an orderly, cost effective, and fair claims process that protects the interests of all participants. And while facing these dilatory tactics, the Receiver has preserved the properties, converted them to cash, and eliminated substantial costs and risks[6] (*e.g.,* continued preservation, management, insurance, taxes, casualty, etc.).[7]

Relatedly, the objectors also argue that the Receiver fails to show a benefit from his efforts over state court foreclosure actions. But that argument presumes a greater efficiency of foreclosure actions without describing at all how that would occur. It ignores that foreclosure actions could potentially fracture this action into myriad other lawsuits. (*See, e.g.,* Opposition of 1839 Fund, Dkt. 563 (similar point in bankruptcy context)) It ignores that most investor lender claimants would be forced to litigate multiple separate foreclosure actions to protect their interests. It presumes an ease, simplicity, fairness, and efficiency that has no basis and has only been asserted in the most conclusory fashion. And it ignores the clear efficiencies and progress already made

---

case to bankruptcy would promote timeliness or efficiency, particularly given the current stage of the proceedings and the work the Receiver has already completed.").

[6] Selling the properties eliminated both the carrying costs of the properties and also the fees associated with continuing to preserve and manage them. *See also, e.g.,* Opposition of 1839 Fund, Dkt. 563 (noting that bankruptcy proceedings would favor the institutional lenders over investors lenders, lose the efficiencies of a receivership, and increase the likelihood of inconsistent results). Here, the Cohens' scheme involved over 100 properties owned by 35 different corporate entities (not including the scores of other entities they created that did not directly own the properties), and a labyrinth of complexities and confusion as to the secured nature and priority of lienholder interests. As this Court has noted, were this action put before the Bankruptcy Court and under the supervision of a bankruptcy trustee, it would eventually land before this Court again for review, which is further inconsistent with the steps this Court has taken to eliminate additional layers of review, substantial delay, and increased costs.

[7] The objectors also argue that the Receiver has preserved, managed, and sold properties where no priority disputes exist. (Response, Dkt. 961, at 6)) But that mischaracterizes the priority issues surrounding the properties, where they describe categories of properties through the lens of their own advocacy, ignoring instances where there are disputes, where title histories tell another story, and that the Receiver is devoting time and resources to working with the lenders for their benefit even with respect to the small number of single claim properties.

by the Receiver to bring all interested parties before the Court, sell the properties, provide a summary process, and be ready to resolve disputes. Finally, it ignores that the claims process will provide the same relief to those claimants who have priority and are entitled to a distribution, but in a more comprehensive proceeding using summary determination procedures.[8]

Furthermore, the Receiver's work on claims has benefited the claimants not merely by identifying and bringing all claimants before the Court, but also because his efforts were needed to design and implement a claims process that is unique to and designed around the needs of this action. (*E.g.,* Dkt. 638, 693, 917, 940, 941) Those efforts included, without limitation, the analysis of thousands of claims, extensive and detailed reporting on claims (*see, e.g.,* Dkt. 468, 477, 548, 624 (Ex. 5), 698 (Ex. 6), 757 (Ex. 8), 839 (Ex. 8), 911 (Ex. A)), designing the claims process (Dkt. 638, 720), crafting and collaborating with respect to standard written discovery. (Dkt. 799, 866, 884, 911, 917, 928, 953, and 972), working with Axos and Avalon to provide all claims and supporting documentation to all claimants (Dkt. 911, 928, 953, and 972), and working with CloudNine, Teamwerks, and lead claimants' counsel to prepare the EquityBuild documents database (*id.*).

The objectors simply duck from the fact that the Court and the Receiver have fashioned a claims process to address their claims and those of others, taking into consideration the objectors' input, requests, and interests in the process (*e.g.,* Dkt. 638, 720, 940, 941); and their counsel have closely participated in the design and implementation of the process (*e.g.,* Dkt. 799, 911, 928, 953,

---

[8] The objecting lenders misstate the law with respect to their security interests under state law and the ability of this Court to adjudicate interests in the property. For starters, there is no question this Court can determine the priority of claims and secured interests in the properties. *See, e.g., Elliott*, 953 F.2d at 1576-77. Secondly, the objectors' reference to language in *SEC v. Wells Fargo* that a district court lacks authority to extinguish state law security interests implies incorrectly and with no basis that a district court cannot determine the nature, legitimacy, and priority of competing secured claims in connection with and to ensure an orderly claims process and distribution of funds, matters which the Court here has reserved for the claims process. *See SEC v. Wells Fargo Bank, N.A.*, 848 F.3d 1339, 1344-45 (11th Cir. 2017).

972). Simply because the process is more balanced, neutral, and not tilted toward the interests of any particular claimants, does not mean that the process does not benefit the objectors. Moreover, the Court has rejected the objectors' argument that the Receiver should not be involved with priority issues in the claim process (*e.g.,* Dkt. 801), the SEC has opposed it (*e.g.,* Dkt. 718, at 10-13), and these lenders themselves have argued for a comprehensive approach to any claims and issues the Receiver may raise within the same process (*e.g.,* Dkt. 708, at 7-10). Additionally, these objectors previously opposed the far more streamlined and cost-effective process for addressing claims and distribution that the Receiver originally proposed (*e.g.,* Dkt. 477, at 9-13).

Even case law relied upon by the objectors indicates that the Receiver is obligated to advocate to the Court what he believes to be the best course of action to distribute the assets of the estate. (Dkt. 708, at 18 (citing *SEC v. Schooler*, 2015 WL 1510949, *3 (S.D. Cal. March 4, 2015))) In *Schooler*, the district court concluded that as an officer of the court a receiver *"has a duty to* protect, preserve, administer and *distribute appropriately the receivership assets and must advocate, to the court, courses of action that are consistent with those duties*." *Id.* (citing *Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006) (receiver's role is to assist the district court in achieving a final, equitable distribution of assets) (emphasis supplied). To remain unbiased between the claimants, a receiver "must not take positions or advocate for actions primarily for the benefit of one party *unless such positions or actions are consistent with the receiver's fiduciary duties*." *Id.* (emphasis supplied). (*See also* Response to Objections, Dkt. 800, at 10-12) In so acting, the Receiver has fulfilled his duties to the claimants and benefited them.

The objectors also ignore what is in plain sight: their litigiousness in this case, to which the Receiver had been forced to frequently respond, has exponentially increased costs and delay. The record speaks for itself in regards to the delays and inefficiencies created by the high volume of

objections, many of which were redundant and without necessity. This receivership could and would have been more streamlined and efficient, and the net funds available for distribution greater, but for the dogged efforts of these objecting institutional lenders to stop, stay, multiply, and delay the Receiver's efforts. *Cf., e.g., In re Cascade*, 815 F.2d at 548 (it is appropriate to allow payment of administrative expenses from the proceeds of secured collateral *when incurred primarily for the benefit of the secured creditor or when the secured creditor caused the expense*).

### III. The Receiver has created and submitted allocation reports for each property in connection with this motion.

In connection with this motion, the Receiver submits herewith a summary report that shows the amounts sought for each property at this time (Exhibit 1) along with *specific* allocation reports for the individual properties (Exhibit 2) and a report containing the billing detail for the *general* allocations (Exhibit 3).

The summary report (Exhibit 1) provides a breakdown both as to specific and general allocations and also by each of the three billing categories that is the subject of the current motion. Specific allocations are those for which the Receiver was able to provide an allocation based on a determination through reasonable efforts, and consistent with the allocation approach the Court previously approved (Dkt. 755, at 22-24; Dkt. 824, at 5), that the task entry corresponds to one or more particular properties. General allocations are those for which the task has not been specifically allocated but which still benefited the properties and therefore are appropriately spread across all of the properties using the allocation methodology approved by the Court. (*Id.*)

There are 108 specific allocation reports (Exhibit 2); one for for each property.[9] Each report has a summary page (appearing as the first page) and the billing detail (immediately

---

[9] Typically, the estate is described as having 116 properties. However, only 108 property allocation reports are needed. Two of the properties are often counted as multiple properties because they correspond to several side by side properties with different street numbers. But it is appropriate to treat them as single

following the summary page) for the tasks that are specifically allocated to that property.   These reports only cover previously approved fees (*i.e.,* through 6/30/2020).  They also are limited to the Asset Disposition, Business Operations, and Claims billing categories.

Finally, a general allocation report is provided that shows all of the billing detail for those time entries that are the subject of the *general* allocation methodology that the Court approved. (Exhibit 3)  These billing task entries are not the same as those appearing on the specific allocation reports (which have been allocated to a specific property or properties), but are the tasks which are allocated generally across all properties in accordance with the approved methodology.  For both the specific allocation reports (Exhibit 2) and the general allocation report (Exhibit 3), the invoice in which the task originally appeared is identified.  Additional context is reflected in the original invoices submitted to the Court.

## IV.    It remains essential for the Court to approve the requested payments and implement a process for expeditious payment of professional fees and costs.

The asserted notion that the Court cannot determine if there is any benefit to the claimants until after the claims process is over is simply wrong.  First, the benefits for preservation, maintenance, and sale are known, as those actions are complete and the Receiver successfully preserved those funds for the benefit of the creditors.  Second, as also has been discussed, substantial efforts have already been taken to establish a fair claims process and address claimant interests.  Third, substantial work by the Receiver and his retained professionals and vendors will be needed to facilitate an expeditious and fair claim process for the claimants, which will benefit all claimants.  The Court has ordered the Receiver to fulfill numerous roles in the process,

---

properties for allocation purposes because they each were sold as part of a single transaction and the claims against them do not differentiate between them.  Also, the Naples property was neither a managed property nor is it within the upcoming claims process; and the Receiver has attempted to exclude all time associated with the Naples property from the allocation spreadsheets.

including but not limited to analyzing and taking positions on claims, facilitating and taking discovery, implementing the claims process, assisting the Court with resolution of claims disputes, and developing a plan for distributing funds to the appropriate claimants. The Court can find that some of that work will provide a benefit and confirm that the Receiver will be fairly compensated for that work from the collateral that is the subject of the claims process. The objectors' opposition disregards *Elliott*, which expressly addresses both the nature of the Receiver's role in a claims process involving secured claims against properties and the appropriateness of compensating a Receiver for that role. *See, e.g., Elliott*, 953 F.2d at 1576-77.

As the Receiver has noted, he has deferred payment of most professional invoices over the past two years. This and the upcoming work has and will place a substantial burden on the professional firms serving the estate. The Court has the discretion to allow payment in such circumstances. See *SEC v. Capital Cove Bancorp LLC*, NO. SACV 15-980, 2016 WL 6078324, at *2 (C.D. Cal. June 29, 2016) ("An award of interim fees is appropriate 'where both the magnitude and the protracted nature of a case impose economic hardships on professionals rendering services to the estate.'") (citation omitted). Allowing payment of previously-approved fees and expenses and ongoing claims process fees and expenses is essential for the Receiver to provide services in the claims process.

Further, the proposed interim process reduces the payment of fees by twenty percent as a hold back, giving the Court a means of ensuring the work is beneficial to the claimants before those fees are paid. That also allows the Court to consider results in the context of the fee application while still ensuring the Receiver and his retained professionals are compensated for their ongoing efforts. Claimants will still have the opportunity to object to the fees sought should

11

the Receiver request fee for opposing their claims. This strikes a reasonable balance with the goal remaining as expeditious and cost-effective implementation of a fair and just claims process.

**V.     Conclusion**

For these reasons, the Receiver respectfully requests that the Court exercise its discretion to (i) approve payment of the previously approved fees and expenses out of the funds held in the separate accounts for the properties, or against any letter of credit issued for a property transferred to a credit bidding lender, consistent with the approved allocation methodology, and (ii) approve of the Receiver's process for interim payments for work performed during the claims resolution process, and (iii) for such other relief as the Court deems equitable and just.


Dated:  April 28, 2021                                      Kevin B. Duff, Receiver


                                                By:     /s/      Michael Rachlis

                                                        Michael Rachlis
                                                        Jodi Rosen Wine
                                                        Rachlis Duff & Peel, LLC
                                                        542 South Dearborn Street, Suite 900
                                                        Chicago, IL 60605
                                                        Phone (312) 733-3950; Fax (312) 733-3952
                                                        mrachlis@rdaplaw.net
                                                        jwine@rdaplaw.net

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 28, 2021, I electronically filed the foregoing **Notice** and **Receiver's Reply in Support of Motion for Approval to Pay Certain Previously Approved Fees and Costs and for Interim Payment of Continuing Claims Process Fees and Costs Pursuant to Receiver's Lien** with the Clerk of the United States District Court for the Northern District of Illinois, using the CM/ECF system. Copies of the foregoing pleadings were served upon counsel of record via the CM/ECF system.

I further certify that I caused true and correct copy of the foregoing **Reply** to be served upon the following individuals or entities by electronic mail:

- All known EquityBuild investors; and

- All known individuals or entities that submitted a proof of claim in this action (sent to the e-mail address each claimant provided on the claim form).

I further certify that the **Reply** will be posted to the Receivership webpage at:

http://rdaplaw.net/receivership-for-equitybuild

/s/ Michael Rachlis

Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Phone  (312) 733-3950
Fax     (312) 733-3952
mrachlis@rdaplaw.net