UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | )<br>)<br>) |
| Plaintiff, | ) Civil Action No. 18-CV-5587 |
| v. | ) Judge John Z. Lee |
| EQUITYBUILD, INC., *et al.*, | ) Magistrate Judge Young B. Kim |
| Defendants. | ) |

**SEC'S REPLY IN SUPPORT OF RECEIVER'S MOTION
FOR PAYMENT OF CERTAIN EXPENSES PURSUANT TO RECEIVER'S LIEN**

The SEC supports the Receiver's Motion to Approve the Payment of Certain Expenses Pursuant to a Receiver's Lien (ECF No. 947). The Receiver's Motion seeks payment, from the proceeds of his Court-approved property sales, for two categories of expenses that the Court *has already found to be beneficial to the properties* in the Receivership Estate. The first category of Court-approved expenses are those associated with preserving, managing, and liquidating the real estate purchased with the funds of the Cohens' defrauded investors. The second category are costs associated with implementing and managing an orderly claims process. This includes both previously approved expenses and certain ongoing expenses whose benefit can be ascertained prior to the eventual resolution of the competing claims.

The only claimants objecting to the Receiver's motion are the institutional lenders. (ECF No. 961). The lenders' opposition simply rehashes arguments they have repeatedly asserted for more than two years of failed and wasteful litigation. In doing so, the lenders ignore that the Court has rejected those arguments many times over. The lenders ignore the competing claims

1

of the defrauded investors, whose mortgages came first and were never validly released. The lenders ignore that because of these competing claims, the Court has determined that the lenders' preferred approach – abandonment, foreclosure, or bankruptcy – is neither equitable nor appropriate given the unique circumstances of this case. The lenders ignore that the Court has affirmed the significant need for an orderly claims process, that the Receiver should have a central role, and that a Receiver's lien is appropriate. And the lenders ignore that the Court has consistently approved the precise types of work at issue in the Receiver's motion, finding them beneficial to the properties from whose sale proceeds the Receiver requests payment.

The lenders also ignore the Receiver's representation that denying him payment of previously approved fees would be detrimental to his small law firm. But denying the Receiver's motion would not only harm this Receiver. It would effectively limit courts to selecting receivers from the largest and most well-financed firms, those that are more able to take on multiyear assignments without payment yet charge much higher fees that ultimately deplete the recovery of victims and other creditors.

Because the Receiver is only seeking payment of expenses the Court has found to be beneficial, and because the Receiver seeks payment from sales proceeds that will only inure to the ultimate winners of the claims resolution process, the Receiver is appropriately entitled to the priority payments requested in his motion.

1. **The Receiver Should be Paid Previously Approved Fees the Court Has Determined to Be Beneficial**

In granting the Receiver's general request for a lien to be paid from the proceeds of his property sales, the Court held that it may appropriately impose a lien for the Receiver's expenses which benefitted the subject properties. (ECF No. 824, p. 4 (citing *Gaskill v. Gordon*, 27 F.3d 248, 251 (7th Cir. 1994))). The institutional lenders do not genuinely dispute this proposition.

Instead, they continue to argue that the Receiver's work has not been beneficial. The Court has repeatedly rejected their arguments.

Most recently, in generally approving a Receiver's lien, the Court found: "the Receiver's efforts have benefitted the Receivership Estate, including through maintaining, marketing, and liquidating properties; representing those properties in adverse litigation; bringing new assets into the Receivership; and designing a claims process by which property sales proceeds will be distributed to senior secured claimants." (ECF No. 824, p. 4). Such beneficial activities include: "manag[ing] a substantial portfolio of residential real estate, work[ing] to ensure the health and safety of its residents, prepar[ing] the properties for sale, and help[ing] formulate a process whereby claims will be evaluated in an orderly fashion." (*Id.*, pp. 5-6). In making these findings, the Court necessarily rejected the lenders' repetitive arguments that abandonment, bankruptcy, or foreclosure would have been more beneficial to the subject properties.

For any expenses the Court has already approved and determined to be beneficial, the Receiver is entitled to be paid now from the more than $50 million in net sales proceeds he deposited in segregated accounts. (ECF No. 947, p. 4).[1] The lenders insist on waiting until the conclusion of the claims process. But they offer no valid reason why past expenses the Court has already found beneficial will somehow become unbeneficial depending on who the Court ultimately determines is the senior secured lender. In other words, the Receiver's prior efforts – managing the properties to prevent their devaluation, selling them to the highest bidder in a Court-approved process, and defending them in city regulatory matters – benefit the properties regardless of whether the investors' or lenders' security interests ultimately have priority.

---

[1] The Receiver anticipates obtaining another $15 million in net sales proceeds once his liquidation efforts are complete. (ECF No. 947, p. 4).

Thus, to the extent the Receiver can itemize his previously approved expenses, and appropriately allocate them to specific properties or generally to the portfolio, there is no detriment to paying the expenses from the property sales proceeds before the claims process's resolution. (*See* ECF No. 824, p. 5 (approving Receiver's proposal to allocate property-specific fees to those properties, with the remaining approved fees allocated generally to the portfolio based on the percentage of each properties' gross sales price)). To that end, the schedules the Receiver recently filed in support of his motion show how the Receiver appropriately apportions his previously approved fees per the methodology approved by the Court. (ECF No. 981, Exs. 1-3).

2. **The Receiver is Entitled to Be Paid Now, for His Prior Work on the Claims Process, and to Interim Payments for Certain Future Claims Process Work**

The Receiver next seeks priority payments for his substantial efforts designing and implementing the claims process. Despite repeated and vigorous objection from the lenders, the Court has already determined that the Receiver's claims-related work is beneficial and entitles him to payment. (ECF No. 824, pp. 3-5). Just as the Receiver should be paid for his work administering and liquidating the properties, he should be paid for his Court-approved work on the claims process. Even the lenders' citation to *SEC v. Elliot* (ECF 961, p. 11) recognizes that a receiver is entitled to a lien for claims-related work in a situation similar to this case:

> In this case, the Receiver opposed many competing claims of secured status to the same property. Although the prevailing secured claimant had to fight the Receiver's opposition to his claim, he reaped benefits when the Receiver defeated competing claims. By combatting competing claims, the Receiver became his ally. We find that, with these type of activities, the Receiver conferred a benefit on the secured creditors and merits fees from their collateral.

*Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992).

Thus, if the claims process the Receiver designed and implemented results in a lender having priority, that lender will have benefitted from the Receiver's work. On the other hand, if a lender is not found to have priority, it will not be prejudiced by the imposition of a receiver's lien on sales proceeds awarded to the prevailing claimants. (*See* ECF No. 824, p. 5 ("Under the Receiver's proposal, the only claimants that would pay for his work would be those the Court ultimately finds to have priority" (citing *Elliott* at 1577))).

For the claims-related work for which the Court has already approved payment, the Receiver should be able to itemize his expenses per the allocation method approved by the Court. For future claims-related efforts, the SEC recognizes that certain types of work – such as fraudulent conveyance claims or recommendations adverse to the claimant eventually found to have priority – may need to be resolved at the end of each claims process tranche. But other recurring future efforts – like the preparation of framing reports, the administration of claimant filings, work related to document vendors, and responding to discovery requests – are the type of Court-mandated activities which should benefit any claimant ultimately found to have priority.

### 3. Denying Payment for Previously Approved Fees Would Harm the Receiver and Hinder Future Receiverships

In his motion, the Receiver details how leaving his Court-approved bills unpaid has "has posed a significant hardship for the Receiver and the professionals working with him." (ECF No. 947, p. 6-7; *see also* ECF No. 981, p. 12 (noting the "substantial burden" deferring the payment of his bills has caused the Receiver and his professional firms)). Under these circumstances, given that the Court has already determined the Receiver's past work to be reasonable and beneficial, denying him payment would not only impact him. It would have a profound effect on the SEC's ability to recommend and utilize receivers in its enforcement actions.

Requiring a receiver to go years without payment of court-approved bills would effectively limit receiver candidates to those from large law firms. This would come at a cost because larger firms tend to impose higher billing rates and devote more staff to engagements. Such costs would ultimately be passed on to securities fraud victims and other creditors of the defendants. For this reason, the SEC often relies on receivers from smaller firms, such as this Receiver, who effectively and efficiently discharge their duties at a much lower cost. While large firm receivers are entirely appropriate for certain engagements, they should not be imposed on the SEC, courts, and fraud victims in all situations.

The Court should avoid setting precedent that would preclude smaller firms, especially those specializing in equity receiverships, from volunteering their services due to concerns of multiyear delays of court-approved payments from available liquidation proceeds.

The Court should likewise refuse to reward the lenders for their overly litigious conduct which has severely slowed the Receiver's efforts to liquidate properties and implement the claims process. As the Receiver observes, absent the lenders' obstructive conduct the claims process, including disputes over paying the Receiver, would likely have already been completed. (ECF No. 947, pp. 6-7).

The lenders' insistence that the claims process must conclude before addressing the Receiver's payment requests is even more problematic given the lenders' simultaneous attempts to delay the claims process's start. Indeed, the institutional lenders, *collectively*, recently requested an indefinite delay to starting the claims process until a *single lender* in the first tranche gets access to a subset of materials (the Equitybuild documents) that will be part of the wider discovery process. (ECF No. 972, pp. 2-3). The lenders' most recent tactic to starve the Receivership, by hinging the Receiver's payment to the claims process's completion while

6

seeking to delay the process's implementation, should not be countenanced.

Finally, the lenders argue that a receiver's lien is unnecessary because the Receiver can recoup his fees through his litigation against Equitybuild's former attorneys. (ECF No. 961, p. 2). But any recovery in that lawsuit is prospective, and would not address the Receiver's current liquidity issues cited in his motion. Moreover, the Court may appropriately impose the Receiver's lien now, and later entertain requests from the claims process "winners" to seek reimbursement from any recovery the Receiver obtains in third-party litigation.

## 4. Conclusion

For the above reasons, the SEC supports the Receiver's motion. For expenditures the Court has previously determined to benefit the Receivership Estate, the Receiver should be paid now from the proceeds for his Court-approved property sales. For certain future costs related to the claims process, to the extent the Receiver establishes their benefit, he likewise is entitled to payment before the conclusion of the claims process's ultimate resolution.

Respectfully submitted,

Dated: April 29, 2021

 /s/ Benjamin Hanauer
Benjamin J. Hanauer (hanauerb@sec.gov)
Timothy J. Stockwell (stockwellt@sec.gov)
U.S. Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Phone: (312) 353-7390
Facsimile: (312) 353-7398

**CERTIFICATE OF SERVICE**

I hereby certify that I provided service of the foregoing Reply, via ECF filing, to all counsel of record and Defendant Shaun Cohen, on April 29, 2021.

    /s/ Benjamin Hanauer
Benjamin J. Hanauer
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Phone: (312) 353-7390
Facsimile: (312) 353-7398

One of the Attorneys for Plaintiff