IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ) ) ) Plaintiff, ) ) v. ) ) EQUITYBUILD, INC., EQUITYBUILD ) FINANCE, LLC, JEROME H. COHEN, ) and SHAUN D. COHEN, ) ) Defendants. ) | No. 18 C 5587 Judge John Z. Lee |

## ORDER

Before the Court is the motion by intervenors Ventus Holdings, LLC, and Ventus Merrill, LLC (collectively, "Ventus"), seeking the return of earnest money deposits relating to Ventus's contracts with the Receiver to purchase three parcels of commercial real estate: 6949–59 South Merrill Avenue, 7600–10 South Kingston Avenue, and 7656–58 South Kingston Avenue. For the following reasons, Ventus's motion [861] is denied.

### I.   Background

The order appointing the Receiver in this case authorized the Receiver to take "all necessary and reasonable actions" to sell or lease "all real property in the Receivership Estate, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such real property." Order Appointing Receiver ¶ 38, ECF No. 16. Pursuant to that authority, in October and

December 2019, the Receiver accepted contracts to sell the properties at issue to Ventus for a total of $4,315,200, and the Court confirmed those sales in February and April 2020. *See* Receiver's Fifth Mot. Confirm Sales, ECF No. 618; 2/21/20 Order, ECF No. 633; 4/1/20 Order, ECF No. 680. Ventus tendered ten percent of the purchase amount—$431,520.00—as an earnest money deposit. Ventus's Mot. Return Earnest Money at 1. On April 20, 2020, however, Ventus informed the Receiver that it had lost its acquisition financing, that it could no longer raise the required equity from its investors, and that it "no longer intend[ed] to proceed with the acquisition of these properties." Receiver's Resp. Opp'n Ventus's Mot. Return Earnest Money ("Receiver's Opp'n"), Ex. K, 4/20/20 Letter from Ventus to Receiver ("4/20/20 Letter"), ECF No. 882 at 130. Ventus added that it was "quite unfortunate that we could not complete these transactions." *Id*.

From there, the Receiver solicited and accepted the next best bids, ultimately signing contracts to sell the three properties for a total of $945,200 less than what Ventus had agreed to pay for them. Reply Supp. Eighth Mot. Confirm Sales at 3, 6, ECF No. 739. On June 11, 2020, the Receiver moved to confirm the sales. Ventus subsequently objected, seeking to reinstate its old contracts in light of new financing it was pursuing (but had not obtained). Ventus Obj. at 3, ECF No. 721-1. Ventus did not indicate that it could honor the earlier sale terms until two months after it backed out of the earlier deal, and over six weeks after the Receiver had found new purchasers for the properties. Ventus's Mot. Return Earnest Money at 2.

The Court overruled Ventus's objection and approved the sale of 6949–59 South Merrill Avenue, 7600–10 South Kingston Avenue, and 7656–58 South Kingston Avenue to the new purchasers. 10/26/20 Order at 1–4, ECF No. 825. But the Court also permitted Ventus to file the instant motion seeking a return of its earnest money deposits. *Id.* at 4. That motion is now ripe for decision.

## II. Analysis

Illinois law governs the relevant purchase and sale agreements. Receiver's Opp'n, Ex. G, 7600 S. Kingston Purchase & Sale Agreement ¶ 25, ECF No. 822 at 68; *id.*, Ex. H, 7656 S. Kingston Purchase & Sale Agreement ¶ 25, ECF No. 882 at 86; *id.*, Ex. J, 6949 S. Merrill Purchase & Sale Agreement ¶ 25, ECF No. 882 at 120. Ventus essentially concedes that it breached its contracts with the Receiver for the purchase of 6949–59 South Merrill Avenue, 7600–10 South Kingston Avenue, and 7656–58 South Kingston Avenue. But, it argues, it is entitled to a return of its earnest money deposits because it only breached its contracts as a result of losing financing due to the COVID-19 pandemic. As such, Ventus claims, its breach is excused under the doctrines of impossibility and commercial frustration.[1] Alternatively, Ventus argues that the liquidated damages provisions of the sales contracts are unenforceable. The Court will address each argument in turn.

---

[1] Ventus focuses most of its arguments on the doctrine of commercial frustration, and briefly mentions "force majeure." But "[f]orce majeure clauses in contracts supersede the common law doctrine of impossibility." *In re Hitz Rest. Grp.*, 616 B.R. 374, 377 (Bankr. N.D. Ill. 2020). Because the contracts at issue do not contain force majeure clauses, the Court will analyze Ventus's "force majeure" argument under the doctrine of impossibility.

3

### A. Impossibility

The doctrine of impossibility excuses performance where (1) "performance is rendered objectively impossible due to destruction of the subject matter of the contract or by operation of law," and (2) the events or circumstances that rendered performance impossible "were not reasonably foreseeable at the time of contracting." *YPI 180 N. LaSalle Owner, LLC v. 180 N. LaSalle II, LLC*, 933 N.E.2d 860, 865 (Ill. 2010). "This doctrine has been narrowly applied due in part to judicial recognition that the purpose of contract law is to allocate the risks that might affect performance and that performance should be excused only in extreme circumstances." *Id.* (cleaned up). "Where a contingency that causes the impossibility might have been anticipated or guarded against in the contract, it must be provided for by the terms of the contract or else impossibility does not excuse performance." *Id.* (citing *Leonard v. Autocar Sales & Serv. Co.*, 64 N.E.2d 477, 479 (Ill. 1945)). The party asserting the doctrine bears the burden of demonstrating each element. *Id.*

The Illinois Supreme Court's decision in *YPI 180 N. LaSalle Owner, LLC v. 180 N. LaSalle II, LLC*, is instructive. *Id.* In that case, the court considered whether the impossibility doctrine excused the contracted-for purchase of commercial real estate on the grounds that the 2008 financial crisis had "prevented [the buyer] from obtaining the commercially-practical financing contemplated when the contract was originally made." *Id.* The Illinois Supreme Court rejected the buyer's framing, stating that "[e]ven if the global credit crisis

4

made it difficult, to nearly impossible, to procure the sought-after commercial financing, this is not the relevant issue. The primary issue is whether it was foreseeable that a commercial lender might not provide [the buyer] with the financing [it] sought." *Id.*

The Supreme Court went on to observe that the "potential inability to obtain commercial financing is generally considered a foreseeable risk that can be readily guarded against by inclusion in the contract of financing contingency provisions." And so the buyer's performance was not excused. *Id.* at 866. Indeed, Illinois courts have long held that "[c]hanging and shifting markets and prices from multitudinous causes is endemic to the economy in which we live." *N. Ill. Gas Co. v. Energy Co-op, Inc.,* 461 N.E.2d 1049, 1059 (Ill. App. Ct. 1984).

In a similar vein, performance is not considered impossible "as long as it lies within the power of the promisor to remove the obstacle to performance." *YPI*, 933 N.E.2d at 866 (cleaned up). In *YPI*, the court found that the buyer failed to demonstrate that "it would have been impossible for [the buyer] to convert its nonliquid assets to liquid assets in order to pay the contract purchase price." *Id.*

Similarly, here, Ventus essentially complains that it lost its financing due to a market downturn. That is not a sufficiently unforeseeable event to excuse its performance under the impossibility doctrine. Like the buyer in *YPI*, Ventus could have provided for the risk that it would lose its financing in the purchase and sale agreements. Furthermore, Ventus admittedly obtained new financing for these contracts two months after breaching them, *see* Ventus's Mot. Return Earnest

5

Money at 2, which indicates that purchasing the real estate in April 2020 was not "objectively impossible," *see YPI*, 933 N.E.2d at 865. And Ventus has not presented any evidence that it was objectively impossible for it to marshal its existing assets to pay the contract purchase price, either. Finally, its April 2020 letter stated in unequivocal terms that Ventus did not intend to take either course of action to muster the funds it needed to purchase the three properties. Its intentions were clear, concluding that it was "quite unfortunate that we could not complete these transactions." *See* 4/20/20 Letter.

Thus, the Court finds that Ventus has failed to meet its burden with respect to either prong of the impossibility doctrine.

**B.  Commercial Frustration**

The doctrine of commercial frustration "is an extension of the defense of impossibility." *Blue Cross Blue Shield of Tenn. v. BCS Ins. Co.*, 517 F. Supp. 2d 1050, 1059 (N.D. Ill. 2007) (citing *Greenlee Foundries, Inc. v. Kussel,* 301 N.E.2d 106, 109 (Ill. App. Ct. 1973)). Commercial frustration excuses performance of a contract if the one asserting it "show[s] that (1) the frustrating event was not reasonably foreseeable and (2) the value of counterperformance has been totally or nearly totally destroyed by the frustrating event." *United States v. Sw. Elec. Co-Op., Inc.*, 869 F.2d 310, 315 (7th Cir. 1989) (citing *N. Ill. Gas Co.*, 461 N.E.2d at 1059). This doctrine is "not to be applied liberally." *N. Ill. Gas Co.*, 461 N.E.2d at 1059.

6

Even assuming that the "frustrating event" was the COVID-19 pandemic (and not a mere loss of financing due to a market downturn, as discussed above), Ventus has failed to carry its burden to demonstrate that the value of the contract was totally or nearly totally destroyed by the pandemic's onset.[2] As Ventus itself points out, it sought to reinstate these very contracts in June of 2020—while the pandemic was still raging. *See* Ventus's Mot. Return Earnest Money at 2. This demonstrates that purchasing the buildings was still valuable to Ventus.

The cases Ventus cites do not support a different conclusion. In *Smith v. Roberts*, the Roberts brothers operated a store in their main building, and they signed a lease for the adjacent premises. 370 N.E.2d 271, 272–73 (Ill. App. Ct. 1977). They intended to add a door between the two buildings to establish another department of their store. *Id.* Unfortunately, a fire completely ruined the Roberts's main building. *Id.* The Illinois Court of Appeals held that the value of the lessor's counterperformance (*i.e.*, the value of the leased premises to the Roberts brothers) was "totally or nearly totally destroyed" because "[a]lthough it would be physically possible to operate the leased premises as a separate entity, . . . operations would have to be changed drastically in order to make the premises self-sufficient," and "the leased premises were never intended to be autonomous." *Id.* at 273–74. Thus, the appellate court found that the existence of the main premises was an implied condition of the contract between the parties,

---

[2] As such, the Court need not address Ventus's argument that the question of foreseeability cannot be decided as a matter of law.

7

and the contract had been commercially frustrated by its destruction. By contrast, here, the value of owning commercial real estate was not "totally destroyed" by the COVID-19 pandemic; in fact, Ventus wanted to purchase them only months later.

This case is also unlike *Scottsdale Ltd. Partnership v. Plitt Theatres, Inc.*, where, after Plitt Theatres signed its lease, the commercial area was re-zoned to prohibit the movie theater it intended to open. No. 97 C 8484, 1999 WL 281085, at *3–4 (N.D. Ill. Mar. 31, 1999). There, the court held, that because the zoning change prohibited the lessee from conducting its business *at all*, the lessee had satisfied its burden to establish commercial frustration. *Id.* at *4. The court expressly contrasted the movie theater operator's situation from one in which the business at issue was simply less profitable as the result of a zoning change. *Id.* Here, while it may have been less profitable for Ventus to purchase the commercial real estate from the Receiver in April 2020, neither the pandemic, nor Ventus's temporary loss of financing, prohibited Ventus from purchasing the properties or running the buildings *at all*.

Curiously, Ventus also claims that the doctrine of commercial frustration can temporarily suspend performance even when it does not permanently excuse performance. Ventus quotes the Second Restatement of Contracts, which states:

> Impracticability of performance or frustration of purpose that is only temporary suspends the obligor's duty to perform while the impracticability or frustration exists but does not discharge his duty or prevent it from arising unless his performance after the cessation of the impracticability or frustration would be materially more burdensome than had there been no impracticability or frustration.

8

Ventus's Mot. Return Earnest Money at 4 (quoting Restatement (Second) of Contracts § 269 (1981)). But that doctrine is no help to Ventus, because the Second Restatement makes clear that it is the *non-breaching party* that is entitled to demand performance "after the cessation of the impracticability or frustration." *Id.* A breaching party, like Ventus, is not entitled to demand that the non-breaching party perform under the contract, because the non-breaching party's duty to perform is discharged by the counterparty's material breach. *See id.* cmt. a. In other words, the Receiver could have required Ventus to *purchase* the properties once Ventus could again obtain alternative financing, but Ventus cannot require the Receiver to *sell* the properties, because the Receiver's obligation to sell ended when Ventus breached the contracts.

Thus, the doctrine of commercial frustration does not excuse Ventus's breach of the sales contracts.

**C.   Liquidated Damages**

Finally, Ventus claims that the "buyer default" provision of each contract is an unenforceable penalty clause, and not, as the Receiver contends, a valid liquidated damages provision.

Each of the contracts at issue states:

> The Buyer and Seller agree that it would be difficult to ascertain the actual damages to be suffered by the Seller in the event of a default by the Buyer and that the amount of the Earnest Money deposited by the Buyer hereunder constitutes the parties' reasonable estimate of the Seller's damages in the event of the Buyer's default, and that upon any such default not caused by the Seller, the Seller shall be entitled to retain the Earnest Money

9

> as liquidated damages, which shall constitute the Seller's sole and exclusive remedy in law or at equity in connection with said default.

7600 S. Kingston Purchase & Sale Agreement ¶ 17; 7656 S. Kingston Purchase & Sale Agreement ¶ 17; 6949 S. Merrill Purchase & Sale Agreement ¶ 17. Here, the earnest money Ventus deposited under each contract constituted 10% of the purchase price.

"There is no dispute that a penalty clause (as opposed to a reasonable liquidated damages clause) is unenforceable in Illinois, and that Illinois courts narrowly construe contracts to avoid forfeiture if possible." *Homeowners Choice, Inc. v. Aon Benfield, Inc.*, 895 F. Supp. 2d 889, 895 (N.D. Ill. 2012), *aff'd* 550 F. App'x 311 (7th Cir. Dec. 19, 2013); *see also Jameson Realty Grp. v. Kostiner*, 813 N.E.2d 1124, 1130 (Ill. App. Ct. 2004) ("It is a general rule of contract law that, for reasons of public policy, a liquidated damages clause which operates as a penalty for nonperformance or as a threat to secure performance will not be enforced."). But, under Illinois law,

> [c]ourts will generally enforce a liquidated damages provision in a real estate contract where it can be shown (1) that the parties intended to establish an agreed upon amount of damages in the event of a breach; (2) that the amount provided as liquidated damages was reasonable at the time of contracting and bears some relation to the actual damages which might be sustained; and (3) that the actual damages would be difficult to prove and uncertain in amount.

*Berggren v. Hill*, 928 N.E.2d 1225, 1229–30 (Ill. App. Ct. 2010) (quoting *Morris v. Flores*, 528 N.E.2d 1013, 1014 (Ill. App. Ct. 1988)). "Whether a provision for

10

damages is a penalty clause or a liquidated damages clause is a question of law." *Morris*, 528 N.E.2d at 1015.

The Court finds that the "buyer default" provisions of the contracts in question are valid, enforceable liquidated damages clauses. Illinois courts have expressly approved liquidated damages clauses that provide for a real estate seller to retain the buyer's earnest money deposits in the event that the buyer defaults on the sales contract. *Id.* at 1014–15. And where the earnest money represented between 10–20% of the purchase price, courts have found that measure of liquidated damages to be reasonable and related to the actual damages that might have been sustained. *See Berggren*, 928 N.E.2d at 1230–31 (discussing *Siegel v. Levy Org. Dev. Co.*, 538 N.E.2d 715, 717 (Ill. App. Ct. 1989) (20%); *Curtin v. Ogborn*, 394 N.E.2d 593, 598–99 (Ill. App. Ct. 1979) (10%)).

As such, the Court holds that the "buyer default" provision recited above is valid and binding on Ventus.

### III.     Conclusion

For the foregoing reasons, Ventus's motion for the return of its earnest money deposits is denied. The Court finds that the doctrines of impossibility and commercial frustration do not excuse Ventus's breach of the purchase and sale agreements relating to 6949–59 South Merrill Avenue, 7600–10 South Kingston Avenue, and 7656–58 South Kingston Avenue. And the "buyer default" provision in each contract is a valid and enforceable liquidated damages clause. Thus, pursuant to the "buyer default" provisions, the Receiver is entitled to retain Ventus's earnest money deposits.

**IT IS SO ORDERED.**  **ENTERED: 8/13/21**

*[signature: John Lee]*

_____

**John Z. Lee**
**United States District Judge**