# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 18-cv-5587 |
| v. | ) ) | Hon. John Z. Lee |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, | ) ) ) ) | Magistrate Judge Young B. Kim |
| Defendants. | ) ) | |

## RECEIVER'S MOTION FOR APPROVAL OF ALLOCATIONS OF FEES TO PROPERTIES FOR PAYMENT PURSUANT TO RECEIVER'S LIEN

Michael Rachlis
Jodi Rosen Wine
Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Phone (312) 733-3950
mrachlis@rdaplaw.net
jwine@rdaplaw.net

*Counsel for Receiver Kevin B. Duff*

Receiver, Kevin B. Duff, respectfully requests approval for the interim payment of fees included in the attached schedules allocating certain fees of the Receiver and his counsel[1] to the liquidated real estate properties of the Receivership Estate pursuant to the Receiver's lien previously approved by the Court. In support of his motion, Receiver states as follows:

On August 17, 2021, this Court granted in part the Receiver's Motion to Approve the Payment of Certain Expenses Pursuant to a Receiver's Lien. (Dkt. 1030) The Court found that interim payment of Receiver's fees from the proceeds of the sale of real property of the estate was appropriate (subject to a 20% holdback), and that the Receiver's lien had priority over the liens of any and all secured creditors with respect to two categories of fees and expenses—(1) the preservation, management, and liquidation of certain real estate belonging to the Receivership Estate, and (2) the implementation and management of an orderly summary claim-priority adjudication process. *Id*. at 9-15.

The Court denied without prejudice, however, the Receiver's request for approval of his proposed line-by-line allocation of specific fees to specific properties, directing the Receiver to seek approval of his proposed allocations in a separate motion to be referred to the Magistrate Judge for disposition. *Id.* at 16. This is that motion.

A.      **The Receiver's Efforts that Have Culminated in the Allocation Schedules Submitted Herewith Have Been Diligent and Exhaustive.**

As described herein, the process that Receiver and his retained counsel have undertaken from the commencement of this receivership to the present to record, assign, review, revise, and allocate legal fees to the individual properties of the estate has been painstaking and extremely

---

[1] For convenience, the fees of the Receiver and his special counsel are collectively referred to as "Receiver's fees" in this motion.

1

time intensive. The Receiver has diligently undertaken this work in good faith and at significant cost to him and his law firm.

### 1. Preparation of the Receiver's and Counsel's Monthly Invoices

The first step of the process involves the creation of monthly invoices setting forth detailed narratives of each timekeeper's work on the matter during the month. Throughout this receivership, the Receiver and his counsel have exercised great care to record their time entries in accordance with the SEC's billing guidelines. In accordance with those instructions, the individual timekeepers describe the work they performed on behalf of the receivership on a given day, assigning each of their daily time entries to the appropriate "Activity Category" (*i.e.,* Asset Disposition, Business Operations, Claims Administration, etc.), and further breaking down each entry into individual tasks and recording the amount of time (in tenths of an hour) spent on each specific task. Each timekeeper has devoted significant time and effort to this timekeeping process.

At this stage, a paralegal proofs the timesheets and generates a "pre-bill" for the Receiver's review. Before a final invoice is generated, the Receiver personally reviews each timekeeper's time entries on the pre-bill, and frequently reduces ("writes off" or "writes down") or re-categorizes certain of the entries. The Receiver's counsel then reviews all of the time entries and adjustments made by the Receiver, and further refines them as necessary. After the time entries are finalized, privileged or identifying information is redacted, and the final invoices are generated. Completed invoices are sent to the SEC quarterly before they are submitted to the Court, and the SEC reviews each invoice and, when appropriate, provides comments.

Each task entry appearing on a final monthly invoice thus involves many layers of professional judgment—(1) first by the timekeeper, who describes the work performed, eliminates any non-allowable time (such as time spent preparing the Receiver's fee applications), and categorizes each discrete activity, (2) then by the Receiver, who reviews each of the

2

individual timekeepers' entries and identifies entries that should be reduced, re-categorized, or not billed at all; (3) then by an attorney at the Receiver's law firm to further proof and revise as necessary the time entries and categorizations, and (4) finally by counsel for the SEC for compliance with the SEC's billing guidelines—with a significant amount of time and effort spent at every level.

### 2.      The Receiver's Fee Applications and Orders

The monthly invoices are then filed in the Court's public record along with the Receiver's quarterly fee applications (to date, the Receiver has submitted 13 such fee applications, 38 monthly invoices for the Receiver and 38 monthly invoices of special counsel).  The Receiver has also made all of his quarterly fee applications and their attached invoices available to any claimants who may not have access to the Court's Electronic Case Filing system, by posting them on the receivership website.

For each quarterly fee application submitted by the Receiver, the Court has typically set dates for objections to be filed, providing ample opportunity for any interested party to respond and raise any objections to the fee application or invoices.  The SEC has consistently informed the Court that "it has reviewed the Receiver's invoices, they substantially comply with the SEC's billing guidelines, and the SEC approves of their payment." (*See, e.g.*, Dkt. 1002)  And while the institutional lenders involved in this matter have filed lengthy objections to each of the Receiver's first twelve quarterly fee applications (Dkt. 442, 511, 581, 595, 617, 648, 777, 907, 960, 1000, and 1039), they have primarily objected to the appropriateness of the receivership and the total amount of the Receiver's fees, and have lodged only the most general objections to the individual time entries (*see, e.g.*, Dkt. 617 at 6, raising general objections to interoffice meetings, correspondence, and telephone conferences). And the objectors have ***never*** objected to the Receiver's categorization of fees into the SEC billing categories.

After considering the fee applications and the objections and replies thereto, the Court has approved each of the Receiver's First through Eleventh Fee Applications (August 2018 – March 31, 2021).[2] The Court approved payment of all fees and costs of the Receiver and his professionals submitted with the first eight fee applications (August 2018 – June 2020) with no hold-back.[3] (Dkt. 546, 547, 614, 710, 824) The Court ordered a 20% holdback of the fees (but not expenses) sought pursuant to the Receiver's Ninth, Tenth, and Eleventh Fee Applications (July 2020- March 2021). (Dkt. 1031)[4]

---

[2] The Court has not ruled on the Receivers' Twelfth or Thirteenth Fee Applications (covering the period from April 2021 – September 2021).

[3] The Receiver notes that fees approved in the First, Second, and Third Fee Applications, which related to work for the entire Receivership Estate, were paid from Receiver's operating account, which contained proceeds from the sale of four properties: 7500-06 S. Eggleston Avenue, 7549-59 S Essex Avenue, 3030-32 E 79th Street, and 2909-19 E 78th Street, as well as a portion of the proceeds from the sale of a fifth property, 7301-09 S Stewart Avenue. (Dkt. 346, 545). None of these five properties had liens recorded against them and thus were reasonably believed to be unencumbered when sold. As previously reported to the Court, the Receiver discovered after selling these properties that investor-lenders have nonetheless asserted claims against all five of the properties, which will need to be addressed during the claims process. (Dkt. 947 at 5) As shown in the attached schedules, the work for which the Receiver has already been paid has been allocated to the specific property or properties for which the work was performed. Through the fee allocations, amounts properly attributed and received from other properties will be used to essentially restore monies to the receivership operating account from where such proceeds were paid. In this way, the allocation avoids any inequity arising from a disproportionate amount of the Receiver's fees being paid from sale of those five properties. (*See* Dkt. 1030 at 16 n.8 ("The Receiver also should take care that creditors of the properties already sold do not bear a heavier share of the cost than the creditors of properties not yet sold."))

[4] Agency fees in the amount of $242,643.07, which were paid to counsel for the Receiver for title work performed in order to close the sales, were deducted from the amounts requested in the Receiver's fee petitions. These fees related to the disposition of assets, and thus will be deducted from the final allocations to the properties. *See* Exhibit 4 setting forth the credits on a property-by-property basis. In preparing Exhibit 4, the Receiver's counsel determined that certain agency fees were incorrectly reported in the prior fee applications. Unreported fees in the amount of $12,223 will be included in the Receiver's fee application for the current quarter, along with any additional agency fees paid from closings during the quarter.

### 3. The Receiver's Lien

As far back as February 28, 2020, the Receiver requested an administrative lien against the real estate comprising the bulk of the Receivership Estate, and that the Receiver's work administering the claims process be paid pursuant to such a receiver's lien. (Dkt. 638, ¶¶ 51-57; Dkt. 720 at 14-20)  The Receiver's motion in this regard was supported by the SEC (Dkt. 718 at 12-13), but contested by the institutional lenders (Dkt. 708 at 21-22).[5]  The Receiver's request for a Receiver's lien was repeated in subsequent filings and each time the Court overruled the institutional lenders' objections.

Additionally, on July 28, 2020, the Receiver submitted with his Seventh Fee Application a detailed description of his proposed methodology for allocating the fees pursuant to the requested Receiver's lien, which in summary provided: (i) first, allocate by property; (ii) second, do not allocate certain billing categories; (iii) third, do not allocate third-party claims by the Receiver; and (iv) fourth, allocate all remaining fees and expenses to the properties as a percentage of their gross sales prices. (Dkt. 755 at 23-24) (methodology attached hereto as Exhibit 5 for the Court's convenience)[6]  The Receiver further proposed that following the sale of all the properties, the Receiver would submit a spreadsheet to the Court showing the allocation of fees and expenses according to the proposed methodology on a property-by-property basis.  *Id.*

---

[5] At the request of the institutional lenders (Dkt. 724, 726), the Court held a series of oral arguments on the Receiver's motion on July 14, August 13, September 23, December 17, 2020, and on January 29, 2021 (Dkt. 745, 762, 801, 836, 915, 931).

[6] This proposed methodology was repeated in the Receiver's Eighth – Eleventh fee applications (Dkt. 778, 885, 945, 993)  Each of these applications were supported by the SEC (Dkt. 797, 803, 922, 970, 1002)  And although the institutional lenders consistently objected to allocation of the costs of the receivership to the properties in which they claim a secured interest (*see* Dkt. 777, 781, 792, 907, 960, 1000), none of the claimants lodged specific objections to the methodology proposed by the Receiver.

On October 26, 2020, the Court issued an order granting the Receiver's lien, and holding that the priority of the Receiver's lien as to any particular property would be determined as part of the claims approval process. (Dkt. 824) In his order, the Court specifically approved the above methodology proposed by the Receiver. *Id.* at 5 ("the Receiver's proposed methodology to allocate fees and expenses to individual properties is reasonable"). Accordingly, in early 2021, the Receiver undertook the laborious process of applying the approved allocation methodology to each of the invoices that had been approved by the Court at that time (*i.e.*, through June 30, 2020).

### 4. The Receiver's Motion for Payment of Fees Pursuant to Receiver's Lien

On February 23, 2021, the Receiver filed his Motion for Approval to Pay Certain Previously Approved Fees and Costs (Dkt. 947), seeking the Court's approval to make interim payments of a subset of the previously-approved fees out of the proceeds from the sales of real estate that are being held in segregated accounts pursuant to Court order. (*See, e.g.,* Dkt. 311, 344)[7] The Court recognized that because the Receiver was seeking an interim payment of fees that had already been approved as reasonable and beneficial, it did not need to reconsider **whether** the fees should have been awarded, but only **when** the fees should be paid, and from **what funds**. (Dkt. 1030 at 7) And, notably, the Receiver did not seek the Court's approval to pay all of the approved fees from the segregated property funds, but limited his request to Receiver's fees associated with (1) the preservation, management, and sale of the assets, and (2) the Receiver's efforts developing the process by which the priority of disputed claims would be determined. (Dkt. 947 at 1)

---

[7] *See also* Dkt. 346, 571, 602, 616, 633, 676, 680, 715, 789, 802, 841, 842, 910, 966, 979, 991, 1015,1024.

With his April 28, 2021 Reply in support of the motion, the Receiver submitted detailed allocation reports indicating on a task-by-task basis which property or properties benefitted from the work. (Dkt. 981, Exhibits 1-3) These reports, which were limited to fees that had been approved at that time,[8] detailed both the *specific* allocations to individual properties, and the *general* allocations that were apportioned among all properties in accordance with the allocation methodology approved by the Court (Dkt. 755 at 22-24; Dkt. 824 at 5) (approving Receiver's proposal to allocate property-specific fees to those properties, with the remaining approved fees allocated generally to the portfolio based on the percentage of each properties' gross sales price). In accordance with the approved methodology, the schedules did not allocate *all* of the remaining approved fees, but only the fees in three billing categories—(1) Asset Disposition (*i.e.*, the sale of the assets); (2) Business Operations (*i.e.*, the preservation and maintenance of the assets); and (3) Claims Administration. Wholly excluded from the schedules was the Receiver's work assigned to categories relating to the general administration of the receivership (*i.e.,* Case Administration, Accounting, Asset Analysis and Recovery, Corporate Finance, Employees, and Taxes). *See* note 11, *infra*.

Before the Court decided the Receiver's motion, certain of the institutional lenders moved for leave to file a sur-reply to address the schedules that the Receiver submitted with his reply brief. In connection with their request, the institutional lenders asserted "that a pre-motion conference would have been helpful here. Had the Receiver provided the Mortgagees with his proposed allocation prior to filing his motion (and in Excel rather than PDF format), these sorts

---

[8] The schedules outlining the Receiver's proposed allocation of fees to specific properties that were submitted in support of the Receiver's motion related to fees for the period through 6/30/2020. (Dkt. 981-1 through 981-6)

of issues could have been resolved without the Court's attention." (Dkt. 986 at 5 n.1) The Court denied the institutional lenders leave to file the sur-reply. (Dkt. 988)

On August 17, 2021, this Court granted the Receiver's motion in part. (Dkt. 1030) Specifically, the Court found that payment of fees relating to (1) the preservation, management and liquidation of the real estate belonging to the Receivership Estate, and (2) the implementation and management of an orderly summary claim-priority adjudication process, should take priority over the liens of any and all secured creditors, and authorized payment of the fees from the sales proceeds of encumbered properties on an interim basis. *Id.* The Court also ordered that all payments of fees pursuant to the Receiver's lien will be subject to a 20% holdback (which, for fees incurred during the period from July 1, 2020 – March 30, 2021 would amount to a total holdback of 40% if paid from the sale proceeds of encumbered properties). *Id.* at 14-16. The Court declined, however, to reach the issue of whether the Receiver's fees were appropriately allocated to the individual properties, and instructed the Receiver to file a separate motion for the approval of his specific line-by-line and property-by-property fee allocations.

### 5. Activities Subsequent to the Court's August 17, 2021 Order

Immediately after ruling on the Receiver's motion for payment of fees pursuant to the Receiver's lien, the Court granted the Receiver's Ninth, Tenth and Eleventh Fee Applications, for the period from 7/1/2020 through 3/31/2021. (Dkt. 1031) Subsequently, the Receiver filed his Twelfth Fee Application (for the quarter ending 6/30/2021) and his Thirteenth Fee Application (for the quarter ending 9/30/2021). (Dkt. 1026, 1087)

Because the institutional lenders had complained in their proposed sur-reply that the Receiver had not shared his proposed allocations with them before submitting them to the Court, and suggested that doing so may have enabled the parties to resolve issues without the Court's involvement, the Receiver engaged the institutional lender's counsel who filed the motion for a

sur-reply in discussions related to the fee allocation schedules. In furtherance of those discussions the Receiver provided counsel with additional information related to the First through Eighth Fee Applications that had been submitted to the Court.

The Receiver also prepared allocation schedules with respect to his Ninth, Tenth, Eleventh, and Twelfth Fee Applications, covering the period from July 1, 2020 through June 30, 2021, which are in addition to those submitted to the Court with the prior motion covering the period through June 30, 2020. (Dkt. 981)[9] The Receiver offered to provide all counsel for the various institutional lenders with his new proposed allocations for the Ninth through Twelfth Fee Applications (in Excel rather than PDF format) prior to filing them with the Court. Three sets of counsel requested this information, and one of them provided specific feedback to the Receiver. The Receiver and his counsel reviewed and considered the comments received from claimants' counsel, and in some instances adjusted the allocations.[10]

Additionally, for the Third Quarter 2021 (July, August and September), the Receiver included his proposed property allocations with his Thirteenth Fee Application filed on November 15, 2021. (Dkt. 1087) Accordingly, all Claimants have had access to these third-quarter allocations since that submission.

---

[9] The Court has not yet ruled on the Receiver's Twelfth or Thirteenth Fee Applications. Objections to the Twelfth Fee Application have been filed (Dkt. 1039) and the Receiver intends to file a reply. The Court has not set a deadline for responses to the Thirteenth Fee Application.

[10] One issue that was raised that was not resolved is the Receiver's allocation of the time spent on the negotiation and development of a "single claim process" to address institutional lender claims against properties without competing claims (other than two small claims from the City of Chicago). (*See, e.g.,* Dkt. 980, 1073) Counsel for the institutional lenders involved in that process do not believe these costs—which resulted from counsel's insistence that a separate process should be put in place for the 28 properties involved, and included briefing, an evaluation of prior encumbrances of record in the title history for those properties, numerous conference calls between counsel, and the exchange of a series of drafts—should be allocated to those properties.

6.      **The Receiver's Schedules Allocating Fees to Properties**

The specific work undertaken by the Receiver and his counsel is thoroughly summarized in the Receiver's quarterly status reports and fee petitions (cumulatively totaling more than 500 pages of narrative), and recorded in granular detail in the Receiver's invoices submitted with the fee petition (close to an additional 2,000 pages) and the attached schedules (setting forth more than 30,000 individual tasks in reports requiring 19,525 pages and corresponding to each of 108 separate properties). Space constraints do not permit the work to be described herein, but the fees which the Receiver has allocated to properties for purposes of this motion fall into the following three categories (with non-exhaustive examples provided):

- **Asset disposition** – *e.g.,* preparation of liquidation plan, retention of sales brokers, motions to approve sale process, marketing of properties (publication, working with real estate sales broker, reviewing offers, entering purchase and sale contracts, compilation of due diligence materials), motions to confirm sales, preparing closing documents, attending closings

- **Business operations** – *e.g.,* working with property managers to address maintenance issues and financial concerns, appearing in administrative proceedings relating to municipal code violations, addressing real estate taxes and real estate tax appeals, negotiating insurance coverage and communicating with insurance representatives, handling liens and collection notices, addressing state court complaints and working with counsel, tackling numerous property repairs and tenant issues, working with property management and accounting firm on financial accounting and reporting, communicating with City counsel and representatives

- **Claims Administration** – *e.g.,* development of claims process and claims form, analysis of claims, motion practice, working with institutional lenders, fielding claims-related inquiries from both investor and institutional lenders, preparing claims status reports, working with claims and records vendors, facilitating the disputed claims process

To prepare the attached schedules consistent with the Court's prior determinations, the Receiver worked with a vendor to apply several rules to assist in separating and categorizing the billing data (*e.g.,* automatically allocating all entries relating to various iterations of the sales process and approval motions to the properties corresponding to each of those motions), which was

necessitated by the sheer detail and volume in the billing records. Moreover, the Receiver has removed and/or deferred a significant number of billing entries in the above categories from his request for payment pursuant to the Receiver's lien following numerous further reviews of the invoices and allocations.[11]

As of September 30, 2021, the Receiver and his counsel had devoted approximately 1,200 hours to this process, which is an administrative expense born entirely by the Receiver's law firm.[12] Additionally, the Receiver's law firm already has incurred more than $25,000 in third-party vendor expenses associated with the creation of the attached schedules, and has not yet been billed for all of the work that has been performed to date. The Receiver's extensive allocation work constitutes another layer of professional judgment applied to the billing entries in this matter.

**B.** **The Court Has Already Ruled on and Approved the Fee Allocation Methodology, the Receiver's Lien, and the Receiver's Fees and Expenses.**

As set forth above, the Court has already decided many of the underlying issues that are relevant to the relief sought in this motion. ***First***, the court has repeatedly affirmed that the

---

[11] For example, work relating to the sale of the Naples, Florida property is not included on the attached schedules. Similarly, work relating to certain properties that EquityBuild disposed of before the Receiver was appointed (*i.e.,* "former properties"), which were the subject of state court litigation and administrative proceedings, is deferred from the current payment request. In total, 1,799 tasks in the billing categories that the Court has determined should be paid pursuant to a Receiver's lien on encumbered properties have been deferred for later consideration, totaling 640.8 hours and $169,311.00 of fees. This is in addition to the time spent on tasks assigned to billing categories other than the ones implicated in the motion; to date, 6,032 tasks totaling 3,010.4 hours and $793,436.50 in fees have been allocated to billing categories that the Receiver is not requesting be paid pursuant to the Receiver's lien at this time pursuant to this motion. Additionally, all of the invoices have limited amounts of expenses that have been approved, allocation of which is also being deferred to a later date.

[12] This time includes time spent briefing the Receiver's motion to approve the payment of fees, as well as work on the Receiver's quarterly fee applications filed in 2021, but does not include significant time spent since September 30, 2021 on preparing this motion and the attached schedules.

Receiver's work has "benefitted and will continue to benefit the Receivership Estate" (*See, e.g.,* Dkt. 824 at 3; Dkt. 1030 at 11)  ***Second***, the Court has approved the allocation methodology proposed by the Receiver more than 16 months ago (Dkt. 755 at 23-34), and never specifically objected to by any party. (Dkt. 824)[13]  ***Third***, the Court has found that interim payments at this time are appropriate. (Dkt. 1030 at 9)  ***Fourth***, the Court has found that fees relating to (a) the preservation, management and liquidation of the real estate belonging to the Receivership Estate, and (b) the implementation and management of an orderly summary claim-priority adjudication process, benefitted the encumbered properties and therefore should be paid pursuant to the Receiver's lien from the sales proceeds of those properties. (Dkt. 1030 at 12, 14)  And ***fifth***, the Court has found that the Receiver's lien as to this subset of categories merits a *first-priority* lien that takes priority over the liens of any and all secured creditors. (Dkt. 1030 at 12, 14)

The Court has already determined that the Receiver's efforts with regard to (a) the preservation, management and liquidation of the real estate belonging to the Receivership Estate, and (b) the implementation and management of an orderly summary claim-priority adjudication process, benefitted the encumbered properties and therefore the Court imposed a lien on the proceeds from the sales of the encumbered properties. (*Id.; see also* Dkt. 824 at 5 (finding "expenses relating directly to a property will be allocated to that property; billing pertaining to the recovery of unsecured funds will not be allocated to any properties; and remaining fees and expenses will be allocated to the properties as a percentage of their gross sales price, once that value is determined for each")).  The attached specific allocation schedules allocate fees relating directly to a property or a group of properties to that property or those properties.  (*See* Exhibit 1)

---

[13] The Receiver is not suggesting that no party has objected to the allocation of fees to properties in principle; those objections are well documented.  But there have not been objections to the methodology itself, nor have any alternate proposals been offered.

Fees benefitting all properties in the estate are set forth in the general allocation schedule and allocated to the properties as a percentage of their gross sales prices. (*See* Exhibits 2-3)

And "benefit" to the secured creditor is not the only basis upon which the fees may be allocated to encumbered funds. It is also appropriate to allow payment of administrative expenses from the proceeds of secured collateral *when the secured creditor caused the expense. In re Cascade Hydraulics & Utility Service, Inc.*, 815 F.2d 546, 548 (9th Cir. 1987) ("We allow payment of administrative expenses from the proceeds of secured collateral when incurred primarily for the benefit of the secured creditor or when the secured creditor caused or consented to the expense."); *see also Matter of Trim-X, Inc.*, 695 F.2d 296, 301 (7th Cir. 1982) (finding expenses of trustee were "caused" by secured creditor in the sense that it failed to promptly respond to trustee's petition); *First Western Savings and Loan Ass'n v. Anderson*, 252 F.2d 544, 548 n. 8 (9th Cir. 1958) (among the factors to be considered in determining whether reorganization expenses should be charged against mortgaged property is: "Were the secured creditors responsible for any delays in connection with the proceedings, or uncooperative in the attempt to formulate an acceptable plan?"); *In re River Oaks Ltd. P'ship*, 166 B.R. 94, 100 (E.D. Mich. 1994) (acknowledging expenses may be paid from secured collateral if secured creditor initiates frivolous or ill-founded legal actions that cause the expenses to be incurred, and remanding for specific determination as to whether creditor caused debtor to incur the allowed expenses).

In this case, the Court has frequently acknowledged that a significant portion of the Receiver's work has been driven by the institutional lenders' numerous and repetitive objections and motions. *See, e.g.,* Dkt. 1030 at 8 ("as the Court has previously acknowledged, "the Receiver and his legal professionals have devoted significant resources responding to various motions,

objections, and inquiries made by lenders," and "certain delays in this case can be attributed to the Receiver's need to respond to various motions and objections made by lenders"). The Receiver's work in response to these actions was caused by the creditors and is therefore appropriately allocated to the encumbered properties:

> The Court notes that the Institutional Lenders' insistence on repeating objections that have been previously overruled is not helpful. There is a difference between preserving an objection and wasting judicial resources and Estate resources. The Lenders complain about the Receiver's fees, but then require the Receiver to respond to dozens of objections raising arguments that have been foreclosed by the law of the case. (Dkt. 1031 at 11-12 n.32)

## C. The Limited Issue Remaining Before the Court

The issue that remains to be determined is narrow—namely, whether the Receiver has followed the methodology that was approved by the Court in proposing his allocations of fees among the liquidated properties' proceeds, and thus, whether the allocations set forth in the attached schedules should be approved. (*See* Dkt. 1030 at 2)

As for the fees that the Receiver has allocated to specific properties, "[w]hat is required is that an earnest effort be made to devise a method of allocating the actual costs of the receivership to specific assets and that the [allocation] order . . . disclose the results of this effort." *SEC v. Elliott*, 953 F.2d 1560, 1578 (11th Cir. 1992). As the discussion above summarizes and the attached schedules evidence, this has been accomplished.

As for the general allocations that are apportioned to properties pro rata based on their gross sales prices (step iv. of the methodology), apportioning the burden of the receivership in this manner is permissible when the benefits cannot be accurately divided between properties. *Id.* at 1578 ("we do not direct the district court to perform the impossible. For some of the Receiver's work, the district court may find that it benefitted the unsecured and the secured equally or that it is impossible to allocate accurately the expense between the two. For this work, the district court

14

shall allocate the cost between the secured and unsecured creditors on the best basis it can determine"); *Bank of Commerce & Tr. Co. v. Hood,* 65 F.2d 281, 283 (5th Cir. 1933) (service and expense which benefitted both secured and unsecured funds but cannot be accurately distributed may be apportioned fairly between them).  Once again, as described above and demonstrated by the attached schedules, this has been accomplished as well.

A receiver "who reasonably and diligently discharges his duties is entitled to be fairly compensated for services rendered and expenses incurred." *SEC v. Byers*, No. 08 CIV. 7104 DC, 2014 WL 7336454, at *5 (S.D.N.Y. Dec. 23, 2014); *accord Elliott*, 953 F.2d at 1577.  The District Court has repeatedly held that the Receiver has reasonably and diligently discharged his duties and benefitted the claimants and the properties. The attached schedules which have come at extraordinary time and expense fully meet and support the District Court's request for further detailed allocation.

WHEREFORE, the Receiver requests that the Court approve the interim payment of fees from the segregated property accounts in accordance with the schedules attached hereto as Exhibits 1-3.

Dated:  December 22, 2021     Respectfully submitted,

           s/ Michael Rachlis
           Michael Rachlis
           Jodi Rosen Wine
           Rachlis Duff & Peel, LLC
           542 South Dearborn Street, Suite 900
           Chicago, IL 60605
           Phone (312) 733-3950
           mrachlis@rdaplaw.net
           jwine@rdaplaw.net
           *Attorneys for Kevin B. Duff, Receiver*

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2021, I electronically filed the foregoing **Receiver's Motion for Approval of Allocations of Fees to Properties for Payment Pursuant to Receiver's Lien** with the Clerk of the United States District Court for the Northern District of Illinois, using the CM/ECF system. A true copy of the foregoing was served upon counsel of record via the CM/ECF system.

I further certify that I caused true and correct copy of the foregoing **Motion** to be served upon all individuals or entities that submitted a proof of claim in this action (sent to the e-mail address each claimant provided on the claim form) and their counsel.

I further certify that the **Motion** will be posted to the Receivership webpage at:

http://rdaplaw.net/receivership-for-equitybuild

/s/ Michael Rachlis

Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Phone  (312) 733-3950
Fax      (312) 733-3952
mrachlis@rdaplaw.net