UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 1:18-cv-5587 |
| v. | |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, | Hon. John Z. Lee |
| | Magistrate Judge Young B. Kim |
| Defendants. | |

## MOTION FOR DETERMINATION THAT RECEIVERSHIP STAY IS NOT APPLICABLE TO THE LIBERTY MALPRACTICE ACTION

Liberty EBCP, LLC ("Liberty"), by and through its counsel, Jaffe, Raitt, Heuer & Weiss, P.C., brings this Motion for Determination That Receivership Stay is Not Applicable to the Liberty Malpractice Action (the "Motion") under Fed.R.Civ. P. 7(b)(1). The grounds for the Motion are set forth in the accompanying brief.

In accordance with the Court's procedures, on January 7, 2022, Liberty's counsel contacted Receiver's counsel, explained the factual and legal basis for the Motion, and sought concurrence in the relief requested in the Motion. Concurrence was denied on January 10, 2022.

WHEREFORE, Liberty respectfully requests that the Court enter an order dismissing declaring that the Malpractice Litigation (as defined in the accompanying brief) against non-debtor parties is not subject to the stay issued as part of the Order Appointing Receiver (the "Receivership Order") [Doc. No. 16] and granting such other relief as the Court deems appropriate.

JAFFE, RAITT, HEUER & WEISS, P.C.

By: /s/ Jay L. Welford
Jay L. Welford (P34471)
Judith Greenstone Miller (P29208)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
Main: (248) 351-3000
Fax: (248) 351-3082
jwelford@jaffelaw.com
jmiller@jaffelaw.com

Counsel for Liberty EBCP, LLC

Dated: January 10, 2022

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 1:18-cv-5587 |
| v. | |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, | Hon. John Z. Lee |
| | Magistrate Judge Young B. Kim |
| Defendants. | |

## BRIEF IN SUPPORT OF MOTION FOR DETERMINATION THAT RECEIVERSHIP STAY IS NOT APPLICABLE TO THE LIBERTY MALPRACTICE ACTION

Liberty EBCP, LLC ("Liberty"), by and through its counsel, Jaffe, Raitt, Heuer & Weiss, P.C., and for its Brief in Support of Motion for Determination that Receivership Stay is Not Applicable to the Liberty Malpractice Action, states as follow:

### INTRODUCTION

Liberty has filed the instant motion to obtain a determination that the Liberty Malpractice Action (as defined below), a direct and distinct action against some of the same third-party defendants, not parties to this Receivership proceedings, that the Receiver is pursuing in separate state court litigation, is not subject to the receivership stay issued by this Court, notwithstanding that both the Receiver and Liberty are asserting separate claims against an insurance policy owned by the third-party defendants. Liberty submits that, even though the Receiver and Liberty have competing claims against the insurance policy, the insurance policy is not an asset of the Receivership estate, but rather property of the non-debtor third parties. Thus, for this reason, as well as the other arguments set forth below, there is no factual or legal basis to justify extending the Receivership stay to the Liberty Malpractice Action.

# I. BACKGROUND FACTS

**A.**     **The Liberty Malpractice Action.**

Liberty is a secured creditor in this Receivership proceeding by virtue of having loaned $9.2 million (the "Loan") to SSDF7 Portfolio I, LLC (the "Borrower")[1] that is secured by two (2) mortgages and guaranteed by Jerome F. Cohen (the "Guarantor") (the "Loan Transaction"). In connection with the Loan Transaction, Ioana Salajanu ("Salajanu"), an attorney employed at Rock Fusco & Connelly, LLC ("RFC"), counsel for the Borrower, delivered an opinion letter (the "Opinion Letter") to Liberty that was signed by Salajanu. Liberty's issuance of the Loan was conditioned on the delivery of the Opinion Letter. RFC and Salajanu knew that Liberty was relying on the Opinion Letter to close the Loan Transaction as the Opinion Letter stated:

> The foregoing opinions may be relied upon by Lender, its successors and/or assigns . . . and their respective counsel . . .

See attached **Exhibit A**, page 5. After the Loan closed, Liberty learned that the Opinion Letter contained untrue representations – to wit: that RFC had "no actual knowledge of any material pending or threatened lawsuits, claims or criminal proceedings against Borrower or Guarantor or specifically applicable to the Property except as set forth on Schedule 1 attached hereto." See attached **Exhibit A**, paragraph 13. Unbeknownst to Liberty, the representation in paragraph 13 of the Opinion Letter was untrue when made – a fact that Liberty contends RFC was well aware of at the time. Thereafter, on April 20, 2020, prior to the running of the applicable statute of limitations, Liberty filed a one-count complaint (the "Complaint") asserting legal malpractice against RFC and Salajanu in the Circuit Court of Cook County, Illinois County Department, Law Division, captioned *Liberty EBCP, LLC v. Rock Fusco & Connelly, LLC, et al.,* Case No. 2020 L

---

[1] The Borrower is one of the subsidiaries of EquityBuild, Inc ("EquityBuild") and EquityBuild Finance, LLC ("EquityBuild Finance") that is subject to the pending Receivership.

4725 (the "Liberty Malpractice Action"). A copy of the Complaint is attached as **Exhibit B**. After the Complaint was filed, RFC notified its insurer and requested that the insurer provide defense costs to it.[2]

B.    **The Receiver's Request to Stay the Liberty Malpractice Action**

On December 12, 2021, eighteen months after Liberty had commenced the Liberty Malpractice Action, Michael C. Bruck, counsel for the Receiver, sent Liberty a letter (the "Receiver's Letter") advising Liberty that the Receiver had also commenced a two-count complaint against RFC, Salajanu and others in the Circuit Court of Cook County Department, Law Department, Case No. 2020 L 8843, alleging legal malpractice and aiding and abetting by the lawyers in connection with the Ponzi scheme perpetrated by EquityBuild, EquityBuild Finance, Jerome Cohen and Shaun Cohen (the "Receiver's Action"), a copy of which complaint is attached as **Exhibit C**. Again, after the Receiver's Action was commenced, RFC triggered defense costs for the Receiver's Action under the Insurance Policy.

In the Receiver's Letter, the Receiver contended, among other things, that (i) the Insurance Policy was property of the Receivership estate, (ii) the continuation of the Liberty Malpractice Action was negatively impacting and diminishing the Insurance Policy, and (iii) the filing of the Liberty Malpractice Action was a violation of the stay issued by this Court under the Order Appointing Receiver ("Receivership Order") [Doc. No. 16] (the "Receivership Stay"). The Receiver then requested that Liberty agree to stay the Liberty Malpractice Action. A copy of the Receiver's Letter is attached as **Exhibit D**.

On December 20, 2021, Liberty sent the Receiver a response (the "Liberty Response") to the Receiver's Letter, a copy of which is attached as **Exhibit E**, indicating that it did not believe

---

[2] RFC has an insurance policy with Argonaut Insurance Company (the "Insurance Company") covering malpractice claims in the amount of $5 million (the "Insurance Policy").

that it had violated the Receivership Stay because (i) the Liberty Malpractice Action was a direct third party action against non-debtor parties on claims that were factually distinct from the claims asserted by the Receiver in the Receiver's Action, (ii) the issuance of a stay would deprive Liberty of due process, and (iii) the Insurance Policy did not constitute an asset of the Receivership estate notwithstanding that both the Receiver and Liberty had asserted claims subject thereto.

The Receiver did not respond to the Liberty Response and, instead, filed a petition to intervene into the Liberty Malpractice Action in order to seek entry of an order staying the Liberty Malpractice Action by the State Court (the "Intervention Petition"). A copy of the Intervention Petition (without exhibits, other than Exhibit A, the proposed Motion to Enforce Stay ("the "Stay Motion"))[3] is attached as **Exhibit F**.[4]

## C.    The Receivership Order

On August 17, 2018, this Court entered the Receivership Order that provides, among other things, for the implementation of the Receivership Stay. Paragraph 32 states in relevant part:

> All civil and legal proceedings of any nature, including, but not limited to bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving: (a) the Receiver, in his capacity as Receiver; (b) any Receivership Assets, wherever located; (c) any of the Receivership Defendants' past or present officers, directors, managers, members, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceeding are hereinafter referred to as "Ancillary Proceedings").

---

[3] The exhibits attached to the Stay Motion are voluminous and, in large part, have already been filed in the Receivership matter. Notwithstanding, they are available upon request.

[4] The Petition for Intervention is set for presentment on January 12, 2022. No briefing schedule has yet been issued in connection with the Petition for Intervention..

Receivership Order, ¶ 32, pg. 16 [Doc. No. 16].

Paragraph 29 of the Receivership Order also provides an injunction against interference with the Receiver and states, in relevant part, as follows:

> C. Dissipate por otherwise diminish the value of any Receivership Assets; such prohibited actions include but are not limited to, . . . enforcing judgments, assessments or claims against any Receivership Assets or any Receivership Defendant . . .

*Id.* at ¶ 29, pg. 15 [Doc. No. 16]. The Receiver contends that the commencement and continuation of the Liberty Malpractice Action is violative of paragraphs 29 and 32 of the Receivership Order based on its assertion that the Insurance Policy is an asset of the Receivership estate. Liberty disagrees.

First, not only is the Insurance Policy not an asset of the Receivership estate, but neither RFC, nor Salajanu, is a "Receivership Defendant" or otherwise subject to the Receivership. The fact that the Receiver has sued them does not make them Receivership Defendants – while they may be targets of the Receivership, neither they, nor their assets are subject to the Receivership. Second, the fact that the Receiver and Liberty both have independent, distinct and direct claims against RFC and Salajanu does not make them Receivership Defendants or otherwise subject or make their assets, *i.e.,* the Insurance Policy, a Receivership asset. Third, while Liberty does not dispute having had notice of the Receivership Order and participated in the Receivership to protect and to effectuate it rights and remedies does not mean that Liberty violated the Receivership Order. Liberty proceeded in good faith to protect its claims against RFC and Salajanu, non-debtor third parties, prior to the expiration of the applicable statute of limitations. Fourth and finally, imposition of a stay would deprive Liberty of its due process rights and destroy its rights to pursue recovery against RFC, Salajanu and the Insurance Policy. Accordingly, as the Receivership Stay was issued by this Court, Liberty has filed this Motion to

seek a determination that the Receivership Stay is not applicable to the Liberty Malpractice Action.

## II. LAW AND ARGUMENT

**A.**  **The Receivership Stay Does Not Apply to the Liberty Malpractice Action.**

While court appointed receivers have broad powers, it is a well-known legal principle, that as officers of the court, "receivers have only those powers and duties conferred on them by the appointing court." *In re Teknek, LLC*, 343 B.R. 850, 881 (Bankr. N.D. Ill. 2006); *Witters v. Hicks,* 335 Ill.App.3d 435, 269 Ill. Dec. 241, 780 N.E.2d 713, 722 (2002); *Powell v. Voight,* 348 Ill. 605, 181 N.E. 403, 404 (1932); *Strong v. Friedman,* 261 Ill. App. 602, 1931 WL 3033, *6 (Ill.App.Ct.1931); *Chicago Title & Trust Co. v. Goldman,* 272 Ill. App. 457, 1933 WL 2689, at *5 (Ill.App.Ct.1933). The Court in this case ordered the Receiver to take "exclusive jurisdiction and possession of the assets" of 41 entities affiliated with EquityBuild and EquityBuild Finance. See, Receivership Order, **Exhibit D**.  Notably, this incredibly long list of entities over which the Receiver has jurisdiction and possession of the assets does *not* include RFC or Salajanu. RFC and Salajanu are wholly independent from the Receivership and, thus, the Receiver's attempts to prevent Liberty's pursuit and recovery of malpractice insurance proceeds under the Insurance Policy from these parties grossly overreaches the powers granted to the Receiver by this Court.

**(i)**  **Neither RFC nor Salajanu are Receivership Defendants.**

The Order [Doc. No. 290] entered by this Court on March 19, 2019, a copy of which is attached at **Exhibit G**, delineates the names of the 41 Receivership Defendants.  Neither RFC, nor Salajanu, the Defendants in the Liberty Malpractice Action and the Receiver's Action, is one of the Receivership Defendants. The fact that the Receiver and Liberty have both asserted claims against these non-debtor third parties does not make them Receivership Defendants or otherwise subject them to the jurisdiction of this Court.   Moreover, just because RFC and Salajanu

provided services to the Receivership Defendants does not make them parties over whom the Receiver has been appointed to administer.

### (ii)     The Insurance Policy is not a Receivership asset.

The fact that both the Receiver and Liberty have asserted claims against RFC and Salajanu and such claims are subject to potential insurance coverage under the Insurance Policy does not make the Insurance Policy a Receivership asset. The Insurance Policy at issue is not an insurance policy provided to one of the Receivership Defendants; rather, it was provided to RFC for the benefit of RFC, Salajanu and the other attorneys employed by RFC – thus, it is a step removed from the Receivership estate. Moreover, notwithstanding that the Insurance Company is providing defense costs in connection with the Receivership Action (as the Insurance Company is likely required to do under the Insurance Policy), it has yet to be determined that the claims asserted in the Receivership Action are even subject to coverage under the Insurance Policy, particularly when the Receiver is asserting fraud and aiding and abetting claims against RFC and the others, as opposed to simply professional malpractice, claims that are usually excluded from coverage.

### (iii)    The Liberty Malpractice Action is factually and legally distinct from the Receiver's Action

A review of the complaints filed in the Liberty Malpractice Action and the Receivership Action demonstrates that the facts giving rise to the two complaints are separate, independent and distinct. The Liberty Malpractice Action is a direct, as opposed to a derivative, action based solely on the professional negligence by RFC and Salajanu in delivery the erroneous Opinion Letter to Liberty. Moreover, the Opinion Letter made clear that the sole beneficiary of the Opinion Letter was Liberty, its successors, assigns and its counsel. Thus, no one other than Liberty has the right to seek redress from RFC's and Salajanu's breach in delivering and issuing

the erroneous Opinion Letter. The Receiver is neither a direct nor an incidental beneficiary of the Opinion Letter.

Moreover, any recovery from the Insurance Policy would merely reduce Liberty's claim in the Receivership estate; however, as the Receiver has no control over the Liberty Malpractice Action since it is not the Receiver's right to pursue, the Receivership estate does not have any interest in this cause of action. As the Court in *Gyncor, Inc. v. Healthshield Capital Corporation (In re Gyncor, Inc.)*, 251 B.R. 344 (Bankr. N.D. Ill. 2000) stated in holding that there was no stay violation in connection with a state court lawsuit brought by a lender that had allegedly breached its commitment to provide financing to prospective purchases of the debtors' assets against the second lender that ultimately provided the financing:

> Although the definition of property for purposes of the Code is broad, and encompasses all kinds of property, including tangible and intangible property, choses in action, subsection 362(a)(3) *does not bar every proceeding hostile to a debtor's claimed interest in property, no matter how intangible, unmatured or unliquidated the debtor's claims, and no matter how indirect the attack upon the estate's interest in property.* (Emphasis added)

*Id* at 355 *(citing Continental Air Lines, Inc. v. Hillblom (In re Continental Air Lines, Inc.)*, 61 B.R. 758, 778 (S.D. Tex.1986).

In contrast, the Receiver is pursuing claims for the benefit of the Receivership estate based on allegations that RFC, Salajanu and others participated and facilitated the Ponzi scheme perpetrated by the Receivership Defendants. In addition to asserting malpractice, the Receiver has asserted claims for aiding and abetting. This action is clearly a derivative action being pursued on behalf of and for the benefit of the Receivership estate and its creditors and not for the benefit of a particular creditor with respect to a specific and discreet wrong done to that creditor.

(iv)    **The Receivership Stay does not apply against non-debtor third parties or their property.**

While a receivership proceeding is not identical to a bankruptcy case that is governed by explicit statutory law – *i.e.*, the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* – nevertheless, many of the principles utilized by the bankruptcy courts in administering bankruptcy cases are borrowed and utilized by the federal courts in addressing and in assessing the handling of various receivership issues, such as the extent and nature of a stay, as illustrated in the proposed Stay Motion filed by the Receiver in the Liberty Malpractice Action that relies, in large part, on cases decided by the bankruptcy courts.  See attached Exhibit F, Stay Motion at pgs. 6-7.

Numerous courts have been confronted with questions concerning the extent and nature to which a court may impose a stay – whether it be the automatic stay governed by 11 U.S.C. § 362(a)[5] or an equitable stay issued by a federal court.  Generally, however, a stay can only be issued to preclude actions being taken against (i) a debtor or the parties over whom a receiver has been appointed, or (ii) property of the Receivership estate or the bankruptcy case.  The courts do not have the authority to stay or to interfere with actions or to obstruct contracts between third parties that are not subject to the proceeding.

In *In re Caesars Entertainment Operating Co., Inc.*, 540 B.R. 637 (Bankr. N.D. Ill. 2015), Judge Goldgar was asked by the debtor to declare that the automatic stay precluded the National Retirement Fund and its trustees (collectively, "NRF") from (i) expelling five employers from Caesars' multi-employer pension plan, and (ii) sending two Caesars' companies

---

[5] Section 362(a) generally provides for an automatic stay upon the filing of a petition in the bankruptcy court that prohibits, among other things, the commencement or continuation of a judicial, administrative or other action or proceeding against a debtor the enforcement of a judgment against a debtor or a debtor's property, an act to obtain possession of or control over property of the estate, an act to create, perfect or enforce a lien against property of the estate, or an act to collect assess or recover a claim against the debtor that arose before commencement of the case.  See e.g., 11 U.S.C. § 362(a).

a notice and demand for payment of withdrawal liability. Notwithstanding that all of the companies were part of a control group, the Court denied the debtor's motions because NRF had not taken any action against a debtor or against property of the estate. Rather, NRF's action had been directed solely to non-debtor members of the control group. In so ruling, the Court noted that:

> The stay protects the debtor, but it *poses no bar to a creditor's actions against non-debtor parties* – including third parties who are "guarantors, sureties, *insurers*, partners, and other persons liable" on the same debt. (Emphasis added)

*Id.* at 643 (citations omitted). In making this ruling, the Court dismissed and distinguished its ruling from the holding in *A.H. Robbins Co., Inc. v. Piccinin*, 788 F.2d 994, 1008 (4th Cir. 1986), relied on by the Receiver in the Stay Motion to justify the imposition of a preliminary injunction on "non-bankruptcy co-defendants" upon a finding of "unusual circumstances," based on the Seventh Circuit not having adopted the A.H. Robbins "unusual circumstances" exception. *In re Caesars Entertainment Operating Co., Inc.*, 540 B.R. at 647, fn. 8. Moreover, the Court noted that, even if there were such an exception, it would not apply here because it only applies "when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *A.H. Robbins*, 788 F.2d at 999. There has been no assertion, nor are there any facts that would suggest, albeit prove, that RFC or Sanajanu were anything but outside attorneys for some of the Receivership Defendants.

Similarly, in *In re Teknek, LLC*, 563 F.3d 639 (7th Cir. 2009), plaintiff had won a patent infringement case against two companies, one of which later filed for bankruptcy. The plaintiff claimed that the shareholders, as alter egos, had looted the two companies to avoid paying on the judgment. The trustee sought to enjoin the plaintiff because it was seeking recovery from the same pool of money as the patent plaintiff. The Court held that the patent claims were not

sufficiently related to the bankruptcy to allow an injunction to be issued. In denying the trustee's request, the Court noted that ". . . though [plaintiff's] claims involve[d] the same pool of money as the trustee's claims . . . alter egos [had] looted both Teknek and Electronics[,] . . . [which were] separate acts, which caused separate injuries to two separate companies, only one of which is in bankruptcy." *Id.* at 649.

Other cases have similarly held that the stay did not apply to non-debtor third parties. See e.g., *National Bank of Arkansas v. Panther Mountain Land Development, LLC (In re Panther Mountain Land Development, LLC0*, 686 F.3d 916 (8th Cir. 2012) (court held that automatic stay did not bar a secured creditor's proposed action against property-owners' improvement districts – separate legal entities from the debtor – even though the district included certain parcels of undeveloped land held by a chapter 11 debtor); *In re A&B Associates,, L.P.*, 2017 WL 4511354 (Bankr. S.D. Ga. 2017) (court refused to extend stay to individual actively involved in the management of the debtor entity, notwithstanding debtor's contention that his participation was critical to the success of the company and that he was a source of funding for the debtor's reorganization; no evidence was presented to support such allegations).

The Receiver has relied on a number of cases in the Stay Motion to support the application of a stay to the Liberty Malpractice Action. These cases are distinguishable from the instant case, and contrary to the Receiver's assertions, do not support the application of a stay in this instance. See e.g., *In re County Treasurer and Ex Officio Collector of Cook County*, 308 Ill. App. 3d 33, 43 (1st Dist. 1999) (court applied stay when it was conclusively determined by the court that the cause of action for statutory penalty interest arose from the same set of facts as the third party action, and thus, unlike the Liberty Malpractice Action, only one party could prevail in obtaining that interest; moreover, the court had yet to determine that the proceeds of the Insurance Policy were property of the Receivership estate); *A. H. Robbins Co., Inc. v Piccinin*,

788 F.2d 994,1008 (4th Cir. 1986) (in contrast to the A.H. Robbins' case, Liberty is not seeking to recover insurance proceeds from a party to the Receivership; nor, upon information and belief, is RFC or Salajanu part of any indemnification agreement with any party to the Receivership, and thus, the Liberty Malpractice Action or any judgment issued therein, unlike the third party action in A.H. Robbins, does not affect any property of or otherwise bind the Receivership estate); *Duff v. Central Sleep Diagnostics, LLC*, 801 F.3d. 833, 842-43 (7th Cir. 2015) (the facts of this case are not at all analogous to the instant matter; in this case, a debtor's attorney filed a claim in the receivership estate and then filed a lien for unpaid fees against a malpractice lawsuit that the debtor had pending in state court, an action that the court held violated the receivership stay; however, the Receiver here has no direct claim to assert in the Liberty Malpractice Action that would justify a similar holding); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92 (2nd Cir. 1988) (court held that (i) a "debtor's insurance policy," as opposed to an insurance policy of a non-debtor third party, is property of the estate, and (ii) unlike the Liberty Malpractice Action, the rights of distributors in the debtor's product liability policies pursuant to vendor endorsements contained therein were "derivative of and inseparable from the debtor's own right ). Accordingly, this Court should find that the Receivership Stay is not applicable to the Liberty Malpractice Action.

**B.** **Application of the Stay to the Liberty Malpractice Action Would Deny Liberty of Due Process.**

If the Court stays the Liberty Malpractice Action, it will deprive Liberty of its due process rights and negatively impact its direct right to pursue recovery against RFC and Salajanu on a cause of action separate and distinct from the claims being pursued by the Receiver in the

Receiver's action.[6]  Moreover, by taking such action, the Court, in essence, would be favoring the Receiver, to the detriment of Liberty, by permitting the Receiver to do exactly what it is complaining about by allowing the Liberty Malpractice Action to continue – to wit: diminishment and dissipation of the Insurance Policy.  To do so, particularly when it is unlikely that Liberty's claim in the Receivership proceeding will be determined anytime in the near future would place Liberty in the position that there may be nothing left in the Insurance Policy to pursue after the Receiver pursues its claims in the Receivership Action.  Furthermore, the imposition of a stay on Liberty Malpractice Action will negatively impact the on-going discovery that is currently taking place in that litigation.  Over time, documents and memories of potential fact witnesses could be lost, thereby prejudicing Liberty's due process rights.

It is patently unfair and violates due process to allow one party – the Receiver – to pursue its claims under the Insurance Policy at the disadvantage of another party, here being Liberty, with a separate, distinct and direct claim to the same Insurance Policy.  If, however, the Court, nevertheless, believes that it must take some action to preserve the Insurance Policy in the interim, then it should either (i) stay both the Receiver Action and the Liberty Action until after claims have been finally adjudicated in the Receivership or, alternatively, (ii) establish a mechanism or formula by which both Liberty and the Receiver can separate pursue their actions against RFC and Salajanu and have at least a portion of the defense costs associated with each lawsuit allocated in a fair and equitable manner between the parties.

---

6 This is no different than if RFC's company owned vehicle caused injury to a Receivership Asset and Liberty in two separate accidents.  Would Liberty be deprived to its right of recovery even if there was a common auto insurer?  Clearly, such a ruling would fly in the face of due process rights of Liberty.

## CONCLUSION

Wherefore, Liberty respectfully requests that this Court determine that the Receivership Stay does not apply to the Liberty Malpractice Action and grant such other just and equitable relief justified in this matter.

Respectfully submitted;

JAFFE, RAITT, HEUER & WEISS, P.C.

By: /s/ Jay L. Welford
Jay L. Welford (P34471)
Judith Greenstone Miller (P29208)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
Main: (248) 351-3000
Fax: (248) 351-3082
jwelford@jaffelaw.com
jmiller@jaffelaw.com

Counsel for Liberty EBCP, LLC

Dated: January 10, 2022

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

U.S. SECURITIES AND EXCHANGE
COMMISSION,

                                      Civil Action No. 1:18-cv-5587

Plaintiff,                            Hon. John Z. Lee

v.                                  Magistrate Judge Young B. Kim

EQUITYBUILD, INC.,
EQUITYBUILD FINANCE, LLC,
JEROME H. COHEN, and
SHAUN D. COHEN, Defendants.
_____/

### CERTIFICATE OF SERVICE

      I hereby certify that on January 10, 2022, I caused to be served a copy of the *Motion For Determination That Receivership Stay Is Not Applicable To The Liberty Malpractice Action, Brief in Support* and this *Certificate of Service* using the Court electronic filing system which will send notification of such filing to all parties who have filed appearances in this case.

                                      Respectfully submitted;
                                      JAFFE, RAITT, HEUER & WEISS, P.C.

                                      By: /s/ Jay L. Welford
                                      Jay L. Welford (P34471)
                                      Judith Greenstone Miller (P29208)
                                      27777 Franklin Road, Suite 2500
                                      Southfield, MI 48034
                                      Main: (248) 351-3000
                                      Fax: (248) 351-3082
                                      jwelford@jaffelaw.com
                                      jmiller@jaffelaw.com

                                      Counsel for Liberty EBCP, LLC

Dated:  January 10, 2022

# EXHIBIT A
[Opinion Letter]

FILED DATE: 4/29/2020 11:10 AM   2020L004725

LAW OFFICES

# ROCK FUSCO & CONNELLY, LLC

IOANA SALAJANU
DIRECT (312) 970-3449

321 NORTH CLARK STREET
SUITE 2200
CHICAGO, ILLINOIS 60654
(312) 494-1000
FAX (312) 494-1001
WWW.RFCLAW.COM

EMAIL:
ISALAJANU@RFCLAW.COM

May 2, 2018

Liberty EBCP, LLC
1500 JFK Blvd., Suite 250
Philadelphia, Pennsylvania 19102
Attention: Leah J. Weiss

> Re: $9,200,000 Loan from Liberty EBCP, LLC, a Delaware limited liability company (together with its successors and assigns, "**Lender**"), to SSDF7 Portfolio 1 LLC, an Illinois limited liability company.

Ladies and Gentlemen:

We have acted as counsel to SSDF7 Portfolio 1 LLC, an Illinois limited liability company ("**Borrower**"), and Jerome H. Cohen ("**Guarantor**") in connection with that certain $9,200,000.00 loan (the "**Loan**") made by Lender to Borrower.

In such capacity, we have reviewed the following documents each dated as of May 2, 2018 unless otherwise noted, as executed in connection with the Loan:

(a) Secured Promissory Note (the "**Note**") made by Borrower to Lender in the principal amount of $9,200,000.00;

(b) Term Loan Agreement (the "**Loan Agreement**") made by and between Borrower and the Lender with respect to the Loan;

(c) Mortgage, Assignment of Rents and Leases and Security Agreement (the "**Security Instrument**") covering the real estate properties identified in Exhibit A;

(d) Mortgage, Assignment of Rents and Leases and Security Agreement (collectively, with the document described in paragraph (c) above, the "**Security Instrument**") covering the real estate properties identified in Exhibit B (collectively, with the properties described in Exhibit A, the "**Property**");

(e) Assignment of Leases and Rents given by Borrower to Lender with respect to the properties identified in Exhibit A;

(f) Assignment of Leases and Rents given by Borrower to Lender with respect to the properties identified in Exhibit B (collectively, with the document described in paragraph (c) above, the "**Assignment of Leases and Rents**");

FILED DATE: 4/29/2020 11:10 AM   2020L004725

(g) Limited Recourse Guaranty (the "**Guaranty**") made by Guarantor for the benefit of Lender;

(h) ADA and Environmental Indemnity Agreement (the "**Environmental Indemnity**") made by Borrower and Guarantor for the benefit of Lender;

(i) UCC-1 Financing Statements (the "**Financing Statements**") showing Borrower as debtor, and Lender as secured party;

(j) Assignment of Management Agreement and Subordination of Management Fees by and among Borrower, Lender and WPD Management LLC;

(k) Assignment of Management Agreement and Subordination of Management Fees by and among Borrower, Lender and Paper Street Realty, LLC (collectively with the document described in paragraph (j) above, the "**Assignment of Management Agreement**");

(l) USA Patriot Act Affidavit of Guarantor and Borrower (the "**Patriot Act**");

(m) Fee Letter between Borrower and Lender (the "**Fee Letter**");

(n) Assignment of Contracts, Licenses and Permits executed Borrower in favor of Lender (the "**Assignment of Contracts**");

(o) Disclosure of Confession of Judgment between Borrower and Lender; (the "**Confession of Judgment**");

(p) Borrower's Closing Certificate executed by Borrower in favor of Lender;

(q) Resolutions of the Managing Member of South Shore Property Holdings LLC;

(r) Operating Agreement of the Borrower, dated April 2, 2018;

(s) Articles of Organization of the Borrower, filed with the Illinois Secretary of State on April 2, 2018;

(t) Operating Agreement of SSDF7 Holdco 1 LLC, a Delaware limited liability company ("**Holdco**"), dated April 26;

(u) Certificate of Formation of Holdco, filed with the Delaware Secretary of State on April 2, 2018;

(v) Amended and Reinstated Operating Agreement of South Shore Property Holdings LLC, a Delaware limited liability company ("**South Shore**", and collectively, with Guarantor, and Holdco, the "**Borrower Parties**"), dated February 16, 2018;

(w) Certificate of Formation and Certificate of Amendment of South Shore, certified by the Delaware Secretary of State as true and correct on April 20, 2018; and

FILED DATE: 4/29/2020 11:10 AM   2020L004725

(x)   Certificate of Good Standing for South Shore, issued by the Delaware Secretary of State on April 20, 2018.

The documents listed in (a) through (p) above are hereinafter collectively referred to as the "**Loan Documents**."

In rendering our opinion we have also examined the certificates of public officials, limited liability company documents and records and other certificates listed in (q) through (x) above (collectively the "**Authorization Documents**").

We have assumed that the Security Instrument will be duly recorded in the Office of the Cook Recorder of Deeds of the county in which the Property is located (the "**Recording Office**") and that all applicable recording taxes imposed thereon will be paid.

We express no opinion with respect to the effect of any law other than the law of the States of Illinois, the federal law of the United States and the statutes comprising the Delaware Limited Liability Company Act as presently in effect in the State of Delaware. Based on the foregoing (including but not limited to our review of the Loan Documents, the Authorization Documents) and upon such other investigation as we have deemed necessary, and subject to the qualifications and exceptions herein contained, we are of the opinion that:

1.     Borrower is a limited liability company duly organized, validly existing, and in good standing, duly formed and validly existing as a limited liability company under the laws of the State of Illinois.

2.     Borrower has the limited liability company power and authority to own, lease and operate the Property and to execute, deliver, and perform Borrower's obligations under the Loan Documents.

3.     There are no consents of, filings with, or actions by, any person, entity, court or government authority which are required in order for the Borrower to execute, deliver and perform its obligations under the Loan Documents that not been obtained, made, taken or performed, except for the proper filing and recording of the Financing Statements and Security Instrument in accordance with the Loan Documents.

4.     Guarantor is the sole member and Managing Member of South Shore, which is the sole Managing Manager of Holdco, which is the sole member and Managing Member of Borrower.

5.     Guarantor, as the Managing Member of South Shore, is duly authorized to execute and deliver the Loan Documents to which Borrower is a party on behalf of Borrower.

6.     None of the Borrower Parties are foreign nationals, and there is no restriction under the federal laws of the United States or under the laws of the State of Illinois which would prohibit or prevent any of the Borrower Parties from mortgaging, owning, developing, operating and managing the Property. Borrower has taken all steps, made all filings

and obtained all permits, licenses and approvals to the extent required under the aforementioned laws to enable it to mortgage, own, develop, operate and manage the Property.

7.     The execution and delivery by Borrower of the Loan Documents to which Borrower is a party, and the performance of Borrower's obligations under such Loan Documents have been duly authorized by all requisite action of Borrower and such Loan Documents have been duly executed and delivered by Borrower.

8.     Guarantor has the legal capacity to execute, deliver and perform under the Loan Documents to which either he is a party. The Loan Documents to which Guarantor is a party have been duly executed and delivered by Guarantor.

9.     The Loan Documents are the valid and binding obligations of Borrower and Guarantor, enforceable against Borrower and Guarantor in accordance with their respective terms.

10.     The execution and delivery by Borrower and Guarantor of the Loan Documents do not, and the payment by Borrower of the indebtedness evidenced by the Note will not, (a) conflict with or violate any provision of the Authorization Documents, or (b) to our actual knowledge, (i) conflict with or violate or result in a breach of any of the provisions of, or constitute a default under, or result in the creation or imposition of a lien, charge or encumbrance upon any of the properties or assets of Borrower or Guarantor pursuant to, any agreement or instrument to which Borrower or Guarantor is a party or by which any of its properties is bound, or (ii) conflict with or violate any judgment, order, writ, injunction or decree binding on Borrower or Guarantor, or (c) conflict with or violate any law, rule, regulation or ordinance applicable to Borrower or Guarantor.

11.     The Security Instrument is in proper form so as to comply with the recording requirements of State of Illinois, and upon recordation of the Security Instrument in the Recording Office, the Security Instrument will create in favor of Lender valid and effective liens on the Property (as defined in the Security Instrument), and shall secure the payment of the obligations purported to be secured thereby, and no further action will be required to create such liens. The Security Instrument, without the need for the filing of a financing statement, will perfect Lender's security interest in all fixtures described in the Security Instrument. Upon filing of the applicable Financing Statement in the Recording Office, the Lender's security interest in all fixtures described in the Security Instrument will be perfected. The Security Instrument contains such rights and remedies in favor of Lender as are customarily found in deeds of trust recorded in the State of Illinois.

12.     The Assignment of Leases and Rents is in proper form so as to comply with the recording requirements of the State of Illinois. Upon recordation thereof, the Assignment of Leases and Rents will create a valid and effective assignment of the leases and rents described therein in favor of Lender. At the time the Assignment of Leases and Rents is delivered to the Recording Office for recording, it will take effect as to all creditors and subsequent purchasers for a valuable consideration without notice, and it shall be entitled to priority over any other similar instrument delivered to said Recording Office for recording after that time, in the absence of actual notice.

FILED DATE: 4/29/2020 11:10 AM    2020L004725

FILED DATE: 4/29/2020 11:10 AM    2020L004725

13.     We have no actual knowledge of any material pending or threatened lawsuits, claims or criminal proceedings against Borrower or Guarantor or specifically applicable to the Property except as set forth on Schedule 1 attached hereto.

14.     The Loan, as made, will not violate any applicable usury laws of the State of Illinois, or other applicable laws of the State of Illinois regulating the interest rate and the interest, fees and other charges that may be charged and/or collected with respect to the Loan.

15.     The Loan Documents create a valid security interest in the personal property described in the Financing Statement intended to be filed with the Secretary of State of the State of Illinois (the "**SOS**"), which Financing Statement is in appropriate form for filing with the SOS.  Upon the filing of the Financing Statement with the SOS, the security interest of Lender in the rights of Borrower in the personal property described in the Financing Statement will be perfected under the Uniform Commercial Code (the "**UCC**") in effect in the State of Illinois to the extent such a security interest can be perfected by the filing of financing statements under the UCC.

16.     The UCC as in effect in the State of Illinois states that the UCC as in effect in the State of the debtor's organization governs the method of perfection of the secured party's security interest in personal property that can be perfected pursuant to the UCC as in effect in the State of Illinois.

17.     A court sitting in the State of Illinois would give effect to the parties' choice of Pennsylvania as contained in the Loan Documents.

The foregoing opinions may be relied upon by Lender, its successors and/or assigns, any rating agency involved in the securitization of the Loan, and their respective counsel, but may not be relied upon by any other party.

Sincerely,
Rock Fusco & Connelly, LLC

Ioana Salajanu

FILED DATE: 4/29/2020 11:10 AM   2020L004725

## EXHIBIT A

## LEGAL DESCRIPTION

### SITE NO. 1

**PARCEL 1:**
**8326-32 S. ELLIS AVENUE, CHICAGO, ILLINOIS 60619 / PIN# 20-35-303-096-0000**

THE NORTH 87.50 FEET OF LOTS 11 TO 24 INCLUSIVE (TAKEN AS A TRACT) IN BLOCK 1 IN MOORE'S SUBDIVISION OF THE NORTHEAST ¼ OF THE NORTHWEST ¼ OF THE SOUTHWEST ¼ OF SECTION 35, TOWNSHIP 38 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

**PARCEL 2:**
**8334-40 S. ELLIS AVENUE, CHICAGO, ILLINOIS 60619 / PIN# 20-35-303-097-0000**

THE SOUTHERLY 87.50 FEET OF THE NORTH 175 FEET OF LOTS 11 TO 24 INCLUSIVE (TAKEN AS A TRACT) IN BLOCK 1 IN MOORE'S SUBDIVISION OF THE NORTHEAST ¼ OF THE NORTHWEST ¼ OF THE SOUTHWEST ¼ OF SECTION 35, TOWNSHIP 38 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

**PARCEL 3:**
**8342 S. ELLIS AVENUE, CHICAGO, ILLINOIS 60619 / PIN# 20-35-303-098-0000**

THE SOUTHERLY 87.50 FEET OF THE NORTH 262.50 FEET OF LOTS 11 TO 24 (TAKEN AS A TRACT) IN BLOCK 1 IN MOORE'S SUBDIVISION OF THE NORTHEAST ¼ OF THE NORTHWEST ¼ OF THE SOUTHWEST ¼ OF SECTION 35, TOWNSHIP 38 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS

**PARCEL 4:**
**8352 S. ELLIS AVENUE, CHICAGO, ILLINOIS 60649 / PIN #20-35-303-099-0000**

LOTS 11 TO 24 INCLUSIVE, TAKEN AS TRACT, (EXCEPT THE NORTH 262.50 FEET THEREOF) IN BLOCK 1 IN MOORE'S SUBDIVISION OF THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 35, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

### SITE NO. 2

**6356 S. CALIFORNIA AVENUE, CHICAGO, ILLINOIS 60629 / PIN# 19-24-107-037-0000**

LOTS 26 AND 27 IN BLOCK 1 IN JOHN BAIN'S SUBDIVISION OF THE EAST ½ OF THE EAST ½ OF THE NORTHWEST ¼ OF SECTION 24, TOWNSHIP 38 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

FILED DATE: 4/29/2020 11:10 AM  2020L004725

<u>SITE NO. 3</u>
**6357 S. TALMAN AVENUE, CHICAGO, ILLINOIS 60629 / PIN# 19-24-203-023-0000**

LOTS 28 AND 29 IN BLOCK 1 IN AVONDALE, A SUBDIVISION OF THE WEST ½ OF THE NORTHEAST ¼ OF SECTION 24, TOWNSHIP 38 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

<u>SITE NO. 4</u>
**7051 S. BENNETT AVENUE, CHICAGO, ILLINOIS 60649 / PIN# 20-24-328-011-0000**

LOT 13 (EXCEPT THE SOUTH 22 FEET THEREOF) AND LOT 14 (EXCEPT THE NORTH 8 FEET THEREOF) IN BLOCK 15 IN JACKSON PARK HIGHLANDS, IN THE EAST HALF OF THE SOUTHWEST QUARTER OF SECTION 24, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

<u>SITE NO. 5</u>
**7442 S. CALUMET AVENUE, Chicago, ILLINOIS 60619 / PIN# 20-27-122-027-0000**

LOT 5 (EXCEPT THE SOUTH 8 FEET THEREOF) IN BLOCK 11 IN PRESCOTT'S SUBDIVISION OF THE EAST HALF OF THE NORTHWEST QUARTER OF SECTION 27, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

<u>SITE NO. 6</u>
**7201 S. DORCHESTER AVENUE, CHICAGO, ILLINOIS 60619 / PIN# 20-26-210-001-0000**

LOTS 14 AND 15 IN BLOCK 10 IN JOHN G. SHORTALL TRUSTEE'S SUBDIVISION OF THE NORTH ½ OF THE NORTHEAST ¼ OF SECTION 26, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

<u>SITE NO. 7</u>
**7546 S. SAGINAW AVENUE, CHICAGO, ILLINOIS 60649 / PIN# 21-30-304-020-0000**

THE SOUTH ½ OF LOT 10 IN DIVISION 2 OF WESTFALL'S SUBDIVISION OF 208 ACRES, BEING THE EAST ½ OF THE SOUTHWEST ¼ AND THE SOUTHEAST FRACTIONAL ¼ OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

FILED DATE: 4/29/2020 11:10 AM   2020L004725

# SCHEDULE 1
# Building Violations

FILED DATE: 4/29/2020 11:10 AM    2020L004725



April 24, 2018


Re: 2736 W 64th Building Violations


To Whom It May Concern:

I am writing in regards to the status of outstanding violations for the property at 2736 W 64th St.,
in Chicago dated June 1, 2017. There were 5 violations noted as part of this inspection. The
missing smoke detector of the 3rd floor rear porch has been replaced along with the front door
latch on the south elevation, and since the time of the inspection the building has had monthly
pest control maintenance. Additionally, the City of Chicago general ordinance was amended in
September 2017 so that building registration for this type of structure is no longer required, and
as such this violation is not relevant. The remaining item, the washed out mortar on the copings
of the east and south elevations we anticipate having cured within 30 days, at which time we will
arrange for re-inspection of the premises to formally cure the outstanding violations. The re-
inspection time frame should be no more than ten days after the work has been completed.
Should there be any further questions or concerns on this matter, please feel free to contact me at
your convenience.



Sincerely,




Tyler DeRoo

Asset Manager


5068 W Plano Pkwy, #300 / Plano, TX 75093 • 800.991.4642 • www.equitybuild.com

FILED DATE: 4/29/2020 11:10 AM   2020L004725



April 24, 2018


Re: 4317 S Michigan Building Violations


To Whom It May Concern:

I am writing in regards to the status of outstanding violations for the property at 4317-19 S
Michigan Ave., in Chicago dated January 28, 2016. There were 3 violations noted as part of this
inspection. The missing smoke detector of the 3rd floor rear porch has been replaced along with
the front door latch on the south elevation, and since the time of the inspection the building has
had monthly pest control maintenance. Additionally, the City of Chicago general ordinance was
amended in September 2017 so that building registration for this type of structure is no longer
required, and as such this violation is not relevant. The remaining item, the washed out mortar on
the copings of the east and south elevations we anticipate having cured within 30 days, at which
time we will arrange for re-inspection of the premises to formally cure the outstanding
violations. The re-inspection time frame should be no more than ten days after the work has been
completed.  Should there be any further questions or concerns on this matter, please feel free to
contact me at your convenience.



Sincerely,




Tyler DeRoo

Asset Manager


5068 W Plano Pkwy, #300  /  Plano, TX 75093  •  800.991.4642  •  www.equitybuild.com

FILED DATE: 4/29/2020 11:10 AM   2020L004725



April 24, 2018


Re: 7201 S Dorchester Building Violations


To Whom It May Concern:

I am writing in regards to the status of outstanding violations for the property at 7201 S Dorchester Ave., in Chicago dated January 28, 2016. There were 3 violations noted as part of this inspection. The missing mortar and chipped bricks on the chimney and the west exterior wall will be cured within the scope of work to be completed that has been provided for the capital expenditure budget as part of this loan. We anticipate the work being completed within the next 50 days at which time we will arrange for re-inspection of the premises . The re-inspection time frame should be no more than ten days after the work has been completed.  Should there be any further questions or concerns on this matter, please feel free to contact me at your convenience.


Sincerely,



Tyler DeRoo

Asset Manager

FILED DATE: 4/29/2020 11:10 AM   2020L004725



April 24, 2018

Re: 7656 S Kingston Ave./2516 W E 77th St. Building Violations

To Whom It May Concern:

I am writing in regards to the status of outstanding violations for the property at 7656 S Kingston Ave., also known as 2516 E 77th St., in Chicago dated April 18, 2017. There were 5 violations noted as part of this inspection. The window sills with the open joints have been repaired and broken north window panes have been replaced. The remaining items, the missing mortar on the west exterior wall and chimney, we anticipate having cured within 30 days, at which time we will arrange for re-inspection of the premises to formally cure the outstanding violations. The re-inspection time frame should be no more than ten days after the work has been completed. Should there be any further questions or concerns on this matter, please feel free to contact me at your convenience.

Sincerely,

Tyler DeRoo

Asset Manager

FILED DATE: 4/29/2020 11:10 AM   2020L004725



April 24, 2018

Re: 7701 S Essex Building Violations

To Whom It May Concern:

I am writing in regards to the status of outstanding violations for the property at 7701 S Essex
Ave., in Chicago dated March 9, 2017. There were 2 violations noted as part of this inspection.
The defective light fixtures on the front of the building along with the Romex cable supplying
those light fixtures has been replace. The re-inspection will be ordered by the end of April and
should be complete within 10 days of the date the inspection is ordered.  Should there be any
further questions or concerns on this matter, please feel free to contact me at your convenience.


Sincerely,



Tyler DeRoo

Asset Manager

FILED DATE: 4/29/2020 11:10 AM   2020L004725



April 24, 2018

Re: 7959 Marquette Building Case #14M1400955

To Whom It May Concern:

I am writing in regards to the status of outstanding items in the 7959 S Marquette Ave. building case, filed on June 4, 2015. There were 21 violations noted as part of this complaint. The following item numbers as recognized in the complaint have been completed and recognized as complied by the city inspector:  3, 9, 11, 12, 13, 17, and 20.

Item number 6, filing the building registration with the city is no longer required per changes to the municipal code in September 2017.

The following item numbers have been completed but not yet complied: 4, 5, 10, 14, 15, 16, 18, 19, and 20. The window screens referenced as part of item 1 have been ordered, and installation should be complete within the next two weeks.

Item numbers 7 and 8 are in the process of being completed under work which required a permit. That permit was issued on April 9th, 2018, under permit number 100756033. This masonry work is expected to be completed within 30 days. The next building court date is June 13, 2018. All the work shall be completed by the end of May, with the building inspection to take place in the first week of June prior to the next court date, at which time we fully expect that all items will be found as complied, and the case will be subsequently dismissed. Should there be any further questions or concerns on this matter, please feel free to contact me at your convenience.

Sincerely,



Tyler DeRoo

Asset Manager

---

5068 W Plano Pkwy, #300  /  Plano, TX 75093  •  800.991.4642  •  www.equitybuild.com

FILED DATE: 4/29/2020 11:10 AM  2020L004725



April 24, 2018

Re: 8201 S Kingston Building Violations

To Whom It May Concern:

I am writing in regards to the status of outstanding violations for the property at 8201 S Kingston Ave., in Chicago dated March 8, 2018. There were 5 violations noted as part of this inspection. The replacement of the handrail on the south elevation exterior stair has been completed. The remaining three building related issues: Washed out mortar on the north elevation window sill, washed out mortar at grade on the east elevation, and the replacement of the garage doors has begun. We anticipate having these items cured within 30 days, at which time we will arrange for re-inspection of the premises to formally cure the outstanding violations. The re-inspection time frame should be no more than ten days after the work has been completed.  Should there be any further questions or concerns on this matter, please feel free to contact me at your convenience.


Sincerely,



Tyler DeRoo

Asset Manager

FILED DATE: 4/29/2020 11:10 AM   2020L004725



April 24, 2018

Re: 8334 Ellis Building Case #17M1401260

To Whom It May Concern:

I am writing in regards to the status of outstanding items in the 8334 S Ellis Ave. building case, filed on July 12, 2017. There were 10 violations noted as part of this complaint. The following item numbers as recognized in the complaint have been completed and recognized as complied by the city inspector: 1, 2, 3, and 4.

Item number 10, filing the building registration with the city is no longer required per changes to the municipal code in September 2017.

Item numbers 5, 6, 7, 8 and 9 are in the process of being completed under work which required a permit. Those permit were issued on January 31st, 2018 and March 23rd, 2018, under permit numbers 100745572 and 100753356 respectively The roof work and iron fence repairs under the permit have been completed and the HVAC and masonry work are expected to be completed within 30 days. The scopes and budgets for all this work have been submitted as part of this loan and the balance due for the work is being held back in escrow as part of this loan. The next building court date is June 7, 2018. All the work shall be completed by the end of May, with the building inspection to take place on June 6, at which time we fully expect that all items will be found as complied, and the case will be subsequently dismissed. Should there be any further questions or concerns on this matter, please feel free to contact me at your convenience.

Sincerely,

Tyler DeRoo

Asset Manager

FILED DATE: 4/29/2020 11:10 AM   2020L004725

# SCHEDULE 1
# Property Litigation

FILED DATE: 4/29/2020 11:10 AM   2020L004725

Pending building cases that Borrower is taking subject to.

RE:  **Issuing Office File Number: 1890661**
     **Property Address: 2453 E 75th St Chicago, IL 60649**

Proceedings pending on a complaint filed on December 21, 2017, as Case No. 17M1-403598, Circuit Court of Cook County, by the City of Chicago and against 7508 S. Essex Condo Association, unknown owners, non-record claimants and the subject property, for building code violations, demolition and lien.
Note: Lis Pendens notice recorded as document number 1802304099.

RE:  **Issuing Office File Number: 1890665**
     **Property Address: 7959 S Marquette Ave Chicago, IL 60617**

Proceedings pending on a complaint filed on March 22, 2014, as Case No. 2014M1-400955, Circuit Court of Cook County, by the City of Chicago and against the subject premises, Chicago Title Land Trust Company, Trustee under Trust #12186904, Willie Crayton, Inland Bank & Trust, unknown owners and non-record claimants, for building code violations, demolition and lien.
Note: Lis Pendens notice recorded as document number 1409341106.

RE:  **Issuing Office File Number: 1890652**
     **Property Address: 8326-54 S Ellis Ave Chicago, IL 60619**

Proceedings pending on a complaint filed on May 22, 2017, as Case No. 17M1-401260, Circuit Court of Cook County, by the City of Chicago and against Chicago Title Land Trust Co., successor to South Holland Trust & Savings Bank, as trustee, George Parrott, unknown owners and non-record claimants and the subject premises, for building code violations, demolition and lien.
Note: Lis Pendens notice recorded as document number 1715841085.

FILED DATE: 4/29/2020 11:10 AM   2020L004725

## EXHIBIT B

## LEGAL DESCRIPTION

### SITE NO. 8
**4317-19 S. MICHIGAN AVENUE, CHICAGO, ILLINOIS 60653 / PIN# 20-03-302-002-0000**

LOT 7 IN BLOCK 1 IN L. W. STONE'S SUBDIVISION OF THE EAST 20 ACRES OF THE NORTH 30 ACRES OF THE WEST ½ OF THE SOUTHWEST 1/4 OF SECTION 3, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

### SITE NO. 9
**2736-2744 W. 64TH STREET, CHICAGO, ILLINOIS 60629 / PIN# 19-24-200-029-0000**

LOT 15 (EXCEPT THE NORTH 10 FEET THEREOF) IN MOREAU AND DE JONG'S RESUBDIVISION OF LOTS 30 TO 48 INCLUSIVE IN BLOCK 16 IN AVONDALE ADDITION TO CHICAGO, BEING A SUBDIVISION OF THE WEST ½ OF THE NORTHEAST ¼ OF SECTION 24, TOWNSHIP 38 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

### SITE NO. 10
**2453 E. 75TH STREET/7508 S. ESSEX AVENUE, CHICAGO, IL 60649 / PIN# 21-30-301-030-0000**

LOT 1 AND THE EAST 18.00 FEET OF LOT 2 IN BLOCK 3 IN SOUTH SHORE PARK, BEING A SUBDIVISION OF THE WEST ½ OF THE SOUTHWEST ¼ OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

### SITE NO. 11
**7701-03 S. ESSEX AVENUE, CHICAGO, ILLINOIS 60649 / PIN# 21-30-320-001-0000**

LOT 36 AND THE NORTH 2.41 FEET OF LOT 35 IN BLOCK 10 IN SOUTH SHORE PARK, A SUBDIVISION OF THE WEST ½ OF THE SOUTHWEST ¼ OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

### SITE NO. 12
**7748-52 S. ESSEX AVENUE, CHICAGO, ILLINOIS 60649 / PIN# 21-30-319-029-0000**

LOTS 16, 17 AND 18, IN BLOCK 11, IN SOUTH SHORE PARK, BEING A SUBDIVISION OF THE WEST HALF OF THE SOUTHWEST QUARTER (EXCEPT STREETS) OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

### SITE NO. 13
**816-22 E. MARQUETTE ROAD, CHICAGO, ILLINOIS 60637 / PIN# 20-23-112-028-0000**

LOT 12 IN BLOCK 8 IN WOODLAWN RIDGE SUBDIVISION OF THE SOUTH ½ OF THE NORTHWEST ¼ OF SECTION 23, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

FILED DATE: 4/29/2020 11:10 AM   2020L004725

**SITE NO. 14**
**7957-59 S. MARQUETTE AVENUE, CHICAGO, ILLINOIS 60617 / PIN# 21-31-106-024-0000**

LOTS 29 AND 30 IN THE SUBDIVISION OF BLOCK 6 OF CIRCUIT COURT PARTITION OF THE NORTHWEST ¼ OF THE NORTHEAST ¼ AND THE NORTHEAST ¼ OF THE NORTHWEST ¼ OF SECTION 31 TOWNSHIP 38 NORTH RANGE 15 EAST OF THE THIRD PRINCIPAL MERIDIAN IN COOK COUNTY, ILLINOIS.

**SITE NO. 15**
**7600 S. KINGSTON AVENUE, CHICAGO, ILLINOIS 60649 / PIN# 21-30-309-030-0000**

LOTS 1, 2 AND 3, IN BLOCK 7, IN SOUTH SHORE PARK, BEING A SUBDIVISION OF THE WEST HALF OF THE SOUTHWEST QUARTER (EXCEPT STREETS) OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

**SITE NO. 16**

**7656 S. KINGSTON AVENUE, CHICAGO, ILLINOIS 60649 / PIN# 21-30-309-026-0000**

LOT 18 IN BLOCK 7 IN SOUTH SHORE PARK, BEING SUBDIVISION OF THE WEST 1/2 OF THE SOUTHWEST ¼ IN SECTION 30, TOWNSHIP 38 NORTH, RANGE 15 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

**SITE NO. 17**
**8201 S. KINGSTON AVENUE, CHICAGO, IL 60617 / PIN# 21-31-126-001-0000**

LOT 38 (EXCEPT THE SOUTH 28 AND ONE HALF FEET THEREOF) AND ALL OF LOTS 39 AND 40 IN BLOCK 4 IN THE SUBDIVISION OF LOTS 1 TO 10, BOTH INCLUSIVE, IN CHARLES RINGER'S SOUTH SHORE ADDITION, BEING A SUBDIVISION OF THE EAST ½ OF THE SOUTHWEST ¼ OF THE NORTHWEST ¼ OF SECTION 31, TOWNSHIP 38 NORTH, RANGE 15 EAST OF THE THIRD PRINCIPAL MERIDIAN (EXCEPT THE SOUTH 33 FEET THEREOF TAKEN FOR WIDENING EAST 83RD STREET) IN COOK COUNTY, ILLINOIS.

Exhibit B

# EXHIBIT B

[Liberty Malpractice Action]

FILED DATE: 4/29/2020 11:10 AM   2020L004725

FILED
4/29/2020 11:10 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

9161919

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

LIBERTY EBCP, LLC, a Delaware limited
liability company,

        Plaintiff,

    v.

ROCK FUSCO & CONNELLY, LLC, an
Illinois limited liability company and IOANA
SALAJANU, an individual,

        Defendants.

Case No.: 2020L004725

## COMPLAINT

Plaintiff Liberty EBCP, LLC ("Liberty"), for the Complaint against Rock Fusco & Connelly, LLC ("RFC") and Ioana Salajanu, states as follows:

1.    This matter arises out of an opinion letter that Ioana Salajanu authored while employed as an attorney at, and on behalf of, Rock Fusco & Connelly which contains statements that Salajanu and RFC knew were untrue at the time that she issued the opinion letter. In reliance on the opinion letter and its untrue representations, Liberty made a $9.2 million loan, the priority of which is now in jeopardy. Liberty brings the instant action to seek redress for injury that it suffered stemming from Defendants' wrongful conduct.

## The Parties

2.    Plaintiff Liberty is a limited liability company organized under the laws of the State of Delaware.

3.    Defendant RFC is a limited liability company organized under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.

FILED DATE: 4/29/2020 11:10 AM    2020L004725

4.      Defendant Salajanu is an attorney formerly employed by RFC.  On information and belief, Salajanu resides in Cook County, Illinois.

## Jurisdiction and Venue

5.      This Court has jurisdiction over the Defendants because they reside in and conduct business in the State of Illinois.

6.      Venue over this dispute is proper in the Circuit Court of Cook County pursuant to 735 ILCS 5/2-101 because the acts alleged occurred in Cook County.

## The Loan Transaction and Accompanying Opinion Letter

7.      On or about May 2, 2018, Liberty loaned SSDF Portfolio I, LLC (the "Borrower") $9.2 million (the "Loan").  The Loan was secured by two mortgages and was guaranteed by Jerome F. Cohen (the "Guarantor").

8.      Employees of RFC including Salajanu represented the Borrower and Guarantor in connection with the Loan.

9.      In connection with the Loan, RFC delivered an Opinion Letter, a copy of which is attached hereto as Exhibit A.  The letter was signed by Salajanu, then an attorney at RFC.

10.      Liberty's issuance of the Loan was conditioned upon delivery of the Opinion Letter by RFC to Liberty, Liberty relied on the Opinion Letter when determining to make the Loan and but for the issuance of the Opinion Letter, Liberty would not have closed the Loan.

11.      RFC knew that Liberty was relying on the Opinion Letter.  The last sentence of the Opinion Letter states that "The foregoing opinions may be relied upon by Lender, its successors and/or assigns… and their respective counsel…" (Ex. A at page 5.)  Accordingly, RFC and Salajanu owed Liberty a duty of care in ensuring that the statements that the representations contained in the Opinion Letter were truthful and accurate.

FILED DATE: 4/29/2020 11:10 AM   2020L004725

**The False Representation**

12.     In the Opinion Letter, RFC represented the firm had "no actual knowledge of any material pending or threatened lawsuits, claims or criminal proceedings against Borrower or Guarantor or specifically applicable to the Property except as set forth on Schedule 1 attached hereto." (Ex. A, Paragraph 13.)  Schedule 1 disclosed three building code violation cases.

13.     Unbeknownst to Liberty, the representation in paragraph 13 of the Opinion Letter was untrue when made—a fact of which RFC was well-aware.

14.     Indeed, RFC failed to disclose that it was aware of at least one, and possibly other, material pending or threatened lawsuits against Borrower or Guarantor that had been filed and served in the month prior to the issuance of the Opinion Letter.

**Defendants' Knowledge of the Untrue Nature of the Representation**

15.     As of May 2, 2018, the Guarantor was a Defendant in a lawsuit pending in the Circuit Court of Cook County, Case No.2018 CH 03665 (the "Illinois Lawsuit").  Other defendants in the Illinois Litigation include affiliates of the Borrower that pursuant to documents prepared by RFC in connection with the Loan, transferred to the Borrower real property that serves as collateral for the Loan.

16.     Service of process of the Illinois Lawsuit was completed by the Cook County Sheriff on or about April 4, 2018 (nearly one month prior to RFC's issuance of the Opinion Letter), by serving RFC, the registered agents for certain defendants in that matter.  A copy of the Affidavit of service is attached hereto as Exhibit B.

17.     RFC had communications with the plaintiff's counsel in the Illinois Lawsuit and was involved in referring the defense of the Illinois Lawsuit to counsel.

18.     The Illinois Lawsuit resulted in a second case being filed against the Borrower (and

FILED DATE: 4/29/2020 11:10 AM    2020L004725

its affiliates), the Guarantor, Liberty and others in the Circuit Court of Cook County, Case No. 2018 CH 13722. In that case, the plaintiff in the Illinois Lawsuit sought to avoid the transfer of the real property serving as collateral for the Loan as a fraudulent conveyance and to subordinate Liberty's mortgage lien on that property on account of the Illinois Lawsuit. Liberty had to expend resources in connection with the lawsuit.

19.     In addition to the Illinois Lawsuit, prior to the issuance of the Opinion Letter, the Borrower and/or the Guarantor were named as defendants and served with pleadings in two lawsuits that had been filed in early 2018 in Texas courts. Salajanu was presumably aware of the lawsuits as she served as the registered agent for the Borrower.

20.     To make matters worse, on August 5, 2018, the United States Securities and Exchange Commission ("SEC") filed a civil action against the Guarantor and certain affiliates of the Borrower in the U.S. District Court for the Northern District of Illinois. On information and belief, the Guarantor, the Borrower and the Borrower's affiliates were aware of the SEC investigation as of May 2, 2018 when the Opinion Letter was issued or had been threatened with material litigation by others as of that date.

21.     Further, as the registered agent for the Borrower and counsel to the Guarantor and the Borrower, RFC and/or Salajanu were presumably aware of the SEC investigation and related or underlying threatened or pending material litigation, claims or criminal proceedings as of the date of the Opinion Letter.

22.     In issuing the Opinion Letter containing the untrue representations in paragraph 13, RPC and Salajanu breached their duty of care.

23.     As a direct and proximate result of Defendants' conduct in connection with the issuance of the Opinion Letter, Liberty has been damaged in an amount exceeding the

FILED DATE: 4/29/2020 11:10 AM   2020L004725

jurisdictional minimum of this Court.

24. To date, Plaintiff has suffered damages in excess of $250,000 which includes costs incurred related to the Loan. This number continues to increase as the full extent of the losses is not yet known. Indeed, no payment has been made on the Loan since August 2018.

25. Had Defendants complied with their duty of care, Plaintiff would not have been damaged because Liberty would have been made aware of the Illinois Lawsuit and perhaps other lawsuits in the Opinion Letter, and as a result would not have closed the $9.2 million loan.

WHEREFORE, Liberty seeks that this Court enter judgment in its favor and against Defendants as follows:

(a) awarding damages in an amount to be proven at trial, together with interest and costs, and

(b) awarding such other and further relief as this Court deems appropriate.

**LIBERTY EBCP, LLC**

By:     */s/ Steven P. Blonder*
        One of Their Attorneys

Steven P. Blonder
MUCH SHELIST, P.C.
191 North Wacker Drive, Suite 1800
Chicago, Illinois 60606
(312) 521-2000
Firm Id. 48345
sblonder@muchlaw.com

5

10757893_2

FILED
4/29/2020 11:10 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

2020L004725

# **EXHIBIT A**

FILED DATE: 4/29/2020 11:10 AM   2020L004725

FILED DATE: 4/29/2020 11:10 AM   2020L004725

LAW OFFICES

# ROCK FUSCO & CONNELLY, LLC

IOANA SALAJANU
DIRECT (312) 970-3449

321 NORTH CLARK STREET
SUITE 2200
CHICAGO, ILLINOIS 60654
(312) 494-1000
FAX (312) 494-1001
WWW.RFCLAW.COM

EMAIL:
ISALAJANU@RFCLAW.COM

May 2, 2018

Liberty EBCP, LLC
1500 JFK Blvd., Suite 250
Philadelphia, Pennsylvania 19102
Attention: Leah J. Weiss

Re:   $9,200,000 Loan from Liberty EBCP, LLC, a Delaware limited liability company (together with its successors and assigns, "**Lender**"), to SSDF7 Portfolio 1 LLC, an Illinois limited liability company.

Ladies and Gentlemen:

We have acted as counsel to SSDF7 Portfolio 1 LLC, an Illinois limited liability company ("**Borrower**"), and Jerome H. Cohen ("**Guarantor**") in connection with that certain $9,200,000.00 loan (the "**Loan**") made by Lender to Borrower.

In such capacity, we have reviewed the following documents each dated as of May 2, 2018 unless otherwise noted, as executed in connection with the Loan:

(a)   Secured Promissory Note (the "**Note**") made by Borrower to Lender in the principal amount of $9,200,000.00;

(b)   Term Loan Agreement (the "**Loan Agreement**") made by and between Borrower and the Lender with respect to the Loan;

(c)   Mortgage, Assignment of Rents and Leases and Security Agreement (the "**Security Instrument**") covering the real estate properties identified in Exhibit A;

(d)   Mortgage, Assignment of Rents and Leases and Security Agreement (collectively, with the document described in paragraph (c) above, the "**Security Instrument**") covering the real estate properties identified in Exhibit B (collectively, with the properties described in Exhibit A, the "**Property**");

(e)   Assignment of Leases and Rents given by Borrower to Lender with respect to the properties identified in Exhibit A;

(f)   Assignment of Leases and Rents given by Borrower to Lender with respect to the properties identified in Exhibit B (collectively, with the document described in paragraph (c) above, the "**Assignment of Leases and Rents**");

FILED DATE: 4/29/2020 11:10 AM 2020L004725

(g) Limited Recourse Guaranty (the "**Guaranty**") made by Guarantor for the benefit of Lender;

(h) ADA and Environmental Indemnity Agreement (the "**Environmental Indemnity**") made by Borrower and Guarantor for the benefit of Lender;

(i) UCC-1 Financing Statements (the "**Financing Statements**") showing Borrower as debtor, and Lender as secured party;

(j) Assignment of Management Agreement and Subordination of Management Fees by and among Borrower, Lender and WPD Management LLC;

(k) Assignment of Management Agreement and Subordination of Management Fees by and among Borrower, Lender and Paper Street Realty, LLC (collectively with the document described in paragraph (j) above, the "**Assignment of Management Agreement**");

(l) USA Patriot Act Affidavit of Guarantor and Borrower (the "**Patriot Act**");

(m) Fee Letter between Borrower and Lender (the "**Fee Letter**");

(n) Assignment of Contracts, Licenses and Permits executed Borrower in favor of Lender (the "**Assignment of Contracts**");

(o) Disclosure of Confession of Judgment between Borrower and Lender; (the "**Confession of Judgment**");

(p) Borrower's Closing Certificate executed by Borrower in favor of Lender;

(q) Resolutions of the Managing Member of South Shore Property Holdings LLC;

(r) Operating Agreement of the Borrower, dated April 2, 2018;

(s) Articles of Organization of the Borrower, filed with the Illinois Secretary of State on April 2, 2018;

(t) Operating Agreement of SSDF7 Holdco 1 LLC, a Delaware limited liability company ("**Holdco**"), dated April 26;

(u) Certificate of Formation of Holdco, filed with the Delaware Secretary of State on April 2, 2018;

(v) Amended and Reinstated Operating Agreement of South Shore Property Holdings LLC, a Delaware limited liability company ("**South Shore**", and collectively, with Guarantor, and Holdco, the "**Borrower Parties**"), dated February 16, 2018;

(w) Certificate of Formation and Certificate of Amendment of South Shore, certified by the Delaware Secretary of State as true and correct on April 20, 2018; and

FILED DATE: 4/29/2020 11:10 AM    2020L004725

    (x)    Certificate of Good Standing for South Shore, issued by the Delaware Secretary of State on April 20, 2018.

The documents listed in (a) through (p) above are hereinafter collectively referred to as the "**Loan Documents**."

In rendering our opinion we have also examined the certificates of public officials, limited liability company documents and records and other certificates listed in (q) through (x) above (collectively the "**Authorization Documents**").

We have assumed that the Security Instrument will be duly recorded in the Office of the Cook Recorder of Deeds of the county in which the Property is located (the "**Recording Office**") and that all applicable recording taxes imposed thereon will be paid.

We express no opinion with respect to the effect of any law other than the law of the States of Illinois, the federal law of the United States and the statutes comprising the Delaware Limited Liability Company Act as presently in effect in the State of Delaware. Based on the foregoing (including but not limited to our review of the Loan Documents, the Authorization Documents) and upon such other investigation as we have deemed necessary, and subject to the qualifications and exceptions herein contained, we are of the opinion that:

    1.    Borrower is a limited liability company duly organized, validly existing, and in good standing, duly formed and validly existing as a limited liability company under the laws of the State of Illinois.

    2.    Borrower has the limited liability company power and authority to own, lease and operate the Property and to execute, deliver, and perform Borrower's obligations under the Loan Documents.

    3.    There are no consents of, filings with, or actions by, any person, entity, court or government authority which are required in order for the Borrower to execute, deliver and perform its obligations under the Loan Documents that not been obtained, made, taken or performed, except for the proper filing and recording of the Financing Statements and Security Instrument in accordance with the Loan Documents.

    4.    Guarantor is the sole member and Managing Member of South Shore, which is the sole Managing Manager of Holdco, which is the sole member and Managing Member of Borrower.

    5.    Guarantor, as the Managing Member of South Shore, is duly authorized to execute and deliver the Loan Documents to which Borrower is a party on behalf of Borrower.

    6.    None of the Borrower Parties are foreign nationals, and there is no restriction under the federal laws of the United States or under the laws of the State of Illinois which would prohibit or prevent any of the Borrower Parties from mortgaging, owning, developing, operating and managing the Property. Borrower has taken all steps, made all filings

and obtained all permits, licenses and approvals to the extent required under the aforementioned laws to enable it to mortgage, own, develop, operate and manage the Property.

7.      The execution and delivery by Borrower of the Loan Documents to which Borrower is a party, and the performance of Borrower's obligations under such Loan Documents have been duly authorized by all requisite action of Borrower and such Loan Documents have been duly executed and delivered by Borrower.

8.      Guarantor has the legal capacity to execute, deliver and perform under the Loan Documents to which either he is a party. The Loan Documents to which Guarantor is a party have been duly executed and delivered by Guarantor.

9.      The Loan Documents are the valid and binding obligations of Borrower and Guarantor, enforceable against Borrower and Guarantor in accordance with their respective terms.

10.      The execution and delivery by Borrower and Guarantor of the Loan Documents do not, and the payment by Borrower of the indebtedness evidenced by the Note will not, (a) conflict with or violate any provision of the Authorization Documents, or (b) to our actual knowledge, (i) conflict with or violate or result in a breach of any of the provisions of, or constitute a default under, or result in the creation or imposition of a lien, charge or encumbrance upon any of the properties or assets of Borrower or Guarantor pursuant to, any agreement or instrument to which Borrower or Guarantor is a party or by which any of its properties is bound, or (ii) conflict with or violate any judgment, order, writ, injunction or decree binding on Borrower or Guarantor, or (c) conflict with or violate any law, rule, regulation or ordinance applicable to Borrower or Guarantor.

11.      The Security Instrument is in proper form so as to comply with the recording requirements of State of Illinois, and upon recordation of the Security Instrument in the Recording Office, the Security Instrument will create in favor of Lender valid and effective liens on the Property (as defined in the Security Instrument), and shall secure the payment of the obligations purported to be secured thereby, and no further action will be required to create such liens. The Security Instrument, without the need for the filing of a financing statement, will perfect Lender's security interest in all fixtures described in the Security Instrument. Upon filing of the applicable Financing Statement in the Recording Office, the Lender's security interest in all fixtures described in the Security Instrument will be perfected. The Security Instrument contains such rights and remedies in favor of Lender as are customarily found in deeds of trust recorded in the State of Illinois.

12.      The Assignment of Leases and Rents is in proper form so as to comply with the recording requirements of the State of Illinois. Upon recordation thereof, the Assignment of Leases and Rents will create a valid and effective assignment of the leases and rents described therein in favor of Lender. At the time the Assignment of Leases and Rents is delivered to the Recording Office for recording, it will take effect as to all creditors and subsequent purchasers for a valuable consideration without notice, and it shall be entitled to priority over any other similar instrument delivered to said Recording Office for recording after that time, in the absence of actual notice.

FILED DATE: 4/29/2020 11:10 AM   2020L004725

13.    We have no actual knowledge of any material pending or threatened lawsuits, claims or criminal proceedings against Borrower or Guarantor or specifically applicable to the Property except as set forth on Schedule 1 attached hereto.

14.    The Loan, as made, will not violate any applicable usury laws of the State of Illinois, or other applicable laws of the State of Illinois regulating the interest rate and the interest, fees and other charges that may be charged and/or collected with respect to the Loan.

15.    The Loan Documents create a valid security interest in the personal property described in the Financing Statement intended to be filed with the Secretary of State of the State of Illinois (the "**SOS**"), which Financing Statement is in appropriate form for filing with the SOS. Upon the filing of the Financing Statement with the SOS, the security interest of Lender in the rights of Borrower in the personal property described in the Financing Statement will be perfected under the Uniform Commercial Code (the "**UCC**") in effect in the State of Illinois to the extent such a security interest can be perfected by the filing of financing statements under the UCC.

16.    The UCC as in effect in the State of Illinois states that the UCC as in effect in the State of the debtor's organization governs the method of perfection of the secured party's security interest in personal property that can be perfected pursuant to the UCC as in effect in the State of Illinois.

17.    A court sitting in the State of Illinois would give effect to the parties' choice of Pennsylvania as contained in the Loan Documents.

The foregoing opinions may be relied upon by Lender, its successors and/or assigns, any rating agency involved in the securitization of the Loan, and their respective counsel, but may not be relied upon by any other party.

Sincerely,
Rock Fusco & Connelly, LLC

Ioana Salajanu

FILED DATE: 4/29/2020 11:10 AM  2020L004725

## EXHIBIT A

## LEGAL DESCRIPTION

### SITE NO. 1

**PARCEL 1:**
**8326-32 S. ELLIS AVENUE, CHICAGO, ILLINOIS 60619 / PIN# 20-35-303-096-0000**

THE NORTH 87.50 FEET OF LOTS 11 TO 24 INCLUSIVE (TAKEN AS A TRACT) IN BLOCK 1 IN MOORE'S SUBDIVISION OF THE NORTHEAST ¼ OF THE NORTHWEST ¼ OF THE SOUTHWEST ¼ OF SECTION 35, TOWNSHIP 38 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

**PARCEL 2:**
**8334-40 S. ELLIS AVENUE, CHICAGO, ILLINOIS 60619 / PIN# 20-35-303-097-0000**

THE SOUTHERLY 87.50 FEET OF THE NORTH 175 FEET OF LOTS 11 TO 24 INCLUSIVE (TAKEN AS A TRACT) IN BLOCK 1 IN MOORE'S SUBDIVISION OF THE NORTHEAST ¼ OF THE NORTHWEST ¼ OF THE SOUTHWEST ¼ OF SECTION 35, TOWNSHIP 38 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

**PARCEL 3:**
**8342 S. ELLIS AVENUE, CHICAGO, ILLINOIS 60619 / PIN# 20-35-303-098-0000**

THE SOUTHERLY 87.50 FEET OF THE NORTH 262.50 FEET OF LOTS 11 TO 24 (TAKEN AS A TRACT) IN BLOCK 1 IN MOORE'S SUBDIVISION OF THE NORTHEAST ¼ OF THE NORTHWEST ¼ OF THE SOUTHWEST ¼ OF SECTION 35, TOWNSHIP 38 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS

**PARCEL 4:**
**8352 S. ELLIS AVENUE, CHICAGO, ILLINOIS 60649 / PIN #20-35-303-099-0000**

LOTS 11 TO 24 INCLUSIVE, TAKEN AS TRACT, (EXCEPT THE NORTH 262.50 FEET THEREOF) IN BLOCK 1 IN MOORE'S SUBDIVISION OF THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 35, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

### SITE NO. 2

**6356 S. CALIFORNIA AVENUE, CHICAGO, ILLINOIS 60629 / PIN# 19-24-107-037-0000**

LOTS 26 AND 27 IN BLOCK 1 IN JOHN BAIN'S SUBDIVISION OF THE EAST ½ OF THE EAST ½ OF THE NORTHWEST ¼ OF SECTION 24, TOWNSHIP 38 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Exhibit A

FILED DATE: 4/29/2020 11:10 AM   2020L004725

SITE NO. 3
**6357 S. TALMAN AVENUE, CHICAGO, ILLINOIS** 60629 / PIN# 19-24-203-023-0000

LOTS 28 AND 29 IN BLOCK 1 IN AVONDALE, A SUBDIVISION OF THE WEST ½ OF THE NORTHEAST ¼ OF SECTION 24, TOWNSHIP 38 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

SITE NO. 4
**7051 S. BENNETT AVENUE, CHICAGO, ILLINOIS 60649 / PIN# 20-24-328-011-0000**

LOT 13 (EXCEPT THE SOUTH 22 FEET THEREOF) AND LOT 14 (EXCEPT THE NORTH 8 FEET THEREOF) IN BLOCK 15 IN JACKSON PARK HIGHLANDS, IN THE EAST HALF OF THE SOUTHWEST QUARTER OF SECTION 24, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

SITE NO. 5
**7442 S. CALUMET AVENUE, Chicago, ILLINOIS 60619 / PIN# 20-27-122-027-0000**

LOT 5 (EXCEPT THE SOUTH 8 FEET THEREOF) IN BLOCK 11 IN PRESCOTT'S SUBDIVISION OF THE EAST HALF OF THE NORTHWEST QUARTER OF SECTION 27, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

SITE NO. 6
**7201 S. DORCHESTER AVENUE, CHICAGO, ILLINOIS 60619 / PIN# 20-26-210-001-0000**

LOTS 14 AND 15 IN BLOCK 10 IN JOHN G. SHORTALL TRUSTEE'S SUBDIVISION OF THE NORTH ½ OF THE NORTHEAST ¼ OF SECTION 26, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

SITE NO. 7
**7546 S. SAGINAW AVENUE, CHICAGO, ILLINOIS 60649 / PIN# 21-30-304-020-0000**

THE SOUTH ½ OF LOT 10 IN DIVISION 2 OF WESTFALL'S SUBDIVISION OF 208 ACRES, BEING THE EAST ½ OF THE SOUTHWEST ¼ AND THE SOUTHEAST FRACTIONAL ¼ OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Exhibit A

FILED DATE: 4/29/2020 11:10 AM   2020L004725

# SCHEDULE 1
# Building Violations

FILED DATE: 4/29/2020 11:10 AM   2020L004725



April 24, 2018

Re: 2736 W 64th Building Violations

To Whom It May Concern:

I am writing in regards to the status of outstanding violations for the property at 2736 W 64th St., in Chicago dated June 1, 2017. There were 5 violations noted as part of this inspection. The missing smoke detector of the 3rd floor rear porch has been replaced along with the front door latch on the south elevation, and since the time of the inspection the building has had monthly pest control maintenance. Additionally, the City of Chicago general ordinance was amended in September 2017 so that building registration for this type of structure is no longer required, and as such this violation is not relevant. The remaining item, the washed out mortar on the copings of the east and south elevations we anticipate having cured within 30 days, at which time we will arrange for re-inspection of the premises to formally cure the outstanding violations. The re-inspection time frame should be no more than ten days after the work has been completed. Should there be any further questions or concerns on this matter, please feel free to contact me at your convenience.

Sincerely,

Tyler DeRoo

Asset Manager

FILED DATE: 4/29/2020 11:10 AM 2020L004725



April 24, 2018

Re: 4317 S Michigan Building Violations

To Whom It May Concern:

I am writing in regards to the status of outstanding violations for the property at 4317-19 S Michigan Ave., in Chicago dated January 28, 2016. There were 3 violations noted as part of this inspection. The missing smoke detector of the 3rd floor rear porch has been replaced along with the front door latch on the south elevation, and since the time of the inspection the building has had monthly pest control maintenance. Additionally, the City of Chicago general ordinance was amended in September 2017 so that building registration for this type of structure is no longer required, and as such this violation is not relevant. The remaining item, the washed out mortar on the copings of the east and south elevations we anticipate having cured within 30 days, at which time we will arrange for re-inspection of the premises to formally cure the outstanding violations. The re-inspection time frame should be no more than ten days after the work has been completed. Should there be any further questions or concerns on this matter, please feel free to contact me at your convenience.

Sincerely,

Tyler DeRoo

Asset Manager



FILED DATE: 4/29/2020 11:10 AM   2020L004725

April 24, 2018


Re: 7201 S Dorchester Building Violations


To Whom It May Concern:

I am writing in regards to the status of outstanding violations for the property at 7201 S Dorchester Ave., in Chicago dated January 28, 2016. There were 3 violations noted as part of this inspection. The missing mortar and chipped bricks on the chimney and the west exterior wall will be cured within the scope of work to be completed that has been provided for the capital expenditure budget as part of this loan. We anticipate the work being completed within the next 50 days at which time we will arrange for re-inspection of the premises . The re-inspection time frame should be no more than ten days after the work has been completed.  Should there be any further questions or concerns on this matter, please feel free to contact me at your convenience.


Sincerely,



Tyler DeRoo

Asset Manager

FILED DATE: 4/29/2020 11:10 AM    2020L004725



April 24, 2018

Re: 7656 S Kingston Ave./2516 W E 77th St. Building Violations

To Whom It May Concern:

I am writing in regards to the status of outstanding violations for the property at 7656 S Kingston Ave., also known as 2516 E 77th St., in Chicago dated April 18, 2017. There were 5 violations noted as part of this inspection. The window sills with the open joints have been repaired and broken north window panes have been replaced. The remaining items, the missing mortar on the west exterior wall and chimney, we anticipate having cured within 30 days, at which time we will arrange for re-inspection of the premises to formally cure the outstanding violations. The re-inspection time frame should be no more than ten days after the work has been completed. Should there be any further questions or concerns on this matter, please feel free to contact me at your convenience.

Sincerely,

Tyler DeRoo

Asset Manager

FILED DATE: 4/29/2020 11:10 AM 2020L004725



April 24, 2018

Re: 7701 S Essex Building Violations

To Whom It May Concern:

I am writing in regards to the status of outstanding violations for the property at 7701 S Essex Ave., in Chicago dated March 9, 2017. There were 2 violations noted as part of this inspection. The defective light fixtures on the front of the building along with the Romex cable supplying those light fixtures has been replace. The re-inspection will be ordered by the end of April and should be complete within 10 days of the date the inspection is ordered. Should there be any further questions or concerns on this matter, please feel free to contact me at your convenience.

Sincerely,

Tyler DeRoo

Asset Manager

FILED DATE: 4/29/2020 11:10 AM  2020L004725



April 24, 2018

Re: 7959 Marquette Building Case #14M1400955

To Whom It May Concern:

I am writing in regards to the status of outstanding items in the 7959 S Marquette Ave. building case, filed on June 4, 2015. There were 21 violations noted as part of this complaint. The following item numbers as recognized in the complaint have been completed and recognized as complied by the city inspector: 3, 9, 11, 12, 13, 17, and 20.

Item number 6, filing the building registration with the city is no longer required per changes to the municipal code in September 2017.

The following item numbers have been completed but not yet complied: 4, 5, 10, 14, 15, 16, 18, 19, and 20. The window screens referenced as part of item 1 have been ordered, and installation should be complete within the next two weeks.

Item numbers 7 and 8 are in the process of being completed under work which required a permit. That permit was issued on April 9th, 2018, under permit number 100756033. This masonry work is expected to be completed within 30 days. The next building court date is June 13, 2018. All the work shall be completed by the end of May, with the building inspection to take place in the first week of June prior to the next court date, at which time we fully expect that all items will be found as complied, and the case will be subsequently dismissed. Should there be any further questions or concerns on this matter, please feel free to contact me at your convenience.

Sincerely,



Tyler DeRoo

Asset Manager

5068 W Plano Pkwy, #300 / Plano, TX 75093 • 800.991.4642 • www.equitybuild.com

FILED DATE: 4/29/2020 11:10 AM   2020L004725



April 24, 2018

Re: 8201 S Kingston Building Violations

To Whom It May Concern:

I am writing in regards to the status of outstanding violations for the property at 8201 S Kingston Ave., in Chicago dated March 8, 2018. There were 5 violations noted as part of this inspection. The replacement of the handrail on the south elevation exterior stair has been completed. The remaining three building related issues: Washed out mortar on the north elevation window sill, washed out mortar at grade on the east elevation, and the replacement of the garage doors has begun. We anticipate having these items cured within 30 days, at which time we will arrange for re-inspection of the premises to formally cure the outstanding violations. The re-inspection time frame should be no more than ten days after the work has been completed. Should there be any further questions or concerns on this matter, please feel free to contact me at your convenience.

Sincerely,

Tyler DeRoo

Asset Manager

5068 W Plano Pkwy, #300 / Plano, TX 75093 · 800.991.4642 · www.equitybuild.com

FILED DATE: 4/29/2020 11:10 AM  2020L004725



April 24, 2018

Re: 8334 Ellis Building Case #17M1401260

To Whom It May Concern:

I am writing in regards to the status of outstanding items in the 8334 S Ellis Ave. building case, filed on July 12, 2017. There were 10 violations noted as part of this complaint. The following item numbers as recognized in the complaint have been completed and recognized as complied by the city inspector: 1, 2, 3, and 4.

Item number 10, filing the building registration with the city is no longer required per changes to the municipal code in September 2017.

Item numbers 5, 6, 7, 8 and 9 are in the process of being completed under work which required a permit. Those permit were issued on January 31st, 2018 and March 23rd, 2018, under permit numbers 100745572 and 100753356 respectively The roof work and iron fence repairs under the permit have been completed and the HVAC and masonry work are expected to be completed within 30 days. The scopes and budgets for all this work have been submitted as part of this loan and the balance due for the work is being held back in escrow as part of this loan. The next building court date is June 7, 2018. All the work shall be completed by the end of May, with the building inspection to take place on June 6, at which time we fully expect that all items will be found as complied, and the case will be subsequently dismissed. Should there be any further questions or concerns on this matter, please feel free to contact me at your convenience.

Sincerely,

Tyler DeRoo

Asset Manager

FILED DATE: 4/29/2020 11:10 AM   2020L004725

# SCHEDULE 1
# Property Litigation

FILED DATE: 4/29/2020 11:10 AM   2020L004725

Pending building cases that Borrower is taking subject to.

**RE:    Issuing Office File Number: 1890661**
**        Property Address: 2453 E 75th St Chicago, IL 60649**

Proceedings pending on a complaint filed on December 21, 2017, as Case No. 17M1-403598, Circuit Court of Cook County, by the City of Chicago and against 7508 S. Essex Condo Association, unknown owners, non-record claimants and the subject property, for building code violations, demolition and lien.
Note: Lis Pendens notice recorded as document number 1802304099.

**RE:    Issuing Office File Number: 1890665**
**        Property Address: 7959 S Marquette Ave Chicago, IL 60617**

Proceedings pending on a complaint filed on March 22, 2014, as Case No. 2014M1-400955, Circuit Court of Cook County, by the City of Chicago and against the subject premises, Chicago Title Land Trust Company, Trustee under Trust #12186904, Willie Crayton, Inland Bank & Trust, unknown owners and non-record claimants, for building code violations, demolition and lien.
Note: Lis Pendens notice recorded as document number 1409341106.

**RE:    Issuing Office File Number: 1890652**
**        Property Address: 8326-54 S Ellis Ave Chicago, IL 60619**

Proceedings pending on a complaint filed on May 22, 2017, as Case No. 17M1-401260, Circuit Court of Cook County, by the City of Chicago and against Chicago Title Land Trust Co., successor to South Holland Trust & Savings Bank, as trustee, George Parrott, unknown owners and non-record claimants and the subject premises, for building code violations, demolition and lien.
Note: Lis Pendens notice recorded as document number 1715841085.

FILED DATE: 4/29/2020 11:10 AM  2020L004725

## EXHIBIT B

## LEGAL DESCRIPTION

### SITE NO. 8
**4317-19 S. MICHIGAN AVENUE, CHICAGO, ILLINOIS 60653 / PIN# 20-03-302-002-0000**

LOT 7 IN BLOCK 1 IN L. W. STONE'S SUBDIVISION OF THE EAST 20 ACRES OF THE NORTH 30 ACRES OF THE WEST ½ OF THE SOUTHWEST 1/4 OF SECTION 3, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

### SITE NO. 9
**2736-2744 W. 64TH STREET, CHICAGO, ILLINOIS 60629 / PIN# 19-24-200-029-0000**

LOT 15 (EXCEPT THE NORTH 10 FEET THEREOF) IN MOREAU AND DE JONG'S RESUBDIVISION OF LOTS 30 TO 48 INCLUSIVE IN BLOCK 16 IN AVONDALE ADDITION TO CHICAGO, BEING A SUBDIVISION OF THE WEST ½ OF THE NORTHEAST ¼ OF SECTION 24, TOWNSHIP 38 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

### SITE NO. 10
**2453 E. 75TH STREET/7508 S. ESSEX AVENUE, CHICAGO, IL 60649 / PIN# 21-30-301-030-0000**

LOT 1 AND THE EAST 18.00 FEET OF LOT 2 IN BLOCK 3 IN SOUTH SHORE PARK, BEING A SUBDIVISION OF THE WEST ½ OF THE SOUTHWEST ¼ OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

### SITE NO. 11
**7701-03 S. ESSEX AVENUE, CHICAGO, ILLINOIS 60649 / PIN# 21-30-320-001-0000**

LOT 36 AND THE NORTH 2.41 FEET OF LOT 35 IN BLOCK 10 IN SOUTH SHORE PARK, A SUBDIVISION OF THE WEST ½ OF THE SOUTHWEST ¼ OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

### SITE NO. 12
**7748-52 S. ESSEX AVENUE, CHICAGO, ILLINOIS 60649 / PIN# 21-30-319-029-0000**

LOTS 16, 17 AND 18, IN BLOCK 11, IN SOUTH SHORE PARK, BEING A SUBDIVISION OF THE WEST HALF OF THE SOUTHWEST QUARTER (EXCEPT STREETS) OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

### SITE NO. 13
**816-22 E. MARQUETTE ROAD, CHICAGO, ILLINOIS 60637 / PIN# 20-23-112-028-0000**

LOT 12 IN BLOCK 8 IN WOODLAWN RIDGE SUBDIVISION OF THE SOUTH ½ OF THE NORTHWEST ¼ OF SECTION 23, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

FILED DATE: 4/29/2020 11:10 AM   2020L004725

### SITE NO. 14
**7957-59 S. MARQUETTE AVENUE, CHICAGO, ILLINOIS** 60617 / **PIN# 21-31-106-024-0000**

LOTS 29 AND 30 IN THE SUBDIVISION OF BLOCK 6 OF CIRCUIT COURT PARTITION OF THE NORTHWEST ¼ OF THE NORTHEAST ¼ AND THE NORTHEAST ¼ OF THE NORTHWEST ¼ OF SECTION 31 TOWNSHIP 38 NORTH RANGE 15 EAST OF THE THIRD PRINCIPAL MERIDIAN IN COOK COUNTY, ILLINOIS.

### SITE NO. 15
**7600 S. KINGSTON AVENUE, CHICAGO, ILLINOIS 60649 / PIN# 21-30-309-030-0000**

LOTS 1, 2 AND 3, IN BLOCK 7, IN SOUTH SHORE PARK, BEING A SUBDIVISION OF THE WEST HALF OF THE SOUTHWEST QUARTER (EXCEPT STREETS) OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

### SITE NO. 16
**7656 S. KINGSTON AVENUE, CHICAGO, ILLINOIS 60649 / PIN# 21-30-309-026-0000**

LOT 18 IN BLOCK 7 IN SOUTH SHORE PARK, BEING SUBDIVISION OF THE WEST 1/2 OF THE SOUTHWEST ¼ IN SECTION 30, TOWNSHIP 38 NORTH, RANGE 15 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

### SITE NO. 17
**8201 S. KINGSTON AVENUE, CHICAGO, IL** 60617 / **PIN# 21-31-126-001-0000**

LOT 38 (EXCEPT THE SOUTH 28 AND ONE HALF FEET THEREOF) AND ALL OF LOTS 39 AND 40 IN BLOCK 4 IN THE SUBDIVISION OF LOTS 1 TO 10, BOTH INCLUSIVE, IN CHARLES RINGER'S SOUTH SHORE ADDITION, BEING A SUBDIVISION OF THE EAST ½ OF THE SOUTHWEST ¼ OF THE NORTHWEST ¼ OF SECTION 31, TOWNSHIP 38 NORTH, RANGE 15 EAST OF THE THIRD PRINCIPAL MERIDIAN (EXCEPT THE SOUTH 33 FEET THEREOF TAKEN FOR WIDENING EAST 83RD STREET) IN COOK COUNTY, ILLINOIS.

Exhibit B

FILED
4/29/2020 11:10 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

2020L004725

FILED DATE: 4/29/2020 11:10 AM   2020L004725

# EXHIBIT B



# SHERIFF'S OFFICE OF COOK COUNTY, ILLINOIS
## AFFIDAVIT OF SERVICE



FILED DATE: 4/29/2020 11:10 AM    2020L004725

| CASE NUMBER: 18CH0366S | MULT.SER. 2 | DOC. TYPE: CHANCERY |
|---|---|---|
| DIE DATE: 04/13/2018 | RECEIVED DATE: 3/21/2018 12:00:00 PM | FILED DATE: 03/20/2018    DIST: 654 DC |

| DEFENDANT | PLANTIFF |
|---|---|
| EQUITYBUILD INC | MICHIGAN SHORE APARTMENTS LLC |
| 321 N CLARK ST | ATTORNEY |
| CHICAGO, IL 60654 | CARY G SCHIFF&ASSOC |
| SUITE 2200 | 134 N.LASALLE #1720 |
| | CHICAGO, IL 60602 |
| | (312) 419-1130 |

FILED
CH-2309
APR 09 2018
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT

ATTACHED FEE AMOUNT:
SERVICE INFORMATION:    RM 802   R/A IOANA SARBAN

I CERTIFY THAT I SERVED THE DEFENDANT/RESPONDENT AS FOLLOWS:

**(1) PERSONAL SERVICE:**
BY LEAVING A COPY OF THE WRIT/ORDER WITH THE DEFENDANT/RESPONDENT PERSONALLY, AND INFORMING DEFENDANT/RESPONDENT OF CONTENTS.

**(2) SUBSTITUTE SERVICE:**
BY LEAVING A COPY OF THE SUMMONS AND COMPLAINT AT THE DEFENDANT'S USUAL PLACE OF ABODE WITH A FAMILY MEMBER OR PERSON RESIDING THERE, 13 YEARS OR OLDER, AND INFORMING THAT PERSON OF THE CONTENTS OF THE SUMMONS. ALSO, A COPY OF THE SUMMONS WAS MAILED TO THE DEFENDANT AT HIS OR HER USUAL PLACE OF ABODE ON THE _____ DAY OF _____ 20____.

**(3) UNKNOWN OCCUPANTS:**
BY LEAVING A COPY OF THE SUMMONS AND COMPLAINT NAMING "UNKNOWN OCCUPANTS" WITH A PERSON OF THE AGE OF 13 OR UPWARDS OCCUPYING SAID PREMISE.

**(4) CORP/CO/BUS/PART:**
BY LEAVING THE APPROPRIATE NUMBER OF COPIES OF THE SUMMONS, COMPLAINTS, INTERROGATORIES, JUDGMENTS, CERTIFICATIONS AND NOTICES WITH THE REGISTERED AGENT, AUTHORIZED PERSON OR PARTNER OF THE DEFENDANT CORPORATION ____ COMPANY ____ BUSINESS ____ PARTNERSHIP

**(5) PROPERTY RECOVERED:**
NO ONE PRESENT TO RECEIVE ORDER OF COURT. ORDER POSTED IN PLAIN VIEW.

**(6) S.O.S./D.O.I.:**
BY LEAVING THE SUMMONS AND COMPLAINT WITH THE SECRETARY OF THE STATE/DIRECTOR OF INSURANCE OF THE STATE OF ILLINOIS, AN AGENT OF SAID DEFENDANT LISTED ABOVE. ANY AGENT OF SAID CORPORATION NOT FOUND IN THE COUNTY OF COOK.

**(7) CERTIFIED MAIL**

***** COMPLETE THIS SECTION IF WRIT IS A THIRD PARTY CITATION/GARNISHMENT *****

**(8)**    AND BY MAILING ON THE _____ DAY OF _____ 20_____ A COPY OF THE THIRD PARTY GARNISHMENT/CITATION SUMMONS AND NOTICE TO THE JUDGMENT DEBTOR'S LAST KNOWN ADDRESS AS INDICATED IN THE NOTICE WITHIN (2) BUSINESS DAYS OF SERVICE UPON GARNISHEE/THIRD PARTY DEFENDANT.

THE NAMED DEFENDANT WAS NOT SERVED FOR THE GIVEN REASON BELOW:

| | | |
|---|---|---|
| (01) NO CONTACT | (05) WRONG ADDRESS | (09) DECEASED |
| (02) MOVED | (06) NO SUCH ADDRESSS | (10) NO REGISTERED AGENT |
| (03) EMPTY LOT | (07) EMPLOYER REFUSAL | (11) OUT OF COOK COUNTY |
| (04) NOT LISTED | (08) CANCELLED BY PLAINTIFF ATTY | (12) OTHER REASON (EXPLAIN) |

EXPLANATION: _____

| | ATTEMPTED SERVICES | |
|---|---|---|
| WRIT SERVED ON: San Martin | DATE | TIME (AM/PM) | STAR # |
| SEX: M/F  RACE:   AGE: | 4-4 | 457 | 10446 |
| THIS _____ DAY OF _____ 20___ | | : | |
| Thomas J. Dart | | : | |
| SHERIFF, BY: _____ 10446 DEPUTY | | : | |

JON614

# EXHIBIT C

[Receiver Action]

FILED
9/25/2020 3:16 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L008843

**IN THE CIRCUIT COURT OF COOK COUNTY**
**COUNTY DEPARTMENT, LAW DIVISION**

FILED DATE: 9/25/2020 3:16 PM   2020L008843

| | |
|---|---|
| KEVIN B. DUFF, RECEIVER FOR THE ESTATE OF EQUITYBUILD INC., EQUITYBUILD FINANCE LLC (f/k/a HARD MONEY COMPANY LLC), 1700 JUNEWAY LLC, 4533-37 S CALUMET LLC, 5450 S INDIANA LLC, 6217-27 S DORCHESTER LLC, 6437 S KENWOOD LLC, 7026 CORNELL, INC., 7109 S CALUMET LLC, 7749-59 S YATES LLC, 7933 S KINGSTON AVE LLC, 8100 S ESSEX LLC, 8104 S KINGSTON ASSOCIATES, 8529 S RHODES AVE LLC, CHICAGO CAPITAL FUND I LLC, CHICAGO CAPITAL FUND II LLC, EB SOUTH CHICAGO 1 LLC, EB SOUTH CHICAGO 2 LLC, EB SOUTH CHICAGO 3 LLC, EB SOUTH CHICAGO 4 LLC, HYBRID CAPITAL FUND LLC, SOUTH SIDE DEVELOPMENT FUND 1 LLC, SOUTH SIDE DEVELOPMENT FUND 2 LLC, SOUTH SIDE DEVELOPMENT FUND 3 LLC, SOUTH SIDE DEVELOPMENT FUND 4 LLC, SOUTH SIDE DEVELOPMENT FUND 5 LLC, SOUTH SIDE DEVELOPMENT FUND 6 LLC, SOUTH SIDE DEVELOPMENT FUND 7 LLC, SOUTH SIDE DEVELOPMENT FUND 8 LLC, SSDF1 4520 S DREXEL LLC, SSDF1 4611 S DREXEL LLC, SSDF1 6751 S MERRILL LLC, SSDF1 7110 S CORNELL LLC, SSDF2 1139 E 79TH LLC, SSDF4 638 N AVERS LLC, SSDF4 6217 S DORCHESTER LLC, SSDF4 6250 S MOZART LLC, SSDF4 7024 S PAXTON LLC, SSDF4 7255 S EUCLID LLC, SSDF5 PORTFOLIO 1 LLC, SSDF6 6160 S MLK LLC, SSDF7 PORTFOLIO 1 LLC, SSPH 6951 S MERRILL LLC, SSPH 7927-49 S ESSEX LLC, SSPH 11117 S LONGWOOD LLC, SSPH PORTFOLIO 1 LLC, <br><br> Plaintiff, <br><br> v. <br><br> ROCK FUSCO & CONNELLY, LLC, IOANA SALAJANU, and BREGMAN, BERBERT, CHWARTZ & GILDAY, LLC, <br><br> Defendants. | CASE NO. 2020 L 8843 <br><br> Hon. Judge Daniel J. Kubasiak <br><br> Calendar T <br><br><br><br><br><br><br><br><br><br><br><br><br><br> JURY TRIAL DEMANDED |

1

FILED DATE: 9/25/2020 3:16 PM     2020L008843

## AMENDED COMPLAINT

Kevin B. Duff, as court-appointed receiver ("Receiver") in the case captioned *SEC v. EquityBuild, Inc., et al.,* Civil Action No. 18-cv-5587, United States District Court for the Northern District of Illinois, Eastern Division (the "SEC Action") for EquityBuild, Inc. ("EquityBuild"), EquityBuild Finance, LLC ("EquityBuild Finance"), their affiliates, and the affiliate entities of Jerome ("Jerry") Cohen and Shaun Cohen, which affiliates are identified in that certain Order Appointing Receiver entered August 17, 2018 (SEC Action, Docket No. 16), as supplemented by that certain Order entered March 14, 2019 (SEC Action, Docket No. 290), and that certain Order entered February 21, 2020 (SEC Action, Docket No. 634), pursuant to the powers vested in him by Order of the Court in the SEC Action, complains against Rock Fusco & Connelly, LLC, Ioana Salajanu, and Bregman, Berbert, Schwartz & Gilday, LLC (collectively the "Defendants"), as follows:

## NATURE OF THE CASE

1.  In August 2018, the United States Securities and Exchange Commission filed the SEC Action to halt an ongoing real estate fraud and Ponzi scheme devised and operated by Jerry Cohen, Shaun Cohen, and various employees of EquityBuild and EquityBuild Finance and materially assisted by, among other aiders and abettors, Ioana Salajanu, a licensed Illinois attorney and a partner at Rock, Fusco & Connelly, LLC and Bregman, Berbert, Schwartz & Gilday, LLC.

2.  A true and accurate copy of the Complaint filed in the SEC is attached as Exhibit 1.

3.  The United States District Court enjoined the scheme and schemers, and shortly thereafter a consent judgment was entered affirming the SEC's allegations. (*See* Exhibit 2).

4.  Through the Ponzi scheme, Jerome Cohen and Shaun Cohen, with the assistance of their various enablers, bilked hundreds of ordinary investors and others across the country out of tens of millions of dollars through a wide variety of fraudulent acts and schemes.

**JURISDICTION AND VENUE**

5.      This court has jurisdiction pursuant to 735 ILCS 5/2-209 as a result of each of the Defendants being present and transacting business in the State of Illinois, committing the acts complained of in this Complaint within the State of Illinois, and/or failing to perform (and/or perform properly) duties and/or a contract substantially connected with this State.

6.      Venue is proper pursuant to 735 ILCS 5/2-101 because Cook County is where one or more of the Defendants resides, where a substantial part of the acts and omissions complained of in this Complaint occurred, and/or where the parties agreed in written engagement letters that disputes such as this one could be litigated.

**THE PARTIES AND OTHER KEY PLAYERS**

7.      Plaintiff Kevin B. Duff serves as court-appointed receiver in the SEC Action for, among other entities, EquityBuild, EquityBuild Finance, 1700 Juneway LLC, 4533-37 S Calumet LLC, 5450 S Indiana LLC, 6217-27 S Dorchester LLC, 6437 S Kenwood LLC, 7026 Cornell, Inc., 7109 S Calumet LLC, 7749-59 S Yates LLC, 7933 S Kingston Ave LLC, 8100 S Essex LLC, 8104 S Kingston Associates, 8529 S Rhodes Ave LLC, Chicago Capital Fund I LLC, Chicago Capital Fund II LLC, EB South Chicago 1 LLC, EB South Chicago 2 LLC, EB South Chicago 3 LLC, Eb South Chicago 4 LLC, Hybrid Capital Fund LLC, South Side Development Fund 1 LLC, South Side Development Fund 2 LLC, South Side Development Fund 3 LLC, South Side Development Fund 4 LLC, South Side Development Fund 5 LLC, South Side Development Fund 6 LLC, South Side Development Fund 7 LLC, South Side Development Fund 8 LLC, SSDF1 4520 S Drexel LLC, SSDF1 4611 S Drexel LLC, SSDF1 6751 S Merrill LLC, SSDF1 7110 S Cornell LLC, SSDF2 1139 E 79th LLC, SSDF4 638 N Avers LLC, SSDF4 6217 S Dorchester LLC, SSDF4 6250 S Mozart LLC, SSDF4 7024 S Paxton LLC, SSDF4 7255 S Euclid LLC, SSDF5 Portfolio 1 LLC, SSDF6 6160 S MLK LLC, SSDF7 Portfolio 1 LLC, SSPH 6951 S Merrill LLC, SSPH 7927-

FILED DATE: 9/25/2020 3:16 PM   2020L008843

49 S Essex LLC, SSPH 11117 S Longwood LLC, and SSPH Portfolio 1 LLC.

8.      Defendant Rock Fusco & Connelly, LLC ("Rock Fusco") is a Chicago based law firm.

9.      Defendant Ioana Salajanu is a licensed Illinois attorney who worked at Rock Fusco from on or about April 1, 2014, to sometime in or around late August 2018.

10.     Defendant Bregman, Berbert, Schwartz & Gilday, LLC ("BBSG") is a law firm with offices in Maryland, Virginia, and the District of Columbia. Mark Rosenberg is an attorney was employed with BBSG in an "of counsel" capacity. BBSG provided legal services to EquityBuild, EquityBuild Finance, and their various affiliate entities from on or about February 3, 2017, until on or about August 17, 2018.

## FACTUAL BACKGROUND

11.     Jerry Cohen formed EquityBuild as a Florida corporation on October 31, 2007.

12.     The Cohens touted EquityBuild as a company that could apply a proprietary methodology to locate undervalued real estate and allow ordinary investors to achieve opportunistic returns.

13.     EquityBuild would submit a contract to purchase residential real estate, either a single-family residence or a multifamily apartment building.

14.     After the contract submitted by EquityBuild was accepted, EquityBuild Finance raised money from investors for the purpose of funding an acquisition and construction loan to EquityBuild.

15.     EquityBuild Finance served the same purpose as the Hard Money Company, which was formed as a Delaware limited liability company by Jerry's son, Shaun, but dissolved in or around February 2014, at about the time that EquityBuild Finance LLC was created to take its place.

4

FILED DATE: 9/25/2020 3:16 PM 2020L008843

16.     Through a team of "remote managers" primarily located in Colorado, EquityBuild Finance would employ Internet advertising and other media channels, including, on at least one occasion, a television infomercial featuring William Shatner, to locate aspiring real estate investors and entice them with the prospect of double-digit returns.

17.     Many of these investors were induced to purchase participating interests in a promissory note to be signed by Jerry Cohen on behalf of EquityBuild, as borrower.

18.     The promissory note would require EquityBuild to pay monthly interest on the originally stated principal balance at rates generally ranging from 13% to 17% per annum and to repay the principal at maturity, typically between 12 and 36 months after the loan was funded.

19.     The promissory note was typically secured by a mortgage to be signed by Jerry Cohen on behalf of EquityBuild and recorded against the property in connection with which the loan was solicited.

20.     In nearly all instances, the mortgage identified each of the investors who participated in the underlying promissory note, as well as the participating interest of each such investor. (To avoid any confusion caused by the common association of the term "investor" with equity ownership, the investors who purchased interests in the EquityBuild promissory notes are henceforth described as "investor-lenders.")

21.     The investor-lenders were typically informed that EquityBuild intended to acquire an undervalued property, to rehabilitate the property, to raise the rents consistent with the new improvements, to increase the occupancy, and then to repay the principal balance of the short-term promissory note either through a refinancing event involving conventional long-term debt or through an arm's length sale of the property.

22.     In nearly every instance, however, the funds raised by EquityBuild Finance from

the investor-lenders were not disbursed to EquityBuild at the closing of the acquisition of the property that EquityBuild held under contract.

23.    Instead, in nearly every instance, EquityBuild would purchase the property solely with cash, while the proceeds of the loan made by the investor-lenders would be transferred, outside of closing, from EquityBuild Finance (to whom the investor-lenders wired their funds) to EquityBuild, where it would then be commingled into one or more bank accounts controlled by Jerry Cohen.

24.    Typically about eight weeks after EquityBuild acquired the property, the mortgage recorded to secure the promissory note in which the investor-lenders participated would be recorded with the Cook County Recorder Of Deeds.

25.    In prevailing real estate lending industry parlance, the investor-lenders would be characterized as so-called "hard money lenders," except that experienced hard money lenders would have underwritten and documented the same transactions much differently.

26.    An experienced hard money lender would have, among other things, charged loan origination fees to EquityBuild (the borrower); reviewed the purchase and sale contract; commissioned an appraisal of the property; ordered a background check or otherwise investigated the EquityBuild principals; committed to loan only a fixed percentage of the total budgeted cost of the project; required that various portions of the loan be escrowed at closing to establish a "holdback for interest reserve," a construction escrow, a real estate tax escrow, and an insurance escrow; demanded a collateral assignment of an arm's-length contract between EquityBuild and a licensed general contractor; insisted that EquityBuild purchase a loan policy of title insurance securing the lender's first priority position in the mortgage to be recorded contemporaneously with the deed; demanded that the entity formed to acquire title to the property be a wholly-owned

FILED DATE: 9/25/2020 3:16 PM    2020L008843

FILED DATE: 9/25/2020 3:16 PM    2020L008843

subsidiary of a holding company whose membership interests in the borrower would be pledged as additional security for the loan; and obtained an unconditional and continuing personal guaranty of repayment from Jerry Cohen.

27.    The loans made to EquityBuild by the investor-lenders lacked substantially all of the underwriting and legal paperwork routinely associated with experienced hard money lending.

28.    The transactions between the investor-lenders and EquityBuild were implemented by attorneys working initially for EquityBuild in Chicago and, then, beginning in or around February 3, 2017, by additional counsel working for EquityBuild in Bethesda, Maryland.

29.    EquityBuild's attorneys would, among other things, review the purchase and sale contracts, propose modifications, analyze the title commitments procured by the seller, conduct all appropriate legal due diligence, organize a limited liability company (or other entity, if necessary) that EquityBuild might form for the purpose of acquiring title, draft an operating agreement evidencing the management and control of the newly-formed entity, prepare a set of buyer's figures for the closing agent, attend the closing, and then review and execute the settlement statement.

30.    In the early years of the Ponzi scheme, when EquityBuild was still purchasing and purportedly "rehabbing" property of the single-family home type, some of the legal work was being performed by the late Gordon Hirsch, a licensed Illinois attorney.

31.    Mr. Hirsch committed suicide in November 2012 and left a series of notes for his daughter in which he disclosed that EquityBuild was operating a Ponzi scheme on the south side of Chicago.

32.    One of the suicide notes left by Mr. Hirsch stated, in part, as follows:

> [P]lease call the FBI Mortgage Fraud Unit. Tell them that EquityBuild, Inc.
> is a ponzi scheme [that] is run by Jerry Cohen [in] Marco Island, Florida. . . .

7

> They take investors money thru Shaun. They find buyers, see the EquityBuild website. They buy the property + resell it the same day for alot more money, add rehab costs, Shaun as lender sends investor $ to Jerry. So Shaun is using investor $ to buy + rehab properties owned by his father Jerry. Crazy mortgages are put on the property & EquityBuild abandons them. . . .

33.     During the period that Mr. Hirsch functioned as counsel, EquityBuild would secure an acquisition and construction loan from one or more participating investor-lenders and then sell the property to a new investor (but not an investor-lender) as a "turn-key" real estate investment opportunity.

34.     The purchaser, frequently an out-of-state investor, did not need to retain a broker to assist in locating a property, did not need to shop the market for an acquisition and construction loan, did not need to find a general contractor to make the repairs (as EquityBuild committed to doing so), and did not need to hire a property management company to lease up the building (EquityBuild already made the appropriate arrangements).

35.     Instead, the purchaser merely needed to pay the monthly debt service on the loan obtained from the investor-lenders with the net operating income generated by the rental stream.

36.     Over time, as the properties acquired by EquityBuild shifted from single-family homes to increasingly bigger apartment buildings, EquityBuild "flipped" the properties to outside investors with less regularity and began holding those properties on its own balance sheet.

37.     Shortly after Mr. Hirsch passed away, EquityBuild retained Ioana Salajanu to handle substantially all of its Chicago legal needs.

38.     Ms. Salajanu joined Rock Fusco on or about March 31, 2015, with whom she continued to be affiliated until late August 2018, shortly after the SEC Action was filed.

39.     Over the course of her work for EquityBuild, Ms. Salajanu assisted EquityBuild in connection with, among other things, the acquisition, disposition, reacquisition, financing, and/or

8

FILED DATE: 9/25/2020 3:16 PM    2020L008843

refinancing of at least 160 properties.

40.     Although EquityBuild, in many instances, managed to pay the monthly debt service to its investor-lenders, it was frequently unable to repay the loans at maturity because, among many other things, EquityBuild overpaid for the properties it acquired and could not resell them at prices consistent with their original projections (and the projections they made for prospective investor-lenders); hundreds of building code violations were inflicting substantial cost to the company; Jerry Cohen and Shaun Cohen were raiding funds earmarked for building improvements to finance their personal lifestyles and concomitantly not making the promised upgrades and repairs to enhance the values of the properties; and those improvements actually made entailed expenditures of considerably less funds than EquityBuild borrowed.

41.     Moreover, because the promissory notes EquityBuild gave to the investor-lenders required the payment of monthly interest at onerous interest rates, EquityBuild was diverting funds raised from new or existing investor-lenders in connection with the proposed acquisition of new property in order to service the monthly debt owed to other investor-lenders on properties previously acquired.

42.     By late 2016, EquityBuild began formulating a new plan to address its inability to repay the investor-lenders at maturity.

43.     Even as the Ponzi scheme was growing and the remote managers at EquityBuild were recruiting ever increasing numbers of investor-lenders, Jerry Cohen and Shaun Cohen were forced to devise a means of raising yet additional capital in order to repay, if possible, the principal balances of the loans obtained from the investor-lenders as the maturity dates of those loans, sometimes already extended more than once at EquityBuild's insistence, gradually approached.

44.     In an effort to stave off the need to repay principal, EquityBuild and EquityBuild

9

Finance would often pressure investor-lenders not to "cash out" at maturity, but, instead, to roll the proceeds of their loan into a new debt investment on a new property.

45.     EquityBuild initiated a plan to entice its investor-lenders into converting their mortgage loans into membership interests in one or more funds that would be formed to own the properties.

46.     EquityBuild and EquityBuild Finance widely advertised that they were targeting "3x" returns to investor-lenders who converted their debt to equity.

47.     Under the plan, EquityBuild intended to refinance the properties encumbered by investor-lender mortgages with new institutional debt at far less onerous interest rates.

48.     Many investor-lenders, however, refused to relinquish their secured debt for unsecured equity, and a growing number of investor-lenders were tiring of EquityBuild's increasingly broken promises to repay their loans following often repeated extensions of the maturity date.

49.     Meanwhile, EquityBuild could not implement its plan to refinance the debt to its investor-lenders so long as the mortgages securing the loans from those investor-lenders encumbered title to the properties being refinanced because the institutional lenders would insist that EquityBuild purchase a loan policy insuring that their own to-be-recorded mortgages would occupy first position.

50.     In order to effectuate a refinancing, therefore, EquityBuild Finance would send Ms. Salajanu an invalid release of the mortgage held by the investor-lenders that was not signed by such investor-lenders, who were not informed that any such document was being recorded, and who did not authorize the recording of any such release, and Ms. Salajanu would deliver that release to the title company.

51.     At the closing of the refinancing transaction, the title company would pay all costs and expenses associated with the refinancing and then wire the remaining proceeds of the replacement loan to EquityBuild Finance in accordance with a payoff letter that EquityBuild Finance deposited into the closing escrow.

52.     EquityBuild Finance rarely, if ever, distributed those remaining proceeds to the investor-lenders, and instead it concealed the fact that a refinancing event had already occurred and that the investor-lender mortgages had been released, and it continued to pressure the investor-lenders to trade their principal for an equity interest in a fund or to roll that principal into a new promissory note secured by a new property.

53.     As a result of these actions, EquityBuild was able to borrow against the same properties twice, ultimately leading to a claims process in the SEC Action in which investor-lenders asserting that their mortgages were unknowingly and unlawfully released are presently engaged in a priority dispute with institutional lenders who contend that their own mortgages occupy first position.

54.     The Ponzi scheme operated by Jerry Cohen and Shaun Cohen with active assistance by the Defendants is typified by EquityBuild's acquisition, financing, and refinancing of the real property and improvements located at 7201 South Dorchester Avenue, a 14-unit apartment building in the Grand Crossing neighborhood of Chicago ("7201 S Dorchester").

55.     EquityBuild submitted a contract to purchase 7201 S Dorchester on December 30, 2015, and that contract was accepted by the owner of record on January 7, 2016. (A true and accurate copy of the Apartments/Investments Purchase and Sale Contract is attached as Exhibit 3.)

56.     On January 8, 2016, Ms. Salajanu began reviewing the purchase and sale contract for 7201 S Dorchester.

11

FILED DATE: 9/25/2020 3:16 PM    2020L008843

57.    During the period between the seller's acceptance of the contract and the closing, EquityBuild Finance solicited prospective investor-lenders to participate in a $1,100,000 loan to EquityBuild in connection with its acquisition and stated intention to rehabilitate 7201 S Dorchester.

58.    EquityBuild ultimately purchased 7201 S Dorchester at a closing held at Chicago Title and Trust Company on March 31, 2016. (A true and accurate copy of the Escrow Trust Disbursement Statement is attached as Exhibit 4.)

59.    At the closing, EquityBuild acquired 7201 S Dorchester for $564,463.95 in cash, following the application of, among other things, closing prorations and credits, closing costs, insurance premiums, and legal fees to Rock Fusco, and Ms. Salajanu signed the disbursement statement pursuant to a power of attorney to act on behalf of Jerry Cohen.

60.    After the closing, the special warranty deed delivered to EquityBuild was recorded with the Cook County Recorder of Deeds. (A true and accurate copy of the file-stamped Special Warranty Deed is attached as Exhibit 5.)

61.    Two months after the special warranty deed was recorded, a mortgage in favor of each of the participating investor-lenders was recorded against 7201 S Dorchester. (A true and accurate copy of the Mortgage is attached as Exhibit 6, pp. 42-48.)

62.    The mortgage identified the 25 individuals or entities who participated in the $1,100,000 loan to EquityBuild in connection with its acquisition and proposed rehabilitation of 7201 S Dorchester, as well as the amounts of their respective contributions to the loan and their respective participation interests in the promissory note (*Id.,* p. 48.)

63.    A specimen promissory note to be signed by Jerry Cohen on behalf of EquityBuild and delivered to the investor-lenders is attached as Exhibit 7.)

FILED DATE: 9/25/2020 3:16 PM    2020L008843

64.     Paragraph 3 of the promissory note recited that the loan evidenced by the note would be secured by a mortgage recorded against <u>7201 S Dorchester</u>, and the prefatory language of the note set forth the payment terms – in this case eleven monthly payments of interest at the rate of 15% per annum, followed by a balloon payment of the original principal balance plus any accrued and unpaid interest.

65.     The promissory note associated with <u>7201 S Dorchester</u> specified that the funding date of the loan would be March 31, 2016 (the date that EquityBuild closed on its acquisition of the property) and that the loan would mature on April 1, 2017.

66.     EquityBuild did not repay the principal balance of the note associated with <u>7201 S Dorchester</u> on April 1, 2017, and, instead, EquityBuild Finance, purporting to act on behalf of the investor-lenders, extended the maturity date to October 1, 2017.

67.     EquityBuild did not repay the principal balance of the note associated with <u>7201 S Dorchester</u> on October 1, 2017, and, instead, EquityBuild Finance, purporting to act on behalf of each of the investor-lenders, extended the maturity date to March 1, 2018.

68.     Meanwhile, EquityBuild was working to refinance the debt on <u>7201 S Dorchester</u> and 16 other properties through a portfolio loan from Liberty EBCP ("Liberty").

69.     Three of the properties that EquityBuild sought to include in the portfolio were then owned by third parties who had purchased those properties from EquityBuild as so-called "turn-key" investments with funds that EquityBuild Finance raised from investor-lenders and based upon a commitment by EquityBuild that it would make the required post-closing improvements.

70.     The individuals to whom EquityBuild sold these properties were complaining that the promised improvements were never made and that the properties were not generating nearly enough revenue to pay the debt service on the loans from the investor-lenders.

13

71.     The referenced individuals were threatening legal action unless EquityBuild repurchased the properties.

72.     A worksheet prepared in connection with the proposed Liberty refinancing indicated that the total cumulative principal balance of the loans received from EquityBuild's investor-lenders in connection with the 17 properties to be subject to the portfolio loan was expected to equal $23,847,540 as of May 3, 2018. (A true and accurate copy of the referenced worksheet is attached as Exhibit 8.)

73.     Based on appraisals of the 17 properties and other underwriting criteria, however, Liberty was only willing to lend EquityBuild $9,200,000.

74.     Moreover, as a predicate to obtaining the Liberty loan, EquityBuild was required to pay a variety of closing costs, title expenses, attorneys' fees, and other charges from the closing escrow.

75.     Specifically, EquityBuild was required to pay loan origination fees, lender legal fees, and loan interest in the combined amount of $315,156.90; outstanding and delinquent real estate taxes in the combined amount of $222,986.24; title charges of $17,876.00; recording fees totaling $2,382.00; mortgage brokerage fees of $92,000.00; outstanding construction invoices in the amount of $157,150.00; outstanding water bills in the combined amount of $16,690.78; Rock Fusco legal fees in the amount of $13,000.00; and other miscellaneous expenses totaling $20,240.25.

76.     In addition, Liberty held back $1,183,179.00 of the $9,200,000 loan to fund reserves for real estate taxes, capital expenditures, property insurance, and loan interest.

77.     After consideration of a $15,263.45 closing credit from Liberty (the balance of EquityBuild's good-faith deposit) the loan holdbacks and the $2,933,765.66 in closing costs,

14

FILED DATE: 9/25/2020 3:16 PM  2020L008843

EquityBuild netted only $5,098,318.79 with which to repay the $21,329,500.00 cumulative principal balance on the investor-lender loans associated with the 14 properties in the portfolio then owned by EquityBuild. (A demonstrative exhibit summarizing the transaction documentation is attached as Exhibit 9.)

78.     To ensure the closing of the Liberty loan, therefore, EquityBuild Finance created payoff letters that falsely understated the total outstanding balance of the mortgage loan to which it related; and Ms. Salajanu delivered these inaccurate payoff letters to the title company. (True and accurate copies are attached as Exhibit 10.)

79.     Releases of the corresponding mortgages lacking the signatures of the mortgagees and otherwise unauthorized were created by Shaun Cohen and delivered by Ms. Salajanu to the title company. (True and accurate copies are attached as Exhibit 11.)

80.     Each of the referenced mortgage releases was executed on April 12, 2018, by Shaun Cohen as "manager" of EquityBuild Finance, although 16 of the 17 mortgages expressly identified the investor-lenders, and not EquityBuild Finance, as the mortgagees of record. (*See* Exhibit 6.)

81.     With the outstanding balances of the investor-lender loans intentionally and falsely reduced to $9,560,648.18, however, EquityBuild still needed $4,462,329.37 in cash to close.

82.     To bridge this shortfall, Jerry Cohen obtained a $3,500,000 *overnight* loan for a fixed fee of $200,000.

83.     Ms. Salajanu and Rock Fusco assisted Mr. Cohen in documenting a loan agreement pursuant to which SSDF7 Portfolio 1, LLC, the entity that EquityBuild formed to acquire title to the 17 properties and enter into the loan agreement with Liberty, would borrow $3,500,000 from Chief Management, LLC, a California company established to extend the 24-hour loan. (A true and accurate copy of the Loan Agreement is attached as Exhibit 12.)

84.     Under the Loan Agreement, Chief Management agreed to wire $3,500,000 into the closing escrow, and EquityBuild (through the entity it established to acquire title to the 17 properties in connection with the portfolio loan) agreed that the title company would disburse the funds directly back to Chief Management at closing.

85.     The Chief Management loan was wired into the closing escrow, and then Jerry Cohen, with the active and knowing assistance and participation of Rock Fusco and Ms. Salajanu, repaid the loan by diverting the already artificially-reduced payoffs to the investor-lenders directly to Chief Management through payoff letters that altered the destination accounts from EquityBuild Finance to Chief Management.

86.     A true and accurate copy of the Final ALTA Settlement Statement associated with the Liberty loan is attached as Exhibit 13.

87.     The Final ALTA Settlement Statement reflects the Chief Management loan as a credit to the borrower and then reflects two of the payoffs of the investor-lender loans as being made to Chief Management, specifically, in the amounts of $1,967,591.22 and $496,533.44.

88.     A third payoff was diverted to Chief Management in connection with EquityBuild's repurchase of one of the three properties from the complaining investors.

89.     To assist Jerry Cohen, Rock Fusco and Ms. Salajanu filed articles of organization in the State of Wyoming to create a distinct Chief Management, LLC (one owned by Mr. Cohen, as distinguished from the Chief Management that made the overnight loan), and she prepared an operating agreement for the Chief Management entity established in Wyoming. (True and accurate copies of these documents are attached as Exhibit 14.)

90.     During the period that Ms. Salajanu assisted the Cohens with the closing of the Liberty loan and prior thereto, she was aware of ample information indicating that EquityBuild

16

and EquityBuild Finance were operating a Ponzi scheme and defrauding investors.

91.    For example, on October 17, 2016, Ms. Salajanu received a letter from an attorney representing a purchaser of property from EquityBuild who alleged, among other things, that EquityBuild committed to making substantial improvements to his property within 120 days of the sale, but that, among other things, construction did not commence until 270 days after the sale, that construction was commenced without a permit, that city inspectors had begun targeting the property for violations of municipal ordinances, and that his client had been paying interest (to the investor-lenders) for 14 months, during which time the property generated zero income. (A true and accurate copy of the referenced letter is attached as Exhibit 15.)

92.    The allegations asserted in the October 17, 2016 letter ultimately resulted in the filing of a ten-count complaint alleging fraud, breach of fiduciary duty, and other intentional and unintentional torts by EquityBuild and its counsel. (A true and accurate copy of the referenced complaint is attached as Exhibit 16.)

93.    The complaint was filed on March 20, 2018, and Ms. Salajanu received a copy.

94.    Meanwhile, in late May 2017, Ms. Salajanu was contacted by Jessica Baier, who worked for EquityBuild in Florida.

95.    During their teleconference, Ms. Baier informed Ms. Salajanu of numerous improprieties in EquityBuild's operations including, among other things, the misallocation of investor-lender funds.

96.    Ms. Baier informed Ms. Salajanu that if she failed to take action to halt the improprieties, she would take matters into her own hands and alert others herself.

97.    Rather than investigate the matter further, Ms. Salajanu immediately called Jerry Cohen to report what she had just been told by Ms. Baier, and Ms. Salajanu and Rock Fusco

FILED DATE: 9/25/2020 3:16 PM    2020L008843

FILED DATE: 9/25/2020 3:16 PM   2020L008843

continued to advance the schemes of the Cohens.

98.     In early February 2017, EquityBuild retained BBSG (and its "of counsel," Mr. Rosenberg) to assist in the defense of an SEC investigation into a Ponzi scheme in which it had been implicated.

99.     Shortly thereafter, BBSG began preparation of private placement memoranda for dissemination to prospective new investors.

100.     Hitherto, EquityBuild and EquityBuild Finance had been acting in derogation of federal securities law in connection with its offering of participation interests in promissory notes to prospective investor-lenders.

101.     The private placement memoranda prepared by BBSG contained false statements about EquityBuild's real estate investment track record and contained "sources and uses" disclosures often detailing the payment of numerous types of fees to EquityBuild that were so onerous and absurd by industry standard that no experienced securities law firm, let alone one originally retained for the purpose of defending the issuer in a Ponzi scheme investigation, could have failed to be aware such issues.

102.     For example, BBSG developed a private placement memorandum for the purchase of the property located at 6437 South Kenwood in Chicago. (A true and accurate copy is attached as Exhibit 17.)

103.     The promissory note to be delivered to the investor-lenders (*Id.,* pp. 65-76) indicates that the entire principal balance plus all accrued interest will be payable in a single lump-sum at maturity, but the sources and uses spreadsheet contained in the private placement memorandum (*Id.,* p. 35) indicates that funds used to pay the interest accrual are included within the capital raise.

18

104. A prudent law firm would know that a rational lender would not have loaned the borrower the very funds that the borrower would later need to pay the interest accrual at maturity and instead would have held back the anticipated interest accrual, thus reducing the amount of the initial loan disbursement.

105. Moreover, simple interest accruing at the rate of 16% per annum on a $2,500,000 loan would have required EquityBuild to pay $800,000 in accrued interest on the 24-month maturity date, meaning that the total outstanding balance of the loan would ultimately equal $3,300,000.

106. By the same token, if the "financed interest" line item in the sources and uses spreadsheet was intended to refer to the cumulative accrued interest at maturity, then a holdback of $456,165 from a $2,500,000 loan would be substantially insufficient to pay the accrued 16% simple interest per annum on a $2,043,835 disbursement, as the total interest due at maturity would then have equaled $654,027.20.

107. The documents and information contained in the private placement memorandum are such that a prudent attorney, would have known that EquityBuild was defrauding investors and would have advised against using or distributing such a private placement memorandum to investors.

108. BBSG failed to investigate and affirm other statements in the private placement memorandum that raised serious questions about the legitimacy of the underlying transaction, including, among other things, the payment to EquityBuild of an $88,875 development fee in connection with the making of only $302,500 in building improvements.

109. The Defendants either directly or impliedly represented the interest of the Cohens by advancing the schemes, creating a conflict of interest in the representation of EquityBuild and

FILED DATE: 9/25/2020 3:16 PM   2020L008843

its affiliates, who were also being represented by these Defendants, as the Defendants placed the interests of the Cohens above those of EquityBuild and its affiliates, and, at a minimum, the Defendants should have withdrawn from their representation of EquityBuild and its affiliates.

110.    On August 15, 2018, the SEC brought an action that details the fraud and Ponzi scheme that the Cohens implemented for their own benefit through EquityBuild which lured investors into investing their monies.

111.    That scheme permeated the entirety of EquityBuild's business, whether it be the purchase and sale of real estate, the establishment of various entities that allowed monies to be shifted from one entity to another or otherwise easily accessed for improper abuses by the Cohens, and finally creation of documentation that assisted in luring investors into the scheme with misrepresentations and the like.

112.    On August 17, 2018, the United States District Court for the Northern District of Illinois granted the SEC's request to enjoin the Cohens and EquityBuild from running such schemes, and appointed Kevin Duff as Receiver for the EquityBuild entities.

113.    Each of the EquityBuild entities was controlled by the Cohens in the fraudulent scheme and thus could not sue those involved in perpetuating or enabling the scheme or allowing it to continue. Thus, the statute of limitations was tolled until the wrongdoers were removed and the Receiver was appointed. The Receiver was appointed by the Court in the SEC Action on August 17, 2018. However, the Receiver did not discover, and could not despite the exercise of reasonable diligence have discovered, until more recently, the Defendants' participation in furthering the EquityBuild Ponzi scheme. Moreover, the Defendants' wrongful acts were inherently undiscoverable. The Receiver also asserts the doctrine of equitable tolling with respect to any applicable statute of limitations.

FILED DATE: 9/25/2020 3:16 PM        2020L008843

**COUNT I**
**Professional Negligence**
**(Against All Defendants)**

114.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

115.    As advisors and attorneys with respect to their handling of the transactions and matters described above for EquityBuild, the Defendants owed EquityBuild a duty to comply with the applicable standard of care.

116.    The Defendants failed to meet the applicable standard of care in the respects set forth above, including without limitation: (1) failing to conduct the proper due diligence associated with the various transactions that led to investors purchasing certain notes, positions in funds or refinancings; (2) allowing for the creation of sham entities and transactions that allowed officers and the like to benefit while at the same time allowing a scheme to proceed which was directly contrary to the interests and viability of the clients they represented; (3) creating inaccurate paperwork which worsened the financial position of EquityBuild; (4) failing to properly investigate and address the serious improprieties that were expressly provided by EquityBuild employees; (5) failing to competently and promptly investigate the bona fides of EquityBuild's business which allowed EquityBuild to worsen its financial position, and allowed its officers and insiders to improperly obtain various monies; (6) failing to take all necessary steps to ensure that the EquityBuild transactions were legitimate and legal; (7) placing the interests of the Cohens ahead of the their clients; and (8) failed to warn or advise EquityBuild and its principals to either not to enter into the transactions and/or not to enter into the transactions in the manner that it did..

117.    Defendants' failure to meet the applicable standard of care constitutes professional negligence.

118.    Defendants' negligence/gross negligence was a proximate cause of Plaintiff's

FILED DATE: 9/25/2020 3:16 PM    2020L008843

damages, as alleged above, including but not limited to all expenses, losses, liabilities, debts and other obligations incurred from the fraud and Ponzi scheme perpetrated by the Cohens.

119.    As a proximate result of the foregoing, Plaintiff has been injured in an amount to be proven at trial including but not limited to the amounts of the expenses, losses, liabilities, debts and other obligations incurred from the fraud and Ponzi scheme perpetrated by the Cohens.

**COUNT II**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Against All Defendants)**
**(In the Alternative to Count I)**

120.    In the alternative to Count I, Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

121.    Jerry Cohen was the head of EquityBuild, Inc. while EquityBuild Finance was run by Shaun Cohen.   The Cohen's owed fiduciary duties to EquityBuild.

122.    The Cohens took countless actions in breach of those fiduciary duties. Indeed, as more fully described herein, they used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

123.    As set forth above, between at least 2014 and through August 2018, Defendants Rock Fusco, Salajanu, and BBSG: (a) knew and were aware of the improper conduct described above orchestrated by the Cohens; (b) were aware of the conduct by Jerome Cohen and Shaun Cohen who had  fiduciary positions with Company, and were aware of the breach of those duties to EquityBuild by engaging in the conduct described above; (c) knowing and substantially assisted and facilitated the fiduciary breaches against the interest of their clients, namely EquityBuild; and

FILED DATE: 9/25/2020 3:16 PM    2020L008843

(d) benefitted directly and/or indirectly from these fiduciary breaches.

124.    For example, the Defendants knowingly and substantially assisted and facilitated the fiduciary breaches of the Cohens as they implemented the various fraudulent schemes that allowed the Ponzi scheme to originate and continue, allowing the Cohens to continue to have substantial monies and dollars, all the while creating greater instability to the financial condition of the Receivership Entities.

125.    As described above, Ms. Salajanu and Rock Fusco were intimately involved in creating the documentation necessary to advance the various schemes. This included, *inter alia*, the preparation of corporate documentation, the preparation of false settlement statements, the submission of unauthorized releases, and the submission of payoff letters containing falsely understated account balances, and then delivering all of the foregoing information to escrow officers and lenders and facilitating the Cohens' misappropriation of refinancing proceeds from investor-lenders.

126.    For their part, from 2017 forward, BBSG continued to include misrepresentations and the like in offerings and private placement memoranda without proper diligence, despite the face of such documents identifying information that well indicated that scheme was ongoing, let alone the fact that almost immediately upon working on the private placement memoranda, the SEC began investigating, which provided additional knowledge that there were improprieties associated with the Cohens' activities.

127.    At all relevant times, the Defendants, and others working on their behalf, worked within the course and scope of their employment, and for their own benefit.

128.    The Defendants supervised, reviewed, approved, and/or ratified the conduct of the Cohens to the detriment of EquityBuild.

FILED DATE: 9/25/2020 3:16 PM   2020L008843

129.    The Defendants willfully ignored obvious indicia of misconduct on the part of the Cohens to reap the benefit of additional fees and ensure their lucrative relationships were maintained.

130.    The Defendants' malfeasance and misfeasance also have proximately caused EquityBuild to sustain substantial damages in an amount to be proven at trial, including but not limited to all expenses, losses, liabilities, debts and other obligations incurred from the fraud and Ponzi scheme perpetrated by the Cohens.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Kevin B. Duff, as Receiver for the Estate of EquityBuild, Inc., et al., respectfully requests that this Court:

A.    Find that the Defendants committed professional malpractice;

B.    Find that the Defendants aided and abetted breaches of fiduciary duty;

C.    Find that the entities for which the Plaintiff was appointed Receiver were damaged and award compensatory and other appropriate damages permitted by law for a sum in excess of the Law Division jurisdictional limit of $50,000;

D.    Award pre-judgment and post-judgment interest to the extent warranted under the common law or under the Illinois Interest Act (815 ILCS 205/2) or other statutes (735 ILCS 2-1303);

E.    Award the Plaintiff reasonable attorneys' fees and costs; and

F.    Grant such other and further relief the Court deems just.

FILED DATE: 9/25/2020 3:16 PM    2020L008843

Dated:  September 25, 2020                    Respectfully submitted,

                                             Kevin B. Duff, Receiver


                                             /s/ Michael Rachlis

                                             Michael Rachlis
                                             Rachlis Duff & Peel LLC
                                             Firm No. 56188
                                             542 South Dearborn Street, Suite 900
                                             Chicago, IL 60605
                                             (312) 733-3950
                                             mrachlis@rdaplaw.net

                                             Andrew Eliot Porter
                                             Porter Law Office
                                             Firm No. 42000
                                             853 North Elston Avenue
                                             Chicago, IL 60642
                                             Tel: (312) 433-0568
                                             andrew@andrewporterlaw.com

                                             Michael C. Bruck
                                             Timothy J. McInerney
                                             SPELLMIRE BRUCK LLP.
                                             One East Wacker Drive – Suite 2350
                                             Chicago, IL  60601
                                             (312) 258-9400
                                             mcb@spellmirebruck.com
                                             tjm@spellmirebruck.com
                                             Firm ID: 62543

                                             Steven J. Roeder
                                             Thomas D. Gipson
                                             Roeder Law Offices LLC
                                             77 West Washington Street, Suite 2100
                                             Chicago, Illinois 60602
                                             Phone: (312) 667-6000
                                             Fax: (708) 843-0618
                                             Firm ID: 58775
                                             sjr@roederlawoffices.com
                                             tdg@roederlawoffices.com


                                             *Attorneys for Plaintiff*

25

# EXHIBIT D

[Receiver Letter]



**Michael C. Bruck**
Phone: (312) 258-9400
Fax: (312) 258-9444
mcb@spellmirebruck.com

December 13, 2021

**VIA EMAIL**
Mr. Steven P. Blonder
Much Shelist, P.C.
191 North Wacker Drive, Suite 1800
Chicago, IL 60606
sblonder@muchshelist.com

Re:       **Liberty EBCP's Compliance With Order Appointing Receiver**

Dear Mr. Blonder:

I am one of the attorneys representing Kevin B. Duff in his capacity as Receiver in a Circuit Court of Cook County, Illinois action against Rock Fusco & Connelly, LLC and Ioana Salajanu (the "Rock Fusco Defendants") for professional negligence and other claims, in a case captioned *Kevin B. Duff, Receiver v. Rock Fusco & Connelly, LLC, et al.*, Case No. 2020 L 8843. For your convenience, the amended complaint filed in that action is attached. Mr. Duff was appointed Receiver in August 2018 in *SEC v. EquityBuild, Inc., et al.*, Case No. 18 CV 5587, which is pending in the United States District Court for the Northern District of Illinois (the "SEC Action"), pursuant to an Order Appointing Receiver (the "Receivership Order"), which is attached (with its amendments) for your convenience.

Liberty EBCP, LLC received notice of the Receivership Order on August 20, 2018 and filed an appearance in the SEC Action on August 23, 2018. Liberty is a claimant in the SEC Action; it made a claim against the Receivership Estate and submitted to the jurisdiction of the Court for adjudication of its interests against assets of the Receivership Estate.

Mr. Duff retained counsel for the professional negligence action against the Rock Fusco Defendants with approval of the District Court and initiated that action consistent with the Receivership Order. The professional negligence action is a Receivership Asset, as is the insurance policy covering the Rock Fusco Defendants that has been triggered by the filing of that action and which provides a source for funding a potential recovery by the Receiver.

We understand that you represent Liberty EBCP, LLC ("Liberty") in matter pending in Cook County, Illinois state court captioned *Liberty EBCP, LLC v. Rock Fusco & Connelly, LLC, et al.,* Case No. 2020 L 4725. As further explained below, we write seeking your client's

Mr. Steven P. Blonder
Page 2 of 3
December 13, 2021

agreement to stay Liberty's action filed against those same Rock Fusco Defendants. The commencement and continued prosecution of that action violates the Receivership Order, which enjoins and stays such actions.

For example, Paragraph 29(c) of the Receivership Order provides that "[A]ll persons receiving notice of this Order … are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would: … (c) Dissipate or otherwise diminish the value of any Receivership Assets…."

Paragraph 32 of the Receivership Order defines what constitutes "Ancillary Proceedings" and reads, in pertinent part, as follows:

> All civil legal proceedings of any nature . . . involving: (a) the Receiver, in his capacity as Receiver; (b) any Receivership Assets, wherever located; (c) any of the Receivership Defendants, including subsidiaries and partnerships; or, (d) any of the Receivership Defendants' past or present officers, directors, managers, members, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

Paragraphs 33 and 34 of the Receivership Order further state that (1) "[t]he parties to any and all Ancillary Proceedings are enjoined from commencing or continuing any such legal proceeding, or from taking any action, in connection with any such proceeding, including, but not limited to, the issuance or employment of process" and (2) "[a]ll Ancillary Proceedings are stayed in their entirety, and all Courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court."

Liberty's pending action against the Rock Fusco Defendants thus violates the Receivership Order as it interferes with the Receivers' efforts to marshal and preserve Receivership Assets, namely by interfering with the action brought by the Receiver against the Rock Fusco Defendants and the insurance policy triggered by that action. Indeed, Liberty's action is diminishing this Receivership Asset by, *inter alia*, causing defense costs to be incurred in that action which are diminishing available funds in the insurance policy that is also triggered by the Receiver's malpractice action. Further, Liberty is diminishing the asset even though its own claims in the SEC Action have not yet been adjudicated, so its losses are unknown. In other words, the action that Liberty is pursuing is also premature. Liberty's action further violates the stay in the Receivership Order, an action that Liberty has been advancing without notification to the Receiver and without express permission under the Receivership Order.

Accordingly, we initially write to request whether Liberty will voluntarily agree to stay its action against the Rock Fusco Defendants, and whether it will submit an order to the court which enters such a stay. Should we not receive word of Liberty's agreement to a stay by the close of

Mr. Steven P. Blonder
Page 3 of 3
December 13, 2021

business on **Wednesday, December 15, 2021**, we will take action to protect the Receivership's interests.

I look forward to your response.

Very truly yours,

SPELLMIRE BRUCK LLP

Michael C. Bruck

cc: Counsel for Rock Fusco Defendants (email only)

FILED
9/25/2020 3:16 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L008843

**IN THE CIRCUIT COURT OF COOK COUNTY**
**COUNTY DEPARTMENT, LAW DIVISION**

|  |  |  |
|---|---|---|
| KEVIN B. DUFF, RECEIVER FOR THE ESTATE OF EQUITYBUILD INC., EQUITYBUILD FINANCE LLC (f/k/a HARD MONEY COMPANY LLC), 1700 JUNEWAY LLC, 4533-37 S CALUMET LLC, 5450 S INDIANA LLC, 6217-27 S DORCHESTER LLC, 6437 S KENWOOD LLC, 7026 CORNELL, INC., 7109 S CALUMET LLC, 7749-59 S YATES LLC, 7933 S KINGSTON AVE LLC, 8100 S ESSEX LLC, 8104 S KINGSTON ASSOCIATES, 8529 S RHODES AVE LLC, CHICAGO CAPITAL FUND I LLC, CHICAGO CAPITAL FUND II LLC, EB SOUTH CHICAGO 1 LLC, EB SOUTH CHICAGO 2 LLC, EB SOUTH CHICAGO 3 LLC, EB SOUTH CHICAGO 4 LLC, HYBRID CAPITAL FUND LLC, SOUTH SIDE DEVELOPMENT FUND 1 LLC, SOUTH SIDE DEVELOPMENT FUND 2 LLC, SOUTH SIDE DEVELOPMENT FUND 3 LLC, SOUTH SIDE DEVELOPMENT FUND 4 LLC, SOUTH SIDE DEVELOPMENT FUND 5 LLC, SOUTH SIDE DEVELOPMENT FUND 6 LLC, SOUTH SIDE DEVELOPMENT FUND 7 LLC, SOUTH SIDE DEVELOPMENT FUND 8 LLC, SSDF1 4520 S DREXEL LLC, SSDF1 4611 S DREXEL LLC, SSDF1 6751 S MERRILL LLC, SSDF1 7110 S CORNELL LLC, SSDF2 1139 E 79TH LLC, SSDF4 638 N AVERS LLC, SSDF4 6217 S DORCHESTER LLC, SSDF4 6250 S MOZART LLC, SSDF4 7024 S PAXTON LLC, SSDF4 7255 S EUCLID LLC, SSDF5 PORTFOLIO 1 LLC, SSDF6 6160 S MLK LLC, SSDF7 PORTFOLIO 1 LLC, SSPH 6951 S MERRILL LLC, SSPH 7927-49 S ESSEX LLC, SSPH 11117 S LONGWOOD LLC, SSPH PORTFOLIO 1 LLC, <br><br> Plaintiff, <br><br> v. <br><br> ROCK FUSCO & CONNELLY, LLC, IOANA SALAJANU, and BREGMAN, BERBERT, CHWARTZ & GILDAY, LLC, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. 2020 L 8843 <br><br> Hon. Judge Daniel J. Kubasiak <br><br> Calendar T <br><br><br><br><br><br><br><br><br><br><br><br><br><br> JURY TRIAL DEMANDED |

FILED DATE: 9/25/2020 3:16 PM   2020L008843

1

FILED DATE: 9/25/2020 3:16 PM    2020L008843

## AMENDED COMPLAINT

Kevin B. Duff, as court-appointed receiver ("Receiver") in the case captioned *SEC v. EquityBuild, Inc., et al.,* Civil Action No. 18-cv-5587, United States District Court for the Northern District of Illinois, Eastern Division (the "SEC Action") for EquityBuild, Inc. ("EquityBuild"), EquityBuild Finance, LLC ("EquityBuild Finance"), their affiliates, and the affiliate entities of Jerome ("Jerry") Cohen and Shaun Cohen, which affiliates are identified in that certain Order Appointing Receiver entered August 17, 2018 (SEC Action, Docket No. 16), as supplemented by that certain Order entered March 14, 2019 (SEC Action, Docket No. 290), and that certain Order entered February 21, 2020 (SEC Action, Docket No. 634), pursuant to the powers vested in him by Order of the Court in the SEC Action, complains against Rock Fusco & Connelly, LLC, Ioana Salajanu, and Bregman, Berbert, Schwartz & Gilday, LLC (collectively the "Defendants"), as follows:

## NATURE OF THE CASE

1. In August 2018, the United States Securities and Exchange Commission filed the SEC Action to halt an ongoing real estate fraud and Ponzi scheme devised and operated by Jerry Cohen, Shaun Cohen, and various employees of EquityBuild and EquityBuild Finance and materially assisted by, among other aiders and abettors, Ioana Salajanu, a licensed Illinois attorney and a partner at Rock, Fusco & Connelly, LLC and Bregman, Berbert, Schwartz & Gilday, LLC.

2. A true and accurate copy of the Complaint filed in the SEC is attached as Exhibit 1.

3. The United States District Court enjoined the scheme and schemers, and shortly thereafter a consent judgment was entered affirming the SEC's allegations. (*See* Exhibit 2).

4. Through the Ponzi scheme, Jerome Cohen and Shaun Cohen, with the assistance of their various enablers, bilked hundreds of ordinary investors and others across the country out of tens of millions of dollars through a wide variety of fraudulent acts and schemes.

2

FILED DATE: 9/25/2020 3:16 PM 2020L008843

## JURISDICTION AND VENUE

5.     This court has jurisdiction pursuant to 735 ILCS 5/2-209 as a result of each of the Defendants being present and transacting business in the State of Illinois, committing the acts complained of in this Complaint within the State of Illinois, and/or failing to perform (and/or perform properly) duties and/or a contract substantially connected with this State.

6.     Venue is proper pursuant to 735 ILCS 5/2-101 because Cook County is where one or more of the Defendants resides, where a substantial part of the acts and omissions complained of in this Complaint occurred, and/or where the parties agreed in written engagement letters that disputes such as this one could be litigated.

## THE PARTIES AND OTHER KEY PLAYERS

7.     Plaintiff Kevin B. Duff serves as court-appointed receiver in the SEC Action for, among other entities, EquityBuild, EquityBuild Finance, 1700 Juneway LLC, 4533-37 S Calumet LLC, 5450 S Indiana LLC, 6217-27 S Dorchester LLC, 6437 S Kenwood LLC, 7026 Cornell, Inc., 7109 S Calumet LLC, 7749-59 S Yates LLC, 7933 S Kingston Ave LLC, 8100 S Essex LLC, 8104 S Kingston Associates, 8529 S Rhodes Ave LLC, Chicago Capital Fund I LLC, Chicago Capital Fund II LLC, EB South Chicago 1 LLC, EB South Chicago 2 LLC, EB South Chicago 3 LLC, Eb South Chicago 4 LLC, Hybrid Capital Fund LLC, South Side Development Fund 1 LLC, South Side Development Fund 2 LLC, South Side Development Fund 3 LLC, South Side Development Fund 4 LLC, South Side Development Fund 5 LLC, South Side Development Fund 6 LLC, South Side Development Fund 7 LLC, South Side Development Fund 8 LLC, SSDF1 4520 S Drexel LLC, SSDF1 4611 S Drexel LLC, SSDF1 6751 S Merrill LLC, SSDF1 7110 S Cornell LLC, SSDF2 1139 E 79th LLC, SSDF4 638 N Avers LLC, SSDF4 6217 S Dorchester LLC, SSDF4 6250 S Mozart LLC, SSDF4 7024 S Paxton LLC, SSDF4 7255 S Euclid LLC, SSDF5 Portfolio 1 LLC, SSDF6 6160 S MLK LLC, SSDF7 Portfolio 1 LLC, SSPH 6951 S Merrill LLC, SSPH 7927-

3

FILED DATE: 9/25/2020 3:16 PM    2020L008843

49 S Essex LLC, SSPH 11117 S Longwood LLC, and SSPH Portfolio 1 LLC.

8.     Defendant Rock Fusco & Connelly, LLC ("Rock Fusco") is a Chicago based law firm.

9.     Defendant Ioana Salajanu is a licensed Illinois attorney who worked at Rock Fusco from on or about April 1, 2014, to sometime in or around late August 2018.

10.    Defendant Bregman, Berbert, Schwartz & Gilday, LLC ("BBSG") is a law firm with offices in Maryland, Virginia, and the District of Columbia. Mark Rosenberg is an attorney was employed with BBSG in an "of counsel" capacity. BBSG provided legal services to EquityBuild, EquityBuild Finance, and their various affiliate entities from on or about February 3, 2017, until on or about August 17, 2018.

## FACTUAL BACKGROUND

11.    Jerry Cohen formed EquityBuild as a Florida corporation on October 31, 2007.

12.    The Cohens touted EquityBuild as a company that could apply a proprietary methodology to locate undervalued real estate and allow ordinary investors to achieve opportunistic returns.

13.    EquityBuild would submit a contract to purchase residential real estate, either a single-family residence or a multifamily apartment building.

14.    After the contract submitted by EquityBuild was accepted, EquityBuild Finance raised money from investors for the purpose of funding an acquisition and construction loan to EquityBuild.

15.    EquityBuild Finance served the same purpose as the Hard Money Company, which was formed as a Delaware limited liability company by Jerry's son, Shaun, but dissolved in or around February 2014, at about the time that EquityBuild Finance LLC was created to take its place.

4

FILED DATE: 9/25/2020 3:16 PM    2020L008843

16.     Through a team of "remote managers" primarily located in Colorado, EquityBuild Finance would employ Internet advertising and other media channels, including, on at least one occasion, a television infomercial featuring William Shatner, to locate aspiring real estate investors and entice them with the prospect of double-digit returns.

17.     Many of these investors were induced to purchase participating interests in a promissory note to be signed by Jerry Cohen on behalf of EquityBuild, as borrower.

18.     The promissory note would require EquityBuild to pay monthly interest on the originally stated principal balance at rates generally ranging from 13% to 17% per annum and to repay the principal at maturity, typically between 12 and 36 months after the loan was funded.

19.     The promissory note was typically secured by a mortgage to be signed by Jerry Cohen on behalf of EquityBuild and recorded against the property in connection with which the loan was solicited.

20.     In nearly all instances, the mortgage identified each of the investors who participated in the underlying promissory note, as well as the participating interest of each such investor. (To avoid any confusion caused by the common association of the term "investor" with equity ownership, the investors who purchased interests in the EquityBuild promissory notes are henceforth described as "investor-lenders.")

21.     The investor-lenders were typically informed that EquityBuild intended to acquire an undervalued property, to rehabilitate the property, to raise the rents consistent with the new improvements, to increase the occupancy, and then to repay the principal balance of the short-term promissory note either through a refinancing event involving conventional long-term debt or through an arm's length sale of the property.

22.     In nearly every instance, however, the funds raised by EquityBuild Finance from

FILED DATE: 9/25/2020 3:16 PM    2020L008843

the investor-lenders were not disbursed to EquityBuild at the closing of the acquisition of the property that EquityBuild held under contract.

23.     Instead, in nearly every instance, EquityBuild would purchase the property solely with cash, while the proceeds of the loan made by the investor-lenders would be transferred, outside of closing, from EquityBuild Finance (to whom the investor-lenders wired their funds) to EquityBuild, where it would then be commingled into one or more bank accounts controlled by Jerry Cohen.

24.     Typically about eight weeks after EquityBuild acquired the property, the mortgage recorded to secure the promissory note in which the investor-lenders participated would be recorded with the Cook County Recorder Of Deeds.

25.     In prevailing real estate lending industry parlance, the investor-lenders would be characterized as so-called "hard money lenders," except that experienced hard money lenders would have underwritten and documented the same transactions much differently.

26.     An experienced hard money lender would have, among other things, charged loan origination fees to EquityBuild (the borrower); reviewed the purchase and sale contract; commissioned an appraisal of the property; ordered a background check or otherwise investigated the EquityBuild principals; committed to loan only a fixed percentage of the total budgeted cost of the project; required that various portions of the loan be escrowed at closing to establish a "holdback for interest reserve," a construction escrow, a real estate tax escrow, and an insurance escrow; demanded a collateral assignment of an arm's-length contract between EquityBuild and a licensed general contractor; insisted that EquityBuild purchase a loan policy of title insurance securing the lender's first priority position in the mortgage to be recorded contemporaneously with the deed; demanded that the entity formed to acquire title to the property be a wholly-owned

6

subsidiary of a holding company whose membership interests in the borrower would be pledged as additional security for the loan; and obtained an unconditional and continuing personal guaranty of repayment from Jerry Cohen.

27.     The loans made to EquityBuild by the investor-lenders lacked substantially all of the underwriting and legal paperwork routinely associated with experienced hard money lending.

28.     The transactions between the investor-lenders and EquityBuild were implemented by attorneys working initially for EquityBuild in Chicago and, then, beginning in or around February 3, 2017, by additional counsel working for EquityBuild in Bethesda, Maryland.

29.     EquityBuild's attorneys would, among other things, review the purchase and sale contracts, propose modifications, analyze the title commitments procured by the seller, conduct all appropriate legal due diligence, organize a limited liability company (or other entity, if necessary) that EquityBuild might form for the purpose of acquiring title, draft an operating agreement evidencing the management and control of the newly-formed entity, prepare a set of buyer's figures for the closing agent, attend the closing, and then review and execute the settlement statement.

30.     In the early years of the Ponzi scheme, when EquityBuild was still purchasing and purportedly "rehabbing" property of the single-family home type, some of the legal work was being performed by the late Gordon Hirsch, a licensed Illinois attorney.

31.     Mr. Hirsch committed suicide in November 2012 and left a series of notes for his daughter in which he disclosed that EquityBuild was operating a Ponzi scheme on the south side of Chicago.

32.     One of the suicide notes left by Mr. Hirsch stated, in part, as follows:

> [P]lease call the FBI Mortgage Fraud Unit. Tell them that EquityBuild, Inc.
> is a ponzi scheme [that] is run by Jerry Cohen [in] Marco Island, Florida. . . .

FILED DATE: 9/25/2020 3:16 PM    2020L008843

> They take investors money thru Shaun. They find buyers, see the EquityBuild website. They buy the property + resell it the same day for alot more money, add rehab costs, Shaun as lender sends investor $ to Jerry. So Shaun is using investor $ to buy + rehab properties owned by his father Jerry. Crazy mortgages are put on the property & EquityBuild abandons them. . . .

33.    During the period that Mr. Hirsch functioned as counsel, EquityBuild would secure an acquisition and construction loan from one or more participating investor-lenders and then sell the property to a new investor (but not an investor-lender) as a "turn-key" real estate investment opportunity.

34.    The purchaser, frequently an out-of-state investor, did not need to retain a broker to assist in locating a property, did not need to shop the market for an acquisition and construction loan, did not need to find a general contractor to make the repairs (as EquityBuild committed to doing so), and did not need to hire a property management company to lease up the building (EquityBuild already made the appropriate arrangements).

35.    Instead, the purchaser merely needed to pay the monthly debt service on the loan obtained from the investor-lenders with the net operating income generated by the rental stream.

36.    Over time, as the properties acquired by EquityBuild shifted from single-family homes to increasingly bigger apartment buildings, EquityBuild "flipped" the properties to outside investors with less regularity and began holding those properties on its own balance sheet.

37.    Shortly after Mr. Hirsch passed away, EquityBuild retained Ioana Salajanu to handle substantially all of its Chicago legal needs.

38.    Ms. Salajanu joined Rock Fusco on or about March 31, 2015, with whom she continued to be affiliated until late August 2018, shortly after the SEC Action was filed.

39.    Over the course of her work for EquityBuild, Ms. Salajanu assisted EquityBuild in connection with, among other things, the acquisition, disposition, reacquisition, financing, and/or

8

FILED DATE: 9/25/2020 3:16 PM    2020L008843

refinancing of at least 160 properties.

40.     Although EquityBuild, in many instances, managed to pay the monthly debt service to its investor-lenders, it was frequently unable to repay the loans at maturity because, among many other things, EquityBuild overpaid for the properties it acquired and could not resell them at prices consistent with their original projections (and the projections they made for prospective investor-lenders); hundreds of building code violations were inflicting substantial cost to the company; Jerry Cohen and Shaun Cohen were raiding funds earmarked for building improvements to finance their personal lifestyles and concomitantly not making the promised upgrades and repairs to enhance the values of the properties; and those improvements actually made entailed expenditures of considerably less funds than EquityBuild borrowed.

41.     Moreover, because the promissory notes EquityBuild gave to the investor-lenders required the payment of monthly interest at onerous interest rates, EquityBuild was diverting funds raised from new or existing investor-lenders in connection with the proposed acquisition of new property in order to service the monthly debt owed to other investor-lenders on properties previously acquired.

42.     By late 2016, EquityBuild began formulating a new plan to address its inability to repay the investor-lenders at maturity.

43.     Even as the Ponzi scheme was growing and the remote managers at EquityBuild were recruiting ever increasing numbers of investor-lenders, Jerry Cohen and Shaun Cohen were forced to devise a means of raising yet additional capital in order to repay, if possible, the principal balances of the loans obtained from the investor-lenders as the maturity dates of those loans, sometimes already extended more than once at EquityBuild's insistence, gradually approached.

44.     In an effort to stave off the need to repay principal, EquityBuild and EquityBuild

Finance would often pressure investor-lenders not to "cash out" at maturity, but, instead, to roll the proceeds of their loan into a new debt investment on a new property.

45.     EquityBuild initiated a plan to entice its investor-lenders into converting their mortgage loans into membership interests in one or more funds that would be formed to own the properties.

46.     EquityBuild and EquityBuild Finance widely advertised that they were targeting "3x" returns to investor-lenders who converted their debt to equity.

47.     Under the plan, EquityBuild intended to refinance the properties encumbered by investor-lender mortgages with new institutional debt at far less onerous interest rates.

48.     Many investor-lenders, however, refused to relinquish their secured debt for unsecured equity, and a growing number of investor-lenders were tiring of EquityBuild's increasingly broken promises to repay their loans following often repeated extensions of the maturity date.

49.     Meanwhile, EquityBuild could not implement its plan to refinance the debt to its investor-lenders so long as the mortgages securing the loans from those investor-lenders encumbered title to the properties being refinanced because the institutional lenders would insist that EquityBuild purchase a loan policy insuring that their own to-be-recorded mortgages would occupy first position.

50.     In order to effectuate a refinancing, therefore, EquityBuild Finance would send Ms. Salajanu an invalid release of the mortgage held by the investor-lenders that was not signed by such investor-lenders, who were not informed that any such document was being recorded, and who did not authorize the recording of any such release, and Ms. Salajanu would deliver that release to the title company.

10

FILED DATE: 9/25/2020 3:16 PM  2020L008843

51.     At the closing of the refinancing transaction, the title company would pay all costs and expenses associated with the refinancing and then wire the remaining proceeds of the replacement loan to EquityBuild Finance in accordance with a payoff letter that EquityBuild Finance deposited into the closing escrow.

52.     EquityBuild Finance rarely, if ever, distributed those remaining proceeds to the investor-lenders, and instead it concealed the fact that a refinancing event had already occurred and that the investor-lender mortgages had been released, and it continued to pressure the investor-lenders to trade their principal for an equity interest in a fund or to roll that principal into a new promissory note secured by a new property.

53.     As a result of these actions, EquityBuild was able to borrow against the same properties twice, ultimately leading to a claims process in the SEC Action in which investor-lenders asserting that their mortgages were unknowingly and unlawfully released are presently engaged in a priority dispute with institutional lenders who contend that their own mortgages occupy first position.

54.     The Ponzi scheme operated by Jerry Cohen and Shaun Cohen with active assistance by the Defendants is typified by EquityBuild's acquisition, financing, and refinancing of the real property and improvements located at 7201 South Dorchester Avenue, a 14-unit apartment building in the Grand Crossing neighborhood of Chicago ("7201 S Dorchester").

55.     EquityBuild submitted a contract to purchase 7201 S Dorchester on December 30, 2015, and that contract was accepted by the owner of record on January 7, 2016. (A true and accurate copy of the Apartments/Investments Purchase and Sale Contract is attached as Exhibit 3.)

56.     On January 8, 2016, Ms. Salajanu began reviewing the purchase and sale contract for 7201 S Dorchester.

57.     During the period between the seller's acceptance of the contract and the closing, EquityBuild Finance solicited prospective investor-lenders to participate in a $1,100,000 loan to EquityBuild in connection with its acquisition and stated intention to rehabilitate 7201 S Dorchester.

58.     EquityBuild ultimately purchased 7201 S Dorchester at a closing held at Chicago Title and Trust Company on March 31, 2016. (A true and accurate copy of the Escrow Trust Disbursement Statement is attached as Exhibit 4.)

59.     At the closing, EquityBuild acquired 7201 S Dorchester for $564,463.95 in cash, following the application of, among other things, closing prorations and credits, closing costs, insurance premiums, and legal fees to Rock Fusco, and Ms. Salajanu signed the disbursement statement pursuant to a power of attorney to act on behalf of Jerry Cohen.

60.     After the closing, the special warranty deed delivered to EquityBuild was recorded with the Cook County Recorder of Deeds. (A true and accurate copy of the file-stamped Special Warranty Deed is attached as Exhibit 5.)

61.     Two months after the special warranty deed was recorded, a mortgage in favor of each of the participating investor-lenders was recorded against 7201 S Dorchester. (A true and accurate copy of the Mortgage is attached as Exhibit 6, pp. 42-48.)

62.     The mortgage identified the 25 individuals or entities who participated in the $1,100,000 loan to EquityBuild in connection with its acquisition and proposed rehabilitation of 7201 S Dorchester, as well as the amounts of their respective contributions to the loan and their respective participation interests in the promissory note (*Id.,* p. 48.)

63.     A specimen promissory note to be signed by Jerry Cohen on behalf of EquityBuild and delivered to the investor-lenders is attached as Exhibit 7.)

64.     Paragraph 3 of the promissory note recited that the loan evidenced by the note would be secured by a mortgage recorded against <u>7201 S Dorchester</u>, and the prefatory language of the note set forth the payment terms – in this case eleven monthly payments of interest at the rate of 15% per annum, followed by a balloon payment of the original principal balance plus any accrued and unpaid interest.

65.     The promissory note associated with <u>7201 S Dorchester</u> specified that the funding date of the loan would be March 31, 2016 (the date that EquityBuild closed on its acquisition of the property) and that the loan would mature on April 1, 2017.

66.     EquityBuild did not repay the principal balance of the note associated with <u>7201 S Dorchester</u> on April 1, 2017, and, instead, EquityBuild Finance, purporting to act on behalf of the investor-lenders, extended the maturity date to October 1, 2017.

67.     EquityBuild did not repay the principal balance of the note associated with <u>7201 S Dorchester</u> on October 1, 2017, and, instead, EquityBuild Finance, purporting to act on behalf of each of the investor-lenders, extended the maturity date to March 1, 2018.

68.     Meanwhile, EquityBuild was working to refinance the debt on <u>7201 S Dorchester</u> and 16 other properties through a portfolio loan from Liberty EBCP ("Liberty").

69.     Three of the properties that EquityBuild sought to include in the portfolio were then owned by third parties who had purchased those properties from EquityBuild as so-called "turn-key" investments with funds that EquityBuild Finance raised from investor-lenders and based upon a commitment by EquityBuild that it would make the required post-closing improvements.

70.     The individuals to whom EquityBuild sold these properties were complaining that the promised improvements were never made and that the properties were not generating nearly enough revenue to pay the debt service on the loans from the investor-lenders.

13

71. The referenced individuals were threatening legal action unless EquityBuild repurchased the properties.

72. A worksheet prepared in connection with the proposed Liberty refinancing indicated that the total cumulative principal balance of the loans received from EquityBuild's investor-lenders in connection with the 17 properties to be subject to the portfolio loan was expected to equal $23,847,540 as of May 3, 2018. (A true and accurate copy of the referenced worksheet is attached as Exhibit 8.)

73. Based on appraisals of the 17 properties and other underwriting criteria, however, Liberty was only willing to lend EquityBuild $9,200,000.

74. Moreover, as a predicate to obtaining the Liberty loan, EquityBuild was required to pay a variety of closing costs, title expenses, attorneys' fees, and other charges from the closing escrow.

75. Specifically, EquityBuild was required to pay loan origination fees, lender legal fees, and loan interest in the combined amount of $315,156.90; outstanding and delinquent real estate taxes in the combined amount of $222,986.24; title charges of $17,876.00; recording fees totaling $2,382.00; mortgage brokerage fees of $92,000.00; outstanding construction invoices in the amount of $157,150.00; outstanding water bills in the combined amount of $16,690.78; Rock Fusco legal fees in the amount of $13,000.00; and other miscellaneous expenses totaling $20,240.25.

76. In addition, Liberty held back $1,183,179.00 of the $9,200,000 loan to fund reserves for real estate taxes, capital expenditures, property insurance, and loan interest.

77. After consideration of a $15,263.45 closing credit from Liberty (the balance of EquityBuild's good-faith deposit) the loan holdbacks and the $2,933,765.66 in closing costs,

14

FILED DATE: 9/25/2020 3:16 PM    2020L008843

EquityBuild netted only $5,098,318.79 with which to repay the $21,329,500.00 cumulative principal balance on the investor-lender loans associated with the 14 properties in the portfolio then owned by EquityBuild. (A demonstrative exhibit summarizing the transaction documentation is attached as Exhibit 9.)

78.    To ensure the closing of the Liberty loan, therefore, EquityBuild Finance created payoff letters that falsely understated the total outstanding balance of the mortgage loan to which it related; and Ms. Salajanu delivered these inaccurate payoff letters to the title company. (True and accurate copies are attached as Exhibit 10.)

79.    Releases of the corresponding mortgages lacking the signatures of the mortgagees and otherwise unauthorized were created by Shaun Cohen and delivered by Ms. Salajanu to the title company. (True and accurate copies are attached as Exhibit 11.)

80.    Each of the referenced mortgage releases was executed on April 12, 2018, by Shaun Cohen as "manager" of EquityBuild Finance, although 16 of the 17 mortgages expressly identified the investor-lenders, and not EquityBuild Finance, as the mortgagees of record. (*See* Exhibit 6.)

81.    With the outstanding balances of the investor-lender loans intentionally and falsely reduced to $9,560,648.18, however, EquityBuild still needed $4,462,329.37 in cash to close.

82.    To bridge this shortfall, Jerry Cohen obtained a $3,500,000 *overnight* loan for a fixed fee of $200,000.

83.    Ms. Salajanu and Rock Fusco assisted Mr. Cohen in documenting a loan agreement pursuant to which SSDF7 Portfolio 1, LLC, the entity that EquityBuild formed to acquire title to the 17 properties and enter into the loan agreement with Liberty, would borrow $3,500,000 from Chief Management, LLC, a California company established to extend the 24-hour loan. (A true and accurate copy of the Loan Agreement is attached as Exhibit 12.)

84. Under the Loan Agreement, Chief Management agreed to wire $3,500,000 into the closing escrow, and EquityBuild (through the entity it established to acquire title to the 17 properties in connection with the portfolio loan) agreed that the title company would disburse the funds directly back to Chief Management at closing.

85. The Chief Management loan was wired into the closing escrow, and then Jerry Cohen, with the active and knowing assistance and participation of Rock Fusco and Ms. Salajanu, repaid the loan by diverting the already artificially-reduced payoffs to the investor-lenders directly to Chief Management through payoff letters that altered the destination accounts from EquityBuild Finance to Chief Management.

86. A true and accurate copy of the Final ALTA Settlement Statement associated with the Liberty loan is attached as Exhibit 13.

87. The Final ALTA Settlement Statement reflects the Chief Management loan as a credit to the borrower and then reflects two of the payoffs of the investor-lender loans as being made to Chief Management, specifically, in the amounts of $1,967,591.22 and $496,533.44.

88. A third payoff was diverted to Chief Management in connection with EquityBuild's repurchase of one of the three properties from the complaining investors.

89. To assist Jerry Cohen, Rock Fusco and Ms. Salajanu filed articles of organization in the State of Wyoming to create a distinct Chief Management, LLC (one owned by Mr. Cohen, as distinguished from the Chief Management that made the overnight loan), and she prepared an operating agreement for the Chief Management entity established in Wyoming. (True and accurate copies of these documents are attached as Exhibit 14.)

90. During the period that Ms. Salajanu assisted the Cohens with the closing of the Liberty loan and prior thereto, she was aware of ample information indicating that EquityBuild

16

and EquityBuild Finance were operating a Ponzi scheme and defrauding investors.

91.     For example, on October 17, 2016, Ms. Salajanu received a letter from an attorney representing a purchaser of property from EquityBuild who alleged, among other things, that EquityBuild committed to making substantial improvements to his property within 120 days of the sale, but that, among other things, construction did not commence until 270 days after the sale, that construction was commenced without a permit, that city inspectors had begun targeting the property for violations of municipal ordinances, and that his client had been paying interest (to the investor-lenders) for 14 months, during which time the property generated zero income. (A true and accurate copy of the referenced letter is attached as Exhibit 15.)

92.     The allegations asserted in the October 17, 2016 letter ultimately resulted in the filing of a ten-count complaint alleging fraud, breach of fiduciary duty, and other intentional and unintentional torts by EquityBuild and its counsel. (A true and accurate copy of the referenced complaint is attached as Exhibit 16.)

93.     The complaint was filed on March 20, 2018, and Ms. Salajanu received a copy.

94.     Meanwhile, in late May 2017, Ms. Salajanu was contacted by Jessica Baier, who worked for EquityBuild in Florida.

95.     During their teleconference, Ms. Baier informed Ms. Salajanu of numerous improprieties in EquityBuild's operations including, among other things, the misallocation of investor-lender funds.

96.     Ms. Baier informed Ms. Salajanu that if she failed to take action to halt the improprieties, she would take matters into her own hands and alert others herself.

97.     Rather than investigate the matter further, Ms. Salajanu immediately called Jerry Cohen to report what she had just been told by Ms. Baier, and Ms. Salajanu and Rock Fusco

FILED DATE: 9/25/2020 3:16 PM    2020L008843

continued to advance the schemes of the Cohens.

98.     In early February 2017, EquityBuild retained BBSG (and its "of counsel," Mr. Rosenberg) to assist in the defense of an SEC investigation into a Ponzi scheme in which it had been implicated.

99.     Shortly thereafter, BBSG began preparation of private placement memoranda for dissemination to prospective new investors.

100.     Hitherto, EquityBuild and EquityBuild Finance had been acting in derogation of federal securities law in connection with its offering of participation interests in promissory notes to prospective investor-lenders.

101.     The private placement memoranda prepared by BBSG contained false statements about EquityBuild's real estate investment track record and contained "sources and uses" disclosures often detailing the payment of numerous types of fees to EquityBuild that were so onerous and absurd by industry standard that no experienced securities law firm, let alone one originally retained for the purpose of defending the issuer in a Ponzi scheme investigation, could have failed to be aware such issues.

102.     For example, BBSG developed a private placement memorandum for the purchase of the property located at 6437 South Kenwood in Chicago. (A true and accurate copy is attached as Exhibit 17.)

103.     The promissory note to be delivered to the investor-lenders (*Id.,* pp. 65-76) indicates that the entire principal balance plus all accrued interest will be payable in a single lump-sum at maturity, but the sources and uses spreadsheet contained in the private placement memorandum (*Id.,* p. 35) indicates that funds used to pay the interest accrual are included within the capital raise.

FILED DATE: 9/25/2020 3:16 PM   2020L008843

104.    A prudent law firm would know that a rational lender would not have loaned the borrower the very funds that the borrower would later need to pay the interest accrual at maturity and instead would have held back the anticipated interest accrual, thus reducing the amount of the initial loan disbursement.

105.    Moreover, simple interest accruing at the rate of 16% per annum on a $2,500,000 loan would have required EquityBuild to pay $800,000 in accrued interest on the 24-month maturity date, meaning that the total outstanding balance of the loan would ultimately equal $3,300,000.

106.    By the same token, if the "financed interest" line item in the sources and uses spreadsheet was intended to refer to the cumulative accrued interest at maturity, then a holdback of $456,165 from a $2,500,000 loan would be substantially insufficient to pay the accrued 16% simple interest per annum on a $2,043,835 disbursement, as the total interest due at maturity would then have equaled $654,027.20.

107.    The documents and information contained in the private placement memorandum are such that a prudent attorney, would have known that EquityBuild was defrauding investors and would have advised against using or distributing such a private placement memorandum to investors.

108.    BBSG failed to investigate and affirm other statements in the private placement memorandum that raised serious questions about the legitimacy of the underlying transaction, including, among other things, the payment to EquityBuild of an $88,875 development fee in connection with the making of only $302,500 in building improvements.

109.    The Defendants either directly or impliedly represented the interest of the Cohens by advancing the schemes, creating a conflict of interest in the representation of EquityBuild and

FILED DATE: 9/25/2020 3:16 PM    2020L008843

its affiliates, who were also being represented by these Defendants, as the Defendants placed the interests of the Cohens above those of EquityBuild and its affiliates, and, at a minimum, the Defendants should have withdrawn from their representation of EquityBuild and its affiliates.

110.    On August 15, 2018, the SEC brought an action that details the fraud and Ponzi scheme that the Cohens implemented for their own benefit through EquityBuild which lured investors into investing their monies.

111.    That scheme permeated the entirety of EquityBuild's business, whether it be the purchase and sale of real estate, the establishment of various entities that allowed monies to be shifted from one entity to another or otherwise easily accessed for improper abuses by the Cohens, and finally creation of documentation that assisted in luring investors into the scheme with misrepresentations and the like.

112.    On August 17, 2018, the United States District Court for the Northern District of Illinois granted the SEC's request to enjoin the Cohens and EquityBuild from running such schemes, and appointed Kevin Duff as Receiver for the EquityBuild entities.

113.    Each of the EquityBuild entities was controlled by the Cohens in the fraudulent scheme and thus could not sue those involved in perpetuating or enabling the scheme or allowing it to continue. Thus, the statute of limitations was tolled until the wrongdoers were removed and the Receiver was appointed. The Receiver was appointed by the Court in the SEC Action on August 17, 2018. However, the Receiver did not discover, and could not despite the exercise of reasonable diligence have discovered, until more recently, the Defendants' participation in furthering the EquityBuild Ponzi scheme. Moreover, the Defendants' wrongful acts were inherently undiscoverable. The Receiver also asserts the doctrine of equitable tolling with respect to any applicable statute of limitations.

FILED DATE: 9/25/2020 3:16 PM    2020L008843

**COUNT I**
**Professional Negligence**
**(Against All Defendants)**

114.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

115.    As advisors and attorneys with respect to their handling of the transactions and matters described above for EquityBuild, the Defendants owed EquityBuild a duty to comply with the applicable standard of care.

116.    The Defendants failed to meet the applicable standard of care in the respects set forth above, including without limitation: (1) failing to conduct the proper due diligence associated with the various transactions that led to investors purchasing certain notes, positions in funds or refinancings; (2) allowing for the creation of sham entities and transactions that allowed officers and the like to benefit while at the same time allowing a scheme to proceed which was directly contrary to the interests and viability of the clients they represented; (3) creating inaccurate paperwork which worsened the financial position of EquityBuild; (4) failing to properly investigate and address the serious improprieties that were expressly provided by EquityBuild employees; (5) failing to competently and promptly investigate the bona fides of EquityBuild's business which allowed EquityBuild to worsen its financial position, and allowed its officers and insiders to improperly obtain various monies; (6) failing to take all necessary steps to ensure that the EquityBuild transactions were legitimate and legal; (7) placing the interests of the Cohens ahead of the their clients; and (8) failed to warn or advise EquityBuild and its principals to either not to enter into the transactions and/or not to enter into the transactions in the manner that it did..

117.    Defendants' failure to meet the applicable standard of care constitutes professional negligence.

118.    Defendants' negligence/gross negligence was a proximate cause of Plaintiff's

FILED DATE: 9/25/2020 3:16 PM    2020L008843

damages, as alleged above, including but not limited to all expenses, losses, liabilities, debts and other obligations incurred from the fraud and Ponzi scheme perpetrated by the Cohens.

119. As a proximate result of the foregoing, Plaintiff has been injured in an amount to be proven at trial including but not limited to the amounts of the expenses, losses, liabilities, debts and other obligations incurred from the fraud and Ponzi scheme perpetrated by the Cohens.

**COUNT II**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Against All Defendants)**
**(In the Alternative to Count I)**

120. In the alternative to Count I, Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

121. Jerry Cohen was the head of EquityBuild, Inc. while EquityBuild Finance was run by Shaun Cohen. The Cohen's owed fiduciary duties to EquityBuild.

122. The Cohens took countless actions in breach of those fiduciary duties. Indeed, as more fully described herein, they used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

123. As set forth above, between at least 2014 and through August 2018, Defendants Rock Fusco, Salajanu, and BBSG: (a) knew and were aware of the improper conduct described above orchestrated by the Cohens; (b) were aware of the conduct by Jerome Cohen and Shaun Cohen who had fiduciary positions with Company, and were aware of the breach of those duties to EquityBuild by engaging in the conduct described above; (c) knowing and substantially assisted and facilitated the fiduciary breaches against the interest of their clients, namely EquityBuild; and

FILED DATE: 9/25/2020 3:16 PM    2020L008843

(d) benefitted directly and/or indirectly from these fiduciary breaches.

124.    For example, the Defendants knowingly and substantially assisted and facilitated the fiduciary breaches of the Cohens as they implemented the various fraudulent schemes that allowed the Ponzi scheme to originate and continue, allowing the Cohens to continue to have substantial monies and dollars, all the while creating greater instability to the financial condition of the Receivership Entities.

125.    As described above, Ms. Salajanu and Rock Fusco were intimately involved in creating the documentation necessary to advance the various schemes. This included, *inter alia*, the preparation of corporate documentation, the preparation of false settlement statements, the submission of unauthorized releases, and the submission of payoff letters containing falsely understated account balances, and then delivering all of the foregoing information to escrow officers and lenders and facilitating the Cohens' misappropriation of refinancing proceeds from investor-lenders.

126.    For their part, from 2017 forward, BBSG continued to include misrepresentations and the like in offerings and private placement memoranda without proper diligence, despite the face of such documents identifying information that well indicated that scheme was ongoing, let alone the fact that almost immediately upon working on the private placement memoranda, the SEC began investigating, which provided additional knowledge that there were improprieties associated with the Cohens' activities.

127.    At all relevant times, the Defendants, and others working on their behalf, worked within the course and scope of their employment, and for their own benefit.

128.    The Defendants supervised, reviewed, approved, and/or ratified the conduct of the Cohens to the detriment of EquityBuild.

129.    The Defendants willfully ignored obvious indicia of misconduct on the part of the Cohens to reap the benefit of additional fees and ensure their lucrative relationships were maintained.

130.    The Defendants' malfeasance and misfeasance also have proximately caused EquityBuild to sustain substantial damages in an amount to be proven at trial, including but not limited to all expenses, losses, liabilities, debts and other obligations incurred from the fraud and Ponzi scheme perpetrated by the Cohens.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Kevin B. Duff, as Receiver for the Estate of EquityBuild, Inc., et al., respectfully requests that this Court:

A.    Find that the Defendants committed professional malpractice;

B.    Find that the Defendants aided and abetted breaches of fiduciary duty;

C.    Find that the entities for which the Plaintiff was appointed Receiver were damaged and award compensatory and other appropriate damages permitted by law for a sum in excess of the Law Division jurisdictional limit of $50,000;

D.    Award pre-judgment and post-judgment interest to the extent warranted under the common law or under the Illinois Interest Act (815 ILCS 205/2) or other statutes (735 ILCS 2-1303);

E.    Award the Plaintiff reasonable attorneys' fees and costs; and

F.    Grant such other and further relief the Court deems just.

FILED DATE: 9/25/2020 3:16 PM    2020L008843

FILED DATE: 9/25/2020 3:16 PM   2020L008843

Dated:  September 25, 2020                    Respectfully submitted,

                                              Kevin B. Duff, Receiver


                                              /s/ Michael Rachlis

                                              Michael Rachlis
                                              Rachlis Duff & Peel LLC
                                              Firm No. 56188
                                              542 South Dearborn Street, Suite 900
                                              Chicago, IL 60605
                                              (312) 733-3950
                                              mrachlis@rdaplaw.net

                                              Andrew Eliot Porter
                                              Porter Law Office
                                              Firm No. 42000
                                              853 North Elston Avenue
                                              Chicago, IL 60642
                                              Tel: (312) 433-0568
                                              andrew@andrewporterlaw.com

                                              Michael C. Bruck
                                              Timothy J. McInerney
                                              SPELLMIRE BRUCK LLP.
                                              One East Wacker Drive – Suite 2350
                                              Chicago, IL  60601
                                              (312) 258-9400
                                              mcb@spellmirebruck.com
                                              tjm@spellmirebruck.com
                                              Firm ID: 62543

                                              Steven J. Roeder
                                              Thomas D. Gipson
                                              Roeder Law Offices LLC
                                              77 West Washington Street, Suite 2100
                                              Chicago, Illinois 60602
                                              Phone: (312) 667-6000
                                              Fax: (708) 843-0618
                                              Firm ID: 58775
                                              sjr@roederlawoffices.com
                                              tdg@roederlawoffices.com


                                              *Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

_____

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES | ) | |
| AND EXCHANGE COMMISSION, | ) | |
|  | ) | Civil Action No. |
| **Plaintiff,** | ) | |
| **v.** | ) | |
|  | ) | **Hon. Judge** |
| EQUITYBUILD, INC., | ) | |
| EQUITYBUILD FINANCE, LLC, | ) | |
| JEROME H. COHEN and | ) | |
| SHAUN D. COHEN | ) | |
|  | ) | |
| **Defendants,** | ) | |

_____)

### ORDER APPOINTING RECEIVER

**WHEREAS** this matter has come before this Court upon Plaintiff United States

Securities and Exchange Commission's ("SEC" or "Commission") Emergency Motion for a

Temporary Restraining Order to Prevent Violations of the Federal Securities Laws, to Appoint a

Receiver, and to Provide for Other Ancillary Relief; and,

**WHEREAS** the Court finds that, based on the record in these proceedings, the

appointment of a receiver in this action is necessary and appropriate for the purposes of

marshaling and preserving all assets of Defendants Equitybuild, Inc., Equitybuild Finance, LLC,

their affiliates, and the affiliate entities of Defendants Jerome Cohen and Shaun Cohen; and,

**WHEREAS** this Court has subject matter jurisdiction over this action and personal

jurisdiction over the Defendants, and venue properly lies in this District.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED**

**THAT:**

1.      This Court hereby takes exclusive jurisdiction and possession of the assets, of

whatever kind and wherever situated, of the following Defendants, and the affiliate entities of

Defendants Jerome Cohen and Shaun Cohen:  Equitybuild, Inc., Equitybuild Finance, LLC, and

affiliates, including but not limited to:  3400 Newkirk, LLC, Hard Money Company LLC,

Tikkun Holdings LLC, 11117 S Longwood LLC, 11318 S Church St Associates, 1632 Shirley

LLC, 1700 Juneway LLC, 2136 W 83RD LLC, 2537 N McVicker LLC, 4520 S Drexel LLC,

4533-37 S Calumet LLC, 4528 Michigan LLC, 4750 Indiana LLC, 4755 S Saint Lawrence

Associates, 5001 S Drexel LLC, 5411 W Wrightwood LLC, 6951 S Merrill LLC, 7107-29 S

Bennett LLC, 7109 S Calumet LLC, 7922 S Luella LLC, 7927-49 S Essex LLC, 7933 S

Kingston LLC, 7945 S Kenwood LLC, 8104 S Kingston LLC, 8153 S Avalon LLC, 8217

Dorchester LLC, 8311 S Green LLC, 8432 S Throop Associates, 8725 S Ada LLC, 8745 S

Sangamon LLC, 8801 S Bishop St Associates, 9158 S Dobson LLC, Chicago Capital Fund I

LLC, Chicago Capital Fund II LLC, EB South Chicago 1 LLC, EB South Chicago 2 LLC, EB

South Chicago 3 LLC, Hybrid Capital Fund LLC, South Shore Property Holdings LLC, South

Side Development Fund 1 LLC, South Side Development Fund 2 LLC, South Side Development

Fund 3 LLC, South Side Development Fund 4 LLC, South Side Development Fund 5 LLC,

South Side Development Fund 6 LLC, South Side Development Fund 7 LLC, and South Side

Development Fund 8 LLC (collectively, the "Receivership Defendants").

2.     Until further Order of this Court, Kevin B. Duff, of the firm Rachlis Duff Adler

Peel & Kaplan, LLC, is hereby appointed to serve without bond as the federal equity receiver

(the "Receiver") for the estate of the Receivership Defendants.

## I.  Asset Freeze

3.     Except as otherwise specified herein, all assets of the Defendants and

Receivership Defendants (collectively, "Receivership Assets") are frozen until further order of

this Court.  "Receivership Assets" means assets of any and every kind whatsoever, including

without limitation all assets described in this Order, that are: (a) owned, controlled, or held, in whole or in part, by or for the benefit of any of the Receivership Defendants, in whole or in part; (b) in the actual or constructive possession of any of the Receivership Defendants, or other individual or entity acting in concert with any of the Receivership Defendants; (c) held by an agent of any of the Receivership Defendants, including as a retainer for the agent's provision of services; or (d) owned, controlled, or held, in whole or in part, by, or in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, trust, or other entity directly or indirectly owned, controlled, or held, in whole or in part, by any of the Receivership Defendants, including assets that have been transferred to other persons or entities but as to which assets such persons or entities do not have a legitimate claim. Accordingly, all persons, institutions and entities with direct or indirect control over any Receivership Assets other than the Receiver, are hereby restrained and enjoined from directly or indirectly transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating or otherwise disposing of or withdrawing such Receivership Assets. This freeze shall include, but not be limited to, Receivership Assets that are on deposit with any financial institutions or other entities, including, but not limited to, banks, brokerage firms and mutual funds. In particular, the Court enjoins any disbursement of proceeds by the Defendants, their agents, representatives, employees and officers and all persons acting in concert or participation with them, whatever business name they may operate under, derived from the sales of interests in Receivership Defendants, or any of them.

## II. **General Powers and Duties of Receiver**

4. The Receiver shall have all powers, authorities, rights and privileges heretofore possessed by the officers, directors, managers, members, and general and limited partners of the

Receivership Defendants under applicable state and federal law, by the governing charters, by-laws, articles and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959, and 1692, Fed. R. Civ. P. 66, and this Order.

5.     The trustees, directors, officers, managers, employees, investment advisors, accountants, attorneys, and other agents of the Receivership Defendants are hereby dismissed and the powers of any general partners, directors and/or managers are hereby suspended. Such persons and entities shall have no authority with respect to the Receivership Defendants' operations or assets, except to the extent as may hereafter be expressly granted by the Receiver. This order, however, does not dismiss Defendants Jerome Cohen and Shaun Cohen's personal attorneys, if any, who file an appearance in this action.

6.     The Receiver shall assume and control the operation of any of the Receivership Defendants and shall pursue and preserve all of their claims or interests. The Receiver may continue and conduct the business of the Receivership Defendants in such manner, to such extent and for such duration as the Receiver may deem to be necessary or appropriate, if at all.

7.     No person holding or claiming any position of any sort with any of the Receivership Defendants shall possess any authority to act for or on behalf of any of the Receivership Defendants, unless expressly authorized, in writing, by the Receiver.

8.     Subject to the specific provisions in Sections II through XIII, below, the Receiver shall have the following general powers and duties:

        A.     To use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Defendants, including, but not limited to, monies, funds, securities, credits, investments, savings, options, shares, cash, currencies, checks, accounts, vehicles, boats, equipment, fixtures, effects, goods, chattels, lands, premises, leases, claims, notes, membership interests in any limited liability company, partnership

interests, contracts, certificates of title, instruments, inheritances, interests in any trust, art, collectibles, furnishings, jewelry, personal effects, digital currencies, virtual currencies, cryptocurrencies, digital or electronic property, rights, and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind and wherever located, which the Receivership Defendants own, possess, have a beneficial interest in, or control directly or indirectly (the foregoing, together with all assets described in this Order collectively may be referred to as "Receivership Assets" or the "Receivership Estate");

B.  To take custody, control, and possession of all Receivership Assets and records relevant thereto from the Receivership Defendants; to sue for and collect, recover, receive, and take into possession from third parties all Receivership Assets and records relevant thereto;

C.  To manage, control, operate and maintain the Receivership Estate and hold in his possession, custody and control all Receivership Assets, pending further Order of this Court;

D.  To take possession of all bank and investment accounts or securities accounts owned controlled, or held, in whole or in part, by or associated with the Receivership Estate or Receivership Defendants, whether in the name of the Receivership Defendants or their subsidiaries or affiliates, wherever located (collectively, the "Accounts").  The Receiver shall have the authority to open, close, transfer and change all bank, investment and securities Accounts.

E.  To sign checks on, otherwise withdraw or transfer, trade, or otherwise control the funds and/or securities contained in any Accounts owned, controlled, or held, in whole or in part, by, or in the name of, the Receivership Defendants and Receivership Estate.  The Receiver shall also be authorized to add or delete signers, including those currently authorized on the Account(s).  The representatives of the Receiver initially designated with authority over these accounts shall be Kevin B. Duff.

F.  To open and maintain new bank accounts in the name of the Receiver for the use in administering and preservation of the Receivership Estate, using the Federal Employer Identification Number of the Receivership Estate, at the Receiver's discretion.

G.  To take control of, conserve, and liquidate any and all securities or commodities, owned, controlled, or held by, in whole or in part, by or for the benefit of the Receivership Estate, as the Receiver deems advisable or necessary.

H.  To use Receivership Assets for the benefit of the Receivership Estate,

making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

I.       To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers, members, trustees, and agents of the Receivership Defendants;

J.       To engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders or auctioneers;

K.       To take such action as necessary and appropriate for the preservation of Receivership Assets or to prevent the dissipation or concealment of Receivership Assets;

L.       To issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure;

M.       To bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver;

N.       To pursue, resist and defend all suits, actions, claims, and demands which may now be pending or which may be brought by or asserted against the Receivership Estate;

O.       To take such other action as may be approved by this Court.

### III.  Defendants' Duties to Receiver

9.       The individual Receivership Defendants and the past and/or present officers, directors, agents, managers, members, general and limited partners, trustees, attorneys, accountants and employees of the entity Receivership Defendants, as well as those acting in their place, are hereby ordered and directed to preserve, provide immediate access, and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Defendants and/or all Receivership Assets; such information shall include but not be limited to books, records, documents, accounts, all financial and accounting records, balance

sheets, income statements, bank records (including monthly statements, canceled checks, records

of wire transfers, details of items deposited, and check registers), client lists, title documents,

writings, drawings, graphs, charts, photographs, audio and video recordings, computer records,

computer files, databases and other data compilations, electronically stored records and

information, access codes, security codes, passwords, safe deposit keys, combinations, and all

other instruments, papers, and electronic data or records of any kind or nature. This does not,

however, include any documents or files of Defendant Jerome Cohen's or Defendant Shaun

Cohen's personal attorneys, if any, that are protected by the work-product doctrine and/or

attorney-client privilege. Notwithstanding the foregoing, the Receivership Defendants and any

person or entity receiving notice of this Order shall turn over to the Receiver forthwith all keys,

including but not limited to physical, digital, and cryptographic keys, codes, device PINs, and

passwords, including but not limited to account, encryption, email account, and computer

passwords, necessary to gain or to secure access to any Receivership Assets or documents of or

pertaining to the Receivership Defendants, including, but not limited to, access to their business

premises, means of communication, accounts, computer systems, mail boxes, lock boxes, storage

facilities, virtual currency accounts, virtual wallets, or other property.

       10.    Within five (5) business days of the entry of this Order, the Receivership

Defendants shall file with the Court and serve upon the Receiver and the Commission a sworn

statement, listing: (a) the identity, location and estimated value of all Receivership Assets,

including contact information for the party in possession of, all assets of such Defendant, held

jointly or singly, including without limitation all assets held outside the territory of the United

States; (b) all employees (and job titles thereof), other personnel, attorneys, accountants and any

other agents or contractors of the Receivership Defendants; and (c) the amount and nature of all

liabilities of such Defendant, including without limitation the names, addresses and amounts of claims of all known creditors of the Receivership Defendants. Such sworn statement shall include the names, addresses, telephone numbers, facsimile numbers, and e-mail addresses of the holders of any legal, equitable, or beneficial interests in such assets and the names, addresses, telephone numbers, facsimile numbers, and e-mail addresses of any financial institutions or other persons or entities holding such assets, along with the account numbers and balances. The sworn statements shall be accurate as of the date of this Order, shall be signed and verified as true and complete under penalty of perjury. Defendants Jerome Cohen and Shaun Cohen shall retain responsibility, and the Receiver shall assume no responsibility, for preparing and filing their respective personal income tax returns.

11. Within thirty (30) days of the entry of this Order, the Receivership Defendants shall file with the Court and serve upon the Receiver and the Commission a sworn statement and accounting, with complete documentation, covering the period from January 1, 2010 to the present:

      A.    Of all Receivership Assets, wherever located, held by or in the name of the Receivership Defendants, or in which any of them, directly or indirectly, has or had any beneficial interest, or over which any of them maintained or maintains and/or exercised or exercises control, including, but not limited to: (a) all securities, investments, funds, real estate, automobiles, jewelry and other assets, stating the location of each; and (b) any and all accounts, including all funds held in such accounts, with any bank, brokerage or other financial institution held by, in the name of, or for the benefit of any of them, directly or indirectly, or over which any of them maintained or maintains and/or exercised or exercises any direct or indirect control, or in which any of them had or has a direct or indirect beneficial interest, including the account statements from each bank, brokerage or other financial institution;

      B.    Identifying every account at every bank, brokerage, or other financial institution: (a) over which Receivership Defendants have signatory authority; and (b) opened by, in the name of, or for the benefit of, or used by, the Receivership Defendants;

     C.     Identifying all credit, bank, charge, debit or other deferred payment card issued to or used by each Receivership Defendant, including but not limited to the issuing institution, the card or account number(s), all persons or entities to which a card was issued and/or with authority to use a card, the balance of each account and/or card as of the most recent billing statement, and all statements for the last twelve months;

     D.     Of all assets received by any of them from any person or entity, including the value, location, and disposition of any assets so received;

     E.     Of all funds received by the Receivership Defendants, and each of them, in any way related, directly or indirectly, to the conduct alleged in the Commission's Complaint. The submission must clearly identify, among other things, all investors, the securities they purchased, the date and amount of their investments, and the current location of such funds;

     G.     Of all expenditures exceeding $1,000 made by any of them, including those made on their behalf by any person or entity; and

     H.     Of all transfers of assets made by any of them.

12. Within ten (10) days of the entry of this Order, the Receivership Defendants shall provide to the Receiver and the Commission copies of the Receivership Defendants' federal income tax returns for 2010 through 2017 with all relevant and necessary underlying documentation. The Receivership Defendants shall also deliver all state licenses, tax identification numbers, and all other relevant tax information.

13. The individual Receivership Defendants and the Receivership Defendants' past and/or present officers, directors, agents, attorneys, managers, members, shareholders, employees, accountants, debtors, creditors, managers and general and limited partners, and other appropriate persons or entities shall answer under oath to the Receiver all questions which the Receiver may put to them and produce all documents as required by the Receiver regarding the business of the Receivership Defendants, or any other matter relevant to the operation or administration of the receivership or the collection of funds due to the Receivership Defendants.

In the event that the Receiver deems it necessary to require the appearance of the aforementioned persons or entities, the Receiver shall make his discovery requests in accordance with the Federal Rules of Civil Procedure. Nothing in this Order shall operate as or effectuate a waiver of the attorney-client privilege regarding communications between Defendants Jerome Cohen and Shaun Cohen and their respective personal attorneys, if any, and such personal attorneys shall not be compelled by this Order to divulge information that would otherwise be protected by the attorney-client privilege.

14. The Receivership Defendants are required to fully cooperate with and assist the Receiver in all respects in fulfilling his duties and obligations. As such, the Receivership Defendants must respond promptly and truthfully to all requests for information and documents from the Receiver. This cooperation and assistance shall include, but not be limited to: (a) providing any information or documents that the Receiver deems necessary or appropriate to the exercise of the Receiver's authority and the discharge of the Receiver's responsibilities under this Order; (b) providing any keys, including but not limited to physical, digital, and cryptographic keys, codes, device PINs, and passwords, including but not limited to account, encryption, email account, and computer passwords required to access any computer, electronic file, or telephonic data in any medium; (c) immediately advising all Persons who owe money or currency of any kind to the Receivership Defendants that all debts should be paid directly to the Receiver; (d) providing full access to all Receivership Assets; and (e) maintaining and not wasting, damaging, disposing of, or transferring in any manner any Receivership Assets.

## IV. Access to Books, Records and Accounts

15. The Receiver is authorized to take immediate possession of all assets, bank accounts or other financial accounts, books and records and all other documents or instruments

relating to the Receivership Defendants.  All persons and entities having control, custody, or possession of any Receivership Assets are hereby directed to turn such property, including but not limited to all Accounts, over to the Receiver.

16.    The Receivership Defendants, as well as their agents, servants, employees, attorneys, any persons acting for or on behalf of the Receivership Defendants, and any persons receiving notice of this Order by personal service, facsimile transmission or otherwise, having possession of the property, business, books, records, accounts or assets of the Receivership Defendants are hereby directed to deliver the same to the Receiver, his agents and/or employees.

17.    All banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody, or control of any Receivership Assets, including without limitation assets or funds held by, in the name of, or for the benefit of, directly or indirectly; and of the Receivership Defendants that receive actual notice of this Order by personal service, email, facsimile transmission, or otherwise shall:

    A.    Not liquidate, transfer, sell, convey or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Receivership Defendants except upon instructions from the Receiver;

    B.    Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;

    C.    Within five (5) business days of receipt of that notice, file with the Court and serve on the Receiver and counsel for the Commission a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice; and,

    D.    Cooperate expeditiously in providing access to accounts, assets and funds, as well as information as well as transferring funds, assets and accounts to the Receiver or at the direction of the Receiver.

**V. <u>Access to Real and Personal Property</u>**

18.     The Receiver is authorized to take immediate possession of all personal property of the Receivership Defendants, wherever located, including but not limited to electronically stored information, computers, laptops, hard drives, external storage drives, and any other such memory, media or electronic storage devices, books, papers, data processing records, evidence of indebtedness, bank records and accounts, savings records and accounts, brokerage records and accounts, certificates of deposit, stocks, bonds, debentures, and other securities and investments, contracts, mortgages, furniture, office supplies, automobiles, and equipment.

19.     The Receiver is authorized to take immediate possession of all real property of the Receivership Defendants, wherever located, including but not limited to all ownership and leasehold interests and fixtures.  Upon receiving actual notice of this Order by personal service, facsimile transmission, or otherwise, all persons other than law enforcement officials acting within the course and scope of their official duties, are (without the express written permission of the Receiver) prohibited from entering such premises, removing anything from such premises, or destroying, concealing, or erasing anything on such premises.  Notwithstanding the foregoing, the individual Receivership Defendants, or any of their respective family members, shall be permitted to continue residing in their respective primary places of residence, until further notice by the Receiver.

20.     In order to execute the express and implied terms of this Order, the Receiver is authorized to change door locks to the real property and premises described above.  The Receivership Defendants, or any other person acting or purporting to act on their behalf, are ordered not to change the locks in any manner, nor to have duplicate keys made, nor shall they have keys in their possession during the term of the receivership unless expressly permitted in advance by the Receiver in writing.

21.     The Receiver is authorized to open all mail, other than mail addressed to Defendant Jerome Cohen's spouse or daughter; or Defendant Shaun Cohen's spouse or children, directed to or received by or at the offices or post office boxes of the Receivership Defendants, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order.

22.     Upon the request of the Receiver, the U.S. Marshals Service, in any judicial district, is hereby ordered to assist the Receiver in carrying out his duties to take possession, custody, and control of, or identify the location of, any assets, records, or other materials belonging to the Receivership Estate.  In addition, the Receiver is authorized to request similar assistance from any other federal, state, county, or civil law enforcement officer(s) or constable(s) of any jurisdiction.

## VI.  <u>Notice to Third Parties</u>

23.     The Receiver shall promptly give notice of his appointment to all known officers, directors, agents, employees, shareholders, creditors, debtors, managers, members, and general and limited partners of the Receivership Defendants, as the Receiver deems necessary or advisable to effectuate the operation of the receivership.

24.     All persons and entities owing any obligation, debt, or distribution with respect to an ownership interest to any Receivership Defendant shall, until further ordered by this Court, pay all such obligations in accordance with the terms thereof to the Receiver, and its receipt for such payments shall have the same force and effect as if the Receivership Defendant had received such payment.

25.     In furtherance of his responsibilities in this matter, the Receiver is authorized to communicate with, and/or serve this Order upon, any person, entity, or government office that he

deems appropriate to inform them of the status of this matter and/or the financial condition of the

Receivership Estate. All government offices which maintain public files of security interests in

real and personal property shall, consistent with such office's applicable procedures, record this

Order upon the request of the Receiver or the Commission.

26.      The Receiver is authorized to instruct the United States Postmaster to hold and/or

reroute mail which is related, directly or indirectly, to the business, operations or activities of any

of the Receivership Defendants (the "Receiver's Mail"), including all mail addressed to, or for

the benefit of, the Receivership Defendants. The Postmaster shall not comply with, and shall

immediately report to the Receiver, any change of address or other instruction given by anyone

other than the Receiver concerning the Receiver's Mail. The Receivership Defendants shall not

open any of the Receiver's Mail and shall immediately turn over such mail, regardless of when

received, to the Receiver. All personal mail of any individual Receivership Defendants, mail

addressed any individual Receivership Defendants' spouse, and/or any mail appearing to contain

privileged information, and/or any mail not falling within the mandate of the Receiver, shall be

released to the named addressee or addressee's attorney by the Receiver. The foregoing

instructions shall apply to any proprietor, whether individual or entity, of any private mail box,

depository, business or service, or mail courier or delivery service, hired, rented, or used by the

Receivership Defendants. The Receivership Defendants shall not open a new mailbox or take

any steps or make any arrangements to receive mail in contravention of this Order, whether

through the U.S. mail, a private mail depository or courier service.

27.      Subject to payment for services provided, any entity or utility furnishing water,

electric, telephone, sewage, garbage, or trash removal services to the Receivership Defendants

shall maintain such service and transfer any such accounts to the Receiver unless instructed to

the contrary by the Receiver.

28.     The Receiver is authorized to assert, prosecute and/or negotiate any claim under any insurance policy held by or issued on behalf of the Receivership Defendants, or their officers, directors, agents, employees, or trustees, and to take any and all appropriate steps in connection with such policies.

## VII.  Injunction Against Interference with Receiver

29.     The Receivership Defendants and all persons receiving notice of this Order by personal service, facsimile, or otherwise, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would:

A.      Interfere with the Receiver's efforts to take control, possession, or management of any Receivership Assets; such prohibited actions include but are not limited to, using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Assets;

B.      Hinder, obstruct or otherwise interfere with the Receiver in the performance of his duties; such prohibited actions include but are not limited to, concealing, destroying or altering records or information;

C.      Dissipate or otherwise diminish the value of any Receivership Assets; such prohibited actions include but are not limited to, releasing claims or disposing, transferring, exchanging, assigning or in any way conveying any Receivership Assets, enforcing judgments, assessments or claims against any Receivership Assets or any Receivership Defendant, attempting to modify, cancel, terminate, call, extinguish, revoke or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement or other agreement executed by any Receivership Defendant or which otherwise affects any Receivership Assets;

D.      Transact any of the business of the Receivership Defendants or transferring any Receivership Assets to anyone other than the Receiver;

E.      Destroy, secrete, deface, transfer, or otherwise alter or dispose of any

15

documents of or pertaining to the Receivership Defendants and to the extent any such documents are no longer in existence, fail to disclose the nature and contents of such documents and how, when and by whom such documents were caused to no longer be in existence;

F.     Fail to notify the Receiver of any Receivership Assets, including accounts constituting Receivership Assets held in any name other than the name of a Receivership Defendant, or by any Person other than the Receivership Defendants, or fail to provide any assistance or information requested by the Receiver in connection with obtaining possession, custody, or control of such Receivership Assets;

G.     Refuse to cooperate with the Receiver or the Receiver's duly authorized agents in the exercise of their powers, duties or authority under any order of this Court; or,

H.     Interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estate.

30.     The Receivership Defendants shall cooperate with and assist the Receiver in the performance of his duties.

31.     The Receiver shall promptly notify the Court and Commission counsel of any failure or apparent failure of any person or entity to comply in any way with the terms of this Order.

## VIII.  <u>Stay of Litigation</u>

32.     As set forth in detail below, the following proceedings, excluding the instant proceeding and all police or regulatory actions and actions of the Commission related to the above-captioned enforcement action, are stayed until further Order of this Court:

All civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving: (a) the Receiver, in his capacity as Receiver; (b) any Receivership Assets, wherever located; (c) any of the Receivership Defendants, including subsidiaries and partnerships; or, (d) any of the Receivership Defendants' past or present officers, directors, managers, members, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

16

33. The parties to any and all Ancillary Proceedings are enjoined from commencing or continuing any such legal proceeding, or from taking any action, in connection with any such proceeding, including, but not limited to, the issuance or employment of process.

34. All Ancillary Proceedings are stayed in their entirety, and all Courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court. Further, as to a cause of action accrued or accruing in favor of one or more of the Receivership Defendants against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action.

## IX. **Managing Assets**

35. The Receiver shall establish one or more accounts at a federally insured bank to receive and hold all cash and cash equivalent Receivership Assets (the "Receivership Funds").

36. The Receiver's deposit account shall be entitled "Receiver's Account, Estate of [Receivership Defendant]" together with the name of the action, or a title to that effect.

37. The Receiver may, without further Order of this Court, transfer, compromise, or otherwise dispose of any Receivership Assets, other than real estate, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such Receivership Assets.

38. Subject to Paragraph 39, immediately below, the Receiver is authorized to locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership Estate, either at public or private sale, on terms and in the manner the Receiver deems most

beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such real property.

39.    Upon further Order of this Court, pursuant to such procedures as may be required by this Court and additional authority such as 28 U.S.C. §§ 2001 and 2004, the Receiver will be authorized to sell, and transfer clear title to, all real property in the Receivership Estate.

40.    The Receiver is authorized to take all actions to manage, maintain, and/or wind-down business operations of the Receivership Estate, including making legally required payments to creditors, employees, and agents of the Receivership Estate and communicating with vendors, investors, governmental and regulatory authorities, and others, as appropriate.

41.    The Receiver shall take all necessary steps to enable the Receivership Funds to obtain and maintain the status of a taxable "Settlement Fund," within the meaning of Section 468B of the Internal Revenue Code and of the regulations, when applicable, whether proposed, temporary or final, or pronouncements thereunder, including the filing of the elections and statements contemplated by those provisions.  The Receiver shall be designated the administrator of the Settlement Fund, pursuant to Treas. Reg. § 1.468B-2(k)(3)(i), and shall satisfy the administrative requirements imposed by Treas. Reg. § 1.468B-2, including but not limited to (a) obtaining a taxpayer identification number, (b) timely filing applicable federal, state, and local tax returns and paying taxes reported thereon, and (c) satisfying any information, reporting or withholding requirements imposed on distributions from the Settlement Fund.  The Receiver shall cause the Settlement Fund to pay taxes in a manner consistent with treatment of the Settlement Fund as a "Qualified Settlement Fund."  The Receivership Defendants shall cooperate with the Receiver in fulfilling the Settlement Funds' obligations under Treas. Reg. § 1.468B-2.

## X.  **Investigate and Prosecute Claims**

18

42.     Subject to the requirement, in Section VI above, that leave of this Court is required to resume or commence certain litigation, the Receiver is authorized, empowered and directed to investigate, prosecute, institute, defend, appears in, intervene in or otherwise participate in, compromise, and/or adjust actions in any state, federal or foreign court or proceeding of any kind as may in his discretion, and in consultation with Commission counsel, be advisable or proper to recover and/or conserve Receivership Assets or that the Receiver deems necessary and advisable to carry out the Receiver's powers and duties under this Order.

43.     Subject to his obligation to expend receivership funds in a reasonable and cost-effective manner, the Receiver is authorized, empowered, and directed to investigate the manner in which the financial and business affairs of the Receivership Defendants were conducted and (after obtaining leave of this Court) to institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Estate, as the Receiver deems necessary and appropriate, also may seek, among other legal and equitable relief, the imposition of constructive trusts, disgorgement of profits, asset turnover, avoidance of fraudulent transfers, rescission and restitution, collection of debts, and such other relief from this Court as may be necessary to enforce this Order.  Where appropriate, the Receiver should provide prior notice to counsel for the Commission before commencing investigations and/or actions.

44.     The Receiver hereby holds, and is therefore empowered to waive, all privileges, including the attorney-client privilege, held by all entity Receivership Defendants.

45.     The Receiver has a continuing duty to ensure that there are no conflicts of interest between the Receiver, his Retained Personnel (as that term is defined below), and the Receivership Estate.

## XI.  Repatriation of Foreign Assets and Documents

46.     The Receiver shall take such steps as are necessary to repatriate to the territory of the United States of America all Receivership Assets that are located in a country other than the United States and are held by or for Defendants or are under Defendants' direct or indirect control, jointly, severally, or individually.

47.     Immediately and without delay, following the entry of this Order, and in no event later than within three (3) business days following entry of this Order, Jerome Cohen and Shaun Cohen shall provide the Receiver and the Commission with a full accounting of all assets, including Receivership Assets, that are located outside of the United States that have been transferred to the United States and are held by or for any Defendant or are under any Defendants' direct or indirect control, jointly, severally, or individually, including the addresses and names of any foreign or domestic financial institution or other entity holding the assets, along with the account numbers and balances.

48.     Jerome Cohen and Shaun Cohen shall take all steps necessary and appropriate to prevent any transfer, disposition, or dissipation whatsoever of any assets, including Receivership Assets, located outside the United States.

49.     Immediately and without delay, following entry of this Order, Jerome Cohen and Shaun Cohen shall provide the Receiver and the Commission access to Defendants' records and documents held by financial institutions or other entities outside the United States, by signing and delivering to the Receiver and Commission's counsel a Consent to Release of Financial Records.  In furtherance of the foregoing repatriation provisions, the Receivership Defendants, their successors and assigns, and their officers, agents, servants, employees, affiliates, and attorneys, and all persons and entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, are hereby enjoined from taking any

action, directly or indirectly, which may result in the encumbrance or dissipation of foreign Receivership Assets, or in the hindrance of the repatriation required by this Order, including but not limited to:

A.   sending any statement, letter, fax, e-mail or wire transmission, or telephoning or engaging in any other act, directly or indirectly, that results in a determination by a foreign trustee or other entity that a "duress" event has occurred under the terms of a foreign trust agreement until such time that all Receivership Assets have been fully repatriated pursuant to this Order; and

B.   notifying any trustee, trust protector, or other agent of any foreign trust or other related entities of either the existence of this Order, or of the fact that repatriation is required pursuant to court order, until such time that all Receivership Assets have been fully repatriated pursuant to this Order.

## XII.  Interference with Repatriation

50.   Defendants are hereby temporarily restrained and enjoined from taking any action, directly or indirectly, that may result in the encumbrance or dissipation of foreign assets, including Receivership Assets, or in the hindrance of the. repatriation required by the preceding Section XI of this Order, including but not limited to:

A.   Sending any statement, letter, facsimile, email or wire transmission, or telephoning, or engaging in any other act, directly or indirectly, that results in a determination by a foreign trustee or other entity that a "duress" event has occurred under

21

the terms of a foreign trust agreement, until such time that the assets have been fully repatriated pursuant to the preceding Section XI of this Order; and

B.      Notifying any trustee, protector, or other agent of any foreign trust or other related entities of either the existence of this Order or the fact that repatriation is required pursuant to a Court Order, until such time as assets, including Receivership Assets, have been fully repatriated pursuant the preceding Section XI of this Order.

## XIII.  Bankruptcy Filing

51.      The Receiver may seek authorization of this Court to file voluntary petitions for relief under Title 11 of the United States Code (the "Bankruptcy Code") for the Receivership Defendants, or any of them.  If a Receivership Defendant is placed in bankruptcy proceedings, the Receiver may become, and may be empowered to operate the Receivership Estate as, a debtor-in-possession.  In such a situation, the Receiver shall have all of the powers and duties as provided a debtor-in-possession under the Bankruptcy Code to the exclusion of any other person or entity.  Pursuant to Paragraph 4 above, the Receiver is vested with management authority for all entity Receivership Defendants and may therefore file and manage a Chapter 11 petition.

52.      The provisions of Section VII above bar any person or entity, other than the Receiver, from placing any of the Receivership Defendants in bankruptcy proceedings.

## XIV.  Liability of Receiver

53.      Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with his fiduciary obligations in this matter.

54.      The Receiver may choose, engage and employ attorneys, accountants, appraisers, and any other independent contractors and technical specialists, including, but not limited to, securities traders, registered representatives, financial or business advisers, liquidating agents,

real estate agents, forensic experts, property managers, brokers, traders, and auctioneers (collectively, "Retained Personnel") as the Receiver deems advisable or necessary in the performance of the Receiver's duties and responsibilities under the authority granted by this Order. The Receiver and his Retained Personnel, acting within the scope of such agency are entitled to rely on all outstanding rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel, nor shall the Receiver or Retained Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of their duties.

55.     No action shall be filed or proceeding commenced against the Receiver or the Retained Personnel arising out of or in any way related to this receivership or their duties or work performed in connection with the receivership without obtaining an order from the Court based upon a showing of good cause. Nothing contained in this Order, nor the grant or exercise of any powers provided for herein by the Receiver shall cause said Receiver to be considered a past or present owner, operator or other potentially responsible or liable party pursuant to any provision of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq.; the Hazardous Site Response Act ("HSRA"), O.C.G.A. § 12-8-90, et seq.; or incur liability based on ownership or operation of the Receivership Assets pursuant to any other statutory, regulatory, common law or strict liability theory. Furthermore, to the extent hazardous substances, wastes or constituents are known or discovered to be present upon the Receivership Assets, the Receiver shall not be considered to be in any direct or indirect

contractual relationship with any party responsible for such substances, wastes or constituents pursuant to CERCLA and/or HSRA, and shall instead be considered to be acting solely in a "fiduciary capacity" with respect to the Receivership Assets, pursuant to 42 U.S.C. § 107(n) of CERCLA and §12-8-92(7)(C) of HSRA.

56.     This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

57.     In the event the Receiver decides to resign, the Receiver shall first give written notice to the Commission's counsel of record and the Court of its intention, and the resignation shall not be effective until the Court appoints a successor.  The Receiver shall then follow such instructions as the Court may provide.

## XV.  <u>Insurance</u>

58.     Given the urgency to appoint a Receiver, the Court recognizes that the Receiver accepts this appointment without time for independent verification that appropriate insurance is in place on the property or that appropriate liability or other insurance is in place to protect the Receivership Assets and the Receivership Estate.  Accordingly, the Court acknowledges that the Receiver has no responsibility or liability until such time as he can confirm that such insurance is in place or acquire the appropriate insurance.  The Receiver shall make it a priority to verify or obtain insurance coverage immediately upon this Order Appointing Receiver being entered; however, the Plaintiff, Receivership Defendants, and Court acknowledge there may be a gap of time before such insurance may be in place to properly protect the assets of the estate and any employees of the estate, and that the Receiver has no responsibility or liability until such time as he/it has notified the Court by filing a notice that insurance is in place.

59.     Jerome Cohen and Shaun Cohen are ordered to immediately provide the Receiver with all available insurance information for both existing and prior insurance policies.  This

includes all applications, policies, riders, correspondence, endorsements, claims and other information. Jerome Cohen and Shaun Cohen are ordered: (1) to advise the insurance agent(s) of this Order in writing, (2) designate all authority over the policies to the Receiver, and (3) take no action with regard to terminating or modifying existing insurance policies.

60.     Any insurance broker, agent, carrier, or underwriter is specifically ordered by the Court to cooperate with the Receiver by timely furnishing the following: (1) copies of all insurance policies including any riders, endorsements and applications with respect to policies related to the Receivership Estate, (2) loss history for five consecutive years or for as long as insurance has been in force if less than five years, (3) premium payment history including current status, and (4) any correspondence with insurance agents, brokers and companies. Policies shall be endorsed by the Defendants naming the Receiver as Named Insured and Loss Payee effective the date of this Order as appropriate to the type of coverage, and evidence of this policy endorsement shall be promptly supplied to the Receiver.

61.     The Receiver is hereby authorized to engage insurance brokers and consultants as necessary to properly insure the Receivership Assets

### XVI.  Recommendations and Reports

62.     The Receiver is authorized, empowered, and directed to develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Assets (the "Liquidation Plan").

63.     Within ninety (90) days of the entry date of this Order, the Receiver shall file the Liquidation Plan in the above-captioned action, with service copies to counsel of record.

64.     Within thirty (30) days after the end of each calendar quarter, the Receiver shall file and serve a full report and accounting of each Receivership Estate (the "Quarterly Status

Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the existence, value, and location of all Receivership Assets, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Estate.

65.     The Quarterly Status Report shall contain the following:

A.     A summary of the operations of the Receiver;

B.     The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C.     A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

D.     A description of all known Receivership Assets, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E.     A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F.     A list of all known creditors with their addresses and the amounts of their claims;

G.     The status of Creditor Claims Proceedings, after such proceedings have been commenced; and,

H.     The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.

66.     On the request of the Commission, the Receiver shall provide the Commission with any documentation that the Commission deems necessary to meet its reporting requirements, that is mandated by statute or Congress, or that is otherwise necessary to further

26

the Commission's mission.

## XVII.  Fees, Expenses and Accountings

67.     Subject to Paragraphs 68 – 74 immediately below, the Receiver need not obtain Court approval prior to the disbursement of Receivership Funds for expenses in the ordinary course of the administration and operation of the receivership.  Further, prior Court approval is not required for payments of applicable federal, state or local taxes.

68.     Subject to Paragraph 69 below, the Receiver is authorized to solicit persons and entities ("Retained Personnel") to assist him in carrying out the duties and responsibilities described in this Order.  The Receiver shall not engage any Retained Personnel without first obtaining an Order of the Court authorizing such engagement.

69.     The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estate as described in the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the "Billing Instructions") agreed to by the Receiver.  Such compensation shall require the prior approval of the Court.

70.     Within forty-five (45) days after the end of each calendar quarter, the Receiver and Retained Personnel shall apply to the Court for compensation and expense reimbursement from the Receivership Estate (the "Quarterly Fee Applications").  The Receiver may file a fee application at the end of September 2018, November 2018, and January 2019, which otherwise must comply with the requirements of this Order that are applicable to Quarterly Fee Applications.  At least thirty (30) days prior to filing each Quarterly Fee Application with the Court, the Receiver will serve upon counsel for the Commission a complete copy of the proposed Application, together with all exhibits and relevant billing information in a format to be provided by

27

Commission staff.

71.     All Quarterly Fee Applications will be interim and will be subject to cost benefit and final reviews at the close of the receivership.  At the close of the receivership, the Receiver will file a final fee application, describing in detail the costs and benefits associated with all litigation and other actions pursued by the Receiver during the course of the receivership.

72.     Quarterly Fee Applications may be subject to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court.  The total amounts held back during the course of the receivership will be paid out at the discretion of the Court as part of the final fee application submitted at the close of the receivership.

73.     Each Quarterly Fee Application shall:

   A.     Comply with the terms of the Billing Instructions agreed to by the Receiver; and,

   B.     Contain representations (in addition to the Certification required by the Billing Instructions) that: (i) the fees and expenses included therein were incurred in the best interests of the Receivership Estate; and, (ii) with the exception of the Billing Instructions, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

74.     At the close of the Receivership, the Receiver shall submit a Final Accounting, in a format to be provided by Commission staff, as well as the Receiver's final application for compensation and expense reimbursement.

**IT IS SO ORDERED, this 17th day of August, 2018, at Chicago, Illinois**

_____

**John Z. Lee**
**UNITED STATES DISTRICT JUDGE**

Entered: 8/17/18

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES SECURITIES and EXCHANGE COMMISSION, | ) ) ) | No. 18 CV 5587 |
| Plaintiff, | ) ) | |
| v. | ) ) | Magistrate Judge Young B. Kim |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, | ) ) ) ) | |
| Defendants. | ) ) | March 14, 2019 |

## ORDER

Kevin B. Duff, as the receiver ("Receiver") for Estate of Defendants EquityBuild, Inc., EquityBuild Finance, LLC, their affiliates, and the affiliate entities of Defendants Jerome Cohen and Shaun Cohen (collectively, the "Receivership Defendants"), having filed a Motion to Amend and Clarify Order Appointing Receiver to Specifically Identify Additional Known Receivership Defendants, (the "Motion"), and the Court having found good cause, it is hereby ordered that the following affiliate entities are Receivership Defendants as defined in Paragraph 1 of the Order Appointing Receiver, (R. 16):

- 109 N. Laramie, LLC
- 400 S. Kilbourn, LLC
- 1422 E68 LLC
- 4520-26 S Drexel LLC - n/k/a SSDF1 4520 S Drexel LLC
- 4611-17 S. Drexel, LLC
- 5450 S. Indiana LLC
- 5618 S MLK LLC
- 5955 Sacramento, Inc.
- 6001 Sacramento, Inc.

- 6217-27 S. Dorchester LLC
- 6250 S. Mozart, LLC
- 6356 California, Inc.
- 6437 S Kenwood, LLC
- 7024 S. Paxton LLC
- 7026 Cornell Inc.
- 7201 Constance Inc.
- 7201 S Constance LLC
- 7304 St. Lawrence, Inc.
- 7450 Luella LLC
- 7546 Saginaw, Inc.
- 7546 S. Saginaw LLC
- 7600 S Kingston LLC
- 7625 East End, Inc.
- 7625-35 S. East End LLC
- 7760 Coles, Inc.
- 7635 East End, Inc.
- 7748 S. Essex LLC
- 7749-59 S. Yates LLC
- 7752 S. Muskegon LLC
- 7823 Essex LLC
- 8000 Justine, Inc.
- 8100 S. Essex LLC
- 8209 S. Ellis, LLC
- 8214 Ingleside, Inc.
- 8809 S Wood Associates
- Amalgamated Capital Fund II LLC
- Amalgamated Capital Fund III LLC
- Chief Management LLC
- EB 6558 S. Vernon LLC
- EB Property Holdings LLC
- EB South Chicago 4 LLC
- EB South Chicago 1 Manager, LLC
- EB South Chicago 2 Manager, LLC
- Eretz Private Capital LLC
- Friendship LLC
- Great Lakes Development Corp LLC
- Heartland Capital Fund I LLC
- Heartland Capital Fund II, LLC
- Heartland Development Fund I LLC
- Heartland Private Capital, LLC
- Offsite Asset Management I LLC
- Offsite Asset Management II LLC
- Offsite Asset Management LLC

- Phoenix Capital Finance LLC
- Portfolio Asset Holdings LLC
- Portfolio Mezzanine Lender, LLC
- Rothbard Equity Fund LLC
- South Shore Property Holdings I LLC
- South Shore Property Holdings II LLC (DE)
- South Shore Property Holdings II LLC (WY)
- South Shore Property Holdings III LLC
- SSDF1 4611 S. Drexel LLC
- SSDF1 6751 S. Merrill LLC
- SSDF1 7110 S Cornell LLC
- SSDF1 Holdco 1, LLC
- SSDF1 Holdco 2 LLC
- SSDF1 Holdco 3 LLC
- SSDF1 Holdco 4 LLC
- SSDF2 1139 E 79th LLC
- SSDF2 Holdco 1 LLC
- SSDF2 Holdco 2 LLC
- SSDF2 Holdco 3 LLC
- SSDF3 Holdco 1 LLC
- SSDF3 Holdco 2 LLC
- SSDF4 638 N Avers LLC
- SSDF4 701 S 5th LLC
- SSDF4 6217 S. Dorchester LLC
- SSDF4 6250 S. Mozart LLC
- SSDF4 7024 S Paxton LLC
- SSDF4 7255 S. Euclid LLC
- SSDF4 Holdco 1 LLC
- SSDF4 Holdco 2 LLC
- SSDF4 Holdco 3 LLC
- SSDF4 Holdco 4 LLC
- SSDF4 Holdco 5 LLC
- SSDF4 Holdco 6 LLC
- SSDF5 Holdco 1 LLC
- SSDF5 Portfolio 1 LLC
- SSDF6 6160 S MLK LLC
- SSDF6 6224 MLK LLC
- SSDF6 Holdco 1 LLC
- SSDF6 Holdco 2 LLC
- SSDF7 2453 E 75TH LLC
- SSDF7 7600 S Kingston LLC
- SSDF7 Holdco 1 LLC
- SSDF7 Holdco 2 LLC
- SSDF7 Holdco 3 LLC

- SSDF7 Holdco 4 LLC
- SSDF7 Marquette Park LLC
- SSDF7 Portfolio 1 LLC
- SSDF8 Holdco 1 LLC
- SSDF8 Portfolio 1 LLC
- SSPH 6951 S Merrill LLC
- SSPH 7927-49 S. Essex LLC
- SSPH Holdco 1 LLC
- SSPH Holdco 2 LLC
- SSPH Portfolio 1 LLC
- SSPH Springer LLC

ENTER:

_____
**Young B. Kim**
**United States Magistrate Judge**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No. 18-cv-5587** |
| ) | |
| **v.** ) | **Hon. John Z. Lee** |
| ) | |
| **EQUITYBUILD, INC., et al.,** ) | **Magistrate Judge Young B. Kim** |
| ) | |
| **Defendants.** ) | |

**ORDER**

WHEREAS, Kevin B. Duff, as receiver ("Receiver") for the Estate of Defendants EquityBuild, Inc., EquityBuild Finance, LLC, their affiliates, and the affiliate entities of Defendants Jerome Cohen and Shaun Cohen (collectively, the "Receivership Defendants"), filed a Motion To Amend Order Appointing Receiver, and the Court having been fully advised in the premises;

NOW, THEREFORE, it is hereby ORDERED that:

1.      The Receiver's Motion is granted.

2.      The Order Appointing Receiver entered August 17, 2018 (Docket No. 16) is amended by deleting 11117 S Longwood LLC from the list of entities enumerated in Paragraph 1 and substituting SSPH 11117 S Longwood LLC in its place, and by adding SSDF1 4520 S. Drexel LLC as a Receivership Defendant.

ENTERED: 2/21/20

_John Z. Lee_

_____
John Z. Lee, United States District Judge

# EXHIBIT E

[Liberty Response]



27777 FRANKLIN ROAD, SUITE 2500 • SOUTHFIELD, MICHIGAN 48034-8214
PHONE 248.351.3000 • FAX 248.351.3082
www.jaffelaw.com

Judith Greenstone Miller
jmiller@jaffelaw.com
248.727.1429

December 20, 2021

Michael C. Bruck                          **VIA EMAIL**
Spellmire Bruck, LLP                      mcb@spellmirebruck.com
One East Wacker Drive, Suite 2350
Chicago, IL 60611

   Re:  SEC v. EquityBuild, Inc. et al., Case No, 18 CV 5587 ("SEC Action" or the
      "Receivership")

      Kevin D, Duff, Receiver v. Rock Fusco & Connelly, LLC, et al., Case No 2020 L
      8843 ("Receiver Case")

      Liberty EBCP, LLC v. Rock Fusco & Connelly, LLC, et al., Case No. 2020 L
      4725 ("Liberty Case")

Dear Michael:

   I am writing to you in regards to the above referenced matters and, more specifically, to
respond to your letter dated December 13, 2021 directed to Steven P. Bonder, local counsel to
Liberty EBCP, LLC ("Liberty"), in which you contend that Liberty had violated the stay
imposed under the Receivership Order [Doc. No 393] issued by the Court on August 17, 2018 in
the SEC Action by filing the Liberty Case. For the reasons more fully set forth below, we
respectfully disagree.

   While we acknowledge that (i) Liberty received notice of the Receivership Order, and (ii)
the Receivership Order imposed a stay on all parties taking action against the assets of the
Receivership estate, we do not believe that in filing the Liberty Case, Liberty violated the stay.
First, the Liberty Case and the claims asserted therein do not constitute assets of the
Receivership. Rather, the malpractice claims asserted by Liberty in the Liberty Case arise from
an opinion letter issued by Rock Fusco & Connell, LLC ("Rock Fusco") to Liberty prior to the
closing on Liberty's loan (the "Opinion Letter"). At that time, as the complaint in the Liberty
Case asserts, Rock Fusco advised Liberty that there were no pending causes of action against the

December 20, 2021
Page 2

borrower.  Liberty relied upon the statement – that subsequently proved to be false – to close on the loan.  Liberty contends that Rock Fusco knew that this statement was false when it issued the Opinion Letter.  Second, the Liberty Case, unlike the Receiver's Case that was filed many months after the Liberty Case, does not allege any facts related to the Ponzi scheme, the subject of the SEC Action; nor does it assert an aiding and abetting claim against Fusco Rock.  In other words, the factual allegations giving rise to the Liberty Case are completely separate, distinct and different than the factual allegations in the Receiver's Case.

The Opinion Letter constitutes a contract between Liberty and Rock Fusco.  A court in a receivership cannot impair obligations under a contract that is between third parties.  Any attempt to do so exceeds the power of the court.  If a court were to take such action and attempt to stay an action to redress injuries that arise under a contract between third parties, would deprive those third parties of due process.  While the Opinion Letter may have been provided for the borrower's benefit to enable it to close on and to receive the loan proceeds from Liberty, the borrower was not a party to the Opinion Letter on which Liberty relied to close on the loan.  Moreover, the Liberty Case is a direct action, not a derivative action, against Rock Fusco only to determine Liberty's rights against Rock Fusco under the Opinion Letter.

The fact that both Liberty and the Receiver named the same defendants and are ultimately seeking recovery of the same property – to wit: potential proceeds of Rock Fusco's malpractice insurance policy or other moneys from Rock Fusco directly – does not mean that Liberty is taking action against an asset of the Receivership estate or otherwise violating the stay under the Receivership Order.  The assets of Rock Fusco and the subject insurance policy are assets of Rock Fusco, not the Receivership estate.  Rock Fusco may be a target of the Receiver but it certainly not a party for whose assets were placed under the Receivership.  Furthermore, there has yet to be a determination by the court that the Receiver may pursue recovery under Rock Fusco's insurance policy or that coverage exists thereunder, particularly when the Receiver is asserting fraud and aiding and abetting claims against Rock Fusco that are usually excluded from coverage.

Accordingly, we do not believe the Liberty violated the stay in the Receivership Order by commencing the Liberty Case.  Please confirm that you agree with this conclusion.  If would like to further discuss this matter, please call me.

Sincerely,

**Jaffe, Raitt, Heuer & Weiss**
Professional Corporation

*Judith Greenstone Miller*

Judith Greenstone Miller

JGM/JGM
cc:      Alicia M. Schehr
          Jay L. Welford
          Steven P. Bonder (Via Email)

4892-6651-2647.v1

# EXHIBIT F

[Petition to Intervene]

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| LIBERTY EBCP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2020-L-004725 |
| v. | ) | |
| | ) | Hon. Mary Colleen Roberts |
| ROCK FUSCO & CONNELLY, LLC and | ) | |
| IOANA SALAJANU, | ) | |
| | ) | |
| Defendants. | ) | |

## PETITION TO INTERVENE AND BRIEF IN SUPPORT

Kevin B. Duff, as receiver ("Receiver") for the Estate of Defendants EquityBuild, Inc. ("EquityBuild"), EquityBuild Finance, LLC ("EquityBuild Finance"), their affiliates, and the affiliate entities of Defendants Jerome Cohen and Shaun Cohen (collectively, the "Receivership Defendants"), pursuant to 735 ILCS 5/2-408, petitions to intervene and respectfully requests that this Court grant the petition and accept for filing the Motion To Stay attached hereto as **Exhibit A**. In support of this petition, the Receiver states as follows:

1.     Intervention is warranted as a matter of right because (a) the Receiver possesses an interest in the subject matter of the case, (b) the ongoing litigation of this matter and the Court's disposition of the case may impair the ability of the Receiver to protect his interests and the interests of the Receivership Estate in the subject matter of the case, and (c) the interests of the Receivership Estate are not adequately represented by the parties to this case.

## Factual Background

2.     On August 15, 2018, the United States Securities and Exchange Commission ("SEC") filed Case No. 18-CV-5587 in the United States District Court for the Northern District of Illinois against EquityBuild, EquityBuild Finance, Jerome Cohen, and Shaun Cohen alleging that the Cohens operated a Ponzi scheme through which they fraudulently induced more than 900

individuals or entities to invest at least $135 million, ultimately resulting in massive financial losses (the "SEC Action"). In its Complaint, the SEC alleged that EquityBuild borrowed money from ordinary investors across the country (otherwise known as "investor-lenders") in connection with the purported acquisition, rehabilitation, and resale or refinancing of (typically) multifamily apartment buildings primarily located on the south side of Chicago. (Exhibit 1, ¶¶ 1-7)[1]

3.      Generally, EquityBuild issued promissory notes evidencing short-term bridge loans from groups of these investor-lenders, who they solicited in violation of federal laws and regulations governing the sales of securities, and the promissory notes were secured by group mortgages recorded against the properties in connection with which the individual loans were made. (*Id*., ¶¶ 20-26)  EquityBuild was consistently unable to repay the promissory notes at maturity, however, because the underlying real estate assets were both overleveraged and underperforming and because fresh funds could not be raised from new investors quickly enough to repay the debt to existing investors. (*Id.*, ¶¶ 27-59)

4.      Depleted of operating capital, EquityBuild required new funds to keep the Ponzi scheme afloat and therefore implemented a plan to refinance its real estate assets with portfolio loans from institutional and other sophisticated private lenders, in connection with which it caused the mortgages securing the existing loans from the investor-lenders to be released. (Exhibit 7, ¶ 6) Most of the investor-lenders contend, however, that the mortgages securing their loans were released without their knowledge or consent and, furthermore, that they received no proceeds from the refinancings, *i.e.,* that EquityBuild borrowed against the same real estate assets twice. (*Id*., ¶¶ 1-6)

---

[1] The exhibits that are referenced are attached to the Motion to Stay that included as Exhibit A to this petition.

5.      Liberty EBCP, the plaintiff in this action, is a private lender that extended a portfolio loan to SSDF7 Portfolio 1 ("SSDF7"), a single-purpose EquityBuild affiliate entity and thus a "Receivership Defendant," as defined under the Order Appointing Receiver in the SEC Action (the "Receivership Order"). (Exhibit 10, Liberty's Initial Statement; *see also* Exhibit 2, the Receivership Order) Specifically, Liberty EBCP advanced $9.2 million to SSDF7 (the "Liberty Loan") and secured the loan by recording mortgages against 17 properties that EquityBuild quitclaimed or otherwise transferred to SSDF7. (Exhibit 10, Liberty's Initial Statement & Exhibit 11, Excerpts from Status Report Attached Master List of Claims) As noted above, however, most of the investor-lenders who made loans to EquityBuild, and who secured those loans with mortgages recorded against properties that were refinanced through the Liberty Loan, were not informed that their mortgages were released. Indeed, in a claims process now being administered in the SEC Action, many of these investor-lenders claim that that they maintain their first secured position with respect to the properties because, *inter alia,* their security interests were released without authorization.

6.      During the referenced claims process, the District Court will be adjudicating priority disputes between the affected investor-lenders and Liberty EBCP, which filed a claim with the Receiver. (Exhibit 8 & 9, Orders Approving Claims Process) If Liberty EBCP is held to occupy "first position," then net proceeds from the sales of the 17 properties owned by SSDF7 will be applied toward the claim submitted by Liberty EBCP, to the extent determined by the District Court and permitted by law. If, on the other hand, the investor-lenders are held to occupy first position, then Liberty EBCP will hold an unsecured claim and would likely recover substantially

less, in which event the policy of title insurance it obtained at the closing of the portfolio refinance may be called upon to make it whole.[2]

7,      In the August 17, 2018 Receivership Order entered in the SEC Action (Exhibit 2), as supplemented by those certain Orders entered March 14, 2019 and February 20, 2021 (Exhibits 3 & 4), the District Court assumed exclusive jurisdiction over, and possession of, the assets of all Receivership Defendants (including SSDF7) and conferred upon the Receiver (1) "all powers, authorities, rights and privileges" theretofore possessed by the principals of the Receivership Defendants under applicable state and federal law and (2) all powers and authority of a receiver at equity, as well as all powers conferred upon a receiver under 28 U.S.C. §§ 754, 959, and 1692, and FRCP 66. (*See* Exhibit 2)

8.      The Receivership Order authorizes the Receiver to take possession, custody, and control of all assets owned by any of the Receivership Defendants ("Receivership Assets") and to sue, if necessary, in order to marshal and hold Receivership Assets for ultimate distribution to the claimants in the SEC Action, including, in this case, Liberty EBCP. (*Id*., ¶¶ 8, 37, 42)  To aid the Receiver in this mission, Paragraph 32 of the Receivership Order implements a stay of the following proceedings until further order of court:

> All civil legal proceedings of any nature . . . involving: (a) the Receiver, in his capacity as Receiver; (b) any Receivership Assets, wherever located; (c) any of the Receivership Defendants, including subsidiaries and partnerships; or, (d) any of the Receivership Defendants' past or present officers, directors, managers, members, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

---

[2] In fact, title insurance has been triggered and counsel has been appointed for Liberty and other institutional lenders.

9.     Paragraphs 33 and 34 of the Receivership Order further state that (1) "[t]he parties to any and all Ancillary Proceedings are enjoined from commencing or continuing any such legal proceeding, or from taking any action, in connection with any such proceeding, including, but not limited to, the issuance or employment of process" and (2) "[a]ll Ancillary Proceedings are stayed in their entirety, and all Courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court."

10.     Further, Paragraph 29 of the Receivership Order enjoins all persons with notice of the Order from interference with the Receiver, including restraining and enjoining all such persons "from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would: (A) Interfere with the Receiver's efforts to take control, possession, or management of any Receivership Assets; … using self-help … for the purpose of … interfering with or creating or enforcing a lien upon any Receivership Assets; … (C) Dissipate or otherwise diminish the value of any Receivership Assets; … or, (H) Interfere with … the Receiver, or interfere in any manner with the exclusive jurisdiction of this [District] Court over the Receivership Estate."

11.     Liberty EBCP was aware of the Receivership Order from almost the inception of the Receivership (Exhibit 10, Liberty's Initial Statement) and should have been cognizant of the automatic stay and injunction entered by the District Court. Nonetheless, it filed the case at bar in April  2020, alleging that Rock Fusco & Connelly, LLC and Ioana Salajanu (collectively, "Rock Fusco") breached a duty of care in connection with its issuance of an opinion letter in connection with the $9.2 million loan from Liberty EBCP to SSDF7.

12.     Meanwhile, on August 17, 2020, the Receiver filed suit in the Circuit Court of Cook County, Law Division, against Rock Fusco for professional malpractice and aiding and abetting a

breach of fiduciary duty (the "Malpractice Action". (Exhibit 5, Amended Complaint) The retention of counsel was approved by the District Court for such actions, and the Receiver has disclosed the existence of the Malpractice Action in his quarterly status reports, which counsel for Liberty has received by ECF service through the District Court. (*E.g.,* Exhibit 16, ECF 839, at 17])

13.     Rock Fusco carries professional liability insurance and placed its insurer on notice of both the Malpractice Action filed against it by the Receiver, as well as this action filed against it by Liberty EBCP.   Counsel for the Receiver has learned that the policy triggered by both this action and the Malpractice action is the same. (**Exhibit 6**, Bruck Declaration)  As a result, the same law firm is contemporaneously representing Rock Fusco in both cases. Moreover, the professional liability policy funding the defense of both cases (and potentially any settlement or indemnity too) is a "wasting policy," meaning that the defense costs in both cases are depleting available limits of coverage.  (*Id.*).

14.     Accordingly, the Receiver petitions to intervene in this case to protect a Receivership Assets, namely, the claim that the Receiver has pending against Rock Fusco and Salajanu and the corresponding Rock Fusco insurance policy proceeds, which are being interfered with and diminished by Liberty EPCP's action here.  As seen from above, until the claim being pursued by Liberty EBCP in the SEC Action is adjudicated, the extent to which Liberty EBCP may have been damaged, if at all, remains uncertain. Thus, the claim that Liberty EBCP is prematurely pursuing against Rock Fusco in this case is directly imperiling the claim being pursued by the Receiver against Rock Fusco in the Malpractice Case and constitutes a violation of the automatic stay and injunction entered by the District Court.

**I.     The Receiver Possesses Standing To Intervene In Order To Safeguard The Interests Of The Receivership Estate In The SEC Action.**

15.     As a matter of law, and consistent with the Receivership Order, the Receiver has

been vested with authority to sue for, collect, recover, receive, and take into possession from third parties all Receivership Assets. *See also* Fed. R. Civ. P. 66; 28 U.S.C. §§ 754, 959, and 1692. The Receiver has standing to protect and marshal Receivership Assets for distribution to the claimants in the SEC Action.

## II.     The Receiver Is Entitled To Intervene As A Matter Of Right.

16.     Intervention should be granted as a matter of right whenever the applicant has timely applied for intervention and when "the applicant is so situated as to be adversely affected by a distribution or other disposition of property in the custody or subject to the control or disposition of the court or a court officer." 735 ILCS 5/2-408(a)(3). Accordingly, the Receiver is entitled to intervene in this action.

### A.     The Petition To Intervene Is Timely.

17.     This petition to intervene is brought before any substantive matters (including discovery, summary judgment, or trial) have commenced. Indeed, for much of the pendency of this litigation, little has transpired because Liberty EBCP almost immediately after filing suit filed a motion to non-suit the matter in May 2020, and the matter laid dormant for much of the subsequent time.   In April 2021, an answer to the complaint was filed by the Rock Fusco and in late September 2021, this Court allowed the initiation of discovery.  At no time did Liberty EBCP provide the Receiver with any notice of the filing of the suit, the motion to non-suit, or the recent activity in the matter.

### B.     The Receiver May Intervene To Protect Receivership Assets.

18,     The Receivership Order expressly vests the Receiver with the right to sue for, collect, recover, receive, and take into possession from third parties all Receivership Assets. (Exhibit 2, ¶¶ 8, 37, 42) The Malpractice Action that the Receiver is now pursuing against Rock Fusco, and the insurance proceeds associated with any recovery in that action, constitute Receivership Assets

and ultimately belong to the receivership estate. Indeed, the defense costs being incurred by Rock Fusco in this action are already eroding any potential recovery and therefore diminishing a Receivership Asset, contrary to the Receivership Order.

**C.** **The Receiver Possesses An Interest In The Subject Matter Of This Action Because The Insurance Potentially Available To Liberty EBCP Constitutes A Receivership Asset.**

19. The Receiver retains an interest in the subject matter of this lawsuit because Liberty EBCP is eroding the same insurance policy that applies to and is available and part of the Receiver's pursuit of the Malpractice Action. Because that policy is a "wasting policy," every dollar consumed on defense costs in this action reduces the amount available for recovery in the Malpractice Action. This invasion of proceeds potentially available to the Receiver is particularly inappropriate given that Liberty EBCP is simultaneously seeking to recover damages in the SEC Action in connection with putative losses potentially sustained in connection with the same loan. Indeed, even if the claim submitted by Liberty EBCP in the SEC Action is rejected on the basis of an adverse priority determination, Liberty EBCP still holds a policy of title insurance from which it could conceivably be made whole, even if this action remained stayed.

**D.** **The Receiver's Interests Are Not Adequately Represented By The Existing Parties.**

20. The District Court in the SEC Action ordered the Receiver to marshal and preserve Receivership Assets. Liberty EBCP lacks the right to pursue or dissipate Receivership Assets and is prohibited from seeking to recover assets to which the Receiver holds a claim and from exercising self-help that would put its interests ahead of the Receivership Estate or other claimants in the SEC Action. As noted above, as well, Paragraph 29(c) of the Receivership Order provides that "[A]ll persons receiving notice of this Order … are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express

written agreement of the Receiver, which would: … (C) Dissipate or otherwise diminish the value of any Receivership Assets….” By virtue of this lawsuit, Liberty EBCP is pursuing action, prematurely, violates this and other provisions of the Receivership Order, as a result of which it is now depleting receivership assets. Accordingly, Liberty EBCP is not only not adequately representing the Receiver's interests, it is actively thwarting and undermining them.

## **CONCLUSION**

Accordingly, the Receiver's Petition To Intervene should be granted as a matter of right pursuant to 735 ILCS 5/2-408.

Dated: December 17, 2021.

Respectfully Submitted,

KEVIN B. DUFF, RECEIVER


By:__*Michael C. Bruck*_____
        One of his attorneys

Michael C. Bruck
Timothy J. McInerney
Spellmire Bruck LLP
Firm No. 62543
One East Wacker Drive, Suite 2350
Chicago, IL 60601
(312) 258-9400
mcb@spellmirebruck.com
tjm@spellmirebruck.com

Michael Rachlis
Rachlis Duff & Peel LLC
Firm No. 56188
542 South Dearborn Street, Suite 900
Chicago, IL 60605
(312) 733-3950
*mrachlis@rdaplaw.net*

Andrew Eliot Porter
Porter Law Office
Firm No. 42000
853 North Elston Avenue
Chicago, IL 60642
(312) 433-0568
*andrew@andrewporterlaw.com*

Steven J. Roeder
Ryan P. Weitendorf
Roeder Law Offices LLC
Firm No. 58775
77 West Washington Street, Suite 2100
Chicago, Illinois 60602
(312) 667-6000
*sjr@roederlawoffices.com*
*rpw@roederlawoffices.com*

# EXHIBIT A

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| LIBERTY EBCP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2020-L-004725 |
| v. | ) | |
| | ) | Hon. Mary Colleen Roberts |
| ROCK FUSCO & CONNELLY, LLC and | ) | |
| IOANA SALAJANU, | ) | |
| | ) | |
| Defendants. | ) | |

**INTERVENOR'S MOTION TO ENFORCE STAY**

Intervenor Kevin B. Duff, as receiver ("Receiver") for the Estate of Defendants EquityBuild, Inc. ("EquityBuild"), EquityBuild Finance, LLC ("EquityBuild Finance"), their affiliates, and the affiliate entities of Defendants Jerome Cohen and Shaun Cohen (collectively, the "Receivership Defendants"), respectfully moves to enforce a stay of this action pursuant to a federal receivership order entered in connection with an enforcement action to end a Ponzi scheme filed by the United States Securities and Exchange Commission in the United States District Court for the Northern District of Illinois and, in support thereof, states as follows:

***Factual and Procedural Background***

1.     On August 15, 2018, the United States Securities and Exchange Commission ("SEC") filed suit to enjoin an ongoing Ponzi scheme in *SEC v. EquityBuild, Inc., EquityBuild Finance, LLC, Jerome H. Cohen, and Shaun D. Cohen*, United States District Court for the Northern District of Illinois, Civil Action No. 18-CV-5587 (the "SEC Action").  (**Exhibit 1**) Pursuant to that complaint, the SEC secured, in connection with an Emergency Motion For A Temporary Restraining Order, the appointment of the Receiver pursuant to that certain Order Appointing Receiver attached hereto as **Exhibit 2**  (the "Receivership Order").

1

2.      In the Receivership Order, the Court conferred upon the Receiver "all powers, authorities, rights and privileges" theretofore possessed by the Receivership Defendants, which includes more than 150 companies. (*See* Exhibit 2, attached hereto; *see also* **Exhibits 3 & 4**, Amendments to the Receivership Order)

3.      The Receivership Order invested the Receiver with all the power and authority of a receiver at equity, as well as all powers conferred under 28 U.S.C. §§ 754, 959, and 1692. (Exhibit 2, ¶ 4)

4.      The Receivership Order authorizes the Receiver to take custody, control, and possession of all assets which the Receivership Defendants own, possess, have a beneficial interest in, or directly or indirectly control ("Receivership Assets") and to investigate and prosecute claims, if necessary, to aid in the marshaling of Receivership Assets.  (*Id.* ¶¶ 8, 37, 42)

5.      The Receivership Order stays any and all civil actions, wheresoever pending, that affect Receivership Assets. Specifically, Paragraph 32 of the Receivership Order reads, in pertinent part, as follows:

> All civil legal proceedings of any nature . . . involving: (a) the Receiver, in his capacity as Receiver; (b) any Receivership Assets, wherever located; (c) any of the Receivership Defendants, including subsidiaries and partnerships; or, (d) any of the Receivership Defendants' past or present officers, directors, managers, members, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

6.      Paragraphs 33 and 34 of the Receivership Order further state that (1) "[t]he parties to any and all Ancillary Proceedings are enjoined from commencing or continuing any such legal proceeding, or from taking any action, in connection with any such proceeding, including, but not limited to, the issuance or employment of process" and (2) "[a]ll Ancillary Proceedings are stayed

in their entirety, and all Courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court."

7.    On August 17, 2020, the Receiver filed suit in the Circuit Court of Cook County, Law Division, against Rock Fusco & Connelly, LLC and Ioana Salajanu (the "Rock Fusco Defendants") for professional malpractice and aiding and abetting a breach of fiduciary duty (the "Malpractice Action"). (**Exhibit 5**, Amended Complaint)

8.    The Rock Fusco Defendants have confirmed that they carry professional liability insurance, as to which the Malpractice Action triggered a duty to defend and potentially a duty to indemnify. (*See* **Exhibit 6**, Declaration of Michael Bruck) Because the professional liability insurance policy is a "wasting policy," defense costs erode available coverage (*Id.*)

9.    Generally speaking, EquityBuild borrowed or otherwise received more than a hundred million dollars in the aggregate from ordinary investors (otherwise known as "investor-lenders") in connection with the purported acquisition, rehabilitation, and resale or refinancing of typically multifamily apartment buildings primarily located on the south side of Chicago. (Exhibit 1, Complaint, ¶¶ 1-7)

10.   EquityBuild issued promissory notes evidencing short-term bridge loans from groups of investor-lenders that they solicited in contravention of federal laws and regulations governing the sale of securities, and those notes were typically secured by group mortgages recorded against the properties in connection with which the individual loans were made. (*Id.*, ¶¶ 20-26)

11.   EquityBuild was consistently unable to repay the promissory notes at maturity, however, because the underlying real estate assets were overleveraged and underperforming and

because fresh funds could not be raised from new investors quickly enough to repay the debt to existing investors. (*Id.*, ¶¶ 27-59)

12. To keep the Ponzi scheme afloat, EquityBuild began engaging in various efforts (*id.)*, and that later included refinancing its real estate assets with portfolio loans from institutional and other sophisticated private lenders, in connection with which it caused the mortgages securing the existing loans from the investor-lenders to be released. (**Exhibit 7**, ¶ 6) The Plaintiff in this action, Liberty EBCP, is one such institutional lender further described below.

13. The overwhelming majority of the investor-lenders allege that the mortgages securing their loans were released without their knowledge or consent and, furthermore, that they received no proceeds from the refinancing, *i.e.,* that EquityBuild borrowed against the same real estate assets twice. (*Id.*, ¶¶ 1-6)

14. As a result, and as part of the SEC Action, the Receiver is administering a claims resolution process in which hundreds of ordinary investors who loaned money to EquityBuild are competing with institutional and private lenders for priority with respect to the liquidated proceeds of the real estate assets. (*See* **Exhibit 8 & 9**, Orders Approving Claims Process)

15. Liberty EBCP, the plaintiff in this action, extended SSDF7 Portfolio 1, a Receivership Defendant, a $9.2 million loan (the "Liberty Loan") secured by 17 properties that EquityBuild quitclaimed or otherwise transferred to the borrower to secure repayment of the debt. (**Exhibit 10**, Liberty's Initial Statement & **Exhibit 11**, Excerpts from Status Report Attached Master List of Claims)

16. In connection with the loan, Liberty EBCP obtained a policy of title insurance from Old Republic National Title Company. (**Exhibit 12**, Excerpts from Policy)

17.     The Receiver served Liberty with the Receivership Order on or about August 20, 2018 (**Exhibit 13**) and counsel for Liberty filed an appearance in the SEC Action at that time (**Exhibit 14**).

18.     In the SEC Action, approximately 856 claimants, as well as Liberty EBCP, submitted proofs of claim asserting first-position mortgages against the 17 properties conveyed by EquityBuild to SSDF7 Portfolio 1, and the District Court will ultimately adjudicate the priority dispute between the competing claimants. (*See* Exhibit 8 & 9)   At this time, the District Court has not yet adjudicated claims associated with Liberty EBCP, but is currently in the process of handling the first group claims associated with a different institutional investor.  (*See* **Exhibit 15**, Framing Report & Order setting up Bloomfield Capital/Group 1)

19.     Without notice to the Receiver and without seeking leave from the District Court to circumvent the stay provisions of the Receivership Order, Liberty EBCP filed this lawsuit against the Rock Fusco Defendants in April 2020.  Liberty EBCP claims generally that the Rock Fusco Defendants failed to exercise due care and diligence in the creation of an opinion letter that was part of the $9.2 million loan extended to SSDF7 Portfolio 1.

20.     The same "wasting" professional liability insurance policy that has been funding the Rock Fusco Defendants' defense in the Receiver's Malpractice Action is contemporaneously funding the Rock Fusco Defendants' defense in this case; and the same law firm is simultaneously defending both lawsuits. (Exhibit 6)

### Argument

***This Action Should Be Stayed Pending Resolution Of The Malpractice Action.***

21.     The Receiver's malpractice action is a Receivership Asset, as is the insurance policy that is currently funding the defense of the Malpractice Action and which funds any

settlement or indemnity. *See, e.g., In re County Treasurer and Ex Officio County Collector of Cook County,* 308 Ill. App. 3d 33, 43 (1st Dist. 1999) (holding that automatic stay is violated by the filing of a notice of appeal and recognizing that stay applies even when property has not been conclusively determined to be property of the estate so as to protect the asset for diminishing: "It is beyond contravention that a debtor's cause of action constitutes proper of the estate. *United States v. Whiting Pools,* 462 U.S. 198, 205 n.9, 103 S.Ct. 2309 n.9, 76 L.Ed 2d. 515, 522 n.9 (1983) [other citations omitted]. In this case even if we consider that at the outset of the bankruptcy case it was not conclusively determined between the debtor and the Bank who was entitled to the statutory penalty interest, it is clear at least that Sacramento had a cause of action to attempt to obtain that property, and it is equally clear that Cambridge's filings in the state court case . . . would have potentially destroyed this property."; *A.H. Robbins Co., Inc. v. Piccinin,* 788 F. 2d 994, 1008 (4th Cir. 1986) (affirming Chapter 11 debtor's request for a preliminary injunction staying suits against co-defendants in product liability actions as those actions "would reduce and diminish insurance fund or pool represented in [an insurance] policy in favor of Robins and thereby affect the property of the debtor to the determinant of the debtor's creditors as a whole"); *Duff v. Central Sleep Diagnostics, LLC,* 801 F. 3d 833, 842-43 (7th Cir. 2015) (settlement proceeds held to be part of receivership estate without regard for any alleged perfected attorney lien obtain in violation of stay order); *Biesek v. Soo Line R. Co.,* 440 F. 3d 410, 413 (7th Cir. 2006) (noting that legal claims are assets to a bankruptcy estate that a trustee can decide to proceed upon or drop); *National Tax Credit Partners L.P. v. Havlik,* 20 F.3d 705, 708 (7th Cir. 1994) (reversing grant of injunction that was found to violate automatic stay provisions, noting that such stays are designed to protect against "every effort to 'exercise control over property of the estate'")*; MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92 (2d Cir. 1988) ("Numerous courts have determined that

6

a debtor's insurance policies are property of the estate, subject to the bankruptcy court's jurisdiction."); *cf. In re Minoco Group of Companies, Ltd.*, 799 F.2d 517, 520 (9th Cir. 1986) (holding that the debtor's D&O policy which protected the debtor against indemnity claims by its directors and officers is property of the estate and subject to the automatic stay);

22.     By continuing to prosecute this lawsuit, Liberty EBCP is directly impacting and interfering with the efforts to collect a Receivership Asset that would benefit the Receivership Estate.  Indeed, because the policy at issue is a wasting policy, every action that Liberty is taking in this case that leads to any action by Rock Fusco and its counsel diminishes the Receivership Asset.

23.     Liberty EBCP's action here is in violation of the stay provision of the Receivership Order.  For example, Paragraph 29(c) of the Receivership Order provides that "[A]ll persons receiving notice of this Order … are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would: … (c) Dissipate or otherwise diminish the value of any Receivership Assets…."  Liberty EBCP has had notice of the Receivership Order for more than three years, and yet has filed and now is prosecuting this action which diminishes the value and interferes with the Receiver's efforts to recover a Receivership Asset.  At no time has Liberty EBCP notified the Receiver of this action; the Receiver has never agreed that such a matter could proceed; and Liberty never sought relief from the stay provisions of the Receivership Order.

24.     In addition, this action is premature because Liberty's damages are speculative, particularly as its claim for relief in the SEC Action has not yet been adjudicated.   At this time, the District Court is supervising work on a group of claims and claimants that is unrelated to Liberty EBCP; Liberty EBCP's claims are yet to be reviewed and resolved.  Until such time as the

District Court rules on that claim, the extent to which Liberty EBCP may have been damaged, if at all, by the alleged actions of the Rock Fusco Defendants cannot be ascertained.

25.     By pursuing claims in this action, Liberty EBCP is not only violating the automatic stay by invading available wasting insurance policy proceeds potentially available to the Receivership Estate (and thus to the claimants in the SEC Action), but is also doing so before it can allege or establish with any level of certainty that it will ultimately sustain damages.

26.     Accordingly, in recognition of the stay of all Ancillary Proceedings in the District Court's Receivership Order, and in order to stop interference with the Receiver's efforts and protect a Receivership Asset from further wasting, this Court should stay the current action pending the outcome of the Receiver's Malpractice Action against the Rock Fusco Defendants and the conclusion of the adjudication of Liberty's claims in the SEC Action. This is by no means an unusual request, as litigants pursuing state court claims against bankrupt entities or which imperil assets available to the bankrupt entities' creditors are routinely stayed pursuant to federal law. *See, e.g., Cohen v. Salata,* 303 Ill. App. 3d 1060, 1065-66 (1st Dist. 1999) (malpractice action commenced following bankruptcy petition violated automatic stay); *In re Minoco Group of Companies, Ltd.*, 799 F.2d at 520; *see also* N.D. Ill. Local Rule 66.1 ("administration of estates by receivers or other officers shall be similar to that in bankruptcy cases").


WHEREFORE, the Receiver respectfully requests that this Court grant the Motion To Stay in accordance with the proposed form of order attached hereto as **Exhibit 17**.

Dated:  December 17, 2021.       Respectfully Submitted,

KEVIN B. DUFF, RECEIVER


By: *Michael C. Bruck*
       One of his attorneys

Michael C. Bruck
Timothy J. McInerney
SPELLMIRE BRUCK LLP
Firm No. 62543
One East Wacker Drive – Suite 2350
Chicago, IL 60601
(312) 258-9400
mcb@spellmirebruck.com
tjm@spellmirebruck.com

Michael Rachlis
Rachlis Duff & Peel LLC
Firm No. 56188
542 South Dearborn Street, Suite 900
Chicago, IL 60605
(312) 733-3950
mrachlis@rdaplaw.net

Andrew Eliot Porter
Porter Law Office
Firm No. 42000
853 North Elston Avenue
Chicago, IL 60642
(312) 433-0568
andrew@andrewporterlaw.com

Steven J. Roeder
Thomas D. Gipson
Roeder Law Offices LLC
Firm No. 58775
77 West Washington Street, Suite 2100
Chicago, Illinois 60602
(312) 667-6000
sjr@roederlawoffices.com
tdg@roederlawoffices.com

*Attorneys for Kevin B. Duff, Receiver*

9

# EXHIBIT G

[Order]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES and EXCHANGE COMMISSION, | ) ) ) | No. 18 CV 5587 |
| Plaintiff, | ) ) | |
| v. | ) ) | Magistrate Judge Young B. Kim |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, | ) ) ) ) | |
| Defendants. | ) ) | March 14, 2019 |

## ORDER

Kevin B. Duff, as the receiver ("Receiver") for Estate of Defendants EquityBuild, Inc., EquityBuild Finance, LLC, their affiliates, and the affiliate entities of Defendants Jerome Cohen and Shaun Cohen (collectively, the "Receivership Defendants"), having filed a Motion to Amend and Clarify Order Appointing Receiver to Specifically Identify Additional Known Receivership Defendants, (the "Motion"), and the Court having found good cause, it is hereby ordered that the following affiliate entities are Receivership Defendants as defined in Paragraph 1 of the Order Appointing Receiver, (R. 16):

- 109 N. Laramie, LLC
- 400 S. Kilbourn, LLC
- 1422 E68 LLC
- 4520-26 S Drexel LLC - n/k/a SSDF1 4520 S Drexel LLC
- 4611-17 S. Drexel, LLC
- 5450 S. Indiana LLC
- 5618 S MLK LLC
- 5955 Sacramento, Inc.
- 6001 Sacramento, Inc.

- 6217-27 S. Dorchester LLC
- 6250 S. Mozart, LLC
- 6356 California, Inc.
- 6437 S Kenwood, LLC
- 7024 S. Paxton LLC
- 7026 Cornell Inc.
- 7201 Constance Inc.
- 7201 S Constance LLC
- 7304 St. Lawrence, Inc.
- 7450 Luella LLC
- 7546 Saginaw, Inc.
- 7546 S. Saginaw LLC
- 7600 S Kingston LLC
- 7625 East End, Inc.
- 7625-35 S. East End LLC
- 7760 Coles, Inc.
- 7635 East End, Inc.
- 7748 S. Essex LLC
- 7749-59 S. Yates LLC
- 7752 S. Muskegon LLC
- 7823 Essex LLC
- 8000 Justine, Inc.
- 8100 S. Essex LLC
- 8209 S. Ellis, LLC
- 8214 Ingleside, Inc.
- 8809 S Wood Associates
- Amalgamated Capital Fund II LLC
- Amalgamated Capital Fund III LLC
- Chief Management LLC
- EB 6558 S. Vernon LLC
- EB Property Holdings LLC
- EB South Chicago 4 LLC
- EB South Chicago 1 Manager, LLC
- EB South Chicago 2 Manager, LLC
- Eretz Private Capital LLC
- Friendship LLC
- Great Lakes Development Corp LLC
- Heartland Capital Fund I LLC
- Heartland Capital Fund II, LLC
- Heartland Development Fund I LLC
- Heartland Private Capital, LLC
- Offsite Asset Management I LLC
- Offsite Asset Management II LLC
- Offsite Asset Management LLC

2

- Phoenix Capital Finance LLC
- Portfolio Asset Holdings LLC
- Portfolio Mezzanine Lender, LLC
- Rothbard Equity Fund LLC
- South Shore Property Holdings I LLC
- South Shore Property Holdings II LLC (DE)
- South Shore Property Holdings II LLC (WY)
- South Shore Property Holdings III LLC
- SSDF1 4611 S. Drexel LLC
- SSDF1 6751 S. Merrill LLC
- SSDF1 7110 S Cornell LLC
- SSDF1 Holdco 1, LLC
- SSDF1 Holdco 2 LLC
- SSDF1 Holdco 3 LLC
- SSDF1 Holdco 4 LLC
- SSDF2 1139 E 79th LLC
- SSDF2 Holdco 1 LLC
- SSDF2 Holdco 2 LLC
- SSDF2 Holdco 3 LLC
- SSDF3 Holdco 1 LLC
- SSDF3 Holdco 2 LLC
- SSDF4 638 N Avers LLC
- SSDF4 701 S 5th LLC
- SSDF4 6217 S. Dorchester LLC
- SSDF4 6250 S. Mozart LLC
- SSDF4 7024 S Paxton LLC
- SSDF4 7255 S. Euclid LLC
- SSDF4 Holdco 1 LLC
- SSDF4 Holdco 2 LLC
- SSDF4 Holdco 3 LLC
- SSDF4 Holdco 4 LLC
- SSDF4 Holdco 5 LLC
- SSDF4 Holdco 6 LLC
- SSDF5 Holdco 1 LLC
- SSDF5 Portfolio 1 LLC
- SSDF6 6160 S MLK LLC
- SSDF6 6224 MLK LLC
- SSDF6 Holdco 1 LLC
- SSDF6 Holdco 2 LLC
- SSDF7 2453 E 75TH LLC
- SSDF7 7600 S Kingston LLC
- SSDF7 Holdco 1 LLC
- SSDF7 Holdco 2 LLC
- SSDF7 Holdco 3 LLC

- SSDF7 Holdco 4 LLC
- SSDF7 Marquette Park LLC
- SSDF7 Portfolio 1 LLC
- SSDF8 Holdco 1 LLC
- SSDF8 Portfolio 1 LLC
- SSPH 6951 S Merrill LLC
- SSPH 7927-49 S. Essex LLC
- SSPH Holdco 1 LLC
- SSPH Holdco 2 LLC
- SSPH Portfolio 1 LLC
- SSPH Springer LLC

ENTER:

_____
Young B. Kim
United States Magistrate Judge