# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| UNITED STATES SECURITIES ) | |
| AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 18-cv-5587 |
| ) | |
| v. ) | Judge John Z. Lee |
| ) | |
| EQUITYBUILD, INC., EQUITYBUILD ) | Magistrate Judge Young B. Kim |
| FINANCE, LLC, JEROME H. COHEN, ) | |
| and SHAUN D. COHEN, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## RECEIVER'S RESPONSE IN SUPPORT OF MOTION TO STAY

The Receiver currently has a legal malpractice action against certain attorney defendants pending in Illinois state court (the "Rock Fusco Defendants"). There is a professional liability policy that has been triggered by the Receiver's action, and the triggered policy provides funds for potential recovery. That policy is a "wasting" policy, where defense costs act to diminish the amount of proceeds available for recovery.

Without notification to the Receiver, or approval from this Court, Liberty brought suit against the Rock Fusco Defendants (the "Liberty Action" or "State Court Action"). The insurance carrier has taken the position that the Liberty Action has triggered the same policy, and considers it to have arisen from a single event. As a result, the defense of the Rock Fusco Defendants in the Liberty Action is diminishing the available proceeds by wasting the same policy triggered by the Receiver's action.

Precisely to address such situations, this Court's Order Appointing Receiver (the "Receivership Order") stays actions such as the Liberty Action. Liberty now seeks a declaration

1

that its Action falls outside of the stay in the Receivership Order. (Docket No. 1119) Such arguments would effectively gut the Receivership Order and harm the interests of the Receivership Estate and its claimants. They are further unsupported by fact, law or equitable principle. The Court should reject Liberty's efforts and confirm that the stay provisions of the Receivership Order preclude Liberty from continuing its action pending resolution of the Receiver's action against the Rock Fusco Defendants.

### The Receivership Order

In the Receivership Order, the Court conferred upon the Receiver "all powers, authorities, rights and privileges" theretofore possessed by the Receivership Defendants, which includes more than 150 entities. The Receivership Order invested the Receiver with all the power and authority of a receiver at equity, as well as all powers conferred under 28 U.S.C. §§ 754, 959, and 1692. (Receivership Order, Docket No. 16, ¶ 4)

The Receivership Order authorizes the Receiver to take custody, control, and possession of all assets which the Receivership Defendants own, possess, have a beneficial interest in, or directly or indirectly control ("Receivership Assets") and to investigate and prosecute claims, if necessary, to aid in the marshaling of Receivership Assets. (*Id.* ¶¶ 8, 37, 42)

In order to allow the Receiver to perform his work, the Receivership Order stays any and all civil actions, wheresoever pending, that may affect Receivership Assets. Specifically, Paragraph 32 of the Receivership Order reads, in pertinent part, as follows:

> All civil legal proceedings of any nature . . . involving: (a) the Receiver, in his capacity as Receiver; (b) any Receivership Assets, wherever located; (c) any of the Receivership Defendants, including subsidiaries and partnerships; or, (d) any of the Receivership Defendants' past or present officers, directors, managers, members, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party

2

defendant, or otherwise (such proceedings are hereinafter referred
to as "Ancillary Proceedings").

Paragraphs 33 and 34 of the Receivership Order further state that (1) "[t]he parties to any
and all Ancillary Proceedings are enjoined from commencing or continuing any such legal
proceeding, or from taking any action, in connection with any such proceeding, including, but not
limited to, the issuance or employment of process" and (2) "[a]ll Ancillary Proceedings are stayed
in their entirety, and all Courts having any jurisdiction thereof are enjoined from taking or
permitting any action until further Order of this Court."

### *The Receiver's Malpractice Action Against Defendants*

On August 17, 2020, the Receiver filed suit in the Circuit Court of Cook County, Law
Division, against Rock Fusco & Connelly, LLC and Ioana Salajanu (the "Rock Fusco Defendants")
for professional malpractice and aiding and abetting a breach of fiduciary duty (the "Malpractice
Action")(attached as Exhibit C to Docket No. 1119). As detailed in the amended complaint, the
Rock Fusco Defendants are alleged to have failed to meet the applicable standard of care in
numerous ways including, *inter alia*: (1) creating inaccurate paperwork which worsened the
financial position of EquityBuild; (2) failing to properly investigate and address the serious
improprieties that were expressly provided by EquityBuild employees; (3) failing to competently
and promptly investigate the bona fides of EquityBuild's business which allowed EquityBuild to
worsen its financial position through refinancings; and (4) failing to take all necessary steps to
ensure that the EquityBuild transactions were legitimate and legal. Indeed, part of the negligence
included the creation of sham entities that allowed for an overnight loan of $3.5 million dollars
that was provided by EquityBuild that would be part of the refinancing that Liberty became
involved with in 2018 and discussed *infra*. (*Id.,* Amended Complaint, ¶¶ 82-90)

The Rock Fusco Defendants have confirmed that they carry professional liability insurance, as to which the Malpractice Action triggered a duty to defend and potentially a duty to indemnify. (*See* Declaration of Michael Bruck, ¶¶ 4-11 (submitted in support of the State Court Action stay motion filed by the Receiver, and attached hereto as Exhibit 1)) Because the professional liability insurance policy is a "wasting policy," defense costs erode available funds for any judgment or settlement. (*Id.* ¶ 8)

### *Liberty's Action In Violation Of The Stay*

The Receiver served Liberty (one of the institutional lenders) with the Receivership Order on or about August 20, 2018 (shortly after the Receivership was established) and counsel for Liberty then filed an appearance. As this Court is aware, Liberty has been an active participant in the Receivership proceedings since that time. Liberty is a claimant in this matter as a result of it extending to SSDF7 Portfolio 1 LLC a Receivership Defendant, a $9.2 million loan secured by 17 properties that EquityBuild quitclaimed or otherwise transferred to the borrower to secure repayment of the debt. Liberty submitted proofs of claim asserting first-position mortgages against the aforementioned 17 properties. The District Court has not yet adjudicated claims associated with Liberty, as it is currently in the process of handling the claims associated with what is referred to Group 1 which involve a different institutional lender claimant.

Yet, despite its active participation in the matters before this Court and despite the express stay language of the Receivership Order, Liberty never brought to the attention of the District Court or the Receiver that Liberty filed suit against the Rock Fusco Defendants in April 2020. (Docket No. 1119, Exhibit B thereto). In the Liberty Action, Liberty claims generally that the Rock Fusco Defendants failed to exercise due care and diligence in the creation of an opinion letter written to support the $9.2 million loan extended to SSDF7 Portfolio 1 LLC.

4

In the Liberty Action, the Rock Fusco Defendants are being defended under the same "wasting" professional liability insurance policy which is contemporaneously funding the Rock Fusco Defendants' defense in the Malpractice Action that the Receiver has brought against the Rock Fusco Defendants, where the same law firm is simultaneously defending both lawsuits. Indeed, further connecting the asset to the Receivership, the reservation of rights letter from the insurer in the Receiver's Malpractice Action provides that, "**Argonaut [the insurer] has determined that the Liberty Suit and the Duff Suit [the Receiver's Suit] arise out of the same 'Wrongful Act' as the Liberty Letter and/or the same series of related 'Wrongful Acts' as the Liberty Letter**. As such, the Liberty Letter, Liberty Suit, and the Duff Suit constitute a single 'Claim' deemed first made and reported to Argonaut at the time of the Liberty Letter. As such, **the only policy potentially implicated by the Liberty Letter, the Liberty Suit, and the Duff Suit is the Argonaut Policy....**" (Exhibit 1, Bruck Declaration, ¶ 10)(emphasis supplied)

### *The Receiver Notifies Liberty That It Is In Violation Of The Stay*

While Liberty filed suit against the Rock Fusco Defendants, it did not prosecute the action for nearly a year. Indeed, after filing suit, Liberty immediately filed a motion to non-suit the case in May 2020 (Exhibit 2), and the matter laid dormant for close to a year. However, in April 2021, the Rock Fusco Defendants filed an answer to the complaint and in late September 2021, the state court then allowed discovery to commence, creating a scenario where significant costs began to be incurred and waste the insurance policy at issue.

At the same time, the Receiver's Malpractice Action has been actively proceeding. Written discovery has been completed and the review and exchange of a significant number of documents has transpired. There remain certain areas of production may require additional motion practice, but the parties are moving to oral fact discovery which is currently set to close on April 20, 2022.

As the Receiver's Malpractice Action was proceeding deeper into discovery, the Receiver's counsel learned from counsel for the Rock Fusco Defendants that the Liberty Action was not dismissed, but instead was apparently poised to be increasing in activity as noted *supra*. Not having been notified by Liberty of the filing of the suit or the situation described above, and faced with the wasting policy, the Receiver's counsel requested that Liberty agree to a voluntary stay of its State Court Action consistent with the Receivership Order. (Docket No. 1119, Exhibit D thereto) Liberty refused the Receiver's request to stay the Liberty Action. (*Id.*, Exhibit E thereto)

As a result, the Receiver filed a petition to intervene and motion to stay in the State Court Action in order to seek compliance with the stay provisions of this Court's Receivership Order. (*Id.,* Exhibit F thereto) Only after that was done, and despite failing to previously notify this Court or the Receiver of its State Court Action or seek relief from this Court's stay order, Liberty then filed the motion at bar before this Court. (Docket No. 1119)

### *Argument*

Liberty's action here violates the stay provisions of the Receivership Order. Paragraph 29(c) of the Receivership Order provides that, "[A]ll persons receiving notice of this Order are hereby restrained and enjoined from ***directly*** or ***indirectly*** taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would: (a) Interfere with the Receiver's efforts to take control … of any Receivership Assets; such prohibited actions include but are not limited to, using self-help or executing or issuing or causing the execution or issuance of any … process for the purpose of … interfering with or creating or enforcing a lien upon any Receivership Assets; … (c) **Dissipate or otherwise diminish the value of any Receivership Assets**…." (Emphasis added.) Paragraph 32 of the Receivership Order expressly stays, "All civil legal proceedings **of any nature** . . . involving: … (b) **any Receivership Assets**,

wherever located; … or, (d) **any of the Receivership Defendants' past ... agents** … sued for, or in connection with, **any action taken by them while acting in such capacity of any nature**…." (Emphasis added.) (*See also* Receivership Order, ¶¶ 33, 34 (quoted above).)

Despite having notice of the Receivership Order for more than three years, Liberty failed to seek relief from the stay. At no time did Liberty notify the Receiver of its State Court Action; the Receiver never agreed that such a matter could proceed; and Liberty never sought relief from the stay provisions of the Receivership Order. Instead, Liberty is prosecuting its Action which directly diminishes the value of a policy triggered by the Malpractice Action and is thereby interfering with the Receiver's efforts to recover a Receivership Asset.

Liberty argues that the insurance policy is not a Receivership Asset but is a "step removed." (Docket No. 1119 at 7) That is inaccurate. The Receiver's Malpractice Action and any recovery that may come of it is a Receivership Asset, and that includes the policy that has been expressly triggered for coverage and which is currently funding the defense of the Malpractice Action and which funds any settlement or indemnity for the Receiver's action. The fact that the same policy has been triggered, the carrier has characterized the Liberty Action and the Malpractice Action as constituting a *single* claim which intertwines them, and the assignment of the same defense counsel to represent the Rock Fusco Defendants in both the Receiver's Malpractice Action and Liberty's Action, leave little room for doubt that the same insurance proceeds at issue are a Receivership Asset under the Receivership Order which is being diminished by the Liberty Action.

Furthermore, the law provides that a stay properly extends to a policy even if it has not been conclusively determined that the Receiver will get those proceeds precisely to protect such asset from diminishing. *See, e.g., In re County Treasurer and Ex Officio County Collector of Cook County,* 308 Ill. App. 3d 33, 43 (1st Dist. 1999) (holding that automatic stay is violated by the

filing of a notice of appeal and recognizing that stay applies even when property has not been conclusively determined to be property of the estate so as to protect the asset for diminishing). "It is beyond contravention that a … cause of action [brought for the benefit of an estate] constitutes property of the estate." *Id.* (quoting *United States v. Whiting Pools,* 462 U.S. 198, 205 n.9 (1983); *see also id.* ("In this case even if we consider that at the outset of the bankruptcy case it was not conclusively determined as between the debtor and the Bank who was entitled to the statutory penalty interest, it is clear at least that Sacramento had a cause of action to attempt to obtain that property, and it is equally clear that Cambridge's filings in the state court case . . . would potentially have destroyed this property."); *A.H. Robbins Co., Inc. v. Piccinin,* 788 F. 2d 994, 1008 (4th Cir. 1986) (affirming Chapter 11 debtor's request for a preliminary injunction staying suits against co-defendants in product liability actions as those actions "would reduce and diminish the insurance fund or pool represented in [an insurance] policy in favor of Robins and thereby affect the property of the debtor to the detriment of the debtor's creditors as a whole"); *Duff v. Central Sleep Diagnostics, LLC,* 801 F. 3d 833, 842-43 (7th Cir. 2015) (settlement proceeds obtained by third party in connection with undisclosed state court action held to be part of federal receivership estate irrespective of an alleged perfected attorney lien asserted and obtained in violation of stay order); *Biesek v. Soo Line R. Co.,* 440 F. 3d 410, 413 (7th Cir. 2006) (noting that legal claims are assets to a bankruptcy estate that a trustee can decide to proceed upon or drop); *National Tax Credit Partners L.P. v. Havlik,* 20 F.3d 705, 708 (7th Cir. 1994) (reversing grant of injunction that was found to violate automatic stay provisions, noting that such stays are designed to protect against "every effort to 'exercise control over property of the estate'"); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92 (2d Cir. 1988) ("Numerous courts have determined that a debtor's insurance policies are property of the estate, subject to the bankruptcy court's jurisdiction."); *cf. In re Minoco*

*Group of Companies, Ltd.*, 799 F.2d 517, 520 (9th Cir. 1986) (holding that the debtor's D&O policy which protected the debtor against indemnity claims by its directors and officers is property of the estate and subject to the automatic stay).

As these authorities and the Receivership Order make clear, by continuing to prosecute its independent State Court Action in competition with the Receiver, Liberty is directly impacting and interfering with the Receiver's efforts to recover a Receivership Asset that would benefit the Receivership Estate. Indeed, because the policy at issue is a wasting policy, every action that Liberty is taking in its competing parallel action that leads to actions by the Rock Fusco Defendants and their counsel diminishes a Receivership Asset that the Receiver is attempting to recover.

Liberty's other arguments in opposition are largely strawmen, attempting to paint a scenario from which they argue there is no relationship between the asset at issue and the Receivership on the basis that a stay is inapplicable to third parties who are not subject to the proceeding. For example, Liberty argues that the stay is inapplicable because the Rock Fusco Defendants are not Receivership Defendants. (Docket No. 1119, at 6-7) That argument however fails in light of the broad and direct language included in the Receivership Order both in terms of what constitutes a Receivership Defendant or a Receivership Asset and the types of actions and efforts impacting Receivership Assets that are covered by the stay. Paragraph 32 of the Receivership Order, expressly covers the Liberty Action as it is brought against the Rock Fusco Defendants who were agents of Receivership Defendants: "All civil legal proceedings **of any nature** . . . involving: … (d) **any of the Receivership Defendants' past ... agents** … sued for, or in connection with, **any action taken by them while acting in such capacity of any nature**…." (Emphasis added.) Paragraph 29(c) precludes suits that "dissipate or diminish the value of any Receivership Asset."

These provisions are directly applicable here. The Liberty Action is enjoined from proceeding against the Rock Fusco Defendants, who were counsel for various Receivership Defendants and therefore "past agents" of the Receivership Defendants for purposes of the Receivership Order – including in the transaction that is directly at issue in the Liberty Action. Further, these provisions enjoin Liberty from directly or indirectly taking any action that diminishes a Receivership Asset, which it is doing by diminishing the policy that has been triggered, and in so doing effectively interfering with the Receiver's Malpractice Action.

In terms of legal authority, Liberty provides little, instead devoting its time to distinguishing the authorities cited by the Receiver above. Liberty argues that bankruptcy related rules discussed in some of the cases do not support the Receiver's position. (Docket 1119 at 9-12) Liberty's efforts fail. For example, Liberty relies heavily on a bankruptcy court decision (*In re Caesars Entertainment Operating Co.*). (Docket No. 1119 at 9-10) because it commented that the Seventh Circuit "has not adopted" the exception discussed in the off-cited Fourth Circuit opinion in *A.H. Robbins, supra*. However, as that same opinion makes clear, the Seventh Circuit has not rejected this rule, but rather discussed it and in the circumstances before it did not find it applicable. *See In Re Caesars Entertainment Operating Co.*, 540 B.R. 637, 647 n.8 (N.D. Ill. 2015) ("in *Fox Valley Constr. Workers,* 140 F.3d 661, the court mentioned the exception and then found it inapplicable without ever endorsing it. *See Fox Valley Constr. Workers,* 140 F.3d at 666; *Fernstrom,* 938 F.2d at 736. Even if there were such an exception, it would not apply here."); *see also*, e.g., *In Re Stinnett*, 465 F.3d 309, 312 (7th Cir. 2006) (citing *A.H. Robbins*).

Indeed, *A.H. Robbins* – a decision itself cited more than 1,000 times by numerous courts – provides relevant guidance here as the appellate court affirmed a district court's stay of product liability actions against certain third-party defendants consistent with numerous provisions of the

bankruptcy code because such matters (even though directed against third parties) acted to diminish possible insurance proceeds available relative to creditors of the debtor. 788 F.2d at 1008. The situation is analogous here as Liberty's Action diminishes possible proceeds available to claimants in the Receivership Estate. As noted, the other authorities relied upon by the Receiver equally support rejection of Liberty's arguments.

The sparse authority advanced by Liberty to support its position does not change the analysis, and if applicable at all, supports enforcement of the stay set forth in the Receivership Order consistent with the Receiver's position.[1] For example, *In re Panther Mountain Land Development, LLC,* 686 F.3d 916 (8th Cir. 2012) (cited in Docket No. 1119 at 11) involves a case where a stay was not applied to a due process type of action brought to determine whether the creation of what was referred to as "Improvement Districts" that were established by the debtor were legal. The court found that the action involving the Improvement Districts did not change control of the debtor's property or divest the estate of possession of property. The court also went through a lengthy analysis to determine if the action had an impact on the value of estate property. The court determined that the action as to whether those districts were properly established did not impact value to the estate, and therefore refused to enter a stay. The type of analysis utilized by

---

[1] None of the cases relied upon by Liberty arise from a federal equity receivership. On the other hand, *Duff v. Central Sleep Diagnostics* cited *supra* by the Receiver, arises from a federal equity receivership and is instructive. In that case, the court considered settlement proceeds a receivership asset even though the settlement proceeds were obtained through an independent third-party action (not initiated by the Receiver). The court soundly rejected an attorney's assertion that his independent efforts to recover against same proceeds – that were a product of an independent third-party action – should be allowed on the basis that he beat out the receiver in a competitive effort to enforce a lien against an asset (*i.e.,* the insurance settlement proceeds) that the receiver deemed an asset of the estate. In any event, the principles and purposes of underlying stay provisions in the bankruptcy code (whether under Section 105 or Section 362) support a stay here as well. *See* note 2, *infra.*

that decision leads to the opposite result here.[2]  The value to the Receivership Estate is directly diminished due to the triggered policy being eaten away day by day, activity by activity.

Liberty also argues that the Receiver inability and right to pursue Liberty's claim is a further basis to reject the applicability of the stay provisions of the Receivership Order.  The Receiver has never suggested that he could or wished to pursue Liberty's claim, but that does not mean that a stay of Liberty's Action is improper or inapplicable.  To the contrary, a stay here would not deprive Liberty of pursuing its claim; rather, it would simply defer pursuit of such a claim to a later date.  To be clear, the Receiver only seeks to stay Liberty's Action until the Receiver's Malpractice Action against the Rock Fusco Defendants is concluded and its claims are adjudicated through the disputed claims process.  Liberty would be free to proceed with its Action thereafter.

---

[2] The same holds true when looking at the other cases relied upon by Liberty.  (Docket No. 1119 at 10-11)  In *In Re: A & B Associates, L.P.,* the court recognized that a bankruptcy court can issue a stay against non-debtors noting that: "In certain circumstances, 'bankruptcy courts have the power to restrain legal action by creditors of the debtor against non-debtor third parties' under § 105." 2017 WL 4511354 (S.D. Ga. Bankr. Sept. 29, 2017) (citing *In re Monroe Well Service, Inc.,* 67 B.R. 746, 751 (Bankr. E.D. Pa. 1986)).  In that case, the court denied the relief sought based on available evidence, but invited motion practice later as evidence were developed.  In any event, the principle underlying Section 105 is applicable as a stay here protects all claimants in the Receivership by allowing a stay against non-debtor third parties. In *In re Tenek, LLC*, 563 F.3d 639 (7th Cir. 2009), the Seventh Circuit affirmed a decision not apply a stay in a circumstance where allowing a party to proceed outside of bankruptcy "would not impair the recovery of a larger class of creditors, so the primary function of the trustee—to maximize recovery on behalf of creditors as a whole—was not implicated."  Here, the opposite is true; if the triggered policy is not available, that does impair the recovery of a larger class of creditors as such funds would go towards the victims who are unsecured creditors.  Finally, in *In re Gyncor, Inc.,* 251 B.R. 344 (N.D. Ill. 2000), the quote relied upon by Liberty is equally supportive of the Receiver's position here.  The court in *Gyncor* simply notes that Section 362(a)(3) of the bankruptcy code (which is not implicated here) "does not bar every proceeding hostile to a debtor's claimed interest in property"; but the circumstances here – in a federal equity receivership where the policy at issue is actually triggered and actually being wasted is precisely a circumstance where such general stay principles are properly applied (including under bankruptcy principles).

But enforcement of the stay provisions in this Court's Receivership Order are essential to ensure that the Receiver has an opportunity to recover assets for the benefit of the Estate and its claimants.

That is not only the right result under the Receivership Order and case law above, but also under the circumstances of the Receivership generally. Liberty's Action is largely premature because Liberty's damages are at this point speculative, particularly as its claim for relief has not yet been adjudicated in the Receivership. At this time, the District Court is supervising work on a group of claims and claimants that are unrelated to Liberty; Liberty's claims are yet to be reviewed and resolved. Until such time as the District Court rules on Liberty's claims, the extent to which Liberty may have been damaged by the alleged actions of the Rock Fusco Defendants cannot be ascertained. As such, Liberty is not only violating the automatic stay by taking actions that are wasting a triggered insurance policy which is a Receivership Asset, but is also doing so before it can establish with any level of certainty that it will ultimately sustain damages.

### *Conclusion*

Accordingly, in recognition of the stay of all Ancillary Proceedings in the District Court's Receivership Order, and in order to stop interference with the Receiver's efforts and protect a Receivership Asset from further wasting, this Court should reject Liberty's motion and affirm that the stay in the Receivership Order acts to stay Liberty's Action pending the outcome of the Receiver's Malpractice Action against the Rock Fusco Defendants and the conclusion of the adjudication of Liberty's claims in this action.

Dated:  January 25, 2022          Respectfully submitted,

                                      KEVIN B. DUFF, RECEIVER

                                      By: /s/ Michael Rachlis
                                          One of his attorneys

                                      Michael Rachlis
                                      Jodi Rosen Wine
                                      Rachlis Duff & Peel LLC
                                      542 South Dearborn Street, Suite 900
                                      Chicago, IL 60605
                                      (312) 733-3950
                                      mrachlis@rdaplaw.net
                                      jwine@rdaplaw.net

                                      *Attorneys for Kevin B. Duff, Receiver*

14

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I provided service of the foregoing Receiver's Response In Support

Of Motion To Stay, via the Court's CM/ECF system, to all counsel of record on January 25, 2022.

/s/ Michael Rachlis

Michael Rachlis
Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Phone (312) 733-3950
Fax (312) 733-3952
mrachlis@rdaplaw.net

FILED DATE: 12/17/2021 3:37 PM   2020L004725

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| LIBERTY EBCP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2020-L-004725 |
| v. | ) | |
| | ) | Hon. Mary Colleen Roberts |
| ROCK FUSCO & CONNELLY, LLC and | ) | |
| IOANA SALAJANU, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF MICHAEL C. BRUCK

I, Michael C. Bruck, state and depose as follows:

1.      I am an attorney in good standing and duly licensed to practice law in the State of Illinois and have personal knowledge and can testify to the matters stated herein.

2.      I am a partner in the law firm Spellmire Bruck LLP and one of the attorneys retained by the Receiver, Kevin B. Duff, and primarily responsible for the prosecution of the Cook County, Illinois lawsuit captioned, *Kevin B. Duff, Receiver v. Rock Fusco & Connelly, LLC, et al.*, Case No. 2020 L 8843 (the "Receiver's Suit").

3.      The Receiver's Suit is and action against Rock Fusco & Connelly, LLC and Ioana Salajanu (the "Rock Fusco Defendants") for professional negligence and other claims.

4.      In the course of the Receiver's Suit we received from counsel for the Rock Fusco Defendants disclosure of its lawyer's professional liability insurance responsive to the Receiver's Suit and were provided with Argonaut Insurance Company policy no. LPL4207045-0, effective from December 28, 2017 to December 27, 2018 (the "Argonaut Policy" attached as **Exhibit A**).

**Exhibit**

**1**

FILED DATE: 12/17/2021 3:37 PM    2020L004725

5.     The Argonaut Policy is a claims-made-and-reported Professional Liability Insurance policy that provides a Limit of Liability of $5,000,000 for each claim and in the aggregate, subject to a $25,000 deductible for each "Claim."

6.     In the course of the Receiver's Suit we also received a copy of a September 30, 2020 reservation of rights letter from Argonaut to Rock Fusco in which Argonaut stated its coverage positions in respect to the Receiver's Suit and the Argonaut Policy (the "Argonaut ROR" attached as **Exhibit B**).

7.     The Argonaut ROR, noted that, in addition to the Receiver's Suit, Liberty EBCP, LLC ("Liberty") issued a "Notice of Claim" to Rock Fusco in an August 17, 2018 letter (referred to as the "Liberty Letter") and that Liberty initiated this action against Rock Fusco and Salajanu on April 29, 2020 (referred to as the "*Liberty Suit*").

8.     The Argonaut ROR, *inter alia*, spelled out that the Argonaut Policy is a "wasting policy" in that "defense costs" spent on defending the Receiver's Suit and the *Liberty Suit* erodes Rock Fusco's $5 million in available insurance because "'Defense Costs' are part of and *not in addition to* the Limits of Liability." (emphasis original).

9.     The Argonaut ROR further reflects Argonaut's conclusion that the Liberty Letter, *Liberty Suit* and the Receiver's Suit are all "related" and constitute a single "Claim."  As a consequence, the $5 million eroding Limit of Liability of the Argonaut Policy is the only known lawyer's professional liability insurance available to Rock Fusco to defend and resolve the claims by the Receiver and Liberty.

10.     The Argonaut ROR states in this respect:

"Argonaut has determined that the *Liberty Suit* and the *Duff Suit* [the Receiver's Suit] arise out of the same "Wrongful Act" as the Liberty Letter and/or the same series of related "Wrongful Acts" as the Liberty Letter. As such, the Liberty Letter, *Liberty Suit*, and the *Duff Suit* constitute a single "Claim" deemed first made and

reported to Argonaut at the time of the Liberty Letter. As such, the only policy potentially implicated by the Liberty Letter, the *Liberty Suit*, and the *Duff Suit* is the Argonaut Policy…."

(Ex. B, Argonaut ROR at p. 7).

11.     Based on my discussions with them, Johnson & Bell is the Chicago law firm retained by Argonaut to defend the Receiver's Suit and as well as the present *Liberty Suit* under the Argonaut Policy.

Under penalties as provided by law pursuant to Section 1-109 of the *Code of Civil Procedure*, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Dated: December 17, 2021.

Affiant further sayeth naught.

    /s/ Michael C. Bruck
Michael C. Bruck

Michael C. Bruck
SPELLMIRE BRUCK LLP
One East Wacker Drive, Suite 2350
Chicago, IL 60601
(312) 258-9400
mcb@spellmirebruck.com
Firm ID #62543
*Attorney for Receiver*

FILED DATE: 12/17/2021 3:37 PM   2020L004725

FILED DATE: 12/17/2021 3:37 PM   2020L004725

# EXHIBIT A

FILED DATE: 12/17/2021 3:37 PM    2020L004725



**ARGO PRO**

*Member Argo Group*

# Lawyers PROtect℠
# Professional Liability Insurance with Cyber Coverage Declarations

### NOTICE: THIS IS CLAIMS MADE AND REPORTED COVERAGE.
### PLEASE READ THE POLICY CAREFULLY.

| **Insurer:** Argonaut Insurance Company<br>175 East Houston Street, Suite 1300<br>San Antonio, TX 78205 | **Producer:** Thompson Flanagan<br>626 West Jackson Blvd<br>Chicago, IL 60661 |
|---|---|

| **Policy Number:** LPL4207045-0 |
|---|
| Renewal of Policy Number: Newline |

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS AND CONDITIONS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

ITEM 1.   **NAMED INSURED** (Name and Mailing Address):
Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, IL 60654

ITEM 2.   **POLICY PERIOD:**   (a) Inception Date: 12/28/2017    (b) Expiration Date: 12/28/2018
Both dates at 12:01 a.m. at the Named Insured's Mailing Address shown in ITEM 1 above.

ITEM 3.   **COVERED PROFESSIONAL SERVICE**
Lawyers' Professional Liability

ITEM 4.   **LIMIT OF LIABILITY AND DEDUCTIBLE**: INSURING AGREEMENTS

| Limit of Liability:<br>Each **Claim** | Limit of Liability:<br>Aggregate for all **Claims** | Deductible:<br>Each **Claim** | Deductible:<br>Aggregate |
|---|---|---|---|
| $5,000,000 | $5,000,000 | $25,000 | $25,000 |

ITEM 5.   **LIMITS OF LIABILITY AND DEDUCTIBLES:** SUPPLEMENTAL EXPENSES

| Expense Event | Limit of Liability: Each **Expense Event** | Limit of Liability: Aggregate | Deductible: Each **Expense Event** |
|---|---|---|---|
| **Crisis Management Expenses** | $25,000 | $25,000 | $0 |
| **Disciplinary Proceedings** | $25,000 | $100,000 | $0 |
| Subpoena Assistance | $15,000 | $25,000 | $0 |

ITEM 6.   **PREMIUM:** █████████████

ITEM 7.   **EXTENDED REPORTING PERIOD OPTION(S):**

12 months at 100% of Full Annual Premium    24 months at 185% of Full Annual Premium
36 months at 200% of Full Annual Premium    48 months at 225% of Full Annual Premium
60 months at 250% of Full Annual Premium    72 months at 275% of Full Annual Premium

ITEM 8.   **RETROACTIVE DATE:** None

ITEM 9.   **NOTICE TO THE INSURER:**

| CLAIMS OR POTENTIAL CLAIMS SEND TO: | ALL OTHER NOTICES SEND TO: |
|---|---|
| ARGO PRO US<br><br>Professional Liability - Claims<br>101 Hudson Street, Suite 1201<br>Jersey City, NJ 07302 | ARGO PRO US<br><br>Professional Liability - Underwriting<br>101 Hudson Street, Suite 1201<br>Jersey City, NJ 07302 |

ITEM 10.   **POLICY FORM AND ENDORSEMENTS ATTACHED AT ISSUANCE:**

Please see Schedule of Forms and Endorsements, DECSCH, for a complete list of forms.

**THESE DECLARATIONS, TOGETHER WITH THE PROFESSIONAL LIABILITY POLICY COVERAGE FORM(S) AND ANY ENDORSEMENT(S), COMPLETE THE ABOVE NUMBERED POLICY.**

FILED DATE: 12/17/2021 3:37 PM    2020L004725

# SCHEDULE OF FORMS AND ENDORSEMENTS

Insured:  Rock Fusco & Connelly, LLC
Policy Number:  LPL4207045-0

Forms and Endorsements applying to and made part of this policy at the time of issuance:

| NUMBER | TITLE |
| --- | --- |
| PRLP1000DEC-0117 | Lawyers' Professional Liability Policy Declarations |
| DECSCH-0117 | Schedule Of Forms And Endorsements |
| PRLP1000-0117 | Lawyers' Professional Liability Policy |
| ILP0200IL-1213 | Illinois Changes - Cancellation And Nonrenewal |
| PR2029-0117 | Prior Acts Schedule With Individual Lawyer Retroactive Date Endorsement |
| ILNOTICE-0117 | Important Information For Illinois Policyholders |
| ILP001-0104 | U.S. Treasury Department's Office Of Foreign Assets Control (OFAC) Advisory |
| PrivacyNotice-0415 | Privacy Policy |
| SIGAIC-0416 | Signature Page |

FILED DATE: 12/17/2021 3:37 PM    2020L004725

# Lawyers PROtect℠
# Professional Liability Insurance with Cyber Coverage

**THIS IS CLAIMS MADE AND REPORTED COVERAGE.**
**PLEASE READ THIS POLICY CAREFULLY.**

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Words and phrases that appear in **bold** are defined and may be used in the singular or plural, as appropriate; please refer to Section III – Definitions.

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the **Insurer**, and subject to all of the terms and conditions of this policy (including all endorsements hereto), the **Insurer** agrees with the **Insured** to provide insurance as stated in this policy.

## SECTION I - COVERAGES

A. Insuring Agreements:

    1. Professional Liability

        The **Insurer** agrees to pay on behalf of the **Insured**, **Loss** in excess of the Deductible amount and up to the Limits of Liability shown in Item 4 of the Declarations; provided that such **Loss** results from a **Claim** first made and reported in writing during the **Policy Period** or Extended Reporting Period, if applicable, arising out of a **Wrongful Act** committed before the end of the **Policy Period** and on or after the **Retroactive Date**, if any, shown in the Declarations.

    2. Cyber Liability

        The **Insurer** agrees to pay on behalf of the **Insured**, **Loss** in excess of the Deductible amount and up to the Limits of Liability shown in Item 4 of the Declarations; provided that such **Loss** results from a **Claim** first made and reported in writing during the **Policy Period** or Extended Reporting Period, if applicable, arising out of a **Privacy Breach, Security Event** or **Social Engineering Incident** taking place before the end of the **Policy Period** and on or after the **Retroactive Date**, if any, shown in Item 8 of the Declarations.

B. Supplemental Payments

    These supplemental payments will be paid in excess of the applicable Deductible shown in Item 5 of the Declarations and up to the Limit of Liability shown in Item 5 of the Declarations, in addition to the applicable Limit of Liability shown in Item 4 of the Declarations.

    1. **Crisis Management Expenses**

        The **Insurer** will reimburse the **Named Insured** for any **Crisis Management Expenses** resulting directly from any **Wrongful Act, Privacy Breach**, **Security Event** or **Social Engineering Incident** that the **Insured** incurs during the **Policy Period**.

        The **Insurer** will have no duty to defend any **Insured** as to any act causing **Crisis Management Expenses.**

    2. **Disciplinary Proceedings**

        If, during the **Policy Period**, a **Disciplinary Proceeding** is first brought against any **Insured**, the **Insurer** will reimburse the **Insured** for reasonable and necessary legal fees and expenses that the **Insured** incurs in the defense of such matter. Such legal fees and expenses do not include any fines, penalties or restitution paid by the **Insured** as part of or to resolve a **Disciplinary Proceeding**.

FILED DATE: 12/17/2021 3:37 PM 2020L004725

FILED DATE: 12/17/2021 3:37 PM 2020L004725

The **Insurer** will have no duty to defend the **Insured** in any such **Disciplinary Proceeding**.

Any notice given to the **Insurer** by any **Insured** under this subsection will be deemed notice of **Potential Claim**.

3.   Subpoena Assistance

If, during the **Policy Period**, an **Insured** first receives a subpoena for documents or testimony arising out of **Professional Services** performed by any **Insured**, and the **Insured** requests the **Insurer's** assistance in responding to such subpoena, the **Insurer** will reimburse the **Insured** for reasonable and necessary: legal fees and expenses incurred to provide the **Insured** advice regarding the production of documents; costs incurred by the **Insured** to produce any documents in response to the subpoena; and legal fees and expenses to prepare the **Insured** for sworn testimony and to represent the **Insured** at the **Insured's** depositions;

provided that:

a.   the subpoena arises out of a lawsuit to which the **Insured is** not a party; and

b.   the **Insured** has not been engaged to provide advice or testimony in connection with the civil lawsuit and the **Insured** has not provided such advice or testimony in the past.

The **Insurer** has no duty to defend the **Insured** in connection with any such subpoena assistance. Compliance with a subpoena will not be considered a **Claim** or **Disciplinary Proceeding** under the policy and the coverage for any Subpoena Assistance is limited to that provided under this section.

## SECTION II – LIMITS OF LIABILITY AND DEDUCTIBLE

A.   Limits of Liability: Insuring Agreements A.1 Professional Liability and A.2 Cyber Liability

1.   Limit of Liability: Each **Claim** under Insuring Agreements A.1 and A.2:  The most the **Insurer** will pay for any **Loss** for each **Claim** covered by this policy under Insuring Agreements A.1 and A.2 is the amount shown for Limit of Liability in Item 4 of the Declarations.

2.   Limits of Liability, Aggregate for all **Claims** under Insuring Agreements A.1 and A.2:  The most the **Insurer** will pay for all **Loss** for all **Claims** in the Aggregate covered by this policy under Insuring Agreements A.1 and A.2 is the amount shown in Item 4 of the Declarations.

3.   **Defense Costs** are part of and not in addition to the Limits of Liability.  Payment of **Defense Costs** by the **Insurer** will reduce, and may exhaust, the Limits of Liability.

B.   Limits of Liability: Supplementary Coverages

Supplemental payments under Insuring Agreement B will be paid in addition to the Each **Claim** or Aggregate Limit of Liability, as applicable, shown in Item 4 of the Declarations.

1.   Limits of Liability: **Crisis Management Expenses** – The most this **Insurer** will pay for **Crisis Management Expenses** covered under Insuring Agreement B.1 of this policy during the **Policy Period** from each **Wrongful Act**, **Privacy Breach**, **Security Event** or **Social Engineering Incident** and in the Aggregate are the amounts shown for **Crisis Management Expenses** in Item 5 of the Declarations.

2.   Limits of Liability: Each **Disciplinary Proceeding**: The most the **Insurer** will pay for each such **Disciplinary Proceeding** and the Aggregate under Insuring Agreement B.2 during the **Policy Period** are the amounts shown in Item 5 of the Declarations.

3.   Limits of Liability: Subpoena Assistance: The most the **Insurer** will pay for each such subpoena and in the Aggregate under Insuring Agreement B.3 of this policy are the amounts shown in Item 5 of the Declarations.  The each Subpoena Limit of Liability will apply to all subpoenas issued in the same civil lawsuit.

C.   Deductible

FILED DATE: 12/17/2021 3:37 PM     2020L004725

1. Regarding the coverage provided by this policy under Insuring Agreements A.1 Professional Liability and A.2, Cyber Liability, the Each Claim Deductible shown in Item 4 of the Declarations applies to each **Claim** and will be paid by the **Insured** as a condition precedent to payment of any **Loss** by the **Insurer**. The **Insured** must pay the applicable deductible for each **Claim** within 30 days of the **Insurer's** written request regardless of the number of **Claims** covered by this policy. Any Aggregate Deductible amount shown in Item 4 of the Declarations is the most the **Insured** will pay as a deductible for all **Claims** covered by this policy.

2. Regarding the coverage provided by this policy under Insuring Agreement B. Supplemental Coverages, the Each **Expense Event** Deductible shown in Item 5 of the Declarations applies respectively to each **Crisis Management Expense**, **Disciplinary Proceeding** or Subpoena and will be paid by the **Insured** as a condition precedent to payment of any **Loss** by the **Insurer**. The Each Subpoena deductible will apply to all subpoenas issued in the same civil lawsuit. The **Insured** must pay the applicable deductible for each **Claim** within 30 days of the **Insurer's** written request regardless of the number of **Claims** covered by this policy. Any Aggregate Deductible amount shown in Item 4 of the Declarations is the most the **Insured** will pay for all **Claims** covered by this policy.

3. The **Insured's** Deductible obligation for each **Claim** will be reduced by 50%, subject to a maximum aggregate reduction of all Deductibles for all **Claims** of $25,000 if, within 180 days of the institution of arbitration proceedings or service of suit, the **Insurer** agrees and the **Insured** consents to the final settlement of a **Claim** during a voluntary mediation. This reduction does not apply to any **Claim** resolved through court-mandated mediation or voluntary or involuntary arbitration.

## SECTION III - DEFINITIONS

A. **Bodily Injury** means physical injury, sickness, disease or death of any person.

B. **Claim** means any of the following arising from a **Wrongful Act**:

1. a written demand received by any **Insured** for monetary, non-monetary or injunctive relief, including a written demand that the **Insured** toll or waive a statute of limitations;

2. a civil proceeding against any **Insured** commenced by the service of a complaint or similar pleading;

3. the institution of an arbitration, mediation, or other alternate dispute resolution proceeding against any **Insured**; or

4. as respects Insuring Agreement A.2, a **Privacy Regulatory Action** against any **Insured**.

C. **Controlled Enterprise** means any business enterprise  if at the time the **Wrongful Act** occurs:

1. such business enterprise is a publicly traded entity and 5% or more of its issued and outstanding securities or voting rights to elect or appoint a board of directors or an equivalent governing body is owned or controlled, individually or collectively, by one or more of the **Insureds** or the **Insured's** qualified domestic partners; or

2. such business enterprise is not a publicly traded entity and 25% or more of the legal, beneficial or equitable ownership of such enterprise is owned or controlled, individually or collectively, by one or more of the **Insureds** or the **Insured's** qualified domestic partners.

**Controlled Enterprise** will not include the **Named Insured** entity or a business enterprise in which the ownership, control, operation or management by any **Insured** is exclusively in a fiduciary capacity as an administrator, conservator, executor, trustee, guardian, receiver or committee or in a similar fiduciary capacity incidental to the practice of law by any **Insured**.

D. **Crisis Management Expenses** mean reasonable and necessary expenses, including legal fees, approved by the Insurer, in its sole discretion, to engage a public relations firm after an **Insured's** Wrongful Act, **Privacy Breach**, **Security Event** or **Social Engineering Incident**.

FILED DATE: 12/17/2021 3:37 PM    2020L004725

E.  **Defense Costs** means:

1.  reasonable and necessary fees, costs and expenses charged by any lawyer consented to or designated by the **Insurer** to defend any **Insured** against a **Claim**;

2.  all other reasonable and necessary fees, costs and expenses resulting from the investigation, discovery, adjustment, defense, settlement or appeal of a **Claim** as authorized by the **Insurer**; and

3.  the cost of a bond or appeal bond, required as a result of a **Claim**, including bonds to release attachments, but only for bond amounts not exceeding the applicable Limit of Liability; however, the **Insurer** has no obligation to apply for, guarantee or furnish any such bond.

**Defense Costs** do not include the remuneration, salaries, overhead, fees or expenses of either the **Insured's** or the **Insurer's** regular employees or officials or any fees or expenses incurred prior to the time that a **Claim** is first made against any **Insured** and reported to the **Insurer**. **Defense Costs** will be paid first and will reduce, and may exhaust, the Limits of Liability shown in Items 4 and 5 of the Declarations.

F.  **Disciplinary Proceeding** means a proceeding before a disciplinary board or similar entity or official to determine violations of disciplinary rules or rules of professional conduct, professional misconduct or other matters relating to licensing and discipline. **Disciplinary Proceeding** does not include charges, investigations or actions filed with a regulatory agency or official, including, without limitation, the Securities and Exchange Commission, the U.S. Patent & Trademark Office or the Internal Revenue Service.

G.  **Expense Event** means any **Disciplinary Proceeding**, subpoena or corporate reputation damage that triggers coverage under Insuring Agreement B.1, B.2. or B.3.

H.  **Information Custodian** means any third party that possesses **Non-public Personal Information** or **Proprietary Business Information** on behalf of the **Named Insured** and which is required to maintain the confidentiality and integrity of that information by a written contract with the **Named Insured**.

I.  **Information System** means any electronic device, electronic or paper storage media, as well as any communication networks, including cloud or other multi-tenant storage models.

J.  **Insured** means:

1.  the **Named Insured**;

2.  any lawyer who is or becomes a past, present or future partner, officer, director, shareholder or employee of the **Named Insured**, but only while performing **Professional Services** on behalf of the **Named Insured**;

3.  the estate, heirs, executors, administrators, assigns and legal representatives of each **Insured** in the event of the death, incapacity, insolvency or bankruptcy of any **Insured**, but only to the extent that such **Insured** would otherwise be provided coverage under this Policy;

4.  any **Insured's** legal spouse, including any natural person qualifying as a domestic partner under the provisions of any applicable state, federal or local law in the United States, but only with respect to **Loss** resulting from **Professional Services** provided by the **Insured** on behalf of the **Named Insured**;

5.  any lawyer listed in the Prior Acts Schedule, who is a partner, "of counsel", officer, director, shareholder or employee of the **Named Insured** at the time the **Claim** is made, but only as respects **Professional Services** rendered by such lawyer while associated with a prior law firm;

6.  any lawyer acting as "of counsel" or as an independent contractor, but only as to any **Claim** involving the performance of **Professional Services** on behalf of the **Named Insured**; or

7.  any non-lawyer employee, intern, volunteer or independent contractor of the **Named Insured**, but only as to any **Claim** involving the performance of **Professional Services** on behalf of the **Named Insured**.

FILED DATE: 12/17/2021 3:37 PM    2020L004725

K. **Insurer** means the insurance company issuing this policy as shown in the Declarations.

L. **Loss** means a monetary judgment or settlement that an **Insured** becomes legally obligated to pay as a result of a **Claim**, including punitive or exemplary damages where insurable under applicable law.

    1. **Loss** includes:

        a. **Defense Costs**;

        b. pre and post judgment interest on the entire amount of any judgment which accrues after the entry of the judgment and before the **Insurer** has paid or tendered or deposited in the court that part of the judgment that does not exceed the policy limit.

        c. as regards the coverage provided under SECTION I – COVERAGES, A. Insuring Agreements, 2. Cyber Liability, **Loss** includes the following for which an **Insured** becomes legally obligated to pay as the result of a **Claim** to which this insurance applies:

            (1) **Regulatory Fines And Penalties** if, and to the extent that, such amounts are insurable under the law of the jurisdiction most favorable to the insurability of such **Regulatory Fines And Penalties** provided such jurisdiction has a substantial relationship to the relevant **Insureds**, the **Insurer**, or the **Claim**; and

            (2) **Regulatory Restitution**.

    2. **Loss** does not include:

        a. any fines, penalties, taxes or sanctions, whether imposed by law or otherwise (except as provided above with respect to punitive or exemplary damages or **Regulatory Fines And Penalties**);

        b. the return, reduction or restitution of fees or costs including any recovery of an overcharge for, or offset due, for legal fees or costs, or any other consideration paid to, or payable to, or received by any **Insured** (except as provided above with respect to **Regulatory Restitution**);

        c. amounts which are uninsurable under applicable law; or

        d. the cost of complying with any injunctive, declaratory or administrative relief.

M. **Named Insured** means the person or entity designated in Item 1 of the Declarations and any **Predecessor** of such entity.

N. **Non-public Personal Information** means any of the following information, if not already publicly available:

    1. social security number, driver's license or government issued identification number;

    2. credit, debit, bank, credit union or brokerage account numbers, balances or account histories;

    3. telephone numbers or telephone records;

    4. medical records, health insurance identification numbers or other protected health information; or

    5. any other non-public information that can be used to identify that individual as specified by a **Privacy Regulation**.

O. **Personal Injury Offense** means:

    1. false arrest, humiliation, mental anguish, emotional distress, unlawful detention, false imprisonment, wrongful entry, eviction or other invasion of private occupancy, abusive litigation, abuse of process or malicious prosecution;

    2. the publication or utterance of a libel or slander or other defamatory or disparaging material, or a publication or utterance in violation of any individual's right to privacy; or

    3. misrepresentation in advertising, infringement of copyright, trademark, service mark, trade dress or trade name.

FILED DATE: 12/17/2021 3:37 PM 2020L004725

P. **Policy Period** means the period from the inception date of this policy to the expiration date of this policy, as shown in Item 2 of the Declarations, or its earlier termination date, if any.

Any extension of the **Policy Period** will not result in an increase or reinstatement of the Limit of Liability.

Q. **Potential Claim** means:

1. any **Wrongful Act** which might reasonably be expected to give rise to a **Claim** against any **Insured** under the policy;

2. any breach of duty to a client or third party, which has not resulted in a **Claim** against any of the **Insureds**; or

3. receipt of notice of a **Disciplinary Proceeding**.

R. **Predecessor** means an individual or entity engaged in **Professional Services** whose financial assets and liabilities the **Named Insured** is the majority successor in interest.

S. **Privacy Breach** means any of the following arising from a **Wrongful Act** taking place on or after the Retroactive Date, if any, shown in Item 8 of the Declarations:

1. the alleged unauthorized alteration, collection, copying, disclosure, dissemination or viewing of **Non-public Personal Information** or **Proprietary Business Information** in any form, from any source, because of an **Insured's** failure to protect such information from unauthorized access or unauthorized use;

2. the alleged accidental release or loss of **Non-public Personal Information** or **Proprietary Business Information**;

3. the alleged wrongful collection, use or sale of **Non-public Personal Information** or **Proprietary Business Information** in any form; and

4. an **Insured's** alleged failure to correct the **Non-public Personal Information** of a third party that is stored on the **Named Insured's Information System** once notified by the affected individual or that individual's legal counsel.

**Privacy Breach** includes the **Named Insured's** vicarious liability for the privacy breach of **Non-public Personal Information** or **Proprietary Business Information** in the care, custody and control of an **Information Custodian** to whom the **Named Insured** entrusted that information.

T. **Privacy Regulation** means any current or future statute or regulation applying to the collection, dissemination or storage of **Non-public Personal Information** promulgated by a **Privacy Regulator** including, but not limited to, state breach notice laws, HIPAA, the Hi-Tech Act, the Federal Trade Commission (FTC) Red Flag rules, Gramm-Leach Bliley or the European Union (EU) Data Protection Act.

U. **Privacy Regulator** means any local, state or federal government of the United States, any provincial or federal government in Canada, the European Union or a member state of the European Union.

V. **Privacy Regulatory Action** means the institution of an investigation, an administrative hearing or civil charges by a **Privacy Regulator** under a **Privacy Regulation** arising out of an actual or alleged **Privacy Breach**.

W. **Professional Services** means services and activities performed for others in the **Insured's** capacity as:

1. a lawyer;

2. a notary public;

3. an arbitrator or mediator;

4. a title insurance agent;

5. a designated issuing lawyer to a title insurance company;

6. a court-appointed fiduciary;

7. a government affairs advisor or lobbyist;

8. a member of a bar association or ethics, peer review, formal accreditation, licensing or similar professional board or committee;

9. an author, strictly in the publication or presentation of research papers or similar materials and only if the fees generated from such work are not greater than $10,000; or

10. an administrator, conservator, receiver, executor, guardian, trustee or any similar fiduciary; however no coverage will apply to any **Loss** sustained or expenses incurred by any **Insured** as the beneficiary, recipient or distributee of any trust or estate.

11. an expert witness, provided the **Insured** was retained to offer expert opinion on issues related to the law, legal procedure or practice of the legal profession.

Any other services, including pro bono services, performed by any **Insured** in a lawyer-client relationship on behalf of the **Named Insured** are considered **Professional Services**, even though such services could have been performed wholly or in part by non-lawyers.

X. **Property Damage** means physical injury to tangible property, including all resulting loss of use of that property.

Y. **Proprietary Business Information** means business records, customer lists, trade secrets or any other non-public information entrusted to an **Insured** under a written contract to protect its confidentiality..

Z. **Regulatory Fines And Penalties** means those sums any **Insured** is required to pay as part of the settlement or judgment of a **Privacy Regulatory Action** to which this insurance applies.

AA. **Regulatory Restitution** means sums deposited into a fund for the purpose of providing compensation to individuals affected by a **Privacy Breach** as part of a settlement or judgment resulting from a **Privacy Regulatory Action**.

BB. **Security Event** means any of the following arising from a **Wrongful Act** taking place on or after the Retroactive Date, if any, shown in Item 8 of the Declarations:

1. the **Insured's** inadvertent transmission of malicious computer code to a third party;

2. the failure to prevent the use of the **Named Insured's Information System** to harm a third party's **Information System,** including the failure to prevent the use of the **Named Insured's Information System** to launch a denial of service attack;

3. the inability of any **Insured** or third party to access the **Named Insured's Information System** due to the failure to prevent a denial of service attack, damage from malicious computer code, unauthorized access to, or unauthorized use of, the **Named Insured's Information System**; or

4. the corruption, destruction or loss of electronic data held within the **Named Insured's Information System** as the direct result of malicious computer code, a denial of service attack or from unauthorized access to, or unauthorized use of, the **Named Insured's Information System**.

CC. **Social Engineering Incident** means the following arising from a **Wrongful Act** taking place on or after the Retroactive Date, if any, shown in Item 8 of the Declarations:

An **Insured** having transferred, paid or delivered funds or data as a direct result of a fraudulent written instruction, electronic instruction (including e-mail or web-based instruction) or telephone instruction which is intended to mislead an **Insured** through misrepresentation of a material fact that is relied upon in good faith by such **Insured**.

DD. **Totally And Permanently Disabled** means that the **Insured** has become so disabled as to be wholly prevented from rendering **Professional Services** in the **Insured's** capacity as a lawyer; provided that such disability has existed continuously for not less than 6 months and is expected to be continuous and permanent. **Totally And Permanently Disabled** does not include any condition which:

1. is the result of war or acts of war, whether or not declared;

2. occurred during active service in the armed forces of any country; or

3. results from:

   a. intentionally self-inflicted injuries;

   b. attempted suicide; or

   c. the abuse or misuse of chemical compounds or alcohol.

EE. **Wrongful Act** means any actual or alleged act, error, omission or breach of duty by any **Insured** in the rendering of or failure to render **Professional Services**. **Wrongful Act** also means an actual or alleged **Personal Injury Offense** by any **Insured** in the rendering of or failure to render **Professional Services**.


SECTION IV - EXCLUSIONS

This policy does not apply to any **Claim** or **Expense Event**:

A. arising out of a **Wrongful Act**, **Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Expense Event** occurring prior to the **Policy Period** if, prior to the effective date of the first Lawyers' Professional Liability Insurance Policy issued by the **Insurer** to the **Named Insured** and continuously renewed and maintained in effect prior to the inception of this **Policy Period**:

   1. any **Insured** gave notice to any prior insurer of any such **Claim**, (including any **Potential Claim** that might lead to a **Claim), Wrongful Act, Privacy Breach, Security Event** or **Social Engineering Incident**; or

   2. any **Insured** had a reasonable basis to believe that the **Insured** had committed a **Wrongful Act**, violated a disciplinary rule, or engaged in professional misconduct.

B. arising out of any actual or alleged intentional, criminal, dishonest, malicious or fraudulent act, error or omission by any **Insured** if such intentional, criminal, dishonest, malicious or fraudulent act, error or omission is established by a final adjudication of the **Claim** in any judicial, administrative or alternative dispute resolution proceeding.

   This Exclusion does not apply to any **Personal Injury Offense** that results from any **Professional Services** by any **Insured**.

   For purposes of this Exclusion, no such act of one of the **Insureds** will be imputed to any of the **Insureds** who were not aware of and did not participate in such act.

C. arising out of any **Insured's** services or capacity as an officer, director, partner, owner, or employee of any corporation, partnership, association or any other business enterprise or charitable organization of any kind or nature other than that of the **Named Insured**.

   This Exclusion does not apply to any **Claim** that results directly from the rendering of or failure to render **Professional Services** by any **Insured** to such corporation, partnership, association or other business enterprise or charitable organization.

D. arising out of any **Insured's** services as a public official, or as an employee of a governmental body, subdivision, or agency.

E. arising out of any actual or alleged violation or breach by any **Insured** as a fiduciary under the Employee Retirement Income Security Act of 1974 and its amendments or any regulation or order issued pursuant thereto or any other similar state or local law.

F. arising out of **Bodily Injury** or **Property Damage**.

   This Exclusion does not apply to the extent that any such **Bodily Injury** or **Property Damage** results from any **Insured's** rendering of or failure to render **Professional Services**.

FILED DATE: 12/17/2021 3:37 PM   2020L004725

FILED DATE: 12/17/2021 3:37 PM   2020L004725

G. arising out of any actual or alleged liability assumed by any **Insured** under any written or oral contract or agreement including, without limitation, any indemnification agreement, provided that this exclusion does not apply to any tort liability that would have attached to any **Insured** in the absence of such contract or agreement and is otherwise covered under this policy.

H. by or on behalf of any **Insured** against any other **Insured** unless such **Claim** arises out of **Professional Services** by any **Insured** rendered to such other **Insured** as a client.

I. arising out of **Professional Services** rendered, or that should have been rendered, to or on behalf of a **Controlled Business Enterprise**.

## SECTION V – EXTENDED REPORTING PERIODS

In the event this policy is cancelled or non-renewed by either the **Named Insured** or the **Insurer**, the **Named Insured** is entitled to the extensions of coverage shown in this Section.

A. Automatic Extended Reporting Period

An Extended Reporting Period is automatically provided to the **Named Insured** without additional charge. This period starts at the end of the **Policy Period** and lasts for 60 days, or the date another policy for professional liability insurance applicable to the **Named Insured** takes effect, whichever occurs first.

1. There will be no entitlement to this Automatic Extended Reporting Period if cancellation or non-renewal is due to any **Insured's** non-payment of premium or deductible due, or failure to comply with the terms and conditions of the policy, or if the policy was issued based on a misrepresentation by any **Insured**.

2. This Automatic Extended Reporting Period will be subject to all the terms and conditions of this policy and will apply only to **Claims** first made against any **Insured** during the Automatic Extended Reporting Period and reported to the **Insurer** during the Automatic Extended Reporting Period and that arise out of a **Wrongful Act** that occurred or is alleged to have occurred subsequent to the **Retroactive Date**, if any, and before the end of the **Policy Period**.

3. The fact that the period during which **Claims** may be reported to the **Insurer** under this policy by way of this Automatic Extended Reporting Period does not in any way increase the Limits of Insurance of this policy.

4. If any other policy of insurance in effect would apply to any **Claims** first made against the **Insured** during the Automatic Extended Reporting Period, then coverage provided under this Automatic Extended Reporting Period will apply in excess of such other insurance.

B. An Optional Extended Reporting Period is available to the **Named Insured**, but only by an endorsement and for an extra premium charge as shown in Item 7 of the Declarations.

1. The **Named Insured** must give the **Insurer** a written request for the endorsement and pay any premium due within 60 days after the end of the **Policy Period**. The Optional Extended Reporting Period will not go into effect unless the **Named Insured** pays the additional premium promptly when due.

2. The Optional Extended Reporting Period is non-cancellable and starts upon the expiration of the **Policy Period**.

3. All premiums paid for the Optional Extended Reporting Period will be deemed fully earned and non-refundable as of the first day of the Optional Extended Reporting Period.

4. There will be no entitlement to this Optional Extended Reporting Period if cancellation or non-renewal is due to any **Insured's** non-payment of premium or deductible due, or failure to comply with the terms and conditions of the policy, or if the policy was issued based on a misrepresentation by any **Insured**.

5. This Optional Extended Reporting Period will be subject to all the terms and conditions of this policy and will apply only to **Claims** first made against any **Insured** during the Optional Extended Reporting Period and reported to the **Insurer** during the Optional Extended Reporting Period and that arise out of a **Wrongful Act** that occurred or is alleged to have occurred subsequent to the **Retroactive Date**, if any, and before the end of the **Policy Period**.

6. If the **Insurer** offers to renew the policy and the **Named Insured** refuses to accept such renewal offer, then upon the effective date of cancellation or non-renewal, the maximum aggregate liability for all **Loss** arising out of **Claims** first made during the Optional Extended Reporting Period will be equal to, in addition to, and not part of the Aggregate Limits of Liability as set forth in Item 4 of the Declarations.

   However, if the **Insurer** has provided coverage under this policy continually for less than three (3) years and the **Insurer** does not offer to renew the policy, then upon the effective date of cancellation or non-renewal, the maximum Aggregate Limit of Liability for all **Loss** arising out of **Claims** first made during the Optional Extended Reporting Period will be equal to the greater of either: (i) the amount remaining in the policy's Aggregate Limit of Liability on the effective date of cancellation or non-renewal; or (ii) an amount equal to fifty percent (50%) of the Aggregate Limit of Liability shown in Item 4 of the Declarations.

7. If any other policy of insurance in effect would apply to any **Claims** first made against the **Insured** during the Optional Extended Reporting Period, then coverage provided under this policy during any Optional Extended Reporting Period will apply in excess of such other insurance.

8. This Optional Extended Reporting Period is not available to any **Insured** who is disbarred, suspended or resigns from the practice of law in lieu of suspension in any state or court where the **Insured** has a license or has a right to practice.

C. Nonpracticing Extended Reporting Period

   1. Eligibility

      a. If any **Insured** completely retires from or otherwise ceases the private practice of law during the **Policy Period**, then such **Insured** has the option to purchase a Nonpracticing Extended Reporting Period, but any such Nonpracticing Extended Reporting Period will apply only to **Claims** first made against the **Insured** during the Nonpracticing Extended Reporting Period for **Wrongful Acts** committed or allegedly committed by the **Insured** on or after any applicable **Retroactive Date** and prior to the date of the **Insured's** retirement or termination of private practice.

      b. The option to purchase a Nonpracticing Extended Reporting Period will apply only to an **Insured** as defined under SECTION III – DEFINITIONS, paragraph J. **Insured**, subparagraph 2.

   2. Nonpracticing Extended Reporting Period Premium and Deductible

      a. The **Named Insured** must elect the specific Nonpracticing Extended Reporting Period during the **Policy Period**. For each Nonpracticing Extended Reporting Period elected, the additional premium charged will be the applicable percentage of the full annual premium of this policy as shown in the Declarations at Item 7, but pro-rated based on the per lawyer price of the coverage of the most recent policy issued to the **Named Insured**.

         (1) The Nonpracticing Extended Reporting Period is non-cancellable and starts upon the expiration of the Policy Period.

         (2) All premiums paid for the Nonpracticing Extended Reporting Period will be deemed fully earned, and non-refundable as of the first day of the Nonpracticing Extended Reporting Period.

      b. The **Insurer** will waive the premium for a Nonpracticing Extended Reporting Period if the **Insured**:

         (1) dies, except by suicide;

FILED DATE: 12/17/2021 3:37 PM 2020L004725

FILED DATE: 12/17/2021 3:37 PM 2020L004725

    (2) becomes **Totally And Permanently Disabled**; or

    (3) retires or otherwise ceases the private practice of law during the **Policy Period** and has been insured by the **Insurer** under a primary Lawyers' Professional Liability Policy continuously for the last 3 years.

  c. The Deductible amount shown in the Declarations and deductible provisions of this policy do not apply to **Claims** first made against the **Insured** during any Nonpracticing Extended Reporting Period.

3. Nonpracticing Extended Reporting Period Limits of Liability

  a. The **Insurer's** limits of liability for all **Claims** first made against the **Insured** during any Nonpracticing Extended Reporting Period will be part of, and not in addition to, the each **Claim** and Aggregate Limits of Liability shown in the Declarations and Section II – Limits Of Liability And Deductible of this policy.

  b. If any other policy of insurance would apply to any **Claims** first made against the **Insured** during the Nonpracticing Extended Reporting Period, then coverage provided under this policy will apply in excess of such other insurance.

4. This Nonpracticing Extended Reporting Period is not available if the **Insured** is disbarred, suspended or resigns from the practice of law in lieu of suspension in any state or court where the **Insured** has a license or has a right to practice.

## SECTION VI – GENERAL CONDITIONS

A. Defense, Settlement And Cooperation

1. The **Insurer** has the right and duty to defend any **Insured** against any **Claim**, even if the allegations of such **Claim** are groundless, false or fraudulent. The **Insurer** will designate, or, in the **Insurer's** sole discretion, approve counsel chosen by an **Insured** to defend the **Claim**. However, the **Insurer** has no duty to defend any **Insured** against any **Claim** to which this insurance does not apply.

    This policy has provisions whereby the **Insurer** will reimburse the **Insured(s)** certain costs incurred as a result of defending a **Disciplinary Proceeding** or responding to a subpoena for documents or testimony; however the **Insurer** has no duty to defend the **Insured** in any such **Disciplinary Proceeding** or in connection with any such subpoena assistance as shown in SECTION I – COVERAGES, B. Supplemental Payments, item 5 of this policy.

2. The **Insurer** has the right to make any investigation the **Insurer** deems necessary and, with the **Insured's** consent, make any settlement of any **Claim** covered by the terms of this policy. If the **Insured** refuses to consent to any settlement or compromise recommended by the **Insurer** and acceptable to the claimant, and the **Insured** elects to contest the **Claim** or continue legal proceedings in connection with such **Claim**, then the **Insurer's** liability under this policy will be limited to the combined total of:

  a. the amount of such proposed settlement or compromise;

  b. the amount of **Defense Costs** incurred prior to the date the **Insured** refused to consent to such proposed settlement or compromise; and

  c. 50% of the amount of **Loss** incurred in excess of the combined total of the amounts set forth in a. and b. of this section.

3. The **Insured** will not, except at the **Insured's** own cost, make any payment, admit any liability, settle any **Claim**, assume any obligation or incur any expense, without the **Insurer's** prior written consent, such consent not to be unreasonably withheld.

4. If the applicable Limit of Liability shown in Items 4 or 5 of the Declarations are exhausted by the payment of **Loss**, then all of the **Insurer's** obligations under this policy will be completely fulfilled

FILED DATE: 12/17/2021 3:37 PM 2020L004725

and exhausted, and the **Insurer** will have no further obligations of any kind or nature whatsoever under this policy. If the applicable Limit of Liability shown in the Declarations is exhausted prior to settlement or judgment of any **Claim**, the **Insurer** will have the right to withdraw from further investigation or defense by tendering control of such investigation or defense to the **Insured**, and the **Insured** agrees, as a condition to the issuance of this policy, to accept such tender.

5. The **Insured** must cooperate with the **Insurer** and assist the **Insurer** in investigating and defending any **Claim** or **Potential Claim** or investigating any event resulting in coverage under Insuring Agreement B. Supplemental Payments. Upon the **Insurer's** request, the **Insured** must submit to examination and interrogation by the **Insurer's** representatives, under oath if required, and the **Insured** must attend hearings, depositions and trials, and assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits and other proceedings, as well as in the giving of a written statement or statements to the **Insurer's** representatives including investigating, defense, and coverage counsel, and meeting with such representatives for the purpose of investigation, including the investigation of coverage issues or defense. The **Insured** must further cooperate with the **Insurer** and do whatever is necessary to secure and effect any rights of indemnity, contribution or apportionment which the **Insured** may have.

B. Reporting And Notice

1. Reporting of **Claims**

If, during the **Policy Period** or any Extended Reporting Period, any **Claim** for a **Wrongful Act** is first made against any **Insured**, as a condition precedent to the **Insured's** right to coverage under this policy, the **Insured** must give the **Insurer** written notice of such **Claim** as soon as practicable, but in no event later than the later of 60 days after the expiration date or earlier termination date of this policy, or the expiration of any Extended Reporting Period, if applicable.

Timely and sufficient notice of a **Claim** by one of the **Insureds** will be deemed timely and sufficient notice for all of the **Insureds** involved in the **Claim**. Such notice must give full particulars of the **Claim**, including, but not limited to: a description of the **Claim** and **Wrongful Act**; the identity of the **Insured** and all potential claimants involved; a description of the injury or damages that resulted from such **Wrongful Act**; information on the time, place and nature of the **Wrongful Act**; and the manner in which the **Insured** first became aware of the **Claim**.

2. Reporting of **Potential Claims**

If, during the **Policy Period**, any **Insured** first becomes aware of any **Potential Claim,** the **Insured** will give the **Insurer** written notice of such **Potential Claim** with full particulars as soon as practicable thereafter, but in any event before the end of the Policy Period. If such **Potential Claim** later becomes a **Claim** not otherwise excluded by this policy, such **Claim** will be treated as if the **Claim** had been first made during the **Policy Period**. Full particulars include, but are not limited to: a description of the **Potential Claim**; the identity of the **Insured** and all potential claimants involved; information on the time, place and nature of the **Potential Claim**; the manner in which the **Insured** first became aware of such **Potential Claim**; and the reasons the **Insured** believe the **Potential Claim** is likely to result in a **Claim**.

Whenever coverage under this policy would be lost because of noncompliance with the preceding paragraph, the **Insurer** agrees to waive such loss of coverage with respect to any **Insured** who failed to comply because they were not aware of such **Potential Claim** or the **Wrongful Act** on which the **Potential Claim** is based, or did not remain passive after learning about non-compliance with the requirements of these conditions 1 or 2.

3. Notice regarding **Crisis Management Expenses**

If, during the **Policy Period,** a **Wrongful Act, Privacy Breach Security Event** or **Social Engineering Incident** occurs, then as a condition precedent to the **Insured's** right to coverage under this policy for **Crisis Management Expenses** regarding such **Wrongful Act, Privacy Breach**, **Security Event** or **Social Engineering Incident**, the **Insured** must give the **Insurer**

written notice of such **Wrongful Act, Privacy Breach**, **Security Event** or **Social Engineering Incident** as soon as practicable, but in no event later than the end of the **Policy Period**.

Such notice must give full particulars of the **Wrongful Act, Privacy Breach, Security Event** or **Social Engineering Incident**, including, but not limited to: a description of the **Wrongful Act, Privacy Breach**, **Security Event** or **Social Engineering Incident**; the identity of the **Insured** and all potential claimants involved; and the manner in which the **Insured** first became aware of such **Wrongful Act, Privacy Breach, Security Event** or **Social Engineering Incident**.

4. Notice of **Disciplinary Proceedings** and Subpoenas

   If, during the **Policy Period**:

   a. a **Disciplinary Proceeding** is first initiated against any **Insured** and covered by SECTION I – COVERAGES, B. Supplemental Payments, 2. Disciplinary Proceedings; or

   b. any **Insured** first receives a subpoena covered by SECTION I – COVERAGES, B. Supplemental Payments, 3. Subpoena Assistance;

   then as a condition precedent to the **Insured's** right to coverage under this policy, the **Insured** must give the **Insurer** written notice of such **Disciplinary Proceeding** or subpoena as soon as practicable, but in no event later than the end of the **Policy Period**.

   Such notice must give full particulars of the **Disciplinary Proceeding** or subpoena, including, but not limited to: a description of the **Disciplinary Proceeding** or subpoena; the identity of the **Insured** and all potential claimants involved; and the manner in which the **Insured** first became aware of such **Disciplinary Proceeding** or subpoena**.**

5. Notices

   All written notices required herein must be sent to the **Insurer** at the **Insurer's** physical address or e-mail address shown in Item 9 of the Declarations.

C. Multiple Wrongful Acts, **Claims** or Claimants

   Two or more **Claims** arising out of a single **Wrongful Act**, or any series of related **Wrongful Acts**, will be considered a single **Claim**. Each **Wrongful Act**, in a series of related **Wrongful Acts**, will be deemed to have occurred on the date of the first such **Wrongful Act**.

D. Organizational Changes

   In the event of a merger, dissolution or acquisition of the **Named Insured**, an **Insured** must notify the **Insurer** at least 60 days prior to the projected date of such change. Notwithstanding the above, the **Insured** must provide written notice to the **Insurer** of any organizational change which occurs during the **Policy Period**, affecting 50% or more of the lawyers at the inception of this policy. This notice must be provided in writing within 60 days of such change. In the event of an organizational change under this Condition, the **Insurer** will have the right to accept, alter or decline coverage and to charge an additional premium.

E. Other Insurance

   This insurance will apply only in excess of the applicable Deductible amount shown in Items 4 and 5 of the Declarations and the amount of any other valid and collectible insurance available to any **Insured** regarding any coverage that is available under any Insuring Agreement to this policy**,** whether such other insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such other insurance is specifically written as excess insurance over the Limits of Liability provided in this policy.

F. Cancellation and Non-Renewal

1. Cancellation

   a. The **Named Insured** may cancel this policy by mailing or delivering advance written notice to the **Insurer** at the **Insurer's** address shown in Item 9 of the Declarations, stating when

FILED DATE: 12/17/2021 3:37 PM    2020L004725

FILED DATE: 12/17/2021 3:37 PM 2020L004725

cancellation will be effective. If the **Insured** cancels this policy, the **Insurer** will retain the customary short rate portion of the premium.

b. The **Insurer** may cancel this policy by mailing written notice to the first **Named Insured** shown in Item 1 of the Declarations stating when, not less than 30 days thereafter (or such longer period of time as required by applicable law), such cancellation will be effective.

c. However, if the **Insurer** cancels this policy because the **Named Insured** has failed to pay a premium or Deductible when due, the **Insurer** may cancel this policy by mailing written notice of cancellation to the first **Named Insured** shown in Item 1 of the Declarations stating when, not less than 10 days thereafter (or such longer period of time as required by applicable law), such cancellation will be effective. Such notice will apply to all of the **Insureds**. If cancelled by the **Insurer**, earned premium will be computed pro rata.

2. Non-renewal

If the **Insurer** elects not to renew this policy, the **Insurer** will mail to the first **Named Insured** shown in Item 1 of the Declarations written notice of non-renewal at least 60 days prior to the expiration date of this policy. If the notice is not given at least 60 days prior to the expiration date, the policy will continue in force until 60 days after the notice of intent not to renew is received by the **Insured**.

Notice of non-renewal will not be required if the **Named Insured** has obtained replacement coverage or have requested or agreed to non-renewal.

G. Appearance at Proceedings

The **Insurer** will pay for loss of earnings for the **Insured's** attendance, at the **Insurer's** written request, at a trial, hearing, arbitration or mediation proceeding involving a **Claim** against any **Insured** covered by this policy. The maximum amount the **Insurer** will pay for any one or series of trials, hearings, mediation or arbitration proceedings arising out of the same **Claim** will not exceed $500 per individual **Insured** for each day, or part thereof. The most the **Insurer** will pay under this subsection is $10,000 each **Claim** and $50,000 in the aggregate for all **Claims** made during the **Policy Period** or applicable Extended Reporting Period.

H. Subrogation

In the event of any payment under this policy, the **Insurer** will be subrogated to all the **Insured's** rights of recovery against any person or organization; provided that the **Insurer** will not exercise any rights of subrogation against any of the **Insureds** who did not commit the wrongdoing.

The **Insured** will execute and deliver instruments, papers, and do whatever else is necessary to secure such rights, and do nothing to prejudice such rights.

Any amount recovered upon the exercise of such rights of subrogation will be applied as follows: first, to the repayment of expenses incurred in the exercise of such subrogation rights; second, to **Loss** paid by the **Insured** in excess of the limits of liability; third, to **Loss** paid by the **Insurer**; fourth, to **Loss** paid by the **Insured** in excess of the deductible amount; and last, to the repayment of any deductible amount paid by the **Insured**.

In no event will the **Named Insured** waive any of its rights of subrogation after it has become aware of any **Claim**, or any circumstances that may give rise to a **Claim**, against any **Insured**.

I. Bankruptcy or Insolvency

Bankruptcy or insolvency of any **Insured** or of any **Insured's** estate will not relieve the **Insurer** of any of the **Insurer's** obligations or deprive the **Insurer** of any of the **Insurer's** rights under this policy.

J. Policy Territory

This policy applies to **Wrongful Acts** occurring anywhere in the world where legally permissible; however, no coverage will be available under this policy for any **Claim** brought, or occurring in any country with which the United States of America does not have active diplomatic relations at the time such **Claim** is made.

FILED DATE: 12/17/2021 3:37 PM    2020L004725

All premiums, Limits of Liability, deductibles and other amounts under this policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of **Loss** under this policy is stated in a currency other than United States Dollars, payment under this policy will be made in United States Dollars at the rate of exchange on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

K. Assignment

Neither this policy nor any **Insured's** interest in this policy may be assigned without the **Insurer's** written consent.

L. Liberalization

If the **Insurer** adopts any revision to this form that would broaden coverage under this policy without additional premium at any time during the **Policy Period**, the broadened coverage will immediately apply to this policy, except that it will not apply to **Claims** that were first made against any **Insured** prior to the effective date of such revision.

M. Policy Changes

Notice to or knowledge possessed by any broker or other person acting on the **Insured's** behalf will not effect a waiver or change in any part of this policy or prevent or estop the **Insurer** from asserting any right(s) under this policy. This policy can only be altered, waived or changed by written endorsement or agreed to in writing by an authorized representative of the **Insurer**.

N. Action Against the **Insurer**

No action can be brought against the **Insurer** unless, as a condition precedent, the **Insured** has fully complied with all the terms and conditions of this policy. Nothing contained in this policy gives any person or organization the right to join the **Insurer** as a party to any **Claim** to determine the **Insured's** liability.

O. Waiver

The **Insurer's** failure to insist on strict compliance with any of the terms or conditions of this policy or the failure to exercise any right or privilege will not operate or be construed as a waiver of any subsequent breach or a waiver of any other terms, conditions, privileges or rights.

P. Representations

By accepting this policy, all **Insureds** agree that all statements made and information furnished to the **Insurer** are true, accurate and complete, and that this policy has been issued in reliance upon the truth and accuracy of those representations, subject to all of the terms and conditions of this policy.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES – CANCELLATION AND NONRENEWAL

All Coverage Parts included in this policy are subject to the following condition.

The Cancellation provision of this policy is deleted and replaced with the following:

A. Cancellation

1. The first **Named Insured** shown in the Declarations may cancel this policy by mailing to the **Insurer** advance written notice of cancellation.

2. The **Insurer** may cancel this policy by mailing to the **Named Insured** written notice stating the reason for cancellation. If the **Insurer** cancels:

   a. for nonpayment of premium, the **Insurer** will mail the notice at least 10 days prior to the effective date of cancellation.

   b. for a reason other than nonpayment of premium, the **Insurer** will mail the notice at least:

      (1) 30 days prior to the effective date of cancellation if the policy has been in effect for 60 days or less.

      (2) 60 days prior to the effective date of cancellation if the policy has been in effect for more than 60 days.

3. If this policy has been in effect for more than 60 days, the **Insurer** may cancel only for one or more of the following reasons:

   a. nonpayment of premium;

   b. the policy was obtained through a material misrepresentation;

   c. **a**ny insured has violated any of the terms and conditions of the policy;

   d. the risk originally accepted has measurably increased;

   e. **c**ertification to the Director of Insurance of the loss of reinsurance by the **Insurer** that provided coverage to the **Insurer** for all or a substantial part of the underlying risk insured; or

   f. a determination by the Director of Insurance that the continuation of the policy could place the **Insurer** in violation of the insurance laws of this State.

4. Notice of cancellation will state the effective date of cancellation. The **Policy Period** will end on that date.

5. If this policy is cancelled, the **Insurer** will send the **Named Insured** any premium refund due. If the **Insurer** cancels, the refund will be pro rata. If the **Named Insured** cancels, the refund will be less than pro rata. The cancellation will be effective even if the **Insurer** has not offered a refund.

B. Nonrenewal

If the **Insurer** decides not to renew or continue this policy, the **Insurer** will mail the **Insured** and the **Insured's** agent or broker and any mortgagee or lienholder known to the **Insurer** written notice, stating the reason for nonrenewal, at least 60 days before the end of the **Policy Period**. If the **Insurer** offers to renew or continue and the **Insured** does not accept, this policy will terminate at the end of the current **Policy Period**. Failure to pay the required renewal or continuation premium when due will mean that the **Insured** has not accepted the **Insurer's** offer.

FILED DATE: 12/17/2021 3:37 PM      2020L004725

FILED DATE: 12/17/2021 3:37 PM   2020L004725

If the **Insurer** fails to mail proper written notice of nonrenewal and the **Insured** obtains other insurance, this policy will end on the effective date of that insurance.

C.  Mailing of Notices

The **Insurer** will mail cancellation and nonrenewal notices to the last addresses known to the **Insurer**.  Proof of mailing will be sufficient proof of notice.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PRIOR ACTS SCHEDULE WITH INDIVIDUAL LAWYER RETROACTIVE DATE ENDORSEMENT

This endorsement modifies insurance provided under the following:

LAWYERS' PROFESSIONAL LIABILITY COVERAGE

SCHEDULE

| | Name of Lawyer | Retroactive Date |
|---|---|---|
| 1. | Cory D. Anderson | None |
| 2. | Matthew P. Connelly | None |
| 3. | David L. Miller | None |
| 4. | | |
| 5. | | |

Part J. **Insured**, item 5. of SECTION III – DEFINITIONS is deleted and replaced with the following:

5. any lawyer shown in the SCHEDULE above who is a partner, "of counsel", officer, director, shareholder or employee of the **Named Insured** at the time the **Claim** is made, but only as respects **Professional Services** rendered by such lawyer while associated with a prior firm, provided, that no coverage will be available under this policy for **Loss** or **Defense Costs** from any **Claim** arising out of any actual or alleged **Wrongful Act** committed or allegedly committed prior to the applicable Retroactive Date set forth opposite such lawyer's name in the SCHEDULE above:

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

FILED DATE: 12/17/2021 3:37 PM   2020L004725

# IMPORTANT INFORMATION FOR ILLINOIS POLICYHOLDERS

FILED DATE: 12/17/2021 3:37 PM    2020L004725

As our policyholder, your satisfaction is very important to us.  If you have any questions about your policy, if you need assistance with a problem, or if you have a claim, you should first contact your insurance agent or us.

To contact us, write or call:

General Counsel
Argo Group US, Inc.
P. O. Box 469011
San Antonio, Texas  78246
Toll Free: 1-877-474-8808

Part 919 of the Rules of the Illinois Department of Insurance requires that our company advise you that, if you wish to take this matter up with the Illinois Department of Insurance, it maintains Consumer Divisions in Chicago and Springfield.

To contact the Department, write or call:

Springfield Office:
Illinois Department of Insurance, Consumer Division
320 W. Washington Street
Springfield, IL 62767
217-782-4515
http://insurance.illinois.gov/

Chicago Office:
Illinois Department of Insurance, Consumer Division
122 S. Michigan Ave., 19th Floor
Chicago, IL 60603
312-814-2420
http://insurance.illinois.gov/

This notice is for information only and does not become a part or condition of this policy.

ILNOTICE-0117                                                                                          Page 1 of 1

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

FILED DATE: 12/17/2021 3:37 PM 2020L004725

FILED DATE: 12/17/2021 3:37 PM    2020L004725


ARGO GROUP US.
Get there together

# Privacy Policy

Argo Group US, Inc. ("Argo Group") recognizes the importance of maintaining the privacy of our customers and the confidentiality of each individual's nonpublic personal information, including Social Security numbers. We take seriously the responsibility that accompanies our collection of nonpublic personal information, including Social Security numbers. Accordingly, Argo's corporate policy is to protect the privacy and confidentiality of our consumers and their nonpublic personal information as required by law.

## Information Collection and Use

In order to conveniently and effectively provide and service the insurance products we sell, we may collect and use Social Security numbers and other nonpublic personal information. As such, this policy does not prohibit the collection or use of Social Security numbers and nonpublic personal information where legally authorized and/or required. This policy complies with the requirements of the Gramm-Leach-Bliley Act (GLBA) and applicable federal and state laws and regulations implementing the act. Such laws impose certain obligations upon third persons and organizations with which we share nonpublic personal information of our consumers, customers, former customers, or claimants. Accordingly, we prohibit the unauthorized disclosure of Social Security numbers and other protected nonpublic personal information, except as legally required or authorized.

## Information Sharing and Disclosure

Argo Group does not rent, sell or share your personally identifiable information with nonaffiliated third parties. Argo Group may, however, share personally identifiable information with third-party contractors. These third-party contractors are prohibited from using the information for purposes other than performing services for Argo Group. Argo Group may disclose your information to third parties when obligated to do so by law and to investigate, prevent, or take action regarding suspected or actual prohibited activities, including but not limited to fraud and situations involving the security of our operations and employees.

Finally, Argo Group may transfer information, including any personally identifiable information, to a successor entity in connection with a corporate merger, consolidation, sale of all or a portion of its assets, bankruptcy, or other corporate change.

## Security

In order to protect your nonpublic personal information, we limit access to nonpublic personal information by only allowing authorized personnel to have access to such information. Furthermore, we maintain physical, electronic and procedural security protections to safeguard the nonpublic personal information in our records. Documents that contain an individual's protected information are destroyed before disposal; this destruction process includes the shredding of print and disposable media and deletion of electronic media. Argo Group has security measures in place to protect the loss, misuse and alteration of the information under our control. Our hardware infrastructure is housed in a controlled access facility that restricts access to authorized individuals. The network infrastructure is protected by a firewall and traffic is monitored and logged both on the firewall and servers. Sensitive administrative activities are carried out over secure, encrypted links between our offices and hosting facility. Administrative

FILED DATE: 12/17/2021 3:37 PM    2020L004725

access is limited not only to authorized employees but also to specific remote administration protocols and IP addresses. All employees with access to personally identifiable information have been advised of Argo Group's security policies and practices. Argo Group will continue to conduct internal audits of its security systems and make all necessary enhancements to ensure the safety of the website and its users. No method of transmission over the Internet or method of electronic storage is 100% secure; therefore, while Argo Group uses commercially acceptable means to protect your information, we cannot guarantee absolute security.

Any Argo Group employee who becomes aware of the inappropriate use or disclosure of Social Security numbers and other protected nonpublic personal information is expected to immediately report such behavior to the General Counsel for further action.

**Corrected/Updated Information**

This policy applies to certain insureds of Argo Group, including but not limited to worker's compensation claimants. If you have any questions about this Privacy Policy, please contact:

General Counsel
Argo Group US, Inc.
P.O. Box 469011
San Antonio, Texas 78246
(210) 321-8400

*Note: Argo Group is the parent of Argonaut Insurance Company; Argonaut-Southwest Insurance Company; Argonaut-Midwest Insurance Company; Argonaut Great Central Insurance Company; Argonaut Limited Risk Insurance Company; ARIS Title Insurance Corporation; Select Markets Insurance Company; Colony Insurance Company; Colony Specialty Insurance Company; Peleus Insurance Company (fka Colony National Insurance Company); Rockwood Casualty Insurance Company; Somerset Casualty Insurance Company; Grocers Insurance Agency, Inc.; Central Insurance Management, Inc.; Alteris Insurance Services, Inc.; Trident Insurance Services, LLC; Commercial Deposit Insurance Agency, Inc.; Sonoma Risk Management, LLC; John Sutak Insurance Brokers, Inc.; Colony Management Services, Inc.; Argonaut Management Services, Inc.; and Argonaut Claims Management, LLC. This Privacy Policy applies to all companies and business produced or underwritten within Argo Group.

# SIGNATURE PAGE

FILED DATE: 12/17/2021 3:37 PM  2020L004725

IN WITNESS WHEREOF, the company issuing this policy has caused this policy to be signed by its President and its Secretary and countersigned (if required) on the Declarations page by a duly authorized representative of the company. This endorsement is executed by the company stated in the Declarations.

Argonaut Insurance Company

**President**                    **Secretary**

FILED DATE: 12/17/2021 3:37 PM   2020L004725

# EXHIBIT B



FILED DATE: 12/17/2021 3:37 PM    2020L004725

September 30, 2020

Matthew P. Connelly, Esq. *(via email)*
Rock Fusco & Connelly, LLC
321 N. Clark St., Suite 2200
Chicago, Illinois 60654

RE:   Insured:     Rock Fusco & Connelly, LLC
      Insurer:     Argonaut Insurance Company
      Matter:      *Liberty EBCP, LLC v. Rock Fusco & Connelly, et al., Case No. 2020-L-004725*

                   *Kevin B. Duff, et al. v. Rock Fusco & Connelly, et al., Case No. 2020-L-008843*
      Policy No.:  LPL4207045
      Claim No.:   266976

Dear Mr. Connelly:

I am the claims professional handling this matter on behalf of Argonaut Insurance Company. In a letter dated October 16, 2018, Argonaut advised Rock Fusco & Connelly, LLC ("RFC") of its coverage position as respects the claims being made by Liberty EBCP, LLC ("Liberty") against RFC in an August 17, 2018 demand letter ("the Liberty Letter"). Since that time, RFC provided notice to Argonaut of the above-referenced lawsuit brought by Liberty arising out of the conduct alleged in the Liberty Letter ("the *Liberty* Suit"). RFC also provided notice to Argonaut of a lawsuit brought against RFC by Kevin B. Duff, as the Receiver for the Estate of EquityBuild Inc., EquityBuild Finance LLC, and various related entities related to the two EquityBuild entities ("the *Duff* Suit").

The purpose of this letter is to advise RFC of the coverage issues potentially implicated by the *Duff* Suit and to seek additional information from RFC as part of Argonaut's ongoing investigation into coverage.

## UNDERLYING ALLEGATIONS AND INFORMATION

Argonaut wishes to make clear at the outset that the allegations made against RFC are only allegations that may be untrue, embellished or exaggerated, and Argonaut does not accept them as true. Nothing in this letter should be construed otherwise. However, Argonaut must necessarily refer to the allegations in order to discuss the coverage issues and to determine whether the Argonaut Policy will respond to the claims being made.

## A.    THE LIBERTY LETTER AND THE *LIBERTY* SUIT

On May 2, 2018, RFC issued a letter as counsel for SSDF7 Portfolio 1 LLC and Jerome H. Cohen (also known as Jerry Cohen), as the asserted borrower and guarantor, respectively, of a loan from Liberty EBCP, LLC ("Liberty") in the amount of $9.2 million. In the letter, RFC attorney Ioana

Salajanu certified to reviewing the loan documents and other authorization documents, and she rendered seventeen opinions about the loan transaction including opinions about Jerry and the borrowing entity. Of relevance, Ms. Salajanu opined that she and RFC "have no actual knowledge of any material pending or threatened lawsuits, claims or criminal proceedings against Borrower or Guarantor or specifically applicable to the Property except as set forth on Schedule 1 attached hereto." Schedule 1 consisted of eight letters identifying building violations at different properties and a list of three lawsuits involving properties owned by the borrower.

In a letter dated August 17, 2018, Liberty issued a "Notice Of Claim" to RFC ("the Liberty Letter"). The Liberty Letter states that RFC failed to disclose that it was aware of at least one, and possibly other, material pending or threatened lawsuits against Jerry Cohen and the borrowing entity at the time of the May 2, 2018 opinion letter. The Liberty Letter specifically identifies Case No. 2018-CH-03665 brought by Michigan Shore Apartments LLC against EquityBuild, Inc., EquityBuild Finance, LLC, Jerry Cohen, Shaun Cohen, and Mark Brosius in the Circuit Court of Cook County, Illinois, which was served on RFC on April 4, 2018. The Liberty Letter also references at least four other lawsuits, including an August 15, 2018 lawsuit brought by the SEC against Jerry. The Liberty Letter asserts that RFC's knowledge of the Illinois lawsuit and any other threatened or pending litigation, in conjunction with its "materially false legal opinion to the contrary," constitutes legal malpractice.

On April 29, 2020, Liberty filed a Complaint against RFC and Ms. Salajanu in the Circuit Court of Cook County, Illinois assigned Case No. 2020-L-004725 ("the *Liberty* Suit"). The *Liberty* Suit alleges the same course of conduct as the August 17, 2018 letter. In addition to the assertions in the letter, the *Liberty* Suit alleges that RFC and Ms. Salajanu were "presumably aware" of the SEC investigation leading to the filing of the August 15, 2018 SEC lawsuit at the time it issued the May 2, 2018 opinion letter.

## B.    THE *DUFF* SUIT

On August 17, 2020, Kevin B. Duff, as the Receiver for the Estate of EquityBuild Inc., EquityBuild Finance LLC, and various related entities related to the two EquityBuild entities, filed a Complaint against RFC, Ms. Salajanu, and others in the Circuit Court of Cook County, Illinois assigned Case No. 2020-L-008843 ("the *Duff* Suit"). The operative pleading in the Duff Suit appears to be an Amended Complaint filed on or about September 25, 2020. The *Duff* Suit relates to the same August 15, 2018 SEC lawsuit alleged in the Liberty matters, which the Amended Complaint describes as a lawsuit "to halt an ongoing real estate fraud and Ponzi scheme devised and operated by Jerry Cohen, Shaun Cohen, and various employees of EquityBuild and EquityBuild Finance and materially assisted by [. . .] Ioana Salajanu, a licensed attorney and partner at" RFC.

The *Duff* Suit provides a detailed explanation of the alleged Ponzi scheme and how it worked. In short, Equity Build's business model was to buy homes and dozens of multi-unit buildings on the South Side of Chicago – the Cohens intended to rehab them, flip them, or rent them out, which would provide regular income to the investors. The Cohens told investors that the properties being purchased cost substantially more than what they actually paid for them, meaning that investors were overcharged and the real estate supposedly securing their investments was worth less than what the Cohens told them. As a result of the losses, the Cohens' investment program devolved

FILED DATE: 12/17/2021 3:37 PM    2020L004725

FILED DATE: 12/17/2021 3:37 PM   2020L004725

into a Ponzi scheme wherein they could only pay earlier investors by raising funds from new investors.

Shortly after November 2012, EquityBuild retained Ms. Salajanu to handle its Chicago legal needs. Ms. Salajanu worked at RFC between March 31, 2015 and late August 2018. The *Duff* Suit alleges that Ms. Salajanu assisted EquityBuild in connection with, among other things, the acquisition, disposition, reacquisition, financing, and/or refinancing of at least 160 properties. The *Duff* Suit explains Ms. Salajanu's involvement in EquityBuild's 2016 purchase of a property located at 7201 S. Dorchester in Chicago, Illinois.

The Amended Complaint alleges that, in early February 2017, EquityBuild retained the Bregman, Berbert, Schwartz & Gilday, LLC law firm to assist in the defense of an SEC investigation into a Ponzi scheme. The Complaint alleges that, in late May 2017, Jessica Baier (an EquityBuild employee in Florida) contacted Ms. Salajanu by telephone. During that call, Ms. Baier allegedly informed Ms. Salajanu "that EquityBuild was committing widespread mortgage fraud, that Jerry Cohen and Shaun Cohen were raiding construction escrows that held funds raised from investor-lenders (and earmarked for property improvement) and diverting the monies for personal uses, including, among other things, overseas trips to Turkey and Israel." The Amended Complaint characterizes the conversation between Ms. Salajanu and Ms. Baier in a slightly different way: "Ms. Baier informed Ms. Salajanu of numerous improprieties in EquityBuild's operations including, among other things, the misallocation of investor-lender funds." According to the pleading, rather than investigate the matter further, Ms. Salajanu told Jerry about the conversation and continued to advance the schemes of the Cohens.

At some point in 2018, EquityBuild sought to refinance through Liberty the debt on the 7201 S. Dorchester property and sixteen other properties in a portfolio. The *Duff* Suit alleges that Liberty agreed to loan EquityBuild $9.2 million (the same loan at issue in the Liberty matters). The pleading further alleges, "[t]o ensure the closing of the Liberty Loan, therefore, EquityBuild Finance created payoff letters that falsely understated the total outstanding balance of the mortgage loan to which it related; and Ms. Salajanu delivered these inaccurate payoff letters to the title company." The *Duff* Suit further alleges, "[r]eleases of the corresponding mortgages lacking the signatures of the mortgagees and other unauthorized were created by Shaun Cohen and delivered by Ms. Salajanu to the title company."

According to the Amended Complaint, because the outstanding balances of the mortgages was reduced, EquityBuild needed $4.4 million in cash to close on its loan with Liberty. The *Duff* Suit alleges that Ms. Salajanu and RFC assisted Jerry in preparing a loan agreement pursuant to which SSDF7 Portfolio 1, LLC (an entity EquityBuild formed to acquire title to the seventeen properties and enter into the loan agreement with Liberty) would borrow cash from a California company prior to closing and return the money back to the California company at closing. The *Duff* Suit alleges that RFC and Ms. Salajanu provided "active and knowing assistance and participation" in diverting artificially-reduced payoffs to the California company that should have gone to mortgagees (the investors).

The Amended Complaint alleges that, to assist Jerry in attempting to conceal this scheme, RFC and Ms. Salajanu filed articles of organization in Wyoming to create a limited liability company

FILED DATE: 12/17/2021 3:37 PM    2020L004725

with the same name as the loaning California company. The *Duff* Suit specifically alleges that during "the period that Ms. Salajanu assisted the Cohens with the closing of the Liberty loan and prior thereto, she was aware of ample information indicating that EquityBuild and EquityBuild Finance were operating a Ponzi scheme and defrauding investors."

The *Duff* Suit alleges that, on August 15, 2018, the SEC brought a lawsuit that details the fraud and Ponzi scheme. The Amended Complaint alleges that, between 2014 and August 2018, RFC and Ms. Salajanu "(a) knew and were aware of the improper conduct described above orchestrated by the Cohens; (b) were aware of the conduct by Jerome Cohen and Shaun Cohen who had fiduciary positions with Company, and were aware of the breach of those duties to EquityBuild by engaging in the conduct described above; (c) knowing and substantially assisted and facilitated the fiduciary breaches against the interest of their clients, namely EquityBuild; and (d) benefitted directly and/or indirectly from these fiduciary breaches."

The *Duff* Suit specifically alleges that Ms. Salajanu and RFC were intimately involved in the creation of the documentation that was necessary to advance the various schemes, including the preparation of corporate documentation, the preparation of false settlement statements, the submission of unauthorized release, and the submission of payoff letters containing falsely understated account balances, and then delivering all of the foregoing to escrow officers and lenders which facilitated the Cohens' misappropriation of refinance proceeds from investor-lenders.

## **RESERVATION OF RIGHTS**

Argonaut Insurance Company issued a claims-made-and-reported Professional Liability Insurance Policies to RFC as the Named Inured bearing policy no. LPL4207045-0, effective from December 28, 2017 to December 27, 2018 ("Argonaut Policy").[1] The Argonaut Policy provides a Limit of Liability of $5,000,000 for each claim and in the aggregate, subject to a $25,000 deductible for each "Claim."

The Insuring Agreement of Section I (Coverages) of the Argonaut Policy provides, in relevant part, as follows:

1.    Professional Liability

The **Insurer** agrees to pay on behalf of the **Insured**, **Loss** in excess of the Deducible amount and up to the Limits of Liability shown in Item 4 of the Declarations; provided that such **Loss** results from a **Claim** first made and reported in writing during the **Policy Period** or Extended Reporting Period, in applicable, arising out of a **Wrongful Act** committed before the end of the **Policy Period** and on or after the **Retroactive Date**, if any, shown in the Declarations.

---

[1] Argonaut's October 16, 2018 letter references the correct policy number, but it inadvertently identifies a policy period of December 28, 2018 to December 28, 2019, a policy period incepting after the date on which Argonaut issued its letter. That correspondence should have identified a policy period of December 28, 2017 to December 28, 2018. This letter shall serve to remedy that typographical error.

FILED DATE: 12/17/2021 3:37 PM    2020L004725

The Argonaut Policy provides coverage for "Loss" in excess of a $25,000 per "Claim" Deductible up to the $5 million Limit of Liability. Section III (Definitions) of the Argonaut Policy defines the term "Loss" and the related term "Defense Costs" to mean, in relevant part, the following:

E.    **Defense Costs** means:

1.    reasonable and necessary fees, costs and expenses charged by any lawyer consented to or designated by the **Insurer** to defend any **Insured** against a **Claim**;

2.    all other reasonable and necessary fees, costs and expenses resulting from the investigation, discovery, adjustment, defense, settlement or appeal of a **Claim** as authorized by the **Insurer**; [. . .]

**Defense Costs** do not include the remuneration, salaries, overhead, fees or expenses of either the **Insured's** or the **Insurer's** regular employees or officials or any fees or expenses incurred prior to the time that a **Claim** is first made against any **Insured** and reported to the **Insurer**. **Defense Costs** will be paid first and will reduce, and may exhaust, the Limits of Liability shown in Items 4 and 5 of the Declarations.

\* \* \*

L.    **Loss** means a monetary judgment or settlement that an **Insured** becomes legally obligated to pay as a result of a **Claim**, including punitive or exemplary damages where insurable under applicable law.

1.    **Loss** includes:

a.    **Defense Costs**;

\* \* \*

2.    **Loss** does not include:

a.    any fines, penalties, taxes or sanctions, whether imposed by law or otherwise (except as provided above with respect to punitive or exemplary damages [. . .]);

b.    the return, reduction or restitution of fees or costs including any recovery of an overcharge for, or offset due, for legal fees or costs, or any other consideration paid to, or payable to, or received by any **Insured** [. . .];

c.    amounts which are uninsurable under applicable law; or

d.    the cost of complying with any injunctive, declaratory or administrative relief.

The Argonaut Policy affords coverage for "Loss," which includes "Defense Costs." Payment of attorneys' fees and costs to defend RFC (and Ms. Salajanu) [2] in the Liberty matters and the *Duff* Suit (to the extent Argonaut owes a duty to defend the *Duff* Suit) reduce the Limit of Liability of

---

[2] Argonaut will be issuing a coverage position letter to Ms. Salajanu under separate cover.

September 30, 2020
Page 6

FILED DATE: 12/17/2021 3:37 PM    2020L004725

the Argonaut Policy. In other words, "Defense Costs" are part of and *not in addition to* the Limits of Liability.[3]  Please contact me if you have any questions about the policy's eroding limit.

According to the Insuring Agreement of the Argonaut Policy, the policy affords coverage for "Loss" resulting from a "Claim" *first made and reported* in writing during the "Policy Period." Section III (Definitions) of the Argonaut Policy defines the term "Claim" and the related terms "Professional Services" and "Wrongful Act" to mean, in relevant part, the following:

> B.  **Claim** means any of the following arising from a **Wrongful Act**:
>
>> 1.  a written demand received by any **Insured** for monetary, non-monetary or injunctive relief, including a written demand that the **Insured** toll or waive a statute of limitations;
>> 2.  a civil proceeding against any **Insured** commenced by the service of a complaint or similar pleading;
>> 3.  the institution of an arbitration, mediation, or other alternative dispute resolution proceeding against any **Insured;** [. . .]
>> \* \* \*
>
> W.  **Professional Services** means services and activities performed for others in the **Insured's** capacity as:
>
>> 1.  a lawyer;
>> \* \* \*
>> 4.  a title insurance agent;
>> 5.  a designated issuing lawyer to a title insurance company;
>> \* \* \*
>
> EE.  **Wrongful Act** means any actual or alleged act, error, omission or breach of duty by any **Insured** in the rendering of or failure to render **Professional Services**. **Wrongful Act** also means an actual or alleged **Personal Injury Offense** by any **Insured** in the rendering of or failure to render **Professional Services**.

The Liberty Letter, the *Liberty* Suit, and the *Duff* Suit all qualify as "Claims" as defined by the Argonaut Policy, to the extent they allege an act, error, omission, or breach of duty in the rendering of or failure to render "Professional Services."  The Argonaut Policy affords coverage for "Claims" first made against RFC between December 28, 2017 and December 28, 2018, and first reported to Argonaut during that same time frame. The Liberty Letter, dated August 17, 2018, was reported to Argonaut during the effective dates of the Argonaut Policy. As such, the Liberty Letter is a "Claim" first made against RFC and reported to Argonaut during the effective dates of the Argonaut Policy.

---

[3] Section II (Limits of Liability and Deductible) provides:

> 3.  **Defense Costs** are part of and not in addition to the Limits of Liability. Payment of **Defense Costs** by the **Insurer** will reduce, and may exhaust, the Limits of Liability.

FILED DATE: 12/17/2021 3:37 PM    2020L004725

The *Liberty* Suit and the *Duff* Suit were filed on April 29, 2020 and August 17, 2020, respectively, and reported to Argonaut shortly after filing. As such, they were technically made against RFC and reported to Argonaut during the policy in effect from December 28, 2019 to December 28, 2020. The Argonaut Policy, however, contains express rules for multiple "Claims" arising from related "Wrongful Acts."  Specifically, Section VI (General Conditions) of the Argonaut Policy provide in relevant part as follows:

> C.       Multiple Wrongful Acts, Claims or Claimants
>
> Two or more **Claims** arising out of a single **Wrongful Act**, or any series of related **Wrongful Acts**, will be considered a single **Claim**. Each **Wrongful Act**, in a series of related **Wrongful Acts**, will be deemed to have occurred on the date of the first such **Wrongful Act**.

Argonaut has determined that the *Liberty* Suit and the *Duff* Suit arise out of the same "Wrongful Act" as the Liberty Letter and/or the same series of related "Wrongful Acts" as the Liberty Letter. As such, the Liberty Letter, *Liberty* Suit, and the *Duff* Suit constitute a single "Claim" deemed first made and reported to Argonaut at the time of the Liberty Letter. As such, the only policy potentially implicated by the Liberty Letter, the *Liberty* Suit, and the *Duff* Suit is the Argonaut Policy referenced in this correspondence.

Coverage under the Argonaut Policy is subject to exclusions. Exclusion A of the Argonaut Policy precludes coverage for a "Claim":

> A.       arising out of a **Wrongful Act** [. . .] occurring prior to the **Policy Period** if, prior to the effective date of the first Lawyers' Professional Liability Insurance Policy issued by the **Insurer** to the **Named Insured** and continuously renewed and maintained in effect prior to the inception of this **Policy Period**:
>
> 1.       any **Insured** gave notice to any prior insurer of any such **Claim**, (including any **Potential Claim** that might lead to a **Claim**), **Wrongful Act**, [. . ]; or
> 2.       any **Insured** had a reasonable basis to believe that the **Insured** had committed a **Wrongful Act**, violated a disciplinary rule, or engaged in professional misconduct.

The Argonaut Policy is the first Lawyers' Professional Liability Insurance Policy issued by Argonaut to RFC. As such, Exclusion A precludes coverage, in relevant part, for "Claims" arising out of a "Wrongful Act" occurring prior to December 28, 2017 if prior to that date, *any "Insured"* had a reasonable basis to believe that the "Insured" had committed a "Wrongful Act," violated a disciplinary rule, or engaged in professional misconduct. The *Duff* Suit makes the following allegations:

■ Between 2014 and August 2018, RFC and Ms. Salajanu "(a) knew and were aware of the improper conduct described above orchestrated by the Cohens; (b) were aware of the

conduct by Jerome Cohen and Shaun Cohen who had fiduciary positions with the Company, and were aware of the breach of those duties to EquityBuild by engaging in the conduct described above; (c) knowing and substantially assisted and facilitated the fiduciary breaches against the interest of their clients, namely EquityBuild; and (d) benefitted directly and/or indirectly from these fiduciary breaches."

- In late May 2017, Jessica Baier (an EquityBuild employee in Florida) contacted Ms. Salajanu by telephone. During that call, Ms. Baier allegedly informed Ms. Salajanu "that EquityBuild was committed widespread mortgage fraud, that Jerry Cohen and Shaun Cohen were raiding construction escrows that held funds raised from investor-lenders (and earmarked for property improvement) and diverting the monies for personal uses, including, among other things, overseas trips to Turkey and Israel." According to the Amended Complaint, Ms. Baier informed Ms. Salajanu "of numerous improprieties in EquityBuild's operations including, among other things, the misallocation of investor-lender funds." Rather than investigate the matter further, Ms. Salajanu told Jerry about the conversation and continued to knowingly advance the schemes of the Cohens.

- In early February 2017, EquityBuild was the subject of an SEC investigation into the Ponzi scheme.

These allegations support the conclusion that, prior to the inception of the Argonaut Policy, RFC and/or Ms. Salajanu (also an "Insured" as a past employee of RFC) were aware of a client's Ponzi scheme and performed legal work to advance that scheme, thereby giving one or both a reasonable basis to believe a "Wrongful Act" had been committed. As part of Argonaut's ongoing investigation into coverage, please provide me with documents and communications relevant to these allegations (including information showing RFC's involvement in the SEC investigation), as well as any other information RFC's believes is relevant to Argonaut's coverage investigation. Argonaut is making a similar inquiry to Ms. Salajanu. Argonaut reserves the right to the extent coverage may be excluded, in whole or in part, based on Exclusion A.

The preamble to the Professional Liability Insurance Coverage Form states, in relevant part, as follows:

> In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the **Insurer**, and subject to all of the terms and conditions of this policy (including all endorsements hereto), the **Insurer** agrees with the **Insured** to provide insurance as stated in this policy.

Additionally, Section VI (General Conditions) of the Argonaut Policy provides, in relevant part, as follows:

> P.    Representations
>
>       By accepting this policy, all **Insureds** agree that all statements made and furnished to the **Insurer** are true, accurate and complete, and that this policy

FILED DATE: 12/17/2021 3:37 PM    2020L004725

September 30, 2020
Page 9

has been issued in reliance upon the truth and accuracy of those representations, subject to all of the terms and conditions of this policy.

Argonaut issued the Argonaut Policy based on statements made and information furnished by RFC. Specifically, in a letter dated December 20, 2017, RFC certified that "after inquiry of all officers, managers and associates, [it] is not aware of any **claims** against the **insured** or circumstances, incidents, disputes or fee problems that may give rise to a **claim** against the **insured**, other than those disclosed in the application." The application did not disclose the Ponzi scheme or the SEC investigation involving services RFC rendered to one or more of the EquityBuild entities. Argonaut reserves the right to assert material breach of the Argonaut Policy and to seek rescission of the policy to the extent RFC did not disclose in its application all circumstances, incidents, or disputes that may give rise to a claim under the Argonaut Policy.

Exclusion B of the Argonaut Policy precludes coverage for a "Claim":

B.      arising out of any actual or alleged intentional, criminal, dishonest, malicious or fraudulent act, error or omission by any **Insured** if such intentional, criminal, dishonest, malicious or fraudulent act, error or omission is established by a final adjudication of the **Claim** in any judicial, administrative or alternative dispute resolution proceeding.

This Exclusion does not apply to any **Personal Injury Offense** that results from any **Professional Services** by any **Insured**.

For purposes of this Exclusion, no such act of one of the **Insureds** will be imputed to any of the **Insureds** who were not aware of and did not participate in such act.

Exclusion B. applies if an intentional, criminal, dishonest, malicious or fraudulent act, error or omission is established by a final adjudication. The *Liberty* Suit alleges that RFC knew of the untrue nature of their representations in Ms. Salajanu's Liberty loan opinion letter, which ultimately led to a breach of their duty of care owed to Liberty. The *Duff* Suit alleges that RFC aided and abetted a Ponzi scheme. While not exhaustive of allegations that could potentially trigger Exclusion B if proven at trial, Argonaut reserves its rights accordingly.

**This letter should not be construed as a determination by Argonaut that there is no coverage for the *Duff* Suit. Rather, Argonaut's investigation into coverage for that lawsuit is ongoing pursuant to this reservation of rights.**

That this letter does not reference other provisions of the Argonaut Policy or other principles of law is not intended to waive any such right or defenses Argonaut may have under the Argonaut Policy and applicable law, and Argonaut expressly reserves its rights to assert any and all such defenses to coverage. Please note that no action taken by Argonaut in investigating, evaluating, or monitoring this matter should be considered an estoppel or waiver of any rights or policy defenses that may be available now or at any time. Argonaut reserves all of its rights and defenses under the terms, conditions, and provisions of the Argonaut Policy, including the right to assert that no

FILED DATE: 12/17/2021 3:37 PM    2020L004725

FILED DATE: 12/17/2021 3:37 PM  2020L004725

coverage is available under the Argonaut Policy. In addition to the foregoing, certain claims, injuries, and/or damages may be further limited or excluded entirely by policy provisions that have not been specified because their applicability is unknown at this time.

Please feel free to call me if you would like to discuss this matter.

Sincerely,

David Dineen, J.D.
Sr. Technical Specialist
On Behalf of Argonaut Insurance Company

Argo Group US
PO Box 469009
San Antonio, TX 78246
T:  (617) 235-6123 | david.dineen@argogroupus.com

FILED
5/21/2020 10:00 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L004725

9299125

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

LIBERTY EBCP, LLC, a Delaware limited
liability company,

Plaintiff,

v.

ROCK FUSCO & CONNELLY, LLC, an
Illinois limited liability company and IOANA
SALAJANU, an individual,

Defendants.

Case No.:  2020 L 004725

Hearing Date: 7/29/2020 9:00 AM - 9:00 AM

## MOTION FOR VOLUNTARY DISMISSAL

In accordance to 735 ILCS 5/2-1009, Plaintiff Liberty EBCP, LLC, by its attorneys, moves

to voluntarily dismiss this action without prejudice and without costs, the defendants (a) having

waived service of process with a copy of the waiver having been filed with the Court, and (b)

having not yet filed an appearance in the matter.

**WHEREFORE**, Liberty EBCP, LLC, respectfully requests that this Court enter an order

dismissing this matter without prejudice and without costs.

Respectfully,

**LIBERTY EBCP, LLC**

By:    _/s/ Steven P. Blonder_
        One of Their Attorneys

Steven P. Blonder
MUCH SHELIST, P.C.
191 North Wacker Drive, Suite 1800
Chicago, Illinois 60606
(312) 521-2000
Firm Id. 48345
sblonder@muchlaw.com

Exhibit

2

FILED DATE: 5/21/2020 10:00 AM   2020L004725

## CERTIFICATE OF SERVICE

I, Steven P. Blonder, an attorney, hereby certify that on May 21, 2020, a true and correct copy of ***Plaintiff's Motion for Voluntary Dismissal*** was electronically filed with the Clerk of the Court using the Odyssey-eFileIL system, which will send electronic notification of such filing and via e-mail to the following:

Mark D. Belongia
Ramses Jalalpour
Johnson & Bell
33 W. Monroe Street, Suite 2700
Chicago, IL 60603
belongiam@jbltd.com
jalapourr@jbltd.com

*/s/ Steven P. Blonder*

10833096_1