UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> EQUITYBUILD, INC., *et al.*, <br><br> Defendants. | Civil Action No. 18-CV-5587 <br><br> Hon. John Z. Lee |

**SEC'S POSITION STATEMENT FOR GROUP 1 OF THE CLAIMS PROCESS**

Pursuant to the Court's Orders regarding the Claims Resolution Process (ECF Nos. 941, 1091), the SEC submits this Position Statement for the Group 1 properties. The SEC's position is that the investors who obtained valid prior-in-time mortgages, who never authorized the fraudulent release of their mortgages, and who never received payment in connection with such releases, have priority over Institutional Lender BC57. Because the investors' "releases" are facially defective and do not purport to release the investors' mortgages, their prior-in-time mortgages remain valid. Moreover, because BC57 had the requisite notice to investigate further, BC57 cannot meet its burden of establishing "*bona fide* purchaser" status.

Accordingly, the Court should find that the defrauded investors have lien priority and are entitled to a distribution of the proceeds of the Receiver's property sales.

**I.    FACTUAL BACKGROUND**

    **A.  Jerome and Shaun Cohen Perpetrate a $135 Million Ponzi Scheme.**

This claims priority dispute originated with a real-estate Ponzi scheme perpetrated by Defendants Jerome and Shaun Cohen, and their companies, Defendants Equitybuild, Inc.

("Equitybuild") and Equitybuild Finance, LLC ("Equitybuild Finance"). Beginning in 2010, the Cohens raised at least $135 million from more than 900 investors. (ECF 5, Declaration of Ann Tushaus in support of the SEC's TRO Motion ("Tushaus Decl."), ¶¶ 10-11). The Cohens do not contest the complaint's allegations (*see* ECF 29), which are supported by Ms. Tushaus' Declaration (ECF 5). And no claim process participant has disputed that the Cohens conducted a fraudulent securities offering or that the investor-claimants are victims of the Cohens' fraud.

> B. The Investors' Investments Were Secured by Real Mortgages that Were Issued and Filed Prior in Time to BC57's Mortgage.

For most of their scheme, the Cohens sold promissory notes backed by real estate, typically on Chicago's South Side. (Tushaus Decl., ¶¶ 10, 14-17; ECF 5-1). The promissory notes typically reference specific residential buildings that Equitybuild would purportedly purchase and renovate using pooled investor funds. (Tushaus Decl. ¶ 17; ECF 5-1). The Cohens represented that the notes were secured by a fractional interest in a mortgage on the identified property. (*Id.*). The Cohens structured the mortgages such that Equitybuild was the "borrower" and investors were collectively the "lenders" and holders of the security interest memorialized by each mortgage. (Tushaus Decl., ¶ 18; *see also* Exs. 1 through 5 (investor mortgages)).[1]

In connection with their investments, investors executed "Collateral Agency and Servicing Agreements" ("CAS Agreements") which authorized Equitybuild Finance to act as the "collateral agent" and "loan servicer" on the investors' mortgages. (Tushaus Decl. ¶ 18; *see also* Exs. 6-10 (sample CAS Agreements), § 2(a)). For four of the five Group 1 properties, the investors' mortgages thus describe each "Lender" as "The Persons Listed on Exhibit A to the Mortgage **c/o *Equitybuild Finance, LLC***." (Exs. 2 through 5 (emphasis added)). For the fifth property, 7752 S. Muskegon, the mortgage describes the "Lender" as "The Persons Listed on

---

[1] The exhibits cited herein are attached to an Index of Exhibits filed along with this Position Statement.

Exhibit A to the Mortgage **c/o *Hard Money Company LLC***."[2] (Ex. 1). The Exhibit A attached to each mortgage lists the investors, their principal investment amount, and each investor's percentage interest in the mortgage. (Exs. 1-5). Between February 2015 and September 2016, Equitybuild filed the investors' mortgages with the Cook County Recorder of Deeds. (*Id.*).

By September 2017, the Cohens' scheme had begun to flounder. In need of cash to keep it afloat, Equitybuild obtained from BC57 a short-term (one-year), $5.3 million loan that charged 11% interest. (Ex. 21 (Loan Agreement) p. 30).[3] As collateral for the loan, BC57 received a mortgage on the subject properties (*id.*, p. 1; Ex. 22 (Mortgage)), which BC57 understood were operating at a loss. (Ex. 26 (Jarjosa Dep. Tr.) at 109:1-5). BC57's high-interest, short-term loan backed by real estate collateral is consistent with the definition of a "hard money" loan proffered by BC57's expert. (Ex. 34 (Expert Report), p. 15 n.49 ("A hard money loan is a type of loan that is secured by real property. Hard money loans are considered loans of 'last resort'…")).

BC57 concedes that the investors' mortgages "were recorded prior" to its mortgage. (ECF 1054, p. 2 ¶ 3).

### C. The Investors Never Authorized the Release of Their Mortgages and Were Never Repaid.

Contrary to BC57's claims, the CAS Agreements *did not* authorize Equitybuild Finance to release the investors' mortgages. Rather, the CAS Agreements generally authorize Equitybuild Finance to perform "ministerial and administrative" functions to service the investors' mortgages. (Exs. 6-10, § 2(a)). However, the agreements place express prohibitions

---

[2] Hard Money Company LLC was an Equitybuild Finance predecessor company owned by Equitybuild whose sole officer was Shaun Cohen. (ECF 1, ¶¶ 14, 16). BC57 understood Hard Money LLC to be "an affiliate of EquityBuild Finance." (Ex. 35, BC57 Standard Interrog. Resp. No. 1.)

[3] In comparison, the prevailing rates for a 30-year mortgage in September 2017 were less than 4%, with lower rates being charged for shorter duration loans. *See*, Federal Financial Institutions Examination Council, *Mortgage Rate Survey Data*, available at: https://www.ffiec.gov/ratespread/mortgagerates.htm.

on Equitybuild Finance's ability to alter or extinguish the investors' security interests. Examples include:

- "IN THE ABSENCE OF WRITTEN INSTRUCTIONS FROM THE REQUIRED LENDERS [the majority of investors, in terms of investment proceeds, on each mortgage], NEITHER THE COLLATERAL AGENT NOR THE SERVICER SHALL FORECLOSE UPON ANY LIEN WITH RESPECT TO ANY OF THE COLLATERAL OR TAKE ANY OTHER ACTION WITH RESPECT TO THE COLLATERAL OR ANY PART THEREOF." (Exs. 6-10, § 3).

- "the Collateral Agent [Equitybuild Finance] shall have no obligation to, and shall not, take any action hereunder or under the Mortgage except upon written instructions from the Required Lenders in accordance with Section 6(a)." (*Id.*, § 4(a)(ii)).

- the "Collateral Agent shall act only on written instructions from all Lenders with respect to the amendment or termination of the Mortgage…" (*Id.*, § 6(a)).

The SEC is unaware of the investors providing written authorization to release their mortgages. Indeed, no investor who BC57 deposed testified they authorized the release of their mortgage or any other security interest in the subject properties. (*See, e.g.*, Ex. 32 (Young Dep. Tr.) at 39:8-42:12; Ex. 31 (Wolff Dep. Tr.) at 36:15-37:5; 39:3-40:17; Ex. 24 (Anglin Dep. Tr.) at 29:21-30:5, 34:17-21; Ex. 29 (Pong Dep. Tr.) at 20:18-21:4; Ex. 27 (Meekoms Dep. Tr.) at 30:15-31:17). Similarly, in response to interrogatories, BC57 could not identify written instructions by the investors to release their mortgages. (Ex. 36 (BC57 Resp. to Interrogs.)).

BC57 and its expert concede the investors were not repaid in connection with any release of their mortgages. (Ex. 36, Answer 1 and 2; Ex. 33 (Nielson Dep. Tr.) at 153:19-22). This is consistent with the investors' testimony that they never received any such payments. (*See* Ex. 32 at 42:3-16; Ex. 31 at 37:6-22, 39:14-40:1; Ex. 24 at 31:2-33:17; Ex. 29 at 19:19-21:4; Ex. 27 at 31:18-32-9).

4

### D. The Payoff Statements Name a Different Lender than the Mortgages.

Before BC57 issued its loan, Equitybuild Finance provided "payoff statements" listing the amount of money for BC57 to pay for each property and wiring instructions for BC57 to send the funds to Equitybuild Finance. (Exs. 11 to 15 (payoff statements)). The payoff statements identify the following parties, each "C/O EquityBuild Finance, LLC," in the "From" lines: "7752 S Muskegon Investors"; "3074 E Cheltenham Investors"; "7201 S Constance Investors"; "7625-35 S East End Investors"; and "7635 S East End Investors." (*Id.*).

The parties identified in the "From" line ("Investors C/O Equitybuild Finance") are thus described differently than the "Lender" listed on each mortgage: "*The Persons Listed on Exhibit A to the Mortgage* c/o" either Equitybuild Finance, LLC or Hard Money Company LLC. (Exs. 1 to 5). Moreover, the 7625 East End payoff statement purports to be from "7625-35 S East End Investors," even though the 7625 and 7635 properties are subject to distinct mortgages and releases. (*Compare* Ex. 14 (payoff statement) *with* Exs. 4 and 5 (mortgages)).

### E. The "Releases" of the Investor Mortgages Were Facially Defective.

After receiving payment from BC57, the Cohens filed "Release Deeds" with the Cook County Recorder ("Releases") that purported to release the investors' mortgages. (*See* Exs. 16-20 (Release Deeds)). As described below, those Releases are facially defective and do not effect a release of the investors' mortgages.

*The Releases Name the Wrong Releasing Party*: The operative text of each Release names Equitybuild as the releasing party and Equitybuild Finance as the party receiving the release. (Exs. 16-20) ("Equitybuild, Inc.…does hereby remise, convey, release and quit-claims unto Equitybuild Finance LLC…")).[4] This conflicts with the investor mortgages, which list

---

[4] BC57 concedes the Releases "identify EquityBuild Inc. as the releasing party." (Ex. 35, BC57 Standard Interrog. Resp. 1).

5

Equitybuild as the *borrower* and the investors as the *lenders*. (Exs. 1-5). Even assuming, arguendo, that the investors had authorized Equitybuild *Finance* to release their mortgages, there is no contention that *Equitybuild* held the mortgages or was entitled to release them. Thus, the Releases are facially defective because they name a releasing party that had no security interest in the subject properties and no entitlement to release the mortgages. In other words, the express terms of the Releases do not have the holder of any mortgage releasing its security interest, and the Releases do not extinguish the investors' prior-in-time mortgages.

*The Releases are Executed by the Wrong Party*: The signature line for each Release names "Equitybuild Finance, LLC" and is signed by Shaun Cohen as "Manager." (Exs. 16-20). This conflicts with the text of the Releases, which name Equitybuild as the releasing party. It also conflicts with the mortgages themselves, which identify as the lender: "The Persons Listed on Exhibit A to the Mortgage C/O EquityBuild Finance, LLC." (Exs. 2-5). Again, the party executing the Releases (Equitybuild Finance) is different than the parties holding the Mortgages (the investors "Listed on Exhibit A" to the Mortgages). Even assuming that Equitybuild Finance was authorized to act as the investors' agent, the Releases do not identify Equitybuild Finance acting in an agency capacity. Indeed, the Releases make no mention of the investors whatsoever, let alone identify them as the parties holding the mortgages or authorizing their release.

This discrepancy is even more pronounced for the 7752 S. Muskegon Release (Ex. 16). Whereas the Muskegon mortgage lists the lender as "The Persons Listed on Exhibit A to the Mortgage C/O *Hard Money Company, LLC*," the Release is executed by *Equitybuild Finance*. (*Compare* Ex. 1 (emphasis added) *with* Ex. 16).

The below chart lists the discrepancies between the parties identified on the mortgages, releases, and payoff letter statements:

6

| Property | "Lender" identified on Mortgage | "From" Line on Payoff Statement | Releasing party listed on Release | Party executing Release |
|---|---|---|---|---|
| 7752 S. Muskegon | *The Persons Listed on Exhibit A to the Mortgage* c/o **Hard Money Company, LLC** | *7752 S Muskegon Investors* C/O EquityBuild Finance, LLC | Equitybuild, Inc. | Equitybuild Finance, LLC |
| 3074 E. Cheltenham | *The Persons Listed on Exhibit A to the Mortgage* c/o Equitybuild Finance, LLC | *3074 E Cheltenham Investors* C/O EquityBuild Finance, LLC | Equitybuild, Inc. | Equitybuild Finance, LLC |
| 7201 S. Constance | *The Persons Listed on Exhibit A to the Mortgage* c/o Equitybuild Finance, LLC | *7201 S Constance Investors* C/O EquityBuild Finance, LLC | Equitybuild, Inc. | Equitybuild Finance, LLC |
| 7625 S. East End | *The Persons Listed on Exhibit A to the Mortgage* c/o Equitybuild Finance, LLC | *7625-35 S East End Investors* C/O EquityBuild Finance, LLC | Equitybuild, Inc. | Equitybuild Finance, LLC |
| 7635 S. East End | *The Persons Listed on Exhibit A to the Mortgage* c/o Equitybuild Finance, LLC | *7635 S East End Investors* C/O EquityBuild Finance, LLC | Equitybuild, Inc. | Equitybuild Finance, LLC |

### F. BC57's Lack of Due Diligence Failed to Discover that the Investors Had Neither Been Repaid Nor Authorized the Release of Their Mortgages.

BC57's employees, attorney, and title insurers approved the short-term, high-interest Equitybuild loan despite the above-described discrepancies on the investors' mortgages, releases, and payoff statements. As detailed below, BC57's insufficient due diligence resulted in it failing to discover the investors never authorized the release of their mortgages and were not repaid.

*BC57 Employees:* Matthew Turzewski, who managed BC57's loan to Equitybuild, did not recall reviewing the investors' mortgages, the documents they signed related to those mortgages (including the CAS Agreements), the Releases, or the payoff statements. (Ex. 30 at 111:1-112:17). Jason Jarjosa, another BC57 employee, similarly did not recall reviewing the

7

Releases, and did not believe anyone at BC57 reviewed the payoff statements. (Ex. 26 at 91:4-14, 92:2-93:7). Jarjosa believed it was not BC57's job to review the Releases or ensure they were valid. (*Id.* at 114:3-115:-20).

*BC57's Attorney:* Kasturi Bagchi, BC57's outside attorney, initially reviewed draft releases that had signature lines for Jerome Cohen, in his individual capacity, even though he was the "primary controller" of the *borrower*, Equitybuild. (Ex. 37, (Sept. 18, 2017 Bagchi email), p. 2; Ex. 25 (Bagchi Dep. Tr.) at 19:8-22:21). Bagchi advised BC57 that the releases instead needed to be signed by Equitybuild Finance. (*Id.*). She later approved the revised releases, even though those releases "looked really unusual." (Ex. 25 at 16:6-23). Bagchi was accustomed to seeing release documents titled "Release of Mortgage," not "Release Deed." (*Id.* at 16:6-23).[5] Earlier in the due diligence process, Bagchi received an email where Equitybuild employees noted that the "optics aren't good" for payoff statements they had prepared directing the payoff to the borrower, Equitybuild, as opposed to Equitybuild Finance. (Ex. 38 (Sept. 18, 2017 Salajanu email), p. 2-3).[6]

Despite these observations, BC57's attorney failed to identify whether the Releases correctly identified the borrower and lender. (Ex. 25 at 16:24-17:9). Rather, the only step the attorney took to make sure the investors' mortgages were released was to "rely on the title insurance company." (*Id.* at 62:15-63:14). The attorney likewise did nothing to make sure the

---

[5] BC57's expert agreed that "Release Deed" is "not a commonly used term" and that he could not recall a "release deed" being used to release an Illinois mortgage. (Ex. 33 (Nielson Dep. Tr.) at 111:4-11, 112:3-11). BC57's expert further testified it was "somewhat unusual" that the investors' mortgages identified both their names and the name of their loan servicer (Equitybuild Finance). (*Id.* at 139:10-14, 140:1-8).

[6] When asked about that email, BC57's expert opined it was not normal for a borrower, such as Equitybuild, to instruct a mortgage servicer, such as Equitybuild Finance, how to prepare a payoff statement. (Ex. 33 at 142:21-24).

investors had authorized the releases or had been repaid in connection with any release. (*Id.* at 82:9-83:12). Thus, when discussing the Releases during her deposition, BC57's attorney could not explain why they listed Equitybuild as the releasing party. (*Id.* at 46:10-47:10 ("If EquityBuild, Inc., is the owner, I'm not sure why this deed was set up this way.")).

*BC57's Title Insurance Agent:* BC57's title insurance agent testified that it was the title insurer's responsibility to review the Releases "to confirm that the lender is the same lender as the lender on title" and otherwise make sure the releases are "satisfactory." (Ex. 28 at 19:23-20:22, 50:1-11, 61:19-23). Nevertheless, BC57's title insurance agent did not review the investors' mortgages. (*Id.* at 29:8-22). She also testified that Equitybuild, as the borrower, would not have the ability to release the investors' mortgages, and that the Releases had "*the wrong party releasing something to the wrong party*." (*Id.* at 61:8-62:14, 87:5-16) (emphasis added)). She also testified she did not see any written instructions from the investors authorizing the release of their mortgages. (*Id.* at 67:24-68:12).

*BC57's Expert:* BC57's expert agreed that a borrower is typically not authorized to release a mortgage. (Ex. 33 at 161:5-9). BC57's expert testified that for a release showing Equitybuild – as opposed to the investors or their loan servicer – attempting to release the mortgage, the title insurer "would start with the assumption that that release is *not valid*." (*Id.* at 161:5-19) (emphasis added). He also testified that in instances where the payoff statement directed payment to a third party other than the loan servicer or lender, this would trigger "further inquiry" by the title insurer. (*Id.* at 186:5-187:20). As discussed above, this situation existed for the Muskegon property, where the mortgage purported to list *Hard Money Company* as the loan servicer yet the payoff statement directed payment to Equitybuild Finance. (*Compare*

9

Exs. 1 and 11). Nevertheless, there is no evidence that BC57 or its title insurer engaged in "further inquiry" into the validity of the Releases or payoff statements.

### G. BC57 Obtained Title Insurance to Protect Against its Lien Not Having Priority.

BC57 obtained a title insurance policy, covering each of the subject properties. (Ex. 23 (Insurance Policy)). That policy insures BC57 against: "Any defect in or lien or encumbrance on the Title." (*Id.* p. 1). BC57 is thus insured against a "defect in the Title" caused by reasons including: "forgery," "fraud," "failure of any person or Entity to have authorized a transfer or conveyance," "a document affecting Title not properly created [or] executed," or the "lack of priority of the lien of the Insured Mortgage …over any other lien or encumbrance." (*Id.* pp. 1-2).

BC57's employees understood that the purpose of its title insurance was to compensate BC57 in the event its mortgage was determined not to have first priority. (Ex. 30 at 97:2-21, 126:6-127:22; Ex. 26 at 118:14-119:9). BC57's title agent agreed. (Ex. 28 at 16:6-17:2 ("we insure a lender that they are the first lien holder if that's what they choose to be"). So did BC57's expert. (Ex. 33 at 8:1-9:4, 121:11-19).

BC57 has already submitted a claim against its title insurance company in the course of this litigation. (Ex. 26 at 106:8-10).

## II. ARGUMENT AND LEGAL AUTHORITY

Applying either Illinois law or equitable considerations, the Court should award the defrauded investors the proceeds of the Receiver's sales of the subject properties.

### A. The Investors' Prior-in-Time Mortgages Have Priority.

It is axiomatic that an original mortgage recorded prior in time has priority over a subsequently recorded mortgage on the same property. *See, e.g., Paliatka v. Bush*, 109 N.E.3d 343, 349 (Ill. App. Ct. 2018) ("Generally, the lien that is recorded first in time has priority and is

entitled to satisfaction by the property it binds before other claims."); *see also Fannie Mae v. Kuipers,* 314 Ill. App. 3d 631, 635 (Ill. App. Ct. 2000) ("A presumption exists that the first mortgage recorded has priority").

Until a release satisfying the Illinois Mortgage Act is filed, the original mortgage lien remains in effect. *Fannie Mae*, 314 Ill. App. 3d at 635. In terms of which party must release the mortgage, the Illinois Mortgage Act provides that "a valid release must be prepared, executed, signed and delivered by *mortgagee*." *Walker v. Ocwen Loan Servicing, LLC,* 2016 WL 3035902, at ¶17 (Ill. App. Ct. May 27, 2016) (citing 765 ILCS 905/2) (emphasis added), *leave to appeal denied*, 60 N.E.3d 883 (Ill. 2016). An invalid release is not effective to release a mortgage, including where "the invalidity of the release was obvious on its face because it was not prepared by [the mortgagees] and did not contain their signatures." *Walker*, at ¶17.

When a release is facially invalid, it puts a subsequent lender on "inquiry notice" to "further investigate" whether the original mortgage holder validly released its mortgage and to ascertain whether the original mortgage is still valid. *Walker*, 2016 WL 3035902, at ¶¶17-18; *see also, Szilagyi v. JPMorgan Chase, N.A.*, 2007 U.S. Dist. LEXIS 51241, at *6 (N.D. Ill. July 12, 2007) ("The chain of title discrepancy alone on the face of the irregular Release was enough to put the Trustee on 'inquiry notice' of a possible mistake.").

To the extent BC57 argues the mortgages were released by virtue of BC57 receiving payoff statements or by paying Equitybuild Finance (but not the investors), BC57 is wrong. In *North Shore Cmty. Bank & Trust Co. v. Sheffield Wellington LLC*, the mortgage holder had been repaid but never delivered a release of the mortgage. 20 N.E.3d 104, 117 (Ill. App. Ct. 2014). Deciding whether a proper release had been effectuated, the court rejected the contention that "once a mortgagee receives full payment for the mortgage, the mortgage is deemed released."

11

*Id.* at 117-119. Analyzing the Illinois Mortgage Act, 765 ILCS 905/2, the court held that while "full payment is a *necessary* condition before a mortgagee is obligated to release a mortgage, it does not suggest that full payment, by itself, is a *sufficient* condition to release a mortgage." *Id.* at 118 (emphasis in original). The court similarly held that while the Mortgage Act provides a cause of action when a mortgagee does not release a mortgage after being repaid, the Mortgage Act "does not say that full payment *by itself* releases the mortgage." *Id.* (emphasis in original).

Even BC57's expert agreed that payment to the lender does not release the mortgage. (Ex. 33 at 167:13-15).

### B. BC57 Cannot Qualify as a *Bona Fide* Purchaser.

The "*bona fide* purchaser" doctrine "is purely an equitable one and should not be extended farther than equitable principles warrant." *Mitchell v. Sherman E. McEwen Assocs., Inc.*, 360 Ill. 278, 286 (Ill. 1935) (declining to apply doctrine on equitable principles, noting: "Where the prior legal owner is wholly innocent, has neither done nor omitted to do anything, it is inequitable to sustain the claims of a subsequent holder even though he be also a *bona fide* purchaser.").[7] To gain protection as a "*bona fide* purchaser," BC57 bears the burden of establishing it acquired an "interest in [the] property for valuable consideration without actual or constructive notice of another's adverse interest in the property." *U.S. Bank Nat'l Ass'n v. Villasenor*, 979 N.E.2d 451, 464 (Ill. App. Ct. 2012) (citations omitted); *see also Walker*, 2016 WL 3035902, at ¶15 ("One who takes a mortgage on property with either actual or constructive knowledge of an earlier mortgage, takes the property subject to the earlier mortgage"); *Daniels v. Anderson*, 162 Ill. 2d 47, 60 (Ill. 1994) (a buyer who "receives notice of an outstanding interest,

---

[7] Among the equitable considerations for the Court is the fact that, unlike the defrauded investors, BC57 is protected by the title insurance it purchased to guard against its lien not having priority. Unlike the investors, BC57 will be compensated for its losses regardless of the Court's priority determination.

12

pays the consideration at his or her peril with respect to the holder of the outstanding interest…is not protected as a *bona fide* purchaser and takes the property bound by the outstanding interest").

Accordingly, a subsequent lender cannot rely on a facially defective release to take priority over a prior mortgage. *Walker*, 2016 WL 3035902, at ¶¶17-18; *see also Szilagyi,* 2007 U.S. Dist. LEXIS 51241, at *6-7 (upholding prior lien when release was "irregular"); *Lennartz v. Quilty*, 191 Ill. 174, 179 (Ill. 1901) (purchaser can rely on recorded release "unless there was something to put a reasonable person upon inquiry whether there was some infirmity in the release."); *c.f. Bank of N.Y. v. Langman*, 986 N.E.2d 749, 753 (Ill. App. Ct. 2013) (subsequent lender could rely on release because it was *not* "patently invalid").

Similarly, a lender cannot rely on an unauthorized release if the lender is on inquiry notice that the party signing the release lacked the authority to do so. *Polish Nat'l All. v. Lipinski*, 288 Ill. App. 234, 243, 246-249 (Ill. App. Ct. 1937); *Kennell v. Herbert*, 342 Ill. 464, 468-69 (Ill. 1930); *MB Fin. Bank, N.A. v. Chicago Title Land Trust Co.*, 2019 WL 457645, at ¶95 (Ill. App. Ct. 2019) ("if the third party has notice of any infirmities in the letter of direction and the trustee's authority to act, it enters into the transaction at its own peril.").

In any event, BC57 carries the burden of establishing that Equitybuild Finance was authorized to release the investors' mortgages. *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.*, 759 N.E.2d 174, 181 (Ill. App. Ct. 2001) ("Only the alleged principal's words and conduct, not those of the alleged agent, establish the agent's authority…The party alleging an agency relationship must prove it by a preponderance of the evidence.") (citations omitted).

As with defective releases, a lender cannot rely on a payoff statement if the lender is on inquiry notice as to deficiencies in the statement. *M&T Bank v. Mallinckrodt*, 43 N.E.3d 1039,

1050 (Ill. App. Ct. 2015) (reversing summary judgment to second-in-time lien holder when issues of fact existed about the reasonableness of its reliance on fraudulent payoff statement).

There is no dispute that BC57 was actually aware of the investors' prior mortgages. BC57 also had constructive notice, since the investors' mortgages were filed with the Cook County Recorder. *Villasenor,* 979 N.E.2d at 465; *Hachem v. Chicago Title Ins. Co.*, 46 N.E.3d 879, 887 (Ill. App. Ct. 2015) (where "a mortgage is recorded in the appropriate public office, the public record provides constructive notice to the whole world."). There is also no dispute BC57 possessed the Releases and payoff statements. Even a cursory review would have revealed the Releases listed the wrong releasing party, the Releases were not signed by the parties named on the investor mortgages, and the payoff statements directed payment to a party that was different than the lenders listed on the mortgages.

BC57 claims the CAS Agreements authorized Equitybuild Finance to release the investors' mortgages. But BC57's employees, attorney, and title insurance agent testified that they never reviewed the CAS Agreements prior to BC57 issuing its mortgages. (Ex. 30 at 112:6-17; Ex. 25 at 50:22-51:6; Ex. 28 at 66:11-67:2). Thus, in order for BC57 to establish it should not have been on notice of Equitybuild Finance's lack of authorization, BC57 must identify evidence of the investors' "words and conduct" showing that they conveyed on Equitybuild Finance the authority to release their mortgages. *Amcore Bank*, 759 N.E.2d at 181.

Had BC57 asked for evidence of Equitybuild Finance's authority to release the mortgages, it would have seen that the CAS Agreements do not provide such authority absent express written instructions from the investors. Moreover, BC57's duty to investigate was even greater given that it was making a high-interest "hard money" loan "of last resort," secured by cash-flow negative properties, to an entity BC57 knew was itself borrowing money from a

14

disperse pool of individual investors. *See, e.g.*, *In re Petters*, 499 B.R. 342, 362 (Bankr. D. Minn. 2013) ("abnormally high" rates of return among factors to consider when determining inquiry notice); *Fisher v. Sellis*, 253 B.R. 866, 876 (Bankr. N.D. Ill. 2000) (same); *Zayed v. Buysse*, 2012 U.S. Dist. LEXIS 200506, *108-109 (D. Minn. Sept. 27, 2012) ("lack of formal paperwork" and "relatively high rates of return" can trigger inquiry notice).[8]

### C. BC57 Cannot Rely on Its Title Insurer to Establish Reasonableness.

Claiming that BC57's due diligence was "reasonable and prudent," BC57's expert points to its use of a title insurance company and assurances the insurer provided regarding the validity of the investors' releases. (Ex. 34, p. 13). However, Illinois courts reject the notion that a title insurer's obligations include providing accurate information to its insured. *First Midwest Bank v. Stewart Title Guar.*, 843 N.E.2d 327, 336 (Ill. 2006) ("We conclude, therefore, that a title insurer is not in the business of supplying information when it issues a title commitment or a policy of title insurance."). Instead of providing information about the validity of title, the purpose of title insurance is to protect the insured against loss resulting from any defect in title:

> it is not the purpose of a title commitment to provide a listing of all defects, liens and encumbrances affecting the property. A title commitment is simply a promise to insure a particular state of title. To the extent that the title commitment contains information concerning the title, such information is provided to give notice of the limitations to the risk that the title insurer is willing to insure.

*Id.* at 335 (citations omitted); *see also Midfirst Bank v. Abney*, 850 N.E. 2d 373, 386-387 (Ill. App. Ct. 2006) ("The purpose of the title commitment is to set forth the terms for issuing a policy of title insurance, and the purpose of the policy of title insurance is to insure against the risk of undiscovered defects, liens, and encumbrances.").

---

[8] Additional examples of BC57's insufficient due diligence efforts are described in the Receiver's disclosure of his fraudulent transfer claim against BC57. (ECF 1118).

Accordingly, a title insurer owes *no duty* to its insured to discover defects in title. *Midfirst*, 850 N.E. at 386; *United Cmty. Bank v. Prairie State Bank & Trust*, 972 N.E.2d 324, 338 (Ill. App. Ct. 2012) ("the title search had only one purpose: to enable [the insurer] to decide the exceptions to the coverage it was willing to offer."). BC57 concedes that its purpose in obtaining title insurance was to receive compensation in the event it does not have lien priority. (Ex. 30 at 97:2-21, 126:6-127:22; Ex. 26 at 118:14-119:9; Ex. 28 at 16:6-17:2; Ex. 33 at 8:1-9:4, 121:11-19).

### D. The Court Should Disregard the Legal Conclusions of BC57's Expert.

Expert testimony "as to legal conclusions that will determine the outcome of the case is inadmissible." *Farmer v. DirectSat USA, LLC*, 2013 U.S. Dist. LEXIS 39912, *26-27 (N.D. Ill. Mar. 22, 2013) (Lee, J.) (citations omitted); *see also RLJCS Enters. v. Pro. Ben. Trust*, 487 F.3d 494, 498-499 (7th Cir. 2007) ("Argument about the meaning of trust indentures, contracts, and mutual-to-stock conversions belongs in briefs, not in 'experts' reports.'"). Conversely, an expert may testify as to industry custom and practice, *if* it would be helpful to the trial of fact. *Essex Ins. Co. v. Structural Shop, Ltd.*, 2017 U.S. Dist. LEXIS 77490, *6-7 (N.D. Ill. May 22, 2017) (Lee, J.). However, an expert cannot offer testimony about legal duties, whether someone satisfied those duties, what advice someone "'should have' given as a legal matter," whether conduct "violated the law," the "legal effect" of conduct, whether a party "is estopped from asserting or has waived defenses," what someone "believed or would have done had [a party] acted differently," or that a party "breached…the standard of care." *Id.* at *9-*12.

Applying these principles, the Court should disregard BC57's expert report for offering impermissible legal conclusions. While purporting to "opine on the customs and practices of lenders and title insurers" (Ex. 34, p. 1), the thrust of BC57's expert report is the legal conclusion

16

that BC57's mortgage should take priority over the investors' mortgages. To that end, BC57's expert makes repeated references to "obligations" under Illinois law:

- "Illinois, like almost all other states, has adopted a statute that *obligates* a lender to release its mortgage" (Ex. 34, at 8) (emphasis added);

- "the lender is not *obligated* to consider the loan paid off until payment is received in full. However, buyers and refinancing lenders *must* rely on payoff figures given by the lender…" (*Id.* at 8 n.40) (emphasis added);

- "*Illinois law also provides… Under that law*, a payoff statement is deemed to be accurate…" (*Id.* at 8-9) (emphasis added);

- "*There is a growing body of law*, both statutory and by precedent, to the effect that…" (*Id.* at 9 n.44) (emphasis added);

- "The closing and title agent *must* perform three separate tasks in order to put the refinance loan mortgage in first position." (*Id.* at 7) (emphasis added);

- "This reliance principle is embodied in the Uniform Residential Mortgage Satisfaction Act…which specifically states...." (*Id.* at 9);

- "The most basic *requirements* [of a title insurance policy] are…" (*Id.* at 4 n.15) (emphasis added); and

- "Payment in full *obligates the lender legally* to release its mortgage" (Ex. 33 (Nielson Dep. Tr.) at 166:23-24) (emphasis added).

Beyond the above legal conclusions, BC57's expert offers various citations to real estate laws the expert purports to interpret. (Ex. 34, pp. 8-9 (citing 765 ILCS 905/2, 765 ILCS 935/10, the Uniform Residential Mortgage Satisfaction Act, and 735 ILCS 15-1505.5(a)).[9] Similarly, BC57's expert testified that the investors' releases could be "valid and binding" despite being unauthorized, before disavowing that he was offering an opinion on the subject. (Ex. 33 at 158:12-24; *see also id.* at 159:9-11 ("can someone release a mortgage that they have no authority to release? Yes, it can happen.").

---

[9] BC57's expert offers these legal conclusions and statutory interpretations despite not holding Illinois law or title insurance licenses. (Ex. 33 at 156:8-20, 159:1-2).

17

Simply put, BC57's expert report is precisely the type of legal opinion offered by a real estate attorney that the Court previously advised would be impermissible. (*See* Jan. 29, 2021 Hearing Tr. at 41:3-7 ("an expert that says, well, you know, I'm a real estate lawyer and I believe that the priority should be this, this, this, and this…those types of experts are non-starters…I don't want to see those reports…")).

### III.  CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court find the investors who obtained valid prior-in-time mortgages, who never authorized the fraudulent release of their mortgages, and who never received payment in connection with such releases, have priority over BC57 and are entitled to a distribution of the proceeds of the Receiver's property sales.

Dated:  January 27, 2022                                      Respectfully submitted,

   /s/ Benjamin Hanauer
Benjamin J. Hanauer (hanauerb@sec.gov)
Timothy J. Stockwell (stockwellj@sec.gov)
Alyssa A. Qualls (qualls@sec.gov)
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Phone:  (312) 353-7390
Facsimile: (312) 353-7398

Attorneys for Plaintiff
U.S. Securities and Exchange Commission

## CERTIFICATE OF SERVICE

      I hereby certify that I provided service of the foregoing Position Statement, via ECF filing, to all counsel of record and Defendant Shaun Cohen, and to all claimants via the Receiver's email distribution list, on January 27, 2022.

      /s/ Benjamin Hanauer
Benjamin J. Hanauer
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Phone: (312) 353-7390
Facsimile: (312) 353-7398

One of the Attorneys for Plaintiff