Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ILLINOIS
 2              EASTERN DIVISION
 3  SEC,                )
                        )
 4      Plaintiff,      )
                        )
 5  vs.            )No. 18-cv-5587
                        )
 6  EQUITYBUILD, INC., et al.,  )
                        )
 7      Defendants.    )
 8
 9
10      The virtual deposition of CECILIA WOLFF,
11  taken pursuant to subpoena in accordance with the
12  Federal Rules of Civil Procedure of the United
13  States District Courts pertaining to the taking of
14  depositions, taken before MARYBETH ROESSLER, CSR,
15  RPR, CSR License No. 084-002864, a notary public
16  within and for the County of Will and State of
17  Illinois, taken on Wednesday, October 27, 2021,
18  commencing at about the hour of 3:30 p.m.
19
20
21
22
23
24
```

Page 2

```
 1  APPEARANCES: (all appearing virtually)
 2      Ms. Alyssa A. Qualls
        U.S. Securities and Exchange
 3      Commission
        175 West Jackson Boulevard
 4      Suite 1450
        Chicago, Illinois  60604
 5      312.886.2542
        quallsa@sec.gov
 6        on behalf of U.S. Securities &
          Exchange Commission;
 7
     Ms. Jodi Rosen Wine
 8   Rachlis Duff & Peel, LLC
     542 South Dearborn
 9   Suite 900
     Chicago, Illinois 60605
10   312.275.5108
     jwine@rdaplaw.com
11     on behalf of Kevin B. Duff, Federal
       Equity Receiver for the Estate of
12     EquityBuild, Inc., etc.;
13   Mr. Kevin Connor
     Dykema
14   10 South Wacker Drive
     Suite 2300
15   Chicago, Illinois  60606
     312.627.8322
16   kconnor@dykema.com
       on behalf of BC57;
17
     Mr. Max A. Stein
18   Boodell & Domanskis
     1 North Franklin
19   Suite 1200
     Chicago, Illinois 60606
20   312.938.4070
     mstein@boodlaw.com
21     on behalf of certain investors;
22
23
24
```

Page 3

```
 1  APPEARANCES: (all appearing virtually)
 2      Mr. Michael Kurtz
        Kurtz & Augenlicht
 3      123 West Madison Street
        Suite 700
 4      Chicago, Illinois  60602
        312.265.0106
 5      mkurtz@kalawchicago.com
          on behalf of 1839 Fund I, LLC.
 6
 7      Also Present: (all appearing virtually)
 8      Mr. Robert Jennings
 9
10
...
24
```

Page 4

```
 1              I N D E X
 2
    WITNESS                      PAGE
 3
    CECILIA WOLFF
 4
      Examination
 5      By Mr. Connor            5
 6    Examination
        By Ms. Qualls            36
 7
      Examination
 8      By Ms. Wine              41
 9    Further Examination
        By Mr. Connor            55
10
11  WOLFF EXHIBITS               PAGE
12  No. 1                         25
13  No. 2                         26
14  No. 3                         28
15  No. 4                         42
16  No. 5                         49
17  No. 6                         51
```

Page 5

1           (Driver's licene shown.)
2       MR. CONNOR:  Court reporter, please swear in
3  the witness.
4           (Witness virtually duly sworn.)
5            CECILIA WOLFF,
6  called as a witness herein, having been virtually
7  first duly sworn, was examined and testified as
8  follows:
9                 EXAMINATION
10     By Mr. Connor:
11     Q    Well, good afternoon to you Ms. Wolff.
12  Thank you for sticking with us through those
13  technical difficulties.  I'm glad we were able to
14  get everything worked out.
15          My name is Kevin Connor.  I'm going to
16  be leading this deposition today.  I represent one
17  of the institutional investors in this case, BC57.
18          There are some other attorneys on this
19  call, some of which already introduced themselves
20  to you.  They may want to ask you questions
21  themselves, that's their decision, but I'll be
22  questioning you first.
23          My first question to you is have you
24  ever been deposed before?

Page 6

1     A    No, I haven't.
2     Q    Okay.  Well, then I'd like to just go
3  over a few basic ground rules to make sure we can
4  do this as smoothly as possible.  One of the people
5  on your screen, Marybeth, is a court reporter.
6  She's going to be taking down everything that we
7  say to each other.
8          To ensure we have a nice, clear record
9  and that we make Marybeth's life easier, I'm going
10  to ask that you please do your best to make sure
11  that I'm done asking my question before you start
12  to answer it, and I'll do my best to make sure that
13  I let you finish answering before I start again.
14  This way we don't have two people talking at the
15  same time.
16          On a related note, we do need everything
17  to get down on the record, so please make sure all
18  of your answers are clear and verbal.  Say yes or
19  no.  Don't shake or nod your head.  That's not
20  going to come through in the transcript.
21          Third is if you answer a question, I'm
22  going to assume that you understood it, but please
23  know that if you don't understand the question or
24  you'd like me to clarify it, please let me know,

Page 7

1  and I'm happy to ask it again or in a way that
2  makes sense to you.
3          And finally, if you need to take a break
4  for any reason, to get a glass of water or if you
5  need to make a phone call, we're happy to let you
6  do that.  I only ask that if there is a question
7  pending before you, that you answer the question
8  and then we'll give you a break for as long as you
9  need.
10          Do you have any questions about any of
11  that?
12     A    No, I don't.
13     Q    Okay.  Great.  Your screen is frozen
14  again.  I don't know, do we want to address that
15  now or see if it resets itself like it did last
16  time?
17     A    Sometimes you're screen looks frozen
18  too, so I think it just goes in and out kind of.
19     Q    All right.  I guess we'll just get
20  started and we'll see.  Hopefully -- we're not
21  going to need the screen for a few minutes yet, so
22  hopefully we can get this problem worked out before
23  we need it.
24     A    Okay.

Page 8

1     Q    First, I'd like you to just tell me a
2  little bit about yourself.
3          Do you have any post-high school
4  education?
5     A    Yes.
6     Q    Could you tell me what you did after
7  high school?
8     A    I have a degree.  I've got a degree in
9  public administration.
10     Q    Public administration.  From what
11  school did you --
12     A    A two year -- I'm sorry.
13     Q    No, excuse me.  Please finish what you
14  were saying.
15     A    A four-year degree in public
16  administration.
17     Q    From what school did you get that
18  degree?
19     A    University of San Francisco.
20     Q    University of San Francisco.
21          And in what year did you get that
22  degree?
23     A    2007.
24     Q    2007.  Okay.

Page 9

1  Are you currently employed?
2  A   No. I am retired.
3  Q   Oh, okay.
4      What was your last employment before
5  your retirement?
6  A   I was with the California State
7  Department of Healthcare Services.
8  Q   Okay. And can you give me a basic
9  overview of what your job was?
10 A   Basically I processed applications for
11 providers for the Medicare program.
12 Q   Okay. Thank you.
13 A   You're welcome.
14 Q   I'd like to ask you now about your
15 experience with EquityBuild.
16     Can you tell me how you first became
17 involved with EquityBuild?
18 A   Through emails at the very beginning and
19 then followed by a phone call.
20 Q   Okay. And when you say through emails,
21 did they send you an email first or did you email
22 them first?
23 A   They sent email that I remember.
24 Q   Okay. So was it like a marketing email?

Page 10

1  It wasn't an email that you signed up to get, it
2  was just one that came into your inbox?
3  A   Correct. Yes, it was like marketing
4  email.
5  Q   Got it. Okay.
6      And how long did you email with them or
7  how many emails do you recall sending at your best
8  guess before you spoke to them on the phone?
9  A   It was maybe about ten or so.
10 Q   Okay. And do you remember over what
11 period of time that happened? Was it one week, one
12 month, two months?
13 A   Maybe about between four and five
14 months.
15 Q   Okay. And then you said it moved to
16 phone calls.
17     Did you call them or did they call you?
18 A   I cannot recall if I did call.
19 Q   Okay.
20 A   I don't remember.
21 Q   Okay. That's fine.
22     Do you remember with whom you spoke at
23 EquityBuild?
24 A   At first it was someone that I only --

Page 11

1  his name was Courtney, but I don't know that -- I
2  think he left the company. He was out of Wyoming
3  that I remember.
4  Q   Okay. Did you ever speak to anyone
5  named Shaun that you recall?
6  A   Shaun Cohen, yes. He called me.
7  Q   Do you ever -- I'm sorry, please finish.
8  A   I think the person that I spoke to,
9  Courtney, came to call me and so he did call me. I
10 remember speaking to him.
11 Q   Okay. And can you give me a basic
12 overview, if you recall, of the nature of your
13 conversation with Shaun?
14 A   He was explaining to me that investing
15 in real estate was very -- a good idea and was
16 profitable. You know, explaining that I should
17 come invest with the company.
18 Q   Got it. And was that the only time that
19 you spoke to him? Did you have more than one
20 conversation?
21 A   That I recall it was the only time I
22 spoke to him.
23 Q   Okay. And do you recall when this
24 happened, when your -- let me clarify that.

Page 12

1      Do you recall when you first contacted
2  EquityBuild?
3  A   I think it was around 2013 that I've
4  seen emails that I started, 2013.
5  Q   Got it. And do you recall when you
6  first invested with EquityBuild?
7  A   I think it was the same year, 2013.
8  Q   Okay.
9  A   I'm pretty sure, I think.
10 Q   Okay. Did you invest in EquityBuild
11 with anyone else?
12 A   No, just myself.
13 Q   Okay. Have you ever made any -- before
14 you invested with EquityBuild, had you ever made
15 any other loans like this, any real estate
16 investments?
17 A   Not at all, no. That was the first
18 time.
19 Q   Okay. Before you agreed to invest with
20 EquityBuild, did you do any kind of -- other than
21 speaking with Shaun Cohen and Courtney, did you
22 research them on the internet or anything like
23 that?
24 A   As a matter of fact, I did. I never

Page 13

1 found any derogatory information on the internet at
2 all, which that's why I felt comfortable investing
3 at that time.
4    Q    Okay.  Thank you.
5    A    You're welcome.
6    Q    Okay.  So do you recall -- you have made
7 several investments with EquityBuild; is that
8 correct?
9    A    Yes, that's correct.
10    Q    Okay.  Do you recall what your first
11 investment was?
12    A    The first investment was 50,000 towards
13 the Addison property.  It was supposed to be a
14 home.
15    Q    Okay.
16    A    Later that was sold.  So I did
17 receive --
18    Q    No, please go ahead.
19    A    I did receive a check for the amount of
20 my original investment, plus I think 14,000
21 additional dollars of interest.  Then I got a call
22 from Matt, Matt McQuillen and he asked me if I
23 wanted to reinvest, that I remember, and I said
24 okay, and that became the Kilbourn investment.

Page 14

1    Q    I'm sorry, that became which
2 investment?
3    A    The address of investment was Kilbourn.
4    Q    Kilbourn, okay.
5    A    Yes.
6    Q    Okay.  All right.  And can you tell me a
7 little bit about that investment.  For example, I
8 know you told me you invested in the Addison
9 property and you received a check for all of your
10 money back plus the interest.
11        How did things go with the Kilbourn
12 investment.
13    A    It went very bad.  That's when -- at
14 first they sent me the payment for -- the interest
15 payments and then that stopped.  They were having
16 problems, and that's when I -- that's when
17 everything went bad, so I didn't receive all my
18 interest and my original investment.
19    Q    Got it.  And do you remember around what
20 time you stopped receiving payments?
21    A    I think it's about 2018.
22    Q    Do you recall whether it was winter,
23 sprung, summer, fall.
24    A    Probably, I don't want to say which -- I

Page 15

1 don't really recall.
2    Q    That's fine.  If you don't know, that's
3 perfectly fine.  Okay.
4        So this incident with the Kilbourn loan,
5 was this before you had invested in the East End
6 address or the Constance address?
7    A    No, it was after.
8    Q    Okay.  Do you recall when you invested
9 in the East End Avenue address?
10    A    I don't recall, but I -- it could be
11 around '15, '16, 2015 or '16.
12    Q    Okay.  And how about the Constance
13 address, do you recall that?
14    A    The Constance was actually a buyout.  I
15 think it's -- let me see.
16        No, actually what happened was I --
17 after I received the check, I closed my account
18 with, with Vanguard.  I had an additional 15,000
19 that I invested with them.  Total was 65,000.  And
20 when I sent the 15,000 to them, that's when they
21 did a buyout for South Constance.
22    Q    Okay.  Can you explain to me what you
23 mean by a buyout?
24    A    I noticed on my paperwork, it said it's

Page 16

1 called a buyout to purchase 6,299 units at one,
2 28 percent ownership.  I have the document right in
3 front of me.  And that's what they called it,
4 buyout.
5    Q    Got it.  Do you remember who
6 specifically at EquityBuild contacted you about the
7 Constance loan?
8    A    No, I don't remember.
9    Q    Do you remember how, how you came to be
10 part of that loan?  Did they send you any
11 documentation, anything to sign?
12    A    Actually, that's what I was wondering,
13 because I sent you the documents they sent me, and
14 I don't remember seeing any more documents, so my
15 name was not even on that.
16    Q    Okay.  Yes.  That's correct.
17    A    As you noted, the documents I sent
18 you -- all I received was the documentation from my
19 plan group, they said it was a buyout.
20    Q    Okay.  When you say your plan group, can
21 you explain to me what you mean by that?
22    A    iPlan is the company that has, that was
23 managing my self-directed IRA.
24    Q    Got it.  So all of this was done through

Page 17
1  your IRA?
2  A    Correct.  Not all of that, because I had
3  some cash investments too.
4  Q    Okay.  Were your cash investments part
5  of these same properties or do you remember to
6  which properties you directed the cash
7  investments?
8  A    The cash investments are for the -- one
9  of them was for the company -- I mean the west --
10 East End property?
11 Q    Okay.
12 A    There were other.  Two East End
13 properties that I had, and there was another one
14 that I sent -- oh, let me see.  7740 South Essex.
15 And actually I send one for MLK Drive, but they
16 didn't --
17         (Reporter interruption.)
18 THE WITNESS:  They didn't invest in that MLK
19 property, so they moved it to a different property.
20 By Mr. Connor:
21 Q    Okay.  Ms. Wolff, is my screen frozen
22 for you?
23 A    Yes, it is.
24 Q    All right.  Jeez, I don't know what I'm

Page 18
1  going to do here.  I wanted to show her some
2  documents.  I guess, let's see how far we get.
3         Ms. Wolff, speaking specifically now
4  about the Constance property, you're claiming an
5  interest in the Constance property for the purposes
6  of this lawsuit; is that correct?
7  A    That's correct.
8  Q    Okay.  And that interest is through your
9  investment with EquityBuild?
10 A    Can you repeat that, please?
11 Q    Yes.  The interest that you're claiming,
12 you're claiming that interest through your
13 investment with EquityBuild?
14 A    Correct.
15 Q    Okay.  Can you tell me the basic terms
16 of your investment as you understand them?  How
17 much you invested, how much you expected to get
18 back, how often you expected to get paid, that kind
19 of thing?
20 A    Whenever I invested, I was told I would
21 get paid monthly interest at 12 percent most of the
22 time, yes.
23 Q    Okay.  And do you recall how long the
24 loan was supposed to last; when the note was

Page 19
1  supposed to mature?
2  A    Well, I remember that when they came --
3  when the notes came due, they always extended them
4  because for some reason, sometimes they would send
5  the documentation to sign up for an extension on a
6  due date.  It could be three months, six months.
7  But every time when towards the end, they just --
8  since everything was going bad, I think, I didn't
9  get any documents.  And I didn't get, didn't get --
10 that's when the SEC took over.
11 Q    Yes.  So when you say towards the end,
12 how long were you invested in the Constance
13 property before things started to unravel for
14 you?
15 A    Yeah, let me see.  The purchase that I
16 see here was done on 8/14/2015.
17 Q    Okay.  Okay.  Thank you.
18 A    You're welcome.
19 Q    Did you sign any document -- I think
20 forgive me if I asked you this already.
21        Did you sign any documents when you made
22 the Constance investment?
23 A    No, I didn't.  I don't -- like I said,
24 all the documents I sent you, that's all I got

Page 20
1  about that investment.  I didn't receive any
2  DocuSign document or anything like that.
3  Q    Okay.  And if I understood what you said
4  earlier -- let me just check my notes for a moment.
5        Constance was a buyout, so it sounds
6  like you didn't originally invest in Constance
7  yourself.  You made a separate investment and then
8  EquityBuild moved to that investment to Constance;
9  is that fair to say?
10 A    That's -- I'm sorry.  That's correct,
11 that's what I said, yes.
12 Q    Okay.
13 A    They moved it.  I didn't have any say on
14 what's going to be invested in.
15 Q    Got it.  And it was a buyout of which
16 property?
17 A    With the 400 South Kilbourn.
18 Q    Got it.  And do you recall signing any
19 documents with respect to 400 South Kilbourn when
20 you made that investment?
21 A    Once I received the documentation, I
22 don't remember.  I'm sorry, I don't remember if I
23 did.
24 Q    No, that's quite all right.

Page 21

1    Did you at any time for either South
2 Kilbourn or South Constance sign a mortgage?
3    A    No.  Actually what I received from them
4 was the two documents that I -- that I sent you.  I
5 don't see my name.  I don't see my signature
6 anywhere.
7    Q    Yes.  Okay.  Yes.  And I did review
8 those.  Thank you for sending me.
9        Do you have any -- aside from what you
10 sent me, do you have any memory of getting any
11 documents like a mortgage, with relation
12 specifically to Kilbourn or Constance?
13    A    With Kilbourn, I got the wire transfer
14 information, and I sent that in recently with all
15 my documents.
16    Q    Yes.  Okay.  Give me just a moment.
17        Am I still frozen on your screen,
18 Ms. Wolff?
19    A    Yes.
20    Q    Okay.  Could you try -- stay on the
21 phone with us, and see if -- well, Marybeth, you're
22 the expert in Zoom, if she stays on the phone, but
23 reboots the meeting on her computer will that kick
24 her off the phone?

Page 22

1    THE REPORTER:  No, it will not.
2    By Mr. Connor:
3    Q    Ms. Wolff, I'm sorry to have to make you
4 do this again after we finally got -- made contact,
5 but if you could try restarting your Zoom on the
6 computer.  Stay on the phone with us, and see if
7 you can restart your Zoom and maybe that will solve
8 the freezing problem?
9    A    Okay.  Can I clarify something?
10    Q    Yes, please.
11    A    About the question on the Kilbourn
12 property.
13    Q    Yes.
14    A    What I did receive after was an amended
15 and restated unsecure promissory note that I
16 signed, that's what I -- and also I sent that
17 originally with all my documents.
18    Q    Okay.  And when you -- I believe you --
19 I don't want to misquote you.
20        You said that was after something?
21    A    After -- it used to -- what I recall is
22 it used to be a secured note, but they made it
23 unsecure for some reason, and that's when they send
24 an amendment and restated unsecured promissory

Page 23

1 note.
2    Q    And do you recall when that happened
3 that you received that unsecured note?
4    A    Let me see the date.  They state here
5 that first payment was due on 3/30/2018.
6    Q    Okay.
7    A    And I signed it 3/26/2018.
8    Q    Okay.
9    A    And that was also a rollover
10 distribution.
11    Q    Okay.  That was a rollover.
12        And do you know what that was a rollover
13 from?
14    A    It was for the South -- 400 South
15 Kilbourn.
16    Q    Got it.
17    A    It was initial investment amount was
18 73,257.
19    Q    Got it.  Okay.  Thank you for that.
20        Now, if you wouldn't mind -- oh, wait.
21 Now you're moving.
22    A    And you're moving too.
23    Q    Finally.
24    A    I think --

Page 24

1    Q    The Zoom God smiled upon us for once.
2 Okay.  Well, let's strike while we have the moment.
3        I'd like to share my screen with you
4 now.  If you don't mind I'm going to show you some
5 documents.
6    A    Okay.
7    Q    And forgive me if I'm repeating myself.
8 I just want to make sure we cover all this ground.
9 Okay.
10        All right.  Ms. Wolff, do you see the
11 document before you labeled mortgage?
12    A    Yes, I can.
13    Q    Okay.  Great.
14        And you'll see it reads this mortgage is
15 given on September 26, 2015.  The mortgagor is
16 EquityBuild, Inc., and then it says --
17    A    Right.
18    Q    -- a little further down the page, for
19 this purpose, borrower does hereby mortgage, grant
20 and convey to lender the following described
21 property located in Cook County, Illinois, which
22 has the address of 7635 South East End, Chicago,
23 Illinois  60649.
24        Ms. Wolff, is that address, 7635 South

Page 25

1  East End, one of the properties in which you
2  invested with EquityBuild?
3      A    One moment. I want to see my notes.
4      Q    Sure.
5      MR. CONNOR: Court Reporter, we're going to
6  mark this as Exhibit 1.
7              (A document was marked Wolff
8               Exhibit No. 1 for
9               identification.)
10     THE WITNESS: I'm sorry?
11     By Mr. Connor:
12     Q    I was speaking to the Court Reporter.
13 Please continue, Ms. Wolff.
14     A    That's correct, that's the correct
15 address for that investment. I have the -- I have
16 in front of me I have my wire transfer proof.
17     Q    Thank you. Then if we scroll back up --
18 I'm sorry, go ahead.
19     A    That was on September 29, 2015.
20     Q    Okay. And then if we were to scroll
21 back up the page a little bit, it says this
22 security instrument is given to the persons listed
23 on Exhibit A to the mortgage, care of EquityBuild
24 Finance, LLC, whose address is 5068 West Plano

Page 26

1  Parkway.
2          I would like to show you a second
3  document now. Here we go.
4      A    Okay.
5              (A document was marked Wolff
6               Exhibit No. 2 for
7               identification.)
8      By Mr. Connor:
9      Q    I want to make sure you can see it okay.
10         Do you see a document now that starts
11 with lender name?
12     A    No.
13     Q    No?
14     A    No, the screen didn't move.
15     Q    The screen didn't move. All right.
16 That's probably me not being good at Zoom. I'm
17 going to stop sharing my screen for just a second
18 and reshare it.
19     A    Okay.
20     Q    Sorry, still learning. Here we go.
21         Okay. How about now?
22     A    Yes, I see it.
23     Q    You see a document that says lender
24 name, okay. Does this --

Page 27

1      A    Yes.
2      Q    -- look at all familiar to you?
3      A    Yes, it does.
4      Q    Okay. And that is lender name Cecilia
5  Wolff, that's you?
6      A    That's me.
7      Q    And $25,000. Do you recall is that the
8  amount you invested in the East End property?
9      A    That's correct.
10     Q    Okay. And is this your electronic
11 signature here under signature?
12     A    It is. It is. Yes, it is.
13     Q    I'll scroll down here at the bottom,
14 you'll see text that says EquityBuild Finance, LLC,
15 as agent and trustee has been authorized by the
16 above listed lenders to receive the payoff in its
17 name and issue and execute a release of said
18 mortgage, upon payment in full of any outstanding
19 balance.
20         Do you see where it says that?
21     A    Yes.
22     Q    Was this -- and this is -- because I
23 want to keep things straight, this is for the East
24 End property.

Page 28

1          Do you recall was this text on this
2  document when you signed it?
3      A    Can you repeat that question again?
4      Q    Yes. The text that I just read to you
5  at the bottom of this page, EquityBuild Finance,
6  LLC, as agent and trustee has been authorized by
7  the above listed lenders.
8          Was that text on this document when you
9  signed it?
10     A    If I recall, I think it was.
11     Q    Okay. Thank you.
12         Do you recall whether you saw or signed
13 a document with this same text as it relates to the
14 Constance property?
15     A    No, I don't recall that.
16     Q    Okay. Thank you. I'll stop sharing my
17 screen for just a moment. Give me just --
18 all right. I'd like to show you one more document.
19     A    Okay.
20             (A document was marked Wolff
21              Exhibit No. 3 for
22              identification.)
23     By Mr. Connor:
24     Q    Okay. Ms. Wolff, do you now see a

Page 29

1  document in front of you that says collateral
2  agency and servicing agreement?
3      A    I do.
4      Q    Does this look at all familiar to you?
5  And I can scroll down, if you'd like.  Let me know
6  if I'm going too fast.
7      A    You can scroll down.  I don't recall.
8      Q    You don't recall.  Okay.
9           Is this your electronic signature here
10 on page 23?  Do you see that?
11     A    Page 23, no, I don't see the page yet.
12     Q    Well, did you see when I scrolled down
13 on my screen?
14     A    Okay.  Now I see it.
15     Q    Yes.
16     A    Yes, that looks like my signature.
17     Q    Okay.  Does that help you remember
18 whether you've seen this document?
19     A    Yes.  I just -- I cannot see my name on
20 it, but I think I remember seeing this document,
21 yes.
22     Q    Okay.  Do you recall whether you saw or
23 signed a document like this with relation to the
24 South Constance property?

Page 30

1      A    No.  When -- as a matter of fact, when
2  you asked me about those documents, I saw that I --
3  my signature was not anywhere on the two documents
4  that I sent you.
5      Q    Okay.
6      A    Although I never saw anything like
7  that.
8      Q    Okay.  Thank you.
9      A    You're welcome.
10     Q    Ms. Wolff, what does the name
11 EquityBuild Finance mean to you?
12     A    I believe that was the other company,
13 the investment company -- well, they had the
14 investment company, but they also had a hard money
15 lender company.
16     Q    Okay.  Which of those was EquityBuild
17 Finance?
18     A    I think this one is EquityBuild
19 Finance.
20     Q    So I know that some of these investments
21 were sent through your IRA, and forgive me, I know
22 we've been jumping back and forth between loans.
23 I'm talking specifically about the Constance loan
24 at this point.

Page 31

1      Q    How did you receive those payments for
2  that loan?
3      A    The payments were sent directly to
4  iPlan, the iPlanGroup, the company that collected
5  -- serviced my IRA.
6      Q    Got it.
7      A    And then they --
8      Q    Please continue.  Sorry.
9      A    I think they went directly into my
10 account.
11     Q    Got it.  Do you know who specifically
12 sent the payments to your IRA?
13     A    As far as I know, it was EquityBuild.
14     Q    Okay.  And is there a difference in your
15 mind between EquityBuild and EquityBuild Finance?
16     A    No.  I think it was the same company.
17     Q    Okay.  Ms. Wolff, do you know, for
18 example, under the terms of the loan, if the loan
19 went into default, do you know how you would have
20 been notified about that?
21     A    No, I wouldn't know.
22     Q    Okay.  Do you know what a prepayment is
23 within the context of your loan?
24     A    Yes.

Page 32

1      Q    Okay.  Did you know that the borrower
2  could make prepayments under the loan?
3      A    No, I didn't.
4      Q    Okay.  Do you know if the borrower
5  wanted to make a prepayment, how they would go
6  about doing that?  Who -- excuse me.  Let me strike
7  that question.
8           If the borrower were to make a
9  prepayment under the loan, do you know how you
10 would find out about that?
11     A    If they let me know.  I wouldn't know.
12     Q    When you say if they let you know, is
13 there someone in your mind whose responsibility it
14 was to let you know?
15     A    The contact that I had with the -- the
16 person that was called the personal relationship
17 manager.
18     Q    The personal relationship manager at
19 EquityBuild?
20     A    Correct.
21     Q    And do you recall his or her name?
22     A    David Geldart was the last one.
23     Q    All right.  I have just a few more
24 questions for you.

Page 33

1    Do you understand what a release is in
2 the context of a mortgage?
3    A    A release?
4    Q    Yes.
5    A    I'm not too clear about that.
6    Q    Okay. What do you understand would
7 happen once your loan was paid in full with
8 relation to the mortgage? I guess -- let me strike
9 that.
10       What happens to the mortgage when your
11 loan is paid in full?
12   A    You get -- you get the deed, the
13 property deed.
14   Q    Okay. And what happens with the loan at
15 that point?
16   A    They close -- it's closed down. You
17 don't owe any loan -- any money.
18   Q    So do you know if you were to make a
19 demand for payment under your loan, do you know how
20 you would do that? Who you would contact to do
21 that?
22   A    The loan company.
23   Q    And when you say the loan company, any
24 more specifically?

Page 34

1    A    The bank.
2    Q    The bank, okay.
3    A    The bank, yeah. The lender, yes, any
4 lender.
5    Q    Any lender.
6       Do you know in this instance if you as
7 the lender wanted to demand payment under your
8 loan, do you know who you'd contact?
9    A    The borrower.
10   Q    The borrower.
11       And in this case that is who?
12   A    EquityBuild.
13   Q    Okay. And do you know would you contact
14 them directly or is there somebody who would act on
15 your behalf to do that?
16   A    I believe I contact them directly.
17   Q    So you mentioned David Geldart. Would
18 that be someone you would contact?
19   A    If I had questions, yes.
20   Q    Okay. Thank you.
21       Did you ever receive a notice from
22 EquityBuild that someone wanted to pay off your
23 loan.
24   A    No, I never did.

Page 35

1    Q    Do you understand that EquityBuild
2 accepted a payoff from someone to pay off the
3 amount of your loan?
4    A    No, I didn't.
5    Q    All right. Do you understand that
6 EquityBuild has released the mortgage relating to
7 your loan?
8    A    Which loan?
9    Q    Thank you for asking that. The
10 Constance loan.
11   A    No, I didn't know.
12   Q    Okay. Well, thank you very much for
13 your time, Ms. Wolff. Those are all the questions
14 that I have for you.
15       Some of the other attorneys here may
16 have questions as well. I'm going to stop sharing
17 my screen now. I didn't realize I've been sharing
18 it this whole time.
19   A    Okay.
20   Q    So please stay with us. There may some
21 other questions from the other attorneys, but thank
22 you very much.
23   A    You're welcome.
24

Page 36

1       EXAMINATION
2    By Ms. Qualls:
3    Q    Ms. Wolff, this is Alyssa Qualls. I
4 have some questions. I represent the Securities
5 and Exchange Commission.
6       Can you hear me all right?
7    A    Yeah. I didn't hear that last part.
8    Q    I represent the Securities and Exchange
9 Commission, and my name is Alyssa Qualls. I have a
10 few questions.
11   A    Sure. Okay. Hi.
12   Q    Okay. Hi.
13       So as I understand it from your
14 testimony -- well, let me -- let me just ask it.
15       Did you authorize EquityBuild or
16 EquityBuild Finance to release the mortgage on the
17 Constance loan?
18   A    No, I didn't know that was done.
19   Q    Okay. But you never -- and you never
20 gave them permission, right?
21   A    No, never.
22   Q    Did you understand that EquityBuild had
23 the ability to release the mortgage without your
24 consent?

Page 37

1  A    No, I didn't.
2  Q    How did you first learn that EquityBuild
3  was releasing the Constance mortgage?
4  A    Actually, I didn't know.  This is the
5  first time I hear about it.
6  Q    Okay.  And did you receive -- ever
7  receive any payment from EquityBuild or EquityBuild
8  Finance in connection with the release of the
9  Constance mortgage?
10 A    No, I never did because they kept
11 paying -- making the interest payments, almost
12 towards the end, they were going to my account with
13 iPlanGroup.
14 Q    Okay.  Would you have allowed your
15 mortgage to be released, this is the Constance
16 mortgage, without your investment principal being
17 returned?
18 A    No, I would not.
19 Q    And what was the amount of the Constance
20 principal?
21 A    Actually, it was like I said, it was a
22 buyout.  It was 6,299, I believe.
23 Q    And was the mortgage that you got on the
24 Constance property an important part of your

Page 38

1  investment decision or your decision to invest with
2  EquityBuild?  I guess this is a little -- let me
3  withdraw that, because the buyout it's a little
4  confusing.
5       But when -- let me ask when you
6  initially invested with EquityBuild, was having a
7  mortgage on your investment, on your loan an
8  important part of your decision to invest?
9  A    No.  Actually I started with Addison
10 property.  I didn't know anything about, but when
11 they invested my money into the South Constance, I
12 was never asked or I never approved.  So that's why
13 I don't see any documents that really show that I
14 signed for that buyout or anything like that.
15 Q    Right.  How much money did you and your
16 family lose by -- on the Constance investment?
17 A    So the property -- the buyout amount was
18 the 6,299.
19 Q    And let's turn to the East End
20 investment.  That -- how much have you lost on that
21 investment?
22 A    25,000.
23 Q    And how has that loss impacted you?
24 A    As you can understand, now I'm retired

Page 39

1  and would like -- it would have been helpful to
2  have those funds available.
3  Q    Uh-huh.  Have you authorized EquityBuild
4  or EquityBuild Finance to release your mortgage on
5  the East End property?
6  A    No, I never did.
7  Q    All right.  And did you understand that
8  EquityBuild had the ability to release the East End
9  mortgage without your consent?
10 A    No, actually, no.
11 Q    And did you know that EquityBuild was
12 releasing your mortgage on the East End property?
13 A    No, I didn't know that.
14 Q    And did you receive any payment in
15 connection with the release of your mortgage on the
16 East End property?
17 A    Do you mean the return of my original
18 investment?
19 Q    Yes.
20 A    No.  I kept getting extensions and
21 extensions.  I never got my money back.
22 Q    And would you have allowed your mortgage
23 to be released on the East End property without
24 your investment principal being returned?

Page 40

1  A    No, I wouldn't.
2  Q    And was the fact that the East End
3  property had a mortgage, was that an important part
4  of your decision to invest?
5  A    Yes.
6  Q    Why was it?
7  A    Because I was -- I was always told
8  always -- I was on the first lien basis, if
9  anything went wrong.  They made it sound like it
10 was a good thing, that even if it defaulted, if the
11 loan defaulted, I wouldn't -- it wouldn't affect me
12 because I was on the first lien basis.
13 Q    And what did you understand -- I'm
14 sorry.
15      What did you understand a first lien
16 basis to mean?
17 A    That I would get my investment back in
18 case anything went wrong with the mortgage or
19 defaulted.
20 Q    Okay.  Thank you.  I don't have any
21 other questions.
22 A    You're welcome.
23
24

Page 41

1          EXAMINATION
2   By Ms. Wine:
3     Q   Ms. Wolff, hi again. My name is Jodi
4 Wine and I represent the receiver, Kevin Duff, in
5 this matter.
6        Are you still able to see the screen? I
7 cannot see you any more.
8     A   Oh, yes. Yes, I'm able to see the
9 screen.
10    Q   Okay. Did you maybe turn your camera
11 off?
12    A   No, I didn't.
13    Q   Okay. I'd like to show you a document,
14 which is part of the discovery responses you sent
15 in in this case.
16    A   Okay.
17    Q   Let me know when you can see that on the
18 screen?
19    A   I see it on the screen.
20    Q   Okay. So we've been talking about the
21 investment in 7201 South Constance, and that was
22 made from your IRA, correct?
23    A   Correct.
24    Q   And this -- do you recognize this

Page 42

1 document that's up on the screen that I'm going to
2 mark as I believe Exhibit 4?
3    MR. CONNOR: (Nodding head.)
4       (A document was marked Wolff
5       Exhibit No. 4 for
6       identification.)
7    THE WITNESS: Yes, I recognize that
8 document.
9    By Ms. Wine:
10   Q   Okay. Does this relate to the loan made
11 through your traditional IRA?
12   A   Yes.
13   Q   These are documents that you provided in
14 this case, correct?
15   A   Correct.
16   Q   Okay. So, I'm going to go to page 21 of
17 this document and this is part of a statement from
18 iPlanGroup, correct?
19   A   Correct.
20   Q   And that's your account for the dates
21 July 1, 2015 through September 30, 2015.
22      Do you see that?
23   A   Yes.
24   Q   And do you recall making an investment

Page 43

1 of $15,000?
2    A   Yes, I recall it.
3    Q   And was that an additional investment
4 you made after originally investing in the
5 400 South Kilbourn property?
6    A   That's correct.
7    Q   And that investment was split between
8 two properties, correct?
9    A   Correct.
10   Q   And did you get an additional ownership
11 interest in the 400 South Kilbourn Avenue
12 property?
13   A   Much -- I think it -- yes, I think I
14 did, but I'm not 100 percent sure.
15   Q   Okay. Do you see a $8701 figure that's
16 circled and the word buyout is written next to
17 it?
18   A   Yes. Yes.
19   Q   Okay. And do you see that's described
20 as purchasing 8701 units?
21   A   Correct.
22   Q   And do you understand that to be the
23 Kilbourn property?
24   A   That's correct, yes.

Page 44

1    Q   Okay. And then you also -- with that
2 same $15,000, did you purchase the interest in 7201
3 South Constance Avenue?
4    A   Yes, that's the one.
5    Q   That was the amount of $6299, correct?
6    A   Correct.
7    Q   And those two figures add to the $15,000
8 cash payment that you sent to EquityBuild; is that
9 correct?
10   A   Correct.
11   Q   And do you see here where this
12 investment of 6299 was described as a purchase of
13 -- I'm sorry -- a purchase of .28 percent ownership
14 in SECPN-368?
15   A   Yes.
16   Q   Did you understand SECPN to mean secured
17 promissory note?
18   A   No. I knew it was secured at one point,
19 but then it became -- it became unsecured for some
20 reason. They changed it later on.
21   Q   Okay. You're talking now about the
22 investment in South Kilbourn, correct?
23   A   Right. Correct.
24   Q   Okay. I'm going to jump now to page 28

Page 45

1  of this document, and there is an email from Max
2  Capistran at EquityBuild dated February 19, 2018.
3      Do you see that?
4   A   No, it didn't move.  So I'm still on the
5  Constance buyout.
6   Q   Okay.  I suspect your screen might be
7  frozen.
8      Are others on the call able to see page
9  28 of this document?
10  MR. CONNOR:  Yes, I can.
11  MS. WINE:  Okay.
12  MR. CONNOR:  Jodi, maybe try unsharing your
13 screen and resharing it.  When I tried that earlier
14 with Ms. Wolff, that helped.
15  MS WINE:  That wasn't the problem.  At that
16 time we couldn't see your share either.  This is
17 something on her end.  I think she just has an
18 unstable internet connection.
19  By Ms. Wine:
20  Q   Ms. Wolff, let me just ask you when
21 EquityBuild contacted you to tell you that they
22 were --
23  A   Oh, I see it now.
24  Q   Okay.  Okay.  So you see the

Page 46

1  February 19, 2018 email from Max Capistran to you;
2  is that correct?
3   A   Yes, I see it.
4   Q   And is this one of the documents you
5  provided in this case?
6   A   I believe so.
7   Q   Okay.  We're on page 28 of the same
8  Exhibit 4 that I showed you earlier.  Okay?
9   A   Yes. Yes.
10  Q   Okay.  And do you see where
11 Mr. Capistran tells you that EquityBuild has
12 brought the 400 South Kilbourn project to an end?
13  A   Yes.
14  Q   And then tells you we will send you back
15 your 73,257 to the account on an amortized note in
16 monthly installments of 24 months at 8 percent
17 APR?
18  A   Yes.
19  Q   And is Mr. Capistran informing you that
20 your secured loan would now be an unsecured
21 promissory note?
22  A   Yes. Yes.
23  Q   Do you see where he says if you would
24 like to have a call to discuss these options, to

Page 47

1  call David directly?
2   A   Yes, I see that.
3   Q   Okay.  And that's David Geldart to your
4  understanding?
5   A   I don't recall.  It's been a while.
6   Q   Okay.  You just had testified earlier
7  that David Geldart was your relationship manager at
8  EquityBuild?
9   A   He was, yes.
10  Q   Okay.  So I assumed when Max Capistran
11 said you could call David directly, that he was
12 referring to David Geldart, but I don't know that.
13 I was just wondering if that was your understanding
14 as well?
15  A   It was, yes.
16  Q   Okay.  Do you believe that you were
17 offered options?
18  A   No, I don't believe that.  Because as I
19 explained, I received -- what I did receive was the
20 amended document, where they amended the note to
21 become, you know, for what he said, that he was
22 going to be an unsecured note, and I would get that
23 -- that interest went down from 12 to 8 percent.
24  Q   And that related to the 400 South

Page 48

1  Kilbourn property, correct?
2   A   That's correct, yes.
3   Q   And are you able now to see page 32 of
4  this document?  It's entitled rollover/distribution
5  authorization form?
6   A   I don't see it right now.
7   Q   Okay.  So your screen has not moved
8  again?
9   A   No, it didn't move right now.
10  Q   Okay.  I'm going to strike that.  I'm
11 going to try one other document and we'll see if
12 you can see it or not.
13  A   Okay.
14  Q   Okay.  Are you able to see a document
15 that's March 26, 2018 email from John Allred?
16  A   No, I don't see it.  I see the other,
17 Max' email.
18      Okay.  Now I see the rollover.
19  Q   Do you see an email from John Allred to
20 David Geldart and you copied?
21  A   I see the -- I see the
22 rollover/distribution authorization form.
23  Q   Okay.
24  A   I see the John Allred.

Page 49

1  Q    Okay.
2  A    Yes, I see that.
3  Q    Your computer is just talking a minute
4  to catch up.
5  A    Yes.
6  Q    I'm going to mark then this as
7  Exhibit No. 5.
8  A    Okay.
9          (A document was marked Wolff
10           Exhibit No. 5 for
11           identification.)
12  By Ms. Wine:
13  Q    Do you recognize this email?
14  A    I do, yes.
15  Q    I'm going to scroll down, because the
16  messages are in reverse order.
17         And the first message on March 26th at
18  11:19 a.m., is this an email you sent to Dave
19  Geldart on March 26th of 2018?
20  A    So I don't see that I -- they sent me
21  that, a copy of that email.
22  Q    Okay. I think your screen is not
23  keeping up with mine.
24  A    No, probably not.

Page 50

1  Q    Okay. Do you recall --
2  A    Okay, it's moving.
3  Q    Okay. Do you recall reaching out to
4  Mr. Geldart on March 26th wondering about your
5  investment on South East End because the due date
6  had been extended to March 1, 2018?
7  A    Yes, I see it. Yes. Yes.
8  Q    Okay. And then do you recall being told
9  by Mr. Allred that that property was under a second
10  extension, projected to mature on October 1st of
11  2018?
12  A    October, I only see March, so I'm not
13  sure. Is there another email?
14  Q    Okay. I'm going to try to share this,
15  and if it doesn't work, I'm going to rest.
16  A    Okay. I see it now.
17  Q    Okay. Can you tell me what you see on
18  your screen?
19  A    That the extension currently projected
20  to mature on 10/1/18 for 7635 South East End.
21  Q    Okay. And did you know at that time
22  that EquityBuild had already released that loan?
23  A    No. I was never notified.
24  Q    Okay. And did you in fact receive a

Page 51

1  DocuSign envelope asking you to sign an extension
2  for that loan at 7635 South East End?
3  A    For the extension, yes, but not for the
4  release.
5          (A document was marked Wolff
6           Exhibit No. 6 for
7           identification.)
8  By Ms. Wine:
9  Q    Correct. Do you see another document on
10  your screen now that's a DocuSign email?
11  A    I see a DocuSign envelope.
12  Q    Dated May 8, 2018?
13  A    May 2018, correct, 8 May.
14  Q    Right. And extension through
15  October 1st of 2018?
16  A    Correct.
17  Q    Okay. And can you see the second
18  extension agreement that you were asked to sign on
19  the screen?
20  A    I'm looking at the email document from
21  DocuSign envelope. Oh, now I see the second
22  extension agreement.
23  Q    Okay.
24  A    Dated March 1, 2018 to extend it to

Page 52

1  October 1, 2018.
2  Q    Did EquityBuild tell you that they
3  wanted to extend the due date of the note and the
4  mortgage secured by 7635 South East End until
5  October 1st of 2018?
6  A    That's what they -- yeah, that's what it
7  indi -- that's what is indicating on this
8  document.
9  Q    And they didn't tell you at that time
10  that that note was no longer secured by that
11  mortgage because it had been released?
12  A    No. I was never notified of that.
13  Q    And that wasn't your understanding that
14  that had happened, correct?
15  A    Correct.
16  Q    And you never authorized such a
17  release?
18  A    No, I never did. I didn't know until
19  now.
20  Q    Okay. And I'm not going to try to use a
21  document, Ms. Wolff, but in these papers that you
22  submitted in discovery you stated that you had
23  received interest payments?
24  A    Interest payments, --

Page 53

1  Q   Do you recall that?
2  A   -- yes. Yes.
3  Q   Okay. And you gave a dollar amount of
4  interest payments that were received?
5  A   For which loan?
6  Q   Okay. You actually gave two different
7  packages, right? One that we were just looking at
8  which related to the IRA investments?
9  A   Correct.
10 Q   And the second package which related to
11 your cash loan?
12 A   Correct.
13 Q   Correct?
14 A   Yes.
15 Q   And your statement says to the best of
16 my knowledge, the total amounts paid to me by
17 EquityBuild for the cash loans totaled 15,722.35.
18     Do you recall that?
19 A   Yes. Yes, I recall that.
20 Q   Okay. And my question is is that amount
21 what you received for the three loans totaling
22 $60,000?
23 A   Yes.
24 Q   So that's not the amount that you

Page 54

1  received on 7635 South East End only; is that
2  correct?
3  A   That's correct.
4  Q   Do you know the amount that you received
5  back on 7635 South East End?
6  A   Actually I don't. I don't have -- I
7  don't have a separate total.
8  Q   Okay. And other than interest payments,
9  did you receive any other money back to your cash
10 account from EquityBuild?
11 A   No. Only what I stated on my
12 document.
13 Q   Did you receive any other types of
14 income other than the interest you --
15 A   No.
16 Q   -- stated?
17 A   No, I didn't receive any other type of
18 income.
19 Q   Okay. And is the same true of the
20 amounts you stated for the IRA, that the total
21 amounts you received back were for all of your
22 investments and not just the investment in
23 7201 South Kilbourn -- I'm sorry -- South
24 Constance?

Page 55

1  A   That's correct.
2  Q   Okay. Did you receive any other money
3  from EquityBuild related to the investment on 7201
4  South Constance?
5  A   No, that's all I received, what I stated
6  on my document.
7  Q   Okay. I will tender the witness.
8      Thank you, Ms. Wolff.
9  A   You're welcome.
10 MR. CONNOR: Anything from you, Michael?
11 MR. KURTZ: I'm good. Thanks.
12 MR. CONNOR: Nothing from Max.
13     FURTHER EXAMINATION
14 By Mr. Connor:
15 Q   I have just a few follow-up questions,
16 Ms. Wolff. Thank you so much for your time. I'm
17 going to -- okay. I'm going to share my screen one
18 more time. Let me know when you can see the
19 document.
20     The document that I'm showing you is the
21 same document that I showed you earlier. I believe
22 it was marked Exhibit 2, and it has the text at the
23 bottom. It has your signature and the text at the
24 bottom that says EquityBuild as agent and trustee

Page 56

1  has been authorized by the list of lenders.
2      Do you see that --
3  A   Yes.
4  Q   -- in front of you?
5  A   I see that, yes.
6  Q   We discussed it relative to the
7  Constance loan, and you mentioned that you did not
8  sign anything like this in relation to the
9  Constance loan.
10     Do you recall signing a document like
11 this with relation to the Kilbourn loan?
12 A   I don't recall.
13 Q   Okay. And then finally I'll share -- I
14 pulled up the servicing agreement you looked at
15 earlier. This was Exhibit 3, I believe.
16     Do you see that in front of you?
17 A   Yes, I see it.
18 Q   This is the one we discussed that you
19 signed with relation to the East End loan. We
20 discussed it with respect to the Constance loan.
21     Same question, do you recall signing a
22 document -- reviewing or signing a document like
23 this with relation to the Kilbourn loan?
24 A   No, I don't recall.

Page 57

1 Q Okay. Thank you very much. Nothing
2 else from me, Ms. Wolff.
3 Does anyone else have any questions? It
4 looks like no.
5 All right. Ms. Wolff, that's it for us.
6 Thank you so much for your time. At this time I'm
7 going to ask you whether you'd like to waive or
8 reserve your signature.
9 What that means is you have the right to
10 review the transcript of your deposition today, and
11 to let us know if you think there are any errors
12 with what you said.
13 You can't go back and change your
14 testimony, but you have the right to review it and
15 make sure that it accurately reflects what you
16 said.
17 If you would like to do that, you
18 reserve your signature. Otherwise, if you just
19 want to be done and not look at it and not review
20 it, you can waive your signature. It's entirely up
21 to you.
22 A Would that change the outcome of the
23 proceeding?
24 Q Well, it's just an opportunity for you,

Page 58

1 if you want to take it, to make sure that what
2 you -- what is written down in the transcript is
3 accurate to what you said. So, you know, your
4 testimony is your testimony. It's -- and the
5 transcript is what goes into the record.
6 So if you'd like to review it to make
7 sure that it's accurate, you can do that. If you
8 don't feel the need to review it, you can waive
9 your signature.
10 A Okay. I could waive that.
11 Q Okay.
12 A Because what I said is what I know that
13 has happened.
14 Q Okay. Certainly. Thank you.
15 All right. Well, that's all we need
16 from you then. Thank you again for your time and
17 your patience as we got through those technical
18 difficulties. We all appreciate it.
19 A You're welcome. Thank you very much.
20 Q Thank you. Have a good afternoon.
21 A Thank you. You too.
22
23 DEPOSITION CONCLUDED
24

Page 59

1 STATE OF ILLINOIS )
           )SS:
2 COUNTY OF W I L L )
3 I, MARYBETH ROESSLER, a notary public
4 within and for the County of Will and State of
5 Illinois, do hereby certify that CECILIA WOLFF,
6 virtually appeared before me on October 27, 2021,
7 as a witness in a cause now pending and
8 undetermined in the United States District Court,
9 Northern District of Illinois, Eastern Division,
10 wherein SEC, is Plaintiff and EquityBuild, Inc.,
11 et al., are Defendants, No. 18-cv-5587.
12 I further certify that the said CECILIA
13 WOLFF by me virtually first duly sworn to testify
14 to the truth, the whole truth and nothing but the
15 truth in the cause aforesaid before the taking of
16 her deposition; that the testimony given was
17 stenographically recorded in the presence of said
18 witness by me, and afterwards reduced to
19 typewriting, and that the foregoing is a true and
20 correct transcript of said testimony.
21 I further certify that there were
22 virtually present at the taking of this deposition
23 the aforementioned counsel.
24 I further certify that I am not counsel

Page 60

1 for nor in any way related to any of the parties to
2 this suit, nor am I in any way interested in the
3 outcome thereof.
4 IN TESTIMONY WHEREOF, I have hereunto set
5 my hand and seal this 8th day of November, 2021.
6
7
8
     _____
9    NOTARY PUBLIC
     WILL COUNTY, ILLINOIS
10   CSR NO. 084-002864
     CSR Expires: May 31, 2023
11
12
13
14
15
16
17
18
19
20
21
22
23
24