# Expert Report

## of

# J. Bushnell Nielsen

## in

### *U.S. Securities and Exchange Comm'n v. EquityBuild, Inc.*

U.S. District Court, Northern District of Illinois, Eastern
Division Case No. 18-cv-5587

Prepared for:

Todd Gale, Esq.
Dykema Gossett PLLC
10 South Wacker Drive
Suite 2300
Chicago, Illinois 60606

## I.      Introduction

This is a report of my expert opinions on behalf of BC57, LLC, a Michigan limited liability company ("BC57") in relation to the claims that may be made in the above-captioned action by the United States Securities and Exchange Commission (the "SEC"); Kevin B. Duff, the federal equity receiver for the estate of EquityBuild, Inc. (the "Receiver"); or the individuals who lent money to EquityBuild, Inc. who are parties to this action (the "Private Lenders").  Collectively, I will refer to the SEC, the Receiver and the Private Lenders as the "Adverse Claimants."

In this report, I evaluate and opine on the customs and practices of lenders and title insurers in the handling and processing of payoffs for loans secured by real estate, particularly in connection with refinance loans.

I reserve the right to modify or supplement this report, and the opinions expressed herein, based on new information or developments, including information that may be produced in ongoing discovery in the case.

## II.      Facts and Assumptions Made

The following is a summary of the facts as I understand them, and a recitation of the assumptions that I have made in forming my expert opinions.

### A.      The Properties

As of 2015, EquityBuild, Inc. ("EquityBuild") owned apartment buildings in the City of Chicago having associated street addresses of 7201 South Constance Avenue, 7625-33 South East End Avenue, 7635-43 South East End Avenue, 7750-7752 South Muskegon Avenue and 7836 South South Shore Drive (collectively, the "Properties").

### B.      The Hard Money Loans

EquityBuild borrowed money under five different loans in late 2014 and 2015, and gave mortgages on the Properties as collateral for those loans.  I will refer to these five loans as the "Hard Money Loans."  The Hard Money Loans were secured by first priority mortgages encumbering the Properties (the "Hard Money Mortgages").

EquityBuild did not obtain institutional financing for the Hard Money Loans. Instead, EquityBuild or EquityBuild Finance, LLC ("EquityBuild Finance") solicited individuals to make loans that would be aggregated.

1

I will refer to the individuals who made loans to EquityBuild as the Private Lenders.[1]

I have also been asked to assume that all of the Private Lenders received a set of documents that included, among other documents, a New Client Form; a Commercial Flat Rate Promissory Note With Balloon Payment Illinois, having relatively short terms and relatively high interest rates; a sample Mortgage that defined the Lender as the persons listed on Exhibit A, care of "Hard Money Company, LLC" or EquityBuild Finance, with an address of 5068 West Plano Parkway in Plano, Texas; an unnamed document that I will refer to as the Authorization Document; a Collateral Agency and Servicing Agreement that appointed EquityBuild Finance as the collateral agent and loan servicer for the Hard Money Loans (the "Loan Servicing Agreement"); Wire Transfer Instructions for a bank account at Wells Fargo Bank with EquityBuild as beneficiary; a Direct Deposit Authorization form for a checking account in the name of EquityBuild Finance; a DocuSign Certificate of Completion reciting the date on which certain signing events occurred; and a Consumer Disclosure concerning the delivery of notices by It's Golden LLC, described in that document as the Company. I will refer to this set of documents as the "Solicitation."

I have been asked to assume that all or most of the individuals signed the Loan Servicing Agreement and the other documents that were part of the Solicitation and that required their signatures.

In 2017, EquityBuild sought a refinance loan that would pay off the Hard Money Loans. Tyler DeRoo of EquityBuild solicited Bloomfield Capital, based in Birmingham, Michigan, to make that refinance loan.[2] Bloomfield Capital's associate, Matthew Turzewski, testified that it is not unusual to see a prior loan made by an affiliate of the borrower.[3]

Bloomfield Capital formed BC57 as the entity to make the refinance loan. BC57 agreed to make a loan to an affiliate of EquityBuild, SSDF5 Portfolio I LLC, an Illinois limited liability company, in the amount of $5,328,433.43 (the "BC57 Loan"). The conditions for the BC57 Loan included that BC57 receive first position mortgages on the Properties and a title insurance policy assuring that lien priority.

---

[1] There were 13 Private Lenders listed on the mortgage encumbering the 7625 South East End Avenue apartment building. There were 25 Private Lenders listed on the mortgage encumbering the 7635 South East End Avenue apartment building. The Constance Avenue mortgage listed 14 Private Lenders and also listed EquityBuild as a lender. The Muskegon Avenue mortgage listed 36 Private Lenders. The South Shore Drive mortgage listed 46 Private Lenders. Some but not all of the Private Lenders appeared on more than one mortgage.

[2] Transcript of the deposition of Matthew Turzewski ("Turzewski Deposition") at 26.

[3] *Id.* at 95-96.

Bloomfield Capital engaged the law firm of Honigman Miller Schwartz and Cohn LLP, based in Bloomfield Hills, Michigan, to serve as its counsel in the making of the BC57 Loan. Attorney Kasturi Bagchi served as one of Bloomfield Capital's attorneys for that loan.

The title insurance and closing orders for the Properties were placed with Lincoln Land Services LLC in New York City.[4] Maribel Morales and attorney Elizabeth Lemole of Lincoln Land Services worked on the matter.[5] Lincoln Land Services, in turn, placed the title and escrow orders with Near North National Title LLC ("Near North Title"), which is based in Chicago.[6] Morales confirmed to Bagchi that Near North Title would be the title agent and closing agent, and would conduct the intake and disbursement of the loan money.[7] Thereafter, Lincoln Land Services served as coordinator for the title and closing services for the BC57 Loan.[8]

Henry Marmol of Near North Title served as the title officer for the BC57 Loan.[9] Kristen Cristia of Near North Title served as escrow officer for the BC57 Loan.[10]

Near North Title issued one or more versions of a title insurance commitment for the mortgage to be granted by EquityBuild to BC57.[11] Bagchi and BC57 required Near North Title to issue the BC57 title insurance loan policy without an exception in Schedule B of the Policy for the Hard Money Mortgages (which would require the release of the Hard Money Mortgages).[12]

Turzewski testified that the title company handles all loan payoff issues.[13] He exchanged emails with DeRoo about the payoff letters sent to Bloomfield Capital.[14] Ms. Bagchi testified that it is not her job, as lender's counsel, to review payoff statements or

---

[4] Turzewski Deposition at 90; transcript of deposition of Kasturi Bagchi ("Bagchi Deposition") at 56.

[5] Transcript of the deposition of Mirabel Morales ("Morales Deposition") at 39.

[6] See BC57006616 and Morales Deposition at 22, 36.

[7] See September 14, 2017 e-mail at BC570006809.

[8] Morales Deposition at 24.

[9] *Id.* at 25.

[10] *Id.* at 26.

[11] A title insurance commitment with an effective date of August 23, 2017 is found at BC570006664-

[12] A marked-up version of the title insurance commitment is at BC570006664.6673.

[13] *Id.* at 96.

[14] *Id.* at 100.

to satisfy the requirements recited in Schedule B-I of the title insurance commitment.[15] She testified that lender's counsel relies on the title company to be satisfied with mortgage release forms.[16] She also testified that it was not the lender's counsel's job to verify that EquityBuild Finance had authority to release the Hard Money Mortgages.[17] She testified that lender's counsel's role is to make sure that the lender gets a title insurance policy that assures that the mortgage is a first lien.[18]

The title insurance commitment said that Near North Title would require "company approved payoff letters" for the Hard Money Loans.[19] EquityBuild Finance issued payoff letters for the Hard Money Loans.[20] Ms. Bagchi testified that she received the payoff letters and forwarded them to Near North Title.[21] Maribel Morales also testified that she may have sent the payoff statements to Near North Title.[22] Morales testified that a title company requests a payoff letter, and the letter is prepared by the lender or loan servicer.[23] Attorney Bagchi understood that EquityBuild Finance was the loan servicer for the Hard Money Loans.[24]

EquityBuild Finance first issued separate payoff letters for the Hard Money Loans secured by 7625 and 7635 South East End Avenue. Later, it issued a revised payoff letter that combined the loans on 7625 and 7635 South East End Avenue. DeRoo told Bagchi that the two buildings were treated as a combined property.[25] Bagchi testified that she did not notice at the time that the payoff amount on the combined payoff statement was the same as the amount shown on the earlier payoff letter that referenced 7635 South East End Avenue only.[26] In Ms. Bagchi's deposition, an attorney for the Adverse Claimants asserted that the aggregate payoff amounts for the Hard Money Loans was about half the

---

[15] *Id.* at 76. Schedule B-I of a title insurance commitment lists those matters that must be addressed or performed before the policy will be issued. The most basic requirements are that the insured mortgage be granted, delivered and recorded, and that the policy premium be paid.

[16] *Id.* at 81.

[17] *Id.* at 83.

[18] *Id.* at 90.

[19] Ms. Bagchi so testified at Bagchi Deposition at 42. In fact, the Near North Title commitment listed as requirements for the issuance of the policy that Near North Title be provided with "company approved pay-off letters" for the Hard Money Loans. See BC570007196-7198.

[20] See BC570012881, which is part of Exhibit 1 to the Bagchi Deposition.

[21] Bagchi Deposition at 38-39.

[22] Transcript of the deposition of Maribel Morales ("Morales Deposition") at 43.

[23] Morales Deposition at 40-41.

[24] Bagchi Deposition at 27.

[25] Bagchi Deposition Exhibit 1 at 103, 107.

[26] Bagchi Deposition at 35, 40-42.

total of the investment amounts listed on the Exhibits A attached to the Hard Money Mortgages.[27]

The releases of the Hard Money Mortgages were delivered to Near North Title.[28] Morales testified that Near North Title would have reviewed the mortgage releases to determine if they were satisfactory.[29] I have assumed that Near North Title held the releases of the Hard Money Mortgages in escrow or trust from the date of receipt to the date of the BC57 Loan closing.

The BC57 Loan closed. From closing, Near North Title delivered wire transfers to EquityBuild Finance in the amounts stated on the payoff letters. I have no information about how the payoff money was disbursed by EquityBuild Finance.

Near North Title recorded the Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing as granted by the EquityBuild affiliate to BC57, on September 29, 2017 as Document No. 1727219056, as later corrected, as collateral for the BC57 Loan (the "BC57 Mortgage"). Near North Title also recorded the releases of the Hard Money Mortgages.[30] Near North Title issued a Chicago Title Insurance Company loan policy to BC57, insuring the validity and priority of the BC57 Mortgage.[31]

## III.    Expert Opinions

In this report, I evaluate and opine on the customs and practices of lenders and title insurers in the handling and processing of payoffs for loans secured by real estate, particularly in connection with refinance loans.

I express my opinions based on my 40 years of personal experience in real estate transactions and disputes. I served as a commercial real estate closer and title insurance underwriter for 16 years, working for two national title insurers. During my 24 years in private practice, I have represented mortgage lenders, including hard money lenders, and loan servicers; written loan servicing agreements; closed hundreds of real estate transactions; and resolved numerous closing and loan payoff disputes. I have taught closing and escrow practices and procedures to hundreds of persons in a number of states, including Illinois. All of my opinions are stated to a reasonable degree of certainty.

---

[27] Bagchi Deposition at 49-50.

[28] See the release deeds in Exhibit 1 to the Bagchi Deposition.

[29] Morales Deposition at 43.

[30] See Bagchi Deposition Exhibit 1 and Bagchi Deposition at 46.

[31] See the November 8, 2017 letter from Sarah Wilson of Near North Title to Kathy Souder of Honigman Miller that enclosed the policy. BC570003639. The policy is found at BC570006253-6278.

In forming my expert opinions, I have relied on the documents, treatises, and other sources recited in this report and those that are identified in Exhibit 1 to the Appendix hereto. One of those treatises is the book I wrote, *Title and Escrow Claims Guide*,[32] which distills the customs and practices employed by title insurers in the closing of real estate transactions. That book incorporates those practices that I learned while I served in the industry, and continue to teach. I have confirmed that the book reflects the customs employed by all or most title insurers in the United States. The book was first published in 1996 and has been updated annually since then.

My work experience, research, writings and other relevant experience and training are described in my curriculum vitae, which is Exhibit 2 of the Appendix. My prior experience in testifying as an expert witness is recited in Exhibit 3 of the Appendix.

## A.    Standard Customs and Practices Concerning Loan Payoffs

It is my expert opinion that Near North National Title followed standard customs and practices in seeking payoff letters and wiring instructions from EquityBuild Finance, wiring the money to EquityBuild Finance's bank account, and in recording the escrowed mortgage releases signed by EquityBuild Finance after the payoff money had been delivered.

A title company closing a refinance loan is aware that the lender expects to receive a lien on the same real estate collateral as the paid-off lender, and that its lien will be in the same priority position as the paid-off lender's lien. Most commonly, that lien is in first priority. It is my understanding that BC57 instructed Near North Title that it was making a refinance loan, conditioned on BC57 receiving the same first-priority lien position on the Properties as was held by the Private Lenders.

In Illinois, a commercial lender typically retains an attorney to prepare the loan documents and to negotiate the terms of all closing documents so that the lender obtains the collateral position on which the loan was underwritten. In this case, BC57 engaged the law firm of Honigman Miller Schwartz and Cohn LLP to draft the loan documents and represent BC57 in the closing of the BC57 Loan. I know from my years of work for a title insurer in Detroit that the Honigman law firm is one of the premier real estate lending law firms in the Detroit area.

The lender's attorney personally does not cause a mortgage to be delivered and recorded in first priority position. The lender's counsel typically and necessarily involves a title insurance agent or branch office in certain closing and title tasks. This delegation is typically accomplished through written closing instructions issued by the lender's

---

[32] J. Bushnell Nielsen, *Title and Escrow Claims Guide*, 2021 Edition, American Land Title Association (hereafter, "*Title and Escrow Claims Guide*").

counsel to the selected title agent or branch office.[33]  In this case, the Honigman law firm placed title and closing orders for the BC57 Loan with Lincoln Land Title, which in turn placed those orders with Near North Title, a well-known title agency in Chicago.  Later, the Honigman law firm gave loan closing instructions to Near North Title for the closing of the BC57 Loan.[34]  By those closing instructions, BC57 appointed Near North Title to serve as its closing agent for the closing of the BC57 Loan.

When a lender appoints a title agency as its closing agent, the title agency wears two hats at the closing—as the closing or escrow agent of the lender, and as the agent of a title insurer in the issuance of a title insurance policy that insures the lien of the lender's mortgage.[35]  This dual agency is the norm for both residential and commercial loan closings in the State of Illinois.

In my experience, loan closing instructions typically instruct the lender's closing agent that the loan may close when the closing agent, in its role as title agent, is in a position to compel the issuance of a title insurance policy to the lender that will assure that its mortgage is a first lien on the property.  By closing the loan, the title agent commits to deliver a title insurance policy to the lender that indemnifies the lender if its mortgage is not in first position.  Ms. Bagchi's loan closing instructions to Near North Title contained exactly this type of instruction.[36]

The closing and title agent must perform three separate tasks in order to put the refinance loan mortgage in first position.  First, in its role as title agent, the company must determine if there are any liens that already exist and that are subordinate to the existing mortgage, and make arrangements for such liens to be subordinated to the new

---

[33] "It is common in a table closing for the buyer-seller closer to also serve as the closing agent for the lender. The lender issues written loan closing instructions to its closing agent. Those instructions are unilateral, although the lender may require the borrower to sign the instructions to signify his or her agreement with those terms. The lender can be liable to its borrower for the acts of the loan closing agent that the lender appoints.  The loan closing agent is the agent solely of the lender in performing the instructions given by the lender.  The loan closing agent is not the agent of the borrower, as to the loan." *Title and Escrow Claims Guide* § 13.1, *Types Of Escrows And Their Purposes*, at 13-3 to 13-4.

[34] This direction was given by Ms. Bagchi to Near North Title in her closing instruction letter dated September 27, 2017, found at BC570003595-3804.  A version of those instructions as signed by Near North Title is at BC570009336-9343.  Ms. Bagchi's authorization to Near North Title to disburse is found at BC570009484.

[35] See *Title and Escrow Claims Guide* § 17.2, *Escrow And Other Functions Outside Scope Of Agency*, for a discussion of the dual agency that exists when a title agent is also appointed the loan closing agent.

[36] Instruction C(7) stated that Near North Title was authorized to close the BC57 Loan when "Title Company shall be in a position to issue the final endorsements to the existing mortgagee title policy for the Additional Property identical and consistent with the Loan Modification Endorsements which must identify and confirm the Affiliate Borrower as the fee owner of the Additional Property ("Endorsements"), containing recording information with respect to the Property Recordable Documents which are to be recorded with respect to the Additional Property."  See BC570003599.

mortgage to be recorded.[37]  Second, as title agent, the company must do everything in its power to prevent the attachment of a lien in the recording gap that would take priority over the new mortgage.[38]  One part of this recording gap protection is a search of the real estate records immediately before closing to determine if any such gap lien has attached.  Another common facet is to obtain a gap indemnity from the borrower.  The third facet is for the company, in its role as closing agent, to record the refinance mortgage promptly, limiting the recording gap period to the shortest possible time period.  The final aspect is for the title agent to conduct another search of the real estate records after the mortgage is recorded, to verify that no gap lien snuck in just ahead of the mortgage.

The third and most important task performed by the title and closing agent to assure that the refinance mortgage will be in first position is to pay off the loan being refinanced and to cause that mortgage to be released of record.[39]  Central to that process is the payoff letter issued by or on behalf of the lender whose loan will be paid off.

It is standard custom and practice for a closing agent to seek a payoff statement from the existing lender or loan servicer, and rely on that letter as accurately stating the loan balance and *per diem* interest.[40]  That custom and practice of requesting a payoff statement from a lender or its servicer, and making payment in reliance on that statement, is referenced in several Illinois statutes.  Illinois, like almost all other states, has adopted a statute that obligates a lender to release its mortgage when it has been paid in full.[41]  Further, Illinois has joined many other states in permitting a title insurer to release a mortgage when the insurer has paid the lender or its agent the amount stated in a written payoff statement.[42]  Illinois law also provides that a lender or its authorized agent shall

---

[37] For example, if there is a second mortgage on the property at present, that lien will become a first lien on the release of the existing first mortgage unless the lender signs a subordination agreement concerning the new lien. The closing agent must arrange for the drafting, signing and recording of the subordination agreement, with the assistance of lender's counsel.

[38] My book describes the so-called recording gap this way: "The commitment excepts from coverage all matters which occur, or for which notice is first recorded, between the effective date of the commitment and the date on which the insured gets an interest which is valid as to the rest of the world." *Title and Escrow Claims Guide* § 6.7, *Gap Exception; Amendment Or Rescission Of Commitment*, at 6-26.

[39] See *Title and Escrow Claims Guide* § 13.5.1, *Loan Payoff Disputes*.

[40] "As to the borrower, the lender is not obligated to consider the loan paid off until payment is received in full. However, buyers and refinancing lenders must rely on payoff figures given by the lender in making payments to clear title of the existing mortgage or deed of trust." *Title and Escrow Claims Guide* § 13.5.1, *Loan Payoff Disputes*, at 13-44.

[41] See 765 ILCS 905/2, discussed in *Title and Escrow Claims Guide* § 13.5.1, *Loan Payoff Disputes*.

[42] See 765 ILCS 935.  Section 765 ILCS 935/10 states that "Receipt of payment pursuant to the lender's written payoff statement shall constitute authority to record a certificate of release."  "Payoff statement" is defined under that law to mean "a statement for the amount of the (i) unpaid balance of a loan secured by a mortgage, including principal, interest, and any other charges due under or secured by the mortgage; and (ii) interest on a per day basis for the unpaid balance."  The certificate of release laws are discussed in *Title and Escrow Claims Guide* § 13.5.1, *Loan Payoff Disputes*, footnote 195.

prepare and deliver "an accurate statement of the total outstanding balance" of the loan (that is, a payoff statement) if a borrower or its agent makes such a request during a foreclosure action.[43]  Under that law, a payoff statement is deemed to be accurate if "prepared in good faith based on the records of the mortgagee or the mortgagee's agent."

My book explains that it is industry custom and practice for the closing agent to assert that its customer relied on a payoff letter issued by the lender or its servicing agent even if that statement recited the wrong loan balance, because buyers and lenders must rely on payoff statements as being accurate.[44]  This reliance principle is embodied in the Uniform Residential Mortgage Satisfaction Act, promulgated by the National Conference of Commissioners on State Laws in 2004, which specifically states that the lender is bound by the terms of the payoff statement that it issues, and must release its mortgage on receipt of the specified amount of money.[45]

The first step taken by a prudent closing agent in making a loan payoff is to request the payoff letter from the lender or its loan servicer.  The first issue is deciding which company or person to call for that information.  Sometimes, the terms of the recorded mortgage answer that question.  When I began work for a title insurance company 40 years ago, a large percentage of commercial and residential loans were held for the life of the loan by the lender that made the loan.  If the mortgage was granted to Harris Bank, the closing agent would call Harris Bank to request a payoff letter for that loan at the time a new loan was to be made with the same property as security.  The Harris Bank loan administration department would issue the payoff letter or statement to the title company.

Since I began work in 1981, many changes have occurred in the way mortgage lending is conducted, and by whom.  As a result, it is now typical for a loan payoff letter

---

[43] 735 ILCS 15-1505.5(a) states: "In a foreclosure action subject to this Article, on the written demand of a mortgagor or the mortgagor's authorized agent (which shall include the mortgagor's name, the mortgaged property's address, and the mortgage account or loan number), a mortgagee or the mortgagee's authorized agent shall prepare and deliver an accurate statement of the total outstanding balance of the mortgagor's obligation that would be required to satisfy the obligation in full as of the date of preparation ("payoff demand statement") to the mortgagor or the mortgagor's authorized agent who has requested it within 10 business days after receipt of the demand. For purposes of this Section, a payoff demand statement is accurate if prepared in good faith based on the records of the mortgagee or the mortgagee's agent."

[44] "There is a growing body of law, both statutory and by precedent, to the effect that third parties are entitled to the release of the real estate on payment of the amount recited in a payoff statement, even if that sum is not sufficient to pay off the loan.  Part of this emerging consensus is the principle that a third party buyer or lender has a right to obtain a release of the real estate when it has relied on a payoff statement, whether or not the letter is accurate." *Title and Escrow Claims Guide* § 13.5.1, *Loan Payoff Disputes*, at 13-44 to 13-45.

[45] See the discussion of that law, and the states that have adopted it, in *Title and Escrow Claims Guide* § 13.5.1, *Loan Payoff Disputes*, at footnote 191.

to be issued by a loan servicer, not the loan originator or holder.[46]  A loan servicer is a company whose job is to collect payments from the borrower, deliver those payments to the holder of the loan, issue notices to the borrower on behalf of the loan holder, and to issue payoff letters and deliver the loan payoff money to the loan holder.  The loan servicer is empowered to cause the release of the mortgage, and is most commonly authorized by the lender to sign the release as the lender's agent.

Unlike this situation, in most cases, the real estate records do not provide reliable information about which entity is the current loan servicer.  For example, a mortgage may have been granted to Harris Bank, but assigned of record to the trustee for the holders of mortgage-backed securities.  Harris Bank may have retained the servicing rights for the loan, or the servicer may be a company that has never owned the loan and whose name is not even listed in the real estate records.[47]

The borrower is the only party who receives notices when the servicing of a loan is moved from one company to another.  Therefore, it is typical for the title agent to ask the borrower for the identity of the loan servicer and the loan number, and then for the title agent to request a payoff statement from the servicer identified by the borrower.  I have never had a borrower give me the wrong information about the loan servicer.  If a title agent were to contact a company that was not the loan servicer, the servicer would so inform the title agent.  Thus, in my experience, title agents consider the borrower to be the most reliable source of information about the identity of a loan servicer if the real estate records do not provide reliable information on that subject.

The party requesting a payoff statement from a loan servicer does so by contacting the servicer and identifying the borrower's name and the loan number.  The servicer is able to pull up its records for the loan account based on the borrower's name and the loan number as supplied by the title agent.  The servicer can corroborate the loan information, if necessary, by obtaining from the title agent the recording data for the mortgage, the

---

[46] The business model of a mortgage banker is to make loans for a short period of time, using a warehouse loan, and then to bundle and sell those loans to third parties.  The mortgage banker may or may not retain the right to service the loans.  Currently, most banks also sell most of the loans they make, either retaining or releasing the servicing rights associated with those loans.  Pools of mortgage loans are often packaged together by investment bankers as the collateral for securities known as RMBS (residential mortgage-backed securities) and CMBS (commercial mortgage-backed securities).  For example, see *Underwriter shortage slowing the pace of private-label deals: Some RMBS issuers relying on loan-pool sampling, even post-transaction due diligence, to cope with the crunch*, by Bill Conroy of HousingWire, November 29, 2021, discussing current difficulties in packaging loans into RMBS products, found at https://www.housingwire.com/articles/underwriter-shortage-slowing-the-pace-of-private-label-deals/.

[47] Another common example is a loan placed in the Mortgage Electronic Registration Systems, Inc. Registry, which eliminates the need to record assignments of the mortgage as a loan is sold or resold.  See https://www.mersinc.org/about/faq.  A user may search the MERS® Registry to accurately determine the holder of the loan.  However, the MERS Registry typically does not identify the name of the loan servicer.

property address associated with the collateral, or the borrower's social security number or federal tax identification number.

Once the loan servicer has verified the loan for which the payoff statement is requested, the loan servicer generates an internal request for the issuance of a payoff statement, to be delivered to the person who made the request. The loan servicer verifies its authority to accept the loan payoff by issuing the payoff statement in response to the title agent's request. In the payoff letter, the loan servicer recites the loan balance, the amount that must be paid for the release of the mortgage as of a specified date, the *per diem* charge for each day after the payoff date stated on the letter, and all other terms of the payoff. The loan servicer also delivers to the requester wiring instructions for the loan servicer's incoming wire transfer bank account.

It is my expert opinion that a closing agent relies on a signed payoff statement as issued by a lender or loan servicing agent as evidence that the lender or servicer holds the loan and has authority to act for the lender in accepting a payoff and releasing the loan collateral. In the rare occasion on which the servicer is not authorized to accept a loan payoff for the lender, the loan servicer explains in the payoff letter how and to whom that payment must be made. In practice, the closing agent deems the lack of any such statement as a representation that the servicer has authority to accept the payoff and to release the mortgage on payment in full. The closing agent also relies on the servicer's delivery of wiring instructions for a bank account in its own name as further proof that the servicer has authority to accept the payoff and release the loan collateral.

As a matter of practice, title insurance companies and closers do not request documentation of a loan servicer's authority. This practice stems from the practices of loan servicers. In my experience, a loan servicer will never give a title agent a copy of the loan servicing agreement, even when the refinancing lender requests evidence that the servicer is authorized to sign a mortgage release. I have never received a copy of the loan servicing agreement from a servicer in connection with a payoff request.

It is customary for a closing agent to rely on the payoff statement as the assurance that, when the loan is paid off, the mortgage held by that lender will be released of record. Very occasionally, a closing agent will ask the lender that will be paid off to escrow a signed and recordable mortgage release instrument with the closing agent, under instructions allowing it to be recorded after the payment has been made. In my experience, this kind of request is made only when the closing agent is extra-prudent, or the servicer is not one of the large institutional servicers and the closing agent does not have sufficient prior experience to have developed confidence in the servicer's practices.

When the lender or servicer has delivered the payoff letter and all other conditions to the closing of the new loan have been met, the loan documents are signed, and the new lender funds the loan by delivering the loan proceeds to its closing agent. The closing agent disburses the loan proceeds according to the Closing Disclosure or loan settlement

11

statement and any ancillary instructions from the lender or borrower. The closing agent typically makes the loan payoff by wire transfer.

Immediately after closing, the closing agent delivers the mortgage and any related documents to the Recorder for recording. If the closing agent is already holding the mortgage release for the paid-off loan, it records that instrument at the same time the new mortgage is recorded. The closing agent also immediately delivers to the lender all other documents signed as part of the closing.

The title agent searches the real estate records again when it is able to search through the date on which the mortgage was recorded. If no instruments are found in the recording gap, the new mortgage will be in first position. Having confirmed that fact, the title agent issues the title insurance policy to the new lender.

**B.      Near North Title and BC57 Handled the Payoffs of the Hard Money Loans Using Standard Customs and Practices.**

It is my expert opinion that BC57, its counsel and its closing agent, Near North Title, followed all of the above standard industry customs and practices in paying off the Hard Money Loans.

As I stated above, it is standard custom and practice for a mortgage lender to appoint counsel to competently represent it in the making of the loan, including all steps necessary to obtain the assurance that the lender's mortgage will have the desired priority as a lien. As I also stated above, it is standard custom and practice for lender's counsel to issue closing instructions to a title company that are designed to give the mortgage the intended priority. In this case, BC57 engaged the Honigman law firm as its counsel, and Honigman hired Near North Title to perform the loan closing and to issue the title insurance policy to BC57.

Thus, in evaluating the conduct of BC57, Honigman and Near North Title in paying off the Hard Money Loans, I will evaluate primarily the conduct of Near North Title.

The title insurance commitment issued by Near North Title shows that it conducted a title search and located the Hard Money Mortgages in the Recorder's office. The Hard Money Mortgages stated that Private Lenders had made the Hard Money Loans. However, the Hard Money Mortgages also stated that the "Lender" was in care of EquityBuild Finance or Hard Money Company, LLC, and listed the servicer's street address as being 5068 West Plano Parkway in Plano, Texas. Paragraph 6 of the Hard Money Mortgages stated that notices to the "Lender" were to be sent to the address stated in the mortgages, which again was EquityBuild Finance's office address. Exhibit A to the Hard Money Mortgages listed the Private Lenders by name, principal amount and

percentage of loan. However, Exhibit A gave no contact information for the Private Lenders.

It is my expert opinion that a title officer or escrow officer would understand from the Hard Money Mortgages that EquityBuild Finance was the servicing agent for the Private Lenders, and was the correct party to be contacted to request a payoff statement for the Hard Money Loans. The evidence shows that either Near North Title or BC57's counsel communicated with EquityBuild Finance. EquityBuild Finance issued the payoff statements for the Hard Money Loans, which in my expert opinion a title company would conclude as further confirming its authority to do so.

It is also my expert opinion that Near North Title was especially diligent in making sure that the BC57 Loan would obtain first priority when recorded, by arranging for releases of the Hard Money Mortgages to be signed and delivered to it before the BC57 Loan closed. As I explained above, this allowed Near North Title to record the BC57 Mortgage and the releases of the Hard Money Mortgages at the same time, immediately after delivering the loan payoffs to EquityBuild Finance.

For all of the above reasons, it is my expert opinion that BC57, its counsel and its closing agent, Near North Title, followed all of standard industry customs and practices in paying off the Hard Money Loans and relying on the payoff statements and the releases of the Hard Money Mortgages, and that their conduct was reasonable and prudent in light of those standard customs and practices.

### C. The Circumstances Concerning the Hard Money Loan Payoffs Did Not Trigger Further Inquiry or Investigation.

You have asked me to assume that the Adverse Claimants will or may assert that there were circumstances about the payoff of the Hard Money Loans that would cause a reasonable and prudent title company to make more than the usual inquiry into the authority of EquityBuild Finance to accept loan payoffs, or to take some extra precautions to assure that the releases of the Hard Money Mortgages were valid and enforceable.

It is my expert opinion that there were no such circumstances about the payoff of the Hard Money Loans that a title company would understand should compel it to make additional inquiry. It is also my expert opinion that, even if one were to assume that there were such circumstances, there are no recognized or reliable further actions that BC57, its counsel or Near North Title could have taken to address such a claimed unusual circumstance.

First, a title company instructed to pay off an existing loan secured by a mortgage does not evaluate the circumstances under which that loan was made. It is not privy to such information. Thus, the title company making the payoff does not undertake a

different or more complicated inquiry based on the circumstances under which the old loan was made. The prior loan has already been made. The mortgage was recorded to serve as collateral for that loan. The only thing the title company does is to pay off the loan in order to secure a release of the mortgage. In my experience, a title company would never inquire into the circumstances about the existing loan.

Second, there are many situations in which a third party, armed with hindsight, could argue that there was some special circumstance about a mortgage that should cause a title company to conduct an investigation that is not standard practice. It is my expert opinion that no title company operates under a two-tiered set of practices, in which it conducted a heightened inquiry into "unusual" existing mortgages but no such inquiry into "usual" mortgages. Moreover, it is my expert opinion that, if a title company did establish two sets of practices, for "usual" and "unusual" existing mortgages, such a set of practices would be completely unworkable.

In fact, there are a surprising number of recorded mortgages that are unusual, complicated or suspicious looking. I will provide a few examples from my own experience. For example, a mortgage may have been assigned to a speculator after the loan has gone into default. This kind of gambler buys the loan for a small fraction of its face amount, because collection on the note or mortgage is a long shot. Those speculator loan buyers are often ruthless, greedy, unorthodox and very hard to deal with. However, when the property will be sold, the title company deals with the speculator assignee in the same way it would any time the title company is charged with obtaining a payoff letter and the release of the mortgage. Commercial loans often involve complicated arrangements. The title company often has to seek payoff information from the trustee for bondholders, a lead lender that has sold numerous participations in the loan, or the trustee for a real estate investment trust who is the agent for hundreds of investors. The title company does not take action to verify the loan servicer or trustee's authority to act, much less understand the complicated facts about the loan itself.

The above are just representative examples of situations that title companies regularly deal with in paying off loans and securing the release of mortgages. The title company applies its standard practices in seeking payoff information and the release of the mortgage even when faced with such unusual or suspicious looking mortgages.

It is my expert opinion that the circumstances concerning the Hard Money Loans would not indicate to a title agent or closing agent that those loans were unusual, complicated or suspicious looking.

A title company would not consider it to be suspicious that EquityBuild Finance was the loan servicer while its related company, EquityBuild, was the borrower. Related-

14

party loans are fairly common on commercial real estate.[48]  Further, in this case, EquityBuild Finance did not make the loan to EquityBuild.  Rather, the Hard Money Mortgages indicate that EquityBuild Finance is merely the loan servicer for the loans made by the Private Lenders as a group.  The information given to the Private Lenders informed them that these would be loans to EquityBuild.  The Private Lenders were presumably not troubled by that fact, as evidenced by the fact that they made the loans.

A title company also would not consider it to be suspicious for a loan to have been made by individuals.  Rather, it is very common for a loan to have been made by a non-institutional lender, such as a hard money lender.[49]  A hard money loan is not an indicator of suspicious activity.

A title company also would not consider it to be suspicious for the Hard Money Loans to have been made by a consortium of private lenders.  Rather, it is quite common for hard money lenders to form a lending consortium, particularly on larger loans secured by commercial property.  This allows the loan to be funded by several smaller stakeholders rather than one person who advances the entire loan amount, increasing the number of potential loan contributors.  Also, each lender has reduced risk in taking only a fractional share of the loan.  In my experience, some lenders consider it safer to lend $100,000 on ten loans with ten different pieces of collateral than to lend $1,000,000 on one loan with one piece of collateral.  This is the same risk-spreading principle that is at the heart of the insurance model.  Thus, a loan made by a consortium of hard money lenders is not an indicator of suspicious activity.

It would not be suspicious for the Private Lenders to have appointed a loan servicer.  Rather, in my experience, every consortium of hard money lenders requires the appointment of a loan servicer.  The group must appoint one party to receive installment payments and distribute the money in the shares equating with the individual lender's percentage interest in the loan.  The group must also have an appointed agent to receive

---

[48] One common situation is when real estate is owned by the executive of a company that occupies the factory or other building, with the executive borrowing the purchase money from his company and then leasing the property to the company.  It is also common for a parent company to pay for real estate owned by its subsidiary, with the purchase money documented and booked as a loan from the parent company to the subsidiary.

[49] The usual definition of a hard money lender is a private party who lends money secured by real estate, in which the lender relies mainly on the cash value of the asset in underwriting the risk.  The borrower's creditworthiness is often not even considered.  The risks of the loan are often reflected in a higher-than-usual interest rate and loan fees.  The loan typically has a very short term, such as six months or one year, and for payments to be interest-only.  It is also common for the lender to build in an interest reserve, so that the monthly interest-only payments are actually advanced by the lender to itself and added onto the loan balance.  One practical definition of the term hard money loan is as follows: "A hard money loan is a type of loan that is secured by real property. Hard money loans are considered loans of 'last resort' or short-term bridge loans. These loans are primarily used in real estate transactions, with the lender generally being individuals or companies and not banks."  Investopedia definition supplied by Troy Segal and reviewed by Somer Anderson, found at https://www.investopedia.com/terms/h/hard_money_loan.asp.

15

communications on their behalf and to deal with the recurring issues of real estate tax payments, property insurance and other joint expenses, and notices from government offices, the borrower and others. Thus, it is my expert opinion that, when Near North Title saw Exhibit A listing a set of individual lenders holding small percentage shares in the Hard Money Loans, it would be customary for it to then peruse the Hard Money Mortgages to identify the loan servicer who was the agent of all lenders.

It appears that the Adverse Claimants might also argue that Near North Title acted imprudently by not requiring EquityBuild Finance to deliver to Near North Title evidence that the Private Lenders had given written instruction to EquityBuild Finance to release the Hard Money Mortgages. It is my expert opinion that such an argument would be contrary to the standard customs of title companies in handling loan payoffs. First, as I stated above, a title company *never* receives a loan servicing agreement in connection with a request for a payoff statement. Thus, it has no knowledge of the terms of that agreement. Second, even if the escrow officer received the Loan Servicing Agreement, it is my expert opinion that the escrow officer would not take any action to make sure that EquityBuild Finance got the necessary authority to release the Hard Money Mortgages. A closing agent customarily depends on a loan servicer to obtain whatever authority it needs from the lender or loan participants in order to accept a loan payoff and release the loan collateral. The closing agent has no authority, time or skill that would enable it to verify that the servicer has obtained authority to act. It is my further expert opinion that an escrow officer would customarily assume that he or she had a right to rely on the payoff statements issued by EquityBuild Finance as a representation that EquityBuild Finance had obtained all necessary authority, and that EquityBuild Finance's signing of the mortgage releases and delivery of those instruments into escrow was a further representation that such authority had been given.

It is also my expert opinion that a title company following standard industry customs and practices would not attempt to contact the individual Private Lenders or desire to make proportional loan payoffs directly to them. It would be extremely time-consuming to contact all of the Private Lenders separately. The Hard Money Mortgages provided no contact information for the Private Lenders. The only source for that information would be EquityBuild Finance, which would be unlikely to give that information to a title company. Further, it is my expert opinion that the Private Lenders would not be a trustworthy or accurate source of information for the amounts owed to them, because they might not have reliable receipts or records, or any experience in producing payoff letters. In addition, even if a title company could obtain payoff letters from all of the Private Lenders, it could not determine if that information was accurate without comparing it to a combined payoff letter issued by the loan servicer, EquityBuild Finance. If the totals did not jibe, the title company would have no way of sorting out the inconsistencies. Further, a title company would understand that the chance of error increases exponentially if payments are made by wire transfer to dozens of persons, rather than one payoff to EquityBuild Finance. If any single wire transfer were

inaccurate or sent to the wrong account, the result would likely be that the Hard Money Mortgage would not be released.[50] Thus, in my experience, it would be neither reasonable nor customary for a title company to make payments directly to participant lenders rather than to their joint loan servicer under the facts of this situation.

It is also my expert opinion that a title company would not conclude that the fact that EquityBuild Finance combined the loans for 7625 and 7635 South East End Avenue into one payoff statement was an indicator of a suspicious circumstance. As I stated above, EquityBuild Finance first issued separate payoff letters for the Hard Money Loans secured by 7625 and 7635 South East End Avenue. Later, it issued a revised payoff letter that combined the loans on 7625 and 7635 South East End Avenue. DeRoo told Bagchi that the two buildings were treated as a combined property.[51] The two apartment buildings are virtually identical, and sit on adjoining lots.[52] It is my expert opinion that DeRoo's explanation was reasonable, and that lender's counsel and the closing agent would accept that statement as being accurate. In my experience, it is common for two or more apartment buildings to be managed as one project, even though there are separate loans and mortgages for each building.

It is also my expert opinion that Near North Title, following industry custom and practice, would not have compared the aggregate amounts of the Hard Money Loans in the first set of payoff letters it received to the aggregate amount of the revised set of payoff letters, or conduct any investigation on that subject. It is my expert opinion that an escrow officer first performs a substantive review of a payoff letter when he or she is in the process of preparing a settlement statement for the transaction. If a payoff

---

[50] I can recall only one situation in which the title insurer for which I worked was instructed to distribute sale proceeds directly to a long list of parties in their fractional shares. My company's escrow department once handled the sale of the sole asset of a real estate partnership that was breaking up due to an internal management dispute. We were instructed to pay the net proceeds of sale to the general and limited partners. The general partner gave us a list of the limited partners and wiring instructions for all of them. We made the payments as instructed. However, two partners had identical names. One partner was supposed to receive $50,000; the other was supposed to receive $1,000,000. We transposed the instructions and sent the wrong amounts to those two partners. It was difficult, time-consuming and unnerving to unwind our error, and we were able to do so only because both of the partners acted honestly and were helpful. After that incident, our department made the firm rule that we would accept no further instructions to pay a large group of partners or shareholders directly. That incident is similar to the situation with the Private Lenders, but not the same. The payees in my incident were limited partners in the owner partnership, not lenders. They were entitled to be paid directly because the partnership was dissolving. We received specific escrow instructions to pay the limited partners directly. The information for making those payoffs was supplied to us by the general partner; we were not asked to contact the limited partners to get that information. We violated our written payment instructions. None of those facts apply to the payoff of the Hard Money Mortgages or the Private Lenders. My example is, however, a good illustration as to why a prudent title company will not voluntarily seek to pay a number of loan investors rather than making payment to their appointed loan servicer and collateral agent.

[51] Bagchi Deposition Exhibit 1 at 103, 107.

[52] See the surveys of the two East End Avenue properties at BC570007159 and -7160.

statement has changed before the escrow officer prepares the draft settlement statement, it is my expert opinion that the escrow officer does not compare the current payoff letter to a prior version of the payoff letter, because the earlier version is nullified by the later version. Morales sent a set of payoff letters to Kristen Cristia of Near North Title on September 15, 2017, including payoff letters for 7625 and 7635 South East End but not including any payoff letter for Muskegon. Near North Title received the revised and final set of four payoff letters on September 25, which included Muskegon and combined 7625 and 7635 South East End into one payoff statement. Cristia prepared the first draft settlement statement for the BC57 Loan the next day, September 26. In that settlement statement, she recited as payoffs all of the amounts shown on the revised set of payoff letters that she had received the day before. Cristia also prepared at least eight later versions of the settlement statement, including the final version prepared on September 29. She used the same payoff information in every subsequent version of the settlement statement. It is my expert opinion that, based on industry custom and practice, Ms. Cristia would have had no reason to compare the payoff amounts that she listed on the draft settlement statements to the dollar amounts listed in the payoff letters that she had received eleven days earlier.

It is also my expert opinion that a title company would not conclude that there was an indicator of a suspicious circumstance in the fact that the payoff amounts for the Hard Money Loans were less than the face amounts of the Hard Money Mortgages. As I stated above, in Ms. Bagchi's deposition, the attorney for the Adverse Claimants asserted in questioning the witness that the aggregate payoff amounts for the Hard Money Loans was about half the total of the investment amounts listed on the Exhibits A attached to the Hard Money Mortgages.[53]

First, it is my expert opinion that it is not customary for a title company employee to compare the face amount of the mortgage to the amount recited on a payoff statement. Such a comparison would be an investigation into the validity or truth of the payoff statement issued by the lender or its loan servicer. It is my expert opinion that a closing agent does not undertake any such investigation. Further, the only source available to the title company for that information is the lender or loan servicer.

Second, comparing the face amount of the mortgage to the balance due as shown on the payoff statement would not be a fruitful or reliable way to conduct an investigation. It is very common for the face amount of the mortgage and the amount listed on the payoff statement to vary widely, especially on business or commercial loans. For example, a business might have a set of loans with its lender, including a line of credit and a series of term loans. The business will often sign a cross-collateralization agreement saying that all loans are secured by all assets of the company. The lender then

---

[53] Bagchi Deposition at 49-50.

18

often records mortgages against all of the business's real estate assets in some large amount tied to the total aggregate loan amount, and having nothing to do with the value of the real estate parcel. However, if one parcel of real estate is sold, the lender will issue a payoff statement in which it allocates some amount of the loan to that property. In such a case, for example, the title company might see a $100 million mortgage on property worth $10 million, and receive a payoff statement stating that the lender will release the mortgage on payment of $2 million. The title company would be unable to determine how the lender arrived at the payoff amount. It would accept the payoff statement as a promise to release the mortgage on payment of the amount stated in the letter.

A second example is the lender that always inserts a face amount on its mortgage of more than its current loan amount. The lender does so because it wants to give notice to possible junior creditors that it will claim a lien that includes principal, interest, protective advances, additional advances or any future loan to the same borrower. It is not uncommon for a lender to add 25% to 50% to the amount of its loan in the amount recited in the mortgage. Indeed, the Hard Money Mortgages all say that they secure the note amount plus interest, all "renewals, extensions and modifications" of the loan, and all protective advances that might be made by the Private Lenders.

A third example is when the lender recites an intentionally overstated dollar amount in its mortgage to discourage any other lender from making a loan secured by a junior lien on the property. This device has the same net effect as having the borrower sign a covenant not to further encumber the property, but has the added advantage that the world is on notice that the first mortgage encumbers the entire value of the property. I have been involved in situations in which the borrower signed a covenant not to further encumber the property, and then breached that covenant by getting a junior loan.

These are just some examples from my own experience that show why a title company does not compare the face amount of a mortgage to the amount stated in a payoff letter for that loan, and why a disparity between those two numbers is not an indicator of fraud or a suspicious circumstance.

Finally, it is my expert opinion that a title company would not deem the fact that the release deeds for the Hard Money Mortgages transposed the names of the mortgagor and mortgagee to be a suspicious circumstance. The release deeds were properly signed by EquityBuild Finance, the loan servicer for the Hard Money Loans. The release deeds also correctly recited the Hard Money Mortgages by their recording data and attached the correct legal descriptions for the Properties. However, in the body of the release deeds, EquityBuild was recited as being the party releasing its rights in the Hard Money

Mortgages to EquityBuild Finance.[54]  In my experience, the transposition of the names of the mortgagor and mortgagee is the most commonly-occurring error on a mortgage release, reconveyance or release deed.  In my expert opinion, as long as the instrument is signed by the correct party, and accurately identifies the mortgage being released, a title officer will accept the release in order to insure title free of the mortgage even if the mortgagor and mortgagee are transposed.  Such a benign error would hardly be considered suspicious, or cause the title officer to make any further inquiry.

For all of the above reasons, it is my expert opinion that there were no circumstances about the payoff of the Hard Money Loans that would cause a reasonable and prudent title company to make more than the usual inquiry into the authority of EquityBuild Finance to accept loan payoffs, or to take some extra precautions to assure that the releases of the Hard Money Mortgages were valid and enforceable.

## IV.    Report Preparation and Compensation

I am paid $375 per hour.  My expenses are reimbursed at cost.  My compensation is not contingent on my opinions or on the outcome of the litigation.

I personally prepared this report.  My signature is affixed below.

Dated this 9th day of December, 2021.

Yours very truly,

J. Bushnell Nielsen

46460411

Appendix enclosed

---

[54] The transposition error was **not** made in the drafts of the release deeds reviewed before closing by Ms. Bagchi.  See BC570012882-12889.  This suggests that the release deeds were changed after Ms. Bagchi reviewed the drafts.

**APPENDIX TO NIELSEN EXPERT REPORT**

in

***United States Securities and Exchange Commission v.***
***Equitybuild, Inc. et al.,***

U.S. District Court, Northern District of Illinois,
Eastern Division Case No. 18-cv-5587

46483111

EXHIBIT 1

DOCUMENTS ON WHICH NIELSEN RELIED
FOR HIS EXPERT OPINIONS

1.  All Bates-labeled documents, treatises, code sections, regulations, articles, title records, authorities and other documents recited in the Nielsen expert report.

2.  Documents produced by BC57 in a folder named 8-6-21 BC57 Produced Discovery Files, in three subfolders labeled Escrow, Title and NNNT Correspondence Documents. The Escrow subfolder contains 28 items. The Title subfolder contains 13 items and further subfolders named clearance, Commitment, Draft documents, IL1706750-D1, New order info, Organizational Docs, Policy, ProForma, Recorded docs, Searches and Survey. The subfolder labeled NNNT Correspondence Documents contains three subfolders labeled Correspondence 1, 2 and 3, containing 21, 18 and 11 emails, respectively.

3.  Transcript and exhibits from deposition of Kasturi Bagchi taken on October 25, 2021 in the matter *United States Securities and Exchange Commission v. Equitybuild, Inc. et al.*, Case No. 18-cv-5587.

4.  Motion for Leave to Include an Expert Witness Disclosure in Position Statement filed in the matter *United States Securities and Exchange Commission v. Equitybuild, Inc. et al.*, Case No. 18-cv-5587.

5.  Order granting leave to include Nielsen Report with Position Statement entered the matter *United States Securities and Exchange Commission v. Equitybuild, Inc. et al.*, Case No. 18-cv-5587.

6.  SEC's Response to BC57 Motion for Leave for Expert Witness filed the matter *United States Securities and Exchange Commission v. Equitybuild, Inc. et al.*, Case No. 18-cv-5587.

7.  Transcript and exhibits from deposition of Jason Jarjosa taken on November 3, 2021 in the matter *United States Securities and Exchange Commission v. Equitybuild, Inc. et al.*, Case No. 18-cv-5587.

8.  Transcript and exhibits from deposition of Matthew Turzewski taken on October 29, 2021 in the matter *United States Securities and Exchange Commission v. Equitybuild, Inc. et al.*, Case No. 18-cv-5587.

9.  Transcript and exhibits from deposition of Maribel Morales taken on November 3, 2021 in the matter *United States Securities and Exchange Commission v. Equitybuild, Inc. et al*., Case No. 18-cv-5587.

10. Documents in a folder labeled Maribel Morales from BC57 Numbered Production, Bates-labeled as BC570003595-11021, BC5700-12775-13740 and BC570013767-14165.

11. 21 emails delivered in a folder labeled Mirabel Morales from NNNT.

12. Transcript of court hearing on November 18, 2021 in the matter *United States Securities and Exchange Commission v. Equitybuild, Inc. et al.*, Case no. 18-cv-5587.

13. A 51-page set of documents labeled as Sample Investment Package and that appear to be the Solicitation documents signed by Kevin Scheel.

14. NNNT Final Accounting Packages (10/11/17 and 10/16/17).

## J. Bushnell Nielsen

Reinhart Boerner Van Deuren s.c.
N16 W23250 Stone Ridge Drive, Suite 1
Waukesha, Wisconsin 53188

Telephone:  262-951-4514
Facsimile:  262-951-4690
Email:  bnielsen@reinhartlaw.com

## SUMMARY OF CREDENTIALS
## AND RESUME

I have 40 years of work experience in and related to the land title insurance industry.

I was employed by two national title insurers for a total of 16 years.  I held five positions with those companies.  As a title officer, I searched and examined title and issued title insurance commitments and policies.  I served as chief underwriting counsel in Michigan and Wisconsin, and managed other underwriting attorneys.  I wrote underwriting manuals and bulletins, and set underwriting practices.  I was a claims counsel for 14 years, handling about 1,500 title insurance and closing claims.  I also supervised other claims counsel who administered claims in nine states.  For several years, I was the manager of agency operations for Ticor Title Insurance Company in the State of Michigan, responsible for signing new title agents and auditing and terminating existing agents.  I also managed a National Business Unit commercial title insurance operation located in Detroit, with responsibility for multi-site and multi-state transactions in all 50 states.  In that capacity, I closed hundreds of real estate transactions, for every type of property, including residences, office buildings, factories, a steel mill and a baseball stadium, located in many states.

I have spent 24 years in private practice, engaged almost exclusively on matters involving title insurance, real estate titles and closing liability issues.  Since 2000, I have been a shareholder at the law firm of Reinhart Boerner Van Deuren s.c., a 200-lawyer firm with offices in Wisconsin, Illinois, Minnesota, Colorado and Arizona.  I also spent three years as a member of the title insurance team at the law firm of Hinshaw & Culbertson, in its Chicago and Milwaukee offices.

I have litigated many disputes about the title to real estate, title insurance coverage, closing problems and related matters.  I have argued a number of cases before the Wisconsin Supreme Court and appellate courts, and have served as *amicus curiae* counsel in cases presenting important issues about real estate titles.

I have conducted many title searches and examinations while in private practice, and continue to search, examine and opine on the title to parcels of real estate.  I have testified at trial concerning my findings as a title searcher and examiner.

I wrote the book *Title and Escrow Claims Guide*, first published in 1996 and updated annually since then.  That 1,744-page treatise is national in scope and is published by American Land Title Association.  The book distills the custom and practice employed by title insurers and

32681761

Exhibit 2

escrow companies, is used by employees of every major title insurer, and has been cited as a learned treatise by appellate courts.

Since 1998, I have been the Editor of *The Title Insurance Law Newsletter*, a publication of the American Land Title Association. The *Newsletter* is a paid-subscription monthly report, national in scope and audience, on recent case law, regulations and claims issues involving title insurance policies, closing and escrow issues, closing protection letters, RESPA liability and conveyancing law. I have written over 3,000 articles about real estate titles, title insurance and escrows, published in *The Title Insurance Law Newsletter*.

I have also written a number of other scholarly articles and two book chapters, which are listed below in my *curriculum vitae*.

I have conducted more than 200 training seminars in at least a dozen states. I have given extensive training to claim administrators on industry customs. I have also trained title examiners, closers, surveyors, registers of deeds, GIS mapping and property records custodians, attorneys, loan officers, real estate brokers and other real estate-related professional groups.

I have suggested, drafted and testified on a number of laws that have improved and simplified real estate records and issues related to title and title insurance, including Wisconsin's closing funds law, a law permitting the correction of deeds by affidavit, a law setting the boundary of Lake Michigan at Milwaukee and a law that permits the release of liens for debts discharged in bankruptcy.

I served as the elected president of both the Michigan Land Title Association and the Wisconsin Land Title Association, a dual honor given to only a few people in the history of the title insurance business. I am a member by invitation of the American College of Real Estate Lawyers. I have received numerous awards and professional accolades, as further described in my *curriculum vitae*, below.

# J. Bushnell Nielsen

**Education/ License**

Ripon College, attended from 1974 to 1976.
B.S. *cum laude*, U. Wisconsin--Stevens Point, 1978.
J.D., Marquette University Law School, 1981. *Law Review*.

Licensed to practice law in Wisconsin (State Bar number 1014758)

Wisconsin Title Insurance Intermediary License No. 2328060
held from 1993 to 2007.

**Work History**

June, 2000 to present:  Shareholder, Reinhart Boerner Van Deuren s.c., Waukesha, Wisconsin.  Title-related and escrow litigation, title insurance coverage opinions, expert witness assignments, real estate transactions, claim investigation and settlement, advice concerning RESPA compliance and affiliated business arrangements and tax-deferred exchanges.

May, 1993 through May, 2000:  Chicago Title Insurance Company, Waukesha, Wisconsin.  Associate Area Counsel, State of Wisconsin, January, 1996 to 2000.  Assistant Regional Counsel, August, 1993 to December, 1995.

August, 1990 to May, 1993:  Hinshaw & Culbertson, Milwaukee, Wisconsin.  Title industry litigation and coverage practice.

July, 1981 to July, 1990:  Ticor Title Insurance Company.  Midwest Region Claims Counsel, Home Office staff, 1988 and 1990.  Michigan State Manager, 1987 and 1988.  Michigan State Counsel, 1984 through 1986.  Milwaukee County Counsel, 1981 through 1983.

**Recognition**

Named a Wisconsin Super Lawyer in the category of real estate by *Law & Politics* and *Milwaukee Magazine* from 2006 to present.

Named in *The Best Lawyers in America*® in the category of Litigation--Real Estate from 2009 to present.  Named the 2022 Lawyer of the Year in the category of Litigation—Real Estate in Milwaukee.

Named in the *Milwaukee Business Journal* list of *Top Lawyers* from 2009 to present.

Named in the M Magazine/AVVO *Leading Lawyers in Milwaukee* list for 2012.

AV-rated by Lexis-Nexis Martindale-Hubbell.

Recipient of Service Award, Wisconsin Land Title Association, October,

2005.

Recipient of Member of the Year Award, Wisconsin Land Title Association, September, 2002.

Commendation by Wisconsin Governor Scott McCallum for service to the land title industry, September 12, 2002.

Recipient of President's Award for Outstanding Service, Wisconsin Land Title Association, May, 2000.

Recipient of President's Award for Outstanding Service, Wisconsin Land Title Association, April, 1996.

Recipient of Bob Jay Outstanding Leadership Award, Michigan Land Title Association, July, 1991.

| | |
|---|---|
| **Professional Associations** | Member (by invitation), American College of Real Estate Lawyers. Member, Title Insurance Committee and Title Insurance Coverage Subcommittee. |

Wisconsin Land Title Association:
President, 2003-2004. Director-At-Large, 1999 to 2003. Member, Legislative Committee, 1990 to present; Vice Chair, 1996 to 2000.

American Land Title Association:
Member, 1990 to present. Member, Title Counsel Committee.

Michigan Land Title Association:
President, 1989-1990. Treasurer, 1986-1988. Director, 1985-1986. Chairman, Underwriting Committee, 1987-1990. Good Funds Committee: Chairman, 1989-90; member, Education Committee, 1984-1989.

American Bar Association:
Member, Real Property Section, 1988 to present. Member, Title Insurance Litigation Committee, Tort Trial and Insurance Practice Section, 1992 to present.

Member, State Bar of Wisconsin.

State Bar of Michigan:
Member (special certificate), 1984 to 1990. Member, Water Law Committee, Real Property Section, 1987 to 1990.

**Significant Appellate Decisions**

*Country Visions Cooperative v. Archer-Daniels-Midland Co., et al.*, Appeal No. 2018AP960. Argued case before the Wisconsin Supreme Court on February 25, 2021. The primary issue is the method to be adopted in Wisconsin for setting the exercise price for property subject to a right of first refusal, when the subject property is sold in conjunction with other real estate.

*Ash Park, LLC v. Alexander & Bishop, LTD.,* Appeal No. 2013AP1532. Presented argument on March 4, 2015 to the Wisconsin Supreme Court as counsel for subsequent purchaser-intervenor in petition concerning real estate broker commission and broker lien.

*Kimble v. Land Concepts, Inc.*, 2014 WI 21, 353 Wis.2d 377, 845 N.W.2d 395 (2014). Counsel for First American Title in petition before the Wisconsin Supreme Court in which the court reversed a punitive damage award against the insurer as being an unconstitutional taking of property. Argued on December 19, 2013.

*Geiger v. Chicago Title Ins. Co.*, 2011 WI App 136, 337 Wis.2d 429, 805 N.W.2d 734 (Wis.App.). Counsel for Chicago Title in case holding that the insurer did not have a duty to defend or pay the insured on a claim concerning a boundary dispute.

*Johnson 1988 Trust v. Bayfield County*, 649 F.3d 799 (7th Cir. 2011), earlier decision 520 F.3d 822 (7th Cir. 2008). Counsel for *amicus curiae* Wisconsin Land Title Association in landmark case affirming private owners' title obtained from railroads after ICC abandonment of rail lines and limiting use of federal rails-to-trails legislation, as discussed in William T. Stuart and Thomas M. Hruz, *Switching Tracks: How the Seventh Circuit Restored Certain Landowners' Rights to Abandoned Railroad Rights-of-Way*, American Land Title Association *Title News*, Volume 90, Number 10 (October 2011), p. 23.

*Solowicz, et al. v. Forward Geneva National,* Appeal No. 2008AP10, 2010 WI 10, 323 Wis.2d 556, 780 N.W.2d 111 (2010). Counsel for *amicus curiae* Wisconsin REALTORS[(r)] Association in significant Wisconsin Supreme Court decision adopting the concept of master planned communities in Wisconsin. I joined in oral argument.

*Residential Funding Company, LLC v. Saurman*, 292 Mich.App. 321, 807 N.W.2d 412 (2011) (Michigan Court of Appeals #290248), reversed by 805 N.W.2d 183, 490 Mich. 909 (2011). Counsel for *amicus curiae* American Land Title Association in precedent-setting case holding that Mortgage Electronic Registrations System, Inc. is qualified to conduct foreclosures by advertisement in Michigan.

*Anderson v. Quinn*, 2007 WI App 260, 306 Wis.2d 686, 743 N.W.2d 492. Significant decision concerning doctrines of bona fide purchaser, inquiry notice and Statute of Frauds.

*Spencer v. Kosir*, 301 Wis.2d 521, 733 N.W.2d 921 (Wis.App. 2007). Landmark decision holding that an easement may not be abandoned if never used.

*Smiljanic v. Niedermeyer*, 2007 Wis. App. 182, 304 Wis.2d 197, 737 N.W.2d 436 (Wis.App. 2007). Decision holds that an easement may not be appended to a deed by an affidavit of correction signed by the broker in the transaction rather than the grantor.

*AKG Real Estate, LLC v. Kosterman*, 2006 WI 106, 296 Wis.2d 1, 717 N.W.2d 835 (2006). Counsel for easement holder whose rights were affirmed by Wisconsin Supreme Court in a decision rejecting a proposed change concerning the right to unilaterally terminate or move easements.

*First American Title Ins. Co. v. Dahlmann*, 2006 WI 65, 291 Wis.2d 156, 715 N.W.2d 609 (2006). Counsel for First American Title Insurance Company. Wisconsin Supreme Court ruled that title insurance policy coverage is triggered by the encroachment of improvements into a neighboring street, if that encroachment is substantial, when the insurer has removed the so-called "survey" exceptions from the policy.

*Megal Development Corp. v. Shadof*, 2005 WI 151, 286 Wis.2d 105, 705 N.W.2d 645 (2005). Counsel for *amicus curiae* Wisconsin Land Title Association. Wisconsin Supreme Court reversed trial court and declared that a judgment lien may be satisfied after discharge of the judgment debt in bankruptcy, adopting reasoning of WLTA.

*Evans v. Samuels*, 119 Nev. 378, 75 P.3d 361, 119 Nev. Adv. Rep. 42 (Nev. 2003). Counsel for amicus curiae Nevada Land Title Association. Nevada Supreme Court clarified the law on duration of judgment liens and effect of attempted renewal of such liens after expiration of six-year lien period.

*Houston v. Bank of America Federal Savings Bank*, 78 P.3d 71 (Nev. 2003). Counsel for amicus curiae Nevada Land Title Association. Nevada Supreme Court adopted the Restatement (Third) of Property view of equitable subrogation, at urging of Nevada Land Title Association, which is favorable to lenders and their title insurers.

*ABKA Limited Partnership v. Wisconsin Department of Natural Resources*, 2002 WI 106, 255 Wis.2d 486, 648 N.W.2d 854 (2002). Counsel for amicus curiae Wisconsin Land Title Association in Wisconsin Supreme

Court case concerning public trust doctrine and marina condominiums.

*Greenberg v. Stewart Title Guar. Co.*, 171 Wis.2d 485, 492 N.W.2d 147 (Wis. 1992). Counsel for *amicus curiae* Wisconsin Land Title Association. Wisconsin Supreme Court rejected abstractor liability on title insurance policy, adopting position of WLTA.

*Jalowitz v. Ticor Title Ins. Co.*, 165 Wis.2d 392, 478 N.W.2d 67 (Table), 1991 WL 271040 (Wis.App.) (unpublished). Counsel for Ticor Title in decision establishing that loss on an owner's policy is measured based on the value of the property on the date of the discovery of the title defect or encumbrance.

|  |  |
|---|---|
| **Legislative and Regulatory Activities** | Presented proposed modifications to the American Land Title Association owner's and loan title insurance policies to the ALTA Forms Committee, on my own behalf and as part of a joint committee of the American Bar Association, American College of Real Estate Lawyers and American College of Mortgage Attorneys, 2019 and 2020. Several changes that I proposed became part of the 2021 ALTA owner's and loan title insurance policies. |

Served on drafting committee for Wisconsin Statute 893.305, concerning the recording of an affidavit of interruption of adverse possession, 2015 Wisconsin Act 200. Testified on behalf of the compromise bill on behalf of Wisconsin Land Title Association.

Testified in opposition to Wisconsin Senate Bills 314 and 344, and Assembly bill 465, which would effectively bar the accrual of title by adverse possession in the State of Wisconsin prospectively. Testimony given on November 18, 2015 and December 10, 2015 on behalf of Wisconsin Land Title Association.

Testified in favor of, and served as advisor to the author and co-sponsors of, Wisconsin Statute 30.2038, adopted in March of 2014, which declares the waterward boundary of two and one half miles of shoreline along Lake Michigan at downtown Milwaukee.

Assisted in drafting of proposed law or regulation for the mandatory issuance of closing protection letters in the State of Wisconsin and the State of Michigan and meetings with state regulators, 2011-2015.

Member of committee that obtained adoption of Uniform Residential Mortgage Satisfaction Act in Wisconsin, 2012-2013.

Lead drafter of bill to enable affidavits of correction in Wisconsin and to modify commercial broker lien and *lis pendens* laws, in joint taskforce of

Wisconsin Land Title Association, Wisconsin Registers of Deeds Association, Wisconsin Real Property Listers Association and State Bar of Wisconsin, 2008-2010. Testified in support of on Senate Bill 587 before Senate Committee on Veterans and Military Affairs, Biotechnology and Financial Institutions on March 10, 2010. Testified on Assembly Bill 821 before Committee on State Affairs and Homeland Security on March 25, 2010. Law adopted in 2010.

ALTA representative to joint drafting committee on uniform loan closing instructions sponsored by ALTA, Mortgage Bankers Association of America and American Escrow Association, 2008-2009.

Presentation of proposed rewrite of ALTA owner's title insurance policy to ALTA Forms Committee, February, 2009.

Drafted law grandfathering marina condominiums in Wisconsin. Wis.Stats. § 30.1335, adopted in July, 2007.

Drafted and testified in favor of change to Wisconsin statutes clarifying that a person discharged of a judgment debt in bankruptcy may obtain a court order satisfying the lien of the judgment. Wis.Stats. § 806.19(4).

Drafted and testified in favor of Wisconsin's law requiring mortgage lenders to deliver good funds to closing. Wis.Stats. § 708.10.

**Publications**       Editor and principal author of <u>The Title Insurance Law Newsletter</u>, a monthly national report of recent legal decisions concerning title insurance, closing and escrow issues, RESPA and conveyancing law, published by American Land Title Association. Since 1998, I have written more than 2,500 articles that have appeared in the *Newsletter*.

Author of <u>Title and Escrow Claims Guide</u>, a national research treatise on title insurance, escrows and conveyancing. Published in 1996 and updated annually. Published by American Land Title Association and available on Westlaw.

<u>Commercial Real Estate Transactions in Wisconsin</u>, Chapter 7, *Title Insurance and Closing Protection Letters*, with Richard Donner, State Bar of Wisconsin, published in 2010, last revised in 2021.

<u>Methods of Practice (4th Edition)</u>, Wisconsin Practice Series, Chapter 9, *Title Insurance*, West Publishing Group, published in 2004, revised in 2012.

<u>Attorney Closer Personally Liable for Assisting in Loan Fraud</u>, *Title News*, Volume 98, Number 10 (October, 2019), page 26.

<u>Florida Loan Closer Convicted for Borrower's Loan Fraud</u>, *Title News*, Volume 97, Number 10 (October, 2018), page 18.

<u>Real Estate Closing, Title Examination and Title Insurance Policy Procedures and Customs in the United States by Region</u>, *Real Estate Finance Journal*, Fall 2018, page 19.

Quoted in <u>New Vetting Tool for Loan Closers: Protect your bank from losses due to title agent fraud</u>, *Wisconsin Banker* magazine, October 2018, page 11.

Quoted in <u>Wisconsin Passes Bill that Eases Curing of Simple Conveyance Mistakes</u>, ALTA *Title News*, August 26, 2010.

<u>HUD Adopts New RESPA Regulations</u>, with Robert W. Habich, *Real Estate Finance Journal*, Spring 2009, page 73.

<u>No More Marina Condos</u>, *Wisconsin Lawyer*, Volume 82, No. 3 (March, 2009), page 36.

<u>Title Policy Blanket Restrictive Covenants Exception Enforceable</u>, 26 *ACREL News* No. 2 (May, 2008), page 5.

<u>Keeping Up With Law & Regulation</u> column, published monthly in <u>Settlement Services Today</u> magazine, July, 1999 to November, 2000.

<u>Case Briefs</u> column, published monthly in <u>Condell Private Letter</u>, April, 1997 to March, 1998.

<u>Chicago Title Insurance Company Wisconsin Examining Manual</u>, Chief Editor, 1995 to 2000.

<u>Escrowee's Duties in the Handling of Funds</u>, Chicago Title and Trust Family of Insurers <u>Underwriting Journal</u>, April, 1998.

<u>Mortgage Payoff and Assignment Issues</u>, Chicago Title and Trust Family of Insurers <u>Underwriting Journal</u>, June, 1997.

<u>Statements and Representations by Closers</u>, Chicago Title and Trust Family of Insurers <u>Underwriting Journal</u>, November, 1997.

<u>Escrowee's Duties Regarding Recording of Documents</u>, Chicago Title and Trust Family of Insurers <u>Underwriting Journal</u>, March, 1997.

Contributing Editor, <u>The Title Insurance Law Newsletter</u>, April, 1992 to May, 1993.

Insuring Title to Riparian or Littoral Property, Michigan Real Property Review, Volume 17, No. 1, p. 11 (Spring 1990).

National Underwriting Manual, Ticor Title Insurance Company, Chapter Author, 1988.

Michigan Underwriting Manual, Ticor Title Insurance Company, Chief Editor, 1984 to 1988.

Determining and Surveying Water Boundary Lines in Michigan, *Michigan Bar Journal*, September, 1987, p. 874.

|  |  |
|---|---|
| **Speeches and Seminars** | Title Insurance Policy Coverage and Claims In-Depth, Minnesota Continuing Legal Education Foundation, May 16, 2021. |

2021 ALTA Policies and Recent Title Insurance Coverage Decisions, Alliant National Title Claims Department, February 19, 2021.

2021 ALTA Policies and Recent Title Insurance Coverage Decisions, Fidelity National Title Group Claims Department, January 20, 2021.

Plotting Legal Descriptions and Understanding Surveys, Fidelity National Law Group Riverside, California, January 29, 2021.

2020 Title Insurance Case Law Update, Minnesota State Bar Annual Real Estate Institute, St. Paul, Minnesota, November 12, 2020.

Current Important Title Insurance Coverage Decisions, presented to American College of Mortgage Attorneys, with Paul Hammann of First American Title as co-presenter. September 10, 2020.

Surprising Strategies for Negotiating Title Insurance Coverage, American Law Institute webinar, March 17, 2020.

Surprising and Creative Title Insurance Solutions, Minnesota State Bar Annual Real Estate Institute, St. Paul, Minnesota, October 31, 2019.

2019 Title Insurance Case Law Update, Minnesota State Bar Annual Real Estate Institute, St. Paul, Minnesota, October 31, 2019.

Understanding Title Insurance, Minnesota State Bar Continuing Legal Education, Minneapolis, Minnesota, June 12, 2019.

Bankers Trust and its Progeny: Construction Lending and Exclusion 3(a), telephone seminar with Paul Peterson, John Hosack and William Just,

presented by the Association of Title Insurance Committees of the American
College of Real Estate Lawyers, American College of Mortgage Attorneys and
American Bar Association Title Insurance Committee, March 14, 2019.

Writing Policy Exceptions, Explaining Title Insurance to the Customer and
the Agent's Role When a Title Claim is Made and How Claims are Resolved
According to the Nature of the Claim and the Type of Policy, Conestoga Title
Insurance Company Conestoga College 2019, Lancaster, Pennsylvania,
January 21, 2019.

Lender Vetting of Loan Closing Agents, Minnesota State Bar Annual Real
Estate Institute, St. Paul, Minnesota, November 2, 2018.

Important Title Insurance Decisions of 2018, Minnesota State Bar Annual
Real Estate Institute, St. Paul, Minnesota, November 1, 2018.

Underwriting the Tough Stuff, panel with Duane Wunsch and Lisa Petersen,
Chicago Title Agent Loyalty Club, Kohler, Wisconsin, October 9, 2018.

Preventing the Most Fascinating and Frustrating Claims in 2019 and Beyond,
Eastern Pennsylvania Chicago Title Agency Seminar, Blue Bell,
Pennsylvania, October 4, 2018.

Errors and Omissions Policies, Insurance Broker Liability and Marketability
of Title, Minnesota Land Title Association annual convention, Breezy Point,
Minnesota, August 11, 2018.

How Title Insurance Claims Are Resolved, Minnesota State Bar Continuing
Legal Education, Minneapolis, Minnesota, May 9, 2018.

Errors and Omissions Policy Pointers, Fidelity National Title Group Agent
Business Conference, Wausau, Wisconsin, May 8, 2018.

Voluntary Conveyance of the Insured Property as Triggering Owner's Policy
Termination, telephone "debate" with Joyce Palomar and Barlow Burke
presented by the Association of Title Insurance Committees of the American
College of Real Estate Lawyers, American College of Mortgage Attorneys and
American Bar Association Title Insurance Committee, February 13, 2018.

Important Recent Title Insurance Decisions, Minnesota State Bar Annual Real
Estate Institute, St. Paul, Minnesota, November 3, 2017.

The New 2016 ALTA Title Insurance Commitment Form, with Fran Iverson,
Vice President and Manager, Chicago Title Insurance Company, Minnesota
State Bar Annual Real Estate Institute, St. Paul, Minnesota, November 2,
2017.

The New 2016 ALTA Title Insurance Commitment Form, Wisconsin Land Title Association annual convention, Milwaukee, Wisconsin, October 19, 2017.

Mechanic Lien Coverage and B & B Syndication Services, Inc. v. First American Title Insurance Company, telephone "debate" with Albert Rush presented by the Association of Title Insurance Committees of the American College of Real Estate Lawyers, American College of Mortgage Attorneys and American Bar Association Title Insurance Committee, October 3, 2017.

How Loan Title Insurance Policy Claims Are Resolved, Corporate Counsel Committee of the American College of Mortgage Attorneys, Asheville, North Carolina, September 14, 2017.

How to Draft Exceptions and Affirmative Coverages, agents of Old Republic National Title Insurance Company, Chippewa Falls, Wisconsin, September 7, 2017.

Important Recent Title Insurance Decisions and Claims on Special Title Policy Coverages, Fidelity National Title Jacksonville, Florida Claims Center, June 6, 2017.

How to Draft Exceptions and Affirmative Coverages, agents of Old Republic National Title Insurance Company, Madison, Wisconsin, April 20, 2017.

Knowledge and Disclosure in Relation to Exclusions 3(a) and 3(b) of the American Land Title Association Title Insurance Policies, telephone "debate" with Albert Rush, presented by the Association of Title Insurance Committees of the American College of Real Estate Lawyers, American College of Mortgage Attorneys and American Bar Association Title Insurance Committee, March 8, 2017.

Important Recent Title Insurance Decisions, First American Title Warrenville, Illinois Claims Center, November 18, 2016.

Important 2016 Cases on Title Insurance Policy Coverage and Claims on Special Title Policy Coverages, Including Forced Removal, Zoning and Encroachments, Minnesota State Bar Annual Real Estate Institute, St. Paul, Minnesota, November 3 and 4, 2016.

Important Recent Title Insurance and Closing Protection Letter Cases and Changes, Fidelity National Title Omaha, Nebraska Claims Center, April 27, 2016.

Closing Protection Letter Claim Issues, Minnesota State Bar Annual Real

12
Exhibit 2

Estate Institute, St. Paul, Minnesota, October 23, 2015.

Explaining Title Insurance to Your Customer and Protecting Your Title Agency When a Claim is Made, Wisconsin Land Title Association Annual Convention, Milwaukee, Wisconsin, September 18, 2015.

Title Insurance Policy Coverage and Claims in Depth, Minnesota State Bar Continuing Legal Education, Minneapolis, Minnesota, August 12, 2015.

Explaining Title Insurance to Your Customer and Protecting Your Title Agency When a Claim is Made, Minnesota Land Title Association, Minneapolis, MN, August 7, 2015.

Closing Protection Letters informational videotapes posted to Reinhart Boerner Van Deuren s.c. website, August, 2015.

Hot Coverage Issues, American Bar Association TIPS Title Insurance Litigation Committee Spring Meeting, Hilton Head Island, South Carolina, May 15, 2015.

Claims on Loan Title Insurance Policies, Minnesota State Bar Annual Real Estate Institute, St. Paul, Minnesota, November 14, 2014.

Important Recent Title Insurance Decisions, Minnesota State Bar Annual Real Estate Institute, St. Paul, Minnesota, November 13, 2014.

Title Insurance Policy Coverage, guest lecturer, Real Estate Transactions 1 course at University of Wisconsin Law School, October 14, 2014.

Closing Protection Letter Legislative Proposal, panel discussion, Wisconsin Land Title Association convention, September 17, 2014.

Interesting New Title Insurance Decisions, Fidelity National Title Omaha, Nebraska Claims Center, May 20, 2014.

Duties of a Title Company in Closings and Escrows, Minnesota State Bar Annual Real Estate Institute, St. Paul, Minnesota, November 15, 2013.

Title Insurance Case Law Update, Minnesota State Bar Annual Real Estate Institute, St. Paul, Minnesota, November 14, 2013.

Claim Avoidance Strategies, Wisconsin Land Title Association graduate course, member of seminar panel, Madison, WI, November 6, 2013.

Closing Protection Letters, Indiana Land Title Association Super Seminar, Carmel, Indiana, July 10, 2013.

_How to Measure Loss Under a Title Insurance Policy_, Wisconsin State Bar 30th Business and Real Estate Institute, Madison, June 13, 2013.

_How Endorsements are Written and Construed_, customers of Chicago Title Insurance Company, Milwaukee and Waukesha, Wisconsin, May 1 and 2, 2013.

_How to Measure Loss Under a Title Insurance Policy_, Minnesota State Bar 30th Annual Real Estate Institute, St. Paul, Minnesota, November 9, 2012.

_Title Insurance Policy Coverage_, guest lecturer, Real Estate Transactions 1 course at University of Wisconsin Law School, October 17, 2012.

_Exception Drafting Workshop_, for employees of Commercial Partners Title, LLC, Minneapolis, Minnesota, September 12, 2012.

_Important Recent Title Insurance Coverage Cases_, seminar for claim administrators of Fidelity National family of insurers, Omaha, Nebraska, September 5, 2012.

_Drafting Exceptions and Endorsements_, seminar for employees of Commercial Partners Title, LLC, Minneapolis, Minnesota, July 10, 2012.

_Title Insurance Policy Coverage in Depth_, Minnesota State Bar Association Continuing Legal Education, Minneapolis, Minnesota, July 9, 2012.

_Closing Protection Letters_, Wisconsin Land Title Association, panel discussion with Nick Hacker, American Land Title Association, Doug Smith, Stewart Title Guaranty Company and Donald Schenker, First American Title Insurance Company, Madison, Wisconsin, April 21, 2012.

_E & O Coverage and Important Title Insurance Cases_, Old Republic National Title's annual Wisconsin agent seminar, Wisconsin Dells, WI, April 17, 2012.

_Closing Protection Letters_, webinar for Fidelity National Title Group agents, with Lisa Petersen, underwriting counsel for Fidelity National Title Group, Milwaukee, WI, April 11, 2012.

_Important Recent Title Insurance Coverage Cases_, Minnesota Land Title Association, St. Cloud, Minnesota, April 5, 2012.

_Commercial Real Estate Transactions: Title Insurance_, State Bar of Wisconsin webinar, Madison, Wisconsin, March 7, 2012.

_Title Insurance: Important Recent Coverage Cases_, Minnesota State Bar 29th

Annual Real Estate Institute, St. Paul, Minnesota, November 4, 2011.

Title Insurance Policy Coverage, guest lecturer, Real Estate Transactions 1 course at University of Wisconsin Law School, October 19, 2011.

Title Insurance: Important Recent Coverage Cases, American Land Title Association convention, Charleston, South Carolina, October 13, 2011.

Unauthorized Practice of Law Issues Relating to the Land Title Industry and Settlement Table Shenanigans, Indiana Land Title Association convention, Fort Wayne, September 21, 2011.

Limiting Your Title Company's Risks in an Uncertain World, Keynote Address at 100th Annual Convention of Ohio Land Title Association, Columbus, Ohio, September 14, 2010.

Closing Problems, Avoidable Title Claims, E&O Coverage and Agency Contract Liability Issues, Indiana Land Title Association five-hour continuing education seminar, Indianapolis, Indiana, August 24, 2010.

Curing Title Using the New Affidavit of Correction Law and Other Techniques, live webcast for State Bar of Wisconsin, Madison, Wisconsin, July 28, 2010.

How to Calculate Loss Under a Title Insurance Policy, Minnesota State Bar 27th Annual Real Estate Institute, St. Paul, MN, November, 2009.

Training of about 300 title insurance claim administrators in 26 full-day training sessions conducted in three locations between June, 2009 and December, 2010.

Title Insurer v. Lender Amidst the Foreclosure Crisis, American Bar Association teleconference, with Benjamin M. Kahrl, April 14, 2009.

Surveying of Boundaries on Water, Northeast Wisconsin Society of Land Surveyors, Green Bay, Wisconsin, March, 2009.

A View from the Trenches: Title Claims by Region in 2009, ABA Tort, Trial and Insurance Practice Title Insurance Litigation Committee seminar, Seattle, Washington, March, 2009.

Title Insurance and Closing Case Law Update 2008, Minnesota State Bar 26th Annual Real Estate Institute, St. Paul, MN, November, 2008.

Current Trends in Mortgage Fraud, clients of Holland + Knight, LLP, Chicago, November, 2008.

<u>Construction Disbursing in Depth</u>, Wisconsin Land Title Association graduate course, various locations and dates, 2004, 2005, 2006 and 2008.

<u>The Real Estate Roots of the Global Financial Crisis</u>, televised press conference and business seminars sponsored by Global Leadership, Youth Against Corruption and Forum of Young Ukrainian Leaders, Kyiv, Ukraine, October, 2008.

<u>Title Insurance Policy Coverage and Closing Duties</u>, Pennsylvania Land Title Institute, Pittsburgh and Philadelphia, October, 2008.

<u>Title Agent Closing Duties and RESPA Compliance</u>, Chicago Title agent meeting, Bay Harbor, Michigan, September, 2008.

<u>Commercial Real Estate</u>, State Bar of Wisconsin, Madison, Wisconsin, June 4, 2008.

<u>Current Views on Title Agent and Escrow Duties</u>, Ohio Land Title Association keynote address, Columbus, Ohio, May 3, 2008.

<u>Mortgage Fraud, Equity Skimming and Their Effect on the Subprime Mortgage Crisis</u>, Waukesha County Bar Association, October 19, 2007.

<u>Closings and Payoffs: The Right and Wrong Way</u>, agents and offices of Chicago Title Insurance Company in Illinois, Indiana, Michigan, Wisconsin and Minnesota, September 12 and 20, 2007.

<u>Closing Errors You Can Avoid</u>, Wisconsin Land Title Association, Racine, Wisconsin, August 24, 2007.

<u>Twelve Simple Steps in Avoiding Stupid Risks</u>, Minnesota Land Title Association, Rochester, Minnesota, August 10, 2007.

<u>The Measure of Loss Under the Title Insurance Policy</u>, national teleseminar for Old Republic National Title Insurance Company claim administrators, April 5, 2007.

<u>Anatomy of a Residential Real Estate Transaction</u>, State Bar of Wisconsin, February 7, 2007.

<u>Recent Title Insurance Coverage Decisions That Matter</u>, Minnesota State Bar 24th Annual Real Estate Institute, St. Paul, MN, November, 2006.

<u>Reverse Exchanges</u>, for customers of Dane County Title Company, Madison, Wisconsin, July, 2006.

16
Exhibit 2

Commercial Title Insurance, Lorman Education, Milwaukee, Wisconsin, June, 2006.

Current Title, Escrow and Class Action Law and Issues, Chicago Title Insurance Company Chicago Metro Agents Meeting, Chicago, Illinois, May, 2006.

Current Issues in Title and Escrow Law, Wisconsin Land Title Association Spring Meeting, Wisconsin Dells, Wisconsin, May, 2006.

The Duty to Defend in Michigan, Ohio, Minnesota, Illinois and Wisconsin, Chicago Title Insurance Company Midwest Regional Claims Center, Chicago, Illinois, February, 2006.

Fascinating Current Title Insurance Coverage Issues, Milwaukee Bar Association, February, 2006.

Late Recording of Mortgages, Current Payoff Issues and Closing Problems Caused by Desperate People, Chicago Title Insurance Company agent telephone and internet seminar, October, 2005.

What the Title Insurance Policy Really Covers, Illinois Land Title Association, Lake Geneva, Wisconsin, July, 2005.

Hard Questions (and Some Answers) on 1031 Exchanges, Wisconsin State Bar Third Annual Commercial Real Estate Law seminar, Brookfield, June, 2005.

Real Estate Issues for Estate Planners, Wisconsin State Bar Convention, Milwaukee, May, 2005.

What the Title Insurance Policy Really Covers, Iowa Land Title Association, Dubuque, Iowa, May, 2005.

For The Record (document recording issues in Wisconsin), Wisconsin Mortgage Bankers Association, November, 2004 and March, 2005.

Ten Things Never To Say In A Closing, Wisconsin Mortgage Bankers Association Real Estate Conference, April, 2004 and March, 2005.

Closing Do's and Don'ts in 2003, Pennsylvania Land Title Association, Philadelphia, December, 2003.

What the Title Insurance Policy Really Covers—2003, Minnesota State Bar 21st Annual Real Estate Institute, St. Paul, MN, November, 2003.

RESPA Issues in 2003, presented to Fidelity National family Roundtable of Agents, November, 2003.

Mortgage Foreclosures in Wisconsin, Lorman Education, Milwaukee, November, 2003.

Like Kind Real Estate Exchanges in Wisconsin, Lorman Education, Milwaukee, September, 2003.

Tricky Title Issues, presented to agents of Chicago Title Insurance Company, September, 2003.

Mastering Real Estate Titles and Title Insurance in Wisconsin, National Business Institute, Milwaukee, February, 2003.

Escrow Duties, presented to agents of Chicago Title Insurance Company, December 10, 2002.

Boundary Law in Wisconsin, National Business Institute, Madison and Milwaukee, October 17 and 18, 2002.

Title to Riparian Property, Michigan Land Title Association, Mt. Pleasant, Michigan, April 17, 2002.

What the Title Insurance Policy Really Covers and Closing Do's and Don'ts, presented to: Indiana Land Title Association, August, 2000; North Dakota Land Title Association, January, 2001; Minnesota Land Title Association, March, 2001; Pennsylvania Land Title Association, March, 2001; Illinois Land Title Association, July, 2001; Arkansas Land Title Association, August, 2001; Minnesota State Bar 19th Annual Real Estate Institute, November, 2001; Louisiana Land Title Association, December, 2001; Chicago Title Insurance Company Indiana, February, 2003; Metropolitan Title Company, Indiana, October, 2003.

Real Estate Issues for Estate Planners, Milwaukee Bar Association, March, 2002.

Mastering Real Estate Titles and Title Insurance in Wisconsin, National Business Institute, Milwaukee, January, 2002.

Understanding the Title Insurance Policy, University of Wisconsin Law School guest lecturer, October 2000 and 2001.

Issues in Real Estate Titles 2001, Wisconsin Real Property Listers Association, Mineral Point, Wisconsin, September, 2001.

Boundary Law in Wisconsin, National Business Institute, Madison and
Milwaukee, September 11 and 12, 2001.

"Insuring Over": Perspectives on Solving Your Title Problems, Milwaukee
Bar Association, February, 2001.

Mastering Real Estate Titles and Title Insurance in Wisconsin, National
Business Institute, Milwaukee, December, 2000.

Title Issues for Real Property Listers—Part II, Wisconsin Real Property
Listers Association, Ashland, Wisconsin, September, 2000.

Title Insurance Issues: Leasehold Policies, Title in Mergers and Acquisitions,
and Current Title Coverage Cases, Wisconsin State Bar Real Property, Probate
& Trust Law Section Meeting, 2000 Annual Convention, June, 2000.

Title Insurance and Survey Issues, Residential Real Estate Conveyancing
seminar, State Bar of Wisconsin, Milwaukee, Wisconsin, May, 2000.

Ownership of Public Records, American Land Title Association Tech Show,
Las Vegas, February, 2000.

Title Issues for Real Property Listers, Wisconsin Real Property Listers
Association, Marinette, Wisconsin, September, 1999.

Insuring Over Mortgages With Indemnities, General Counsel's Conference,
Chicago Title Insurance Company, San Diego, California, June, 1999.

Wisconsin's New Child Support Lien Law, Milwaukee Bar Association,
Milwaukee, April, 1999.

Recent Title Insurance Policy Coverage Cases and Hot Issues in Title
Insurance Underwriting, State Bar of Wisconsin, Madison and Milwaukee,
October, 1998.

Wisconsin's New Commercial Broker Lien Law, Milwaukee Bar Association
Real Property Section, Milwaukee, October 8, 1998.

Advanced Principles of Title Insurance, National Business Institute, Inc.,
Milwaukee, June 5, 1998.

Proposed Revision of Construction Lien Law, American Subcontractors
Association, Milwaukee, Wisconsin, February, 1998.

Riparian Rights in Michigan, Michigan Land Title Association, Mt. Pleasant,

Michigan, April 15, 1997.

<u>Adverse Possession</u> and <u>Riparian Rights</u>, 48th Annual Surveyors' Institute, Wisconsin Society of Land Surveyors, Stevens Point, Wisconsin, January 12 and 13, 1997.

<u>Title Insurance Claims and Coverages</u>, State Bar of Wisconsin, Madison and Milwaukee, November 14 and 15, 1996.

<u>Advanced Principles of Title Insurance</u>, National Business Institute, Inc., Milwaukee, July 11, 1996.

<u>Escrows and Escrow Liability</u>, Milwaukee Bar Association, Milwaukee, June, 1996.

<u>Ways To Solve A Title Problem and Save A Closing</u>, Milwaukee Bar Association and Chicago Title Insurance Co., Milwaukee, November 12, 1993.

<u>Title Insurance Claims--Selected Issues</u>, Milwaukee Bar Association, Milwaukee, October 18, 1993.

<u>Michigan Title Insurance Law</u>, Professional Education Systems, Inc., Detroit, Lansing, Grand Rapids, Michigan, June, 1990.

20
Exhibit 2

**J. Bushnell Nielsen**
**Expert testimony at trial or deposition from 2000 to present**

I have been found qualified to testify as an expert witness, and have testified, at 20 trials, two arbitrations, an administrative hearing and a class certification evidentiary hearing, conducted in Delaware, Florida, Idaho, Illinois, Maryland, Minnesota, Missouri, Nevada, New Mexico, South Carolina, Texas, Virginia and Wisconsin. My expert opinions have also been admitted by numerous courts in affidavit or declaration form.

The following is a list of cases in which I have provided testimony as an expert witness at a trial, a court hearing, arbitration or by deposition, from July 1, 2000 to the present. This list is intended to comply with Federal Rule of Civil Procedure 26(a)(2), which says that an expert witness is to provide "a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years." This list also includes some cases in which my testimony was submitted to a court in affidavit form, but is not a complete list of those instances. This is not a complete list of cases in which I have been engaged as an expert witness.

1.  *Town of Richfield v. Kletsch's Beach Access Ass'n*, Washington County, Wisconsin Circuit Court Case No. 99-CV-0360. Lawsuit by Wisconsin municipality to have real estate declared to have been validly dedicated to the public for lake access purposes. Testified at bench trial testimony in 2000, on behalf of municipality.

2.  *Leja v. Town of Green Valley*, Shawano County, Wisconsin Circuit Court Case No. 01-CV-270. Lawsuit concerning conflicting chains of title and overlapping legal descriptions. Testified at bench trial on behalf of municipality. Judgment entered in favor of municipality.

3.  *Roozen v. Stratton and M & I Lake Country Bank*, Waukesha County, Wisconsin Circuit Court Case No. 00-CV-2375. Lawsuit concerning claimed slander and unmarketabilty of title due to filing of lien. Affidavit testimony accepted by court.

4.  *Cebolleta Ranch Ltd. Co. LLC and Fuller v. First American Title, Inc., et al.*, No. CV-2001-1321, Dist.Ct., Bernalillo Co., N.M. Lawsuit against title insurer concerning policy coverage for threatened cutoff of access by Native American pueblo. Deposition taken. Case settled.

5.  *Kennedy's Houseboats, Inc. v. City of St. Croix Falls*, Polk County, Wisconsin Case No. 99-CV-289, and related matters 99-SC-712 and 00-CV-4. Lawsuits concerning title to property conveyed by municipality. Trial testimony and qualification as expert witness on behalf of City of St. Croix Falls in January, 2003.

6.  *Hampel and Wardin v. Town of East Troy*, Walworth County, Wisconsin Circuit Court Case No. 03-CV-00603. Testimony on behalf of plaintiff land owners regarding restrictions not appearing in chain of title, insufficiency of dedication of hiking path to public. Affidavit of expert opinions filed and admitted by court.

7. *Wildenradt v. Wisniewski*, Walworth County, Wisconsin Circuit Court Case No. 04-CV-00905. Testimony on behalf of plaintiff land owners regarding chains of title, ownership of disputed property. Testimony and qualification as expert witness at injunction hearing. Judgment entered in favor of plaintiff land owners.

8. *Buttacavoli v. Lawyers Title Ins. Corp.*, AAA arbitration Case No. 51-159-01850-06, Chicago, Illinois. Testimony regarding title insurance policy coverage and custom and practice in the land title industry concerning measure of loss. Testimony admitted at arbitration; title insurer received favorable arbitration award.

9. *Illinois Real Estate Lawyers Ass'n v. One World Title Corp.*, Cook County, Illinois Case No. 04-CH-232. Testimony on behalf of title agency concerning prudent considerations in a customer's selection of a title insurance agency and the insurer for whom it writes insurance. Deposition taken on August 15, 2006. Case settled.

10. *Kingwood Crossroads, L.P. v. First American Title Ins. Co.*, Cause No. 05-03-02662-CV, Montgomery County, Texas (410th Judicial District). Deposition taken in 2006.

11. *Kamin v. Lawyers Title Ins. Corp.,* AAA Case No. 51 159 E 00632 05. Testified at Illinois arbitration regarding measure of loss under title insurance policy.

12. *Somers v. Luterbach, et al.*, Waukesha County, Wisconsin Circuit Court Case No. 04-CV-680. Testimony on behalf of defendant land owner regarding priority of federal tax lien versus land contract vendee interest. Testified and qualified as expert witness at trial in June, 2009.

13. *Carr v. Marshall v. Chicago Title Ins. Co.*, Case No. 07 MR 1456, Lake County, Illinois Circuit Court. Testimony regarding title insurance claim administration custom and practices. Testified and qualified as expert witness at trial on November 2-3, 2009.

14. *Pullum Window Corp. v. Randy M. Deprez Custom Builder, Inc., et al.*, Oakland County, Michigan Circuit Case No. 08-093505 CH. Testimony on behalf of Greco Title regarding liability of title agent in the issuance of a title insurance policy. Affidavit filed in April, 2009. Case decided favorably on summary judgment in May, 2009.

15. *G & I Real Estate, LLC v. Singh*, Milwaukee County, Wisconsin Circuit Court Case No. 2009-CV-18443. Testimony regarding ownership of property, marketability of title and title insurer's willingness to insure title. Testified and qualified as expert witness at bench trial in August, 2009.

16. *Larpenteur v. Burnet Realty, Inc.,* Case No. 27-CV-08-24562, Fourth Judicial District Court, Hennepin County, Minnesota. Testimony on behalf of Burnet Realty about the proper factors to be considered in the selection of a title agent and underwriter, on behalf of a real estate broker sued for allegedly breaching a fiduciary

duty to steer its customers to the lowest-cost provider of title services. Testified and qualified as expert witness at class certification evidentiary hearing in January, 2010.

17.     *Commonwealth Land Title Ins. Co. v. St. Johns Bank & Trust Company,* Civil Action No. 4:08-cv-01433-CAS, U.S. District Court, Eastern District of Missouri. Testimony about the correct measure of loss under a loan policy when the insured mortgage is junior to another lien on one of several parcels. Deposition taken in January, 2010.

18.     *Sam N. Wilson, et al. v. Chicago Title Ins. Co., et al.*, Denton County, Texas (158th Judicial District) Cause No. 2008-20140-158. Testimony about the alleged bad faith conduct of a title insurer that denied a claim because the policy had terminated after accepting the claim, and the insured's concealment of the fact that the property had been conveyed before the claim was submitted. Deposition taken on July 1, 2010.

19.     *Nationwide Life Ins. Co. v. Commonwealth Land Title Ins. Co.*, E.D. Pennsylvania Case No. 05-00281. Testimony concerning industry custom and practice as to the underwriting of ALTA 9 endorsement. Expert report submitted to court by affidavit in support of summary judgment motion. On January 20, 2011, the court ruled, on a motion in limine to exclude my testimony, that I was qualified to opine and that my testimony on industry custom was admissible, but found other opinions inadmissible.

20.     *USA Real Estate Investment Trust v. Security Title Guarantee Corporation of Baltimore and Sheehan*, U.S. Dist.Ct. S.D.Miss. Civil Action No. 1:09-cv-00684-HSO-JMR. Testimony in favor of insured lender against title insurer concerning closing protection letter and violation of lender's closing instructions. Deposition taken on October 13, 2010.

21.     *Roger Tilkemeier, et al. v. Tim Vigil, et al.*, Santa Fe County, New Mexico Case No. D-101-CV 2009-02503. Testimony admitted at jury trial concerning limits of access coverage in title insurance policy and insurer's alleged bad faith conduct in handling of claim, conducted in March of 2011.

22.     *Chesapeake Land Development Co., LLC v. Lawyers Title Ins. Corp.*, U.S. Dist.Ct. N.Dist. Texas—Fort Worth Case No. 4:10-CV-67. Testimony concerning title insurance policy coverage, including Exclusion 3(a). Deposition taken on March 15, 2011.

23.     *Benninghoff, et al. v. Tilton*, *et al.*, Allegan County, Michigan Case No. 06-39595-CH. Testimony on behalf of plaintiff land owners concerning inverse condemnation of property by township actions, including recorded deed. Deposition taken on March 24, 2011.

24.     *Stallion Funding, LLC, et al. v. Lawyers Title Ins. Corp., et al.,* District Court of Dallas County, Texas, 134th Judicial District Cause No. DC-10-07371. Testimony concerning Texas closing service letters and lack of actual or apparent authority of a title agent to conduct a settlement as the agent of a title insurer. Deposition taken on July 8, 2011.

25.     *Metro Fill Development, L.L.C., et al., v. Lawyers Title Ins. Corp.*, St. Louis County Cause No. 09SL-CC02081.  Testimony concerning encumbrances on title and title insurance policy coverage.  Deposition taken on July 11, 2011.  Also, testimony concerning the nature of a title insurance commitment and an alleged implied contract to search and examine title.  Second deposition taken on September 9, 2012.

26.     *Zan, LLC v. Ripley Cove, LLC*, *et al.*, Charleston County, South Carolina Civil Action No. 2008-CP-10-2641.  Testimony concerning title industry claims practices and policy coverage.  Testified at jury trial testimony on July 28, 2011.

27.     *Anchorbank, FSB et al vs. Terry V. Anderson et al.*, Shawano County, Wisconsin Case No. 2009-cv-436.  Testimony concerning standard of care for construction loan disburser.  Deposition taken on September 2, 2011.

28.     *Williamson v. Mills, et al.*, Waukesha County, Wisconsin Circuit Court Case No. 2010-cv-2400.  Testimony concerning the custom and practice of persons engaging in hard money lending and short sales of real estate in the State of Wisconsin.  Deposition taken on November 2, 2011.

29.     *Quicken Loans, Inc. v. Downing, et al.*, Southern District of Indiana District Court Cause No. 1:10-CV-1565-TWP-DKL.  Testimony on behalf of Quicken Loans concerning the custom and practice and standard of care for persons appointed as loans closing agents for mortgage lenders, and the standard of care for real estate closers and notaries public.  Deposition taken on December 7, 2011.

30.     *Fidelity National Title Ins. Co. v. Captiva Lake Investments, L.L.C.*, E.D. Mo. Dist.Ct. Case No. 4:10-cv-01890-CEJ.  Testimony regarding construction loan disbursing and policy issuance.  Deposition taken on June 11, 2012.

31.     *Lawyers Title Ins. Corp. v. North Idaho Title Company*, Kootenai County, Idaho Case No. CV11-3050.  Testimony regarding title examination methods and standards.  Deposition taken on June 19, 2012.  Testimony at trial on October 23, 2012.

32.     *Mead and Vertes v. Lawyers Title Ins. Corp., et al.*, Maricopa County, Arizona Superior Court Case No. CV 2010-029652.  Testimony regarding title search and examination methods and standards concerning access coverage.  Deposition taken on July 20, 2012.

33.     *Stewart Title Guaranty Co. v. Shelby Realty Holdings, LLC*, N.D.Ala. Southern Division Case CV-08-P-0267-S.  Testimony regarding claim administration custom and practice concerning measure of loss and other issues.  Deposition taken on August 21, 2012.

34.     *First American Title Ins. Co. v. Chicago Abstract Title Agency, LLC, et al.*, Cook County, Illinois Chancery Division Case No. 2008 CH 41629.  Testimony concerning custom and practice of title insurance industry concerning scope of title agency and alleged liability of title insurer for theft of closing funds.  Deposition taken on October 8, 2012.

35. *Equity Income Partners Limited Partnership and Galileo Capital Partners, Ltd. v. Chicago Title Ins. Co.,* U.S.Dist.Ct. Arizona Case No. 2:11-cv-01614-GMS. Testimony concerning custom and practice in the title insurance industry regarding measure of loss on loan policies and alleged bad faith handling of claim. Deposition taken on December 13, 2012.

36. *Lawyers Title Ins. Corp. v. Gary F. Christensen, et al.,* Ada County, Idaho Case No. CVOC 1009768. Testimony regarding custom in title insurance industry regarding taking of construction lien indemnities and related subjects. Deposition taken on December 21, 2012.

37. *Guenther v. Old Republic National Title Insurance Company,* U.S.Dist.Ct. Idaho Case No. 1:12-CV-237-REB. Testimony concerning custom and practice in the title insurance industry regarding access coverage and alleged bad faith handling of claim. Deposition taken on December 22, 2012.

38. *The Sylvan Agency, Inc. v. Old Republic Title Company of Kansas City, Inc., et al.,* State of Missouri, Clay County Case No. 11CY-CV14181. Testimony about custom and practice in the title insurance industry regarding mechanics' lien coverage and alleged vexatious refusal to pay under Missouri law in the handling of a claim. Video deposition taken on February 18, 2013.

39. *Rickey Fontenot v. LandAmerica Commonwealth Title of Houston, Inc., et al.,* Chambers County, Texas Cause No. 25162. Testimony regarding escrow officer customs and practices. Testified at jury trial on February 28, 2013. Verdict issued finding no liability of LandAmerica Commonwealth Title. Verdict affirmed on appeal on August 28, 2014, Texas First District Court of Appeals.

40. *Moore v. Angelus, et al.,* Clark County, Nevada District Court Case No. A-10-616929-C. Testimony on behalf of plaintiff partners regarding title industry use of doctrine of equitable subrogation. Testified at bench trial on April 2, 2013. Decision issued favorable to the plaintiffs who retained me.

41. *HomeBanc, N.A. v. Old Republic National Title Insurance Company,* Palm Beach, Florida County Case No. 50 2011 CA 003124 XXXXMB. Testimony concerning the scope of a title insurance policy-issuing agency, history and regulation of closing protection letters, and title insurer practices in termination of a title agent. Deposition taken on April 5, 2013.

42. *Fiserv Solutions, Inc. v. Westchester Fire Insurance Co., et al.,* Case No. 2:11-cv-00603-CNC, United States District Court, Eastern District of Wisconsin. Testimony on behalf of Fiserv Solutions regarding the nature of title insurance policies and the type of policy issued by First American Title through Fiserv Solutions as its agent. Deposition taken on June 28, 2013.

43. *Jara v. Fidelity National Title Ins. Co.,* Cause No. 2012-03196, Harris County, Texas District Court. Testimony regarding Covered Risk 5, concerning building code violation orders, industry custom regarding payment of "lost" rent and interest, and

alleged bad faith conduct of insurer in responding to the claim. Deposition taken on August 14, 2013.

44.     *Stewart Title Guaranty Co. v. Credit Suisse*, Idaho U.S. Dist. Ct. Case No. 11-CV-227-BLW. Testimony regarding title insurance claim administrator custom and practice. Deposition taken on August 29, 2013.

45.     *Synovus Bank v. Fidelity National Title Insurance Company,* United States District Court for the Middle District of Georgia, Columbus Division, Civil Action File No.: 4:12-CV-00244-CDL. Testimony regarding title insurance claim administrator custom and practice. Deposition taken on September 4, 2013.

46.     *Cove Mini Storage, Inc. et al. v. First American Title Ins. Co.*, 91st District Court, Eastland, Texas Cause No. CV 1042068A. Testimony regarding custom and practice of title insurance claim administrators concerning prosecution of lawsuit filed by insured and how special exceptions are written by underwriting personnel and interpreted by claim administrators. Deposition taken on October 9, 2013.

47.     *Embassy Marina Plaza, LLC v. Fidelity National Title Company, LLC, et al.*, Lake County, Florida Case No. 2012 CA 585. Testimony regarding interpretation of railroad deed and measure of loss under title insurance policy according to industry custom and practice. Testified at bench trial on November 13, 2013.

48.     *Roman Geronimo Martinez Mendez v. Sky View at Las Palmas, L.L.C., et al.,* Hidalgo County, Texas Cause No. C-1401-10-G. Testimony regarding customs and practices in title insurance claim administration. Deposition taken on February 4, 2014.

49.     *New Mexico Bank & Trust v. Commonwealth Land Title Insurance Company*, New Mexico First Judicial District Court, Cause No. D-0101-CV-2011-01651. Testimony regarding customs and practices in title insurance claim administration concerning claims on loan policies. Deposition taken on February 11, 2014.

50.     *Marchetti v. Chicago Title Ins. Co.,* Northern District Illinois Case No. 12-CV-5985. Testimony regarding customs and practices in title insurance claim administration concerning date of loss on owner's policies and elements of loss payable by insurer. Deposition taken on February 18, 2014.

51.     *North Shore Lodging LLC v. Commonwealth Land Title Ins. Co.*, E.D. La. Civil Action No. 13-6070. Testimony regarding customs and practices in title insurance claim administration and alleged bad faith handling of owner's title insurance policy claim. Deposition taken on May 15, 2014.

52.     *One Reverse Mortgage, LLC v. Chicago Title Ins. Co.,* Circuit Court of Chesterfield County, Virginia Case No. 041CL13000492-00. Testimony regarding customs and practices in title insurance claim administration and alleged bad faith handling of loan title insurance policy claim. Deposition taken on May 23, 2014; testimony at bench trial on June 9, 2014.

53.     *MT Properties, LLC v. Chicago Title Ins. Co.*, Maricopa County, Arizona Superior Court Case No. CV2013-002183.  Testimony regarding customs and practices in title insurance claim administration and alleged bad faith handling of owner's title insurance policy claim.  Deposition taken on June 19, 2014.  Testimony regarding alleged bad faith failure to pay a claim. Deposition taken on June 30, 2015.

54.     *First American Title Ins. Co. and Adams Investments, LLC v. 1st Service Title & Closing, Inc. and National Union Fire Insurance Co. of Pittsburgh,* Milwaukee County, Wisconsin Case No. 2012-CV-1072.  Testimony regarding customs of title insurance title officers in examination of title and detection of red flags of forgery.  Deposition taken on July 24, 2014.

55.     *Northern States Power Co. v. The City of Ashland, et al*., United States District Court, Western District of Wisconsin Case No. 12-CV-602-bbc.  Testimony regarding chains of title to parcels in Ashland, Wisconsin, the interpretation of conveyances to railroads and several aspects of the public trust doctrine.  Deposition taken on October 2, 2014.

56.     *C1031 Properties, Inc. v. First American Title Insurance Company*, Spokane County, Washington Case No. 09-2-01656-3.  Testimony regarding alleged bad faith of title insurer.  Deposition taken on February 6, 2015.

57.     *Nancy Brown v. Chicago Title Ins. Co.,* St. Johns County, Florida District Court Case No. CA14-949.  Testimony regarding appropriate appraisal method for proof of loss under title insurance policy.  Deposition taken on February 12, 2015.

58.     *Fidelity Nat'l Title Ins. Co. v. Empire Title Agency of Arizona, LLC*, Maricopa County, Arizona Superior Court Case No. CV2011-014914.  Testimony regarding gross negligence of title agent in issuance of policy containing an affirmative coverage by endorsement.  Deposition taken on February 13, 2015.

59.     *Fidelity National Title Ins. Co. v. Captiva Lake Investments, L.L.C.*, E.D. Mo. Dist.Ct. Case No. 4:10-cv-01890-CEJ.  Testimony regarding construction loan disbursing and claim administration.  Deposition taken on June 4, 2015.  [I sat for a deposition in this case in 2012 also, which is recited above.]

60.     *Jeanne Lee, et al., v. Chicago Title Insurance Company,* Mohave County, Arizona Superior Court Case No. CV2013-01220.  Testimony regarding customs and practices of escrow officers.  Deposition taken on June 29, 2015.

61.     *C&K Residential Properties, et al. v. Commonwealth Title of Dallas, Inc., et al*., 116th Judicial District (Dallas), Texas Cause No. DC-13-06369-F.  Testimony regarding customs and practices in title insurance claim administration and alleged bad faith handling.  Deposition taken on July 7, 2015.

62.     *Hawthorn Bank v. First American Title Insurance Company*, Jackson County, Missouri Circuit Court Case No. 1316-CV31342.  Testimony regarding customs

and practices in title insurance claim administration and vexatious refusal to pay. Deposition taken on July 15, 2015.

63.     *Fidelity National Title Ins. Co. v. Captiva Lake Investments, L.L.C.*, E.D. Mo. Dist.Ct. Case No. 4:10-cv-01890-CEJ.  Testimony regarding marketability of title and claim administration practices at jury trial in federal court in St. Louis, on July 22, 2015.

64.     *Anderson, Frank & Mack, LLC, et al. v. Tri State Surveying Ltd., et al.*, Washoe County, Nevada Case No. CV14-00821.  Testimony concerning title insurer's claim handling and alleged bad faith of insurer.  Deposition taken on July 28, 2015.

65.     *Kent Bank v. Rockford Title Co.*, Winnebago County, Illinois Case No. 11 L 21.  Testimony concerning construction loan disbursing practices at jury trial on October 14, 2015 (my deposition was taken on May 8, 2015).

66.     *Federal Deposit Ins. Corp. v. Nevada Title Company*, United States District Court, District of Nevada Case No. 2:14-cv-01567-GMN-GWF.  Testimony concerning escrowee's duty to disclose facts indicating fraud.  Deposition taken on January 6, 2016.

67.     *RA Southeast Land Company, LLC v. First American Title Insurance Company*, Nevada District Court Case No. 2:14-cv-01621-APG-NJK.  Testimony concerning alleged bad faith of title insurer in its refusal to pay the insured for the effect of development delay while insurer was successfully defending title.  Deposition taken on February 23, 2016.

68.     *In re Stanley Thaw*, Eastern District of Texas Bankruptcy Court Case No. 11-43603, Adversary Proceeding No. 14-04022.  Trial testimony concerning Texas T-1R title insurance policy issues and industry claim handling customs concerning policy termination, exclusions and measure of loss.  Trial conducted in Dallas on August 9, 2016.

69.     *United States of America, ex rel. Victor E. Bibby and Brian J. Donnelly v. Wells Fargo Bank, N.A.*, United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action File No. 1:06-CV-547-AT.  Testimony concerning title insurance rate systems in use throughout the United States, title search and examination charges, and compliance with Department of Veterans Affairs regulations for Interest Rate Reduction Refinancing Loans.  Deposition taken on October 3, 2016.

70.     *Chicago Title Ins. Co. v. Elizabeth LaPuma, et al.*, Connecticut Superior Court, Judicial District of Ansonia/Milford Case No. AAN-CV-15-6018031-S. Testimony concerning the customs of title insurers in measuring and seeking appraisals about loss caused by the failure of a right of access.  Deposition taken on December 9, 2016.

71.     *PNC Bank, N.A. v. Fidelity Nat'l Title Ins. Co.*, M.D. La. Civil Action No. 13-578.  Testimony concerning actions taken to clear title in this situation; industry

customs about the limits of actions that title insurers take to clear title on behalf of an insured; and concerning the assertion that title to the parcels was unmarketable. Deposition taken on January 20, 2017.

72.    *Carnett's Properties, LLC v. R. Phillip Shinall, et al.*, Gwinnett County, Georgia Superior Court File No. 16A-02795-9. Testimony concerning title industry customs in clearing of title and responding to claim of bad faith title clearance actions. Deposition taken on June 27, 2017.

73.    *Maryland Insurance Administration v. Chicago Title Ins. Co.*, MIA Case No. MIA-2-10-05-014 (Jen and Shuler). Testimony at contested case hearing in Baltimore, Maryland concerning insurer's claimed bad faith conduct in denying claim about alleged lack of a right of access to the insured parcel. Hearing testimony given on August 15, 2017.

74.    *Mahon v. Chicago Title Ins. Co.*, United States District Court, District of Connecticut, Case No. 3:09CV690 (AWT). Testimony concerning the interpretation and use of the filed rate for refinance loan policies in Connecticut, and issues concerning a reasonable search and examination of title and use of prior policies in conducting such a search and exam. Deposition taken on August 31, 2017.

75.    *CCI-LAP No. II, LP v. Commonwealth Land Title Ins. Co. v. ICP 400, LLC*, et al., Maricopa County Superior Court Case No. CV2016-005919. Testimony concerning title insurance industry customs in pursuing recovery against indemnitors. Deposition taken on January 29, 2018.

76.    *First American Title Ins. Co. v. Bowles Rice, LLP*, U.S.D.C. N.D. West Virginia Case No. 1:16-CV-219 (Keeley). Testimony concerning title insurance agency contract terms and recovery by title insurer from title agent for losses paid on mechanic's lien claims. Deposition taken on April 10, 2018.

77.    *WFG Lender Services, LLC v. SLK Global BPO Services Pvt., Ltd.*, U.S. Dist.Ct. S.D. Texas Houston Division Civil Action No. 4:17-CV-02455. Testimony concerning sufficiency of title search performed by third party title search company. Deposition taken on June 20, 2018.

78.    *Shoe-Bar Ranch, Inc. and Ward v. Preferred Proppants, LLC*, U.S. District Court, Western District of Texas, Midland-Odessa Division, Cause No. 7:17-cv-00210. Testimony concerning buyer's right to make title objections and encumbrances on title to Texas ranch. Deposition taken on August 28, 2018.

79.    *Johnson v. Molnar and First American Title Ins. Co.*, Orange County, California Superior Court Case No. 30-2017-00896962. Testimony concerning customs and practices of Nevada escrow officers concerning identification of parties to transaction, accommodation recordings and third party depositors. Deposition taken on September 25, 2018.

80. *Zaghi v. Kennedy*, San Francisco Superior Court Case No. CGC-13-532265. Testimony concerning customs of escrow officers in wiring money from escrow and accepting wiring instructions from escrow parties. Deposition taken on December 21, 2018.

81. *Chicago Title Insurance Company v. Kasmark, Inc.*, Marion County, Florida Fifth Judicial Circuit Court Case No. 14-2583-CAB. Testimony concerning customs used in ordering and reviewing real estate appraisals obtained to demonstrate difference value in property due to covered title matter. Deposition taken on March 7, 2019.

82. *The Money Source, Inc. v. Chartered Holdings, Inc., et al*., Clark County, Nevada District Court Case No. A-17-749645-C. Trial testimony concerning the duties in Nevada of a deed of trustee and an escrowee concerning payoff of secured loans and reconveyance of deeds of trust. Trial testimony given in state court in Las Vegas on May 9, 2019.

83. *Hall CA-NV, LLC v. Old Republic National Title Ins. Co*., U.S. District Court Northern District of Texas Case No. 3:18-cv-380. Testimony concerning alleged bad faith of title insurer in mechanic lien dispute concerning California and Nevada property. Deposition taken on June 11, 2019.

84. *Chesapeake Land Development Company, L.L.C. v. Chicago Title Ins. Co*., United States District Court, Western District of Oklahoma Case No. CIV-16-132-HE. Testimony concerning alleged bad faith of title insurer in obtaining a release of a recorded use restriction affecting Oklahoma property. Deposition taken on July 2, 2019.

85. *Essex Property Management, Inc. v. Old Republic Nat'l Title Ins. Co*., St. Johns County, Florida circuit court Case No. 2017-CA-000747. Testimony concerning alleged bad faith conduct of title insurer in denying policy claim concerning underground pipe for which no easement was granted. Deposition taken on July 23, 2019.

86. *Adobe Investments LLC v. Chicago Title Insurance Company*, Sonoma County, California Superior Court Case No. SCV-262610. Testimony concerning alleged bad faith conduct of title insurer in paying loss to insured based on *Overholtzer* method for determining diminution in value. Deposition taken on August 14, 2019.

87. *PennyMac Holdings, LLC v. Fidelity Nat'l Title Ins. Co.,* Clark County, Nevada District Court Case No. A-16-746790-C. Testimony concerning alleged bad faith conduct of title insurer in denying defense to insured due to tardy tender of defense. Deposition taken on August 20, 2019.

88. *Gainquick LLC v. JTH Holdings, LLC, et al.*, Orange County, California Superior Court Case No. 30-2016-00874017-CU-OR-CJC. Testimony concerning the prudent actions that a property owner takes to protect against business entity theft. Deposition taken on October 3, 2019.

89.     *Ruscher v. Scott Revocable Trust*, Waukesha County, Wisconsin Circuit Court Case No. 2018-CV-1106.  Testimony concerning whether or not an easement would be considered to be within the chain of title to the burdened parcel.  Trial testimony given on January 9, 2020.

90.     *G&G Real Estate Investment, et al. v. Fidelity Nat'l Title Ins. Co.*, Maricopa County, Arizona District Court Case No. CV2018-051956.  Testimony concerning alleged bad faith of title insurer in handling and payment of insurance claim.  Deposition taken on January 15, 2020.

91.     *Citizens State Bank v. Travelers Casualty and Surety Company of America*, W.D. Texas Waco Division Civil Action No. 6:18-cv-237.  Testimony concerning loan closing practices in various states and the process of vetting closing agents and title insurance agents.  Deposition taken on February 12, 2020.

92.     *AB Stable VIII LLC, v. MAPS Hotels and Resorts One LLC, et al.*, Delaware Court of Chancery Case No. 2020-0310-JTL.  Testimony concerning an off-record agreement as being an encumbrance on title, and on title insurance risk underwriting procedures, in a lawsuit between the seller and buyer of 15 hotels valued at $5.7 billion in which buyer refused to close because of defects in title.  Deposition taken on August 14, 2020.  Trial testimony given on August 28, 2020.  Decision issued on November 30, 2020 in favor of the defendant for whom I testified, with the decision relying in part on my testimony.

93.     *Hayward Property, L.L.C. v. Commonwealth Land Title Ins. Co.*, United States District Court, Northern District of California Case No. 4:17-cv-06177-SBA.  Testimony concerning the relevance of tax parcel numbers in conveyancing and title insurance coverage and other title insurance coverage issues.  Deposition taken on October 6, 2020.

94.     *Wester v. Commonwealth Land Title Insurance Co*., Montana First Judicial District Case No. CDV-2017-269.  Testimony concerning title insurance policy measure of loss, special method used by appraisers to establish the loss amount, watchful waiting, the Montana title search statute, and the claimed bad faith conduct of the title insurer.  Deposition taken on February 18, 2021.

95.     *Prime AZ/Libra LLC and Federal Deposit Ins. Corp. v. Fidelity National Title Insurance Company*, United States District Court, District of Arizona Case No. 2:19-cv-01291-DLR.  Testimony concerning mechanic lien disbursements and policy coverage on property in Phoenix.  Deposition taken on April 13, 2021.

96.     *Ruscher v. Scott Revocable Trust*, Waukesha County, Wisconsin Circuit Court Case No. 2018-CV-1106.  Testimony concerning easement and chain of title and doctrine of prescriptive easement.  Trial testimony given on May 5, 2021.

97.     *Molinaroli v. Vetter Architects, Inc., et al.*, Milwaukee County, Wisconsin Circuit Court Case No. 19-CV-4989.  Testimony concerning standard of care of an

attorney in the drafting of an easement permitting alterations of limited common elements and common elements.  Deposition taken on May 14, 2021.

98.     *KWALA, LLC v. First American Title Ins. Co.*, Los Angeles Superior Court Case No. 19SSTCV22991.  Testimony concerning alleged bad faith conduct of title insurer concerning tender of defense and *Moskopoulos*-type claims against insured. Deposition taken on August 13, 2021.

99.     *Walstad v. Pillatzke, et al,* Montana First Judicial District, Lewis and Clark County Cause No. BDV 2020-65.  Testimony concerning notary verification of identity, reasonable title examination, and investigation of escrow breach claim. Deposition taken on September 23, 2021.

100.    *Sam Wilson, Jr., et al. v. Eagle National Bank, et al.*, United States District Court, Southern Division of Maryland, Civil Action No. 8:20-cv-1344. Testimony concerning the range of fees charged for title examinations, title insurance premiums and closing fees in various jurisdictions, and the reasons why such charges vary widely from state to state and transaction to transaction.  Deposition taken on October 15, 2021.