**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Civil Action No. 1:18-cv-5587 |
| v. | Judge John Z. Lee |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, | Magistrate Judge Young B. Kim |
| Defendants. | |

## BC57, LLC'S ANSWERS TO SEC'S FIRST SET OF INTERROGATORIES

BC57, LLC by their attorneys, answers Plaintiff United States Securities and Exchange

Commission's ("SEC") First Set of Interrogatories below. BC57 reserves the right to revise and

supplement these answers upon further investigation of the issues.

1.     Do you contend that any Investor-Lender directly received payment in connection
with the release of their mortgage(s) on any property in the Group separate and apart from the
payoffs made to EquityBuild Finance at the closing of the refinancing? If so, describe in detail
the basis for your belief that any Investor-Lender, as opposed to EquityBuild Finance, ever
received any funds in connection with the purported release(s) of their mortgage(s), including by
identifying all such Investor-Lenders, the amounts they were paid directly, and the payors.

> ANSWER:     BC57 does not have any knowledge at this time, and therefore does
> not now contend, that any Investor-Lender directly received
> payment in connection with the release of their mortgage on any
> property in the Group separate and apart from the payoffs made to
> the Investor-Lenders' authorized agent EquityBuild Finance at the
> closing of the refinancing. BC57 is still reviewing the EquityBuild
> documents furnished by the Receiver, and the claims and discovery
> responses furnished by the Investor-Lenders, and reserves the right
> to revise or supplement this answer.

2.     Do you contend that any Investor-Lender directly received the principal balance
due to them under their loans related to any property in the Group, as opposed to payments
purportedly made on their behalf in care of EquityBuild Finance? If so, describe in detail the

basis for your belief that any Investor-Lender received such direct payments, including by identifying all such Investor-Lenders, the amounts they were paid, and the payors.

ANSWER: Certain Investor-Lenders identified on one of the five mortgages in this Group may have received the principal balance by accepting an interest in another property not in the Group and/or an equity stake in an Equity Build related entity, *i.e.* rollover, but BC57 has not completed its analysis of the EquityBuild documents furnished by the Receiver, and the claims and discovery responses furnished by the Investor-Lenders. BC57 does not have any knowledge at this time, and therefore does not now contend, that any Investor-Lender directly received the principal balance due to them under their loans related to any property in the Group, as opposed to payments made on their behalf in care of their authorized agent EquityBuild Finance. BC57 is still reviewing the EquityBuild documents furnished by the Receiver, and the claims and discovery responses furnished by the Investor-Lenders, and reserves the right to revise or supplement this answer.

3. Describe in detail the basis for your contention that any Investor-Lender authorized the release of any mortgages on any property in the Group, including by specifically identifying all documents reflecting such authorization and referencing the particular language in such documents purportedly authorizing the release.

BC57 relies upon the following documents which establish that the Investor-Lenders authorized EquityBuild Finance, LLC to release the mortgages on each of the properties in this Group. The Mortgages. Four of the five mortgages from which the Investor-Lenders assert their interests from the properties in this Group (the "Mortgages") identified the "Lender" as "The Persons Listed in Exhibit A to the Mortgage c/o EquityBuild Finance, LLC whose address is 5068 West Plano Pkwy, #300 Plano, TX." The fifth mortgage, recorded against the property located at 7752 S. Muskegon Ave., identified the "Lender" as "The Persons Listed in Exhibit A to the Mortgage c/o Hard Money Company, LLC whose address is 5068 West Plano Pkwy, #300 Plano, TX." EquityBuild Finance, LLC was formerly known as Hard Money Company, LLC (see Complaint, ¶ 14) and will jointly be referred to as "EBF." The Mortgages also provided that all notices should be sent to the Lender's c/o EBF at EBF's address stated in the mortgage. (¶6.) Each of the Mortgages provided that upon payment of the sums secured by the mortgage, the Lender shall release the mortgage. (¶10.) See BC57 17332-17340; 17363-17370; 17381-17388; 17400-17408; 17409-17416. Consequently, each Investor-Lender authorized EBF to communicate on their behalf as their agent, including providing loan payoff information on their behalf, and agreed that upon payment of the debt secured by a mortgage,

the mortgage shall be released. Third-parties had the right to rely upon communications from EBF as communications from the Investor-Lenders.

The Notes. The first page of each note secured by each of the Mortgage (the "Notes") provided that the borrower promises to pay "The person listed on Exhibit A to this Note c/o [EBF] (hereinafter collectively referred to as the "Holder" of "Lender"), at 5068 West Plano Pkwy, #300 Plano, TX." Each of the Notes also provided that all notices to the Lender shall be given to "The person listed on Exhibit A to this Note c/o [EBF]." Each of the Notes identified the scheduled payments to pay off the loan, the last being the final balloon payment. (See first pages of each of the Notes.) See BC57 17341-17352; 17353-17362; 17371-17380; 17389-17399; 17417-17426. Consequently, the Investor-Lenders directed that all sums due on each loan to be paid to EBF on their behalf.

The Collateral Agency and Servicing Agreement. Documents reviewed to date show that the vast majority of the Investor-Lenders executed a Collateral Agency and Servicing Agreement (collectively, the "Servicing Agreements") with respect to the Notes and Mortgages, which was part of the Investor-Lenders' investment packages ("Investment Packages"). (See sample Investment Package, attached as Ex. A to these response. Investments packages for Investor-Lenders are contained in the Investor-Lenders' claim submissions and discovery responses and the Receiver's production of EB and EBF documents.) BC57 believes based upon the documents reviewed to date that all Investor-Lenders executed the same type of documents as part of their investment. The parties to the Servicing Agreements named EBF as the Collateral Agent and the Servicer. (See opening paragraph of the Servicing Agreements.) The Servicing Agreements recited that the Investor-Lenders agreed to make the loan to the borrower "only upon the condition, among others, that the Borrower grant to the Collateral Agent for the benefit of the Lenders, as security for the Borrower's obligations to the Lenders and the Collateral Agent under or in respect of the Note and the Mortgage (as defined below), a protective lien on, and security interest in, the Collateral (as defined below)" (Recital B). The Servicing Agreements also recited that the Investor-Lenders wanted EBF to act as their agent to collect all scheduled payments on the loan (Recital D). The Investor- Lenders appointed and designated EBF as the Collateral Agent on their behalf and as the Servicer. See Ex. A., p. 17.

Among other things, the Investor-Lenders agreed to the following in the Servicing Agreements:

"The Lenders hereby authorize and direct the Collateral Agent to (a) enter into the Mortgage and the Note for and on behalf of and for the benefit of the Lenders in accordance with the terms hereof and thereof, (b) exercise such rights and powers under this Agreement, the Note or the Mortgage as the case may be, as are specifically granted or delegated to the Collateral Agent by the terms hereof and thereof, together with such other rights and powers as are reasonably incidental thereto or as are customarily and typically exercised by agents performing duties similar to the duties of the Collateral Agent hereunder and under the Collateral Documents, subject, however, to any express limitations set forth herein or in the Mortgage, and (c) perform the obligations of the Collateral Agent thereunder. The Lenders hereby agree to be bound by the provisions of the Mortgage and the Note." (§2(a).) It is customary and typical for a Servicer to issue statements of amounts due on a loan, including payoff letters, and collect loan payments, including, but not limited to loan payoffs, and for a Collateral Agent to release a mortgage upon payment of the amount specified in the payoff letter. Based on the terms of the documents described elsewhere in this response, each Investor-Lender expressly authorized and instructed EBF to perform such actions.

"Each Lender does hereby irrevocably delegate to the Collateral Agent all of each such Lender's rights and powers under the Note and the Mortgage and agrees for the benefit of the Collateral Agent and the other Lenders not to exercise any right or power of such Lender under the Note or the Mortgage." (§2(b).)

"IN THE ABSENCE OF WRITTEN INSTRUCTIONS FROM THE REQUIRED LENDERS, NEITHER THE COLLATERAL AGENT NOR THE SERVICER SHALL FORECLOSE UPON ANY LIEN WITH RESPECT TO ANY OF THE COLLATERAL OR TAKE ANY OTHER ACTION WITH RESPECT TO THE COLLATERAL OR ANY PART. THEREOF." This paragraph does not require EBF to obtain written instructions to issue statements of amounts due on a loan, including payoff letters, collect loan payments, including, but not limited to loan payoffs, or to release a mortgage upon payment of the amount specified by it in the payoff letter.

"Unless otherwise excused as provided herein, both the Collateral Agent and the Servicer shall act on all written instructions received from the Required Lenders, with respect to any action to be taken

or not to be taken in connection with this Agreement, the Mortgage or the Note, including, without limitation, actions to be taken in connection with an insolvency proceeding in respect of the Borrower; provided, however, that the Collateral Agent shall act only on written instructions from all Lenders with respect to the amendment or termination of the Mortgage, or, except as provided in the Mortgage, any Lien on property of the Borrower granted under the Mortgage." (§6(a).) Based on the terms of the documents described in this response, each Investor-Lender authorized and instructed EBF to issue statements of amounts due on a loan, including payoff letters, collect loan payments, including, but not limited to loan payoffs, and to release the Mortgages upon payments of the amounts shown due in the payoff letters.

"In its capacity as the Servicer, EBF shall: * * * (b) issue payoff demands, beneficiary statements and mortgage ratings; (c) demand, receive and collect all Loan payments, deposit them by the next business day into the Servicer's trust account and/or facilitate having them paid directly to Lender, in each case within 25 days of the date due; * * * *." (§9(a).) Thus, the Investor-Lenders authorized EBF to issue payoff demands and collect all loan payments, including those specified in a payoff demand.

Exhibit to Mortgage. Documents reviewed to date show that the vast majority of the Investor-Lenders executed what they identify as the "Exhibit to the Mortgage," which was part of the Investor-Lenders' Investment Packages. In each Exhibit to the Mortgage, the Investor-Lender agreed that EBF "as agent and trustee has been authorized by the above listed lenders to receive the payoff in its name and issue and execute a release of said mortgage, upon payment in full of any outstanding balance." See Ex A., p. 17.

The Releases of the Mortgages. EBF executed and delivered a release of each of the Mortgages (BC57 17283-17292) as instructed and authorized by the above-referenced documents.

Based upon these documents, and the above-cited provisions, the Investor-Lenders authorized EBF to collect all loan payments, issue payoff statements, collect the funds due as shown in the payoff statements and release the Mortgages upon payment of those amounts. (BC57 has not, at this time, located investment packages for each Investor-Lender, but the documents produced by the Receiver and the Investor-Lenders demonstrate that EBF required Investor-Lenders to execute an investment package as a condition to invest in a loan.) For each of the Mortgages within the Group, EBF performed those tasks on behalf of the Investor-Lenders. In particular, EBF issued payoff statements showing the

amounts due for each of the loans secured by the Mortgages, as expressly authorized by the Investor-Lenders in the above-referenced documents, payments of those amounts to EBF were made in reliance on those payoff statements and the authority the Investor-Lenders gave EBF, and releases of the Mortgages were received. Further, Illinois law requires the release of a mortgage when the debt is paid. *First,* Illinois statutes provide for the release of a mortgage upon payment of the debt, 765 ILCS 905/2. *Second,* when the mortgage debt is paid, the mortgage, which is but an incident to the debt, is no longer a lien on the property. *See Dunas v. Metropolitan Trust Company*, 41 Ill.App.3d 167, 170 (1st Dist. 1963) *citing Markus v. Chicago Title & Trust Co.*, 373 Ill. 557, 560 (1940); *Bradley v. Lightcap*, 201 Ill. 511, 517 (1903) (when the debt is paid, the mortgagee's title is extinguished by operation of law). *Third,* Section 2 of the Fiduciaries Obligations Act provides that "A person who in good faith pays or transfers to a fiduciary any money or other property which the fiduciary as such is authorized to receive, is not responsible for the proper application thereof by the fiduciary; and any right or title acquired from the fiduciary in consideration of such payment or transfer is not invalid in consequence of a misapplication by the fiduciary." 760 ILCS 65/2. The Investor-Lenders identified EBF as their agent, which establishes a fiduciary relationship.

BC57 is still reviewing the EquityBuild documents furnished by the Receiver, and the claims and discovery responses furnished by the Investor-Lenders, and reserves the right to revise or supplement this answer.

4.     Do you contend that Collateral Agency and Servicing Agreements entered by the Investor-Lenders authorized any person or entity to release any Investor-Lenders' mortgage(s)? If so, describe in detail the basis for that contention and identify the language in the Collateral Agency and Servicing Agreements purportedly authorizing the releases.

Yes, independently and in conjunction with the Exhibits to the Mortgages, the Notes, and the Mortgage. Answering further, see Response to Interrogatory No. 3. BC57 is still reviewing the EquityBuild documents furnished by the Receiver, and the claims and discovery responses furnished by the Investor-Lenders, and reserves the right to revise or supplement this answer.

5.     Do you contend that any document, communication, or agreement other than the Collateral Agency and Servicing Agreements entered by the Investor-Lenders authorized any person or entity to release any Investor-Lenders' mortgage(s)? If so, describe in detail the basis for that contention and identify any such document, communication, or agreement.

Yes, the Notes, Mortgages and the "Exhibits to the Mortgage.".
Further, as stated above, Illinois law required the release.
Answering further, see answer to Interrogatory No. 3. BC57 is still
reviewing the EquityBuild documents furnished by the Receiver,
and the claims and discovery responses furnished by the Investor-
Lenders, and reserves the right to revise or supplement this answer.

6.      Do you contend the Collateral Agency and Servicing Agreements entered by the
Investor-Lenders authorized any person or entity to release any Investor-Lenders' mortgage(s)
other than by written instructions by the Investor-Lender? If so, describe in detail the basis for
your contention.

Yes. First, the Collateral Agency and Servicing Agreements
authorized EBF to engage in acts that are customary and typical for
a Collateral Agents and Servicers, which includes issuing
statements of amounts due on a loan, including payoff statements,
collecting loan payments, including, but not limited to loan
payoffs, and releasing mortgages upon payments of the amount
specified by it in the payoff statement.  Moreover, based on the
terms of the documents described elsewhere in this response, the
Investor-Lender authorized and instructed EBF to perform those
tasks.. Further answering see answer to Interrogatory No. 3. BC57
is still reviewing the EquityBuild documents furnished by the
Receiver, and the claims and discovery responses furnished by the
Investor-Lenders, and reserves the right to revise or supplement
this answer.

7.      Do you contend that any Investor-Lender authorized EquityBuild Finance by
written instruction to release their mortgages on any property in the Group? If so, describe in
detail the basis for your belief that any Investor-Lender provided written instruction to
EquityBuild Finance to authorize the release of their mortgages, including by identifying 1) all
Investor-Lenders that authorized the release of their mortgage(s), and 2) any such written
instructions.

Based on the terms of the documents set forth above, and as a
matter of Illinois law specified above, no separate written
instruction from the Investor-Lenders was required for EBF to
release a mortgage upon receipt of a payment in the amount
specified in a payoff statement issued by it.  Moreover, at a
minimum, the following constitute instructions that empowered
EBF to release the mortgages: the authorization in the Exhibits to
the Mortgage "to receive the payoff in its name and issue and
execute a release of said mortgage, upon payment in full of any
outstanding balance"; the irrevocable delegation to the Collateral
Agent in the Servicing Agreements of all of the Lenders' rights
and powers under the Note and the Mortgage, including complying
with ¶10 of each mortgage, which provides that upon payment of

the sums secured by the mortgage, the Lender shall release the mortgage; the authorization and direction in the Servicing Agreements to "(b) exercise such rights and powers under this Agreement, the Note or the Mortgage as the case may be, as are specifically granted or delegated to the Collateral Agent by the terms hereof and thereof, together with such other rights and powers as are reasonably incidental thereto or as are customarily and typically exercised by agents performing duties similar to the duties of the Collateral Agent hereunder and under the Collateral Documents, subject, however, to any express limitations set forth herein or in the Mortgage, and (c) perform the obligations of the Collateral Agent thereunder"; and the direction in the Servicing Agreements to "(b) issue payoff demands, beneficiary statements and mortgage ratings; (c) demand, receive and collect all Loan payments". Further answering, see answers to Interrogatory Nos. 3 and 6. BC57 has not completed its review of the Investor-Lenders' claim submissions, discovery responses and EquityBuild documents, but based upon its review to date, BC57 located executed Collateral Agreements and Exhibits to the mortgage from all of the Investor-Lenders other than: Degenhardt, Duane A; Jill Meekcoms (Halverson); QuestIRAFBOFrancisDWebb1437711; TruStar Real Estate Solutions, LLC; Walter T Akita and Margaret M Akita; Geronimo Usuga Carmona; United Capital Properties, LLC,; Equity Trust Custodian FBO Dorothy Marie Baker IRA; iPlanGroup Agent for Custodian FBO Laura Dirnberger Roth IRA; JK Electron, Inc., Jan Kobylarczyk; Alton Motes (Alton P. Motes Trust UTA 12-15-11); Daniel J Martineau, and QuestIRAFBOFrancisDWebb1437711.

Respectfully submitted,

BC57

| | |
|---|---|
| | By: /s/ Michael Gilman |
| | Edward S. Weil |
| | (eweil@dykema.com) |
| | Michael A. Gilman (6182779) |
| | (mgilman@dykema.com) |
| | Todd Gale |
| | (tgale@dykema.com) |
| | Benjamin W. Chertok |
| | (bchertok@dykema.com) |
| | Kevin Connor |
| | (kconnor@dykema.com) |
| | Dykema Gossett PLLC |
| | 10 S. Wacker Drive |
| | Suite 2300 |
| | Chicago, Illinois 60606 |
| | (312) 627-5675 |

## **VERIFICATION**

I, Jason Jarjosa, Authorized Agent for BC57, LLC, state that I have reviewed the above answers to the SEC's First Set of Interrogatories and verify that facts stated therein are true and correct to the best of my information, knowledge and belief based on the documents identified in the answers.

I declare under penalty of perjury that the foregoing is true and correct.

**BC57, LLC**

By: Jason Jarjosa
Its: Authorized Agent

Dated: 9-17-2021

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 17, 2021, I caused the foregoing **BC57, LLC's Answers to SEC's First Set of Interrogatories** to be served upon attorneys of records via email.

_/s/Michael Gilman_

097077.000109 4817-9324-9275.1

DocuSign Envelope ID: 282F5B26-D65C-4E99-A86E-2B6D5E05802B



**EQUITYBUILD, INC.**

# The Keys to Wealth & Security

*Turn Your Good Credit Into A Low Risk, High Return Investment.*

Phone: (877) 978-1869 | Email: help@equitybuild.com

# New Client Form

Check if LLC is a self-directed IRA ☐

**Name:** _Kevin Scheel_____

              Preferred name on legal documents        LLC name if applicable

**Preferred Email:** ███████████_____

                      Default                Alternate

**Address:** ████████████████_____

      Street           City        State    Zip

**Cpmtact Number(s):** ██████_____

                Primary        Secondary

**SSN/EIN:** ██████_____

Required to send your 1099 for your taxes

**\*if investing via an IRA**
**Please list your preferred custodian:**_____

            Name        Email

**Please scan and send a photo ID (Drivers License, Passport, etc.)**
**To: NewAccount@EquityBuildFinance.com**

**Signature:** _Kevin Scheel_____
               DocuSigned by:
               8F2F54DF6A62483...

**Date:** _7/30/2015_____

DocuSign Envelope ID: 282FB526-B65B-4F99-A86E-2B6DEE05902B

| LENDER | BORROWER |
|---|---|
| **The persons listed on** | EQUITYBUILD, INC. |
| **Exhibit A to the Note** | 1083 N COLLIER BLVD. #132 |
| C/O EQUITYBUILD FINANCE, LLC | MARCO ISLAND, FL 34145 |
| 5068 WEST PLANO PKWY #300 | |
| PLANO, TX 75093 | |

**COMMERCIAL FLAT RATE PROMISSORY NOTE**
**With Balloon Payment**
**Illinois**

| Interest Rate | Principal | Funding Date | Maturity Date | Loan Number |
|---|---|---|---|---|
| **15%** For 24 Months | $2,250,000 | 07/08/2015 | 07/01/2017 | N/A |

THIS LOAN IS PAYABLE IN FULL ON OR BEFORE THE "MATURITY DATE" LISTED HEREIN. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND ANY UNPAID INTEREST, AND FEES AND COSTS, THEN DUE TO THE LENDER. **LENDER IS UNDER NO OBLIGATION TO REFINANCE, EXTEND OR MODIFY THE LOAN AT THAT TIME**. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER (WHICH MAY OR MAY NOT BE THE LENDER YOU HAVE THIS LOAN WITH), WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER. FOR VALUE RECEIVED, the undersigned Borrower(s), Maker(s) and/or Guarantor(s) (hereinafter the "Borrower") promises to pay **The persons listed on Exhibit A** to this Note C/O EquityBuild Finance, LLC (hereinafter collectively referred to as the "Holder" or "Lender"), at **5068 West Plano Pkwy. #300 Plano, TX 75093**, the principal sum of **TWO MILLION TWO HUNDRED FIFTY THOUSAND and 00/100 DOLLARS ($2,250,000.00)**, together with interest from the above date at the interest rate of **FIFTEEN PERCENT (15.0%)** per annum on the unpaid principal balance until paid. The principal of this Note, plus accrued interest at the rate aforesaid, shall be due and payable in **TWENTY-FOUR (24)** installments as follows:

a) ONE (1) interest payment in the amount of **TWELVE THOUSAND ONE HUNDRED EIGHTY-SEVEN and 50/100 DOLLARS ($12,187.50)**, beginning on or before **JULY 08, 2015**; and

a) TWENTY-TWO (22) equal and consecutive interest only payments in the amount of **TWENTY-EIGHT THOUSAND ONE HUNDRED TWENTY-FIVE and 00/100 DOLLARS ($28,125.00)**, beginning on or before **SEPTEMBER 01, 2015**; and continuing each and every month thereafter; and

b) One (1) final balloon payment on or before **JULY 01, 2017**, at which time the entire principal balance, together with accrued but unpaid interest thereon, and any costs and expenses, shall be due and payable.

Anything in this Note contrary notwithstanding, the entire unpaid balance of the principal sum and all unpaid interest accrued thereon shall, unless sooner paid, be and become due and payable on **JULY 01, 2017** ("Maturity Date").

1. **Application of Payments**. All payments on this Note shall be made in lawful money of the United States of America and shall be applied first to any late charges due hereunder, second to the payment of accrued but unpaid interest and the remainder to the reduction of principal. The Borrower shall make all payments when due,

1

Borrower's Initials: _____

Ex. A 2

without set-offs of any nature.

2.    **Late Charge/Dishonored Check.** There shall be a grace period of five (5) days for any payment due under this Note. The Borrower shall pay a late charge of 5% of the monthly payment amount, or $50.00, whichever is greater, if such payment is received by Lender after the grace period. If the Maturity Date of the Note has expired the late fee will be at the rate of 1.5% per month plus the face amount of the Note.

In the event any check given by Borrower to Lender as a payment on this Note is dishonored, or in the event there are insufficient funds in Borrower's designated account to cover any preauthorized monthly debit from Borrower's checking account, then, without limiting any other charges or remedies, Borrower shall pay to Lender a processing fee of $50.00 (but not more than the maximum amount allowed by law) for each such event.

3.    **Security**. To secure the payment and performance of obligations incurred under this Note, this Note shall be secured by and subject to the terms of a Mortgage of even date herewith from the Borrower which encumbers real property and improvements located at

**7201 S CONSTANCE AVE., CHICAGO, IL 60649**, and the maturity hereof is subject to acceleration as therein set forth. Both this Note and the Mortgage are given in consideration of a loan of even date herewith in the amount of the principal sum by the Lender to the Borrower.

In addition to the property described above, Borrower grants Lender a security interest in all of Borrower's right, title and interest in all monies and instruments of Borrower that are now or in the future in Lender's custody or control.

4.    **Events of Default.** An Event of Default will occur under this Note in the event that Borrower any guarantor or any other third party pledging collateral to secure this Note:

    a.  Fails to make any payment of principal and/or interest or any other sum due hereunder when the same is due pursuant to the terms of this Note;

    b.  If Borrower, guarantor or such third party:

        i.  Applies for or consents to the appointment of a receiver, trustee or liquidator of Borrower, guarantor or such third party or of all or a substantial part of its assets;

        ii.  Files a voluntary petition in bankruptcy, whether by the Federal Bankruptcy Act or any similar State stature, or admits in writing its inability to pay its debts as they come due;

        iii.  Makes an assignment for the benefit of creditors;

        iv.  Files a petition or an answer seeking a reorganization or an arrangement with creditors or seeking to take advantage of any insolvency law;

        v.  Performs any other act of bankruptcy; or

        vi.  Files an answer admitting the material allegations of a petition filed against Borrower, guarantor or such third party in any bankruptcy, reorganization or insolvency proceeding; or

    c.  Permits the entry of any order, judgment or decree by any court of competent jurisdiction adjudicating Borrower, guarantor or such third party a bankrupt or an insolvent, or approving a receiver, trustee or liquidator of Borrower, guarantor or such third party or of all or a substantial part of its assets; or

    d.  There otherwise commences with respect to Borrower, guarantor or such third party or any of its assets any proceeding under any bankruptcy, reorganization, arrangement, insolvency, readjustment, receivership or like law or statute, and if the order, judgment, decree or proceeding continues unstayed for any period of 60 consecutive days, or continues in effect for more than 10 days after any stay thereof.

    e.  Fails to perform or violates any obligations or covenants under the terms of this Note or any Mortgages or any additional loan documents or any other present or future written agreements regarding this Note or any other indebtedness or obligations between Borrower, guarantor or such third party and Lender;

    f.  Defaults under the terms of any note, mortgage, security instrument, or any other loan documents or written agreements for any other loans secured by the property representing the collateral for this Note;

    g.  Permits the entry of any judgment or lien, or the issuance of any execution, levy, attachment or

DocuSign Envelope ID: 2835B526-B650-4E99-A86E-2B6DEE05902B

garnishment proceedings against Borrower, guarantor or such third party;

h.     Sells or otherwise conveys any property which constitutes security or collateral for the payment of this Note without the prior written consent of the Lender and/or the destruction, loss or damage to such collateral in any material respect and/or the seizure, condemnation or confiscation of the collateral;

i.     Provides or causes to be provided any false or misleading signature or representation to be provided to Lender;

j.     Has a garnishment, judgment, tax levy, attachment or lien entered or served against Borrower, any guarantor, or any third party pledging collateral to secure this Note or any of their property;

k.     Dies, becomes legally incompetent, is dissolved or terminated, or ceases to operate its business;

l.     Fails to provide Lender evidence of satisfactory financial condition;

m.     Has a majority of its outstanding voting securities sold, transferred or conveyed to any person or entity other than any person or entity that has the majority ownership as of the date of the execution of this Note;

n.     Causes Lender to deem itself insecure due to a significant decline in the value of any real or personal property securing payment of this Note, or Lender, in good faith believes the prospect of payment or performance is impaired;

o.     Fails to keep an insurance policy in place on the subject property being used as collateral for this loan with Lender as the mortgagee and/or as the loss payee including its successor and/or assigns;

p.     Fails to keep property taxes current on property used as security for this Note.

5.     **Rights of Lender On Event of Default**. In the Event of Default as set forth herein, or in the event of the breach of any covenant or obligation contained in the herein referred to Mortgage or Loan Documents on the part of the undersigned to be kept, observed or performed, the Lender, at its sole and absolute discretion, may exercise one or more of the following remedies without notice or demand (except as required by law):

a.     Declare the entire unpaid balance of principal of this Note, along with accrued and unpaid interest thereon and all other charges, costs and expenses, provided for herein and in the Mortgage immediately due and payable. Such acceleration shall be automatic and immediate in the Event of Default is a filing under the Bankruptcy Code;

b.     Collect the outstanding obligations of Borrower with or without judicial process;

c.     Cease making advances under this Note or any other agreement between Borrower and Lender;

d.     Take possession of any collateral in any manner permitted by law;

e.     require Borrower to deliver and make available to Lender any collateral at a place reasonably convenient to Borrower and Lender;

f.     Sell, lease or otherwise dispose of any collateral and collect any deficiency balance with or without resorting to legal process;

g.     Assume any and all mortgages/deeds of trust in existence at the time of default on all collateral securing loans made to Borrower;

h.     Set-off Borrower's obligations against any amounts due to Borrower including, but not limited to, monies and instruments, maintained with Lender; and

i.     Exercise all other rights available to Lender under any other written agreement or applicable law.

At any time an Event of Default shall have occurred and be continuing and/or after maturity of the Loan, including maturity upon acceleration, the unpaid principal balance, all accrued and unpaid interest and all other amounts payable under the Note shall bear interest at the "Default Rate" set forth in this Note. The unpaid principal balance shall continue to bear interest after the Maturity Date at the Default Rate set forth in this Note until and including the date on which it is paid in full. Any regularly scheduled monthly installment of interest that is received by Lender before the date it is due shall be deemed to have been received on the due date solely for the purpose of calculating interest due. Any accrued interest remaining past due for 30 days or more shall be added to and become part of the unpaid principal balance and shall bear interest at the rate or rates specified in this Note, and any reference herein to "accrued interest" shall refer to accrued interest which has not become part of the unpaid principal balance. Interest under this Note shall be computed on the basis of a 360-day year consisting of twelve 30-day months. Borrower shall make all payments of

IL: Commercial Flat Rate Promissory Note                                         Borrower's Initials: _____

Ex. A 4

DocuSign Envelope ID: 2835B526-B658-4F99-A86E-2B6DEE05902B

principal and interest under this Note without relief from valuation and appraisement laws.

Lender's remedies in this Section are in addition to any available at common law and nothing in this Section shall impair right which the Holder has under this Note, or at law or in equity, to accelerate the debt on the occurrence of any other Event of Default, whether or not relating to this Note. Lender's rights or remedies as provided in this Note shall be cumulative and concurrent and may be pursued singly, successively, or together against Borrower or any guarantor or third party (without first having to proceed against Borrower), at Lender's sole and absolute discretion. Borrower shall pay to Lender on Lender's demand the amount of all expenses incurred by Lender (a) in enforcing it's rights under this Note, or (b) as the result of a default by Borrower under this Note, including but not limited to the cost of collecting any amount owed hereunder, and any reasonable attorney's fees. The failure by Lender to exercise any of its options contained herein shall not constitute a waiver of the right to exercise such option in the event of any subsequent default.

6.   **Costs and Expenses.** To the extent permitted by law, Borrower agrees to pay any and all reasonable fees and costs, including, but not limited to, fees and costs of attorneys and other agents (including without limitation paralegals, clerks and consultants), whether or not such attorney or agent is an employee of Lender, which are incurred by Lender in collecting any amount due or enforcing any right or remedy under this Note, whether or not suit is brought, including, but not limited to, all fees and costs incurred on appeal, in bankruptcy, and for post-judgment collection actions. Said collection fees shall be in the minimum amount of Fifteen Percent (15%) of the amount of the judgment as collected (or, if collected without judgment, a minimum fee of Fifteen Percent (15%) of the amount collected), which attorney's fee shall not be diminished by any other fees, costs or damages, but in no event shall the attorney's fees be less than $3,000.00.

7.   **Extensions.** The Borrower shall remain liable for the payment of this Note, including interest, notwithstanding any extension or extensions of time of payment or any indulgence of any kind or nature that the Lender may grant or permit any subsequent owner of the encumbered property, whether with or without notice to the Borrower and the Borrower hereby expressly waives such notice.

8.   **Confessed Judgment.** UPON ANY DEFAULT BY THE BORROWER AS SET FORTH IN THIS NOTE, AND TO THE EXTENT PERMITTED BY LAW, THE BORROWER HEREBY AUTHORIZES ANY ATTORNEY AT LAW TO APPEAR FOR THE BORROWER IN ANY COURT OF COMPETENT JURISDICTION AND WAIVE THE ISSUANCE AND SERVICE OF PROCESS AND CONFESS A JUDGMENT AGAINST THE BORROWER IN FAVOR OF THE LENDER FOR SUCH AMOUNTS AS MAY THEN APPEAR TO BE UNPAID HEREON TOGETHER WITH COSTS, EXPENSES AND ATTORNEY'S FEES IN THE MINIMUM AMOUNT OF FIFTEEN PERCENT (15%) OF THE AMOUNT DUE FOR COLLECTION (BUT IN NO EVENT SHALL SUCH FEES BE LESS THAN $3000.00), AND TO RELEASE ALL PROCEDURAL ERRORS AND WAIVE ALL RIGHTS OF APPEAL. IF THE CONFESSION OF JUDGMENT ABOVE PROVIDED FOR IS AUTHORIZED OR RECOGNIZED BY THE LAW OF THE JURISDICTION CONTROLLING BUT SUCH LAW REQUIRES SPECIAL FORMALITIES AND PROCEDURE, THEN THE SAID ATTORNEY IS EMPOWERED TO EXECUTE THE NECESSARY FORM AND COMPLY WITH SUCH SPECIAL PROCEDURES. THIS POWER OF CONFESSION OF JUDGMENT SHALL NOT BE EXHAUSTED BY ANY ONE OR MORE EXERCISES, AND THE POWER SHALL CONTINUE UNDIMINISHED AND MAY BE EXERCIED FROM TIME TO TIME AS OFTEN AS LENDER SHALL ELECT UNTIL ALL AMOUNTS PAYABLE TO LENDER UNDER THIS NOTE SHALL HAVE BEEN PAID IN FULL.

9.   **Forbearance**. The Lender shall not by any act or omission to act be deemed to waive any of its rights or remedies hereunder unless such waiver is in writing and signed by the Lender and then only to the extent specifically set forth therein. A waiver on one occasion shall not be construed as continuing or as a bar to or waiver of such right or remedy on any other occasion. All remedies conferred upon the Lender by this Note or any other instrument or agreement connected herewith or related hereto shall be cumulative and none is exclusive, and such remedies may be exercised concurrently or consecutively at the Lender's option.

10.   **Modification and Waiver**. Borrower and/or every person at any time liable for the payment of the debt evidenced hereby, waives the exercise of all exemption rights which it holds at law or in equity concerning to the debt evidenced by this Note whether under state constitution, homestead laws or otherwise. Borrower and any endorsers or guarantors hereof severally waive valuation and appraisement, presentment and demand for payment, notice of intent to accelerate maturity, notice of acceleration of maturity, protest or notice of protest and nonpayment, bringing of suit

Borrower's Initials: _____

Ex. A 5

and diligence in taking any action to collect any sums owing hereunder or in proceeding against any of the rights and properties securing payment hereof, and trial by jury in any litigation arising out of, relating to, or connected with this Note or any instrument given as security hereof.

From time to time, without affecting Borrower's obligation to pay any sums due under this Note and perform Borrower's covenants herein, without affecting the obligations of any endorser hereto or guarantor hereof, without giving notice to or obtaining the consent of Borrower or any endorser hereto or guarantor hereof, and without liability on the part of the Holder, Holder may, acting it its sole and absolute discretion, extend the Maturity Date or any other time for payment of interest hereon and/or principal hereof, reduce the payments hereunder, release anyone liable under this Note accept a renewal of this Note, modify the terms and time of payment of this Note, join in any extension or subordination or exercise any option or election hereunder, modify the rate of interest or period of amortization or principal due date of this Note, or exercise any option or election hereunder. No one or more such actions shall constitute a novation.

11.    **Voluntary and Involuntary Prepayments.**

(a)    A prepayment premium shall be payable in connection with any prepayment made under this Note as provided below:

(i)    Borrower may voluntarily prepay all of the unpaid principal balance of this Note on a Business Day designated as the date for such prepayment in a Notice from Borrower to Lender given at least 30 days prior to the date of such prepayment. Such prepayment shall be made by paying (A) the amount of principal being prepaid, (B) all accrued interest, (C) all other sums due Lender at the time of such prepayment, and (D) the prepayment premium calculated pursuant to Section 11(f) of this Note. For purposes of this Note, a **"Business Day"** means any day other than a Saturday, Sunday or any other day on which Lender is not open for business. For all purposes including the accrual of interest, but excluding the determination of the prepayment date under Section 11(f) of this Note, any prepayment received by Lender on any day other than the last calendar day of the month shall be deemed to have been received on the last calendar day of such month.

(ii)    Borrower may voluntarily prepay less than all of the unpaid principal balance of this Note (a **"Partial Prepayment"**) at any time. Upon delivery of the Partial Prepayment, a prepayment premium calculated pursuant to Section 11(f) of this Note, based on the amount being prepaid, shall be due and payable to Lender upon demand.

(iii)    Upon Lender's exercise of any right of acceleration under this Note, Borrower shall pay to Lender, in addition to the entire unpaid principal balance of this Note outstanding at the time of the acceleration, (A) all accrued interest, (B) and all other sums due Lender, and (C) the prepayment premium calculated pursuant to Section 11(f) of this Note, to the extent such prepayment premium does not exceed the maximum rate permitted by applicable law.

(iv)    Any application by Lender of any proceeds of collateral or other security to the repayment of any portion of the unpaid principal balance of this Note prior to the Maturity Date and in the absence of acceleration shall be deemed to be a partial prepayment by Borrower, requiring the payment to Lender by Borrower of a prepayment premium. The amount of any such partial prepayment shall be computed so as to provide to Lender a prepayment premium computed pursuant to Section 11(f) of this Note without Borrower having to pay out-of-pocket any additional amounts.

(b)    Notwithstanding the provisions of Section 11(a), no prepayment premium shall be payable with respect to (A) any prepayment made after the expiration of the Prepayment Premium Period (as defined in Section 11(f) of this Note), or (B) any prepayment occurring as a result of the application of any insurance proceeds or condemnation award under the Security Instrument.

(c)    Any permitted or required prepayment of less than the unpaid principal balance of this Note shall not extend or postpone the due date of any subsequent monthly installments or change the amount of such installments, unless Lender agrees otherwise in writing.

(d)    Borrower recognizes that any prepayment of the unpaid principal balance of this Note, whether voluntary or involuntary or resulting from a default by Borrower, will result in Lender's incurring loss, including reinvestment loss, additional expense and frustration or impairment of Lender's ability to meet its commitments to third parties. Borrower agrees to pay to Lender upon demand damages for the detriment caused by any prepayment, and agrees that it is extremely difficult and impractical to ascertain the extent of such damages. Borrower therefore acknowledges and agrees that the formula for calculating prepayment premiums set forth in Section 11(f) represents a reasonable estimate of the damages Lender will incur because of a prepayment.

(e)    Borrower further acknowledges that the prepayment premium provisions of this Note are a material part

Borrower's Initials: _____

Ex. A 6

of the consideration for the Loan, and acknowledges that the terms of this Note are in other respects more favorable to Borrower as a result of the Borrower's voluntary agreement to the prepayment premium provisions.

      (f)    Any prepayment premium payable under this Section 11 shall be computed as follows:

      (i)    If the prepayment is made between the date of the initial funding of the loan evidenced by this Note and the last day of **JUNE 2015** (the "**Prepayment Premium Period**"), the prepayment premium shall be the interest at the Note rate herein that would be earned on full loan amount for the balance of the Prepayment Premium Period.

      (ii)    If the prepayment is made after the expiration of the Prepayment Premium Period, there shall be no prepayment premium due.

      12.    **Default Rate.** So long as (a) any monthly installment under this Note remains past due for thirty (30) days or more or (b) any other Event of Default has occurred and is continuing, interest under this Note shall accrue on the unpaid principal balance from the earlier of the due date of the first unpaid monthly installment or the occurrence of such other Event of Default, as applicable, at a rate (the "**Default Rate**") equal to the lesser of **seven (7)** percentage points above the rate stated in the first paragraph of this Note or the maximum interest rate which may be collected from Borrower under applicable law. If the unpaid principal balance and all accrued interest are not paid in full on the Maturity Date, the unpaid principal balance and all accrued interest shall bear interest from the Maturity Date at the Default Rate. Borrower acknowledges that (a) its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Loan, (b) during the time that any monthly installment under this Note is delinquent for thirty (30) days or more, Lender will incur additional costs and expenses arising from its loss of the use of the money due and from the adverse impact on Lender's ability to meet its other obligations and to take advantage of other investment opportunities; and (c) it is extremely difficult and impractical to determine those additional costs and expenses. Borrower also acknowledges that, during the time that any monthly installment under this Note is delinquent for thirty (30) days or more or any other Event of Default has occurred and is continuing, Lender's risk of nonpayment of this Note will be materially increased and Lender is entitled to be compensated for such increased risk. Borrower agrees that the increase in the rate of interest payable under this Note to the Default Rate represents a fair and reasonable estimate, taking into account all circumstances existing on the date of this Note, of the additional costs and expenses Lender will incur by reason of the Borrower's delinquent payment and the additional compensation Lender is entitled to receive for the increased risks of nonpayment associated with a delinquent loan. During any period that the Default Rate is in effect the additional interest accruing over and above the rate stated in the first paragraph of this Note shall be immediately due and payable in addition to the regularly scheduled principal and interest payments. Lender shall impose the Default Rate without any notice requirement to Borrower, guarantor or any third party pledging collateral as security for this Note.

      13.    **Loan Charges/Maximum Rate Permitted By Law.** Neither this Note nor any of the other Loan Documents shall be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law. If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any other Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of this Note. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note. If Lender reasonably determines that the interest rate (together with all other charges or payments that may be deemed interest) stipulated under this Note is or may be usurious or otherwise limited by law, the unpaid balance of this Note, with accrued interest at the highest rate permitted to be charged by stipulation in writing between Lender and Borrower, at the option of Lender, shall immediately become due and payable.

      14.    **Waiver of Jury Trial.** THE BORROWER WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF, OR IN ANY WAY PERTAINING TO, THIS NOTE OR ANY DEED OF TRUST/MORTGAGE ARISING FROM THIS NOTE. THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY

IL: Commercial Flat Rate Promissory Note

Borrower's Initials: _____

Ex. A 7

DocuSign Envelope ID: 2825B526-B668-4F99-A86E-2B6DEE05902B

OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY THE BORROWER, AND THE BORROWER HEREBY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.

15. **Notices**. Any Notice or other communication required, permitted or desirable under the terms of this Note shall be sufficiently given if sent to each party as follows:

Lender:     The persons listed on Exhibit A to this Note
C/O EquityBuild Finance, LLC
5068 West Plano Pkwy, #300
Plano, Texas 75093
Fax: 239-244-8666
Email: shaun.d.cohen@gmail.com

Borrower:   EquityBuild, Inc.
1083 N Collier Blvd. #132
Marco Island, FL 34145
Fax: 202-204-8423
Email: jerry@equitybuild.com

Any notice, demand, consent, approval, request or other communication or document to be given hereunder to a party hereto shall be (a) in writing, and (d) deemed to have been given (i) on the 3rd business day after being sent as certified or registered mail in the United States mails, postage prepaid, return receipt requested, or (ii) on the next business day after being deposited (with instructions to deliver it on that business day) with a reputable overnight courier service, or (iii) (if the party's receipt thereof is acknowledged in writing) on being sent by telefax or another means of immediate electronic communication, in each case to the party's address set forth above or any other address in the United States of America which it designates from time-to-time by notice to each other party hereto, or (iv) (if the party's receipt thereof is acknowledged in writing) on being given by hand or other actual delivery to the party.

16. **Entire Agreement/Severability.** The terms and conditions of this Note together with the terms and conditions of the Mortgages which are incorporated herein by reference as if set forth fully herein contain the entire understanding between the Borrower and Lender with respect the indebtedness evidenced hereby. Such understanding may not be modified, amended or terminated except in a written document duly executed by Borrower and Lender. In the event that any one or more of the provisions set forth in this Note or any accompanying Arbitration Agreement is determined by law to be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired hereby, and each provision in this Note shall be construed liberally in favor of Lender to the fullest extent of the law.

17. **Joint and Several Liability/Credit Reporting**. The liability of the undersigned, as well as any endorsers and/or guarantor(s), shall be both joint and several. This Note shall be binding upon the heirs, successors and assigns of Borrower and Lender. Information concerning this Note may be reported to credit reporting agencies and will be made available when requested by proper legal process.

18. **Governing Law.** This Note is delivered and made in, and shall be construed pursuant to the laws of the State of Illinois Unless applicable law provides otherwise, Borrower consents to the jurisdiction and venue of any court of competent jurisdiction located in **Cook County**, Illinois.

19. **Construction**. As used herein, Person means a natural person, trustee, corporation, partnership, limited liability company or other legal entity, and all references made (a) in the neuter, masculine or feminine gender shall be deemed made in all genders, (b) in the singular or plural number shall also be deemed made in the plural or singular number, and (c) to any Section, subsection, paragraph or subparagraph shall, unless therein expressly indicated to the contrary, be deemed made to that part of the Note. The headings of those parts are provided only for convenience of reference, and shall not be considered in construing their contents. Each document referred to herein

DocuSign Envelope ID: 2825B526-B559-4F09-A86E-2B6DEE05902B

as being attached hereto as an exhibit or otherwise designated herein as an exhibit hereto shall be a part hereof.

20.    **Time of Essence**. Time shall be of the essence of this Note, but (other than as to payment of principal and/or interest) if the last day for a Person to exercise a right or perform a duty hereunder is a Saturday, Sunday or statutory holiday, it shall have until the next day other than such a day to do so.

21.    **Assignment**. Borrower agrees not to assign any of Borrower's rights, remedies or obligations described in this Note without the prior written consent of Lender, which consent may be withheld by Lender in its sole discretion. Borrower agrees that Lender is entitled to assign some or all of its rights and remedies described in this Note without notice to or the prior consent of Borrower.

22.    **Commercial Purpose.** It is expressly stipulated, warranted and agreed that the loan evidenced by this Note and any Loan Documents is a "commercial loan" under applicable State or Federal law, and all proceeds shall be used for business, commercial or investment purposes and expressly not for personal, family or household purposes.

23.    **Extension**. Intentionally omitted.

24.    **Arbitration**. If arbitration has been agreed to, Borrower(s) and Lender have entered into a separate Arbitration Agreement on this date, the terms of which are incorporated herein and made a part hereof by reference.

25.    **Contingency Funds**. Intentionally omitted.

26.    **Demand Feature**. Intentionally omitted.

27.    **Consent To Relief From Automatic Stay**. Borrower hereby agrees that if any of them shall (i) file with any bankruptcy court of competent jurisdiction or be the subject of any petition under Title 11 of the U.S. Code, as amended; (ii) be the subject of any order for relief issued under such Title 11 of the U.S. Code, as amended; (iii) file or be the subject of any petition seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors; (iv) seek, consent to or acquiesce in the appointment of any trustee, receiver, conservator or liquidator; (v) be the subject of any order, judgment or decree entered by any court of competent jurisdiction approving a petition filed against Borrower for any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or relief for debtors, Lender shall thereupon be entitled to relief from any automatic stay imposed by Section 362 of Title 11 of the U.S. Code, as amended, or from any other stay or suspension of remedies imposed in any other manner with respect to the exercise of the rights and remedies otherwise available to Lender under the Loan Documents.

28.    **Financial Information**. Borrower will at all times keep proper books of record and account in which full, true and correct entries shall be made in accordance with generally accepted accounting principles and will deliver to Lender, within ninety (90) days after the end of each fiscal year of Borrower, a copy of the annual financial statements of Borrower relating to such fiscal year, such statement to include (i) the balance sheet of Borrower as at the end of such fiscal year (ii) the related income statement, statement of retained earnings and statement of cash flow of Borrower for such fiscal year, prepared by such certified public accountants as may be reasonably satisfactory to Lender. Borrower also agrees to deliver to Lender within fifteen (15) days after filing same, a copy of Borrower's income tax returns and also, from time to time, such other financial information with respect to Borrower as Lender may request.

_____

**THE PERSONS SIGNING BELOW ACKNOWLEDGE THAT THEY HAVE BEEN GIVEN AMPLE OPPORTUNITY TO READ THIS AGREEMENT AND SEEK INDEPENDENT LEGAL COUNSEL AND ACKNOWLEDGE THEY HAVE COMPLETELY READ AND UNDERSTAND AND AGREE TO THE TERMS AND CONDITIONS OF THIS NOTE AND THE ACCOMPANYING ARBITRATION AGREEMENT (IF APPLICABLE), AND FURTHER ACKNOWLEDGE RECEIPT OF AN EXACT COPY OF THIS NOTE AND THE ARBITRATION AGREEMENT.**

DATED: _____

DocuSign Envelope ID: 282FB526-B950-4F99-A86F-2B6DEE05902B

BORROWER(S): EQUITYBUILD, INC.

_____(SEAL)

JERRY COHEN, President


STATE OF _____, COUNTY OF _____:          ss:

　　　On this _____ day of _____, 20____, before me, a notary public, personally appeared _____ me known (or proved to me on the basis of satisfactory evidence) to be the person(s) who executed the foregoing instrument and acknowledged the same for the purpose therein contained and in my presence signed and sealed the same.

_____

NOTARY PUBLIC

My Comm. Expires:_____

9

## <u>Exhibit A</u>

**Lender Name:**   Kevin Scheel

**Lender Amount:**   $25,000.00

**Percentage of Ownership of Total Loan:**   1.11%

**Monthly Interest Payment Amount to Be Received:**   $250.00 at 12%

*Kevin Scheel*

**Lender Signature**

Mail To:

_____[The Above Space For Recorder's Use Only]_____

## MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on July 8th, 2015. The mortgagor is EquityBuild, Inc. ("Borrower").

This Security Instrument is given to The Persons Listed on <u>Exhibit A</u> to the Mortgage C/O Hard Money Company, LLC whose address is 5068 West Plano Pkwy. #300 Plano, TX 75093 ("Lender").

Borrower owes Lender the principal sum of Two Million Two Hundred Fifty Thousand and 00/100 Dollars (U.S. $2,250,000.00). This debt is evidenced by Borrower's note dated  the same date as this Security Instrument (Mortgage), which provides for a final payment of the full debt,  if not paid earlier, due and payable July 1st, 2017. This Security Instrument secures to Lender:
(a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extension and modifications; (b) the payment of all other sums, with interest advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in COOK County, Illinois:

PIN: 20-25-119-001-0000

which has the address of 7201 S Constance Ave. Chicago, IL 60649 ("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents, royalties, mineral, oil and gas rights and profits, water rights and stock and all fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANT. Borrower and Lender covenant and agree as follows:

1. Payment of Principal and Interest; Prepayment and Late Charges. Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. Hazard Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration and repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 19 the property is acquired by Lender, Borrower's rights to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of sums secured by this Security Instrument immediately prior to the acquisition.

3. Preservation and Maintenance of Property; Leaseholds. Borrower shall not destroy, damage or substantially change the Property, allow the Property to deteriorate or commit waste. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease, and if Borrower acquires fee title to the Property, the leasehold and fee title shall not merge unless Lender agrees to the merger in writing.

4. Protection of Lender's Rights in the Property; Mortgage Insurance. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees, and entering on the Property to make repairs. Although Lender may take action under this paragraph 4, Lender does not have to do so.

5. Successor and Assigns Bound; Joint and Several Liability; Co-signers. The covenants and agreements of this Security Interest shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 9. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey the Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forebear or make any accommodations with regard to the terms of this Security Instrument or the Note without the Borrower's consent.

6. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

7. Governing Law; Severability. This Security Instrument shall be governed by federal law and the law of jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

8. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

9. Transfer of the Property or a beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

10. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

11. Assignment of Rents and Leases. As additional security for the payment of the Indebtedness, Mortgagor assigns and transfers to Mortgagee, pursuant to 1953 PA 210, as amended by 1966 PA 151 (MCLA 554.231 et seq., MSA 26.1137(1) et seq.), all the rents, profits, and income under all leases, occupancy agreements, or arrangements upon or affecting the Premises (including any extensions or amendments) now in existence or coming into existence during the period this Mortgage is in effect. This assignment shall run with the land and be good and valid as against Mortgagor and those claiming under or through Mortgagor. This assignment shall continue to be operative during foreclosure or any other proceedings to enforce this Mortgage. If a foreclosure sale results in a deficiency, this assignment shall stand as security during the redemption period for the payment of the deficiency. This assignment is given only as collateral security and shall not be construed as obligating Mortgagee to perform any of the covenants or undertakings required to be performed by Mortgagor in any leases.In the event of default in any of the terms or covenants of this Mortgage, Mortgagee shall be entitled to all of the rights and benefits of MCLA 554.231-.233, MSA 26.1137(1)-(3), and 1966 PA 151, and Mortgagee shall be entitled to collect the rents and income from the Premises, to rent or lease the Premises on the terms that it may deem best, and to maintain proceedings to recover rents or possession of the Premises from any tenant or trespasser.Mortgagee shall be entitled to enter the Premises for the purpose of delivering notices or other communications to the tenants and occupants. Mortgagee shall have no liability to Mortgagor as a result of those acts. Mortgagee may deliver all of the notices and communications by ordinary first-class U.S. mail.If Mortgagor obstructs Mortgagee in its efforts to collect the rents and income from the Premises or unreasonably refuses or neglects to assist Mortgagee in collecting the rent and income, Mortgagee shall be entitled to appoint a receiver for the Premises and the income, rents, and profits, with powers that the court making the appointment may confer. Mortgagor shall at no time collect advance rent in excess of one month under any lease pertaining to the Premises, and Mortgagee shall not be bound by any rent prepayment made or received in violation of this paragraph. Mortgagee shall not have any obligation to collect rent or to enforce any other obligations of any tenant or occupant of the Premises to Mortgagor. No action taken by Mortgagee under this paragraph shall cause Mortgagee to become a "mortgagee in possession."

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

BORROWER: EquityBuild, Inc.

_____(SEAL)
Jerry Cohen, President

_____[Space Below This Line For Acknowledgement]_____

STATE OF FLORIDA, _____ County ss:

     I hereby certify that on this day, before me, an officer duly authorized in the state aforesaid and  in the county aforesaid to take acknowledgements, personally appeared Jerry Cohen, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he/she executed the same for the purpose therein expressed.

     WITNESS my hand and official seal in the county and state aforesaid this _____ day of _____, 20____.

My Commission expires:

    {Seal}

_____
  Notary Public

**Lender Name:**   Kevin Scheel

**Lender Amount:**   $25,000.00

**Percentage of Ownership of Total Loan:**   1.11%

**Monthly Interest Payment Amount to Be Received:**   $250.00 at 12%

DocuSigned by:

*Kevin Scheel*

**Lender Signature**

EquityBuild Finance, LLC, as agent and trustee has been authorized by the above listed lenders to receive the payoff in its name and issue and execute a release of said mortgage, upon payment in full of any outstanding balance.

Ex. A 17

# COLLATERAL AGENCY AND SERVICING AGREEMENT

among

# EQUITYBUILD FINANCE, LLC,

## as Collateral Agent and Loan Servicer,

and

# EACH OF THE LENDERS PARTY HERETO

## DATED AS OF 7/30/2015 _____

DocuSign Envelope ID: 2835B526-B558-4F99-A86E-2B6DEE05902B

## COLLATERAL AGENCY AND SERVICING AGREEMENT

This **COLLATERAL AGENCY AND SERVICING AGREEMENT** (as amended, supplemented or otherwise modified from time to time, this "**Agreement** ") is made as of _____, by and among (i) EquityBuild Finance, LLC, a Florida limited liability Borrower (in its individual capacity, "**EBF**", and in its capacity as collateral agent for the Lenders (as defined below), and in its capacity as loan servicer for the Lenders, the "**Collateral Agent**" or the "**Servicer**"), and (ii) each of the Lenders party hereto (together with their respective successors and assigns as beneficiaries of the Note (as defined below), the "**Lenders**"), and is acknowledged, consented and agreed to by EquityBuild, Inc. (the "**Borrower**").

7/30/2015

## RECITALS

**A.** Reference is made to that certain Note, dated _____ (as the same from time to time hereafter may be amended, restated, supplemented or otherwise modified, the "**Note**") by the Borrower in favor of the Lenders, pursuant to which, subject to the terms and conditions set forth therein, the Lenders shall make individual investment loans (each an "**Investment**") to the Borrower as a collective secured loan (the "**Loan**").

07/22/2015

**B.** The Lenders have agreed to make the Loan to the Borrower, but only upon the condition, among others, that the Borrower grant to the Collateral Agent, for the benefit of the Lenders, as security for the Borrower's obligations to the Lenders and the Collateral Agent under or in respect of the Note and the Mortgage (as defined below), a perfected lien on, and security interest in, the Collateral (as defined below).

**C.** The Lenders desire that EBF act as the collateral agent for and on behalf of all of the Lenders regarding the Collateral, all as more fully provided herein; and the Collateral Agent and the Lenders have entered into this Agreement to, among other things, further define the rights, duties, authority and responsibilities of the Collateral Agent and the relationship among the Lenders regarding their *pari passu* interests in the Collateral.

**D.** The Lenders also desire to retain EBF as the loan servicer to act as their agent to employ commercially reasonable and prudent practices to collect all scheduled payments on the Loan, and to protect to the best of the Servicer's ability, the security for the Loan.

## AGREEMENT

**NOW, THEREFORE,** in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, EBF and the Lenders agree as follows:

2

## 1. DEFINED TERMS.

As used in this Agreement, and unless the context requires a different meaning, the following terms have the respective meanings indicated below, all such definitions to be equally applicable to the singular and plural forms of the terms defined.

*Actionable Default* – means the existence and continuance of any Event of Default (as defined in the Note) beyond any grace period in respect thereof provided in the Note or the acceleration of the maturity of the Note.

*Affiliate* – means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, has control of, is controlled by, or is under common control with, such specified Person. For these purposes, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management of any Person, whether through the ownership of voting securities, by contract or otherwise.

*Agent Professionals* – means attorneys, legal counsel, accountants, appraisers, business valuation experts, environmental engineers, turnaround consultants, or other professionals or experts at any time retained by EBF in the discharge of its duties hereunder or under any of the Collateral Documents.

*Agent-Related Persons* – means EBF, in its capacity as Collateral Agent or Servicer, and any successor collateral agent or loan servicer, and any co-agents or separate agents appointed pursuant to Section 5, together with their respective Affiliates, and the officers, directors, employees, representatives, agents and Agent Professionals of such Persons and Affiliates.

*Agreement* – has the meaning specified for such term in the Preamble hereto.

*Business Day* – means a day (i) other than Saturday or Sunday and (ii) on which commercial banks are open for business in New York, New York.

*Collateral* – has the meaning specified for such term in Mortgage.

*Collateral Agent* – has the meaning specified for such term in the Preamble hereto.

*Collateral Documents* – means the Mortgage and any other document now or hereafter evidencing a security interest, lien or other encumbrance granted to secure the obligations payable under the Note or any guarantee thereof.

*Enforcement Notice* – means a written notice given by the Required Lenders to the Collateral Agent stating that an Actionable Default exists.

*EBF*– has the meaning specified for such term in the Preamble hereto.

*Lenders* – has the meaning specified for such term in the Preamble hereto.

***Liens*** – means any pledges, liens, claims, encumbrances or security interests.

***Mortgage*** – has the meaning specified for such term in Note.

***Obligations*** – means and includes all present and future indebtedness, obligations and liabilities of every kind and nature of the Borrower from time to time owed to any Lender under the Note arising from, evidenced by or relating to the Note or the Mortgage.

***Note*** – has the meaning specified for such term in Recital A hereto.

***Person*** – means any individual, partnership, corporation, limited liability Borrower, unincorporated organization or association, trust or other entity.

***Required Lenders*** – means the Lenders acting by a majority of principal advanced by the Lenders under the Note.

***Servicer*** – has the meaning specified in the Preamble hereto.

***Total Investments*** – means, with respect to Investments that remain outstanding in whole or in part, the total original amount of Investments a Lender has loaned to the Borrower; provided that for purposes of Section 10(e) hereof, such amounts shall be rounded down to the nearest whole $25,000 increment. By way of example only, if actual Total Investments equaled $176,000, for purposes of Section 10(e), such Total Investments would equal $175,000.

## 2. APPOINTMENTS; IRREVOCABLE DELEGATION OF AUTHORITY.

### (a) Appointment as Collateral Agent and Loan Servicer.

The Lenders hereby appoint and designate EBF as collateral agent on their behalf hereunder and under the Mortgage. The Lenders hereby also appoint and designate EBF as the loan servicer with respect to the Loan. EBF hereby accepts such appointments on the terms and conditions set forth herein and acknowledges that it holds the Collateral and acts under the Mortgage as agent for and on behalf of the Lenders. The Lenders hereby authorize and direct the Collateral Agent to (a) enter into the Mortgage and the Note for and on behalf of and for the benefit of the Lenders in accordance with the terms hereof and thereof, (b) exercise such rights and powers under this Agreement, the Note or the Mortgage as the case may be, as are specifically granted or delegated to the Collateral Agent by the terms hereof and thereof, together with such other rights and powers as are reasonably incidental thereto or as are customarily and typically exercised by agents performing duties similar to the duties of the Collateral Agent hereunder and under the Collateral Documents, subject, however, to any express limitations set forth herein or in the Mortgage, and (c) perform the obligations of the Collateral Agent thereunder. The Lenders hereby agree to be bound by the provisions of the Mortgage and the Note. The duties of the Collateral Agent and the Servicer shall be deemed ministerial and administrative in nature, and neither the Collateral Agent nor the Servicer shall have, by reason of this Agreement or either of the Mortgage or the Note, a fiduciary relationship with any Lender and/or any Affiliate thereof.

**(b) Irrevocable Delegation of Authority.**

Each Lender does hereby irrevocably delegate to the Collateral Agent all of each such Lender's rights and powers under the Note and the Mortgage and agrees for the benefit of the Collateral Agent and the other Lenders not to exercise any right or power of such Lender under the Note or the Mortgage.

## 3. LIMITATIONS ON DUTIES AND ACTIONS OF COLLATERAL AGENT AND THE SERVICER.

Neither the Collateral Agent nor the Servicer shall have any duties or responsibilities except those expressly set forth in this Agreement and the Mortgage. Neither the Collateral Agent nor the Servicer shall be liable for any action taken or omitted by it, or any action suffered by it to be taken or omitted, excepting only its own gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction. IN THE ABSENCE OF WRITTEN INSTRUCTIONS FROM THE REQUIRED LENDERS, NEITHER THE COLLATERAL AGENT NOR THE SERVICER SHALL FORECLOSE UPON ANY LIEN WITH RESPECT TO ANY OF THE COLLATERAL OR TAKE ANY OTHER ACTION WITH RESPECT TO THE COLLATERAL OR ANY PART THEREOF.

## 4. RECOURSE THROUGH COLLATERAL AGENT; SHARING OF COLLATERAL.

**(a) Recourse Through Collateral Agent.**

Each of the Lenders acknowledges and agrees that (i) it shall only have recourse to the Collateral through the Collateral Agent and that it shall have no independent recourse to the Collateral and (ii) the Collateral Agent shall have no obligation to, and shall not, take any action hereunder or under the Mortgage except upon written instructions from the Required Lenders in accordance with Section 6(a).

**(b) Sharing of Collateral.**

No Lender shall contest the validity, perfection, priority or enforceability of, or seek to avoid, any Lien securing any Obligation, and each party hereby agrees to cooperate, at no cost to the Collateral Agent, in the defense of any action contesting the validity, perfection, priority or enforceability of any such Lien. No Lender shall have the right to obtain any of the Collateral or the benefit of any Lien on any property of the Borrower solely in respect of Obligations owing to such Lender or any group of Lenders comprised of less than all the Lenders.

## 5. CO-AGENTS; COLLATERAL AGENT'S AND SERVICER'S USE OF PROFESSIONALS.

**(a) Co-Agents.**

Each of the Collateral Agent and the Servicer shall have power to appoint one or

DocuSign Envelope ID: 2825B526-B65C-4F99-A86E-2B6DEE05902B

more Persons to act as a co-agent or co-agents, jointly with the Collateral Agent and/or the Servicer, or to act as a separate agent or separate agents, with respect to all or any part of the Collateral or to enforce the Lender's rights under the Note, and to vest in such Person or Persons, in such capacity, such rights, powers, duties and obligations of the Collateral Agent and/or the Servicer, with the consent of the Required Lenders (such consent not to be unreasonably withheld or delayed), in any case only as may be necessary or desirable for the purpose of meeting any legal requirements of any jurisdiction in which any part of the Collateral may at the time be located. Absent any specific agreement to the contrary, any co-agent or co-agents or separate agent or separate agents so appointed shall, to the extent applicable, have the rights, powers, obligations and duties of the Collateral Agent and/or the Servicer hereunder. Neither the Collateral Agent nor the Servicer shall be responsible for the negligence, default or misconduct of any such co-agent or separate agent selected by it with reasonable care nor for any fees or expenses of such co-agent or separate agent.

**(b) Agent Professionals.**

The Collateral Agent and the Servicer may employ one or more Agent Professionals to advise or assist it from time to time, but shall not be responsible for the negligence, default or misconduct of any such Agent Professionals selected by it with reasonable care. The Collateral Agent and the Servicer shall be entitled to rely on the advice and statements of Agent Professionals so selected. The Borrower shall pay reasonable remuneration for all services performed by Agent Professionals for the Collateral Agent and the Servicer in the discharge of its duties hereunder and under the Collateral Documents in accordance with Section 11(b) hereof.

**6. INSTRUCTIONS FROM LENDERS; ENFORCEMENT NOTICE.**

**(a) Instructions from Lenders.**

Unless otherwise excused as provided herein, both the Collateral Agent and the Servicer shall act on all written instructions received from the Required Lenders, with respect to any action to be taken or not to be taken in connection with this Agreement, the Mortgage or the Note, including, without limitation, actions to be taken in connection with an insolvency proceeding in respect of the Borrower; *provided, however,* that the Collateral Agent shall act only on written instructions from all Lenders with respect to the amendment or termination of the Mortgage, or, except as provided in the Mortgage, any Lien on property of the Borrower granted under the Mortgage. If either the Collateral Agent or the Servicer shall request instructions from the Lenders with respect to taking any particular action in connection with this Agreement, the Mortgage, the Note or any such Lien, the Collateral Agent and the Servicer shall be entitled to refrain from taking such particular action unless and until it shall have received written instructions from the Required Lenders (in which event it shall be required to act in accordance with such written instructions unless otherwise excused as provided herein), and neither the Collateral Agent nor the Servicer shall incur any liability to any Person for so refraining. Without limiting the foregoing, no Lender shall have any right of action whatsoever against the Collateral Agent or the Servicer as a result of the Collateral Agent or the

6

DocuSign Envelope ID: 282FB526-D656-4F99-A86E-2B6DEE05902B

Servicer taking or not taking any action hereunder or pursuant to or in accordance with the written instructions of such Required Lenders, except for the Collateral Agent's or the Servicer's own gross negligence or willful misconduct in connection with any action taken or not taken by it, as finally determined by a court of competent jurisdiction. Notwithstanding anything to the contrary contained in this Agreement or any of the Collateral Documents, (i) the failure of the Collateral Agent or the Servicer to take any action shall not constitute gross negligence or willful misconduct by the Collateral Agent or the Servicer hereunder (A) following a request by the Collateral Agent or the Servicer for the Required Lenders' consent to such action and the failure of the Required Lenders to respond to such request or (B) in the absence of written instructions from the Required Lenders and (ii) neither the Collateral Agent nor the Servicer shall be required to take any action that is, in its opinion (which may be, but is not required to be, based on the advice of legal counsel), contrary to applicable law or the Note or the Mortgage or that would, in its reasonable opinion, subject it or any Agent-Related Persons to liability or that would require it to expend or risk its own funds.

**(b) Enforcement Notices.**

The Collateral Agent shall, as soon as practicable but in any event, if applicable, within ten (10) Business Days following receipt thereof, furnish to each of the Lenders:

(i) a copy of each Enforcement Notice received by the Collateral Agent;

(ii) a copy of each certificate or other written notice received by the Collateral Agent rescinding or withdrawing an Enforcement Notice;

(iii) a copy of any written notice or other written communication given or received by the Collateral Agent under the Note or the Mortgage; and

(iv) such other written notices required by the terms of this Agreement to be furnished by or to the Collateral Agent.

Any Enforcement Notice shall be deemed to have been given when actually received by the Collateral Agent and to have been rescinded or withdrawn when the Collateral Agent has actually received from the notifying party a written notice rescinding or withdrawing such Enforcement Notice. Any Enforcement Notice shall be deemed to be outstanding and in effect at all times after such notice has been given until such time, if any, as such notice has been rescinded or withdrawn.

**7. NO RESPONSIBILITY OF COLLATERAL AGENT OR SERVICER FOR CERTAIN MATTERS.**

Neither the Collateral Agent nor the Servicer shall be responsible in any manner whatsoever for the correctness of any recitals, statements, information, representations or warranties contained herein or in the Mortgage except for those made by it herein. Neither the Collateral Agent nor the Servicer makes any representation or warranty as to, and is not responsible in any way for: (i) the description, value, location, existence, or condition of any Collateral; (ii) the financial condition of the Borrower or the title of the

7

DocuSign Envelope ID: 283FB526-B658-4E99-A86E-2B6DEF05902B

Borrower to any of the Collateral; (iii) the sufficiency of the security afforded by this Agreement, the Note or the Mortgage or whether registration in respect thereof has been properly effected or maintained; (iv) the validity, genuineness, correctness, perfection, or priority of any Lien with respect to the Collateral; (v) other than in respect of itself as to the Collateral Agent's and the Servicer's representations in Section 15(p) hereof, the validity, proper execution, enforceability, legality, or sufficiency of this Agreement, the Note, the Mortgage or any instrument deposited with the Collateral Agent or the Servicer; (vi) the identity, authority or right of any Lender executing any document; or (vii) the filing or renewal of any registration of the Mortgage or any public filing required under applicable law to perfect any of the Collateral Agent's Liens, for the benefit of the Lenders, in any of the Collateral. Neither the Collateral Agent nor the Servicer shall be required to ascertain or inquire as to the performance by the Borrower of any of its covenants or obligations hereunder or under the Mortgage or the Note. In no event shall either the Collateral Agent or the Servicer be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Collateral Agent or the Servicer has been advised of the likelihood of such loss or damage and regardless of the form of action.

## 8. LIMITED DUTIES OF COLLATERAL AGENT REGARDING COLLATERAL; FURTHER ACTS WITH RESPECT TO COLLATERAL.

(a) The Collateral Agent shall not be responsible for insuring any of the Collateral or for the payment of taxes, charges, fines, levies, assessments or for ensuring or protecting the validity, genuineness, correctness, perfection, or priority of any Lien upon any of the Collateral, and shall be indemnified therefor as provided in Section 12. Furthermore, the Collateral Agent shall not be responsible for the maintenance or safeguarding of any Collateral, except as provided in the immediately following sentence when the Collateral Agent has actual possession of any Collateral. The Collateral Agent shall not have any duty to any of the Lenders with respect to any Collateral, including, without limitation, any Collateral in its possession or control or in the possession or control of any agent or nominee of the Collateral Agent selected by it with reasonable care, or any income therefrom or for the preservation of rights against prior parties or any other rights pertaining to the Collateral, except as stated in the next succeeding paragraph.

(b) Beyond the exercise of reasonable care in the custody thereof and the duty to account for monies actually received by it, the Collateral Agent shall have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Collateral Agent shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral. The Collateral Agent shall be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property and shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Collateral Agent with

8

DocuSign Envelope ID: 2837B526-B558-4F99-A86E-2B6DEF05902B

reasonable care. The Collateral Agent shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Collateral Agent, or for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of the Borrower to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral.

## 9. DUTIES AS LOAN SERVICER.

### (a) Specific Loan Services/Functions.

In its capacity as the Servicer, EBF shall: (a) issue payment coupons or monthly statements to the Borrower directing Loan repayment to the Lenders or the Servicer; (b) issue payoff demands, beneficiary statements and mortgage ratings; (c) demand, receive and collect all Loan payments, deposit them by the next business day into the Servicer's trust account and/or facilitate having them paid directly to Lender, in each case within 25 days of the date due; (d) issue annual Form 1099 income tax statements to the Borrower and Lenders; (e) answer Borrower inquiries, demands and requests; (f) grant appropriate payment deferrals, but not of the maturity of the Loan unless approved by the Required Lenders; (g) monitor the continued effectiveness and claims on any property insurance listed in the Loan escrow instructions; (h) request and receive notices of default on senior liens; (i) receive notices of property tax delinquencies, should a tax service be ordered through escrow or subsequently; and (j) execute and deliver on Lenders' behalf and in Lenders' name any documents necessary or convenient for the purpose of maintaining or enforcing the Loan.

### (b) Protective Advances.

Upon request of the Servicer, Lenders shall make such advances as approved by the Required Lenders to be necessary and prudent to protect and to collect Lenders' interest in the Loan. If any Lender fails to make advances approved by the Required Lenders, the other Lenders are authorized to advance the amount the non-paying Lender failed to advance and to receive payment in full with interest at 10% per annum before any further payments are made to the non-paying Lender and, the non-defaulting Lender shall also have the option, exercisable within 30 days after Lender's failure to pay, to purchase such Lender's interest in the Loan for the outstanding principal balance and any accrued interest, fees and costs owed to the defaulting Lender, payable within 15 days after the election to purchase is made. The Servicer, in its absolute discretion, may advance its own funds to protect the security of the Loan, including advances to cure senior liens, property insurance, foreclosure expenses, repair, advertising, litigation expenses and similar items, but not Loan payments. The Servicer shall be reimbursed such advances, with interest at the interest rate then payable with respect to the Loan, from the next Loan payment, or within 10 days after a written request to Lenders. To secure the Servicer's

9

DocuSign Envelope ID: 2825B526-B958-4F99-A86E-2B6DEE05902B

advances, Lenders hereby irrevocably assign to the Servicer, to the extent of advances owed to the Servicer, the first Loan payments received after an advance is made.  A defaulting or non-paying Lender will be liable to the remaining Lenders for all damages incurred as result of his/her/their failure to act or failure to advance funds including, but not limited to, actual attorneys' fees, court costs and fees, or any damages related to loss of the security for the Loan.

**(c) Loan Documents.**

To the extent not maintained by the Collateral Agent, the Servicer shall retain custody as agent for Lenders of the original Note and Mortgage.

**(d) Real Estate Owned.**

The Servicer is also Lenders' agent (in conjunction with the Collateral Agent) to liquidate any real estate acquired by Lenders in foreclosure of the property securing the Loan (the "**Property**").  During the foreclosure process, the Servicer's servicing fee shall continue as set forth in Section 12 herein.  Additionally, at the option of Lenders and by separate fee agreement to be signed by the parties, the Servicer shall: (i) arrange appropriate property insurance; (ii) manage the Property, including arranging maintenance and construction, tenant relations, repair and security; (iii) arrange for the valuation and resale of the Property, including hiring a Realtor® or broker to list, show and sell the Property; and (iv) accept reasonable offers on the Property, at the price and terms approved by the Required Lenders and execute all necessary and appropriate documentation to carry out the sale.

**(e) Servicing Fees.**

The Servicer's fee to each Lender to service any Loan shall be up to 3% interest per annum on the Investment made by such Lender in the Loan, as such amount may adjust from time to time upon making an Investment in the Loan (or upon making Investments in any other Loan) in accordance with this Section 10(e).  The Servicer's fee to a Lender in respect of its Investment is calculated as follows:

(i)   0% interest per annum on the Investment if either: (a) the original Investment in the Loan equals or exceeds $350,000; or (b) the original amount of the Total Investments equals or exceed $1,000,000; or

(ii)  For so long as clause (i) is not applicable, 1% interest per annum on the Investment if either: (a) the original Investment in the Loan equals or exceeds $200,000; or (b) the original amount of the Total Investments equals or exceeds $500,000; or

(iii) For so long as clauses (i) or (ii) are not applicable, 2% interest per annum on the Investment if either: (a) the original Investment in the Loan equals or exceeds $100,000 or (b)  the original amount of the Total Investments equals or exceeds $250,000; or

10

DocuSign Envelope ID: 2825B526-B658-4E99-A86E-3B6DEE05902B

(iv)     For so long as clauses (i), (ii) or (iii) are not applicable, 3% interest per annum on the Investment in the Loan.

The fee is deducted from the interest payment payable by the Borrower under the Note. The Servicer shall be further compensated for work in respect of delinquent payments or other default by Borrower by assessing and receiving late charges, and by collecting an additional 2% of the principal amount of the Loan of any payments (whether interest or late fees) made to Lenders (or for their benefit) after the assessment of default interest on the Borrower under the Note that equal or exceed 2% interest per annum of the principal amount of the Loan. Said additional amounts shall only be collected if default interest is, in fact, charged to the Borrower. Lenders shall receive any benefit of the default interest rate and late fee payments in excess of the 2% interest per annum on the principal amount of the Loan collected by the Servicer.

**(f)    Origination Fee.**

On the Closing Statement of the Loan the Collateral Agent may charge the Borrower an origination fee ("**Origination Fee**") of up to 5% of the principal amount of the Loan. If such Origination Fee is collected, the Collateral Agent shall remit to each Lender a portion of the Origination Fee attributable to such Lender's percentage of the Loan (i.e., its Investment over all Investments in the Loan (the "**Relative Percentage**") to the extent actually collected from the Borrower. Such remittance shall be calculated as follows:

(i)     for Loans of $0 to $750,000:

    (A) a remittance of 2.5% of the principal of the Loan for a Lender whose Relative Percentage is 100%;

    (B) a remittance of 1.5% of the principal of the Loan for Lenders whose Relative Percentage is equal to or greater than 50%, but less than 100%;

    (C) a remittance of 0.5% of the principal of the Loan for Lenders whose Relative Percentage is equal to or greater than 25%, but less than 50%;

(ii)     for Loans of $750,001 to $1,500,000:

    (A) a remittance of 3.0% of the principal of the Loan for Lenders whose Relative Percentage is 100%;

    (B) a remittance of 2.0% of the principal of the Loan for Lenders whose Relative Percentage is equal to or greater than 50%, but less than 100%;

    (C) a remittance of 1.0% of the principal of the Loan for Lenders whose Relative Percentage is equal to or greater than 25%, but less than 50%;

(iii)     for Loans of $1,500,001 and above:

    (A) a remittance of 3.5% of the principal of the Loan for Lenders whose Relative Percentage is 100%;

    (B) a remittance of 2.5% of the principal of the Loan for Lenders whose

DocuSign Envelope ID: 2825B526-B658-4F99-A865-2B6DEF05902B

Relative Percentage is equal to or greater than 50%, but less than 100%;

(C) a remittance of 1.5% of the principal of the Loan for Lenders whose Relative Percentage is equal to or greater than 25%, but less than 50% of the value of the Loan;

(iv) for all Qualifying Lenders, a 0.5% of the principal amount of the Loan shall be remitted among all Lenders who have committed the Investment within seven days after the Investment is made available (each, a "**Qualifying Lender**") based on each such Qualifying Lender's Investment to all such other Qualifying Lenders' Investments.

## 10. RELIANCE ON WRITINGS.

Both the Collateral Agent and the Servicer shall be entitled and fully authorized to rely and act, and shall be fully protected in relying and acting, upon any writing, instruction, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or other document believed by it to be genuine and correct and to have been signed or sent by or on behalf of the proper Person or Persons, and statements of the Borrower (including, without limitation, counsel to the Borrower) or the Lenders. Neither the Collateral Agent nor the Servicer shall have any duty to verify or confirm the content of any writing, instruction, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or other document.

12

**11. RESIGNATION AND REMOVAL OF COLLATERAL AGENT AND/OR SERVICER.**

    **(a) Resignation or Removal.**

    Both the Collateral Agent and the Servicer may at any time resign, effective upon 30 days prior written notice (or such shorter period as may be agreed to by the Required Lenders and such party) to the Lenders and the Borrower, and either may be removed for or without cause at any time by the Required Lenders, effective upon 30 days' notice. In the event of any resignation or removal, the Required Lenders shall have the right to appoint a successor Collateral Agent and/or Servicer (which successor Collateral Agent and/or Servicer may be one of the Lenders or a financial institution that is engaged in the provision of agency services in syndicated commercial loan transactions or a trust Borrower that is engaged in the provision of trust services in secured private placement transactions), but, if the Required Lenders have not appointed a successor Collateral Agent and/or Servicer, as the case may be, within 30 days after the resigning Collateral Agent's and/or Servicer's giving of notice of resignation or its removal, the retiring Collateral Agent and/or Servicer, as the case may be, shall, at the expense of the Borrower, on behalf of the Lenders, subject to the above provision regarding the identity and nature of a permissible successor Collateral Agent and/or Servicer, either appoint a successor Collateral Agent and/or Servicer or apply to the appropriate court to make such appointment. Upon the acceptance of any appointment as a Collateral Agent and/or Servicer, as the case may be, hereunder by a successor, to be evidenced by the successor Collateral Agent's or Servicer's, as the case may be, execution and delivery to the Borrower, the Lenders and the retiring Collateral Agent and/or Servicer, as the case may be, of a counterpart of this Agreement, such successor Collateral Agent and/or Servicer, as the case may be, shall thereupon succeed to and become vested with all the rights, powers, privileges, duties and obligations of the retiring Collateral Agent and/or Servicer, as the case may be, and the retiring Collateral Agent and/or Servicer, as the case may be, shall be discharged from any further duties and obligations as Collateral Agent and/or Servicer, as the case may be, as appropriate, under this Agreement, the Note and the Mortgage. The payment and indemnity obligations of the Borrower provided for in Section 12 shall survive any such removal or resignation in favor of the retiring Collateral Agent and/or Servicer, as the case may be, in respect of any matter arising during or after its tenure as Collateral Agent and/or Servicer, as the case may be. For the avoidance of doubt, removal hereunder of EBF as the Collateral Agent in no way constitutes a removal of EBF as the Servicer and vice versa.

    **(b) Vesting.**

    Upon the request of any successor Collateral Agent and/or Servicer, at the expense of the Borrower, the Lenders, the Borrower and the predecessor Collateral Agent and/or Servicer, as the case may be, shall promptly execute and deliver such instruments, conveyances, and assurances reflecting terms consistent with the terms hereof, the Mortgage and the Note for the purpose of more fully and certainly vesting and confirming in such successor Collateral Agent and/or Servicer, as the case may be, its

13

DocuSign Envelope ID: 2835B526-B658-4F99-A86E-2B6DEE05902B

interest in, and Liens upon, the Collateral and all rights, powers, duties, and obligations of the predecessor Collateral Agent and/or Servicer, as the case may be, hereunder and under the Mortgage and the Note, and the predecessor Collateral Agent and/or Servicer, as the case may be, shall also promptly assign and deliver to the successor Collateral Agent and/or Servicer, as the case may be, any Collateral subject to the Liens of the Mortgage that may then be in its possession, as applicable.

### (c) Successors.

Any entity into which a Collateral Agent or Servicer may be amalgamated or merged, or with which it may be consolidated, or any entity resulting from any amalgamation, merger or consolidation to which a Collateral Agent or Servicer shall be a party, as a whole or substantially as a whole, shall be the successor of such Collateral Agent or Servicer hereunder if legally bound hereby as such successor, without the necessity for execution or filing of any paper or any further act on the part of any of the parties hereto, anything to the contrary contained herein notwithstanding.

## 12. FEES TO COLLATERAL AGENT; PAYMENTS; INDEMNITY.

### (a) Fees.

In addition to any other fees owed to Servicer or Collateral Agent from either (i) Borrower, and paid by Borrower to Servicer or Collateral Agent, or (ii) Lender, and paid by Borrower out of amounts otherwise due to Lender, the Lender shall pay to the Collateral Agent all fees required to be paid under the Fee Schedule attached hereto as Schedule I with respect to this Agreement at the times and in the amounts set forth therein. Any amounts owed by Lender may, at Collateral Agent's discretion, be paid by Borrower out of amounts otherwise payable from Borrower to Lender.

### (b) Payment by the Borrower.

The Borrower agrees that it will pay all of the Collateral Agent's and the Servicer's fees, as applicable, including those owed by the Lender listed on Schedule I, which shall be paid by the Borrower on behalf of the Lender out of amounts otherwise due to the Borrower, for its respective services hereunder and will pay or reimburse the Collateral Agent and the Servicer upon its request for all of their respective expenses, disbursements and advances incurred or made in the administration of their respective duties hereunder and under the Note and the Mortgage, as applicable (including, without limitation, reasonable legal fees and expenses and the reasonable compensation of all Agent Professionals, Agent-Related Persons and other advisers, agents or experts employed or retained by the Collateral Agent or the Servicer pursuant to this Agreement). In addition to and without limiting any other protection of the Collateral Agent and/or the Servicer hereunder or otherwise by law, the Borrower shall indemnify the Agent-Related Persons for any and all liabilities, obligations, losses, damages, penalties, actions, claims, demands, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be suffered by, imposed on, incurred by or asserted against any Agent-Related Person, whether groundless or otherwise, howsoever arising from or out

14

DocuSign Envelope ID: 283F8526-B658-4E99-A86E-2B6DEE05902B

of, or in any way related to the subject matter of, this Agreement, the Note, the Mortgage or any of the Collateral or the performance or enforcement of any of the terms of any thereof, including fees and expenses of special counsel; *provided* that the Borrower shall not be liable for any such payment to any Agent-Related Person to the extent the obligation to make such payment has been caused by such Agent-Related Person's own gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction. All statements from the Collateral Agent, the Servicer or any other Person for obligations owing by the Borrower pursuant to the preceding sentence shall be sent to the Borrower. Any amount due under this Section 12(b) and unpaid 10 Business Days after request for such payment will bear interest from the expiration of such 10 Business Days at a rate per annum equal to two percent (2%) above the rate of interest publicly announced by JPMorgan Chase Bank, N.A. from time to time in New York City as its prime rate, payable on demand. If not timely paid by the Borrower, at the Collateral Agent's or the Servicer's election, all amounts so payable and the interest thereon will be payable out of any assets in the possession of the Collateral Agent and/or the Servicer and any other Collateral in priority to amounts owing to any and all other parties to this Agreement.

**(c)  Survival.**

The obligations of the Borrower and the Lenders under this Section 12 shall survive the payment in full of all of the other Obligations, the resignation or removal of the Collateral Agent and/or the Servicer and the termination of this Agreement.

## 13.  COLLATERAL AGENT'S AND SERVICER'S FUNDS NOT AT RISK.

For purposes of clarity, no provision of this Agreement or the Mortgage, and no request of any Lender or other Person shall require either the Collateral Agent or the Servicer to expend or risk any of its own funds, or to take any legal or other action under this Agreement, the Note or the Mortgage which might, in its reasonable judgment, involve any expense or any financial or other liability unless the Collateral Agent or the Servicer shall be furnished with indemnification acceptable to it, acting reasonably, including the advance of funds sufficient in the judgment of the Collateral Agent or the Servicer, as applicable, to satisfy such liability, costs and expenses.

## 14.  INDEPENDENT CREDIT DECISIONS.

Each Lender acknowledges that it has, independently and without reliance upon the Collateral Agent, the Servicer or any other Lender and based upon such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon any of the Collateral Agent, the Servicer or any other Lender and based upon such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.

## 15.  DETERMINATION OF LENDERS; SUBSEQUENT LENDERS BOUND.

15

DocuSign Envelope ID: 2835B526-B6E8-4E99-A86E-3B6DEE05902B

The Collateral Agent and the Servicer may deem and treat the payee of any promissory note or other evidence of indebtedness or obligation relating to any Obligation as the owner thereof for all purposes hereof unless and until (i) a written notice of the assignment or transfer thereof signed by such payee and (ii) a written acknowledgment agreeing to be bound by the terms hereof and such other documents required by Section 16(d), each signed by the assignee or transferee, and in form reasonably satisfactory to the Collateral Agent and/or the Servicer, shall have been filed with the Collateral Agent and/or the Servicer, as applicable. Any request, authority or consent of any Person who at the time of making such request or giving such authority or consent is the holder of any such note or other evidence of indebtedness or obligation, shall be conclusive and binding on any subsequent holder, transferee or assignee of such note or other evidence of indebtedness or obligation and of any note or notes or other evidences of indebtedness or obligation issued in exchange therefor.

## 16. MISCELLANEOUS.

### (a) Notices.

All notices, requests and other communications shall have been duly given and shall be effective (a) when delivered by hand, (b) when transmitted via telecopy or email (or other facsimile device) with receipt confirmed with respect to telecopy, (c) the Business Day next following the day on which the same has been delivered prepaid to a reputable national overnight air courier service, or (d) the third Business Day next following the day on which the same is sent by certified or registered mail, postage prepaid, in each case to the respective parties at the address, telecopy number or email address as provided in the immediately succeeding sentence; provided, however, that if any notice is delivered on a day other than a Business Day, or after 5:00 P.M. (Eastern time) on any Business Day, then such notice shall not be effective until the next Business Day. For purposes hereof, the address of each party hereto and its facsimile number or email address (until written notice of a change thereof is delivered to the Collateral Agent, the Servicer, the Borrower and each Lender) shall be as set forth in Schedule II hereto, or at such other address as such party may specify by written notice to the other parties hereto. Notices to any Person that becomes a holder of Obligations after the date hereof shall be given to such address or facsimile number or email address of which such Person shall have given written notice to the Collateral Agent, the Servicer and the Borrower.

### (b) Amendments.

No provision of this Agreement may be amended or waived except by a writing signed by the Required Lenders, the Collateral Agent and the Servicer; provided, however, that any amendment expanding the obligations or liabilities of the Borrower either hereunder or thereunder shall require the Borrower's consent.

### (c) Conflicts with Collateral Documents and other Transaction Documents.

The Collateral Agent, the Servicer and the Lenders agree that, if any provision of this Agreement is inconsistent with or contrary to any provisions in the Note or the

16

DocuSign Envelope ID: 2825B526-B550-4E99-A86E-2B6DEE05902B

Mortgage, the provisions of this Agreement shall prevail as between and among the Collateral Agent, the Servicer and the Lenders.

**(d) Successors and Assigns.**

This Agreement shall be binding upon, and inure to the benefit of, the Collateral Agent, the Servicer and the Lenders and their respective successors and assigns.  If any Lender shall assign or transfer the Obligations owing to it, it shall promptly so notify the Collateral Agent and the Servicer in writing.  No Lender which assigns or transfers any Obligations owing to it shall assign or transfer its benefits under the Collateral Documents without obtaining from the assignee or transferee and delivering to the Collateral Agent, the Servicer and the Lenders a joinder agreement and an executed acknowledgment of the assignee or transferee agreeing to be bound by the terms hereof to the same extent as if it had been a Lender on the date hereof.  Each assignee or transferee of any Obligations shall take such Obligations subject to the provisions of this Agreement and to any request made, waiver or consent given or other action taken or authorized hereunder by each previous holder of such Obligations prior to the receipt by the Collateral Agent and the Servicer of written notice of such assignment or transfer; and, except as expressly otherwise provided in such notice, the Collateral Agent and/or the Servicer shall be entitled to assume conclusively that the assignee or transferee named in such notice shall thereafter be vested with all rights and powers as a Lender under this Agreement (and the Collateral Agent and the Servicer may conclusively assume that no Obligations have been subject to any assignment or transfer other than transfers of which the Collateral Agent and the Servicer have received such a notice).  Upon the written request of any Lender or the Borrower, the Collateral Agent and the Servicer will provide such Lender and the Borrower with copies of any written notices of transfer received pursuant hereto.

**(e) Continuing Effectiveness.**

This Agreement shall continue to be effective among the Collateral Agent, the Servicer and the Lenders even though a case or proceeding under any bankruptcy or insolvency law or any proceeding in the nature of a receivership, whether or not under any insolvency law, shall be instituted with respect to the Borrower or any portion of the property or assets of the Borrower, and all actions taken by the Collateral Agent with respect to the Collateral or by the Collateral Agent, the Servicer and the Lenders with regard to such proceeding shall be determined by the Required Lenders; provided, however, that nothing herein shall be interpreted to preclude any Lender from filing a proof of claim with respect to its Obligations or from casting its vote, or abstaining from voting, for or against confirmation of a plan of reorganization in a case of bankruptcy, insolvency or similar law in its sole discretion.

**(f) Further Assurances.**

Each party and the Borrower agrees to do such further acts and things and to execute and deliver such additional agreements, powers and instruments as necessary or as any Lender or the Collateral Agent or the Servicer may reasonably request to carry into effect

17

DocuSign Envelope ID: 2837B526-B658-4E99-A865-2B6DEE05902B

the terms, provisions and purposes of this Agreement or to better assure and confirm unto the Collateral Agent or the Servicer or any of the other Lenders their respective rights, powers and remedies hereunder.

**(g)  Counterparts.**

This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart.  Delivery of an executed counterpart of a signature page to this Agreement by fax or pdf shall be effective as delivery of a manually executed counterpart of this Agreement.

**(h)  Effectiveness.**

This Agreement shall become effective immediately upon execution hereof by the Collateral Agent, the Servicer, the Required Lenders and the Borrower, and shall continue in full force and effect until 91 days following the date upon which all Obligations are irrevocably paid and satisfied in full; provided that, if the Obligations due and owing to a Lender have been paid and satisfied in full, then such Lender shall be deemed released from this Agreement without any further action being necessary.  Any such released Lender shall give the Collateral Agent notice of such release but the failure to give such notice shall not affect such release.

**(i)  Governing Law.**

**THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES SHALL BE GOVERNED BY, THE INTERNAL LAW OF THE STATE OF ILLINOIS, EXCLUDING CHOICE-OF-LAW PRINCIPLES OF THE LAW OF SUCH STATE THAT WOULD PERMIT THE APPLICATION OF THE LAWS OF A JURISDICTION OTHER THAN SUCH STATE.**

**(j)  Jurisdiction.**

(i) Each party hereto irrevocably submits to the non-exclusive jurisdiction of any Illinois state or federal court sitting in Cook County, Illinois, over any suit, action or proceeding arising out of or relating to this Agreement or any of the agreements, documents or instruments delivered in connection herewith or therewith.  To the fullest extent permitted by applicable law, the parties hereto irrevocably waive and agree not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject to the jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(ii) Nothing in this Section 16(j) shall affect the right that the Collateral Agent, the Servicer or any of the Lenders to serve process in any manner permitted by law, or limit any right that any party hereto may have to bring proceedings against the Borrower

18

DocuSign Envelope ID: 2825B526-B550-4E99-A86E-2B6DEE05902B

in the courts of any appropriate jurisdiction or to enforce in any lawful manner a judgment obtained in one jurisdiction in any other jurisdiction.

(iii) THE PARTIES HERETO IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER AGREEMENT, DOCUMENT OR INSTRUMENT DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR THE ACTIONS OF THE LENDERS, THE COLLATERAL AGENT OR THE SERVICER IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF OR THEREOF.

### (k) Headings; Sections.

Headings of Sections of this Agreement have been included herein for convenience only and should not be considered in interpreting this Agreement. Unless stated otherwise in this Agreement, references in this Agreement to Sections are references to Sections of this Agreement.

### (l) No Implied Beneficiaries.

Nothing in this Agreement (except Section 16(b)), expressed or implied, is intended or shall be construed to confer upon or give to any Person, other than the Lenders, the Collateral Agent and the Servicer, any right, remedy or claim under or by reason of this Agreement or any covenant, condition or stipulation herein contained.

### (m) Severability.

If any provision of this Agreement shall be held or deemed to be, or shall in fact be, inoperative or unenforceable as applied in any particular case in any jurisdiction, or because it conflicts with any other provision or provisions hereof or with any constitution or statute or rule of public policy, or for any other reason, such circumstance shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstance, or rendering any other provision herein contained invalid, inoperative or unenforceable to any extent whatsoever. Upon the determination that any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to give effect to their original intention as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the maximum extent possible.

### (n) Obligations Individual.

The obligations and representations and warranties of the Collateral Agent, the Servicer and each of the Lenders herein are made by each of them individually. Nothing herein contained shall be construed as creating among the Lenders, or among the Collateral Agent, the Servicer and the Lenders, a partnership, joint venture or other joint association.

19

DocuSign Envelope ID: 282FB526-B5E8-4F99-A86E-2B6DEE05902B

**(o)  No Obligation to Extend Credit.**

No provision of this Agreement shall be construed as obligating the Collateral Agent, the Servicer or any Lender to advance any monies or otherwise extend credit to the Borrower at any time.

20

DocuSign Envelope ID: 282FB526-B658-4E99-A86E-3B6DEE05902B

**(p)  Representations of Parties.**

Each of the Lenders, the Collateral Agent and the Servicer, severally and not jointly, represents and warrants to the other parties hereto that such party has all requisite power and capacity to execute, deliver and perform this Agreement and that the execution, delivery and performance of this Agreement has been duly authorized by all necessary action on the part of such party and that this Agreement constitutes the legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization or similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or law).

**(q)  Limitation of Liability Due to Forces Beyond Collateral Agent's or Servicer's Control.**

In no event shall the Collateral Agent or the Servicer be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Collateral Agent and the Servicer shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

*[Remainder of page intentionally left blank; next page is signature page.]*

**IN WITNESS WHEREOF**, the Collateral Agent, the Servicer and the Lenders have executed or caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized, all as of the date first above written.

**COLLATERAL AGENT:**

**EQUITYBUILD FINANCE, LLC,** as Collateral Agent on behalf of the Lenders listed below

By: _Elizabeth Kammerer_
_____
EBCD41F369DA479...

Name: Elizabeth Kammerer

Title: Asset Manager


**SERVICER:**

**EQUITYBUILD FINANCE, LLC,** as Servicer

By: _Elizabeth Kammerer_
_____
EBCD41F369DA479...

Name: Elizabeth Kammerer

Title: Asset Manager


[Signature Page to Collateral Agency and Servicing Agreement]

**LENDERS:**

By: _____

Name: Kevin Scheel

Title: _____


By: _____

Name: _____

Title: _____


By: _____

Name: _____

Title: _____


[Signature Page to Collateral Agency Agreement]

<u>ACKNOWLEDGED, CONSENTED AND AGREED TO</u>:

**BORROWER:**

**EquityBuild, Inc.**

By: _Elizabeth Kammerer_

Name: Elizabeth Kammerer

Title: Closing Coordinator

[Signature Page to Collateral Agency Agreement]

SCHEDULE I

COLLATERAL AGENT FEE SCHEDULE

**Section 1:  Payouts**

All payouts paid by check.

If Lender requests different method, fees are as follows:

- Wire funds:          $50
- Overnight check:     $50
- Direct deposit:      No fee

**Section 2:  Buyouts**

If Lender requests principal back prior to Loan's maturity date (and request granted), Lender must pay an early liquidation fee equal to:  (i) 12% of the amount being returned if the request is made within one year of the date the Loan is funded (the "**Origination Date**"); and (ii) 10% of the amount being returned if the request is made between one and two years of the Origination Date. This fee is not intended to be a penalty but is an estimate, and indicative, of the actual cost and expenses EBF will incur in conjunction with such request.

EBF reserves the right to extend the maturity date on any Loan at the request of the Borrower.  At that time, anyone who wishes to not participate in the extension may receive a return of their Investment and no fee will be charged in respect thereof .

.
25325308.8

<u>SCHEDULE II</u>

ADDRESSES FOR NOTICES

If to EquityBuild Finance, LLC, as either Collateral Agent or Servicer:

       EquityBuild Finance, LLC
[Address] 5068 West Plano Pkwy. #300
       Plano, TX 75093
Attention:  [Elizabeth Kammerer]
Facsimile:  [_____]
E-mail:  [elizabeth@equitybuildfinance.com]

If to the Lenders:

[Name]  Kevin Scheel
[Address]
Attention:  [_____]
Facsimile:  [_____]
E-mail:  ██████████████

[Name]
[Address]
Attention:  [_____]
Facsimile:  [_____]
E-mail:  [_____]

[Name]
[Address]
Attention:  [_____]
Facsimile:  [_____]
E-mail:  [_____]

If to the Borrower:

       EquityBuild, Inc.
[Address] 1083 N Collier Blvd. #132
       Marco Island, FL 34145
Attention:  [Elizabeth Kammerer]
Facsimile:  [_____]
E-mail:  [elizabeth@equitybuild.com]

DocuSign Envelope ID: 283FB526-D6F0-4E39-A8CF-2B6D5E0590 2B



### The Keys to Wealth & Security

*Turn Your Good Credit Into A Low Risk, High Return Investment.*

Phone: (877) 978-1869 | Email: help@equitybuild.com

EQUITYBUILD, INC.

# Wire Transfer Instructions

Bank: **Wells Fargo Bank, N.A.**

Address: **420 Montgomery**
**San Francisco, CA 94104**

Beneficiary: **EquityBuild, Inc.**

ABA: 

Account:

Property/Investment Address: 7201 S Constance Ave.

Amount To Wire: $ 25,000.00

Lender Initial: ᴅˢ KS

Date Wire Will Be Initiated: July 30th

## Business Payroll Services
# Direct Deposit Authorization



WELLS
FARGO

---

## 1. Company Information

| Company Name | | Company EIN | |
|---|---|---|---|
| EquityBuild Finance, LLC | | 27-4934617 | |

## 2. Investor Information (Individual)

| Last Name | First Name | MI |
|---|---|---|
| Scheel | Kevin | M |

Social Security Number (SSN) for year-end tax notification **only.**

## 2. Investor Information (LLC)

Business Name    N/A

Employee Identification Number (EIN) for year-end tax notification **only.**

## 3. Bank Information *

| Bank Name | Account Type |
|---|---|
| Chase | ☒ Checking ☐ Savings |

Routing/Transit Number. *These are the nine digits to the left of your account number on the bottom of your check (must begin with 0, 1, 2, or 3).*

Account Number

Deposit interest for $_____ of total investment in this account

## 4. Additional Bank Information *

| Bank Name | Account Type |
|---|---|
| | ☐ Checking ☐ Savings |

Routing/Transit Number. *These are the nine digits to the left of your account number on the bottom of your check (must begin with 0, 1, 2, or 3).*

Account Number

Deposit interest for $_____ of total investment in this account

## 5. Authorization Agreement For Direct Deposit

*Please note, it can take 6-10 business days to process your direct deposit request and or you to begin receiving direct deposits.

*I authorize my employer to make deposits to my account. In the unlikely event of a deposit error, I authorize my employer to make adjustments to correct the error.*

| Signature | Date |
|---|---|
| DocuSigned by: Kevin Scheel  8F2F54DF0A02469... | 7/30/2015 |

Ex. A 45

©2009 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. BPS-OP-CDDA-041709

DocuSign Envelope ID: 282F3B526-B6E8-4F99-A86E-3B6DEE05902B

# Memorandum

**To**:     Kevin Scheel
**From**:   EquityBuild Finance, LLC C/O Shaun Cohen
**Date**:   July 30th, 2015
**Re**:     7201 S Constance

## Summary

On or about June 22nd, 2015, an agreement was made by and between Towpath Investments, LLC; Michael Borgia; Reynald Lalonde and Chantal Lemaire; Initium, LLC, managed by Harry Saint-Preux; Steven J. Talyai; Shaw Family Trust; PNW Investments, LLC; John Sullivan; Arthur L and Dinah F Bertrand; Kirk Road Investments, LLC; Equity Trust Company Custodian FBO Sidney Haggins IRA; Quest IRA, Inc. FBO Steven K. Chennappan IRA # 17293-31; Edge Investments, LLC; Property Solutions, LLC; and EquityBuild, Inc.; C/O EquityBuild Finance, LLC in order to purchase a real property.

On or about July 30th, 2015, EquityBuild, Inc. agreed to sell part of their investment and Kevin Scheel agreed to purchase part of the interest of EquityBuild, Inc. in the sum of $25,000.00. This amount purchased part of EquityBuild, Inc.'s investment of $689,734.00 representing 30.65% of the current issued and outstanding interests and reducing EquityBuild, Inc.'s interest to $664,374.00, representing 29.53% of the current issued and outstanding interests in the partnership. Kevin Scheel agreed to be bound by the existing agreement between the original parties and to take part of the position of EquityBuild, Inc. representing 1.11% of the current issued and outstanding interest in the partnership.

This transaction was agreed to by the parties and without objection from the remaining investors C/O EquityBuild Finance, LLC and this memorandum will be provided to all the investors in agreement in order to memorialize this transaction. This memorandum in no way affects the rights and responsibilities of the several investors involved and remains governed by their existing agreement.

Respectfully submitted,

Shaun Cohen, President
EquityBuild Finance, LLC
5068 West Plano Pkwy. #300
Plano, TX 75093

1



## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Number: 282FB526B6564E09A86E2B6DEE05902B | | Status: Completed |
| Subject: 7201 S Constance Kevin Scheel Investment Packet | | |
| Source Envelope: | | |
| Document Pages: 46 | Signatures: 8 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 1 | Meredith Smith |
| AutoNav: Enabled | | 5068 W Plano Pkwy |
| EnvelopeId Stamping: Enabled | | Suite 300 |
| | | Plano, TX  75093 |
| | | meredith@equitybuild.com |
| | | IP Address: 99.113.180.25 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Meredith Smith | Location: DocuSign |
| 7/30/2015 8:38:09 AM PT | meredith@equitybuild.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Elizabeth Kammerer<br>elizabeth@equitybuildfinance.com<br>Closing Coordinator<br>EquityBuild, Inc.<br>Security Level: Email, Account Authentication (None) | *Elizabeth kammerer*<br>EBCD41F369DA479...<br><br>Using IP Address: 107.107.189.222 | Sent: 7/30/2015 11:36:19 AM PT<br>Viewed: 7/30/2015 12:22:05 PM PT<br>Signed: 7/30/2015 12:22:40 PM PT |
| Electronic Record and Signature Disclosure:<br>Accepted: 7/17/2013 8:56:06 AM PT<br>ID: f688591d-1eec-406f-9698-8f1be225a536 | | |
| Meredith Smith<br>Meredith@equitybuild.com<br>Customer Service Rep<br>EquityBuild, Inc.<br>Security Level: Email, Account Authentication (None) | **Completed**<br><br>Using IP Address: 99.113.180.25 | Sent: 7/30/2015 11:36:19 AM PT<br>Viewed: 7/30/2015 11:36:39 AM PT<br>Signed: 7/30/2015 11:42:58 AM PT |
| Electronic Record and Signature Disclosure:<br>Not Offered<br>ID: | | |
| Kevin Scheel<br>▓▓▓▓▓▓▓▓▓▓<br>Security Level: Email, Account Authentication (None) | *Kevin Scheel*<br>8F2F54DF6A62483...<br><br>Using IP Address: 75.172.208.90 | Sent: 7/30/2015 12:22:45 PM PT<br>Viewed: 7/30/2015 2:04:16 PM PT<br>Signed: 7/30/2015 11:00:20 PM PT |
| Electronic Record and Signature Disclosure:<br>Accepted: 7/30/2015 2:04:15 PM PT<br>ID: 3b6afc29-98b2-4ab9-8341-c9e38230a1a4 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Brandon Jenkins<br>brandon@equitybuild.com<br>Security Level: Email, Account Authentication (None)<br>Electronic Record and Signature Disclosure:<br>　　Accepted: 7/16/2015 2:00:18 PM PT<br>　　ID: 2cb8c5d7-f99b-4840-8786-d2582fa27051 | **COPIED** | Sent: 7/30/2015 12:22:43 PM PT |
| Danielle Poteshman<br>danielle@equitybuild.com<br>Security Level: Email, Account Authentication (None)<br>Electronic Record and Signature Disclosure:<br>　　Accepted: 7/2/2015 12:36:32 PM PT<br>　　ID: e349e963-1546-431d-839d-7c0871fa86c7 | **COPIED** | Sent: 7/30/2015 11:00:24 PM PT |

| Notary Events | | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 7/30/2015 11:00:24 PM PT |
| Certified Delivered | Security Checked | 7/30/2015 11:00:24 PM PT |
| Signing Complete | Security Checked | 7/30/2015 11:00:24 PM PT |
| Completed | Security Checked | 7/30/2015 11:00:24 PM PT |

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 1/16/2013 5:08:29 AM
Parties agreed to: Elizabeth Kammerer, Kevin Scheel, Brandon Jenkins, Danielle Poteshman

Case: 1:18-cv-05587 Document #: 1147-36 Filed: 01/27/22 Page 59 of 61 PageID #:55121

**CONSUMER DISCLOSURE**

From time to time, It's Golden LLC (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign, Inc. (DocuSign) electronic signing system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the â€˜I agreeâ€™ button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after signing session and, if you elect to create a DocuSign signer account, you may access them for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign â€˜Withdraw Consentâ€™ form on the signing page of a DocuSign envelope instead of signing it. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact It's Golden LLC:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: kirasrooms@gmail.com

**To advise It's Golden LLC of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at kirasrooms@gmail.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc. to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in the DocuSign system.

**To request paper copies from It's Golden LLC**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to kirasrooms@gmail.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with It's Golden LLC**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

> ii. send us an e-mail to kirasrooms@gmail.com and in the body of such request you must state your e-mail, full name, US Postal Address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows® 2000, Windows® XP, Windows Vista®; Mac OS® X |
|---|---|
| Browsers: | Final release versions of Internet Explorer® 6.0 or above (Windows only); Mozilla Firefox 2.0 or above (Windows and Mac); Safariâ„¢ 3.0 or above (Mac only) |
| PDF Reader: | Acrobat® or similar software may be required to view and print PDF files |
| Screen Resolution: | 800 x 600 minimum |

| Enabled Security Settings: | Allow per session cookies |
| --- | --- |

** These minimum requirements are subject to change. If these requirements change, you will be asked to re-accept the disclosure. Pre-release (e.g. beta) versions of operating systems and browsers are not supported.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the â€˜I agreeâ€™ button below.

By checking the â€˜I agreeâ€™ box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC CONSUMER DISCLOSURES document; and
- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and
- Until or unless I notify It's Golden LLC as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by It's Golden LLC during the course of my relationship with you.