# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 18-cv-5587 |
| v. | ) ) | Hon. John Z. Lee |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, | ) ) ) ) ) | Mag. Judge Young B. Kim |
| Defendants. | ) ) | |

## POSITION STATEMENT OF CLAIMANT BC57, LLC

Claimant BC57, LLC ("BC57"), pursuant to Docket Entry No. 941, paragraph 12, respectfully submits this Position Statement demonstrating that BC57 holds first position, perfected security interests in all properties in Group 1, all of which are in Chicago, Illinois: Property 74, 3074 E. Cheltenham Place a/k/a 7836 S. South Shore Drive; Property 75, 7625 S. East End Avenue; Property 76, 7635 S. East End Avenue; Property 77, 7752 S. Muskegon Avenue; and Property 78, 7201 S. Constance Avenue (collectively, the "Properties").

### SUMMARY

This matter involves a mortgage priority dispute arising because EquityBuild Finance, LLC ("EBF") – the agent placed in power by certain individuals and entities (the "Investor-Lenders") – is alleged to have committed a fraud and misappropriated funds that BC57 provided to pay off the Investor-Lenders' mortgage loans on the Properties. Despite the reported fraud having been committed by the Investor-Lenders' agent, in the course of carrying out duties that their agent was

authorized to carry out, the Investor-Lenders ask that the loss for their agent's fraud be borne by BC57, a subsequent lender that, in good faith, remitted funds to the agent for the express purpose of paying off the outstanding debt owed to the Investor-Lenders. As set forth in full below, based on established statutory and common law, the Investor-Lenders are bound by the acts of their agent, and must bear any loss caused by their agent's fraud.

Group 1 involves a mortgage priority dispute between (1) BC57, the mortgagee of a mortgage (the "BC57 Mortgage") recorded against the Properties to secure a loan (the "BC57 Loan") and (2) the Investor-Lenders who claim an interest in one or more of five mortgages (the "Investor-Lender Mortgages") granted by EquityBuild. Inc. ("EB") to secure loans (the "Investor-Lender Loans"). Each of the Investor-Lender Mortgages was recorded against one of the five Properties before the recordation of the BC57 Mortgage.[1]

Proceeds of the BC57 Loan were paid to EBF, the Investor-Lenders' appointed collateral agent and servicer of the Investor-Lender Loans, pursuant to payoff statements (the "Payoff Statements") issued by the Investor-Lenders' agent, EBF, upon which BC57 and its agents reasonably relied. Following these payments, EBF-executed releases of the Investor-Lender Mortgages were recorded (the "Releases"). Because the Investor-Lenders authorized EBF to issue payoff statements, to accept payments on the Investor-Lender Loans, and to release the Investor-Lender Mortgages, BC57 has the sole mortgage lien on the Properties and thus a right, ahead of the Investor-Lenders and others, to the proceeds of the Receiver's sale of the Properties to pay the

---

[1] There are also claims by investors who purportedly invested in the limited liability company that owned the property, but they have not articulated any claim that their interest is not subject to the BC57 Mortgage. In addition, there are claims by mechanics lien claimants and the City of Chicago for building code violations. BC57 reserves the right to respond to any claims asserted by these parties.

debt secured by the BC57 Mortgage. The amount of the debt owed to BC57 as of July 1, 2019 was at least $6,439,520.67. *See* BC57 Claim Form, BC57 Exhibit 1.

Although no pleadings have been filed in conjunction with the Group 1 dispute, BC57 expects that the Investor-Lenders, the SEC and the Receiver (the "Opposition") will assert that the Investor-Lender Mortgages remain as existing, prior liens on the Properties, despite the payment that BC57 made to EBF pursuant to the Payoff Statements and despite the Investor-Lender Mortgages having been released of record. Based upon the proceedings to date, the Opposition will likely contend that: (1) EBF failed to remit to the Investor-Lenders the funds it received on their behalf; (2) the Payoff Statements represented amounts due on the Investor-Lender Loans that were less than the actual amounts due; (3) EBF lacked authority to release the Investor-Lender Mortgages; and/or (4) BC57 and the BC57 Loan settlement agent did not reasonably rely upon the Payoff Statements.[2]

If these are the claims of the Opposition, neither the factual record nor the law supports the Opposition's position. *First*, no dispute can exist that the Investor-Lenders gave EBF, as their agent, the express authority to issue payoff statements, to receive all payments on the Investor-Lender Loans, and to release the Investor-Lender Mortgages upon payment of the debt secured by them. And no dispute can exist that EBF received the payoff funds pursuant to the Payoff Statements and a Closing Statement signed by the borrower, and executed and furnished the Releases. *Second*, any failure by EBF to remit the payoff funds to the Investor-Lenders does not defeat BC57's priority position because BC57, under common law principal-agency law, had no obligation to make certain that EBF paid its principals the amounts that EBF received, and the

---

[2] BC57 reserves the right to respond to the actual arguments asserted by the Opposition in their position papers and other filings, and to produce additional evidence once all of the Opposition's claims have been advanced.

3

applicable statutory law – the Fiduciary Obligations Act, 760 ILCS 65/0.01, *et seq.*, and the Mortgage Certificate of Release Act, 765 ILCS 935/1, *et seq.* – protects BC57's priority position. *Third*, under principal-agency law, the Investor-Lenders are bound by EBF's purported misrepresentations in the Payoff Statements of the amounts due. *Fourth,* despite any claims that EBF lacked authority and misrepresented the amounts due on the Investor-Lender Loans, BC57 reasonably relied upon the Payoff Statements when it authorized the payment of proceeds from the BC57 Loan to EBF with the expectation that the Investor-Lender Mortgages would be released. Neither BC57 nor the settlement agent had any knowledge that EBF misrepresented the amounts due or exceeded its authority, nor did they have notice of any facts that triggered a duty to inquire as to EBF's authority or the accuracy of the Payoff Statements. *Fifth,* if EBF committed fraud, BC57 is a victim of that fraud; under established law, because the Investor-Lenders enabled EBF to commit the fraud, they should not benefit over BC57. Furthermore, BC57's loan was made, and the related mortgages were of record, more than a year before the start of the Receivership, and no Investor-Lenders ever notified BC57 about any alleged dispute over the release of the mortgages. As a result, BC57 continued to advance its loan funds, and those monies were directly used to benefit the Properties, including to pay real estate taxes[3] and amounts to settle housing court liens.

## FACTS AND EVIDENCE SUPPORTING CLAIM(S)

A. <u>The Properties</u>

The Properties are located in Chicago at 7752 S. Muskegon Avenue (the "Muskegon Property"), 7635 S. East End Avenue (the "7635 East End Property"), 7625 S. East End Avenue (the "7625 East End Property"), 3074 E. Cheltenham Place, a/k/a 7836 S. South Shore Dr. (the

---

[3] *See* BC57 Exhibits 25-2, 26-1 and 26-2 ($127,127.13 of the BC57 Loan Proceeds were used to pay 2016 Real Estate Taxes real estate taxes on the Properties).

"Cheltenham Property"), and 7201 S. Constance Avenue (the "Constance Property"). EquityBuild,

Inc., acquired the Properties as follows:

| Property | Date Deed to EquityBuild Recorded | Recorder of Deeds Doc. No. | Receiver Assigned Property No. | BC57 Exhibit No. |
|----------|------------------------------------|----------------------------|--------------------------------|------------------|
| Muskegon Property | 12/31/15 | 1436522031 | 77 | 2 |
| 7625 East End Property | 12/2/15 | 1533641008 | 75 | 3 |
| 7635 East End Property | 12/2/15 | 1533641009 | 76 | 4 |
| Constance Property | 7/30/15 | 1521113052 | 78 | 5 |
| Cheltenham Property | 7/29/16 | 1621134011 | 74 | 6 |

B.    The Investor-Lender Mortgages

In 2015 and early 2016, EB granted five Investor-Lender Mortgages, one recorded against

each of the Properties, each to secure an Investor-Lender Loan. SEC Exhibits 1-5.[4] The terms and

provisions of the recorded Investor-Lender Mortgages and the promissory notes secured by the

Investor-Lender Mortgages (the "Notes") were substantially similar.

For each Investor-Lender Loan, the Investor-Lenders entered into contracts with EBF,

formerly known as Hard Money Company LLC,[5] (collectively "EBF") titled the "Collateral

Agency and Servicing Agreement among EquityBuild Finance, LLC and Each of the Lenders

Party Hereto" (the "Collateral Agent and Servicing Agreement"), documenting the Investor-

---

[4] In this Position Statement, "SEC Exhibit" refers to exhibits filed by the Plaintiff Securities and Exchange Commission, an index of which has been filed as Docket Entry No. 1147.

[5] Hard Money Company, LLC was the predecessor to EBF (see Docket Entry No. 1, SEC Complaint, ¶14). In January 2015, Hard Money Company, LLC amended its Certificate of Formation to designate EBF as its new name. *See* BC57 Exhibit 8.

Lenders' appointment of EBF as the collateral agent and servicer in connection with the Investor-Lender Loans and the Investor-Lender Mortgages.

        1.      The Mortgages and Notes.

Each Investor-Lender Mortgage identified the mortgagees as the persons listed on Exhibit A to the specified mortgage care of EBF, at EBF's address in Texas. *See* SEC Exhibits 1-5. Not all of the Investor-Lenders who claim an interest in a particular Investor-Lender Mortgage are identified on the Exhibit A to the mortgage to which the Investor-Lender claims an interest. *See* BC57 Exhibit 7, Spreadsheet, column G. Each Investor-Lender Mortgage further provided that all notices to the Lender were to be sent to EBF at its Texas address (*see* SEC Exhibits 1-5 (¶6 of each mortgage)), and that upon payment of the sums secured by the mortgage, the Lender shall release the mortgage (*see* SEC Exhibits 1-5 (¶10 of each mortgage)). The Investor-Lender Mortgages did not set forth the repayment terms of the secured Investor-Lender Loan. However, the Investor-Lender Mortgages did set forth the principal amount of the loan, the interest rate and the maturity date. That information, as provided in the Investor-Lender Mortgages, is as follows:

| Property | Date Mortgage Recorded | Recorder of Deeds Doc. No. | Note Execution | Loan Amount | Interest Rate | Loan Term/Maturity Date | SEC Ex. No. |
|---|---|---|---|---|---|---|---|
| Muskegon Property | January 16, 2015 (corrected copy recorded February 17, 2015) | | December 22, 2014 | $2,100,000 | 12% | 24-month/ November 1, 2017 | 1 |
| 7625 East End Property | January 21, 2016 | | October 29, 2015 | $1,605,749 | 15% | 24-month/ November 1, 2017 | 3 |
| 7635 East End Property | October 29, 2015 | | October 29, 2015 | $1,703,649 | 15% | 24-month/ November 1, 2017 | 5 |
| Constance Property | November 17, 2015 | | July 22, 2015 | $2,250,000 | 15% | 24-month/ August 1, 2017 | 4 |
| Cheltenham Property | September 8, 2016 | | July 14, 2016 | $2,200,000 | 18% | 18-month/ January 1, 2018 | 2 |

Each Note secured by an Investor-Lender Mortgage stated that all loan payments on these high interest "hard money" loans, including the final payment, were to be made to the Lender care of EBF at EBF's Texas address. BC57 Exhibits 9-13 (initial paragraph). Each also provided that all notices were to be sent to the Lender care of EBF at EBF's Texas address. BC57 Exhibits 9-13 (¶15 of each mortgage).

2. The Investor-Lenders' Investment Packages

The agreements between the Investor-Lenders and EBF were memorialized in the documents that comprise the "Investment Package." A sample Investment Package is attached as BC57 Exhibit 14. The Investment Package typically included: (1) a new client form (*see* p. 1); (2) an unexecuted copy of one of the Notes (*see* pp. 2-10); (3) an Exhibit A to the unexecuted Note, executed by the Investor-Lender, that identified the Investor-Lender, the amount of the investment, the Investor-Lender's percentage of ownership of the entire loan, the amount of the monthly interest payment to be received and the rate of interest (*see* p. 17); (4) an unexecuted copy of the Investor-Lender Mortgage (*see* pp. 12-13); (5) an executed untitled document, sometimes referenced as Exhibit A (the "Authorization Document") (*see* p. 17); (6) the executed Collateral Agency and Servicing Agreement (pp. 18-43); and (7) a Certificate of Completion documenting EBF and the Investor-Lenders' execution of the documents contained in the Investment Package (*see* pp. 47-51).

The Spreadsheet attached as Exhibit 7, which identifies each Investor-Lender claimant, sets forth the exhibit number of each Investor-Lender's executed Authorization Document and Collateral Agency and Servicing Agreement, located from the Investor-Lenders' submissions and the EB documents made available for review in this litigation. Among the documents from EB's files that the Receiver has made available for Claimants to review, BC57 has not located both

Collateral Agent and Servicing Agreements and Authorization Documents executed by approximately 17 Investor-Lenders (see Exhibit 7, Spreadsheet, columns H and I) -- which is less than ten percent of the total number of Investor-Lenders claiming an interest in Group 1 properties.[6] Because several of the claimants identified as Investor-Lenders did not produce documents, BC57 cannot confirm that they all participated in the Investor-Lender Loans.

> a. Authority Granted to EBF

Within the Collateral and Servicing Agreement and the Authorization Document, the Investor-Lenders designated EBF as their collateral agent and the servicer of the Investor-Lender Loans. As set forth below, those documents expressly granted EBF the authority to, *inter alia,* issue payoff statements, collect loan payments and receive payoffs, and execute releases of the Investor-Lender Mortgages.

> i. Collateral Agent and Servicing Agreement

In the Collateral Agent and Servicing Agreement, the Investor-Lenders appointed and designated EBF as the "**Collateral Agent**" on their behalf and as the "**Servicer**" of the Investor-Lender Loans. BC57 Exhibit 14, p. 19 (opening paragraph). The parties recited that the Investor-Lenders agreed to make the loan to the borrower, EB, "only upon the condition, among others, that the Borrower grant to the Collateral Agent for the benefit of the Lenders, as security for the Borrower's obligations to the Lenders and the Collateral Agent under or in respect of the Note and the Mortgage (as defined below), a protective lien on, and security interest in, the Collateral (as

---

[6] Given the number of Investor-Lenders' Investment Packages located, the terms contained in the Authorization Document and Collateral Agency and Servicing Agreement must be deemed to apply to each Investor-Lender and control the terms of the investment. For those Investor-Lenders for whom no Investment Package has been located, no other documents have been located which set forth the terms of the agreement between that Investor-Lender and EBF. Thus, the only reasonable conclusion is that this small subset of Investor-Lenders agreed to the Authorization Document and Collateral Agency and Servicing Agreement.

defined below)." BC57 Exhibit 14, p. 2 (Recital B). The Investor-Lenders appointed EBF to act as

their agent to collect all scheduled payments on the loan. BC57 Exhibit 14, p. 2 (Recital D).

Each Investor-Lender "irrevocably delegate[d] to [EBF] all of [it] rights and powers under

the Note and the Mortgage and agree[d] for the benefit of [EBF] and the other [Investor-Lenders]

not to exercise any right or power of such [Investor-Lender] under the Note or the Mortgage. BC57

Exhibit 14, p. 22.

Among other things, the Investor-Lenders agreed as follows:

Section 2(a). The Lenders hereby authorize and direct the Collateral Agent to (a) enter into the Mortgage and the Note for and on behalf of and for the benefit of the Lenders in accordance with the terms hereof and thereof, (b) exercise such rights and powers under this Agreement, the Note or the Mortgage as the case may be, as are specifically granted or delegated to the Collateral Agent by the terms hereof and thereof, together with such other rights and powers as are reasonably incidental thereto or as are customarily and typically exercised by agents performing duties similar to the duties of the Collateral Agent hereunder and under the Collateral Documents, subject, however, to any express limitations set forth herein or in the Mortgage, and (c) perform the obligations of the Collateral Agent thereunder. The Lenders hereby agree to be bound by the provisions of the Mortgage and the Note.

Section 2(b). **Each Lender does hereby irrevocably delegate to the Collateral Agent all of each such Lender's rights and powers under the Note and the Mortgage** and agrees for the benefit of the Collateral Agent and the other Lenders not to exercise any right or power of such Lender under the Note or the Mortgage. (Emphasis added.)

Section 3. IN THE ABSENCE OF WRITTEN INSTRUCTIONS FROM THE REQUIRED LENDERS, NEITHER THE COLLATERAL AGENT NOR THE SERVICER SHALL FORECLOSE UPON ANY LIEN WITH RESPECT TO ANY OF THE COLLATERAL OR TAKE ANY OTHER ACTION WITH RESPECT TO THE COLLATERAL OR ANY PART THEREOF.

Section 6(a). Unless otherwise excused as provided herein, both the Collateral Agent and the Servicer shall act on all written instructions received from the Required Lenders, with respect to any action to be taken or not to be taken in connection with this Agreement, the Mortgage or the Note, including, without limitation, actions to be taken in connection with an insolvency proceeding in respect of the Borrower; provided, however, that the Collateral Agent shall act only on written instructions from all Lenders with respect to the amendment or termination of the Mortgage, or, except as provided in the Mortgage, any Lien on property of the Borrower granted under the Mortgage.

Section 9(a). **In its capacity as the Servicer, EBF shall**: (a) issue payment coupons or monthly statements to the Borrower directing Loan repayment to the Lenders or the Servicer; (b) **issue payoff demands**, beneficiary statements and mortgage ratings; (c) demand, receive and collect all Loan payments, deposit them by the next business day into the Servicer's trust account and/or facilitate having them paid directly to Lender, in each case within 25 days of the date due. (Emphasis added.)

BC57 Exhibit 14, pp. 21- 26.

ii. The Authorization Document

The Investor-Lenders also executed the Authorization Document (BC57 Exhibit 14, p. 17), an untitled document, sometimes referenced as Exhibit A, which provided:

EquityBuild Finance, LLC, as agent and trustee has been authorized by the above listed lenders to receive the payoff in its name and issue and execute a release of said mortgage, upon payment in full of any outstanding balance.[7]

C. BC57's Interest

In or around late August to early September 2017, EB sought re-financing from Bloomfield Capital, LLC ("Bloomfield") in connection with the Properties. Bloomfield operates investment funds that make loans secured by commercial real estate.

Bloomfield and EB reached an agreement concerning a refinance loan. EB sponsored a limited purpose limited liability company, SSDF5 Portfolio I LLC ("SSDF5"), to acquire title to the Properties, and Bloomfield sponsored BC57 to be the lender of a $5,328,433.43 loan to SSDF5 (the "BC57 Loan"), evidenced by, among other things, a Loan Agreement (*see* BC57 Exhibit 16) and a Promissory Note (*see* BC57 Exhibit 17), both effective as of September 27, 2017, and secured by a Corrective Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, effective September 27, 2017 and recorded against each of the Properties (the

---

[7] For some Investor-Lenders, the "agent and trustee" referenced is Hard Money Company, LLC, rather than EquityBuild Finance, LLC. *See* footnote 5, *supra*.

"BC57 Mortgage") on October 4, 2017. *See* BC57 Exhibit 18. A corrective mortgage was subsequently recorded. *See* BC57 Exhibit 19.

The BC57 Loan served to refinance the existing debt on the Properties, pay delinquent real estate taxes, and provide funds to repair the Properties. *See* BC57 Exhibit 16, Loan Agreement, ¶1.c. BC57 conditioned making the BC57 Loan on, among other things, the BC57 Mortgage occupying a first mortgage lien position on each of the Properties and SSDF5 furnishing a title insurance policy that insured the BC57 Mortgage as a first mortgage lien on each of the Properties. *See* BC57 Exhibit 16, Loan Agreement, ¶1.d(i), ¶3.c.

BC57 retained counsel, Kasturi Bagchi of Honigman, Miller Schwartz & Cohn, to handle the legal aspects of the BC57 Loan transaction. SEC Exhibit 25, Bagchi Dep, p. 6, lines 17-20. With assistance from Lincoln Land Services, Near North National Title Company ("NNNT") was retained to serve as the settlement agent to close the transaction and relied upon NNNT to handle title related issues and furnish title insurance to insure the BC57 Mortgage as a first mortgage lien on the Properties. SEC Exhibit 25, Bagchi Dep, p. 56, lines 14-218; SEC Exhibit 30, Turzewski Dep, p. 21, lines 6-10. BC57's legal counsel instructed NNNT in the Escrow Closing Instructions (the "Escrow Instructions") that it could close the transaction upon certain conditions and disburse the proceeds of the BC57 Loan (the "Loan Proceeds") only if and when, among other things, NNNT would issue a title insurance policy to BC57 as the insured showing the BC57 Mortgage as the first mortgage lien on each of the Properties. *See* BC57 Exhibit 20, Escrow Instructions Agreement, ¶C.6.

NNNT, as escrowee in connection with serving as the loan closer, received, among other things: (1) five separate deeds executed by EB to convey title to each of the Properties to SSDF5 (the "Deed") (*see* BC57 Exhibit 21); (2) four EBF-issued Payoff Statements for the five Properties

(the 7625 East End and 7635 East End Properties, which are physically adjacent, were combined) stating the amounts due on the Investor-Lender Loans (*see* BC57 Group Exhibit 22); (3) the EBF-executed Releases of the Investor-Lender Mortgages (*see* SEC Exhibits 16-20); (4) $5,115,296.09 in Loan Proceeds from BC57 (BC57 Exhibit 23-1); and (5) $1,510,000 of additional funds from EB (BC57 Exhibit 23-2) to fund the capital reserve account (*see* BC57 Exhibit 16, Loan Agreement, ¶4.s).

Each Payoff Statement identified the issuer as EBF, stated it was "From [the address of one or more of the Properties] c/o EBF,"[8] and identified the loan number, the mortgaged property address, the date the loan was due for payment, the unpaid principal balance, interest due from 9/1/17 to 9/30/17, and the total amount due through September 30, 2017. *See* BC57 Group Exhibit 22. Each Payoff Statement also included wire instruction to EBF's bank account at Wells Fargo Bank, N.A., for credit to EBF's account. The Payoff Statements stated that the following amounts were due:

| Property | Payoff Amount | BC57 Ex. No. 22 |
|---|---|---|
| Muskegon Property | $1,185,600.00 | page 3 |
| 7625 East End Property/7635 East End Property (combined) | $1,225,125.00 | page 1 |
| Constance Property | $1,366,875.00 | page 2 |
| Cheltenham Property | $1,167,250.00 | page 4 |

Each Release, in the form of a "release deed," stated that it released the Investor-Lender Mortgage identified by the recording number of the Investor-Lender Mortgage. *See* SEC Exhibits 16-20. EBF executed each Release, although the body of each Release erroneously described EB (the mortgagor), not EBF, as the party releasing the Investor-Lender Mortgage.

---

[8] See footnote 5.

Attorney Bagchi and BC57 received copies of, among other things, the Payoff Statements and the Releases. As is typical for such transactions, they relied upon NNNT to address matters affecting title to the Properties. SEC Exhibit 30, Turzewski Dep, p. 21, lines 6-10.

On September 29, 2017, BC57 authorized NNNT to disburse the Loan Proceeds consistent with BC57's Escrow Instructions, and provided NNNT could issue the requisite title insurance policy. BC57 Exhibit 24.

NNNT relied upon the Payoff Statements as stating the correct amounts due on the loans identified in them. *See* Declaration of Ms. Bereckis, the settlement agent who closed the transaction. BC57 Exhibit 30, ¶8. It is a common practice to rely upon payoff letters issue by servicers. *Id.* at ¶9. She further stated that noting in the connection with the closing or the Payoff Statements arouse her suspicions or made her believe that the Payoff Statements were inaccurate. *Id.* at ¶10. NNNT wired $4,944,850 in the aggregate to EBF pursuant to the Payoff Statements to pay off the Investor-Lender Mortgages (*see* BC57 Exhibit 25-1), paid $127,127.13 to the Cook County Collector's Office for 2016 Real Estate Taxes (*see* BC57 Exhibit 25-2), and caused the recordation of the Deeds, the Releases and the BC57 Mortgage. Copies of the Settlement Statement and Disbursement Statement documenting these payments are attached as BC57 Exhibits 26-1 and 26-2, respectively.

Neither NNNT nor BC57 had a copy of the Collateral Agent and Servicing Agreement or the Authorization Document when the refinancing closed.

## LEGAL AUTHORITY AND ARGUMENT

The BC57 Mortgage is superior to the Investor-Lender Mortgages because the Investor-Lender Mortgages were released by Releases executed by EBF, the Investor-Lenders' appointed

servicer and collateral agent, whom the Investor-Lenders authorized to release the Investor-Lender Mortgages. These releases were duly recorded into the public record by NNNT.

The Receiver states EBF defrauded the Investor-Lenders. If so, EBF also defrauded BC57, and it is the Investor-Lenders must bear the loss because they enabled the fraud, by agreeing to the Investor-Lender Mortgages that identified EBF as their contact person and by executing the Collateral Agent and Servicing Agreement and the Authorization Document that granted EBF the authority to issue payoff statements, collect all payments on the Investor-Lender Loans, and issue and tender releases of the Investor-Lenders Mortgages. Consequently, EBF and the Investor-Lenders were obligated, as a matter of equity and the law, to release the Investor-Lender Mortgages – and, in fact, they did so. EBF's failure to remit any of the payoff funds to the Investor-Lenders would not absolve the Investor-Lenders from this obligation because BC57 had no duty to insure that the Investor-Lenders' agent remitted the funds, and BC57's priority position is protected by the Fiduciary Obligations Act, as discussed below.

As evidenced by the Investor-Lender Mortgages, the Collateral Agent and Servicing Agreement, and the Authorization Document, the Investor-Lenders expressly authorized EBF to issue payoff statements, to collect all payments on the Investor-Lender Loans, and release the Investor-Lender Mortgages upon receipt of the funds to pay off the debt secured by them. The Payoff Statements contained EBF's representations as agent of the Investor-Lenders of the amounts due on the Investor-Lender Loans and that, upon payment, the Investor-Lender Mortgages would be released.

Even if EBF lacked the authority to execute the Releases and misrepresented in the Payoff Statements the amounts required to pay off the Investor-Lenders Loans to release the Investor-Lender Mortgages, the Investor-Lenders are bound by the Payoff Statements because the Payoff

Statements were issued by EBF, the agent that the Investor-Lenders expressly authorized to issue payoff statements and collect payments on the Investor-Lender Loans. NNNT and BC57, through NNNT, reasonably relied upon the Payoff Statements in disbursing proceeds from the BC57 Loan to EBF, lacking knowledge of any absence of authority or fraud, or notice of facts to trigger any duty to inquire as to EBF's authority or the accuracy of the amounts due on the Investor-Lender Loans.

Consequently, the BC57 Mortgage has priority over the Investor-Lender Mortgages, such that the proceeds from the sales of the Properties should first be used to pay off the BC57 Mortgage.

## I. The Investor-Lenders' Reported Non-Receipt of the Payoff Funds Does Not Negate BC57's Priority.

Illinois law imposes no obligation on a payor to ensure that payment made to an authorized agent of a principal is properly remitted by that agent to its principal. Rather, liability for the loss caused by an agent that diverts funds for unauthorized or improper purposes is the responsibility of the principal who placed its agent in power.

Neither BC57 nor NNNT had any obligation to ensure that EBF remitted the Payoff Funds to the Investor-Lenders. In *Rockford Life Ins. Co. v. Rios*, 128 Ill. App. 2d 190, 193 (1970), the court explained:

> If payment is made to an authorized agent . . . , the payor is not bound to inquire into the application of such payment. The default of such agent is the responsibility of the principal. It is the principal who in the first instance selects the agent, grants him the authority and enables him to come into possession of the funds which are diverted. It is this conduct which makes the loss possible and the principal may not shift the burden to the party dealing with his agent.

Furthermore, Section 2 of the Illinois Fiduciary Obligations Act provides:

> A person who in good faith pays or transfers to a fiduciary any money or other property which the fiduciary as such is authorized to receive, is not responsible for the proper

application thereof by the fiduciary; and any right or title acquired from the fiduciary in consideration of such payment or transfer is not invalid in consequence of a misapplication by the fiduciary.

760 ILCS 65/2. The Fiduciary Obligations Act serves to "facilitate banking and financial transactions and place on the principal the burden of employing honest fiduciaries." *Cty. of Macon v. Edgcomb*, 274 Ill. App. 3d 432, 435, 654 N.E.2d 598, 601 (4th Dist. 1995). It protects a person who deals with another knowing him to be a fiduciary. *Id.*

EBF acted as a fiduciary of the Investor-Lenders under Illinois law. The Fiduciary Obligations Act broadly defines "fiduciary" to include an agent:

> a trustee under any trust, expressed, implied, resulting or constructive[,] executor, administrator, guardian, conservator, curator, receiver, trustee in bankruptcy, assignee for the benefit of creditors, partner, **agent**, officer of a corporation, public or private, public officer, or any other person acting in a fiduciary capacity for any person, trust or estate. 760 ILCS 65/1(1) (emphasis added).

Although the Collateral Agent and Servicing Agreement disclaims a fiduciary relationship between the Investor-Lenders and EBF (see BC57 Exhibit 14, p. 21, §2(a)), a principal-agent relationship is a "fiduciary relationship" and the parties' conduct, not labels in a written agreement, creates a principal-agent relationship. *See, e.g., McNerney v. Allamuradov*, 2017 IL App (1st) 153515, ¶ 69, 84 N.E.3d 437, 453 (the label of "independent contractor" in a written agreement "is not controlling where the conduct of the parties demonstrates the existence of an agency relationship"). As discussed in Section II below, an agency relationship, and thus a fiduciary relationship, existed between EBF and the Investor-Lenders. Therefore, the Fiduciary Obligations Act applies to protect BC57's payment of the Loan Proceeds to EBF.

The Fiduciary Obligations Act is designed to protect an innocent lender, like BC57, who relied on another's fiduciary. BC57, in good faith, provided funds to the Investor-Lender's appointed fiduciary agent, who in return provided the Releases, thereby allowing BC57 to have first priority liens on the Properties. The fact that it is argued that the Investor-Lender's chosen

16

fiduciary agent misappropriated the funds cannot be used to invalidate the releases and strip BC57 of the first priority lien provided to BC57 in exchange for the funds.

The Fiduciary Obligations Act would not protect BC57 if BC57 had "actual knowledge" that EBF was breaching its fiduciary duties to the Investor-Lenders or acted in "bad faith." Neither is present here. *See Cty. of Macon*, 654 N.E.2d at 601. "An example of bad faith is where the taker suspects that the fiduciary is acting improperly and deliberately refrains from investigating in order that he may avoid knowledge that the fiduciary is acting improperly." *Id.* Significantly, "mere suspicious circumstances are not enough to require a creditor to inquire about the fiduciary's actions." *Hosselton v. K's Merchandise Mart*, 247 Ill. App. 3d 808, 810 (1993). Here, no facts suggest that any of the parties suspected that EBF was acting improperly, or somehow knew that EBF was breaching its fiduciary obligations.

The aforementioned common law precedent and statutory law are in line with the established precedent that "[w]here one of two innocent persons must suffer by reason of the fraud or wrong conduct of another, the burden must fall upon him who put it in the power of the wrongdoer to commit the fraud or do the wrong." *M&T Bank v. Mallinckrodt*, 2015 IL App (2d) 141233, 43 N.E.3d 1039, 1049-50 (Ill. App. Ct. 2015)(*citing Connor v. Wahl,* 330 Ill. 136, 146, 161 N.E. 306 (1928). Because the Investor-Lenders placed EBF in power to commit the fraud, the Investor-Lenders are estopped from challenging the validity of the releases, and are further estopped from claiming a priority ahead of BC57 with respect to the funds BC57 paid to EBF, the Investor-Lender's agent.

Under well-established Illinois common and statutory law, the weight of EBF's fraud must fall on EBF's principals who placed EBF in power as their fiduciary agent. Stripping BC57 of its first priority lien due to any fraud by the Investor-Lenders' fiduciary agent would be inequitable

17

and contrary to the Fiduciary Obligations Act and applicable common law. Accordingly, BC57 is entitled to retain its first priority lien on the Properties.

## II. EBF Had Express Authority to Issue Payoff Statements, Collect Payoff Amounts, and Release Investor-Lender Mortgages, Which Binds the Investor-Lenders to its Acts.

Because the Investor-Lenders authorized their agent EBF to issue Payoff Statements, collect payoff amounts and release mortgages, the Investor-Lenders are bound by EBF's actions. As a matter of law, a principal is bound by acts he expressly authorizes an agent to do and by whatever is necessary to the performance of the act. *See Advance Mortg. Corp. v. Concordia Mut. Life Ass'n*, 135 Ill. App. 3d 477, 481-82 (1985) (noting that a "Purchase and Servicing Agreement" that expressly authorized a servicing agent "to cause" a mortgaged premise to be insured and taxes levied, gave the agent authority to pay for insurance premiums and taxes from its own funds when the agreement only required those funds be paid either by the mortgagor or by the investor). Further, when an agent acts on behalf of his principal, he binds the principal even if the agent exceeds the principal's instructions. *See Hartmann v. Prudential Ins. Co. of Am.*, 9 F.3d 1207, 1210 (7th Cir. 1993) ("[the agent] might be a collection agent and resort to methods that his principal would not have authorized and may even have forbidden; nevertheless the principal is bound."); *see also Chicago v. Roppolo*, 113 Ill. App. 3d 602, 614 ("It is well established that the principal may be liable to third persons for wrongful or tortuous [sic] acts committed by his agent at his direction or while acting withing the scope of his authority.").

An agent's authority may be actual, either express or implied, or apparent. *Granite Props. L.P. v. Granite Inv. Co.*, 220 Ill. App. 3d 711, 713-14 (1991). Implied authority is "'actual authority circumstantially proved' and is regarded as authority implied from the facts and circumstances." *Id.* at 714, *quoting Devers v. Prudential Property & Casualty Insurance Co.* (1980), 86 Ill. App. 3d 542, 546, 408 N.E.2d 462, 465. Whether an agency relationship exists and the scope of the

purported agent's authority are questions of fact. *Amcore Bank, N.A*., 326 Ill. App. 3d 126. Circumstantial evidence may be used to establish the existence and extent of an agent's authority. *Wadden v. Woodridge*, 193 Ill. App. 3d 231, 238-39 (1990). Only the alleged principal's words and conduct, not those of the alleged agent, establish the agent's authority, whether actual or apparent. *Zahl v. Krupa*, 365 Ill. App. 3d 653, 661 (2006); *First Am. Title Ins. Co. v. TCF Bank, F.A.*, 286 Ill. App. 3d 268, 274 (1997). The party alleging an agency relationship must prove it by a preponderance of the evidence. *Granite Props. L.P. v. Granite Inv. Co.,* 220 Ill. App. 3d 711, 714 (1991); *Hofner v. Glenn Ingram & Co*., 140 Ill. App. 3d 874, 881 (1985).

An agency relationship exists where the principal has the right to control the agent's conduct, and the agent has the power to act on the principal's behalf and thereby affect the principal's legal relations. *Sperl v. C.H. Robinson Worldwide, Inc*., 408 Ill. App. 3d 1051, 1057, 946 N.E.2d 463, 470 (2011). A written agreement between two parties to establish a principal-agent relationship establishes the fact of agency. *See Advance Mortg. Corp*., 135 Ill. App. 3d at 481-82 (noting that only the scope of an agency relationship was at issue when a written servicing agreement existed that established plaintiff was the mortgage servicing agent for the defendant); *see also Rockford Life Ins. Co. v. Rios*, 128 Ill. App. 2d 190, 193 (1970) ("In our view, the written servicing agreement confers the requisite authority . . . .").

Here, the Collateral Agent and Servicing Agreement and the Authorization Document expressly appoint EBF as the Investor-Lenders' agent. Further, the documents show that the Investor-Lenders had the right to control EBF's conduct, and that EBF had the authority to act on behalf of the Investor-Lenders and thereby affect the Investor-Lenders' legal relations. In the Collateral Agent and Servicing Agreement, the parties stated that "[t]he Lenders . . . desire to retain EBF as the loan servicer to act as their agent to employ commercially reasonable and prudent

practices to collect all scheduled payments on the Loan, and to protect to the best of the Servicer's ability, the security for the Loan," (BC57 Exhibit 14, p. 18, Recital D) thus evidencing the agency and fiduciary relationship between the Investor-Lenders and EBF.

Pursuant to the Collateral Agent and Servicing, EBF was authorized to "issue payoff demands" and "demand, receive and collect all Loan payments." BC57 Exhibit 14, p. 26, §9. The Investor-Lenders also limited EBF's discretion and established their control of EBF where, for example, they required EBF to receive instructions before taking action that affected the collateral, BC57 Exhibit 14, p. 22, §3, and to terminate the mortgage, BC57 Exhibit 14, p. 23, ¶ 6(a). And, in the Authorization Document, the Investor-Lenders acknowledged that EBF served as their agent and trustee, and exercised their control, authorizing EBF to issue payoff statements, collect payoff funds, and release the mortgages.

Because an agency relationship existed between EBF, as servicer and collateral agent, and the Investor-Lenders, as principals, the Investor-Lenders are bound by EBF's issuance of the Payoff Statements, collection of the Payoff Funds, and execution of the Releases.

*First*, the Investor-Lenders advised the world in the recorded Investor-Lender Mortgages that EBF served as their contact. Both the Collateral Agent and Servicing Agreement and Authorization Document confirm that EBF was acting as the Investor-Lenders' agent. And the Investor-Lenders recited in the Collateral Agent and Servicing Agreement that they agreed to make the loan to EB "only upon the condition, among others, that [EB] grant [a mortgage] to the Collateral Agent for the benefit of the Lenders." BC57 Exhibit 14, p. 19 (Recital B). Consistent with this provision, the language in the Investor-Lender Mortgages identifying the mortgagees as the persons identified on the exhibit to the mortgage "c/o EBF" evidences the Investor-Lenders' intent that EBF would act as the mortgagee for their benefit.

*Second,* the first page of each of the Notes provided that the borrower promises to pay "[t]he person listed on Exhibit A to this Note c/o [EBF] (hereinafter collectively referred to as the "Holder" of "Lender")," at EBF's Texas address.[9] (BC57 Exhibits 9-13). Each of the Notes identified the scheduled payments to pay off the loan, the last being the final balloon payment. (*See* first pages of each of the Notes.) (BC57 Exhibits 9-13.) Consequently, the Investor-Lenders directed that all sums due on each Investor-Lender Loan be paid to EBF on their behalf.

*Third*, the Investor-Lenders expressly authorized EBF to "(b) issue payoff demands, . . . ; [and] (c) demand, receive and collect all Loan payments." (BC57 Exhibit 14, p. 26,§ 9(a).) And, in the Authorization Document, the Investor-Lenders documented that EBF, as their "agent and trustee has been authorized . . . to receive the payoff in [the Lender's name] and issue and execute a release of said mortgage, upon payment in full of any outstanding balance." BC57 Exhibit 17.

Consequently, when EBF furnished the Payoff Statements, collected the payoff funds and released the Investor-Lender Mortgages, it acted squarely within the scope of its agency relationship with the Investor-Lenders. By authorizing EBF to represent in the Payoff Statements the amounts due on the Investor-Lender Loans, and collect the payoffs and release the Investor-Lender Mortgages, the Investor-Lenders were and are bound by EBF's conduct in carrying out those tasks, and are therefore bound by the release of the Investor-Lender Mortgages upon EBF's receipt of the Loan Proceeds. *See Hartmann v. Prudential Ins. Co. of Am.*, 9 F.3d at 1210; *Chicago v. Roppolo*, 113 Ill. App 3d at 614.

Although the authorization given in Collateral Agent and Servicing Agreement was subject to any express limitations set forth therein, including requirements that EBF obtain instructions

---

[9] Each of the Notes also provided that all notices to the Lender shall be given to "The person listed on Exhibit A to this Note c/o [EBF]." *Id.*

from the Investor-Lenders to take action with respect to the collateral or any part thereof (*see* §3) and to terminate the Investor-Lender Mortgage (*see* §6(a)), the Authorization Document expressly provided the Investor-Lenders' authority and "instructions" to EBF to release the Investor-Lender Mortgages. *See* BC57 Exhibit 14, p. 17. Further, any alleged failure of EBF to obtain instructions from the Investor-Lenders evidences only a contract issue between EBF and the Investor-Lenders. Any such failure has no impact on BC57's right to rely on the Payoff Statements.

Illinois law recognizes that the payment of the amount stated in a payoff statement entitles the mortgage to be released. The Mortgage Certificate of Release Act, 765 ILCS 935/1, *et seq*., reflects the principle that third-parties are entitled to rely upon payments made pursuant to a payoff statement furnished by the servicer of a mortgage loan. The Act permits an officer or agent of a title insurance company to execute a certificate of release of a mortgage "provided that payment of the loan secured by the mortgage was made in accordance with a written payoff statement furnished by the mortgagee or the mortgage servicer." 765 ILCS 935/15. The lender or its servicer's "[r]eceipt of payment pursuant to the lenders' written payoff statements shall constitute authority to record a certificate of release." 765 ILCS 935/10. A recorded certificate of release constitutes a release of the lien of the mortgage. 765 ILCS 935/35.

Any claim that the Payoff Statements did not accurately show the amounts due on the Investor-Lender Loans, or contained misrepresentations or fraudulent statements, does not relieve the Investor-Lenders of the consequences thereof because EBF would have committed that fraud carrying out the duties it was authorized to perform. *See Letsos v. Century 21 - New West Realty*, 285 Ill. App. 3d 1056, 1069, 221 Ill. Dec. 310, 675 N.E.2d 217 (1996) ("Under common-law principles of respondeat superior, a principal is liable for deceit of its agent, if committed in the very business the agent was appointed to carry out, even where the agent's specific conduct was

carried out without knowledge of the principal.") (*citing Commodities Futures Trading Commission v. Premex, Inc*., 655 F.2d 779, 784 (7th Cir. 1981)); *National Acceptance Co. v. Coal Producers Association, Inc.*, 604 F.2d 540, 543 (7th Cir. 1979) (*quoting* Restatement of the Law of Agency, Second, § 261 (1958), "A person who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit fraud upon third persons is subject to liability to such third persons for fraud").

The Investor-Lenders appointed EBF as their agent to issue payoff statements, to collect payments, and to issue releases of the mortgages. The Investor-Lenders are bound by the actions taken by EBF in those capacities. The facts and the law dictate this result.

**III. Any Fraud in the Payoff Statements or the Releases Does Not Defeat BC57's Priority Because BC57 and NNNT Reasonably Relied Upon the Payoff Statements and Releases.**

Even though the Opponents assert that EBF misrepresented the payoff amounts within the Payoff Statements that it was authorized to issue, NNNT and BC57 (through NNNT) reasonably relied upon the Payoff Statements to release BC57's Loan Proceeds to EBF. A refinancing lender's reasonable reliance upon a loan payoff statement, which is ultimately determined to be incorrect or fraudulent, and payment pursuant to that payoff statement, allows that lender to assert a priority position over the prior mortgagee. *See generally, M&T Bank v. Mallinckrodt*, 2015 IL App (2d) 141233. This follows the long established principle that a party must bear responsibility for the fraudulent acts its agent, as discussed below. *See also Letsos v. Century 21 - New West Realty*, 285 Ill. App. 3d 1056, 1069, 221 Ill. Dec. 310, 675 N.E.2d 217 (1996); *National Acceptance Co. v. Coal Producers Association, Inc.*, 604 F.2d 540, 543 (7th Cir. 1979) (*quoting* Restatement of the Law of Agency, Second, § 261 (1958) (all discussed *supra*).

In *Mallinckrodt*, a title company disbursed refinancing loan proceeds in reliance on a payoff statement that was subsequently determined to be fraudulent. Based upon that reliance, the

trial court entered partial summary judgment of priority in favor of the refinancing lender. *Id.* at ¶19. The prior lender appealed. On appeal, the appellate court concluded that the case arose from fraud by a third party. *Id.* at ¶52. Quoting from *Connor v. Wahl*, 330 Ill. 136, 146, 161 N.E. 306 (1928), the appellate court in *Mallinckrodt* recognized the precedent that "[w]here one of two innocent persons must suffer by reason of the fraud or wrong conduct of another, the burden must fall upon him who put it in the power of the wrongdoer to commit the fraud or do the wrong." To assess the refinancing lender's innocence, the court framed the dispositive inquiry as whether the refinancing lender's reliance on the payoff was reasonable. *Id.* The court concluded that "there [was] a genuine issue of material fact as to whether [the refinancing lender or title agent] reasonably relied on [the borrower's] payoff statement," and remanded the case for further proceedings. *Id.*

Here, there can be no question of material fact regarding the reasonable reliance of BC57 and NNNT. As set forth below, the record establishes that NNNT, and thus BC57, acted in compliance with industry custom and standards in receiving the Payoff Statements and paying the Loan Proceeds to EBF to pay off the Investor-Lender Loans. These facts are distinguishable from those present in *Mallinckrodt*.

*First*, the Payoff Statements were issued by EBF, which was identified in the recorded Mortgages as the Investor-Lenders' contact and the likely servicer of the Investor-Lender Loans, and thus the entity that would furnish the Payoff Statements. Indeed, the Collateral Agent and Servicing Agreement and the Authorization Document, although not furnished to BC57 or NNNT when the refinance closed, confirm EBF's express authority to issue payoff statements and collect all payments on the Investor-Lender Loans. *See* BC57 Exhibit 14, p. 26, §9(a) ("EBF shall . . . issue payoff demands, . . . [and] demand, receive and collect all Loan payments"); and *see* BC57

Exhibit 14, p. 17. ("[EBF, as agent and trustee has been authorized by the above listed lenders to receive the payoff in its name and issue and execute a release of said mortgage, upon payment in full of any outstanding balance.") Furthermore, the Notes each provided that payments on the Investor-Lender Loans were to be made to EBF. *See* BC57 Exhibits 9-13. It was reasonable, and ultimately correct, to understand that EBF would furnish the Payoff Statements on behalf of the Investor-Lenders and receive the funds that BC57 provided to pay off the Investor-Lenders' Loans.

*Second*, BC57 and NNNT had no reason to question EBF's authority to issue the Payoff Statements, or request proof that EBF possessed that authority. As shown below, settlement agents do not request proof of that authority. But even if BC57 or NNNT went beyond any duty imposed upon them by Illinois law and requested proof of EBF's authority to issue payoffs, EBF would have produced the Collateral Agent and Servicing Agreement and the Authorization Document, which would have confirmed EBF's authority. Under an inquiry notice analysis, a party is not charged with knowledge of fraud or other wrongdoing, but instead is charged with knowledge of matters that a diligent inquiry would produce:

> "Inquiry notice describes the situation where the transferee has been made aware of facts or circumstances from which the existence or possibility of a prior claim might reasonably be inferred. If so, the purchaser then has a duty to verify or dispel the inference through further inquiry. If he fails to make inquiry, he is nonetheless chargeable with knowledge of facts that a diligent inquiry would have disclosed, the same as if he had acquired actual knowledge of those facts."

*Peoples Nat'l Bank, N.A. v. Banterra Bank*, 719 F.3d 608, 612 (7th Cir. 2013), *quoting In re Shara Manning Properties, Inc.*, 475 B.R. 898, 906 (Bankr. C.D.Ill. 2010).

*Third,* no occurrence or fact triggered a duty upon NNNT or BC57 to inquire as to whether EBF, the Investor-Lenders' expressly authorized servicer, misrepresented the amounts shown due on the Payoff Statements. The Opposition may argue that BC757 or NNNT should have been suspicious because the amounts shown due in the Payoff Statements were less than the original

principal balances of the Investor-Lender Loans reflected in the recorded Investor-Lender Mortgages, and the combined Payoff Statement for the East End Properties was less than the aggregate of the amounts shown due in the two previously-furnished separate draft payoffs for those two Properties. But as explained below in more detail, those items did not and would not cause a reasonably prudent commercial lender or title agent to inquire as to the amounts shown on the Payoff Statements issued by EBF.

Also, BC57 and NNNT had no reason to study or compare the original loan amounts with the amounts shown due in the Payoff Statements. Neither was privy to the notes related to the Investor-Lender Loans, or their payment histories. No reason existed for them to believe that the amounts requested in the Payoff Statements, which were less than the original principal loan amounts, resulted from anything other than periodic payments on, or pay downs of, the Investor-Lender Loans.

Contrary to what the Opposition might argue, the combined Payoff Statement for the 7625 East End Property and the 7635 East End Property, showing an amount due less than the aggregate of the two prior payoff statements for those properties, would not reasonably trigger inquiry. Mr. DeRoo from EB explained to BC57 that the two East End Properties were treated as a single property because they were adjoining parcels. SEC Exhibit 25, Bagchi Deposition Exhibit 1 at 103, 107. No reason existed to doubt that explanation.

In fact, the principal balance amounts shown due in the prior draft statements, $1,170,000 for 7625 S. East End (SEC Exhibit 14) and $1,210,000 for 7635 S. East End (SEC Exhibit 15), far exceeded the original $925,000 original principal balances of those two loans, and thus, on their face, would have indicated an error in the prior payoff statements. The combined payoff statement, showing an amount due less than the aggregate of the original loan amounts, would reflect

26

payments on the loans or pay downs, consistent with the other payoffs that showed amounts due that were less than the original loan amounts, and consistent with Mr. DeRoo's explanation.

Further, the prior separate draft payoff statements were furnished on September 11, 2017 (BC57 Exhibit 27), nearly two weeks before the preparation of the closing settlement statement on September 26, 2017, (BC57 Exhibit 28). They were furnished to Henry Marmol, the underwriter at NNNT, for confirmation as to their form. *See* Mr. Marmol Declaration, BC57 Exhibit No. 31, and e-mail exhibits. Mr. Marmol advised that the payoff statements contained the required information. *Id.* at ¶8. Because preparation of the closing settlement statement would not commence until some 14 days later, there was no reason that anyone would have reviewed those amounts at that time. The combined Payoff Statement, furnished on September 25, 2017, BC57 Group Exhibit 22, p. 1, functioned as the operative Payoff Statement and superseded the prior individual payoff statements and rendered the prior ones obsolete because the earlier drafts were not needed to prepare the closing settlement statement dated September 26, 2017. BC57 Exhibit 28.

*Fourth,* and turning to the Releases, those were executed by EBF, the entity that the Investor-Lenders expressly cloaked with the authority to issue and execute releases of the Investor-Lender Mortgages. The Opposition may contend that although EBF executed the Releases, the identification in the body of the Releases of EB as the releasor, not EBF, should have raised suspicion. That error shows only sloppiness or a scrivener's error, not fraud. No question can exist that EBF, the Investor-Lenders' expressly authorized agent, intended to release the Investor-Lender Mortgages, which were identified by recording number. If the Investor-Lender Mortgages were not going to be released, the title company would not have issued a title insurance policy, the BC57 Loan would not have closed, and EBF would not have accepted the BC57 Loan Proceeds.

No serious argument can be advanced that EB, the mortgagor, intended to release the mortgages because it is fundamental that only the mortgagee or its agent, not the mortgagor, can execute an effective release of a mortgage. If someone caught that error, EBF would certainly have corrected it. Further, "[W]here the parties intend to pass a present estate to an existent grantee but under the name other than the correct one, such a conveyance passes title to the intended grantee." *Chance v. Kimbree*, 376 Ill. 615, 621 (1941); *Church of Christ v. Christian Church*, 193 Ill. 144, 150 (1901) ("The general rule is, that the misnomer of a corporation has the same effect as the misnomer of an individual, and when the true name is necessarily to be collected from the instrument in which such misnomer occurs, or is shown by proper averments, a grant by deed to a corporation, or a contract with it, will not be invalidated thereby.").

To the extent the Opposition argues that the error renders the Releases ineffective, Illinois law requires the release of a mortgage when the debt is paid. 765 ILCS 905/2 (the Illinois Mortgage Act provides that a lender must release a mortgage upon payment of the debt). Further, when the mortgage debt is paid, the mortgage, which is but an incident to the debt, is no longer a lien on the property. *See Dunas v. Metropolitan Trust Company*, 41 Ill.App.3d 167, 170 (1st Dist. 1963), *citing Markus v. Chicago Title & Trust Co.*, 373 Ill. 557, 560 (1940); *Bradley v. Lightcap*, 201 Ill. 511, 517 (1903) (when the debt is paid, the mortgagee's title is extinguished by operation of law). Also, each of the Investor-Lender Mortgages required the Lender to release the security upon payment of the debt (*See* SEC Exhibits 1-5, ¶10). Because EBF, the Investor-Lenders' agent, advised BC57 and NNNT in the Payoff Statements of the amounts of the debts and those amounts were paid, EBF and the Investor-Lenders are obligated to release the Investor-Lender Mortgages, and the Investor-Lender Mortgages must be deemed released as a matter of law.

A.   <u>Compliance with Industry Customs and Practices</u>

The reasonableness of BC57 and NNNT's reliance is supported by the fact that their conduct comported with industry standards in paying off prior loans. Mr. J. Bushnell Nielsen is an expert on the customs and practices of title agents in paying off prior loans based upon "40 years of work experience in and related to the land title insurance industry" (Core Exhibit 34, Expert Report of J. Bushnell Nielsen ("Nielsen Report"), at Appendix, Exhibit 2 (Summary of Credentials and Resume), p. 1). Mr. Nielsen examined the facts in this case and concluded that BC57 and NNNT followed standard customs and practices "in seeking payoff letters and wiring instructions from [EBF], wiring the money to [EBF's] bank account, and in recording the escrowed mortgage releases signed by [EBF] after the payoff money had been delivered." Nielsen Report, p. 6. Mr. Nielsen's opinions are uncontroverted because no Claimant in Group 1 designated a rebuttal expert.

Mr. Nielsen explained that a lender's attorney typically and necessarily involves the title insurance agent in certain closing and title tasks, and will issue closing instructions to the title agent. *Id*. at 6-7. In this case, BC57's counsel issued closing instructions to NNNT and appointed NNNT as its closing agent for the closing of the BC57 Loan. *Id*. at 7. He stated that a title agent's most important task in closing a refinance loan is to pay off the loan being refinanced and to cause the prior mortgage to be released of record. *Id*. at 8. To accomplish that task, the title agent needs a payoff statement from the existing lender or its servicer, "whose job is to collect payments from the borrower, deliver those payments to the holder of the loan, issue notices to the borrower on behalf of the loan holder, and to issue payoff letters and deliver the loan payoff money to the loan holder." *Id*. at 10. In a payoff letter, the loan servicer states the loan balance, the amount that must be paid for the release of the mortgage as of a specified date, the per diem charge for each day after the payoff date stated on the letter, other terms of the payoff and wiring instructions for the

loan servicer's incoming wire transfer bank account. *Id*. at 11. "It is standard custom and practice for a closing agent to seek a payoff statement from the existing lender or loan servicer, and rely on that letter as accurately stating the loan balance and per diem interest." *Id*. at 8.

Mr. Nielsen further opined:

It is my expert opinion that a closing agent relies on a signed payoff statement as issued by a lender or loan servicing agent as evidence that the lender or servicer holds the loan and has authority to act for the lender in accepting a payoff and releasing the loan collateral on payment in full. . . . The closing agent also relies on the servicer's delivery of wiring instructions for a bank account in its own name as further proof that the servicer has authority to accept the payoff and release the loan collateral.

*Id*. at 11. Mr. Nielsen explained that "as a matter of practice, title insurance companies and closers do not request documentation of a loan servicer's authority." *Id*.

This practice stems from the practices of loan servicers. In my experience, a loan servicer will never give a title agent a copy of the loan servicing agreement, even when the refinancing lender requests evidence that the servicer is authorized to sign a mortgage release. I have never received a copy of the loan servicing agreement from a servicer in connection with a payoff request.

It is customary for a closing agent to rely on the payoff statement as the assurance that, when the loan is paid off, the mortgage held by that lender will be released of record. Very occasionally, a closing agent will ask the lender that will be paid off to escrow a signed and recordable mortgage release instrument with the closing agent, under instructions allowing it to be recorded after the payment has been made. In my experience, this kind of request is made only when the closing agent is extra-prudent, or the servicer is not one of the large institutional servicers and the closing agent does not have sufficient prior experience to have developed confidence in the servicer's practices.

*Id*.

Mr. Nielsen opined that because "a title company *never* receives a loan servicing agreement in connection with a request for a payoff statement, it has no knowledge of the terms of that agreement." *Id*. at 16 (emphasis in original). Even if NNNT received the Collateral Agent and Servicing Agreement, Mr. Nielsen opined that EBF, not NNNT, would need to make sure that it received the necessary authority to release the Investor-Lender Mortgages: "A closing agent customarily depends on a loan servicer to obtain whatever authority it needs from the lender or

loan participants in order to accept a loan payoff and release the loan collateral. The closing agent has no authority, time or skill that would enable it to verify that the servicer has obtained authority to act." *Id*. Title agents customarily assume a right to rely on the payoff statements issued by the servicer as a representation that the servicer "had obtained all necessary authority, and that [the] signing of the mortgage releases and delivery of those instruments into escrow was a further representation that such authority had been given." *Id*.

He also noted that when the conditions of the closing instructions are met, the closing agent makes the prior loan payoff. If it has the release of the prior mortgage, it records the release along with the refinance mortgage. *Id*. at 11-12.

Mr. Nielsen opined that there were no circumstances with respect to this transaction "that would cause a reasonable and prudent title company to make more than the usual inquiry into the authority of [EBF] to accept loan payoffs, or to take some extra precautions to assure that the releases of the [Investor-Lender] Mortgages were valid and enforceable" *Id*. at 20. He opined that EBF's servicing of a loan to a related company, EB, would not cause suspicion because related-party loans are fairly common in commercial real estate and EBF was the servicer, not the lender. *Id*. at 14-15. He noted that the Investor-Lenders made the loans despite the relationship between EB and EBF. *Id*. at 15. Moreover, the nature of the loan as a hard money loan made by non-institutional lenders would not raise suspicion because such loans are common. *Id*. "[A] title company instructed to pay off an existing loan secured by a mortgage does not evaluate the circumstances under which that loan was made. It is not privy to such information. Thus, the title company making the payoff does not undertake a different or more complicated inquiry based on the circumstances under which the old loan was made. The prior loan has already been made. The mortgage was recorded to serve as collateral for that loan. The only thing the title company does

31

is to pay off the loan in order to secure a release of the mortgage. In my experience, a title company would never inquire into the circumstances about the existing loan." *Id*. at 13-14.

With respect to the Payoff Statements showing amounts due less than the original loan amounts, Mr. Nielsen opined that a title company does not compare the face amount of the loan with the payoff amount because it does not investigate the truth or validity of the payoff statement. *Id*. at 18. With respect to EBF's combined payoff statement, Mr. Nielsen opined that "[i]t is my expert opinion that an escrow officer first performs a substantive review of a payoff letter when he or she is in the process of preparing a settlement statement for the transaction. If a payoff statement has changed before the escrow officer prepares the draft settlement statement, it is my expert opinion that the escrow officer does not compare the current payoff letter to a prior version of the payoff letter, because the earlier version is nullified by the later version." *Id*. at 17-18. "A title company would not conclude that the fact that [EBF] combined the loans for 7625 and 7635 South East End Avenue into one payoff statement was an indicator of a suspicious circumstance. . . . It is my expert opinion that DeRoo's explanation was reasonable, and that lender's counsel and the closing agent would accept that statement as being accurate. In my experience, it is common for two or more apartment buildings to be managed as one project, even though there are separate loans and mortgages for each building." *Id*. at 17.

With respect to the closing of the BC57 Loan, Mr. Nielsen opined that "BC57, its counsel and its closing agent, Near North Title, followed all of the above standard industry customs and practices in paying off the [Investor-Lenders Loans.]" *Id*. at 12. He further stated:

> It is my expert opinion that a title officer or escrow officer would understand from the [Investor-Lenders] Mortgages that [EBF] was the servicing agent for the [Investor-Lenders], and was the correct party to be contacted to request a payoff statement for the [Investor-Lenders] Loans. The evidence shows that either [NNNT] or BC57's counsel communicated with [EBF]. [EBF] issued the payoff statements for the [Investor-Lender

Mortgages], which in my expert opinion a title company would conclude as further confirming its authority to do so.

It is also my expert opinion that Near North Title was especially diligent in making sure that the BC57 Loan would obtain first priority when recorded, by arranging for releases of the Hard Money Mortgages to be signed and delivered to it before the BC57 Loan closed. As I explained above, this allowed Near North Title to record the BC57 Mortgage and the releases of the Hard Money Mortgages at the same time, immediately after delivering the loan payoffs to EquityBuild Finance.

For all of the above reasons, it is my expert opinion that BC57, its counsel and its closing agent, Near North Title, followed all of standard industry customs and practices in paying off the Hard Money Loans and relying on the payoff statements and the releases of the Hard Money Mortgages, and that their conduct was reasonable and prudent in light of those standard customs and practices.

*Id*. at 13.

The Investor-Lender Mortgages were similar to many of the mortgages that will be at issue in subsequent groups. BC57 Group Exhibit 29 contains copies of some, but not all, of these mortgages. There, as here, institutional lenders funded refinance loans but the affected investor-lenders contend that their interests were not extinguished. NNNT was not the settlement agent for any of those Institutional Lenders mortgages. This fact demonstrates that NNNT followed the same custom in the industry followed by other settlement agents, which confirms that BC57 and NNNT complied with reasonably prudent practices.

## CONCLUSION

BC57's mortgage interest in the Properties is not subject to the Investor-Lender Mortgages. EBF, the Investor-Lenders' authorized agent, executed the Releases that released the Properties from the Investor-Lender Mortgages. The Releases were recorded after EBF, on behalf of the Investor-Lenders, received the amounts it stated were due in the Payoff Statements that EBF was authorized to issue, and thus are binding on the Investor-Lenders. Notwithstanding reports that EBF committed fraud, the Investor-Lenders are bound by EBF's acts and estopped from

challenging BC57's priority because EBF was acting as the Investor-Lenders' agent when it committed the fraud and because NNNT and BC57 reasonably relied upon the Payoff Statements.

Dated: January 27, 2022

/s/ *Michael A. Gilman*
Edward S. Weil (eweil@dykema.com)
Michael A. Gilman (mgilman@dykema.com)
Todd Gale (tgale@dykema.com)
Kevin Connor (kconnor@dykema.com)
Benjamin W. Chertok (bchertok@dykema.com)
Dykema Gossett PLLC
10 South Wacker Drive, Suite 2300
Chicago, Illinois 60606
(312) 876-1700

David E. Hart (dhart@maddinhauser.com)
Robert M. Horwitz (rhorwitz@maddinhauser.com)
Maddin, Hauser, Roth & Heller, P.C.
28400 Northwestern Drive, 2nd Floor
Southfield, MI 48034
(248) 354-4030

Attorneys for Claimant
BC57, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2022, I caused the foregoing Position Statement of Claimant BC57 to be electronically filed with the Clerk of Court through the Court's CM/ECF system, which sent electronic notification of such filing to all parties of record, and e-mailed to ebgroup1service@rdaplaw.net, which is designed to send electronic notification of such filing to all parties involved in Group 1.

/s/ *Michael A. Gilman*

097077.000109 4871-2013-7483.9