# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| | Civil Action No. 1:18-cv-5587 |
| Plaintiff, | Judge John Z. Lee |
| v. | Magistrate Judge Young B. Kim |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, | |
| Defendants. | |

## MOTION FOR APPOINTMENT OF A FEE EXAMINER, OR, IN THE ALTERNATIVE, TO ESTABLISH A PRACTICAL AND COST EFFECTIVE PROCEDURE TO RESPOND TO THE RECEIVER'S FEE ALLOCATION MOTION AND SUFFICIENT TIME TO DO SO

The Lenders identified on Exhibit A ("Lenders"), in the interest of judicial economy, respectfully move this Court for entry of an order appointing an independent professional fee examiner ("Fee Examiner") to assist the Court in reviewing the fee and expense allocations (the "Allocations") in the Receiver's Motion for Approval of Allocations of Fees to Properties for Payment Pursuant to Receiver's Lien ("Fee Allocation Motion") (Dkt. 1107) against Receivership estate properties (the "Properties") for which the Lenders and the Individual Investors (collectively, the "Secured Creditors")[1] have asserted liens.

---

[1] The Receiver has identified hundreds of "Individual Investors" that have asserted claims against real property that is the subject of the Receivership Estate. For the sake of convenience, but without admitting the merits of their alleged claims, the Individual Investors are included within the definition of "Secured Creditors" herein.

An independent examination of the Receiver's 30,000+ time entries is necessary in light of overwhelming deficiencies, most notably involving the lack of detail needed to satisfy the Receiver's burden of proving that his services benefitted the Properties against which he seeks a first priority lien. According to the Receiver, his time is documented "in granular detail" in the invoices attached to his Fee Petitions "(close to an additional 2,000 pages)" and in the schedules attached to the Fee Allocation Motion "setting forth more than 30,000 individual tasks in reports requiring 19,525 pages and corresponding to each of 108 separate properties" (Dkt. 1107, p. 10), an average of 180-pages for each separate property allocation report.

Although the Lenders theoretically could devote hundreds of hours to the review this massive quantity of data, based on their efforts since the last Court hearing, they are unlikely to be able to do so with the same eye or uniformity. Moreover, even if they could coordinate their efforts for the convenience of the Court, through no desire of their own, would burden the Court in having to review challenges to approximately 180 pages of time entries per property, multiplied by the 108 properties against which surcharge is sought, for a total of approximately 20,000 pages of potential document review. Such a process is neither time nor cost effective. Consequently, the most judicious course of action is for the Court to appoint a Fee Examiner to review and categorize the Allocations based on criteria determined by it.

The Lenders propose that such criteria be established by the Court through consideration of the Secured Creditors' objections to the Allocations in a representative cross-section of two or three Estate Properties, including both Properties against which there are competing claims and Properties against which only one claim has been asserted. Once the Court details the criteria against which the Allocations will be judged, a Fee Examiner can engage reasonably priced staff

2

to conduct a uniform review of all Allocations and convey his or her findings to the Court and the parties in a summary report with supporting documentation.

This practice is used regularly to review fee petitions in complex bankruptcy cases and, consistent with that practice, all parties will have an opportunity to review and provide input on the examination before the Court rules on the Fee Allocation Motion. *See, e.g., In re Collins & Aikman Corp.*, 368 B.R. 623, 625 (Bankr. E.D. Mich. 2007) (in a large and complex case, the Court may appoint a fee examiner pursuant to §105 of the Bankruptcy Code or Fed. R. Evid. 706(a) to assist the Court in carrying out its duties). Like in a bankruptcy case, the Fee Examiner's cost is considered an administrative expense, which can be allocated by the Court to the Properties.

In the alternative, the Lenders ask the Court to establish a procedure akin to the dispute resolution process pursuant to which Secured Creditors who claim liens against a representative selection of Properties can file challenges to the Allocations concerning those Properties, rather than burdening the Secured Creditors by, and inundating the Court with, thousands of pages of Allocations to review. The Court then can make findings concerning the Allocations involving a representative cross-section of the Properties that can be used to guide the parties in the process of their review and objections to Allocations involving the remaining Properties on a schedule to be established by the Court.

The Lenders believe that one of these alternatives is necessary to facilitate the Court's review of the Fee Allocation Motion because the Receiver's records are so voluminous and lacking in detail that hundreds of hours likely will be required to compile their extensive objections, each and every one of which will need to be reviewed by this Court to adjudicate the

Fee Allocation Motion and to preserve the issues for appellate review, none of which will lead to a cost-effective and efficient resolution of the Fee Allocation Motion.

In support of this Motion, the Lenders respectfully state as follows.

**FACTUAL BACKGROUND**

1. The Receivership Estate includes 108 Properties, many of which are subject to competing mortgage lien claims by the Secured Creditors, while others only have one lien claim against them.

2. During the course of the Receivership, the Receiver submitted quarterly requests for approval of his fees and expenses ("Fees") to which the Lenders objected, arguing, among other things, that the Estate was underwater, and that many of their secured claims exceeded the value of their collateral. (See e.g., Dkts. 777, 792)

3. The Receiver ultimately conceded that there were insufficient unencumbered Estate assets to pay his Fees and sought the imposition of a first priority or priming lien against the Properties. (Dkt 755; 1031.)

4. On October 26, 2020, the Court awarded the Receiver a receiver's lien and approved the Receiver's methodology of allocating that lien among the Properties: "expenses relating directly to a property will be allocated to that property; billing pertaining to the recovery of unsecured funds will not be allocated to any properties; and remaining fees and expenses will be allocated to the properties as a percentage of their gross sales price, once that value is determined for each." (Dkt 824, p. 5.) However, the Court stated that the priority of the Receiver's lien as to any of the Properties – whether it would prime a secured lien – would be determined as part of the claims resolution process. (Dkt. 824, p. 6.)

5. On August 17, 2021, the Court granted the Receiver a priming lien with respect to Fees incurred in connection with two Court-approved categories - (1) the preservation, management, and liquidation of certain real estate belonging to the Receivership Estate; and (2) the implementation and management of an orderly summary claim-priority adjudication process." Dkt. 1030. The Court excluded, for the time being, Fees related to the claim-priority adjudications, such as discovery, filing a framing report, and making recommendations to the Court, because the benefit to the to-be-determined first-priority secured creditor cannot be determined until the conclusion of the claims process. (Dkt. 1030, p. 14, n.7.) Thus, those Fees were not to be part of the Receiver's Allocation Motion.

6. The Court also authorized interim payments of the Receiver's Fees through the priming lien, but mandated a 20% holdback on the payment of all fees, but not expenses. (Dkt. 1030, p. 15.) Based upon the 20% holdback of fees requested in the Receiver's 9th, 10th and 11th fee application (Dkt 1031), any fees approved for payment in Dkt 1031 are limited to 80% of the 80% of the fees approved for payment pursuant to the Fee Allocation Motion.

7. The Court stated that the Receiver may seek approval of his proposed allocation by a separate motion to be referred to Magistrate Judge Kim for disposition, with instructions that the Receiver file by September 7, 2021 a motion for his proposed line-by-line and property-by-property fee allocation. (Dkt. 1031.) In a footnote, the Court advised the Receiver "to be mindful of *Elliott's* [*SEC v. Elliott*, 953 F.2d 1560 (11th Cir. 1992] admonishment that an across-the-board allocation may be inappropriate. *Elliott*, 953 F.2d at 1578 ("We hold that merely counting heads is not an equitable way to divide the burden of the receivership. *Secured creditors should only be charged for the benefit they actually receive.* That their claims represented a large portion of the gross proceeds does not necessarily mean the Receiver spent an

5

equally proportionate amount of time on their claims. . . . What is required is that an earnest effort be made to devise a method of allocating the actual costs of the receivership to specific assets and that the [allocation] order . . . disclose the results of this effort." [Emphasis added.]). *Cf. Gaskill v. Gordon*, 27 F.3d 248, 254 (7th Cir. 1994) ("We must remand this case to the district court to set out in greater detail the expenditures included in the $265,000 lien.") (Dkt. 1030, p.16, n.8.)

8. Due to the complexity of the process, the Receiver requested and received, without any objection by the Lenders, extensions totaling approximately 3-1/2 months to file his Fee Allocation Motion. (Dkts. 1049, 1082, 1097, 1105.)

9. On December 22, 2021, the Receiver filed his Fee Allocation Motion, 116 days after it was originally to be filed. It includes over 30,000 individual tasks spread over 108 separate documents reflecting the Receiver's Allocations to specific Properties, many of which documents exceed 200 pages (Dkt. 1107, Ex. 1 ) and a 190-page "General Task Detail" identifying tasks that the Receiver allocated among the Properties (Dkt. 1107 , Ex. 3).

10. Magistrate Judge Kim set the matter to January 12, 2022 to determine how to proceed on the Fee Allocation Motion. The Lenders requested 30 days to respond based upon their initial review of the Fee Allocation Motion. When that effort commenced, however, they discovered, among other things, that the Receiver repeatedly failed to include in his time records reasonable detail concerning the Properties for which services were rendered. In some cases, no Properties were identified. In others, multiple Properties were identified without any detail of the time spent on each, apparently assuming each of the Properties required equal time. Other issues are described below.

11. All of this was attributable to the failure of the Receiver and his attorneys to allocate their time entries to specific Properties and tasks as they were performed. As a result, the Receiver and his counsel allegedly spent approximately 1,200 hours and more than $25,000 in associated third-party vendor expenses to create the Allocations. (Dkt. 1107, p. 11.) Notwithstanding, the Allocations do not prove that the Receiver has conferred benefits on the Properties in the amounts asserted.

12. Among other things, the Receiver's time entries consistently do not identify the Properties, property managers, brokers, lenders, investors, creditors, counsel, pleadings, and documents involved; span multiple Properties without detailing the amount of work done for, or the proportional benefit to, each Property; erroneously relate to different Properties or involve tasks completed after a Property was sold; appear to contain redactions of potentially privileged information that prevents third-parties from evaluating those entries; and inappropriately seek lien priority for work related to the Receiver's own failure to segregate rents as required by applicable law, and his efforts to establish a single-lien claim process that cannot possibly confer a benefit on the sole secured creditor whose lien the Receiver proposes to challenge.

13. For instance, an analysis of the first 100 pages of the Receiver's Allocations for one of the Properties, 5001 S. Drexel, attached as Exhibit B[2], demonstrates the problems with the Allocations, as follows:

- The entries highlighted in yellow lack sufficient information to assess whether the task is attributable to a particular property because they do not reference a specific property.
- The entries highlighted in pink are not attributable to any property, but reflect general fees, such as interviews of potential property managers and brokers (even though

---

[2] Exhibits B through D and the analyses are representations of the issues, and are not complete analyses of the identified time entries.

there were multiple property managers and brokers who could not have provided any benefit to the properties in which they were not involved); review of the brokers/managers' proposals and issues involving compensation of same; general receivership strategy; tasks related to the proposed liquidation plan.

- The entries highlighted in red reflect tasks not associated with the property that was the subject of the fee allocation, such as where another property was identified in the Allocation or where the entry involved Fees incurred after the subject property was transferred to buyer and removed from Estate.

- The entries highlighted in blue violate *Elliot's* prohibition of an across-the-board allocation because the entry states it is with respect to multiple "lenders", "managers" or "properties." Dkt. 1030, p.16, n.8. For example, there are instances where there are multiple properties sold in the same tranche or sale motion, but the entry does not state what work was performed and time incurred for each of the properties, such as negotiations with title companies, the nature and extent of which likely varied from property-to-property.

- Although they are relatively few and far between, entries highlighted in green contain sufficient information to show that the tasks are within the categories of Fees that may prime secured creditors and are allocable to the property.

- In contrast, the entries highlighted in gray contain sufficient information to show that the tasks are NOT within the categories of Fees that may prime Secured Creditors, although they are attributable to the Property. For example, some of these tasks relate to the Lenders' objection to the Receiver's erroneous failure to segregate rents by property from which the rents were received, which the Court sustained. Dkts. 222, 223. Fees associated with the Receiver's efforts not to segregate the rents did not benefit any of the properties and thus should not prime the secured creditors' liens. It also includes responses to investor inquiries, without identifying the investors or Properties involved, the nature of the communications, or how they benefitted the Lenders' interests in the collateral.

14. The above-described analysis required approximately six attorney hours to review and color code, but encompassed only the first 100 pages of a 190-page Property Allocation report, to identify issues. A complete coding of all 190 pages would likely require 10 hours in total. If the same color coding discipline is adopted, based on the 180 page average property allocation size multiplied by 108 properties, this Court would receive approximately 20,000 color coded pages to review. That review would require 1080 hours of attorney coding time, at ten hours per property. All of this assumes but a single objection, by a Secured Creditor, to a given property's allocation.

15. With respect to single-claim properties – where only one Secured Creditor asserts a secured claim – two primary objections exist to the Receiver's Allocations: (i) allocation of work performed on the multi-claim or claims resolution process after the date that the Receiver identified the single-claim properties, January 30, 2020; and (ii) allocation of work performed on the single-claim process. With respect to the first objection, any alleged benefit received by the single-claim properties was complete when the Receiver eliminated any adverse claims on January 30, 2020. With respect to the second objection, the single-claim process is devoted entirely to the Receiver's attempt to avoid the Secured Creditors claims which inures to the sole benefit of the unsecured creditors – tasks for which the Receiver concedes he is not entitled to a lien. Representative objections concerning single-lien Properties are demonstrated on <u>Exhibits C and D</u>. Exhibit C identifies the objections to the Receiver's Allocations to the property located at 8529 S. Rhodes Avenue, a single-claim property, and Exhibit D identifies select objections to the Receiver's Allocations of general task items, identifying (i) fee entries that appear to be related to general estate administration as opposed to property management or liquidation or claims process (administration fees); (ii) fee entries that fail to provide sufficient information to assess the Allocation; (iii) fee entries that should be allocated to a specific property. Objections also include time spent by the Receiver related to his failure to segregate rents and expenses by property without reference to the Secured Creditors' respective interests in that collateral in contravention of applicable law, which does not even arguably benefit the Secured Creditors; time spent that benefited unsecured creditors, such as the identification of Properties against which no one asserted a lien; time spent in the pursuit of unencumbered assets, such as causes of action, some cash and the Texas/Florida properties, and the protection of roll-over claimants who

no longer have secured claims against the Properties that may originally have been subject to their liens.

16.     These are but a few of the problems throughout the Allocations. However, before spending the time and resources needed to complete an exhaustive analysis of these deficiencies across approximately 108 properties, the Lenders determined that it would be prudent to advise the Court of the nature and extent of the problem, to propose alternative approaches to it, and request a reasonable schedule to complete the process depending on the procedure the Court adopts.

17.     The reason for the need for a Fee Examiner or an agreed upon discipline for delivery of objections in a format acceptable to the Court are numerous:

- *First*, as is borne out by the examples provided, there appear to be significant deficiencies in the time descriptions to permit third parties to determine whether the specific time allocated is properly surchargeable under the rulings made to date, by this Court.

- *Second*, having a multitude of different eyes (of individual or institutional investors) reviewing the time entries allocated to their specific properties will bring into the picture different subjectivity and interpretation of ambiguous descriptions, resulting in a lack of uniformity in review.

- *Third*, through discussions with the Receiver, it was learned that the "best evidence" of the Receiver's time entries are not those attached to the Fee Allocation Motion. Instead, the Receiver has advised that in reviewing each individual time entry, redactions were made for privilege and/or work product privilege. Those redactions included the names of persons and possibly properties that would assist in understanding the applicability of a given time entry to a given property. A Fee Examiner can flag those instances where review of redacted information is required to assess the nature of an entry, and in camera review and the entry of appropriate confidentiality would facilitate a far more accurate review, something not available currently to the investors and lenders, to aid in their review.

10

- *Fourth*, the sheer magnitude of the entries (averaging 180 pages) and their applicability of each entry against 108 properties dictates that a procedure is needed.

- *Fifth*, the costs of a Fee Examiner will be far be less than the costs of review by all investors and lenders of an average of 180 pages of time entries over 108 properties. A Fee Examiner can utilize hourly personnel, at rates far lower than attorney or paralegal rates.

- *Sixth*, a Fee Examiner will be provided with the necessary search and review criteria and will be able to bring uniformity to its review of each time entry and its application to a given property or set of properties. Once a time entry is reviewed, the Fee Examiner can allocate that time entry against those properties to which it relates in an Excel type spreadsheet. This requires but a single review by a single set of eyes of a given time entry and its allocation. It will not require 108 or more counter-determinations to those of the Receiver as to a given time entry. The Fee Examiner will be able to confer with the Receiver, including the review of any work product the receiver created in reviewing a given time entry. The Receiver has advised that as part of the Receiver's review of a given time entry, reference was made to the docket, emails, and other records to attempt to tie the entry to a specific task and property. Having a single objective third party utilize that additional data (again, not available to the investors or lenders) will additionally aid in the "best evidence" having been brought forth to support the surcharges sought by the Receiver.

- *Seventh*, while a Fee Examiner's determination is not a binding determination, it will be a great aid to the Court and the parties in determining the surchargeability of a given time entry against a given property, This review can result in a single matrix, with each time entry allocated against each of the 108 properties.

- *Eighth*, the fee allocation issue will be an ongoing issue for the Receiver, the parties and this Court. Having a Fee Examiner in place can help alleviate the going forward burden on the Receiver in having to spend an additional 1200 hours on fee allocation issues related to future surcharge motions.

**AUTHORITY IN SUPPORT OF APPOINTMENT OF A FEE EXAMINER**

18. The Lenders believe that it is desirable and in the best interests of the Court and all parties for the Court to appoint a Fee Examiner as a disinterested person to examine the

Allocations to determine within constraints decided by the Court whether each Allocation falls within one of the two Court-approved categories, and, if so, whether the Receiver properly allocated the associated Fees to the property or properties to which the Fees relate.

19. The Lenders request this relief because the exhibits to the Receiver's Fee Allocation Motion do not provide sufficient information to permit the Lenders to assess whether (1) the Receiver has included only those Fees that were incurred in connection with (a) the preservation, management, and liquidation of specified real estate belonging to the Receivership Estate; and (b) the implementation and management of an orderly summary claim-priority adjudication process; and (2) whether the Receiver allocated Fees only to the properties to which the allocated Fees pertain. The Lenders believe that an independent Fee Examiner can best complete this process in a uniform and cost-effective manner, cloaked with the authority of the Court and with the ability to review allegedly privileged documents to better understand the information in entries redacted by the Receiver or otherwise.

20. Local Rule 66.1 of the United States District Court for the Northern District of Illinois, provides that "the administration of estates by receivers or other officers shall be similar to that in bankruptcy cases. . . ." Consequently, the Lenders request that the Court appoint a Fee Examiner pursuant to Section 1104(c) of title 11, United States Code ("Bankruptcy Code") which authorizes the appointment of a Fee Examiner.

21. Section 1104(c) of the Bankruptcy Code governs the appointment of a Fee Examiner in Chapter 11 proceedings, stating as follows:

> (c) If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States Trustee ("**US Trustee**"), and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence,

misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if-

(1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or

(2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

22. Accordingly, Section 1104(c) requires the Court to appoint an examiner if: (a) no trustee has been appointed; (b) no plan has been confirmed; (c) a party in interest or the US Trustee has requested an examiner; and either: (i) the appointment of the examiner is in the best interests of creditors, interest holders, or the estate; or (ii) the debtor's fixed, liquidated, and unsecured debts to non-insiders exceed $5 million. *See e.g., In re UAL Corp.*, 307 B.R. 80, 84 (Bankr. N.D. Ill. 2004) ("[A]ppointment of an examiner is mandatory if the four conditions are met, but the court retains the discretion to determine the nature and scope of the examiner's investigation").

23. Here, no trustee has been appointed and no plan has been confirmed because this is a Receivership; however all of the other elements of section 1104(c) of the Bankruptcy Code are met because it is in the best interest of the creditors of the Estate, interest holders in the Estate and, the claimants fixed, liquidated, and unsecured debts to non-insiders exceed $5 million. For example, in the First Group alone, the Investor-Lenders claim in excess of $10,000,000 and the Institutional Lender (BC57, LLC) asserts a claim in excess of $6,000,000.

24. This request also is made pursuant to the inherent power of the Court to advance the efficient and effective administration of justice. In this regard, independent of the Bankruptcy Code, federal judges possess "inherent power to provide themselves with appropriate instruments required for the performance of their duties" and to "appoint persons unconnected with the court

13

to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause." *In Ex parte Peterson*, 253 U.S. 300, 312, 64 L. Ed. 919, 40 S. Ct. 543 (1920); *See, e.g., Danville Tobacco Ass'n v. Bryant-Buckner Assoc., Inc.*, 333 F.2d 202, 208 (4th Cir. 1964) (stating that the term "'Master' was a misnomer. In truth [the appointee] did not serve as a master. . . . The Court chose him as an expert for its guidance."); *Scott v. Spanjer Bros., Inc.*, 298 F.2d 928, 930 (2d Cir. 1961) ("Appellate courts no longer question the inherent power of a trial court to appoint an expert under proper circumstances, to aid it in the just disposition of a case.") (*citing Ex parte Peterson*, 253 U.S. 300, 64 L. Ed. 919, 40 S. Ct. 543 (1920)).

25. Such a course of action also is consistent with F.R.E. 706, which permits the Court to "appoint any expert that the parties agree on and any of its own choosing" to perform such duties as informed by the Court.

26. The appointment of a Fee Examiner will not usurp judicial functions, *see Kimberly v. Arms*, 129 U.S. 512, 524, 32 L. Ed. 764, 9 S. Ct. 355 (1889) (court may not "abdicate its duty to determine by its own judgment the controversy presented"), or result in "an independent mission of finding facts" outside the record of the case, *See Johnson v. United States*, 780 F.2d 902, 910 (11th Cir. 1986) (citation omitted). Instead, the Lender's request that a Fee Examiner examine the records submitted by the Receiver to assess the Receiver's allocation of Fees in accordance with this Court's direction.

27. Instead, having a Fee Examiner conduct an investigation as proposed in this Motion and provide a report would avoid a multiplicity of efforts and interactions, saving time and expense for the Court, the Estate, and the Secured Creditors and result in an independent report that will greatly streamline the Fee Allocation process.

28. Alternatively, the Court has the inherent power to establish an efficient and cost-effective procedure and a reasonable amount of time for the parties to submit their own representative challenges to the Allocations, so that the Court can consider and adjudicate those challenges, provide guidance that may be used in reviewing the remaining Allocations, and avoid unnecessary and undue burden on the Court and the parties.

**CONCLUSION**

**WHEREFORE**, the Lenders request that the Court enter an order appointing a Fee Examiner to separate - based on criteria established by the Court - the Receiver's Allocations in the Fee Allocation Motion into categories based on whether (1) they do or do not fall within court-approved categories to support a priming lien against specific Properties against which the Secured Creditors have asserted liens and, if so, (2) the amount of time and charges that conferred a discernable benefit on those specific Properties, and (3) other categories approved by the Court. In the alternative, the Lenders request that the Court establish a procedure pursuant to which (1) Secured Creditors who claim liens against a representative selection of Properties can file challenges to the Allocations concerning those Properties, and (2) the Court then can make findings concerning the Allocations involving that representative cross-section of Properties which can be used to guide the parties in the process of their review and objections to Allocations involving the remaining Properties. In either case, the Lenders request a reasonable time to complete the process.

Respectfully submitted,

| /s/ Michael Gilman<br>Michael Gilman (6182779)<br>(mgilman@dykema.com)<br>Dykema Gossett PLLC<br>10 S. Wacker Drive<br>Suite 2300 | /s/ Ronald A. Damashek<br>Ronald Damashek<br>(rdamashek@dickinsonwright.com)<br>Dickinson Wright PLLC<br>55 West Monroe Street — Suite 1200<br>Chicago, Illinois 60603 |

| | |
|---|---|
| Chicago, Illinois 60606<br>(312) 627-5675<br>*Federal Home Loan Mortgage Corporation Wilmington Trust, National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Trust 2014-LC16, Commercial Mortgage Pass-Through Certificates, Series 2014-LC16; Wilmington Trust, National Association, as Trustee for the Registered Holders of UBS Commercial Mortgage Trust 2017-C1,Commercial Mortgage Pass-Through Certificates, Series 2017-C1; Citibank N.A., as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2018-SB48; Federal National Mortgage Association; U.S. Bank National Association, as Trustee for the registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2017-SB41;U.S. Bank National Association, as Trustee for the registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2018-SB50;U.S. Bank National Association, as Trustee for the registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2017-SB30 Sabal TL1 LLC; Midland Loan Services, a Division of PNC Bank, N.A. as servicer for Wilmington Trust, N.A., as Trustee for the Benefit of Corevest American Finance 2017-1 Trust Mortgage Pass-Through Certificates; Midland Loan Services, a Division of PNC Bank, N.A. as servicer for Wilmington Trust, N.A., as Trustee for the Registered Holders of Corevest American Finance 2017-2 Trust, Mortgage Pass-Through Certificates, Series 2017¬2; BC57, LLC; UBS AG; 1111 Crest Dr., LLC, Pakravan Living Trust, Hamid Ismail, Farsaa, Inc.; Thorofare Asset Based* | **PH:** (312) 377-7858<br>Fax: (312) 423-8160<br>*Counsel for Citibank N.A., as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2018-SB14; Midland Loan Services, a Division of PNC Bank, National Association; Thorofare Asset Based Lending REIT Fund IV, LLC; and Liberty EBCP, LLC*<br><br>s/ James P. Sullivan<br>James P. Sullivan<br>James P. Sullivan (6256746)<br>CHAPMAN AND CUTLER LLP<br>320 S. Canal Street<br>Chicago, Illinois 60606<br>312.845.3445 (P)<br>312.701.2361 (F)<br>jsullivan@chapman.com<br>*Counsel for BMO Harris Bank N.A.*<br><br>s/ Jill L. Nicholson<br>Jill L. Nicholson (jnicholson@foley.com)<br>Andrew T. McClain (amcclain@foley.com)<br>Foley & Lardner LLP<br>321 N. Clark St., Ste. 3000<br>Chicago, IL 60654<br>Ph: (312) 832-4500<br>Fax: (312) 644-7528<br>*Counsel for Citibank N.A., as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2018-SB48; U.S. Bank National Association, as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2017-SB30; U.S. Bank National Association, as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through* |

16

| | |
|---|---|
| *Lending REIT Fund IV LLC* | *Certificates, Series 2017-SB41; U.S. Bank National Association, as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2018-SB50; Wilmington Trust, National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Trust 2014-LC16, Commercial Mortgage Pass-Through Certificates, Series 2014-LC16; Federal National Mortgage Association; and Sabal TL1, LLC* |
| s/Jay L. Welford<br>Jay L. Welford<br>jwelford@jaffelaw.com<br>Jaffe Raitt, Heuer & Weiss, P.C.<br>Jay L. Welford (P34471)<br>27777 Franklin Road, Suite 2500<br>Southfield, Michigan 48034<br>(248) 351-3000<br>*Counsel to Liberty EBCP, LLC*<br>s/ Mark S. Landman<br>mlandman@lcbf.com<br>Landman Corsi Ballaine & Ford P.C.<br>120 Broadway, 13th Floor<br>New York, NY 10271<br>Ph: (212) 238-4800<br>Fax: (212) 238-4848<br>*Counsel for Freddie Mac*<br><br>/s/ Thomas B. Fullerton<br>Thomas B. Fullerton (6296539)<br>Akerman LLP<br>71 S. Wacker Drive, 47th Floor<br>Chicago, IL 60606<br>(312) 634-5700<br>thomas.fullerton@akerman.com<br><br>/s/ Michael D. Napoli<br>Michael D. Napoli (TX 14803400)<br>Akerman LLP<br>2001 Ross Avenue, Suite 3600<br>Dallas, TX 75201 | s/ William J. Serritella, Jr.<br>William J. Serritella, Jr.<br>wserritella@taftlaw.com<br>Zachary R. Clark<br>zclark@taftlaw.com<br>Taft Stettinius & Hollister LLP<br>111 East Wacker Drive, Suite 2800<br>Chicago, IL 60601<br>(312) 527-4000<br>/s/ Jennifer Walker<br>Jennifer Walker<br>jjwalker@plunkettcooney.com<br>Plunkett Cooney, PC<br>221 N. LaSalle Street, Ste. 3550<br>Chicago, IL 60601<br>Ph: (312) 970-3410<br>Fax: (248) 901-4040<br>*Counsel for UBS AG*<br><br><br>/s/Scott Mueller<br>Scott B. Mueller, #6294642<br>(Scott.Mueller@stinson.com)<br>7700 Forsyth Blvd., Suite 1100<br>St. Louis, MO 63105<br>Phone: (314) 863-0800<br>Fax: (314) 259-3931<br>*Attorneys for BMO Harris Bank, N.A., and Midland Loan Services, a division of PNC Bank, NA, acting under authority designated by Colony American Finance* |

17

| | |
|---|---|
| (214) 720-4360<br>michael.napoli@akerman.com<br>*Counsel for Midland Loan Services, a Division of PNC Bank, National Association* | *Lender, LLC, assignee Wilmington Trust, N.A. as Trustee for the benefit of registered holder of Colony American Finance 2015-1*<br><br>/s/ David Hart<br>David Hart<br>(dhart@maddinhauser.com)<br>Maddin, Hauser, Roth & Heller, P.C.<br>28400 Northwestern Highway<br>Suite 200-Essex Centre<br>Southfield MI 48034<br>Phone: (248) 827-1884<br>Fax: (248) 359-6184<br>*Counsel for BC57, LLC* |

**CERTIFICATE OF SERVICE**

   I hereby certify that on February 10, 2022, I caused the foregoing **Motion for Appointment of a Fee Examiner, or, in the Alternative, to Establish a Practical and Cost Effective Procedure to Respond to The Receiver's Fee Allocation Motion and Sufficient Time To Do So** to be electronically filed with the Clerk of Court through the Court's CM/ECF system, which sent electronic notification of such filing to all parties of record.

                /s/ Michael A. Gilman