# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

|  |  |  |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | **Civil Action No. 18-cv-5587** |
| **v.** | ) ) | **Hon. John Z. Lee** |
| **EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN,** | ) ) ) ) | **Magistrate Judge Young B. Kim** |
| **Defendants.** | ) ) ) | |

## RECEIVER'S OPPOSITION TO INSTITUTIONAL LENDERS' MOTION TO APPOINT FEE EXAMINER AND/OR OTHER RELIEF

Michael Rachlis
Jodi Rosen Wine
Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Phone (312) 733-3950
mrachlis@rdaplaw.net
jwine@rdaplaw.net

*Attorneys for Kevin B. Duff, Receiver*

**Table of Contents**

I.  The Objectors Have Had Significant Time to Review the Receiver's Allocations and Can Make Objections through the Process Established by the Court ..........................................2

II.  A Fee Examiner Is Unnecessary and the Purported Need Is Unsupported.........................5

III.  None of the Examples Advanced by the Objectors Support the Remedy They Seek and the Delay that Would Result ....................................................................................................8

    A.  The Specific Allocation Examples Does Not Support Objectors' Motion .............8

        1.  The Objectors' Specificity Objection Was Not Raised Before Despite Ample Opportunity ......................................................................................8

        2.  The Receiver's Process for Allocation Established and Provided Exhaustive Details ......................................................................................9

        3.  The Objectors' Examples of Purported Deficiencies Establish No Such Deficiency ...............................................................................................12

    B.  The General Allocation Examples Do Not Support the Objectors' Motion .........14

    C.  The Single Lien Example Does Not Support Objectors' Motion .........................16

    D.  The "Uniformity" Rationale Does Not Support The Objectors' Motion...............17

    E.  The Objectors' Arguments Are Inequitable.........................................................17

**Table of Authorities**

*Danville Tobacco Ass'n v. Bryant-Buckner Assoc., Inc.,*
   333 F.2d 202 (4th Cir. 1964) ........................................................................6

*Gaskill v. Gordon,*
   27 F.3d 248 (7th Cir. 1994) ..........................................................................5

*In Re Collins & Aikman Corp.,*
   368 B.R. 623 (E.D. Mich. 2007).............................................................7 n.3

*In re Peterson*
   253 U.S. 300 (1920).......................................................................................6

*In Re UAL Corp.,*
   307 B.R. 80 (N.D. Ill. Bk. 2004)...................................................................6

*Scott v. Spanjer Bros., Inc.,*
   298 F.2d 928 (2d Cir. 1961)...........................................................................7

*SEC v. Elliott,*
   953 F.2d 1560 (11th Cir. 1992) ............................................................ *passim*

*SEC v. First Securities Co. of Chicago,*
   528 F.2d 449 (7th Cir. 1976) .........................................................................1

**Federal Statutes and Regulations**

11 U.S.C. §1104(c) .............................................................................................6

The District Court has approved the Receiver's fees, found them beneficial to the Estate, and directed the Magistrate Judge to address the Receiver's Fee Allocation Motion for purposes of reviewing the allocation of payments from the properties in the Receivership Estate for two categories of receivership activities. Consistent with generally-accepted precedent, this Court is not asked to do the impossible in reviewing the Receiver's Fee Allocation Motion and the corresponding allocations. Nor need it do so, especially as the Receiver has done the heavy lifting by creating allocation tables for each of the 108 properties against which the District Court has ordered application of the Receiver's lien for purposes of paying certain receivership expenses. The Receiver, who is the Court's appointed independent fiduciary, has complied with the Court's orders and followed the Court's approved allocation methodology.

None of nearly 900 other claimants have filed any objection or appeared before this Court to oppose the Receiver's proposed allocations. Nor has the SEC objected to the Receiver's allocations. *See, e.g., SEC v. First Securities Co. of Chicago*, 528 F.2d 449, 451 (7th Cir. 1976) ("In securities law receiverships, the position of the Securities and Exchange Commission in regard to the awarding of fees will be given great weight."). But faced with the prospect of this Court accepting the Receiver's thorough allocations as reasonable and created in good faith, the movant objectors now ask this Court to lose the forest for the trees and switch to a new field on which they can wage their opposition to the Receiver's efforts.

The objectors do not simply ask for a reasonable extension, *e.g.,* fourteen days, to prepare their objections, but instead they ask the Court to fashion a wholly-new yet completely undefined procedure, another layer of review and costs (all of which will be subject to more review, objections, and litigation), and for the first time ask that such expenses be paid from the properties' sales proceeds. In a new narrative that they are now the ones who are overburdened, these financial

1

institutions now assert that reviewing the Receiver's allocations is practically impossible for them. They argue that setting forth their objections to and litigating every single task, down to the tenth of an hour, will simply take them too long, cost too much, and lack uniformity. They argue it would be practically impossible for this Court to sift through each and every task and resolve all of the objections that they are planning to assert for each task. But this is an entirely false construct. The District Court did not direct this Court is "to perform the impossible," nor does applicable law require it to do so. *See SEC v. Elliott*, 953 F.2d 1560, 1578 (11th Cir. 1992). Rather, the Court is called upon to review the allocation of cost prepared by the Receiver consistent with the District Court's previously approved methodology for the Receiver's efforts between the properties "on the best basis it can determine." *Id.* (citations omitted).

Simply because the objectors wish to litigate to an atomic level and engage a fee examiner to review every single task description in the Receiver's invoices does not mean this is necessary. "What is required is that an earnest effort be made to devise a method of allocating the actual costs of the receivership to specific assets…." *Id.* This is what the Receiver has done. And that is all that this Court is called upon to do. The objectors' motion advances a new and unnecessary track that will not be helpful, but instead create a different and expensive ground for further litigation and motion practice.

## I. The Objectors Have Had Significant Time to Review the Receiver's Allocations and Can Make Objections through the Process Established by the Court.

The objectors' motion is a transparent effort to exponentially complicate this Court's review of the Receiver's allocations foist costs for this effort onto others and delay the entire process and payments on the approved Receiver's lien. The objectors first received detailed allocation spreadsheets for Fee Applications 1 through 8 on April 28, 2021. (Dkt. 981) In response, not once did they suggest that a fee examiner was necessary. (Dkt. 986, 988) In fact, the opposite

was suggested, as the objectors then stated that if the Receiver had shared the proposed allocations prior to filing, the objections that are now being asserted "could have been resolved without the Court's attention." (Dkt. 986 at 5 n.1). It could not be clearer that no fee examiner was necessary or contemplated.

And, in September 2021, the Receiver's counsel provided lead counsel for the objectors detailed allocation spreadsheets for Fee Applications 9 through 12. (*See* Dkt. 1107 at 8-9 (discussing provision of such materials); *see also* Ex. A (10/15/2021 email from J. Wine)) In the following weeks, Midland's counsel had no difficulty providing comments, questions, and concerns about the allocations to the Receiver. However, having only heard from Midland's counsel, the Receiver's counsel followed up in mid-October asking, "Are you planning to get back to us with comments regarding specific allocations for us to consider before we submit them to the Court? And if so, when do you anticipate doing so and how extensive are your comments likely to be?" (*See* Ex. A) In response, with no indication that they were unable to review the allocation spreadsheets nor that a fee examiner was needed or would be requested, and contravening their previous criticism that the Receiver should have reached out to them in advance, lead title counsel for the objectors merely responded, "we prefer to hold off commenting until we see the actual allocation per property." (*Id.*)

The objectors then received the pending fee allocation motion and schedules on December 22, 2021, and had 20 days before the presentment hearing before this Court to review the motion. They could have at that time, but did not, advise the Court that they could not timely review the Receiver's allocations. They also could have indicated, but did not, that they believed a fee examiner was needed. Instead, they told the Court that they had reviewed the motion (*see also* Motion, ¶¶ 9-10) and that they agreed to the schedule the Court set for submitting their response.

Furthermore, against the backdrop of this Court's careful order which noted that anyone intending to object to the Receiver's motion needed to appear (Dkt. 1116), at that hearing, only a few institutional lenders' counsel indicated that they planned to object (indeed, less than those who signed the motion at bar). Now, with their response due this week, the objectors have lobbed a figurative grenade to delay and derail the process indefinitely. This simply should not be countenanced, and must be considered within the following context.

Thirteen fee petitions have been filed, containing the time entries that underlie the allocations before the Court; eleven of them[1] have been scrubbed and opposed by these same objectors with their typical fervor. The District Court has overruled their objections and consistently noted that the Receiver's work has benefitted the properties and the estate. (*See, e.g.,* Dkt. 1030 at 4 (citing Dkt. 541, 614, 710, 824)) On October 26, 2020, after a full vetting and briefing, the District Court granted the Receiver's request for a lien. (Dkt. 824) In that order, the District Court approved the methodology to allocate property-specific fees to the properties, with the remaining approved fees allocated generally to the portfolio based on the percentage of each properties' gross sales price. *Id.* at 5 ("the Receiver's proposed methodology to allocate fees and expenses to individual properties is reasonable"). In compliance with the District Court's orders, the Receiver then diligently followed that methodology to allocate the tasks in each invoice approved by the Court; the Receiver has now completed allocations through December 31, 2021.

As noted, ten months ago the Receiver provided detailed allocations in support of his Motion for Approval to Pay Certain Previously Approved Fees and Costs. (Dkt. 947)[2] Those allocations were through June 30, 2020 (representing the first eight fee petitions), the last date for

---

[1] The 12th and 13th fee applications are pending before Judge Lee and have a briefing schedule for remaining objections and replies that goes through March 4, 2022. (Dkt. 1026, 1087, 1169) The 14th fee application was filed on February 14, 2022. (Dkt. 1181)

[2] *See also* Dkt. 346, 571, 602, 616, 633, 676, 680, 715, 789, 802, 841, 842, 910, 966, 979, 991, 1015, 1024.

which fees had been approved at that point. (Dkt. 755 at 22-24; Dkt. 824 at 5) (approving Receiver's proposal). Additional schedules were later presented after subsequent fee petitions were approved by the Court, and the Receiver offered those to lenders for review before they were filed; and a schedule was submitted with the 13th motion filed in November 2021. (Dkt. 981, 1087) As such, the objectors have had many of the invoices for years and additional allocation spreadsheets available for at least the first eight fee applications for nearly ten months.

Finally, the issue of appointing a fee examiner was never presented to the District Court, despite ample opportunity that the objectors have had over the past three years to do so. And the District Court has denied requests to retain additional professionals in this case, specifically to limit further costs against the estate and its assets.

## II.   A Fee Examiner Is Unnecessary and the Purported Need Is Unsupported.

The objectors' newly minted request for the appointment of a fee examiner is unsupported by their citations and the circumstances at bar. They have not cited any case in a federal equity receivership context, in which the Court enjoys broad discretion for approving fees and determining how they will be paid, as this Court has repeatedly noted. *See, e.g.,* Dkt. 614 (at 2), 710 (at 2), & 824 (at 2)); *see also Elliott*, 953 F.2d at 1577-78; *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994) ("[T]he court may consider all of the factors involved in a particular receivership in determining an appropriate fee."). For example, *Elliott*, frequently cited in this action by the Court and the parties, arises in a complex federal equity receiver context but no such examiner was involved. Indeed, here the District Court has already reviewed and/or is in the process of reviewing every fee petition and has considered all objections thereto. The District Court also has reviewed and approved the methodology for allocating fees to the encumbered

5

properties and has now asked this Court to review the allocations which are the culmination of review process, without a fee examiner.

Furthermore, the bankruptcy statute advanced by the objectors (11 U.S.C. §1104(c)) as a mandate for a fee examiner is not; in fact, it is wholly inapplicable. Even the objectors acknowledge that the provision is inapplicable on its face because the matter is not in bankruptcy. (Motion, ¶ 23) But even if one were to consider the potential applicability, premised on similarities in the administration between receiverships and bankruptcy cases, the section again is patently inapplicable as it applies only *when no trustee* has been appointed. (11 U.S.C. §1104(c) ("If the court does not order the appointment of a trustee….")). Furthermore, in a Chapter 11 context, the section applies "to conduct such an investigation *of the debtor* as is appropriate, including an *investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor.*" *In Re UAL Corp.,* 307 B.R. 80, 84 (N.D. Ill. Bankr. 2004) (emphasis added). This provision was enacted "as an alternative form of protection against corporate mismanagement." *Id.* at 86. None of these circumstances applies here.

In any event, the majority of the decisions cited by the objectors (Motion, ¶¶ 22-24) did not involve appointment of a fee examiner relative to a receiver's or trustee's fees. In *UAL*, the issues involved representations made by the debtor regarding retirement benefit issues that were at issue in the bankruptcy. *In re Petersen* involved an auditor that looked at the merits dispute of the litigants regarding contractual compliance. *Danville Tobacco* also did not involve a fee dispute but issues regarding that allotment of public auction time in warehouses associated with tobacco

sales. And *Scott v. Spanjer* involved the appointment of a medical expert to examine an infant.[3] The bottom line is there is no basis to rely upon the legal authorities advanced by the objectors.

Further, the hypocrisy of the objectors cannot be overlooked, for indeed that also demonstrates the lack of substance for their position. On this issue, the objectors not only advocate a fee examiner but want to have the cost allocated to the properties (not paid out of pocket). Yet, when the Receiver, the Court's appointed independent fiduciary, has made (and is making) such a request for *approved* fees subject to an *approved* Receiver's lien, the objectors have brought out a full court press on every occasion to oppose such a request. It is evident that the objectors actually and simply seek delay and to avoid performing the work or shouldering the cost themselves, unlike the Receiver who with minimal staff and at his own cost has devoted significant time and energy to such issues as the Court approved and requested, all the while continuing in the efforts towards handling asset management and the claims process (among other activities) for the Estate.

Finally, even if a fee examiner were appointed (though it should not), that would not eliminate skirmishing with the objectors over the Receiver's fee allocations. Locating someone to serve and setting rules for engagement and the nature of the review will inevitably lead to further disagreement, objections, motion practice, and delay – as the docket in this action plainly shows. This Court would still need to review a fee examiner's work and resolve objections relating to such work, which ultimately will be reviewed by the District Court. In short, it would be a further layer of administration, review, motion practice, and costs, resulting in less money for distribution to claimants, more delays, and further postponing addressing compensation pursuant to the Receiver's lien.

---

[3] *In Re Collins & Aikman Corp.,* 368 B.R. 623 (E.D. Mich. 2007) did involve appointment of a fee examiner in a matter involving the billing from twenty (20) professional firms an approaching 100 million dollars, including a motion for such examiner by the appointed trustee.

**III.    None of the Examples Advanced by the Objectors Support the Remedy They Seek and the Delay that Would Result.**

As reflected in the District Court's order of August 17, 2021 (Dkt. 1030), what is required "is that an earnest effort be made to devise a method of allocating the actual costs of the receivership to specific assets and that the [allocation] order . . . disclose the results of this effort." *Elliott*, 953 F.2d at 1578.  The District Court has approved the allocation methodology and the Receiver's allocation spreadsheets disclose the results of those efforts here.  Indeed, while the objectors chide the Receiver in regards to the time and effort taken on refining the proposed allocation (Motion, ¶ 8), those efforts reflect that the Receiver – without *any* cost to the Receivership and at his own expense and that of his firm – spent significant time and money in an "earnest effort" to devise a method of allocating actual costs and generate those results. The Receiver did so on his own for *all* properties, unlike the objectors who have only their own their own properties to consider.  Nothing prevents each objecting institutional lender from addressing the spreadsheet that is unique to the properties against which they have asserted liens, which is a much more limited task than that undertaken by the Receiver and consistent with the process envisioned by the District Court.

**A.  The Specific Allocation Examples Does Not Support Objectors' Motion.**

The objectors argue there are "overwhelming deficiencies, most notably involving the lack of detail" supporting the specific allocations.  (Motion, at 2)  Their argument that the descriptions are not specific enough and that there is a need for more information is not only untimely, but also wrong, superficial, and extremely misleading.

*1.  The Objectors' Specificity Objection Was Not Raised Before Despite Ample Opportunity.*

As discussed above, the objectors had ample opportunity to complain about specific entries when the fee applications were presented, but they routinely failed to do so. Nor did they raise any specificity issue in regards to task narratives when the Receiver's lien and fee allocation methodology were presented to the Court. The District Court itself has noted that the objectors have repeatedly failed to offer specifics with their objections. (*See, e.g.,* Dkt. 710, at 4; Dkt. 1031, at 11 n.31.) And they still failed to raise any issue about task narrative specificity when agreeing to file their objections by February 18, 2022. But now, days away from their objections being due, the objectors assert that they "*discovered* … that the Receiver repeatedly failed to include in his time records reasonable detail concerning the Properties for which services were rendered." (Motion, at 6, ¶ 10) This ignores reality. There was no "discovery."

2. *The Receiver's Process for Allocation Established and Provided Exhaustive Details.*

As to the purported lack of detail, the objectors myopically focus only on task descriptions and only as they appeared in the original invoices. They fail to acknowledge the tremendous information present in the allocation spreadsheets for all 108 properties and the corresponding invoices. They ignore that: the Receiver has provided a specific allocation for each and every task, in accordance with the allocation methodology approved by the Court; the tasks are organized according to SEC billing categories; the incremental time for each task is recorded in tenths of an hour; the original invoices include some property allocations; and, significantly, that the allocation spreadsheets provide this information comprehensively.[4]

In order to prepare the first set of allocation spreadsheets submitted to the Court, the Receiver worked with an outside vendor to place all of the timekeeping entries in all of the invoices

---

[4] To ensure the integrity of the tasks as they were originally submitted to the Court in the invoices, no changes were made to the wording of those tasks as they appear in the allocation spreadsheets. This allows one to look at the allocation spreadsheet and find the exact same task description in the original invoice. If the task as written did not reflect an allocation on its fact, one was added in the allocation spreadsheets.

for the Receiver and RDP into spreadsheets, resulting in each task having its own row and associated data. The Receiver and the vendor then developed a series of automated allocation rules in an effort to provide allocations and appropriately differentiate between discrete types of tasks. For example, rules were created to capture references to the different numbered motions to approve the sales of properties (*e.g.,* fourth, fifth, etc.) and ensure that only those properties that were the subject of those different motions received an allocation according to that rule. After those rules were implemented, the rules were refined.

After that, each timekeeper undertook a manual review of all of the task entries corresponding to their submitted time to ensure that any task allocated by rules were properly allocated or corrected and to add allocations where none were included in the original task description or assigned as a result of the automated rules. Timekeepers referenced various documents and records such as e-mails, notes, and pleadings to ensure allocations were proper and accurate. In some instances, this effort took weeks given the intensive, thorough, complete nature of the review. As each of the timekeepers completed their allocation reviews, their work was then reviewed by the Receiver and/or Ms. Wine at the direction of the Receiver (and frequently by both). The allocations were also reviewed for technical errors or spreadsheet discrepancies by the vendor, who identified discrepancies for the Receiver to review, approve, or resolve.

After further instruction from the District Court in its August 2021 orders (Dkt. 1030, 1031), the Receiver undertook yet another exhaustive review of all 30,000 tasks in the first 12 fee applications. The Receiver took into consideration the Court's rulings on the Receiver's lien and fee applications, which categories of activities were approved for application of the lien, and objections or feedback that had been raised by certain lenders' counsel who communicated with the Receiver. In addition to working to ensure that allocations were accurate and complete, these

efforts specifically addressed the Court's request that the Receiver "be mindful of Elliott's admonishment that an across-the-board allocation may be inappropriate." (Dkt. 1020, at 16 n.8 (citing *Elliott*, 953 F.2d at 1578))  To that end, the Receiver made further differentiations to refine the allocations.  The Receiver accounted for allocation differences based on geography, property damage, code violations, utility bills, lawsuits, property security, insurance renewal, real estate taxes, and sundry other property-specific issues to ensure that allocations were made to those properties involved in those various activities.[5]  The objectors ignore that the specific allocations are now part of the express information that the Receiver has provided to demonstrate that each of the tasks for which a specific allocation has been provided relate to the identified specific properties, and further fail to acknowledge how the process approved and instituted by the District Court has created a high degree of specificity and accuracy for the allocations.

In manufacturing its lack of detail position, the objectors also ignore the detail provided by the accompanying fee applications, status reports, and other matters in the record which well-document the nature of the work in which the Receiver was engaged at various times.  In instances where a task describes work without great detail, in addition to allocations now added in the spreadsheets, the Court's docket includes fee applications, status reports, motions, briefs, and other filings that demonstrate the nature of the work that was being undertaken in greater detail. The

---

[5] The objectors criticize the Receiver for purportedly filing the Fee Allocation Motion "116 days after it was originally to be filed."  However, in addition to all of this work that is described, the objectors ignore that during this time the Receiver also: undertook this additional review of the fee tasks for their benefit to ensure the allocations were accurate; solicited additional feedback directly from the objectors counsel (having heard from and providing information to counsel for one of the lenders); simultaneously implemented, administered, and participated in the claims process for Group 1 claims; worked with counsel for the sole lien claimants to develop a wholly separate claims process for 28 of the properties and started review of those claims; marketed and sold several properties; and timely fulfilled all other duties and deadlines, including preparation and filing of status reports and fee applications.  Moreover, the vendor the Receiver relied on for preparation of the allocation spreadsheets at the heart of the Receiver's Fee Allocation Motion had a complete turnover of personnel during this period.

District Court, too, has noted that the docket provides a wealth of information about the nature of the Receiver's activities. (*See, e.g.,* Dkt. 1030, at 11 (and citations therein))

The objectors further ignore the detail obtained from other time entries. Frequently, the context for individual tasks is provided, clarified, or made clearer from the tasks described in surrounding entries. This includes not only the other tasks by the same timekeeper on the same day in the same billing category, but also similar tasks by different timekeepers on the same day in the same billing category as well as other tasks by the same timekeeper on different days in the same billing category. Such entries also provide context and insight regarding timekeepers, who may have spent time on distinct elements of the Receivership. These issues and factors are representative of the many ways in which the Receiver properly allocated the tasks to specific properties and of the information that provides the details for the specific allocations set forth in the 108 different allocation spreadsheets and disproving the contention that the allocations are based on a lack of information.

   3.  *The Objectors' Examples of Purported Deficiencies Establish No Such Deficiency.*

The objectors own examples prove the point that they simply ignore the details provided for the allocations. For example, in Exhibit B to their motion, the first yellow highlighted task reads: "Prepare for and meet with property manager and A. Porter (1.7)." They argue this task "demonstrates the problems with the Allocations" and "lack[s] sufficient information to assess whether the task is attributable to a particular property because they do not reference a specific property." (Motion, at 7, ¶ 13, 1st bullet & Ex. B) In fact, the allocation spreadsheets for this particular property (*i.e.,* 5001 Drexel) and others show that the Receiver has specifically allocated this task to 5001 Drexel and other properties. The objectors know without needing to be told that the property manager referenced is WPD Management because they know it managed 5001

Drexel. They also know from this task description that the length of the meeting was 1.7 hours, it included Mr. Porter, and related to Business Operations. They know the timekeeper was Mr. Duff and his billing rate is $390. They know that the value of the task was $663 (*i.e.*, 1.7 hours x $390). They further know that the share attributable to 5001 Drexel was $9.75, which means that 5001 Drexel was one of 68 properties for which this task was allocated (*i.e.,* $663 / $9.75 = 68). This stands to reason because the task reflects a preparation for and discussion between WPD, Mr. Porter, and Mr. Duff, relating to all of the properties (68) that WPD had under management at the beginning of the receivership. Moreover, this was the first meeting between the Receiver and the property manager (reflected by the date), which provides context for the length of the meeting and the fact that it was wide-ranging in nature, but obviously related to property management, Business Operations, and all of the properties managed by that particular property manager at that time.

By comparison, Mr. Porter's time for that date reflected the same meeting and noted that the meeting was "regarding roles and responsibilities, background of properties under management, accounting issues, cash management, and action items." (*See* Motion, Ex. B, 8/22/18, Business Operations, A. Porter task narrative) The objectors ignore the obvious and clear connection between these tasks and instead wrongly lump Mr. Porter's entry into a "blue" category which they assert as contrary to *Elliott's "*across-the-board" admonition. But this is wrong, as noted above, and because the allocation purposefully and correctly is not an across-the-board allocation but rather is only an allocation to those properties managed by the particular property manager. And the allocation is made in a manner that is consistent with the allocation methodology approved by the District Court.[6] Thus, all of this information in the Receiver's allocation

---

[6] The District Court has already found that there was "a significant need for the Receivership assets to be managed by a neutral party" (Dkt. 1030, at 11), that "the Receiver's efforts on that front have benefited and will continue to benefit the Receivership Estate" (*id.*), that the Receiver's efforts in this regard are well-documented (*id.*), and that "it is fair and equitable that the Receiver's lien take priority over the liens of any

spreadsheets and invoices in fact, show not that they "lack sufficient information to assess whether the task is attributable to a particular property because they do not reference a specific property" (Motion, at 7, ¶ 13, 1st bullet & Ex. B) as the objectors assert, but that the Receiver has properly and adequately the allocated the task to this particular property (*i.e.,* 5001 Drexel) and others.

By way of further example, taking the first "pink" highlighted task of which they complain (Motion, Ex. B), the objectors again ignore the information provided in order to advance their position. This task narrative provides, "study correspondence from property manager representative regarding compensation structure." The information disclosed with this task reveals substantial information that the objectors ignore. Much of the comments discussed above apply to this entry. The information provided also shows the task occurred at the absolute beginning of the receivership so it is appropriate and not surprising that the Receiver discussed compensation with the property manager. It is astonishing the objectors would question the need for work to ensure that the properties remained under management under reasonable terms to preserve their alleged collateral. The Court certainly recognized this need (*e.g.,* Dkt. 1030, at 11).

Notably, while the objectors dispute the nature and extent of the benefit represented by the efforts described in the fee applications that District Court has approved, there is no requirement that each individual task entry describe in detail the benefit bestowed on each property. As the court notes in *Elliott*, "a benefit to a secured party may take more subtle forms than a bare increase in monetary value. Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation." *Elliott*, 953 F.2d at 1577 (citation omitted).

**B. The General Allocation Examples Do Not Support the Objectors' Motion.**

---

and all secured creditors with respect to this first category of fees and expenses" (*i.e.*, "the preservation, management, and liquidation of certain real estate belonging to the Receivership Estate") (*id.* at 11-12).

The objectors also suggest that the allocations labelled "general" allocations (to distinguish them from the "specific" allocations somehow support the need for a "fee examiner" or a wholly different process. But the "general allocations" were applied by the Receiver consistent with *Elliot* and follow the allocation methodology approved by the District Court in this case. (*See* Dkt. 824, at 5) Notably, the general allocations for fees that District Court has already approved represent less than 20% of all allocations that are the subject of the allocation spreadsheets prepared by the Receiver; and they are segregated and consolidated into a single spreadsheet for ease of review. Moreover, the "general allocations" are not divided by counting heads, against which *Elliott* cautions; instead, the allocations are weighted according to the relative sale price of each property, which is a method proposed by the Receiver intentionally to comply with *Elliott.* (Dkt. No. 638, at 23-25) and approved by the District Court (Dkt. 824, at 5)

The objectors' criticism of the general allocations also ignores the significance of billing categorization for each task within the general allocations. The allocations in the Receiver's pending fee allocation motion are only within the billing categories that the Court approved for application of the Receiver's lien. (Dkt. 1030) The "general" allocation tasks thus align with the two categories of activities that the Court found beneficial to all of the properties and claimants: "(1) the preservation, management, and liquidation of certain real estate belonging to the Receivership Estate; and (2) the implementation and management of an orderly summary claim-priority adjudication process." (Dkt. 1030, at 2, 11)

"As to the first category, [as the Court itself has said,] the Court has repeatedly found that there has been a significant need for the Receivership assets to be managed by a neutral party until an orderly claims process is concluded, and the Receiver's efforts on that front have benefited and will continue to benefit the Receivership Estate." (*Id.* at 11 (citing, *e.g.,* Dkt. 824, at 3; Dkt. 710,

at 3; Dkt. 614, at 3))  In finding such activities beneficial to the Estate, the Court was relying not merely the invoices corresponding to such work but also that, "over the past three years, the Receiver has documented in numerous filings his efforts to preserve, operate, maintain, and ultimately sell the more than 100 properties in question, including addressing numerous health and safety issues (such as the more than two dozen open building code violations, as an example), overseeing significant repairs and improvements, paying the required real estate taxes, and litigating various state court actions involving the properties." (*Id.* (citing Dkt. 258, at 17-18; Dkt. 467, at 2-7; Dkt. 839, at 11-12))  And, based on this record, the Court found "that these activities benefited the Estate at a whole, as well as all of the creditors collectively." (*Id.*)  Furthermore, the Court has rejected the notion that the objectors and the properties against which they have asserted claims were not benefited because the properties were "underwater" and should never have been administered in the first place. (*Id.* at 11-12; *contrast* Motion, at 4, ¶ 2)

In respect to the second category, the District Court also has already found that "[b]y developing and implementing the summary claim-priority adjudication process, the Receiver has conferred a similar benefit here, regardless of which claimant is determined to be the first-priority secured lienholder at the end." (Dkt. 1030, at 13)  In this regard, these allocations do specifically refer to tasks associated with the properties, but as noted could not be further broken down.

Overall, what is evident is that the objectors appear here to simply wish to raise a global objection to these items which they suggest violates *Elliott*.  While this objection is without merit substantively, in no way does it justify the need of a fee examiner.

**C.  The Single Lien Example Does Not Support Objectors' Motion.**

The examples associated with the objections to what is referred to as the single lien claim process also do not support the need for anything other than what these lenders said they were to

16

going to do – review the material and providing the court with their objection. The Receiver does not agree with the points raised as these objectors seek to reject allocations for time spent associated with questions on the single lien claims process (a process which the court later implemented and is currently supervising), but those objections do not necessitate any of the relief being sought by their motion to appoint a fee examiner. If anything, they have demonstrated by this type of objection that they can make objections based on the Receiver's allocations (even if they are without merit).

### D. The "Uniformity" Rationale Does Not Support The Objectors' Motion.

The objectors also claim that a fee examiner or other process is necessary because having numerous individuals review the schedules will hurt "uniformity." This is a non-issue. Here, when it has come to objections, these lenders have had no problem gathering themselves and making countless filings and submissions that were put together as one, as well as separately. The record is overflowing with evidence of their ability to fashion both joint and individual objections. Their argument also ignores the fact that many of them have the same counsel. This notion is not a reason to derail the current process or order a new one.

### E. The Objectors' Arguments Are Inequitable.

Finally, the inequity of putting a further economic burden on the properties themselves, and on the Receiver and his retained professionals by delaying payment under the Receiver's lien should not be overlooked. In this regard, it is also important to remember the objectors themselves have been a major and substantial contributor to the length and complexity of the Receiver's invoices and allocation spreadsheets. As the District Court has expressly observed, the objectors themselves have been a major and substantial contributor to the length and complexity of the Receiver's invoices and allocation spreadsheets. (*E.g.,* Dkt. 1031 n.32; *see also* Dkt. 1030

at 8 (itself quoting Dkt. 710 at 4-5))  This should be juxtaposed with the objectors' position now advanced looking to avoid payment and work on their part, which is at the least an implied admission that their litigation tactics end up creating more cost than the amounts at issue.

WHEREFORE, The Court should deny the motion and maintain the current schedule – to which the objectors agreed – for the objecting institutional lenders to respond with their objections to the Receiver's allocation motion.

Dated:  February 16, 2022                    Respectfully submitted,

s/ Michael Rachlis
Michael Rachlis
Jodi Rosen Wine
Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Phone (312) 733-3950
mrachlis@rdaplaw.net
jwine@rdaplaw.net

*Attorneys for Kevin B. Duff, Receiver*

18

## CERTIFICATE OF SERVICE

I hereby certify that I provided service of the foregoing Receiver's Opposition To Institutional Lenders' Motion To Appoint Fee Examiner And/Or Other Relief, via the Court's CM/ECF system, to all counsel of record on February 16, 2022.

/s/ Michael Rachlis

Michael Rachlis
Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Phone (312) 733-3950
Fax (312) 733-3952
mrachlis@rdaplaw.net

| | |
|---|---|
| **From:** | Gilman, Michael |
| **To:** | Jodi Wine; Michael Napoli; Mueller, Scott B.; Gale, Todd; Weil, Edward |
| **Cc:** | Kevin Duff |
| **Subject:** | RE: Fee Allocation Spreadsheets |
| **Date:** | Friday, October 15, 2021 1:01:22 PM |

Jodi,

We appreciate your transmittal of the spreadsheet, but we prefer to hold off commenting until we see the actual allocation per property. We understand from your prior e-mail that you will provide the allocation per property in the filed motion.

Thanks.



| | | | |
|---|---|---|---|
| | **Michael A. Gilman**<br>Attorney<br>MGilman@dykema.com | 312-627-5675 Direct<br>312-876-1700 Main<br>866-925-0914 Fax | 10 South Wacker Drive, Suite 2300<br>Chicago, Illinois 60606<br>www.dykema.com |

**From:** Jodi Wine <jwine@rdaplaw.net>
**Sent:** Friday, October 15, 2021 12:31 PM
**To:** Michael Napoli <michael.napoli@akerman.com>; Mueller, Scott B. <scott.mueller@stinson.com>; Gilman, Michael <MGilman@dykema.com>; Gale, Todd <TGale@dykema.com>; Weil, Edward <EWeil@dykema.com>
**Cc:** Kevin Duff <kduff@rdaplaw.net>
**Subject:** Fee Allocation Spreadsheets

**\*\*\* EXTERNAL\*\*\***

Counsel:

On September 28 or 30, I provided each of you with a spreadsheet containing the allocations of fees to properties for the Receiver's 9th - 12th fee applications.

I am following up regarding your intentions with relation to these allocations. Are you planning to get back to us with comments regarding specific allocations for us to consider before we submit them to the Court? And if so, when do you anticipate doing so and how extensive are your comments likely to be?

We currently have a deadline to submit our motion with the allocations to the court next Thursday, October 21, and it appears that we will need to request another extension of this deadline to allow adequate time to consider your feedback. It would be very helpful in this regard if we knew what to expect in order to better estimate the time that will be needed.

Exhibit

A

Thank you,
Jodi

Jodi Rosen Wine
Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, Illinois 60605
jwine@rdaplaw.net
mobile  312-351-3231
direct   312-275-5108

*** Notice from Dykema Gossett PLLC: This Internet message may contain information that is privileged, confidential, and exempt from disclosure. It is intended for use only by the person to whom it is addressed. If you have received this in error, please (1) do not forward or use this information in any way; and (2) contact me immediately. Neither this information block, the typed name of the sender, nor anything else in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message.