**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ) ) ) | |
| Plaintiff, ) | Civil Action No. 18-cv-5587 |
| v. ) | Hon. John Z. Lee |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, ) ) ) | Magistrate Judge Young B. Kim |
| Defendants. ) | |

**RECEIVER'S REPLY IN SUPPORT OF HIS THIRTEENTH (13TH) INTERIM APPLICATION AND MOTION FOR COURT APPROVAL OF PAYMENT OF FEES AND EXPENSES OF RECEIVER AND RECEIVER'S RETAINED PROFESSIONALS**

Certain institutional lenders (out of the more than 900 claimants) have filed the only objection (Dkt. 1188) to the Receiver's 13th Fee Application (Dkt. 1087), for services between July 1, 2021 and September 30, 2021. Notably, the SEC communicated with the Receiver that it has no objection to the fees set forth in the Receiver's 13th Fee Application and confirmed that such fees comply with the SEC guidelines.

As to the objectors, the latest objections reference prior objections to the Receiver's pending fee applications (*see* list, Dkt. 1188, at 2), and raise a limited number of unfounded new objections. Like the objectors, the Receiver incorporates by reference herein the responses, explanations, and arguments set forth in his replies to the objectors' prior objections (Dkt. 527, 607, 703, 800, 923, 971, 1003, and 1206), as well as the underlying fee applications (Dkt. 411, 487, 569, 576, 608, 626, 755, 778, 885, 945, 993, 1026, and 1087), and also refers the Court to the SEC's reply in support of the Receiver's prior fee applications (Dkt. 526, 606, 622, 705, 797, 803,

922, 970, and 1002). The Receiver endeavors below to only address matters that require updated information or raise new points that have not been previously addressed in other filings.

The objectors devote half of their Response to their spin on procedural history and context. (Dkt. 1188, at 1-4) Rather than belabor or take specific issue with this recitation, the Receiver directs the Court to his prior submissions that cover the relevant procedural history and context of his fee application, and particularly with respect to the allocation issues that are a major undercurrent of the objectors' Response. (*See, e.g.,* Dkt. 1107, 1182)

   1. **The Objectors Ignore the Billing Categories and Other Information Provided in the Fee Applications, Invoices, and Allocations in Errantly Asserting that the Fees and Expenses of the 13th Fee Application Are Not within the Categories Approved by the Court.**

As an initial matter, the objectors wrongly assert that Exhibit J to the Receiver's 13th Fee Application does not show "the amount" of the Receiver's allocation to a particular property. (Dkt. 1188, at 5) The face of Exhibit J shows this is wrong. (Dkt. 1087, Ex. J) In fact, every incremental task down to the tenth of an hour is set forth in Exhibit J and reflects the Task Hours, the Task Rate, the Task Cost, the Property Allocations (*i.e.,* the address of each of the properties to which the task is allocated), and the Property Allocation Count (*i.e.,* the number of properties to which the task is allocated).

The objectors also assert an objection premised on the notion that there are allocations "based upon the gross proceeds from the sale of the property, without consideration of the tasks performed for a particular property or the benefit to that property." (Dkt. 1188, at 5) This objection is baseless, ignores the allocations that the Receiver has provided, and presumes, wrongly, that the Receiver has not considered which properties each task relates to and the benefits obtained. In fact, for purposes of the allocation analysis, the Receiver has only allocated tasks to a specific property if the task relates to that property and falls within one of the categories that the Court has

already found benefited the properties and the claimants. For example, the Receiver only allocated claims-related tasks for the five Group 1 properties to those five properties and when appropriate only allocated claims-related work to an individual property when the task only related to that specific property.[1] Moreover, for fees allocated to all properties, the Receiver used the Court's approved allocation methodology (Dkt. 824, at 5), which allocates according to the relative value of each property in a manner that aligns with the benefit received by each. All of this information, including the Receiver's allocations (both specific and general), is reflected in the fee application, the invoices submitted, the allocation summary set forth in Exhibit J to the fee application, and in property allocation spreadsheets filed and provided to all claimants (Dkt. 1107, Exs. 1-3).[2]

Without any challenge to the fees themselves, the objectors wrongly assert that the Receiver has not shown that the fees and expenses in the 13th Fee Application are within the categories of tasks that the Court has approved for application of the receiver's lien. (*See* Dkt. 1188, Section II) The first example raised by the objectors is that "some" of the tasks are related to the claims process for the Group 1 properties. In fact, the Receiver expressly allocated such tasks either to "Group 1" (*i.e.,* all five properties in Group 1) or to specific properties within Group 1. The Court can and should approve such fees.

Next, they object to tasks related to "City of Chicago code violation matters which *may have arisen* from acts or omissions of the Receiver and his property managers…." (Dkt. 1188, at 6 (emphasis added)) They then assert, "[t]he creditors should not bear the costs arising from *those* errors and omissions." (*Id.* (emphasis added)) This is a specious argument. They deftly ignore

---

[1] The Receiver also excluded tasks from the Asset Disposition, Business Operations, and Claims billing categories that are not beneficial to the properties or the claimants.

[2] The allocation spreadsheets filed with the Receiver's Fee Allocation Motion that has been referred to Judge Kim (Dkt. 1107) include the allocations for the Receiver's 12th and 13th Fee Applications, and the motion indicated that these two applications had not been approved by the District Court at the time of filing.

the inconsistency of their own argument, which acknowledges uncertainty ("may have arisen") about whether it is even true but then makes the sweeping charge that they should not bear the cost for "*those* errors and omissions." (*Id.* (emphasis added))  Nowhere do they identify any such errors and omissions, let alone anything that supports withholding approval for the fees and costs associated with such work.  In fact, the record shows that the Receiver (i) worked with the assistance of counsel and property managers to address building code violations, including some for which the City failed to provide proper or timely notice, (ii) favorably resolved or obtained dismissal of certain violations, and (iii) referred the City to the claims process for asserting claims. (*See* Dkt. 1087, at 5-6 & nn.2-3; *see also* Dkt. 1026, at 5-6 & nn.2-3; *see also* Dkt. 1181, at 5 (14th fee application); Dkt. 1201, at 13-14 (submission on Group 1 claims))  And the Court itself has previously noted that this is precisely the type of work by the Receiver and his retained professionals that has conferred a benefit.  (*See* Dkt. 824, at 4 ("representing those properties in adverse litigation"))

       The next objection concerns tasks relating to "restoration motions" and their argument is premised on the misplaced notion that the tasks described relate to "rent restoration."  (Dkt. 1188, at 6-7)  They suggest, without basis, that such work somehow relates to an improper commingling of rents, fees, and expenses.  (*Id.*)  But the February 2019 Order they cite (Dkt. 223) has nothing to do with the work at issue in the 13th Fee Application, which concerns the period from July 1, 2021 through September 30, 2021.  As previously reported to the Court and to the objectors, the rent restoration ordered by the Court (Dkt. 223) was wholly completed in September 2020.  (Dkt. 985, at 8)  In fact, the tasks at issue here related, for example, to gathering information to ensure proper accounting for expenses relating to specific properties, tracking and reviewing property management records for proper expense charges and accounting, confirming the properties for

4

allocation of expenses paid for out of general receivership funds, and ensuring that any funds expended for the benefit of any specific properties out of general receivership funds are restored to the Receivership and that no property bears more than its share of any such expenses. None of this work had anything to do with either the use of rental income from one property for the benefit of another nor did it relate to or involve any commingling of rental income of any sort. A prime example is work done to ensure that insurance premiums, which the Receiver paid on behalf of the properties out of general receivership funds, are properly accounted for and allocated to those properties.

The objectors then complain, without any specificity, that "[s]ome of the fees clearly do not fall within any of the Court-approved categories…." (Dkt. 1188, at 7) Their only example is "fees incurred with respect to a third-party subpoena." (*Id.*) It seems they are complaining about subpoenas issued in connection with the claims process or other work related to claimants' requests to obtain claims records. (*See, e.g.,* Dkt, 1190, at 20-22, orange entries) Yet, the claims process approved by the Court provided for service of certain third-party subpoenas (*e.g.,* to title companies) by the Receiver. (Dkt. 941, ¶ 9(e)) The Court has previously noted that "the Institutional Lenders will reap the benefits of the process," in connection with claims-related discovery "to untangle the morass of competing claims." (Dkt. 1030, at 13-14)

Midland and U.S. Bank next object to the allocation of claims-related work for the single-claim properties.[3] They first object "to any fees related to implementation and management of the

---

[3] The 28 single-claim properties are: 10012 S LaSalle Avenue; 1017 W 102nd Street; 11318 S Church Street; 1516 E 85th Place; 2129 W 71st Street; 2136 W 83rd Street; 3213 S Throop Street; 406 E 87th Place; 417 Oglesby Avenue; 6554 S Rhodes Avenue; 6749-59 S Merrill Avenue; 6759 S Indiana Avenue; 6825 S Indiana Avenue; 7110 S Cornell Avenue; 7210 S Vernon Avenue; 7712 S Euclid Avenue; 7922 S Luella Avenue; 7925 S Kingston Avenue; 8030 S Marquette Avenue; 8104 S Kingston Avenue; 8107 S Kingston Avenue; 8346 S Constance Avenue; 8403 S Aberdeen Street; 8432 S Essex Avenue; 8517 S Vernon Avenue; 8529 S Rhodes Avenue; 9212 S Parnell Avenue; 9610 S Woodlawn Avenue.

5

summary claim-priority adjudication process after January 30, 2020." (Dkt. 1188, at 7 (citing Dkt. 624)) As initial matter, while it is not clear from their description, it appears these objectors are distinguishing between the claims process for multiple claims against properties (sometimes referred to in other filings as the "disputed claims process") (Dkt. 941) and the separate claims process demanded by the objectors and approved by the Court for single claim properties (*i.e.,* properties as to which the Receiver only received one claim, which is sometimes referred to in fee task descriptions as the "sole lien" process) (Dkt. 1090). To be clear, the Receiver has neither attempted nor intended to allocate work relating to the disputed claims process that was performed during 3Q2021 to the 28 properties that are the subject of the separate claims process for single-claim properties.[4] For this reason alone, any objection in this regard by Midland and U.S. Bank should be overruled. In addition, for allocations that the Receiver intended to allocate to those 28 properties, either the task description includes a specific "sole lien" reference or the only properties to which the task was allocated are the 28 single-claim properties.[5]

With respect to the Receiver's work related to this separate single-claim process, the Receiver disagrees that it is not properly allocated to the 28 properties at issue. The only other argument presented for not approving these allocations is that if the Receiver successfully objects the objectors' claims against the single claim properties then the proceeds of the sale of those properties will become available for the benefit of unsecured creditors. (Dkt. 1188, at 8) But that argument ignores that the Receiver's considerable efforts to negotiate and implement a fair,

---

[4] Note that Exhibit J to the Receiver's fee application (Dkt. 1087) includes a column labeled, "Property Allocation Count." None of the tasks in the Claims billing category for the 13th Fee Application are allocated to all properties in the Estate. Tasks only allocated to the 28 single-claim properties are easy to identify as the Property Allocation Count is shown as, "28."

[5] While the objectors reference January 30, 2020 as a line of demarcation, the proper date is January 29, *2021*, which is the date that the Court first expressed the need for a separate claims process for single-claim properties. Until that point, the Court had consistently indicated that all disputes relating to all properties should be handled as part of a single claims process.

6

reasonable, and streamlined process is a benefit. In addition, the objectors ignore that some of these properties have title histories that raise questions that may impact their claims, even though they alone submitted a claim to the Receiver, which was the subject of extended discussions between the Receiver and the objecting claimants. Thus, not only implementing a process, but creating a public record to that gives others notice and an opportunity to be heard benefits the objectors.

Further, as they are aware, but fail to note, the Receiver worked with the objecting claimants to coordinate, prepare, serve, pursue, and gather discovery from third parties in connection with the single claim process, which the objectors themselves sought in connection with the process; the Receiver also has prepared joint status reports and taken on various other tasks together with and for the benefit of the sole lien claimants. (*See, e.g.,* Dkt. 1073, 1090) And, as this Court has itself noted, the benefits provided by the Receiver may take subtle forms and are not limited to financial benefits. (*See, e.g.,* Dkt. 1030, at 10-14; *SEC v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992))

Finally, while the objectors cite to *Elliott* on the basis that secured creditors "'are not liable for the Receiver's time spent on activities adverse to them,' including 'the time the Receiver spent opposing their claims to be secured" (Dkt. 1188), they make no showing that any of the time set forth in the 13th Fee Application was adverse to them or reflected time opposing their claims. They do not even assert, because they cannot, that the Receiver has opposed their claims. On the contrary, the tasks at issue reflect time that the Receiver and his counsel spent was working jointly with the objectors to determine the separate process that they demanded. Under the process approved by the Court, there will come a time for the Receiver to oppose their claims, if necessary and appropriate, but that time has not yet come. (Dkt. 1090 ("The Receiver's position paper with

7

regard to the single-claim properties is due 4/29/22. If the Receiver objects to a claim, the position paper shall set forth the factual and legal basis for that objection."))

### 2. The Court Should Overrule Objections to the Receiver's Allocations.

"[I]f a receiver reasonably and diligently discharges his duties, he is entitled to compensation." *Elliott*, 953 F.2d at 1577 (citation omitted). In reviewing fee applications in this action, this Court is not required by applicable law "to perform the impossible," *Id.* at 1578. Rather, the Court need only review the allocation of cost prepared by the Receiver consistent with the District Court's previously approved methodology for the Receiver's efforts between the properties "on the best basis it can determine." *Id.* (citations omitted). Simply because the objectors wish to continue to object and litigate every single task description in the Receiver's invoices down to every 6-minute segment does not mean this is necessary. "What is required is that an earnest effort be made to devise a method of allocating the actual costs of the receivership to specific assets...." *Id.* This is what the Receiver has done. And that is all that this Court must do.

For the 13th Fee Application, as is the case for all prior fee applications, the Receiver has provided detailed allocations for each task entry. Every claimant knows exactly which tasks are allocated to each property. The allocations provide not only task hours, task rate, task cost, property allocations, and property allocation count – as discussed above – but they also provide a narrative task description, the billing category, the timekeeper, and the billing rate, for each of the 1,385 tasks in the 13th Fee Application. And they are allocated in accordance with the Court's approved allocation methodology. (Dkt. 755, at 23-24; Dkt. 1105, Ex. 5; Dkt. 1182, at 8-14 (describing additional information available to determine the appropriateness of the allocations))

8

The objectors had an opportunity to review the Receiver's allocations and they premised many of their arguments on whether or not the Receiver's allocations provided a benefit. In fact, they had more than three months (since November 15, 2021) to review, develop, and write-up their objections to the Receiver's allocations for the tasks in the 13th Fee Application. (Dkt. 1087) As shown above, those objections are without merit. Indeed, in recognition of such concerns, the investor lender claimants who vastly outnumber the institutional lender objectors have voiced their opposition to the objectors' efforts to stymie the Receiver's requests to be paid for the valuable work he has done. (*E.g.,* Dkt. 1198)

### 3. The Receiver Recommends against Any Holdback.

The Court has previously found that the Receiver's Ninth, Tenth, and Eleventh Fee Applications are subject to a 20% holdback, and further indicated that "if the Receiver seeks to pay fees approved by this order from the sales proceeds of *encumbered* real estate, then the amount the Receiver is entitled to draw is subject to an additional 20% holdback." (Dkt. 1031, at 14) The objectors have requested that the fees requested in the 13th Fee Application likewise be subject to a 20% holdback, and that any fees the Receiver seeks to pay from the proceeds of sale be subject to an additional 20% holdback. (Dkt. 1188, at 9) For the same reasons set forth in his reply to objections on the 12th Fee Application (Dkt. 1206, at 4-7), the Receiver requests that the Court not apply any holdback relative to this 13th Fee Application; but, if the Court deems it appropriate, that any cumulative holdback not exceed 20%. The Receiver offers the following points for the Court's consideration.

The rate discounts provided by the Receiver and his firm equate to a substantial savings on the invoices submitted in connection with the 13th Fee Application. The following Table reflects the extent of this discount:

9

| Time Keeper | Value of Total Hours at Standard Rate | Value of Total Hours at Discount Rate | Value of Difference |
|---|---:|---:|---:|
| K. Duff | 55,375.00 | 34,554.00 | 20,821.00 |
| M. Rachlis | 11,687.50 | 7,293.00 | 4,394.50 |
| E. Duff | 5,557.50 | 3,705.00 | 1,852.50 |
| A. Porter | 27,202.50 | 18,135.00 | 9,067.50 |
| J. Wine | 125,833.50 | 55,926.00 | 69,907.50 |
| K. Pritchard | 11,931.00 | 8,148.00 | 3,783.00 |
| A. Watychowicz | 25,686.50 | 17,542.00 | 8,144.50 |
| J. Rak | 12,669.00 | 8,652.00 | 4,017.00 |
| S. Zjalic | 1,751.00 | 1,133.00 | 618.00 |
| TOTALS | $277,693.50 | $155,088.00 | $122,605.50 |

Prior to submitting the invoices that are the subject of the 13th Fee Application, the Receiver provided a further discount by writing-off 39.5 hours of recorded time, amounting to a $7,369 reduction at the discounted rates. In addition, the Receiver and RDP devoted 355.8 hours to billing efforts in 3Q 2021 (valued at $93,194.00, at the discounted rates), none of which is included in the submitted invoices and is not within the write-off amounts referenced above. (*See also* Dkt. 1206, at 6 n.4)

If the amounts sought by the invoices in the 13th Fee Application are considered in the context of the discounts and unbilled time already applied, the inequity of what would be an additional 40% holdback is laid bare.

The following Table summarizes the primary discounts and unbilled time discussed above:

| Rate Discount | Write-Offs | Billing Hours | Total Discount & Unbilled Time | Total Fees in 13th Fee Application | % Reduction Already Applied |
|---:|---:|---:|---:|---:|---:|
| $122,605.50 | $7,369.00 | $93,194.00 | $223,168.50 | $155,088.00 | 41% |

As this chart evidences, any additional holdback only magnifies the financial impact. It also shows that there is no windfall nor any appearance of a windfall. To add yet an additional 20-

10

40% holdback, as the objectors have requested, would be even more onerous and inequitable under the circumstances described above. For all of these reasons, and those set forth in his reply in support of the 12th Fee Application (Dkt. 1206, at 4-7), the Receiver respectfully recommends and requests that the Court not apply any holdback, but if so, that such holdback not be greater than 20% in total for fees paid from property accounts.

## CONCLUSION

For the foregoing reasons, as well as those set forth in the Receiver's prior fee applications, the supporting briefs filed by the SEC and the Receiver, and in the Receiver's motion for approval to pay certain previously approved fees and costs, the Receiver respectfully requests that the Court exercise its discretion to:

(i) find that the Receiver has preserved, enhanced, or otherwise benefited the properties and the claimants in connection with the work performed and expenses incurred as reflected in the 13th Fee Application;

(ii) approve the Receiver's 13th Fee Application and payment of all fees and expenses described therein out of the funds in the Receiver's account, including as to any such future funds that come into the Receiver's account;

(iii) impose a first priority receiver's lien on the properties and proceeds of sale to satisfy the receivership expenses; and

(iv) grant such other relief as the Court deems equitable and just.

Dated: March 4, 2022  			Respectfully submitted,

					Kevin B. Duff, Receiver

				By:	/s/ Michael Rachlis
					Michael Rachlis (mrachlis@rdaplaw.net)
					Jodi Rosen Wine (jwine@rdaplaw.net)

11

Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Phone (312) 733-3950

**CERTIFICATE OF SERVICE**

I hereby certify that on March 4, 2022, I electronically filed the foregoing **Receiver's Reply in Support of His Thirteenth (13th) Interim Application and Motion for Court Approval of Payment of Fees and Expenses of Receiver and Receiver's Retained Professionals** with the Clerk of the United States District Court for the Northern District of Illinois, using the CM/ECF system. A copy of the foregoing was served upon counsel of record via the CM/ECF system.

/s/ Michael Rachlis

Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Phone (312) 733-3950
mrachlis@rdaplaw.net