UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 1:18-cv-5587 |
| v. | |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, | Hon. Judge John Z. Lee<br><br>Hon. Magistrate Judge Young B. Kim |
| Defendants. | |

## LENDERS' RESPONSE TO RECEIVER'S FEE ALLOCATION MOTION

The Lenders identified on Exhibit A (the "Lenders")[1] submit this Response to the Receiver's Motion for Approval of Allocations of Fees to Properties for Payment Pursuant to Receiver's Lien ("Fee Allocation Motion") (Dkt. 1107).

## INTRODUCTION

The Court granted the Receiver a limited priming lien on the Lenders' collateral.[2] To date, that lien is limited to fees incurred by the Receiver for "(1) the preservation, management, and liquidation of certain real estate belonging to the Receivership Estate; or (2) the implementation and management of an orderly summary claim-priority adjudication process." (Dkt. 1030) As such, the Receiver's fees can be allocated against, and paid out of the proceeds

---

[1] In addition, Fannie Mae and Freddie Mac adopt and fully incorporate by reference the Federal Housing Finance Agency's Objection to Receiver's Motion for Approval of Allocations of Fees as set forth in this Response.

[2] The Lenders have objected, and continue to object, to the Receiver's priming lien in its entirety for the reasons stated in their prior pleadings, which are incorporated here for preservation on appeal. *See, e.g.*, Dkt. 961.

of sale of, the Lenders' collateral only if they fall within either of these two approved categories and are attributable to the specific properties to which the Receiver seeks to allocate them.

As set forth below, the Receiver fails to meet his burden of proof as to a substantial portion of the fees that are the subject of his Motion.[3] Not only do the Receiver's fee entries frequently lack sufficient detail to categorize them properly, but they too often fall outside of the two approved categories or incorrectly have been allocated equally among properties without establishing that such fees have provided such a proportional benefit to each specific property. Such allocations violate the Court's admonishment that, in keeping with *SEC v. Elliott*, 953 F.2d 1560 (11th Cir. 1992), secured creditors should only be charged for the benefit they actually receive. (Dkt. 1030, p.16, n.8)

In addition, the Receiver wrongly seeks to surcharge Group 1 properties[4] with fees that relate to claim-priority adjudications, such as discovery, filing a framing report, and making recommendations to the Court. The Court expressly excluded these fees from the pending Fee

---

[3]In comparable circumstances, Bankruptcy Code Section 506(c) enables the "trustee [to] recover from" collateral "the reasonable, necessary costs and expenses of preserving, or disposing of, [the collateral] to the extent of any benefit to the" secured lender. "To recover expenses under this provision, the trustee bears the burden of proving" that: "(1) the expenditure was necessary, (2) the amounts expended were reasonable, and (3) the creditor benefited from the expenses." *Id.*, quoting *In re Delta Towers, Ltd.*, 924 F.2d 74, 76 (5th Cir. 1991). *See generally In re Flagstaff Foodservice Corp.*, 739 F.2d 73, 76 (2d Cir. 1984) (if trustee incurs "properly identified" preservation expenses "primarily for the benefit of" the secured lender, Code Section 506(c) provides an exception if the lender has either "caused" or consented to the accrual of these expenses); *In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir. 1984). Other courts have explained that Code Section 506(c) essentially requires a "quantifiable and direct benefit to the secured creditor; indirect or speculative benefits may not be surcharged, nor may expenses that benefit the debtor or other creditors." *In re Blackwood Assocs. L.P.*, 153 F.3d 61, 68 (2d Cir. 1998); *In re Grimland, Inc.*, 243 F.3d 228, 232 (5th Cir. 2001).

[4] The following properties are included in the first group of properties in the dispute resolution process: 7201 S. Constance, 7752 S Muskegon Ave, 7635-43 S. East End Ave., 3074 Cheltenham, a/k/a 7836 S. South Shore Dr. and 7625-33 S. East End.

2

Allocation Motion because the benefit to the to-be-determined first-priority secured creditors cannot be determined until the conclusion of the claims process. (Dkt. 1030, p. 14, n.7)

Similarly, the Receiver improperly attempts to apportion fees associated with the creation of the single-claim resolution process to properties against which there is but a single claim. Such an allocation starkly violates the requirement that a benefit be conferred on the single claim secured creditors because the only purpose of the single-claim procedure is to provide a forum in which the Receiver can challenge their claims for the benefit of the unsecured creditors. Likewise, the single-claim properties should not be surcharged with fees incurred to implement and manage the multi-claim dispute resolution process.

The Lenders summarize their objections below and detail them in the attached schedules. Respectfully, they request that the Court refuse to allocate the Receiver's fees to their secured collateral except to the extent that the specific tasks enumerated by the Receiver (a) relate to (1) the preservation, management, and liquidation of specific real estate belonging to the Receivership Estate (the "Estate") or (2) the implementation and management of an orderly summary claim-priority adjudication process to which they are a party, and (b) are attributable to the specific properties to which the Receiver seeks to allocate them in the proportions proposed by the Receiver. [5]

## BACKGROUND

1. On October 26, 2020, the Court awarded the Receiver a receiver's lien against, and approved the Receiver's methodology of allocating that lien among, Estate properties (the "Properties"). This methodology contemplates that "expenses relating directly to a property will

---

[5] The Lenders acknowledge that, subject to the outcome of the claims adjudication process, the fees shown on the exhibits related to claim-priority adjudications may, at a future date, be determined to be payable by a priming lien after the conclusion of the claims process.

3

be allocated to that property; billing pertaining to the recovery of unsecured funds will not be allocated to any properties; and remaining fees and expenses will be allocated to the properties as a percentage of their gross sales price, once that value is determined for each." (Dkt. 824, p. 5) However, the Court stated that the priority of the Receiver's lien as to any of the Properties – whether it would prime a secured lien – would be determined as part of the claims resolution process. (Dkt. 824, p. 6)

2.      On August 17, 2021, the Court, over the Lenders' (Mortgagees) objections (*see* Dkt. 961), determined that the Receiver would be entitled to a super-priority lien for certain categories of expenses. (Dkt. 1030) In entering that Order, the Court recited that the Receiver conceded that there were insufficient unencumbered Estate assets to pay his fees and sought the imposition of a first priority or priming lien against the Properties. (Dkt 755; 1030, p. 5)

3.      The two Court-approved categories that provide a basis for a priority lien are those fees incurred for "(1) the preservation, management, and liquidation of certain real estate belonging to the Receivership Estate; and (2) the implementation and management of an orderly summary claim-priority adjudication process." (Dkt. 1030)  However, Judge Lee stated that he has not found that every entry on the Receiver's submitted schedules "actually falls within the two categories of billing described above. Magistrate Judge Kim may find that a  particular line item falls outside those categories or reflects activities that will not benefit the Estate's creditors." (Dkt. 1030, pp. 161-7)  In addition, Judge Lee excluded, for the time being, fees related to the claim-priority adjudications, such as discovery, filing a framing report, and making recommendations to the Court, because the benefit to the to-be-determined first-priority secured creditor cannot be determined until the conclusion of the claims process. (Dkt. 1030, p. 14, n.7.)

CORE/3505587.0060/172999223.1
62469862;1

4.      Judge Lee also authorized interim payments of the Receiver's Fees through the priming lien, but mandated a 20% holdback on the payment of all fees, but not expenses. (Dkt. 1030, p. 15) Based upon the 20% holdback of fees requested in the Receiver's 9th, 10th and 11th fee application (Dkt. 1031), any fees approved for payment in Dkt. 1031 are limited to 80% of the 80% of the fees approved for payment pursuant to the Fee Allocation Motion.  As of the filing of this Response, Judge Lee has not ruled on the Receiver's subsequent fee applications and thus has not approved fees incurred from April 1, 2021 to the present.  Therefore, any allocation award to the Receiver for that time period should be deferred until Judge Lee rules on such fees, or be made subject thereto.

5.      Judge Lee referred the review of the Receiver's proposed fee allocations to Magistrate Judge Kim for disposition, with instructions that the Receiver file a motion for his proposed line-by-line and property-by-property fee allocation by September 7, 2021. (Dkt. 1030) In a footnote, Judge Lee advised the Receiver "to be mindful of Elliott's [*SEC v. Elliott*, 953 F.2d 1560 (11th Cir. 1992] admonishment that an across-the-board allocation may be inappropriate. *Elliott*, 953 F.2d at 1578:

> ("We hold that merely counting heads is not an equitable way to divide the burden of the receivership. Secured creditors should only be charged for the benefit they actually receive. That their claims represented a large portion of the gross proceeds does not necessarily mean the Receiver spent an equally proportionate amount of time on their claims. . . . What is required is that an earnest effort be made to devise a method of allocating the actual costs of the receivership to specific assets and that the [allocation] order . . . disclose the results of this effort." [Emphasis added.]). *Cf. Gaskill v. Gordon*, 27 F.3d 248, 254 (7th Cir. 1994) ("We must remand this case to the district court to set out in greater detail the expenditures included in the $265,000 lien.") (Dkt. 1030, p.16, n.8)

6.      On December 22, 2021, the Receiver filed his Fee Allocation Motion. (Dkt. 1107) The Receiver's proposed allocations consist of approximately "30,000 individual tasks in reports requiring 19,525 pages covering 108 separate properties," (Dkt. 1107, p. 10), which is an average

of 180 pages for each separate property allocation report (the "Specific Allocations"). In addition, the Receiver submitted a separate general allocation report for tasks that the Receiver asserts should be allocated across all Estate Properties based on their respective gross sales prices (the "General Allocations"). (Receiver's Ex. 3, ECF 107-9)

7.     Given the magnitude of this task, the Receiver obtained multiple extensions of time to complete and file the Fee Allocation Motion, ultimately totaling 3-½ months.

8.     After reviewing the Receiver's allocation reports, the Lenders filed a Motion for Appointment of a Fee Examiner, which they believe provided the most efficient and cost effective means of examining the Receiver's allocations. (Dkt. 1177) On February 17, 2022, the Court denied the Lenders' Motion and ordered them to file their response by March 4, 2022. (Dkt. 1184) On March 2, 2022 (Dkt. 1205), the Court denied the Lenders' Agreed Motion for a one-week extension of time for their response, but permitted them to file that response by March 6, 2022 (Dkt. 1202).

9.     The Lenders have attempted to coordinate their response to the greatest extent possible within the time permitted by the Court.[6]   Although the Lenders are filing such a consolidated response, due to time constraints and the enormity of the project, they were unable to combine their objections into a single exhibit. Instead, the objections are set forth in the following Exhibits, with the list of applicable Lenders and Properties, together with a summary table of the coding of objections used by those particular Lenders set forth at the beginning of their respective Exhibits where applicable:

    **A.     Exhibits Identifying Objections to All Allocations.**

---

[6] In its January 12, 2022 Minute Order, the Court permitted the Lenders to file a consolidated brief in excess of 15 pages. (Dkt. 1127).

CORE/3505587.0060/172999223.1
62469862;1

**Exhibit B**:   A Microsoft Excel spreadsheet converted to pdf format consolidating the Property Reports prepared by the Receiver of properties in which Lenders assert an interest, sorted by property address in numerical order, which identifies by keywords the bases of Lenders' contentions that the fees associated with the identified task constitutes an impermissible surcharge (collectively, the "Excel Objections"). The Exhibit B coversheet includes a key to the bases of the objections.

**Exhibit B-1:**      A Microsoft Excel spreadsheet converted to pdf format which seeks to summarize the objections shown in Exhibit B so that only a single objection for an entry is identified even if that entry appears in more than one Property Report. In other words, it seeks to identify once each objection to a particular entry even if that objectionable entry appears on more than one Property Report. There are instances where, as a result of conversion variances, the spreadsheet shows the entry more than once. By means of this Exhibit B-1, the Lenders assert that same objection on whichever Property Report it appears.

**Exhibit C**:   This Microsoft Excel spreadsheet of Lender Liberty EBCP, LLC ("Liberty") details the objections to the Specific Allocations for one of its secured properties[7], and incorporates those objections to its other secured properties to the extent they are consistently identical (the 'Liberty Objections').   This spreadsheet tracks the Receiver's allocation spreadsheet for the subject property, but to better understand the Receiver's allocations, adds a column on the right to identify the number of properties against which Liberty believes the individual task entries were

_____

[7] Property # 81: 4315-19 S. Michigan Avenue, Chicago, Illinois.

7

allocated.[8]  Liberty's objections to the allocation entries for its collateral that are unique (i.e., not identical) were reviewed as part of, and are included in, the Excel Objections.

**Exhibit D**:  Another Lender, Citibank N.A., as Trustee[9], noted its objections on a representative highlighted PDF of the Specific Allocations for one of its secured properties.[10]  This Lender, and the others listed on Exhibit D, incorporate those objections to all identical entries on the Specific Allocations for all of their secured properties (the "Drexel Objections").

**Exhibit E**:  All Lenders, including the Sole Claimants (as defined below), also have objected to the Receiver's General Allocations through this Exhibit (the 'General Allocation Objections").

The Lenders recognize that the Court may agree with some categories of objections or particular objections to the Allocations that, due to time limitations, may not have been captured in detail on one or more of the foregoing objection Exhibits.  To that extent, all of the Lenders, including the Sole Claimants, adopt by reference each of the foregoing Objections as if asserted with respect to their collateral.  As such, each of the Lenders respectfully requests that the Court's rulings be applied uniformly to all such time entries.

### B.    Additional Objections as to Single-Claim Properties.

**Exhibits F and G**:  In addition to incorporating the Objections listed above, in these Exhibits, the Sole Claimants  make "bright line" objections to both the Specific and General

---

[8] Liberty calculated the number of properties by dividing the time in the Receiver's Task Hours column by the percentage in the Receiver's Allocated Hours column (e.g., using the first entry, $0.4/0.0037736 = 105.999576$, rounded to the nearest whole number = 106).

[9] Citibank N.A., as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2018-SB48; U.S. Bank National Association, as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2017-SB30.

[10] Property #3: 5001 S. Drexel Boulevard, Chicago, Illinois.

8

Allocations asserted against those properties ("Single-Claim Properties") against which a Lender is the only claimant (the "Single-Claim Objections"). Exhibit F contains a consolidated list of the Sole Claimants objections to the Specific Allocations applicable to each of the Single-Claim Properties and Exhibit G contains a consolidated list of their objections to the General Allocation, both as they relate to the Single-Claim issues raised therein. At base, the Sole Claimants object to the allocation of any fees in the "Claims Administration and Objections" category incurred after January 30, 2020 – the date that the Receiver identified the Single-Claim Properties in his Sixth Status Report (ECF 624).

## ARGUMENT

An attorney's fee applicant bears the burden of documenting the propriety of his billable hours and rates. *Tomazzoli v. Sheedy*, 804 F.2d 93, 96 (7th Cir. 1986). This includes task billing from which the Court can determine the amount and reasonableness of the attorney's charges for each distinct task performed. *Trs. of the Chi. Plastering Inst. Pension Trust v. Cork Plastering Co.*, 570 F.3d 890, 906 (7th Cir. 2009) (for a court to examine a request for attorney's fees, an itemized record of the time devoted to particular tasks is a common-sense requirement and such detail is routinely expected in support of attorney-fee requests).

In the context of a request to surcharge a receiver's fees to a secured creditor's collateral, the Receiver must prove that the work described in a particular entry was properly apportioned to the properties that actually benefited from the work. *Elliot, supra.* Among other things, that cannot be done if the Receiver's time entries 1) fail to provide sufficient detail to describe the work or the properties benefitted; 2) are beyond the scope of the Court-approved lien priority categories; 3) are combined so as to include both approved lien priority and disallowed tasks, or; 4) include tasks involving multiple properties that cannot be apportioned equally.

A. **Across-the-Board Allocation and Lumping of Matters Across All Lenders in Violation of *Elliott* Prohibitions.**

1. **Improper Allocations Among Properties**

Among the most egregious misallocations occur are those that the Receiver incorrectly billed to the wrong property. These include time entries that either did not involve the property that was the subject of the Specific Allocation or that involved tasks for other properties that were, but should not have been, allocated equally to the subject property. Such charges must be removed from the incorrectly allocated property and reallocated to the correct property (if the respective time entries provide sufficient detail to do so).

For instance, task entries that include settlement of an insurance claim, fire damage, or removal of judgment liens involving one or more buildings should not have been allocated equally among larger groups of properties (*see, e.g.*, Ex. C, lines 224, 1840, and 2355-58). Similarly, an entry that includes property in Naples, Florida should not have been allocated to an Illinois property; entries referencing properties on Bennett and Avers Streets should not have been allocated to a Michigan Avenue property, and time related to three different property sales tranches should not have been allocated to a property that only is a part of one of those groups (*see, e.g.,* Ex. C, lines 2047 [Naples property], line 2476 [Bennett and Avers properties], and lines 2176 [series x tranche], 2179 [series 4 tranche], and 2351 [series 7 tranche]).

Indeed, these problems are not isolated, but are widespread. For example, a cursory review of just one property (Ex. D, 5001 S. Drexel, "Drexel") found the following non-exhaustive entries that are emblematic of a wide-ranging issue – the Receiver's misplacement of time regarding activities related to the Properties.

- 9/26/19 3.5 hour red entry (p. 122): "Appear for and attend administrative court for a dozen building cases and four street and sanitation cases and appear for housing court on property (7616 Phillips) (3.5)"

o      The Phillips property has nothing to do with Drexel.

•      9/26/19 2.8 hour red entry (p. 122): "review title commitments for the second and third tranche and draft additional creditors claim list (2.8)"
o      Drexel was in the 1st tranche, not the 2nd or 3rd tranches.

•      3/18/19 3.5 hour red entry (p. 64): "Read e-mails from title company underwriter regarding changes to receiver's deed and other conveyance documents, begin preparation for all closing documents for property in first sales tranche (7927-49 S Essex) , , , "
o      This entry specifically references the wrong property. The remaining portion of the entry generally references tranche 1 properties.

•      3/20/19 red entry (p. 64): "Teleconference with K. Duff reading need for FEIN's of properties in first sales tranche, fire at property in first sales tranche (7943 Essex), and status of review of draft motion to approve sale of single-family homes (.3).
o      Again, the wrong property (Essex) is referenced and Drexel is not a single-family home.

•      3/21/19 red entry (p .72): "conference with K. Duff and E. Duff regarding accounting and issues at cross-collateralized properties (.2)"
o      Drexel is not a cross-collateralized property, and this relates to an entirely different lender's property.

•      4/23/19 red entry (p. 79): "review, analyze and update closing checklists for same two unencumbered properties in first sales tranche and communicate with prospective purchaser regarding potential scheduling of closing (.5)"
o      While Drexel was in the 1st tranche, it was not an unencumbered property and this time is misplaced.

•      Multiple entries in red (pp. 87-88, 97, 99, 101, 105-106) relating to property renewals and proof of insurance
o      The Drexel sale closed on May 22, 2019. Yet, these entries are on 5/23, 24, 28. and 29 – after the property had already been sold.

•      6/4/19 red entry (p. 99): "prepare final revisions to proposed bid procedures (.7)"
o      This time entry for bid procedures occurs after the closing of Drexel on May 22, 2019, so it cannot relate to this property.

•      6/17/19 red entry (p. 100): "exchange correspondence with property manager regarding rent roll for second/third tranche of properties (.2)
o      Drexel was in the 1st tranche.

•      6/19/10 red entry p. 100): "Attention to issues on purchase and sale agreement issues regarding upcoming sales (.8)
o      Drexel cannot be an "upcoming" sale." This time was entered on 6/19/19 and Drexel was sold on May 22, 2019. There are several additional entries on p. 100 referencing

CORE/3505587.0060/172999223.1
62469862;1

"upcoming" sales and the 2nd and 3rd tranches that suffer for the same problem and cannot relate to Drexel.

- 6/19/10 red entry (p. 101): "revise spreadsheet to reflect same and correspond with property manager regarding same and regarding other violations (8107 S. Ellis, 7760 S. Coles, 7300 Saint Lawrence), and other building cases (.9)"
  o  Again, not Drexel.

- 6/19/10 red entry (p. 106): "study draft correspondence to lenders counsel regarding property  status issues (.2)"
  o  Drexel was sold a month earlier.

- 7/1/10 red entry (p. 109): "confer with brokers, M. Rachlis, A. Porter and K. Duff relating to sale of the second and third tranche (1.5)"
  o  Drexel was sold in the 1st tranche.

## 2.      General Receivership Activities

Many of the Receiver's allocations violate *Elliott* because they are an impermissible across-the-board allocation and lumping of time involving multiple "lenders," "managers"  or "properties," without any specificity concerning the benefit to each secured collateral.  For instance, numerous time entries refer to "various properties" (*see, e.g.,* Ex. C, lines 2184, 2186, 2187-88, 2192-93) and others refer to a potential purchaser(s) or an offer to purchase properties without identifying the property or properties involved. (*see, e.g.,* Ex. C, lines 1972, 1975, & 2048).

In other instances, the allocations include time entries that make no mention of the particular property involved, such as interviews of potential property managers and brokers; review of brokers/managers' proposals and compensation; general receivership strategy; and proposed liquidation plans.  This work deals with the general operation and administration of the receivership, rather than benefits conferred upon specific collateral.  Below is a non-exhaustive list of additional representative improper time entries from Ex. D.

- 11/15/19 blue entry (p. 127): "study information regarding sold properties and sale proceeds."

12

o   There were multiple tranches of properties sold.  In fact, some of the time entries charged to the collateral (which was in the 1st tranche) reference 2nd and 3rd tranches of sales and have no relationship to the collateral whatsoever.

•   1/6/20 blue entry (p. 128): "Review emails and update post-closing reconciliation spreadsheet with several closed properties"
o   Same objection as above and entry is lumped with multiple properties and time entry is almost 8 months after sale of the property at issue closed.

•   2/19/20 5.2 hour blue entry (p. 129): "work on organization of closing documents from all closings (5.2)"
o   This entry allocates 5.2 hours of attorney time for all closings even though the closing at issue for the specific property was on 5/22/19 – again a closing  almost 9 months earlier.

•   2/13/20 3.9 hour blue entry (p. 129):  "Review property manger's financial statements and perform a comparison analysis of both for all Equitybuild properties."
o   3.9 hours was spent so that the receiver could compare properties in the case, not for the property at issue.

•   6/6/20 3.2 hour blue entry (p. 133): "Begin preparation of spreadsheet listing all properties, associated litigation matters, judgment amounts, and payment status (3.2)
o   Again, time is being lumped together for all properties and all litigation matters and payment status regardless of the property.

•   6/6/20 blue entry (p. 133): "Assemble all files relating to any administrative housing court proceedings pertaining to any receivership properties between 2015 and the present (2.4)"
o   Same objection as above.

•   6/6/20 blue entry (p. 133): "organize same (1.4)
o   Same objection

•   1/5/21 blue entry (p. 143): "Organization and research property information related to original EquityBuild purchase dates, recording dates, Equitybuild debt and mechanic's lien regarding properties in receivership and previously acquired and sold properties and update Equitybuild portfolio spreadsheet."
o   Same objections as above.  This time entry is 2.2 hours.

In short, the allocations simply distribute wholesale time that clearly is not related to the

specific property at issue.  Such spreading does not demonstrate a relationship to the property at

issue, but actually demonstrates the opposite – and should not serve as the basis of a priming

lien.

13

### 3.       Claims Administration vs. Multi-Claimant Dispute Resolution Procedure

As set forth above, the Court authorized a priming lien for the Receiver's efforts in establishing the summary claim-priority adjudication process.  Yet, the Receiver's allocations indiscriminately include fees incurred in the general claims administration process unrelated to dispute resolution.  Such fees, included both in the first column of the Specific Allocations categorized as "Claims Administration and Objections" and elsewhere based on the task descriptions in the Specific Allocations, are not allowed as a priming lien because they do not relate to (1) the implementation and management of an orderly summary claim-priority adjudication process or (2) the adjudication of claims.  Examples from Ex. C include, but are not limited to, collection of information and documentation from the Lenders (lines 55 – 71);claim form communications with claimants (line 1313), review of claim forms (lines 2130 – 2132), and review of and analysis of rollover claims (line 2144).[11]

From a timing perspective, charges in the first year plus of the receivership are particularly suspect because the Receiver did not file his Motion for Approval of Process for Resolution of Disputed Claims until February 28, 2020. (Dkt. 638)  According to that Motion, the dispute resolution process emerged at Court hearings beginning on October 30, 2019.  (Dkt. 638, p. 1)  Fees incurred prior thereto involving claim identification and data collection, do not fall within the claims adjudication category approved by the Court.  Moreover, as indicated in the Receiver's task entries, not all time spent by the Receiver on Claims Administration thereafter related to the dispute resolution process, and thus is not entitled to lien priority.

---

[11] As indicated on Exhibit E, the General Allocations also have innumerable objectionable time entries related to the preparation of the claim form, collection of claims documents and information, and communications with claimants.

14

### 4. Comingling of Rents and Rent Restoration

In the fall of 2018, certain Lenders objected to the Receiver's use of rents collected from one secured property to cover the expenses of another property of the Estate on the grounds that the practice was not permitted by the Court's order appointing the Receiver because the Properties' rents were not Estate assets. (*See, e.g.,* Dkt. 90; 109)  On February 13, 2019, the Court ordered the Receiver not to commingle the rents, to account for rents received and applied, and restore rents previously comingled. (Dkt. 223, p. 9)  As acknowledged by the Court in its Opinion, the Receiver improperly comingled rents from various properties using collateral from one property to pay the debts of other unrelated properties.  As such, the Court directed the Receiver  to restore funds not properly charged against the Lenders' collateral.  *See, e.g*., entries highlighted in Gray on Exhibits C and D, or so categorized as such in the descriptive objections on Exhibit B.

It appears as if over 160 hours were billed by the Receiver related to the rent restoration issue.  Assuming a 40-hour work week, that is four weeks of billable time that conferred no benefit on the Lenders or their collateral, and should not be surcharged to them.

### 5. Credit Bidding

The Receiver seeks to allocate tasks related to credit bidding, including time spent by him in unsuccessfully opposing certain Lenders' motion to permit credit bidding.  *See* Memorandum Opinion and Order dated May 2, 2019, adjudicating the Receiver's Second Motion for Court Approval of the Process of Public Sale of Certain Real Estate.  (Dkt. 352, p. 6-8; *see also*, Ex. C, lines 331 – 343)  The Receiver is not entitled to a priming lien for forcing the Lenders to expend their resources in this regard, which did not benefit them or their collateral.

The Receiver also seeks to allocate time associated with the implementation of the credit bid process following the Court's May 2, 2019 ruling. (*See, e.g.*, Ex. C, lines 1353 -54.) However, those efforts are a component of the claims administration process precluded from a priming lien, as they relate to the treatment of the rights of various claimants in and to their collateral. Moreover, these subsequent actions did not involve all of the secured creditors or all of the secured collateral. Therefore, it is inappropriate for the Receiver to allocate the credit bid implementation time to all of the receivership properties.

6.      **Tasks not Equally Divisible**

The Receiver has allocated fees over groups of properties, in many instances without identifying the particular properties involved or the details of the issues applicable to each property. For instance, some properties were subject to liens that had to be paid off at closing; however, they were grouped with properties that were being so that were not subject to liens. Any lien related work should have been billed only to the properties that were subject to liens, rather than being spread across the entire sales pool. (*See, e.g.*, Ex. C, line 830 [allocation of lien-related work against 39 properties in compound entry[12]] and lines 2355-56 [judgment lien time spread across 79 properties])

Similarly, some of the Properties were subject to infirmities, such as code violations, real estate tax and utility delinquencies, and administrative or housing Court proceedings, while others were not. Yet, the Receiver apparently allocated time spent litigating, addressing, and tracking such infirmities across-the-board to a large number of the Properties even though it

---

[12] To the greatest extent possible, the Lenders have objected to these compound entries according to the component that is most inappropriate. In doing so, however, they do not waive (but instead continue to assert) any of the other categories of objections raised by them elsewhere in their Exhibits.

16

appears as if a much smaller number of the Properties actually were subject to the infirmities. (see, e.g., Ex. C, lines 389, 402, and 405 [code violation, scofflaw, and repair time allocated among all 106 properties regardless of condition]; 859 [communications with the City regarding "various" properties allocated among 106 properties]; 1288 [past due utility bills allocated among all 37 properties in property grouping]; 1805 [real estate tax related work for "certain" properties allocated among 90 properties]; 2117 [utility refund checks deposited to some accounts allocated among 103 properties]; and 2357 [tracking "any administrative or housing court proceedings pertaining to any receivership properties between 2018 and the present" across 79 properties).

Moreover, the Receiver's allocations do not address the magnitude of the infirmities or associated work involved. For instance, if six properties in a group had "unresolved title exceptions", the Receiver indiscriminately divided his time equally among the six properties, regardless of the number, nature or extent of the problems involved. (*see, e.g.,* Ex. C, line 2696)

Such tasks are not susceptible to equal allocation. Instead, one of the properties may have had one minor code violation, another may have had three mid-level code violations, and a third may had five serious code violations. The time spent on each necessarily would vary. As such, the Receiver's time should not have been apportioned equally among the six properties because it does not reflect the actual benefit provided by the Receiver to each.

*Such generalized allocations violate the principles of Elliott*, as they impose burdens on collateral equally without proof of benefit to the subject collateral. To be clear, this does not mean that the Receiver should not get paid for his Court-approved work; rather, he just should not be paid from the Lenders' collateral without proving the benefit conferred with sufficient specificity to justify a surcharge.

In addition, the Lenders' collateral should not be surcharged for the malfeasance of the Receiver's agents. In that regard, the Specific Allocations often are lacking in detail as to the timing of code violation complaints, so that the Court cannot tell if the complaints are attributable to actions occurring before or after the start of the receivership. However, at least in some cases, it would appear that the problems arose after his property managers took possession and had sufficient time to make the Properties code compliant. (*See, e.g.,* Ex. C, line 1947 ["new" violations on 1/8/2020]) The Lenders' collateral should not be surcharged for such malfeasance.

7. **Title Examination Charges**

The Receiver improperly allocated time expended on title examination work related to property sales in his Specific Allocations. Although the Lenders recognize that title insurance is a necessary component of real property sales, title charges are deducted from the gross sales proceeds in the form of title insurance premium charges. Therefore, the Specific Properties should not have been billed for both the title premiums and the underlying title examinations. *See, e.g.,* 6.1 hours related to title examinations on Receiver's Specific Allocation Report for Property #89, 7600-10 S Kingston Avenue, Chicago, Illinois at pp. 48 – 49 (3/13/2019 [2.3 hours], 3/14/2019 [1.9 hours], and 3/29/19 [1.9 hours]).

The Lenders recognize that the Receiver has reported that he has provided the Estate with a credit for his attorneys' receipt of their share of title insurance premiums received as title agents. To the extent such premium dollars are received, they should be applied to pay the cost of the underlying title examinations, rather than surcharging the Lenders' collateral for such costs. Further, if and to the extent that the cost of the Receiver's title examination time exceeds the share of premium dollars received, such excess cost should not be borne by the Lenders'

18

collateral, as that would result in a double payment for the benefit of the title insurance required to close.

### 8.     Ambiguous Entries

Many of the Receiver's time entries are ambiguous.  Often, they are completely lacking in detail, such as entries that say only "call" or "calls" (*see, e.g.*, Ex. C, lines 2205, 2282, and 2521).  In other instances, the Receiver's time entries do not contain sufficient detail to determine if any of the tasks or properties involved related to subject property as distinct from properties with which it had been grouped.  Examples of such entries the "review [of] due diligence documents received from property manager for various properties" apportioned between 36 properties and tasks involving "current properties under contract and related matters and issues with closings" allocated to 45 properties (*see, e.g.*, Ex. C, lines 2192 - 2193).  In either case, neither the Lenders nor the Court can determine the nature or extent of the work, or the identity of the properties involved.  As such, the Receiver has failed to meet his burden of proof in this regard and the Lenders' collateral should not be surcharged.

### 9.     Claims Adjudication Litigation

The Receiver also seeks a priming lien for allocated fees related to claim-priority adjudications, such as discovery, filing a framing report, and making recommendations to the Court.  Such tasks were excluded specifically by the Court because the benefit to the to-be-determined first-priority secured creditor cannot be determined until the conclusion of the claims process. (Dkt. 1030, p. 14, n.7)

### 10.    General Fee Allocation Deficiencies

In his General Fee Allocations, the Receiver identified tasks the he asserts should be allocated among all of the Properties based on their respective gross sales prices.  These

19

Allocations suffer from the same deficiencies as the Specific Allocations, including, most noticeably, the inclusion of time associated with the process of collecting claims-related data, as distinct from the Receiver's efforts regarding the dispute resolution process that has been approved by the Court. For the reasons set forth above, such time entries cannot be surcharged against the Lenders' collateral.

**11.    The Inadequacy of the Receiver's Explanations**

In the Receiver's Response to the Lenders' Fee Examiner Motion, the Receiver attempted to explain certain of his allocations. (Dkt. 1182) Such select examples based on extrinsic information do not justify the wholesale adoption of the Receiver's allocations even if the Court may find some of those explanations theoretically credible.

Not only is there insufficient information in the task entries in the Fee Allocation Motion from which the Court can make such determinations, but isolated examples cannot be applied wholesale. An explanation of a single time entry simply does not mean that all 30,000 time entries in almost 2000 pages of fee allocations were prepared in the same manner and with the same applicability.

In fact, the Receiver's initial time entries are replete with examples of compound entries from which the time allocated to each task cannot be determined and entries that fail to identify the property or properties involved and the time spent on each.[13] Absent such information, it is impossible for this to allocate only that portion of the time entry that benefits a secured creditor to that creditor's collateral.

---

[13] The lack of detail in the original time entries has been exacerbated by the apparent cutting and pasting and redactions made by the Receiver in the compilation of the exhibits to the Fee Allocation Motion. *See, e.g.*, "call" or "calls" (Ex. C, lines 2205, 2282, and 2521).

CORE/3505587.0060/172999223.1
62469862;1

Whether this is attributable to the fact that the Receiver initially thought that the Estate contained sufficient assets to cover his fees so that he would not have to prove-up a surcharge request or otherwise, the fact remains that the Receiver had the ability to make such detailed task entries, and that the Lenders' collateral should not be surcharged arbitrarily and without appropriate proofs based on his failure to do so. This does not mean that the Receiver should not be compensated for his time. However, it precludes the allocation of that time as a priming lien against the secured creditors collateral.

**B.     Additional Objections Applicable to Single-Claim Properties**

U.S. Bank National Association, as Trustee for the registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2018-SB50 ("U.S. Bank as Trustee") and Midland Loan Services, a Division of PNC Bank, NA ("Midland" together with U.S. Bank as Trustee, the "Sole Claimants" for purposes of this section) object to certain of the Receiver's allocations against the Single-Claim Properties.[14] The Sole Claimants' objections fall into two categories:

- The Sole Claimants object to allocation of fees related to the summary claim-priority adjudication process to the Single-Claim Properties after January 30, 2020 – the date that the Receiver identified the Single-Claim Properties in his Sixth Status Report (ECF 624).

---

[14] The Single-Claim Properties are properties against which only one claimant has asserted that it holds a lien. They are: 1017 W 102nd Street, 1516 E 85th Place, 2136 W 83rd Street, 417 Oglesby Avenue, 7922 S Luella Avenue, 8030 S Marquette Avenue, 8104 S Kingston Avenue, 8403 S Aberdeen Street, 8529 S Rhodes Avenue, 11318 S Church Street, 2129 W 71st Street, 6749-59 S Merrill Avenue, 7110 S Cornell Avenue, 7925 S. Kingston, 9212 S. Parnell, 7210 S. Vernon, 6825 S. Indiana, 406 E 87th Place, 6554 S. Rhodes, 7712 S. Euclid, 8432 S. Essex, 3213 S Throop, 8107 S. Kingston, 8346 S. Constance, 10012 S LaSalle, 9610 S. Woodlawn, 6759 S. Indiana Ave, and 8517 S. Vernon.

- The Sole Claimants object to the allocation of fees related to the Single-Claim Process (defined below) to the Single-Claim Properties.

At base, the Sole Claimants object to the allocation to the Single-Claim Properties of any fees in the "Claims Administration and Objections" category incurred after January 30, 2020.

In Exhibits F and G, the Sole Claimants have identified time entries falling within their two objection categories. The Receiver included some of the objected-to fees in his General Allocation (Exhibit 3 to his motion – ECF 1107-9) and some in specific allocations to the Single-Claim Properties. Exhibits F and G contain consolidated lists of the Sole Claimants objections divided into subparts for the Specific Allocations and the General Allocation. The Sole Claimants that the Receiver has allocated the objectionable time entries to all of the Single-Claim Properties. Accordingly, they object to the allocation of each time entry identified on Exhibits F and G as they have been allocated to all Single-Claim Properties.

### 1. Background of Single-Claim Properties Dispute

In 2019, the Receiver initiated a claims process designed to identify who held claims against the estate and whether those claims were allegedly secured by a lien on one or more of the estate's properties. The Court ordered parties making a claim against the estate to file a proof of claim with the Receiver by July 1, 2019. Upon the Receiver's motion, the Court extended the bar date to December 31, 2019. As the Receiver began reporting the results of his initial claims review, it became clear that while most of the estate's properties were subject to lien claims by multiple claimants, twenty-eight of the properties, the Single-Claim Properties, were subject to a lien claim by only one claimant. On January 30, 2020, the Receiver identified the Single-Claim Properties. Sixth Report (ECF 624) at Ex. 5.

Approximately one month later, the Receiver moved the Court to approve a process to resolve disputes over the priority of multiple lien claims as to individual properties (i.e., the summary claim-priority adjudication process). Receiver's Claim Process Motion (ECF 638) at 8-9 (discussing the existence of lien priority disputes). In that motion, the Receiver acknowledged that there were a "number of properties for which there may be no dispute as to the priority of the claimants' secured interests." *Id*. at 9. The Receiver stated that he "anticipate[d] either filing a separate motion to address any issues that the Receiver identifies with respect to the claims associated with those properties and/or requesting a referral to the Magistrate Judge for settlement purposes to address issues with those properties." *Id*.

Shortly after the Court adopted a process to deal with the priority lien disputes, the Sole Claimants moved the Court to either distribute funds related to the Single-Claim Properties to them or create a process to resolve any objections the Receiver might have to their claims. *See* US Bank as Trustee's Motion for Priority Determination (ECF 785); Reply of US Bank as Trustee and Midland in Support of Priority Determination (ECF 817). After extensive negotiations and motion practice, the Court created a process by which the Receiver was to identify and assert any potential objections to the Sole Claimants' claims (the "Single-Claim Process") and ordered it to begin. Minute Order, dated November 18, 2021 (ECF 1090). The Single-Claim Process is currently ongoing.

In his proposed fee allocation, the Receiver allocated fees incurred after January 30, 2020 and related to the claim process for multiple-claim properties to the Single-Claim Properties. He also allocated fees related to the Single-Claim Process to the Single-Claim Properties. He is not entitled to a lien on the Single-Claim Properties for either category. Nor is he entitled to recover his fees for these categories from the Single-Claim Properties' sale proceeds.

CORE/3505587.0060/172999223.1
62469862;1

2.     **The Receiver cannot allocate fees incurred after January 30, 2020 for the summary claim-priority adjudication process for multiple-claim properties to the Single-Claim Properties.**

The Receiver allocated substantial fees incurred after January 30, 2020 for the multi-claim process to the Single-Claim Properties.[15] These charges range from compiling claims related to the Lenders to litigating the claims process motion. As all of the subject charges relate to the process for resolving claims related to properties on which multiple parties claim a lien, they are not allocable to properties on which only one party claims a lien – the Single-Claim Properties.

The Receiver is not entitled to a priming lien on the Single-Claim Properties for fees related to the multi-claim adjudication process after January 30, 2020. By that date, the Receiver had determined that there were no competing claims to the Single-Claim Properties. Neither the Single-Claim Properties nor the Sole Claimants benefited from further development of the multiple-claim process. Their part in that process had ended. Thus, the Receiver is not entitled to recover such fees from the proceeds of the sale of the Single-Claim Properties.

Over the Lenders' objections, this Court held that the Receiver is entitled to a priming lien for the fees he incurred in administrating the initial claims process and setting up the summary adjudication process because that work would ultimately lead to the elimination of competing lien claims. Order Approving First Priority Lien for Certain Categories of Expenses (ECF 1030) (hereafter, the "Priority Order") at 14. Quoting *SEC v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992), the Court reasoned that:

> Although the prevailing secured claimant had to fight the Receiver's opposition to his claim, he reaped benefits when the Receiver defeated competing claims. By combatting competing claims, the Receiver became his ally. We find that, with

---

[15] Examples of the time entries in question are identified on Exhibits F and G by the notation "Multi-claim process; not applicable to single claim properties."

these type of activities, the Receiver conferred a benefit on the secured creditors and merits fees from their collateral.

Priority Order at 13.

With respect to the Single-Claim Properties, the Receiver "defeated" any competing claims when he reported on January 30, 2020 that there were no competing lien claims on those properties. Once the possibility of competing claims was eliminated, the summary claims-priority process conferred no further benefit on the Single-Claim Properties or the Sole Claimants. As such, the Receiver may not allocate fees to the Single-Claim Properties for claims processing after January 30, 2020.

**The Sole Claimants object categorically to the allocation of fees for any claims process to the Single-Claim properties after January 30, 2020.** After that date, the work on the claims process related to determining the priority of multiple claims involving a single property. This process simply did not implicate the Single-Claim Properties. Moreover, once the possibility of multiple claims were eliminated, the only potential dispute remaining involved the Receiver's potential claim to avoid the Sole Claimants' liens for the benefit of the unsecured creditors. As set forth below, the Receiver's work related to his potential avoidance claim does not benefit the Sole Claimants. This is not chargeable against the Single-Claim Properties.

3. **The Receiver cannot allocate expenses related to the Single-Claim Process to the Single-Claim Properties**

To date, the Receiver has allocated substantial charges related to the Single-Claim Process to the Single-Claim Properties.[16] These charges generally relate to negotiations and litigation with the Sole Claimants as well as the Receiver's efforts to determine whether to object to the Sole

---

[16] The specific time entries in question are identified on Exhibits F and G by the notation "Single claim process is related to recovery of unsecured funds; not for benefit of lien holder or property."

Claimants' claims. Because the majority of the Single-Claim Process will occur after the dates included in the current motion, we anticipate that the Receiver will attempt to allocate additional charges for this type of work in future motions.[17] <u>The Receiver simply is not entitled to any lien, much less a priming lien, for these fees.</u>

The Receiver is not entitled to a lien on the Single-Claim Properties (or any other property) for costs related to the Single-Claim Process and is not entitled to seek payment from the Single-Claim Properties' sale proceeds for these fees. The only purpose of this process is to adjudicate the Receiver's objection to the Sole Claimants' claims. Had the Receiver not reserved his right to attempt to invalidate the Sole Claimants' liens for the benefit of the unsecured creditors, the Single-Claim process would have been unnecessary.

The Single-Claim Process presents a true, classic one-on-one conflict between the Receiver who seeks to invalidate a secured claim for the estate's benefit and a secured creditor who seeks to preserve its lien for its own benefit. If the Receiver objects and prevails, the liens become invalid, thus rendering the proceeds of the sale of the affected properties unsecured funds. Any recovery would be for the benefit of the unsecured creditors. To be sure, the Receiver concedes this point. 11/18/2021 Hearing Tr. at 15:8-20 (Receiver's counsel acknowledging that the invalidation of a Sole Claimant's secured claim would result in sale proceeds going to the unsecured claimants). As such, the Receiver's fees for the Single-Claim process fall within the Court's prohibition of a lien for fees "pertaining to the recovery of unsecured funds." Order Granting Receiver's 7th and 8th Fee Applications (ECF 824) at 5.

---

[17] In his 13th and 14th Fee Applications (ECF 1087, 1181), the Receiver allocated fees related to the Single-Claim Process to the Single-Claim Properties.

The Court correctly determined that the Receiver is not entitled to a lien for work opposing a single secured creditor's claim – the sole object of the Single-Claim Process. The parties have argued and the Court has found that *SEC v. Elliott* controls the availability and priority of the Receiver's lien. *See* Priority Order at 13. In *Elliott*, the Eleventh Circuit distinguished between a receiver's work to cut through a web of competing claims (allowed) and a receiver's work in opposition to a claim (disallowed). *Elliott*, 953 F.2d at 1577-78. Secured investors, such as the Sole Claimants, "are not liable for the Receiver's time spent on activities adverse to them, for those activities benefitted the unsecured creditors." *Id*. at 1578. Among other things, these "adverse activities include the time the Receiver spent opposing their claims to be secured." *Id*.

The same is true here. The Single-Claim Process is designed to adjudicate the Receiver's objections to the Sole Claimants' security interests and claims for the benefit of unsecured creditors. Any time spent by the Receiver in this process is "time the Receiver spent opposing their claims to be secured." Accordingly, such time is not allocable to the Single-Claim Properties, the Receiver enjoys no priority (or any) lien, and such fees cannot be paid from the Single-Claim Properties' sale proceeds.

The Receiver mistakenly suggested that the Court's approval of a priority lien for the summary claim adjudication process allows a priority lien for the Single-Claim Process. This is untrue.

First, the Receiver has not previously sought a lien for work related to the Single-Claims Process. Fee Allocation Motion (ECF 1107) at 6 (limiting lien claim to 'Receiver's efforts developing the process by which the priority of disputed claims would be determined'). The Single-Claims Process does not involve priority disputes. Second, the Court's grant of a first

priority lien for the Receiver's work related to the summary claim-priority adjudication process does not include work related to the Single-Claim Process.

In its order approving the priority lien for the Receiver, the Court made clear that the "summary claim-priority adjudication process" for which it granted a lien is the process for multiple claimants, a process in which the Single-Claim Properties do not participate. Priority Order at 4 (discussing the development of the process "designed to resolve competing claims created by the Cohens"). In granting the priority lien, the Court reasoned that the Receiver was entitled to a priority lien because his efforts to resolve competing claims benefited all putative secured claimants involved in that process. *Id*. at 13 (quoting *Elliott*). The Sole Claimants are not part of that group.

## CONCLUSION

The Receiver's proposed allocations go well beyond the categories approved by the Court for all of the Lenders, and even more so for the Sole Claimants whose collateral is being attacked directly, not benefitted, by the Receiver. Moreover, even where theoretically within the approved categories, the Receiver's time entries lack the specificity and clarity needed to prove benefit to the specific collateral that the Receiver seeks to surcharge. Therefore, the Lenders respectfully ask the Court to deny the Receiver's Fee Allocation Motion.

| /s/ Michael Gilman | s/ Ronald Damashek |
|---|---|
| Edward S. Weil (eweil@dykema.com) Michael A. Gilman (mgilman@dykema.com) Todd Gale (tgale@dykema.com) Benjamin W. Chertok (bchertok@dykema.com) | Ronald Damashek rdamashek@stahlcowen.com Dickinson Wright PLLC 55 West Monroe Street, Suite 1200 Chicago, IL 60603 (312) 377-7858 Counsel for Citibank N.A., as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., |

28

Kevin Connor
(kconnor@dykema.com)
Dykema Gossett PLLC
10 S. Wacker Drive
Suite 2300
Chicago, Illinois 60606
(312) 627-5675
*Federal Home Loan Mortgage Corporation Wilmington Trust, National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Trust 2014-LC16, Commercial Mortgage Pass-Through Certificates, Series 2014-LC16; Wilmington Trust, National Association, as Trustee for the Registered Holders of UBS Commercial Mortgage Trust 2017-C1,Commercial Mortgage Pass-Through Certificates, Series 2017-C1; Citibank N.A., as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2018-SB48; Federal National Mortgage Association; U.S. Bank National Association, as Trustee for the registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2017-SB41;U.S. Bank National Association, as Trustee for the registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2018-SB50;U.S. Bank National Association, as Trustee for the registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2017-SB30 Sabal TL1*

s/ Jill L. Nicholson
Jill L. Nicholson (jnicholson@foley.com)
Andrew T. McClain (amcclain@foley.com)
Foley & Lardner LLP
321 N. Clark St., Ste. 3000
Chicago, IL 60654
Ph: (312) 832-4500
Fax: (312) 644-7528
*Counsel for Citibank N.A., as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2018-SB48; U.S. Bank National Association, as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2017-SB30; U.S. Bank National Association, as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2017-SB41; U.S. Bank National Association, as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2018-SB50; Wilmington Trust, National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Trust 2014-LC16, Commercial Mortgage Pass-Through Certificates, Series 2014-LC16; Federal National Mortgage Association; and Sabal TL1, LLC*

| | |
|---|---|
| *Corevest American Finance 2017-2 Trust, Mortgage Pass-Through Certificates, Series 2017¬2; BC57, LLC; UBS AG; 1111 Crest Dr., LLC, Pakravan Living Trust, Hamid Ismail, Farsaa, Inc.; Thorofare Asset Based Lending REIT Fund IV LLC* | |
| s/Jay L. Welford<br>Jay L. Welford<br>Counsel to Liberty EBCP, LLC<br>jwelford@jaffelaw.com<br>JAFFE RAITT, HEUER & WEISS, P.C.<br>Jay L. Welford (P34471)<br>27777 Franklin Road, Suite 2500<br>Southfield, Michigan 48034<br>(248) 351-3000 | s/ William J. Serritella, Jr.<br>William J. Serritella, Jr.<br>wserritella@taftlaw.com<br>Zachary R. Clark<br>zclark@taftlaw.com<br>Taft Stettinius & Hollister LLP<br>111 East Wacker Drive, Suite 2800<br>Chicago, IL 60601<br>(312) 527-4000 |
| s/ Mark S. Landman<br>mlandman@lcbf.com<br>Landman Corsi Ballaine & Ford P.C.<br>120 Broadway, 13th Floor<br>New York, NY 10271<br>Ph: (212) 238-4800<br>Fax: (212) 238-4848<br>*Counsel for Freddie Mac* | /s/ Jennifer Walker<br>Jennifer Walker<br>JWalker@plunkettcooney.com<br>Plunkett Cooney, PC<br>221 N. LaSalle Street, Ste. 1550<br>Chicago, IL 60601<br>Ph: (312) 970-3410<br>Fax: (248) 901-4040<br>*Counsel for UBS AG* |
| /s/ Thomas B. Fullerton<br>Thomas B. Fullerton (6296539)<br>Akerman LLP<br>71 S. Wacker Drive, 47th Floor<br>Chicago, IL 60606<br>(312) 634-5700<br>thomas.fullerton@akerman.com | /s/Scott Mueller<br>Scott B. Mueller, #6294642<br>(Scott.Mueller@stinson.com)<br>7700 Forsyth Blvd., Suite 1100<br>St. Louis, MO 63105<br>Phone: (314) 863-0800<br>Fax: (314) 259-3931<br>*Attorneys for BMO Harris Bank, N.A., and Midland Loan Services, a division of PNC Bank, NA, acting under authority designated by Colony American Finance Lender, LLC, assignee Wilmington Trust, N.A. as Trustee for the benefit of registered holder of Colony American Finance 2015-1* |
| Michael D. Napoli (TX 14803400)<br>Akerman LLP<br>2001 Ross Avenue, Suite 3600<br>Dallas, TX 75201<br>(214) 720-4360<br>michael.napoli@akerman.com<br>*Counsel for Midland Loan Services, a Division of PNC Bank, National Association* | /s/ David Hart<br>David Hart<br>(dhart@maddinhauser.com)<br>Maddin, Hauser, Roth & Heller, P.C. |

| | 28400 Northwestern Highway<br>Suite 200-Essex Centre<br>Southfield MI 48034<br>Phone: (248) 827-1884<br>Fax: (248) 359-6184<br>*Counsel for BC57, LLC* |
| --- | --- |

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on March _6_, 2022 I caused the foregoing to be electronically filed with the Northern District of Illinois using the ECF filing system.

*/s/ Michael Gilman*