**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN,<br><br>Defendants. | Civil Action No. 18-cv-5587<br><br>Hon. John Z. Lee<br><br>Mag. Judge Young B. Kim |

**RESPONSIVE POSITION STATEMENT OF CERTAIN INDIVIDUAL INVESTORS**

The undersigned Group 1 Investor-Lenders (the "Certain Investor-Lenders"), jointly submit this Responsive Position Statement in further support of their claims and those of the other Investor-Lenders and in opposition to the claim submitted by BC57 LLC ("BC57").

**INTRODUCTION**

The Position Statements submitted by the claimants in Group 1 make it clear that the question now before the Court is, at its core, which claims should have priority: the claims submitted by just about every other claimant, including the Certain Investor-Lenders, or the claim submitted by BC57? In resolving this issue, there is no dispute that the liens held by the Investor-Lenders predate the lien that BC57 received in connection with its $5,328,433.43 loan to EquityBuild (the "BC57 Loan") and so, absent an effective release, the claims of the Investor-Lenders have higher priority.

Accordingly, the key issue now before the Court is whether those Investors' liens were properly released. As the evidence presented in the parties' claims and Position Statements demonstrates, they were not. This, in turn, means that the liens of the Investor-Lenders remain

{00961838 }

valid, first position mortgage liens and therefore have higher priority than the lien upon which BC57 relies.

In hopes of convincing the Court otherwise, BC57's Position Statement attempts to distract the Court with red herrings while ignoring the plain language of the relevant documents and assuming the outcome of key issues now before the Court. (Doc. 1152, Position Statement of BC57 ("BC57's Statement").) In all of this, BC57 ignores the facial defects of the releases on which it relies, ignores that EquityBuild Finance did not have the powers BC57 claims it did, and ignores that BC57's employees and agents did nothing to investigate numerous, obvious issues with the BC57 Loan and the documents related to it.

For instance, BC57 asserts there is no dispute that the Investor-Lenders granted EquityBuild Finance "the express authority … to release the Investor-Lender Mortgages upon payment of the debt secured by them." (*Id.*, p. 3.) In making this assertion, BC57 ignores the fact that the documents that supposedly granted that "express authority" – the Collateral Agent and Service Agreement (the "CAS Agreements") – explicitly state that EquityBuild Finance had such power ***only if*** all of the Investor-Lenders unanimously agreed in writing to authorize release of their respective mortgages. (Docs. 1147-6 – 1147-10, Exs. 6-10.)

BC57 even goes so far as to rely on that illusory grant of authority to argue that the Investor-Lenders somehow enabled EquityBuild Finance to defraud BC57 (*See, e.g.*, Doc 1152, p. 4.), ignoring the fact that the Investor-Lenders were the first victims of that very fraud. Acknowledging the weaknesses in their arguments, BC57 falls back to an apparent authority argument, which the Certain Investor-Lenders thoroughly debunked in their Position Statement. (Doc. 1151, Position Statement of Certain Individual Investors (the "Certain Investor-Lenders' Statement"), pp. 11-16.) In short: One cannot bury one's head in the sand, refuse to do even a

cursory amount of diligence, and then claim to have been relying on a document that party purposefully avoided reading.

Ultimately, nothing in BC57's Statement changes the fact that the releases on which BC57 relies for its priority argument are ineffective, meaning BC57's arguments fail. Accordingly, the Court should now hold that the Investor-Lenders' liens are higher in priority than BC57's lien and that, therefore, the Receiver should be authorized to release the proceeds of the sale of the Group 1 buildings to the Investor-Lenders.

**ARGUMENT**

I. **THE RELEASES UPON WHICH BC57 RELIES ARE FACIALLY INVALID.**

Initially, and as explained in the Certain Investor-Lenders' Statement (Doc. 1151, pp. 6-11), the releases upon which BC57 relies fail to release the Investor-Lenders' liens. This is because the language of the releases have the wrong party releasing the liens, stating that EquityBuild, the borrower, is releasing the liens when, in reality, those liens could only be released by the Lenders – meaning the Investor-Lenders – or, at least according to BC57, EquityBuild Finance as the servicer. (*See, e.g.*, *id*, pp. 6-8.) Despite this clear problem with the releases, BC57's Statement does little, other than to offer excuses provided by its proffered expert whose opinions, by his own admission, have no relevance to the priority issue being decided by the Court. (Doc. 1147-33, Ex. 33, Deposition of J. Bushnell Nielsen ("Nielsen Dep."), 20:7-21:19; 125:22-126:19.)

Seemingly realizing that its excuses are unlikely to save its claim, BC57's Statement argues that the Illinois Mortgage Act, 765 ILCS 905/2 (the "Mortgage Act"), means the Investor-Lenders' mortgages "must be deemed released as a matter of law." (Doc. 1152, p. 28.) Initially, BC57's Statement notably points to no legal authority in support of its assertion that because a mortgagee is obligated under the Illinois Mortgage Act to release their lien, the lien is released as

a matter of law. Instead, BC57's Statement relies on cases that predate the July 1, 1962 effective date of the Mortgage Act. (*Id.*)

Reviewing the language of the Mortgage Act itself demonstrates that BC57's argument fails. Section 2 of the Mortgage Act provides, in relevant part: "Every mortgagee of real property … having received full satisfaction and payment of all such sum or sums of money as are really due to him from the mortgagor … shall, at the request of the mortgagor … make, execute and deliver to the mortgagor … an instrument in writing … releasing such mortgage …." 765 ILCS 905/2. Thus, full payment and a request by the mortgagor after a full payment was made are a necessary conditions before a mortgagee is obligated to release a mortgage, but do not, alone, constitute a sufficient condition to require release of the mortgage. The Mortgage Act mandates an additional step in the release process, to wit: once a mortgagee receives full payment it must "make, execute and deliver … an instrument in writing … releasing such mortgage." *Id*. So, full payment alone does not release the mortgage, it only triggers the obligation of a mortgagee to release a mortgage and then only after receiving a request from the mortgagor. *Id.*; *see also* 765 ILCS 905/4. Thus, the Mortgage Act provides for such a request, but only from the mortgagor, not a third party like BC57.

Moreover, no such request was made in this instance, not by EquityBuild, which, presumably, did not make such a request for fear it would alert the Investor-Lenders to its fraud, and not by the Receiver, who, after commencement of this receivership, had the power to request it if he believed that the Investor-Lender mortgages had been fully repaid. This makes sense, of course, as it is undisputed the Investor-Lenders did not receive full payment following the BC57 Loan. Accordingly, they did not have any obligation to release their mortgages, nor did they do so. This means the Investor-Lenders' mortgages remain in full force and effect. *See North Shore*

*Community Bank and Trust Company v. Sheffield Wellington LLC*, 2014 Il. App. 1st 123784, ¶¶ 72-76.

## II. BC57 CANNOT RELY ON AUTHORITY NOT ACTUALLY GRANTED IN A DOCUMENT IT NEVER REVIEWED.

Once BC57's lengthy exposition on irrelevant arguments is stripped away, the fundamental question regarding the release is remarkably simple: Is there any avenue by which EquityBuild Finance had authority to execute the release deeds? The record demonstrates that the answer to this question is an unequivocal no, for multiple reasons.

### A. The CAS Agreements That BC57 Failed To Even Review Do Not Actually Grant EquityBuild Finance The Authority That BC57's Claims They Do.

The first answer to the question of whether EquityBuild Finance had the authority to execute the release deeds comes from the language of the CAS Agreements. In its Statement, BC57 engages in extensive, after-the-fact analysis of the CAS Agreements necessitated by the fact that BC57 failed to even obtain copies of, let alone analyze, the CAS Agreements prior to making its loan. (Doc. 1152, pp. 13, 24.) Based on this analysis, BC57 repeatedly asserts that the CAS Agreements authorized EquityBuild Finance, as the Investor-Lenders' agent, the express authority to (1) issue payoff statements, (2) to receive all payments on the Investor-Lender loans, and (3) to release the Investor-Lenders' Mortgages upon payment of the debt secured by then. (*See, e.g.*, Doc. 1152, pp. 2, 3, 13-14, 18.) The actual language of the CAS Agreements – language that BC57 never reviewed as part of its underwriting[1] – does only the

---

[1] BC57's Statement cites to numerous cases that discuss the scope of an agent's authority, noting that it is the words of the principal that create the power of the agent. (*See, e.g.*, Doc. 1152, BC57's Statement, pp. 18-19 (citing *Chicago v. Roppolo*, 113 Ill. App. 3d 602, 614; *Zahl v. Krupai*, 365 Ill. App. 3d 653, 661 (2006)).) Here, however, it is uncontested that BC57 had no knowledge of the words of the principals, as it did not have those words as contained in the CAS Agreements, let alone review them. (*See, e.g.*, Doc 1152, BC57 Statement, pp. 13, 24 (acknowledging that BC57 did not have the CAS Agreements prior to closing the BC57 Loan).)

first two of these three things. For the third – the release of the Investor-Lenders' Mortgages – the CAS Agreements explicitly require, as BC57's Statement actually acknowledges (Doc. 1152, pp. 20, 21-22), unanimous written direction for such authority to vest.

Indeed, had BC57, its employees, attorneys, title insurance and escrowee agent, or any combination of them actually reviewed the CAS Agreements before closing BC57's loan, BC57 would have known that the CAS Agreements did not authorize EquityBuild Finance to release the Investor-Lenders' mortgages without written instructions from the Investor-Lenders. This is because Section 6(a) of each of CAS Agreement provides, in pertinent part:

> Unless otherwise excused as provided herein, both the Collateral Agent and the Servicer shall act on all written instructions received from the Required Lenders, with respect to any action to be taken or not to be taken in connection with this Agreement, the Mortgage or the Note, including, without limitation, actions to be taken in connection with an insolvency proceeding in respect of the Borrower; provided, however, that ***the Collateral Agent shall act only on written instructions from all Lenders with respect to the amendment or termination of the Mortgage***, or, except as provided in the Mortgage, any Lien on the property of the Borrower granted under the Mortgage. …

(Doc. 1147-6 – 1147-10, Exs. 6-10.) Though it quotes Section 6(a) in its Position Statement (Doc. 1152, p. 9), BC57's argument ignores that the language it quoted requires the Investor-Lenders' written authorization to amend or terminate the Investor-Lenders' mortgages and fails to identify a written authorization from ***any*** of the Investor-Lenders, let alone such an authorization from ***all*** of them.[2]

---

[2] BC57 appears to argue that another document executed at the same time as the CAS Agreement – an untitled document that BC57 has dubbed the Authorization Document – somehow provided those written instructions. (*See, e.g.*, Doc. 1152, pp. 21-22.) This, however, fails both because BC57 has not identified an Authorization Document for each of the Investor-Lenders (Doc. 1152, pp. 7-8) and because those that it has identified do not mean what BC57 claims. Indeed, it would make no sense for a lender to authorize the release of its security at the same time that it executed the documents granting that security as part of making the loan being secured; such a document would make the security underpinning the loan illusory.

Thus, contrary to BC57's outrageous suggestions, the Investor-Lenders did not enable the fraud that cost them millions of dollars. To the contrary, they reasonably relied on express provisions in the CAS Agreements that should have precluded the fraud. Those provisions failed to prevent EquityBuild's fraud not because the instrument containing them was somehow ineffective, but solely because BC57 failed to even obtain copies of those CAS Agreements, let alone review them to see that they required written authorizations from the Investor-Lenders.

Given this express restriction upon EquityBuild Finance's authority to release, BC57's admitted failure to even get a copy of the CAS Agreements, let alone review them, and the several additional facts and documents supporting the Receiver's Fraudulent Transfer Claim (Doc. 1118, Receiver's Disclosure, pp. 4-8), the Court should now conclude that BC57 should have inquired further into EquityBuild Finance's authority to execute releases of the Investor-Lenders' mortgages. Having failed to do so, BC57 should not now be allowed to rely on its ignorance to wipe out the otherwise valid mortgage liens held by the Investor-Lenders.

**B.     BC57's Claim That EquityBuild Finance Somehow Had Apparent Authority Also Fails.**

BC57's second explanation for how EquityBuild Finance had the authority to release the Investor-Lenders' mortgages is under a theory of apparent authority. (Doc. 1152, pp. ___.) Apparent authority, however, is an unwinnable paradox for BC57. Apparent authority is an outgrowth of actual authority and BC57 never reviewed the CAS Agreements, the instruments which vested any authority in EquityBuild Finance. The other side of this coin is that even if BC57 had reviewed the CAS Agreements, that review would have made it immediately apparent that EquityBuild Finance was not authorized to release the mortgages. This paradox means that either BC57 and its agents never saw the CAS Agreements, in which case there is no evidence of *any* authority granted to EquityBuild Finance by the Investor-Lenders, or they saw the CAS

Agreements and were directly informed that the hoped-for authority simply did not and does not exist. Authority of an agent flows directly and solely from its principal. Here, those principals – the Investor Lenders – made their position crystal clear, if BC57 had bothered to look at the CAS Agreements. Having failed to do so, BC57 cannot claim that there was no way for it to know otherwise.

Instead, BC57 attempts a sort of *ex post facto* bootstrapping to paper over their failures. BC57 waits until page 27 of its Statement to directly address the key question, and then fails to fully address it. Indeed, nowhere in its Statement does BC57 provide:

- Any reference to any written instructions provided by any Lender identified on any of the Exhibits A to the Mortgages;

- Any explanation for why BC57 did no investigation as to the scope of EquityBuild Finance's agency;

- Any explanation for why neither BC57 nor its title agent had copies of the CAS Agreements prior to the closing of its loans to EquityBuild;

- Any explanation, beyond baseless assumption, for why it believed EquityBuild Finance had any authority to execute the releases; or

- Any explanation for how BC57 could possibly rely on the authority granted by a document neither it nor any of its agents had even read.

BC57 tries to excuse its failures by claiming that the various indicators of EquityBuild's fraudulent scheme would not have revealed anything had they actually been investigated or were nothing more than sloppiness or scrivener's errors, which BC57 then excuses by noting that others, such as its choosen title company, relied on those same sloppy documents. (*See, e.g.*, Doc. 1152, pp. 25, 27-28.) These excuses, however, all presume that nothing would have come from BC57 asking questions regarding what is now known to be a fraudulent Ponzi scheme – a presumption should not excuse BC57's failures.

The real answer is simple: BC57 had no opinion regarding the scope of authority at the time of closing because BC57 never bothered to do even the most basic of investigation into the property interest it was receiving. Everything else is Herculean efforts by its skilled lawyers (including lawyers provided by its title insurer who, if this Court rules against BC57, may be on the hook for BC57's losses) to confound and distract from this fatal flaw. BC57's reckless actions put the adverse claimants in this position, not, as BC57 boldly asserts, any action by the Investor-Lenders. The Court should not twist the laws of agency and equity into knots and punish the Investor-Lenders to rescue BC57 from its own mistakes.

### III. BC57'S RELIANCE ON ITS PROFFERED EXPERT IS OF NO RELEVANCE.

BC57's Statement closes with a discussion of how it acted in a manner that complied with industry customs and practices. (Doc. 1152, pp. 28-33.) Initially, as the Certain Investor-Lenders' Statement explained, the opinions of BC57's proffered expert upon which B57 relies for this discussion are of no moment because he is not addressing the question now before the Court and conflict with Illinois law. (Doc. 1151, pp. 20-21; *see also* Doc. 1147-33, Nielson Dep., 20:7-21:19; 125:22-126:19.) Indeed, as numerous courts have held for decades, federal judges are experts on federal law, meaning the testimony of a legal expert in federal cases is generally unnecessary. *See, e.g.*, *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 803 F.2d 454, 461 (9th Cir. 1986); *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2nd Cir. 1977), *cert. denied*, 434 U.S. 861, 54 L. Ed. 2d 134, 98 S. Ct. 188 (1977); *Loeb v. Hammond*, 407 F.2d 779, 781 (7th Cir. 1969).

Moreover, even if BC57's expert's opinions were relevant, they would not change the outcome. To the contrary, were every lender as sloppy and trusting as BC57 and its expert says they are – which they are not – that argument would not change the standards by which BC57

should be judged, but rather would only demonstrate that lenders are failing to take the necessary steps to properly protect and secure the loans they are making.

## CONCLUSION

For all of the reasons set forth in the Certain Investor-Lenders' Statement and this Responsive Statement, the Court should now find that all of the Investor Lenders continue to hold higher priority liens than BC57 and hold that the proceeds of the Group 1 properties should be distributed first to the Investor Lenders.

Dated: March 14, 2022

**ARTHUR AND DINAH BERTRAND, PAT DESANTIS, GIRL CAT CAPITAL WEST LLC, SIDNEY HAGGINS, INITIUM LLC / HARRY SAINT-PREUX, ROBERT JENNINGS, KNICKERBOCKER INVESTMENT GROUP LLC, STEVEN AND LINDA LIPSCHULTZ, JILL MEEKCOMS, LORI MORELAND, MARK MOUTY, GLYNIS SHEPPARD / J. FIELDS LIVING TRUST, RANDALL SOTKA / TAHITI TRUST / BIG BEAN LLC, LOUIS DUANE VELEZ,**

By: ___/s/ *Max A. Stein*___
      One of their attorneys

Max A. Stein
Boodell & Domanskis, LLC
One North Franklin, Suite 1200
Chicago, IL 60606
(312) 938-4070
mstein@boodlaw.com

**1839 FUND LLC**

By: ___/s/ *Michael O'Malley Kurtz*___

Michael O'Malley Kurtz
Kurtz & Augenlicht LLP
123 W Madison St, Ste. 700
Chicago, IL 60602

312.265.0106
mkurtz@kalawchicago.com

**KIRK ROAD INVESTMENTS, LLC, LEROY JOHNSON, MARTHA JOHNSON, AND LMJ SALES, INC.,**

By:    /s/ *Kevin P. Brown*

Jerome F. Crotty
Kevin P. Brown
Rieck and Crotty, P.C.
161 North Clark Street, Suite 2500
Chicago, Illinois 60601
312-726-4646
kbrown@rieckcrotty.com

## CERTIFICATE OF SERVICE

I, Max A. Stein, an attorney, certify that I caused a copy of the aforementioned **RESPONSIVE POSITION STATEMENT OF CERTAIN INDIVIDUAL INVESTORS** to be served upon the parties and counsel of record through the CM/ECF system and through the ebgroup1service@rdaplaw.net email.

*/s/ Max A. Stein*