**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) |
| Plaintiff, | ) Civil Action No. 18-CV-5587 ) |
| v. | ) Hon. John Z. Lee ) |
| EQUITYBUILD, INC., *et al.*, | ) ) |
| Defendants. | ) ) ) |

**SEC'S RESPONSE TO BC57's GROUP 1 POSITION STATEMENT**

The SEC's Position Statement (ECF 1146) demonstrated that the investor-victims of the Cohens' Ponzi scheme: (a) obtained prior-in-time mortgages which were never validly released; (b) never authorized their mortgages' release; and (c) never received payment in connection with any such release. The SEC's Position Statement is consistent with those filed by the defrauded investors. (*See*, *e.g.*, ECF 1140, 1149, 1151). It is also supported by the Receiver. (ECF 1201, at 2). The *only* Group 1 claimant offering a contrary position is BC57.

Despite its outlier position, BC57 disputes few, if any, of the facts proffered by the SEC. Among the central facts BC57 concedes are: (a) the investors' mortgages came first; (b) the releases name the wrong parties and were not signed by the investors; and (c) the investors were not repaid. BC57 also makes the key concession that *BC57 never saw the documents* by which it claims the investors authorized Equitybuild Finance to release their mortgages. BC57 thus admits being unaware of the scope of authority or any agency relationship between Equitybuild Finance and the investors. BC57 similarly concedes that it took no efforts to confirm the scope of any such authority.

Faced with undisputed facts supporting the investors' lien priority, BC57 attempts to salvage its claims by relying on statutes that do not apply and the incorrect legal conclusions of its real estate lawyer expert. BC57 goes so far as to blame the investors for falling victim to the Cohens' Ponzi scheme, while failing to accept any responsibility for its own woefully deficient due diligence efforts. Yet BC57 offers no evidence to support its attacks on the investors and concedes that, unlike the investors, BC57 is a sophisticated real estate lending firm that had ample resources to conduct due diligence and is fully protected by its title insurance policy.

Given that the key facts are not in dispute, and that BC57's arguments fail as a matter of law, the Court should uphold the validity of the investors' prior-in-time mortgages and resolve this priority dispute in the investors' favor.

### A. BC57 Concedes that the Releases Contain the Defects Identified by the SEC

The SEC's Position Statement showed why the Releases are invalid. Each Release names the wrong parties, by identifying Equitybuild as the releasing party and Equitybuild Finance as the party receiving the release. (*See* ECF 1146, at 5 (citing Exs. 16-20)). This conflicts with the investor mortgages, which name Equitybuild as the *borrower* and the investors as the *lenders*. (*Id.*, at 5-6 (citing Exs. 1-5)). The SEC further showed that the Releases were executed by the wrong party, Equitybuild Finance, whereas the investors' mortgages identify the lender as "The Persons Listed on Exhibit A to the Mortgage C/O" either Equitybuild Finance or Hard Money Company, LLC. (*Id.*). Again, the party executing the Releases (Equitybuild Finance) is different than the parties holding the Mortgages (the investors "Listed on Exhibit A" to the Mortgages).

BC57 disputes none of this. Rather, BC57 concedes: "EBF executed each Release, although the body of each Release erroneously described EB (the mortgagor), not EBF, as the

2

party releasing the [investor's] Mortgage." (ECF 1152, at 12). BC57 likewise admits: "it is fundamental that only the mortgagee or its agent, not the mortgagor, can execute an effective release of a mortgage." (*Id.* at 28).

Recognizing the implications of the defective Releases, BC57 attempts to cure their flaws by characterizing them as mere "scrivener's errors." (*Id.* at 27-28). The party asserting a scrivener's error bears the burden of establishing the alleged error is "mechanical or technical" as opposed to "decisional or judgmental." *See, e.g., Fifth Third Bank, N.A. v. Rosen*, 957 N.E.2d 956, 964-65 (Ill. App. Ct. 2011) (citations omitted); *see also Gerlib v. R.R. Donnelly & Sons Co.*, 2002 U.S. Dist. LEXIS 10755, *10 (N.D. Ill. June 11, 2002) ("the mistake of a scrivener in drafting a document may be reformed based upon parol evidence, provided the evidence is 'clear, precise, convincing and of the most satisfactory character' that a mistake has occurred and that the mistake does not reflect the intent of the parties.") (citations omitted). BC57 likewise must prove that any mistake was mutual, "leaving no reasonable doubt as to the mutual intention of the parties, a mere preponderance of the evidence being insufficient." *Berry v. Lewis*, 23 Ill. 2d 380, 385 (Ill. 1961) (citations omitted).

Here, BC57 cannot possibly carry the burden of establishing a scrivener's error or mutual mistake. Among other reasons, BC57 presents no testimony from or evidence showing the intent of the two parties to the Releases, Equitybuild or Equitybuild Finance. Absent such evidence, any attempt to determine their "mutual intention" would be entirely speculative.

### B. The Illinois Mortgage Statutes Do Not Help BC57

The SEC's Position Statement showed that under the Illinois Mortgage Act, an invalid release does *not* effect a release of a mortgage, even if a subsequent lender obtains a payoff statement or provides payment to a third party. (ECF 1146, at 10-11 (citing *Walker v. Ocwen*

3

*Loan Servicing, LLC,* 2016 WL 3035902, at ¶17 (Ill. App. Ct. May 27, 2016) and *N. Shore Cmty. Bank & Tr. Co. v. Sheffield Wellington LLC*, 20 N.E.3d 104, 117 (Ill. App. Ct. 2014)). Ignoring this authority, BC57 clams that "Illinois law requires the release of a mortgage when the debt is paid" such that the investors' mortgages "must be deemed released as a matter of law." (ECF 1152, at 28). Even if this proposition were true, it would not save BC57. This is because the investors never received the funds BC57 gave to Equitybuild Finance. Thus, the payment of the "mortgage debt," which BC57 says necessitates a release, never occurred.

BC57's reliance on the Illinois Mortgage Certificate of Release Act ("MCRA"), 765 ILCS 935/1, *et seq*. (ECF 1152, at 22), is even less persuasive. Indeed, MCRA only governs "the recording of a 'certificate of release' by a *title insurance company*." *In re Good*, 2006 Bankr. LEXIS 1810, at *4-*5 (Bankr. C.D. Ill. Aug. 23, 2006) (emphasis added). BC57 seems to recognize this MCRA prerequisite. (ECF 1152, at 22 ("The Act permits an officer or agent of a title insurance company to execute a certificate of release of a mortgage")). To that end, MCRA Section 20 provides: "A certificate of release executed under this Act *must* contain substantially all of the following for each mortgage being released," including:

(a) "the name of the original mortgagee,"

(b) "A statement that…there is no objection from the mortgagee or mortgage servicer or its successor in interest"; and

(c) "A statement that the person executing the certificate of release is an officer or a duly appointed agent of *a title insurance company*…"

765 ILCS 935/20 (emphasis added).[1]

---

[1] *See also* 765 ILCS 935/15 (MCRA release to be executed by an "officer or duly appointed agent of a title insurance company"); 765 ILCS 935/25 (any agent executing a MCRA release "must be a currently registered title insurance agent of the title insurance company"); Illinois Mortgage Act Section 2, 965 ILCS 905/2 (a "certificate of release *issued and recorded by a title insurance company or its duly appointed agent* pursuant to [MRCA] shall satisfy the requirements of this Section 2.") (emphasis added).

4

The Releases BC57 rely on contain none of this information. (ECF 1147-16 through 1147-20). Nor could they, especially since the Releases were executed by Equitybuild Finance, and not any title insurance company or its agent.

### C. BC57 Cannot Establish the Investors Authorized the Release of Their Mortgages or that a Fiduciary Relationship Existed

Given the defective Releases, the investors' mortgages remain in effect. The Court can thus decide lien priority without determining whether Equitybuild Finance had the requisite authority to release the mortgages. Nevertheless, the undisputed facts show that no such authority existed and BC57 lacked sufficient information to determine if Equitybuild Finance was the investors' fiduciary or was otherwise authorized to release their mortgages.

#### 1. BC57's Heavy Burden

BC57 carries the burden of establishing Equitybuild Finance's authority to release the investors' mortgages. *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.*, 759 N.E.2d 174, 181 (Ill. App. Ct. 2001) ("The party alleging an agency relationship must prove it by a preponderance of the evidence.") (citations omitted). To establish a fiduciary relationship, BC57's burden is even heavier. BC57 must prove the relationship "by proof 'so strong, unequivocal and unmistakable as to lead to but one conclusion.'" *In re Estate of Rothenberg*, 176 Ill. App. 3d 176, 182-183 (Ill. App. Ct. 1998) (citations omitted); *see also Specialty Earth Scis., LLC v. Carus Corp.*, 2021 U.S. Dist. LEXIS 197639, at *57-58 (N.D. Ill. Oct. 14, 2021) ("The party asserting the fiduciary relationship has the burden of proving the existence of a fiduciary duty by clear and convincing evidence.") (citing *Burdett v. Miller*, 957 F.2d 1375, 1382 (7th Cir. 1992)). In any event, "one who deals with an agent 'takes the risk not only of ascertaining whether the person with whom he is dealing is the agent, but also of ascertaining the scope of his powers.'" *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 675 (7th Cir. 2004) (citations omitted).

5

## 2. The Investors Did Not Authorize the Release of Their Mortgages

BC57 points to two documents it claims authorized Equitybuild Finance to release the investors' mortgages: (1) the CAS Agreements and (2) what BC57 refers to as the "Authorization Document." (*See* ECF 1152, at 8-10). Despite insisting these two documents establish the authority on which it relied, *BC57 admits it never saw either document*. (*Id.* at 13 ("Neither NNNT [BC57's title insurer] nor BC57 had a copy of the [CAS] Agreement or the Authorization Document when the refinancing closed.")).

As detailed in the SEC's Position Statement, rather than authorizing Equitybuild Finance to release the investors' mortgages, the CAS Agreements expressly precluded their release absent written instructions from all investors holding an interest in the mortgage. (*See* ECF 1146, at 3-4). BC57 admits the CAS Agreements "required EBF to receive instructions before taking action that affected the collateral [and] to terminate the mortgage." (ECF 1152, at 20). BC57 similarly acknowledges "the authorization given in [the CAS] Agreement was subject to any express limitations set forth therein." (*Id.* at 21).

Critically, BC57 concedes each CAS Agreement expressly "*disclaims a fiduciary relationship*" between the investors and Equitybuild Finance. (ECF 1152, at 16 (emphasis added); *see also* ECF 1147-6 through 1147-10, § 2(a) ("neither the Collateral Agent nor the Servicer shall have…a fiduciary relationship with any [investor] Lender.")). Recognizing the CAS Agreements imposed limitations on Equitybuild Finance's authority, BC57 argues the requite "written instructions" came from an "Authorization Document" the investors executed along with the CAS Agreements at the time they invested. (ECF 1152, at 8-10). But the "Authorization Document" merely says that either Hard Money Company or Equitybuild Finance is "authorized by the above listed [investor] lenders to receive the payoff in

its name and issue and execute a release of said mortgage, upon payment in full of any outstanding balance." (*See, e.g.,* ECF 1160, at 78; *see also* ECF 1168-1, at 63, 140, 218). The "Authorization Document" BC57 cites (ECF 1160, at 78) is copied here:

> **Lender Name:** Kevin Scheel
>
> **Lender Amount:** $25,000.00
>
> **Percentage of Ownership of Total Loan:** 1.11%
>
> **Monthly Interest Payment Amount to Be Received:** $250.00 at 12%
>
> *Kevin Scheel*
> **Lender Signature**
>
> EquityBuild Finance, LLC, as agent and trustee has been authorized by the above listed lenders to receive the payoff in its name and issue and execute a release of said mortgage, upon payment in full of any outstanding balance.

Notably, while the "Authorization Document" contains the investor's signature, the signature is *above* the quoted language and pertains to the amount of the investor's investment and percentage interest in the mortgage. (*Id.*). There is no signature affirming the purported authorization. In other words, the investors *never signed* what BC57 claims to be authorization or written instructions to release the mortgages.[2]

Even if the investors had signed below the operative language, it would not constitute the requisite written instructions to release their mortgages. Specifically, this language does not actually instruct anyone to do anything. Instead, at best, it provides a general authorization to

---

[2] BC57 also admits not locating CAS Agreements or Authorization Documents for at least 17 investors. (ECF 1152, at 7-8). For these investors, this lack of critical evidence means BC57's burden to establish authority or fiduciary duties is even greater. This evidentiary gap also precludes BC57 from proving that *all investors* provided written instructions to release the mortgages, which the CAS Agreements required.

7

execute a release in the event the investors were repaid. Because the investors were never repaid, this language provides no grant of authority. While BC57 may have been unaware that Equitybuild Finance stole the investors' money, BC57 had enough information – as described by the Receiver and conceded by BC57 – to realize the Payoff Statements reflected loan balances that were less than half of the mortgages' loan principal. (*See* ECF 1118, at 5-6; ECF 1152, at 25-26). Had BC57 actually paid attention, it should have determined that "payment in full of any outstanding balance" never occurred.

Also, BC57 proffers that investors completed the "Authorization Document" as part of the same "Investment Package" that includes the CAS Agreements. (ECF 1152, at 7). If the "Authorization Document" is construed in the manner BC57 suggests, the CAS Agreements' provisions requiring written instructions to release the mortgages would be rendered superfluous. *See, e.g., Land of Lincoln Goodwill Indus. v. PNC Fin. Servs. Grp.*, 762 F.3d 673, 679 (7th Cir. 2014) ("whenever possible we attempt to give meaning to every provision of the contract and avoid a construction that would render a provision superfluous."). BC57's reading of the Authorization Document – *ex ante* authority to release the mortgages – also directly conflicts with BC57's assertion that the investors "established their control of EBF [by requiring] EBF to receive instructions before taking action that affected the collateral." (ECF 1152, at 20).

### 3. No Fiduciary Relationship Existed

Beyond failing to establish the investors granted Equitybuild Finance authority to release their mortgages, BC57 cannot demonstrate that a fiduciary relationship existed. BC57 claims the source of the fiduciary relationship was the CAS Agreements. (ECF 1152, at 19-20). But that mere contractual relationship is not enough to create a fiduciary one. "Under Illinois law, a contractual relationship normally does not create a fiduciary relationship between the contracting

8

parties." *Glovaroma, Inc. v. Maljack Prods., Inc.*, 1998 U.S. Dist. LEXIS 2399, at *12-*14 (N.D. Ill. Feb. 25, 1998) (citations omitted) (plaintiff's "'mere trust' it placed in [defendant] to fulfill its contractual duties…does not establish a fiduciary duty"); *see also Specialty Earth Scis.*, 2021 U.S. Dist. LEXIS 197639, at *60 ("SES did not sufficiently entrust its business affairs to Carus so as to give rise to a fiduciary relationship. Here, SES's breach of fiduciary duty claim is predicated solely on Carus's failure to fulfill its obligations under the License Agreement").

Specifically, the contractual obligation to collect money for another's benefit – which BC57 claims established Equitybuild Finance's fiduciary obligations – is insufficient. *See, e.g., Glovaroma*, 1998 U.S. Dist. LEXIS 2399, at *10-*14; *Sony Music Ent. Inc. v. Robison*, 2002 U.S. Dist. LEXIS 3100, at *9 (S.D.N.Y. Feb. 25, 2002) ("The fact that Sony is responsible for collecting royalties and passing them on to Defendants does not create a fiduciary relationship.").

For this reason, courts routinely hold that loan servicers, such as what Equitybuild Finance purported to be, are *not* fiduciaries. *Turner v. Trinity Fin. Servs.*, 2015 U.S. Dist. LEXIS 161529, at *5-*6 (S.D. Ind. Oct. 30, 2015) (loan servicer not a fiduciary); *McMorgan & Co. v. First Cal. Mortg. Co.*, 916 F. Supp. 966, 973 (N.D. Cal. 1995) (same); *Wells Fargo Bank, N.A. v. Favino*, 2011 U.S. Dist. LEXIS 35618, at *41-*42 (N.D. Ohio Mar. 31, 2011) (same); *Argonaut P'ship, L.P. v. Bankers Tr. Co.*, 2001 U.S. Dist. LEXIS 7100, at *8-*9 (S.D.N.Y. May 30, 2001) (same); *Moss v. Ditech Fin., LLC*, 2016 U.S. Dist. LEXIS 100041, at *28-*29 (D. Md. Aug. 1, 2016) (same). BC57 cites no authority to the contrary.

Here, the CAS Agreements expressly provide that Equitybuild Finance's "duties…shall be deemed ministerial and administrative in nature." (ECF 11147-6 to 1147-10; § 2(a)). The CAS Agreements likewise are explicit that Equitybuild Finance would *not* have "a fiduciary relationship with any [investor] Lender." (*Id.*). This alone precludes BC57 from meeting its

9

heavy burden of establishing a fiduciary relationship. *Tucker v. Soy Cap. Bank & Trust Co.*, 974 N.E.2d 820, 828-830 (Ill. App. Ct. 2012) (upholding contractual release of fiduciary obligations).

### 4. BC57 Lacked Knowledge of Equitybuild Finance's Scope of Authority

Faced with CAS Agreements expressly disavowing a fiduciary relationship, BC57 argues it nevertheless understood Equitybuild Finance to be the investors' agent with the authority to release their mortgages. (ECF 1152, at 18-21). "Under Illinois law, the party asserting the existence of apparent authority…must meet a three-part test: (1) the principal consented to or knowingly acquiesced in the agent's exercise of authority; (2) based on the actions of the principal and agent, the third person reasonably concluded that the party was an agent of the principal; and (3) the third person justifiably and detrimentally relied on the agent's apparent authority." *Sphere Drake*, 376 F.3d at 672-73. BC57 cannot satisfy any of these elements.

The investors did not consent or knowingly acquiesce to Equitybuild Finance releasing their mortgages. Rather, the opposite occurred when the investors signed CAS Agreements expressly precluding Equitybuild Finance from releasing their mortgages without their written instructions. In *Sphere Drake*, an insurance broker agreed to bind coverage beyond limits contained in the contract between the broker and insurance company. 376 F.3d at 673. The Seventh Circuit held: "Because of this misrepresentation [as to only binding coverage within the contractual limitations], it was not possible for Sphere Drake to 'knowingly acquiesce' in EIU's actions." *Id.* As in *Sphere Drake*, Equitybuild Finance acted beyond the scope of authority granted by the investors by breaching the contractual limitations governing their relationship.

*Sphere Drake* likewise held that "one who deals with an agent 'takes the risk not only of ascertaining whether the person with whom he is dealing is the agent, but also of ascertaining the scope of his powers.'" 376 F.3d at 675 (citations omitted). BC57's Position Statement makes

clear that BC57 did little, if anything, to determine whether Equitybuild Finance was the investors' agent, and did nothing to ascertain the scope of Equitybuild Finance's authority. As discussed earlier, BC57 admits it never saw the documents it claims established Equitybuild Finance's authority to release the mortgages. (ECF 1152, at 13).

Instead, the only documents BC57 claims to have seen establishing Equitybuild Finance's agency relationship with the investors were the mortgages themselves. According to BC57, the investors "advised the world in the…Mortgages that EBF served as their *contact*." (ECF 1152, at 20) (emphasis added). But the only reference the mortgages make to Equitybuild Finance is that the security interest granted by the mortgage is "given to The Persons Listed in Exhibit A to the Mortgage ***C/O*** EquityBuild Finance." (*See*, *e.g.*, ECF 1147-3, p. 2; 1147-4, p. 2) (emphasis added). Being a "contact" or having a "C/O" relationship is very different from establishing a broad-ranging agency or fiduciary relationship, certainly not one allowing the "contact" to extinguish a mortgage. BC57 cites no case to the contrary.

At best, BC57 claims it divined from the mortgages that Equitybuild Finance was the "likely servicer" of the mortgages. (ECF 1152, at 24). Yet BC57 cannot point to any efforts it took to determine the scope of authority the investors granted to their "contact." BC57 oddly argues apparent authority is established by promissory notes the investors received from Equitybuild, which directed payment and notices to the investors "c/o" Equitybuild Finance. (*Id.* at 25). But BC57 *concedes it never saw the notes*. (*Id.* at 26 ("Neither [BC57 nor its title insurer] was privy to the notes related to the [investors'] Loans")).

Because BC57 possessed no evidence to believe that Equitybuild Finance had the authority to release the investors' mortgages, and did nothing to verify that such authority existed, BC57 cannot meet the third *Sphere Drake* factor, that it "justifiably…relied" on

11

Equitybuild Finance's apparent authority. 376 F.3d at 673 ("it was not reasonable for All American to conclude that EIU was, at the time, authorized to bind Sphere Drake").[3]

### 5. BC57's Reliance on the Illinois Fiduciary Obligations Act is Misplaced

BC57's reliance on the Illinois Fiduciary Obligations Act ("FOA") is puzzling, since that statute governs *banks* in their transactions with fiduciaries. *Mikrut v. First Bank*, 359 Ill. App. 3d 37, 48 (Ill. App. Ct. 2005) ("The purpose of the [FOA] is to protect depository banks"); *Crawford Supply Grp., Inc. v. Bank of Am., N.A.*, 2011 U.S. Dist. LEXIS 32777, at *14-15 (N.D. Ill. Mar. 28, 2011) ("In passing [FOA], 'the Illinois General Assembly expressed the intent to preempt other state law and to establish a total defense *to banks* for all claims arising from a *bank's* honest interactions with fiduciaries.'") (citation omitted and emphasis added); *Geimer v. Bank of Am., N.A.*, 784 F. Supp. 2d 926, 932 (N.D. Ill. 2011) (the Act "governs a *financial institution's* liability for participation in a breach of fiduciary duty by a third party. As a general rule, [FOA] shields a *bank* from liability…") (emphasis added).

BC57's invocation of FOA should be rejected, in the first instance, because Equitybuild Finance was not a bank. Moreover, as discussed above, Equitybuild Finance was not the investors' fiduciary and thus does not fall within FOA's definition of "fiduciary," which applies only to specified examples of a "person acting in a fiduciary capacity." 760 ILCS 65/1.[4]

Interpreting FOA's definition of "fiduciary," the Seventh Circuit holds that FOA's "reference to the capacity in which the agent is acting suggests that his status as a fiduciary

---

[3] BC57 does not offer evidence of what contemporaneous efforts it undertook, if any, to ascertain why *Equitybuild Finance* had the authority to release the 7752 Muskegon mortgage, where the security interest was held by the investors "C/O *Hard Money Company, LLC*." (ECF 1147-1) (emphasis added).

[4] The only case BC57 cites applying FOA to a non-bank defendant involved an undisputed fiduciary relationship involving an estate's guardian. *Hosselton v. K's Merch. Mart*, 247 Ill. App. 3d 808 (Ill. App. Ct. 1993).

depends upon the particular activity in which he is engaged." *Mut. Serv. Cas. Ins. Co. v. Elizabeth St. Bank*, 265 F.3d 601, 624 (7th Cir. 2001). The court emphasized "the need to focus on the agent's authority with respect to the particular transaction at issue." *Id*. If the alleged agent exceeded the scope of its authority, FOA offers no protection. *Id.* at 624-625. FOA thus does not apply to Equitybuild Finance's *ultra vires* release of the investors' mortgages.

Beyond being limited to situations involving an actual fiduciary relationship, FOA only covers transactions where the party transferring funds *knows* its counterparty is a fiduciary. *Am. Hardware Mfrs. Ass'n v. Reed Elsevier, Inc.*, 2008 U.S. Dist. LEXIS 27836, at *15-16 (N.D. Ill. Apr. 3, 2008) ("The purpose of the Act is to…cover situations which arise when one person honestly deals with another *knowing him* to be a fiduciary.") (emphasis added) (quoting *Appley v. West*, 832 F.2d 1021, 1031 (7th Cir. 1987)); *Johnson v. Citizens Nat'l Bank*, 30 Ill. App. 3d 1066, 1069-70 (Ill. App. Ct. 1975) (same). Unlike those cases, Equitybuild Finance expressly disavowed owing fiduciary duties to the investors, and acted beyond the scope of its authority by releasing the investors' mortgages without paying them in full. BC57 likewise had no knowledge or reasonable belief that Equitybuild Finance was a fiduciary or was otherwise authorized to receive money on behalf of the investors. Accordingly, Equitybuild Finance does not fall within FOA's definition of "fiduciary," and the statute does not apply.[5]

Even if FOA applied, it provides no support to BC57 in this priority dispute. This is because FOA's protections, by its own terms, merely: (a) limit the liability of the party transferring funds; and (b) refuse to invalidate "any right or title acquired from the fiduciary in consideration of such payment." 760 ILCS 65/2. Here, BC57's liability is not at issue. As for

---

[5] BC57 also claims that, under FOA, the investors must establish that BC57 had "actual knowledge" of Equitybuild Finance's fraud. (ECF 1152, at 17). This heightened requirement conflicts with the "inquiry notice" standard BC57 acknowledges applies to this priority dispute. (*Id.* at 25).

13

the "right or title acquired from the fiduciary," the only consideration BC57 received from Equitybuild Finance were the Releases. As discussed above, those Releases are invalid because of their defective language and because Equitybuild Finance lacked authority to release the investors' mortgages. Thus, even if FOA protects BC57 from the releases being invalidated due to *misappropriation*, the statute cannot cure the other defects that render the Releases invalid. Absent a valid release, the investors' prior-in-time mortgages retain priority. *Paliatka v. Bush*, 109 N.E.3d 343, 349 (Ill. App. Ct. 2018) ("Generally, the lien that is recorded first in time has priority and is entitled to satisfaction by the property it binds before other claims.").

### D. BC57's "Custom and Practice" Argument Relies Entirely on the (Incorrect) Legal Conclusions of its Lawyer Expert Witness

In an attempt to establish the "reasonableness" of its conduct, BC57 relies on its real estate lawyer expert witness. (ECF 1152, at 29-33). While potentially relevant to the "inquiry notice" aspect of a *bona fide* purchaser determination, a finding that the Releases were invalid would obviate the need to address the issue of reasonableness.

In any event, as detailed in the SEC's Position Statement, the thrust of BC57's expert opinion is the legal conclusion that BC57 acted reasonably by retaining a title insurer. (*See* ECF 1146, at 15-18). But that legal opinion is wrong, since a title insurer's duties are limited to compensating the insured in the event of defective title, and *not* to discover defects on the insured's behalf. *First Midwest Bank v. Stewart Title Guar.*, 843 N.E.2d 327, 336 (Ill. 2006).

Given the Illinois Supreme Court's holding that insureds cannot rely on their title insurers for anything other than insurance payments, BC57 curiously devotes the entirety of its "custom and practice" argument to its expert's opinion that BC57's *title insurer* acted reasonably. (ECF 1152, at 29-33). While such an opinion could be relevant to a dispute to between BC57 and its title insurer, the conduct of its insurer is irrelevant to the issue of *BC57's* reasonableness. As

14

BC57 recognizes, "title insurance is a necessary component of real property sales." (ECF 1210, at 18). For this reason, BC57's purchase of title insurance simply meant doing the bare minimum, and cannot establish *bona fide* purchaser status. Indeed, under BC57's expert's logic, a second-in-time mortgage holder would *always* be a *bona fide* purchaser, simply by virtue of its routine purchase of title insurance.

Moreover, given the rubber stamp nature of its due diligence and failure to investigate red flags, BC57's expert's view that BC57's title insurer was "especially diligent" (ECF 1147-34, at 14) is even more dubious. This further demonstrates that BC57's expert opinion is nothing more than legal advocacy by a lawyer.

### E. BC57's Attempts to Blame the Investors Fail

Completely ignoring its own lack of due diligence, BC57 goes so far as to blame the defrauded investors for falling victim to Cohens' Ponzi scheme. BC57 brazenly claims the investors "must bear the loss because they enabled the fraud," by authorizing Equitybuild Finance to be their loan servicer. (ECF 1152, at 14). BC57 further claims that the investors "placed [Equitybuild Finance] in power to commit the fraud" and, *without citing any authority*, insists the investors "are estopped from challenging the validity of the releases, and are further estopped from claiming a priority ahead of BC57." (*Id.* at 17).

Putting aside the tone-deaf nature of BC57's attacks on the victims of a Ponzi scheme, BC57's claims that the investors bear responsibility utterly lack merit. The *only* evidence BC57 proffers of the investors "enabling" the Cohens' fraud is their authorization of Equitybuild Finance to be their loan servicer. (ECF 1152, at 14). But BC57 offers no explanation why the retention of a loan servicer was unreasonable, especially from the perspective of an

15

unsophisticated and unsuspecting investor. On the other hand, BC57's own expert opined that loan servicers are commonplace in the real estate industry. (*See* ECF 1147-34, at 10-12).[6]

Contrasting the complete lack of evidence of the investors acting unreasonably, the SEC, the Receiver, and various investors have offered substantial evidence that BC57 bears responsibility due to its woefully inadequate due diligence efforts. For instance, the SEC's Position Statement details the various ways in which BC57's unreasonable lack of due diligence and failure to follow-up on red flags resulted in it not discovering that the investors never authorized the release of their mortgages and were not repaid. (*See* ECF 1146, at 7-10). Various investors' Position Statement presented additional evidence demonstrating BC57's unreasonable lack of inquiry. (*See* ECF 1151, at 10-11, 14-18). So too did the Receiver, first in his disclosure of a fraudulent transfer claim against BC57 (ECF 1118), and in even greater detail in response to BC57's contention interrogatories (*see* ECF 1199, at 11-18).

Given all of this evidence, BC57's claim – that "there can be no question of material fact regarding the reasonable reliance of BC57 and [its title insurer]" (ECF 1152 at 24) – rings hollow. Indeed, if the Court decides to balance the relative culpability of the investors, it should consider that BC57 was a sophisticated real estate lending firm that employed a team of professionals, analysts, attorneys, and title agents. The fact that BC57 has title insurance, and will be compensated even if does not have lien priority, further pushes the equitable considerations even more in the investors' favor.

---

[6] BC57 faults the investors for not discovering or complaining that their mortgages were released. (ECF 1152, at 4). Yet BC57 cites no evidence that any investor *was aware* the Cohens had filed fraudulent releases. Nor should the investors have been on any heightened notice, since the CAS Agreements they signed required their written instructions to release the mortgages.

Dated: March 14, 2022	Respectfully submitted,

  /s/ Benjamin Hanauer
Benjamin J. Hanauer (hanauerb@sec.gov)
Timothy J. Stockwell (stockwellj@sec.gov)
Alyssa A. Qualls (qualls@sec.gov)
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Phone: (312) 353-7390
Facsimile: (312) 353-7398

Attorneys for Plaintiff
U.S. Securities and Exchange Commission

## CERTIFICATE OF SERVICE

      I hereby certify that I provided service of the foregoing Position Statement, via ECF filing, to all counsel of record and Defendant Shaun Cohen, and to all claimants via the Receiver's email distribution list, on March 14, 2022.

      /s/ Benjamin Hanauer
Benjamin J. Hanauer
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Phone: (312) 353-7390
Facsimile: (312) 353-7398

One of the Attorneys for Plaintiff