UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 1:18-cv-5587 |
| v. | |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, | Hon. Judge John Z. Lee |
| | Hon. Magistrate Judge Young B. Kim |
| Defendants. | |

## RESPONSIVE STATEMENT OF CLAIMANT BC57, LLC

Claimant BC57, LLC ("BC57"), pursuant to Docket Entry Nos. 941 and 1091, respectfully submits this Responsive Statement ("Response") concerning BC57's first position right to the sales proceeds from all Properties[1] in Group 1, and that neither the BC57 Mortgage nor the Releases constitute a voidable fraudulent transfer.

## LEGAL AUTHORITY AND ARGUMENT

As shown in BC57's Position Statement (Docket Entry No. 1152), the uncontroverted facts are that BC57 received the Payoff Statements from EBF, the entity authorized by the Investor-Lenders to issue payoff statements, paid the amounts reflected therein, and received and recorded the Releases of the Investor-Lender Mortgages. The Investor-Lenders (*see* Investor-Lenders Position Statement, Docket Entry No. 1151) and SEC (*see* SEC Position Statement, Docket Entry No. 1146) spend much time attempting to spin those facts in an attempt to avoid the impact of the

---

[1] Capitalized terms in this Response are defined consistently with the definitions articulated in the Position Statement of BC57, LLC (Docket Entry No. 1152).

1

longstanding rule that the party whose agent commits a wrongdoing must bear the result of that loss.

The Investor-Lenders[2] and the SEC primarily argue that (1) the Releases are facially defective and therefore ineffective to release the Investor-Lender Mortgages, (2) EBF lacked authority to release the Investor-Lender Mortgages, and (3) certain claimed discrepancies in the Payoff Statements and the Releases placed BC57 on inquiry notice of EB's fraud. For support, the SEC and the Investor-Lenders rely on hindsight – knowing that EB committed fraud, they have combed through the documents related to the BC57 Loan and now raise purported benign discrepancies as if they are red-flag indicia of fraud. But when analyzed closely, those arguments ring hollow and do not support the Investor-Lenders' request for priority with respect to the Properties' sales proceeds.

*First*, none of the claimed discrepancies in the Releases rendered them ineffective. The Releases executed by EBF, the authorized agent and trustee of the Investor-Lenders, released the Investor-Lender Mortgages and were furnished as part of the BC57 Loan closing. All parties understood they were intended to release the Investor-Lender Mortgages.

*Second*, the claimed discrepancies are mere draftsmanship issues. When BC57 made its loan and received the BC57 Mortgage, those claimed discrepancies raised no suspicion, and would not have made a prudent commercial lender or settlement agent think twice about closing the transaction, and did not warrant an investigation of the details of Investor-Lender Loans. Indeed, neither the SEC nor the Investor-Lenders explain why, and present no expert opinion to suggest

---

[2] In this Response, the term "Investor-Lenders" refers specifically to the position statement filed by certain Investor-Lenders through their counsel, Max Stein and Michael Kurtz. Not all of the Investor-Lenders joined in that position statement; some filed separate position statements, which will be identified to the extent addressed herein, and some Investor-Lenders did not file a position statement.

that, those discrepancies would have caused a prudent lender or its settlement agent to launch an investigation of the Investor-Lender Loans, or that an investigation would have disclosed malfeasance by EB or EBF. If any lender or its settlement agent would have investigated the Investor-Lender Loans, they would have received the Authorization Document, which the SEC and Investor-Lenders glaringly fail to address in their position papers – even though BC57's answers to the SEC's interrogatories (*see* SEC Exhibit 36, Docket Entry No. 1147-36, BC57's Answers to SEC's First Set of Interrogatories, Nos. 3-6) show that BC57 relies on the Authorization Document (among other things) to demonstrate EBF's authority. The Authorization Documents confirm EBF's authority to issue the Payoff Statements, receive the payoffs and release the Investor-Lender Mortgages. Nothing in the Investor-Lenders or SEC's position statements show that a contemporaneous investigation would have uncovered fraud. In fact, as explained in BC57's Position Statement and below, any investigation would have led to the indisputable fact that the Investor-Lenders gave EBF, their agent and trustee, authority to issue payoff statements, receive payoffs, and release mortgages. Because the Releases were issued by the agent and trustee that the Investor-Lenders authorized to issue releases, the Investor-Lenders are bound by the Releases.

Because the Investor-Lender Mortgages were released by EBF, the Investor-Lenders' authorized agent and trustee, the SEC and the Investor-Lenders fail to establish that the Investor-Lender Mortgages still encumbered the Properties when this receivership commenced. They further fail to establish that BC57/NNNT did not reasonably rely upon the Payoff Statements and Releases, because the Investor-Lenders and SEC fail to show that either BC57 or its settlement agent NNNT had notice of facts to prompt further investigation, or that further investigation would have suggested that EBF lacked authority to issue the Payoff Statements, collect the payoffs, or

release the Investor-Lender Mortgages, or that EBF might fail to remit funds from the BC57 Loan

to the Investor-Lenders. Consequently, the BC57 Mortgage occupied the first mortgage lien

encumbering the Properties when this receivership commenced, entitling BC57 to the proceeds

from the Receiver's sales of the Properties.

This Response does not separately address the Receiver's Submission on Group 1 Claims

(Docket Entry No. 1201) regarding lien priority issues, because the Receiver merely adopted and

incorporated the SEC and Investor-Lenders' Position Statements (*see id.*, p. 2) without any

independent analysis of the relevant facts. For example, the Receiver failed to address the

Authorization Document upon which BC57 relies to show that the Investor-Lenders authorized

EBF to issue payoff statements, collect payments and release their mortgages. (*See* BC57 Position

Statement, Docket Entry No. 1152, pp. 10, 14, 19-22, 25.) Neither the SEC nor the Investor-

Lenders referenced the Authorization Document or advanced any argument that the Authorization

Document did not authorize EBF to, among other things, release the Investor-Lenders' mortgages.

The Receiver also knew from BC57's answers to the SEC's interrogatories and from BC57's

Position Statement that BC57 relies upon the Authorization Document, yet the Receiver chose not

to advise the Court whether the Authorization Document supported or failed to support BC57's

position.

Although the SEC and the Investor-Lenders may have strategically decided not to address

the Authorization Document in their position statements, the Receiver's failure to reference them

or advise the Court, given their significance to BC57's argument, demonstrates that the Receiver

failed to consider or analyze all the relevant facts as a true neutral, the function he represented to

the Court he would serve (*see* Docket Entry No. 638, p. 16, ¶ 37), and failed to fulfill the duty the

Court placed on him when it authorized him to make recommendations to the Court (Docket Entry

No. 941, p. 7, ¶ 13(a)). Indeed, in rejecting the Institutional Lenders' objections to the Receiver's participation in the claims adjudication process, the Court granted the Receiver's request to be permitted to provide recommendations to the Court on the grounds that a federal equity receiver is an officer of the court and has a duty to assist in the equitable distribution of the assets of the estate. (*See* Docket Entry No. 813, 9/23/20 Transcript, p. 34.)[3] The Receiver's failure to even reference BC57's argument relating to the Authorization Document demonstrates that the Receiver failed in that duty, and thus his recommendation should be given no weight or deference in determining lien priority.

The Receiver has also failed to prove, by clear and convincing evidence, that the grant to BC57 of a mortgage on the properties is a voidable fraudulent transfer. As discussed below, the Receiver has yet to demonstrate that he has standing to assert this claim against BC57, let alone establish all of the elements necessary to prove a fraudulent transfer. And moreover, the Receiver's attempt to use the judicially-created Ponzi scheme presumption to establish the actual intent element of the claim is futile for the simple reason that the Receiver has not, and cannot, show that a true Ponzi scheme existed, or that the grant of security to BC57 was made in furtherance of any such scheme. Last, BC57 has an absolute defense to any fraudulent transfer action by the Receiver because it received the grant of the security for its loan in good faith and for equivalent value.

## I.     BC57 HELD A FIRST POSITION, PERFECTED SECURITY INTEREST IN THE GROUP 1 PROPERTIES WHEN THIS RECEIVERSHIP COMMENCED.

The Investor-Lenders authorized EBF to issue payoff statements, collect payoffs and release their mortgages, as documented in the Collateral Agent and Servicing Agreement and the Authorization Document. EBF, as authorized by the Investor-Lenders, executed the Releases on

---

[3] A true and correct copy of the 9/23/20 Transcript is filed herewith as Exhibit 1.

their behalf. None of the purported discrepancies in the Releases or in the Payoff Statements rendered the Releases ineffective, or would have prompted an investigation or caused a commercial real estate lender or its settlement agent to think twice about closing the transaction. Consequently, the Releases effectively released the Investor-Lender Mortgages.

A.      **The Investor-Lenders Authorized EBF to Issue Payoff Statements, Collect Payoff Amounts and Release the Investor-Lender Mortgages.**

The record establishes that the Investor-Lenders gave EBF actual authority to release the Investor-Lender Mortgages. *First*, in the Authorization Document, they expressly authorized EBF to release their mortgages. *Second*, by authorizing EBF to issue payoff statements and receive payoffs in the Collateral Agent and Servicing Agreement, the Investor-Lenders impliedly authorized EBF to release their mortgages.

Neither the SEC nor the Investor-Lenders deny that the Investors-Lenders, in Section 9(a) of the Collateral Agent and Servicing Agreement, authorized EBF to issue payoff statements and collect payments on the Investor-Lender Loans, including payoffs. SEC Exhibits 6-10, Docket Entry Nos. 1147-6 through 1147-10. They also do not dispute that NNNT wired to EBF the funds that the Payoff Statements represented were due on the Investor-Lender Loans. They claim, however, that EBF lacked authority to release the Investor-Lender Mortgages, relying solely on a provision in the Collateral Agent and Servicing Agreement that EBF could not release the Investor-Lender Mortgages unless instructed by the Investor-Lenders. This argument blatantly ignores the fact that the Investor-Lenders also executed the Authorization Document, which provided that "EquityBuild Finance, LLC, as agent and trustee has been authorized by the above listed lenders to receive the payoff in its name and issue and execute a release of said mortgage, upon payment in full of any outstanding balance." (Exhibit 14 to BC57 Position Statement, Docket Entry No.

6

1160, p. 78 of 398.) The Investor-Lenders thus expressly authorized and instructed EBF to, among other things, release their mortgages upon payment of the debts secured by them.[4]

BC57 located Authorization Documents from the vast majority of the Investor-Lenders in Group 1, which demonstrates that the Authorization Document was an integral part and term of each Investor-Lender's investment. *See* Exhibit 7 to BC57 Position Statement, Docket Entry No. 1156, pp. 2-6 of (Table of Investor-Lenders). BC57 files with this Response its Exhibit 2, a table related to those Investor-Lenders for whom BC57 could not locate an executed Authorization Document, which shows that BC57's inability to locate Authorization Documents from them does not mean that they did not agree to or execute an Authorization Document.

One of those Investor-Lenders, Kelly Welton, filed a position paper with an executed Authorization Document attached. May M. Akamine for Aurora Investments, LLC also executed an Authorization Document. Receiver-denominated Investor-Lender Saint-Preux rolled-over his investment to an unsecured note and Receiver-denominated Investor-Lender Peter Paul Nuspl Living Trust rolled-over his investment into an equity position. The Receiver determined that its claim on 7625-33 S East End Avenue duplicated its claim on 7625-33 S East End Avenue, for which loan BC57 had previously located an Authorization Document. One Investor-Lender, Vladimir Matviishin, filed a claim individually without a copy of an executed Authorization Document, and d/b/a Network Expert, with a copy of an Authorization Document. The Receiver found in his submission that the claims were duplicate. Investor-Lender Jill Meekcoms testified

---

[4] The Investor-Lenders also had a duty under their mortgages to release their mortgages upon payment of the secured debt (*See, e.g.*, SEC Exhibits 1-5, Docket Entry Nos. 1147-1 through 1147-5, ¶10) and under Section 2 of the Mortgage Act, 765 ILCS 905/2. *See* SEC Position Statement, Docket Entry No. 1152, p. 28. Further, NNNT had the right pursuant to Sections 10 and 15 of the Mortgage Certificate of Release Act to issue a Certificate of Release upon its disbursement of the loan proceeds pursuant to the Payoffs. 765 ILCS 935/10, 15. *Id*., p. 22.

that she was familiar with the Authorization Document and servicing agreement, even though she could not recall whether she signed one for her Group 1 property. Investor-Lender Dennis and Mary Ann Hennefer stated in a letter that they did not have the loan documents.

The remaining Investor-Lenders for whom BC57 could not locate an executed Authorization Document appear not have produced, either in support of their claims or in responses to discovery complete Investment Packages. Some produced no loan documents; others produced parts of the Investment Package. They too may not have been able to locate their loan documents, or otherwise did not produce them.

Sixteen Investor-Lenders for whom Authorization Documents in Group 1 have not been located invested in other EBF properties for which they did submit executed an Authorization Document, which stands as evidence that they agreed to grant EBF the express authority to release their mortgages with respect to those properties, and knew that the investments included the execution of Authorization Document. Dorothy Marie Baker received a deposition notice and request for documents from BC57, but neither produced documents nor appeared for her deposition. *See* Deposition Notice for Dorothy Marie Baker, filed herewith as Exhibit 3. This Court has stated that Investor-Lenders including Ms. Baker who did not comply with discovery orders in this matter could waive claims or arguments. See Docket Entry No. 1070.

The failure of all Investor-Lenders to have kept or produced all documents relevant to their investment, and any incompleteness in the EquityBuild data base, over which BC57 has no control, does not mean that all of the Investor-Lenders did not agree to the terms of the Authorization Document. No reason exists why EBF would have offered a few Investor-Lenders different deals than all the others. Nor could EBF have done so, because that would have prevented EBF from acting uniformly.

There is no support for the position that the Authorization Document as to any Investor-Lender was doctored. One Investor-Lender, Deborah Mullica, claimed that her Authorization Document was amended after she signed it. Position Statement of Deborah Mullica, Docket Entry No. 1140. Ms. Mullica's documents, like all the other Investor-Lenders', were signed via DocuSign, an electronic signature software. When Ms. Mullica completed her electronic signature, DocuSign created a summary of the activity and generated an automated email to Jerry Cohen, notifying him that Mullica's documents had been signed. This automated email included copies of the signed documents, including the signed Authorization Document. Jerry Cohen received his email on January 25, 2015 at 8:40 am CT. The DocuSign summary sheet shows that Deborah Mullica signed on January 25, 2015 at 6:40 am PT—the same minute Cohen received the email. The automated email to Cohen contains a copy of the Authorization Document including the language that Ms. Mullica claims was not on the Authorization Document when she signed it. In short, Ms. Mullica is mistaken. She signed at 6:40 am PT, after which her documents were immediately and automatically delivered to Jerry Cohen, along with a summary of the signing activity. The Authorization Document for Ms. Mullica that Cohen received—including the language regarding releases and payoffs—is the same one that Ms. Mullica signed. Copies of the DocuSign summary sheet, automated email to Jerry Cohen, and signed Authorization are attached as Group Exhibit 4.[5]

Because the Authorization Document was an integral part of the Investment Packages, the Court can conclude that all Investor-Lenders agreed to it. If the Court does not so conclude, then

---

[5] Also, there were two documents in each Investment Package that identified the Investor-Lender's investment, one attached to the draft note and one attached to the draft mortgage – the latter being the Authorization Document. The one attached to the draft note appeared like the Authorization Document, but it did not have the authorization language. Ms. Mullica attached copies of both of these documents to her affidavit. Accordingly, Ms. Mullica may have confused the two documents.

the Court should hold that those 154 Investor-Lenders for whom an executed Authorization Document has been produced are bound by the Releases of their interests in the Properties.

The holdings in the cases cited by the Investor-Lenders,[6] *McClintock v. Helberg*, 168 Ill. 384 (Ill. 1897), and *Schroeder v. Wolf*, 127 Ill. App. 506 (Ill. App. 1906), do not defeat the effectiveness of the Releases. The Investor-Lenders acknowledge that releases may be signed by "the party holding the rights or an agent authorized by that party." *See* Investor-Lender's Position Statement, Docket Entry No. 1151, p. 9. Moving beyond that admission, in each of those cases, the acts taken by the agent were unauthorized and not related to the asserted "agency." In *McClintock*, the court held that an attorney, solely by virtue of his status as an attorney, did not have express authority to execute a release. Absent express authority from his client, an attorney has no power to bind his client by a compromise of a pending suit, or other matter, entrusted to his care, and implied authority did not suffice. 168 Ill. at 390-392. And in *Schroeder*, the court held that no evidence established that the person entrusted with three payment coupons and the trust deed (mortgage) for the sole purpose of proceeding with foreclosure had actual authority, either express or implied, to compromise a claim and pay upon the note. 127 Ill. App. at 509

In this case, by contrast, the Investor-Lenders each executed the Authorization Document, giving EBF actual express authority to release their mortgages upon payment. The act taken by EBF was directly related to agency powers granted to it, which included issuing releases of mortgages. As stated in BC57's Position Statement (*see, e.g.*, Docket Entry No. 1152, p. 18), when an agent acts on behalf of his principal, he binds the principal even if he exceeds his instructions.

But even irrespective of the Authorization Document, as the Investor-Lenders' express agent to issue payoff statements and collect payoff amounts, EBF had the implied actual authority

---

[6] *See* Investor-Lenders Position Statement, Docket Entry No. 1151, pp. 6-7.

to release the Investor-Lender Mortgages. As discussed in BC57's Position Statement (Docket Entry No. 1152, pp. 18-20), an agent's actual authority may be express or implied. *Granite Props. L.P. v. Granite Inv. Co*., 220 Ill. App. 3d 711, 713-14 (1991). Implied authority is actual authority implied from the facts and circumstances. *Id.* at 714. A party pays the amount stated due in a payoff statement with the reasonable expectation that the mortgage will be released. Because the Releases were issued by EBF, an agent and trustee authorized to issue payoff statements and receive payoffs (and thus, at a minimum, also impliedly authorized to issue releases), those Releases are effective and the Investor-Lenders, who are EBF's principals, are bound by them. Even if that authority had not been expressly provided in the Authorization Document, EBF had implied actual authority to issue the Releases arising from its authority to issue payoff statements and receive payoffs pursuant to the Collateral Agent and Servicing Agreement signed by the Investor-Lenders.[7]

Consequently, the SEC and the Investor-Lenders fail to show that EBF did not have actual authority, express or implied, to release the Investor-Lender Mortgages. Nor could they, because (1) the Authorization Document granted EBF the authority to release the Investor-Lender Mortgages and the Investor-Lender principals are bound even if EBF exceeded their instructions, and (2) the Collateral Agent and Servicing Agreement impliedly granted that authority by giving EBF the authority to issue payoff statements and receive payoffs.

## B.     The Releases Effectively Released the Investor-Lender Mortgages.

EBF intended to release the Investor-Lender Mortgages to satisfy BC57's condition that the BC57 Loan be secured by a first lien on the Properties. EBF knew that, absent the Releases, the BC57 Loan would not close. The Releases are effective because they were executed by the

---

[7] The custom and practice in the industry is to accept a release executed by the servicer. *See* SEC Exhibit 34, Nielsen Report, pp. 12, 17. Neither the Investor-Lenders nor the SEC offered an opposing expert opinion.

Investor-Lenders' authorized agent with the intent to release the Investor-Lender Mortgages, and any claimed discrepancies do not destroy their effectiveness. Simply put, the execution of the Releases by EBF demonstrates who is releasing the mortgages despite any misidentification of the releasor in the body of the Releases. Furthermore, it does not matter whether EBF stated that it executed the Releases as agent of the mortgagees, because EBF and BC57/NNNT understood that EBF intended to release the mortgages. Indeed, EBF furnished the Releases along with the Payoff Statements, in which it stated that it was furnishing them on behalf of the "Investors" – *i.e.*, the Investor-Lenders. The Investor-Lenders never expected to individually execute a release of any mortgage, and instead knew that EBF would execute releases of their mortgages. The SEC and the Investor-Lenders' contentions to the contrary[8] improperly place form over the substance in an attempt to negate the effect of the Releases issued by the agent that the Investor-Lenders placed in power.

*First*, although the Releases misidentify EB as the releasing party, EBF's execution of the Releases demonstrates that EB was not the releasing party and that the use of its name as the releasing party was a transposition or scrivener's error. That error does not defeat the import of the Releases. Misnaming a party to an instrument is a correctable error if it is clear which party was intended to sign. "[A] misnomer or variation from the precise name of the corporation in a grant or obligation by or to it is not material if the identity of the corporation is unmistakable, either from the face of the instrument or from the averments and proof." *Malleable Iron Range Co. v. Pusey*, 244 Ill. 184, 193-194 (1910) (holding that it was proper for a trial court to admit evidence establishing the proper name of the contracting party) (internal quotations omitted).

---

[8] *See* SEC Position Statement, Docket Entry No. 1146, pp. 5-7 and 10-12, and Investor-Lenders Position Statement, Docket Entry No. 1151, pp. 6-11.

"Instruments in writing are not void because made to a party by a wrong name, and any misnomer or apparent variance may be reconciled and explained, in pleading, by averment, and avoided, in effect, by proof." *Id. See also Covey v. Citizens Sav. Bank*, 284 B.R. 663 (N.D. Ill. Bankr. 2002) (a deed was valid even though the deed had misnamed the grantee: "where the parties intend to pass a present estate to an existent grantee but execute the instrument under an incorrect name, such a conveyance passes title to the intended grantee . . . . the controlling factor is the intention of the parties as to who shall receive title." Illinois law has long favored interpretation of documents to reflect the intent of the parties, when (as here) that intent can be discerned from the facts surrounding the documents. *Id.* at 671.

J. Bushnell Nielsen is the only expert before this Court regarding "the customs and practices of lenders and title issuers in the handling and processing of payoffs for loans secured by real estate, particularly in connection with refinance loans." Nielsen Report, Docket Entry No. 1147-34, SEC Exhibit 34, p. 5. As Mr. Nielsen stated in his Expert Report, transposition of the name of the releasor and the releasee on a release is one of the most common errors on releases. (*Id.*, p. 20.)[9] But that common mistake does not make the Release ineffective. Rather, the law clearly establishes that the intention prevails. Here, the uncontroverted intention was that EBF (again, the Investor-Lenders' agent and trustee), was releasing the Investor-Lender Mortgages.

---

[9] Mr. Nielsen did not state in his Expert Report, as the Investor-Lenders misstate (Investor-Lenders Position Statement, Docket Entry No. 1151, p. 8), that the use of EquityBuild's name instead of the *Investor-Lenders'* names on the Releases was a transposition of names. Instead, Mr. Nielsen opined that the use of EquityBuild's name instead of EquityBuild Finance's name as the releasing party was a transposition error and that transposing the names of the releasor for the releasee was one of the more common occurring errors on releases. (Nielsen Report, SEC Exhibit 34, Docket Entry No. 1147-34, p. 20.) BC57 understands that the Investor-Lenders assert that the Investor-Lender names should have been shown as the releasing parties, rather than EBF, but that does not warrant the misstatement of Mr. Nielsen's opinion.

There are simply no facts to the contrary. Accordingly, the transposition of names does not invalidate the effect of the Releases.

*Second*, the Investor-Lenders never expected that they would individually execute any release but, instead, agreed that EBF would execute any release as their agent and trustee. Indeed, the Collateral Agent and Servicing Agreement provision upon which they rely in their Position Statement[10] – that EBF could not release their mortgages without their instructions –demonstrates that they agreed that EBF would execute any release as their agent. Further, the Authorization Documents explicitly authorized EBF to "issue and execute a release of said mortgage." Exhibit 14 to BC57 Position Statement, Docket Entry No. 1160, p. 78 of 398. Consequently, the Investor-Lenders cannot complain that the Releases are ineffective on the grounds they did not execute them individually, or that EBF does not state that it executed them as their agent.

The Investor-Lenders and the SEC misplace reliance on the Illinois Mortgage Act's requirements that a release be "prepared, executed, signed, and delivered by the mortgagee" to argue that the Releases were ineffective because the Releases were executed by the authorized agent of the Investor-Lenders, EBF. As shown above, the Investor-Lenders never contemplated executing a release and, instead, expected that EBF would execute any release as their agent and trustee. They cannot now object to the Releases on the grounds that they did not execute them individually. In support of its argument, the SEC[11] improperly cites to *Walker v. Ocwen Loan Servicing*, LLC, 2016 IL App (3d) 150034-U, an unpublished decision which, under Illinois Supreme Court Rule 23, is not precedent or persuasive authority. Further, in *Walker,* unlike the matter at hand, neither the mortgagee nor its agent executed the release. *Id.* at ¶ 17.

---

[10] *See, e.g.*, Investor-Lenders Position Statement, Docket Entry No. 1151, p. 6.

[11] SEC Position Statement, Docket Entry No. 1146, p. 11.

It is also significant to both note that: (1) as the Receiver has recently advised the Court, the original Investor-Lender Loans were repaid in varying amounts by EB/EBF, and some Investor-Lenders who seek remuneration here had apparently agreed to roll their investments either into equity positions or debt positions secured by other properties (Receiver's Submission on Group 1 Claims, Docket Entry No. 1201, pp. 8-12, and Exhibits 1 through 5 thereto); and (2) none of the Investor-Lenders contacted BC57 or disputed BC57's first lien priority position in the nine months between the closing of the BC57 Loan and the initiation of this lawsuit.

*Third,* the fact that EBF did not state that it was the Investor-Lenders' agent on the face of the Releases does not invalidate the Releases. Disclosure of the agency capacity serves to protect the agent from personal liability; the failure to disclose the agency capacity does not mean that the principal is not bound. *See, e.g.*, *Mawer-Gulden-Annis, Inc. v. Brazilian & Colombian Coffee Co.*, 49 Ill. App. 2d 400, 403-05, 199 N.E.2d 222 (1964) (while an agent must disclose the agency relationship to avoid personal liability, disclosure of the principal renders the principal alone liable); *Lake Shore Mgmt Co. v. Blum*, 92 Ill. App. 2d 47, 50, 235 N.E.2d 366 (1968) (a third party who deals with the agent of a partially disclosed principal is liable to the principal); *Rose Marine Transp. v. Kaiser Aluminum & Chemical Corp.*, 1990 U.S. Dist. LEXIS 17222, at *3 (N.D. Ill., Dec. 13, 1990) (an undisclosed principal is bound by contracts and conveyances made on his account by an agent acting within his authority).

*Fourth,* the Release of the Muskegon mortgage executed by EBF, rather than Hard Money Company, LLC, did not render it ineffective. The Releases could not have been signed by Hard Money Company, LLC, because that entity had changed its name to EBF. *See* BC57 Position Statement, Docket Entry No. 1152, p. 5, fn. 5.

*Fifth*, the Investor-Lenders further contend (Investor-Lenders Position Statement, Docket Entry No. 1151, p. 7, fn. 5) that Release Deeds were forms not typically used in Illinois. This does not mean that the form of the Releases rendered them ineffective. Nor could it, because the form, which provided for the "release . . . of all rights, title, interest, claim or demand whatsoever he/she may have acquired in, through or by [described mortgage on the described property]" (*see* SEC Exhibits 16-20, Docket Entry Nos. 1147-16 through 1147-20) contains the necessary language to release the rights in the described mortgage that encumbered the property.

Even if the Releases were ineffective, which BC57 denies, the mortgage is extinguished by operation of law when a debt is paid, discharged, released or barred by limitation. *Bradley v. Lightcap*, 201 Ill. 511, 66 N.E. 546 (1903). The SEC relies upon *North Shore Cmty. Bank & Trust Co. v. Sheffield Wellington LLC*, 20 N.E.3d 104, 117 (Ill. App. Ct. 2014), to argue that absent a recorded written release, the mortgage remains a lien on the property.[12] In that case, the court addressed the narrow issue of whether the Mortgage Act provided that the mortgage falls when the debt secured by it has been paid. The court ruled only that the Mortgage Act did not provide that the mortgage was automatically released upon payment of the debt, and instead that it only required the bank to furnish a release. *Id.* at ¶72. The court did not address the common law rule established in *Bradley v. Lightcap, supra,* that the mortgage falls as a matter of law upon payment of the debt. In this case, the Investor-Lenders (or, more precisely, their authorized agent EBF), likewise would have been required to furnish a release.

In summation, the Releases executed by the Investor-Lenders' authorized agent effectively released the Investor-Lender Mortgages. Neither the misidentification of the releasor, the absence of language stating EBF's capacity, nor the form of Release Deeds defeat the Releases or the

---

[12] SEC Position Statement, Docket Entry No. 1146, pp. 11-12.

expectations of EBF and BC57/NNNT that, upon transmission of the payoff amounts, the Releases would be effective.

**C.** **BC57/NNNT Reasonably Relied upon the Payoff Statements and Releases, and did not have Inquiry Notice of EB's Fraud.**

The SEC and the Investor-Lenders assert that BC57 should have obtained proof of EBF's authority. Because EBF had actual authority to issue the Payoff Statements and Releases, as shown above, their argument is a red-herring. Further, the practice and custom in the industry does not require a loan servicer's proof of authority, including the authority to release a mortgage upon payment of the amount stated due in a payoff statement. *See* Nielsen Report, SEC Exhibit 34, Docket Entry No. 1147-34, pp. 12, 17. Neither the SEC nor the Investor-Lenders offer any evidence to dispute Mr. Nielsen's expert opinion that BC57 acted in accordance with standard industry custom and practice.

Because EBF had the authority to issue payoff statements and receive the payoffs, which the SEC and the Investor-Lenders do not deny, the Investor-Lenders were obligated to release their mortgages upon EBF's receipt of the funds requested in the Payoff Statements pursuant to the terms of their mortgages (*see, e.g.*, SEC Exhibits 1-5, Docket Entry Nos. 1147-1 through 1147-5, ¶10) and under Section 2 of the Mortgage Act, 765 ILCS 905/2. *See* BC57 Position Statement, Docket Entry No. 1152, p. 28.

This is true even if the payoff amounts were less than the amounts due, because the Investor-Lenders' authorized agent represented the amounts due and BC57 paid those amounts to EBF to obtain a first lien mortgage. *See generally, M&T Bank v. Mallinckrodt*, 2015 IL App (2d) 141233 (a refinancing lender's reasonable reliance upon a loan payoff statement, which is ultimately determined to be incorrect or fraudulent, and payment pursuant to that payoff statement, allows that lender to assert a priority position over the prior mortgagee); *see also Letsos v. Century*

17

21 - *New West Realty*, 285 Ill. App. 3d 1056, 1069, 221 Ill. Dec. 310, 675 N.E.2d 217 (1996) (a party must bear responsibility for the fraudulent acts of its agent). This is also true even if the Investor-Lenders did not receive the payoff amounts because BC57 did not have an obligation to assure that the Investor-Lenders received payment. *See Rockford Life Ins. Co. v. Rios*, 128 Ill. App. 2d 190, 195, 261 N.E.2d 530 (1970); Fiduciary Obligations Act, 760 ILCS 65/0.01, *et seq*.

BC57 did not have inquiry notice of fraud by EB or EBF. A party acquiring an interest in property that has notice of facts that would have caused a prudent person to further inquire is deemed to have inquiry notice of the facts that a reasonable inquiry would have disclosed. *Glenview State Bank v. Shyman*, 146 Ill. App. 3d 136, 138, 496 N.E.2d 1078 (1986). The claimed discrepancies in the Payoff Statements and Releases cited by the SEC and the Investor Lenders did not place BC57 on inquiry notice because the claimed discrepancies would not have made a prudent lender think twice about closing the transaction. *See In re Application of Cnty Collector*, 397 Ill. App. 3d 535, 549, 921 N.E.2d 462, 336 Ill. Dec. 848 (2009) (a purchaser is placed on "inquiry notice" when facts would cause a reasonable individual to think twice about completing the transaction). Neither the SEC nor the Investor-Lenders establish that any of the claimed discrepancies were of a nature to raise suspicion about EBF's authority to issue, or the legitimacy of, the Payoffs or Releases. And they have not offered any testimony to support their claims. In fact, the SEC and the Investor-Lenders stand before this Court without a single witness, whether lay or expert, having professed an opinion that a reasonable person conducting the type of loan transaction that BC57 was engaged in would have made further inquiry based on the facts at hand. And neither the SEC not the Investor-Lenders acknowledge that a number of other financial institutions were making loans to and doing business with EB at or around the time of the BC57

Loan – and none of those institutions uncovered any fraud by EB. *See* BC57 Position Statement, Docket Entry 1152, p. 33.

The SEC and the Investor-Lenders attempt, unsuccessfully, to recast benign discrepancies into indicia of fraud. For example, the SEC contends that the Payoff Statements were suspect because they stated that they were from each of the Properties' "Investors," and not from "The Persons Listed on Exhibit A to the Mortgage c/o EquityBuild Finance, LLC [Hard Money Company]. . . ("Lender")," the lenders named in the Investor-Lender Mortgages. SEC Position Statement, Docket Entry No. 1146, p. 5. But "The Persons Listed on Exhibit A to the Mortgage c/o EquityBuild Finance, LLC . . . ("Lender")" were then the Investor-Lenders, and, accordingly, there is nothing improper with that terminology. *See* Exhibit 14 to BC57 Position Statement, Docket Entry No. 1160, pp. 62-112 (Sample Investment Package). No question exists that EBF furnished the Payoff Statements on behalf of the lenders identified in the Investor-Lender Mortgages.

In a payoff statement issued by EBF, the loan servicer entity identified in these pooled mortgages, the failure to identify the lender more specifically would not cause a prudent lender or settlement agent to think twice about proceeding with the transaction. Likewise, the reference on the Payoff Statement for the Muskegon Property to EBF, and not Hard Money Company as the furnisher of the Payoff Statement or to whom the payoff should be wired, if it had raised a concern, may have been resolved by a review of public records that confirm that EBF was formerly known as Hard Money Company. *See* Exhibit 8 to BC57 Position Statement, Docket Entry No. 1160, p. 2.

Furthermore, the nature of the discrepancies in the Releases, discussed above, did not put BC57 on inquiry notice "of the illegitimacy of the whole transaction" (*see* Investor-Lenders

19

Position Statement, Docket Entry No. 1151, p. 7) because they would not have made a prudent lender or settlement agent investigate beyond the diligence conducted. Industry custom and practice expert Mr. Nielsen opined that "there were no circumstances about the payoff of the [Investor-Lender Loans] that would cause a reasonable and prudent title company to make more than the usual inquiry into the authority of EquityBuild Finance to accept loan payoffs, or to take some extra precautions to assure that the releases of the [Investor-Lender Mortgages] were valid and enforceable." Nielsen Report, SEC Exhibit 34, p. 20. Neither the SEC nor the Investor-Lenders offer an expert opinion to counter Mr. Nielsen's opinions.

The SEC's citation to *Mitchell v. Sherman E. McEwen Associates, Inc.*, 360 Ill. 278, 196 N.E. 186 (1935), for the proposition that the "bona fide purchaser" doctrine "is purely an equitable one and should not be extended farther than equitable principles warrant" (*see* SEC Position Statement, Docket Entry No. 1146, p. 12), takes that proposition out of context. In *Mitchell*, the property owners executed and delivered a deed as security, but before the recordation of the deed, the grantee changed the name of the grantee. When the owners discovered the alteration, they sought to rescind the deed. The current owners claimed that they were protected by the bona fide purchaser doctrine even if they did not pay valuable consideration for their interest. The court responded with the proposition cited by the SEC – that it will not extend the doctrine to purchasers who did not pay valuable consideration and, finding that the current record owners did not prove that they paid value for their interest, denied their position. In this case, the SEC and the Investor-Lenders do not deny that BC57 paid EBF the full amounts stated in the Payoff and Closing Statements. *Id.* at 286.

The SEC also relies on *Walker v. Ocwen Loan Servicing, LLC*, 2016 IL App (3d) 150034-U, and *Szilagyi v. JPMorgan Chase, N.A.*, 2007 U.S. Dist. LEXIS 51241, at *6 (N.D. Ill. July 12,

2007), to argue that a facially invalid release puts a subsequent purchaser on inquiry notice to further investigate whether the prior mortgage was validly released. (*See* SEC Position Statement, Docket Entry No. 1146, p. 11.) These cases are wholly distinguishable because, in those cases, the subsequent purchaser relied upon a previously recorded mortgage release to claim it was a *bona fide* purchaser without notice and the courts found that they were not because a recorded release was not signed by the mortgagee or an agent (*Walker*) and the release was executed by an entity outside of the chain of title (*Szilagyi*). Each court found that the defects imposed a duty to inquire and that, if the purchaser had inquired, that purchaser would have discovered particular facts that each court identified.

In this case, BC57/NNNT relied upon the Releases as part of the BC57 Loan transaction, and not as a previously recorded document. All of the claimed discrepancies were benign and did not indicate that the Releases were unauthorized. If any of the claimed discrepancies raised a concern and required inquiry, EBF would have revised the Releases to cure the discrepancy, and the revisions would not have caused a prudent lender or its title agent to become suspicious or question EBF's authority to issue them. Moreover, even if BC57/NNNT, contrary to custom and practice in the industry, would have requested proof of EBF's authority to issue the Releases, the Authorization Document would have confirmed EBF's authority.

In *Lennartz v. Quilty*, 191 Ill. 174, 179 (Ill. 1901), cited by the SEC (*see* SEC Position Statement, Docket Entry No. 1146, p. 13), the court found *in favor* of a subsequent purchaser based upon the subsequent purchaser's reliance upon an unauthorized release. Significantly, the court stated: "It is to be remembered that [the subsequent purchaser] was a purchaser whose *only* duty was to ascertain the condition of the title, *and she was under no obligation or duty to see that the note was paid or canceled*." *Id*. at 180 (emphasis added).

21

The cases of *Polish Nat'l All. v. Lipinski*, 288 Ill. App. 234, 243, 246-249 (Ill. App. Ct. 1937), *Kennell v. Herbert*, 342 Ill. 464, 468-69 (Ill. 1930), and *MB Fin. Bank, N.A. v. Chicago Title Land Trust Co.*, 2019 IL App (2d) 170659-U, 2019 WL 457645, at ¶95 (Ill. App. Ct. 2019), cited by the SEC (*see* SEC Position Statement, Docket Entry No. 1146, p. 13), are not relevant because EBF had the authority to release the Investor-Lender Mortgages. Further, the recorded documents or facts in those cases, unlike the facts of this case, created a duty to inquire. In *Polish Nat'l,* recorded documents indicated that the trustee of a trust deed was unauthorized to release the trust deed, which created a duty to inquire. 288 Ill. App. at 249. In *Kennell*, because the trust deed did not permit prepayment of the debt, a release issued before the secured notes were due required further inquiry. 342 Ill. at 469-70. And in *MB Fin.* (an unpublished decision which cannot be cited as precedent or for persuasive purposes pursuant to Illinois Supreme Court Rule 23), material disputed facts existed regarding whether a bank had notice of an underlying forgery and thus questions existed as to whether the Bank could rely on a recorded document signed by the trustee. 2019 IL App (2d) 170659-U, ¶1. All of the facts in the above cases that put a subsequent purchaser on notice concerned the actual validity of the document. All of claimed discrepancies in this case relate to the form of the Releases, and raised no questions about EBF's authority to issue the Releases or their validity. Or, the conduct of the Investor-Lenders after the closing, in that they raised no objections to BC57's mortgage or the improvements which were being funded at the properties by the lender over the following months.

Contrary to the SEC's argument (*see* SEC Position Statement, Docket Entry No. 1146, pp. 14-15), the interest rate of the BC57 Loan did not create a heightened duty to investigate EBF's authority to release the Investor-Lender Mortgages. Preliminarily, the grant of the BC57 Mortgage is not an issue in this priority dispute. The SEC relies on fraudulent transfer cases, *In re Petters*,

499 B.R. 342, 362 (Bankr. D. Minn. 2013), *Fisher v. Sellis*, 253 B.R. 866, 876 (Bankr. N.D. Ill. 2000), and *Zayed v. Buysse*, 2012 U.S. Dist. LEXIS 200506, *108-109 (D. Minn. Sept. 27, 2012), where the courts found that the high rates of interest triggered a duty to inquire to defeat a good faith defense to a fraudulent transfer claim. Because this priority dispute addresses the releases of the Investor-Lender Mortgages, the interest rate of the BC57 Loan did not trigger a duty to investigate the authority to release the Investor-Lender Mortgages.

Further, the SEC has not put forth any evidence indicating that the rates of return on the BC57 Loan were "abnormally high" or out of the ordinary. Tellingly, there is no expert testimony or other comparison of what the SEC contends are normal (as opposed to abnormal) rates of return. And the interest rate on each of the Investor-Lender Loans was higher than the interest rate on the BC57 Loan that refinanced them. *Compare* Investor-Lender Notes, BC57 Exhibits 9-13, Docket Entry No. 1160, pp. 3-60 of 398 (interest rates ranging from 12% to 18%) *with* BC57 Note, BC57 Exhibit 17, Docket Entry No. 1160, pp. 160-167 of 398 (interest rate of 11%).

The Investor-Lenders contend that BC57's professionals should have investigated the "significance" of the form used to release the Investor-Lender Mortgages – a "Release Deed." Investor-Lenders Position Statement, Docket Entry No. 1151, p. 7 fn. 5. As discussed above, because the form of the document did not impact EBF's ability to release a mortgage, no inquiry would have been required. Indeed, the Investor-Lenders do not argue that the form of the release, by itself, rendered the Releases ineffective.

Even if any alleged discrepancies warranted an investigation, that investigation would have disclosed the Collateral Agent and Servicing Agreement and the Authorization Document, which collectively gave EBF had the authority to issue the payoff statements, receive the payoffs and release the Investor-Lender Mortgages. BC57 would have had the right to rely upon them and no

further inquiry would have been warranted. *See Glenview State Bank v. Shyman,* 146 Ill. App. 3d 136, 138, 496 N.E.2d 1078 (1986).

In *Glenview State Bank*, a pre-sale condominium unit purchaser asserted an unrecorded interest in a condominium unit superior to the mortgage of the construction lender-mortgagee. The unit purchaser sought to charge the mortgagee bank with inquiry notice of his interest. The appellate court found that the writings that would have been discovered by an investigation did not show any interest of the purchaser or any fact that would have caused the bank to inquire further into any potential interest in the condominium unit. The court stated that where an investigation would have revealed written documents, the investigating party has the right to rely upon them without further inquiry. *Id*.

> [T]hese contracts would have caused one to believe that no further investigation was required as the rider specifically states that if the seller conveyed any of the units prior to substantial completion, as was done in this case, those units would be subject to the construction-loan mortgages. We believe that Glenview State Bank had a right to rely on this provision and was under no duty to contact each presale purchaser to ascertain whether the terms of the contracts had been altered. To conclude otherwise would place an undue burden of inquiry on prospective purchasers and mortgagees.

Id. at 138.

Had BC57/NNNT requested proof of EBF's authority, the Authorization Document establishes that EBF had authority to accept payments and issue releases, and the Collateral Agent and Servicing Agreement shows that EBF had authority to issue payoff statements and collect payments. Neither the SEC nor the Investor-Lenders show in their respective position statements that further investigation would have disclosed fraud.

**E.    BC57 Adhered to Prudent Business Practices and Acted with Due Diligence.**

As Mr. Nielsen's expert report demonstrates, BC57 and NNNT acted within the standard custom and practice in the industry. Despite Mr. Nielsen's unrebutted expert opinions, the

Investor-Lenders and the SEC argue that BC57 and NNNT failed to act prudently and with due diligence. But they fail to offer any evidence of the custom and practice in the industry by which to assess BC57 and NNNT's conduct. Instead, they merely request, without factual or legal support, that this Court should disregard Mr. Nielsen's report. But as the parties claiming that BC57 and NNNT acted improperly in relying on the Payoff Statements and Releases, it is the Investor-Lenders and the SEC who have the burden to prove that BC57 and NNNT did not act with due diligence and prudence when closing the BC57 Loan. The Investor-Lenders and SEC attempt to carry that burden without any factual or expert testimony indicating that a reasonably prudent commercial lender or title agent would have made further inquiry or acted differently based on the facts at hand. This Court does not have one piece of testimony or evidence from an individual with experience in the lending field which states that they would have made further inquiry as a result of any of the perceived issues raised by the Investor-Lenders and the SEC. *Cf. M&T Bank v. Mallinckrodt*, 2015 IL App (2d) 141233, 43 N.E.3d 1039, 1050 (Ill. App. Ct. 2015) (appellate court remanded for further factual determination due to material unresolved factual issues regarding lender's reasonable reliance).

Further, the Investor-Lenders' claim that BC57 buried its head in the sand misstates Bloomfield Capital's business practices and how business entities delegate tasks, and is premised on a glaring mischaracterization of the role of Maribel Morales and Lincoln Land Transfer's role in these transactions. (*See* Investor-Lenders Position Statement, Docket Entry No. 1151, p. 10.)

The record shows that the lender, as is standard industry practice, relied upon people with different expertise to document and close the loan while insuring that it is secured by a first lien mortgage. Bloomfield Capital personnel make the underwriting decision of whether to make the loan based upon the ability of the borrower to repay the loan and the value of the real estate

25

collateral, among other things,[13] and it relies on its experienced lawyers and title agents to establish that the security for the loan is a first lien on the collateral.[14]

The Position Statements of Investor-Lenders (Docket Entry No. 1151, p. 10) and the SEC (Docket Entry No. 1146, p. 9) misstate that Lincoln Land Services was BC57's title agent. BC57 retained NNNT as its title agent, not Lincoln Land Services, as evidenced by the NNNT records that were produced in response to a subpoena served by the SEC and certain Investor-Lenders. See Exhibit 5, Receiver's Subpoena to NNNT. And Ms. Morales testified that BC57 contacted Lincoln Land to serve as the title agent but that Lincoln Land, located in New York, could not serve in that capacity because it was not licensed in Illinois, and therefore did not perform any escrow, disbursement or title work, or have any substantive role in the transaction. (Morales Dep., SEC Exhibit 28, Docket Entry No. 1147-28, pp. 24:10-2, 50:11-6.) Instead, Lincoln Land served only as a liaison between BC57 and NNNT. (*Id.*, pp. 22:10-13). Despite knowing that NNNT, and not Lincoln Land, was BC57's title agent, no one took deposition testimony from anyone from NNNT. Instead, the SEC and Investor-Lenders argue, based on Ms. Morales's deposition testimony that she did not review the closing documents, that BC57 failed to exercise due diligence. (SEC Position Statement, Docket Entry No. 1146, p. 9; Investor-Lenders Position Statement, Docket Entry No. 1151, p. 10.) Of course Ms. Morales did not review the closing documents; she was not the title agent, nor was her employer, Lincoln Land.

As BC57's retained title agent, NNNT performed two functions. *First*, it served as BC57's agent for the closing of the BC57 Loan. *Second*, it served as the title issuing agent for Chicago Title Insurance Company ("CTIC"), authorized to issue CTIC title insurance policies. An agent

---

[13] *See, e.g.*, Jarjosa Dep., SEC Exhibt 26, Docket Entry No. 1147-26, pp. 5:23-6:4; 17:9-22:1.

[14] *Id.*, pp. 22:2-23:19.

authorized by a title company to issue title policies may wear "two hats," one as an agent to issue or sell title insurance policies, and the other as a settlement agent to conduct closings on his or her own behalf. *Nat'l Mortg. Warehouse, LLC v. Bankers First Mortg. Co.*, 190 F. Supp. 2d 774, 780 (D. Md. 2002). *See also* Nielsen Report, SEC Exhibit 34; p. 8. The SEC and Investor-Lenders fail to distinguish those separate roles of a settlement agent and a title issuing agent when they argue that BC57 could not rely on its title and settlement agent, citing *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 843 N.E.2d 327, 342 (2006).[15] In *First Midwest,* the court held that the economic loss doctrine barred a negligence action against a title insurer because a title insurer was not in the business of supplying information. Because BC57 relied upon NNNT as the closing and settlement agent with respect to the Payoff Statements and the Releases, the *Midwest* decision does hold that BC57 could not rely upon NNNT.

BC57's counsel and NNNT followed standard custom and practice in the industry. NNNT received the Payoff Statements and the Releases. As shown above, neither the Payoff Statements nor the Releases would have raised any suspicions. And in fact, nothing with respect to the Payoff Statements or the closing aroused the suspicions of Kristen A. Bereckis, the NNNT employee who served as the settlement agent for the BC57 Loan. *See* Kristen A. Bereckis Declaration, Exhibit 30 to BC57 Position Statement, Docket Entry No. 1160, pp. 351-356 of 398. She stated that she relied upon the Payoff Statements. *Id.*

In an effort to suggest that BC57 did not act diligently, the Investor-Lenders claim that BC57 rushed into this transaction. (Investor-Lenders Position Statement, Docket Entry No. 1151, p. 2). Not so. Indeed, Bloomfield Capital has made two prior loans to EB before the BC57 Loan

---

[15] *See* SEC Position Statement, Docket Entry No. 1146, pp. 15-16; Investor-Lenders Position Statement, Docket Entry No. 1151, pp. 15-16.

(*see* Jarjosa Dep., SEC Exhibt 26, Docket Entry No. 1147-26, pp. 34:5-35:18), and the record shows that BC57 complied with standard custom and practice in underwriting the loan and in delegating to its lawyers and title agent legal and title issues to assure that BC57 would be secured by a first mortgage lien in the Properties. It did not omit any step in the process.

Industry custom and practice expert Mr. Nielsen did not state, as argued by the Investor-Lenders, that the transaction was unusual in the extreme. (*Cf. id.*). Instead, he stated in his report:

> It is my expert opinion that the circumstances concerning the Hard Money Loans would not indicate to a title agent or closing agent that those loans were unusual, complicated or suspicious looking. (Nielsen Report, SEC Exhibit 34, Docket Entry No. 1147-34, p. 14.)

The Investor-Lenders claim that BC57's counsel knew that EB and EBF were playing "fast and loose" with their roles (*see* Investor-Lenders Position Statement, Docket Entry No. 1151, p. 11, fn. 7), relying on an e-mail chain to which BC57's counsel, Ms. Bagchi, was added in the penultimate e-mail exchange as a means to transmit copies of the payoffs to her, with a one-word message, "Payoffs." *See* Exhibit 6 to Nielsen Dep., Exhibit C to Investor-Lenders Position Statement, Docket Entry No. 1151-3. The prior exchanges were between EBF and EB, not Ms. Bagchi. The SEC likewise tries to create a false impression that the portion of the e-mail discussion about bad optics was directed to Ms. Bagchi (SEC Position Statement, Docket Entry No. 1146, p. 8; *see also* SEC Exhibit 38, Docket Entry No. 1147-38 (email)).

Despite placing great focus on the email in their Position Statements, nobody asked Ms. Bagchi at her deposition about that e-mail or whether she read any of the exchanges prior to her addition to the chain. She had no need or logical reason to scroll down the e-mail chain to review the prior exchanges to which she was *not* a party, and there is no basis to presume she read the EB-EBF e-mail exchange. Thus, there is no evidence, and no presumption can arise, that she saw the exchange relied upon by the Investor-Lenders that stated that the payoffs should be remitted to

EBF, not EB, and suggesting that "the optics aren't good."[16] And fundamentally, the SEC and Investor-Lenders' reliance on the "optics" language is just another example of hindsight, and attempting to reinterpret language in light of what is now known about EB's business practices.

The SEC argues that BC57 did not exercise due diligence because it failed to discover that the Investor-Lenders were not repaid. As a matter of law, a party paying the agent of the principal has no duty to confirm the agent remitted the payment of the principal. *Rockford Life Ins. Co. v. Rios*, 128 Ill. App. 2d 190, 195, 261 N.E.2d 530 (1970); *see also* Fiduciary Obligations Act. 790 ILCS 65/2. And, as a practical matter, EBF received payment from the BC57 Loan proceeds and thus BC57 could not have confirmed that EBF paid the Investor-Lenders before it closed the transaction.

Consequently, neither the SEC nor the Investor-Lenders have shown that BC57 failed to exercise due diligence. They also have not shown that NNNT failed to act reasonably and with due diligence. Instead, the facts shows that BC57 and NNNT followed standard industry custom and practice. Nielsen Report, SEC Exhibit 34, Docket Entry No. 1147-34, pp. 6, 12.

**F.    The Court Should not Disregard Mr. Nielsen's Opinions.**

The Court should not disregard Mr. Nielsen's testimony and opinions. Mr. Nielsen's opinions are relevant to establish the standard custom and practice in the industry, and to show that BC57 and NNNT acted prudently in accepting the Payoff Statements and Releases because those documents did not raise the type of concerns that would prompt a prudent commercial lender or its title and settlement agent to investigate further.

---

[16] Likewise, industry custom and practice expert Mr. Nielsen, when questioned about the email, testified that he did not believe that the email warranted further inquiry. Nielsen Dep., SEC Exhibit 33, Docket Entry No. 1147-33, pp. 141:6–144:21.

The statutes referenced in Mr. Nielsen's report were not offered as his legal opinions. Any discussion of legal concepts during his deposition were in response to questions from the Investor-Lenders, the SEC or the Receiver, and are not relied upon by BC57 in this matter. An adverse party cannot ask an expert witness for legal opinions and then use the expert's responses to disqualify him for rendering impermissible legal opinions.

The SEC's cases are inapposite. *See* SEC Position Statement, Docket Entry No. 1146, p. 16. The SEC quotes this Court's *Farmer* opinion, which states that "expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Farmer v. DirectSat USA, LLC*, 2013 U.S. Dist. LEXIS 39912, *26-27 (N.D. Ill. (Mar. 23, 2013)). But the paragraph in the opinion continues with examples of the inadmissible testimony that are distinct from our expert's testimony: "Here Becker's report contains numerous legal conclusions. For example, Becker concludes that '[m]y review and analysis of the records and documents in this case discloses that violations of the FLSA have occurred.' Becker also concludes that 'no overtime exemptions [from FLSA requirements] could be applied' to DirectSat employees." *Id.*

The internal quotation from the *Farmer* opinion is itself a direct quotation from *Good Shepard Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). The Court rejected expert testimony in that case because "[t]he proffered testimony was largely on purely legal matters and made up solely of legal conclusions, such as conclusions that the city's actions violated the FHAA." This is distinct from Mr. Nielsen's report and deposition testimony, as he is offers no conclusions about the law itself.

The Investor-Lenders' efforts to discredit Mr. Nielsen miss the mark. They rely on the fact that he is not licensed to practice law in Illinois, and the unfounded claim that he does not understand Illinois law. But BC57 did not retain Mr. Nielsen to render legal opinions and, in fact,

he offered none. Instead, Mr. Nielsen stands as the only expert to assist the Court as factfinder in understanding the customs and practices of the industry.

Consequently, Mr. Nielsen's opinions show the standard industry custom and practice to close loans and release pre-existing mortgages, and establish that nothing would have prompted a prudent lender or its title and settlement agent to inquire as to EBF's authority to issue the Releases. Neither the SEC nor the Investor-Lenders have provided any evidence or expert opinion to show that the claimed discrepancies should have caused further inquiry.

**G.    The Court Should Disregard Arguments Directed at BC57's Insured Status and the Fact that BC57 is Characterized Here as an Institutional Investor.**

The SEC's and Investor-Lenders' references to BC57's insured status are wholly improper and inadmissible. As codified by the federal rules of evidence (as well as Illinois rules of evidence), an insurance policy "is not admissible to prove whether the person acted negligently or otherwise wrongfully." FED. R. EVID. 411. *See also* ILL. R. EVID. 411. Likewise, evidence of collateral benefits coverage is irrelevant and prejudicial. *Lawson v. Trowbridge*, 153 F.3d 368, 379 (7th Cir. 1998).

Despite that the Investor-Lenders themselves—by giving agency powers to EBF—were the "persons who put the wrongdoer in the position to commit the fraud" (*see* BC57 Position Statement, Docket Entry No. 1152, p. 24 and Investor-Lenders Position Statement, Docket Entry No. 1151, p. 21, both citing *Connor v. Wahl*, 330 Ill. 136, 146 (Ill. 1928)), they still argue that it was BC57 who neglected "numerous irregularities and materially defective instruments in a fundamentally irregular transaction[.]" Investor-Lenders Position Statement, Docket Entry No. 1151, p. 21. The SEC makes similar arguments. *See* SEC Position Statement, Docket Entry No. 1146, p. 15. They claim that BC57 acted unreasonably, and then discuss how "the purpose of title insurance is to protect the insured against loss resulting from any defect in title[.]" *Id.* Both

31

Investor-Lenders and the SEC then proceed to further emphasize how BC57 is insured against loss, and that that fact should give priority to the Investor-Lenders. *See* Docket Entry No. 1151, p. 22; Docket Entry No. 1146, p. 15. These types of arguments are exactly of the kind that Rule 411 prohibits. *See Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, No. 94 C 3277, 1998 U.S. Dist. LEXIS 3995 at * 37 (N.D. Ill. 1998) (excluding evidence of liability insurance policies where a title insurer sued a fiduciary title company and bank for allegedly misusing real estate closing funds.).

Nevertheless, the Investor-Lenders ask this Court to give them priority simply because BC57 is "secure in their own insurance policy," Docket Entry No. 1151, p. 22, while the SEC asks for the same result because "BC57 has already submitted a claim against its title insurance company in the course of this litigation." Docket Entry No. 1146, p. 10. "But in general, references to insurance are not relevant to the issues and will not be permitted." *Dahlstrand v. Us*, No. 15 CV 7603, 2021 U.S. Dist. LEXIS 197727, at *21 (N.D. Ill. 2021) (relying on FED. R. EVID. 411 to grant motions in limine barring discussion of liability insurance.). The same is true in the instant case. Whether or not BC57 has an insurance policy to protect against a third party's fraud in no way sheds any light on whether it should be arbitrarily forced to give up its rightful place in line as the first position lienholder. BC57's liens indeed have priority, that priority should be enforced, and no amount of insurance changes that analysis.

Similarly, all claimants, whether large or small, are entitled to the Court's objectivity. This Court will not be able to determine the order of lien priorities in this case by examining which claimants are individuals and which are business entities. Moreover, such an examination would plainly run afoul to the fundamental notions of equality under the law. *See Honda Motor Co. v. Oberg*, 512 U.S. 415, 432 (1994) (discussing safeguards to avoid "biases against big business[.]").

Not only would it be unjust to factor the size of the claimants—or whether they are business entities as opposed to persons—but in this case, it would also be illogical. BC57 is a special purpose entity managed by Bloomfield Capital, which its corporate representative testified is limited to only about 20 employees. *See* Jarjosa Dep., SEC Exhibit 26, Docket Entry No. 1147-26, p. 13:20. Furthermore, Bloomfield Capital acts as an investment manager, and many of its clients are individual investors. *See id*., p. 13:11-16. In other words, this case is not as simple as a dispute between a collection of individuals and a large institutional lender. Rather, if the Court decides not to enforce BC57's rightful position as first priority lienholder, there will be individual people who lose their investment. Hence, there is no valid distinction when it comes to the size of the claimants and, in truth, all litigants in this matter stand on equal ground before this Court.

**H.    The Investor-Lenders are not Entitled to a Priority Equitable Lien.**

The Court should deny the Investor-Lenders' alternate request that it award them a priority equitable lien against the proceeds of the sale of the Properties, because to do so would inequitably deprive BC57 of a first priority lien on the sale proceeds. BC57 conditioned its loan on BC57 receiving a first priority lien and authorized the release of the BC57 Loan proceeds on the condition and assurance that the BC57 Mortgage would have priority status. The award of an equitable lien to the Investor-Lenders would be inequitable because it would defeat BC57's right to a priority lien. Further, as discussed at length in BC57's Position Statement and above, equity requires that the parties who put an agent in power must bear the loss caused by that agent's conduct.

The Investor-Lenders concede that an equitable lien cannot take priority over a party who acquires an interest in the property without notice of the equitable interest, but seek to escape this limitation by claiming that BC57, as a purchaser of an interest, is charged with notice of any rights appearing in the property's chain of title. (Investor-Lenders Position Statement, Docket Entry No.

1151, p. 19.) Although BC57 had notice of the Investor-Lenders' original rights in the Properties arising from the Investor-Lender Mortgages, the Releases executed by their authorized agent, by which the Investor-Lenders released "all rights, title, interest, claim or demand whatsoever" arising under the Investor-Lender Mortgages (SEC Exhibits 16-20, Docket Entry Nos. 1147-16 through 1147-20), extinguished all of their interests in the their mortgages.

For the reasons set forth in its Position Statement and in this Responsive Position Statement, BC57 had no notice, actual, constructive, or inquiry that the Releases did not terminate all of the Investor-Lenders' interests in the Properties. The claimed discrepancies in the Payoff Statements and Releases did not create a duty to inquire. Likewise, none of the so-called additional facts relied upon the Investor-Lenders to support their equitable lien claim[17] would have caused a prudent commercial lender or its title and settlement agent to investigate, or show that EBF lacked authority to issue the Releases or was engaging in fraud. Specifically, the claim that EB advised BC57 of more than one purpose for the refinancing loan would not have caused a prudent commercial lender or its title and settlement agent to inquire. EB explained the purpose of the loan and there was no reason to question the veracity of that statement. Further, it would not have caused a prudent person to be suspicious of *EBF's* authority to release the Investor-Lender Mortgages. Any inquiry would have confirmed EBF's authority. And the difference between the original principal balances of the Investor-Lender Loans shown in the Investor-Lender Mortgages and the amounts shown due in the Payoff Statements would not have raised suspicion. Nielsen Report, SEC Exhibit 34, Docket Entry No. 1147-34, pp. 18-19; *see also Lennartz v. Quilty*, 191 Ill. 174, 180 (Ill. 1901) (the subsequent purchaser "was a purchaser whose only duty was to ascertain the

---

[17] *See* Investor-Lenders Position Statement, Docket Entry No. 1151, p. 20.

condition of the title, and she was under no obligation or duty to see that the note was paid or canceled").

EBF, as agent of the Investor-Lenders, intended to release the Investor-Lenders' interest in the Properties, and BC57 intended to have a priority lien on the Properties and authorized the release of its funds provided that it would have a priority lien on the Properties. Under these facts, fairness and justice do not permit the Investor-Lenders to defeat that intent by the imposition of an equitable lien.

Investor-Lender Deborah L Mullica/Spectra Investments, LLC's, assertion in her position statement that the BC57 Mortgage should be equitably subordinated to the Investor-Lender Mortgages, citing only *Citicorp Venture Capital, Ltd*., 323 F.3d 228 (3rd Cir. 2003) (*see* Docket Entry No. 1140, p. 5) should also be denied. In *Citicorp*, the Court of Appeals affirmed a bankruptcy's court equitable subordination of the creditor's attorney's fees because of the creditor's inequitable conduct. *Id*. at 234. In the instant case, BC57 did not act inequitably. Instead, it relied upon the Payoff Statements and Releases furnished by EBF, the authorized agent of the Investor-Lenders. Inequitable conduct of EBF does not support the equitable subordination of BC57's interest to the Investor-Lenders. Indeed, because the Investor-Lenders placed EBF in a position to commit fraud, BC57's interest should not be subordinated to their interests.

## II. THE GRANT TO BC57 OF A MORTGAGE ON THE PROPERTIES IS NOT A VOIDABLE FRAUDULENT TRANSFER.

In his disclosure of an avoidance claim, filed on January 7, 2022 (Docket Entry No. 1118), the Receiver alleges that, to the extent that the Investor-Lenders' Mortgages are deemed not to be in first position (because those mortgages were properly released and BC57 has a valid, first-priority lien on all of the Properties), the grant to BC57 of a mortgage on the Properties is a voidable fraudulent transfer under the Illinois Fraudulent Transfer Act, 740 ILCS 160 (the "Act").

(Receiver's Avoidance Disclosure, Docket Entry No. 1118, p. 1.) As detailed above, there is sufficient evidence that BC57 holds a valid first-priority mortgage on the Properties. And, as demonstrated below, there is equally no support, in law or fact, for the Receiver's assertion that the grant to BC57 of a first priority mortgage is a voidable fraudulent transfer.

A.    **The Receiver Lacks Standing to Pursue this Claim.**

As a threshold matter, if the BC57 Mortgage is otherwise a valid first-priority mortgage, the Receiver lacks standing to pursue any avoidance action against BC57 under the Act. "[A]n equity receiver may sue only to redress injuries to the entity in receivership." *See Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir. 1995); *cf. Pearlman v. Alexis*, No. 09–20865–CIV, 2009 WL 3161830, at *4 (S.D. Fla. Sept. 25, 2009) ("An equity receiver may not pursue fraudulent-transfer claims owned by the creditors of the receivership entities; for [a]lthough a receivership is typically created to protect the rights of creditors, the receiver is not the class representative for creditors and receives no general assignment rights from creditors. Thus, the receiver may only pursue such *claims on behalf of the receivership entities that qualify as creditors*.") (internal quotation and citation omitted; emphasis added); *see also Boston Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1514 (1st Cir. 1987) (explaining that the "Receiver draws his authority to sue from a court order that gives him full power to prosecute all claims . . . *on behalf of [the receivership entities]*. It does not give him authority to prosecute clams on behalf of [the receivership entities'] creditors.") (internal quotation and citation omitted) (emphasis in original).

The Receiver has the burden to establish his standing to sue, thus requiring that he present factual evidence establishing a direct injury to the receivership entity resulting from the granting of the mortgage to BC57. *See Scholes*, 56 F.3d at 753. The Receiver has failed to set forth any facts sufficient to show that the avoidance action will redress injuries to the receivership entity

caused by the transaction with BC57. In fact, the uncontested facts establish that no injury resulted to any receivership entity from this transaction. The BC57 Loan paid off prior mortgages and resulted in an equivalent or smaller mortgage on the same properties. The authorized servicer for the prior mortgagees on each property received the payoff funds, and the remainder of the funds funded tax payments and improvements to the real estate. The transaction unquestionably benefitted the receivership entities, and neither entity was harmed as a creditor by the fully-funded loan and the resulting mortgage to secure the loan, which loan, among other things, resulted in over $1 million in renovations to the subject properties. Jarjosa Dep., SEC Exhibit 26, Docket Entry No. 1147-26, pp. 50-62. Accordingly, the Receiver lacks standing under the Act to pursue an avoidance action, and any such claim must be dismissed.

**B.    The Receiver Cannot Meet His Burden to Prove Actual Intent.**

If he had standing, the Receiver has the burden to prove all of the elements of the fraudulent transfer claim raised regarding the BC57 Mortgage on the Properties. Section 5 of the Act provides, in relevant part:

> Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor;
>
> . . . . and the debtor:
>
> > (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5. Thus, the Receiver must prove, by clear and convincing evidence, *see In re Zeigler*, 320 B.R. 362, 372 (Bankr. N.D. Ill. 2005), that EB had "*actual* intent to hinder, delay, or defraud any creditor" when it granted BC57 a mortgage on the Properties. 740 ILCS 160/5 (emphasis added).

1.      **The Ponzi Scheme Presumption Does Not Apply to Claims Brought Pursuant to the Act.**

The Receiver's Avoidance Disclosure declares use of the so-called "Ponzi scheme presumption" to establish the necessary element of actual intent to defraud. (Docket Entry No. 1118, p. 2.) Because a Ponzi scheme is, by definition, an intended fraud from the outset, some courts have entitled parties raising claims pursuant to the Bankruptcy Code or a state's version of the Uniform Fraudulent Transfer Act to a presumption—the Ponzi scheme presumption—of actual fraudulent intent if, and only if, the elements of a Ponzi scheme are established. *See, e.g.*, *Damian v. Heartland Bank & Tr. Co.*, No. 20 C 7819, 2021 WL 5937153, at *11 (N.D. Ill. Dec. 15, 2021) (recognizing the Ponzi scheme presumption); *In re Equip. Acquisition Res., Inc.*, 483 B.R. 823, 834 (Bankr. N.D. Ill. 2012) (same); *see also In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th 181, 196 (2d Cir. 2021) (explaining that "the existence of a Ponzi scheme demonstrates actual intent as a matter of law because transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors") (internal quotation omitted); *In re Pac. Forest Prods. Co.*, 05-23268-CIV-GOLD, 2006 WL 8433477, at *6 (S.D. Fla. May 24, 2006) ("The rationale for inferring fraudulent intent derives from the structure of a Ponzi scheme, in that Ponzi schemers know from the beginning that future investors will not be paid.  Therefore, a Ponzi scheme is, by its nature, fraudulent.") (internal citation omitted).

Although federal courts applying Illinois law have recognized and applied the Ponzi scheme presumption, *see, e.g.*, *Damian*, 2021 WL 5937153, at *11, the Illinois Supreme Court has yet to opine as to whether the presumption applies to claims brought pursuant to the Act. Two state supreme courts that have recently been tasked with determining whether to apply the Ponzi Scheme Presumption to their state's version of the Uniform Fraudulent Transfer Act have rejected

its application. *See Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560 (Tex. 2016); *Finn v. Alliance Bank*, 860 N.W.2d 638 (Minn. 2015). The Minnesota Supreme Court emphasized that there "is no statutory justification for relieving the Receiver of its burden of proving—or for preventing the transferee from attempting to disprove—fraudulent intent. Instead, fraudulent intent must be determined in light of the facts and circumstances of each case." *Finn*, 860 N.W.2d at 647.

Accordingly, because whether to permit the use of the Ponzi scheme presumption to presume actual intent pursuant to the Act is a question involving the interpretation of state law, it is the Illinois Supreme Court that should determine its applicability. Earlier case law suggests that the Illinois Supreme Court would agree with the Minnesota and Texas courts if presented with the issue, and would find that no "Ponzi scheme presumption" exists. According to the Illinois Supreme Court, "actual fraud is never presumed but must be proved by clear and convincing evidence." *Ray v. Winter*, 67 Ill.2d 296, 303 (Ill. 1977) (citing *Carroll v. Caldwell*, 12 Ill.2d 487, 494 (Ill. 1957)); *see also Hofmann v. Hofmann*, 94 Ill.2d 205, 222 (Ill. 1983) (noting that "fraud will not be presumed in this State and must be proved by clear and convincing evidence").

Furthermore, although the presumption has been applied by some federal courts in Illinois, the foundation for doing so is shaky at best with respect to actions under the Act. There is no Seventh Circuit authority for the application of the presumption, and the United States District and Bankruptcy Courts that have applied it did so pursuant to section 548 of the Bankruptcy Code, or by bringing in claims pursuant to the Act through section 544 of the Bankruptcy Code. *See, e.g.*, *Equip. Acquisition Res.*, 483 B.R. at 834; *In re Lancelot Invs. Fund, LP*, 451 B.R. 833 (Bankr. N.D. Ill. 2011); *In re Lake States Commodities, Inc.*, 272 B.R. 233 (Bankr. N.D. Ill. 2002); *In re Foos*, 188 B.R. 239, 244 (Bankr. N.D. Ill. 1995), *rev'd on other*

*grounds*, 1996 WL 563503 (N.D. Ill. Sept. 23, 1996). One District Court case, *Damian v. Heartland Bank & Trust*, applied the presumption to a claim brought solely pursuant to the Act, but relied exclusively on cases that apply the presumption to claims under the Bankruptcy Code. *See* 2021 WL 5937153, at *11. Finally, a single lower state court opinion applies the presumption to a claim brought pursuant to the Act, in the context of a motion to dismiss, relying on out-of-circuit authority in a bankruptcy case. *See Sender v. A.S.A.M. Partners II*, No. 12CH03206, 2013 WL 3956899, at *5-6 (Ill. Cir. Ct. June 10, 2013) (citing *In re Dreier LLP*, 452 B.R. 391, 424 (S.D.N.Y. 2011)).[18]

This Court should follow the Illinois Supreme Court's rule that actual fraud can never be presumed, *see Ray*, 67 Ill.2d at 303, and join the Minnesota and Texas courts in finding that no Ponzi scheme presumption exists under the Act.

### 2. Even if the Ponzi Scheme Presumption Could be Applied to Claims Brought Pursuant to the Act, it does not Apply in this Case.

As a necessary (but not sufficient) condition to raising the presumption, the Receiver first must prove the existence of a Ponzi scheme as a matter of fact. *See Equip. Acquisition Res.*, 483 B.R. at 834; *In re Taneja*, No. 10–1225, 2012 WL 3073175, at *4 (Bankr. E.D. Va. July 30, 2012) (explaining that "the burden is on the trustee to prove the predicate facts: that a Ponzi scheme existed and that the transactions were a part of the Ponzi scheme"). If the receiver "cannot carry his burden of proof, the presumption will not arise." *See Taneja*, 2012 WL 3073175, at *4, *7 (determining that the trustee had not carried his burden to establish the presumption, despite the existence of fraud, and explaining that "[a]ll Ponzi schemes are frauds. Not all frauds are Ponzi

---

[18] *Sender* cites to the Seventh Circuit case, *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995), but *Scholes* does not actually mention or endorse the Ponzi scheme presumption. *Scholes* involved a typical "badges of fraud" analysis.

schemes."). Since the Receiver must prove actual fraud by clear and convincing evidence, courts hold that the existence of a Ponzi scheme (and that the challenged transfer was integral to the scheme, as discussed below) must also be established by clear and convincing evidence. *See e.g.*, *In re Fair Finance Co.*, No. 10-50494, 2018 WL 1069443, at *29-30, 35 (Bankr. N.D. Ohio Feb. 23, 2018); *see also In re Goldberg*, 623 B.R. 225, 241 (Bankr. D. Conn. 2020).

A Ponzi scheme "involves an enterprise which makes payments to investors from money received from more recent investors, rather than from profits of a legitimate business enterprise." *Equip. Acquisition Res.*, 483 B.R. at 834. Importantly, in order to be a Ponzi scheme, the scheme must have been fraudulent from the beginning. *See Pac. Forest Prods.*, 2006 WL 8433477, at *6, *7 (explaining that "Ponzi schemers know from the beginning that future investors will not be paid" and noting further that a "Ponzi scheme, [by] its very definition, is an illicit operation *from the outset*") (emphasis added); *see also In re Reagor-Dykes Motors, LP*, Case No. 18-50214-RLJ-11, 2020 WL 4939180, at *9 (Bankr. N.D. Tex. Aug. 24, 2020) (differentiating a Ponzi scheme and a check-kiting scheme, and explaining that, unlike the latter, a "Ponzi scheme is fraudulent from the beginning"). Indeed, the logic of allowing the presumption exists only if the scheme is inherently fraudulent from the outset, thus making all actions critical to the scheme done with actual intent to defraud.

As the court explained in *In re Direct Access Partners, LLC*, this unique aspect of Ponzi schemes (entirely fraudulent from the outset) underlies the presumption, which does not arise in every case with fraudulent or even criminal activity:

> [T]he so-called Ponzi scheme presumption is based on the peculiar characteristics of a Ponzi scheme, under which every payment made to one investor is necessarily part of the scheme to defraud a new investor, and necessarily part of a scheme that ultimately will leave someone unpaid. As the court explained in [*In re Bayou Grp., LLC*], 439 B.R. 284, 306 n.19 (S.D.N.Y. 2010) [(internal citation omitted)]:

> The logic for applying a presumption of actual intent to defraud in the Ponzi scheme scenario is tied to the fact that a Ponzi scheme 'cannot work forever.' When the pool of investors runs dry – as it will – the operator knows that the scheme will collapse and that those still invested in the enterprise will lose their money. 'Knowledge to a substantial certainty constitutes intent in the eyes of the law,' and awareness that some investors will not be paid is sufficient to establish actual intent to defraud.

> By contrast, the mere fact that a business engages in some other form of illegal activity (even if substantial in amount) does not automatically mean that the business inevitably will fail or that creditors will be left unpaid. Accordingly, illegal activity, standing alone, does not support a presumption that payments made by a business are made with an actual intent to hinder, delay or defraud the creditors of the business.

602 B.R. 495, 540-41 (Bankr. S.D.N.Y. 2019).

In order to prove the existence of a Ponzi scheme, the Receiver must establish an initial and unbroken fraudulent intent, with clear and convincing evidence that from the outset and continuing through the challenged transfer, that "deposits were made by investors; the *Ponzi* scheme operator conducted little or no legitimate business operations as represented to investors; the purported business operation produces little or no profits or earnings, the source of the funds being new investments by subsequent investors; and the source of payments to investors is cash infused by new investors." *Equip. Acquisition Res.*, 483 B.R. at 834.

As noted, establishing a Ponzi scheme is necessary but not sufficient to raise the presumption. The Receiver also carries the burden of proving, with clear and convincing evidence, that the particular transaction with BC57 was in *furtherance* of that scheme and integral to its continuation. *See In re Foos*, 188 B.R. at 244 (explaining that "when an action is brought to recover payments that were part of the Ponzi scheme it is reasonable to presume an intent to defraud" *but* "[w]here, as here . . . the individual who is operating the Ponzi scheme conducts ordinary business transactions outside of the Ponzi scheme, the basis for presuming fraud is not present"); *see also Sale v. Ferrari Fin. Servs., Inc.*, No. 19-23563-CIV-MORENO, 2020 WL 5750502, at *5 (S.D.

Fla. Sept. 25, 2020) (finding that the Ponzi scheme presumption did not apply because the transfers at issue were not made to "perpetuate the [Ponzi] scheme"); *Taneja*, 2012 WL 3073175, at *4 (explaining that, to use the Ponzi scheme presumption, one must "prove the predicate facts: that a Ponzi scheme existed and that the transactions were a part of the Ponzi scheme"); *In re M&M Marketing, L.L.C.*, No. BK09–81458–TJM, 2013 WL 5592909, at *3 (Bankr. D. Neb. Oct. 10, 2013) ("[t]he Ponzi scheme presumption requires proof of the existence and operation of a Ponzi scheme involving the debtor, *and* the debtor's transfer of property to another entity in furtherance of the scheme.") (emphasis added); *In re ATM Fin. Servs., LLC*, No. 6:08–bk–969– KSJ, 2011 WL 2580763, at * (Bankr. M.D. Fla. June 14, 2011) ("To establish the debtor's fraudulent intent . . . the trustee must show that *each transfer* was made *in furtherance of* the Ponzi scheme. The reason for this is clear: the Court can only infer intent to defraud future purchasers when the trustee has shown the transfers at issue somehow perpetuated the debtor's Ponzi scheme. Transfers made by the debtor unrelated to the Ponzi scheme do not warrant this inference.") (emphasis in original); *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 13 (S.D.N.Y. 2007) (requiring proof that the transfers at issue were "in furtherance of the Ponzi scheme" in order to "trigger the Ponzi scheme presumption") (internal quotation marks omitted). Thus, the Receiver carries the burden of proving a direct nexus between the granting of a mortgage to BC57 and furtherance of the Ponzi scheme.

The Receiver's attempt to use the Ponzi scheme presumption to bypass the need to otherwise establish actual intent must fail because the Receiver cannot prove the existence of a Ponzi scheme. In the Receiver's Disclosure, the Receiver merely states, in a conclusory fashion: "The evidence that EquityBuild and the Cohens were operating a Ponzi scheme is a matter of record and incontrovertible." (Receiver's Avoidance Disclosure, Docket Entry No. 1118, p. 3.) In

fact, there is no such finding on the record and no admission of the existence of a Ponzi scheme. The Cohens' stipulations neither admit nor deny the existence of a Ponzi scheme. (Docket Entry Nos. 29-2, 29-3.) Besides citing to a couple of docket entries that establish no such thing, the Receiver does not state what evidence the Receiver is relying upon in support of the existence of a Ponzi scheme as defined by applicable case law. While the SEC's original complaint repeats the Ponzi scheme label without basis, its factual allegations actually establish that, as a matter of fact and law, a Ponzi scheme did not exist and is not even properly pleaded, as detailed below. (Docket Entry No, 1. p. 2, ¶ 3 and p. 9, ¶ 45.)

**a.    The Ponzi Scheme Presumption does not Apply Because the Defendants' Businesses were not Fraudulent from the Outset.**

The Receiver fails to raise the Ponzi scheme presumption for two reasons. *First*, regardless of what the EB enterprise eventually became, it began with legitimate intentions and legitimate business activities. The SEC acknowledges this in its Complaint. When describing the factual background supporting its claims against the Cohens and their businesses, the SEC was careful to highlight that the origins of the Cohens' investment scheme were not fraudulent. For example, the SEC explained that only after the "Defendants sustained heavy losses and the properties they pitched to investors failed to earn anywhere near enough to pay the promised double-digit returns" did the "Defendants' investment program *devolve[]* into a Ponzi scheme." (Docket Entry No. 1, p. 2, ¶ 3) (emphasis added.) Only at this point, according to the SEC, the Defendants, "[r]ather than disclosing their financial problems . . . continued to solicit investors with offers of safe investment and outsized returns." (*Id.*, p. 2, ¶ 4). The Complaint establishes a timeline: the Cohens operated a real estate investment business and, by 2010, began offering and selling promissory notes (*Id.*, p. 5), informing investors that they would receive double-digit returns through third-party purchasers. (*Id.*, p. 7, ¶ 34.) However, over time, the properties securing the notes performed poorly,

eliminating the supply of ready purchasers, and "by 2015, Defendants no longer even tried to find third-party buyers." (*Id.*, p. 9, ¶ 44.) It was only at this point, in 2015, the SEC alleges that "[w]ith the properties failing to generate sufficient income," that "Defendants *began* operating the Notes offering as a Ponzi scheme, using new investor funds to pay earlier investors' interest payments." (*Id.*, p. 9, ¶ 45) (emphasis added.)

The Tushaus declaration filed in support of the SEC's motion for a temporary restraining order, filed concurrently with the Complaint, supports this timeline. (Docket Entry No. 5.) According to the Tushaus Declaration, the business suffered substantial net losses in 2015, and that bank records indicate that from

> January 2015 through February 2017, investors received approximately $14.5 million in interest payments from EquityBuild . . . . [but] during the same period, the money transferred to EquityBuild from property managers and third-party buyers' monthly payments amounted to only $3.8 million. Based on this analysis, it appears that EquityBuild used investor proceeds to make investor interest payments.

(Docket Entry No. 5, p. 11, ¶ 43.) Together, the Complaint and the Tushaus Declaration make clear that the SEC's position is that the use of investor proceeds to make investor interest payments—payments claimed to be characteristic of a Ponzi scheme—did not begin until 2015—five years after the Defendants began offering and selling promissory notes. But even this statement admits that rents and sale proceeds provided some of the payments to investors, as originally intended and advertised.

As explained above, a critical and necessary aspect of a Ponzi scheme is that it *begins* as a fraudulent business. *See Pac. Forest Prods.*, 2006 WL 8433477, at *6, *7 (explaining that "Ponzi schemers know from *the beginning* that future investors will not be paid" and noting further that a "Ponzi scheme, [by] its very definition, is an illicit operation *from the outset*") (emphasis added); *see also Reagor-Dykes Motors, LP*, 2020 WL 4939180, at *9 (explaining that a "Ponzi scheme is

fraudulent from the beginning"). Therefore, by definition, a Ponzi scheme cannot, as the SEC characterized, "devolve" into a Ponzi scheme. (Docket Entry No. 1, p. 2, ¶ 3, *see also* p. 9, ¶ 45.) Because the Defendants did not begin making "Ponzi-style" payments until 2015—five years after they began offering notes as part of their business model—whatever enterprise the Defendants were operating cannot be properly classified as a Ponzi scheme. *See Taneja*, 2012 WL 3073175, at *7 (explaining that "[a]ll Ponzi schemes are frauds. Not all frauds are Ponzi schemes."). There may have been fraudulent activities at some point, but never a Ponzi scheme under the law, and therefore use of the Ponzi scheme presumption is unavailable to the Receiver.

      **b.**    **The Ponzi Scheme Presumption does not Apply Because the Transaction with BC57 was not in Furtherance of the Defendants' Scheme.**

The Receiver fails to trigger the Ponzi scheme presumption relative to the alleged avoidance claim against BC57 for a *second* reason: the Receiver cannot prove that the specific transaction with BC57 was in furtherance of a broader fraudulent scheme. In fact, the Receiver does not even allege a nexus between the borrowing from BC57 and the grant of a mortgage to secure that borrowing and the alleged fraudulent scheme. Indeed, not once in either the Receiver's Avoidance Disclosure (Docket Entry No. 1118) or the Receiver's Answers to BC57 LLC's Contention Discovery (Ex. 1 to Docket Entry 1199) does the Receiver attempt to show that the transaction with BC57 was related to the alleged Ponzi-style payments the Defendants were making to investors, or that the transaction was made to further the scheme. Nor could he ever do so. The Receiver has the burden of proof on this element, and he fails to meet it.

The dearth, in the Receiver's Avoidance Disclosure and the Receiver's Answers to BC57 LLC's Contention Discovery, to any reference to a connection between the BC57 transaction and the Defendants' scheme related to the payments to investors is not an oversight. There was no connection. The BC57 transaction was an ordinary course, arm's length commercial loan that

benefitted the receivership entities. The loan issued by BC57 was a standard third-party financing transaction; the loan served to refinance the existing debt on the Properties, pay delinquent real estate taxes, and provide funds to repair the Properties. (Ex. 16 to BC57 Position Statement, Docket Entry No. 1160, pp. 113-58.) As noted above, the Ponzi scheme presumption applies only to activities conducted in furtherance of the scheme. *See Foos*, 188 B.R. at 244 ("Where, as here . . . the individual who is operating the Ponzi scheme conducts ordinary business transactions outside of the Ponzi scheme, the basis for presuming fraud is not present"); *Taneja*, 2012 WL 3073175, at *4 (explaining that, to use the Ponzi scheme presumption, one must "prove the predicate facts: that a Ponzi scheme existed and that the transactions were a part of the Ponzi scheme"). The burden is on the Receiver to prove that the transaction with BC57 was in furtherance of the Defendants' scheme, and the Receiver has failed to meet such burden. *See id.* The transactions with BC57 and the security interest granted to it were "outside of the Ponzi scheme," and therefore "the basis for presuming fraud is not present." *See Foos*, 188 B.R. at 244. Moreover, BC57 made the loan at issue in September 2017. According to the SEC Complaint, "as of late 2017, investors in more than 1,200 notes had not been repaid their principal." (Docket Entry No. 1, pp. 11-12, ¶ 59.) This suggests that, even if Ponzi scheme conditions had existed, they ended before the loan was made.

Accordingly, because the Receiver has not—and cannot—show the existence of a true Ponzi scheme, and has not alleged and cannot prove that the transactions with BC57 were in furtherance of any alleged Ponzi scheme (even if one existed), the presumption cannot arise. *See Taneja*, 2012 WL 3073175, at *4. Without the use of the Ponzi scheme presumption, the Receiver has no other basis to prove actual intent, and has not alleged or offered any other proof. Therefore, because the Receiver has failed to prove, and cannot prove, a necessary element of his fraudulent transfer claim, this claim must fail.

**C.     Even if the Court Could Determine that a Fraudulent Transfer Occurred, BC57's Mortgage Remains Valid Because it was Taken in Good Faith and for Reasonably Equivalent Value.**

Even if the Receiver were to prove a fraudulent transfer pursuant to Section 5 of the Act, BC57's security interest remains valid because it accepted the mortgage in good faith and for reasonably equivalent value. As the Receiver concedes in the Receiver's Avoidance Disclosure (Docket Entry No.1118, p. 3), the Act recognizes a good faith defense for creditors who accept a transfer in good faith and for reasonably equivalent value. *See* 740 ILCS 160/9 ("A transfer or obligation is not voidable under paragraph (1) of subsection (a) of Section 5 against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee").

As discussed above, there is no doubt that BC57 exchanged reasonably equivalent value for the mortgage granted to it. The record makes that clear and the Receiver does not contend otherwise. BC57's good faith is also established as a matter of law and fact.

True, "if the circumstances would place a reasonable person on inquiry as to the fraudulent scheme (and such inquiry would have revealed it), the good faith defense will be unavailable." *In re Equip. Acquisition Res., Inc.*, 481 B.R. 422, 429 (Bankr. N.D. Ill 2012). But, as discussed above, inquiry notice did not occur here. The term inquiry notice "signifies awareness of suspicious facts that would have led a reasonable firm, acting diligently, to investigate further and by doing so discover wrongdoing." *In re Sentinel Mgmt. Grp, Inc.*, 809 F.3d 958, 961 (7th Cir. 2016). The creditor "must show that the circumstances surrounding the *transfers at issue* would not have placed a reasonable person on inquiry notice of the alleged fraud." *Equip. Acquisition Res.*, 481 B.R. at 429 (emphasis added). Courts have held "that it is information suggesting insolvency or a fraudulent purpose in making a transfer that triggers

48

inquiry notice." *See, e.g.*, *In re Bayou Grp., LLC*, 439 B.R. 284, 313-14 (S.D.N.Y. 2010) (collecting cases). Whether a transferee had the requisite inquiry notice "is informed by the standards, norms, practices, sophistication, and experience generally possessed by participants in the transferee's industry or class." *Id.* at 313.

In the context of the good-faith defense to fraudulent transfer claims, courts have limited the definition of "inquiry notice," noting that a broad inquiry notice standard would "render the good faith defense largely illusory whenever a transferor is actually engaged in fraud or is insolvent." *See id.* at 316. Accordingly, courts emphasize that the inquiry notice standard involves both subjective and objective components when examining what the transferee knew or should have known at the time, explaining that "even courts that use the phrase 'should have known' acknowledge that the first step in the inquiry notice analysis looks to what facts the defendant *knew*." *See Madoff*, 12 F.4th at 191 (emphasis in original) (citing *Bayou*, 439 B.R. at 310; *Sentinel Mgmt.*, 809 F.3d at 961); *In re Taneja*, 743 F.3d 423, 430 (4th Cir. 2014) (recognizing that evaluating good faith in an avoidance action involves both subjective components, which involves looking at the "honesty" and "state of mind" of the transferee, and objective components, which takes into account the "observance of reasonable commercial standards") (internal quotations omitted); *In re First Nat'l Parts Exch., Inc.*, No. 98 C 5915, 2000 WL 988177, at *6, *7 (N.D. Ill. July 18, 2000) (highlighting the need for courts to consider both subjective and objective components when evaluating the good faith defense to a fraudulent transfer claim); *see also Sentinel Mgmt.*, 809 F.3d at 961 (noting that the inquiry notice standard requires examining the transferee's "*awareness* of suspicious facts" at the time).

In order to have had the requisite "inquiry notice" at the time of the transaction, BC57 must have known information about EB suggesting insolvency or a fraudulent purpose in granting

the mortgage, that would have led a reasonable commercial real estate lender to inquire further, taking into account industry standards for commercial real estate lenders in the context of short-term, collateral-focused bridge loans. *See, e.g.*, *Bayou*, 439 B.R. at 313-14. In the Receiver's Disclosure, the Receiver outlines a number of facts allegedly known to BC57 that he claims were red flags sufficient to trigger inquiry notice. (Docket Entry No. 1118, pp. 4-8.) These alleged facts, other than highlighting the sloppiness of some of EB's initial mortgage release paperwork and some confusion about the exact payoff amounts of the prior mortgages, would not be red flags for a commercial real estate bridge lender like BC57, and certainly are not sufficient enough to suggest insolvency or fraud by EB sufficient to trigger inquiry notice. *See Bayou,* 439 B.R. at 314 (expressly rejecting the notion that "infirmity" in the transaction or "in the integrity of management" could trigger inquiry notice, noting that the phrase "infirmity"—which could "include poor business model, incompetent management, inadequate accounting controls, lack of research capabilities, poor marketing, insufficient capital, and a host of other deficiencies"—is "so broad as to be indefinable"); *see also First Nat'l Parts Exch.*, 2000 WL 988177, at *6 (explaining that "the mere fact that a transferee is on notice of the precarious financial condition of the transferor does not preclude a finding of good faith under all circumstances").

As the deposition testimony of Bloomfield Capital and BC57's employees and counsel establish, both BC57 and its law firm relied on NNNT, acting in its role as settlement agent, to handle both the accuracy of the payoff amounts needed to release the existing mortgages and the adequacy and validity of the mortgage releases. *See* Turzewski Dep., SEC Exhibit 30, Docket Entry No. 1147-30, p. 96; Bagchi Dep., SEC Exhibit 25, Docket Entry No. 1147-25, pp. 63-76. Like other commercial real estate bridge lenders, BC57 focused on loan to value, and primarily required a first priority mortgage and title insurance. Jarjosa Dep., SEC Exhibit 26, Docket Entry

No. 1147-26, pp. 37, 41, 76, 96. When NNNT advised that the payoffs were in the proper amount and that the release documents were sufficient under Illinois law, there were no issues and no flags of any color. Jarjosa Dep., SEC Exhibit 26, Docket Entry No. 1147-26, p. 103; Bagchi Dep., SEC Exhibit 25, Docket Entry No. 1147-25, pp. 63-76. At the time that BC57 closed its loan and received the mortgage, no open issues existed that had not been categorically and clearly resolved by NNNT. Bagchi Dep., SEC Exhibit 25, Docket Entry No. 1147-25, pp. 73-76. There was nothing to trigger inquiry notice and nothing that BC57 learned that affected its decision to make the loan. Bagchi Dep., SEC Exhibit 25, Docket Entry No. 1147-25, pp. 73-76; Jarjosa Dep., SEC Exhibit 26, Docket Entry No. 1147-26, p. 103.

Moreover, in the Receiver's Answers to BC57, LLC's Contention Discovery, when asked what facts *could* BC57 have discovered if it inquired further into EB before issuing its loan, the Receiver outlined facts related to the Cohens and their other business ventures, certain lawsuits involving EB, and discrepancies between information provided to BC57 and publicly-available information. (Exhibit 1 to Docket Entry 1199, pp. 7-10). As explained above, BC57 had no reason to further investigate EB in relation to this transaction but, even if it had determined the need to investigate, these "facts" would not have been sufficient to show that BC57 did not enter into the transaction in good faith. *See* 740 ILCS 160/9. Indeed, in *Bayou*, when considering information *actually known* to the transferee, the court determined that (1) allegations made in a lawsuit against the transferor by a former principal of the transferor, (2) certain delays and inconsistencies in disclosures and communications related to specific transaction, and (3) negative information concerning the principals of the transferor contained in background investigation reports, were not sufficient to place a reasonable institutional hedge fund investor on inquiry notice. *See Bayou*, 439 B.R. at 318-28. Similarly, the Receiver cannot point to anything that BC57, as a reasonably

51

prudent commercial real estate bridge lender, actually knew or should have known about EB, that would have suggested "insolvency or a fraudulent purpose" in the transaction at issue. *Id.* at 314. As Mr. Jarjosa testified, there was nothing in the background check on Jerome Cohen or in the litigation reports that BC57 received that rose to the level of not making the loan. Jarjosa Dep., SEC Exhibit 26, p. 103. Accordingly, because BC57 was not on inquiry notice of any fraudulent scheme orchestrated by EB related to the specific transaction, BC57 engaged in the transaction in good faith.

The transaction involving BC57 otherwise has all of the indicia of good faith. The transaction was clearly at arm's length, as demonstrated by the multi-step, arm's length negotiations over the terms of the loan. Jarjosa Dep., SEC Exhibit 26, Docket Entry No. 1147-26, pp. 50-62; Turzewski Dep., SEC Exhibit 30, Docket Entry No. 1147-30, pp. 63-70. As courts have emphasized, "whether the transaction carries the earmarks of an arms-length bargain" is relevant to the good faith determination. *See In re Think Retail Sols., LLC*, No. 15-56153-BEM, 2019 WL 2912717, at *21 (Bankr. N.D. Ga. July 5, 2019) (internal quotation omitted). Courts in this district have found similar third-party loan transactions to be in good faith and therefore unavoidable under fraudulent transfer law. *See, e.g.*, *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 559-60 (Bankr. N.D. Ill. 1994).

For the reasons set forth above, even if the Receiver were able to establish that a fraudulent transfer occurred—which BC57 believes is impossible on this record—BC57's acceptance of the transfer in good faith and for reasonably equivalent value will defeat the Receiver's claim.

## CONCLUSION

For the reasons set forth above and in its opening Position Statement, BC57 has a first priority unavoidable lien upon the subject properties, and the Court should so hold, entitling BC57 to payment from the proceeds of the sale of its collateral.

Dated: March 14, 2022               **BC57, LLC**

/s/  David E. Hart
David E. Hart
Robert M. Horwitz
Maddin Hauser Roth & Heller, PC
28400 Northwestern Drive, 2nd Floor
Southfield, MI 48034
(248) 827-1884
dhart@maddinhauser.com
rhorwitz@maddinhauser.com

*-and-*

/s/  Michael A. Gilman
Edward S. Weil (eweil@dykema.com)
Michael A. Gilman (mgilman@dykema.com)
Todd Gale (tgale@dykema.com)
Kevin Connor (kconnor@dykema.com)
Benjamin W. Chertok (bchertok@dykema.com)
Dykema Gossett PLLC
10 South Wacker Drive, Suite 2300
Chicago, Illinois  60606
(312) 876-1700

*-and-*

/s/  Robert J. Keach
Robert J. Keach
Letson Douglass Boots
Kyle D. Smith
Bernstein, Shur, Sawyer & Nelson, P.A.
Portland, ME 04104
Telephone: (207) 774-1200
Facsimile: (207) 774-1127

rkeach@bernsteinshur.com
lboots@bernsteinshur.com
kdsmith@bernsteinshur.com

Attorneys for Claimant
BC57, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2022, I caused the foregoing Responsive Statement of Claimant BC57, LLC to be electronically filed with the Clerk of Court through the Court's CM/ECF system, which sent electronic notification of such filing to all parties of record, and e-mailed to ebgroup1service@rdaplaw.net, which is designed to send electronic notification of such filing to all parties involved in Group 1.

/s/ *Michael A. Gilman*

097077.000109  4886-7009-1285.1