## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

U.S. SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

    v.

EQUITYBUILD, INC., EQUITYBUILD
FINANCE, LLC, JEROME H. COHEN, and
SHAUN D. COHEN,

        Defendants.

No. 18 CV 5587

Judge Manish S. Shah

### MEMORANDUM OPINION AND ORDER

Defendants Jerome Cohen and Shaun Cohen ran a Ponzi scheme through their real estate companies, EquityBuild, Inc. and EquityBuild Finance, LLC, from at least 2010 to 2018. The United States Securities Exchange Commission sued them, alleging fraud. They admitted to the scheme and a receiver was appointed to advise the court on distributing assets. This opinion focuses on claims to the liquidated funds from five properties (the so-called "Group 1 claims"). Multiple individual investors, as well as private lender BC57, invested in these properties. The issue is which of the parties has priority to receive the funds liquidated by the receiver's sale of the properties. (The individual investors have filed position statements and other briefs as a bloc and do not contest each other's priority.) Because Equitybuild Finance's mortgage releases were facially defective and Equitybuild Finance lacked the authority to release the individual investors' mortgages, the individual investors have priority to the funds.

## I.    Legal Standard

District courts have broad discretion in approving a plan for distribution of receivership funds. *See S.E.C. v. Wealth Mgmt. LLC*, 628 F.3d 323, 332 (7th Cir. 2010); *see also S.E.C. v. Enter. Trust Co.*, 559 F.3d 649, 652 (7th Cir. 2009). A district court's primary job in supervising an equitable receivership is to ensure that the receiver's proposed plan of distribution is "fair and reasonable." *S.E.C. v. Wealth Mgmt. LLC*, 628 F.3d at 332.

## II.    Facts

Starting in 2010 or earlier, defendants began selling promissory notes to investors. [1] ¶ 20.[1] Each note represented a fractional interest in a specific real estate property. [1] ¶ 24. Most of the real estate consisted of residential properties in underdeveloped areas on the South Side of Chicago. [1] ¶ 19. Investors' funds would be pooled together to purchase each property, which would then be renovated or developed. [1] ¶ 24. The notes provided for interest rates ranging from 12% to 20%; the more someone invested, the higher their promised rate of return was. [1] ¶ 22. The parties to the notes were Equitybuild (the borrower) and the individual investors (the lenders). [1] ¶ 21. The investors, per an investment form defendants drafted, signed away most of their rights and powers under the notes and mortgages to a

---

[1] Bracketed numbers refer to entries on the district court docket. Page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to court transcripts and depositions, which use the transcript's original page number. The facts are taken from the SEC's complaint and exhibits submitted by the SEC. [1]; [1147]. Jerome and Shaun Cohen consented to entry of judgment against them without admitting or denying the allegations of the complaint, while also agreeing, for purposes of exceptions to bankruptcy discharge, that the allegations of the complaint were true and admitted. [40].

2

"collateral agent," Equitybuild Finance. [1] ¶ 25. So the mortgages were typically structured to be between Equitybuild and the investors "care of" Equitybuild Finance. [1] ¶ 25. Defendants told investors that the investment plan was structured as follows.

The investors' funds would go toward collectively purchasing one of the properties. [1] ¶ 24. The investors and defendants would thus enter into a mortgagee-mortgagor relationship. The defendants, in turn, would enter into a mortgagee-mortgagor relationship with a third party. [1] ¶ 34. The third parties would borrow on shorter terms and at a higher rate than purchasers using traditional mortgages (including defendants themselves). *See* [1] ¶ 34. Defendants would retain as profits the difference between the mortgage payments received from the third parties and the promised interest payments made to the investors. [1] ¶ 35.

Defendants assured investors that default was unlikely—the third parties, they said, were "qualified" borrowers with "A-grade" credit. [1] ¶ 36. The third-party payments would generate "more than enough revenue to cover [defendants'] note payments [to the investors] as well as all of the property's operating expenses, and still return positive cash flow." [1] ¶ 36. And in the unlikely scenario that an investor's mortgage went into default, defendants assured investors they could simply sell the property in a quick sale and get their money out of the investment. [1] ¶ 31.

Little of that was true. Equitybuild itself owned most of the properties securing the notes, with some third parties renting. [1] ¶¶ 44, 45. Defendants also told investors that the properties securing their notes were worth significantly more than

3

the actual cost of the properties—47% more, on average. [1] ¶ 38. That extra money from investors meant that, for a time, it wasn't a problem that there were no third-party mortgage purchasers to generate profit for the defendants or generate the promised returns for investors. Instead, defendants could generate profit by keeping some of the investors' investments as undisclosed fees. [1] ¶ 37. And they did, at a rate of 15% to 30%. [1] ¶ 37. They also used later investors' inflated investments to repay earlier investors, in what soon became a Ponzi scheme. [1] ¶¶ 39, 45. From January 2015 to February 2017, for example, defendants earned only $3.8 million in revenue from the properties, but investors received around $14.5 million in interest payments. [1] ¶ 45.

On top of all that, because the properties were worth significantly less than the investors' investments, their investments weren't fully secured, as defendants had promised. [1] ¶ 40. Instead, they were only secured by the actual, much smaller, value of the properties. [1] ¶ 40.

Defendants' payments to investors eventually became unsustainable, and defendants started to kick the can down the road. They routinely extended the payback terms on investors' notes, often for years. [1] ¶ 48. They forced investors to either agree to those extensions or be placed on a "buyout list" and wait for defendants to find another investor willing to buy out the original investment. [1] ¶ 48. As of June 2018, there were around $3 million worth of investments on the buyout list. [1] ¶ 48. Defendants also forced around 100 investors to accept unsecured promissory notes in lieu of their original "secured" notes. [1] ¶ 49. Throughout, defendants

continued offering securities to new investors without disclosing any of this information. [1] ¶ 49.

In 2017, Jerome and Shaun Cohen changed their business model. [1] ¶ 52. Instead of offering promissory notes, they began offering investments in real estate funds. [1] ¶ 53. Again, they said they would pool investors' proceeds to purchase and renovate properties. [1] ¶ 53. As with the promissory notes, they promised double-digit returns. [1] ¶ 54. Significant portions of fund investor money were used to repay earlier promissory-note investors. [1] ¶ 56. What's more, many of the properties that fund investors were investing in were the same properties that were supposedly securing the promissory-note investors' investments. [1] ¶ 58. In September 2017, BC57 lent roughly $5.3 million in exchange for a first mortgage on five properties. [1147-21] (loan agreement).  Around the same time, Shaun Cohen signed off as Equitybuild Finance manager on five releases for those properties. [1147-16]–[1147-20].[2] Those releases stated:

> Know all men by these presents, that EQUITYBUILD, INC. for and in consideration of TEN DOLLARS ($10.00) and for other good and valuable considerations, the receipt of which is hereby confessed, does hereby remise, convey, release, and quit-claims unto EQUITYBUILD FINANCE, LLC of the County of COLLIN, State of TEXAS, all rights, title, interest, claim or demand whatsoever he/she may have acquired in, through or by a certain Mortgage bearing the date of [2/21/2014 or 12/30/2014].

---

[2] The mortgage for one of the properties, 7752 S. Muskegon Ave., listed the lender as "The Persons Listed on Exhibit A to the Mortgage c/o *Hard Money Company, LLC*." [1147-1] (emphasis added). But as with the other properties, Cohen signed the Muskegon Ave. release on behalf of Equitybuild Finance and not Hard Money Company. [1147-16].

Each release included the address of the property it was releasing, as well as a description of the property. [1147-16]–[1147-20]. Each was notarized by a notary public and filed with the Cook County Recorder of Deeds. [1147-16]–[1147-20].

By late 2017, investors in more than 1,200 notes still hadn't been repaid their principal, totaling almost $75 million in delinquent payments. [1] ¶ 59. By late May 2018, Equitybuild and Equitybuild Finance had less than $100,000 in their bank accounts. [1] ¶ 59.

In May and June 2018, defendants disclosed to earlier investors that they couldn't continue making interest payments on the notes and that they had "no choice but to restructure and reduce the debt burden" by unilaterally converting investors' notes to equity positions in one of the funds. [1] ¶¶ 61–62. In August 2018, in a video recording emailed to note investors (i.e., earlier investors), Shaun Cohen admitted that Equitybuild had funded investor interest payments by using the investments of later investors, but that the structure was no longer sustainable. [1] ¶ 63. Cohen also warned investors not to file suits against Equitybuild and told them that the company wouldn't be able to respond to investor inquiries because it had cut down to a "skeleton crew." [1] ¶ 63. But defendants shared none of this information with later investors, and instead continued to promise "guaranteed" returns and high annual returns on investment. [1] ¶ 64.

The SEC filed suit in August 2018, alleging violations of the Exchange Act, 15 U.S.C. §§ 78a, *et seq.*, and Securities Act, 15 U.S.C. §§ 77a, *et seq.* [1]. Specifically, the SEC alleged violations of the following Exchange Act sections: 10(b) and its

6

corresponding regulation, 17 C.F.R. 240.10b-5 (fraud in connection with the purchase or sale of securities); 20(e) (aiding and abetting said fraud); and 20(a) (control person liability resulting in joint and several liability for Jerome and Shaun Cohen). [1] ¶¶ 65–76. The SEC also alleged violations of Sections 5(a), 5(c), and 17(a) of the Securities Act. [1] ¶¶ 77–83.

The SEC quickly obtained a temporary restraining order against defendants. [3], [14]–[15]. The court appointed a receiver and directed him to "develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Assets." [16] ¶ 62. The Receiver filed a liquidation plan in late November 2018, informing the court of the properties he had identified that were owned by Equitybuild. [166]. Among those properties are the five at issue here: 3074 Cheltenham Ave. (Property 74), 7625-33 S East End Ave. (Property 75), 7635-43 S East End Ave. (Property 76), 7750 S Muskegon Ave. (Property 77), and 7201 S Constance Ave. (Property 78). [1201] at 1, 18, 21, 23, 25, 28. The claims against these properties are the "Group 1" claims. There are 169 claimants in Group 1 who have submitted proof-of-claims forms. [1201] at 1.[3] The Receiver, SEC, and individual investors say that the individual investor lenders have priority over BC57. [1118]; [1146]; [1151]; [1201]; [1215]; [1216]; [1227]. They argue that the mortgage releases were facially defective, and that Equitybuild Finance lacked authority to release the individual investors' mortgages without their consent. [1146]; [1151]; [1215]; [1216].

---

[3] Individuals or entities who submitted claims against more than one property in Group 1 are considered a separate claimant for each property. [1201] at n.1.

They also argue that, even if the releases weren't facially defective and Equitybuild Finance had the authority to release the mortgages, BC57 was on inquiry notice of Equitybuild Finance's fraud. [1118]; [1146] [1151]; [1227]. BC57 therefore doesn't qualify as a bona fide purchaser, and any release constituted a fraudulent transfer, they say. [1118]; [1146] [1151]; [1227].

BC57 argues that it has priority because the releases were valid, and Equitybuild Finance had express, implied, and apparent authority to unilaterally execute them. [1152]; [1217]. It also says it was a bona fide purchaser and that the transfer wasn't fraudulent. [1152]; [1217].

## III.   Evidentiary Issues

### A.   Expert Opinion Testimony and Report

The SEC and individual investors argue that I shouldn't consider the report and testimony of BC57's expert, J. Bushnell Nielsen. [1146] at 16–18, [1215] at 9–10, [1216] at 14–15. The SEC says Nielsen's report and testimony provide impermissible legal conclusions. [1146] at 16–18.[4] Experts generally cannot provide legal conclusions or statements about what the law is. *See Jimenez v. City of Chicago*, 732

---

[4] At the same time as it argues this, the SEC peppers its position statement with concessions from Nielsen that cut in its favor. *See, e.g.*, [1146] at 3 (Nielsen's definition of a "hard money" loan), 4 (conceding investors weren't repaid in connection with release of mortgages), n.5 (concession that "Release Deed" is "not a commonly used term" and that Nielsen couldn't recall a "release deed" being used to release an Illinois mortgage); *id.* ("somewhat unusual" that the investors' mortgages identified both their names and the name of their loan servicer"), n.6 (Nielsen's opinion that it's normal for a borrower, like Equitybuild, to instruct a mortgage servicer, like Equitybuild Finance, how to prepare a payoff statement.), 9 (borrower typically not authorized to release a mortgage), *id.* (for a release showing a borrower attempting to release the mortgage—instead of the investors or loan servicer—the title insurer "would start with the assumption that that release is not valid").

F.3d 710, 721 (7th Cir. 2013); *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). And before this case was reassigned, Judge Lee told the parties he didn't want to see legal conclusions in the testimony or report. *See* [942] at 41:3–7 ("[A]n expert that says, well, you know, I'm a real estate lawyer and I believe that the priority should be this, this, this, and this…those types of experts are non-starters…I don't want to see those reports."). But for the most part, Nielsen didn't provide that sort of testimony. He generally focused on industry custom and practice. For instance, he talked about the documents that closing agents and title insurance companies rely on to determine that a loan servicer has authority to release a mortgage. [1147-34] at 12. He talked about how payoff statements don't come with loan servicing agreements, so title insurers don't know the terms of the agreement. [1147-34] at 17. And he said that the transposition of the name of the releasor and releasee on a release is such a common mistake that a title officer wouldn't inquire about it. [1147-34] at 21.

There were times when he stepped outside his expert role to reach legal conclusions. For instance, he explained parts of Illinois mortgage law. *See* [1147-34] at 9 ("Illinois, like almost all other states, has adopted a statute that obligates a lender to release its mortgage when it has been paid in full. Further, Illinois…permit[s] a title insurer to release a mortgage when the insurer has paid the lender or its agent the amount stated in a written payoff statement.); n.44 ("There is a growing body of law, both statutory and by precedent, to the effect that third parties are entitled to the release of the real estate on payment of the amount recited in a

payoff statement, even if that sum is not sufficient to pay off the loan. Part of this emerging consensus is the principle that a third[-]party buyer or lender has a right to obtain a release of the real estate when it has relied on a payoff statement, whether or not the letter is accurate."). He also applied that law to conclude BC57's conduct regarding the hard-money loans "was reasonable and prudent," and that the circumstances wouldn't have triggered further inquiry for a reasonable title agent or closing agent. [1147-34] at 14–15. These are legal conclusions, so I disregard them.

The SEC objects to Nielsen's opinions about industry custom and practice on another ground: it thinks the opinions are irrelevant. [1216] at 14. Or, rather, only relevant to the inquiry-notice issue, which I don't have to resolve unless I reach the bona-fide-purchaser or fraudulent-transfer issues. [1216] at 14. Because I can resolve this case by holding that the releases were facially defective or that Equitybuild Finance lacked authority to release the mortgages, Nielsen's testimony about industry custom and practice is of no help, the SEC says. *See* [1216] at 14.

I agree that I don't need to—and don't—resolve the bona-fide-purchaser or fraudulent-transfer questions. But compliance with industry custom and practice is relevant to implied authority and apparent authority. Implied authority is actual authority "established through circumstantial evidence." *Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 939 (7th Cir. 2016). Apparent authority arises when a principal's conduct makes a "third party reasonably believe that [the principal] has consented to an action done on his behalf by someone purporting to act for him." *Id.* "[T]he scope of the agent's authority may be ascertained by determining what persons

10

of reasonable prudence, ordinarily familiar with business practices, in dealing with the agent might rightfully believe him to possess, based on the principals' conduct." *Mateyka v. Schroeder*, 152 Ill. App. 3d 854, 864 (5th Dist. 1987); *see also Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 675 (7th Cir. 2004) ("Custom and practice in the industry is relevant towards determining whether a third party acted reasonably and diligently."). I therefore consider Nielsen's opinions on industry practice and custom. Whether that practice and custom is reasonable under agency law is a separate question.

### B.    BC57's Insured Status

The SEC points out that BC57, unlike the individual investors, has title insurance and will be compensated even if I find that BC57 doesn't have priority. [1216] at 16; *see also id.* at 2, [1146] at 10. The individual investors note that some of BC57's lawyers have been provided by the title insurer, which "may be on the hook for BC57's losses" if BC57 doesn't have priority. [1215] at 9. BC57 says considering its insured status is inappropriate and irrelevant to the legal issue. [1217] at 32–33. The Federal Rules of Evidence don't apply here, so I'm not bound by Rule 411's prohibition on considering a party's insured status in certain circumstances. Fed. R. Evid. 411. Still, I agree that BC57's insured status is irrelevant to the validity of the releases, so I don't consider it. Nor do I consider the relative size and sophistication of the claimants.

### IV.    Analysis

The parties focus on four issues: whether the releases were facially defective, whether Equitybuild Finance had authority to release the mortgages, whether the

release (if valid) was a fraudulent transfer, and whether BC57 qualified as a bona fide purchaser. BC57 says the receiver lacks standing to pursue any avoidance action against BC57. [1217] at 37. Because the first two issues resolve the priority dispute, I don't reach the others.

### A.    The Releases are Facially Defective

The individual investors say their mortgages were never released because the release documents were facially defective: they listed different parties as the releasor in different sections of the document and were signed by the wrong party. The SEC sides with the individual investors, but BC57 responds that the so-called defects were mere transcription errors of no consequence and that Equitybuild Finance was the correct signatory.

#### 1.    *Discrepancy between Body and Signature*

The body and signature line of the releases conflict with each other. The body lists Equitybuild as the party issuing the release, but the signature line lists Equitybuild Finance as the party issuing the release. [1147-16]–[1147-20]. BC57 says that listing Equitybuild as the mortgagee in the body of the release was clearly a scrivener's error and should be disregarded in favor of the parties' obvious intent. [1217] at 12–13. The fact that Equitybuild Finance, and not Equitybuild, signed the releases shows that Equitybuild Finance was intended as the releasing party, BC57 says. [1217] at 12. But this is conclusory; the importance of the discrepancy is that it's not clear who is claiming to release the mortgage. BC57 provides no reason that the intended releasor would necessarily be the signatory party, as opposed to the party whose name is listed in the fully drafted version of the contract. Nor does BC57

provide any evidence from Equitybuild or Equitybuild Finance—let alone evidence that is "clear, precise, convincing and of the most satisfactory character"—to show that they intended for Equitybuild Finance to be listed in the body. *Young v. Verizon's Bell Atl. Cash Balance Plan*, 667 F. Supp. 2d 850, 894 (N.D. Ill. 2009), *affirmed*, 615 F.3d 808 (7th Cir. 2010). That sort of evidence about the parties' intent is required to find a scrivener's error, and it's the burden of the party asserting a scrivener's error to provide it. *Id.*

BC57 says other courts have found scrivener's errors where one of the parties was misnamed. [1217] at 12–13 (citing *Malleable Iron Range Co. v. Pusey*, 244 Ill. 184 (1910), and *In re Pak Builders*, 284 B.R. 663 (C.D. Ill. Bankr. 2002)). In both cases BC57 cites, the party's name was written incorrectly in the contract, but it wasn't replaced with the name of another party to the suit. Instead, the errors named companies that didn't exist. For instance, in one case, a check was made out to "Beaver Dam Malleable Iron Range Co.," instead of "Malleable Iron Range Co.," a company based in Beaver Dam, Wisconsin. *Malleable Iron Range Co.*, 244 Ill. at 193–95. "Beaver Dam Malleable Iron Range Co." didn't exist—Equitybuild does. The same is true of *In re Pak Builders*, where an estate was inadvertently granted to a non-existent entity. 284 B.R. at 669. It's fair to assume a mistake has been made when a mortgage is released to or by a non-existent entity, but not necessarily when it's been released to or by an existing entity, let alone one that's closely affiliated with the supposedly intended grantee. BC57 has not proven a scrivener's error.

2.    *Improper Signatory*

The Illinois Mortgage Act provides, 765 ILCS 905/2:

> Every mortgagee of real property…having received full satisfaction and payment of all such sum or sums of money as are really due to him or her from the mortgagor…shall, at the request of the mortgagor…make, execute, and deliver to the mortgagor…an instrument in writing…releasing such mortgage.

The language of the statute makes clear that a release is invalid if not executed by the mortgagee. *Id.* The releases were signed by Equitybuild Finance and Shaun Cohen instead of the individual-investor mortgagees. [1147-16]–[1147-20]. But neither Equitybuild Finance nor Cohen held mortgages in the five properties; they weren't the mortgagees that the statute says must execute the release. BC57 responds that Equitybuild Finance was signing as the individual investors' agent, so was authorized to act in their place. [1217] at 14. As I explain below, Equitybuild Finance lacked the authority to do so.

### B. Equitybuild Finance Lacked the Authority to Execute the Releases Without the Investors' Consent.

BC57 bears the burden of proving by a preponderance of the evidence that Equitybuild Finance had the authority to bind individual investors to Equitybuild Finance's purported mortgage releases. *See Curto v. Illini Manors, Inc.*, 405 Ill. App. 3d 888, 892 (3d Dist. 2010); *Schoenberger v. Chicago Transit Auth.*, 84 Ill. App. 3d 1132, 1136 (1st Dist. 1980). There are three kinds of authority: express actual authority, implied actual authority, and apparent authority. *Bridgeview Health Care Ctr., Ltd.*, 816 F.3d at 938. Express authority is actual authority granted explicitly by the principal to the agent by words. *See Patrick Eng'g, Inc v. City of Naperville*, 2012 IL 113148 ¶ 34. Implied authority is actual authority "established through circumstantial evidence." *Bridgeview Health Care Ctr., Ltd.*, 816 F.3d at 939. For instance, if doing something that isn't expressly authorized is necessary to accomplish

14

a task for which an agent has express authority, the agent has implied authority to do that thing. *See id.* Apparent authority exists when a third party reasonably believes that the principal has authorized the agent to enter into an agreement on the principal's behalf. *See Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 866 (7th Cir. 1998). A third party can only ascertain apparent authority from the actions or conduct of the principal and not from the agent. *See Chase v. Consol. Foods Corp.*, 744 F.2d 566, 568–69 (7th Cir. 1984) ("[An agent] cannot just bootstrap himself into a position where he can bind his principal."); *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 867–68 (7th Cir. 1999).

### 1. Actual Authority

According to BC57, two documents granted Equitybuild Finance the authority to release the mortgages: the Collateral Agent and Servicing Agreement (CAS) and the Authorization Document. [1217] at 6–11. The CAS impliedly granted that authority by authorizing Equitybuild Finance to issue payoff statements and receive payoffs, and the Authorization Document expressly granted that authority, BC57 says. [1217] at 10–11.

### a. Implied Actual Authority from the CAS

Implied authority is actual authority either "(1) to do what is necessary, usual, and proper to accomplish or perform an agent's express responsibilities or (2) to act in a manner in which an agent believes the principal wishes the agent to act based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objectives and other facts known to the agent." Restatement (Third) of the Law of Agency § 2.01. Such authority is implied by facts and circumstances and

may be proved by circumstantial evidence. *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000).

BC57 doesn't argue that executing releases was necessary to accomplish Equitybuild Finance's express responsibilities (issue payoff statements and collect loan payments, among others). Instead, it argues that, because the individual investors authorized those things, they obviously intended for Equitybuild Finance to also unilaterally execute mortgage releases. *See* [1217] at 11 ("EBF had implied actual authority to issue the Releases arising from its authority to issue payoff statements and receive payoffs pursuant to the [CAS] signed by the Investor-Lenders."); *id.* ("[T]he [CAS] impliedly granted that authority [to execute releases] by giving EBF the authority to issue payoff statements and receive payoffs."); *id.* at 12 ("The Investor-Lenders never expected to individually execute a release of any mortgage, and instead knew that EBF would execute releases of their mortgages.").

There are a few problems with this assumption. For one, it mischaracterizes the implied-authority issue. Neither the individual investors nor the SEC argues that Equitybuild Finance lacked any authority to execute the releases. They argue that Equitybuild Finance lacked the authority to do so without the individual investors' consent. *See* [1215] at 5–6; [1216] at 6. Second, whether the individual investors intended for Equitybuild Finance to unilaterally execute the releases is beside the point. Implied authority is based on what the agent would have reasonably believed

about the scope of its authority based on the principal's manifestations—not the principal's intent. Restatement (Third) of the Law of Agency § 2.01.

Third, and most importantly, it's not clear why expressly granting an agent authority to issue payoff statements and receive payoffs on the principal's behalf would make an agent reasonably believe that the principal wanted the agent to do a wholly separate thing (release a mortgage)—something that implicates the basis of the principal-agent relationship (the principals' ownership of the mortgages). Even if that were a reasonable assumption in general, it wouldn't be reasonable in a scenario like this. The CAS, the same document from which BC57 gleans the implied authority, precludes that. It says, [1147-6]–[1147-10], §§ 3, 4(a), 6(a):

- IN THE ABSENCE OF WRITTEN INSTRUCTIONS FROM THE REQUIRED LENDERS, NEITHER THE COLLATERAL AGENT NOR THE SERVICER SHALL FORECLOSE UPON ANY LIEN WITH RESPECT TO ANY OF THE COLLATERAL OR TAKE ANY OTHER ACTION WITH RESPECT TO THE COLLATERAL OR ANY PART THEREOF.

- [T]he Collateral Agent shall have no obligation to, and shall not, take any action hereunder or under the Mortgage except upon written instructions from the Required Lenders in accordance with Section 6(a).

- Collateral Agent shall act only on written instructions from all Lenders with respect to the amendment or termination of the Mortgage.

BC57 acknowledges the constraints this language creates. *See* [1152] at 9 (quoting the language); [1152] at 20 ("The Investor-Lenders also limited EBF's discretion and established their control of EBF where, for example, they required EBF to receive instructions before taking action that affected the collateral…and [terminated] the mortgage."); [1152] at 21–22 (CAS required "that EBF obtain instructions from the Investor-Lenders to take action with respect to the collateral or

17

any part thereof (*see* § 3) and to terminate the Investor-Lender Mortgage (*see* § 6(a)).”). Still, BC57 insists that an agent with Equitybuild Finance’s power to issue payoff statements and receive payoffs would reasonably believe it had the power to unilaterally release the mortgages. [1217] at 6, 11. But no agent could reasonably believe that they had the authority to do something that their principal explicitly forbade them from doing. The CAS did not give Equitybuild Finance implied authority to release the mortgages without written consent from the individual investor-lenders.

### b.     Express Actual Authority from the Authorization Document

Even without implied authority from the CAS, BC57 says Equitybuild Finance had express authority from the Authorization Document. [1217] at 6. The Authorization Document, signed by (at least some) individual investors, reads: “Equitybuild Finance, LLC, as agent and trustee has been authorized by the above listed lenders to receive the payoff in its name and issue and execute a release of said mortgage, upon payment in full of any outstanding balance.” [1160] at 78.

The SEC rejects the idea that this granted express authority to release the mortgages for three reasons. First, it points to the location of the investors’ signatures on the Authorization Documents. The documents looked like this, [1160] at 78; [1168-1] at 63:

**Lender Name:**   Kevin Scheel

**Lender Amount:**   $25,000.00

**Percentage of Ownership of Total Loan:**   1.11%

**Monthly Interest Payment Amount to Be Received:**   $250.00 at 12%

DocuSigned by:
*Kevin Scheel*
_____
**Lender Signature**

EquityBuild Finance, LLC, as agent and trustee has been authorized by the above listed lenders to receive the payoff in its name and issue and execute a release of said mortgage, upon payment in full of any outstanding balance.

Based on the document's layout, the SEC says the individual investors were signing off on the amount of their investment and their percentage interest in the mortgage. [1216] at 7. They weren't signing off on the language that came below the signature. *See* [1216] at 7. The SEC cites no legal authority for this argument. In fact, under Illinois law, it isn't necessary for a signature to be at the end of a contract. "[I]f the party's name is written by him or her in any part of the agreement with the intent to sign it…it is sufficient to bind that party." 12 Ill. Law & Prac. Contracts § 39 (citing

*McConnell v. Brillhart*, 17 Ill. 354, 361 (1856); *First Nat'l Bank of Elgin v. Husted*, 57 Ill. App. 2d. 227, 230 (2d Dist. 1965) (signatory was bound to contract terms on the flip side of the page from his signature)). The placement of the release on the document is not a persuasive sign that the investors did not grant release authority to Equitybuild Finance.

But even if the signatures bound the investors to the quoted language, the SEC says, the language only authorized release "upon payment in full of any outstanding balance." [1160] at 78. The SEC says that never happened because the individual investors received nothing. [1216] at 8. BC57 says it did happen—BC57 paid Equitybuild Finance, after all. [1217] at 17. The language doesn't specify to whom payment in full must be made. Given the requirements of the Illinois Mortgage Act, 765 ILCS 905/2, though, the reasonable interpretation is payment in full to the mortgagee (i.e., the individual investors). The terms of the Authorization Document therefore were not met.

BC57 counters that it was under no obligation to make sure its payment to Equitybuild Finance ended up in the individual investors' hands. [1152] at 14, 15; [1217] at 29. It cites the Illinois Fiduciary Obligations Act and *Rockford Life Ins. Co. v. Rios* to argue that "a party paying the agent of the principal has no duty to confirm the agent remitted the payment of the principal." [1217] at 29 (citing 760 ILCS 65/1, 65/2 and 128 Ill. App. 2d 190, 195 (3d Dist. 1970)). The Illinois Fiduciary Obligations Act only applies to a fiduciary relationship, which is expressly disclaimed by the CAS. *See* [1147-6]–[1147-10], § 2(a) (Equitybuild Finance's "duties…shall be deemed

20

ministerial and administrative in nature, and neither the Collateral Agent nor the Servicer shall have, by reason of this Agreement or either of the Mortgage or the Note, a fiduciary relationship with any Lender and/or any Affiliate thereof.").

*Rockford Life Ins. Co.* is more relevant, but its facts are materially different from the ones here. There, Sterling Federal Savings and Loan Association paid the full interest and principal due on a mortgage owned by Rockford Life Insurance Co. 128 Ill. App. 2d at 192. Rockford, the equivalent of the individual investors here, used a loan servicer called H.A. Roe Co., the equivalent of Equitybuild Finance. *Id.* Sterling paid Roe the full interest and principal due on the mortgage, assuming Roe would remit the payment to Rockford minus commission. *Id.* Roe didn't do that. *Id.* Instead, it took Sterling's lump-sum payment but continued sending to Rockford only the amount of the monthly payment. *Id.* Seemingly unaware of what was happening, Rockford tried to foreclose on the mortgage. *See id.* at 193. When Sterling challenged Rockford's ability to foreclose, Rockford claimed it hadn't released the mortgage because Rockford hadn't been paid for it. *Id.* The court disagreed. *Id.* at 193–94. It said that "[u]nder the general rules of agency[,] if Roe [the loan servicer] had either actual or apparent authority to receive the payment[,] then payment to him had the same legal effect as payment to Rockford Life, its principal." *Id.* at 193.

This case is different from *Rockford*. The contract between Rockford and Roe did not "include any limitations or exceptions on the authority of the agent" to collect payments. *Id.* The language was broad and in fact obligated the servicer to service the mortgage "continuously from the date of purchase until the principal and interest

are paid in full." *Id.* The contract here explicitly barred Equitybuild Finance from unilaterally releasing the mortgages. [1147-6]–[1147-10] §§ 3, 4(a), 6(a). Further, Rockford and Roe's past conduct was consistent with the agent's authority to implement the termination of the mortgage. *Id.* at 194. In the five years preceding Roe's fraud, ten loans were paid before maturity. *Id.* Each of those was handled by paying the final balance to Roe. *Id.* Roe then remitted the payments to Rockford minus commission, and Rockford forwarded the mortgage releases to Roe for delivery to the borrowers. *Id.* "If any ambiguity existed in the language of the agreement…the course of conduct between the parties[,] representing as it does the contemporaneous construction of the agreement, would indicate that the agent had actual authority to accept the pre-payment," the court said. *Id.* In contrast, here there was no course of conduct establishing Equitybuild Finance's practice (and authority) of releasing investors' mortgages.

More fundamentally, the mortgage in *Rockford* had been slowly paid down over nearly a decade before payment in full was made and the mortgage was released. *Id.* at 192. The release, though earlier than Rockford might have anticipated, wasn't wholly unexpected. Here, though, the individual investors had no notice of a potential release. In fact, there's no indication that the individual investors even knew of BC57 until after they'd already (purportedly) lost the properties to BC57. *Rockford*'s holding, and the Authorization Document's statement, that payment in full releases a mortgage must be read in the context of other requirements. Among those is the existence of a valid release—whether executed by the holder of the mortgage or by

22

the holder's agent, who has been given the authority to do so by past conduct. The Authorization Document did not allow for automatic release of the mortgages upon payment in full to Equitybuild Finance absent a valid written release.

Third, the SEC argues that construing the Authorization Document to give Equitybuild Finance unilateral release authority would render sections of the CAS superfluous. [1216] at 8. Sections 2 and 6 of the CAS require written instructions from the individual investors to release the mortgages. [1147-6]–[1147-10]. The Authorization Document was completed as part of the same investment package as the CAS. If BC57 is right, the Authorization Document provided ex ante authority to release the mortgages, making parts of Sections 2 and 6 unnecessary.

I must "look to the contract [here, the investment package, including the CAS and Authorization Document] as a whole in interpreting its individual terms." *Land of Lincoln Goodwill Indus., Inc. v. PNC Fin. Servs.*, 762 F.3d 673, 679 (7th Cir. 2014) (citing *Smith v. West Suburban Med. Ctr.*, 397 Ill. App. 3d 995, 1000 (1st Dist. 2010)). And I must "attempt to give meaning to every provision of the contract and avoid a construction that would render a provision superfluous." *Id.*; *see also Hot Light Brands, L.L.C. v. Harris Realty Inc.*, 392 Ill. App. 3d 493, 499 (2d Dist. 2009). Assuming that the CAS required the individual investors to authorize Equitybuild Finance's release of the mortgages, and that the Authorization Documents simultaneously gave Equitybuild Finance permission to release those mortgages (as BC57 claims they did), what was the point of the CAS provisions in the first place? That interpretation would have rendered them superfluous.

23

Of course, BC57 might ask: What was the point of the Authorization Document if not to authorize Equitybuild Finance to release the mortgages whenever it chose to down the line? The point, as the SEC notes and as the document itself shows, was to get the individual investors to authorize the amount of their investment and their percentage interest in the mortgage. [1216] at 7. The Authorization Document did not give Equitybuild Finance authority to unilaterally release the mortgages.

2.    *Apparent Authority*

According to BC57, even if Equitybuild Finance lacked actual authority to unilaterally release the mortgages, the releases are valid because Equitybuild Finance had apparent authority. [1152] at 20; [1217] at 17–19.[5] Apparent authority exists when a principal's conduct makes a "third party reasonably believe that [the principal] has consented to an action done on his behalf by someone purporting to act for him." *Bridgeview Health Care Ctr., Ltd.*, 816 F.3d at 939. A third party can only ascertain apparent authority from the words or conduct of the *principal* and not the agent. *Sphere Drake Ins. Ltd.*, 376 F.3d at 672.

Whether it was reasonable for BC57 to believe that the individual investors consented to Equitybuild Finance's release of their mortgages depends on what BC57

---

[5] BC57 doesn't use the language of "apparent authority." But the arguments it makes in the agency sections of its briefs go to apparent authority. For instance, BC57 says "the Investor-Lenders *advised the world* in the recorded Investor-Lender Mortgages that EBF served as their contact." [1152] at 20. The parties' bona-fide-purchaser, fraudulent-transfer, and reasonable-reliance arguments are also relevant to apparent authority. [1146] at 13 (lender can't rely on facially defective release or unauthorized release if lender is on inquiry notice); [1217] at 20–21; [1217] at 48–51 (good-faith defense to finding of fraudulent transfer depends on whether transferee was on inquiry notice); [1152] at 24. Each depends, in part, on whether Equitybuild Finance acted in accordance with industry custom and standards.

24

knew or should have known. *See* Restatement (Second) of Agency §§ 166, 167 cmt. a. "A third person dealing with a known agent may not act negligently with regard to the extent of the agent's authority or blindly trust the agent's statements in such respect. Rather, he must use reasonable diligence and prudence to ascertain whether the agent is acting and dealing with him within the scope of his powers." *Gen. Refrigeration & Plumbing Co. v. Goodwill Indus.*, 30 Ill. App. 3d 1081, 1086 (5th Dist. 1975) (quoting 3 John Bourdeau, et al., Am. Juris. Law of Agency (2d ed.)); *see also Malcak v. Westchester Park Dist.*, 754 F.2d 239, 245 (7th Cir.1985) ("A third party dealing with an agent has the obligation to verify both the fact and extent of the agent's authority."). If "a document open to and intended for [the third party's] inspection" shows the fact and scope of an agent's authority, the third party should have known about (and read) that document. *See* Restatement (Second) of Agency § 167 cmt. a. Failing to do so shows a lack of "ordinary diligence" that falls on the third party—not the principal. *See Sphere Drake Ins. Ltd.*, 376 F.3d at 673–74 (quoting Restatement (Second) of Agency § 167 cmt. a. and citing *Application of Lester*, 386 N.Y.S.2d 509, 514 (N.Y. Sup. Ct. 1976)).

BC57 admits that it didn't have a copy of the CAS or Authorization Document throughout the refinancing process. [1152] at 13. And in depositions, BC57 employees said they didn't recall reviewing those documents, the recorded mortgages, or payoff letters. [1147-30] at 111:1–112:17; [1147-26] at 91:10–14, 92:21–93:7. One BC57 employee said the company would not have reviewed the releases because "[i]t wouldn't be our job or within our purview to do that." [1147-26] at 114:21–115:20.

BC57's outside counsel reiterated that sentiment. [1147-25] at 60:18–63:14 ("A: I didn't have to understand [the rights of the individual investors]. It wasn't my obligation to understand," "Q: Did you do anything beyond rely on the title insurance company to determine whether the liens had been released, A: No.").

BC57 says this behavior isn't out of the ordinary. In support, it cites to Nielsen's expert testimony and report. According to Nielsen, it's common for, [1147-34] at 12–15, 17; [1147-33] at 24:15–19:

- a title insurer and closing agent to not request documentation of a loan servicer's authority;

- a closing agent to rely on a signed payoff statement from the loan servicing agent as evidence that the lender or servicer holds the loan and has authority to act for the lender in accepting a payoff and releasing the loan collateral on payment in full;

- a lender to appoint counsel to represent it in making the loan, including taking all necessary steps to obtain assurance that the lender's mortgage will have the desired priority;

- title companies to not conduct a heightened inquiry into existing mortgages made under unusual circumstances;

- a closing agent to rely on a loan servicer to obtain whatever authority it needs from the lender in order to accept a loan payoff and release the loan collateral; this is because the closing agent doesn't have the authority, time, or skill to verify that the servicer has authority to act;

- a title insurer, lender, or lender's counsel to not receive or review servicing agreements.

Nielsen also testified that he wasn't aware of any instances where a servicer didn't have the authority to release a mortgage. [1147-33] at 50:11–14. And it would be "impossible to verify that the servicer is telling you the truth [about its authority] because there is no other source to whom you can turn who can give you better

26

information. Also, it simply is not custom to verify the statements of the servicer, which begins with the presumption that the servicer may be perpetrating a fraud, not have authority, or would be lying in some capacity. That is not [a] presumption that the title industry or the lenders making new loans operate under." [1147-33] at 62:13–63:1.

Much of Nielsen's expert testimony is about whether the *title insurer*'s conduct was reasonable. *See, e.g.*, [1147-34] at 15–21. That's beside the point. A "title insurer is not in the business of supplying information when it issues a title commitment or a policy of title insurance," *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 218 Ill.2d 326, 341 (2006), so BC57 could not rely on the title insurer, Near North Title, doing its own review.

BC57 counters that even if hiring Near North Title as a title insurer has no bearing on whether BC57 conducted its due diligence, hiring Near North Title as a closing agent does. [1217] at 26–27. According to Nielsen, "[w]hen a lender appoints a title agency as its closing agent, the title agency wears two hats at the closing—as the closing or escrow agent of the lender, and as the agent of a title insurer." [1147-34] at 8. BC57 says the SEC and individual investors fail to distinguish these roles when they argue that BC57 could not rely on Near North Title. [1217] at 27.

BC57 might be right about this. In its role as closing agent, Near North Title may well have been in the "business of providing information" if its value was in its "analytical work," similar to the services provided by attorneys and real estate brokers. *See Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, 720 F. Supp. 2d 978, 994

27

(N.D. Ill. 2010). So hiring Near North Title as a closing agent may be a factor that cuts in BC57's favor. But it doesn't get BC57 to a finding of reasonableness. Despite his earlier testimony that it's "impossible to verify" that the servicer is being honest about its authority, Nielsen admitted that BC57 could easily have made its loan contingent on being able to contact the existing lenders to verify Equitybuild Finance's release authority. *See* [1147-33] at 64:1–6. Instead, BC57 entirely outsourced due-diligence work and failed to look at the most basic documents. Had BC57 looked at the CAS, it would have learned that the individual investors had expressly disclaimed Equitybuild Finance's authority to unilaterally release. It cannot now blame its lack of knowledge on its own failure to do its homework.

I'm not swayed by the argument that because this sort of lax review is commonplace, it should be accepted as reasonable. *See* [1147-33] at 63:8–10 (individual investors' attorney's questioning of Nielsen) ("What the industry may have decided to do doesn't mean that there isn't something that the industry could be doing."). BC57 isn't off the hook simply because it belongs to an industry that, to hear Nielsen tell it, is sloppy and too trusting. Equitybuild Finance did not have apparent authority to unilaterally release the individual investors' mortgages.

## C. BC57's Payment for the Mortgages Didn't Automatically Release Them.

BC57 says that even if the releases were defective and even if Equitybuild Finance lacked the authority to release the mortgages, the mortgages were released because Equitybuild Finance provided payment in full. [1217] at 6. In support, BC57 cites to *Bradley v. Lightcap*, 201 Ill. 511 (1903), which holds that "when [a] debt is

paid, discharged, [or] released…the mortgagee's title is extinguished by operation of law." *Id.* at 517, *reversed in unrelated part by*, 195 U.S. 1 (1904). Assuming this was the common-law rule, the Illinois legislature replaced that rule in 1961 when it passed the Illinois Mortgage Act, 765 ILCS 905/2. The Act says a payment (together with a request for a mortgage release) triggers an *obligation* to release the mortgage—it doesn't trigger the release itself. *Id.*; *see North Shore Cmty. Bank & Tr. Co. v. Sheffield Wellington LLC*, 2014 IL App (1st) 123784 ¶ 72. That's why Section 4 of the Mortgage Act makes a mortgagee liable for failing to release a mortgage within a month of receiving full payment—because there is no automatic release. 765 ILCS 905/4; *see North Shore Cmty. Bank & Trust Co.* 2014 IL App (1st) 123784 ¶ 73.

BC57 also relies on the Illinois Mortgage Certificate of Release Act, 765 ILCS 935. [1152] at 22; [1217] at n.4. Under the Act, "[r]eceipt of payment pursuant to the lender's written payoff statement shall constitute authority to record a certificate of release." 765 ILCS 935/10. The Act also provides that "a certificate of release…upon being recorded with the recorder, shall constitute a release of the lien of the mortgage described in the certificate of release." 765 ILCS 935/35. The Act doesn't help BC57; it only applies to certificates of release executed by an agent of a title insurance company. *See* 765 ILCS 935/20 ("A certificate of release executed under this Act must contain…[a] statement that the person executing the certificate of release is an officer or a duly appointed agent of a title insurance company."); *see also* 765 ILCS 935/15. The releases were not executed by Near North Title, but instead by Equitybuild Finance. The Act is therefore inapplicable.

29

## V.      Conclusion

The individual investors' mortgages have priority. The Receiver shall submit a proposed order for disbursement of the proceeds from the Group 1 properties (3074 Cheltenham Ave. (Property 74), 7625-33 S East End Ave. (Property 75), 7635-43 S East End Ave. (Property 76), 7750 S Muskegon Ave. (Property 77), and 7201 S Constance Ave. (Property 78)) by March 8, 2023.[6]

ENTER:

Manish S. Shah
United States District Judge

Date:  February 15, 2023

---

[6] To the extent the City of Chicago's Position Statement, [1144], affects the receiver's ability to propose a distribution plan, the parties may file supplemental position statements, limited to the City of Chicago's claimed interests, by March 8, 2023.