

Mark Young
_____
5224 SW 40th Terrace
Topeka, KS 66610
(785) 249-6020


Honorable Manish S. Shaw
United States District Court for the Northern District of Illinois

    Re: Case No: 1:18-cv-05587
    United States Securities and Exchange Commission v. Equitybuild, Inc. et al.


Dear Judge Shaw;


Thank you for the opportunity to address the court in the case referred to above.

I am an individual claimant and I strongly disagree with the attorneys for BC57 who argue that the Investor-Lenders named Equity Build Finance (EBF) as their agent and allowed EBF to transfer our secured interests. The Investor-Lenders did no such thing, and for BC 57 and their advisors to make that assumption was extremely irresponsible.

The legal counsel for the institutional lenders states that since the individual lenders designated EBF as the servicer of the loans, we granted EBF the authority to execute releases of the our Mortgages. This statement is false, as the document also reads in paragraph 6(a) on page 6 that the Collateral Agent shall act only on written instructions from all Lenders with respect to the amendment or termination of the Mortgage". It appears that the counsel for BC57 would like only certain parts of the agreement to be enforced. The Collateral and Servicing Agreement clearly states that any release can only be made with the written consent of all Investor-Lenders.

This requirement would have been obvious to the Title Company and BC57 had they simply reviewed the Agreement. However, their legal counsel admits that "neither the title company nor BC57 had a copy of the Collateral Agent and Servicing Agreement when the refinancing closed". It is easy for the BC 57 attorney to refer to the implied authority now, years after the transaction took place, but at the time of the refinancing they admit their client didn't even know the document existed.

The attorney for BC57 now claims that EBF had implied authority to release the investor-lender mortgages simply because the recorded Mortgage stated that the secured lender was "The Persons Listed on Exhibit A to the Mortgage C/O EquityBuild Finance, LLC". They <u>assumed</u> that EBF was acting as agent and <u>assumed</u> that EBF had the authority to release the mortgage, but they didn't know because they didn't

bother to inquire about the existence of the agreements, nor did they read them. They carelessly made assumptions that turned out to be incorrect.

BC 57 claims that "once a mortgagee receives full payment for the mortgage, the mortgage is deemed released", but in fact the mortgagee (the individual lenders) did not receive full payment. BC 57 and its agents carelessly made payment to the Equity Build entities, who were not authorized to release the mortgage without written consent of all the individual lenders.

Now, many years after the transactions have occurred, the attorneys for BC 57 state that "EBF was indisputably authorized to accept payment on behalf of the Investor-Lenders", which is true, but the same agreement that provides that right also states that the secured interest of the Investor-Lenders cannot be transferred without written approval by all the Investor-Lenders. This document existed at the time the loan was made by BC 57, but neither BC 57 nor their attorneys bothered to read it.

One only needs to review the records submitted in the deposition of Kasturi Bagchi to determine how careless the institutional lenders and their advisers were in the completion of the refinance transaction.

Page six of the exhibit is an email from Kasturi Bagchi in which she states she doesn't know if she has all the releases, but in the attachment to her email, page eight is a draft of a Release Deed that would release and transfer the collateral from Equity Build Finance to Equity Build, Inc. with Jerry Cohen's name on the signature block.

Page nineteen is an email from an attorney to Kasturi that lets her know there are other liens pending. Copies of the liens filed by the city of Chicago are attached to the email, and they show the liens were filed against EB as the owner of the property, and against all the individual lenders. Any reasonable person would be aware that the individual lenders were in a secured position. Certainly, the City of Chicago was aware of this.

Page forty-six is an email from Kasturi dated September 18th that states the releases should be signed by Equity Build Finance and not Jerry Cohen as an individual. There are several attachments to this email, one of which is page fifty-eight that indicates the lenders on 3074 E Cheltenham are "The Persons listed on Exhibit A of the Mortgage". It should be obvious to Kasturi and all the recipients of this email that the individual lenders have a secured position, and if Equity Build Finance is serving as their agent, there must be some document that defines the rights and responsibilities of Equity Build Finance. Had they read this document, they would have seen that Equity Build Finance did not have the authority to transfer our secure interests without our signatures.

BC57 also indicated that they had no reason to suspect that the payoff statements were incorrect or that EBF would attempt to defraud the original lenders even though the discovery documents provided by their attorney include multiple liens filed by the City of Chicago for various violations, multiple instances of unpaid taxes, and the fact

that Equity Build admitted that they failed to properly use the proceeds of the original loan as stated in their business plan.

Another obvious warning that this loan was hastily crafted and poorly reviewed is the fact that the release documents provided in discovery were drafted incorrectly and identified Equity Build, Inc. as the releasor, when the party releasing the mortgage was Equity Build Finance. The attorney for BC57 suggests that this error, another in a long series of errors, is not important and that "the error shows only sloppiness or a scrivener's error", which is precisely my point. The entire due diligence and underwriting of this transaction was full of bad assumptions, careless mistakes, and the lack of attention to the obvious conflict of interest between Equity Build and Equity Build Finance.

The servicing agreement is very specific in that the underlying property cannot be transferred without the signature of all individual lenders. This is basic contract law, and I entered into the loan agreement with Equity Build with the assumption that if something went terribly wrong with the transaction the legal system would protect me and the other individual lenders.

The attorneys for BC 57 also make the absurd argument that the individual lenders should somehow be responsible because "EBF was indisputably authorized to accept payment on behalf of the Investor-Lenders…and that "where one of two innocent persons must suffer by reason of the fraud or wrong conduct of another, the burden must fall upon him who put it in the power of the wrongdoer to commit the fraud or do the wrong".

I assume that the attorneys are referring to the Collateral Agent and Servicing Agreement. Earlier they admitted that "neither the title company nor BC 57 had a copy of the Collateral Agent and Servicing Agreement when the refinancing closed". If they didn't have a copy of the agreement, they couldn't possibly have known that EBF was indisputably authorized, and EBF had authority to release our secured interest in the property.

Before I made loans to Equity Build Finance, I had a telephone conversation with Shaun Cohen and expressed my concern regarding the assignment of responsibilities to Equity Build Finance through the Servicing Agreement. Shaun directed me to paragraph 6(a) on page 6 of the agreement and said to me "there is no way Equity Build Finance can legally transfer the collateral without the signatures of all the lenders". Unfortunately, the Cohens attempted to fraudulently transfer the assets to the institutional lenders who carelessly and unwisely loaned money to Equity Build based on his fraudulent actions.

It is unfortunate that Equity Build obtained loans from BC 57 based on these fraudulent documents but had BC 57 and their advisors simply reviewed the legal documents that they assumed existed and performed reasonable due diligence, they could have chosen to not make the loan and prevented their losses. It is the institutional lenders and their advisers who have made mistakes, not the original lenders.

The individual lenders are victims not only of the attempted fraudulent conveyance by the Cohens and Equity Build but have also suffered from the depletion of the receivership assets because of the endless motions filed by the attorneys for the institutional lenders. The original, secured lenders should receive the proceeds from the receivership assets for which the Receiver and the SEC have worked so hard to preserve, but we should also be reimbursed by the institutional lenders for the substantial costs incurred to defend the receivership from these motions and claims that are without merit.

The institutional lenders may be entitled to recover losses from the title insurance companies and their legal counsel that provided such poor service, but the receivership assets should be awarded to the individual lenders that retain their secured interest.

I am very grateful to the Receiver and the SEC who have worked so hard on our behalf, and I thank you for your consideration of our position. I sincerely hope that the original, secured lenders will at long last receive the proceeds from the receivership to which we are entitled.

Respectfully submitted,

*/s/ Mark E. Young*

Mark Young