IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 1:18-cv-5587 |
| v. | Hon. Manish S. Shah |
| EQUITYBUILD, INC., et al., | Magistrate Judge Young B. Kim |
| Defendants. | |

**CLAIMANT BC57'S MOTION FOR STAY PENDING APPEAL**

Claimant BC57, LLC ("BC57"), through its undersigned counsel, pursuant to Federal Rule of Civil Procedure 62, hereby moves this Court for a stay, without security, of any distribution or disbursement of the proceeds from the sale of the Group 1 properties to the Investor-Lenders, pending appeal of the Court's May 3, 2023 Order (the "Disbursement Order"), thereby bringing up for review the Court's February 15, 2023 Order (the "Priority Order") determining the priority of mortgages held by BC57 and a group of individual investor-lenders (the "Investor-Lenders"). In support thereof, BC57 states as follows:

**BACKGROUND**

After Defendants Jerome Cohen and Shaun Cohen allegedly engaged in a securities fraud scheme involving their real estate companies—Equitybuild, Inc. and Equitybuild Finance, LLC ("EBF")—the Court appointed the Receiver to advise the Court on distributing assets. The properties at issue were organized into ten groups for purposes of claims resolution. This matter concerns a mortgage lien priority dispute concerning the first group of properties, the "Group 1" properties. Specifically, two claimants—BC57 and the Investor-Lenders—each claim their

respective mortgage liens have priority to the funds liquidated by the Receiver's sale of the Group 1 properties.

On February 15, 2023, after reviewing position statements filed by the investor claimants, the SEC, and the Receiver, but without the benefit of a hearing, the Court issued an order concluding that the Investor-Lenders' mortgages have priority over BC57's mortgage. (Dkt. 1386, the Priority Order.) Specifically, the Court concluded that certain mortgage releases—issued by EBF after receiving BC57's payment of the debt secured by the Investor-Lenders' mortgages—were facially defective due to discrepancies between the body of the release and the signatory. The Court also found EBF lacked authority to execute the releases on the Investor-Lenders' behalf. With regard to the payments BC57 made to EBF, the Court found that those payments were insufficient to extinguish the Investor-Lender mortgages absent a release signed by them, pursuant to the Illinois Mortgage Act, 765 ILCS 905/2, which the Court concluded replaced the common law rule that a mortgage is extinguished upon payment of the underlying debt. (Dkt. 1386 at 28-29, citing *North Shore Cmty. Bank & Tr. Co. v. Sheffield Wellington LLC*, 2014 IL App (1st) 123784). The Court concluded the Priority Order with an instruction to the Receiver to "submit a proposed order for disbursement of the proceeds from the Group 1 properties . . . by March 8, 2023." (*Id*. at 30.)

On May 3, 2023, the Court entered the Receiver's proposed disbursement order, "approv[ing] the Receiver's preliminary recommendation of final distributions" pursuant to the Court's February 15, 2023 order "determining the priority of claimants to liquidated funds from the sale" of the Group 1 properties. (Dkt. 1451 at 5, 1, the Disbursement Order.) BC57 is appealing the Court's Disbursement Order, which brings up for review the Court's priority

determination in the Priority Order.[1] For the reasons set forth herein, BC57 now moves for a stay of the Court's Disbursement Order to maintain the status quo of the funds liquidated by the Receiver's sale of the Group 1 properties until its appeal is resolved.[2]

## **GROUNDS FOR RELIEF**

Courts have inherent power to stay proceedings and to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. *Fleury v. Union Pac. R.R.*, No. 20 C 390, 2021 U.S. Dist. LEXIS 117453, at *2 (N.D. Ill. Jun. 23, 2021) (citing *Stone v. INS*, 514 U.S. 386, 411 (1995)). In evaluating a motion to stay, courts consider whether the movant has shown "that it has a significant probability of success on the merits; that it will face irreparable harm absent a stay; and that a stay will not injure the opposing party and will be in the public interest." *Hinrichs v. Bosma*, 440 F.3d 393, 396 (7th Cir. 2006). "As with a motion for a preliminary injunction, a 'sliding scale' approach applies; the greater the moving party's likelihood of success on the merits, the less heavily the balance of harms must weigh in its favor, *and vice versa*." *In re A&F Enters., Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014) (emphasis

---

[1] As described in BC57's Docketing Statement, filed contemporaneously with its Notice of Appeal and this Motion for Stay, BC57 has filed its appeal pursuant to the collateral order doctrine. *See* Dkt. 1453. BC57 has standing to pursue its appeal as a nonparty, nonintervening lender affected by the Receiver's plan of distribution. *See SEC v. Wealth Mgmt. LLC*, 628 F.3d 323, 330 n.3 (7th Cir. 2010) ("[I]n *SEC v. Enterprise Trust Co.*, 559 F.3d 649, 652 (7th Cir. 2009), [the Seventh Circuit] held that nonparty, nonintervening investors affected by a receiver's plan of distribution have standing to appeal an order approving the plan.").

[2] Consistent with the Court's standing order regarding motion practice, counsel for BC57 asked counsel for the SEC, the Receiver, and the Investor-Lenders (as listed in the "Position Statement of Certain Individual Investors," Dkt. No. 1151), whether there is any objection to this Motion.

The Receiver takes no position as to the stay, but intends to submit his own responsive statement.

The SEC, the Investor-Lenders, Creditor 1839 Fund I LLC, Leroy and Martha Johnson, LMJ Sales, and Kirk Road Investments object to the requested stay pending appeal.

3

added); *see also Nationstar Mortg. LLC v. Hunte*, No. 16-CV-8708 (KMK), 2022 U.S. Dist. LEXIS 212733, at *8 (S.D.N.Y. Nov. 23, 2022) ("[T]he Court must treat the four factors in this inquiry as a 'sliding scale' where the probability of success is inversely proportional to the amount of irreparable harm [a party] will suffer absent the stay."). For the reasons set out below, each of these factors favors issuance of a stay pending the resolution of BC57's appeal.

I. **There is a significant probability of success on the merits of Claimant-Appellant BC57's appeal.**

There is a significant probability of success on the merits of BC57's appeal. The Court erred in concluding that the Investor-Lenders' mortgages have priority over BC57's mortgage. Each of the issues BC57 plans to raise on appeal are legal issues, subject to *de novo* review, *see, e.g.*, *Envision Healthcare, Inc. v. PreferredOne Ins. Co.*, 604 F.3d 983, 985 (7th Cir. 2010), which means there is more than a minimal likelihood of success on appeal.[3]

As noted above, the Court's decision turned in large part on its finding that the mortgage releases BC57 received from EBF were invalid. But those releases were not necessary to effectuate the legal consequence of BC57's payments to EBF in satisfaction of the Investor-Lenders' mortgage-secured debts. As a matter of Illinois law, BC57's payment to the Investor-Lenders' authorized agent, EBF, extinguished the Investor-Lenders' security interest in the underlying properties. *See, e.g.*, *Bradley v. Lightcap*, 201 Ill. 511, 517 (1903) ("[T]he title conveyed to the mortgagee is a mere incident of the mortgage debt, available only for the purpose of securing payment . . . *when the debt is paid*, discharged, released or barred by limitation, *the mortgagee's title is extinguished by operation of law*.") (emphasis added), *rev'd on other grounds*, 195 U.S. 1

---

[3] BC57 will raise at least the issues detailed in its Motion for Stay on appeal, but anticipates it will refine and further develop these and other arguments in its comprehensive briefing before the Seventh Circuit.

(1904); *see also City of Chicago v. Elm State Prop. LLC*, 2016 IL App (1st) 152552 ¶ 21 ("A mortgage only creates a lien on the property. . . . It conveys a security interest that may be extinguished by the mortgagor paying in full any time prior to foreclosure."); *Rockford Life Ins. Co. v. Rios*, 128 Ill. App. 2d 190, 193 (1970) (affirming the trial court's holding that because the note secured by the mortgage was fully paid to Rockford Life's agent, "Rockford Life was not entitled to foreclose its mortgage and the defendants were entitled to a release of the mortgage.")

Neither the Illinois Mortgage Act, 765 ILCS 905 *et seq.*, nor *North Shore Cmty. Bank & Tr. Co. v. Sheffield Wellington LLC*, 2014 IL App (1st) 123784, undermine this established tenet of property law. In *North Shore*, the Illinois appellate court rejected a party's argument, in the context of a standing analysis, that the Illinois Mortgage Act, *in and of itself*, provided support for "its contention that, once a mortgagee receives full payment for the mortgage, the mortgage is deemed released." 2014 IL App (1st) 123784 ¶ 71. Neither the Act, which enables a mortgagor "to obtain a release when the terms of the mortgage have been fully satisfied" and imposes penalties should the mortgagee fail to timely do so (*In re Gluth Bros. Constr. Inc.*, 451 B.R. 447, 452 (Bankr. N.D. Ill. 2011)), nor the court in *North Shore*, even acknowledge, much less upset the well-established rule that payment of a debt secured by a mortgage extinguishes a party's interest in the mortgaged property. *North Shore* unquestionably highlights the limited scope of the Illinois Mortgage Act, which is focused on enabling a mortgagor to obtain a release. But decisions rendered after the enactment of the Illinois Mortgage Act make clear that the fundamental principle—when the debt underlying a mortgage is paid, the mortgage is extinguished—remains good law. *See, e.g.*, *Rockford Life Ins. Co.*, 128 Ill. App. 2d 190.

Here, BC57's payment to EBF, the Investor-Lenders' servicing agent, was effective to extinguish the Investor-Lenders' mortgages because BC57 had no duty to ensure that their agent,

5

EBF, remitted the payment to its principals, who must bear the consequences of their authorized agent's actions. The Court erred in distinguishing BC57's case law applying this principle, including *Rockford Life Ins. Co. v. Rios*, 128 Ill. App. 2d 190 (1970), which the Court concluded involved "materially different" facts than those at issue in this case. (*See* Dkt. 1386 at 21.) *Rockford* not only is factually analogous because EBF was indisputably authorized to accept payment on behalf of the Investor-Lenders, but the case also upholds the well-settled principle that "[w]here one of two innocent persons must suffer by reason of the fraud or wrong conduct of another, the burden must fall upon him who put it in the power of the wrongdoer to commit the fraud or do the wrong." *M&T Bank v. Mallinckrodt*, 2015 IL App (2d) 141233 ¶ 52; *see Rockford*, 128 Ill. App. 2d at 195 ("It is this conduct [principal granting agent authority] which makes the loss possible and the principal may not shift the burden to the party dealing with his agent"); *see also Brenner v. Franke*, 18 Ill. App. 2d 202, 209 (1958) ("Where one of two innocent parties must suffer the loss must fall on the one who makes the loss possible or whose agent occasioned the loss."). The Court further erred in discounting the application of the Illinois Fiduciary Act—which similarly protects good-faith payments to a fiduciary authorized to receive such payments— because the Act expressly includes agents within its scope. *See* 760 ILCS 65/1.

BC57 also reasonably relied on the payoff statements it received from EBF in issuing its payment in satisfaction of the Investor-Lenders' mortgage debts. BC57's reliance on the payoff statements was reasonable because BC57 had no reason to question EBF's authority to issue the payoff statements and to receive payment on the Investor-Lenders' behalf.[4] Even if BC57 had reason to question EBF's authority, under an inquiry notice analysis, BC57 would still only be

---

[4] Indeed, BC57's expert evidence attesting to the custom and practices observed by BC57 and the title closing agents was unrebutted.

6

"chargeable with knowledge of facts that a diligent inquiry would have disclosed." *Peoples Nat'l Bank, N.A. v. Banterra Bank*, 719 F.3d 608, 612 (7th Cir. 2013). Here, diligent inquiry would have confirmed EBF's express authority to issue payoff statements and accept payment. For all of these reasons, the Investor-Lenders' mortgages were extinguished and rendered unenforceable when BC57 paid their servicing agent, EBF, to satisfy the Investor-Lenders' mortgage debt, leaving BC57 with the *only* enforceable mortgage lien against the Group 1 properties.

Finally, contrary to the Court's holding, the releases BC57 received from EBF were valid. The Investor-Lenders gave EBF express actual authority, in writing, to execute and issue releases on their behalf. In concluding otherwise, the Court erred in several respects. For example, the Court misconstrued the interplay between the relevant agreements conferring EBF's authority. The Court also misinterpreted the Illinois Mortgage Act as requiring payment to be made directly to the Investor-Lenders, notwithstanding the fact that payment to an agent is the legal equivalent to payment to the principal. In so concluding, the Court omitted language from the Act, which specifically contemplates payment through a "legal representative." 765 ILCS 905/2. Further, that the body of the releases contained a scrivener's error by naming "Equitybuild" rather than "Equitybuild Finance" as the releasing party, does not defeat the effectiveness of the releases. The releases were all signed by EBF, who unquestionably intended to release the Investor-Lenders' mortgages. Simply put, any scrivener's error did not negate the releases' validity, particularly given the clear intent to release.

**II.     Claimant-Appellant BC57 will face irreparable harm absent a stay.**

Even if the Court were inclined to disagree as to BC57's likelihood of success on appeal, the risk of harm to BC57 weighs heavily in its favor and therefore necessitates a stay. *See A&F Enters., Inc. II*, 742 F.3d at 766; *see also Prudential Ins. Co. of Am. v. Kamrath*, No. 4:03-CV-

7

1736 (CEJ), 2006 U.S. Dist. LEXIS 87471, at *8 (E.D. Mo. Dec. 4, 2006) (granting stay pending appeal, notwithstanding that "[m]ovant] is not likely to succeed on the merits" because "the remaining factors . . . weigh in [movant's] favor. If the Court allows the disbursement of funds . . . and [movant] prevails on appeal, [movant] will be irreparably injured."). Without a stay, the Receiver will disburse $3,760,615.08 of the $4,038,891.89 total funds available for distribution from the Group 1 property proceeds to the Investor-Lenders pursuant to the Court's Disbursement Order, in response to some 160 different claims.[5] (*See* Dkt. 1451-1.) The $3,760,615.08 distribution will exhaust the proceeds of four of the five Group 1 property sales, and the "excess proceeds" for one property—$278,276.81—will "be held in the account for that property until further order of the Court." (Dkt. 1451 at 6.) As it stands, BC57 will receive no proceeds pursuant to the Disbursement Order due to the Investor-Lenders' priority status, as determined by the Court's February 15, 2023 Priority Order.

If BC57 is successful on appeal, and the Court of Appeals determines that BC57 has priority over the Investor-Lenders, obtaining the distributed funds from these various claimants presents a serious "practical question" as to "how that ruling may be carried out." *Wells Fargo Bank, N.A. v. ESM Fund I, LP*, 2012 U.S. Dist. LEXIS 102940, at *13 (S.D.N.Y. Apr. 3, 2012); *see also In re B. Cohen & Sons Caterers, Inc.*, 147 B.R. 369, 377 (Bankr. E.D. Pa. 1992) (describing the difficulties in "redo[ing] the entire distribution," noting "[w]hen this sort of relief is considered, the practicalities which underlie undoing a confirmation order and a distribution scheme become manifested."). Beyond the very real administrative challenges of executing a claw

---

[5] The Receiver identified 169 claimants in Group 1 who had submitted proof of claims forms. *See* Dkt. 1201 at 1. The Receiver noted that "several individuals or entities submitted claims against more than one property in Group 1," but considered those individuals as separate claimants for each property in reaching its total. *Id*. at 1, n.1.

8

back process of more than 160 different claims, permitting the Receiver to distribute the funds during the pendency of BC57's appeal may likely render such an effort futile. For example, while every appeal is obviously different, the average time for the resolution of a civil appeal in the Seventh Circuit, from the time of filing the notice of appeal to final disposition, is approximately 10 months. (*See* Seventh Circuit Annual Report (2021), *available at* https://www.ca7.uscourts.gov/annual-report/2021_CA7_report.pdf.) Any number of the Investor-Lenders could spend the proceeds from the sale of the Group 1 properties during that extended period of time, effectively putting the funds beyond the reach of both the parties and the Court. *See, e.g.*, *In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128, 1133-34 (8th Cir. 1984) (finding appellant showed sufficient possibility of irreparable harm for purposes of appellate jurisdiction "[s]ince claimants who receive distributions from the Escrow Fund would probably spend or otherwise dissipate them" thus depriving appellant of ability to trace proceeds for purpose of constructive trust claim).

Moreover, even if the disbursed funds are recoverable from the Investor-Lenders, if BC57 prevails and is entitled to priority, it will not receive the benefit of that priority. Instead, it will have to await the return of the already-distributed funds. As a result, BC57 would "effectively be denied the priority that it has been seeking to establish in this lawsuit." *Wells Fargo,* 2012 U.S. Dist. LEXIS 102940, at *16-17 (S.D.N.Y. Apr. 3, 2012). "[T]hat deprivation too represents a form of irreparable harm." *Id*.

Courts in the Seventh Circuit and across the country regularly order stays in similar circumstances involving pools of funds for distribution to avoid the irreparable harm BC57 faces in this case absent a stay. *See, e.g.*, *United States SEC v. ISC, Inc.*, No. 15-cv-45-jdp, 2017 U.S. Dist. LEXIS 139258, at *19 (W.D. Wis. Aug. 30, 2017) (authorizing receiver's distribution plan

9

but ordering "the distribution will have to wait at least until the dispute over the APA [on appeal] is resolved, because that will affect the funds available for distribution."); *see also Wells Fargo*, 2012 U.S. Dist. LEXIS 102940 at *13-14 (recommending a stay pending appeal due to irreparable harm, noting "[i]n the event that the Second Circuit reverses . . . the practical question posed will be how that ruling may be carried out. As long as the funds in question remain in escrow, that will be a very simple process. If, however, the escrowed funds . . . are now released to the [claimants], it is less clear how and whether [appellant] can be fully reimbursed" if successful on appeal); *Life Ins. Co. of N. Am. v. Camm*, No. 4:02-cv-0106-DFH-WGH, 2007 U.S. Dist. LEXIS 64454, at *4 (S.D. Ind. Aug. 30, 2007) (granting a motion for stay pending appeal, finding that if the movant "prevail[ed] on appeal . . . he [was] likely to suffer irreparable harm in the absence of a stay" because another party "assert[ed] the right to use or invest the funds now as she sees fit," and "[t]here [wa]s no indication that she would be in a position to remedy the harm . . . if the insurance proceeds [we]re distributed to her and it [wa]s later determined that [the movant] [wa]s entitled to them."); *In re Wolf*, 558 B.R. 140, 144 n.5 (Bankr. E.D. Pa. 2016) (collecting district court and circuit authority from across the country "suggest[ing] that when an existing fund has been dedicated to satisfaction of competing claims, distribution of the fund before the court's determination is final and no longer subject to modification or reversal on appeal may constitute irreparable harm to the appellant.").

In addition to the practical difficulties the parties would face should unwinding the distribution become necessary following resolution of BC57's appeal absent a stay, BC57 also risks further challenge under the doctrine of equitable mootness. *See Wealth Mgmt.*, 628 F.3d at 331-332 ("The [equitable mootness] doctrine applies in the context of securities-fraud receiverships. . . ) (citations omitted). Pursuant to the doctrine of equitable mootness, "if a plan of

reorganization has been carried out, so that providing relief to an objector to the plan would require rescinding it and forcing a host of innocent third parties (the other creditors) to return the money, securities, or other things of value that they had obtained pursuant to the plan, the court will not entertain the objection." *SEC v. Wozniak*, 33 F.3d 13, 15 (7th Cir. 1994), *overruled on other grounds by SEC v. Enter. Trust Co.*, 559 F.3d 649 (7th Cir. 2009).  In such circumstances, courts may find an appeal equitably moot where "unwinding the sale and distribution of the sale proceeds would be complex, impractical, and would potentially prejudice the rights of third parties" even if the re-distribution were, logistically speaking, possible. *See, e.g.*, *In re Bardos*, No. CC-13-1316-PaKuBl, 2014 Bankr. LEXIS 3211, at *25-26 (B.A.P. 9th Cir. July 25, 2014).  Accordingly, the threat of equitable mootness is another harm BC57 faces in the absence of a stay.

As the above discussion demonstrates, the risk of irreparable harm to BC57 is substantial, immediate, and concrete.  Moreover, "the potential inability of" BC57 "to recover some portion of the entire corpus at issue in this case, as well as the potential loss of the underlying entitlement that might otherwise be enforced if" BC57 "prevails, which is priority vis-à-vis" the Investor-Lenders, is "far more extensive tha[n] what the" Investor-Lenders "face from the grant of a stay." *Wells Fargo*, 2012 U.S. Dist. LEXIS 102940 at *22-23.

### III. A stay will not injure any of the parties or claimants in this matter.

A stay will not injure any of the parties or claimants in this matter, including the Investor-Lenders.  The disputed funds are already in the Receiver's possession, so there is no risk of injury to any party or claimant's interest in those funds.  As long as the funds stay in the Receiver's possession, "[i]n the event of an affirmance by our circuit court, there is no danger, even with a stay, that" the Investor-Lenders "will not be paid the full amounts of which they have been deprived." *Wells Fargo*, 2012 U.S. Dist. LEXIS 102940 at *18; *see also Life Ins. Co. of N. Am.*,

11

2007 U.S. Dist. LEXIS 64454 at *3 ("[s]tays pending appeal . . . *do not appear to be unusual*" in cases where "the court has the disputed funds already in its possession so that all parties are protected from the risk that another party will dissipate them or put them beyond the reach of the court and other parties") (emphasis added); *see also Palm Props., LLC v. Metro. Nat'l Bank*, No. 4:09CV00038 JLH, 2010 U.S. Dist. LEXIS 90408, at *7 (E.D. Ark. July 22, 2010) ("In an interpleader case, such as here, the court has the disputed funds already in its possession so that all parties are protected from risk."). What is more, the funds are in interest-bearing accounts and will continue to accrue interest as long as the funds remain in those accounts. (*See* Dkt. 1451 at 5.) As such, there is no risk of the funds diminishing in value during the pendency of BC57's appeal. Accordingly, there is no risk of injury to the Investor-Lenders or any other parties or claimants.

**IV.     A stay is in the public interest.**

Public interest also favors a stay in this case. The public interest is served in accurately distributing the proceeds of the sale of Group 1 properties. *See Life Ins. Co. of N. Am.*, 2007 U.S. Dist. LEXIS 64454 at *5 ("[A]n erroneous distribution of the money that is not corrected might tend to undermine confidence in courts, the public interest points in the direction of making sure that the courts decide the case correctly."). This is especially true here, where resolution of the priority dispute at issue in BC57's appeal may be relevant to the Court's determination of the remaining assets under receivership that will be subject to similar priority disputes.

* * *

BC57 faces a serious risk of irreparable harm absent a stay, while the Investor-Lenders are protected from any harm by maintaining the status quo and leaving the funds where they are until the appeal is resolved. Moreover, given that BC57 is likely to succeed on the merits of its

12

arguments on appeal, and the public's interest in accurate distributions of receivership funds, a stay is appropriate in this matter.

## V.     A supersedeas bond is not required.

To the extent a supersedeas bond may sometimes be required for money judgments, no such bond is necessary here. The Court has the discretion to waive bond requirements and considers five factors to determine whether waiver is appropriate:

> (1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in an insecure position.

*Sorrano v. N.Y. Life Ins. Co.*, No. 96 C 7882, 2006 U.S. Dist. LEXIS 27339, at *4 (N.D. Ill. Apr. 13, 2006) (quoting *Dillon v. City of Chi.*, 866 F.2d 902, 904-05 (7th Cir. 1988)).

In this case, the third factor—the degree of confidence that the district court has in the availability of funds to pay the judgment—is determinative. The purpose of a supersedeas bond is to protect an appellee from loss should the judgment debtor become insolvent. *See Celotex Corp. v. Edwards*, 514 U.S. 300, 332 (1995). Here, a supersedeas bond is unnecessary to secure the availability of funds to pay the Investor-Lenders if BC57's appeal is unsuccessful because those funds are not in BC57's control—they are already securely in receivership until distribution. In other words, the non-appealing parties' rights pending appeal are already protected because there is no "risk of the money disappearing." *See Exxon Valdez v. Exxon Mobil Corp.*, 568 F.3d 1077, 1085 (9th Cir. 2009) ("The rationale for a supersedeas bond is that there can be no certainty about who is in the right until the appeals are done . . . but in the meantime, the party that won in

the district court should not be at risk of the money disappearing."). Accordingly, BC57 respectfully requests that this Court grant its motion for stay without requiring a bond.[6]

WHEREFORE, Claimant BC57, LLC, through its undersigned counsel, respectfully requests that this Court issue a stay, without security, of any distribution or disbursement of the proceeds from the sale of the Group 1 properties to the Investor-Lenders pending appeal.

Dated: May 4, 2023

Respectfully submitted,

/s/ Andrew R. DeVooght
Andrew R. DeVooght
Alexandra J. Schaller
LOEB & LOEB LLP
321 N. Clark St., Ste. 2300
Chicago, IL 60654
Telephone: (312) 464-3100
Facsimile: (312) 464-3111
adevooght@loeb.com
aschaller@loeb.com

Edward S. Weil
Michael A. Gilman
Todd Gale
Brett J. Natarelli
DYKEMA GOSSETT PLLC
10 South Wacker Drive, Ste. 2300
Chicago, IL 60606
Telephone: (312) 876-1700
Facsimile: (888) 828-6441
eweil@dykema.com
mgilman@dykema.com
tgale@dykema.com
bnatarelli@dykema.com

*Attorneys for Claimant BC57, LLC*

---

[6] If the Court disagrees and believes a bond is necessary, BC57 respectfully requests, in the alternative, that the Court impose a modest bond given the circumstances. *See* Local Rule 62.1 ("The bond amount fixed hereunder is without prejudice to any party's right to seek timely judicial determination of a higher or lower amount.").

14

**CERTIFICATE OF SERVICE**

      I hereby certify that on May 4, 2023, I electronically filed the foregoing MOTION FOR STAY PENDING APPEAL with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

                                              */s/ Andrew R. DeVooght*
                                              Andrew R. DeVooght