**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) |  |
|  | ) | |
| **Plaintiff,** | ) | **Civil Action No. 18-cv-5587** |
|  | ) | |
| **v.** | ) | **Hon. Manish S. Shah** |
|  | ) | |
| **EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN,** | ) ) ) ) | **Magistrate Judge Young B. Kim** |
|  | ) | |
| **Defendants.** | ) ) | |

### RECEIVER'S RESPONSE TO BC57'S MOTION TO STAY PENDING APPEAL

Kevin B. Duff, as the receiver ("Receiver") in this action, respectfully submits this response to BC57's Motion to Stay Pending Appeal (Dkt. 1455).

**I.      The Court Has Discretion Whether or Note to Stay Distribution**

Whether or not to issue a stay pending appeal is a matter reserved for the exercise of the Court's judicial discretion. *Nken v. Holder,* 556 U.S. 418, 433 (2009).

**II.      Expeditious Distribution of Funds to Victims Is Consistent with the Primary Purpose of Equity Receiverships.**

The Receiver is prepared to implement and distribute funds consistent with the orders entered by the Court as soon as practicable, recognizing that claimants have been waiting now years for receipt of distributions. Indeed, the distribution of such funds enhances the public policy supporting equity receiverships, where the goal is to distribute monies back to claimants efficiently and expeditiously. *See, e.g., SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986) ("primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district

court for the benefit of creditors"). To be clear, and consistent with the orders approving the sales of Group 1 properties which required the Receiver to hold the net proceeds of those sales pending further Court order (Dkt. 545, 602, 802), the Receiver will only distribute those funds as ordered by the Court to do so.

III. **The Court May Consider the Relative Impact of the Underlying Fraud on Claimants in Determining How and When to Distribute Receivership Funds.**

In determining whether or not to grant or deny BC57's motion to stay distribution, the Court may consider the relative interests and circumstances of the claimants and the extent to which distribution now versus a stay of distribution would impact them. *Cf. Duff v. Central Sleep Diagnostics, LLC*, 801 F.3d 833, 840 (7th Cir. 2015) (referencing the court's awareness that "some of the claimants are elderly, and many were very badly harmed by [the defendant's] fraud"). Here, the Receiver and the receivership team have received scores if not hundreds of communications from investors about the "utterly devasting" impact of the Defendants' fraud, including for many the loss of their life savings and monthly income, sickness, depression, inability to provide for children, inability to pay for healthcare, and sundry other problems. Among the messages sent by Group 1 investors throughout the receivership are the following:

- "I cannot believe that I was duped by this Ponzi scheme. I feel so stupid. I used about $50K from my self-directed IRA retirement account. At 67yo I'll never make up for that amount of lost money."

- "The money I invested is much needed. I can't work because I can't concentrate. I'm a mess. Please help me. Please!!!!!!!"

- "[W]e had invested the majority of our retirement funds in this company over 5 years ago, & we need to know at least approximately when we can expect future payments, as we are depending on these to help us live."

- "I am crushed that we trusted someone with our lifelong savings…."

Case: 1:18-cv-05587 Document #: 1479 Filed: 05/15/23 Page 3 of 18 PageID #:102041

- "Some investors, myself included, are retirees who have invested their life savings in various real properties offered by EBF et al. The monthly interest payments on our loans are crucial to our financial stability, especially as we are elderly and experiencing medical issues. At age 81, my wife is suffering dementia, and I, at age 84 am dealing with chronic pain resulting from a herniated disc."

- "I am now 91 years in age and don't expect to live much longer. HELP!!!" (Sent in 2019; claimant died in 2022.)

Many of the approximately 170 investors in Group 1 are in their 70s, 80s, and 90s. Other investors have died during the course of the receivership while they were waiting to recoup their losses. Two investors (including a Group 1 investor) appeared at a recent Court hearing to convey the personal hardships and devastation caused to them and other investors both by having their funds taken by the Defendants and also the delay of receiving money back through the claims process. (Exhibit A, 4/26/2023 Tr. at 8-12, 38-43)

The Receiver notes that the Court has recognized that a material factor contributing to the length of the case has been the manner in which the institutional lenders such as BC57 have chosen to litigate this matter. (*See, e.g.,* Dkt. 1030 at 8 ("the Receiver and his legal professionals have devoted significant resources responding to various motions, objections and inquires made by lenders," and "certain delays in this case can be attributed to the Receiver's need to respond to various motions and objections made by the [institutional] lenders."))

IV.     **BC57 Has Not Shown a Likelihood of Success on Appeal.**

The Receiver does not agree with the principal arguments in BC57's motion, including but not limited to BC57's argument that is likely to succeed in its appeal. (Dkt. 1455 at 4-7) As the Seventh Circuit observed in *SEC v. Enterprise Trust Co.*, in which the Court affirmed the District Court's approval of a receiver's distribution plan in an investor fraud scenario, individuals whose property is marshaled by a receiver and whose claims are resolved in the receivership proceedings

are "like creditors of a debtor in bankruptcy, [and] must accept the distribution that the court believes appropriate." 559 F.3d 649, 652 (7th Cir. 2009).

To be fair, BC57 recognizes that its burden here is to establish a "significant probability of success." In other words, it must meet a higher burden than what is typically required for preliminary injunctive relief. *See In re Forty-Eight Insulations, Inc.,* 115 F.3d 1294, 1301 (7th Cir. 1987) (movant "need[s] to demonstrate a substantial showing of likelihood of success, not merely the possibility of success, because they must convince the reviewing court that the lower court, after having the benefit of evaluating the relevant evidence, has likely committed reversible error.") However, for the reasons set forth in the Receiver's submission on Group 1 claims (Dkt. 1201 at 2-3), as well as those raised by the SEC in its opposition to the motion to stay (Dkt. 1470), the arguments BC57 has proffered remain weak.[1]  (*See also* Dkt. 1470, *passim*)

## V. If a Stay Is Considered, the Court Should Require BC57 to Post an Appeal Bond and/or Hold Back a Limited Amount of Funds for Receivership Administration, Including for the Costs of Appeal and Final Distribution.

"Ordinarily a party is entitled to a stay pending appeal only by posting an appropriate bond." *In re Carlson,* 224 F.3d 716, 719 (7th Cir. 2000) (affirming district court decision not to waive bond requirement on motion to stay). If the Court determines that a stay is appropriate, then it should also require BC57 to post a bond in an amount determined by the Court to protect the receivership estate and the distributees from the financial impact of a meritless appeal. In the

---

[1] For example, BC57 argues that it meets its substantial burden because, *inter alia*, it intends to raise what it characterizes as legal issues which it contends will be reviewed *de novo* (Br. at 4). Even if BC57 were accurate in this characterization, application of a *de novo* standard of review does not make BC57's arguments stronger. Put differently, simply because a court may apply a *de novo* standard of review does not equate to showing that a party has a substantial likelihood of success on appeal. Were that the case, a stay would be appropriate any time an appeal involves a *de novo* review of an issue. This is most certainly not the law.

alternative, and at a minimum, the Receiver requests that the Court hold back 5% of the amounts to be distributed, to be available to cover the fees and costs of the Receiver's remaining work related to the Group 1 properties, including relating to BC57's appeal and any subsequent work of the Receiver including but not limited to administration of a final distribution if a holdback is ordered.[2]

Moreover, any stay order should be limited so that it does not restrict distributions relating to receivership administration including but not limited to any approved fees and costs. This is consistent with BC57's request for relief, which states that it "respectfully requests that this Court issue a stay, without security, of any distribution or disbursement of the proceeds from the sale of the Group 1 properties to the Investor-Lenders pending appeal." (Dkt. 1455) In other words, any stay should *not* apply to other matters pending in the Receivership which might impact the funds held in the separate accounts for the Group 1 properties, including but not limited to the Receiver's pending second fee allocation motion (Dkt. 1321), the Receiver's fee applications (*e.g.,* Dkt. 1478), or to future applications or motions seeking approval, reimbursement, and/or restoration of funds.

Dated:  May 15, 2023                          Respectfully submitted,

                                              s/ Michael Rachlis
                                              Michael Rachlis
                                              Jodi Rosen Wine
                                              Rachlis Duff & Peel, LLC
                                              542 South Dearborn Street, Suite 900
                                              Chicago, IL 60605
                                              Phone (312) 733-3950
                                              mrachlis@rdaplaw.net
                                              jwine@rdaplaw.net

                                              *Attorneys for Kevin B. Duff, Receiver*

---

[2] As of March 31, 2023, the total amount held for the five properties in Group 1 was $4,505,527.04. (*See* Dkt. 1448 at Ex. 1)

## CERTIFICATE OF SERVICE

I hereby certify that I provided service of the foregoing Receiver's Response to BC57's Motion to Stay Pending Appeal, through the Court's CM/ECF system, to all counsel of record on May 15, 2023.

I further certify that I caused true and correct copy of the foregoing Response to be served upon all individuals or entities that submitted a proof of claim in this action (sent to the e-mail address each claimant provided on the claim form) and their counsel.

I further certify that the Response will be posted to the Receivership webpage at: http://rdaplaw.net/receivership-for-equitybuild

/s/ Michael Rachlis

Michael Rachlis
Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Phone (312) 733-3950
Fax (312) 733-3952
mrachlis@rdaplaw.net

1

```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   UNITED STATES SECURITIES AND      )
     EXCHANGE COMMISSION, et al.,      )
 4                                     )
                 Plaintiffs,           )
 5                                     )
          vs.                          )  No. 18 C 5587
 6                                     )
     EQUITYBUILD, INC.,                )
 7   EQUITYBUILD FINANCE, L.L.C.,      )
     JEROME H. COHEN, SHAUN D. COHEN,  )
 8   and CITIBANK, N.A., as Trustee,   )  Chicago, Illinois
                                       )  April 26, 2023
 9               Defendants.           )  11:05 o'clock a.m.

10                  TRANSCRIPT OF PROCEEDINGS -
11                       Motion Hearing
            BEFORE THE HONORABLE MANISH S. SHAH
12

13   APPEARANCES:

14   For Plaintiff SEC:     U.S. SECURITIES AND EXCHANGE
                            COMMISSION
15                          BY:  MR. BENJAMIN J. HANAUER
                            175 West Jackson Boulevard, Suite 1450
16                          Chicago, Illinois  60604
                            (312) 353-8642
17

18   For FHFA:              ARNOLD & PORTER KAYE SCHOLER, L.L.P.
                            BY:  MR. DANIEL E. RAYMOND
19                          70 West Madison Street, Suite 4200
                            Chicago, Illinois  60602-4231
20                          (312) 583-2379

21
     For Certain Trustees/  DICKINSON WRIGHT, P.L.L.C.
22   Mortgagees/Creditors   BY:  MR. RONALD A. DAMASHEK
     Citibank, Thorofare,   55 West Monroe Street, Suite 1200
23   Liberty, Midland:      Chicago, Illinois  60603
                            (312) 641-0060
24

25
```

Exhibit

A

**Colleen M. Conway, Official Court Reporter**

1    THE COURT:  Good morning, Ms. Kalisiak.  If you could

2 -- could you step up to the microphones here?

3     (Person approaches.)

4    MS. KALISIAK-TINGLE:  Good morning, Your Honor.

5    THE COURT:  Good morning.  Could you state your name,

6 please?

7    MS. KALISIAK-TINGLE:  Susan Kalisiak-Tingle.  I'm

8 here representing myself as an EquityBuild investor.

9    I had about $350,000 invested in about six different

10 properties.  I think I'm involved in three or four different

11 tranches, one of those being the first tranche.

12    THE COURT:  What would you like me to know --

13    MS. KALISIAK-TINGLE:  Okay.

14    THE COURT:  -- about where things stand --

15    MS. KALISIAK-TINGLE:  Okay.

16    THE COURT:  -- with you?

17    MS. KALISIAK-TINGLE:  Well, thank you for giving us

18 the opportunity to be here today, and what I spent, you know,

19 over $2,000 to be here today, and got on an airplane at 4:30

20 yesterday morning, was just maybe for you to understand the

21 gravity of us that were investors, what we lost, the blows that

22 came to us.  Not just losing the initial 350,000, which would

23 -- on an annual yearly salary, would take a person ten years of

24 their life, working every day a normal job, to make that up;

25 which at my time, back in 2018 when I lost that, I was a single

1    mom of two girls, and that was my means of income for

2    continuing to be a stay-at-home mom for them.  And it was about

3    95% of my net worth at that time.

4            I was in the process of moving to a new location, a

5    new city.  I wasn't able to buy a home because the money that I

6    was going to use to purchase a home was tied up in this mess.

7    And I had to rent just a small townhome for the girls and I at,

8    you know, $1500 a month for two years.

9            So that was on top of the loss that we'd already

10   sustained.  That was another, you know, $36,000 loss, if you

11   multiply that out.

12           Another blow that we have sustained is that -- I

13   understand you're not a criminal judge, but that these guys

14   have continued to go scot-free.  They haven't even had a slap

15   on the hand of any kind.

16           My understanding is the father has passed away, maybe

17   from cancer, but that the son has been allowed to flee to

18   another country.  So there was no justice done in that, in

19   that, you know, his passport wasn't taken him -- taken away

20   from him.

21           Another large blow to it was the future earning

22   power.  I am a real estate agent by trade.  That's what my

23   daily income is for the last eight or so years.

24           And so, just as an example, I'm working with a client

25   right now that bought a property around the same time in 2018.

1    Paid around the same amount of money, $300,000.  He's closing
2    on that property with me here in a couple weeks for $540,000.
3    So he was able to take that same amount of money and grow it
4    by, you know, 200-and-something thousand; that we could have
5    done that as well if we had access to our funds that were -- I
6    hate to use the word "victim," but kind of -- that's what we
7    were -- that was taken away from us.  A crime was committed to
8    us, and, you know, it just seems like nothing's been done about
9    it.
10             And I appreciate all of these people being here
11   today.  I know they've spent countless hours on it.  But this
12   has been dragging on -- we're coming up on the end -- or close
13   to the five-year mark, and we're still just in the first
14   tranche.
15             And, like I said, I'm in several other tranches.  I
16   feel like the average investor -- I know there were 900 of us.
17   We don't feel like we know kinda what's going on in all of it.
18   We do sometimes get filings and notices from the court, but a
19   lot of times we either don't have the time to read through
20   those lengthy things or we don't have the legal knowledge to
21   really know what's going on.  So we feel like kinda maybe what
22   we're getting is secondhand or incorrect information.
23             Every time one of the lenders that comes in and
24   appeals a decision you've already made -- I think one of 'em,
25   it's like nine or twelve times that he's appealed a decision

1    you've already made -- that's another blow to us.

2          And so I think that -- I'm just -- I'm representing

3    myself today, but I think that what the average investor would

4    just want us to say is we're just ready to see some results.

5    We're ready to see some justice done on the matter.  We know

6    we're probably not going to get back, you know, pennies on the

7    dollar from what we had invested.

8          I know you were not on the case back when -- I think

9    it was Capital Title -- and, like I said, I'm a real estate

10   agent.  When Capital Title -- no, Chicago Title.  Chicago Title

11   was subpoenaed, I believe, by Max Stein, and came in and did a

12   deposition on them.  They admitted that they didn't do their

13   due diligence to make sure those of us in the first-lien

14   position were actually paid off at that time like we were

15   supposed to be.  So it seems like there should be some kind of

16   title policy insurance that should be able to come in and make

17   us whole.

18         So that would be kind of -- I just want you to know,

19   we're real people, we're real lives, we're real families.  I

20   know there were other people that were investors.  I'm, like I

21   said, in my 40s, a single mom of teenagers.  There were other

22   people that were investors, that that was their life savings,

23   what they had worked their whole life to save.  And right now,

24   they should be out enjoying the good life, their retirement,

25   but they've had to continue going back to work or whatever

1    because of this.

2            And so it feels like we're being -- I know that

3    they're working on it.  But it feels like we're being punished

4    for a crime that we didn't commit, and that the real criminals,

5    they've just -- nothing's really happened to them.  And we

6    don't even really know, I mean, even where he's at, for sure.

7            THE COURT:  Thank you.  You can go ahead and have a

8    seat.

9        (Person returns to gallery.)

10           THE COURT:  I do appreciate those comments.  And I

11   suspect you're not alone in your opinion.  And it's important

12   to me to hear that point of view and that expression.  And I do

13   know, even though I am one of the newer players in this case, I

14   do know how frustrating the process is and has been.

15           And what is unfortunate on top of all of the

16   unfortunate circumstances here is that ultimately this process,

17   however long it takes and however it ends up, is not going to

18   be satisfying.  That is just where things have ended up because

19   of the nature of the collapse here.  So to get to an end, when

20   it happens, that you can tell and know already is not going to

21   be a satisfying one adds to the frustration of the whole

22   process.  And, unfortunately, all I can say about that is I get

23   it.  I know that that's what's happening.  But we will do what

24   we can to keep things moving along.

25           But I appreciate the fact that there was real loss

1 approved method to take advantage of the opportunity to be

2 heard at this hearing.  That's why I didn't call you up at the

3 beginning of this hearing.

4         But I know you're here, and I see that you're here,

5 and I will give you an opportunity to speak briefly.  But you

6 need to understand that if you don't follow the rules, you're

7 not going to be allowed to speak.

8         MR. MARCUS:  Uhm.

9         THE COURT:  Having said that, I will hear what you

10 have to say about where things stand, understanding that I have

11 seen your e-mails, I have seen your communications.  I have a

12 good sense of your frustration with this process, and I

13 understand that.  But you also ought to be heard, and so I will

14 give you an opportunity to be heard.

15         MR. MARCUS:  Thank you, Judge Shah.

16         And I just want to say, the reason I did it is

17 because -- I was here four years ago when Magistrate Kim was

18 here, and I had sent a letter certified receipt, and he allowed

19 me to speak.  In fact, I had -- someone else was supposed to

20 speak, and, unfortunately, she refused to show up.  So I didn't

21 know that we were so firm on this procedure.

22         I'm a senior citizen.  For me technologically,

23 technology is just a -- it's a problem.  But that's -- having

24 said that, I'm sorry that -- and I'll know in the future, I

25 guess.

1          This is a tough situation.  I want to say a lot more,
2    but I don't know if you'll let me -- give me the time.  I'm
3    just glad you have me speaking now.

4          It's just a terrible thing.  It's almost -- and to
5    back up, like what Susan said, it's nice to see another
6    investor here.  You know, 900 investors, two show up, that's a
7    disgrace.

8          And it's a shame that it happened.  There are a lot
9    of people suffering.  They're not here in the courtroom.  I've
10   spoken to 60 or 70 of them.  And they have reasons for it.  And
11   one of the reasons is it's almost like the court does not
12   want -- we're second-class citizens, third-class citizens.

13         It's nice for me to be here, you know, in front of
14   all these lawyers.  I feel like it's a David-and-Goliath deal.
15   And some of it has to do -- and I hate to say it -- with the
16   receiver.  It's not -- a lot of people don't even know what's
17   going on.  They just don't.  They ask me because I happen to be
18   the most active investor out of 900 investors.

19         Eventually, I plan to write a book on this.  I plan
20   to grate people on this.  If you asked a hundred thousand
21   people in Chicago about EquityBuild, not one person would know.
22   Not one.

23         Now, here, you have Bernie Madoff went smooth.  This
24   is going to take a long time.  I'm in the eighth tranche.  What
25   does that mean?  I'll be lucky if we get to this by 2030.

1          So, I mean, it's beyond frustration.  There are

2    people are going to be dying -- who die before this is

3    resolved.  People will be financially crushed, devastated

4    because of this.

5          Now, unfortunately, we had a situation.  We get back

6    to this.  Because you have two people, Jerry and Shaun Cohen,

7    that were evil geniuses.  And the thing was -- I don't know if

8    you're aware of this, but ten years ago, they came here.  They

9    picked Chicago out.  They were in Philadelphia.  They moved to

10   Chicago, for whatever reason.  I have my ideas about that.

11         And what happened was they had a lawyer, Mr. Hirsch,

12   who told them ten years ago, "Please do not do this Ponzi

13   scheme.  I'm afraid I may have to go to jail."  And they

14   laughed at him.

15         And what happened was before he -- Mr. Hirsch told

16   his daughter, "Do me a favor.  I'm afraid of these people.  Go

17   to the SEC, go to the FBI, and see what they can do for us."

18   Okay?  She went.  They told her, "Keep quiet.  We'll take care

19   of it.  We'll investigate it."  Zero was done, zero.

20         So what happened was this Mr. Hirsch, he committed

21   suicide.  And what happened was -- he also documented

22   everything that would happen.  He even stated that Mr. Cohen

23   will flee to Israel and nothing will be done with 'em.  They

24   won't spend a day in jail, not a minute and whatever.  It's

25   fantastic.  They get a free pass.

1          What a country this is, that you can do these things,

2     you can harm 900 people of $135 million and get totally away

3     with it.  Now, I know God took care of Jerry Cohen, he'll take

4     care of Jerry Cohen.  And eventually in this other world, God

5     will take care of Shaun Cohen.

6          I had dinner with Shaun Cohen twice.  I mean, this

7     guy, when I say evil -- I mean, this whole court has been

8     touched by Shaun Cohen.  When I say evil, I --

9          THE COURT:  Sir, Mr. Marcus, I'm sorry to interrupt,

10    but I want to give you an opportunity to make productive use --

11         MR. MARCUS:  Okay.

12         THE COURT:  -- of our brief --

13         MR. MARCUS:  I've waited to get --

14         THE COURT:  -- time together.

15         MR. MARCUS:  I'm ready to get to my point.

16         THE COURT:  That is, the history of this tragedy

17    is --

18         MR. MARCUS:  Understand.

19         THE COURT:  -- well-documented.

20         MR. MARCUS:  Understood, understood.

21         THE COURT:  What we are doing today is attempting to

22    administer the assets that the receiver has been able --

23         MR. MARCUS:  Okay.

24         THE COURT:  -- to collect.  And we are working

25    towards the end of the goal being, let's administer these

1    assets and get them out the door.

2              MR. MARCUS:  I appreciate that.  Now --

3              THE COURT:  The thing that would be useful to me --

4              MR. MARCUS:  Okay.  I'll -- let me explain.

5              THE COURT:  Let me just interrupt and I'm just going

6    to ask you a question, and that's the question that you can

7    answer, and that will then conclude our time together.  And

8    that is just, what do you want me to know about how to

9    administer this process going forward?

10             MR. MARCUS:  Well, two years ago in May, when Judge

11   John Zee Lee decided to do eight tranches and all this stuff,

12   it was proposed it was going to be six to nine months at the

13   most and then the other tranches would be done a lot more

14   rapidly.

15             We're entering the second year.  My feeling about

16   that is -- and it's a little radical.  I know we have all these

17   institutional lenders.  But what I would say to you is we

18   gotta -- it was a good idea then.  It's not a good idea now,

19   with the tranches.  It's a bad idea.  It's a terrible idea.

20   And it's only gonna have more suffering.

21             I feel that the investors have been treated like

22   second- and third-class citizens.  And I believe that that

23   should be wholly wiped out, with the tranches, number one.  You

24   do a flat, kind of, percentage thing.  Let's get on with it.

25             See, there's no sense of urgency here at all, zero.

1    You have the power, you have the authority to do a tremendous

2    thing.  You could snap your fingers and, like with a magic

3    wand, you can make things better for 900-plus investors.

4            So what I'm saying to you is if you could do --

5    within the -- you know, maybe next six months or so, you -- if

6    you could disburse the monies, start something, do -- it would

7    be -- in Jewish, we say it would be a mitzvah, it would be a

8    great deed.  And I tell you something.  A lot of people would

9    be -- it would help their lives.

10           Now, what happens is people -- these 900 people, they

11   need a hero.  And I just want to let you know, Judge Shah, I

12   want you to be my hero.

13           Thank you very much.  And God bless you.

14           THE COURT:  Thank you, Mr. Marcus.

15       (Person returns to gallery.)

16           MR. STEIN:  Your Honor, if I may?

17           THE COURT:  Yes.

18           MR. STEIN:  Good morning, Your Honor.  Max Stein on

19   behalf of a group of individual investors.

20           And I just want to make clear that there are a number

21   of individual investors who are represented here in the

22   courtroom today by me.  That we are -- we share many of the

23   frustrations that you have heard from the two individuals who

24   have spoken today.

25           We agree that there is a lack of urgency, especially