**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 18-cv-5587 |
| v. | ) ) | Hon. Manish S. Shah |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, | ) ) ) ) | Magistrate Judge Young B. Kim |
| Defendants. | ) ) | |

## RECEIVER'S GROUP 2 DISCLOSURE

Pursuant to Section 11 of the Court's Order Regarding Claims Resolution Process No. 2 (Dkt. 941) and the schedule set by the Court regarding Group 2 as amended (Dkt. 1532), the Receiver hereby discloses his position that the security interest given by EquityBuild, Inc. ("EquityBuild") to (i) Shatar Capital Inc. a/k/a Shatar Capital Partners, 1111 Crest Dr. LLC, Abraham Aaron Ebriani[1], Hamid Esmail, and Farsaa Inc. (collectively "Shatar") with respect to two properties (5450 S. Indiana and 7749 S. Yates) and (ii) Direct Lending Partner LLC (successor to Arena DLP Lender LLC and DLP Lending Fund LLC (hereinafter "DLP") related to 6160 S. Martin Luther King, all of which are among the Group 2 properties, constitute voidable fraudulent transfers under the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160 ("the Act") or are otherwise voidable under applicable law, as discussed below.

---

[1] Ebriani's interest was subsequently assigned to Pakravan Living Trust, who has appeared in this action. [Ex. 1, Shatar 975-76]. Documents cited in this Disclosure as "Ex. ___ " are attached hereto for the convenience of the claimants and the Court.

As a preliminary matter, the Receiver submits that if the investor-lenders' mortgages are deemed to be in first position, then the fraudulent conveyance issues to which this disclosure relates will essentially be moot and neither the participants nor the Court should devote time or expense to the matter. For this reason, the Receiver's Group 2 Disclosure is provided in the alternative and asserted herein only insofar as the Court determines that these mortgage interests are superior in position to the investor-lenders' mortgage interests.[2] This Disclosure is based on currently available documents and information, including as drawn from EquityBuild files, records and written discovery provided by claimants in respect to the properties at issue, and/or from deposition testimony in Group 2 discovery.[3]

## I. General Principles and Framework

### A. Legal Basis of Fraudulent Transfer Claim

Section 5 of the Act, 740 ILCS 160/5, provides in relevant part as follows:

> Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; . . . and the debtor:

---

[2] Following the Receiver's avoidance disclosure for Group 1, the Court deferred addressing the issues presented by that disclosure, as the Court's priority determination rendered it unnecessary to do so. (*See* Dkt. 1386 at 12)

[3] The Receiver notes that information obtained through discovery is continuing to be reviewed. For example, the Receiver notes that a subpoenaed party (Rock Fusco & Connelly) provided 360,000 pages of material approximately six weeks ago in unorganized fashion and presented review challenges for Group 2 participants including the Receiver, resulting in that party's reproduction of the materials in a different format on November 6, 2023. There is also a separate subpoena that the Receiver has issued for which information continues to be gathered. The Receiver has been reviewing these materials and will continue to review any further information that is provided, and reserves the right to add, delete, and/or modify this Disclosure.

(B)     intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

A Ponzi scheme is "an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments." *In re M & L Business Mach. Co., Inc.*, 84 F.3d 1330, 1332 n.1 (10th Cir. 1996). Proof of a Ponzi scheme is sufficient to establish actual intent to hinder, delay or defraud creditors. *See, e.g., In re Bernard L. Madoff Investment Securities LLC*, 12 F.4th 171, 196 (2d Cir. 2021) ("Under the so-called 'Ponzi scheme presumption,' the existence of a Ponzi scheme demonstrates actual intent as a matter of law because transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors."); *In re Agricultural Research and Technology Group, Inc.*, 916 F.2d 528, 535-36 (9th Cir. 1990) ("the mere existence of a Ponzi scheme, which could be established by circumstantial evidence, has been found to fulfill the requirement of actual intent on the part of the debtor"). The evidence that EquityBuild and the Cohens were operating a Ponzi scheme is a matter of record and incontrovertible. (*See, e.g.,* Dkt. 40; Dkt. 492 at 3-7, 10-14; Dkt. 533 at 2; Dkt. 603)

The Act does, however, recognize a "good faith" defense for creditors who accept a pledge of assets in good faith and for reasonably equivalent value:

Sec. 9. (a) A transfer or obligation is not voidable under paragraph (1) of subsection (a) of Section 5 against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee.

740 ILCS 160/9. *See also* 11 U.S.C.A § 548(c). The transferee/obligee carries the burden of demonstrating good faith. *See, e.g., In re Agricultural Research and Technology Group, Inc.*, 916 F.2d at 539; *Madoff*, 12 F.4th at 196.

3

In the context of fraudulent conveyance law, "inquiry notice" is the appropriate standard for determining lack of good faith. *In re Sentinel Management Group, Inc.*, 809 F.3d 958 (7th Cir. 2016) (bank which accepts pledge of assets is not acting in good faith if it had "inquiry notice" of possible fraud); *Madoff*, 12 F.4th at 186-88. "Inquiry notice" is the "awareness of suspicious facts that would have led a reasonable firm, acting diligently, to investigate further and by doing so discover wrongdoing." *In re Sentinel*, 809 F.3d at 961 (citing *In re M & L Business Machine Co.*, 84 F.3d at 1335-38; *In re Sherman*, 67 F.3d 1348, 1355 (8th Cir. 1995); *In re Agricultural Research & Technology Group, Inc.*, 916 F.2d at 535-36). Actual knowledge of the Ponzi scheme or fraud is not necessary to a finding that a creditor lacked good faith. *In re Sentinel*, 809 F.3d. at 962 ("inquiry notice is not knowledge of fraud or other wrongdoing but merely knowledge that would lead a reasonable, law-abiding person to inquire further—would make him in other words suspicious enough to conduct a diligent search for possible dirt"); *In re Nieves*, 648 F.3d 232, 242 (4th Cir. 2011) (finding no actual knowledge but affirming finding that mortgagee did not take in good faith where numerous facts known to mortgagee would have led a reasonable person to inquire further as to the voidability of the transfer). Even if the transferee gave reasonably equivalent value in exchange for the transfer, the transferee may not recover such value if the exchange was not in good faith because good faith is "indispensable" for the transferee who would recover any value given pursuant to 11 U.S.C. § 548(c) or state Uniform Fraudulent Transfer statutes. *In re Agricultural Research and Technology Group, Inc.*, 916 F.2d at 535.

A finding of inequitable conduct on the part of the transferee is also unnecessary. Instead, "mere negligence—or ineptitude" suffices for inquiry notice. *In re Sentinel*, 809 F.3d at 962-63 ("Notice that because of the recipient's obtuseness fails to trigger suspicion is

nevertheless sufficient to create inquiry notice because all that is required to trigger it is information that would cause a *reasonable* person to be suspicious enough to investigate.") (emphasis in original).

The first step in the inquiry notice analysis thus looks to the facts which a transferee knew. *Id.; see also Madoff*, 12 F.4th at 191-92. The second and third steps of the inquiry are whether the facts known by the transferee would have led a reasonable person to conduct further inquiry into the transferor's possible fraud, and whether diligent inquiry by the transferee would have discovered the fraudulent purpose of the transfer. *Id.* Thus, the "good faith" inquiry includes both subjective and objective components. *Id.*; *see also M & L Business Mach.*, 84 F.3d at 1332 n.1.

## II.     Facts and Documents Supporting Avoidance Against Shatar

Documents and information in the possession of Shatar at the time EquityBuild granted security interests in the properties at 5450 Indiana (the "Indiana" property) and 7749 Yates (the "Yates" property) to Shatar and its investors demonstrates that Shatar was aware of numerous facts that would have led a reasonable person to inquire further into the validity of the grants of security interests. Further, such inquiry would have led to the discovery of the fraudulent purposes of the EquityBuild's actions, including by previously granting first-position security interests to investor lenders in the same properties in which Shatar was investing and then acting to deprive those investor lenders of their security interests through fraudulent means and without the authority of the investor-lender mortgagees. Those facts include the following:

- Starting not later than the last quarter of 2016 forward, Shatar was gathering information to learn about and understand the details of EquityBuild's business. Shatar's due diligence into EquityBuild was led and evaluated by Ezri Namvar, an individual very familiar

with real estate investment and lending, real estate transactions, and entities engaging in Ponzi schemes.[4]  [*See* Ex. 2, 11/1/23 Tr. of Ezri Namvar as Rule 30(b)(6) Representative of Shatar at 124:16-125:8; 126:1-20 (hereinafter "11/1/23 Tr. at ___")]

- Namvar's experience provided Shatar with insights in regards to true business operations and practices of EquityBuild, as further described below.  Indeed, Shatar's Namvar claims that he is the "number one, the best hard money lender, knowledgeable hard money lender in the nation."  [Ex. 2, 11/1/23 Tr. at 99:13-15]  Shatar's corporate representative testified that his loan decisions are done in minutes: "On the phone I decide whether a loan is good or not. I say to everybody if I want to say no, it takes three minutes.  If I want to say yes, it takes ten minutes."  [*Id.* at 100:5-8]

- In November, 2016, EquityBuild sales representative, Christopher Mora, provided Mr. Namvar with detailed information about EquityBuild's business model, providing Namvar with an offering memorandum for a different property (7024 S. Paxton) and explaining "*as with all other EBF notes*, this private mortgage note is fully secured by the Paxton property as collateral, and the lenders are further protected with *a first lien position on the property.*"  [Ex. 3, Exhibit 4 to Shatar 30(b)(6) Deposition (hereinafter "Shatar Dep. Ex. ___")] (emphasis added). Mora further informed Namvar that EquityBuild had already raised more than $2.5 million from investors on the Paxton property from which it was seeking funding from Shatar.[5]

---

[4] Mr. Namvar is known as the "Beverly Hills Madoff" and served prison time for securities fraud as a result of his involvement in an unrelated Ponzi scheme.  *See* "Ezri Namvar is the New Bernie Madoff and the Most Reviled Man in Town," LA Weekly (July 21, 2011).

[5] Shatar did subsequently make a loan on 7024 S Paxton, but that loan was paid off prior to the receivership and therefore Shatar has not submitted a claim against that property.

- On December 23, 2016 Shatar (through Ezri Namvar) wrote to EquityBuild's Jerry Cohen and Tyler DeRoo (with an email copy to Ezri Namvar's son, Daniel Namvar) looking for additional information and background on EquityBuild's properties and investment:

  > "SINCE WE HAVE BECOME AWARE OF YOUR BUSINESS STRUCTURE, ASSUMING YOUR PREVIOUS DEALS HAVE BEEN CLOSED WITH CROUDFOUNDING INVESTORS, WE NEED TO MAKE SURE YOUR RE[F]INANCING OF ALREADY CLOSED DEALS ARE ALLOWED AND KOSHER…."

[*See* Ex. 4, Shatar Dep. Ex. 5 (emphasis in original) (authenticated 11/1/2023 in Shatar's 30(b)(6) deposition)] This email alone shows that, prior to making the refinancing loan at issue, Shatar was not only aware of EquityBuild's "business structure" but also that EquityBuild was using security interests with "crowdfunding investors." These were red flags that EquityBuild's business was far from kosher and should have led Shatar to inquire and investigate further before it engaged in these transactions. [Ex. 2, 11/1/23 Tr. at 38:6-39:20]

- A separate e-mail was exchanged between DeRoo and Ezri Namvar on December 23, 2016, where DeRoo provided Shatar with EquityBuild's "standard rollover" form. The rollovers were used by EquityBuild as part of its scheme, frequently with the "crowdfunding investors" that Shatar was focusing upon understanding and well recognized as part of the EquityBuild model. [*See* Ex. 5, Shatar Dep. Ex. 6; Ex. 2, 11/1/23 Tr. at 38:6-39:20]

- On December 27, 2016, DeRoo provided to Shatar samples of all of EquityBuild's lending documents, including the Collateral Agency and Servicing Agreement ("CASA"), providing further insights into the manner in which EquityBuild performed its business.[6] [*See* Ex. 6, Shatar Dep. Ex. 7] All of these documents allowed Shatar to understand

---

[6] This is the same form of CASA that the Court has previously reviewed in conjunction with its decision regarding Group 1. (*See* Dkt. 1386)

how EquityBuild was doing business, including "how [it] raised money" and its relationship with investors. [Ex. 7, Shatar Dep. Ex. 14]

- In or about March 2017, Shatar was evaluating possible investments with EquityBuild in regards to the Indiana and Yates properties. [Ex. 8, Shatar Dep. Ex. 8; *see also* Ex. 2, 11/1/23 Tr. at 100:21-102:21] Shatar discussed such investments with EquityBuild, at which time EquityBuild expressed great urgency in having Shatar invest in these properties. *Id.*

- Shatar's due diligence involved primarily looking at the value of the properties, and purportedly making sure that EquityBuild had real equity in the deal, where Namvar claimed not to know, but it was "enough to make me feel comfortable." [Ex. 2, 11/1/23 Tr. at 108:6-11]

- At this time (and earlier), Shatar's Ezri Namvar was in contact with another EquityBuild investor, Doron Kermanian, regarding investing in EquityBuild. On March 17, 2017, Kermanian signed documents and wired funds to EquityBuild for a share of the EquityBuild mortgage on 7749 S Yates, and specifically asked EquityBuild to contact "my partner ezri namvar regarding both the property and also the company equity finance." [*See* Group Ex. 10, *see also* Ex. 11] In fact, not later than the fourth quarter of 2016, Kermanian had been discussing investments in EquityBuild with Ezri Namvar. [Ex. 3, Shatar Dep. Ex. 4; *see also* Ex. 2, 11/1/23 Tr. at 29:13-20]

- Kermanian has submitted a claim in the receivership in connection with his investment in the Yates property. [Claim No. 5-380, Ex. 5 To Receiver's Twenty-First Status Report (Dkt. 1535) at 9] Kermanian's claim is representative of the claims of other investors in the Yates and Indiana properties.

- Shatar paid Kermanian a referral fee in conjunction with Shatar's investments in the Indiana and Yates properties. [Ex. 12, Shatar 6502-03]

8

- Through these interactions with Kermanian, and other interactions and knowledge obtained about EquityBuild's business described above, Shatar was aware (or should have known) that EquityBuild was soliciting "crowd funding" type investments in regards to the Yates and Indiana properties, and that such investments were being secured with first position mortgages, given its understanding of EquityBuild's business model. Indeed, EquityBuild closed on the Yates property, after funds had been raised from investors for purposes of acquiring and obtaining a secured interest in the property, and before any funds from Shatar were provided. Shatar was made aware that the Yates property had already closed, such closing occurring only a very short time before Shatar would provide its own investment funds to EquityBuild, itself raising red flags. [Ex. 2, 11/1/23 Tr. at 41:15-42-9; 59:16- 60:24; 61:18-62:5; *see also,* Ex. 9, Shatar Dep. Ex. 9; Ex. 13, Shatar Dep. Ex. 10]

- Understanding that the Yates transaction had just closed, Shatar was (or should have been) aware that there was no recorded mortgage associated with the closing for the Yates property, another red flag given Shatar's knowledge of EquityBuild's crowdfunding business model.

- Namvar was principally responsible for the due diligence and underwriting for Shatar's investments, including those for the Yates and Indiana properties. [Ex. 2, 11/1/23 Tr. at 54:2-19; 55:1-55:8; 99:10-103:16] While fully understanding the nature of EquityBuild's business, and with at least constructive notice that crowdfunding investors like Kermanian were lending money for a secured interest in the Yates property at the time Shatar was looking to those properties as securities for its investment, Shatar nonetheless demanded that it have a first priority secured interest, without any further investigation or diligence. [Ex. 14, Shatar Dep. Ex. 12; Ex. 2, 11/1/23 Tr. at 39:11-13; 41:15-42:9]

9

- EquityBuild recorded Shatar's mortgage on Yates property or about April 4, 2017. [Ex. 14, Shatar Dep. Ex. 12]

- Despite investor lenders, like Kermanian, being in place before Shatar -- the deal was done with these investors on or about March 17, 2017 -- the pre-existing mortgage associated with their investment was not recorded by EquityBuild until two months later. [*See* Ex. 15, Shatar Dep. Ex. 11]

- Shatar admitted at its 30(b)(6) deposition that, had it made a diligent inquiry into EquityBuild's fundraising with respect to the Yates property, it would not have made the loan. [Ex. 2, 11/1/23 Tr. at 113:8-114:22]

- Shatar's Namvar acknowledged the importance of performing due diligence as to the honesty of the individuals involved in the transaction, because "if we find out that [someone] lied to us, I would recommend not do the loan." [Ex. 2, 11/1/23 Tr. at 106:4-15]

- Given the experience of Shatar's lead person on due diligence and information provided to it, Shatar failed to perform further investigation that should have been performed which would have identified dishonesty and uncovered at the least the following that would have demanded further inquiry:

(1) Jerome Cohen was a fugitive from justice in Pennsylvania in November 1993.

(2) American Home Rentals, a company operated by Jerome Cohen and Steve Cohen, was sued by the Preate's Bureau of Consumer Protection in February 1993 for defrauding customers of about $350,000 over a period of two years.

(3) In June 1993, the Deputy Attorney General of Pennsylvania sued American Home Rentals for violating an injunction by operating under a different name.

(4)     In September 1994, American Home Rentals was sued by the Commonwealth of Pennsylvania for systematically violating the state Unfair Trade Practice and Consumer Protection Law.

(5)     More than 100 real estate tax lien petitions were filed against Jerome Cohen by the City of Philadelphia.

(6)     Jerome Cohen filed a personal bankruptcy petition in the United States District Court for the Middle District of Florida in September 1994 and that case was transferred to the Eastern District of Pennsylvania in January 1995.

(7)     Jerome Cohen was the subject of an unsatisfied judgment in the amount of $66,991.

(8)     An Internet discussion forum hosted by Bigger Pockets at *https://www.biggerpockets.com/forums/311/topics/300843-has-anyone-invested-in-any-of-the-equitybuild-properties* contained a series of comments posted by Lindsay Hirsch, who stated that her father, Gordon Hirsch, an attorney who committed suicide shortly after he withdrew from his representation of EquityBuild, left a note stating that that the company was running a Ponzi scheme and stating that: "Shaun [Cohen] is using investor money to buy and rehab properties owned by his father Jerry. Crazy mortgages are put on the property and EquityBuild abandons them."

(9)     The Cook County Recorder of Deeds website identifies EquityBuild as a grantor of 190 properties and a grantee of 160 properties.

(10)     The following lawsuits, which individually and collectively disclose material information regarding the business practices of BC57's prospective borrower, were filed by or against EquityBuild in the Circuit Court of Cook County, Illinois:

11

(a)     *EquityBuild, Inc. v. Lams Investment Group, LLC*, Case No. 11-L-3113.

(b)     *James B. Fannin, et al. v. EquityBuild, Inc*., Case No. 15-L-3211.

(c)     *EquityBuild, Inc. v. G-Slow Construction Services, LLC*, Case No. 15-L-3458.

(d)     *Taty Construction, Inc. v. EquityBuild, Inc., et al*., Case No. 16-CH-3189.

(e)     *Brooke Lee v. EquityBuild, Inc*., Case No. 17-L-6742.

## III.     Facts and Documents Supporting Avoidance Against DLP

With regard to the property at 6160 South Martin Luther King Drive, it is the Receiver's position that the security interest provided by EquityBuild to DLP is subject to being deemed a fraudulent transfer.  Currently available facts supporting that position include the following:

- Certain investor lenders provided a loan to EquityBuild in the amount of $4,370,000 on or about November 9, 2016. The list of investor lenders who provided the loan are specifically identified as Exhibit A on the mortgage securing the loan, which was recorded on January 13, 2017. [Chicago Title production (hereinafter identified as "CT"), Ex. 16, CT 105-113]

- A corrective recording of the mortgage deleting EquityBuild as an investor and adding two additional investors to Schedule A was later submitted and recorded on March 7, 2017.  [Ex. 17, CT 93-103]

- An Assignment of Partial Interest in Mortgage from one of the investor lenders identified on Exhibit A to The Entrust Group FBO Daniel Matthews IRA was recorded on October 13, 2017 [Ex. 18, CT 89-91]

- DLP worked with Chicago Title to obtain title insurance associated with the refinancing.  Exception 10 to Chicago Title's original title commitment listed the three recorded

12

instruments described in the preceding paragraphs, and directed that "The original, canceled note or notes secured by the mortgage to be satisfied must be submitted to [Chicago Title]" and "For each entity to join in the release of said Mortgage, the appropriate authority documentation (*e.g.*, entity standing, list of authorized signatories, resolutions, if necessary, etc..) should be furnished." [Direct Lending Partners' production (hereinafter identified as, "DL"), Ex. 19, DL 5087-5097 at 5]

- Chicago Title requested payoff letters for these recorded liens and was informed by EquityBuild that "There is no payoff. They are releasing the mortgage. We will have two original releases to record at closing." [Ex. 20, CT 3140-45]

- Because the releases were being provided without payoffs, a particularly suspicious circumstance, Chicago Title repeatedly asked EquityBuild for information reflecting that no monies were owed to the mortgagees as well as sign off from those mortgagees for their release of their security interests. On May 23, 2018, a senior underwriter for Chicago Title instructed the agent handling the closing that "we need to make sure this is paid with another document to support the release without a payoff" [Ex. 21, CT 2571-3], and the agent related to EquityBuild that "we need to make sure that this note has been paid in full as we are not paying it through closing" [Ex. 22, CT 2605-6; *see also* Ex. 20, CT 3141]

- On its part, DLP appears to have done nothing to ascertain whether Shaun Cohen or EquityBuild Finance had the authority to release the investors' mortgage, but relied solely on its title insurer. Indeed, in response to Interrogatory No. 4 to the standard discovery requests to Institutional Lenders, asking DLP to describe all efforts it took before extending financing to ensure that the investor-lenders had voluntarily released their mortgage interests in the property, DLP responded "DLP required a title commitment/lender policy, a closing protection letter, and

a legal opinion on behalf of the borrower, all of which ensured or otherwise confirmed that DLP's lien was in first priority position."

- On June 6, 2018, the day before the closing, DLP's counsel spoke to Chicago Title and confirmed that "I understand that you are <u>not</u> yet in a position to close since you are waiting on . . . documents relating to the payoff and cancellation of the existing financing. Would you please let us know when you estimate receiving those items?" [Ex. 23, CT 2658 (from DLP's counsel to CT)]

- Despite the lack of answers to such questions that confirmed that the pre-existing secured investor lenders had been paid and released their first position mortgage interest, DLP and Chicago Title ultimately accepted the form of release provided by EquityBuild and the closing proceeded forward.

- The release from EquityBuild that was accepted, however, does not even purport to be given by the individual lenders listed on Exhibit A, nor does it even mention the mortgagees on the earlier recorded mortgage, let alone contain the signatures of any of the mortgagees listed on Exhibit A to the corrected mortgage, or purport to be executed on their behalf.  [Ex. 25, CT 280-82] Instead, the release is just given by EquityBuild Finance LLC, and signed by Shaun Cohen as its President.  And there is no evidence of any actual or apparent authority that Cohen or EquityBuild Finance had to execute such a release on behalf of such mortgagees.  The Collateral Agent and Servicing Agreement ("CASA") provided no such express authority. [*See* Ex. 6 at 11-44]  And, as noted, the release itself does not state that is on behalf of those mortgagees.  Even if the release had contained such language, the CASA provides express language limiting the acts that EquityBuild Finance could take in regards to the mortgage, including but not limited to a prohibition on unilaterally releasing the mortgage

14

without the express written consent of the mortgagees. *Id.* There also is no documentation that has been produced which establishes apparent authority.

- EquityBuild also raised a specific question about the need for a release of the partial interest that had been assigned by one of the original mortgagees to the Entrust Group. [*See* Ex. 26, CT 3351] Chicago Title responded: "We will need to see before closing a copy of the note and assignment of note and we would need a statement from both assignees that no funds are due and owing for the release being presented for recording." [Ex. 27, CT 2553] EquityBuild subsequently provided a signed and notarized release from the Entrust Group. [Ex. 24] The fact that Chicago Title required the signature of a single mortgagee expressly releasing the interest he had obtained by assignment from one of the mortgagees listed on Exhibit A, but nothing from the other mortgagees listed on Exhibit A is striking.

- Given that the prior mortgages recorded against 6160 MLK identified every individual mortgagee, DLP knew or should have known that without having those individual investor mortgagees sign a release, the release provided by EBF and Shaun Cohen was insufficient and required additional follow up.

- Apparently, what DLP and Chicago Title accepted in lieu of a proper release was an Affidavit of Lost Note from Shaun Cohen, individually, dated the day of the June 7, 2018 closing, indicating that "the undersigned was the lender/mortgagee of the Mortgage/Security Instrument in the initial principal amount of $4,370,000 dated recorded 01/13/2017" and stating that, "This affidavit is provided to induce Chicago Title to waive exceptions to title." [Ex. 28, CT 287-88] In their rush to close, DLP and Chicago Title accepted this instrument in lieu of a cancelled note secured by the mortgage to be satisfied, and waived exception 10 despite the fact that Shaun Cohen was not the mortgagee, and EquityBuild had never provided a signoff from

15

actual mortgagees for their release of the mortgage nor the appropriate authority documentation for each entity joining in the release.

- As persuasive but not binding authority, this Court's decision of February 15, 2023 (Dkt. 1386) is also instructive in regards to such issues in regards to lack of actual and apparent authority.

- DLP did not conduct adequate due diligence. Little if any diligence was performed in conjunction with the personal financial statement provided by Jerry Cohen. Proper due diligence not only would have focused more upon the recorded mortgage and the problematic release, but would have also uncovered at the least the following facts that would have demanded further inquiry:

(1) Jerome Cohen was a fugitive from justice in Pennsylvania in November 1993.

(2) American Home Rentals, a company operated by Jerome Cohen and Steve Cohen, was sued by the Preate's Bureau of Consumer Protection in February 1993 for defrauding customers of about $350,000 over a period of two years.

(3) In June 1993, the Deputy Attorney General of Pennsylvania sued American Home Rentals for violating an injunction by operating under a different name.

(4) In September 1994, American Home Rentals was sued by the Commonwealth of Pennsylvania for systematically violating the state Unfair Trade Practice and Consumer Protection Law.

(5) More than 100 real estate tax lien petitions were filed against Jerome Cohen by the City of Philadelphia.

(6)     Jerome Cohen filed a personal bankruptcy petition in the United States District Court for the Middle District of Florida in September 1994 and that case was transferred to the Eastern District of Pennsylvania in January 1995.

(7)     Jerome Cohen was the subject of an unsatisfied judgment in the amount of $66,991.

(8)     An Internet discussion forum hosted by Bigger Pockets at *https://www.biggerpockets.com/forums/311/topics/300843-has-anyone*-invested-*in-any-of-the-equitybuild-properties* contained a series of comments posted by Lindsay Hirsch, who stated that her father, Gordon Hirsch, an attorney who committed suicide shortly after he withdrew from his representation of EquityBuild, left a note stating that that the company was running a Ponzi scheme and stating that: "Shaun [Cohen] is using investor money to buy and rehab properties owned by his father Jerry. Crazy mortgages are put on the property and EquityBuild abandons them."

(9)     The Cook County Recorder of Deeds website identifies EquityBuild as a grantor of 190 properties and a grantee of 160 properties.

(10)    The following lawsuits, which individually and collectively disclose material information regarding the business practices of BC57's prospective borrower, were filed by or against EquityBuild in the Circuit Court of Cook County, Illinois:

>    (a)     *EquityBuild, Inc. v. Lams Investment Group, LLC*, Case No. 11-L-3113.
>
>    (b)     *James B. Fannin, et al. v. EquityBuild, Inc.*, Case No. 15-L-3211.
>
>    (c)     *EquityBuild, Inc. v. G-Slow Construction Services, LLC*, Case No. 15-L-3458.
>
>    (d)     *Taty Construction, Inc. v. EquityBuild, Inc., et al.*, Case No. 16-CH-3189.

17

(e)     *Brooke Lee v. EquityBuild, Inc*., Case No. 17-L-6742.

\*     \*     \*     \*

The Receiver reserves the right to rely upon or cite to other evidence supporting its positions in this Disclosure in its later submissions including but not limited to any information and documents cited by other claimants that is presented in their position statements.

Dated:  November 8, 2023                    Respectfully submitted,

                                            s/ Michael Rachlis
                                            Michael Rachlis
                                            Jodi Rosen Wine
                                            Rachlis Duff & Peel, LLC
                                            542 South Dearborn Street, Suite 900
                                            Chicago, IL 60605
                                            Phone (312) 733-3950
                                            mrachlis@rdaplaw.net
                                            jwine@rdaplaw.net

                                            *Attorneys for Kevin B. Duff, Receiver*

18

## CERTIFICATE OF SERVICE

I hereby certify that I provided service of the foregoing Receiver's Group 2 Disclosure, via ECF filing, to all counsel of record on November 8, 2023.

I further certify that I caused true and correct copies of the foregoing to be served upon the following individuals or entities by electronic mail:

-    All known individuals or entities that submitted a proof of claim in this action (sent to the e-mail address each claimant provided on the claim form).

I further certify that the Receiver's Group 2 Disclosure will be posted to the Receivership webpage at: http://rdaplaw.net/receivership-for-EquityBuild

/s/ Michael Rachlis

Michael Rachlis
Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Phone (312) 733-3950
Fax (312) 733-3952
mrachlis@rdaplaw.net

*1900434067*

Doc# 1900434067 Fee $60.00

RHSP FEE:$9.00 RPRF FEE: $1.00
EDWARD M. MOODY
COOK COUNTY RECORDER OF DEEDS
DATE: 01/04/2019 02:04 PM  PG:  1 OF 1

**RECORDING REQUESTED BY:**
Chicago Title Company
Prepared by
AND WHEN RECORDED MAIL TO

NAME        SHATAR CAPITAL PARTNERS
ADDRESS     12121 WILSHIRE BLVD, STE. 555
CITY, ST & ZIP   LOS ANGELES, CA 90025
"Accumulation Recording" Parcel 1
"CT" 8984422   108 2

# ASSIGNMENT OF MORTGAGE

**FOR VALUE RECEIVED**, the undersigned hereby grants, assigns and transfers to
**PAKRAVAN LIVING TRUST**
all beneficial interest of said Trustor(s) AS SPECIFIED UNDER EXHIBIT "A" Beneficiary List, under that certain Mortgage dated MARCH 30, 2017 executed by
7749-59 S. Yates **LLC, an Illinois limited liability company** Trustor(s),        to
**1111 Crest Dr. LLC, a California limited liability company, as to undivided 50% ownership**
**Abraham Aaron Ebriani, a Simgle Man, as to undivided 14% ownership**
**Hamid Esmail, a Single man, as to undivided 14% ownership**
**Farsaa Inc., a California company, as to undivided 22% ownership, Trustee(s),**
and recorded as Instrument No. **1709445117** on **April 4, 2017** in book **N/A** page **N/A**, of Official Records in the County Recorder's office of **COOK** County, ILLINOIS, describing land therein as:

PIN: 21-30-318-013-0000
Address: 7749-59 South Yates Boulevard, Chicago, IL 60649

Legal Description
LOTS 19, 20 AND 21 IN BLOCK 12 IN SOUTH SHORE PARK, BEING A SUBDIVISION OF THE WEST HALF OF THE SOUTHWEST QUARTER OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Mortgage.

Dated 11/20/2018

Signature _Ebriani_

Printed Name _Abraham Aaron Ebriani_

_Box 400_

OSMAN POSADA
Commission # 2144675
Notary Public - California
Los Angeles County
My Comm. Expires Mar 1, 2020

On 11/20/2018 before me  Osman Posada a Notary
(here insert name and title of the officer), personally appeared _Abraham A. Ebriani_, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
**I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.**
WITNESS my hand and official seal.

Signature _Osman P._                                    (Seal)

OSMAN POSADA
Commission # 2144675
Notary Public - California
Los Angeles County
My Comm. Expires Mar 1, 2020

**Exhibit 1**

DOCUMENT PROVIDED BY STEWART TITLE OF CALIFORNIA, INC.

ASSGNDT1.DOC

SHATAR_CAP0000975



```
*1900434068*

Doc# 1900434068 Fee $60.00

RHSP FEE:$9.00 RPRF FEE: $1.00
EDWARD M. MOODY
COOK COUNTY RECORDER OF DEEDS
DATE: 01/04/2019 02:04 PM  PG: 1 OF 1
```

RECORDING REQUESTED BY:
Chicago Title Company
Prepared by
AND WHEN RECORDED MAIL TO

NAME       SHATAR CAPITAL PARTNERS
ADDRESS    12121 WILSHIRE BLVD, STE. 555
CITY, ST & ZIP    LOS ANGELES, CA 90025
"Accomodation Recording" Parcel 2
"CT" 8984422  208 2

# ASSIGNMENT OF MORTGAGE

**FOR VALUE RECEIVED**, the undersigned hereby grants, assigns and transfers to
**PAKRAVAN LIVING TRUST**
all beneficial interest of said Trustor(s) AS SPECIFIED UNDER EXHIBIT "A" Beneficiary List, under that certain Mortgage dated
MARCH 20, 2017 executed by
**5450 S. Indiana LLC, an Illinois limited liability company** Trustor(s),     to
**1111 Crest Dr. LLC, a California limited liability company, as to undivided 50% ownership**
**Abraham Aaron Ebriani, a Simgle Man, as to undivided 14% ownership**
**Hamid Esmail, a Single man, as to undivided 14% ownership**
**Farsaa Inc., a California company, as to undivided 22% ownership**, Trustee(s),
and recorded as Instrument No. **1709445116** on **April 4, 2017** in book **N/A** page **N/A**, of Official Records in the County
Recorder's office of **COOK** County, ILLINOIS, describing land therein as:

PIN: 20-10-310-056-0000
Address: 5450 South Indiana Avenue, Chicago, IL 60615

Legal Description
LOT 1 IN SIDNEY A. KENT'S SUBDIVISION OF LOTS 1 TO 19, INCLUSIVE, IN BLOCK 1 IN KENT AND WILLOUGHBY'S
SUBDIVISION OF PART OF THE SOUTHWET QUARTER OF SECTION 10, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE
THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE MAP OF SAID SUBDIVISION RECORDED MAY 3, 1889, IN BOOK 35 OF
PLATS, PAGE 5, AS DOCUMENT 1095293, IN COOK COUNTY, ILLINOIS

TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon with interest, and all
rights accrued or to accrue under said Mortgage.

Dated 11/20/2018

Signature

*Abraham Aaron Ebriani*
Printed Name

Box 400

On 11/20/2018 before me OSMAN POSADA, a NOTARY
(here insert name and title of the officer), personally appeared Abraham A. Ebria who proved to me on the basis of
satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to
me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on
the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
**I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is
true and correct.**
WITNESS my hand and official seal.

Signature _____ (Seal)

OSMAN POSADA
Commission # 2144675
Notary Public - California
Los Angeles County
My Comm. Expires Mar 1, 2020

DOCUMENT PROVIDED BY STEWART TITLE OF CALIFORNIA, INC.

ASSGNDT1.DOC

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
                  EASTERN DIVISION


UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,
                                Civil Action No.
             Plaintiff,         18-cv-5587

        vs.                     Hon. Manish S. Shah

EQUITYBUILD, INC., EQUITYBUILD    Magistrate Judge
FINANCE, LLC, JEROME H. COHEN     Young B. Kim
and SHAUN D. COHEN,

             Defendants.
```

The Zoom vidoeconference deposition of

EZRI NAMVAR, called by the Defendants for

examination, pursuant to Notice, and pursuant to

the Rules of Civil Procedure for the United States

District Courts pertaining to the taking of

depositions, taken remotely before Joanne M.

Gagliardi, a Certified Shorthand Reporter and

Registered Professional Reporter, on November 1,

2023, at the hour of 1:00 p.m.

REPORTED BY:  Joanne M. Gagliardi, CSR, RPR

LICENSE NO.:  084-002466

JOB NO.:  21443

<div style="float:right">

**Exhibit**

**2**

exhibitsticker.com

</div>

**312.345.1500**
**847.551.3460**

*Precise* KRUSE

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

                                                              Page 2

1    APPEARANCES:

2

3    U.S. SECURITIES AND EXCHANGE COMMISSION
     BY MR. BENJAMIN HANAUER
4    175 West Jackson Blvd.
     Suite 1450
5    Chicago, Illinois  60604
     312-353-8642
6    hanauerb@sec.gov

7        appeared remotely on behalf of Plaintiff.

8

9    RACHLIS DUFF AND PEEL, LLC
     BY MS. JODI ROSEN WINE
10   542 South Dearborn Stree
     Suite 900
11   Chicago, Illinois  60605
     312-275-5102
12   jwine@rdplaw.net

13       Appeared remotely on behalf of Defendants;

14

15   LOEB & LOEB, LLP
     BY MR. ANDREW R. DEVOOGHT
16   BY MS. ALEXANDRA J. SCHALLER
     321 North Clark Street
17   Suite 2300
     Chicago, Illinois  60654
18   312-464-3100
     devooght@loeb.com
19   aschaller@loeb.com

20       Appeared remotely on behalf of Shatar
         Capital LLC and Deponent;

21

22

23

24

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 3

```
 1   APPEARANCES CONTINUED:

 2

 3     CHERNY LAW
       BY MR. WILLIAM CHERNY
 4     111 East Jefferson Avenue
       Naperville, Illinois  60540
 5     630-219-4384
       bill@chernylaw.com
 6
             Appeared remotely on behalf of Shatar
 7           Capital LLC;

 8

 9     TOTTIS LAW
       BY MR. MAX A. STEIN
10     401 North Michigan Avenue
       Suite 530
11     Chicago, Illinois  60611
       312-527-1400.
12     mstein@tottislaw.com

13           Appeared remotely on behalf of Individual
             Investors.
14

15

16

17   ALSO PRESENT:

18     MS. CAROLYN MIZE

19     MR. EITAN BLANC

20

21

22

23

24
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 4

```
 1                    I N D E X

 2                  EZRI NAMVAR

 3                                           PAGE

 4    MS. WINE:

 5      DIRECT EXAMINATION                      6

 6

 7    MR. STEIN:

        CROSS EXAMINATION                     80
 8

 9    MR. DEVOOGHT:

10      CROSS EXAMINATION                     128

11

12

13
                    INDEX TO EXHIBITS
14
      NUMBER          DESCRIPTION           PAGE
15
      Exhibit 1    Notice of 30(b)(6) Deposition    8
16    Exhibit 2    Proof of Claim Form        18
      Exhibit 3    Demand Statement           24
17    Exhibit 4    November 22, 2016, Email    30
      Exhibit 5    December 23, 2016, Email    38
18    Exhibit 6    December 23, 2016, Email Chain    43
      Exhibit 7    December 27, 2016, Email Chain    50
19    Exhibit 8    March 7, 2017, Email Chain    52
      Exhibit 9    March 15, 2017, Email Chain    58
20    Exhibit 10   March 30, 2017, Email Chain    62
      Exhibit 11   Mortgage                   65
21    Exhibit 12   Mortgage, Assignment of Leases and    68
                   Rents, Fixture Filing, and Security
22                 Agreement
      Exhibit 13   April 19, 2017, Email Chain    75
23    Exhibit 14   March 15, 2017, Email Chain    121

24
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 5

1        THE REPORTER:  If I could have everyone

2    present on the Zoom call at this time state

3    their name, if they represent a party, just

4    so I could have a record of who is present.

5        MS. WINE:  I'll begin.  This is Jodi

6    Rosen Wine here on behalf of the receiver.

7        MR. DEVOOGHT:  Andy DeVooght and Ali

8    Schaller on behalf of Shatar Capital and its

9    30(b)(6) designee who is sitting for the

10    deposition today.

11        MR. CHERNY:  William Cherny, C-h-e-r-n-y,

12    on behalf of Shatar Capital, LLC.

13        MR. STEIN:  Max Stein on behalf of

14    individual investors.

15        MR. HANAUER:  Good afternoon.  This is

16    Ben Hanauer for the SEC.

17        THE REPORTER:  Thank you.  I have a

18    Carolyn Mize.  She also has no microphone or

19    camera, so she's present she said for MID LLC

20    in Group 2.  And Mr. Blanc is here as an

21    observer.

22        MR. NAMVAR:  Ezri Namvar, witness.

23        THE REPORTER:  Thank you.  And if I could

24    just put a statement on the record.  Good

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 6

1      afternoon.  My name is Joanne Gagliardi, and

2      I am a Certified Shorthand Reporter.

3            Before we proceed, pursuant to Federal

4      Rules of Civil Procedure 30(b)(4) regarding

5      remote electronic depositions, I will ask

6      counsel to agree on the record that there is

7      no objection to myself administering a

8      binding oath to the witness remotely.

9            Counsel, please state your name and your

10     agreement on the record.

11           MS. WINE:  Jodi Wine.  I agree with the

12     procedure.

13           MR. DEVOOGHT:  Andrew DeVooght.  We agree

14     with the procedure.  Thank you.

15           MR. CHERNY:  Bill Cherny.  We agree.

16           MR. STEIN:  Max Stein.  Agreed.

17           MR. HANAUER:  Ben Hanauer.  Agreed.

18           THE REPORTER:  Sir, if I could have you

19     raise your right hand, please.

20                 (Witness sworn.)

21

22

23

24

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 7

```
 1                    EZRI NAMVAR,
 2   called as a witness on behalf of defendants,
 3   having been first duly sworn, was examined and
 4   testified as follows:
 5                 DIRECT EXAMINATION
 6   BY MS. WINE:
 7       Q.   Okay, thank you.  Mr. Namvar, could you
 8   please state your full name.
 9       A.   First name is Ezri, E-z-r-i.  Last name
10   is Namvar, N, as Norman, a-m, as Mary, V, Victor,
11   a-r.
12          MS. WINE:  Thank you.  So everyone, I am
13       going to put in the chat a link to a Dropbox,
14       and I'm going to attempt to seamlessly put
15       deposition exhibits into that Dropbox as I
16       use them.  Can everyone see a link?
17          MR. DEVOOGHT:  Yes.
18          MS. WINE:  There's currently one exhibit.
19       I'm also going to put it on the screen.
20       There's no reason you have to download it or
21       view it separately.  I just thought if
22       counsel wanted a copy, that that was the best
23       way to do that.
24          So I'm going to go ahead and seamlessly
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 8

```
 1      again share my screen.

 2   BY MS. WINE:

 3      Q.   So, Mr. Namvar, are you able to see on

 4   the screen the document that I'm marking as

 5   Exhibit 1?

 6      A.   I am seeing the top of the first page.

 7      Q.   And I tried to make it big enough for

 8   people to see it.  I may have to shrink it a

 9   little to get more text on the screen, but Exhibit

10   1 is the notice of this deposition, and the

11   deposition is of Shatar Capital Partners.

12      A.   Can you please hold one second?  Can I

13   turn up the volume here or not?  What do I do?

14   This one?

15         Okay.  Go ahead.  Sorry about that.

16      Q.   So do you understand that you're here

17   today to testify on behalf of Shatar Capital

18   Partners?

19      A.   Yes.

20      Q.   And the mortgage loans that are the

21   subject of Shatar Capital's involvement in this

22   case do use the term Shatar Capital Partners to

23   identify the identity.  Many of the other

24   documents I've seen say Shatar Capital Inc.
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 9

1          So my first question to you is:  What is

2     the difference between Shatar Capital Partners and

3     Shatar Capital Inc.?

4     A.    I don't think there is any difference.  I

5     don't know who brought partners up, but it's

6     Shatar Capital Inc.

7     Q.    So that is a corporation?

8     A.    It is a corporation.

9     Q.    And what state is it incorporated?

10    A.    California.

11    Q.    And when was Shatar Capital Inc.

12    incorporated?

13    A.    Early part of 2016.

14    Q.    Okay.  And do you know who incorporated

15    the entity?

16    A.    Yes, my son, Daniel Namvar.

17    Q.    And is Daniel Namvar an officer of Shatar

18    Capital Inc.?

19    A.    Yes.

20    Q.    For purposes of this deposition if I

21    mention Shatar or the company, we understand that

22    to mean I'm talking about either Shatar Capital

23    Partners or Shatar Capital Inc., which you say are

24    one and the same thing?

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 10

```
 1      A.    Yes.

 2      Q.    Who are the officers of Shatar Capital?

 3      A.    As far as I know, only Daniel.

 4      Q.    You're not an officer of the company?

 5      A.    No.

 6      Q.    How many employees does Shatar Capital

 7   have currently?

 8      A.    Employees like on salary-type employees,

 9   none.

10      Q.    So they have no payroll, no W-2

11   employees?

12      A.    No.

13      Q.    Who other than Daniel Namvar is working

14   at or with the company?

15      A.    Just Daniel.

16      Q.    Okay.  As of 2017 when the loans that

17   brings us here today were made, how many employees

18   did the company have?

19      A.    None.

20      Q.    Have you ever been employed by Shatar

21   Capital?

22      A.    No.

23      Q.    What is your relationship to Shatar

24   Capital?
```

312.345.1500
847.551.3460

*Precise* KRUSE

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 11

```
 1      A.   We've been called analyst, underwriter,
 2  somebody who knows the loan business and can
 3  handle loans and whatever --
 4      Q.   If I can ask you to speak up a little
 5  bit.  I'm not sure I heard.
 6           MS. WINE:  Joanne, I don't know if you
 7      heard the answer.
 8           THE REPORTER:  Do you want me to read it?
 9           MS. WINE:  Sure, would you read it,
10      please.
11                (Record read.)
12  BY MS. WINE:
13      Q.   And whatever what?
14      A.   Whatever relates to making a loan.
15      Q.   Okay.  And what is the business of the
16  company?
17      A.   It's a real estate brokerage business
18  which their license involves them to do loans.
19  Also real estate loans, because I am buying and
20  selling real estate projects, earning a
21  commission.
22      Q.   Okay.  And making loans, what percentage
23  of the business would you say is making loans?
24      A.   At that time?
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 12

1    Q.   Yes, thank you.  In 2017.

2    A.   Over 60, 70 percent.

3    Q.   And how about currently?

4    A.   Currently Shatar Capital is very

5    inactive, not much.

6    Q.   Give me one minute.  I'm going to try to

7    get my volume up a little bit.

8         Okay.  Thank you.  Before getting into

9    the specific loans, let me back up a minute.  I

10   wanted to ask you about this deposition notice.

11   Are you -- have you seen the last page of this

12   notice, Schedule A, which is the topics for this

13   deposition?

14   A.   Yeah, I'm sure when we received it, we

15   saw it.

16   Q.   Have you prepared yourself to testify

17   about the information that's known or reasonably

18   available to Shatar Capital about these topics?

19   A.   Yes.

20   Q.   And have you been designated to testify

21   about each one of these topics?

22   A.   Yes.

23   Q.    In 2017 or that time period, 2016, 2017,

24   how did it Shatar Capital identify deals or loans

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 13

```
1   that they were interested in?
2        A.   They were what?  How did we identify the
3   loans that people needed money?
4        Q.   Right.  How did Shatar Capital get
5   business?
6        A.   Word of mouth.
7        Q.   Okay.  And can you kind of describe what
8   due diligence the company did before making a loan
9   just in general at that time?
10       A.   Every loan is different.
11       Q.   In what way?
12       A.   There's not a set formula.
13       Q.   I'm sorry.  Can you repeat that?
14       A.   We do not have a set formula like
15  institutional lenders, every loan is different and
16  custom made.
17       Q.   Were there any general practices that
18  were employed on each and every loan?
19       A.   You are talking items in common with
20  every loan?
21       Q.   Correct.
22       A.   We are looking at the title report to
23  make sure 99.9 percent of our loans are first
24  mortgages, to make sure that we had a clean title
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 14

```
 1    commitment to make a first mortgage.  Over 70 or
 2    80 percent of the loans we do we might run a
 3    credit report, and then, of course, the loan
 4    documents depending on the location and the type
 5    of the property, reviewing, me or our lawyers, the
 6    commitment letter -- title commitment to see what
 7    kind of endorsements, if any, we might need, and
 8    finding a way to be comfortable with the
 9    valuation.
10         Q.   Does that mean valuation of the
11    property --
12         A.   Yes.
13         Q.   -- that's being used as collateral for
14    the loan?
15         A.   That's the most important thing.  That's
16    an overwhelming -- that condition trumps
17    everything else because we are hard money lenders.
18         Q.   Can you explain what you mean by hard
19    money lender?
20         A.   Not institutional, not a bank.  We
21    don't -- hard money lender.  We are private money,
22    hard money lenders, not as many requirements.  We
23    don't look at tax returns usually.  We -- in most
24    cases we don't get an appraisal because -- unless
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 15

1   the borrower comes with an old appraisal or a new

2   appraisal.  They have it, so we'll take it for our

3   files and gather the information from the

4   appraisal.

5          You just wanted to know what hard money

6   means?  I don't understand.  I mean I explained it

7   as much as I could.

8      Q.   Okay.  How do you get comfortable with

9   the valuation if you don't have an appraisal?

10     A.   Most of the loans we have made during the

11  last -- since 2017 anyways, most of them, more

12  than 80, 90 percent, have been purchase money

13  loans.  My duty and function is to make sure that

14  the purchase contract is not -- is real.  It's not

15  somebody playing funny, double escrowing.  It's

16  arm's length, for lack of a better word.  If it's

17  arm's length, and I ask sizes, number of units,

18  blah, blah, and then I will feel comfortable about

19  the value.

20         The refinancing, which is not this case

21  anyway, it's harder process.  We need to know when

22  they bought it, how much they spend in it; and we

23  always like the borrowers, excuse the term, to be

24  pregnant.  They have to have their own money in

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 16

```
 1   the deal.  They cannot, you know, cash out, so to
 2   speak.
 3       Q.   What do you do to evaluate the
 4   creditworthiness of the borrower?
 5       A.   Not much unless I make a couple of calls
 6   or run a credit report to make sure they're not in
 7   bankruptcy or they have judgments against them;
 8   and even if they do, we sometimes close our eyes
 9   to that if they give us explanation.  That's
10   another function of the hard money lender.  We're
11   not as stringent as banks and institutions.
12       Q.   Shatar Capital has filed a claim in the
13   SEC action that we're appearing here today in,
14   correct?
15       A.   Yes.  I remember we getting a Proof of
16   Claim from you guys or your client, and we filled
17   it and sent it.
18       Q.   Okay.  Who did the -- who prepared the
19   Proof of Claim Form?
20       A.   There was a girl in the office called
21   Maria Yellon (phonetic).  I don't know how to
22   spell her last name.  Maria did this.  And I
23   looked at it, and I'm sure Daniel looked at it
24   too.
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 17

```
 1      Q.    I've seen email correspondence with Maria
 2   that the domain is nutfarmers.com?
 3      A.    Nut Farmers is the major employer.
 4      Q.    What is Nut Farmers?
 5      A.    They are into pistachio and almond
 6   farming.  That's the main business.
 7      Q.    And whose company is that?
 8      A.    I really don't know, but it belongs to my
 9   brother's family.  I don't know if it's his wife
10   or son, my nephew.  I don't know.  I don't know
11   the makeup of the company, and they have a lot of
12   other partners too, outside partners.
13      Q.    What's your brother's name?
14      A.    Mousa, M-o-u-s-a.
15      Q.    So are you telling me that employees of
16   Nut Farmers worked for Shatar?
17      A.    They didn't work for Shatar.  We could
18   pull them to do accounting and other things, and
19   whether we pay them or not I'm not sure.  I know
20   in some cases we paid them, reimbursed like their
21   hours or whatever; but it was like the accounting
22   or keeping track of the payments because it's not
23   too time-consuming.
24      Q.    Okay.  And there's another gentleman that
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 18

1   was involved in the communications relating to

2   this loan named Andrew Calleja, C-a-l-l-e-j-a.

3       A.   Andrew Calleja, I'm glad you brought him

4   up.  I think at some time -- he is not here

5   anymore for years.  Way before COVID he went to

6   the Philippines, and he kept servicing the loans

7   until maybe two years ago, year and a half ago.

8   He would keep track of the payments and bill

9   people maybe for the payments if the interest

10  wasn't already prepaid.  He was at the Nut Farmers

11  office too.

12      Q.   But he didn't work for Shatar Capital?

13      A.   I'm 99 -- I don't know.  I don't think he

14  was ever an employee of Shatar Capital.  That's

15  easy to find out, but I don't know.

16      Q.   Okay.  I've now put in the Dropbox

17  folder -- I gave people access to an Exhibit 2.

18  You may need to refresh your computer to...

19          MR. DEVOOGHT:  Jodi, are you going to put

20      it on the screen?

21          MS. WINE:  Yeah.  I was just looking at

22      the chat.  Some back and forth about this

23      exhibit or the Dropbox link.

24          MR. DEVOOGHT:  Okay.  Got it.

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 19

1      MS. WINE:  Can everyone now see a Proof

2    of Claim Form that has been marked as Exhibit

3    2?

4  BY MS. WINE:

5    Q.   Mr. Namvar, you can see that on the

6  screen?

7    A.   Yes.

8    Q.   And this was a Proof of Claim that was

9  submitted by:  "Shatar Capital Inc., et al.

10  (Please see Exhibit A attached)."  Do you see

11  that?

12    A.   Yes.

13    Q.   Is the Exhibit A that was attached the

14  list of lenders that was attached to the mortgage?

15    A.   I don't know.  Show me Exhibit A and I'll

16  tell you.

17    Q.   The way that we got this, there were

18  hundreds of pages attached to the claim form.  The

19  only thing that was marked as Exhibit A was

20  attached to promissory note and the mortgage --

21  mortgages, plural, related to the properties

22  located at 5450 South Indiana and 7749 South

23  Yates.  I wasn't clear on what was meant by

24  "please see Exhibit A attached."

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 20

1    A.   I imagine, I'm not sure, that when we do

2   the loan documents, usually always Exhibit A is

3   the legal description.  So this Exhibit A and that

4   Exhibit A may be different, if you just got the

5   legal description.

6           I'm imagining, imagining, unless you show

7   me something, that this Exhibit A here talks about

8   the breakdown of monies owed.  If you put the

9   investor's name in there, that could be, but I

10   can't testify to anything unless I see this

11   Exhibit A or the other Exhibit A, if I have to

12   distinguish.

13    Q.   Let me just ask you this:  Who is the

14   claimant on the claim that has been asserted by

15   Shatar Capital?

16    A.   Right now it would be Shatar Capital.

17   You can call it anybody you want, or the

18   investors; and if we get anything, we will -- by

19   the way, hold one second, please.

20           Bill, where are you?  Which one is Bill?

21   Bill Cherny?

22           MR. CHERNY:  I'm here.

23           THE WITNESS:  You're here, okay.  What

24      did you ask?  What was your last question?

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 21

1      Sorry.  It would be the -- the claimants

2      would be either Shatar on behalf of the

3      current noteholders.  I don't know the

4      percentages, but I can tell you who they are,

5      or themselves directly.  It doesn't make any

6      difference.  They trust us.  We have always

7      distributed any money we got, et cetera, et

8      cetera.

9   BY MS. WINE:

10     Q.   And the claim submitted by Shatar Capital

11  in this case related to the two properties I just

12  identified, 5450 South Indiana and 7749 South

13  Yates?

14     A.   Correct.

15     Q.   And are there any other loans that Shatar

16  Capital had outstanding with EquityBuild?

17     A.   At that time I'm not sure, but I think we

18  made EquityBuild one loan before this loan.  I'm

19  not sure.  I don't know the dates of when they

20  were due or not, but the one we made before this

21  loan we got paid.

22     Q.   Okay.  So your understanding is Shatar

23  Capital made two different loans to EquityBuild,

24  one of them was paid off and this one resulted in

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 22

1    this claim?

2         A.    I don't want to say Shatar Capital made.

3    I like to say the word arranged, Shatar Capital

4    arranged.

5         Q.    Okay.  I think we go to the last page of

6    this exhibit, let me explain.  The third to the

7    last page has signature of Daniel Namvar.  He's

8    the one that signed this Proof of Claim, correct?

9         A.    Are you asking me a question?

10        Q.    Yes.

11        A.    What's the question?

12        Q.    This claim was submitted by Daniel

13   Namvar?

14        A.    I'm assuming so, yes.  I have no reason

15   to doubt it.

16        Q.    And let me just explain to you these last

17   pages that are appended on to Exhibit 2 sets out

18   some of the information on the exhibit the way

19   these claim forms were generated.  I'll give you

20   an example.  On page 5 of the exhibit where it

21   says:  "Describe the basis for other amounts you

22   claim," do you see that there?

23        A.    Yes.

24        Q.    This information was pretty much

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 23

 1    illegible on the form as printed out, so there's a

 2    separate document that has that information, the

 3    other claimed amounts basis.  This is the

 4    information that was typed into that section of

 5    the claim form.

 6             I'm not asking a question there.  Since I

 7    went to the end of the document and saw this, if

 8    anyone wants to see any information that's not

 9    legible, this is where it can be found.

10             MR. DEVOOGHT:  Thank you.

11    BY MS. WINE:

12       Q.   Section 3 of this claim form indicates

13    $240,750.30 was the total amount received from the

14    receivership defendants.  Do you see that?

15       A.   I see the number, yes.

16       Q.   And that same number is listed under

17    interest that was received on this loan?

18       A.   Okay.

19       Q.   And then there's another $100,000

20    principal returned to you?

21       A.   Correct.

22       Q.   So based on that you're listing

23    $340,750.30 that was received by Shatar Capital on

24    this loan?

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 24

1    A.   Yes, interest entries.

2    Q.   And the total amount loaned was

3  $1,800,000?

4    A.   Correct.

5    Q.   If we go to section 5 of the document.

6  Sorry if I'm making you dizzy.  I believe it is

7  section 5.  Okay.  Section 5 shows outstanding

8  principal balance of $2,247,163.78.  Do you see

9  that?

10    A.   Yes.

11    Q.   How did the principal balance increase by

12  almost $450,000?

13    A.   Probably default rates and legal fees,

14  calculated and default rates which are not allowed

15  and add any out-of-pocket fees.  That's not

16  unusual.

17    Q.   So you're adding default interest and

18  legal fees to the principal balance of the loan?

19    A.   Yes, as our note allows.

20    Q.   The loan documentation allows that?

21    A.   The loan documents is very specific about

22  default rates and legal fees and collection fees.

23    Q.   Let me show you then another exhibit

24  which I will mark as Exhibit 3.  Do you see a

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 25

1   Demand Statement that's been marked as Exhibit 3

2   on your screen?

3       A.   Yes.

4       Q.   Okay.  And this document is dated June 5,

5   2023?

6       A.   What?

7       Q.   Do you see the document is dated June 5,

8   2023?

9       A.   That's a few months ago.  I see that

10  date, yeah.

11      Q.   Okay.  And the header on this document

12  says Shatar Holdings LLC?

13      A.   That -- yeah, that's the service there

14  now.  Most servicing is done by Shatar Holdings.

15      Q.   So Shatar Holdings LLC is a separate

16  company from Shatar Capital Inc. and Shatar

17  Capital Partners?

18      A.   Yes.  Shatar Capital Partners and Inc.

19  are the same, but this one is different.

20      Q.   And Shatar Holdings LLC, who are the

21  members of that entity?

22      A.   Pardon?  What was your question?

23      Q.   Shatar Holdings LLC is a limited

24  liability company, correct?

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 26

```
 1      A.   Yes.

 2      Q.   And who are the members of that company?

 3      A.   I don't know the exact members, but maybe

 4  my nephew is one, Mousa's son, and for sure I know

 5  Daniel is not involved.

 6      Q.   Are you a member of that LLC?

 7      A.   No.

 8      Q.   What is Mousa's son's name?

 9      A.   Ariel.

10      Q.   Namvar also?

11      A.   Yes.

12      Q.   And on Exhibit 3 do you see that the

13  total amount due by June 5, 2023 is over 5 million

14  dollars?

15      A.   I don't know how we got there, but it's

16  probably a different -- I don't know.  Let me see.

17  Can you go up?  Let me see this.

18      Q.    I will go up to the top.  It appears that

19  every month there's a monthly interest due and a

20  10 percent penalty that's added to the principal

21  balance and then some legal fees which are showing

22  up in blue, and those are all added to the

23  principal balance -- this doesn't show principal

24  balance.  I'm sorry.  The column does say
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 27

```
 1   principal balance, so the $5,048,000 is the
 2   principal balance as of June 5, 2023.
 3   (Simultaneous talking.)
 4          THE REPORTER:  I'm sorry.  I didn't hear
 5      that.
 6          THE WITNESS:  I said I will make you a
 7      deal.  Give me 3 million, we are done.
 8          MR. DEVOOGHT:  Let's let her ask
 9      questions.  You can answer her questions.
10          THE WITNESS:  All right.
11   BY MS. WINE:
12      Q.   Okay.  Your testimony is that your loan
13   documentation enables you to add all of these fees
14   and interest to the principal balance, correct?
15      A.   I really am not sure, I'll be honest with
16   you, about the late charges.  The default rate,
17   yes, 100 percent.  I don't think once the loan
18   matures you can charge those late charges.  The 10
19   percent late fees we're willing to waive it and
20   take it off the statement.  They don't -- I don't
21   think they legally apply, according to California
22   law anyways.  Default rate does for sure.
23      Q.   Turning back to Exhibit 2, section 5D
24   lists the payments that were received, do you see
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 28

```
 1   that, D, Details About Money Returned and/or Paid
 2   To You?  And this lists a $1,000 payment on April
 3   4, 2017, which is identified as a per diem.  Do
 4   you understand that to be money that was paid out
 5   at the closing of the loan?
 6        A.   I'm not sure.  Sometimes the way our
 7   format works, if we close, if we close, we get
 8   prepaid interest for the amount of -- for the
 9   number of days till the 1st of the month.  And
10   then the first payment comes due the 1st of the
11   following month, the next month.
12        Q.   Okay.  And that's consistent with the
13   documents that we've seen in this case that
14   there's $1,100 per diem paid at the loan closing?
15        A.   Yes, from 26 days.
16        Q.   It's actually two days?
17        A.   Assuming.  Because let's just say we
18   close on April 4, and then to May 1 it's 26 days
19   so we would charge that; but the next payment is
20   not due May 1.  It's due June 1 because interest,
21   unlike rent, gets paid at the rears, at the end of
22   each month, not the beginning of each month.
23        Q.   Okay.  And this Proof of Claim Form
24   listed -- and it's going to be hard for you to see
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 29

1    that, but there's 15 payments of $16,500 listed?

2       A.   If my memory serves me right, we were

3    never late on this loan.  It was performing like

4    clockwork until your clients came in.

5       Q.   Okay.  In July of 2018 a principal

6    payment of $100,000 was made.

7       A.   Correct.

8       Q.   And then the payment in August was

9    increased to $16,666.66.  Do you know why that

10    happened?

11       A.   Unless there was a late charge I don't

12    know.  It should have gone down, not up.

13       Q.   I want to talk about EquityBuild now.

14    What was the first contact that Shatar Capital had

15    with someone at EquityBuild?

16       A.   I, as a representative, Ezri.  I just

17    want to make sure.  There was a guy named Chris

18    Miro [sic] that was introduced to me by somebody

19    else, Doron Kermanian.

20       Q.   Just to interrupt for the court reporter,

21    Chris Mora is spelled M-o-r-a, correct?

22       A.   M-i-r-o I think.  Mora -- I don't think

23    it was Mora.  It was Miro I think.

24       Q.   Well, I can show you a document.

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 30

```
 1      A.   Chris is the one.

 2      Q.   Just one second I'll mark as Exhibit 4.

 3   Not quite as quick as I would like.  Okay you

 4   should now be able to see a document marked as

 5   Exhibit 4?

 6          MR. DEVOOGHT:  Yes.  Thank you.

 7   BY MS. WINE:

 8      Q.   Okay.  And you see that Exhibit 4 is an

 9   email sent from Christopher Mora, M-o-r-a?

10      A.   Yeah.  Then you're right.

11      Q.   That's the gentleman you're talking

12   about?

13      A.   Yes.

14      Q.   And then it also mentions in the first

15   line Doron Kermanian told me that he thought you

16   would be interested, and that's the Doron

17   Kermanian you just mentioned?

18      A.   Yes.

19      Q.   Okay.  And you said that Mr. Kermanian

20   introduced you to Mr. Mora?

21      A.   Yes.

22      Q.   And were you partners with Mr. Kermanian

23   in a different business venture?

24      A.   Never.
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 31

1    Q.   What was your relationship with him?

2    A.   I knew his father for years and years,

3    for over -- I've known his father who has passed

4    away since 1980, 1979 even.

5    Q.   Okay.  And did you do business with

6    Mr. Kermanian, the son?

7    A.   The son, never except this, I mean if you

8    call this a business.  We gave him one of two

9    referral fees on this stuff that he would refer to

10   us.  I was very passionate about him making money

11   because he had lost his father.

12   Q.   And you understood that he was also

13   investing in EquityBuild?

14   A.   No, I was not.

15   Q.   Did you talk to him about --

16   A.   I never thought he had any money.

17   Q.   But you were talking to him about this

18   particular loan?

19   A.   Not even.  I don't think he knows

20   anything about the loan.  He just introduced me to

21   Christopher Mora; and when the loan was made, we

22   gave him some sort of a referral fee.  I don't

23   remember how much it was; a few thousand dollars.

24   Q.   This exhibit we've marked as Exhibit 4

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 32

1  from November 22, 2016, do you believe this is the

2  first contact you had with Mr. Mora, or had you

3  already been communicating with him before this?

4       A.   I'm assuming almost 100 percent that this

5  is the first time.  I really -- time flies.  I

6  really never would have thought it's been seven

7  years, oh, my God.

8       Q.   Okay.

9       A.   My goodness.

10      Q.   Mr. Mora sent you in this email he says a

11  link to the offering memorandum for 7024 South

12  Paxton?

13      A.   Yeah.  That was probably the first loan

14  we made.

15      Q.   Okay.  And Mr. Mora explains the model of

16  EquityBuild which consists of three key

17  components?  Do you see that?  I'm not sure what

18  you can see.  Do you see --

19      A.   I see No. 1 where your mouse is at.

20      Q.   You can see the mouse.  I wasn't sure if

21  you could.

22           MR. DEVOOGHT:  Yeah, we can see 1 and A.

23  BY MS. WINE:

24      Q.   And then it continues B through F below,

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 33

1    and then 2 and 3?

2        A.    Okay.  I mean I see all of that.

3            MR. DEVOOGHT:  Do you want him to read

4        it?

5            MS. WINE:  I don't.

6    BY MS. WINE:

7        Q.    You understood that EquityBuild was

8    finding investors and offering them secured loans?

9        A.    I don't know.  When I read this, I see

10   what you're saying, but not only equity, but a lot

11   of people us to be their partners in the deal or

12   be equity players.  We just want to make bridge

13   loans, that's all, first mortgages only; and

14   that's what I would have told him for sure.

15       Q.    Okay.  Do you understand what Mr. Mora

16   means when he says no pooling?  Let me read this

17   to you.  He says:  "Each lender has a first lien

18   position on the money they lend and their funds

19   are further secured by the property itself as

20   collateral.  This is not a pooling model that

21   investors commonly see with other companies."

22   What do you understand that to mean?

23       A.    I can tell you that I understand what No.

24   3 is saying.  I can also, although I've been

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 34

1    advised not to, tell you that what I think

2    happened here, he just copied and pasted whatever

3    EquityBuild sent him, Shaun Cohen or whoever.

4    Chris Mora, as I remember, is not this detailed at

5    all.

6           He probably copy and pasted one of the

7    emails that he received from EquityBuild and sent

8    it to me.  This was an introduction email.  So I

9    didn't go into it in detail unless I talk to the

10   borrower and ask questions about the property they

11   want a loan on.

12      Q.   Okay.  And he's telling you that there's

13   a few spots left on this Paxton note with about

14   $100,000 left to raise of the overall 2.75

15   million.  Do you see that?

16      A.   I see that, yes.

17      Q.   So you understood that EquityBuild had

18   already raised over 2 1/2 million dollars on -- a

19   note on -- secured by 7024 Paxton?

20           MR. DEVOOGHT:  Object to the form.

21           THE WITNESS:  I see what's written here,

22       but what does this have to do with our loan

23       of today's deposition?

24   BY MS. WINE:

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 35

1    Q.   Shatar Capital made a loan on 7024

2    Paxton, correct?

3    A.   A loan, a first mortgage loan and got

4    paid off.

5    Q.   And that loan was made after EquityBuild

6    told you that they had already raised over 2 1/2

7    million dollars from investors that was secured by

8    that property?

9    A.   Doesn't matter to me anyways.  We look at

10   the property that we're making a loan on.  We make

11   sure our documents are dotted and crossed, and we

12   get a title policy, and that's all I care about.

13   What this says doesn't matter to me because we

14   hadn't even got -- I don't think when this was

15   sent, I didn't talk to Shaun Cohen in my life.

16        This is an introductory letter, whatever

17   it is.  I go -- when I get to the bottom and to

18   the nitty-gritty, that's when I concentrate, and I

19   put my head on.  Because we get, believe it or

20   not, probably 15, 20 requests a week, at that time

21   maybe 10 requests a week.  So I don't have time to

22   sit and read every sentence or comma or dot.

23   Q.   After receiving this letter from

24   Mr. Mora, did you have further contact with

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 36

1  EquityBuild regarding what Mr. Mora was offering?

2     A.   Not regarding what Mr. Mora was offering,

3  I think that letter was the beginning of me or the

4  introduction or the setup or the precursor for me

5  to speak to Shaun Cohen, which is the first person

6  I spoke to from EquityBuild.

7     Q.   And what do you recall of the first

8  communications you had with Mr. Cohen, Mr. Shaun

9  Cohen?

10    A.   I don't recall exact words.

11    Q.   I've seen a meeting invite for a week

12  after this email on November 28, 2017.  Does that

13  sound about when you might have talked to

14  Mr. Cohen?

15    A.   I don't know.  I really don't know.  If

16  you want to show me something, I'm not going to

17  deny it; but as my lawyers have seen, I forget

18  common names including my own people now at my

19  age.  Now you want me to go back six years and

20  tell you what it was.  I don't know.

21    Q.   Fair enough.  Other than Shaun Cohen and

22  Chris Mora, who else at EquityBuild did Shatar

23  Capital have contact with?

24    A.   That's a question I remember.  Toward the

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 37

```
 1    end -- and I'm sure there was a couple others too.
 2    I don't remember names, but Tyler DeRoo toward the
 3    end, and a couple or three years before you people
 4    came on board he was my -- I could say my main
 5    contact.
 6        Q.   Did you have any contact with Jerry
 7    Cohen, Jerome Cohen?
 8        A.   One time.  I mean I'm sure there's a
 9    couple emails back and forth between us, but
10    speaking on the phone one time because I remember
11    specifically Shaun was in Israel or someplace.  I
12    had to call the father.  Is that Jerome; is that
13    the father, Jerry?
14        Q.   That is.
15        A.   I had to call him.  He was in Florida,
16    and my total conversation had to do with how to
17    sign a guarantee or send it where, and it didn't
18    last maximum.  It must have lasted -- might have
19    lasted one and a half minutes.  It's the only
20    conversation I had with him.
21        Q.   So most of your dealings were with Shaun
22    Cohen or Tyler DeRoo?
23        A.   EquityBuild, yes, and their lawyers.
24        Q.   Okay.  I'm going to show you another
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 38

```
 1   exhibit marked as Exhibit 5 which is a December
 2   23, 2016, email from you to both Shaun Cohen and
 3   Tyler DeRoo, copying your son, Daniel Namvar.  Do
 4   you see that?
 5        A.   I see, yes.
 6        Q.   And do you see on the third paragraph
 7   that's in all caps you state:  "Since we have
 8   become aware of your business structure, assuming
 9   your previous deals have been closed with
10   crowdfunding investors, we need to make sure
11   you're not refinancing already-closed deals" --
12   sorry.  Let me strike that.
13        "Since we have become aware of your
14   business structure, assuming your previous deals
15   have been closed with crowdfunding investors, we
16   need to make sure your refinancing of
17   already-closed deals are allowed and kosher, in
18   case the proceeds is not distributed and/or going
19   toward new deals."  Do you see that?
20        A.   I see that, of course.
21        Q.   And what did you mean by that?
22        A.   What it says.  We got to make sure, I
23   told you, like the Ts are crossed, dots, you know.
24   Although we were getting title policy, I wanted to
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 39

```
 1   make sure there is no funny business, and that's
 2   what you should tell your clients, that there is
 3   no funny business.  Please stop and give us our
 4   money.
 5       Q.   Okay.  So are you referring to
 6   EquityBuild's business structure getting different
 7   investors to lend money secured by properties; is
 8   that what you mean by crowdfunding investors?
 9       A.   I don't know where I got that term.  I
10   don't use crowdfunding.  That's something he
11   probably said to me.  But what I'm saying is we
12   have to have a very clean first mortgage and make
13   sure everything is arm's length.  That's why we
14   employed attorneys and gave him this in caps;
15   although I see a couple of spelling errors, but
16   that's okay.
17       Q.   I'm asking what you meant by crowdfunding
18   investors when you used that in this email?
19       A.   I don't want to guess; outside investors
20   maybe.  I don't want to guess.
21       Q.   You go on and ask for documents:  "Please
22   provide any document you can."  And then it said:
23   Depending on our underwriting we may need a strong
24   opinion letter from EquityBuild's attorney?
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 40

1    A.   Yes.

2    Q.   And what would that opinion letter say?

3    A.   A lot of things.  The LLCs are correct.

4    They're authorized.  Corporate resolutions are

5    there.  The purchase price is arm's length.  Our

6    documents are enforceable and correct.  I mean I

7    don't have one in front of me, but we use

8    different opinion letters from opposing counsel,

9    which our counsel normally draws and goes back and

10   forth with the opposing counsel until it gets

11   finalized.

12   Q.   When you say you needed to make sure that

13   the refinancing of already-closed deals are

14   allowed and kosher, what did you mean by that?

15   A.   Because according to Chicago laws and

16   regulations or Illinois, that's something I would

17   have present to any new person I would meet, not

18   the people I do repeated business with because

19   they know my model.  Don't waste my time.  I just

20   want to make sure that everything is kosher.

21   Q.   You follow that to say:  "In case the

22   proceeds is not distributed or going toward new

23   deals."  Can you explain what you meant by that?

24   A.   This is before we probably got the

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 41

```
 1   packet.  The proceeds of our loan went toward the
 2   purchase of the deal.  It was a purchase money
 3   loan in every case.
 4        Q.   So you understood that --
 5        A.   This would be --
 6        Q.   Sorry.  I didn't mean to interrupt you.
 7   What were you saying?
 8        A.   This maybe 100 percent doesn't apply
 9   here.  What I was telling him, if you want
10   refinancing, we've got to make sure everything is
11   correct; but this wasn't a refinance I don't
12   believe.  Paxton was not a refinance.  I think
13   that was also purchase.  But Indiana/Yates was for
14   sure a purchase money loan.
15        Q.   And you understood that the property on
16   Yates Boulevard had closed before Shatar Capital
17   made its loan, correct?
18        A.   If you tell me that, I believe, and then
19   we probably required as an additional security
20   because the money he was asking wouldn't stand
21   alone on Indiana.  Just telling you my format and
22   my thought process.
23        Q.   I'm sorry.  You said that you probably
24   would have required additional security?  I'm not
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 42

1    sure I heard you correctly.

2        A.   If Indiana was a purchase money loan and

3    he wanted 1.8 million -- I thought both of them

4    were purchase money, but I'm going to take you at

5    your word.  If you tell me Yates had closed before

6    this loan, then I'm telling you we probably wanted

7    Yates as an additional security because 1.8 was

8    too much under Indiana law based on what I would

9    feel comfortable with a loan to valuations.

10       Q.   Okay.

11       A.   I don't remember those details, but I'm

12   telling you the way I think and I conduct myself.

13           MR. DEVOOGHT:  Jodi, we've been going

14       about an hour.  When you're at a good spot,

15       do you mind if we take a short break?

16           MS. WINE:  Let's go ahead and do that now

17       since I don't have a document on the screen.

18       We can take a -- how long would you like?  I

19       think -- there's not a big time constraint at

20       the end of the day for me.  If you don't have

21       one, we could take ten minutes.

22           MR. DEVOOGHT:  Sure, let's do ten and not

23       do the lawyer thing and more generally make

24       it 20.  Let's make it ten, actual ten, how

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 43

1      about that?  We can say five and it would be

2      ten, but let's say ten and take ten.

3              MS. WINE:  Okay.  We'll go back on the

4      record at 2:10, how is that?

5              MR. DEVOOGHT:  That's perfect.

6                      (Whereupon a recess was taken from

7                       2:01 p.m. to 2:11 p.m., after

8                       which the preceding deposition

9                       continued as follows:)

10     BY MS. WINE:

11         Q.   Mr. Namvar, we're back from the break,

12     and I am going to share another exhibit with you.

13     Are you able to see the document that's been

14     marked as Exhibit 6?

15             MR. DEVOOGHT:  We can see part of a

16         paragraph, we can see the top, and then --

17         there we go.  Thank you.

18     BY MS. WINE:

19         Q.   So I'm going to go down.  This is an

20     email chain that -- the bottom part of the chain

21     actually ended up as an attachment, which I've

22     seen on emails usually coming from Max.  But you

23     see here at the bottom of the chain is the email

24     we were just looking at as Exhibit 5.  Do you

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 44

1    recognize that, Mr. Namvar?

2        A.   Yes, yes.  Who is saying that?

3        Q.   Can you maybe get a little closer to the

4    microphone.  I'm having trouble hearing you again.

5        A.   Who is saying that?  Who is including

6    Shaun and whatever; me or somebody else?

7        Q.   This is the email we just looked at,

8    Exhibit 5, from you.  See "Ezri Namvar wrote"?

9        A.   Right.

10       Q.   And that this is the same email we just

11   looked at, correct?

12       A.   Right.

13       Q.   Okay.  And then if you go up, the

14   response to that, do you see from Mr. Cohen to you

15   also on December 23rd?  Can you see it?

16            Mr. -- first can you answer the question,

17   are you able to see that on the screen the email

18   from Shaun Cohen to you?

19       A.   Yes, I've seen it.

20       Q.   And Mr. Cohen says:  "On all refinances

21   we send out rollover documents to ask our

22   lenders -- asking them if they would like their

23   funds back or if they would like to roll over

24   their funds into a new deal."  And he asks:  Would

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 45

1    you like to have samples that they have sent out

2    on previous deals?

3        A.    What was my answer?

4        Q.    And your answer also the same day said:

5    "Please do.  This is good to know."  Do you see

6    that?

7        A.    Yeah.  That means -- yes, I see.

8        Q.    And then the response from -- the email

9    comes from Tyler DeRoo, so it's probably not a

10   response, but he sends you standard rollover

11   forms, do you see that, and there's an attachment?

12       A.    I see what it says.

13       Q.    Okay.  I'm going to go through some of

14   the attachments to this email.  There's a

15   Rollover/Distribution Authorization form that's

16   not filled out.

17            I'm going to go back up, and he also says

18   that he's -- he says:  "I think it would be

19   easiest and best to start with 7024 South Paxton.

20   You already have the relevant financial

21   information for this one as it was one of the

22   original buildings we had you look at."  Do you

23   see that?

24            Did you actually come to Chicago and look

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 46

1    at buildings?  Mr. Namvar?

2        A.    No, I did not.

3        Q.    Okay.  So I think when he said had you

4    look at them, that meant that he sent you

5    financial information?

6        A.    That would have been by email or other

7    means.

8        Q.    Right.  And then he also says he attached

9    the title policy, closing statement and relevant

10   closing documents in an email yesterday with all

11   the closing information, but he reattaches it for

12   convenience.

13            Okay.  Then Mr. DeRoo says he thinks it

14   would be probably easiest and best if we focus on

15   7524 Paxton since we dry closed this yesterday and

16   are scheduled to fund on Tuesday.  So we need to

17   get going on this one ASAP.  And then he asks you

18   for financing for 75 percent of the purchase

19   price.  Do you see that?

20       A.    I see it.

21       Q.    And this is the property that you've

22   already been told that EquityBuild has taken

23   2.5 -- I'm sorry.  Yeah, 2 1/2 million dollars

24   from investors that were given first position

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 47

1    mortgage loans?

2        A.    I don't relate in that way.  I get to

3    every specific deal, make sure I have a first

4    mortgage, I have a title policy, insurance policy,

5    casualty insurance, coverage, and all the other

6    relative requirements.

7        Q.    So if EquityBuild promised first

8    mortgages to other people, as long as that wasn't

9    in the title, it wasn't a concern of yours?

10       A.    I didn't even think that way.  My mind

11   doesn't think that way.  I've been a lender for

12   years, over 40 years.  I need a title policy.  I

13   need certain documents, and I'm not saying that we

14   made that loan.  It's a loan request for 75

15   percent, which is very unlikely.  If he made it,

16   then we made it.

17            The dry close, which means within the

18   same week which we call it desktop closing to me,

19   to me, is the same as purchase money loan.

20       Q.    Can you explain what dry closing means?

21       A.    I don't know -- he says dry closing.  We

22   have here or I use the term desktop closing.  If

23   your close to a title company and the escrow

24   company is known to you and your attorneys provide

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 48

1   either the escrow, the title letters and

2   assurances that this is okay, they will do a

3   closing, maybe money gets -- I don't know.  They

4   will do a closing without total money is getting

5   transferred or not.  It's very rare; but since

6   I've done it before on my end, I call it desktop

7   closing.

8          So maybe a deed was recorded a few days

9   before or after -- I mean a few days before, two,

10  three, four, five days.  That to me is the same as

11  purchase money loan; and I'm sure when it says dry

12  closing, he means desktop closing.  I don't know.

13  Ask him what he meant by that.

14          I don't remember these emails word for

15  word.  I read things, and I kind of put it in the

16  back burner until it comes to the closing and the

17  nitty-gritty, and our attorneys advising us what's

18  missing, what's not missing.

19          And the only reason I say attorneys is

20  because we use outside attorneys for almost all of

21  our out-of-state loans.  In California we use

22  attorneys also, but very occasionally, because our

23  processing department has loan docs which for the

24  most part are standard, and we use those.

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 49

1     Q.   Okay.  When Shaun Cohen told you that

2    they asked investors to roll their investment to a

3    different loan, and you said that was good to

4    know?

5     A.   No.  I think the good to know is that we

6    always have deals we're closing, and I thought,

7    well, if these guys are performing and they are

8    the way they are, they're ideal clients.  I can

9    get repeat businesses from them all the time.

10    That's what I meant good to know.

11          And I know you haven't asked me a

12    question, but I prefer to tell it to you right

13    now.  I would have never signed, neither would I,

14    the rollover papers they sent us.  We only use our

15    own documents.

16     Q.   Did you ask to see rollover papers for

17    investors in this property?

18     A.   He probably send it to me.  I want to

19    know what it looks like, because I also collect

20    legal documents.  I have over 2,800 legal

21    documents, including a 520-page ground lease

22    document from port authorities in New York.  I

23    collect documents.

24     Q.   I'm going to show you a different exhibit

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 50

1    now.  Can you now see another exhibit on the

2    screen?

3           MR. DEVOOGHT:  Right now we see a list of

4       exhibits, like a file, subfolder with Exhibit

5       1, 2, 3, 4, 5, 6, 7; and it's your mouse that

6       is on Exhibit 7, but we don't see that actual

7       document.

8           MS. WINE:  Thank you.

9           Okay.  Now do you see a document that's

10      Exhibit 7?

11          MR. DEVOOGHT:  We see the top of one,

12      yeah, just a one-sentence email.

13          MS. WINE:  Correct.

14   BY MS. WINE:

15      Q.   All right.  Mr. Namvar, Exhibit 7 is a

16   December 27, 2016, email from Tyler DeRoo to you

17   with the subject Lender Doc Set and listing

18   attachments; and the text says:  "Please find

19   attached our standard lender docs.  Let me know if

20   you have any questions."  Do you see that?

21      A.   I see that.

22      Q.   And do you recall getting this email from

23   Mr. DeRoo?

24      A.   I'm assuming I did, but I don't recall

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 51

1   these things by memory.

2       Q.   Okay.  I'm going to scroll through some

3   of the documents.  There's wire instructions, a

4   blank document called Exhibit A.  Then there's a

5   Mortgage that's a standard form apparently because

6   it has no dollars and cents or properties in it.

7   Actually the property is listed as 123 South Oak

8   Street, probably a pretend address, the form of a

9   promissory note, a document called a Collateral

10  Agency and Servicing Agreement between EquityBuild

11  and each of the lenders.

12          EquityBuild sent you these documents.  Do

13  you know if you requested them or why Mr. DeRoo is

14  sending them to you at this time?

15      A.   I don't remember whether I request them

16  or sent them.  I don't remember.

17      Q.   Why would you want to see these

18  documents?

19      A.   If I requested them, that would be a good

20  question.  I don't know that I did.

21      Q.   Let's talk now a little bit about the

22  loan at issue.  Go ahead and mark a document --

23  because it's easy to -- it helps with the dates.

24          Okay.  I've now put on the screen a

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 52

1    document marked as Exhibit 8, which is an email.

2    The top of the chain is from you to Andrew Calleja

3    and Daniel Namvar at Shatar on March 7, 2017.  Do

4    you see that?

5        A.   Yes.

6        Q.   Okay.  And that's forwarding a message

7    from Tyler DeRoo to you also on March 7th.  Do you

8    see that?  Do you see it?

9        A.   I'm seeing No. 1, just going through No.

10   1.  Wait.

11       Q.   But you see this is an email from Tyler

12   DeRoo to you sent on March 7, 2017; is that

13   correct?

14       A.   Yeah.  Yes I mean.

15       Q.   And Mr. DeRoo is following up with you on

16   some new deals that EquityBuild needs help with?

17       A.   I see that.

18       Q.   And one of those is -- the No. 1 on his

19   list is 5450 South Indiana?

20       A.   Correct.

21       Q.   And Mr. DeRoo says that they only have

22   until next Wednesday to get this done.  Did you

23   understand that to mean to get the loan closed?

24       A.   I see it.

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 53

```
 1      Q.   So the email was sent on Tuesday, March
 2   7th.  He said they only have until next Wednesday,
 3   which is eight days.  Is that a very quick
 4   turnaround, or is that standard in your
 5   experience?
 6      A.   It's typical for us to do loans within a
 7   week out of state eight, nine days.  I don't know
 8   when this got recorded.  If everything is ready,
 9   but in California we have done loans as short as
10   three business days from --
11           MR. DEVOOGHT:  Jodi, just -- go ahead.
12       Sorry.  And this is just a function of Zoom,
13       can we just see the rest of the email before
14       we continue with the questioning just so we
15       can see the full?  Great.  Thank you.
16           MS. WINE:  That was it.  It does have a
17       third page, but there's nothing on it.
18           THE WITNESS:  I did not read past No. 2.
19       Okay.  Let me read No. 3.
20           MR. DEVOOGHT:  Thank you, Jodi.
21   BY MS. WINE:
22      Q.   So Mr. Namvar, you forwarded this email
23   to Mr. Calleja and your son, Daniel Namvar?
24      A.   Yes, processing and underwriting
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 54

```
 1    purposes.
 2        Q.   Okay.  And are those the two individuals
 3    at Shatar that were doing the underwriting?
 4        A.   I would do most of the like mental
 5    underwriting.  The paperwork would be handled by
 6    mostly Andrew; and I wanted Daniel, since he was
 7    the broker on the deal, to be aware what's going
 8    on.  I don't know what he looked at or did not
 9    look at.
10        Q.   Why did you send it to them?
11        A.   Make a file, if I need to follow up on
12    something like paperwork, so Andrew would be
13    aware, and Daniel is the broker on the deal.  He
14    has to have a file.
15        Q.   Was there anyone else that was involved
16    in these loans other than the three of you?
17        A.   Not that I remember.  On our side, no.
18    Maybe an attorney, we would have finally hired a
19    law firm to do the docs.
20        Q.   But nobody else that was --
21        A.    Not that I remember, not that I'm aware
22    of.
23        Q.   To finish my question, I was going to say
24    nobody else that was part of Shatar.
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 55

```
 1          What due diligence did Shatar perform
 2   before making this loan?
 3       A.   Make sure that a title policy or the
 4   title commitment was okay, that's the first thing;
 5   to make sure that the purchase contracts are arm's
 6   length; and to -- I don't know whether we ran a
 7   credit report on this.  Maybe on Paxton we did.
 8   We didn't do it twice so close to each other; and
 9   to make sure that the property values are there,
10   either by calling and asking around or looking at
11   documents or otherwise.
12       Q.   And do you recall specifically whether
13   you did that in this case?
14       A.   Which one, which part?
15       Q.   Whether Shatar -- okay.  Starting with
16   the property values, did Shatar confirm the value
17   of these properties?
18       A.   Yes.
19       Q.   How did Shatar do that?
20       A.   I called a friend of mine who owns
21   apartment building and commercial buildings.  He's
22   not an appraiser.  He's a very big investor in
23   Chicago and lives in Chicago.  I guess you want
24   his name, right?
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 56

1      Q.   If you have it.

2      A.   Kourosh.  I don't know what his American

3   name is.  I know him as Kourosh, which is Cyrus,

4   K-o-u-r-o-s-h, Cohan, C-o-h-a-n; but I think he

5   has a different name, both first and last,

6   American.  Ushie (phonetic) may be his last name

7   in Chicago.  I don't know.  I have no problem

8   finding the details and giving it to Ali.  Kourosh

9   Cohan who lives there.  He did me a big favor, and

10  he drove by these two properties.  I remember --

11     Q.   You also -- sorry.  I thought you were

12  done.  Did you have more?

13     A.   He looked at these properties.  He called

14  me from his car while he was at the properties.

15  He said if you're making so much loan -- I don't

16  remember how much, I don't remember what -- you

17  cannot go wrong.

18     Q.   You also said that you didn't recall

19  whether you got a credit report in this instance,

20  correct?

21     A.   If I didn't, it was because we had one

22  from the Paxton deal, which was before this; and

23  if I had one from Paxton and I was seeing the

24  performance, which was perfect, I wouldn't need to

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 57

1    run a credit report.

2        Q.    I think you mentioned before you did a

3    credit report to see if there were bankruptcies

4    was one of the things you looked at, correct?

5        A.    The purpose are my credit reports would

6    have been to look at any judgments the

7    individual -- and I only run credit reports on

8    individuals who are guarantors.  I never ran a

9    credit report on EquityBuild because our attorneys

10   were instructed to do the public record search for

11   that purpose.

12       Q.    They did a public record search?

13       A.    I'm sure they did; otherwise they

14   wouldn't have done their job.

15       Q.    Do you recall anything about the results

16   of those searches or the credit report?

17       A.    I don't remember anything unless it was

18   something adverse.

19       Q.    Were you aware that Jerry Cohen had filed

20   bankruptcy on at least one occasion?

21       A.    That's the father?

22       Q.    Correct.

23       A.    No.

24       Q.    All right.  Are prior bankruptcies a

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 58

1  problem for you when you make loans, or is it

2  something that is an automatic deal breaker or

3  just --

4       A.   I don't understand the question.

5       Q.   I'll strike the question.  It wasn't a

6  particularly good question.

7            You also mentioned that you make sure

8  that the transaction is at arm's length?

9       A.   Yes.

10      Q.   Did you do anything to make sure that

11 this transaction was at arm's length?

12      A.   All the documents look arm's length to me

13 and not...

14      Q.   You relied on the documents.  Would that

15 be the purchase and sale agreement?

16      A.   And the title commitment and the dates

17 and advice of my lawyers.  If there was anything

18 adverse, they would have let me know.  I don't

19 remember receiving a call from them regarding

20 adverse situation.

21      Q.   Can you now see on the screen a document

22 marked as Exhibit 9?

23      A.   Yes.

24      Q.   And I'm going to go down to the bottom of

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 59

1   this chain.  It's in reverse chronological order.

2   Do you see that Mr. DeRoo is introducing Andrew

3   Calleja to EquityBuild's lawyers?  Is the name

4   Ioana, which is I-o-a-n-a, familiar to you?

5       A.   Yes.

6       Q.   And do you understand her to be

7   EquityBuild's lawyer?

8       A.   Yes.

9       Q.   Go up the chain a little bit because

10  there's a lot of messages in here, do you see on

11  March 14th Andrew Calleja of Shatar Capital sent a

12  message to Patty San Martin, who is identified

13  below as the paralegal working with Ioana

14  Salajanu?

15      A.   I see that.

16      Q.   And Andrew says:  As per our discussion,

17  since the purchase loan for 7749 South Yates was

18  just closed today, please email the final closing

19  statement for them.

20      A.   I see that, yes.

21      Q.   So we talked about before about this

22  being a purchase money loan, but Shatar was aware

23  that the purchase of 7749 South Yates happened at

24  least by March 14, 2017, or on March 14, 2017?

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 60

1     A.   What's your question?  I mean I see what

2   this says, but --

3     Q.   So does that refresh your recollection

4   that that was not a purchase money loan?

5     A.   Well, the previous emails you showed me

6   and the different term sheets it was a purchase

7   money loan to begin with.  If it ended up

8   differently for one of them, then I don't know.  I

9   need to look at a lot of emails and what happened.

10     Q.   You were copied on this email?

11     A.   Yes, and you want me to remember all my

12   emails?

13     Q.   And you responded to this email chain

14   saying:  "Tyler, I must speak with you.  Call me

15   ASAP"?

16     A.   Yes.

17     Q.   All in capital letters?

18     A.   Yes.

19     Q.   Do you recall why you needed to speak

20   with him urgently?

21     A.   I don't remember specifically.

22     Q.   Did it relate to the fact that this loan

23   had already closed, the sale of this property?

24     A.   I don't remember.

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 61

1    Q.   Let me ask you, I've seen in your

2    signature block as well as others at Shatar

3    Capital the letters BH before your name.

4    A.   Are you Jewish?  Not adversely.  I'm not

5    ask -- that means Baruch Hashem, bless God.  That

6    we do on every letter we write, every document we

7    have.

8    Q.   And why do you add that?

9    A.   You want to ask me religious questions

10   now?

11   Q.   I'm asking you why you include that on

12   your business signature block?

13   A.   That would take the whole two hours for

14   me to explain to you.

15   Q.   Are you trying to convey anything in

16   particular by including that in your signature?

17   A.   No, just blessings.

18   Q.   I think you testified earlier that if the

19   loan was not a purchase money loan, that you would

20   take different steps?

21   A.   Yes, a little bit, couple of the steps

22   would be different.

23   Q.   And were any different steps taken in

24   this case since this closing of 7749 South Yates

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 62

1   had occurred before the loan?

2       A.   I don't recall; but if it had, it would

3   have to do with determining that the value was

4   there; and my friend, Kourosh, looked at it, made

5   sure that the value is there.

6       Q.   Can you now see an email marked as

7   Exhibit 10 from you to Angie Yoo at Chicago Title

8   and others dated March 30, 2017?

9           MR. DEVOOGHT:  If the last part of -- I

10      don't know if it's a chain.

11          MS. WINE:  I'm sorry.  Andy, I could not

12      hear that.

13          MR. DEVOOGHT:  Jodi, we can see the top,

14      just the last email.  It looks like it's a

15      thread.  We can see the email "What?"

16          MS. WINE:  Right.  I'm just trying to

17      confirm that you can actually see the

18      documents.  I don't know about the screen --

19          MR. DEVOOGHT:  You got it.

20          MS. WINE:  -- because -- (simultaneous

21      talking).  At least one occasion --

22          MR. DEVOOGHT:  That's true, with the

23      directory.  So I can confirm we can see the

24      top email from Ezri, now you're scrolling.

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 63

1          MS. WINE:  Okay, thank you.  The bottom

2      of the document is just a two-page document,

3      3519.  And I'll just say that these are

4      documents produced by Shatar Capital, and the

5      Bates numbers at the bottom identify where

6      the production...

7  BY MS. WINE:

8      Q.   In an email on March 30th in the middle

9  of the chain Ms. Yoo from Chicago Title indicates

10 the borrower is receiving approximately $86,000

11 from the closing.  Please let her know what these

12 funds are being used for.  And then your response

13 to that message said:  "What?  I thought the

14 borrowers are putting over 1.5 million in to close

15 the purchases.  Can someone explain this to me?"

16 Do you see that?

17     A.   I see that.

18     Q.   And do you recall this email exchange?

19     A.   No, but I can't say it's not true.  It

20 speaks for itself.

21     Q.   Okay.  And did you get an explanation for

22 this?

23     A.   I don't know.  Do you have an email that

24 I did?  I don't remember.

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 64

1    Q.   I don't have an email for you.  I believe

2    EquityBuild's counsel sent you closing documents

3    from the closing of the South Yates property.

4    A.   I really don't remember any specific

5    documents unless you show it to me.

6    Q.   And I understand you personally don't

7    remember Shatar Capital testifying on behalf of

8    Shatar Capital was there -- you know, did someone

9    at Shatar Capital receive an explanation?

10   A.   The email speaks for itself, and I cannot

11   think of any reason to dispute its authenticity.

12   Q.   What was your understanding of where the

13   borrowers -- of where EquityBuild was getting 1

14   1/2 million to close the purchase?

15   A.   I heard they were syndicators.

16   Q.   Can you explain what you mean by that?

17   A.   When you syndicate the purchase of the

18   property, you look at your investors and say this

19   is how much money we need for a down payment and

20   this is the loan we're getting.  People who put up

21   the equity will have an arrangement; they get so

22   much of the profit, maybe you prefer to examine,

23   maybe not.  And EquityBuild, as the promoter and

24   the syndicator, would get a cut at the end from

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 65

1    the profits or other arrangements.  I don't know.

2        Q.   EquityBuild had already told you that

3    their business model was that they offered first

4    mortgage loans to their investors, correct?

5        A.   I don't know about which investors where.

6    I thought they were offering me that, and I said I

7    don't want to be syndicator.  I mean a limited

8    partner.  I'm just making bridge loans.  As long

9    as the paperwork is correct, I don't care.

10       Q.   Do you now see on your screen a different

11   exhibit marked as Exhibit 11?

12           MR. DEVOOGHT:  Yes.

13   BY MS. WINE:

14       Q.   And Exhibit 11 is a copy of a Mortgage.

15   Do you see that?

16       A.   I see a Mortgage document, yes.

17       Q.   And it's identified as a Mortgage given

18   on March 14, 2017, and secured by property at

19   7749-59 South Yates in Chicago?

20       A.   Yes.

21       Q.   And this Mortgage identifies the lenders

22   as the persons listed on Exhibit A.  Do you see

23   that?

24       A.   Where is that?  Where is that?

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 66

1    Q.    (Indicating.)

2    A.    Yes, I see that.

3    Q.    And Exhibit A to this document is on the

4    7th of 8 pages.  Do you see that?

5    A.    What?  No, no, no, no.  I don't -- are

6    you saying that these were -- are investors?  I

7    don't remember.  I don't know these people.

8    Q.    This is a document that was produced by

9    Shatar Capital.  When did Shatar Capital first

10   become aware of this mortgage from March 14th of

11   2017?

12   A.    It's --

13        MR. DEVOOGHT:  Hold on.  I'm sorry.  Just

14        again, given I know this is not -- since we

15        don't have a hard copy, can you give him a

16        chance to just scroll through and familiarize

17        himself with each page so he understands

18        whose mortgage it is and the specifics of the

19        document I think given your question?

20        MS. WINE:  Right, it is harder when it's

21        not a hard copy in front of the witness.

22        MR. DEVOOGHT:  If he had it in his hands,

23        he would be able to focus in and familiarize

24        himself more quickly, right.  But if you go

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 67

```
 1        to the first page and just give him the time
 2        he says he needs.  If you could start at the
 3        top.  And if you could minimize, Jodi, he
 4        could see the whole page.  There you go.
 5        Thank you.
 6             MS. WINE:  Sometimes people have a hard
 7        time seeing these.
 8             MR. DEVOOGHT:  100 percent.  I have my
 9        old-man glasses on, so trust me.
10             Ezri, please take your time and read
11        through this document.  If you can't read it,
12        you can ask Jodi to make a particular page
13        bigger, just the way you would if you had a
14        hard copy.
15   BY MS. WINE:
16        Q.   Shatar Capital sees a lot of mortgage
17   instruments, correct?
18        A.   Oh, my God.  You're going too fast with
19   this screen.
20             MR. DEVOOGHT:  Can we go back to the
21        first page again, and he will tell you when
22        he's ready to move to the next.  That would
23        be great.  I only ask because of the Zoom
24        setup.  Thank you.
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 68

```
 1          THE WITNESS:  Now go to the next page,
 2     please.  Roll up.  Roll up, up to the --
 3     okay.
 4  BY MS. WINE:
 5     Q.   This way?
 6     A.   Right here.  (Witness examines document.)
 7          Okay.  Without going through the rest,
 8  let me assume -- if my assumption is right, I can
 9  answer your question.  This is a Mortgage that
10  they had on Yates, and the fractionalized lenders
11  were all listed in Exhibit 8, correct or not
12  correct?
13     Q.   That is correct.
14     A.   Okay.  So what's your question?
15     Q.   My question is:  When did Shatar Capital
16  first become aware of this mortgage?
17     A.   I don't remember seeing this.  I'm sure
18  it's in our documents.  That's something our
19  attorneys would look at if they need to, or my
20  Andrew would look at.  For sure Daniel would not.
21     Q.   Okay.  Mr. Namvar, I'm now showing you
22  the mortgage that I marked as Exhibit 12.  Do you
23  recognize this document?
24     A.   Yes.
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 69

```
 1      Q.   This is the mortgage that Shatar Capital
 2  was involved in secured by 7749 South Yates?
 3  (Simultaneous talking).
 4          I'm sorry?
 5      A.   Just please hold on right here.  (Witness
 6  examines document.)
 7          I'm assuming it was, yes.  Geraci Law
 8  Firm was our law firm.
 9      Q.   I'm going to go down to the 36th of 38
10  pages.  Do you see Exhibit A, Beneficiary List?
11      A.   Yes.  These are the original
12  beneficiaries.
13      Q.   And these are the individuals identified
14  on page 1 of the mortgage saying that the lenders
15  in Exhibit A attached hereto and incorporated
16  herein whose address is care of Shatar Capital
17  Partners, those are the lenders on this mortgage
18  loan?
19      A.   These were the original lenders, original
20  investors, yes.
21      Q.   And how were these original lenders
22  identified?
23      A.   What?
24      Q.   How did Shatar find these people to make
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 70

1  this loan?

2      A.   We all know them for years.  These are

3  people known to me, except Hamid Esmail.  I think

4  Hamid Esmail is a friend of Farsaa, Farokh Saadat,

5  who told us that he has some money.  Can I put him

6  in the same loan offering again?  I said fine, no

7  problem.

8          I don't know Hamid Esmail.  I don't think

9  I ever met him.  The others I can telling you as

10  much as you want.  I know all of them.

11     Q.   Are there individuals you've had business

12  with in the past, that Shatar Capital had business

13  with?

14     A.   Hold on one second.  I had done business

15  with the father -- I mean the father is dead.  The

16  Crest Drive LLC belongs to the Hekmatja family.

17  The father is dead.  I had done business with the

18  father at least 20, 30 years ago, maybe a couple,

19  three occasions.

20     Q.   I'm sorry.  Which family did you say?

21     A.   Hekmatja.  Do you want the spelling?

22     Q.   I think the court reporter would like

23  that?

24     A.   H, as Harry, e-k, as kilo, M, as Mary,

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 71

1    a-t, as Tom, J, as June, A, as apple, Hekmatja

2    family.  There is an ex-wife remaining and three

3    sons.  I'm not sure about a daughter; but they

4    own, as far as I know, Crest Drive LLC.  So we

5    refer to them as the Hekmatja loan.

6           Abraham Ebriani was in our office at the

7    time we made loan -- I don't know when he

8    started -- with no salary.  He was learning,

9    processing in the loan business from me and

10   Daniel, and finally he landed a great job.  That's

11   Aaron -- we called him Aaron.  It says Abraham,

12   but anyway -- yeah, Aaron.  It says Aaron Ebriani.

13          Hamid Esmail I don't know at all.  Farsaa

14   is Farokh, F-a-r-o-k-h, Saadat, S-a-a-d, as David,

15   a-t, as Tom, who was a friend of mine, well-known

16   to me for years.

17      Q.   Did Shatar discuss the opportunity of

18   investing in this loan with anyone other than

19   these four?

20      A.   Sure, you know, as the investors come.

21   It's a very fluid business, I'm sure, but it would

22   have been me discussing it.  Nobody else.  The

23   only reason Hamid Esmail came was because Farokh

24   Saadat who brought him.

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 72

```
 1          THE REPORTER:  I'm sorry.  I didn't --
 2     could you repeat that, please.
 3          THE WITNESS:  The only reason Hamid
 4     Esmail is in there is because of Farokh
 5     Saadat who brought him in as his coattails,
 6     or whatever the right word is.
 7  BY MS. WINE:
 8     Q.   Who is Nicholas Klein?
 9     A.   He is an attorney in town, very
10  experienced attorney.
11     Q.   You say "in town."  In Los Angeles?
12     A.   In Los Angeles.
13     Q.   Why did you send him these loan
14  documents?
15     A.   I don't know.  Probably, probably either
16  the Hekmatjas or Farokh Saadat or somebody asked
17  me to send it.  I don't know why I send it because
18  we had Geraci on it, right?  Unless it was for
19  future assignments.  What is the date I send it to
20  because these lenders changed at some point?
21     Q.   I'm sorry.  I didn't hear that last thing
22  you said.
23     A.   These lenders changed at some points, and
24  maybe new investors or an old investor wanted Nick
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 73

```
 1   to look at the assignment document.  I don't know.
 2   I don't know.  Where does it say I send this to
 3   Nick?  I know Nick very well.
 4       Q.   I'm trying to streamline and not mark
 5   more exhibits than I have to.  There was an email
 6   showing you sent them.  I was just asking you why.
 7   But if you don't recall, that's fine.  We'll move
 8   on.
 9           You did just mention the lenders changed.
10   There's also an assignment to Pakravan Living
11   Trust.  I can show you that document.
12       A.   No, I know we did.  He bought two of
13   these lenders when they wanted money back.
14       Q.   Which two lenders?
15       A.   I don't know which two but not -- Hamid
16   Esmail and Farokh Saadat for sure.  I don't know
17   about Ebriani, whether he bought Ebrianis or not.
18       Q.   I believe the only document that I've
19   seen is an assignment of the Ebrianis' interest?
20       A.   No.  For sure Hamid Esmail and Farokh
21   Saadat assigned theirs too.  The three I saw were
22   Ebriani, Hamid Esmail and Farsaa.  For sure 100
23   percent I know they are not in this loan anymore.
24       Q.   And how did Pakravan Living Trust -- let
```



**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 74

```
 1   me ask you this first:  Who is the grantor for the
 2   Pakravan Living Trust?
 3        A.   Either him or his wife.  I've known him
 4   also for 40 years.
 5        Q.   Who is him?
 6        A.   Danny Pakravan.
 7        Q.   And how did Danny Pakravan come to
 8   purchase these interests from the other investors?
 9        A.   First of all, let me spell Danny for you,
10   D-a-n-n-y.  That's how he spells his name.
11   Secondly, I've given Pakravan at least eight,
12   nine, ten loans, different loans, different
13   places.  He is an investor and trustee for years.
14   I called him.
15        Q.   The date of the assignment that I've
16   seen, which I can show you if you need to, but
17   it's dated November 20, 2018, which is after the
18   receivership.  So why did Mr. Pakravan want to
19   invest in a loan when the company borrows in
20   receivership?
21        A.   Because the first mortgage was a secured,
22   perfect mortgage at that time.  Documents were
23   perfect.  Everything was perfect.  The fact that
24   things --
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 75

1    Q.   Did Mr. Pakravan know that borrower was

2    in receivership?

3    A.   100 percent.  And he loves to buy things

4    in acquisition because of the default rates.

5    Q.   I'm now going to show you --

6         MR. DEVOOGHT:  Jodi, we're just under an

7    hour.  If you're switching topics, do you

8    want to take a quick break before the last

9    hour?

10        MS. WINE:  You know, I'm going to do this

11   one last exhibit, and then we can have a

12   break.

13        MR. DEVOOGHT:  Okay.  Sounds good.

14        MS. WINE:  Has the screen now switched to

15   Exhibit 13?

16        MR. DEVOOGHT:  Yes.  We can see the top

17   email, Jerry Cohen.

18   BY MS. WINE:

19   Q.   Okay.  I'm going to go down to the bottom

20   email from Daniel Namvar sent on April 19, 2017.

21   It splits two pages but can you see the entire

22   email?

23        MR. DEVOOGHT:  We can see -- the top on

24   April 19, Shaun/Jerry.  And then we can see

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 76

```
 1      the text of the email on the next page.
 2  BY MS. WINE:
 3      Q.    So on April 19 Daniel Namvar sent an
 4  email to Shaun and Jerry Cohen saying:  "This
 5  email is to confirm our agreement that all loans
 6  from Shatar or related entities to you shall be
 7  subject to the provisions of a Heter Iska."  I'm
 8  not sure I'm pronouncing that correctly.  How do
 9  you pronounce that term?
10      A.    Heter Iska.
11      Q.    Okay.  What is a Heter Iska?
12      A.    It's a religious document between
13  observant Jews.  All Jews should be; but some
14  rabbis say if they're very observant, like they
15  keep Sabbath, have a Heter Iska with them.  It's
16  to make the prohibition of the Bible against
17  charging interest to another, which this wasn't
18  the case because EquityBuild was not an
19  individual.
20          But since my son is super-duper
21  religious, a lot more than me, he wanted to have
22  Heter Iska signed.  It's a -- I don't know how to
23  put it.  It's a document to make the provision --
24  I mean the prohibition against charging another
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 77

1   Jew interest.  Correct, it makes it correct.

2       Q.   And does it make it correct by converting

3   the debt into an equity instrument and have the --

4       A.   Heter Iska, okay, how much time do you

5   have?  I can talk about this and run out the time.

6   I'd love to.  Heter Iska, it's on our choice only,

7   only, if they can prove with two major religious

8   witnesses that they lost money on the loan they

9   got from us.

10          If they can prove they lost money in the

11  transaction, not by appointment of receiver -- the

12  receiver alone makes the Heter Iska provisions

13  invalid or nonexistent; but if they can prove I

14  borrowed money from you and I put it in X, Y, Z,

15  and I lost money, we are obligated as lenders --

16  and they have to bring it to our attention very

17  quickly.  We are obligated to give them all the

18  interest and points back.  The principal still

19  stands.  That's a Heter Iska document.

20          MR. DEVOOGHT:  Do we have a Bates number

21      on this document?  It doesn't look like it

22      has a source.

23          MS. WINE:  This one was not produced by

24      Shatar Capital.  It would have been in the

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

Page 78

1      database of documents that we shared with

2      all --

3              MR. DEVOOGHT:  Okay.  Thank you.

4              MS. WINE:  -- claimants.  Sorry.

5      BY MS. WINE:

6      Q.   So is my understanding from looking at

7      this correct that a Heter Iska makes the lender

8      into a joint business partner and converts it from

9      a loan to a joint venture?

10     A.   If all other provisions of Heter Iska,

11     which I don't know how many Jews are in the room,

12     with Gemara has three full books just talking

13     about Heter Iska.  If all provisions apply, it

14     could be that; but the fact that one of those

15     major provisions is appointment of the receiver,

16     and the receiver is taking the position of Shaun

17     Cohen and Jerry Cohen as guarantors, not, you

18     know -- and we're not going after those

19     guarantees, so it doesn't apply.  Besides, the

20     receiver now for all practical purposes is not a

21     religious Jew appointed, this doesn't apply

22     anymore.

23     Q.   And after Shatar sent confirmation of the

24     agreement that the loans would be subject to the

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 79

1    provisions of a Heter Iska, you see that both

2    Shaun Cohen and Jerry Cohen confirmed that

3    agreement?

4        A.   That's what this shows to Daniel.

5        MS. WINE:  Okay.  I think now would be a

6    good time to take that break.

7        MR. DEVOOGHT:  Okay.  What are we at

8    here; 3:13?  Do you want to shoot for 3:23?

9        MS. WINE:  That would work.  Is that good

10    with everyone else, especially the court

11    reporter?

12        THE WITNESS:  Can I ask a question?

13        MR. DEVOOGHT:  No.  You can ask me -- you

14    can call me, okay?

15              (Whereupon a recess was taken from

16              3:14 p.m. to 3:25 p.m., after

17              which the preceding deposition

18              continued as follows:)

19        MS. WINE:  So I am going to turn the

20    questioning over to Max Stein.  Thank you for

21    your testimony thus far.  Appreciate it.

22        THE WITNESS:  Stay warm.  I never come to

23    Chicago.  The wind factor is unbelievable.

24        MR. DEVOOGHT:  Let's let them ask their

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 80

1      questions, and we can move forward.  Thank

2      you.

3                    CROSS EXAMINATION

4      BY MR. STEIN:

5          Q.   Good afternoon, Mr. Namvar.  As was

6      indicated, my name is Max Stein.  I am one the

7      attorneys representing some of the individual

8      investors who have made claims in the

9      receivership.  Can you hear me okay?

10         A.   Yes.

11         Q.   Okay.  I'm going to follow up on the

12     questions that you've already been asked by

13     Ms. Rosen Wine.  As a result, I will be jumping

14     around.  If I lose you in my jumping, raise your

15     hand and tell me because I want to make sure we're

16     talking about the same things at the same time.

17     Does that make sense?

18         A.   Yes.

19         Q.   Great.  Mr. Namvar, you started off your

20     testimony today looking at a document that was a

21     Notice of Deposition that included deposition

22     topics.  Do you remember that?

23         A.   Yes.

24         Q.   What did you do to prepare for today's

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 81

1    deposition, and in particular, what did you do to

2    make sure that you had all of the knowledge that

3    you needed on behalf of Shatar Capital regarding

4    the deposition topics?

5            MR. DEVOOGHT:  I'll just state that I

6        know Max is an experienced lawyer, and he

7        certainly doesn't intend to suggest that you

8        would disclose -- and he's not angry so

9        there's not trickery here.  He's not asking

10       you to disclose your conversations with your

11       attorneys, as your -- like the substance of

12       your conversations with us.

13           You can describe for him you had

14       meetings.  You can describe who you had

15       meetings with, if you looked at materials,

16       you know, materials you looked at, those

17       types of things.  He wants just a general

18       understanding of the steps you took, not

19       asking you about you talking with me or Ali

20       or Bill or others, just to confirm.

21           MR. STEIN:  Yes, thank you.

22           THE WITNESS:  We, I, Ezri, just made sure

23       to go to Maria, Andrew or whoever and have

24       them send every document or email that we had

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 82

1    on this Indiana Yates loan.

2         I also searched my email.  I don't know

3    if I already delete it or not before I

4    searched them, and folders, my own personal

5    email, and see if he had anything which I

6    think at the beginning we sent it to Bill

7    Cherny, right, Bill?  Is he on?

8         Anyway, we send it to Bill Cherny, and

9    who he sent it to on our behalf, I'm sure he

10    sent it to all the proper people.

11   BY MR. STEIN:

12    Q.   And so -- I'm sorry.  Go ahead.

13    A.   Before this deposition I did not look at

14   any of this list anymore, especially since I leave

15   everything to the last minute.  And my computer,

16   it's well-proven known to all, crashed about 10,

17   12 days ago, and it's still not back; although I

18   bought a new computer.  It totally crashed unlike

19   something I ever seen or heard before.  My tech

20   guy also was very surprised.

21         And I always tell myself you show me a

22   document, I'll tell you if it's correct or not, I

23   don't remember little detailed commas and dots and

24   sentences; but I do remember like my conversation

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 83

1  with Jerry Cohen because it was a one-time

2  conversation, things like that.  So I said I'll

3  answer your questions.

4      Q.   So just so I'm understanding what you're

5  saying, when you mentioned that you made sure with

6  Maria, Andrew and whoever and had them send every

7  document or email that Shatar had on Indiana and

8  Yates, that's what you did when you gathered the

9  documents that you provided to your counsel who

10  then produced them; is that what you're saying?

11      A.   That was part of it.  Also I personally

12  searched.

13      Q.   I understand.  What I'm trying to

14  understand right now, Mr. Namvar, is when did that

15  occur?  Did that occur within the last month or so

16  in connection with this deposition or had that

17  occurred some months prior when the documents were

18  produced?

19      A.   When I got the notice for production.

20      Q.   For production.  So when you got the

21  notice for the deposition, what work did you do to

22  make sure that you, as the corporate

23  representative, had all of the information that

24  Shatar Capital had about those topics?

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 84

```
 1      A.   Not much because I didn't think that I
 2  need to do that.  The deposition is yours.  You
 3  ask me questions and I'll answer them, but I had
 4  everything that I could probably produce.
 5      Q.   Do you understand, Mr. Namvar, that
 6  you're testifying today not in your individual
 7  capacity but as a corporate representative?
 8      A.   Yes.
 9      Q.   And so as a corporate representative,
10  you're supposed to be here prepared to tell us
11  everything that the corporation, Shatar Capital,
12  knows about these topics.  Do you understand that?
13      A.   Yes, and I'm telling you.
14      Q.   Okay.  And you're able to do that without
15  having done any additional preparation for today's
16  deposition?
17      A.   Yes.  I met with Daniel and made sure
18  that he has produced everything.
19      Q.   So you met with Daniel, your son; is that
20  right?
21      A.   Few days ago.
22      Q.   I'm sorry.  What?
23      A.   Few days ago.
24      Q.   Did you just receive a note or something
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 85

1    that reminded you of that?

2        A.    Yeah, I was coming to deposition.  I

3    wanted to make sure that he had -- he was aware

4    that I was a Shatar representative.  He said 100

5    percent.  I don't want to tell you the

6    attorney-client privilege statement, so that's it.

7    I met with Daniel, see if there was anything else

8    I needed to know.  He didn't bring anything to my

9    attention that I did not know.

10       Q.    Mr. Namvar, you've looked a couple of

11   times to your left there.  Is there a note for you

12   on the table there?

13       A.    No.

14           MS. SCHALLER:  I'm over here.

15           MR. STEIN:  I understand.  Did you write

16       a note to the witness?

17           MS. SCHALLER:  We had previously

18       discussed that we met as a group.

19           MR. STEIN:  Okay.  So that's your

20       testimony.  I need his testimony.  Did you

21       write him a note?

22           MS. SCHALLER:  No.

23   BY MR. STEIN:

24       Q.    Okay.  So Mr. Namvar --

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 86

1         MR. DEVOOGHT:  Ask better questions, Max.

2    You're turning this deposition upside-down

3    unnecessarily in an academic fashion.  If you

4    have a problem with the topic, let's talk

5    about the topic versus like --

6         MR. STEIN:  No.  I have a problem with

7    the witness who apparently did nothing to

8    prepare, and I'm asking questions that are

9    appropriate to understand what he did to

10   prepare.  I will ask the questions I need to

11   ask. (Simultaneous talking.)

12        MR. DEVOOGHT:  It's running.

13        THE WITNESS:  I did not tell Max that.

14        MS. SCHALLER:  Hold on.

15        THE WITNESS:  I told you that I'm

16   prepared --

17        MS. SCHALLER:  Hold on.

18        THE WITNESS:  -- with the best of my

19   ability --

20        MS. SCHALLER:  Hold on.

21        THE WITNESS:  -- on everything.  Stop it.

22        MS. SCHALLER:  I think there's some

23   confusion on production --

24        THE WITNESS:  Stop it.

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 87

1              MS. SCHALLER:  -- and his dep prep.

2              THE WITNESS:  Stop it.

3              MR. DEVOOGHT:  Ezri, calm down.  Calm

4       down.  Don't fall prey to this.

5              THE WITNESS:  I don't want to deprive any

6       investors of a real legitimate loan that was

7       made.

8              MR. DEVOOGHT:  We know.  We know.

9              THE WITNESS:  Stop it.  Stop this hitting

10      below --

11             MR. DEVOOGHT:  We're going to take five

12      minutes.  We're going to take five minutes

13      right now.

14             THE WITNESS:  No, we're not.  I'm going

15      to be quiet.  Okay.  Ask the questions, real

16      questions.  I told you, I did everything in

17      my capacity to prepare, and I did.  Now ask

18      your questions.

19   BY MR. STEIN:

20      Q.   You mentioned that you met with your son,

21   Daniel; is that right?

22      A.   Yes.

23      Q.   Is your son, Daniel, an attorney?

24      A.   No.

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 88

1     Q.    Was anybody else at that meeting?

2     A.    In one of the meetings, yes.

3     Q.    In one of the meetings it was just you

4  and Daniel?

5     A.    No.  I had a phone call with Danny which

6  lasted seven, eight minutes.  We had a Zoom

7  meeting with Daniel, I and my lawyers, or the

8  lawyers that are here now.

9     Q.    And when was that Zoom meeting?

10    A.    During the last week.

11    Q.    Okay.  Approximately how long did it

12 last?

13    A.    With the lawyers?  The one I told you.

14 Don't ask me repeat questions.  I told you might

15 lasted seven or eight minutes.

16    Q.    I know.  And I asked you how long did the

17 Zoom meeting with the lawyers last?

18    A.    Probably 15 minutes or 20 minutes.

19    Q.    Okay.  Did you have any other meetings to

20 prepare for the deposition?

21    A.    With Daniel?

22    Q.    With anyone.

23    A.    No, I don't need to except, you know,

24 Bill Cherny and I have been talking before, not

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 89

1    recently.

2       Q.   Okay.  So the meetings that you had to

3    prepare for the deposition was the phone call with

4    Daniel and the Zoom meeting with the lawyers,

5    right?

6       A.   Asked and answered.  I'm going to get

7    with you now.  Asked and answered.

8            MR. DEVOOGHT:  Just answer the question.

9            THE WITNESS:  Asked and answered.  Leave

10       me alone.  Go forward.  I answered you that.

11   BY MR. STEIN:

12       Q.   Mr. Namvar, please answer my question.

13       A.   I'm not because I --

14       Q.   Are you refusing to answer the question?

15       A.   I answered the question.  Okay.

16            MS. SCHALLER:  Why don't we --

17            MR. DEVOOGHT:  Why don't we take a

18       five-minute break.

19            THE WITNESS:  I don't want to take a

20       five-minute break.  This is my deposition.

21            MR. DEVOOGHT:  Yes.  We're going off the

22       record.

23            THE WITNESS:  We had the --

24            MR. DEVOOGHT:  Court Reporter, we're

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 90

```
 1        going off the record. Close the video.
 2                         (Whereupon a recess was taken from
 3                         3:35 p.m. to 2:44 p.m., after
 4                         which the preceding deposition
 5                         continued as follows:)
 6    BY MR. STEIN:
 7        Q.   Mr. Namvar, you at one point mentioned
 8    that Shatar Capital made a loan on the Paxton
 9    property that was paid off.  Do you recall that?
10        A.   Yes.
11        Q.   Thank you.  How much was that loan?
12        A.   I don't remember.
13        Q.   And when was it paid off?
14        A.   After the Indiana and Yates loan was
15    made.
16        Q.   So just to make sure I understand the
17    timing, you made the Paxton loan, then you made
18    the Indiana and Yates loans or loan; and then at
19    some point after that but before the receivership
20    began the Paxton loan was paid off; is that right?
21        A.   That's my recollection.
22             MR. STEIN:  Okay.  Thank you.  You know
23        what, let's go off the record a quick second.
24                         (Discussion held off the record.)
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 91

1   BY MR. STEIN:

2       Q.   Can you see that okay, Mr. Namvar?

3       A.   Yes, I said.

4       Q.   Oh, thank you.  I think when you speak

5   very shortly, it doesn't -- with very short

6   sentences, it doesn't quite get picked up each

7   time.  That's why I keep not hearing you.  So my

8   apologies.

9           MR. STEIN:  Miss Court Reporter, we're

10      back on the record?

11          THE REPORTER:  Yes.

12  BY MR. STEIN:

13      Q.    Mr. Namvar, this is the document that was

14  previously marked as Exhibit 5, and it's an email

15  that you sent on December 23, 2016.  Do you

16  remember being asked questions about this exhibit

17  earlier in the deposition?

18      A.    Yes.  He doesn't hear me.  I said yes.

19      Q.    That one I heard.  Thank you.

20          In the email you say here that you need a

21  detailed request letter what properties we are

22  looking at and the amount of the loans.  Was this

23  regarding the Paxton loan or the Yates and Indiana

24  loans?

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 92

1     A.   I really don't know because if I look at

2  all the different dates, I may take a guess, but I

3  don't know as I sit here.

4     Q.   Okay.  You say then that if it's purchase

5  money that the loan would be used for, you would

6  need one set of information, and if it's a

7  refinance, you would need a different set of

8  information; is that right?

9     A.   Yes.

10     Q.   And why the different information?

11     A.   Not difference -- not different.  90

12  percent, 95 percent of the information in both

13  cases would be the same.  The only other

14  information we may need is as to regarding the

15  valuation.  If it's a purchase money loan and I

16  decide or we decide or our attorneys decide it's

17  an arm's length transaction, we take the purchase

18  price as the value; but if it's a refinance loan,

19  it depends on a lot of previous stuff, what

20  happened, what was the purchase price, the date of

21  the purchase price, whatever money they have spent

22  in it so far, the market conditions according to

23  me, has Chicago gone up, gone down since then, to

24  make sure we feel comfortable with the valuation.

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 93

1   And I told you we never get appraisers because we

2   don't have time.

3       Q.   Just so that I understand, what you're

4   sort of -- what I understood you to be explaining

5   there is that with a purchase price you can rely

6   on the fact that it's an arm's length transaction

7   between strangers, and they're going to come up

8   with a fair value; whereas with a refinance you

9   need to confirm that the value being proposed by

10  the owner is a fair value.  Is that -- that's

11  obviously a short summary -- shortened summary of

12  what you said, but is that fair?

13      A.   Yes.

14      Q.   Okay.  Thank you.  At this point in time

15  you were talking about information you might need

16  for purchase loans and for refinance loans.  Does

17  that mean that at this point in time, that is,

18  December 2016, Shatar Capital is contemplating

19  making either type of loan to EquityBuild?

20      A.   I don't remember where my head was at,

21  but, yes, we made both kind of loans as long as

22  there's equity and we can get our rates.

23      Q.   You've mentioned a couple of times that

24  Shatar Capital relies on outside attorneys

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 94

1  particularly for loans in other states; is that

2  right?

3      A.   Correct.

4      Q.   Who were the outside attorneys that

5  Shatar relied on for the loans with EquityBuild?

6      A.   In this case it was the Geraci Law Firm.

7      Q.   And what did that law firm -- what

8  services did the law firm provide that Shatar

9  Capital relied on in making the loan?

10      A.   Mostly loan documents, checking the

11  entity documents to make sure they're valid,

12  they're outstanding and they're legal and the

13  signatures are right, the right person signs them,

14  and reading entity documents if we needed to or if

15  they needed to.

16      Q.   What do you mean by reading entity

17  documents if they need to?

18      A.   If there is an LLC formed, they need to

19  inspect and read the LLC to make sure who has the

20  authority to sign for loan documents, who has the

21  authority to do the corporate resolution, et

22  cetera, et cetera, et cetera.

23      Q.   And was there an LLC involved in this

24  loan?

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 95

1      A.   I'm assuming there was, yes.

2      Q.   But you don't remember right now?

3      A.   No, I do not.

4      Q.   Do you have any -- do you or Shatar

5  Capital have any concerns with the legal services

6  that were provided to it in the course of making

7  this loan?

8      A.   With the Geraci Law Firm?

9      Q.   Yes.

10     A.   No.  They did a lot, a lot of documents

11 for us.  We've always been happy with them.

12     Q.   Thank you.  Sorry.  I'm going to pull up

13 another exhibit.

14          Mr. Namvar, I've now brought back up what

15 was previously marked as Exhibit 7.  This was an

16 email from Mr. DeRoo at EquityBuild sent to you,

17 copying Shaun Cohen with the lender doc set.  Do

18 you remember seeing this exhibit earlier?

19     A.   Earlier today, yes.

20     Q.   Thank you, that's what I meant.  Attached

21 to the document are, as Mr. DeRoo said in the

22 cover email, blank loan documents.  I'm not

23 expecting you to look at them; but if you need me

24 to scroll through any of them, let me know.

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 96

1          My question to you though is:  Did anyone
2    at Shatar Capital review these documents?
3          A.   I did not, and the person to have done it
4    would have been me because I don't know why we
5    have to look at their loan documents.  We had our
6    own and we had our own attorneys.
7          Q.   And I'm sorry.  You said the person who
8    would have had to and then I didn't hear.
9          A.   If anybody from Shatar had to look at
10   this, would have been me and would have been our
11   attorneys; but knowing ourselves and our mode of
12   operation, because we had outside attorneys and we
13   have our own set of loan documents, I don't see
14   why I would look at this or even consider it.
15         Q.   Okay.  Thank you.  Let me circle back to
16   your role at Shatar Capital.  You've mentioned
17   that the only member of Shatar is your son,
18   Daniel; is that right?
19         A.   Correct.
20         Q.   And there are no Shatar employees; is
21   that right?
22         A.   No.
23         Q.   I'm sorry.  You say no when I asked is
24   that right.  It's hard to know whether you're

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 97

1   saying, no, it's not right or you're agreeing with

2   me that there are no employees.

3       A.   Shatar did not have any employees.

4       Q.   Thank you.

5       A.   Pool employees in the office for

6   accounting, for processing, and I testified that

7   I'm not sure whether we gave monies to Andrew.  If

8   we did give monies to Andrew, would not have been

9   as an employee.  It would have been as a

10  third-party vendor because his hours change, and

11  we would give him whatever money he billed; and

12  then we would 1099 him at the end of the year.

13      Q.   Thank you.  Do you make money for the

14  work that you do for Shatar Capital?

15      A.   Okay.  That's a very tough question to

16  answer and I'll tell you why.  It's not a trick

17  answer, and I don't want to open up old can of

18  worms about the past.  When I lost all of my money

19  in 2018, my brothers, my son, everybody is

20  supporting my living expenses.  My rent is being

21  paid by my mother.  Insurance is paid by two or

22  three brothers.  And every time my wife needs

23  money, they get it from them.

24           So officially getting a check for a

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 98

```
 1    commission or something, no, but I owe them.  I

 2    owe the family so much that this is very minor.

 3        Q.   And so effectively -- and I appreciate

 4    what you just explained.  What you're saying is

 5    effectively you don't get paid, but you are doing

 6    this and there's value to it; but the reason

 7    you're doing it is because you have been so well

 8    supported by your family over the years?

 9        A.   Yeah, especially my son.  So whatever --

10        Q.   Okay.

11        A.   -- it goes in my son's pocket.  I still

12    probably owe him a couple, three million dollars

13    just since 2016.

14        Q.   One of the things that you mentioned that

15    you do for Shatar Capital is mental

16    underwriting -- sorry.  Yes?

17        A.   I need to correct the previous statement.

18    For a while while I was under probation -- I know

19    these questions haven't come up, but you know

20    about me.  I had to have an employment or the

21    probation department to let me work officially.

22             So Nut Farmers, which is one of my

23    brothers or nephew or my sister-in-law, I don't

24    know, companies was employed me and paid me $1,800
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 99

1   a month.

2       Q.   Okay.  And I don't actually need to get

3   into all of that.  I was actually trying to better

4   understand your role at Shatar Capital, and I'm

5   focused -- right now my questions are going to be

6   focused on Shatar Capital.  And the way you

7   answered it helped me better understand your role

8   in the company and why it is that you're doing

9   these things.

10          So I'm going to now move to what you said

11  was mental underwriting.  What did you mean by

12  mental underwriting?

13      A.   I know my attorneys don't -- I consider

14  myself number one, the best hard money lender,

15  knowledgeable hard money lender in the nation.  I

16  used to be one of the biggest from control funds

17  we funded 100, 150 million a month.  I've done 20

18  billion dollars plus of that business in my past

19  life and present life; and everybody, including

20  some attorneys, call me when they have a question.

21          So I see also -- one of my abilities, my

22  sixth sense, whatever, I see from A to Z, the end

23  of the tunnel, very quickly in my head.  I ask

24  different question than other people ask.  Most

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 100

1   people -- most underwriters ask about income,

2   what's the income of the -- I go by size.  How

3   much land do you have?  How much building do you

4   have?  I ask the income too.

5          On the phone I decide whether a loan is

6   good or not.  I say to everybody if I want to say

7   no, it takes three minutes.  If I want to say yes,

8   it takes ten minutes; and I need to assure you,

9   you haven't asked the question, we've never lost

10  money in hard money loans.  They've gone through

11  foreclosures.  We have some, very few,

12  foreclosures; but I know this business

13  upside-down.

14      Q.   So when you say mental underwriting, what

15  you're effectively saying is based on your years

16  of experience and expertise in this area you size

17  up the loan and decide whether it makes sense to

18  make the loan that's being requested or not; is

19  that a fair summary?

20      A.   Exactly correct.

21      Q.   Okay.  Thank you.  What questions did you

22  ask about the Yates and Indiana properties?

23      A.   The number of units, the purchase price,

24  location, income; and I wanted to see, which I'm

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 101

1    sure we saw, the escrow instructions -- we call it

2    escrow here.  Over there you go through

3    attorneys --  the purchase contract and the title

4    commitment, that's something I can smell for arm's

5    length transaction purposes.

6           When I look at the title commitment, for

7    example, if I see the ownership that is selling,

8    has been in the building for 20, 30 years, the

9    chances of this to be cheating or improper is very

10   low.  But if this present ownership went on title

11   only a month ago for 2 million and they're selling

12   it for 3 million or 2.8, that raises flags and red

13   lights in my head, and I need to check further.

14       Q.   And then the other thing that you did in

15   terms of underwriting for the Yates and Indiana

16   loan is you had your friend who lives in Chicago

17   and who is an experienced real estate investor in

18   Chicago drive by the properties; is that right?

19       A.   On Indiana/Yates, yes, I did.

20       Q.   Okay.  Based on all -- so you did your

21   mental underwriting.  You had your friend drive

22   by.  Were there other things that went into your

23   decision, your, Mr. Ezri Namvar's decision, to

24   move forward with this loan?

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 102

1      A.   By designating the various parts of the

2   loan process, which is making sure the title

3   commitment is there; making sure the attorney asks

4   for 125 percent cover, always ask him; making sure

5   we can have an ALTA policy, I -- not besides my

6   attorney, I read title reports too, and I decide

7   which items that even some normal lenders don't

8   want to eliminate or subordinate that I may need

9   to eliminate or subordinate.

10          I also look at these things to see what

11   kind of endorsements are necessary.  I know title

12   endorsements better than most attorneys who deal

13   with this kind of stuff because I've been through

14   a lot.  I used to also -- this is unnecessary,

15   used to own a bank too.

16      Q.   So for this particular loan did you have

17   any issues with those additional items that you

18   just mentioned?

19      A.   At the first look before sending it to

20   the attorney I don't remember that I did.  I don't

21   think I did; but once the Geraci Law Firm got hold

22   of it, they do their own thing.  They're very

23   detailed attorneys.  We respect them, like them a

24   lot, and they're national.  They do documentations

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 103

1   and whatever, this kind of thing nationally not

2   only in Chicago; but they happen to be based in

3   California.

4       Q.   And did they raise any issues?

5       A.   I don't remember.  I don't think so.  If

6   they did have a concern about something, it would

7   have been in the closing instructions to the title

8   people and escrow people.

9       Q.   And then they would have been satisfied

10  prior to the loan closing; is that right?

11      A.   Yeah.  If they're not satisfied -- yeah,

12  and they tell us not to do this or we need this or

13  we need that.

14      Q.   And then the loan doesn't close until

15  whatever it is gets satisfied; is that right?

16      A.   Correct.

17      Q.   You mentioned that you would have

18  included Daniel on loan documents because he was

19  the broker on the deal.  What kind of a broker is

20  Daniel?

21      A.   He has a real estate broker's license

22  which he uses for Shatar Capital as well.  He's

23  designated, he's registered, and I love him to

24  death.

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 104

1    Q.   Was he acting as a real estate broker on

2    the loans that were made for the Yates and Indiana

3    property to EquityBuild?

4    A.   Yes.

5    Q.   I'm just -- he was, okay.  I'm just

6    trying to understand what role a real estate

7    broker would have played on these loans from the

8    lender's perspective?

9    A.   Yes, absolutely.

10   Q.   So what role did he play as the real

11   estate broker?

12   A.   Naming himself as the real estate broker

13   on the documents.

14   Q.   Doesn't the real estate broker usually

15   get named by either the buyer or seller of real

16   estate?

17   A.   That's a different kind of a broker.

18   That's a buying and selling.  The broker

19   license -- the real estate license in California

20   allows you to buy and sell and earn commissions;

21   but in order to be also a mortgage broker you need

22   to be falling under two different categories not

23   at the same time, either/or, either you have to be

24   a real estate broker, which Daniel was, and it

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 105

 1   allowed him to do loan brokerage, or you have to

 2   go through Department of Corporation and do

 3   whatever they -- what is the name?  MLA, like

 4   lender license which --

 5       Q.   Right, okay.

 6       A.   -- we are not.

 7       Q.   Thank you.  That explains it.  We won't

 8   test your knowledge on things that aren't actually

 9   relevant to the loan that you all made in this

10   case.

11            You've mentioned a few times that the

12   most important thing was getting comfortable with

13   the value of the property; is that right?

14       A.   What was that?  Yeah, most important.

15   You want me to tell you what it is?

16       Q.   No, I'm sorry.  I'm switching topics

17   slightly, and I want to be sure you're coming with

18   me.

19       A.   Please repeat your question.

20       Q.   Sure.  So you've testified the most

21   important part of underwriting is getting

22   comfortable with the value of the property; is

23   that right?

24       A.   Yes.

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 106

1      Q.   Okay.  And that trumps everything because

2   Shatar you said was -- pardon me.  Let me start

3   over.

4           You previously testified that that trumps

5   everything because Shatar was a hard money lender;

6   is that right?

7      A.   It doesn't trump everything.  Even if the

8   value is there, if we know we are dealing with a

9   difficult character or somebody who is very

10  litigious, I'm just giving you examples, or

11  somebody who lied to us, you know, if we find out

12  that he lied to us, I would recommend not to do

13  the loan.  Life is too short.

14     Q.   Do you believe that Shaun or Jerry Cohen

15  ever lied to you?

16     A.    No, not ever.  I thought they were the

17  best people that walked under the sun.  He was

18  telling me how religious he was, Shaun, not Jerry,

19  and he wanted to come to Los Angeles.  His kid go

20  to Jewish school.  I don't know whether you're

21  Jewish or not, they wear the tzitzit.  So he

22  really got me sold, if that's the right word.

23     Q.   And even as you sit here today, you don't

24  believe that you were ever lied to by Shaun or

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 107

1   Jerry Cohen?

2       A.   At the time we made the loan?

3       Q.   Yes.

4       A.   At the time we made the loan, no.  Now I

5   think of him differently.

6       Q.   Okay.  You also mentioned that you want

7   the borrowers to be pregnant, meaning that they

8   have their own money at the deal and cannot cash

9   out.  What did you mean by that?

10      A.   Let's just say Shaun Cohen says we're

11  buying this property or we closed it a month ago,

12  and I told you and I told Ms. Jodi Wine I think is

13  her name that 30 days before you close, it's the

14  same as purchase price for us.  It doesn't have to

15  be exactly the stake.  But I want to make sure you

16  have your own equity, that EquityBuild had real

17  equity in the deal.  We don't finance or cash out

18  people.  One of the biggest psychological

19  underwriting points with me is they need to stay

20  pregnant.

21      Q.   So they need to keep their money in the

22  property as well as your money; is that what

23  you're saying?

24      A.   Their money would be junior to us as

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 108

1   equity.  Our money would be senior.  But since

2   that underwriting formula makes a lot of sense

3   since most of our loans are six months to a year.

4   We don't make loans over a year.  We don't even

5   make two-year loans.

6       Q.   How much money did you understand

7   EquityBuild had in the Indiana and Yates loan

8   after you made the loan?

9       A.   I can't tell you exactly.  I could look

10  at documents and tell you correct or not, but

11  enough, enough to make me feel comfortable.

12      Q.   And what generally is enough to make you

13  feel comfortable?

14      A.   Sometimes I make 80 percent loans.

15  Sometimes I don't even make 50 or 55 percent.  In

16  this case I relied on Kourosh's sentence a lot,

17  Kourosh Cohan.  And when I told him the amount of

18  the loan, which I don't remember right now, he

19  said you cannot go wrong.  Don't worry about it.

20      Q.   And that was based on his looking at the

21  property and having a sense as to what it was

22  worth and knowing that that meant that the

23  property had enough value in it that if

24  EquityBuild stopped paying on the loan, the

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 109

1   underlying property would be sufficient to make

2   sure that your lenders were made whole; is that

3   right?

4       A.   Correct, but please know, I'm answering

5   more than you asked.  I sent him the number of

6   units and the rents and all of that too.

7       Q.   So he looked at the sort of demographic

8   information about the loan, and then he went and

9   looked at the property; and based on his

10  assessment of the numbers and his looking at the

11  properties -- physically looking at the

12  properties, he was confident that there was

13  sufficient value in the properties to allow you to

14  be safe if you made the loan?

15      A.   Yes, and he actually -- I mean this guy

16  was like me in the past.  He's a very big shot.  I

17  wouldn't think that he would get in his car and

18  drive there himself.  He wanted to introduce me to

19  others.  I said, no.  Please do this yourself.  He

20  called me when he was there from his car, I

21  remember that specifically, and he told me you

22  cannot go wrong.

23      Q.   And about how long a conversation did you

24  have with him in total about his efforts regarding

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 110

1    this loan?

2        A.   My God, that's a hard question, but the

3    car conversation was less than ten minutes.

4    Probably two or three calls before that.

5        Q.   And was any of them more than ten minutes

6    would you guess?

7        A.   I don't think so because I don't --

8    everybody who knows me, I don't stay on the phone

9    for that long.

10       Q.   I was going to guess that, but I didn't

11   want to be presumptuous.

12       A.   No, you can ask me anything you want.

13       Q.   In the middle of March you sent an email

14   to Tyler DeRoo in which you said in all caps I

15   must speak with you.  Do you remember looking at

16   that earlier today?

17       A.   Was it Tyler DeRoo or Shaun Cohen?

18       Q.   I believe it was Tyler DeRoo.  I was

19   trying to do it without sharing it just because I

20   was lazy.  I'll pull it up.  Hang on a second.

21       A.   If I remember today, Ms. Wine asked me a

22   question about that cap.  The caps I remember, but

23   I thought that was a reply or something to Shaun.

24   If it's Tyler, I'll stand corrected.

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 111

1          Yeah, it's Tyler and others and Shaun is

2     also.

3          Q.   And you said:  "Tyler, I must speak with

4     you.  Call me ASAP," right?

5          A.   Correct.

6          Q.   Did Tyler call you?

7          A.   I don't remember.

8          Q.   Do you remember talking with anybody from

9     EquityBuild after you sent this email?

10         A.   I don't remember.

11         Q.   Do you know if anyone from Shatar Capital

12    spoke with anyone from EquityBuild about the topic

13    of this email?

14         A.   The proper answer would be not I don't

15    know, but the strong guessing answer would be

16    nobody else would have talked to them except me.

17         Q.   So your expectation as the corporate

18    representative for Shatar Capital is that the only

19    person who would have spoken with somebody from

20    EquityBuild about this email would be you and that

21    you don't remember talking with somebody about it;

22    is that right?

23         A.    I don't remember at this point, but I'm

24    not saying I didn't.  I don't remember.

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 112

```
1      Q.   Understood.  Sorry.  So your testimony
2  now is that if somebody spoke with somebody
3  from -- pardon me.
4           If somebody from Shatar Capital spoke
5  with somebody from EquityBuild about this email,
6  it would have been you, and you don't remember
7  having that conversation; is that right?
8      A.   Correct.
9      Q.   Thank you.  Do you remember what it was
10  in the email exchange that prompted you to send
11  that email to Tyler?
12     A.   I don't know.  I'm not trying to play
13  games.  I prefer not to guess.
14     Q.   I was going to say I'm scrolling down to
15  show you the email that preceded the email that
16  you sent.
17     A.   I really don't know why I would have sent
18  that email, but I'm sure since I capitalized it,
19  it was an important matter.
20     Q.   When you say you capitalized it, the
21  email at the very top of the exhibit is in all
22  caps, and you're saying that you used all caps
23  there to communicate the importance of your
24  request; is that right?
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 113

1     A.    Emphasize.

2     Q.    To emphasize your request, thank you.

3           You also testified earlier that you

4    believed that EquityBuild was a syndicator and had

5    raised funds for purchases of properties that way.

6    Do you remember that testimony?

7     A.    Yes.

8     Q.    What was the basis for your understanding

9    that EquityBuild was a syndicator?

10    A.    Probably just what I saw, especially what

11   I'm seeing now.  When I saw, for example, I mean I

12   want to say this and my attorneys probably would

13   object but I'm going to go ahead anyway.  Sorry

14   about that.

15          If, if I had seen, I know that that

16   exhibit is there, that these guys raised $20,000

17   increments or $10,000 increments from people, I

18   thought they would be much heavier hitters than

19   this.  I would have never done business with this

20   guy.

21    Q.    I'm sorry.  What -- go ahead.

22    A.    One of the things, if I had seen that

23   EquityBuild raises small amounts of money, like

24   20,000 here, 15,000 there, they would have -- it

312.345.1500
847.551.3460

*Precise* KRUSE

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 114

1  would have spooked me as very small, nitty-gritty

2  players; and I would not -- that would have been

3  one of the things that would have made me say we

4  don't want to do the loan no matter how much --

5  not because of Ponzi or anything, no matter how

6  good the loan's value is.  This is stupid.  Our

7  category is so different than theirs.

8       Q.   So what you're saying is that learning

9  later that EquityBuild was getting purchase money

10 from investors making smaller investments, 10, 20,

11 30 thousand dollars, would have been enough to

12 cause you, Mr. Namvar, as the underwriter for

13 Shatar Capital, to decide not to proceed with the

14 loan?

15           MR. DEVOOGHT:  Object to the form.

16           THE WITNESS:  In that time, yes, you are

17      correct; but I found out these small amounts

18      today for the first time when you showed me

19      that exhibit.  I'm not saying it's -- I

20      really don't remember ever seeing this, and

21      knowing that these guys solicit, you know,

22      peanuts.

23 BY MR. STEIN:

24      Q.   And when you say the exhibit you saw

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 115

```
 1    earlier today, are you referring to the mortgage
 2    that you were shown as an exhibit by Ms. Rosen
 3    Wine that was the mortgage to the equity -- that
 4    EquityBuild gave to its investors?
 5        A.   Yes, for the same loan, are you kidding
 6    me?
 7        Q.   When you made the loan, what did you
 8    understand EquityBuild was -- strike that.  Let me
 9    start again.
10            When you made the loan, what kind of
11    money did you understand that EquityBuild was
12    syndicating such that you were comfortable going
13    ahead and making the loan?
14            MR. DEVOOGHT:  Object to the form.
15            THE WITNESS:  I don't remember.  I heard
16        150 one time.  I don't know whether they said
17        they have closed 150 million dollars worth of
18        deals or they had equity 150 million, but
19        that stuck in my head.  That's what Shaun
20        Cohen told me.
21    BY MR. STEIN:
22        Q.   So what you remember Shaun Cohen telling
23    you was that they had aggregated funds of around
24    150 million dollars, and that signaled to you that
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 116

```
 1   they were the kinds of significant players you
 2   would have expected them to be; is that right?
 3       A.   Not exactly.  What I said is funds,
 4   not --
 5           MR. DEVOOGHT:  Mr. Namvar, you have to
 6       give me a chance -- I need you to slow down a
 7       little bit just so I can lodge my objection.
 8       Max asks a question.  You've got to give me
 9       just a split second to lodge an objection.
10       Sorry to interrupt.  Object to the form.  Go
11       ahead.
12           THE WITNESS:  I can answer now?
13           MR. DEVOOGHT:  Yes.  Thank you.
14           THE WITNESS:  I said I wasn't sure
15       whether the 150 million was transactional
16       value including, including first mortgages or
17       the 150 million I had was all equity plus the
18       existing mortgages which would have raised
19       that number.  I don't remember.  But the 150
20       million I specific -- that number is in my
21       head.
22   BY MR. STEIN:
23       Q.   And you testified earlier that you don't
24   remember previously having seen the mortgage that
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 117

```
 1    EquityBuild gave to its individual investor
 2    lenders; is that right?
 3         A.   What did I say?  I said I wasn't aware of
 4    it.
 5         Q.   Yes.
 6         A.   I thought the format was raising equity,
 7    not to give --
 8         Q.   Right.  And I'm sorry.  Just so it's
 9    clear.  You were not aware that there was a
10    mortgage that had been given to individual
11    investors for the same property that you were
12    making the loan on; is that right?
13         A.   Absolutely correct, I was not.  If I was,
14    why would I have done business with this guy?
15         Q.   And I just want to make sure that your
16    testimony as the corporate representative on
17    behalf of Shatar Capital is that nobody at Shatar
18    Capital was aware of that mortgage; is that right?
19         A.   Correct, 100 percent.
20         Q.   You were asked questions about Danny
21    Pakravan, and I'm probably mispronouncing that,
22    purchasing the interest of some of the lenders on
23    the Shatar Capital loan.  Do you recall that?
24         A.   Yes.
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 118

1      Q.   And that purchase happened after the

2   EquityBuild -- sorry.  That was a complete brain

3   cramp.  Let me start all over.

4          That purchase occurred after the

5   EquityBuild receivership had begun; is that right?

6          MR. DEVOOGHT:  Object to the form.

7          THE WITNESS:  Ms. Jodi Wine represented

8       that, and I have no reason to believe she is

9       wrong, but you've got to look at the dates;

10      and it's very, very obvious because we would

11      have given the assignment from those people

12      to Danny, which is recorded document, and the

13      date is on it two or three days after he

14      brought the money or concurrently when he

15      brought the money.  So those dates can tell

16      you, and if you can show me, I can testify,

17      but you don't need to, that when Danny

18      Pakravan gets involved, other people shifts.

19   BY MR. STEIN:

20      Q.   How much did Danny pay for those

21   interests?  Did he pay 100 percent of the value of

22   them, did he pay 75 percent of the value, 50

23   percent of the value?

24      A.   No.  I'll tell you what, and this is a

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 119

 1   total guess which is 95 percent correct, they got

 2   their money plus normal interest.  Daniel would

 3   keep the default interest, which is the extra

 4   money Daniel would have made.

 5       Q.   So Daniel would have -- Danny would have

 6   paid them 100 percent of the amount of the money

 7   that they made as part of the loan plus the

 8   interest that they should have received but didn't

 9   from EquityBuild; is that right?

10       A.   The regular interest, yes.

11       Q.   And then Danny was looking to make his

12   money on getting the elevated interest -- an

13   elevated default interest rate on his, when he got

14   paid; is that right?

15       A.   Right.

16       Q.   Has Shatar Capital made any other claims

17   besides the claim it made in the receivership

18   related to the funds that it's seeking in the

19   receivership?

20       A.   Any other claims to who?

21       Q.   To any insurance companies, title

22   insurance companies, anybody else?

23            MR. DEVOOGHT:  Object to the form.

24            THE WITNESS:  It's hard for me -- where

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 120

```
 1      did Bill go?  Is Bill here?  I think we made
 2      a claim against the title company at some
 3      point.  I think so.  I'm not sure.
 4  BY MR. STEIN:
 5      Q.   Okay.  Sorry.  Go ahead.
 6      A.   No other person.
 7      Q.   So you think that a claim was made
 8  against the title insurance company; is that
 9  right?
10      A.   Yeah, that's a normal thing to do in our
11  business, and so we did.
12          MR. DEVOOGHT:  Court Reporter, can we get
13      a time check?
14          THE REPORTER:  We're at 2 hours 50
15      minutes.
16          MR. STEIN:  5-0?
17          THE REPORTER:  Yes.
18          MR. STEIN:  Why don't we go off the
19      record for ten minutes.  I'm just about done.
20      I just need to double-check what else I might
21      need to cover and what I can do in ten
22      minutes.
23          MR. DEVOOGHT:  Okay.
24              (Whereupon a recess was taken from
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 121

1           4:24 p.m. to 4:31 p.m., after

2           which the preceding deposition

3           continued as follows:)

4   BY MR. STEIN:

5       Q.   Mr. Namvar, I'm now showing you what has

6   been marked as Exhibit 14.  It is an email dated

7   March 15, 2017, from you to Tyler DeRoo.  Do you

8   see that?

9       A.   I see it.

10      Q.   In this email you ask Mr. DeRoo:  "Can

11  you please send us a detailed resume or brochure

12  on the company?  How you raise money, the length

13  in business, how many units you control, et

14  cetera, et cetera.  Thanks."  Do you see that?

15      A.   Yes.

16           MR. DEVOOGHT:  Max, is there -- again,

17      the Zoom format.  Is there a thing below it?

18      You can show us the email.  Is that the only

19      email?

20           MR. STEIN:  It was sent in response to

21      this email.

22           MR. DEVOOGHT:  Okay.

23           MR. STEIN:  Thank you.

24           MR. DEVOOGHT:  Thanks.

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 122

1    BY MR. STEIN:

2        Q.   Mr. Namvar, feel free to read this email

3    because the question I was about to ask -- oh,

4    wait, hang on.  Let me see.  That's the beginning

5    of the email thread.  And now I will stop making

6    everybody dizzy by moving it around.

7            The email that you sent, Mr. Namvar, that

8    we just read was sent in response to this email

9    from Mr. DeRoo in which he said he wanted to

10   correct a previous typing mistake on this

11   building.  The assets purchase price was 1.55

12   million, and he had previously written 1.35

13   million.  Do you recall this exchange?

14       A.   I don't recall it, but I can testify that

15   it's probably a correct email chain.

16       Q.   Do you remember receiving any information

17   from Mr. DeRoo in response to your request to him

18   for a detailed resume or brochure on the company

19   and information on how it raises money, the length

20   it's been in business and how many units it

21   controls?

22       A.   I don't remember.

23       Q.   Do you believe as you sit here today that

24   you received information in response to that

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 123

1    request?

2        A.    Tyler was very good about responding and

3    sending things.  I'm assuming he did.  I don't

4    know whether he did, but I know this is not a yes

5    or no answer, but I can think about why I sent

6    that and I need to put it out there for my

7    attorneys.

8            They were also at the same time asking me

9    to raise 100 million dollar credit line for them.

10   We also broker loans to institutions, banks,

11   funds, what have you.  If I ask for this kind of

12   information, it was most probably for one of the

13   institutional lenders to see if I can get them a

14   credit line.  That's my guess.

15       Q.    Okay.  And do you have any recollection

16   as to whether you -- what you received that you

17   shared with those institutional lenders that would

18   have provided information on EquityBuild and how

19   it raises money?

20       A.    If it's not in my document production, I

21   either did not receive it or may have lost it or

22   deleted it.  I don't know.  I don't know.  I don't

23   know.

24       Q.    As you sit here today as the corporate

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 124

1   representative for Shatar Capital, do you have an

2   understanding as to what Shatar Capital knew in

3   March of 2017 about how EquityBuild raised money?

4       A.   Not on top of what I've already testified

5   to.

6       Q.   Okay.  One last topic I need to cover,

7   Mr. Namvar.  We touched on it a little bit.

8   You've been convicted of some crimes; is that

9   right?

10          MR. DEVOOGHT:  Object to the form.  What

11      is the relevance of this?  This is a 30(b)(6)

12      deposition as the Shatar corporate

13      representative from the topics in the

14      deposition notice.

15  BY MR. STEIN:

16      Q.   You can answer the question, Mr. Namvar.

17      A.   Crime, I hate that word.  I was indicted

18  on four counts of misrepresentation.

19      Q.   Were you convicted of any of those

20  counts?

21          MR. DEVOOGHT:  Object to form.  This is

22      all public record.  You know the answer to

23      these questions, Max.  This is just

24      harassment.

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 125

```
 1   BY MR. STEIN:
 2       Q.   You can answer.
 3       A.   I agree with my lawyer, but I can talk
 4   about it as long as you want; but I was convicted
 5   of four counts because my exhibits never got to
 6   the jury room by clerk's mistake.
 7       Q.   Okay.  What was the nature of the
 8   misrepresentations?
 9           MR. DEVOOGHT:  Object to the form.  This
10       is all public record.  This has nothing to do
11       with the topics in the deposition notice.
12       This is harassment, but you can answer.
13           THE WITNESS:  We owned -- had nothing to
14       do with loans.  We owned a 1031 exchange
15       accommodation business.  Our exchange
16       documents all mention in paragraph 5 that we
17       used the money.  We don't put it in a bank.
18           MR. DEVOOGHT:  Court Reporter, can we
19       have a time check, please?
20           THE REPORTER:  Four more minutes.
21           THE WITNESS:  Okay.  It was regarding
22       four investors out of 93 who lost money and
23       lied, four counts.
24   BY MR. STEIN:
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 126

```
 1      Q.   Did the investors claim that they had

 2   lost money as a result of your misrepresentations?

 3           MR. DEVOOGHT:  Object to the form.  This

 4       is all public record.  This has nothing to do

 5       with Shatar.  This is witness harassment and

 6       a waste of time.  But you may answer.

 7           THE WITNESS:  They claimed that they

 8       didn't know what they were signing; and if

 9       they did know what they were signing, the

10       jury was buying it by nodding heads and

11       stuff, unless at the last minute three days

12       later we found out that our exhibits never

13       got to the jury room.  It was by mistake of

14       the clerk left in the codefendant's lawyer's

15       carts.

16           So they never looked at any 18 exhibits

17       we had out of 500 exhibits.  They only looked

18       at the prosecutor's 500 exhibits which was

19       all our quarterly accounting documents.  When

20       I write my book, I'll send you a copy.

21   BY MR. STEIN:

22       Q.   Please.  But I want to get a clear answer

23   to the question.  Did the four investors who

24   claimed that you made misrepresentations lose
```

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

Page 127

1      money in their investments as a result?

2          MR. DEVOOGHT:  Object to the form.  This

3      has doing to do with the Shatar corporate

4      representative, which Mr. Stein has gone out

5      of his way to highlight.  This is a corporate

6      deposition.  This is not in the topics.  This

7      is an embarrassment.  You're harassing the

8      witness.  You may answer the question.

9          THE WITNESS:  They lost money not because

10     of me.  The money was in the account.  They

11     lost money because the trustee took every

12     money we had in every account and paid

13     themselves over 500 million dollars worth of

14     legal fees.  And Ms. Jodi Wine and you have

15     to listen to this.  500 million dollars.

16         MR. DEVOOGHT:  Can we get a time check,

17     please?

18         THE REPORTER:  Two 58.

19         MR. STEIN:  I have no further questions.

20         MR. DEVOOGHT:  I have a couple follow-up,

21     Ms. Wine, are you --

22         MS. WINE:  No.  I was going to ask if

23     anyone else had any questions.

24         MR. DEVOOGHT:  Mr. Hanauer, do you have

```
                                              Page 128

 1      any questions on behalf of the SEC?

 2            MR. HANAUER:  No.  Thank you, Counselor.

 3            MR. DEVOOGHT:  I do.

 4                    CROSS EXAMINATION

 5   BY MR. DEVOOGHT:

 6      Q.   I have a couple quick questions for you.

 7   First so the record is clear on the substance of

 8   your level of preparation (inaudible) --

 9            THE REPORTER:  I'm sorry.  We can't hear

10   you.

11   BY MR. DEVOOGHT:

12      Q.   Okay.  I want to ask you just a couple

13   quick questions, sir.  You were asked some

14   questions about your preparation today, do you

15   remember that, by Mr. Stein?

16      A.   Yes.

17      Q.   Okay.  And, in fact, you met with --

18   without disclosing the substance, isn't it true

19   you met with your attorneys to discuss the

20   deposition topics on a number of occasions?

21      A.   Yes.

22            MR. STEIN:  Object to the form of the

23      question.

24   BY MR. STEIN:
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 129

```
 1      Q.   Including didn't you meet with your
 2   attorneys for like an hour and a half by Zoom to
 3   discuss the topics?
 4           MR. STEIN:  Object to the form of the
 5       question.  Leading.
 6   BY MR. DEVOOGHT:
 7      Q.   You can answer.
 8      A.   Yes.
 9      Q.   And isn't it true that you spoke with
10   your son to ask him any questions you had about
11   Shatar, the structure of Shatar, as he was the
12   president of that entity?
13      A.   Yes.
14           MR. STEIN:  Object to the form of the
15       question.
16           MR. DEVOOGHT:  Thank you for your time
17       today, sir.  I have no further questions.
18           MS. WINE:  I have no further questions of
19       this witness either.  I think that means
20       we're done.
21           THE REPORTER:  What about signature?  Do
22       we do signature?
23           MR. DEVOOGHT:  Yeah, read and sign.
24       Thank you so much for your time today, most
```

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 130

1    important.

2         THE REPORTER:  Thank you.  Transcripts,

3    Ms. Wine?

4         MS. WINE:  Yeah.  I'll have my office

5    call you about what type of order.  Thank

6    you.

7         THE REPORTER:  Okay.  I'll let everybody

8    else know then.

9         MS. WINE:  Thank you, Mr. Namvar.

10             (Whereupon the deposition

11              concluded at 4:41 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 131

```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION

 3
    UNITED STATES SECURITIES AND
 4  EXCHANGE COMMISSION,
                               Civil Action No.
 5            Plaintiff,        18-cv-5587

 6         vs.                  Hon. Manish S. Shah

 7  EQUITYBUILD, INC., EQUITYBUILD   Magistrate Judge
    FINANCE, LLC, JEROME H. COHEN    Young B. Kim
 8  and SHAUN D. COHEN,

 9            Defendants.
    _____
10

11          I, EZRI NAMVAR, being first administered

12  an oath, say that I am the deponent in the

13  aforesaid deposition taken on November 1, 2023;

14  that I have read the foregoing transcript of my

15  deposition, and affix my signature to same.

16

17                    _____

18                    Ezri Namvar

19

20

    Subscribed and sworn to
21  before me this _____ day
    of _____, 2023.
22

23

    _____
24  Notary Public
```

312.345.1500
847.551.3460

*Precise* KRUSE

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 132

1    STATE OF ILLINOIS  )
                        ) SS.
2    COUNTY OF C O O K  )

3

4              I, JOANNE M. GAGLIARDI, CSR, RPR, do

5    hereby certify that EZRI NAMVAR, was by me

6    remotely first duly sworn to testify to the truth,

7    the whole truth, and nothing but the truth, and

8    that the above deposition was recorded

9    stenographically by me and reduced to

10   computer-aided transcription by me.

11             I FURTHER CERTIFY that the foregoing

12   transcript of the said deposition is a true,

13   correct, and complete transcript of the testimony

14   given by the said witness at the time and place

15   specified hereinbefore.

16             I FURTHER CERTIFY that I am not a

17   relative or employee or attorney or counsel of any

18   of the parties, nor a relative or employee of such

19   attorney or counsel, or financially interested

20   directly or indirectly in this action.

21

22

23

24

**Ezri Namvar**
**U.S. Securities and Exchange Commission v. Equitybuild, Inc.**

Page 133

```
 1            I FURTHER CERTIFY that my certificate

 2     annexed hereto applies to the original and typed

 3     transcripts only, signed and certified transcripts

 4     only.  I assume no responsibility for the accuracy

 5     of any reproduced copies not made under my control

 6     or direction.

 7            IN WITNESS WHEREOF, I have hereunto

 8     set my hand this 6th day of November, 2023

 9

10     _____

11     Certified Shorthand Reporter
       Registered Professional Reporter
12     C.S.R. No. 084-002466

13

14

15

16

17

18

19

20

21

22

23

24
```

Case: 1:18-cv-05587 Document #: 1537 Filed: 11/08/23 Page 155 of 370 PageID #:105538

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

Page 1

**A**

**a-m** 7:10
**a-r** 7:11
**a-t** 71:1,15
**Aaron** 71:11,11
71:12,12
**abilities** 99:21
**ability** 86:19
**able** 8:3 30:4
43:13 44:17
66:23 84:14
**Abraham** 71:6
71:11
**absolutely** 104:9
117:13
**academic** 86:3
**access** 18:17
**accommodation**
125:15
**account** 127:10
127:12
**accounting**
17:18,21 97:6
126:19
**accuracy** 133:4
**acquisition** 75:4
**acting** 104:1
**action** 1:4 16:13
131:4 132:20
**actual** 42:24
50:6
**add** 24:15 27:13
61:8
**added** 26:20,22
**adding** 24:17
**additional** 41:19
41:24 42:7
84:15 102:17
**address** 51:8
69:16
**administered**
131:11
**administering**
6:7

**adverse** 57:18
58:18,20
**adversely** 61:4
**advice** 58:17
**advised** 34:1
**advising** 48:17
**affix** 131:15
**aforesaid** 131:13
**afternoon** 5:15
6:1 80:5
**age** 36:19
**Agency** 51:10
**aggregated**
115:23
**ago** 18:7,7 25:9
70:18 82:17
84:21,23
101:11 107:11
**agree** 6:6,11,13
6:15 125:3
**Agreed** 6:16,17
**agreeing** 97:1
**agreement** 4:22
6:10 51:10
58:15 76:5
78:24 79:3
**ahead** 7:24 8:15
42:16 51:22
53:11 82:12
113:13,21
115:13 116:11
120:5
**al** 19:9
**ALEXANDRA**
2:16
**Ali** 5:7 56:8
81:19
**allow** 109:13
**allowed** 24:14
38:17 40:14
105:1
**allows** 24:19,20
104:20
**almond** 17:5
**already-closed**

38:11,17 40:13
**ALTA** 102:5
**American** 56:2,6
**amount** 23:13
24:2 26:13
28:8 91:22
108:17 119:6
**amounts** 22:21
23:3 113:23
114:17
**analyst** 11:1
**and/or** 28:1
38:18
**Andrew** 2:15
6:13 18:2,3
52:2 54:6,12
59:2,11,16
68:20 81:23
83:6 97:7,8
**Andy** 5:7 62:11
**Angeles** 72:11
72:12 106:19
**Angie** 62:7
**angry** 81:8
**annexed** 133:2
**answer** 11:7
27:9 44:16
45:3,4 68:9
83:3 84:3 89:8
89:12,14 97:16
97:17 111:14
111:15 116:12
123:5 124:16
124:22 125:2
125:12 126:6
126:22 127:8
129:7
**answered** 89:6,7
89:9,10,15
99:7
**answering** 109:4
**anybody** 20:17
88:1 96:9
111:8 119:22
**anymore** 18:5

73:23 78:22
82:14
**anyway** 15:21
71:12 82:8
113:13
**anyways** 15:11
27:22 35:9
**apartment** 55:21
**apologies** 91:8
**apparently** 51:5
86:7
**APPEARANC...**
2:1 3:1
**appeared** 2:7,13
2:20 3:6,13
**appearing** 16:13
**appears** 26:18
**appended** 22:17
**apple** 71:1
**applies** 133:2
**apply** 27:21 41:8
78:13,19,21
**appointed** 78:21
**appointment**
77:11 78:15
**appraisal** 14:24
15:1,2,4,9
**appraiser** 55:22
**appraisers** 93:1
**appreciate** 79:21
98:3
**appropriate**
86:9
**approximately**
63:10 88:11
**April** 4:22 28:2
28:18 75:20,24
76:3
**area** 100:16
**Ariel** 26:9
**arm's** 15:16,17
39:13 40:5
55:5 58:8,11
58:12 92:17
93:6 101:4

**arranged** 22:3,4
**arrangement**
64:21
**arrangements**
65:1
**ASAP** 46:17
60:15 111:4
**aschaller@loe...**
2:19
**asked** 49:2,11
72:16 80:12
88:16 89:6,7,9
91:16 96:23
100:9 109:5
110:21 117:20
128:13
**asking** 22:9 23:6
39:17 41:20
44:22 55:10
61:11 73:6
81:9,19 86:8
123:8
**asks** 44:24 46:17
102:3 116:8
**asserted** 20:14
**assessment**
109:10
**assets** 122:11
**assigned** 73:21
**assignment** 4:21
73:1,10,19
74:15 118:11
**assignments**
72:19
**assume** 68:8
133:4
**assuming** 22:14
28:17 32:4
38:8,14 50:24
69:7 95:1
123:3
**assumption** 68:8
**assurances** 48:2
**assure** 100:8
**attached** 19:10

Case: 1:18-cv-05587 Document #: 1537 Filed: 11/08/23 Page 156 of 370 PageID #:105539

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

Page 2

19:13,14,18,20
19:24 46:8
50:19 69:15
95:20
**attachment**
43:21 45:11
**attachments**
45:14 50:18
**attempt** 7:14
**attention** 77:16
85:9
**attorney** 39:24
54:18 72:9,10
87:23 102:3,6
102:20 132:17
132:19
**attorney-client**
85:6
**attorneys** 39:14
47:24 48:17,19
48:20,22 57:9
68:19 80:7
81:11 92:16
93:24 94:4
96:6,11,12
99:13,20 101:3
102:12,23
113:12 123:7
128:19 129:2
**August** 29:8
**authenticity**
64:11
**authorities**
49:22
**authority** 94:20
94:21
**Authorization**
45:15
**authorized** 40:4
**automatic** 58:2
**available** 12:18
**Avenue** 3:4,10
**aware** 38:8,13
54:7,13,21
57:19 59:22

66:10 68:16
85:3 117:3,9
117:18

**B**
**B** 1:7 32:24
131:7
**back** 12:9 18:22
27:23 36:19
37:9 40:9 43:3
43:11 44:23
45:17 48:16
67:20 73:13
77:18 82:17
91:10 95:14
96:15
**balance** 24:8,11
24:18 26:21,23
26:24 27:1,2
27:14
**bank** 14:20
102:15 125:17
**bankruptcies**
57:3,24
**bankruptcy**
16:7 57:20
**banks** 16:11
123:10
**Baruch** 61:5
**based** 23:22 42:8
100:15 101:20
103:2 108:20
109:9
**basis** 22:21 23:3
113:8
**Bates** 63:5 77:20
**began** 90:20
**beginning** 28:22
36:3 82:6
122:4
**begun** 118:5
**behalf** 2:7,13,20
3:6,13 5:6,8,12
5:13 7:2 8:17
21:2 64:7 81:3

82:9 117:17
128:1
**believe** 24:6 32:1
35:19 41:12,18
64:1 73:18
106:14,24
110:18 118:8
122:23
**believed** 113:4
**belongs** 17:8
70:16
**Ben** 5:16 6:17
**beneficiaries**
69:12
**Beneficiary**
69:10
**BENJAMIN** 2:3
**best** 7:22 45:19
46:14 86:18
99:14 106:17
**better** 15:16
86:1 99:3,7
102:12
**BH** 61:3
**Bible** 76:16
**big** 8:7 42:19
55:22 56:9
109:16
**bigger** 67:13
**biggest** 99:16
107:18
**bill** 6:15 18:8
20:20,20,21
81:20 82:6,7,8
88:24 120:1,1
**bill@chernyla...**
3:5
**billed** 97:11
**billion** 99:18
**binding** 6:8
**bit** 11:5 12:7
51:21 59:9
61:21 116:7
124:7
**blah** 15:18,18

**Blanc** 3:19 5:20
**blank** 51:4 95:22
**bless** 61:5
**blessings** 61:17
**block** 61:2,12
**blue** 26:22
**Blvd** 2:4
**board** 37:4
**book** 126:20
**books** 78:12
**borrowed** 77:14
**borrower** 15:1
16:4 34:10
63:10 75:1
**borrowers** 15:23
63:14 64:13
107:7
**borrows** 74:19
**bottom** 35:17
43:20,23 58:24
63:1,5 75:19
**bought** 15:22
73:12,17 82:18
**Boulevard** 41:16
**brain** 118:2
**break** 42:15
43:11 75:8,12
79:6 89:18,20
**breakdown** 20:8
**breaker** 58:2
**bridge** 33:12
65:8
**bring** 77:16 85:8
**brings** 10:17
**brochure** 121:11
122:18
**broker** 54:7,13
103:19,19
104:1,7,11,12
104:14,17,18
104:21,24
123:10
**broker's** 103:21
**brokerage** 11:17
105:1

**brother's** 17:9
17:13
**brothers** 97:19
97:22 98:23
**brought** 9:5 18:3
71:24 72:5
95:14 118:14
118:15
**building** 55:21
100:3 101:8
122:11
**buildings** 45:22
46:1 55:21
**burner** 48:16
**business** 11:2,15
11:17,23 13:5
17:6 30:23
31:5,8 38:8,14
39:1,3,6 40:18
53:10 61:12
65:3 70:11,12
70:14,17 71:9
71:21 78:8
99:18 100:12
113:19 117:14
120:11 121:13
122:20 125:15
**businesses** 49:9
**buy** 75:3 104:20
**buyer** 104:15
**buying** 11:19
104:18 107:11
126:10

**C**
**C** 132:2
**C-a-l-l-e-j-a**
18:2
**C-h-e-r-n-y** 5:11
**C-o-h-a-n** 56:4
**C.S.R** 133:11
**calculated** 24:14
**California** 9:10
27:21 48:21
53:9 103:3

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

Page 3

| | | | | |
|---|---|---|---|---|
| 104:19 | 90:8 93:18,24 | 132:16 133:1 | **Christopher** | **closing** 28:5,14 |
| **call** 5:2 20:17 | 94:9 95:5 96:2 | **cetera** 21:7,8 | 30:9 31:21 | 46:9,10,11 |
| 31:8 37:12,15 | 96:16 97:14 | 94:22,22,22 | **chronological** | 47:18,20,21,22 |
| 47:18 48:6 | 98:15 99:4,6 | 121:14,14 | 59:1 | 48:3,4,7,12,12 |
| 58:19 60:14 | 103:22 111:11 | **chain** 4:18,18,19 | **circle** 96:15 | 48:16 49:6 |
| 79:14 88:5 | 111:18 112:4 | 4:19,20,22,23 | **Civil** 1:4,14 6:4 | 59:18 61:24 |
| 89:3 99:20 | 114:13 117:17 | 43:20,20,23 | 131:4 | 63:11 64:2,3 |
| 101:1 111:4,6 | 117:18,23 | 52:2 59:1,9 | **claim** 4:16 16:12 | 103:7,10 |
| 130:5 | 119:16 124:1,2 | 60:13 62:10 | 16:16,19 19:2 | **coattails** 72:5 |
| **called** 1:12 7:2 | **Capital's** 8:21 | 63:9 122:15 | 19:8,18 20:14 | **codefendant's** |
| 11:1 16:20 | **capitalized** | **chance** 66:16 | 21:10 22:1,8 | 126:14 |
| 51:4,9 55:20 | 112:18,20 | 116:6 | 22:12,19,22 | **Cohan** 56:4,9 |
| 56:13 71:11 | **caps** 38:7 39:14 | **chances** 101:9 | 23:5,12 28:23 | 108:17 |
| 74:14 109:20 | 110:14,22 | **change** 97:10 | 119:17 120:2,7 | **Cohen** 1:7,8 |
| **Calleja** 18:2,3 | 112:22,22 | **changed** 72:20 | 126:1 | 34:3 35:15 |
| 52:2 53:23 | **car** 56:14 109:17 | 72:23 73:9 | **claimant** 20:14 | 36:5,8,9,14,21 |
| 59:3,11 | 109:20 110:3 | **character** 106:9 | **claimants** 21:1 | 37:7,7,22 38:2 |
| **calling** 55:10 | **care** 35:12 65:9 | **charge** 27:18 | 78:4 | 44:14,18,20 |
| **calls** 16:5 110:4 | 69:16 | 28:19 29:11 | **claimed** 23:3 | 49:1 57:19 |
| **calm** 87:3,3 | **Carolyn** 3:18 | **charges** 27:16 | 126:7,24 | 75:17 76:4 |
| **camera** 5:19 | 5:18 | 27:18 | **claims** 80:8 | 78:17,17 79:2 |
| **cap** 110:22 | **carts** 126:15 | **charging** 76:17 | 119:16,20 | 79:2 83:1 |
| **capacity** 84:7 | **case** 8:22 15:20 | 76:24 | **Clark** 2:16 | 95:17 106:14 |
| 87:17 | 21:11 28:13 | **chat** 7:13 18:22 | **clean** 13:24 | 107:1,10 |
| **capital** 2:20 3:7 | 38:18 40:21 | **cheating** 101:9 | 39:12 | 110:17 115:20 |
| 5:8,12 8:11,17 | 41:3 55:13 | **check** 97:24 | **clear** 19:23 | 115:22 131:7,8 |
| 8:22,24 9:2,3,6 | 61:24 76:18 | 101:13 120:13 | 117:9 126:22 | **collateral** 14:13 |
| 9:11,18,22,23 | 94:6 105:10 | 125:19 127:16 | 128:7 | 33:20 51:9 |
| 10:2,6,21,24 | 108:16 | **checking** 94:10 | **clerk** 126:14 | **collect** 49:19,23 |
| 12:4,18,24 | **cases** 14:24 | **Cherny** 3:3,3 | **clerk's** 125:6 | **collection** 24:22 |
| 13:4 16:12 | 17:20 92:13 | 5:11,11 6:15 | **client** 16:16 | **column** 26:24 |
| 18:12,14 19:9 | **cash** 16:1 107:8 | 6:15 20:21,22 | **clients** 29:4 39:2 | **come** 45:24 |
| 20:15,16 21:10 | 107:17 | 82:7,8 88:24 | 49:8 | 71:20 74:7 |
| 21:16,23 22:2 | **casualty** 47:5 | **Chicago** 2:5,11 | **clockwork** 29:4 | 79:22 93:7 |
| 22:3 23:23 | **categories** | 2:17 3:11 | **close** 16:8 28:7,7 | 98:19 106:19 |
| 25:16,17,18 | 104:22 | 40:15 45:24 | 28:18 47:17,23 | **comes** 15:1 |
| 29:14 35:1 | **category** 114:7 | 55:23,23 56:7 | 55:8 63:14 | 28:10 45:9 |
| 36:23 41:16 | **cause** 114:12 | 62:7 63:9 | 64:14 90:1 | 48:16 |
| 59:11 60:17 | **cents** 51:6 | 65:19 79:23 | 103:14 107:13 | **comfortable** |
| 61:3 63:4 64:7 | **certain** 47:13 | 92:23 101:16 | **closed** 38:9,15 | 14:8 15:8,18 |
| 64:8,9 66:9,9 | **certainly** 81:7 | 101:18 103:2 | 41:16 42:5 | 42:9 92:24 |
| 67:16 68:15 | **certificate** 133:1 | **choice** 77:6 | 46:15 52:23 | 105:12,22 |
| 69:1,16 70:12 | **certified** 1:17 | **Chris** 29:17,21 | 59:18 60:23 | 108:11,13 |
| 77:24 81:3 | 6:2 133:3,10 | 30:1 34:4 | 107:11 115:17 | 115:12 |
| 83:24 84:11 | **certify** 132:5,11 | 36:22 | **closer** 44:3 | **coming** 43:22 |

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

85:2 105:17
**comma** 35:22
**commas** 82:23
**commercial**
55:21
**commission** 1:4
2:3 11:21 98:1
131:4
**commissions**
104:20
**commitment**
14:1,6,6 55:4
58:16 101:4,6
102:3
**common** 13:19
36:18
**commonly** 33:21
**communicate**
112:23
**communicating**
32:3
**communicatio...**
18:1 36:8
**companies** 33:21
98:24 119:21
119:22
**company** 9:21
10:4,14,18
11:16 13:8
17:7,11 25:16
25:24 26:2
47:23,24 74:19
99:8 120:2,8
121:12 122:18
**complete** 118:2
132:13
**components**
32:17
**computer** 18:18
82:15,18
**computer-aided**
132:10
**concentrate**
35:18
**concern** 47:9

103:6
**concerns** 95:5
**concluded**
130:11
**concurrently**
118:14
**condition** 14:16
**conditions** 92:22
**conduct** 42:12
**confident**
109:12
**confirm** 55:16
62:17,23 76:5
81:20 93:9
**confirmation**
78:23
**confirmed** 79:2
**confusion** 86:23
**connection**
83:16
**consider** 96:14
99:13
**consistent** 28:12
**consists** 32:16
**constraint** 42:19
**contact** 29:14
32:2 35:24
36:23 37:5,6
**contemplating**
93:18
**continue** 53:14
**continued** 3:1
43:9 79:18
90:5 121:3
**continues** 32:24
**contract** 15:14
101:3
**contracts** 55:5
**control** 99:16
121:13 133:5
**controls** 122:21
**convenience**
46:12
**conversation**
37:16,20 82:24

83:2 109:23
110:3 112:7
**conversations**
81:10,12
**converting** 77:2
**converts** 78:8
**convey** 61:15
**convicted** 124:8
124:19 125:4
**copied** 34:2
60:10
**copies** 133:5
**copy** 7:22 34:6
65:14 66:15,21
67:14 126:20
**copying** 38:3
95:17
**corporate** 40:4
83:22 84:7,9
94:21 111:17
117:16 123:24
124:12 127:3,5
**corporation** 9:7
9:8 84:11
105:2
**correct** 13:21
16:14 21:14
22:8 23:21
24:4 25:24
27:14 29:7,21
35:2 40:3,6
41:11,17 44:11
50:13 52:13,20
56:20 57:4,22
65:4,9 67:17
68:11,12,13
77:1,1,2 78:7
82:22 94:3
96:19 98:17
100:20 103:16
108:10 109:4
111:5 112:8
114:17 117:13
117:19 119:1
122:10,15

132:13
**corrected**
110:24
**correctly** 42:1
76:8
**correspondence**
17:1
**counsel** 6:6,9
7:22 40:8,9,10
64:2 83:9
132:17,19
**Counselor** 128:2
**counts** 124:18
124:20 125:5
125:23
**COUNTY** 132:2
**couple** 16:5 37:1
37:3,9 39:15
61:21 70:18
85:10 93:23
98:12 127:20
128:6,12
**course** 14:3
38:20 95:6
**court** 1:1 29:20
70:22 79:10
89:24 91:9
120:12 125:18
131:1
**Courts** 1:15
**cover** 95:22
102:4 120:21
124:6
**coverage** 47:5
**COVID** 18:5
**cramp** 118:3
**crashed** 82:16
82:18
**credit** 14:3 16:6
55:7 56:19
57:1,3,5,7,9,16
123:9,14
**creditworthin...**
16:4
**Crest** 70:16 71:4

**Crime** 124:17
**crimes** 124:8
**CROSS** 4:7,10
80:3 128:4
**crossed** 35:11
38:23
**crowdfunding**
38:10,15 39:8
39:10,17
**CSR** 1:22 132:4
**current** 21:3
**currently** 7:18
10:7 12:3,4
**custom** 13:16
**cut** 64:24
**Cyrus** 56:3

**D**
**D** 1:8 4:1 28:1
131:8
**D-a-n-n-y** 74:10
**Daniel** 9:16,17
10:3,13,15
16:23 22:7,12
26:5 38:3 52:3
53:23 54:6,13
68:20 71:10
75:20 76:3
79:4 84:17,19
85:7 87:21,23
88:4,7,21 89:4
96:18 103:18
103:20 104:24
119:2,4,5
**Danny** 74:6,7,9
88:5 117:20
118:12,17,20
119:5,11
**database** 78:1
**date** 25:10 72:19
74:15 92:20
118:13
**dated** 25:4,7
62:8 74:17
121:6

Precise KRUSE

Case: 1:18-cv-05587 Document #: 1537 Filed: 11/08/23 Page 159 of 370 PageID #:105542

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

Page 5

**dates** 21:19
51:23 58:16
92:2 118:9,15
**daughter** 71:3
**David** 71:14
**day** 42:20 45:4
131:21 133:8
**days** 28:9,15,16
28:18 48:8,9
48:10 53:3,7
53:10 82:17
84:21,23
107:13 118:13
126:11
**dead** 70:15,17
**deal** 16:1 27:7
33:11 41:2
44:24 47:3
54:7,13 56:22
58:2 102:12
103:19 107:8
107:17
**dealing** 106:8
**dealings** 37:21
**deals** 12:24 38:9
38:11,14,17,19
40:13,23 45:2
49:6 52:16
115:18
**Dearborn** 2:10
**death** 103:24
**debt** 77:3
**December** 4:17
4:18,18 38:1
44:15 50:16
91:15 93:18
**decide** 92:16,16
92:16 100:5,17
102:6 114:13
**decision** 101:23
101:23
**deed** 48:8
**default** 24:13,14
24:17,22 27:16
27:22 75:4

119:3,13
**defendants** 1:9
1:12 2:13 7:2
23:14 131:9
**delete** 82:3
**deleted** 123:22
**Demand** 4:16
25:1
**demographic** 109:7
**deny** 36:17
**dep** 87:1
**department** 48:23 98:21
105:2
**depending** 14:4
39:23
**depends** 92:19
**deponent** 2:20
131:12
**deposition** 1:11
4:15 5:10 7:15
8:10,11 9:20
12:10,13 34:23
43:8 79:17
80:21,21 81:1
81:4 82:13
83:16,21 84:2
84:16 85:2
86:2 88:20
89:3,20 90:4
91:17 121:2
124:12,14
125:11 127:6
128:20 130:10
131:13,15
132:8,12
**depositions** 1:16
6:5
**deprive** 87:5
**DeRoo** 37:2,22
38:3 45:9
46:13 50:16,23
51:13 52:7,12
52:15,21 59:2

95:16,21
110:14,17,18
121:7,10 122:9
122:17
**describe** 13:7
22:21 81:13,14
**description** 4:14
20:3,5
**designated** 12:20 103:23
**designating** 102:1
**designee** 5:9
**desktop** 47:18
47:22 48:6,12
**detail** 34:9
**detailed** 34:4
82:23 91:21
102:23 121:11
122:18
**details** 28:1
42:11 56:8
**determining** 62:3
**DeVooght** 2:15
4:9 5:7,7 6:13
6:13 7:17
18:19,24 23:10
27:8 30:6
32:22 33:3
34:20 42:13,22
43:5,15 50:3
50:11 53:11,20
62:9,13,19,22
65:12 66:13,22
67:8,20 75:6
75:13,16,23
77:20 78:3
79:7,13,24
81:5 86:1,12
87:3,8,11 89:8
89:17,21,24
114:15 115:14
116:5,13 118:6
119:23 120:12

120:23 121:16
121:22,24
124:10,21
125:9,18 126:3
127:2,16,20,24
128:3,5,11
129:6,16,23
**devooght@loe...** 2:18
**diem** 28:3,14
**difference** 9:2,4
21:6 92:11
**different** 13:10
13:15 20:4
21:23 25:19
26:16 30:23
39:6 40:8 49:3
49:24 56:5
60:6 61:20,22
61:23 65:10
74:12,12 92:2
92:7,10,11
99:24 104:17
104:22 114:7
**differently** 60:8
107:5
**difficult** 106:9
**diligence** 13:8
55:1
**DIRECT** 4:5 7:5
**direction** 133:6
**directly** 21:5
132:20
**directory** 62:23
**disclose** 81:8,10
**disclosing** 128:18
**discuss** 71:17
128:19 129:3
**discussed** 85:18
**discussing** 71:22
**discussion** 59:16
90:24
**dispute** 64:11
**distinguish**

20:12
**distributed** 21:7
38:18 40:22
**District** 1:1,1,15
131:1,1
**DIVISION** 1:2
131:2
**dizzy** 24:6 122:6
**doc** 50:17 95:17
**docs** 48:23 50:19
54:19
**document** 8:4
23:2,7 24:5
25:4,7,11
29:24 30:4
39:22 42:17
43:13 49:22
50:7,9 51:4,9
51:22 52:1
58:21 61:6
63:2,2 65:16
66:3,8,19
67:11 68:6,23
69:6 73:1,11
73:18 76:12,23
77:19,21 80:20
81:24 82:22
83:7 91:13
95:21 118:12
123:20
**documentation** 24:20 27:13
**documentations** 102:24
**documents** 8:24
14:4 20:2
24:21 28:13
35:11 39:21
40:6 44:21
46:10 47:13
49:15,20,21,23
51:3,12,18
55:11 58:12,14
62:18 63:4
64:2,5 68:18

Case: 1:18-cv-05587 Document #: 1537 Filed: 11/08/23 Page 160 of 370 PageID #:105543

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

Page 6

72:14 74:22
78:1 83:9,17
94:10,11,14,17
94:20 95:10,22
96:2,5,13
103:18 104:13
108:10 125:16
126:19
**doing** 54:3 98:5
98:7 99:8
127:3
**dollar** 123:9
**dollars** 26:14
31:23 34:18
35:7 46:23
51:6 98:12
99:18 114:11
115:17,24
127:13,15
**domain** 17:2
**Doron** 29:19
30:15,16
**dot** 35:22
**dots** 38:23 82:23
**dotted** 35:11
**double** 15:15
**double-check**
120:20
**doubt** 22:15
**download** 7:20
**draws** 40:9
**drive** 70:16 71:4
101:18,21
109:18
**Dropbox** 7:13
7:15 18:16,23
**drove** 56:10
**dry** 46:15 47:17
47:20,21 48:11
**due** 13:8 21:20
26:13,19 28:10
28:20,20 55:1
**DUFF** 2:9
**duly** 7:3 132:6
**duty** 15:13

**E**

**E** 4:1
**e-k** 70:24
**E-z-r-i** 7:9
**earlier** 61:18
91:17 95:18,19
110:16 113:3
115:1 116:23
**Early** 9:13
**earn** 104:20
**earning** 11:20
**easiest** 45:19
46:14
**East** 3:4
**EASTERN** 1:2
131:2
**easy** 18:15 51:23
**Ebriani** 71:6,12
73:17,22
**Ebrianis** 73:17
**Ebrianis'** 73:19
**effectively** 98:3
98:5 100:15
**efforts** 109:24
**eight** 53:3,7
74:11 88:6,15
**EITAN** 3:19
**either** 9:22 21:2
48:1 55:10
72:15 74:3
93:19 104:15
104:23 123:21
129:19
**either/or** 104:23
**electronic** 6:5
**elevated** 119:12
119:13
**eliminate** 102:8
102:9
**email** 4:17,17,18
4:18,19,19,20
4:22,23 17:1
30:9 32:10
34:8 36:12

38:2 39:18
43:20,23 44:7
44:10,17 45:8
45:14 46:6,10
50:12,16,22
52:1,11 53:1
53:13,22 59:18
60:10,13 62:6
62:14,15,24
63:8,18,23
64:1,10 73:5
75:17,20,22
76:1,4,5 81:24
82:2,5 83:7
91:14,20 95:16
95:22 110:13
111:9,13,20
112:5,10,11,15
112:15,18,21
121:6,10,18,19
121:21 122:2,5
122:7,8,15
**emails** 34:7 37:9
43:22 48:14
60:5,9,12
**embarrassment**
127:7
**emphasize** 113:1
113:2
**employed** 10:20
13:18 39:14
98:24
**employee** 18:14
97:9 132:17,18
**employees** 10:6
10:8,8,11,17
17:15 96:20
97:2,3,5
**employer** 17:3
**employment**
98:20
**enables** 27:13
**ended** 43:21
60:7
**endorsements**

14:7 102:11,12
**enforceable** 40:6
**entire** 75:21
**entities** 76:6
**entity** 9:15 25:21
94:11,14,16
129:12
**entries** 24:1
**equity** 33:10,12
64:21 77:3
93:22 107:16
107:17 108:1
115:3,18
116:17 117:6
**EquityBuild** 1:7
1:7 21:16,18
21:23 29:13,15
31:13 32:16
33:7 34:3,7,17
35:5 36:1,6,22
37:23 46:22
47:7 51:10,12
52:16 57:9
64:13,23 65:2
76:18 93:19
94:5 95:16
104:3 107:16
108:7,24 111:9
111:12,20
112:5 113:4,9
113:23 114:9
115:4,8,11
117:1 118:2,5
119:9 123:18
124:3 131:7,7
**EquityBuild's**
39:6,24 59:3,7
64:2
**errors** 39:15
**escrow** 47:23
48:1 101:1,2
103:8
**escrowing** 15:15
**Esmail** 70:3,4,8
71:13,23 72:4

73:16,20,22
**especially** 79:10
82:14 98:9
113:10
**estate** 11:17,19
11:20 101:17
103:21 104:1,6
104:11,12,14
104:16,19,24
**et** 19:9 21:7,7
94:21,22,22
121:13,14
**evaluate** 16:3
**everybody** 97:19
99:19 100:6
110:8 122:6
130:7
**ex-wife** 71:2
**exact** 26:3 36:10
**exactly** 100:20
107:15 108:9
116:3
**examination**
1:13 4:5,7,10
7:5 80:3 128:4
**examine** 64:22
**examined** 7:3
**examines** 68:6
69:6
**example** 22:20
101:7 113:11
**examples** 106:10
**exchange** 1:4 2:3
63:18 112:10
122:13 125:14
125:15 131:4
**excuse** 15:23
**exhibit** 4:15,16
4:16,17,17,18
4:18,19,19,20
4:20,21,22,23
7:18 8:5,9
18:17,23 19:2
19:10,13,15,19
19:24 20:2,3,4

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

20:7,11,11
22:6,17,18,20
24:23,24 25:1
26:12 27:23
30:2,5,8 31:24
31:24 38:1,1
43:12,14,24
44:8 49:24
50:1,4,6,10,15
51:4 52:1
58:22 62:7
65:11,11,14,22
66:3 68:11,22
69:10,15 75:11
75:15 91:14,16
95:13,15,18
112:21 113:16
114:19,24
115:2 121:6
**exhibits** 4:13
7:15 50:4 73:5
125:5 126:12
126:16,17,18
**existing** 116:18
**expectation**
111:17
**expected** 116:2
**expecting** 95:23
**expenses** 97:20
**experience** 53:5
100:16
**experienced**
72:10 81:6
101:17
**expertise** 100:16
**explain** 14:18
22:6,16 40:23
47:20 61:14
63:15 64:16
**explained** 15:6
98:4
**explaining** 93:4
**explains** 32:15
105:7
**explanation**

16:9 63:21
64:9
**extra** 119:3
**eyes** 16:8
**Ezri** 1:12 4:2
5:22 7:1,9
29:16 44:8
62:24 67:10
81:22 87:3
101:23 131:11
131:17 132:5

**F**

**F** 32:24
**F-a-r-o-k-h**
71:14
**fact** 60:22 74:23
78:14 93:6
128:17
**factor** 79:23
**fair** 36:21 93:8
93:10,12
100:19
**fall** 87:4
**falling** 104:22
**familiar** 59:4
**familiarize**
66:16,23
**family** 17:9
70:16,20 71:2
98:2,8
**far** 10:3 71:4
79:21 92:22
**Farmers** 17:3,4
17:16 18:10
98:22
**farming** 17:6
**Farokh** 70:4
71:14,23 72:4
72:16 73:16,20
**Farsaa** 70:4
71:13 73:22
**fashion** 86:3
**fast** 67:18
**father** 31:2,3,11

37:12,13 57:21
70:15,15,17,18
**favor** 56:9
**Federal** 6:3
**fee** 31:22
**feel** 15:18 42:9
92:24 108:11
108:13 122:2
**fees** 24:13,15,18
24:22,22 26:21
27:13,19 31:9
127:14
**file** 50:4 54:11
54:14
**filed** 16:12 57:19
**files** 15:3
**Filing** 4:21
**filled** 16:16
45:16
**final** 59:18
**finalized** 40:11
**finally** 54:18
71:10
**finance** 1:7
107:17 131:7
**financial** 45:20
46:5
**financially**
132:19
**financing** 46:18
**find** 18:15 50:18
69:24 106:11
**finding** 14:8
33:8 56:8
**fine** 70:6 73:7
**finish** 54:23
**firm** 54:19 69:8
69:8 94:6,7,8
95:8 102:21
**first** 7:3,9 8:6
9:1 13:23 14:1
28:10 29:14
30:14 32:2,5
32:13 33:13,17
35:3 36:5,7

39:12 44:16
46:24 47:3,7
55:4 56:5 65:3
66:9 67:1,21
68:16 74:1,9
74:21 102:19
114:18 116:16
128:7 131:11
132:6
**five** 43:1 48:10
87:11,12
**five-minute**
89:18,20
**Fixture** 4:21
**flags** 101:12
**flies** 32:5
**Florida** 37:15
**fluid** 71:21
**focus** 46:14
66:23
**focused** 99:5,6
**folder** 18:17
**folders** 82:4
**follow** 40:21
54:11 80:11
**follow-up**
127:20
**following** 28:11
52:15
**follows** 7:4 43:9
79:18 90:5
121:3
**foreclosures**
100:11,12
**foregoing**
131:14 132:11
**forget** 36:17
**form** 4:16 16:19
19:2,18 23:1,5
23:12 28:23
34:20 45:15
51:5,8 114:15
115:14 116:10
118:6 119:23
124:10,21

125:9 126:3
127:2 128:22
129:4,14
**format** 28:7
41:21 117:6
121:17
**formed** 94:18
**forms** 22:19
45:11
**formula** 13:12
13:14 108:2
**forth** 18:22 37:9
40:10
**forward** 80:1
89:10 101:24
**forwarded**
53:22
**forwarding** 52:6
**found** 23:9
114:17 126:12
**four** 48:10 71:19
124:18 125:5
125:20,22,23
126:23
**fractionalized**
68:10
**free** 122:2
**friend** 55:20
62:4 70:4
71:15 101:16
101:21
**front** 40:7 66:21
**full** 7:8 53:15
78:12
**function** 15:13
16:10 53:12
**fund** 46:16
**funded** 99:17
**funds** 33:18
44:23,24 63:12
99:16 113:5
115:23 116:3
119:18 123:11
**funny** 15:15
39:1,3

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

Page 8

**further** 33:19
35:24 101:13
127:19 129:17
129:18 132:11
132:16 133:1
**future** 72:19

**G**

**Gagliardi** 1:17
1:22 6:1 132:4
**games** 112:13
**gather** 15:3
**gathered** 83:8
**Gemara** 78:12
**general** 13:9,17
81:17
**generally** 42:23
108:12
**generated** 22:19
**gentleman** 17:24
30:11
**Geraci** 69:7
72:18 94:6
95:8 102:21
**getting** 12:8
16:15 38:24
39:6 48:4
50:22 64:13,20
97:24 105:12
105:21 114:9
119:12
**girl** 16:20
**give** 12:6 16:9
22:19 27:7
39:3 66:15
67:1 77:17
97:8,11 116:6
116:8 117:7
**given** 46:24
65:17 66:14,19
74:11 117:10
118:11 132:14
**giving** 56:8
106:10
**glad** 18:3

**glasses** 67:9
**go** 7:24 8:15
22:5 24:5
26:17,18 34:9
35:17 36:19
39:21 42:16
43:3,17,19
44:13 45:13,17
51:22 53:11
56:17 58:24
59:9 66:24
67:4,20 68:1
69:9 75:19
81:23 82:12
89:10 90:23
100:2 101:2
105:2 106:19
108:19 109:22
113:13,21
116:10 120:1,5
120:18
**God** 32:7 61:5
67:18 110:2
**goes** 40:9 98:11
**going** 7:13,14,19
7:24 12:6
18:19 28:24
36:16 37:24
38:18 40:22
42:4,13 43:12
43:19 45:13,17
46:17 49:24
51:2 52:9 54:7
54:23 58:24
67:18 68:7
69:9 75:5,10
75:19 78:18
79:19 80:11
87:11,12,14
89:6,21 90:1
93:7 95:12
99:5,10 110:10
112:14 113:13
115:12 127:22
**good** 5:15,24

42:14 45:5
49:3,5,10
51:19 58:6
75:13 79:6,9
80:5 100:6
114:6 123:2
**goodness** 32:9
**grantor** 74:1
**great** 53:15
67:23 71:10
80:19
**ground** 49:21
**group** 5:20
85:18
**guarantee** 37:17
**guarantees**
78:19
**guarantors** 57:8
78:17
**guess** 39:19,20
55:23 92:2
110:6,10
112:13 119:1
123:14
**guessing** 111:15
**guy** 29:17 82:20
109:15 113:20
117:14
**guys** 16:16 49:7
113:16 114:21

**H**

**H** 1:7 70:24
131:7
**half** 18:7 37:19
129:2
**Hamid** 70:3,4,8
71:13,23 72:3
73:15,20,22
**Hanauer** 2:3
5:15,16 6:17
6:17 127:24
128:2
**hanauerb@se...**
2:6

**hand** 6:19 80:15
133:8
**handle** 11:3
**handled** 54:5
**hands** 66:22
**hang** 110:20
122:4
**happen** 103:2
**happened** 29:10
34:2 59:23
60:9 92:20
118:1
**happy** 95:11
**harassing** 127:7
**harassment**
124:24 125:12
126:5
**hard** 14:17,18
14:21,22 15:5
16:10 28:24
66:15,21 67:6
67:14 96:24
99:14,15
100:10 106:5
110:2 119:24
**harder** 15:21
66:20
**Harry** 70:24
**Hashem** 61:5
**hate** 124:17
**head** 35:19
93:20 99:23
101:13 115:19
116:21
**header** 25:11
**heads** 126:10
**hear** 27:4 62:12
72:21 80:9
91:18 96:8
128:9
**heard** 11:5,7
42:1 64:15
82:19 91:19
115:15
**hearing** 44:4

91:7
**heavier** 113:18
**Hekmatja** 70:16
70:21 71:1,5
**Hekmatjas**
72:16
**held** 90:24
**help** 52:16
**helped** 99:7
**helps** 51:23
**hereinbefore**
132:15
**hereto** 69:15
133:2
**hereunto** 133:7
**Heter** 76:7,10,11
76:15,22 77:4
77:6,12,19
78:7,10,13
79:1
**highlight** 127:5
**hired** 54:18
**hitters** 113:18
**hitting** 87:9
**hold** 8:12 20:19
66:13 69:5
70:14 86:14,17
86:20 102:21
**Holdings** 25:12
25:14,15,20,23
**Hon** 1:6 131:6
**honest** 27:15
**hour** 1:19 42:14
75:7,9 129:2
**hours** 17:21
61:13 97:10
120:14
**hundreds** 19:18

**I**

**I-o-a-n-a** 59:4
**ideal** 49:8
**identified** 21:12
28:3 59:12
65:17 69:13,22

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

Page 9

**identifies** 65:21
**identify** 8:23
  12:24 13:2
  63:5
**identity** 8:23
**illegible** 23:1
**Illinois** 1:1 2:5
  2:11,17 3:4,11
  40:16 131:1
  132:1
**imagine** 20:1
**imagining** 20:6
  20:6
**importance**
  112:23
**important** 14:15
  105:12,14,21
  112:19 130:1
**improper** 101:9
**inactive** 12:5
**inaudible** 128:8
**include** 61:11
**included** 80:21
  103:18
**including** 36:18
  44:5 49:21
  61:16 99:19
  116:16,16
  129:1
**income** 100:1,2
  100:4,24
**incorporated**
  9:9,12,14
  69:15
**increase** 24:11
**increased** 29:9
**increments**
  113:17,17
**INDEX** 4:13
**Indiana** 19:22
  21:12 41:21
  42:2,8 52:19
  82:1 83:7
  90:14,18 91:23
  100:22 101:15

104:2 108:7
**Indiana/Yates**
  41:13 101:19
**indicated** 80:6
**indicates** 23:12
  63:9
**Indicating** 66:1
**indicted** 124:17
**indirectly**
  132:20
**individual** 3:13
  5:14 57:7
  76:19 80:7
  84:6 117:1,10
**individuals** 54:2
  57:8 69:13
  70:11
**information**
  12:17 15:3
  22:18,24 23:2
  23:4,8 45:21
  46:5,11 83:23
  92:6,8,10,12
  92:14 93:15
  109:8 122:16
  122:19,24
  123:12,18
**inspect** 94:19
**instance** 56:19
**institutional**
  13:15 14:20
  123:13,17
**institutions**
  16:11 123:10
**instructed** 57:10
**instructions**
  51:3 101:1
  103:7
**instrument** 77:3
**instruments**
  67:17
**insurance** 47:4,5
  97:21 119:21
  119:22 120:8
**intend** 81:7

**interest** 18:9
  23:17 24:1,17
  26:19 27:14
  28:8,20 73:19
  76:17 77:1,18
  117:22 119:2,3
  119:8,10,12,13
**interested** 13:1
  30:16 132:19
**interests** 74:8
  118:21
**interrupt** 29:20
  41:6 116:10
**introduce**
  109:18
**introduced**
  29:18 30:20
  31:20
**introducing**
  59:2
**introduction**
  34:8 36:4
**introductory**
  35:16
**invalid** 77:13
**invest** 74:19
**investing** 31:13
  71:18
**investment** 49:2
**investments**
  114:10 127:1
**investor** 55:22
  72:24 74:13
  101:17 117:1
**investor's** 20:9
**investors** 3:13
  5:14 20:18
  33:8,21 35:7
  38:10,15 39:7
  39:8,18,19
  46:24 49:2,17
  64:18 65:4,5
  66:6 69:20
  71:20 72:24
  74:8 80:8 87:6

114:10 115:4
  117:11 125:22
  126:1,23
**invite** 36:11
**involved** 18:1
  26:5 54:15
  69:2 94:23
  118:18
**involvement**
  8:21
**involves** 11:18
**Ioana** 59:4,13
**Iska** 76:7,10,11
  76:15,22 77:4
  77:6,12,19
  78:7,10,13
  79:1
**Israel** 37:11
**issue** 51:22
**issues** 102:17
  103:4
**items** 13:19
  102:7,17

**J**
**J** 2:16 71:1
**Jackson** 2:4
**Jefferson** 3:4
**Jerome** 1:7 37:7
  37:12 131:7
**Jerry** 37:6,13
  57:19 75:17
  76:4 78:17
  79:2 83:1
  106:14,18
  107:1
**Jew** 77:1 78:21
**Jewish** 61:4
  106:20,21
**Jews** 76:13,13
  78:11
**Joanne** 1:16,22
  6:1 11:6 132:4
**job** 1:24 57:14
  71:10

114:10 115:4
**Jodi** 2:9 5:5 6:11
  18:19 42:13
  53:11,20 62:13
  67:3,12 75:6
  107:12 118:7
  127:14
**joint** 78:8,9
**Judge** 1:7 131:7
**judgments** 16:7
  57:6
**July** 29:5
**jumping** 80:13
  80:14
**June** 25:4,7
  26:13 27:2
  28:20 71:1
**junior** 107:24
**jury** 125:6
  126:10,13
**jwine@rdpla...**
  2:12

**K**
**K** 132:2
**K-o-u-r-o-s-h**
  56:4
**keep** 18:8 76:15
  91:7 107:21
  119:3
**keeping** 17:22
**kept** 18:6
**Kermanian**
  29:19 30:15,17
  30:19,22 31:6
**key** 32:16
**kid** 106:19
**kidding** 115:5
**kilo** 70:24
**Kim** 1:7 131:7
**kind** 13:7 14:7
  48:15 93:21
  102:11,13
  103:1,19
  104:17 115:10
  123:11

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

**kinds** 116:1
**Klein** 72:8
**knew** 31:2 124:2
**know** 9:5,14
 10:3 11:6 15:5
 15:21 16:1,21
 17:8,9,10,10
 17:19 18:13,15
 19:15 21:3,19
 26:3,4,15,16
 29:9,12 33:9
 36:15,15,20
 38:23 39:9
 40:19 45:5
 47:21 48:3,12
 49:4,5,10,11
 49:19 50:19
 51:13,20 53:7
 54:8 55:6 56:2
 56:3,7 58:18
 60:8 62:10,18
 63:11,23 64:8
 65:1,5 66:7,14
 70:2,8,10 71:4
 71:7,13,20
 72:15,17 73:1
 73:2,3,12,15
 73:16,23 75:1
 75:10 76:22
 78:11,18 81:6
 81:16 82:2
 85:8,9 87:8,8
 88:16,23 90:22
 92:1,3 95:24
 96:4,24 98:18
 98:19,24 99:13
 100:12 102:11
 106:8,11,20
 109:4 111:11
 111:15 112:12
 112:17 113:15
 114:21 115:16
 123:4,4,22,22
 123:23 124:22
 126:8,9 130:8

**knowing** 96:11
 108:22 114:21
**knowledge** 81:2
 105:8
**knowledgeable**
 99:15
**known** 12:17
 31:3 47:24
 70:3 74:3
 82:16
**knows** 11:2
 31:19 84:12
 110:8
**kosher** 38:17
 40:14,20
**Kourosh** 56:2,3
 56:8 62:4
 108:17
**Kourosh's**
 108:16

**L**

**lack** 15:16
**land** 100:3
**landed** 71:10
**lasted** 37:18,19
 88:6,15
**late** 27:16,18,19
 29:3,11
**law** 3:3,9 27:22
 42:8 54:19
 69:7,8 94:6,7,8
 95:8 102:21
**laws** 40:15
**lawyer** 42:23
 59:7 81:6
 125:3
**lawyer's** 126:14
**lawyers** 14:5
 36:17 37:23
 58:17 59:3
 88:7,8,13,17
 89:4
**lazy** 110:20
**Leading** 129:5

**learning** 71:8
 114:8
**lease** 49:21
**Leases** 4:21
**leave** 82:14 89:9
**left** 34:13,14
 85:11 126:14
**legal** 20:3,5
 24:13,18,22
 26:21 49:20,20
 94:12 95:5
 127:14
**legally** 27:21
**legible** 23:9
**legitimate** 87:6
**lend** 33:18 39:7
**lender** 14:19,21
 16:10 33:17
 47:11 50:17,19
 78:7 95:17
 99:14,15 105:4
 106:5
**lender's** 104:8
**lenders** 13:15
 14:17,22 19:14
 44:22 51:11
 65:21 68:10
 69:14,17,19,21
 72:20,23 73:9
 73:13,14 77:15
 102:7 109:2
 117:2,22
 123:13,17
**length** 15:16,17
 39:13 40:5
 55:6 58:8,11
 58:12 92:17
 93:6 101:5
 121:12 122:19
**let's** 27:8 28:17
 42:16,22,24
 43:2 51:21
 79:24 86:4
 90:23 107:10
**letter** 14:6 35:16

 35:23 36:3
 39:24 40:2
 61:6 91:21
**letters** 40:8 48:1
 60:17 61:3
**level** 128:8
**liability** 25:24
**license** 1:23
 11:18 103:21
 104:19,19
 105:4
**lied** 106:11,12
 106:15,24
 125:23
**lien** 33:17
**life** 35:15 99:19
 99:19 106:13
**lights** 101:13
**limited** 25:23
 65:7
**line** 30:15 123:9
 123:14
**link** 7:13,16
 18:23 32:11
**list** 19:14 50:3
 52:19 69:10
 82:14
**listed** 23:16
 28:24 29:1
 51:7 65:22
 68:11
**listen** 127:15
**listing** 23:22
 50:17
**lists** 27:24 28:2
**litigious** 106:10
**little** 8:9 11:4
 12:7 44:3
 51:21 59:9
 61:21 82:23
 116:7 124:7
**lives** 55:23 56:9
 101:16
**living** 73:10,24
 74:2 97:20

**LLC** 1:7 2:9,20
 3:7 5:12,19
 25:12,15,20,23
 26:6 70:16
 71:4 94:18,19
 94:23 131:7
**LLCs** 40:3
**LLP** 2:15
**loan** 11:2,14
 13:8,10,15,18
 13:20 14:3,14
 18:2 20:2
 21:18,18,21
 23:17,24 24:18
 24:20,21 27:12
 27:17 28:5,14
 29:3 31:18,20
 31:21 32:13
 34:11,22 35:1
 35:3,3,5,10
 41:1,3,14,17
 42:2,6,9 47:14
 47:14,19 48:11
 48:23 49:3
 51:22 52:23
 55:2 56:15
 59:17,22 60:4
 60:7,22 61:19
 61:19 62:1
 64:20 69:18
 70:1,6 71:5,7,9
 71:18 72:13
 73:23 74:19
 77:8 78:9 82:1
 87:6 90:8,11
 90:14,17,18,20
 91:23 92:5,15
 92:18 93:19
 94:9,10,20,24
 95:7,22 96:5
 96:13 100:5,17
 100:18 101:16
 101:24 102:2
 102:16 103:10
 103:14,18

Precise KRUSE

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

105:1,9 106:13
107:2,4 108:7
108:8,18,24
109:8,14 110:1
114:4,14 115:5
115:7,10,13
117:12,23
119:7
**loan's** 114:6
**loaned** 24:2
**loans** 8:20 10:16
11:3,18,19,22
11:23 12:9,24
13:3,23 14:2
15:10,13 18:6
21:15,23 33:4
33:13 47:1
48:21 53:6,9
54:16 58:1
65:4,8 74:12
74:12 76:5
78:24 90:18
91:22,24 93:16
93:16,21 94:1
94:5 100:10
104:2,7 108:3
108:4,5,14
123:10 125:14
**located** 19:22
**location** 14:4
100:24
**lodge** 116:7,9
**LOEB** 2:15,15
**long** 42:18 47:8
65:8 88:11,16
93:21 109:23
110:9 125:4
**look** 14:23 35:9
45:22,24 46:4
54:9 57:6
58:12 60:9
64:18 68:19,20
73:1 77:21
82:13 92:1
95:23 96:5,9

96:14 101:6
102:10,19
108:9 118:9
**looked** 16:23,23
44:7,11 54:8
56:13 57:4
62:4 81:15,16
85:10 109:7,9
126:16,17
**looking** 13:22
18:21 43:24
55:10 78:6
80:20 91:22
108:20 109:10
109:11 110:15
119:11
**looks** 49:19
62:14
**Los** 72:11,12
106:19
**lose** 80:14
126:24
**lost** 31:11 77:8
77:10,15 97:18
100:9 123:21
125:22 126:2
127:9,11
**lot** 17:11 33:10
40:3 59:10
60:9 67:16
76:21 92:19
95:10,10
102:14,24
108:2,16
**love** 77:6 103:23
**loves** 75:3
**low** 101:10

—————————
**M**

**M** 1:16,22 70:24
132:4
**M-i-r-o** 29:22
**M-o-r-a** 29:21
30:9
**M-o-u-s-a** 17:14

**Magistrate** 1:7
131:7
**main** 17:6 37:4
**major** 17:3 77:7
78:15
**makeup** 17:11
**making** 11:14,22
11:23 13:8
24:6 31:10
35:10 55:2
56:15 65:8
93:19 94:9
95:6 102:2,3,4
114:10 115:13
117:12 122:5
**Manish** 1:6
131:6
**March** 4:19,19
4:20,23 52:3,7
52:12 53:1
59:11,24,24
62:8 63:8
65:18 66:10
110:13 121:7
124:3
**Maria** 16:21,22
17:1 81:23
83:6
**mark** 24:24 30:2
51:22 73:4
**marked** 19:2,19
25:1 30:4
31:24 38:1
43:14 52:1
58:22 62:6
65:11 68:22
91:14 95:15
121:6
**market** 92:22
**marking** 8:4
**Martin** 59:12
**Mary** 7:10 70:24
**materials** 81:15
81:16
**matter** 35:9,13

112:19 114:4,5
**matures** 27:18
**Max** 3:9 5:13
6:16 43:22
79:20 80:6
81:6 86:1,13
116:8 121:16
124:23
**maximum** 37:18
**mean** 9:22 14:10
14:18 15:6
31:7 33:2,22
37:8 38:21
39:8 40:6,14
41:6 48:9
52:14,23 60:1
64:16 65:7
70:15 76:24
93:17 94:16
99:11 107:9
109:15 113:11
**meaning** 107:7
**means** 15:6
33:16 45:7
46:7 47:17,20
48:12 61:5
129:19
**meant** 19:23
39:17 40:23
46:4 48:13
49:10 95:20
108:22
**meet** 40:17
129:1
**meeting** 36:11
88:1,7,9,17
89:4
**meetings** 81:14
81:15 88:2,3
88:19 89:2
**member** 26:6
96:17
**members** 25:21
26:2,3
**memorandum**

32:11
**memory** 29:2
51:1
**mental** 54:4
98:15 99:11,12
100:14 101:21
**mention** 9:21
73:9 125:16
**mentioned** 30:17
57:2 58:7 83:5
87:20 90:7
93:23 96:16
98:14 102:18
103:17 105:11
107:6
**mentions** 30:14
**message** 52:6
59:12 63:13
**messages** 59:10
**met** 70:9 84:17
84:19 85:7,18
87:20 128:17
128:19
**Michigan** 3:10
**microphone**
5:18 44:4
**MID** 5:19
**middle** 63:8
110:13
**million** 26:13
27:7 34:15,18
35:7 42:3
46:23 63:14
64:14 98:12
99:17 101:11
101:12 115:17
115:18,24
116:15,17,20
122:12,13
123:9 127:13
127:15
**mind** 42:15
47:10
**mine** 55:20
71:15

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

**minimize** 67:3
**minor** 98:2
**minute** 12:6,9
  82:15 126:11
**minutes** 37:19
  42:21 87:12,12
  88:6,15,18,18
  100:7,8 110:3
  110:5 120:15
  120:19,22
  125:20
**Miro** 29:18,23
**mispronouncing**
  117:21
**misrepresenta...**
  124:18
**misrepresenta...**
  125:8 126:2,24
**missing** 48:18,18
**mistake** 122:10
  125:6 126:13
**Mize** 3:18 5:18
**MLA** 105:3
**mode** 96:11
**model** 32:15
  33:20 40:19
  65:3
**money** 13:3
  14:17,19,21,21
  14:22 15:5,12
  15:24 16:10
  21:7 28:1,4
  31:10,16 33:18
  39:4,7 41:2,14
  41:20 42:2,4
  47:19 48:3,4
  48:11 59:22
  60:4,7 61:19
  64:19 70:5
  73:13 77:8,10
  77:14,15 92:5
  92:15,21 97:11
  97:13,18,23
  99:14,15
  100:10,10

106:5 107:8,21
107:22,24
108:1,6 113:23
114:9 115:11
118:14,15
119:2,4,6,12
121:12 122:19
123:19 124:3
125:17,22
126:2 127:1,9
127:10,11,12
**monies** 20:8
  97:7,8
**month** 26:19
  28:9,11,11,22
  28:22 83:15
  99:1,17 101:11
  107:11
**monthly** 26:19
**months** 25:9
  83:17 108:3
**Mora** 29:21,22
  29:23 30:9,20
  31:21 32:2,10
  32:15 33:15
  34:4 35:24
  36:1,2,22
**mortgage** 4:20
  4:21 8:20 14:1
  19:14,20 35:3
  39:12 47:1,4
  51:5 65:4,14
  65:16,17,21
  66:10,18 67:16
  68:9,16,22
  69:1,14,17
  74:21,22
  104:21 115:1,3
  116:24 117:10
  117:18
**mortgages** 13:24
  19:21 33:13
  47:8 116:16,18
**mother** 97:21
**Mousa** 17:14

**Mousa's** 26:4,8
**mouse** 32:19,20
  50:5
**mouth** 13:6
**move** 67:22 73:7
  80:1 99:10
  101:24
**moving** 122:6
**mstein@tottisl...**
  3:12

___

**N**

N 4:1 7:10
**name** 5:3 6:1,9
  7:8,9,9 16:22
  17:13 20:9
  26:8 55:24
  56:3,5,6 59:3
  61:3 74:10
  80:6 105:3
  107:13
**named** 18:2
  29:17 104:15
**names** 36:18
  37:2
**Naming** 104:12
**Namvar** 1:12
  4:2 5:22,22 7:1
  7:7,10 8:3 9:16
  9:17 10:13
  19:5 22:7,13
  26:10 38:3
  43:11 44:1,8
  46:1 50:15
  52:3 53:22,23
  68:21 75:20
  76:3 80:5,19
  83:14 84:5
  85:10,24 89:12
  90:7 91:2,13
  95:14 114:12
  116:5 121:5
  122:2,7 124:7
  124:16 130:9
  131:11,17

132:5
**Namvar's**
  101:23
**Naperville** 3:4
**nation** 99:15
**national** 102:24
**nationally** 103:1
**nature** 125:7
**necessary**
  102:11
**need** 14:7 15:21
  18:18 38:10,16
  39:23 46:16
  47:12,13 54:11
  56:24 60:9
  64:19 68:19
  74:16 84:2
  85:20 86:10
  88:23 91:20
  92:6,7,14 93:9
  93:15 94:17,18
  95:23 98:17
  99:2 100:8
  101:13 102:8
  103:12,13
  104:21 107:19
  107:21 116:6
  118:17 120:20
  120:21 123:6
  124:6
**needed** 13:3
  40:12 60:19
  81:3 85:8
  94:14,15
**needs** 52:16 67:2
  97:22
**neither** 49:13
**nephew** 17:10
  26:4 98:23
**never** 29:3 30:24
  31:7,16 32:6
  49:13 57:8
  79:22 93:1
  100:9 113:19
  125:5 126:12

126:16
**new** 15:1 38:19
  40:17,22 44:24
  49:22 52:16
  72:24 82:18
**Nicholas** 72:8
**Nick** 72:24 73:3
  73:3
**nine** 53:7 74:12
**nitty-gritty**
  35:18 48:17
  114:1
**nodding** 126:10
**nonexistent**
  77:13
**normal** 102:7
  119:2 120:10
**normally** 40:9
**Norman** 7:10
**North** 2:16 3:10
**NORTHERN**
  1:1 131:1
**Notary** 131:24
**note** 19:20 24:19
  34:13,19 51:9
  84:24 85:11,16
  85:21
**noteholders** 21:3
**notice** 1:13 4:15
  8:10 12:10,12
  80:21 83:19,21
  124:14 125:11
**November** 1:18
  4:17 32:1
  36:12 74:17
  131:13 133:8
**number** 4:14
  15:17 23:15,16
  28:9 77:20
  99:14 100:23
  109:5 116:19
  116:20 128:20
**numbers** 63:5
  109:10
**Nut** 17:3,4,16

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

| | | | | |
|---|---|---|---|---|
| 18:10 98:22 | **oh** 32:7 67:18 | **old-man** 67:9 | 90:3 121:1,1 | 8:22 9:2,5,23 |
| **nutfarmers.com** | 91:4 122:3 | **once** 27:17 | 130:11 | 17:12,12 25:17 |
| 17:2 | **okay** 7:7 8:15 | 102:21 | **packet** 41:1 | 25:18 30:22 |
| | 9:14 10:16 | **one-sentence** | **page** 4:3,14 8:6 | 33:11 69:17 |
| **O** | 11:15,22 12:8 | 50:12 | 12:11 22:5,7 | **parts** 102:1 |
| **O** 132:2,2 | 13:7 15:8 | **one-time** 83:1 | 22:20 53:17 | **party** 5:3 |
| **Oak** 51:7 | 16:18 17:24 | **open** 97:17 | 66:17 67:1,4 | **passed** 31:3 |
| **oath** 6:8 131:12 | 18:16,24 20:23 | **operation** 96:12 | 67:12,21 68:1 | **passionate** 31:10 |
| **object** 34:20 | 21:22 22:5 | **opinion** 39:24 | 69:14 76:1 | **pasted** 34:2,6 |
| 113:13 114:15 | 23:18 24:7 | 40:2,8 | **pages** 19:18 | **Patty** 59:12 |
| 115:14 116:10 | 25:4,11 27:12 | **opportunity** | 22:17 66:4 | **Paxton** 32:12 |
| 118:6 119:23 | 28:12,23 29:5 | 71:17 | 69:10 75:21 | 34:13,19 35:2 |
| 124:10,21 | 30:3,8,19 31:5 | **opposing** 40:8 | **paid** 17:20 21:21 | 41:12 45:19 |
| 125:9 126:3 | 32:8,15 33:2 | 40:10 | 21:24 28:1,4 | 46:15 55:7 |
| 127:2 128:22 | 33:15 34:12 | **order** 59:1 | 28:14,21 35:4 | 56:22,23 90:8 |
| 129:4,14 | 37:24 39:5,16 | 104:21 130:5 | 90:9,13,20 | 90:17,20 91:23 |
| **objection** 6:7 | 42:10 43:3 | **original** 45:22 | 97:21,21 98:5 | **pay** 17:19 |
| 116:7,9 | 44:13 45:13 | 69:11,19,19,21 | 98:24 119:6,14 | 118:20,21,22 |
| **obligated** 77:15 | 46:3,13 48:2 | 133:2 | 127:12 | **paying** 108:24 |
| 77:17 | 49:1 50:9 51:2 | **out-of-pocket** | **Pakravan** 73:10 | **payment** 28:2,10 |
| **observant** 76:13 | 51:24 52:6 | 24:15 | 73:24 74:2,6,7 | 28:19 29:6,8 |
| 76:14 | 53:19 54:2 | **out-of-state** | 74:11,18 75:1 | 64:19 |
| **observer** 5:21 | 55:4,15 63:1 | 48:21 | 117:21 118:18 | **payments** 17:22 |
| **obvious** 118:10 | 63:21 68:3,7 | **outside** 17:12 | **papers** 49:14,16 | 18:8,9 27:24 |
| **obviously** 93:11 | 68:14,21 75:13 | 39:19 48:20 | **paperwork** 54:5 | 29:1 |
| **occasion** 57:20 | 75:19 76:11 | 93:24 94:4 | 54:12 65:9 | **payroll** 10:10 |
| 62:21 | 77:4 78:3 79:5 | 96:12 | **paragraph** 38:6 | **peanuts** 114:22 |
| **occasionally** | 79:7,14 80:9 | **outstanding** | 43:16 125:16 | **PEEL** 2:9 |
| 48:22 | 80:11 84:14 | 21:16 24:7 | **paralegal** 59:13 | **penalty** 26:20 |
| **occasions** 70:19 | 85:19,24 87:15 | 94:12 | **pardon** 25:22 | **people** 8:8 13:3 |
| 128:20 | 88:11,19 89:2 | **overall** 34:14 | 106:2 112:3 | 18:9,17 33:11 |
| **occur** 83:15,15 | 89:15 90:22 | **overwhelming** | **part** 9:13 43:15 | 36:18 37:3 |
| **occurred** 62:1 | 91:2 92:4 | 14:16 | 43:20 48:24 | 40:18 47:8 |
| 83:17 118:4 | 93:14 96:15 | **owe** 98:1,2,12 | 54:24 55:14 | 64:20 66:7 |
| **offered** 65:3 | 97:15 98:10 | **owed** 20:8 | 62:9 83:11 | 67:6 69:24 |
| **offering** 32:11 | 99:2 100:21 | **owned** 125:13 | 105:21 119:7 | 70:3 82:10 |
| 33:8 36:1,2 | 101:20 104:5 | 125:14 | **particular** 31:18 | 99:24 100:1 |
| 65:6 70:6 | 105:5 106:1 | **owner** 93:10 | 61:16 67:12 | 103:8,8 106:17 |
| **office** 16:20 | 107:6 120:5,23 | **ownership** 101:7 | 81:1 102:16 | 107:18 113:17 |
| 18:11 71:6 | 121:22 123:15 | 101:10 | **particularly** | 118:11,18 |
| 97:5 130:4 | 124:6 125:7,21 | **owns** 55:20 | 58:6 94:1 | **percent** 12:2 |
| **officer** 9:17 10:4 | 128:12,17 | | **parties** 132:18 | 13:23 14:2 |
| **officers** 10:2 | 130:7 | **P** | **partner** 65:8 | 15:12 26:20 |
| **officially** 97:24 | **old** 15:1 72:24 | **p.m** 1:19 43:7,7 | 78:8 | 27:17,19 32:4 |
| 98:21 | 97:17 | 79:16,16 90:3 | **partners** 8:11,18 | 41:8 46:18 |

Case: 1:18-cv-05587 Document #: 1537 Filed: 11/08/23 Page 168 of 370 PageID #:105551

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

Page 14

47:15 67:8
73:23 75:3
85:5 92:12,12
102:4 108:14
108:15 117:19
118:21,22,23
119:1,6
**percentage**
11:22
**percentages**
21:4
**perfect** 43:5
56:24 74:22,23
74:23
**perform** 55:1
**performance**
56:24
**performing** 29:3
49:7
**period** 12:23
**person** 36:5
40:17 94:13
96:3,7 111:19
120:6
**personal** 82:4
**personally** 64:6
83:11
**persons** 65:22
**perspective**
104:8
**pertaining** 1:15
**Philippines** 18:6
**phone** 37:10
88:5 89:3
100:5 110:8
**phonetic** 16:21
56:6
**physically**
109:11
**picked** 91:6
**pistachio** 17:5
**place** 132:14
**places** 74:13
**Plaintiff** 1:5 2:7
131:5

**play** 104:10
112:12
**played** 104:7
**players** 33:12
114:2 116:1
**playing** 15:15
**please** 6:9,19 7:8
8:12 11:10
19:10,24 20:19
39:3,21 45:5
50:18 59:18
63:11 67:10
68:2 69:5 72:2
89:12 105:19
109:4,19
121:11 125:19
126:22 127:17
**plural** 19:21
**plus** 99:18
116:17 119:2,7
**pocket** 98:11
**point** 72:20 90:7
90:19 93:14,17
111:23 120:3
**points** 72:23
77:18 107:19
**policy** 35:12
38:24 46:9
47:4,4,12 55:3
102:5
**Ponzi** 114:5
**Pool** 97:5
**pooling** 33:16,20
**port** 49:22
**position** 33:18
46:24 78:16
**practical** 78:20
**practices** 13:17
**preceded** 112:15
**preceding** 43:8
79:17 90:4
121:2
**precursor** 36:4
**prefer** 49:12
64:22 112:13

**pregnant** 15:24
107:7,20
**prep** 87:1
**prepaid** 18:10
28:8
**preparation**
84:15 128:8,14
**prepare** 80:24
86:8,10 87:17
88:20 89:3
**prepared** 12:16
16:18 84:10
86:16
**present** 3:17 5:2
5:4,19 40:17
99:19 101:10
**president** 129:12
**presumptuous**
110:11
**pretend** 51:8
**pretty** 22:24
**previous** 38:9,14
45:2 60:5
92:19 98:17
122:10
**previously** 85:17
91:14 95:15
106:4 116:24
122:12
**prey** 87:4
**price** 40:5 46:19
92:18,20,21
93:5 100:23
107:14 122:11
**principal** 23:20
24:8,11,18
26:20,23,23
27:1,2,14 29:5
77:18
**printed** 23:1
**prior** 57:24
83:17 103:10
**private** 14:21
**privilege** 85:6
**probably** 24:13

26:16 32:13
34:6 35:20
39:11 40:24
41:19,23 42:6
45:9 46:14
49:18 51:8
72:15,15 84:4
88:18 98:12
110:4 113:10
113:12 117:21
122:15 123:12
**probation** 98:18
98:21
**problem** 56:7
58:1 70:7 86:4
86:6
**procedure** 1:14
6:4,12,14
**proceed** 6:3
114:13
**proceeds** 38:18
40:22 41:1
**process** 15:21
41:22 102:2
**processing** 48:23
53:24 71:9
97:6
**produce** 84:4
**produced** 63:4
66:8 77:23
83:10,18 84:18
**production** 63:6
83:19,20 86:23
123:20
**Professional**
1:18 133:11
**profit** 64:22
**profits** 65:1
**prohibition**
76:16,24
**promissory**
19:20 51:9
**promised** 47:7
**promissory**
19:20 51:9
**promoter** 64:23

**prompted**
112:10
**pronounce** 76:9
**pronouncing**
76:8
**Proof** 4:16 16:15
16:19 19:1,8
22:8 28:23
**proper** 82:10
111:14
**properties** 19:21
21:11 39:7
51:6 55:17
56:10,13,14
91:21 100:22
101:18 109:11
109:12,13
113:5
**property** 14:5
14:11 33:19
34:10 35:8,10
41:15 46:21
49:17 51:7
55:9,16 60:23
64:3,18 65:18
90:9 104:3
105:13,22
107:11,22
108:21,23
109:1,9 117:11
**proposed** 93:9
**prosecutor's**
126:18
**prove** 77:7,10,13
**provide** 39:22
47:24 94:8
**provided** 83:9
95:6 123:18
**provision** 76:23
**provisions** 76:7
77:12 78:10,13
78:15 79:1
**psychological**
107:18
**public** 57:10,12

Case: 1:18-cv-05587 Document #: 1537 Filed: 11/08/23 Page 169 of 370 PageID #:105552

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

Page 15

124:22 125:10
126:4 131:24
**pull** 17:18 95:12
110:20
**purchase** 15:12
15:14 40:5
41:2,2,13,14
42:2,4 46:18
47:19 48:11
55:5 58:15
59:17,22,23
60:4,6 61:19
64:14,17 74:8
92:4,15,17,20
92:21 93:5,16
100:23 101:3
107:14 114:9
118:1,4 122:11
**purchases** 63:15
113:5
**purchasing**
117:22
**purpose** 57:5,11
**purposes** 9:20
54:1 78:20
101:5
**pursuant** 1:13
1:13 6:3
**put** 5:24 7:13,14
7:19 18:16,19
20:8 35:19
48:15 51:24
64:20 70:5
76:23 77:14
123:6 125:17
**putting** 63:14

**Q**

**quarterly**
126:19
**question** 9:1
20:24 22:9,11
23:6 25:22
36:24 44:16
49:12 51:20

54:23 58:4,5,6
60:1 66:19
68:9,14,15
79:12 89:8,12
89:14,15 96:1
97:15 99:20,24
100:9 105:19
110:2,22 116:8
122:3 124:16
126:23 127:8
128:23 129:5
129:15
**questioning**
53:14 79:20
**questions** 27:9,9
34:10 50:20
61:9 80:1,12
83:3 84:3 86:1
86:8,10 87:15
87:16,18 88:14
91:16 98:19
99:5 100:21
117:20 124:23
127:19,23
128:1,6,13,14
129:10,17,18
**quick** 30:3 53:3
75:8 90:23
128:6,13
**quickly** 66:24
77:17 99:23
**quiet** 87:15
**quite** 30:3 91:6

**R**

**R** 2:15
**rabbis** 76:14
**RACHLIS** 2:9
**raise** 6:19 34:14
80:14 103:4
121:12 123:9
**raised** 34:18
35:6 113:5,16
116:18 124:3
**raises** 101:12

113:23 122:19
123:19
**raising** 117:6
**ran** 55:6 57:8
**rare** 48:5
**rate** 27:16,22
119:13
**rates** 24:13,14
24:22 75:4
93:22
**read** 11:8,9,11
33:3,9,16
35:22 48:15
53:18,19 67:10
67:11 94:19
102:6 122:2,8
129:23 131:14
**reading** 94:14
94:16
**ready** 53:8 67:22
**real** 11:17,19,20
15:14 87:6,15
101:17 103:21
104:1,6,10,12
104:14,15,19
104:24 107:16
**really** 17:8 27:15
32:5,6 36:15
64:4 92:1
106:22 112:17
114:20
**rears** 28:21
**reason** 7:20
22:14 48:19
64:11 71:23
72:3 98:6
118:8
**reasonably**
12:17
**reattaches** 46:11
**recall** 36:7,10
50:22,24 55:12
56:18 57:15
60:19 62:2
63:18 73:7

90:9 117:23
122:13,14
**receive** 64:9
84:24 123:21
**received** 12:14
23:13,17,23
27:24 34:7
119:8 122:24
123:16
**receiver** 5:6
77:11,12 78:15
78:16,20
**receivership**
23:14 74:18,20
75:2 80:9
90:19 118:5
119:17,19
**receiving** 35:23
58:19 63:10
122:16
**recess** 43:6
79:15 90:2
120:24
**recognize** 44:1
68:23
**recollection** 60:3
90:21 123:15
**recommend**
106:12
**record** 5:4,24
6:6,10 11:11
43:4 57:10,12
89:22 90:1,23
90:24 91:10
120:19 124:22
125:10 126:4
128:7
**recorded** 48:8
53:8 118:12
132:8
**red** 101:12
**reduced** 132:9
**refer** 31:9 71:5
**referral** 31:9,22
**referring** 39:5

115:1
**refinance** 41:11
41:12 92:7,18
93:8,16
**refinances** 44:20
**refinancing**
15:20 38:11,16
40:13 41:10
**refresh** 18:18
60:3
**refusing** 89:14
**regarding** 6:4
36:1,2 58:19
81:3 91:23
92:14 109:24
125:21
**registered** 1:18
103:23 133:11
**regular** 119:10
**regulations**
40:16
**reimbursed**
17:20
**relate** 47:2 60:22
**related** 19:21
21:11 76:6
119:18
**relates** 11:14
**relating** 18:1
**relationship**
10:23 31:1
**relative** 47:6
132:17,18
**relevance**
124:11
**relevant** 45:20
46:9 105:9
**relied** 58:14 94:5
94:9 108:16
**relies** 93:24
**religious** 61:9
76:12,21 77:7
78:21 106:18
**rely** 93:5
**remaining** 71:2

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

remember 16:15
31:23 34:4
36:24 37:2,10
42:11 48:14
51:15,16 54:17
54:21 56:10,16
56:16 57:17
58:19 60:11,21
60:24 63:24
64:4,7 66:7
68:17 80:22
82:23,24 90:12
91:16 93:20
95:2,18 102:20
103:5 108:18
109:21 110:15
110:21,22
111:7,8,10,21
111:23,24
112:6,9 113:6
114:20 115:15
115:22 116:19
116:24 122:16
122:22 128:15
reminded 85:1
remote 6:5
remotely 1:16
2:7,13,20 3:6
3:13 6:8 132:6
rent 28:21 97:20
rents 4:21 109:6
repeat 13:13
49:9 72:2
88:14 105:19
repeated 40:18
reply 110:23
report 13:22
14:3 16:6 55:7
56:19 57:1,3,9
57:16
REPORTED
1:22
reporter 1:17,18
5:1,17,23 6:2
6:18 11:8 27:4

29:20 70:22
72:1 79:11
89:24 91:9,11
120:12,14,17
125:18,20
127:18 128:9
129:21 130:2,7
133:10,11
reports 57:5,7
102:6
represent 5:3
representative
29:16 83:23
84:7,9 85:4
111:18 117:16
124:1,13 127:4
represented
118:7
representing
80:7
reproduced
133:5
request 47:14
51:15 91:21
112:24 113:2
122:17 123:1
requested 51:13
51:19 100:18
requests 35:20
35:21
required 41:19
41:24
requirements
14:22 47:6
resolution 94:21
resolutions 40:4
respect 102:23
responded 60:13
responding
123:2
response 44:14
45:8,10 63:12
121:20 122:8
122:17,24
responsibility

133:4
rest 53:13 68:7
result 80:13
126:2 127:1
resulted 21:24
results 57:15
resume 121:11
122:18
returned 23:20
28:1
returns 14:23
reverse 59:1
review 96:2
reviewing 14:5
right 6:19 13:4
20:16 27:10
29:2 30:10
44:9,12 46:8
49:12 50:3,15
55:24 57:24
62:16 66:20,24
68:6,8 69:5
72:6,18 82:7
83:14 84:20
87:13,21 89:5
90:20 92:8
94:2,13,13
95:2 96:18,21
96:24 97:1
99:5 101:18
103:10,15
105:5,13,23
106:6,22
108:18 109:3
111:4,22 112:7
112:24 116:2
117:2,8,12,18
118:5 119:9,14
119:15 120:9
124:9
role 96:16 99:4,7
104:6,10
roll 44:23 49:2
68:2,2
rollover 44:21

45:10 49:14,16
Rollover/Distr...
45:15
room 78:11
125:6 126:13
Rosen 2:9 5:6
80:13 115:2
RPR 1:22 132:4
Rules 1:14 6:4
run 14:2 16:6
57:1,7 77:5
running 86:12

—————
S
S 1:6 131:6
S-a-a-d 71:14
Saadat 70:4
71:14,24 72:5
72:16 73:16,21
Sabbath 76:15
safe 109:14
Salajanu 59:14
salary 71:8
salary-type 10:8
sale 58:15 60:23
samples 45:1
San 59:12
satisfied 103:9
103:11,15
saw 12:15 23:7
73:21 101:1
113:10,11
114:24
saying 33:10,24
39:11 41:7
44:2,5 47:13
60:14 66:6
69:14 76:4
83:5,10 97:1
98:4 100:15
107:23 111:24
112:22 114:8
114:19
says 22:21 25:12
32:10 33:16,17

35:13 38:22
44:20 45:12,17
45:18 46:8,13
47:21 48:11
50:18 52:21
59:16 60:2
67:2 71:11,12
107:10
Schaller 2:16
5:8 85:14,17
85:22 86:14,17
86:20,22 87:1
89:16
Schedule 12:12
scheduled 46:16
school 106:20
screen 7:19 8:1,4
8:9 18:20 19:6
25:2 42:17
44:17 50:2
51:24 58:21
62:18 65:10
67:19 75:14
scroll 51:2 66:16
95:24
scrolling 62:24
112:14
seamlessly 7:14
7:24
search 57:10,12
searched 82:2,4
83:12
searches 57:16
SEC 5:16 16:13
128:1
second 8:12
20:19 30:2
70:14 90:23
110:20 116:9
Secondly 74:11
section 23:4,12
24:5,7,7 27:23
secured 33:8,19
34:19 35:7
39:7 65:18

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

69:2 74:21
**SECURITIES**
 1:3 2:3 131:3
**security** 4:21
 41:19,24 42:7
**see** 7:16 8:3,8
 14:6 19:1,5,10
 19:10,24 20:10
 22:22 23:8,14
 23:15 24:8,24
 25:7,9 26:12
 26:16,17 27:24
 28:24 30:4,8
 32:17,18,18,19
 32:20,22 33:2
 33:9,21 34:15
 34:16,21 38:4
 38:5,6,19,20
 39:15 43:13,15
 43:16,23 44:8
 44:14,15,17
 45:5,7,11,12
 45:23 46:19,20
 49:16 50:1,3,6
 50:9,11,20,21
 51:17 52:4,8,8
 52:11,17,24
 53:13,15 57:3
 58:21 59:2,10
 59:15,20 60:1
 62:6,13,15,17
 62:23 63:16,17
 65:10,15,16,22
 66:2,4 67:4
 69:10 75:16,21
 75:23,24 79:1
 82:5 85:7 91:2
 96:13 99:21,22
 100:24 101:7
 102:10 121:8,9
 121:14 122:4
 123:13
**seeing** 8:6 52:9
 56:23 67:7
 68:17 95:18

113:11 114:20
**seeking** 119:18
**seen** 8:24 12:11
 17:1 28:13
 36:11,17 43:22
 44:19 61:1
 73:19 74:16
 82:19 113:15
 113:22 116:24
**sees** 67:16
**sell** 104:20
**seller** 104:15
**selling** 11:20
 101:7,11
 104:18
**send** 37:17 44:21
 49:18 54:10
 72:13,17,17,19
 73:2 81:24
 82:8 83:6
 112:10 121:11
 126:20
**sending** 51:14
 102:19 123:3
**sends** 45:10
**senior** 108:1
**sense** 80:17
 99:22 100:17
 108:2,21
**sent** 16:17 30:9
 32:10 34:3,7
 35:15 45:1
 46:4 49:14
 51:12,16 52:12
 53:1 59:11
 64:2 73:6
 75:20 76:3
 78:23 82:6,9
 82:10 91:15
 95:16 109:5
 110:13 111:9
 112:16,17
 121:20 122:7,8
 123:5
**sentence** 35:22

108:16
**sentences** 82:24
 91:6
**separate** 23:2
 25:15
**separately** 7:21
**serves** 29:2
**service** 25:13
**services** 94:8
 95:5
**servicing** 18:6
 25:14 51:10
**set** 13:12,14
 50:17 92:6,7
 95:17 96:13
 133:8
**sets** 22:17
**setup** 36:4 67:24
**seven** 32:6 88:6
 88:15
**Shah** 1:6 131:6
**share** 8:1 43:12
**shared** 78:1
 123:17
**sharing** 110:19
**Shatar** 2:20 3:6
 5:8,12 8:11,17
 8:21,22,24 9:2
 9:3,6,11,17,21
 9:22,23 10:2,6
 10:20,23 12:4
 12:18,24 13:4
 16:12 17:16,17
 18:12,14 19:9
 20:15,16 21:2
 21:10,15,22
 22:2,3 23:23
 25:12,14,15,16
 25:16,18,20,23
 29:14 35:1
 36:22 41:16
 52:3 54:3,24
 55:1,15,16,19
 59:11,22 61:2
 63:4 64:7,8,9

66:9,9 67:16
 68:15 69:1,16
 69:24 70:12
 71:17 76:6
 77:24 78:23
 81:3 83:7,24
 84:11 85:4
 90:8 93:18,24
 94:5,8 95:4
 96:2,9,16,17
 96:20 97:3,14
 98:15 99:4,6
 103:22 106:2,5
 111:11,18
 112:4 114:13
 117:17,17,23
 119:16 124:1,2
 124:12 126:5
 127:3 129:11
 129:11
**Shaun** 1:8 34:3
 35:15 36:5,8
 36:21 37:11,21
 38:2 44:6,18
 49:1 76:4
 78:16 79:2
 95:17 106:14
 106:18,24
 107:10 110:17
 110:23 111:1
 115:19,22
 131:8
**Shaun/Jerry**
 75:24
**sheets** 60:6
**shifts** 118:18
**shoot** 79:8
**short** 42:15 53:9
 91:5 93:11
 106:13
**shortened** 93:11
**Shorthand** 1:17
 6:2 133:10
**shortly** 91:5
**shot** 109:16

**show** 19:15 20:6
 24:23 26:23
 29:24 36:16
 37:24 49:24
 64:5 73:11
 74:16 75:5
 82:21 112:15
 118:16 121:18
**showed** 60:5
 114:18
**showing** 26:21
 68:21 73:6
 121:5
**shown** 115:2
**shows** 24:7 79:4
**shrink** 8:8
**sic** 29:18
**side** 54:17
**sign** 37:17 94:20
 129:23
**signaled** 115:24
**signature** 22:7
 61:2,12,16
 129:21,22
 131:15
**signatures** 94:13
**signed** 22:8
 49:13 76:22
 133:3
**significant** 116:1
**signing** 126:8,9
**signs** 94:13
**simultaneous**
 27:3 62:20
 69:3 86:11
**sir** 6:18 128:13
 129:17
**sister-in-law**
 98:23
**sit** 35:22 92:3
 106:23 122:23
 123:24
**sitting** 5:9
**situation** 58:20
**six** 36:19 108:3

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

**sixth** 99:22
**size** 100:2,16
**sizes** 15:17
**slightly** 105:17
**slow** 116:6
**small** 113:23
 114:1,17
**smaller** 114:10
**smell** 101:4
**sold** 106:22
**solicit** 114:21
**somebody** 11:2
 15:15 29:18
 44:6 72:16
 106:9,11
 111:19,21
 112:2,2,4,5
**someplace** 37:11
**son** 9:16 17:10
 26:4 31:6,7
 38:3 53:23
 76:20 84:19
 87:20,23 96:17
 97:19 98:9
 129:10
**son's** 26:8 98:11
**sons** 71:3
**sorry** 8:15 13:13
 21:1 24:6
 26:24 27:4
 38:12 41:6,23
 46:23 53:12
 56:11 62:11
 66:13 69:4
 70:20 72:1,21
 78:4 82:12
 84:22 95:12
 96:7,23 98:16
 105:16 112:1
 113:13,21
 116:10 117:8
 118:2 120:5
 128:9
**sort** 31:22 93:4
 109:7

**sound** 36:13
**Sounds** 75:13
**source** 77:22
**South** 2:10
 19:22,22 21:12
 21:12 32:11
 45:19 51:7
 52:19 59:17,23
 61:24 64:3
 65:19 69:2
**speak** 11:4 16:2
 36:5 60:14,19
 91:4 110:15
 111:3
**speaking** 37:10
**speaks** 63:20
 64:10
**specific** 12:9
 24:21 47:3
 64:4 116:20
**specifically**
 37:11 55:12
 60:21 109:21
**specifics** 66:18
**specified** 132:15
**spell** 16:22 74:9
**spelled** 29:21
**spelling** 39:15
 70:21
**spells** 74:10
**spend** 15:22
**spent** 92:21
**split** 116:9
**splits** 75:21
**spoke** 36:6
 111:12 112:2,4
 129:9
**spoken** 111:19
**spooked** 114:1
**spot** 42:14
**spots** 34:13
**SS** 132:1
**stake** 107:15
**stand** 41:20
 110:24

**standard** 45:10
 48:24 50:19
 51:5 53:4
**stands** 77:19
**start** 45:19 67:2
 106:2 115:9
 118:3
**started** 71:8
 80:19
**Starting** 55:15
**state** 5:2 6:9 7:8
 9:9 38:7 53:7
 81:5 132:1
**statement** 4:16
 5:24 25:1
 27:20 46:9
 59:19 85:6
 98:17
**states** 1:1,3,14
 94:1 131:1,3
**stay** 79:22
 107:19 110:8
**Stein** 3:9 4:6
 5:13,13 6:16
 6:16 79:20
 80:4,6 81:21
 82:11 85:15,19
 85:23 86:6
 87:19 89:11
 90:6,22 91:1,9
 91:12 114:23
 115:21 116:22
 118:19 120:4
 120:16,18
 121:4,20,23
 122:1 124:15
 125:1,24
 126:21 127:4
 127:19 128:15
 128:22,24
 129:4,14
**stenographica...**
 132:9
**steps** 61:20,21
 61:23 81:18

**stop** 39:3 86:21
 86:24 87:2,9,9
 122:5
**stopped** 108:24
**strangers** 93:7
**streamline** 73:4
**Stree** 2:10
**Street** 2:16 51:8
**strike** 38:12 58:5
 115:8
**stringent** 16:11
**strong** 39:23
 111:15
**structure** 38:8
 38:14 39:6
 129:11
**stuck** 115:19
**stuff** 31:9 92:19
 102:13 126:11
**stupid** 114:6
**subfolder** 50:4
**subject** 8:21
 50:17 76:7
 78:24
**submitted** 19:9
 21:10 22:12
**subordinate**
 102:8,9
**Subscribed**
 131:20
**substance** 81:11
 128:7,18
**sufficient** 109:1
 109:13
**suggest** 81:7
**Suite** 2:4,10,17
 3:10
**summary** 93:11
 93:11 100:19
**sun** 106:17
**super-duper**
 76:20
**supported** 98:8
**supporting**
 97:20

**supposed** 84:10
**sure** 11:5,9
 12:14 13:23,24
 15:13 16:6,23
 17:19 20:1
 21:17,19 26:4
 27:15,22 28:6
 29:17 32:17,20
 33:14 35:11
 37:1,8 38:10
 38:16,22 39:1
 39:13 40:12,20
 41:10,14 42:1
 42:22 47:3
 48:11 55:3,5,9
 57:13 58:7,10
 62:5 68:17,20
 71:3,20,21
 73:16,20,22
 76:8 80:15
 81:2,22 82:9
 83:5,22 84:17
 85:3 90:16
 92:24 94:11,19
 97:7 101:1
 102:2,3,4
 105:17,20
 107:15 109:2
 112:18 116:14
 117:15 120:3
**surprised** 82:20
**switched** 75:14
**switching** 75:7
 105:16
**sworn** 6:20 7:3
 131:20 132:6
**syndicate** 64:17
**syndicating**
 115:12
**syndicator** 64:24
 65:7 113:4,9
**syndicators**
 64:15

————————
 **T**

Case: 1:18-cv-05587 Document #: 1537 Filed: 11/08/23 Page 173 of 370 PageID #:105556

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

Page 19

**table** 85:12
**take** 15:2 27:20
  42:4,15,18,21
  43:2 61:13,20
  67:10 75:8
  79:6 87:11,12
  89:17,19 92:2
  92:17
**taken** 1:16 43:6
  46:22 61:23
  79:15 90:2
  120:24 131:13
**takes** 100:7,8
**talk** 29:13 31:15
  34:9 35:15
  51:21 77:5
  86:4 125:3
**talked** 36:13
  59:21 111:16
**talking** 9:22
  13:19 27:3
  30:11 31:17
  62:21 69:3
  78:12 80:16
  81:19 86:11
  88:24 93:15
  111:8,21
**talks** 20:7
**tax** 14:23
**tech** 82:19
**tell** 19:16 21:4
  33:23 34:1
  36:20 39:2
  41:18 42:5
  49:12 67:21
  80:15 82:21,22
  84:10 85:5
  86:13 97:16
  103:12 105:15
  108:9,10
  118:15,24
**telling** 17:15
  34:12 41:9,21
  42:6,12 70:9
  84:13 106:18

115:22
**ten** 42:21,22,24
  42:24 43:2,2,2
  74:12 100:8
  110:3,5 120:19
  120:21
**term** 8:22 15:23
  39:9 47:22
  60:6 76:9
**terms** 101:15
**test** 105:8
**testified** 7:4
  61:18 97:6
  105:20 106:4
  113:3 116:23
  124:4
**testify** 8:17
  12:16,20 20:10
  118:16 122:14
  132:6
**testifying** 64:7
  84:6
**testimony** 27:12
  79:21 80:20
  85:20,20 112:1
  113:6 117:16
  132:13
**text** 8:9 50:18
  76:1
**thank** 5:17,23
  6:14 7:7,12
  12:1,8 23:10
  30:6 43:17
  50:8 53:15,20
  63:1 67:5,24
  78:3 79:20
  80:1 81:21
  90:11,22 91:4
  91:19 93:14
  95:12,20 96:15
  97:4,13 100:21
  105:7 112:9
  113:2 116:13
  121:23 128:2
  129:16,24

130:2,5,9
**Thanks** 121:14
  121:24
**theirs** 73:21
  114:7
**thing** 9:24 14:15
  19:19 42:23
  55:4 72:21
  101:14 102:22
  103:1 105:12
  120:10 121:17
**things** 17:18
  40:3 48:15
  51:1 57:4
  74:24 75:3
  80:16 81:17
  83:2 98:14
  99:9 101:22
  102:10 105:8
  113:22 114:3
  123:3
**think** 9:4 18:4
  18:13 21:17
  22:5 27:17,21
  29:22,22,23
  31:19 34:1
  35:14 36:3
  41:12 42:12,19
  45:18 46:3
  47:10,11 49:5
  56:4 57:2
  61:18 64:11
  66:19 70:3,8
  70:22 79:5
  82:6 84:1
  86:22 91:4
  102:21 103:5
  107:5,12
  109:17 110:7
  120:1,3,7
  123:5 129:19
**thinks** 46:13
**third** 22:6 38:6
  53:17
**third-party**

97:10
**thought** 7:21
  30:15 31:16
  32:6 41:22
  42:3 49:6
  56:11 63:13
  65:6 106:16
  110:23 113:18
  117:6
**thousand** 31:23
  114:11
**thread** 62:15
  122:5
**three** 32:16 37:3
  48:10 53:10
  54:16 70:19
  71:2 73:21
  78:12 97:22
  98:12 100:7
  110:4 118:13
  126:11
**till** 28:9
**time** 5:2 11:24
  12:23 13:9
  18:4 21:17
  32:5,5 35:20
  35:21 37:8,10
  40:19 42:19
  49:9 51:14
  67:1,7,10 71:7
  74:22 77:4,5
  79:6 80:16
  91:7 93:2,14
  93:17 97:22
  104:23 107:2,4
  114:16,18
  115:16 120:13
  123:8 125:19
  126:6 127:16
  129:16,24
  132:14
**time-consuming**
  17:23
**times** 85:11
  93:23 105:11

**timing** 90:17
**title** 13:22,24
  14:6 35:12
  38:24 46:9
  47:4,9,12,23
  48:1 55:3,4
  58:16 62:7
  63:9 101:3,6
  101:10 102:2,6
  102:11 103:7
  119:21 120:2,8
**today** 5:10 8:17
  10:17 16:13
  59:18 80:20
  84:6 95:19
  106:23 110:16
  110:21 114:18
  115:1 122:23
  123:24 128:14
  129:17,24
**today's** 34:23
  80:24 84:15
**told** 30:15 33:14
  35:6 38:23
  46:22 49:1
  65:2 70:5
  86:15 87:16
  88:13,14 93:1
  107:12,12
  108:17 109:21
  115:20
**Tom** 71:1,15
**top** 8:6 26:18
  43:16 50:11
  52:2 62:13,24
  67:3 75:16,23
  112:21 124:4
**topic** 86:4,5
  111:12 124:6
**topics** 12:12,18
  12:21 75:7
  80:22 81:4
  83:24 84:12
  105:16 124:13
  125:11 127:6

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

128:20 129:3
**total** 23:13 24:2
26:13 37:16
48:4 109:24
119:1
**totally** 82:18
**TOTTIS** 3:9
**touched** 124:7
**tough** 97:15
**town** 72:9,11
**track** 17:22 18:8
**transaction** 58:8
58:11 77:11
92:17 93:6
101:5
**transactional**
116:15
**transcript**
131:14 132:12
132:13
**transcription**
132:10
**transcripts**
130:2 133:3,3
**transferred** 48:5
**trick** 97:16
**trickery** 81:9
**tried** 8:7
**trouble** 44:4
**true** 62:22 63:19
128:18 129:9
132:12
**trump** 106:7
**trumps** 14:16
106:1,4
**trust** 21:6 67:9
73:11,24 74:2
**trustee** 74:13
127:11
**truth** 132:6,7,7
**try** 12:6
**trying** 61:15
62:16 73:4
83:13 99:3
104:6 110:19

112:12
**Ts** 38:23
**Tuesday** 46:16
53:1
**tunnel** 99:23
**turn** 8:13 79:19
**turnaround**
53:4
**turning** 27:23
86:2
**twice** 55:8
**two** 18:7 21:11
21:23 28:16
31:8 48:9 54:2
56:10 61:13
73:12,14,15
75:21 77:7
97:21 104:22
110:4 118:13
127:18
**two-page** 63:2
**two-year** 108:5
**Tyler** 37:2,22
38:3 45:9
50:16 52:7,11
60:14 110:14
110:17,18,24
111:1,3,6
112:11 121:7
123:2
**type** 14:4 93:19
130:5
**typed** 23:4 133:2
**types** 81:17
**typical** 53:6
**typing** 122:10
**tzitzit** 106:21

**U**

**U.S** 2:3
**unbelievable**
79:23
**underlying**
109:1
**understand** 8:16

9:21 15:6 28:4
33:15,22,23
52:23 58:4
59:6 64:6
83:13,14 84:5
84:12 85:15
86:9 90:16
93:3 99:4,7
104:6 108:6
115:8,11
**understanding**
21:22 64:12
78:6 81:18
83:4 113:8
124:2
**understands**
66:17
**understood**
31:12 33:7
34:17 41:4,15
93:4 112:1
**underwriter**
11:1 114:12
**underwriters**
100:1
**underwriting**
39:23 53:24
54:3,5 98:16
99:11,12
100:14 101:15
101:21 105:21
107:19 108:2
**United** 1:1,3,14
131:1,3
**units** 15:17
100:23 109:6
121:13 122:20
**unnecessarily**
86:3
**unnecessary**
102:14
**unusual** 24:16
**upside-down**
86:2 100:13
**urgently** 60:20

**use** 7:16 8:22
39:10 40:7
47:22 48:20,21
48:24 49:14
**uses** 103:22
**Ushie** 56:6
**usually** 14:23
20:2 43:22
104:14

**V**

**V** 7:10
**valid** 94:11
**valuation** 14:9
14:10 15:9
92:15,24
**valuations** 42:9
**value** 15:19
55:16 62:3,5
92:18 93:8,9
93:10 98:6
105:13,22
106:8 108:23
109:13 114:6
116:16 118:21
118:22,23
**values** 55:9,16
**various** 102:1
**vendor** 97:10
**venture** 30:23
78:9
**versus** 86:5
**Victor** 7:10
**video** 90:1
**vidoeconference**
1:11
**view** 7:21
**volume** 8:13
12:7
**vs** 1:6 131:6

**W**

**W-2** 10:10
**wait** 52:10 122:4
**waive** 27:19

**walked** 106:17
**want** 11:8 20:17
22:2 29:13,17
33:3,12 34:11
36:16,19 39:19
39:20 40:20
41:9 49:18
51:17 55:23
60:11 61:9
65:7 70:10,21
74:18 75:8
79:8 80:15
85:5 87:5
89:19 97:17
100:6,7 102:8
105:15,17
107:6,15
110:11,12
113:12 114:4
117:15 125:4
126:22 128:12
**wanted** 7:22
12:10 15:5
38:24 42:3,6
54:6 72:24
73:13 76:21
85:3 100:24
106:19 109:18
122:9
**wants** 23:8
81:17
**warm** 79:22
**wasn't** 18:10
19:23 32:20
41:11 47:8,9
58:5 76:17
116:14 117:3
**waste** 40:19
126:6
**way** 7:23 13:11
14:8 18:5
19:17 20:19
22:18 28:6
42:12 47:2,10
47:11 49:8

Case: 1:18-cv-05587 Document #: 1537 Filed: 11/08/23 Page 175 of 370 PageID #:105558

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

Page 21

67:13 68:5
99:6 113:5
127:5
**we'll** 15:2 43:3
73:7
**we're** 16:10,13
27:19 35:10
43:11 49:6
64:20 75:6
78:18 80:15
87:11,12,14
89:21,24 91:9
107:10 120:14
129:20
**we've** 11:1 28:13
31:24 41:10
42:13 95:11
100:9
**wear** 106:21
**Wednesday**
52:22 53:2
**week** 35:20,21
36:11 47:18
53:7 88:10
**well-known**
71:15
**well-proven**
82:16
**went** 18:5 23:7
41:1 101:10,22
109:8
**West** 2:4
**WHEREOF**
133:7
**wife** 17:9 74:3
97:22
**William** 3:3 5:11
**willing** 27:19
**wind** 79:23
**Wine** 2:9 4:4 5:5
5:6 6:11,11 7:6
7:12,18 8:2
11:6,9,12
18:21 19:1,4
21:9 23:11

27:11 30:7
32:23 33:5,6
34:24 42:16
43:3,10,18
50:8,13,14
53:16,21 62:11
62:16,20 63:1
63:7 65:13
66:20 67:6,15
68:4 72:7
75:10,14,18
76:2 77:23
78:4,5 79:5,9
79:19 80:13
107:12 110:21
115:3 118:7
127:14,21,22
129:18 130:3,4
130:9
**wire** 51:3
**witness** 5:22 6:8
6:20 7:2 20:23
27:6,10 34:21
53:18 66:21
68:1,6 69:5
72:3 79:12,22
81:22 85:16
86:7,13,15,18
86:21,24 87:2
87:5,9,14 89:9
89:19,23
114:16 115:15
116:12,14
118:7 119:24
125:13,21
126:5,7 127:8
127:9 129:19
132:14 133:7
**witnesses** 77:8
**word** 13:6 15:16
22:3 42:5
48:14,15 72:6
106:22 124:17
**words** 36:10
**work** 17:17

18:12 79:9
83:21 97:14
98:21
**worked** 17:16
**working** 10:13
59:13
**works** 28:7
**worms** 97:18
**worry** 108:19
**worth** 108:22
115:17 127:13
**wouldn't** 41:20
56:24 57:14
109:17
**write** 61:6 85:15
85:21 126:20
**written** 34:21
122:12
**wrong** 56:17
108:19 109:22
118:9
**wrote** 44:8

_____
### X
_____
**X** 4:1 77:14
_____
### Y
_____
**Y** 77:14
**Yates** 19:23
21:13 41:16
42:5,7 59:17
59:23 61:24
64:3 65:19
68:10 69:2
82:1 83:8
90:14,18 91:23
100:22 101:15
104:2 108:7
**yeah** 12:14
18:21 25:10,13
30:10 32:13,22
45:7 46:23
50:12 52:14
71:12 85:2
98:9 103:11,11

105:14 111:1
120:10 129:23
130:4
**year** 18:7 97:12
108:3,4
**years** 18:5,7
31:2,2 32:7
36:19 37:3
47:12,12 70:2
70:18 71:16
74:4,13 98:8
100:15 101:8
**Yellon** 16:21
**yesterday** 46:10
46:15
**Yoo** 62:7 63:9
**York** 49:22
**Young** 1:7 131:7
_____
### Z
_____
**Z** 77:14 99:22
**Zoom** 1:11 5:2
53:12 67:23
88:6,9,17 89:4
121:17 129:2
_____
### 0
_____
**084-002466** 1:23
133:11
_____
### 1
_____
**1** 1:18 4:15 8:5
8:10 28:18,20
28:20 32:19,22
50:5 52:9,10
52:18 64:13
69:14 131:13
**1,000** 28:2
**1,100** 28:14
**1,800** 98:24
**1,800,000** 24:3
**1.35** 122:12
**1.5** 63:14
**1.55** 122:11
**1.8** 42:3,7

**1/2** 34:18 35:6
46:23 64:14
**1:00** 1:19
**10** 4:20 26:20
27:18 35:21
62:7 82:16
114:10
**10,000** 113:17
**100** 27:17 32:4
41:8 67:8
73:22 75:3
85:4 99:17
117:19 118:21
119:6 123:9
**100,000** 23:19
29:6 34:14
**1031** 125:14
**1099** 97:12
**11** 4:20 65:11,14
**111** 3:4
**12** 4:21 68:22
82:17
**121** 4:23
**123** 51:7
**125** 102:4
**128** 4:10
**13** 4:22 75:15
**14** 4:23 59:24,24
65:18 121:6
**1450** 2:4
**14th** 59:11 66:10
**15** 4:19,23 29:1
35:20 88:18
121:7
**15,000** 113:24
**150** 99:17
115:16,17,18
115:24 116:15
116:17,19
**16,500** 29:1
**16,666.66** 29:9
**175** 2:4
**18** 4:16 126:16
**18-cv-5587** 1:5
131:5

Ezri Namvar
U.S. Securities and Exchange Commission v. Equitybuild, Inc.

Page 22

**19** 4:22 75:20,24
  76:3
**1979** 31:4
**1980** 31:4
**1st** 28:9,10

---

**2**

**2** 4:16 5:20
  18:17 19:3
  22:17 27:23
  33:1 34:18
  35:6 46:23
  50:5 53:18
  101:11 120:14
**2,247,163.78**
  24:8
**2,800** 49:20
**2.5** 46:23
**2.75** 34:14
**2.8** 101:12
**2:01** 43:7
**2:10** 43:4
**2:11** 43:7
**2:44** 90:3
**20** 35:20 42:24
  70:18 74:17
  88:18 99:17
  101:8 114:10
**20,000** 113:16,24
**2016** 4:17,17,18
  4:18 9:13
  12:23 32:1
  38:2 50:16
  91:15 93:18
  98:13
**2017** 4:19,19,20
  4:22,23 10:16
  12:1,23,23
  15:11 28:3
  36:12 52:3,12
  59:24,24 62:8
  65:18 66:11
  75:20 121:7
  124:3
**2018** 29:5 74:17

  97:19
**2023** 1:19 25:5,8
  26:13 27:2
  131:13,21
  133:8
**21443** 1:24
**22** 4:17 32:1
**23** 4:17,18 38:2
  91:15
**2300** 2:17
**23rd** 44:15
**24** 4:16
**240,750.30** 23:13
**26** 28:15,18
**27** 4:18 50:16
**28** 36:12

---

**3**

**3** 4:16 23:12
  24:24 25:1
  26:12 27:7
  33:1,24 50:5
  53:19 101:12
**3:13** 79:8
**3:14** 79:16
**3:23** 79:8
**3:25** 79:16
**3:35** 90:3
**30** 4:17,20 62:8
  70:18 101:8
  107:13 114:11
**30(b)(4)** 6:4
**30(b)(6)** 4:15 5:9
  124:11
**30th** 63:8
**312-275-5102**
  2:11
**312-353-8642**
  2:5
**312-464-3100**
  2:18
**312-527-1400**
  3:11
**321** 2:16
**340,750.30** 23:23

**3519** 63:3
**36th** 69:9
**38** 4:17 69:9

---

**4**

**4** 4:17 28:3,18
  30:2,5,8 31:24
  50:5
**4:24** 121:1
**4:31** 121:1
**4:41** 130:11
**40** 47:12 74:4
**401** 3:10
**43** 4:18
**450,000** 24:12

---

**5**

**5** 4:17 22:20
  24:5,7 25:4,7
  26:13,13 27:2
  38:1 43:24
  44:8 50:5
  91:14 125:16
**5-0** 120:16
**5,048,000** 27:1
**50** 4:18 108:15
  118:22 120:14
**500** 126:17,18
  127:13,15
**52** 4:19
**520-page** 49:21
**530** 3:10
**542** 2:10
**5450** 19:22
  21:12 52:19
**55** 108:15
**58** 4:19 127:18
**5D** 27:23

---

**6**

**6** 4:5,18 43:14
  50:5
**60** 12:2
**60540** 3:4
**60604** 2:5

**60605** 2:11
**60611** 3:11
**60654** 2:17
**62** 4:20
**630-219-4384**
  3:5
**65** 4:20
**68** 4:21
**6th** 133:8

---

**7**

**7** 4:18,19 50:5,6
  50:10,15 52:3
  52:12 95:15
**70** 12:2 14:1
**7024** 32:11
  34:19 35:1
  45:19
**75** 4:22 46:18
  47:14 118:22
**7524** 46:15
**7749** 19:22
  21:12 59:17,23
  61:24 69:2
**7749-59** 65:19
**7th** 52:7 53:2
  66:4

---

**8**

**8** 4:15,19 52:1
  66:4 68:11
**80** 4:7 14:2
  15:12 108:14
**86,000** 63:10

---

**9**

**9** 4:19 58:22
**90** 15:12 92:11
**900** 2:10
**93** 125:22
**95** 92:12 119:1
**99** 18:13
**99.9** 13:23

**EXHIBIT NO. 4**

| | |
|---|---|
| **From:** | Christopher Mora |
| **Sent:** | Tuesday, November 22, 2016 9:34 PM CST |
| **To:** | ezrinamvar@gmail.com |
| **Subject:** | Follow Up - EquityBuild Finance |

Hi Ezri,

I hope you are well. Doron Kermanian told me that he thought you would be very interested to know about our investor/developer company, EquityBuild Inc. and our private mortgage note investment company EquityBuild FInance LLC. He said that what EBF is doing to help our clients was something that you would want to discuss. Thank you for expressing interest in EquityBuild Finance (EBF), LLC, and making the decision to take closer look at CEO Shaun Cohen's offer.

**Please reply back to let me know that you received this email.**

I am based out of McLean, Virginia (Washington, DC metro), though our clients are nation-wide. If you are on LinkedIn.com, I welcome you to view my profile and read the summary about EquityBuild Inc. & EquityBuild Finance LLC, and further, read the recommendations/testimonials that some of my clients have posted. The link is here:

https://www.linkedin.com/in/christopher-mora-7528b43

As a point of reference, I am not only a consultant with EBF, but I am also a full time real estate investor and I have a buy-and-hold portfolio of single family and multi-family properties on the Mississippi Gulf Coast (which I acquired prior to working with EquityBuild, when I was still in the civilian practice of mortgage law and, as an attorney, I worked on several major real estate investment or re-development projects to include the $750 million BRAC and re-development of a New Orleans Navy base as Federal City New Orleans, a public-private mixed-use development (www.nolafederalcity.com)) and I am also a client / lender on several EBF private mortgage notes in my self directed Roth IRA.

**Right now, we are paying 16% return, plus 1% bonus (from points paid at closing) on our current private mortgage notes. I am happy to discuss this with you in greater detail.**

The current EquityBuild opportunity/private mortgage note is for 7024 S Paxton. As with all other EBF notes, this private mortgage note is fully secured by the Paxton property as collateral, and lenders are further protected with a first lien position. on the property. As always, clients are able to invest with either personal funds AND/OR using funds within their self directed IRA (SDIRA) (if you have a 401k with a former employer or an IRA that is not a SDIRA, we can help you get one set up with a SDIRA custodian to transfer from the old account into the SDIRA to take advantage of this opportunity if the IRA is your source of funds).

Here's a link to the Offering Memorandum -

7024 S Paxton

You should be able to click and download it or view it.

7024 S Paxton is an 18-month note that has an advertised closing date of November 28th, and the return it will earn and pay out is 16% per year and also 1% bonus point from the points at the closing. So, you'd effectively earn 17% in the first year, actually. Also, from the time funds are received until the closing date, these funds will also earn a 6% per diem rate of interest. So, with EBF there is never a time when your funds are not earning a rate of return. Then, from the closing date onward, they will earn the full 16%.

Our model consists of three key components to ensure the security of your investment:

1. Experience: As a real estate investment and asset management firm, EquityBuild Inc. handles all aspects of the rehabilitation, leasing, and property management of the properties we serve.

a. EquityBuild Inc. has been in the real estate industry since 1984 and has successfully closed over 1,500 deals

**Exhibit**

**3**

b.  EB is the largest buyer of small to mid-sized commercial multi-family properties in emerging markets in Chicago, the third largest city in the country.
c.  EquityBuild Finance has over $100,000,000 of lender/clients' funds under asset management
d.  Our team has over 120 years of combined real estate experience.
e.  Our construction managers have over 50 years of combined experience including work on apartment buildings, hotels, malls, and schools.
f.  Our property management companies are some of the top in all Chicagoland and boast a less than 5% vacancy rate

2. Qualified Investors: Financing is only available for qualified clients who purchase real estate from our inventory.  Borrowers are evaluated in a way similar to the process for applying for a traditional mortgage.  This ensures that they are qualified and creates a more secure investment for our lenders.

3. No Pooling: Each lender has a first lien position on the money they lend and their funds are further secured by the property itself as collateral.  This is not a pooling model that investors commonly see with other companies.

FYI: We have a few spots left on this Paxton note, with about $100,000 left to raise of the overall $2.75 million.  It will probably fully fund by Wednesday, tomorrow, especially with 16% return + 1% bonus point.

Again, please reply to this email and let me know you got this, and let me know if you'd like to speak this week?

Further, if you'd like, you can reply to this email and let me know what amount you wanted to reserve for a position on the funding report for this note (to hold a spot for you) just in case it moves quickly before we speak by phone.  Don't worry if this one fully funds - our deal flow is consistent, and we'll have another property in our pipeline after Paxton.

Best regards,

Chris


--
**Christopher D. Mora, BA, MA, MPA, JD |** Relationship Manager
US Navy (Active, 99-03, 07-13, 16-Pres; USNR, 03-07, 13-16; Afghanistan 2013)
University of Pennsylvania Law School, 1999; Harvard University, 2005
University of New Orleans, 1996; US Naval War College, 2008

**EquityBuild Finance, LLC**
direct  +469.371.0002
fax    +1.800.578.7161
EquityBuildFinance.com

Dallas, TX | Marco Island, FL | Denver, CO | Chicago, IL



Please Note: This email, including attachments, is intended only for the addresses(s) indicated, and may include non-public, proprietary, confidential or legally privileged information. If you are not an intended recipient or an authorized agent of an intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained in or transmitted with this e-mail is unauthorized and strictly prohibited. If you have received this email in error, delete it and any attachments or copies immediately.

**EXHIBIT NO. 5**

| | |
|---|---|
| **From:** | Ezri Namvar |
| **Sent:** | Friday, December 23, 2016 12:35 PM CST |
| **To:** | 'Shaun Cohen'; 'Tyler DeRoo' |
| **CC:** | 'Daniel Namvar' |
| **Subject:** | chicago |

SO THERE IS NO MISUNDERSTANING ANY MORE  I am including shaun and Tyler
both on this message :

---I need a detailed request letter what properties we r looking at , and the amount of the loans
---if purchase money –I need all offers, counter offers, rent rolls, purchase contracts, amendments, title reports, appraisals etc. etc.,
---on the refinance properties please provide all of the above , plus the title policy and the new rent roll, plus any rehab cost breakdown

-----SINCE WE HAVE BECOME AWARE OF YOUR BUSINESS STRUCTURE, ASSUMING YOUR PREVIOUS DEALS HAVE BEEN CLOSED WITH CROUDFUNDING INVESTORS, WE NEED TO MAKE SURE YOUR REINANCING OF ALREADY CLOSED DEALS ARE ALLOWED AND KOSHER, IN CASE THE PROCEEDS IS NOT DISTRIBUTED AND/OR GOING TOWARD NEW DEALS—IN THAT REGARD PLEASE PROVIDE ANY DOCUMENT U CAN—DEPENDING ON OUR UNDERWRITING WE MAY NEED A STRONG OPINION LETTER FROM YOUR ATTORNEY----PLEASE NOTE THAT THIS REQUIREMENT IS ONLY ON THE REFINANCE DEALS AND NOT THE PURCHASE MONEY LOANS.

Please get back 2 me, thnx

B"H
**Ezri Namvar**
T: 310.873.9575
ezrinamvar@gmail.com

**NOTICE:**  This communication is not intended to provide, and should not be relied upon for real estate, legal, tax, or accounting advice; and is not a solicitation, nor an offer to buy or sell securities, nor a loan approval or commitment to engage in any business transaction.  NOTHING IN THIS COMMUNICATION SHALL BE BINDING OR CONTRACTUAL.  Before engaging in any transaction, you should consult your own real estate, legal, tax or accounting experts.  The information contained in this message and any attachments are intended only for the use of the individual or entity to which such message is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you have received this message in error, you are prohibited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message from your system.

**Exhibit**

**4**

**EXHIBIT NO. 6**

| | |
|---|---|
| **From:** | Tyler DeRoo |
| **Sent:** | Friday, December 23, 2016 2:40 PM CST |
| **To:** | Ezri Namvar |
| **CC:** | Shaun Cohen; Daniel Namvar |
| **Subject:** | Re: chicago |
| **Attachments:** | 7024paxtonbuyerdocs.pdf, Untitled attachment 248810.htm, Rollover Form.pdf, Untitled attachment 248813.htm |

Hi Ezri,

Please find attached our standard rollover forms we use. In regards to the 4 buildings we wish to finance, i think it will be easiest and best to start with 7024 S Paxton. You already have all the relevant financial info on this one as this was one of the original buildings we had you look at. I also attached the title policy, closing statement, and relevant closing docs in my email yesterday with all the closing info but i have re-attached it here for convenience. I think it would probably be easiest and best if we could focus on 7024 Paxton since we dry closed this yesterday and are schedule to fund on Tuesday, so we need to get going on this one ASAP. The purchase price is $1.85MM so we would like to get have financing on this one for 75% of the purchase price, which would be $1,387,500. Please advise what further info you need from us to move this forward. Thanks again.

Tyler DeRoo
C. 847.420.2095

**Exhibit**

**5**

exhibitsticker.com

On Dec 23, 2016, at 12:52 PM, Ezri Namvar <ezrinamvar@gmail.com> wrote:

Please do
This is good 2 know

B"H
**Ezri Namvar**
T: 310.873.9575
ezrinamvar@gmail.com

NOTICE:  This communication is not intended to provide, and should not be relied upon for real estate, legal, tax, or accounting advice; and is not a solicitation, nor an offer to buy or sell securities, nor a loan approval or commitment to engage in any business transaction.  NOTHING IN THIS COMMUNICATION SHALL BE BINDING OR CONTRACTUAL.  Before engaging in any transaction, you should consult your own real estate, legal, tax or accounting experts.  The information contained in this message and any attachments are intended only for the use of the individual or entity to which such message is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you have received this message in error, you are prohibited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message from your system.

---

**From:** Shaun Cohen [mailto:shaun@equitybuildfinance.com]
**Sent:** Friday, December 23, 2016 10:48 AM
**To:** Ezri Namvar <ezrinamvar@gmail.com>
**Cc:** Tyler DeRoo <tyler@equitybuild.com>; Daniel Namvar <daniel@shatar.com>
**Subject:** Re: chicago

Ezri,

On all refinances we send out rollover documents to our lenders asking them if they would like their funds back or if they would like to rollover their funds into a new deal. Would you like me to have samples that we have sent out on previous deals?

Thanks,



Shaun Cohen
President
EquityBuild Finance, LLC
shaun@equitybuildfinance.com
Tel:  (877) 978-1916 x 1807
Cell: (215) 407-5777
Fax: (239) 244-8666
www.equitybuildfinance.com

Sent from my iPhone

On Dec 23, 2016, at 1:35 PM, Ezri Namvar <ezrinamvar@gmail.com> wrote:

SO THERE IS NO MISUNDERSTANING ANY MORE  I am including shaun and Tyler
both on this message :

---I need a detailed request letter what properties we r looking at , and the amount of the loans
---if purchase money –I need all offers, counter offers, rent rolls, purchase contracts, amendments, title reports, appraisals etc. etc.,
---on the refinance properties please provide all of the above , plus the title policy and the new rent roll, plus any rehab cost breakdown

-----SINCE WE HAVE BECOME AWARE OF YOUR BUSINESS STRUCTURE, ASSUMING YOUR PREVIOUS DEALS HAVE BEEN CLOSED WITH CROUDFUNDING INVESTORS, WE NEED TO MAKE SURE YOUR REINANCING OF ALREADY CLOSED DEALS ARE ALLOWED AND KOSHER, IN CASE THE PROCEEDS IS NOT DISTRIBUTED AND/OR GOING TOWARD NEW DEALS—IN THAT REGARD PLEASE PROVIDE ANY DOCUMENT U CAN—DEPENDING ON OUR UNDERWRITING WE MAY NEED A STRONG OPINION LETTER FROM YOUR ATTORNEY----PLEASE NOTE THAT THIS REQUIREMENT IS ONLY ON THE REFINANCE DEALS AND NOT THE PURCHASE MONEY LOANS.

Please get back 2 me, thnx

B"H
**Ezri Namvar**
T: 310.873.9575
ezrinamvar@gmail.com

NOTICE:  This communication is not intended to provide, and should not be relied upon for real estate, legal, tax, or accounting advice; and is not a solicitation, nor an offer to buy or sell securities, nor a loan approval or commitment to engage in any business transaction.  NOTHING IN THIS COMMUNICATION SHALL BE BINDING OR CONTRACTUAL.  Before engaging in any transaction, you should consult your own real estate, legal, tax or accounting experts.  The information contained in this message and any attachments are intended only for the use of the individual or entity to which such message is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you have received this message in error, you are prohibited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message from your system.

**Rollover/Distribution Authorization**

**Client Name:**

**Registration:**

**Investment Address:** _____

**Initial Investment Amount:  $_____**

**Interest to be Received: $_____**

**Total: $_____**

☐ **OPTION 1. Direct Deposit (Non IRA Investments and Form Must already be on file)**
           **OR**
    **Check To IRA Custodian**

☐ **OPTION 2. Wire ($50.00 wire fee will be deducted from Total)**

Please email bank wire instructions to Accounting@EquityBuildFinance.com, RE: _____ Payout-Your Name

☐ **OPTION 3. ROLL OVER FUNDS FROM PAYOUT ON EXISTING DEAL(s)**

Funds will be rolled over to _____

Funds will be rolled over to _____

Funds will be rolled over to _____

☐ **OPTION 4. PARTIAL PAYMENT/ PARTIAL ROLLOVER**

Funds (_____) will be rolled over to: _____

Funds (_____) will be mailed to: _____

Funds (_____) will be Direct Deposited to account on file

These numbers are not estimates.  Your authorization for direction of investment will be considered acceptable, by your signature.

**AUTHORIZATION AND SIGNATURE**

I am authorizing EquityBuild, Inc., Hard Money Company and it's subsidiaries and agents to hold and release funds necessary to roll my investment from one deal to the next.

| Account Owner Authorization and Signature | | |
|---|---|---|
| X | Print Name | Date |
| **Responsible Individual Authorization and Signature** | | |
| X | Print Name | Date |
| INTERNAL USE ONLY | | |
| Date Received: | Received by: | Date Approved: | Approved by: |

 **CHICAGO TITLE & TRUST**　　　**CASH ESCROW TRUST AGREEMENT**

Chicago Title and Trust Company, as Escrow Trustee　**Date:**　December 19, 2016
10 South LaSalle Street, Suite 2930　　　　　　　**Escrow No.:**　16WSA649095LP
Chicago, IL 60603
Phone: (312)223-2801  Fax:  312-223-2920

Commitment No.:　16WSA649095LP

Seller:　　　　CLTLT 8002348089

Purchaser:　　Equity Build, Inc.

Property Address: 7024 S Paxton, Chicago, IL 60649

1. The undersigned seller and purchaser (or representatives) hereby authorize Chicago Title and Trust Company to make disbursements for the sale of the subject property in accordance with the signed

   Escrow Trust Disbursement Statement

   **OR**

   Escrow Receipt and Disbursement Authorization and RESPA attached hereto.

2. It is expressly understood, that Chicago Title and Trust Company does not represent either seller or purchaser; further Chicago Title and Trust Company is acting solely as an escrow trustee for disbursement of funds deposited herein and closing of the sale transaction, all in accordance with this escrow trust agreement.

3. The undersigned hereby direct you to make the above-referenced disbursements only when the following conditions are satisfied:

   A. You have received funds by either wire transfer, cashier's or certified checks.  NOTE:  Some restrictions and additional fees may be applicable in the event Chicago Title and Trust Company is asked to wire transfer any disbursements;

   B. You have received transfer documents in a form satisfactory to seller and purchaser;

   C. You have received clearance documentation (including but not limited to ALTA, survey, payoff letters, tax bills, etc.) sufficient to permit Chicago Title Insurance Company to issue its regular form of owner's title insurance policy insuring Equity Build, Inc. in the amount of One Million Eight Hundred Fifty Thousand And No/100  Dollars  ($1,850,000.00)  subject  only  to  the  following  title  exceptions  shown  in  the above-referenced order number:

   subject only to those exceptions shown on the commitment attached hereto.

   **OR**

   D. You have received documentation sufficient to permit Chicago Title and Trust Company to issue the following endorsements to the owner's title insurance policy referenced above:

   E. You have received from the seller a 1099 solicitation/certification of exemption and/or a copy of the FIRPTA affidavit given to the purchaser.

---

NOTE:  This form of escrow trust agreement is to be used for cash transactions with immediate disbursement only.  If disbursement does not take place the same day, deed and money escrow trust instructions should be used.

## CASH ESCROW TRUST AGREEMENT
(continued)

4. When you have made the above-referenced disbursements, the undersigned hereby direct you to:

   A. Record the transfer documents;

   B. Obtain releases for any liens paid from funds deposited herein and deliver recorded releases and cancelled mortgage documents to CLTLT 8002348089.

   C. Issue the above-referenced owner's title insurance policy and deliver same to Equity Build, Inc..

   In the event the conditions set forth herein are not satisfied for any reason on the date this agreement is executed, you are to immediately return all funds and documents given to you in accordance with Section 3 above ("deposits") to the party who delivered them to you at once. In such case this escrow trust agreement shall be considered null and void.

   NOTE: If the parties hereto wish to leave their deposits with Chicago Title and Trust Company until such a time as the transaction can be closed, separate deed and money escrow trust instructions should be prepared and executed to govern the transaction.

5. The following Chicago Title and Trust Company and Chicago Title Insurance Company charges shall be paid from seller's funds: State and County transfer stamps, releases recorded to clear seller's title, owner's title insurance policy, 875.00 escrow fee and .

6. The following Chicago Title and Trust Company and Chicago Title Insurance Company charges shall be paid from purchaser's funds: transfer stamps, recording the deed, 875.00 escrow fee and .

IN WITNESS WHEREOF, the undersigned have executed this document on the date(s) set forth below.

SELLER(S): *7. Dry Close until 12/27 when in receipt of buyers funds.*

CLTLT 8002348089

BY:_____          _____
                                                  Date

PURCHASER(S):

Equity Build, Inc.

BY _____        ___12/22/2016___
                                                  Date

ACCEPTED:

Chicago Title and Trust Company, as Escrow Trustee

_____              _____
          Signature                              Date

By: _____
          Print Name

Its: _____
          Print Title

<u>TRUSTEE'S DEED</u>

This indenture made the 13th day of December, 2016, between **CHICAGO TITLE LAND TRUST COMPANY,** as Trustee, as Trustee under the provisions of a deed or deeds in trust, duly recorded and delivered to said company pursuant to a Trust Agreement dated 22nd day January, 2007, and known as trust number 8002348089, party of the first part and **EQUITYBUILD, INC.,** party of the second part.

Address of Grantee:
**1083 North Collier Blvd.**
**Marco Island, Florida 34145**

Reserved for Recorder's Office

**WITNESSETH**, That said party of the first part, in consideration of the sum of **TEN and no/100 DOLLARS ($10.00) AND OTHER GOOD AND VALUABLE** consideration in hand paid, does hereby **CONVEY AND QUIT CLAIM** unto said party of the second part, in the following described real estate, situated in Cook County, Illinois, to wit:

<u>SEE LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A"</u>

P.I.N. 20-24-424-011-0000

Property Address: 7024 SOUTH PAXTON, CHICAGO, ILLINOIS 60649

Together with the tenements and appurtenances thereunto belonging.

TO HAVE AND TO HOLD the same unto said party of the second part, and to the proper use, benefit and behoof forever of said party the second part.

**This deed is executed pursuant to and in the exercise of the power and authority granted to and vested in Said trustee by the terms of said deed or deeds in trust delivered to said trustee in pursuance of the trust agreement above mentioned.**

IN WITNESS WHEREOF, said party of the first part has caused its corporate seal to be hereto affixed, and has caused its name to be signed to these presents by its Assistant Vice President, the day and year first above written.

CHICAGO TITLE LAND TRUST COMPANY,
as Trustee as Aforesaid

By: _____
Mario V. Gotanco, **Assistant Vice President**

Trustee's Deed as Tenants in Common (1/96)
F. 154

State of Illinois    )

                **SS.**

County of Cook   )

I, the undersigned, a Notary Public in and for the County and State aforesaid, do hereby certify that Mario V. Gotanco, Assistant Vice President of **CHICAGO TITLE LAND TRUST COMPANY**, personally known to me to be the same person whose name is subscribed to the foregoing instrument as such Assistant Vice President appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his own free and voluntary act and as the free and voluntary act of the Company; and the said Assistant Vice President then and there caused the corporate seal of said Company to be affixed to said instrument as his own free and voluntary act and as the free and voluntary act of the Company.

Given under my hand and Notarial Seal this 13th day of December, 2016

_____
NOTARY PUBLIC

```
"OFFICIAL SEAL"
NATALIE FOSTER
Notary Public, State of Illinois
My Commission Expires 07/01/2017
```

This instrument was prepared by:
CHICAGO TITLE LAND TRUST COMPANY
10 South LaSalle Street, Suite 2750
Chicago, Illinois 60603

**MAIL DEED TO:**

**NAME:**

**ADDRESS:**

**CITY, STATE, ZIP CODE:**

**MAIL TAX BILLS TO:**

**NAME:**

**ADDRESS:**

**CITY, STATE, ZIP CODE:**

## EXHIBIT A
## LEGAL DESCRIPTION

THE SOUTH 20 FEET OF LOT 5, ALL OF LOT 6 AND THE NORTH 40 FEET OF LOT 7 IN THE SUBDIVISION OF THE EAST ½ OF BLOCK 4 (EXCEPT THE SOUTH 22 FEET THEREOF) AND PART ALREADY DEDICATED FOR ALLEY IN COMMISSIONER'S PARTITION, A SUBDIVISION OF THE SOUTH ½ OF THE SOUTHWEST ¼ OF THE SOUTHEAST ¼ OF SECTION 24, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PROPERTY COMMONLY KNOWN AS: 7024-32 S. PAXTON, CHICAGO, IL, 60649

PERMANENT INDEX NUMBER(S): 20-24-424-011-0000

## ALTA LOAN AND EXTENDED COVERAGE OWNERS POLICY STATEMENT

Commitment No. _____                    Loan No. _____

    The undersigned hereby certifies with respect to the land described in the above commitment it has been advised by the Beneficiaries of said Trust
1. That, to the best knowledge and belief of the undersigned, no contracts for the furnishing of any labor or material to the land or the improvements thereon, and no security agreements or leases in respect to any goods or chattel that have or are to become attached to the land or any improvements thereon as fixtures, have been given or are outstanding that have not been fully performed and satisfied; that there are no unrecorded contracts to purchase the land; and that there are no unrecorded leases to which the land is subject, except as listed below, and that if any leases are listed below, they contain no options to purchase, rights of renewal, or other unusual provisions, except as noted below. (If no leases or contracts, state "none".)

_____

(Use back page hereof if necessary)

    2. That, in the event the undersigned is a mortgagor in a mortgage to be issued pursuant to the above commitment, the mortgage and the principal obligations it secures are good and valid and free from all defenses except as to any personal liability of the undersigned; that any person purchasing the mortgage and the obligations it secures, or otherwise acquiring any interest therein, may do so in reliance upon the truth of the matters herein recited; and that this certification is made for the purpose of better enabling the holder or holders, from time to time of the above mortgage and obligations to sell, pledge or otherwise dispose of the same freely at any time, and to insure the purchasers or pledgees thereof against any defenses thereto, except as to any personal liability of the undersigned by the mortgagor or the mortgagor's heirs, personal representatives or assigns.

| I N D I V I D U A L S | Date _____ | | I N D I V I D U A L S | |
|---|---|---|---|---|

INDIVIDUALS

Date _____

     Seller or Owner
_____ (Seal)
_____ (Seal)

This Agreement is signed by **Chicago Title Land Trust Company** not individually but solely as Trustee under a certain Trust Agreement known as Trust No._8002348089_, said Trust Agreement is hereby made a part hereof and any claims against said Trustee which may result from the signing of this Agreement shall be payable only out of any trust property which may be held thereunder, and said Trustee shall not be personally liable for the performance of any of the terms and conditions of this agreement or for the validity or condition of the title of said property or for any agreement with respect thereto. Any and all personal liability of **Chicago Title Land Trust Company** is hereby expressly waived by the parties hereto and their respective successors and assigns.

INDIVIDUALS

    Purchaser
_____ (Seal)
_____ (Seal)

This statement is based solely upon information and belief, upon information furnished by the beneficiary or beneficiaries of the aforesaid trust. The undersigned has no personal knowledge of any of the facts or statements herein contained.

TRUSTEES

The above statements are made by **Chicago Title Land Trust Company** not personally but solely as Trustee under the trust agreement known as Trust No. _8002348089_ on the above date by virtue of the written authority and direction of the beneficiaries under the trust.

By:_____ (Seal)
    Assistant Vice President

    I/We certify that no survey was furnished to me/us and none is available.

TRUSTEES

The above statements are made by **Chicago Title Land Trust Company** not personally but as Trustee under the trust agreement known as Trust No. _____ on the above date by virtue of the written authority and direction of the beneficiaries under the trust.

By:_____ (Seal)
    Trust Officer

LENDER'S DISBURSEMENT STATEMENT

    The undersigned hereby certifies that the proceeds of the loan secured by the mortgage to be insured under the loan policy to be issued pursuant to the above commitment were fully disbursed to or on the order of the mortgagor on _____ and, to the best knowledge and belief of the undersigned, the proceeds are not to be used to finance the making of future improvements or repairs on the land. You are hereby authorized to date down the above commitment to cover the date of said disbursement.

_____          _____
Dated                                                                    Signature

## ALTA LOAN AND EXTENDED COVERAGE OWNERS POLICY STATEMENT

Commitment No. _____       Loan No. _____

The undersigned hereby certifies with respect to the land described in the above commitment it has been advised by the Beneficiaries of said Trust

1. That, to the best knowledge and belief of the undersigned, no contracts for the furnishing of any labor or material to the land or the improvements thereon, and no security agreements or leases in respect to any goods or chattel that have or are to become attached to the land or any improvements thereon as fixtures, have been given or are outstanding that have not been fully performed and satisfied; that there are no unrecorded contracts to purchase the land; and that there are no unrecorded leases to which the land is subject, except as listed below, and that if any leases are listed below, they contain no options to purchase, rights of renewal, or other unusual provisions, except as noted below. (If no leases or contracts, state "none".)

_____

(Use back page hereof if necessary)

2. That, in the event the undersigned is a mortgagor in a mortgage to be insured under a loan policy to be issued pursuant to the above commitment, the mortgage and the principal obligations it secures are good and valid and free from all defenses except as to any personal liability of the undersigned; that any person purchasing the mortgage and the obligations it secures, or otherwise acquiring any interest therein, may do so in reliance upon the truth of the matters herein recited; and that this certification is made for the purpose of better enabling the holder or holders, from time to time of the above mortgage and obligations to sell, pledge or otherwise dispose of the same freely at any time, and to insure the purchasers or pledges thereof against any defenses thereto, except as to any personal liability of the undersigned by the mortgagor or the mortgagor's heirs, personal representatives or assigns.

| | |
|---|---|
| **I N D I V I D U A L S** | Date _____<br><br>Seller or Owner<br>_____ (Seal)<br>_____ (Seal) |

**I N D I V I D U A L S**    Purchaser _____ (Seal)    _____ (Seal)

This Agreement is signed by **Chicago Title Land Trust Company** not individually but solely as Trustee under a certain Trust Agreement known as Trust No. 8002348089, said Trust Agreement is hereby made a part hereof and any claims against said Trustee which may result from the signing of this Agreement shall be payable only out of any trust property which may be held thereunder, and said Trustee shall not be personally liable for the performance of any of the terms and conditions of this agreement or for the validity or condition of the title of said property or for any agreement with respect thereto. Any and all personal liability of **Chicago Title Land Trust Company** is hereby expressly waived by the parties hereto and their respective successors and assigns.

This statement is based solely upon information and belief, upon information furnished by the beneficiary or beneficiaries of the aforesaid trust. The undersigned has no personal knowledge of any of the facts or statements herein contained.

**T R U S T E E S**    The above statements are made by **Chicago Title Land Trust Company** not personally but solely as Trustee under the trust agreement known as Trust No. 8002348089 on the above date by virtue of the written authority and direction of the beneficiaries under the trust.

By: _____ (Seal)
Assistant Vice President

I/We certify that no survey was furnished to me/us and none is available.

**T R U S T E E S**    The above statements are made by **Chicago Title Land Trust Company** not personally but as Trustee under the trust agreement known as Trust No. _____ on the above date by virtue of the written authority and direction of the beneficiaries under the trust.

By: _____ (Seal)
Trust Officer

### LENDER'S DISBURSEMENT STATEMENT

The undersigned hereby certifies that the proceeds of the loan secured by the mortgage to be insured under the loan policy to be issued pursuant to the above commitment were fully disbursed to or on the order of the mortgagor on _____ and, to the best knowledge and belief of the undersigned, the proceeds are not to be used to finance the making of future improvements or repairs on the land. You are hereby authorized to date down the above commitment to cover the date of said disbursement.

_____
Dated

_____
Signature

 **CHICAGO TITLE & TRUST**     **JOINT DIRECTION TO TRANSFER FUNDS**

Wendy L. Peca, Clerk
Chicago Title and Trust Company, as Escrow Trustee
10 South LaSalle Street, Suite 2850
Chicago, IL 60603
Phone: (312)223-2800  Fax: (312)223-2815

**Date:**        December 19, 2016
**Escrow No.:**  16WSA649095LPJL.

You are hereby authorized and directed to:

☐  Liquidate the existing  investment made on behalf of the parties hereto.

☐  Transfer the sum of Twenty-Five Thousand And No/100 Dollars ($25,000.00) to Escrow Number 16wsa649095lp.

☐  Interest earned less investment fee is to be paid to/at the direction of .

☐  Escrow Fee is to be paid as follows:

   Bill to:  Account No.:

        Account Name:

☐  Disburse remaining funds as follows:


IN WITNESS WHEREOF, the undersigned have executed this document on the date(s) set forth below.

**SELLER(S):**


CLTLT 8002348089

BY:_____        _____
                                                        Date


**BUYER(S):**


Equity Build, Inc.

BY _____        _____12/22/2016____
                                                        Date

## JOINT DIRECTION TO TRANSFER FUNDS
(continued)

**LENDER:**

_____
Print Company Name

_____          _____
Signature                                                          Date

By: _____
Print Name

Its: _____
Print Title

**ACCEPTED:**

Chicago Title and Trust Company

_____          _____
Signature                                                          Date

By: _____
Print Name

Its: _____
Print Title

 CHICAGO TITLE & TRUST

**NOTICE OF SETTLEMENT AGENT RESPONSIBILITY**

Chicago Title and Trust Company
10 South LaSalle Street, Suite 2930
Chicago, IL 60603
Phone: (312)223-2801  Fax: 312-223-2920

**Date:** December 19, 2016
**Escrow No.:** 16WSA649095LP
**Seller(s):** CLTLT 8002348089
**Borrower(s):** Equity Build, Inc.
**Property:** 7024 S Paxton
Chicago, IL 60649

The Foreign Investment in Real Property Tax Act (FIRPTA), Title 26 U.S.C., Section 1445, and the regulations there under, provide in part, that a transferee (buyer) of a U.S. real property interest from a foreign person must withhold a statutory percentage of the amount realized on the disposition, report the transaction and remit the withholding to the Internal Revenue Service (IRS) within twenty (20) days after the transfer. Chicago Title and Trust Company will not determine nor aid in the determination of whether the FIRPTA withholding provisions are applicable to the subject transaction, nor act as a Qualified Substitute under state or federal law, nor furnish tax advice to any party to the transaction. Chicago Title and Trust Company will not determine nor aid in the determination of whether the transaction will qualify for an exception or an exemption and is not responsible for the filing of any tax forms with the IRS as they relate to FIRPTA, nor responsible for collecting and holding of any documentation from the buyer or seller on the buyer's behalf for the purpose of supporting a claim of an exception or exemption. Chicago Title and Trust Company is not an agent for the buyer for the purposes of receiving and analyzing any evidence or documentation that the seller in the subject transaction is a U.S. citizen or resident alien. Chicago Title and Trust Company is not responsible for the payment of this tax and/or penalty and/or interest incurred in connection therewith and such taxes are not a matter covered by the Owner's Policy of Title Insurance to be issued to the buyer. Chicago Title and Trust Company is not responsible for the completion of any IRS documents or related forms related to the referenced statute. The buyer is advised: they must independently make a determination of whether the contemplated transaction is subject to the withholding requirement; bear full responsibility for compliance with the withholding requirement if applicable and/or for payment of any tax, interest, penalties and/or other expenses that may be due on the subject transaction; and they are responsible for the completion of any and all forms, including but not limited to applicable IRS documentation, and the mailing of those forms. The Buyer is advised any forms, documents, or information received from Chicago Title and Trust Company is not tax or legal advice and should not be construed as such nor treated as a complete representation of FIRPTA requirements. Buyer should seek outside counsel from a qualified individual to determine any and all implications of the referenced statute.

IN WITNESS WHEREOF, the undersigned have executed this document on the date(s) set forth below.

**PURCHASER(S):**

Equity Build, Inc.

BY _____

_____12/22/2016_____
Date

## BULK SALES ACT IDEMNIFICATION

Pertaining to the Illinois Withholding Tax, Seller represents, warrants and shall indemnify and hold harmless Purchaser that the sale of the Property is not subject to, and does not subject Purchaser to liability under, 35 ILCS 5/902 (d) or 35 ILCS 120/5j. Seller shall have notified the Illinois Department of Revenue (herein referred to as the "Department") of the intended sale and requested the Department to make a determination as to whether the Seller has an assessed, but paid, amount of tax, penalties, or interest under the Act. In the event that the Department, post-closing determines that a liability exists Seller shall fully release and forever discharge Purchaser, and each of their respective agents, members, managers, employees and successors and assigns from any and all claims, demands, liens, covenants, actions, suits, causes of action, obligations, controversies, debts, costs, expenses, damages, judgments, order and liabilities of whatever kind or nature in Jaw, equity or otherwise, whether now known or unknown, vested or contingent, suspected or unsuspected, and whether or not concealed or hidden, which have existed or may have existed, including but not limited to any action based on the allegations out of or relating to 35 ILCS 5/902 (d) or 35 ILCS 120/5j and any determination by the Department. Seller shall also fully and promptly pay to the Department any and all funds necessary to address any claims or demands by the Department. Without in any way limiting the generality of the foregoing language, the release shall include any and all claims, demands, or causes of action, arising out of or in any way connected with any occurrence, acts, omissions, transactions, practices or policies, which were or could have been asserted under any and all laws, rules regulations and any and all amendments to the foregoing statues, federal common law, state common law, and/or any other federal, state or local statute, Jaw ordinance, regulation or order, etc., including claims under the regulations or orders, all claims for attorney's fees regardless of the basis, as well as all state law claims based on statute, contract, tort or public policy.

_____ , December 20 , 2016

STEVE THOMAS

Rent Roll

7024 S. Paxton (7024)

As Of = 12/19/2016

Month Year = 12/2016

| Unit | Unit Type | Sq Ft | Resident | Name | Market Rent | Actual Rent | Resident Deposit | Other Deposit | Move In | Lease Expiration | Move Out | % Unit Occupancy | % Sqft Occupied | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Current/Notice/Vacant Residents** | | | | | | | | | | | | | | |
| 7024-1A | 3bd/1ba | 0.00 | 00002243 | Regina (DOH) Taylor | 815.00 | 815.00 | 0.00 | 0.00 | 11/01/2011 | 09/30/2016 | | | | 0.00 |
| 7024-1B | 2bd/1ba | 0.00 | 00001735 | Ebonie Duniver | 750.00 | 750.00 | 0.00 | 0.00 | 03/14/2016 | 03/13/2017 | | | | 1,100.48 |
| 7024-1B | 3bd/1ba | 0.00 | lalpic | Latisha(DOH) Jackson | 775.00 | 775.00 | 0.00 | 0.00 | 10/01/2010 | | | | | 312.00 |
| 7024-2A | 3bd/1ba | 0.00 | 00001781 | Katie (Payment Plan) Jenkins | 850.00 | 850.00 | 0.00 | 0.00 | 05/07/2016 | 06/06/2017 | | | | 2,360.00 |
| 7024-2B | 2bd/1ba | 0.00 | thejor | Theresa(CHA) Jordan | 993.00 | 993.00 | 1,100.00 | 0.00 | 04/20/2009 | 03/31/2016 | | | | -1,824.67 |
| 7024-3A | 3bd/1ba | 0.00 | 00002021 | Beverly Lee | 850.00 | 850.00 | 0.00 | 0.00 | 09/01/2011 | 07/31/2016 | | | | 40.00 |
| 7024-3B | 2bd/1ba | 0.00 | VACANT | VACANT | 775.00 | 0.00 | 0.00 | 0.00 | | | | | | 0.00 |
| 7026-1A | 1bd/1ba | 0.00 | 00001721 | Sequita(CHA) Macon | 940.00 | 940.00 | 0.00 | 0.00 | 02/17/2016 | 03/16/2016 | | | | 0.00 |
| 7026-2A | 1bd/1ba | 0.00 | VACANT | VACANT | 675.00 | 0.00 | 0.00 | 0.00 | | | | | | 0.00 |
| 7026-5A | 1bd/1ba | 0.00 | donsmith | Donald(CHA) Smith | 869.00 | 869.00 | 869.00 | 0.00 | 01/01/2008 | 10/31/2016 | | | | 48.81 |
| 7028-1B | 2bd/1ba | 0.00 | 00005518 | Ronnie(CC) Noys | 850.00 | 850.00 | 850.00 | 0.00 | 09/01/2012 | 07/31/2016 | | | | 89.44 |
| 7028-2B | 2bd/1ba | 0.00 | 00014433 | Rosie (CHA) Sanders | 920.00 | 920.00 | 0.00 | 0.00 | 01/26/2016 | 01/25/2016 | | | | -26.00 |
| 7028-3B | 2bd/1ba | 0.00 | lholmes | Isabella(DOH) Holmes | 775.00 | 775.00 | 0.00 | 0.00 | 01/31/2010 | 01/31/2010 | | | | -671.00 |
| 7030-1A | 2bd/1ba | 0.00 | 00001815 | Pamela(FF) Gray | 775.00 | 775.00 | 0.00 | 0.00 | 08/01/2016 | 07/31/2017 | | | | 775.00 |
| 7030-1B | 2bd/1ba | 0.00 | dagpea | Darlene(CHA) Pearson | 868.00 | 868.00 | 868.00 | 0.00 | 08/06/2009 | | | | | -0.09 |
| 7030-2A | 2bd/1ba | 0.00 | 00001599 | Lyna(DOH) Edwards | 775.00 | 775.00 | 0.00 | 0.00 | 09/08/2015 | 10/07/2015 | | | | 580.00 |
| 7030-2B | 2bd/1ba | 0.00 | 00001561 | Porscha(DOH) Rodgers | 775.00 | 775.00 | 0.00 | 0.00 | 08/05/2015 | 07/04/2016 | | | | -502.26 |
| 7030-3A | 2bd/1ba | 0.00 | 00001544 | Dawn(DOH) Robinson | 775.00 | 775.00 | 0.00 | 0.00 | 04/23/2015 | 05/22/2015 | | | | 1,106.67 |
| 7030-3B | 2bd/1ba | 0.00 | elizbrow | Elizabeth(CHA) Browning | 946.00 | 946.00 | 0.00 | 0.00 | 07/17/2009 | 06/30/2016 | | | | 564.00 |
| 7032-1A | 3bd/1ba | 0.00 | sylmck | Sylvester(CHAC) McKinley | 900.00 | 900.00 | 900.00 | 0.00 | 11/01/2002 | 02/28/2016 | | | | -0.09 |
| 7032-1B | 2bd/1ba | 0.00 | 00001382 | Sandra Barney | 775.00 | 775.00 | 0.00 | 0.00 | 10/03/2014 | 10/02/2015 | | | | 775.00 |
| 7032-2A | 3bd/1ba | 0.00 | 00001160 | Loretta(DOH) Marshall | 815.00 | 815.00 | 0.00 | 0.00 | 05/06/2014 | 04/05/2015 | | | | -105.00 |
| 7032-2B | 2bd/1ba | 0.00 | VACANT | VACANT | 775.00 | 0.00 | 0.00 | 0.00 | | | | | | 0.00 |
| 7032-3A | 3bd/1ba | 0.00 | 00001790 | Cherry Knazze | 825.00 | 825.00 | 0.00 | 0.00 | 07/13/2016 | 07/12/2017 | | | | 175.65 |
| 7032-3B | 2bd/1ba | 0.00 | 00001543 | Latanya(DOH) Jefferies | 775.00 | 775.00 | 0.00 | 0.00 | 04/23/2015 | 05/22/2015 | | | | 0.00 |
| **Total** | | | | **7024 S. Paxton(7024)** | **20,614.00** | **18,389.00** | **4,587.00** | **0.00** | | | | | | **4,797.94** |

| Summary Groups | Square Footage | Market Rent | Actual Rent | Security Deposit | Other Deposits | # Of Units | % Unit Occupancy | % Sqft Occupied | Balance |
|---|---|---|---|---|---|---|---|---|---|
| **Current/Notice/Vacant Residents** | | | | | | | | | |
| Future Residents/Applicants | | | | 4,587.00 | 0.00 | 22 | 88.00 | 0.00 | 4,797.94 |
| Occupied Units | 0.00 | 18,389.00 | 18,389.00 | 4,587.00 | 0.00 | | | | 0.00 |
| Total Non Rev Units | 0.00 | 0.00 | 0.00 | | | 0 | 0.00 | 0.00 | |
| Total Vacant Units | 0.00 | 2,225.00 | | | | 3 | 12.00 | 0.00 | |
| **Totals:** | **0.00** | **20,614.00** | **18,389.00** | **4,587.00** | **0.00** | **25** | **100.00** | **0.00** | **4,797.94** |



CHICAGO TITLE INSURANCE COMPANY

**BILL OF SALE**

Seller, **Chicago Title Land Trust Company, as Trustee under the provisions of a Trust Agreement dated January 22, 2007, known as Trust Number 8002348089** of the City of Chicago, County of Cook, State of Illinois , in consideration of **TEN & 00/100 DOLLARS, and other good and valuable consideration**, receipt whereof is hereby acknowledged, does hereby sell, assign, transfer and set over to buyer **EQUITY BUILD, INC.** a Florida Corporation, the following described personal property located on the premises commonly known as **7024 SOUTH PAXTON, CHICAGO, IL, 60649** to-wit: **All items of personal property listed on real estate sales contract dated 10/07/2016**

Seller hereby represents and warrants to Buyer that Seller is the absolute owner of said property, that said property is free and clear of all liens, charges and encumbrances, and that Seller has full right, power and authority to sell said personal property and to make this bill of sale. All warranties of quality, fitness, and merchantability are hereby excluded.

If this bill of sale is signed by more than one person, all persons so signing shall be jointly and severally bound hereby.

IN WITNESS WHEREOF, Seller has signed and sealed this bill of sale at **CHICAGO, IL** this date
9 December 2016 .

_____ **(SEAL)**
**Steve Thomas as Beneficiary of Chicago Title Land Trust**
**Agreement Dated January 22, 2007, known as Trust Number**
**80022348089**

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, CERTIFY THAT Steve Thomas personally known to me to be the same person(s) whose name(s) are subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that they signed, sealed and delivered the instrument as their free and voluntary act, for the uses and purposes therein set forth

Given under my hand and notarial seal this ____9____ day of ___December___ , 2016

_____
Notary Public

GREGORY V MILLER
Notary Public - State of Illinois
My Commission Expires Apr 23, 2017



CHICAGO TITLE INSURANCE COMPANY      **AFFIDAVIT OF TITLE COVENANT AND WARRANTY**

STATE OF Illinois                          )
                                       ) SS.

COUNTY OF COOK                )

- The undersigned affiant, being first duly sworn, on oath says, and also covenants with and warrants to the grantee hereinafter named: **EQUITY BUILD, INC. a Florida Corporation**.

- That affiant has an interest in the premises described below or in the proceeds thereof or is the grantor in the deed dated **December 13th 2016** to **EQUITY BUILD, INC.** grantee, conveying the following described premises: **THE SOUTH 20 FEET OF LOT 5, ALL OF LOT 6 AND THE NORTH 40 FEET OF LOT 7 INTHE SUBDIVISION OF THE EAST 1/2 OF BLOCK 4 (EXCEPT THE SOUTH 22 FEET THEREOF) AND PART ALREADY DEDICATED FOR ALLEY IN COMMISSIONER'S PARTITION, A SUBDIVISION OF THE SOUTH 1/2 OF THE SOUTHWEST 1/4 OF THE SOUTHEAST 1/4 OF SECTION 24, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS** .

- That no labor or material has been furnished for premises within the last four months, that is not fully paid for.

- That since the title date of _____**9-27-2016**_____, in the report on title issued by Chicago Title Insurance Company, affiant has not done or suffered to be done anything that could in any way affect the title to premises, and no proceedings have been filed by or against affiant, nor has any judgment or decree been rendered against affiant, nor is there any judgment, note or other instrument that can result in a judgment or decree against affiant within five days from the date hereof.

- That the parties, if any, in possession of premises are bona fide tenants only, and have paid promptly and in full their rent to date, and are renting from __PER RENT ROLL_to __PER RENT ROLL_____, and not for any longer term, and have no other or further interest whatsoever in premises.

- That all water taxes, except the current bill, have been paid, and that all the insurance policies assigned have been paid for.

- That this instrument is made to induce, and in consideration of, the said grantee's consummation of the purchase of premises.

_____ **(SEAL)**
**Steve Thomas as Beneficiary of Chicago Title Land Trust Agreement dated Janury 22, 2007, known as Trust Number 8002348089**

Subscribed and sworn to before me this ____9____ day of __December__, 2016

_____
Notary Public

OFFICIAL SEAL
GREGORY V MILLER
Notary Public - State of Illinois
My Commission Expires Apr 23, 2017

# NO MANAGEMENT LETTER

STEVE G. THOMAS as Owner, attests that there is no management agreement or company currently managing the property located 7024 S. Paxton , Chicago, Illinois 60649.

Steve G. Thomas As Beneficiary of
CTLT Dated January 22nd 2007
Known as Trust # 8002348089

# ASSIGNMENT OF APARTMENT LEASES
# FOR 7024 S. PAXTON, CHICAGO, ILLINOIS 60649

December 13, 2016

**Steve G. Thomas**, as Secretary of The Genesis Group 7024 S. Paxton Inc, assignor hereby assigns all of its rights and privileges in the apartment leases for the property located at 7024 S. Paxton, Chicago, Illinois to Equity Build, Inc. Said leases are attached hereto and are incorporated herein by reference.

Steve G. Thomas

#12352888-2502-11/07/16-DR - MISC  10.00



**City of Chicago**
**Department of Revenue**
**City Hall, Room 107**

----- **66075** -----
**DEPOSIT SLIP/ RECEIPT**

Date: 11/07/2016
Dept: Buildings

| CODE | FUND | DEPT. | ORGN. | ACCT. | AMOUNT | REFERENCE |
|------|------|-------|-------|-------|--------|-----------|
| BB70 | 100 | 67 | 3010 | 3334 | $10.00 | CITY HALL REGISTRATION |
|  |  |  |  |  |  | STEVE THOMAS |
|  |  |  |  |  |  | 647 E. 75TH ST. |
|  |  |  |  |  |  | CHICAGO, IL. 60619 |
|  |  |  |  |  |  | 312-953-4191 |
|  |  |  |  |  |  |  |

**Teller Use Only**

Description: _____ CITY HALL REGISTRATION _____

Maker's Name (if check over $10,000)
_____

Payment Type Other _____ Check No. _____ Routing No. _____ Account No. _____

Paid By STEVE THOMAS - CREDIT CARD _____ Phone (312) 953-4191 _____

_____ By: _____

7024 - 7024 S PAXTON AVE
2016 2016

# BUILDING REGISTRATION CERTIFICATE

## CUSTOMER COPY - KEEP FOR YOUR RECORDS

Full Payment Certificate

# FPC Summary: 917618

**Status:** READY **Type:** Online

| Created: | Ready: | Certified: | Expires: |
|---|---|---|---|
| 12/14/2016 | 12/15/2016 | | 01/23/2017 |

## Premises Information

7024 S PAXTON ST

## Requested By

Wendy Peca
wendyl.peca@ctt.com
Chicago Title

## Seller

CTLT Dtd 1-22-17, #8002348089
312-733-2424

## Buyer

Equity Build, Inc.
7024 S PAXTON ST Chicago IL
60649
312-494-1000

## Contact

Steve Thomas/16WSA649095LP
312-953-4191

## Accounts Balance and fees may be subject to change prior to certification

| Account Number | Premises | Owner | Service Class | Utility Charge | Fee | Fee Applied |
|---|---|---|---|---|---|---|
| 835366-555839 | 7024 30 S PAXTON AVE | THE GENESIS GROUP 7024 INC | Residential: Over 12 Flat | $8,792.94 | $50.00 | Yes |

Ashley L (mailto:fpc@cityofchicago.org) [City]
12/15/2016 09:52AM
Book: 47 Page: 41 MC: 35895 Premises: same Additional details: jas 11-9-16

Maximum file size is **10 MB** and must be one of the following file types **doc docx pdf jpeg jpg png txt**

| File Name | Uploaded |
|---|---|
| 16WSA649095LP.pdf (/FpcWebApp/documents/137189) | 12/14/2016 09:23 |

**EXHIBIT NO. 7**

| | |
|---|---|
| **From:** | Tyler DeRoo |
| **Sent:** | Tuesday, December 27, 2016 12:30 PM CST |
| **To:** | Ezri Namvar |
| **CC:** | Shaun Cohen |
| **Subject:** | Lender Doc Set |
| **Attachments:** | EquityBuild, Inc Wire Instructions.pdf, Untitled attachment 248887.htm, EB Mortgage.docx, Untitled attachment 248890.htm, Latest EquityBuild, Inc. as Borrower - Collateral Agency and Servicing Agreement.pdf, Untitled attachment 248893.htm, Exhibit A Note.docx, Untitled attachment 248896.htm, EB Note.docx, Untitled attachment 248899.htm, Exhibit A Mortgage.docx, Untitled attachment 248902.htm |

Ezri,

Please find attached our standard lender docs. Let me know if you have any question. Thank you.

Tyler DeRoo
C. 847.420.2095

**Exhibit**

**6**



Phone: (877) 978-1916 X 1814  Email: docs@equitybuild.com

# Wire Transfer Instructions

| | |
|---|---|
| Bank: | **Wells Fargo Bank, N.A.** |
| Address: | **420 Montgomery**<br>**San Francisco, CA 94104** |
| Beneficiary: | **EquityBuild, Inc.** |
| ABA: | **121000248** |
| Account: | **8345876992** |

Property/Investment Address:_____

Amount To Wire: $_____

Lender Initial: _____

Date Wire Will Be Initiated: _____

## Exhibit A

**Lender Name:**


**Lender Amount:**


**Percentage of Ownership of Total Loan:**


**Monthly Interest Payment Amount to Be Received:**


_____

**Lender Signature**

Mail To:

_____[The Above Space For Recorder's Use Only]_____

## MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on _____, 20__. The mortgagor is EquityBuild, Inc. ("Borrower").

This Security Instrument is given to the persons listed on <u>Exhibit A</u> to this Mortgage c/o EquityBuild Finance, LLC whose address is 5068 West Plano  Parkway, #300, Plano, TX 75093 ("Lender").

Borrower owes Lender the principal sum of _____  and xx/100 Dollars (U.S. $xxx,xxx.xx). This debt is evidenced by Borrower's note dated  the same date as this Security Instrument, which provides for a final payment of the full debt,  if not paid earlier, due and payable _____, 20__. This Security Instrument secures to Lender:
(a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extension and modifications; (b) the payment of all other sums, with interest advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in COOK County, Illinois:

PIN: xx-xx-xxx-xxx-0000

which has the address of 123 S Oak St. Chicago, IL 60600 ("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents, royalties, mineral, oil and gas rights and profits, water rights and stock and all fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANT. Borrower and Lender covenant and agree as follows:

1. Payment of Principal and Interest; Prepayment and Late Charges. Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. Hazard Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration and repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 19 the property is acquired by Lender, Borrower's rights to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of sums secured by this Security Instrument immediately prior to the acquisition.

3. Preservation and Maintenance of Property; Leaseholds. Borrower shall not destroy, damage or substantially change the Property, allow the Property to deteriorate or commit waste. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease, and if Borrower acquires fee title to the Property, the leasehold and fee title shall not merge unless Lender agrees to the merger in writing.

4. Protection of Lender's Rights in the Property; Mortgage Insurance. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees, and entering on the Property to make repairs. Although Lender may take action under this paragraph 4, Lender does not have to do so.

5. Successor and Assigns Bound; Joint and Several Liability; Co-signers. The covenants and agreements of this Security Interest shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 9. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey the Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forebear or make any accommodations with regard to the terms of this Security Instrument or the Note without the Borrower's consent.

6. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

7. Governing Law; Severability. This Security Instrument shall be governed by federal law and the law of jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

8. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

9. Transfer of the Property or a beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

10. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:


_____(SEAL)
EquityBuild, Inc., BORROWER




_____[Space Below This Line For Acknowledgement]_____

STATE OF FLORIDA, LEE County ss:

I hereby certify that on this day, before me, an officer duly authorized in the state aforesaid and in the county aforesaid to take acknowledgements, personally appeared EquityBuild, Inc., to me known to be the person described in and who executed the foregoing instrument and acknowledged that he/she executed the same for the purpose therein expressed.

WITNESS my hand and official seal in the county and state aforesaid this ____ day of _____, 20___.

My Commission expires:

{Seal}
_____
Notary Public

**Exhibit A**

| Lender Name | Principal Amount | Percentage of Loan |
|---|---|---|
|  |  |  |

| **LENDER** | **BORROWER** |
|---|---|
| The persons listed on | EQUITYBUILD, INC. |
| D **Exhibit A to the Note** | 1083 N COLLIER BLVD. #132 |
| C/O EQUITYBUILD FINANCE, LLC | MARCO ISLAND, FL 34145 |
| 5068 WEST PLANO PKWY #300 | |
| PLANO, TX 75093 | |

**COMMERCIAL FLAT RATE PROMISSORY NOTE**
**Illinois**

| Interest Rate | Principal | Funding Date | Maturity Date | Loan Number |
|---|---|---|---|---|
| **xx%** **For xx Months** | **$xxx,xxx.xx** | **xx/xx/20xx** | **xx/xx/20xx** | **N/A** |

THIS LOAN IS PAYABLE IN FULL ON OR BEFORE THE "MATURITY DATE" LISTED HEREIN. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND ANY UNPAID INTEREST, AND FEES AND COSTS, THEN DUE TO THE LENDER. **LENDER IS UNDER NO OBLIGATION TO REFINANCE, EXTEND OR MODIFY THE LOAN AT THAT TIME**. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER (WHICH MAY OR MAY NOT BE THE LENDER YOU HAVE THIS LOAN WITH), WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER. FOR VALUE RECEIVED, the undersigned Borrower(s), Maker(s) and/or Guarantor(s) (hereinafter the "Borrower") promises to pay **The PERSONS LISTED ON Exhibit A to this Note C/O EquityBuild Finance, LLC** (hereinafter collectively referred to as the "Holder" or "Lender"), at **5068 West Plano Pkwy. #300 Plano, TX 75093**, the principal sum of _____ **and 00/100 DOLLARS ($xxx,xxx.xx)**, together with interest from the above date at the interest rate of _____ **PERCENT (xx.x%)** per annum on the unpaid principal balance until paid. The principal of this Note, plus accrued interest at the rate aforesaid, shall be due and payable in _____ (**xx**) installments as follows:

        a) _____ (xx) equal and consecutive interest only payments in the amount of _____ **and xx/100 DOLLARS ($x,xxx.xx)**, beginning on or before _____, **20__**; and

        b) _____ (xx) equal and consecutive interest only payments in the amount of _____ **and xx/100 DOLLARS ($xx,xxx.xx)**, beginning on or before _____, **20__** and continuing each and every month thereafter; and

        c) One (1) final balloon payment on or before _____, **20__**, at which time the entire principal balance, together with accrued but unpaid interest thereon, and any costs and expenses, shall be due and

<div align="center">1</div>

payable.

Anything in this Note contrary notwithstanding, the entire unpaid balance of the principal sum and all unpaid interest accrued thereon shall, unless sooner paid, be and become due and payable on _____, 20___ ("Maturity Date").

1.  **Application of Payments**. All payments on this Note shall be made in lawful money of the United States of America and shall be applied first to any late charges due hereunder, second to the payment of accrued but unpaid interest and the remainder to the reduction of principal. The Borrower shall make all payments when due, without set-offs of any nature.

2.  **Late Charge/Dishonored Check.** There shall be a grace period of five (5) days for any payment due under this Note. The Borrower shall pay a late charge of 5% of the monthly payment amount, or $50.00, whichever is greater, if such payment is received by Lender after the grace period. If the Maturity Date of the Note has expired the late fee will be at the rate of 1.5% per month plus the face amount of the Note.
In the event any check given by Borrower to Lender as a payment on this Note is dishonored, or in the event there are insufficient funds in Borrower's designated account to cover any preauthorized monthly debit from Borrower's checking account, then, without limiting any other charges or remedies, Borrower shall pay to Lender a processing fee of $50.00 (but not more than the maximum amount allowed by law) for each such event.

3.  **Security**. To secure the payment and performance of obligations incurred under this Note, this Note shall be secured by and subject to the terms of a Mortgage of even date herewith from the Borrower which encumbers real property and improvements located at

**PROPERTY ADDRESS**, and the maturity hereof is subject to acceleration as therein set forth. Both this Note and the Mortgage are given in consideration of a loan of even date herewith in the amount of the principal sum by the Lender to the Borrower.

In addition to the property described above, Borrower grants Lender a security interest in all of Borrower's right, title and interest in all monies and instruments of Borrower that are now or in the future in Lender's custody or control.

4.  **Events of Default.** An Event of Default will occur under this Note in the event that Borrower any guarantor or any other third party pledging collateral to secure this Note:

    a.  Fails to make any payment of principal and/or interest or any other sum due hereunder when the same is due pursuant to the terms of this Note;
    b.  If Borrower, guarantor or such third party:
        i.  Applies for or consents to the appointment of a receiver, trustee or liquidator of Borrower, guarantor or such third party or of all or a substantial part of its assets;
        ii.  Files a voluntary petition in bankruptcy, whether by the Federal Bankruptcy Act or any similar State stature, or admits in writing its inability to pay its debts as they come due;
        iii.  Makes an assignment for the benefit of creditors;
        iv.  Files a petition or an answer seeking a reorganization or an arrangement with creditors or seeking to take advantage of any insolvency law;
        v.  Performs any other act of bankruptcy; or
        vi.  Files an answer admitting the material allegations of a petition filed against Borrower, guarantor or such third party in any bankruptcy, reorganization or insolvency proceeding; or
    c.  Permits the entry of any order, judgment or decree by any court of competent jurisdiction adjudicating Borrower, guarantor or such third party a bankrupt or an insolvent, or approving a receiver, trustee or liquidator of Borrower, guarantor or such third party or of all or a substantial part of its assets; or
    d.  There otherwise commences with respect to Borrower, guarantor or such third party or any of its assets any proceeding under any bankruptcy, reorganization, arrangement, insolvency, readjustment, receivership or like law or statute, and if the order, judgment, decree or proceeding continues unstayed for any period of 60 consecutive days, or continues in effect for more than 10 days after any stay

<div align="center">2</div>

thereof.

e.      Fails to perform or violates any obligations or covenants under the terms of this Note or any Mortgages or any additional loan documents or any other present or future written agreements regarding this Note or any other indebtedness or obligations between Borrower, guarantor or such third party and Lender;

f.      Defaults under the terms of any note, mortgage, security instrument, or any other loan documents or written agreements for any other loans secured by the property representing the collateral for this Note;

g.      Permits the entry of any judgment or lien, or the issuance of any execution, levy, attachment or garnishment proceedings against Borrower, guarantor or such third party;

h.      Sells or otherwise conveys any property which constitutes security or collateral for the payment of this Note without the prior written consent of the Lender and/or the destruction, loss or damage to such collateral in any material respect and/or the seizure, condemnation or confiscation of the collateral;

i.      Provides or causes to be provided any false or misleading signature or representation to be provided to Lender;

j.      Has a garnishment, judgment, tax levy, attachment or lien entered or served against Borrower, any guarantor, or any third party pledging collateral to secure this Note or any of their property;

k.      Dies, becomes legally incompetent, is dissolved or terminated, or ceases to operate its business;

l.      Has a majority of its outstanding voting securities sold, transferred or conveyed to any person or entity other than any person or entity that has the majority ownership as of the date of the execution of this Note;

m.      Causes Lender to deem itself insecure due to a significant decline in the value of any real or personal property securing payment of this Note, or Lender, in good faith believes the prospect of payment or performance is impaired;

n.      Fails to keep an insurance policy in place on the subject property being used as collateral for this loan with Lender as the mortgagee and/or as the loss payee including its successor and/or assigns;

o.      Fails to keep property taxes current on property used as security for this Note.

     5.    **Rights of Lender On Event of Default**. In the Event of Default as set forth herein, or in the event of the breach of any covenant or obligation contained in the herein referred to Mortgage or Loan Documents on the part of the undersigned to be kept, observed or performed, the Lender, at its sole and absolute discretion, may exercise one or more of the following remedies without notice or demand (except as required by law):

a.      Declare the entire unpaid balance of principal of this Note, along with accrued and unpaid interest thereon and all other charges, costs and expenses, provided for herein and in the Mortgage immediately due and payable. Such acceleration shall be automatic and immediate in the Event of Default is a filing under the Bankruptcy Code;

b.      Collect the outstanding obligations of Borrower with or without judicial process;

c.      Cease making advances under this Note or any other agreement between Borrower and Lender;

d.      Take possession of any collateral in any manner permitted by law;

e.      require Borrower to deliver and make available to Lender any collateral at a place reasonably convenient to Borrower and Lender;

f.      Sell, lease or otherwise dispose of any collateral and collect any deficiency balance with or without resorting to legal process;

g.      Assume any and all mortgages/deeds of trust in existence at the time of default on all collateral securing loans made to Borrower;

h.      Set-off Borrower's obligations against any amounts due to Borrower including, but not limited to, monies and instruments, maintained with Lender; and

i.      Exercise all other rights available to Lender under any other written agreement or applicable law.

At any time an Event of Default shall have occurred and be continuing and/or after maturity of the Loan, including maturity upon acceleration, the unpaid principal balance, all accrued and unpaid interest and all other amounts payable

<center>3</center>

under the Note shall bear interest at the "Default Rate" set forth in this Note. The unpaid principal balance shall continue to bear interest after the Maturity Date at the Default Rate set forth in this Note until and including the date on which it is paid in full. Any regularly scheduled monthly installment of interest that is received by Lender before the date it is due shall be deemed to have been received on the due date solely for the purpose of calculating interest due. Any accrued interest remaining past due for 30 days or more shall be added to and become part of the unpaid principal balance and shall bear interest at the rate or rates specified in this Note, and any reference herein to "accrued interest" shall refer to accrued interest which has not become part of the unpaid principal balance. Interest under this Note shall be computed on the basis of a 360-day year consisting of twelve 30-day months. Borrower shall make all payments of principal and interest under this Note without relief from valuation and appraisement laws.

Lender's remedies in this Section are in addition to any available at common law and nothing in this Section shall impair any right which the Holder has under this Note, or at law or in equity, to accelerate the debt on the occurrence of any other Event of Default, whether or not relating to this Note. Lender's rights or remedies as provided in this Note shall be cumulative and concurrent and may be pursued singly, successively, or together against Borrower or any guarantor or third party (without first having to proceed against Borrower), at Lender's sole and absolute discretion. Borrower shall pay to Lender on Lender's demand the amount of all expenses incurred by Lender (a) in enforcing it's rights under this Note, or (b) as the result of a default by Borrower under this Note, including but not limited to the cost of collecting any amount owed hereunder, and any reasonable attorney's fees. The failure by Lender to exercise any of its options contained herein shall not constitute a waiver of the right to exercise such option in the event of any subsequent default.

6.　　**Costs and Expenses.** To the extent permitted by law, Borrower agrees to pay any and all reasonable fees and costs, including, but not limited to, fees and costs of attorneys and other agents (including without limitation paralegals, clerks and consultants), whether or not such attorney or agent is an employee of Lender, which are incurred by Lender in collecting any amount due or enforcing any right or remedy under this Note, whether or not suit is brought, including, but not limited to, all fees and costs incurred on appeal, in bankruptcy, and for post-judgment collection actions. Said collection fees shall be in the minimum amount of Fifteen Percent (15%) of the amount of the judgment as collected (or, if collected without judgment, a minimum fee of Fifteen Percent (15%) of the amount collected), which attorney's fee shall not be diminished by any other fees, costs or damages, but in no event shall the attorney's fees be less than $3,000.00.

7.　　**Extensions.** The Borrower shall remain liable for the payment of this Note, including interest, notwithstanding any extension or extensions of time of payment or any indulgence of any kind or nature that the Lender may grant or permit any subsequent owner of the encumbered property, whether with or without notice to the Borrower and the Borrower hereby expressly waives such notice.

8.　　**Confessed Judgment.** UPON ANY DEFAULT BY THE BORROWER AS SET FORTH IN THIS NOTE, AND TO THE EXTENT PERMITTED BY LAW, THE BORROWER HEREBY AUTHORIZES ANY ATTORNEY AT LAW TO APPEAR FOR THE BORROWER IN ANY COURT OF COMPETENT JURISDICTION AND WAIVE THE ISSUANCE AND SERVICE OF PROCESS AND CONFESS A JUDGMENT AGAINST THE BORROWER IN FAVOR OF THE LENDER FOR SUCH AMOUNTS AS MAY THEN APPEAR TO BE UNPAID HEREON TOGETHER WITH COSTS, EXPENSES AND ATTORNEY'S FEES IN THE MINIMUM AMOUNT OF FIFTEEN PERCENT (15%) OF THE AMOUNT DUE FOR COLLECTION (BUT IN NO EVENT SHALL SUCH FEES BE LESS THAN $3000.00), AND TO RELEASE ALL PROCEDURAL ERRORS AND WAIVE ALL RIGHTS OF APPEAL. IF THE CONFESSION OF JUDGMENT ABOVE PROVIDED FOR IS AUTHORIZED OR RECOGNIZED BY THE LAW OF THE JURISDICTION CONTROLLING BUT SUCH LAW REQUIRES SPECIAL FORMALITIES AND PROCEDURE, THEN THE SAID ATTORNEY IS EMPOWERED TO EXECUTE THE NECESSARY FORM AND COMPLY WITH SUCH SPECIAL PROCEDURES. THIS POWER OF CONFESSION OF JUDGMENT SHALL NOT BE EXHAUSTED BY ANY ONE OR MORE EXERCISES, AND THE POWER SHALL CONTINUE UNDIMINISHED AND MAY BE EXERCIED FROM TIME TO TIME AS OFTEN AS LENDER SHALL ELECT UNTIL ALL AMOUNTS PAYABLE TO LENDER UNDER THIS NOTE SHALL HAVE BEEN PAID IN FULL.

9.　　**Forbearance**. The Lender shall not by any act or omission to act be deemed to waive any of its rights or remedies hereunder unless such waiver is in writing and signed by the Lender and then only to the extent specifically set forth therein. A waiver on one occasion shall not be construed as continuing or as a bar to or waiver of such right or remedy on any other occasion. All remedies conferred upon the Lender by this Note or any other

<center>4</center>

instrument or agreement connected herewith or related hereto shall be cumulative and none is exclusive, and such remedies may be exercised concurrently or consecutively at the Lender's option.

10. **Modification and Waiver**. Borrower and/or every person at any time liable for the payment of the debt evidenced hereby, waives the exercise of all exemption rights which it holds at law or in equity concerning to the debt evidenced by this Note whether under state constitution, homestead laws or otherwise. Borrower and any endorsers or guarantors hereof severally waive valuation and appraisement, presentment and demand for payment, notice of intent to accelerate maturity, notice of acceleration of maturity, protest or notice of protest and nonpayment, bringing of suit and diligence in taking any action to collect any sums owing hereunder or in proceeding against any of the rights and properties securing payment hereof, and trial by jury in any litigation arising out of, relating to, or connected with this Note or any instrument given as security hereof.

From time to time, without affecting Borrower's obligation to pay any sums due under this Note and perform Borrower's covenants herein, without affecting the obligations of any endorser hereto or guarantor hereof, without giving notice to or obtaining the consent of Borrower or any endorser hereto or guarantor hereof, and without liability on the part of the Holder, Holder may, acting it its sole and absolute discretion, extend the Maturity Date or any other time for payment of interest hereon and/or principal hereof, reduce the payments hereunder, release anyone liable under this Note accept a renewal of this Note, modify the terms and time of payment of this Note, join in any extension or subordination or exercise any option or election hereunder, modify the rate of interest or period of amortization or principal due date of this Note, or exercise any option or election hereunder. No one or more such actions shall constitute a novation.

11. **Voluntary and Involuntary Prepayments.**

(a) A prepayment premium shall be payable in connection with any prepayment made under this Note as provided below:

(i) Borrower may voluntarily prepay all of the unpaid principal balance of this Note on a Business Day designated as the date for such prepayment in a Notice from Borrower to Lender given at least 30 days prior to the date of such prepayment. Such prepayment shall be made by paying (A) the amount of principal being prepaid, (B) all accrued interest, (C) all other sums due Lender at the time of such prepayment, and (D) the prepayment premium calculated pursuant to Section 11(f) of this Note. For purposes of this Note, a "**Business Day**" means any day other than a Saturday, Sunday or any other day on which Lender is not open for business. For all purposes including the accrual of interest, but excluding the determination of the prepayment date under Section 11(f) of this Note, any prepayment received by Lender on any day other than the last calendar day of the month shall be deemed to have been received on the last calendar day of such month.

(ii) Borrower may voluntarily prepay less than all of the unpaid principal balance of this Note (a "**Partial Prepayment**") at any time. Upon delivery of the Partial Prepayment, a prepayment premium calculated pursuant to Section 11(f) of this Note, based on the amount being prepaid, shall be due and payable to Lender upon demand.

(iii) Upon Lender's exercise of any right of acceleration under this Note, Borrower shall pay to Lender, in addition to the entire unpaid principal balance of this Note outstanding at the time of the acceleration, (A) all accrued interest, (B) and all other sums due Lender, and (C) the prepayment premium calculated pursuant to Section 11(f) of this Note, to the extent such prepayment premium does not exceed the maximum rate permitted by applicable law.

(iv) Any application by Lender of any proceeds of collateral or other security to the repayment of any portion of the unpaid principal balance of this Note prior to the Maturity Date and in the absence of acceleration shall be deemed to be a partial prepayment by Borrower, requiring the payment to Lender by Borrower of a prepayment premium. The amount of any such partial prepayment shall be computed so as to provide to Lender a prepayment premium computed pursuant to Section 11(f) of this Note without Borrower having to pay out-of-pocket any additional amounts.

(b) Notwithstanding the provisions of Section 11(a), no prepayment premium shall be payable with respect to (A) any prepayment made after the expiration of the Prepayment Premium Period (as defined in Section 11(f) of this Note), or (B) any prepayment occurring as a result of the application of any insurance proceeds or condemnation award under the Security Instrument.

(c) Any permitted or required prepayment of less than the unpaid principal balance of this Note shall not extend or postpone the due date of any subsequent monthly installments or change the amount of such installments, unless Lender agrees otherwise in writing.

<div align="center">5</div>

(d)     Borrower recognizes that any prepayment of the unpaid principal balance of this Note, whether voluntary or involuntary or resulting from a default by Borrower, will result in Lender's incurring loss, including reinvestment loss, additional expense and frustration or impairment of Lender's ability to meet its commitments to third parties. Borrower agrees to pay to Lender upon demand damages for the detriment caused by any prepayment, and agrees that it is extremely difficult and impractical to ascertain the extent of such damages. Borrower therefore acknowledges and agrees that the formula for calculating prepayment premiums set forth in Section 11(f) represents a reasonable estimate of the damages Lender will incur because of a prepayment.

(e)     Borrower further acknowledges that the prepayment premium provisions of this Note are a material part of the consideration for the Loan, and acknowledges that the terms of this Note are in other respects more favorable to Borrower as a result of the Borrower's voluntary agreement to the prepayment premium provisions.

(f)     Any prepayment premium payable under this Section 11 shall be computed as follows:

(i)     If the prepayment is made between the date of the initial funding of the loan evidenced by this Note and the last day of **the month after the month of close** (the "**Prepayment Premium Period**"), the prepayment premium shall be the interest at the Note rate herein that would be earned on full loan amount for the balance of the Prepayment Premium Period.

(ii)    If the prepayment is made after the expiration of the Prepayment Premium Period, there shall be no prepayment premium due.

12.     **Default Rate.** So long as (a) any monthly installment under this Note remains past due for thirty (30) days or more or (b) any other Event of Default has occurred and is continuing, interest under this Note shall accrue on the unpaid principal balance from the earlier of the due date of the first unpaid monthly installment or the occurrence of such other Event of Default, as applicable, at a rate (the "**Default Rate**") equal to the lesser of **seven (7)** percentage points above the rate stated in the first paragraph of this Note or the maximum interest rate which may be collected from Borrower under applicable law. If the unpaid principal balance and all accrued interest are not paid in full on the Maturity Date, the unpaid principal balance and all accrued interest shall bear interest from the Maturity Date at the Default Rate. Borrower acknowledges that (a) its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Loan, (b) during the time that any monthly installment under this Note is delinquent for thirty (30) days or more, Lender will incur additional costs and expenses arising from its loss of the use of the money due and from the adverse impact on Lender's ability to meet its other obligations and to take advantage of other investment opportunities; and (c) it is extremely difficult and impractical to determine those additional costs and expenses. Borrower also acknowledges that, during the time that any monthly installment under this Note is delinquent for thirty (30) days or more or any other Event of Default has occurred and is continuing, Lender's risk of nonpayment of this Note will be materially increased and Lender is entitled to be compensated for such increased risk. Borrower agrees that the increase in the rate of interest payable under this Note to the Default Rate represents a fair and reasonable estimate, taking into account all circumstances existing on the date of this Note, of the additional costs and expenses Lender will incur by reason of the Borrower's delinquent payment and the additional compensation Lender is entitled to receive for the increased risks of nonpayment associated with a delinquent loan. During any period that the Default Rate is in effect the additional interest accruing over and above the rate stated in the first paragraph of this Note shall be immediately due and payable in addition to the regularly scheduled principal and interest payments. Lender shall impose the Default Rate without any notice requirement to Borrower, guarantor or any third party pledging collateral as security for this Note.

13.     **Loan Charges/Maximum Rate Permitted By Law.** Neither this Note nor any of the other Loan Documents shall be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law. If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any other Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of this Note. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note. If Lender reasonably

<div align="center">6</div>

determines that the interest rate (together with all other charges or payments that may be deemed interest) stipulated under this Note is or may be usurious or otherwise limited by law, the unpaid balance of this Note, with accrued interest at the highest rate permitted to be charged by stipulation in writing between Lender and Borrower, at the option of Lender, shall immediately become due and payable.

14. **Waiver of Jury Trial.** THE BORROWER WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF, OR IN ANY WAY PERTAINING TO, THIS NOTE OR ANY DEED OF TRUST/MORTGAGE ARISING FROM THIS NOTE. THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY THE BORROWER, AND THE BORROWER HEREBY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.

15. **Notices**. Any Notice or other communication required, permitted or desirable under the terms of this Note shall be sufficiently given if sent to each party as follows:

| | |
|---|---|
| Lender: | The persons listed on <u>Exhibit A</u> to this Note |
| | C/O EquityBuild Finance, LLC |
| | 5068 West Plano Pkwy, #300 |
| | Plano, Texas 75093 |
| | Fax: 239-244-8666 |
| | Email: shaun.d.cohen@gmail.com |
| | |
| Borrower: | EquityBuild, Inc. |
| | 1083 N Collier Blvd. #132 |
| | Marco Island, FL 34145 |
| | Fax: 202-204-8423 |
| | Email: jerry@equitybuild.com |

Any notice, demand, consent, approval, request or other communication or document to be given hereunder to a party hereto shall be (a) in writing, and (d) deemed to have been given (i) on the 3rd business day after being sent as certified or registered mail in the United States mails, postage prepaid, return receipt requested, or (ii) on the next business day after being deposited (with instructions to deliver it on that business day) with a reputable overnight courier service, or (iii) (if the party's receipt thereof is acknowledged in writing) on being sent by telefax or another means of immediate electronic communication, in each case to the party's address set forth above or any other address in the United States of America which it designates from time-to-time by notice to each other party hereto, or (iv) (if the party's receipt thereof is acknowledged in writing) on being given by hand or other actual delivery to the party.

16. **Entire Agreement/Severability.** The terms and conditions of this Note together with the terms and conditions of the Mortgages which are incorporated herein by reference as if set forth fully herein contain the entire understanding between the Borrower and Lender with respect the indebtedness evidenced hereby. Such understanding may not be modified, amended or terminated except in a written document duly executed by Borrower and Lender. In the event that any one or more of the provisions set forth in this Note or any accompanying Arbitration Agreement is determined by law to be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired hereby, and each provision in this Note shall be construed liberally in favor of Lender to the fullest extent of the law.

17. **Joint and Several Liability/Credit Reporting**. The liability of the undersigned, as well as any endorsers and/or guarantor(s), shall be both joint and several. This Note shall be binding upon the heirs, successors and assigns of Borrower and Lender. Information concerning this Note may be reported to credit reporting agencies and will be made available when requested by proper legal process.

18. **Governing Law.** This Note is delivered and made in, and shall be construed pursuant to the laws of the State of Illinois Unless applicable law provides otherwise, Borrower consents to the jurisdiction and venue of any court

<div align="center">7</div>

of competent jurisdiction located in **Cook County**, Illinois.

19. **Construction**. As used herein, Person means a natural person, trustee, corporation, partnership, limited liability company or other legal entity, and all references made (a) in the neuter, masculine or feminine gender shall be deemed made in all genders, (b) in the singular or plural number shall also be deemed made in the plural or singular number, and (c) to any Section, subsection, paragraph or subparagraph shall, unless therein expressly indicated to the contrary, be deemed made to that part of the Note. The headings of those parts are provided only for convenience of reference, and shall not be considered in construing their contents. Each document referred to herein as being attached hereto as an exhibit or otherwise designated herein as an exhibit hereto shall be a part hereof.

20. **Time of Essence**. Time shall be of the essence of this Note, but (other than as to payment of principal and/or interest) if the last day for a Person to exercise a right or perform a duty hereunder is a Saturday, Sunday or statutory holiday, it shall have until the next day other than such a day to do so.

21. **Assignment**. Borrower agrees not to assign any of Borrower's rights, remedies or obligations described in this Note without the prior written consent of Lender, which consent may be withheld by Lender in its sole discretion. Borrower agrees that Lender is entitled to assign some or all of its rights and remedies described in this Note without notice to or the prior consent of Borrower.

22. **Commercial Purpose.** It is expressly stipulated, warranted and agreed that the loan evidenced by this Note and any Loan Documents is a "commercial loan" under applicable State or Federal law, and all proceeds shall be used for business, commercial or investment purposes and expressly not for personal, family or household purposes.

23. **Extension**. Intentionally omitted.

24. **Arbitration**. If arbitration has been agreed to, Borrower(s) and Lender have entered into a separate Arbitration Agreement on this date, the terms of which are incorporated herein and made a part hereof by reference.

25. **Contingency Funds**. Intentionally omitted.

26. **Demand Feature**. Intentionally omitted.

27. **Consent To Relief From Automatic Stay**. Borrower hereby agrees that if any of them shall (i) file with any bankruptcy court of competent jurisdiction or be the subject of any petition under Title 11 of the U.S. Code, as amended; (ii) be the subject of any order for relief issued under such Title 11 of the U.S. Code, as amended; (iii) file or be the subject of any petition seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors; (iv) seek, consent to or acquiesce in the appointment of any trustee, receiver, conservator or liquidator; (v) be the subject of any order, judgment or decree entered by any court of competent jurisdiction approving a petition filed against Borrower for any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or relief for debtors, Lender shall thereupon be entitled to relief from any automatic stay imposed by Section 362 of Title 11 of the U.S. Code, as amended, or from any other stay or suspension of remedies imposed in any other manner with respect to the exercise of the rights and remedies otherwise available to Lender under the Loan Documents.

**THE PERSONS SIGNING BELOW ACKNOWLEDGE THAT THEY HAVE BEEN GIVEN AMPLE OPPORTUNITY TO READ THIS AGREEMENT AND SEEK INDEPENDENT LEGAL COUNSEL AND ACKNOWLEDGE THEY HAVE COMPLETELY READ AND UNDERSTAND AND AGREE TO THE TERMS AND CONDITIONS OF THIS NOTE AND THE ACCOMPANYING ARBITRATION AGREEMENT (IF APPLICABLE), AND FURTHER ACKNOWLEDGE RECEIPT OF AN EXACT COPY OF THIS NOTE AND THE ARBITRATION AGREEMENT.**

DATED: _____

BORROWER(S): EQUITYBUILD, INC.

_____(SEAL)
JERRY COHEN, President

STATE OF _____, COUNTY OF _____:    ss:

On this _____ day of _____, 20____, before me, a notary public, personally appeared _____, to me known (or proved to me on the basis of satisfactory evidence) to be the person(s) who executed the foregoing instrument and acknowledged the same for the purpose therein contained and in my presence signed and sealed the same.

_____
NOTARY PUBLIC

My Comm. Expires:_____

**9**

Borrower's Initials: _____

**Exhibit A**

| Lender Name | Principal Amount | Percentage of Loan |
|---|---|---|
|  |  |  |

**10**

# COLLATERAL AGENCY AND SERVICING AGREEMENT

among

## EQUITYBUILD FINANCE, LLC,

### as Collateral Agent and Loan Servicer,

and

# EACH OF THE LENDERS PARTY HERETO

## DATED AS OF _____

## COLLATERAL AGENCY AND SERVICING AGREEMENT

This **COLLATERAL AGENCY AND SERVICING AGREEMENT** (as amended, supplemented or otherwise modified from time to time, this "**Agreement**") is made as of _____, by and among (i) EquityBuild Finance, LLC, a Florida limited liability Borrower (in its individual capacity, "**EBF**", and in its capacity as collateral agent for the Lenders (as defined below), and in its capacity as loan servicer for the Lenders, the "**Collateral Agent**" or the "**Servicer**"), and (ii) each of the Lenders party hereto (together with their respective successors and assigns as beneficiaries of the Note (as defined below), the "**Lenders**"), and is acknowledged, consented and agreed to by EquityBuild, Inc. (the "**Borrower**").

## RECITALS

**A.** Reference is made to that certain Note, dated _____ (as the same from time to time hereafter may be amended, restated, supplemented or otherwise modified, the "**Note**") by the Borrower in favor of the Lenders, pursuant to which, subject to the terms and conditions set forth therein, the Lenders shall make individual investment loans (each an "**Investment**") to the Borrower as a collective secured loan (the "**Loan**").

**B.** The Lenders have agreed to make the Loan to the Borrower, but only upon the condition, among others, that the Borrower grant to the Collateral Agent, for the benefit of the Lenders, as security for the Borrower's obligations to the Lenders and the Collateral Agent under or in respect of the Note and the Mortgage (as defined below), a perfected lien on, and security interest in, the Collateral (as defined below).

**C.** The Lenders desire that EBF act as the collateral agent for and on behalf of all of the Lenders regarding the Collateral, all as more fully provided herein; and the Collateral Agent and the Lenders have entered into this Agreement to, among other things, further define the rights, duties, authority and responsibilities of the Collateral Agent and the relationship among the Lenders regarding their *pari passu* interests in the Collateral.

**D.** The Lenders also desire to retain EBF as the loan servicer to act as their agent to employ commercially reasonable and prudent practices to collect all scheduled payments on the Loan, and to protect to the best of the Servicer's ability, the security for the Loan.

## AGREEMENT

**NOW, THEREFORE,** in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, EBF and the Lenders agree as follows:

2

1. **DEFINED TERMS.**

As used in this Agreement, and unless the context requires a different meaning, the following terms have the respective meanings indicated below, all such definitions to be equally applicable to the singular and plural forms of the terms defined.

*Actionable Default* – means the existence and continuance of any Event of Default (as defined in the Note) beyond any grace period in respect thereof provided in the Note or the acceleration of the maturity of the Note.

*Affiliate* – means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, has control of, is controlled by, or is under common control with, such specified Person. For these purposes, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management of any Person, whether through the ownership of voting securities, by contract or otherwise.

*Agent Professionals* – means attorneys, legal counsel, accountants, appraisers, business valuation experts, environmental engineers, turnaround consultants, or other professionals or experts at any time retained by EBF in the discharge of its duties hereunder or under any of the Collateral Documents.

*Agent-Related Persons* – means EBF, in its capacity as Collateral Agent or Servicer, and any successor collateral agent or loan servicer, and any co-agents or separate agents appointed pursuant to Section 5, together with their respective Affiliates, and the officers, directors, employees, representatives, agents and Agent Professionals of such Persons and Affiliates.

*Agreement* – has the meaning specified for such term in the Preamble hereto.

*Business Day* – means a day (i) other than Saturday or Sunday and (ii) on which commercial banks are open for business in New York, New York.

*Collateral* – has the meaning specified for such term in Mortgage.

*Collateral Agent* – has the meaning specified for such term in the Preamble hereto.

*Collateral Documents* – means the Mortgage and any other document now or hereafter evidencing a security interest, lien or other encumbrance granted to secure the obligations payable under the Note or any guarantee thereof.

*Enforcement Notice* – means a written notice given by the Required Lenders to the Collateral Agent stating that an Actionable Default exists.

*EBF* – has the meaning specified for such term in the Preamble hereto.

*Lenders* – has the meaning specified for such term in the Preamble hereto.

3

*Liens* – means any pledges, liens, claims, encumbrances or security interests.

*Mortgage* – has the meaning specified for such term in Note.

*Obligations* – means and includes all present and future indebtedness, obligations and liabilities of every kind and nature of the Borrower from time to time owed to any Lender under the Note arising from, evidenced by or relating to the Note or the Mortgage.

*Note* – has the meaning specified for such term in Recital A hereto.

*Person* – means any individual, partnership, corporation, limited liability Borrower, unincorporated organization or association, trust or other entity.

*Required Lenders* – means the Lenders acting by a majority of principal advanced by the Lenders under the Note.

*Servicer* – has the meaning specified in the Preamble hereto.

*Total Investments* – means, with respect to Investments that remain outstanding in whole or in part, the total original amount of Investments a Lender has loaned to the Borrower; provided that for purposes of Section 10(e) hereof, such amounts shall be rounded down to the nearest whole $25,000 increment. By way of example only, if actual Total Investments equaled $176,000, for purposes of Section 10(e), such Total Investments would equal $175,000.

## 2. APPOINTMENTS; IRREVOCABLE DELEGATION OF AUTHORITY.

**(a) Appointment as Collateral Agent and Loan Servicer.**

The Lenders hereby appoint and designate EBF as collateral agent on their behalf hereunder and under the Mortgage. The Lenders hereby also appoint and designate EBF as loan servicer with respect to the Loan. EBF hereby accepts such appointments on the terms and conditions set forth herein and acknowledges that it holds the Collateral and acts under the Mortgage as agent for and on behalf of the Lenders. The Lenders hereby authorize and direct the Collateral Agent to (a) enter into the Mortgage and the Note for and on behalf of and for the benefit of the Lenders in accordance with the terms hereof and thereof, (b) exercise such rights and powers under this Agreement, the Note or the Mortgage as the case may be, as are specifically granted or delegated to the Collateral Agent by the terms hereof and thereof, together with such other rights and powers as are reasonably incidental thereto or as are customarily and typically exercised by agents performing duties similar to the duties of the Collateral Agent hereunder and under the Collateral Documents, subject, however, to any express limitations set forth herein or in the Mortgage, and (c) perform the obligations of the Collateral Agent thereunder. The Lenders hereby agree to be bound by the provisions of the Mortgage and the Note. The duties of the Collateral Agent and the Servicer shall be deemed ministerial and administrative in nature, and neither the Collateral Agent nor the Servicer shall have, by reason of this Agreement or either of the Mortgage or the Note, a fiduciary relationship with any Lender and/or any Affiliate thereof.

4

(b)  **Irrevocable Delegation of Authority**.

Each Lender does hereby irrevocably delegate to the Collateral Agent all of each such Lender's rights and powers under the Note and the Mortgage and agrees for the benefit of the Collateral Agent and the other Lenders not to exercise any right or power of such Lender under the Note or the Mortgage.

3.  **LIMITATIONS ON DUTIES AND ACTIONS OF COLLATERAL AGENT AND THE SERVICER**.

Neither the Collateral Agent nor the Servicer shall have any duties or responsibilities except those expressly set forth in this Agreement and the Mortgage.  Neither the Collateral Agent nor the Servicer shall be liable for any action taken or omitted by it, or any action suffered by it to be taken or omitted, excepting only its own gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction.  IN THE ABSENCE OF WRITTEN INSTRUCTIONS FROM THE REQUIRED LENDERS, NEITHER THE COLLATERAL AGENT NOR THE SERVICER SHALL FORECLOSE UPON ANY LIEN WITH RESPECT TO ANY OF THE COLLATERAL OR TAKE ANY OTHER ACTION WITH RESPECT TO THE COLLATERAL OR ANY PART THEREOF.

4.  **RECOURSE THROUGH COLLATERAL AGENT; SHARING OF COLLATERAL**.

(a)  **Recourse Through Collateral Agent**.

Each of the Lenders acknowledges and agrees that (i) it shall only have recourse to the Collateral through the Collateral Agent and that it shall have no independent recourse to the Collateral and (ii) the Collateral Agent shall have no obligation to, and shall not, take any action hereunder or under the Mortgage except upon written instructions from the Required Lenders in accordance with Section 6(a).

(b)  **Sharing of Collateral**.

No Lender shall contest the validity, perfection, priority or enforceability of, or seek to avoid, any Lien securing any Obligation, and each party hereby agrees to cooperate, at no cost to the Collateral Agent, in the defense of any action contesting the validity, perfection, priority or enforceability of any such Lien.  No Lender shall have the right to obtain any of the Collateral or the benefit of any Lien on any property of the Borrower solely in respect of Obligations owing to such Lender or any group of Lenders comprised of less than all the Lenders.

5.  **CO-AGENTS; COLLATERAL AGENT'S AND SERVICER'S USE OF PROFESSIONALS**.

(a)  **Co-Agents**.

Each of the Collateral Agent and the Servicer shall have power to appoint one or

more Persons to act as a co-agent or co-agents, jointly with the Collateral Agent and/or the Servicer, or to act as a separate agent or separate agents, with respect to all or any part of the Collateral or to enforce the Lender's rights under the Note, and to vest in such Person or Persons, in such capacity, such rights, powers, duties and obligations of the Collateral Agent and/or the Servicer, with the consent of the Required Lenders (such consent not to be unreasonably withheld or delayed), in any case only as may be necessary or desirable for the purpose of meeting any legal requirements of any jurisdiction in which any part of the Collateral may at the time be located. Absent any specific agreement to the contrary, any co-agent or co-agents or separate agent or separate agents so appointed shall, to the extent applicable, have the rights, powers, obligations and duties of the Collateral Agent and/or the Servicer hereunder. Neither the Collateral Agent nor the Servicer shall be responsible for the negligence, default or misconduct of any such co-agent or separate agent selected by it with reasonable care nor for any fees or expenses of such co-agent or separate agent.

(b) **Agent Professionals**.

The Collateral Agent and the Servicer may employ one or more Agent Professionals to advise or assist it from time to time, but shall not be responsible for the negligence, default or misconduct of any such Agent Professionals selected by it with reasonable care. The Collateral Agent and the Servicer shall be entitled to rely on the advice and statements of Agent Professionals so selected. The Borrower shall pay reasonable remuneration for all services performed by Agent Professionals for the Collateral Agent and the Servicer in the discharge of its duties hereunder and under the Collateral Documents in accordance with Section 11(b) hereof.

6.   **INSTRUCTIONS FROM LENDERS; ENFORCEMENT NOTICE.**

(a) **Instructions from Lenders**.

Unless otherwise excused as provided herein, both the Collateral Agent and the Servicer shall act on all written instructions received from the Required Lenders, with respect to any action to be taken or not to be taken in connection with this Agreement, the Mortgage or the Note, including, without limitation, actions to be taken in connection with an insolvency proceeding in respect of the Borrower; *provided, however,* that the Collateral Agent shall act only on written instructions from all Lenders with respect to the amendment or termination of the Mortgage, or, except as provided in the Mortgage, any Lien on property of the Borrower granted under the Mortgage. If either the Collateral Agent or the Servicer shall request instructions from the Lenders with respect to taking any particular action in connection with this Agreement, the Mortgage, the Note or any such Lien, the Collateral Agent and the Servicer shall be entitled to refrain from taking such particular action unless and until it shall have received written instructions from the Required Lenders (in which event it shall be required to act in accordance with such written instructions unless otherwise excused as provided herein), and neither the Collateral Agent nor the Servicer shall incur any liability to any Person for so refraining. Without limiting the foregoing, no Lender shall have any right of action whatsoever against the Collateral Agent or the Servicer as a result of the Collateral Agent or the

Servicer taking or not taking any action hereunder or pursuant to or in accordance with the written instructions of such Required Lenders, except for the Collateral Agent's or the Servicer's own gross negligence or willful misconduct in connection with any action taken or not taken by it, as finally determined by a court of competent jurisdiction. Notwithstanding anything to the contrary contained in this Agreement or any of the Collateral Documents, (i) the failure of the Collateral Agent or the Servicer to take any action shall not constitute gross negligence or willful misconduct by the Collateral Agent or the Servicer hereunder (A) following a request by the Collateral Agent or the Servicer for the Required Lenders' consent to such action and the failure of the Required Lenders to respond to such request or (B) in the absence of written instructions from the Required Lenders and (ii) neither the Collateral Agent nor the Servicer shall be required to take any action that is, in its opinion (which may be, but is not required to be, based on the advice of legal counsel), contrary to applicable law or the Note or the Mortgage or that would, in its reasonable opinion, subject it or any Agent-Related Persons to liability or that would require it to expend or risk its own funds.

(b) **Enforcement Notices**.

The Collateral Agent shall, as soon as practicable but in any event, if applicable, within ten (10) Business Days following receipt thereof, furnish to each of the Lenders:

(i) a copy of each Enforcement Notice received by the Collateral Agent;

(ii) a copy of each certificate or other written notice received by the Collateral Agent rescinding or withdrawing an Enforcement Notice;

(iii) a copy of any written notice or other written communication given or received by the Collateral Agent under the Note or the Mortgage; and

(iv) such other written notices required by the terms of this Agreement to be furnished by or to the Collateral Agent.

Any Enforcement Notice shall be deemed to have been given when actually received by the Collateral Agent and to have been rescinded or withdrawn when the Collateral Agent has actually received from the notifying party a written notice rescinding or withdrawing such Enforcement Notice. Any Enforcement Notice shall be deemed to be outstanding and in effect at all times after such notice has been given until such time, if any, as such notice has been rescinded or withdrawn.

## 7. NO RESPONSIBILITY OF COLLATERAL AGENT OR SERVICER FOR CERTAIN MATTERS.

Neither the Collateral Agent nor the Servicer shall be responsible in any manner whatsoever for the correctness of any recitals, statements, information, representations or warranties contained herein or in the Mortgage except for those made by it herein. Neither the Collateral Agent nor the Servicer makes any representation or warranty as to, and is not responsible in any way for: (i) the description, value, location, existence, or condition of any Collateral; (ii) the financial condition of the Borrower or the title of the

7

Borrower to any of the Collateral; (iii) the sufficiency of the security afforded by this Agreement, the Note or the Mortgage or whether registration in respect thereof has been properly effected or maintained; (iv) the validity, genuineness, correctness, perfection, or priority of any Lien with respect to the Collateral; (v) other than in respect of itself as to the Collateral Agent's and the Servicer's representations in Section 15(p) hereof, the validity, proper execution, enforceability, legality, or sufficiency of this Agreement, the Note, the Mortgage or any instrument deposited with the Collateral Agent or the Servicer; (vi) the identity, authority or right of any Lender executing any document; or (vii) the filing or renewal of any registration of the Mortgage or any public filing required under applicable law to perfect any of the Collateral Agent's Liens, for the benefit of the Lenders, in any of the Collateral. Neither the Collateral Agent nor the Servicer shall be required to ascertain or inquire as to the performance by the Borrower of any of its covenants or obligations hereunder or under the Mortgage or the Note. In no event shall either the Collateral Agent or the Servicer be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Collateral Agent or the Servicer has been advised of the likelihood of such loss or damage and regardless of the form of action.

8. **LIMITED DUTIES OF COLLATERAL AGENT REGARDING COLLATERAL; FURTHER ACTS WITH RESPECT TO COLLATERAL.**

(a) The Collateral Agent shall not be responsible for insuring any of the Collateral or for the payment of taxes, charges, fines, levies, assessments or for ensuring or protecting the validity, genuineness, correctness, perfection, or priority of any Lien upon any of the Collateral, and shall be indemnified therefor as provided in Section 12. Furthermore, the Collateral Agent shall not be responsible for the maintenance or safeguarding of any Collateral, except as provided in the immediately following sentence when the Collateral Agent has actual possession of any Collateral. The Collateral Agent shall not have any duty to any of the Lenders with respect to any Collateral, including, without limitation, any Collateral in its possession or control or in the possession or control of any agent or nominee of the Collateral Agent selected by it with reasonable care, or any income therefrom or for the preservation of rights against prior parties or any other rights pertaining to the Collateral, except as stated in the next succeeding paragraph.

(b) Beyond the exercise of reasonable care in the custody thereof and the duty to account for monies actually received by it, the Collateral Agent shall have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Collateral Agent shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral. The Collateral Agent shall be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property and shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Collateral Agent with

8

reasonable care. The Collateral Agent shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Collateral Agent, or for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of the Borrower to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral.

9. **DUTIES AS LOAN SERVICER.**

   **(a) Specific Loan Services/Functions.**

   In its capacity as the Servicer, EBF shall: (a) issue payment coupons or monthly statements to the Borrower directing Loan repayment to the Lenders or the Servicer; (b) issue payoff demands, beneficiary statements and mortgage ratings; (c) demand, receive and collect all Loan payments, deposit them by the next business day into the Servicer's trust account and/or facilitate having them paid directly to Lender, in each case within 25 days of the date due; (d) issue annual Form 1099 income tax statements to the Borrower and Lenders; (e) answer Borrower inquiries, demands and requests; (f) grant appropriate payment deferrals, but not of the maturity of the Loan unless approved by the Required Lenders; (g) monitor the continued effectiveness and claims on any property insurance listed in the Loan escrow instructions; (h) request and receive notices of default on senior liens; (i) receive notices of property tax delinquencies, should a tax service be ordered through escrow or subsequently; and (j) execute and deliver on Lenders' behalf and in Lenders' name any documents necessary or convenient for the purpose of maintaining or enforcing the Loan.

   **(b) Protective Advances.**

   Upon request of the Servicer, Lenders shall make such advances as approved by the Required Lenders to be necessary and prudent to protect and to collect Lenders' interest in the Loan. If any Lender fails to make advances approved by the Required Lenders, the other Lenders are authorized to advance the amount the non-paying Lender failed to advance and to receive payment in full with interest at 10% per annum before any further payments are made to the non-paying Lender and, the non-defaulting Lenders shall also have the option, exercisable within 30 days after Lender's failure to pay, to purchase such Lender's interest in the Loan for the outstanding principal balance and any accrued interest, fees and costs owed to the defaulting Lender, payable within 15 days after the election to purchase is made. The Servicer, in its absolute discretion, may advance its own funds to protect the security of the Loan, including advances to cure senior liens, property insurance, foreclosure expenses, repair, advertising, litigation expenses and similar items, but not Loan payments. The Servicer shall be reimbursed such advances, with interest at the interest rate then payable with respect to the Loan, from the next Loan payment, or within 10 days after a written request to Lenders. To secure the Servicer's

9

advances, Lenders hereby irrevocably assign to the Servicer, to the extent of advances owed to the Servicer, the first Loan payments received after an advance is made. A defaulting or non-paying Lender will be liable to the remaining Lenders for all damages incurred as result of his/her/their failure to act or failure to advance funds including, but not limited to, actual attorneys' fees, court costs and fees, or any damages related to loss of the security for the Loan.

(c) **Loan Documents**.

To the extent not maintained by the Collateral Agent, the Servicer shall retain custody as agent for Lenders of the original Note and Mortgage.

(d) **Real Estate Owned**.

The Servicer is also Lenders' agent (in conjunction with the Collateral Agent) to liquidate any real estate acquired by Lenders in foreclosure of the property securing the Loan (the "**Property**"). During the foreclosure process, the Servicer's servicing fee shall continue as set forth in Section 12 herein. Additionally, at the option of Lenders and by separate fee agreement to be signed by the parties, the Servicer shall: (i) arrange appropriate property insurance; (ii) manage the Property, including arranging maintenance and construction, tenant relations, repair and security; (iii) arrange for the valuation and resale of the Property, including hiring a Realtor® or broker to list, show and sell the Property; and (iv) accept reasonable offers on the Property, at the price and terms approved by the Required Lenders and execute all necessary and appropriate documentation to carry out the sale.

(e) **Servicing Fees**.

The Servicer's fee to each Lender to service any Loan shall be up to 8% interest per annum on the Investment made by such Lender in the Loan, as such amount may adjust from time to time upon making an Investment in the Loan (or upon making Investments in any other Loan) in accordance with this Section 9(e). The Servicer's fee to a Lender in respect of its Investment shall be the specified interest per annum listed on the signed Exhibit A to the Note and the signed Exhibit A to the Mortgage provided in the investment paperwork and signed by the Lender.

The fee is deducted from the interest payment payable by the Borrower under the Note. The Servicer shall be further compensated for work in respect of delinquent payments or other default by Borrower by assessing and receiving late charges, and by collecting an additional 2% of the principal amount of the Loan of any payments (whether interest or late fees) made to Lenders (or for their benefit) after the assessment of default interest on the Borrower under the Note that equal or exceed 2% interest per annum of the principal amount of the Loan. Said additional amounts shall only be collected if default interest is, in fact, charged to the Borrower. Lenders shall receive any benefit of the default interest rate and late fee payments in excess of the 2% interest per annum on the principal amount of the Loan collected by the Servicer.

    (f)  **Origination Fee**.

On the Closing Statement of the Loan the Collateral Agent may charge the Borrower an origination fee ("**Origination Fee**") of up to 5% of the principal amount of the Loan.

## 10. RELIANCE ON WRITINGS.

Both the Collateral Agent and the Servicer shall be entitled and fully authorized to rely and act, and shall be fully protected in relying and acting, upon any writing, instruction, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or other document believed by it to be genuine and correct and to have been signed or sent by or on behalf of the proper Person or Persons, and statements of the Borrower (including, without limitation, counsel to the Borrower) or the Lenders. Neither the Collateral Agent nor the Servicer shall have any duty to verify or confirm the content of any writing, instruction, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or other document.

11. **RESIGNATION AND REMOVAL OF COLLATERAL AGENT AND/OR SERVICER.**

(a) **Resignation or Removal**.

Both the Collateral Agent and the Servicer may at any time resign, effective upon 30 days prior written notice (or such shorter period as may be agreed to by the Required Lenders and such party) to the Lenders and the Borrower, and either may be removed for or without cause at any time by the Required Lenders, effective upon 30 days' notice. In the event of any resignation or removal, the Required Lenders shall have the right to appoint a successor Collateral Agent and/or Servicer (which successor Collateral Agent and/or Servicer may be one of the Lenders or a financial institution that is engaged in the provision of agency services in syndicated commercial loan transactions or a trust Borrower that is engaged in the provision of trust services in secured private placement transactions), but, if the Required Lenders have not appointed a successor Collateral Agent and/or Servicer, as the case may be, within 30 days after the resigning Collateral Agent's and/or Servicer's giving of notice of resignation or its removal, the retiring Collateral Agent and/or Servicer, as the case may be, shall, at the expense of the Borrower, on behalf of the Lenders, subject to the above provision regarding the identity and nature of a permissible successor Collateral Agent and/or Servicer, either appoint a successor Collateral Agent and/or Servicer or apply to the appropriate court to make such appointment. Upon the acceptance of any appointment as a Collateral Agent and/or Servicer, as the case may be, hereunder by a successor, to be evidenced by the successor Collateral Agent's or Servicer's, as the case may be, execution and delivery to the Borrower, the Lenders and the retiring Collateral Agent and/or Servicer, as the case may be, of a counterpart of this Agreement, such successor Collateral Agent and/or Servicer, as the case may be, shall thereupon succeed to and become vested with all the rights, powers, privileges, duties and obligations of the retiring Collateral Agent and/or Servicer, as the case may be, and the retiring Collateral Agent and/or Servicer, as the case may be, shall be discharged from any further duties and obligations as Collateral Agent and/or Servicer, as the case may be, as appropriate, under this Agreement, the Note and the Mortgage. The payment and indemnity obligations of the Borrower provided for in Section 12 shall survive any such removal or resignation in favor of the retiring Collateral Agent and/or Servicer, as the case may be, in respect of any matter arising during or after its tenure as Collateral Agent and/or Servicer, as the case may be. For the avoidance of doubt, removal hereunder of EBF as the Collateral Agent in no way constitutes a removal of EBF as the Servicer and vice versa.

(b) **Vesting**.

Upon the request of any successor Collateral Agent and/or Servicer, at the expense of the Borrower, the Lenders, the Borrower and the predecessor Collateral Agent and/or Servicer, as the case may be, shall promptly execute and deliver such instruments, conveyances, and assurances reflecting terms consistent with the terms hereof, the Mortgage and the Note for the purpose of more fully and certainly vesting and confirming in such successor Collateral Agent and/or Servicer, as the case may be, its

interest in, and Liens upon, the Collateral and all rights, powers, duties, and obligations of the predecessor Collateral Agent and/or Servicer, as the case may be, hereunder and under the Mortgage and the Note, and the predecessor Collateral Agent and/or Servicer, as the case may be, shall also promptly assign and deliver to the successor Collateral Agent and/or Servicer, as the case may be, any Collateral subject to the Liens of the Mortgage that may then be in its possession, as applicable.

**(c) Successors**.

Any entity into which a Collateral Agent or Servicer may be amalgamated or merged, or with which it may be consolidated, or any entity resulting from any amalgamation, merger or consolidation to which a Collateral Agent or Servicer shall be a party, as a whole or substantially as a whole, shall be the successor of such Collateral Agent or Servicer hereunder if legally bound hereby as such successor, without the necessity for execution or filing of any paper or any further act on the part of any of the parties hereto, anything to the contrary contained herein notwithstanding.

## 12. FEES TO COLLATERAL AGENT; PAYMENTS; INDEMNITY.

**(a) Fees**.

In addition to any other fees owed to Servicer or Collateral Agent from either (i) Borrower, and paid by Borrower to Servicer or Collateral Agent, or (ii) Lender, and paid by Borrower out of amounts otherwise due to Lender, the Lender shall pay to the Collateral Agent all fees required to be paid under the Fee Schedule attached hereto as <u>Schedule I</u> with respect to this Agreement at the times and in the amounts set forth therein.  Any amounts owed by Lender may, at Collateral Agent's discretion, be paid by Borrower out of amounts otherwise payable from Borrower to Lender.

**(b) Payment by the Borrower**.

The Borrower agrees that it will pay all of the Collateral Agent's and the Servicer's fees, as applicable, including those owed by the Lender listed on <u>Schedule I</u>, which shall be paid by the Borrower on behalf of the Lender out of amounts otherwise due to the Borrower, for its respective services hereunder and will pay or reimburse the Collateral Agent and the Servicer upon its request for all of their respective expenses, disbursements and advances incurred or made in the administration of their respective duties hereunder and under the Note and the Mortgage, as applicable (including, without limitation, reasonable legal fees and expenses and the reasonable compensation of all Agent Professionals, Agent-Related Persons and other advisers, agents or experts employed or retained by the Collateral Agent or the Servicer pursuant to this Agreement).  In addition to and without limiting any other protection of the Collateral Agent and/or the Servicer hereunder or otherwise by law, the Borrower shall indemnify the Agent-Related Persons for any and all liabilities, obligations, losses, damages, penalties, actions, claims, demands, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be suffered by, imposed on, incurred by or asserted against any Agent-Related Person, whether groundless or otherwise, howsoever arising from or out

13

of, or in any way related to the subject matter of, this Agreement, the Note, the Mortgage or any of the Collateral or the performance or enforcement of any of the terms of any thereof, including fees and expenses of special counsel; *provided* that the Borrower shall not be liable for any such payment to any Agent-Related Person to the extent the obligation to make such payment has been caused by such Agent-Related Person's own gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction. All statements from the Collateral Agent, the Servicer or any other Person for obligations owing by the Borrower pursuant to the preceding sentence shall be sent to the Borrower. Any amount due under this Section 12(b) and unpaid 10 Business Days after request for such payment will bear interest from the expiration of such 10 Business Days at a rate per annum equal to two percent (2%) above the rate of interest publicly announced by JPMorgan Chase Bank, N.A. from time to time in New York City as its prime rate, payable on demand. If not timely paid by the Borrower, at the Collateral Agent's or the Servicer's election, all amounts so payable and the interest thereon will be payable out of any assets in the possession of the Collateral Agent and/or the Servicer and any other Collateral in priority to amounts owing to any and all other parties to this Agreement.

    **(c)** **Survival**.

    The obligations of the Borrower and the Lenders under this Section 12 shall survive the payment in full of all of the other Obligations, the resignation or removal of the Collateral Agent and/or the Servicer and the termination of this Agreement.

## 13. COLLATERAL AGENT'S AND SERVICER'S FUNDS NOT AT RISK.

    For purposes of clarity, no provision of this Agreement or the Mortgage, and no request of any Lender or other Person shall require either the Collateral Agent or the Servicer to expend or risk any of its own funds, or to take any legal or other action under this Agreement, the Note or the Mortgage which might, in its reasonable judgment, involve any expense or any financial or other liability unless the Collateral Agent or the Servicer shall be furnished with indemnification acceptable to it, acting reasonably, including the advance of funds sufficient in the judgment of the Collateral Agent or the Servicer, as applicable, to satisfy such liability, costs and expenses.

## 14. INDEPENDENT CREDIT DECISIONS.

    Each Lender acknowledges that it has, independently and without reliance upon the Collateral Agent, the Servicer or any other Lender and based upon such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon any of the Collateral Agent, the Servicer or any other Lender and based upon such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.

## 15. DETERMINATION OF LENDERS; SUBSEQUENT LENDERS BOUND.

The Collateral Agent and the Servicer may deem and treat the payee of any promissory note or other evidence of indebtedness or obligation relating to any Obligation as the owner thereof for all purposes hereof unless and until (i) a written notice of the assignment or transfer thereof signed by such payee and (ii) a written acknowledgment agreeing to be bound by the terms hereof and such other documents required by Section 16(d), each signed by the assignee or transferee, and in form reasonably satisfactory to the Collateral Agent and/or the Servicer, shall have been filed with the Collateral Agent and/or the Servicer, as applicable. Any request, authority or consent of any Person who at the time of making such request or giving such authority or consent is the holder of any such note or other evidence of indebtedness or obligation, shall be conclusive and binding on any subsequent holder, transferee or assignee of such note or other evidence of indebtedness or obligation and of any note or notes or other evidences of indebtedness or obligation issued in exchange therefor.

## 16. MISCELLANEOUS.

### (a) Notices.

All notices, requests and other communications shall have been duly given and shall be effective (a) when delivered by hand, (b) when transmitted via telecopy or email (or other facsimile device) with receipt confirmed with respect to telecopy, (c) the Business Day next following the day on which the same has been delivered prepaid to a reputable national overnight air courier service, or (d) the third Business Day next following the day on which the same is sent by certified or registered mail, postage prepaid, in each case to the respective parties at the address, telecopy number or email address as provided in the immediately succeeding sentence; provided, however, that if any notice is delivered on a day other than a Business Day, or after 5:00 P.M. (Eastern time) on any Business Day, then such notice shall not be effective until the next Business Day. For purposes hereof, the address of each party hereto and its facsimile number or email address (until written notice of a change thereof is delivered to the Collateral Agent, the Servicer, the Borrower and each Lender) shall be as set forth in Schedule II hereto, or at such other address as such party may specify by written notice to the other parties hereto. Notices to any Person that becomes a holder of Obligations after the date hereof shall be given to such address or facsimile number or email address of which such Person shall have given written notice to the Collateral Agent, the Servicer and the Borrower.

### (b) Amendments.

No provision of this Agreement may be amended or waived except by a writing signed by the Required Lenders, the Collateral Agent and the Servicer; provided, however, that any amendment expanding the obligations or liabilities of the Borrower either hereunder or thereunder shall require the Borrower's consent.

### (c) Conflicts with Collateral Documents and other Transaction Documents.

The Collateral Agent, the Servicer and the Lenders agree that, if any provision of this Agreement is inconsistent with or contrary to any provisions in the Note or the

Mortgage, the provisions of this Agreement shall prevail as between and among the Collateral Agent, the Servicer and the Lenders.

(d) **Successors and Assigns**.

This Agreement shall be binding upon, and inure to the benefit of, the Collateral Agent, the Servicer and the Lenders and their respective successors and assigns. If any Lender shall assign or transfer the Obligations owing to it, it shall promptly so notify the Collateral Agent and the Servicer in writing. No Lender which assigns or transfers any Obligations owing to it shall assign or transfer its benefits under the Collateral Documents without obtaining from the assignee or transferee and delivering to the Collateral Agent, the Servicer and the Lenders a joinder agreement and an executed acknowledgment of the assignee or transferee agreeing to be bound by the terms hereof to the same extent as if it had been a Lender on the date hereof. Each assignee or transferee of any Obligations shall take such Obligations subject to the provisions of this Agreement and to any request made, waiver or consent given or other action taken or authorized hereunder by each previous holder of such Obligations prior to the receipt by the Collateral Agent and the Servicer of written notice of such assignment or transfer; and, except as expressly otherwise provided in such notice, the Collateral Agent and/or the Servicer shall be entitled to assume conclusively that the assignee or transferee named in such notice shall thereafter be vested with all rights and powers as a Lender under this Agreement (and the Collateral Agent and the Servicer may conclusively assume that no Obligations have been subject to any assignment or transfer other than transfers of which the Collateral Agent and the Servicer have received such a notice). Upon the written request of any Lender or the Borrower, the Collateral Agent and the Servicer will provide such Lender and the Borrower with copies of any written notices of transfer received pursuant hereto.

(e) **Continuing Effectiveness**.

This Agreement shall continue to be effective among the Collateral Agent, the Servicer and the Lenders even though a case or proceeding under any bankruptcy or insolvency law or any proceeding in the nature of a receivership, whether or not under any insolvency law, shall be instituted with respect to the Borrower or any portion of the property or assets of the Borrower, and all actions taken by the Collateral Agent with respect to the Collateral or by the Collateral Agent, the Servicer and the Lenders with regard to such proceeding shall be determined by the Required Lenders; provided, however, that nothing herein shall be interpreted to preclude any Lender from filing a proof of claim with respect to its Obligations or from casting its vote, or abstaining from voting, for or against confirmation of a plan of reorganization in a case of bankruptcy, insolvency or similar law in its sole discretion.

(f) **Further Assurances**.

Each party and the Borrower agrees to do such further acts and things and to execute and deliver such additional agreements, powers and instruments as necessary or as any Lender or the Collateral Agent or the Servicer may reasonably request to carry into effect

16

the terms, provisions and purposes of this Agreement or to better assure and confirm unto the Collateral Agent or the Servicer or any of the other Lenders their respective rights, powers and remedies hereunder.

(g) **Counterparts**.

This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart. Delivery of an executed counterpart of a signature page to this Agreement by fax or pdf shall be effective as delivery of a manually executed counterpart of this Agreement.

(h) **Effectiveness**.

This Agreement shall become effective immediately upon execution hereof by the Collateral Agent, the Servicer, the Required Lenders and the Borrower, and shall continue in full force and effect until 91 days following the date upon which all Obligations are irrevocably paid and satisfied in full; provided that, if the Obligations due and owing to a Lender have been paid and satisfied in full, then such Lender shall be deemed released from this Agreement without any further action being necessary. Any such released Lender shall give the Collateral Agent notice of such release but the failure to give such notice shall not affect such release.

(i) **Governing Law**.

THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES SHALL BE GOVERNED BY, THE INTERNAL LAW OF THE STATE OF ILLINOIS, EXCLUDING CHOICE-OF-LAW PRINCIPLES OF THE LAW OF SUCH STATE THAT WOULD PERMIT THE APPLICATION OF THE LAWS OF A JURISDICTION OTHER THAN SUCH STATE.

(j) **Jurisdiction**.

(i) Each party hereto irrevocably submits to the non-exclusive jurisdiction of any Illinois state or federal court sitting in Cook County, Illinois, over any suit, action or proceeding arising out of or relating to this Agreement or any of the agreements, documents or instruments delivered in connection herewith or therewith. To the fullest extent permitted by applicable law, the parties hereto irrevocably waive and agree not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject to the jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(ii) Nothing in this Section 16(j) shall affect the right that the Collateral Agent, the Servicer or any of the Lenders to serve process in any manner permitted by law, or limit any right that any party hereto may have to bring proceedings against the Borrower

17

in the courts of any appropriate jurisdiction or to enforce in any lawful manner a judgment obtained in one jurisdiction in any other jurisdiction.

(iii) THE PARTIES HERETO IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER AGREEMENT, DOCUMENT OR INSTRUMENT DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR THE ACTIONS OF THE LENDERS, THE COLLATERAL AGENT OR THE SERVICER IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF OR THEREOF.

**(k) Headings; Sections.**

Headings of Sections of this Agreement have been included herein for convenience only and should not be considered in interpreting this Agreement. Unless stated otherwise in this Agreement, references in this Agreement to Sections are references to Sections of this Agreement.

**(l) No Implied Beneficiaries.**

Nothing in this Agreement (except Section 16(b)), expressed or implied, is intended or shall be construed to confer upon or give to any Person, other than the Lenders, the Collateral Agent and the Servicer, any right, remedy or claim under or by reason of this Agreement or any covenant, condition or stipulation herein contained.

**(m) Severability.**

If any provision of this Agreement shall be held or deemed to be, or shall in fact be, inoperative or unenforceable as applied in any particular case in any jurisdiction, or because it conflicts with any other provision or provisions hereof or with any constitution or statute or rule of public policy, or for any other reason, such circumstance shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstance, or rendering any other provision herein contained invalid, inoperative or unenforceable to any extent whatsoever. Upon the determination that any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to give effect to their original intention as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the maximum extent possible.

**(n) Obligations Individual.**

The obligations and representations and warranties of the Collateral Agent, the Servicer and each of the Lenders herein are made by each of them individually. Nothing herein contained shall be construed as creating among the Lenders, or among the Collateral Agent, the Servicer and the Lenders, a partnership, joint venture or other joint association.

18

**(o)  No Obligation to Extend Credit.**

No provision of this Agreement shall be construed as obligating the Collateral Agent, the Servicer or any Lender to advance any monies or otherwise extend credit to the Borrower at any time.

**(p)  Representations of Parties**.

Each of the Lenders, the Collateral Agent and the Servicer, severally and not jointly, represents and warrants to the other parties hereto that such party has all requisite power and capacity to execute, deliver and perform this Agreement and that the execution, delivery and performance of this Agreement has been duly authorized by all necessary action on the part of such party and that this Agreement constitutes the legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization or similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or law).

**(q)  Limitation of Liability Due to Forces Beyond Collateral Agent's or Servicer's Control**.

In no event shall the Collateral Agent or the Servicer be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Collateral Agent and the Servicer shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

*[Remainder of page intentionally left blank; next page is signature page.]*

**IN WITNESS WHEREOF**, the Collateral Agent, the Servicer and the Lenders have executed or caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized, all as of the date first above written.

**COLLATERAL AGENT**:

**EQUITYBUILD FINANCE, LLC,** as Collateral Agent on behalf of the Lenders listed below

By: _____

Name:     Elizabeth Kammerer

Title: Asset Manager

**SERVICER**:

**EQUITYBUILD FINANCE, LLC,** as Servicer

By: _____

Name:     Elizabeth Kammerer

Title: Asset Manager

[Signature Page to Collateral Agency and Servicing Agreement]

21

**LENDERS:**


By: _____

Name: _____

Title: _____


By: _____

Name: _____

Title: _____


By:

Name:

Title:


[Signature Page to Collateral Agency Agreement]

22

ACKNOWLEDGED, CONSENTED AND AGREED TO:

**BORROWER**:

**EquityBuild, Inc**.

By: _____

Name:   Elizabeth Kammerer

Title: Closing Coordinator

[Signature Page to Collateral Agency Agreement]

## SCHEDULE I

## COLLATERAL AGENT FEE SCHEDULE

**Section 1:  Payouts**

All payouts paid by check.

If Lender requests different method, fees are as follows:

- Wire funds:          $50
- Overnight check:     $50
- Direct deposit:      No fee

**Section 2:  Buyouts**

If Lender requests principal back prior to Loan's maturity date (and request granted), Lender must pay an early liquidation fee equal to:  (i) 12% of the amount being returned if the request is made within one year of the date the Loan is funded (the "**Origination Date**"); and (ii) 10% of the amount being returned if the request is made between one and two years of the Origination Date. This fee is not intended to be a penalty but is an estimate, and indicative, of the actual cost and expenses EBF will incur in conjunction with such request.

EBF reserves the right to extend the maturity date on any Loan at the request of the Borrower.  At that time, anyone who wishes to not participate in the extension may receive a return of their Investment and no fee will be charged in respect thereof .

24

SCHEDULE II

ADDRESSES FOR NOTICES

If to EquityBuild Finance, LLC, as either Collateral Agent or Servicer:

       EquityBuild Finance, LLC
[Address] 5068 West Plano Pkwy. #300
       Plano, TX 75093
Attention:  [Elizabeth Kammerer]
Facsimile:  [_____]
E-mail:  [elizabeth@equitybuildfinance.com]

If to the Lenders:

[Name]
[Address]
Attention:  [_____]
Facsimile:  [_____]
E-mail:  [_____]

[Name]
[Address]
Attention:  [_____]
Facsimile:  [_____]
E-mail:  [_____]

[Name]
[Address]
Attention:  [_____]
Facsimile:  [_____]
E-mail:  [_____]

If to the Borrower:

       EquityBuild, Inc.
[Address] 1083 N Collier Blvd. #132
       Marco Island, FL 34145
Attention:  [Elizabeth Kammerer]
Facsimile:  [_____]
E-mail:  [elizabeth@equitybuild.com]

**Lender Name:**

**Lender Amount:**

**Percentage of Ownership of Total Loan:**

**Monthly Interest Payment Amount to Be Received:**

_____

**Lender Signature**

EquityBuild Finance, LLC, as agent and trustee has been authorized by the above listed lenders to receive the payoff in its name and issue and execute a release of said mortgage, upon payment in full of any outstanding balance.

**EXHIBIT NO. 14**

| | |
|---|---|
| **From**: | Ezri Namvar [ezrinamvar@gmail.com] |
| **Sent**: | 3/15/2017 11:09:29 AM |
| **To**: | 'Tyler DeRoo' [tyler@equitybuild.com] |
| **CC**: | 'Andrew Calleja' [andrew@shatar.com]; 'Daniel Namvar' [daniel@shatar.com] |
| **Subject**: | RE: 7749 S Yates |

Can u please send us a detailed resume or brochure on the company?
How u raise money , the length in business, how many units your control, etc. etc.
thnx

B"H
**Ezri Namvar**
T: 310.873.9575
ezrinamvar@gmail.com

NOTICE: This communication is not intended to provide, and should not be relied upon for real estate, legal, tax, or accounting advice; and is not a solicitation, nor an offer to buy or sell securities, nor a loan approval or commitment to engage in any business transaction. NOTHING IN THIS COMMUNICATION SHALL BE BINDING OR CONTRACTUAL. Before engaging in any transaction, you should consult your own real estate, legal, tax or accounting experts. The information contained in this message and any attachments are intended only for the use of the individual or entity to which such message is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you have received this message in error, you are prohibited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message from your system.

---

**From:** Tyler DeRoo [mailto:tyler@equitybuild.com]
**Sent:** Wednesday, March 15, 2017 11:08 AM
**To:** Ezri Namvar <ezrinamvar@gmail.com>
**Cc:** Andrew Calleja <andrew@shatar.com>
**Subject:** 7749 S Yates

Hi Guys,

Wanted to correct a previous typing mistake on this building. The assets purchase price was $1.55MM. It came to my attention that i indicated $1.35MM in previous email, that was not correct, the correct amount it $1.55MM per the attached PSA. Let me know if you have any further questions or concerns. Thanks.

Tyler DeRoo
C. 847.420.2095

**Exhibit**

**7**

exhibitsticker.com

**EXHIBIT NO. 8**

| | |
|---|---|
| **From**: | Ezri Namvar [ezrinamvar@gmail.com] |
| **Sent**: | 3/7/2017 12:23:07 PM |
| **To**: | 'Andrew Calleja' [andrew@shatar.com]; 'Daniel Namvar' [daniel@shatar.com] |
| **Subject**: | FW: New Deals |

New deal
I will discuss with u

B"H
**Ezri Namvar**
T: 310.873.9575
ezrinamvar@gmail.com

NOTICE: This communication is not intended to provide, and should not be relied upon for real estate, legal, tax, or accounting advice; and is not a solicitation, nor an offer to buy or sell securities, nor a loan approval or commitment to engage in any business transaction. NOTHING IN THIS COMMUNICATION SHALL BE BINDING OR CONTRACTUAL. Before engaging in any transaction, you should consult your own real estate, legal, tax or accounting experts. The information contained in this message and any attachments are intended only for the use of the individual or entity to which such message is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you have received this message in error, you are prohibited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message from your system.

---

**From:** Tyler DeRoo [mailto:tyler@equitybuild.com]
**Sent:** Tuesday, March 07, 2017 8:26 AM
**To:** Ezri Namvar <ezrinamvar@gmail.com>
**Cc:** Shaun Cohen <shaun@equitybuildfinance.com>
**Subject:** New Deals

Hi Ezri,

Shaun wanted me to follow up with you on the new deals we need seem help with.

1. 5450 S Indiana - 27 units, Purchase price is $1.675MM. We have another smaller lender looking at this deal but they are only coming in at $835k for a loan, so i'd like to see if you guys can do any better, but we only have until next Wednesday to get this done. Dropbox link to all DD info below:

https://www.dropbox.com/sh/s7d5ff1fdoxqh2h/AAALVh_AZbisg1JphYJQ6Z1sa?dl=0

2. 7749 Yates - I sent you the info on this before. We need to close in two weeks. 36 Units, Purchase is $1.36MM, and we have 650k in rehab to go into it. Dropbox DD link below:

https://www.dropbox.com/sh/b83zr4iqjud5p2k/AACttB22bn0vyTThHahMk3s2a?dl=0

3. 8100 S Essex - I also sent you this previously, this would be a refi on a building with a $2.3MM appraisal we bought about 9 months ago. We have a few weeks on this yet, so no rush. Dropbox link below:

https://www.dropbox.com/sh/2b2c0xtt2bc2nl7/AADh64-wzl9eCH1GJQtQkhJoa?dl=0

Please have a look at these, especially the first two as they are time sensitive and let us know if this is something you can help out with. Thanks.

Tyler DeRoo
C. 847.420.2095



**Exhibit**

**8**

SHATAR_CAP0001209

EXHIBIT NO. 9

| | |
|---|---|
| **From:** | Ezri Namvar |
| **To:** | "Patty San Martin"; "Andrew Calleja"; "Tyler DeRoo" |
| **Cc:** | "Shaun Cohen"; "Daniel"; "Ioana Salajanu" |
| **Subject:** | RE: 5450 S Indiana Ave and 7749 S Yates Blvd - Purchase Paperwork |
| **Date:** | Wednesday, March 15, 2017 10:16:23 AM |

TYLER I MUST SPEAK WITH U

CALL ME ASAP

B"H

**Ezri Namvar**
T: 310.873.9575
ezrinamvar@gmail.com

NOTICE: This communication is not intended to provide, and should not be relied upon for real estate, legal, tax, or accounting advice; and is not a solicitation, nor an offer to buy or sell securities, nor a loan approval or commitment to engage in any business transaction. NOTHING IN THIS COMMUNICATION SHALL BE BINDING OR CONTRACTUAL. Before engaging in any transaction, you should consult your own real estate, legal, tax or accounting experts. The information contained in this message and any attachments are intended only for the use of the individual or entity to which such message is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you have received this message in error, you are prohibited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message from your system.

**From:** Patty San Martin [mailto:PSanMartin@rfclaw.com]
**Sent:** Wednesday, March 15, 2017 9:41 AM
**To:** Andrew Calleja <andrew@shatar.com>; 'Ezri Namvar' <ezrinamvar@gmail.com>; 'Tyler DeRoo' <tyler@equitybuild.com>
**Cc:** 'Shaun Cohen' <shaun@equitybuildfinance.com>; 'Daniel' <Daniel@shatar.com>; Ioana Salajanu <Isalajanu@rfclaw.com>
**Subject:** RE: 5450 S Indiana Ave and 7749 S Yates Blvd - Purchase Paperwork

Hi Andrew,

Attached you will find the following documentation:

Articles/Operating Agreement for 7749-59 S. Yates, LLC
Closing Statement and Insurance for the Yates purchase.

5450 S. Indiana Purchase

Title Commitment
Purchase contract with amendments.

Please let me know if you have any questions.

Thank you,

*Patty*

Patricia San Martin
Real Estate Paralegal

**Exhibit**

**9**

SHATAR_CAP0005595

Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
(312) 494-1000 - Telephone
(312) 494-1001 - Facsimile
psanmartin@rfclaw.com

---

**From:** Andrew Calleja [mailto:andrew@shatar.com]
**Sent:** Tuesday, March 14, 2017 5:19 PM
**To:** 'Ezri Namvar' <ezrinamvar@gmail.com>; Patty San Martin <PSanMartin@rfclaw.com>; 'Tyler DeRoo' <tyler@equitybuild.com>
**Cc:** 'Shaun Cohen' <shaun@equitybuildfinance.com>; 'Daniel' <Daniel@shatar.com>; Ioana Salajanu <lsalajanu@rfclaw.com>
**Subject:** RE: 5450 S Indiana Ave and 7749 S Yates Blvd - Purchase Paperwork

Hi Patty,

As per our discussion, since the purchase loan for 7749-59 S Yates Blvd was just closed today 03/14/2017. Please email to us the copy of the final closing statement for this property including the copy of the evidence of insurance.

Regards,

B"H
**Andrew Calleja**
**Shatar Capital Partners**
12121 Wilshire Blvd. #555
Los Angeles, CA 90025
**Direct Line:** 310.873.9560
**Main Line:** 310.207.1000
andrew@shatar.com
www.shatar.com

NOTICE:  This communication is not intended to provide, and should not be relied upon for legal, tax, or accounting advice; and is not a solicitation, nor an offer to buy or sell securities, nor a loan approval or commitment to engage in any business transaction.  NOTHING IN THIS COMMUNICATION SHALL BE BINDING OR CONTRACTUAL.  Before engaging in any transaction, you should consult your own legal, tax or accounting experts.  The information contained in this message and any attachments are intended only for the use of the individual or entity to which such message is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you have received this message in error, you are prohibited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message from your system.

---

**From:** Ezri Namvar [mailto:ezrinamvar@gmail.com]
**Sent:** Tuesday, March 14, 2017 1:19 PM
**To:** 'Patty San Martin'; 'Andrew Calleja'; 'Tyler DeRoo'
**Cc:** 'Shaun Cohen'; 'Daniel'; 'Ioana Salajanu'
**Subject:** RE: 5450 S Indiana Ave and 7749 S Yates Blvd - Purchase Paperwork

One blanket loan on both properties

B"H
**Ezri Namvar**
T: 310.873.9575
ezrinamvar@gmail.com

SHATAR_CAP0005596

NOTICE: This communication is not intended to provide, and should not be relied upon for real estate, legal, tax, or accounting advice; and is not a solicitation, nor an offer to buy or sell securities, nor a loan approval or commitment to engage in any business transaction. NOTHING IN THIS COMMUNICATION SHALL BE BINDING OR CONTRACTUAL. Before engaging in any transaction, you should consult your own real estate, legal, tax or accounting experts. The information contained in this message and any attachments are intended only for the use of the individual or entity to which such message is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you have received this message in error, you are prohibited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message from your system.

**From:** Patty San Martin [mailto:PSanMartin@rfclaw.com]
**Sent:** Tuesday, March 14, 2017 1:04 PM
**To:** Andrew Calleja <andrew@shatar.com>; 'Tyler DeRoo' <tyler@equitybuild.com>
**Cc:** 'Ezri Namvar' <ezrinamvar@gmail.com>; 'Shaun Cohen' <shaun@equitybuildfinance.com>; 'Daniel' <Daniel@shatar.com>; Ioana Salajanu <Isalajanu@rfclaw.com>
**Subject:** RE: 5450 S Indiana Ave and 7749 S Yates Blvd - Purchase Paperwork

Hi Andrew,

Will the loan being just one for both properties or will there be two loans? Please provide me with the info for the loan so I could have the title commitment for Indiana updated.

Thank you,

*Patty*

Patricia San Martin
Real Estate Paralegal
Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
(312) 494-1000 - Telephone
(312) 494-1001 - Facsimile
psanmartin@rfclaw.com

---

**From:** Andrew Calleja [mailto:andrew@shatar.com]
**Sent:** Tuesday, March 14, 2017 2:48 PM
**To:** Patty San Martin <PSanMartin@rfclaw.com>; 'Tyler DeRoo' <tyler@equitybuild.com>
**Cc:** 'Ezri Namvar' <ezrinamvar@gmail.com>; 'Shaun Cohen' <shaun@equitybuildfinance.com>; 'Daniel' <Daniel@shatar.com>; Ioana Salajanu <Isalajanu@rfclaw.com>
**Subject:** RE: 5450 S Indiana Ave and 7749 S Yates Blvd - Purchase Paperwork

Hi Patty,

Please provide the following documentations for **5450 S Indiana Ave and 7749 S Yates Blvd** so we start preparing the loan document for both properties.

1. **Fully Executed Purchase Contract/Agreement with all amendments showing the final purchase price for each properties.**
2. **Escrow Instructions**

SHATAR_CAP0005597

3. **Updated Prelim Report dated within 30 days**
4. **Vesting Information for each properties**
5. **LLC Document - Complete Entity Documents including Executed Operating Agreement, Filed LLC-1; LLC-12**
6. **Please confirm the close of escrow date for both properties.**

Best Regards,

B"H
**Andrew Calleja**
**Shatar Capital Partners**
12121 Wilshire Blvd. #555
Los Angeles, CA 90025
**Direct Line:** 310.873.9560
**Main Line:** 310.207.1000
andrew@shatar.com
www.shatar.com

NOTICE: This communication is not intended to provide, and should not be relied upon for legal, tax, or accounting advice; and is not a solicitation, nor an offer to buy or sell securities, nor a loan approval or commitment to engage in any business transaction. NOTHING IN THIS COMMUNICATION SHALL BE BINDING OR CONTRACTUAL. Before engaging in any transaction, you should consult your own legal, tax or accounting experts. The information contained in this message and any attachments are intended only for the use of the individual or entity to which such message is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you have received this message in error, you are prohibited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message from your system.

**From:** Patty San Martin [mailto:PSanMartin@rfclaw.com]
**Sent:** Monday, March 13, 2017 12:37 PM
**To:** Tyler DeRoo; Andrew Calleja
**Cc:** Ezri Namvar; Shaun Cohen; Daniel; Ioana Salajanu
**Subject:** RE: Indiana ave Chicago - Term Sheet and Wire

Are we creating a new LLC for Indiana? If yes, who will be the manager and member?

Thank you,

*Patty*

Patricia San Martin
Real Estate Paralegal
Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
(312) 494-1000 - Telephone
(312) 494-1001 - Facsimile
psanmartin@rfclaw.com

**From:** Tyler DeRoo [mailto:tyler@equitybuild.com]
**Sent:** Monday, March 13, 2017 2:00 PM
**To:** Andrew Calleja <andrew@shatar.com>
**Cc:** Ezri Namvar <ezrinamvar@gmail.com>; Shaun Cohen <shaun@equitybuildfinance.com>; Daniel <Daniel@shatar.com>; Ioana Salajanu <Isalajanu@rfclaw.com>; Patty San Martin

SHATAR_CAP0005598

<PSanMartin@rfclaw.com>
**Subject:** Re: Indiana ave Chicago - Term Sheet and Wire

Andrew,

Im looping in our counsel (Ioana), and her paralegal (Patty) on this.

Ioana,

Andrew who is with Ezri and Shatar, will be helping us put together the loan on 5450 S indiana and 7749 Yates. They will be funding this when we close indiana and taking a first position lien on both assets. I've attached the term sheet.

Also, we need to transfer the loan on 7024 S Paxton we closed in december into an SPV.

Let me know if there are any questions.

Tyler DeRoo
C. 847.420.2095

On Mar 13, 2017, at 1:56 PM, Andrew Calleja <andrew@shatar.com> wrote:

Thank you. Do you have the escrow instructions and updated Prelim report for both properties?

Regards,

B"H
**Andrew Calleja**
**Shatar Capital Partners**
12121 Wilshire Blvd. #555
Los Angeles, CA 90025
**Direct Line:** 310.873.9560
**Main Line:** 310.207.1000
andrew@shatar.com
www.shatar.com

NOTICE: This communication is not intended to provide, and should not be relied upon for legal, tax, or accounting advice; and is not a solicitation, nor an offer to buy or sell securities, nor a loan approval or commitment to engage in any business transaction. NOTHING IN THIS COMMUNICATION SHALL BE BINDING OR CONTRACTUAL. Before engaging in any transaction, you should consult your own legal, tax or accounting experts. The information contained in this message and any attachments are intended only for the use of the individual or entity to which such message is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you have received this message in error, you are prohibited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message from your system.

**From:** Tyler DeRoo [mailto:tyler@equitybuild.com]
**Sent:** Monday, March 13, 2017 11:52 AM
**To:** Ezri Namvar
**Cc:** Andrew Calleja; Shaun Cohen; Daniel

**Subject:** Re: Indiana ave Chicago - Term Sheet and Wire

New term sheet attached.

SHATAR_CAP0005600

| | |
|---|---|
| **From:** | Doron Kermanian |
| **Sent:** | Friday, March 17, 2017 11:01 AM CDT |
| **To:** | EquityBuild Documents Team |
| **Subject:** | Re: Completed: 7749 S Yates - Doron and Nahid Kermanin -Investment Packet |

i completed the sighning of documents please let me know when i recieve copies and confirmation of my signnatures thank you.


doron kermanian
las vegas nv
702 255 8954

On Fri, Mar 17, 2017 at 8:58 AM, EquityBuild Documents Team via DocuSign <dse@docusign.net> wrote:





Your document has been completed

**REVIEW DOCUMENTS**

**EquityBuild Documents Team**
docs@equitybuild.com


All parties have completed 7749 S Yates - Doron and Nahid Kermanin -Investment Packet.

Welcome to EquityBuild, Inc. - we are here to make your life easy. DocuSign will guide you to the areas that require your attention. Once complete (identified when you see the "confirm signatures" button), DocuSign will automatically route the packet to the next signatory. All closing dates and subsequent payment dates are subject to change due to unforeseen

Exhibit

10

changes to the closing date. The final notarized and executed note and mortgage with the binding close date and interest payment dates will be sent via email to all investors after the successful closing and funding of this investment.

Documents can be downloaded at any time for your records. Your investment packet will include:

Memorandum

Note

Mortgage

Wire Instructions

Collateral Agent Servicing Agreement

New Client Form

Direct Deposit Form

Payment Schedule

Thank you for choosing EquityBuild, Have a wonderful day

Powered by 

**Do Not Share This Email**

This email contains a secure link to DocuSign. Please do not share this email, link, or access code with others.

**Alternate Signing Method**

Visit DocuSign.com, click 'Access Documents', and enter the security code:

297883C32A15429BBB00B5CEB078757B1

**About DocuSign**

Sign documents electronically in just minutes. It's safe, secure, and legally binding. Whether you're in an office, at home, on-the-go -- or even across the globe -- DocuSign provides a professional trusted solution for Digital Transaction Management™.

**Questions about the Document?**

If you need to modify the document or have questions about the details in the document, please reach out to the sender by emailing them directly.

If you are having trouble signing the document, please visit the Help with Signing page on our Support Center.

 Download the DocuSign App

This message was sent to you by EquityBuild Documents Team who is using the DocuSign Electronic Signature Service. If you would rather not receive email from this sender you may contact the sender with your request.



**Bank of America** ⬲

**Funds Transfer Request Authorization (FTRA)**

| Customer Information | | | |
|---|---|---|---|
| Name: | MR DORON KERMANIAN | Address: | 8213 DESERT BEACH DR |
| Phone: | (702)255-8954 | | LAS VEGAS |
| | | | NV 891287418 US |

| Account Information | |
|---|---|
| Account: | PER_1649 |
| Account Title: | NAHIDEH KERMANIAN DORON KERMANIAN |
| Requestor Name: | |

| Wire Information | | | |
|---|---|---|---|
| Wire Type: | DOMESTIC | Wire Date: | 03/17/2017 |
| Country: | US | Wire Amount (USD): | 25,000.00 |
| Currency of Recipient Account: | USD | | |
| | | Wire Fee: | 30.00 |
| Source: | IN PERSON | | |
| ID Verification | | | |
| ID Type: | DRIVER'S LICENSE (WITH PHOTO) FROM | | |
| ID Type: | BANK OF AMERICA DEBIT CARD, ATM CAR | | |

| Recipient Information | | | |
|---|---|---|---|
| Recipient Name: | EQUITY BUILD INC | Bank Name: | WELLS FARGO BANK NATIONAL ASSOCIATION |
| Account Number Type: | ACCOUNT NUMBER | Bank ID: | 121000248 |
| Account Number: | 8345876992 | Address: | 1000 LOUISIANA ST, TUNNEL LVL |
| Address: | US | | HOUSTON |
| | | | TX 77002 US |
| Information about payment: | | | |
| Purpose of Payment: | OTHER | Additional Phone Advice: | |
| Additional Reference Information: | | Additional Bank Instructions: | PROP. INVT ADD 7749 S. YATES |

| Customer Approval |
|---|
| I authorize Bank of America to transfer my funds as set forth in the instructions herein (including debiting my account if applicable), and agree that such transfer of funds is subject to the Bank of America standard transfer agreement (see disclosure pages of this form) and applicable fees. If this is a foreign currency wire transfer, I accept the conversion rate provided by Bank of America at the time the wire is sent. |
| For a Consumer International wire: We rely on you, the customer, to inform us of the currency of the receiving account (denoted under 'Currency of Recipient Account') so that we may disclose the exchange rate for conversion in the wire process. If you chose to send USD rather than the foreign currency of the account, we will honor your choice, however, we will not be able to provide exchange rate information. Additionally, so that we may provide required disclosures, you must remain in the financial center until we provide you the Remittance Transfer Receipt (RTR). If you leave prior to receiving the RTR, we will cancel the international remittance transfer. |

Customer Signature _____    Date of Request  3 / 17 / 17

| For Bank Use Only: Wire Initiation/Financial Center Information | | | |
|---|---|---|---|
| Financial Center Name | SUMMERLIN | Date: | March 17, 2017 |
| Company # / Cost Center # | 00336 0007866 | Phone #: | 702-654-6860 |
| Initiating Associate Name: | VERTIDO, JOSEFINA | Remittance ID #: | 5WZ7VG98W |
| Indicate Method of Signature Verification (if applicable): | | ✓ Sig Card | Bus. Resolution        Posted Check # |

Funds Transfer Agreement

This is an Agreement between you ("Customer" or "you") and Bank of America, N.A. and its subsidiary banks ("Bank" or "we", "us", etc.)

By requesting the Bank to execute payment orders to transfer funds for you, you hereby agree to the following terms and conditions:

1. The Bank will exercise reasonable efforts to execute all payment orders on the Business Day received, when received prior to our daily deadline which we may establish and change from time to time. "Business Day" means that part of a day during which the Bank is open for the receipt and processing of payment orders. Saturdays, Sundays, and bank holidays are not considered Business Days. You agree that the Bank may handle payment orders received from you and other customer in any order selected by us, and that we may use any means or routes which we, in our sole discretion, consider suitable for the transmission of funds. The Bank shall be under no obligation to make any transfer unless you have on deposit with the Bank in one or more accounts available funds sufficient to cover such transfer, or you present sufficient funds in person at the time of making the transfer request. However, the Bank may, in its sole discretion execute a payment order which causes an overdraft in your account in which case you shall be liable for the overdraft any overdraft fees and interest thereon, as set forth in the Deposit Agreement which governs our account.

The Bank may execute certain payment orders for you known as "Remittance Transfers". A Remittance Transfer is an electronic funds transfer initiated by a consumer primarily for personal, family or household purposes to a designated recipient in a foreign country. Effective on the date set forth in the final rule implementing EFTA (defined below), federal law provides certain rights and obligations related to Remittance Transfers that may differ from rights and obligations that apply to other types of payment orders, including disclosure, cancellation and error resolution rights. To the extent the provisions of this Agreement are inconsistent with the oral or written disclosures provided to you for a Remittance Transfer governed by Section 919 of the Electronic Funds Transfer Act (EFTA), 15 U.S.C. Section 1693o-1, the terms of the disclosures provided at the time of the Remittance Transfer shall govern. Notwithstanding anything to the contrary contained herein, the rights and obligations that apply to Remittance Transfers are set forth in the EFTA and, as applicable, as set forth in New York law.

2. For certain transfers of funds made out of the Bank accounts, we will provide a confirmation to you by mail at the address indicated in our records or through Online Banking if you selected paperless delivery through Online Banking for your deposit account documents. The confirmation will note the date and the amount of the transfer and the bank or institution to which the transfer was made. You agree to examine the confirmation promptly upon receipt and to notify us immediately of any discrepancy between the confirmation and your records. The Bank shall not be liable for interest compensation, as set forth below, unless the Bank is notified of the discrepancy within 30 days from the date of your receipt of the confirmation or your bank statement including the debit for the payment order in question, whichever is earlier.

3. You agree to pay all fees as determined by the Bank's fee schedules for money transfers, which we may change from time to time. You further agree to reimburse the Bank for any actual expenses we may incur to effect or revoke any transfer or perform any related act at your request. In addition, if you specify that your wire transfer should be routed through an intermediary or "send thru" bank, that bank may impose additional charges that will be charged to you.

4. You expressly agree that the Bank shall be liable to you only for our negligent performance or non-performance of the services provided pursuant to the Agreement, and that our responsibility thereunder shall be limited to the exercise of reasonable and ordinary care. The Bank shall not be liable for any error or delay on the part of any third party, including without limitation third parties used by the Bank, in executing any payment order or performing a related act, or for any error or delay in executing a payment order or performing a related act due to any cause other than our own failure to exercise reasonable and ordinary care, and no such third party shall be deemed to be our agent. Further, we shall not be liable to you or any third party for failure to execute any transfer or perform a related act if such failure is due to causes or conditions beyond our reasonable control, including without limitations, strikes, riots, insurrection, war, military, or national emergencies, acts of God, natural disasters, fire, outage of computers or associated equipment, or failure of transportation or communication methods or power supplies. In no event shall the Bank be liable for special, indirect or consequential damages, including, without limitations, loss or damages from subsequent wrongful dishonor resulting from Bank's acts or omissions, except as may be otherwise provided by law. Bank shall not be liable for your attorney's fees, except as required by law. The Bank's liability shall, in the event of delay or failure to transfer, be limited to the interest on the amount transferred in error, plus interest thereon from the date of the transfer until the date of the refund, but not to exceed sixty days. Except as may be limited by applicable law, you agree to indemnify the Bank and hold the Bank harmless (including payment of reasonable attorney's fees) against all liability to third parties arising out of, or in connection with, the terms and conditions of this Agreement or the services provided thereunder or otherwise pursuant to your instructions.

5. (a) This agreement shall be governed by and interpreted according to (i) U.S. federal law and (ii) the law of the state of New York, without reference to the principles of conflicts of law of the U.S. or of such state. (b) Wire transfers to your account or funded from your account or otherwise funded by you may involve one or more funds transfer systems, including, without limitation, Fedwire, Clearing House Interbank Payments System (CHIPS) or through Society for Worldwide Interbank Financial Telecommunication (SWIFT). Accordingly, notwithstanding any choice of law that may be provide elsewhere in this agreement, such wire transfers will be governed by the rules of any funds transfer system through which the transfers are made, as amended from time to time, including, without limitation, Fedwire, the National Automated Clearing House Association, any regional association (each an "ACH"), CHIPS and SWIFT. Funds transfer through Fedwire will be governed by, and subject to, Regulation J, Subpart B, and Uniform Commercial Code Article 4A incorporated by reference thereunder. Wire transfers through CHIPS are governed by, and subject to, CHIPS Rules and Administrative Procedures and by the laws of the State of New York, including Article 4-A of the New York Uniform Commercial Code, regardless of whether the payment message is part of a wire transfer that

is a Remittance Transfer, except that in the case of an inconsistency between New York law and EFTA, EFTA shall govern. With respect to payment orders issued executed through SWIFT, the SWIFT operating rules shall govern the payment orders.

6. You are hereby notified that in the event that you provide an incorrect account number or institutional identifying number, and we are not able to recover the funds, you may lose the amount of the payment order.

7. Except with respect to Remittance Transfers, the Bank may at its option accept your cancellations or amendments to a payment order. You acknowledge that if the Bank attempts to cancel or amend then the reversal request or amendment must be agreed to by each financial institution which has accepted a payment order related to the funds transfer at issue before it will be acted upon and further agree that the Bank shall have no liability if a cancellation or amendment is not effected. You agree that you shall indemnify and hold the Bank and offices, directors, employees, and representatives harmless from and against any and all claims, demands, losses, liabilities and expenses, including attorneys' fees and costs, resulting directly or indirectly from compliance with your cancellation or amendment request.

### RECALLING AN INTERNATIONAL WIRE TRANSFER

Once an international wire transfer has been sent it cannot be cancelled. You may request an international wire transfer be recalled, and we will communicate your request to the beneficiary's bank. If the beneficiary's bank agrees to return the funds to us, then upon confirmation of receipt of funds in our accounts, we will credit your account at the current Bank of America buy rate for the currency that day. Please note that the exchange rate will be different from the original rate applied to the outgoing wire, which may result in a loss to you. Furthermore, the foreign bank may assess charges for their services, which will be deducted from the amount returned to you. We will have no liability to you if the foreign bank or foreign beneficiary refuses your request to recall the international wire transfer.

### RETURNED WIRES

If an international wire transfer is returned by the receiving bank for no fault of ours, we will credit your account at the current Bank of America retail buy rate for that currency that day. Please note that the exchange rate will be different from the original rate applied to the outgoing wire, which may result in a loss to you. Furthermore, the foreign bank may assess charges for their services, which will be deducted from the amount returned to you.

8. In the event that the Bank shall be liable to you for interest compensation hereunder or under applicable law, interest shall be calculated on the basis of the average Federal Funds rate at the Federal Reserve Bank of Richmond for each day of the period involved computed on the basis of a 360-day year and shall be remitted by (1) direct payment to you, or (2) providing a balance earnings credit to your account with us.

9. The Bank will use best efforts to provide oral, written or electronic notice to you of rejection of a payment order on the execution date of the order; provided, however, that the Bank shall not be liable to you for interest compensation for its failure to give such notice.

10. If you are sending a wire transfer to a bank account that is not denominated in U.S. Dollars ("Non-USD Account"), we recommend and we may require that you convert your payment into the currency of the Non-USD Account ("Local Currency") and send your wire transfer in Local Currency. If you send U.S. Dollars to a Non-USD Account, your payment may be converted into Local Currency by an intermediary bank or the receiving bank (and we may receive compensation in connection with any such conversion). We are not responsible for the exchange rate applied by any intermediary bank or the receiving bank.

11. Rates. The exchange rate that Bank of America will offer you is determined by Bank of America based upon market conditions. Please note that exchange rates for retail transactions are not the same as exchange rates for inter-bank transactions reported in The Wall Street Journal or elsewhere. Exchange rates offered by other dealers, or shown at other sources (including online sources) may be different from Bank of America's rates. We do not accept any liability if our rates are different from rates offered or reported by third parties, or offered by us at a different time, at a different location, for a different transaction amount, or involving a different payment media (banknotes, check, wire transfer, etc.).

Non Real-time Rates. If we assign a currency exchange rate to your transaction, such exchange rate will be determined by us based upon market conditions. We consider many factors in setting out exchange rates, including without limitations exchanges rates charged by other parties, desired rates of return, market risk and credit risk. You acknowledge that exchange rates for retail and commercial transactions, and for transactions effected after regular business hours and on weekends, are different from the exchange rates for large inter-bank transactions effected during the business day, as reported in the Wall Street Journal or elsewhere. Exchange rates offered by other dealers, or shown at other sources (including online sources) may be different from our rates. We do not accept any liability if our rates are different from rates offered or reported by third parties, or offered by us at a different time, at a different location, for a different transaction amount, or involving a different payment media (banknotes, check, wire transfer, etc).

| | |
|---|---|
| **From:** | Doron Kermanian |
| **Sent:** | Friday, March 17, 2017 12:04 PM CDT |
| **To:** | Christopher Mora |
| **Subject:** | doron to chris |

chris  i forgot if you can contact my partner ezri namvar regarding both the property and  also the company equity finance tell about the company and properties  he also has  investors  that have interest in this  invesmtn as well  his number is 310 873 9575  let me know  how it goes as well thank you.


doron

| | |
|---|---|
| **From:** | Doron Kermanian |
| **Sent:** | Monday, March 20, 2017 1:22 PM CDT |
| **To:** | Christopher Mora |
| **Subject:** | Re: doron kermanian |

thank you chris i  got call from acounting  they reicieved  the wire and i am relieved   and now  we can proceed with   other items i shall let you know when i have more funds to  wire to deposit on the investment  and also  again  contact ezri namvar regarding this investmetn he is looking for these kinds of investments  as well i send you his number    310 875 9575   and maybe we can do a multiple deals and profit  all the bes  and wish  for the best to come.


thank you again
doron .

On Mon, Mar 20, 2017 at 10:50 AM, Christopher Mora <cmora@equitybuildfinance.com> wrote:
 Hi Doron,

 Yes, I did write back to let you know that I received your scanned copy of your wire transfer.

 Then, I forwarded your scanned confirmation to EquityBuild's documents team.  When the funds are confirmed received on EquityBuild's end, the documents team sends you a confirmation email.

 I am copying our documents team, to let them know you are saying you are worried that you have not received their email confirmation yet.

 Docs -- can you validate that you received a $25,000 wire from Doron Kermanian and provide the standard email confirmation back to him?

 Thank you,

 Chris


On Mon, Mar 20, 2017 at 12:14 PM, Doron Kermanian <dkermanian425@gmail.com> wrote:
 to chris  again i didnot hear from you please  let me know if you recieved my wire i am worried i need to make sure you recieved my wire awaiting your  reply back .

 thank you
 doron

**Exhibit**

**11**

--
**Christopher D. Mora, BA, MA, MPA, JD |** Relationship Manager
US Navy (Active, 99-03, 07-13, 16-Pres; USNR, 03-07, 13-16; Afghanistan 2013)
University of Pennsylvania Law School, 1999; Harvard University, 2005
University of New Orleans, 1996; US Naval War College, 2008

**EquityBuild Finance, LLC**
direct  +469.371.0002
fax    +1.800.578.7161
EquityBuildFinance.com

Dallas, TX | Marco Island, FL | Denver, CO | Chicago, IL



Please Note: This email, including attachments, is intended only for the addresses(s) indicated, and may include non-public, proprietary, confidential or legally privileged information. If you are not an intended recipient or an authorized agent of an intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained in or transmitted with this e-mail is unauthorized and strictly prohibited. If you have received this email in error, delete it and any attachments or copies immediately.

**From**: Andrew Calleja [andrew@shatar.com]
**Sent**: 4/6/2017 1:41:46 PM
**To**: 'Mousa Namvar' [Mousa@nutfarmers.com]; daniel@shatar.com
**CC**: Ezri Namvar [ezrinamvar@gmail.com]
**Subject**: RE: Chicago Loan - Reconciliation
**Attachments**: Chicago Loan - Indiana and Yates - Reconciliation.pdf; Indiana-Yates - Final Loan Checks.pdf

Hi Mousa,

Attached is the reconciliation and copy of the check that we received for the Chicago loan.

Regards,

B"H
**Andrew Calleja**
**Shatar Capital Inc.**
12121 Wilshire Blvd. #555
Los Angeles, CA 90025
**Direct Line:** 310.873.9560
**Main Line:** 310.207.1000 Ext 2
andrew@shatar.com
www.shatar.com

NOTICE: This communication is not intended to provide, and should not be relied upon for legal, tax, or accounting advice; and is not a solicitation, nor an offer to buy or sell securities, nor a loan approval or commitment to engage in any business transaction. NOTHING IN THIS COMMUNICATION SHALL BE BINDING OR CONTRACTUAL. Before engaging in any transaction, you should consult your own legal, tax or accounting experts. The information contained in this message and any attachments are intended only for the use of the individual or entity to which such message is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you have received this message in error, you are prohibited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message from your system.

Exhibit

12

SHATAR_CAP0006502

**PROPERTY:** 5450 S INDIANA AVE., CHICAGO, IL 60615
7749-59 S YATES BLVD., CHICAGO, IL 60649

**BORROWER:** 5450 S INDIANA AVE LLC / 7749-59 S YATES LLC  - * CHICAGO LOAN *

**LENDER:** 1111 CREST DR. LLC - 50% OWNERSHIP
ABRAHAM AARON EBRIANI - 14% OWNERSHIP
HAMID ESMAIL - 14% OWNERSHIP
FARSAA INC -  22% OWNERSHIP

**LOAN AMOUNT:** $1,800,000
**FIRST PAYMENT** 5/1/2017

### CLOSING RECONCILIATION

| DATE | TRANSACTION DESCRIPTION | DEBIT | CREDIT |
|------|-------------------------|-------|--------|
| 3/13/2017 | WIRE - BORROWERS DEPOSITS TO SHATAR HOLDINGS INC | | $ 9,000.00 |
| 3/30/2017 | WIRE - BRAUM FAMILY LLC WIRE TO TITLE (FBO 1111 CREST DR LLC) - **$900,000** | | |
| 3/30/2017 | WIRE - ABRAHAM AARON EBRIANI  WIRE TO TITLE - **$252,000** | | |
| 3/30/2017 | WIRE - HAMID ESMAIL WIRE TO TITLE - **$252,000** | | |
| 3/30/2017 | WIRE - MASTER HOLDINGS LLC WIRE TO TITLE (FBO FARSAA INC) - **$396,000** | | |
| 3/10/2017 | FEES - DANIEL NAMVAR - LOAN ORIGINATION FEE | $ 72,000.00 | |
| 3/10/2017 | FEES - DANIEL NAMVAR - LOAN DOCUMENT/PROCESSING FEE | 4,500.00 | |
| 3/10/2017 | FEES - PER DIEM MORTGAGE INTEREST **03/30/2017 - 03/31/2017** | 1,100.00 | |
| 3/31/2017 | CHECK - SHATAR HOLDINGS LLC | | 1,100.00 |
| 3/31/2017 | CHECK - SHATAR HOLDINGS LLC : **$72,000 LESS $9,000 DEPOSIT** | | 63,000.00 |
| 3/31/2017 | CHECK - SHATAR HOLDINGS LLC | | 4,500.00 |
| | | $ 77,600.00 | $ 77,600.00 |

| | | | |
|------|---|---|---|
| | TOTAL LOAN ORIGINATION FEE - 4% | $ 72,000.00 | |
| 3/31/2017 | DORON KERMANIAN - REFERRAL FEE | (4,500.00) | |
| | NET LOAN ORIGINATION FEE | $ 67,500.00 | |

### OUTSTANDING CHECKS

3/31/2017 **PER DIEM DUE TO LENDERS**

| | |
|---|---|
| 1111 CREST DR. LLC - 50% OWNERSHIP | 550.00 |
| ABRAHAM AARON EBRIANI - 14% OWNERSHIP | 154.00 |
| HAMID ESMAIL - 14% OWNERSHIP | 154.00 |
| FARSAA INC -  22% OWNERSHIP | 242.00 |
| | |
| 3/31/2017 ANDREW CALLEJA - PROCESSING FEE | 250.00 |
| 3/29/2017 INVOICE#5163-W  DUE : **GERACI LAW FIRM** (LOAN DOCS PREP) | 2,500.00 |

SHATAR_CAP0006503

**EXHIBIT NO. 10**

| | |
|---|---|
| **From**: | Ezri Namvar [ezrinamvar@gmail.com] |
| **Sent**: | 3/30/2017 9:28:53 AM |
| **To**: | 'Yoo, Angie' [angie.yoo@ctt.com]; 'Bottigliero, John' [john.bottigliero@ctt.com]; 'Andrew Calleja' [andrew@shatar.com]; 'Patty San Martin' [PSanMartin@rfclaw.com]; 'Ioana Salajanu' [Isalajanu@rfclaw.com]; 'Tyler DeRoo' [tyler@equitybuild.com]; 'Shaun Cohen' [shaun@equitybuildfinance.com]; daniel@shatar.com |
| **Subject**: | RE: Loan -5450 S Indiana Ave and 7749 S Yates Blvd - Order 1401-008984422 - Escrow 201701509 |

What ???
I thought the borrowers are putting over 1.5 mil in to close the purchases
Can someone explain this 2 me ?

B"H

**Ezri Namvar**
T: 310.873.9575
ezrinamvar@gmail.com

NOTICE: This communication is not intended to provide, and should not be relied upon for real estate, legal, tax, or accounting advice; and is not a solicitation, nor an offer to buy or sell securities, nor a loan approval or commitment to engage in any business transaction. NOTHING IN THIS COMMUNICATION SHALL BE BINDING OR CONTRACTUAL. Before engaging in any transaction, you should consult your own real estate, legal, tax or accounting experts. The information contained in this message and any attachments are intended only for the use of the individual or entity to which such message is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you have received this message in error, you are prohibited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message from your system.

---

**From:** Yoo, Angie [mailto:angie.yoo@ctt.com]
**Sent:** Thursday, March 30, 2017 9:05 AM
**To:** Bottigliero, John <john.bottigliero@ctt.com>; Andrew Calleja <andrew@shatar.com>; 'Patty San Martin' <PSanMartin@rfclaw.com>; 'Ioana Salajanu' <Isalajanu@rfclaw.com>; 'Tyler DeRoo' <tyler@equitybuild.com>; 'Shaun Cohen' <shaun@equitybuildfinance.com>; 'Ezri Namvar' <ezrinamvar@gmail.com>; daniel@shatar.com
**Subject:** RE: Loan -5450 S Indiana Ave and 7749 S Yates Blvd - Order 1401-008984422 - Escrow 201701509

All,

The Borrower is receiving approximately $86,000 from the closing. Please let me know what these funds are being used for.

Thanks,

**Angie Yoo ~** angie.yoo@ctt.com
Associate Commercial Underwriter
Chicago Title Insurance Company ~ National Commercial Services | Chicago
10 South LaSalle St. Suite 3100, Chicago, IL 60603
p:312-223-3231 | f:312-223-2925 | c:312-485-1488

---

**From:** Bottigliero, John
**Sent:** Thursday, March 30, 2017 11:01 AM
**To:** Andrew Calleja <andrew@shatar.com>; 'Patty San Martin' <PSanMartin@rfclaw.com>; 'Ioana Salajanu' <Isalajanu@rfclaw.com>; 'Tyler DeRoo' <tyler@equitybuild.com>; 'Shaun Cohen' <shaun@equitybuildfinance.com>; 'Ezri Namvar' <ezrinamvar@gmail.com>; daniel@shatar.com
**Cc:** Yoo, Angie <angie.yoo@ctt.com>
**Subject:** RE: Loan -5450 S Indiana Ave and 7749 S Yates Blvd - Order 1401-008984422 - Escrow 201701509

A revised disbursement statement is attached. Please let me know if there are any comments or revisions.

The following items remain open for the close.



Exhibit

13

SHATAR_CAP0003518

<u>From Borrower</u>
- Receipt of Borrower's Documents/Signatures
- Invoices/ wire instructions for Third Party Payments(if any or if all invoices are on Chicago Title disbursement statement please advise)
- Signed disbursement statement
- Wire instructions for proceeds
- Final ok to close, Borrower

<u>From Lender</u>
- Payee for the Borrower Deposit Credit
- Payee for the Per Diem Interest
- Approval of loan proforma
- Loan proceeds
- Final ok to close, Lender

<u>From Underwriter</u>
- Confirmation that Angie has all clearance
- Confirmation that Angie is prepared to issue proforma
- Confirmation that the documents are in recordable form

<u>From Escrow</u>
- Confirmation that the Acquisition Escrow is in position to close

**John Bottigliero ~** john.bottigliero@ctt.com
Escrow Officer
Chicago Title Insurance Company ~ National Commercial Services | Chicago
10 South LaSalle St. Suite 3100, Chicago, IL 60603
p:312-223-2124 | f:312-223-3409

---

NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

SHATAR_CAP0003519

EXHIBIT NO. 12 

# Illinois Anti-Predatory Lending Database Program

## Certificate of Exemption

*1709445117*

Doc# 1709445117 Fee $112.00

RHSP FEE:$9.00 RPRF FEE: $1.00
KAREN A.YARBROUGH
COOK COUNTY RECORDER OF DEEDS
DATE: 04/04/2017 04:10 PM PG: 1 OF 38

**Report Mortgage Fraud**
**800-532-8785**

---

The property identified as: **PIN:** 21-30-318-013-0000

**Address:**
**Street:** 7749-59 South Yates Boulevard
**Street line 2:**
**City:** Chicago    **State:** IL    **ZIP Code:** 60649

**Lender:** 1111 Crest Dr. LLC, Abraham Aaron Ebriani, Hamid Esmail, Farsaa Inc.

**Borrower:** 7749-59 S. Yates LLC

**Loan / Mortgage Amount:** $3,600,000.00

This property is located within the program area and is exempt from the requirements of 765 ILCS 77/70 et seq. because it is commercial property.

**Exhibit**

**14**

**Certificate number:** F540384A-3B46-4185-B9B4-E3F8F462D528    **Execution date:** 3/30/2017

SHATAR_CAP0000523

RECORDING REQUESTED BY, RETURN TO:

c/o Shatar Capital Partners
12121 Wilshire Boulevard, Suite 555
Los Angeles, California 90025

This Mortgage Prepared by:

Melissa Martorella, Esq.
Geraci Law Firm
90 Discovery
Irvine, California 92618

PIN: 21-30-318-013-0000

**Property Address:** 7749-59 South Yates Boulevard, Chicago, Illinois 60649

**Real Property Tax Identification Number: 21-30-318-013-0000**

## MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, FIXTURE FILING, AND SECURITY AGREEMENT
### (*Commercial*)

THIS DOCUMENT CONSTITUTES A FIXTURE FILING IN ACCORDANCE WITH
THE ILLINOIS UNIFORM COMMERCIAL CODE (810 ILCS 5/9-502)

**MAXIMUM LIEN. At no time shall the principal amount of Indebtedness secured by this Mortgage, not including sums advanced to protect the security of this Mortgage, exceed $3,600,000.00.**

This Mortgage, Assignment of Leases and Rents, Fixture Filing, and Security Agreement (the "Mortgage") is made as of March 30, 2017, among 7749-59 S. Yates LLC, an Illinois limited liability company, as mortgagor ("Borrower"), whose address 201 North Westshore, Unit 1501, Chicago, Illinois 60601; and, the lenders in the Exhibit "A" attached hereto and incorporated herein, as mortgagee ("Lender"), whose address is c/o Shatar Capital Partners, 12121 Wilshire Boulevard, Suite 555, Los Angeles, California 90025.

### TRANSFER OF RIGHTS IN THE PROPERTY

To secure the full and timely payment of the Indebtedness and the full and timely performance and discharge of the Obligations, Borrower MORTGAGES, WARRANTS, GRANTS, BARGAINS, SELLS, AND CONVEYS to Lender the Mortgaged Property, with power of sale and right of entry, subject only to the Permitted Encumbrances, to have and to hold the Mortgaged Property to Lender, its successors and assigns forever, and Borrower does hereby bind itself, its successors, and its assigns to warrant and forever defend the title to the Mortgaged Property to Lender against anyone lawfully claiming it or any part of it; provided, however, that if the Indebtedness is paid in full as and when it becomes due and payable and the Obligations are performed on or before the date they are to be performed and discharged, then the liens, security interests, estates, and rights granted by the Loan Documents shall terminate; otherwise, they shall

---

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

1

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000524

remain in full force and effect. As additional security for the full and timely payment of the Indebtedness and the full and timely performance and discharge of the Obligations, Borrower grants to Lender a security interest in the Personalty, Fixtures, Leases, and Rents under Article Nine of the Uniform Commercial Code – Secured Transactions in effect in the State of Illinois. Borrower further grants, bargains, conveys, assigns, transfers, and sets over to Lender, a security interest in and to all of Borrower's right, title, and interest in, to, and under the Personalty, Fixtures, Leases, Rents, and Mortgaged Property (to the extent characterized as personal property) to secure the full and timely payment of the Indebtedness and the full and timely performance and discharge of the Obligations.

Borrower agrees to execute and deliver, from time to time, such further instruments, including, but not limited to, security agreements, assignments, and UCC financing statements, as may be requested by Lender to confirm the lien of this Mortgage on any of the Mortgaged Property.

Borrower further irrevocably grants, transfers, and assigns to Lender the Rents. This assignment of Rents is to be effective to create a present security interest in existing and future Rents of the Mortgaged Property under 765 Illinois Compiled Statutes 5/31.5.

TO MAINTAIN AND PROTECT THE SECURITY OF THIS MORTGAGE, TO SECURE THE FULL AND TIMELY PERFORMANCE BY BORROWER OF EACH AND EVERY OBLIGATION, COVENANT, AND AGREEMENT OF BORROWER UNDER THE LOAN DOCUMENTS, AND AS ADDITIONAL CONSIDERATION FOR THE INDEBTEDNESS AND OBLIGATIONS EVIDENCED BY THE LOAN DOCUMENTS, BORROWER HEREBY COVENANTS, REPRESENTS, AND AGREES AS FOLLOWS:

1. **Definitions.** For purposes of this Mortgage, each of the following terms shall have the following respective meanings:

    **1.1.** "**Attorney Fees.**" Any and all attorney fees (including the allocated cost of in-house counsel), paralegal, and law clerk fees, including, without limitation, fees for advice, negotiation, consultation, arbitration, and litigation at the pretrial, trial, and appellate levels, and in any bankruptcy proceedings, and attorney costs and expenses incurred or paid by Lender in protecting its interests in the Mortgaged Property, including, but not limited to, any action for waste, and enforcing its rights under this Mortgage.

    **1.2.** "**Borrower.**" The named Borrower in this Mortgage and the obligor under the Note, whether or not named as Borrower in this Mortgage, and subject to paragraph 19 and paragraph 20 of this Mortgage, the heirs, legatees, devisees, administrators, executors, successors in interest to the Mortgaged Property, and the assigns of any such person.

    **1.3.** "**Default Rate.**" The Default Rate as defined in the Note.

    **1.4.** "**Event of Default.**" An Event of Default as defined in paragraph 19 of this Mortgage.

    **1.5.** "**Environmental Laws.**" Any Governmental Requirements pertaining to health, industrial hygiene, or the environment, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) as amended (42 United States Code ("U.S.C.") §§ 9601-9675); the Resource Conservation and Recovery Act of 1976 (RCRA) (42 U.S.C. §§ 6901-6992k); the Hazardous Materials Transportation Act (49 U.S.C. §§ 5101-5127); the Federal Water Pollution Control Act (33 U.S.C. §§ 1251-1376); the Clean Air Act (42 U.S.C. §§ 7401-7671q); the Toxic Substances Control Act (15 U.S.C. §§ 2601-2692); the Refuse Act (33 U.S.C. §§ 407-426p); the Emergency Planning and Community Right-To-Know Act (42 U.S.C. §§ 11001-11050); the Safe Drinking Water Act (42 U.S.C. §§ 300f-300j); and, the Illinois Environmental Protection Act.

    **1.6.** "**Fixtures.**" All right, title, and interest of Borrower in and to all materials, supplies, equipment, apparatus, and other items now or later attached to, installed on or in the Land or the Improvements, or that in some fashion are deemed to be fixtures to the Land or Improvements under the laws of the State of Illinois, including the Illinois Uniform Commercial Code. "Fixtures" includes, without limitation, all items of Personalty to the extent that they may be deemed Fixtures under Governmental Requirements.

---

2



Rev. 10/14
Borrower's Initials

SHATAR_CAP0000525

**1.7.** **"Governmental Authority."** Any and all courts, boards, agencies, commissions, offices, or authorities of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city, or otherwise) whether now or later in existence.

**1.8.** **"Governmental Requirements."** Any and all laws, statutes, codes, ordinances, regulations, enactments, decrees, judgments, and orders of any Governmental Authority.

**1.9.** **"Hazardous Substance."** Any and all (a) substances defined as "hazardous substances," "hazardous materials," "toxic substances," or "solid waste" in CERCLA, RCRA, and the Hazardous Materials Transportation Act (49 United States Code §§5101-5127), and in the regulations promulgated under those laws; (b) substances defined as "hazardous wastes" in 415 ILCS 5/3.220 and in the regulations promulgated under the Illinois Environmental Protection Act; (c) substances defined as "hazardous substances" in 415 ILCS 5/3.215 and in the regulations promulgated under the Illinois Environmental Protection Act; (d) substances listed in the United States Department of Transportation Table (49 Code of Federal Regulations § 172.101 and amendments); (e) substances defined as "medical wastes" in 415 ILCS 5/3.360 and in the regulations promulgated under the Illinois Environmental Protection Act (f) asbestos-containing materials; (g) polychlorinated biphenyl; (h) underground storage tanks, whether empty, filled, or partially filled with any substance; (i) petroleum and petroleum products, including crude oil or any fraction thereof, natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel, or any such mixture; and (j) such other substances, materials, and wastes that are or become regulated under applicable local, state, or federal law, or that are classified as hazardous or toxic under any Governmental Requirements or that, even if not so regulated, are known to pose a hazard to the health and safety of the occupants of the Mortgaged Property or of real property adjacent to it.

**1.10.** **"Impositions."** All real estate and personal property taxes, water, gas, sewer, electricity, and other utility rates and charges; charges imposed under any subdivision, planned unit development, or condominium declaration or restrictions; charges for any easement, license, or agreement maintained for the benefit of the Mortgaged Property; and all other taxes, charges, and assessments and any interest, costs, or penalties of any kind and nature that at any time before or after the execution of this Mortgage may be assessed, levied, or imposed on the Mortgaged Property or on its ownership, use, occupancy, or enjoyment.

**1.11.** **"Improvements."** Any and all buildings, structures, improvements, fixtures, and appurtenances now and later placed on the Mortgaged Property, including, without limitation, all apparatus and equipment, whether or not physically affixed to the land or any building, which is used to provide or supply air cooling, air conditioning, heat, gas, water, light, power, refrigeration, ventilation, laundry, drying, dish washing, garbage disposal, or other services; and all elevators, escalators, and related machinery and equipment, fire prevention and extinguishing apparatus, security and access control apparatus, partitions, ducts, compressors, plumbing, ovens, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains, curtain rods, mirrors, cabinets, paneling, rugs, attached floor coverings, furniture, pictures, antennas, pools, spas, pool and spa operation and maintenance equipment and apparatus, and trees and plants located on the Mortgaged Property, all of which, including replacements and additions, shall conclusively be deemed to be affixed to and be part of the Mortgaged Property conveyed to Lender under this Mortgage.

**1.12.** **"Indebtedness."** The principal of, interest on, and all other amounts and payments due under or evidenced by the following:

    1.12.1. The Note (including, without limitation, the prepayment premium, late payment, and other charges payable under the Note);

    1.12.2. This Mortgage and all other Loan Documents;

    1.12.3. All funds later advanced by Lender to or for the benefit of Borrower under any provision of any of the Loan Documents;

    1.12.4. Any future loans or amounts advanced by Lender to Borrower when evidenced by a written instrument or document that specifically recites that the Obligations evidenced by such document are secured by the terms of this Mortgage, including, but not limited to, funds advanced to protect the security or priority of the Mortgage; and

---

3

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*



Rev. 10/14
Borrower's Initials

SHATAR_CAP0000526

1.12.5. Any amendment, modification, extension, rearrangement, restatement, renewal, substitution, or replacement of any of the foregoing.

**1.13.** **"Land."** The real estate or any interest in it described in Exhibit A attached to this Mortgage and made a part of it, together with all Improvements and Fixtures and all rights, titles, and interests appurtenant to it.

**1.14.** **"Leases."** Any and all leases, subleases, licenses, concessions, or other agreements (written or verbal, now or later in effect) that grant a possessory interest in and to, or the right to extract, mine, reside in, sell, or use the Mortgaged Property, and all other agreements, including, but not limited to, utility contracts, maintenance agreements, and service contracts that in any way relate to the use, occupancy, operation, maintenance, enjoyment, or ownership of the Mortgaged Property, except any and all leases, subleases, or other agreements under which Borrower is granted a possessory interest in the Land.

**1.15.** **"Legal Requirements."** Collectively, (a) any and all present and future judicial decisions, statutes, rulings, rules, regulations, permits, certificates, or ordinances of any Governmental Authority in any way applicable to Borrower, any guarantor (with respect to the Indebtedness or the Mortgaged Property), or the Mortgaged Property, including, but not limited to, those concerning its ownership, use, occupancy, possession, operation, maintenance, alteration, repair, or reconstruction, (b) Borrower's or guarantor's presently or subsequently effective bylaws and articles of incorporation, or any instruments establishing any partnership, limited partnership, joint venture, trust, limited liability company, or other form of business association (if either, both, or all, by any of same), (c) any and all Leases and other contracts (written or oral) of any nature to which Borrower or any guarantor may be bound, and (d) any and all restrictions, reservations, conditions, easements, or other covenants or agreements now or later of record affecting the Mortgaged Property.

**1.16.** **"Lender."** The named Lender in this Mortgage and the owner and holder (including a pledgee) of any Note, Indebtedness, or Obligations secured by this Mortgage, whether or not named as Lender in this Mortgage, and the heirs, legatees, devisees, administrators, executors, successors, and assigns of any such person.

**1.17.** **"Loan."** The extension of credit made by Lender to Borrower under the terms of the Loan Documents.

**1.18.** **"Loan Documents."** Collectively, this Mortgage, the Note, and all other instruments and agreements required to be executed by Borrower or any guarantor in connection with the Loan.

**1.19.** **"Mortgaged Property."** The Land, Improvements, Fixtures, Personalty, Leases, and Rents located in the City of Chicago, County of Cook, State of Illinois, that is described as follows:

SEE EXHIBIT "B," ATTACHED HERETO AND MADE A PART HEREOF,

commonly known as **7749-59 South Yates Boulevard, Chicago, Illinois 60649,**
**PIN: 21-30-318-013-0000 (the "Mortgaged Property");**

together with:

1.19.1. All right, title, and interest (including any claim or demand or demand in law or equity) that Borrower now has or may later acquire in or to such Mortgaged Property; all easements, rights, privileges, tenements, hereditaments, and appurtenances belonging or in any way appertaining to the Mortgaged Property; all of the estate, right, title, interest, claim, demand, reversion, or remainder of Borrower in or to the Mortgaged Property, either at law or in equity, in possession or expectancy, now or later acquired; all crops growing or to be grown on the Mortgaged Property; all development rights or credits and air rights; all water and water rights (whether or not appurtenant to the Mortgaged Property) and shares of stock pertaining to such water or water rights, ownership of which affects the Mortgaged Property; all minerals, oil, gas, and other hydrocarbon substances and rights thereto in, on, under, or upon the Mortgaged Property and all royalties and profits from any such rights or shares of stock; all right, title, and interest of Borrower in and to any streets, ways, alleys, strips, or gores of land adjoining the Land or any

---

4

SHATAR_CAP0000527

part of it that Borrower now owns or at any time later acquires and all adjacent lands within enclosures or occupied by buildings partly situated on the Mortgaged Property;

1.19.2. All intangible Mortgaged Property and rights relating to the Mortgaged Property or its operation or used in connection with it, including, without limitation, permits, licenses, plans, specifications, construction contracts, subcontracts, bids, deposits for utility services, installations, refunds due Borrower, trade names, trademarks, and service marks;

1.19.3. All of the right, title, and interest of Borrower in and to the land lying in the bed of any street, road, highway, or avenue in front of or adjoining the Land;

1.19.4. Any and all awards previously made or later to be made by any Governmental Authority to the present and all subsequent owners of the Mortgaged Property that may be made with respect to the Mortgaged Property as a result of the exercise of the right of eminent domain, the alteration of the grade of any street, or any other injury to or decrease of value of the Mortgaged Property, which award or awards are assigned to Lender and Lender, at its option, is authorized, directed, and empowered to collect and receive the proceeds of any such award or awards from the authorities making them and to give proper receipts and acquittances for them;

1.19.5. All certificates of deposit of Borrower in Lender's possession and all bank accounts of Borrower with Lender and their proceeds, and all deposits of Borrower with any Governmental Authority and/or public utility company that relate to the ownership of the Mortgaged Property;

1.19.6. All Leases of the Mortgaged Property or any part of it now or later entered into and all right, title, and interest of Borrower under such Leases, including cash or securities deposited by the tenants to secure performance of their obligations under such Leases (whether such cash or securities are to be held until the expiration of the terms of such Leases or applied to one or more of the installments of rent coming due immediately before the expiration of such terms), all rights to all insurance proceeds and unearned insurance premiums arising from or relating to the Mortgaged Property, all other rights and easements of Borrower now or later existing pertaining to the use and enjoyment of the Mortgaged Property, and all right, title, and interest of Borrower in and to all declarations of covenants, conditions, and restrictions as may affect or otherwise relate to the Mortgaged Property;

1.19.7. Any and all proceeds of any insurance policies covering the Mortgaged Property, whether or not such insurance policies were required by Lender as a condition of making the loan secured by this Mortgage or are required to be maintained by Borrower as provided below in this Mortgage; which proceeds are assigned to Lender, and Lender, at its option, is authorized, directed, and empowered to collect and receive the proceeds of such insurance policies from the insurers issuing the same and to give proper receipts and acquittances for such policies, and to apply the same as provided below;

1.19.8. If the Mortgaged Property includes a leasehold estate, all of Borrower's right, title, and interest in and to the lease, more particularly described in Exhibit A attached to this Mortgage (the Leasehold) including, without limitation, the right to surrender, terminate, cancel, waive, change, supplement, grant subleases of, alter, or amend the Leasehold;

1.19.9. All plans and specifications for the Improvements; all contracts and subcontracts relating to the Improvements; all deposits (including tenants' security deposits; provided, however, that if Lender acquires possession or control of tenants' security deposits Lender shall use the tenants' security deposits only for such purposes as Governmental Requirements permit), funds, accounts, contract rights, instruments, documents, general intangibles, and notes or chattel paper arising from or in connection with the Land or other Mortgaged Property; all permits, licenses, certificates, and other rights and privileges obtained in connection with the Land or other Mortgaged Property; all soils reports, engineering reports, land planning maps, drawings, construction contracts, notes, drafts, documents, engineering and architectural drawings, letters of credit, bonds, surety bonds, any other intangible rights relating to the Land and Improvements, surveys, and other reports, exhibits, or plans used or to be used in connection with the construction, planning, operation, or maintenance of the Land and Improvements and all amendments and modifications; all proceeds arising from or by virtue of the sale, lease, grant of option, or other disposition of all or any part of the Land, Fixtures, Personalty, or other Mortgaged Property (consent to same is not

5

SHATAR_CAP0000528

granted or implied); and all proceeds (including premium refunds) payable or to be payable under each insurance policy relating to the Land, Fixtures, Personalty, or other Mortgaged Property;

1.19.10. All trade names, trademarks, symbols, service marks, and goodwill associated with the Mortgaged Property and any and all state and federal applications and registrations now or later used in connection with the use or operation of the Mortgaged Property;

1.19.11. All tax refunds, bills, notes, inventories, accounts and charges receivable, credits, claims, securities, and documents of all kinds, and all instruments, contract rights, general intangibles, bonds and deposits, and all proceeds and products of the Mortgaged Property;

1.19.12. All money or other personal property of Borrower (including, without limitation, any instrument, deposit account, general intangible, or chattel paper, as defined in Division 9 of the Illinois Uniform Commercial Code) previously or later delivered to, deposited with, or that otherwise comes into Lender's possession;

1.19.13. All accounts, contract rights, chattel paper, documents, instruments, books, records, claims against third parties, money, securities, drafts, notes, proceeds, and other items relating to the Mortgaged Property;

1.19.14. All construction, supply, engineering, and architectural contracts executed and to be executed by Borrower for the construction of the Improvements; and

1.19.15. All proceeds of any of the foregoing.

As used in this Mortgage, "Mortgaged Property" is expressly defined as meaning all or, when the context permits or requires, any portion of it and all or, when the context permits or requires, any interest in it.

**1.20.** "**Note.**" The Promissory Note payable by Borrower to the order of Lender in the principal amount of **One Million Eight Hundred Thousand and 00/100 Dollars ($1,800,000.00), which matures on April 1, 2018**, evidencing the Loan, in such form as is acceptable to Lender, together with any and all rearrangements, extensions, renewals, substitutions, replacements, modifications, restatements, and amendments to the Promissory Note.

**1.21.** "**Obligations.**" Any and all of the covenants, warranties, representations, and other obligations (other than to repay the Indebtedness) made or undertaken by Borrower to Lender as set forth in the Loan Documents; any lease, sublease, or other agreement under which Borrower is granted a possessory interest in the Land; each obligation, covenant, and agreement of Borrower in the Loan Documents or in any other document executed by Borrower in connection with the loan(s) secured by this Mortgage whether set forth in or incorporated into the Loan Documents by reference; each and every monetary provision of all covenants, conditions, and restrictions, if any, pertaining to the Mortgaged Property and on Lender's written request, the enforcement by Borrower of any covenant by third parties to pay maintenance or other charges, if they have not been paid, or valid legal steps taken to enforce such payment within 90 days after such written request is made; if the Mortgaged Property consists of or includes a leasehold estate, each obligation, covenant, and agreement of Borrower arising under, or contained in, the instrument(s) creating any such leasehold; all agreements of Borrower to pay fees and charges to Lender whether or not set forth in this Mortgage; and charges, as allowed by law, when they are made for any statement regarding the obligations secured by this Mortgage.

**1.22.** "**Permitted Encumbrances.**" At any particular time, (a) liens for taxes, assessments, or governmental charges not then due and payable or not then delinquent; (b) liens, easements, encumbrances, and restrictions on the Mortgaged Property that are allowed by Lender to appear in Schedule B, with Parts I and II of an ALTA title policy to be issued to Lender following recordation of the Mortgage; and (c) liens in favor of or consented to in writing by Lender.

**1.23.** "**Person.**" Natural persons, corporations, partnerships, unincorporated associations, joint ventures, and any other form of legal entity.

**1.24.** "**Personalty.**" All of the right, title, and interest of Borrower in and to all tangible and intangible personal property, whether now owned or later acquired by Borrower, including, but not limited to, water rights (to the extent they may constitute personal property), all equipment, inventory, goods,

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

 Rev. 10/14
Borrower's Initials

SHATAR_CAP0000529

consumer goods, accounts, chattel paper, instruments, money, general intangibles, letter-of-credit rights, deposit accounts, investment property, documents, minerals, crops, and timber (as those terms are defined in the Illinois Uniform Commercial Code) and that are now or at any later time located on, attached to, installed, placed, used on, in connection with, or are required for such attachment, installation, placement, or use on the Land, the Improvements, Fixtures, or on other goods located on the Land or Improvements, together with all additions, accessions, accessories, amendments, modifications to the Land or Improvements, extensions, renewals, and enlargements and proceeds of the Land or Improvements, substitutions for, and income and profits from, the Land or Improvements. The Personalty includes, but is not limited to, all goods, machinery, tools, equipment (including fire sprinklers and alarm systems); building materials, air conditioning, heating, refrigerating, electronic monitoring, entertainment, recreational, maintenance, extermination of vermin or insects, dust removal, refuse and garbage equipment; vehicle maintenance and repair equipment; office furniture (including tables, chairs, planters, desks, sofas, shelves, lockers, and cabinets); safes, furnishings, appliances (including ice-making machines, refrigerators, fans, water heaters, and incinerators); rugs, carpets, other floor coverings, draperies, drapery rods and brackets, awnings, window shades, venetian blinds, curtains, other window coverings; lamps, chandeliers, other lighting fixtures; office maintenance and other supplies; loan commitments, financing arrangements, bonds, construction contracts, leases, tenants' security deposits, licenses, permits, sales contracts, option contracts, lease contracts, insurance policies, proceeds from policies, plans, specifications, surveys, books, records, funds, bank deposits; and all other intangible personal property. Personalty also includes any other portion or items of the Mortgaged Property that constitute personal property under the Illinois Uniform Commercial Code.

    **1.25.** "**Rents**." All rents, issues, revenues, income, proceeds, royalties, profits, license fees, prepaid municipal and utility fees, bonds, and other benefits to which Borrower or the record title owner of the Mortgaged Property may now or later be entitled from or which are derived from the Mortgaged Property, including, without limitation, sale proceeds of the Mortgaged Property; any room or space sales or rentals from the Mortgaged Property; and other benefits paid or payable for using, leasing, licensing, possessing, operating from or in, residing in, selling, mining, extracting, or otherwise enjoying or using the Mortgaged Property.

    **1.26.** "**Water Rights**." All water rights of whatever kind or character, surface or underground, appropriative, decreed, or vested, that are appurtenant to the Mortgaged Property or otherwise used or useful in connection with the intended development of the Mortgaged Property.

    Any terms not otherwise defined in this Mortgage shall have the meaning given them in the Note dated of even date herewith between Borrower and Lender.

**2.**    **Repair and Maintenance of Mortgaged Property.** Borrower shall (a) keep the Mortgaged Property in good condition and repair; (b) not substantially alter, remove, or demolish the Mortgaged Property or any of the Improvements except when incident to the replacement of Fixtures, equipment, machinery, or appliances with items of like kind; (c) restore and repair to the equivalent of its original condition all or any part of the Mortgaged Property that may be damaged or destroyed, including, but not limited to, damage from termites and dry rot, soil subsidence, and construction defects, whether or not insurance proceeds are available to cover any part of the cost of such restoration and repair, and regardless of whether Lender permits the use of any insurance proceeds to be used for restoration under paragraph 5 of this Mortgage; (d) pay when due all claims for labor performed and materials furnished in connection with the Mortgaged Property and not permit any mechanics' or materialman's lien to arise against the Mortgaged Property or furnish a loss or liability bond against such mechanics' or materialman's lien claims; (e) comply with all laws affecting the Mortgaged Property or requiring that any alterations, repairs, replacements, or improvements be made on it; (f) not commit or permit waste on or to the Mortgaged Property, or commit, suffer, or permit any act or violation of law to occur on it; (g) not abandon the Mortgaged Property; (h) cultivate, irrigate, fertilize, fumigate, and prune in accordance with prudent agricultural practices; (i) if required by Lender, provide for management satisfactory to Lender under a management contract approved by Lender; (j) notify Lender in writing of any condition at or on the

7

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000530

Mortgaged Property that may have a significant and measurable effect on its market value; (k) if the Mortgaged Property is rental property, generally operate and maintain it in such manner as to realize its maximum rental potential; and (l) do all other things that the character or use of the Mortgaged Property may reasonably render necessary to maintain it in the same condition (reasonable wear and tear expected) as existed at the date of this Mortgage.

3.    **Use of Mortgaged Property.** Unless otherwise required by Governmental Requirements or unless Lender otherwise consents in writing, Borrower shall not allow changes in the use of the Mortgaged Property from that which is contemplated by Borrower and Lender at the time of execution of this Mortgage, as specified in the loan application and the Loan Documents. Borrower shall not initiate or acquiesce in a change in the zoning classification of the Mortgaged Property without Lender's prior written consent.

4.    **Insurance.**

    4.1.    **Casualty Insurance.** Borrower shall at all times keep the Mortgaged Property insured for the benefit of Lender as follows, despite Governmental Requirements that may detrimentally affect Borrower's ability to obtain or may materially increase the cost of such insurance coverage:

        4.1.1.    Against damage or loss by fire and such other hazards (including lightning, windstorm, hail, explosion, riot, acts of striking employees, civil commotion, vandalism, malicious mischief, aircraft, vehicle, and smoke) as are covered by the broadest form of extended coverage endorsement available from time to time, in an amount not less than the full insurable value (as defined in paragraph 4.9) of the Mortgaged Property, with a deductible amount not to exceed an amount satisfactory to Lender. Windstorm coverage is included under the extended coverage endorsement of most hazard policies, but in some states it may be excluded. If the hazard policy excludes the windstorm/hail endorsement a separate windstorm policy must be provided. The coverage amounts must equal that of the hazard policy;

        4.1.2.    Rent loss or business interruption or use and occupancy insurance on such basis and in such amounts and with such deductibles as are satisfactory to Lender;

        4.1.3.    Against damage or loss by flood if the Land is located in an area identified by the Secretary of Housing and Urban Development or any successor or other appropriate authority (governmental or private) as an area having special flood hazards and in which flood insurance is available under the National Flood Insurance Act of 1968 or the Flood Disaster Protection Act of 1973, as amended, modified, supplemented, or replaced from time to time, on such basis and in the maximum amount of NFIP flood insurance coverage available, or the Note amount;

        4.1.4.    Against damage or loss from (a) sprinkler system leakage and (b) boilers, boiler tanks, heating and air conditioning equipment, pressure vessels, auxiliary piping, and similar apparatus, on such basis and in such amounts as Lender may require;

        4.1.5.    During any alteration, construction, or replacement of the Improvements, or any substantial portion of it, a Builder's All Risk policy with extended coverage with course of construction and completed value endorsements, for an amount at least equal to the full insurable value of the Improvements, and workers' compensation, in statutory amounts, with provision for replacement with the coverage described in paragraph 4.1, without gaps or lapsed coverage, for any completed portion of the Improvements;

        4.1.6.    Against damage or loss by earthquake, in an amount and with a deductible satisfactory to Lender, if such insurance is required by Lender in the exercise of its business judgment in light of the commercial real estate practices existing at the time the insurance is issued and in the County where the Land is located; and

        4.1.7.    For Attached Condominiums, the master hazard or blanket insurance policy must cover fixtures, equipment, and other personal property inside individual units. Otherwise, evidence of "walls-in" coverage (HO-6 hazard insurance policy) sufficient to repair the condo unit to its condition prior to a loss claim event is required. For properties in a designated flood area, and the flood insurance policies are paid by the HOA, the dwelling coverage must be equal to the building replacement cost on the master hazard insurance policy.

8

SHATAR_CAP0000531

**4.2.** **Liability Insurance.** Borrower must obtain a policy of commercial general liability insurance, including a broad form comprehensive general liability endorsement on an occurrence basis against claims for personal injury, bodily injury, death and/or property damage. Policy must cover the following; (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability for all legal contracts. The minimum limits of liability applying exclusively to the property shall be a combined limit of not less than $5,000,000.00 in the aggregate and $1,000,000.00 per occurrence, with a maximum deductible of $50,000.

**4.3.** **Other Insurance.** Borrower shall procure and maintain such other insurance or such additional amounts of insurance, covering Borrower or the Mortgaged Property, as (a) may be required by the terms of any construction contract for the Improvements or by any Governmental Authority, (b) may be specified in any other Loan Documents, or (c) may be required by Lender from time to time.

**4.4.** **Form of Policies.** All insurance required under this paragraph 3 shall be fully paid through the earlier of (i) the Maturity Date, or (ii) one year from the date of this security instrument. Existing policies (refinance transactions only) must have at least six months remaining with the premium paid. The policies shall contain such provisions, endorsements, and expiration dates as Lender from time to time reasonably requests and shall be in such form and amounts, and be issued by such insurance companies doing business in the state where the Mortgaged Property is situated, as Lender shall approve in Lender's sole and absolute discretion. Unless otherwise expressly approved in writing by Lender, each insurer shall have a Best Rating of Class A, Category VIII, or better. All policies shall (a) contain a waiver of subrogation endorsement; (b) provide that the policy will not lapse or be canceled, amended, or materially altered (including by reduction in the scope or limits of coverage) without at least 30 days prior written notice to Lender; (c) with the exception of the comprehensive general liability policy, contain a mortgagee's endorsement (438 BFU Endorsement or equivalent), and name Lender as insured; and (d) include such deductibles as Lender may approve, which shall not exceed five percent (5%) of the face value of the policy. If a policy required under this paragraph contains a co-insurance or overage clause, the policy shall include a stipulated value or agreed amount endorsement acceptable to Lender. The annual premium amount must be disclosed as well as any remaining balance. If the policy is paid in full, the remaining balance should state "$0" or "paid in full". Existing policies (refinance transactions only) must have at least six months remaining with the premium paid. Quotes and applications are not acceptable. The insurance agent's name, address and phone number must be reflected on the evidence of insurance.

**4.5.** **Duplicate Originals or Certificates.** Duplicate original policies evidencing the insurance required under this paragraph 4 and any additional insurance that may be purchased on the Mortgaged Property by or on behalf of Borrower shall be deposited with and held by Lender and, in addition, Borrower shall deliver to Lender (a) receipts evidencing payment of all premiums on the policies and (b) duplicate original renewal policies or a binder with evidence satisfactory to Lender of payment of all premiums at least 30 days before the policy expires. In lieu of the duplicate original policies to be delivered to Lender under this paragraph 4.5, Borrower may deliver an underlier of any blanket policy, and Borrower may also deliver original certificates from the issuing insurance company, evidencing that such policies are in full force and effect and containing information that, in Lender's reasonable judgment, is sufficient to allow Lender to ascertain whether such policies comply with the requirements of this paragraph.

**4.6.** **Increased Coverage.** If Lender determines that the limits of any insurance carried by Borrower are inadequate or that additional coverage is required, Borrower shall, within 10 days after written notice from Lender, procure such additional coverage as Lender may require in Lender's sole and absolute discretion.

**4.7.** **No Separate Insurance.** Borrower shall not carry separate or additional insurance concurrent in form or contributing in the event of loss with that required under this paragraph 4 unless endorsed in favor of Lender as required by this paragraph and otherwise approved by Lender in all respects.

**4.8.** **Transfer of Title.** In the event of foreclosure of this Mortgage or other transfer of title or assignment of the Mortgaged Property in extinguishment, in whole or in part, of the Obligations and the Indebtedness, all right, title, and interest of Borrower in and to all insurance policies required under this

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000532

paragraph 4 or otherwise then in force with respect to the Mortgaged Property and all proceeds payable under, and unearned premiums on, such policies shall immediately vest in the purchaser or other transferee of the Mortgaged Property.

**4.9.** **Replacement Cost.** For purposes of this paragraph 3, the term "full insurable value" means the lesser of (a) 100% of the full replacement cost for building and improvements as defined by Marshall & Swift "Good" or nationally recognized equivalent or (b) the Indebtness, with a replacement cost endorsement to compensate for the full amount of the damage or loss to improvements. Policy shall include Building Ordinance coverage, Sections A,B,C. In the event that the replacement cost of a building(s) and improvements are less than the value of the loan per Marshall & Swift "GOOD," a waiver from the Lender shall be required.

**4.10.** **Approval Not Warranty.** No approval by Lender of any insurer may be construed to be a representation, certification, or warranty of its solvency and no approval by Lender as to the amount, type, or form of any insurance may be construed to be a representation, certification, or warranty of its sufficiency.

**4.11.** **Lender's Right to Obtain.** Borrower shall deliver to Lender original policies or certificates evidencing such insurance at least 30 days before the existing policies expire. If any such policy is not so delivered to Lender or if any such policy is canceled, whether or not Lender has the policy in its possession, and no reinstatement or replacement policy is received before termination of insurance, Lender, without notice to or demand on Borrower, may (but is not obligated to) obtain such insurance insuring only Lender with such company as Lender may deem satisfactory, and pay the premium for such policies, and the amount of any premium so paid shall be charged to and promptly paid by Borrower or, at Lender's option, may be added to the Indebtedness. Borrower acknowledges that, if Lender obtains insurance, it is for the sole benefit of Lender, and Borrower shall not rely on any insurance obtained by Lender to protect Borrower in any way.

**4.12.** **Duty to Restore After Casualty.** If any act or occurrence of any kind or nature (including any casualty for which insurance was not obtained or obtainable) results in damage to or loss or destruction of the Mortgaged Property, Borrower shall immediately give notice of such loss or damage to Lender and, if Lender so instructs, shall promptly, at Borrower's sole cost and expense, regardless of whether any insurance proceeds will be sufficient for the purpose, commence and continue diligently to completion to restore, repair, replace, and rebuild the Mortgaged Property as nearly as possible to its value, condition, and character immediately before the damage, loss, or destruction.

**5.** **Condemnation and Insurance Proceeds.**

**5.1.** **Assignment to Lender.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of or damage or injury to the Mortgaged Property, or any part of it, or for conveyance in lieu of condemnation, are assigned to and shall be paid to Lender, regardless of whether Lender's security is impaired. All causes of action, whether accrued before or after the date of this Mortgage, of all types for damages or injury to the Mortgaged Property or any part of it, or in connection with any transaction financed by funds lent to Borrower by Lender and secured by this Mortgage, or in connection with or affecting the Mortgaged Property or any part of it, including, without limitation, causes of action arising in tort or contract or in equity, are assigned to Lender as additional security, and the proceeds shall be paid to Lender. Lender, at its option, may appear in and prosecute in its own name any action or proceeding to enforce any such cause of action and may make any compromise or settlement of such action. Borrower shall notify Lender in writing immediately on obtaining knowledge of any casualty damage to the Mortgaged Property or damage in any other manner in excess of $5,000.00 or knowledge of the institution of any proceeding relating to condemnation or other taking of or damage or injury to all or any portion of the Mortgaged Property. Lender, in its sole and absolute discretion, may participate in any such proceedings and may join Borrower in adjusting any loss covered by insurance. Borrower covenants and agrees with Lender, at Lender's request, to make, execute, and deliver, at Borrower's expense, any and all assignments and other instruments sufficient for the purpose of

---

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000533

assigning the aforesaid award or awards, causes of action, or claims of damages or proceeds to Lender free, clear, and discharged of any and all encumbrances of any kind or nature.

**5.2.** **Insurance Payments.** All compensation, awards, proceeds, damages, claims, insurance recoveries, rights of action, and payments that Borrower may receive or to which Lender may become entitled with respect to the Mortgaged Property if any damage or injury occurs to the Mortgaged Property, other than by a partial condemnation or other partial taking of the Mortgaged Property, shall be paid over to Lender and shall be applied first toward reimbursement of all costs and expenses of Lender in connection with their recovery and disbursement, and shall then be applied as follows:

5.2.1. Lender shall consent to the application of such payments to the restoration of the Mortgaged Property so damaged only if Borrower has met all the following conditions (a breach of one of which shall constitute a default under this Mortgage, the Note, and any Loan Documents): (a) Borrower is not in default under any of the terms, covenants, and conditions of the Loan Documents; (b) all then-existing Leases affected in any way by such damage will continue in full force and effect; (c) Lender is satisfied that the insurance or award proceeds, plus any sums added by Borrower, shall be sufficient to fully restore and rebuild the Mortgaged Property under then current Governmental Requirements; (d) within 60 days after the damage to the Mortgaged Property, Borrower presents to Lender a restoration plan satisfactory to Lender and any local planning department, which includes cost estimates and schedules; (e) construction and completion of restoration and rebuilding of the Mortgaged Property shall be completed in accordance with plans and specifications and drawings submitted to Lender within 30 days after receipt by Lender of the restoration plan and thereafter approved by Lender, which plans, specifications, and drawings shall not be substantially modified, changed, or revised without Lender's prior written consent; (f) within 3 months after such damage, Borrower and a licensed contractor satisfactory to Lender enter into a fixed price or guaranteed maximum price contract satisfactory to Lender, providing for complete restoration in accordance with such restoration plan for an amount not to exceed the amount of funds held or to be held by Lender; (g) all restoration of the Improvements so damaged or destroyed shall be made with reasonable promptness and shall be of a value at least equal to the value of the Improvements so damaged or destroyed before such damage or destruction; (h) Lender reasonably determines that there is an identified source (whether from income from the Mortgaged Property, rental loss insurance, or another source) sufficient to pay all debt service and operating expenses of the Mortgaged Property during its restoration as required above; and (i) any and all funds that are made available for restoration and rebuilding under this paragraph 5 shall be disbursed, at Lender's sole and absolute discretion to Lender, through Lender or a title insurance or trust company satisfactory to Lender, in accordance with standard construction lending practices, including a reasonable fee payable to Lender from such funds and, if Lender requests, mechanics' lien waivers and title insurance date-downs, and the provision of payment and performance bonds by Borrower, or in any other manner approved by Lender in Lender's sole and absolute discretion; or

5.2.2. If fewer than all conditions (a) through (i) in paragraph 5.2.1 are satisfied, then such payments shall be applied in the sole and absolute discretion of Lender (a) to the payment or prepayment, with any applicable prepayment premium, of any Indebtedness secured by this Mortgage in such order as Lender may determine, or (b) to the reimbursement of Borrower's expenses incurred in the rebuilding and restoration of the Mortgaged Property. If Lender elects under this paragraph 5.2.2 to make any funds available to restore the Mortgaged Property, then all of conditions (a) through (i) in paragraph 5.2.1 shall apply, except for such conditions that Lender, in its sole and absolute discretion, may waive.

**5.3.** **Material Loss Not Covered.** If any material part of the Mortgaged Property is damaged or destroyed and the loss, measured by the replacement cost of the Improvements according to then current Governmental Requirements, is not adequately covered by insurance proceeds collected or in the process of collection, Borrower shall deposit with Lender, within 30 days after Lender's request, the amount of the loss not so covered.

**5.4.** **Total Condemnation Payments.** All compensation, awards, proceeds, damages, claims, insurance recoveries, rights of action, and payments that Borrower may receive or to which Borrower may become entitled with respect to the Mortgaged Property in the event of a total condemnation or other total

---

11

SHATAR_CAP0000534

taking of the Mortgaged Property shall be paid over to Lender and shall be applied first to reimbursement of all Lender's costs and expenses in connection with their recovery, and shall then be applied to the payment of any Indebtedness secured by this Mortgage in such order as Lender may determine, until the Indebtedness secured by this Mortgage has been paid and satisfied in full. Any surplus remaining after payment and satisfaction of the Indebtedness secured by this Mortgage shall be paid to Borrower as its interest may then appear.

    **5.5.**   **Partial Condemnation Payments.** All compensation, awards, proceeds, damages, claims, insurance recoveries, rights of action, and payments ("funds") that Borrower may receive or to which Borrower may become entitled with respect to the Mortgaged Property in the event of a partial condemnation or other partial taking of the Mortgaged Property, unless Borrower and Lender otherwise agree in writing, shall be divided into two portions, one equal to the principal balance of the Note at the time of receipt of such funds and the other equal to the amount by which such funds exceed the principal balance of the Note at the time of receipt of such funds. The first such portion shall be applied to the sums secured by this Mortgage, whether or not then due, including but not limited to principal, accrued interest, and advances, and in such order or combination as Lender may determine, with the balance of the funds paid to Borrower. Any dispute as to the fair market value of the Mortgaged Property shall be settled by arbitration in accordance with the Real Estate Valuation Arbitration Rules of the American Arbitration Association.

    **5.6.**   **No Cure or Waiver of Default.** Any application of such amounts or any portion of it to any Indebtedness secured by this Mortgage shall not be construed to cure or waive any default or notice of default under this Mortgage or invalidate any act done under any such default or notice.

**6.**   **Taxes and Other Sums Due.** Borrower shall promptly pay, satisfy, and discharge: (a) all Impositions affecting the Mortgaged Property before they become delinquent; (b) such other amounts, chargeable against Borrower or the Mortgaged Property, as Lender reasonably deems necessary to protect and preserve the Mortgaged Property, this Mortgage, or Lender's security for the performance of the Obligations; (c) all encumbrances, charges, and liens on the Mortgaged Property, with interest, which in Lender's judgment are, or appear to be, prior or superior to the lien of this Mortgage or all costs necessary to obtain protection against such lien or charge by title insurance endorsement or surety company bond; (d) such other charges as Lender deems reasonable for services rendered by Lender at Borrower's request; and (e) all costs, fees, and expenses incurred by Lender in connection with this Mortgage, whether or not specified in this Mortgage.

    On Lender's request, Borrower shall promptly furnish Lender with all notices of sums due for any amounts specified in the preceding clauses 6(a) through (e), and, on payment, with written evidence of such payment. If Borrower fails to promptly make any payment required under this paragraph 6, Lender may (but is not obligated to) make such payment. Borrower shall notify Lender immediately on receipt by Borrower of notice of any increase in the assessed value of the Mortgaged Property and agrees that Lender, in Borrower's name, may (but is not obligated to) contest by appropriate proceedings such increase in assessment. Without Lender's prior written consent, Borrower shall not allow any lien inferior to the lien of this Mortgage to be perfected against the Mortgaged Property and shall not permit any improvement bond for any unpaid special assessment to issue.

**7.**   **Leases of Mortgaged Property by Borrower.** At Lender's request, Borrower shall furnish Lender with executed copies of all Leases of the Mortgaged Property or any portion of it then in force. If Lender so requires, all Leases later entered into by Borrower are subject to Lender's prior review and approval and must be acceptable to Lender in form and content. Each Lease must specifically provide, inter alia, that (a) it is subordinate to the lien of this Mortgage; (b) the tenant attorns to Lender (and Borrower consents to any such attornment), such attornment to be effective on Lender's acquisition of title to the Mortgaged Property; (c) the tenant agrees to execute such further evidence of attornment as Lender may from time to time request; (d) the tenant's attornment shall not be terminated by foreclosure; and (e) Lender, at Lender's option, may accept or reject such attornment. If Borrower learns that any tenant proposes to do, or is doing, any act that may give rise to any right of setoff against rent, Borrower shall immediately (i) take measures

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000535

reasonably calculated to prevent the accrual of any such right of setoff; (ii) notify Lender of all measures so taken and of the amount of any setoff claimed by any such tenant; and (iii) within 10 days after the accrual of any right of setoff against rent, reimburse any tenant who has acquired such right, in full, or take other measures that will effectively discharge such setoff and ensure that rents subsequently due shall continue to be payable without claim of setoff or deduction.

At Lender's request, Borrower shall assign to Lender, by written instrument satisfactory to Lender, all Leases of the Mortgaged Property, and all security deposits made by tenants in connection with such Leases. On assignment to Lender of any such Lease, Lender shall succeed to all rights and powers of Borrower with respect to such Lease, and Lender, in Lender's sole and absolute discretion, shall have the right to modify, extend, or terminate such Lease and to execute other further leases with respect to the Mortgaged Property that is the subject of such assigned Lease.

**8.** **Right to Collect and Receive Rents.** Despite any other provision of this Mortgage, Lender grants permission to Borrower to collect and retain the Rents of the Mortgaged Property as they become due and payable; however, such permission to Borrower shall be automatically revoked on default by Borrower in payment of any Indebtedness secured by this Mortgage or in the performance of any of the Obligations, and Lender shall have the rights set forth in 765 ILCS 5/31.5 without regard to the adequacy of the security for the Indebtedness secured by this Mortgage. Failure of or discontinuance by Lender at any time, or from time to time, to collect any such Rents shall not in any manner affect the subsequent enforcement by Lender at any time, or from time to time, of the right, power, and authority to collect these Rents. The receipt and application by Lender of all such Rents under this Mortgage, after execution and delivery of declaration of default and demand for sale as provided in this Mortgage or during the pendency of judicial sale proceedings under this Mortgage, shall neither cure such breach or default nor affect such sale proceedings, or any sale made under them, but such Rents, less all costs of operation, maintenance, collection, and Attorney Fees, when received by Lender, may be applied in reduction of the entire Indebtedness from time to time secured by this Mortgage, in such order as Lender may decide. Nothing in this Mortgage, nor the exercise of Lender's right to collect, nor an assumption by Lender of any tenancy, lease, or option, nor an assumption of liability under, nor a subordination of the lien or charge of this Mortgage to, any such tenancy, lease, or option, shall be, or be construed to be, an affirmation by Lender of any tenancy, lease, or option.

If the Rents of the Mortgaged Property are not sufficient to meet the costs, if any, of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall become an Indebtedness of Borrower to Lender secured by this Mortgage. Unless Lender and Borrower agree in writing to other terms of payment, such amounts shall be payable on notice from Lender to Borrower requesting such payment and shall bear interest from the date of disbursement at the rate stated in the Note unless payment of interest at such rate would be contrary to Governmental Requirements, in which event the amounts shall bear interest at the highest rate that may be collected from Borrower under Governmental Requirements.

Borrower expressly understands and agrees that Lender will have no liability to Borrower or any other person for Lender's failure or inability to collect Rents from the Mortgaged Property or for failing to collect such Rents in an amount that is equal to the fair market rental value of the Mortgaged Property. Borrower understands and agrees that neither the assignment of Rents to Lender nor the exercise by Lender of any of its rights or remedies under this Mortgage shall be deemed to make Lender a "mortgagee-in-possession" or otherwise responsible or liable in any manner with respect to the Mortgaged Property or the use, occupancy, enjoyment, or operation of all or any portion of it, unless and until Lender, in person or by agent, assumes actual possession of it. Nor shall appointment of a receiver for the Mortgaged Property by any court at the request of Lender or by agreement with Borrower, or the entering into possession of the Mortgaged Property or any part of it by such receiver be deemed to make Lender a mortgagee-in-possession or otherwise responsible or liable in any manner with respect to the Mortgaged Property or the use, occupancy, enjoyment, or operation of all or any portion of it.

---

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000536

During an Event of Default, any and all Rents collected or received by Borrower shall be accepted and held for Lender in trust and shall not be commingled with Borrower's funds and property, but shall be promptly paid over to Lender.

**9.**    **Funds for Taxes and Insurance.** If Borrower is in default under this Mortgage or any of the Loan Documents, regardless of whether the default has been cured, then Lender may at any subsequent time, at its option to be exercised on 30 days written notice to Borrower, require Borrower to deposit with Lender or its designee, at the time of each payment of an installment of interest or principal under the Note, an additional amount sufficient to discharge the obligations of Borrower under the Note and this Mortgage as they become due. The calculation of the amount payable and of the fractional part of it to be deposited with Lender shall be made by Lender in its sole and absolute discretion. These amounts shall be held by Lender or its designee not in trust and not as agent of Borrower and shall not bear interest, and shall be applied to the payment of any of the Obligations under the Loan Documents in such order or priority as Lender shall determine. If at any time within 30 days before the due date of these obligations the amounts then on deposit shall be insufficient to pay the obligations under the Note and this Mortgage in full, Borrower shall deposit the amount of the deficiency with Lender within 10 days after Lender's demand. If the amounts deposited are in excess of the actual obligations for which they were deposited, Lender may refund any such excess, or, at its option, may hold the excess in a reserve account, not in trust and not bearing interest, and reduce proportionately the required monthly deposits for the ensuing year. Nothing in this paragraph shall be deemed to affect any right or remedy of Lender under any other provision of this Mortgage or under any statute or rule of law to pay any such amount and to add the amount so paid to the Indebtedness secured by this Mortgage. Lender shall have no obligation to pay insurance premiums or taxes except to the extent the fund established under this paragraph is sufficient to pay such premiums or taxes, to obtain insurance, or to notify Borrower of any matters relative to the insurance or taxes for which the fund is established under this paragraph.

Lender or its designee shall hold all amounts so deposited as additional security for the sums secured by this Mortgage. Lender may, in its sole and absolute discretion and without regard to the adequacy of its security under this Mortgage, apply such amounts or any portion of it to any Indebtedness secured by this Mortgage, and such application shall not be construed to cure or waive any default or notice of default under this Mortgage.

If Lender requires deposits to be made under this paragraph 9, Borrower shall deliver to Lender all tax bills, bond and assessment statements, statements for insurance premiums, and statements for any other obligations referred to above as soon as Borrower receives such documents.

If Lender sells or assigns this Mortgage, Lender shall have the right to transfer all amounts deposited under this paragraph 9 to the purchaser or assignee. After such a transfer, Lender shall be relieved and have no further liability under this Mortgage for the application of such deposits, and Borrower shall look solely to such purchaser or assignee for such application and for all responsibility relating to such deposits.

**10.**    **Assignment of Causes of Action, Awards, and Damages.** All causes of action, and all sums due or payable to Borrower for injury or damage to the Mortgaged Property, or as damages incurred in connection with the transactions in which the Loan secured by this Mortgage was made, including, without limitation, causes of action and damages for breach of contract, fraud, concealment, construction defects, or other torts, or compensation for any conveyance in lieu of condemnation, are assigned to Lender, and all proceeds from such causes of action and all such sums shall be paid to Lender for credit against the Indebtedness secured by this Mortgage. Borrower shall notify Lender immediately on receipt by Borrower of notice that any such sums have become due or payable and, immediately on receipt of any such sums, shall promptly remit such sums to Lender.

After deducting all expenses, including Attorney Fees, incurred by Lender in recovering or collecting any sums under this paragraph 10, Lender may apply or release the balance of any funds received by it under this paragraph, or any part of such balance, as it elects. Lender, at its option, may appear in and prosecute in its own name any action or proceeding to enforce any cause of action assigned to it under this

---

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000537

paragraph and may make any compromise or settlement in such action whatsoever. Borrower covenants that it shall execute and deliver to Lender such further assignments of any such compensation awards, damages, or causes of action as Lender may request from time to time. If Lender fails or does not elect to prosecute any such action or proceeding and Borrower elects to do so, Borrower may conduct the action or proceeding at its own expense and risk.

**11.     Defense of Mortgage; Litigation.**  Borrower shall give Lender immediate written notice of any action or proceeding (including, without limitation, any judicial, whether civil, criminal, or probate, or nonjudicial proceeding to foreclose the lien of a junior or senior mortgage or deed of trust) affecting or purporting to affect the Mortgaged Property, this Mortgage, Lender's security for the performance of the Obligations and payment of the Indebtedness, or the rights or powers of Lender under the Loan Documents. Despite any other provision of this Mortgage, Borrower agrees that Lender may (but is not obligated to) commence, appear in, prosecute, defend, compromise, and settle, in Lender's or Borrower's name, and as attorney-in-fact for Borrower, and incur necessary costs and expenses, including Attorney Fees in so doing, any action or proceeding, whether a civil, criminal, or probate judicial matter, nonjudicial proceeding, arbitration, or other alternative dispute resolution procedure, reasonably necessary to preserve or protect, or affecting or purporting to affect, the Mortgaged Property, this Mortgage, Lender's security for performance of the Obligations and payment of the Indebtedness, or the rights or powers of Lender under the Loan Documents, and that if Lender elects not to do so, Borrower shall commence, appear in, prosecute, and defend any such action or proceeding. Borrower shall pay all costs and expenses of Lender , including costs of evidence of title and Attorney Fees, in any such action or proceeding in which Lender may appear or for which legal counsel is sought, whether by virtue of being made a party defendant or otherwise, and whether or not the interest of Lender in the Mortgaged Property is directly questioned in such action or proceeding, including, without limitation, any action for the condemnation or partition of all or any portion of the Mortgaged Property and any action brought by Lender to foreclose this Mortgage or to enforce any of its terms or provisions.

**12.     Borrower's Failure to Comply With Mortgage.**  If Borrower fails to make any payment or do any act required by this Mortgage, or if there is any action or proceeding (including, without limitation, any judicial or nonjudicial proceeding to foreclose the lien of a junior or senior mortgage or deed of trust) affecting or purporting to affect the Mortgaged Property, this Mortgage, Lender's security for the performance of the Obligations and payment of the Indebtedness, or the rights or powers of Lender under the Note or this Mortgage, Lender may (but is not obligated to) (a) make any such payment or do any such act in such manner and to such extent as either deems necessary to preserve or protect the Mortgaged Property, this Mortgage, or Lender's security for the performance of Borrower's Obligations and payment of the Indebtedness, or the rights or powers of Lender under the Loan Documents, Lender being authorized to enter on the Mortgaged Property for any such purpose; and (b) in exercising any such power, pay necessary expenses, retain attorneys, and pay Attorney Fees incurred in connection with such action, without notice to or demand on Borrower and without releasing Borrower from any Obligations or Indebtedness.

**13.     Sums Advanced to Bear Interest and to Be Secured by Mortgage.**  At Lender's request, Borrower shall immediately pay any sums advanced or paid by Lender under any provision of this Mortgage or the other Loan Documents. Until so repaid, all such sums and all other sums payable to Lender shall be added to, and become a part of, the Indebtedness secured by this Mortgage and bear interest from the date of advancement or payment by Lender at the same rate as provided in the Note, unless payment of interest at such rate would be contrary to Governmental Requirements. All sums advanced by Lender under this Mortgage or the other Loan Documents, whether or not required to be advanced by Lender under the terms of this Mortgage or the other Loan Documents, shall conclusively be deemed to be mandatory advances required to preserve and protect this Mortgage and Lender's security for the performance of the Obligations and payment of the Indebtedness, and shall be secured by this Mortgage to the same extent and with the same priority as the principal and interest payable under the Note.

---

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000538

14.    Inspection of Mortgaged Property.  Lender may, or authorize other persons, including, but not limited to, appraisers and prospective purchasers at any foreclosure sale commenced by Lender, to enter on or inspect the Mortgaged Property at reasonable times and for reasonable durations. Borrower shall permit all such entries and inspections to be made as long as Lender has given Borrower written notice of such inspection at least 24 hours before the entry and inspection.

15.    **Financial Statements; Estoppel Certificates.**

15.1.    **Borrower's Financial Statements.**  On receipt of Lender's written request and without expense to Lender, Borrower shall furnish to Lender (a) an annual statement of the operation of the Mortgaged Property prepared and certified by Borrower, showing in reasonable detail satisfactory to Lender total Rents received and total expenses together with an annual balance sheet and profit and loss statement, within 90 days after the close of each fiscal year of Borrower, beginning with the fiscal year first ending after the date of recordation of this Mortgage; (b) within 30 days after the end of each calendar quarter (March 31, June 30, September 30, December 31) interim statements of the operation of the Mortgaged Property showing in reasonable detail satisfactory to Lender total Rents and other income and receipts received and total expenses for the previous quarter, certified by Borrower; and (c) copies of Borrower's annual state and federal income tax returns within 30 days after filing them. Borrower shall keep accurate books and records, and allow Lender, its representatives and agents, on notice, at any time during normal business hours, access to such books and records regarding acquisition, construction, and development of the Mortgaged Property, including any supporting or related vouchers or papers, shall allow Lender to make extracts or copies of any such papers, and shall furnish to Lender and its agents convenient facilities for the audit of any such statements, books, and records.

15.2.    **Recordkeeping.**  Borrower shall keep adequate records and books of account in accordance with generally accepted accounting principles and practices and shall permit Lender, by its agents, accountants, and attorneys, to examine Borrower's records and books of account and to discuss the affairs, finances, and accounts of Borrower with the officers of Borrower, at such reasonable times as Lender may request.

15.3.    **Guarantors' Financial Statements.**  Except to the extent already required by paragraph 15.1, Borrower, its controlling shareholders, and all guarantors of the Indebtedness, if any, shall deliver to Lender with reasonable promptness after the close of their respective fiscal years a balance sheet and profit and loss statement, prepared by an independent certified public accountant satisfactory to Lender, setting forth in each case, in comparative form, figures for the preceding year, which statements shall be accompanied by the unqualified opinion of such accountant as to their accuracy. Throughout the term of this Mortgage, Borrower and any guarantor shall deliver, with reasonable promptness, to Lender such other information with respect to Borrower or guarantor as Lender may from time to time request. All financial statements of Borrower or guarantor shall be prepared in accordance with generally accepted accounting principles and practices applied on a consistent basis and shall be delivered in duplicate. Documents and information submitted by Borrower to Lender are submitted confidentially, and Lender shall not disclose them to third parties and shall limit access to them to what is necessary to service the loan, accomplish the normal administrative, accounting, tax-reporting, and other necessary functions, to sell all or any part of the loan and to report such information as required to the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the Internal Revenue Service, and similar entities.

15.4.    **Estoppel Certificates.**  Within 10 days after Lender's request for such information, Borrower shall execute and deliver to Lender, and to any third party designated by Lender, in recordable form, a certificate of the principal financial or accounting officer of Borrower, dated within 3 days after delivery of such statements, or the date of such request, as the case may be, reciting that the Loan Documents are unmodified and in full force and effect, or that the Loan Documents are in full force and effect as modified and specifying all modifications asserted by Borrower. Such certificate shall also recite the amount of the Indebtedness and cover other matters with respect to the Indebtedness or Obligations as Lender may reasonably require, the date(s) through which payments due on the Indebtedness have been paid and the amount(s) of any payments previously made on the Indebtedness. The certificate shall include

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000539

a detailed statement of any right of setoff, counterclaim, or other defense that Borrower contends exists against the Indebtedness or the Obligations; a statement that such person knows of no Event of Default or prospective Event of Default that has occurred and is continuing, or, if any Event of Default or prospective Event of Default has occurred and is continuing, a statement specifying the nature and period of its existence and what action Borrower has taken or proposes to take with respect to such matter; and, except as otherwise specified, a statement that Borrower has fulfilled all Obligations that are required to be fulfilled on or before the date of such certificate.

  **15.5.** **Failure to Deliver Estoppel Certificate.** If Borrower fails to execute and deliver the certificate required by paragraph 15.4 within such 10-day period, (a) the Loan Documents shall, as to Borrower, conclusively be deemed to be either in full force and effect, without modification, or in full force and effect, modified in the manner and to the extent specified by Lender, whichever Lender reasonably and in good faith may represent; (b) the Indebtedness shall, as to Borrower, conclusively be deemed to be in the amount specified by Lender and no setoffs, counterclaims, or other defenses exist against the Indebtedness; and (c) Borrower shall conclusively be deemed to have irrevocably constituted and appointed Lender as Borrower's special attorney-in-fact to execute and deliver such certificate to any third party.

  **15.6.** **Reliance on Estoppel Certificate.** Borrower and Lender expressly agree that any certificate executed and delivered by Borrower, or any representation in lieu of a certificate made by Lender under paragraph 15.5, may be relied on by any prospective purchaser or any prospective assignee of any interest of Lender in the Note and other Indebtedness secured by this Mortgage or in the Mortgaged Property, and by any other person, without independent investigation or examination, to verify the accuracy, reasonableness, or good faith of the recitals in the certificate or representation.

  **15.7.** **No Waiver of Default or Rights.** Lender's exercise of any right or remedy provided by this paragraph 15 shall not constitute a waiver of, or operate to cure, any default by Borrower under this Mortgage, or preclude any other right or remedy that is otherwise available to Lender under this Mortgage or Governmental Requirements.

  **16.** **Uniform Commercial Code Security Agreement.** This Mortgage is intended to be and shall constitute a security agreement under the Illinois Uniform Commercial Code for any of the Personalty specified as part of the Mortgaged Property that, under Governmental Requirements, may be subject to a security interest under the Illinois Uniform Commercial Code, and Borrower grants to Lender a security interest in those items. Borrower authorizes Lender to file financing statements in all states, counties, and other jurisdictions as Lender may elect, without Borrower's signature if permitted by law. Borrower agrees that Lender may file this Mortgage, or a copy of it, in the real estate records or other appropriate index or in the Office of the Secretary of State of the State of Illinois and such other states as the Lender may elect, as a financing statement for any of the items specified above as part of the Mortgaged Property. Any reproduction of this Mortgage or executed duplicate original of this Mortgage, or a copy certified by a County Recorder in the State of Illinois, or of any other security agreement or financing statement, shall be sufficient as a financing statement. In addition, Borrower agrees to execute and deliver to Lender, at Lender's request, any UCC financing statements, as well as any extensions, renewals, and amendments, and copies of this Mortgage in such form as Lender may require to perfect a security interest with respect to the Personalty. Borrower shall pay all costs of filing such financing statements and any extensions, renewals, amendments, and releases of such statements, and shall pay all reasonable costs and expenses of any record searches for financing statements that Lender may reasonably require. Without the prior written consent of Lender, Borrower shall not create or suffer to be created any other security interest in the items, including any replacements and additions.

  On any Event of Default, Lender shall have the remedies of a secured party under the Illinois Uniform Commercial Code and, at Lender's option, may also invoke the remedies in paragraph 21 of this Mortgage as to such items. In exercising any of these remedies, Lender may proceed against the items of Mortgaged Property and any items of Personalty separately or together and in any order whatsoever, without in any way affecting the availability of Lender's remedies under the Illinois Uniform Commercial Code or of the remedies in paragraph 21 of this Mortgage.

---

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000540

**17.    Fixture Filing.** This Mortgage constitutes a financing statement filed as a fixture filing under the Illinois Uniform Commercial Code, as amended or recodified from time to time, covering any portion of the Mortgaged Property that now is or later may become a fixture attached to the Mortgaged Property or to any Improvement.

**18.    Waiver of Statute of Limitations.** Borrower waives the right to assert any statute of limitations as a defense to the Loan Documents and the Obligations secured by this Mortgage, to the fullest extent permitted by Governmental Requirements.

**19.    Events of Default.** The term Event of Default as used in this Mortgage means the occurrence or happening, at any time and from time to time, of any one or more of the following:

   **19.1.    Payment of Indebtedness.** Borrower fails to pay any installment of interest and/or principal under the Note or any other Indebtedness when due and such failure continues for more than 5 days after the date such payment was due and payable whether on maturity, the date stipulated in any Loan Document, by acceleration, or otherwise.

   **19.2.    Performance of Obligations.** The failure, refusal, or neglect to perform and discharge fully and timely any of the Obligations as and when required, and the continuance of such failure for 30 days after Lender gives written notice of such failure to Borrower.

   **19.3.    Judgment.** If any final judgment, order, or decree is rendered against Borrower or a guarantor and is not paid or executed on, or is not stayed by perfection of an appeal or other appropriate action, such as being bonded, or is not otherwise satisfied or disposed of to Lender's satisfaction within 30 days after entry of the judgment, order, or decree.

   **19.4.    Voluntary Bankruptcy.** If Borrower or any guarantor (a) seeks entry of an order for relief as a debtor in a proceeding under the Bankruptcy Code; (b) seeks, consents to, or does not contest the appointment of a receiver for itself or for all or any part of its property; (c) files a petition seeking relief under the bankruptcy, arrangement, reorganization, or other debtor relief laws of the United States or any state or any other competent jurisdiction; (d) makes a general assignment for the benefit of its creditors; or (e) states in writing its inability to pay its debts as they mature.

   **19.5.    Involuntary Bankruptcy.** If (a) a petition is filed against Borrower or any guarantor seeking relief under any bankruptcy, arrangement, reorganization, or other debtor relief laws of the United States or any state or other competent jurisdiction; or (b) a court of competent jurisdiction enters an order, judgment, or decree appointing, without the consent of Borrower or any guarantor, a receiver for it, or for all or any part of its property; and (c) such petition, order, judgment, or decree is not discharged or stayed within 90 days after its entry.

   **19.6.    Foreclosure of Other Liens.** If the holder of any lien or security interest on the Mortgaged Property (without implying Lender's consent to the existence, placing, creating, or permitting of any lien or security interest) institutes foreclosure or other proceedings to enforce its remedies thereunder and any such proceedings are not stayed or discharged within 30 days after institution of such foreclosure proceedings.

   **19.7.    Sale, Lease, Encumbrance, or Other Transfer.** Any sale, lease, exchange, assignment, conveyance, encumbrance (other than a Permitted Encumbrance), transfer of possession, or other disposition of all or any portion of the Land or Improvements or any of Borrower's interest in the Land or Improvement without Lender's prior written consent, or any sale, lease, exchange, assignment, conveyance, encumbrance (other than a Permitted Encumbrance), or other disposition of any portion of the Personalty, without Lender's prior written consent, or if there is a sale or transfer of beneficial interests in Borrower equal to 25 percent or more of the beneficial ownership interests of Borrower outstanding at the date of this Mortgage, without Lender's prior written consent.

   **19.8.    Title and Lien Priority.** If Borrower's title to any or all of the Mortgaged Property or the status of this Mortgage as a first and prior lien and security interest on the Mortgaged Property is endangered in any manner, and Borrower fails to cure the same on Lender's demand; provided, however, that Borrower shall not be in default under this paragraph if Borrower is diligently pursuing a contest or cure of such title

18

SHATAR_CAP0000541

or lien issue and Borrower has posted adequate security to protect Lender's rights, interest, and priority under this Mortgage, as determined by Lender.

**19.9.** **Other Defaults.** The occurrence of an Event of Default or any default, as defined or described in the other Loan Documents, or the occurrence of a default on any Indebtedness or Obligations.

**19.10.** **Levy on Assets.** A levy on any of the assets of Borrower or any guarantor, and such levy is not stayed or abated within 60 days after such levy.

**19.11.** **Breach of Representations.** The breach of any representation, warranty, or covenant in this Mortgage or other Loan Documents.

**19.12.** **Default Under Prior Mortgage, Mortgage, or Lien.** The failure to pay on a timely basis, or the occurrence of any other default under any note, deed of trust, mortgage, contract of sale, lien, charge, encumbrance, or security interest encumbering or affecting the Mortgaged Property and having priority over the lien of this Mortgage.

**20.** **Acceleration on Transfer or Encumbrance.**

**20.1.** **Acceleration on Transfer or Encumbrance of Mortgaged Property.** If Borrower sells, contracts to sell, gives an option to purchase, conveys, leases with an option to purchase, encumbers, or alienates the Mortgaged Property, or any interest in it, or suffers its title to, or any interest in, the Mortgaged Property to be divested, whether voluntarily or involuntarily; or if there is a sale or transfer of beneficial interests in Borrower equal to 25 percent or more of the beneficial ownership interests of Borrower outstanding at the date of this Mortgage; or if Borrower changes or permits to be changed the character or use of the Mortgaged Property, or drills or extracts or enters into any lease for the drilling or extracting of oil, gas, or other hydrocarbon substances or any mineral of any kind or character on the Mortgaged Property; or if title to such Mortgaged Property becomes subject to any lien or charge, voluntary or involuntary, contractual or statutory, without Lender's prior written consent, then Lender, at Lender's option, may, without prior notice, declare all sums secured by this Mortgage, regardless of their stated due date(s), immediately due and payable and may exercise all rights and remedies in this Mortgage, including those in paragraph 21.

**20.2.** **Replacement Personalty.** Despite the provisions of paragraph 20.1, Borrower may from time to time replace Personalty constituting a part of the Mortgaged Property, as long as (a) the replacements for such Personalty are of equivalent value and quality; (b) Borrower has good and clear title to such replacement Personalty free and clear of any and all liens, encumbrances, security interests, ownership interests, claims of title (contingent or otherwise), or charges of any kind, or the rights of any conditional sellers, vendors, or any other third parties in or to such replacement Personalty have been expressly subordinated to the lien of the Mortgage in a manner satisfactory to Lender and at no cost to Lender; and (c) at Lender's option, Borrower provides at no cost to Lender satisfactory evidence that the Mortgage constitutes a valid and subsisting lien on and security interest in such replacement Personalty of the same priority as this Mortgage has on the Mortgaged Property and is not subject to being subordinated or its priority affected under any Governmental Requirements.

**20.3.** **Permitted Encumbrances.** If Lender consents in writing, which consent may not be unreasonably withheld, the due-on-encumbrance provision set forth in paragraph 20.1 shall not apply to a junior voluntary deed of trust or mortgage lien in favor of another lender encumbering the Mortgaged Property (the principal balance of any such junior encumbrance shall be added to the principal balance of the Indebtedness for purposes of determining compliance with the financial covenants of the Note); as long as Borrower gives Lender at least 30 days written notice of the further encumbrance and reimburses Lender for all out-of-pocket costs and expenses incurred in connection with such encumbrance.

**21.** **Rights and Remedies on Default.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000542

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Borrower to declare the entire Indebtedness immediately due and payable, including any prepayment penalty which Borrower would be required to pay.

**UCC Remedies**. With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents**. Lender shall have the right, without notice to Borrower, to take possession of the Mortgaged Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Mortgaged Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Borrower irrevocably designates Lender as Borrower's attorney-in-fact to endorse instruments received in payment thereof in the name of Borrower and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Mortgagee in Possession.** Lender shall have the right to be placed as mortgagee in possession or to have a receiver appointed to take possession of all or any part of the Mortgaged Property, with the power to protect and preserve the Mortgaged Property, to operate the Mortgaged Property preceding foreclosure or sale, and to collect the Rents from the Mortgaged Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The mortgagee in possession or receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Mortgaged Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure**. Lender may obtain a judicial decree foreclosing Borrower's interest in all or any part of the Mortgaged Property.

**Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Note or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Borrower hereby waives any and all right to have the Mortgaged Property marshaled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Mortgaged Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Mortgaged Property.

**Notice of Sale**. Lender shall give Borrower reasonable notice of the time and place of any public sale of the Personalty or of the time after which any private sale or other intended disposition of the Personalty is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personalty may be made in conjunction with any sale of the Land.

20

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000543

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower under this Mortgage, after Borrower's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies. Nothing under this Mortgage or otherwise shall be construed so as to limit or restrict the rights and remedies available to Lender following an Event of Default, or in any way to limit or restrict the rights and ability of Lender to proceed directly against Borrower and/or against any other co-maker, guarantor, surety or endorser and/or to proceed against any other collateral directly or indirectly securing the Indebtedness.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Borrower also will pay any court costs, in addition to all other sums provided by Governmental Requirements.

**22.** **Obligation to Notify Lender of Bankruptcy, Insolvency, Transfer, or Encumbrance.** Borrower shall notify Lender in writing, at or before the time of the occurrence of any event described in paragraphs 19 and 20 of this Mortgage, of such event and shall promptly furnish Lender with any and all information on such event that Lender may request.

**23.** **Waiver of Marshaling.** Despite the existence of interests in the Mortgaged Property other than that created by this Mortgage, and despite any other provision of this Mortgage, if Borrower defaults in paying the Indebtedness or in performing any Obligations, Lender shall have the right, in Lender's sole and absolute discretion, to establish the order in which the Mortgaged Property will be subjected to the remedies provided in this Mortgage and to establish the order in which all or any part of the Indebtedness secured by this Mortgage is satisfied from the proceeds realized on the exercise of the remedies provided in this Mortgage. Borrower and any person who now has or later acquires any interest in the Mortgaged Property with actual or constructive notice of this Mortgage waives any and all rights to require a marshaling of assets in connection with the exercise of any of the remedies provided in this Mortgage or otherwise provided by Governmental Requirements.

**24.** **Environmental Matters.**

    **24.1.** **Borrower's Representations and Warranties.** Borrower represents and warrants to Lender that:

        24.1.1. The Mortgaged Property and Borrower are not in violation of any Environmental Laws or subject to any existing, pending, or threatened investigation by any Governmental Authority under any Environmental Laws.

        24.1.2. Borrower has not obtained and is not required by any Environmental Laws to obtain any permits or licenses to construct or use the Mortgaged Property or the Improvements.

        24.1.3. Borrower has conducted an appropriate inquiry into previous uses and ownership of the Mortgaged Property, and after such inquiry determined that no Hazardous Substance has been disposed of, transported, or released on or at the Mortgaged Property.

---

21

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000544

24.1.4. No part of the Mortgaged Property is being used or, to the knowledge of Borrower, has been used at any previous time, for the disposal, storage, treatment, processing, transporting, or other handling of Hazardous Substances, nor is any part of the Mortgaged Property affected by any Hazardous Substance contamination.

24.1.5. To the best of Borrower's knowledge and belief, no real property adjoining the Mortgaged Property is being used, or has ever been used at any previous time, for the disposal, storage, treatment, processing, or other handling of Hazardous Substances, nor is any other real property adjoining the Mortgaged Property affected by Hazardous Substances contamination.

24.1.6. No investigation, administrative order, consent order or agreement, litigation, or settlement with respect to Hazardous Substances or Hazardous Substances contamination is proposed, threatened, anticipated, or in existence regarding the Mortgaged Property. The Mortgaged Property is not currently on, and to Borrower's knowledge, after diligent investigation and inquiry, has never been on, any federal or state "Superfund" or "Superlien" list.

24.1.7. Neither Borrower nor, to the best of Borrower's knowledge and belief, any tenant of any portion of the Mortgaged Property has received any notice from any Governmental Authority regarding any violation of any Environmental Laws.

24.1.8. The use that Borrower makes and intends to make of the Mortgaged Property shall not result in the disposal or release of any Hazardous Substances on, in, or to the Mortgaged Property.

24.1.9. Borrower shall not cause any violation of any Environmental Laws, nor permit any tenant of any portion of the Mortgaged Property to cause such a violation, nor permit any environmental liens to be placed on any portion of the Mortgaged Property.

24.1.10. Neither Borrower nor any third party shall use, generate, manufacture, store, release, discharge, or dispose of any Hazardous Substance on, under, or about the Mortgaged Property, or transport any Hazardous Substance to or from the Mortgaged Property.

**24.2.** **Survival of Representations and Warranties.** The foregoing representations and warranties shall be continuing and shall be true and correct for the period from the date of this instrument to the release of this Mortgage (whether by payment of the Indebtedness secured by this Mortgage or foreclosure or action in lieu of foreclosure), and these representations and warranties shall survive such release.

**24.3.** **Notice to Lender.** Borrower shall give prompt written notice to Lender of:

24.3.1. Any proceeding or inquiry by any Governmental Authority (including, without limitation, the Illinois State Department of Public Health or the Illinois Environmental Protection Agency) regarding the presence or threatened presence of any Hazardous Substance on the Mortgaged Property;

24.3.2. All claims made or threatened by any third party against Borrower or the Mortgaged Property relating to any loss or injury resulting from any Hazardous Substance;

24.3.3. Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Mortgaged Property that could cause it or any part of it to be subject to any restrictions on the ownership, occupancy, transferability, or use of the Mortgaged Property under any Environmental Laws.

**24.4.** **Lender's Right to Join Legal Actions.** Lender shall have the right, at its option, but at Borrower's sole cost and expense, to join and participate in, as a party if it so elects, any legal proceedings or actions initiated by or against Borrower or the Mortgaged Property in connection with any Environmental Laws.

**24.5.** **Borrower's Indemnity.** Borrower shall indemnify, defend, and hold harmless Lender, its directors, officers, employees, agents, successors, and assigns from and against any loss, damage, cost, expense, or liability directly or indirectly arising from or attributable to the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal, or presence of a Hazardous Substance on, under, or about the Mortgaged Property, or any order, consent decree, or settlement relating to the cleanup of a Hazardous Substance, or any claims of loss, damage, liability, expense, or injury relating to or arising from, directly or indirectly, any disclosure by Lender to anyone of information, whether true or not,

---

22

relative to a Hazardous Substance or Environmental Law violation, including, without limitation, Attorney Fees. This indemnity shall survive the release of this Mortgage (whether by payment of the Indebtedness secured by this Mortgage or foreclosure or action in lieu of foreclosure).

**25.**     **Reserved.**

**26.**     **Reserved.**

**27.**     **Release.**  Upon payment of all sums secured by this Mortgage, Lender shall release this Mortgage. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Mortgage, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**28.**     **Reserved.**

**29.**     **No Waiver by Lender.**  No waiver by Lender of any right or remedy provided by the Loan Documents or Governmental Requirements shall be effective unless such waiver is in writing and signed by two authorized officers of Lender. Waiver by Lender of any right or remedy granted to Lender under the Loan Documents or Governmental Requirements as to any transaction or occurrence shall not be deemed a waiver of any future transaction or occurrence. The acceptance of payment of any sum secured by this Mortgage after its due date, or the payment by Lender of any Indebtedness or the performance by Lender of any Obligations of Borrower under the Loan Documents, on Borrower's failure to do so, or the addition of any payment so made by Lender to the Indebtedness secured by this Mortgage, or the exercise of Lender's right to enter the Mortgaged Property and receive and collect the Rents from it, or the assertion by Lender of any other right or remedy under the Loan Documents, shall not constitute a waiver of Lender's right to require prompt performance of all other Obligations of Borrower under the Loan Documents and payment of the Indebtedness, or to exercise any other right or remedy under the Loan Documents for any failure by Borrower to timely and fully pay the Indebtedness and perform its Obligations under the Loan Documents. Lender may waive any right or remedy under the Loan Documents or Governmental Requirements without notice to or consent from Borrower, any guarantor of the Indebtedness and of Borrower's Obligations under the Loan Documents, or any holder or claimant of a lien or other interest in the Mortgaged Property that is junior to the lien of this Mortgage, and without incurring liability to Borrower or any other person by so doing.

**30.**     **Consents and Modifications; Borrower and Lien Not Released.**  Despite Borrower's default in the payment of any Indebtedness secured by this Mortgage or in the performance of any Obligations under this Mortgage or Borrower's breach of any obligation, covenant, or agreement in the Loan Documents, Lender, at Lender's option, without notice to or consent from Borrower, any guarantor of the Indebtedness and of Borrower's Obligations under the Loan Documents, or any holder or claimant of a lien or interest in the Mortgaged Property that is junior to the lien of this Mortgage, and without incurring liability to Borrower or any other person by so doing, may from time to time (a) extend the time for payment of all or any portion of Borrower's Indebtedness under the Loan Documents; (b) accept a renewal note or notes, or release any person from liability, for all or any portion of such Indebtedness; (c) agree with Borrower to modify the terms and conditions of payment under the Loan Documents; (d) reduce the amount of the monthly installments due under paragraph 9 of this Mortgage; (e) reconvey or release other or additional security for the repayment of Borrower's Indebtedness under the Loan Documents; (f) approve the preparation or filing of any map or plat with respect to the Mortgaged Property; (g) enter into any extension or subordination agreement affecting the Mortgaged Property or the lien of this Mortgage; and (h) agree with Borrower to modify the term, the rate of interest, or the period of amortization of the Note or alter the amount of the monthly installments payable under the Note. No action taken by Lender under this paragraph shall be effective unless it is in writing, subscribed by Lender, and, except as expressly stated in such writing, no such action will impair or affect (i) Borrower's obligation to pay the Indebtedness secured by this Mortgage and to observe all Obligations of Borrower contained in the Loan Documents; (ii) the guaranty of any Person of the payment of the Indebtedness secured by this Mortgage; or (iii) the lien or priority of the lien of this Mortgage. At Lender's request, Borrower shall promptly pay Lender a reasonable

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000546

service charge, together with all insurance premiums and Attorney Fees as Lender may have advanced, for any action taken by Lender under this paragraph.

Whenever Lender's consent or approval is specified as a condition of any provision of this Mortgage, such consent or approval shall not be effective unless such consent or approval is in writing, signed by two authorized officers of Lender.

**31.** **Waiver of Right of Offset.** No portion of the Indebtedness secured by this Mortgage shall be or be deemed to be offset or compensated by all or any part of any claim, cause of action, counterclaim, or cross-claim, whether liquidated or unliquidated, that Borrower may have or claim to have against Lender.

**32.** **Future Advances.** On request by Borrower, Lender, at Lender's option, may make future advances to Borrower. All such future advances, with interest, shall be added to and become a part of the Indebtedness secured by this Mortgage when evidenced by promissory notes reciting that such note(s) are secured by this Mortgage.

**33.** **Prepayment.** If the Note secured by this Mortgage provides for a fee or charge as consideration for the acceptance of prepayment of principal, Borrower agrees to pay said fee or charge if the Indebtedness or any part of it shall be paid, whether voluntarily or involuntarily, before the due date stated in the Note, even if Borrower has defaulted in payment or in the performance of any agreement under this Mortgage and Lender, for that reason or by reason of paragraphs 20 and 21 of this Mortgage, shall have declared all sums secured by this Mortgage immediately due and payable.

**34.** **Additional Borrower Representations.** To induce Lender to enter into this Mortgage, the Note, and the other Loan Documents and to make the Loan, Borrower makes the following representations and warranties, which are deemed made as of both the date and the recordation of this Mortgage:

    **34.1.** **Capacity.** Borrower and the individuals executing Loan Documents on Borrower's behalf have the full power, authority, and legal right to execute and deliver, and to perform and observe the provisions of this Mortgage, the Note, the other Loan Documents, and any other document, agreement, certificate, or instrument executed in connection with the Loan, and to carry out the contemplated transactions.

    **34.2.** **Authority and Enforceability.** Borrower's execution, delivery, and performance of this Mortgage, the Note, the other Loan Documents, and any other document, agreement, certificate, or instrument executed in connection with the Loan have been duly authorized by all necessary corporate or other business entity action and do not and shall not require any registration with, consent, or approval of, notice to, or any action by any Person or Governmental Authority. Borrower has obtained or will obtain on or before the recordation of this Mortgage all necessary Governmental Authority and other approvals necessary for Borrower to comply with the Loan Documents. This Mortgage, the Note, and the other Loan Documents executed in connection with the Loan, when executed and delivered by Borrower, shall constitute the legal, valid, binding, and joint and several obligations of Borrower enforceable in accordance with their respective terms.

    **34.3.** **Compliance With Other Instruments.** The execution and delivery of this Mortgage and the other Loan Documents, and compliance with their respective terms, and the issuance of the Note and other Loan Documents as contemplated in this Mortgage, shall not result in a breach of any of the terms or conditions of, or result in the imposition of, any lien, charge, or encumbrance (except as created by this Mortgage and the other Loan Documents) on any properties of Borrower, or constitute a default (with due notice or lapse of time or both) or result in an occurrence of an event for which any holder or holders of indebtedness may declare the same due and payable under, any indenture, agreement, order, judgment, or instrument to which Borrower is a party or by which Borrower or its properties may be bound or affected.

    **34.4.** **Compliance With Law.** The execution and delivery of this Mortgage, the Note, and the other Loan Documents, or any other document, agreement, certificate, or instrument to which Borrower is bound in connection with the Loan, do not conflict with, result in a breach or default under, or create any lien or charge under any provision of any Governmental Requirements to which it is subject and shall not violate any of the Governmental Requirements.

---

24

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000547

**34.5.** **Material Adverse Events.** Since the date of the financial statements delivered to Lender before recordation of this Mortgage, neither the condition (financial or otherwise) nor the business of Borrower and the Mortgaged Property have been materially adversely affected in any way.

**34.6.** **Litigation.** There are no actions, suits, investigations, or proceedings pending or, to Borrower's knowledge after due inquiry and investigation, threatened against or affecting Borrower at law or in equity, before or by any Person or Governmental Authority, that, if adversely determined, would have a material adverse effect on the business, properties, or condition (financial or otherwise) of Borrower or on the validity or enforceability of this Mortgage, any of the other Loan Documents, or the ability of Borrower to perform under any of the Loan Documents.

**34.7.** **No Untrue Statements.** All statements, representations, and warranties made by Borrower in this Mortgage or any other Loan Document and any other agreement, document, certificate, or instrument previously furnished or to be furnished by Borrower to Lender under the Loan Documents (a) are and shall be true, correct, and complete in all material respects at the time they were made and on and as of the recordation of this Mortgage, (b) do not and shall not contain any untrue statement of a material fact, and (c) do not and shall not omit to state a material fact necessary to make the information in them neither misleading nor incomplete. Borrower understands that all such statements, representations, and warranties shall be deemed to have been relied on by Lender as a material inducement to make the Loan.

**34.8.** **Policies of Insurance.** Each copy of the insurance policies relating to the Mortgaged Property delivered to Lender by Borrower (a) is a true, correct, and complete copy of the respective original policy in effect on the date of this Mortgage, and no amendments or modifications of said documents or instruments not included in such copies have been made, except as stated in this paragraph 34.8 and (b) has not been terminated and is in full force and effect. Borrower is not in default in the observance or performance of its material obligations under said documents or instruments and Borrower has done all things required to be done as of the date of this Mortgage to keep unimpaired its rights thereunder.

**34.9.** **Financial Statements.** All financial statements furnished to Lender are true and correct in all material respects, are prepared in accordance with generally accepted accounting principles, and do not omit any material fact the omission of which makes such statement or statements misleading. There are no facts that have not been disclosed to Lender by Borrower in writing that materially or adversely affect or could potentially in the future affect the Mortgaged Property or the business prospects, profits, or condition (financial or otherwise) of Borrower or any guarantor or Borrower's abilities to perform the Obligations and pay the Indebtedness.

**34.10.** **Water Rights.** (a) Borrower is the sole owner of record of the Water Rights; (b) the Water Rights are appurtenant to the Mortgaged Property and are free and clear of all liens and encumbrances except as set forth in the title report described in paragraph 1.22; (c) the Water Rights are sufficient to satisfy all water requirements of the development of the Mortgaged Property as presently contemplated; (d) the Water Rights include all water rights appurtenant to the Mortgaged Property; (e) Borrower has received a water service commitment from the applicable local water district, guaranteeing water service for the Mortgaged Property in an amount necessary to satisfy the requirements for such property in its currently contemplated final state of development; and (f) on recordation of this Mortgage with the county recorder, Lender shall have a valid, first priority, perfected security interest in the Water Rights.

**34.11.** **Taxes.** Borrower has filed or caused to be filed all tax returns that are required to be filed by Borrower under the Governmental Requirements of each Governmental Authority with taxing power over Borrower, and Borrower has paid, or made provision for the payment of, all taxes, assessments, fees, and other governmental charges that have or may have become due under said returns, or otherwise, or under any assessment received by Borrower except that such taxes, if any, as are being contested in good faith and as to which adequate reserves (determined in accordance with generally accepted accounting principles) have been provided.

**34.12.** **Leases.** If the Mortgaged Property includes a leasehold estate, Borrower has not and shall not surrender, terminate, cancel, waive, accept waiver, change, supplement, grant subleases of, alter, surrender, or amend, and shall comply with all terms, covenants, and conditions in the Leasehold.

---

25

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000548

**34.13. Further Acts.** Borrower shall, at its sole cost and expense, and without expense to Lender, do, execute, acknowledge, and deliver all and every such further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers, and assurances as Lender shall from time to time require, for the purpose of better assuring, conveying, assigning, transferring, pledging, mortgaging, warranting, and confirming to Lender the Mortgaged Property and rights, and as to Lender the security interest as to the Personalty, conveyed or assigned by this Mortgage or intended now or later so to be, or for carrying out the intention or facilitating the performance of the terms of this Mortgage, or for filing, registering, or recording this Mortgage and, on demand, shall execute and deliver, and authorizes Lender to execute in the name of Borrower, to the extent it may lawfully do so, one or more financing statements, chattel mortgages, or comparable Mortgages, to evidence more effectively the lien of this Mortgage on the Mortgaged Property.

**34.14. Filing Fees.** Borrower shall pay all filing, registration, or recording fees, all Governmental Authority stamp taxes and other fees, taxes, duties, imposts, assessments, and all other charges incident to, arising from, or in connection with the preparation, execution, delivery, and enforcement of the Note, this Mortgage, the other Loan Documents, any supplemental deed of trust or mortgage, or any instrument of further assurance.

**34.15. Entity Compliance.** As long as it is the owner of the Mortgaged Property, Borrower, if a corporation, limited liability company, or partnership, shall do all things necessary to preserve and keep in full force and effect its existence, franchises, rights, and privileges as such entity under the laws of the state of its incorporation or formation, and shall comply with all Governmental Requirements of any Governmental Authority applicable to Borrower or to the Mortgaged Property or any part of it.

**35. Governing Law; Consent to Jurisdiction and Venue.** The validity of this Mortgage and its construction, interpretation, and enforcement, and the parties' rights under such documents and concerning the Mortgaged Property, shall be decided under, governed by, and construed in accordance with the laws of the State of Illinois. The Parties agree that all actions or proceedings arising in connection with this Mortgage shall be tried and litigated only in the state courts located in the county in which the property is located, or the applicable federal district court that covers said county. Borrower waives any right Borrower may have to assert the doctrine of forum non conveniens or to object to such venue.

Notwithstanding the foregoing, the Promissory Note and all other documents related to the transaction are, by agreement of the Parties, subject to the laws of the State of California. The Parties agree that jurisdiction and venue for any dispute, claim or controversy arising out of or relating to the Promissory Note and loan documents (other than with respect to the enforcement or foreclosure of this Mortgage) shall be Los Angeles County, California, and Borrower submits to personal jurisdiction in that forum for any and all purposes. Borrower waives any right Borrower may have to assert the doctrine of forum non conveniens or to object to such venue.

**36. Taxation of Mortgage.** In the event of the enactment of any law deducting from the value of the Mortgaged Property any mortgage lien on it, or imposing on Lender the payment of all or part of the taxes, charges, or assessments previously paid by Borrower under this Mortgage, or changing the law relating to the taxation of mortgages, debts secured by mortgages, or Lender's interest in the Mortgaged Property so as to impose new incidents of tax on Lender, then Borrower shall pay such taxes or assessments or shall reimburse Lender for them; provided, however, that if in the opinion of Lender's counsel such payment cannot lawfully be made by Borrower, then Lender may, at Lender's option, declare all sums secured by this Mortgage to be immediately due and payable without notice to Borrower. Lender may invoke any remedies permitted by this Mortgage.

**37. Mechanics' Liens.** Borrower shall pay from time to time when due, all lawful claims and demands of mechanics, materialmen, laborers, and others that, if unpaid, might result in, or permit the creation of, a lien on the Mortgaged Property or any part of it, or on the Rents arising therefrom, and in general shall do or cause to be done everything necessary so that the lien and security interest of this Mortgage shall be fully preserved, at Borrower's expense, without expense to Lender; provided, however, that if Governmental Requirements empower Borrower to discharge of record any mechanics', laborer's, materialman's, or other

---

26

SHATAR_CAP0000549

lien against the Mortgaged Property by the posting of a bond or other security, Borrower shall not have to make such payment if Borrower posts such bond or other security on the earlier of (a) 10 days after the filing or recording of same or (b) within the time prescribed by law, so as not to place the Mortgaged Property in jeopardy of a lien or forfeiture.

**38.** **Brokerage.** Borrower represents and warrants to Lender that Borrower has not dealt with any Person, other than parties identified in the final settlement statement approved by Lender and Borrower, who is or may be entitled to any finder's fee, brokerage commission, loan commission, or other sum in connection with the execution of this Mortgage, the consummation of the transactions contemplated by this Mortgage, or the making of the Loan secured by this Mortgage by Lender to Borrower, and Borrower indemnifies and agrees to hold Lender harmless from and against any and all loss, liability, or expense, including court costs and Attorney Fees, that Lender may suffer or sustain if such warranty or representation proves inaccurate in whole or in part.

**39.** **Liability for Acts or Omissions.** Lender shall not be liable or responsible for its acts or omissions under this Mortgage, except for Lender's own gross negligence or willful misconduct, or be liable or responsible for any acts or omissions of any agent, attorney, or employee of Lender, if selected with reasonable care.

**40.** **Notices.** Except for any notice required by Governmental Requirements to be given in another manner, (a) all notices required or permitted by the Loan Documents shall be in writing; (b) each notice shall be sent (i) for personal delivery by a delivery service that provides a record of the date of delivery, the individual to whom delivery was made, and the address where delivery was made; (ii) by certified United States mail, postage prepaid, return receipt requested; or (iii) by nationally recognized overnight delivery service, marked for next-business-day delivery; and (c) all notices shall be addressed to the appropriate party at its address as follows or such other addresses as may be designated by notice given in compliance with this provision:

|  |  |
|---|---|
| Lender: | See Exhibit "A" |
|  | At the address provided above |
| | |
| Borrower: | 7749-59 S. Yates LLC |
|  | At the address provided above |

Notices will be deemed effective on the earliest of (a) actual receipt; (b) rejection of delivery; or (c) if sent by certified mail, the third day on which regular United States mail delivery service is provided after the day of mailing or, if sent by overnight delivery service, on the next day on which such service makes next-business-day deliveries after the day of sending.

To the extent permitted by Governmental Requirements, if there is more than one Borrower, notice to any Borrower shall constitute notice to all Borrowers. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address(es).

**41.** **Statement of Obligations.** Except as otherwise provided by Governmental Requirements, at Lender's request, Borrower shall promptly pay to Lender such fee as may then be provided by law as the maximum charge for each statement of obligations. Lender's statement, Lender's demand, payoff statement, or other statement on the condition of, or balance owed, under the Note or secured by this Mortgage.

**42.** **Application of Payments.** Except as otherwise expressly provided by Governmental Requirements or any other provision of this Mortgage, all payments received by Lender from Borrower under the Loan Documents shall be applied by Lender in the following order: (a) costs, fees, charges, and advances paid or incurred by Lender or payable to Lender and interest under any provision of this Note or the Mortgage, in such order as Lender, in its sole and absolute discretion, elects, (b) interest payable under the Note, and (c) principal under the Note.

---

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000550

**43.** **Remedies Are Cumulative.** Each remedy in this Mortgage is separate and distinct and is cumulative to all other rights and remedies provided by this Mortgage or by Governmental Requirements, and each may be exercised concurrently, independently, or successively, in any order whatsoever.

**44.** **Obligations of Borrower Joint and Several.** If more than one Person is named as Borrower, each obligation of Borrower under this Mortgage shall be the joint and several obligations of each such Person.

**45.** **Severability.** If any provision of the Loan Documents, or the application of them to the circumstances, is held void, invalid, or unenforceable by a court of competent jurisdiction, the Loan Documents, and the applications of such provision to other parties or circumstances, shall not be affected thereby, the provisions of the Loan Documents being severable in any such instance.

**46.** **Delegation of Authority.** Whenever this Mortgage provides that Borrower authorizes and appoints Lender as Borrower's attorney-in-fact to perform any act for or on behalf of Borrower or in the name, place, and stead of Borrower, Borrower expressly understands and agrees that this authority shall be deemed a power coupled with an interest and such power shall be irrevocable.

**47.** **General Provisions.**

**47.1.** **Successors and Assigns.** Subject to paragraphs 19 and 20 of this Mortgage, this Mortgage applies to, inures to the benefit of, and binds, the respective heirs, legatees, devisees, administrators, executors, successors, and assigns of each party to this Mortgage.

**47.2.** **Meaning of Certain Terms.** As used in this Mortgage and unless the context otherwise provides, the words "herein," "hereunder" and "hereof" mean and include this Mortgage as a whole, rather than any particular provision of it.

**47.3.** **Authorized Agents.** In exercising any right or remedy, or taking any action provided in this Mortgage, Lender may act through its employees, agents, or independent contractors, as Lender expressly authorizes.

**47.4.** **Gender and Number.** Wherever the context so requires in this Mortgage, the masculine gender includes the feminine and neuter, the singular number includes the plural, and vice versa.

**47.5.** **Captions.** Captions and paragraph headings used in this Mortgage are for convenience of reference only, are not a part of this Mortgage, and shall not be used in construing it.

**47.6.** **Time Is of the Essence.** As a material inducement and consideration to the parties entering into this Mortgage, and but for this provision the parties would not enter into this Mortgage, the parties agree that the performance in a timely manner of each deadline set forth in this Mortgage before its expiration is of crucial importance to the parties. Failure by a party to timely perform an obligation before the deadline set forth in this Mortgage (no matter for what reason, nor how soon thereafter it may have been performed, nor the lack of prejudice to the other party as the result of such nonperformance) shall result in a default by the nonperforming party or the failure of a condition, as appropriate. The parties expressly waive any equitable relief with respect to a missed deadline.

**48.** **Leasehold Provisions.**

**48.1.** **Leasehold Estate.** If the security for this Mortgage is a leasehold estate demised by a lease (the "Leasehold"), this Mortgage shall be a lien on all present and future right, title, estate, and interest of Borrower in the Mortgaged Property and Improvements covered by the Leasehold and on all Mortgaged Property interests acquired by Borrower as a result of the exercise of any option in the Leasehold or as amended, in the same manner and to the same extent as if the Mortgaged Property encompassed in the Leasehold and option agreements had been held in fee by Borrower at the time of the execution of this Mortgage, and Borrower agrees not to amend, change, or modify its leasehold interest, or any of its terms, or to exercise any option to purchase, or agree to do so, without having obtained Lender's prior written consent. In a violation of this provision, Lender may, at its option, declare all sums secured by this Mortgage immediately due and payable. Consent to any amendment, change, or modification, or a waiver of the right to require such consent in one instance, shall not be a waiver of the right to require such consent at a subsequent time. The term "Mortgaged Property" as used in this Mortgage means such leasehold estate or any other present or future interest of Borrower in the Mortgaged Property whenever the context requires.

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000551

**48.2.** **Compliance With Leasehold.** In the event that the security for this Mortgage is a leasehold estate, Borrower covenants and agrees as follows: (a) to promptly and faithfully observe, perform, and comply with all Leasehold terms, covenants, and provisions on its part to be observed, performed, and complied with, at the times set forth in the Leasehold; (b) not to do, permit, suffer, or refrain from doing anything, as a result of which, there would be a default under or breach of any of the terms of the Leasehold; (c) not to cancel, surrender, modify, amend, or in any way alter or permit the alteration of any of the terms of the Leasehold; (d) to give Lender immediate notice of any default by anyone under the Leasehold and to promptly deliver to Lender copies of each notice of default and all other notices, communications, plans, specifications, and other similar instruments received or delivered by Borrower in this connection; (e) to furnish to Lender such information and evidence as Lender may reasonably require for Borrower's due observance, performance, and compliance with the Leasehold terms, covenants, and provisions; (f) that any default of the tenant under the Leasehold shall constitute an Event of Default under this Mortgage; and (g) to give immediate written notice to Lender of the commencement of any remedial proceedings under the Leasehold by any party to it and, if required by Lender, to permit Lender as Borrower's attorney-in-fact to control and act for Borrower in any such remedial proceedings. Borrower expressly transfers and assigns to Lender the benefit of all covenants in the Leasehold, whether or not such covenants run with the land, but Lender shall have no liability with respect to such covenants or any other covenants in the Leasehold.

**48.3.** **Borrower's Warranties and Representations.** With respect to the Leasehold, Borrower warrants and represents as follows: (a) the Leasehold is in full force and effect, unmodified by any writing or otherwise, except as specifically set forth in Exhibit B; (b) all rent, additional rent, and other charges reserved in the Leasehold have been paid to the extent they are payable to the date of this Mortgage; (c) Borrower enjoys the quiet and peaceful possession of the Mortgaged Property demised by the Leasehold; (d) Borrower is not in default under any Leasehold term and, to the best of its knowledge, there are no circumstances that, with the passage of time or the giving of notice or both, would constitute an Event of Default under the Leasehold; (e) to the best of Borrower's knowledge, the landlord under the Leasehold is not in default under any Leasehold term or provision the landlord is required to observe or perform.

**48.4.** **Assignments to Lender.** If Borrower files any petition or action for relief under any bankruptcy, reorganization, insolvency, moratorium law, or any other law or laws for the relief of or relating to debtors, on demand by Lender, Borrower covenants to transfer and assign to Lender its leasehold estate and the Leasehold in lieu of rejection of the Leasehold by Borrower and covenants to assign to Lender its right to accept or reject the Leasehold and to apply for any extension of time within which to accept or reject the Leasehold. These assignments to Lender shall be automatic on Lender's demand. If Lender demands the assignment of the Leasehold under this Mortgage, Lender covenants to cure any defaults outstanding under the Leasehold after the Leasehold is assigned to Lender.

**48.5.** **Default Under Leasehold.** If Borrower defaults in performing any of its obligations under the Leasehold, including, without limitation, any default in the payment of rent and other charges and impositions made payable by the tenant under the Leasehold, then, in each and every case, Lender may, at its option and without notice, cause the default or defaults to be remedied and otherwise exercise any and all of the rights of Borrower under the Leasehold in the name of and on behalf of Borrower. Borrower shall, on demand, reimburse Lender for all advances made and expenses incurred by Lender in curing any such default (including, without limitation, reasonable Attorney Fees), together with interest computed at the rate provided for in the Note from the date that an advance is made or expense is incurred, to and including the date the same is paid. Lender shall have no duty to prevent the termination of the leasehold estate by the landlord. If the landlord terminates the leasehold estate, Lender shall have the right, at its option, to declare all sums secured by this Mortgage immediately due and payable and immediately bring an action on the Note, provided there is no other real property security for the Note.

**48.6.** **Options.** Borrower shall give Lender notice of its intention to exercise each and every option to extend the term of the Leasehold at least 20 days but not more than 60 days before expiration of the time to exercise such option under the Leasehold. If Borrower intends to extend the term of the Leasehold, it shall deliver to Lender, with the notice of such decision, a copy of the notice of extension

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000552

delivered to the landlord under the Leasehold. If Borrower does not intend to extend the term of the Leasehold, Lender may, at its option, exercise the option to extend in the name and on behalf of Borrower.

**48.7.** **No Merger/Attorney-in-Fact.** It is hereby agreed that the fee title, the leasehold estate, and the subleasehold estate in the Mortgaged Property demised by the Leasehold shall not merge but shall be kept separate and distinct, despite the union of these estates in either the landlord under the Leasehold, Borrower, or a third party, whether by purchase or otherwise. If Borrower acquires the fee title or any other estate, title, or interest in the Mortgaged Property demised by the Leasehold or any part of it, the lien of this Mortgage shall attach to, cover, and be a lien on such acquired estate, title, or interest and it shall simultaneously be and become a part of the Mortgaged Property with the same force and effect as if specifically encumbered in this Mortgage. Borrower agrees to execute all instruments and documents that Lender may reasonably require to ratify, confirm, and further evidence Lender's lien on the acquired estate, title, or interest. Furthermore, Borrower appoints Lender as its true and lawful attorney-in-fact to execute and deliver all such instruments and documents in the name and on behalf of Borrower. This power, being coupled with an interest, shall be irrevocable as long as any amounts secured by this Mortgage remain unpaid.

**48.8.** **Interests in Successor Leasehold.** If the Leasehold is canceled or terminated, and if Lender or its nominee shall acquire an interest in any new lease of the Mortgaged Property demised by the Leasehold, Borrower shall have no right, title, or interest in or to the new lease or the leasehold estate created by such new lease.

**48.9.** **Estoppel Certificate.** Borrower shall use its best efforts to obtain and deliver to Lender, within 20 days after written demand by Lender, an estoppel certificate from the landlord under the Leasehold setting forth (a) the name of the tenant under the Leasehold, (b) that the Leasehold has not been modified or, if it has been modified, the date of each modification (together with copies of each such modification), (c) the basic rent payable under the Leasehold, (d) the date to which the tenant paid all rental charges under the Leasehold, and (e) whether there are any alleged defaults of the tenant under the Leasehold and, if there are, setting forth their nature in reasonable detail.

**48.10.** **Limitations on Lender's Liability Under Leasehold.** Despite anything to the contrary in this Mortgage, this Mortgage shall not constitute an assignment of the Leasehold within the meaning of any provision of the Leasehold prohibiting its assignment, and Lender shall have no liability or obligation under the Leasehold because of its acceptance of this Mortgage. Lender shall be liable for the tenant's obligations arising under the Leasehold for only that period of time that Lender is in possession of the Mortgaged Property covered by the Leasehold or has acquired, by foreclosure or otherwise, and is holding all of Borrower's right, title, and interest in the Mortgaged Property covered by the Leasehold.

**49.** **Contractual Right to Appoint a Receiver Upon Default.** Upon an Event of Default under this Mortgage or a breach of any clause of any agreement signed in connection with the loan to Trustor, Trustor agrees that Lender may appoint a receiver to control the Mortgaged Property within seven (7) days of any default. Trustor agrees to cooperate with the receiver and turn over all control to said receiver and otherwise cooperate with the receiver appointed by Lender.

**50.** **Dispute Resolution: Waiver of Right to Jury Trial**

**50.1** **WAIVER OF RIGHT TO JURY TRIAL.** TO THE EXTENT PERMITTED BY APPLICABLE LAW, BORROWER AND LENDER AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED ON OR ARISING FROM THIS MORTGAGE. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. BORROWER AND, BY ITS ACCEPTANCE OF THE BENEFITS OF THIS MORTGAGE, LENDER EACH (A) ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR BORROWER AND LENDER TO ENTER INTO A BUSINESS RELATIONSHIP, THAT BORROWER AND LENDER HAVE ALREADY RELIED ON

---

30

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000553

THIS WAIVER BY ENTERING INTO THIS MORTGAGE OR ACCEPTING ITS BENEFITS, AS THE CASE MAY BE, AND THAT EACH SHALL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS, AND (B) FURTHER WARRANTS AND REPRESENTS THAT EACH HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS MORTGAGE.

BORROWER'S INITIALS:

**50.2    ARBITRATION.** TO THE EXTENT A PREDISPUTE WAIVER OF THE RIGHT TO TRIAL BY JURY IS NOT ENFORCEABLE UNDER APPLICABLE LAW, ANY AND ALL DISPUTES, CONTROVERSIES OR CLAIMS ARISING OUT OF OR RELATING TO THIS MORTGAGE AND OTHER LOAN DOCUMENTS OR TRANSACTIONS CONTEMPLATED THEREBY, INCLUDING, WITHOUT LIMITATION, THE MAKING, PERFORMANCE, OR INTERPRETATION OF THIS MORTGAGE OR OTHER LOAN DOCUMENTS, SHALL BE RESOLVED BY BINDING ARBITRATION. UNLESS OTHERWISE AGREED ON, THE ARBITRATION SHALL BE CONDUCTED IN ACCORDANCE WITH THE THEN-CURRENT ARBITRATION PROCEDURES SET FORTH IN THE ILLINOIS RULES OF CIVIL PROCEDURE AND LOCAL SUPPLEMENTARY RULES THEN IN EFFECT. JUDGMENT ON THE ARBITRATION AWARD MAY BE ENTERED IN ANY COURT HAVING JURISDICTION. UNLESS OTHERWISE AGREED BY THE PARTIES, THE ARBITRATION SHALL BE HELD BEFORE A SINGLE ARBITRATOR SELECTED AS FOLLOWS: THE DISPUTING PARTIES SHALL, WITHIN TEN (10) BUSINESS DAYS FROM THE DATE ARBITRATION IS REQUESTED BY EITHER PARTY, AGREE UPON AN ARBITRATOR. IF THE PARTIES CANNOT SO AGREE, THEN EACH PARTY, WITHIN FIVE (5) BUSINESS DAYS THEREAFTER, SHALL NAME AN ARBITRATOR WHO SHALL BE AN ATTORNEY LICENSED TO PRACTICE IN ILLINOIS AND EXPERIENCED AND QUALIFIED IN REAL ESTATE MATTERS OF THE TYPE CONTEMPLATED BY THIS MORTGAGE AND OTHER LOAN DOCUMENTS OR A RETIRED ILLINOIS SUPERIOR OR APPELLATE COURT JUDGE. THOSE TWO NAMED ARBITRATORS SHALL THEN, WITHIN FIVE (5) BUSINESS DAYS, SELECT A THIRD ARBITRATOR WHO SHALL BE QUALIFIED AS DEFINED ABOVE, AND SUCH THIRD ARBITRATOR SHALL BE THE SOLE ARBITRATOR TO HEAR AND DETERMINE THE DISPUTE. IF ANY PARTY HERETO FAILS TO NAME AN ARBITRATOR WITHIN THE TIME LIMIT PROVIDED IN THIS PARAGRAPH, THEN THE ARBITRATOR TIMELY NAMED BY THE OTHER PARTY SHALL HEAR AND DECIDE THE DISPUTE. IF THE ARBITRATION IS COMMENCED, THE PARTIES AGREE TO PERMIT DISCOVERY PROCEEDINGS OF THE TYPE PROVIDED BY THE ILLINOIS CODE OF CIVIL PROCEDURE BOTH IN ADVANCE OF, AND DURING RECESSES OF, THE ARBITRATION HEARINGS. ALL FACTS AND OTHER INFORMATION RELATING TO ANY ARBITRATION ARISING UNDER THIS DECLARATION SHALL BE KEPT CONFIDENTIAL TO THE FULLEST EXTENT PERMITTED BY LAW. THE DECISION OR THE ARBITRATOR(S) SHALL FOLLOW THE LAW, SHALL BE RENDERED WITHIN TEN (10) BUSINESS DAYS FOLLOWING THE CONCLUSION OF THE ARBITRATION, AND SHALL BE SET FORTH IN A WRITTEN OPINION STATING THE FINDINGS OF FACT OR THE ARBITRATOR(S) AND LEGAL AUTHORITIES THAT ARE THE BASIS OF THE DECISION. THE VENUE FOR ANY SUCH ARBITRATION SHALL BE THE COUNTY IN WHICH BENEFICIARY'S OFFICE AT THE ADDRESS SET FORTH HEREIN IS SITUATED. THE COSTS OF THE ARBITRATOR(S) SHALL BE SPLIT EQUALLY BY THE PARTIES BUT SHALL BE A RECOVERABLE COST FOR THE PARTY PREVAILING IN THE ARBITRATION.

31

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000554

**50.3   PROVISIONAL REMEDIES; FORECLOSURE AND INJUNCTIVE RELIEF.**
Nothing in Section 50.2, above, shall be deemed to apply to or limit the right of Lender to: (a) exercise self help remedies, (b) foreclose judicially or nonjudicially against any real or personal property collateral, or to exercise judicial or nonjudicial power of sale rights, (c) obtain from a court provisional or ancillary remedies (including, but not limited to, injunctive relief, a writ of possession, prejudgment attachment, a protective order or the appointment of a receiver) or (d) pursue rights against Borrower or any other party in a third party proceeding in any action brought against Lender (including, but not limited to, actions in bankruptcy court). Lender may exercise the rights set forth in the foregoing clauses (a) through (d), inclusive, before, during, or after the pendency of any proceeding referred to in Section 50.2, above. Neither the exercise of self help remedies nor the institution or maintenance of an action for foreclosure or provisional or ancillary remedies or the opposition to any such provisional remedies shall constitute a waiver of the right of any Borrower, Lender or any other party, including, but not limited to, the claimant in any such action, to require submission the dispute, claim or controversy occasioning resort to such remedies to any proceeding referred to in Section 50.2, above.

**51.   Illinois Collateral Protection Act Disclosure.**

"Unless you provide us with evidence of the insurance coverage required by your agreement with us, we may purchase insurance at your expense to protect our interests in your collateral. This insurance may, but need not, protect your interests. The coverage that we purchase may not pay any claim that you make or any claim that is made against you in connection with the collateral. You may later cancel any insurance purchased by us, but only after providing us with evidence that you have obtained insurance as required by our agreement. If we purchase insurance for the collateral, you will be responsible for the costs of that insurance, including interest and any other charges we may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to your total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance you may be able to obtain on your own."

**52.   Waiver of Homestead Exemption.** Borrower hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Illinois as to all Indebtedness secured by this Mortgage.

**53.   Waiver of Right of Redemption.** NOTWITHSTANDING ANY OF THE PROVISIONS TO THE CONTRARY CONTAINED IN THIS MORTGAGE, BORROWER HEREBY WAIVES, TO THE EXTENT PERMITTED UNDER 735 ILCS 5/15-1601(b) OR ANY SIMILAR LAW EXISTING AFTER THE DATE OF THIS MORTGAGE, ANY AND ALL RIGHTS OF REDEMPTION ON BORROWER'S BEHALF AND ON BEHALF OF ANY OTHER PERSONS PERMITTED TO REDEEM THE MORTGAGED PROPERTY.

*[Signature page follows]*

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

 Rev. 10/14
Borrower's Initials

SHATAR_CAP0000555

IN WITNESS WHEREOF, Borrower has executed and delivered this Mortgage as of the date first written above.

**BORROWER:**

**7749-59 S. YATES LLC, AN ILLINOIS**
**LIMITED LIABILITY COMPANY**

Jerome H. Cohen, Manager of Offsite
Asset Management II, LLC, a
Wyoming limited liability company,
Manager of 7749-59 S. Yates LLC, an
Illinois limited liability company

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000556

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of __Florida__ )
County of __manatee__ )
On __march 29, 2017__ before me, __Jessica Ann Baier__
  Date                         Here Insert Name and Title of the Officer
Personally Appeared __Jerry Cohen__ 
                         Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

**JESSICA ANN BAIER**
MY COMMISSION #FF019714
EXPIRES July 26, 2017
FloridaNotaryService.com
(407) 398-0153

I certify under PENALTY OF PERJURY under the laws of the State of __Florida__ that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature __Jessica Ann Baier__
         *Signature of Notary Public*

34

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000557

<u>Exhibit "A"</u>
Beneficiary List

**1111 Crest Dr. LLC, a California limited liability company, as to undivided 50%
ownership** – Address: 6551 Van Nuys Blvd., Mezzanine Floor, Van Nuys CA 91401
**Abraham Aaron Ebriani, a Single man, as to undivided 14% ownership** - Address: P.O.
Box 1577, Torrance, CA 90505
**Hamid Esmail , a Single man, as to undivided 14% ownership** – Address: P.O. Box 104,
Bakersfield, CA 93302
**Farsaa Inc., a California company, as to undivided 22% ownership** – Address: 1760
Roscomare Rd. Los Angeles, CA 90077

35

SHATAR_CAP0000558

Exhibit "B"
Legal Description

# COOK COUNTY
# RECORDER OF DEEDS

# COOK COUNTY
# RECORDER OF DEEDS

# COOK COUNTY
# RECORDER OF DEEDS

---

36

© 2007 Geraci Law Firm; All Rights Reserved.
*Mortgage*

Rev. 10/14
Borrower's Initials

SHATAR_CAP0000559

<u>Legal Description</u>

LOTS 19, 20 AND 21 IN BLOCK 12 IN SOUTH SHORE PARK, BEING A SUBDIVISION OF THE WEST HALF OF THE SOUTHWEST QUARTER OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

**EXHIBIT NO. 14**

# Illinois Anti-Predatory Lending Database Program

## Certificate of Exemption



**Report Mortgage Fraud**
**844-768-1713**

*1717413022*

Doc# 1717413022 Fee $52.00

RHSP FEE:$9.00 RPRF FEE: $1.00

KAREN A.YARBROUGH

COOK COUNTY RECORDER OF DEEDS

DATE: 06/23/2017 10:56 AM PG: 1 OF 8

| | |
|---|---|
| The property identified as: | **PIN:** 21-30-318-013-0000 |

**Address:**
**Street:** 7749-59 S. YAtes Ave

**Street line 2:**

**City:** Chicago  **State:** IL  **ZIP Code:** 60649

**Lender:** The Persons Listed on Exhibit A to the Mortgage c/o EquityBuild Finance, LLC

**Borrower:** 7749-59 S. Yates, LLC

**Loan / Mortgage Amount:** $2,860,000.00

This property is located within the program area and is exempt from the requirements of 765 ILCS 77/70 et seq. because it is not owner-occupied.

**Exhibit**

**15**

**Certificate number:** FBC372B1-2DDB-4E6C-98FA-1C795C599B19  **Execution date:** 3/14/2017

SHATAR_CAP0000830

Mail To: + *Prepared by:*
*EquityBuild Finance, LLC*
*5068 W. Plano Pkwy, #300*
*Plano, TX 75093* _____[The Above Space For Recorder's Use Only]_____

## MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on March 14th, 2017. The mortgagor is 7749-59 S. Yates, LLC ("Borrower").

This Security Instrument is given to The Persons Listed on Exhibit A to the Mortgage C/O EquityBuild Finance, LLC whose address is 5068 West Plano Pkwy. #300 Plano, TX 75093 ("Lender").

Borrower owes Lender the principal sum of Two Million Eight Hundred Sixty and 00/100 Dollars (U.S. $2,860,000.00). This debt is evidenced by Borrower's notes as this Security Instrument (Mortgage), which provides for a final payment of the full debt, if not paid earlier, due and payable September 1st, 2018 unless otherwise specified on the notes. This Security Instrument secures to Lender:
(a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extension and modifications; (b) the payment of all other sums, with interest advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in COOK COUNTY, Illinois:

PIN: 21-30-318-013-0000

which has the address of 7749-59 S Yates Ave. Chicago, IL 60649 ("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents, royalties, mineral, oil and gas rights and profits, water rights and stock and all fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANT. Borrower and Lender covenant and agree as follows:

1. Payment of Principal and Interest; Prepayment and Late Charges. Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. Hazard Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration and repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 19 the property is acquired by Lender, Borrower's rights to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of sums secured by this Security Instrument immediately prior to the acquisition.

3. Preservation and Maintenance of Property; Leaseholds. Borrower shall not destroy, damage or substantially change the Property, allow the Property to deteriorate or commit waste. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease, and if Borrower acquires fee title to the Property, the leasehold and fee title shall not merge unless Lender agrees to the merger in writing.

SHATAR_CAP0000832

4. Protection of Lender's Rights in the Property; Mortgage Insurance. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees, and entering on the Property to make repairs. Although Lender may take action under this paragraph 4, Lender does not have to do so.

5. Successor and Assigns Bound; Joint and Several Liability; Co-signers. The covenants and agreements of this Security Interest shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 9. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey the Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forebear or make any accommodations with regard to the terms of this Security Instrument or the Note without the Borrower's consent.

6. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

7. Governing Law; Severability. This Security Instrument shall be governed by federal law and the law of jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

8. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

9. Transfer of the Property or a beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

10. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

11. Assignment of Rents and Leases. As additional security for the payment of the Indebtedness, Mortgagor assigns and transfers to Mortgagee, pursuant to 1953 PA 210, as amended by 1966 PA 151 (MCLA 554.231 et seq., MSA 26.1137(1) et seq.), all the rents, profits, and income under all leases, occupancy agreements, or arrangements upon or affecting the Premises (including any extensions or amendments) now in existence or coming into existence during the period this Mortgage is in effect. This assignment shall run with the land and be good and valid as against Mortgagor and those claiming under or through Mortgagor. This assignment shall continue to be operative during foreclosure or any other proceedings to enforce this Mortgage. If a foreclosure sale results in a deficiency, this assignment shall stand as security during the redemption period for the payment of the deficiency. This assignment is given only as collateral security and shall not be construed as obligating Mortgagee to perform any of the covenants or undertakings required to be performed by Mortgagor in any leases. In the event of default in any of the terms or covenants of this Mortgage, Mortgagee shall be entitled to all of the rights and benefits of MCLA 554.231-.233, MSA 26.1137(1)-(3), and 1966 PA 151, and Mortgagee shall be entitled to collect the rents and income from the Premises, to rent or lease the Premises on the terms that it may deem best, and to maintain proceedings to recover rents or possession of the Premises from any tenant or trespasser. Mortgagee shall be entitled to enter the Premises for the purpose of delivering notices or other communications to the tenants and occupants. Mortgagee shall have no liability to Mortgagor as a result of those acts. Mortgagee may deliver all of the notices and communications by ordinary first-class U.S. mail. If Mortgagor obstructs Mortgagee in its efforts to collect the rents and income from the Premises or unreasonably refuses or neglects to assist Mortgagee in collecting the rent and income, Mortgagee shall be entitled to appoint a receiver for the Premises and the income, rents, and profits, with powers that the court making the appointment may confer. Mortgagor shall at no time collect advance rent in excess of one month under any lease pertaining to the Premises, and Mortgagee shall not be bound by any rent prepayment made or received in violation of this paragraph. Mortgagee shall not have any obligation to collect rent or to enforce any other obligations of any tenant or occupant of the Premises to Mortgagor. No action taken by Mortgagee under this paragraph shall cause Mortgagee to become a "mortgagee in possession."

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

BORROWER: 7749-59 S. YATES, LLC

_____(SEAL)
Jerry Cohen, Manager

_____[Space Below This Line For Acknowledgement]_____

SHATAR_CAP0000834

STATE OF FLORIDA, Manatee_____ County ss:

I hereby certify that on this day, before me, an officer duly authorized in the state aforesaid and in the county aforesaid to take acknowledgements, personally appeared Jerry Cohen, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he/she executed the same for the purpose therein expressed.

WITNESS my hand and official seal in the county and state aforesaid this 14th day of March____, 2017.

My Commission expires: July 26, 2017

{Seal}

_Jessica Ann Baier_____
Notary Public

JESSICA ANN BAIER
MY COMMISSION #FF019714
EXPIRES July 26, 2017
(407) 398-0153    FloridaNotaryService.com

## Exhibit A

| Lender Name | Principal Amount | Percentage of Loan |
|---|---|---|
| Advanta IRA Services, LLC FBO Dwight L. Plymale IRA #8006189 | $97,000 | 3.35% |
| American Estate & Trust FBO Donald R Hendrickson IRA | $10,000 | 0.35% |
| American Estate & Trust FBO Karen L Hendrickson IRA | $10,000 | 0.35% |
| American Estate & Trust LC, FBO Lynn Kupfer's IRA | $100,000 | 3.45% |
| American Estate and Trust, LC FBO Edward J. Netzel IRA | $10,000 | 0.35% |
| Amit Hammer | $30,000 | 1.04% |
| Cadaval Investment Trust FBO Manuel Cadaval Solo 401k. | $25,000 | 0.86% |
| Clearwood Funding, LLC | $50,000 | 1.73% |
| David M. Harris | $100,000 | 3.45% |
| Duke E. Heger and Viviana Heger | $35,000 | 1.21% |
| Ed Bancroft | $5,000 | 0.17% |
| EquityBuild, Inc. | $989,000 | 34.13% |
| Grathia Corporation | $100,000 | 3.45% |
| iPlan Group Agent for Custodian FBO Christopher Mora IRA | $6,000 | 0.21% |
| iPlan Group Agent for Custodian FBO Dana Speed IRA | $169,000 | 5.83% |
| iPlan Group Agent for Custodian FBO Filomena Mora IRA | $3,200 | 0.11% |
| iPlan Group Agent for Custodian FBO Joshua Mora IRA | $4,000 | 0.14% |
| iPlan Group Agent for Custodian FBO Rama Voddi IRA | $33,000 | 1.14% |
| iPlan Group Agent for Custodian FBO Rosa Ricciardi IRA | $16,700 | 0.58% |
| iPlanGroup Agent for Custodian FBO Janice G. Burrell IRA | $50,000 | 1.73% |
| iPlanGroup Agent for Custodian FBO Paula Levand IRA | $12,000 | 0.41% |
| iPlanGroup Agent for Custodian FBO Teena Ploeger IRA | $18,500 | 0.64% |
| iPlanGroup Agent for Custodian FBO Todd Colucey IRA | $8,000 | 0.28% |
| John E. Bloxham | $35,000 | 1.21% |
| John Witzigreuter | $50,000 | 1.73% |
| Joseph P. McCarthy | $10,000 | 0.35% |
| Joshua A. Lapin | $25,000 | 0.86% |
| Keith P. Rowland and Jane E. Rowland. | $50,000 | 1.73% |
| Keith Randall | $70,000 | 2.42% |
| Kevin D. & Laura H. Allred JTWROS | $50,000 | 1.73% |
| KKW Investments, LLC | $3,000 | 0.10% |
| Madison Trust Company custodian FBO Guenter Scheel IRA M1702087 | $25,000 | 0.86% |
| Madison Trust Company Custodian FBO James R. Talman IRA | $20,000 | 0.69% |
| Manuel Cadaval | $25,000 | 0.86% |
| Manuel Cadaval Custodian for Jacob A. Cadaval. | $25,000 | 0.86% |
| Michael F. Grant & L. Gretchen Grant Revocable Trust Dated March 16 2012 | $50,000 | 1.73% |
| Michael Grow Jr. | $100,000 | 3.45% |
| Naveen Kwatra | $25,000 | 0.86% |
| Optima Property Solutions, LLC | $100,000 | 3.45% |
| Patrick Connely | $20,000 | 0.69% |
| PNW Investments, LLC | $12,000 | 0.41% |
| Quantum Growth Holdings, LLC | $5,500 | 0.19% |
| Raymond Thompson Investment Trust, LLC | $30,000 | 1.04% |
| Seadog Properties, LLC | $24,000 | 0.83% |
| Shlomo Zussman | $25,000 | 0.86% |
| Steve Weera Tonasut and Esther Kon Tonasut as Trustees of the Tonasut Family Trust dated June 14, 2004 | $50,000 | 1.73% |
| Steven G. Mouty Trust | $50,000 | 1.73% |
| Summit Trust Company, Trustee David R Theil MD PS PL Profit Sharing Keogh FBO David R Theil Plan Administrator | $25,000 | 0.86% |
| Tolu Makinde | $30,000 | 1.04% |
| Wesley Pittman | $32,000 | 1.10% |
| White Tiger Revocable Trust | $50,000 | 1.73% |

Lots 19, 20 and 21 in Block 12 in South Shore Park, a subdivision of the West ½ of the Southwest ¼ of Section 30, Township 38 North, Range 15, East of the Third Principal Meridian, in Cook County, Illinois

COOK COUNTY
RECORDER OF DEEDS

COOK COUNTY
RECORDER OF DEEDS

SHATAR_CAP0000837

# Illinois Anti-Predatory Lending Database Program

## Certificate of Exemption



Doc# 1701318125 Fee $54.00

RHSP FEE:$9.00 RPRF FEE: $1.00

KAREN A.YARBROUGH

COOK COUNTY RECORDER OF DEEDS

DATE: 01/13/2017 01:45 PM PG: 1 OF 9

**Report Mortgage Fraud**
**800-532-8785**

---

The property identified as:   **PIN:** 20-15-317-040-0000

**Address:**
**Street:**        6160-6260 S Martin Luther King Dr
**Street line 2:**
**City:** Chicago        **State:** IL        **ZIP Code:** 60637

**Lender:** The Persons Listed on Exhibit A to the Mortgage c/o EquityBuild Finance, LLC

**Borrower:** EquityBuild, Inc.

**Loan / Mortgage Amount:** $4,370,000.00

This property is located within the program area and is exempt from the requirements of 765 ILCS 77/70 et seq. because it is not owner-occupied.

**Exhibit**

**16**

**Certificate number:** 7B3CB5AE-3336-4540-AE09-3BFB080EB25A        **Execution date:** 11/9/2016

Mail To: + *Prepared by:*
Equity Build Finance, LLC
5068 W. Plano Pkwy, #300
Plano, TX 75093

_____[The Above Space For Recorder's Use Only]_____

## MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on November 9th, 2016. The mortgagor is EquityBuild, Inc. ("Borrower").

This Security Instrument is given to The Persons Listed on Exhibit A to the Mortgage C/O EquityBuild Finance, LLC whose address is 5068 West Plano Pkwy. #300 Plano, TX 75093 ("Lender").

Borrower owes Lender the principal sum of Four Million Three Hundred Seventy Thousand and 00/100 Dollars (U.S. $4,370,000.00). This debt is evidenced by Borrower's note dated the same date as this Security Instrument (Mortgage), which provides for a final payment of the full debt, if not paid earlier, due and payable May 1st, 2018. This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extension and modifications; (b) the payment of all other sums, with interest advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in COOK County, Illinois:

PIN: 20-15-317-040-0000
20-15-317-039-0000

which has the address of 6160-6260 S Martin Luther King Dr., Chicago, IL 60637 ("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents, royalties, mineral, oil and gas rights and profits, water rights and stock and all fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANT. Borrower and Lender covenant and agree as follows:

1. Payment of Principal and Interest; Prepayment and Late Charges. Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. Hazard Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration and repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 19 the property is acquired by Lender, Borrower's rights to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of sums secured by this Security Instrument immediately prior to the acquisition.

3. Preservation and Maintenance of Property; Leaseholds. Borrower shall not destroy, damage or substantially change the Property, allow the Property to deteriorate or commit waste. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease, and if Borrower acquires fee title to the Property, the leasehold and fee title shall not merge unless Lender agrees to the merger in writing.

4. Protection of Lender's Rights in the Property; Mortgage Insurance. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees, and entering on the Property to make repairs. Although Lender may take action under this paragraph 4, Lender does not have to do so.

5. Successor and Assigns Bound; Joint and Several Liability; Co-signers. The covenants and agreements of this Security Interest shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 9. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey the Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forebear or make any accommodations with regard to the terms of this Security Instrument or the Note without the Borrower's consent.

6. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

7. Governing Law; Severability. This Security Instrument shall be governed by federal law and the law of jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

8. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

9. Transfer of the Property or a beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

10. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

11. Assignment of Rents and Leases. As additional security for the payment of the Indebtedness, Mortgagor assigns and transfers to Mortgagee, pursuant to 1953 PA 210, as amended by 1966 PA 151 (MCLA 554.231 et seq., MSA 26.1137(1) et seq.), all the rents, profits, and income under all leases, occupancy agreements, or arrangements upon or affecting the Premises (including any extensions or amendments) now in existence or coming into existence during the period this Mortgage is in effect. This assignment shall run with the land and be good and valid as against Mortgagor and those claiming under or through Mortgagor. This assignment shall continue to be operative during foreclosure or any other proceedings to enforce this Mortgage. If a foreclosure sale results in a deficiency, this assignment shall stand as security during the redemption period for the payment of the deficiency. This assignment is given only as collateral security and shall not be construed as obligating Mortgagee to perform any of the covenants or undertakings required to be performed by Mortgagor in any leases. In the event of default in any of the terms or covenants of this Mortgage, Mortgagee shall be entitled to all of the rights and benefits of MCLA 554.231-.233, MSA 26.1137(1)-(3), and 1966 PA 151, and Mortgagee shall be entitled to collect the rents and income from the Premises, to rent or lease the Premises on the terms that it may deem best, and to maintain proceedings to recover rents or possession of the Premises from any tenant or trespasser. Mortgagee shall be entitled to enter the Premises for the purpose of delivering notices or other communications to the tenants and occupants. Mortgagee shall have no liability to Mortgagor as a result of those acts. Mortgagee may deliver all of the notices and communications by ordinary first-class U.S. mail. If Mortgagor obstructs Mortgagee in its efforts to collect the rents and income from the Premises or unreasonably refuses or neglects to assist Mortgagee in collecting the rent and income, Mortgagee shall be entitled to appoint a receiver for the Premises and the income, rents, and profits, with powers that the court making the appointment may confer. Mortgagor shall at no time collect advance rent in excess of one month under any lease pertaining to the Premises, and Mortgagee shall not be bound by any rent prepayment made or received in violation of this paragraph. Mortgagee shall not have any obligation to collect rent or to enforce any other obligations of any tenant or occupant of the Premises to Mortgagor. No action taken by Mortgagee under this paragraph shall cause Mortgagee to become a "mortgagee in possession."

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

BORROWER: EquityBuild, Inc.

_____ (SEAL)
Jerry Cohen, President


_____[Space Below This Line For Acknowledgement]_____

STATE OF FLORIDA, _Manatee_ County ss:

    I hereby certify that on this day, before me, an officer duly authorized in the state aforesaid and in the county aforesaid to take acknowledgements, personally appeared <u>Jerry Cohen</u>, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he/she executed the same for the purpose therein expressed.

    WITNESS my hand and official seal in the county and state aforesaid this _9th_ day of _November_, 20 16.

My Commission expires: July 26, 2017

    {Seal}

_Jessica Ann Baier_
Notary Public

JESSICA ANN BAIER
MY COMMISSION #FF019714
EXPIRES July 26, 2017
(407) 398-0153   FloridaNotaryService.com

**Exhibit A**

| Lender Name | Principal Amount | Percentage of Loan |
|---|---|---|
| Steven Roche | $50,000 | 1.14% |
| TSC Trust | $50,000 | 1.14% |
| Valmar, PLC | $25,000 | 0.57% |
| David M. Harris | $96,000 | 2.20% |
| Quest IRA Inc. FBO Terri S. Tracy, IRA #24921-31 | $25,000 | 0.57% |
| iPlanGroup Agent For Custodian FBO Laurie A Connely IRA | $20,000 | 0.46% |
| Gary R. Burnham Jr Solo 401k Trust EIN 46-2522802 | $10,000 | 0.23% |
| iPlan Group Agent for Custodian FBO Wanda Hebert IRA | $101,000 | 2.31% |
| Francisco Fernandez | $65,000 | 1.49% |
| Madison Trust Company Custodian FBO Arvind Kinjarapu Roth IRA #M1609117 | $35,000 | 0.80% |
| Eleven St. Felix Street Realty Corp | $100,000 | 2.29% |
| 2nd City Solo 401K Trust | $40,000 | 0.92% |
| Victor M. Shaw and Jane R. Shaw, Trustees, or their Successor(s) in Trust of the Shaw Family Trust | $50,000 | 1.14% |
| Madison Trust Company Custodian FBO Brent Jacobs M1609105 | $37,881 | 0.87% |
| Steve Bald | $30,000 | 0.69% |
| Receivables to Cash, LLC d/b/a Berenger Capital | $50,000 | 1.14% |
| John E. Mize | $50,000 | 1.14% |
| Robert A. Potter | $23,000 | 0.53% |
| Professional Rental LP | $50,000 | 1.14% |
| JDM 401K Trust | $50,000 | 1.14% |
| Madison Trust Company Custodian FBO Sarah Geldart IRA #M1609068 | $20,000 | 0.46% |
| William and Marjorie Dreischmeir | $60,000 | 1.37% |
| Amit Hammer | $50,000 | 1.14% |
| Meadows Enterprises Inc. | $25,000 | 0.57% |
| Guenter Scheel and Karen Scheel JTWROS | $25,000 | 0.57% |
| Green Light Investments, LLC | $50,000 | 1.14% |
| Levent Kesen | $50,000 | 1.14% |
| Yin Liu and Ping Xu | $100,000 | 2.29% |
| Mike Goldman | $61,861 | 1.42% |
| Elaine Sison Ernst | $50,000 | 1.14% |
| EquityBuild, Inc. | $150,000 | 3.43% |
| Philip J Lombardo and Dianne E Lombardo JTWROS | $50,000 | 1.14% |
| Kyle Jacobs | $30,000 | 0.69% |
| Nandini S. Chennappan | $10,000 | 0.23% |
| Grathia Corporation | $50,000 | 1.14% |
| EastWest Funding Trust | $50,000 | 1.14% |
| Todd and Cindy Colucy | $50,000 | 1.14% |
| John A. Martino & Carole J. Wysocki JTWROS | $50,000 | 1.14% |
| Pat Desantis | $250,000 | 5.72% |
| Karl R. DeKlotz | $100,000 | 2.29% |
| Irene Gacad | $25,000 | 0.57% |
| Madison Trust Company Custodian FBO Kathy B. Talman IRA | $25,000 | 0.57% |
| James Walsh | $50,000 | 1.14% |
| Paul N. Wilmesmeier | $25,000 | 0.57% |
| CAMA SDIRA, LLC FBO Bill Akins IRA | $35,000 | 0.80% |
| The Entrust Group Inc, FBO DeeAnn Nason, 7230011277 | $50,000 | 1.14% |
| Larry White | $52,500 | 1.20% |
| iPlanGroup Agent for Custodian FBO David Trengove IRA Account#3300951 | $150,000 | 3.43% |
| Real Envisions, LLC | $50,000 | 1.14% |
| John B. & Glenda K. Allred JTWROS | $65,000 | 1.49% |
| Quest IRA Inc. FBO Charles E. Smith IRA #2684811 | $350,000 | 8.01% |
| EZ NJ VENTURES, LLC | $50,000 | 1.14% |
| Wisemove Properties, LLC | $100,000 | 2.29% |
| DK Phenix Investments, LLC | $100,000 | 2.29% |
| Madison Trust Company Custodian FBO William Cook III M1610004 | $100,000 | 2.29% |

| Lender Name | Principal Amount | Percentage of Loan |
|---|---|---|
| US Freedom Investments, LLC | $25,000 | 0.57% |
| Florybeth & David Stratton | $23,768 | 0.54% |
| Michael R. Warner, TTEE Warner Chiropractic Care Ctr. PC PSP Pooled Acct. | $90,000 | 2.06% |
| New Direction IRA, Inc FBO Ingrid Beyer Roth IRA | $25,000 | 0.57% |
| Ingrid and Joel Beyer | $10,000 | 0.23% |
| MayREI, LLC | $60,000 | 1.37% |
| Jason Ragan | $60,000 | 1.37% |
| Clifton Armoogam | $9,990 | 0.23% |
| Terry L. Merrill & Sheryl R. Merrill | $50,000 | 1.14% |
| United Capital Properties, LLC | $30,000 | 0.69% |
| iPlanGroup Agent for Custodian FBO Alcalli Sabat IRA | $11,000 | 0.25% |
| NEHASRI LTD | $50,000 | 1.14% |
| iPlanGroup Agent for Custodian FBO William Jack Needham IRA Account#3300944 | $25,000 | 0.57% |
| Knickerbocker, LLC | $50,000 | 1.14% |
| Optima Property Solutions, LLC | $200,000 | 4.58% |
| iPlanGroup Agent for Custodian FBO Brett Burnham IRA | $8,000 | 0.18% |
| Burnham 401k Trust | $5,000 | 0.11% |
| Gowrisankar Challagundla | $50,000 | 1.14% |
| iPlanGroup Agent for Custodian FBO Andrew Brooks IRA | $20,000 | 0.46% |
| Vistex Properties, LLC | $100,000 | 2.29% |

Parcel 1:

The South 1 and 3/4 inches of Lot 9 in Block 1 in Isaac Pflaum's Subdivision of Lot 6 and that part of Lot 12 lying North of the South line of Lot 6 in Wilson, Heald and Stebbing's Subdivision of the East 1/2 of the Southwest 1/4 of Section 15, Township 38 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois

Parcel 2:

Lots 1 to 8 in Block 1 in Davidson's Subdivision of Blocks 7 and 8 and part of Block 12 in Wilson, Heald and Stebbing's Subdivision of the East 1/2 of the Southwest 1/4 of Section 15m Township 38 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois

P.I.N: 20-15-317-040-0000 + 20-15-317-039-0000



## CORRECTIVE RECORDING AFFIDAVIT

THIS FORM IS PROVIDED COMPLIMENTS OF
KAREN A. YARBROUGH, COOK COUNTY
RECORDER OF DEEDS, AS A COURTESY FORM
WHICH MAY BE USED TO DETAIL A DESIRED
CORRECTION TO A PREVIOUSLY RECORDED
DOCUMENT. CUSTOMER'S MAY USE THEIR OWN
AFFIDAVIT AS WELL, BUT IT MUST INCLUDE ALL
OF THE BELOW REQUIRED INFORMATION. THIS
FORM DOES NOT CONSTITUTE LEGAL ADVICE.
PREPARER: _Equity Build, Inc._

Doc# 1706634060 Fee $58.00

KAREN A.YARBROUGH
COOK COUNTY RECORDER OF DEEDS
DATE: 03/07/2017 01:31 PM PG:  1 OF 11

THE COOK COUNTY RECORDER OF DEEDS (CCRD) NO LONGER ACCEPTS RE RECORDINGS, BUT INSTEAD
OFFERS  CORRECTIVE RECORDINGS . DOCUMENTS ATTEMPTING TO UPDATE A PREVIOUSLY RECORDED
DOCUMENT MUST INCLUDE THE FOLLOWING INFORMATION, PLUS A CERTIFIED COPY OF THE ORIGINAL.

I, _Jerry Cohen_ ,THE AFFIANT, do hereby swear or affirm, that the attached document with the document
number _1701318125_ , which was recorded on: _1-13-2017_ by the Cook County Recorder
of Deeds, in the State of Illinois, contained the following **ERROR**, which this affidavit seeks to correct:

DETAILED EXPLANATION (INCLUDING PAGE NUMBER(S), LOCATION, PARAGRAPH, ETC.) OF ERROR AND WHAT
THE CORRECTION IS. USE ADDITIONAL SHEET IF MORE SPACE NEEDED FOR EXPLANATION OR SIGNATURES.

_Exhibit A was changed to delete EquityBuild, Inc as an investor and to_
_add Rene Hribal and Distributive Marketing, Inc as investors_

Furthermore, I, _Jerry Cohen_ , THE AFFIANT, do hereby swear or affirm, that this submission includes
a CERTIFIED COPY OF THE ORIGINAL DOCUMENT, and this Corrective Recording Affidavit is being submitted
to correct the aforementioned error. Finally, this correction was approved and/or agreed to by the original GRANTOR(S)
and GRANTEE(S), as evidenced by their notarized signature's below (or on a separate page for multiple signatures).

| _Jerry Cohen_ | _[signature]_ | _2/28/17_ |
|---|---|---|
| PRINT GRANTOR NAME ABOVE | GRANTOR SIGNATURE ABOVE | DATE AFFIDAVIT EXECUTED |
| _Jerry Cohen_ | _[signature]_ | _2/28/17_ |
| PRINT GRANTEE NAME ABOVE | GRANTEE SIGNATURE | DATE AFFIDAVIT EXECUTED |
| | | |
| GRANTOR/GRANTEE 2 ABOVE | GRANTOR/GRANTEE 2 SIGNATURE | DATE AFFIDAVIT EXECUTED |
| | | |
| PRINT AFFIANT NAME ABOVE | AFFIANT SIGNATURE ABOVE | DATE AFFIDAVIT EXECUTED |

NOTARY SECTION TO BE COMPLETED AND FILLED OUT BY WITNESSING NOTARY

STATE: _Florida_ )
                        ) SS
COUNTY _manatee_ )

Subscribed and sworn to me this _28_ day of _February, 2017_

_Jessica Ann Baier_    _Jessica Ann Baier_    _2/28/17_
PRINT NOTARY NAME ABOVE    NOTARY SIGNATURE ABOVE    DATE AFFIDAVIT NOTARIZED



**JESSICA ANN BAIER**
MY COMMISSION #FF019714
EXPIRES July 26, 2017
(407) 398-0153    FloridaNotaryService.com

---

**Exhibit**

**17**

Licensed to ... Cook County Recorder of Deeds

# Illinois Anti-Predatory Lending Database Program

## Certificate of Exemption

Doc# 1701318125 Fee $54.00

RHSP FEE:$9.00 RPRF FEE: $1.00

KAREN A.YARBROUGH

COOK COUNTY RECORDER OF DEEDS

DATE: 01/13/2017 01:45 PM  PG:  1 OF 9

**Report Mortgage Fraud
800-532-8785**

The property identified as:      **PIN:** 20-15-317-040-0000

**Address:**
**Street:**      6160-6260 S Martin Luther King Dr

**Street line 2:**

**City:** Chicago         **State:** IL         **ZIP Code:** 60637

**Lender:** The Persons Listed on Exhibit A to the Mortgage c/o EquityBuild Finance, LLC

**Borrower:** EquityBuild, Inc.

**Loan / Mortgage Amount:** $4,370,000.00

This property is located within the program area and is exempt from the requirements of 765 ILCS 77/70 et seq. because it is not owner-occupied.

*This instrument is being re-recorded to correct Exhibit A*

**Certificate number:** 7B3CB5AE-3336-4540-AE09-3BFB080EB25A         **Execution date:** 11/9/2016

Licensed to Property Insight by Cook County Recorder of Deeds

Mail To: & Prepared by:
Equity Build Finance, LLC
5068 W. Plano Pkwy, #300
Plano, TX 75093

_____[The Above Space For Recorder's Use Only]_____

## MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on November 9th, 2016. The mortgagor is EquityBuild, Inc. ("Borrower").

This Security Instrument is given to The Persons Listed on Exhibit A to the Mortgage C/O EquityBuild Finance, LLC whose address is 5068 West Plano Pkwy. #300 Plano, TX 75093 ("Lender").

Borrower owes Lender the principal sum of Four Million Three Hundred Seventy Thousand and 00/100 Dollars (U.S. $4,370,000.00). This debt is evidenced by Borrower's note dated the same date as this Security Instrument (Mortgage), which provides for a final payment of the full debt, if not paid earlier, due and payable May 1st, 2018. This Security Instrument secures to Lender:
(a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extension and modifications; (b) the payment of all other sums, with interest advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in COOK County, Illinois:

PIN: 20-15-317-040-0000
20-15-317-039-0000

which has the address of 6160-6260 S Martin Luther King Dr., Chicago, IL 60637 ("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents, royalties, mineral, oil and gas rights and profits, water rights and stock and all fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANT. Borrower and Lender covenant and agree as follows:

1. Payment of Principal and Interest; Prepayment and Late Charges. Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. Hazard Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration and repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 19 the property is acquired by Lender, Borrower's rights to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of sums secured by this Security Instrument immediately prior to the acquisition.

3. Preservation and Maintenance of Property; Leaseholds. Borrower shall not destroy, damage or substantially change the Property, allow the Property to deteriorate or commit waste. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease, and if Borrower acquires fee title to the Property, the leasehold and fee title shall not merge unless Lender agrees to the merger in writing.

CT00096

4. Protection of Lender's Rights in the Property; Mortgage Insurance. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees, and entering on the Property to make repairs. Although Lender may take action under this paragraph 4, Lender does not have to do so.

5. Successor and Assigns Bound; Joint and Several Liability; Co-signers. The covenants and agreements of this Security Interest shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 9. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey the Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forebear or make any accommodations with regard to the terms of this Security Instrument or the Note without the Borrower's consent.

6. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

7. Governing Law; Severability. This Security Instrument shall be governed by federal law and the law of jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

8. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

9. Transfer of the Property or a beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

10. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

11. Assignment of Rents and Leases. As additional security for the payment of the Indebtedness, Mortgagor assigns and transfers to Mortgagee, pursuant to 1953 PA 210, as amended by 1966 PA 151 (MCLA 554.231 et seq., MSA 26.1137(1) et seq.), all the rents, profits, and income under all leases, occupancy agreements, or arrangements upon or affecting the Premises (including any extensions or amendments) now in existence or coming into existence during the period this Mortgage is in effect. This assignment shall run with the land and be good and valid as against Mortgagor and those claiming under or through Mortgagor. This assignment shall continue to be operative during foreclosure or any other proceedings to enforce this Mortgage. If a foreclosure sale results in a deficiency, this assignment shall stand as security during the redemption period for the payment of the deficiency. This assignment is given only as collateral security and shall not be construed as obligating Mortgagee to perform any of the covenants or undertakings required to be performed by Mortgagor in any leases. In the event of default in any of the terms or covenants of this Mortgage, Mortgagee shall be entitled to all of the rights and benefits of MCLA 554.231-.233, MSA 26.1137(1)-(3), and 1966 PA 151, and Mortgagee shall be entitled to collect the rents and income from the Premises, to rent or lease the Premises on the terms that it may deem best, and to maintain proceedings to recover rents or possession of the Premises from any tenant or trespasser. Mortgagee shall be entitled to enter the Premises for the purpose of delivering notices or other communications to the tenants and occupants. Mortgagee shall have no liability to Mortgagor as a result of those acts. Mortgagee may deliver all of the notices and communications by ordinary first-class U.S. mail. If Mortgagor obstructs Mortgagee in its efforts to collect the rents and income from the Premises or unreasonably refuses or neglects to assist Mortgagee in collecting the rent and income, Mortgagee shall be entitled to appoint a receiver for the Premises and the income, rents, and profits, with powers that the court making the appointment may confer. Mortgagor shall at no time collect advance rent in excess of one month under any lease pertaining to the Premises, and Mortgagee shall not be bound by any rent prepayment made or received in violation of this paragraph. Mortgagee shall not have any obligation to collect rent or to enforce any other obligations of any tenant or occupant of the Premises to Mortgagor. No action taken by Mortgagee under this paragraph shall cause Mortgagee to become a "mortgagee in possession."

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

BORROWER: EquityBuild, Inc.

_____(SEAL)
Jerry Cohen, President

_____[Space Below This Line For Acknowledgement]_____

STATE OF FLORIDA, _Manatee_ County ss:

I hereby certify that on this day, before me, an officer duly authorized in the state aforesaid and in the county aforesaid to take acknowledgements, personally appeared <u>Jerry Cohen</u>, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he/she executed the same for the purpose therein expressed.

WITNESS my hand and official seal in the county and state aforesaid this _9th_ day of _November_, 20_16_.

My Commission expires: _July 26, 2017_

{Seal}

_Jessica Ann Baier_
Notary Public

JESSICA ANN BAIER
MY COMMISSION #FF019714
EXPIRES July 26, 2017
(407) 398-0153    FloridaNotaryService.com

Licensed to Property Insight by Cook County Recorder of Deeds

**Exhibit A**

| Lender Name | Principal Amount | Percentage of Loan |
|---|---|---|
| Steven Roche | $50,000 | 1.14% |
| TSC Trust | $50,000 | 1.14% |
| Valmar, PLC | $25,000 | 0.57% |
| David M. Harris | $96,000 | 2.20% |
| Quest IRA Inc. FBO Terri S. Tracy, IRA #24921-31 | $25,000 | 0.57% |
| iPlanGroup Agent For Custodian FBO Laurie A Connely IRA | $20,000 | 0.46% |
| Gary R. Burnham Jr Solo 401k Trust EIN 46-2522802 | $10,000 | 0.23% |
| iPlan Group Agent for Custodian FBO Wanda Hebert IRA | $101,000 | 2.31% |
| Francisco Fernandez | $65,000 | 1.49% |
| Madison Trust Company Custodian FBO Arvind Kinjarapu Roth IRA #M1609117 | $35,000 | 0.80% |
| Eleven St. Felix Street Realty Corp | $100,000 | 2.29% |
| 2nd City Solo 401K Trust | $40,000 | 0.92% |
| Victor M. Shaw and Jane R. Shaw, Trustees, or their Successor(s) in Trust of the Shaw Family Trust | $50,000 | 1.14% |
| Madison Trust Company Custodian FBO Brent Jacobs M1609105 | $37,881 | 0.87% |
| Steve Bald | $30,000 | 0.69% |
| Receivables to Cash, LLC d/b/a Berenger Capital | $50,000 | 1.14% |
| John E. Mize | $50,000 | 1.14% |
| Robert A. Potter | $23,000 | 0.53% |
| Professional Rental LP | $50,000 | 1.14% |
| JDM 401K Trust | $50,000 | 1.14% |
| Madison Trust Company Custodian FBO Sarah Geldart IRA #M1609068 | $20,000 | 0.46% |
| William and Marjorie Dreischmeir | $60,000 | 1.37% |
| Amit Hammer | $50,000 | 1.14% |
| Meadows Enterprises Inc. | $25,000 | 0.57% |
| Guenter Scheel and Karen Scheel JTWROS | $25,000 | 0.57% |
| Green Light Investments, LLC | $50,000 | 1.14% |
| Levent Kesen | $50,000 | 1.14% |
| Yin Liu and Ping Xu | $100,000 | 2.29% |

| Lender Name | Principal Amount | Percentage of Loan |
|---|---|---|
| Mike Goldman | $61,861 | 1.42% |
| Elaine Sison Ernst | $50,000 | 1.14% |
| Rene Hribal | $100,000 | 2.29% |
| Philip J Lombardo and Dianne E Lombardo JTWROS | $50,000 | 1.14% |
| Kyle Jacobs | $30,000 | 0.69% |
| Nandini S. Chennappan | $10,000 | 0.23% |
| Grathia Corporation | $50,000 | 1.14% |
| EastWest Funding Trust | $50,000 | 1.14% |
| Todd and Cindy Colucy | $50,000 | 1.14% |
| John A. Martino & Carole J. Wysocki JTWROS | $50,000 | 1.14% |
| Pat Desantis | $250,000 | 5.72% |
| Karl R. DeKlotz | $100,000 | 2.29% |
| Irene Gacad | $25,000 | 0.57% |
| Madison Trust Company Custodian FBO Kathy B. Talman IRA | $25,000 | 0.57% |
| James Walsh | $50,000 | 1.14% |
| Paul N. Wilmesmeier | $25,000 | 0.57% |
| CAMA SDIRA, LLC FBO Bill Akins IRA | $35,000 | 0.80% |
| The Entrust Group Inc, FBO DeeAnn Nason, 7230011277 | $50,000 | 1.14% |
| Larry White | $52,500 | 1.20% |
| iPlanGroup Agent for Custodian FBO David Trengove IRA Account#3300951 | $150,000 | 3.43% |
| Real Envisions, LLC | $50,000 | 1.14% |
| John B. & Glenda K. Allred JTWROS | $65,000 | 1.49% |
| Quest IRA Inc. FBO Charles E. Smith IRA #2684811 | $350,000 | 8.01% |
| EZ NJ VENTURES, LLC | $50,000 | 1.14% |
| Wisemove Properties, LLC | $100,000 | 2.29% |
| DK Phenix Investments, LLC | $100,000 | 2.29% |
| Madison Trust Company Custodian FBO William Cook III M1610004 | $100,000 | 2.29% |
| US Freedom Investments, LLC | $25,000 | 0.57% |
| Florybeth & David Stratton | $23,768 | 0.54% |
| Michael R. Warner, TTEE Warner Chiropractic Care Ctr. PC PSP Pooled Acct. | $90,000 | 2.06% |

| Lender Name | Principal Amount | Percentage of Loan |
|---|---|---|
| New Direction IRA, Inc FBO Ingrid Beyer Roth IRA | $25,000 | 0.57% |
| Ingrid and Joel Beyer | $10,000 | 0.23% |
| MayREI, LLC | $60,000 | 1.37% |
| Jason Ragan | $60,000 | 1.37% |
| Clifton Armoogam | $9,990 | 0.23% |
| Terry L. Merrill & Sheryl R. Merrill | $50,000 | 1.14% |
| United Capital Properties, LLC | $30,000 | 0.69% |
| iPlanGroup Agent for Custodian FBO Atcalli Sabat IRA | $11,000 | 0.25% |
| NEHASRI LTD | $50,000 | 1.14% |
| iPlanGroup Agent for Custodian FBO William Jack Needham IRA Account#3300944 | $25,000 | 0.57% |
| Knickerbocker, LLC | $50,000 | 1.14% |
| Optima Property Solutions, LLC | $200,000 | 4.58% |
| iPlanGroup Agent for Custodian FBO Brett Burnham IRA | $8,000 | 0.18% |
| Burnham 401k Trust | $5,000 | 0.11% |
| Gowrisankar Challagundla | $50,000 | 1.14% |
| iPlanGroup Agent for Custodian FBO Andrew Brooks IRA | $20,000 | 0.46% |
| Vistex Properties, LLC | $100,000 | 2.29% |
| DISTRIBUTIVE MARKETING, Inc. | $50,000 | 1.14% |

Parcel 1:

The South 1 and 3/4 inches of Lot 9 in Block 1 in Isaac Pflaum's Subdivision of Lot 6 and that part of Lot 12 lying North of the South line of Lot 6 in Wilson, Heald and Stebbing's Subdivision of the East 1/2 of the Southwest 1/4 of Section 15, Township 38 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois

Parcel 2:

Lots 1 to 8 in Block 1 in Davidson's Subdivision of Blocks 7 and 8 and part of Block 12 in Wilson, Heald and Stebbing's Subdivision of the East 1/2 of the Southwest 1/4 of Section 15m Township 38 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois

P.I.N: 20-15-317-040-0000 & 20-15-317-039-0000

Doc# 1728613038 Fee $42.00

RHSP FEE:$9.00 RPRF FEE: $1.00
KAREN A.YARBROUGH
COOK COUNTY RECORDER OF DEEDS
DATE: 10/13/2017 12:52 PM  PG:  1 OF 3

**ASSIGNMENT OF PARTIAL INTEREST
IN MORTGAGE**

(For Recorder Use Only)

Prepared by: & Mail to:
EquityBuild Finance, LLC
5068 W. Plano Parkway, #300
Plano, TX, 75093

## ASSIGNMENT OF PARTIAL INTEREST IN MORTGAGE

FOR VALUE RECEIVED, the undersigned, 2nd City Solo 401k Trust, as represented by Leah Matthews, located at 11809 Grande Vista Dr. Whittier, CA 90601, ("ASSIGNOR/GRANTOR"), hereby grants, conveys assigns to: The Entrust group FBO Daniel Matthews IRA Acct #51-01005, whose IRA is located at 555 12 Street, Suite 1250, Oakland, CA, 94607 ("ASSIGNEE/GRANTEE) beneficial interest in the amount of $40,000.00 under that certain MORTGAGE, dated 11/09/2016 and executed by EQUITYBUILD, INC., borrower to: 2nd City Solo 401k Trust, original lender[s], in the State of Illinois, given to secure a certain Promissory Note covering property located at 6160-6260 S Martin Luther King Dr. Chicago, IL 60637.

TOGETHER with the note or notes therein described and secured thereby, the money due and to become due thereon, with interest, and all rights accrued or to accrue under said Mortgage including the right to have re-conveyed, in whole or in part, the real property described therein.

Dated: 9-2-17

ASSIGNOR: _Leah Matthews_

_Leah Matthews, Trustee_

1

**Exhibit
18**

Licensed to Property Insight by Cook County Recorder of Deeds

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**　　　　　　　**CIVIL CODE § 1189**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California ⟩
County of LoS Angeles ⟩

On 09/09/2017 before me, Laura Arrevillaga, Notary Public,
　　　*Date*　　　　　　　*Here Insert Name and Title of the Officer*

personally appeared Leah Matthews
　　　　　　　　　　*Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

LAURA ARREVILLAGA
COMM. #2114943
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Commission Expires 07/09/2019

Signature _Laura Arrevillaga_
　　　　　　*Signature of Notary Public*

*Place Notary Seal Above*

──────────────── **OPTIONAL** ────────────────

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: Assignment of Partial Interest in Mortgage — Martin Luther King Dr　Document Date: 9/2/17
Number of Pages: 1　Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _____ | Signer's Name: _____ |
|---|---|
| ☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited ☐ General | ☐ Partner — ☐ Limited ☐ General |
| ☐ Individual ☐ Attorney in Fact | ☐ Individual ☐ Attorney in Fact |
| ☐ Trustee ☐ Guardian or Conservator | ☐ Trustee ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)　Item #5907

Licensed to the property of Cook County Recorder of Deeds

Parcel 1:

The South 1 and 3/4 inches of Lot 9 in Block 1 in Isaac Pflaum's Subdivision of Lot 6 and that part of Lot 12 lying North of the South line of Lot 6 in Wilson, Heald and Stebbing's Subdivision of the East 1/2 of the Southwest 1/4 of Section 15, Township 38 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois

Parcel 2:

Lots 1 to 8 in Block 1 in Davidson's Subdivision of Blocks 7 and 8 and part of Block 12 in Wilson, Heald and Stebbing's Subdivision of the East 1/2 of the Southwest 1/4 of Section 15m Township 38 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois

P.I.N: 20-15-317-040-0000 + 20-15-317-039-0000
C/K/A: 6160-6260 S. Martin Luther King Drive, Chicago, Il 60637

Licensed to Priority Industry Cook County Recorder of Deeds

# ALTA COMMITMENT FOR TITLE INSURANCE

 CHICAGO TITLE INSURANCE COMPANY

Commitment Number:

**18006574LFE**
**Revision 1**

### NOTICE

**IMPORTANT - READ CAREFULLY:** THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES. ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE. THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

### COMMITMENT TO ISSUE POLICY

Subject to the Notice; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and the Commitment Conditions, Chicago Title Insurance Company, a Florida corporation (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment. This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Policy Amount and the name of the Proposed Insured.

If all of the Schedule B, Part I-Requirements have not been met within one hundred eighty (180) days after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

**Chicago Title Insurance Company**

By: _____
President

Attest: _____
Secretary

**Exhibit**

**19**

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

DIRECT_LENDING0005087

CHICAGO TITLE INSURANCE COMPANY

**COMMITMENT NO. 18006574LFE**
**REVISION 1**

*Transaction Identification Data for reference only:*

| ORIGINATING OFFICE: | FOR SETTLEMENT INQUIRIES, CONTACT: |
|---|---|
| Chicago Title Company, LLC<br>10 South LaSalle Street, Suite 2930<br>Chicago, IL 60603<br>Main Phone: 312-223-2809<br>Email: loopcommercial@ctt.com | Chicago Title and Trust Company<br>10 South LaSalle Street, Suite 2930<br>Chicago, IL 60603<br>Main Phone: (312)223-2801 Main Fax: 312-223-2920 |

Issued By: Chicago Title Company, LLC
    10 South LaSalle Street, Suite 2930
    Chicago, IL 60603

**Order Number: 18006574LFE**

Property Ref.: 6160-6212 S King Dr, Chicago, IL 60637

## SCHEDULE A

1. Commitment Date: March 28, 2018

2. Policy to be issued:

  (a) ALTA Loan Policy 2006
    Proposed Insured:  Arena DLP Lender, LLC ISAOA/ATIMA, its successors and/or assigns as their
              respective interests may appear
    Proposed Policy Amount: $2,923,500.00

3. The estate or interest in the Land described or referred to in this Commitment is:

  Fee Simple

4. Title to the estate or interest in the Land is at the Commitment Date vested in:

  <u>EquityBuild, Inc.</u>

5. The Land is described as follows:

  PARCEL 1:

  THE SOUTH 1 AND 3/4 INCHES OF LOT 9 IN BLOCK 1 IN ISAAC PFLAUM'S SUBDIVISION OF LOT 6
  AND THAT PART OF LOT 12 LYING NORTH OF THE SOUTH LINE OF LOT 6 IN WILSON, HEALD
  AND STEBBIN'S SUBDIVISION OF THE EAST 1/2 OF THE SOUTHWEST 1/4 OF SECTION 15;

  PARCEL 2:

  LOTS 1 TO 8 IN BLOCK 1 IN DAVIDSON SUBDIVISION OF BLOCKS 7 AND 8 AND PART OF BLOCK
  12 IN WILSON, HEALD AND STEBBIN'S SUBDIVISION OF THE EAST 1/2 OF SOUTHWEST 1/4 OF
  SECTION 15, TOWNSHIP 38 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN
  COOK COUNTY, ILLINOIS.

### END OF SCHEDULE A

---

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

Printed: 05.15.18 @ 11:24 AM
IL-CT-FSWM-01080.225141-SPS-1-18-18006574LFE

DIRECT_LENDING0005088

**CHICAGO TITLE INSURANCE COMPANY**

**COMMITMENT NO. 18006574LFE**
**REVISION 1**

# SCHEDULE B, PART I
# REQUIREMENTS

All of the following Requirements must be met:

1. The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land. The Company may then make additional Requirements or Exceptions.

2. Pay the agreed amount for the estate or interest to be insured.

3. Pay the premiums, fees, and charges for the Policy to the Company.

4. Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records.

5. Notice: Please be aware that due to the conflict between federal and state laws concerning the cultivation, distribution, manufacture or sale of marijuana, the Company is not able to close or insure any transaction involving Land that is associated with these activities.

6. Be advised that the "good funds" of the title insurance act (215 ILCS 155/26) became effective 1-1-2010. This act places limitations upon the settlement agent's ability to accept certain types of deposits into escrow. Please contact your local Chicago Title office regarding the application of this new law to your transaction.

7. Effective June 1, 2009, pursuant to Public Act 95-988, satisfactory evidence of identification must be presented for the notarization of any and all documents notarized by an Illinois notary public. Satisfactory identification documents are documents that are valid at the time of the notarial act; are issued by a state or federal government agency; bear the photographic image of the individual's face; and bear the individual's signature.

8. **The Proposed Policy Amount(s) must be increased to the full value of the estate or interest being insured, and any additional premium must be paid at that time. An Owner's Policy should reflect the purchase price or full value of the Land. A Loan Policy should reflect the loan amount or value of the property as collateral. Proposed Policy Amount(s) will be revised and premiums charged consistent therewith when the final amounts are approved.**

**END OF SCHEDULE B, PART I**

---

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

DIRECT_LENDING0005089

CHICAGO TITLE INSURANCE COMPANY

## SCHEDULE B, PART II
## EXCEPTIONS

THIS COMMITMENT DOES NOT REPUBLISH ANY COVENANT, CONDITION, RESTRICTION, OR LIMITATION CONTAINED IN ANY DOCUMENT REFERRED TO IN THIS COMMITMENT TO THE EXTENT THAT THE SPECIFIC COVENANT, CONDITION, RESTRICTION, OR LIMITATION VIOLATES STATE OR FEDERAL LAW BASED ON RACE, COLOR, RELIGION, SEX, SEXUAL ORIENTATION, GENDER IDENTITY, HANDICAP, FAMILIAL STATUS, OR NATIONAL ORIGIN.

The Policy will not insure against loss or damage resulting from the terms and provisions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

1. **General Exceptions**

2. **Rights or claims of parties in possession not shown by Public Records.**

3. **Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the title that would be disclosed by an accurate and complete land survey of the Land.**

4. **Easements, or claims of easements, not shown by the Public Records.**

5. **Any lien, or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown by the Public Records.**

6. **Taxes or special assessments which are not shown as existing liens by the Public Records.**

7. **We should be furnished a properly executed ALTA statement and, unless the land insured is a condominium unit, a survey if available. Matters disclosed by the above documentation will be shown specifically.**

8. Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I-Requirements are met.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

DIRECT_LENDING0005090

CHICAGO TITLE INSURANCE COMPANY

COMMITMENT NO. 18006574LFE
REVISION 1

## SCHEDULE B, PART II
## EXCEPTIONS
(continued)

A    9.

     1.      Taxes for the year(s) 2016, 2017 and 2018
               2018 taxes are not yet due or payable.

     1A.      Note: 2017 first installment was due March 1, 2018
                 Note: 2017 final installment not yet due or payable

| Perm tax# | Pcl | Year | 1st Inst | Stat |
|---|---|---|---|---|
| 20-15-317-039-0000 | 1 of 2 | 2017 | Not Billed | |
| 20-15-317-040-0000 | 2 of 2 | 2017 | $18,609.13 | Unpaid |

Perm tax#  20-15-317-040-0000  Pcl 2 of 2 Year 2016 Volume 257

     2A    The general taxes as shown below

| Year | Amount |
|---|---|
| 2016 | $ 33,834.79 |

The first estimated installment amounting to $16,954.21 is paid
The final installment amounting to $16,880.58 is unpaid

E    10.      Mortgage dated November 9, 2016 and recorded January 13, 2017 as Document No. 1701318125 made by EquityBuild, Inc. to The Persons Listed on Exhibit A to the Mortgage c/o EquityBuild Finance, LLC to secure an indebtedness in the amount of $4,370,000.00.

As corrected by Corrective Recording, recorded March 7, 2017 as Document No. 1706634060, to correct the investors listed on Exhibit A to the Mortgage.

Assignment of Partial Interest in Mortgage, in which 2nd City Solo 401K Trust, as represented by Leah Matthews, assigns its beneficial interest in the mortgage to The Entrust Group FBO Daniel Matthews IRA Acct #51-01005, recorded October 13, 2017 as Document No. 1728613038.

The original, canceled note or notes secured by the mortgage to be satisfied must be submitted to the Company.

For each entity to join in the release of said Mortgage, the appropriate authority documentation (e.g, entity standing, list of authorized signatories, resolutions, if necessary, etc..) should be furnished.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

DIRECT_LENDING0005091

CHICAGO TITLE INSURANCE COMPANY

COMMITMENT NO. 18006574LFE
REVISION 1

## SCHEDULE B, PART II
### EXCEPTIONS
(continued)

F   11.   The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance by the corporation named below:

Name of Corporation:   EquityBuild, Inc.

a)  A Copy of the corporation By-laws and Articles of Incorporation

b)  An original or certified copy of a resolution authorizing the transaction contemplated herein

c)  If the Articles and/or By-laws require approval by a 'parent' organization, a copy of the Articles and By-laws
of the parent

d)  A current dated certificate of good standing from the proper governmental authority of the state in which the
entity was created

The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

L   12.   The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below.

Limited Liability Company:  SSDF6 6160 S MLK LLC, an Illinois Limited liability company

a.  A copy of its operating agreement, if any, and any and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

b.  If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendment thereto with the appropriate filing stamps.

c.  If the Limited Liability Company is member-managed a full and complete current list of members certified by the appropriate manager or member.

d.  A current dated certificate of good standing from the proper governmental authority of the state in which
the entity was created

e.  If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

AMERICAN
LAND TITLE
ASSOCIATION

DIRECT_LENDING0005092

CHICAGO TITLE INSURANCE COMPANY

## SCHEDULE B, PART II
## EXCEPTIONS
(continued)

G | 13. | Municipal Real Estate Transfer Tax Stamps (or proof of exemption) must accompany any conveyance and certain other transfers or property located in Chicago. Please contact said municipality prior to closing for its specific requirements, which may include the payment of fees, an inspection or other approvals.

B | 14. | Encroachment of the steps attached mainly to the building located on the Land over and onto the property East and adjoining the Land by undisclosed distances as shown on the Plat of survey made by Stonelake Survey Co., Ltd, dated August 14, 2009, order No. 9044ALTAUPDATE.

C | 15. | Encroachment of the 2 story building located mainly on the Northeast corner of the Land over and onto the property North and adjoining the Land by .14 Of a foot and over the property to the East by.10 Of a foot as shown on the Plat of survey made by Stonelake Survey Co., Ltd, dated August 14, 2009, order No. 9044ALTAUPDATE.

D | 16. | Easement in favor of Comcast of Illinois, Inc. , and its/their respective successors and assigns, to install, operate and maintain all equipment necessary for the purpose of serving the Land and other property, together with the right of access to said equipment, and the provisions relating thereto contained in the grant recorded/filed as Document No. 1300744112.

Note: The document does not depict the location of the easement. For further particulars see record.

H | 17. | The Company may pay current year Cook County taxes when furnished an original tax bill at or before the time the Company is requested to make payments. If an original tax bill is not furnished, the Company will pay current taxes via ach payment, which results in an additional $7 duplicate tax bill fee payable to Cook County and collected from the taxpayer at closing.

I | 18. | Effective June 1, 2009, if any document of conveyance for Cook County Residential Real Property is to be notarized by an Illinois notary public, Public Act 95-988 requires the completion of a Notarial Record for each grantor whose signature is notarized. The Notarial Record will include the thumbprint or fingerprint of the grantor. The grantor must present identification documents that are valid; are issued by a state or federal government agency, or consulate; bear the photographic image of the individual's face; and bear the individual's signature. The Company will charge a fee of $25.00 per Notarial Record.

J | 19. | Note: The land lies within a county which is subject to the Predatory Lending Database Act (765 ILCS 77/70 et seq. as amended). A Certificate of Compliance with the act or a Certificate of Exemption therefrom must be obtained at time of closing in order for the Company to record any insured mortgage. If the closing is not conducted by the company, a certificate of compliance or a certificate of exemption must be attached to any mortgage to be recorded.

Note: for Kane, Will and Peoria counties, the act applies to mortgages recorded on or after July 1, 2010.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

DIRECT_LENDING0005093

CHICAGO TITLE INSURANCE COMPANY

COMMITMENT NO. 18006574LFE
REVISION 1

## SCHEDULE B, PART II
## EXCEPTIONS
(continued)

K    20.    All endorsement requests should be made prior to closing to allow ample time for the company to examine required documentation. (This note will be waived for policy).

**END OF SCHEDULE B, PART II**

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

DIRECT_LENDING0005094

## COMMITMENT CONDITIONS

**1. DEFINITIONS**
   (a) "Knowledge" or "Known": Actual or imputed knowledge, but not constructive notice imparted by the Public Records.
   (b) "Land": The land described in Schedule A and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.
   (c) "Mortgage": A mortgage, deed of trust, or other security instrument, including one evidenced by electronic means authorized by law.
   (d) "Policy": Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.
   (e) "Proposed Insured": Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.
   (f) "Proposed Policy Amount": Each dollar amount specified in Schedule A as the Proposed Policy Amount of each Policy to be issued pursuant to this Commitment.
   (g) "Public Records": Records established under state statutes at the Commitment Date for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge.
   (h) "Title": The estate or interest described in Schedule A.

**2.** If all of the Schedule B, Part I-Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.

**3.** The Company's liability and obligation is limited by and this Commitment is not valid without:
   (a) the Notice;
   (b) the Commitment to Issue Policy;
   (c) the Commitment Conditions;
   (d) Schedule A;
   (e) Schedule B, Part I-Requirements;
   (f) Schedule B, Part II-Exceptions; and
   (g) a counter-signature by the Company or its issuing agent that may be in electronic form.

**4. COMPANY'S RIGHT TO AMEND**
The Company may amend this Commitment at any time. If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5. The Company shall not be liable for any other amendment to this Commitment.

**5. LIMITATIONS OF LIABILITY**
   (a) The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended Commitment, resulting from the Proposed Insured's good faith reliance to:
   (i) comply with the Schedule B, Part I-Requirements;
   (ii) eliminate, with the Company's written consent, any Schedule B, Part II-Exceptions; or
   (iii) acquire the Title or create the Mortgage covered by this Commitment.
   (b) The Company shall not be liable under Commitment Condition 5(a) if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.
   (c) The Company will only have liability under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.
   (d) The Company's liability shall not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and described in Commitment Conditions 5(a)(i) through 5(a)(iii) or the Proposed Policy Amount.
   (e) The Company shall not be liable for the content of the Transaction Identification Data, if any.
   (f) In no event shall the Company be obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I-Requirements have been met to the satisfaction of the Company.
   (g) In any event, the Company's liability is limited by the terms and provisions of the Policy.

**6. LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT**
   (a) Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

DIRECT_LENDING0005095

COMMITMENT NO. 18006574LFE
**CHICAGO TITLE INSURANCE COMPANY**                                 REVISION 1

(continued)

(b) Any claim must be based in contract and must be restricted solely to the terms and provisions of this Commitment.

(c) Until the Policy is issued, this Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.

(d) The deletion or modification of any Schedule B, Part II-Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.

(e) Any amendment or endorsement to this Commitment must be in writing and authenticated by a person authorized by the Company.

(f) When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

**7. IF THIS COMMITMENT HAS BEEN ISSUED BY AN ISSUING AGENT**
The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies. The issuing agent is not the Company's agent for the purpose of providing closing or settlement services.

**8. PRO-FORMA POLICY**
The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide. A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

**9. ARBITRATION**
The Policy contains an arbitration clause. All arbitrable matters when the Proposed Policy Amount is Two Million And No/100 Dollars ($2,000,000.00) or less shall be arbitrated at the option of either the Company or the Proposed Insured as the exclusive remedy of the parties. A Proposed Insured may review a copy of the arbitration rules at http://www.alta.org/arbitration.

**END OF CONDITIONS**

**1031 EXCHANGE SERVICES**

**If your transaction involves a tax deferred exchange, we offer this service through our 1031 division, IPX1031. As the nation's largest 1031 company, IPX1031 offers guidance and expertise. Security for Exchange funds includes segregated bank accounts and a 100 million dollar Fidelity Bond. Fidelity National Title Group also provides a 50 million dollar Performance Guaranty for each Exchange. For additional information, or to set-up an Exchange, please call Scott Nathanson at (312)223-2178 or Anna Barsky at (312)223-2169.**

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

DIRECT_LENDING0005096

 Inquire before you wire!

# WIRE FRAUD ALERT

This Notice is not intended to provide legal or professional advice.
If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions. Parties to a transaction rarely change wire instructions in the course of a transaction.

- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you. DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify. **Obtain the number of relevant parties to the transaction as soon as an escrow account is opened.** DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.

- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols. Make your passwords greater than eight (8) characters. Also, change your password often and do NOT reuse the same password for other online accounts.

- **USE MULTI-FACTOR AUTHENTICATION** for email accounts. Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

*Federal Bureau of Investigation:*
*http://www.fbi.gov*

*Internet Crime Complain Center:*
*http://www.ic3.gov*

*TM and © Fidelity National Financial, Inc. and/or an affiliate. All rights reserved*

DIRECT_LENDING0005097

**To:** Nutley, Cheryl[Cheryl.Nutley@CTT.com]
**Cc:** Lange, Alice[alice.lange@ctt.com]
**From:** Patty San Martin[PSanMartin@rfclaw.com]
**Sent:** Tue 5/22/2018 11:41:20 AM (UTC-07:00)
**Subject:** RE: 18006574lfe

<mark>IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.</mark>
I will let them know.

Thank you,

*Patty*

Patricia San Martin
**Rock Fusco & Connelly, LLC**
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
312.494.1000 (p) 312.494.1001 (f)
psanmartin@rfclaw.com I http://www.rfclaw.com

---

**From:** Nutley, Cheryl [mailto:Cheryl.Nutley@CTT.com]
**Sent:** Tuesday, May 22, 2018 1:39 PM
**To:** Patty San Martin <PSanMartin@rfclaw.com>
**Cc:** Lange, Alice <alice.lange@ctt.com>
**Subject:** RE: 18006574lfe

We will need to see before closing a copy of the note and assignment of note and we would need a statement from both assignees that no funds are due and owing for the release being presented for recording.

CHERYL NUTLEY
CHICAGO TITLE

10 S. LASALLE STREET SUITE 2930
CHICAGO, IL 60603

PHONE 312-223-3616
FAX 312-223-3638

**BE AWARE!**

*ONLINE BANKING FRAUD IS ON THE RISE.*
*IF YOU RECEIVE AN EMAIL CONTAINING*
**WIRE TRANSFER INSTRUCTIONS**
*CALL YOUR ESCROW OFFICER IMMEDIATELY*
*TO VERIFY THE INFORMATION PRIOR TO*
*SENDING FUNDS.*

> **Exhibit**
>
> **20**

---

NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

**From:** Patty San Martin [mailto:PSanMartin@rfclaw.com]
**Sent:** Tuesday, May 22, 2018 1:31 PM

CT03140

**To:** Nutley, Cheryl <Cheryl.Nutley@CTT.com>
**Subject:** RE: 18006574lfe

IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.

There is no payoff.  They are releasing the mortgage.  We will have two original releases to record at closing. also, please do not forget that we are recording the quit claim deed.

Please send me the revised statement.

Thank you,

*Patty*

Patricia San Martin
**Rock Fusco & Connelly, LLC**
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
312.494.1000 (p) 312.494.1001 (f)
psanmartin@rfclaw.com | http://www.rfclaw.com



---

**From:** Nutley, Cheryl [mailto:Cheryl.Nutley@CTT.com]
**Sent:** Tuesday, May 22, 2018 12:46 PM
**To:** Patty San Martin <PSanMartin@rfclaw.com>
**Subject:** RE: 18006574lfe

I will make this change and add atty fees do you have a payoff letter?

CHERYL NUTLEY
CHICAGO TITLE

10 S. LASALLE STREET SUITE 2930
CHICAGO, IL 60603

PHONE 312-223-3616
FAX 312-223-3638

## BE AWARE!
*ONLINE BANKING FRAUD IS ON THE RISE.*
*IF YOU RECEIVE AN EMAIL CONTAINING*
**WIRE TRANSFER INSTRUCTIONS**
*CALL YOUR ESCROW OFFICER IMMEDIATELY*
*TO VERIFY THE INFORMATION PRIOR TO*
*SENDING FUNDS.*

---

NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

**From:** Patty San Martin [mailto:PSanMartin@rfclaw.com]
**Sent:** Tuesday, May 22, 2018 11:39 AM
**To:** Lange, Alice <alice.lange@ctt.com>

CTO3141

**Cc:** Nutley, Cheryl <Cheryl.Nutley@CTT.com>
**Subject:** RE: 18006574lfe

IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.
Terrific. Thanks.

Thank you,

*Patty*

Patricia San Martin
**Rock Fusco & Connelly, LLC**
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
312.494.1000 (p) 312.494.1001 (f)
psanmartin@rfclaw.com I http://www.rfclaw.com



---

**From:** Lange, Alice [mailto:alice.lange@ctt.com]
**Sent:** Tuesday, May 22, 2018 11:36 AM
**To:** Patty San Martin <PSanMartin@rfclaw.com>
**Cc:** Nutley, Cheryl <Cheryl.Nutley@CTT.com>
**Subject:** RE: 18006574lfe

I will agree to 150%.

Cheryl, go ahead and reduce.

Best Regards,

## Alice Lange

*Loop Area Senior Underwriter – Commercial and Residential*
10 S. LaSalle St.
Suite 2850
Chicago, IL 60565
**Chicago Title Insurance Company**
312.223.2990
alice.lange@ctt.com
cttcastleconnect.com



NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

---

**From:** Patty San Martin [mailto:PSanMartin@rfclaw.com]
**Sent:** Tuesday, May 22, 2018 10:56 AM
**To:** Lange, Alice <alice.lange@ctt.com>; Nutley, Cheryl <Cheryl.Nutley@CTT.com>
**Subject:** RE: 18006574lfe

IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.
I know that CT holds more than they have to but can we hold 150% instead of 200%?

Thank you,

*Patty*

Patricia San Martin
**Rock Fusco & Connelly, LLC**
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
312.494.1000 (p) 312.494.1001 (f)
psanmartin@rfclaw.com | http://www.rfclaw.com



---

**From:** Lange, Alice [mailto:alice.lange@ctt.com]
**Sent:** Tuesday, May 22, 2018 10:49 AM
**To:** Patty San Martin <PSanMartin@rfclaw.com>; Nutley, Cheryl <Cheryl.Nutley@CTT.com>
**Subject:** RE: 18006574lfe

6 to 8 weeks

Best Regards,

## Alice Lange
*Loop Area Senior Underwriter – Commercial and Residential*
10 S. LaSalle St.
Suite 2850
Chicago, IL 60565
**Chicago Title Insurance Company**
312.223.2990
alice.lange@ctt.com
cttcastleconnect.com



CASTLE CONNECT

NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

---

**From:** Patty San Martin [mailto:PSanMartin@rfclaw.com]
**Sent:** Tuesday, May 22, 2018 9:58 AM
**To:** Lange, Alice <alice.lange@ctt.com>; Nutley, Cheryl <Cheryl.Nutley@CTT.com>
**Subject:** RE: 18006574lfe

IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.
Ok.  I will let the client know.  Do you have an idea of when the county will start to issue the redemptions?

Thank you,

*Patty*

Patricia San Martin
**Rock Fusco & Connelly, LLC**
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
312.494.1000 (p) 312.494.1001 (f)
psanmartin@rfclaw.com | http://www.rfclaw.com



**From:** Lange, Alice [mailto:alice.lange@ctt.com]
**Sent:** Tuesday, May 22, 2018 9:55 AM
**To:** Nutley, Cheryl <Cheryl.Nutley@CTT.com>; Patty San Martin <PSanMartin@rfclaw.com>
**Subject:** RE: 18006574lfe

Agreed, we are unable to redeem as the county will not issue an estimate of redemption at this time. We will need to set up a title indemnity for all unsold taxes at 200%.

Best Regards,

**Alice Lange**
*Loop Area Senior Underwriter – Commercial and Residential*
10 S. LaSalle St.
Suite 2850
Chicago, IL 60565
**Chicago Title Insurance Company**
312.223.2990
alice.lange@ctt.com
cttcastleconnect.com



NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

**From:** Nutley, Cheryl
**Sent:** Tuesday, May 22, 2018 9:30 AM
**To:** Patty San Martin <PSanMartin@rfclaw.com>; Lange, Alice <alice.lange@ctt.com>
**Subject:** RE: 18006574lfe

I don't think so because the tax sale is going on. Alice can you please confirm or let us know

CHERYL NUTLEY
CHICAGO TITLE

10 S. LASALLE STREET SUITE 2930
CHICAGO, IL 60603

PHONE 312-223-3616
FAX 312-223-3638

## *BE AWARE!*

*ONLINE BANKING FRAUD IS ON THE RISE.*
*IF YOU RECEIVE AN EMAIL CONTAINING*
**WIRE TRANSFER INSTRUCTIONS**
*CALL YOUR ESCROW OFFICER IMMEDIATELY*
*TO VERIFY THE INFORMATION PRIOR TO*
*SENDING FUNDS.*

NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii) do

**From:** Patty San Martin [mailto:PSanMartin@rfclaw.com]
**Sent:** Tuesday, May 22, 2018 9:29 AM
**To:** Nutley, Cheryl <Cheryl.Nutley@CTT.com>; Lange, Alice <alice.lange@ctt.com>
**Subject:** RE: 18006574lfe

<mark>IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.</mark>
Can't we redeem the sold taxes and pay the 1st installment at closing?

Thank you,

*Patty*

Patricia San Martin
**Rock Fusco & Connelly, LLC**
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
312.494.1000 (p) 312.494.1001 (f)
psanmartin@rfclaw.com I http://www.rfclaw.com



**From:** Nutley, Cheryl [mailto:Cheryl.Nutley@CTT.com]
**Sent:** Tuesday, May 22, 2018 9:16 AM
**To:** Lange, Alice <alice.lange@ctt.com>
**Cc:** Patty San Martin <PSanMartin@rfclaw.com>
**Subject:** 18006574lfe

Please take a look at the taxes on this file in think we will need a title indemnity.  Please advise

CHERYL NUTLEY
CHICAGO TITLE


10 S. LASALLE STREET SUITE 2930
CHICAGO, IL 60603

PHONE 312-223-3616
FAX 312-223-3638

## <span style="color:red">_BE AWARE!_</span>
*ONLINE BANKING FRAUD IS ON THE RISE.*
*IF YOU RECEIVE AN EMAIL CONTAINING*
<span style="color:red">WIRE TRANSFER INSTRUCTIONS</span>
*CALL YOUR ESCROW OFFICER IMMEDIATELY*
*TO VERIFY THE INFORMATION PRIOR TO*
*SENDING FUNDS.*

NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

**To:**       Carrillo, Veronica[Veronica.Carrillo@ctt.com]
**From:**    Lange, Alice[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=CD2EE43045B84EB4A9F8BCFCA50D0B9A-LANGE, ALIC]
**Sent:**    Wed 5/23/2018 12:25:47 PM (UTC-07:00)
**Subject:** RE: Document Delivery Notice - Order # Ref 1: EquityBuild, Inc., SSDF6 6160 S MLK LLC, an Illino Ref 2:

We need to make sure this is paid with another document to support the release without a payoff.


Best Regards,


## Alice Lange
*Loop Area Senior Underwriter – Commercial and Residential*
10 S. LaSalle St.
Suite 2850
Chicago, IL 60565
**Chicago Title Insurance Company**
312.223.2990
alice.lange@ctt.com
cttcastleconnect.com



---

NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

---

**From:** Carrillo, Veronica
**Sent:** Wednesday, May 23, 2018 2:16 PM
**To:** Lange, Alice <alice.lange@ctt.com>
**Subject:** FW: Document Delivery Notice - Order # Ref 1: EquityBuild, Inc., SSDF6 6160 S MLK LLC, an Illino Ref 2:

Hi Alice,

Cheryl says that you were working with Patty on this file. Do we really need the original note? Attached are the 2 purposed releases.

Veronica Carrillo | ⊛ Chicago Title Insurance Company | 312.223.2847 | veronica.carrillo@ctt.com

---

**From:** Patty San Martin [mailto:PSanMartin@rfclaw.com]
**Sent:** Wednesday, May 23, 2018 2:14 PM
**To:** Carrillo, Veronica <Veronica.Carrillo@ctt.com>; Nutley, Cheryl <Cheryl.Nutley@CTT.com>
**Subject:** RE: Document Delivery Notice - Order # Ref 1: EquityBuild, Inc., SSDF6 6160 S MLK LLC, an Illino Ref 2:

<mark>IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.</mark>
I have to find out from the borrower.  Will it be an issue if they don't have it?

Thank you,

*Patty*

Patricia San Martin
**Rock Fusco & Connelly, LLC**
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654



CT02571

312.494.1000 (p) 312.494.1001 (f)
[psanmartin@rfclaw.com](mailto:psanmartin@rfclaw.com) | [http://www.rfclaw.com](http://www.rfclaw.com)



---

**From:** Carrillo, Veronica [[mailto:Veronica.Carrillo@ctt.com](mailto:Veronica.Carrillo@ctt.com)]
**Sent:** Wednesday, May 23, 2018 2:08 PM
**To:** Patty San Martin <[PSanMartin@rfclaw.com](mailto:PSanMartin@rfclaw.com)>; Nutley, Cheryl <[Cheryl.Nutley@CTT.com](mailto:Cheryl.Nutley@CTT.com)>
**Subject:** RE: Document Delivery Notice - Order # Ref 1: EquityBuild, Inc., SSDF6 6160 S MLK LLC, an Illino Ref 2:

Hi Patty,

Do you have the original note?

Veronica Carrillo | ⬤ Chicago Title Insurance Company | 312.223.2847 | [veronica.carrillo@ctt.com](mailto:veronica.carrillo@ctt.com)

---

**From:** Patty San Martin [[mailto:PSanMartin@rfclaw.com](mailto:PSanMartin@rfclaw.com)]
**Sent:** Wednesday, May 23, 2018 2:03 PM
**To:** Nutley, Cheryl <[Cheryl.Nutley@CTT.com](mailto:Cheryl.Nutley@CTT.com)>
**Cc:** Carrillo, Veronica <[Veronica.Carrillo@ctt.com](mailto:Veronica.Carrillo@ctt.com)>
**Subject:** RE: Document Delivery Notice - Order # Ref 1: EquityBuild, Inc., SSDF6 6160 S MLK LLC, an Illino Ref 2:

<mark>IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.</mark>
Hi Cheryl and Veronica,

Attached you will find the releases of mortgage for exception #10. Please review and let me know it it's ok. I will like to send them out today for execution.

Thank you,

*Patty*

Patricia San Martin
**Rock Fusco & Connelly, LLC**
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
312.494.1000 (p) 312.494.1001 (f)
[psanmartin@rfclaw.com](mailto:psanmartin@rfclaw.com) | [http://www.rfclaw.com](http://www.rfclaw.com)



---

**From:** Nutley, Cheryl [[mailto:Cheryl.nutley@ctt.com](mailto:Cheryl.nutley@ctt.com)]
**Sent:** Wednesday, May 23, 2018 11:50 AM
**To:** Patty San Martin <[PSanMartin@rfclaw.com](mailto:PSanMartin@rfclaw.com)>
**Cc:** [brendastrockyj@dreamliverprosper.com](mailto:brendastrockyj@dreamliverprosper.com)
**Subject:** Document Delivery Notice - Order # Ref 1: EquityBuild, Inc., SSDF6 6160 S MLK LLC, an Illino Ref 2:

CTO2572

Please click on the link(s) below to access your documents. Note, these links never expire.

[Master Statement Letter (CDF).pdf](Master Statement Letter (CDF).pdf)

REVISED STATEMENT

NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

**To:** Carrillo, Veronica[Veronica.Carrillo@ctt.com]; Nutley, Cheryl[Cheryl.Nutley@CTT.com]
**From:** Patty San Martin[PSanMartin@rfclaw.com]
**Sent:** Wed 5/23/2018 1:48:02 PM (UTC-07:00)
**Subject:** RE: Document Delivery Notice - Order # Ref 1: EquityBuild, Inc., SSDF6 6160 S MLK LLC, an Illino Ref 2:

<mark>IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.</mark>
I have asked for it already.

Just so you know, most of EB's mortgage are done inhouse. These mortgage is given by people who invest with EB all the time. I've never been asked for original notes.   In the meantime, are the releases ok.  I need to send them to be executed.

Thank you,

*Patty*

Patricia San Martin
**Rock Fusco & Connelly, LLC**
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
312.494.1000 (p) 312.494.1001 (f)
psanmartin@rfclaw.com | http://www.rfclaw.com



---

**From:** Carrillo, Veronica [mailto:Veronica.Carrillo@ctt.com]
**Sent:** Wednesday, May 23, 2018 3:45 PM
**To:** Patty San Martin <PSanMartin@rfclaw.com>; Nutley, Cheryl <Cheryl.Nutley@CTT.com>
**Subject:** RE: Document Delivery Notice - Order # Ref 1: EquityBuild, Inc., SSDF6 6160 S MLK LLC, an Illino Ref 2:

Hi Patty,

Yes, we need to make sure that this note has been paid in full as we are not paying it through closing.

Veronica Carrillo | ⬤ Chicago Title Insurance Company | 312.223.2847 | veronica.carrillo@ctt.com

---

**From:** Patty San Martin [mailto:PSanMartin@rfclaw.com]
**Sent:** Wednesday, May 23, 2018 2:14 PM
**To:** Carrillo, Veronica <Veronica.Carrillo@ctt.com>; Nutley, Cheryl <Cheryl.Nutley@CTT.com>
**Subject:** RE: Document Delivery Notice - Order # Ref 1: EquityBuild, Inc., SSDF6 6160 S MLK LLC, an Illino Ref 2:

<mark>IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.</mark>
I have to find out from the borrower.  Will it be an issue if they don't have it?

Thank you,

*Patty*

Patricia San Martin
**Rock Fusco & Connelly, LLC**
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
312.494.1000 (p) 312.494.1001 (f)
psanmartin@rfclaw.com | http://www.rfclaw.com





Exhibit

22

CT02605

**From:** Carrillo, Veronica [mailto:Veronica.Carrillo@ctt.com]
**Sent:** Wednesday, May 23, 2018 2:08 PM
**To:** Patty San Martin <PSanMartin@rfclaw.com>; Nutley, Cheryl <Cheryl.Nutley@CTT.com>
**Subject:** RE: Document Delivery Notice - Order # Ref 1: EquityBuild, Inc., SSDF6 6160 S MLK LLC, an Illino Ref 2:

Hi Patty,

Do you have the original note?

Veronica Carrillo | ☺ Chicago Title Insurance Company | 312.223.2847 | veronica.carrillo@ctt.com

---

**From:** Patty San Martin [mailto:PSanMartin@rfclaw.com]
**Sent:** Wednesday, May 23, 2018 2:03 PM
**To:** Nutley, Cheryl <Cheryl.Nutley@CTT.com>
**Cc:** Carrillo, Veronica <Veronica.Carrillo@ctt.com>
**Subject:** RE: Document Delivery Notice - Order # Ref 1: EquityBuild, Inc., SSDF6 6160 S MLK LLC, an Illino Ref 2:

<mark>IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.</mark>
Hi Cheryl and Veronica,

Attached you will find the releases of mortgage for exception #10.  Please review and let me know it it's ok.  I will like to send them out today for execution.

Thank you,

*Patty*

Patricia San Martin
**Rock Fusco & Connelly, LLC**
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
312.494.1000 (p) 312.494.1001 (f)
psanmartin@rfclaw.com I http://www.rfclaw.com


---

**From:** Nutley, Cheryl [mailto:Cheryl.nutley@ctt.com]
**Sent:** Wednesday, May 23, 2018 11:50 AM
**To:** Patty San Martin <PSanMartin@rfclaw.com>
**Cc:** brendastrockyj@dreamliverprosper.com
**Subject:** Document Delivery Notice - Order # Ref 1: EquityBuild, Inc., SSDF6 6160 S MLK LLC, an Illino Ref 2:

Please click on the link(s) below to access your documents. Note, these links never expire.

CT02606

**Sent:** Wednesday, June 06, 2018 10:14 AM
**To:** Merkel, Douglas; Nutley, Cheryl
**Cc:** Fabio Baum; Packer, David; Brandy Seyferth; Don Moses; Barry W. DeGroot; Alex Broome; Nathan Trunfio; Don Wenner; Jason Starr; Dozell Varner; Brenda Strockyj
**Subject:** RE: Arena/DLP - Punch List

I hope to have the closing documents sometime today. As to the original Note, I should have it by tomorrow.

Thank you,

*Patty*

Patricia San Martin
**Rock Fusco & Connelly, LLC**
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
312.494.1000 (p) 312.494.1001 (f)
psanmartin@rfclaw.com I http://www.rfclaw.com



---

**From:** Merkel, Douglas [mailto:dmerkel@pircher.com]
**Sent:** Wednesday, June 06, 2018 12:12 PM
**To:** Nutley, Cheryl <Cheryl.Nutley@CTT.com>
**Cc:** Fabio Baum <fbaum@arenaco.com>; Packer, David <DPACKER@pircher.com>; Brandy Seyferth <brandy@directlendingpartner.com>; Don Moses <dmoses@arenaco.com>; Barry W. DeGroot <barry@dreamliveprosper.com>; Alex Broome <abroome@arenaco.com>; Nathan Trunfio <nate@directlendingpartner.com>; Don Wenner <don@dreamliveprosper.com>; Jason Starr <jstarr@arenaco.com>; Dozell Varner <dozellvarner@dreamliveprosper.com>; Brenda Strockyj <brendastrockyj@dreamliveprosper.com>; Patty San Martin <PSanMartin@rfclaw.com>
**Subject:** RE: Arena/DLP - Punch List

Hi Cheryl,

Thank you for taking the time to talk with me.  I understand that you are <u>not</u> yet in a position to close since you are waiting on certain affidavits, indemnities or other documents from the borrower, in addition to documents relating to the payoff and cancellation of the existing financing.  Would you please let us know when you estimate receiving those items?

Thanks,
Doug

**Douglas Merkel**
**Pircher, Nichols & Meeks LLP**
1901 Avenue of the Stars, Suite 1200, Los Angeles, CA 90067
T: 310.201.8948 | F: 310.564.1848 | E: dmerkel@pircher.com
www.pircher.com

---

**From:** Nutley, Cheryl [mailto:Cheryl.Nutley@CTT.com]
**Sent:** Wednesday, June 06, 2018 9:33 AM
**To:** Brenda Strockyj; Patty San Martin
**Cc:** Fabio Baum; Packer, David; Brandy Seyferth; Don Moses; Merkel, Douglas; Barry W. DeGroot; Alex Broome; Nathan Trunfio; Don Wenner; Jason Starr; Dozell Varner
**Subject:** RE: Arena/DLP - Punch List

Updated master statement

**Exhibit 23**

CTO2658

**RELEASE OF MORTGAGE OR
TRUST DEED(ILLINOIS)**

Prepared by and return after
Recording to:

Rock Fusco & Connelly, LLC
Ioana Salajanu
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654



Doc# 1820534070 Fee $44.00

RHSP FEE:$9.00 RPRF FEE: $1.00
KAREN A.YARBROUGH
COOK COUNTY RECORDER OF DEEDS
DATE: 07/24/2018 02:16 PM PG: 1 OF 4

The above space is for the recorder's use only

FOR THE PROTECTION OF THE OWNER, THIS RELEASE SHALL BE FILED WITH THE
RECORDER OF DEEDS IN WHOSE OFFICE THE MORTGAGE OR DEED OF TRUST WAS FILED.

KNOW TO ALL MEN BY THESE PRESENT, That **THE ENTRUST GROUP FBO DANIEL
MATTHEWS IRA ACCT #51-01005** for and in consideration of the payment of the indebtedness secured
by the Mortgage hereinafter mentioned, and the cancellation of all the notes thereby secured, and of the
sum of one dollar, the receipt whereof is hereby acknowledged, do hereby **REMISE, RELEASE,
CONVEY, and QUIT CLAIM** unto **EQUITYBUILD, INC.**, a Florida corporation, and its heirs, legal
representatives and assigns, all the right, title, interest, claim or demand whatsoever they may have acquired
in, through or by a certain **ASSIGNMENT OF PARTIAL INTEREST IN MORTGAGE**, recorded on
the 13th day of **October, 2017**, in the Recorder's Office of **COOK** County, in the State of Illinois, as
Document No. **1728613038**, to the premises therein described as follows, situated in the County of **COOK**,
in the State of Illinois, to wit:

SEE ATTACHED EXHIBIT "A".

together with all the appurtenances and privileges thereunto belonging or appertaining.

Permanent Real Estate Index Number(s): **20-15-317-039-0000 and 20-15-317-040-0000**

Property Address: **6160–6212 S. KING DRIVE, CHICAGO, ILLINOIS 60637**

SIGNATURE PAGE TO FOLLOW.

**Exhibit**

**24**

1820534070 Page: 2 of 4

IN WITNESS WHEREOF, this instrument was executed on 22 day of ~~May~~ June, 2018.

THE ENTRUST GROUP FBO DANIEL
MATTHEWS IRA ACCT #51-01005

By: NARLISA M. PATH

Its: Authorized Signer

STATE OF _____ ) SS .
COUNTY OF _____ )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY
that _____, is personally known to me to be the _____, of THE
ENTRUST GROUP FBO DANIEL MATTHEWS IRA ACCT #51-01005, and personally known to me to
be the same person whose name is subscribed to the foregoing instrument as such, respectively, appeared
before me this day in person, and acknowledged that they signed, sealed and delivered the said instrument
as his/her own free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal, this _____ day of May, 2018.

See Attached (Notary Public)

Licensed to Property by Cook County Recorder of Deeds

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California   )

County of Alameda   )

On ___June 22, 2018___ before me, _____Irena Vann_____ a Notary Public,

personally appeared _____Narcisa M. Patio_____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

IRENA VANN
Commission No. 2211601
NOTARY PUBLIC-CALIFORNIA
ALAMEDA COUNTY
My Comm. Expires September 23, 2021

SIGNATURE _____ (Seal)

Description of the attached document:

Release of Mortgage or Trust Deed

Licensed to Property Insight by Cook County Recorder of Deeds

**EXHIBIT "A"**

PARCEL 1:

THE SOUTH 1 AND ¾ INCHES OF LOT 9 IN BLOCK 1 IN ISAAC PFLAUM'S SUBDIVISION OF LOT 6 AND THAT PART OF LOT 12 LYING NORTH OF THE SOUTH LINE OF LOT 6 IN WILSON, HEALD AND STEBBIN'S SUBDIVISION OF THE EAST ½ OF THE SOUTHWEST 1/4 OF SECTION 15

PARCEL 2:

LOTS 1 TO 3 IN BLOCK 1 IN DAVIDSON SUBDIVISION OF BLOCKS 7 AND 8 AND PART OF BLOCK 12 IN WILSON, HEALD AND STEBBIN'S SUBDIVISION OF THE EAST ½ OF SOUTHWEST ¼ OF SECTION 15, TOWNSHIP 38 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Licensed to / A Property Insight by Cook County Recorder of Deeds

**RELEASE OF MORTGAGE OR
TRUST DEED(ILLINOIS)**

Prepared by and return after
Recording to:

**Rock Fusco & Connelly, LLC
Ioana Salajanu
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654**

1800657YLFE.
The above space is for the recorder's use only

FOR THE PROTECTION OF THE OWNER, THIS RELEASE SHALL BE FILED WITH THE
RECORDER OF DEEDS IN WHOSE OFFICE THE MORTGAGE OR DEED OF TRUST WAS FILED.

**KNOW TO ALL MEN BY THESE PRESENT,** That **EQUITYBUILD FINANCE, LLC,** for and in
consideration of the payment of the indebtedness secured by the Mortgage hereinafter mentioned, and the
cancellation of all the notes thereby secured, and of the sum of one dollar, the receipt whereof is hereby
acknowledged, do hereby **REMISE, RELEASE, CONVEY, and QUIT CLAIM** unto **EQUITYBUILD,
INC.**, a Florida corporation, and its heirs, legal representatives and assigns, all the right, title, interest, claim
or demand whatsoever they may have acquired in, through or by a certain **MORTGAGE**, recorded on the
**13th** day of **January, 2017**, as Document No. **1701318125 as** corrected by the **Corrective Recording**
recorded on the **7th** day of **March, 2017** as Document No. **1706634060,** in the Recorder's Office of **COOK**
County, in the State of Illinois, to the premises therein described as follows, situated in the County of
**COOK**, in the State of Illinois, to wit:

**SEE ATTACHED EXHIBIT "A".**

together with all the appurtenances and privileges thereunto belonging or appertaining.

Permanent Real Estate Index Number(s): **20-15-317-039-0000 and 20-15-317-040-0000**

Property Address: **6160-6212 S. KING DRIVE, CHICAGO, ILLINOIS 60637**

**SIGNATURE PAGE TO FOLLOW.**

**Exhibit**

**25**

CT00280

IN WITNESS WHEREOF, this instrument was executed on 30th day of May, 2018.

EQUITYBUILD FINANCE, LLC,
a Florida limited liability company

By: _Shaun Cohen_

Its: _President_

STATE OF _Illinois_ ) SS
COUNTY OF _Cook_ )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that _Shaun Cohen_ , is personally known to me to be the _President_ , of THE EQUITYBUILD FINANCE, LLC, a Florida limited liability company, and personally known to me to be the same person whose name is subscribed to the foregoing instrument as such, respectively, appeared before me this day in person, and acknowledged that they signed, sealed and delivered the said instrument as his/her own free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal, this _31th_ day of May, 2018.

_____ (Notary Public)

OFFICIAL SEAL
LLOYD LETT
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires May 24, 2020

CT00281

## EXHIBIT "A"

PARCEL 1:

THE SOUTH 1 AND ¾ INCHES OF LOT 9 IN BLOCK 1 IN ISAAC PFLAUM'S SUBDIVISION OF LOT 6 AND THAT PART OF LOT 12 LYING NORTH OF THE SOUTH LINE OF LOT 6 IN WILSON, HEALD AND STEBBIN'S SUBDIVISION OF THE EAST ½ OF THE SOUTHWEST 1/4 OF SECTION 15.

PARCEL 2:

LOTS 1 TO 8 IN BLOCK 1 IN DAVIDSON SUBDIVISION OF BLOCKS 7 AND 8 AND PART OF BLOCK 12 IN WILSON, HEALD AND STEBBIN'S SUBDIVISION OF THE EAST ½ OF SOUTHWEST ¼ OF SECTION 15, TOWNSHIP 38 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

| From: | Patty San Martin |
| Sent: | Wednesday, May 30, 2018 2:35 PM |
| To: | Nutley, Cheryl |
| Cc: | Carrillo, Veronica |
| Subject: | RE: 6160 MLK |
| Attachments: | 6160 Note.pdf |
| | |
| Importance: | High |

IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.

Veronica – attached is a copy of the Note.  If we provide you with the original Note, will you return it after the closing? EB Finance will like to retain the original for their records. We have never been asked to present the original Note in EB's other transaction so that is why we are a little confused.

Also, I need an answer for the email that I sent earlier today.

Thank you,

*Patty*

Patricia San Martin
**Rock Fusco & Connelly, LLC**
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
312.494.1000 (p) 312.494.1001 (f)
psanmartin@rfclaw.com | http://www.rfclaw.com



From: Patty San Martin
Sent: Wednesday, May 30, 2018 9:42 AM
To: Nutley, Cheryl <Cheryl.Nutley@CTT.com>
Cc: Carrillo, Veronica <Veronica.Carrillo@ctt.com>
Subject: RE: 6160 MLK

Hi Cheryl and Veronica,

I have a question regarding the releases, I have the release for the original mortgage.  I have the note.  Do you also need a release for the assignment of partial interest to 2nd City Solo 4K Trust?

Thank you,

*Patty*

Patricia San Martin
**Rock Fusco & Connelly, LLC**
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
312.494.1000 (p) 312.494.1001 (f)
psanmartin@rfclaw.com | http://www.rfclaw.com



From: Nutley, Cheryl [mailto:Cheryl.Nutley@CTT.com]
Sent: Tuesday, May 29, 2018 5:00 PM
To: Brenda Strockyj <brendastrockyj@dreamliveprosper.com>
Cc: Carrillo, Veronica <Veronica.Carrillo@ctt.com>; Patty San Martin <PSanMartin@rfclaw.com>; Brandy Seyfreth <brandy@directlendingpartner.com>; Nathan Trunfio <Nate@directlendingpartner.com>; Alex Broome <abroome@arenaco.com>
Subject: RE: 6160 MLK

Here is the revised statement.  I have a 2:00 on the 31st I will put you in.

CHERYL NUTLEY
CHICAGO TITLE

10 S. LASALLE STREET SUITE 2930
CHICAGO, IL 60603

PHONE 312-223-3616
FAX 312-223-3638

*BE AWARE!*
*ONLINE BANKING FRAUD IS ON THE RISE.*
*IF YOU RECEIVE AN EMAIL CONTAINING*
WIRE TRANSFER INSTRUCTIONS
*CALL YOUR ESCROW OFFICER IMMEDIATELY*
*TO VERIFY THE INFORMATION PRIOR TO*
*SENDING FUNDS.*



NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

From: Brenda Strockyj [mailto:brendastrockyj@dreamliveprosper.com]
Sent: Tuesday, May 29, 2018 4:31 PM
To: Nutley, Cheryl <Cheryl.Nutley@CTT.com>
Cc: Carrillo, Veronica <Veronica.Carrillo@ctt.com>; Patty San Martin <PSanMartin@rfclaw.com>; Brandy Seyfreth <brandy@directlendingpartner.com>; Nathan Trunfio <Nate@directlendingpartner.com>; Alex Broome <abroome@arenaco.com>
Subject: Re: 6160 MLK

IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.

Hello Cheryl,

Thank you for taking my call today

CT03351

**To:** Patty San Martin[PSanMartin@rfclaw.com]
**Cc:** Lange, Alice[alice.lange@ctt.com]
**From:** Nutley, Cheryl[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=D84B7C7142DC40EFA3BE1B85D7E7A55A-NUTLEY, CHERYL]
**Sent:** Tue 5/22/2018 11:39:28 AM (UTC-07:00)
**Subject:** RE: 18006574lfe

We will need to see before closing a copy of the note and assignment of note and we would need a statement from both assignees that no funds are due and owing for the release being presented for recording.

CHERYL NUTLEY
CHICAGO TITLE

10 S. LASALLE STREET SUITE 2930
CHICAGO, IL 60603

PHONE 312-223-3616
FAX 312-223-3638

## *BE AWARE!*

*ONLINE BANKING FRAUD IS ON THE RISE.*
*IF YOU RECEIVE AN EMAIL CONTAINING*
WIRE TRANSFER INSTRUCTIONS
*CALL YOUR ESCROW OFFICER IMMEDIATELY*
*TO VERIFY THE INFORMATION PRIOR TO*
*SENDING FUNDS.*

---

NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

**From:** Patty San Martin [mailto:PSanMartin@rfclaw.com]
**Sent:** Tuesday, May 22, 2018 1:31 PM
**To:** Nutley, Cheryl <Cheryl.Nutley@CTT.com>
**Subject:** RE: 18006574lfe

IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.
There is no payoff.  They are releasing the mortgage.  We will have two original releases to record at closing. also, please do not forget that we are recording the quit claim deed.

Please send me the revised statement.

Thank you,

*Patty*

Patricia San Martin
**Rock Fusco & Connelly, LLC**
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
312.494.1000 (p) 312.494.1001 (f)
psanmartin@rfclaw.com I http://www.rfclaw.com



**Exhibit**

**27**

CT02553

Affidavit of Lost Note

1. The undersigned being, Shaun Cohen, of the city of Plano, in the State of Texas.

2. The undersigned was the lender/mortgagee of the Mortgage/Security Instrument in the initial principal amount of $4,370,000 dated recorded 01/13/2017 as document no. 1701318125 in office of the Cook County Recorder of Deeds.

3. The undersigned further represents and warrants that the debt evidenced by said security instrument and of which the original promissory note was lost and cannot be located. The undersigned further avers that no transfer, sale, or assignment of said note was made and we remain the only holder of said security instrument.

4. This affidavit is provided to induce Chicago Title to waive exceptions to title for file 18006574LFE.

5. We will indemnify and hold harmless Chicago Title, from and against any and all demands, claims, losses, damages, expenses (including, but not limited to, attorneys' fees and costs) and the like in the event that the representations and warranties contained in Paragraph 3 are incorrect.

Signature page to follow.

**Exhibit**

**28**

Signed:
Date: 6/7/18

State of _New York_
County of _New York_

I, _Miluska Rios_, a notary public for the county and state above do hereby certify that
_Shaun Cohen_ personally known to me to the same persons whose names appear above,
appeared before me this day in person and acknowledged that they signed and delivered
this instrument as their voluntary act, for the uses set forth above.

Dated this 7th day of June, 2018

Notary Public

MILUSKA RIOS
NOTARY PUBLIC-STATE OF NEW YORK
No. 01RI6301528
Qualified in Bronx County
My Commission Expires 04-14-2022