## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil Action No. 18-cv-5587 |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, AND SHAUN D. COHEN, | ) ) ) ) | Hon. Manish S. Shah |
| Defendants. | ) ) | |

### GROUP 2 POSITION STATEMENT OF CERTAIN INDIVIDUAL INVESTORS

The undersigned Group 2 individual investors (collectively, the "Certain Individual Investors"), jointly submit this Position Statement in support of their claims and those of the other individual investors[1] and in opposition to the claims submitted by (1) Direct Lending Partner LLC (successor to Arena DLP Lender LLC and DLP Lending Fund LLC, collectively "DLP") for the EquityBuild property located at 6160 S. Martin Luther King Drive (the "MLK Property"); (2) Shatar Capital Inc. a/k/a Shatar Capital Partners ("Shatar") apparently for the lenders identified in the mortgage granted by 7749-59 S. Yates LLC for the EquityBuild properties located at 5450 S. Indiana (the "Indiana Property") and 7749 S. Yates (the "Yates Property");[2] and (3) Thorofare

---

[1] In supporting their claims and those of the other individual investors, the Certain Individual Investors are taking the position that all of the lenders identified in the Exhibits A to the EquityBuild Mortgages should be in the same lien position and that the funds available for the properties in Group 2 should be distributed among the individual investors *pro rata* according to their interests as reflected in those Exhibits A. Throughout this Position Statement, those lenders are referred to collectively as the "Individual Investors."

[2] The March 30, 2017 mortgage defines the "Lender" under the mortgage as "the lenders in the Exhibit 'A' attached hereto and incorporated herein, as mortgagee." (Doc. 1537, Ex. 12.) Exhibit A then lists 1111 Crest Dr. LLC, Abraham Aaron Ebrianai, Hamid Esmail, and Farsaa Inc. (collectively the "Shatar Lenders").

Asset Based Lending REIT Fund IV, LLC ("Thorofare" and, collectively with DLP and Shatar, the "Institutional Lenders") for the EquityBuild property located at 1700 Juneway (the "Juneway Property").

In making this submission, the Certain Individual Investors are relying on their existing claims and the information currently available to them (*see, e.g.*, Doc. 1537 at n.3) and reserve the right to modify their submission. Further, in an effort to avoid duplication, the Certain Individual Investors have not repeated all of the points made in the Receiver's Group 2 Disclosure (Doc. 1537), and instead adopts those not repeated here.

## INTRODUCTION

As the Court well knows by now, this receivership began after the SEC took action to end the Ponzi scheme perpetrated by Defendants Jerome H. Cohen and Shaun D. Cohen (collectively, "the Cohens") by selling opportunities to invest in EquityBuild, Inc. ("EquityBuild" and along with the Cohens and EquityBuild Finance, LLC ("EquityBuild Finance" or "EBF"), collectively the "EquityBuild Defendants") that were secured by mortgages on properties on the south and west sides of Chicago. (*See, e.g.,* Docs. 1, 1386.) After being appointed by the Court, the Receiver marshalled over $66 million in assets in the Receivership estate now under the Court's supervision, including over $7 million currently in the accounts tied to the five properties at issue in Group 2. (Doc. 1535, Receiver's Twenty-First Status Report, Ex. 1.) The question now before the Court is how the funds related to those five properties preserved by the Receiver's efforts should be distributed among the competing claimants.

On the one hand are individual investor lenders, like the Certain Individual Investors, who consist largely of individuals who invested retirement savings with EquityBuild. Those Individual Investors made their investments relying on promises from the EquityBuild Defendants that those

investments would be secured by first-position mortgage liens on the property or properties in which they invested. (Doc. 1, ¶¶ 21-24.) Accordingly, the Individual Investors assert that they should be the first recipients of the proceeds preserved. Those promises and the resulting mortgage documents assured investors that those mortgage liens could not be released without the investor's written authorization after payment in full. (*See, e.g.*, Sample Collateral Agency and Servicing Agreements, Docs. 1147-6 to 1147-10, Sections 3 and 6(a).[3]) The EquityBuild Defendants trumpeted the promised protections through a variety of public promotions, including their website, "white papers," emails to prospective investors, a call center, salespeople, in-person presentations, social media, and Google advertising. (Doc. 1, ¶¶ 27-32.) Having made their investments, received the promised mortgages, and never been paid in full nor released or given written authorization for the release of their mortgages, the liens granted to these Individual Investors should remain in first lien position.

Alternatively, because their liens were not paid in full, the Certain Individual Investors and the other Individual Investors have an equitable lien that should take priority over the subsequent mortgages.

On the other hand are the Institutional Lenders, each of whom made loans *after* at least some of the Individual Investors made their loans. Their loans came after the EquityBuild Defendants had accepted funds from Individual Investors, at times when basic due diligence such as a few simple questions to EquityBuild or even a simple Google search would have alerted the Institutional Lenders to EquityBuild's business model, and in particular how it raised funds from

---

[3] In connection with the claims process for Group 1, the SEC filed example documents, including of the Collateral Agency and Servicing Agreement (the "CASA"). As there is no dispute that the terms of the CASA for each of the EquityBuild properties were substantively identical, this Position Statement refers to those examples.

individual investors and provided them with mortgages as security for those investments. The Institutional Lenders, however, failed to conduct that due diligence and instead made loans to the EquityBuild Defendants without properly considering whether investments from individual investors might impair the security given them by the EquityBuild Defendants. Specifically, DLP relied on a fraudulent release signed by one of the Cohens, and not by any of the individual investors who had actually made the loan. Meanwhile, both Shatar and Thorofare made their loans seemingly without even fully considering the possibility that EquityBuild might have accepted investments from individual investors and given them mortgages to secure those investments.

No one in this Receivership is arguing that the Individual Investors' loans were repaid or otherwise satisfied. Nonetheless, the Institutional Lenders will almost certainly assert that their liens should be enforced as first priority against the Receivership estate. Yet, as they made their loans, each Institutional Lender failed to adequately inquire into whether the EquityBuild Defendants could properly give them the security upon which they claim their loans relied. Instead, each Institutional Lenders buried its proverbial head in the sand, tempting the risk they now face. As a result, the Court should find that the individual investors' mortgages and liens survive and that they therefore have a superior claim to the proceeds preserved by the Receiver.

## ARGUMENT

**I.     DLP'S RELIANCE ON A DEFECTIVE RELEASE MEANS THE MORTGAGE LIEN SECURING THE INDIVIDUAL INVESTORS' INVESTMENTS IN THE MLK PROPERTY REMAINS AND THE INDIVIDUAL INVESTORS CONTINUE TO HAVE A HIGHER LIEN POSITION.**

The circumstances of the dispute regarding the liens on the MLK Property are similar to those the Court addressed in resolving the claims in Group 1, most significantly, including a release executed by an "improper signatory." (Doc. 1386, pp. 13-14.) Those similarities mean that, as the

Court decided regarding Group 1, the Individual Investors' mortgages should be given first priority.

The Individual Investors involved in the MLK Property had mortgages that, it is uncontested, made the Individual Investors' investments and the liens securing them matters of public record, available for anyone who cared to review them. (Doc. 1537, Ex. 17, p. 2.) That publicly available mortgage made it clear who the lenders were—"The Persons Listed on Exhibit A to the Mortgage c/o EquityBuild Finance LLC"—and that they were the beneficiaries of the mortgage—"This Security Instrument is given to the Persons Listed on Exhibit A to the Mortgage C/O EquityBuild Finance LLC." (Doc. 1537, Ex. 17, p. 3.) Exhibit A to the mortgage, in turn, identifies each of the Individual Investors for the MLK Property, listing their names, the amount of their investments, and the percentage that investment was of the total loan being secured by the mortgage. (Doc. 1537, Ex. 17, Ex. A.)

Aware of that mortgage, both constructively and actually, DLP then made its own loan, and got its own mortgage from the EquityBuild Defendants. As part of that transaction, DLP relied on a fraudulent release signed by Shaun Cohen on behalf of EquityBuild Finance purporting to release the Individual Investors' existing mortgage. (Doc. 1537, Ex. 25.) Like in Group 1, a review of the release shows that DLP accepted an ineffective fraudulent document. Notably, the Individual Investors are nowhere to be found in the release. Instead, the only party identified is EquityBuild Finance and it is Shaun Cohen that signed the release on behalf EquityBuild Finance itself, not as agent or otherwise on behalf of the Individual Investors identified as the lenders in Exhibit A. Further, neither the mortgage nor the release defines the role supposedly being played by either EquityBuild Finance or Shaun Cohen. Thus, the fraudulent release that DLP unreasonably accepted and now relies on includes no language regarding the Individual Investors, despite the

fact that each was identified by name in Exhibit A to the mortgage that the EquityBuild Defendants purported to release. By accepting a release not signed or otherwise authorized by the actual lenders identified on the mortgage, DLP accepted a facially deficient release. This is just like what the Court found in considering the facially deficient release at issue in Group 1, where the Court held that the signature of Shaun Cohen for EquityBuild Finance came from an "improper signatory." (Doc. 1386, pp. 13-14.)

Significantly, Illinois cases going back over a century reinforce that releases must be signed either by the party holding the rights or an agent authorized by that party. *See, e.g.*, *McClintock v. Helberg*, 168 Ill. 384, 390-392 (Ill. 1897); *Schroeder v. Wolf*, 127 Ill. App. 506, 509 (Ill. App. 1906).[4] These cases, discussing facts remarkably similar to the fraud that the Cohens' used to perpetuate their Ponzi scheme, explain why it is that documents signed by a supposed agent cannot be effective, especially where that supposed agent's principal (here, the Individual Investors) has

---

[4] To the extent that DLP argues that the Individual Investors authorized EquityBuild Finance to act as their agents in releasing the mortgage, a review of the terms of the CASA—the only document under which that authorization could be granted—shows otherwise. (Docs. 1147-6 to 1147-10, Sections 3 (stating that EBF cannot take any action with respect to the collateral "in the absence of written instructions from the required lenders"), 4(a) (stating that EBF shall not take any actions under the mortgage "except upon written instructions from the Required Lenders"), 6(a) (stating that EBF "shall act only on written instructions from all Lenders with respect to amendment or termination of the Mortgage"), 9(a) (granting EquityBuild Finance agency to collect loan payments, issue statements, and issue payoff demands).) Authority to bind a principal cannot be presumed; instead, it can come only from the principal and must be based on some word or act of the principal. *Schoenberger v. Chicago Trans. Auth.*, 405 N.E.2d 1076, 1080 (Ill. 1st Dist. 1980); *see also Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 732 (7th Cir. 2014) (holding that a principal must control an alleged agent's conduct and that alleged conduct must have fallen within the scope of the agency). Thus, the CASA fails to support any suggestion that the Individual Investors authorized EBF to release their mortgage liens. Nor can DLP claim that EBF somehow had apparent authority, since that would require conduct on the part of the Individual Investors, not EBF, suggesting that EBF was their agent for purposes of releasing the mortgage. *Chase v. Consolidated Foods Corp.*, 744 F.2d 566, 568-69 (7th Cir. 1984). What is more, here again, all of this are things the Court recognized in its Group 1 ruling and nothing about the specifics of DLP's loan change those conclusions. (Doc 1386, pp. 14-28.)

no knowledge of the agent's actions. *See, e.g.*, *Schroeder*, 127 Ill. App. at 509 (rejecting arguments for recognition of a release). These same concepts are reinforced by the Illinois Mortgage Act, which requires a release be signed by the mortgagee. 765 ILCS 905/2; *see also Walker v. Ocwen Loan Servicing, LLC,* 2016 WL 3035902, at ¶17 (Ill. App. Ct. May 27, 2016). All of which the Court recognized in its ruling regarding Group 1. (Doc. 1386.) There is nothing about this release that changes any of that analysis.

DLP has no one to blame but itself for failing to conduct sufficient due diligence to address these basic issues and accepting that fraudulent release. As it acknowledged in its responses to the standard discovery requests to Institutional Lenders, DLP did little to nothing to determine if the Individual Investors' released their mortgages, had been paid in connection with that supposed release, or had authorized any of the EquityBuild Defendants to release their mortgages. As DLP itself put it, to determine that the Individual Investors had released their mortgages, DLP relied on three documents: (1) a title commitment/lender policy from a title insurance company, (2) a closing protection letter, and (3) a legal opinion on behalf of the borrower, EquityBuild. (Exhibit A, Responses to Standard Discovery Requests Directed to Institutional Lenders Relating to 6160-6212 S. Martin Luther King Drive (Property No. 79), p. 5.) Yet, none of these documents shows that the Individual Investors identified in Exhibit A to the mortgage had released their liens.[5]

---

[5] Further, as a matter of Illinois law, a title insurer issuing a title commitment or a policy of title insurance is not in the business of supplying information for the purpose of guiding business decisions or transactions. *First Midwest Bank v. Stewart Title Guar.*, 843 N.E.2d 327, 336 (Ill. 2006). Instead, a title commitment is a promise to insure a particular state of title, and any information provided concerning the title is provided only to give notice of the limitations of the risk the insurer is willing to insure. *Id.*, 1 Am. Jur. 2d *Abstracts of Title* § 2 (2005). Thus the title commitment upon which DLP relies for its claimed lien priority actually means that, because the Individual Investors' respective mortgages were not properly paid off and released, DLP's title insurer chose to insure for any losses that DLP may incur. This does nothing to establish DLP's lien priority, nor offer any insight into the significance of the release on which DLP relies (except that a title insurer says that the release relieves it of an obligation that would otherwise fall to it).

Significantly, none of these three documents required DLP to do anything itself. By placing its trust in these three documents, DLP not only outsourced this critical matter to others, but also sought to shift the risk associated with obtaining a first mortgage lien to them. Yet, now that it lacks the first position lien it expected, DLP asks the Court, not its title insurer or anyone else, to make it whole. And because doing so would come at the expense of the Individual Investors, it would be inequitable to place DLP (or any other Institutional Lender that chose to rely on a title insurer for similar protections) ahead of the Individual Investors.

The obvious flaws with that fraudulent release should have given DLP actual knowledge of the release's invalidity and certainly put it on inquiry notice of the illegitimacy of the whole transaction. DLP, however, ignored this entirely and went ahead and closed its loan. Having acted so cavalierly in making its loan to the EquityBuild Defendants, DLP cannot now rely on that fraudulent release to claim that the Individual investors' mortgages and liens were actually released. Accordingly, the Court should find that the Individual Investors' mortgages and liens survive and remain in higher priority than DLP's. Based on that finding, the Court should order the Receivership assets tied to the MLK Property be distributed to the Individual Investors *pro rata* according to each investor's interest as set forth in the Mortgage's Exhibit A.

## II. BECAUSE SHATAR KNEW ABOUT THE INDIVIDUAL INVESTORS' MORTGAGE FOR THE INDIANA AND YATES PROPERTIES, THAT LIEN SHOULD HAVE HIGHER PRIORITY THAN THE MORTGAGE LIEN HELD BY SHATAR.

For the issues related to the mortgages and liens on the Indiana Property and the Yates Property, the EquityBuild Defendants added a new wrinkle to their scheme. Though they had been accepting investments from Individual Investors for these properties for months, the EquityBuild Defendants did not actually execute the mortgage granted to the Individual Investors for the Yates Property until March 14, 2017 and waited until June 23, 2017 to record it. (Doc. 1537, Ex. 15.)

During this interim, the EquityBuild Defendants obtained another loan secured by those same properties, this time from Shatar, granted Shatar a mortgage on March 30, 2017 and recorded it on April 4, 2017. Thus, there was no recorded mortgage when Shatar made its loan. That, though, does not mean that Shatar's mortgage should have higher priority.

To the contrary, when it made its loan, Shatar had more than enough knowledge about the EquityBuild Defendants' business generally, the properties involved in its loan specifically, and the Individual Investors' actual loan and mortgage that it should have investigated the effect of that existing mortgage. And because it didn't do anything to investigate, the Individual Investors' mortgages should retain higher priority than Shatar's mortgage.

### A.    Shatar Is Not A Proper Claimant.

In addition to the new wrinkle presented by EquityBuild's actions, Shatar's claim also involves issues as to whether it was submitted by the proper party. As noted above, the mortgage on which Shatar bases its claim was granted to the four Shatar Lenders, who were identified on an exhibit to the mortgage (much like EquityBuild did with its mortgages). (Doc. 1537, Ex. 14.) Ezri Namvar, as Shatar's corporate representative, testified that Shatar itself had not made any loans to the EquityBuild Defendants: "I don't want to say Shatar Capital made. I like to say the word arranged, Shatar Capital arranged" the two loans it made to EquityBuild. (Doc. 1537, Ex. 2 (Rule 30(b)(6) Deposition of Ezri Namvar (the "Shatar Dep."), 21:15-22:4.[6])

---

[6] While Namvar was designated as Shatar's corporate representative, he was never an officer or employee of Shatar; rather the company was formed and owned by Daniel Namvar, Ezri's son, and Daniel was the only person working at or with the company. (Shatar Dep., 8:16–19, 9:1–10:19.) Ezri Namvar did, though, do work for Shatar in a role that had been called analyst or underwriter, but was basically somebody who knew the loan business and could handle loans. (Shatar Dep., 10:20–11:14.) Though this, alone, does not mean that Namvar was not a suitable Rule 30(b)(6) designee, Namvar's deposition testimony suggested that he did not properly prepare to fulfill that role. When asked what work he did to make sure he, as Shatar's representative, had all of the information that Shatar had regarding the topics identified in the Rule 30(b)(6) deposition notice, Namvar testified: "Not much because I didn't think I need to do that. The deposition is

The claim, meanwhile, was filed by "Shatar Capital Inc. et al (Please see Exhibit 'A' attached)" and was signed by Daniel Namvar, Shatar's owner. (Exhibit B, Proof of Claim Form submitted by Shatar Capital, pp. 1, 32.[7]) When asked who the claimant was Namvar testified: "Right now it would be Shatar Capital. You can call it anybody you want, or the investors; and if we get anything, we will … It would be the -- the claimants would be either Shatar on behalf of the current noteholders. I don't know the percentages, but I can tell you who they are or themselves directly. They trust us, We have always distributed any money we got, et cetera, et cetera." (Doc. 1537, Ex. 2 (Rule 30(b)(6) Deposition of Ezri Namvar (the "Shatar Dep."), 20:13-21:8.) Further, two of the lenders who funded Shatar's loan sold their interests to another lender *after* this Receivership began, meaning that portion of the loan is now held by someone who knew of the alleged Ponzi scheme, but bought the interests in the loan anyway. (Shatar Dep., 73:4-75:4.) Though Shatar has been handling this claim, neither Shatar nor the Shatar Lenders (nor the subsequent purchaser) have submitted documents establishing that Shatar has the authority to pursue the claim.

Despite all of this, based on $1.8 million loan made in March 2017 and on which over $340,000 in interest and principal was received prior to the start of the Receivership, Shatar is now

---

yours. You ask me questions and I'll answer them, but I had everything that I could probably produce." (Shatar Dep., 83:20-84:4.) Demonstrating the informational deficiencies caused by his lack of preparation, Namvar indicated that he "didn't know" the answers to pertinent questions regularly throughout his deposition. (*See, e.g.*, Namvar Dep., 19:8-16 (Namvar does not know what Exhibit A to Shatar's Proof of Claim is); 94:23-95:3 (Namvar does not remember if there was an LLC involved in the loan Shatar made to EquityBuild); 122:16-124:5 (Namvar does not remember whether Shatar received information from EquityBuild about, among other things, how it raised money).) The topic of Namvar's preparation for his role as Shatar's corporate representative even angered Namvar to the extent that Shatar's counsel declared a break minutes after the deposition resumed from an earlier break. (Shatar Dep., 80:19-90:5.)

[7] Namvar testified that Shatar Capital Inc. is also known as Shatar Capital Partners. (Shatar Dep., 8:16-10:1.)

10

pursuing a claim in excess of $5 million, including charges that its corporate representative acknowledged it may not be entitled to charge. (Shatar Dep., 23:12-27:22.) Because Shatar cannot establish that Shatar is a proper claimant, the Court should reject its claim.

**B.      Shatar Knew, Or Should Have Known, About Aspects of EquityBuild's Business That Shatar Itself Said Would Be Problematic.**

Even if Shatar could properly pursue a claim for the Shatar Lenders, its lien still should not be granted priority over the Individual Investors' lien given the many issues with EquityBuild's business of which Shatar had actual knowledge. Shatar first learned of the EquityBuild Defendants based on an introduction that Doron Kermanian, an Individual Investor himself and the son of a long-time acquaintance of Ezri Namvar, Shatar's corporate representative, made in late 2016. (Shatar Dep., 30:14-32:7 and Doc. 1537, Ex. 3.) At the time, Shatar was real estate brokerage business that also operated as a hard money lender, making loans using private money which allowed it to make loans with fewer requirements than traditional mortgage lenders such as banks. (Shatar Dep., 11:15-12:2, 14:10-15:4.) Shatar obtained business through word of mouth. (Shatar Dep., 13:4-6.) For most of its loans, Shatar provided purchase money, and in those instances Shatar's due diligence focused on making sure that the purchase contract was real. (Shatar Dep., 15:8-19.) When a loan was to refinance a property that the borrower already owned, it was a harder process for Shatar, as it needed to know make sure that the borrower would have their own money in the deal and would not be cashing out. (Shatar Dep., 15:8-16:2.)

Following the introduction from Kermanian, EquityBuild emailed Namvar to introduce itself to Shatar and offer the opportunity to participate in a loan for a property at 7024 S. Paxton (the "Paxton Property"). (Shatar Dep., 31:24-35:22 and Ex. 3.) In that email, EquityBuild explained its business model, noting that for the current opportunity for the Paxton Property, "[a]s with all other EBF notes, this private mortgage note is fully secured by the Paxton property as

collateral and lenders are further protected with a first lien position on the property" before explaining that clients are able to invest with private funds or using retirement funds. (Doc. 1537, Ex. 3.) The email then explained that EquityBuild had about $100,000 left to raise towards a total loan of $2.75 million. (*Id.*)

Thus, in the email introducing it to the EquityBuild Defendants, Shatar was told that EquityBuild made loans using investments from multiple individuals, with investments as small as $100,000, and that EquityBuild prided itself on securing those loans with first lien positions on the properties. Shatar, though, may not have fully understood this at the time, since, as Namvar testified, that email did not "matter to me anyways" as it was "an introductory letter" and did not focus on details until a loan "get[s] to the bottom and to the nitty-gritty, that's when I concentrate, and I put my head on." (Shatar Dep., 35:5-22.) Namvar further explained that, because Shatar was getting 10-20 requests a week around this time, he did not have time to "sit and read every sentence or comma or dot." (*Id.*)

How EquityBuild raised money, and in particular, whether it used "crowdfunding," was an important issue for Shatar. About a month after that introductory email, Namvar demanded information about EquityBuild's business model. In an email, Namvar noted that Shatar "HAVE BECOME AWARE OF YOUR BUSINESS STRUCTURE, ASSUMING YOUR PREVIOUS DEALS HAVE BEEN CLOSED WITH CROWDFUNDING INVESTORS" and stated that "WE NEED TO MAKE SURE YOUR REFINANCING OF ALREADY CLOSED DEALS ARE ALLOWED AND KOSHER, IN CASE THE PROCEEDS IS NOT DISTRIBUTED AND/OR GOING TOWARD NEW DEALS." (Doc. 1537, Ex. 4.) To get this understanding, Namvar requested any documents that EquityBuild could provide and indicated that, depending on its underwriting, Shatar might need a strong opinion letter from EquityBuild's attorney. (*Id.*) Namvar

made these requests because he wanted "to make sure ... the Ts are crossed, dots, you know." (Shatar Dep., 38:6-39-23.) Explaining further, Namvar testified that although Shatar was "getting title policy, I wanted to make sure there is not funny business" and explained that he was doing this because he did not want someone to "waste my time. I just want to make sure that everything is kosher." (*Id.*, 38:6-39:4, 40:12-20.[8]) In response, the EquityBuild Defendants promptly sent Shatar two emails that included explanations of their model and copies of various EquityBuild form documents. (Doc. 1537, Exs. 5-6.) Significantly, those documents included EquityBuild's standard rollover form, mortgage, note, and collateral agency and servicing agreement. (*Id.*) Shatar, however, did not review these documents. (Shatar Dep., 95:14-96:14.)

Thus, by the end of 2016, Shatar had received multiple communications from EquityBuild that made clear how its business worked—and that likely would have been enough to put Shatar on notice that there was likely "funny business," possibly even a Ponzi scheme.[9]

### C. Shatar Capital Knew, Or Should Have Known, About Issues With The Yates Property, Including The Individual Investors' Loan, That Shatar Itself Said Would Be Problematic.

In March 2017, Shatar decided to move forward with a loan to EquityBuild for the Yates and Indiana Properties. (Doc. 1537, Ex. 8.) In deciding to make the loan, Shatar apparently

---

[8] Mr. Namvar's testimony included a comment suggesting that, even now, he believes that there was nothing wrong with EquityBuild's business, and instead it is the Receiver that is the problem, telling the attorney for the Receiver "and that's what you should tell your clients, that there is no funny business. Please stop and give us our money." (Shatar Dep., 39:1-4.)

[9] That Namvar was so concerned about these issues, including the possibility of the EquityBuild Defendants not distributing proceeds and/or having funds going towards new deals—hallmarks of Ponzi schemes—is not surprising given that, by 2011, he himself had been dubbed the "Beverly Hills Madoff" and, by the time of his dealings with EquityBuild, had served prison time for securities fraud resulting from his involvement in a Ponzi scheme. *See, e.g.*, *"Ezri Namvar is the New Bernie Madoff and the Most Reviled Man in Town," LA Weekly* (July 21, 2011), https://www.laweekly.com/ezri-namvar-is-the-new-bernie-madoff-and-the-most-reviled-man-in-town/ last visited November 27, 2023.

believed that the loan would be used as purchase money for both properties. (Doc. 1537, Ex. 9 at SHATAR_CAP 0005597-98.) Though Namvar made it clear that he would have different standards for a refinance loan than a purchase money loan (*see, e.g.*, Shatar Dep., 92:4-93:2), Shatar did nothing to confirm that its loan would actually be a purchase money loan. Further confusing matters, Namvar testified multiple times that Shatar's loans to EquityBuild were purchase money loans: "The proceeds of our loan went toward the purchase of the deal. It was a purchase money loan in every case." (Shatar Dep., 40:21-41:3; *see also* 41:6-14.)

In actuality, Shatar knew that EquityBuild had already closed on a purchase loan for the Yates Property on March 14, 2017. (Doc. 1537, Ex. 9 at SHATAR_CAP 0005596 ("…since the purchase loan for [the Yates Property] was just closed today 3/14/2017").) After getting the documents from that closing and realizing that there was already a purchase money loan in place for the Yates Property, Namvar demanded, in all capital letters, that EquityBuild's Tyler DeRoo "CALL ME ASAP." (Doc. 1537, Ex. 9.) Though, he could not remember why he wanted to speak with DeRoo (Shatar Dep., 60:13-24) and did not remember if he talked with DeRoo or anyone else from EquityBuild (Shatar Dep., 110:13-112:8), Within the hour, Namvar again requested information about EquityBuild's business model: "Can u please send us a detailed resume or brochure on the company? How u raise money, the length in business, how many units your control, etc. etc." (Doc. 1537, Ex. 7.)

Namvar made this request to EquityBuild as Shatar was doing the little due diligence it did on the loan it would ultimately make. As Namvar explained it, he was responsible for "mental underwriting" at Shatar and considered himself "the best hard money lender, knowledgeable hard money lender in the nation." Namvar's experience and skill allowed him to size up a potential loan in between three minutes (if it is going to be declined) and ten minutes (if it is going to be made).

14

(Shatar Dep., 99:10-100:20.) In addition to relying on Namvar's mental underwriting, Shatar's due diligence prior to making the loan consisted of:

- Asking about the number of units, the purchase price, location, income, purchase contract terms, and the title commitment. (Shatar Dep., 100:21-101:13.)

- Making "sure that a title policy or the title commitment was okay," confirming the purchase contracts were arm's length agreements, and possibly running a credit report. (Shatar Dep., 55:1-11.)

- Confirming the value of the properties by having a friend of Namvar's who owns apartment buildings and commercial buildings but is not an appraiser drive by, look at the properties, and then confirm their value to Namvar in a phone conversation that was less than ten minutes. (Shatar Dep., 55:15-17; 108:12-110:9.)

- Having its attorneys review the loan documents and perform a public records search on EquityBuild that did not turn up anything negative (even though Jerome Cohen had previously filed for bankruptcy at least once). (Shatar Dep., 57:2-23, 102:16-103:16.)

- Confirming that the transaction was arm's length by reviewing the documents that did not reveal anything adverse. (Shatar Dep., 58:10-20.)

These efforts did not identify any issues for Shatar. Nonetheless, red flags appeared during the course of finalizing the Shatar loan for the Yates Property. In addition to those discussed above that had already popped up, on March 30, 2017, someone from Chicago Title noted that EquityBuild, as the borrower, would be receiving approximately $86,000 from the closing of the Shatar loan. (Doc. 1537, Ex. 13.) In response, Shatar's Namvar wrote: "What??? I thought the borrowers are putting over 1.5 mil in to close the purchases. Can someone explain this 2 me?" (Doc. 1537, Ex. 13.) Despite this request, Namvar could not recall if Shatar received an explanation for this. (Shatar Dep., 63:8-11.) Further, Namvar could not explain where he understood that EquityBuild was getting the $1.5 million he believed it was putting into the deal to close the loan, suggesting that he thought they may have been acting as "syndicators." (Shatar Dep., 64:12-65:1.) Nonetheless, the mortgage for the Yates Property granted to Shatar was executed that same day, March 30, 2017. (Doc. 1537, Ex. 14.) That Shatar proceeded to make the loan without receiving

15

answers to these questions was at odds with its usual insistence that its borrowers be "pregnant," meaning they have their own money in the deal. As Namvar explained, it was important for him to make sure that Shatar's borrowers like EquityBuild had real equity in the deal because Shatar dos not "finance or cash out people." (Shatar Dep. 107:6-107:20.)

Despite the multiple indications that the loan for the Yates Property was not actually a purchase-money loan, Shatar did not take the different steps that its corporate representative said it would use for such a loan. (Shatar Dep., 61:18-62:5.) Instead, Namvar testified that, though he could not remember if those different steps were taken, if they had been, "it would have to do with determining that the value was there," which Namvar's friend had done. (Shatar Dep., 61:23-62:5.) And when presented with the March 14, 2017 mortgage that was granted to the Individual Investors who made the original loan for the Yates Property, Namvar, as Shatar's corporate representative, did not remember seeing it but indicated he was "sure it's in our documents" and claimed that it was something that Shatar's attorneys would look at if they need to. (Shatar Dep., 68:15-20.) Later, though, Namvar disclaimed any knowledge of the loan whatsoever, claiming that neither he nor anyone at Shatar was aware of the mortgage and that if he or Shatar had been, the loan would not have been made because "why would I have done business this guy?" (Shatar Dep., 117:8-14; *see also* 116:23-117:19.)

Notably, Namvar was clear that Shatar would not make a loan to borrowers about which it had concerns. As he explained it: "Even if the value is there, if we know we are dealing with a difficult character or somebody who is very litigious, I'm just giving you examples, or somebody who lied to us, I would recommend not to do the loan. Life is too short." (Shatar Dep., 105:20-1056:13.) Shatar made the loan to EquityBuild because, despite the multiple instances of Shatar raising issues with representations made to it by EquityBuild, Namvar did not believe that Shaun

or Jerry Cohen had ever lied to him. Instead, at the time Shatar made its loan to EquityBuild, he "though they were the best people that walked under the sun." (Shatar Dep., 106:14-107:5.)

Namvar was also clear that Shatar would not have made a loan to EquityBuild if he had realized that it was raising money in small increments like $10,000 to $20,000 each. (Shatar Dep., 113:8-115:6.) Despite having asked multiple times about EquityBuild's business model between late 2016 and the March 30, 2017 close of Shatar's loan, Namvar claimed he did not realize how small the investments that Individual Investors made with EquityBuild were until he saw the mortgage EquityBuild gave to the Individual Investors for the Yates Property during the Shatar 30(b)(6) deposition. (Shatar Dep., 114:8-115:6.)

*     *     *

Given Shatar's actual knowledge and repeated failures to follow up on that information, there should be little doubt that it (a) knew that EquityBuild raised funds by offering investors first position mortgages in exchange for their investments and (b) that EquityBuild had raised funds in this manner for at least the Yates Property. Further, Shatar knew that there was a mortgage granted to the Individual Investors for the Yates Property on March 14, 2017 and had a copy of that mortgage. Despite this, Shatar did little to nothing to determine whether that the mortgage had been released by the Individual Investors. Yet, Shatar went ahead and funded a loan to EquityBuild using funds from its own investors, somehow expecting that the mortgage they received would be in first position.

Given Shatar's reckless actions, the Court should find that the Individual Investors, who did in fact receive a first-position mortgage lien from EquityBuild before Shatar funded its loan that was never released, remain in first position. The fact that EquityBuild then recorded the mortgage funded by Shatar before it recorded the mortgage to the Individual Investors should not

change this analysis because Shatar had more than ample knowledge of the Individual Investors' mortgage and ample opportunity to learn more about its likely impact on Shatar's own mortgage. Based on these findings, the Court should order the Receivership assets tied to the Indiana and Yates Properties be distributed to the Individual Investors *pro rata* according to each investor's interest as set forth in the Mortgages' Exhibits A.

III. **BECAUSE THOROFARE SHOULD HAVE KNOWN ABOUT THE INDIVIDUAL INVESTORS' INVESTMENTS IN THE JUNEWAY PROPERTY, ITS LIEN SHOULD NOT BE GIVEN HIGHER PRIORITY THAN THE INDIVIDUAL INVESTORS' MORTGAGE.**

For the Juneway Property, EquityBuild added another new wrinkle: This time, EquityBuild executed mortgages with the Individual Investors and the Institutional Investor, Thorofare, on the same day, April 11, 2017. It then recorded the Thorofare mortgage months before recording the Individual Investors' mortgage. The Individual Investors, however, had been making their investments for some time prior to the actual execution of the mortgages on April 11, 2017. Among the Certain Individual Investors, multiple investments were made in early March. Because, as discussed above, any Institutional Lender should have been aware that EquityBuild's business model relied on those investments and granted mortgage liens in exchange for them, Thorofare should have investigated whether there were any investors who had made investments connected to the Juneway Property in reliance on promises from EquityBuild that their investments would be protected by first position mortgage liens. Having failed to adequately investigate this, Thorofare's mortgage should not be given higher priority than the Individual Investors' mortgage of the same date. Rather, given that their investments predate the loan made by Thorofare and Thorofare should have known of those investments, the Individual Investors' mortgage should be given higher priority or, at worst, the two mortgages bearing the same date should be deemed to be of equal priority.

IV.    **ALTERNATIVELY, THE INDIVIDUAL INVESTORS ARE ENTITLED TO EQUITABLE LIENS AGAINST THE PROPERTIES SUPERIOR TO THE INSTITUTIONAL LENDER'S MORTGAGES.**

If the Court finds that the circumstances surrounding any of the Institutional Lender's mortgages mean the Individual Investors no longer have enforceable mortgage interests superior to one or more of the Institutional Lenders' interests, this does not mean that those Institutional Lenders should automatically be allowed to recover the assets preserved by the Receiver. Instead, because it is uncontested that the Individual Investors were never repaid, be it with proceeds from the Institutional Lenders' loans or otherwise, the Court should hold that the Individual Investors have equitable liens on the properties and in the proceeds of sale of such properties superior to the Institutional Lenders' mortgages.

An equitable lien may be imposed on property out of considerations of fairness. *W.E. Erickson Construction, Inc. v. Congress-Kenilworth Corp.*, 132 Ill. App. 3d 260, 270-71, (1st Dist. 1985). An equitable lien is not a debt or a property right, but a remedy for a debt. *Paine/Wetzel Associates, Inc. v. Gitles*, 174 Ill. App. 3d 389, 393 (1st Dist. 1988). The elements of an equitable lien are: (1) a debt, duty, or obligation owed by one person to another; and (2) a *res* to which the obligation attaches. *Id.* Equitable liens have been imposed where a contract manifests the intent that a particular property is to act as security for the debt and there has been a promise to convey the property as security. *Uptown National Bank of Chicago v. Stramer*, 218 Ill. App. 3d 905, 907-08 (1st Dist. 1991).

Here, it is undisputed that the Individual Investors' debt was originally secured by the properties. It is also undisputed that the Individual Investors' debt was never paid in full. Further, for the MLK Property, it is undisputed that the release of the Mortgages was recorded without the Individual Investors' consent and without the Individual Investors' debt being paid in full. For the Indiana, Yates, and Juneway Properties, meanwhile, it is undisputed that at least some of the

Individual Investors made their loans to the EquityBuild Defendants prior to the Institutional Lenders' own loans and mortgages. In each instance, however, due to the Ponzi scheme perpetuated by the EquityBuild Defendants and enabled by the Institutional Lenders' lax due diligence efforts, nothing was done to investigate whether those loans existed or would survive eve after the Institutional Lenders made their loans. Since the Individual Investors' debt was not paid in full, the Court should recognize an equitable lien against the properties in favor of the Individual Investors superior to the mortgage interests of the Institutional Investors.

Generally, the holder of an equitable lien cannot take priority over the interest of a party who acquires an interest in a property without notice of the equitable interest. *Stump v. Swanson Development Co., LLC*, 2014 IL App (3d) 110784; *Trustees of Zion Methodist Church v. Smith*, 335 Ill. App. 233 (4th Dist. 1948). A party with notice of an existing equitable interest in the same property, however, is liable in equity to the same extent as the seller. *In re Cutty's-Gurnee, Inc.*, 133 B.R. 934, 949 (7th Cir. 1991). Here, where the Institutional Lenders were making loans to a business that trumpeted its crowdsourced funding and used lenders like them to refinance that funding, the Institutional Lenders knew or, as prudent persons, should have been on inquiry to investigate whether there were any existing loans on the properties. And that knowledge or lack of inquiry means that the Institutional Lenders can be deemed to have had knowledge of other facts that might have been discovered through diligent inquiry. *Reed v. Eastin*, 379 Ill. 586, 591-92 (1942).

As discussed throughout this Position Statement, the Institutional Lenders' due diligence, with reasonable inquiry, should have uncovered facts sufficient for the Court to conclude that each had actual notice and knowledge of the Individual Investors' loans, that those loans remained outstanding, and that they therefore had equitable liens on the properties.

## CONCLUSION

For the reasons set forth above, the Court should rule that mortgage liens granted to the Individual Investors, including the undersigned Certain Individual Investors, have higher priority than those granted to the Institutional Lenders and distribute the assets recovered by the Receiver to the Individual Investors *pro rata* based on their relative interests in those mortgages.

Dated: November 29, 2023

WILLIAM H. AKINS;
PAUL S. APPLEFIELD, DDS 401K PLAN,
    QUESTTRUST FBO ROBIN
    APPLEFIELD ROTH IRA, AND
    QUESTTRUST FBO PAUL
    APPLEFIELD ROTH IRA;
THE BE COMPANY LITD. F/K/A
    BLUEBRIDGE PARTNERS LTD.;
ARTHUR AND DINAH BERTRAND;
BRIGHT VENTURE, LLC;
KARL R. DEKLOTZ;
PAT DESANTIS;
DISTRIBUTIVE MARKETING INC.;
EASTWEST FUNDING TRUST,
    MARGARET PALMS, TRUSTEE
JUILETTE FARR-BARKSDALE;
FRANCISCO FERNANDEZ;
GIRL CAT CAPITAL WEST LLC;
AMIT HAMMER;
ROBERT W. JENNINGS;
LEVENT KESEN;
LYNN KUPFER;
TOLU MAKINDE AND TMAKINDE,
    LLC;
JOSEPH MCCARTHY;
JILL MEEKCOMS;
R. D. MEREDITH GENERAL
    CONTRACTORS LLC AND R. D.
    MEREDITH GENERAL
    CONTRACTORS 401K, AND
    RICHARD D. MEREDITH;
MARK A. MILLER ATF DOMANSKIN
    REVOCABLE TRUST;
MARK MOUTY;
HARENDRA PAL;
PIONER VALLEY PROPERTIES LLC;

STEVEN ROCHE;
SOURCE ONE FUNDING, LLC;
MADISON TRUST COMPANY FOR
    BENEFIT OF KATHY TALMAN IRA
     AND CLEARWOOD FUNDING LLC;
STEVE WEERA TONASUT; AND
VISTEX PROPERTIES, LLC


By:    /s/ Max A. Stein         
          One of their attorneys

Max A. Stein
TottisLaw
401 N. Michigan Ave. Suite 530
Chicago, IL 60611
mstein@tottislaw.com