**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

        Plaintiff,

    v.

EQUITYBUILD, INC., et al.,

        Defendants.

Case No. 1:18-cv-5587

Hon. Manish S. Shah

Magistrate Judge Young B. Kim

**REPLY STATEMENT OF CLAIMANT
DIRECT LENDING PARTNER LLC**

By operation of the EBF Investor-Lenders' release (the "EBF Release"), as well as Equitybuild Finance, LLC's ("EBF") apparent authority to release the EBF Investor-Lenders' Mortgage, Direct Lending Partner LLC (successor to Arena DLP Lender LLC and DLP Lending Fund LLC) ("DLP")), holds the only valid lien on the Group 2 property located at 6160-6260 S. Martin Luther King Dr., Chicago, Illinois, 60637 (the "6160 MLK Property"). The SEC, Receiver, and the Certain Individual Investors challenge DLP's lien priority,[1] arguing that the EBF 6160 MLK Mortgage remains in effect because the EBF Investor-Lenders did not authorize the release of their mortgage, rendering the EBF Release invalid. Further, they suggest that "[b]ecause the MLK Property involves the same facts and same law as Group 1, the Court should reach the same result." (*See* Dkt. 1556 at 1; Dkt. 1564 at 4-7; *but see* Dkt. 941, ¶ 16 ("The ruling as to any

---

[1] To the extent other claimants challenge DLP's priority on the 6160 MLK Property (*see* Dkt. 1566), DLP reiterates its lien priority for the reasons expressed herein, as well as in its position statement (Dkt. 1559). Notably, numerous individuals in their separate position statements assert, often as the only basis for their position, that Equitybuild told them they would have a first lien. But, on this particular point, DLP is no worse situated with respect to priority because DLP was also told by borrower's counsel, in writing, and in signed mortgage documentation, that it had a first lien. (*See* Dkt. 1559 at 2.)

particular Group of properties . . . will not have preclusive effect with respect to any property that is not the subject of the pending Framing Report.").) However, material differences between the release at issue in Group 1 and the EBF Release, warrant a different outcome.

## ARGUMENT

I.    **DLP Reasonably Relied On The Valid EBF Release.**

Both the SEC and the Certain Individual Investors contend that issues with the signatory on the EBF Release render it invalid (Dkts. 1556 at 7, 1564 at 5-6) and, consequently, that DLP's reliance on the "fraudulent release" was unreasonable. (Dkt. 1564 at 5-6.) But DLP reasonably relied on EBF's apparent authority—as indicated in the EBF Release itself as well as other documents of record—to release the EBF 6160 MLK Mortgage of record.

The SEC and the Certain Individual Investors primarily argue the EBF Release was invalid due to errors in the signatory, but those purported errors do not render the EBF Release invalid. First, both the SEC and Certain Individual Investors assert that "a release is ineffective if 'not executed by the mortgagee.'" (Dkt. 1556 at 7; *see also* Dkt. 1564 at 5-7.) Rather than bearing the signatures of approximately 75+ individual investors, the EBF Release is instead signed by the EBF Investor-Lenders' agent and loan servicer, EBF.[2] (Dkt. 1559-2 at 3.) Specifically, and unlike the Group 1 release which only indicated "Equitybuild Finance, LLC" as the signatory, the EBF Release bears Shaun Cohen's signature, as "Its [EBF's] President." (*Id*.) Given that the Illinois Mortgage Act expressly states that a release may be executed by a mortgagee's legal

---

[2] As the Receiver has acknowledged, the individual EBF Investor-Lenders often rolled over, or swapped in and out of the loans, rendering it impossible to be certain who the actual mortgagees were at any given time. (*See* Dkt. 1571 at 3, 18-19, 21.) These common developments are precisely why loan servicers are employed in the industry, and why it is reasonable for DLP to have relied upon EBF's authority to issue a release on the mortgagees' behalf.

representative, *see* 765 ILCS 905/2, the fact that the EBF Release is not signed by 75+ individual investors cannot render it invalid.

Second, the Certain Individual Investors further contend that EBF signature's failure to expressly designate that EBF was signing in its agent capacity further undermines the EBF Release's validity. (Dkt. 1564 at 5-6.) According to the Certain Investor Lenders, to be enforceable a release "must be signed either by the party holding the rights or an agent authorized by that party," citing two cases. (Dkt. 1564 at 6-7.) In addition to the fact that, as noted, the Illinois Mortgage Act permits a "legal representative" such as EBF to execute a release, *see* 765 ILCS 905/2, the two cases the Certain Individual Investors rely on for this proposition are readily distinguishable. Most notably, neither case actually involved a mortgage release.

In *McClintock v. Helberg*, 168 Ill. 384 (1897), an attorney made an unauthorized "surrender[ of] a claim for $750.00 . . . and a note for $3690.00 secured by a trust deed upon land which was worth much more than the amount of the note, in exchange for a bond which was, to say the least, of very doubtful value." *Id*. at 392. The court's ruling concerned a release of a cause of action, not a mortgage release. Based on Illinois law specific to attorneys acting as agents in active litigation—specifically that "an attorney has no power, without express authority, to bind his client by a compromise of a pending suit"—the court concluded the appellant should have "inquired as to the authority of the solicitor to make the arrangement." *Id*. at 392-93.

*Schroeder v. Wolf*, 127 Ill. App. 503 (1st Dist. 1906), is equally distinguishable. In *Schroeder*, a trustee sold a note and trust deed to a subsequent buyer without the note holder's knowledge. *Id*. at 509. There was <u>no</u> release of record, rather the trustee simply marked the note "paid." *Id*. The subsequent buyer, however, never reviewed the record, which would have revealed the trust deed remained in force and that there was no release on record. *Id*. at 509. For that reason,

the trustee's unauthorized "release" did not operate to discharge the lien; "the original trust deed . . . never having been released of record, was not discharged nor its lien affected by the unauthorized arrangement made by [the trustee] . . . for his own use and benefit." *Id*. at 509-10. The court also noted "[t]here [was] no evidence tending to show that [the trustee] was the agent of the appellee . . . to write 'paid' upon the note and trust deed.'" *Id*. at 510.

Critically, unlike in *Schroeder*, there is evidence that EBF was the EBF Investor-Lenders' servicing agent. The EBF 6160 MLK Mortgage—a matter of public record—listed the lenders as "The Persons Listed on Exhibit A to the Mortgage **c/o EquityBuild Finance, LLC**" (Dkt. 1559-1 (emphasis added).) The EBF Release mirrored EBF's apparent authority in this regard, with EBF signing the EBF Release consistent with the EBF 6160 MLK Mortgage.

Further unlike *Schroeder* (and *McClintock*), the court's conclusion in *5201 Wash. Investors LLC & Arthur Bertrand v. Equitybuild, Inc.*, 2023 Ill. Cir. LEXIS 79, relating to the very same "care of" mortgage language remains especially instructive on the issue of apparent authority.[3] Published three months after the Court's Group 1 decision, the *5201 Wash. Investors* decision

---

[3] The Receiver discusses *5201 Wash. Investors*, but focuses on distinctions that are immaterial to the court's conclusion concerning apparent authority. (*See* Dkt. 1571 at 3, n.2.) For example, the Receiver notes the "issue there was the import of a property buyer's reliance on a title report rather than, "like here, the due diligence of a lender." *Id*. The Receiver also contends "DLP has made no effort to—nor could it—show that it was similarly situated to Fannie Mae in that case," because Fannie Made "took its assignment of the loan in good faith, for value, and without notice," while, according to the Receiver, "DLP was on inquiry notice." *Id*. Neither point changes the relevance of *5201 Wash. Investors*' apparent authority conclusion, which, as discussed, is based on identical mortgage language of record. Further, the Receiver's criticism that DLP "has made no effort" to show it is similarly situated to Fannie Mae is unfair and, at a minimum, premature. *Id*. As discussed in Section V, the Court stayed briefing on avoidance claims so the claimants, including DLP, have not yet had an opportunity to take discovery in connection with or otherwise address the Receiver's avoidance arguments. *See also* Dkt. 1547 (DLP's motion requesting leave to take further discovery in response to Receiver's avoidance disclosure); Dkt. 1549 (minute entry entering and continuing DLP's motion).) Though the details of DLP's defense will no doubt be informed by the requested discovery, like Fannie Mae, DLP has an absolute defense to any fraudulent transfer action because it received the grant of the security for its loan in good faith and for equivalent value.

involves **identical** mortgage language—"[t]he first page of the [*5201 Wash.*] Investor Mortgage identifies the 'Lender' as 'The Persons Listed on Exhibit A to the Mortgage **% Equity Build Finance, LLC.'**" *Id.* at *13. Based on that language, the court concluded "[t]he recorded mortgage **identifies on its face that the Investors designated EBF as their authorized agent**." *Id.* (emphasis added). The court then explicitly connected the recorded mortgage language to the apparent authority given to EBF, concluding the *5201 Wash.* release and public record (again reflecting the mortgage and the identical "c/o" language) were "**consistent with the apparent authority given to EBF on the face of the Investor Mortgage**." *Id.* at *12-13 (emphasis added). Accordingly, as in *5201 Wash. Investors*, it was reasonable for DLP to believe that "The Persons Listed on Exhibit A to the Mortgage" authorized EBF to act on their behalf; such persons could have designated a different agent other than EBF in the EBF 6160 MLK Mortgage, or not listed any agent at all, but instead chose to publicly designate EBF as their agent for the EBF 6160 MLK Mortgage.[4]

Other Illinois opinions offer similar observations. For example, in *Bank of N.Y. v. Langman*, 2013 IL App (2d) 120609, two mortgagees asserted competing claims of priority, with one mortgagee arguing it "ha[d] priority due to proper reliance on a forged release of the [prior competing] mortgage." *Id.* at ¶ 1. Though the Illinois Court of Appeals ultimately disagreed that the subsequent mortgagee was entitled to priority for other reasons—the prior mortgagee had *also*

---

[4]Moreover, while not relevant to DLP's reliance on EBF's apparent authority, neither EBF nor any other Equitybuild entity fraudulently designated EBF as the individual investors' agent in connection with the EBF 6160 MLK Mortgage. To the contrary, investment documents between the EBF Investor-Lenders and Equitybuild confirm that the individual lenders understood their mortgages for the 6160 MLK Property would publicly designate EBF as their agent. *See, e.g.*, DLP Reply Ex. 1 (completed Investment Package for Steven Roche, indicating lender as "persons listed on Exhibit A to the Note, **c/o Equitybuild Finance, LLC**" (at 3, 9), including in the 6160 MLK Mortgage itself (at 13), available in CloudNine database at REL0001418030).

recorded a pending foreclosure action on its mortgage, independently giving the subsequent mortgagee notice that the prior mortgagee's mortgage was superior—it also disagreed with the contention that the forged release was "patently invalid." *Id*. at ¶ 19. Notwithstanding that the release was forged, the court noted the release "clearly purport[ed] to extinguish the [prior] debt . . . and the remaining mortgagees in the chain of title had reason to believe that the [prior] mortgage had been released," thus entitling the subsequent mortgagee to rely upon it. *Id*.

For the same reason, the separate enforceability of the EBF Release as between the EBF Investor-Lenders and EBF has no bearing on the reasonableness of DLP's reliance on EBF's apparent authority to release the EBF 6160 MLK Mortgage. The EBF Release itself had numerous indicia of authenticity. Critically, and unlike the Group 1 release, the EBF Release contained *no scrivener's error* in the signature block, or anywhere else for that matter. The EBF Release further expressly referenced the EBF 6160 MLK Mortgage by record index number, which itself indicated EBF was authorized to act on behalf of the lenders listed on Exhibit A. (Dkt. 1559-2.) DLP would further have no reason to question Shaun Cohen's authority, as EBF's President, to sign on behalf of EBF as indicated in the EBF Release signature block. (*Id*.) Further, that an agent was authorized to act on behalf of the group—here upwards of 75 lenders—would not surprise a subsequent lender like DLP, let alone raise suspicion as to EBF's authority, given that mortgagees commonly delegate the servicing of their loans to servicers. *See* R. Wilson Freyermuth, "Why Mortgagors Can't Get No Satisfaction," 72 Mo. L. Rev. 1159, 1164 (2007). Finally, the EBF Release was prepared and delivered by borrower's counsel, further underscoring the reasonableness of DLP's reliance on EBF's apparent authority to release the EBF 6160 MLK Mortgage.

In short, by operation of the EBF Release, executed and recorded consistent with EBF's apparent authority to act on behalf of the EBF Investor-Lenders, which authority DLP reasonably

relied upon, the EBF Investor-Lenders' Mortgage is no longer a valid lien. Moreover, DLP is not responsible for a third-party's, EBF's, fraud in executing the release; the EBF Investor-Lenders must bear the responsibility for their agent's fraud. *See M&T Bank v. Mallinckrodt*, 2015 IL App (2d) 141233, ¶ 52 ("'Where one of two innocent persons must suffer by reason of the fraud or wrong conduct of another, the burden must fall upon him who put it in the power of the wrongdoing to commit the fraud or do the wrong.'") (quoting *Connor v. Wahl*, 330 Ill. 136 (1928)). Accordingly, the DLP Mortgage is the only valid lien on the 6160 MLK Property and is thus entitled to priority to receive the funds liquidated by the Receiver's sale of the 6160 MLK Property.

## II.     The Court Should Disregard Arguments Directed At DLP's Insured Status.

The Certain Individual Investors suggest DLP is inappropriately seeking to defend its priority position in Court rather than asking "its title insurer . . . to make it whole." (Dkt. 1564 at 8.) As was the case in the Group 1 proceedings, the Certain Individual Investors' reliance on DLP's insured status as a basis to affect its lien priority is wholly improper, and the Court should disregard DLP's insured status for the same reasons it did in Group 1. (Dkt. 1386 at 11.) Regardless of the applicability of the Federal Rules of Evidence, the rationale underlying Rule 411's prohibition against admitting evidence of an insurance policy to prove whether a person acted negligently or otherwise wrongfully applies with equal relevance here. *See* Fed. R. Evid. 411 Advisory Committee Note ("The courts have with substantial unanimity rejected evidence of liability insurance for the purpose of proving fault . . . . At best the inference of fault from the fact of insurance coverage is a tenuous one, as is its converse. More important, no doubt, has been the feeling that knowledge of the presence or absence of liability insurance would induce juries to decide cases on improper grounds."). Whether or not DLP has an insurance policy in no way sheds light on whether it should be forced to give up its rightful place in line as the first position (and

only) lienholder. More fundamentally, all claimants—whether "institutional" or "individual," insured or not—are entitled to the Court's objectivity. Accordingly, as it did in Group 1, the Court should disregard DLP's insured status in evaluating its priority claim. (*See* Dkt. 1386 at 11.)

## III. Illinois Law Does Not Permit An "Equitable Lien" Under These Circumstances.

The Certain Individual Investors further argue, in the alternative, that even if the Court finds that DLP has priority, the Court should hold that the EBF Investor-Lenders should have an equitable lien on the 6160 MLK Property, entitling them to the proceeds of the sale of the properties ahead of DLP. (Dkt. 1564 at 19-20.) In support, the Certain Individual Investors argue "it is undisputed that the release of the Mortgages was recorded without the Individual Investors' consent and without the Individual Investors' debt being paid in full," and further that DLP "enabled" Equitybuild's "Ponzi scheme" by its "lax due diligence efforts." (*Id*. at19- 20.) There is ***no*** evidence of record, however, that DLP knew the EBF Release was recorded without the EBF Investor-Lenders' consent—as described, DLP reasonably relied on EBF's apparent authority to execute the EBF Release—and certainly ***no*** evidence that DLP "enabled" Equitybuild's fraud in any way.

Moreover, as noted, it is well established that "[w]here one of two innocent persons must suffer by reason of the fraud or wrong conduct of another, the burden must fall upon him who put it in the power of the wrongdoer to commit the fraud or do the wrong." *M&T Bank*, 2015 IL App (2d) 141233, at ¶ 52 (internal citation omitted). Here, the EBF Investor-Lenders empowered EBF to act as the collateral agent and servicer of the EBF Investor-Lenders' loan, including with respect to releases, (*see* Dkt. 1559-7 at § 2(a); *see also* Dkt. 1559-8), and it was the EBF Investor-Lenders' agent, EBF, that executed a (purportedly) improper release. Simply put, Illinois law does not

8

burden DLP, an innocent third-party to the relationship between EBF and the EBF Investor-Lenders, with the responsibility for the EBF Investor-Lenders' agent's actions.

**IV. DLP Is Entitled To The Entirety Of Its Secured Claim Up To The Amount Of The Net Proceeds, Or, In The Alternative, The Court Should Stay Briefing On The Specific Amounts Due And Rule Only On Priority.**

The Receiver argues that Post-Receivership Interest and late fees, attorneys' fees, and other ancillary charges permitted by the applicable loan documents should be denied, even to the victorious priority secured creditor. (*See* Dkt. 1571 at 11-16.) The Receiver's argument is grounded primarily in (i) general concepts of equitable discretion, and (ii) that Equitybuild operated as a Ponzi Scheme. (Dkt. 1571 at 11-16.) There are fatal defects as well as procedural issues as to both propositions.

**a. A Secured Creditor Is Entitled To The Complete Recovery Authorized Under Illinois Law.**

The notion that the Court may override a secured mortgagee's rights violates the fundamental precept that equity follows law. *See, e.g.*, *In re BNT Terminals, Inc.*, 1991 Bankr. LEXIS 421, *20 (Bankr. N.D. Ill. Feb. 21, 1991) (declining to reinstate liens "premised upon 'basic concepts of equity'" because "equity follows law and [defendant's] lawyers have failed to articulate what the basic concepts of equity are that the Court should apply."). At least one court[5] has explicitly considered whether a court administering an equity receivership has "general authority to ignore state law in the name of equity" in order to distribute receivership proceeds on

---

[5] To be clear, the substance of the opinion in *Jupiter* was drafted by a Special Master, whom the court appointed to determine which investors were entitled to what portion of what remained in the investment pool. After conducting "a de novo review of the [Special Master's] Report and Recommendation and the objections to it," the court adopted the Special Master's report. (*See In re Real Prop. Located at [Redacted] Jupiter Drive*, No. 2:05-CV-01013-DB (Utah D. Ct.), "Order Adopting the First Report and Recommendation of the Special Master," Dkt. 272 at 1-2.) In light of the district court's adoption of the Special Maser's report, and for ease of reference, Thorofare refers to the *Jupiter* opinion as coming from the court.

a pro rata basis, rather than in accordance with state law priority rules. *In re Real Prop. Located at [Redacted] Jupiter Drive*, No. 2:05-CV-01013-DB, 2007 U.S. Dist. LEXIS 65276 (Utah D. Ct. Jun. 7, 2007). In that case, the court confirmed it *did not* have such broad authority, rejecting an argument that the "the district court's discretion in supervising a receivership includes the ability to deny 'state law remedies' in dealing with receivership assets." *Id*. at *11 (quoting competing investor's brief). Citing Supreme Court authority for the proposition that it is "well-established that a 'receiver appointed by a federal court takes [a] property subject to all liens, priorities or privileges existing or accruing under the laws of the State," the court ultimately agreed it was "governed by the general rule that state law regarding lien priorities is to be respected in receiverships." *Id*. at *12. Further observing that "[t]he United States Constitution specifically states that contractual rights are not to be impaired," the court explained that "[t]he consequences may be harsh for the [competing] Investors, but the law is clear. Equity has its limits." *Id*. at *26-27 (citing U.S. Const. Art. I, § 10, cl. 1).

As in *Jupiter*, the Court should decline the Receiver's invitation to abandon Illinois lien priority rules in favor of equity. Illinois law is clear that the recording of a mortgage creates a security interest in real estate for the payment of the underlying indebtedness. *See* 765 ILCS 5/11 ("Such mortgage, when otherwise properly executed, shall be deemed and held a good and sufficient mortgage in fee to *secure the payment of the moneys therein specified*.") (emphasis added); *see also Ogle v. Koerner*, 140 Ill. 170, 179 (1892) ("A mortgage. . . vests in the party secured a lien upon the mortgage premises" and "[b]y virtue of that lien the mortgagee is entitled to . . . the proceeds of the sale [of the property in foreclosure] applied to the payment of the debt secured."). Illinois law further confirms that where a prior recorded mortgage is released of record, the prior mortgage is no longer a lien on the property. *See, e.g.*, *Fannie Mae v. Kuipers*, 314 Ill.

10

App. 3d 631, 637 (2d Dist. 2000) ("Because no release of lien had been filed, pursuant to section 2 of the Mortgage Act, there was no indication to third parties that the lien was ever extinguished."); *see also Bank of N.Y.*, 2013 IL App (2d) 120609, ¶ 19 (disagreeing that recorded forged release was "patently invalid[]" where it "clearly purport[ed] to extinguish the [prior] debt . . . and the remaining mortgagees in the chain of title had reason to believe that the [prior] mortgage had been released."). Accordingly, as the only mortgage lien on the 6160 MLK Property, Illinois law entitles DLP to the payment of the amounts specified in its mortgage.

For DLP, in addition to the remainder of the principal, its mortgage specifies it is entitled to interest. (*See* Dkt. 1559-3 at 15; *see also* Reply Ex. 2, Construction Loan Agreement excerpted from DLP's Proof of Claim, at §§ 2.1.5, 2.1.6.) The Receiver, however, contends "[a]s a general rule, in equity receiverships, interest on a debtor's obligations ceases to accrue at the inception of the proceeding," relying on the Supreme Court's decision in *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 163 (1946). (Dkt. 1571 at 12 ("the *Vanston* Court made clear that interest is not permitted in a federal equity receivership. . .").)[6] Notably, the *Vanston* case was limited to a challenge to the potential recovery of interest on interest in which the subordinate creditors "concede[d] that the first mortgage bondholders should receive simple interest on the principal due them." *Vanston*, 329 U.S. at 159. The Receiver's other cited cases are similarly distinguishable.[7]

---

[6] Although 11 U.S.C. 506(b) is not implicated as to DLP because the liquidated value of the 6160 MLK Property is not greater than the amount of DLP's claim, *Vanston* nevertheless has been limited by that statute. *See In re Urban Communicators PCS Ltd. P'ship*, 379 B.R. 232, 252-53 (Bankr. S.D.N.Y. 2007), *rev'd on other grounds* (while "has never . . . been legislatively or judicially overruled," it has, been "superseded in the respects that section 506(b) provides.").

[7] *See SEC v. Capital Cove Bancorp LLC*, 2015 U.S. Dist. LEXIS 174856 (C.D. Cal., Oct. 13, 2015) (concerning default interest); *In re Hollstrom*, 133 B.R. 535, 539 (Bankr. D. Colo. 1991) (concerning default interest); *Duff v. Cent. Sleep Diagnostics, LLC*, 801 F.3d 833, 844 (7th Cir. 2015) (involving question of whether a receivership court had the discretion to treat claimants'

The *Jupiter* opinion is instructive on this point, as well. *Jupiter* further held "[h]aving reviewed the cases and the treatises . . . [t]he institution of a receivership does not stop the running of interest contracted for by a secured party any more than it interferes with the priority afforded such a party by state law." *Id.* at *23 (citing Clark on Receivers, § 660 (noting that "appointment of a receiver cannot deprive a party to the suit or a claimant of his contractual rights.")). Accordingly, as noted, the DLP is entitled to interest pursuant to its loan documents. (*See* Dkt. 1559-3 at 15; *see also* Reply Ex. 2.)

**b. The Receiver Has Not Met His Burden Of Proving That The Ponzi Scheme Presumption Applies As To DLP.**

The Receiver improperly assumes the Ponzi scheme presumption applies to trigger the so-called "netting rule." *See In re Taneja*, 2012 Bankr. LEXIS 3554, *14 (Bankr. E.D. Va. July 30, 2012) ("A party seeking to raise a [Ponzi scheme] presumption has the burden of proving the predicate facts that give rise to the presumption."). Specifically, the Receiver argues the Cohens' operation of a Ponzi scheme "was alleged with specificity by the SEC in its Complaint, and the Cohens did not deny the Ponzi scheme having entered into a Consent Judgment." (Dkt. 1571 at 15.) But because the application of the Ponzi scheme presumption is not established—particularly, as discussed *infra*, where the Receiver has not yet proven its avoidance claim as to DLP and where DLP has not yet had an opportunity to take discovery or respond to that claim—and the Cohens' consent judgment alone is inadmissible as evidence of a Ponzi scheme as to DLP's loan,[8] it does not follow that the "netting rule" applies.

---

names as confidential, not whether the court could ignore state and federal rights of secured creditors in their collateral).

[8] Consent judgments are not admissible evidence of the allegations stated therein. *See, e.g.*, *Carpenters Health & Welfare Fund v. The Coca-Cola Co.*, 2008 U.S. Dist. LEXIS 112503, *14 (N.D. Ga. Apr. 23, 2008) (a consent judgment "falls squarely into the class of evidence deemed inadmissible pursuant to Rule 408"). This rule serves the "high public policy value of encouraging

**c. In The Alternative, The Court Should Defer Decision On Distribution Amounts Until The Resolution Of The Receiver's Avoidance Claim.**

In the alternative, if the Court disagrees with DLP that DLP is entitled to its entire secured claim under Illinois law, the Court need not and should not decide now what specific amounts to order by way of distribution. The bases for the equitable and Ponzi scheme considerations the Receiver urges should limit DLP's recovery substantially overlap with the avoidance claims as disclosed by the Receiver (Dkt. 1537), which the Court agreed to stay pending resolution of Group 2 priority (Dkt. 1565). Further, the Receiver has only disclosed his intent to pursue an avoidance claim against DLP's loan—the Receiver has not *proven* a voidable transfer under the Illinois Uniform Fraudulent Transfer Act, 740 ILCS § 160, as required to trigger the so-called "netting rule." In fact, the only two authorities the Receiver cites to support his argument that netting should apply are both wholly focused on analyzing whether netting was appropriate upon proof and application of the applicable Uniform Fraudulent Transfer statute for each case. *See Scholes v. Lehmann*, 56 F.3d 750, 757-58 (7th Cir. 1995) (analyzing whether netting was appropriate by applying predecessor statute to Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160, while also discussing analysis under current statute); *Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2008) (analyzing netting while applying California's Uniform Fraudulent Transfer Act).

Critically, at the November 16, 2023 hearing the Court also agreed to stay any discovery on avoidance issues pending resolution of the priority dispute. As a result, the claimants, including DLP, have not yet had an opportunity to pursue discovery relating to the Receiver's Group 2 avoidance disclosure, let alone an opportunity to brief the issue for the Court. Accordingly, out of

---

entities . . . to settle their disputes with . . . governmental agencies," and avoids the "chilling effect" that "would likely" result from admitting the consent judgment as evidence of wrongdoing by private litigants." *Id.* at *3.

fairness to the claimants, DLP requests that the Court stay briefing on the specific amounts due until after the Court has adjudicated priority and avoidance issues, which will ultimately impact the distribution amounts, or order such briefing to occur as part of the avoidance briefing when that schedule is set.

## **CONCLUSION**

For the above reasons, and for those stated in DLP's Position Statement (Dkt. 1559), DLP's mortgage interest in the 6160 MLK Property is the only valid mortgage lien of record. DLP is thus entitled to receive the funds liquidated by the Receiver's sale of the 6160 MLK Property in the amounts due as specified in its loan documents. (*See* Dkt. 1559-3; *see also* Reply Ex. 2.)


Dated: January 10, 2024                                   Respectfully submitted,

                                                          */s/ Andrew R. DeVooght*
                                                          Andrew R. DeVooght
                                                          Alexandra J. Schaller
                                                          LOEB & LOEB LLP
                                                          321 N. Clark St., Ste. 2300
                                                          Chicago, IL 60654
                                                          Telephone: (312) 464-3100
                                                          Facsimile: (312) 464-3111
                                                          adevooght@loeb.com
                                                          aschaller@loeb.com

                                                          Edward S. Weil
                                                          Todd Gale
                                                          Brett J. Natarelli
                                                          DYKEMA GOSSETT PLLC
                                                          10 South Wacker Drive, Ste. 2300
                                                          Chicago, IL 60606
                                                          Telephone: (312) 876-1700
                                                          Facsimile: (888) 828-6441
                                                          eweil@dykema.com
                                                          tgale@dykema.com
                                                          bnatarelli@dykema.com

*Attorneys for Claimant Direct Lending Partner LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 10, 2024 I electronically filed the foregoing **REPLY POSITION STATEMENT OF CLAIMANT DIRECT LENDING PARTNER LLC** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record, and further caused the foregoing to be served upon all members of Claims Group 2 by email to the distribution list ebgroup2service@rdaplaw.net.

*/s/ Andrew R. DeVooght*
Andrew R. DeVooght