UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ) ) ) | |
| Plaintiff, ) ) | Civil Action No. 18-cv-5587 |
| v. ) ) | Hon. Manish S. Shah |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, ) ) ) ) | Magistrate Judge Young B. Kim |
| Defendants. ) | |

<u>RECEIVER'S SUBMISSION ON GROUP 5 CLAIMS</u>

Kevin B. Duff, as the receiver ("Receiver") for the Estate of Defendants EquityBuild, Inc., EquityBuild Finance, LLC, their affiliates, and the affiliate entities of Defendants Jerome Cohen and Shaun Cohen, and pursuant to the powers vested in him by the Order of this Court entered on August 17, 2018, submits the following to assist the Court in regards to the resolution of Group 5 claims asserted against four properties: (i) 7300-04 St. Lawrence Avenue (Property 49); (ii) 310 E 50th Street (Property 52); (iii) 4520-26 S Drexel Boulevard (Property 63)[1]; and (iv) 5001 S Drexel Boulevard (Property 3).

There are 83 claimants, in total, who submitted a proof of claim form asserting a claim against one or more of the Group 5 properties.[2] The Receiver has reviewed each of the claims submitted, various EquityBuild records, and other information, for purposes of providing recommendations. Exhibits 1-8, attached hereto, are spreadsheets for each of the four properties

---

[1] A number of the claims asserting an interest related to 4520 S Drexel have been assigned "property" number 901, which corresponds to the South Side Development Fund I (*see* Section I(C) below).

[2] Several individuals or entities submitted claims against more than one property in Group 5. For purposes of this submission, those individuals or entities are considered a separate claimant for each property.

in Group 5, and contain: (i) the Receiver's recommendations in regards to whether each non-institutional lender claim is secured or unsecured and the maximum amount to be distributed to such claimant, if funds are available (Exhibits 1-4); and (ii) similar information regarding the institutional lender claim asserted against each property (Exhibits 5-8).

Section I of this submission sets forth the Receiver's recommendation on the issue of priority between the investor-lender claimants and the institutional lenders as it relates to each of the four properties. Section II addresses certain general principles that support the Receiver's recommendations that are applicable to all claimants in Group 5. Section III addresses the nature of the Ponzi scheme in this matter.

## I. Priority and Other Recommendations for Group 5 Properties

Consistent with the instructions of the Court and its February 9, 2021 Order, the Receiver makes the following recommendations regarding the claims submitted to the Receiver. (Dkt. 941)

### A. The Receiver Recommends that Claimant Miss Property LLC Has First Priority and that the Institutional Lender Has Second Priority in Regards to 7300-04 St. Lawrence Avenue.

With regard to the priority dispute between Midland Loan Services ("Midland") (the institutional lender) and the investor-lenders with respect to 7300 St. Lawrence, the Receiver recommends that the Court find that a single investor lender's claim has priority over Midland's claim and that Midland's claim is in second position.

On November 17, 2015, EquityBuild recorded a $618,603 mortgage against 7300 St. Lawrence as document #1532145038. (*See* Ex. 9) The mortgage instrument was executed on October 9, 2015, and the lenders were identified as "the persons listed on Exhibit A c/o EquityBuild Finance LLC." This mortgage interest was never released. The Receiver recommends, however, that all but one of the investor-lender claimants asserting an interest in

7300 St. Lawrence pursuant to this mortgage be found to have relinquished their secured interest in the property by agreeing to roll their loan to another investment. (*See* Ex. 1) Among the investors listed on Ex. A to the investor lenders' mortgage who submitted a claim, the Receiver recommends the Court find that only SD ROTH IRA Miss Property, LLC ("Miss Property") retained a secured interest in 7300 St. Lawrence.

Miss Property originally held a 1.07% interest in the mortgage, in the amount of $6,624. However, on July 17, 2017, Miss Property agreed to accept a $3,627.58 repayment and to roll the remaining $2,996.42 to an unsecured amortized promissory note. But both claimant's proof of claim and EquityBuild's records indicate this repayment never occurred, and therefore it appears the $3,627.58 balance remains secured by the property located at 7300 St. Lawrence. The Receiver further recommends that $1,258,56 interest paid to Miss Property on the 7300 St. Lawrence note be deducted, resulting in a maximum distribution to Miss Property from the property account of $2,369.02. This claimant also has an unsecured claim of $1,751.99 for the balance of the unsecured note.

The mortgage pursuant to which Midland asserts a security interest was recorded on June 28, 2017. This $1,491,000 loan to EquityBuild entity EB South Chicago 3, LLC was secured by a portfolio of seven properties, including 7300 St. Lawrence.[3] After making a distribution on the Miss Property claim, the Receiver recommends that the balance of the funds held in the property account for 7300 St. Lawrence be used to repay most of the portion of Midland's mortgage that was allocated to 7300 St. Lawrence. (*See* Ex. 5) The Receiver's decision to not pursue an avoidance claim against Midland on this particular property is based upon review of circumstances

---

[3] The other six properties include: three of the 26 "single claim" properties, for which distributions were made pursuant to the Court's order (Dkt. 1303); 5437 S Laflin, for which distributions were made pursuant to the Court's order (Dkt. 1364); a property that was sold in a tax sale prior to the receivership (8809 S Wood); and a property (7760 S Coles) that is in Group 6.

associated with only this property, and is neither a determination in regards to the remaining property in the portfolio associated with Midland's loan to EB South Chicago 3, LLC, nor a waiver in any regard relative to Midland's other claims.

The City of Chicago also asserted a claim against 7300 St. Lawrence. This claim related to administrative orders that were paid in full when the Receiver sold the property. (*See* Ex. 10) The City's claim should be denied on this basis.

**B.     The Receiver Recommends that the Institutional Lender Has Priority in Regards to 310 E 50th Street.**

With regard to the priority dispute between Midland (the institutional lender) and the other claimants with respect to 310 E 50th, the Receiver recommends that the Court find that Midland's claim has priority over the other claims.

There are two non-institutional lender claims against 310 E 50th, asserted by: investor-lender Kirk Road Investments, LLC; and trade creditor (and former property manager) Paper Street Realty LLC DBA Rent Ready Apartments. The Receiver recommends the Court find (1) that both of these claims are unsecured claims of lesser priority than Midland's claim, and (2) that neither claim is entitled to further recovery from the Estate.

The Kirk Road Investments LLC claim is an atypical situation where the claimant's principal, Martha Johnson, purchased the property from EquityBuild, using funds ostensibly from Hard Money Company LLC, but that Kirk Road Investments LLC had wired to Hard Money. The secured lender on the recorded mortgage was Hard Money and Johnson was the borrower. Accordingly, Johnson was the equity owner of the property and not a secured lender. Further, the secured lender, Hard Money, recorded a release of its mortgage. Moreover, the evidence provided by Kirk Road Investments with its proof of claim shows that it was paid in full on this particular loan. (*See* Ex. 2)

4

The Paper Street claim relates to an $49,600.68 invoice for "Roof, tuckpointing and porch system repairs, and rehab of units 1, 2 and 3." No lien was recorded against the property, and Paper Street submitted a lien waiver at the Receiver's closing of 310 E 50th, reading:

> Paper Street Realty, LLC . . . does waive and release any and all lien or claim or right to a lien under the Statues [sic] of Illinois relating to Mechanic's Liens on the above described premises and improvements thereon and on the monies or other considerations due or becoming due from the owner on account of labor or services, materials fixtures, apparatus, or machinery heretofore furnished or which may be furnished at any time hereafter by the undersigned for the above described premises. (Ex. 11)

In recommending that Midland be found to have priority over other claims on 310 E 50th, the Receiver expressly notes that the loan—pursuant to which Midland asserts an interest in 310 E 50th—was a $2,426,250.00 loan to EquityBuild entity EB South Chicago 4, LLC that was associated with a portfolio of seven properties, including 310 E 50th.[4] The decision to not pursue an avoidance claim on this particular property is based upon review of circumstances concerning only this property, and is neither a determination in regards to Midland's claims with respect to the other properties in that portfolio nor a waiver in any regard relative to Midland's claims against other properties in the portfolio.

## C. The Receiver Recommends that the Institutional Lender Has Priority Over Other Claimants in Regards to 4520-26 S Drexel Boulevard.

With regard to the priority dispute between U.S. Bank National Association ("U.S. Bank") (the institutional lender) and the investor-lenders with respect to 4520 Drexel, the Receiver recommends that the Court find that U.S. Bank has a secured first position priority given the nature of the investor-lenders' interests.

---

[4] The other six properties in the EB South Chicago 4 LLC loan portfolio are in claim Group 6.

Unlike investors in previous claim groups, the investors asserting a claim against 4520 Drexel are not secured lenders. Although EquityBuild routinely identified this investment to the claimants by the property address, the paperwork presented to and executed by the investors was quite different than the promissory notes and mortgages contained in the investment packages for most of the other properties. These investments constituted membership interests in the South Side Development Fund I, LLC ("SSDF1").[5] The documentation provided to the investors by EquityBuild expressly informed them that they were acquiring an interest in a limited liability company which would acquire an equity interest in properties. This documentation consisted of a "Confidential Private Offering Memorandum" (a copy of which is attached as Exhibit 12), which contained the following provisions:

> South Side Development Fund I, LLC (the "Company") is offering limited liability company Interests through this Confidential Private Placement Memorandum to investors in order to fund a real estate investment fund for the purposes of purchasing interests in at least two related entities that currently own two multifamily buildings in Chicago's south side neighborhoods. (*Id.* at 21)
>
> * * *
>
> The Company will make equity investments in buildings that will also have third party debt in order to maximize the returns to the Fund. The Company projects that it will be able to pay an 8% annual dividend to equity investors from available cash in the Fund on a quarterly basis. The Company intends initially to acquire up to an 80% equity interest in a related entity (4520-26 S Drexel, LLC), which entity owns a multi-family building, 4520-26 S Drexel Blvd (the "4520 Drexel Building"). If sufficient funds are received by the Company in this Offering, the Company will then acquire up to an 80% equity interest in another related entity, 4511-15 Drexel, LLC, which owns a building located at 4511-17 Drexel Avenue, on the same street as the 4520 Drexel Building. (*Id.* at 22)

The investors also were informed that "South Shore Property Holdings, LLC has already solicited and received a term sheet from Red Mortgage Capital, to refinance the existing bridge

---

[5] Indeed, about half of these 49 claimants characterized their claim as a loan secured by 4520 Drexel, and the other half characterized their claim as an equity investment in SSDF1.

debt on the 4520 Drexel Building through the Freddie Mac small balance loan program" (*id.* at 23) and that "[i]f the Company incurs indebtedness, a portion of its cash flow will have to be dedicated to the payment of principal and interest on such indebtedness" and "[a] default under a loan agreement could result in the loan becoming immediately due and payable and, if unpaid, a judgment in favor of such lender which would be senior to the rights of members of the Company." (*Id.* at 35-36)

Accordingly, the individual investors asserting an interest in 4520 Drexel or SSDF1 are equity investors whose rights are subordinate to U.S. Bank's secured mortgage interest. (*See* Exhibit 3 for the Receiver's recommendations regarding the investor claims against 4520 Drexel and/or SSDF1) Therefore, the Receiver recommends distribution of funds out of the account for 4520 Drexel to U.S. Bank up to the amount of its principal actually invested, which does *not* include the portion of the principal that was held back in reserve by U.S. Bank, after deducting amounts paid by EquityBuild as interest, origination fees, and late charges.[6] Exhibit 7 attached hereto itemizes U.S. Bank's proof of claim (showing the amount of its claim as of July 1, 2019, the date the claim was submitted), and further calculates the Receiver's recommended maximum distribution to U.S. Bank from the proceeds held from the sale of 4520 Drexel. (*See also* Section II, *infra*.)

Because the current balance in the account held for 4520 Drexel is approximately $6.43 million, if the Court accepts the Receiver's recommendation to so limit the amount of U.S. Bank's recovery, then in excess of $2 million will remain in the property account to be transferred to the Receiver's account for distribution to eligible unsecured claimants and for administration of the

---

[6] The U.S. Bank loan was a refinance of a January 31, 2017 loan extended by BC57, LLC to enable EquityBuild to acquire the 4520 Drexel property. EquityBuild contributed approximately $1.85 million of investor funds to close the BC57 loan.

Estate.  The claims against this property underscore the equity of limiting maximum distribution amounts to claimants' out-of-pocket losses.  For this property alone, there are about $4.7 million of unsecured claims (even after deducting distributions received prior to rollovers into the SSDF1 fund).  (Ex. 3) These unsecured claimants will not recover from the liquidation of 4520 Drexel. Thus, the extent to which they and other eligible unsecured claimants will receive any recovery will depend on unencumbered funds in the Receiver's account and the distribution plan proposed by the Receiver.

If the Court were to decide that U.S. Bank does not have a secured claim, then the Receiver recommends that the Court find that there is no secured claimant on the property and all of the funds held in the account for 4520 Drexel should be transferred to the Receiver's account.

>           **D.      The Receiver Recommends that the Institutional Lender Has
>                     Priority over Other Claimants in Regards to 5001 S Drexel
>                     Boulevard.**

With regard to the priority dispute between Wilmington Trust, National Association, as Trustee ("Wilmington Trust") (the institutional lender) and other claimants asserting an interest in the property at 5001 Drexel, the Receiver recommends that the Court find that the mortgage recorded by Wilmington Trust has a secured first position priority given the nature of the investor-lenders' interests.

Similar to the claims against 4520 Drexel, the individual investors asserting an interest in 5001 Drexel are not secured lenders.  Pursuant to the agreements presented to and executed by the 5001 Drexel investors, the investors obtained a membership interest in SSDF2 Holdco 2, LLC ("SSDF2").  The investors signed an Operating Agreement for this LLC in essentially the format

of Ex. 13 attached hereto.[7]  Investors made capital contributions to become Class C members of

the LLC, the purpose of which was described as:

> 2.2 Purpose. Notwithstanding any provision hereof to the contrary, the following shall govern: The nature of the business and of the purposes to be conducted and promoted by the Company, is to engage solely in the following activities: (1) to own one hundred percent of the ownership interests in GLDC 5001 S Drexel LLC, an Illinois limited liability company; and (2) to exercise all powers enumerated in this Agreement and the limited liability company law of the State of Delaware necessary or convenient to the conduct, promotion or attainment of the business or purposes otherwise set forth herein. (*Id.* at 5)

Thus, although EquityBuild identified this opportunity to the investors as an investment in

the property located at 5001 Drexel, the investments constituted membership interests in an LLC,

whose rights are subordinate to Wilmington Trust's secured mortgage interest.  (*See* Exhibit 4 for

the Receiver's recommendations regarding the investor claims against 5001 Drexel and/or SSDF2)

Therefore, the Receiver recommends distribution of funds out of the account for 5001

Drexel to Wilmington Trust up to the amount of its principal actually invested, which does *not*

include the portion of the principal that was held back in reserve by Wilmington Trust, after

deducting amounts paid by EquityBuild as interest, assumption, and processing fees.  Exhibit 8,

attached hereto, itemizes Wilmington Trust's proof of claim (showing the amount of its claim as

of June 28, 2019, the date the claim was submitted), and further reflects the amount the Receiver

has calculated as the recommended maximum distribution to Wilmington Trust from the remaining

proceeds held from the sale of 5001 Drexel.  (*See also* Section II*, infra*.)

Because the current balance in the account held for 5001 Drexel is approximately $2.8

million, if the Court accepts the Receiver's recommendation to so limit the amount of Wilmington

Trust's recovery, then approximately $1.3 million will remain in the property account to be

---

[7] It does not appear that EquityBuild provided the 5001 Drexel claimants with a Confidential Private Offering Memorandum such as was provided to the 4520 Drexel investors.  Instead, the investors appear to have been provided only the LLC Operating Agreement.

transferred to the Receiver's account for distribution to eligible unsecured claimants and for administration of the Estate. The claims against this property similarly underscore the equity of limiting maximum distribution amounts to claimants' out-of-pocket losses. For 5001 Drexel, there are about $1.75 million of unsecured claims (after deducting distributions received prior to rollovers into SSDF2 Holdco 2 LLC). (Ex. 4) These unsecured claimants will not recover from the liquidation of 5001 Drexel. Thus, the extent to which they and other eligible unsecured claimants will receive any recovery will depend on unencumbered funds in the Receiver's account and the distribution plan proposed by the Receiver.

If the Court were to decide that Wilmington Trust does not have a secured claim, then the Receiver recommends that the Court find that there is no secured claimant on the property and all of the funds held in the account for 5001 Drexel should be transferred to the Receiver's account.

## II. The Court Has Broad Discretion to Fashion a Just and Reasonable Distribution Plan for Group 5 Properties which Should Exclude from Consideration All Amounts in Excess of Principal.

Most claimants in Group 5 are seeking amounts in addition to the return of the principal amounts that they lent to EquityBuild. For example, many claimants seek anticipated interest payments and/or default interest. Other claimants seek to recover various types of penalties, attorneys' fees, and other additional amounts. The Receiver recommends that none of those categories—beyond return of principal outlay—be allowed, consistent with the position the Receiver has taken with respect to the recommendations made for earlier claims groups. This position is consistent with this Court's equitable powers and mandate to enter a fair and reasonable distribution plan, as further discussed below.

### A. This Court Has the Equitable Authority to Enter a Just and Reasonable Distribution Plan.

The Seventh Circuit has repeatedly held that a district court overseeing a federal equity receivership has broad discretion to fashion a just and equitable distribution plan.[8]  *See, e.g., Duff v. Central Sleep Diagnostics, LLC,* 801 F.3d 833, 844 (7th Cir. 2015) (affirming distribution plan and broad discretion of the district court in such matters, and stating: "A federal receivership is not governed by the Bankruptcy Code.").

In *SEC v. Wealth Management LLC*, 628 F.3d 323, 332 (7th Cir. 2010), the Seventh Circuit described the Court's role as follows:

> In supervising an equitable receivership, the primary job of the district court is to ensure that the proposed plan of distribution is fair and reasonable. *See Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC,* 467 F.3d 73, 84 (2d Cir. 2006). The district court has broad equitable power in this area . . . .

*See also, e.g., Broadbent v. Advantage Software, Inc.*, 415 Fed. Appx. 73, 78-79 (10th Cir. 2011) (affirming distribution plan which included offsets for monies previously received: "In this case, it was proper for the district court to summarily reject appellants' statute of limitations and various contract law arguments in favor of treating appellants like all other similarly situated claimants**.** Indeed, the district court is authorized and expected to determine claims in an equity receivership based on equitable, rather than formalistic, principles."); *SEC v. Credit Bancorp, Ltd.,* No. 99 CIV. 11395 RWS, 2000 WL 1752979 *19 (S.D.N.Y. Nov. 29, 2000) ("Rather, this is a case in which numerous victims of a fraud have competing claims to a limited receivership res. The relief sought

---

[8] The Receiver acknowledges that some claimants have previously argued that they have a right to post-receivership interest under Section 506 of the Bankruptcy Code.  However, this Court's discretion in this regard is not impinged by bankruptcy statutes or bankruptcy court decisions.  This matter is not in bankruptcy and those rules simply do not apply or supersede the discretion of the Court to do equity in this receivership.  Indeed, as discussed *infra,* even if creditors in a bankruptcy may recover post-petition interest when the value of the collateral exceeds the sum of the principal and all interest due, that too is subject to equitable considerations that would militate against such payments.

by the SECO Intervenors would come at the direct expense of the other Credit Bancorp victims. As this Court noted in *Credit Bancorp I,* under these circumstances, '[t]he Receiver at once represents the interests of all and none of Credit Bancorp's customers.... To the extent that the Receiver the interests of all in mind, he is the adversary of the individual customer—whose concern is only for the return of his deposits.'" *SEC v. Credit Bancorp, Ltd.,* 194 F.R.D. 457, 461 (S.D.N.Y 2000) (citing *SEC v. Elliott,* 953 F.2d 1560, 1577 (11th Cir. 1992)); *cf. In re Teltronics, Ltd.,* 649 F.2d 1236, 1239 (7th Cir. 1981) (rejecting, under Illinois receivership law, argument that receiver takes no better title to property than person subject to receivership, since receiver is empowered "to manage the claims of defrauded rightful owners.")).

The distribution plan fashioned and approved by this Court therefore must be guided by these principles.

### B. Disallowance of Post-Receivership Interest, Penalties, Fees, and Other Such Amounts Is Appropriate.

As a general rule, in equity receiverships, interest on a debtor's obligations ceases to accrue at the inception of the proceeding. *See, e.g., Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 163 (1946); *see also Matter of Fesco Plastics Corp.,* 996 F.2d 152, 155 (7th Cir. 1993) (referring to bankruptcy cases; "The age-old rule in bankruptcy, adopted from the English system, is that interest on claims stops accruing when the bankruptcy petition is filed."). One of the many purposes of the rule is that the courts are charged with preserving and protecting the estate for the benefit of *all* interests involved. *Vanston,* 329 U.S. at 163. To that point, the *Vanston* Court made clear that interest may be disallowed in a federal equity receivership – whether to a secured or unsecured creditor, a decision reached in the effort to balance equities between creditors. *Vanston,* 329 U.S. at 165 ("the touchstone of each decision on allowance of interest in

12

… receivership … has been a balance of equities between creditor and creditor or between creditors and the debtor").

For example, in *SEC v. Capital Cove Bancorp LLC*, No. SACV 15-980-JLS (JCx), 2015 WL 9701154 (C.D. Cal. Oct. 13, 2015), the district court disallowed the accrual of post-receivership interest, noting how allowing such interest would harm junior and unsecured creditors, and that staying interest payments satisfied the "'primary purpose' of receiverships, which is 'to promote orderly and efficient administration of the estate' for the benefit of all creditors." *Id*. at *11-12 & n.10 (citing *SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986) (granting motion to stay interest, and citing *Vanston* and other authorities)); *see also, e.g., SEC v. Capital Consultants, LLC,* No. Civ. 00-1290-KI, 2002 WL 32502451 (D. Or. May 24, 2002) (granting receiver's motion to exclude post-petition interest that was not received as of the date of the receivership).

And other courts facing the issue of interest have used equitable authority to preclude application of a default rate of interest, focusing instead on concepts of simple interest. *See, e.g., In re Real Prop. Located at Redacted Jupiter Drive, Salt Lake City, Utah*, 2:05-CV-1013, 2007 WL 7652297 (D. Utah Sept. 4, 2007); *see also In re Hollstrom,* 133 B.R. 535, 539 (Bankr. D. Colo. 1991) (discussing bankruptcy law and stating: "No court which directly addresses the issue appears willing to rule out the possibility that certain circumstances might necessitate an equitable deviation from the stated contractual default rate of interest, and there is no clear, emerging, definite enumeration of these special circumstances or equitable considerations."). Indeed, courts have recognized that default interest above contract interest acts to penalize an estate such as the one at bar by virtue of circumstances outside of the receiver's control—that is, the creation of the receivership estate and the schedule by which the court is addressing and resolving the claims in

13

order to ensure that all claimants receive due process. *See, e.g., Nicholas v. United States*, 384 U.S. 678, 683-84 (1966) ("[C]reditors should not be disadvantaged vis-a-vis one another by legal delays attributable solely to the time-consuming procedures inherent in the administration of the bankruptcy laws. In the context of interest-bearing debts, the equitable principle enunciated in Sexton and Saper rests at bottom on an awareness of the inequity that would result if, through the continuing accumulation of interest in the course of subsequent bankruptcy proceedings, obligations bearing relatively high rates of interest were permitted to absorb the assets of a bankrupt estate whose funds were already inadequate to pay the principal of the debts owed by the estate."). Even in bankruptcy, where Section 506(b) may provide a holder of an oversecured claim with "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose," the right to the contractual default rate is subject to rebuttal based on equitable considerations. *Matter of Terry Limited Partnership*, 27 F.3d 241, 243-244 (7th Cir. 1994) (citing bankruptcy court decisions finding presumption of contract rate was rebutted where default interest rates were between 25% and 36% higher than the pre-default rates). It is worth noting that, in the matter at bar, the default interest rates claimed by US Bank and Wilmington Trust in this case are 91% and 94% higher than the pre-default interest rates provided in those loan agreements.[9]

Moreover, the Order Appointing Receiver in this case prohibits lenders from taking any action which would affect a receivership asset, including using self-help for the purpose of enforcing any lien upon a Receivership Asset (Dkt. 16 ¶ 29(A)), modifying any mortgage agreement executed by a Receivership Defendant (*id.* ¶ 29(C)), or instituting default proceedings (*id.* ¶ 32). The loans at issue were not in default prior to the institution of the receivership—by

---

[9] The US Bank loan has a contract rate of 4.380% and a default rate of 8.380%. The Wilmington Trust loan has a contract rate of 5.3% and a default rate of 10.3%.

way of example, according to Section 5D of claimants' proof of claim submissions, EquityBuild made its last payment to U.S. Bank on August 1, 2018, and to Wilmington Trust on August 14, 2018. Thus, increasing the contract rate of interest "without the express written agreement of the Receiver" (*id.* ¶ 29)—which was not given—would run afoul of the proscriptions in the Order Appointing Receiver at the expense of other claimants.

Consistent with these principles of law and equity, and under the circumstances described above in Section I, the Receiver recommends that all post-receivership interest be disallowed for every claim against any of the properties. For Group 5, this is an issue in regards to the properties at 4520 Drexel, 5001 Drexel, 7300 St. Lawrence (as it relates to the individual lender who is in a first secured position) where the amounts in the property accounts exceed the amounts of principal owed. Given the nature of the fraud – which included pressure exerted on claimants to rollover secured investments into funds, multiple sales of interests in the same properties, manipulations of mortgage recording dates and the like – and the commingling that occurred in running the EquityBuild portfolio, such a result is equitable and justified. For example, EquityBuild contributed approximately $1.87 million of investor funds to purchase 4520 Drexel and approximately $1.5 million of investor funds to purchase 5001 Drexel. (*See* Exs. 14-15 (settlement statements)) By proceeding in such a fashion, this Court would act to treat similarly situated claimants—here, secured creditors holding interests throughout the EquityBuild portfolio—as all would be limited to recovery of principal. As the Seventh Circuit has emphasized, "equality is equity":

> We start with the principle that where investors' assets are commingled and the recoverable assets in a receivership are insufficient to fully repay the investors, "equality is equity." *Cunningham v. Brown,* 265 U.S. 1, 13, 44 S.Ct. 424, 68 L.Ed. 873 (1924). Distribution of assets on a pro rata basis ensures that investors with substantively similar claims to repayment receive proportionately equal distributions. Courts have routinely endorsed pro rata distribution plans as an

equitable way to distribute assets held in receivership in this situation. *See, e.g., Forex Asset Mgmt.,* 242 F.3d at 331–32 (affirming pro rata distribution even where objecting investors' funds were segregated in a separate account and never commingled, noting that whether funds are commingled or traceable is "a distinction without a difference") . . . .

*Wealth Management,* 628 F.3d at 333.

Additionally, as the Court also is aware, substantial delays in these proceedings—including in respect to liquidation of the properties, processing claims against them, and the expeditious distribution of receivership funds—have been caused by factors outside of the Receiver's control (*e.g.,* litigious institutional lender claimants, government shutdown, the pandemic, and the like). Such delays provide additional grounds to reject the efforts to recover amounts above principal through interest payments. *See, e.g., Fesco Plastics*, 996 F.2d at 155 (justification for the bankruptcy rule that "interest on claims stops accruing when the bankruptcy petition is filed … [includes:] … sav[ing] the estate from having to pay extra for the delay in payment when that delay is necessary if the courts are to preserve and protect the estate for the benefit of all creditors …[,] allow[ing] the trustee to fulfill the duty of objecting to questionable claims, … without worrying that an unsuccessful objection will lead to claims for interest and increased administrative expense …[, and] prevent[ing] any unmerited gain or loss by creditors whose claims have different interest rates or who are paid at different times by the … court; all are treated equally") (citing *Vanston*, 329 U.S. at 164; *In re Goldblatt Bros., Inc.*, 61 B.R. 459, 463 (Bankr. N.D. Ill.1986)) (internal citation omitted)).[10]

---

[10] In the alternative only, were this Court to believe that interest is to be considered, for the reasons discussed, *supra,* default interest should not be awarded. Not only do the facts and law support firmly rejecting such an award, the fact that the institutional lenders contributed significantly to delay in this proceeding (*see, e.g.,* Dkt. 1031 at n.32), further demonstrates why charging of default interest under these circumstances is even more inappropriate and inequitable.

Separately, and consistent with the authorities discussed above and their logical underpinnings, the Receiver recommends that requests for late fees, penalties (pre-payment or otherwise), attorneys fees, and all such other costs also be denied for all claimants. To allow such amounts, like interest, would be antithetical to the goal of preserving and protecting the estate for the benefit of *all* interests involved. *See Vanston,* 329 U.S. at 163. Moreover, awarding late fees, penalties, attorneys fees and the like (as with amounts for interest) to a secured creditor in these circumstances—following the liquidation of an asset that was acquired with commingled funds from investors whose security interest would not have existed but for the contribution of stolen and commingled investor funds—would serve to further victimize those investors and other unsecured creditors. Such protection is consistent with and supports the primary purpose of receiverships which is "'to promote orderly and efficient administration of the estate' for the benefit of all creditors." *Capital Cove Bancorp LLC,* 2015 WL 9701154 at *12 (citing *SEC v. Hardy,* 803 F.2d at 1038)*.*

Moreover, and as this Court is aware, the Receivership was put in place involuntarily, over the objections of the Defendants, which also renders the various penalty clauses unenforceable. *See also, e.g., Village of Rosemont v. Maywood-Proviso State Bank*, 149 Ill. App. 3d 1087, 1091-92 (1st Dist. 1986) (finding prepayment clause unenforceable in the event of condemnation which is involuntary). And, as a matter of equity, the rejection of such claims is particularly appropriate here where the EquityBuild companies and portfolio operated as a Ponzi scheme where new investor monies were commingled and used to continue operations. *See* Section III, *infra*.

In sum, penalties and fees that are the product of delays or litigation tactics should not serve to penalize the Estate, nor inure to the benefit of any claimants who contributed to the delay, nor

come at the expense of the interest of other similarly situated or unsecured claimants to potential recovery of any amounts that might otherwise remain available for distribution.

C.    **The Receiver Recommends that the Court Account for Distributions Previously Received from EquityBuild.**

With the Cohens having implemented a Ponzi scheme in which they commingled funds and used new funds from investor and institutional lenders to pay principal and exorbitant profits in the form of interest to prior and existing lenders and investors which were not tied directly and exclusively to income generated by the real estate assets associated with their loans and/or investments, the Receiver recommends that all claimants' claims, whether institutional lender or investor-lender, be set-off by all pre-receivership distributions (whether characterized as payments of principal, interest, bonuses, or other types of returns) that they received from EquityBuild, as well as any amounts held in reserve, in order to achieve a ratable distribution of remaining assets among all of the defrauded investors. *See Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) ("The 'winners' in the Ponzi scheme, even if innocent of any fraud themselves, should not be permitted to 'enjoy an advantage over later investors sucked into the Ponzi scheme who were not so lucky.'") (citation omitted).  Under the "netting rule," amounts transferred by the Ponzi scheme perpetrator to the investor are netted against the initial amounts invested by that individual. *Id.* at 771.  And the fact that the claimants may be innocent victims does not change the analysis, as described by the Seventh Circuit in another Ponzi scheme:

> The money used for the trades came from investors gulled by fraudulent representations. Phillips was one of those investors, and it may seem "only fair" that he should be entitled to the profits on trades made with his money. That would be true as between him and [the Ponzi scheme operator]. It is not true as between him and either the creditors of or the other investors in the corporations. He should not be permitted to benefit from a fraud at their expense merely because he was not himself to blame for the fraud. All he is being asked to do is to return the net profits of his investment—the difference between what he put in at the beginning and what he had at the end.

18

*Scholes v. Lehmann*, 56 F.3d 750, 757-58 (7th Cir. 1995).

Consistent with the logic of these cases, and the authorities discussed above, the Receiver recommends that the distributions already received by the claimants on their loans, as well as any amounts held in reserve by the lenders, be taken into consideration when determining the maximum amount that claimant ultimately should recover, whether from secured funds held in the property account or from unencumbered funds of the Estate. These amounts are material: for instance, in regards to the 4520 Drexel, U.S. Bank received $223,631.08 in payments and is holding $156,220.59 in reserves; at 5001 Drexel, Wilmington received $102,433.63 in payments and is holding $598,839.11 in reserves. (Exs. 7-8)

Accordingly, Exhibits 1-8, hereto, set forth the reserves and distributions made to the Group 5 claimants in the form of interest, principal, or "other" distributions (*e.g.,* origination fees or credits for incentive "coupons" or bonuses). The amounts reflected in Exhibits 1-8 are taken from the claimants' sworn proofs of claim or EquityBuild records. These distributions are then used to reflect the net difference between "money in" and "money out" for each Group 5 claimant. These recommended amounts represent a ceiling – *i.e.,* the amount the Receiver would recommend for distribution if there were sufficient funds available. If available funds from the property liquidation exceed these net amounts, any excess would be distributed to subordinate secured creditors and/or transferred to the Receiver's account along with all other unencumbered funds.

Additional equitable considerations are present here given the fact that there are numerous unsophisticated individual lenders who were left with unsecured claims despite having investments that had the patina of a secured investment, who will not recover the amounts owed. In this way, the Receiver's recommendations represent a factual, legal, and equitable balance of those interests.

### III.    This Court Has Repeatedly Found that the Cohens Perpetrated a Ponzi Scheme.

This Court has repeatedly found that the Cohens engaged in Ponzi scheme.  For the Court's convenience, the Receiver summarizes the evidence so that it is included in the record in relation to Group 5.

The Ponzi scheme created and implemented by the Cohens and EquityBuild was first described with particularity by the SEC in its Complaint (*e.g.,* Dkt. 1, ¶ 45); the Cohens did not deny the Ponzi scheme and entered into a Consent Judgment. (Dkt. 40)  Testimony provided to the District Court in support of both the motion for appointment of the Receiver and, later, turnover of Jerry Cohen's Naples, Florida home, established through a forensic accounting analysis that the Cohens had perpetrated a Ponzi scheme; and this Court agreed.  (*See, e.g.,* Dkt. 492 at 3-7 (Magistrate Judge Kim ruling discussing Tushaus testimony describing the forensic accounting work proving the existence of a Ponzi scheme); Dkt. 603 at 6 (the District Court affirmed the magistrate judge ruling, stating "the [District] Court agrees with the magistrate judge's assessment of the hearing evidence, which 'show[s] that the funds used [to purchase the Naples Property] came from [i]nvestor [m]onies tied to Cohen's Ponzi scheme'" (*citing* Dkt. 492 at 3-7, 10-14)))  The District Court's later entry of a monetary judgment found that the Cohens had been operating a Ponzi scheme.  (*See,* Dkt. 533 at 2 ("Accordingly, the Cohens began running a Ponzi scheme, using new investors' funds to pay earlier investors' interest payments."))

Additionally, facts that have come to light in submissions in the claims process provide additional evidence of a Ponzi scheme, including the evidence presented in the Group 1 claims proceedings. (*See, e.g.,* Dkt. 1227 at 2-3, explaining that EquityBuild used most of the proceeds of the BC57 loan, which were intended to pay off the existing investor mortgages in Group 1, to

instead purchase a property at 11117 S Longwood, for which 61 investors in Group 4 were brought into the scheme.)

By proceeding as the Receiver recommends in respect to amounts claimed in excess of principal, the Court also properly takes into account the other creditors impacted by the Ponzi scheme. In that regard, it important to recognize that the victims of the Cohens' fraud will not be made whole. Indeed, while final figures will not be available until a final distribution plan of remaining unsecured funds is prepared and approved (after disputes between allegedly secured claimants have been resolved), it appears likely that unsecured creditors' losses will exceed $40 million, including among them: (i) numerous claimants who were defrauded by EquityBuild, who as a result of such activities do not have secured interests despite believing they did; and/or (ii) many secured creditors on properties who were unable to recover anything on the properties for which they were promised first secured priority interests, but whose claims turn out to be unsecured. With the number of unsecured lenders being large (several hundreds), and the pool of remaining unsecured funds likely to be relatively small (*i.e.,* a fraction of the amounts claimed), it is particularly important to take into account such equitable considerations.

Limiting distributions on Group 5 to the return of principal less any amounts already recovered from EquityBuild (*see* Section II(C), above), as the Receiver recommends, allows the institutional lenders to be made whole in regards to their cash outlay (which also allows such secured creditors to be treated equally, and therefore equitably, across the Receivership), but also allows the Court to undertake a balancing of interests in regard to other claimants. Given the Court's broad discretion in a federal equity receivership, it is appropriate to consider and give weight to the facts and circumstances discussed above and the totality of the impact on the victims

of the Cohens' fraudulent activities in determining how funds held by the Receiver ought to be distributed in relation to the Group 5 properties and claims.

**IV. Conclusion**

Following the Court's rulings regarding priority and in regards to the Receiver's recommendations on Group 5 as set forth in the attached Exhibits and the foregoing discussion, the Receiver will distribute funds as ordered by the Court or recommend a distribution plan and methodology, including the amount to be distributed to each eligible claimant.

Dated: March 20, 2024                    Kevin B. Duff, Receiver

                                By:    /s/ Michael Rachlis

                                       Michael Rachlis
                                       Jodi Rosen Wine
                                       Rachlis Duff & Peel, LLC
                                       542 South Dearborn Street, Suite 900
                                       Chicago, IL 60605
                                       Phone (312) 733-3950
                                       mrachlis@rdaplaw.net
                                       jwine@rdaplaw.net

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2024, I electronically filed the foregoing Receiver's Submission on Group 5 Claims with the Clerk of the United States District Court for the Northern District of Illinois, using the CM/ECF system. A copy of the foregoing was served upon counsel of record via the CM/ECF system.

I further certify that I caused true and correct copy of the foregoing Submission to be served upon all claimants included on the Email Service List for Group 5 by electronic mail.

I further certify that the Submission will be posted to the Receivership webpage at: http://rdaplaw.net/receivership-for-equitybuild

/s/ Michael Rachlis
Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Phone  (312) 733-3950
Fax     (312) 733-3952
mrachlis@rdaplaw.net

Ex. 1 - 7300-04 S St. Lawrence (Property 49)
Receiver's Recommendations - Individual Claimants

| Claimant Name | Lender Name | Fiduciary Claim: Fiduciary Claim Name | Claimant Submissions | Amount Claimed (Invested in Property) | Secured Claim Remaining | Unsecured Claim (This Investment) | Pre-Rollover Distributions | Distributions Received on Property | Source of Distribution | Total Distributions Recvd on Investment | Max Potential Dist (Proceeds of Sales) | Max Potential Dist. (Unencumbered) | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bernadette Chen Eleven St. Felix Street Realty Corp. | Eleven St. Felix Street Realty Corp. | 49-2012 | POC | $ 50,000.00 | $ | | | $ 10,250.06 | POC; LSA | $ 10,250.06 | $ - | $ - | Claimant agreed to rollover this loan to 7927 S Essex |
| City of Chicago | City of Chicago | 49-693 | | $ 1,182.83 | $ | | | $ - | | $ - | $ - | $ - | Claim paid from closing of Receiver's sale of property |
| Helen Boyd | Helen L. Boyd | 49-2010 | POC | $ 50,000.00 | $ | | | $ 11,583.27 | LSA | $ 11,583.27 | $ - | $ - | Claimant agreed to rollover this loan to 7927 S Essex |
| LaDawn K Westbrook - Miss Property LLC | SD ROTH IRA MissProperty, LLC | 49-271 | POC | $ 5,256.63 | $ 3,627.58 | $ 1,942.06 | | $ 1,258.56 | LSA | $ 1,258.56 | $ 2,369.02 | $1,751.99 | Partial rollover to unsecured promissory note |
| Matthew Boyd | Matthew T. Boyd | 49-2060 | POC | $ 259,302.00 | $ | | | $ 60,071.65 | LSA | $ 60,071.65 | $ - | $ - | Claimant agreed to rollover this loan to 7927 S Essex |
| Paul N. Wilmesmeier | Paul N. Wilmesmeier | 49-300 | POC | $ 25,000.00 | $ | | | $ 5,990.21 | POC | $ 5,990.21 | $ - | $ - | Claimant agreed to rollover this loan to 7927 S Essex |
| | | | | $ 390,741.46 | $ 3,627.58 | $ 1,942.06 | | | | | $ 2,369.02 | $ 1,751.99 | |



Exhibit

1

Receiver's Submission on Group 5 Claims

Ex. 2 - 310 E 50th Street (Property 52)
Receiver's Recommendations - Individual Investors

| Claimant Name | Lender Name | Fiduciary Claim: Fiduciary Claim Name | Amount Claimed (Invested in Property) | Secured Claim Remaining | Unsecured Claim (This Investment) | Pre-Rollover Distributions | Distributions Received on Property | Source of Distribution | Total Distributions Recvd on Investment | Max Potential Dist (Proceeds of Sales) | Max Potential Dist. (Unencumbered) | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paper Street Realty LLC DBA Rent Ready Apartments | Paper Street Realty LLC DBA Rent Ready Apartments | 52-1206 | $ 49,600.68 | $ - | $ 49,600.68 | | $ - | | $ - | $ - | $ - | Lien waiver executed |
| Kirk Road Investments, LLC | Kirk Road Investments LLC | 52-755 | $ 193,750.00 | $ - | | | $ 52,795.92 | POC | $ 52,795.92 | $ - | $ - | This loan was repaid in full |
| | | | $ 243,350.68 | $ - | $ 49,600.68 | | | | | $ - | $ - | |

**Exhibit**

**2**

Receiver's Submission on Group 5 Claims

Ex. 3 - 4520 S Drexel (Property 63)
Receiver's Recommendations - Individual Investors

| Claimant Name | Lender Name | Fiduciary Claim: Fiduciary Claim Name | Claimant Submissions | Amount Claimed (Invested in Property) | Secured Claim Remaining | Unsecured Claim (This Investment) | Pre-Rollover Distributions | Distributions Received on Property | Source of Distribution | Total Distributions Recv'd on Investment | Max Potential Dist (Proceeds of Sales) | Max Potential Dist. (Unencumbered) | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Adir Hazan | | 63-143 | POC | $ 100,000.00 | $ | $ 100,000.00 | $ 16,330.49 | | LSA | $ 16,330.49 | $ | $ 83,669.51 | LLC membership interest; prerollover distributions from loans secured by 6355 S Talman and 3074 S Cheltenham |
| Adir Hazan | Adir Hazan | 901-143 | POC | $ 100,000.00 | $ | $ 100,000.00 | | $ | | $ | $ | $ | |
| Asbury R. Lockett | | 63-210 | POC | $ 100,000.00 | $ | $ 100,000.00 | $ 7,044.43 | | POC; LSA | $ 7,044.43 | $ | $ 92,955.57 | LLC membership interest; prerollover distributions from loan secured by 8326 S Ellis |
| Asians Investing In Real Estate LLC | Asians Investing In Real Estate LLC | 63-503 | POC | $ 160,000.00 | $ | $ 160,000.00 | $ 40,668.21 | | POC; LSA | $ 40,668.21 | $ | $ 119,331.79 | LLC membership interest; prerollover distributions from loan secured by 7546 S Saginaw, 7600 S Kingston and 7635 S East Emd |
| Cadaval Investment Trust FBO Dana Cadaval Solo 401k | | 901-1242 | POC | $ 50,000.00 | $ | $ 50,000.00 | $ 1,816.66 | | LSA | $ 1,816.66 | $ | $ 48,183.34 | LLC membership interest; prerollover distributions from loan secured by 1700 Juneway |
| Cadaval Investment Trust FBO Manuel Cadaval Solo 401k | | 901-1236 | POC | $ 100,000.00 | $ | $ 100,000.00 | $ 846.19 | | LSA | $ 846.19 | $ | $ 99,153.81 | LLC membership interest; prerollover distributions from loan secured by 7749 S Yates |
| Capital Liability Investments, LLC | | 901-186 | POC | $ 55,000.00 | $ | $ 55,000.00 | $ 8,106.43 | | LSA | $ 8,106.43 | $ | $ 46,893.57 | LLC membership interest; prerollover distributions from loan secured by 7508 S Essex |
| Cindy L. Chambers | | 63-85 | POC | $ 33,337.00 | $ | $ 33,337.00 | | $ | | $ | $ | $ 33,337.00 | LLC membership interest |
| DVH Investment Trust | | 901-1410 | POC | $ 315,000.00 | $ | $ 315,000.00 | $ 62,820.33 | | LSA | $ 62,820.33 | $ | $ 252,179.67 | LLC membership interest; prerollover distributions from loan secured by 7026 S Cornell |
| Florybeth & David Stratton | Florybeth & David Stratton | 901-604 | POC | $ 200,000.00 | $ | $ 200,000.00 | $ 8,310.00 | | LSA | $ 8,310.00 | $ | $ 191,689.93 | LLC membership interest; prerollover distributions from loans secured by 6160 S MLK and 7024 S Paxton |
| Frank and Laura Sohm | Frank and Laura Sohm | 63-906 | POC | $ 65,000.00 | $ | $ 65,000.00 | $ 4,377.80 | | POC; LSA | $ 4,377.80 | $ | $ 60,622.20 | LLC membership interest; prerollover distributions from loan secured by 816 E Marquette |
| Gary R Burnham FBO Raegan D Burnham Roth IRA (custodian IPLA | Gary R Burnham FBO Raegan D Burnham Roth IRA (custodian IPLAN Group LLC) | 901-1065 | POC | $ 7,161.00 | $ | $ 7,161.00 | $ 1,960.00 | | POC | $ 1,960.00 | $ | $ 5,201.00 | LLC membership interest; prerollover distributions from loan secured by 5201 Washington and 8100 Essex |
| Gary R Burnham Jr. Family HSA (custodian IPLAN Group LLC) | iPlan Group FBO Gary R. Burnham Jr. Family HSA | 901-1066 | POC | $ 30,718.00 | $ | $ 30,718.00 | $ 6,204.00 | | POC | $ 6,204.00 | $ | $ 24,514.00 | LLC membership interest; prerollover distributions from loan secured by 5201 Washington, 1700 Juneway, and 8100 Essex |
| Gary R. Burnham Jr. Solo 401K Trust | Gary R. Burnham Jr. Solo 401K Trust | 901-1174 | POC | $ 204,026.00 | $ | $ 204,026.00 | $ 30,441.00 | | POC | $ 30,441.00 | $ | $ 173,585.00 | LLC membership interest; prerollover distributions from loans secured by 5201 Washington, 8100 Essex, 6160 MLK, 6001 Sacramento, 7546 Saginaw and 7024 Paxton |
| Grathia Corp | Grathia Corp | 63-1445 | POC | $ 100,000.00 | $ | $ 100,000.00 | | $ | | $ | $ | $ 100,000.00 | LLC membership interest |
| Greg S. Wirth | Madison Trust Company Custodian FBO Greg Wirth M1608104 | 63-563 | POC | $ 12,600.00 | $ | $ 12,600.00 | $ 1,019.15 | | POC; LSA | $ 1,019.15 | $ | $ 11,580.85 | LLC membership interest; prerollover distributions from loan secured by 4611 S Drexel |
| Greg S. Wirth | Madison Trust Company Custodian FBO Greg Wirth M1608103 | 63-593 | POC | $ 7,300.00 | $ | $ 7,300.00 | $ 634.47 | | | $ 634.47 | $ | $ 6,665.53 | LLC membership interest; prerollover distributions from loan secured by 4611 S Drexel |
| Henry S. Scheuller | Henry S. Scheuller | 63-357 | POC | $ 85,000.00 | $ | $ 85,000.00 | | $ | | $ | $ | $ 85,000.00 | LLC membership interest |
| IRA Services Trust Company CFBO Melbourne Kimsey II | IRA Services Trust Company CFBO Melbourne Kimsey II | 901-661 | POC | $ 50,000.00 | $ | $ 50,000.00 | | $ | | $ | $ | $ 50,000.00 | LLC membership interest |
| IRA Services Trust Company IRA220656 for Jean-Marc Cabrol | IRA Services Trust Company CFBO Jean-Marc Cabrol IRA 220656 | 901-120 | POC | $ 381,650.00 | $ | $ 381,650.00 | $ 58,571.04 | | POC; LSA | $ 58,571.04 | $ | $ 323,078.96 | LLC membership interest; prerollover distributions from loans secured by 8326 S Ellis, 5450 Indiana and 1700 Juneway |
| James Anthony Ande | New Direction IRA, Inc. FBO James Anthony Ande IRA | 63-591 | POC | $ 75,000.00 | $ | $ 75,000.00 | $ 6,245.84 | | POC; LSA | $ 6,245.84 | $ | $ 68,754.16 | LLC membership interest; prerollover distributions from loan secured by 4611 S Drexel and 5450 S Indiana |
| James Tutsock | James Tutsock | 63-2057 | POC | $ 319,483.00 | $ | $ 650,000.00 | $ 139,338.73 | | POC; Other | $ 172,567.53 | $ | $ 477,432.47 | LLC membership interest; prerollover distributions from loan secured by 7201 S Constance and 6801 S East End |
| Jeffrey Lee Blankenship | | 63-1241 | POC | $ 103,698.00 | $ | $ 103,698.00 | $ 6,314.63 | | POC | $ 6,314.63 | $ | $ 97,383.37 | LLC membership interest; prerollover distributions from loan secured by 701 S 5th and unsecured promissory note |
| Jeremy Hemphill | | 901-290 | POC | $ 50,000.00 | $ | $ 50,000.00 | $ 14,000.00 | | LSA; Other | $ 14,000.00 | $ | $ 36,000.00 | LLC membership interest; prerollover distributions from loan secured by 7750 S Muskegon |
| Jeremy Hemphill for REAP, LLC | REAP, LLC | 63-1371 | POC | $ 100,000.00 | $ | $ 100,000.00 | $ 5,365.37 | | LSA | $ 5,365.37 | $ | $ 94,634.63 | LLC membership interest; prerollover distributions from loan secured by 6217 S Dorchester |



Exhibit

3

Receiver's Submission on Group 5 Claims

Ex. 3 - 4520 S Drexel (Property 63)
Receiver's Recommendations - Individual Investors

| Claimant Name | Lender Name | Fiduciary Claim: Fiduciary Claim Name | Claimant Submissions | Amount Claimed (Invested in Property) | Secured Claim Remaining | Unsecured Claim (This Investment) | Pre-Rollover Distributions | Distributions Received on Property | Source of Distribution | Total Distributions Recvd on Investment | Max Potential Dist (Proceeds of Sales) | Max Potential Dist. (Unencumbered) | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| John Witzigreuter | John Witzigreuter | 901-729 | POC | $ 200,000.00 | $ - | $ 200,000.00 | $ 22,077.66 | $ - | LSA | $ 22,077.66 | $ - | $ 177,922.34 | LLC membership interest; prerollover distributions from loans secured by 7748 Essex, 7255 Euclid and 4611 Drexel. |
| Joseph P. McCarthy | | 63-1367 | POC | $ 45,000.00 | $ - | | | $ - | | $ - | $ - | $ - | Duplicative of claim 901-1367 |
| Joseph P. McCarthy | | 901-1367 | POC | $ 45,000.00 | $ - | $ 45,000.00 | $ 8,792.09 | | LSA | $ 8,792.09 | $ - | $ 36,207.91 | LLC membership interest; prerollover distributions from loans secured by 6001 S Sacramento and 7546 S Saginaw |
| Joshua Lapin | | 63-1243 | POC | $ 25,000.00 | $ - | $ 25,000.00 | $ 1,068.41 | | LSA | $ 1,068.41 | $ - | $ 23,931.59 | LLC membership interest; prerollover distributions from loan secured by 7749 S Yates |
| KAMEDA INVESTMENTS, LLC (Sole Owner/Manager - Arnold Kunio K | KAMEDA INVESTMENTS, LLC (Sole Owner/Manager - Arnold Kunio Kameda) | 63-121 | POC | $ 125,000.00 | $ - | $ 125,000.00 | | $ - | | $ - | $ - | $ 125,000.00 | LLC membership interest |
| Keith Randall | | 63-1086 | POC | $ 170,000.00 | $ - | | | $ - | | $ - | $ - | $ - | Duplicative of claim 901-1086 |
| Keith Randall | | 901-1086 | POC | $ 170,000.00 | $ - | $ 170,000.00 | $ 9,952.35 | | LSA | $ 9,952.35 | $ - | $ 160,047.65 | LLC membership interest; prerollover distributions from loan secured by 7749 S Yates and 7748 S Essex |
| Madison Trust Company FBO Laurie Connely, IRA | iPlanGroup Agent For Custodian FBO Laurie A Connely IRA | 901-900 | POC | $ 20,000.00 | $ - | $ 20,000.00 | $ 1,935.58 | | LSA | $ 1,935.58 | $ - | $ 18,064.42 | LLC membership interest; prerollover distributions from loan secured by 6160 S MLK |
| Manuel Cadaval | | 901-1084 | POC | $ 25,000.00 | $ - | $ 25,000.00 | $ 1,068.41 | | LSA | $ 1,068.41 | $ - | $ 23,931.59 | LLC membership interest; prerollover distributions from loan secured by 7749 S Yates |
| Manuel Cadaval custodian for Jacob Cadaval | | 901-1244 | POC | $ 25,000.00 | $ - | $ 25,000.00 | $ 1,068.41 | | LSA | $ 1,068.41 | $ - | $ 23,931.59 | LLC membership interest; prerollover distributions from loan secured by 7749 S Yates |
| Mark P. Mouty | Mark Mouty | 63-165 | POC | $ 10,000.00 | $ - | $ 10,000.00 | | $ - | | $ - | $ - | $ 10,000.00 | LLC membership interest |
| Michael D More | | 901-682 | POC | $ 100,000.00 | $ - | $ 100,000.00 | $ 18,000.00 | | POC | $ 18,000.00 | $ - | $ 82,000.00 | LLC membership interest; prerollover distributions from loan secured by 7656 S Kingston |
| Natalie T. Scheuller | Natalie T. Scheuller | 63-358 | POC | $ 85,000.00 | $ - | $ 85,000.00 | | $ - | | $ - | $ - | $ 85,000.00 | LLC membership interest |
| NEXT GENERATION TS FBO ELAINE SISON ERNST IRA 2410 | | 901-1030 | POC | $ 100,000.00 | $ - | $ 100,000.00 | | $ 1,324.70 | POC | $ 1,324.70 | $ - | $ 98,675.30 | LLC membership interest |
| Optima Property Solutions, LLC | Optima Property Solutions, LLC | 901-1023 | POC | $ 856,284.00 | $ - | $ 856,284.00 | $ 174,492.05 | | LSA | $ 174,492.05 | $ - | $ 681,791.95 | LLC membership interest; ; prerollover distributions from loans secured by 4533 S Calumet, 7026 Cornell, 7237 Bennett, 7844 S Ellis, 638 Avers, and 7201 S Dorchester |
| Patrick Connely | Patrick Connely | 901-939 | POC | $ 50,000.00 | $ - | $ 50,000.00 | $ 2,352.77 | | LSA | $ 2,352.77 | $ - | $ 47,647.23 | LLC membership interest; prerollover distributions from loan secured by 1700 Juneway |
| Peters, David (The Dominquez-Peters Living Turst) | | 901-2045 | POC | $ 50,000.00 | $ - | $ 50,000.00 | $ 4,453.90 | | LSA | $ 4,453.90 | $ - | $ 45,546.10 | LLC membership interest; prerollover distributions from loan secured by 7024 S Paxton |
| Sunwest Trust-FBO Mark P. Mouty | | 63-334 | POC | $ 100,000.00 | $ - | $ 100,000.00 | $ 15,200.00 | | LSA | $ 15,200.00 | $ - | $ 84,800.00 | LLC membership interest; prerollover distributions from loan secured by 7051 S Bennett |
| Terry M McDonald - Horizon Trust Custodian FBO Terry M McDon | Horizon Trust Custodian FBO Terry M McDonald IRA | 901-571 | POC | $ 137,333.33 | $ - | $ 137,333.33 | $ 21,747.48 | | LSA | $ 21,747.48 | $ - | $ 115,585.85 | LLC membership interest; prerollover distributions from loan secured by 7546 S Saginaw and 4611 S Drexel |
| The Entrust Group FBO Dee Ann Nason 7230011277 | The Entrust Group Inc., FBO DeeAnn Nason, 7230011277 | 63-790 | POC | $ 50,000.00 | $ - | $ 50,000.00 | | $ - | | $ - | $ - | $ 50,000.00 | LLC membership interest |
| Todd Colucy | iPlanGroup Agent for Cust. FBO Todd Colucy IRA | 901-322 | POC | $ 50,000.00 | $ - | $ 50,000.00 | $ 6,794.21 | | LSA | $ 6,794.21 | $ - | $ 43,205.79 | LLC membership interest; prerollover distributions from loan secured by 400 S Kilbourn and 7749 S Yates |
| US Freedom Investments, LLC | US Freedom Investments, LLC (Kevin Scheel) | 901-1234 | POC | $ 100,000.00 | $ - | $ 100,000.00 | $ 12,930.61 | | LSA | $ 12,930.61 | $ - | $ 87,069.39 | LLC membership interest; prerollover distributions from loan secured by 7024 S Paxton; 7255 S Euclid and 7201 S Constance |
| Walter T Akita and Margaret M Akita | | 63-950 | POC | $ 50,000.00 | $ - | $ 50,000.00 | | $ - | | POC | $ - | $ - | $ 50,000.00 | LLC membership interest |
| White Tiger Revocable Trust Ira Lovitch Zinaida Lovitch (aka | White Tiger Revocable Trust | 63-537 | POC | $ 50,000.00 | $ - | $ 50,000.00 | $ 1,911.80 | | POC; LSA | $ 1,911.80 | $ - | $ 48,088.20 | LLC membership interest; prerollover distributions from loan secured by 7749 S Yates |
| | | | | $ 5,443,590.33 | $ - | $ 5,459,107.33 | | | | $ - | $ - | $ 4,700,293.26 | |

Ex. 4 - 5001 S Drexel (Property 3)
Receiver's Recommendations - Individual Investors

| Claimant Name | Lender Name | Fiduciary Claim: Fiduciary Claim Name | Claimant Submissions | Amount Claimed (Invested in Property) | Secured Claim Remaining | Unsecured Claim (This Investment) | Pre-Rollover Distributions | Distributions Received on Property | Source of Distribution | Total Distributions Recvd on Investment | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Adir Hazan | Adir Hazan | 3-143 | POC | $ 50,000.00 | $ - | $ - | | $ 56,258.33 | POC | $ 56,258.33 | LLC membership interest |
| Alan Schankman | Alan Schankman | 3-2096 | POC | $ 50,000.00 | $ - | $ 50,000.00 | | $ 3,754.17 | LSA | $ 3,754.17 | LLC membership interest |
| Asians Investing In Real Estate LLC | Asians Investing In Real Estate LLC | 3-503 | POC | $ 95,000.00 | $ - | $ 95,000.00 | | $ 7,125.00 | POC | $ 7,125.00 | LLC membership interest |
| Benjamin J Serebin | | 3-1288 | POC | $ 300,000.00 | $ - | $ 150,000.00 | | $ 10,263.89 | POC | $ 10,263.89 | LLC membership interest |
| Bernadette Chen Eleven St. Felix Street Realty Corp. | Bernadette Chen (Eleven St Felix St. Realty) | 3-2012 | POC | $ 200,000.00 | $ - | $ 200,000.00 | | $ 15,016.67 | LSA | $ 15,016.67 | LLC membership interest |
| Bright Venture, LLC | Bright Venture, LLC | 3-84 | POC | $ 50,000.00 | $ - | $ 50,000.00 | | $ 3,754.17 | POC; LSA | $ 3,754.17 | LLC membership interest |
| Bryan Corey Purkis , Trustee Vivant Ventures Trust | | 3-1413 | POC | $ 150,000.00 | $ - | $ 150,000.00 | | $ 13,500.00 | POC; LSA | $ 13,500.00 | LLC membership interest |
| Capital Investors, LLC | Capital Investors, LLC | 3-1490 | POC | $ 295,000.00 | $ - | $ 275,000.00 | | $ - | | $ - | LLC membership interest |
| Consuelo V Needs-Medical Dictation Services, Inc. | | 3-541 | POC | $ 50,000.00 | $ - | $ 50,000.00 | | $ 3,025.00 | POC; LSA | $ 3,025.00 | LLC membership interest |
| Doron Reichenberg | Doron Reichenberg | 3-708 | POC | $ 50,000.00 | $ - | $ 50,000.00 | | $ - | | $ - | LLC membership interest |
| Horst Siegrfied Filtzer Jr. | Horst S. Filtzer Jr. | 3-1085 | POC | $ 100,000.00 | $ - | $ 100,000.00 | | $ 9,016.67 | POC; LSA | $ 9,016.67 | LLC membership interest |
| LEVENT KESEN | Levent Kesen | 3-1078 | POC | $ 50,000.00 | $ - | $ 50,000.00 | | $ 3,754.17 | POC; LSA | $ 3,754.17 | LLC membership interest |
| Madison Trust Company FBO Judy Newton IRA | | 3-533 | POC | $ 50,000.00 | $ - | $ 50,000.00 | | $ 3,600.00 | POC; LSA | $ 3,600.00 | LLC membership interest |
| Michael Alden Schankman | | 3-2052 | POC | $ 50,000.00 | $ - | $ 50,000.00 | | $ 3,754.17 | LSA | $ 3,754.17 | LLC membership interest |
| Nancy Lynn Cree Cree Capital Ventures, LLC | | 3-2014 | POC | $ 300,000.00 | $ - | $ 300,000.00 | | $ 22,525.00 | POC; LSA | $ 22,525.00 | LLC membership interest |
| Rachael B Curcio | | 3-292 | POC | $ 50,000.00 | $ - | $ 50,000.00 | | $ 3,675.00 | POC; LSA | $ 3,675.00 | LLC membership interest |
| Scott Eaton | Scott H. Eaton | 3-1470 | POC | $ 100,000.00 | $ - | $ 100,000.00 | | $ 7,508.33 | LSA | $ 7,508.33 | LLC membership interest |
| Tiger Chang Investments LLC | Tiger Chang Investments LLC | 3-164 | POC | $ 5,000.00 | $ - | $ 5,000.00 | | $ 375.42 | POC; LSA | $ 375.42 | LLC membership interest |
| US Freedom Investments, LLC | US Freedom Investments, LLC | 3-1234 | POC | $ 17,000.00 | $ - | $ 17,000.00 | | $ 1,181.50 | LSA | $ 1,181.50 | LLC membership interest |



Exhibit

4

Receiver's Submission on Group 5 Claims

Ex. 4 - 5001 S Drexel (Property 3)
Receiver's Recommendations - Individual Investors

| Claimant Name | Lender Name | Fiduciary Claim: Fiduciary Claim Name | Claimant Submissions | Amount Claimed (Invested in Property) | Secured Claim Remaining | Unsecured Claim (This Investment) | Pre-Rollover Distributions | Distributions Received on Property | Source of Distribution | Total Distributions Recvd on Investment | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Victor Esposito T/A 2E-LLC | 2E, LLC | 3-308 | POC | $ 50,000.00 | $ - | $ 49,925.00 | $ 9,190.00 | $ 3,930.00 | POC | $ 13,120.00 | LLC membership interest; prerollover distributions from loan secured by 7107 S Bennett |
| Victor Esposito T/A 2E-LLC I am the manager member and the | 2E, LLC | 902-308 | POC | $ 50,000.00 | $ - | | | $ - | | $ - | Duplicate of claim 3-308 |
| Victor Shaw | Victor M. Shaw and Jane R. Shaw, Trustees, or their Successor(s) in Trust of the Shaw Family Trust | 3-1040 | POC | $ 50,000.00 | $ - | $ 50,000.00 | | $ 3,750.00 | POC; LSA | $ 3,750.00 | LLC membership interest |
| | | | | $ 2,162,000.00 | $ - | $ 1,891,925.00 | | | | | |

**Claimant Midland Loan Services, a Division of PNC Bank, N.A. as servicer for Wilmington Trust, N.A., as Trustee for the Benefit of Corevest American Finance 2017-1 Trust Mortgage Pass-Through Certificates**

Claim Number:  49-1464

**Properties in which asserting security interest:**
49 - 7300-04 St Lawrence Avenue

**Claim:**

| | | |
|---|---|---|
| Principal Balance | $ | 1,471,942.01 |
| Contract interest accrued pre-8/18/18 | $ | 4,488.86 |
| Contract Interest Accrued after 8/18/18 | $ | 84,253.60 |
| Default rate interest accrued before August 18, 2018 | $ | 96,069.71 |
| Default Rate Interest Accrued on or after August 18, 2018 | $ | 55,913.85 |
| Other Amounts Claimed | $ | 303,941.03 |
| Escrow balances (combined) | $ | (43,215.54) |
| **Total (after accouting for escrows)** | **$** | **1,973,393.52** |

| | | |
|---|---|---|
| Loan amount | $ | 1,491,000.00 |
| Allocated to 7300-04 St Lawrence Avenue | $ | 375,000.00 |
| Percent of total loan | | 25.151% |

**Receiver's recommendation:**

| | | | Allocated to Property (25.151%) | |
|---|---|---|---|---|
| Principal Balance | $ | 1,471,942.01 | $ | 370,206.74 |
| Less tax escrow | $ | (10,307.38) | $ | (2,592.40) |
| Less insurance escrow | $ | (13,961.45) | $ | (3,511.43) |
| Less replacement reserves | $ | (18,946.71) | $ | (4,765.27) |
| **Subtotal** | **$** | **1,428,726.47** | **$** | **359,337.64** |
| Less loan origination fee | $ | (14,910.00) | $ | (3,750.00) |
| Less inteest paid at closing | $ | (1,622.71) | $ | (408.13) |
| Less interest payments received (7/11/2017 - 8/13/2018) | $ | (122,874.02) | $ | (30,903.93) |
| **Maximum amount available for distribution from proceeds of sale** | **$** | **1,289,319.74** | **$** | **324,275.59** |



Exhibit
**5**
Receiver's Submission on Group 5 Claims
exhibitsticker.com

**Claimant Midland Loan Services, a Division of PNC Bank, N.A. as servicer for Wilmington Trust, N.A., as Trustee for the Registered Holders of Corevest American Finance 2017-2 Trust, Mortgage Pass-Through Certificates, Series 2017-2**

Claim Number:  52-1466

**Properties in which asserting security interest:**
52 - 310 E 50th Street

**Claim:**

| | | |
|---|---|---:|
| Principal Balance | $ | 2,403,082.84 |
| Contract interest accrued pre-8/18/18 | $ | 7,034.90 |
| Contract Interest Accrued after 8/18/18 | $ | 132,060.47 |
| Default rate interest accrued before August 18, 2018 | $ | 1,234.38 |
| Default Rate Interest Accrued on or after August 18, 2018 | $ | 117,482.00 |
| Other Amounts Claimed | $ | 397,994.07 |
| Escrow balances (combined) | $ | (55,759.60) |
| **Total (after accouting for escrows)** | **$** | **3,003,129.06** |

| | | |
|---|---|---:|
| Original Loan Amount | $ | 2,426,250.00 |
| Allocated to 310 E. 50th | $ | 336,979.17 |
| Percent of total loan - 310 E 50th | | 13.889% |

**Receiver's recommendation:**

| | | | Allocated to Property (13.889%) | |
|---|---|---:|---|---:|
| Principal Balance | $ | 2,403,082.84 | $ | 333,761.51 |
| Less tax escrow | $ | (11,168.57) | $ | (1,551.19) |
| Less insurance escrow | $ | (15,093.00) | $ | (2,096.25) |
| Less replacement reserves | $ | (29,498.03) | $ | (4,096.95) |
| **Subtotal** | **$** | **2,347,323.24** | **$** | **326,017.12** |
| Less loan origination fee | $ | (24,262.50) | $ | (3,369.79) |
| Less interest paid at closing | $ | (6,761.15) | $ | (939.05) |
| Less interest payments received (11/13/2017 - 8/09/2018) | $ | (127,915.04) | $ | (17,765.98) |
| | | | | |
| **Maximum amount available for distribution from proceeds of sale** | **$** | **2,188,384.55** | **$** | **303,942.30** |



**Exhibit**

**6**

Receiver's Submission on Group 5 Claims

**Claimant U.S. Bank National Association, as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2017-SB41**

Claim Number: 64-1448

**Properties in which asserting security interest:**
63 - 4520-26 S Drexel Boulevard

**Claim:**

| | | |
|---|---|---|
| Principal Balance | $ | 4,400,000.00 |
| Contract interest accrued pre-8/18/18 | $ | 9,636.00 |
| Contract Interest Accrued after 8/18/18 | $ | 169,165.33 |
| Default rate interest accrued before August 18, 2018 | $ | - |
| Default Rate Interest Accrued on or after August 18, 2018 | $ | 163,288.93 |
| Other Amounts Claimed | $ | 88,886.89 |
| **Total** | **$** | **4,830,977.15** |

**Receiver's recommendation:**

| | | |
|---|---|---|
| Principal Balance | $ | 4,400,000.00 |
| Less capital expenditure reserve | $ | (151,500.00) |
| Less tax escrow | $ | (4,720.59) |
| **Subtotal** | **$** | **4,243,779.41** |
| Less loan origination fee | $ | (44,000.00) |
| Less interest payments received (9/12/2017 - 8/01/2018) | $ | (178,801.31) |
| Less late charge paid | $ | (829.77) |
| **Maximum recommended distribution from proceeds of sale** | **$** | **4,020,148.33** |



**Exhibit**

**7**

Receiver's Submission on Group 5 Claims

**Claimant Wilmington Trust, National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Trust 2014-LC16, Commercial Mortgage Pass-Through Certificates Series 2014-LC16**

Claim Number:  3-1329

**Properties in which asserting security interest:**

3 - 5001 S Drexel Boulevard

**Claim:**

| | | |
|---|---|---|
| Principal Balance | $ | 2,195,582.51 |
| Contract interest accrued pre-8/18/18 | $ | 5,495.06 |
| Contract Interest Accrued after 8/18/18 | $ | 102,466.62 |
| Default rate interest accrued before August 18, 2018 | $ | 969.72 |
| Default Rate Interest Accrued on or after August 18, 2018 | $ | 96,666.62 |
| Other Amounts Claimed | $ | 478,421.14 |
| **Total** | **$** | **2,879,601.67** |

**Receiver's recommendation:**

| | | |
|---|---|---|
| Principal Balance | $ | 2,195,582.51 |
| Less replacement reserve | $ | (580,376.50) |
| Less insurance reserve | $ | (16,473.46) |
| Less tax escrow | $ | (1,989.15) |
| **Subtotal** | **$** | **1,596,743.40** |
| Less assumption fee | $ | (11,108.53) |
| Less processing fee | $ | (2,500.00) |
| Less interest payments received (12/12/2017 - 8/14/2018) | $ | (88,825.10) |
| **Maximum recommended distribution from proceeds of sale** | **$** | **1,494,309.77** |



Exhibit

8

Receiver's Submission on Group 5 Claims

# Illinois Anti-Predatory Lending Database Program

## Certificate of Exemption



Doc#: 1532145038 Fee: $52.00
RHSP Fee:$9.00 RPRF Fee: $1.00
Karen A.Yarbrough
Cook County Recorder of Deeds
Date: 11/17/2015 12:06 PM Pg: 1 of 8

**Report Mortgage Fraud
800-532-8785**

---

The property identified as:      **PIN:** 20-27-219-018-0000

**Address:**
**Street:**      7304 S. St. Lawrence Avenue
**Street line 2:**
**City:** Chicago                **State:** IL                **ZIP Code:** 60619

**Lender:** EquityBuild Finance, LLC

**Borrower:** EquityBuild, Inc.

**Loan / Mortgage Amount:** $618,603.00

This property is located within the program area and is exempt from the requirements of 765 ILCS 77/70 et seq. because it is not owner-occupied.

> **Exhibit**
>
> **9**
>
> Receiver's Submission on Group 5 Claims

**Certificate number:** 16F54033-F809-4D68-B550-7485AC7F1CE1            **Execution date:** 10/9/2015

---

Mail To:

*Equity Build Finance*
*5068 W. Plano Pkwy #300*
*Plano, TX 75093*

_____[The Above Space For Recorder's Use Only]_____

## MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on October 9th, 2015. The mortgagor is EquityBuild, Inc. ("Borrower").

This Security Instrument is given to The Persons Listed on Exhibit A to the Mortgage C/O EquityBuild Finance, LLC whose address is 5068 West Plano Pkwy. #300 Plano, TX 75093 ("Lender").

Borrower owes Lender the principal sum of Six Hundred Eighteen Thousand Six Hundred Three and 00/100 Dollars (U.S. $618,603.00). This debt is evidenced by Borrower's note dated  the same date as this Security Instrument (Mortgage), which provides for a final payment of the full debt,  if not paid earlier, due and payable October 1st, 2016. This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extension and modifications; (b) the payment of all other sums, with interest advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in COOK County, Illinois:

PIN: 20-27-219-018-0000

which has the address of 7304 S St. Lawrence Ave., Chicago, IL 60619 ("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents, royalties, mineral, oil and gas rights and profits, water rights and stock and all fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANT. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. **Hazard Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration and repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 19 the property is acquired by Lender, Borrower's rights to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of sums secured by this Security Instrument immediately prior to the acquisition.

3. **Preservation and Maintenance of Property; Leaseholds.** Borrower shall not destroy, damage or substantially change the Property, allow the Property to deteriorate or commit waste. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease, and if Borrower acquires fee title to the Property, the leasehold and fee title shall not merge unless Lender agrees to the merger in writing.

4. Protection of Lender's Rights in the Property; Mortgage Insurance. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees, and entering on the Property to make repairs. Although Lender may take action under this paragraph 4, Lender does not have to do so.

5. Successor and Assigns Bound; Joint and Several Liability; Co-signers. The covenants and agreements of this Security Interest shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 9. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey the Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forebear or make any accommodations with regard to the terms of this Security Instrument or the Note without the Borrower's consent.

6. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

7. Governing Law; Severability. This Security Instrument shall be governed by federal law and the law of jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

8. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

9. Transfer of the Property or a beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

10. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

11. Assignment of Rents and Leases. As additional security for the payment of the Indebtedness, Mortgagor assigns and transfers to Mortgagee, pursuant to 1953 PA 210, as amended by 1966 PA 151 (MCLA 554.231 et seq., MSA 26.1137(1) et seq.), all the rents, profits, and income under all leases, occupancy agreements, or arrangements upon or affecting the Premises (including any extensions or amendments) now in existence or coming into existence during the period this Mortgage is in effect. This assignment shall run with the land and be good and valid as against Mortgagor and those claiming under or through Mortgagor. This assignment shall continue to be operative during foreclosure or any other proceedings to enforce this Mortgage. If a foreclosure sale results in a deficiency, this assignment shall stand as security during the redemption period for the payment of the deficiency. This assignment is given only as collateral security and shall not be construed as obligating Mortgagee to perform any of the covenants or undertakings required to be performed by Mortgagor in any leases. In the event of default in any of the terms or covenants of this Mortgage, Mortgagee shall be entitled to all of the rights and benefits of MCLA 554.231-.233, MSA 26.1137(1)-(3), and 1966 PA 151, and Mortgagee shall be entitled to collect the rents and income from the Premises, to rent or lease the Premises on the terms that it may deem best, and to maintain proceedings to recover rents or possession of the Premises from any tenant or trespasser. Mortgagee shall be entitled to enter the Premises for the purpose of delivering notices or other communications to the tenants and occupants. Mortgagee shall have no liability to Mortgagor as a result of those acts. Mortgagee may deliver all of the notices and communications by ordinary first-class U.S. mail. If Mortgagor obstructs Mortgagee in its efforts to collect the rents and income from the Premises or unreasonably refuses or neglects to assist Mortgagee in collecting the rent and income, Mortgagee shall be entitled to appoint a receiver for the Premises and the income, rents, and profits, with powers that the court making the appointment may confer. Mortgagor shall at no time collect advance rent in excess of one month under any lease pertaining to the Premises, and Mortgagee shall not be bound by any rent prepayment made or received in violation of this paragraph. Mortgagee shall not have any obligation to collect rent or to enforce any other obligations of any tenant or occupant of the Premises to Mortgagor. No action taken by Mortgagee under this paragraph shall cause Mortgagee to become a "mortgagee in possession."

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

BORROWER: EquityBuild, Inc.

_____ (SEAL)
Jerry Cohen, President

_____[Space Below This Line For Acknowledgement]_____

STATE OF FLORIDA, _manatee_____ County ss:

I hereby certify that on this day, before me, an officer duly authorized in the state aforesaid and  in the county aforesaid to take acknowledgements, personally appeared <u>Jerry Cohen</u>, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he/she executed the same for the purpose therein expressed.

WITNESS my hand and official seal in the county and state aforesaid this _9th_ day of _October_____, 20 _15_.

My Commission expires: _July 26, 2017_

{Seal}

_Jessica Ann Baier_
Notary Public

JESSICA ANN BAIER
MY COMMISSION #FF019714
EXPIRES July 26, 2017
(407) 398-0153    FloridaNotaryService.com

### Exhibit A

| Lender Name | Principal Amount | Percentage of Loan |
|---|---|---|
| 2nd City Solo 401K Trust | $47,677 | 7.71% |
| Eleven st.Felix Street Realty Corp. | $50,000 | 8.08% |
| Paul N. Wilmesmeier | $25,000 | 4.04% |
| Matthew T. Boyd | $259,302 | 41.92% |
| Helen L. Boyd | $50,000 | 8.08% |
| Melanie T. and Gary M. Gonzales | $155,000 | 25.06% |
| iPlanGroup Agent for Custodian FBO Yanicque Michaux IRA | $25,000 | 4.04% |
| SD ROTH IRA MissProperty, LLC | $6,624 | 1.07% |

1532145038 Page: 8 of 8

The North 65 feet of Lot 1 in the resubdivision of Lot 1 (except the South 1 foot thereof) and the East 12 feet and 4 1/2 inches of Lot 2 (except the South 1 foot and except the West 8 feet taken for alley), all in Block 1 in Flemings' Subdivision of the Southwest 1/4 of the Northeast 1/4 of Section 27, Township 38 North, Range 14, East of the Third Principal Meridian, also Lot "A" in Lots 7 and 8 in Block 1 in Flemings' Subdivision aforesaid, in Cook County, Illinois

| Property Address | | Docket Number | Respondent | Amount Due |
|---|---|---|---|---|
| 7109-19 S CALUMET AVE 20-27-105-004-0000 | | 17BT00378A | EQUITYBUILD, INC C/O IOANA SALAJANU | $381.84 |
| 6437-41 S KENWOOD AVE 213-009-0000 | 20-23- | 04BS11768A | 6437 S KENWOOD LLC JOHN A OHAWRAS | $5,247.91 |
| 7300-04 S ST LAWRENCE AVE 27-219-018-0000 | 20- | 17DS63827L | EQUITYBUILD, INC. C/O JERRY COHEN | $348.45 |
| 7300-04 S ST LAWRENCE AVE 27-219-018-0000 | 20- | 17DS67083L | EQUITYBUILD, INC. C/O IOANA SALAJANU | $345.26 |
| 8000-02 S JUSTINE ST 20-32-108-019-0000 | | 17DS67402L | EQUITYBUILD, INC. C/O IOANA SALAJANU | $488.53 |
| 8000-02 S JUSTINE ST 20-32-108-019-0000 | | 17DS69306L | EQUITYBUILD, INC. C/O JERRY COHEN | $486.18 |
| 9610 S WOODLAWN AVE 25-11-108-045-0000 | | 15BT04530A | EQUITYBUILD, INC C/O JERRY H COHEN | $431.13 |
| 8326-54 S ELLIS AVE 35-303-096/097/098/099-0000 | 20- | 17DS70976L | EQUITYBUILD, INC C/O JERRY H. COHEN | $770.04 |
| 8326-54 S ELLIS AVE 35-303-096/097/098/099-0000 | 20- | 18DS16846L | EQUITYBUILD, INC. C/O IOANA SALAJANU | $847.78 |
| 8326-54 S ELLIS AVE 35-303-096/097/098/099-0000 | 20- | 18DS86695L | EQUITYBUILD, LLC | $1,445.86 |
| 8517 S VERNON AVE 407-005-0000 | 20-34- | 18DS24159L | EB SOUTH CHICAGO 2, LLC C/O THE CORPORATION TRUST COMPANY | $841.94 |
| 8405 S MARQUETTE AVE 21-31-314-002-0000 | | 19DS35071L | SSDF4 7024 S PAXTON LLC C/O IOANA SALAJANU | $260.00 |
| 8405 S MARQUETTE AVE 21-31-314-002-0000 | | AC1420749-125245 | SSDF4 7024 S PAXTON LLC C/O IOANA SALAJANU | $153.84 |
| 5618-20 S MARTIN LUTHER KING DR 20-15-112-018-0000 112-019-0000 | 20-15- | 18DS16638L | SSPH PORTFOLIO 1 LLC C/O IOANA SALAJANU | $1,510.11 |
| 5618-20 S MARTIN LUTHER KING DR 20-15-112-018-0000 112-019-0000 | 20-15- | 18DS16914L | SSPH PORTFOLIO 1 LLC C/O IOANA SALAJANU | $1,509.55 |
| 5618-20 S MARTIN LUTHER KING DR 20-15-112-018-0000 112-019-0000 | 20-15- | 18DS17588L | SSPH PORTFOLIO 1 LLC C/O IOANA SALAJANU | $1,508.14 |
| 7625-33 S EAST END AVE 25-310-008-0000 | 20- | 16BT04181A | EQUITYBUILD, INC C/O ACORN PROPERTY MGMT | $1,546.09 |
| 7625-33 S EAST END AVE 25-310-008-0000 | 20- | 17DS61992L | EQUITYBUILD, INC. C/O JERRY COHEN | $349.81 |

Exhibit

10

Receiver's Submission on Group 5 Claims

| Address | | Number | Owner | Amount |
|---|---|---|---|---|
| 7635-43 S EAST END AVE<br>25-310-009-0000 | 20- | 17BT05174A | EQUITYBUILD, INC. C/O<br>IOANA SALAJANU | $610.08 |
| 7255-57 S EUCLID AVE<br>25-112-007-0000 | 20- | 17DS55877L | EQUITYBUILD, INC. C/O<br>JERRY H COHEN | $1,118.05 |
| 7255-57 S EUCLID AVE<br>25-112-007-0000 | 20- | 17DS55891L | EQUITYBUILD, INC. C/O<br>JERRY H COHEN | $529.60 |
| 7748-54 S ESSEX AVE<br>30-319-029-0000 | 21- | 17DS61258L | EQUITYBUILD, INC. C/O<br>IOANA SALAJANU | $642.09 |
| 7748-54 S ESSEX AVE<br>30-319-029-0000 | 21- | 17DS61328L | EQUITYBUILD, INC. C/O<br>IOANA SALAJANU | $496.16 |
| 7748-54 S ESSEX AVE<br>30-319-029-0000 | 21- | 17DS61330L | EQUITYBUILD, INC. C/O<br>IOANA SALAJANU | $496.16 |
| 7748-54 S ESSEX AVE<br>30-319-029-0000 | 21- | 18DS98035L | EQUITYBUILD, INC. C/O<br>IOANA SALAJANU | $463.29 |
| 7600-10 S KINGSTON AVE<br>21-30-309-030-0000 | | 17DS66268L | EQUITYBUILD, INC. C/O<br>IOANA SALAJANU | $346.09 |
| 7600-10 S KINGSTON AVE<br>21-30-309-030-0000 | | 17DS66278L | EQUITYBUILD, INC. C/O<br>IOANA SALAJANU | $562.39 |
| 7600-10 S KINGSTON AVE<br>21-30-309-030-0000 | | 17DS66293L | EQUITYBUILD, INC. C/O<br>IOANA SALAJANU | $634.49 |
| 107-13 N LARAMINE AVE | | 17BT03356A | EQUITYBUILD, INC. C/O<br>IOANA SALAJANU | $1,715.34 |
| 7304 S ST LAWRENCE AVE<br>20-27-219-018-0000 | | 17DS67073L | EQUITYBUILD, INC. C/O<br>IOANA SALAJANU | $489.12 |
| 6035 S EBERHART AVE<br>20-15-403-014-0000 | | 18DS89497L | PORTFOLIO ASSETS, INC.<br>C/O IOANA SALAJANU | $885.34 |
| 1449 N TALMAN AVE<br>211-004-0000 | 16-01- | 18DS18481L | TIKKUN HOLDINGS, LLC<br>C/O JERRY COHEN | $1,647.16 |
| 1449 N TALMAN AVE<br>211-004-0000 | 16-01- | 18DS18555L | TIKKUN HOLDINGS, LLC<br>C/O JERRY COHEN | $1,647.16 |
| | | | | **$30,754.98** |



Docket #: 17DS63827L   Status: REFERRED TO CO... ▼   Orig Hearing: 06/30/2017

Source: AHMS   Status Date: 09/09/2017   Cont Hearing:

Dept: S+S   Admin Review:   Interest BeginDate: 08/05/2017

Unit:   AR Disposition:   Interest End Date: 06/25/2019

Case: Liable ▼   Bankruptcy Filing:   Adjustment Date:

Settlement Amt:   Adj Reason: ▼

**Adjustments**

| 0.00 |
| 0.00 |
| 0.00 |
| 0.00 |
| 0.00 |
| 0.00 |
| 0.00 |
| 0.00 |
| 0.00 |
| 0.00 |

**Fines & Fees**

| Total Fine: | 200.00 |
| Admin Fee: | 40.00 |
| Sanction Fee: | 0.00 |
| NSF Fee: | |
| CCC Fee: | |
| Storage Fee: | 0.00 |
| Tow Fee: | 0.00 |
| Attorney Fee: | 0.00 |
| Collection Cost: | 67.68 |
| Court Cost: | 0.00 |
| Interest: | 40.77 |

Gross Amount Due: 348.45
Total Amount Paid: 0.00
Current Balance: 348.45

| First Name | Last Name | Business Name | Street # | Str. Dir | Street Name | Stree |
|---|---|---|---|---|---|---|
| | | EQUITYBUILD, IN( | 1083 | N | COLLIER BLVD # 132 | |
| | | EQUITYBUILD, IN( | 321 | N | CLARK | STREET |
| | | | | | | |

| Citation | Count | Municipal Code | Finding | Final Fine |
|---|---|---|---|---|
| 163827L | 1 | 7-28-710  Dumping or accumul | CTYNSUIT | 0.00 |
| 163827L | 2 | 7-28-261(b) Over accumulation | LIABPLEA | 200.00 |
| | | | | |

NOV Date: 08/02/2016   Total: 200
Paymt Plan: ☐   Contact Log: ☐

**Violation Address Information**

Street #   Str. Dir Street Name

7304   S   ST LAWRENCE AVE

City   State  Zip

CHICAGO   IL   60619-1710

☐ Manually Changed ?

| Docket Detail | Vehicle | Payment Info | Adjustments | Law Firm Status | Contact Log | Holds Liens | Forms/Notices |

# IN THE CITY OF CHICAGO, ILLINOIS
## DEPARTMENT OF ADMINISTRATIVE HEARINGS

**CITY OF CHICAGO**, a Municipal Corporation, Petitioner,   )

    v.      )

       )

Equitybuild, Inc. C/O Jerry Cohen     )

1083 N. COLLIER BLVD # 132     )

MARCO ISLAND, FL 34145     )

    and     )

Equitybuild, Inc. C/O Ioana Salajanu     )

321 N CLARK ST STE 2200     )

CHICAGO, IL 60654     )

                  , Respondents. )

Address of Violation:

7304 S St Lawrence Avenue

Docket #: 17DS63827L

Issuing City

Department:  Streets and Sanitation

## FINDINGS, DECISIONS & ORDER

This matter coming for Hearing, notice given and the Administrative Body advised in the premises, having considered the motions, evidence and arguments presented, IT IS ORDERED:  As to the count(s), this tribunal finds by a preponderance of the evidence and rules as follows:

| *Finding* | *NOV#* | *Count(s)* | *Municipal Code Violated* | *Penalties* |
|---|---|---|---|---|
| City non-suit | 163827L | 1 | 7-28-710   Dumping or accumulation of garbage or trash - potential rat harborage. | $0.00 |
| Liable - By plea | 163827L | 2 | 7-28-261(b)  Over accumulation of refuse in refuse container. | $200.00 |

**Sanction(s):**

**Admin Costs:**  $40.00

**JUDGMENT TOTAL:**  $240.00

**Balance Due:**  $240.00

Respondent is ordered to come into immediate compliance with any/all outstanding Code violations.

ENTERED: _____

            Administrative Law Judge                  24            Jun 20, 2017

                                                 ALO#           Date

**This Order may be appealed to the Circuit Court of Cook Co. (Daley Center 6th Fl.) within 35 days by filing a civil law suit and by paying the appropriate State mandated filing fees.**

**Pursuant to Municipal Code Chapter 1-19, the city's collection costs and attorney's fees shall be added to the balance due if the debt is not paid prior to being referred for collection.**



# IN THE CITY OF CHICAGO, ILLINOIS
## DEPARTMENT OF ADMINISTRATIVE HEARINGS

| | | |
|---|---|---|
| | | Address of Violation: |
| **CITY OF CHICAGO**, a Municipal Corporation, Petitioner, | ) | 7304 S St Lawrence Avenue |
| v. | ) | |
| | ) | |
| Equitybuild, Inc. C/O Ioana Salajanu | ) | Docket #: 17DS67083L |
| 321 N CLARK ST, STE 2200 | ) | |
| CHICAGO, IL 60654 | ) | Issuing City |
| and | ) | Department: Streets and Sanitation |
| Equitybuild, Inc. C/O Jerry Cohen | ) | |
| 1083 N COLLIER BLVD #132 | ) | |
| MARCO ISLAND, FL 34145 | ) | |
| , Respondents. | ) | |

## FINDINGS, DECISIONS & ORDER

This matter coming for Hearing, notice given and the Administrative Body advised in the premises, having considered the motions, evidence and arguments presented, IT IS ORDERED:  As to the count(s), this tribunal finds by a preponderance of the evidence and rules as follows:

| *Finding* | *NOV#* | *Count(s)* | *Municipal Code Violated* | *Penalties* |
|---|---|---|---|---|
| Liable - By plea | 167083L | 1 | 7-28-261(b)  Over accumulation of refuse in refuse container. | $200.00 |

**Sanction(s):**

**Admin Costs:** $40.00

**JUDGMENT TOTAL:** $240.00

**Balance Due:** $240.00

Respondent is ordered to come into immediate compliance with any/all outstanding Code violations.

ENTERED: _____

|  | 104 | Aug 15, 2017 |
|---|---|---|
| Administrative Law Judge | ALO# | Date |

**This Order may be appealed to the Circuit Court of Cook Co. (Daley Center 6th Fl.) within 35 days by filing a civil law suit and by paying the appropriate State mandated filing fees.**

**Pursuant to Municipal Code Chapter 1-19, the city's collection costs and attorney's fees shall be added to the balance due if the debt is not paid prior to being referred for collection.**

17DS67083L

Date Printed:   Jun 24, 2019 3:50 pm

Page 1 of 1



**AH Referrals**

Docket #: 17DS67073L   Status: REFERRED TO CO... ▾   Orig Hearing: 08/23/2017
Source: AHMS   Status Date: 11/04/2017   Cont Hearing:

Dept: S+S   Admin Review:   Interest BeginDate: 09/28/2017
Unit: 6   AR Disposition:   Interest End Date: 06/25/2019
Case: Liable ▾   Bankruptcy Filing:   Adjustment Date:
Settlement Amt:   Adj Reason: ▾

| Adjustments | Fines & Fees | |
|---|---|---|
| 0.00 | Total Fine: | 300.00 |
| 0.00 | Admin Fee: | 40.00 |
| 0.00 | Sanction Fee: | 0.00 |
| 0.00 | NSF Fee: | |
| 0.00 | CCC Fee: | |
| 0.00 | Storage Fee: | 0.00 |
| 0.00 | Tow Fee: | 0.00 |
| 0.00 | Attorney Fee: | 0.00 |
| 0.00 | Collection Cost: | 95.88 |
| 0.00 | Court Cost: | 0.00 |
| 0.00 | Interest: | 53.24 |

Gross Amount Due: 489.12
Total Amount Paid: 0.00
Current Balance: 489.12

| First Name | Last Name | Business Name | Street # | Str. Dir | Street Name | Stree |
|---|---|---|---|---|---|---|
| | | EQUITYBUILD, IN( | 1083 | N | COLLIER BLVD #132 | |
| | | EQUITYBUILD, IN( | 321 | N | CLARK | STREET |

| Citation | Count | Municipal Code | | Finding | Final Fine |
|---|---|---|---|---|---|
| 167073L | 1 | 7-28-261(b) | Over accumulation | CTYNSUIT | 0.00 |
| 167073L | 2 | 7-28-720 | Accumulation of mat | LIABPLEA | 300.00 |
| | | | | | |

NOV Date: 08/09/2016   Total: 300
Paymt Plan: ☐   Contact Log: ☐

**Violation Address Information**
Street #   Str. Dir   Street Name
7304   S   LAWRENCE AVE
City   State   Zip
CHICAGO   IL
☐ Manually Changed ?

Docket Detail | Vehicle | Payment Info | Adjustments | Law Firm Status | Contact Log | Holds ,Liens | Forms/Notices

# IN THE CITY OF CHICAGO, ILLINOIS
## DEPARTMENT OF ADMINISTRATIVE HEARINGS

|  |  |
|---|---|
| **CITY OF CHICAGO**, a Municipal Corporation, Petitioner, ) | Address of Violation: |
| v.                                                      ) | 7304 S Lawrence Avenue |
|                                                         ) |  |
| Equitybuild, Inc. C/O Jerry Cohen                       ) | Docket #: 17DS67073L |
| 1083 N COLLIER BLVD #132                                ) |  |
| MARCO ISLAND, FL 34145                                  ) | Issuing City |
| and                                                     ) | Department: Streets and Sanitation |
| Equitybuild, Inc. C/O Ioana Salajanu                    ) |  |
| 321 N CLARK ST, STE 2200                                ) |  |
| CHICAGO, IL 60654                                       ) |  |
| , Respondents. )                                        |  |

### FINDINGS, DECISIONS & ORDER

This matter coming for Hearing, notice given and the Administrative Body advised in the premises, having considered the motions, evidence and arguments presented, IT IS ORDERED: As to the count(s), this tribunal finds by a preponderance of the evidence and rules as follows:

| _Finding_ | _NOV#_ | _Count(s)_ | _Municipal Code Violated_ | _Penalties_ |
|---|---|---|---|---|
| City non-suit | 167073L | 1 | 7-28-261(b) Over accumulation of refuse in refuse container. | $0.00 |
| Liable - By plea | 167073L | 2 | 7-28-720 Accumulation of materials or junk - potential rat harborage. | $300.00 |

**Sanction(s):**

**Admin Costs:** $40.00

**JUDGMENT TOTAL:** $340.00

**Balance Due:** $340.00

Respondent is ordered to come into immediate compliance with any/all outstanding Code violations.

ENTERED: _Heather Neaveill-Kramer_

|  | 104 | Aug 15, 2017 |
|---|---|---|
| Administrative Law Judge | ALO# | Date |

**This Order may be appealed to the Circuit Court of Cook Co. (Daley Center 6th Fl.) within 35 days by filing a civil law suit and by paying the appropriate State mandated filing fees.**

**Pursuant to Municipal Code Chapter 1-19, the city's collection costs and attorney's fees shall be added to the balance due if the debt is not paid prior to being referred for collection.**

### First American Title Insurance Company

First American

30 North LaSalle Street, Suite 2220 • Chicago, IL 60602

Office Phone:(312)750-6780 Office Fax:(866)563-2766

### Final Settlement Statement

| | | | | |
|---|---|---|---|---|
| **Property Address:** | 7300-04 St. Lawrence Avenue,<br>Chicago, IL 60619 | **File No:** | C-2985065 | |
| | | **Officer:** | Dawn Bragg/db | |
| | | **Settlement Date:** | 07/24/2020 | |
| | | **Disbursement Date:** | | |
| | | **Print Date:** | 07/27/2020, 1:49 PM | |

| | |
|---|---|
| **Buyer:** | St. Lawrence Court, LLC |
| **Address:** | 7300-04 St. Lawrence Avenue, Chicago, IL 60619 |
| **Seller:** | EB South Chicago 3 LLC |
| **Address:** | |
| **Lender:** | Beverly Bank and Trust Company |
| **Address:** | 9801 West Higgins, 4th Floor, Rosemont, IL, 60018 |
| **Loan No.:** | |

| Buyer Charge | Buyer Credit | Charge Description | Seller Charge | Seller Credit |
|---|---|---|---|---|
| | | **Consideration:** | | |
| 330,000.00 | | Total Consideration | | 330,000.00 |
| | | | | |
| | | **Deposits in Escrow:** | | |
| | 72,000.00 | Receipt No. 100194642 on 07/24/2020 by St. Lawrence Court, LLC | | |
| | | | | |
| | | **Earnest Money:** | | |
| | 33,000.00 | Total Deposit/Earnest Money | | |
| | | Disbursed as Proceeds ($33000.00) | | |
| | | Excess Deposit | | |
| | | | | |
| | | **Adjustments:** | | |
| | 163.20 | Rent Credit | 163.20 | |
| | 1,487.61 | Rent Proration | 1,487.61 | |
| | 13.57 | Water Proration | 13.57 | |
| | | | | |
| | | **Prorations:** | | |
| | 5,482.74 | County Taxes 01/01/20 to 07/24/20 @$0.00/yr | 5,482.74 | |
| | | | | |
| | | **Commission:** | | |
| | | Real Estate Commission to SVN Chicago Commercial | 13,200.00 | |
| | | | | |
| | | **Attorney:** | | |
| 5,000.00 | | Attorney Fee to Arnold H. Landis | | |
| | | | | |
| | | **New Loan(s):** | | |
| | | Lender: Beverly Bank and Trust Company | | |
| | 310,000.00 | Loan Amount - Beverly Bank and Trust Company | | |
| 75,000.00 | | Lender Holdback to Beverly Bank and Trust Company | | |
| 1,000.00 | | Appraisal Fee to Beverly Bank and Trust Company | | |
| 21.00 | | Flood Certification to Beverly Bank and Trust Company | | |
| 3,100.00 | | Loan Fee to Beverly Bank and Trust Company | | |
| 80.00 | | Lien Search to Beverly Bank and Trust Company | | |
| 350.00 | | Enviornmental Cost to Beverly Bank and Trust Company | | |
| 1,608.93 | | Escrow Deposit to Beverly Bank and Trust Company | | |
| | | | | |
| | | **Title/Escrow Charges to:** | | |
| | | Closing Protection Coverage-Seller to First American Title Insurance Company | 50.00 | |
| 25.00 | | Closing Protection Coverage-Lender to First American Title Insurance Company | | |
| 25.00 | | Closing Protection Coverage-Buyer to First American Title Insurance Company | | |
| 750.00 | | Deed and Money Escrow to First American Title Insurance Company | 750.00 | |
| 50.00 | | PLDP Compliance Processing Charge to First American Title Insurance Company | | |
| 250.00 | | Escrow Fee Money Lender's to First American Title Insurance Company | | |
| | | Commitment Update Search to First American Title Insurance Company | 150.00 | |

Initials: _____  _____

Page 1 of 2

Continued From Page 1

## *Final Settlement Statement*

| Settlement Date: | 07/24/2020 | | File No: | C-2985065 |
| Print Date: | 07/27/2020 | | Officer: | Dawn Bragg/db |

| Buyer Charge | Buyer Credit | Charge Description | Seller Charge | Seller Credit |
|---|---|---|---|---|
| 175.00 | | GAP Coverage to First American Title Insurance Company | 175.00 | |
| | | Chicago Water Process and Payment Service Fee to First American Title Insurance Company | 100.00 | |
| | | Service/Handling Wire Transfer Fee to First American Title Insurance Company | 40.00 | |
| | | Tax Payment Service Fee to First American Title Insurance Company | 50.00 | |
| | | County Property Taxes 2nd 1/2 2019 Taxes 20-27-219-018-0000 to Cook County Collector | 4,260.59 | |
| | | County Property Taxes 2018 2nd 1/2 Taxes 20-27-219-018-0000 to Cook County Collector | 5,544.95 | |
| | | County Property Taxes 1st 1/2 2019 Taxes 20-27-2198-018-0000 to Cook County Collector | 5,392.98 | |
| 150.00 | | Policy Update Search to First American Title Insurance Company | | |
| 500.00 | | Loan Policy-Simultaneous to First American Title Insurance Company | | |
| | | Owner's Policy to First American Title Insurance Company | 2,030.00 | |
| | | Commercial Extended Coverage End O to First American Title Insurance Company | 350.00 | |
| 250.00 | | Endorsement(s) L ALTA 9 to First American Title Insurance Company | | |
| 750.00 | | [ALTA 3.1-06] Zoning - Completed Structure to First American Title Insurance Company | | |
| 98.00 | | Deed | | |
| 98.00 | | Mortgage | | |
| 98.00 | | Assignment of Rents | | |
| | | State Transfer Tax | 330.00 | |
| | | County Transfer Tax | 165.00 | |
| 2,475.00 | | City Transfer Tax | 990.00 | |
| | | | | |
| | | **Disbursements Paid:** | | |
| | | Water Certification to City of Chicago The Department of Water | 803.52 | |
| | | Payoff Doc # 17DS63827L to City of Chicago | 366.57 | |
| | | Payoff Doc #17DS67073L to City of Chicago | 514.77 | |
| | | Payoff Doc #17DS67083L to City of Chicago | 363.37 | |
| | | Payoff Doc #18DS23138L to City of Chicago | 1,586.29 | |
| | | Survey to Professionals Associated | 2,400.00 | |
| | | | | |
| 293.19 | | Cash ( From) (X To) Buyer | | |
| | | **Cash (X To) ( From) Seller** | 283,239.84 | |
| | | | | |
| 422,147.12 | 422,147.12 | **Totals** | 330,000.00 | 330,000.00 |

BUYER(S):

St. Lawrence Court, LLC

First American Title Insurance Company

By
Dawn Bragg

SELLER(S):

EB South Chicago 3 LLC, a Delaware
limited liability company

Initials: _____  _____

Page 2 of 2

Continued From Page 1

## Final Settlement Statement

| | | |
|---|---|---|
| Settlement Date: | 07/24/2020 | |
| Print Date: | 07/27/2020 | |

| | | |
|---|---|---|
| File No: | C-2985065 | |
| Officer: | Dawn Bragg/db | |

| Buyer Charge | Buyer Credit | Charge Description | Seller Charge | Seller Credit |
|---|---|---|---|---|
| 175.00 | | GAP Coverage to First American Title Insurance Company | 175.00 | |
| | | Chicago Water Process and Payment Service Fee to First American Title Insurance Company | 100.00 | |
| | | Service/Handling Wire Transfer Fee to First American Title Insurance Company | 40.00 | |
| | | Tax Payment Service Fee to First American Title Insurance Company | 50.00 | |
| | | County Property Taxes 2nd 1/2 2019 Taxes 20-27-219-018-0000 to Cook County Collector | 4,260.59 | |
| | | County Property Taxes 2018 2nd 1/2 Taxes 20-27-219-018-0000 to Cook County Collector | 5,544.95 | |
| | | County Property Taxes 1st 1/2 2019 Taxes 20-27-2198-018-0000 to Cook County Collector | 5,392.98 | |
| 150.00 | | Policy Update Search to First American Title Insurance Company | | |
| 500.00 | | Loan Policy-Simultaneous to First American Title Insurance Company | | |
| | | Owner's Policy to First American Title Insurance Company | 2,030.00 | |
| | | Commercial Extended Coverage End O to First American Title Insurance Company | 350.00 | |
| 250.00 | | Endorsement(s) L ALTA 9 to First American Title Insurance Company | | |
| 750.00 | | [ALTA 3.1-06] Zoning - Completed Structure to First American Title Insurance Company | | |
| 98.00 | | Deed | | |
| 98.00 | | Mortgage | | |
| 98.00 | | Assignment of Rents | | |
| | | State Transfer Tax | 330.00 | |
| | | County Transfer Tax | 165.00 | |
| 2,475.00 | | City Transfer Tax | 990.00 | |
| | | | | |
| | | **Disbursements Paid:** | | |
| | | Water Certification to City of Chicago The Department of Water | 803.52 | |
| | | Payoff Doc # 17DS63827L to City of Chicago | 366.57 | |
| | | Payoff Doc #17DS67073L to City of Chicago | 514.77 | |
| | | Payoff Doc #17DS67083L to City of Chicago | 363.37 | |
| | | Payoff Doc #18DS23138L to City of Chicago | 1,586.29 | |
| | | Survey to Professionals Associated | 2,400.00 | |
| | | | | |
| 293.19 | | Cash ( From) (X To) Buyer | | |
| | | Cash (X To) ( From) Seller | 283,239.84 | |
| | | | | |
| 422,147.12 | 422,147.12 | **Totals** | 330,000.00 | 330,000.00 |

BUYER(S): _See attached_

St. Lawrence Court, LLC

First American Title Insurance Company

By _Dawn Bragg_
Dawn Bragg

SELLER(S): _[signature]_

EB South Chicago 3 LLC, a Delaware limited liability company, by Kevin B Duff, Federal Equity Receiver, by Andrew E Porter, Atty. In Fact

Initials: _cl_

**PROPERTY MANAGER'S WAIVER OF LIEN**

WHEREAS, Paper Street Realty, LLC, an Illinois limited liability company, has been employed by Kevin B. Duff, as Federal Equity Receiver for EB South Chicago 4 LLC to furnish services as the property manager at the following premises, legally described in the corresponding Chicago Title Insurance Company Orders:

      1401 W 109th Place, Chicago, IL 60643       20NW7143136LFE

      310 E 50th Street, Chicago, IL 60615       20NW7143137LFE

      6807 S Indiana Avenue, Chicago, IL 60637       20NW7143138LFE

NOW, THEREFORE, the undersigned, for and in consideration of Ten and No/100 Dollars ($10.00), and other good and valuable consideration, including cash on hand for each property, receipt whereof is hereby acknowledged, does waive and release any and all lien or claim or right to a lien under the Statues of Illinois relating to Mechanic's Liens on the above described premises and improvements thereon and on the monies or other considerations due or becoming due from the owner on account of labor or services, materials fixtures, apparatus, or machinery heretofore furnished or which may be furnished at any time hereafter by the undersigned for the above described premises.

Dated this 24th day of May 2021

By: _____
      Michael S. Abraham, Co-Manager

**AFFIDAVIT**

The undersigned affiant, Michael S. Abraham, being first duly sworn, deposes and says that he is Co-Manager of Paper Street Realty, LLC, which was retained by Kevin B. Duff, Federal Equity Receiver for EB South Chicago 4 LLC, to provide property management services at the following properties:

      1401 W 109th Place, Chicago, IL 60643

      310 E 50th Street, Chicago, IL 60615

      6807 S Indiana Avenue, Chicago, IL 60637

The affiant states that there are no contracts for outstanding work and that there is nothing due to any person for material, labor, or work of any kind done or to be done or in connection with the premises noted therein. Cash on hand for each property is adequate to cover all outstanding debts owed and shall be satisfied upon closing. No contracts have been let, either verbal or written, by the undersigned as agent for the owner.

Dated this 24th day of May 2021

_____
      Michael S. Abraham

Subscribed and sworn to before me this 24th day of May 2021

Notary Public
State of Virginia, County of Arlington
Notarized online using audio-video communication



Timothy Oladamola Olukanni
REGISTRATION NUMBER
7888148
COMMISSION EXPIRES
October 31, 2024

**Exhibit 11**
Receiver's Submission on Group 5 Claims

# CONFIDENTIAL PRIVATE OFFERING MEMORANDUM

# South Side
# Development Fund I, LLC
# $5,950,000

| | |
|---:|:---|
| Maximum Membership Units Offered: | 5,950,000 |
| Minimum Membership Units Offered: | 500,000 |
| Price Per Unit: | $1.00 |
| Minimum Investment: | $50,000.00 (50,000 Units)(1) |

**South Side Development Fund I, LLC (the "Company" or "The Fund"), an Illinois limited liability company, is offering a minimum of 500,000 and a maximum of 5,950,000 membership units for $1.00 per unit. The offering price per unit has been arbitrarily determined by the Company**.

**ACCREDITED INVESTORS AND UP TO**
**THIRTY-FIVE (35) NON-ACCREDITED INVESTORS ONLY**

**THESE ARE SPECULATIVE SECURITIES WHICH INVOLVE A HIGH DEGREE OF RISK. ONLY THOSE INVESTORS WHO CAN BEAR THE LOSS OF THEIR ENTIRE INVESTMENT SHOULD INVEST IN THESE UNITS.**

**THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), THE SECURITIES LAWS OF THE STATE OF CALIFORNIA, OR UNDER THE SECURITIES LAWS OF ANY OTHER STATE OR JURISDICTION IN RELIANCE UPON THE EXEMPTIONS FROM REGISTRATION PROVIDED BY THE ACT AND REGULATION D RULE 506 PROMULGATED THEREUNDER, AND THE COMPARABLE EXEMPTIONS FROM REGISTRATION PROVIDED BY OTHER APPLICABLE SECURITIES LAWS.**

## The Date of this Memorandum is May 16, 2017



Exhibit

12

Receiver's Submission on Group 5 Claims

1

DocuSign Envelope ID: 790D5E3F-9A93-462E-8E62-4B15EFB47B4E

| | Sale Price | Selling Commissions (2) | Proceeds to Company (3) |
|---|---|---|---|
| Per Unit | $1.00 | $0 | $100 |
| Minimum | $500,000 | $0 | $500,000 |
| Maximum | $5,950,000 | $0 | $5,950,000 |

The Company reserves the right to waive the 50,000 Unit minimum subscription requirement for any investor. The Offering is not underwritten. The Units are offered on a "best efforts" basis by the Company through its officers and directors. The Company has set a minimum offering amount of 500,000 Units with minimum gross proceeds of $500,000 for this Offering. All proceeds from the sale of Units up to $5,950,000 will be deposited in an escrow account. Upon the sale of $500,000 of Units, all proceeds will be delivered directly to the Company's corporate account and be available for use by the Company at its discretion.

(1) Units may also be sold by FINRA member brokers or dealers who enter into a Participating Dealer Agreement with the Company, who will receive commissions of up to 10% of the price of the Units sold. However, the Company has no current intention to utilize brokers or dealers to sell Units in this Offering. The Company reserves the right to pay expenses related to this Offering from the proceeds of the Offering. See **"PLAN OF PLACEMENT and USE OF PROCEEDS"**.

(2) The Offering will terminate on the earliest of: (a) the date the Company, in its discretion, elects to terminate, or (b) the date upon which all Units have been sold, or (c) July 15, 2017, or such date as may be extended from time to time by the Company, but not later than 180 days thereafter (the "Offering Period".)

THIS OFFERING IS NOT UNDERWRITTEN. THE OFFERING PRICE HAS BEEN ARBITRARILY SET BY THE MANAGEMENT OF THE COMPANY. THERE CAN BE NO ASSURANCE THAT ANY OF THE SECURITIES WILL BE SOLD.

THE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES AGENCY, NOR HAS ANY SUCH

DocuSign Envelope ID: 790D5E3F-9AB2-482F-8E63-4B15FEB47B4E

REGULATORY BODY REVIEWED THIS OFFERING MEMORANDUM FOR ACCURACY OR COMPLETENESS. BECAUSE THESE SECURITIES HAVE NOT BEEN SO REGISTERED, THERE MAY BE RESTRICTIONS ON THEIR TRANSFERABILITY OR RESALE BY AN INVESTOR. EACH PROSPECTIVE INVESTOR SHOULD PROCEED ON THE ASSUMPTION THAT HE MUST BEAR THE ECONOMIC RISKS OF THE INVESTMENT FOR AN INDEFINITE PERIOD, SINCE THE SECURITIES MAY NOT BE SOLD UNLESS, AMONG OTHER THINGS, THEY ARE SUBSEQUENTLY REGISTERED UNDER THE APPLICABLE SECURITIES ACTS OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE. THERE IS NO TRADING MARKET FOR THE COMPANY'S MEMBERSHIP UNITS AND THERE CAN BE NO ASSURANCE THAT ANY MARKET WILL DEVELOP IN THE FUTURE OR THAT THE UNITS WILL BE ACCEPTED FOR INCLUSION ON NASDAQ OR ANY OTHER TRADING EXCHANGE AT ANY TIME IN THE FUTURE. THE COMPANY IS NOT OBLIGATED TO REGISTER FOR SALE UNDER EITHER FEDERAL OR STATE SECURITIES LAWS THE UNITS PURCHASED PURSUANT HERETO, AND THE ISSUANCE OF THE UNITS IS BEING UNDERTAKEN PURSUANT TO RULE 506 OF REGULATION D UNDER THE SECURITIES ACT. ACCORDINGLY, THE SALE, TRANSFER, OR OTHER DISPOSITION OF ANY OF THE UNITS, WHICH ARE PURCHASED PURSUANT HERETO, MAY BE RESTRICTED BY APPLICABLE FEDERAL OR STATE SECURITIES LAWS (DEPENDING ON THE RESIDENCY OF THE INVESTOR) AND BY THE PROVISIONS OF THE SUBSCRIPTION AGREEMENT REFERRED TO HEREIN. THE OFFERING PRICE OF THE SECURITIES TO WHICH THE CONFIDENTIAL TERM SHEET RELATES HAS BEEN ARBITRARILY ESTABLISHED BY THE COMPANY AND DOES NOT NECESSARILY BEAR ANY SPECIFIC RELATION TO THE ASSETS, BOOK VALUE OR POTENTIAL EARNINGS OF THE COMPANY OR ANY OTHER RECOGNIZED CRITERIA OF VALUE.

No person is authorized to give any information or make any representation not contained in the Memorandum and any information or representation not contained herein must not be relied upon. Nothing in this Memorandum should be construed as legal or tax advice.

The Management of the Company has provided all of the information stated herein. The Company makes no express or implied representation or warranty as to the completeness of this information or, in the case of projections, estimates, future plans, or forward looking assumptions or statements, as to their attainability or the accuracy and completeness of the assumptions from which they are derived, and it is expected that each prospective investor will pursue his, her, or its own independent investigation. It must

3

DocuSign Envelope ID: 790D5E3F-9AB2-462E-8E62-4B15FFB47B4E

be recognized that estimates of the Company's performance are necessarily subject to a high degree of uncertainty and may vary materially from actual results.

Other than the Company's Management, no one has been authorized to give any information or to make any representation with respect to the Company or the Units that is not contained in this Memorandum. Prospective investors should not rely on any information not contained in this Memorandum.

This Memorandum does not constitute an offer to sell or a solicitation of an offer to buy to anyone in any jurisdiction in which such offer or solicitation would be unlawful or is not authorized or in which the person making such offer or solicitation is not qualified to do so. This Memorandum does not constitute an offer if the prospective investor is not qualified under applicable securities laws.

This offering is made subject to withdrawal, cancellation, or modification by the Company without notice and solely at the Company's discretion. The Company reserves the right to reject any subscription or to allot to any prospective investor less than the number of units subscribed for by such prospective investor.

This Memorandum has been prepared solely for the information of the person to whom it has been delivered by or on behalf of the Company. Distribution of this Memorandum to any person other than the prospective investor to whom this Memorandum is delivered by the Company and those persons retained to advise them with respect thereto is unauthorized. Any reproduction of this Memorandum, in whole or in part, or the divulgence of any of the contents without the prior written consent of the Company is strictly prohibited. Each prospective investor, by accepting delivery of this Memorandum, agrees to return it and all other documents received by them to the Company if the prospective investor's subscription is not accepted or if the Offering is terminated.

By acceptance of this Memorandum, prospective investors recognize and accept the need to conduct their own thorough investigation and due diligence before considering a purchase of the Units. The contents of this Memorandum should not be considered to be investment, tax, or legal advice and each prospective investor should consult with their own counsel and advisors as to all matters concerning an investment in this Offering.

**EACH PROSPECTIVE INVESTOR WILL BE GIVEN AN OPPORTUNITY TO ASK QUESTIONS OF, AND RECEIVE ANSWERS FROM, MANAGEMENT OF THE COMPANY**

4

CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING AND TO OBTAIN ANY ADDITIONAL INFORMATION, TO THE EXTENT THE COMPANY POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORTS OR EXPENSE, NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM. IF YOU HAVE ANY QUESTIONS WHATSOEVER REGARDING THIS OFFERING, OR DESIRE ANY ADDITIONAL INFORMATION OR DOCUMENTS TO VERIFY OR SUPPLEMENT THE INFORMATION CONTAINED IN THIS MEMORANDUM, PLEASE WRITE OR CALL:

**South Side Development Fund I, LLC**
**180 N Stetson St, Suite 3500**
**Chicago, Illinois 60601**

**(877) 978-1916**

5

## TABLE OF CONTENTS

I. Jurisdictional (NASAA) Legends ............................................................. 8
II. Summary of the Offering ...................................................................... 20
  A. The Company ............................................................................... 20
  B. The Benefits of LLC Membership ..................................................... 20
  C. Operations ................................................................................... 21
  D. Business Plan ............................................................................... 22
  E. The Offering ................................................................................ 30
  F. Risk Factors ................................................................................ 30
  G. Use of Proceeds ............................................................................ 30
  H. Minimum Offering Proceeds - Escrow of Subscription Proceeds ................ 30
  I. Membership Units .......................................................................... 29
  J. Registrar ..................................................................................... 30
  K. Subscription Period ....................................................................... 30
III. Requirements for Purchasers ............................................................... 30
  A. General Suitability Standards ......................................................... 30
  B. Accredited Investors ...................................................................... 31
  C. Other Requirements ...................................................................... 32
  D. Non-Accredited Investors................................................................34
IV. Forward Looking Information .............................................................. 33
V. Risk Factors .................................................................................... 34
  A. Development Stage Business ........................................................... 34
  B. Inadequacy of Funds ..................................................................... 34
  C. Dependence on Management ........................................................... 34
  D. Risks of Rental Properties .............................................................. 36
  E. Competition…...............................................................................36
  F. Risks of Borrowing…......................................................................37
  G. Management Discretion as to Use of Proceeds .................................... 36
  H. Control By Management ................................................................. 36
  I. Return of Profits ........................................................................... 36
  J Limited Transferability and Liquidity ................................................ 36
  K. Broker - Dealer Sales of Units ......................................................... 37
  L. Long Term Nature of Investment ..................................................... 38
  M. No Current Market For Units .......................................................... 38

6

DocuSign Envelope ID: 790D5E3F-9AB2-462F-9E62-4B15FFB47B4E

N.    Compliance with Securities Laws ................................................................ 38

O.    Offering Price ............................................................................................. 40

P.    Lack of Firm Underwriter ........................................................................... 40

Q.    Projections:  Forward Looking Information.................................................. 40

VI.   Use Of Proceeds .............................................................................................. 39

A.    Sale of Equity ............................................................................................. 39

B.    Offering Expenses & Commissions ............................................................. 40

C.    Corporate Application of Proceeds .............................................................. 40

D.    Total Use of Proceeds ................................................................................. 41

VII.  Management.................................................................................................... 41

VIII. Management Compensation............................................................................ 43

IX.   Litigation………………………………………………………………… 46

X.    Description of Units ....................................................................................... 44

XI.   Transfer Agent and Registrar ......................................................................... 45

XII.  Plan of Placement ........................................................................................... 45

A.    Separate Account for Subscription Funds ................................................... 45

B.    How to Subscribe for Units ......................................................................... 45

C.    Additional
      Information……………………………………………………………….48

Exhibits:

Exhibit A – LLC Operating Agreement of South Side Development Fund I, LLC

Exhibit B - Subscription Agreement

Exhibit C - Investor Suitability Questionnaire

Exhibit D – Financial Statement of the Company

Exhibit E – Reinvestment Request Form

Exhibit F – Business Plan of South Side Development Fund I, LLC

DocuSign Envelope ID: 790D5E3F-9AB2-462E-B5E2-4B15FFB47B4E

# I.    JURISDICTIONAL (NASAA) LEGENDS

**FOR RESIDENTS OF ALL STATES: THE PRESENCE OF A LEGEND FOR ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THAT STATE AND SHOULD NOT BE CONSTRUED TO MEAN AN OFFER OR SALE MAY BE MADE IN A PARTICULAR STATE. IF YOU ARE UNCERTAIN AS TO WHETHER OR NOT OFFERS OR SALES MAY BE LAWFULLY MADE IN ANY GIVEN STATE, YOU ARE HEREBY ADVISED TO CONTACT THE COMPANY. THE SECURITIES DESCRIBED IN THIS MEMORANDUM HAVE NOT BEEN REGISTERED UNDER ANY STATE SECURITIES LAWS (COMMONLY CALLED "BLUE SKY" LAWS) THESE SECURITIES MUST BE ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION OF SUCH SECURITIES UNDER SUCH LAWS, OR AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED. THE PRESENCE OF A LEGEND FOR ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THE STATE AND SHOULD NOT BE CONSTRUED TO MEAN AN OFFER OF SALE MAY BE MADE IN ANY PARTICULAR STATE.**

**1. NOTICE TO ALABAMA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE ALABAMA SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ALABAMA SECURITIES COMMISSION. THE COMMISSION DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THIS PRIVATE PLACEMENT MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

**2. NOTICE TO ALASKA RESIDENTS ONLY:** THE SECURITIES OFFERED HAVE NOT BEEN REGISTERED WITH THE ADMINISTRATOR OF SECURITIES OF THE STATE OF ALASKA UNDER PROVISIONS OF 3 AAC 08.503 AAC 08.506. THE INVESTOR IS ADVISED THAT THE ADMINISTRATOR HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THIS DOCUMENT SINCE THE DOCUMENT IS NOT REQUIRED TO BE FILED WITH THE ADMINISTRATOR. THE FACT OF REGISTRATION DOES NOT MEAN THAT THE ADMINISTRATOR HAS PASSED IN ANY WAY UPON THE MERITS, RECOMMENDED, OR APPROVED THE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A VIOLATION OF 45.55.170. THE INVESTOR MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

**3. NOTICE TO ARIZONA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ARIZONA SECURITIES ACT IN RELIANCE UPON AN EXEMPTION

8

DocuSign Envelope ID: 790D5E3F-9AB5-482F-8E62-4B15FFB47B4E

FROM REGISTRATION PURSUANT TO A.R.S. SECTION 44-1844 (1) AND THEREFORE CANNOT BE RESOLD UNLESS THEY ARE ALSO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

**4. NOTICE TO ARKANSAS RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED IN RELIANCE UPON CLAIMS OF EXEMPTION UNDER THE ARKANSAS SECURITIES ACT AND SECTION 4(2) OF THE SECURITIES ACT OF 1933. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ARKANSAS SECURITIES DEPARTMENT OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE DEPARTMENT NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, MADE ANY RECOMMENDATIONS AS TO THEIR PURCHASE, APPROVED OR DISAPPROVED THIS OFFERING OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**5. FOR CALIFORNIA RESIDENTS ONLY:** THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS OFFERING HAS NOT BEEN QUALIFIED WITH COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFORE PRIOR TO SUCH QUALIFICATIONS IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPTED FROM QUALIFICATION BY SECTION 25100, 25102, OR 25104 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS OFFERING ARE EXPRESSLY CONDITION UPON SUCH QUALIFICATIONS BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

**6. FOR COLORADO RESIDENTS ONLY:** THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1991 BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE RESOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1991, IF SUCH REGISTRATION IS REQUIRED.

**7. NOTICE TO CONNECTICUT RESIDENTS ONLY:** SHARES ACQUIRED BY CONNECTICUT RESIDENTS ARE BEING SOLD AS A TRANSACTION EXEMPT UNDER SECTION 36b-31-21b-9b OF THE CONNECTICUT, UNIFORM SECURITIES ACT. THE SHARES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF CONNECTICUT. ALL INVESTORS SHOULD BE AWARE THAT THERE ARE CERTAIN RESTRICTIONS AS TO THE TRANSFERABILITY OF THE SHARES.

**8. NOTICE TO DELAWARE RESIDENTS ONLY:** IF YOU ARE A DELAWARE RESIDENT, YOU ARE HEREBY ADVISED THAT THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE DELAWARE SECURITIES ACT. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

**9. NOTICE TO DISTRICT OF COLUMBIA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES BUREAU OF THE DISTRICT OF COLUMBIA NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR

9

DocuSign Envelope ID: 790D5E3F-9AB2-482E-B562-4B15FFB47B4F

ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**10. NOTICE TO FLORIDA RESIDENTS ONLY:** THE SHARES DESCRIBED HEREIN HAVE NOT BEEN REGISTERED WITH THE FLORIDA DIVISION OF SECURITIES AND INVESTOR PROTECTION UNDER THE FLORIDA SECURITIES ACT. THE SHARES REFERRED TO HEREIN WILL BE SOLD TO, AND ACQUIRED BY THE HOLDER IN A TRANSACTION EXEMPT UNDER SECTION 517.061 OF SAID ACT. THE SHARES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, ALL OFFEREES WHO ARE FLORIDA RESIDENTS SHOULD BE AWARE THAT SECTION 517.061(11)(a)(5) OF THE ACT PROVIDES, IN RELEVANT PART, AS FOLLOWS: "WHEN SALES ARE MADE TO FIVE OR MORE PERSONS IN [FLORIDA], ANY SALE IN [FLORIDA] MADE PURSUANT TO [THIS SECTION] IS VOIDABLE BY THE PURCHASER IN SUCH SALE EITHER WITHIN 3 DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE PURCHASER TO THE ISSUER, AN AGENT OF THE ISSUER OR AN ESCROW AGENT OR WITHIN 3 DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER." THE AVAILABILITY OF THE PRIVILEGE TO VOID SALES PURSUANT TO SECTION 517.061(11) IS HEREBY COMMUNICATED TO EACH FLORIDA OFFEREE. EACH PERSON ENTITLED TO EXERCISE THE PRIVILEGE TO AVOID SALES GRANTED BY SECTION 517.061 (11) (A)(5) AND WHO WISHES TO EXERCISE SUCH RIGHT, MUST, WITHIN 3 DAYS AFTER THE TENDER OF ANY AMOUNT TO THE COMPANY OR TO ANY AGENT OF THE COMPANY (INCLUDING THE SELLING AGENT OR ANY OTHER DEALER ACTING ON BEHALF OF THE PARTNERSHIP OR ANY SALESMAN OF SUCH DEALER) OR AN ESCROW AGENT CAUSE A WRITTEN NOTICE OR TELEGRAM TO BE SENT TO THE COMPANY AT THE ADDRESS PROVIDED IN THIS CONFIDENTIAL EXECUTIVE SUMMARY. SUCH LETTER OR TELEGRAM MUST BE SENT AND, IF POSTMARKED, POSTMARKED ON OR PRIOR TO THE END OF THE AFOREMENTIONED THIRD DAY. IF A PERSON IS SENDING A LETTER, IT IS PRUDENT TO SEND SUCH LETTER BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ASSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME IT WAS MAILED. SHOULD A PERSON MAKE THIS REQUEST ORALLY, HE MUST ASK FOR WRITTEN CONFIRMATION THAT HIS REQUEST HAS BEEN RECEIVED.

**11. NOTICE TO GEORGIA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE GEORGIA SECURITIES ACT PURSUANT TO REGULATION 590-4-5-04 AND -01. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

**12. NOTICE TO HAWAII RESIDENTS ONLY:** NEITHER THIS PROSPECTUS NOR THE SECURITIES DESCRIBED HEREIN BEEN APPROVED OR DISAPPROVED BY THE COMMISSIONER OF SECURITIES OF THE STATE OF HAWAII NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS.

**13. NOTICE TO IDAHO RESIDENTS ONLY:** THESE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE IDAHO SECURITIES ACT IN RELIANCE UPON EXEMPTION FROM REGISTRATION PURSUANT TO SECTION 30-14-203 OR 302(c) THEREOF AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SAID ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SAID ACT.

10

DocuSign Envelope ID: 790D5E3F-9AB2-482E-8E62-4B15EFB47B4E

**14. NOTICE TO ILLINOIS RESIDENTS:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECRETARY OF THE STATE OF ILLINOIS NOR HAS THE STATE OF ILLINOIS PASSED UPON THE ACCURACY OR ADEQUACY OF THE PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**15. NOTICE TO INDIANA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 23-2-1-2 OF THE INDIANA SECURITIES LAW AND HAVE NOT BEEN REGISTERED UNDER SECTION 23-2-1-3. THEY CANNOT THEREFORE BE RESOLD UNLESS THEY ARE REGISTERED UNDER SAID LAW OR UNLESS AN EXEMPTION FORM REGISTRATION IS AVAILABLE. A CLAIM OF EXEMPTION UNDER SAID LAW HAS BEEN FILED, AND IF SUCH EXEMPTION IS NOT DISALLOWED SALES OF THESE SECURITIES MAY BE MADE. HOWEVER, UNTIL SUCH EXEMPTION IS GRANTED, ANY OFFER MADE PURSUANT HERETO IS PRELIMINARY AND SUBJECT TO MATERIAL CHANGE.

**16. NOTICE TO IOWA RESIDENTS ONLY:** IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED; THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

**17. NOTICE TO KANSAS RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 81-5-15 OF THE KANSAS SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

**18. NOTICE TO KENTUCKY RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER TITLE 808 KAR 10:210 OF THE KENTUCKY SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

**19. NOTICE TO LOUISIANA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER RULE 1 OF THE LOUISIANA SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

11

DocuSign Envelope ID: 790D5E3F-9AB2-462E-B563-4B15FFB47B4E

**20. NOTICE TO MAINE RESIDENTS ONLY:** THE ISSUER IS REQUIRED TO MAKE A REASONABLE FINDING THAT THE SECURITIES OFFERED ARE A SUITABLE INVESTMENT FOR THE PURCHASER AND THAT THE PURCHASER IS FINANCIALLY ABLE TO BEAR THE RISK OF LOSING THE ENTIRE AMOUNT INVESTED.

THESE SECURITIES ARE OFFERED PURSUANT TO AN EXEMPTION UNDER §16202(15) OF THE MAINE UNIFORM SECURITIES ACT AND ARE NOT REGISTERED WITH THE SECURITIES ADMINISTRATOR OF THE STATE OF MAINE.

THE SECURITIES OFFERED FOR SALE MAY BE RESTRICTED SECURITIES AND THE HOLDER MAY NOT BE ABLE TO RESELL THE SECURITIES UNLESS:

    (1)    THE SECURITIES ARE REGISTERED UNDER STATE AND FEDERAL SECURITIES LAWS, OR

    (2)    AN EXEMPTION IS AVAILABLE UNDER THOSE LAWS.

**21. NOTICE TO MARYLAND RESIDENTS ONLY:** IF YOU ARE A MARYLAND RESIDENT AND YOU ACCEPT AN OFFER TO PURCHASE THESE SECURITIES PURSUANT TO THIS MEMORANDUM, YOU ARE HEREBY ADVISED THAT THESE SECURITIES ARE BEING SOLD AS A TRANSACTION EXEMPT UNDER SECTION 11-602(9) OF THE MARYLAND SECURITIES ACT. THE SHARES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF MARYLAND. ALL INVESTORS SHOULD BE AWARE THAT THERE ARE CERTAIN RESTRICTIONS AS TO THE TRANSFERABILITY OF THE SHARES.

**22. NOTICE TO MASSACHUSETTS RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MASSACHUSETTS UNIFORM SECURITIES ACT, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THIS OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

**23. NOTICE TO MICHIGAN RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER SECTION 451.701 OF THE MICHIGAN UNIFORM SECURITIES ACT (THE ACT) AND MAY BE TRANSFERRED OR RESOLD BY RESIDENTS OF MICHIGAN ONLY IF REGISTERED PURSUANT TO THE PROVISIONS OF THE ACT, OR IF AN EXEMPTION FROM REGISTRATION IS AVAILABLE. THE INVESTMENT IS SUITABLE IF IT DOES NOT EXCEED 10% OF THE INVESTOR'S NET WORTH.

**24. NOTICE TO MINNESOTA RESIDENTS ONLY:** THESE SECURITIES BEING OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER CHAPTER 80A OF THE MINNESOTA SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO REGISTRATION, OR AN EXEMPTION THEREFROM.

**25. NOTICE TO MISSISSIPPI RESIDENTS ONLY:** THE SHARES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE MISSISSIPPI SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE MISSISSIPPI SECRETARY OF STATE OR WITH THE SECURITIES AND EXCHANGE

12

DocuSign Envelope ID: 790D5E3F-9AB2-462E-B5E2-4B15FFB47B4E

COMMISSION. NEITHER THE SECRETARY OF STATE NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, OR APPROVED OR DISAPPROVED THIS OFFERING. THE SECRETARY OF STATE DOES NOT RECOMMEND THE PURCHASE OF THESE OR ANY OTHER SECURITIES.  EACH PURCHASER OF THE SECURITIES MUST MEET CERTAIN SUITABILITY STANDARDS AND MUST BE ABLE TO BEAR AN ENTIRE LOSS OF THIS INVESTMENT. THE SECURITIES MAY NOT BE TRANSFERRED FOR A PERIOD OF ONE (1) YEAR EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE MISSISSIPPI SECURITIES ACT OR IN A TRANSACTION IN COMPLIANCE WITH THE MISSISSIPPI SECURITIES ACT.

**26. FOR MISSOURI RESIDENTS ONLY:** THE SECURITIES OFFERED HEREIN WILL BE SOLD TO, AND ACQUIRED BY, THE PURCHASER IN A TRANSACTION EXEMPT UNDER SECTION 4.G OF THE MISSOURI SECURITIES LAW OF 1953, AS AMENDED. THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF MISSOURI. UNLESS THE SECURITIES ARE SO REGISTERED, THEY MAY NOT BE OFFERED FOR SALE OR RESOLD IN THE STATE OF MISSOURI, EXCEPT AS A SECURITY, OR IN A TRANSACTION EXEMPT UNDER SAID ACT.

**27. NOTICE TO MONTANA RESIDENTS ONLY:** IN ADDITION TO THE INVESTOR SUITABILITY STANDARDS THAT ARE OTHERWISE APPLICABLE, ANY INVESTOR WHO IS A MONTANA RESIDENT MUST HAVE A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) IN EXCESS OF FIVE (5) TIMES THE AGGREGATE AMOUNT INVESTED BY SUCH INVESTOR IN THE SHARES.

**28. NOTICE TO NEBRASKA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER CHAPTER 15 OF THE NEBRASKA SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

**29. NOTICE TO NEVADA RESIDENTS ONLY:** IF ANY INVESTOR ACCEPTS ANY OFFER TO PURCHASE THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION NRS 92.520 OF THE NEVADA SECURITIES LAW. THE INVESTOR IS HEREBY ADVISED THAT THE ATTORNEY GENERAL OF THE STATE OF NEVADA HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING AND THE FILING OF THE OFFERING WITH THE BUREAU OF SECURITIES DOES NOT CONSTITUTE APPROVAL OF THE ISSUE, OR SALE THEREOF, BY THE BUREAU OF SECURITIES OR THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEVADA. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. NEVADA ALLOWS THE SALE OF SECURITIES TO 25 OR FEWER PURCHASERS IN THE STATE WITHOUT REGISTRATION. HOWEVER, CERTAIN CONDITIONS APPLY, I.E., COMMISSIONS ARE LIMITED TO LICENSED BROKER-DEALERS. THIS EXEMPTION IS GENERALLY USED WHERE THE PROSPECTIVE INVESTOR IS ALREADY KNOWN AND HAS A PRE-EXISTING RELATIONSHIP WITH THE COMPANY. (SEE NRS 90.530.11.)

**30. NOTICE TO NEW HAMPSHIRE RESIDENTS ONLY:** NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE UNDER THIS CHAPTER HAS BEEN FILED WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF

13

DocuSign Envelope ID: 790D5E3F-9AB2-482F-8E62-4B15FFB47B4E

NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

**31. NOTICE TO NEW JERSEY RESIDENTS ONLY:** IF YOU ARE A NEW JERSEY RESIDENT AND YOU ACCEPT AN OFFER TO PURCHASE THESE SECURITIES PURSUANT TO THIS MEMORANDUM, YOU ARE HEREBY ADVISED THAT THIS MEMORANDUM HAS NOT BEEN FILED WITH OR REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**32. NOTICE TO NEW MEXICO RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES DIVISION OF THE NEW MEXICO DEPARTMENT OF BANKING NOR HAS THE SECURITIES DIVISION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PRIVATE PLACEMENT MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

**33. NOTICE TO NEW YORK RESIDENTS ONLY:** THIS DOCUMENT HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE COMPANY HAS TAKEN NO STEPS TO CREATE AN AFTER MARKET FOR THE SHARES OFFERED HEREIN AND HAS MADE NO ARRANGEMENTS WITH BROKERS OF OTHERS TO TRADE OR MAKE A MARKET IN THE SHARES. AT SOME TIME IN THE FUTURE, THE COMPANY MAY ATTEMPT TO ARRANGE FOR INTERESTED BROKERS TO TRADE OR MAKE A MARKET IN THE SECURITIES AND TO QUOTE THE SAME IN A PUBLISHED QUOTATION MEDIUM, HOWEVER, NO SUCH ARRANGEMENTS HAVE BEEN MADE AND THERE IS NO ASSURANCE THAT ANY BROKERS WILL EVER HAVE SUCH AN INTEREST IN THE SECURITIES OF THE COMPANY OR THAT THERE WILL EVER BE A MARKET THEREFORE.

**34. NOTICE TO NORTH CAROLINA RESIDENTS ONLY:** IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FORGOING AUTHORITIES HAVE NOT CONFIRMED ACCURACY OR DETERMINED ADEQUACY OF THIS DOCUMENT. REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

14

DocuSign Envelope ID: 790D5E3F-9AB2-482E-8E62-4B15EEB47B4F

**35. NOTICE TO NORTH DAKOTA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES COMMISSIONER OF THE STATE OF NORTH DAKOTA NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

**36. NOTICE TO OHIO RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 1707.3(X) OF THE OHIO SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

**37. NOTICE TO OKLAHOMA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED FOR SALE IN THE STATE OF OKLAHOMA IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION FOR PRIVATE OFFERINGS. ALTHOUGH A PRIOR FILING OF THIS MEMORANDUM AND THE INFORMATION HAS BEEN MADE WITH THE OKLAHOMA SECURITIES COMMISSION, SUCH FILING IS PERMISSIVE ONLY AND DOES NOT CONSTITUTE AN APPROVAL, RECOMMENDATION OR ENDORSEMENT, AND IN NO SENSE IS TO BE REPRESENTED AS AN INDICATION OF THE INVESTMENT MERIT OF SUCH SECURITIES. ANY SUCH REPRESENTATION IS UNLAWFUL.

**38. NOTICE TO OREGON RESIDENTS ONLY:** THE SECURITIES OFFERED HAVE BEEN REGISTERED WITH THE CORPORATION COMMISSION OF THE STATE OF OREGON UNDER PROVISIONS OF ORS 59.049. THE INVESTOR IS ADVISED THAT THE COMMISSIONER HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THIS DOCUMENT SINCE THE DOCUMENT IS NOT REQUIRED TO BE FILED WITH THE COMMISSIONER. THE INVESTOR MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE COMPANY CREATING THE SECURITIES, AND THE TERMS OF THE OFFERING INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

**39. NOTICE TO PENNSYLVANIA RESIDENTS ONLY:** EACH PERSON WHO ACCEPTS AN OFFER TO PURCHASE SECURITIES EXEMPTED FROM REGISTRATION BY SECTION 203(d), DIRECTLY FROM THE ISSUER OR AFFILIATE OF THIS ISSUER, SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE WITHOUT INCURRING ANY LIABILITY TO THE SELLER, UNDERWRITER (IF ANY) OR ANY OTHER PERSON WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE ISSUER OF HIS WRITTEN BINDING CONTRACT OF PURCHASE OR, IN THE CASE OF A TRANSACTION IN WHICH THERE IS NO BINDING CONTRACT OF PURCHASE, WITHIN TWO (2) BUSINESS DAYS AFTER HE MAKES THE INITIAL PAYMENT FOR THE SECURITIES BEING OFFERED. IF YOU HAVE ACCEPTED AN OFFER TO PURCHASE THESE SECURITIES MADE PURSUANT TO A PROSPECTUS WHICH CONTAINS A NOTICE EXPLAINING YOUR RIGHT TO WITHDRAW YOUR ACCEPTANCE PURSUANT TO SECTION 207(m) OF THE PENNSYLVANIA SECURITIES ACT OF 1972 (70 PS § 1-207(m), YOU MAY ELECT, WITHIN TWO (2) BUSINESS DAYS AFTER THE FIRST TIME YOU HAVE RECEIVED THIS NOTICE AND A PROSPECTUS TO WITHDRAW FROM YOUR PURCHASE AGREEMENT AND RECEIVE A FULL REFUND OF ALL MONEYS PAID BY YOU. YOUR WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, YOU NEED ONLY SEND A LETTER OR TELEGRAM TO

15

DocuSign Envelope ID: 790D5E3F-9AB2-492E-8E62-4B15FFB47B4E

THE ISSUER (OR UNDERWRITER IF ONE IS LISTED ON THE FRONT PAGE OF THE PROSPECTUS) INDICATING YOUR INTENTION TO WITHDRAW. SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IF YOU ARE SENDING A LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD YOU MAKE THIS REQUEST ORALLY, YOU SHOULD ASK WRITTEN CONFIRMATION THAT YOUR REQUEST HAS BEEN RECEIVED. NO SALE OF THE SECURITIES WILL BE MADE TO RESIDENTS OF THE STATE OF PENNSYLVANIA WHO ARE NON-ACCREDITED INVESTORS. EACH PENNSYLVANIA RESIDENT MUST AGREE NOT TO SELL THESE SECURITIES FOR A PERIOD OF TWELVE (12) MONTHS AFTER THE DATE OF PURCHASE, EXCEPT IN ACCORDANCE WITH WAIVERS ESTABLISHED BY RULE OR ORDER OF THE COMMISSION. THE SECURITIES HAVE BEEN ISSUED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF THE PENNSYLVANIA SECURITIES ACT OF 1972. NO SUBSEQUENT RESALE OR OTHER DISPOSITION OF THE SECURITIES MAY BE MADE WITHIN 12 MONTHS FOLLOWING THEIR INITIAL SALE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION, EXCEPT IN ACCORDANCE WITH WAIVERS ESTABLISHED BY RULE OR ORDER OF THE COMMISSION, AND THEREAFTER ONLY PURSUANT TO AN EFFECTIVE REGISTRATION OR EXEMPTION.

**40. NOTICE TO RHODE ISLAND RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE DEPARTMENT OF BUSINESS REGULATION OF THE STATE OF RHODE ISLAND NOR HAS THE DIRECTOR PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**41. NOTICE TO SOUTH CAROLINA RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE SOUTH CAROLINA UNIFORM SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE SOUTH CAROLINA SECURITIES COMMISSIONER. THE COMMISSIONER DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THIS PRIVATE PLACEMENT MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

**42. NOTICE TO SOUTH DAKOTA RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED FOR SALE IN THE STATE OF SOUTH DAKOTA PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SOUTH DAKOTA BLUE SKY LAW, CHAPTER 47-31, WITH THE DIRECTOR OF THE DIVISION OF SECURITIES OF THE DEPARTMENT OF COMMERCE AND REGULATION OF THE STATE OF SOUTH DAKOTA. THE EXEMPTION DOES NOT CONSTITUTE A FINDING THAT THIS MEMORANDUM IS TRUE, COMPLETE, AND NOT MISLEADING, NOR HAS THE DIRECTOR OF THE DIVISION OF SECURITIES PASSED IN ANY WAY UPON THE MERITS OF, RECOMMENDED, OR GIVEN APPROVAL TO THESE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

**43. NOTICE TO TENNESSEE RESIDENT ONLY:** IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.

THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE

DocuSign Envelope ID: 790D5E3F-9AB2-482E-8E62-1B15FFB47B4E

FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD. EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISK OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

**44. NOTICE TO TEXAS RESIDENTS ONLY:** THE SECURITIES OFFERED HEREUNDER HAVE NOT BEEN REGISTERED UNDER APPLICABLE TEXAS SECURITIES LAWS AND, THEREFORE, ANY PURCHASER THEREOF MUST BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE SECURITIES CANNOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER SUCH SECURITIES LAWS OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE. FURTHER, PURSUANT TO §109.13 UNDER THE TEXAS SECURITIES ACT, THE COMPANY IS REQUIRED TO APPRISE PROSPECTIVE INVESTORS OF THE FOLLOWING: A LEGEND SHALL BE PLACED, UPON ISSUANCE, ON CERTIFICATES REPRESENTING SECURITIES PURCHASED HEREUNDER, AND ANY PURCHASER HEREUNDER SHALL BE REQUIRED TO SIGN A WRITTEN AGREEMENT THAT HE WILL NOT SELL THE SUBJECT SECURITIES WITHOUT REGISTRATION UNDER APPLICABLE SECURITIES LAWS, OR EXEMPTIONS THEREFROM.

**45. NOTICE TO UTAH RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE UTAH SECURITIES ACT. THE SECURITIES CANNOT BE TRANSFERRED OR SOLD EXCEPT IN TRANSACTIONS WHICH ARE EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

**46. NOTICE TO VERMONT RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES DIVISION OF THE STATE OF VERMONT NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**47. NOTICE TO VIRGINIA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION UNDER SECTION 13.1-514 OF THE VIRGINIA SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

**48. NOTICE TO WASHINGTON RESIDENTS ONLY:** THE ADMINISTRATOR OF SECURITIES HAS NOT REVIEWED THE OFFERING OR PRIVATE PLACEMENT MEMORANDUM AND THE SECURITIES HAVE NOT BEEN REGISTERED IN RELIANCE UPON THE SECURITIES ACT OF WASHINGTON, CHAPTER 21.20 RCW, AND THEREFORE, CANNOT BE RESOLD UNLESS THEY ARE REGISTERED UNDER THE SECURITIES ACT OF WASHINGTON, CHAPTER 21.20 RCW, OR UNLESS AN EXEMPTION FROM REGISTRATION IS MADE AVAILABLE.

**49. NOTICE TO WEST VIRGINIA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER

17

DocuSign Envelope ID: 790D5E3F-9AB2-482F-8E63-4B15FEB47B4F

TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 15.06(b)(9) OF THE WEST VIRGINIA SECURITIES LAW AND MAY NOT BE REOFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

**50. NOTICE TO WISCONSIN RESIDENTS ONLY:** IN ADDITION TO THE INVESTOR SUITABILITY STANDARDS THAT ARE OTHERWISE APPLICABLE, ANY INVESTOR WHO IS A WISCONSIN RESIDENT MUST HAVE A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) IN EXCESS OF THREE AND ONE-THIRD (3 1/3) TIMES THE AGGREGATE AMOUNT INVESTED BY SUCH INVESTOR IN THE SHARES OFFERED HEREIN.

**51. FOR WYOMING RESIDENTS ONLY:** ALL WYOMING RESIDENTS WHO SUBSCRIBE TO PURCHASE SHARES OFFERED BY THE COMPANY MUST SATISFY THE FOLLOWING MINIMUM FINANCIAL SUITABILITY REQUIREMENTS IN ORDER TO PURCHASE SHARES:

(1) A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) OF TWO HUNDRED FIFTY THOUSAND ($250,000) DOLLARS; AND

(2) THE PURCHASE PRICE OF SHARES SUBSCRIBED FOR MAY NOT EXCEED TWENTY PERCENT (20%) OF THE NET WORTH OF THE SUBSCRIBER; AND

(3) "TAXABLE INCOME" AS DEFINED IN SECTION 63 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, DURING THE LAST TAX YEAR AND ESTIMATED "TAXABLE INCOME" DURING THE CURRENT TAX YEAR SUBJECT TO A FEDERAL INCOME TAX RATE OF NOT LESS THAN THIRTY-THREE PERCENT (33%).

IN ORDER TO VERIFY THE FOREGOING, ALL SUBSCRIBERS WHO ARE WYOMING RESIDENTS WILL BE REQUIRED TO REPRESENT IN THE SUBSCRIPTION AGREEMENT THAT THEY MEET THESE WYOMING SPECIAL INVESTOR SUITABILITY REQUIREMENTS.

During the course of the Offering and prior to any sale, each offeree of the Shares and his or her professional advisor(s), if any, are invited to ask questions concerning the terms and conditions of the Offering and to obtain any additional information necessary to verify the accuracy of the information set forth herein. Such information will be provided to the extent the Company possess such information or can acquire it without unreasonable effort or expense.

18

DocuSign Envelope ID: 790D5E3F-9AB2-462F-8E62-4B15FFB47B46

EACH PROSPECTIVE INVESTOR WILL BE GIVEN AN OPPORTUNITY TO ASK QUESTIONS OF, AND RECEIVE ANSWERS FROM, MANAGEMENT OF THE COMPANY CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING AND TO OBTAIN ANY ADDITIONAL INFORMATION, TO THE EXTENT THE COMPANY POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORTS OR EXPENSE, NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM.  IF YOU HAVE ANY QUESTIONS WHATSOEVER REGARDING THIS OFFERING, OR DESIRE ANY ADDITIONAL INFORMATION OR DOCUMENTS TO VERIFY OR SUPPLEMENT THE INFORMATION CONTAINED IN THIS MEMORANDUM, PLEASE WRITE OR CALL:

**SOUTH SIDE DEVELOPMENT FUND I, LLC**
**180 N Stetson St, Suite 3500**
**Chicago, Illinois 60601**

**(877) 978-1916**

19

DocuSign Envelope ID: 790D5E3F-9AB2-462E-8E63-4B15FEB47B4E

## II.      SUMMARY OF THE OFFERING

The following material is intended to summarize information contained elsewhere in this Limited Offering Memorandum (the "Memorandum").  This summary is qualified in its entirety by express reference to this Memorandum and the materials referred to and contained herein.  Each prospective subscriber should carefully review the entire Memorandum and all materials referred to herein and conduct his or her own due diligence before subscribing for Membership Units.

### A.      The Company

**SOUTH SIDE DEVELOPMENT FUND I, LLC** ("the Fund" or the "Company"), began operations in May, 2017, with the purpose of acquiring an interest in related entities that will renovate, refinance or sell at least two (2) multi-family apartment buildings on the South Side of Chicago. The Company was formed as a limited liability company (LLC) under the laws of the State of Delaware on May 12, 2017.  Its principal offices are presently located at 180 North Stetson St, Suite 3500, Chicago, Illinois 60601. The Company's telephone number is (877) 978-1916

### B.      The Benefits of LLC Membership

The limited liability company (LLC) is a relatively new form of doing business in the United States.  An LLC is not a corporation, a partnership nor is it a sole proprietorship.  The LLC is a new hybrid that combines the characteristics of a corporate structure and a partnership structure.  It is a separate legal entity like a corporation but it has entitlement to be treated as a partnership for tax purposes and therefore carries with it certain tax benefits for the investors.

The owners and investors are called *members* and can be virtually any entity including individuals (domestic or foreign), corporations, other LLCs, trusts, pension plans etc.  Unlike corporate stocks and shares, members purchase membership units.  *Members* who hold the majority of the membership units maintain controlling management of the LLC as specified in the LLC operating agreement.

The primary advantage of an LLC is limiting the liability of its members.  Unless personally guaranteed, members are not personally liable for the debts and obligations of the LLC. Additionally, "pass-through" or "flow-through" taxation is available, meaning that (generally speaking) the earnings of an LLC are not subject to double taxation unlike that of a "standard" corporation. However, they are treated like the earnings from partnerships, sole proprietorships and S corporations with an added benefit for all of its members.  There is greater flexibility in structuring the LLC than is

20

ordinarily the case with a corporation, including the ability to divide ownership and voting rights in unconventional ways while still enjoying the benefits of "pass-through" taxation. The limited liability company is becoming the entity of choice for business in every realm. Due to its flexibility and tax advantages for all of its members, it will continue to gain momentum as more and more people learn of its existence.

C.     **Operations**

**South Side Development Fund I, LLC** (the "Company") is offering limited liability company Interests through this Confidential Private Placement Memorandum to investors in order to fund a real estate investment fund for the purposes of purchasing interests in at least two related entities that currently own two multifamily buildings in Chicago's south side neighborhoods. Those related entities will renovate and refinance those buildings. If additional capital is available through such refinancing or sales of those two buildings, the Company may invest in other related entities that own other multi-family buildings that are similar to the two identified building. The Company will make equity investments in buildings that will also have third party debt in order to maximize the returns to the Fund. The Company projects that it will be able to pay an 8% annual dividend to equity investors from available cash in the Fund on a quarterly basis. The Company intends initially to acquire up to an 80% equity interest in a related entity (4520-26 S Drexel, LLC), which entity owns a multi-family building, 4520-26 S Drexel Blvd (the "4520 Drexel Building"). If sufficient funds are received by the Company in this Offering, the Company will then acquire up to an 80% equity interest in another related entity, 4511-15 Drexel, LLC, which owns a building located at 4511-17 Drexel Avenue, on the same street as the 4520 Drexel Building.

Both related entities plan to renovate and refinance the building that they own. If they are able to refinance those buildings successfully, the Company will receive its share of funds from those two related entities, and then will utilize the cash from the refinance to acquire equity interests in related entities, each of which will own a third (or fourth) similar multi-family building. Using funds from each successive refinance, the Company intends to acquire other similar buildings during the five year time frame from the end of this offering and may acquire and refinance up to six (6) buildings, all on the south side of Chicago.

At the end of the fourth year, the Company intends to begin the disposition process of all its assets at which time investor capital will be returned along with any accrued and/or unpaid dividends, with the

DocuSign Envelope ID: 790D5E3F-9AB2-462E-8E62-4B15FFB47B4F

fund earning 80% of any remaining profits. **THERE IS NO GUARANTEE THAT ANY OR ALL OF THESE REFINANCING WILL OCCUR OR THAT THERE WILL BE SUFFICIENT AVAILABLE CASH TO PAY THESE PROJECTED DIVIDENDS.**

At the end of the fifth year, it is anticipated by the Company that the limited liability companies that own the buildings will have sold those buildings, distributed the share of those LLCs to the Company, and that the Company will at that point purchase all of the Interests from Investors in this Offering. If that has not occurred by the end of the fifth year, the Company will continue its operations until the end of the sixth year. If that has not occurred by the end of the sixth year, the Company will continue its operation until the end of the seventh year, when it will fully liquidate and distribute all remaining cash and other assets to its Members.

### D. Business Plan

**Executive Summary:**

South Side Development Fund 1, LLC (the "Company") is offering limited liability company Interests through a Confidential Private Placement Memorandum to investors in order to fund a real estate investment fund for the purposes of purchasing, renovating, and stabilizing two multifamily buildings in Chicago's south side neighborhoods. The Company will make equity investments in single purpose entities that will own multifamily assets leveraged with third party debt in order to maximize the returns to the Fund. The Company projects that it will be able to pay an 8% annual dividend to equity investors from available cash in the Fund on a quarterly basis. The Company intends initially to acquire a multi-family building, 4520-26 S Drexel Blvd (the "4520 Drexel Building"). Upon acquisition the 4520 Drexel Building, the company will acquire a second multi-family building, 4611-17 S Drexel Blvd, (the "4611 Drexel Building"). The Company will renovate and refinance these buildings, and then utilize the cash from the refinance to acquire and stabilize additional similar multi-family assets. At the end of the fifth year, the Company intends to begin the disposition process of all its assets at which time investor capital will be returned along with any accrued and/or unpaid dividends, with the fund earning 80% of any remaining profits. **THERE IS NO GUARANTEE THAT THERE WILL BE SUFFICIENT AVAILABLE CASH TO PAY THESE PROJECTED DIVIDENDS.**

**Business Plan:**

22

DocuSign Envelope ID: 790D5E3F-9AB2-482F-8E62-4B15FFB47B4E

The Company, **South Side Development Fund I, LLC**, is a real estate equity investment entity for the sole objective of purchasing, stabilizing, and disposing of the multi-family buildings. The initial investment will be made into several related entities that own buildings at 4520-26 Drexel Avenue and 4611-15 Drexel Avenue. Subsequent investments may be made into entities that own similar buildings yet to be identified. A related entity, South Shore Property Holdings, LLC, acquired the 4520 Drexel Building on January 31, 2017 for $5,700,000 plus closing costs, utilizing $4,275,000 in bridge financing from Bloomfield Capital, and $1,865,868.24 from the funds of South Shore Property Holdings, LLC, of which $370,000 was reserved as a construction escrow and another $330,000 being paid in over 10 months to fund the full construction escrow of $700,000. South Shore Property Holdings, LLC, also acquired the 4611 Drexel Building on December 15, 2016 for $3,500,000 plus closing costs utilizing $2,625,000 in bridge financing from Bloomfield Capital and $972,694 from the funds of South Shore Property Holdings, LLC, of which $150,000 was reserved as a construction escrow and another $350,000 being paid in over 10 months to fund the full construction escrow of $500,000.

An unrelated local management company (the "Property Manager"), has taken over day-to-day property management responsibilities. EquityBuild, Inc. an affiliate of the Company, is the developer of the building ("Developer") and has begun a competitive bidding process to select the most cost-effective competent bid from a pool of third party unrelated general contractors per the scope of work as determined by the Property Manager. Renovation work on eight of the apartment units has already been contracted by the Property Manager and is being performed. Within thirty (30) days, the Developer will award the remaining work and bid to the selected general contractor and renovation work will commence.

The Company anticipates the work on the core building systems and initial vacant units to be completed within ninety (90) days of the awarded bid. Concurrently, the Company will continue to co-ordinate with the Property Manager a lease up process whereby the Property Manager will systematically issue notices of rental increases to the tenants commensurate with the rental targets as determined by the Developer. Tenants who do not accept the rental increases will re-locate and renovation work will begin in that unit based on the scope as determined by the developer subject to the unit updates budget constraints. Tenants who do accept the rental increases will remain in their units and no substantial renovation will occur within that unit.

The Company anticipates that the total unit turnover and lease up process will take approximately fifteen (15) months. South Shore Property Holdings, LLC has already solicited and received a term sheet from Red Mortgage Capital, to refinance the existing bridge debt on the 4520 Drexel Building through the Freddie Mac small balance loan program. The Company anticipates that the

23

refinancing of the building will be completed within ninety (90) days, at which time the building is anticipated to have positive cash flow, after which the company will refinance the 4611 Drexel Building through the same program. The Company intends to structure the refinance loan such that the loan carries no pre-payment penalty after twenty –four (24) months. It is also anticipated that the first twelve (12) months of the loan will be interest only payments, and that this will allow a "cash out" refinance at a higher market value base on the stabilized physical and income improvements. The Company will then utilize the net cash available from the refinance to acquire a similar asset to add to the Company's holdings. The stabilization and refinance process will repeat as many times as financially beneficial to the Fund over a four year period at which time acquisitions will cease, remaining assets will be stabilized. At that point, the Company anticipated that all buildings will be sold within twenty-four (24) months of the completion of the acquisition phase. **THERE IS NO GUARANTEE THAT THE COMPANY WILL ABLE TO REFINANCE THESE BUILDINGS OR TO DISPOSE OF THESE BUILDINGS AS PLANNED.**

**Related Entities:**

A related entity, South Shore Property Holdings, LLC a Wyoming limited Liability Company ("South Shore"), is owned 100% by Jerome H. Cohen, a Florida individual. South Shore will be the Managing Member of the related entities (4520-26 S Drexel, LLC and 4511-15 S Drexel, LLC) and will own at least 20% of each of those entities, with all of the voting rights in those entities, while the Company will hold up to 80% of the membership, with no voting rights. Together, South Shore and the Company will own 100% of the membership interest in, and voting rights of, the related entities (4520-26 S Drexel, LLC and 4511-15 S Drexel, LLC), which will each hold title to the buildings. Depending upon the amount of capital raised in this Offering, and the success of the planned refinancing of the buildings, the Company may acquire additional equity interests in other related entities that each own a multi-family building, and the same type of relationship among the Company, the related entity and South Shore will be used.

The two related entities (4520-26 S Drexel, LLC and 4511-15 S Drexel, LLC), EquityBuild Inc., to manage to stabilization process by hiring unrelated third party property managers and general contractors to complete all renovation work on the asset. EquityBuild Inc. is wholly owned by Jerome H. Cohen, a Florida individual. The Company has EquityBuild Finance LLC, a wholly owned subsidiary of EquityBuild Inc., to raise the equity capital for The Company, and Eretz Private Capital

24

DocuSign Envelope ID: 790D5E3F-9AB2-462F-9E63-4B15FFB47B4F

LLC (the "Fund Manager"), a Delaware limited liability company wholly owned by Jerome H. Cohen, to act as the Managing Member of the Company (with a 0.1% interest in the Company, assuming that all Units are subscribed for) as described in this Confidential Private Placement Memorandum.

**Fee Structure:**

The Company will receive all revenues of the offering entity net of costs and fees, including but not limited to; direct building operating costs, closing costs, management fees, financing charges and interest, and other costs. A Developer Fee will be paid to EquityBuild Inc. in an amount equal to 10% of the total initial purchase and renovation costs. An Acquisition Fee in the amount of 2% of the net purchase price of the initial buildings will be paid to EquityBuild Inc. A loan guarantee fee in the amount of 1% of the initial loan amount shall be paid to South Shore Property Holdings, LLC. An Asset Management Fee in the amount of 3.5% of the Net Operating Income of the building shall be paid to the Fund Manager, Eretz Private Capital, LLC. An equity fee in the amount of 5% of the equity raised shall be paid the EquityBuild Finance, LLC. South Shore Property Holdings, LLC will have a 20% promoted interest in the profits of the entity net of debt and preferred equity payments. **THESE FEES WERE NOT NEGOTIATED AT ARMS-LENGTH AND NO REPRESENTATION IS BEING MADE THAT THOSE FEES ARE REASONABLE OR ARE LESS OR MORE THAN WOULD BE NEGOTIATED AT ARMS-LENGTH.**

**Related Entities:**

A related entity, South Shore Property Holdings, LLC a Delaware limited Liability Company, is owned 100% by Jerome H. Cohen, a Florida individual. It will form a Partnership with the Company for each individual asset, in which South Shore Property Holdings will hold 20% of the membership interest in, and all the voting rights of, the Partnership, while the Company will hold 80% of the membership, with no voting rights. The partnership will own 100% of the membership interest in, and voting rights of, the SPV which will hold title to the asset. There will be one partnership and SPV for each real asset the Company invests in. The two related entities (4520-26 S Drexel, LLC and 4511-17 S Drexel, LLC) have has hired a related party the Developer, EquityBuild Inc., to manage to stabilization process by hiring unrelated third party property managers and general contractors to complete all renovation work on the asset. EquityBuild Inc. is wholly owned by Jerome H. Cohen, a Florida individual. The Company has EquityBuild Finance LLC, a wholly owned subsidiary of EquityBuild Inc., to raise the equity capital for The Company, and Eretz Private Capital, LLC (the "Fund Manager"), a Delaware limited liability company wholly owned by Jerome H. Cohen, to manage and service the Company per the terms of the Confidential Private Placement Memorandum.

25

DocuSign Envelope ID: 790D5E3F-9AB2-462E-8E62-4B15FEB47B4E

**Fee Structure:**

The Company will receive all revenues of the offering entity net of costs and fees, including but not limited to; direct building operating costs, closing costs, management fees, financing charges and interest, and other costs. A Developer Fee will be paid to EquityBuild Inc. in an amount equal to 10% of the total initial purchase and renovation costs. An Acquisition Fee in the amount of 2% of the net purchase price of the initial buildings will be paid to EquityBuild Inc. An Asset Management Fee in the amount of 3.5% of the Net Operating Income of the building shall be paid to the Fund Manager, Eretz Private Capital, LLC. An equity fee in the amount of 5% of the equity raised shall be paid the EquityBuild Finance, LLC. South Shore Property Holdings, LLC will have a 20% promoted interest in the profits of the entity net of debt and preferred equity payments. **THESE FEES WERE NOT NEGOTIATED AT ARMS-LENGTH AND NO REPRESENTATION IS BEING MADE THAT THOSE FEES ARE REASONABLE OR ARE LESS OR MORE THAN WOULD BE NEGOTIATED AT ARMS-LENGTH.**

Portions of the South Side Development Fund I, LLC Business Plan, included as a separate document, were prepared by the Company using assumptions, including several forward looking statements. Each prospective investor should carefully review the Business Plan in association with this Memorandum before purchasing Units. Management makes no representations as to the accuracy or achievability of the underlying assumptions and projected results contained herein. **THERE IS NO GUARANTEE THAT THE COMPANY WILL BE ABLE TO ACQUIRE OR REFINANCE THE BUILDINGS IN ORDER TO RECEIVE CASH FROM THE HIGHER VALUATIONS IN ORDER TO ACQUIRE ADDITIONAL BUILDINGS WITHOUT ADDITIONAL CASH CONTRIBUTIONS.**

**Recent Examples of Properties Similar to 4520-26 Drexel Blvd.
and 4511-17 Drexel Blvd. owned by Affiliates of the Company.**

Here are a number of EquityBuild's recent multi-family real estate transactions in Chicago:

**7635 S. Coles**

**13-unit building,** purchase price: $580,000, rehabilitation cost: $440,000, total cost: $1,020,000

DocuSign Envelope ID: 790D5E3F-9AB2-462F-8E62-4B15FFB47B4F

Refinance value is estimated at $1,370,000, increase: $350,000 / 34.3%, purchase cap rate: 19.38%, refinance cap rate: 8.20%

**Performance Indicator: Costs were estimated within 2.5% of final total, refinance value 34% higher than total purchase and rehabilitation cost.**

### 7109 S. Calumet Avenue

21-unit building, purchase price: $1,100,000, rehabilitation cost: $126,000, total cost: $1,226,000

Refinance value is estimated at $2,245,000, increase: $1,019,000 / 83.1%, purchase cap rate: 14.38%, refi cap rate: 7.05%

**Performance Indicator: Rehabilitation has been completed 26% below estimate, refi value $1.01 million higher than total purchase and rehabilitation cost.**

### 6558 S. Vernon Avenue

12-unit building, purchase price: $808,833, rehabilitation cost: $0, total cost: $808,833

Refinance value is estimated at $1,050,000, increase: $241,167 / 29.8%, purchase cap rate: 11.09%, refi cap rate: 8.55%

**Performance Indicator: This property not yet refinanced, refinance value is estimated at 30% above total costs – based on December 2015 appraisal. EquityBuild believes that the value has increased further since then.**

### 7200 S. Stony Island Avenue

24-unit building, purchase price: $350,000, rehabilitation cost: $1,185,635, total cost: $1,535,635

Refinance value is estimated at $1,750,000, increase: $214,365 / 14.0%, purchase cap rate: 45.06%, refinance cap rate: 9.01%

27

DocuSign Envelope ID: 790D5E3F-9AB2-482F-8E63-4B15FEB47B4E

**Performance Indicator: Estimated refinance value is $214,000 higher than total purchase and rehab cost. This building included a full rehabilitation of all systems. As a result, the cost of the renovation substantially exceeded the purchase price.**

### 6142 S. ML King Drive

15-unit building, purchase price: $145,000, rehabilitation cost: $952,985, total cost: $1,097,985

Refinance value is estimated at $1,800,000, increase: $702,015 / 63.9%, purchase cap rate: 93.58%, refinance cap rate: 7.54%

**Performance Indicator: After purchase, EquityBuild decided to do upgraded finishes which led to higher rehabilitation costs than initially estimated. These upgraded finishes also had the effect of raising the NOI and refinance value which was 63.9% above total cost**

### 6201 S. Langley Avenue

12-unit building, purchase price: $210,000, rehabilitation cost: $600,000, total cost: $810,000

Refinance value is estimated at $1,300,000, increase: $490,000 / 60.5%, purchase cap rate: 48.56%, refinance cap rate: 7.84%

**Performance Indicator: The Property was refinanced in two stages, and the result was that the refinance value was approximately 60% above total purchase and rehabilitation cost.**

**(Note: There is a standard deviation of 10% on NOI (net operating income). NOI is a projection based on knowledge at the time of its preparation that may deviate 10% from the represented value to account for market fluctuation in rents and expenses correlated with commodity pricing.)**

**The above properties are listed as examples of the type of multi-family residential deals that have been done by EquityBuild in the past. The performance of these buildings is no guarantee that the building being financed with the Notes in this Offering will be comparable. EquityBuild has**

DocuSign Envelope ID: 790D5E3F-9AB2-482E-8E62-4B15EEB47B4E

estimated certain results of these properties and believes that the results are correct and accurate. The status of each of these properties is described as of the date of this Memorandum, and that status may change in the future. **IF ANY PROSPECTIVE INVESTOR WISHES FURTHER INFORMATION ON THESE PROPERTIES, PLEASE CONTACT THE COMPANY.**

E.    **The Offering**

The Company is offering a minimum of 500,000 and a maximum of 5,950,000 Units at a price of $1.00 per Unit.  Each purchaser must execute a Subscription Agreement making certain representations and warranties to the Company, including such purchaser's qualifications as an Accredited Investor as defined by the Securities and Exchange Commission in Rule 501(a) of Regulation D promulgated.  **See "REQUIREMENTS FOR PURCHASERS" section.**

F.    **Risk Factors**

See "RISK FACTORS" section in this Memorandum for certain factors that could adversely affect an investment in the Units.  Those factors include, but are not limited to **unanticipated obstacles to execution of the Business Plan, general economic factors, the general risks of rental real estate and other risk factors**.

G.    **Use of Proceeds**

Proceeds from the sale of Units will be used to acquire, renovate and stabilize two buildings on Drexel Avenue on the south side of Chicago See "USE OF PROCEEDS" section.

H.    **Minimum Offering Proceeds - Escrow of Subscription Proceeds**

The Company has set a minimum offering proceeds figure of $500,000 (the "minimum offering proceeds") for this Offering.  The Company has established an Investment Holding Account with Wells Fargo Bank, into which the minimum offering proceeds will be placed.  At least 500,000 Units must be sold for $500,000 before such proceeds will be released from the escrow account and utilized by the Company.  After the minimum number of Units is sold, all subsequent proceeds from the sale of Units will be delivered directly to the Company.  **See "PLAN OF PLACEMENT - ESCROW ACCOUNT ARRANGEMENT" section.**

I.    **Membership Units**

Upon the sale of the maximum number of Units from this Offering, the number of issued and outstanding interests in the Company will be held as follows:

29

DocuSign Envelope ID: 790D5E3F-9AB2-482E-8E62-4B15FEB47B4E

| | |
|---|---|
| **Present Members** | **0.1%** |
| **New Members** | **99.9%** |

J.  **Registrar**

The Company will serve as its own registrar and transfer agent with respect to its Membership Units.

K.  **Subscription Period**

The Offering will terminate on the earliest of:  (a) the date the Company, in its discretion, elects to terminate, or (b) the date upon which all Units have been sold, or (c) July 15, 2017, or such date as may be extended from time to time by the Company, but not later than 180 days thereafter (the "Offering Period".)

Requirements for Purchasers

Prospective purchasers of the Units offered by this Memorandum should give careful consideration to certain risk factors described under "RISK AND OTHER IMPORTANT FACTORS" section and especially to the speculative nature of this investment and the limitations described under that caption with respect to the lack of a readily available market for the Units and the resulting long term nature of any investment in the Company.  This Offering is available only to suitable Accredited Investors, having adequate means to assume such risks and of otherwise providing for their current needs and contingencies should consider purchasing Units.

L.  **General Suitability Standards**

The Units will not be sold to any person unless such prospective purchaser or his or her duly authorized representative shall have represented in writing to the Company in a Subscription Agreement that:

a)  The prospective purchaser has adequate means of providing for his or her current needs and personal contingencies and has no need for liquidity in the investment of the Units;

b)  The prospective purchaser's overall commitment to investments which are not readily marketable is not disproportionate to his, her, or its net worth and the investment in the Units will not cause such overall commitment to become excessive; and

c)  The prospective purchaser is an "Accredited Investor" (as defined below) suitable for purchase in the Units.

d)  Each person acquiring Units will be required to represent that he, she, or it is purchasing the Units for his, her, or its own account for investment purposes and not with a view to resale or distribution.  See "SUBSCRIPTION FOR UNITS" section.

DocuSign Envelope ID: 790D5E3F-9AB2-462E-8E62-4B15EEB47B4E

M.      **Accredited Investors**

The Company will conduct the Offering in such a manner that Units may be sold only to "Accredited Investors" as that term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933 (the "Securities Act"), as well as no more than thirty-five investors who are not accredited ("Non-Accredited Investors"). In summary, a prospective investor will qualify as an "Accredited Investor" if he, she, or it meets any one of the following criteria:

a)  Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase, exceeds $1,000,000 excluding the value of the primary residence of such natural person;

b)  Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and who has a reasonable expectation of reaching the same income level in the current year;

c)  Any bank as defined in Section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities and Exchange Act of 1934 (the "Exchange Act"); any insurance company as defined in Section 2(13) of the Exchange Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any Small Business Investment Company (SBIC) licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment advisor, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons who are Accredited Investors;

d)  Any private business development company as defined in Section 202(a)(22) of the Investment Advisors Act of 1940;

31

DocuSign Envelope ID: 790D5E3F-9AB2-462E-8E62-4B15EEB47B4E

e)  Any organization described in Section 501(c)(3)(d) of the Internal Revenue Code, corporation, business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

f)  Any director or executive officer, or general partner of the issuer of the securities being sold, or any director, executive officer, or general partner of a general partner of that issuer;

g)  Any trust, with total assets in excess of $5,000,000, not formed for the   specific   purpose   of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Section 506(b)(2)(ii) of Regulation D adopted under the Act; and

h)  Any entity in which all the equity owners are Accredited Investors.

N.  **Other Requirements**

No subscription for the Units will be accepted from any investor unless he is acquiring the Units for his own account (or accounts as to which he has sole investment discretion), for investment and without any view to sale, distribution or disposition thereof.  Each prospective purchaser of Units may be required to furnish such information as the Company intends to determine whether any person or entity purchasing Units is an Accredited Investor.

O.  **NONACCREDITED INVESTORS**

Up to and including thirty-five (35) investing Subscribers may be accepted by the Company as suitable Investors if each such Subscriber has a net worth sufficient to bear the risk of losing his entire investment and meets the above "General Suitability Standards."

For purposes of this Offering, the Company will consider the Subscription of any Non-Accredited Investor who meets the following criteria:

1.  Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds Three Hundred Thousand ($300,000) Dollars excluding the value of the primary residence of such natural person; or

2.  Any natural person who had an individual income in excess of One Hundred and Twenty-Five Thousand ($125,000) Dollars in each of the two most recent years, or joint income with that person's spouse in excess of Two Hundred Thousand ($200,000) Dollars in each of those years and has a reasonable expectation of reaching the same income level in the current year.

**Potential Subscribers Who Hold Debt from Affiliates**

If a potential Subscriber is current holding debt from any affiliate of the Company or any affiliate of EquityBuild, Inc., that potential Subscriber may apply to have the amount of the debt currently held by that potential Subscriber invested in the Company. Such potential Subscriber may invest all or part of the debt held currently, including principal and/or accrued debt by contacting EquityBuild, Inc. to get a current statement of what is owed to that potential Subscriber and then filling in and sending the Reinvestment Request Form located at Exhibit F of this Confidential Private Placement Memorandum, along with all other required forms to subscribe. If such potential Subscriber's subscription agreement is accepted, EquityBuild, Inc. will require that the existing Promissory Note be marked "Paid in Full" and will admit the potential Subscriber as a Member of the Company, with the number of Units equivalent to the debt held by the potential Subscriber. **THE COMPANY RESERVES THE RIGHT TO ACCEPT LESS THAN THE MINIMUM NUMBER OF UNITS**.

## IV. Forward Looking Information

Some of the statements contained in this Memorandum, including information incorporated by reference, discuss future expectations, or state other forward looking information. Those statements are subject to known and unknown risks, uncertainties and other factors, several of which are beyond the Company's control, which could cause the actual results to differ materially from those contemplated by the statements. The forward looking information is based on various factors and was derived using numerous assumptions. In light of the risks, assumptions, and uncertainties involved, there can be no assurance that the forward looking information contained in this Memorandum will in fact transpire or prove to be accurate.

Important factors that may cause the actual results to differ from those expressed within may include, but are not limited to:

- The success or failure of the Company's efforts to successfully renovate the Buildings, raise the rental rates at the Buildings and refinance or sell the Buildings.

- The effect of changing economic conditions;

- The ability of the Company to obtain adequate debt financing if only a fraction of this Offering is sold;

33

These along with other risks, which are described under "RISK FACTORS" may be described in future communications to members. The Company makes no representation and undertakes no obligation to update the forward looking information to reflect actual results or changes in assumptions or other factors that could affect those statements.

## V.    RISK FACTORS

**Investing in the Company's Units is very risky. You should be able to bear a complete loss of your investment. You should carefully consider the following factors, including those listed in the accompanying business plan.**

### A. Development Stage Business

South Side Development Fund I, LLC commenced operations on May 16th, 2017 and is organized as a limited liability company under the laws of the State of Delaware. Accordingly, the Company has only a limited history upon which an evaluation of its prospects and future performance can be made. The Company's proposed operations are subject to all business risks associated with new enterprises. The likelihood of the Company's success must be considered in light of the problems, expenses, difficulties, complications, and delays frequently encountered in connection with the expansion of a business, operation in a competitive industry, and the continued development of advertising, promotions and a corresponding customer base. There is a possibility that the Company could sustain losses in the future. There can be no assurances that South Side Development Fund I will even operate profitably.

### B. Inadequacy of Funds

Gross offering proceeds of a minimum of $500,000 and a maximum of $5,950,000 may be realized. Management believes that such proceeds will capitalize and sustain South Side Development Fund I, LLC sufficiently to allow for the implementation of the Company's Business Plans. If only a fraction of this Offering is sold, or if certain assumptions contained in Management's business plans prove to be incorrect, the Company may have inadequate funds to fully develop its business and may need debt financing or other capital investment to fully implement the Company's business plans.

### C. Dependence on Management

In the early stages of development the Company's business will be significantly dependent on the Company's management team. The Company's success will be particularly dependent

34

DocuSign Envelope ID: 790D5E3F-9AB2-462E-8E62-4B15FFB47B4E

upon: Jerome H. Cohen, Shaun D. Cohen and Ronald J. Bol.  The loss of any one of these individuals could have a material adverse effect on the Company.  See "MANAGEMENT" section.


### D.      Risks of Rental Properties

The Company is very familiar with the rental rates and occupancy rates of multi-family buildings in this area of Chicago and believes that, with the upgrades to be made to the Drexel Buildings, the Company will be able to rent apartments relatively quickly and increase the occupancy rates and base rents. The Company intends to renovate and upgrade each apartment as it becomes vacant, and believes that it will be able to accomplish such renovation quickly and within its budget**. HOWEVER, THERE ARE MANY RISKS WITH RENTAL PROPERTIES AND INVESTORS SHOULD BE AWARE THAT FAILURE TO ATTAIN THE OCCUPANCY RATES AND/OR RENT LEVELS PROJECTED COULD SUBSTANTIAL AFFECT THE COMPANY'S ABILITY TO PAY DISTRIBUTIONS TO INVESTORS AND/OR TO REFINANCE THE BUILDINGS HELD BY THE COMPANY.**


### E.      Competition

There are many other multi-family buildings in this area of Chicago and rents for apartments are competitive. The Company believes that, with the upgrades that it will accomplish whenever an apartment becomes vacant, and with proper marketing, it will be able to rent such upgraded apartments quickly at acceptable base rent levels. **HOWEVER, THE COMPANY DOES NOT GUARANTEE THAT OCCUPANCY RATES WILL BE HIGHER IN THE FUTURE, AND FAILURE TO MAINTAIN PROPER OCCUPANCY RATES MAY HAVE AN IMPACT UPON THE VALUE OF THE DREXEL BUILDINGS.**

### F.      Risks of Borrowing

If the Company incurs indebtedness, a portion of its cash flow will have to be dedicated to the payment of principal and interest on such indebtedness.  Typical loan agreements also might contain restrictive covenants, which may impair the Company's operating flexibility.   Such loan agreements would also provide for default under certain circumstances, such as failure to meet certain financial covenants.  A default under a loan agreement could result in the loan becoming immediately due

35

and payable and, if unpaid, a judgment in favor of such lender which would be senior to the rights of members of the Company. A judgment creditor would have the right to foreclose on any of the Company's assets resulting in a material adverse effect on the Company's business, operating results or financial condition.

### G. Management Discretion as to Use of Proceeds

The net proceeds from this Offering will be used for the purposes described under "Use of Proceeds." The Company reserves the right to use the funds obtained from this Offering for other similar purposes not presently contemplated which it deems to be in the best interests of the Company and its members in order to address changed circumstances or opportunities. As a result of the foregoing, the success of the Company will be substantially dependent upon the discretion and judgment of Management with respect to application and allocation of the net proceeds of this Offering. Investors for the Units offered hereby will be entrusting their funds to the Company's Management, upon whose judgment and discretion the investors must depend.

### H. Control By Management

As of May 16, 2017, the Company's Manager (Eretz Private Capital, LLC) owns 100% of the Company's outstanding units. Upon completion of this Offering, the Company's Manager will own 0.1% of the Units, and will be able to continue to control because they will own the only Interests with voting rights. Investor members will own only Interests without voting rights. **Investor members will not have the ability to control either a vote of the Company's Manager or any appointed officers. See "MANAGER" section.**

### I. Return of Profits

The Company intends to retain any initial future earnings to fund operations and expand the Company's business. A member will be entitled to receive revenue profits proportionate to the amount of units held by that member. The Company's Managing Members will determine a profit distribution plan based upon the Company's results of operations, financial condition, capital requirements, and other circumstances. **See "DESCRIPTION OF SECURITIES" section.**

### J. Limited Transferability and Liquidity

To satisfy the requirements of certain exemptions from registration under the Securities Act, and to conform with applicable state securities laws, each investor must acquire his Units for investment purposes only and not with a view towards distribution. Consequently, certain conditions of

36

the Securities Act may need to be satisfied prior to any sale, transfer, or other disposition of the Units. Some of these conditions may include a minimum holding period, availability of certain reports, including financial statements from South Side Development Fund I, LLC, limitations on the percentage of Units sold and the manner in which they are sold. South Side Development Fund I, LLC can prohibit any sale, transfer or disposition unless it receives an opinion of counsel provided at the holder's expense, in a form satisfactory to the Company, stating that the proposed sale, transfer or other disposition will not result in a violation of applicable federal or state securities laws and regulations. No public market exists for the Units and no market is expected to develop. Consequently, owners of the Units may have to hold their investment indefinitely and may not be able to liquidate their investments in the Company or pledge them as collateral for a loan in the event of an emergency.

K.        **Broker - Dealer Sales of Units**

The Company's Membership Units are not presently included for trading on any exchange, and there can be no assurances that the Company will ultimately be registered on any exchange due to the fact that it is a limited liability company and not a corporation. The NASDAQ Stock Market, Inc. has recently enacted certain changes to the entry and maintenance criteria for listing eligibility on the NASDAQ SmallCap Market. The entry standards require at least $4 million in net tangible assets or $750,000 net income in two of the last three years. The proposed entry standards would also require a public float of at least $1 million shares, $5 million value of public float, a minimum bid price of $2.00 per share, at least three market makers, and at least 300 shareholders. The maintenance standards (as opposed to entry standards) require at least $2 million in net tangible assets or $500,000 in net income in two of the last three years, a public float of at least 500,000 shares, a $1 million market value of public float, a minimum bid price of $1.00 per share, at least two market makers, and at least 300 shareholders. No assurance can be given that the Membership Unit of the Company will ever qualify for inclusion on the NASDAQ System or any other trading market until such time as the Managing Members deem it necessary and the limited liability company is converted to a corporation. As a result, the Company's Membership Units are covered by a Securities and Exchange Commission rule that opposes additional sales practice requirements on broker-dealers who sell such securities to persons other than established customers and accredited investors. For transactions covered by the rule, the broker-dealer must make a special suitability determination for the purchaser and receive the purchaser's written agreement to the transaction prior to the sale. Consequently, the rule may affect the ability of broker-dealers to sell the Company's securities and will also affect the ability of members to sell their units in the secondary market.

**L. Long Term Nature of Investment**

An investment in the Units may be long term and illiquid. As discussed above, the offer and sale of the Units will not be registered under the Securities Act or any foreign or state securities laws by reason of exemptions from such registration, which depends in part on the investment intent of the investors. Prospective investors will be required to represent in writing that they are purchasing the Units for their own account for long-term investment and not with a view towards resale or distribution. Accordingly, purchasers of Units must be willing and able to bear the economic risk of their investment for an indefinite period of time. It is likely that investors will not be able to liquidate their investment in the event of an emergency.

**M. No Current Market For Units**

There is no current market for the Units offered in this private Offering and no market is expected to develop in the near future.

**N.      Compliance with Securities Laws**

The Units are being offered for sale in reliance upon certain exemptions from the registration requirements of the Securities Act, applicable Illinois Securities Laws, and other applicable state securities laws. If the sale of Units were to fail to qualify for these exemptions, purchasers may seek rescission of their purchases of Units. If a number of purchasers were to obtain rescission, South Side Development Fund I, LLC would face significant financial demands, which could adversely affect the Company as a whole, as well as any non-rescinding purchasers.

**O.      Offering Price**

The price of the Units offered has been arbitrarily established by South Side Development Fund I, considering such matters as the state of the Company's business development and the general condition of the industry in which it operates. The Offering price bears little relationship to the assets, net worth, or any other objective criteria of value applicable to South Side Development Fund I, LLC.

**P.      Lack of Firm Underwriter**

The Units are offered on a "best efforts" basis by the Managing Members of South Side Development Fund I, LLC without compensation.

38

DocuSign Envelope ID: 790D5E3F-9AB2-462E-8E63-4B15FFB47B4E

**Q.** **Projections: Forward Looking Information**

Management has prepared projections regarding the Company's anticipated financial performance. The Company's projections are hypothetical and based upon a presumed financial performance of the Company, the addition of a sophisticated and well funded marketing plan, and other factors influencing the business of South Side Development Fund I. The projections are based on Management's best estimate of the probable results of operations of the Company, based on present circumstances, and have not been reviewed by any independent accountants. These projections are based on several assumptions, set forth therein, which Management believes are reasonable. Some assumptions upon which the projections are based, however, invariably will not materialize due the inevitable occurrence of unanticipated events and circumstances beyond Management's control. Therefore, actual results of operations will vary from the projections, and such variances may be material. **Assumptions regarding future changes in sales and revenues are necessarily speculative in nature. In addition, projections do not and cannot take into account such factors as general economic conditions, unforeseen regulatory changes, the entry into the market of South Side Development Fund I of additional competitors, the terms and conditions of future capitalization, and other risks inherent to the Company's business. While Management believes that the projections accurately reflect possible future results of the Company's operations, those results cannot be guaranteed.**

## VI. USE OF PROCEEDS

The Company seeks to raise minimum gross proceeds of $500,000 and maximum gross proceeds of $5,950,000 from the sale of Units in this Offering. The Company intends to apply these proceeds substantially as set forth herein, subject only to reallocation by Management in the best interests of the Company. The Use of Proceeds below reflects how the two limited liability companies (the owners of the buildings) into which the Company will invest intend to use those proceeds of the investments:

**A. Sale of Equity**

| Category | Maximum Proceeds | Percentage of Total Proceeds | Minimum Proceeds | Percentage of Proceeds |
|---|---|---|---|---|
| **Proceeds from Sale of Units** | **$5,950,000** | 100% | $500,000 | 100% |

39

DocuSign Envelope ID: 790D5E3F-9AB2-462E-8E63-4B15FFB47B4E

**B. Offering Expenses & Commissions**

| Category | Maximum Proceeds | Percentage of Total Proceeds | Minimum Proceeds | Percentage of Proceeds |
|---|---|---|---|---|
| Offering Expenses (1) | $25,000 | 0.42% | $25,000 | 5.0% |
| Brokerage Commissions(2) | $0 | 0% | $0 | 0% |
| Total Offering Fees/Exp. | $25,000 | 0% | $0 | 0% |

**C. Application of Proceeds**

| Category | Maximum Proceeds | Percentage of Total Proceeds | Minimum Proceeds | Percentage of Proceeds |
|---|---|---|---|---|
| Net Offering Proceeds | $5,950,000 | 100% | $500,000 | 100% |
| Building Purchase | $2,300,000 | 38.82% | $0 | 100% |
| Building Renovation | $1,200,000 | 20.25% | $475,000 | 100% |
| Due Diligence, Legal and Closing Costs | $11,500 | 0.19% | $0 | 0% |
| Prepaid Insurance | $27,525 | 0.46% | $0 | 0% |
| Acquisition Fee | $184,000 | 3.11% | $0 | 0% |
| Development Fee | $1,040,000 | 17.55% | $0 | 0% |
| Equity Fee | $295,633 | 4.99% | $0 | 0% |
| Sponsor Guarantee Fee | $69,000 | 1.16% | $0 | 0% |

40

| | | | | |
|---|---|---|---|---|
| Lender Origination Fees | $276,000 | 4.66% | $0 | 0% |
| Financed Interest | $379,500 | 6.41% | $0 | 0% |
| Lender legal, application and closing costs | $29,500 | 0.50% | $0 | 0% |
| Operating Capital | $112,342 | 1.90% | $0 | 0% |

P.    **Total Use of Proceeds**

| Category | Maximum Proceeds | Percentage of Total Proceeds | Minimum Proceeds | Percentage of Proceeds |
|---|---|---|---|---|
| Offering Expenses & Commissions | $25,000 | 0.42% | $25,000 | 5.0% |
| **Total Proceeds** | $5,950,000 | 100% | $500,000 | 100% |

**Footnotes:**

(1) Includes estimated memorandum preparation, filing, printing, legal, accounting and other fees and expenses related to the Offering.

(2) This Offering is being sold by the Manager of the Company and its affiliates.  No compensatory sales fees or related commissions will be paid to such Manager or its affiliates. Registered broker or dealers who are members of the FINRA and who enter into a Participating Dealer Agreement with the Company may sell units.  Such brokers or dealers may receive commissions up to ten percent (10%) of the price of the Units sold. The Company has no present intention to use such brokers or dealers in this Offering.

**VII.    MANAGEMENT**

At the present time, three individuals are actively involved in the management of the Limited Liability Company.  They are:

41

DocuSign Envelope ID: 790D5E3F-9AB2-482E-8E62-4B15EEB47B4E

### Jerome H. Cohen – Chief Executive Officer

Jerome H. Cohen is the founder and Chief Executive Officer of the EquityBuild companies. Mr. Cohen has a decades-long track record as an entrepreneur, both in operating companies and in real estate. In 1979, Mr. Cohen founded American Pest Management Company in Pennsylvania, and built that company until it was sold in 1984. From 1984 through 1997, Mr. Cohen built a large portfolio of personal real estate investments, located in several states.

While continuing his personal real estate investments, Mr. Cohen also founded and built Global 2-Way, Inc., a two-way radio dealer headquartered in Marco Island, Florida that became one of the largest two-way radio dealers in the United States. Mr. Cohen sold that company in 1994 and founded EquityBuild, Inc.in Florida in 2007.

### Shaun D. Cohen – President

Shaun D. Cohen is the son of Jerry Cohen and has been involved in real estate investing since he bought and managed his first investment property at age 10. He also worked in construction and property management for American Home Rentals located in Philadelphia.

Shaun Cohen graduated from St. Johns College in Annapolis, Maryland with a B.A. degree in 2000 and received his Masters' Degree in Economics from George Mason University in Fairfax, Virginia in 2009. He became Vice-President of EquityBuild, Inc. in 2009 and from 2010 to the current date, he has served as President of EquityBuild Finance, LLC.

### Ronald J. Bol – Chief Operating Officer

Ron has spent over 27 years in real estate, with a focus on residential and commercial asset acquisition and construction. His expertise spans from strategy consulting to business development and operations, with an emphasis on value engineering and value creation over a combined commercial asset portfolio worth well over $250 million.

Ronald J. Bol is the creator of the PCR process and inspection protocol used to analyze each opportunity considered by EquityBuild. Mr. Bol led the team and is co-developer of the proprietary

42

Asset Management program used to monitor the performance of each building within the portfolio which produces, in real time, a report that will identify deviations from projections and prescribe the actions required to correct them. With his background in real estate, value engineering and contractor means and methods, Ron has been frequently consulted for architectural and engineering firms throughout the Chicago Metropolitan area. This includes nationally recognized firms such as Raths, Raths & Johnson, Klein & Hoffman, Wiss, Janey, Elstner, Walker Parking Consultants and Desman Associates. Ron has also provided consulting and construction services to national property management firms that include CBRE, Cushman & Wakefield, Draper & Kramer and Hines Interests.

As Chief Operating Officer of EquityBuild, Mr. Bol is focused on the operational activities connected to the acquisition of value add commercial assets and the acquisition and transformation of underperforming or distressed commercial assets through which investor returns are delivered and communities are improved.

The management team may be expanded with additional qualified and experienced executives, professionals and consultants in the future.

## VIII. MANAGEMENT COMPENSATION

There is no accrued compensation that is due any member of Management. The Managing Member will be entitled to reimbursement of expenses incurred while conducting Company business. Each Manager may also be a member in the Company and as such will share in the profits of the Company when and if revenues are disbursed. Management reserves the right to reasonably increase their salaries assuming the business is performing profitably and Company revenues are growing on schedule. Any augmentation of these salaries will be subject to the profitability of the Business and the effect on the Business cash flows.

The following table contains certain information as of May 16, 2017 as to the number of units beneficially owned by (i) each person known by the Company to own beneficially more than 5% of the Company's units, (ii) each person who is a Managing Member of the Company, (iii) all persons as a group who are Managing Members and/or Officers of the Company, and as to the percentage of the outstanding units held by them on such dates and as adjusted to give effect to this Offering.

| Name | Currently | Post-Offering Ownership |
|------|-----------|-------------------------|
| Eretz Private Capital, LLC | 100% | At least 0.1% |

43

DocuSign Envelope ID: 790D5E3F-9AB2-462E-B562-4B15FEB47B4E

| | | |
|---|---|---|
| Subscribers | 0% | Up to 99.9% |
| Total | **100.00%** | 100.00% |

## IX. LITIGATION

The Company is not presently a party to any material litigation, nor to the knowledge of Management is any litigation threatened against the Company, which may materially affect the business of the Company or its assets.

## X. DESCRIPTION OF UNITS

The Company is offering a minimum of 500,000 and a maximum of 5,950,000 Units at a price of $1.00 per Unit, $.001 par value per unit. The units of ownership are equal in all respects, and upon completion of the Offering, the units will comprise the only representation of ownership that the Company will have issued and outstanding to date, upon close of the Offering.

**MEMBERS WHO JOIN THE COMPANY IN THIS OFFERING WILL NOT BE ENTITLED TO VOTE AND MANAGEMENT OF THE COMPANY WILL RESIDE SOLELY WITH THE MANAGING MEMBERS**.

Units are not redeemable and do not have conversion rights. The Units currently outstanding are, and the Units to be issued upon completion of this Offering will be, fully paid and non-assessable.

In the event of the dissolution, liquidation or winding up of the Company, the assets then legally available for distribution to the members will be distributed ratably among such members in proportion to their units.

Members are only entitled to profit distributions proportionate to their units of ownership when and if declared by the Managing Members out of funds legally available therefore. The Company to date has not given any such profit distributions. Future profit distribution policies are subject to the discretion of the Managing Members and will depend upon a number of factors, including among other things, the capital requirements and the financial condition of the Company.

44

## XI.    TRANSFER AGENT AND REGISTRAR

The Company will act as its own transfer agent and registrar for its units of ownership.

## XII.   PLAN OF PLACEMENT

The Units are offered directly by the Managing Members of the Company on the terms and conditions set forth in this Memorandum.  FINRA brokers and dealers may also offer units.  The Company is offering the Units on a "best efforts" basis.  The Company will use its best efforts to sell the Units to investors. There can be no assurance that all or any of the Units offered, will be sold.

### A. Separate Account for Subscription Funds

Commencing on the date of this Memorandum all funds received by the Company in full payment of subscriptions for Units will be deposited into a separate bank account for the Company. The Company has set a minimum offering proceeds figure of $500,000 for this Offering.  The Company has established a separate bank account with Wells Fargo Bank, into which the minimum offering proceeds will be placed.  At least 500,000 Units must be sold for $500,000 before such proceeds will be released from the separate bank account and utilized by the Company.  After the minimum number of Units are sold, all subsequent proceeds from the sale of Units will be delivered directly to the Company and be available for its use.  Subscriptions for Units are subject to rejection by the Company at any time.

### B. How to Subscribe for Units

A purchaser of Units must complete, date, execute, and deliver to the Company the following documents, as applicable. All of which are included as part of the Investor Subscription Package:

a)   An Investor Suitability Questionnaire;

b)   An original signed copy of the appropriate Subscription Agreement;

c)   A signed signature page for the South Side Development Fund I, LLC Operating Agreement;

d)   A wire payable to "South Side Development Fund I, LLC" in the amount of $1.00 per Unit for each Unit purchased as called for in the Subscription Agreement (minimum purchase of 50,000 Units for $50,000); and

e)   If you currently hold debt from an affiliate of the Company or the Managing Member or EquityBuild, Inc., the Reinvestment Form found at Exhibit F hereto.

45

DocuSign Envelope ID: 790D5E3F-9A82-482E-8E62-4B15FFB47B4E

**Prospective Purchasers of Units will receive an Investor Subscription Package containing an Investor Suitability Questionnaire, the Subscription Agreement, and the signature page of the LLC Operating Agreement of the Company. Those documents should be signed, either electronically or by hand and returned to the Company.**

Subscribers may not withdraw subscriptions that are tendered to the Company (Florida, Georgia and Pennsylvania Residents See NASAA Legend in the front of this Memorandum for important information).

## XIII.  ADDITIONAL INFORMATION

Each prospective investor may ask questions and receive answers concerning the terms and conditions of this offering and obtain any additional information which the Company possesses, or can acquire without unreasonable effort or expense, to verify the accuracy of the information provided in this Memorandum. The principal executive offices of the Company are located at:

**SOUTH SIDE DEVELOPMENT FUND I, LLC**
**201 North Westshore Drive, Suite 1501**
**Chicago, Illinois 60601**

**(877) 978-1916**

# Exhibit A

# LLC Operating Agreement of

# South Side Development Fund I

DocuSign Envelope ID: 790D5E3F-0A92-462E-8562-4B15EFB479A5

# LLC OPERATING AGREEMENT OF
# SOUTH SIDE DEVELOPMENT FUND I, LLC

**Any securities created by this operating agreement, if any, have not been registered with the United States Securities and Exchange Commission in reliance upon an exemption from such registration set forth in the Securities Act of 1933 provided by Section 4(2) thereof, nor have they been registered under the securities or Blue Sky laws of any other jurisdiction. The interests created hereby have been acquired for investment purposes only and may not be offered for sale, pledged, hypothecated, sold or transferred except in compliance with the terms and conditions of this operating agreement and in a transaction which is either exempt from registration under such Acts or pursuant to an effective registration statement under such Acts.**

**THIS OPERATING AGREEMENT** is made and entered into effective as of the 25th day of July , 2017, by the parties who have executed counterparts of this Operating Agreement as indicated on the signature page(s) attached.

## ARTICLE 1.  DEFINITIONS

The following terms used in this Operating Agreement shall have the following meanings (unless otherwise expressly provided herein):

**"Affiliate."**  With respect to any Person, (i) in the case of an individual, any blood relative of such Person, (ii) any officer, director, trustee, partner, member, manager, employee or holder of ten percent (10%) or more of any class of the voting securities of or equity interest in such Person; (iii) any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person; or (iv) any officer, director, trustee, partner, member, manager, employee or holder of ten percent (10%) or more of the outstanding voting securities of any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person.

**"Applicable Preferred Return."**  If profits are realized, a Preferred Return of 8.00% per annum shall be paid as follows: 2.00% payable quarterly beginning 120 days from the date of subscription, and/or 8.00% payable annually.  Preferred Return shall be calculated based on a three hundred sixty (360) day year and charged for the actual number of days elapsed.

**"Articles of Organization."**  The Articles of Organization of South Side Development Fund, I, LLC, as filed with the Delaware Secretary of State, as the same may be amended from time to time.

**"Capital Account."**  A capital account maintained in accordance with the rules contained in Section 1.704-1(b)(2)(iv) of the Regulations, as amended from time to time.

**"Capital Contribution."**  Any contribution to the capital of the Company in cash or property by a Member whenever made.

48

DocuSign Envelope ID: 790D5E3F-0A92-462E-8562-4B15EFB479A5

**"Code."**  The Internal Revenue Code of 1986, as amended from time to time.

**"Company."**  South Side Development Fund I, LLC, a Delaware limited liability company.

**"Disability."**  The failure or inability of a Manager or Member to fulfill his obligations under this Operating Agreement for a period in excess of ninety (90) consecutive days.

**"Distributable Cash."**  All cash received by the Company from Company operations, plus any cash that becomes available from Reserves, less the sum of the following to the extent paid or set aside by the Company:  (i) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (ii) all cash expenditures incurred in the operation of the Company's business; and (iii) Reserves.

**"Economic Interest."**  A Member's share of one or more of the Company's Net Profits, Net Losses and rights to distributions of the Company's assets pursuant to this Operating Agreement and the Delaware Act, not including any right to vote on, consent to or otherwise participate in any decision of the Members.

**"Entity."**  Any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association or any foreign trust or foreign business organization, or any other legal entity.

**"Fiscal Year."**  The Company's fiscal year shall end on December 31st unless otherwise decided by a Majority Vote of the Managers.

**"Gross Asset Value."**  With respect to any asset, the asset's adjusted basis for Federal income tax purposes, adjusted as provided in this Agreement.

**"Initial Capital Contribution."**  The initial contribution to the capital of the Company made by a Member pursuant to this Operating Agreement.

**"Interest."**  Any interest in the Company, including a Membership Interest, an Economic Interest, any right to vote or participate in the business of the Company, or any other interest in the Company.

**"Liquidation."**  Defined as set forth in Section 1.704-1(b)(2)(ii)(g) of the Regulations.

**"Majority Interest."**  Ownership Percentages of Members which, taken together, constitute a majority of all Ownership Percentages.

49

DocuSign Envelope ID: 790D5E3F-8A92-462E-8562-4B15EFB479AF

**"Majority Vote."**  (i) With respect to Members, the vote or written consent of Members holding a majority of the Ownership Percentages held by all such Members entitled to vote on or consent to the issue in question; (ii) with respect to Managers, the vote or written consent of a majority of the Managers entitled to vote on or consent to the issue in question.

**"Manager."**  One or more managers designated pursuant to this Operating Agreement.  A Manager is not required to be a Member of the Company.

**"Member."**  Each Person who executes this Operating Agreement or a counterpart thereof as a Member and each of the Persons who may hereafter become Members as provided in this Operating Agreement.

**"Membership Interest."**  A Member's entire Interest in the Company including such Member's Economic Interest and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement.

**"Net Profits"** and **"Net Losses."**  The Company's taxable income or loss determined in accordance with Code Section 703(a) for each of its Fiscal Years (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss); provided, such Net Profits and Net Losses will be computed as if items of tax-exempt income and nondeductible, non-capital expenditures (under Code Section 705(a)(1)(B) and 705(a)(2)(B)) were included in the computation of taxable income or loss.  If any Member contributes property to the Company with an initial book value to the Company different from its adjusted basis for federal income tax purposes to the Company, or if Company property is revalued pursuant to Section 1.704-1(b)(2)(iv)(f) of the Regulations or as otherwise required by the Regulations, Net Profits and Net Losses will be computed as if the initial adjusted basis for federal income tax purposes to the Company of such contributed or revalued property equaled its initial book value to the Company as of the date of contribution or revaluation. All profits are considered K-1 Profits and not 1099 interest income as defined by the Code.

**"Officer."**  One or more individuals appointed by the Managers to whom the Managers delegate specified responsibilities.  The Managers may, but shall not be required to, create such offices as they deem appropriate, including, but not limited to, a President, Executive Vice President, Senior Vice Presidents, Vice Presidents, Secretary and Treasurer.  The Officers shall have such duties as are assigned to them by the Managers from time to time.  All Officers shall serve at the pleasure of the Managers and the Managers may remove any Officer from office without cause and any Officer may resign at any time.

**"Operating Agreement."**  This Operating Agreement as originally executed and as amended from time to time.

**"Ownership Percentage."**  For each Member, the ownership percentage in the Company, as set forth herein, or as otherwise established and agreed to by the Members by Majority Vote.  For purposes of

50

DocuSign Envelope ID: 790D5E3F-0A92-462E-8562-4B15EFB479A5

the provisions hereof relating to actions taken or approval by Members, including voting, written consents or other approval, only Ownership Percentages held by Members shall be taken into account.

**"Person."**  Any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

**"Reserves."**  Funds set aside and amounts allocated to reserves in amounts determined by the Managers for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

**"Treasury Regulations"** or **"Regulations."**  The federal income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## ARTICLE 2.  FORMATION OF COMPANY

**Section 2.1  <u>Formation</u>**.  On May 12, 2017, the Company was formed as a Delaware limited liability company by the filing of the Articles of Organization with the Secretary of State of Delaware in accordance with the provisions of the Delaware Act.  All actions taken by the Organizer of the Company are hereby ratified and approved by the Members and Managers and the Organizer shall have no liability to the Company or to third parties for any reason whatsoever.

**Section 2.2  <u>Name</u>**.  The name of the Company is South Side Development Fund I, LLC.

**Section 2.3  <u>Principal Place of Business</u>**.  The principal place of business of the Company is 180 North Stetson St, Suite 3500, Chicago, Illinois 60601.  The Company may locate its places of business and registered office at any other place or places as the Managers may from time to time deem advisable.

**Section 2.4  <u>Registered Office and Registered Agent</u>**.  The Company's initial registered office shall be at 3411 Silverside Road, Tamall Building #104, Wilmington, Delaware 19810.  The initial registered agent is Corporate Creations Network, Inc. The registered office and registered agent may be changed from time to time by the Managers pursuant to the Delaware Act and the applicable rules promulgated thereunder.

**Section 2.5  <u>Term</u>**.  The term of the Company commenced on the date the Articles of Organization were filed with the Secretary of State of Delaware and shall continue until the Company is dissolved and its affairs wound up in accordance with the provisions of this Operating Agreement or the Delaware Act.

DocuSign Envelope ID: 790D5E3F-9A92-462E-8562-1B15EFB4794E

## ARTICLE 3.  BUSINESS OF COMPANY

The business of the Company (the "Business") is to enter into any business arrangement or relationship, exercise all rights and powers and engage in all activities as determined by the Manager, which a limited liability company may legally exercise pursuant to the Act.  In furtherance thereof, the Company may exercise all powers necessary to or reasonably connected with the Company's business which may be legally exercised by limited liability companies under the Delaware Act, and may engage in all activities necessary, customary, convenient, or incident to any of the foregoing.

## ARTICLE 4.  NAMES AND ADDRESSES OF MEMBERS

The names, Ownership Percentages and addresses of the current Members are set out on **Exhibit "A"** attached hereto and incorporated herein. Upon the close of the offering all names and addresses of members will be consolidated onto one document and delivered to each member via U.S. Mail.

## ARTICLE 5.  RIGHTS AND DUTIES OF MANAGERS

**Section 5.1  Management**.  The business and affairs of the Company shall be managed by its Managers. The Managers shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.  Except as otherwise provided herein, at any time when there is more than one Manager, all decisions and actions of the Managers shall be approved by the Majority Vote of the Managers.  Powers vested in Managers may be modified at any time by the Members. Eretz Private Capital, LLC, the Fund's sole Manager, shall remain the sole Manager, except if removed by a vote of all of the Members and with the consent of the Manager.

**Section 5.2  Number, Tenure and Qualifications**.  The Company shall initially have one (1) Manager. Eretz Private Capital, LLC, a Delaware limited liability company shall serve as sole Manager. The number of Managers may be increased by a Majority Vote of the Members.  Managers shall hold office until their successor shall have been elected and qualified or until earlier death, disability, resignation or removal.  Subject to the foregoing, Managers shall be elected or removed only by the consent of the Manager.

**Section 5.3  Deadlock**. INTENTIONALLY DELETED.

**Section 5.4  Certain Powers of Managers**.  Without limiting the generality of Section 5.1, the Managers shall have power and authority, on behalf of the Company:

52

DocuSign Envelope ID: 790D5E3F-0A92-462E-8562-4B15EFB479415

**(a)**      To acquire property from any Person as the Managers may determine.  The fact that a Manager or a Member is directly or indirectly affiliated or connected with any such Person shall not prohibit the Managers from dealing with that Person;

**(a)**      To borrow money for the Company from banks, other lending institutions, Managers, Members, or Affiliates of a Manager or Member on such terms as the Managers deem appropriate, and in connection therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums.  No debt shall be contracted or liability incurred by or on behalf of the Company except by the Managers, or by agents or employees of the Company expressly authorized to contract such debt or incur such liability by the Managers;

**(b)**      To purchase liability and other insurance to protect the Company's property and business;

**(c)**      To hold and real and/or personal property in the name of the Company;

**(d)**      To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

**(e)**      To sell or otherwise dispose of all or substantially all of the assets of the Company as part of a single transaction or plan so long as such disposition is not in violation of or a cause of a default under any other agreement to which the Company may be bound;

**(f)**      To execute on behalf of the Company all instruments and documents, including, without limitation: checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage or disposition of the Company's property, assignments, bills of sale, leases, partnership agreements, operating agreements of other limited liability companies, and any other instruments or documents necessary, in the opinion of the Managers, to the business of the Company;

**(g)**      To employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from Company funds;

**(h)**      To enter into any and all other agreements on behalf of the Company, with any other Person for any purpose, in such forms as the Managers may approve;

**(j)**      To pay any Manager a reasonable fee for services;

**(k)**      To create offices and designate Officers; and

DocuSign Envelope ID: 790D5E3F-0A92-462E-B562-1B15EFB4784E

        **(l)**      To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

Unless authorized to do so by the Managers of the Company, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose. No Member shall have any power or authority to bind the Company unless the Member has been authorized by the Managers to act as an agent of the Company in accordance with the previous sentence.

**Section 5.7**  **Liability for Certain Acts**. No Manager or Member has guaranteed or shall have any obligation with respect to the return of a Member's Capital Contributions or profits from the operation of the Company. Notwithstanding the Delaware Act, no Manager or Member shall be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member except loss or damage resulting from the intentional misconduct or knowing violation of law or a transaction for which such Manager received a personal benefit in violation or breach of the provisions of the Operating Agreement. Each Manager shall be entitled to rely on information, opinions, reports or statements, including but not limited to financial statements or other financial data prepared or presented by: (i) any one or more Members, Managers, Officers or employees of the Company whom the Manager reasonably believes to be reliable and competent in the matter presented, (ii) legal counsel, public accountants, or other persons as to matters the Manager reasonably believes are within the person's professional or expert competence, or (iii) a committee of Managers of which he or she is not a member if the Manager reasonably believes the committee merits confidence.

**Section 5.8**  **Managers Have No Exclusive Duty to Company**. Any Manager may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Operating Agreement, to share or participate in such other investments or activities of the Manager or to the income or proceeds derived therefrom. The Managers shall incur no liability to the Company or to any of the Members as a result of engaging in any other business or venture.

**Section 5.9**  **Bank Accounts**. The Managers may from time to time open bank accounts in the name of the Company, and designated Manager(s) shall be the sole signatories thereon, unless the Managers determine otherwise.

**Section 5.10**  **Indemnity of the Managers, Members, Officers, Employees and Other Agents**. To the fullest extent permitted by the Delaware Act, the Company shall indemnify each Manager and Member and make advances for expenses to each Manager and Member arising from any loss, cost, expense, damage, claim or demand, in connection with the Company, the Manager's or Member's status as a Manager or Member of the Company, the Manager's, General Manger's or Member's participation in the management, business and affairs of the Company or such Manager's or Member's activities on behalf of the Company. To the fullest extent permitted by the Delaware Act, the Company shall also indemnify its Officers, employees and other agents who are not Managers or Members arising from any loss, cost, expense, damage, claim or demand in connection with the Company, any such Person's participation in the business and affairs of the Company or such Person's activities on behalf of the Company.

**Section 5.11**  **Resignation**. Any Manager of the Company may resign at any time by giving thirty (30) days written notice to the Members of the Company. The resignation of any Manager shall take effect

54

upon the date specified in such notice, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.  The resignation of a Manager who is a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of the Manager as a Member or an Event of Dissociation, except as provided in Section 12.

**Section 5.12  Removal**.  Managers may be removed at a special meeting called for that purpose by a Majority Vote of the Members.

**Section 5.13  Vacancies**.  Any vacancy occurring for any reason in the number of Managers of the Company shall be filled by the unanimous vote of the remaining Managers and by the unanimous vote of the Members if there are no remaining Managers.

## ARTICLE 6.  RIGHTS AND OBLIGATIONS OF MEMBERS

**Section 6.1  Limitation on Liability**.  Each Member's liability shall be limited as set forth in the Delaware Act.

**Section 6.2  No Liability for Company Obligations**.  No Member will have any personal liability for any debts or losses of the Company.

**Section 6.3  List of Members**.  Upon written request of any Member, the Company shall provide a list showing the names, addresses and Ownership Percentage of all Members and the other information required by the Delaware Act.

**Section 6.4  Approvals of Members**.  The Members shall have no right to make any decisions with regard to the Company, notwithstanding the Delaware Act, except as otherwise set forth herein.

## ARTICLE 7.  MEETINGS OF MANAGERS

**Section 7.1  Meetings**.  Meetings of the Managers, for any purpose or purposes, may be called by the Majority Vote of the Managers.

**Section 7.2  Place of Meetings**.  The Persons calling any meeting may designate any place, either within or outside the State of Delaware, as the place of meeting for any meeting of the Managers.  If no designation is made the place of meeting shall be the principal executive office of the Company in the State of Delaware.

**Section 7.3  Notice of Meetings**.  Written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than two (2) nor more than fifty (50) days before the date of the meeting, either personally or by mail, by or at the direction of the

55

DocuSign Envelope ID: 790D5E3F-8A98-462F-8562-1B155FB4794F

Managers calling the meeting, to each Manager entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered two calendar days after being deposited in the United States mail, addressed to the Manager at its address as it appears on the books of the Company, with postage thereon prepaid.

**Section 7.4   Meeting of All Managers**.  If all of the Managers shall meet at any time and place, either within or outside of the State of Delaware, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting any lawful action may be taken.

**Section 7.5   Record Date**.  For the purpose of determining Managers entitled to notice of or to vote at any meeting of Managers or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Managers for any other purpose, the date on which notice of the meeting is mailed or the date on which the distribution is made, as the case may be, shall be the record date for such determination of Managers unless the Managers shall otherwise specify another record date.  When a determination of Managers entitled to vote at any meeting of Managers has been made as provided in this Section, such determination shall apply to any adjournment thereof.

**Section 7.6   Quorum**.  Managers holding a Majority Interest represented in person or by proxy, shall constitute a quorum at any meeting of Managers.  In the absence of a quorum at any such meeting, a majority of the Managers so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice.  However, if at the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Manager of record entitled to vote at the meeting.  At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed.  The Managers present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Ownership Percentages whose absence would cause less than a quorum to be present.

**Section 7.7   Manner of Acting**.  The Majority Vote of the Managers shall be the act of the Managers.

**Section 7.8   Proxies**.  A Manager may vote in person or by proxy executed in writing by the Manager or by a duly authorized attorney-in-fact.  Such written proxy shall be delivered to the Company.

**Section 7.9   Action by Managers Without a Meeting**.  Action required or permitted to be taken by the Managers at a meeting may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by the Managers entitled to vote.  Action taken under this Section is effective when the Managers required to approve such action have signed the consent, unless the consent specifies a different effective date.  The record date for determining Managers entitled to take action without a meeting shall be the date the first Manager signs a written consent.  Any signature delivered by facsimile is acceptable.

**Section 7.10   Waiver of Notice**.  When any notice is required to be given to any Manager, a waiver thereof in writing signed by the person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

56

DocuSign Envelope ID: 790D5E3F-0A92-462E-8562-AB155FB4794F

**Section 7.11  Meeting by Telephone**.  Managers may also meet by conference telephone call if all Managers can hear one another on such call and the requisite notice is given or waived.

**ARTICLE 8.  CONTRIBUTIONS TO THE COMPANY AND CAPITAL LOANS**

**Section 8.1  Members' Capital Contributions**.  Each Member shall contribute the amount set forth next to such Member's name on **Exhibit "A"** hereto as the Member's Initial Capital Contribution. No Member shall hold more than twenty percent (20%) of the then outstanding Interests of the Company, unless that Member has been designated as a Manager.

**Section 8.2  Loans to Company**.  The Company may borrow funds from Members on terms and conditions as determined by the Managers.  Repayment of such loans shall be on the terms and conditions determined by the Managers**.**

**Section 8.3  Option to Purchase Members' Interests**.  At the end of the fifth year after the Effective Date of this LLC Operating Agreement, and at any time thereafter, the Company shall have the right, but not the obligation to purchase any or all of the Interests owned by the Members. Said right may be exercised by the Manager by sending a written notice of its intention to said Member or Members. After the sending of said notice, Manager may purchase said Interests by tendering to each Member the amount of that Member's Interests as calculated by multiplying the book value of all of the assets of the Company by the percentage owned by that Member, and by either tendering that amount to each said Member or tendering a promissory note from the Company to said member. The Manager may purchase any portion (or all) of any Interests owned by any Member.

**Section 8.3  Additional Capital Contributions**.  Except as otherwise may be expressly provided herein, the Members shall not be required to make additional capital contributions.  The Manager shall have the discretion to request, in writing, additional Capital Contributions from each Member in proportion to their Membership Percentage ("Capital Call") in the event that the Company has insufficient funds to operate the Business of the Company or to make required payments on any debt of the Company (collectively "Operating Expenses"); provided, however, the timing and amount of a Capital Call must be reasonable.

**Section 8.4  Failure to Pay Capital**.  Should any Member fail to pay the amount of any Capital Call requested by Manager pursuant to Section 8.4 hereinabove (the "Defaulting Member"), any other Member may, at his election, make the required payment on behalf of the Defaulting Member; provided however, that any Member which intends to make such a payment shall first provide written notice of that intention to all other Members (including the Defaulting Member); and the Defaulting Member shall have five (5) days to cure its failure to pay by making payment of the required Capital Call, plus interest on such amount from the date it was due until the date paid, at the Applicable Rate.  If the Defaulting Member has so affected its cure, no Member will have any further rights under this Section with respect to the failure which has been cured. Any Member which makes a payment to the Company on behalf of a Defaulting Member pursuant to this Section 8.4 (a "Contributing Member") shall treat the payment as an additional capital contribution to the capital of the Company for the Contributing Member's own Capital Account, and in such case, the Contributing Member's and Defaulting Member's Ownership Percentage in the Company shall be adjusted in accordance with the formula set forth herein.  If more than one Member elects to be a Contributing Member, then all contributing Members shall contribute on a pro rata basis determined by the ratio of the respective

DocuSign Envelope ID: 790D5E3F-0A92-462F-8562-4B15EFB47B4E

Membership Interest of the Contributing Members. The respective Ownership Percentage of each Contributing Member and the Defaulting Member shall be adjusted and recalculated in accordance with the following formula and Exhibit "A" shall be revised accordingly:

Contributing Member:

The Membership Percentage of Contributing Member shall be multiplied by total invested Capital of Company plus (Amount of Additional Capital Contributed by Contributing Member on behalf of himself/herself/itself and the Defaulting Member) divided by the Total invested Capital of the Company) plus the total Additional Capital Contributions contributed to the Company pursuant to Section.

Defaulting Member:

The Membership Percentage of Defaulting Member shall be multiplied by total invested Capital of the Company)] divided by the Total invested Capital of the Company plus the total Additional Capital Contributions contributed to the Company pursuant to Section 8.4.

**Section 8.5     Capital Accounts**.   A Capital Account shall be established and maintained for each Member in accordance with the following provisions:

a)      To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of Profits and any items in the nature of income or gain that are specially allocated pursuant to this Agreement, and the amount of any liabilities of the Company that are assumed by such Member, or which are secured by any assets of the Company distributed to such Member.

b)      To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Company assets distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Net Losses and any items in the nature of expenses or losses that are specially allocated pursuant to this Agreement, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

c)      If ownership of any Membership Interest in the Company is assigned in accordance with the terms of this Agreement, the assignee shall succeed to the Capital Account of the assignor to the extent it relates to the assigned Membership Interest.

d)      In determining the amount of any liability for purposes of Subsections 3.04(a) and (b) above, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

e)      To each Member's Capital Account, there shall be debited or credited, as the case may be, adjustments which are necessary to reflect a revaluation of Company assets to reflect the Gross Asset Value of all Company assets, as required by Regulations Section 1.704-1(b)(2)(iv)(f) and Section 3.08.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 704 of the Code and Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulations. The Company shall make any adjustments that are necessary or appropriate to maintain equality between the Capital

Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet as computed for book purposes in accordance with Section 1.704-1(b)(2) (iv)(q) of the Regulations.

**Section 8.6** __Gross Asset Value.__  The Gross Asset Value of any asset of the Company shall be equal to the asset's adjusted basis for Federal income tax purposes, except as follows:

a)  The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Company.

b)  The Gross Asset Values of all Company assets, excluding goodwill, going concern value and similar intangible assets except to the extent purchased by the Company, shall be adjusted to equal their respective gross fair market values in connection with (and to be effective immediately prior to) the following events: (1) the acquisition of an additional Membership Interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (2) the distribution by the Company to a Member of more than a de minimis amount of property (including cash) as consideration for an interest in the Company; and (3) the Liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that an adjustment pursuant to clauses (1) and (2) above shall be made only if such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company.

c)  The Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution.

d)  The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and Section 10.01 hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this Subsection to the extent that an adjustment pursuant to Subsection (b) above is made in connection with a transaction that would otherwise result in an adjustment pursuant to this Subsection.

e)  If the Gross Asset Value of an asset has been determined or adjusted pursuant to this Section 3.08, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

## ARTICLE 9.  DISTRIBUTIONS TO MEMBERS

**Section 9.1**  __Distributions__.  All distributions shall be made to the Members as the Managers may determine, as cash flow allows, in proportion to their respective Ownership Percentages at the time of distribution; provided, that following the dissolution of the Company, distributions shall be made in accordance with Section 14.3 hereof.

**Section 9.2**  __Limitation Upon Distributions__.  No distribution shall be made to Members if prohibited by the Delaware Act.

59

**Section 9.3  Preferred Return and Return of Capital Contributions**.  Member's Capital Contribution will determine the return of its Capital Contribution and/or interest, and shall be paid at the rate of 01667% monthly, and/or 8.00% annually.

**Section 9.4  Priority and Return of Capital**.  No Member shall have priority over any other Member, either as to the return of Capital Contributions or as to Net Profits, Net Losses or distributions.  This Section shall not apply to loans (as distinguished from Capital Contributions) which a Member has made to the Company.

## ARTICLE 10.  ALLOCATIONS OF NET PROFITS AND NET LOSSES

Except as otherwise set forth herein, Net Profits and Net Losses shall be allocated for each Fiscal Year to the Members in proportion to their respective Ownership Percentages.

## ARTICLE 11.  BOOKS AND RECORDS

**Section 11.1  Accounting Period**.  The Company's accounting period shall be the Fiscal Year.

**Section 11.2  Records and Reports**.  At the expense of the Company, the Managers shall maintain records and accounts of all operations and expenditures of the Company.  The Company shall keep at its principal place of business the following records:

     **(a)**     A current list of the full name and last known address of each Member and Manager;

     **(b)**     Copies of records to enable a Member to determine the relative voting rights, if any, of the Members;

     **(c)**     A copy of the Articles of Organization of the Company and all amendments thereto;

     **(d)**     Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years;

     **(e)**     Copies of this Operating Agreement, together with any amendments thereto; and

     **(f)**     Copies of any financial statements of the Company for the three most recent years.

DocuSign Envelope ID: 790D5E3F-9A92-462E-8562-1B15FFB4794F

The books and records shall at all times be maintained at the principal office of the Company and shall be open to the reasonable inspection and examination of the Members, or their duly authorized representatives during reasonable business hours.

**Section 11.3** <u>**Tax Returns**</u>. The Managers shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. Copies of such returns, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of the Company's fiscal year.

## ARTICLE 12. TRANSFERABILITY

**Section 12.1** <u>**General Prohibition**</u>. Except as otherwise permitted by this Agreement, no Member may assign, convey, sell, transfer, liquidate, encumber, or in any way alienate by operation of law or otherwise (collectively a "Transfer"), all or any part of his Interest unless otherwise specifically permitted by this Agreement or unless approved by a Majority Vote of the Members, which consent may be given or withheld in the sole discretion of each Member. Any attempted Transfer of all or any portion of an Interest without the necessary consent or as otherwise permitted hereunder, shall be null and void and shall have no effect whatsoever.

Q. Section 12.2 <u>Permitted Transfers</u>. A Member shall be free at any time to Transfer up to ten percent (10%) of his Membership Interest to any one or more of that Member's Family Members. For purposes of this Article, a Member's "Family Members" shall mean the Member's spouse, children, and trusts for the primary benefit of the Member himself or such spouse or children. For purposes of this Agreement, a Transfer permitted under this Section 12.2 shall be referred to as a "Permitted Transfer." A Member may transfer greater than ten percent (10%) of his Membership Interest for estate planning purposes if he first obtains the unanimous written consent of the other Members.

**Section 12.3** <u>**Conditions of Transfer and Assignment**</u>. A transferee of an Interest shall become a Member only if approved by a Majority Vote of the Members and if the following conditions have been satisfied:

      **(a)** the transferor, his legal representative or authorized agent must have executed a written instrument of transfer of such Interest in the form and substance satisfactory to the Members approving the transaction;

      **(b)** the transferee must have executed a written agreement, in form and substance satisfactory to the Members approving the transaction, to assume all of the duties and obligations of the transferor under this Operating Agreement with respect to the transferred Interest and to be bound by and subject to all of the terms and conditions of this Operating Agreement;

      **(c)** the transferor, his legal representative or authorized agent, and the transferee must have executed a written agreement, in form and substance satisfactory to the Members approving

this transaction to indemnify and hold the Company, the Managers and the other Members harmless from and against any loss or liability arising out of the transfer;

(d)     the transferee must have executed such other documents and instruments as the Members approving the transaction may deem necessary to effect the admission of the transferee as a Member; and

(e)     unless waived by the Members approving the transaction, the transferee or the transferor must have paid the expenses incurred by the Company in connection with the admission of the transferee to the Company.

**Section 12.4  Option Rights.**

(a)     Option Events.   Upon the occurrence of any one of the following situations (hereinafter individually referred to as an "Option Event"), the Interest of the Member who suffers or causes an Option Event ("Leaving Member") shall be subject to the option to purchase set forth in this Section.

(i)     Death.  Upon the death of a Member.

(ii)     Disability.  Upon the Disability of a Member.  As used herein, "disability" shall mean any illness or condition which causes a Member to be unable to perform his duties in the manner in which such duties were previously performed by such Member for a continuous period of ninety (90) days or more, the same being determined by a doctor licensed to practice medicine in the state of such Member's residence.

(iii)     Insolvency.   Upon the Insolvency of a Member.   As used herein, "Insolvency of a Member" shall mean that the Member filed a voluntary petition or had an involuntary petition filed against him under any federal or state bankruptcy or insolvency act or law, or in the event a receiver or trustee is appointed as custodian of such Member's property, or such Member has failed to pay any judgment against him at least ten (10) days prior to the date on which any of his assets may be lawfully sold to satisfy such judgment, or such Member shall suffer an attachment, sequestration or garnishment to be levied against or the assets of such Member.

(iv)     Divorce.  If in connection with the dissolution of the marriage of any married Member, the Member enters into a property settlement agreement or any court issues an interlocutory decree or other order, the terms of which transfer or award all or part of the Interest of the Member in the Company to the Member's spouse, whether as a confirmation or a disposition of the spouse's property rights or otherwise.

(v)     Voluntary Withdrawal as Member/Manager.  Upon a Member's voluntary withdrawal as a Member or Manger of the Company.

DocuSign Envelope ID: 790D5E3F-9A92-462E-8562-AB15EFB479145

(vi)     Failure to Perform Obligations.  Upon a Member's failure to perform any of its obligations under this Agreement, either as a Member or Manager, and the same has not been cured or cure has not been commenced within ten (10) days from date of notice of such breach has been delivered to the Member by the other Member.

(vii)     Failure to Pay Additional Capital Contributions.  Upon the second instance of a Member failing to pay the amount of additional capital contributions required to be contributed pursuant to Section 8.4 and Section 8.5.

(viii)     Attempted Transfer of Interest.  If any Member attempts to transfer his Interest in the Company not in accordance with the terms of this Article.

(b)     Exercise of Option.  Upon occurrence of an Option Event or the receipt of written notice from the Leaving Member of the occurrence of an Option Event, the Company shall have the irrevocable option exercisable for thirty (30) days after the receipt of notice of the Option Event and the determination of the Purchase Price pursuant to Section 12.5 below to purchase the Leaving Member's Membership Interest affected by the Option Event for the Purchase Price determined pursuant to **Section 12.5** below.  In the event the Company does not exercise its option to purchase, the other Members ("Other Members") each shall have the right to purchase a pro rata share of the Leaving Member's Membership Interest exercisable for thirty (30) days after the date the Company elects (affirmatively or otherwise) not to purchase such Interest.  If neither the Company nor the Other Members elect to purchase the entire Interest of the Leaving Member, the remaining Leaving Member's Interest ("Remaining Interest") shall be transferred to the Leaving Member's heirs, administrators, estate, representatives, custodians, trustees, or assigns.

**Section 12.5  Purchase Price/Company Valuation**.  Within twenty  (20) days after notice is received of the occurrence of the Option Event, the Leaving Member (or his heirs or personal representatives) and the other Members shall meet to unanimously establish the fair market value of the Company.  If the Members cannot agree upon the fair market value of the Company, the Members shall select an independent appraiser who shall establish the fair market value of the Company within sixty (60) days after his selection.  If the Members are unable to unanimously select an independent appraiser, then the Leaving Member shall select one independent appraiser and the Other Members select one independent appraiser and the two independent appraisers shall have sixty (60) days after their selection to determine the fair market value of the Company.  The Leaving Member and the Other Members shall pay all costs charged by their respective appraiser.  If there is less than a ten percent (10%) difference between the values established by each such appraiser, the average of such values shall be the fair market value of the Company.  If the difference between the values established by the appraisers is greater than ten percent (10%), then the two appraisers shall, within twenty (20) days after establishing their values, appoint a third independent appraiser who shall determine the fair market value of the Company, and the fair market value established by this third independent appraiser shall be final and binding upon the Company and its Members.  The cost of the third independent appraiser shall be borne by the Leaving Member or the Other Members, as the case may be, whose appraiser established a fair market value farthest away from the fair market value established by the third independent appraiser.  The Purchase Price shall be established by multiplying the fair market value of the Company by the Ownership Percentage represented by the Membership Interest of the Leaving Member.

**Section 12.6  Payment of Purchase Price.**  The Purchase Price shall be paid to the Leaving Member by delivering ten percent (10%) of the Purchase Price in cash at the consummation of the transfer of the

DocuSign Envelope ID: 790D5E3F-0A92-462E-8562-4B15FFB479-4F

Leaving Member's Interest. The balance of the Purchase Price shall be paid by delivering a promissory note, signed by the Company or, as the case may be, the Other Members which shall be due and payable in sixty (60) equal monthly installments of principal and interest, with interest to accrue on the unpaid principal balance of the note at the rate of six percent (6%) per annum. The closing of the purchase of the Leaving Member's Interest shall take place within sixty (60) days after the Purchase Price has been established in accordance with this Agreement.

**Section 12.7  Failure to deliver Voting Rights/Membership Interest.**  If a Member or other Person, including but not limited to the heir, administrator, estate, representative, custodian, trustee, or spouse of Leaving Member, becomes obligated to sell, transfer or assign any Membership Interest to the Company or the Other Members under this Operating Agreement (the "Obligated Person") and fails to deliver such Membership Interest in accordance with the terms of this Operating Agreement, the Company or such Other Members may, in addition to all other remedies it or they may have, tender to the Obligated Person, at the address set forth herein or such place as Obligated Person may be located, the Purchase Price for such Membership Interest as is herein specified and then transfer such Membership Interest on the books and records of the Company to the person entitled hereunder to receive the Membership Interest.

## ARTICLE 13.  ISSUANCE OF ADDITIONAL MEMBERSHIP INTERESTS

Any Person approved by all of the Managers may become a Member in the Company by the issuance by the Company of Membership Interests for such consideration as the Managers shall unanimously determine. The Managers shall determine at the time of such issuance of Membership Interests the Ownership Percentage of such newly admitted Member (with the Ownership Percentages of the then-existing Members being decreased respectively.)

## ARTICLE 14.  DISSOLUTION AND TERMINATION

**Section 14.1  Dissolution**.

(a)  The Company shall be dissolved upon the occurrence of any of the following events:

(i)  by the Majority Vote of the Members and the Managers; or

(ii)  the sale of all or substantially all of the Company's assets and the collection of all proceeds therefrom; or

(iii)  the ninetieth (90th) day following the occurrence of an event specified in Section 14-11-601(a)(1) (relating to voluntary withdrawal of a Member), Section 14-11-601(a)(2) (relating to cessation of Member status in certain circumstances), Section 14-11-601(a)(3) (relating to removal of a Member), Section 14-11-601(a)(4) (relating to redemption of a Member's interest), Section 14-11-601(a)(5) (relating to various voluntary insolvency and bankruptcy proceedings or dissolution), Section 14-11-601(a)(6) (relating to various involuntary insolvency and bankruptcy proceedings or

64

dissolution), or Section 14-011-601(a)(7) (relating to death or incompetence of a Member) of the Delaware Act (collectively an "Event of Dissociation"), as to any Member who is a Manager or the ninetieth (90th) day after there is no Member who is a Manager, unless within such 90-day period the Company is continued by the affirmative Majority Vote of the Members other than the Member as to whom the Event of Dissociation occurred and a Majority Vote of the Managers.  The occurrence of an Event of Dissociation as to a Member who is not a Manager will not cause the Company to be dissolved.

       **(b)**     A Member shall not voluntarily withdraw from the Company or take any other voluntary action which causes an Event of Dissociation.

       **(c)**     Unless otherwise approved by a Majority Vote of the Managers, a Member who suffers or incurs an Event of Dissociation or whose status as a Member is otherwise terminated (a "Withdrawing Member"), regardless of whether such termination was the result of a voluntary act by such Withdrawing Member, shall not be entitled to receive the fair value of his Membership Interest, and such Withdrawing Member shall lose all of his right to vote on any of the matters designated to the Members herein, and such Withdrawing Member shall also lose any and all rights to participate in the business and affairs of the Company (for which Members have been designated pursuant hereto).  The Withdrawing Member in this case shall own only an Economic Interest in the Company.

       **(d)**     Damages for breach of Section 14.1(b) shall be monetary damages only (and not specific performance), and such damages may be offset against distributions by the Company to which the Withdrawing Member would otherwise be entitled.

**Section 14.2**  <u>**Effect of Dissolution**</u>.  Upon dissolution, the Company shall cease to carry on its business, except as permitted by the Delaware Act.  Upon dissolution, the Managers shall file a statement of commencement of winding up and publish the notice permitted by the Delaware Act.

**Section 14.3**  <u>**Winding-Up, Liquidation and Distribution of Assets**</u>.

       **(a)**     Upon dissolution, an accounting shall be made by the Company's accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution.  The Manager(s), or if none, the Persons or Persons selected by Majority Vote of the Members (the "Liquidators") shall immediately proceed to wind up the affairs of the Company.

       **(b)**     If the Company is dissolved and its affairs are to be wound up, the Liquidators shall:

       **(i)**  Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Liquidators may determine to distribute any assets to the Members in kind);

       **(ii)**  Allocate any profit or loss resulting from such sales to the Members in accordance with the terms herein;

DocuSign Envelope ID: 790D5E3F-0A92-462E-8562-4B15EFB47945

      **(iii)**   Discharge all liabilities of the Company, including liabilities to Members and Managers who are creditors, to the extent otherwise permitted by law, other than liabilities to Members for distributions, and establish such Reserves as may be reasonably necessary to provide for contingencies or liabilities of the Company;

      **(iv)**   Distribute the remaining assets to the Members, either in cash or in kind, in accordance with the positive balance (if any) in each Member's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's Fiscal Year during which the liquidation occurs), with any balance in excess thereof being distributed in proportion to the Members' respective Ownership Percentages. Any such distributions in respect to Capital Accounts shall, to the extent practicable, be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations; and

      **(v)**   If any assets of the Company are to be distributed in kind, the net fair market value of such assets shall be determined by independent appraisal or by agreement of the Members. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members shall be adjusted pursuant to the provisions of this Operating Agreement to reflect such deemed sale.

      **(c)**    Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution to reduce or eliminate the negative balance of such Member's Capital Account.

      **(d)**    Upon completion of the winding-up, liquidation and distribution of the assets, the Company shall be deemed terminated.

**Section 14.4  <u>Certificate of Termination</u>**. When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefore and all of the remaining property and assets have been distributed to the Members, a certificate evidencing such termination may be executed and filed with the Secretary of State of Delaware in accordance with the Delaware Act.

**Section 14.5  <u>Return of Contribution Nonrecourse to Other Members</u>**. Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of the Member's Capital Account. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the Capital Account of one or more Members, including, without limitation, all or any part of that Capital Account attributable to Capital Contributions, then such Member or Members shall have no recourse against any other Member.

## ARTICLE 15.  MISCELLANEOUS PROVISIONS

**Section 15.1  Compliance with Regulations.**  The provisions of this Agreement are intended to comply with, and in some cases are required by, Code Section 704(b) and 704(c) and the regulations thereunder. Some of the language in this Agreement is taken directly from or is based on such Regulations.  These provisions are intended to be interpreted in such a manner as to comply with such Regulations.  The Managers may make any modification to the manner in which the Capital Accounts are computed that the Managers determine is appropriate in order to comply with such Regulations, provided that such modification is not likely to have a material effect on the amount intended to be distributable to any Member upon the dissolution of the Company.  The Managers may also make any modification the Managers deem appropriate to comply with such Regulations if unanticipated events might otherwise cause this Agreement to not comply with such Regulations.

**Section 15.2  Application of Delaware Law**.  This Operating Agreement, and the application or interpretation hereof, shall be governed exclusively by its terms and by the Delaware Act.

**Section 15.3  No Action for Partition**.  No Member has any right to maintain any action for partition with respect to the property of the Company.

**Section 15.4  Execution of Additional Instruments**.  Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

**Section 15.5  Construction**.  Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

**Section 15.6  Headings**.  The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

**Section 15.7  Waivers**.  The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

**Section 15.8  Rights and Remedies Cumulative**.  The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies.  Such rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

67

**Section 15.9  Exhibits**.  All exhibits referred to in this Operating Agreement and attached hereto are incorporated herein by this reference.

**Section 15.10  Heirs, Successors and Assigns**.  Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

**Section 15.11  Creditors**.  None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company or by any Person not a party hereto.

**Section 15.12  Counterparts**.  This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

**Section 15.13  Federal Income Tax Elections; Tax Matters Partner**.  All elections required or permitted to be made by the Company under the Code shall be made by Managers.  For all purposes permitted or required by the Code, the Members constitute and appoint Jerome H. Cohen as Tax Matters Partner.  The provisions on limitations of liability of the Managers and Members and indemnification set forth herein shall be fully applicable to the Tax Matters Partner in his capacity as such.  The Tax Matters Partner may resign at any time by giving written notice to the Company and each of the other Members.  Upon the resignation of the Tax Matters Partner, a new Tax Matters Partner may be elected by Majority Vote of the Managers.

**Section 15.14  Notices**.  Any and all notices, offers, demands or elections required or permitted to be made under this Operating Agreement ("Notices") shall be in writing, signed by the party giving such Notice, and shall be deemed given and effective (i) when hand-delivered (either in person or by commercial courier), or (ii) on the third (3rd) business day (which term means a day when the United States Postal Service, or its legal successor ("Postal Service") is making regular deliveries of mail on all of its regularly appointed week-day rounds in Chicago, Illinois) following the day (as evidenced by proof of mailing) upon which such notice is deposited, postage pre-paid, certified mail, return receipt requested, with the Postal Service, and addressed to the other party at such party's respective address as set forth on Exhibit "A," or at such other address as the other party may hereafter designate by Notice.

**Section 15.15  Certificate of Non-Foreign Status**.  In order to comply with § 1445 of the Code and the applicable Treasury Regulations thereunder, in the event of the disposition by the Company of a United States real property interest as defined in the Code and Treasury Regulations, each Member shall provide to the Company an affidavit stating, under penalties of perjury, (i) the Member's address, (ii) United States taxpayer identification number, and (iii) that the Member is not a foreign person as that term is defined in the Code and Treasury Regulations.  Failure by any Member to provide such affidavit by the date of such disposition shall authorize the Managers to withhold ten percent (10%) of each such Member's distributive share of the amount realized by the Company on the disposition.

**Section 15.16  Amendments**.  Any amendment to this Operating Agreement shall be made in writing and must be approved by the Majority Vote of the Managers.

DocuSign Envelope ID: 790D5E3F-9A92-462E-8562-1B15FFB47945

**Section 15.17  Invalidity**.  The invalidity or unenforceability of any particular provision of this Operating Agreement shall not affect the other provisions hereof, and the Operating Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.  If any particular provision herein is construed to be in conflict with the provisions of the Delaware Act, the provisions of this Operating Agreement shall control to the fullest extent permitted by applicable law.  Any provision found to be invalid or unenforceable shall not affect or invalidate the other provisions hereof, and this Operating Agreement shall be construed in all respects as if such conflicting provision were omitted.

**Section 15.18  Arbitration**.  Any dispute, controversy or claim arising out of or in connection with, or relating to, this Operating Agreement or any breach or alleged breach hereof shall, upon the request of any party involved, be submitted to, and settled by, arbitration in the City of Chicago, State of Illinois, pursuant to the commercial arbitration rules then in effect of the American Arbitration Association (or at any time or at any other place or under any other form of arbitration mutually acceptable to the parties so involved).  Any award rendered shall be final and conclusive upon the parties and a judgment thereon may be entered in the highest court of the forum, state or federal, having jurisdiction.  The expenses of the arbitration shall be borne equally by the parties to the arbitration, provided that each party shall pay for and bear the cost of its own experts, evidence and counsel's fees, except that in the discretion of the arbitrator, any award may include the cost of a party's counsel if the arbitrator expressly determines that the party against whom such award is entered has caused the dispute, controversy or claim to be submitted to arbitration as a dilatory tactic.

**Section 15.19  Determination of Matters Not Provided for in This Operating Agreement**.  The Members shall decide any and all questions arising with respect to the Company and this Operating Agreement which are not specifically or expressly provided for in this Operating Agreement.

**Section 15.20  Further Assurances**.  The Members each agree to cooperate, and to execute and deliver in a timely fashion any and all additional documents necessary to effectuate the purposes of the Company and this Operating Agreement.

**Section 15.21  No Partnership Intended for Non-Tax Purposes**.  The Members have formed the Company under the Delaware Act, and expressly disavow any intention to form a partnership under Delaware's Uniform Partnership Act, Delaware's Uniform Limited Partnership Act or the partnership act or laws of any other state.  The Members do not intend to be partners one to another or partners as to any third party except for tax purposes.  To the extent any Member, by word or action, represents to another person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

**Section 15.22  Time**.  Time is of the essence of this Operating Agreement, and to any payments, allocations and distributions provided for under this Operating Agreement.

69

**IN WITNESS WHEREOF**, the undersigned have set their hands and seals as of the date and year set forth on the first page herein.

## SIGNATURE PAGE

ERETZ PRIVATE CAPITAL, LLC

MANAGER

BY: _Jerry Cohen_ _____

JEROME H. COHEN

Read and
Approved

ESE

_____         7/19/2017

MEMBER

Next Generation TS FBO Elaine Sison Ernst IRA 2410
_____

NAME PRINTED

_____

DATE SIGNED

_____

MEMBER

_____

NAME PRINTED

_____

DATE SIGNED

DocuSign Envelope ID: 790D5E3F-0A92-462E-8562-4B15EFB4794F

## EXHIBIT "A"

(To be supplied once the entity has been fully subscribed)

### MEMBERS

| NAME | CAPITAL CONTRIBUTION | ADDRESS | PERCENTAGE OF OWNERSHIP |
|---|---|---|---|
| MEMBER #1 | | | _____% |
| MEMBER #2 | | | _____% |
| MEMBER #3 | | | _____% |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

72

South Side Development Fund I, LLC

# __Exhibit B__

# Subscription Agreement

South Side Development Fund I, LLC

# Subscription Agreement

South Side Development Fund I
180 North Stetson St, Suite 3500
Chicago, Illinois 60601

Ladies and Gentlemen:

You have informed the undersigned (the "Purchaser") that South Side Development Fund I, an Illinois limited liability company, (the "Company") wishes to raise a minimum of Three Million Two Hundred and Fifty Thousand ($500,000) Dollars and a maximum of Five Million Nine Hundred Thousand ($5,950,000) Dollars from various persons by selling up to 5,950,000 Membership Units of ownership, $0.001 par value (the "Units"), at a price of One ($1.00) Dollar per Unit.

I have received, read, and understand the Confidential Private Offering Memorandum dated May 16th, 2017 (the "Memorandum"). I further understand that my rights and responsibilities as a Purchaser will be governed by the terms and conditions of this Subscription Agreement, the Memorandum and the Operating Agreement of South Side Development Fund I LLC. I understand that you will rely on the following information to confirm that I am either an "Accredited Investor", as defined in Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"), or that I am a qualified investor as determined by the standards listed in the Confidential Private Offering Memorandum, and that I am qualified to be a Purchaser.

This Subscription Agreement is one of a number of such subscriptions for Units. By signing this Subscription Agreement, I offer to purchase and subscribe from the Company the number of Units set forth below on the terms specified herein. The Company reserves the right, in its complete discretion, to reject any subscription offer or to reduce the number of Units allotted to me. If this offer is accepted, the Company will execute a copy of this Subscription Agreement and return it to me. I understand that commencing on the date of this Memorandum all funds received by the Company in full payment of subscriptions for Units will be deposited in a separate bank account. The Company has set a minimum offering proceeds figure of $500,000 for this Offering. The Company has established an Investment Holding Account with Wells Fargo Bank, into which the minimum offering proceeds will be placed. At least 500,000 Units must be sold for $500,000 before such proceeds will be released from the holding account and utilized by the Company. After the minimum number of Units are sold,

74

DocuSign Envelope ID: 790D5E3F-0A93-462E-8562-4B15FFB47B4F

South Side Development Fund I, LLC

all proceeds from the sale of Units will be delivered directly to the Company and be available for its use.

_____  1.  <u>Accredited Investor</u>.  I am an Accredited Investor because I qualify within one of the following categories:

Please Check the Appropriate Category

\_\_\_\_\_  $1,000,000 Net Worth.

A natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000 excluding the value of the primary residence of such natural person.

_____

Purchaser's Initials

\_\_\_\_\_  $200,000/$300,000 Income.

A natural person who had an individual income in excess of $200,000 (including contributions to qualified employee benefit plans) or joint income with such person's spouse in excess of $300,000 per year in each of the two most recent years and who reasonably expects to attain the same individual or joint levels of income (including such contributions) in the current year.

\_\_\_\_\_  Director or Officer of Issuer.

Any director or executive officer of the Company

\_\_\_\_\_  All Equity Owners In Entity Are Accredited.

An entity, (i.e. corporation, partnership, trust, IRA, etc.) in which all of the equity owners are Accredited Investors as defined herein.

\_\_\_\_\_  Corporation.

A corporation not formed for the specific purpose of acquiring the Shares offered, with total assets in excess of $5,000,000.

\_\_\_\_\_  Other Accredited Investor.

Any natural person or entity which qualifies as an Accredited Investor pursuant to Rule 501(a) of Regulation D promulgated under the Act; specify basis for qualification:

75

DocuSign Envelope ID: 790D5E3F-0A92-462E-8562-1B15EFB479A5

South Side Development Fund I, LLC

_____

_____

_____X____ 2. Non-accredited Investor. I represent that I am qualified under the terms of this Offering because I (check one):

_____ a. Have an income of over one hundred and twenty-five thousand ($125,000) dollars for the last two years and expect to have an income over one hundred and twenty-five thousand dollars for this current year; or

_____ b. With my spouse, have an income of over two hundred thousand ($200,000) dollars per year for the last two years and expect to have an income of over two hundred thousand dollars for the current year; or

_____X____ c. Have assets (excluding my personal residence) of over five hundred thousand ($500,000) dollars.

2. <u>Representations and Warranties</u>. I represent and warrant to the Company that:

(A) I (i) have adequate means of providing for my current needs and possible contingencies and I have no need for liquidity of my investment in the Units, (ii) can bear the economic risk of losing the entire amount of my investment in Units, and (iii) have such knowledge and experience that I am capable of evaluating the relative risks and merits of this investment; (iv) the purchase of Units is consistent, in both nature and amount, with my overall investment program and financial condition.

(B) The address set forth below is my true and correct residence, and I have no intention of becoming a resident of any other state or jurisdiction.

(C) I have not utilized the services of a "Purchaser Representative" (as defined in Regulation D promulgated under the Securities Act) because I am a sophisticated, experienced investor, capable of determining and understanding the risks and merits of this investment.

_____
**Purchaser's initials**

Read and
Approved
7/19/2017



— DS
ese

76

DocuSign Envelope ID: 790D5E3F-8A92-462E-8562-1B15FEB479 15

South Side Development Fund I, LLC

(D) I have received and read, and am familiar with the Offering Documents, including the Memorandum, Subscription Agreement, and Operating Agreement of the Company. All documents, records and books pertaining to the Company and the Units requested by me, including all pertinent records of the Company, financial and otherwise, have been made available or delivered to me.

(E) I have had the opportunity to ask questions of and receive answers from the Company's officers and representatives concerning the Company's affairs generally and the terms and conditions of my proposed investment in the Units.

(F) I understand the risks implicit in the business of the Company. Among other things, I understand that there can be no assurance that the Company will be successful in obtaining the funds necessary for its success. If only a fraction of the maximum amount of the Offering is raised, the Company may not be able to expand as rapidly as anticipated, and proceeds from this Offering may not be sufficient for the Company's long term needs.

(G) Other than as set forth in the Memorandum, no person or entity has made any representation or warranty whatsoever with respect to any matter or thing concerning the Company and this Offering, and I am purchasing the Units based solely upon my own investigation and evaluation.

(H) I understand that no Units have been registered under the Securities Act, nor have they been registered pursuant to the provisions of the securities or other laws of applicable jurisdictions.

(I) The Units for which I subscribe are being acquired solely for my own account, for investment and are not being purchased with a view to or for their resale or distribution. In order to induce the Company to sell Units to me, the Company will have no obligation to recognize the ownership, beneficial or otherwise, of the Units by anyone but me.

(J) I am aware of the following:

77

South Side Development Fund I, LLC

(i)The Units are a speculative investment which involves a high degree of risk; and

(ii) My investment in the Units is not readily transferable; it may not be possible for me to liquidate my investment.

(iii) The financial statements of the Company have merely been compiled, and have not been reviewed or audited.

(iv)There are substantial restrictions on the transferability of the Units registered under the Securities Act; and

Read and Approved

7/19/2017

*ESE* —DS

_____

Purchaser's Initials

(v) No federal or state agency has made any finding or determination as to the fairness of the Units for public investment nor any recommendation or endorsement of the Units;

(K) Except as set forth in the Memorandum, none of the following information has ever been represented, guaranteed, or warranted to me expressly or by implication, by any broker, the Company, or agents or employees of the foregoing, or by any other person:

(i) The appropriate or exact length of time that I will be required to hold the Units;

(ii) The percentage of profit and/or amount or type of consideration, profit, or loss to be realized, if any, as a result of an investment in the Units; or

(iii) That the past performance or experience of the Company, or associates, agents, affiliates, or employees of the Company or any other person, will in any

78

South Side Development Fund I, LLC

way indicate or predict economic results in connection with the purchase of Units;

(iv)The amount of dividends or distributions that the Company will make;

(L) I have not distributed the Memorandum to anyone, no other person has used the Memorandum, and I have made no copies of the Memorandum; and

(M) I hereby agree to indemnify and hold harmless the Company, its managers, directors, and representatives from and against any and all liability, damage, cost or expense, including reasonable attorneys' fees, incurred on account of or arising out of:

(i) Any inaccuracy in the declarations, representations, and warranties set forth above;

(ii) The disposition of any of the Units by me which is contrary to the foregoing declarations, representations, and warranties; and

(iii) Any action, suit or proceeding based upon: (1) the claim that said declarations, representations, or warranties were inaccurate or misleading or otherwise cause for obtaining damages or redress from the Company; or (2) the disposition of any of the Units.

(N) By entering into this Subscription Agreement, I acknowledge that the Company is relying on the truth and accuracy of my representations.

The foregoing representation and warranties are true and accurate as of the date hereof, shall be true and accurate as of the date of the delivery of the funds to the Company and shall survive such delivery. If, in any respect, such representations and warranties are not true and accurate prior to delivery of the funds, I will give written notice of the fact to the Company,

DocuSign Envelope ID: 790D5E3F-A492-462E-8562-4B15EFB47B45

South Side Development Fund I, LLC

specifying which representations and warranties are not true and accurate and the reasons therefor.

*ESE*

Read and
Approved

**Purchaser's Initials**      7/19/2017

*ESE*

3.  <u>Transferability</u>.  I understand that I may sell or otherwise transfer my Units only if registered under the Securities Act or I provide the Company with an opinion of counsel acceptable to the Company to the effect that such sale or other transfer may be made in absence of registration under the Securities Act.  I have no right to cause the Company to register the Units.  Any certificates or other documents representing my Units will contain a restrictive legend reflecting this restriction, and stop transfer instructions will apply to my Units.

4.  <u>Indemnification</u>.  I understand the meaning and legal consequences of the representations and warranties contained in Paragraph 2 hereof, and I will indemnify and hold harmless the Company, its officers, directors, and representatives involved in the offer or sale of the Units to me, as well as each of the managers and representatives, employees and agents and other controlling persons of each of them, from and against any and all loss, damage or liability due to or arising out of a breach of any representation or warranty of mine contained in this Subscription Agreement.

5.  <u>Revocation</u>.  I will not cancel, terminate or revoke this Subscription Agreement or any agreement made by me hereunder and this Subscription Agreement shall survive my death or disability.

6.  <u>Termination of Agreement</u>.  If this subscription is rejected by the Company, then this Subscription Agreement shall be null and void and of no further force and effect, no party shall have any rights against any other party hereunder, and the Company shall promptly return to me the funds delivered with this Subscription Agreement.

South Side Development Fund I, LLC

7. <u>Miscellaneous.</u>

(a) This Subscription Agreement shall be governed by and construed in accordance with the substantive law of the State of Illinois.

(b) This Subscription Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only in writing and executed by all parties.

(c) By Purchasing the Units in South Side Development Fund I, LLC I hereby agree to the terms and provisions of the Operating Agreement of the LLC – as included in this Memorandum as Exhibit B. I have hereby read and understand the Operating Agreement and understand how an LLC functions as a corporate entity.

8. <u>Ownership Information</u>. Please print here the total number of Units to be purchased, and the exact name(s) in which the Units will be registered.

Total Units: <u>100,000</u>

Name(s): <u>Next Generation TS FBO Elaine Sison Ernst IRA 2410</u>

_____ Single Person

_____ Husband and Wife, as community property

_____ Joint Tenants (with right of survivorship)

_____ Tenants in Common

_____ A Married Person as separate property

_____ Corporation or other organization

_____
Purchaser's Initials

_____ A Partnership

_____ Trust

__X___ IRA

81

DocuSign Envelope ID: 790D5E3F-0A92-462E-8562-4B15EFB47945

South Side Development Fund I, LLC

_____ Tax-Qualified Retirement Plan

    (i)  Trustee(s)/ Custodian_____

    (ii)  Trust Date_____

    (iii)  Name of Trust_____

    (iv)  For the Benefit of_____


_____ Other:_____

        (please explain)


Social Security or Tax I.D.#:_____


Residence Address:

_____
                         Street Address


_____
       City                 State           Zip


Mailing Address:  (Complete only if different from residence)

_____
      Street Address  (If P.O.Box, include address for surface delivery if different than
             residence)


_____
       City                 State           Zip


Phone Numbers

Home: _____

Business: _____

Facsimile: (_____)_____

_____   Read and
Purchaser's Initials  Approved
               7/19/2017

82

South Side Development Fund I, LLC

9. <u>Date and Signatures.</u>  Dated: _____.

Read and
Approved
7/19/2017

**Signatures**                                                    **Purchaser Name (Print)**

Elaine Sison Ernst _____                Next Generation TS FBO Elaine Sison Ernst IRA 2410
14F44065EBB44F8...                                                _____

_____                _____

(Each co-owner or joint owner must sign - Names must be signed exactly as listed under
"Purchaser Name")


ACCEPTED:

**South Side Development Fund I, LLC**

**By: ERETZ PRIVATE CAPITAL, LLC**
    **Its Manager**

**By** Jerry Cohen _____       **Dated:** 7/25/2017 _____
    B07F03F896EF4CC...
    Jo____  ____ _en
    Managing Member

Read and
Approved
7/19/2017

                                    _____              _____
                                    Purchaser's Initials              Purchaser's Initials


83

DocuSign Envelope ID: 790D5E3F-9492-462E-8562-4B15FFB47945

South Side Development Fund I, LLC

# Exhibit C

# Investor Suitability Questionnaire

South Side Development Fund I, LLC

# Investor Suitability Questionnaire

To:  Prospective purchasers of LLC Membership Units offered by South Side Development Fund I (the "Company").

The Purpose of this Questionnaire is to solicit certain information regarding your financial status to determine whether you are an "Accredited Investor," as defined under applicable federal and state securities laws, and otherwise meet the suitability criteria established by the Company for purchasing Units. ***This questionnaire is not an offer to sell securities***.

Your answers will be kept as confidential as possible.  You agree, however, that this Questionnaire may be shown to such persons as the Company deems appropriate to determine your eligibility as an Accredited Investor or to ascertain your general suitability for investing in the Units.

***Please answer all questions completely and execute the signature page***

**A. Personal**

1.  Name: Next Generation TS FBO Elaine Sison Ernst IRA 2410

2.  Address of Principal Residence: _____

   _____ County: _____

3.  Residence Telephone: _____

4.  Where are you registered to vote? _____

5.  Your driver's license is issued by the following state: _____

85

DocuSign Envelope ID: 790B5F3F-9A92-462E-8E62-4B15EFB47B4F

South Side Development Fund I, LLC

6.   Other Residences or Contacts:  Please identify any other state where you own a residence, are registered to vote, pay income taxes, hold a driver's license or have any other contacts, and describe your connection with such state:

_____

_____

7.  Please send all correspondence to:

(1)___X___  Residence Address (as set forth in item A-2)

(2)_____  Business Address (as set forth in item B-1)

8.  Date of Birth: [REDACTED] _____

9.  Citizenship: [REDACTED] _____

10.  Social Security or Tax I.D. #: [REDACTED] _____

**B.  Occupations and Income**

1.  Occupation: [REDACTED] _____

(a)  Business Address: [REDACTED] _____

86

DocuSign Envelope ID: 790B5E3F-9A92-462E-8E62-4B15FFB47B4F

South Side Development Fund I, LLC

_____

      (b)  Business Telephone Number: _ ▭▭▭▭▭ _____

2.  Gross income during each of the last two years exceeded:

▭▭▭▭▭▭▭▭▭▭▭▭▭▭▭▭

3.  Joint gross income with spouse during each of the last two years exceeded $300,000

▭▭▭▭▭▭▭▭▭▭▭▭▭▭▭▭

    Joint gross income with spouse during each of the last two years exceeded $200,000

▭▭▭▭▭▭▭▭▭▭▭▭

4.  Gross income during current year estimated to exceed:

▭▭▭▭▭▭▭▭▭▭▭▭▭▭▭▭

5. Joint gross income with spouse during current year estimated to exceed $300,000?

▭▭▭▭▭▭▭▭▭▭▭▭

87

South Side Development Fund I, LLC

Joint gross income with spouse during current year estimated to exceed $200,000?

**C. Net Worth**

1. Current net worth or joint net worth with spouse (note that "net worth" includes all of the assets owned by you and your spouse in excess of total liabilities, excluding the value of your primary residence.)

2. Current value of liquid assets (cash, freely marketable securities, cash surrender value of life insurance policies, and other items easily convertible into cash) is sufficient to provide for current needs and possible personal contingencies:

**D. Affiliation with the Issuer**

Are you a director or executive officer of the Company?

**E. Investment Percentage of Net Worth**

88

South Side Development Fund I, LLC

     If you expect to invest at least $150,000 in Units, does your total purchase price exceed 10% of your net worth at the time of sale, or joint net worth with your spouse.

**F. Consistent Investment Strategy**

     Is this investment consistent with your overall investment strategy?

**G. Prospective Investor's Representations**

     The information contained in this Questionnaire is true and complete, and the undersigned understands that the Company and its counsel will rely on such information for the purpose of complying with all applicable securities laws as discussed above. The undersigned agrees to notify the Company promptly of any change in the foregoing information which may occur prior to any purchase by the undersigned of securities from the Company.

Prospective Investor:    Read and Approved
    7/19/2017

_____    Date**:**_____
Signature

_____
Signature (of joint purchase if purchase is to be made as joint tenants or as tenants in common)

89

South Side Development Fund I, LLC

# **Exhibit D**

# **SOUTH SIDE DEVELOPMENT FUND I, LLC FINANCIAL STATEMENT**

South Side Development Fund I, LLC

# South Side Development Fund I, LLC
## Profit and Loss
### January - May 16, 2017

| | | |
|---|---|---|
| Income | | |
| Total Income | $ | 0.00 |
| Gross Profit | $ | 0.00 |
| Expenses | | |
|    Incorporation Fees | $ | 474.00 |
| Total Expenses | $ | 474.00 |
| Net Operating Income | -$ | 474.00 |
| Net Income | -$ | 474.00 |

91

DocuSign Envelope ID: 790D5E3F-0A99-462F-9E62-4B15EFB47B4E

South Side Development Fund I, LLC

# South Side Development Fund I, LLC
## Balance Sheet
### As of May 16, 2017

|  | Total |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Bank Accounts** | |
| Wells Fargo | 100.00 |
| **Total Bank Accounts** | $ 100.00 |
| | |
| **TOTAL ASSETS** | $ 100.00 |
| **LIABILITIES AND EQUITY** | |
| **Total Liabilities** | $ 0.00 |
| Equity | |
| Owners Equity | 574.00 |
| Net Income | -474.00 |
| **Total Equity** | $ 100.00 |
| **TOTAL LIABILITIES AND EQUITY** | $ 100.00 |

DocuSign Envelope ID: 790D5E3F-0492-462E-8562-4B15EFB47B4F

South Side Development Fund I, LLC

# **Exhibit E**

# **REINVESTMENT REQUEST FORM**

DocuSign Envelope ID: 790D5E3F-0A92-462E-8562-4B15FEB47845

South Side Development Fund I, LLC

## SOUTH SIDE DEVELOPMENT FUND

## REINVESTMENT REQUEST FORM


To: Eretz Private Capital, LLC
    Manager
    South Side Development Fund I, LLC (the "Company")


Gentlemen:

      I previously loaned funds to an affiliate of your Company, and I would like to reinvest the proceeds of my loan in the Company. Here is the information on my loan to an affiliate and the amount that I want to invest in the Company:

Name of Lender(s) _____

Address of Lender(s)_____

Initial Loan Amount $_____

Accrued Interest (to date) $_____

Total Due to me $_____

Entity that is the Borrower _____

Date of Initial Loan _____

Amount of Proceeds to be Invested in the Company $_____

Amount of Proceeds to be returned to me or my IRA custodian $_____

(For IRA investments only): Name and address of IRA Custodian:

_____

Account Number of IRA:_____


**I UNDERSTAND THAT MY PROPOSED SUBSCRIPTION FOR AN EQUITY INTEREST IN THE COMPANY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM DATED MAY 16, 2017, WHICH I HAVE RECEIVED AND REVIEWED, AND THAT SUCH UNITS ARE BEING OFFERED SUBJECT TO AN EXEMPTION FROM THE REQUIREMENTS OF REGISTRATION WITH THE SECURITIES AND EXCHANGE COMMISSION. I UNDERSTAND THAT THE FUNDS BEING INVESTED IN THE COMPANY ARE FOR AN EQUITY INVESTMENT, NOT A DEBT INVESTMENT OR A LOAN. I FURTHER UNDERSTAND THAT MY ACCEPTANCE AS A SUBSCRIBER BY THE COMPANY IS AT THE DISCRETION OF THE COMPANY.**

**Account Owner Authorization and Signature**

94

South Side Development Fund I, LLC

Read and
Approved

7/19/2017

I hereby authorize EquityBuild, Inc., EquityBuild Finance, LLC and its subsidiaries and affiliates, and their agents to hold and release funds necessary to make the investment into the Company, based on the instructions above.

_____ DS

*ESE*

_____          Printed Name:_____
                                 Next Generation TS FBO Elaine Sison Ernst IRA 2410

Date:_____

95

South Side Development Fund I, LLC

# **Exhibit F**

# **BUSINESS PLAN**

**FOR SALE | MULTIFAMILY**

# South Side Development Fund 1

4520 & 4611 S. Drexel Blvd., Chicago, IL 60653



CHICAGO, IL



EQUITYBUILD INC. 877-978-1869

# CONTENTS

PROPERTY INFORMATION     4

LOCATION INFORMATION     9

FINANCIAL ANALYSIS     13

DEMOGRAPHICS     17

## CONFIDENTIALITY & DISCLAIMER

All materials and information received or derived from EquityBuild Inc. its directors, officers, agents, advisors, affiliates and/or any third party sources are provided without representation or warranty as to completeness , veracity, or accuracy, condition of the property, compliance or lack of compliance with applicable governmental requirements, developability or suitability, financial performance of the property, projected financial performance of the property for any party's intended use or any and all other matters. Neither EquityBuild Inc. its directors, officers, agents, advisors, or affiliates makes any representation or warranty, express or implied, as to accuracy or completeness of the any materials or information provided, derived, or received. Materials and information from any source, whether written or verbal, that may be furnished for review are not a substitute for a party's active conduct of its own due diligence to determine these and other matters of significance to such party. EquityBuild Inc. will not investigate or verify any such matters or conduct due diligence for a party unless otherwise agreed in writing.

EACH PARTY SHALL CONDUCT ITS OWN INDEPENDENT INVESTIGATION AND DUE DILIGENCE.

Any party contemplating or under contract or in escrow for a transaction is urged to verify all information and to conduct their own inspections and investigations including through appropriate third party independent professionals selected by such party. All financial data should be verified by the party including by obtaining and reading applicable documents and reports and consulting appropriate independent professionals. EquityBuild Inc. makes no warranties and/or representations regarding the veracity, completeness, or relevance of any financial data or assumptions. EquityBuild Inc. does not serve as a financial advisor to any party regarding any proposed transaction. All data and assumptions regarding financial performance, including that used for financial modeling purposes, may differ from actual data or performance. Any estimates of market rents and/or projected rents that may be provided to a party do not necessarily mean that rents can be established at or increased to that level. Parties must evaluate any applicable contractual and governmental limitations as well as market conditions,vacancy factors and other issues in order to determine rents from or for the property. Legal questions should be discussed by the party with an attorney. Tax questions should be discussed by the party with a certified public accountant or tax attorney. Title questions should be discussed by the party with a title officer or attorney. Questions regarding the condition of the property and whether the property complies with applicable governmental requirements should be discussed by the party with appropriate engineers, architects, contractors, other consultants and governmental agencies. All properties and services are marketed by EquityBuild Inc. in compliance with all applicable fair housing and equal opportunity laws.



EQUITYBUILD INC. 877-978-1869

DocuSign Envelope ID: 790D5E3F-9A92-462E-8E62-4B15EFB47B4F

4520 & 4611 S. DREXEL BLVD. | 112 UNITS | CHICAGO, IL

# Executive Summary



## FUND SUMMARY

| | |
|---|---|
| Total Equity Capitalization: | $5,950,000 |
| Target Annual Preferred Return: | 8% |
| Projected Fund IRR: | 22.01% |
| Projected Fund Equity Multiple: | 1.98 |

## OFFERING SUMMARY

South Side Development Fund 1, LLC (the "Company") is offering limited liability company Interests through a Confidential Private Placement Memorandum to investors in order to fund a real estate investment fund for the purposes of purchasing, renovating, and stabilizing two multifamily buildings in Chicago's south side neighborhoods. The Company will make equity investments in single purpose entities that will own multifamily assets leveraged with third party debt in order to maximize the returns to the Fund. The Company projects that it will be able to pay an 8% annual dividend to equity investors from available cash in the Fund on a quarterly basis. The Company intends initially to acquire a multi-family building, 4520-26 S Drexel Blvd (the " 4520 Drexel Building"). Upon acquisition the 4520 Drexel Building, the company will acquire a second multi-family building, 4611-15 S Drexel Blvd, (the "4615 Drexel Building"). The Company will renovate and refinance these buildings, and then utilize the cash from the refinance to acquire and stabilize additional similar multi-family assets. At the end of the fifth year, the Company intends to begin the disposition process of all its assets at which time investor capital will be returned along with any accrued and/or unpaid dividends, with the fund earning 80% of any remaining profits. THERE IS NO GUARANTEE THAT THERE WILL BE SUFFICIENT AVAILABLE CASH TO PAY THESE PROJECTED DIVIDENDS.

DocuSign Envelope ID: 790D5E3E-9A92-462E-8E62-4B15EEB47B4E

SECTION 1

# PROPERTY INFORMATION



EQUITYBUILD INC. 877-978-1869

DocuSign Envelope ID: 790D5E3F-9A92-462F-8E62-4B15EFB47B45

SOUTH SIDE DEVELOPMENT FUND 1 | 112 UNITS | CHICAGO, IL

# Business Plan

**BUSINESS PLAN**

 The Company, South Side Development Fund 1, is real estate equity investment entity for the sole objective of purchasing, stabilizing, and disposing of the multi-family buildings. The initial assets will be the 4520 Drexel Building and the 4615 Drexel Building, and similar buildings yet to be identified. A related entity, South Shore Property Holdings, LLC, acquired the 4520 Drexel Building on January 31, 2017 for $5,700,000 plus closing costs, utilizing $4,275,000 in bridge financing from Bloomfield Capital, and $1,865,868.24 from the funds of South Shore Property Holdings, LLC, of which $370,000 was reserved as a construction escrow and another $330,000 being paid in over 10 months to fund the full construction escrow of $700,000 . South Shore Property Holdings, LLC, also acquired the 4615 Drexel Building on December 15, 2016 for $3,500,000 plus closing costs utilizing $2,625,000 in bridge financing from Bloomfield Capital and $972,694 from the funds of South Shore Property Holdings, LLC, of which $150,000 was reserved as a construction escrow and another $350,000 being paid in over 10 months to fund the full construction escrow of $500,000.WPD Management, an unrelated third party (the "Property Manager"), has taken over day-to-day property management responsibilities. EquityBuild, Inc. an affiliate of the Company, is the developer of the building ("Developer") and has begun a competitive bidding process to select the most cost-effective competent bid from a pool of third party unrelated general contractors per the scope of work as determined by the Property Manager. Renovation work on eight of the apartment units has already been contracted to the WPD Management. Within thirty (30) days, the Developer will award the remaining work and bid to the selected general contractor and renovation work will commence.The Company anticipates the work on the core building systems and initial vacant units to be completed within ninety (90) days of the awarded bid. Concurrently, the Company will continue to co-ordinate with the Property Manager a lease up process whereby the Property Manager will systematically issue notices of rental increases to the tenants commensurate with the rental targets as determined by the Developer. Tenants who do not accept the rental increases will re-locate and renovation work will begin in that unit based on the scope as determined by the developer subject to the unit updates budget constraints. Tenants who do accept the rental increases will remain in their units and no substantial renovation will occur within that unit.The Company anticipates that the total unit turnover and lease up process will take approximately fifteen (15) months. South Shore Property Holdings, LLC has already solicited and received a term sheet from Red Mortgage Capital, to refinance the existing bridge debt on the 4520 Drexel Building through the Freddie Mac small balance loan program. The Company anticipates that the refinancing of the building will be completed within ninety (90) days, at which time the building is anticipated to have positive cash flow, after which the company will refinance the 4611 Drexel Building through the same program. The Company intends to structure the refinance loan such that the loan carries no pre-payment penalty after twenty –four (24) months. It is also anticipated that the first twelve (12) months of the loan will be interest only payments, and that this will allow a cash out refinance at a higher market value base on the stabilized physical and income improvements. The Company will then utilize the net cash available from the refinance to acquire a similar asset to add to the Company's holdings. The stabilization and refinance process will repeat as many times as financially beneficial to the Fund over a four year period at which time acquisitions will cease, remaining assets will be stabilized. At that point, the Company anticipated that all buildings will be sold within twenty-four (24) months of the completion of the acquisition phase. THERE IS NO GUARANTEE THAT THE COMPANY WILL ABLE TO REFINANCE THESE BUILDINGS OR TO DISPOSE OF THESE BUILDINGS AS PLANNED.

DocuSign Envelope ID: 790B5E3F-9A92-462E-8E62-4B15EEB47B4E
Case: 1:23-cv-00834 Document #: 1626 Filed: 03/20/24 Page 155 of 209 PageID #:11571

SOUTH SIDE DEVELOPMENT FUND 1 | 112 UNITS | CHICAGO, IL

# Property Description

## RELATED ENTITIES

A related entity, South Shore Property Holdings, LLC a Delaware limited Liability Company, is owned 100% by Jerome H. Cohen, a Florida individual. It will form a Partnership with the Company for each individual asset, in which South Shore Property Holdings will hold 20% of the membership interest in, and all the voting rights of, the Partnership, while the Company will hold 80% of the membership, with no voting rights. The partnership will own 100% of the membership interest in, and voting rights of, the SPV which will hold title to the asset. There will be one partnership and SPV for each real asset the Company invests in. The Partnership has hired the Developer, EquityBuild Inc., to manage to stabilization process by hiring unrelated third party property managers and general contractors to complete all renovation work on the asset. EquityBuild Inc. is wholly owned by Jerome H. Cohen, a Florida individual. The Company has EquityBuild Finance LLC, a wholly owned subsidiary of EquityBuild Inc., to raise the equity capital for The Company, and Eretz Private Capital LLC (the "Fund Manager"), a Delaware LLC wholly owned by Jerome H. Cohen, to manage and service the Company per the terms of the Confidential Private Placement Memorandum.



## FEE STRUCTURE

The Company will receive all revenues of the offering entity net of costs and fees, including but not limited to; direct building operating costs, closing costs, management fees, financing charges and interest, and other costs. A Developer Fee will be paid to EquityBuild Inc. in an amount equal to 10% of the total initial purchase and renovation costs. An Acquisition Fee in the amount of 2% of the net purchase price of the initial buildings will be paid to EquityBuild Inc. A loan guarantee fee in the amount of 1% of the initial loan amount shall be paid to South Shore Property Holdings, LLC. An Asset Management Fee in the amount of 3.5% of the Net Operating Income of the building shall be paid to the Fund Manager, Eretz Private Capital, LLC. An equity fee in the amount of 5% of the equity raised shall be paid the EquityBuild Finance, LLC. South Shore Property Holdings, LLC will have a 20% promoted interest in the profits of the entity net of debt and preferred equity payments. . THESE FEES WERE NOT NEGOTIATED AT ARMS-LENGTH AND NO REPRESENTATION IS BEING MADE THAT THOSE FEES ARE REASONABLE OR ARE LESS OR MORE THAN WOULD BE



4520 & 4611 S. DREXEL BLVD. | 112 UNITS | CHICAGO, IL

# Property Details

| | |
|---|---|
| **PROPERTY NAME:** | South Side Development - Fund 1 |
| **PROPERTY ADDRESS:** | 4520 & 4611 S. Drexel Blvd.<br>Chicago, IL 60653 |
| **APN:** | |
| **PRICE / SF:** | $113.58 |
| **LOT SIZE:** | 0.0 AC |
| **BUILDING SIZE:** | 81,000 SF |
| **BUILDING CLASS:** | Multifamily Apartments |
| **ZONING:** | RM-5 |
| **YEAR BUILT:** | 1930's |
| **NUMBER OF STORIES:** | 3 |
| **FOUNDATION:** | Concrete Basement |
| **WALLS:** | Brick |
| **NUMBER OF UNITS:** | 112 |
| **ROOF:** | Flat Membrane |

4520 & 4611 S. DREXEL BLVD. | 112 UNITS | CHICAGO, IL

# Additional Photos







SECTION 2

# LOCATION INFORMATION



DocuSign Envelope ID: 790D5E3F-9A92-462E-8E62-4B15EEB47B4F

4520 & 4611S. DREXEL BLVD. | 112 UNITS | CHICAGO, IL

# Location Description

**LOCATION OVERVIEW**

Located on beautiful, tree-lined stretch of Drexel Boulevard that stretches down to Washington Park, the property is also easy walking distance to Jackson Park – recently announced as the future home of the Obama Presidential Library (regardless of where you stand politically, presidential libraries have a record of raising area property values) -- and Burnham Park, Chicago's six-mile long park that stretches down the shore of Lake Michigan. The building is near churches, restaurants, shops and schools. The campus of the University of Chicago lies just to the south. It is convenient to public transportation, with the 47th Street stations for both the Green Line L Train and the Metrarail nearby, along with multiple bus stops. Our analysis indicates that the property will generate more than enough revenue to cover mortgage payments on the building as well as all of the property's operating expenses, and still return positive cash flow. This is why we consider this multi-unit building to be an excellent investment opportunity.





SECTION 2.835 A ABOUT THE INVESTMENT

DocuSign Envelope ID: 790D5E3F-9A92-462E-8E62-4B15EFB47B4E
Case: 1:24-cv-01965 Document #: 1-526 Filed: 03/20/24 Page 160 of 209 PageID #:111576

4520 & 4611 S. DREXEL BLVD. | 112 UNITS | CHICAGO, IL

# Location Maps





DocuSign Envelope ID: 790D5E3F-9A92-462E-8E62-4B15EFB47B4E

4520 & 4611 S. DREXEL BLVD. | 112 UNITS | CHICAGO, IL

# Retailer Map



DocuSign Envelope ID: 790D5E3F-9492-462E-8E62-4B15EFB47B4E

SECTION 3

# FINANCIAL ANALYSIS



4520 & 4611 S. DREXEL BLVD. | 112 UNITS | CHICAGO, IL

# 10 Year Building Pro Forma

| Assumptions | |
|---|---|
| Vacancy At 30% Yearly Turnover And 2 Months Average Absorption | 5.00% |
| Income Inflation Rate | 3.50% |
| Expense Inflation Rate | 3.50% |
| Property Management Fee | 5.00% |
| Bad Debt/Uncollectable Expense | 3.00% |
| Selling Costs | 5.00% |

| Income | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Year Ending | 3/31/18 | 3/31/19 | 3/31/20 | 3/31/21 | 3/31/22 | 3/31/23 | 3/31/24 | 3/31/25 | 3/31/26 | 3/31/27 |
| Gross Potential Rent | $1,233,242 | $1,407,015 | $1,443,240 | $1,493,753 | $1,546,035 | $1,600,146 | $1,656,151 | $1,714,116 | $1,774,110 | $1,836,204 |
| Vacancy/Loss | $(181,050) | $(70,351) | $(72,162) | $(74,688) | $(77,302) | $(80,007) | $(82,808) | $(85,706) | $(88,706) | $(91,810) |
| Gross Scheduled Rent | $1,052,192 | $1,336,664 | $1,371,078 | $1,419,066 | $1,468,733 | $1,520,139 | $1,573,344 | $1,628,411 | $1,685,405 | $1,744,394 |
| Less Uncollectables | $(31,566) | $(40,100) | $(41,132) | $(42,572) | $(44,062) | $(45,604) | $(47,200) | $(48,852) | $(50,562) | $(52,332) |
| Other Income | $23,588 | $26,756 | $27,165 | $28,116 | $29,100 | $30,118 | $31,172 | $32,263 | $33,393 | $34,561 |
| Operating Income | $1,044,214 | $1,323,321 | $1,357,111 | $1,404,610 | $1,453,771 | $1,504,653 | $1,557,316 | $1,611,822 | $1,668,236 | $1,726,624 |
| Expenses | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
| Leasing Commissions | $(21,813) | $(10,778) | $(9,029) | $(9,345) | $(9,672) | $(10,011) | $(10,361) | $(10,724) | $(11,099) | $(11,488) |
| Real Estate Taxes | $(59,262) | $(61,040) | $(62,871) | $(65,072) | $(67,349) | $(69,706) | $(72,146) | $(74,671) | $(77,285) | $(79,990) |
| Insurance | $(26,721) | $(27,523) | $(28,348) | $(29,341) | $(30,367) | $(31,430) | $(32,530) | $(33,669) | $(34,847) | $(36,067) |
| Gas/Heat | $(74,645) | $(84,935) | $(85,949) | $(88,957) | $(92,071) | $(95,293) | $(98,628) | $(102,080) | $(105,653) | $(109,351) |
| Electric | $(7,418) | $(8,435) | $(8,542) | $(8,841) | $(9,150) | $(9,471) | $(9,802) | $(10,145) | $(10,500) | $(10,868) |
| Water | $(48,496) | $(54,770) | $(55,863) | $(57,818) | $(59,842) | $(61,936) | $(64,104) | $(66,348) | $(68,670) | $(71,073) |
| Trash | $(4,950) | $(5,625) | $(5,700) | $(5,900) | $(6,106) | $(6,320) | $(6,541) | $(6,770) | $(7,007) | $(7,252) |
| Snow Removal/Landscaping | $(4,950) | $(5,625) | $(5,700) | $(5,900) | $(6,106) | $(6,320) | $(6,541) | $(6,770) | $(7,007) | $(7,252) |
| Pest Control | $(4,950) | $(5,625) | $(5,700) | $(5,900) | $(6,106) | $(6,320) | $(6,541) | $(6,770) | $(7,007) | $(7,252) |
| Legal | $(4,950) | $(5,625) | $(5,700) | $(5,900) | $(6,106) | $(6,320) | $(6,541) | $(6,770) | $(7,007) | $(7,252) |
| Repairs & Maintenance | $(61,400) | $(63,242) | $(65,139) | $(67,419) | $(69,779) | $(72,221) | $(74,749) | $(77,365) | $(80,073) | $(82,875) |
| G&A | $(22,800) | $(23,484) | $(24,189) | $(25,035) | $(25,911) | $(26,818) | $(27,757) | $(28,728) | $(29,734) | $(30,775) |
| Management Fee  5% | $(52,211) | $(66,166) | $(67,856) | $(70,230) | $(72,689) | $(75,233) | $(77,866) | $(80,591) | $(83,412) | $(86,331) |
| Operating Expenses | $(394,566) | $(422,873) | $(430,586) | $(445,656) | $(461,254) | $(477,398) | $(494,107) | $(511,401) | $(529,300) | $(547,826) |
| % Operating Income | 37.79% | 31.96% | 31.73% | 31.73% | 31.73% | 31.73% | 31.73% | 31.73% | 31.73% | 31.73% |
| Net Operating Income | $649,649 | $900,447 | $926,525 | $958,953 | $992,516 | $1,027,255 | $1,063,208 | $1,100,421 | $1,138,936 | $1,178,798 |
| Cap Rate (Purchase Price) | 7.06% | 9.79% | 10.07% | 10.42% | 10.79% | 11.17% | 11.56% | 11.96% | 12.38% | 12.81% |

4520 & 4611 S. DREXEL BLVD. | 112 UNITS | CHICAGO, IL

# Building Investment Summary

## Investment Summary

| | |
|---|---|
| Purchase Pr ce | 9,200,000 |
| Ex t Cap | 6.50% |
| Sa e At End Of Year | 6 |
| Ex t Cos ng Costs | 2.0% |
| Asset Management Fee | 3.50% |
| Stab zed Ref Year | 2 |
| Ref Cap Rate | 6.50% |

### Capitalization Summary

| | |
|---|---|
| Sponsor Equ ty | 0 |
| Partner Equ ty | 5,912,658 |
| Mezzan ne Debt At (20.0%) | 0 |
| Debt | 6,900,000 |
| **Total Capitalization** | 12,812,658 |

### Property Cash Flow

| | Totals | Year 0 Apr 2017 | Year 1 Mar 2018 | Year 2 Mar 2019 | Year 3 Mar 2020 | Year 4 Mar 2021 | Year 5 Mar 2022 | Year 6 Mar 2023 | Year 7 Mar 2024 | Year 8 Mar 2025 | Year 9 Mar 2026 | Year 10 Mar 2027 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase Pr ce | (9,200,000) | (9,200,000) | | | | | | | | | | |
| Cos ng Costs | (1,288,025) | (1,288,025) | | | | | | | | | | |
| Rehab Costs | (1,200,000) | (1,200,000) | | | | | | | | | | |
| F nanc ng Costs | (670,133) | (670,133) | | | | | | | | | | |
| Soft Costs | (454,500) | (454,500) | | | | | | | | | | |
| A l In Cost | (12,812,658) | (12,812,658) | | | | | | | | | | |

**Property Investment Cash Flow**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Operat ng Income | 5,455,345 | 0 | 649,649 | 900,447 | 926,525 | 958,953 | 992,516 | 1,027,255 | | | | |
| Asset Management Fee | (190,937) | 0 | (22,738) | (31,516) | (32,428) | (33,563) | (34,738) | (35,954) | | | | |
| D spos t on Proceeds | 15,803,916 | | | | | | | 15,803,916 | | | | |
| Property Leve Cos ng Costs | (316,078) | | | | | | | (316,078) | | | | |

| **Unleveraged Cash Flow** | 7,939,588 | (12,812,658) | 626,911 | 868,931 | 894,096 | 925,390 | 957,778 | 16,479,139 | | | | |
| *Yield on All-In Cost* | | | *4.89%* | *6.78%* | *6.98%* | *7.22%* | *7.49%* | *128.62%* | | | | |

| | |
|---|---|
| IRR | 9.46% |
| Prof ts | 7,939,588 |
| Mu t p e | 1.34x |

### Property Debt

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Br dge Loan Proceeds | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| Repayment of Br dge Loan | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| Mezzan ne Debt Proceeds | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| Repayment of Mezzan ne Debt | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| Net Ref Proceeds / Repayment At 80% LTV | 797,340 | 6,900,000 | 0 | 4,182,426 | 0 | 0 | 0 | (10,285,085) | | | | |
| Or g nat on/Payoff Fees Pa d | (41,824) | 0 | 0 | (41,824) | 0 | 0 | 0 | 0 | | | | |
| Interest Pa d | (2,445,840) | 0 | (300,438) | (325,837) | (467,392) | (459,295) | (450,847) | (442,033) | | | | |
| Pr nc pa Pa d | (894,746) | 0 | 0 | (97,405) | (186,835) | (194,932) | (203,380) | (212,194) | | | | |

| **Leveraged Cash Flows** | 5,354,518 | (5,912,658) | 326,474 | 4,586,290 | 239,870 | 271,163 | 303,552 | 5,539,827 | | | | |
| *Cash-on-Cash Yield* | | | *5.52%* | *77.57%* | *4.06%* | *4.59%* | *5.13%* | *93.68%* | | | | |
| *DSCR* | | | *0 000* | *2 127* | *1 416* | *1 466* | *1 517* | *1 570* | | | | |

| | |
|---|---|
| IRR | 18.74% |
| Prof ts | 5,354,518 |
| Mu t p e | 0.91x |

### Cash Flow Waterfall

**Partner Preferred Return (8.0%)**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Partner Beg nn ng Equ ty Ba ance | | | 5,912,658 | 6,059,197 | 1,957,642 | 1,874,384 | 1,753,171 | 1,589,873 | | | | |
| Partner Preferred Interest | IRR Check | | 473,013 | 484,736 | 156,611 | 149,951 | 140,254 | 127,190 | | | | |
| Partner Preferred Interest Pa d | 8.00% | | (326,474) | (484,736) | (156,611) | (149,951) | (140,254) | (127,190) | | | | |
| Return Of Cap ta (100.0% Of Cash After Pref | | | 0 | (4,101,554) | (83,259) | (121,213) | (163,298) | (1,589,873) | | | | |
| Partner End ng Equ ty Ba ance | | 5,912,658 | 6,059,197 | 1,957,642 | 1,874,384 | 1,753,171 | 1,589,873 | 0 | | | | |

| **Equity Interest Paid + Return Of Capital** | | | 326,474 | 4,586,290 | 239,870 | 271,163 | 303,552 | 1,717,063 | | | | |
| *Cash Return Of Equity (Based On Equity Balance At Start Of Year)* | | | *5.52%* | *75.69%* | *12.25%* | *14.47%* | *17.31%* | *108.00%* | | | | |

**Remaining Cash After Equity**

| | | | 0 | 0 | 0 | 0 | 0 | 3,822,764 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Partner Remaining Cash**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Partner Prof t (80%) | | | 0 | 0 | 0 | 0 | 0 | (3,058,211) | | | | |
| Sponsor Prof t (20%) | | | 0 | 0 | 0 | 0 | 0 | (764,553) | | | | |

**Remaining Cash**

| | | | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

| | Tota s | Apr 2017 | Mar 2018 | Mar 2019 | Mar 2020 | Mar 2021 | Mar 2022 | Mar 2023 | Mar 2024 | Mar 2025 | Mar 2026 | Mar 2027 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Yearly Gross Profits (Preferred Return +Profit)** | 4,443,426 | 0 | 326,474 | 484,736 | 156,611 | 149,951 | 140,254 | 3,185,401 | | | | |
| *Cash On Cash Return* | | | *5.52%* | *8.00%* | *8.00%* | *8.00%* | *8.00%* | *200.38%* | | | | |
| **Partner Investment Cash Flow** | 4,589,965 | (5,912,658) | 326,474 | 4,586,290 | 239,870 | 271,163 | 303,552 | 4,775,274 | | | | |
| *Return On Investment* | | | *5.52%* | *77.57%* | *4.06%* | *4.59%* | *5.13%* | *80.76%* | | | | |

| | |
|---|---|
| IRR | 17.07% |
| Prof ts | 4,589,965 |
| Mu t p e | 0.78x |

4520 & 4611 S. DREXEL BLVD. | 112 UNITS | CHICAGO, IL

# Fund Investment Summary

## Investment Summary

| | |
|---|---|
| Purchase Price | 9,200,000 |
| Exit Cap | 6.50% |
| Sale At End Of Year | 10 |
| Exit Closing Costs | 2.0% |
| Asset Management Fee | 3.50% |
| Stabilized Ref Year | 2 |
| Ref Cap Rate | 6.50% |

**Capitalization Summary**

| | |
|---|---|
| Sponsor Equity | 0 |
| Partner Equity | 5,912,658 |
| Mezzanine Debt At (20.0%) | 0 |
| Debt | 6,900,000 |
| **Total Capitalization** | **12,812,658** |

**Property Cash Flow**

| | Totals | Year 0 Apr 2017 | Year 1 Mar 2018 | Year 2 Mar 2019 | Year 3 Mar 2020 | Year 4 Mar 2021 | Year 5 Mar 2022 | Year 6 Mar 2023 | Year 7 Mar 2024 | Year 8 Mar 2025 | Year 9 Mar 2026 | Year 10 Mar 2027 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LCF 1 | | (5,912,658) | 326,474 | 4,586,290 | 239,870 | 271,163 | 303,552 | 337,074 | | | | |
| LCF 2 | | 0 | 0 | 0 | 326,474 | 4,586,290 | 239,870 | 271,163 | | | | |
| LCF 3 | | 0 | 0 | 0 | 0 | 0 | 326,474 | 4,586,290 | | | | |
| **Aggregate LCF** | **12,576,204** | **(5,912,658)** | **326,474** | **4,586,290** | **566,344** | **4,857,453** | **869,896** | **5,194,528** | | | | |

**Disposition Proceeds**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| LCF 1 | | 0 | 0 | 0 | 0 | 0 | 0 | 15,487,838 |
| LCF 2 | | 0 | 0 | 0 | 0 | 0 | 0 | 14,458,063 |
| LCF 3 | | 0 | 0 | 0 | 0 | 0 | 0 | 13,575,972 |
| Total | | 0 | 0 | 0 | 0 | 0 | 0 | 43,521,872 |

**PrePay & Principle**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| LCF 1 | | 0 | 0 | 0 | 0 | 0 | 0 | (10,387,936) |
| LCF 2 | | 0 | 0 | 0 | 0 | 0 | 0 | (11,021,679) |
| LCF 3 | | 0 | 0 | 0 | 0 | 0 | 0 | (11,082,426) |
| Total | | 0 | 0 | 0 | 0 | 0 | 0 | (32,492,041) |

**Taxable Income**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Total | | | 170,787 | 306,973 | 362,284 | 538,995 | 636,317 | 856,581 |

| | Totals | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|---|---|---|---|
| **Leveraged Cash Flows** | **(5,912,658)** | **326,474** | **555,765** | **566,344** | **826,929** | **869,896** | **16,224,359** | |
| *Cash-on-Cash Yield* | | *5.52%* | *9.40%* | *9.58%* | *13.99%* | *14.71%* | *274.40%* | |
| *DSCR* | | *0.000* | *2.127* | *1.416* | *1.466* | *1.517* | *1.570* | |

**Cash Flow Waterfall**

**Partner Preferred Return (8.0%)**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Partner Beginning Equity Balance | | 5,912,658 | 5,912,658 | 6,059,197 | 6,059,197 | 6,059,197 | 6,059,197 | 6,059,197 |
| Partner Preferred Interest | IRR Check | | 473,013 | 484,736 | 484,736 | 484,736 | 484,736 | 484,736 |
| Partner Preferred Interest Paid | 8.00% | | (326,474) | (484,736) | (484,736) | (484,736) | (484,736) | (484,736) |
| Return Of Capital (0%) Of Cash After Pref | | | 0 | 0 | 0 | 0 | 0 | (6,059,197) |
| Partner Ending Equity Balance | | 5,912,658 | 6,059,197 | 6,059,197 | 6,059,197 | 6,059,197 | 6,059,197 | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Equity Interest Paid + Return Of Capital** | | | **326,474** | **484,736** | **484,736** | **484,736** | **484,736** | **6,543,932** |
| *Cash Return Of Equity (Based On Equity Balance At Start Of Year)* | | | *5.52%* | *8.20%* | *8.20%* | *8.20%* | *8.20%* | *110.66%* |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Remaining Cash After Equity** | | | **454,500** | **525,530** | **607,137** | **949,330** | **1,334,490** | **11,014,917** |

**Partner Remaining Cash**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Partner Profit (80%) | | 0 | 0 | 0 | 0 | 0 | 0 | (8,811,933) |
| Sponsor Profit (20%) | | 0 | 0 | 0 | 0 | 0 | 0 | (2,202,983) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Remaining Cash** | | | **454,500** | **525,530** | **607,137** | **949,330** | **1,334,490** | **0** |

| | Totals | Apr 2017 | Mar 2018 | Mar 2019 | Mar 2020 | Mar 2021 | Mar 2022 | Mar 2023 | Mar 2024 | Mar 2025 | Mar 2026 | Mar 2027 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Yearly Gross Profits (Preferred Return +Profit)** | **11,562,086** | **0** | **326,474** | **484,736** | **484,736** | **484,736** | **484,736** | **9,296,669** | | | | |
| *Cash On Cash Return* | | | *5.52%* | *8.00%* | *8.00%* | *8.00%* | *8.00%* | *153.43%* | | | | |
| **Partner Investment Cash Flow** | **11,708,625** | **(5,912,658)** | **326,474** | **484,736** | **484,736** | **484,736** | **484,736** | **15,355,866** | | | | |
| *Return On Investment* | | | *5.52%* | *8.20%* | *8.20%* | *8.20%* | *8.20%* | *259.71%* | | | | |

| | |
|---|---|
| IRR | 22.01% |
| Profits | 11,708,625 |
| Multiple | 1.98x |

## Taxable Income Variance Table

**Taxable Income Based On Equity Conversion**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Ordinary Taxable Income | | | 170,787 | 306,973 | 362,284 | 538,995 | 636,317 | 856,581 |
| Total Cash Flow | | (5,912,658) | 326,474 | 484,736 | 484,736 | 484,736 | 484,736 | 15,355,866 |
| Repayment Of Basis | | 0 | 0 | 0 | 0 | 0 | 0 | 5,912,658 |
| Dividend Payments | | 0 | 326,474 | 484,736 | 484,736 | 484,736 | 484,736 | 484,736 |
| Capital Gains | | 0 | 0 | 0 | 0 | 0 | 0 | 8,811,933 |
| Ordinary Income (35%) | | 0 | (59,776) | (107,441) | (126,799) | (188,648) | (222,711) | (299,803) |
| Long Term Capital Gains (18%) | | 0 | 0 | 0 | 0 | 0 | 0 | (1,586,148) |
| Total Tax | | 0 | (59,776) | (107,441) | (126,799) | (188,648) | (222,711) | (1,885,951) |
| Post Tax Cash Flow | | 0 | 266,698 | 377,295 | 357,936 | 296,087 | 262,025 | 13,469,914 |
| *Post Tax Cash Return* | | | *4.31%* | *6.38%* | *6.05%* | *5.01%* | *4.43%* | *227.81%* |

| | |
|---|---|
| IRR | 18.22% |
| Profits | 9,117,296 |
| Multiple | 1.54x |

SECTION 4

# DEMOGRAPHICS



EQUITYBUILD INC. 877-978-1869

DocuSign Envelope ID: 790B5E3F-9A92-462E-8E62-4B15EFB47B4E

4520 & 4611 S. DREXEL BLVD. | 112 UNITS | CHICAGO, IL

# Demographics Map



| POPULATION | 0.5 MILES | 1 MILE | 1.5 MILES |
|---|---|---|---|
| TOTAL POPULATION | 12,848 | 42,268 | 75,766 |
| MEDIAN AGE | 33.8 | 35.0 | 34.5 |
| MEDIAN AGE (MALE) | 33.4 | 33.5 | 32.3 |
| MEDIAN AGE (FEMALE) | 33.8 | 36.7 | 36.1 |

| HOUSEHOLDS & INCOME | 0.5 MILES | 1 MILE | 1.5 MILES |
|---|---|---|---|
| TOTAL HOUSEHOLDS | 5,942 | 19,483 | 34,683 |
| # OF PERSONS PER HH | 2.2 | 2.2 | 2.2 |
| AVERAGE HH INCOME | $58,000 | $62,263 | $59,365 |
| AVERAGE HOUSE VALUE | $333,218 | $372,808 | $349,441 |

* Demographic data derived from 2010 US Census

DocuSign Envelope ID: 790D5E3F-9A92-462F-8E62-4B15EFB47B4F

# Wire Transfer Instructions
## for
## 4520 S Drexel

Bank:                     **Wells Fargo Bank, N.A.**

Address:                  **420 Montgomery**
                          **San Francisco, CA 94104**

Beneficiary:              **Southside Development**
                          **Fund, LLC**

Beneficiary Address:      **180 N Stetson St., Suite 3500**
                          **Chicago, IL 60601**

ABA:                      **121000248**

Account:                  **1149143123**

Property/Investment Address: 4520 S. Drexel Blvd. Chicago, IL 60653

Amount To Wire: $ 100,000.00

Lender Initial: *ESE*

Date Wire Will Be Initiated: _____   Wire Received On: 07/24/2017

**NEXT GENERATION TRUST SERVICES**
75 LIVINGSTON AVENUE, 3RD FLOOR
ROSELAND, NJ 07068
P: 973-533-1880 * F: 973-533-1088

# PRIVATE PLACEMENT
# INSTRUCTION LETTER



## PRIVATE PLACEMENT LETTER FOR ACCOUNT OWNER

Account Holder Name: __Elaine Sison Ernst__                                      Next Generation Account #: _____

Name of Entity __4520=26_S_Drexel_,_LLC_____    South Side Development Fund I, LLC

Entity Address __4520-26 S Drexel Blvd__

City, State, Zip __Chicago, IL 60653__

Name of Entity Manager __Jerry Cohen__                                      EIN of Entity _____

*Next Generation Trust Services (Administrator) has received instructions from the above referenced Account Owner concerning an investment in the above named entity through his or her Account. The account to be invested is referred to in this document as the "Account", regardless of whether it is a retirement account under Internal Revenue Code (the "IRC") §401, §408 or §408A, a Coverdell Education Savings Account under IRC §530, a Health Savings Account under IRC §223, or a qualified retirement plan. The following instructions must be followed to ensure compliance with both IRS requirements and Next Generation Trust Services policy.*

1) All vestings for entities must read: **Next Generation TS FBO (Account Name) IRA (Account Number).** The address and contact information for this investment must be recorded as that of Next Generation Trust Services. All notices concerning the investment in the entity should be sent to the Administrator. Any questions pertaining to the Account should be referred to the Administrator.

2) **Do not use the Account Owner's personal social security number** with respect to this investment for any purpose. If the Account is an investor to which a K-1 or similar tax document will be issued, **please use the following E.I.N.:** _____

3) If the Account is a 100% owner of the entity, the entity must apply for its own EIN. It is not permitted under Next Generation Trust Services Policy to use the EIN shown above for any other purpose than the issuance of a K-1 or similar tax document to the Account as investor in the entity.

4) Original stock certificates, membership certificates or other proof of ownership showing the proper vesting must be sent to and held by the Administrator on behalf of the Custodian and the Account.

5) All payments, income, distributions or payoffs for this investment must be sent to the Administrator for the benefit of the Account. Under the Internal Revenue Code, it is never acceptable to send funds directly to the Account Owner (or the Account Owner's nominee or designee), or any other account owned by the Account Owner.

6) As the owner of the investment on behalf of the Account, the Administrator must be notified promptly of any change in address, telephone number, or company status (such as bankruptcy filings, regulatory agency investigations or litigation).

7) In the event that future capital contributions to the entity are required or desired (and provided the Account Owner determines that the capital call is not a prohibited transaction under Internal Revenue Code §4975 and there are sufficient funds in the Account), all funds must come from the Account. The Account Owner may not advance funds on behalf of the Account.

8) The Account Owner may not personally guarantee on behalf of the Account any indebtedness of the entity to a third party nor may the Account Owner guarantee any indebtedness of the Account to the entity.

9) You understand and agree that the Custodian and/or the Administrator for your Account (including, but not limited to Next Generation Trust Services or any agent, affiliate or designee of Next Generation Trust Services) have given you no tax advice regarding the possibility that your Account may be subject to Unrelated Business Income Tax (UBIT) as a result of its investment in the identified entity. If your Account owes UBIT on its profits from the entity, you agree to prepare or cause to be prepared and filed a IRS Form 990T, and any similar filing required under applicable state laws, for each year with respect to which any such form is required, and to cause your Account to pay any UBIT that is reported in such forms. You understand and agree that any UBIT owed must come from funds belonging to the Account. Your agreement to indemnify and hold harmless includes liability of the parties named therein with respect to UBIT and the preparation and filing of IRS Form 990T and similar state tax filings.

10) You understand and agree that the Custodian and/or Administrator for your Account (including, but not limited to Next Generation Trust Services or any agent, affiliate or designee of Next Generation Trust Services) do not approve investments or actions you personally make or direct the Custodian and/or Administrator to take on behalf of your Account. The Custodian and/or Administrator are limited in their responsibilities under your Account, and their responsibilities do not include investment selection.

11) You understand and agree that the Custodian and/or the Administrator for your Account (including, but not limited to Next Generation Trust Services or any agent, affiliate or designee of Next Generation Trust Services) do not review and approve the subscription agreement, operating agreement, by-laws, limited or general partnership agreement, or any other similar agreement regarding the purchase or operation of the entity you want your Account to invest in. It is the responsibility of the Account Owner to review and approve all documentation pertaining to the investment.

**WWW.NEXTGENERATIONTRUST.COM**          © 2013 Next Generation TS Rev 04/13

**Next Generation Trust Services**
75 Livingston Avenue, 3rd Floor
Roseland, NJ 07068
P: 973-533-1880 * F: 973-533-1088

# Private Placement Instruction Letter



## Private Placement Letter for Account Owner

12) You understand and agree that the Custodian and/or the Administrator for your Account (including, but not limited to Next Generation Trust Services or any agent, affiliate or designee of Next Generation Trust Services) do not make any attempt to evaluate the entity you want your Account to invest in. For example, they make no attempt to check the financial strength of the entity, nor do they check with the Secretary of State to see if the entity is in good standing, nor do they check with the Securities and Exchange Commission, the Better Business Bureau or any other governmental or non-governmental agency to see if any complaints have been filed against the entity. You, as the owner of the Account, are 100% responsible for evaluating the entity, its operations and the investment potential of the entity, including taking the steps described in the preceding sentence.

13) You understand and agree that you are also responsible for confirming that none of the "disqualified persons" with respect to your Account (including Next Generation Trust Services, its affiliates and designees, and every other entity that is the Custodian and/or Administrator and/or Record-keeper with respect to your Account, their officers, directors, shareholders or employees) are associated in a way which could result in a prohibited transaction with the entity you in which you are investing.

14) You understand and agree that you are solely responsible for making sure that the entity was not formed and will not operate in a way that does or may lead to a prohibited transaction under IRC §4975.

15) You understand and agree that if the entity your Account is investing in becomes a "disqualified person" (as that term is defined in IRC §4975) upon funding (this may occur, for example, if your IRA and other disqualified persons, including you personally, own more than 50% of the entity), then any future mandatory capital calls may be considered to be a prohibited transaction under IRC §4975.

16) You understand and agree that if the Plan Asset Regulations issued by the U.S. Department of Labor apply, the entity is disregarded for purposes of the prohibited transaction rules of IRC §4975. In that case, the underlying assets of the entity are considered to be the assets in which your Account is investing, and each of the statements above regarding the entity must be true with regard to each of the assets that the entity invests in. You represent that you either understand the Plan Asset Regulations and Interpretive Bulletin 75-2 or that you have sought competent legal counsel regarding the Plan Asset Regulations and Interpretive Bulletin 75-2 and their potential application to the entity that you want your Account to invest in, prior to making your investment decision.

17) You agree and understand that Next Generation Trust Services is required to report the fair market value of the Account to the Internal Revenue Service and/or to the Plan each year. You agree to obtain a fair market value for the Account's investment in the entity as of December 31 each year and report this information to Next Generation Trust Services on a form approved by Next Generation Trust Services no later than December 31. You understand and agree that Next Generation Trust Services is entitled to rely on the valuation provided by you for reporting purposes and shall bear no responsibility as to the accuracy of the information provided. You understand and agree that until a different valuation is reported to Next Generation Trust Services, the value of the investment in the entity will be reported based on the Account's total investment in the entity. You understand and agree that if you fail to provide a fair market value to Next Generation Trust Services as required, Next Generation Trust Services may withdraw as administrator of your account and distribute the asset to you or to a successor custodian.

18) You understand that with some types of accounts there are rules for required minimum distributions from the account. If you are now subject to the required minimum distribution rules for your Account, or if you will become subject to those rules during the term of the investment, you represent that you have verified either that the entity that your Account is investing in provides distributions that will be sufficient to cover each required minimum distribution, or that there are other assets in your Account, or in other accounts that you may access for this purpose, that are sufficiently liquid (including cash) from which you will be able to withdraw your required minimum distributions as they become required.

19) By signing this agreement, you agree to indemnify and hold harmless the Custodian and/or Administrator for your Account (including, but not limited to Next Generation Trust Services or any agent, affiliate or designee of Next Generation Trust Services), and their respective officers, directors, shareholders and employees against any liability associated with investing in the identified entity, including funding a capital call, and including any liability that arises because the investment is or may be a prohibited transaction under IRC §4975.

To signify your agreement with all of the above paragraphs, please sign below and return it to us.

Account Holder Signature _Elaine Sison Ernst_ Date 7/19/2017
14F44085EBB44F8...



**NEXT GENERATION TRUST SERVICES**
75 LIVINGSTON AVENUE, 3RD FLOOR
ROSELAND, NJ 07068
P: 973-533-1880 * F: 973-533-1088

# PRIVATE PLACEMENT INVESTOR
# ADVISORY NOTICE

(FOR RETIREMENT PLAN INVESTORS)

**NEXT GENERATION**
TRUST SERVICES
*CONTROL YOUR FUTURE, TODAY*

## PRIVATE PLACEMENT LETTER FOR ENTITY

**Account Holder Name** Elaine Sison Ernst
*(Retirement Plan Account Beneficial Owner Name)*

**Next Generation Account #** _____

**Name of Entity** 4520-26 S Drexel, LLC   South Side Development Fund I, LLC

**Entity Address** 4520-26 S Drexel Blvd

**City, State, Zip** Chicago, IL 60653

**Name of Entity Manager** Jerry Cohen     **EIN of Entity** _____

Next Generation TS, LLC ('NGTS', the Administrator) has received instructions from the above referenced retirement plan account owner concerning an investment in the above named entity through his or her NGTS retirement account. The account to be invested is referred to in this document as the "account", regardless of whether it is a retirement account under Internal Revenue Code (the "IRC") §401, §408 or §408A, a Coverdell Education Savings Account ('CESA') under IRC §530, a Health Savings Account ('HSA') under IRC §223, or a qualified retirement plan. For the purpose of this document, the term 'IRA' in the investor name may also include, but is not limited to: Traditional, ROTH, SEP IRAs, SIMPLE and Qualified plans, HSAs and CESAs. The following instructions must be followed to ensure compliance with both IRS requirements and Next Generation TS, LLC policy.

1) The investor name must read: Next Generation TS FBO (Account Owner Name) IRA (NGTS Account Number).

2) All payments, income, disbursements or payoffs for this investment must be made payable to the Investor Name listed above. Under the Internal Revenue Code, it is never acceptable to issue funds directly or make funds payable to the account owner (or the account owner's nominee or designee), or any other account owned by the NGTS account owner, as the NGTS account is the legal investor and is not affiliated with any other accounts owned by the NGTS account owner.

3) Do not use the account owner's personal social security number with respect to this investment for any purpose. If the account is an investor to which a K-1 or similar tax document will be issued, please use the following Next Generation Trust Account E.I.N.: _____ It is not permitted under NGTS Policy to use the E.I.N. shown above for any other purpose than the issuance of a K-1 or similar tax document to the account as investor in the entity. If a Form 990-T is required to pay unrelated business income tax ("UBIT") or unrelated debt-financed income tax ("UDFI"), do not use the Next Generation Trust Account E.I.N. tax identification number. The account owner must obtain a new tax identification number from the Internal Revenue Service for the NGTS retirement account to report and pay the taxes on Form 990-T.

4) The NGTS account owner may not personally guarantee on behalf of the account any indebtedness of the entity to a third party nor may the account owner personally guarantee any indebtedness of the account to the entity.

5) Original stock certificates, membership certificates, counter signed contracts or other proof of ownership showing the proper vesting must be sent to and held by NGTS, on behalf of the Custodian and the account.

6) In the event that future capital contributions to the investment entity are required or desired (and provided the Account Owner determines that the capital call is not a prohibited transaction under Internal Revenue Code §4975), all funds must come from the NGTS account. The account owner may not advance funds on behalf of the NGTS account.

7) As the Administrator of the account, Next Generation TS must be notified promptly of any change in address, telephone number, or company status (such as bankruptcy filings, regulatory agency investigations or litigation).

8) It is understood that Next Generation Trust Services is required to report the fair market value of the NGTS account to the Internal Revenue Service and/or to the Plan each year. The NGTS account owner has agreed to obtain a fair market value for the NGTS account's investment in the entity as of December 31st each year and report this information to Next Generation Trust Services on a form approved by Next Generation Trust Services no later than January 15th of the following calendar year. It is understood and agreed that Next Generation Trust Services is entitled to rely on the valuation provided by the NGTS account holder or by the investment entity for reporting purposes and shall bear no responsibility as to the accuracy of the information provided. It is understood and agreed that until a different valuation is reported to Next Generation Trust Services, the value of the investment in the entity will be reported based on the Account's total investment in the entity. It is strongly advised that any reported values or statements should be delivered to Next Generation Trust Services as an original, copy or duplicate statement to avoid any discrepancy in reported values by the asset and the value of the asset reported in the NGTS account. It is understood and agreed that if the client and/or the investment entity fails to provide a fair market value to Next Generation Trust Services as required, Next Generation Trust Services can withdraw as administrator of the account and distribute the assets to the NGTS account holder personally or to a successor custodian.

9) Next Generation TS, LLC ('Administrator') is a self-directed retirement custodial account administrator to the custodian. The NGTS IRA beneficial owner whose name appears on the Retirement Plan Application Form(s) (hereinafter called "account owner") has established a Retirement Custodial Account (an 'account') within Kingdom Trust Company or its successor (hereinafter referred to as "Custodian"). This NGTS account is established for the exclusive benefit of the individual (account owner, or his/her beneficiaries) within the meaning of §408A of the Internal Revenue Code and the related Treasury regulations. The Custodian has delegated certain account record keeping and administrative functions ('Administrative Services') to NGTS, as the administrator. Neither NGTS nor any of it's officers, directors, shareholders or employees is associated in any way with any company that may instruct the administrator to invest on behalf of the NGTS account. Neither the administrator nor any of its officers, directors, shareholders or employees provide any investment, legal or tax advice pertaining to any investments, holdings, or filings of the NGTS account or account owner. The account owner understands and agrees that the administrator makes no attempt to evaluate any entity, company, agreements, contracts or other investment entities or investment structures the account owner instructs the administrator to invest in, on behalf of the NGTS account. For example, NGTS makes no attempt to check the financial strength of the company, nor does NGTS check with the Secretary of State to see if the company is in good standing, nor check with the Securities and Exchange Commission, the Better Business Bureau or any other governmental or non-governmental agency to see if any complaints have been filed against the entities. The account owner is solely responsible for evaluating any entity, contract, agreement and/or any investment on behalf of the NGTS account. Any agreements signed by NGTS, not individually but solely as agent for the Custodian under the Individual Retirement Account (IRA) Plan Agreement also known as Form 5305, is signed only by instruction by the account owner. Said Form 5305 Agreement is hereby made a part hereof any agreements, contracts or any legally binding agreements and any claims against NGTS which may result here from, shall be payable only out of any IRA property which may be held hereunder the NGTS account. Any and all personal liability of NGTS is hereby expressly waived by the parties hereto and their respective successors, beneficiaries, assignees, transferees, designees, nominees, recipients, and legal counsel. All representations and undertakings are of NGTS as agent for the Custodian and not individually; no liability is assumed by and/or shall be asserted against NGTS as a result of the signing of any instrument(s) on behalf of the account and/or account holder. The grantor, or account owner as account controller, has made all representations and warranties contained within any and all documentation, contracts, agreements and subscriptions and NGTS, as agent for the Custodian and authorized signatory to the account, is signing (the) document(s) along with and/or for the grantor merely to assist the grantor, the NGTS account owner, in this purchase as prescribed by the Internal Revenue procedures requiring the purchase to be made by an IRA Custodian on behalf of the NGTS retirement account. NGTS is not a fiduciary to the account and hereby disclaims all fiduciary responsibility for the investment choice and its inherent risks. The retirement account beneficial owner has indemnified and hereby agrees to hold NGTS harmless in following any and all instructions and provisions.

*By signing this agreement you are acknowledging that you understand and agree with all the above paragraphs, representations and warranties. Please sign below and return to our office.*

**Signature of Entity** *Jerry Cohen*     **Date** 7/19/2017

**Title of Signatory** Manager E96EF4CC...

DocuSign Envelope ID: D9032DF6-0E37-477D-A285-5ABDC9996BBC

THE MEMBERSHIP INTERESTS DESCRIBED IN THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED OR THE SECURITIES LAWS OF ANY JURISDICTION.  THESE INTERESTS MAY NOT BE SOLD OR OTHERWISE DISPOSED OF, OR OFFERED FOR SALE OR OTHER DISPOSITION, UNLESS A REGISTRATION STATEMENT UNDER THOSE LAWS WITH RESPECT TO THE INTERESTS IS THEN IN EFFECT OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THOSE LAWS IS THEN APPLICABLE TO THE INTERESTS, AND UNLESS THE PROVISIONS OF ARTICLE VII OF THIS AGREEMENT ARE SATISFIED.

## FIRST AMENDED AND RESTATED OPERATING AGREEMENT

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## SSDF2 Holdco 2, LLC

THIS LIMITED LIABILITY COMPANY AGREEMENT is made and entered into as of November 28th, 2017 by and among the members of the Company listed on **Exhibit "A"** attached hereto and made part hereof (hereafter each individually referred to as a "Member" and collectively as "Members," all as further defined in Article I (k) below), who have subscribed their respective names as a Member to their respective Member Signature Page also attached hereto.

The Members have caused **SSDF2 Holdco 2, LLC,** a Delaware limited liability company (the "Company" or the "LLC") to be formed and desire to enter into this Agreement to regulate and manage the affairs of the Company, the conduct of its business and the relations of its members.

NOW, THEREFORE, in consideration of the mutual promises set forth below, the parties hereby agree as follows.

### ARTICLE I

### CERTAIN DEFINITIONS

Unless the context otherwise requires, the terms defined below shall, for purposes of this Agreement, have the meanings specified:

a.  "Act" means the Limited Liability Company Act of the State of Delaware, as amended from time to time (or any corresponding provisions of succeeding law).

b.  "Affiliate" with respect to any Person means (i) any other Person who controls, is controlled by or is under common control with such Person, (ii) any director, officer, partner or employee of such Person or any Person specified in clause (i) above, or (iii) any immediate family member of any Person specified in clause (i) or (ii) above.

1



Exhibit

13

Receiver's Submission on Group 5 Claims

exhibitsticker.com

DocuSign Envelope ID: D9032DE6-0B3F-457D-A285-5ABDC9996BB2

c.   "Agreement" means this Limited Liability Company Agreement as originally executed and as amended from time to time.

d.   "Available Cash" means all cash and cash equivalents of the Company on hand at any time, less such cash reserves as the Manager deems reasonably necessary for working capital and to meet any other foreseeable cash needs of the Company.

e.   "Capital Transaction" means (i) a sale, exchange, condemnation or other disposition of all or any portion of the Property or any other asset of the Company if such asset is disposed of outside of the ordinary course of business of this Company, (ii) a fire or other casualty or condemnation affecting all or any portion of the Property, (iii) a refinancing of any indebtedness of the Company or (iv) sale of the Property.

f.   "Certificate" means the Certificate of Formation filed with the Secretary of State of Delaware on  November, 2017 for the purpose of forming the Company, as originally filed and as amended from time to time.

g.   "Class A Members" means members who have voting rights. Said member assumes all liability in terms of expenses irrespective of the percentage of ownership, a preferred rate of return as defined herein, and subordination of payment to Class C and Class B on the capital contribution made.

h.   "Class B Members or Preferred Class B Member" means members who have no voting rights, and a preferred rate of return as defined herein.  Said members have no liability in terms of expenses, irrespective of percentage of ownership, and subordination of payment to Class C on the capital contributions made and to profit payments. Class B Members are not required to make any additional capital contributions beyond their original capital contribution. No Class B Member who does not own Twenty (20%) of Class A Membership Units, can own more than Twenty Percent (20%) of the Company.

i.   "Class C Members or Preferred Class C Member" means members who have no voting rights, and a preferred rate of return as defined herein.  Said members have no liability in terms of expenses irrespective of percentage of ownership.  Class C Members are not required to make any additional capital contributions beyond their original capital contribution. Class C has priority payments in terms of capital contributions made. Class C members can be bought out at the capital contribution amount, plus the preferred rate amount due.  Class C members are not entitled to profit.

j.   "Code" means the Internal Revenue Code of 1986, as amended from time to time (or corresponding provisions of succeeding laws).

k.   "Extraordinary Transactions", and each, an "Extraordinary Transaction", means

(i)   the admission of additional Members to the Company;

2

DocuSign Envelope ID: D9032DF6-9B3E-457D-A285-5ABDC99968BC

          (ii)     the Company's engaging in any other business other than the ownership and management of various real estate properties;

          (iii)    any amendments to or modifications of this Agreement;

          (iv)    borrow money for and on behalf of the Company; on a secured or unsecured basis;

          (v)     change the purpose of the Company;

          (vi)    sell any of the Property or any interest therein;

          (vii)   enter into any financing transaction which creates any recourse liability to the Members or which requires the Members to pledge their Membership Interests in the Company to any financial party;

          (viii)  permit the Company or any Affiliate of the Company to incur or issue any borrowing, guaranty or the like, or any refinancing or replacement thereof;

          (ix)    providing or making distributions of Company cash or other property;

          (x)     entering into any management or leasing agreement with respect to the Property;

          (xi)    calling for Additional Capital contribution pursuant to a "Capital Call Notice" as provided for in Article III;

          (x) remove a Manager.

l.   "Fiscal Year" means the Company's fiscal year, which shall be the calendar year.

m.  "Initial Capital Contributions" has the meaning set forth in Section 3.1.

n.  "Lender" has the meaning set forth in Article XI.

o.  "Loan" has the meaning set forth in Article XI.

p.  "Loan Agreement" has the meaning set forth in Article XI.

q.  "Loan Documents" shall mean, collectively, the Loan Agreement, the Note, the Security Instrument, the Assignment of Leases, the Guaranty, the Environmental Indemnity, the Assignment of Management Agreement, the Cash Management Agreement, the Deposit Account Control Agreement, and all other documents, agreements, certificates and instruments now or hereafter executed and/or delivered by Company in connection with the Loan.

r.  "Majority" means a vote by Class A members in excess of 75% of votes.

3

s. "<u>Manager</u>" means South Shore Property Holdings LLC, a Delaware limited liability company, or any Person(s) subsequently designated to manage the Company pursuant to the Loan Documents, this Agreement and the Act, but does not include any Person who has ceased to act in that capacity.

t. "<u>Member Loans</u>" shall mean loans from the Members to the Company made pursuant to this Operating Agreement. A Member Loan shall bear interest at a rate of interest of 1% per annum.

q. "<u>Membership Interest</u>" means a Member's entire interest in the Company, including the Member's right to share in Net Profits and Net Losses and to receive distributions from the Company, and all other rights of a Member under this Agreement or of a member of a limited liability company under the Act. The initial Members' initial Membership Interest percentages are stated on Exhibit A attached hereto.

r. "<u>Name</u>" means the name of the Company and under which it will conduct business. The Name is **SSDF2 Holdco 2, LLC**, a Delaware limited liability company.

s. "<u>Net Profits</u>" and "<u>Net Losses</u>" mean, for each Fiscal Year, the taxable income or loss of the Company for such Year determined in accordance with Section 703(a), of the Code using the accrual method of accounting, plus any income exempt from federal income tax under the Code, and less any expenditures not deductible in computing such income or loss and not property chargeable to capital account under the Code.

t. "<u>Ownership Interest</u>" means the Company's interest in any entity the Company invests in order to acquire all or part of the Properties, including company's right to share in net profits and net losses and to share in distributions from such companies and all other rights under this Agreement or of a member of a limited liability Company under the Act.

u. "<u>Membership Interest</u>" means the percentages stated on **<u>Exhibit A</u>** to this Operating Agreement.

v. "<u>Person</u>" means an individual, Limited Liability Company, partnership, business trust, Joint Membership Interest Company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

w. "<u>Preferred Rate of Return Class B</u>" means an 8% interest rate, cumulative, compounded annually, return calculated on the amount of such Class B Member's Accumulated Capital Contribution to be paid on a quarterly basis to Class B Members.

x. "<u>Preferred Rate of Return Class C</u>" means an 18% interest rate, cumulative, compounded annually, return calculated on the amount of such Class C Member's Accumulated Capital Contribution, said 18% interest to be paid on a monthly basis, and the total amount of Class C Member's Accumulated Capital Contribution, and any Preferred Rate of Return Class C to be returned to the Class C member within four (4) months from December 1, 2017.

4

DocuSign Envelope ID: D9032DF6-8B37-477D-A285-5ABDC99068BC

y. "Property" has the meaning set forth in Section 2.2.

z. "Regulations" means the Income Tax Regulations, including temporary regulations, promulgated under the Code, as amended from time to time.

aa. "Transfer" means (a) as a noun, the transfer of legal, equitable, or beneficial ownership by sale, exchange, assignment, gift, donation, grant, or other conveyance or disposition of any kind, whether voluntary or involuntary, including transfers by operation of law or legal process, and includes any (i) option, right of first refusal or similar right, whether or not presently exercisable, (ii) appointment of a receiver, trustee, liquidator, custodian, or other similar official for a Members or all or any part of the property of a Members under applicable bankruptcy or insolvency laws, (iii) gift, donation, transfer by will or intestacy or other similar type of transfer or disposition, whether *inter vivos* or *mortis causa,* and (iv) any transfer or disposition to a spouse or former spouse of a Members (including by reason of a separation agreement or divorce, equitable or community or marital property distribution, judicial decree or other court order concerning the division or partition of property between spouses or former spouses or other persons); and (b) as a verb, the act of making any Transfer.

bb. "Unreturned Initial Capital" means the amount of a Member's Initial Capital Contribution less amounts distributed to such Member pursuant to Sections 4.1(a) and 4.1(b).

cc. "Unreturned Capital" means, as to any Member, at any time, (i) the amount of capital contributed to the Company by such Member, less (ii) the total amount previously distributed to it by the Company pursuant to Section 4.1(b).

## ARTICLE II

## FORMATION OF COMPANY

2.1 <u>Formation</u>. The Certificate was filed and the Company formed as a limited liability company under and pursuant to the provisions of the Act. The rights and obligations of the Members and the Manager shall be as provided in the Act except as otherwise expressly provided in this Agreement.

2.2 <u>Purpose</u>. Notwithstanding any provision hereof to the contrary, the following shall govern: The nature of the business and of the purposes to be conducted and promoted by the Company, is to engage solely in the following activities: (1) to own one hundred percent of the ownership interests in GLDC 5001 S Drexel LLC, an Illinois limited liability company; and (2) to exercise all powers enumerated in this Agreement and the limited liability company law of the State of Delaware necessary or convenient to the conduct, promotion or attainment of the business or purposes otherwise set forth herein.

2.3 <u>Principal Place of Business</u>. The principal place of business of the Company shall be located at 1414 E 62nd Pl, Chicago, IL 60637, or at such other place as the Manager may determine.

DocuSign Envelope ID: D9032DF6-0B37-477D-A285-5ABDC99968B2

2.4    Term.  The term of the Company shall be perpetual, unless sooner dissolved in accordance with the provisions of this Agreement or the Act.

ARTICLE III

CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

3.1    Initial Capital Contributions.  Following the execution of this Agreement, as and when it may be required for acquisition of the Ownership Interest or the Property, of Members shall contribute to the capital of the Company the amount of capital set forth opposite its name on **Exhibit A** of this Agreement (the "Initial Capital Contributions"). The amounts of each Class A Member's payments of the Initial Capital Contributions shall be as and when determined by the Manager.

3.2    Additional Capital Contributions:

(a)    The Class A Members expect and intend that any cash requirements of the Company in excess of the Initial Capital Contributions shall be provided by loans from unrelated third parties and from the operations of the Company, and neither Class B or Class C Members, nor their principals, shall be required to make any additional capital contribution except as provided herein, and shall not be liable for any acts or debts of the Company, except as otherwise provided in the Act.  Class B Members shall not be subjected to a capital call and need not pay any additional capital contribution amounts.

(b)    Notwithstanding anything herein to the contrary, if the funds available from third party borrowings and the operations of the Company are insufficient to meet the cash requirements of the Company for the reasonable expenses of maintaining and preserving the Property and any loans to the Company related thereto, as determined by the Manager, the Class A Members shall contribute to the Company the amount so required in  proportion to the Membership Interest of each Member bears to the amount of the additional Capital so required.  The Manager shall notify each Member in writing of the amount of capital required if such Member were to make its full Additional Capital contribution (the "Capital Call Notice").

(c)    Notwithstanding anything herein to the contrary, within Eight (8) days of the receipt of a Capital Call Notice, if any of the Class A Members respond in writing that it does not desire to make the capital contribution or if such Class A Member fails to make the capital contribution (a "Defaulting Member"), the other Class A Members shall have the right, but not the obligation, to make a contribution in the total amount set forth in the Capital Call Notice in the form of a loan to the Company, subject and subordinate to the terms and provision of the Loan Documents, a "Member Loan" which Member Loan shall earn interest at the rate of 8% per annum and shall be paid to such Member prior to any other distribution to the Members.

3.3    Capital Accounts.  (a) A separate capital account shall be established and maintained for each Member.  Each Member's capital account shall be increased by (i) the amount

6

DocuSign Envelope ID: D9032DF6-8E3F-4F7D-A285-5ABDC9996BB2

of money contributed by such Member to the Company; (ii) the fair market value of property or property interests contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to pursuant to the provisions of Section 752 of the Code); and (iii) the amount of Net Profits allocated to such Member, and shall be decreased by (iv) the amount of money distributed to such Member by the Company; (v) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to pursuant to the provisions of Section 752 of the Code); and (vi) the amount of Net Losses allocated to such Member, and shall otherwise be adjusted in accordance with Regulations Section 1.704-1 (b).

(b)　　The capital accounts of the Members shall reflect reevaluations of property in all events in which such revaluation is permissible or required under the Regulations. In the event that the capital accounts of the Members are, in accordance with the preceding sentence, computed with reference to a book value of any asset that differs from its adjusted tax basis, then the capital accounts shall be adjusted for depreciation, depletion, amortization, and gain or loss, as computed for book purposes with respect to such asset in accordance with the Regulations.

(c)　　The foregoing provisions, and other provisions of this Agreement relating to the maintenance of capital accounts and allocation of income, gain, loss, deduction and credit, are intended to comply with Regulations Section 1.704-1(b) and 1.704-2 and shall be interpreted and applied in a manner consistent with those Regulations. If the Manager determines that it is prudent to modify the manner in which capital accounts, or any debits or credits thereto, are computed in order to comply with those Regulations, the Manager may make such modification upon 10 days prior written notice to all Members of such proposed modification, provided that such modification is not likely to have a material effect on the amount distributable to any Member by the Company. Any such modification shall not require an amendment to this Agreement or the approval of any Member.

3.4　　<u>No Withdrawal or Payment of Interest</u>. No Member shall have the right to (a) withdraw all or any part of its capital contribution prior to the dissolution of the Company, (b) receive any return or interest on any part of its capital contribution, except as otherwise provided in this Agreement, or (c) withdraw or resign from the Company, except with the consent of the Manager and other Members or by transfer or other disposition of all of its Membership Interest in accordance with the terms of this Agreement.

ARTICLE IV

<u>DISTRIBUTIONS AND ALLOCATIONS</u>

4.1　　<u>Distributions</u>. (a) Available <u>Cash from operational cash flow</u> shall be distributed to the Members at such times and in such amounts as the Manager determines, as follows:

i.　　First, to each Class C Member in the amount of the Preferred Rate of Return Class C on any capital contribution made by that Class C Member to the Company;

DocuSign Envelope ID: D9032DF6-0B3F-457D-A285-5ABDC99968B2

ii.      Second, to each Class B Member in the amount of the Preferred Rate of Return Class B on any capital contribution made by that Class B Member to the Company;

iii.      Third, payment of the original amount of capital contribution to Class C Members

iv.      Fourth, to each member in the amount of any outstanding balance of any Member Loan made by that member to the Company;

v.      Fifth, issuance of profit, if any, to Class B Members in the amount of percentage of ownership at Manager's discretion during the operation of the business, if any amounts are available for profit distribution and at the discretion of the Manager;

vi.      Sixth, issuance of profit, if any, to Class A Members in the amount of percentage of ownership at Manager's discretion during the operation of the business, if any amounts are available for profit distribution and at the discretion of the Manager;

    (b)      Cash available from any **Capital Transaction** shall be distributed to the Members promptly after its receipt, after giving due consideration to the reasonably foreseeable cash needs of the Company, as follows:

i.      First, to each Class C Member in the amount of the Preferred Rate of Return Class C on any capital contribution made by that Class C Member to the Company;

ii.      Second, to each Class B Member in the amount of the Preferred Rate of Return Class B on any capital contribution made by that Class B Member to the Company;

iii.      Third, payment of the original amount of capital contribution to Class C Members;

iv.      Fourth, payment of the original amount of capital contribution to Class B Members;

v      Fifth, payment of the original amount of capital contribution to Class A Members;

vi.      Sixth, in the event of refinance or sale of the Company, to each member in the aggregate amount equal to Class C Member's Unreturned Capital;

vii.      Seventh, in the event of refinance or sale of the Company, to each member in the aggregate amount equal to Class B Member's Unreturned Capital;

DocuSign Envelope ID: D9032DF6-8E3E-4577-A285-5ABDC9996BE2

viii.     Eighth, in the event of refinance or sale of the Company, to each member in the aggregate amount equal to Class A Member's Unreturned Capital;

ix.     Ninth, issuance of profit, if any, to Class B Members in the amount of percentage of ownership at Manager's discretion during the operation of the business, and upon an event of sale of the Company or a refinancing event of the Company, if any amounts are available for profit distribution and at the discretion of the Manager;

x.     Tenth, issuance of profit, if any, to Class A Members in the amount of percentage of ownership at Manager's discretion upon an event of sale of the Company or a refinancing event of the Company, if any amounts are available for profit distribution and at the discretion of the Manager;

xi.     Eleventh, issuance of additional profit, if any, to Class B Members in the total amount of based on the percentage of ownership to Class A Members, solely upon an event of sale of the Company or a refinancing event of the Company, if any amounts are available for profit distribution and at the discretion of the Manager. Said funds, if any shall be distributed within Fifteen (15) calendar days after the issuance of a quarterly financial report by LLC. LLC shall release the quarterly financial report within Thirty (30) calendar days from the end of each quarter.

     4.2     <u>Allocations of Net Losses</u>.

     (a)     <u>Allocation of Net Losses</u>.  After giving effect to the original allocations set forth in Section 4.3, the Net Losses of the Company for each Fiscal Year shall be allocated as follows:

     (i)     Only to Class A Members with a positive balance in their capital accounts, but under no circumstances shall any Class B Member or Class C Members be allocated Net Losses; until such Member has been allocated aggregate losses pursuant to this <u>Section 4.2(b)(i)</u> equal to the aggregate of amount income allocated such Class A Member pursuant to <u>Section 4.2(a)</u>, but under no circumstances shall any Class A Member be allocated Net Losses pursuant to this Section 4.2(b)(i) that would reduce such Member's balance in its capital account below Zero; and

     (ii)     Second, to those Members with a positive balance in their capital accounts, give to the aggregate Percentage Interests of all Members; until such Class A Member has been allocated aggregate losses pursuant to this <u>Section 4.2(b)(i)</u> equal to the aggregate of amount income allocated such Class A Member pursuant to <u>Section 4.2(a)</u>, but under no circumstances shall any Class A Member be allocated Net Losses pursuant to this Section 4.2(b)(i) that would reduce such Member's balance in its capital account below Zero; and

9

DocuSign Envelope ID: D9032DF6-8B3F-457D-A285-5ABDC9996BB2

4.3    <u>Regulatory and Curative Allocations</u>.  (a) The following allocations shall be made in the following order:

(i)    <u>Minimum Gain Chargeback</u>.  Notwithstanding any other provision of this Agreement, if there is a net decrease in Minimum Gain (as defined below) during any Fiscal Year, each Member shall be allocated, before any other allocation of Company items for such Fiscal Year, items of gross income and gain for such Year (and, if necessary, for subsequent Fiscal Years) in proportion to, and to the extent of, the amount of such Member's share of the net decrease in Minimum Gain during such year.  The income allocated pursuant to this Section 4.3(a)(i) in any Fiscal Year shall consist first of gains recognized from the disposition of property subject to one or more nonrecourse liabilities of the Company, and any remainder shall consist of a pro rata portion of other items of income or gain of the Company.  The allocation otherwise required by this Section 4.3(a)(i) shall not apply to a Member to the extent provided in Regulations Sections 1,704-2(f)(2) through (5).

(ii)    <u>Qualified Income Offset</u>.  Notwithstanding any other provision of this Agreement, if a Member unexpectedly receives an adjustment, allocation or distribution described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) that causes or increases an Excess Deficit Capital Account Balance (as defined below) with respect to such Member, items Of Company gross income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, such excess deficit capital account balance as quickly as possible, provided that an allocation pursuant to this Section 4.3(a)(ii) shall be made only if as to the extent that such Member would have an Excess Deficit Capital Account Balance Account Balance after all other allocations provided for in this Section 4.3(a)(ii) have been tentatively made on as of this Section 4.3(a)(ii) was not in this Agreement.

(iii)    <u>Gross Income Allocation</u>.  If at the end of Fiscal Year, a Member has an Excess Deficit Capital Account Balance, such Member shall be specially allocated items of Company income or gain in an amount and manner sufficient to eliminate such excess deficit capital account balance as quickly as possible, provided that an allocation pursuant to this Section 4.3(a)(iii) shall be made only if as to the extent that such Member would have an Excess Deficit Capital Account Balance after all other allocations provided for in this Section 4.3(a)(iii) have been tentatively made as if this Section 4.3(a)(iii) or Section 4.3(a)(ii) were not in this Agreement.

(iv)    <u>Nonrecourse Deductions</u>.  Any deductions attributable to nonrecourse liabilities (as determined pursuant to Regulations Section 1.704-2(c)) of the Company for any Fiscal Year shall be allocated among the Members in the same proportion as Net Profits or Net Losses (as may apply) for such Year are allocated.

DocuSign Envelope ID: D9032DF6-0B3E-477D-A285-5ABDC9996BB2

      (v)   <u>Definitions</u>.

      (A)   "Minimum Gain" shall have the meaning given such term in Regulations Section 1.704-2(d), and shall generally mean the amount by which the nonrecourse liabilities secured by any assets of the Company as of the date of determination exceed the adjusted tax basis of such assets to the Company as of such date. A Member's share of Minimum Gain (and any net decrease thereof) at any time shall be determined in accordance with Regulation Section 1.704-2(g).

      (B)   The "Excess Deficit Capital Account Balance" of any Member shall be the capital account balance of such Member, adjusted as provided in the immediately following sentence, to the extent, if any, that such balance is a deficit (after adjustment). For purposes of determining the existence and amount of an Excess Deficit Capital Account Balance, the capital account balance of a Member shall be adjusted by: (1) crediting thereto (x) that portion of any deficit capital account balance that such Member is required to restore under the terms of this Agreement, and (y) the amount of such Member's share of Minimum Gain, including any "partner nonrecourse debt minimum gain" (as defined in Regulations Section 1,704-2(i)); and (2) charging thereto the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) that apply to such Member. The existence and amount of any Excess Deficit Capital Account Balance at the end of any Fiscal Year shall be determined before any other allocations provided for in this Article IV for such Year have been made.

      (vi)   <u>Member Nonrecourse Debt</u>. Notwithstanding any other provision of this Agreement, any item of Company loss, deduction or expenditures described in Section 705(a)(2)(B) of the Code that is attributable to a "partner nonrecourse debt" (as defined in Regulations Section 1.704-2(b)(4)) of a Member shall be allocated to those Members that bear the economic risk of loss for such partner nonrecourse debt, and among such Members in accordance with the ratios in which they share such economic risk, determined in accordance with Regulation Section 1.704-2(i), If there is a net decrease in any partner non-recourse debt minimum gain during any Fiscal Year, each Member with a share of such partner nonrecourse debt minimum gain as of the beginning of such Year shall be allocated items of gross income and &a in the manner and to the extent provided in Regulations Section 1.704-2(i)(4).

      (vii)   <u>Interpretation</u>. The foregoing provisions of this Section 4,3(a) are intended to comply with Regulations Sections 1,704-1(b) and 1.704-2 and shall be interpreted consistently with this intention. Any terms used in such provisions that are not specifically defined in this Agreement shall have the meanings, if any, given such terms in the Regulations cited above.

DocuSign Envelope ID: D9032DF6-0B3F-457D-A285-5ABDC9996DB0

(b)     The allocations set forth in Section 4.3(a) (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations with special allocations of the items of Company income, gain, loss or deduction pursuant to this Section 4.3(b).  Therefore, notwithstanding any other provision of this Article IV (other than in Section 4.3(a)), the Manager shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's capital account balance is, to the extent possible, equal to the capital account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 4.2.

4.4     Section 704(c) Allocation.  Notwithstanding the foregoing allocations of Net Profits and Net Losses, if any property contributed to the Company has a fair market value (as set forth herein or as otherwise determined by the Members) that differs from its adjusted basis for federal income tax purposes at the time of such contribution, or if there is a revaluation of any Company property such that the book value of such property differs from its adjusted basis for federal income tax purposes, items of income, gain, loss, and deduction with respect to any such property shall be allocated among the Members so as to take account of such difference, in the mariner intended by Section 704(c) of the Code and Regulation Section 1.704-3, using such method permitted by such Regulations as the Manager may determine.

4.5     Property Distributions.  No property of the Company shall be distributed in kind without the consent of the Members except upon the dissolution of the Company.

4.6     Resignation of a Member.  No Member shall be entitled to resign or withdraw from the Company, except with the consent of the Members.

4.7     Tax Distributions.  Notwithstanding anything to the contrary herein, with respect to each calendar year, but subject to the limitations imposed by law, if sufficient cash is not to otherwise be distributed to the Members, the Company shall within 90 days after the close of such calendar year, distribute to each Member an amount at least equal to the such Member's share of taxable income for such calendar year multiplied by the highest combined Federal and state income tax rate applicable to any Member with respect to such taxable income.  Amounts distributed pursuant to this Section shall be treated as an advance against amounts distributable to such Member pursuant to Section 4.1(a) and/or Section 4.1(b), depending on the source of such distributions, and shall be treated as if it was distributed pursuant to such Section.

ARTICLE V

MANAGEMENT, SEPARATION OF MEMBERS AND MEMBERS

5.1     Management.  The business and affairs of the Company shall be manager managed and controlled by, or under the direction of the Manager, and the Manager shall have exclusive authority to act for and bind the Company in all matters.  Except as expressly provided in this

Agreement or the Act, no Member who is not also a Manager shall have any right to participate in, or have any power or authority over the management or control of, the business or affairs of the Company or to act for or bind the Company, except Members shall have the right to vote on matters as otherwise delineated herein. South Shore Property Holdings LLC, a Delaware limited liability company, as Manager, shall have daily, operational control and management authority of the Company. The unanimous approval of the Members shall be required to take any action on behalf of the Company pertaining to an Extraordinary Transaction but once so approved the Manager shall be sufficient to implement such approved action.

5.2     Manager.  (a) There shall be at least one Manager.  The initial Manager is set forth in Section 5.1.

Notwithstanding anything contained herein to the contrary, (i) any Manager who becomes bankrupt or is declared incompetent by a court shall cease to be a Manager and the remaining Manager shall manage and control the business and affairs of the Company, and (ii) in the event of the death of a Manager, the remaining Manager shall manage and control the business affairs of the Company.

5.3     Powers of Manager.  The Manager shall have the right and authority to make all decisions affecting the business and affairs of the Company and to take all actions it may deem necessary, useful, or appropriate to carry out the purpose of the Company.   In performing his duties, the Manager shall be entitled to rely (unless it has knowledge concerning the matter in question that would cause such reliance to be unwarranted) on information, opinions, reports or statements of one or more employees or other agents of the Company (including any affiliates of the Manager) whom the Manager reasonably believes to be reliable and competent in the matters presented, or any attorney, accountant or other person as to matters which the Manager reasonably believes to be within such person's professional or expert competence.  The Manager may exercise all of the powers of the Company under the Act and do any and all other things not contrary to law or this Agreement which, in its reasonable judgment, are necessary or desirable to carry out the purposes of the Company.

5.4     Intentionally omitted.

5.5     Compensation Reimbursement.  (a)  Neither the Manager, the Members nor any affiliates shall be entitled to any compensation from the Company for its services in its capacity as a Manager or Member, but shall be reimbursed by the Company for any reasonable expenses that it advances on behalf of the Company.

(b)     The Manager may directly perform, or, upon the consent of the Manager as provided above, may engage a Member or an Affiliate of a Manager or any Member to perform services for the Company which are directly related to Company purposes as stated above; provided, however, that any such engagement by the Manager shall be in writing and shall provide that any compensation, fee, commission or other payment in connection therewith shall either (i) not unreasonably exceed the rates generally charged any third parties for similar services or (ii) be approved by the majority vote of the Members.

13

DocuSign Envelope ID: D9032DF6-8B3F-457D-A285-5ABDC9996BB2

5.6     <u>Third Parties</u>.  No third party dealing with the Company in any matter shall be obligated to inquire into the propriety, necessity or expediency of the exercise of any power or authority by the Manager or any person to whom the Manager has delegated any of its power or authority and such third party shall be fully protected in accepting any written instrument executed by the Manager or such person stating that it or he has such power or authority.

5.7     <u>Exculpation</u>.  Neither the Manager nor any Member shall be liable to the Company or any Member (a) for mistakes of judgment, or for other acts or omissions not amounting to willful misconduct or gross negligence, or for losses or liabilities due to such mistakes or other acts or omissions, so long as it acted in good faith and in a manner it reasonably believed to be in the best interests of the Company, or (b) due to the negligence, dishonesty or bad faith of any agent, employee or independent contractor retained or engaged to provide services, provided that reasonable care was exercised in selecting, employing, supervising or appointing such person.

5.8     <u>Indemnification and Liability for Certain Acts</u>.  Each Manager shall perform his duties as Manager in good faith, in a manner he reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.  A Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager.

The Company shall defend, indemnify and hold harmless the Members from any loss, cost, damage or expense, including but not limited to reasonable attorneys' fees and expenses, incurred by the Members by reason of anything it may do or refrain from doing for or on behalf of the Company so long as the Member's activities were in accordance with the standards set forth herein.

5.9     <u>Intentionally omitted</u>.

5.10     Relative to any financing, refinancing, or the like of the Property obtained by or on behalf of the Company, if any personal guarantees are required by any lender in connection therewith, it is expressly agreed by that SSPH Portfolio 2  LLC shall not be in any way obligated by this Agreement or otherwise to personally guarantee any such financing   hereof or other third party be entitled to any contribution or right of contribution or indemnification from the Company, in connection with or arising out of any such personal guarantees or any liability thereunder.

5.11     <u>Action by Members.</u> In the Extraordinary Transaction context if an action or the consent or approval of the Class A Members is required herein or under the applicable law, *"consent"* or "<u>approval</u>" means: (i) with respect to a vote of the Class A Members or written action in lieu of a meeting, the approval, authorization, consent or ratification of Class A Members holding more than seventy-five percent (75%) of the votes as a whole, at a meeting duly held pursuant to this Agreement or given by such Class A Members in an instrument duly executed and delivered in the manner provided herein.

5.13     <u>Intentionally omitted</u>.

DocuSign Envelope ID: D9032DF6-0B37-4577-A285-5ABDC99968B2

5.14. <u>Bank Accounts</u>. The Manager may from time to time open bank accounts in the name of the Company, and the Manager shall be the sole signatories thereon, unless the Manager shall designate other permitted signatories.

5.15    <u>Indemnity of the Manager, Employees and Other Agents</u>.  Provided that a majority of the Class A Members    approve, the Company shall, to the maximum extent permitted under herein, indemnify and make advances for expenses to Manager, its employees, and other agents.

5.16    <u>Resignation</u>. Subject to the Loan Documents, any Manager of the Company may resign at any time by giving written notice to the Members of the Company.  The resignation of any Manager shall take effect upon receipt of notice thereof or at such later date specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.  The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

5.17    <u>Removal</u>.  At a meeting called expressly for that purpose, all or any lesser number of Managers may, subject to the Loan Documents, be removed at any time, with or without cause, by the affirmative vote of Class A Members.  The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

5.18    <u>Vacancies</u>.  Any vacancy occurring for any reason in the number of Managers of the Company may be filled by the majority vote of Class A Members.  Any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by the majority vote of Class A Members.  A Manager elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office and shall hold office until the expiration of such term and until his successor shall be elected and qualified or until his earlier death, resignation or removal.  A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until his successor shall be elected and qualified, or until his earlier death, resignation or removal.

5.19    <u>Intentionally omitted</u>.

5.20    <u>Limitation of Liability</u>. Each Member's liability shall be limited as set forth in this Operating Agreement, the Act and other applicable law.

5.21    <u>Company Debt Liability</u>. A Member will not be personally liable for any debts or losses of the Company beyond his respective Capital Contributions and any obligation of the Member herein to make Capital Contributions, except as provided in Section 6.07 or as otherwise required by law.

5.22    <u>List of Members</u>. The Manager shall subject to the Loan Documents, have the right, by the majority vote of Class A Members to approve the sale, exchange or other disposition of any one individual piece of real estate or all, or substantially all, of the Company's assets which is to occur as part of a single transaction or plan.

15

DocuSign Envelope ID: DB032DF6-8E3E-477D-A285-5ABDC99068B2

5.23 <u>Liability of a Member to the Company</u>. A Member who receives a distribution or the return in whole or in part of its contribution is liable to the Company only to the extent of his capital contribution.

ARTICLE VI

<u>BOOKS OF ACCOUNT, RECORDS AND REPORTS</u>

6.1 <u>Books of Account</u>. The Manager shall cause the Company to maintain full and accurate books and records at its principal place of business, showing all receipts and expenditures, assets and liabilities, profits and losses, and all other matters required by the Act. The books and records of the Company shall be open to the reasonable inspection and examination of each Member in person or by its duly authorized representative at any time during regular business hours for any purpose reasonably related to such Member's interest as a member.

6.2 <u>Information</u>. Any Member may obtain from the Company from time to time, upon reasonable demand for any purpose reasonably related to such Member's interest as a member, (a) true and full information regarding the state of the business and financial condition of the Company and any other information regarding the affairs of the Company, including, without limitation, information regarding potential leases, sales and refinancing, and (b) promptly after becoming available, a copy of the Company's federal, state and local income tax returns for each Fiscal Year. The Manager shall also prepare or cause to be prepared and distributed to the Members, not less frequently than quarterly, a report of the affairs of the Company, including without limitation, leasing activities, income and expenses, results of operations and such other information as may be reasonably requested by a Member.

6.3 <u>Bank Accounts</u>. All funds received by the Company shall be, deposited in the name of the Company in such checking and savings accounts, time deposit or certificates of deposit, or other accounts or instruments at such financially sound and insured commercial banks, savings banks and savings and loan institutions as may be designated by the Manager, with one or more signatories appointed by the Manager.

6.4 <u>Tax Returns</u>. The Manager shall cause all required tax returns of the Company to be prepared and filed in a timely fashion and shall furnish to each Member the information reasonably required to enable it to properly report his distributive share of Company income, gain, loss, deduction or credit for federal, state and local income tax reporting purposes. In addition, without limiting the generality of the foregoing, the Manager shall cause the Company to furnish to each Member its respective IRS Form K-1 not later than March 1 of each year.

6.5 <u>Tax Matters Partner</u>. Jerome H. Cohen shall be the "tax matters partner" pursuant to Section 6231 of the Code. In the event of an audit of the Company's federal income tax return, the tax matters partner shall promptly advise all Members of the audit and provide each Member with a copy of any final administrative adjustment resulting from such audit.

16

DocuSign Envelope ID: D9032DF6-0B3E-457D-A285-5ABDC99068B9

6.6 <u>Tax Elections</u>. The Manager may make any and all elections for federal, state and local tax purposes, including, without limitation, any election if permitted by applicable law to adjust the basis of property of the Company pursuant to Sections 754, 734(b) and 743(b) of the Code, or comparable provisions of state or local law in connection with transfers of Membership Interests and distributions of assets of the Company.

## ARTICLE VII

## TRANSFER OF MEMBERSHIP INTERESTS

7.1 <u>Investment Intent</u>. Each Member acknowledges that sufficient financial and other information has been given or made available to it in order to permit it to evaluate its investment in the Company, that by reason of its business or financial experience it is able to protect its own interest in connection with such investment, and that it is aware that the Membership Interest being acquired by it has not been registered under the Securities Act of 1933, as amended, and as a result it may be required to hold its Membership Interest indefinitely. Each Member hereby represents and warrants to the Company and the other Member that it is acquiring its Membership Interest for its own account, for investment and not with a view to the distribution or resale thereof, and that it is able to bear the economic risk of its investment in the Company.

7.2 <u>Termination of Membership</u>. Upon the happening of any event that terminates the continued membership of a Member for any reason, the transfer to the person succeeding to the ownership of such former Member's Membership Interest shall constitute a transferee described in Section 7.4(b) unless the other Member consents to such Person's admission as a Member.

7.3 <u>Transferee as a Member</u>. (a) Any transferee of a Membership Interest to whom the non-transferor Member has consented or deemed to have consented under this Agreement shall, subject to the Loan Documents, become a substituted Member, and be admitted to all the rights of a Member, upon the satisfaction of such additional requirements as the Manager shall determine, including, by way of illustration:

(i) An opinion of counsel satisfactory to the Manager to the effect that such transfer will not violate any then applicable federal or state securities law;

(ii) Such transferee's acceptance of, and agreement to be bound by, all of the terms and provisions of this Agreement, in form and substance satisfactory to the Manager; and

(iii) The payment of such amount as the Manager determines to cover all expenses incurred by the Company in connection with such substitution as a Member.

From and after the date such transferee becomes a substituted Member, it shall have all of the rights and powers, and be subject to all of the restrictions and liabilities, of its transferor to the extent of the Membership Interest so transferred, but such substitution shall not release such transferor from liability to the Company for any contributions it agreed to make or any other obligation it has under this Agreement.

17

DocuSign Envelope ID: D9032DF6-8B3F-457D-A285-5ABDC99968B2

(b)     Any transferee of a Membership Interest to whom the non-transferor Member has consented or deemed to have consented under this Agreement who does not become a substituted Member shall, except as otherwise provided in the Act, and subject to the Loan Documents, be entitled to receive only the share of Net Profits, Net Losses and distributions of the Company to which its transferor would otherwise be entitled with respect to such Membership Interest, and shall not have (i) any right to participate in the management or affairs of the Company, (ii) any right to vote on, consent to, approve or otherwise take part in any decision of the Members, or (iii) any of the other rights associated with such Membership Interest.

7.4     <u>Restrictions on Transferability.</u>  No Members shall, while this Agreement is in force, assign, encumber, pledge, transfer or otherwise dispose of any of the Membership Interest of the LLC now or hereafter owned by him except pursuant to the terms of the Loan Documents and this Agreement.
The LLC and Member agree that all Membership Interest is subject to the Loan Documents and to these restrictions:

(i)     any "Transfer" (as hereinafter defined) of Membership Interest is subject to the terms, conditions, covenants and restrictions of this Agreement;

(ii)     any issuance by the LLC of additional Membership Interest (an "Issuance") is subject to the terms, conditions, covenants and restrictions of this Agreement;

(iii)     all Membership Interest which any Member may hereafter acquire, regardless of the circumstances or manner of such acquisition, are subject to the terms, conditions, covenants and restrictions of this Agreement; and

(iv)     any purported Transfer or Issuance of Membership Interest other than in accordance with the terms, conditions, covenants and restrictions of this Agreement is void and of no force or effect.

7.5     <u>Proposed Bona Fide Sale.</u> If any Member  (a "Transacting Members" or "Offering Members"), while living, intends to sell any Membership Interest (the "Sale Membership Interest") to a person who is not then a Members, (a "Qualified Purchaser") in an arms-length transaction pursuant to a written offer (a "Bona Fide Purchase Offer"), the LLC and remaining Member shall have the option subject to the Loan Documents (the "Sale Purchase Option") to acquire the Sale Membership Interest in accordance with the following procedures:

7.6     <u>Right of First Offer When Selling Company Membership Interest</u>.  Subject to the terms and conditions of this Subsection, the Loan Documents, and applicable securities laws, if the Company proposes to offer or sell any new securities, the Company shall first offer such to each Member.  A Member shall be entitled to apportion the right of first offer hereby granted to it, in such proportions as it deems appropriate, among (i) itself and (ii) its Affiliates; provided that each such Affiliate (iii) is not a Competitor or FOIA Party, unless such party's purchase of new securities is otherwise consented to by the Board of Directors, (iv) agrees to enter into this Agreement  and (v) agrees to purchase at least such number of new securities as are allocable hereunder to the Member holding the fewest Membership Interest of Class B Membership Interest

DocuSign Envelope ID: D9032DF6-8B3F-477D-A285-5ABDC99969B2

       7.7    <u>Disposition of Membership Interest - Voluntary Transfer.</u>  In the event a Member desires to dispose of or encumber all or any part of his Membership Interest in the LLC to any person other than the LLC, he shall first offer, in writing, such Membership Interest for sale to the LLC, (a "LLC Sale Notice"). The LLC Sale Notice must include a copy of the Bona Fide Purchase Offer which must specify, at a minimum, the name and address of Qualified Purchaser, the number of sale membership Interest, the purchase price and terms of payment, and other material terms and conditions of the offer, including sale contingencies, if any.

If the Members intends to dispose of such Membership Interest, the LLC shall have the option to purchase all, or less than all, of such Membership Interest so offered at the purchase price for which the offering Members intends to sell such Membership Interest as stated in the aforesaid statement required to be attached to the offer or for the purchase price set forth below.

The LLC may exercise the Sale Purchase Option by providing written notice to the Offering Members (a "Purchase Notice") within thirty (30) days of the LLC's receipt of the LLC Sale Notice, of the LLC's agreement to purchase all or a designated portion of the Sale Membership Interest on the same terms and conditions as contained in the Bona Fide Purchase Offer, except that the LLC may, at its sole option, modify the terms of payment in accordance with the "Payment Terms" (as hereinafter defined). In addition, the "Closing Procedures" (as hereinafter defined) shall control over any contrary or inconsistent closing procedures specified in the Bona Fide Purchase Offer.

If the LLC does not deliver a Purchase Notice for the Sale Membership Interest within thirty (30) days of its receipt of the LLC Sale Notice, the Transacting Members shall provide written notice to the other Member of the Member's intent to sell the Sale Membership Interest (or the portion of the Sale Membership Interest that was not the subject of a Purchase Notice from the LLC) (a "Members Sale Notice"). The Members Sale Notice must include all documentation required as part of the LLC Sale Notice under subsection above, and, if applicable, a copy of the Purchase Notice from the LLC.

The other Member may exercise the Sale Purchase Option by providing a Purchase Notice to the Offering Members and the other Member within thirty (30) days from the date of the Member' receipt of the Members Sale Notice, of such Member' agreement to purchase its pro-rata portion of the remaining Sale Membership Interest on the same terms and conditions as contained in the Bona Fide Purchase Offer, except that each of the purchasing Member may, at their sole option, modify the terms of payment in accordance with the Payment Terms. In addition, the Closing Procedures shall control over any contrary or inconsistent closing procedures specified in the Bona Fide Purchase Offer. If any Members does not purchase the pro-rata portion of Sale Membership Interest which the Members is entitled to purchase under this option, the remaining Sale Membership Interest may be purchased pro-rata by the those Member which have delivered a Purchase Notice, until Purchase Notices have been delivered with respect to all Sale Membership Interest, or there is no remaining Members who desires to purchase any remaining Sale Membership Interest.

Subject to compliance with subsections above and all other applicable terms, covenants, conditions and restrictions of this Agreement, to the extent that the Offering Members has not received from

DocuSign Envelope ID: D9032BF6-9B3F-477D-A285-5ABDC99969B2

the LLC and the other Member Purchase Notices with respect to all of the Sale Membership Interest, an Offering Members may Transfer the Sale Membership Interest to a Qualified Purchaser pursuant to a Bona Fide Purchase Offer provided that the closing of such sale occurs within thirty (30) days of the last day upon which a Purchase Notice could have been delivered by a Members pursuant to the section above.

The obligations of the Offering Members under this subsection do not apply to a Bona Fide Purchase Offer as to which the offering Member (as hereinafter defined) have exercised a "Drag-Along Right" (as hereinafter defined) in accordance with subsection below.

If the offering Members dies prior to the closing of the sale and transfer contemplated pursuant to this Section, the Membership Interest of Membership Interest of the offering Members shall be subject to sale and purchase pursuant to the provisions hereof.

The purchaser of any Membership Interest transferred pursuant to this Section, shall, whether or not such purchaser is an original party hereto, take such Membership Interest subject to all the restrictions, limitations and other terms and conditions set forth in the governing documents of the LLC and any existing Members Agreement and this Agreement.

Notwithstanding anything to the contrary herein, the terms and provisions of this Section 7.7 shall be subject and subordinate to the terms and provisions of the Loan Documents and to all liens created thereby.

      7.8.   <u>Disposition of Membership Interest - Involuntary Transfer.</u>  In the event that for any reason other than the Member's death Membership Interest are transferred by operation of law to any person other than the LLC (including but not limited to a trustee in bankruptcy, a purchaser at a creditor's or court sale or a guardian or conservator) then the LLC and the other Member shall have the same rights to purchase the Membership Interest of the Members whose Membership Interest are so transferred as would exist if, pursuant to the terms said section, such Members had offered all of his Membership Interest for sale to the LLC on the date of such transfer of Membership Interest and on the sixty-first (61) days following the date of such transfer of Membership Interest had offered for sale to the other Member any such Membership Interest as to which the LLC had failed to exercise its option to purchase provided herein. In the event of transfer of Membership Interest as aforesaid the purchase price for such Membership Interest shall be the price set forth below. The closing shall take place within thirty (30) days after the exercise of the option by the LLC or the other Member. Any Membership Interest of a Members whose Membership Interest are so transferred as to which the LLC and the other Member shall each fail to exercise its or their respective option to purchase as herein provided shall continue to be subject to the restrictions of this Agreement and such a transferee must become a party to this Agreement by executing a counterpart signature page.

Notwithstanding anything to the contrary herein, the terms and provisions of this Section 7.8 shall be subject and subordinate to the terms and provisions of the Loan Documents and to all liens created thereby.

      7.9   <u>Disposition of Membership Interest - Death.</u>  Upon the death of a Member (a "Deceased Members"), the LLC shall purchase the Membership Interest owned at the time of the

Member's death by the Deceased Members (the "Death Membership Interest") in accordance with the following procedures:

(i)     The personal representative of the estate of the Deceased Members shall sell to the LLC, and the LLC shall purchase from the estate of the Deceased Members the Death Membership Interest at a price equal to the "Fair Market Value" (as hereinafter defined) per Share.

(ii)     "Fair Market Value" means the value (after discount for minority interest and lack of marketability) of the Membership Interest determined by an independent appraiser, which is mutually acceptable to the LLC and the personal representative of the selling Members.

(iii)     Each Members shall include in such Member's Last Will and Testament a direction to the executor, administrator, trustee or personal representative thereunder to comply with the terms and conditions of this Agreement. Irrespective of a Member's compliance with the foregoing covenant, all of the obligations of the Member apply to and are binding upon the successors in interest of any Deceased Members, including the executor or administrator of the estate of any Deceased.

Notwithstanding anything to the contrary herein, the terms and provisions of this Section 7.9 shall be subject and subordinate to the terms and provisions of the Loan Documents and to all liens created thereby.

7.10.   DRAG-ALONG AND TAG-ALONG RIGHTS.

7.10.1 Drag-Along Rights. If one or more Member who collectively own at least eighty percent (80%) of the then issued and outstanding Membership Interest ("Offering Member") propose to Transfer (in a sale consummated in a single transfer or a series of related transfers to a single purchaser or a group of purchasers as part of a single transaction or group of related transactions) Membership Interest representing at least eighty percent (80%) of the then issued and outstanding Membership Interest pursuant to a Bona Fide Purchase Offer (a "Majority Sale Transaction"), in lieu of compliance with the provisions of subsection 3(a), the Offering Member shall comply with the following procedures:

(i)     The Offering Member have the right ("Drag-Along Right"), but not the obligation, to cause each of the other Member ("Other Member") to tender to the third party offeror(s) ("Third Party") for purchase, at the same price per Share and on the same terms and conditions as apply to the Offering Member, a number of Membership Interest held by such Other Members equal to the total number of Membership Interest held by such Other Members multiplied by a fraction, the numerator of which is the number of Membership Interest the Offering Member propose to themselves Transfer to the Third Party, and the denominator of which is the aggregate number of Membership Interest held by the Offering Member. In order to exercise the Drag-Along Right, the Offering Member must enter into an enforceable written agreement with each other (if there is more than one Offering Members) and the Third Party (the "Drag-Along Bylaws") in which the Third Party agrees

21

DocuSign Envelope ID: D9032DF6-0B35-477D-A285-5ABDC9996BB2

unconditionally to purchase from the Other Member any Membership Interest required to be sold by such Other Member pursuant to a "Drag-Along Notice" (as hereinafter defined);

(ii)     To exercise the Drag-Along Right, the Offering Member must deliver a written notice to the LLC and Other Member (the "Drag-Along Notice") that contains (a) the name and address of the Third Party, (b) the number of Membership Interest proposed to be Transferred, (c) the proposed amount and form of consideration and terms and conditions of payment offered by the Third Party, and (d) any other material terms pertaining to the Majority Sale Transaction ("Majority Sale Terms"). The Drag-Along Notice shall also contain a complete copy of the fully executed Drag-Along Bylaws. The Drag-Along Notice shall be given at least thirty (30) days before the proposed date of the closing of the Majority Sale Transaction;

(iii)     Upon receipt of the Drag-Along Notice, each Other Members shall be entitled and obligated to sell the number of Membership Interest set forth therein to the Third Party on the Majority Sale Terms provided that such terms do not "Unfairly Discriminate" (as hereinafter defined) against the Other Member in any material respect. For purposes hereof, a term will "Unfairly Discriminate" against an Other Members if it causes such Other Members to receive less than its proportionate share of consideration in respect of the Membership Interest being sold, causes such Other Members to assume more than its proportionate share of liabilities or risk of loss following the closing of the Majority Sale Transaction, or in any other material respect deprives the Other Members of substantially similar and proportionate economic benefits to those enjoyed by the Offering Member; provided, however, that adverse tax consequences to one or more Other Member due to their particular tax situation is not deemed to Unfairly Discriminate against, or increase the liabilities or obligations of, the adversely affected Other Members;

(iv)     At the closing of a Majority Sale Transaction, each Other Members shall be obligated to make such closing deliveries and comply with other conditions of closing as are generally applicable to the Offering Member, and shall be entitled to receive such sale consideration on the same terms and conditions as payable to the Offering Member, all as may be more specified in the Majority Sale Terms.

Notwithstanding anything to the contrary herein, the terms and provisions of this Section 7.10 shall be subject and subordinate to the terms and provisions of the Loan Documents and to all liens created thereby.

7.11.     PURCHASE PRICE AND PAYMENT.

7.11.1. Purchase Price.   In the event of a disposition of Membership Interest pursuant to the Sections herein, the purchase price of each share of Membership Interest, to the extent determined in accordance with this Section shall be equal to the fair market value of said Membership Interest as mutually agreed to by the selling Member, his/her representative and the purchaser (s). If the selling Member and the purchaser(s) shall for any reason be unable to agree to the fair market value of the Membership Interest so offered, the selling Member and the purchaser(s) shall each engage an MAI appraiser. Both appraisers shall be instructed to determine the fair market value of the Membership Interest being offered for sale, and the fair market value

DocuSign Envelope ID: D9032DF6-9B3F-4E7D-A285-5ABDC99968BC

as agreed to by said appraisers shall be conclusive and binding on the parties. If the appraisers shall for any reason be unable to agree to the fair market value of said Membership Interest, the two appraisers shall jointly engage a third MAI appraiser, and all three appraisers shall meet to determine the fair market value of said Membership Interest. The determination of a majority of the appraisers shall conclusively establish the fair market value of said Membership Interest. However, if two or more appraisers are unable to agree upon the fair market value of said Membership Interest, the lowest and highest appraisals shall be discarded and the middle appraisal shall conclusively establish the fair market value of said Membership Interest and shall be binding on the parties. Each of the parties shall pay the costs and expenses of the appraiser they engaged pursuant hereto. If a third appraiser is required, the selling Member and the purchaser(s) shall each pay one-half of the costs and expenses of such third appraiser. If there is more than one purchaser, each such purchaser shall bear such appraisal expenses in proportion to the number of Membership Interest being purchased by each of them. Each appraiser shall have experience in valuing companies in the field of LLC that are of a similar size to that of the LLC.

7.11.2 <u>Payment Terms.</u> The terms of payment for Membership Units ("Payment Terms") purchased pursuant to this Agreement by the LLC or a Member (each a "Purchaser") are as follows:

(i) *Cash Payment.* Payment in full of the Membership Units by available funds in the form of a certified check, cash or money order;

(ii) *Cash Down Payment:* The Purchaser shall make a cash down payment of at least twenty percent (20%) of the purchase price. The Purchaser, in its sole discretion, may choose to increase the amount of the cash down payment;

(iii) *Balance:* The balance of the purchase price, if any, shall be paid in five (5) equal annual installments commencing one (1) year from the date of purchase. Each payment of principal shall be accompanied by a payment of accrued interest on the unpaid principal balance at a fixed rate equal to the prime rate of Citibank, N.A. as of the date of purchase. To evidence its payment obligation, the Purchaser shall deliver to the Member a Purchase Money Note;

(iv) *Purchase Money Note.* If any portion of the price of Membership Units purchased in accordance with this Bylaws is payable over time, the Purchaser shall execute and deliver to the Offering Member a non-negotiable secured promissory note (each, a "Purchase Money Note"). The Purchase Money Note may be prepaid, in whole or in part, at any time without premium or penalty, and shall be secured by a pledge of the Membership Units being acquired, but not by any other assets of the LLC. If the LLC is the Purchaser, the debt evidenced by the Purchase Money Note shall be subordinated to any institutional lender of the LLC which the board of directors determines in good faith requires such subordination, and the holder of a Purchase Money Note shall execute, deliver and perform under any subordination or similar agreements which the LLC's lender may request. The unpaid principal balance of a Purchase Money Note, at the option of the holder, may be declared immediately due and payable if (i) fifty one percent (51%) or more of the Membership Units are Transferred to persons or entities who were not Members as of the date of sale, (ii) substantially all of the LLC's assets are sold outside of the normal and ordinary course of business of the LLC, or (iii) the LLC enters into any merger,

23

DocuSign Envelope ID: D9032DF6-8B3E-457D-A285-5ABDC99968B2

reorganization, recapitalization or other transaction which results in the Transfer of more than fifty one percent (51%) of the Membership Units, (iv) the LLC ceases to do business, or (v) insolvency proceedings are initiated by or against the LLC.

7.11.3   <u>Restriction on Corporate Action.</u> For so long as any part of the principal balance of a Purchase Money Note remains unpaid, the Company shall not declare, authorize, approve, issue or pay any distribution or dividend to any of the remaining Members.

7.12    <u>DEADLOCK PROVISION</u>:

7.12.1 <u>Deadlock</u>. For purposes of this Agreement, a "Deadlock" shall be deemed to exist when there is a substantial dispute concerning any of the matters requiring joint decision or action of the Member, which dispute materially and adversely affects or prevents the operation of the Company's business and any Initial Member delivers a written notice (the "Deadlock Notice") to the other Member specifying in reasonable detail the nature of the dispute and the date on which the ten (10) day period provided below shall begin and end (the date specified in the Deadlock Notice as the date on which the ten (10) day period specified herein shall end is referred to herein as the "Termination Date"). Notwithstanding anything in this Agreement to the contrary, section 7.12 shall not apply while any debt to the Lender is outstanding.

(a)    <u>Cooling Off Period</u>. In the event of a Deadlock, the Member shall use their best efforts to resolve such Deadlock in an amicable manner within ten (10) days.

(b)    <u>Rights in the Case of an Unresolved Deadlock</u>.  If the Initial Member are not able to resolve the Deadlock in the ten (10) day period provided for above then commencing on the business day following the Termination Date, the Initial Member shall, subject to the Loan Documents, have the following rights:

(i) any initial Member shall be entitled to deliver a written notice (the "Offer Notice") to the other Initial Member (the "Deciding Member") specifying in such notice that the Initiating Member offers to purchase all, but not less than all, of the Membership Interest Interests of the Deciding Member at a price and upon the terms and conditions specified in reasonable detail in the Offer Notice (which price shall be based upon the amount that the Deciding Member would receive as a liquidating distribution if the Company were to sell the Property or its interest in Property Owner at a price designated by the initiating Member (the "Designated Sales Price") and distribute the proceeds of such sale, less customary brokerage commissions and other costs of sale (the "Net Proceeds") to the Member in accordance with the provisions of this Agreement).

(ii) upon receipt of an Offer Notice, the Deciding Member shall have fourteen (14) days to deliver a written notice (the "Response Notice") to the Initiating Member specifying in the Response Notice either that: (iii) the Deciding Member has elected to sell all of its Membership Interest in the Company to the initiating Member at the price and upon the terms and conditions specified in the Offer Notice, and for a price equal to the amount that the Deciding Member would receive as

a liquidating distribution if the Company were to sell the Property for the Designated Sales Price and distribute the Net Proceeds to the Member in accordance with this Agreement, in which case the initiating Member shall purchase, and the Deciding Member shall sell, all of the Deciding Member's Interests in the Company at the price and upon the terms and conditions specified in the Offer Notice; or (iv) the Deciding Member has elected to purchase all of the initiating Member's Membership Interest Interests in the Company upon the terms and conditions specified in the Offer Notice and for a price equal to the amount that the Initiating Member would receive as a liquidating distribution if the Company were to sell the Property for the Designated Sales Price and distribute the Net Proceeds to the Member in accordance with this Agreement, in which case the Deciding Member shall purchase, and the Initiating Member shall sell, all of the Initiating Member's Membership Interest Interests in the Company at such price and upon such terms and conditions specified in the Offer Notice. In either case, the closing of the sale and purchase of a Membership Interest pursuant to this Section (the "Buy-Sell Closing") shall be all cash and shall occur within sixty (60) days of the date of receipt by the initiating Member of the Response Notice. The sale and purchase of the Membership Interest shall be subject to all liabilities and obligations of the Company and, at the Buy-Sell Closing, the purchasing Member shall assume the selling Member's share of all Company liabilities and obligations (including any guaranty descried in Section 3.8) and the selling Member shall be released from all liability under any guaranty provided in connection with the Member Loan; provided, however, that if any of the Company creditors do not consent to such assumption the purchasing Member shall, in any event, indemnify and hold the selling Member harmless from any losses or expenses incurred or payments made in connection with such company liabilities and obligations, provided that the purchasing Member shall have no obligation to indemnify the selling Member for payments made by the purchasing Member as a result of any default by the selling Member. The selling Member and the purchasing Member shall split all closing costs, including without limitation, escrow costs and transfer taxes. The selling Member shall assign to the purchasing Member the selling Member's Membership Interest in the Company free and clear of all liens, claims and encumbrances, and shall execute all assignments of interest, deeds, bills of sale, instruments of conveyance, and other instruments that may be necessary or appropriate and as the purchasing Member shall reasonably require to transfer said selling Member's Membership Interest. In the event the selling Member shall fail or refuse to execute such instruments at the Buy-Sell Closing after ten (10) business days written notice specifically designating the instruments to be executed, then the selling Member irrevocably nominates, constitutes and appoints the purchasing Member, its true and lawful attorney-in-fact for the purposes of (i) executing in the selling Member's name, place, and stead all of the foregoing instruments and (ii) giving notices to creditors and others dealing with the Company of the termination of the selling Member's interest in the Company and publishing notice of the termination of selling Member's interest in the Company. The foregoing power of attorney, being coupled with an interest, is irrevocable. In the event the purchasing Member shall fail to give notice of closing or close the buy-sell transaction as set forth herein, then the selling Member, in addition to any other remedy, shall have the right and option to designate itself as the purchaser thereunder,

DocuSign Envelope ID: D9032DF6-0B3F-457D-A285-5ABDC99062B2

in which case it shall give at least ten (10) days prior notice of the Buy-Sell Closing which shall be held within forty-five (45) days of the last date that the Buy- Sell Closing date could have been held if the original transaction had been consummated. If the purchasing Member fails to close, in addition to any other remedies that the selling Member may have, the selling Member, if it elects to designate itself as the purchaser hereunder, may reduce the amounts to be paid at closing by ten percent (10%) of the price set forth herein, as applicable. (b)Notwithstanding any provision herein to the contrary, an Offer Notice shall be valid if delivered on or after the business day following the Termination Date, and any Offer Notice delivered prior to such time shall be deemed null and void and have no force or effect.  (c) Notwithstanding any provision herein to the contrary, upon delivery of an Offer Notice to either Member, the Deciding Member shall not be permitted to deliver a subsequent Offer Notice and any such subsequent Offer Notice shall be deemed null and void and have no force or effect; provided, however, that in the event that each of the Member shall have delivered to the other an Offer Notice on the same day (without regard to the time of day such Offer Notice is received) then, in such event, the Offer Notice which contains the lower purchase price for the other's Membership Interest in the Company shall be deemed null and void and have no force or effect. (d) Notwithstanding any provision herein to the contrary, in the event that the Deciding Member has not delivered a Response Notice within the fourteen (14) day period provided for above, then for the purposes of this Agreement the Deciding Member shall be deemed to have made the election specified above and thereafter the Deciding Member shall sell all its Membership Interest Interests in the Company to the Initiating Member at the price and upon the terms and conditions specified in the Offer Notice.

7.12.2  <u>Representations of the Selling Member</u>. The Member whose Membership Interest is to be sold shall be deemed to represent and warrant to the purchasing Member that its Membership Interest is subject to no lien or encumbrance or other legal or equitable claims (other than the legal or equitable claims to such Interests, if any, of the purchasing Member pursuant to this Section XII) and shall deliver an instrument confirming such representation and warranty to the purchasing Member at the closing of the sale of the Membership Interest.

7.12.3  <u>Other Documents</u>. In order to give effect to the provisions of this Section, the Member hereby agree to execute, acknowledge, verify and deliver any instruments or other documents reasonably required to effect the sale, assignment, transfer or other disposition of the Membership Interest Interests in accordance with the provisions of this Section.

7.12.4  <u>Compliance with Other Agreements</u>. The Member hereby acknowledge and agree that the provisions of this Section are expressly subject to the provisions of any and all agreements, contracts, and other documents to which the Company is a party including, without limitation, any loan agreement, note or mortgage.

7.12.5  <u>Time of the Essence</u>. (a) The Member agree that time is of the essence with respect to any time periods set forth in this Section. (b) Without limiting the foregoing, if the purchasing Member described above fails to close on the purchase of the other Member's Membership Interest

DocuSign Envelope ID: D9032DF6-8B3F-4F7F-A285-5ABDC99969B2

in the Company as described above (other than by reason of the Selling Member default), the Selling Member shall have the right to acquire the Defaulting Purchasing Member's Membership Interest in the Company at the same price and on the same terms and conditions specified in the Offer Notice as if it were the purchasing Member except that it shall have an additional sixty (60) days to close.

(iv)     Notwithstanding anything to the contrary herein, the terms and provisions of this Section 7.12 shall be subject and subordinate to the terms and provisions of the Loan Documents and to all liens created thereby

## ARTICLE VIII

## DISSOLUTION AND TERMINATION

8.1     <u>Dissolution</u>.  The Company shall be dissolved and its affairs shall be wound up upon the happening of the first to occur of the following events:

(a)     The consent of the Manager and all of the Class A Members;

(b)     The sale or other disposition of all, or substantially all, of the assets of the Company and the collection of all amounts derived from such sale or other disposition (including all amounts payable to the Company under any promissory notes or other evidence of indebtedness taken by the Company in connection with such sale or other disposition, unless the Manager elects to distribute such evidence of indebtedness to the Members in kind);

(c)     The retirement, resignation, expulsion, bankruptcy, with respect to, or dissolution of, a Member or the occurrence of any other event that terminates the continued membership of a Member in the Company, unless there is at least one remaining Member; or

(d)     Any other event that, under the Act, would cause the dissolution of the Company or make it unlawful for the business of the Company to be continued.

8.2     <u>Distribution of Assets Upon Dissolution</u>.  Upon the winding up of the Company, the assets of the Company shall be distributed as follows:

(a)     To creditors, including Members who are creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company; and

(b)     The balance, in accordance with Section 4.1 (a).

8.3     <u>Articles of Dissolution</u>.  When all debts liabilities and obligations of the Company have been paid and discharged or adequate provision has been made therefor and all of the remaining property and assets of the Company have been distributed to the Members, the Manager shall execute and file a certificate of cancellation pursuant to the Act.

8.4    Winding Up.  Except as provided by law, upon dissolution, each Member shall look solely to the assets of the Company for the return of its capital contribution.  If the assets remaining after the payment or discharge of the debts and liabilities of the Company are insufficient to return the capital contribution of each Member, such Member shall have no recourse against the Manager or any other Member.  The winding up of the affairs of the Company and the distribution of its assets shall be conducted exclusively by the Manager, and the Manager may take all actions necessary to accomplish such distribution, including without limitation, selling any assets of the Company.

ARTICLE IX

AMENDMENTS

9.1    Without Members' Consent.  This Agreement may not be amended without the written consent of the majority vote of its Class A Members.

ARTICLE X

MISCELLANEOUS PROVISIONS

10.1    Notices.  Any notice, distribution, demand or other communication required or permitted to be given under this Agreement shall be deemed to have been given and received for all purposes on the earlier of the date when actually received or the second business day following the date of mailing if sent by registered or certified mail, postage prepaid, addressed if to the Company or the Manager, at the principal office of the Company and, if to a Member, at its address as it appears in the Company's records.  The names and addresses of the initial Members are stated on **Exhibit A** attached hereto.

10.2    Waiver of Partition.  Each Member irrevocably waives any right that it may have to maintain any action for partition with respect to any asset of the Company.

10.3    Further Assurance.  Each Member shall execute such other documents and take such further action as the Manager or any other Member deems necessary or appropriate to effectuate the intent of this Agreement.

10.4    Construction.  As used in this Agreement, the singular shall include the plural, and the masculine shall include the feminine and neuter and vice versa, as the context requires.

10.5    Headings.  The headings in this Agreement are inserted for convenience only and shall not in any way define or affect the meaning, construction or scope of any provision of this Agreement.

10.6    Binding Effect.  Subject to the provisions of this Agreement restricting transfers of Membership Interests, this Agreement shall be binding upon, and shall inure to the benefit of, the parties and their respective heirs, personal representatives, successors and assigns.

DocuSign Envelope ID: DB032DF6-0B37-477D-A285-5ABDC99969B2

10.7    <u>Waivers</u>.  Neither the waiver by any Member of a breach of or a default under any provision of this Agreement, nor the failure of any Member on one or more occasions to enforce any of the provisions of this Agreement or to exercise any right, remedy or privilege hereunder, shall be construed as a waiver of any subsequent breach or default of a similar nature or as a waiver of any such provision, right, remedy or privilege.

10.8    <u>Exercise of Rights</u>.  No failure or delay on the part of any Member or the Company in exercising any right, power or privilege under this Agreement and no course of dealing between the Members or between any Member and the Company shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies provided in this Agreement are cumulative and not exclusive of any other rights or remedies which a Member or the Company would otherwise have at law or in equity.

10.9    <u>No Third Party Beneficiary</u>.  This Agreement is for the benefit of the Members, the Manager and the Company and, except for as set forth in Article XI, no other person shall have any rights, interest or claims under this Agreement or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

10.10    <u>Attorneys' Fees and Expenses of Litigation</u>.  If any Member shall bring suit to enforce or interpret this Agreement, the substantially prevailing party shall be entitled to a reasonable sum as attorneys' fees and all other reasonable costs and expenses in connection with such suit, which sum shall be included in the judgment or decree entered in such suit.

10.11    <u>Governing Law and Partial Invalidity</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.  If any part of this Agreement shall be held invalid for any reason, the remainder of this Agreement shall continue in full force and effect.

10.12    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

10.13.    <u>Disclosure and Waiver of Conflicts</u>.  The Members acknowledge and agree that: (i) the attorney who prepared this Agreement ("Attorney") acted as initial legal counsel to SSPH Holdco 1, LLC, an Delaware a limited liability company, (the **"Represented Parties"**) and not to any of the other Members or the Company; (ii) the Members have been advised by the Attorney that the interests of the Represented Parties may be opposed to the interests of the other Members and to the interests of the Company, and, accordingly, the Attorney's representation of the Represented Parties may not be in the best interests of the other Members or the Company; and (iii) each of the other Members and the Company have been advised by the Attorney to retain separate legal counsel.  Notwithstanding the foregoing provisions of this Section, the other Members: (1) acknowledge that they have been advised to retain separate counsel and have either retained separate counsel or waived their right to do so; and (2) jointly and severally forever waive any claim that the Attorney's representation of the Represented Parties with respect to the preparation of this Agreement constitutes a conflict of interest.

**SIGNATURES CONTAINED ON FOLLOWING PAGES**

DocuSign Envelope ID: DB032DE6-8B37-477D-A285-5ABDC99968B2

IN WITNESS WHEREOF, each Member has duly executed this Operating Agreement as of the date first above written.

**CLASS A MEMBER:**

South Shore Property Holdings LLC,
a Delaware limited liability company, its Manager

By: _____
Name:  Jerome H. Cohen
Title:    Sole Managing Member
DATE: 11/28/2017

**CLASS B MEMBER:**

South Side Development Fund 2, LLC,
a Delaware limited liability company

By: _____
Name:  Jerome H. Cohen
Title:    Sole Managing Member
DATE: 11/28/2017

**CLASS C MEMBER:**

2E, LLC _____

_____

By:     Victor Esposito   _____
Name:  Victor Esposito
Title:    _____
DATE:01/08/2018

30

# EXHIBT A

| MEMBER | PERCENTAGE OF OWNERSHIP | CAPITAL CONTRIBUTION |
|---|---|---|
| **CLASS A MEMBER:** | | |
| South Shore Property Holdings LLC, a Delaware limited liability company (Manager) | 20% | $0.00 |
| **CLASS B MEMBER:** | | |
| South Side Development Fund 2 LLC, a Delaware limited liability company | 0.00% | $0.00 |
| **CLASS C MEMBERS:** | 2.46 % | $ 50,000 .00 |

31



# CHICAGO TITLE AND TRUST COMPANY

10 S LASALLE STREET
CHICAGO, IL 60603

## ESCROW TRUST DISBURSEMENT STATEMENT

DISBURSEMENT DATE: January 31, 2017

REFER TO: ERIN K. CACCAMO
PHONE:    (312)223-2731
FAX:      (312)223-2108

ESCROW TRUST NO.    D2201607123-001

TITLE ORDER NO.    01401-008983001

PARTIES:
SELLER: VCP FUNDING III, LLC
BUYER: 4520-26 S DREXEL LLC
LENDER: BC57, LLC

RECEIPTS:

| | | | |
|---|---|---|---|
| 01/30/17 | 4520-26 S. DREXEL LLC<br>--BUYER FUNDS | | 1,406,609.95 |
| 01/27/17 | CHICAGO TITLE<br>--SJO #201604937-EARNEST MONEY | | 75,000.00 |
| 01/30/17 | BC57, LLC<br>--LENDER FUNDS | | 4,269,353.29 |
| | | $ | 5,750,963.24 |

DISBURSEMENTS:

01) PRORATIONS/CREDITS - Seller

| | |
|---|---|
| EXTENSION FEE PRORATION | 714.29 |
| 2016 TAX CREDIT | 25,405.29- |
| WATER PRORATION | 318.73- |
| 2017 TAX CREDIT | 4,385.02- |
| SURVEY CREDIT | 500.00- |
| PREPAID RENT | 1,140.40- |
| RENT 1/30-1/31 | 1,276.54- |
| TOTAL PRORATIONS | 32,311.69- |
| PURCHASE PRICE | 5,700,000.00 |
| ADJUSTED PURCHASE PRICE | $5,667,688.31 | $5,667,688.31 |

02) CHICAGO TITLE AND TRUST COMPANY - Seller's Charges

Re: Title Order No. 01401-008983001

| | |
|---|---|
| ESCROW FEE | 450.00 |
| NY CLOSING FEE | 150.00 |
| TITLE INSURANCE | 2,850.00 |
| COMMITMENT UPDATE FEE | 125.00 |
| WIRE TRANSFER FEE | 80.00 |
| TAX PAYMENT FEE | 50.00 |
| STATE TRANSFER TAX | 5,700.00 |
| COUNTY TRANSFER TAX | 2,850.00 |
| CHICAGO TRANSFER TAX | 17,100.00 |
| | $29,355.00 | $29,355.00 |

03) MGR
WATER CERT FEE                        125.00                $125.00

04) MGR
WATER BILL                          5,530.40              $5,530.40

EC2    01/30/17    16:36    NOTE: * - Indicates items Paid Outside of Closing.

**Exhibit**

**14**

exhibitsticker.com

Receiver's Submission on Group 5 Claims

```
                                          ESCROW TRUST NO.    D2201607123-001
                                              PAGE NO.   2
```

```
05) KATHRYN HAMILTON FINK
    ATTORNEY FEE
                                              3,526.00
                                                                 $3,526.00
06) COOK COUNTY TREASURER
    2016 1ST INSTALLMENT
                                             27,945.82
                                                                $27,945.82
07) COOK COUNTY TREASURER
    DUPLICATE BILL FEE
                                                  7.00
                                                                     $7.00
08) 33 REALTY
    COMMISSION
                                             85,500.00
                                                                $85,500.00
09) KALE REALTY
    COMMISSION
                                             85,500.00
                                                                $85,500.00
10) MB FINANCIAL
    PAYOFF
                                          2,817,648.01
                                                             $2,817,648.01

11) VCP FUNDING III, LLC, SERIES VCP 4611 AND DREXEL, AN ILLINOI
    NET PROCEEDS TO SELLER
                                                             $2,612,551.08
                                                             ==================

12) PRORATIONS/CREDITS - Buyer
    EXTENSION FEE PRORATION                     714.29-
    SURVEY CREDIT                               500.00
    2017 TAX CREDIT                           4,385.02
    2016 TAX CREDIT                          25,405.29
    RENT 1/30-1/31                            1,276.54
    WATER PRORATION                             318.73
    PREPAID RENT                             1,140.40
                                          --------------------
    TOTAL PRORATIONS                         32,311.69
    PURCHASE PRICE                        5,700,000.00
                                          --------------------
    ADJUSTED PURCHASE PRICE               $5,667,688.31       $5,667,688.31

13) CHICAGO TITLE AND TRUST COMPANY - Buyer's Charges

    Re: Title Order No. 01401-008983001

    ESCROW FEE                                 450.00
    NY CLOSING FEE                             150.00
    EXTENDED COVERAGE                          350.00
    TITLE INSURANCE                            350.00
    ENDORSEMENTS                             3,050.00
    POLICY UPDATE FEE                          125.00
    WIRE TRANSFER FEE                           80.00
    EMAIL PACAKGE FEE                           40.00
    COUNTY TAX                              42,750.00
    RECORDING AND SERVICE FEE                  500.00
                                          --------------------
                                             $47,845.00          $47,845.00
14) BANCSERV
    NOTARY FEE
                                                300.00
                                                                    $300.00
```

```
   EC2     01/30/17    16:36        NOTE: * - Indicates items Paid Outside of Closing.
```

ESCROW TRUST NO.    D2201607123-001
PAGE NO.  3

15) ROCK FUSCO & CONNELLY, LLC
    ATTORNEY FEE
                                                    1,185.71
                                                                        $1,185.71

16) ROCK FUSCO & CONNELLY, LLC
    PAST DUE BALANCE
                                                    7,500.00
                                                                        $7,500.00

17) ROCK FUSCO & CONNELLY, LLC
    MISCELLANEOUS EXPENSES
                                                    451.00
                                                                        $451.00

18) ROSENTHAL BROS, INC
    INSURANCE PREMIUM
                                                    21,585.00
                                                                        $21,585.00

19) WAYLS SURVEY LLC
    ALTA SURVEY
                                                    2,500.00
                                                                        $2,500.00

20) HATHAWAY & KUNZ P.C.
    FEES
                                                    2,550.00
                                                                        $2,550.00

21) BC57, LLC
    LOAN POINTS                              *    177,889.72
                                              --------------
                                                    $0.00                $0.00

22) BLOOMFIELD CAPITAL
    CAPITAL IMPROVEMENT RESERVE                    370,000.00
    THIRD PARTY FEES                               14,258.29
                                              --------------
                                                    $384,258.29          $384,258.29

23) 4520-26 S. DREXEL LLC
    TOTAL DISBURSEMENT AMOUNT                                            $6,135,863.31
    TOTAL BUYER RECEIPTS                                                 $5,750,963.24
                                                                        --------------
    AMOUNT DUE FROM BUYER                                                $384,900.07
                                                                        ==============

DISBURSEMENTS APPROVED:                VCP Funding III, LLC, VCP Series
                                       4520 Drexel

January 30, 2017                       _Kathryn Hamilton_
DATE                                   FOR SELLER    Attorney in Fact    FOR BUYER

DATE                                   FOR LENDER

DATE

DATE  1/30/17                          FOR CHICAGO TITLE AND TRUST


EC2     01/30/17    16:36       NOTE: * - Indicates items Paid Outside of Closing.

```
                                          ESCROW TRUST NO.   D2201607123-001
                                                 PAGE NO.    3
```

15) ROCK FUSCO & CONNELLY, LLC
    ATTORNEY FEE

                                          1,185.71
16) ROCK FUSCO & CONNELLY, LLC                                $1,185.71
    PAST DUE BALANCE

                                          7,500.00
17) ROCK FUSCO & CONNELLY, LLC                                $7,500.00
    MISCELLANEOUS EXPENSES

                                          451.00
18) ROSENTHAL BROS, INC                                       $451.00
    INSURANCE PREMIUM

                                          21,585.00
19) WAYLS SURVEY LLC                                          $21,585.00
    ALTA SURVEY

                                          2,500.00
20) HATHAWAY & KUNZ P.C.                                      $2,500.00
    FEES

                                          2,550.00
21) BC57, LLC                                                 $2,550.00
    LOAN POINTS

                                   *      177,889.72
                                          ------------
22) BLOOMFIELD CAPITAL             $0.00                      $0.00
    CAPITAL IMPROVEMENT RESERVE
    THIRD PARTY FEES                       370,000.00
                                           14,258.29
                                          ------------
                                          $384,258.29         $384,258.29

23) 4520-26 S. DREXEL LLC
    TOTAL DISBURSEMENT AMOUNT
    TOTAL BUYER RECEIPTS                                      $6,135,863.31
                                                             $5,750,963.24
    AMOUNT DUE FROM BUYER                                     --------------

                                                             $384,900.07
                                                             ==============

DISBURSEMENTS APPROVED:

DATE _____        FOR SELLER _____    FOR BUYER _____

DATE _____        FOR LENDER _____             _____

DATE _____

DATE _____        FOR CHICAGO TITLE AND TRUST


EC2     01/30/17    16:36    NOTE: * - Indicates Items Paid Outside of Closing.



# CHICAGO TITLE AND TRUST COMPANY

### 10 S LASALLE STREET
### CHICAGO, IL 60603

## ESCROW TRUST DISBURSEMENT STATEMENT

DISBURSEMENT DATE: November 30, 2017

REFER TO: Jacqueline Martindale
PHONE:   (312)223-2296
FAX:     (312)223-2108

ESCROW TRUST NO.    D2201703679-001

PARTIES:
SELLER: OHIO COMMONS, LLC
BUYER: 5001 S. DREXEL LLC
PROPERTY: 5001-5005 S DREXEL,CHICAGO IL
SPECIAL SERVICER: LNR PARTNERS
MASTER SERVICER: WELLS FARGO

TITLE ORDER NO.     01401-008977743

---

RECEIPTS:

| | | | |
|---|---|---|---:|
| 12/01/17 | EQUITYBUILD INC OPERATING<br>--BUYERS FUNDS TO CLOSE | | 1,457,674.16 |
| 11/30/17 | CT E# 201605994<br>--EARNEST MONEY-EARNEST MONEY | | 50,000.00 |
| | | $ | 1,507,674.16 |

DISBURSEMENTS:

01) PRORATIONS/CREDITS - Seller

| | | |
|---|---:|---:|
| EARNEST MONEY | 160,000.00- | |
| LOAN TAX ESCROW ACCOUNT | 5,195.04 | |
| LOAN INSURANCE ESCROW ACCOUNT | 12,454.60 | |
| LOAN REPLACEMENT RESERVE ACCOUNT | 12,910.00 | |
| LOAN INTEREST CREDIT (1 DAY) | 327.90- | |
| OUTSTNADING LN PRINCIPAL BALANCE CREDIT | 2,221,705.50- | |
| 2017 REAL ESTATE TAXES | 16,371.00- | |
| PREPAID RENT | 472.85- | |
| DECEMEBER MONTH PAYMENT | 15,692.91 | |
| TOTAL PRORATIONS | 2,352,624.70- | |
| PURCHASE PRICE | 3,200,000.00 | |
| ADJUSTED PURCHASE PRICE | $847,375.30 | $847,375.30 |

02) CHICAGO TITLE AND TRUST COMPANY - Seller's Charges

Re: Title Order No. 01401-008977743

| | | |
|---|---:|---:|
| ESCROW FEE | 750.00 | |
| NY CLOSING FEE | 200.00 | |
| TITLE INSURANCE | 2,720.00 | |
| COMMITMENT UPDATE FEE | 125.00 | |
| WIRE TRANSFER FEE | 40.00 | |
| HOLDBACK | 350.00 | |
| TRANSFER TAX - STATE OF ILLINOIS | 978.50 | |
| COUNTY TAX - COOK | 489.25 | |
| CITY OF CHICAGO TRANSFER TAX | 9,600.00 | |
| | $15,252.75 | $15,252.75 |

03) CHICAGO TITLE FILE NO. 8961556

| | | |
|---|---:|---:|
| DATE DOWN ENDORSEMENT | 1,000.00 | |
| | | $1,000.00 |

04) MGR

| | | |
|---|---:|---:|
| WATER CERTIFICATION | 5,049.91 | |
| | | $5,049.91 |

JM2    12/01/17    16:02        NOTE: * - Indicates items Paid Outside of Closing.

Exhibit

15

Receiver's Submission on Group 5 Claims

```
                                              ESCROW TRUST NO.    D2201703679-001
                                                      PAGE NO.  2


05) INTERRA
    BROKER COMMISSION                              112,000.00
                                                                    $112,000.00

06) CT E# 201703679-002
    SJO HOLDBACK                                    10,000.00
                                                                     $10,000.00

07) OHIO COMMONS LLC
    NET PROCEEDS TO SELLER                                          $704,072.64
                                                                 ====================

08) PRORATIONS/CREDITS - Buyer
    EARNEST MONEY                                  160,000.00
    LOAN INSURANCE ESCROW ACCOUNT                   12,454.60-
    OUTSTNADING LN PRINCIPAL BALANCE CREDIT      2,221,705.50
    LOAN INTEREST CREDIT (1 DAY)                      327.90
    LOAN TAX ESCROW ACCOUNT                         5,195.04-
    PREPAID RENT                                      472.85
    LOAN REPLACEMENT RESERVE ACCOUNT               12,910.00-
    2017 REAL ESTATE TAXES                          16,371.00
    DECEMEBER MONTH PAYMENT                         15,692.91-
                                                 -------------------
    TOTAL PRORATIONS                             2,352,624.70
    PURCHASE PRICE                               3,200,000.00
                                                 -------------------
    ADJUSTED PURCHASE PRICE                       $847,375.30         $847,375.30

09) CHICAGO TITLE AND TRUST COMPANY - Buyer's Charges

    Re: Title Order No. 01401-008977743

    ESCROW FEE                                         750.00
    NY CLOSING FEE                                     200.00
    POLICY UPDATE FEE                                  125.00
    ILLINOIS PREDATORY LENDING CERT                     50.00
    WIRE TRANSFER FEE                                   40.00
    LATER DATE FEES 10/13/16 & 12/11/15                250.00
    CITY OF CHICAGO TRANSFER TAX                    24,000.00
    RECORDING & SERVICE FEE                            500.00
                                                 -------------------
                                                   $25,915.00         $25,915.00

10) ROSENTHAL BROS., INC.
    INSURANCE INVOICE 117541                        11,643.00
                                                                      $11,643.00

11) ROCK FUSCO & CONNELLY, LLC
    ATTORNEY FEES                                    2,300.00
                                                                       $2,300.00

12) ROCK FUSCO & CONNELLY, LLC
    DECEMBER RETAINER                               13,000.00
                                                                      $13,000.00

13) ROCK FUSCO & CONNELLY, LLC
    PAST DUE BALANCE                                15,000.00
                                                                      $15,000.00

14) KILPATRICK TOWNSEND
    LEGAL FEES ($25,000 POC)                         2,873.74
                                                                       $2,873.74


    JM2      12/01/17      16:02        NOTE: * - Indicates items Paid Outside of Closing.
```

```
                                    ESCROW TRUST NO.    D2201703679-001
                                         PAGE NO.   3
```

```
15) ROCK FUSCO & CONNELLY, LLC
    LLC'S EXPENSES                         6,580.00
                                                              $6,580.00

16) MASTER SERVICER: WELLS FARGO
    DEP REPLACEMENT RESERVE              561,279.00
    PROCESSING FEE                         2,500.00
    ASSUMPTION FEE                        11,108.53
                                   --------------------
                                       $574,887.53        $574,887.53

17) SPECIAL SERVICER: LNR PARTNERS
    ADMINISTRATIVE FEE                       125.00
    FLOOD DETERMINATION FEE                   15.00
    ASSUMPTION FEE ($6,500 POC)            4,608.53
    PROCESSING FEE                         2,500.00
    CREDIT REVIEW FEE                        295.00
    INSURANCE REVIEW FEE                     400.00
                                   --------------------
                                         $7,943.53          $7,943.53

18) EQUITYBUILD
    TOTAL DISBURSEMENT AMOUNT                             $1,507,518.10
    TOTAL BUYER RECEIPTS                                  $1,507,674.16
                                                      --------------------
    OVERDEPOSIT TO BUYER                                     $156.06
                                                      ====================
```

DISBURSEMENTS APPROVED:

```
  12/1/17
-------------------             --------------------        --------------------
DATE                            FOR SELLER                  FOR BUYER

    12/1/17
-------------------             --------------------        --------------------
DATE                            FOR BUYER                   FOR LENDER

-------------------             --------------------
DATE                            FOR CHICAGO TITLE AND TRUST
```

JM2     12/01/17     16:02        NOTE: * - Indicates items Paid Outside of Closing.