UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

               Plaintiff,

         v.

EQUITYBUILD, INC., EQUITYBUILD
FINANCE, LLC, JEROME H. COHEN, and
SHAUN D. COHEN,

               Defendants.

No. 18 CV 5587

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Jerome and Shaun Cohen ran a Ponzi scheme through their real estate investment companies, Equitybuild, Inc. and Equitybuild Finance, LLC. The SEC sued them, they consented to judgment against them, and a receiver was appointed to take over the Cohens' and the companies' assets and advise the court on how to equitably distribute them to defrauded investors. The Cohens' scheme is described in *S.E.C. v. Equitybuild, Inc.*, No. 18-cv-5587, 2023 WL 2018906, at **1–4 (N.D. Ill. Feb. 15, 2023) and *S.E.C. v. EquityBuild, Inc.*, 101 F.4th 526, 528 (7th Cir. 2024). This opinion resolves competing claims for priority on properties that were grouped together as "Group 2."

## I. Legal Standards

District courts have broad discretion in approving a plan for distributing receivership funds. *See S.E.C. v. Wealth Mgmt. LLC,* 628 F.3d 323, 332–33 (7th Cir. 2010); *see also S.E.C. v. First Choice Mgmt. Svcs. Inc.*, 743 Fed. App'x 33, 35 (7th Cir.

2018). A district court's primary job in supervising an equitable receivership is to ensure that the receiver's proposed plan of distribution is "fair and reasonable." *Wealth Mgmt.*, 628 F.3d at 332.

## II.  Facts

There are five properties in Group 2: 6160–6212 Martin Luther King Dr., 5450 South Indiana Ave., 7749–59 South Yates Blvd., 1700–08 Juneway Terrace, and 6949 South Merrill Ave. All five properties have been sold and the receiver is holding the proceeds of those sales in separate bank accounts; none of the accounts hold sufficient funds to pay all the claimants in full. *Compare* [1652-1] at 2, 5, 6, 8 *with* [1571] at 26, 28, 30, 32, 34–37.[1] The Receiver negotiated a settlement of the dispute over 6949 S. Merrill Ave., [1678], and resolution of the claims against that property will wait until claimants have had an opportunity to object to the settlement.

As part of the fraud scheme, Equitybuild gave out multiple mortgages on the same property, recording mortgages out of sequence or recording a purported release in order to present a clean chain of title to future lenders. In addition, many of the mortgages secured loans that were for more money than the recent sale price of the property, meaning the loans were not fully secured. [1] ¶¶ 38, 40.

Individuals invested in Equitybuild by contributing to a pool of funds that Equitybuild advertised would be used to invest in a particular property; in return for their investment, the individuals were promised a first position lien on the property.

---

[1] Bracketed numbers refer to entries on the district court docket. Page numbers are taken from the CM/ECF header placed at the top of filings.

2

[1] ¶¶ 20–24; [1537] at 177 ("As with all other EBF notes, this private mortgage note is fully secured by the Paxton property as collateral, and lenders are further protected with a first lien position on the property."). The mortgage in favor of individual investors named the lender/mortgagee as "The Persons Listed on Exhibit A to the Mortgage c/o EquityBuild Finance, LLC"; Exhibit A to the mortgage listed the names of the individual investors for the particular property. *See* [1537] at 314–22 (6160 S. MLK); [1537] at 306–13 (7749 S. Yates); [1562-4] at 2–10 (5450 S. Indiana); [1563-3] at 2–10 (1700 W. Juneway). I refer generally to the lenders in these transactions as "Individual Investors."

Institutional lenders also invested in Equitybuild but usually did so as the only lender in a transaction and secured their loan with a mortgage on one or two properties. An institutional lender claims priority in each of the Group 2 properties based on mortgages recorded first in time or after a prior mortgage was purportedly released.

### A. Direct Lending Partners LLC and 6160–6212 MLK Drive

Equitybuild, Inc. executed a mortgage in favor of Individual Investors on the property located at 6160–6212 Martin Luther King Drive on November 9, 2016. [1537] at 314–322. The mortgage listed the mortgagee/lender as "The Persons Listed on Exhibit A to the Mortgage C/O EquityBuild Finance, LLC" and was recorded on January 3, 2017. [1537] at 314–15.[2]

---

[2] A correction to the mortgage was filed the next day. *See* [1537] at 323–33.

In the spring of 2018, Equitybuild, Inc. sought funding from Direct Lending Partner LLC for a large construction loan and offered to secure the loan with mortgages in 6160 MLK and another property. *See* [1557-7].[3] Equitybuild provided a purported release of the Individual Investors' mortgage; the release was executed in the name of "Equitybuild Finance, LLC" and signed by Shaun Cohen as president of Equitybuild Finance, LLC. [1602-1] at 179–80. After being pressed by the title insurance company, Shaun Cohen also provided an "affidavit of lost note," which stated he was the lender/mortgagee on the Individual Investors' mortgage and the original promissory note "was lost and cannot be located." [1557-9] at 3. Cohen signed the affidavit in his personal capacity. *Id*. at 4.

The purported release of the Individual Investors' mortgage on 6160 MLK was recorded on June 11, 2018, the same day a mortgage in favor of Direct Lending Partners was recorded against the property. *See* [1602-1] at 179; [1559-3] at 2–27.

### B.    Shatar Capital, LLC and 5450–52 Indiana Ave. & 7749–59 S. Yates Blvd.

Equitybuild had been soliciting individual investments in 5450 S. Indiana since at least December 2016. *See* [1602-1] at 114. Those investors received promissory notes and mortgages (unsigned by Equitybuild) and signed Collateral Agency and Servicing Agreements from Equitybuild at the time of their investment. *See* [1602-1] at 66–114 (individual investor's loan package for 5450 S. Indiana).

---

[3] The original lender was "Arena DLP Lender, LLC" but no one has disputed that Direct Lending Partner LLC is the successor in interest to that entity and I refer to the lender, and now claimant, as Direct Lending Partners.

Equitybuild solicited investments from individual investors for 7749 S. Yates at least as early as February 2017. *See* [1602-1] at 115–161.

Shatar Capital LLC was a private lender (and sometimes broker) introduced to Equitybuild in November 2016. *See* [1537] at 177–78.[4] Ezri Namvar, one of Shatar's principals, received an email from an Equitybuild Finance consultant with information on Equitybuild Finance's investment model for individual investors. *Id.*[5] This email stated, in part: "As with all other EBF notes, this private mortgage note is fully secured by the Paxton property as collateral, and lenders are further protected with a first lien position on the property." [1537] at 177. The email represented that Equitybuild would handle all of the rehabilitation, leasing, and property management of the investment properties and that Equitybuild had over $100 million of lender/clients' funds under asset management. *Id.* at 177–78.

By December 2016, Shatar and Equitybuild were engaged in discussions about a different type of loan, in which Shatar was the sole lender of much more money. *See* [1537] at 179. In a December 2016 email, Namvar wrote to Equitybuild (original in all caps):

---

[4] Namvar testified that Shatar helped to "arrange" loans, connecting people or entities that wished to invest money with entities looking for investors. [1537] at 32 (11:17–21), 41–43 (20:16–22:4). The 7749 S. Yates and 5450 S. Indiana loan were made with capital from four entities for whom Shatar acted as agent and "servicer." [1537] at 90–92 (69:13–72:24); [1587-1]; [1587-2]; [1587-3]; [1587-4].

[5] Ezri Namvar testified that he was never an officer or employee of Shatar, but he served as Shatar's corporate representative for a Fed. R. Civ. P 30(b)(6) deposition. *See* [1537] at 28–32 (7:9–11:14). Namvar was involved in the Shatar-Equitybuild transaction and had decision-making authority for Shatar. *Id.* at 32–36 (11:1–15:19), 56–62 (35:9–40:20), 68 (47:2–19), 75 (54:4–22).

> Since we have become aware of your business structure, assuming your
> previous deals have been closed with crowdfunding investors, we need
> to make sure your refinancing of already closed deals are allowed and
> kosher, in case the proceeds is not distributed and/or going toward new
> deals—in that regard please provide any document u can—depending
> on our underwriting we may need a strong opinion letter from your
> attorney[.]

[1537] at 179. Shaun Cohen responded to the email, telling Namvar that on
refinances Equitybuild asked its investors if they wanted their funds returned or to
rollover their funds into a new deal and sent Namvar a blank copy of the rollover
forms. *See* [1537] at 180–83. Tyler DeRoo, an Equitybuild employee, sent Namvar
blank copies of the standard lender documents including wire instructions, mortgage,
servicing agreement, and note, but Namvar did not read the documents. [1537] at
203–246; [1537] at 116–17 (95:20–96:14).

On March 7, 2017, DeRoo emailed Namvar about the Indiana and Yates
properties with information on the purchase prices and closing dates for each
property. *See* [1537] at 248.

On March 14, 2017, Equitybuild, acting through 7749-59 S Yates LLC,
purchased 7749 S. Yates for $1,550,000.00. [1602-1] at 164. Jerome Cohen executed
a mortgage on 7749 S. Yates to the Individual Investors for $2,860,000.00 on the same
day. [1537] at 306–313.

Shatar and Equitybuild agreed to terms for a loan of $1,800,000.00 to be
secured by 5450 S. Indiana and 7749 S. Yates. [1602-1] at 162–63. While preparing
the loan documents, Equitybuild's real estate attorney's office shared the information
that the purchase transaction for 7749 S. Yates had already closed. *See* [1602-1] at

170–73. Namvar then wrote DeRoo asking him to call "ASAP." *Id.* at 170. There is no evidence in the record about what occurred during that phone call.

Later in March 2017, while preparing the closing documents for 5450 S. Indiana, an employee for the title insurance company shared via email with Shatar, Equitybuild, and Equitybuild's real estate attorney that Equitybuild was receiving $86,000.00 from the closing. *See* [1602-1] at 168. Namvar responded to the email, "What??? I thought the borrowers are putting over 1.5 mil in to close the purchases[.] Can someone explain this 2 me?" *Id.* The closing documents for the 5450 S. Indiana purchase reflect that the borrower (Equitybuild's property-specific LLC) received approximately $100,0000.00 from the transaction. *See* [1587-7] at 3.[6]

On or about March 30, 2017, Jerome Cohen executed mortgages on both 7749 S. Yates and 5450 S. Indiana in favor of Shatar Capital's lenders for a maximum lien of $3,060,000.00. *See* [1537] at 268–305 *and* [1562-2] at 2–39. These mortgages secured a March 28, 2017 promissory note from the Shatar Lenders to Equitybuild for $1,800,000.00. [1587-11] at 2–9.

On March 31, 2017, Cohen signed a mortgage on 5450 S. Indiana to the Individual Investors for $3,050,000.00. [1562-4] at 2–10.

Shatar's mortgages on 7749 S. Yates and 5450 S. Indiana were recorded on April 4, 2017. [1562-3] at 2 (7749 S. Yates); [1562-2] at 2 (5450 S. Indiana). The

---

[6] Equitybuild purchased 5450 S. Indiana for $1,675,000.00 on or about March 31, 2017. [1587-8] at 2. The escrow disbursement statement for the transaction shows that the title insurance company received $1,800,000.00 from the Shatar lenders and paid out origination fees to Daniel Namvar and Shatar Holdings, LLC. [1587-7] at 2.

7

Individual Investors' mortgages in the same properties were recorded on June 23, 2017. [1562-5] at 2 (7749 S. Yates); [1562-4] at 2 (5450 S. Indiana).

### C. Thorofare Asset Based Lending REIT Fund IV, LLC and 1700–08 Juneway Terrace

Equitybuild followed a similar pattern with the purchase and financing of 1700–08 Juneway Terrace. It began collecting funds for the property from Individual Investors as of at least March 1, 2017. *See* [1602-1] at 18–65. After accepting money from the Individual Investors, Equitybuild would send the individuals a promissory note and mortgage, unsigned by Equitybuild, and a signed Collateral Agency and Servicing Agreement. *Id.*

Through a promissory note dated April 6, 2017, Equitybuild borrowed $2,175,000.00 from Thorofare to purchase 1700 Juneway. [1588-7] at 2–13. Jerome Cohen executed an April 6, 2017 mortgage in favor of Thorofare, *see* [1563-1] at 2–55, which was recorded on April 11, 2017. [1563-1] at 2.[7] Thorofare held back $839,877.50 at the closing for tax, interest, capital expenditures, repair, and insurance reserves, fees, and the partial month's interest payment. [1602-1] at 176. The property was purchased for $2,400,000.00 and the title company's settlement statement reflects that Equitybuild had to come up with an additional $1,008,850.02 to close the transaction. [1602-1] at 176–77.

On the same day, April 6, 2017, Equitybuild signed a different mortgage for 1700 Juneway in favor of Individual Investors and in the amount of $4,120,000.00;

---

[7] A corrected mortgage was recorded one day later that had the correct exhibits setting out approved repairs and servicing costs. *See* [1563-2] at 2–55.

but waited until June 23, 2017, to record the Individual Investors' mortgage. [1563-3] at 2–10.

## III. Analysis

The Cohens, through Equitybuild, Inc., Equitybuild Finance, and other subsidiaries, perpetrated a Ponzi scheme by using money from later investors to pay returns to earlier investors. *See* [1386] at 4–6; [492] at 1, 3, 11–12 (report and recommendation); [603] at 2–3, 6 (order adopting report and recommendation); [5] ¶¶ 48, 58–59, 69. This receivership was set up to "marshal[] and preserv[e] all assets of Defendants Equitybuild, Inc., Equitybuild Finance, LLC, their affiliates, and the affiliate entities of Defendants Jerome Cohen and Shaun Cohen." [16] at 1. The proceeding is now at the point of distributing the proceeds of the liquidated assets among the victims of the scheme.

### A.    Equitable Receiverships after a Ponzi Scheme

"In supervising an equitable receivership, the primary job of the district court is to ensure that the proposed plan of distribution is fair and reasonable." *S.E.C. v. Wealth Mgmt., LLC*, 628 F.3d 323, 332 (7th Cir. 2010). One of the guiding principles in creating a fair and reasonable distribution is that claimants who are similarly situated should be treated similarly. *Id*. at 333; *see also*, *Cunningham v. Brown*, 265 U.S. 1, 13 (1924). "District courts have broad equitable power" in supervising an equitable receivership in a securities fraud enforcement action. *Wealth Mgmt.*, 628 F.3d at 333.

While a federal statute requires receivers to "manage and operate the property in [their] possession … according to the requirements of the valid laws of the State in

which such property is situated," *see* 28 U.S.C. § 959(b), that requirement is not applicable to the liquidation of the estate. *See Wealth Mgmt.*, 628 F.3d at 334. The Federal Rules of Civil Procedure require a receiver to administer an estate in "accord with the historical practice in federal courts or with a local rule." Fed. R. Civ. P. 66. The Northern District of Illinois's local rule states that administration of estates by receivers should be similar to bankruptcy cases but gives courts the discretion to "direct the manner in which the estate shall be administered, including the conduct of its business, the discovery and acquirement of its assets, and the formation of reorganization plans." N.D. Ill. L.R. 66.1(a)(2). Indeed, receivership cases are not bankruptcies and are "not governed by the Bankruptcy Code." *Duff v. Cent'l Sleep Diagnostics, LLC*, 801 F.3d 833, 844 (7th Cir. 2015).

Equitable receiverships inhabit a middle ground where, in an effort to craft a fair and reasonable distribution plan, some legal principles and contractual rights are respected, and others are not. The parties disagree about which rules should apply here regarding security, priority, collection of interest and costs, and calculating relief.

### 1.    *Retaining Secured Interests and Priority*

A receiver takes the property in the estate subject to the "liens, priorities or privileges existing or accruing under the laws of the state." *Marshall v. People of New York*, 254 U.S. 380, 385 (1920). Whether a claimant has a secured interest in an asset legally distinguishes claimants and make them "differently situated" from one

another. *See Ticonic Nat. Bank v. Sprague*, 303 U.S. 406, 412 (1938).[8] Because the claimants are differently situated, it is appropriate for federal equitable receiverships to treat secured claimants differently than unsecured claimants and respect rules of priority. *See, for example, Wealth Mgmt.*, 628 F.3d at 333 n. 6 (explaining distinction between creditor and investor claimants and why receiver's plan properly prioritized distributions to creditors before investors); *S.E.C. v. Elliott*, 953 F.2d 1560, 1573 (11th Cir. 1992) ("A claimant is not treated better in the eyes of the law if the controlling facts surrounding his or her case lead to a different legal conclusion … it is incorrect to say the law prefers one claimant if that claimant's situation differs in a legally cognizable way."); *S.E.C. v. Byers*, 637 F.Supp.2d 166, 171–72 (S.D.N.Y. 2009) (secured creditors given higher priority than unsecured creditors), *aff'd sub nom. S.E.C. v. Orgel*, 407 Fed. App'x 504 (2d Cir. 2010) *and S.E.C. v. Malek*, 397 Fed. App'x 711 (2d Cir. 2010). Finally, this court approved of a claims resolution process that would determine classification and priority of claimants' interests and distribute assets accordingly. *See* [941] at 2.

Consistent with historical practice in receiverships and the case's own history, the distribution plan for Group 2 will prioritize secured creditors' claims and use Illinois law to determine the priority of secured claimants' interests in the proceeds of the sale of a property.

---

[8] Secured creditors can recover through two mechanisms—an action against the property in which they have an interest and an action against the entity who signed the loan contract; unsecured creditors can only enforce their right to payment against the entity who signed or guaranteed the loan contract. *Ticonic Nat. Bank*, 303 U.S. at 411–12. Market forces value a secured creditor's interest differently than an unsecured creditor; a secured creditor's investment likely reflects some kind of premium in exchange for its status.

2.      *Interest, Fees, and Costs*

The Receiver proposes that claimants should not receive interest, penalties, attorneys' fees or any other costs. *See* [1571] at 11. The Institutional Lenders argue that Illinois law requires a secured creditor to recover all of the money owed to it under the terms of the note and that their promissory notes and mortgages provide for interest, attorneys' fees, and costs. *See* [1588] at 10 (citing 765 ILCS 5/11). Relying on the precept that "equity follows the law," the Institutional Lenders assert that the distribution plan must allow them to recover all of the amounts to which they are entitled under their contract and Illinois law.[9] But the law of equitable receiverships does not require a receiver to distribute the assets of the receivership estate in accordance with state law—instead the distribution plan should treat similarly situated claimants similarly. *See Wealth Mgmt.*, 628 F.3d at 334, 333. In this case, the Receiver's proposal is that no secured creditors should receive interest, penalties, attorneys' fees or any other costs, so the proposal treats all similarly situated claimants—secured creditors with contractual rights to collect interest, penalties,

---

[9] The Institutional Lenders cite to *In re BNT Terminals, Inc.*, for the aphorism "equity follows the law." *See* 125 B.R. 963, 979–80 (Bankr. N.D. Ill. 1990) (opinion on motion to reconsider published in 1991). *BNT Terminals* is a bankruptcy adversary proceeding in which courts must follow state law to determine the nature of interests held by parties in the adversary proceeding. *Id.* at 970. As discussed above, liquidation of federal receiverships is not governed by state law. The *BNT Terminals* court used the adage about equity following the law in reference to the idea that the bankruptcy court could not give the adversary defendant a legal position that it did not already have (that of creditor), i.e., it could not create a legal right that did not previously exist. *Id.* at 978–80. A court, even one sitting in equity, does not have the power to create a legal interest from whole cloth. But a court sitting in equity can determine which contractual rights should be strictly enforced when trying to remedy fraud. *Cf. Hedges v. Dixon County*, 150 U.S. 182, 189 (1893) ("[A] court of equity, in the absence of fraud, accident, or mistake, cannot change the terms of a contract.").

and costs—the same. In the context of a securities fraud enforcement case, the court of appeals has approved in passing of a receiver's plan to disallow all penalties, interest, and attorneys' fees. *See Duff*, 801 F.3d at 844 ("To treat the claimants equally across the board, the final distribution plan reasonably excluded claim amounts attributable to penalties, interest, and attorney's fees.").

It is reasonable to disallow claims for penalties, interest, and fees. Courts overseeing receiverships may limit the contractual (and equitable) rights of higher priority claimants so that lower priority claimants can recover some portion of their principal. Creditors have been denied the right to default interest and to credit bid on a property, *S.E.C. v. Capital Cove Bancorp LLC*, No. SACV 15-980-JLS (JCx), 2015 WL 9701154, at **1, 11–12 (C.D. Cal. Oct. 13, 2015), to interest on accrued interest, *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 163 (1946), to penalties, interest, and attorney's fees, *Duff*, 801 F.3d at 844, and to deficiency claims, *see Byers*, 637 F.Supp.2d at 183.

Underlying these cases is the "general rule [that] after property of an insolvent passes into the hands of a receiver or of an assignee in insolvency, interest is not allowed on the claims against the funds." *Vanston*, 329 U.S. at 163–64 (1946).[10] "In the context of interest-bearing debts, the equitable principle … rests at bottom on an awareness of the inequity that would result if, through the continuing accumulation

---

[10] The Institutional Lenders argue that *Vanston* has been superseded by Section 506(b) of the Bankruptcy Code, which allows for post-petition interest in certain situations. *See* [1588] at 11. But the Code is not binding on this proceeding and *Vanston* addresses a receivership-turned-bankruptcy, so its holding is relevant to the principles that should govern a federal equitable receivership. *See Vanston*, 329 U.S. at 158–59.

of interest in the course of subsequent bankruptcy proceedings, obligations bearing relatively high rates of interest were permitted to absorb the assets of a bankrupt estate whose funds were already inadequate to pay the principal of the debts owed by the estate." *Nicholas v. United States*, 384 U.S. 678, 683–84 (1966) (pre-Bankruptcy Code opinion holding that interest may run against debtor-in-possession seeking to reorganize up until the entity files for liquidation). Courts have denied claimants' contractual rights due to a concern about how secured creditors' ability to recover more would affect junior and unsecured creditors' recovery. *See Capital Cove Bancorp*, 2015 WL 9701154, at *12; *Byers*, 637 F.Supp.2d at 183.

The Institutional Lenders rely heavily on *In re Real Property Located at Redacted Jupiter Drive*, No. 2:05-CV-1013, 2007 WL 7652297 (D. Utah Sept. 4, 2007), in which the court allowed interest to accrue on secured claims during the receivership. *Id.* at **7–8. I disagree that disallowing interest results in a preference of junior creditors over senior creditors, *see id.*, and find that *Vanston*, *Duff*, and *Byers* better articulate and apply the rules for distributing the assets of a federal equitable receivership. Other cases hold that a claim in a receivership may accrue interest, but many of those cases arise out of non-securities fraud receivership cases. *See, for example*, *Ticonic Nat'l Bank*, 303 U.S. at 410–14 (creditors entitled to interest from receivership of national bank that went into voluntary liquidation). Because those receiverships did not deal with claimants who were all victims of fraud, it was reasonable to uphold contractual rights and damages; but where the vindication of those rights comes at the expense of other victims because of insufficient funds, a

14

different rule should apply in an effort to treat victims equitably. *See Vanston*, 329 U.S. at 164–65 ("[T]he touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor.").

The Institutional Lenders also point to Section 506(b) of the Bankruptcy Code to argue that they are entitled to interest, fees and costs up to the amount available in each property's bank account. Section 506(b) of the Bankruptcy Code allows fully secured creditors to be paid interest on their claim and "any reasonable fees, costs or charges provided for under the agreement … under which such claim arose." 11 U.S.C. § 506(b).

But the local rules give me the discretion to direct the manner in which the receivership estate should be administered. *See* N.D. Ill. L.R. 66.1(a)(2). Bankruptcy principles, especially those used in liquidations, can be helpful guides to crafting a distribution plan, but the distribution plan is not governed by the Bankruptcy Code. *See Duff*, 801 F.3d at 844. The underlying equities and goals of a receivership arising out of a Ponzi scheme are different than the equities and goals in a bankruptcy, so it is reasonable for the rules to differ as well. *See Byers*, 637 F.Supp.2d at 175 ("The reason the Wextrust entities are in shambles is not—as is typical in a bankruptcy case—because of poor economic conditions or garden variety mismanagement. The reason is fraud."). For that reason, many of the cases upon which the Institutional Lenders rely are not persuasive. *See, for example, In re Fesco Plastics Corp.*, 996 F.2d 152, 154–56 (7th Cir. 1993) (creditors in Chapter 7 case cannot rely on equity to argue

15

for recovery of fees and interest because there are specific provisions of the Code that address when fees and interest can be recovered); *In re Cella III, LLC*, 625 B.R. 19, 25–26 (Bankr. E.D. La. 2020) (recognizing over-secured creditor's right to fees and interest under § 506(b) but calculating that amount of equity in the underlying asset was not sufficient to pay out both in Chapter 11 case); *In re Croatan Surf Club, LLC*, No. 11-00194-8-SWH, 2012 WL 1906386, at **6–7 (Bankr. E.D.N.C. May 25, 2012) (analyzing § 506(b) in a Chapter 11 proceeding); *In re Broomall Printing Corp.*, 131 B.R. 32, 35 (Bankr. D. Md. 1991) (same); *Liberty Nat'l Bank & Trust Co. of Louisville v. George*, 70 B.R. 312, 315–16 (W.D. Ky. 1987) (same).

The final consideration is whether the prohibition on interest should apply to interest that accrued before the receivership was instituted. *Vanston* and its progeny only discuss interest accruing after the institution of the receivership. On the other hand, the court of appeals has approved of a distribution plan that reduced claims by "late penalties, accrued interest, and/or attorney's fees," and a review of the distribution plan in that case indicates that "accrued interest" included *all* interest. *See Duff*, 801 F.3d at 844; *see also* 10-cv-06162, Docket No. [379] at 16 (N.D. Ill.). A distribution plan preventing secured creditors from recovering their "deficiency" claim, a fundamental contractual right for secured creditors, has also been approved by federal courts. *See Byers*, 637 F.Supp.2d at 183.

The general rule of treating similarly situated claimants similarly favors disallowing the recovery of all interest (and penalties, fees, or costs). All of the secured claimants who have been determined to have priority thus far in the Receivership

16

have only been able to recover their principal (minus amounts previously received from Equitybuild). *See* [1451] at 3, [1451-1] at 2–13 (order approving Group 1 distribution to Individual Investors with no interest, fees, or costs to be paid); [1552] at 4, 7–11 (order approving Group 3 distribution to Institutional Lenders who had secured interests with no interest, fees, or costs to be paid); [1627] at 4–6, [1626] at 10–17, [1671] (Receiver's recommendations for Groups 4 and 5 to omit all interest, fees, penalties to secured creditors, whether Individual Investors or Institutional Lenders, and order approving the recommendations). All secured claimants, whether Individual Investors or Institutional Lenders, had a contractual right to accrue interest on their loan. Nevertheless, the distribution plans thus far have not allowed the recovery of any interest (and required the return of "interest payments"), so it is equitable to prohibit secured claimants in Group 2 from recovering any interest, fees, or penalties from the estate.

A final benefit to the blanket prohibition on the recovery of interest is that it is easier to administer than a rule that distinguishes between pre and post receivership interest. "Receivers have a duty to avoid overly costly investigations, and at a certain point, the costs of such individualized determinations outweigh the benefits." *Wealth Mgmt.*, 628 F.3d at 336. Some secured claimants have already disputed what interest should or should not be included, including whether they were paid interest in the first place. *See, for example*, [1588] at 14–15.

Because there are insufficient funds to pay all the claimants and first-position secured claimants are more likely to recover something, it is equitable to prohibit

17

them from recovering any form of interest, fees, penalties, or costs associated with their claim. This applies to all secured claimants, whether they be Individual Investors or Institutional Lenders.

### 3. Netting Rule

Some Institutional Lenders argue that their claims should not be set off by payment they received from Equitybuild. They make two arguments in support of the position: (a) that funds lent to Equitybuild went to the seller of the properties, so the Lenders' funds were not part of a Ponzi scheme, and (b) that netting is inappropriate when the Receiver is not making a fraudulent conveyance claim.

Even if the Institutional Lenders' loan proceeds did not go directly to Equitybuild, the loans benefitted Equitybuild because it did not have to use other money to purchase the real estate properties. Because money is fungible, Equitybuild could use the Institutional Lenders' loan proceeds to purchase properties and use the money taken from Individual Investors to make "interest payments" to other investors and continue its scheme. Additionally, the evidence is that in at least one case Equitybuild (through a property-specific LLC) did receive cash proceeds from the transaction. The closing documents for 5450 S. Indiana reflect that the Shatar lenders' loan was for $1.8 million, the purchase price and closing costs was approximately $1.69 million, and the borrower (Equitybuild) received $109,751.13 from the transaction. [1587-7] at 2–3. Similarly, Thorofare held back $585,845.00 for capital expenditures and allowed Equitybuild to draw on that reserve after the closing. *See* [1571] at 37. All of the institutional lenders' loans were made to benefit Equitybuild and allowed it to further its fraudulent scheme.

18

Distribution plans in the aftermath of a securities fraud enforcement action regularly deduct amounts previously received by the particular claimant from their recovery. *See S.E.C. v. Huber*, 702 F.3d 903, 904–07 (7th Cir. 2012) (discussing two ways of calculating an investors' recovery in securities fraud enforcement receivership, both of which account for money previously received); *see also S.E.C. v. Capital Consultants*, 397 F.3d 733, 737–41 (9th Cir. 2005) (approving of distribution plan that only allowed recovery of net loss and offsets that recovery by 50% of amounts received by third parties); *C.F.T.C. v. Topworth Intern., Ltd.*, 205 F.3d 1107, 1115–16 (9th Cir. 1999) (approving distribution plan in commodities fraud context that returned claimants' investment less any amounts returned to claimant and/or trading profits reinvested or credited to a claimant); *S.E.C. v. Credit Bancorp, Ltd.*, No. 99 CIV 11395 RWS, 2000 WL 1752979, **40–42 (S.D.N.Y. Nov. 29, 2000) *aff'd*, 290 F.3d 80 (2d Cir. 2002).

The Institutional Lenders point out that the cases the Receiver cites in his brief are claw-back cases brought under a state or federal Fraudulent Transfer Act and suggest that netting a recovery should only happen when a fraudulent conveyance has occurred. *See Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995) *and Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2008). These cases articulate the general principle that Ponzi schemes result in an inherent inequity between earlier investors and later investors because early investors may have received some return on their investment, not from a legitimate source but from the money solicited by later investors. *Scholes*, 56 F.3d at 757–58; *Donell*, 533 F.3d at 770. And both cases hold that earlier investors

19

are not entitled to those returns because the entire scheme was fraudulent, and the goal of the law is to provide all the defrauded investors some portion of their principal. *Scholes*, 56 F.3d at 757; *Donnell*, 533 F.3d at 770. The Institutional Lenders do not articulate why these general principles should be applied differently to the distribution plan at the end of a federal receivership. In both a clawback and a liquidation, the court is working to allocate limited assets among many fraud victims.

I agree that no investors, individual or institutional, should be allowed to retain the so-called "interest payments" or any form of return on their investment and approve of the Receiver's proposed net loss distribution plan, a decision well within my discretion. *See Huber*, 702 F.3d at 908.

## B. Direct Lending Partners and 6160–6212 S. Martin Luther King

Both DLP and Individual Investors claim a first position lien in the proceeds of 6160–6212 S. Martin Luther King via the existence of a recorded mortgage in their favor. A purported release of the Individual Investors' mortgage was recorded on the same day as DLP's mortgage. *See* [1602-1] at 179–80; [1559-3] at 2. DLP argues that the release is valid, so its mortgage is in primary position. The Individual Investors argue that the release is invalid because they neither released the mortgage themselves nor did they authorize Shaun Cohen or Equitybuild Finance to do so on their behalf.[11]

---

[11] As both parties note, this legal issue was addressed at length in the opinion for the Group 1 properties. While decisions on one group of properties do not have preclusive effect for other groups, *see* [941] at 7, applying the law to a similar set of facts will garner a similar result. As with Group 1, I am considering whether a purported release should be binding upon mortgagees who did not sign the release themselves.

"[A] perfected mortgage lien remains in effect unless released pursuant to the Mortgage Act." *Federal Nat'l Mortgage Ass'n v. Kuipers*, 314 Ill.App.3d 631, 637 (2d Dist. 2000). Upon full payment of the note underlying a mortgage, "[e]very mortgagee of real property, his or her assignee of record, or other legal representatives … shall make, execute and deliver to the mortgagor … an instrument in writing releasing such mortgage … or shall deliver that release to the recorder or registrar for recording or registering." 765 ILCS 905/2. The terms of the statute require a release to be signed by either the mortgagee, her assignee, or her legal representative. *Id.*

The mortgage to the Individual Investors was in favor of "The Persons Listed on Exhibit A c/o EquityBuild Finance Co." [1537] at 315. The release of the mortgage was executed by Shaun Cohen as president of Equitybuild Finance. [1602-1] at 179–80. Equitybuild Finance Co. is a different entity than "The Persons Listed on Exhibit A," and is not listed as a mortgagee on the mortgage; it could not release the mortgage unless it was the Individual Investors' assignee or legal representative. DLP argues that Equitybuild Finance had the authority, actual or apparent, to sign the release and was therefore a proper signatory as the Individual Investors' legal representative.

Actual authority can be express or implied. *See Peterson v. Devita*, 2023 IL App (1st) 230356, ¶ 40 (opinion not yet published in permanent law reporters). Express authority exists when a principal grants power to the agent to perform a particular act. *Id.* "Implied authority happens when the conduct of the principal, reasonably interpreted, causes *the agent* to believe that the principal wants him or her to act on

the principal's behalf." *Id.* (citing to Restatement (Second) of the Law of Agency § 26) (emphasis added).

DLP argues that the Individual Investors gave Equitybuild Finance actual authority to release their mortgage by authorizing Equitybuild Finance to be their "Collateral Agent" in the Collateral Agency and Servicing Agreements. [1559] at 4 n.2. The language of the Servicing Agreement says that Equitybuild Finance is authorized to exercise rights and powers "as are specifically granted or delegated to the Collateral Agent by the terms hereof" and then limits the Collateral Agent from "tak[ing] any other action with respect to the collateral or any part thereof" without "written instructions from the required lenders." [1559-7] at 5–6 (§§ 2(a), 3); *see also* [1559-7] at 7 (§ 6(a): "the Collateral Agent shall act only on written instructions from all Lenders with respect to the amendment or termination of the Mortgage.").

The language of the Servicing Agreement prohibits Equitybuild Finance from releasing the Mortgage absent written instructions from all Lenders. The only written instruction from Individual Investors to Equitybuild Finance regarding the release of the Mortgage is the "Authorization Document," which states that "Equitybuild Finance … has been authorized by the above listed lenders to … execute a release of said mortgage, upon payment in full of any outstanding balance." [1559-8] at 2. There is no evidence that the balance on the note was paid off and DLP does not argue that the proceeds of its loan should count as such a payment. The Servicing Agreement did not give Equitybuild Finance actual express authority to release the Mortgage without written instructions and it (along with the Authorization

Document) could not serve as the basis for Equitybuild Finance to reasonably believe that the Individual Investors authorized it to release the Mortgage without payment.

Apparent authority "is the authority which a reasonably prudent person, exercising diligence and discretion, in view of *the principal's* conduct, would naturally suppose the agent to possess." *Brayboy v. Advoc. Health & Hosp. Corp.*, 2024 IL App (1st) 221846, ¶ 24 (opinion not yet published in permanent law reporters) (emphasis added); *see also*, *Wing v. Lederer*, 77 Ill.App.2d 413, 417 (2d Dist. 1966). Apparent authority requires (a) the principal's consent or knowing acquiescence to the agent's exercise of authority, (b) the third party's knowledge and good-faith belief that the agent possessed such authority, and (c) the third party's detrimental reliance on the agent's apparent authority. *Weil, Freiburg & Thomas, P.C. v. Sara Lee Corp.*, 218 Ill.App.3d 383, 390 (1st Dist. 1991).[12] "One dealing with an assumed agent is duty bound to acertain [sic] the extent of the agent's authority … anyone dealing with such agent must, at his own peril, ascertain not only the fact of the agency, but also the extent of the agent's authority." *Wing*, 77 Ill.App.2d at 417.

DLP argues that the Individual Investors acquiesced to Equitybuild Finance acting on their behalf because the Mortgage lists the lenders as "care of Equitybuild Finance." DLP points to only one case to support that a reasonable interpretation of the term "care of" is that the first party is consenting to the second party's exercise of

---

[12] "Apparent authority" can also be called "authority by estoppel," because "[a] principal that places an agent in a situation where the agent may be presumed to have authority to act is estopped as against a third party from denying the agent's apparent authority." *Weil*, 219 Ill.App.3d at 390.

authority. That case, *5201 Washington Invs., LLC & Arthur Bertrand v. Equitybuild, Inc.*, is a Cook County Circuit Court opinion, which is not binding authority on this court. *Id.*, No. 22-CH-1268, 2023 Ill. Cir. LEXIS 79 (Cir. Ct. of Cook Cnty. May 18, 2023). I disagree with that court's conclusion that listing the lenders as "care of" Equitybuild Finance on the Mortgage indicates that the Individual Investors granted Equitybuild Finance authority to release the Mortgage on their behalf. *See Weil*, 218 Ill.App.3d at 391 (analyzing whether the principal consented to or knowingly acquiesced to the specific exercise of authority). I also note that the determinative question in *5201 Washington Investors* was whether the mortgage and release, considered together, should have put a subsequent purchaser on notice that there might be an issue with the chain of title. *See 5201 Wash. Invs.*, 2023 Ill. Cir. LEXIS 79, at **10–15 (determining that the defendants were bona fide purchasers because they lacked notice that the release was fraudulent).[13] That is a different inquiry than whether Equitybuild Finance had apparent authority to execute the release of the Individual Investors' mortgage, such that the Individual Investors should be estopped from denying the validity of the release.

DLP points to no other evidence of the *Individual Investors'* actions that would lead it to believe that they had consented to Equitybuild Finance releasing the

---

[13] The other case cited by DLP, *Bank of New York v. Langman*, concerns a forged release but there is no discussion of who signed the release, so it is not relevant to a determination of whether a release signed by someone other than the mortgagee is valid. *See id.*, 2013 IL App (2d) 120609, ¶¶ 17–20. Furthermore, *Langman* is about whether subsequent purchasers could rely on the release or whether it should have put them on inquiry notice; again, that is a different legal question than whether a mortgage's language creates a reasonable basis to believe that a party other than the mortgagee has the authority to release the mortgage.

24

mortgage on their behalf. The principal's actions must be the basis for the reasonable belief that an agent has the requisite authority. *See Schoenberger v. Chicago Transit Auth.*, 84 Ill.App.3d 1132, 1136 (1st Dist. 1980); *Weil*, 218 Ill.App.3d at 390. For that reason, neither Equitybuild's real estate attorney's opinion letter, nor the affidavit of lost note prepared and signed by Equitybuild Finance is evidence of Equitybuild Finance's apparent authority. The same is true for the title commitment and the closing protection letter issued by the title insurance company.

It is DLP's burden to show that Equitybuild Finance had the authority, actual or apparent, to release the Individual Investors' mortgage. *Schoenberger*, 84 Ill.App.3d at 1136. DLP has not done so. The release of the Individual Investors' mortgage was signed by someone other than the mortgagee or their legal representative, so it is not valid. The Individual Investors have a first-position secured interest in the proceeds of 6160–6212 S. Martin Luther King Drive and should receive *pro rata* shares of those proceeds, using a net loss calculation method.

## C.  Shatar Capital LLC and 5450 S. Indiana Ave. & 7749 S. Yates Ave.

Equitybuild solicited funds to invest in 5450 S. Indiana Ave. and 7749 S. Yates Ave. from both Individual Investors and Shatar Capital and represented to both that they had a first-position lien in the properties to secure their loans. The Receiver recommends that Shatar's claim be considered an equity investment because the Shatar and the Cohens agreed to a *heter iska*; the parties also dispute who has the senior lien in the properties.

25

1.   *Heter Iska*

A *heter iska* is an agreement under Jewish law that treats money loaned to another as an investment in a business venture. The owner of the venture, i.e., the borrower, pays a fixed monthly return to the lender as a share of profits from the venture. This agreement allows religious Jews to lend and borrow money to one another without formally charging interest, which is prohibited by Jewish law. *See In re Venture Mortg. Fund, L.P.*, 245 B.R. 460, 466 (Bankr. S.D.N.Y. 2000), *aff'd*, 282 F.3d 185 (2d Cir. 2002); *see also Barclays Discount Bank, Ltd. v. Levy*, 743 F.2d 722, 724 n.2 (9th Cir. 1984). When other contracts exist that define the relationship between two parties, the *heter iska* does not supersede the language of the underlying contract. *See Edelkind v. Fairmont Funding, Ltd.*, 539 F.Supp.2d 449, 454 (D. Mass. 2008), *abrogated on other grounds by Culhane v. Aurora Loan Servs. of Nebraska*, 708 F.3d 282 (1st Cir. 2013); *cf. Colby v. Newman*, No. CV 11-07413 JGB(RZx), 2013 WL 12124390, at *12 (C.D. Cal. June 11, 2013) (if religious agreement is the only contract between the parties, then it can be enforceable).

In this case, Shatar and Equitybuild contracted through the note and mortgage; the *heter iska* was something that Daniel Namvar requested to ensure he was complying with Jewish law, not an agreement to change the terms of the parties' contract. Because the note and mortgage define the Shatar lenders as secured creditors, that is how the secular courts treat them.

2.   *Lien Priority*

Both Shatar and the Individual Investors claim priority in the proceeds of Indiana and Yates properties. For mortgages, deeds, and other instruments of writing

26

to be enforceable against third parties, they must be recorded: "[A]ll such deeds and title papers shall be adjudged void as to all such creditors and subsequent purchasers, without notice, until the same shall be filed for record." 765 ILCS 5/30. This means that the first person to record a deed or mortgage has priority. The case law further recognizes:

> the statute gives a priority to the deed first recorded only where the grantee of the recorded deed has acted fairly and in good faith. A subsequent purchaser who has notice before he buys a particular parcel that a deed has been executed to another person is bound by the former deed even though his own deed be recorded first.

*Reed v. Eastin*, 379 Ill. 586, 592 (Ill. 1942) (cleaned up).[14] A subsequent purchaser or mortgagee "having notice of facts which would put a prudent man on notice is chargeable with knowledge of other facts which he might have discovered by diligent inquiry. Whatever is notice enough to excite attention and put the party on his guard is notice of everything to which such inquiry might have led and every unusual circumstance is a ground of suspicion and demands investigation." *Id*. The party charging notice has the burden of proof. *Id*.

The Individual Investors' mortgage on 7749 S. Yates was executed first, then the Shatar Lenders' mortgages on 7749 S. Yates and 5450 S. Indiana were executed, and lastly the Individual Investors' mortgage on 5450 S. Indiana was executed. The

---

[14] Although much of the case law is about purchase of property, courts recognize that similar rules apply to liens against a property. *See Life Sav. & Loan Ass'n of America v. Bryant*, 125 Ill.App.3d 1012, 1019 (1st Dist. 1984) ("Where, however, the mortgagee, at the time of taking the mortgage, has knowledge or legal notice of a prior conveyance, it is not entitled to the protection of a bona fide purchaser."); *see also US Bank N.A. v. Villasenor*, 2012 IL App (1st) 120061, ¶¶ 58–60, 54 (finding that bank was not a bona fide mortgagee because it had inquiry notice of prior owner's continuing interest in the home).

27

Shatar Lenders' mortgages were both recorded on April 4, 2017, close in time to the actual transactions. The Individual Investors' mortgages were recorded on June 23, 2017. Following the rule of first-in-time to record takes priority, Shatar would have the priority lien in both properties. However, Shatar's mortgages only have priority if they recorded their liens without notice of the Individual Investors' liens (or any potential equitable lien).

Notice can be actual or constructive; actual notice is self-explanatory—what did the party know at the time of the transaction? *Almazan v. 7354 Corp.*, 2023 IL App (1st) 220794, ¶ 25. "[C]onstructive knowledge is knowledge that the law imputes to the purchaser," and is divided into two sub-types—record notice and inquiry notice. *Id*. Record notice is the information kept by the office of the recorder of deeds or registrar. *Id*. Inquiry notice occurs when the information available to the purchaser or mortgagee would cause a prudent person "to think twice"; the law imputes "knowledge of facts that he or she would have discovered by diligent inquiry" to a purchaser or mortgagee on inquiry notice. *Id*. at ¶ 26; *see also AS1, LLC v. Celtic Home Solutions, LLC*, 2022 IL App (1st) 220485, ¶ 33 ("A purchaser of real estate may rely on the public record of conveyances and instruments affecting title unless he has notice or is chargeable with notice of a claim or interest that is inconsistent with the record."); *U.S. Bank N.A. v. Johnston*, 2016 IL App (2d) 150128, ¶ 45 ("a purchaser having notice of facts that would put a prudent man on inquiry is chargeable with knowledge of other facts he might have discovered by diligent inquiry").

Shatar (and other institutional lenders) argue that the knowledge imputed to those on inquiry notice is limited to what a purchaser or mortgagee would have found through a "title search" and because there was no mortgage in the records at the time, Shatar can't be charged with notice of another lien. But inquiry notice is different than record notice—all purchasers and mortgagees are charged with knowledge of what was in the recorder of deeds' public records at the time of the transaction. *In re County Collector*, 397 Ill.App.3d 535, 549 (1st Dist. 2009). Inquiry notice is about what information could be found out during the "title search process," but nowhere is "title search process" defined so narrowly that it's only what exists in the public records. *See County Collector*, 397 Ill.App.3d at 549; *Stump v. Swanson Dev. Co. LLC*, 2014 IL App (3d) 110784, ¶ 104.

In *Stump*, the court analyzed whether a lender's mortgage was valid because plaintiff Stump conveyed title to properties to his business partner and relied on a promise that he would be paid for the properties when their redevelopment plan became profitable. 2014 IL App (3d) 110784, ¶¶ 3–6. The business partner borrowed money using the properties as collateral and used the loan proceed for costs other than the development project. *Id*. at ¶¶ 5–9. The court asked what information the prospective lender would have found had it inquired into Stump's interest and concluded that, had the bank talked to Stump and examined the documents then existing between Stump and the business partner, it would have learned that the plan was "working"—that Stump thought he would be paid back from profits from the development of the property and there was no indication that the business

29

partner was going to behave differently. *Id.* at ¶¶ 117–19.[15] In this case, however, an inquiry into the relationship between the Individual Investors and Equitybuild would have uncovered that Equitybuild was promising a first position lien to the Individual Investors and sending loan documents with mortgages to the Individual Investors upon accepting their money.

For 7749 S. Yates, Shatar was on inquiry notice that there were other investors who had an interest in the property. First, Shatar received an email stating that Equitybuild Finance pooled money from individual investors to invest in a specific property and that it represented to those investors, "[a]s with all other EBF notes," they would have a "first lien position on the property." [1537] at 177. Shatar argues that because the email was sent in relation to a different property, it is not relevant to Shatar's knowledge about Yates and Indiana. I agree that it is not direct evidence that Shatar knew that there were other investors in Yates and Indiana, but the email is evidence that Shatar knew that Equitybuild Finance had a business model where it promised a first lien position to "all other" individual investors who had pooled their money to invest in a property.

Second, Namvar sent an email to Equitybuild confirming that he understood Equitybuild Finance was pooling smaller investors' loans to buy property: "Since we have become aware of your business structure, assuming your previous deals have

---

[15] The business partner "defaulted" on a promised payment to Stump about two months before the business partner obtained the last loan on the property, so for most of the transactions there was no delinquency or indication that the business partner was not following his promises. *Stump*, 2014 IL App (3d) 110784, ¶ 118.

been closed with crowdfunding investors, we need to make sure your refinancing of already closed deals are allowed and kosher[.]" [1537] at 179. Third, Equitybuild sent Namvar the template note, mortgage and servicing agreements for individual investors, which gave notice that individual investors were getting a mortgage to secure their loans. [1537] at 203–46. Namvar testified that he did not read those documents, [1537] at 116–17 (95:20–96:14), but Namvar can't disclaim notice just because he did not read through an email sent to him by the potential borrower.

Most importantly, Shatar knew that Equitybuild had already purchased 7749 S. Yates, so its loan was not being used to purchase the property. *See* [1602-1] at 170–74 (March 14, 2017 email that purchase transaction for 7749 S. Yates had already closed); *see also* [1602-1] at 162–63 (internal March 20, 2017 Shatar email stating Yates had been purchased).[16] A prudent person would have been alarmed to find out one of the properties which was supposed to be purchased with her loan had already been purchased—it suggests that the money for the purchase was supplied by someone else. Namvar knew that Equitybuild was going to receive money from the closing of Shatar's loan and he had previously believed that Equitybuild had to bring money to the table to close the deal for 5450 S. Indiana and 7749 S. Yates. See [1602-1] at 168. A reasonably prudent person who believed that Shatar's loan was going to be used to purchase 5450 S. Indiana and pay off the purchase loan for 7749 S. Yates,

---

[16] In his deposition, Namvar states he thought it could have been a "desktop closing," but does not explain why that means there would not be money from another source to fund the purchase. *See* [1537] at 68–69 (47:17–48:07). Namvar acknowledges that these types of closings are "very rare"—if Namvar thought something out of the norm was happening, he needed to investigate to find out the truth of the situation.

*and* that Equitybuild needed to put up more money to complete the transaction, would be alarmed to learn that Equitybuild was actually getting money out of the transaction.

The facts that Shatar could have learned through a diligent inquiry would have led it to know that other investors already had a mortgage against 7749 S. Yates. *See Johnston*, 2016 IL App (2d) 150128, ¶ 45 (person on notice is charged with facts that could be learned from diligent inquiry). If a lender knew that his loan was being used to re-finance an existing loan, it is reasonable to ask for proof that the prior loan was paid off. Namvar asked a general question about re-financing loans, but just received blank copies of rollover forms. *See* [1537] at 180–83. There is nothing in the record to suggest that Namvar asked how Equitybuild purchased 7749 S. Yates or for proof that the prior loan on 7749 S. Yates had been paid off. If he had, he would have learned that the original loan was made by a group of smaller investors and that there were no rollover documents for those investors. If, as the court in *Stump* posited, Namvar had spoken with the Individual Investors, he would have learned that they believed they had a first position lien in the property and that a signed mortgage granting a lien to the Individual Investors already existed. *See* [1537] at 306–313.

Namvar can be charged with knowledge of an existing lien on 7749 S. Yates, so the Individual Investors' lien takes priority over Shatar's mortgage. *See Bryant*, 125 Ill.App.3d at 1019 ("One who takes a mortgage upon property with knowledge, either actual or constructive, of an earlier although unrecorded conveyance of it, takes

32

it subject thereto and will not be permitted by placing his mortgage first on the record to gain priority over the earlier lien."). The Individual Investors should receive *pro rata* shares of the money in the 7749 S. Yates bank account, using a net loss calculation method.

For 5450 S. Indiana, there was no signed mortgage in favor of the Individual Investors at the time that Shatar made its loan to Equitybuild, and received and recorded its mortgage against the property. The legal questions, therefore, are what, if any, legal interest did the Individual Investors hold in 5450 S. Indiana at that time, can inquiry notice be applied to that kind of legal interest, and did Shatar have inquiry notice of the Individual Investors' interest in the property?

The Individual Investors and Receiver posit two legal theories that the Individual Investors had a cognizable interest in 5450 S. Indiana before Shatar—that the Individual Investors had (1) an equitable mortgage or (2) an equitable lien. An equitable mortgage arises when "money is loaned or credit given in reliance upon the security of property of the debtor but pledged by him in such manner as not to be enforceable as a mortgage at law." *Wilkinson v. Johnson*, 29 Ill.2d 392, 398–99 (Ill. 1963). A court may find an equitable mortgage when a written agreement evinces an intent that "the property therein described is to be held, given, or transferred as security for the obligation." *Hibernian Banking Ass'n v. Davis*, 295 Ill. 537, 543 (Ill. 1920); *see also Grigaitis v. Gaidauskis*, 214 Ill.App. 111, 117 (1st Dist. 1919) ("Pursuant to the maxim that equity will consider that which ought to be done as already in being, the promise to give a mortgage to secure a loan may be treated as

33

an actual mortgage."). The intent that a written instrument should serve as an equitable mortgage must be shown by "clear, satisfactory and convincing evidence." *Wilkinson*, 29 Ill.2d at 399.

Equitybuild began soliciting investments from Individual Investors as early as December 2016 and returned a signed servicing agreement and unsigned mortgage and promissory note to those individuals. *See* [1602-1] at 66–107. The promissory note was dated February 6, 2017, and stated that the debt would be secured by a mortgage in 5450 S. Indiana Ave. Chicago, IL 60615. [1602-1] at 66–67. Each Individual Investor signed Exhibit A to the promissory note with the amount of their loan and the monthly interest amounts to be received. [1602-1] at 75. The unsigned mortgage listed the total amount of the Individual Investors' loan and specifically referred to 5450 S. Indiana as the property in which an interest was being granted; a final page was signed by each Individual Investor with the percentage of the total loan and the amount of monthly interest to be received. [1602-1] at 76, 82. Finally, the Collateral Agency and Servicing Agreement between Equitybuild Finance and each Individual Investor referenced the February 2, 2017 note and defined the "Mortgage" as how it was specified in the "Note" and gave the term "Collateral" the meaning defined in the Mortgage. [1602-1] at 84–86. All three documents evince that the parties intended the Individual Investors to be granted an interest in 5450 S. Indiana to secure their loan. These documents are clear and convincing evidence that the parties intended that 5450 S. Indiana secure the Individual Investors' mortgage

34

and I find that the Individual Investors had equitable mortgages in 5450 S. Indiana and do not reach whether they had a distinct equitable lien.[17]

A second-in-time mortgagee who had notice of an equitable interest in a property can have its interest subordinated to that equitable interest. *See Villasenor*, 2012 IL App (1st) 120061, ¶¶ 58–59, 63–64, 71 (relying on possession by someone other than record title holder to find that second-in-time mortgagee was on inquiry notice and subordinating the second-in-time mortgage to an equitable mortgage). As discussed above, Shatar knew of Equitybuild Finance's general business model of pooling money from smaller investors and granting those investors a lien in the property; Namvar had the template documents in his possession. [1537] at 177, 203–246. Shatar also knew that Equitybuild was getting cash from the closing of the purchase of 5450 S. Indiana, when it had believed that its loan was going to be used to purchase 5450 S. Indiana. [1602-1] at 168.

While it is possible that the money out to Equitybuild was "coming from" the portion of the Shatar loan that was secured by 7749 S. Yates, the very fact that Equitybuild was getting cash out should have put Shatar on notice that the deal was different than expected. *See Reed*, 379 Ill. at 592 ("[E]very unusual circumstance is a

---

[17] "Equitable lien" and "equitable mortgage" are often used interchangeably. *See, for example*, *Pacini v. Ragopoulos*, 281 Ill.App.3d 274, 282 (1st Dist. 1996). An "equitable mortgage" requires a writing, and in turn gives the grantee more rights vis-à-vis that property: "where an instrument manifests an intent to charge or pledge property as security for a debt, and the property is identified, a lien will be recognized in equity." *Trustees of Zion Methodist Church v. Smith*, 335 Ill.App. 233, 237 (4th Dist. 1948). An "equitable lien" on the other hand can arise without a writing (although rarely) and is simply "the right to have property subjected to the payment of a claim. It is neither a debt nor a right of property, but a remedy for a debt." *Cole Taylor Bank v. Cole Taylor Bank*, 224 Ill.App.3d 696, 703–04 (1st Dist. 1992) (internal citation omitted).

ground of suspicion and demands investigation."). Finally, had Shatar inquired whether Equitybuild was getting money from another source to invest in 5450 S. Indiana, the documents existing at that time included the promissory notes, mortgages, and servicing agreements granting the Individual Investors an interest in 5450 S. Indiana. Shatar is charged with knowledge of the Individual Investors' equitable mortgages in 5450 S. Indiana and takes a second-place position.[18]

The Institutional Lenders point to *Stump* for the proposition that an equitable mortgage cannot supersede a recorded mortgage because *Stump* held that the doctrine of inquiry notice does not apply to implied vendor liens, an equitable lien. *See* 2014 IL App (3d) 110784, ¶¶ 94–102. But *Stump* relied on the fact that an implied vendor lien is "not an interest or estate in the property" nor is it an "instrument of writing which is authorized to be recorded," so it is not implicated by the Illinois Conveyances Act (and the resulting application of inquiry notice). *Id*. at ¶ 100. Unlike an implied vendor lien, however, equitable mortgages are recognized by the Illinois Mortgage Foreclosure law as "mortgages." *See Gandy v. Kimbrough*, 406 Ill.App.3d 867, 876 (1st Dist. 2010). Equitable mortgages therefore fall within the Conveyances

---

[18] Shatar, and other Institutional Lenders argue that the Individual Investors must show they have the right to equitable subrogation in order to supersede the Institutional Lender's lien. Equitable subrogation is appropriate when a later lender's loan is used to pay an earlier loan and the later lender's lien is treated as taking the position of the first lender's lien (often over a lien that was recorded between the time of the first and second loan). *See Aames Capital Corp. v. Interstate Bank of Oak Forest*. 315 Ill.App.3d 700, 705–07 (2d Dist. 2000) (ultimately holding that conventional subrogation applied to mortgage refinancing agreement). This is not a case where one lender is taking the lien position of another, instead the issue is whose lien should have priority, i.e., whether the Institutional Lenders' liens should be subordinated to the Individual Investors' liens due to the Institutional Lenders being on inquiry notice.

36

Act's recordation rules and the exception for a purchaser or mortgagee who is on notice of an earlier deed or interest. *Gandy*, 406 Ill.App.3d at 876–78 (finding that equitable mortgage superseded interest of third-party purchaser who was on inquiry notice).

The Individual Investors should receive *pro rata* shares of the money in the 5450 S. Indiana bank account, using a net loss calculation method. If there are funds remaining, then Shatar should recover its principal using a net loss calculation method.

### D.   Thorofare Capital, Inc. and 1700–08 Juneway Terrace

#### 1.   *Lien Priority*

Equitybuild began soliciting money from individual investors for 1700 Juneway as early as March 1, 2017, and sent investors signed Servicing Agreements, and unsigned copies of the mortgage and promissory, *see* [1602-1] at 18–65, but did not execute a mortgage in favor of the Individual Investors until April 6, 2017. [1563-3] at 2–10. The Individual Investors' mortgage was not recorded until June 23, 2017. [1563-3] at 2.

Equitybuild borrowed $2,175,000.00 from Thorofare Capital, Inc; some of the money was used to purchase 1700 Juneway Terrace and $600,000.00 was put into a capital expenditure reserve to be drawn on for improvements to the property. [1602-1] at 176–77.[19] Equitybuild's purchase of 1700 Juneway Terrace closed on April 6,

---

[19] Equitybuild put up $1 million of its own money to close the deal. [1602-1] at 176. There were also reserves (money held back from the loan) for taxes, interest, immediate repairs, and insurance. [1602-1] at 176.

2017, and Equitybuild executed a mortgage to Thorofare Capital on the same day. *See* [1563-1] at 2–55. Thorofare's mortgage was recorded on April 11, 2017. *Id.* at 2.

The Individual Investors argue that Thorofare was on inquiry notice of their interest in 1700 Juneway at the time that it made the loan to Equitybuild so its lien should be subordinated to theirs. As with the facts described above for 7749 S. Yates and 5450 S. Indiana, the Individual Investors had been making investments for some time before Thorofare gave a promissory note to Equitybuild on April 6, 2017. *See* [1588-7] at 2–13. While the record does not reveal which mortgage was executed first on April 6, 2017, the facts support a finding that the Individual Investors obtained an equitable mortgage in 1700 Juneway when they sent money to Equitybuild and received the mortgages, notes, and servicing agreements.

The next issue is whether Thorofare was on inquiry notice of the Individual Investors' prior lien when it made the loan to Equitybuild and obtained its interest in Juneway. Thorofare apparently commissioned a background investigation into Jerome Cohen. [1571] at 51–59. The document relates that Equitybuild "syndicates its real estate deals to investors and markets itself as 'a way for hard working people to secure their financial future.'" [1571] at 53. The investigation uncovered that Cohen had been sought by the police in 1993 and went through a lengthy bankruptcy beginning in 1994. [1571] at 55, 58. The background report also reflected that the State of Florida's Office of Financial Regulation had filed suit against Cohen in 2013, but that a hearing in 2014 was cancelled and the case was listed as "disposed." [1571] at 57.

38

Aside from the general statement that Equitybuild acted as a syndicator for smaller investors, there is nothing in this report that would put Thorofare on notice that there was another party (or parties) with an interest in 1700 W. Juneway. The record does not reflect whether Thorofare knew that Equitybuild was going to put up a portion of its own money as part of the transaction. All of the other negative information in the background report was about Cohen's creditworthiness, real estate tax issues, and criminal history. While relevant to a determination of whether Thorofare wanted to lend to Cohen, this information is not about the 1700 W Juneway deal and is not a basis to find that Thorofare was on inquiry notice of the Individual Investors' lien. As such, Thorofare has a first-position lien in the proceeds of 1700 W. Juneway.[20]

### 2. Calculating Recovery

Thorofare challenges the Receiver's application of the netting rule to its loans. For 1700 Juneway, Thorofare argues that it should be able to recover the $54,375 loan origination fee, $5,000 processing fee, and $10,973.50 prepaid interest because those amounts were loaned to Equitybuild and not paid back. [1588] at 14. But that money was not an outlay from Thorofare. The fees and pre-paid interest may have been normal parts of the transaction if Equitybuild were legitimate, ongoing concern, but that is not the case here. The distribution plan is attempting to ensure that as many people receive some kind of recovery on the money that left their "pockets" and

---

[20] This analysis also applies to Deborah Mullica's argument about equitable subordination made in her position statement. *See* [1555].

went to Equitybuild. *See Capital Consultants*, 397 F.3d at 737 (describing net loss recovery as "money-in, money-out" calculation). Because Thorofare received the fees and prepaid interest from Equitybuild at the closing, *see* [1602-1] at 176, they do not count as part of Thorofare's principal and are not losses to be compensated from the receivership estate. As for funds held in reserve, those funds never left Thorofare, so do not count as part of Thorofare's loss.

Because I find that no secured party should be able to recover accrued interest, I do not address Thorofare's arguments about how interest should be calculated. Finally, to the extent that Thorofare disputes the amount of interest payments it received from Equitybuild, it should have disclosed the correct amounts in its initial proof of claim; I accept the Receiver's estimate as a reasonable calculation of the interest payments received by Thorofare.

### E. Miscellaneous Issues

I accept the Receiver's recommendations as to the following miscellaneous issues. First, that claimants who rolled over their secured investment in specific properties into an equity position or an unsecured promissory note should be treated as unsecured creditors. *See* [1571] at 19 (list of properties and related investors who rolled funds over). Second, I agree that claimants whose funds were not actually rolled from a secured to an unsecured investment should retain their secured interests. *See* [1571] at 20 (list of properties and related voided rollovers). Finally, I will address claimants Optima Property Solutions and Eleven St. Felix Realty Corp's claims that were originally to 5450 S. Indiana when I address the properties in which

40

their money was finally invested.[21] Finally, Entrust Group FBO Daniel Matthews IRA executed a release of its lien, which was recorded in the chain of title for 6160 S. Martin Luther King, so it does not have a secured interest in the property. *See* [1537] at 360–63.

Participants in the fraudulent scheme should not receive any money from the receivership. *See S.E.C. v. Enterprise Trust Co.*, No. 08-cv-1260, 2008 WL 4534154, at \*6 (N.D. Ill. Oct. 7, 2008) *aff'd,* 559 F.3d 649 (7th Cir. 2009). I have previously denied John Allred's claim because of his participation in the fraud. *See* [1528] (order disallowing Allred's claim in Group 3 due to his participation in the scheme); *see also* [1602-1] at 109, 114 (John Allred cc'ed on signature documents for individual lender and email confirming receipt of funds). Furthermore, in response to the Receiver's recommendation, Allred did not dispute that he was part of the fraudulent scheme. I accept the Receiver's recommendation and disqualify Allred's claim.

I also accept the Receiver's recommendation that CLD Construction, Inc., CLC Electric, Inc., and Bauer Latoza Studio, Ltd. should be treated as unsecured claimants and those unsecured claims be disallowed where the claimants provided insufficient records to support their claim.

Claimant Paul Harrison moved to reinstate his claim to the proceeds of 5450 S. Indiana and that motion was approved. *See* [1600] *and* [1614]. Harrison's claim

---

[21] This does not affect Eleven St. Felix Street Realty Corp.'s claim to 6160–6212 S. Martin Luther King.

should be included as part of the Individual Investors' claims against 5450 S. Indiana and treated accordingly.

Because I find that DLP and Shatar's liens do not have priority under Illinois law, I do not address whether their liens could be voided as fraudulent conveyance. Both parties' motions for discovery on fraudulent conveyance issues, [1546] and [1547], are denied as moot.

## IV. Conclusion

The Individual Investors (of each respective property) have a first-position lien in the proceeds of 6160–6212 S. Martin Luther King Drive, 7749 S. Yates, and 5450 S. Indiana Ave. DLP has a second-position lien in the proceeds of 6160 S. Martin Luther King; Shatar has a second-position lien in the proceeds of 7749 S. Yates and 5450 S. Indiana Ave. Thorofare has a first-position lien in the proceeds of 1700–08 Juneway Terrace. The Individual Investors have a second-position lien in the proceeds of 1700–08 Juneway. Any objections to the notice of settlement for Property 101 (6949–59 S. Merrill Ave.) must be filed by July 5, 2024.

All secured claimants in first position should recover a *pro rata* share of the proceeds, based on the amount of their original principal, minus any amounts received from Equitybuild. If any proceeds remain, then secured claimants in second position should be entitled to the same type of distribution. Any proceeds remaining after that should be transferred to the Receiver's general account for later distribution to unsecured claimants and administrative expenses. The motions for discovery, [1546] and [1547], are denied as moot.

The Receiver shall prepare proposed distribution orders consistent with this opinion and submit them to proposed_order_shah@ilnd.uscourts.gov on or before July 12, 2024.


ENTER:

Manish S. Shah
United States District Judge

Date: June 20, 2024