CERTIFIED COPY
A True Copy
Teste:

_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 23-1870

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

and

KEVIN B. DUFF, Receiver, *et al.*,

*Appellees,*

*v.*

EQUITYBUILD, INC., *et al.*,

*Defendants,*

APPEAL OF: BC57, LLC.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18-cv-5587 — **Manish S. Shah**, *Judge.*

_____

ARGUED JANUARY 22, 2024 — DECIDED MAY 6, 2024

_____

Before EASTERBROOK, ST. EVE, and JACKSON-AKIWUMI, *Circuit Judges.*

Case: 1:18-cv-05587 Document #: 1684 Filed: 06/24/24 Page 2 of 16 PageID #:114030
Case: 23-1870     Document: 00714397991     Filed: 06/24/2024     Pages: 16

2                                                                   No. 23-1870

ST. EVE, *Circuit Judge*. After the collapse of a real estate Ponzi scheme, investors filed claims in hopes of getting their money back. This appeal concerns the proceeds from the liquidation of five properties over which individual investor-claimants and a private lender, BC57, both claim priority. Following the court-appointed receiver's recommendation, the district court awarded priority to the individual investors because their security interests were first in time and were never extinguished. BC57 now appeals that decision, and we affirm.

## I. Background

### A. The Scheme

Jerome and Shaun Cohen ran a Ponzi scheme through their real estate companies EquityBuild, Inc. and EquityBuild Finance, LLC ("EBF") from at least 2010 to 2018. The scheme began with the Cohens, through EquityBuild, selling promissory notes to investors, each note representing a fractional interest in a specific real estate property. They promised interest rates ranging from 12% to 20%. A mortgage on the respective properties, mostly located in underdeveloped areas of Chicago, secured each of the notes.

As part of their transactions with investors, the Cohens drafted, and the investors executed, a Collateral Agent and Servicing Agreement ("CAS"). The CAS granted certain rights and powers to EBF, which was to act as a "collateral agent" and service the loans. Thus, the mortgages were structured as between EquityBuild (the borrower) and the individual investors (the lenders), "care of" EBF—an entity distinct from EquityBuild despite the similar names.

The CAS authorized EBF to issue monthly statements and payoff demands, and to demand, receive, and collect loan

No. 23-1870 3

payments. It also limited EBF's powers, including by requiring written instructions from the individual investors prior to foreclosure, amendment or termination of the mortgage, or other actions.

In addition to a CAS, many of the investors also signed an untitled document listing the investor's name, amount invested, percent ownership of the total loan, and monthly interest payment the investor would receive. Beneath the lender's signature line appeared a statement that purported to provide EBF with the authority to receive payment on behalf of the investor and issue and execute a release of the mortgage.

By overvaluing the properties involved in the scheme, the Cohens generated money that they pocketed as undisclosed fees and used to pay earlier investments. The overvaluation also meant that, contrary to representations, the investments were not fully secured.

As it became more difficult for the Cohens to sustain making interest payments to investors, they found ways to put off those payments and continue their scheme. That mischief resulted in a new business model in 2017. Instead of offering investors promissory notes, the Cohens began offering opportunities to invest in real estate funds. As before, they told investors that EquityBuild would pool investments to buy and renovate properties at exceptional rates of return. The Cohens apparently used much of these later investments to make payments to earlier investors.

At that stage, BC57, LLC, a private lender and investor, lent roughly $5.3 million to EquityBuild, allegedly in exchange for a first mortgage on the five properties at issue, all

on the south side of Chicago. Those five properties were already owned by EquityBuild and were subject to preexisting liens from the individual investors here. To deal with the problem of competing security interests, EBF provided false payoff letters to BC57 at closing purporting to pay the existing loans secured by existing liens on the five properties with BC57's investment. BC57's settlement agent, Near North National Title Company, received the payoff letters as escrowee. Near North also received executed releases for each property, with Shaun Cohen signing off as EBF manager on all five releases.[1] The releases stated:

> Know all men by these presents, that EQUITYBUILD, INC. for and in consideration of TEN DOLLARS ($10.00) and for other good and valuable considerations, the receipt of which is hereby confessed, does hereby remise, convey, release, and quit-claims unto EQUITYBUILD FINANCE, LLC of the County of COLLIN, State of TEXAS, all rights, title, interest, claim or demand whatsoever he/she may have acquired in, through or by a certain Mortgage bearing the date of [2/21/2014 or 12/30/2014].

Each release included the address and a description of the released property. Each was notarized and recorded. Individual investors did not sign any of the releases, however, nor did they receive any money from BC57's payment.

---

[1] The mortgage for one of the properties, 7752 S. Muskegon Ave, listed the lender as the individual investors "c/o Hard Money Company, LLC," not EBF. Yet Cohen signed this release on behalf of EBF, not Hard Money Company.

The scheme collapsed in 2018 after the Cohens admitted that EquityBuild had funded investor interest payments with later investments. The Securities and Exchange Commission ("SEC") filed suit shortly thereafter against the Cohens, EquityBuild, and EBF, alleging violations of various sections of the Securities Exchange Act of 1934 and Securities Act of 1933.

**B. Procedural Background**

The SEC obtained a temporary restraining order against the Cohens, and the district court appointed a receiver to develop a plan for the recovery and liquidation of all remaining, recoverable receivership assets. The receiver later filed a liquidation plan identifying the properties owned by EquityBuild. Among them are the five properties at issue in this appeal. With approval from the district court, the receiver sold the five properties and now holds the proceeds, over $3 million, pending the resolution of the claims process at issue here.

The individual investors whose loans BC57's investment purportedly paid off claim priority to those proceeds, arguing that they never received payment or released their interests, despite the releases signed by Shaun Cohen. BC57 disagrees and asserts that it has priority. The district court ultimately awarded priority to the individual investors, finding that the mortgage releases were facially defective and that EBF lacked the authority to execute them. The court also found that BC57's payment in full did not, on its own, extinguish the individual investors' mortgage liens. After entering the final distribution plan, the district court stayed distribution of the proceeds pending the outcome of this appeal.

## II. Analysis

Appealing the interlocutory order, BC57 argues the district court erred by concluding that EBF's receipt of payment did not extinguish prior mortgage liens and by finding the releases of those mortgage liens facially defective and invalid.[2] We take each issue in turn.

### A. BC57's Payment

BC57 claims that its $5.3 million payment in exchange for a mortgage with first priority extinguished the existing liens on the properties, regardless of the validity of the releases signed by Shaun Cohen. Whether BC57 is correct—and is therefore the creditor with first priority over the proceeds from the sale of those properties—depends in part on whether the Illinois Mortgage Act, 765 ILCS 905/2, abrogated the Illinois common law rule that payment of a debt underlying a mortgage automatically extinguishes that security interest.

Generally, we review questions of law de novo. *See Tsareff v. ManWeb Servs., Inc.*, 794 F.3d 841, 848 (7th Cir. 2015). Although we have not explicitly applied that standard of review to a district court's application of law in receivership proceedings, we have done so implicitly. *See Wealth Mgmt.*, 628 F.3d at 334–35. Several of our sister circuits similarly apply de novo review to legal questions in receivership proceedings. *See, e.g., United States v. Acorn Tech. Fund, L.P.*, 429 F.3d 438, 442 (3d

---

[2] We have jurisdiction to consider an interlocutory appeal of a district court's distribution plan under the collateral order doctrine. *See SEC v. Wealth Mgmt. LLC*, 628 F.3d 323, 330–31 (7th Cir. 2010) (holding that a district court order approving a receiver's distribution plan satisfies all requirements for interlocutory review under *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949), and its progeny).

No. 23-1870 7

Cir. 2005); *FTC v. Assail, Inc.*, 410 F.3d 256, 262 (5th Cir. 2005); *SEC v. Wells Fargo Bank, N.A.*, 848 F.3d 1339, 1343 (11th Cir. 2017); *Slattery v. Roth*, 710 F.3d 1336 (Fed. Cir. 2013). We agree.

Under Illinois common law, the payment of a debt underlying a mortgage automatically extinguishes the security interest belonging to the holder of that debt. *See, e.g., Bradley v. Lightcap*, 66 N.E. 546, 548 (Ill. 1903) ("[T]he title conveyed to the mortgagee is a mere incident of the mortgage debt, … and when the debt is paid, discharged, released, or barred by limitation, the mortgagee's title is extinguished by operation of law."). BC57 contends that under this common law rule, its payment of the debt alone, regardless of the validity of the releases, extinguished those interests. This common law rule remains in full effect, BC57 argues, because Section 2 of the Illinois Mortgage Act ("the Act"), passed in 1961, did not abrogate the rule.

The first step Illinois courts take when considering whether a statute has abrogated a common law rule is to ask whether the statute contains a "plainly and clearly stated" expression of abrogation. *Rush Univ. Med. Ctr. v. Sessions*, 980 N.E.2d 45, 50 (Ill. 2012). We therefore first turn to the text of the statute. Section 2 of the Illinois Mortgage Act provides:

> Every mortgagee of real property, his or her assignee of record, or other legal representative, having received full satisfaction and payment of all such sum or sums of money as are really due to him or her from the mortgagor… shall, at the request of the mortgagor, … in case such mortgage or trust deed has been recorded or registered, make, execute and deliver to the mortgagor or grantor in a deed of trust in the nature of a mortgage, … an instrument in

> writing executed in conformity with the provisions of this Section releasing such mortgage or deed of trust in the nature of a mortgage, which release shall be entitled to be recorded or registered and the recorder or registrar upon receipt of such a release and the payment of the recording fee therefor shall record or register the same.
>
> Mortgages of real property and deeds of trust in the nature of a mortgage shall be released of record only in the manner provided herein or as provided in the Mortgage Certificate of Release Act.

765 ILCS 905/2. While the Act obligates a mortgagee to issue a release of the mortgage upon full satisfaction of the debt underlying the lien, it does not expressly abrogate the common law rule that payment automatically extinguishes the lien. It does not even mention the common law rule, let alone provide a "plain and clear statement" rejecting automatic extinguishment of a security interest upon payment of a debt underlying a mortgage.

But the absence of an express statement does not end the inquiry. The Act nevertheless abrogates the common law rule if there is "an 'irreconcilable repugnancy' between the statute and the common law right such that both cannot be carried into effect." *Rush*, 980 N.E.2d at 51 (quoting *People ex rel. Nelson v. W. Englewood Tr. & Sav. Bank*, 187 N.E. 525, 529 (1933)).

Although the Illinois Supreme Court has not spoken on this issue, we are not writing on a blank slate. *See Nationwide Agribusiness Ins. Co. v. Dugan*, 810 F.3d 446, 450 (7th Cir. 2015) (noting that when we exercise diversity jurisdiction, we apply Illinois state law as the Illinois Supreme Court has interpreted

No. 23-1870 9

it). Without guidance from the state's highest court, "decisions of the Illinois Appellate Courts control, unless there are persuasive indications that the Illinois Supreme Court would decide the issue differently." *Id.*

Illinois Appellate Courts have applied the Act to mean that "a perfected mortgage lien remains in effect *unless released pursuant to the Mortgage Act*." *Fed. Nat'l Mortg. Ass'n v. Kuipers*, 732 N.E.2d 723, 728 (Ill. App. Ct. 2000) (emphasis added); *see also N. Shore Cmty. Bank & Tr. Co. v. Sheffield Wellington LLC*, 20 N.E.3d 104, 117–19 (Ill. App. Ct. 2014). In *Kuipers*, the court found that the assignment of a mortgage does not extinguish the original lien, reasoning that under Section 2 of the Mortgage Act, a mortgage lien remains in effect until it is released. 732 N.E.2d at 727. Without a properly executed and delivered release, the lien persists. *Id.* at 728.

*North Shore* similarly held that a mortgage lien is only extinguished upon the delivery of a written release. 20 N.E.3d at 118 (citing 765 ILCS 905/2). It reasoned that, "[w]hile the plain language of section 2 [of the Act] does indicate that full payment is a *necessary* condition before a mortgagee is obligated to release a mortgage, it does not suggest that full payment, by itself, is a *sufficient* condition to release a mortgage." *Id.* The court concluded:

> [The] challenge to the Bank's standing rests entirely on the theory that the Bank released its mortgage by receiving full payment. However, even if there was full payment, the plain language of the Mortgage Act indicates that delivery is necessary before a mortgage is released. Since it is undisputed that there was no delivery, the mortgage has not been released.

Case: 1:18-cv-05587 Document #: 1684 Filed: 06/24/24 Page 10 of 16 PageID #:114038
Case: 23-1870   Document: 00714397991   Filed: 06/24/2024   Pages: 16

10                                                          No. 23-1870

*Id*. at 118–19. In other words, payment alone is not enough.

Due to the deference we owe Illinois Appellate Courts on matters of Illinois state law, we interpret *Kuipers* and *North Shore* to mean that the Act abrogated the common law rule: there must be payment *and* delivery of the release to extinguish a mortgage lien.

*Rockford Life Insurance Co. v. Rios*, cited by BC57, is not to the contrary. *See* 261 N.E.2d 530 (Ill. App. Ct. 1970). In *Rockford*, the Illinois Appellate Court ordered the release of a mortgage after it determined that the note securing the mortgage had been properly paid to the mortgagee's authorized agent. *Id*. at 531–32. At no point did the court find that payment alone extinguished any security interest; indeed, the order to release the mortgage suggests that only upon release is that interest extinguished. In fact, BC57 cannot identify a single decision by an Illinois court applying the common law rule to a transaction occurring after the passage of the Mortgage Act, nor could we find one ourselves.

Finding that under the Illinois Mortgage Act, payment alone does not extinguish any pre-existing interest absent a valid release, we consider whether the release purportedly executed by EBF was valid.

**B. EBF's Release**

The district court found that discrepancies in the releases granted by EBF when BC57 closed the loan rendered those releases facially invalid. It specifically found that those discrepancies were not mere scrivener's errors. BC57 argues this decision was erroneous, claiming that any discrepancies do not

No. 23-1870                                                           11

invalidate the releases because they fall under the doctrine of mutual mistake.[3]

In Illinois, the party arguing mutual mistake has the burden of proving by "clear and convincing evidence" that the parties to a transaction committed a mutual mistake in their written agreement. *Fisher v. State Bank of Annawan*, 643 N.E.2d 811, 814 (Ill. 1994); *see also Wheeler-Dealer, Ltd. v. Christ*, 885 N.E.2d 350, 355 (Ill. App. Ct. 2008). Whether that party has met its burden "is a question of fact" to be resolved by the lower court, whose "decision in the matter will not be disturbed on review unless it is against the manifest weight of the evidence." *Wheeler-Dealer*, 885 N.E.2d at 355.

No party disputes that the releases contain fundamental errors that give rise to uncertainty over who granted them. The releases, purportedly granted by EBF (and signed by Shaun Cohen acting as EBF manager), list EquityBuild as the party issuing the release, even though EquityBuild was the borrower, not the lender or the lender's agent. The signature line, in contrast, lists EBF as the party issuing the release.

Contrary to BC57's arguments, while documents may show that EBF was the *correct* issuer of the releases, BC57 does not present clear and convincing evidence that both parties *intended* for EBF to be the issuer. Nor does BC57 demonstrate that the discrepancies in the releases were merely mutual mistakes. The district court concluded the opposite, a conclusion that is not against the manifest weight of the evidence. We

---

[3] On appeal, the investors argue that BC57 waived any argument as to mutual mistake by not raising it below. But Illinois courts treat mutual mistake as a type of scrivener's error, which BC57 did argue to the district court. *See Roots v. Uppole*, 400 N.E.2d 1003, 1006 (Ill. App. Ct. 1980).

find it particularly difficult to fault that determination when the Cohens' entire business model operated to purposefully obfuscate responsibility and ownership. In fact, some of the evidence indicates that EquityBuild, not EBF, exercised control over the releases by directing their contents. An EquityBuild employee set the dollar amounts for payoff quotes. And when the original releases directed BC57 to send payment directly to EquityBuild, that same employee explained that payment should go to EBF instead, not because it was authorized to receive payment on behalf of the individual investors, but because "the optics aren't good." This evidence supports that the release named EquityBuild because it directed the process, not due to a mutual mistake.

The conclusion that the releases were facially invalid is not against the manifest weight of the evidence, so we need not decide whether EBF had the authority to release the mortgages. The releases had no effect, and the individual investors maintain their interests in these five properties.

### III. Conclusion

Because payment alone cannot extinguish a preexisting security interest without a valid release under the Illinois Mortgage Act, and because no valid release occurred, we AFFIRM.

No. 23-1870 13

EASTERBROOK, *Circuit Judge*, concurring. I question the existence of appellate jurisdiction. The district court allowed the receiver to sell five properties and distribute the proceeds to a set of investors; it denied BC57's claim to priority. This order ends the litigation for these investors and BC57. But it does not wrap up the suit. Although all properties in the receivership estate have been sold, other investors' competing claims to the undistributed funds must be resolved. Normally an appeal under 28 U.S.C. §1291 awaits the final decision—i.e., resolution of all claims by and against all parties. Interlocutory appeals from some orders in receiverships are authorized by 28 U.S.C. §1292(a)(2), but no one contends that the district court's order in this case qualifies.

The court today says that the collateral-order doctrine supports an immediate appeal. Slip op. 6 n.2. This reflects a holding of *SEC v. Wealth Management LLC*, 628 F.3d 323, 330–31 (7th Cir. 2010), so I do not dissent. But I doubt that *Wealth Management* is correctly decided.

Appealable collateral orders are orders "that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action." *Swint v. Chambers County Commission*, 514 U.S. 35, 42 (1995). The Court has stressed that this doctrine must not be allowed to displace the norm that appeal under §1291 is not proper until the district court has finished with the case. See, e.g., *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100 (2009).

Did the district court in this case resolve questions "separate from the merits"? Far from being "collateral" to the merits, a decision about who receives how much of the proceeds from a sale *is* the merits. The goal of a receivership is to

marshal and distribute assets. A distribution order such as the one at issue here is the end of the process for the claimants involved, rather than collateral to something else.

*Liberty Mutual Insurance Co. v. Wetzel*, 424 U.S. 737 (1976), tells us that a disposition that resolves both liability and damages equals a decision on the merits. In this litigation, liability for this Ponzi scheme was established years ago, and the court's decision about who gets what supplies the remedy (or, for BC57, sends it away without a remedy). There's nothing more to do in the district court with respect to any of these claimants, and a terminal order can't be "collateral" to the merits.

How about whether the order is "effectively unreviewable on appeal from the final judgment in the underlying action"? That requirement, too, is not satisfied. Once the district court has specified the final distribution, BC57 could present on appeal the same arguments that we resolve today.

BC57 would be unable to enjoy the fruits of an appellate victory if the investors who receive the funds dissipated them in the interim. But that potential problem has multiple solutions. (1) The district court could order the receiver to retain the funds, investing them while the case continues. (2) Distribution to the investors could be conditioned on the posting of security so that the money remains available if a competing claimant prevails on appeal from the final decision. (3) The district court could enter a partial final judgment under Fed. R. Civ. P. 54(b).

The third of these is the most common. Once a district court has resolved all claims by or against a particular litigant, it may enter a partial judgment to facilitate an immediate

appeal. That could have been done here, but apparently no one asked the district judge. Instead BC57 appealed, assertedly as of right, preventing the district judge from exercising discretion to manage the litigation. See *Curtiss-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 7–8 (1980) (discussing district judges' discretion under Rule 54(b)).

*Wealth Management* did not address any of this. The panel took as given that a distribution order in a receivership is collateral to the merits. It did not explain why. Instead it followed *SEC v. Forex Asset Management LLC*, 242 F.3d 325, 330–31 (5th Cir. 2001), and *SEC v. Basic Energy & Affiliated Resources, Inc.*, 273 F.3d 657, 666–67 (6th Cir. 2001). *Forex* is the first in a line of decisions that includes *Basic Energy* and *SEC v. Torchia*, 922 F.3d 1307, 1315–16 (11th Cir. 2019), as well as a handful of nonprecedential decisions. *Forex* did not justify treating a distribution order as "collateral" when it is the final decision on the merits with respect to particular litigants. Nor did it discuss the relation between this supposedly "collateral" order and Rule 54(b). *Wealth Management* and some other circuits followed *Forex* without much elaboration.

All but one. *SEC v. Capital Consultants LLC*, 453 F.3d 1166, 1171–72 (9th Cir. 2006), disagrees with *Forex* and *Basic Energy*. *Capital Consultants* explains why a distribution order of the kind under review today is a decision on the merits. The panel in *Wealth Management* did not cite *Capital Consultants* and apparently did not recognize that it was choosing sides in a conflict among the circuits. (*Wealth Management* did cite an earlier decision in the *Capital Consultants* litigation, but not the decision that discusses the collateral-order doctrine. That earlier appeal reviewed a partial final judgment entered under Rule 54(b). *SEC v. Capital Consultants, LLC*, 397 F.3d 733, 737 n.4

(9th Cir. 2005). The fact that review was possible under Rule 54(b) excludes calling the order "collateral".)

Appellate courts should not use the collateral-order doctrine to nullify the discretion that district judges possess under Rule 54(b) and override the limitations on receivership appeals under §1292(a)(2). Still, there is an established conflict among the circuits, and it is rarely prudent to move from one side of a conflict to the other. The Supreme Court or the Judicial Conference (through its power under 28 U.S.C. §2072(c) to define final decisions) could resolve the conflict. We cannot. I therefore join my colleagues' opinion, which accurately resolves the substance of the litigants' dispute.