**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) | |
| **Plaintiff,** | ) ) | **Civil Action No. 18-cv-5587** |
| **v.** | ) ) | **Hon. Manish S. Shah** |
| **EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN,** | ) ) ) ) | **Magistrate Judge Young B. Kim** |
| **Defendants.** | ) ) | |

**RECEIVER'S MOTION TO APPROVE SETTLEMENT AND RELEASE AGREEMENT
WITH ROCK FUSCO & CONNELLY, LLC AND TO AUTHORIZE PAYMENT OF
CONTINGENCY FEES AND COSTS TO RECEIVER'S COUNSEL**

Kevin B. Duff, as receiver ("Receiver") for the Estate of Defendants EquityBuild, Inc.,

EquityBuild Finance, LLC, their affiliates, and the affiliate entities of Defendants Jerome Cohen

and Shaun Cohen, respectfully moves for approval of a settlement agreement reached with Rock

Fusco & Connelly, LLC and Ioana Salajanu (collectively, "RFC"), pursuant to which the

Receivership Estate will receive a minimum of $9,670,855.10 (representing the full remaining

insurance policy limits for coverage available to RFC, as further described herein), and to

authorize payment of fees and costs to counsel for the Receiver. (*See* **Exhibit A** ("RFC Settlement

Agreement" or "Agreement")) In support of this Motion, the Receiver states as follows:

***Receiver's Appointment and Power to Settle Claims***

On August 15, 2018, the United States Securities and Exchange Commission (the "SEC")

filed this action (the "SEC Action") which, among other requests for relief, sought the appointment

of a receiver to marshal and preserve all assets of the Receivership Defendants and to handle all related claims. (Dkt. 1) Key among the challenges presented by the nature of the fraud that is the subject of the SEC's action is its size and complexity, including over 800 investors and institutional lenders who had a tangled web of secured and allegedly secured interests in EquityBuild's assets.

On August 17, 2018, the Court entered an Order assuming exclusive jurisdiction and possession of the Receivership Defendants' assets, of whatever kind and wherever situated, as defined by Paragraph 1 of the August 17, 2018 Order and by two subsequent Orders, and appointing Kevin Duff as Receiver (collectively, the "Order Appointing Receiver"). (Dkt. 16, 290, 634) The Receivership Defendants identified in the Order Appointing Receiver and in the RFC Settlement Agreement that is the subject of this motion, are referred to herein as "EquityBuild."

Absent a receiver, EquityBuild's claimants faced a collective-action problem, with each motivated to bring their own claims against EquityBuild, its assets, and its sources of recovery, at the expense of competing claimants. *See Zacarias v. Stanford Int'l Bank*, 945 F.3d 883, 902 (5th Cir. 2019). The Receiver thus was charged by the Court to serve the Estate, "curb [claimants'] individual advantage," and gather assets for competing victims and creditors. *See id.* at 897 (The Receiver is "an officer or arm of the court ... appointed to assist the court in protecting and preserving, for the benefit of all parties concerned, the properties in the court's custody[.]") (citations omitted). Without a receiver, those owed money by EquityBuild would be free and incentivized to claw over each other to scoop up whatever they could gain by speed, aggression, and outspending, then leaving latecomers, the impecunious, and the resourceless among them empty-handed and unremunerated. In this type of situation, a "disorderly race to the courthouse ensues, resulting in inefficiency as assets are dissipated in piecemeal and duplicative litigation.

The results are also potentially iniquitous, with vastly divergent results" among competing claimants. *Id.* at 896-97.

In the Order Appointing Receiver, the Court conferred upon the Receiver (1) all powers, authorities, rights and privileges theretofore possessed by the principals of the Receivership Defendants under applicable state and federal law, as well as by the governing operating and shareholders' agreements, and (2) all powers and authority of a receiver at equity, as well as all powers conferred upon a receiver under 28 U.S.C. §§ 754, 959, and 1692, and FRCP 66. (Dkt. 16, ¶ 4) The Order Appointing Receiver authorizes the Receiver to take custody, control, and possession of all assets which the Receivership Defendants own, possess, have a beneficial interest in, or control directly or indirectly ("Receivership Assets"), to issue subpoenas for documents and testimony, and to sue for, collect, recover, receive, and take into possession from third parties all Receivership Assets. (*Id.* ¶ 8) Fundamentally, for purposes of this motion, the Court authorized the Receiver to investigate, prosecute, and compromise claims related to Receivership Assets. (*Id.* ¶¶ 37, 42)

The Order Appointing Receiver also stayed all ancillary litigation and actions interfering with the Receiver's efforts to recover assets or diminishing the value of any receivership assets. (*Id.* ¶¶ 29, 32-34) The purpose of such a stay is to ensure the "receivership [is] free of interference in other court proceedings." *Zacarias*, 945 F.3d at 896. "The receivership's role is undermined if … claimants jump the queue, circumventing the receivership in an attempt to recover beyond their pro rata share. The court's powers include 'orders preventing interference with its administration of the receivership property.'" *Id.* at 896-97 (citations omitted). "Courts of Appeals have upheld orders enjoining broad classes of individuals from taking any action regarding receivership

property. Such orders can serve as an important tool permitting a district court to prevent dissipation of property or assets subject to multiple claims …, as well as preventing piecemeal resolution of issues that call for a uniform result." *Id.* at 897 (quoting *Schauss v. Metals Depository Corp.*, 757 F.2d 649, 654 (5th Cir. 1985); and citing *SEC v. Byers*, 609 F.3d 87, 92 (2d Cir. 2010) ("An anti-litigation injunction is simply one of the tools available to courts to help further the goals of the receivership.")). Such orders can include stay orders and bar orders that do not "reach claims that are independent and non-derivative and that do not involve assets claimed by the receivership," especially when receivership claimants "can participate in the receivership process, their claims are derivative of and dependent on the receiver's claims, and their suits directly affect the receiver's assets." *Id.*

### *Receiver's Action against RFC*

The law firm of Rock Fusco & Connelly, LLC performed legal services for EquityBuild, Inc., EquityBuild Finance, LLC, and their affiliates starting in or around March 2015, and lasting through the appointment of the Receiver in this action. During that period, RFC handled substantially all of EquityBuild's real estate transactions, loan acquisitions, financings, and refinancings for at least 160 properties. RFC also served as litigation counsel to EquityBuild in investor lawsuits, myriad housing court cases, and various related work. Further, RFC also created many of the LLCs that would ultimately hold title to EquityBuild properties.

On August 17, 2020, the Receiver filed a complaint in Cook County, Illinois, against RFC and Ioana Salajanu, an RFC attorney during the time period in question, in connection with legal services provided to EquityBuild, Inc., EquityBuild Finance, LLC, and their affiliated individuals and entities. The Receiver stated claims for professional negligence and aiding and abetting breach

4

of fiduciary duties. The Receiver subsequently twice amended his complaint, the last iteration of which was a Second Amended Complaint filed on March 8, 2024, a copy of which is attached hereto as **Exhibit B** ("Receiver 2AC"). RFC answered the Receiver's 2AC on May 22, 2024, and asserted various affirmative defenses, including for contributory negligence and comparative fault. (**Exhibit C**, at 105-07)

The Receiver alleged that RFC's deep involvement in EquityBuild's operations gave it not only an opportunity but a duty to advise EquityBuild regarding numerous issues and problems with respect to EquityBuild's business, transactions, conflicts, and various related matters. Those issues and problems included, but were not limited to, an unreasonable number of short sales (*i.e.,* selling properties at losses), scheming to release investor lenders' mortgages without consent, failing to properly advise EquityBuild in connection with refinancings, negligently providing legal services in refinancing transactions with institutional lenders, missing and/or ignoring problems with an overnight loan obtained from one lender in order to close a refinancing with another lender, providing one or more negligent representation letters to EquityBuild's lenders, ignoring EquityBuild's scofflaw building code violation history, and many other matters. The Receiver alleged, alternatively, that RFC was aware of the Cohens' improper conduct and substantially assisted and facilitated their breaches of fiduciary duty, as they knew of the Ponzi scheme and allowed it to continue while working for the Receivership Entities. (*See* Receiver 2AC, Count II)

The fraudulent real estate Ponzi scheme that is the focus of the SEC's action before this Court is the same fraudulent real estate scheme that is the focus of the Receiver's action against RFC. The properties, real estate transactions, loan documents, financings, and refinancings that are the subject of the Receiver's claims in the Receiver's Illinois state court action are the same

properties, real estate transactions, loan documents, financings, and refinancings that are at the heart of the proceedings and claims against the Receivership Estate in this action. The properties seized, secured, and liquidated by the Receiver in this action are the same properties for which RFC served as EquityBuild's real estate counsel. The claimants before this Court in the SEC action include those investor lenders and institutional lenders with whom RFC had pre-Receivership interactions, with respect to the same transactional closings for real estate acquisitions, financing, and refinancings, on behalf of and for the benefit of EquityBuild.

The Receiver alleged that RFC's negligence caused "all expenses, losses, liabilities, debts, and other obligations incurred from the fraud and Ponzi scheme" incurred by the Receivership Estate. (2AC, ¶ 350) The unpaid claims against the Estate—arising out of and in connection with the EquityBuild Ponzi scheme as to which RFC's legal services were inextricably intertwined— include the same claims that serve as the primary source of damages the Receiver has alleged against and sought from RFC. (*See, e.g.,* **Exhibit D**, Plaintiff's Answers to Defendant Ioana Salajanu's Second Set of Interrogatories, Answers to Nos. 2-5 & accompanying exhibits) Those unpaid claim amounts, which serve as the primary basis for the Receiver's damages against RFC, are the same amounts identified in the Receiver's claims process submissions in this action. And, of course, the ultimate goal of the Receiver's claims process efforts is vetting claims and equitably distributing funds to the Receivership Estate's claimants who are due money as a result of their victimization by the EquityBuild Ponzi scheme and the actions of all of its participants and those responsible for its devastating impact.

Over the course of more than five years, the Receiver, his counsel, and their staff have devoted over 8,000 hours to the investigation, preparation, and prosecution of the lawsuits against

former attorneys for EquityBuild, most of which either directly related to the claims against RFC or related to the claims against all defendant law firms. Those efforts included substantial research, investigation, discovery, including exhaustive written discovery (including multiple rounds of offensive and defensive written discovery and the production, receipt and analysis of over nine million pages of documents), depositions, interviews, damages analysis, motion practice, extensive third-party discovery, heavily mining information from EquityBuild records and the proof of claims and supporting documents submitted by more than 800 claimants in this action, consultation with standard of care and damages experts to develop and support the Receiver's claims, and several mediations and pretrial settlement conferences with current or retired judges. The case is on the cusp of the close of fact discovery and beginning of expert discovery. A trial is scheduled for 2 to 3 weeks in June 2025.

While the Receiver believes the case against RFC is strong, RFC has denied it bears any liability. Should the case go to trial, the Receiver is cognizant of RFC's defenses that will be vigorously advanced and  the substantial legal, evidentiary, and other challenges to address in the presentation of a highly complex matter, with numerous witnesses to testify and documents to be introduced in evidence, all of which are impacted by issues of witness availability. As the Court knows, Jerry Cohen is deceased. Shaun Cohen was last known to be in Turkey. Ioana Salajanu is in Switzerland. Other RFC personnel are no longer with the firm. The Receiver will be called upon to provide testimony in order to get collected documents and other information into evidence and with respect to the Receivership proceedings and the damages case. The cost of expert discovery, expert trial testimony and further litigation expenses to take this case to trial is expected to be substantial.

### *RFC's Insurance Coverage*

During the course of discovery, the Receiver learned that RFC has insurance for the Receiver's claims against it and for all other claims asserted or which may be asserted against RFC, in connection with RFC's representation of EquityBuild, under two policies: a primary Argo Pro Policy with $5 million in wasting limits; and a North River Insurance Company Excess Liability Policy with $5 million in limits that follows form to the Argo primary policy. In other words, a wasting $10 million (which is now less), in total policy limits, for all claims against RFC by anyone relating to EquityBuild.

The Receiver's position has been that such policies are properly considered an asset of the Receivership estate, and importantly these policies are a "wasting" asset, meaning they decrease in value with any and every effort by any claimant to seek recovery under the same policy and circumstances as to which the Receiver is also seeking recovery. That position was upheld by this Court (The Honorable John Z. Lee), which earlier in the Receivership issued a stay of an action that was wrongfully initiated by a claimant in violation of the Order Appointing Receiver. That action sought the same damages being sought in the Receivership and which were covered by the same wasting insurance policies. This Court held that such action was properly stayed because it was seeking to dissipate a Receivership asset. (Dkt. 1222, at 6-7)

### *Receiver's Settlement with RFC*

The parties began discussion of a potential resolution of the Receiver's claims in mid-2023. The Receiver and RFC engaged in several mediation efforts, including a July 2023 conference with the Honorable Patrick Sherlock of the Circuit Court of Cook County, Illinois. That settlement effort was unsuccessful; however, the parties continued their discussions in

parallel with their ongoing litigation and trial preparation. Substantial fact discovery was completed and a trial date was set for June 2025, when discussions about reigniting settlement discussions before Judge Sherlock, as mediator, heated up. In the midst of those discussions, the parties appeared at a hearing relating to their mediation efforts before the Honorable Daniel J. Kubasiak, the Circuit Judge in the Commercial Calendar Section of the Circuit Court of Cook County, Illinois, who is overseeing the Receiver's case against RFC. At that hearing, RFC's in-house counsel and representative, Michael Connelly, appeared before the court to advocate for mediating with the Receiver and declared on the record that the Receiver's lawsuit against RFC represents "an existential threat" to the RFC law firm, especially given that its available insurance has wasting limits.[1] (*See* **Exhibit E**, at 5-6) Thereafter, the parties agreed to participate in additional mediation sessions before Judge Sherlock on September 19, 2024 and September 30, 2024. The parties, each represented by counsel, then negotiated in good faith in efforts to resolve the Receiver's claims and any and all other disputes by and between them.

Those settlement efforts before Judge Sherlock—involving the Receiver, RFC, and both of RFC's carriers—culminated in an agreement resolving all disputes between the Receiver and RFC. Specifically, due to the continued efforts of the parties, and the assistance and recommendations of Judge Sherlock, the Receiver and RFC achieved a settlement, pursuant to

---

[1] Rock Fusco also faces potential additional claims arising from its representation of EquityBuild that are also covered by the Primary and Excess Policies, including claims that have been asserted by one of the EquityBuild claimants, Liberty EBCP ("Liberty"). However, Liberty's claim, along with all other claims, are currently enjoined pursuant to the Order Appointing Receiver. (*See, e.g.,* Dkt. 16, ¶¶ 8(A), 29(c)) Liberty violated that order by filing a lawsuit against RFC (Dkt. 1119, Ex. B; *see also* Dkt. 1141), which the Receivership Court stayed at the Receiver's request, with the Receivership Court finding that Rock Fusco's insurance policies are Receivership assets (Dkt. 1222, at 6-7).

which RFC will pay all remaining insurance limits out of RFC's primary and excess policies (each, on its face, providing $5 million in coverage) to the Receivership Estate. Given the wasting nature of the primary policy, the Receiver and RFC agreed that RFC will pay no less than $9,670,855.10 to the Receivership Estate, which constitutes the $10 million coverage limit, less RFC's legal fees and costs incurred through September 30, 2024 totaling $254,144.90, less an additional amount not to exceed $75,000.00 for the period from October 1, 2024 through the date an Approval Order for this motion becomes final, in recognition of RFC's need for further legal work to finalize the written settlement and cooperate in obtaining Court approval of the RFC Settlement Agreement. (*See* **Exhibit A**, at Section 3)

The RFC Parties expressly conditioned their willingness to enter the RFC Settlement Agreement and pay full policy limits of nearly $10 million to the Receivership Estate on this Court entering a bar order to bar all claims brought or that could be brought against RFC relating to EquityBuild and the fraudulent scheme[2] by any person or entity who submitted a claim in the Receivership Action. (*See* RFC Settlement Agreement, Section 4(a) & Proposed Approval Order, Paragraph 5) In addition, the Agreement provides that "the issuance of an Approval Order" is "a necessary and essential condition to the RFC Parties' ultimate acceptance of the terms and

---

[2] "Barred Claims," under the proposed Approval Order are limited to those that "relate to, are based upon, arise from, or are connected with: (i) claims released in the RFC Settlement Agreement; (ii) the events or occurrences underlying the claims or allegations in the SEC Action, or claims or allegations that could have been brought in the SEC Action; (iii) the RFC Parties' representation of EquityBuild (as defined in the Settlement and Release Agreement), including but not limited to statements made by the RFC Parties to third parties in connection to loans made to EquityBuild; or (iv) the events or occurrences underlying the claims or allegations in the Receiver's Action, or claims or allegations that could have been brought in the Receiver's Action." (*See* RFC Settlement Agreement, Proposed Approval Order, Paragraph 5(c)) It does not bar claims for damages that are independent of the foregoing.

conditions of the Settlement Agreement." (*See* RFC Settlement Agreement, Section 4(a)) The parties further agreed that the RFC Settlement Agreement is subject to the approval of this Court.

As further discussed herein, the Receiver respectfully submits that the RFC Settlement Agreement is fair, reasonable, and in the best interests of the Receivership Estate, and respectfully requests the Court's approval of the RFC Settlement Agreement and entry of the proposed Approval Order which is attached as an exhibit to the Agreement.

### *The Court Has Broad Authority to Approve the RFC Settlement Agreement*

The Court has broad powers and wide discretion to oversee an equity receivership and determine the appropriate measures for its administration. *See SEC v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992); *SEC v. Cap. Consultants, LLC,* 397 F.3d 733, 738 (9th Cir. 2005) ("[A] district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad.") (quoting *SEC v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986)). The Court's broad discretion stems from the inherent authority of an equity court to determine and devise appropriate relief. *Elliott*, 953 F.2d at 1566. In a receivership, the Court assumes custody and control over all assets and property within the receivership and holds broad equitable authority to issue any orders necessary for the effective administration of the receivership estate. *See SEC v. Credit Bancorp Ltd.,* 290 F.3d 80, 82-83 (2d Cir. 2002); *SEC v. Wencke*, 622 F.2d 1363, 1370 (9th Cir. 1980). The Court may issue any orders it deems necessary and appropriate to enable the Receiver to fulfill his duty to preserve and manage the property and funds within the Receivership Estate. *See, e.g., Official Comm. of Unsecured Creditors of Worldcom, Inc. v. SEC*, 467 F.3d 73, 81 (2d Cir. 2006).

The Court has the authority to approve a settlement proposed by the Receiver if it is fair, reasonable, and adequate, and results from good faith negotiations following an adequate investigation by the Receiver. *See Sterling v. Steward*, 158 F.3d 1199, 1203-04 (11th Cir. 1998). "Determining the fairness of the settlement is left to the sound discretion of the trial court and we will not overturn the court's decision absent a clear showing of abuse of that discretion." *Id.* at 1202 (quoting *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984)).

As part of its oversight authority over an equity receivership, the Court possesses the authority to issue an order that precludes others from pursuing claims against a settling party when those claims could have been brought by or through the receivership or are related to the facts underlying the receivership—commonly known as a "bar order." *See, e.g., Zacarias*, 945 F.3d at 897-902 (affirming district court's entry of bar orders "to effectuate and preserve the coordinating function of the receivership," preclude claimants—who are participating in the receivership claims process and have the opportunity to be benefited from the receiver's efforts to recover funds for the Receivership Estate—from jumping over other claimants, and prevent other proceedings from undermining the receivership's operation); *SEC v. DeYoung*, 850 F.3d 1172, 362-63 (10th Cir. 2017) (approving bar order where barred parties retained the right to participate in the claims process and to pursue claims independent of the fraud underlying the SEC's action); *see also, e.g., SEC v. Kaleta*, 530 F. App'x 360, 362 (5th Cir. 2013) (discussed in *DeYoung*) (approving bar order in SEC receivership as to all other claims arising out of the fraudulent scheme where barred persons were permitted to participate in the receiver's distribution process).

A bar order is often necessary to facilitate settlement, where it is (1) "essential" to the settlement, and (2) "fair and equitable, with an eye toward its effect on the barred parties." *SEC*

*v. Quiros*, 966 F.3d 1195, 1199 (11th Cir. 2020) (citing *In re Munford, Inc.*, 97 F.3d 449, 455

(11th Cir. 1996) (approving a bar order in a bankruptcy case)); *compare, e.g., In re Sentinel Funds,*

*Inc.*, 380 B.R. 902, 905 (S.D. Fla. 2008) (court found bar order not integral to the settlement

because the trustee was only required to use best efforts to obtain it). To establish a bar order as

an essential term, it is not enough that the parties' agreement provide that they will attempt to

obtain a bar order; rather, the agreement must require that the bar order be entered. *See Quiros*,

766 F.3d at 1201 (denying bar order where settlement was premised on the parties' "seek[ing]

issuance of a bar order," but not on the necessity that the bar order actually be entered). A bar

order also may be justified on the basis that the claims brought by the Receiver, those brought or

which could be brought by claimants, as well as related defenses and claims "are complex and so

inextricably intertwined such that a determination of each party's liabilities and rights

independently may be impossible or, at a minimum, impracticable without extensive litigation."

*DeYoung*, 850 F.3d at 1176-77 (describing factors relied on by district court, in affirming order

approving bar order). Like any settlement agreement in a receivership action, a bar order entered

by the Court is reviewed pursuant to an abuse of discretion standard. *Quiros*, 766 F.3d at 1199;

*see also DeYoung*, 850 F.3d at 1182 (potential objectors challenging a bar order have "the weighty

burden of showing an abuse of discretion") (citation omitted).

### The RFC Settlement Agreement Is in the Receivership Estate's Best Interest

Over the course of more than five years, the Receiver and the law firms representing the

Receiver devoted thousands of hours investigating, researching, and evaluating issues related to

the various activities of RFC and Salajanu. The Receiver and his counsel have completely

investigated the claims against these defendants. They have taken great pains to fully understand

and analyze the strengths and weaknesses of those claims. The Receiver also fully identified, developed, and assessed the potential damages to be recovered from RFC, both to prove the case against RFC and to provide leverage to settle those claims on the best terms possible.[3] The Receiver and his counsel have consulted with experts to confirm their assessments. Those efforts enabled the Receiver to thoroughly evaluate the probability of success in the litigation and damages to be recovered.

The Receiver also evaluated the very complex nature of the evidence and litigation overall, as well as the expense, inconvenience, and delay necessarily attending further prosecution of the claims against RFC. The Receiver considered that continued litigation against RFC would entail significant and various uncertainties, would be unduly time consuming and costly including, but not limited to, substantial anticipated expert witness costs, limited and wasting assets recoverable from RFC, the unavailability of any further insurance (which issue was further complicated by the wasting nature of the existing policies), as well as the complexity of preparing the case for trial, and ultimately the efforts to reach closure with significant recoveries for claimants who have already been waiting for considerable time for some relief. In evaluating the strengths of his claims and potential damages case against RFC, the Receiver also weighed potential challenges in enforcing a prospective judgment against the RFC defendants, and material concerns about the collectability of any judgment. (*See also* note 4, *infra*) He accounted for those potential difficulties by weighing the pros and cons of achieving a settlement at this point versus any other future point

---

[3] This included making policy limits demands on RFC's insurance carriers to contribute all remaining coverage amounts, and thereby establishing the necessary predicates for an action against a carrier for bad faith failure to settle in the event that the insurers did not offer the remaining policy limits.

in the litigation. He also considered RFC's affirmative defenses, including those that would have sought to reduce or eliminate its liability or damages on the basis that the claims were time-barred, that any damages sustained by EquityBuild were caused by contributory negligence and/or the comparative fault of EquityBuild by or through its agents, or that the Receiver's damages were caused by the superseding and/or intervening acts of the Cohens or other third parties. (*See* Exhibit C, at 105-07)

The Receiver then carefully, intentionally, and aggressively negotiated with RFC in order to ensure the Settlement Amount represented the maximum amount that could be recovered from RFC by settlement. The Receiver has taken into account the impact on claimants of both the money to be paid to the Estate for the benefit of claimants and also the impact of an order barring related claims against RFC, seeking to maximize through the settlement the economic benefit to the Receivership Estate and its claimants, collectively. In particular, the Receiver ensured that the bar order only applies to Receivership Estate claimants, does not apply to claims that are independent of and unrelated to EquityBuild and the fraudulent scheme, does not apply to anyone who is not a claimant against the Receivership Estate, and does not interfere with claimants' ability to participate in the claims process including seeking distributions of funds recovered by the Receiver through the RFC Settlement Agreement.

The RFC Settlement Agreement and the bar order to be entered pursuant thereto are also in the best interests of EquityBuild's claimants because they represent a substantial maximum recovery to the Receivership estate without the expense and risk of further litigation, thereby benefiting claimants with approved claims through the Receivership claims process. *See DeYoung*, 850 F.3d at 1183 (affirming order approving settlement that "offered the highest

potential recovery for the Receivership Estate," where "Claims Bar Order was necessary to that settlement"); *Kaleta*, 530 F. App'x at 362 (investors may "pursue their claims by participat[ing] in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate") (alteration in original; internal quotation marks omitted); *Zacarias*, 945 F.3d at 903 (rejecting third party's argument that "bar order deprived them of their property (that is, their claims) without due process and without just compensation" because "the bar orders channel investors' recovery associated with [the settling parties] through the receivership's distribution process"). By settling with RFC, even after accounting for contingent attorneys' fees and expenses, the net amount will increase the amount currently in the Receiver' account by over 65%. It will substantially contribute to the Receiver's efforts to protect the *res* of the Receivership Estate by reducing or potentially eliminating claims to receivership assets by the same class of barred parties seeking, in Group 10 of the claims process, to receive distributions of unencumbered funds of the Estate.

Upon advice of his counsel, based on his own experience as a federal receiver and commercial litigator, and supplemented by the efforts and recommendation by Judge Sherlock, who mediated the settlement discussions with RFC, the Receiver concluded that settling his claims against RFC upon the terms negotiated by the parties would be in the best interests of the Receivership Estate. *See, e.g., DeYoung*, 850 F.3d at 1176.

For all the foregoing reasons, the Receiver believes that the RFC Settlement Agreement, negotiated at arm's length with RFC, is fair, reasonable, and in the best interests of Receivership Estate. *See, e.g., id.* (affirming district court approval of bar order that was the product of arm's length negotiation and three days of mediation with a professional mediator). Courts in receivership proceedings have been guided by decisions in other legal contexts, such as bankruptcy

or class actions. *See, e.g., Poertner v. Gillette Co.*, 14-13882, 2015 WL 4310896, *6 (11th Cir. 2015) (affirming approval of class action settlement, noting the parties' arm's-length negotiations moderated by an experienced mediator); *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 496 (N.D. Ill. 2015) (approving settlement and noting that parties' use of a highly respected mediator supported the conclusion that the settlement was not the product of collusion); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011) (approving class action settlement, noting that competent counsel's opinion that the settlement was fair, reasonable, and adequate weighed in favor of approving settlement); *Hamilton v. SunTrust Mortg. Inc.*, No. 13-60749-CIV, 2014 WL 5419507, at *2 (S.D. Fla. Oct. 24, 2014) (noting that the fact that the settlement occurred following significant litigation, considerable document discovery, and months of negotiations with the help of a well-respected mediator supported approval of class action settlement).

### ***The RFC Settlement Agreement Follows Precedent from SEC Receiverships***

The precedent and lessons of *Zacarias*, another SEC receivership action, and the line of cases it follows, are instructive and serve as a persuasive basis upon which the Court, here, should approve the RFC Settlement Agreement and enter the bar order it requires. *Zacarias*, 945 F.3d at 895-902. In *Zacarias*, the Fifth Circuit approved a settlement that included bar orders. *Id.* at 902. That case involves a well-known Ponzi scheme that engulfed Stanford Bank and resulted in a receivership. Like here, and central to the district court's decision to enter the bar orders in that case, were the facts that the receivership had finite resources and its claimants had an avenue to recover their losses through the receivership distribution process. *Id.* at 900. Notably, here, the scope of barred persons specified in the RFC Settlement Agreement is limited to those who have the opportunity to vie for not only the settlement proceeds that RFC has agreed to pay but also for

all other Receivership Estate funds that are ultimately available for distribution. The Fifth Circuit recognized in *Zacarias* that a bar order is often necessary to prevent self-interested objectors from circumventing the orderly process of a receivership: "Allowing investors to circumvent the receivership would dissolve this orderly process—circumvention that must be foreclosed for the receivership to work. It was no abuse of discretion for the district court to enter the bar orders to effectuate and preserve the coordinating function of the receivership." 945 F.3d at 902.

In *SEC v. Kaleta,* cited by the court in *Zacarias*, the Fifth Circuit approved a claims bar order in similar circumstances as are present here. 530 F. App'x at 360. In the *Kaleta* receivership action, the court entered a "bar order enjoining … investors from commencing or continuing any legal action against the [settling third parties] that arises from the underlying fraud." The court overruled objections from claimants, ruling that a bar order was supported by "the necessity of the bar order for securing" the settlement payment to the Receivership Estate. *Id.* The Court reasoned that the impact of the bar order on claimants was minimal because they still had the ability "to pursue their claims by participat[ing] in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate." *Id.* (internal quotation marks omitted). The same situation is presented here, as the claimants have had and will continue to have an opportunity to have their claims heard by the Court and be entitled to a determination of whether they should receive additional funds recovered by the Receiver for the benefit of the Estate and its creditors.

In addition, like here, the Stanford receiver in *Zacarias* sued the defendants to recover for liability that the receivership estate had incurred to the Ponzi scheme's claimants as a result of the defendants' role in the scheme. *Zacarias*, 945 F.3d at 900. The Fifth Circuit noted that claims of this nature "are derivative of and dependent on the receiver's claims and compete with the

receiver" to recover from parties who may otherwise be the targets of claimants' suits. *Id.* Such potentially competing claims affect receivership assets because any recovery by a claimant from a mutual target of the receiver is a recovery the receiver cannot achieve, which then frustrates the receiver's efforts to recover money for distribution to the very claimants whose putative claims against such mutual targets are to be precluded by the bar orders. *Id.* (*See also* note 1, *supra*.) The funds at stake here are vital to the Receiver's efforts to provide compensation to the Cohens' victims on a fair and equitable basis.

Requiring recovery to flow through the Receivership Estate ensures an orderly and equitable distribution to claimants, avoiding a chaotic "race to the courthouse." This approach is particularly crucial in cases involving insurance proceeds, where there is often a single pool of funds available for settlement, often contingent upon the entry of a bar order. Absent such an order, both the insured and the insurer may withhold additional coverage to address potential future judgments and uncertain litigation costs. *See, e.g., Zacarias*, 945 F.3d at 900 (settling defendants' "incentives to settle are reduced—likely eliminated—if each [claimant] retains an option to pursue full recovery in individual satellite litigation"). Courts have recognized that federal equity receiverships are well-suited to facilitate the fair distribution of settlement proceeds. As a result, they have approved settlements contingent upon the entry of bar orders, without which such settlements would not be achievable. *See, e.g.*, *Gordon v. Dadante*, 336 F. App'x 540, 542 (6th Cir. 2009) (approving a settlement that was conditioned on the entry of a bar order); *DeYoung*, 850 F.3d at 1183 & n.5 (Tenth Circuit emphasized the limited availability of funds and upheld the entry of a bar order to maximize the settlement's value for the receivership estate) (citing *Gordon* and citing additional federal court cases approving settlement and bar order).

Moreover, like here, the Stanford defendants required a bar order as a settlement condition. *Zacarias*, 945 F.3d at 894; *see also DeYoung*, 850 F.3d at 1182-83. And, like here, the alternative—leaving claimants free to pursue full recovery against the same defendants arising out of the same facts in individual ancillary litigation—is no resolution at all because "any potential value of the receiver's ultimate recovery must be reduced by the costs of prolonged litigation over the same assets, not only in the receiver's own action but also in the [claimants'] myriad satellite suits, into which the receivership is likely to be drawn." *Zacarias*, 945 F.3d at 900-01. Were the bar order to be rejected and claimants allowed to pursue separate claims against RFC, claimants of the Receivership Estate may ultimately recover less from independent litigation than may be available for distribution due to the Receiver's efforts and settlement with RFC as "continued litigation would eat away at the limited funds available under [the defendants'] 'wasting' insurance policy." *Id.* at 901. Because of the limited and "wasting" nature of RFC's insurance coverage, the costs of subjecting RFC to piecemeal litigation would consume the funds available for claimants' recovery and substantially harm the Receivership Estate. This is an important factor for the Court to consider in determining whether to approve the RFC Settlement Agreement with the bar order. *See, e.g., SEC v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338, 341 (5th Cir. 2011) (affirming stay of investor litigation that could "deplete possible assets coming into the estate" by wasting available sources of recovery from the third-party defendant).

The fact that the Receiver's claims are an existential threat to RFC alone demonstrates that the path of continuing to litigate does not provide a better or viable option for greater recovery. If litigated, both the Receiver and RFC expect the Receiver's claims would wipe out the firm. In that event, not only would there be substantially less insurance money to satisfy any judgment the

Receiver would obtain, but there would not be a firm remaining against which any other potential claimants could recover for any putative independent claims they may have against RFC.[4]

Additionally, approval of the settlement and bar order is critical to bringing litigation surrounding the Receivership Estate and its claimants to a close, an express concern for both the Court and the Receiver. Key among such considerations is finalizing the claims process, accounting for all amounts distributed to claimants, and distributing remaining receivership funds to the Estate's eligible victims and creditors. Absent an order barring claims against RFC related to its representation of EquityBuild, the Receiver's case against RFC will continue. Such litigation, and attendant appeals, could persist for years. Notably, should the litigation with RFC continue and this matter proceed to trial, the Receiver also will need to devote substantial time and efforts toward the RFC trial, which will directly impact and cause delay to the Court's and the Receiver's efforts to bring the claims process to an expeditious conclusion. Further, until the RFC case is concluded, the Receiver will need to continue efforts to obtain a recovery from RFC—as the Receiver obviously cannot distribute money to claimants recovered from his claims against RFC until after such a recovery has been obtained. In stark contrast to the RFC Settlement Agreement,

---

[4] The Receiver also considered the prospect of obtaining and enforcing a judgment above policy limits against the firm and its partners. That is an uncertain path at best, with the only certainty being additional expense and extensive delay. In the first instance, it presumes obtaining a judgment, for which neither liability nor any particular amount can be guaranteed. But, even if one were obtained, it would be limited by Illinois Supreme Court Rule 722, which affords certain protections to law firms that are set up as limited liability companies, when the firm maintains minimum insurance which is not required to be more than $5 million per claim and $10 million annual aggregate. It would be further complicated by the fact that Ioana Salajanu, the RFC lawyer who performed most of the legal work for EquityBuild, is now in Switzerland. Finally, RFC has represented to the Receiver that any financial contribution—beyond the legal fees the firm has already incurred and $25,000 deductible which it is obligated to pay—could not be made without the firm incurring additional debt (the availability of which is itself speculative), which would severely limit the ability of the firm to operate going forward.

which will allow the Receiver to obtain all of RFC's remaining insurance now, the denial of the Agreement would preclude the Court and the Receiver from bringing the Receivership to a conclusion until such time as the RFC litigation—including potential appeals—is concluded.

Moreover, the costs of such litigation to the Receivership Estate would likely include hundreds of thousands of dollars, including for standard of care and damages experts, document management services (including for more than nine million pages of produced records), and other typical litigation expenses. Far more daunting, however, would be the anticipated fees and expenses of RFC's defense counsel and experts, and expenses, which would almost certainly exceed numbers well into seven figures, and reduce the available coverage thereby. Opening the floodgates to ancillary litigation against RFC would further deplete the available insurance and any potential recovery, whether by the Receiver or others. Given RFC's willingness to pay all remaining insurance policy limits to settle the claims and potential claims against it, the Receiver believes it is certain that there will be no better point to achieve a higher economic result than the present. *See Commodity Futures Trading Comm'n v. Equity Fin. Group*, CIV. 04-1512 (RBK), 2007 WL 2139399, at *1 (D.N.J. July 23, 2007) (approving settlement agreement and bar order as reasonable and in the best interests of the receivership estate when the Receiver considered: available malpractice insurance coverage, defendants' assets were likely not substantial enough to justify the expense of collection, better result could not be assured from further litigation, costs of discovery and trial were likely substantial, and pursuing litigation would further delay the progress of the receivership and satisfaction of claims against the estate).

Ultimately, the claims bar order is grounded in the Receiver's duty to take necessary actions to preserve estate assets and ensure the orderly administration of the Receivership Estate.

Courts have consistently upheld collateral injunctions that prohibit creditors from pursuing independent claims to safeguard the Receivership Estate. *See, e.g., SEC v. Byers*, 609 F.3d 87, 91 (2d Cir. 2010) ("district courts may issue anti-litigation injunctions barring" creditors from filing claims to commence involuntary bankruptcy proceedings against a debtor "as part of their broad equitable powers in the context of an SEC receivership"); *Schauss*, 757 F.2d at 654 (5th Cir. 1985) ("Courts of Appeals have upheld orders enjoining broad classes of individuals from taking any action regarding receivership property.").[5] Here, the bar order included in the RFC Settlement Agreement is consistent with those consistently approved in federal equity receiverships because it limits the scope of the bar to Receivership claimants and to EquityBuild's fraudulent scheme. (*See* RFC Settlement Agreement, Exhibit A thereto, Proposed Approval Order, Paragraph 5(c)) It does not bar claims for damages independent of these limitations. (*Id.*)

For all of these reasons, like in *Zacarias* and other decisions, it is appropriate and well-within this Court's discretion to approve the RFC Settlement Agreement, including the required bar order, "to effectuate and preserve the coordinating function of the receivership." *Id.* at 902.

---

[5] The All Writs Act also "empowers federal courts to issue injunctions to protect or effectuate their judgments." *Burr & Forman v. Blair*, 470 F.3d 1019, 1026 (11th Cir. 2006) (internal quotation marks omitted). Further, "[t]he power conferred by the Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice…." *United States v. New York Tele. Co.*, 434 U.S. 159, 174 (1977) (citations omitted). The claims bar order in the Agreement between the Receiver and RFC is firmly encompassed within the scope of this delegated power. *See, e.g., In re Baldwin-United Corp.*, 770 F.2d 328, 337 (2d Cir. 1985) (All-Writs Act authorized district court to enjoin litigation by third-parties against defendants that "could only serve to frustrate the district court's efforts to craft a settlement" with those defendants in the litigation before the court).

### _Request to Pay Contingency Fees and Costs to Receiver's Counsel_

As noted above, the Receiver and his counsel have invested considerable time investigating, analyzing, preparing, and pursuing claims against these defendants. Pursuant to the Court's September 23, 2020 Order Granting Receiver's Motion for Retention of Counsel (Dkt. 801), and with respect to the RFC Settlement Agreement, the Receiver requests that the Court authorize and approve payment consistent with the previously approved contingency fee percentage of thirty-five percent[6] to the Receiver's counsel in the amount of $3,411,049.28 in fees (less a reduction for the _pro rata_ amount corresponding to RFC fees and expenses incurred from October 1, 2024 through the date the Approval Order becomes Final)[7] and $86,792.54 in costs. The costs include $3,203.76 in deposition costs (court reporter fees, videographer fees, and transcript costs), $8,060.50 for undisclosed expert fees, and $75,528.28 for a prorated portion of the costs for a database of over nine million pages of digital records. (_See_ **Exhibit F**, Summary of Costs) The latter amount accounts for an amount previously reimbursed through the Rosenberg and BBSG settlements. (Dkt. 1622, 1628, 1763) Further database costs after September 2024 will be addressed in the Receiver's subsequent fee applications.

In particular, the Receiver requests that the Court approve: (i) the Settlement Amount, as described in and determined by the terms of the RFC Settlement Agreement, which is to be made by RFC (through its insurers) and deposited into the Receiver's account, and (ii) upon receipt of the Settlement Amount, the Receiver will transfer approved contingency fees plus expenses from the Receiver's Account to the Spellmire Bruck LLP client fund account to be thereafter split

---

[6] Given the privilege concerns, Judge Lee reviewed the retention agreement _in camera_ prior to granting the motion seeking approval to retain counsel on a contingency basis (Dkt. 801).
[7] _See_ Exhibit A, RFC Settlement Agreement, Section 3.

between the engaged counsel in accordance with their engagement letter. The Receiver submits that the requested fees and costs are reasonable, customary, and consistent with the Court's previous approvals of fees and costs in this action.

### *Notice of This Motion to Potentially Interested Participants*

The Receiver will provide fair, adequate, and sufficient notice of this motion to all interested parties. In addition to service through the Court's electronic case filing system, the Receiver will serve a copy of this motion (and the accompanying notice of motion) to all claimants by electronic mail (to the extent he possesses an e-mail address) or by regular mail if he only possesses a mailing address. A copy of this motion will also be posted on the Receiver's webpage at *http://rdaplaw.net/receivership-for-equitybuild*.

WHEREFORE, for the foregoing reasons, the Receiver respectfully requests that the Court: (A) enter the proposed order attached hereto as **Exhibit G** approving both the RFC Settlement Agreement and authorizing the Receiver to pay counsel the corresponding contingency fees and to reimburse counsel for the out-of-pocket expenses described above, and (B) grant such other and further relief as the Court deems just and proper.

Dated: December 12, 2024        KEVIN B. DUFF, RECEIVER

          /s/ Michael Rachlis
          Michael Rachlis
          Jodi Rosen Wine
          Rachlis Duff & Peel LLC
          542 South Dearborn Street, Suite 900
          Chicago, IL 60605
          Telephone:  (312) 733-3950

          *Counsel for Plaintiff, Kevin B. Duff, as Receiver*

# Exhibit A

## SETTLEMENT AGREEMENT
## AND RELEASE OF CLAIMS

This Agreement (the "*Agreement*" or the "*Settlement Agreement*") is entered into and effective the 27th day of November, 2024 (the "Effective Date"), by and among Kevin B. Duff, Receiver for the Estate of EquityBuild, Inc., EquityBuild Finance, LLC, their affiliates, and the affiliate entities of Jerome Cohen and Shaun Cohen (the "*Receiver*"), on the one hand, and Rock Fusco & Connelly, LLC and Ioana Salajanu (collectively, "*RFC*"), on the other hand (the Receiver and RFC are hereinafter collectively referred to as the "Parties" and each of them as a "Party"), to settle any and all disputes between them related to or arising out of the acts and omissions alleged or otherwise at issue in the civil action entitled, *Kevin B. Duff, Receiver for the Estate of EquityBuild, Inc., et al. v. Rock Fusco & Connelly, LLC, Ioana Salajanu, and Bregman, Berbert, Schwartz & Gilday, LLC*, pending in the Circuit Court of Cook County, Illinois, Case No. 2020 L 8843 (the "*Receiver's Action*").

WHEREAS, on August 15, 2018, the United States Securities and Exchange Commission (the "*SEC*") filed the lawsuit styled *United States Securities and Exchange Commission v. EquityBuild, Inc., EquityBuild Finance, LLC, Jerome H. Cohen, and Shaun D. Cohen; Civil Action No. 18-CV-5587 in the United States District Court for the Eastern District of Illinois* (the "*SEC Action*") which, among other requests for relief, sought the appointment of a receiver to marshal and preserve all assets of the defendant businesses and their affiliates and handle all related claims.

WHEREAS, the Court in the SEC Action entered an Order on August 17, 2018 (Docket #16) (the "*Order Appointing Receiver*") taking exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated, of Jerome Cohen and Shaun Cohen, including EquityBuild, Inc., EquityBuild Finance, LLC, and affiliates, as defined by Paragraph 1 of the Order Appointing Receiver (the "*res of the Receivership Estate*"). The Order Appointing Receiver was supplemented by two subsequent Orders, identifying additional affiliate entities as defendants in the SEC Action, on (i) March 14, 2019 (Docket #290), and (ii) February 21, 2020 (Docket #634). This Agreement collectively refers to the Receivership Defendants identified in the three Orders as "*EquityBuild*."

WHEREAS, Kevin B. Duff was appointed by the Court, in the Order Appointing Receiver, to act as the Receiver for EquityBuild. The Receiver was directed to "assume control and operation of [EquityBuild] and preserve all of [its] claims or interests." Under the Order Appointing Receiver, the Receiver has "all powers, authorities, rights and privileges heretofore possessed by the officers, directors, managers, members, and general and limited partners of the Receivership Defendants under applicable state and federal law, by the governing charters, by-laws, articles and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959, and 1692, Fed. R. Civ. P. 66, and this Order." Among his powers, the Receiver is authorized to (i) "bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver," (ii) "pursue, resist and defend all suits, actions, claims, and demands which may now be pending or which may be brought by or asserted against the Receivership Estate," (iii) "investigate, prosecute, institute, defend . . . compromise, and/or adjust actions in any state, federal or foreign court or proceeding of any kind as may in his discretion, and in consultation with [SEC] counsel, be advisable or proper to recover and/or



1

conserve Receivership Assets," and (iv) "institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Estate, as the Receiver deems necessary."

WHEREAS, RFC was retained by EquityBuild beginning on or about April 1, 2015 to provide professional legal services to EquityBuild.

WHEREAS, RFC denied and continues to deny any liability or unlawful conduct asserted or alleged by Receiver in the Receiver's Action.

WHEREAS, contingent upon entry of an Order by the Court in the SEC Action (the "*Receivership Court*") approving this Agreement, the Parties wish to resolve any and all claims that they have or may have against each other, including any and all claims affecting the res of the Receivership Estate and that the Receiver or EquityBuild has or may have, including any and all claims the Receiver has the authority to assert against RFC, arising out of RFC's professional services engagements by EquityBuild or such other claims within the Receivership, and any claims that RFC may have against the Receiver or EquityBuild.

NOW, THEREFORE, in consideration of the promises set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the Parties agree as follows:

**1.** **Approval**. The Parties acknowledge and agree that this Settlement Agreement is subject to the approval of the Receivership Court and, therefore, will not be binding until such approval has been granted and any appeals have been exhausted (the "*Approval*"). The Parties will jointly submit or otherwise approve a motion to the Receivership Court for Approval of this Agreement.

**2.** **Release of Claims**.

(a) In exchange for good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged by the Receiver, the Receivership Estate (as defined in the Order Appointing Receiver), and EquityBuild hereby release, discharge and forever acquit RFC and its current and former shareholders, members, partners, officers, principals, managers, directors, fiduciaries, employees, representatives, associate attorneys, "of counsel" attorneys, insurers, reinsurers, and agents (collectively, the "*RFC Parties*") from liability for, and the Receiver, the Receivership Estate, and EquityBuild hereby waive, release, discharge, and settle any and all claims, damages, demands, or causes of action of any kind whether known or unknown, against any RFC Party, including any and all claims, damages, demands, or causes of action relating to any contract, tort, common law, statutory, or administrative claim, including without limitation: (i) claims for professional negligence, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, conspiracy, fraud, breach of implied or express contract, breach of implied covenant of good faith and fair dealing, promissory estoppel, or tortious interference; (ii) any allegation for costs, fees, or other expenses including attorneys' fees incurred in, or with respect to, a Released Claim; (iii) any claim for compensation, benefits, or damages of any kind not expressly set forth in this Agreement; or (iv) such other claims within the Receivership, including but not limited to any and all claims the Receiver has the authority to assert,



2

including such claims that affect the res of the Receivership Estate (collectively, the "***Receiver Released Claims***"). This release shall be construed as a general release to the maximum extent permitted by applicable law and Court Order that is intended to release the RFC Parties from any claims whatsoever that the Receiver, the Receivership Estate, and EquityBuild have or might have against the RFC Parties, now or in the future, arising out of anything at all that happened, might have happened, or failed to happen at any time before the date of this Agreement, whether or not the parties are aware of such claims at this time. The provisions of this release are not intended to, and do not in fact, release, waive, or discharge Jerome Cohen, Shaun Cohen, Patricia Cohen, Eldebran Cohen, and the former attorneys (other than the RFC Parties), accountants, and other professionals, employees, or independent contractors of EquityBuild from any type of claims, liabilities, or demands accruing to the Receiver, the Receivership Estate, or EquityBuild.

(b)     In exchange for good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged by the RFC Parties, the RFC Parties hereby release, discharge and forever acquit the Receiver, the Receiver's attorneys, the Receivership Estate, and EquityBuild and each of their current and former shareholders, members, partners, officers, principals, managers, directors, fiduciaries, employees, representatives, and agents (collectively, the "***Receiver Parties***") from liability for, and the RFC Parties hereby waive, release, discharge, and settle any and all claims, damages, demands, or causes of action of any kind that the RFC Parties have, whether known or unknown, against any Receiver Party, including any and all claims, damages, demands, or causes of action relating to any contract, tort, common law, statutory, or administrative claim, including without limitation: (i) for recovery pursuant to any claim submitted to the Receiver in the SEC action; (ii) any fees, costs, or other expenses including attorneys' fees incurred in, or with respect to, a Released Claim: (iii) any claim for compensation, benefits, or damages of any kind not expressly set forth in this Agreement; or (iv) any and all claims any RFC Party has the authority to assert, including such claims that affect the res of the Receivership Estate (collectively, the "***RFC Released Claims***"). This release shall be construed as a general release to the maximum extent permitted by applicable law and Court Order that is intended to release the Receiver Parties from any claims whatsoever that the RFC Parties have or might have against the Receiver Parties, now or in the future, arising out of anything at all that happened, might have happened, or failed to happen at any time before the date of this Agreement, whether or not the Parties are aware of such claims at this time.

(c)     The Receiver Parties on the one hand, and the RFC Parties on the other hand, hereby represent and warrant to the other that neither of them has brought or joined any lawsuit or filed any charge or claim against the other Parties in any court or before any government agency or arbitrator for or with respect to a matter, claim or incident that occurred or arose out of one or more occurrences that took place on or prior to execution of this Agreement. The Parties hereby further represent and warrant that neither has assigned, sold, delivered, transferred, or conveyed any rights the Receiver, the Receivership Estate, or EquityBuild has asserted or may have against any of the RFC Parties or that RFC has asserted or may have against any of the Receiver Parties to any person or entity, in each case, with respect to any Receiver Released Claims or RFC Released Claims. The Parties affirm that they are the holders of the claims referenced

herein and represent that they have the authority to enter into this Agreement. The Receiver further represents and warrants that he has authority to release any claims on behalf of himself, as Receiver, and all EquityBuild entities or such other claims within the Receivership in accordance with the Order Appointing Receiver or as otherwise authorized by the Court. RFC further represents that the amount of the Payment set forth in Section 3, below, is the full amount of all remaining insurance coverage available on all policies that provide coverage to the RFC Parties with respect to the Receiver's Action and any and all related claims made, asserted, or that could be asserted against the RFC Parties by the Receiver or any claimant in the SEC Action, less covered defense costs in an amount limited by and consistent with Section 3, below.

3.     **Payment to the Receivership Estate.**   Within thirty (30) days following the Approval Order (defined herein) becoming Final (defined herein), RFC, through its insurers, agrees to pay to the Receivership Estate the total amount of Ten Million Dollars (USD) (10,000,000.00), minus legal fees and costs incurred by RFC as of September 30, 2024, which total $254,144.90, minus an additional amount up to Seventy Five Thousand Dollars (USD) ($75,000.00) in reasonable legal fees and costs incurred by RFC from October 1, 2024 through the date the Approval Order becomes Final (the "*Settlement Amount*"). To be clear, the Settlement Amount will be no less than $9,670,855.10. The Settlement Amount will be paid in two payments, first from the primary insurer and the second from the excess insurer, in the form of wire transfer to the Receiver's fiduciary account for the Receivership Estate, in accordance with bank wire transfer instructions to be provided by the Receiver to RFC, to "Estate of EquityBuild, Inc." Payment in accordance with the provisions of this section shall satisfy the obligation of the RFC Parties to make payment under this Agreement.

4.     **Settlement Motion and Claims Bar.**   The Receiver will file a motion with the Receivership Court in the SEC Action ("*Settlement Motion*") requesting: (i) approval of this Agreement; and (ii) entry of an order by the Receivership Court in the SEC Action in substantially the same form and substance as attached hereto as Exhibit A (the "*Approval Order*"), which includes a bar of certain claims by the Receivership Court in the SEC Action in substantially the same form and substance as described therein (referenced, at times herein, as the "claims bar").

(a)     The RFC Parties have expressly conditioned their willingness to enter into the Settlement Agreement, and pay, or cause to be paid, the Settlement Amount, on a full and final resolution with respect to any and all claims instituted now or hereafter by any and all of the Barred Persons (as defined in the Approval Order) against any and all of the RFC Parties that relate in any manner whatsoever to: the events and occurrences underlying the claims in the SEC Action, the Receiver's Action, or Circuit Court of Cook County Case No. 2020-L-4725, the Receivership Entities, or the Receivership Estate (the "Barred Claims," as more fully in the Approval Order). As established by the Settlement Agreement, a necessary and essential condition to the RFC Parties' ultimate acceptance of the terms and conditions of the Settlement Agreement is the issuance of an Approval Order that contains a claims bar provision consistent with this Agreement and that the Approval Order becomes "Final," meaning the time allowed by law for any appeals has expired and there is no pending appeal of the Approval Order. Pursuant to the terms of the Settlement Agreement, entry of the Approval Order and the Approval Order becoming Final are necessary conditions precedent to the payment of the Settlement Amount.

4

(b)     The Receiver shall provide notice of the Settlement Motion by ECF to all persons who have entered an appearance in the SEC Action and by last known email address to all claimants who have not appeared in the SEC Action individually or through counsel.

(c)     If the Receivership Court in the SEC Action does not approve this Agreement, then this Agreement will terminate and the entire Settlement will be null and void.

(d)     If any person or entity violates the claims bar provision in the Approval Order by pursuing or attempting to pursue Barred Claims against RFC and/or the Receiver, then either, jointly or independently, may seek to enforce the claims bar provisions in the Approval Order, but neither shall have an obligation to do so. The Receiver will cooperate with any reasonable efforts of RFC to enforce the claims bar provisions in the Approval Order. The Receiver's obligation to participate in enforcement of the claims bar provision as provided herein will continue only for the duration of his appointment as receiver in the SEC Action and will terminate upon his discharge as receiver in the SEC Action.

5.     **No Admission**. The payments, covenants, promises, conditions, conveyances, and agreements contained in this Agreement are made pursuant to a settlement between and amongst the Parties and shall not be admissible in evidence in any suit or proceeding before any tribunal or agency as evidence or admission of wrongdoing by any Party. The Parties agree that this Agreement is entered into solely to compromise disputed claims, as set forth herein, and to avoid the expense of further litigation.

6.     **Good Faith Finding**. The Parties will jointly submit or otherwise approve a motion in the Receiver's Action that the settlement was entered into in good faith under the Illinois Joint Tortfeasor Contribution Act, 740 ILCS 100/0.01, *et seq.*, unless at the time of the Approval of this Agreement by the Receivership Court the Parties are the only remaining parties in the Receiver's Action.

7.     **Dismissal of Litigation**. Based on the agreement memorialized herein, and subject to the contingencies described herein, within forty-five (45) days following the Approval Order becoming Final and following the Receiver's receipt of the Settlement Amount, the Receiver agrees to cause the Receiver's Action as respects RFC only to be dismissed in its entirety with prejudice, consistent with the terms recited herein.

8.     **Attorneys' Fees and Costs**. Each Party to the matters now being resolved through this Agreement shall bear their own costs and fees.

9.     **No Duress**. Each Party agrees to sign this Agreement as its own voluntary act and deed and represents that such execution was not the result of any duress, coercion, or undue influence.

10.     **Binding Effect**. This Agreement shall be binding upon the Parties hereto and their respective past, present and future partners, officers, directors, stockholders, attorneys, insurers, agents, servants, representatives, employees, subsidiaries, affiliates, predecessors and successors in interest, and assigns.

5

11. **Governing Law**. This Agreement and any other documents referred to herein shall in all respects be interpreted, enforced, and governed by and under the laws of the State of Illinois and applicable federal law.

12. **Dispute Resolution**. Any action, controversy, or claim between the parties arising out of or relating to this Agreement, including those relating to the validity, interpretation, construction, performance and enforcement of this Agreement, shall be determined by the Receivership Court that granted Approval to this Agreement.

13. **No Third-Party Beneficiaries**. Except as expressly provided in this Agreement, no rights, privileges, or immunities, legal or equitable, of any Party shall inure to the benefit of any third party; nor shall any third party be deemed to be a third-party beneficiary of any of the provisions contained herein.

14. **No Waiver**. No failure by any Party at any time to give notice of any breach by the other Party of, or to require compliance with, any condition or provision of this Agreement shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.

15. **Recitals**. The recitals above are incorporated into this Agreement.

16. **Headings; Interpretation**. Titles and headings to Sections hereof are for the purpose of reference only and shall in no way limit, define or otherwise affect the provisions hereof. The word "or" as used herein is not exclusive and is deemed to have the meaning "and/or." The words "herein," "hereof," "hereunder" and other compounds of the word "here" shall refer to the entire Agreement, including all exhibits, and not to any particular provision hereof. The use herein of the word "including" following any general statement, term or matter shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation," "but not limited to," or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest possible scope of such general statement, term or matter.

17. **Severability and Modification**. To the extent permitted by applicable law, the Parties agree that any term or provision of this Agreement (or part thereof) that renders such term or provision (or part thereof) or any other term or provision (or part thereof) of this Agreement invalid or unenforceable in any respect shall be severable and shall be modified or severed to the extent necessary to avoid rendering such term or provision (or part thereof) invalid or unenforceable, and such severance or modification shall be accomplished in the manner that most nearly preserves the benefit of the Parties' bargain hereunder.

18. **Preparation of Agreement and Construction**. In connection with the negotiation and execution of this Agreement, each Party has had the benefit of representation by independent legal counsel and other professionals of their own choosing. Each Party further acknowledges that they and their counsel have had adequate opportunity to make whatever investigation or inquiry they may deem necessary or desirable in connection with the subject matter of this Agreement prior to the execution hereof and the delivery and acceptance of the consideration specified herein.



6

This Agreement has been prepared jointly by respective counsel for each of the Parties, with a full opportunity for the Parties to negotiate its terms. Accordingly, any rule of law or legal decision that would require interpretation of any ambiguities in this Agreement against the Party that drafted it is not applicable and is hereby waived. On the contrary, this Agreement has been reviewed by each of the Parties hereto and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of the Parties.

     **19.** **Counterparts**. This Agreement may be executed in one or more counterparts (including portable document format (.pdf) and facsimile counterparts), each of which shall be deemed to be an original, but all of which together will constitute one and the same agreement.

     **20.** **Entire Agreement**. This Agreement constitutes the entire agreement between the Parties with respect to the matters herein provided and all prior understandings and agreements regarding the subject matter hereof have been incorporated herein. No modifications or waiver of any provision hereof shall be effective unless in writing and signed by each Party.

*[Signatures begin on the following page]*



IN WITNESS WHEREOF, the Parties have executed this Agreement with the intent to be legally bound.

**AGREED AND ACCEPTED:**

**KEVIN B. DUFF, as Receiver for the Estate of EquityBuild, Inc., EquityBuild Finance, LLC, their affiliates, and the affiliate entities of Jerome Cohen and Shaun Cohen**

By: _____

Printed Name:  Kevin B. Duff

Title:  Receiver

Dated:  November __27_, 2024.



**ROCK FUSCO & CONNELLY, LLC**

By: _____

Printed Name: _____

Title: _____

Dated:  November ___, 2024.



**IOANA SALAJANU**

By: _____

Printed Name:  Ioana Salajanu

Dated:  November ___, 2024.

IN WITNESS WHEREOF, the Parties have executed this Agreement with the intent to be legally bound.

**AGREED AND ACCEPTED:**

**KEVIN B. DUFF, as Receiver for the Estate of EquityBuild, Inc., EquityBuild Finance, LLC, their affiliates, and the affiliate entities of Jerome Cohen and Shaun Cohen**

By: _____
Printed Name:  Kevin B. Duff
Title:  Receiver

Dated:  November _____, 2024.


**ROCK FUSCO & CONNELLY, LLC**

By: _____
Printed Name: _JOHN J. ROCK_____
Title: _MANAGER_____

Dated:  November 22, 2024.


**IOANA SALAJANU**

By: _____
Printed Name:  Ioana Salajanu

Dated:  November ___, 2024.

IN WITNESS WHEREOF, the Parties have executed this Agreement with the intent to be legally bound.

**AGREED AND ACCEPTED:**

**KEVIN B. DUFF, as Receiver for the Estate of EquityBuild, Inc., EquityBuild Finance, LLC, their affiliates, and the affiliate entities of Jerome Cohen and Shaun Cohen**

By: _____
Printed Name:  Kevin B. Duff
Title:  Receiver

Dated:  November _____, 2024.

**ROCK FUSCO & CONNELLY, LLC**

By: _____
Printed Name: _____
Title: _____

Dated:  November ____, 2024.

**IOANA SALAJANU**

By: _____
Printed Name:  Ioana Salajanu

Dated:  November 27, 2024.

EXHIBIT A

**("Approval Order")**

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | No. 18-cv-5587 |
| v. | ) ) | Hon. Manish S. Shah |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, | ) ) ) ) | Magistrate Judge Young B. Kim |
| Defendants. | ) ) ) | |

**[ PROPOSED ]
ORDER GRANTING RECEIVER'S MOTION TO
APPROVE SETTLEMENT AND RELEASE AGREEMENT
WITH ROCK FUSCO & CONNELLY, LLC AND IOANA SALAJANU
AND TO AUTHORIZE PAYMENT OF CONTINGENCY FEE AND COSTS
TO RECEIVER'S COUNSEL**

This matter came before the Court upon the Receiver's Motion to Approve Settlement and Release Agreement with Rock Fusco & Connelly, LLC and Ioana Salajanu (collectively, "RFC") and to Authorize Payment of Contingency Fee and Costs to Receiver's Counsel [ECF No. _____] (the "Motion"). The Court, having considered the Motion and the record of this receivership action and being otherwise duly advised in the premises, hereby finds and orders as follows:

1. The Motion [ECF No. _____] is GRANTED.

2. The Court finds that the Settlement and Release Agreement, attached as Exhibit A to the Motion, is reasonable, fair, adequate, and in the best interest of the Receivership Estate.

3.     The Court confirms the Receiver's authority to enter into the Settlement and Release Agreement.

4.     The Court finds that the Receiver and RFC have agreed to the settlement in good faith and that RFC is paying, through its insurers, a fair share of the potential damages for which the RFC Parties are alleged to be liable, though they deny any wrongdoing or liability, and no court has determined there to be any wrongdoing or liability.

5.     The Court hereby permanently bars, restrains, and enjoins any Barred Persons from engaging in any Barred Conduct against the RFC Parties (as defined in the Settlement and Release Agreement) with respect to the Barred Claims, as those terms are defined hereunder:

   a.     "Barred Persons" means: any person or entity who submitted a claim in the Receivership Action, including but not limited to all persons or entities identified on Exhibits 5-6 of "The Receiver's Twenty-First Status Report (Third Quarter 2023)" (*see* Dkt. 1535), and their assigns and/or subrogees;

   b.     "Barred Conduct" means: instituting, reinstituting, intervening in, initiating, commencing, maintaining, continuing, filing, encouraging, soliciting, supporting, participating in, collaborating in, assisting, otherwise prosecuting, or otherwise pursuing or litigating in any case, forum, or manner, whether pre-judgment or post-judgment, or enforcing, levying, employing legal process, attaching, garnishing, sequestering, bringing proceedings supplementary to execution, collecting, or otherwise recovering, by any means or in any manner, based upon any liability or responsibility, or asserted or potential liability or responsibility, directly or indirectly, or through a third party, relating in any way to the Barred Claims;

c.  "Barred Claims" means: any and all claims, actions, lawsuits, causes of action, investigations, demands, complaints, cross claims, counter claims, or third party claims or proceedings of any nature, including, but not limited to, litigation, arbitration, or other proceedings, in any federal or state court, or in any other court, arbitration forum, administrative agency, or other forum in the United States, whether arising under local, state, federal, or foreign law, that in any way relate to, are based upon, arise from, or are connected with: (i) claims released in the Settlement Agreement; (ii) the events or occurrences underlying the claims or allegations in the SEC Action, or claims or allegations that could have been brought in the SEC Action; (iii) the RFC Parties' representation of EquityBuild (as defined in the Settlement and Release Agreement), including but not limited to statements made by the RFC Parties to third parties in connection to loans made to EquityBuild; or (iv) the events or occurrences underlying the claims or allegations in the Receiver's Action, or claims or allegations that could have been brought in the Receiver's Action. The foregoing specifically includes any claim, however denominated, seeking contribution, indemnity, damages, or other remedy where the alleged injury to any person, entity, or other party, or the claim asserted by any person, entity, or other party, is based upon any of the Barred Claims whether pursuant to a demand, judgment, claim, agreement, settlement, or otherwise;

h.  The provisions of Paragraph 5 of this Order do not apply to: (i) the United States of America, its agencies or departments, or to any state or local government; and (ii) the Settling Parties' respective obligations under the Settlement Agreement.

i.      Nothing in this Approval Order is or will be construed to be an admission or concession of any violation of any statute or law, of any fault, liability, or wrongdoing, or of any infirmity in the claims or defenses of the Receiver or RFC with regard to any case or proceeding, including but not limited to the Receiver's Action.

j.      The provisions of this Approval Order will not be impaired, modified, or otherwise affected in any manner other than by direct appeal of this Approval Order, or motion for reconsideration or rehearing thereof, made in accordance with the Federal Rules of Civil Procedure.

k.      Pursuant to Fed. R. Civ. P. 54(b), and the Court's authority in this equity receivership to issue ancillary relief, this Approval Order is a final order for all purposes, including, without limitation, for purposes of the time to appeal or to seek rehearing or reconsideration.

l.      Any party, attorney, or other person who acts in a manner contradictory to the claims bar provisions in this Approval Order may be subject to such remedies for contempt as the Court may deem appropriate.

6.      The Court finds that the contingency fee amount for the Receiver's counsel is fair and reasonable and that they are entitled to a total payment of $_____, representing the total of the approved contingency fee plus expenses (comprising $_____ in fees and $_____ in expenses) from the $_____ settlement amount.

7.      The Court approves: (i) the settlement payment in the amount of Ten Million Dollars (USD) (10,000,000.00), minus legal fees and costs incurred by RFC as of September 30, 2024, which total $254,144.90, minus an additional amount up to Seventy Five Thousand Dollars

12

(USD) ($75,000.00) in reasonable legal fees and costs incurred by RFC from October 1, 2024 through the date the Approval Order becomes Final (as defined in the Settlement and Release Agreement) to be made by RFC, through its insurers, to the Receiver's Account; and (ii) upon the Receiver's receipt of the Settlement Amount from RFC, and without further order of the Court, the Receiver's immediate payment of $_____, representing the total of the approved contingency fee plus expenses, from the Receiver's Account to the client fund account of Spellmire Bruck LLP to be thereafter split between the engaged counsel in accordance with their agreement as set forth in the engagement letter.

8.      The Court finds that the Receiver has given fair, adequate, and sufficient notice of the Motion to all interested parties.

9.      The Court shall retain exclusive jurisdiction over all matters concerning the Settlement and Release Agreement, including without limitation the enforcement thereof.

ORDERED in the United States District Court

for Northern District of Illinois, Eastern Division,

on this ____ day of _____, 2024.

_____

UNITED STATES DISTRICT COURT JUDGE

# Exhibit B

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, T

FILED DATE: 3/8/2024 2:46 PM  2020L008843

FILED
3/8/2024 2:46 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020L008843
Calendar, T
26745281

# IN THE CIRCUIT COURT OF COOK COUNTY
## COUNTY DEPARTMENT, LAW DIVISION

KEVIN B. DUFF, RECEIVER FOR THE ESTATE OF )
EQUITYBUILD INC., EQUITYBUILD FINANCE LLC )
(f/k/a HARD MONEY COMPANY LLC), )
1700 JUNEWAY LLC, 4533-37 S CALUMET LLC, )
5450 S INDIANA LLC, 6217-27 S DORCHESTER LLC, )
6437 S KENWOOD LLC, 7026 CORNELL, INC., )
7109 S CALUMET LLC, 7749-59 S YATES LLC, )    CASE NO. 2020 L 8843
7933 S KINGSTON AVE LLC, 8100 S ESSEX LLC, )
8104 S KINGSTON ASSOCIATES, 8529 S RHODES )    Hon. Judge Daniel J. Kubasiak
AVE LLC, CHICAGO CAPITAL FUND I LLC, )
CHICAGO CAPITAL FUND II LLC, EB SOUTH )    Calendar T
CHICAGO 1 LLC, EB SOUTH CHICAGO 2 LLC, )
EB SOUTH CHICAGO 3 LLC, EB SOUTH )
CHICAGO 4 LLC, HYBRID CAPITAL FUND LLC, )
SOUTH SIDE DEVELOPMENT FUND 1 LLC, )
SOUTH SIDE DEVELOPMENT FUND 2 LLC, )
SOUTH SIDE DEVELOPMENT FUND 3 LLC, )
SOUTH SIDE DEVELOPMENT FUND 4 LLC, )
SOUTH SIDE DEVELOPMENT FUND 5 LLC, )
SOUTH SIDE DEVELOPMENT FUND 6 LLC, )
SOUTH SIDE DEVELOPMENT FUND 7 LLC, )
SOUTH SIDE DEVELOPMENT FUND 8 LLC, )
SSDF1 4520 S DREXEL LLC, SSDF1 4611 )
S DREXEL LLC, SSDF1 6751 S MERRILL LLC, )
SSDF1 7110 S CORNELL LLC, SSDF2 1139 )
E 79TH LLC, SSDF4 638 N AVERS LLC, SSDF4 )
6217 S DORCHESTER LLC, SSDF4 6250 )    JURY TRIAL DEMANDED
S MOZART LLC, SSDF4 7024 S PAXTON LLC, )
SSDF4 7255 S EUCLID LLC, SSDF5 )
PORTFOLIO 1 LLC, SSDF6 6160 S MLK LLC, )
SSDF7 PORTFOLIO 1 LLC, SSPH 6951 )
S MERRILL LLC, SSPH 7927-49 S ESSEX LLC, )
SSPH 11117 S LONGWOOD LLC, SSPH )
PORTFOLIO 1 LLC, )
)
   Plaintiff, )
)
    v. )
)
ROCK FUSCO & CONNELLY, LLC, )
IOANA SALAJANU, and BREGMAN, BERBERT, )
SCHWARTZ & GILDAY, LLC, )
)
   Defendants. )

1

FILED DATE: 3/8/2024 2:46 PM    2020L008843

## SECOND AMENDED COMPLAINT

Kevin B. Duff, as court-appointed receiver ("Receiver") in the case captioned *SEC v. EquityBuild, Inc., et al.,* Civil Action No. 18-cv-5587, United States District Court for the Northern District of Illinois, Eastern Division (the "SEC Action") for EquityBuild, Inc. ("EquityBuild"), EquityBuild Finance, LLC ("EquityBuild Finance"), their affiliates, and the affiliate entities of Jerome ("Jerry") Cohen and Shaun Cohen, which affiliates are identified in that certain Order Appointing Receiver entered August 17, 2018 (SEC Action, Docket No. 16), as supplemented by that certain Order entered March 14, 2019 (SEC Action, Docket No. 290), and that certain Order entered February 21, 2020 (SEC Action, Docket No. 634), pursuant to the powers vested in him by Order of the Court in the SEC Action, complains against Rock Fusco & Connelly, LLC, Ioana Salajanu, and Bregman, Berbert, Schwartz & Gilday, LLC (collectively the "Defendants"), as follows:

## NATURE OF THE CASE

1.      In August 2018, the United States Securities and Exchange Commission filed the SEC Action to halt an ongoing real estate fraud and Ponzi scheme devised and operated by Jerry Cohen, Shaun Cohen, and various employees of EquityBuild and EquityBuild Finance and materially assisted by, among other aiders and abettors, Ioana Salajanu, a licensed Illinois attorney and a partner at Rock, Fusco & Connelly, LLC and Bregman, Berbert, Schwartz & Gilday, LLC.

2.      The United States District Court enjoined the scheme and schemers, and shortly thereafter a consent judgment was entered affirming the SEC's allegations.

3.      Through the Ponzi scheme, Jerome Cohen and Shaun Cohen, with the assistance of their various enablers, bilked hundreds of ordinary investors and others across the country out of tens of millions of dollars through a wide variety of fraudulent acts and schemes.

**JURISDICTION AND VENUE**

4.    This court has jurisdiction pursuant to 735 ILCS 5/2-209 as a result of each of the Defendants being present and transacting business in the State of Illinois, committing the acts complained of in this Complaint within the State of Illinois, and/or failing to perform (and/or perform properly) duties and/or a contract substantially connected with this State.

5.    Venue is proper pursuant to 735 ILCS 5/2-101 because Cook County is where one or more of the Defendants resides, where a substantial part of the acts and omissions complained of in this Complaint occurred, and/or where the parties agreed in written engagement letters that disputes such as this one could be litigated.

**THE PARTIES AND OTHER KEY PLAYERS**

6.    Plaintiff Kevin B. Duff serves as court-appointed receiver in the SEC Action for, among other entities, EquityBuild, EquityBuild Finance, 1700 Juneway LLC, 4533-37 S Calumet LLC, 5450 S Indiana LLC, 6217-27 S Dorchester LLC, 6437 S Kenwood LLC, 7026 Cornell, Inc., 7109 S Calumet LLC, 7749-59 S Yates LLC, 7933 S Kingston Ave LLC, 8100 S Essex LLC, 8104 S Kingston Associates, 8529 S Rhodes Ave LLC, Chicago Capital Fund I LLC, Chicago Capital Fund II LLC, EB South Chicago 1 LLC, EB South Chicago 2 LLC, EB South Chicago 3 LLC, Eb South Chicago 4 LLC, Hybrid Capital Fund LLC, South Side Development Fund 1 LLC, South Side Development Fund 2 LLC, South Side Development Fund 3 LLC, South Side Development Fund 4 LLC, South Side Development Fund 5 LLC, South Side Development Fund 6 LLC, South Side Development Fund 7 LLC, South Side Development Fund 8 LLC, SSDF1 4520 S Drexel LLC, SSDF1 4611 S Drexel LLC, SSDF1 6751 S Merrill LLC, SSDF1 7110 S Cornell LLC, SSDF2 1139 E 79th LLC, SSDF4 638 N Avers LLC, SSDF4 6217 S Dorchester LLC, SSDF4 6250 S Mozart LLC, SSDF4 7024 S Paxton LLC, SSDF4 7255 S Euclid LLC, SSDF5 Portfolio 1 LLC, SSDF6 6160 S MLK LLC, SSDF7 Portfolio 1 LLC, SSPH 6951 S Merrill LLC, SSPH 7927-

FILED DATE: 3/8/2024 2:46 PM   2020L008843

FILED DATE: 3/8/2024 2:46 PM    2020L008843

49 S Essex LLC, SSPH 11117 S Longwood LLC, and SSPH Portfolio 1 LLC.

7.    Defendant Rock Fusco & Connelly, LLC ("Rock Fusco") is a Chicago based law firm.

8.    Defendant Ioana Salajanu is a licensed Illinois attorney who worked at Rock Fusco during the relevant time period. Unless otherwise noted, all acts, omissions, knowledge and notice of Salajanu were in her capacity as an agent of Rock Fusco.

9.    Defendant Bregman, Berbert, Schwartz & Gilday, LLC ("BBSG") is a law firm with offices in Maryland, Virginia, and the District of Columbia. Mark Rosenberg, an attorney, was employed with BBSG in an "of counsel" capacity.

## FACTUAL BACKGROUND

### Overview of the Ponzi Scheme

10.    Jerry Cohen formed EquityBuild as a Florida corporation on October 31, 2007.

11.    Jerry Cohen formed EquityBuild Finance as a Florida limited liability company in 2009.

12.    EquityBuild Finance was managed and wholly-owned by EquityBuild.

13.    The daily operations of EquityBuild Finance were carried out by Shaun Cohen.

14.    The Cohens promoted a "turnkey" approach to real estate investing by recruiting inexperienced but aspiring investors to at various times either purchase property for rehabilitation and resale ("investor-owners"), to purchase interests in EquityBuild affiliates that would purchase and renovate property for resale ("equity investors"), to participate in the making of loans to investor-owners, to companies owned by equity investors, or to EquityBuild itself ("investor-lenders"), or to purchase interests in development funds that indirectly owned one or more real estate assets ("fund investors").

15.    The investor-lenders were typically informed that EquityBuild, an EquityBuild

4

affiliate, or an investor-owner intended to acquire and rehabilitate an undervalued property, to raise rents consistent with the improvements, to increase occupancy, and to repay the principal balance of the short-term, interest-only promissory note either through a refinancing or sale of the property.

16.　　Typically, EquityBuild or the investor-owners bought property with acquisition and construction loans originated by EquityBuild Finance (or Hard Money Company, LLC, as its *de facto* predecessor) for the benefit of investor-lenders. (Unless context demands otherwise, Hard Money Company, LLC ("Hard Money Company") and EquityBuild Finance are sometimes referred to hereinafter as EquityBuild Finance.)

17.　　As an EquityBuild employee once described EquityBuild's business model to Ioana Salajanu, EquityBuild was "the borrower on most of our investments," EquityBuild Finance was the loan servicer, the loans were funded by investor-lenders, and EquityBuild Finance was not the true lender because "we have no money lent into the deal."

18.　　In early years EquityBuild would submit a contract to purchase residential real estate, either a single-family residence or a multifamily apartment building, to a real estate seller.

19.　　Through a team of "remote managers" EquityBuild Finance employed Internet advertising and other media channels, including, on at least one occasion, a television infomercial featuring William Shatner, to locate aspiring real estate investors and entice them with the prospect of double-digit returns on debt or equity investments in real estate assets.

20.　　The investor-lenders were induced to make loans evidenced by promissory notes issued by EquityBuild or, in some instances, an EquityBuild affiliate or investor-owner.

21.　　A typical promissory note would require EquityBuild to pay monthly interest on the originally stated principal balance at rates generally ranging from 13% to 18% per annum and to repay the principal at maturity, typically between 12 and 36 months after the date on the

promissory note or a date designated by EquityBuild Finance.

22.     The promissory notes were typically secured by a mortgage.

23.     In nearly all instances the mortgage identified each of the investor-lenders and the participating interest of each such investor-lender.

*The CASAs*

24.     The investor-lenders typically signed a Collateral Agency and Servicing Agreement ("CASA") with EquityBuild Finance.

25.     The CASA articulated the limited and restricted ways EquityBuild Finance would be authorized to enforce the loan upon default, which, subject to terms and conditions, put the matter to a vote of the noteholders, who were prohibited from acting unilaterally.

26.     Section 3 of the CASA contained the following language: "IN THE ABSENCE OF WRITTEN INSTRUCTIONS FROM THE REQUIRED LENDERS, NEITHER THE COLLATERAL AGENT NOR THE SERVICER SHALL FORECLOSE UPON ANY LIEN WITH RESPECT TO ANY OF THE COLLATERAL OR TAKE ANY OTHER ACTION WITH RESPECT TO THE COLLATERAL OR ANY PART THEREOF."

27.     The "required lenders" was defined to mean investor-lenders holding a majority of the principal advanced under the promissory note.

28.     Section 6(a) of the CASA contained the following disclaimer: "[T]he Collateral Agent shall act only on written instructions from all Lenders with respect to the amendment or termination of the Mortgage, or, except as provided in the Mortgage, any Lien on property of the Borrower granted under the Mortgage."

29.     On October 22, 2015, Elizabeth Kammerer, an EquityBuild Finance employee, forwarded Salajanu an e-mail from a prospective investor-lender who was expressing concern

FILED DATE: 3/8/2024 2:46 PM   2020L008843

FILED DATE: 3/8/2024 2:46 PM    2020L008843

about the loan documentation, including (1) the evident lack of insurance carried by EquityBuild Finance, particularly given language in the CASA exempting itself from liability for negligence, (2) ambiguity regarding the prepayment penalty, (3) failure of the mortgage to make express reference to the promissory note, (4) lack of any representation by EquityBuild Finance regarding the financial condition of the borrower or the perfection and priority of the mortgage, (5) lack of clarity regarding the relationship between the borrower and the collateral agent and servicer and the implications associated with a potential default, and (6) lack of a special purpose entity borrower.

30.    On October 28, 2015, Kammerer forwarded Salajanu a copy of the CASA then being used by EquityBuild Finance.

31.    On October 29, 2015, Shaun Cohen provided additional information to Salajanu, informing her, among other things, that EquityBuild Finance "does not want a prepayment penalty," that there are "multiple lenders syndicated on each mortgage and note with [EquityBuild Finance] as the collateral and servicing agent in the middle," and that the "lenders are not intended to have any power except [as] specified in the CASA."

32.    Between December 2015 and January 2016, Salajanu and her Rock Fusco colleague Patrick Clancy read and revised the CASA, but made only minor changes to the agreement, leaving in place the language in Section 6(a) that "the Collateral Agent shall act only on written instructions from all Lenders with respect to the amendment or termination of the Mortgage[.]"

*Re-Review of the CASA*

33.    On March 27, 2018, Elizabeth Kammerer e-mailed Salajanu indicating that the "CASAs need to be overhauled to cover all and be clearer," and she attached copies of the CASA's then being used for both secured and unsecured promissory notes.

7

34.     Salajanu made some revisions to the language of the CASAs and returned a proposed new draft on April 3, 2018.

35.     The proposed new draft returned by Salajanu *deleted* the following sentence:

> IN THE ABSENCE OF WRITTEN INSTRUCTIONS FROM THE REQUIRED LENDERS, NEITHER THE COLLATERAL AGENT NOR THE SERVICER SHALL FORECLOSE UPON ANY LIEN WITH RESPECT TO ANY OF THE COLLATERAL OR TAKE ANY OTHER ACTION WITH RESPECT TO THE COLLATERAL OR ANY PART THEREOF.

36.     The proposed new draft returned by Salajanu also *deleted* the following sentence:

> [T]he Collateral Agent shall act only on written instructions from all Lenders with respect to the amendment or termination of the Mortgage, or, except as provided in the Mortgage, any Lien on property of the Borrower granted under the Mortgage.

37.     Salajanu deleted the foregoing language because, as set forth in numerous examples below, she knew that EquityBuild Finance had been releasing investor-lender mortgages without their unanimous written consent and in violation of the CASAs.

***The Loan Documents***

38.     The loans originated by EquityBuild Finance included advances that were used to pay unusually steep acquisition and development fees to EquityBuild, as well as unusually high loan origination fees to EquityBuild Finance.

39.     The loans originated by EquityBuild Finance typically resulted in an initial advance of 150 to 200% of the amount spent to acquire the property (and sometimes more).

40.     The assets encumbered by the mortgage debt consistently failed to appreciate in value by an amount sufficient to repay the investor-lenders' debt at maturity, either through selling or refinancing the property.

41.     Rather than declare a default and take steps to enforce the investor-lenders' rights under a promissory note, EquityBuild Finance, as loan servicer, would typically enter into a loan

FILED DATE: 3/8/2024 2:46 PM 2020L008843

FILED DATE: 3/8/2024 2:46 PM    2020L008843

extension agreement with EquityBuild, as borrower.

42.     Loan extension agreements afforded EquityBuild additional time to refinance or sell the property and afforded EquityBuild Finance additional time to persuade the investor-lenders to roll their (illusory) principal into a new investment.

43.     As a growing number of investor-lenders complained about the repeated loan extensions, refused to "roll" their principal into a new investment, and demanded the immediate return of their money, EquityBuild Finance attempted to find new investor-lenders to buy out the interests of the complaining investor-lenders.

44.     Occasionally, EquityBuild Finance succeeded in brokering buyouts, but most complaining investor-lenders remained in a "buyout queue."

45.     If a particular property or group of properties could not be refinanced or sold for an amount that would yield proceeds sufficient to repay the entire principal balance due on an investor-lender loan, EquityBuild would effectuate a short sale or short refinance, in the latter case either individually or through portfolio loans.

46.     To consummate these short sales or short refinances, EquityBuild would (1) cause EquityBuild Finance to submit a knowingly inaccurate payoff statement to the title company either (a) indicating that EquityBuild Finance would agree to release the mortgage in exchange for payment of a falsely understated outstanding principal balance due or (b) accurately stating the outstanding principal balance due, but indicating that EquityBuild Finance would agree to release the mortgage in exchange for "100% Net Proceeds" of the sale or refinance and/or (2) submit a mortgage release.

47.     In nearly all instances the payoff statements instructed the title company to wire the payoff proceeds to an EquityBuild Finance bank account.

48.     When acting as loan servicer in furtherance of its scheme, *EquityBuild Finance never solicited nor obtained the written consent of any investor-lender* (let alone investor-lenders holding a majority of the interests in a particular loan) prior to issuing a payoff statement.

49.     After receiving the short payoffs, EquityBuild Finance would repay only selected investor-lenders, if any, and divert the remaining proceeds back into the Ponzi scheme.

*50.*     EquityBuild Finance misled investor-lenders not paid off by a particular short sale or short refinance by representing that their loan had been extended and/or that a refinancing or sale remained in process.

**Salajanu Commencement Of Work At Rock Fusco**

51.     Salajanu began representing EquityBuild and EquityBuild Finance in 2014, while employed at Bryce Downey & Lenkov LLC ("Bryce Downey"). In or about March 2015, Salajanu joined Rock Fusco.  Over the course of her work for EquityBuild, Salajanu assisted EquityBuild in connection with, among other things, the acquisition, disposition, reacquisition, financing, and/or refinancing of at least 160 properties.  In addition, Salajanu created many of the LLCs that would ultimately hold title to the properties.

52.     Within her first three months at Rock Fusco, Salajanu assisted EquityBuild in reselling four properties to investor-owners in transactions that consistently generated substantial gross profits to EquityBuild and in which the investor-owners acquired the property with loans originated by EquityBuild Finance – loans that substantially exceeded the purchase price, to-wit:

    a.     Salajanu represented EquityBuild when it purchased <u>7953 S Marquette</u> for $335,000, and she represented EquityBuild when it resold the property for $637,000 to an investor-owner who acquired the asset with the benefit of an $887,000 loan from EquityBuild Finance.

    b.     Salajanu represented EquityBuild when it purchased <u>8107 S Ellis</u> for $335,000, and she represented EquityBuild when it resold the property for $499,500 to an investor-owner who acquired the asset with the benefit of a $525,000 loan from EquityBuild Finance.

FILED DATE: 3/8/2024 2:46 PM    2020L008843

FILED DATE: 3/8/2024 2:46 PM   2020L008843

c.  Salajanu represented EquityBuild when it purchased 7450 S Luella for $370,000, and she represented EquityBuild when it resold the property for $544,000 to an investor-owner who acquired the asset with the benefit of an $594,000 loan from EquityBuild Finance.

d.  Salajanu represented EquityBuild when it purchased 7616 S Phillips for $725,000, and she represented EquityBuild when it resold the property for $1,514,650 to an investor-owner who acquired the asset with the benefit of a $1,950,000 loan from EquityBuild Finance.

53.  Within the first five months of her tenure at Rock Fusco, Salajanu assisted EquityBuild in selling five properties encumbered with EquityBuild Finance debt, and each of the loans was short paid at closing, to wit:

a.  Salajanu represented EquityBuild with the sale of 5342 N Linder and, although the payoff statement indicated an unpaid principal balance due of $397,298.81, the payoff made to EquityBuild Finance at closing was only $268,558.80.

b.  Salajanu represented EquityBuild with the sale of 5209 S Warwick and, although the payoff statement indicated an unpaid principal balance due of $372,138, the payoff made to EquityBuild Finance at closing was only $204,268.24.

c.  Salajanu represented EquityBuild with the sale of 8107 S Ellis and, although the payoff statement indicated an unpaid principal balance due of $525,000, the payoff made to EquityBuild Finance at closing was only $447,343.14.

d.  Salajanu represented EquityBuild with the sale of 4944 W Roscoe and, although the payoff statement indicated an unpaid principal balance due of $368,161, the payoff made to EquityBuild Finance at closing was only $267,106.28.

e.  Salajanu represented EquityBuild with the sale of 4109 N Kimball and, although the payoff statement indicated an unpaid principal balance due of $402,237, the payoff made to EquityBuild Finance at closing was only $252,323.12.

54.  In connection with the sale of 5342 N Linder, Salajanu received an e-mail shortly before the closing in which the title agent asked: "[A]re we only paying off one investor?"

55.  Salajanu signed the closing statements as attorney-in-fact for Jerry Cohen in

11

connection with each of the referenced short sales.

***Short Payoff Example: 4930 W Cornelia***

56.    Salajanu represented EquityBuild on the sale of <u>4930 W Cornelia</u> for $233,500, which closed on November 4, 2015.

57.    On the day of the closing, Kammerer e-mailed Salajanu and stated: "Just to clarify because I am still new to reviewing the [closing statements] solo, we are not getting anything from this so we do not have money to payoff our lenders unfortunately? And is the amount listed for the payoff of the mortgage supposed to be short by $250,162.77[?]"

58.    The payoff statement reflected an unpaid principal balance of $426,476, but indicated that the mortgage would be released in exchange for 100% of the net sales proceeds of $233,500.

59.    The investor-lender loan was short paid at closing, and Salajanu signed the settlement statement as attorney-in-fact for Jerry Cohen.

60.    Salajanu knew or should have known that the participating investor lenders did not provide written consent to a short payoff as required by the CASAs.

***Short Payoff Example: 7200 S Stony Island***

61.    Salajanu represented EquityBuild on the sale of <u>7200 S Stony Island</u> for $1,850,000, which closed on November 5, 2015.

62.    The title commitment that Salajanu reviewed prior to the closing indicated that the property was encumbered by two mortgages, and, after EquityBuild Finance provided the payoff statements to the title company, the escrow agent indicated that EquityBuild would be required to "bring $358,125.81 to the closing tomorrow."

63.    Kammerer forwarded the e-mail to Jerry Cohen and asked, "[C]an we bring this?"

FILED DATE: 3/8/2024 2:46 PM  2020L008843

FILED DATE: 3/8/2024 2:46 PM   2020L008843

and Jerry responded (copying Salajanu), "Zero out file please."

64.     Kammerer subsequently prepared and submitted new payoff statements indicating that EquityBuild Finance would release the mortgage in exchange for 100% of the "net proceeds."

65.     As a result, the investor-lender loans were short paid by $351,278.90, and Salajanu signed the settlement statement as attorney-in-fact for Jerry Cohen.

66.     Salajanu knew or should have known that the participating investor lenders did not provide written consent to a short payoff as required by the CASAs.

**Short Payoff Example: 4511 Merrimac**

67.     Salajanu represented EquityBuild in connection with the sale of 4511 N Merrimac for $230,000, which closed on April 15, 2016.

68.     The payoff statement provided by EquityBuild Finance to Stacie Chimera (a Rock Fusco paralegal) indicated that the unpaid principal balance of the investor-lender loan equaled $351,092.

69.     At the closing, only $191,056.79 of the total principal balance due was wired to EquityBuild Finance, and Salajanu signed the settlement statement as attorney-in-fact for Jerry Cohen.

70.     Salajanu knew or should have known that the participating investor lenders did not provide written consent to a short payoff as required by the CASAs.

**Short Payoff Example: 4108 N Monticello**

71.     Salajanu represented EquityBuild in connection with the sale of 4108 N Monticello for $400,000, which closed on May 27, 2016.

72.     The title commitment that Salajanu reviewed in preparation for the conveyance disclosed a $387,792 mortgage recorded against the property.

13

FILED DATE: 3/8/2024 2:46 PM    2020L008843

73.     At the closing, the buyer insisted that EquityBuild escrow $10,000 in respect of "plumbing issues."

74.     Rather than having EquityBuild wire $10,000 to closing, Kammerer prepared a revised payoff statement indicating that $10,000 of the anticipated payoff to the investor-lenders would be held back to secure the repairs.

75.     The revised payoff statement was created and transmitted to the title company within 26 minutes.

76.     Only $339,888.17 of the $427,117 balance due under the promissory note was wired to EquityBuild Finance at the closing, and Salajanu signed the settlement statement as attorney-in-fact for Jerry Cohen.

77.     Salajanu knew or should have known that the participating investor lenders did not provide written consent to a short payoff as required by the CASAs.

### Short Payoff Example: 4351 S Calumet

78.     Salajanu represented EquityBuild in connection with the sale of 4351 S Calumet for $307,900, which closed on August 23, 2016.

79.     The title commitment that Salajanu reviewed in preparation for the conveyance disclosed a $260,000 mortgage recorded in favor of Hard Money Company.

80.     In preparation for the sale, Patty San Martin (a Rock Fusco paralegal) informed Kammerer that "[EquityBuild] will need to bring cash to the closing" because the anticipated sale proceeds precluded a full payoff.

81.     Jerry Cohen replied to all (including Salajanu) and instructed Kammerer to submit "a short payoff that eliminates the cash required."

82.     Kammerer responded to San Martin's indication that EquityBuild would need to

contribute cash at closing, writing in an e-mail that "[t]he payoffs for these always are higher than the amount we receive, not sure why there is an issue this time" and adding that "we have been doing short sales for a year now."

83. Salajanu knew or should have known that the five participating investor-lenders did not provide written consent as required by the CASAs to a short payoff in the 39 minutes between the time that San Martin informed EquityBuild that it would be required to contribute cash at closing and the time that Jerry Cohen instructed Kammerer to reduce the payoff.

84. Only $246,164.23 of the $260,000 outstanding balance due was wired to EquityBuild Finance at closing, and Patrick Clancy of Rock Fusco signed the settlement statement as attorney-in-fact for Jerry Cohen.

### Short Payoff Example: 6801 S East End

85. Salajanu represented EquityBuild when it acquired 6801 S East End on March 1, 2016, for $450,000 in cash.

86. Salajanu represented EquityBuild in connection with the sale of 6801 S East End to an investor-owner for $1,383,000, which closed on December 29, 2016.

87. The title commitment that Salajanu reviewed in connection with the conveyance disclosed the existence of a $1,374,714 mortgage identifying 24 investor-lenders who extended EquityBuild a loan outside of the initial closing.

88. The investor-owner acquired the property with the benefit of a $1,374,714 loan originated by EquityBuild Finance.

89. At the closing, Salajanu simultaneously represented EquityBuild (as seller) and EquityBuild Finance (as loan originator and servicer for the prospective investor-owner).

90. The mortgage recorded by EquityBuild Finance on behalf of the 24 investor-lenders

FILED DATE: 3/8/2024 2:46 PM    2020L008843

who were ostensibly making the loan to the investor-owner was nearly identical to the mortgage recorded by EquityBuild Finance on behalf of the same 24 investor-lenders who made the initial loan to EquityBuild, and only the identity of the borrower, the date on the front page of the mortgage, and the borrower signature page had been modified.

91.     The 24 investor-lenders did not provide written consent to have their loan to EquityBuild transformed into a loan to an investor-owner.

92.     Prior to closing the title agent informed Salajanu (among others) that she "reduced the payoff to the net proceeds [because if] I increase it to the full payoff then EquityBuild, Inc. needs to bring in about $25,000.00 or so."

***Building Code Violations***

93.     During the period that Rock Fusco represented EquityBuild, more than 200 circuit court or administrative actions were filed against properties it either owned or agreed to improve for investor-owners, and Rock Fusco defended these cases. The violations included, *inter alia*, the presence of rats, cockroaches, bed bugs, broken windows and criminal activity, failure to meet minimum standards in electrical, plumbing and HVAC, and hazardous conditions such as failing masonry, porch guardrails, stairs, and missing smoke detectors.

94.     Salajanu became aware that EquityBuild was frequently unable or unwilling to pay for repairs to these properties, even though it received funds from investor-lenders for precisely this purpose.

95.     In one housing court matter, the City of Chicago named as defendants each of the investor-lenders identified on the mortgage. Rock Fusco entered an appearance for each of them without obtaining conflict waivers in connection with its simultaneous representation of EquityBuild and the investor-lenders.

16

FILED DATE: 3/8/2024 2:46 PM   2020L008843

96.     On October 31, 2016, Salajanu participated in an extended conference call to discuss how to respond to the increasing amount of building code litigation, and a week later Berard and Salajanu discussed their "strategy for [a] meeting with [the] City to discuss increased scrutiny of EquityBuild[.]"

97.     On September 5, 2017, Berard circulated an EquityBuild Litigation Management Matrix identifying 31 separate properties subject to present or past housing court or administrative actions.  Berard indicated that the litigation matrix included 12 open housing court cases and 10 open administrative actions.

98.     By October 16, 2017, EquityBuild had been added to the Chicago Housing Authority "debarment list" as a result of its inclusion on the City of Chicago "scofflaw list."  In an e-mail, Berard explained: "The Scofflaw list is for residential building owners with 3 or more properties that are the subject of active Circuit Court cases where the violations remain uncorrected after the second court hearing. EquityBuild currently has 12 cases that fit this description."

*Refinancings*

99.     Beginning in or about February 2017, with Salajanu as transaction counsel, EquityBuild began refinancing properties encumbered with investor-lender loans either individually or in portfolios.

100.     The refinancings resulted in the investor-lenders releasing their collateral.  In most or all instances, Salajanu knew or should have known that the investor-lenders did not provide written consent for the release of their collateral as required by the CASAs, yet she failed to advise EquityBuild Finance that unanimous consent of the investor-lenders was required in order to release their collateral.

*Individual Refinance Example: 7109 S Calumet*

17

FILED DATE: 3/8/2024 2:46 PM    2020L008843

101.    With Salajanu serving as transaction counsel, EquityBuild (through 7109 S. Calumet LLC, the special purpose entity borrower) refinanced <u>7109 S Calumet</u> with the benefit of a $1,507,000 loan from Red Mortgage Capital that closed on or about February 6, 2017.

102.    Salajanu represented EquityBuild when it acquired the property for $1,100,000 in cash on September 3, 2014.

103.    On October 5, 2016, Tyler DeRoo of EquityBuild e-mailed Salajanu a copy of the $1,800,000 mortgage recorded against the property for the benefit of 21 investor-lenders, the promissory note, and the CASA.

104.    DeRoo had not been involved in the short sales that preceded this transaction and was seeking Salajanu's advice regarding the potential short payment of the promissory note as a means of overcoming the insufficiency of new funds to retire the existing loan debt.

105.    The payoff statement submitted by EquityBuild Finance indicated that the outstanding principal balance due was $1,500,000 and that "EquityBuild Finance, LLC is willing to give a release in exchange for 100% Net Proceeds[.]"

106.    At the closing of the refinance of <u>7109 S Calumet</u>, the mortgage loan was short paid, and only $1,440,104.86 of the $1,500,000 stated principal balance due was wired to EquityBuild Finance.

107.    Salajanu knew or should have known that the investor-lenders never provided written consent to the release of the mortgage, which was required by the CASA.

108.    Salajanu never advised EquityBuild Finance that the investor-lenders were required to consent in writing to the release of the collateral or that EquityBuild Finance could have declared a default and enforced the promissory note in lieu of accepting a short payoff.

***Individual Refinance Example: 4533 S Calumet***

109.    With Salajanu serving as transaction counsel, EquityBuild (through 4533-37

18

S. Calumet LLC, the special purpose entity borrower) refinanced 4533 S Calumet with the benefit of a $1,510,000 loan from BMO Harris that closed on or about February 10, 2017.

110.     Salajanu represented EquityBuild when it acquired the property for $1,750,000 in cash on July 25, 2016.

111.     After and outside the closing on the acquisition, a $2,900,000 mortgage had been recorded for the benefit of 44 investor-lenders.

112.     At the closing of the refinance, BMO Harris held back $882,000 for construction costs, substantially reducing both the initial advance and the proceeds available to pay off the investor-lenders. The construction holdback is an example of a protocol used by sophisticated lenders but not by EquityBuild Finance on behalf of the ordinary investor-lenders.

113.     To consummate the refinancing, EquityBuild needed to reduce the payoff balance by $2,315,968.94, so EquityBuild Finance prepared and submitted a payoff statement reflecting an unpaid principal balance due of only $584,031.06, which was the amount identified as "PAYOFF MORTGAGE" on the settlement statement.

114.     Salajanu knew or should have known that EquityBuild did not repay $2,315,968.94 in investor-lender debt in less than seven months.

115.     Salajanu knew or should have known that the investor-lenders never provided written consent to the release of the mortgage as required by the CASAs.

116.     Salajanu never advised EquityBuild Finance that the investor-lenders were required to consent in writing to the release of the collateral or that EquityBuild Finance could have declared a default and enforced the promissory note in lieu of accepting a short payoff.

***Individual Refinance Examples: 6250 S Mozart and 7255 S Euclid***

117.     Salajanu represented EquityBuild in connection with the separate refinancings of 6250 S Mozart and 7255 S Euclid, both of which closed on December 13, 2017.

19

118.   Salajanu represented EquityBuild when it acquired 7255 S Euclid for $800,000 in cash on May 23, 2016.

119.   A $1,250,000 mortgage was later recorded against the property.

120.   Salajanu represented EquityBuild when it acquired 6250 S Mozart for 1,250,000 in cash on June 27, 2016.

121.   A $1,825,000 mortgage was later recorded against the property.

122.   Two days prior to the December 13, 2017 closings of the refinances of both properties, DeRoo submitted payoff statements to Salajanu instructing the title company to wire the payoff proceeds to an EquityBuild Finance bank account.

123.   Salajanu knew or should have known that none of the participating investor-lenders on either of the two loans being refinanced signed a written consent to the release of their collateral as required by the CASAs.

124.   Salajanu never advised EquityBuild Finance that the investor-lenders were required to consent in writing to the release of the collateral or that EquityBuild Finance could have declared a default and enforced the promissory note in lieu of accepting a short payoff.

***Individual Refinance Example: 6160 S King***

125.   Salajanu counseled EquityBuild in connection with the refinancing of 6160 S King.

126.   Salajanu represented EquityBuild when it purchased 6160 S King for $1,750,000 in cash on November 9, 2016.

127.   The title commitment that Salajanu reviewed in connection with the refinancing revealed that the property had subsequently been encumbered with a mortgage in the amount of $4,370,000.

128.   The refinancing lender agreed to extend SSDF6 6160 S MLK LLC, the special purpose borrower entity created by EquityBuild, a $2,750,000 loan, but at closing it held back

20

$222,812.50 for interest and $2,071,302.23 for renovations.

129.     Prior to the closing San Martin asked DeRoo for a payoff statement, and DeRoo responded by asking whether Jerry or Shaun already signed a release of the mortgage, adding: "[I'm] almost certain that we have moved all of our investors off of this one."

130.     On May 23, 2018, DeRoo asked San Martin to prepare a release of the investor-lender mortgage.

131.     No payoff statement was submitted in connection with the closing of the refinance, and no funds were used to make any type of payoff in respect of the investor-lender mortgage loan.

132.     At closing, the borrower was required to fund an escrow to pay for the redemption of first and second installment 2016 Cook County property taxes and to pay past due first installment 2017 Cook County property taxes.

133.     On July 10, 2018, Elizabeth Kammerer asked Salajanu and San Martin whether they ever received a release from the assignee of a partial interest in the investor-lender mortgage recorded against the property, forwarding a thread of correspondence with the IRA custodian for the assignee in which she had informed the assignee that the payoff amount, if any, could not be ascertained until the closing figures were better understood.

134.     Salajanu knew or should have known that the investor-lenders who DeRoo was "almost certain" had moved off the loan had not provided written consent to the release of the mortgage in writing as required by the CASAs before San Martin prepared the mortgage release and submitted it to Shaun Cohen for execution and delivery to the title company.

135.     Salajanu never advised EquityBuild Finance that the investor-lenders were required to consent in writing to the release of the collateral or that EquityBuild Finance could have declared a default and enforced the promissory note in lieu of accepting a short payoff.

21

*FILED DATE: 3/8/2024 2:46 PM 2020L008843*

### *Individual Refinance Example: 638 N Avers*

136.    Salajanu counseled EquityBuild in connection with the refinancing of <u>638 N Avers</u>.

137.    Salajanu represented EquityBuild when it purchased <u>638 N Avers</u> for $800,000 in cash on September 27, 2016.

138.    The title commitment that Salajanu reviewed in connection with the refinancing revealed that the property had subsequently been encumbered with a mortgage in the amount of $1,300,000.

139.    On the morning of the closing, June 26, 2018, DeRoo supplied San Martin with a payoff statement reflecting a $964,250 balance due as of June 30, 2018.

140.    Salajanu knew or should have known that the investor-lenders had not provided written consent to the release of the mortgage in writing as required by the CASAs.

141.    Salajanu never advised EquityBuild Finance that the investor-lenders were required to consent in writing to the release of the collateral or that EquityBuild Finance could have declared a default and enforced the promissory note in lieu of accepting a short payoff.

### *Portfolio Refinances*

### *UBS AG*

142.    On February 23, 2017, Salajanu received an e-mail from counsel for UBS AG ("UBS") regarding the origination of a mortgage loan to be secured by seven properties, <u>7450 S Luella</u>, <u>2800 E 81st</u>, <u>7842 S Yates</u>, <u>1422 E 68th</u>, <u>4750 S Indiana</u>, <u>6558 S Vernon</u>, and <u>5618 S King</u>.

143.    In connection with her preparation for the closing, Salajanu also received information and documentation indicating, among other things, that:

> a.    Of the seven properties being refinanced through UBS, six had previously been sold by EquityBuild to either investor-owners or EquityBuild affiliates owned by equity investors.

FILED DATE: 3/8/2024 2:46 PM    2020L008843

b.     Six of the seven properties being refinanced were encumbered by investor-lender debt that exceeded the prices for which EquityBuild sold them, and one of those six properties was sold for $104,000 and later encumbered with $589,917.88 in investor-lender loan debt.

c.     Each of the six properties owned by investor-owners or EquityBuild affiliates was now being conveyed back to EquityBuild (and, specifically, to SSPH Portfolio 1, LLC, the special purpose borrowing entity established for the refinance).

144.    On May 11, 2017, the title company wrote to DeRoo and Salajanu to indicate that, based on her preparation of the preliminary settlement statement, the borrower would need to wire $468,353.68 into the closing escrow in order to consummate the refinance.

145.    DeRoo replied that "[o]ne of the payoffs is being reduced so this will come down a bit."  Salajanu asked DeRoo: "Are you changing the payoffs?" and DeRoo replied: "One of them yes."

146.    A few hours later DeRoo produced a revised payoff statement for 6558 S Vernon which identified the unpaid principal balance as $510,699, while the statement he provided Salajanu six days earlier identified that balance as $1,035,000.

147.    Later that evening, an executive director at UBS asked DeRoo (copying, among others, Salajanu) whether there is "an additional payoff on Vernon" because they had it estimated at $1,035,000.

148.    The following morning, the day of the closing, outside counsel for UBS wrote to Salajanu and asked: "Did they really pay off $524,367.00 in the last week?"

149.    Salajanu forwarded the e-mail to DeRoo and wrote: "See below!!!"

150.    To consummate the closing, Salajanu signed and submitted an opinion letter indicating that there were "no judgments filed or actions, law suits, claims or proceedings of any kind pending or threatened" against Jerry Cohen.

151.    Salajanu knew that this assertion was incorrect because she knew that at least ten

tax lien petitions were pending against Jerry Cohen in Philadelphia.

152. Salajanu knew or should have known that no investor-lender provided written consent to the release of its mortgage as required by the CASAs.

153. Salajanu never advised EquityBuild Finance that the investor-lenders were required to consent in writing to the release of the collateral or that EquityBuild Finance could have declared a default and enforced the promissory note in lieu of accepting a short payoff.

***Portfolio Refinance: Colony American Financial Lender***

154. By March 23, 2017, Salajanu knew that EquityBuild intended to refinance a portfolio of properties through Colony American Finance Lender ("Colony").

155. EquityBuild referred to this transaction as the "Colony T3 refinance."

156. The properties ultimately collateralized for the Colony T3 refinance were 2129 W 71st, 5437 S Laflin, 6759 S Indiana, 9610 S Woodlawn, 8809 S Wood, 7760 S Coles, and 7300 S St Lawrence.

157. EquityBuild established a single-purpose entity known as EB South Chicago 3, LLC ("EBSC3") to acquire title to the properties and enter into the promissory note with Colony.

158. Salajanu knew that two of the properties being included within the portfolio refinance (5437 S Laflin and 6759 S Indiana) were being conveyed to EBSC3 by an investor-owner and that one property (8809 S Wood) was being conveyed to EBSC3 by an EquityBuild affiliate owned by equity investors.

159. Salajanu also knew that two properties she assisted EquityBuild in acquiring for cash and which were now being refinanced had been encumbered by EquityBuild Finance loans originated for groups of investor-lenders in which the mortgage amounts exceeded the purchase prices.

24

FILED DATE: 3/8/2024 2:46 PM   2020L008843

160.     Salajanu represented EquityBuild when it acquired 7760 S Coles on June 30, 2015, for $521,000 in cash, but the property was later encumbered by a mortgage securing an $810,000 loan.

161.     Salajanu represented EquityBuild when it acquired 7300 S St Lawrence on September 30, 2015 for $325,000 in cash, but the property was later encumbered by a mortgage securing an $618,603 loan.

162.     To avoid the imposition of transfer taxes on the conveyances of 5437 S Laflin and 6759 S Indiana from the investor-owners to EBSC3, Salajanu informed counsel for Colony that the transfers would be evidenced by deeds in lieu of foreclosure.

163.     On May 18, 2017, Salajanu wrote as follows: "The purchase price of the contracts are offset by the debt on the property. Given that the lender has the same underlying principals as the purchaser, no funds are being exchanged physically. The purchase price extinguishes the debt."

164.     Salajanu's assertion that "the lender has the same underlying principals as the purchaser" was false because the investor-lenders did not share the same underlying principals as EBSC3.

165.     During the same period that Salajanu was informing counsel for Colony that the properties were being conveyed to EBSC3 by deeds in lieu of foreclosure, DeRoo and Patty San Martin were informing the title company that EBSC3 would be paying for the properties and that the seller would be paying off the investor-lender mortgage loan at closing.

166.     An attorney employed by the title company subsequently wrote to DeRoo (among others), in part, as follows:

> I am not comfortable with the fact that these properties are not vested in your entities, but you're telling us they're not purchases, and the information I've received from your attorney is conflicting as to exactly what is going on. I've stated before, both in

25

FILED DATE: 3/8/2024 2:46 PM    2020L008843

conversation and emails that we cannot accept payoffs provided by the borrower-it's the reason we ask for lender information on our Borrower Information Sheet. When a borrower does provide payoffs we have to independently verify the information which takes the same amount of time as obtaining the payoff ourselves. We have been trying to verify payoffs all week and have been unsuccessful.

Further, the fact that deeds by [the investor-owners] were executed this week without our knowledge, despite the numerous conversations we've had to obtain information to schedule their signing, is troubling. We need to speak with these individuals and need copies of their identifications. You stated in a previous conference call that they had an equity interest, but neither is involved in any entity in this transaction. When you look at the totality of the circumstances here it looks like something other than what you're stating is actually going on. If there is a clear explanation for this we need to know. I cannot clear these 3 properties to close without having spoken to these individuals to obtain a clear picture of the structure of this transaction. I don't want this issue to delay closing. Please provide the contact information we've requested. Thank you.

167. DeRoo forwarded Ms. Perez's e-mail to Salajanu and sought guidance, to which Salajanu replied: "What did you tell her???"

168. Jerry Cohen then wrote that "[t]his is starting to look like a problem" and asked whether they can "fix it," to which DeRoo replied, "Yes, working on it with Ioana."

169. On May 22, 2017, Salajanu informed counsel for Colony that the owner-investors would sell the properties to EBSC3 and pay off the mortgage loan at closing (*i.e.,* the transactions would no longer be deeds in lieu of foreclosure).

170. Counsel for Colony then requested copies of the purchase and sale agreements along with contact information for the sellers.

171. A half an hour later, San Martin sent DeRoo three standard-form purchase and sale contracts with the parties' names and the corresponding purchase prices handwritten on the first page and requested signatures from each seller and Jerry Cohen.

172. After the structure of the transactions was settled, the title company requested

documentary proof that EquityBuild Finance possessed the power to release the mortgages.

173.    On May 17, 2017, DeRoo had sent both the title company and Salajanu a payoff statement for <u>2129 W 71st</u> indicating an unpaid principal balance due of $97,343.67.

174.    The payoff statement was printed on EquityBuild Finance letterhead and directed the payoff proceeds to a Wells Fargo bank account in Marco Island, Florida, for final credit to EquityBuild Finance.

175.    The title company rejected the payoff statement because the mortgagee was identified as the Aldrich Company Employees Retirement Trust ("Aldrich").

176.    The title company required EquityBuild to obtain a payoff statement issued directly by Aldrich.

177.    The payoff statement subsequently submitted by Aldrich instructed the title company to wire a specified amount of loan payoff proceeds directly to a bank account controlled by Aldrich, not by EquityBuild Finance.

178.    With respect to <u>5437 S Laflin</u>, DeRoo had originally submitted a payoff statement issued by EquityBuild Finance and directing that the proceeds be wired to its own account, but Salajanu later wrote to the title company to "clear the confusion" and indicate that the loan had actually been repaid.

179.    With respect to the remaining properties being conveyed to EBSC3, Salajanu informed the title company, OS National, that EquityBuild Finance served as loan servicer for the investor-lenders and issued payoff statements on their behalf.

180.    Salajanu did not disclose that the CASAs precluded EquityBuild Finance from releasing the collateral absent the unanimous consent of the investor-lenders.

181.    The title company subsequently requested copies of the CASAs, and Salajanu

relayed that request to Shaun Cohen, who indicated that there would be an "enormous amount" of them and asked whether they need "every single one."

182. Salajanu informed Shaun that, because the title company had not yet requested production of the CASA's, she would attempt to limit the scope of the request if and when it was made.

183. Salajanu wrote to Shaun, in part, as follows: "I am assuming that they will ask for them as they have asked for every other document that we have referenced. I gave them an explanation clarifying the statements previously made that there [were] assignments of mortgages, which there are not and [that] EB Finance is servicer. . . . If I was their lawyer, I would ask for a CASA signed by everyone involved in this transaction."

184. Later that afternoon, Kammerer forwarded Salajanu a CASA executed by one of the investor-lenders in connection with the mortgage recorded against 7300 S St Lawrence, and that CASA prohibited EquityBuild Finance from releasing the mortgage without the unanimous consent of the investor-lenders.

185. Salajanu never advised EquityBuild Finance that the investor-lenders were required to consent in writing to the release of the collateral being offered to Colony by EBSC3 or that EquityBuild Finance could have declared a default and enforced the promissory note in lieu of accepting a short payoff.

*Portfolio Refinance: BC 57, LLC*

186. Salajanu represented EquityBuild with a five-property portfolio refinancing with the benefit of a loan obtained from BC 57, LLC ("BC 57"), an entity affiliated with Bloomfield Capital, a private real estate investing and lending company.

187. The properties being refinanced through BC 57 were 3074 E Cheltenham,

FILED DATE: 3/8/2024 2:46 PM    2020L008843

FILED DATE: 3/8/2024 2:46 PM    2020L008843

7625 S East End, 7635 S East End, 7750 S Muskegon, and 7201 S Constance, and Salajanu represented EquityBuild when it acquired each of them except 7201 S Constance.

188.    On September 8, 2017, DeRoo forwarded Salajanu and San Martin draft payoff statements and releases for 3074 E Cheltenham, 7625 S East End, 7635 S East End, and 7201 S Constance.

189.    The e-mail chain forwarded to Salajanu and San Martin revealed that DeRoo instructed Kammerer to modify the initial drafts of the releases to reflect that the payoffs would be made to EquityBuild Finance rather than EquityBuild because "the optics aren't good."

190.    Although five properties were being refinanced, the e-mail that Salajanu received and forwarded to Bloomfield Capital contained only four payoff statements, as follows:

    a.    A payoff statement for 3074 E Cheltenham reflecting an unpaid principal balance of $1,150,000.

    b.    A payoff statement for 7625 S East End reflecting an unpaid principal balance of $1,170,000.

    c.    A payoff statement for 7635 S East End reflecting an unpaid principal balance of $1,210,000.

    d.    A payoff statement for 7201 S Constance reflecting an unpaid principal balance of $1,350,000.

191.    The title commitment that Salajanu received and reviewed in connection with the prospective refinancing indicated that the issuance of title insurance would be conditioned on the production of the following documents:

    a.    An approved payoff letter for the mortgage recorded against 3074 E Cheltenham to secure a promissory note in the amount of $2,200,000.

    b.    An approved payoff letter for the mortgage recorded against 7625 S East End to secure a promissory note in the amount of $1,605,749.

    c.    An approved payoff letter for the mortgage recorded against 7635 S East End to secure a promissory note in the amount of $1,703,649.

29

FILED DATE: 3/8/2024 2:46 PM    2020L008843

    d.    An approved payoff letter for the mortgage recorded against 7201 S Constance to secure a promissory note in the amount of $2,250,000.

    e.    An approved payoff letter for the mortgage recorded against 7750 S Muskegon to secure a promissory note in the amount of $2,250,000.

192. Based on the payoff statements received from DeRoo, the title commitments she received and reviewed, and her work on the original acquisitions of four of the properties, Salajanu possessed information and documentation sufficient to establish the following facts:

| Property | Purchase Price | EBF Mortgage | Loan To Purchase Price | Payoff Statement | Principal Reduction |
|---|---|---|---|---|---|
| 3074 E Cheltenham | $1,305,000 | $2,200,000 | 168.58% | $1,150,000 | $1,050,000 |
| 7625 S East End | $925,000 | $1,605,749 | 173.59% | $1,170,000 | $435,749 |
| 7635 S East End | $925,000 | $1,703,649 | 184.18% | $1,210,000 | $493,649 |
| 7201 S Constance | | $2,250,000 | | $1,350,000 | $900,000 |
| 7750 S Muskegon | $1,360,000 | $2,250,000 | 165.44% | *[None]* | |
| **Totals** | | | | **$4,880,000** | **$2,879,398** |

193. Salajanu possessed information sufficient to ascertain that (1) EquityBuild acquired these properties for cash and subsequently recorded mortgages to secure investor-lender loans averaging 172.95% of the purchase prices and (2) EquityBuild reduced the cumulative loan balances on four of the five properties by $2,879,398.

194. On September 18, 2017, counsel for Bloomfield Capital informed Salajanu, among other things, that the mortgage releases "must be signed by EquityBuild Finance LLC and not Jerome Cohen individually" and that the payoff information for 7750 S Muskegon had not yet been provided.

195. A week later, Salajanu e-mailed four payoff statements to Bloomfield Capital.

196. This time Salajanu included a payoff statement for 7750 S Muskegon reflecting an unpaid principal balance of $1,170,000, and the payoff statements for 7625 S East End and

30

7635 S East End were consolidated, with "7625-35 S East End" designated as a single property encumbered by a single loan with an unpaid principal balance of $1,210,000.

197.    The refinance through Bloomfield Capital closed on September 27, 2017, and each of the investor-lender mortgages was short paid with the payoff proceeds wired directly to EquityBuild Finance and not to the individual investor-lenders.

198.    Salajanu knew or should have known that none of the participating investor-lenders signed a written consent to the release of their collateral as required by the CASAs.

199.    Salajanu never advised EquityBuild Finance that the investor-lenders were required to consent in writing to the release of the collateral or that EquityBuild Finance could have declared a default and enforced the promissory note in lieu of accepting a short payoff.

### *Portfolio Refinance: Colony American Finance Lender*

200.    Salajanu assisted EquityBuild and EquityBuild Finance with the refinancing of the following seven properties that were conveyed to EB South Chicago 4, LLC ("EBSC4") and collateralized to secure a loan from Colony (the "Colony T4 refinance"): 310 E 50th, 1401 W 109th, 6807 S Indiana, 8000 S Justine, 8209 Ellis, 8214 S Ingleside, and 8107 S Ellis.

201.    Salajanu knew that three of these properties (1401 W 109th, 6807 S Indiana, and 8107 S Ellis) were conveyed to EBSC4 by investor-owners who purchased them from EquityBuild.

202.    Salajanu knew that 310 E 50th was conveyed to EBSC3 by an investor-owner and then conveyed by EBSC3 to EBSC4.

203.    The property at 310 E 50th was originally slated for inclusion within the Colony T3 refinance, but was carved out after counsel for Colony rejected Salajanu's attempt to characterize the conveyance from the investor-owner directly to EBSC3 as a deed in lieu of foreclosure.

31

204.    Counsel for Colony informed Salajanu that her proposed deed-in-lieu agreement indicated that EBSC3 was an assignee of the lender and informed her that EBSC3 "cannot hold the note of the prior indebtedness."

205.    In a private e-mail to Shaun Cohen and DeRoo, Salajanu wrote: "He is right (as I indicated would be brought up.)"

206.    The deed that Salajanu already prepared to evidence the conveyance of 310 E 50th from the investor-owner to EBSC3 was signed, notarized, and returned by the investor-owner and recorded, but the property was not identified as collateral in the Colony T3 refinance.

207.    The instrument was labeled as a "WARRANTY DEED," but Salajanu caused it to be stamped as transfer tax-exempt on the basis that no consideration was being exchanged.

208.    Salajanu knew that 8209 E Ellis was conveyed back to EquityBuild by an investor-owner for no consideration, and then conveyed by EquityBuild to EBSC4.

209.    Salajanu represented EquityBuild when it acquired 8214 S Ingleside for $280,000 in cash on May 15, 2015, and she later became aware that a $759,000 investor-lender mortgage had been recorded against the property outside the closing.

210.    Salajanu also represented EquityBuild when it acquired 8000 S Justine for $375,000 in cash on June 15, 2015, and she later became aware that an $855,000 investor-lender mortgage had been recorded against the property outside the closing.

211.    The Colony T4 refinance closed on September 15, 2017, and payoff funds were wired to EquityBuild Finance in connection with the mortgage loan being refinanced on each property except 310 E 50th.

212.    Salajanu knew or should have known that none of the participating investor-lenders signed a written consent to the release of their collateral.

FILED DATE: 3/8/2024 2:46 PM    2020L008843

*Portfolio Refinance: Liberty EBCP, LLC*

213.     On or about May 2, 2018, Liberty EBCP, LLC ("Liberty") extended a $9.2 million portfolio loan to SSDF7 Portfolio 1, LLC ("SSDF7").

214.     The Liberty loan was collateralized by seventeen properties that were conveyed to SSDF7.

215.     Salajanu served as transaction counsel when EquityBuild acquired sixteen of the seventeen properties for cash, specifically, 8326-58 S Ellis, 6356 S California, 6355 S Talman, 7051 S Bennett,   7442 S Calumet,   7201 S Dorchester,   7546 S Saginaw,   4315 S Michigan, 2736 W 64th, 7508 S Essex, 7748 S Essex, 816 E Marquette, 7600 S Kingston, 8201 S Kingston, 7953 S Marquette, and 7656 S Kingston.

216.     Prior to the closing, Salajanu reviewed title commitments revealing that each property was encumbered by a mortgage loan.

217.     Salajanu possessed information sufficient to ascertain that the amount of each mortgage loan exceeded the acquisition price of the corresponding property by at least 50% and that in the case of 2736 W 64th the mortgage loan exceeded the purchase price by more than 400%.

218.     Salajanu possessed information sufficient to ascertain that the aggregate acquisition prices of the assets totaled $14,765,000, while the aggregate mortgage debt encumbering those assets totaled $23,863,040.

219.     On April 16, 2018, after San Martin prepared and submitted a proposed release of mortgage for execution by one of the participating investor-lenders who received an assignment of a prior investor-lender's interest in a promissory note associated with one of the properties being refinanced through Liberty. The assignee wrote back to San Martin and stated, in part, as follows:

> Also, it seems that by signing, I am relinquishing my interest in the property to Equity Build. How does this work? It seems like I'd be

giving up my financial interest. Shouldn't there be another document affirming that Equity Build owes me the money?

I can take care of this today, but am not feeling secure about what's happening on that end.

### *Salajanu Assists with a Suspicious Overnight Loan*

220.    To consummate the Liberty refinance, Jerry Cohen and Salajanu knew that EquityBuild (or SSDF7) would be required to contribute approximately $4,500,000 in cash at closing.

221.    Salajanu assisted Jerry Cohen with the negotiation of a $3,500,000 million overnight loan from Chief Management, LLC ("Chief Management") for $200,000 in fixed interest.

222.    On April 24, 2018, Salajanu sent a letter to counsel for Chief Management that stated, in part, as follows:

> This is to confirm that Chief Management LLC, a California limited liability company ("Lender") shall made a loan to SSDF7 Portfolio 1, LLC, an Illinois limited liability company, ("Borrower") in the principal amount of $3,500,000 and a fixed interest amount of $200,000 ("Loan") due to be issued by Lender on the date of the refinance closing of Borrower with Liberty EBCP LLC, a limited liability company ("Liberty") on or about April 27, 2018.

> Lender shall wire the funds to the title company, Old Republic Title Company, who is acting as escrow agent for the Liberty refinance. Lender will be paid at the closing from the proceeds of the Borrower refinance with Liberty. Old Republic Title Company will be instructed to release funds to Lender at the Liberty refinance.

223.    As a condition to making their loans, both Liberty and Chief Management required the borrower to submit a legal opinion letter that would contain, among other things, a representation that Salajanu and Rock Fusco lacked knowledge of any material pending or threatened lawsuits, claims, or criminal proceedings pending against the borrower or the guarantors.

34

224. By letter dated May 1, 2018, Salajanu, on behalf of Rock Fusco, informed Chief Management, among other things, that "[w]e have no actual knowledge of any material pending or threatened lawsuits, claims, bankruptcy actions or criminal proceedings against Borrower or Guarantors."

225. Salajanu knew the foregoing statement was false.

**The 7617 S Phillips Complaint**

226. On August 23, 2016, Salajanu received a copy of a demand letter from an attorney representing the investor-owner of <u>7616 S Phillips</u>.

227. In the demand letter, counsel for the investor-owner complained about his purchase of the property from EquityBuild and requested restitution because, among other things, (1) EquityBuild did not commence the improvement work until 150 days after the improvements were promised to have been completed, (2) the work was commenced without permits, drawing increased scrutiny from the City of Chicago, and (3) no income had been produced by the property after 14 straight months of mortgage payments.

228. Counsel for the investor-owner sent Carly Berard a demand letter on March 7, 2018, seeking a $500,000 settlement payment and threatening to "pursue all . . . rightful and legal remedies" if EquityBuild did not "agree to this demand within seven days."

229. Berard forwarded the letter to Salajanu and Bol, indicating that she computed the exposure as $438,846.02, excluding legal fees, and asking whether EquityBuild wanted to counter with a figure closer to that.

230. EquityBuild made no counter-offer, and on March 22, 2018, Berard circulated (to Salajanu, among others) a copy of a Verified Complaint naming, among others, EquityBuild, EquityBuild Finance, Jerry Cohen, and Shaun Cohen as defendants and asserting claims for fraud,

FILED DATE: 3/8/2024 2:46 PM   2020L008843

breach of fiduciary duty, negligent misrepresentation, breach of contract, unjust enrichment, civil conspiracy, negligence, and legal malpractice.

231.    On March 28, 2018, Salajanu authored and sent an e-mail to Jerry Cohen, Shaun Cohen, and Ronald Bol which contained the following admonition:

> As we repeatedly stated, you need to settle this asap in light of the existing circumstances- even if you have a viable legal basis to contest the allegations. These public affirmations against [EquityBuild], Shaun and Jerry personally are very damaging. Your current lenders, potential investors and investigative bodies are going to consider these allegations strongly.

232.    On information and belief, the "investigative bodies" to which Salajanu was referring included the SEC.

233.    On April 25, 2018, Berard forwarded to Jerry, Shaun, Bol, and Salajanu a letter from counsel for the investor-owner of 7616 S Phillips requesting an accounting of all "outstanding loans" to EquityBuild or its affiliates by entities formed by his client, and this list included loans made against properties that Salajanu assisted in short-selling more than a year earlier.

234.    On May 2, 2018, at 9:41 a.m., the day after Rock Fusco represented to Chief management that "[w]e have no actual knowledge of any material pending or threatened lawsuits, claims, bankruptcy actions or criminal proceedings against Borrower or Guarantors," Berard sent Salajanu an e-mail (copying Rock Fusco partners Jay Rock and Cory Anderson) which stated, in part, as follows:

> I just got a call from attorney Cary Schiff on the EquityBuild investor fraud case. He asked if we would be representing EB in the matter. He said if we filed an appearance, he would agree to a 30-day extension to answer. If no appearance is filed, he will proceed with a motion for default. You mentioned to me yesterday that you had informed EB that they needed to hire separate counsel to represent them in this case. We need to contact them and urge them to engage another firm to file an appearance, or, once and for all

FILED DATE: 3/8/2024 2:46 PM    2020L008843

FILED DATE: 3/8/2024 2:46 PM    2020L008843

make a settlement offer. I asked Cary again about the breakdown we had requested for the $500,000 demand. He said he'd get it to me but that it "wasn't a high priority" because he doesn't think EB is going to make an offer. He's not wrong to feel this way. EB has had the demand since March 7, and received the leases and rent information that it had asked for, that Ron said he needed to come up with a counter.

You and I know the counter shouldn't be anything less than $488,000 based on what we know Michigan Shore paid. You need to call Jerry and impress upon him how important it is to settle, or at the least, that they must have counsel file an appearance to get an extension. I told [opposing counsel that] Jerry was in Jerusalem. He laughed and said they have pay phones in Jerusalem. He has 0 tolerance for EB's shit. Settlement needs to happen NOW.

235.    At 11:43 a.m. on May 2, 2018, Salajanu wrote to Jerry, Shaun, and Bol and stated, in part, that "per our various prior discussions, this case needs to settle asap."

236.    By letter dated May 2, 2018, Salajanu, on behalf of Rock Fusco, informed Liberty, among other things, that "[w]e have no actual knowledge of any material pending or threatened lawsuits, claims or criminal proceedings against Borrower or Guarantor or specifically applicable to the Property except as set forth on Schedule 1 attached hereto."

237.    Schedule 1 attached to the May 2, 2018 opinion letter solely disclosed building code cases then pending in connection with nine of the seventeen properties being refinanced and contained no reference to the litigation regarding 7616 S Phillips.

238.    A settlement statement associated with the Liberty refinance, which Salajanu reviewed and approved on May 1, 2018, reflected a $3,500,000 deposit into the closing escrow by Chief Management followed by the repayment of four of the investor-lender loans *not* to EquityBuild Finance (for the ostensible benefit of the investor-lenders), but directly to Chief Management.

239.    On May 1, 2018, Salajanu received an e-mail confirming that the payoff proceeds associated with the investor-lender debt recorded against 8326-58 S Ellis, 7442 S Calumet,

FILED DATE: 3/8/2024 2:46 PM 2020L008843

7701 S Essex, and 7656 S Kingston were being wired directly to Chief Management, and on May 2, 2018, she received confirmation that the funds had been received.

240.    Salajanu knew or should have known that none of the participating investor-lenders on any of the seventeen loans being refinanced signed a written consent to the release of their collateral as required by the CASAs.

241.    Salajanu never advised EquityBuild Finance that the investor-lenders were required to consent in writing to the release of the collateral or that EquityBuild Finance could have declared a default and enforced the promissory note in lieu of accepting a short payoff.

***A Package Sale With No Loan Payoffs***

242.    Salajanu represented EquityBuild in connection with the conveyance of three properties (5201 W Washington, 400 S Kilbourn, and 109 N Laramie) sold to the same purchaser at a closing that occurred on November 29, 2017 (the "Package Sale").

243.    Salajanu represented EquityBuild when it acquired 5201 W Washington for $1,150,000 in cash on January 22, 2015.

244.    The title commitment Salajanu reviewed in connection with the Package Sale indicated that a mortgage in the amount of $2,200,000 had subsequently been recorded against the property.

245.    Salajanu represented EquityBuild when it acquired 400 S Kilbourn for $400,000 on April 28, 2015.

246.    The title commitment Salajanu reviewed in connection with the Package Sale indicated that a mortgage in the amount of $925,000 had subsequently been recorded against the property.

247.    Salajanu represented EquityBuild when it acquired 107 N Laramie for $740,000 in

cash on July 31, 2015.

248.     The title commitment Salajanu reviewed in connection with the Package Sale indicated that a mortgage in the amount of $1,750,000 had subsequently been recorded against the property.

249.     Salajanu possessed information demonstrating that EquityBuild acquired the three properties for a combined $2,290,000 and that $4,875,000 in combined mortgage debt had been recorded against them.

250.     Salajanu also knew that EquityBuild was now selling the properties for a combined $1,710,000, representing a loss of at least $3,165,000.

251.     Rock Fusco had also defended several administrative actions filed against EquityBuild in connection with its ownership of 5201 W Washington and 400 S Kilbourn which revealed myriad dangerous conditions and ordinance violations.

252.     At the closing of the Package Sale, EquityBuild was required to redeem more than $75,000 in delinquent and sold property taxes.

253.     At the closing of the Package Sale, EquityBuild also received $1,392,601.23 in cash and did not make even a partial payoff of any of the three mortgage loans.

254.     Instead, EquityBuild Finance submitted mortgage releases to the title company, as though the $4,875,000 in investor-lender loans had already been retired.

255.     Salajanu knew or should have known that none of the investor-lenders identified in any of the EquityBuild Finance mortgages recorded against the properties included within the Package Sale signed a written consent to the release of their collateral as required by the CASAs.

256.     Salajanu never advised EquityBuild Finance that the investor-lenders were required to consent in writing to the release of the collateral or that EquityBuild Finance could have declared

a default and enforced the promissory note in lieu of accepting a short payoff.

***EquityBuild Employee Informs Salajanu of Fraudulent Activity***

257.    In or around March 2017, Jessica Baier, an EquityBuild employee, called Salajanu and alleged that EquityBuild was engaged in, among other things, embezzlement, mortgage fraud, and misappropriation of funds.

258.    During the telephone call, Baier stated that if Salajanu took no steps to halt the misconduct, she would take the matter to the authorities.

259.    Salajanu promised to investigate Baier's concerns and strongly discouraged her from taking further action.

260.    Salajanu did not investigate further.

261.    Salajanu immediately reported her conversation with Jessica Baier to Jerry Cohen.

***Salajanu Knowledge Of Jerry Cohen's Checkered Past***

262.    During the course of the UBS refinancing (around February 2017), a UBS paralegal e-mailed Salajanu a list of ***48 judgments*** entered against Jerry Cohen between August 12, 1998, and May 5, 2006, and requested a "formal explanation."

263.    The previous day, DeRoo forwarded Salajanu an e-mail from a different private lender who discovered at least ten separate real estate tax lien petitions that had been filed against Jerry Cohen in connection with properties owned in Philadelphia between March 8, 2016, and March 22, 2017.

264.    Salajanu never brought the tax lien petitions to the attention of UBS.

265.    On May 2, 2017, outside counsel for UBS e-mailed, among others, Salajanu and DeRoo, requesting proof that each of the judgments had been satisfied.

266.     On May 4, 2017, DeRoo provided Salajanu with the letter of explanation submitted

by Jerry Cohen in which Jerry explained that he had backed his cousin "in a largely silent role" in connection with his cousin's acquisition, renovation, leasing, and refinancing of real estate properties in Philadelphia.

267.   In the letter, Jerry also elaborated as follows: "After a couple years it became apparent to me that his underwriting assumptions for acquisition were wholly inaccurate; his renovation costs were consistently low, his construction timelines were consistently short and rents and collections were lower than I was told at the onset, resulting in the net income of the portfolio being unable to sustain the debt service in the high interest rate environment at the time. As the cash flow issues accrued, lenders were unwilling to renegotiate the loans, and a chapter 11 filing became the only route to restructure the portfolio. My cousin filed bankruptcy in 1995 and everything that I was attached to him on became included in the bankruptcy."

268.   On May 3, 2017, Jerry forwarded Salajanu a 103-page docket report from the personal bankruptcy proceeding he initiated on January 23, 1995, which was later converted from a Chapter 13 to a Chapter 7, and which was not terminated until March 2, 2000.

269.   Salajanu was aware that Jerry Cohen did not disclose his bankruptcy filing in response to the UBS request for a formal explanation of the judgments previously entered against him.

270.   Later, on October 24, 2017, DeRoo forwarded Salajanu an e-mail from a prospective private commercial lender that was requesting letters of explanation from Jerry Cohen regarding various items identified during a background check, including a criminal arrest warrant, the bankruptcy filing, the Pennsylvania tax liens, the unsatisfied judgments, and a lawsuit filed by the Pennsylvania Bureau of Consumer Protection.

271.   On April 24, 2018, Salajanu received an e-mail from Gary Federico, an EquityBuild

41

FILED DATE: 3/8/2024 2:46 PM    2020L008843

sales and marketing manager who was seeking assistance with a "new complaint that surfaced on the web."

272. In his e-mail to Salajanu, Federico quoted the allegations made by the complainant as follows:

> If you plan to invest with EBF, you will want to do your research first. And the first thing that you'll want to do is to check on the property's history that they are selling you for an investment on the Cook County Recorder of Deeds web site. And you can only do that if they give you the correct address of the property, which they don't always do. (1st surprise) If you are able to check the property's history, you'll soon discover that their valuation has no economic basis whatsoever. (2nd surprise) You'll quickly discover that what they've told you is baseless. I could write a short book on this company and I'm surprised that the FTC hasn't closed them down along with involving DOJ and FBI with indictments and prosecutions.
>
>          \*       \*       \*
>
> The owners use "Resource Managers" (hired self employed people) so they can have a cushion (plausible deniability) should the Feds come knocking, which they will at some point if not already. I'm a prior client but was able to get my funds and profits returned with a great deal of effort. Why me, who knows. All I know is that I was fortunate.
>
> Do not second guess what I'm saying as I have no agenda here except to protect unsophisticated people with money to loan from making an egregious error with their finances. Don't do it. Have you ever heard of Bernie Madoff? This is nothing more than [a] ponzi scheme.
>
>          \*       \*       \*
>
> They . .  will meet their legal maker at some point.

### When Investors Complained, Salajanu Assisted EquityBuild in Paying them Off

273. On March 6, 2017, Salajanu was forwarded an e-mail from John Gorske, the investor-owner who purchased 7656 S Kingston.

274. Mr. Gorske indicated that he was frustrated with EquityBuild's lack of

responsiveness, was considering hiring counsel and had been unable to obtain any evidence that the $93,110 he paid EquityBuild at closing to perform various building improvements was ever actually expended on improvement work, and he stated that "if you can't provide proof that any work was done it didn't happen and the promise that was made to me prior to the purchase of this building was a lie."

275.    Mr. Gorske's claims were resolved when EquityBuild agreed to repurchase 7656 S Kingston and contribute his "out of pocket" losses to a fund that would indirectly own the realty being refinanced, and on March 20, 2018, Salajanu was copied on the e-mail confirming this agreement.

276.    On April 10, 2018, Mr. Gorske executed a special warranty deed prepared by Salajanu which conveyed 7656 S Kingston to SSDF7, and he also executed a power of attorney in favor of Salajanu, although Rock Fusco was simultaneously representing EquityBuild, as the buyer.

277.    After EquityBuild sold 7953 S Marquette to Property Solutions (an investor-owner), Property Solutions was served with a circuit court complaint alleging 21 separate violations of the Chicago municipal code.

278.    Property Solutions demanded its money back from EquityBuild.

279.    On April 10, 2018, Property Solutions, through Kevin Bybee, executed a special warranty deed prepared by Salajanu which conveyed 7953 S Marquette to SSDF7, and it also executed a power of attorney in favor of Salajanu.

280.    EquityBuild sold 7701 S Essex to Shane Veltri, an investor-owner.

281.    Between November 17, 2017, and February 8, 2018, Rock Fusco represented Mr. Veltri in connection with five notices of violation filed by the City of Chicago Department of

FILED DATE: 3/8/2024 2:46 PM    2020L008843

Streets and Sanitation, and fines were assessed in all five cases.

282.    On April 13, 2018, Mr. Veltri executed a special warranty deed prepared by Salajanu conveying 7701 S Essex to SSDF7, and he also executed a power of attorney in favor of Salajanu.

**THE ROLE OF BBSG**

283.    Prior to February 2017, EquityBuild had employed attorney Michael Voynich of Sutherland, Asbill & Brennan LLP for representation and advice in connection with EquityBuild's sales of securities and in connection with various investigations into EquityBuild's affairs.

284.    On January 31, 2017, Mr. Voynich withdrew from representing EquityBuild due to EquityBuild's refusal to follow Voynich's advice to operate in compliance with securities laws.

285.    In early February 2017, EquityBuild retained BBSG (and its "of counsel" agent, Mark Rosenberg) to provide legal services.  Over time, these services included, but were not limited to, representation in the defense of an SEC investigation into a Ponzi scheme in which EquityBuild had been implicated, counsel as to the legality of EquityBuild's business model and preparation of private placement memoranda ("PPM") to accompany the sale of securities. BBS&G attorney Wendy Pullano was also substantially involved in various aspects of the representation.

286.    On March 2, 2017, shortly after BBS&G was retained, the Cohens enlisted its assistance with their latest securities enforcement issue: On February 16, 2017, EquityBuild and EquityBuild Finance had been subpoenaed in the SEC's so-called "Rebuilding America" investigation.

287.    The SEC's subpoena requested production of a vast array of documents concerning EquityBuild's properties, EquityBuild's investors and how the investors' money had been used.

FILED DATE: 3/8/2024 2:46 PM    2020L008843

Gathering the information needed to fully and truthfully respond to the SEC's subpoena would have caused a reasonably prudent attorney to conclude that EquityBuild was running a Ponzi scheme. Alternatively, the inability to gather the information needed to fully and truthfully respond to the SEC subpoena would have, among other things, caused a reasonably prudent attorney to refrain from making statements in PPMs touting EquityBuild and its track record of success.

288. On March 8, 2017, BBS&G was also asked and agreed to assist in responding to a subpoena issued by the Colorado Department of Regulatory Agencies, Division of Securities. Through its work with the SEC investigations BBS&G had access to a wide range of documents that provided it with even more information on the inherent issues with the EquityBuild model, including that EquityBuild was not using a broker dealer and was marketing its offerings through unlicensed representatives.

289. Shaun Cohen expressed to BBS&G's Rosenberg an interest in using a broker dealer but feared that, because of the SEC investigations, no broker dealer would want to do business with EquityBuild. Shaun Cohen articulated these concerns to BBS&G's Rosenberg in a March 14, 2017 text message:

> Broker Dealers - with the environment that we are in with the SEC, how can we even move the ball forward with a broker dealer and the rep licensing? Assuming this is not an issue, can you begin working on some BD's we can contact?

290. In that same text message, Shaun Cohen expressed concerns to Rosenberg about the burden of responding to the SEC investigations while making "the massive changes we have to implement." Cohen further stated to Rosenberg the following:

> **What if we go to the SEC and enter a complete guilty plea and simply tell them the exact quantity of deals, how they were structured, that we worked with non-accredited investors and paid transaction based commissions. We**

**would also say that we want to be compliant and will do whatever it takes to do so. What are your thoughts on this**?

291.     In response to Shaun Cohen's suggestion to "enter a complete guilty plea," to be transparent with the SEC about EquityBuild's violations of the law and to "be compliant" and "do whatever it takes to do so," Rosenberg responded, "***That's not the way to go.  Don't panic***.  We will work it out with the SEC.  Let's talk tomorrow morning."

292.     Thus, the perpetrator of a sprawling Ponzi scheme approached BBS&G and expressed interest in cooperating with the SEC and complying with securities laws, and BBS&G attorney Mark Rosenberg negligently dissuaded BBS&G's client from doing so, thereby foregoing an opportunity halt the Ponzi scheme and causing the proliferation and prolongation of EquityBuild's failing business model by more than a year.

293.     On March 15, 2017 Shaun Cohen again e-mailed Rosenberg to express his "concerns about approaching a [broker dealer]." He asked: "Should we be transparent with what is going on [with the SEC]? If so, how could we get anyone interested?"

294.     Rosenberg thus knew or should have known EquityBuild was, *inter alia*, operating out of compliance with securities laws.

295.     On March 22, 2017, Rosenberg responded to Shaun Cohen regarding the options available to prospective issuers like EquityBuild (1) seeking exemptions from SEC registration in order to sell securities through general solicitations of the public and (2) seeking to make sales of unregistered securities other than through a registered broker-dealer. Rosenberg's email also identified and attached a copy of Rule 3a4-1 (17 C.F.R.  240.3a4–1).

296.     As for exemptions from registration, Rosenberg referred to Regulation D (17 C.F.R. § 230.501 *et seq.*), which offers safe harbors from registration provided the issuer complies with requirements relating to such things as offering size and investor accreditation and

FILED DATE: 3/8/2024 2:46 PM    2020L008843

verification.

297.    As for selling securities other than through a registered broker-dealer (as required by Section 15(a) of the Securities Exchange Act of 1934), Rosenberg referred to Rule 3a4-1, which provides a non-exclusive safe harbor to an "associated person of an issuer" – which, in this case, would be an EquityBuild employee -- provided that:

   (1)    the associated person is not subject to a statutory disqualification, does not receive transaction-based compensation (such as commissions), and is not an "associated person" of a broker or dealer; ***and***

   (2)    the associated person:

      (a)    restricts his sales activity to certain types of transactions (none relevant to the EquityBuild business model); ***or***

      (b)    primarily performs substantial duties for the issuer otherwise than in connection with transactions in securities, was not an associated person of a broker-dealer during the preceding 12 months, and does not participate in selling securities for the issuer more than once every twelve months; ***or***

      (c)    only prepares written communications and does not engage in oral solicitation, responds to inquiries of potential purchasers in communications initiated by the purchaser, or solely performs ministerial and clerical work.

298.    Rosenberg knew or should have known that EquityBuild never retained a broker-dealer to assist with the marketing and sale of the promissory notes, and therefore, he knew or should have known that EquityBuild was violating federal and state securities law. Indeed, Rosenberg knew or should have known EquityBuild did not comply with the rule because, among other things, it was not soliciting purchases of promissory notes exclusively through employees who perform substantial duties other than selling securities, who are ineligible to receive transaction-based compensation, and who do not participate in securities sales more than once every twelve months. Further, the fact that Rosenberg subsequently produced at least <u>nine PPMs</u> over approximately 12 months demonstrates that EquityBuild was soliciting investments too

FILED DATE: 3/8/2024 2:46 PM    2020L008843

frequently to comply with federal securities law and Rule 3a4-1.

299.    Despite the fact that Rosenberg knew or should have known that EquityBuild was not complying with federal and state securities law and Rule 3a4-1, Rosenberg nevertheless negligently advised Shaun Cohen to prepare and disseminate private placement memoranda to prospective investors and then went on to prepare a series of such offerings throughout 2017 and into 2018.

300.    In a March 31, 2017 e-mail to Cohen Rosenberg offered to "build" EquityBuild a PPM to accompany offerings of securities. By April 3, 2017, Rosenberg had already circulated the first draft of a PPM describing a prospective offering of participation interests in a promissory note associated with the proposed acquisition, rehabilitation, and refinance or disposition of a 25-unit apartment building located at 6437 South Kenwood Avenue in Chicago. Over the ensuing three weeks, Rosenberg prepared eight more drafts until, on April 24, 2017, he circulated a provisionally final PPM (the "Kenwood PPM").

301.    The Kenwood PPM contained financial projections and sources and uses tables that would have caused a reasonably prudent attorney, particularly one with Rosenberg's background, education, experience and knowledge about EquityBuild's operations, to question the legitimacy of the business model and to recognize that his clients, who were already under SEC investigation, were making impossible promises, omitting material information and peddling unsuitable products via unlicensed representatives to unsophisticated customers.  The errors, omissions and misleading statements in the PPM include but are not limited to the following:

A.    The Kenwood PPM stated that "no legal actions are contemplated against the [issuer] and/or its Managers [EquityBuild]," except that Rosenberg knew about, *and was representing EquityBuild in connection with*, (1) an SEC subpoena requesting an extensive production of documents pertaining to its business dealings and (2) a securities law investigation by the State of Colorado. The PPM omitted any disclosure of these matters and the bases for those investigations, omissions of

48

FILED DATE: 3/8/2024 2:46 PM    2020L008843

FILED DATE: 3/8/2024 2:46 PM  2020L008843

highly material information.  The PPM also omitted any disclosures that EquityBuild and EquityBuild Finance had hitherto been conducting business in a state of non-compliance with applicable securities laws and regulations, including but not limited to working with non-accredited investors and paying transaction based commissions, facts that Shaun Cohen directly told Rosenberg.  In addition, EquityBuild was in receipt of a demand letter from an attorney in the aforementioned 7617 S Phillips investor fraud matter.

B.  The PPM, while describing the purported credentials of Jerry and Shaun Cohen and noting that the "success of the Company is highly dependent upon the services and expertise of existing management" failed to disclose that both Shaun and Jerry Cohen had previously filed for bankruptcy, one of several material omissions.

C.  Touting EquityBuild's "solid track record" the PPM stated that "overall operations of the EquityBuild companies have been ongoing since 1984."  In fact, however, EquityBuild was formed in 2007 and its track record was far from solid.

D.  The PPM stated "the Company believes it is in full compliance with any and all applicable laws, rules and regulations."  However, Shaun Cohen had already told Rosenberg information directly contrary to this statement.

E.  The PPM, despite touting EquityBuild's "proprietary econometric model" to select properties, failed to disclose that the so-called econometric model was merely back of the envelope calculations and that selecting real estate was not a "core competency" of EquityBuild or its managers.

F.  The issuer (6437 S. Kenwood LLC, an EquityBuild affiliate) was offering 16% annual rates of return (18% for investors who purchased at least $150,000 in promissory notes) for a secured first-priority position, a mismatch of pricing and risk so unusual that it should have triggered further inquiry.

G.  There was no explanation as to how the promissory notes would be held or how any particular subscriber would be able to enforce its rights in the event of a default – a material omission.

H.  The PPM Rosenberg sent did not include a copy of either the promissory note or the mortgage that would be recorded to secure the loan, a material omission.

I.  The PPM did not identify the loan servicer or the fees any such servicer would charge – a material omission.

J.  The offering summary indicated that the total project cost would be raised entirely with funds from the offering, meaning EquityBuild had no skin in the game and would collect its usurious fees regardless of the project's success, while the entire economic risk would be borne by the noteholders.

K.  The offering summary indicated that the $456,165 required to pay monthly interest to the investor-lenders would be included within the total amount raised. In other

words, investor-lenders would be paying EquityBuild the very funds that EquityBuild would later need to pay the investor-lenders their monthly installments of interest. This was contrary to generally accepted lending practices, and no sophisticated lender would agree to such terms if properly disclosed.

L.      Total interest payable to the subscribing investor-lenders based on a 16% annual return associated with a $2.5 million raise would be $800,000 over a 24 month period, not $456,165 (as falsely stated in the sources and uses table), thus the issuer would need $343,835 in additional cash to prevent a loan default, except that the *Stabilized Pro Forma* included in the PPM projected only $303,009 in net operating income during that period, essentially verifying that default was inevitable. Therefore, had the total interest payable to investor-lenders been correctly stated in the sources and uses table, the PPM would have forecasted a default which likely would have prevented investments.

M.      The *Stabilized Pro Forma* could not reasonably be reconciled with the terms of the interest-only promissory notes because it assumed a long-term amortization of the loan and a steadily decreasing principal balance using figures that appear to be mathematically impossible.

N.      The *Stabilized Pro Forma* projected "cash on cash" returns of 48.38% and 35.65% during the two years of the loan, although the issuer retained no equity in the property. This was a clear *non-sequitur* because the cash-on-cash returns would necessarily be infinite.

O.      The PPM indicated that funds received from subscribers would be held in a Wells Fargo account until the minimum raise was reached, but stated that the issuer retained the right to withdraw funds from that account at any time. Any knowledgeable lender would have required the entirety of the loan proceeds to remain in escrow and not be disbursed for any purpose until the loan was ready to be funded.

302.    Following the issuance of the Kenwood PPM, EquityBuild assembled, and Rosenberg reviewed and approved, at least four other PPMs to be distributed to potential purchasers of promissory notes (aka, investor-lenders). The EquityBuild affiliates established to issue these securities included SSPH 11117 S Longwood LLC, SSPH 7927-49 S Essex LLC, Chicago Capital Fund 1 LLC, and Chicago Capital Fund 2 LLC. The same or substantially similar errors, omissions, and "red flags" contained in the Kenwood PPM can also be found in the PPMs for these other investment vehicles.

303.    Some of these PPM's raised debt capital, and some raised equity capital. Rosenberg

knew that the prospective equity investors consisted primarily of investor-lenders who were persuaded to convert their debt to equity once it became apparent that EquityBuild could not repay the loans associated with past acquisitions at maturity because the very business model touted in the Kenwood PPM unsurprisingly failed in virtually every prior transaction.

304.    These prospective equity investors were informed in the PPMs that they could achieve substantially greater returns by trading their participating interests in the promissory notes secured by first-position mortgages for membership interests in a "fund" whose assets were already encumbered because they were either acquired with conventional third-party financing or refinanced in a transaction in which the existing investor-lender mortgage was released (often without the knowledge or authorization of the investor-lenders).

305.    Thus, Rosenberg should have recognized that the conversions of debt to equity were the product of an additional set of false representations designed to eliminate the existing onslaught of defaults by steering the investor-lenders into equity positions from which they could not invoke future defaults.

***BBS&G Recognizes Deficiencies in the PPM***

306.    In October of 2017, Shaun Cohen forwarded Rosenberg an email string that included comments from an attorney for a prospective investor in SSPH 7927-49 S Essex LLC and Chicago Capital Fund I.  The prospective investor's attorney cited no less than 44 errors, omissions, red flags or discrepancies in the PPM for SSPH 7927-49 S Essex LLC and offering memorandum for Chicago Capital Fund I.  Rosenberg negligently failed to take appropriate action to remedy these deficiencies.

307.    Also in October, 2017, Wendy Pullano, an attorney at BBS&G, e-mailed Rosenberg with comments regarding a PPM he was preparing for Chicago Capital Fund 1 LLC,

FILED DATE: 3/8/2024 2:46 PM   2020L008843

FILED DATE: 3/8/2024 2:46 PM   2020L008843

relating to an offering of participating interests in a promissory note secured by a portfolio of three properties.

308.　Among other things, BBS&G's Pullano noted that the draft PPM omitted a meaningful description of the mortgage to be recorded in favor of the investor-lenders, adding that "THIS IS THAT ALL-IMPORTANT DISCLOSURE THAT YOU AND I DISCUSSED." (Emphasis in original.)

309.　This "ALL-IMPORTANT DISCLOSURE" was not included in any prior PPM that Rosenberg approved and, in fact, was not even contained in the final draft of the PPM associated with Chicago Capital Fund 1 LLC, the PPM BBS&G's Pullano was then reviewing.

310.　In her e-mail, BBS&G's Pullano highlighted other significant deficiencies in the PPM, including, but not limited to, the absence of the mortgage and the business loan agreement from the subscription documents, the ability of the borrower to extend the term of the note unilaterally an unlimited number of times (likely rendering the note unenforceable), and the remedy of acceptance by the lender of a deed in lieu of foreclosure upon default – as to which BBS&G's Pullano wrote that "we talked about this" and that the remedy should be "THE ABILITY OF THE INVESTOR TO FORECLOSE" (emphasis in original). As it turned out, the deficiencies Pullano cited were present in prior PPMs too.  Neither Pullano nor Rosenberg advised EquityBuild of the need to make corrective disclosures applicable to prior PPMs.

311.　For example, in one instance, EquityBuild enlisted Rosenberg to assist with the preparation of a PPM to accompany the offering for sale of membership interests in South Side Development Fund 1.

312.　According to the PPM, the business plan was to purchase, renovate, stabilize, and refinance two apartment buildings on the south side of Chicago, specifically 4520-26 South Drexel

Boulevard ("4520 S Drexel) and 4611-15 South Drexel Boulevard ("4611 S Drexel").

313.    According to the PPM, the property at 4611 S Drexel had been acquired for $3,500,000 with the benefit of $2,625,000 in financing from BC57 LLC, a private bridge lender, and the property at 4520 S Drexel had been acquired for $5,700,000 with the benefit of $4,275,000 in financing from BC57 LLC (in each case, a 75% loan-to-value ratio). In other words, EquityBuild had a total of $2.3 million in equity in the two properties.

314.    Despite this, the PPM that Rosenberg assisted in preparing for South Side Development Fund 1 not only announced an offering of $5.95 million in membership interests, it also indicated that Jerry Cohen (through South Shore Property Holdings, LLC, a Wyoming limited liability company) would own 20% of the membership interests in the holding companies formed to own the properties, while South Side Development Fund 1 (the issuer) would only own 80% of those membership interests. Thus, EquityBuild sought to raise $5.95 million to sell $1.84 million of equity.

315.    Rosenberg's negligent failure to notice or disclose the clearly unworkable economics of the model foreseeably resulted in the fleecing of the investors.

316.    The terms proposed to the investors were quixotic: The "Use Of Proceeds" section of the PPM indicated that, of the $5.95 million to be raised, $2.3 million would buy out EquityBuild's initial equity in the properties (but, since Jerry Cohen would retain 20% of the ownership, it really only bought $1.84 million in equity), and $1,864,633 would be paid out in fees to EquityBuild and its affiliates, consisting of a $184,000 acquisition fee to EquityBuild, a $1,040,000 development fee to EquityBuild, a $69,000 sponsor guaranty fee to an unidentified entity, a $295,633 equity fee to EquityBuild Finance, and $276,000 in lender origination fees (presumably to EquityBuild Finance, although the identity of the lender is not disclosed, nor is the

FILED DATE: 3/8/2024 2:46 PM    2020L008843

basis for the payment of loan origination fees).

317.    The payment of $1,864,633 in fees to the sponsor (*i.e.,* more than 20% of the total raise), over and above the sale of $5.95 million in membership interests for $1.84 million in fund equity, should have indicated to Rosenberg that EquityBuild was engaged in securities violations and fraudulent activity, even if the fees were disclosed. This is particularly so given the knowledge Rosenberg already possessed, in the face of an SEC investigation, of EquityBuild's securities violations and failed borrowing history.

318.    In addition, the South Side Development Fund 1 PPM also projected an 8% annual dividend to investors on a quarterly basis and indicated that the properties would be refinanced on more favorable terms after 24 months. Assuming the fund paid *no* dividends to investors, therefore, the refinance value of the properties would need to be $15,527,500 in order to generate the projected 8% return on invested equity (net of Cohen's 20% promoted interest), or a 69% increase in value over the original $9.2 million in combined acquisition prices. These assumptions were unrealistic to say the least and, at a minimum, should have been supported by a *pro forma* justifying the conclusions, but no such spreadsheet was included in the PPM.

319.    In addition to the PPM for South Side Development Fund 1, Rosenberg reviewed and approved four other PPMs to accompany the solicitation of equity investments in real estate funds in 2017 and 2018, namely, South Side Development Fund 2 LLC, South Side Development Fund 4 LLC, South Side Development Fund 8 LLC and Hybrid Capital Fund LLC.

320.    The same or substantially similar errors, omissions, and "red flags" contained in the South Side Development Fund 1 PPM can be found in the PPMs for these other fund vehicles, which were customized from the template created by Rosenberg for South Side Development Fund 1.

FILED DATE: 3/8/2024 2:46 PM    2020L008843

321.     In total, BBS&G and Rosenberg provided substantial assistance preparing, and then reviewed and approved, at least 10 PPMs, five in connection with the solicitation of sales of participating interests in promissory notes and five in connection with the solicitation of sales of membership interests in fund entities.

322.     Rosenberg departed from BBS&G in early 2018 and continued providing legal services to EquityBuild and the Cohens well into 2018.

323.     Shaun Cohen informed Rosenberg in June 2018 that EquityBuild was operating at a staggering $1.3 million per month shortfall and was unable to perform its obligations to investors. Shortly thereafter, Shaun Cohen informed Rosenberg that "we are starting a fund for only Indian tribes to invest in.  Does that need to be a PPM?" Rosenberg responded, undeterred, "Yes.  Let me know the details."

**The SEC Sues to Enjoin the Scheme**

324.     On August 15, 2018, the SEC brought an action that details the fraud and Ponzi scheme that the Cohens implemented for their own benefit through EquityBuild which lured investors into investing their monies.

325.     That scheme permeated the entirety of EquityBuild's business, whether it be the purchase and sale of real estate, the establishment of various entities that allowed monies to be shifted from one entity to another or otherwise easily accessed for improper abuses by the Cohens, and finally creation of documentation that assisted in luring investors into the scheme with misrepresentations and the like.

326.     On August 17, 2018, the United States District Court for the Northern District of Illinois granted the SEC's request to enjoin the Cohens and EquityBuild from running such schemes, and appointed Kevin Duff as Receiver for the EquityBuild entities.

327. Each of the EquityBuild entities was controlled by the Cohens in the fraudulent scheme and thus could not sue those involved in perpetuating or enabling the scheme or allowing it to continue. Thus, the statute of limitations was tolled until the wrongdoers were removed and the Receiver was appointed. The Receiver was appointed by the Court in the SEC Action on August 17, 2018. However, the Receiver did not discover, and could not despite the exercise of reasonable diligence have discovered, until more recently, the Defendants' participation in furthering the EquityBuild Ponzi scheme. Moreover, the Defendants' wrongful acts were inherently undiscoverable. The Receiver also asserts the doctrine of equitable tolling with respect to any applicable statute of limitations.

**COUNT I**
**Professional Negligence**
**(Against Rock Fusco and Ioana Salajanu)**

328. Plaintiff repeats and realleges Paragraphs 1-327 as though fully set forth herein.

329. Salajanu knew that investor-lenders' collateral was on numerous occasions released without the required written consent of the investor-lenders as required by the CASAs.

330. Salajanu knew that the loans were being originated, underwritten, and serviced by EquityBuild Finance and that EquityBuild Finance also served as collateral agent on behalf of participating groups of investor-lenders.

331. Salajanu knew that the investor-lender loans being originated by EquityBuild Finance were for the benefit of EquityBuild, the sole owner and manager of the loan originator, underwriter, servicer, and collateral agent.

332. Salajanu knew that virtually every property she assisted EquityBuild in selling to an investor-owner was subsequently conveyed back to EquityBuild based on a complaint that EquityBuild made false promises regarding investment returns.

333. Salajanu received a telephone call from an EquityBuild employee who alleged

widespread fraud.

334.     Salajanu was forwarded e-mails from investors alleging false promises and/or fraud by EquityBuild.

335.     Salajanu reviewed a comment posted on a public forum by a former investor who provided specific allegations of Ponzi scheme activity.

336.     Salajanu knew that Jerry Cohen filed for personal bankruptcy and tried to conceal that fact from a lender.

337.     Salajanu represented to lenders that she was unaware of any pending or contemplated litigation against EquityBuild when she knew that to be false.

338.     Salajanu knew that Jerry Cohen was once the subject of a criminal arrest warrant.

339.     Salajanu knew that Jerry Cohen was involved in a real estate business in Philadelphia that closely resembled the real estate business being conducted by EquityBuild and that the Pennsylvania Bureau of Consumer Protection filed an action in connection with his real estate activities in Philadelphia.

340.     On every single transaction in which Salajanu represented EquityBuild at both the acquisition and the disposition, her client was unable to repay the entire principal balance alleged to be due on the investor-lender loan debt at closing.

341.     Salajanu represented EquityBuild in connection with the separate acquisitions of 7625 S East End and 7635 S East End, and she knew that separate mortgages were recorded against each, yet she knew that the two loans were being paid off as though they were a single loan secured by a single property, *i.e.,* "7625-35 S East End."

342.     Salajanu knew that EquityBuild received a $3,500,000 unsecured overnight loan then repaid the debt the following day with $200,000 in fixed interest and with funds that Salajanu

FILED DATE: 3/8/2024 2:46 PM    2020L008843

knew were represented to the title company and to Liberty as being used to pay off investor-lenders.

343.    Salajanu knew that the investor-owner who filed suit in connection with his purchase of 7616 S Phillips had not received payoffs on loans that had been released during prior refinancings or short sales.  Salajanu knew that this investor-owner was alleging fraud and advised EquityBuild of the urgent need to settle this lawsuit.

344.    Salajanu repeatedly represented EquityBuild as borrower and EquityBuild Finance, its wholly-owned subsidiary, as loan servicer and collateral agent, in the same transactions.

345.    Salajanu repeatedly represented investor-owners, as sellers of property back to EquityBuild, *and* EquityBuild, as purchaser of those properties, in the same transaction.

346.    Salajanu represented EquityBuild at 62 separate closings in which real estate was acquired for a total of $58,834,500 in cash.  Salajanu knew that uninsured mortgages evidencing loans equaling or exceeding 150 to 200% of the property value were later recorded against the properties acquired for cash.  Salajanu knew that, despite receiving loans equaling or exceeding 150 to 200% of the purchase price, EquityBuild often lacked funds to perform property repairs, including property repairs being sought by the City of Chicago in building code enforcement actions and property repairs required by mandatory injunction.

347.    As advisors and attorneys with respect to their handling of the transactions and matters described above for EquityBuild and EquityBuild Finance, Rock Fusco and its agents, including, but not limited to, Salajanu owed a duty to comply with applicable standards of care.

348.    Rock Fusco and Salajanu failed to meet the applicable standards of care in the respects set forth above, including without limitation:

      a.    failing to properly investigate and/or address the misconduct described by Jessica Baier or by complaining present or former investor-owners and

investor-lenders;

b.    failing to competently and promptly investigate the *bona fides* of EquityBuild's business which allowed EquityBuild to worsen its financial position and allowed its officers and insiders to improperly obtain various monies;

c.    failing to take all necessary steps to ensure that the EquityBuild transactions were legitimate, legal and free of undisclosed conflicts of interest for all parties they represented;

d.    failing to properly advise EquityBuild Finance regarding the scope of its authority under the CASA;

e.    failing to recognize that EquityBuild and EquityBuild Finance were using funds from new investors to pay returns to existing investors and thus running a Ponzi scheme and failing to advise them against the consequences of the same;

f.    placing the interests of the Cohens ahead of their clients;

g.    representing two or more clients with conflicting interests in the same transaction and, in transactions where a conflict was waivable, failing to obtain written conflicts waivers;

h.    failing to warn or advise EquityBuild and its principals to either not enter into the transactions and/or not enter into the transactions in the manner that it did, and failing to advise under IRPC 1.6(b)(2) and (3) in order to prevent a fraud and/or continuing to represent EquityBuild in violation of IRPC 1.2(d) ("a lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent….") and comment 12 thereunder ("[A] lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if: (1) the representation will result in violation of the Rules of Professional Conduct or other law….".

349.    The failures of Rock Fusco and Salajanu to meet the applicable standard of care constitutes professional negligence.

350.    The negligence of Rock Fusco and Salajanu was a proximate cause of the plaintiff's damages, as alleged above, including, but not limited to, all expenses, losses, liabilities, debts, and other obligations incurred from the fraud and Ponzi scheme perpetrated by the Cohens. In addition, Rock Fusco and Salajanu were enriched by continuing to bill and collect fees.

FILED DATE: 3/8/2024 2:46 PM 2020L008843

WHEREFORE, Plaintiff Kevin B. Duff, as Receiver for the Estate of EquityBuild, Inc., *et al.*, respectfully requests that this Court:

A.   Enter judgment in favor of the Receiver and against defendants Rock Fusco and Salajanu;

B.   Award damages in an amount in excess of the Law Division jurisdictional limit of $50,000;

C.   Award pre-judgment and post-judgment interest to the extent warranted under the common law or under the Illinois Interest Act (815 ILCS 205/2) or other statutes (735 ILCS 2-1303);

D.   Award the plaintiff reasonable attorneys' fees and costs; and

E.   Grant such other and further relief the Court deems just.

### COUNT II
### Aiding and Abetting Breach of Fiduciary Duty
### (Against Rock Fusco and Ioana Salajanu)
### (In the Alternative to Count I)

351.   In the alternative to Count I, the plaintiff repeats and realleges Paragraphs 1-327 as though fully set forth herein.

352.   Jerry and Shaun Cohen owed fiduciary duties to EquityBuild and EquityBuild Finance.

353.   The Cohens breached their fiduciary duties by employing devices, schemes, and artifices to defraud; making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaging in acts, practices, and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

354.   Between April 2015 and August 2018, Rock Fusco and Salajanu (a) were aware of the Cohens' improper conduct; (b) were aware that the Jerry and Shaun owed fiduciary duties to

FILED DATE: 3/8/2024 2:46 PM   2020L008843

FILED DATE: 3/8/2024 2:46 PM    2020L008843

the companies they oversaw; (c) were aware that the Cohens were breaching their fiduciary duties; (d) knowingly and substantially assisted and facilitated the breaches of fiduciary duty by the Cohens; and (e) benefitted directly and/or indirectly from these breaches of fiduciary duty.

355.    For example, Rock Fusco and Salajanu knowingly and substantially assisted and facilitated the Cohens' breaches of fiduciary duty as they allowed the Ponzi scheme to originate and continue, personally enriching the Cohens to the financial detriment of the Receivership Entities.

356.    At all relevant times, Salajanu, and other Rock Fusco attorneys working for the Receivership Entities, were acting within the course and scope of their employment.

357.    Rock Fusco and Salajanu willfully ignored obvious evidence of misconduct by the Cohens in order to reap additional fees and to ensure that their lucrative business relationships were maintained.

358.    The malfeasance and misfeasance of Rock Fusco and Salajanu proximately caused the Receivership Entities to sustain substantial damages in an amount to be proven at trial, including, but not limited to, all expenses, losses, liabilities, debts, and other obligations incurred in connection with the Ponzi scheme perpetrated by the Cohens.

WHEREFORE, Plaintiff Kevin B. Duff, as Receiver for the Estate of EquityBuild, Inc., *et al.*, respectfully requests that this Court:

A.    Enter judgment in favor of the Receiver and against defendants Rock Fusco and Salajanu;

B.    Award damages in an amount in excess of the Law Division jurisdictional limit of $50,000;

C.    Award pre-judgment and post-judgment interest to the extent warranted under the common law or under the Illinois Interest Act (815 ILCS 205/2) or other statutes (735 ILCS 2-1303);

D.    Award the plaintiff reasonable attorneys' fees and costs; and

FILED DATE: 3/8/2024 2:46 PM   2020L008843

E.      Grant such other and further relief the Court deems just.

## COUNT III
### Professional Negligence
### (BBS&G)

359.    Plaintiff repeats and realleges paragraphs 1-327 as if fully set forth herein.

360.    As advisors and attorneys with respect to their handling of the transactions and matters described above for EquityBuild, BBS&G and its agents including but not limited to Mark Rosenberg and Wendy Pullano owed EquityBuild a duty to comply with the applicable standard of care.

361.    BBS&G failed to meet the applicable standard of care in the respects set forth above, including without limitation:

a.  Negligently, recklessly, or intentionally ignored "red flags" demonstrating fraud, evidence of a Ponzi scheme and other violations of law;

b.  Negligently advised Shaun Cohen not to admit guilt to the SEC for operating in derogation of securities laws, not to be transparent with the SEC and not to bring EquityBuild's operations into compliance with securities laws;

c.  In connection with the preparation of offering materials and preparation of the private placement memoranda, blindly relying upon and advancing information provided by EquityBuild without undertaking a reasonable independent investigation of such information;

d.  Failed to use reasonable care to ensure that the statements within private placement memoranda he prepared, reviewed and/or approved were accurate;

e.  Prepared disclosure documents that were inadequate to satisfy the requirements of federal securities law;

f.  Failing to properly advise EquityBuild to properly comply with federal securities law;

g.  failing to advise or recognize that EquityBuild and EquityBuild Finance were offering and selling unregistered securities without complying with federal securities laws;

h.  failing to properly address conflict of representation between EquityBuild and Equity Build Finance who were both sides of transactions taking on all roles of originator, servicer, and collateral agent;

i.  Otherwise negligently dispensing legal advice.

62

FILED DATE: 3/8/2024 2:46 PM 2020L008843

362.    BBS&G's failure to meet the applicable standard of care constitutes professional negligence.

363.    BBS&G's negligence was a proximate cause of Plaintiff's damages, as alleged above, including but not limited to all expenses, losses, liabilities, debts, and other obligations incurred from the fraud and Ponzi scheme perpetrated by the Cohens.

364.    As a proximate result of the foregoing, Plaintiff has been injured in an amount to be proven at trial including but not limited to the amounts of the expenses, losses, liabilities, debts, and other obligations incurred from the fraud and Ponzi scheme perpetrated by the Cohens.

WHEREFORE, Plaintiff Kevin B. Duff, as Receiver for the Estate of EquityBuild, Inc., et al., respectfully requests that this Court:

A.      Enter judgment in favor of the Receiver and against defendant BBS&G;

B.      Award damages in an amount in excess of the Law Division jurisdictional limit of $50,000;

C.      Award pre-judgment and post-judgment interest to the extent warranted under the common law or under the Illinois Interest Act (815 ILCS 205/2) or other statutes (735 ILCS 2-1303);

D.      Award the plaintiff reasonable attorneys' fees and costs; and

F.      Grant such other and further relief the Court deems just.

### COUNT IV
### Aiding and Abetting Breach of Fiduciary Duty
### (Against BBS&G)
### (In the Alternative to Count III)

365.    In the alternative to Count III, Plaintiff repeats and realleges paragraphs 1-327 as if fully set forth herein.

366.    Jerry Cohen was the head of EquityBuild, Inc. while EquityBuild Finance was run by Shaun Cohen.   The Cohens owed fiduciary duties to EquityBuild.

367.    The Cohens took countless actions in breach of those fiduciary duties. Indeed, as more fully described herein, they used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

368.    As set forth above, starting in February 2017 or soon thereafter and through August 2018, Defendant BBSG and its agent Mark Rosenberg: (a) knew and were aware of the improper conduct described above orchestrated by the Cohens; (b) were aware of the conduct by Jerome Cohen and Shaun Cohen who had fiduciary positions with Company, and were aware of the breach of those duties to EquityBuild by engaging in the conduct described above; (c) knowingly and substantially assisted and facilitated the fiduciary breaches against the interest of their clients, namely EquityBuild; and (d) benefitted directly and/or indirectly from these fiduciary breaches.

369.    For example, BBS&G and Rosenberg knew in March 2017 that EquityBuild was operating in violation of securities laws and Rosenberg never received indication that EquityBuild had brought its operations into compliance, yet Rosenberg continued to prepare PPM after PPM to bring more investors and more money into the scheme.  Moreover, Rosenberg was informed by a colleague at BBS&G, Wendy Pullano, that the PPM Rosenberg was working on lacked several material disclosures, yet Rosenberg failed to ensure the proper disclosures were contained in the final version sent to investors and knew or should have known that these same disclosures were absent from prior PPMs he had prepared.

370.    From 2017 forward, BBSG continued to include misrepresentations and the like in offerings and private placement memoranda without proper diligence, during which time the SEC

was investigating EquityBuild and the Cohens, an additional red flag indicating improprieties associated with the Cohens' activities.

371.     In addition, Shaun Cohen informed Rosenberg in June 2018 that EquityBuild was operating at a staggering $1.3 million per month shortfall and was unable to perform its obligations to investors.  Rosenberg expressed no surprise at this information, which suggests that the information was previously known to him, and shortly thereafter expressed interest in preparing a PPM to solicit investments from "Indian tribes," which again suggests that Rosenberg had no qualms about furthering EquityBuild's scheme.

372.     At all relevant times, BBS&G and Rosenberg worked within the course and scope of their employment, and for their own benefit.

373.     BBS&G and Rosenberg supervised, reviewed, approved, and/or ratified the conduct of the Cohens to the detriment of EquityBuild.

374.     BBS&G and Rosenberg willfully ignored obvious indicia of misconduct on the part of the Cohens to reap the benefit of additional fees and ensure their lucrative relationships were maintained.

375.     BBS&G's and Rosenberg's malfeasance and misfeasance also have proximately caused EquityBuild to sustain substantial damages in an amount to be proven at trial, including but not limited to all expenses, losses, liabilities, debts, and other obligations incurred from the fraud and Ponzi scheme perpetrated by the Cohens.

WHEREFORE, Plaintiff Kevin B. Duff, as Receiver for the Estate of EquityBuild, Inc., et al., respectfully requests that this Court:

A.     Find that the Defendant BBS&G aided and abetted breaches of fiduciary duty;

B.     Find that the entities for which the Plaintiff was appointed Receiver were damaged and award compensatory and other appropriate damages permitted by law for a sum

FILED DATE: 3/8/2024 2:46 PM      2020L008843

in excess of the Law Division jurisdictional limit of $50,000;

C.      Award pre-judgment and post-judgment interest to the extent warranted under the common law or under the Illinois Interest Act (815 ILCS 205/2) or other statutes (735 ILCS 2-1303);

D.      Award the Plaintiff reasonable attorneys' fees and costs; and

E.      Grant such other and further relief the Court deems just.

Dated:  March 8, 2024                         Respectfully submitted,

                                              Kevin B. Duff, Receiver

                                              /s/ Michael C. Bruck_____

                                              Michael Rachlis
                                              Rachlis Duff & Peel LLC
                                              Firm No. 56188
                                              542 South Dearborn Street, Suite 900
                                              Chicago, IL 60605
                                              (312) 733-3950
                                              mrachlis@rdaplaw.net

                                              Andrew Eliot Porter
                                              Porter Law Office
                                              Firm No. 42000
                                              853 North Elston Avenue
                                              Chicago, IL 60642
                                              Tel: (312) 433-0568
                                              andrew@andrewporterlaw.com

                                              Michael C. Bruck
                                              Timothy J. McInerney
                                              SPELLMIRE BRUCK LLP.
                                              One East Wacker Drive – Suite 2350
                                              Chicago, IL  60601
                                              (312) 258-9400
                                              mcb@spellmirebruck.com
                                              tjm@spellmirebruck.com
                                              Firm ID: 62543

FILED DATE: 3/8/2024 2:46 PM    2020L008843

FILED DATE: 3/8/2024 2:46 PM   2020L008843

Steven J. Roeder
Ryan P. Wietendorf
Roeder Law Offices LLC
77 West Washington Street, Suite 2100
Chicago, Illinois 60602
Phone: (312) 667-6000
Fax: (708) 843-0618
Firm ID: 58775
sjr@roederlawoffices.com
tdg@roederlawoffices.com

*Attorneys for Plaintiff*

FILED DATE: 3/8/2024 2:46 PM 2020L008843

**IN THE CIRCUIT COURT OF COOK COUNTY**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| KEVIN B. DUFF, RECEIVER FOR THE ESTATE OF EQUITYBUILD INC., et al., ) | |
| ) | CASE NO. 2020 L 8843 |
| Plaintiff, ) | Hon Judge Kubasiak |
| ) | |
| v. ) | Calendar T |
| ) | |
| ROCK FUSCO & CONNELLY, LLC, ) IOANA SALAJANU, and BREGMAN, BERBERT, ) SCHWARTZ & GILDAY, LLC, ) | |
| ) | |
| Defendants. ) | |

**AFFIDAVIT PURSUANT TO**
**ILLINOIS SUPREME COURT RULE 222**

I, MICHAEL C. BRUCK, under oath and subject to the penalties of perjury, depose and state that the damages sought in this cause exceed the sum of FIFTY THOUSAND DOLLARS ($50,000.00).

Pursuant to 735 ILCS 5/1-109, the undersigned certifies that the foregoing Affidavit is true and correct based upon the personal knowledge of the undersigned.

Respectfully submitted,
SPELLMIRE BRUCK LLP

By: _____ */s/ Michael C. Bruck* _____
One of the attorneys for Plaintiff

Michael C. Bruck
Timothy J. McInerney
Spellmire Bruck LLP
One East Wacker Drive Suite 2350
Chicago, IL 60601
(312) 258-9400
mcb@spellmirebruck.com
tjm@spellmirebruck.com
Firm ID #62543

68

# Exhibit C

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| KEVIN B. DUFF, RECEIVER FOR THE ESTATE OF EQUITYBUILD INC., EQUITYBUILD FINANCE LLC (f/k/a HARD MONEY COMPANY LLC), 1700 JUNEWAY LLC, 4533-37 S CALUMET LLC, 5450 S INDIANA LLC, 6217-27 S DORCHESTER LLC, 6437 S KENWOOD LLC, 7026 CORNELL, INC., 7109 S CALUMET LLC, 7749-59 S YATES LLC, 7933 S KINGSTON AVE LLC, 8100 S ESSEX LLC, 8104 S KINGSTON ASSOCIATES, 8529 S RHODES AVE LLC, CHICAGO CAPITAL FUND I LLC, CHICAGO CAPITAL FUND II LLC, EB SOUTH CHICAGO 1 LLC, EB SOUTH CHICAGO 2 LLC, EB SOUTH CHICAGO 3 LLC, EB SOUTH CHICAGO 4 LLC, HYBRID CAPITAL FUND LLC, ) SOUTH SIDE DEVELOPMENT FUND 1 LLC, ) SOUTH SIDE DEVELOPMENT FUND 2 LLC, SOUTH SIDE DEVELOPMENT FUND 3 LLC, SOUTH SIDE DEVELOPMENT FUND 4 LLC, SOUTH SIDE DEVELOPMENT FUND 5 LLC, SOUTH SIDE DEVELOPMENT FUND 6 LLC, SOUTH SIDE DEVELOPMENT FUND 7 LLC, SOUTH SIDE DEVELOPMENT FUND 8 LLC, SSDF1 4520 S DREXEL LLC, SSDF1 4611 S DREXEL LLC, SSDF1 6751 S MERRILL LLC, SSDF1 7110 S CORNELL LLC, SSDF2 1139 E 79TH LLC, SSDF4 638 N AVERS LLC, SSDF4 6217 S DORCHESTER LLC, SSDF4 6250 S MOZART LLC, SSDF4 7024 S PAXTON LLC, SSDF4 7255 S EUCLID LLC, SSDF5 PORTFOLIO 1 LLC, SSDF6 6160 S MLK LLC, SSDF7 PORTFOLIO 1 LLC, SSPH 6951 S MERRILL LLC, SSPH 7927-49 S ESSEX LLC, SSPH 11117 S LONGWOOD LLC, SSPH PORTFOLIO 1 LLC, <br><br>   Plaintiffs, <br>v. <br><br>ROCK FUSCO & CONNELLY, LLC, IOANA SALAJANU, and BREGMAN, BERBERT, CHWARTZ & GILDAY, LLC, <br><br>   Defendants. | Court No: 2020 L 008843 |

## DEFENDANTS' ROCK FUSCO & CONNELLY, LLC AND IOANA SALAJANUS' ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT

Defendants, ROCK FUSCO & CONNELLY, LLC ("Rock Fusco") and IOANA SALAJANU ("Salajanu") (collectively, "Defendants"), by their attorneys, Johnson & Bell, Ltd., for their Answer in response to Plaintiff's Second Amended Complaint (the "Complaint"), state as follows:

## NATURE OF THE CASE

1. In August 2018, the United States Securities and Exchange Commission filed the SEC Action to halt an ongoing real estate fraud and Ponzi scheme devised and operated by Jerry Cohen, Shaun Cohen, and various employees of EquityBuild and EquityBuild Finance and materially assisted by, among other aiders and abettors, Ioana Salajanu, a licensed Illinois attorney and a partner at Rock, Fusco & Connelly, LLC and Bregman, Berbert, Schwartz & Gilday, LLC.

**ANSWER: Defendants deny that Rock Fusco and/or Salajanu assisted or aided and abetted Jerry Cohen, Shaun Cohen, EquityBuild, and/or EquityBuild Finance in any alleged real estate fraud and/or Ponzi scheme. Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 1.**

2. The United States District Court enjoined the scheme and schemers, and shortly thereafter a consent judgment was entered affirming the SEC's allegations.

**ANSWER: Defendants deny that Rock Fusco and/or Salajanu assisted or aided and abetted Jerry Cohen, Shaun Cohen, EquityBuild, and/or EquityBuild Finance in any alleged real estate fraud and/or Ponzi scheme. Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 2 and note that the terms "scheme and schemers" are undefined.**

-2-

3.      Through the Ponzi scheme, Jerome Cohen and Shaun Cohen, with the assistance of their various enablers, bilked hundreds of ordinary investors and others across the country out of tens of millions of dollars through a wide variety of fraudulent acts and schemes.

**ANSWER:    Defendants deny that Rock Fusco and/or Salajanu assisted or aided and abetted Jerry Cohen, Shaun Cohen, EquityBuild, and/or EquityBuild Finance in any alleged real estate fraud and/or Ponzi scheme.  Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 3 and note that the terms "enablers" and "wide variety of fraudulent acts and schemes" are undefined.**

### JURISDICTION AND VENUE

4.      This court has jurisdiction pursuant to 735 ILCS 5/2-209 as a result of each of the Defendants being present and transacting business in the State of Illinois, committing the acts complained of in this Complaint within the State of Illinois, and/or failing to perform (and/or perform properly) duties and/or a contract substantially connected with this State.

**ANSWER:    Defendants deny committing the acts complained of in the Complaint or failing to perform or perform properly their duties as alleged in the Complaint. The remaining allegations contained in Paragraph 4 state legal conclusions to which no response is necessary.  To the extent an answer is deemed required, Defendants deny.**

5.      Venue is proper pursuant to 735 ILCS 5/2-101 because Cook County is where one or more of the Defendants resides, where a substantial part of the acts and omissions complained of in this Complaint occurred, and/or where the parties agreed in written engagement letters that disputes such as this one could be litigated.

**ANSWER:    Defendants deny committing the acts and omissions complained of in the Complaint.  The remaining allegations contained in Paragraph 6 state legal conclusions**

to which no response is necessary. To the extent an answer is deemed required, Defendants deny.

## THE PARTIES AND OTHER KEY PLAYERS

6.  Plaintiff Kevin B. Duff serves as court-appointed receiver in the SEC Action for, among other entities, EquityBuild, EquityBuild Finance, 1700 Juneway LLC, 4533-37 S Calumet LLC, 5450 S Indiana LLC, 6217-27 S Dorchester LLC, 6437 S Kenwood LLC, 7026 Cornell, Inc., 7109 S Calumet LLC, 7749-59 S Yates LLC, 7933 S Kingston Ave LLC, 8100 S Essex LLC, 8104 S Kingston Associates, 8529 S Rhodes Ave LLC, Chicago Capital Fund I LLC, Chicago Capital Fund II LLC, EB South Chicago 1 LLC, EB South Chicago 2 LLC, EB South Chicago 3 LLC, Eb South Chicago 4 LLC, Hybrid Capital Fund LLC, South Side Development Fund 1 LLC, South Side Development Fund 2 LLC, South Side Development Fund 3 LLC, South Side Development Fund 4 LLC, South Side Development Fund 5 LLC, South Side Development Fund 6 LLC, South Side Development Fund 7 LLC, South Side Development Fund 8 LLC, SSDF1 4520 S Drexel LLC, SSDF1 4611 S Drexel LLC, SSDF1 6751 S Merrill LLC, SSDF1 7110 S Cornell LLC, SSDF2 1139 E 79th LLC, SSDF4 638 N Avers LLC, SSDF4 6217 S Dorchester LLC, SSDF4 6250 S Mozart LLC, SSDF4 7024 S Paxton LLC, SSDF4 7255 S Euclid LLC, SSDF5 Portfolio 1 LLC, SSDF6 6160 S MLK LLC, SSDF7 Portfolio 1 LLC, SSPH 6951 S Merrill LLC, SSPH 7927-49 S Essex LLC, SSPH 11117 S Longwood LLC, and SSPH Portfolio 1 LLC.

**ANSWER:** Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 6. To the extent an answer is deemed required, Defendants deny.

7.  Defendant Rock Fusco & Connelly, LLC ("Rock Fusco") is a Chicago based law firm.

**ANSWER:** **Admit.**

8.      Defendant Ioana Salajanu is a licensed Illinois attorney who worked at Rock Fusco during the relevant time period. Unless otherwise noted, all acts, omissions, knowledge and notice of Salajanu were in her capacity as an agent of Rock Fusco.

**ANSWER:** **Defendants admit that Salajanu is a licensed Illinois attorney who worked at Rock Fusco. The allegation contained in Paragraph 8 that "all acts, omissions, knowledge and notice of Salajanu were in her capacity as an agent of Rock Fusco" states a legal conclusion to which no response is necessary. To the extent an answer is deemed required, Defendants deny. Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 8. To the extent an answer is deemed required, Defendants deny.**

9.      Defendant Bregman, Berbert, Schwartz & Gilday, LLC ("BBSG") is a law firm with offices in Maryland, Virginia, and the District of Columbia. Mark Rosenberg, an attorney, was employed with BBSG in an "of counsel" capacity.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 9. To the extent an answer is deemed required, Defendants deny.**

## FACTUAL BACKGROUND

### *Overview of the Ponzi Scheme*

10.      Jerry Cohen formed EquityBuild as a Florida corporation on October 31, 2007.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 10. To the extent an answer is deemed required, Defendants deny.**

11.     Jerry Cohen formed EquityBuild Finance as a Florida limited liability company in 2009.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 11.  To the extent an answer is deemed required, Defendants deny.**

12.     EquityBuild Finance was managed and wholly-owned by EquityBuild.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 12.  To the extent an answer is deemed required, Defendants deny.**

13.     The daily operations of EquityBuild Finance were carried out by Shaun Cohen.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 13.  To the extent an answer is deemed required, Defendants deny.**

14.     The Cohens promoted a "turnkey" approach to real estate investing by recruiting inexperienced but aspiring investors to at various times either purchase property for rehabilitation and resale ("investor-owners"), to purchase interests in EquityBuild affiliates that would purchase and renovate property for resale ("equity investors"), to participate in the making of loans to investor-owners, to companies owned by equity investors, or to EquityBuild itself ("investor-lenders"), or to purchase interests in development funds that indirectly owned one or more real estate assets ("fund investors").

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 14.  To the extent an answer is deemed required, Defendants deny.**

15.     The investor-lenders were typically informed that EquityBuild, an EquityBuild affiliate, or an investor-owner intended to acquire and rehabilitate an undervalued property, to raise rents consistent with the improvements, to increase occupancy, and to repay the principal balance of the short-term, interest-only promissory note either through a refinancing or sale of the property.

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 15.  To the extent an answer is deemed required, Defendants deny.**

16.     Typically, EquityBuild or the investor-owners bought property with acquisition and construction loans originated by EquityBuild Finance (or Hard Money Company, LLC, as its de facto predecessor) for the benefit of investor-lenders. (Unless context demands otherwise, Hard Money Company, LLC ("Hard Money Company") and EquityBuild Finance are sometimes referred to hereinafter as EquityBuild Finance.)

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 16.  To the extent an answer is deemed required, Defendants deny.**

17.     As an EquityBuild employee once described EquityBuild's business model to Ioana Salajanu, EquityBuild was "the borrower on most of our investments," EquityBuild Finance was the loan servicer, the loans were funded by investor-lenders, and EquityBuild Finance was not the true lender because "we have no money lent into the deal."

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 17.  To the extent an answer is deemed required, Defendants deny.**

18.    In early years EquityBuild would submit a contract to purchase residential real estate, either a single-family residence or a multifamily apartment building, to a real estate seller.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 18.  To the extent an answer is deemed required, Defendants deny.**

19.    Through a team of "remote managers" EquityBuild Finance employed Internet advertising and other media channels, including, on at least one occasion, a television infomercial featuring William Shatner, to locate aspiring real estate investors and entice them with the prospect of double-digit returns on debt or equity investments in real estate assets.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 19.  To the extent an answer is deemed required, Defendants deny.**

20.    The investor-lenders were induced to make loans evidenced by promissory notes issued by EquityBuild or, in some instances, an EquityBuild affiliate or investor-owner.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 20.  To the extent an answer is deemed required, Defendants deny.**

21.    A typical promissory note would require EquityBuild to pay monthly interest on the originally stated principal balance at rates generally ranging from 13% to 18% per annum and to repay the principal at maturity, typically between 12 and 36 months after the date on the promissory note or a date designated by EquityBuild Finance.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 21. To the extent an answer is deemed required, Defendants deny.**

22. The promissory notes were typically secured by a mortgage.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 22. To the extent an answer is deemed required, Defendants deny.**

23. In nearly all instances the mortgage identified each of the investor-lenders and the participating interest of each such investor-lender.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 23. To the extent an answer is deemed required, Defendants deny.**

**The CASAs**

24. The investor-lenders typically signed a Collateral Agency and Servicing Agreement ("CASA") with EquityBuild Finance.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 24. To the extent an answer is deemed required, Defendants deny.**

25. The CASA articulated the limited and restricted ways EquityBuild Finance would be authorized to enforce the loan upon default, which, subject to terms and conditions, put the matter to a vote of the noteholders, who were prohibited from acting unilaterally.

**ANSWER:** **Paragraph 25 calls for legal conclusions to which no response is necessary. To the extent an answer is deemed required, Defendants deny.**

26.     Section 3 of the CASA contained the following language: "IN THE ABSENCE OF WRITTEN INSTRUCTIONS FROM THE REQUIRED LENDERS, NEITHER THE COLLATERAL AGENT NOR THE SERVICER SHALL FORECLOSE UPON ANY LIEN WITH RESPECT TO ANY OF THE COLLATERAL OR TAKE ANY OTHER ACTION WITH RESPECT TO THE COLLATERAL OR ANY PART THEREOF."

**ANSWER:     Defendants admit that certain CASAs contained the language quoted in Paragraph 26.**

27.     The "required lenders" was defined to mean investor-lenders holding a majority of the principal advanced under the promissory note.

**ANSWER:     Paragraph 27 calls for legal conclusions to which no response is necessary.  To the extent an answer is deemed required, Defendants deny.**

28.     Section 6(a) of the CASA contained the following disclaimer: "[T]he Collateral Agent shall act only on written instructions from all Lenders with respect to the amendment or termination of the Mortgage, or, except as provided in the Mortgage, any Lien on property of the Borrower granted under the Mortgage."

**ANSWER:     Defendants admit that certain CASAs contained the language quoted in Paragraph 28.**

29.     On October 22, 2015, Elizabeth Kammerer, an EquityBuild Finance employee, forwarded Salajanu an e-mail from a prospective investor-lender who was expressing concern about the loan documentation, including (1) the evident lack of insurance carried by EquityBuild Finance, particularly given language in the CASA exempting itself from liability for negligence, (2) ambiguity regarding the prepayment penalty, (3) failure of the mortgage to make express reference to the promissory note, (4) lack of any representation by EquityBuild Finance regarding

the financial condition of the borrower or the perfection and priority of the mortgage, (5) lack of clarity regarding the relationship between the borrower and the collateral agent and servicer and the implications associated with a potential default, and (6) lack of a special purpose entity borrower.

**ANSWER:** **Defendants admit that on October 22, 2015, Elizabeth Kammerer forwarded to Salajanu an email from a prospective investor-lender. Defendants state that the email speaks for itself and deny the allegation of Paragraph 29 to the extent they are inconsistent with the email. Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 29. To the extent an answer is deemed required, Defendants deny.**

30. On October 28, 2015, Kammerer forwarded Salajanu a copy of the CASA then being used by EquityBuild Finance.

**ANSWER:** **Admit.**

31. On October 29, 2015, Shaun Cohen provided additional information to Salajanu, informing her, among other things, that EquityBuild Finance "does not want a prepayment penalty," that there are "multiple lenders syndicated on each mortgage and note with [EquityBuild Finance] as the collateral and servicing agent in the middle," and that the "lenders are not intended to have any power except [as] specified in the CASA."

**ANSWER:** **Admit.**

32. Between December 2015 and January 2016, Salajanu and her Rock Fusco colleague Patrick Clancy read and revised the CASA, but made only minor changes to the agreement, leaving in place the language in Section 6(a) that "the Collateral Agent shall act only on written instructions from all Lenders with respect to the amendment or termination of the Mortgage[.]"

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 32. To the extent an answer is deemed required, Defendants deny.**

**Re-Review of the CASA**

33. On March 27, 2018, Elizabeth Kammerer e-mailed Salajanu indicating that the "CASAs need to be overhauled to cover all and be clearer," and she attached copies of the CASA's then being used for both secured and unsecured promissory notes.

**ANSWER:** **Defendants admit that on March 27, 2018, Elizabeth Kammerer e-mailed Salajanu indicating that the "CASAs need to be overhauled to cover all and be clearer," and she attached copies of the CASA's for both secured and unsecured promissory notes. Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 33. To the extent an answer is deemed required, Defendants deny.**

34. Salajanu made some revisions to the language of the CASAs and returned a proposed new draft on April 3, 2018.

**ANSWER:** **Admit.**

35. The proposed new draft returned by Salajanu deleted the following sentence:

IN THE ABSENCE OF WRITTEN INSTRUCTIONS FROM THE REQUIRED LENDERS, NEITHER THE COLLATERAL AGENT NOR THE SERVICER SHALL FORECLOSE UPON ANY LIEN WITH RESPECT TO ANY OF THE COLLATERAL OR TAKE ANY OTHER ACTION WITH RESPECT TO THE COLLATERAL OR ANY PART THEREOF.

**ANSWER:** **Admit.**

36. The proposed new draft returned by Salajanu also deleted the following sentence:

> [T]he Collateral Agent shall act only on written instructions from all Lenders with respect to the amendment or termination of the Mortgage, or, except as provided in the Mortgage, any Lien on property of the Borrower granted under the Mortgage.

**ANSWER:** **Admit.**

37. Salajanu deleted the foregoing language because, as set forth in numerous examples below, she knew that EquityBuild Finance had been releasing investor-lender mortgages without their unanimous written consent and in violation of the CASAs.

**ANSWER:** **Deny.**

**The Loan Documents**

38. The loans originated by EquityBuild Finance included advances that were used to pay unusually steep acquisition and development fees to EquityBuild, as well as unusually high loan origination fees to EquityBuild Finance.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 38. To the extent an answer is deemed required, Defendants deny.**

39. The loans originated by EquityBuild Finance typically resulted in an initial advance of 150 to 200% of the amount spent to acquire the property (and sometimes more).

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 39. To the extent an answer is deemed required, Defendants deny.**

40. The assets encumbered by the mortgage debt consistently failed to appreciate in value by an amount sufficient to repay the investor-lenders' debt at maturity, either through selling or refinancing the property.

**ANSWER:** Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 40. To the extent an answer is deemed required, Defendants deny.

41. Rather than declare a default and take steps to enforce the investor-lenders' rights under a promissory note, EquityBuild Finance, as loan servicer, would typically enter into a loan extension agreement with EquityBuild, as borrower.

**ANSWER:** Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 41. To the extent an answer is deemed required, Defendants deny.

42. Loan extension agreements afforded EquityBuild additional time to refinance or sell the property and afforded EquityBuild Finance additional time to persuade the investor-lenders to roll their (illusory) principal into a new investment.

**ANSWER:** Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 42. To the extent an answer is deemed required, Defendants deny.

43. As a growing number of investor-lenders complained about the repeated loan extensions, refused to "roll" their principal into a new investment, and demanded the immediate return of their money, EquityBuild Finance attempted to find new investor-lenders to buy out the interests of the complaining investor-lenders.

**ANSWER:** Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 43. To the extent an answer is deemed required, Defendants deny.

44.     Occasionally, EquityBuild Finance succeeded in brokering buyouts, but most complaining investor-lenders remained in a "buyout queue."

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 44.  To the extent an answer is deemed required, Defendants deny.**

45.     If a particular property or group of properties could not be refinanced or sold for an amount that would yield proceeds sufficient to repay the entire principal balance due on an investor-lender loan, EquityBuild would effectuate a short sale or short refinance, in the latter case either individually or through portfolio loans.

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 45.  To the extent an answer is deemed required, Defendants deny.**

46.     To consummate these short sales or short refinances, EquityBuild would (1) cause EquityBuild Finance to submit a knowingly inaccurate payoff statement to the title company either (a) indicating that EquityBuild Finance would agree to release the mortgage in exchange for payment of a falsely understated outstanding principal balance due or (b) accurately stating the outstanding principal balance due, but indicating that EquityBuild Finance would agree to release the mortgage in exchange for "100% Net Proceeds" of the sale or refinance and/or (2) submit a mortgage release.

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 46.  To the extent an answer is deemed required, Defendants deny.**

-15-

47.     In nearly all instances the payoff statements instructed the title company to wire the payoff proceeds to an EquityBuild Finance bank account.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 47.  To the extent an answer is deemed required, Defendants deny.**

48.     When acting as loan servicer in furtherance of its scheme, EquityBuild Finance never solicited nor obtained the written consent of any investor-lender (let alone investor-lenders holding a majority of the interests in a particular loan) prior to issuing a payoff statement.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 48.  To the extent an answer is deemed required, Defendants deny.**

49.     After receiving the short payoffs, EquityBuild Finance would repay only selected investor-lenders, if any, and divert the remaining proceeds back into the Ponzi scheme.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 49.  To the extent an answer is deemed required, Defendants deny.**

50.     EquityBuild Finance misled investor-lenders not paid off by a particular short sale or short refinance by representing that their loan had been extended and/or that a refinancing or sale remained in process.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 50.  To the extent an answer is deemed required, Defendants deny.**

*Salajanu Commencement Of Work At Rock Fusco*

51.     Salajanu began representing EquityBuild and EquityBuild Finance in 2014, while employed at Bryce Downey & Lenkov LLC ("Bryce Downey"). In or about March 2015, Salajanu joined Rock Fusco. Over the course of her work for EquityBuild, Salajanu assisted EquityBuild in connection with, among other things, the acquisition, disposition, reacquisition, financing, and/or refinancing of at least 160 properties. In addition, Salajanu created many of the LLCs that would ultimately hold title to the properties.

**ANSWER:     Defendants deny that Salajanu "created many of the LLCs that would ultimately hold title to the properties."  Defendants admit that Salajanu began representing EquityBuild and EquityBuild Finance in 2014, while employed at Bryce Downey & Lenkov LLC and that in or around March 2015, Salajanu joined Rock Fusco. Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 51.  To the extent an answer is deemed required, Defendants deny.**

52.     Within her first three months at Rock Fusco, Salajanu assisted EquityBuild in reselling four properties to investor-owners in transactions that consistently generated substantial gross profits to EquityBuild and in which the investor-owners acquired the property with loans originated by EquityBuild Finance – loans that substantially exceeded the purchase price, to-wit:

    a.    Salajanu represented EquityBuild when it purchased 7953 S Marquette for $335,000, and she represented EquityBuild when it resold the property for $637,000 to an investor-owner who acquired the asset with the benefit of an $887,000 loan from EquityBuild Finance.

    b.    Salajanu represented EquityBuild when it purchased 8107 S Ellis for $335,000, and she represented EquityBuild when it resold the property for $499,500 to an investor-owner who acquired the asset with the benefit of a $525,000 loan from EquityBuild Finance.

    c.    Salajanu represented EquityBuild when it purchased 7450 S Luella for $370,000, and she represented EquityBuild when it resold the property for

$544,000 to an investor-owner who acquired the asset with the benefit of an $594,000 loan from EquityBuild Finance.

d.     Salajanu represented EquityBuild when it purchased 7616 S Phillips for $725,000, and she represented EquityBuild when it resold the property for $1,514,650 to an investor-owner who acquired the asset with the benefit of a $1,950,000 loan from EquityBuild Finance.

**ANSWER:   Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 52.  To the extent an answer is deemed required, Defendants deny.**

53.    Within the first five months of her tenure at Rock Fusco, Salajanu assisted EquityBuild in selling five properties encumbered with EquityBuild Finance debt, and each of the loans was short paid at closing, to wit:

a.     Salajanu represented EquityBuild with the sale of 5342 N Linder and, although the payoff statement indicated an unpaid principal balance due of $397,298.81, the payoff made to EquityBuild Finance at closing was only $268,558.80.

b.     Salajanu represented EquityBuild with the sale of 5209 S Warwick and, although the payoff statement indicated an unpaid principal balance due of $372,138, the payoff made to EquityBuild Finance at closing was only $204,268.24.

c.     Salajanu represented EquityBuild with the sale of 8107 S Ellis and, although the payoff statement indicated an unpaid principal balance due of $525,000, the payoff made to EquityBuild Finance at closing was only $447,343.14.

d.     Salajanu represented EquityBuild with the sale of 4944 W Roscoe and, although the payoff statement indicated an unpaid principal balance due of $368,161, the payoff made to EquityBuild Finance at closing was only $267,106.28.

e.     Salajanu represented EquityBuild with the sale of 4109 N Kimball and, although the payoff statement indicated an unpaid principal balance due of $402,237, the payoff made to EquityBuild Finance at closing was only $252,323.12.

**ANSWER:** Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 53. To the extent an answer is deemed required, Defendants deny.

54. In connection with the sale of 5342 N Linder, Salajanu received an e-mail shortly before the closing in which the title agent asked: "[A]re we only paying off one investor?"

**ANSWER:** Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 54. To the extent an answer is deemed required, Defendants deny.

55. Salajanu signed the closing statements as attorney-in-fact for Jerry Cohen in connection with each of the referenced short sales.

**ANSWER:** Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 55. To the extent an answer is deemed required, Defendants deny.

*Short Payoff Example: 4930 W Cornelia*

56. Salajanu represented EquityBuild on the sale of 4930 W Cornelia for $233,500, which closed on November 4, 2015.

**ANSWER:** Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 56. To the extent an answer is deemed required, Defendants deny.

57. On the day of the closing, Kammerer e-mailed Salajanu and stated: "Just to clarify because I am still new to reviewing the [closing statements] solo, we are not getting anything from this so we do not have money to payoff our lenders unfortunately? And is the amount listed for the payoff of the mortgage supposed to be short by $250,162.77[?]"

**ANSWER:** **Defendants admit that on November 4, 2015, Kammerer e-mailed Salajanu and stated: "Just to clarify because I am still new to reviewing the HUDs solo, we are not getting anything from this so we do not have money to payoff our lenders unfortunately? And is the amount listed for the payoff of the mortgage supposed to be short by $250,162.77."  Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 57.  To the extent an answer is deemed required, Defendants deny.**

58.    The payoff statement reflected an unpaid principal balance of $426,476, but indicated that the mortgage would be released in exchange for 100% of the net sales proceeds of $233,500.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 58.  To the extent an answer is deemed required, Defendants deny.**

59.    The investor-lender loan was short paid at closing, and Salajanu signed the settlement statement as attorney-in-fact for Jerry Cohen.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 59.  To the extent an answer is deemed required, Defendants deny.**

60.    Salajanu knew or should have known that the participating investor lenders did not provide written consent to a short payoff as required by the CASAs.

**ANSWER:** **Deny.**

-20-

*Short Payoff Example: 7200 S Stony Island*

61.     Salajanu represented EquityBuild on the sale of 7200 S Stony Island for $1,850,000, which closed on November 5, 2015.

**ANSWER:     Defendants admit that Salajanu represented EquityBuild on the sale of 7200 S Stony Island.  Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 61.  To the extent an answer is deemed required, Defendants deny.**

62.     The title commitment that Salajanu reviewed prior to the closing indicated that the property was encumbered by two mortgages, and, after EquityBuild Finance provided the payoff statements to the title company, the escrow agent indicated that EquityBuild would be required to "bring $358,125.81 to the closing tomorrow."

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 62.  To the extent an answer is deemed required, Defendants deny.**

63.     Kammerer forwarded the e-mail to Jerry Cohen and asked, "[C]an we bring this?" and Jerry responded (copying Salajanu), "Zero out file please."

**ANSWER:     Deny.**

64.     Kammerer subsequently prepared and submitted new payoff statements indicating that EquityBuild Finance would release the mortgage in exchange for 100% of the "net proceeds."

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 64.  To the extent an answer is deemed required, Defendants deny.**

65.     As a result, the investor-lender loans were short paid by $351,278.90, and Salajanu signed the settlement statement as attorney-in-fact for Jerry Cohen.

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 65.  To the extent an answer is deemed required, Defendants deny.**

66.     Salajanu knew or should have known that the participating investor lenders did not provide written consent to a short payoff as required by the CASAs.

**ANSWER:     Deny.**

*Short Payoff Example: 4511 Merrimac*

67.     Salajanu represented EquityBuild in connection with the sale of 4511 N Merrimac for $230,000, which closed on April 15, 2016.

**ANSWER:     Defendants admit that Salajanu represented EquityBuild in connection with the sale of 4511 N Merrimac.  Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 67.  To the extent an answer is deemed required, Defendants deny.**

68.     The payoff statement provided by EquityBuild Finance to Stacie Chimera (a Rock Fusco paralegal) indicated that the unpaid principal balance of the investor-lender loan equaled $351,092.

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 68.  To the extent an answer is deemed required, Defendants deny.**

69.     At the closing, only $191,056.79 of the total principal balance due was wired to EquityBuild Finance, and Salajanu signed the settlement statement as attorney-in-fact for Jerry Cohen.

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 69.  To the extent an answer is deemed required, Defendants deny.**

70.     Salajanu knew or should have known that the participating investor lenders did not provide written consent to a short payoff as required by the CASAs.

**ANSWER:     Deny.**

***Short Payoff Example: 4108 N Monticello***

71.     Salajanu represented EquityBuild in connection with the sale of 4108 N Monticello for $400,000, which closed on May 27, 2016.

**ANSWER:     Defendants admit that Salajanu represented EquityBuild in connection with the sale of 4108 N Monticello.  Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 71.  To the extent an answer is deemed required, Defendants deny.**

72.     The title commitment that Salajanu reviewed in preparation for the conveyance disclosed a $387,792 mortgage recorded against the property.

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 72.  To the extent an answer is deemed required, Defendants deny.**

73.     At the closing, the buyer insisted that EquityBuild escrow $10,000 in respect of "plumbing issues."

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 73. To the extent an answer is deemed required, Defendants deny.**

74.     Rather than having EquityBuild wire $10,000 to closing, Kammerer prepared a revised payoff statement indicating that $10,000 of the anticipated payoff to the investor-lenders would be held back to secure the repairs.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 74. To the extent an answer is deemed required, Defendants deny.**

75.     The revised payoff statement was created and transmitted to the title company within 26 minutes.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 75. To the extent an answer is deemed required, Defendants deny.**

76.     Only $339,888.17 of the $427,117 balance due under the promissory note was wired to EquityBuild Finance at the closing, and Salajanu signed the settlement statement as attorney-in-fact for Jerry Cohen.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 76. To the extent an answer is deemed required, Defendants deny.**

77.     Salajanu knew or should have known that the participating investor lenders did not provide written consent to a short payoff as required by the CASAs.

**ANSWER:** **Deny.**

*Short Payoff Example: 4351 S Calumet*

78.     Salajanu represented EquityBuild in connection with the sale of 4351 S Calumet for $307,900, which closed on August 23, 2016.

**ANSWER:     Defendants admit that Salajanu represented EquityBuild in connection with the sale of 4351 S Calumet.  Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 78.  To the extent an answer is deemed required, Defendants deny.**

79.     The title commitment that Salajanu reviewed in preparation for the conveyance disclosed a $260,000 mortgage recorded in favor of Hard Money Company.

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 79.  To the extent an answer is deemed required, Defendants deny.**

80.     In preparation for the sale, Patty San Martin (a Rock Fusco paralegal) informed Kammerer that "[EquityBuild] will need to bring cash to the closing" because the anticipated sale proceeds precluded a full payoff.

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 80.  To the extent an answer is deemed required, Defendants deny.**

81.     Jerry Cohen replied to all (including Salajanu) and instructed Kammerer to submit "a short payoff that eliminates the cash required."

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 81.  To the extent an answer is deemed required, Defendants deny.**

82.     Kammerer responded to San Martin's indication that EquityBuild would need to contribute cash at closing, writing in an e-mail that "[t]he payoffs for these always are higher than the amount we receive, not sure why there is an issue this time" and adding that "we have been doing short sales for a year now."

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 82.  To the extent an answer is deemed required, Defendants deny.**

83.     Salajanu knew or should have known that the five participating investor-lenders did not provide written consent as required by the CASAs to a short payoff in the 39 minutes between the time that San Martin informed EquityBuild that it would be required to contribute cash at closing and the time that Jerry Cohen instructed Kammerer to reduce the payoff.

**ANSWER:     Deny.**

84.     Only $246,164.23 of the $260,000 outstanding balance due was wired to EquityBuild Finance at closing, and Patrick Clancy of Rock Fusco signed the settlement statement as attorney-in-fact for Jerry Cohen.

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 84.  To the extent an answer is deemed required, Defendants deny.**

***Short Payoff Example: 6801 S East End***

85.     Salajanu represented EquityBuild when it acquired 6801 S East End on March 1, 2016, for $450,000 in cash.

**ANSWER:     Defendants admit that Salajanu represented EquityBuild when it acquired 6801 S East End.  Defendants are without sufficient knowledge to either admit or**

deny the remaining allegations contained in Paragraph 85. To the extent an answer is deemed required, Defendants deny.

86. Salajanu represented EquityBuild in connection with the sale of 6801 S East End to an investor-owner for $1,383,000, which closed on December 29, 2016.

**ANSWER: Defendants admit that Salajanu represented EquityBuild in connection with the sale of 6801 S East End. Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 86. To the extent an answer is deemed required, Defendants deny.**

87. The title commitment that Salajanu reviewed in connection with the conveyance disclosed the existence of a $1,374,714 mortgage identifying 24 investor-lenders who extended EquityBuild a loan outside of the initial closing.

**ANSWER: Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 87. To the extent an answer is deemed required, Defendants deny.**

88. The investor-owner acquired the property with the benefit of a $1,374,714 loan originated by EquityBuild Finance.

**ANSWER: Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 88. To the extent an answer is deemed required, Defendants deny.**

89. At the closing, Salajanu simultaneously represented EquityBuild (as seller) and EquityBuild Finance (as loan originator and servicer for the prospective investor-owner).

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 89.  To the extent an answer is deemed required, Defendants deny.**

90.    The mortgage recorded by EquityBuild Finance on behalf of the 24 investor-lenders who were ostensibly making the loan to the investor-owner was nearly identical to the mortgage recorded by EquityBuild Finance on behalf of the same 24 investor-lenders who made the initial loan to EquityBuild, and only the identity of the borrower, the date on the front page of the mortgage, and the borrower signature page had been modified.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 90.  To the extent an answer is deemed required, Defendants deny.**

91.    The 24 investor-lenders did not provide written consent to have their loan to EquityBuild transformed into a loan to an investor-owner.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 91.  To the extent an answer is deemed required, Defendants deny.**

92.    Prior to closing the title agent informed Salajanu (among others) that she "reduced the payoff to the net proceeds [because if] I increase it to the full payoff then EquityBuild, Inc. needs to bring in about $25,000.00 or so."

**ANSWER:    Deny.**

***Building Code Violations***

93.    During the period that Rock Fusco represented EquityBuild, more than 200 circuit court or administrative actions were filed against properties it either owned or agreed to improve

for investor-owners, and Rock Fusco defended these cases. The violations included, inter alia, the presence of rats, cockroaches, bed bugs, broken windows and criminal activity, failure to meet minimum standards in electrical, plumbing and HVAC, and hazardous conditions such as failing masonry, porch guardrails, stairs, and missing smoke detectors.

**ANSWER:** **Defendants admit that Rock Fusco represented EquityBuild with respect to numerous building code violation cases. Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 93. To the extent an answer is deemed required, Defendants deny.**

94.    Salajanu became aware that EquityBuild was frequently unable or unwilling to pay for repairs to these properties, even though it received funds from investor-lenders for precisely this purpose.

**ANSWER:** **Deny.**

95.    In one housing court matter, the City of Chicago named as defendants each of the investor-lenders identified on the mortgage. Rock Fusco entered an appearance for each of them without obtaining conflict waivers in connection with its simultaneous representation of EquityBuild and the investor-lenders.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 95. To the extent an answer is deemed required, Defendants deny.**

96.    On October 31, 2016, Salajanu participated in an extended conference call to discuss how to respond to the increasing amount of building code litigation, and a week later Berard and Salajanu discussed their "strategy for [a] meeting with [the] City to discuss increased scrutiny of EquityBuild[.]"

**ANSWER:  Defendants admit that their invoice records show that on October 31, 2016, Salajanu participated in an "[e]xtended conference call with Ron re City issues and course of action" and that on November 7, 2016, Berard and Salajanu held a conference "regarding strategy for meeting with City to discuss[] increased scrutiny of EquityBuild." Defendants deny any remaining allegations contained in Paragraph 96 inconsistent therewith.**

97.     On September 5, 2017, Berard circulated an EquityBuild Litigation Management Matrix identifying 31 separate properties subject to present or past housing court or administrative actions. Berard indicated that the litigation matrix included 12 open housing court cases and 10 open administrative actions.

**ANSWER:  Defendants admit that on September 5, 2017, Berard circulated an EquityBuild Litigation Matrix.  Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 97.  To the extent an answer is deemed required, Defendants deny.**

98.     By October 16, 2017, EquityBuild had been added to the Chicago Housing Authority "debarment list" as a result of its inclusion on the City of Chicago "scofflaw list." In an e-mail, Berard explained: "The Scofflaw list is for residential building owners with 3 or more properties that are the subject of active Circuit Court cases where the violations remain uncorrected after the second court hearing. EquityBuild currently has 12 cases that fit this description."

**ANSWER:  Defendants admit the allegations of Paragraph 98 but affirmatively state that on October 26, 2017, the Chicago Housing Authority communicated that EquityBuild would be removed from the debarment list.**

*Refinancings*

99.     Beginning in or about February 2017, with Salajanu as transaction counsel, EquityBuild began refinancing properties encumbered with investor-lender loans either individually or in portfolios.

**ANSWER:    Defendants admit that Salajanu represented EquityBuild in certain refinance transactions.  Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 99.  To the extent an answer is deemed required, Defendants deny.**

100.    The  refinancings resulted in the investor-lenders releasing their collateral. In most or all instances, Salajanu knew or should have known that the investor-lenders did not provide written consent for the release of their collateral as required by the CASAs, yet she failed to advise EquityBuild Finance that unanimous consent of the investor-lenders was required in order to release their collateral.

**ANSWER:    Deny.**

*Individual Refinance Example: 7109 S Calumet*

101.    With Salajanu serving as transaction counsel, EquityBuild (through 7109 S. Calumet LLC, the special purpose entity borrower) refinanced 7109 S Calumet with the benefit of a $1,507,000 loan from Red Mortgage Capital that closed on or about February 6, 2017.

**ANSWER:    Defendants admit that Salajanu served as transaction counsel with respect to the refinancing of 7109 S Calumet.  Defendants are without sufficient knowledge**

to either admit or deny the remaining allegations contained in Paragraph 101.  To the extent an answer is deemed required, Defendants deny.

102.    Salajanu represented EquityBuild when it acquired the property for $1,100,000 in cash on September 3, 2014.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 102.  To the extent an answer is deemed required, Defendants deny.**

103.    On October 5, 2016, Tyler DeRoo of EquityBuild e-mailed Salajanu a copy of the $1,800,000 mortgage recorded against the property for the benefit of 21 investor-lenders, the promissory note, and the CASA.

**ANSWER:    Defendants admit that On October 5, 2016, Tyler DeRoo of EquityBuild e-mailed Salajanu a copy of the $1,800,000 mortgage recorded against the property for the benefit of 21 investor-lenders, the promissory note, and a CASA between Hard Money Company, LLC and one of the investor-lenders  Defendants deny any remaining allegations contained in Paragraph 103.**

104.    DeRoo had not been involved in the short sales that preceded this transaction and was seeking Salajanu's advice regarding the potential short payment of the promissory note as a means of overcoming the insufficiency of new funds to retire the existing loan debt.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 104.  To the extent an answer is deemed required, Defendants deny.**

105.    The payoff statement submitted by EquityBuild Finance indicated that the outstanding principal balance due was $1,500,000 and that "EquityBuild Finance, LLC is willing to give a release in exchange for 100% Net Proceeds[.]"

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 105. To the extent an answer is deemed required, Defendants deny.**

106.    At the closing of the refinance of 7109 S Calumet, the mortgage loan was short paid, and only $1,440,104.86 of the $1,500,000 stated principal balance due was wired to EquityBuild Finance.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 106. To the extent an answer is deemed required, Defendants deny.**

107.    Salajanu knew or should have known that the investor-lenders never provided written consent to the release of the mortgage, which was required by the CASA.

**ANSWER:    Deny.**

108.    Salajanu never advised EquityBuild Finance that the investor-lenders were required to consent in writing to the release of the collateral or that EquityBuild Finance could have declared a default and enforced the promissory note in lieu of accepting a short payoff.

**ANSWER:    Deny.**

***Individual Refinance Example: 4533 S Calumet***

109.    With Salajanu serving as transaction counsel, EquityBuild (through 4533-37 S. Calumet LLC, the special purpose entity borrower) refinanced 4533 S Calumet with the benefit of a $1,510,000 loan from BMO Harris that closed on or about February 10, 2017.

**ANSWER:** **Defendants admit that Salajanu served as transaction counsel with respect to the refinance of 4533 S Calumet. Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 109. To the extent an answer is deemed required, Defendants deny.**

110.    Salajanu represented EquityBuild when it acquired the property for $1,750,000 in cash on July 25, 2016.

**ANSWER:** **Defendants admit that Salajanu represented EquityBuild when it acquired 4533 S Calumet. Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 110. To the extent an answer is deemed required, Defendants deny.**

111.    After and outside the closing on the acquisition, a $2,900,000 mortgage had been recorded for the benefit of 44 investor-lenders.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 111. To the extent an answer is deemed required, Defendants deny.**

112.    At the closing of the refinance, BMO Harris held back $882,000 for construction costs, substantially reducing both the initial advance and the proceeds available to pay off the investor-lenders. The construction holdback is an example of a protocol used by sophisticated lenders but not by EquityBuild Finance on behalf of the ordinary investor-lenders.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 112. To the extent an answer is deemed required, Defendants deny.**

-34-

113.    To consummate the refinancing, EquityBuild needed to reduce the payoff balance by $2,315,968.94, so EquityBuild Finance prepared and submitted a payoff statement reflecting an unpaid principal balance due of only $584,031.06, which was the amount identified as "PAYOFF MORTGAGE" on the settlement statement.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 113.  To the extent an answer is deemed required, Defendants deny.**

114.    Salajanu knew or should have known that EquityBuild did not repay $2,315,968.94 in investor-lender debt in less than seven months.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 114.  To the extent an answer is deemed required, Defendants deny.**

115.    Salajanu knew or should have known that the investor-lenders never provided written consent to the release of the mortgage as required by the CASAs.

**ANSWER:    Deny.**

116.    Salajanu never advised EquityBuild Finance that the investor-lenders were required to consent in writing to the release of the collateral or that EquityBuild Finance could have declared a default and enforced the promissory note in lieu of accepting a short payoff.

**ANSWER:    Deny.**

***Individual Refinance Examples: 6250 S Mozart and 7255 S Euclid***

117.    Salajanu represented EquityBuild in connection with the separate refinancings of 6250 S Mozart and 7255 S Euclid, both of which closed on December 13, 2017.

**ANSWER:** Defendants admit that Salajanu represented EquityBuild in connection with the refinancings of 6250 S Mozart and 7255 S Euclid. Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 117. To the extent an answer is deemed required, Defendants deny.

118. Salajanu represented EquityBuild when it acquired 7255 S Euclid for $800,000 in cash on May 23, 2016.

**ANSWER:** Defendants admit that Salajanu represented EquityBuild when it acquired 7255 S Euclid. Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 118. To the extent an answer is deemed required, Defendants deny.

119. A $1,250,000 mortgage was later recorded against the property.

**ANSWER:** Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 119. To the extent an answer is deemed required, Defendants deny.

120. Salajanu represented EquityBuild when it acquired 6250 S Mozart for 1,250,000 in cash on June 27, 2016.

**ANSWER:** Defendants admit that Salajanu represented EquityBuild when it acquired 6250 Mozart. Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 120. To the extent an answer is deemed required, Defendants deny.

121. A $1,825,000 mortgage was later recorded against the property.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 121.  To the extent an answer is deemed required, Defendants deny.**

122.    Two days prior to the December 13, 2017 closings of the refinances of both properties, DeRoo submitted payoff statements to Salajanu instructing the title company to wire the payoff proceeds to an EquityBuild Finance bank account.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 122.  To the extent an answer is deemed required, Defendants deny.**

123.    Salajanu knew or should have known that none of the participating investor-lenders on either of the two loans being refinanced signed a written consent to the release of their collateral as required by the CASAs.

**ANSWER:    Deny.**

124.    Salajanu never advised EquityBuild Finance that the investor-lenders were required to consent in writing to the release of the collateral or that EquityBuild Finance could have declared a default and enforced the promissory note in lieu of accepting a short payoff.

**ANSWER:    Deny.**

*Individual Refinance Example: 6160 S King*

125.    Salajanu counseled EquityBuild in connection with the refinancing of 6160 S King.

**ANSWER:    Admit.**

126.    Salajanu represented EquityBuild when it purchased 6160 S King for $1,750,000 in cash on November 9, 2016.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 126. To the extent an answer is deemed required, Defendants deny.**

127. The title commitment that Salajanu reviewed in connection with the refinancing revealed that the property had subsequently been encumbered with a mortgage in the amount of $4,370,000.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 127. To the extent an answer is deemed required, Defendants deny.**

128. The refinancing lender agreed to extend SSDF6 6160 S MLK LLC, the special purpose borrower entity created by EquityBuild, a $2,750,000 loan, but at closing it held back 222,812.50 for interest and $2,071,302.23 for renovations.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 128. To the extent an answer is deemed required, Defendants deny.**

129. Prior to the closing San Martin asked DeRoo for a payoff statement, and DeRoo responded by asking whether Jerry or Shaun already signed a release of the mortgage, adding: "[I'm] almost certain that we have moved all of our investors off of this one."

**ANSWER:** **Deny.**

130. On May 23, 2018, DeRoo asked San Martin to prepare a release of the investor-lender mortgage.

**ANSWER: Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 130. To the extent an answer is deemed required, Defendants deny.**

131. No payoff statement was submitted in connection with the closing of the refinance, and no funds were used to make any type of payoff in respect of the investor-lender mortgage loan.

**ANSWER: Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 131. To the extent an answer is deemed required, Defendants deny.**

132. At closing, the borrower was required to fund an escrow to pay for the redemption of first and second installment 2016 Cook County property taxes and to pay past due first installment 2017 Cook County property taxes.

**ANSWER: Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 132. To the extent an answer is deemed required, Defendants deny.**

133. On July 10, 2018, Elizabeth Kammerer asked Salajanu and San Martin whether they ever received a release from the assignee of a partial interest in the investor-lender mortgage recorded against the property, forwarding a thread of correspondence with the IRA custodian for the assignee in which she had informed the assignee that the payoff amount, if any, could not be ascertained until the closing figures were better understood.

**ANSWER: Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 133. To the extent an answer is deemed required, Defendants deny.**

134.    Salajanu knew or should have known that the investor-lenders who DeRoo was "almost certain" had moved off the loan had not provided written consent to the release of the mortgage in writing as required by the CASAs before San Martin prepared the mortgage release and submitted it to Shaun Cohen for execution and delivery to the title company.

**ANSWER:    Deny.**

135.    Salajanu never advised EquityBuild Finance that the investor-lenders were required to consent in writing to the release of the collateral or that EquityBuild Finance could have declared a default and enforced the promissory note in lieu of accepting a short payoff.

**ANSWER:    Deny.**

*Individual Refinance Example: 638 N Avers*

136.    Salajanu counseled EquityBuild in connection with the refinancing of 638 N Avers.

**ANSWER:    Admit.**

137.    Salajanu represented EquityBuild when it purchased 638 N Avers for $800,000 in cash on September 27, 2016.

**ANSWER:    Defendants admit that Salajanu represented EquityBuild when it purchased 638 N Avers.  Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 137.  To the extent an answer is deemed required, Defendants deny.**

138.    The title commitment that Salajanu reviewed in connection with the refinancing revealed that the property had subsequently been encumbered with a mortgage in the amount of $1,300,000.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 138. To the extent an answer is deemed required, Defendants deny.**

139. On the morning of the closing, June 26, 2018, DeRoo supplied San Martin with a payoff statement reflecting a $964,250 balance due as of June 30, 2018.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 139. To the extent an answer is deemed required, Defendants deny.**

140. Salajanu knew or should have known that the investor-lenders had not provided written consent to the release of the mortgage in writing as required by the CASAs.

**ANSWER:** **Deny.**

141. Salajanu never advised EquityBuild Finance that the investor-lenders were required to consent in writing to the release of the collateral or that EquityBuild Finance could have declared a default and enforced the promissory note in lieu of accepting a short payoff.

**ANSWER:** **Deny.**

*Portfolio Refinances UBS AG*

142. On February 23, 2017, Salajanu received an e-mail from counsel for UBS AG ("UBS") regarding the origination of a mortgage loan to be secured by seven properties, 7450 S Luella, 2800 E 81st, 7842 S Yates, 1422 E 68th, 4750 S Indiana, 6558 S Vernon, and 5618 S King.

**ANSWER:** **Admit.**

143. In connection with her preparation for the closing, Salajanu also received information and documentation indicating, among other things, that:

    a.    Of the seven properties being refinanced through UBS, six had previously been sold by EquityBuild to either investor-owners or EquityBuild affiliates owned by equity investors.

    b.    Six of the seven properties being refinanced were encumbered by investor-lender debt that exceeded the prices for which EquityBuild sold them, and one of those six properties was sold for $104,000 and later encumbered with $589,917.88 in investor-lender loan debt.

    c.    Each of the six properties owned by investor-owners or EquityBuild affiliates was now being conveyed back to EquityBuild (and, specifically, to SSPH Portfolio 1, LLC, the special purpose borrowing entity established for the refinance).

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 143. To the extent an answer is deemed required, Defendants deny.**

144.    On May 11, 2017, the title company wrote to DeRoo and Salajanu to indicate that, based on her preparation of the preliminary settlement statement, the borrower would need to wire $468,353.68 into the closing escrow in order to consummate the refinance.

**ANSWER:** **Admit.**

145.    DeRoo replied that "[o]ne of the payoffs is being reduced so this will come down a bit." Salajanu asked DeRoo: "Are you changing the payoffs?" and DeRoo replied: "One of them yes."

**ANSWER:** **Admit.**

146.    A few hours later DeRoo produced a revised payoff statement for 6558 S Vernon which identified the unpaid principal balance as $510,699, while the statement he provided Salajanu six days earlier identified that balance as $1,035,000.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 146.  To the extent an answer is deemed required, Defendants deny.**

147.    Later that evening, an executive director at UBS asked DeRoo (copying, among others, Salajanu) whether there is "an additional payoff on Vernon" because they had it estimated at $1,035,000.

**ANSWER:    Admit.**

148.    The following morning, the day of the closing, outside counsel for UBS wrote to Salajanu and asked: "Did they really pay off $524,367.00 in the last week?"

**ANSWER:    Admit.**

149.    Salajanu forwarded the e-mail to DeRoo and wrote: "See below!!!"

**ANSWER:    Admit.**

150.    To consummate the closing, Salajanu signed and submitted an opinion letter indicating that there were "no judgments filed or actions, law suits, claims or proceedings of any kind pending or threatened" against Jerry Cohen.

**ANSWER:    Defendants admit that Salajanu signed and submitted an opinion letter indicating that there were "no judgments filed or actions, law suits, claims or proceedings of any kind pending or threatened" against Jerry Cohen.  Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 150. To the extent an answer is deemed required, Defendants deny.**

151.    Salajanu knew that this assertion was incorrect because she knew that at least ten tax lien petitions were pending against Jerry Cohen in Philadelphia.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 151. To the extent an answer is deemed required, Defendants deny.**

152. Salajanu knew or should have known that no investor-lender provided written consent to the release of its mortgage as required by the CASAs.

**ANSWER:** **Deny.**

153. Salajanu never advised EquityBuild Finance that the investor-lenders were required to consent in writing to the release of the collateral or that EquityBuild Finance could have declared a default and enforced the promissory note in lieu of accepting a short payoff.

**ANSWER:** **Deny.**

*Portfolio Refinance: Colony American Financial Lender*

154. By March 23, 2017, Salajanu knew that EquityBuild intended to refinance a portfolio of properties through Colony American Finance Lender ("Colony").

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 154. To the extent an answer is deemed required, Defendants deny.**

155. EquityBuild referred to this transaction as the "Colony T3 refinance."

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 155. To the extent an answer is deemed required, Defendants deny.**

156. The properties ultimately collateralized for the Colony T3 refinance were 2129 W 71st, 5437 S Laflin, 6759 S Indiana, 9610 S Woodlawn, 8809 S Wood, 7760 S Coles, and 7300 S St Lawrence.

**ANSWER:** **Admit.**

157.    EquityBuild established a single-purpose entity known as EB South Chicago 3, LLC ("EBSC3") to acquire title to the properties and enter into the promissory note with Colony.

**ANSWER:** **Admit.**

158.    Salajanu knew that two of the properties being included within the portfolio refinance (5437 S Laflin and 6759 S Indiana) were being conveyed to EBSC3 by an investor-owner and that one property (8809 S Wood) was being conveyed to EBSC3 by an EquityBuild affiliate owned by equity investors.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 158. To the extent an answer is deemed required, Defendants deny.**

159.    Salajanu also knew that two properties she assisted EquityBuild in acquiring for cash and which were now being refinanced had been encumbered by EquityBuild Finance loans originated for groups of investor-lenders in which the mortgage amounts exceeded the purchase prices.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 159. To the extent an answer is deemed required, Defendants deny.**

160.    Salajanu represented EquityBuild when it acquired 7760 S Coles on June 30, 2015, for $521,000 in cash, but the property was later encumbered by a mortgage securing an $810,000 loan.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 160.  To the extent an answer is deemed required, Defendants deny.**

161.    Salajanu represented EquityBuild when it acquired 7300 S St Lawrence on September 30, 2015 for $325,000 in cash, but the property was later encumbered by a mortgage securing an $618,603 loan.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 161.  To the extent an answer is deemed required, Defendants deny.**

162.    To avoid the imposition of transfer taxes on the conveyances of 5437 S Laflin and 6759 S Indiana from the investor-owners to EBSC3, Salajanu informed counsel for Colony that the transfers would be evidenced by deeds in lieu of foreclosure.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 161.  To the extent an answer is deemed required, Defendants deny.**

163.    On May 18, 2017, Salajanu wrote as follows: "The purchase price of the contracts are offset by the debt on the property. Given that the lender has the same underlying principals as the purchaser, no funds are being exchanged physically. The purchase price extinguishes the debt."

**ANSWER:    Admit.**

164.    Salajanu's assertion that "the lender has the same underlying principals as the purchaser" was false because the investor-lenders did not share the same underlying principals as EBSC3.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 164. To the extent an answer is deemed required, Defendants deny.**

165. During the same period that Salajanu was informing counsel for Colony that the properties were being conveyed to EBSC3 by deeds in lieu of foreclosure, DeRoo and Patty San Martin were informing the title company that EBSC3 would be paying for the properties and that the seller would be paying off the investor-lender mortgage loan at closing.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 165. To the extent an answer is deemed required, Defendants deny.**

166. An attorney employed by the title company subsequently wrote to DeRoo (among others), in part, as follows:

> I am not comfortable with the fact that these properties are not vested in your entities, but you're telling us they're not purchases, and the information I've received from your attorney is conflicting as to exactly what is going on. I've stated before, both in conversation and emails that we cannot accept payoffs provided by the borrower-it's the reason we ask for lender information on our Borrower Information Sheet. When a borrower does provide payoffs we have to independently verify the information which takes the same amount of time as obtaining the payoff ourselves. We have been trying to verify payoffs all week and have been unsuccessful.
>
> Further, the fact that deeds by [the investor-owners] were executed this week without our knowledge, despite the numerous conversations we've had to obtain information to schedule their signing, is troubling. We need to speak with these individuals and need copies of their identifications. You stated in a previous conference call that they had an equity interest, but neither is involved in any entity in this transaction. When you look at the totality of the circumstances here it looks like something other than what you're stating is actually going on. If there is a clear explanation for this we need to know. I cannot clear these 3 properties to close without having spoken to these individuals to obtain a clear picture of the structure of this

transaction. I don't want this issue to delay closing. Please provide the contact information we've requested. Thank you.

**ANSWER:   Admit.**

167.    DeRoo forwarded Ms. Perez's e-mail to Salajanu and sought guidance, to which Salajanu replied: "What did you tell her???"

**ANSWER:   Admit.**

168.    Jerry Cohen then wrote that "[t]his is starting to look like a problem" and asked whether they can "fix it," to which DeRoo replied, "Yes, working on it with Ioana."

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 168.  To the extent an answer is deemed required, Defendants deny.**

169.    On May 22, 2017, Salajanu informed counsel for Colony that the owner-investors would sell the properties to EBSC3 and pay off the mortgage loan at closing (*i.e.,* the transactions would no longer be deeds in lieu of foreclosure).

**ANSWER:   Admit.**

170.    Counsel for Colony then requested copies of the purchase and sale agreements along with contact information for the sellers.

**ANSWER:   Deny.**

171.    A half an hour later, San Martin sent DeRoo three standard-form purchase and sale contracts with the parties' names and the corresponding purchase prices handwritten on the first page and requested signatures from each seller and Jerry Cohen.

**ANSWER:    Defendants admit that San Martin sent DeRoo three standard-form purchase and sale contracts with the parties' names and the corresponding purchase prices**

-48-

**handwritten on the first page and requested signatures from each seller and Jerry Cohen. Defendants deny the remaining allegations contained in Paragraph 171.**

172. After the structure of the transactions was settled, the title company requested documentary proof that EquityBuild Finance possessed the power to release the mortgages.

**ANSWER: Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 172. To the extent an answer is deemed required, Defendants deny.**

173. On May 17, 2017, DeRoo had sent both the title company and Salajanu a payoff statement for 2129 W 71st indicating an unpaid principal balance due of $97,343.67.

**ANSWER: Admit.**

174. The payoff statement was printed on EquityBuild Finance letterhead and directed the payoff proceeds to a Wells Fargo bank account in Marco Island, Florida, for final credit to EquityBuild Finance.

**ANSWER: Admit.**

175. The title company rejected the payoff statement because the mortgagee was identified as the Aldrich Company Employees Retirement Trust ("Aldrich").

**ANSWER: Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 175. To the extent an answer is deemed required, Defendants deny.**

176. The title company required EquityBuild to obtain a payoff statement issued directly by Aldrich.

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 176.  To the extent an answer is deemed required, Defendants deny.**

177.     The payoff statement subsequently submitted by Aldrich instructed the title company to wire a specified amount of loan payoff proceeds directly to a bank account controlled by Aldrich, not by EquityBuild Finance.

**ANSWER: Admit.**

178.     With respect to 5437 S Laflin, DeRoo had originally submitted a payoff statement issued by EquityBuild Finance and directing that the proceeds be wired to its own account, but Salajanu later wrote to the title company to "clear the confusion" and indicate that the loan had actually been repaid.

**ANSWER:     Defendants admit that on May 24, 2017, Salajanu sent an email to the title company stating, "I want to clear the confusion."  Defendants further admit that in said email, Salajanu also stated, "The Borgia mortgage was paid, but the lien was never released. The Sierra Pacific mortgage stands."  Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 178.  To the extent an answer is deemed required, Defendants deny.**

179.     With respect to the remaining properties being conveyed to EBSC3, Salajanu informed the title company, OS National, that EquityBuild Finance served as loan servicer for the investor-lenders and issued payoff statements on their behalf.

**ANSWER:     Admit.**

180.     Salajanu did not disclose that the CASAs precluded EquityBuild Finance from releasing the collateral absent the unanimous consent of the investor-lenders.

**ANSWER:    Deny.**

181.    The title company subsequently requested copies of the CASAs, and Salajanu relayed that request to Shaun Cohen, who indicated that there would be an "enormous amount" of them and asked whether they need "every single one."

**ANSWER:    Defendants admit that an agent for the title company requested as follows: "Please provide me with a copy of the service agreement between these lenders and EBF." Defendants admit that Salajanu relayed said request to Shaun Cohen, who responded that, "The CASA is with each individual lender, there will be an enormous amount of these. Do they really need every single one or just for the problem properties we have been working on?" Defendants deny the remaining allegations contained in Paragraph 181.**

182.    Salajanu informed Shaun that, because the title company had not yet requested production of the CASA's, she would attempt to limit the scope of the request if and when it was made.

**ANSWER:    Admit.**

183.    Salajanu wrote to Shaun, in part, as follows: "I am assuming that they will ask for them as they have asked for every other document that we have referenced. I gave them an explanation clarifying the statements previously made that there [were] assignments of mortgages, which there are not and [that] EB Finance is servicer. . . . If I was their lawyer, I would ask for a CASA signed by everyone involved in this transaction."

**ANSWER:    Admit.**

184.    Later that afternoon, Kammerer forwarded Salajanu a CASA executed by one of the investor-lenders in connection with the mortgage recorded against 7300 S St Lawrence, and

that CASA prohibited EquityBuild Finance from releasing the mortgage without the unanimous consent of the investor-lenders.

**ANSWER: Defendants admit that later that afternoon, Kammerer forwarded Salajanu a CASA executed by one of the investor-lenders in connection with the mortgage recorded against a property on St. Lawrence. The allegation that the "CASA prohibited EquityBuild Finance from releasing the mortgage without the unanimous consent of the investor-lenders" states a legal conclusion to which no response is necessary. Should a response be deemed required, Defendants deny.**

185.    Salajanu never advised EquityBuild Finance that the investor-lenders were required to consent in writing to the release of the collateral being offered to Colony by EBSC3 or that EquityBuild Finance could have declared a default and enforced the promissory note in lieu of accepting a short payoff.

**ANSWER:    Deny.**

*Portfolio Refinance: BC 57, LLC*

186.    Salajanu represented EquityBuild with a five-property portfolio refinancing with the benefit of a loan obtained from BC 57, LLC ("BC 57"), an entity affiliated with Bloomfield Capital, a private real estate investing and lending company.

**ANSWER:    Defendants admit that Salajanu represented EquityBuild in connection with a five-property portfolio refinancing with a lender named BC57, LLC. Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 186. To the extent an answer is deemed required, Defendants deny.**

187.    The properties being refinanced through BC 57 were <u>3074 E Cheltenham</u>, <u>7625 S East End</u>, <u>7635 S East End</u>, <u>7750 S Muskegon</u>, and <u>7201 S Constance</u>, and Salajanu represented EquityBuild when it acquired each of them except 7201 S Constance.

**ANSWER:    Defendants admit that the properties being refinanced through BC57 were 3074 E Cheltenham, 7625 S East End, 7635 S East End, 7750 S Muskegon, and 7201 S Constance.  Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 187.  To the extent an answer is deemed required, Defendants deny.**

188.    On September 8, 2017, DeRoo forwarded Salajanu and San Martin draft payoff statements and releases for 3074 E Cheltenham, 7625 S East End, 7635 S East End, and 7201 S Constance.

**ANSWER:    Admit.**

189.    The e-mail chain forwarded to Salajanu and San Martin revealed that DeRoo instructed Kammerer to modify the initial drafts of the releases to reflect that the payoffs would be made to EquityBuild Finance rather than EquityBuild because "the optics aren't good."

**ANSWER:    Admit.**

190.    Although five properties were being refinanced, the e-mail that Salajanu received and forwarded to Bloomfield Capital contained only four payoff statements, as follows:

a.    A payoff statement for 3074 E Cheltenham reflecting an unpaid principal balance of $1,150,000.

b.    A payoff statement for 7625 S East End reflecting an unpaid principal balance of $1,170,000.

c.    A payoff statement for 7635 S East End reflecting an unpaid principal balance of $1,210,000.

      d.     A payoff statement for 7201 S Constance reflecting an unpaid principal balance of $1,350,000.

**ANSWER: Admit.**

191. The title commitment that Salajanu received and reviewed in connection with the prospective refinancing indicated that the issuance of title insurance would be conditioned on the production of the following documents:

      a.     An approved payoff letter for the mortgage recorded against 3074 E Cheltenham to secure a promissory note in the amount of $2,200,000.

      b.     An approved payoff letter for the mortgage recorded against 7625 S East End to secure a promissory note in the amount of $1,605,749.

      c.     An approved payoff letter for the mortgage recorded against 7635 S East End to secure a promissory note in the amount of $1,703,649.

      d.     An approved payoff letter for the mortgage recorded against 7201 S Constance to secure a promissory note in the amount of $2,250,000.

      e.     An approved payoff letter for the mortgage recorded against 7750 S Muskegon to secure a promissory note in the amount of $2,250,000.

**ANSWER:**    **Admit.**

192. Based on the payoff statements received from DeRoo, the title commitments she received and reviewed, and her work on the original acquisitions of four of the properties, Salajanu possessed information and documentation sufficient to establish the following facts:

| Property | Purchase Price | EBF Mortgage | Loan to Purchase Price | Payoff Statement | Principal Reduction |
|---|---|---|---|---|---|
| 3074 E Cheltenham | $1,305,000 | $2,200,000 | 168.58% | $1,150,000 | $1,050,000 |
| 7625 S. East End | $925,000 | $1,605,749 | 173.59% | 1,1700 000 | $435,749 |
| 7635 S East End | $925,000 | $1,703,649 | 184.18% | 121000 0 | $493,649 |
| 7201 S Constance | | $2,250,000 | | 1350,0 00 | 900,000 |
| 7750 S Muskegon | $1,360,000 | $2,250,000 | 165.44% | None | |
| **Totals** | | | | **$4,880, 000** | **$2,879,398** |
| | | | | | |

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 192. To the extent an answer is deemed required, Defendants deny.**

193. Salajanu possessed information sufficient to ascertain that (1) EquityBuild acquired these properties for cash and subsequently recorded mortgages to secure investor-lender loans averaging 172.95% of the purchase prices and (2) EquityBuild reduced the cumulative loan balances on four of the five properties by $2,879,398.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 193. To the extent an answer is deemed required, Defendants deny.**

194. On September 18, 2017, counsel for Bloomfield Capital informed Salajanu, among other things, that the mortgage releases "must be signed by EquityBuild Finance LLC and not Jerome Cohen individually" and that the payoff information for 7750 S Muskegon had not yet been provided.

**ANSWER:** **Defendants admit that on September 18, 2017, counsel for Bloomfield Capital emailed Salajanu, among other things, that the mortgage releases "must be signed by EquityBuild Finance LLC and not Jerome Cohen individually" and that a release for 7750 S Muskegon had not yet been provided. Defendants deny any remaining allegations contained in Paragraph 194.**

195. A week later, Salajanu e-mailed four payoff statements to Bloomfield Capital.

**ANSWER:** **Admit.**

196. This time Salajanu included a payoff statement for 7750 S Muskegon reflecting an unpaid principal balance of $1,170,000, and the payoff statements for 7625 S East End and 7635

S East End were consolidated, with "7625-35 S East End" designated as a single property encumbered by a single loan with an unpaid principal balance of $1,210,000.

**ANSWER:    Admit.**

197.    The refinance through Bloomfield Capital closed on September 27, 2017, and each of the investor-lender mortgages was short paid with the payoff proceeds wired directly to EquityBuild Finance and not to the individual investor-lenders.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 197.  To the extent an answer is deemed required, Defendants deny.**

198.    Salajanu knew or should have known that none of the participating investor-lenders signed a written consent to the release of their collateral as required by the CASAs.

**ANSWER:    Deny.**

199.    Salajanu never advised EquityBuild Finance that the investor-lenders were required to consent in writing to the release of the collateral or that EquityBuild Finance could have declared a default and enforced the promissory note in lieu of accepting a short payoff.

**ANSWER:    Deny.**

***Portfolio Refinance: Colony American Finance Lender***

200.    Salajanu assisted EquityBuild and EquityBuild Finance with the refinancing of the following seven properties that were conveyed to EB South Chicago 4, LLC ("EBSC4") and collateralized to secure a loan from Colony (the "Colony T4 refinance"): 310 E 50th, 1401 W 109th, 6807 S Indiana, 8000 S Justine, 8209 Ellis, 8214 S Ingleside, and 8107 S Ellis.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 200.  To the extent an answer is deemed required, Defendants deny.**

201.    Salajanu knew that three of these properties (1401 W 109th, 6807 S Indiana, and 8107 S Ellis) were conveyed to EBSC4 by investor-owners who purchased them from EquityBuild.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 201.  To the extent an answer is deemed required, Defendants deny.**

202.    Salajanu knew that 310 E 50th was conveyed to EBSC3 by an investor-owner and then conveyed by EBSC3 to EBSC4.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 202.  To the extent an answer is deemed required, Defendants deny.**

203.    The property at 310 E 50th was originally slated for inclusion within the Colony T3 refinance, but was carved out after counsel for Colony rejected Salajanu's attempt to characterize the conveyance from the investor-owner directly to EBSC3 as a deed in lieu of foreclosure.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 203.  To the extent an answer is deemed required, Defendants deny.**

204.   Counsel for Colony informed Salajanu that her proposed deed-in-lieu agreement indicated that EBSC3 was an assignee of the lender and informed her that EBSC3 "cannot hold the note of the prior indebtedness."

**ANSWER:   Defendants admit that counsel for Colony sent an email to Salajanu on May 23, 2017 stating as follows: "The agreement notes the SPE is an assignee of Lender. The SPE cannot hold the note of the prior indebtedness."  Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 204. To the extent an answer is deemed required, Defendants deny.**

205.   In a private e-mail to Shaun Cohen and DeRoo, Salajanu wrote: "He is right (as I indicated would be brought up.)"

**ANSWER:   Admit.**

206.   The deed that Salajanu already prepared to evidence the conveyance of 310 E 50th from the investor-owner to EBSC3 was signed, notarized, and returned by the investor-owner and recorded, but the property was not identified as collateral in the Colony T3 refinance.

**ANSWER:   Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 206.  To the extent an answer is deemed required, Defendants deny.**

207.   The instrument was labeled as a "WARRANTY DEED," but Salajanu caused it to be stamped as transfer tax-exempt on the basis that no consideration was being exchanged.

**ANSWER:   Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 207.  To the extent an answer is deemed required, Defendants deny.**

208.     Salajanu knew that 8209 E Ellis was conveyed back to EquityBuild by an investor-owner for no consideration, and then conveyed by EquityBuild to EBSC4.

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 208.  To the extent an answer is deemed required, Defendants deny.**

209.     Salajanu represented EquityBuild when it acquired 8214 S Ingleside for $280,000 in cash on May 15, 2015, and she later became aware that a $759,000 investor-lender mortgage had been recorded against the property outside the closing.

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 209.  To the extent an answer is deemed required, Defendants deny.**

210.     Salajanu also represented EquityBuild when it acquired 8000 S Justine for $375,000 in cash on June 15, 2015, and she later became aware that an $855,000 investor-lender mortgage had been recorded against the property outside the closing.

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 210.  To the extent an answer is deemed required, Defendants deny.**

211.     The Colony T4 refinance closed on September 15, 2017, and payoff funds were wired to EquityBuild Finance in connection with the mortgage loan being refinanced on each property except 310 E 50th.

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 211.  To the extent an answer is deemed required, Defendants deny.**

212.     Salajanu knew or should have known that none of the participating investor-lenders signed a written consent to the release of their collateral.

**ANSWER:     Deny.**

*Portfolio Refinance: Liberty EBCP, LLC*

213.     On or about May 2, 2018, Liberty EBCP, LLC ("Liberty") extended a $9.2 million portfolio loan to SSDF7 Portfolio 1, LLC ("SSDF7").

**ANSWER:     Admit.**

214.     The Liberty loan was collateralized by seventeen properties that were conveyed to SSDF7.

**ANSWER:     Admit.**

215.     Salajanu served as transaction counsel when EquityBuild acquired sixteen of the seventeen properties for cash, specifically, 8326-58 S Ellis, 6356 S California, 6355 S Talman, 7051 S Bennett, 7442 S Calumet, 7201 S Dorchester, 7546 S Saginaw, 4315 S Michigan, 2736 W 64th, 7508 S Essex, 7748 S Essex, 816 E Marquette, 7600 S Kingston, 8201 S Kingston, 7953 S Marquette, and 7656 S Kingston

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 215.  To the extent an answer is deemed required, Defendants deny.**

216.     Prior to the closing, Salajanu reviewed title commitments revealing that each property was encumbered by a mortgage loan.

**ANSWER:     Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 216.  To the extent an answer is deemed required, Defendants deny.**

217. Salajanu possessed information sufficient to ascertain that the amount of each mortgage loan exceeded the acquisition price of the corresponding property by at least 50% and that in the case of 2736 W 64th the mortgage loan exceeded the purchase price by more than 400%.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 217. To the extent an answer is deemed required, Defendants deny.**

218. Salajanu possessed information sufficient to ascertain that the aggregate acquisition prices of the assets totaled $14,765,000, while the aggregate mortgage debt encumbering those assets totaled $23,863,040.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 218. To the extent an answer is deemed required, Defendants deny.**

219. On April 16, 2018, after San Martin prepared and submitted a proposed release of mortgage for execution by one of the participating investor-lenders who received an assignment of a prior investor-lender's interest in a promissory note associated with one of the properties being refinanced through Liberty. The assignee wrote back to San Martin and stated, in part, as follows:

> Also, it seems that by signing, I am relinquishing my interest in the property to Equity Build. How does this work? It seems like I'd be giving up my financial interest. Shouldn't there be another document affirming that Equity Build owes me the money?
>
> I can take care of this today, but am not feeling secure about what's happening on that end.

**ANSWER:** **Deny.**

220. To consummate the Liberty refinance, Jerry Cohen and Salajanu knew that EquityBuild (or SSDF7) would be required to contribute approximately $4,500,000 in cash at closing.

**ANSWER: Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 220. To the extent an answer is deemed required, Defendants deny.**

221. Salajanu assisted Jerry Cohen with the negotiation of a $3,500,000 million overnight loan from Chief Management, LLC ("Chief Management") for $200,000 in fixed interest.

**ANSWER: Deny.**

222. On April 24, 2018, Salajanu sent a letter to counsel for Chief Management that stated, in part, as follows:

> This is to confirm that Chief Management LLC, a California limited liability company ("Lender") shall made a loan to SSDF7 Portfolio 1, LLC, an Illinois limited liability company, ("Borrower") in the principal amount of $3,500,000 and a fixed interest amount of $200,000 ("Loan") due to be issued by Lender on the date of the refinance closing of Borrower with Liberty EBCP LLC, a limited liability company ("Liberty") on or about April 27, 2018.

> Lender shall wire the funds to the title company, Old Republic Title Company, who is acting as escrow agent for the Liberty refinance. Lender will be paid at the closing from the proceeds of the Borrower refinance with Liberty. Old Republic Title Company will be instructed to release funds to Lender at the Liberty refinance.

**ANSWER: Admit.**

223. As a condition to making their loans, both Liberty and Chief Management required the borrower to submit a legal opinion letter that would contain, among other things, a representation that Salajanu and Rock Fusco lacked knowledge of any material pending or

threatened lawsuits, claims, or criminal proceedings pending against the borrower or the guarantors.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 223.  To the extent an answer is deemed required, Defendants deny.**

224.    By letter dated May 1, 2018, Salajanu, on behalf of Rock Fusco, informed Chief Management, among other things, that "[w]e have no actual knowledge of any material pending or threatened lawsuits, claims, bankruptcy actions or criminal proceedings against Borrower or Guarantors."

**ANSWER:    Admit.**

225.    Salajanu knew the foregoing statement was false.

**ANSWER:    Deny.**

***The 7617 S Phillips Complaint***

226.    On August 23, 2016, Salajanu received a copy of a demand letter from an attorney representing the investor-owner of 7616 S Phillips.

**ANSWER:    Admit.**

227.    In the demand letter, counsel for the investor-owner complained about his purchase of the property from EquityBuild and requested restitution because, among other things, (1) EquityBuild did not commence the improvement work until 150 days after the improvements were promised to have been completed, (2) the work was commenced without permits, drawing increased scrutiny from the City of Chicago, and (3) no income had been produced by the property after 14 straight months of mortgage payments.

**ANSWER:    Admit.**

228.     Counsel for the investor-owner sent Carly Berard a demand letter on March 7, 2018, seeking a $500,000 settlement payment and threatening to "pursue all . . . rightful and legal remedies" if EquityBuild did not "agree to this demand within seven days."

**ANSWER:   Deny.**

229.     Berard forwarded the letter to Salajanu and Bol, indicating that she computed the exposure as $438,846.02, excluding legal fees, and asking whether EquityBuild wanted to counter with a figure closer to that.

**ANSWER:   Admit.**

230.     EquityBuild made no counter-offer, and on March 22, 2018, Berard circulated (to Salajanu, among others) a copy of a Verified Complaint naming, among others, EquityBuild, EquityBuild Finance, Jerry Cohen, and Shaun Cohen as defendants and asserting claims for fraud, breach of fiduciary duty, negligent misrepresentation, breach of contract, unjust enrichment, civil conspiracy, negligence, and legal malpractice.

**ANSWER:   Defendants are without sufficient knowledge to either admit or deny whether EquityBuild made a counter offer. To the extent an answer is deemed required, Defendants deny.  Defendants admit the remaining allegations of Paragraph 230.**

231.     On March 28, 2018, Salajanu authored and sent an e-mail to Jerry Cohen, Shaun Cohen, and Ronald Bol which contained the following admonition:

> As we repeatedly stated, you need to settle this asap in light of the existing circumstances- even if you have a viable legal basis to contest the allegations. These public affirmations against [EquityBuild], Shaun and Jerry personally are very damaging. Your current lenders, potential investors and investigative bodies are going to consider these allegations strongly.

**ANSWER:   Admit.**

-64-

232.    On information and belief, the "investigative bodies" to which Salajanu was referring included the SEC.

**ANSWER:    Deny.**

233.    On April 25, 2018, Berard forwarded to Jerry, Shaun, Bol, and Salajanu a letter from counsel for the investor-owner of 7616 S Phillips requesting an accounting of all "outstanding loans" to EquityBuild or its affiliates by entities formed by his client, and this list included loans made against properties that Salajanu assisted in short-selling more than a year earlier.

**ANSWER:    Defendants admit on April 25, 2018, Berard forwarded to Jerry, Shaun, Bol, and Salajanu a letter from counsel for the investor-owner of 7616 S Phillips requesting an accounting of all "outstanding loans" to EquityBuild or its affiliates by "Michigan Shore Apartments, LLC and/or its principal."   Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 197.  To the extent an answer is deemed required, Defendants deny.**

234.    On May 2, 2018, at 9:41 a.m., the day after Rock Fusco represented to Chief management that "[w]e have no actual knowledge of any material pending or threatened lawsuits, claims, bankruptcy actions or criminal proceedings against Borrower or Guarantors," Berard sent Salajanu an e-mail (copying Rock Fusco partners Jay Rock and Cory Anderson) which stated, in part, as follows:

> I just got a call from attorney Cary Schiff on the EquityBuild investor fraud case. He asked if we would be representing EB in the matter. He said if we filed an appearance, he would agree to a 30-day extension to answer. If no appearance is filed, he will proceed with a motion for default. You mentioned to me yesterday that you had informed EB that they needed to hire separate counsel to represent them in this case. We need to contact them and urge them to engage another firm to file an appearance, or, once and for all make a settlement offer. I asked Cary again about the breakdown we had requested for the $500,000 demand. He said he'd get it to me but that it "wasn't a high priority" because he doesn't think EB is going to make an offer. He's not wrong to feel this way. EB has had the demand

since March 7, and received the leases and rent information that it had asked for, that Ron said he needed to come up with a counter.

You and I know the counter shouldn't be anything less than $488,000 based on what we know Michigan Shore paid. You need to call Jerry and impress upon him how important it is to settle, or at the least, that they must have counsel file an appearance to get an extension. I told [opposing counsel that] Jerry was in Jerusalem. He laughed and said they have pay phones in Jerusalem. He has 0 tolerance for EB's shit. Settlement needs to happen NOW.

**ANSWER: Defendants admit that on May 2, 2018 at 9:41 a.m., Berard sent Salajanu an email (copying Rock Fusco Partners Jay Rock and Cory Anderson) and that the quoted language from said email in Paragraph 234 is accurate. Defendants deny the remaining allegations of Paragraph 234.**

235. At 11:43 a.m. on May 2, 2018, Salajanu wrote to Jerry, Shaun, and Bol and stated, in part, that "per our various prior discussions, this case needs to settle asap."

**ANSWER: Admit.**

236. By letter dated May 2, 2018, Salajanu, on behalf of Rock Fusco, informed Liberty, among other things, that "[w]e have no actual knowledge of any material pending or threatened lawsuits, claims or criminal proceedings against Borrower or Guarantor or specifically applicable to the Property except as set forth on Schedule 1 attached hereto."

**ANSWER: Admit.**

237. Schedule 1 attached to the May 2, 2018 opinion letter solely disclosed building code cases then pending in connection with nine of the seventeen properties being refinanced and contained no reference to the litigation regarding 7616 S Phillips.

**ANSWER: Admit.**

238. A settlement statement associated with the Liberty refinance, which Salajanu reviewed and approved on May 1, 2018, reflected a $3,500,000 deposit into the closing escrow by

Chief Management followed by the repayment of four of the investor-lender loans *not* to EquityBuild Finance (for the ostensible benefit of the investor-lenders), but directly to Chief Management.

**ANSWER:  Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 238.  To the extent an answer is deemed required, Defendants deny.**

239.    On May 1, 2018, Salajanu received an e-mail confirming that the payoff proceeds associated with the investor-lender debt recorded against 8326-58 S Ellis, 7442 S Calumet, 7701 S Essex, and 7656 S Kingston were being wired directly to Chief Management, and on May 2, 2018, she received confirmation that the funds had been received.

**ANSWER:  Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 239.  To the extent an answer is deemed required, Defendants deny.**

240.    Salajanu knew or should have known that none of the participating investor-lenders on any of the seventeen loans being refinanced signed a written consent to the release of their collateral as required by the CASAs.

**ANSWER:  Deny.**

241.    Salajanu never advised EquityBuild Finance that the investor-lenders were required to consent in writing to the release of the collateral or that EquityBuild Finance could have declared a default and enforced the promissory note in lieu of accepting a short payoff.

**ANSWER:  Deny.**

242.     Salajanu represented EquityBuild in connection with the conveyance of three properties (5201 W Washington, 400 S Kilbourn, and 109 N Laramie) sold to the same purchaser at a closing that occurred on November 29, 2017 (the "Package Sale").

**ANSWER:    Admit.**

243.     Salajanu represented EquityBuild when it acquired 5201 W Washington for $1,150,000 in cash on January 22, 2015.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 243.  To the extent an answer is deemed required, Defendants deny.**

244.     The title commitment Salajanu reviewed in connection with the Package Sale indicated that a mortgage in the amount of $2,200,000 had subsequently been recorded against the property.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 244.  To the extent an answer is deemed required, Defendants deny.**

245.     Salajanu represented EquityBuild when it acquired 400 S Kilbourn for $400,000 on April 28, 2015.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 245.  To the extent an answer is deemed required, Defendants deny.**

246.     The title commitment Salajanu reviewed in connection with the Package Sale indicated that a mortgage in the amount of $925,000 had subsequently been recorded against the property.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 246. To the extent an answer is deemed required, Defendants deny.**

247.  Salajanu represented EquityBuild when it acquired 107 N Laramie for $740,000 in cash on July 31, 2015.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 247. To the extent an answer is deemed required, Defendants deny.**

248.  The title commitment Salajanu reviewed in connection with the Package Sale indicated that a mortgage in the amount of $1,750,000 had subsequently been recorded against the property.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 248. To the extent an answer is deemed required, Defendants deny.**

249.  Salajanu possessed information demonstrating that EquityBuild acquired the three properties for a combined $2,290,000 and that $4,875,000 in combined mortgage debt had been recorded against them.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 249. To the extent an answer is deemed required, Defendants deny.**

250.  Salajanu also knew that EquityBuild was now selling the properties for a combined $1,710,000, representing a loss of at least $3,165,000.

**ANSWER:** **Deny.**

-69-

251.    Rock Fusco had also defended several administrative actions filed against EquityBuild in connection with its ownership of 5201 W Washington and 400 S Kilbourn which revealed myriad dangerous conditions and ordinance violations.

**ANSWER: Defendants admit that Rock Fusco defended EquityBuild in connection with certain administrative actions and/or housing court actions relating to 5201 W Washington and 400 S Kilbourn. Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 251. To the extent an answer is deemed required, Defendants deny.**

252.    At the closing of the Package Sale, EquityBuild was required to redeem more than $75,000 in delinquent and sold property taxes.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 252. To the extent an answer is deemed required, Defendants deny.**

253.    At the closing of the Package Sale, EquityBuild also received $1,392,601.23 in cash and did not make even a partial payoff of any of the three mortgage loans.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 253. To the extent an answer is deemed required, Defendants deny.**

254.    Instead, EquityBuild Finance submitted mortgage releases to the title company, as though the $4,875,000 in investor-lender loans had already been retired.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 254. To the extent an answer is deemed required, Defendants deny.**

255.    Salajanu knew or should have known that none of the investor-lenders identified in any of the EquityBuild Finance mortgages recorded against the properties included within the Package Sale signed a written consent to the release of their collateral as required by the CASAs.

**ANSWER:    Deny.**

256.    Salajanu never advised EquityBuild Finance that the investor-lenders were required to consent in writing to the release of the collateral or that EquityBuild Finance could have declared a default and enforced the promissory note in lieu of accepting a short payoff.

**ANSWER:    Deny.**

257.    In or around March 2017, Jessica Baier, an EquityBuild employee, called Salajanu and alleged that EquityBuild was engaged in, among other things, embezzlement, mortgage fraud, and misappropriation of funds.

**ANSWER:    Deny.**

258.    During the telephone call, Baier stated that if Salajanu took no steps to halt the misconduct, she would take the matter to the authorities.

**ANSWER:    Deny.**

259.    Salajanu promised to investigate Baier's concerns and strongly discouraged her from taking further action.

**ANSWER:    Deny.**

260.    Salajanu did not investigate further.

**ANSWER:    Deny.**

261.    Salajanu immediately reported her conversation with Jessica Baier to Jerry Cohen.

**ANSWER:    Deny.**

262.    During the course of the UBS refinancing (around February 2017), a UBS paralegal e-mailed Salajanu a list of *48 judgments* entered against Jerry Cohen between August 12, 1998, and May 5, 2006, and requested a "formal explanation."

**ANSWER:    Admit.**

263.    The previous day, DeRoo forwarded Salajanu an e-mail from a different private lender who discovered at least ten separate real estate tax lien petitions that had been filed against Jerry Cohen in connection with properties owned in Philadelphia between March 8, 2016, and March 22, 2017.

**ANSWER:    Defendants admit that the previous day, DeRoo forwarded Salajanu an e-mail from a different private lender who communicated that he had discovered at least ten separate real estate tax lien petitions that had been filed against Jerry Cohen in connection with properties owned in Philadelphia between March 8, 2016, and March 22, 2017.**

264.    Salajanu never brought the tax lien petitions to the attention of UBS.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 264.  To the extent an answer is deemed required, Defendants deny.**

265.    On May 2, 2017, outside counsel for UBS e-mailed, among others, Salajanu and DeRoo, requesting proof that each of the judgments had been satisfied.

**ANSWER:    Admit.**

266.    On May 4, 2017, DeRoo provided Salajanu with the letter of explanation submitted by Jerry Cohen in which Jerry explained that he had backed his cousin "in a largely silent role" in connection with his cousin's acquisition, renovation, leasing, and refinancing of real estate properties in Philadelphia.

**ANSWER:    Defendants states that the letter referenced in Paragraph 266 was sent by DeRoo to counsel for UBS on May 1, 2017 and that counsel for UBS then forwarded said letter to Salajanu on May 2, 2017.  Defendants deny any remaining allegations contained in Paragraph 266.**

267.    In the letter, Jerry also elaborated as follows: "After a couple years it became apparent to me that his underwriting assumptions for acquisition were wholly inaccurate; his renovation costs were consistently low, his construction timelines were consistently short and rents and collections were lower than I was told at the onset, resulting in the net income of the portfolio being unable to sustain the debt service in the high interest rate environment at the time. As the cash flow issues accrued, lenders were unwilling to renegotiate the loans, and a chapter 11 filing became the only route to restructure the portfolio. My cousin filed bankruptcy in 1995 and everything that I was attached to him on became included in the bankruptcy."

**ANSWER:    Defendants admit that the quoted language in Paragraph 267 accurately restates the quoted section of Jerry's letter.  Defendants deny any remaining allegations contained in Paragraph 267.**

268.    On May 3, 2017, Jerry forwarded Salajanu a 103-page docket report from the personal bankruptcy proceeding he initiated on January 23, 1995, which was later converted from a Chapter 13 to a Chapter 7, and which was not terminated until March 2, 2000.

**ANSWER:    Admit.**

269.    Salajanu was aware that Jerry Cohen did not disclose his bankruptcy filing in response to the UBS request for a formal explanation of the judgments previously entered against him.

**ANSWER:    Deny.**

270.    Later, on October 24, 2017, DeRoo forwarded Salajanu an e-mail from a prospective private commercial lender that was requesting letters of explanation from Jerry Cohen regarding various items identified during a background check, including a criminal arrest warrant, the bankruptcy filing, the Pennsylvania tax liens, the unsatisfied judgments, and a lawsuit filed by the Pennsylvania Bureau of Consumer Protection.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 270.  To the extent an answer is deemed required, Defendants deny.**

271.    On April 24, 2018, Salajanu received an e-mail from Gary Federico, an EquityBuild sales and marketing manager who was seeking assistance with a "new complaint that surfaced on the web."

**ANSWER:    Admit.**

272.    In his e-mail to Salajanu, Federico quoted the allegations made by the complainant as follows:

> If you plan to invest with EBF, you will want to do your research first. And the first thing that you'll want to do is to check on the property's history that they are selling you for an investment on the Cook County Recorder of Deeds web site. And you can only do that if they give you the correct address of the property, which they don't always do. (1st surprise) If you are able to check the property's history, you'll soon discover that their valuation has no economic basis whatsoever. (2nd surprise) You'll quickly discover that what they've told you is baseless. I could write a short book on this company and I'm surprised that the FTC hasn't closed them down along with involving DOJ and FBI with indictments and prosecutions.
>
> * * *
>
> The owners use "Resource Managers" (hired self employed people) so they can have a cushion (plausible deniability) should the Feds come knocking, which they will at some point if not already. I'm a prior client but was able to get my funds and profits returned with a great deal of effort. Why me, who knows. All I know is that I was fortunate.

> Do not second guess what I'm saying as I have no agenda here except to protect unsophisticated people with money to loan from making an egregious error with their finances. Don't do it. Have you ever heard of Bernie Madoff? This is nothing more than [a] ponzi scheme.
>
> * * *
>
> They . . will meet their legal maker at some point.

**ANSWER:    Admit.**

273.    On March 6, 2017, Salajanu was forwarded an e-mail from John Gorske, the investor-owner who purchased 7656 S Kingston.

**ANSWER:    Admit.**

274.    Mr. Gorske indicated that he was frustrated with EquityBuild's lack of responsiveness, was considering hiring counsel and had been unable to obtain any evidence that the $93,110 he paid EquityBuild at closing to perform various building improvements was ever actually expended on improvement work, and he stated that "if you can't provide proof that any work was done it didn't happen and the promise that was made to me prior to the purchase of this building was a lie."

**ANSWER:    Admit.**

275.    Mr. Gorske's claims were resolved when EquityBuild agreed to repurchase 7656 S Kingston and contribute his "out of pocket" losses to a fund that would indirectly own the realty being refinanced, and on March 20, 2018, Salajanu was copied on the e-mail confirming this agreement.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 275.  To the extent an answer is deemed required, Defendants deny.**

276.    On April 10, 2018, Mr. Gorske executed a special warranty deed prepared by Salajanu which conveyed 7656 S Kingston to SSDF7, and he also executed a power of attorney in favor of Salajanu, although Rock Fusco was simultaneously representing EquityBuild, as the buyer.

**ANSWER:    Defendants admit that Mr. Gorske executed a special warranty deed which conveyed 7656 S Kingston to SSDF7 and that he also executed a power of attorney in favor of Salajanu.  Defendants are without sufficient knowledge to either admit or deny the remaining allegations contained in Paragraph 276.  To the extent an answer is deemed required, Defendants deny.**

277.    After EquityBuild sold 7953 S Marquette to Property Solutions (an investor-owner), Property Solutions was served with a circuit court complaint alleging 21 separate violations of the Chicago municipal code.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 277.  To the extent an answer is deemed required, Defendants deny.**

278.    Property Solutions demanded its money back from EquityBuild.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 278.  To the extent an answer is deemed required, Defendants deny.**

279.    On April 10, 2018, Property Solutions, through Kevin Bybee, executed a special warranty deed prepared by Salajanu which conveyed 7953 S Marquette to SSDF7, and it also executed a power of attorney in favor of Salajanu.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 279. To the extent an answer is deemed required, Defendants deny.**

280. EquityBuild sold 7701 S Essex to Shane Veltri, an investor-owner.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 280. To the extent an answer is deemed required, Defendants deny.**

281. Between November 17, 2017, and February 8, 2018, Rock Fusco represented Mr. Veltri in connection with five notices of violation filed by the City of Chicago Department of Streets and Sanitation, and fines were assessed in all five cases.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 281. To the extent an answer is deemed required, Defendants deny.**

282. On April 13, 2018, Mr. Veltri executed a special warranty deed prepared by Salajanu conveying 7701 S Essex to SSDF7, and he also executed a power of attorney in favor of Salajanu.

**ANSWER:** **Admit.**

**THE ROLE OF BBSG**

283. Prior to February 2017, EquityBuild had employed attorney Michael Voynich of Sutherland, Asbill & Brennan LLP for representation and advice in connection with EquityBuild's sales of securities and in connection with various investigations into EquityBuild's affairs.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 283. To the extent an answer is deemed required, Defendants deny.**

284.    On January 31, 2017, Mr. Voynich withdrew from representing EquityBuild due to EquityBuild's refusal to follow Voynich's advice to operate in compliance with securities laws.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 284. To the extent an answer is deemed required, Defendants deny.**

285.    In early February 2017, EquityBuild retained BBSG (and its "of counsel" agent, Mark Rosenberg) to provide legal services. Over time, these services included, but were not limited to, representation in the defense of an SEC investigation into a Ponzi scheme in which EquityBuild had been implicated, counsel as to the legality of EquityBuild's business model and preparation of private placement memoranda ("PPM") to accompany the sale of securities. BBS&G attorney Wendy Pullano was also substantially involved in various aspects of the representation.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 285. To the extent an answer is deemed required, Defendants deny.**

286.    On March 2, 2017, shortly after BBS&G was retained, the Cohens enlisted its assistance with their latest securities enforcement issue: On February 16, 2017, EquityBuild and EquityBuild Finance had been subpoenaed in the SEC's so-called "Rebuilding America" investigation.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 286. To the extent an answer is deemed required, Defendants deny.**

287.    The SEC's subpoena requested production of a vast array of documents concerning EquityBuild's properties, EquityBuild's investors and how the investors' money had been used Gathering the information needed to fully and truthfully respond to the SEC's subpoena would have caused a reasonably prudent attorney to conclude that EquityBuild was running a Ponzi scheme. Alternatively, the inability to gather the information needed to fully and truthfully respond to the SEC subpoena would have, among other things, caused a reasonably prudent attorney to refrain from making statements in PPMs touting EquityBuild and its track record of success.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 287. To the extent an answer is deemed required, Defendants deny.**

288.    On March 8, 2017, BBS&G was also asked and agreed to assist in responding to a subpoena issued by the Colorado Department of Regulatory Agencies, Division of Securities. Through its work with the SEC investigations BBS&G had access to a wide range of documents that provided it with even more information on the inherent issues with the EquityBuild model, including that EquityBuild was not using a broker dealer and was marketing its offerings through unlicensed representatives.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 288. To the extent an answer is deemed required, Defendants deny.**

289.    Shaun Cohen expressed to BBS&G's Rosenberg an interest in using a broker dealer but feared that, because of the SEC investigations, no broker dealer would want to do business with EquityBuild. Shaun Cohen articulated these concerns to BBS&G's Rosenberg in a March 14, 2017 text message:

> Broker Dealers - with the environment that we are in with the SEC, how can we even move the ball forward with a broker dealer and the rep licensing? Assuming this is not an issue, can you begin working on some BD's we can contact?

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 289.  To the extent an answer is deemed required, Defendants deny.**

290.    In that same text message, Shaun Cohen expressed concerns to Rosenberg about the burden of responding to the SEC investigations while making "the massive changes we have to implement." Cohen further stated to Rosenberg the following:

> What if we go to the SEC and enter a complete guilty plea and simply tell them the exact quantity of deals, how they were structured, that we worked with non-accredited investors and paid transaction based commissions. We would also say that we want to be compliant and will do whatever it takes to do so. What are your thoughts on this?

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 290.  To the extent an answer is deemed required, Defendants deny.**

291.    In response to Shaun Cohen's suggestion to "enter a complete guilty plea," to be transparent with the SEC about EquityBuild's violations of the law and to "be compliant" and "do whatever it takes to do so," Rosenberg responded, "***That's not the way to go. Don't panic.*** We will work it out with the SEC. Let's talk tomorrow morning."

-80-

**ANSWER: Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 291. To the extent an answer is deemed required, Defendants deny.**

292. Thus, the perpetrator of a sprawling Ponzi scheme approached BBS&G and expressed interest in cooperating with the SEC and complying with securities laws, and BBS&G attorney Mark Rosenberg negligently dissuaded BBS&G's client from doing so, thereby foregoing an opportunity halt the Ponzi scheme and causing the proliferation and prolonging of EquityBuild's failing business model by more than a year.

**ANSWER: Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 292. To the extent an answer is deemed required, Defendants deny.**

293. On March 15, 2017 Shaun Cohen again e-mailed Rosenberg to express his "concerns about approaching a [broker dealer]." He asked: "Should we be transparent with what is going on [with the SEC]? If so, how could we get anyone interested?"

**ANSWER: Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 293. To the extent an answer is deemed required, Defendants deny.**

294. Rosenberg thus knew or should have known EquityBuild was, *inter alia,* operating out of compliance with securities laws.

**ANSWER: Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 294. To the extent an answer is deemed required, Defendants deny.**

295.   On March 22, 2017, Rosenberg responded to Shaun Cohen regarding the options available to prospective issuers like EquityBuild (1) seeking exemptions from SEC registration in order to sell securities through general solicitations of the public and (2) seeking to make sales of unregistered securities other than through a registered broker-dealer. Rosenberg's email also identified and attached a copy of Rule 3a4-1 (17 C.F.R. 240.3a4–1).

**ANSWER:   Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 295.  To the extent an answer is deemed required, Defendants deny.**

296.   As for exemptions from registration, Rosenberg referred to Regulation D (17 C.F.R. § 230.501 *et seq.),* which offers safe harbors from registration provided the issuer complies with requirements relating to such things as offering size and investor accreditation and verification.

**ANSWER:   Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 296.  To the extent an answer is deemed required, Defendants deny.**

297. As for selling securities other than through a registered broker-dealer (as required by Section 15(a) of the Securities Exchange Act of 1934), Rosenberg referred to Rule 3a4-1, which provides a non-exclusive safe harbor to an "associated person of an issuer" – which, in this case, would be an EquityBuild employee -- provided that:

(1)   the associated person is not subject to a statutory disqualification, does not receive transaction-based compensation (such as commissions), and is not an "associated person" of a broker or dealer; ***and***

(2)   the associated person:

(a)   restricts his sales activity to certain types of transactions (none relevant to the EquityBuild business model); ***or***

    (b)    primarily performs substantial duties for the issuer otherwise than in connection with transactions in securities, was not an associated person of a broker-dealer during the preceding 12 months, and does not participate in selling securities for the issuer more than once every twelve months; ***or***

    (c)    only prepares written communications and does not engage in oral solicitation, responds to inquiries of potential purchasers in communications initiated by the purchaser, or solely performs ministerial and clerical work.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 297. To the extent an answer is deemed required, Defendants deny.**

298. Rosenberg knew or should have known that EquityBuild never retained a broker-dealer to assist with the marketing and sale of the promissory notes, and therefore, he knew or should have known that EquityBuild was violating federal and state securities law. Indeed, Rosenberg knew or should have known EquityBuild did not comply with the rule because, among other things, it was not soliciting purchases of promissory notes exclusively through employees who perform substantial duties other than selling securities, who are ineligible to receive transaction-based compensation, and who do not participate in securities sales more than once every twelve months. Further, the fact that Rosenberg subsequently produced at least nine PPMs over approximately 12 months demonstrates that EquityBuild was soliciting investments too frequently to comply with federal securities law and Rule 3a4-1.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 298. To the extent an answer is deemed required, Defendants deny.**

299. Despite the fact that Rosenberg knew or should have known that EquityBuild was not complying with federal and state securities law and Rule 3a4-1, Rosenberg nevertheless

negligently advised Shaun Cohen to prepare and disseminate private placement memoranda to prospective investors and then went on to prepare a series of such offerings throughout 2017 and into 2018.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 299.  To the extent an answer is deemed required, Defendants deny.**

300.    In a March 31, 2017 e-mail to Cohen Rosenberg offered to "build" EquityBuild a PPM to accompany offerings of securities. By April 3, 2017, Rosenberg had already circulated the first draft of a PPM describing a prospective offering of participation interests in a promissory note associated with the proposed acquisition, rehabilitation, and refinance or disposition of a 25-unit apartment building located at 6437 South Kenwood Avenue in Chicago. Over the ensuing three weeks, Rosenberg prepared eight more drafts until, on April 24, 2017, he circulated a provisionally final PPM (the "Kenwood PPM").

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 300.  To the extent an answer is deemed required, Defendants deny.**

301.    The Kenwood PPM contained financial projections and sources and uses tables that would have caused a reasonably prudent attorney, particularly one with Rosenberg's background, education, experience and knowledge about EquityBuild's operations, to question the legitimacy of the business model and to recognize that his clients, who were already under SEC investigation, were making impossible promises, omitting material information and peddling unsuitable products via unlicensed representatives to unsophisticated customers. The errors, omissions and misleading statements in the PPM include but are not limited to the following:

A. The Kenwood PPM stated that "no legal actions are contemplated against the [issuer] and/or its Managers [EquityBuild]," except that Rosenberg knew about, *and was representing EquityBuild in connection with,* (1) an SEC subpoena requesting an extensive production of documents pertaining to its business dealings and (2) a securities law investigation by the State of Colorado. The PPM omitted any disclosure of these matters and the bases for those investigations, omissions of highly material information. The PPM also omitted any disclosures that EquityBuild and EquityBuild Finance had hitherto been conducting business in a state of non-compliance with applicable securities laws and regulations, including but not limited to working with non-accredited investors and paying transaction based commissions, facts that Shaun Cohen directly told Rosenberg. In addition, EquityBuild was in receipt of a demand letter from an attorney in the aforementioned 7617 S Phillips investor fraud matter.

B. The PPM, while describing the purported credentials of Jerry and Shaun Cohen and noting that the "success of the Company is highly dependent upon the services and expertise of existing management" failed to disclose that both Shaun and Jerry Cohen had previously filed for bankruptcy, one of several material omissions.

C. Touting EquityBuild's "solid track record" the PPM stated that "overall operations of the EquityBuild companies have been ongoing since 1984." In fact, however, EquityBuild was formed in 2007 and its track record was far from solid.

D. The PPM stated "the Company believes it is in full compliance with any and all applicable laws, rules and regulations." However, Shaun Cohen had already told Rosenberg information directly contrary to this statement.

E. The PPM, despite touting EquityBuild's "proprietary econometric model" to select properties, failed to disclose that the so-called econometric model was merely back of the envelope calculations and that selecting real estate was not a "core competency" of EquityBuild or its managers.

F. The issuer (6437 S. Kenwood LLC, an EquityBuild affiliate) was offering 16% annual rates of return (18% for investors who purchased at least $150,000 in promissory notes) for a secured first-priority position, a mismatch of pricing and risk so unusual that it should have triggered further inquiry.

G. There was no explanation as to how the promissory notes would be held or how any particular subscriber would be able to enforce its rights in the event of a default – a material omission.

H. The PPM Rosenberg sent did not include a copy of either the promissory note or the mortgage that would be recorded to secure the loan, a material omission.

I. The PPM did not identify the loan servicer or the fees any such servicer would charge – a material omission.

J. The offering summary indicated that the total project cost would be raised entirely with funds from the offering, meaning EquityBuild had no skin in the game and would collect its usurious fees regardless of the project's success, while the entire economic risk would be borne by the noteholders.

K. The offering summary indicated that the $456,165 required to pay monthly interest to the investor-lenders would be included within the total amount raised. In other words, investor-lenders would be paying EquityBuild the very funds that EquityBuild would later need to pay the investor-lenders their monthly installments of interest. This was contrary to generally accepted lending practices, and no sophisticated lender would agree to such terms if properly disclosed.

L. Total interest payable to the subscribing investor-lenders based on a 16% annual return associated with a $2.5 million raise would be $800,000 over a 24 month period, not $456,165 (as falsely stated in the sources and uses table), thus the issuer would need $343,835 in additional cash to prevent a loan default, except that the *Stabilized Pro Forma* included in the PPM projected only $303,009 in net operating income during that period, essentially verifying that default was inevitable. Therefore, had the total interest payable to investor-lenders been correctly stated in the sources and uses table, the PPM would have forecasted a default which likely would have prevented investments.

M. The *Stabilized Pro Forma* could not reasonably be reconciled with the terms of the interest-only promissory notes because it assumed a long-term amortization of the loan and a steadily decreasing principal balance using figures that appear to be mathematically impossible.

N. The *Stabilized Pro Forma* projected "cash on cash" returns of 48.38% and 35.65% during the two years of the loan, although the issuer retained no equity in the property. This was a clear *non-sequitur* because the cash-on-cash returns would necessarily be infinite.

O. The PPM indicated that funds received from subscribers would be held in a Wells Fargo account until the minimum raise was reached, but stated that the issuer retained the right to withdraw funds from that account at any time. Any knowledgeable lender would have required the entirety of the loan proceeds to remain in escrow and not be disbursed for any purpose until the loan was ready to be funded.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 301.  To the extent an answer is deemed required, Defendants deny.**

302.    Following the issuance of the Kenwood PPM, EquityBuild assembled, and Rosenberg reviewed and approved, at least four other PPMs to be distributed to potential purchasers of promissory notes (aka, investor-lenders). The EquityBuild affiliates established to issue these securities included SSPH 11117 S Longwood LLC, SSPH 7927-49 S Essex LLC, Chicago Capital Fund 1 LLC, and Chicago Capital Fund 2 LLC. The same or substantially similar errors, omissions, and "red flags" contained in the Kenwood PPM can also be found in the PPMs for these other investment vehicles.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 302.  To the extent an answer is deemed required, Defendants deny.**

303.    Some of these PPM's raised debt capital, and some raised equity capital. Rosenberg knew that the prospective equity investors consisted primarily of investor-lenders who were persuaded to convert their debt to equity once it became apparent that EquityBuild could not repay the loans associated with past acquisitions at maturity because the very business model touted in the Kenwood PPM unsurprisingly failed in virtually every prior transaction.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 303.  To the extent an answer is deemed required, Defendants deny.**

304.    These prospective equity investors were informed in the PPMs that they could achieve substantially greater returns by trading their participating interests in the promissory notes

secured by first-position mortgages for membership interests in a "fund" whose assets were already encumbered because they were either acquired with conventional third-party financing or refinanced in a transaction in which the existing investor-lender mortgage was released (often without the knowledge or authorization of the investor-lenders).

**ANSWER: Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 304. To the extent an answer is deemed required, Defendants deny.**

305.     Thus, Rosenberg should have recognized that the conversions of debt to equity were the product of an additional set of false representations designed to eliminate the existing onslaught of defaults by steering the investor-lenders into equity positions from which they could not invoke future defaults.

**ANSWER: Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 305. To the extent an answer is deemed required, Defendants deny.**

### *BBS&G Recognizes Deficiencies in the PPM*

306.     In October of 2017, Shaun Cohen forwarded Rosenberg an email string that included comments from an attorney for a prospective investor in SSPH 7927-49 S Essex LLC and Chicago Capital Fund I. The prospective investor's attorney cited no less than 44 errors, omissions, red flags or discrepancies in the PPM for SSPH 7927-49 S Essex LLC and offering memorandum for Chicago Capital Fund I. Rosenberg negligently failed to take appropriate action to remedy these deficiencies.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 306. To the extent an answer is deemed required, Defendants deny.**

307. Also in October, 2017, Wendy Pullano, an attorney at BBS&G, e-mailed Rosenberg with comments regarding a PPM he was preparing for Chicago Capital Fund 1 LLC, relating to an offering of participating interests in a promissory note secured by a portfolio of three properties.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 307. To the extent an answer is deemed required, Defendants deny.**

308. Among other things, BBS&G's Pullano noted that the draft PPM omitted a meaningful description of the mortgage to be recorded in favor of the investor-lenders, adding that "THIS IS THAT ALL-IMPORTANT DISCLOSURE THAT YOU AND I DISCUSSED." (Emphasis in original.)

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 308. To the extent an answer is deemed required, Defendants deny.**

309. This "ALL-IMPORTANT DISCLOSURE" was not included in any prior PPM that Rosenberg approved and, in fact, was not even contained in the final draft of the PPM associated with Chicago Capital Fund 1 LLC, the PPM BBS&G's Pullano was then reviewing.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 309. To the extent an answer is deemed required, Defendants deny.**

310.    In her e-mail, BBS&G's Pullano highlighted other significant deficiencies in the PPM, including, but not limited to, the absence of the mortgage and the business loan agreement from the subscription documents, the ability of the borrower to extend the term of the note unilaterally an unlimited number of times (likely rendering the note unenforceable), and the remedy of acceptance by the lender of a deed in lieu of foreclosure upon default – as to which BBS&G's Pullano wrote that "we talked about this" and that the remedy should be "THE ABILITY OF THE INVESTOR TO FORECLOSE" (emphasis in original). As it turned out, the deficiencies Pullano cited were present in prior PPMs too. Neither Pullano nor Rosenberg advised EquityBuild of the need to make corrective disclosures applicable to prior PPMs.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 310.  To the extent an answer is deemed required, Defendants deny.**

311.    For example, in one instance, EquityBuild enlisted Rosenberg to assist with the preparation of a PPM to accompany the offering for sale of membership interests in South Side Development Fund 1.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 311.  To the extent an answer is deemed required, Defendants deny.**

312.    According to the PPM, the business plan was to purchase, renovate, stabilize, and refinance two apartment buildings on the south side of Chicago, specifically 4520-26 South Drexel Boulevard ("4520 S Drexel) and 4611-15 South Drexel Boulevard ("4611 S Drexel").

**ANSWER:** Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 312. To the extent an answer is deemed required, Defendants deny.

313. According to the PPM, the property at 4611 S Drexel had been acquired for $3,500,000 with the benefit of $2,625,000 in financing from BC57 LLC, a private bridge lender, and the property at 4520 S Drexel had been acquired for $5,700,000 with the benefit of $4,275,000 in financing from BC57 LLC (in each case, a 75% loan-to-value ratio). In other words, EquityBuild had a total of $2.3 million in equity in the two properties.

**ANSWER:** Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 313. To the extent an answer is deemed required, Defendants deny.

314. Despite this, the PPM that Rosenberg assisted in preparing for South Side Development Fund 1 not only announced an offering of $5.95 million in membership interests, it also indicated that Jerry Cohen (through South Shore Property Holdings, LLC, a Wyoming limited liability company) would own 20% of the membership interests in the holding companies formed to own the properties, while South Side Development Fund 1 (the issuer) would only own 80% of those membership interests. Thus, EquityBuild sought to raise $5.95 million to sell $1.84 million of equity.

**ANSWER:** Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 314. To the extent an answer is deemed required, Defendants deny.

315. Rosenberg's negligent failure to notice or disclose the clearly unworkable economics of the model foreseeably resulted in the fleecing of the investors.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 315.  To the extent an answer is deemed required, Defendants deny.**

316.    The terms proposed to the investors were quixotic: The "Use Of Proceeds" section of the PPM indicated that, of the $5.95 million to be raised, $2.3 million would buy out EquityBuild's initial equity in the properties (but, since Jerry Cohen would retain 20% of the ownership, it really only bought $1.84 million in equity), and $1,864,633 would be paid out in fees to EquityBuild and its affiliates, consisting of a $184,000 acquisition fee to EquityBuild, a $1,040,000 development fee to EquityBuild, a $69,000 sponsor guaranty fee to an unidentified entity, a $295,633 equity fee to EquityBuild Finance, and $276,000 in lender origination fees (presumably to EquityBuild Finance, although the identity of the lender is not disclosed, nor is the basis for the payment of loan origination fees).

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 316.  To the extent an answer is deemed required, Defendants deny.**

317.    The payment of $1,864,633 in fees to the sponsor (*i.e.,* more than 20% of the total raise), over and above the sale of $5.95 million in membership interests for $1.84 million in fund equity, should have indicated to Rosenberg that EquityBuild was engaged in securities violations and fraudulent activity, even if the fees were disclosed. This is particularly so given the knowledge Rosenberg already possessed, in the face of an SEC investigation, of EquityBuild's securities violations and failed borrowing history.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 317. To the extent an answer is deemed required, Defendants deny.**

318.     In addition, the South Side Development Fund 1 PPM also projected an 8% annual dividend to investors on a quarterly basis and indicated that the properties would be refinanced on more favorable terms after 24 months. Assuming the fund paid *no* dividends to investors, therefore, the refinance value of the properties would need to be $15,527,500 in order to generate the projected 8% return on invested equity (net of Cohen's 20% promoted interest), or a 69% increase in value over the original $9.2 million in combined acquisition prices. These assumptions were unrealistic to say the least and, at a minimum, should have been supported by a *pro forma* justifying the conclusions, but no such spreadsheet was included in the PPM.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 318. To the extent an answer is deemed required, Defendants deny.**

319.     In addition to the PPM for South Side Development Fund 1, Rosenberg reviewed and approved four other PPMs to accompany the solicitation of equity investments in real estate funds in 2017 and 2018, namely, South Side Development Fund 2 LLC, South Side Development Fund 4 LLC, South Side Development Fund 8 LLC and Hybrid Capital Fund LLC.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 319. To the extent an answer is deemed required, Defendants deny.**

320.     The same or substantially similar errors, omissions, and "red flags" contained in the South Side Development Fund 1 PPM can be found in the PPMs for these other fund vehicles,

which were customized from the template created by Rosenberg for South Side Development Fund 1.

**ANSWER:  Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 320.  To the extent an answer is deemed required, Defendants deny.**

321.    In total, BBS&G and Rosenberg provided substantial assistance preparing, and then reviewed and approved, at least 10 PPMs, five in connection with the solicitation of sales of participating interests in promissory notes and five in connection with the solicitation of sales of membership interests in fund entities.

**ANSWER:  Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 321.  To the extent an answer is deemed required, Defendants deny.**

322.    Rosenberg departed from BBS&G in early 2018 and continued providing legal services to EquityBuild and the Cohens well into 2018.

**ANSWER:  Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 322.  To the extent an answer is deemed required, Defendants deny.**

323.    Shaun Cohen informed Rosenberg in June 2018 that EquityBuild was operating at a staggering $1.3 million per month shortfall and was unable to perform its obligations to investors. Shortly thereafter, Shaun Cohen informed Rosenberg that "we are starting a fund for only Indian tribes to invest in. Does that need to be a PPM?" Rosenberg responded, undeterred, "Yes. Let me know the details."

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 323. To the extent an answer is deemed required, Defendants deny.**

**The SEC Sues to Enjoin the Scheme**

324. On August 15, 2018, the SEC brought an action that details the fraud and Ponzi scheme that the Cohens implemented for their own benefit through EquityBuild which lured investors into investing their monies.

**ANSWER:** **Admit.**

325. That scheme permeated the entirety of EquityBuild's business, whether it be the purchase and sale of real estate, the establishment of various entities that allowed monies to be shifted from one entity to another or otherwise easily accessed for improper abuses by the Cohens, and finally creation of documentation that assisted in luring investors into the scheme with misrepresentations and the like.

**ANSWER:** **Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 325. To the extent an answer is deemed required, Defendants deny.**

326. On August 17, 2018, the United States District Court for the Northern District of Illinois granted the SEC's request to enjoin the Cohens and EquityBuild from running such schemes, and appointed Kevin Duff as Receiver for the EquityBuild entities.

**ANSWER:** **Admit.**

327. Each of the EquityBuild entities was controlled by the Cohens in the fraudulent scheme and thus could not sue those involved in perpetuating or enabling the scheme or allowing it to continue. Thus, the statute of limitations was tolled until the wrongdoers were removed and

the Receiver was appointed. The Receiver was appointed by the Court in the SEC Action on August 17, 2018. However, the Receiver did not discover, and could not despite the exercise of reasonable diligence have discovered, until more recently, the Defendants' participation in furthering the EquityBuild Ponzi scheme. Moreover, the Defendants' wrongful acts were inherently undiscoverable. The Receiver also asserts the doctrine of equitable tolling with respect to any applicable statute of limitations.

**ANSWER: Deny.**

## COUNT I
### Professional Negligence
### (Against Rock Fusco and Ioana Salajanu)

328. Plaintiff repeats and realleges Paragraphs 1-327 as though fully set forth herein.

**ANSWER: Defendants repeat and reassert their answers to Paragraphs 1-327 as though fully set forth herein.**

329. Salajanu knew that investor-lenders' collateral was on numerous occasions released without the required written consent of the investor-lenders as required by the CASAs.

**ANSWER: Deny.**

330. Salajanu knew that the loans were being originated, underwritten, and serviced by EquityBuild Finance and that EquityBuild Finance also served as collateral agent on behalf of participating groups of investor-lenders.

**ANSWER: Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 333. To the extent an answer is deemed required, Defendants deny.**

331. Salajanu knew that the investor-lender loans being originated by EquityBuild Finance were for the benefit of EquityBuild, the sole owner and manager of the loan originator, underwriter, servicer, and collateral agent.

**ANSWER: Deny.**

332. Salajanu knew that virtually every property she assisted EquityBuild in selling to an investor-owner was subsequently conveyed back to EquityBuild based on a complaint that EquityBuild made false promises regarding investment returns.

**ANSWER: Deny.**

333. Salajanu received a telephone call from an EquityBuild employee who alleged widespread fraud.

**ANSWER: Deny.**

334. Salajanu was forwarded e-mails from investors alleging false promises and/or fraud by EquityBuild.

**ANSWER: Deny.**

335. Salajanu reviewed a comment posted on a public forum by a former investor who provided specific allegations of Ponzi scheme activity.

**ANSWER: Deny.**

336. Salajanu knew that Jerry Cohen filed for personal bankruptcy and tried to conceal that fact from a lender.

**ANSWER: Deny.**

337. Salajanu represented to lenders that she was unaware of any pending or contemplated litigation against EquityBuild when she knew that to be false.

**ANSWER: Deny.**

338.    Salajanu knew that Jerry Cohen was once the subject of a criminal arrest warrant.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 338.  To the extent an answer is deemed required, Defendants deny.**

339.    Salajanu knew that Jerry Cohen was involved in a real estate business in Philadelphia that closely resembled the real estate business being conducted by EquityBuild and that the Pennsylvania Bureau of Consumer Protection filed an action in connection with his real estate activities in Philadelphia.

**ANSWER:    Deny.**

340.    On every single transaction in which Salajanu represented EquityBuild at both the acquisition and the disposition, her client was unable to repay the entire principal balance alleged to be due on the investor-lender loan debt at closing.

**ANSWER:    Deny.**

341.    Salajanu represented EquityBuild in connection with the separate acquisitions of 7625 S East End and 7635 S East End, and she knew that separate mortgages were recorded against each, yet she knew that the two loans were being paid off as though they were a single loan secured by a single property, *i.e.,* "7625-35 S East End."

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 341.  To the extent an answer is deemed required, Defendants deny.**

342.    Salajanu knew that EquityBuild received a $3,500,000 unsecured overnight loan then repaid the debt the following day with $200,000 in fixed interest and with funds that Salajanu

knew were represented to the title company and to Liberty as being used to pay off investor-lenders.

**ANSWER:    Deny.**

343.    Salajanu knew that the investor-owner who filed suit in connection with his purchase of 7616 S Phillips had not received payoffs on loans that had been released during prior refinancings or short sales. Salajanu knew that this investor-owner was alleging fraud and advised EquityBuild of the urgent need to settle this lawsuit.

**ANSWER:    Deny.**

344.    Salajanu repeatedly represented EquityBuild as borrower and EquityBuild Finance, its wholly-owned subsidiary, as loan servicer and collateral agent, in the same transactions.

**ANSWER:    Defendants are without sufficient knowledge to either admit or deny the allegations contained in Paragraph 344.  To the extent an answer is deemed required, Defendants deny.**

345.    Salajanu repeatedly represented investor-owners, as sellers of property back to EquityBuild, *and* EquityBuild, as purchaser of those properties, in the same transaction.

**ANSWER:    Deny.**

346.    Salajanu represented EquityBuild at 62 separate closings in which real estate was acquired for a total of $58,834,500 in cash. Salajanu knew that uninsured mortgages evidencing loans equaling or exceeding 150 to 200% of the property value were later recorded against the properties acquired for cash. Salajanu knew that, despite receiving loans equaling or exceeding 150 to 200% of the purchase price, EquityBuild often lacked funds to perform property repairs, including property repairs being sought by the City of Chicago in building code enforcement actions and property repairs required by mandatory injunction.

**ANSWER:    Deny.**

347.    As advisors and attorneys with respect to their handling of the transactions and matters described above for EquityBuild and EquityBuild Finance, Rock Fusco and its agents, including, but not limited to, Salajanu owed a duty to comply with applicable standards of care.

**ANSWER:    Paragraph 347 calls for legal conclusions to which no response is necessary.  To the extent an answer is deemed required, Defendants deny.**

348.    Rock Fusco and Salajanu failed to meet the applicable standards of care in the respects set forth above, including without limitation:

a.    failing to properly investigate and/or address the misconduct described by Jessica Baier or by complaining present or former investor-owners and investor-lenders;

b.    failing to competently and promptly investigate the *bona fides* of EquityBuild's business which allowed EquityBuild to worsen its financial position and allowed its officers and insiders to improperly obtain various monies;

c.    failing to take all necessary steps to ensure that the EquityBuild transactions were legitimate, legal and free of undisclosed conflicts of interest for all parties they represented;

d.    failing to properly advise EquityBuild Finance regarding the scope of its authority under the CASA;

e.    failing to recognize that EquityBuild and EquityBuild Finance were using funds from new investors to pay returns to existing investors and thus running a Ponzi scheme and failing to advise them against the consequences of the same;

f.    placing the interests of the Cohens ahead of their clients;

g.    representing two or more clients with conflicting interests in the same transaction and, in transactions where a conflict was waivable, failing to obtain written conflicts waivers;

h.    failing to warn or advise EquityBuild and its principals to either not enter into the transactions and/or not enter into the transactions in the manner that it did, and failing to advise under IRPC 1.6(b)(2) and (3) in order to prevent a fraud and/or continuing to represent EquityBuild in violation of IRPC 1.2(d) ("a lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent….") and comment 12 thereunder ("[A] lawyer shall not represent a client or, where representation has commenced, shall withdraw from the

-100-

representation of a client if: (1) the representation will result in violation of the Rules of Professional Conduct or other law….".

**ANSWER:    Deny.**

349.    The failures of Rock Fusco and Salajanu to meet the applicable standard of care constitutes professional negligence.

**ANSWER:    Deny.**

350.    The negligence of Rock Fusco and Salajanu was a proximate cause of the plaintiff's damages, as alleged above, including, but not limited to, all expenses, losses, liabilities, debts, and other obligations incurred from the fraud and Ponzi scheme perpetrated by the Cohens. In addition, Rock Fusco and Salajanu were enriched by continuing to bill and collect fees.

**ANSWER:    Deny.**

**COUNT II**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Against Rock Fusco and Ioana Salajanu)**
**(In the Alternative to Count I)**

351.    In the alternative to Count I, the plaintiff repeats and realleges Paragraphs 1-327 as though fully set forth herein.

**ANSWER:    Defendants repeat and reassert their answers to Paragraphs 1-327 as though fully set forth herein.**

352.    Jerry and Shaun Cohen owed fiduciary duties to EquityBuild and EquityBuild Finance.

**ANSWER:    Paragraph 352 calls for legal conclusions to which no response is necessary.  To the extent an answer is deemed required, Defendants deny.**

353.     The Cohens breached their fiduciary duties by employing devices, schemes, and artifices to defraud; making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaging in acts, practices, and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

**ANSWER:     Paragraph 353 calls for legal conclusions to which no response is necessary.  To the extent an answer is deemed required, Defendants deny.**

354.     Between April 2015 and August 2018, Rock Fusco and Salajanu (a) were aware of the Cohens' improper conduct; (b) were aware that the Jerry and Shaun owed fiduciary duties to the companies they oversaw; (c) were aware that the Cohens were breaching their fiduciary duties; (d) knowingly and substantially assisted and facilitated the breaches of fiduciary duty by the Cohens; and (e) benefitted directly and/or indirectly from these breaches of fiduciary duty.

**ANSWER:     Deny.**

355.     For example, Rock Fusco and Salajanu knowingly and substantially assisted and facilitated the Cohens' breaches of fiduciary duty as they allowed the Ponzi scheme to originate and continue, personally enriching the Cohens to the financial detriment of the Receivership Entities.

**ANSWER:     Deny.**

356.     At all relevant times, Salajanu, and other Rock Fusco attorneys working for the Receivership Entities, were acting within the course and scope of their employment.

**ANSWER:     Paragraph 356 calls for legal conclusions to which no response is necessary.  To the extent an answer is deemed required, Defendants deny.**

357.    Rock Fusco and Salajanu willfully ignored obvious evidence of misconduct by the Cohens in order to reap additional fees and to ensure that their lucrative business relationships were maintained.

**ANSWER:    Deny.**

358.    The malfeasance and misfeasance of Rock Fusco and Salajanu proximately caused the Receivership Entities to sustain substantial damages in an amount to be proven at trial, including, but not limited to, all expenses, losses, liabilities, debts, and other obligations incurred in connection with the Ponzi scheme perpetrated by the Cohens.

**ANSWER:    Deny.**

**COUNT III**
**Professional Negligence**
**(BBS&G)**

**COUNT III IS NOT DIRECTED AT DEFENDANTS. THEREFORE NO RESPONSE IS NECESSARY. TO THE EXTENT A RESPONSE TO COUNT III IS DEEMED NECESSARY, DEFENDANTS DENY ALL ALLEGATIONS CONTAINED THEREIN.**

**COUNT IV**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Against BBS&G)**
**(In the Alternative to Count III)**

**COUNT IV IS NOT DIRECTED AT DEFENDANTS. THEREFORE NO RESPONSE IS NECESSARY. TO THE EXTENT A RESPONSE TO COUNT III IS DEEMED NECESSARY, DEFENDANTS DENY ALL ALLEGATIONS CONTAINED THEREIN.**

**WHEREFORE**, Defendants, ROCK FUSCO & CONNELLY, LLC and IOANA SALAJANU, deny that Plaintiff is entitled to judgment in any amount whatsoever and request judgment in their favor and for costs so wrongfully sustained.

**FIRST AFFIRMATIVE DEFENSE**
**(Statute of Limitations – 735 ILCS 5/13-214.3)**

1.    735 ILCS 5/13-214.3(b) provides in relevant part as follows:

> (b) An action for damages based on tort, contract, or otherwise (i) against an attorney arising out of an act or omission in the performance of professional services or (ii) against a non-attorney employee arising out of an act or omission in the course of his or her employment by an attorney to assist the attorney in performing professional services must be commenced within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought.

*See* 735 ILCS 5/13-214.3(b).

2.      Plaintiff's claims against Defendant arise out of the provision of legal services rendered by Defendants and are barred by the two-year statute of limitations set forth in 735 ILCS 5/13-214.3(b).

3.      Plaintiff filed the present lawsuit on August 17, 2020.

4.      EquityBuild, EquityBuild Finance, and any of their related or affiliated entities, *i.e.,* the entities on whose behalf Plaintiff brings suit, were aware that they were wrongfully injured before August 17, 2018.

5.      At the absolute latest, EquityBuild, EquityBuild Finance, and any of their related or affiliated entities, *i.e.,* the entities on whose behalf Plaintiff brings suit, were aware that they were wrongfully injured on August 16, 2018, when Jerry Cohen became aware that the SEC had filed suit to halt EquityBuild and EquityBuild Finance's ongoing Ponzi scheme.

6.      Therefore, Plaintiff's claims are barred by 735 ILCS 5/13-214.3(b).

## SECOND AFFIRMATIVE DEFENSE
### (Superseding Causation – Criminal Conduct of Cohens)

1.      The Second Amended Complaint alleges that Jerry Cohen and Shaun Cohen, as the owners and/or operators of EquityBuild, EquityBuild Finance, and their related and affiliated entities, committed widespread fraud and other illegal conduct.

2.     That fraud and illegal conduct was not reasonably foreseeable and therefore constitutes an intervening act that supersedes Defendant's alleged negligence and serves as the proximate cause of Plaintiff's alleged damages.

## THIRD AFFIRMATIVE DEFENSE
### (Superseding Causation – Other Parties)

1.     Plaintiff has alleged that numerous other individuals and entities, through their actions and inactions, assisted in the Ponzi scheme that forms the basis of Plaintiff's alleged damages.

2.     The actions and inactions of said individuals and entities constitute intervening and superseding causes of the damages sought in this matter.

## FOURTH AFFIRMATIVE DEFENSE
### (Contributory Negligence)

1.     The Second Amended Complaint alleges that Jerry Cohen and Shaun Cohen, as the owners and/or operators of EquityBuild, EquityBuild Finance, and their related and affiliated entities, committed widespread fraud and other illegal conduct.

2.     Jerry Cohen and Shaun Cohen's knowledge of and participation in the ongoing Ponzi scheme and other illegal conduct are imputed to the companies which they owned, operated, and/or controlled.

3.     Thus, any damages sustained by EquityBuild, EquityBuild Finance, and their related and affiliated entities were caused by their own contributory negligence.

4.     The actions and inactions of said individuals and entities constitute intervening and superseding causes of the damages sought in this matter.

## FIFTH AFFIRMATIVE DEFENSE
### (Comparative fault)

1.      If the allegations of Plaintiff's Complaint are true, EquityBuild, EquityBuild Finance, and their respective agents outside of the control of Defendants were, at all relevant times, under a duty to monitor and oversee the EquityBuild and EquityBuild Finance's business and the financial status of its business – including a duty not to defraud its investors.

2.      Upon information and belief, agents for EquityBuild and EquityBuild Finance breached their duties to for EquityBuild and EquityBuild Finance by:

   a.   Failing to properly monitor and operate for EquityBuild and EquityBuild Finance's business and financial affairs;

   b.   Failing to properly advise for EquityBuild and EquityBuild Finance's consultants, lawyers and other agents of the nature of its business and/or of the purported Ponzi scheme;

   c.   Failing to comply with Federal and state laws concerning real estate transactions, securities transactions and other laws governing their business and financial operations;

   d.   Failing to completely and honestly prepare and file paperwork concerning the businesses' operations and financials, as proscribed by State and Federal law;

   e.   Failing to alert any authority of their purportedly fraudulent conduct;

   f.   Perpetuating a scheme to defraud its investors;

   g.   Falsifying documents to perpetuate this scheme; and

   h.   Otherwise failing to operate their businesses in a legal, forthright and competent manner.

3.      If all or part of Plaintiff's damages could have been avoided – or, alternatively, reduced – through the exercise of the rights, powers and/or duties enumerated above, then agent(s) of EquityBuild and EquityBuild Finance breached their duties to for EquityBuild and EquityBuild Finance.

4.      Therefore, Plaintiff's damages, if any, were caused by the comparative fault of EquityBuild and EquityBuild Finance's agents or by EquityBuild and EquityBuild Finance through their agents and should be reduced and/or barred accordingly.

### SIXTH AFFIRMATIVE DEFENSE
**(Acts or Omissions of Third Parties Not in Defendants' Control)**

1.      Plaintiff alleges that EquityBuild was, in essence, a Ponzi scheme wherein the Cohens knew of the nature of the scheme and, nonetheless, perpetuated the scheme for years.

2.      Further, Plaintiff alleges EquityBuild received substantial assistance with respect to this scheme from attorney Mark Rosenberg, as well as numerous other individuals and entities.

3.      Upon information and belief, neither the Cohens, Mark Rosenberg, nor any other agent or employee of EquityBuild or EquityBuild Finance acted in a timely manner to prevent the purported scheme from continuing or otherwise halt the conduct which led to Plaintiff's supposed damages, despite these individuals/entities allegedly having knowledge of the alleged scheme and/or misconduct.

4.      At no point were the Cohens, Mark Rosenberg, nor any other agent or employee of EquityBuild or EquityBuild Finance (including but not limited to their accounts, auditors, principals, managers, consultants, employees, and other attorneys) hat contributed to Plaintiff's purported damages under Defendants' control.

5.      Therefore, Plaintiff's injuries, if any, were caused by the acts or omissions of those listed above and others to be proven at trial, over whom Defendants had no control and for whose acts Defendants are not responsible.

## SEVENTH AFFIRMATIVE DEFENSE
### (Lack of Standing)

1.      The "embezzlement" portion of the scheme was solely controlled and executed by the Cohens and other close insiders of the EquityBuild companies, as they were controlling the purported diversion of funds.

2.      Defendants' alleged involvement related to the "sales" step of the scheme, and not the "embezzlement" portion.  *See Knauer v. Jonathon Roberts Fin. Group*, 348 F. 3d 320 (7th Cir. 2003).

3.      Plaintiff, to the extent he would have any standing to bring claims against individual/entities involved with the purported scheme, would only have standing to bring said claims against those involved in the "embezzlement" portion of the scheme.

4.      Therefore, Plaintiff lacks standing to bring these claims against Defendants.

## EIGHTH AFFIRMATIVE DEFENSE
### (Setoff)

1.      To the extent Plaintiff is seeking recovery herein for damages to the EquityBuild estate established in the SEC Action, Defendants are entitled to a setoff of any damages awarded against them in proportion with the extent to which any such damages to the EquityBuild estate have already been satisfied, whether by sale of assets, settlements or otherwise.

**\*\*\*DEFENDANTS DEMAND A TRIAL BY JURY ON ALL CLAIMS AND DEFENSES\*\*\***

Respectfully submitted,

ROCK FUSCO & CONNELLY, LLC AND
IOANA SALAJANU

By: /s/ *Joseph R. Marconi*
    One of Their Attorneys

Joseph R. Marconi (marconij@jbltd.com)
Ramses Jalalpour (jalalpourr@jbltd.com)
JOHNSON & BELL, LTD.
33 West Monroe Street - Suite 2700
Chicago, Illinois 60603
312.372.0770 (T)
312.372.9818 (F)
Firm I.D. No.: 40505

*Attorneys for Defendants*

Exhibit D

**IN THE CIRCUIT COURT OF COOK COUNTY**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| KEVIN B. DUFF, RECEIVER FOR ) THE ESTATE OF EQUITYBUILD, INC., *etc.* ) ) Plaintiff, ) ) v. ) ) ROCK FUSCO & CONNELLY, LLC, ) IOANA SALAJANU, and BREGMAN, ) BERBERT, SCHWARTZ & GILDAY, LLC, ) ) Defendants. ) | Case No. 2020-L-008843 Calendar T |

**PLAINTIFF'S ANSWERS TO DEFENDANT IOANA
SALAJANU'S SECOND SET OF INTERROGATORIES**

Kevin B. Duff, as court-appointed receiver ("Receiver") for EquityBuild, Inc. ("EquityBuild"), EquityBuild Finance, LLC ("EquityBuild Finance"), their affiliates, and the affiliate entities of Jerome ("Jerry") Cohen and Shaun Cohen (collectively, the "Receivership Defendants"), for his Answers to Defendant, Ioana Salajanu's Second Set of Interrogatories, states as follows:

**General Objections**

The Receiver incorporates his objections to Defendant's prior interrogatories as though fully set forth herein. The Receiver also objects to the Interrogatories to the extent they request information beyond his personal knowledge and has answered these interrogatories based on a review of documents in the possession of the Receivership Defendants, copies of which have been produced to the defendants, or other documents that are equally available to the defendants, such as court filings in the action in which the Receiver was appointed. The Receiver cannot attest to having seen every single document in the possession of the Receivership Defendants and therefore reserves the right to amend any of the answers herein based on newly discovered, identified, or located

1

information. The Receiver also objects to the instructions and definitions to the extent such matters are vague, ambiguous, and use definitions or seek to create obligations that are contrary to the Illinois Rules of Civil Procedure and/or the Illinois Supreme Court Rules. The Receiver also objects to the Interrogatories on the grounds that they seek information beyond the scope of the Court's March 12, 2024 order.

These general objections are incorporated into each of the interrogatory answers set forth below.

## INTERROGATORIES

1.      State the full name, job title, job description, and current business and/or resident address of the individual(s) answering these Interrogatories.

**ANSWER:  Kevin B. Duff, Receiver, with the assistance of his counsel.**

2.      For each property identified in your answer to Interrogatory No. 2 of Rock Fusco's Third Set of Interrogatories, specify the damages you claim were the result of Defendants' alleged negligence.

**ANSWER: Plaintiff objects to Rock Fusco's Interrogatory No. 2 to the extent it misstates or mischaracterizes the Receiver's claims and the nature and manner in which Rock Fusco caused damage to EquityBuild and/or EBF. Plaintiff further objects to Interrogatory No. 2 to the extent that damages will be the subject of expert testimony and Plaintiff fully reserves the right to amend or supplement his answers with expert opinions. Plaintiff further incorporates his prior responses and objections to discovery on the subject matter of this interrogatory.**

**Subject to these objections and the General Objections, Plaintiff states that Defendants' negligence has subjected the Receivership Defendants to, *inter alia*, the claims of numerous investor lenders, institutional lenders and others, which presently compiled total approximately $190,716,356.96. The Receiver has made distributions to certain claimants related to net sale proceeds on properties for which the claims process has completed (presently compiled to total $7,956,571.80), and also has cash on hand that may be authorized to pay claims (presently compiled to total $60,376,263.86). The total amount of claims, less distributions and cash on hand presently compiled totals approximately $122,383,521.30. In the matter in which the Receiver was appointed, *SEC v. EquityBuild, et al*., Case No. 18-cv-5587 (N.D. Ill.), however, the Receiver has made recommendations to the District Court as to the maximum amount of distributions claimants should receive on their claims with respect to some of the properties (such process remains ongoing and is not complete).  If the court accepts the Receiver's recommendations as to those properties in whole or in part, the total amount of**

2

recommended distributions, less actual distributions and cash on hand presently compiled would be reduced to approximately $95,693,163.61. The charts and notes attached as Exhibits 1-3 reflect the Receiver's present compilation of these figures by property. Plaintiff reserves the right to amend this interrogatory answer and all information provided herein as additional recommendations are made to the District Court and/or as additional information otherwise becomes available.

      3.      For each property identified in your answer to Interrogatory No. 2 of Rock Fusco's

Third Set of Interrogatories, specify the damages you claim were the result of Defendants' alleged

aiding and abetting breach of fiduciary duty.

**ANSWER: Plaintiff objects to Interrogatory No. 3 to the extent that damages will be the subject of expert testimony and Plaintiff fully reserves the right to amend or supplement his answers with expert opinions. Plaintiff further incorporates his prior responses to discovery on the subject matter of the interrogatory. Subject to these objections and the General Objections, Plaintiff states that the damages sought in this action were caused by Defendants' negligence, but in the alternative the damages sought in this action were caused by Defendants' aiding and abetting breaches of fiduciary duty. Accordingly, Plaintiff restates and incorporates his answer to Interrogatory No. 2 as though fully set forth herein.**

      4.      Calculate and categorize, with specificity, the damages you are alleging against

Defendants as a result of Defendants' alleged negligence that are not included in your answer to

Interrogatory No. 2 above.

**ANSWER: Plaintiff objects to Interrogatory No. 4 to the extent that damages will be the subject of expert testimony and Plaintiff fully reserves the right to amend and/or supplement his answers with expert opinions. Plaintiff further incorporates his prior responses to discovery on the subject matter of the interrogatory. Subject thereto and to the General Objections, Plaintiff states that in addition to the damages referenced in his answers to Interrogatory Nos. 2 and 3, Plaintiff seeks the following damages:**

- **All amounts paid to Rock Fusco as attorneys' fees, in an amount equal to or exceeding $820,166.**
- **Receivership costs and expenses as set forth in the fees petitions that have been submitted or will be submitted to the court that are publicly available or subsequently available on PACER and on the Receiver's website.**
- **Claims against the receivership estate that are not secured by the liquidated assets of the estate, in an amount exceeding $13,000,000.**
- **Transactional costs, brokerage commissions, title fees, and other costs associated with the real estate transactions identified in response to Interrogatory No. 2 of Rock Fusco's Third Set of Interrogatories. In addition, Defendants are directed to previously produced closing statements for each of the aforementioned transactions as well as all motions for approval of sales of properties held by Receivership Estate which are available on PACER and on the Receiver's website, all of which is equally available to the Defendants.**

- **Investigation continues.**

5.     Calculate and categorize, with specificity, the damages you are alleging against Defendants as a result of Defendants' alleged negligence that are not included in your answer to Interrogatory No. 3 above.

**ANSWER:  Plaintiff objects to Interrogatory No. 5 to the extent that damages will be the subject of expert testimony and Plaintiff fully reserves the right to amend or supplement his answers with expert opinions. Plaintiff further incorporates his prior responses to discovery on the subject matter of the interrogatory. Subject thereto and to the General Objections, Plaintiff refers Defendants to his answers to Interrogatory Nos. 3 and 4.**

6.     For each property identified in your answer to Interrogatory No. 2 of Rock Fusco's Third Set of Interrogatories, identify all individuals and/or entities involved in the transaction of said property, including but not limited to:
   a)  The title company (if any);
   b)  The lender (if any);
   c)  The purchaser (if any);
   d)  The seller (if any);
   e)  The Investor-Lender(s) (as that term is used in Paragraph 14 of the Complaint (if any);
   f)  The Investor-Owner(s) (as that term is used in Paragraph 14 of the Complaint (if any);
   g)  The Equity-Investor(s) (as that term is used in Paragraph 14 of the Complaint (if any);
   h)  The Fund-Investor(s) (as that term is used in Paragraph 14 of the Complaint (if any); and
   i)  The attorney(s) that represented any of the above individuals/entities with respect to the transaction.

**ANSWER:  Pursuant to Illinois Supreme Court Rule 213(e), the Receiver will produce documents containing information responsive to Interrogatory No. 6.**

7.     For each property identified in your answer to Interrogatory No. 2 of Rock Fusco's Third Set of Interrogatories, identify any other attorney(s) besides Defendants that represented EquityBuild, EquityBuild Finance, or any Estate entity as part of the transaction involving said property.

**ANSWER: Pursuant to Illinois Supreme Court Rule 213(e), the Receiver will produce documents containing information responsive to Interrogatory No. 7.**

8.     Specifically state and describe all facts, documents, and bases supporting your

4

allegation that, "Salajanu knew that this assertion was incorrect because she knew that at least ten tax lien petitions were pending against Jerry Cohen in Philadelphia," (*see* Complaint, at ¶ 151), including but not limited to the identity of all documents and things referring or relating thereto, and the identity of the persons with knowledge thereof.

**ANSWER: Subject to the General Objections, Defendants are directed to the Second Amended Complaint in general and paragraphs 263-270 in particular. Plaintiff further refers Defendants to the documents bates labeled RFC 235260-RFC235261. Investigation continues.**

9. If you denied any request to admit in response to Salajanu's First Set of Requests to Admit, specifically state and describe all facts, documents, and bases supporting your denial, including but not limited to the identity of all documents and things referring or relating thereto, and the identity of the persons with knowledge thereof.

**ANSWER: Plaintiff incorporates his objections to Salajanu's First Set of Requests to Admit as though fully set forth herein. Plaintiff further objects to Interrogatory No. 9 to the extent it seeks to impose an undue burden on Plaintiff to review every transaction identified in Plaintiff's Answer to Interrogatory No. 2 of Rock Fusco's Third Set of Interrogatories and examine whether each "counter-party" (as the term is vaguely defined) and title insurance company was in possession of a Collateral Agency and Servicing Agreement ("CASA") between EquityBuild Finance and an investor-lender who held an interest in the mortgage encumbering the property(ies) at issue in the transaction. Plaintiff further objects to Interrogatory No. 9 on the grounds that the information requested is equally available to Defendants in the materials Plaintiff has produced and/or the materials Defendants have produced or in other documents that are equally available to the defendants, such as court filings in the action in which the Receiver was appointed.**

**Subject to and without waiving these objections and the General Objections, Plaintiff states that not all of the "counter-parties" as the term is vaguely defined in the Request to Admit and not all of the title insurance companies involved in the transactions identified in Plaintiff's Answer to Interrogatory No. 2 of Rock Fusco's Third Set of Interrogatories were in possession of at least one CASA between EquityBuild Finance and an investor-lender who held an interest in the mortgage encumbering the property(ies) at issue in the transaction.**

**For example, in the case of BC57 (an institutional lender providing refinancing), information obtained through the claims process established that neither BC57 nor its title insurer had the CASAs that were involved with various investor lenders with respect to the five properties at issue. In its position statement filed as part of the process associated its claim, BC57 stated that neither it nor its title insurer "had a copy of the Collateral Agent and Servicing Agreement . . . when the refinancing closed." Dkt. 1152 at 13.**

**Plaintiff has previously provided access to CASAs within the records of EquityBuild, and Defendants have equal access to the information and materials containing this information. Investigation continues.**

Dated:  April 26, 2024

Respectfully submitted,

KEVIN B. DUFF, FEDERAL EQUITY RECEIVER
FOR THE ESTATE OF EQUITYBUILD, INC., ETC.

By: _____*Michael C. Bruck*_____
   Michael C. Bruck
   Timothy J. McInerney
   Spellmire Bruck LLC
   One East Wacker Drive, Suite 2350
   Chicago, Illinois 60601
   (312) 258-9400
   *mcb@spellmirebruck.com*
   *tjm@spellmirebruck.com*

   Andrew E. Porter
   Porter Law Office
   853 North Elston Avenue
   Chicago, Illinois 60642
   (312) 433-0568
   *andrew@andrewporterlaw.com*

   Michael Rachlis
   Rachlis Duff & Peel LLC
   542 South Dearborn Street, Suite 900
   Chicago, Illinois 60605
   (312) 733-3950
   *mrachlis@rdaplaw.net*

   Steven J. Roeder
   Ryan P. Weitendorf
   Roeder Law Offices LLC
   77 West Washington Avenue, Suite 2100
   Chicago, Illinois 60602
   (312) 667-6000
   *sjr@roederlawoffices.com*
   *rpw@roederlawoffices.com*

## <u>VERIFICATION</u>

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in **Plaintiff's Answers to Defendant Ioana Salajanu's Second Set of Interrogatories** are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

_____/s/ *Kevin B. Duff*_____

Kevin B. Duff, Receiver

# EXHIBIT 1

| Asset Number | Property Address | Investor Lender Claims (Amount Invested) | Investor Lender - Receiver's Recommendations | Institutional Lenders Claims | Institutional Lender Claims (Loan Amount) | Institutional Lenders Claims (Receiver's Recommendations) | Institutional Lenders | Total Claims |
|---|---|---|---|---|---|---|---|---|
| 1 | 1700 W Juneway | $ 3,964,953.90 | $ 3,276,811.63 | $ 2,698,133.51 | $ 2,175,000.00 | $ 1,518,260.29 | Thorofare Asset Based Lending REIT Fund IV, LLC | $ 6,663,087.41 |
| 2 | 4533 S Calumet | $ 2,731,008.00 | | $ 1,719,582.97 | $ 1,510,000.00 | | BMO | $ 4,450,590.97 |
| 3 | 5001 S Drexel | $ 1,891,925.00 | $ 1,763,225.84 | $ 2,879,601.67 | $ 2,195,582.51 | $ 1,494,309.77 | Wilmington Trust | $ 4,771,526.67 |
| 4 | 5450 S Indiana | $ 2,806,948.60 | $ 2,247,387.00 | $ 1,544,824.93 | $ 900,000.00 | $ 681,366.67 | Shatar Capital Inc. | $ 4,351,773.53 |
| 5 | 7749 S Yates | $ 2,785,293.00 | $ 2,278,367.20 | $ 1,544,824.93 | $ 900,000.00 | $ 681,366.67 | Shatar Capital Inc. | $ 4,330,117.93 |
| 6 | 6437 S Kenwood | $ 2,327,747.91 | $ 1,961,920.67 | | | | | $ 2,327,747.91 |
| 7 | 7109 Calumet | $ 591,275.00 | | $ 1,691,737.07 | $ 1,507,000.00 | | US Bank | $ 2,283,012.07 |
| 9 | 8100 S Essex | $ 3,238,750.00 | $ 2,389,675.94 | | | | | $ 3,238,750.00 |
| 10 | 7301 S Stewart 7500 S Eggleston 3030 E 79th | $ 5,753,942.96 | $ 5,081,430.14 | | | | | $ 5,753,942.96 |
| 13 | 2909 E 78th 7549 S Essex 8047 S Manistee | $ 7,406,750.00 | $ 6,930,391.02 | | | | | $ 7,406,750.00 |
| 47 | 5437 Laflin | $ 250,000.00 | $ 250,000.00 | $ 140,956.08 | $ 106,500.00 | | Midland (distribution of $23,646.53) | $ 390,956.08 |
| 49 | 7300 S St Lawrence | $ 5,569.64 | $ 4,121.01 | $ 496,328.20 | $ 375,000.00 | $ 324,275.59 | Midland - EB South Chicago 3 | $ 501,897.84 |
| 50 | 7760 S Coles | $ 464,316.52 | | $ 714,709.93 | $ 540,000.00 | | Midland - EB South Chicago 3 | $ 1,179,026.45 |
| 53 | 6807 S Indiana | $ 145,000.00 | | $ 213,185.12 | $ 172,233.80 | | Midland - EB South Chicago 4 | $ 358,185.12 |
| 54 | 8000 S Justine | $ 839,974.71 | | $ 472,714.81 | $ 381,909.72 | | Midland - EB South Chicago 4 | $ 1,312,689.52 |
| 55 | 8107 S Ellis | $ 421,032.00 | | $ 519,059.40 | $ 419,351.85 | | Midland - EB South Chicago 4 | $ 940,091.40 |
| 56 | 8209 S Ellis | $ 762,700.00 | | $ 685,899.93 | $ 554,143.52 | | Midland - EB South Chicago 4 | $ 1,448,599.93 |
| 57 | 8214 S Ingleside | $ 777,986.00 | | $ 574,672.90 | $ 464,282.40 | | Midland - EB South Chicago 4 | $ 1,352,658.90 |
| 58 | 5955 S Sacramento | $ 1,153,489.19 | $ 811,121.76 | | | | | $ 1,153,489.19 |
| 59 | 6001 S Sacramento | $ 830,729.00 | $ 516,911.51 | | | | | $ 830,729.00 |
| 60 | 7026 S Cornell | $ 1,380,295.43 | $ 995,938.85 | | | | | $ 1,380,295.43 |

| 1 Asset Number | 2 Property Address | 3 Investor Lender Claims (Amount Invested) | 4 Investor Lender - Receiver's Recommendations | 5 Institutional Lenders Claims | 6 Institutional Lender Claims (Loan Amount) | 7 Institutional Lenders Claims (Receiver's Recommendations) | 8 Institutional Lenders | 9 Total Claims |
|---|---|---|---|---|---|---|---|---|
| 61 | 7237 S Bennett | $ 2,111,617.97 | $ 1,510,440.49 | | | | | $ 2,111,617.97 |
| 62 | 7834-44 S Ellis | $ 2,672,862.77 | $ 1,974,732.82 | | | | | $ 2,672,862.77 |
| 63 | 4520 S Drexel LLC | $ 5,495,107.33 | $ 4,700,293.26 | $ 4,830,977.15 | $ 4,400,000.00 | $ 4,020,148.33 | US Bank | $ 10,326,084.48 |
| 64 | 4611 S Drexel | $ 3,372,015.00 | | $ 3,697,340.98 | $ 3,280,000.00 | | Citibank | $ 7,069,355.98 |
| 65 | 6751 S Merrill | $ - | $ - | $ 1,526,037.70 | $ 1,420,000.00 | $ 1,376,188.44 | US Bank (distribution $1,328,035.76) | $ 1,526,037.70 |
| 66 | 7110 S Cornell | $ - | $ - | $ 1,400,491.73 | $ 1,220,000.00 | $ 1,167,219.89 | US Bank (distribution $1,043,137.47) | $ 1,400,491.73 |
| 67 | 1131 E 79th | $ 1,565,000.00 | $ 1,496,185.36 | $ 1,319,255.08 | $ 1,300,000.00 | $ 1,113,381.83 | Federal National Mortgage Association | $ 2,884,255.08 |
| 68 | 6217 S Dorchester | $ 3,640,437.69 | | $ 1,954,113.57 | $ 1,700,000.00 | | Citibank | $ 5,594,551.26 |
| 69 | 6250 S Mozart | $ 1,775,858.00 | | $ 1,461,176.83 | $ 1,264,000.00 | | Citibank | $ 3,237,034.83 |
| 70 | 638 N Avers | $ 1,573,129.00 | | $ 1,273,346.96 | $ 1,020,000.00 | | Freddie Mac | $ 2,846,475.96 |
| 71 | 701 S 5th | $ 2,249,413.82 | $ 1,642,577.29 | | | | | $ 2,249,413.82 |
| 72 | 7024 S Paxton | $ 50,153.84 | $ 45,749.94 | $ 1,825,895.85 | $ 1,541,000.00 | | Freddie Mac | $ 1,876,049.69 |
| 73 | 7255 S Euclid | $ 1,414,371.65 | | $ 1,151,462.06 | $ 984,000.00 | | Citibank | $ 2,565,833.71 |
| 74 | 3074 E Cheltenham | $ 2,070,383.85 | $ 1,558,935.01 | $ 1,287,900.53 | $ 1,065,686.69 | $ 861,005.15 | BC57, LLC | $ 3,358,284.38 |
| 75 | 7625 S East End | $ 1,316,206.76 | $ 901,037.44 | $ 1,287,900.53 | $ 1,065,686.69 | $ 861,005.15 | BC57, LLC | $ 2,604,107.29 |
| 76 | 7635 S East End | $ 1,484,020.76 | $ 1,023,044.57 | $ 1,287,900.53 | $ 1,065,686.69 | $ 861,005.15 | BC57, LLC | $ 2,771,921.29 |
| 77 | 7750 S Muskegon | $ 2,129,873.83 | $ 1,276,707.67 | $ 1,287,900.53 | $ 1,065,686.69 | $ 861,005.15 | BC57, LLC | $ 3,417,774.36 |
| 78 | 7201 Constance | $ 2,409,845.89 | $ 1,715,079.19 | $ 1,287,900.53 | $ 1,065,686.69 | $ 861,005.15 | BC57, LLC | $ 3,697,746.42 |
| 79 | 6160 S Martin Luther King | $ 4,410,131.79 | $ 3,392,497.13 | $ 3,118,675.50 | $ 2,750,000.00 | $ 188,242.27 | DLP, LLC | $ 7,528,807.29 |
| 80 | 2736 W 64th | $ 747,300.00 | | $ 625,811.55 | $ 541,176.47 | | Liberty EBCP, LLC | $ 1,373,111.55 |
| 81 | 4317 S Michigan | $ 989,000.00 | | $ 625,811.55 | $ 541,176.47 | | Liberty EBCP, LLC | $ 1,614,811.55 |

| Asset Number | Property Address | Investor Lender Claims (Amount Invested) | Investor Lender - Receiver's Recommendations | Institutional Lenders Claims | Institutional Lender Claims (Loan Amount) | Institutional Lenders Claims (Receiver's Recommendations) | Institutional Lenders | Total Claims |
|---|---|---|---|---|---|---|---|---|
| 82 | 6355 Talman | $ 1,126,990.00 | | $ 625,811.55 | $ 541,176.47 | | Liberty EBCP, LLC | $ 1,752,801.55 |
| 83 | 6356 S California | $ 906,169.33 | | $ 625,811.55 | $ 541,176.47 | | Liberty EBCP, LLC | $ 1,531,980.88 |
| 84 | 7051 Bennett | $ 1,277,280.00 | | $ 625,811.55 | $ 541,176.47 | | Liberty EBCP, LLC | $ 1,903,091.55 |
| 85 | 7201 S Dorchester | $ 1,200,824.00 | | $ 625,811.55 | $ 541,176.47 | | Liberty EBCP, LLC | $ 1,826,635.55 |
| 86 | 7442 S Calumet | $ 1,090,950.00 | | $ 625,811.55 | $ 541,176.47 | | Liberty EBCP, LLC | $ 1,716,761.55 |
| 87 | 7508 S Essex/2453 E 75th | $ 1,461,457.00 | | $ 625,811.55 | $ 541,176.47 | | Liberty EBCP, LLC | $ 2,087,268.55 |
| 88 | 7546 S Saginaw | $ 1,655,392.33 | | $ 625,811.55 | $ 541,176.47 | | Liberty EBCP, LLC | $ 2,281,203.88 |
| 89 | 7600 S Kingston | $ 3,355,709.40 | | $ 625,811.55 | $ 541,176.47 | | Liberty EBCP, LLC | $ 3,981,520.95 |
| 90 | 7656 Kingston | $ 705,195.05 | | $ 625,811.55 | $ 541,176.47 | | Liberty EBCP, LLC | $ 1,331,006.60 |

| 1 Asset Number | 2 Property Address | 3 Investor Lender Claims (Amount Invested) | 4 Investor Lender - Receiver's Recommendations | 5 Institutional Lenders Claims | 6 Institutional Lender Claims (Loan Amount) | 7 Institutional Lenders Claims (Receiver's Recommendations) | 8 Institutional Lenders | 9 Total Claims |
|---|---|---|---|---|---|---|---|---|
| 91 | 7701 S Essex | $ 1,346,134.00 | | $ 625,811.55 | $ 541,176.47 | | Liberty EBCP, LLC | $ 1,971,945.55 |
| 92 | 7748 S Essex | $ 2,687,877.70 | | $ 625,811.55 | $ 541,176.47 | | Liberty EBCP, LLC | $ 3,313,689.25 |
| 93 | 7957-59 S Marquette | $ 1,014,155.00 | | $ 625,811.55 | $ 541,176.47 | | Liberty EBCP, LLC | $ 1,639,966.55 |
| 94 | 816 E Marquette | $ 1,080,000.00 | | $ 625,811.55 | $ 541,176.47 | | Liberty EBCP, LLC | $ 1,705,811.55 |
| 95 | 8201 S Kingston | $ 815,000.00 | | $ 625,811.55 | $ 541,176.47 | | Liberty EBCP, LLC | $ 1,440,811.55 |
| 96 | 8326-58 S Ellis | $ 4,010,786.54 | | $ 625,811.55 | $ 541,176.47 | | Liberty EBCP, LLC | $ 4,636,598.09 |
| 100 | 11117 S Longwood | $ 5,055,850.00 | $ 4,320,897.73 | | | | | $ 5,055,850.00 |
| 101 | 6949 S Merrill | $ - | $ - | $ 1,915,706.50 | $ 1,540,000.00 | $ 873,447.20 | Thorofare Asset Based Lending REIT Fund IV, LLC | $ 1,915,706.50 |
| 102 | 7927 S Essex | $ 2,895,494.00 | $ 2,370,420.72 | | | | | $ 2,895,494.00 |
| 107 | 1422 E 68th | $ 357,551.00 | $ 192,551.00 | $ 437,607.09 | $ 385,882.00 | | UBS AG (distribution $342,000) | $ 795,158.09 |
| 108 | 2800 E 81st | $ 770,395.00 | | $ 492,308.83 | $ 434,118.00 | | UBS AG | $ 1,262,703.83 |

| 1<br>Asset Number | 2<br>Property Address | 3<br>Investor Lender Claims (Amount Invested) | 4<br>Investor Lender - Receiver's Recommendations | 5<br>Institutional Lenders Claims | 6<br>Institutional Lender Claims (Loan Amount) | 7<br>Institutional Lenders Claims (Receiver's Recommendations) | 8<br>Institutional Lenders | 9<br>Total Claims |
|---|---|---|---|---|---|---|---|---|
| 109 | 4750 Indiana | $ 376,097.74 | | $ 812,700.02 | $ 716,639.00 | | UBS AG | $ 1,188,797.76 |
| 110 | 5618 MLK | $ 710,677.80 | | $ 961,173.58 | $ 847,563.00 | | UBS AG | $ 1,671,851.38 |
| 111 | 6558 Vernon | $ 724,177.22 | | $ 929,915.93 | $ 820,000.00 | | UBS AG | $ 1,654,093.15 |
| 112 | 7450 S Luella | $ 265,517.00 | | $ 500,122.39 | $ 441,008.00 | | UBS AG | $ 765,639.39 |
| 113 | 7840 Yates | $ 726,589.00 | | $ 515,751.79 | $ 454,790.00 | | UBS AG | $ 1,242,340.79 |
| 115 | 109 N Laramie | $ 1,322,709.34 | | | | | | $ 1,322,709.34 |
| 117 | 3915 N Kimball | $ 213,592.00 | | | | | | $ 213,592.00 |
| 118 | 400 S Kilbourn | $ 909,622.00 | | | | | | $ 909,622.00 |
| 119 | 4109 N Kimball | $ 188,659.15 | | | | | | $ 188,659.15 |
| 122 | 7616 S Phillips | $ 1,625,000.00 | | | | | | $ 1,625,000.00 |
| 124 | 6801 S East End | $ 2,613,625.62 | | | | | | $ 2,613,625.62 |
| 126 | 5201 W Washington | $ 2,099,000.00 | | | | | | $ 2,099,000.00 |
| 129 | 4944 W Roscoe | $ 55,564.90 | | | | | | $ 55,564.90 |
| 130 | 4511 N Merrimac | $ 312,953.87 | | | | | | $ 312,953.87 |
| 131 | 4108 N Monticello | $ 182,324.50 | | | | | | $ 182,324.50 |
| 135 | 4930 W Cornelia | $ 107,137.35 | | | | | | $ 107,137.35 |
| 140 | 4528 S Michigan | $ 81,683.00 | | | | | | $ 81,683.00 |
| 142 | 5209 W Warwick | $ 162,970.00 | | | | | | $ 162,970.00 |
| 153 | 7200 S Stony Island | $ - | | | | | | $ - |
| 156 | 4351 S Calumet | $ 120,239.25 | | | | | | $ 120,239.25 |
| xx | 5342 N Linder | $ - | | | | | | $ - |
| | | $ 127,617,766.90 | $ 56,628,452.19 | $ 63,098,590.06 | $ 53,248,437.23 | $ 17,743,232.68 | | $ 190,716,356.96 |

# EXHIBIT 2

| 9 Total Claims | 10 Distribution to Claimants | 11 Bank Account Balance 4/8/24 | 12 Distributions and Cash on Hand | 13 Claims Less Distributions and Cash on Hand | 14 Receiver's Recommended Less Distributions and Cash on Hand | 15 Notes |
|---|---|---|---|---|---|---|
| $ 6,663,087.41 | | $ 2,790,546.88 | $ 2,790,546.88 | $ 3,872,540.53 | $ 2,004,525.04 | |
| $ 4,450,590.97 | | $ 2,276,844.56 | $ 2,276,844.56 | $ 2,173,746.41 | $ 2,173,746.41 | |
| $ 4,771,526.67 | | $ 2,814,112.05 | $ 2,814,112.05 | $ 1,957,414.62 | $ 443,423.56 | |
| $ 4,351,773.53 | | $ 1,799,979.57 | $ 1,799,979.57 | $ 2,551,793.96 | $ 1,128,774.10 | Shatar has a total claim of $3,089,649.86 against 5450 Indiana (#4) and 7749 Yates (#5). The principal amount of the loan was $1,800,000, and the Receiver's Recommendation is $1,362,733.34. Each of these amounts have been divided equally among the two properties for purposes of this analysis. |
| $ 4,330,117.93 | | $ 588,143.57 | $ 588,143.57 | $ 3,741,974.36 | $ 2,371,590.30 | Shatar has a total claim of $3,089,649.86 against 5450 Indiana (#4) and 7749 Yates (#5). The principal amount of the loan was $1,800,000, and the Receiver's Recommendation is $1,362,733.34. Each of these amounts have been divided equally among the two properties for purposes of this analysis. |
| $ 2,327,747.91 | | $ 1,375,194.70 | $ 1,375,194.70 | $ 952,553.21 | $ 586,725.97 | |
| $ 2,283,012.07 | | $ 1,502,012.69 | $ 1,502,012.69 | $ 780,999.38 | $ 780,999.38 | |
| $ 3,238,750.00 | | $ 885,870.09 | $ 885,870.09 | $ 2,352,879.91 | $ 1,503,805.85 | |
| $ 5,753,942.96 | $ 1,604,623.94 | $ - | $ 1,604,623.94 | $ 4,149,319.02 | $ 3,476,806.20 | CCF1 consists of 7301 Stewart (171220), 7500 Eggleston (171218), 3030 E 79th (171222) Order approving distribution was entered 11/17/23 (Dkt. 1552) and the distribution occurred 12/18/23. |
| $ 7,406,750.00 | $ 2,970,511.77 | $ - | $ 2,970,511.77 | $ 4,436,238.23 | $ 3,959,879.25 | CCF2 consists of 2909 E 78th (150508), 7549 S Essex (180508), 8047 Manistee (180508) Order approving distribution was entered 11/17/23 (Dkt. 1552) and the distribution occurred 12/18/23. |
| $ 390,956.08 | $ 23,646.53 | $ - | $ 23,646.53 | $ 367,309.55 | $ 367,309.55 | Midland has a total claim of $1,973,393.5 against EB South Chicago 3 LLC properties 2129 W 71st (#45); 6759 S Indiana (#48); 5437 Laflin (#47); 9610 Woodlawn (#46); 8809 Wood; 7304 St Lawrence (#49) and 7760 S Coles (#50). The principal amount of the loan was $1,491,000, which was allocated among these properties in Schedule A to the Loan Agreement. The claim amount has been pro-rated based on those allocations. Order approving distribution was entered 12/28/22 (Dkt. 1364) and the distribution occurred 12/30/22. |
| $ 501,897.84 | | $ 290,132.14 | $ 290,132.14 | $ 211,765.70 | $ 38,264.46 | Midland has a total claim of $1,973,393.5 against EB South Chicago 3 LLC properties 2129 W 71st (#45); 6759 S Indiana (#48); 5437 Laflin (#47); 9610 Woodlawn (#46); 8809 Wood; 7304 St Lawrence (#49) and 7760 S Coles (#50). The principal amount of the loan was $1,491,000, which was allocated among these properties in Schedule A to the Loan Agreement. The claim amount has been pro-rated based on those allocations. |
| $ 1,179,026.45 | | $ 83,813.40 | $ 83,813.40 | $ 1,095,213.05 | $ 1,095,213.05 | Midland has a total claim of $1,973,393.5 against EB South Chicago 3 LLC properties 2129 W 71st (#45); 6759 S Indiana (#48); 5437 Laflin (#47); 9610 Woodlawn (#46); 8809 Wood; 7304 St Lawrence (#49) and 7760 S Coles (#50). The principal amount of the loan was $1,491,000, which was allocated among these properties in Schedule A to the Loan Agreement. The claim amount has been pro-rated based on those allocations. |
| $ 358,185.12 | | $ 104,044.10 | $ 104,044.10 | $ 254,141.02 | $ 254,141.02 | Midland has a total claim of $3,003,129.41 against EB South Chicago 4 LLC properties: 1401 W 109th Place (#51); 310 E 50th Street (#52); 6807 S Indiana Avenue (#53); 8000-02 S Justine Street (#54); 8107-09 S Ellis Avenue (#55); 8209 S Ellis Avenue (#56); and 8214-16 S Ingleside Avenue (#57). The principal amount of the loan was $2,426,250.00, which was allocated among these properties in Schedule A to the Loan Agreement. The claim amount has been pro-rated based on those allocations. |
| $ 1,312,689.52 | | $ 159,447.07 | $ 159,447.07 | $ 1,153,242.45 | $ 1,153,242.45 | Midland has a total claim of $3,003,129.41 against EB South Chicago 4 LLC properties: 1401 W 109th Place (#51); 310 E 50th Street (#52); 6807 S Indiana Avenue (#53); 8000-02 S Justine Street (#54); 8107-09 S Ellis Avenue (#55); 8209 S Ellis Avenue (#56); and 8214-16 S Ingleside Avenue (#57). The principal amount of the loan was $2,426,250.00, which was allocated among these properties in Schedule A to the Loan Agreement. The claim amount has been pro-rated based on those allocations. |

| 9 Total Claims | 10 Distribution to Claimants | 11 Bank Account Balance 4/8/24 | 12 Distributions and Cash on Hand | 13 Claims Less Distributions and Cash on Hand | 14 Receiver's Recommended Less Distributions and Cash on Hand | 15 Notes |
|---|---|---|---|---|---|---|
| $ 940,091.40 | | $ 78,285.64 | $ 78,285.64 | $ 861,805.76 | $ 861,805.76 | Midland has a total claim of $3,003,129.41 against EB South Chicago 4 LLC properties: 1401 W 109th Place (#51); 310 E 50th Street (#52); 6807 S Indiana Avenue (#53); 8000-02 S Justine Street (#54); 8107-09 S Ellis Avenue (#55); 8209 S Ellis Avenue (#56); and 8214-16 S Ingleside Avenue (#57). The principal amount of the loan was $2,426,250.00, which was allocated among these properties in Schedule A to the Loan Agreement. The claim amount has been pro-rated based on those allocations. |
| $ 1,448,599.93 | | $ 227,734.31 | $ 227,734.31 | $ 1,220,865.62 | $ 1,220,865.62 | Midland has a total claim of $3,003,129.41 against EB South Chicago 4 LLC properties: 1401 W 109th Place (#51); 310 E 50th Street (#52); 6807 S Indiana Avenue (#53); 8000-02 S Justine Street (#54); 8107-09 S Ellis Avenue (#55); 8209 S Ellis Avenue (#56); and 8214-16 S Ingleside Avenue (#57). The principal amount of the loan was $2,426,250.00, which was allocated among these properties in Schedule A to the Loan Agreement. The claim amount has been pro-rated based on those allocations. |
| $ 1,352,658.90 | | $ 189,656.73 | $ 189,656.73 | $ 1,163,002.17 | $ 1,163,002.17 | Midland has a total claim of $3,003,129.41 against EB South Chicago 4 LLC properties: 1401 W 109th Place (#51); 310 E 50th Street (#52); 6807 S Indiana Avenue (#53); 8000-02 S Justine Street (#54); 8107-09 S Ellis Avenue (#55); 8209 S Ellis Avenue (#56); and 8214-16 S Ingleside Avenue (#57). The principal amount of the loan was $2,426,250.00, which was allocated among these properties in Schedule A to the Loan Agreement. The claim amount has been pro-rated based on those allocations. |
| $ 1,153,489.19 | | $ 453,048.42 | $ 453,048.42 | $ 700,440.77 | $ 358,073.34 | |
| $ 830,729.00 | | $ 327,725.05 | $ 327,725.05 | $ 503,003.95 | $ 189,186.46 | |
| $ 1,380,295.43 | | $ 887,557.39 | $ 887,557.39 | $ 492,738.04 | $ 108,381.46 | |
| $ 2,111,617.97 | | $ 474,146.73 | $ 474,146.73 | $ 1,637,471.24 | $ 1,036,293.76 | |
| $ 2,672,862.77 | | $ 1,704,469.30 | $ 1,704,469.30 | $ 968,393.47 | $ 270,263.52 | |
| $ 10,326,084.48 | | $ 6,484,346.70 | $ 6,484,346.70 | $ 3,841,737.78 | $ 2,236,094.89 | |
| $ 7,069,355.98 | | $ 5,133,196.24 | $ 5,133,196.24 | $ 1,936,159.74 | $ 1,936,159.74 | |
| $ 1,526,037.70 | $ 1,328,035.76 | $ - | $ 1,328,035.76 | $ 198,001.94 | $ 198,001.94 | |
| $ 1,400,491.73 | $ 1,043,137.47 | $ - | $ 1,043,137.47 | $ 357,354.26 | $ 357,354.26 | |
| $ 2,884,255.08 | | $ 1,261,239.91 | $ 1,261,239.91 | $ 1,623,015.17 | $ 1,348,327.28 | |
| $ 5,594,551.26 | | $ 2,272,071.62 | $ 2,272,071.62 | $ 3,322,479.64 | $ 3,322,479.64 | |
| $ 3,237,034.83 | | $ 850,798.10 | $ 850,798.10 | $ 2,386,236.73 | $ 2,386,236.73 | |
| $ 2,846,475.96 | | $ 511,110.78 | $ 511,110.78 | $ 2,335,365.18 | $ 2,335,365.18 | |
| $ 2,249,413.82 | | $ 612,887.23 | $ 612,887.23 | $ 1,636,526.59 | $ 1,029,690.06 | |
| $ 1,876,049.69 | | $ 1,952,779.44 | $ 1,952,779.44 | $ (76,729.75) | $ (1,907,029.50) | |
| $ 2,565,833.71 | | $ 1,083,686.09 | $ 1,083,686.09 | $ 1,482,147.62 | $ 1,482,147.62 | |

| | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|
| | Total Claims | Distribution to Claimants | Bank Account Balance 4/8/24 | Distributions and Cash on Hand | Claims Less Distributions and Cash on Hand | Receiver's Recommended Less Distributions and Cash on Hand | Notes |
| | $ 3,358,284.38 | | $ 961,596.75 | $ 961,596.75 | $ 2,396,687.63 | $ 1,458,343.41 | BC57 has a total claim of $6,439,502.67 against five properties: 3074 Cheltenham Place (#74); 7625-33 S East End Avenue (#75); 7635-43 S East End Avenue (#76); 7750-58 S Muskegon Avenue (#77); and 7201 S Constance Avenue (#78). The principal balance of the BC57 loan is $5,328,433.43, and the Receiver's Recommendation is $4,305,025.73. Each of these amounts have been divided equally among the five properties for purposes of this analysis. |
| | $ 2,604,107.29 | | $ 1,229,956.31 | $ 1,229,956.31 | $ 1,374,150.98 | $ 532,086.28 | BC57 has a total claim of $6,439,502.67 against five properties: 3074 Cheltenham Place (#74); 7625-33 S East End Avenue (#75); 7635-43 S East End Avenue (#76); 7750-58 S Muskegon Avenue (#77); and 7201 S Constance Avenue (#78). The principal balance of the BC57 loan is $5,328,433.43, and the Receiver's Recommendation is $4,305,025.73. Each of these amounts have been divided equally among the five properties for purposes of this analysis. |
| | $ 2,771,921.29 | | $ 1,025,396.16 | $ 1,025,396.16 | $ 1,746,525.13 | $ 858,653.56 | BC57 has a total claim of $6,439,502.67 against five properties: 3074 Cheltenham Place (#74); 7625-33 S East End Avenue (#75); 7635-43 S East End Avenue (#76); 7750-58 S Muskegon Avenue (#77); and 7201 S Constance Avenue (#78). The principal balance of the BC57 loan is $5,328,433.43, and the Receiver's Recommendation is $4,305,025.73. Each of these amounts have been divided equally among the five properties for purposes of this analysis. |
| | $ 3,417,774.36 | | $ 348,236.97 | $ 348,236.97 | $ 3,069,537.39 | $ 1,789,475.85 | BC57 has a total claim of $6,439,502.67 against five properties: 3074 Cheltenham Place (#74); 7625-33 S East End Avenue (#75); 7635-43 S East End Avenue (#76); 7750-58 S Muskegon Avenue (#77); and 7201 S Constance Avenue (#78). The principal balance of the BC57 loan is $5,328,433.43, and the Receiver's Recommendation is $4,305,025.73. Each of these amounts have been divided equally among the five properties for purposes of this analysis. |
| | $ 3,697,746.42 | | $ 737,835.11 | $ 737,835.11 | $ 2,959,911.31 | $ 1,838,249.23 | BC57 has a total claim of $6,439,502.67 against five properties: 3074 Cheltenham Place (#74); 7625-33 S East End Avenue (#75); 7635-43 S East End Avenue (#76); 7750-58 S Muskegon Avenue (#77); and 7201 S Constance Avenue (#78). The principal balance of the BC57 loan is $5,328,433.43, and the Receiver's Recommendation is $4,305,025.73. Each of these amounts have been divided equally among the five properties for purposes of this analysis. |
| | $ 7,528,807.29 | | $ 355,785.28 | $ 355,785.28 | $ 7,173,022.01 | $ 3,224,954.12 | |
| | $ 1,373,111.55 | | $ 330,490.45 | $ 330,490.45 | $ 1,042,621.10 | $ 1,042,621.10 | Liberty has a total claim of $10,638,796.40 against 17 properties: 2736-44 W 64th Street (#80); 4317-19 S Michigan Avenue (#81); 6355-59 S Talman Avenue (#82); 6356 S California Avenue (#83); 7051 S Bennett Avenue (#84); 7201-07 S Dorchester Avenue (#85); 7442-48 S Calumet Avenue (#86); 7508 S Essex Avenue (#87); 7546-48 S Saginaw Avenue (#88); 7600-10 S Kingston Avenue (#89); 7656-58 S Kingston Avenue (#90); 7701-03 S Essex Avenue (#91); 7748-52 S Essex Avenue (#92); 7953-59 S Marquette Road (#93); 816-20 E Marquette Road (#94); 8201 S Kingston Avenue (#95); and 8326-58 S Ellis Avenue (#96). The principal amount of the loan was $9,200,000. Both of these amounts have been divided equally among the 17 properties for purposes of this analysis. |
| | $ 1,614,811.55 | | $ 832,343.55 | $ 832,343.55 | $ 782,468.00 | $ 782,468.00 | Liberty has a total claim of $10,638,796.40 against 17 properties: 2736-44 W 64th Street (#80); 4317-19 S Michigan Avenue (#81); 6355-59 S Talman Avenue (#82); 6356 S California Avenue (#83); 7051 S Bennett Avenue (#84); 7201-07 S Dorchester Avenue (#85); 7442-48 S Calumet Avenue (#86); 7508 S Essex Avenue (#87); 7546-48 S Saginaw Avenue (#88); 7600-10 S Kingston Avenue (#89); 7656-58 S Kingston Avenue (#90); 7701-03 S Essex Avenue (#91); 7748-52 S Essex Avenue (#92); 7953-59 S Marquette Road (#93); 816-20 E Marquette Road (#94); 8201 S Kingston Avenue (#95); and 8326-58 S Ellis Avenue (#96). The principal amount of the loan was $9,200,000. Both of these amounts have been divided equally among the 17 properties for purposes of this analysis. |
| | $ 1,752,801.55 | | $ 453,803.75 | $ 453,803.75 | $ 1,298,997.80 | $ 1,298,997.80 | Liberty has a total claim of $10,638,796.40 against 17 properties: 2736-44 W 64th Street (#80); 4317-19 S Michigan Avenue (#81); 6355-59 S Talman Avenue (#82); 6356 S California Avenue (#83); 7051 S Bennett Avenue (#84); 7201-07 S Dorchester Avenue (#85); 7442-48 S Calumet Avenue (#86); 7508 S Essex Avenue (#87); 7546-48 S Saginaw Avenue (#88); 7600-10 S Kingston Avenue (#89); 7656-58 S Kingston Avenue (#90); 7701-03 S Essex Avenue (#91); 7748-52 S Essex Avenue (#92); 7953-59 S Marquette Road (#93); 816-20 E Marquette Road (#94); 8201 S Kingston Avenue (#95); and 8326-58 S Ellis Avenue (#96). The principal amount of the loan was $9,200,000. Both of these amounts have been divided equally among the 17 properties for purposes of this analysis. |

| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|
| Total Claims | Distribution to Claimants | Bank Account Balance 4/8/24 | Distributions and Cash on Hand | Claims Less Distributions and Cash on Hand | Receiver's Recommended Less Distributions and Cash on Hand | Notes |
| $ 1,531,980.88 | | $ 266,024.37 | $ 266,024.37 | $ 1,265,956.51 | $ 1,265,956.51 | Liberty has a total claim of ($10,638,796.40 against 17 properties: 2736-44 W 64th Street (#80); 4317-19 S Michigan Avenue (#81); 6355-59 S Talman Avenue (#82); 6356 S California Avenue (#83); 7051 S Bennett Avenue (#84); 7201-07 S Dorchester Avenue (#85); 7442-48 S Calumet Avenue (#86); 7508 S Essex Avenue (#87); 7546-48 S Saginaw Avenue (#88); 7600-10 S Kingston Avenue (#89); 7656-58 S Kingston Avenue (#90); 7701-03 S Essex Avenue (#91); 7748-52 S Essex Avenue (#92); 7953-59 S Marquette Road (#93); 816-20 E Marquette Road (#94); 8201 S Kingston Avenue (#95); and 8326-58 S Ellis Avenue (#96). The principal amount of the loan was $9,200,000. Both of these amounts have been divided equally among the 17 properties for purposes of this analysis. |
| $ 1,903,091.55 | | $ 412,217.35 | $ 412,217.35 | $ 1,490,874.20 | $ 1,490,874.20 | Liberty has a total claim of ($10,638,796.40 against 17 properties: 2736-44 W 64th Street (#80); 4317-19 S Michigan Avenue (#81); 6355-59 S Talman Avenue (#82); 6356 S California Avenue (#83); 7051 S Bennett Avenue (#84); 7201-07 S Dorchester Avenue (#85); 7442-48 S Calumet Avenue (#86); 7508 S Essex Avenue (#87); 7546-48 S Saginaw Avenue (#88); 7600-10 S Kingston Avenue (#89); 7656-58 S Kingston Avenue (#90); 7701-03 S Essex Avenue (#91); 7748-52 S Essex Avenue (#92); 7953-59 S Marquette Road (#93); 816-20 E Marquette Road (#94); 8201 S Kingston Avenue (#95); and 8326-58 S Ellis Avenue (#96). The principal amount of the loan was $9,200,000. Both of these amounts have been divided equally among the 17 properties for purposes of this analysis. |
| $ 1,826,635.55 | | $ 344,166.23 | $ 344,166.23 | $ 1,482,469.32 | $ 1,482,469.32 | Liberty has a total claim of ($10,638,796.40 against 17 properties: 2736-44 W 64th Street (#80); 4317-19 S Michigan Avenue (#81); 6355-59 S Talman Avenue (#82); 6356 S California Avenue (#83); 7051 S Bennett Avenue (#84); 7201-07 S Dorchester Avenue (#85); 7442-48 S Calumet Avenue (#86); 7508 S Essex Avenue (#87); 7546-48 S Saginaw Avenue (#88); 7600-10 S Kingston Avenue (#89); 7656-58 S Kingston Avenue (#90); 7701-03 S Essex Avenue (#91); 7748-52 S Essex Avenue (#92); 7953-59 S Marquette Road (#93); 816-20 E Marquette Road (#94); 8201 S Kingston Avenue (#95); and 8326-58 S Ellis Avenue (#96). The principal amount of the loan was $9,200,000. Both of these amounts have been divided equally among the 17 properties for purposes of this analysis. |
| $ 1,716,761.55 | | $ 537,712.92 | $ 537,712.92 | $ 1,179,048.63 | $ 1,179,048.63 | Liberty has a total claim of ($10,638,796.40 against 17 properties: 2736-44 W 64th Street (#80); 4317-19 S Michigan Avenue (#81); 6355-59 S Talman Avenue (#82); 6356 S California Avenue (#83); 7051 S Bennett Avenue (#84); 7201-07 S Dorchester Avenue (#85); 7442-48 S Calumet Avenue (#86); 7508 S Essex Avenue (#87); 7546-48 S Saginaw Avenue (#88); 7600-10 S Kingston Avenue (#89); 7656-58 S Kingston Avenue (#90); 7701-03 S Essex Avenue (#91); 7748-52 S Essex Avenue (#92); 7953-59 S Marquette Road (#93); 816-20 E Marquette Road (#94); 8201 S Kingston Avenue (#95); and 8326-58 S Ellis Avenue (#96). The principal amount of the loan was $9,200,000. Both of these amounts have been divided equally among the 17 properties for purposes of this analysis. |
| $ 2,087,268.55 | | $ 704,592.11 | $ 704,592.11 | $ 1,382,676.44 | $ 1,382,676.44 | Liberty has a total claim of ($10,638,796.40 against 17 properties: 2736-44 W 64th Street (#80); 4317-19 S Michigan Avenue (#81); 6355-59 S Talman Avenue (#82); 6356 S California Avenue (#83); 7051 S Bennett Avenue (#84); 7201-07 S Dorchester Avenue (#85); 7442-48 S Calumet Avenue (#86); 7508 S Essex Avenue (#87); 7546-48 S Saginaw Avenue (#88); 7600-10 S Kingston Avenue (#89); 7656-58 S Kingston Avenue (#90); 7701-03 S Essex Avenue (#91); 7748-52 S Essex Avenue (#92); 7953-59 S Marquette Road (#93); 816-20 E Marquette Road (#94); 8201 S Kingston Avenue (#95); and 8326-58 S Ellis Avenue (#96). The principal amount of the loan was $9,200,000. Both of these amounts have been divided equally among the 17 properties for purposes of this analysis. |
| $ 2,281,203.88 | | $ 535,645.46 | $ 535,645.46 | $ 1,745,558.42 | $ 1,745,558.42 | Liberty has a total claim of ($10,638,796.40 against 17 properties: 2736-44 W 64th Street (#80); 4317-19 S Michigan Avenue (#81); 6355-59 S Talman Avenue (#82); 6356 S California Avenue (#83); 7051 S Bennett Avenue (#84); 7201-07 S Dorchester Avenue (#85); 7442-48 S Calumet Avenue (#86); 7508 S Essex Avenue (#87); 7546-48 S Saginaw Avenue (#88); 7600-10 S Kingston Avenue (#89); 7656-58 S Kingston Avenue (#90); 7701-03 S Essex Avenue (#91); 7748-52 S Essex Avenue (#92); 7953-59 S Marquette Road (#93); 816-20 E Marquette Road (#94); 8201 S Kingston Avenue (#95); and 8326-58 S Ellis Avenue (#96). The principal amount of the loan was $9,200,000. Both of these amounts have been divided equally among the 17 properties for purposes of this analysis. |

| 9 Total Claims | 10 Distribution to Claimants | 11 Bank Account Balance 4/8/24 | 12 Distributions and Cash on Hand | 13 Claims Less Distributions and Cash on Hand | 14 Receiver's Recommended Less Distributions and Cash on Hand | 15 Notes |
|---|---|---|---|---|---|---|
| $ 3,981,520.95 | | $ 1,361,795.23 | $ 1,361,795.23 | $ 2,619,725.72 | $ 2,619,725.72 | Liberty has a total claim of ($10,638,796.40 against 17 properties: 2736-44 W 64th Street (#80); 4317-19 S Michigan Avenue (#81); 6355-59 S Talman Avenue (#82); 6356 S California Avenue (#83); 7051 S Bennett Avenue (#84); 7201-07 S Dorchester Avenue (#85); 7442-48 S Calumet Avenue (#86); 7508 S Essex Avenue (#87); 7546-48 S Saginaw Avenue (#88); 7600-10 S Kingston Avenue (#89); 7656-58 S Kingston Avenue (#90); 7701-03 S Essex Avenue (#91); 7748-52 S Essex Avenue (#92); 7953-59 S Marquette Road (#93); 816-20 E Marquette Road (#94); 8201 S Kingston Avenue (#95); and 8326-58 S Ellis Avenue (#96). The principal amount of the loan was $9,200,000. Both of these amounts have been divided equally among the 17 properties for purposes of this analysis. |
| $ 1,331,006.60 | | $ 87,167.62 | $ 87,167.62 | $ 1,243,838.98 | $ 1,243,838.98 | Liberty has a total claim of ($10,638,796.40 against 17 properties: 2736-44 W 64th Street (#80); 4317-19 S Michigan Avenue (#81); 6355-59 S Talman Avenue (#82); 6356 S California Avenue (#83); 7051 S Bennett Avenue (#84); 7201-07 S Dorchester Avenue (#85); 7442-48 S Calumet Avenue (#86); 7508 S Essex Avenue (#87); 7546-48 S Saginaw Avenue (#88); 7600-10 S Kingston Avenue (#89); 7656-58 S Kingston Avenue (#90); 7701-03 S Essex Avenue (#91); 7748-52 S Essex Avenue (#92); 7953-59 S Marquette Road (#93); 816-20 E Marquette Road (#94); 8201 S Kingston Avenue (#95); and 8326-58 S Ellis Avenue (#96). The principal amount of the loan was $9,200,000. Both of these amounts have been divided equally among the 17 properties for purposes of this analysis. |
| $ 1,971,945.55 | | $ 740,254.66 | $ 740,254.66 | $ 1,231,690.89 | $ 1,231,690.89 | Liberty has a total claim of ($10,638,796.40 against 17 properties: 2736-44 W 64th Street (#80); 4317-19 S Michigan Avenue (#81); 6355-59 S Talman Avenue (#82); 6356 S California Avenue (#83); 7051 S Bennett Avenue (#84); 7201-07 S Dorchester Avenue (#85); 7442-48 S Calumet Avenue (#86); 7508 S Essex Avenue (#87); 7546-48 S Saginaw Avenue (#88); 7600-10 S Kingston Avenue (#89); 7656-58 S Kingston Avenue (#90); 7701-03 S Essex Avenue (#91); 7748-52 S Essex Avenue (#92); 7953-59 S Marquette Road (#93); 816-20 E Marquette Road (#94); 8201 S Kingston Avenue (#95); and 8326-58 S Ellis Avenue (#96). The principal amount of the loan was $9,200,000. Both of these amounts have been divided equally among the 17 properties for purposes of this analysis. |
| $ 3,313,689.25 | | $ 1,199,179.58 | $ 1,199,179.58 | $ 2,114,509.67 | $ 2,114,509.67 | Liberty has a total claim of ($10,638,796.40 against 17 properties: 2736-44 W 64th Street (#80); 4317-19 S Michigan Avenue (#81); 6355-59 S Talman Avenue (#82); 6356 S California Avenue (#83); 7051 S Bennett Avenue (#84); 7201-07 S Dorchester Avenue (#85); 7442-48 S Calumet Avenue (#86); 7508 S Essex Avenue (#87); 7546-48 S Saginaw Avenue (#88); 7600-10 S Kingston Avenue (#89); 7656-58 S Kingston Avenue (#90); 7701-03 S Essex Avenue (#91); 7748-52 S Essex Avenue (#92); 7953-59 S Marquette Road (#93); 816-20 E Marquette Road (#94); 8201 S Kingston Avenue (#95); and 8326-58 S Ellis Avenue (#96). The principal amount of the loan was $9,200,000. Both of these amounts have been divided equally among the 17 properties for purposes of this analysis. |
| $ 1,639,966.55 | | $ 207,822.95 | $ 207,822.95 | $ 1,432,143.60 | $ 1,432,143.60 | Liberty has a total claim of ($10,638,796.40 against 17 properties: 2736-44 W 64th Street (#80); 4317-19 S Michigan Avenue (#81); 6355-59 S Talman Avenue (#82); 6356 S California Avenue (#83); 7051 S Bennett Avenue (#84); 7201-07 S Dorchester Avenue (#85); 7442-48 S Calumet Avenue (#86); 7508 S Essex Avenue (#87); 7546-48 S Saginaw Avenue (#88); 7600-10 S Kingston Avenue (#89); 7656-58 S Kingston Avenue (#90); 7701-03 S Essex Avenue (#91); 7748-52 S Essex Avenue (#92); 7953-59 S Marquette Road (#93); 816-20 E Marquette Road (#94); 8201 S Kingston Avenue (#95); and 8326-58 S Ellis Avenue (#96). The principal amount of the loan was $9,200,000. Both of these amounts have been divided equally among the 17 properties for purposes of this analysis. |
| $ 1,705,811.55 | | $ 842,528.99 | $ 842,528.99 | $ 863,282.56 | $ 863,282.56 | Liberty has a total claim of ($10,638,796.40 against 17 properties: 2736-44 W 64th Street (#80); 4317-19 S Michigan Avenue (#81); 6355-59 S Talman Avenue (#82); 6356 S California Avenue (#83); 7051 S Bennett Avenue (#84); 7201-07 S Dorchester Avenue (#85); 7442-48 S Calumet Avenue (#86); 7508 S Essex Avenue (#87); 7546-48 S Saginaw Avenue (#88); 7600-10 S Kingston Avenue (#89); 7656-58 S Kingston Avenue (#90); 7701-03 S Essex Avenue (#91); 7748-52 S Essex Avenue (#92); 7953-59 S Marquette Road (#93); 816-20 E Marquette Road (#94); 8201 S Kingston Avenue (#95); and 8326-58 S Ellis Avenue (#96). The principal amount of the loan was $9,200,000. Both of these amounts have been divided equally among the 17 properties for purposes of this analysis. |

| 9 Total Claims | 10 Distribution to Claimants | 11 Bank Account Balance 4/8/24 | 12 Distributions and Cash on Hand | 13 Claims Less Distributions and Cash on Hand | 14 Receiver's Recommended Less Distributions and Cash on Hand | 15 Notes |
|---|---|---|---|---|---|---|
| $ 1,440,811.55 | | $ 262,828.17 | $ 262,828.17 | $ 1,177,983.38 | $ 1,177,983.38 | Liberty has a total claim of $10,638,796.40 against 17 properties: 2736-44 W 64th Street (#80); 4317-19 S Michigan Avenue (#81); 6355-59 S Talman Avenue (#82); 6356 S California Avenue (#83); 7051 S Bennett Avenue (#84); 7201-07 S Dorchester Avenue (#85); 7442-48 S Calumet Avenue (#86); 7508 S Essex Avenue (#87); 7546-48 S Saginaw Avenue (#88); 7600-10 S Kingston Avenue (#89); 7656-58 S Kingston Avenue (#90); 7701-03 S Essex Avenue (#91); 7748-52 S Essex Avenue (#92); 7953-59 S Marquette Road (#93); 816-20 E Marquette Road #94); 8201 S Kingston Avenue (#95); and 8326-58 S Ellis Avenue (#96). The principal amount of the loan was $9,200,000. Both of these amounts have been divided equally among the 17 properties for purposes of this analysis. |
| $ 4,636,598.09 | | $ 1,318,210.59 | $ 1,318,210.59 | $ 3,318,387.50 | $ 3,318,387.50 | Liberty has a total claim of $10,638,796.40 against 17 properties: 2736-44 W 64th Street (#80); 4317-19 S Michigan Avenue (#81); 6355-59 S Talman Avenue (#82); 6356 S California Avenue (#83); 7051 S Bennett Avenue (#84); 7201-07 S Dorchester Avenue (#85); 7442-48 S Calumet Avenue (#86); 7508 S Essex Avenue (#87); 7546-48 S Saginaw Avenue (#88); 7600-10 S Kingston Avenue (#89); 7656-58 S Kingston Avenue (#90); 7701-03 S Essex Avenue (#91); 7748-52 S Essex Avenue (#92); 7953-59 S Marquette Road (#93); 816-20 E Marquette Road #94); 8201 S Kingston Avenue (#95); and 8326-58 S Ellis Avenue (#96). The principal amount of the loan was $9,200,000. Both of these amounts have been divided equally among the 17 properties for purposes of this analysis. |
| $ 5,055,850.00 | | $ 1,735,591.81 | $ 1,735,591.81 | $ 3,320,258.19 | $ 2,585,305.92 | |
| $ 1,915,706.50 | | $ 1,495,858.52 | $ 1,495,858.52 | $ 419,847.98 | $ (622,411.32) | |
| $ 2,895,494.00 | $ 604,616.33 | $ - | $ 604,616.33 | $ 2,290,877.67 | $ 1,765,804.39 | Listed as separate closings for: 7927 S Essex; 7935 S Essex, 7937-39 S Essex, 7943-45 S Essex, 7947-49 S Essex on two closing dates: 171108 and 171204 Order approving distribution was entered 11/17/23 (Dkt. 1552) and the distribution occurred 12/18/23. |
| $ 795,158.09 | $ 382,000.00 | $ 15.10 | $ 382,015.10 | $ 413,142.99 | $ 413,142.99 | UBS has a total claim of $4,649,579.63 against 7 properties: 1422 E 68th (#107) (settled); 2800-06 E 81st Street (#108); 4750-52 S Indiana Avenue (#109); 5618-20 S Martin Luther King Drive (#110); 6558 S Vernon Avenue (#111); 7450 S Luella Avenue (#112); and 7840-42 S Yates Avenue (#113). The principal amount of the loan was $4,100,000, which was allocated among these properties in Schedule VI of the Loan Agreement. The claim amount has been pro-rated based on those allocations. |
| $ 1,262,703.83 | | $ 442,164.43 | $ 442,164.43 | $ 820,539.40 | $ 820,539.40 | UBS has a total claim of $4,649,579.63 against 7 properties: 1422 E 68th (#107) (settled); 2800-06 E 81st Street (#108); 4750-52 S Indiana Avenue (#109); 5618-20 S Martin Luther King Drive (#110); 6558 S Vernon Avenue (#111); 7450 S Luella Avenue (#112); and 7840-42 S Yates Avenue (#113). The principal amount of the loan was $4,100,000, which was allocated among these properties in Schedule VI of the Loan Agreement. The claim amount has been pro-rated based on those allocations. |
| $ 1,188,797.76 | | $ 753,155.07 | $ 753,155.07 | $ 435,642.69 | $ 435,642.69 | UBS has a total claim of $4,649,579.63 against 7 properties: 1422 E 68th (#107) (settled); 2800-06 E 81st Street (#108); 4750-52 S Indiana Avenue (#109); 5618-20 S Martin Luther King Drive (#110); 6558 S Vernon Avenue (#111); 7450 S Luella Avenue (#112); and 7840-42 S Yates Avenue (#113). The principal amount of the loan was $4,100,000, which was allocated among these properties in Schedule VI of the Loan Agreement. The claim amount has been pro-rated based on those allocations. |
| $ 1,671,851.38 | | $ 615,899.25 | $ 615,899.25 | $ 1,055,952.13 | $ 1,055,952.13 | UBS has a total claim of $4,649,579.63 against 7 properties: 1422 E 68th (#107) (settled); 2800-06 E 81st Street (#108); 4750-52 S Indiana Avenue (#109); 5618-20 S Martin Luther King Drive (#110); 6558 S Vernon Avenue (#111); 7450 S Luella Avenue (#112); and 7840-42 S Yates Avenue (#113). The principal amount of the loan was $4,100,000, which was allocated among these properties in Schedule VI of the Loan Agreement. The claim amount has been pro-rated based on those allocations. |

| 9 Total Claims | 10 Distribution to Claimants | 11 Bank Account Balance 4/8/24 | 12 Distributions and Cash on Hand | 13 Claims Less Distributions and Cash on Hand | 14 Receiver's Recommended Less Distributions and Cash on Hand | 15 Notes |
|---|---|---|---|---|---|---|
| $ 1,654,093.15 | | $ 514,026.85 | $ 514,026.85 | $ 1,140,066.30 | $ 1,140,066.30 | UBS has a total claim of $4,649,579.63 against 7 properties: 1422 E 68th (#107) (settled); 2800-06 E 81st Street (#108); 4750-52 S Indiana Avenue (#109); 5618-20 S Martin Luther King Drive (#110); 6558 S Vernon Avenue (#111); 7450 S Luella Avenue (#112); and 7840-42 S Yates Avenue (#113).  The principal amount of the loan was $4,100,000, which was allocated among these properties in Schedule VI of the Loan Agreement.  The claim amount has been pro-rated based on those allocations. |
| $ 765,639.39 | | $ 191,323.06 | $ 191,323.06 | $ 574,316.33 | $ 574,316.33 | UBS has a total claim of $4,649,579.63 against 7 properties: 1422 E 68th (#107) (settled); 2800-06 E 81st Street (#108); 4750-52 S Indiana Avenue (#109); 5618-20 S Martin Luther King Drive (#110); 6558 S Vernon Avenue (#111); 7450 S Luella Avenue (#112); and 7840-42 S Yates Avenue (#113).  The principal amount of the loan was $4,100,000, which was allocated among these properties in Schedule VI of the Loan Agreement.  The claim amount has been pro-rated based on those allocations. |
| $ 1,242,340.79 | | $ 357,758.71 | $ 357,758.71 | $ 884,582.08 | $ 884,582.08 | UBS has a total claim of $4,649,579.63 against 7 properties: 1422 E 68th (#107) (settled); 2800-06 E 81st Street (#108); 4750-52 S Indiana Avenue (#109); 5618-20 S Martin Luther King Drive (#110); 6558 S Vernon Avenue (#111); 7450 S Luella Avenue (#112); and 7840-42 S Yates Avenue (#113).  The principal amount of the loan was $4,100,000, which was allocated among these properties in Schedule VI of the Loan Agreement.  The claim amount has been pro-rated based on those allocations. |
| $ 1,322,709.34 | | | $ - | $ 1,322,709.34 | $ 1,322,709.34 | |
| $ 213,592.00 | | | $ - | $ 213,592.00 | $ 213,592.00 | |
| $ 909,622.00 | | | $ - | $ 909,622.00 | $ 909,622.00 | |
| $ 188,659.15 | | | $ - | $ 188,659.15 | $ 188,659.15 | |
| $ 1,625,000.00 | | | $ - | $ 1,625,000.00 | $ 1,625,000.00 | |
| $ 2,613,625.62 | | | $ - | $ 2,613,625.62 | $ 2,613,625.62 | |
| $ 2,099,000.00 | | | $ - | $ 2,099,000.00 | $ 2,099,000.00 | |
| $ 55,564.90 | | | $ - | $ 55,564.90 | $ 55,564.90 | |
| $ 312,953.87 | | | $ - | $ 312,953.87 | $ 312,953.87 | |
| $ 182,324.50 | | | $ - | $ 182,324.50 | $ 182,324.50 | |
| $ 107,137.35 | | | $ - | $ 107,137.35 | $ 107,137.35 | |
| $ 81,683.00 | | | $ - | $ 81,683.00 | $ 81,683.00 | |
| $ 162,970.00 | | | $ - | $ 162,970.00 | $ 162,970.00 | |
| $ - | | | $ - | $ - | $ - | |
| $ 120,239.25 | | | $ - | $ 120,239.25 | $ 120,239.25 | |
| $ - | | | $ - | $ - | $ - | |
| $ 190,716,356.96 | $ 7,956,571.80 | $ 60,376,263.86 | $ 68,332,835.66 | $ 122,383,521.30 | $ 95,693,163.61 | |

# EXHIBIT 3

Notes regarding Columns in Exhibits 1-2:

1.      Column 1 shows the unique identifier assigned to the properties in *SEC v. EquityBuild, et al.*, Case No. 18-cv-5587 (N.D. Ill.).

2.      Column 2 shows the address of the EquityBuild liquidated asset.

3.      Column 3 contains the amount the investor lenders indicated they invested in the property in their Proof of Claim submission in 2019.  For those properties for which the Receiver has submitted his recommendations, however, only those claims deemed to be affiliated with the property at issue (*i.e.*, not rolled to a different property or fund) are included.

4.      For the properties for which the Receiver has submitted his recommendations, Column 3 contains the aggregate amount the Receiver determined are valid secured or unsecured claims affiliated with the property at issue (*i.e.*, not rolled to a different property or fund). For all other properties, Column 3 contains the amount the investor lenders indicated they invested in the property in their Proof of Claim submission.

5.      Column 4 is the aggregate amount the Receiver recommended as the maximum distributions on the investor lender claims submitted against the property.

6.      Column 5 shows the total amount of the claims submitted by the institutional lenders in 2019.  Because several of the institutional lender claims relate to loans secured by multiple properties, the claim amount has been allocated among the properties.  To the extent the loan documentation allocated the loan among the properties securing it, the claim amount was allocated pro-rata accordingly.  To the extent such allocations were not available, the loan amount was divided equally among the properties.

7.      Column 6 shows the principal amount of the institutional lender loan, either allocated in accordance with the loan documentation, or divided equally among the properties where such an allocation was not available.

8.      Column 7 shows the amount the Receiver recommended as the maximum distributions on the institutional lender claims, either allocated pro-rata among the properties securing the loan in accordance with the loan documentation, or divided equally among the properties where such an allocation was not available.

9.      Column 8 identifies the institutional lender asserting an interest in the property.

10.     Column 9 is the sum of Columns 3 and 5.

11.     Column 10 shows the distributions that have been made to claimants to date.

12.     Column 11 shows the balance in the segregated account held for the liquidated asset as of the date indicated.

13.  Column 12 is the sum of Columns 10 and 11.

14.  Column 13 is the amount remaining after deducting the distributions and cash on hand (Column 12) from the total claims (Column 9).

15.  For the properties for which recommendations have been made, Column 14 is the amount remaining after deducting the distributions and cash on hand (Column 12) from the Receiver's recommended maximum distributions to investor lenders (Column 4) and Institutional Lenders (Column 7).  For all other properties, the amount in Column 14 is the same as the amount in Column 13.

16.  Column 15 contains property specific notes.

# Exhibit E

Page 1

```
 1    STATE OF ILLINOIS   )
                          )  ss:
 2    COUNTY OF C O O K   )
 3          IN THE CIRCUIT COURT OF COOK COUNTY
               COUNTY DEPARTMENT - LAW DIVISION
 4
      KEVIN B. DUFF, RECEIVER FOR    )
 5    THE ESTATE OF EQUITYBUILD,     )
      INC., et al.,                  )
 6                                   )
                    Plaintiff,       ) No. 2020 L 008843
 7                                   )
              -vs-                   )
 8                                   )
      ROCK FUSCO & CONNELLY, LLC,    )
 9    IOANA SALAJANU and BREGMAN,    )
      BERBERT, SCHWARTZ & GILDAY,    )
10    LLC,                           )
                                     )
11                  Defendants.      )
12         Record of proceedings before the Honorable
13    DANIEL J. KUBASIAK, Judge of the Circuit Court of
14    Cook County, Illinois, commencing at 8:45 a.m., on
15    the 29th day of August, 2024 upon the trial of the
16    above entitled case.
17
18
19
20
21
22
23
24
```

1  A P P E A R A N C E S :
2  SPELLMIRE BRUCK LLP by
   MR. MICHAEL C. BRUCK
3  MR. TIMOTHY J. McINERNEY,
   One East Wacker Drive
4  Suite 2350
   Chicago, Illinois 60601
5  mcb@spellmirebruck.com
   tjm@spellmirebruck.com
6
     on behalf of the Plaintiffs;
7
   JOHNSON & BELL, LTD., by
8  MR. RAMSES JALAPOUR,
   33 West Monroe Street
9  Suite 2700
   Chicago, Illinois 60603
10 (312) 372-0770
   jalalpourr@jbltd.com
11
     on behalf of the Defendants;
12
13 WILSON ELSER MOSKOWITZ EDELMAN & DICKER by
   MR. ROBERT F. MERLO,
14 55 West Monroe Street
   Suite 3800
15 Chicago, Illinois 60603
   (312) 704-0550
16 robert.merlo@wilsonelser.com
17   on behalf of the Defendants;
18
   ALSO PRESENT:
19   Mr. Michael Connelly.
20
21
22
23
24

1    THE COURT: So, Mr. McInerney is here, Mr. Bruck
2  is here, Mr. Merlo is here, Mr. Jalalpour is here.
3  Once again, I don't recognize the one gentleman on
4  the bottom screen. Is he with either party?
5    MR. BRUCK: Judge, that's Mike Connelly. He is
6  another attorney for Rock Fusco.
7    THE COURT: Okay. That's fine. All right.
8  Looking at the last order, I thought what we were
9  going to talk about whether or not this matter is
10 going to be referred for a pre-trial settlement
11 conference this morning.
12   Mr. Bruck or Mr. McInerney, is there
13 something else that we're discussing?
14   MR. BRUCK: I think that's is mainly it, Judge.
15   THE COURT: All right. So what do we got? Is
16 there an agreement to do something?
17   MR. BRUCK: Well, Judge Sherlock is available, so
18 we know that. I spoke with BBSG's counsel yesterday,
19 Miss Blair, and I think she was receptive to
20 referring it out to a pre-trial with Judge Sherlock.
21   I think Rock Fusco, at least the client, is
22 favorably disposed to that. I'm not sure about
23 Mr. Jalalpour and his staff.
24   THE COURT: Mr. Jalalpour.

1    MR. JALALPOUR: Judge, I don't know if I've got
2  authorization to do so. I think it's probably a good
3  idea.
4    What I do know is we would like the
5  receiver's deposition before we did the pre-trial at
6  minimum. But I don't see a reason why we wouldn't do
7  a pre-trial, but I would like it in terms of
8  scheduling to get that receiver's deposition out of
9  the way first.
10   THE COURT: Mr. Bruck, what about the receiver
11 deposition?
12   MR. BRUCK: I don't think that's going to change
13 anything, and it's not necessary for purposes of the
14 settlement conference.
15   THE COURT: If it's not going to change anything,
16 is there a problem with having it conducted before
17 then?
18   MR. BRUCK: There is, Judge, because the Rock
19 Fusco insurance policy is a declining limits policy.
20 It's an assets -- the Federal Court has said it's an
21 asset of the receivership estate.
22   THE COURT: Right.
23   MR. BRUCK: And it shouldn't be wasted. There's
24 two insurance policies on the Rock Fusco side, a

1  primary and an access. The access has already agreed
2  to pay its limit. The primary is dithering, and
3  that's why we wanted a settlement conference.
4    This is a unique situation where the asset
5  is being wasted, and I think Rock Fusco itself has
6  demanded that the case settle for the policy limits.
7  So the only thing holding it up is this primary
8  insurance carrier, which, you know, we believe that
9  if we get into a settlement conference we can address
10 these issues.
11   They threw hurdles at us of why the case
12 shouldn't settle, we resolved all those things for
13 them, and now they're being recalcitrant.
14   THE COURT: Okay. Mr. Jalalpour, when is the
15 last time you had a discussion with your client about
16 this?
17   MR. JALALPOUR: Two days ago, Judge.
18   THE COURT: And their position is?
19   MR. CONNELLY: Judge, I'm the client. I'm Mike
20 Connelly.
21   THE COURT: You're the client. Okay. That's
22 fine. Go ahead. Your position is, sir?
23   MR. CONNELLY: Well, we understand and respect
24 our defense counsel. This is an existential threat.

2 (Pages 2 - 5)

Page 6

1 The damages in this case are in excess of
2 $100 million, and there's two cases behind this one.
3 It is a $10 million policy with wasting limits. If
4 there's any potential for settlement, the client
5 would like it settled.
6    THE COURT: All right. Well, then it sounds like
7 there's an agreement. And would you accept Judge
8 Sherlock?
9    MR. CONNELLY: On behalf of the client we would,
10 yes.
11    THE COURT: Well, then I suggest you set up a
12 date with Judge Sherlock. If there's an agreement
13 all around, he's here. I don't know what his
14 schedule is, but --
15    MR. MCINERNEY: He's available the 5th and 12th,
16 Judge. Can we get an order from your Honor referring
17 it to Judge Sherlock to one of those dates?
18    THE COURT: If Mr. Connelly is speaking on behalf
19 of the client and he's willing to do that -- well,
20 Mr. Merlo, did you start to say something?
21    MR. MERLO: Yeah. I would just like to note that
22 we spoke with Mr. Bruck yesterday, we spoke with our
23 clients and their insurance adjuster, they are open
24 to being referred out for settlement conference.

Page 7

1    The only minor hiccup is the primary
2 adjuster. We spoke with his boss, but the primary
3 adjuster is on vacation. We don't know if he'll be
4 available on the 5th, but if he is, then we can do
5 it. It's just a matter of scheduling, but we're
6 amenable to it being referred out.
7    THE COURT: All right. Well, the Court can enter
8 an order referring this to Judge Sherlock for
9 settlement purposes only, and continuing it to
10 probably a future date, I guess, just for the purpose
11 of putting something in the Court's file.
12    You said the 12th, is that correct?
13    MR. MCINERNEY: Correct.
14    THE COURT: I'll probably continue it to some
15 time towards the end of September. Why don't I just
16 continue matters here until September 23rd at 9:00
17 o'clock. You've either -- I mean, I may never see
18 you if you reach a settlement and the matter is
19 dismissed, or you may come back and tell me that you
20 haven't settled, it's been continued or something.
21 But the Court will enter the order.
22    I'm sending it to -- and I'm presuming, I
23 don't need to confirm anything with Judge Sherlock,
24 you're going to provide all of the relevant filings

Page 8

1 that you think he needs in order for that, I suppose.
2 All right. The Court will enter the order this
3 morning and you will get a copy of it.
4    Is there anything else?
5    MR. JALALPOUR: Judge, just so we're clear --
6    THE COURT: One at a time. Mr. Jalalpour.
7    MR. JALALPOUR: Thank you, Judge. Just so we're
8 clear. There's not going to be an order barring any
9 further discovery, including the deposition of the
10 receiver?
11    THE COURT: I'm not entering such an order.
12    MR. JALALPOUR: Okay.
13    THE COURT: Mr. Bruck, did you start to say
14 something?
15    MR. BRUCK: Yes. Are you preparing the order?
16    THE COURT: Well, actually why don't you prepare
17 the order, it's one less thing I have to have done
18 this morning. Just prepare the order referring the
19 matter to Judge Sherlock for settlement purposes
20 only.
21    The matter is continued here to 9-23-24 at
22 9:00 o'clock. Okay.
23    MR. BRUCK: Fair enough.
24    THE COURT COORDINATOR: I'll send the parties a

Page 9

1 standing order.
2    THE COURT: All right. Annette is going to send
3 you the standing order, Mr. Bruck.
4    MR. BRUCK: Great. Thank you.
5    THE COURT: Gentleman, have a good day and don't
6 blow it. Don't below it.
7    MR. JALALPOUR: Thank you, Judge.
8    MR. BRUCK: Thanks, Judge.
9        (Which were all the proceedings had
10        or offered at said hearing of the
11        above-entitled cause.)
12
13
14
15
16
17
18
19
20
21
22
23
24

3 (Pages 6 - 9)

Page 10

1   STATE OF ILLINOIS  )
                        ) ss:
2     COUNTY OF COOK  )
3         JOANNE RYAN, being first duly sworn,
4   deposes and says that she is a Certified Shorthand
5   Reporter in Cook County, Illinois, and reporting
6   proceedings in the Courts in said County;
7         That she reported in shorthand and
8   thereafter transcribed the foregoing proceedings;
9         That the within and foregoing transcript
10  is true, accurate and complete and contains all the
11  evidence which was received in the proceedings had
12  upon the above-entitled cause.
13
14
15
            JOANNE RYAN, C.S.R.
16          License No. 084-004187
            Notary Public
17          One North Franklin
            Suite 2100
18          Chicago, Illinois 60606
19
20
21
22
23
24

4 (Page 10)

# Exhibit F

| EXHIBIT 2 (RFC Settlement) | |
|---|---|
| **Description** | **Reimbursement Amount** |
| Depositions | $ 3,203.76 |
| Expert fees | $ 8,060.50 |
| Database fees | $ 75,528.28 |
| TOTALS | $ 86,792.54 |

Exhibit G

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | No. 18-cv-5587 |
| v. | ) ) | Hon. Manish S. Shah |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, | ) ) ) ) | Magistrate Judge Young B. Kim |
| Defendants. | ) ) | |

**[ PROPOSED ]
ORDER GRANTING RECEIVER'S MOTION TO
APPROVE SETTLEMENT AND RELEASE AGREEMENT
WITH ROCK FUSCO & CONNELLY, LLC AND IOANA SALAJANU
AND TO AUTHORIZE PAYMENT OF CONTINGENCY FEE AND COSTS
TO RECEIVER'S COUNSEL**

This matter came before the Court upon the Receiver's Motion to Approve Settlement and Release Agreement with Rock Fusco & Connelly, LLC and Ioana Salajanu (collectively, "RFC") and to Authorize Payment of Contingency Fee and Costs to Receiver's Counsel [ECF No. _____] (the "Motion"). The Court, having considered the Motion and the record of this receivership action and being otherwise duly advised in the premises, hereby finds and orders as follows:

1.      The Motion [ECF No. _____] is GRANTED.

2.      The Court finds that the Settlement and Release Agreement, attached as Exhibit A to the Motion, is reasonable, fair, adequate, and in the best interest of the Receivership Estate.

3.      The Court confirms the Receiver's authority to enter into the Settlement and Release Agreement.

1

4.     The Court finds that the Receiver and RFC have agreed to the settlement in good faith and that RFC is paying, through its insurers, a fair share of the potential damages for which the RFC Parties are alleged to be liable, though they deny any wrongdoing or liability, and no court has determined there to be any wrongdoing or liability.

5.     The Court hereby permanently bars, restrains, and enjoins any Barred Persons from engaging in any Barred Conduct against the RFC Parties (as defined in the Settlement and Release Agreement) with respect to the Barred Claims, as those terms are defined hereunder:

a.     "Barred Persons" means: any person or entity who submitted a claim in the Receivership Action, including but not limited to all persons or entities identified on Exhibits 5-6 of "The Receiver's Twenty-First Status Report (Third Quarter 2023)" (*see* Dkt. 1535), and their assigns and/or subrogees;

b.     "Barred Conduct" means: instituting, reinstituting, intervening in, initiating, commencing, maintaining, continuing, filing, encouraging, soliciting, supporting, participating in, collaborating in, assisting, otherwise prosecuting, or otherwise pursuing or litigating in any case, forum, or manner, whether pre-judgment or post-judgment, or enforcing, levying, employing legal process, attaching, garnishing, sequestering, bringing proceedings supplementary to execution, collecting, or otherwise recovering, by any means or in any manner, based upon any liability or responsibility, or asserted or potential liability or responsibility, directly or indirectly, or through a third party, relating in any way to the Barred Claims;

c.     "Barred Claims" means: any and all claims, actions, lawsuits, causes of action, investigations, demands, complaints, cross claims, counter claims, or third party claims or proceedings of any nature, including, but not limited to, litigation,

arbitration, or other proceedings, in any federal or state court, or in any other court, arbitration forum, administrative agency, or other forum in the United States, whether arising under local, state, federal, or foreign law, that in any way relate to, are based upon, arise from, or are connected with: (i) claims released in the Settlement Agreement; (ii) the events or occurrences underlying the claims or allegations in the SEC Action, or claims or allegations that could have been brought in the SEC Action; (iii) the RFC Parties' representation of EquityBuild (as defined in the Settlement and Release Agreement), including but not limited to statements made by the RFC Parties to third parties in connection to loans made to EquityBuild; or (iv) the events or occurrences underlying the claims or allegations in the Receiver's Action, or claims or allegations that could have been brought in the Receiver's Action. The foregoing specifically includes any claim, however denominated, seeking contribution, indemnity, damages, or other remedy where the alleged injury to any person, entity, or other party, or the claim asserted by any person, entity, or other party, is based upon any of the Barred Claims whether pursuant to a demand, judgment, claim, agreement, settlement, or otherwise;

d.   The provisions of Paragraph 5 of this Order do not apply to: (i) the United States of America, its agencies or departments, or to any state or local government; and (ii) the Settling Parties' respective obligations under the Settlement Agreement.

e.   Nothing in this Approval Order is or will be construed to be an admission or concession of any violation of any statute or law, of any fault, liability, or wrongdoing, or of any infirmity in the claims or defenses of the Receiver or RFC

with regard to any case or proceeding, including but not limited to the Receiver's Action.

f.      The provisions of this Approval Order will not be impaired, modified, or otherwise affected in any manner other than by direct appeal of this Approval Order, or motion for reconsideration or rehearing thereof, made in accordance with the Federal Rules of Civil Procedure.

g.      Pursuant to Fed. R. Civ. P. 54(b), and the Court's authority in this equity receivership to issue ancillary relief, this Approval Order is a final order for all purposes, including, without limitation, for purposes of the time to appeal or to seek rehearing or reconsideration.

h.      Any party, attorney, or other person who acts in a manner contradictory to the claims bar provisions in this Approval Order may be subject to such remedies for contempt as the Court may deem appropriate.

6.      The Court finds that the contingency fee amount for the Receiver's counsel is fair and reasonable and that they are entitled to a total payment of $_____, representing the total of the approved contingency fee plus expenses (comprising $_____ in fees and $86,792.54 in expenses) from the $_____ settlement amount.

7.      The Court approves: (i) the settlement payment in the amount of Ten Million Dollars (USD) (10,000,000.00), minus legal fees and costs incurred by RFC as of September 30, 2024, which total $254,144.90, minus an additional amount up to Seventy Five Thousand Dollars (USD) ($75,000.00) in reasonable legal fees and costs incurred by RFC from October 1, 2024 through the date the Approval Order becomes Final (as defined in the Settlement and Release Agreement) to be made by RFC, through its insurers, to the Receiver's Account; and (ii) upon the

Receiver's receipt of the Settlement Amount from RFC, and without further order of the Court, the Receiver's immediate payment of $_____, representing the total of the approved contingency fee plus expenses, from the Receiver's Account to the client fund account of Spellmire Bruck LLP to be thereafter split between the engaged counsel in accordance with their agreement as set forth in the engagement letter.

8.    The Court finds that the Receiver has given fair, adequate, and sufficient notice of the Motion to all interested parties.

9.    The Court shall retain exclusive jurisdiction over all matters concerning the Settlement and Release Agreement, including without limitation the enforcement thereof.


ORDERED in the United States District Court
for Northern District of Illinois, Eastern Division,
on this _____ day of _____, 2024.


_____
UNITED STATES DISTRICT COURT JUDGE