**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) | |
| **Plaintiff,** | ) ) | **Civil Action No. 18-cv-5587** |
| **v.** | ) ) | **Judge Manish Shah** |
| **EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN,** | ) ) ) ) | **Magistrate Judge Young B. Kim** |
| **Defendants.** | ) ) ) | |

**RECEIVER'S MOTION FOR ENTRY OF JUDICIAL ORDER DIRECTING
DISBURSEMENT OF EARNEST MONEY HELD IN STRICT JOINT ORDER ESCROW**

Kevin B. Duff, as receiver ("Receiver") for the Estate of Defendants EquityBuild, Inc. ("EquityBuild"), EquityBuild Finance, LLC ("EquityBuild Finance"), their affiliates, and the affiliate entities of Defendants Jerome Cohen and Shaun Cohen (collectively, the "Receivership Defendants"), respectfully moves this court for an order directing the transfer of monies from escrow account(s) held at First American Title Insurance Company to the Receiver's account. In support of his motion, the Receiver states as follows:

During the early period of the Receivership, the Receiver was actively engaged in the process of preserving, managing and disposing of approximately 120 properties that were part of the Receivership Estate. Those included the properties at 7600-10 South Kingston Avenue, 7656 South Kingston Avenue, and 6949-59 South Merrill Avenue. In the October and December 2019 time period, contracts for each of those three properties were offered by Ventus Holdings, LLC and Ventus Merrill, LLC (collectively "Ventus") and accepted by the Receiver. Pursuant to the

Strict Joint Order Escrow Agreement that was part of each package of contract documents, earnest money deposits from Ventus were held in escrow for all three of the properties by First American Title Insurance Company ("First American"). (*See* Exhibits 1-3 at Ex. A (p. 14))

Pursuant to the purchase agreements for the three properties, Ventus tendered a total of $431,520 as earnest monies held by First American. Under the Strict Joint Escrow Agreement, each escrow deposit shall not be "surrendered except on an order signed by the parties hereto, their respective legal representatives or assigns, *or order of court.*" (Exs. 1-3 at Ex. A, ¶ 3) (emphasis supplied).

Ventus backed out of the three contracts, leading to litigation about the return of escrow moneys. Ventus filed a motion seeking release of the escrow funds to them by First American. (Dkt. 861) The District Court (Judge Lee presiding) denied the motion, noting that "Ventus essentially concedes that it breached its contracts with the Receiver" for the purchase of these properties. (*See* Dkt. 1025 at 3, attached hereto as Exhibit 4) The District Court ruled that "Ventus's motion for the return of its earnest money deposits is denied," and that the Receiver "is entitled to retain Ventus's earnest money deposits." (*Id.* at 11)[1]

The earnest money deposits remain with First American in escrow. Consistent with this Court's prior ruling, the Receiver requests an order directing that First American Title Insurance Company release and transfer the monies held in escrow for these three properties to the Receiver's

---

[1] Ventus twice sought appellate review of the Court's orders relative to the sale of the three properties, first challenging the sale of the three properties to other buyers after Ventus's breach, and then the District Court's decision rejecting Ventus's request that the escrow monies be directed back to Ventus. Both of these appeals were dismissed for lack of appellate jurisdiction. (*See* Exhibit 5, Seventh Circuit Order Granting Motion to Dismiss Ventus Appeal in Case No. 20-3155 (regarding challenge to the sale); Exhibit 6, Seventh Circuit Order Granting Motion to Dismiss Ventus Appeal in Case No. 21-2664 (regarding District Court's denial of Ventus's request for return of escrow funds))

account. Those monies will then be part of the amounts used for distribution to unsecured creditors in Group 10 as well as for administration of the Receivership estate.

Wherefore, for all the foregoing reasons, the Receiver respectfully requests that the Court enter an order directing First American Title Insurance Company to disburse the earnest money deposited by Ventus Holdings, LLC or Ventus Merrill, LLC in connection with the prospective acquisitions of 7600-10 South Kingston Avenue, 7656 South Kingston Avenue, and 6949-59 South Merrill Avenue to the Receiver for deposit into the Receiver's operating account for the administration of the Estate and distributions as ordered by the Court.

Dated: September 9, 2025        Kevin B. Duff, Receiver

                  By:    /s/ Michael Rachlis
                       Michael Rachlis
                       Jodi Rosen Wine
                       Rachlis Duff & Peel LLC
                       542 South Dearborn Street, Suite 900
                       Chicago, IL 60605
                       Phone (312) 733-3950
                       Fax (312) 733-3952
                       *mrachlis@rdaplaw.net*
                       *jwine@rdaplaw.net*

## PURCHASE & SALE AGREEMENT

This Purchase & Sale Agreement ("Agreement") is made by and between the court-appointed federal equity receiver for SSDF7 Portfolio 1, LLC ("Seller") pursuant to that certain Order Appointing Receiver entered August 17, 2018 (Dkt. 16), as supplemented by that certain Order entered March 14, 2019 (Dkt. 290), in the case captioned *United States Securities and Exchange Commission v. EquityBuild, Inc., et al.*, United States District Court for the Northern District of Illinois, Eastern Division, Civil Action No. 1:18-cv-05587 (the "SEC Action"), and

VENTUS HOLDINGS, LLC OR NOMINEE ("Buyer")

for the purchase and sale of that certain real property and all fixtures, equipment, and personal property appurtenant thereto (the "Property") located at 7600 -10 South Kingston Avenue | 2527-29 East 76th Street, Chicago, Illinois 60649 and legally described as follows:

LOTS 1, 2 AND 3, IN BLOCK 7, IN SOUTH SHORE PARK, BEING A SUBDIVISION OF THE WEST HALF OF THE SOUTHWEST QUARTER (EXCEPT STREETS) OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Permanent Index No. 21-30-309-030

\*       \*       \*

### TERMS AND CONDITIONS

The Seller agrees to sell the Property, and the Buyer agrees to purchase the Property, on the following terms and conditions:

1.      **Purchase Price**. The purchase price for the Property shall be $ 1,870,000 (the "Purchase Price"). The Buyer shall pay the Purchase Price as follows:

   a.      An earnest money deposit (the "Earnest Money") in an amount equal to ten percent (10%) of the Purchase Price within three (3) business days following the date of acceptance of the Agreement by the Seller (the "Acceptance Date").

   b.      The balance of the Purchase Price, subject to any applicable credits and prorations, at Closing.

*[Note: If the Buyer desires to enter into this Agreement subject to a financing contingency, then Rider A should be completed. Otherwise, Rider A should be left blank.]*

*[Note: If the Buyer purports to hold a mortgage interest in the Property and tenders this Agreement in connection with a credit bid, then Rider B should be completed. Otherwise, Rider B should be left blank.]*

i

**Exhibit**

**1**

P043

2.    **Earnest Money**. The Earnest Money shall be held by First American Title Company ("First American Title") in a segregated escrow account. In connection with said Earnest Money deposit, the Buyer shall execute and deliver to the Seller a copy of that certain strict joint order escrow agreement in the form attached hereto as Exhibit A.

3.    **Court Approval**. As soon as practicable after the Acceptance Date, the Seller shall move before the Honorable John Z. Lee or any judge sitting in his stead or to whom he has made a referral in the SEC Action (the "Receivership Court") for approval of the sale of the Property pursuant to this Agreement. In the event that the Receivership Court does not issue the requisite approval, then the Agreement shall become null and void and all Earnest Money shall be promptly refunded to the Buyer.

4.    **Escrow Closing**. This sale shall be closed through an escrow with First American Title in accordance with the general provisions of the usual form of deed and money escrow agreement then furnished and in use by said title company. Payment of the Purchase Price and delivery of the receiver's deed shall be made through the escrow. The cost of the escrow shall be divided equally between the Buyer and the Seller unless the Buyer acquires the Property with financing, in which event that portion of the cost of the escrow relating to the financing shall be borne by the Buyer. Unless otherwise specified herein, all other closing costs shall be paid in accordance with custom for apartment investment sales transactions in Cook County, Illinois.

5.    **Irrevocable Offer**. This Agreement when executed by the Buyer and delivered to the Seller shall constitute an irrevocable offer to purchase the Property until ~~August 28, 2019~~ [handwritten: 10/17/2019] (the "Offer Expiration Date"). In the event that the offer is not accepted by the Seller before the Offer Expiration Date, then the offer shall be deemed withdrawn.

[handwritten: KD / CE 10/M/19]

6.    **Personal Property**. At Closing, the Seller shall tender to the Buyer a bill of sale for the personal property appurtenant to the Property (the "Personal Property") warranting only that Seller is the absolute owner of said Personalty, that said Personalty is free and clear of all liens, charges, and encumbrances, and that the Seller has the full right, power, and authority to sell said Personalty and to deliver the bill of sale. The Seller shall neither make nor adopt any warranty whatsoever with respect to the Personal Property and shall specifically disclaim any implied warranty of merchantability or fitness for a particular purpose. The price of the Personal Property shall be included in the Purchase Price, and the Buyer agrees to accept all such Personal Property in "as is" condition.

7.    **The Closing Date**. The closing shall be held on a date (the "Closing Date") to be designated by the Seller after the Receivership Court approves the sale of the Property pursuant to this Agreement, provided, however, that the Buyer shall be entitled to five business days' advance Notice of the Closing Date.

8.    **Conveyance of Title**. At Closing, the Seller shall convey title to the Property by a recordable form receiver's deed subject only to (a) general real estate taxes not yet due and payable at the time of Closing; (b) covenants, conditions, restrictions, or building lines and

2

easements of record, if any; (c) public and utility easements; (d) applicable zoning and building laws and ordinances; (f) acts done by or suffered through Buyer or anyone claiming by, through, or under Buyer; (g) governmental actions or proceedings concerning or affecting the Property; and (h) encroachments of a minor nature, if any, that can be insured over at closing (the "Permitted Exceptions"). The Seller agrees to surrender possession of the Property at the time of Closing.

9. **Commitment For Title Insurance**. Within ten (10) business days after the Acceptance Date, the Seller shall deliver to the Buyer evidence of merchantable title by delivering a commitment for title insurance with extended coverage from First American Title in the amount of the Purchase Price with a commitment date not earlier than July 1, 2019, subject only to general exceptions, the Permitted Exceptions, and exceptions pertaining to liens or encumbrances of a definite and ascertainable amount which may be removed by the payment of money by Seller, endorsed over by First American Title at the Seller's sole expense, or which will be extinguished by order of the Receivership Court. Such title commitment shall be conclusive evidence of good and merchantable title, subject only to the foregoing exceptions. If the commitment for title insurance discloses title exceptions other than the general exceptions, Permitted Exceptions, exceptions waivable through the payment of money or the issuance of an endorsement, or exceptions to be extinguished by Receivership Court order, the Seller shall have thirty (30) calendar days from the Closing Date to cure, or insure over, the unpermitted exceptions and the Closing shall be postponed until said unpermitted exceptions are cured or insured over. If the Seller fails to timely secure the removal of the unpermitted exceptions or obtain an endorsement insuring over the unpermitted exceptions, the Purchaser may terminate this Contract with a full refund of Earnest Money upon Notice to the Seller within ten (10) business days after the expiration of the thirty (30) day period. In such event, this Agreement shall become null and void and neither party shall thereafter have any rights against the other, and the Seller may not be held liable for direct, indirect, incidental, or consequential damages.

10. **Survey**. At least five (5) business days prior to the Closing Date, the Seller shall provide the Buyer with a survey by a licensed land surveyor dated not more than six months prior to the date of Closing, indicating the present location of all improvements. If the Buyer or the Buyer's mortgagee desires a more recent or extensive survey, the survey shall be obtained at the Buyer's expense.

11. **Assignment And Assumption Of Leases**. At Closing, the Seller shall deliver to the Buyer, and the Seller and Buyer shall execute, an assignment and assumption of leases (in the form attached hereto as Exhibit B) pursuant to which the Seller shall convey all right, title, and interest in and to any leases in effect at the Property to the Buyer, and the Buyer shall agree to assume all of the Seller's obligations under said leases.

12. **Prorations**. Prepaid service contracts and other similar items shall be credited ratably at Closing. Any and all rents collected from or on behalf of tenants until the date of the Closing shall be applied by the Seller first to past due balances and then to currently scheduled monthly rent. Each tenant's scheduled monthly rent shall then be prorated for the month of Closing. To

3

the extent that any tenant has paid all rent through and including the month prior to the
Closing, then all additional rent received from such tenant shall be applied by the Seller first to
rent for the period between the first day of the month in which the Closing occurs and the date
of the Closing, and the balance of said rent, if any, shall be paid to the Buyer. Any and all rents
that remain delinquent as of the Closing Date shall belong to the Buyer upon collection.
Notwithstanding the foregoing, real estate taxes associated with the ownership of the Property
shall be prorated as of the Closing Date based on 105% of the most recently ascertainable tax
bill.

13.     **Inspection Period**. The Buyer acknowledges that it was afforded the opportunity to
conduct a limited tour of the Property prior to submitting its offer. Within three (3) calendar
days following the Acceptance Date, the Seller shall produce the following documents to the
Buyer (the "Due Diligence Materials"):

  a.    *Current Rent Roll*. A current rent roll for the Property generated by the
        management company.

  b.    *Utility Bills*. Copies of all utility bills relating to the Property, to the extent
        available, for the twelve calendar months preceding the month of the
        Acceptance Date.

  c.    *Leases*. Copies of all existing leases affecting the Property.

  d.    *Profit & Loss Statement*. A current trailing twelve-month profit and loss
        statement reflecting all categories of operating income and expenses associated
        with the Property, as generated by the management company.

  e.    *Litigation Documents*. Copies of documents, including notices of violation,
        orders, judgments, and other pleadings, pertaining to any known litigation or
        proceedings currently affecting the Property.

In addition, the Seller shall allow the Buyer reasonable access to the Property for twenty days
from and after the Acceptance Date (the "Inspection Period") for the purpose of conducting an
inspection of the major structural and mechanical components of the Property. A major
structural or mechanical component shall be deemed to be in acceptable operating condition if
it substantially performs the function for which it is intended, regardless of age, and does not
pose a threat to health or safety. In the event that the Buyer possesses sound evidence that any
major structural or mechanical component of the Property does not substantially perform the
function for which it is intended, then the Buyer shall have the right to terminate this
Agreement upon the delivery of Notice to the Seller on or before the conclusion of the
Inspection Period, such notice to be accompanied by the relevant pages of an inspection report
prepared by a licensed or certified inspector and identifying the defect justifying the
termination. Upon receipt by the Seller of the notice of termination, this Agreement shall be
considered null and void and the parties shall be discharged of any and all obligations
hereunder (except those obligations which survive termination) and First American Title shall

4

release the Earnest Money to the Buyer. In the event that the Buyer does not terminate the Agreement on or prior to the conclusion of the Inspection Period, the Property shall be considered accepted by the Buyer and the Earnest Money shall thereafter be non-refundable. In connection with its inspection of the Property, the Buyer shall keep the Property free and clear of liens, shall indemnify and hold Seller harmless from any and all liability, loss, cost, damage, or expense relating to its inspection of the Property, and shall repair any and all damage arising from the inspection. These obligations shall survive termination of the Agreement.

14.    **Entry Into Or Renewal Of Contracts & Material Changes**. Following the expiration of the Inspection Period, the Seller shall not without the prior written consent of the Buyer, said consent not to be unreasonably withheld, conditioned, or delayed, enter into or renew any service contract or lease affecting or concerning the Property. In addition, the Seller shall not make any material changes to the Property, perform or engage in any act, or enter into any agreement that materially changes the value of the Property or the rights of the Buyer relating to the Property.

15.    **Material Destruction**. Risk of loss to the Property shall be borne by the Seller until title has been conveyed to Buyer. If, prior to Closing, a material portion of the Property shall be destroyed or materially damaged by fire or other casualty, then the Seller shall provide prompt notice of said fire or other casualty to the Buyer and this Agreement shall thereafter, at the option of the Buyer, exercised by Notice to the Seller within five (5) business days after receipt of notice of such material damage, be null and void, and all Earnest Money shall be refunded to the Buyer. Failure of the Buyer to provide timely notice shall constitute a waiver of the right to terminate.

16.    **Condition Of Property**. The Buyer understands and agrees that the Property is being sold "as is" and "with all faults" and that neither the Seller nor any agent or attorney of the Seller, makes, or has made, any representation or warranty as to the physical condition or value of the Property or its suitability for the Buyer's intended use. The Seller has no obligation to repair or correct any alleged patent or latent defect at the Property, or to compensate the Buyer for any such defect, and, upon closing, the Buyer waives, releases, acquits, and forever discharges the Seller, and all of the Seller's agents and attorneys, to the maximum extent permitted by law, from any and all claims, actions, causes or action, demands, rights, liabilities, losses, damages, costs, or expenses, direct or indirect, known or unknown, foreseen or unforeseen, that it now has or which may arise in the future on account of or in any way arising from or relating to any alleged patent or latent defect at the Property.

17.    **Buyer Default**. The Buyer and Seller agree that it would be difficult to ascertain the actual damages to be suffered by the Seller in the event of a default by the Buyer and that the amount of the Earnest Money deposited by the Buyer hereunder constitutes the parties' reasonable estimate of the Seller's damages in the event of the Buyer's default, and that upon any such default not caused by the Seller, the Seller shall be entitled to retain the Earnest

P047

Money as liquidated damages, which shall constitute the Seller's sole and exclusive remedy in law or at equity in connection with said default.

18.     **Seller Default**. In the event that the Seller shall fail to sell, transfer, and assign the Property to Purchaser in violation of the terms of this Agreement and/or fail to perform any other material obligation of Seller hereunder, then the Buyer may give Notice to the Seller specifying the nature of the default. The Seller shall thereafter have five (5) business days from receipt of said Notice, but in no event beyond the Closing Date, within which to cure the alleged default. If the Seller fails to cure the default within the cure period, then the Buyer shall be entitled to the return of all Earnest Money and (a) to declare the Agreement null and void and sue for reasonable out-of-pocket expenses incurred in connection with this Agreement prior to the alleged default or (b) to sue for specific performance, the parties recognizing that the Property is unique and that the Buyer otherwise lacks an adequate remedy at law. In the latter event, the Buyer is advised that Section VIII of the Order Appointing Receiver entered in the SEC Action enjoins the filing or prosecution of all civil proceedings against the Receiver, in his capacity as Receiver, until further order of the court.

19.     **Representations and Warranties**. As a material inducement to the Buyer to enter into this Agreement, the Seller hereby makes the following representations and warranties, each of which shall remain true and correct as of the Closing Date:

a.     The Seller has the full right, power, and authority to convey the Property to the Buyer as provided in this Agreement and to carry out its obligations hereunder. In addition, the individual executing this Agreement on behalf of the Seller has the legal right, power, and authority to bind the Seller to the terms hereof.

b.     The Seller will not take any action affecting title to the Property following the Acceptance Date.

c.     To the best of the Seller's knowledge, there are no actions, investigations, suits, or proceedings, pending or threatened, that affect the Property, or the ownership or operation thereof, other than the SEC Action and the following:

*[None.]*

d.     To the best of the Seller's knowledge, the Property is not in violation, nor has been under investigation for violation, of any federal, state, or local law, ordinance, or regulation regulating environmental conditions in, at, on, under, or about the Property, including but not limited to, soil and groundwater conditions.

20.     **Notices**. All notices required or permitted under this Agreement shall be in writing and served by registered or certified United States mail, return receipt requested; nationally recognized overnight mail courier (signature required); or electronic mail (evidenced by

6

P048

competent and authentic proof of transmission). Any notices given to the Seller shall be delivered to the Seller's counsel, at the following physical or e-mail addresses:

> Andrew E. Porter
> Porter Law Office
> 853 North Elston Avenue
> Chicago, Illinois 60614
> andrew@andrewporterlaw.com

> Michael Rachlis
> Rachlis Duff Peel & Kaplan LLC
> 542 South Dearborn, Suite 900
> Chicago, Illinois 60605
> mrachlis@rdaplaw.net

Any such notices or demands given to the Buyer shall be delivered to the Buyer's counsel, at the following address physical or e-mail addresses:

> MICHAEL ELMAN
>
> 10 S LA SALLE, STE 1420
>
> CHICAGO, IL 60603
>
> MELMAN@MBELMANLAW.COM

21.    **Like-Kind Exchange**. The Seller agrees to cooperate if the Buyer elects to acquire the Property as part of a like-kind exchange under Section 1031 of the Internal Revenue Code. The Buyer's contemplated exchange shall not impose upon the Seller any additional liability or financial obligation, and the Buyer agrees to hold the Seller harmless from any liability that might arise from such exchange. This Agreement is neither subject to nor contingent upon the Buyer's ability to dispose of its exchange property or to effectuate an exchange. In the event any exchange contemplated by the Buyer should fail to occur, for whatever reason, the sale of the Property shall nonetheless be consummated as provided herein.

22.    **Real Estate Agents**. Purchaser represents and warrants that, other than Seller's Agent and Buyer's Agent, if any, no other putative real estate agent or broker was involved in submitting, showing, marketing, or selling the Property to the Buyer, and the Buyer agrees to indemnify and hold Seller, and its successors and assigns, harmless from and against any and all liability, loss, damages, cost, or expense, including reasonable attorneys' fees, arising from or relating to any claim for a commission, fee, or other form of payment or compensation asserted by a putative real estate agent or broker purporting to have procured the Buyer in connection with this Agreement.

7

23.     Foreign Investor Disclosure. The Seller and the Buyer agree to execute and deliver any instrument, affidavit, or statement, and to perform any act reasonably necessary to carry out the provisions of the Foreign Investment in Real Property Tax Act and regulations promulgated thereunder. The Seller represents that the Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code.

24.     Merger. This Agreement expresses the entire agreement of the parties and supersedes any and all previous agreements or understandings between them with regard to the Property. There are no other understandings, oral or written, which in any way alter or enlarge the terms of this Agreement, and there are no warranties or representations of any nature whatsoever, either express or implied, except as set forth herein. This Agreement may be modified only by a written instrument signed by the party to be charged.

25.     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

*      *      *

The undersigned Buyer hereby offers and agrees to purchase the Property upon the terms and conditions stated herein as of this 14TH____day of August, 2019. In addition, the individual signing below on behalf of the Buyer represents and warrants that s/he is authorized to execute this Agreement on behalf of the Buyer.

8

**Buyer**

VENTUS HOLDINGS, LLC OR NOMINEE

10 S LA SALLE STE 1420

Chicago, IL 60603

By: /Zach Elman/

Its: Manager

**Buyer's Agent**

**Seller**

KEVIN B. DUFF,
FEDERAL EQUITY RECEIVER FOR
SSDF7 PORTFOLIO 1 LLC

Rachlis Duff Peel & Kaplan LLC
542 South Dearborn Street, Suite 900
Chicago, Illinois 60605
(312) 733-3390

Acceptance Date: 10/14/19

**Seller's Agent**

Jeffrey Baasch
SVN Chicago Commercial
940 West Adams Street, Suite 200
Chicago, Illinois 60607
(312) 676-1866

P051

## RIDER A

_____ If the Buyer desires that the terms and provisions of this Rider be incorporated into the Purchase And Sale Agreement to which it is annexed, please initial this paragraph.

*     *     *

This Agreement is contingent upon the Buyer securing, no later than 21 days following the

Acceptance Date (the "Financing Contingency Deadline"), a firm written mortgage commitment

for a fixed or adjustable rate mortgage from an established multifamily residential mortgage

lender in the amount of $_____, at an interest rate (or initial interest rate if an adjustable

rate mortgage) not to exceed %_____per annum, amortized over_____years, payable monthly,

with a loan origination fee not to exceed %_____, plus appraisal and credit report fees, if any. If

the Buyer is unable to secure a firm written mortgage commitment as described herein within

the referenced time period, then the Buyer may terminate this Agreement with a full refund of

Earnest Money by providing notice to the Seller prior to the expiration of the Financing

Contingency Deadline. If the Buyer does not provide the requisite notice to the Seller as

provided herein, then the Buyer shall be deemed to have waived this financing contingency,

and this Agreement shall remain in full force and effect.

## RIDER B

_____ If the Buyer purports to hold a mortgage interest in the Property and tenders the Purchase And Sale Agreement to which this rider is annexed (the "Agreement") in connection with the submission of a credit bid, please initial this paragraph and provide the information and supply any additional terms and conditions to the Agreement, or modifications to the Agreement, as requested herein. Any such terms and conditions shall supersede any contrary or conflicting terms and conditions set forth in the Agreement itself.

\*     \*     \*

The Buyer consists of the following mortgagee or mortgagees purporting to hold a perfected and unreleased security interest in the Property:

 

*[Using additional sheets, please indicate, for each mortgagee identified above, the total unpaid balance due under the promissory note secured by the corresponding mortgage and itemize each component of the current alleged loan balance, including, but not limited to, principal, interest, default rate interest, late fees, service fees, liquidation fees, protective advances, and other charges.]*

The Purchase Price shall be the amount of the credit bid submitted by the Buyer, and any requirement to make an earnest money deposit is deleted. Payment of the Purchase Price shall not be made through the escrow at closing.

In addition, the Buyer shall pay all closing costs approved by the Court, which may, subject to the Court's ruling, include, but not be limited to, owner's title insurance premiums, applicable transfer taxes, the survey invoice, property management fees accrued through the closing, due and unpaid real estate taxes, escrow fees, brokerage commissions, unpaid utilities, title commitment update fees, gap insurance premiums, State of Illinois policy fees, extended coverage premiums, the costs of closing protection coverage for the Seller, all other expenses required to be paid by the Seller at closing, all amounts advanced for the benefit of the Property which are required to be reimbursed and/or any amount required to discharge any Receiver's lien.

*[Using additional sheets, set forth any other terms and conditions to be included in the Agreement, or any modifications to the Agreement, and to which your credit bid shall remain subject.]*

EXHIBIT A



First American
Title Insurance Company

## STRICT JOINT ORDER ESCROW AGREEMENT

Open Date: _____    Expected Release Date: _____    Escrow Number: __2964652__

Property Address: __7600 South Kingston, Chicago, Illinois 60649__

Deposit Amount: $ _____    Purpose: ☒ Earnest Money    ☐ Repairs: _____
Document(s) Held _____             ☐ Tax Escrow    ☐ Other: _____

The above is hereby deposited with First American Title Insurance Company, as Escrowee (hereinafter referred to as the Escrowee) pursuant to this Strict Joint Order Escrow Agreement (hereinafter referred to as the Agreement). Said deposit shall be released and delivered by the Escrowee only upon the joint written order of the undersigned or their respective legal representatives or assigns.

Escrowee is hereby expressly authorized to disregard, in its sole discretion, any and all notices or warnings given by any other person or corporation, but the Escrowee is hereby expressly authorized to regard and to comply with and obey any and all orders, judgments or decrees entered or issued by any court with or without jurisdiction, and in case the Escrowee obeys or complies with any such order, judgment or decree of any court it shall not be liable to any party hereto or any other person, firm or corporation by reason of such compliance, notwithstanding any such order, judgment or decree being entered without jurisdiction or being subsequently reversed, modified, annulled, set aside or vacated. In case of any suit or proceeding regarding the Agreement, to which the Escrowee is or may at any time become a party, it shall have a lien on the contents hereof for any and all costs, and reasonable attorneys' fees, whether such attorneys shall be regularly retained or specially employed, and any other expenses which it may have incurred or become liable for on account thereof, and it shall be entitled to reimburse itself therefore out of said deposit, and the undersigned agree to pay the Escrowee upon demand all such costs, fees and expenses so incurred, to the extent the funds deposited hereunder shall be insufficient to allow for such reimbursement.

In no case shall the above mentioned deposits be surrendered except on an order signed by the parties hereto, their respective legal representatives or assigns, or order of court as aforesaid.

Interest, income or other benefits, if any, earned or derived from the funds deposited shall belong to the Escrowee. The Escrowee may deposit all funds received hereunder to one or more of its general accounts. The Escrowee shall be under no duty to invest or reinvest any funds, at any time, held by it pursuant to the terms of the Agreement.

Unless otherwise tendered, the Escrowee is authorized to pay an Escrow Fee in the amount of $300.00, and thereafter a Maintenance Fee in the amount of $200.00 (charged per annum beginning one year following the date of the Agreement) from the funds deposited in this escrow. The Escrowee also reserves the right to add applicable administration fees at its discretion.

| Purchaser: | | Seller: | Kevin B. Duff, as Federal Equity Receiver for SSDF7 Portfolio 1 LLC |
|---|---|---|---|
| Signed: | _____ | Signed: | |
| Print Name: | _____ | Print Name: | Rachlis Duff Peel & Kaplan LLC |
| Address: | _____ | Address: | 542 South Dearborn, Suite 900 |
| | _____ | | Chicago, Illinois 60605 |
| Email: | _____ | Email: | kduff@rdaplaw.net |
| Primary Phone: | _____ | Primary Phone: | (312) 733-3390 |
| Alternate Phone: | _____ | Alternate Phone: | _____ |

Primary Contact (if other than above): _____

Accepted: First American Title Insurance Company, Escrowee          By: _____

27775 Diehl Road, Ste 200, Warrenville, IL 60555
T E L 877-295-4328 · F A X 866-525-5530
titleindemnity.warrenville.il@firstam.com

## PURCHASE & SALE AGREEMENT

This Purchase & Sale Agreement ("Agreement") is made by and between the court-appointed federal equity receiver for SSDF7 Portfolio 1, LLC ("Seller") pursuant to that certain Order Appointing Receiver entered August 17, 2018 (Dkt. 16), as supplemented by that certain Order entered March 14, 2019 (Dkt. 290), in the case captioned *United States Securities and Exchange Commission v. EquityBuild, Inc., et al.*, United States District Court for the Northern District of Illinois, Eastern Division, Civil Action No. 1:18-cv-05587 (the "SEC Action"), and

VENTUS HOLDINGS, LLC OR NOMINEE              ("Buyer")

for the purchase and sale of that certain real property and all fixtures, equipment, and personal property appurtenant thereto (the "Property") located at 7656 South Kingston Avenue | 2514-20 East 77th Street, Chicago, Illinois 60649 and legally described as follows:

LOT 18 IN BLOCK 7 IN SOUTH SHORE PARK, BEING A SUBDIVISION OF THE WEST HALF OF THE SOUTHWEST QUARTER OF SECTION 30, TOWNSHIP 38 NORTH, RANGE 15, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Permanent Index No. 21-30-309-026

\*       \*       \*

### TERMS AND CONDITIONS

The Seller agrees to sell the Property, and the Buyer agrees to purchase the Property, on the following terms and conditions:

1.      **Purchase Price**. The purchase price for the Property shall be $ 510,000              (the "Purchase Price"). The Buyer shall pay the Purchase Price as follows:

   a.      An earnest money deposit (the "Earnest Money") in an amount equal to ten percent (10%) of the Purchase Price within three (3) business days following the date of acceptance of the Agreement by the Seller (the "Acceptance Date").

   b.      The balance of the Purchase Price, subject to any applicable credits and prorations, at Closing.

*[Note: If the Buyer desires to enter into this Agreement subject to a financing contingency, then Rider A should be completed. Otherwise, Rider A should be left blank.]*

*[Note: If the Buyer purports to hold a mortgage interest in the Property and tenders this Agreement in connection with a credit bid, then Rider B should be completed. Otherwise, Rider B should be left blank.]*

1

**Exhibit**

**2**

2.    **Earnest Money**. The Earnest Money shall be held by First American Title Company ("First American Title") in a segregated escrow account. In connection with said Earnest Money deposit, the Buyer shall execute and deliver to the Seller a copy of that certain strict joint order escrow agreement in the form attached hereto as Exhibit A.

3.    **Court Approval**. As soon as practicable after the Acceptance Date, the Seller shall move before the Honorable John Z. Lee or any judge sitting in his stead or to whom he has made a referral in the SEC Action (the "Receivership Court") for approval of the sale of the Property pursuant to this Agreement. In the event that the Receivership Court does not issue the requisite approval, then the Agreement shall become null and void and all Earnest Money shall be promptly refunded to the Buyer.

4.    **Escrow Closing**. This sale shall be closed through an escrow with First American Title in accordance with the general provisions of the usual form of deed and money escrow agreement then furnished and in use by said title company. Payment of the Purchase Price and delivery of the receiver's deed shall be made through the escrow. The cost of the escrow shall be divided equally between the Buyer and the Seller unless the Buyer acquires the Property with financing, in which event that portion of the cost of the escrow relating to the financing shall be borne by the Buyer. Unless otherwise specified herein, all other closing costs shall be paid in accordance with custom for apartment investment sales transactions in Cook County, Illinois.

5.    **Irrevocable Offer**. This Agreement when executed by the Buyer and delivered to the Seller shall constitute an irrevocable offer to purchase the Property until ~~August 28, 2019~~ 10/17/2019 (the "Offer Expiration Date"). In the event that the offer is not accepted by the Seller before the Offer Expiration Date, then the offer shall be deemed withdrawn.

6.    **Personal Property**. At Closing, the Seller shall tender to the Buyer a bill of sale for the personal property appurtenant to the Property (the "Personal Property") warranting only that Seller is the absolute owner of said Personalty, that said Personalty is free and clear of all liens, charges, and encumbrances, and that the Seller has the full right, power, and authority to sell said Personalty and to deliver the bill of sale. The Seller shall neither make nor adopt any warranty whatsoever with respect to the Personal Property and shall specifically disclaim any implied warranty of merchantability or fitness for a particular purpose. The price of the Personal Property shall be included in the Purchase Price, and the Buyer agrees to accept all such Personal Property in "as is" condition.

7.    **The Closing Date**. The closing shall be held on a date (the "Closing Date") to be designated by the Seller after the Receivership Court approves the sale of the Property pursuant to this Agreement, provided, however, that the Buyer shall be entitled to five business days' advance Notice of the Closing Date.

8.    **Conveyance of Title**. At Closing, the Seller shall convey title to the Property by a recordable form receiver's deed subject only to (a) general real estate taxes not yet due and payable at the time of Closing; (b) covenants, conditions, restrictions, or building lines and

2

easements of record, if any; (c) public and utility easements; (d) applicable zoning and building laws and ordinances; (f) acts done by or suffered through Buyer or anyone claiming by, through, or under Buyer; (g) governmental actions or proceedings concerning or affecting the Property; and (h) encroachments of a minor nature, if any, that can be insured over at closing (the "Permitted Exceptions"). The Seller agrees to surrender possession of the Property at the time of Closing.

9.      **Commitment For Title Insurance**. Within ten (10) business days after the Acceptance Date, the Seller shall deliver to the Buyer evidence of merchantable title by delivering a commitment for title insurance with extended coverage from First American Title in the amount of the Purchase Price with a commitment date not earlier than July 1, 2019, subject only to general exceptions, the Permitted Exceptions, and exceptions pertaining to liens or encumbrances of a definite and ascertainable amount which may be removed by the payment of money by Seller, endorsed over by First American Title at the Seller's sole expense, or which will be extinguished by order of the Receivership Court. Such title commitment shall be conclusive evidence of good and merchantable title, subject only to the foregoing exceptions. If the commitment for title insurance discloses title exceptions other than the general exceptions, Permitted Exceptions, exceptions waivable through the payment of money or the issuance of an endorsement, or exceptions to be extinguished by Receivership Court order, the Seller shall have thirty (30) calendar days from the Closing Date to cure, or insure over, the unpermitted exceptions and the Closing shall be postponed until said unpermitted exceptions are cured or insured over. If the Seller fails to timely secure the removal of the unpermitted exceptions or obtain an endorsement insuring over the unpermitted exceptions, the Purchaser may terminate this Contract with a full refund of Earnest Money upon Notice to the Seller within ten (10) business days after the expiration of the thirty (30) day period. In such event, this Agreement shall become null and void and neither party shall thereafter have any rights against the other, and the Seller may not be held liable for direct, indirect, incidental, or consequential damages.

10.     **Survey**. At least five (5) business days prior to the Closing Date, the Seller shall provide the Buyer with a survey by a licensed land surveyor dated not more than six months prior to the date of Closing, indicating the present location of all improvements. If the Buyer or the Buyer's mortgagee desires a more recent or extensive survey, the survey shall be obtained at the Buyer's expense.

11.     **Assignment And Assumption Of Leases**. At Closing, the Seller shall deliver to the Buyer, and the Seller and Buyer shall execute, an assignment and assumption of leases (in the form attached hereto as Exhibit B) pursuant to which the Seller shall convey all right, title, and interest in and to any leases in effect at the Property to the Buyer, and the Buyer shall agree to assume all of the Seller's obligations under said leases.

12.     **Prorations**. Prepaid service contracts and other similar items shall be credited ratably at Closing. Any and all rents collected from or on behalf of tenants until the date of the Closing shall be applied by the Seller first to past due balances and then to currently scheduled monthly rent. Each tenant's scheduled monthly rent shall then be prorated for the month of Closing. To

P063

the extent that any tenant has paid all rent through and including the month prior to the Closing, then all additional rent received from such tenant shall be applied by the Seller first to rent for the period between the first day of the month in which the Closing occurs and the date of the Closing, and the balance of said rent, if any, shall be paid to the Buyer. Any and all rents that remain delinquent as of the Closing Date shall belong to the Buyer upon collection. Notwithstanding the foregoing, real estate taxes associated with the ownership of the Property shall be prorated as of the Closing Date based on 105% of the most recently ascertainable tax bill.

13.    **Inspection Period**. The Buyer acknowledges that it was afforded the opportunity to conduct a limited tour of the Property prior to submitting its offer. Within three (3) calendar days following the Acceptance Date, the Seller shall produce the following documents to the Buyer (the "Due Diligence Materials"):

   a.    *Current Rent Roll*. A current rent roll for the Property generated by the management company.

   b.    *Utility Bills*. Copies of all utility bills relating to the Property, to the extent available, for the twelve calendar months preceding the month of the Acceptance Date.

   c.    *Leases*. Copies of all existing leases affecting the Property.

   d.    *Profit & Loss Statement*. A current trailing twelve-month profit and loss statement reflecting all categories of operating income and expenses associated with the Property, as generated by the management company.

   e.    *Litigation Documents*. Copies of documents, including notices of violation, orders, judgments, and other pleadings, pertaining to any known litigation or proceedings currently affecting the Property.

In addition, the Seller shall allow the Buyer reasonable access to the Property for twenty days from and after the Acceptance Date (the "Inspection Period") for the purpose of conducting an inspection of the major structural and mechanical components of the Property. A major structural or mechanical component shall be deemed to be in acceptable operating condition if it substantially performs the function for which it is intended, regardless of age, and does not pose a threat to health or safety. In the event that the Buyer possesses sound evidence that any major structural or mechanical component of the Property does not substantially perform the function for which it is intended, then the Buyer shall have the right to terminate this Agreement upon the delivery of Notice to the Seller on or before the conclusion of the Inspection Period, such notice to be accompanied by the relevant pages of an inspection report prepared by a licensed or certified inspector and identifying the defect justifying the termination. Upon receipt by the Seller of the notice of termination, this Agreement shall be considered null and void and the parties shall be discharged of any and all obligations hereunder (except those obligations which survive termination) and First American Title shall

4

release the Earnest Money to the Buyer. In the event that the Buyer does not terminate the Agreement on or prior to the conclusion of the Inspection Period, the Property shall be considered accepted by the Buyer and the Earnest Money shall thereafter be non-refundable. In connection with its inspection of the Property, the Buyer shall keep the Property free and clear of liens, shall indemnify and hold Seller harmless from any and all liability, loss, cost, damage, or expense relating to its inspection of the Property, and shall repair any and all damage arising from the inspection. These obligations shall survive termination of the Agreement.

14.     **Entry Into Or Renewal Of Contracts & Material Changes**. Following the expiration of the Inspection Period, the Seller shall not without the prior written consent of the Buyer, said consent not to be unreasonably withheld, conditioned, or delayed, enter into or renew any service contract or lease affecting or concerning the Property. In addition, the Seller shall not make any material changes to the Property, perform or engage in any act, or enter into any agreement that materially changes the value of the Property or the rights of the Buyer relating to the Property.

15.     **Material Destruction**. Risk of loss to the Property shall be borne by the Seller until title has been conveyed to Buyer. If, prior to Closing, a material portion of the Property shall be destroyed or materially damaged by fire or other casualty, then the Seller shall provide prompt notice of said fire or other casualty to the Buyer and this Agreement shall thereafter, at the option of the Buyer, exercised by Notice to the Seller within five (5) business days after receipt of notice of such material damage, be null and void, and all Earnest Money shall be refunded to the Buyer. Failure of the Buyer to provide timely notice shall constitute a waiver of the right to terminate.

16.     **Condition Of Property**. The Buyer understands and agrees that the Property is being sold "as is" and "with all faults" and that neither the Seller nor any agent or attorney of the Seller, makes, or has made, any representation or warranty as to the physical condition or value of the Property or its suitability for the Buyer's intended use. The Seller has no obligation to repair or correct any alleged patent or latent defect at the Property, or to compensate the Buyer for any such defect, and, upon closing, the Buyer waives, releases, acquits, and forever discharges the Seller, and all of the Seller's agents and attorneys, to the maximum extent permitted by law, from any and all claims, actions, causes or action, demands, rights, liabilities, losses, damages, costs, or expenses, direct or indirect, known or unknown, foreseen or unforeseen, that it now has or which then may arise in the future on account of or in any way arising from or relating to any alleged patent or latent defect at the Property.

17.     **Buyer Default**. The Buyer and Seller agree that it would be difficult to ascertain the actual damages to be suffered by the Seller in the event of a default by the Buyer and that the amount of the Earnest Money deposited by the Buyer hereunder constitutes the parties' reasonable estimate of the Seller's damages in the event of the Buyer's default, and that upon any such default not caused by the Seller, the Seller shall be entitled to retain the Earnest

5

Money as liquidated damages, which shall constitute the Seller's sole and exclusive remedy in law or at equity in connection with said default.

18.    **Seller Default**. In the event that the Seller shall fail to sell, transfer, and assign the Property to Purchaser in violation of the terms of this Agreement and/or fail to perform any other material obligation of Seller hereunder, then the Buyer may give Notice to the Seller specifying the nature of the default. The Seller shall thereafter have five (5) business days from receipt of said Notice, but in no event beyond the Closing Date, within which to cure the alleged default. If the Seller fails to cure the default within the cure period, then the Buyer shall be entitled to the return of all Earnest Money and (a) to declare the Agreement null and void and sue for reasonable out-of-pocket expenses incurred in connection with this Agreement prior to the alleged default or (b) to sue for specific performance, the parties recognizing that the Property is unique and that the Buyer otherwise lacks an adequate remedy at law. In the latter event, the Buyer is advised that Section VIII of the Order Appointing Receiver entered in the SEC Action enjoins the filing or prosecution of all civil proceedings against the Receiver, in his capacity as Receiver, until further order of the court.

19.    **Representations and Warranties**. As a material inducement to the Buyer to enter into this Agreement, the Seller hereby makes the following representations and warranties, each of which shall remain true and correct as of the Closing Date:

   a.    The Seller has the full right, power, and authority to convey the Property to the Buyer as provided in this Agreement and to carry out its obligations hereunder. In addition, the individual executing this Agreement on behalf of the Seller has the legal right, power, and authority to bind the Seller to the terms hereof.

   b.    The Seller will not take any action affecting title to the Property following the Acceptance Date.

   c.    To the best of the Seller's knowledge, there are no actions, investigations, suits, or proceedings, pending or threatened, that affect the Property, or the ownership or operation thereof, other than the SEC Action and the following:

         *[None.]*

   d.    To the best of the Seller's knowledge, the Property is not in violation, nor has been under investigation for violation, of any federal, state, or local law, ordinance, or regulation regulating environmental conditions in, at, on, under, or about the Property, including but not limited to, soil and groundwater conditions.

20.    **Notices**. All notices required or permitted under this Agreement shall be in writing and served by registered or certified United States mail, return receipt requested; nationally recognized overnight mail courier (signature required); or electronic mail (evidenced by

6

competent and authentic proof of transmission). Any notices given to the Seller shall be
delivered to the Seller's counsel, at the following physical or e-mail addresses:

> Andrew E. Porter
> Porter Law Office
> 853 North Elston Avenue
> Chicago, Illinois 60614
> andrew@andrewporterlaw.com

> Michael Rachlis
> Rachlis Duff Peel & Kaplan LLC
> 542 South Dearborn, Suite 900
> Chicago, Illinois 60605
> mrachlis@rdaplaw.net

Any such notices or demands given to the Buyer shall be delivered to the Buyer's counsel, at the
following address physical or e-mail addresses:

> MICHAEL ELMAN
>
> 10 S LA SALLE, STE 1420
>
> CHICAGO, IL 60603
>
> MELMAN@MBELMANLAW.COM

21.　**Like-Kind Exchange**. The Seller agrees to cooperate if the Buyer elects to acquire the
Property as part of a like-kind exchange under Section 1031 of the Internal Revenue Code. The
Buyer's contemplated exchange shall not impose upon the Seller any additional liability or
financial obligation, and the Buyer agrees to hold the Seller harmless from any liability that
might arise from such exchange. This Agreement is neither subject to nor contingent upon the
Buyer's ability to dispose of its exchange property or to effectuate an exchange. In the event
any exchange contemplated by the Buyer should fail to occur, for whatever reason, the sale of
the Property shall nonetheless be consummated as provided herein.

22.　**Real Estate Agents**. Purchaser represents and warrants that, other than Seller's Agent
and Buyer's Agent, if any, no other putative real estate agent or broker was involved in
submitting, showing, marketing, or selling the Property to the Buyer, and the Buyer agrees to
indemnify and hold Seller, and its successors and assigns, harmless from and against any and all
liability, loss, damages, cost, or expense, including reasonable attorneys' fees, arising from or
relating to any claim for a commission, fee, or other form of payment or compensation asserted
by a putative real estate agent or broker purporting to have procured the Buyer in connection
with this Agreement.

P067

23.     **Foreign Investor Disclosure**. The Seller and the Buyer agree to execute and deliver any instrument, affidavit, or statement, and to perform any act reasonably necessary to carry out the provisions of the Foreign Investment in Real Property Tax Act and regulations promulgated thereunder. The Seller represents that the Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code.

24.     **Merger**. This Agreement expresses the entire agreement of the parties and supersedes any and all previous agreements or understandings between them with regard to the Property. There are no other understandings, oral or written, which in any way alter or enlarge the terms of this Agreement, and there are no warranties or representations of any nature whatsoever, either express or implied, except as set forth herein. This Agreement may be modified only by a written instrument signed by the party to be charged.

25.     **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

*      *      *

The undersigned Buyer hereby offers and agrees to purchase the Property upon the terms and

conditions stated herein as of this 14TH      day of August, 2019. In addition, the individual

signing below on behalf of the Buyer represents and warrants that s/he is authorized to execute

this Agreement on behalf of the Buyer.

8

**Buyer**

VENTUS HOLDINGS, LLC OR NOMINEE

_____

10 S LA SALLE STE 1420

Chicago, IL 60603

_____

By: /ZACH ELMAN/

Its: MANAGER

**Buyer's Agent**

_____

_____

_____

_____

_____

**Seller**

KEVIN B. DUFF,
FEDERAL EQUITY RECEIVER FOR
SSDF7 PORTFOLIO 1 LLC

Rachlis Duff Peel & Kaplan LLC
542 South Dearborn Street, Suite 900
Chicago, Illinois 60605
(312) 733-3390

Acceptance Date: 10/15/19

**Seller's Agent**

Jeffrey Baasch
SVN Chicago Commercial
940 West Adams Street, Suite 200
Chicago, Illinois 60607
(312) 676-1866

9

## RIDER A

_____ If the Buyer desires that the terms and provisions of this Rider be incorporated into the Purchase And Sale Agreement to which it is annexed, please initial this paragraph.

*    *    *

This Agreement is contingent upon the Buyer securing, no later than 21 days following the

Acceptance Date (the "Financing Contingency Deadline"), a firm written mortgage commitment

for a fixed or adjustable rate mortgage from an established multifamily residential mortgage

lender in the amount of $_____, at an interest rate (or initial interest rate if an adjustable

rate mortgage) not to exceed %_____per annum, amortized over_____years, payable monthly,

with a loan origination fee not to exceed %_____, plus appraisal and credit report fees, if any. If

the Buyer is unable to secure a firm written mortgage commitment as described herein within

the referenced time period, then the Buyer may terminate this Agreement with a full refund of

Earnest Money by providing notice to the Seller prior to the expiration of the Financing

Contingency Deadline. If the Buyer does not provide the requisite notice to the Seller as

provided herein, then the Buyer shall be deemed to have waived this financing contingency,

and this Agreement shall remain in full force and effect.

## RIDER B

_____ If the Buyer purports to hold a mortgage interest in the Property and tenders the Purchase And Sale Agreement to which this rider is annexed (the "Agreement") in connection with the submission of a credit bid, please initial this paragraph and provide the information and supply any additional terms and conditions to the Agreement, or modifications to the Agreement, as requested herein. Any such terms and conditions shall supersede any contrary or conflicting terms and conditions set forth in the Agreement itself.

*    *    *

The Buyer consists of the following mortgagee or mortgagees purporting to hold a perfected and unreleased security interest in the Property:

_[Using additional sheets, please indicate, for each mortgagee identified above, the total unpaid balance due under the promissory note secured by the corresponding mortgage and itemize each component of the current alleged loan balance, including, but not limited to, principal, interest, default rate interest, late fees, service fees, liquidation fees, protective advances, and other charges.]_

The Purchase Price shall be the amount of the credit bid submitted by the Buyer, and any requirement to make an earnest money deposit is deleted. Payment of the Purchase Price shall not be made through the escrow at closing.

In addition, the Buyer shall pay all closing costs approved by the Court, which may, subject to the Court's ruling, include, but not be limited to, owner's title insurance premiums, applicable transfer taxes, the survey invoice, property management fees accrued through the closing, due and unpaid real estate taxes, escrow fees, brokerage commissions, unpaid utilities, title commitment update fees, gap insurance premiums, State of Illinois policy fees, extended coverage premiums, the costs of closing protection coverage for the Seller, all other expenses required to be paid by the Seller at closing, all amounts advanced for the benefit of the Property which are required to be reimbursed and/or any amount required to discharge any Receiver's lien.

*[Using additional sheets, set forth any other terms and conditions to be included in the Agreement, or any modifications to the Agreement, and to which your credit bid shall remain subject.]*

EXHIBIT A



First American
Title Insurance Company

## STRICT JOINT ORDER ESCROW AGREEMENT

Open Date: _____     Expected Release Date: _____     Escrow Number: __2964652__

Property Address: __7656 South Kingston Avenue, Chicago, Illinois 60649__

Deposit Amount: $ _____     Purpose: ☒ Earnest Money     ☐ Repairs: _____
Document(s) Held _____          ☐ Tax Escrow          ☐ Other: _____

The above is hereby deposited with First American Title Insurance Company, as Escrowee (hereinafter referred to as the Escrowee) pursuant to this Strict Joint Order Escrow Agreement (hereinafter referred to as the Agreement). Said deposit shall be released and delivered by the Escrowee only upon the joint written order of the undersigned or their respective legal representatives or assigns.

Escrowee is hereby expressly authorized to disregard, in its sole discretion, any and all notices or warnings given by any other person or corporation, but the Escrowee is hereby expressly authorized to regard and to comply with and obey any and all orders, judgments or decrees entered or issued by any court with or without jurisdiction, and in case the Escrowee obeys or complies with any such order, judgment or decree of any court it shall not be liable to any party hereto or any other person, firm or corporation by reason of such compliance, notwithstanding any such order, judgment or decree being entered without jurisdiction or being subsequently reversed, modified, annulled, set aside or vacated. In case of any suit or proceeding regarding the Agreement, to which the Escrowee is or may at any time become a party, it shall have a lien on the contents hereof for any and all costs, and reasonable attorneys' fees, whether such attorneys shall be regularly retained or specially employed, and any other expenses which it may have incurred or become liable for on account thereof, and it shall be entitled to reimburse itself therefore out of said deposit, and the undersigned agree to pay the Escrowee upon demand all such costs, fees and expenses so incurred, to the extent the funds deposited hereunder shall be insufficient to allow for such reimbursement.

In no case shall the above mentioned deposits be surrendered except on an order signed by the parties hereto, their respective legal representatives or assigns, or order of court as aforesaid.

Interest, income or other benefits, if any, earned or derived from the funds deposited shall belong to the Escrowee. The Escrowee may deposit all funds received hereunder to one or more of its general accounts. The Escrowee shall be under no duty to invest or reinvest any funds, at any time, held by it pursuant to the terms of the Agreement.

Unless otherwise tendered, the Escrowee is authorized to pay an Escrow Fee in the amount of $300.00, and thereafter a Maintenance Fee in the amount of $200.00 (charged per annum beginning one year following the date of the Agreement) from the funds deposited in this escrow. The Escrowee also reserves the right to add applicable administration fees at its discretion.

| Purchaser: | | Seller: | Kevin B. Duff, as Federal Equity Receiver for SSDF7 Portfolio 1 LLC |
|---|---|---|---|
| Signed: | _____ | Signed: | |
| Print Name: | _____ | Print Name: | Rachlis Duff Peel & Kaplan LLC |
| Address: | _____ | Address: | 542 South Dearborn, Suite 900 |
| | _____ | | Chicago, Illinois 60605 |
| Email: | _____ | Email: | kduff@rdaplaw.net |
| Primary Phone: | _____ | Primary Phone: | (312) 733-3390 |
| Alternate Phone: | _____ | Alternate Phone: | _____ |

Primary Contact (if other than above): _____

Accepted: First American Title Insurance Company, Escrowee     By: _____

27775 Diehl Road, Ste 200, Warrenville, IL 60555
*T E L* 877-295-4328 · *F A X* 866-525-5530
titleindemnity.warrenville.il@firstam.com

## PURCHASE & SALE AGREEMENT

This Purchase & Sale Agreement ("Agreement") is made by and between the court-appointed federal equity receiver for SSPH 6951 S Merrill LLC ("Seller") pursuant to that certain Order Appointing Receiver entered August 17, 2018 (Dkt. 16), as supplemented by that certain Order entered March 14, 2019 (Dkt. 290), in the case captioned *United States Securities and Exchange Commission v. EquityBuild, Inc., et al.*, United States District Court for the Northern District of Illinois, Eastern Division, Civil Action No. 1:18-cv-05587 (the "SEC Action"), and

Ventus Merrill, LLC _____ ("Buyer")

for the purchase and sale of that certain real property and all fixtures, equipment, and personal property appurtenant thereto (the "Property") located at 6949-59 South Merrill Avenue, Chicago, Illinois 60619 and legally described as follows:

LOTS 29 AND 30, IN FIRST ADDITION TO BRYN MAWR HIGHLANDS, A SUBDIVISION OF THE NORTH 3/4 OF THE WEST HALF OF THE SOUTHEAST QUARTER OF SECTION 24, TOWNSHIP 38 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN IN COOK COUNTY, ILLNOIS.

Permanent Index No. 20-24-417-014-0000

\* \* \*

### *TERMS AND CONDITIONS*

The Seller agrees to sell the Property, and the Buyer agrees to purchase the Property, on the following terms and conditions:

1.      **Purchase Price**. The purchase price for the Property shall be $ 1,935,200 _____ (the "Purchase Price"). The Buyer shall pay the Purchase Price as follows:

   a.      An earnest money deposit (the "Earnest Money") in an amount equal to ten percent (10%) of the Purchase Price within three (3) business days following the date of acceptance of the Agreement by the Seller (the "Acceptance Date").

   b.      The balance of the Purchase Price, subject to any applicable credits and prorations, at Closing.

*[Note: If the Buyer desires to enter into this Agreement subject to a financing contingency, then Rider A should be completed. Otherwise, Rider A should be left blank.]*

*[Note: If the Buyer purports to hold a mortgage interest in the Property and tenders this Agreement in connection with a credit bid, then Rider B should be completed. Otherwise, Rider B should be left blank.]*

1

**Exhibit**

**3**

2.    **Earnest Money**. The Earnest Money shall be held by First American Title Company ("First American Title") in a segregated escrow account. In connection with said Earnest Money deposit, the Buyer shall execute and deliver to the Seller a copy of that certain strict joint order escrow agreement in the form attached hereto as Exhibit A.

3.    **Court Approval**. As soon as practicable after the Acceptance Date, the Seller shall move before the Honorable John Z. Lee or any judge sitting in his stead or to whom he has made a referral in the SEC Action (the "Receivership Court") for approval of the sale of the Property pursuant to this Agreement. In the event that the Receivership Court does not issue the requisite approval, then the Agreement shall become null and void and all Earnest Money shall be promptly refunded to the Buyer.

4.    **Escrow Closing**. This sale shall be closed through an escrow with First American Title in accordance with the general provisions of the usual form of deed and money escrow agreement then furnished and in use by said title company. Payment of the Purchase Price and delivery of the receiver's deed shall be made through the escrow. The cost of the escrow shall be divided equally between the Buyer and the Seller unless the Buyer acquires the Property with financing, in which event that portion of the cost of the escrow relating to the financing shall be borne by the Buyer. Unless otherwise specified herein, all other closing costs shall be paid in accordance with custom for apartment investment sales transactions in Cook County, Illinois.

5.    **Irrevocable Offer**. This Agreement when executed by the Buyer and delivered to the Seller shall constitute an irrevocable offer to purchase the Property until   January 10, 2020   (the "Offer Expiration Date"). In the event that the offer is not accepted by the Seller before the Offer Expiration Date, then the offer shall be deemed withdrawn.

6.    **Personal Property**. At Closing, the Seller shall tender to the Buyer a bill of sale for the personal property appurtenant to the Property (the "Personal Property") warranting only that Seller is the absolute owner of said Personalty, that said Personalty is free and clear of all liens, charges, and encumbrances, and that the Seller has the full right, power, and authority to sell said Personalty and to deliver the bill of sale. The Seller shall neither make nor adopt any warranty whatsoever with respect to the Personal Property and shall specifically disclaim any implied warranty of merchantability or fitness for a particular purpose. The price of the Personal Property shall be included in the Purchase Price, and the Buyer agrees to accept all such Personal Property in "as is" condition.

7.    **The Closing Date**. The closing shall be held on a date (the "Closing Date") to be designated by the Seller after the Receivership Court approves the sale of the Property pursuant to this Agreement, provided, however, that the Buyer shall be entitled to five business days' advance Notice of the Closing Date.

8.    **Conveyance of Title**. At Closing, the Seller shall convey title to the Property by a recordable form receiver's deed subject only to (a) general real estate taxes not yet due and payable at the time of Closing; (b) covenants, conditions, restrictions, or building lines and

2

easements of record, if any; (c) public and utility easements; (d) applicable zoning and building laws and ordinances; (f) acts done by or suffered through Buyer or anyone claiming by, through, or under Buyer; (g) governmental actions or proceedings concerning or affecting the Property; and (h) encroachments of a minor nature, if any, that can be insured over at closing (the "Permitted Exceptions"). The Seller agrees to surrender possession of the Property at the time of Closing.

9.     Commitment For Title Insurance. Within ten (10) business days after the Acceptance Date, the Seller shall deliver to the Buyer evidence of merchantable title by delivering a commitment for title insurance with extended coverage from First American Title in the amount of the Purchase Price with a commitment date not earlier than July 1, 2019, subject only to general exceptions, the Permitted Exceptions, and exceptions pertaining to liens or encumbrances of a definite and ascertainable amount which may be removed by the payment of money by Seller, endorsed over by First American Title at the Seller's sole expense, or which will be extinguished by order of the Receivership Court. Such title commitment shall be conclusive evidence of good and merchantable title, subject only to the foregoing exceptions. If the commitment for title insurance discloses title exceptions other than the general exceptions, Permitted Exceptions, exceptions waivable through the payment of money or the issuance of an endorsement, or exceptions to be extinguished by Receivership Court order, the Seller shall have thirty (30) calendar days from the Closing Date to cure, or insure over, the unpermitted exceptions and the Closing shall be postponed until said unpermitted exceptions are cured or insured over. If the Seller fails to timely secure the removal of the unpermitted exceptions or obtain an endorsement insuring over the unpermitted exceptions, the Purchaser may terminate this Contract with a full refund of Earnest Money upon Notice to the Seller within ten (10) business days after the expiration of the thirty (30) day period. In such event, this Agreement shall become null and void and neither party shall thereafter have any rights against the other, and the Seller may not be held liable for direct, indirect, incidental, or consequential damages.

10.     Survey. At least five (5) business days prior to the Closing Date, the Seller shall provide the Buyer with a survey by a licensed land surveyor dated not more than six months prior to the date of Closing, indicating the present location of all improvements. If the Buyer or the Buyer's mortgagee desires a more recent or extensive survey, the survey shall be obtained at the Buyer's expense.

11.     Assignment And Assumption Of Leases. At Closing, the Seller shall deliver to the Buyer, and the Seller and Buyer shall execute, an assignment and assumption of leases (in the form attached hereto as Exhibit B) pursuant to which the Seller shall convey all right, title, and interest in and to any leases in effect at the Property to the Buyer, and the Buyer shall agree to assume all of the Seller's obligations under said leases.

12.     Prorations. Prepaid service contracts and other similar items shall be credited ratably at Closing. Any and all rents collected from or on behalf of tenants until the date of the Closing shall be applied by the Seller first to past due balances and then to currently scheduled monthly rent. Each tenant's scheduled monthly rent shall then be prorated for the month of Closing. To

3

the extent that any tenant has paid all rent through and including the month prior to the Closing, then all additional rent received from such tenant shall be applied by the Seller first to rent for the period between the first day of the month in which the Closing occurs and the date of the Closing, and the balance of said rent, if any, shall be paid to the Buyer. Any and all rents that remain delinquent as of the Closing Date shall belong to the Buyer upon collection. Notwithstanding the foregoing, real estate taxes associated with the ownership of the Property shall be prorated as of the Closing Date based on 105% of the most recently ascertainable tax bill.

13.     **Inspection Period**. The Buyer acknowledges that it was afforded the opportunity to conduct a limited tour of the Property prior to submitting its offer. Within three (3) calendar days following the Acceptance Date, the Seller shall produce the following documents to the Buyer (the "Due Diligence Materials"):

a.     *Current Rent Roll*. A current rent roll for the Property generated by the management company.

b.     *Utility Bills*. Copies of all utility bills relating to the Property, to the extent available, for the twelve calendar months preceding the month of the Acceptance Date.

c.     *Leases*. Copies of all existing leases affecting the Property.

d.     *Profit & Loss Statement*. A current trailing twelve-month profit and loss statement reflecting all categories of operating income and expenses associated with the Property, as generated by the management company.

e.     *Litigation Documents*. Copies of documents, including notices of violation, orders, judgments, and other pleadings, pertaining to any known litigation or proceedings currently affecting the Property.

In addition, the Seller shall allow the Buyer reasonable access to the Property for twenty days from and after the Acceptance Date (the "Inspection Period") for the purpose of conducting an inspection of the major structural and mechanical components of the Property. A major structural or mechanical component shall be deemed to be in acceptable operating condition if it substantially performs the function for which it is intended, regardless of age, and does not pose a threat to health or safety. In the event that the Buyer possesses sound evidence that any major structural or mechanical component of the Property does not substantially perform the function for which it is intended, then the Buyer shall have the right to terminate this Agreement upon the delivery of Notice to the Seller on or before the conclusion of the Inspection Period, such notice to be accompanied by the relevant pages of an inspection report prepared by a licensed or certified inspector and identifying the defect justifying the termination. Upon receipt by the Seller of the notice of termination, this Agreement shall be considered null and void and the parties shall be discharged of any and all obligations hereunder (except those obligations which survive termination) and First American Title shall

4

release the Earnest Money to the Buyer. In the event that the Buyer does not terminate the Agreement on or prior to the conclusion of the Inspection Period, the Property shall be considered accepted by the Buyer and the Earnest Money shall thereafter be non-refundable. In connection with its inspection of the Property, the Buyer shall keep the Property free and clear of liens, shall indemnify and hold Seller harmless from any and all liability, loss, cost, damage, or expense relating to its inspection of the Property, and shall repair any and all damage arising from the inspection. These obligations shall survive termination of the Agreement.

14.     **Entry Into Or Renewal Of Contracts & Material Changes.** Following the expiration of the Inspection Period, the Seller shall not without the prior written consent of the Buyer, said consent not to be unreasonably withheld, conditioned, or delayed, enter into or renew any service contract or lease affecting or concerning the Property. In addition, the Seller shall not make any material changes to the Property, perform or engage in any act, or enter into any agreement that materially changes the value of the Property or the rights of the Buyer relating to the Property.

15.     **Material Destruction.** Risk of loss to the Property shall be borne by the Seller until title has been conveyed to Buyer. If, prior to Closing, a material portion of the Property shall be destroyed or materially damaged by fire or other casualty, then the Seller shall provide prompt notice of said fire or other casualty to the Buyer and this Agreement shall thereafter, at the option of the Buyer, exercised by Notice to the Seller within five (5) business days after receipt of notice of such material damage, be null and void, and all Earnest Money shall be refunded to the Buyer. Failure of the Buyer to provide timely notice shall constitute a waiver of the right to terminate.

16.     **Condition Of Property.** The Buyer understands and agrees that the Property is being sold "as is" and "with all faults" and that neither the Seller nor any agent or attorney of the Seller, makes, or has made, any representation or warranty as to the physical condition or value of the Property or its suitability for the Buyer's intended use. The Seller has no obligation to repair or correct any alleged patent or latent defect at the Property, or to compensate the Buyer for any such defect, and, upon closing, the Buyer waives, releases, acquits, and forever discharges the Seller, and all of the Seller's agents and attorneys, to the maximum extent permitted by law, from any and all claims, actions, causes or action, demands, rights, liabilities, losses, damages, costs, or expenses, direct or indirect, known or unknown, foreseen or unforeseen, that it now has or which may arise in the future on account of or in any way arising from or relating to any alleged patent or latent defect at the Property.

17.     **Buyer Default.** The Buyer and Seller agree that it would be difficult to ascertain the actual damages to be suffered by the Seller in the event of a default by the Buyer and that the amount of the Earnest Money deposited by the Buyer hereunder constitutes the parties' reasonable estimate of the Seller's damages in the event of the Buyer's default, and that upon any such default not caused by the Seller, the Seller shall be entitled to retain the Earnest

5

P099

Money as liquidated damages, which shall constitute the Seller's sole and exclusive remedy in law or at equity in connection with said default.

18.     **Seller Default.** In the event that the Seller shall fail to sell, transfer, and assign the Property to Purchaser in violation of the terms of this Agreement and/or fail to perform any other material obligation of Seller hereunder, then the Buyer may give Notice to the Seller specifying the nature of the default. The Seller shall thereafter have five (5) business days from receipt of said Notice, but in no event beyond the Closing Date, within which to cure the alleged default. If the Seller fails to cure the default within the cure period, then the Buyer shall be entitled to the return of all Earnest Money and (a) to declare the Agreement null and void and sue for reasonable out-of-pocket expenses incurred in connection with this Agreement prior to the alleged default or (b) to sue for specific performance, the parties recognizing that the Property is unique and that the Buyer otherwise lacks an adequate remedy at law. In the latter event, the Buyer is advised that Section VIII of the Order Appointing Receiver entered in the SEC Action enjoins the filing or prosecution of all civil proceedings against the Receiver, in his capacity as Receiver, until further order of the court.

19.     **Representations and Warranties.** As a material inducement to the Buyer to enter into this Agreement, the Seller hereby makes the following representations and warranties, each of which shall remain true and correct as of the Closing Date:

    a.     The Seller has the full right, power, and authority to convey the Property to the Buyer as provided in this Agreement and to carry out its obligations hereunder. In addition, the individual executing this Agreement on behalf of the Seller has the legal right, power, and authority to bind the Seller to the terms hereof.

    b.     The Seller will not take any action affecting title to the Property following the Acceptance Date.

    c.     To the best of the Seller's knowledge, there are no actions, investigations, suits, or proceedings, pending or threatened, that affect the Property, or the ownership or operation thereof, other than the SEC Action and the following:

    *[None.]*

    d.     To the best of the Seller's knowledge, the Property is not in violation, nor has been under investigation for violation, of any federal, state, or local law, ordinance, or regulation regulating environmental conditions in, at, on, under, or about the Property, including but not limited to, soil and groundwater conditions.

20.     **Notices.** All notices required or permitted under this Agreement shall be in writing and served by registered or certified United States mail, return receipt requested; nationally recognized overnight mail courier (signature required); or electronic mail (evidenced by

6

competent and authentic proof of transmission). Any notices given to the Seller shall be delivered to the Seller's counsel, at the following physical or e-mail addresses:

> Andrew E. Porter
> Porter Law Office
> 853 North Elston Avenue
> Chicago, Illinois 60614
> andrew@andrewporterlaw.com

> Michael Rachlis
> Rachlis Duff Peel & Kaplan LLC
> 542 South Dearborn, Suite 900
> Chicago, Illinois 60605
> mrachlis@rdaplaw.net

Any such notices or demands given to the Buyer shall be delivered to the Buyer's counsel, at the following address physical or e-mail addresses:

> Zach Elman
>
> Ventus Merrill, LLC
>
> 10 S La Salle Ste. 1420
>
> Chicago, IL 60603

21.    **Like-Kind Exchange**. The Seller agrees to cooperate if the Buyer elects to acquire the Property as part of a like-kind exchange under Section 1031 of the Internal Revenue Code. The Buyer's contemplated exchange shall not impose upon the Seller any additional liability or financial obligation, and the Buyer agrees to hold the Seller harmless from any liability that might arise from such exchange. This Agreement is neither subject to nor contingent upon the Buyer's ability to dispose of its exchange property or to effectuate an exchange. In the event any exchange contemplated by the Buyer should fail to occur, for whatever reason, the sale of the Property shall nonetheless be consummated as provided herein.

22.    **Real Estate Agents**. Purchaser represents and warrants that, other than Seller's Agent and Buyer's Agent, if any, no other putative real estate agent or broker was involved in submitting, showing, marketing, or selling the Property to the Buyer, and the Buyer agrees to indemnify and hold Seller, and its successors and assigns, harmless from and against any and all liability, loss, damages, cost, or expense, including reasonable attorneys' fees, arising from or relating to any claim for a commission, fee, or other form of payment or compensation asserted by a putative real estate agent or broker purporting to have procured the Buyer in connection with this Agreement.

23.  **Foreign Investor Disclosure**. The Seller and the Buyer agree to execute and deliver any instrument, affidavit, or statement, and to perform any act reasonably necessary to carry out the provisions of the Foreign Investment in Real Property Tax Act and regulations promulgated thereunder. The Seller represents that the Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code.

24.  **Merger.** This Agreement expresses the entire agreement of the parties and supersedes any and all previous agreements or understandings between them with regard to the Property. There are no other understandings, oral or written, which in any way alter or enlarge the terms of this Agreement, and there are no warranties or representations of any nature whatsoever, either express or implied, except as set forth herein. This Agreement may be modified only by a written instrument signed by the party to be charged.

25.  **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

*       *       *

The undersigned Buyer hereby offers and agrees to purchase the Property upon the terms and conditions stated herein as of this 13th      day of December, 2019. In addition, the individual signing below on behalf of the Buyer represents and warrants that s/he is authorized to execute this Agreement on behalf of the Buyer.

X

**Buyer**

Zachary Elman

By:

Its:

**Buyer's Agent**

**Seller**

KEVIN B. DUFF,
FEDERAL EQUITY RECEIVER FOR
SSPH 6951 S MERRILL LLC

Rachlis Duff Peel & Kaplan LLC
542 South Dearborn Street, Suite 900
Chicago, Illinois 60605
(312) 733-3390

Acceptance Date: 12/19/2019

**Seller's Agent**

Jeffrey Baasch
SVN Chicago Commercial
940 West Adams Street, Suite 200
Chicago, Illinois 60607
(312) 676-1866

9

## RIDER A

_____ If the Buyer desires that the terms and provisions of this Rider be incorporated into the Purchase And Sale Agreement to which it is annexed, please initial this paragraph.

*          *          *

This Agreement is contingent upon the Buyer securing, no later than 21 days following the Acceptance Date (the "Financing Contingency Deadline"), a firm written mortgage commitment for a fixed or adjustable rate mortgage from an established multifamily residential mortgage lender in the amount of $ 1,649,200 , at an interest rate (or initial interest rate if an adjustable rate mortgage) not to exceed 5%____per annum, amortized over 30 ___ years, payable monthly, with a loan origination fee not to exceed 1%____, plus appraisal and credit report fees, if any. If the Buyer is unable to secure a firm written mortgage commitment as described herein within the referenced time period, then the Buyer may terminate this Agreement with a full refund of Earnest Money by providing notice to the Seller prior to the expiration of the Financing Contingency Deadline. If the Buyer does not provide the requisite notice to the Seller as provided herein, then the Buyer shall be deemed to have waived this financing contingency, and this Agreement shall remain in full force and effect.

## RIDER B

_____ If the Buyer purports to hold a mortgage interest in the Property and tenders the Purchase And Sale Agreement to which this rider is annexed (the "Agreement") in connection with the submission of a credit bid, please initial this paragraph and provide the information and supply any additional terms and conditions to the Agreement, or modifications to the Agreement, as requested herein. Any such terms and conditions shall supersede any contrary or conflicting terms and conditions set forth in the Agreement itself.

♠          ♠          ♠

The Buyer consists of the following mortgagee or mortgagees purporting to hold a perfected and unreleased security interest in the Property:

| | |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

*[Using additional sheets, please indicate, for each mortgagee identified above, the total unpaid balance due under the promissory note secured by the corresponding mortgage and itemize each component of the current alleged loan balance, including, but not limited to, principal, interest, default rate interest, late fees, service fees, liquidation fees, protective advances, and other charges.]*

The Purchase Price shall be the amount of the credit bid submitted by the Buyer, and any requirement to make an earnest money deposit is deleted. Payment of the Purchase Price shall not be made through the escrow at closing.

In addition, the Buyer shall pay all closing costs approved by the Court, which may, subject to the Court's ruling, include, but not be limited to, owner's title insurance premiums, applicable transfer taxes, the survey invoice, property management fees accrued through the closing, due and unpaid real estate taxes, escrow fees, brokerage commissions, unpaid utilities, title commitment update fees, gap insurance premiums, State of Illinois policy fees, extended coverage premiums, the costs of closing protection coverage for the Seller, all other expenses required to be paid by the Seller at closing, all amounts advanced for the benefit of the Property which are required to be reimbursed and/or any amount required to discharge any Receiver's lien.

*[Using additional sheets, set forth any other terms and conditions to be included in the Agreement, or any modifications to the Agreement, and to which your credit bid shall remain subject.]*

**EXHIBIT A**



**First American**
**Title Insurance Company**

STRICT JOINT ORDER ESCROW AGREEMENT

Open Date: _____     Expected Release Date: _____     Escrow Number: 2964570

Property Address: 6949-59 South Merrill, Chicago, Illinois 60619

Deposit Amount: $ _____     Purpose: ☒ Earnest Money      ☐ Repairs: _____
Document(s) Held _____                    ☐ Tax Escrow        ☐ Other: _____

The above is hereby deposited with First American Title Insurance Company, as Escrowee (hereinafter referred to as the Escrowee) pursuant to this Strict Joint Order Escrow Agreement (hereinafter referred to as the Agreement). Said deposit shall be released and delivered by the Escrowee only upon the joint written order of the undersigned or their respective legal representatives or assigns.

Escrowee is hereby expressly authorized to disregard, in its sole discretion, any and all notices or warnings given by any other person or corporation, but the Escrowee is hereby expressly authorized to regard and to comply with and obey any and all orders, judgments or decrees entered or issued by any court with or without jurisdiction, and in case the Escrowee obeys or complies with any such order, judgment or decree of any court it shall not be liable to any party hereto or any other person, firm or corporation by reason of such compliance, notwithstanding any such order, judgment or decree being entered without jurisdiction or being subsequently reversed, modified, annulled, set aside or vacated. In case of any suit or proceeding regarding the Agreement, to which the Escrowee is or may at any time become a party, it shall have a lien on the contents hereof for any and all costs, and reasonable attorneys' fees, whether such attorneys shall be regularly retained or specially employed, and any other expenses which it may have incurred or become liable for on account thereof, and it shall be entitled to reimburse itself therefore out of said deposit, and the undersigned agree to pay the Escrowee upon demand all such costs, fees and expenses so incurred, to the extent the funds deposited hereunder shall be insufficient to allow for such reimbursement.

In no case shall the above mentioned deposits be surrendered except on an order signed by the parties hereto, their respective legal representatives or assigns, or order of court as aforesaid.

Interest, income or other benefits, if any, earned or derived from the funds deposited shall belong to the Escrowee. The Escrowee may deposit all funds received hereunder to one or more of its general accounts. The Escrowee shall be under no duty to invest or reinvest any funds, at any time, held by it pursuant to the terms of the Agreement.

Unless otherwise tendered, the Escrowee is authorized to pay an Escrow Fee in the amount of $300.00, and thereafter a Maintenance Fee in the amount of $200.00 (charged per annum beginning one year following the date of the Agreement) from the funds deposited in this escrow. The Escrowee also reserves the right to add applicable administration fees at its discretion.

Purchaser:                                      Seller: Kevin B. Duff, as Federal Equity Receiver
Signed: _____                        for SSPH 6951 S Merrill LLC
                                               Signed: _____

Print Name: _____                    Print Name: _____
                                               Rachlis Duff Peel & Kaplan LLC
Address: 1050 W. Belle Ste 1470                Address: 542 South Dearborn, Suite 900
         _____                                Chicago, Illinois 60605

Email: _____                         Email: kduff@rdaplaw.net

Primary Phone: _____                  Primary Phone: (312) 733-3390

Alternate Phone: _____                Alternate Phone: _____

Primary Contact (if other than above): _____

Accepted: First American Title Insurance Company, Escrowee     By: _____

27775 Diehl Road, Ste 200, Warrenville, IL 60555
T E L 877-295-4328 · F A X 866-525-5530
titleindemnity.warrenville.il@firstam.com

P108

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 C 5587 |
| | ) | |
| v. | ) | Judge John Z. Lee |
| | ) | |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Before the Court is the motion by intervenors Ventus Holdings, LLC, and Ventus Merrill, LLC (collectively, "Ventus"), seeking the return of earnest money deposits relating to Ventus's contracts with the Receiver to purchase three parcels of commercial real estate: 6949–59 South Merrill Avenue, 7600–10 South Kingston Avenue, and 7656–58 South Kingston Avenue. For the following reasons, Ventus's motion [861] is denied.

## I.     Background

The order appointing the Receiver in this case authorized the Receiver to take "all necessary and reasonable actions" to sell or lease "all real property in the Receivership Estate, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such real property." Order Appointing Receiver ¶ 38, ECF No. 16. Pursuant to that authority, in October and

December 2019, the Receiver accepted contracts to sell the properties at issue to Ventus for a total of $4,315,200, and the Court confirmed those sales in February and April 2020.  *See* Receiver's Fifth Mot. Confirm Sales, ECF No. 618; 2/21/20 Order, ECF No. 633; 4/1/20 Order, ECF No. 680.  Ventus tendered ten percent of the purchase amount—$431,520.00—as an earnest money deposit.  Ventus's Mot. Return Earnest Money at 1.  On April 20, 2020, however, Ventus informed the Receiver that it had lost its acquisition financing, that it could no longer raise the required equity from its investors, and that it "no longer intend[ed] to proceed with the acquisition of these properties."  Receiver's Resp. Opp'n Ventus's Mot. Return Earnest Money ("Receiver's Opp'n"), Ex. K, 4/20/20 Letter from Ventus to Receiver ("4/20/20 Letter"), ECF No. 882 at 130.  Ventus added that it was "quite unfortunate that we could not complete these transactions."  *Id*.

From there, the Receiver solicited and accepted the next best bids, ultimately signing contracts to sell the three properties for a total of $945,200 less than what Ventus had agreed to pay for them.  Reply Supp. Eighth Mot. Confirm Sales at 3, 6, ECF No. 739.  On June 11, 2020, the Receiver moved to confirm the sales.  Ventus subsequently objected, seeking to reinstate its old contracts in light of new financing it was pursuing (but had not obtained).  Ventus Obj. at 3, ECF No. 721-1.  Ventus did not indicate that it could honor the earlier sale terms until two months after it backed out of the earlier deal, and over six weeks after the Receiver had found new purchasers for the properties.  Ventus's Mot. Return Earnest Money at 2.

The Court overruled Ventus's objection and approved the sale of 6949–59 South Merrill Avenue, 7600–10 South Kingston Avenue, and 7656–58 South Kingston Avenue to the new purchasers. 10/26/20 Order at 1–4, ECF No. 825. But the Court also permitted Ventus to file the instant motion seeking a return of its earnest money deposits. *Id.* at 4. That motion is now ripe for decision.

## II.    <u>Analysis</u>

Illinois law governs the relevant purchase and sale agreements. Receiver's Opp'n, Ex. G, 7600 S. Kingston Purchase & Sale Agreement ¶ 25, ECF No. 822 at 68; *id.*, Ex. H, 7656 S. Kingston Purchase & Sale Agreement ¶ 25, ECF No. 882 at 86; *id.*, Ex. J, 6949 S. Merrill Purchase & Sale Agreement ¶ 25, ECF No. 882 at 120. Ventus essentially concedes that it breached its contracts with the Receiver for the purchase of 6949–59 South Merrill Avenue, 7600–10 South Kingston Avenue, and 7656–58 South Kingston Avenue. But, it argues, it is entitled to a return of its earnest money deposits because it only breached its contracts as a result of losing financing due to the COVID-19 pandemic. As such, Ventus claims, its breach is excused under the doctrines of impossibility and commercial frustration.[1] Alternatively, Ventus argues that the liquidated damages provisions of the sales contracts are unenforceable. The Court will address each argument in turn.

---

[1]    Ventus focuses most of its arguments on the doctrine of commercial frustration, and briefly mentions "force majeure." But "[f]orce majeure clauses in contracts supersede the common law doctrine of impossibility." *In re Hitz Rest. Grp.*, 616 B.R. 374, 377 (Bankr. N.D. Ill. 2020). Because the contracts at issue do not contain force majeure clauses, the Court will analyze Ventus's "force majeure" argument under the doctrine of impossibility.

3

A.      **Impossibility**

The doctrine of impossibility excuses performance where (1) "performance is rendered objectively impossible due to destruction of the subject matter of the contract or by operation of law," and (2) the events or circumstances that rendered performance impossible "were not reasonably foreseeable at the time of contracting."  *YPI 180 N. LaSalle Owner, LLC v. 180 N. LaSalle II, LLC*, 933 N.E.2d 860, 865 (Ill. 2010).  "This doctrine has been narrowly applied due in part to judicial recognition that the purpose of contract law is to allocate the risks that might affect performance and that performance should be excused only in extreme circumstances."  *Id.* (cleaned up).  "Where a contingency that causes the impossibility might have been anticipated or guarded against in the contract, it must be provided for by the terms of the contract or else impossibility does not excuse performance."  *Id.* (citing *Leonard v. Autocar Sales & Serv. Co.*, 64 N.E.2d 477, 479 (Ill. 1945)).  The party asserting the doctrine bears the burden of demonstrating each element.  *Id.*

The Illinois Supreme Court's decision in *YPI 180 N. LaSalle Owner, LLC v. 180 N. LaSalle II, LLC*, is instructive.  *Id.*  In that case, the court considered whether the impossibility doctrine excused the contracted-for purchase of commercial real estate on the grounds that the 2008 financial crisis had "prevented [the buyer] from obtaining the commercially-practical financing contemplated when the contract was originally made."  *Id.*  The Illinois Supreme Court rejected the buyer's framing, stating that "[e]ven if the global credit crisis

4

made it difficult, to nearly impossible, to procure the sought-after commercial financing, this is not the relevant issue. The primary issue is whether it was foreseeable that a commercial lender might not provide [the buyer] with the financing [it] sought." *Id.*

The Supreme Court went on to observe that the "potential inability to obtain commercial financing is generally considered a foreseeable risk that can be readily guarded against by inclusion in the contract of financing contingency provisions." And so the buyer's performance was not excused. *Id.* at 866. Indeed, Illinois courts have long held that "[c]hanging and shifting markets and prices from multitudinous causes is endemic to the economy in which we live." *N. Ill. Gas Co. v. Energy Co-op, Inc.,* 461 N.E.2d 1049, 1059 (Ill. App. Ct. 1984).

In a similar vein, performance is not considered impossible "as long as it lies within the power of the promisor to remove the obstacle to performance." *YPI*, 933 N.E.2d at 866 (cleaned up). In *YPI*, the court found that the buyer failed to demonstrate that "it would have been impossible for [the buyer] to convert its nonliquid assets to liquid assets in order to pay the contract purchase price." *Id.*

Similarly, here, Ventus essentially complains that it lost its financing due to a market downturn. That is not a sufficiently unforeseeable event to excuse its performance under the impossibility doctrine. Like the buyer in *YPI*, Ventus could have provided for the risk that it would lose its financing in the purchase and sale agreements. Furthermore, Ventus admittedly obtained new financing for these contracts two months after breaching them, *see* Ventus's Mot. Return Earnest

5

Money at 2, which indicates that purchasing the real estate in April 2020 was not "objectively impossible," *see YPI*, 933 N.E.2d at 865. And Ventus has not presented any evidence that it was objectively impossible for it to marshal its existing assets to pay the contract purchase price, either. Finally, its April 2020 letter stated in unequivocal terms that Ventus did not intend to take either course of action to muster the funds it needed to purchase the three properties. Its intentions were clear, concluding that it was "quite unfortunate that we could not complete these transactions." *See* 4/20/20 Letter.

Thus, the Court finds that Ventus has failed to meet its burden with respect to either prong of the impossibility doctrine.

## B.    Commercial Frustration

The doctrine of commercial frustration "is an extension of the defense of impossibility." *Blue Cross Blue Shield of Tenn. v. BCS Ins. Co.*, 517 F. Supp. 2d 1050, 1059 (N.D. Ill. 2007) (citing *Greenlee Foundries, Inc. v. Kussel,* 301 N.E.2d 106, 109 (Ill. App. Ct. 1973)). Commercial frustration excuses performance of a contract if the one asserting it "show[s] that (1) the frustrating event was not reasonably foreseeable and (2) the value of counterperformance has been totally or nearly totally destroyed by the frustrating event." *United States v. Sw. Elec. Co-Op., Inc.*, 869 F.2d 310, 315 (7th Cir. 1989) (citing *N. Ill. Gas Co.*, 461 N.E.2d at 1059). This doctrine is "not to be applied liberally." *N. Ill. Gas Co.*, 461 N.E.2d at 1059.

Even assuming that the "frustrating event" was the COVID-19 pandemic (and not a mere loss of financing due to a market downturn, as discussed above), Ventus has failed to carry its burden to demonstrate that the value of the contract was totally or nearly totally destroyed by the pandemic's onset.[2] As Ventus itself points out, it sought to reinstate these very contracts in June of 2020—while the pandemic was still raging. *See* Ventus's Mot. Return Earnest Money at 2. This demonstrates that purchasing the buildings was still valuable to Ventus.

The cases Ventus cites do not support a different conclusion. In *Smith v. Roberts*, the Roberts brothers operated a store in their main building, and they signed a lease for the adjacent premises. 370 N.E.2d 271, 272–73 (Ill. App. Ct. 1977). They intended to add a door between the two buildings to establish another department of their store. *Id.* Unfortunately, a fire completely ruined the Roberts's main building. *Id.* The Illinois Court of Appeals held that the value of the lessor's counterperformance (*i.e.*, the value of the leased premises to the Roberts brothers) was "totally or nearly totally destroyed" because "[a]lthough it would be physically possible to operate the leased premises as a separate entity, . . . operations would have to be changed drastically in order to make the premises self-sufficient," and "the leased premises were never intended to be autonomous." *Id.* at 273–74. Thus, the appellate court found that the existence of the main premises was an implied condition of the contract between the parties,

---

[2]     As such, the Court need not address Ventus's argument that the question of foreseeability cannot be decided as a matter of law.

and the contract had been commercially frustrated by its destruction.  By contrast, here, the value of owning commercial real estate was not "totally destroyed" by the COVID-19 pandemic; in fact, Ventus wanted to purchase them only months later.

This case is also unlike *Scottsdale Ltd. Partnership v. Plitt Theatres, Inc.*, where, after Plitt Theatres signed its lease, the commercial area was re-zoned to prohibit the movie theater it intended to open.  No. 97 C 8484, 1999 WL 281085, at *3–4 (N.D. Ill. Mar. 31, 1999).  There, the court held, that because the zoning change prohibited the lessee from conducting its business *at all*, the lessee had satisfied its burden to establish commercial frustration.  *Id.* at *4.  The court expressly contrasted the movie theater operator's situation from one in which the business at issue was simply less profitable as the result of a zoning change.  *Id.* Here, while it may have been less profitable for Ventus to purchase the commercial real estate from the Receiver in April 2020, neither the pandemic, nor Ventus's temporary loss of financing, prohibited Ventus from purchasing the properties or running the buildings *at all*.

Curiously, Ventus also claims that the doctrine of commercial frustration can temporarily suspend performance even when it does not permanently excuse performance.  Ventus quotes the Second Restatement of Contracts, which states:

> Impracticability of performance or frustration of purpose that is only temporary suspends the obligor's duty to perform while the impracticability or frustration exists but does not discharge his duty or prevent it from arising unless his performance after the cessation of the impracticability or frustration would be materially more burdensome than had there been no impracticability or frustration.

8

Ventus's Mot. Return Earnest Money at 4 (quoting Restatement (Second) of Contracts § 269 (1981)). But that doctrine is no help to Ventus, because the Second Restatement makes clear that it is the *non-breaching party* that is entitled to demand performance "after the cessation of the impracticability or frustration." *Id.* A breaching party, like Ventus, is not entitled to demand that the non-breaching party perform under the contract, because the non-breaching party's duty to perform is discharged by the counterparty's material breach. *See id.* cmt. a. In other words, the Receiver could have required Ventus to *purchase* the properties once Ventus could again obtain alternative financing, but Ventus cannot require the Receiver to *sell* the properties, because the Receiver's obligation to sell ended when Ventus breached the contracts.

Thus, the doctrine of commercial frustration does not excuse Ventus's breach of the sales contracts.

## C. Liquidated Damages

Finally, Ventus claims that the "buyer default" provision of each contract is an unenforceable penalty clause, and not, as the Receiver contends, a valid liquidated damages provision.

Each of the contracts at issue states:

> The Buyer and Seller agree that it would be difficult to ascertain the actual damages to be suffered by the Seller in the event of a default by the Buyer and that the amount of the Earnest Money deposited by the Buyer hereunder constitutes the parties' reasonable estimate of the Seller's damages in the event of the Buyer's default, and that upon any such default not caused by the Seller, the Seller shall be entitled to retain the Earnest Money

9

> as liquidated damages, which shall constitute the Seller's
> sole and exclusive remedy in law or at equity in
> connection with said default.

7600 S. Kingston Purchase & Sale Agreement ¶ 17; 7656 S. Kingston Purchase &
Sale Agreement ¶ 17; 6949 S. Merrill Purchase & Sale Agreement ¶ 17. Here, the
earnest money Ventus deposited under each contract constituted 10% of the
purchase price.

"There is no dispute that a penalty clause (as opposed to a reasonable
liquidated damages clause) is unenforceable in Illinois, and that Illinois courts
narrowly construe contracts to avoid forfeiture if possible." *Homeowners Choice,
Inc. v. Aon Benfield, Inc.*, 895 F. Supp. 2d 889, 895 (N.D. Ill. 2012), *aff'd* 550 F.
App'x 311 (7th Cir. Dec. 19, 2013); *see also Jameson Realty Grp. v. Kostiner*, 813
N.E.2d 1124, 1130 (Ill. App. Ct. 2004) ("It is a general rule of contract law that, for
reasons of public policy, a liquidated damages clause which operates as a penalty
for nonperformance or as a threat to secure performance will not be enforced.").
But, under Illinois law,

> [c]ourts will generally enforce a liquidated damages
> provision in a real estate contract where it can be shown
> (1) that the parties intended to establish an agreed upon
> amount of damages in the event of a breach; (2) that the
> amount provided as liquidated damages was reasonable
> at the time of contracting and bears some relation to the
> actual damages which might be sustained; and (3) that
> the actual damages would be difficult to prove and
> uncertain in amount.

*Berggren v. Hill*, 928 N.E.2d 1225, 1229–30 (Ill. App. Ct. 2010) (quoting *Morris v.
Flores*, 528 N.E.2d 1013, 1014 (Ill. App. Ct. 1988)). "Whether a provision for

damages is a penalty clause or a liquidated damages clause is a question of law." *Morris*, 528 N.E.2d at 1015.

The Court finds that the "buyer default" provisions of the contracts in question are valid, enforceable liquidated damages clauses. Illinois courts have expressly approved liquidated damages clauses that provide for a real estate seller to retain the buyer's earnest money deposits in the event that the buyer defaults on the sales contract. *Id.* at 1014–15. And where the earnest money represented between 10–20% of the purchase price, courts have found that measure of liquidated damages to be reasonable and related to the actual damages that might have been sustained. *See Berggren*, 928 N.E.2d at 1230–31 (discussing *Siegel v. Levy Org. Dev. Co.*, 538 N.E.2d 715, 717 (Ill. App. Ct. 1989) (20%); *Curtin v. Ogborn*, 394 N.E.2d 593, 598–99 (Ill. App. Ct. 1979) (10%)).

As such, the Court holds that the "buyer default" provision recited above is valid and binding on Ventus.

## III.    Conclusion

For the foregoing reasons, Ventus's motion for the return of its earnest money deposits is denied. The Court finds that the doctrines of impossibility and commercial frustration do not excuse Ventus's breach of the purchase and sale agreements relating to 6949–59 South Merrill Avenue, 7600–10 South Kingston Avenue, and 7656–58 South Kingston Avenue. And the "buyer default" provision in each contract is a valid and enforceable liquidated damages clause. Thus, pursuant to the "buyer default" provisions, the Receiver is entitled to retain Ventus's earnest money deposits.

**IT IS SO ORDERED.**                                      **ENTERED: 8/13/21**

**John Z. Lee**
**United States District Judge**

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



| Everett McKinley Dirksen United States Courthouse<br>Room 2722 - 219 S. Dearborn Street<br>Chicago, Illinois 60604 | | Office of the Clerk<br>Phone: (312) 435-5850<br>www.ca7.uscourts.gov |

## ORDER

December 11, 2020

*Before*

FRANK H. EASTERBROOK, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

| | |
|---|---|
| No. 20-3155 | SECURITIES AND EXCHANGE COMMISSION,<br>Plaintiff - Appellee<br><br>and<br><br>KEVIN B. DUFF,<br>Appellee<br><br>v.<br><br>VENTUS HOLDINGS, LLC,<br>Defendant - Appellant |
| **Originating Case Information:** | |
| District Court No: 1:18-cv-05587<br>Northern District of Illinois, Eastern Division<br>District Judge John Z. Lee | |

The following is before the court: **RECEIVER'S MOTION TO DISMISS APPEAL FILED BY VENTUS HOLDINGS, LLC**, filed on November 19, 2020, by counsel for the appellee.

Under 28 U.S.C. § 1292(a)(2) a court of appeals has jurisdiction of appeals from "Interlocutory orders appointing receivers, or refusing orders to wind up receiverships

No. 20-3155                                                                                    Page 2

or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property." Appellant appeals from the district court's October 26, 2020, order granting the receiver's eighth motion to confirm the sale of certain real estate. Appellant did not submit a timely response to the receiver's motion to dismiss for lack of jurisdiction. *See* Fed. R. App. P. 27(a)(3)(A). We agree with the receiver that the challenged order does not fall within the scope of § 1292(a)(2). *See United States v. Antiques Ltd. P'ship*, 760 F.3d 668, 671 (7th Cir. 2014). Therefore,

**IT IS ORDERED** that the motion to dismiss is **GRANTED** and the appeal is **DISMISSED** for lack of jurisdiction.

form name: **c7_Order_3J** (form ID: **177**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## ORDER

November 4, 2021

Before

FRANK H. EASTERBROOK, *Circuit Judge*
MICHAEL S. KANNE, *Circuit Judge*
DIANE P. WOOD, *Circuit Judge*

| No. 21-2664 | SECURITIES AND EXCHANGE COMMISSION,<br>      Plaintiff<br><br>and<br><br>KEVIN B. DUFF,<br>       Appellee<br><br>v.<br><br>EQUITYBUILD, INC., et al.,<br>      Defendants<br><br>and<br><br>VENTUS HOLDINGS, LLC and VENTUS MERRILL, LLC,<br>      Intervenors - Appellants |
|---|---|
| **Originating Case Information:** | |

District Court No: 1:18-cv-05587
Northern District of Illinois, Eastern Division
District Judge John Z. Lee

The following are before the court:

1. **MOTION TO DISMISS APPEAL**, filed on October 13, 2021, by counsel for the appellee.

Exhibit

6

2. **RESPONSE TO MOTION TO DISMISS APPEAL**, filed on October 28, 2021, by counsel for the appellants.

Under 28 U.S.C. § 1292(a)(2) this court has jurisdiction to hear appeals from "Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property." Appellant appeals from the district court's order denying a motion for return of earnest money paid to the receiver under a contract to purchase property. This order was not a refusal to take steps to accomplish the purposes for winding up a receivership or either of the other types of orders listed in § 1292(a)(2). *See United States v. Antiques Ltd. P'ship*, 760 F.3d 668, 671 (7th Cir. 2014). We thus agree with the receiver that this appeal does not fall within the scope of that section, and the order is not otherwise appealable as a final decision, 28 U.S.C. § 1291. Therefore, **IT IS ORDERED** that the motion to dismiss is **GRANTED** and this appeal is **DISMISSED** for lack of jurisdiction.

form name: **c7_Order_3J**    (form ID: **177**)