In the

# United States Court of Appeals

## For the Seventh Circuit

————————————

No. 24-2254

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

*and*

KEVIN B. DUFF, Receiver, *et al.,*

*Appellees,*

*v.*

EQUITYBUILD, INC., *et al.,*

*Defendants,*

APPEAL OF: SHATAR CAPITAL PARTNERS.

————————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cv-05587 — **Manish S. Shah,** *Judge.*

————————————

ARGUED SEPTEMBER 4, 2025 — DECIDED DECEMBER 4, 2025

————————————

Before BRENNAN, *Chief Judge,* and KOLAR and
MALDONADO, *Circuit Judges.*

CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

KOLAR, *Circuit Judge*. This appeal concerns the district court's distribution of proceeds from the sale of two properties in the aftermath of a real estate Ponzi scheme. Victims of the scheme—a group of individual investors and appellant Shatar Capital Partners—both claim priority to those proceeds. We previously decided a similar appeal concerning proceeds from a different set of properties involved in the same Ponzi scheme in *SEC v. EquityBuild, Inc.*, 101 F.4th 526 (7th Cir. 2024) ("*EquityBuild I*").

Here, as in *EquityBuild I*, the district court adopted its appointed receiver's recommended distribution plan, awarding priority in both properties to the individual investors and limiting the claimants' recoveries to their contributed principal, less any distributions previously received from EquityBuild. On appeal, Shatar challenges that decision, arguing that it should have priority because it recorded its mortgages on the properties before the individual investors recorded theirs. But because the district court did not err in determining that when Shatar invested, it was on inquiry notice of the individual investors' preexisting interests in the properties, we affirm.

## I. Background

We recite the relevant factual and procedural background, including the EquityBuild Ponzi scheme, SEC action, receivership, *EquityBuild I*, and the individual investors' and Shatar's investments in the subject properties.[1]

---

[1] All facts relevant to this appeal are set forth in this opinion, but more detailed descriptions of the Ponzi scheme are recounted in *EquityBuild I*, 101 F.4th at 528–29 and *SEC v. EquityBuild, Inc.*, 2023 WL 2018906, at *1–3 (N.D. Ill. Feb. 15, 2023).

### A.  The EquityBuild Ponzi Scheme

From approximately 2010 to 2018, Jerome and Shaun Cohen ran a Ponzi scheme through their real estate investment companies, EquityBuild, Inc. and EquityBuild Finance, LLC ("EBF"). The scheme began with the Cohens selling promissory notes to institutional lenders and individual investors. Each note supposedly represented a fractional interest in a specific real estate property, mostly residences on Chicago's South Side. The notes entitled investors to 12 to 20% returns on their principal contributions.

EquityBuild's stated business model was straightforward. They pitched high-return promissory notes to investors, representing that the notes were fully secured by real property. In exchange for their contributions, EquityBuild's investors could obtain fractional ownership shares in rental properties that EquityBuild would manage—an attractive passive investment with little apparent downside, given that the notes were purportedly secured by the properties.

Using investors' collective funds, the Cohens would purchase an income-generating property, creating a mortgagee-mortgagor relationship between EquityBuild, on one hand, and the group of investors for a particular property on the other. EquityBuild would then enter a separate mortgagee-mortgagor arrangement with a third party at a higher interest rate and with a shorter term than traditional mortgages. EquityBuild would retain the difference between the mortgage payments received from the third parties and the interest payments made to the noteholder investors.

The Cohens assured their investors that the third parties were qualified borrowers with strong credit, making default

unlikely. That was false. In reality, EquityBuild secured few third-party buyers, and itself owned most of the properties securing the notes, with some third parties renting. EquityBuild also inflated the properties' values, collecting on average 47% more from investors than was needed to purchase the properties. That difference allowed the Cohens to retain 15 to 30% of the funds invested.

In 2017, as they struggled to make payments on the promissory notes, the Cohens shifted away from selling notes and began offering investors stakes in real estate funds, which would pool capital to buy and renovate properties. Again the Cohens promised large returns. But EquityBuild used much of the new fund investors' contributions to pay off earlier noteholders. And many of the properties the real estate funds invested in were the same properties supposedly securing the earlier noteholders' investments.

By late 2017, investors in more than 1,200 notes still had not been repaid their principal, and EquityBuild owed almost $75 million in delinquent payments. By May 2018, EquityBuild and EBF had less than $100,000 in their accounts.

EquityBuild's activities bore the hallmarks of a Ponzi scheme, in which fraudsters secure funds from new investors to repay earlier investors, creating the illusion of high returns. For example, in the 25-month period from January 2015 to February 2017, the Cohens collected only $3.8 million in revenue from the properties while making $14.5 million in interest payments to investors. In August 2018, Shaun Cohen admitted in a video emailed to EquityBuild's noteholders that the company had used later investments to fund interest payments to earlier investors, and the business structure was no longer sustainable.

### B.  SEC Action and Equitable Receivership

In August 2018, the Securities and Exchange Commission brought an enforcement action alleging that the Cohens, through EquityBuild and EBF, violated various provisions of the Securities Exchange Act of 1934 and the Securities Act of 1933. Days later, the SEC obtained a temporary restraining order against the Cohens that froze their assets and halted EquityBuild's operations.

The district court appointed a receiver and directed him to develop a plan to recover and liquidate EquityBuild's assets for the benefit of the victims. Soon after, EquityBuild entered a consent judgment with the SEC, acknowledging the scheme. The receiver identified the properties owned by EquityBuild and presented the district court with his proposed liquidation plan. The receiver organized those properties into ten groups to facilitate an orderly distribution of funds to victims.

### C.  *EquityBuild I*

*EquityBuild I* arose from the claims-resolution process for the first of those ten groups: the Group 1 properties.

*EquityBuild I* involved a private lender, BC57, LLC, that loaned about $5.3 million to EquityBuild in 2017 (after EquityBuild had shifted its model from issuing notes to soliciting investments in real estate funds). The loan was secured by five properties on the South Side of Chicago. BC57 believed it had made its loan in exchange for priority mortgages on the five Group 1 properties. But at the time of BC57's loan, those properties were already owned by EquityBuild and were subject to preexisting liens held by various individual investors.

BC57 was defrauded: at the closing of BC57's investment, EquityBuild supplied it with false payoff letters and releases

purporting to show that the investment proceeds would pay off the existing loans secured by the individual investors' liens on the five properties. But the individual investors with preexisting liens neither signed the releases nor received the funds contributed by BC57.

The district court determined that the releases were facially invalid and found that BC57's payment in full alone did not extinguish the individual investors' mortgages, awarding priority to the individual investors.

BC57 appealed, and we affirmed. We observed that under Illinois law, without a valid release, payment alone does not extinguish a preexisting interest in real property. And we held that the district court did not err in determining that EquityBuild's releases were invalid. The individual investors thus maintained their priority interests in the Group 1 properties.

*EquityBuild I*, like the case before us, involved an entity investing funds with the belief that it was receiving a priority interest. But as here, principles of Illinois law affecting mortgage priority undermined that expectation.

### D. 7749 South Yates and 5450 South Indiana

Against that backdrop, we now discuss the facts directly relevant to this appeal, arising from the claims-resolution process for another five properties (the "Group 2 properties"). Two of those properties are at issue here: 7749 South Yates ("Yates") and 5450 South Indiana ("Indiana"). We must decide who has the priority mortgage in each property—Shatar or the individual investors.

EquityBuild began soliciting investments from individuals for the purchases of the Indiana and Yates properties in

December 2016 and February 2017, respectively. On March 14, 2017, EquityBuild bought the Yates property for $1,550,000, and Jerome Cohen and the individual investors executed a mortgage on Yates for $2,860,000. Later, on March 30, EquityBuild bought the Indiana property for $1,675,000 and the next day, Cohen and the individual investors executed a mortgage on Indiana for $3,050,000. The mortgages on the properties listed the individual investors' identities in an exhibit. The individual investors recorded their mortgages in both properties on June 23, 2017.

During the same period, EquityBuild was soliciting investments in the same properties from Shatar. In December 2016, while discussing opportunities for Shatar to invest in EquityBuild, Shatar's principal, Ezri Namvar, emailed Shaun Cohen and Tyler DeRoo (an EquityBuild representative). The email shows that Shatar understood EquityBuild's business model and the potential pitfalls that model posed to determining investors' priority: "Since we have become aware of your business structure, assuming your previous deals have been closed with cro[w]dfunding investors, we need to make sure your re[f]inancing of already closed deals are allowed and kosher[.]" Cohen and DeRoo responded by furnishing copies of EquityBuild's rollover forms (used when investors would contribute proceeds from an existing investment into new transactions) and blank copies of EquityBuild's standard lender documents, including its template wire instructions, mortgage, servicing agreement, and note. Namvar later testified that he never reviewed those documents.

In March 2017, one week before buying the Yates property and executing the Yates mortgage to the individual investors, EquityBuild emailed Namvar about the Indiana and Yates

properties with information on the purchase prices and closing dates for each property. Ultimately, Shatar and EquityBuild agreed to terms for one loan of $1,800,000 to be secured by both the Indiana and Yates properties. On March 15, while preparing the loan documents, EquityBuild's real estate attorney's office conveyed to Shatar that the purchase transaction for the Yates property had already closed. Namvar then emailed DeRoo asking him to call "ASAP," but there is no evidence in the record regarding that phone call.

On March 30, 2017, while preparing the closing documents for the Indiana property, an employee for the title insurance company emailed Shatar, EquityBuild, and EquityBuild's real estate attorney that EquityBuild would receive $86,000 from the closing. Namvar responded to the email, "What??? I thought the borrowers are putting over 1.5 mil in to close the purchases[.] Can someone explain this 2 me?" The closing documents for the Indiana property reflect that the borrower (an EquityBuild entity) ultimately received nearly $110,000 from the transaction.

Also on March 30, Jerome Cohen executed mortgages on both the Yates and Indiana properties in favor of Shatar for a maximum lien of $3,600,000. These mortgages secured a March 28 promissory note from Shatar to EquityBuild for $1,800,000. Shatar recorded its mortgages on both the Yates and Indiana properties on April 4, 2017—more than two months before the individual investors' mortgages were recorded.

In summary, EquityBuild purchased the Yates property on March 14 for $1,550,000 and executed a mortgage on Yates for $2,860,000 to the individual investors the same day. On March 28, Shatar loaned EquityBuild $1,800,000. On March

30, EquityBuild purchased the Indiana property for
$1,675,000 and executed mortgages on Indiana and Yates to
Shatar for a total maximum lien of $3,600,000. The next day,
EquityBuild executed a mortgage on the Indiana property for
$3,050,000 to the individual investors. Shatar recorded on
April 4; the individual investors recorded on June 23.

As in *EquityBuild I,* after the SEC uncovered the Cohens'
scheme and the district court set up the equitable receiver-
ship, the receiver sold the five Group 2 properties and now
holds the proceeds of the sales in separate bank accounts
pending resolution of the claims at issue here. The funds are
insufficient to fully repay the victims who invested in the
Group 2 properties.

### E. Procedural Background

In the proceedings below, the district court determined
that the individual investors have first-position priority inter-
ests in the Indiana and Yates properties over Shatar. Shatar
claimed priority because it indisputably recorded its mort-
gages in both properties before the individual investors. But
the district court found that Shatar was on inquiry notice of
the individual investors' mortgage in the Yates property and
of their equitable mortgage in the Indiana property. Thus,
Shatar's first-in-time recording would not give it priority.

The district court also determined that the individual in-
vestors were not entitled to recover interest—only their *pro
rata* share of the proceeds in the sales of the Yates and Indiana
properties, calculated based on the amount of each individual
investor's original principal, minus any amounts already re-
ceived from EquityBuild.

Shatar appealed. As in *EquityBuild I*, the district court
stayed the distribution of any proceeds pending the outcome
of this appeal.

## II. Discussion

We first determine that we have appellate jurisdiction and
that Shatar may pursue this appeal. Finding our jurisdiction
secure, we review the district court's priority determination
for each property. We reject Shatar's arguments for reversing
the district court, primarily because Shatar was on inquiry no-
tice—that is, it knew facts that would make a prudent person
conduct further investigation before investing—well before
Shatar recorded its mortgages. Finally, we conclude that Sha-
tar's challenge to the mode of distribution is moot.

### A. Appellate Jurisdiction

No party challenges our jurisdiction, but before proceed-
ing to the merits, we have an independent duty to ensure that
we may exercise appellate jurisdiction. *Dexia Credit Loc. v.
Rogan*, 602 F.3d 879, 883 (7th Cir. 2010).

Shatar challenges on appeal the order approving the dis-
tribution of proceeds from the Group 2 properties—one com-
ponent of the broader, ongoing receivership proceedings. We
have appellate jurisdiction to review a district court's "final
decision." 28 U.S.C. § 1291. But a "district court's order affirm-
ing the receiver's distribution plan is not a final order." *SEC
v. Wealth Mgmt. LLC*, 628 F.3d 323, 330 (7th Cir. 2010). Thus,
on its face, § 1291 forecloses interlocutory review of the dis-
trict court's distribution order.

However, the collateral order doctrine establishes appel-
late jurisdiction under § 1291 for interlocutory review of "that
small class [of decisions] which finally determine claims of

right separable from, and collateral to, rights asserted in the
action, too important to be denied review and too independ-
ent of the cause itself to require that appellate consideration
be deferred until the whole case is adjudicated." *Id.* (quoting
*Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)).
To be within the collateral order doctrine's scope, an appeal
must: (1) "conclusively determine the disputed question," (2)
"resolve an important issue completely separate from the
merits of the underlying action," and (3) "be effectively unre-
viewable on appeal from a final judgment." *Id.*

We have previously exercised jurisdiction under the col-
lateral order doctrine to review an interlocutory appeal of a
district court's distribution plan in equitable receivership pro-
ceedings. *Id.*; *EquityBuild I*, 101 F.4th at 530 n.2. We do so here,
too.[2]

With our jurisdiction secure, we examine another thresh-
old issue: whether Shatar may pursue this appeal.

**B. Shatar is a Proper Claimant**

Shatar made the loans to EquityBuild for the Yates and In-
diana properties with funds contributed by four lenders, for
whom Shatar acts as agent and servicer. Shatar's lenders are
not parties to this appeal. The individual investors urge that
Shatar's *lenders*—not Shatar—are the proper claimants

---

[2] The *EquityBuild I* concurrence "question[ed] the existence of appel-
late jurisdiction" to review the distribution of proceeds from the Group 1
properties under the collateral order doctrine. *EquityBuild I*, 101 F.4th at
533 (Easterbrook, J., concurring). But the concurrence expressly noted that
the majority's conclusion that "the collateral-order doctrine supports an
immediate appeal … reflects a holding of" *Wealth Management*. *Id.* The
same is true here.

against the receivership estate, so we should reject Shatar's appeal. But we are satisfied that Shatar itself may pursue these claims.

Executed letter agreements show that the four lenders authorized Shatar to act as a servicer on their behalf for their investments in the Indiana and Yates properties. Under the agreements, Shatar was entitled to "retain a split on payments made" on the EquityBuild notes. The agreements also provided that Shatar "will retain and maintain all original documents, monthly payments received and distribution of funds," "will manage [its lenders'] interest in the subject property and any further actions as they deem necessary," and "has authorization to act as an authorized agent specific to this transaction as deemed necessary."

Those contractual rights empower Shatar to pursue claims against the receivership estate. In *CWCapital Asset Management, LLC v. Chicago Properties, LLC*, we recognized a mortgage servicer's standing to bring suit on behalf of its lenders against the former tenant of a commercial landlord (the borrower) to recover funds that the former tenant had paid to the landlord to settle a dispute over unpaid rent. 610 F.3d 497, 501 (7th Cir. 2010). Much like Shatar's lenders, the *CWCapital* lenders had granted the servicer "full power and authority, acting alone, to do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable." *Id.* We observed that the servicing agreement "delegates what is effectively equitable ownership of the claim (albeit for eventual distribution of proceeds to the owners of the tranches of the mortgage-backed security in accordance with their priorities) to the servicer." *Id.*

Here, as in *CWCapital*, Shatar's agreements with its lenders empower it to pursue the lenders' claims. Moreover, because it was entitled to "retain a split on payments made," Shatar has its own pocketbook injury allowing it to pursue claims against the receivership estate. "In cases involving the disposition of assets, as here, parties whose assets are affected by the actions of another party or a court ruling generally have standing to appeal." *Big Shoulders Cap. LLC v. San Luis & Rio Grande R.R., Inc.*, 13 F.4th 560, 568 (7th Cir. 2021).

Assured that Shatar is a proper claimant, we turn to the merits.

## C. The Individual Investors Have Priority Interests in the Proceeds of the Indiana and Yates Properties

In administering a receivership estate, the district court's equitable powers are broad, "appellate scrutiny is narrow," and the standard of review is abuse of discretion. *Wealth Management*, 628 F.3d at 332–33. "District judges possess discretion to classify claims sensibly in receivership proceedings," *SEC v. Enter. Tr. Co.*, 559 F.3d 649, 652 (7th Cir. 2009), in which "the primary job of the district court is to ensure that the proposed plan of distribution is fair and reasonable," *Wealth Management*, 628 F.3d at 332. That said, "[a] clear error of fact or law counts as an abuse of discretion." *Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023). And we "apply de novo review to legal questions in receivership proceedings." *EquityBuild I*, 101 F.4th at 530.

In this equitable receivership, the receiver takes the two properties at issue, both in Chicago, "subject to all liens, priorities, or privileges existing or accruing under the laws of the state" of Illinois. *Marshall v. New York*, 254 U.S. 380, 385 (1920).

Under Illinois law, mortgages must be recorded to be en-
forced "as to all creditors and subsequent purchasers, without
notice." 765 ILCS 5/30. The first to record a mortgage gener-
ally has priority over another who records later. *Reed v. Eastin*,
379 Ill. 586, 592 (1942).

The individual investors executed their mortgage on the
Yates property first, then came Shatar's mortgages on Yates
and Indiana, and lastly the individual investors' mortgage on
the Indiana property. Shatar recorded its mortgages first, on
April 4, 2017; the individual investors recorded theirs on June
23, 2017. So, based on 765 ILCS 5/30's plain application and
the timing of the recordings alone, it would appear that Shatar
had priority interests in both properties.

But that only holds if Shatar recorded without notice of the
individual investors' mortgages. Under Illinois law, a subse-
quent purchaser *with* notice of an earlier interest "is bound by
the former deed even though his own deed be recorded first."
*Id.* In other words, "[a] person or entity cannot be a *bona fide*
purchaser of property if he or she has actual or constructive
notice of the outstanding rights of other parties to the prop-
erty." *Almazan v. 7354 Corp.*, 2023 IL App (1st) 220794, ¶ 25.

A purchaser like Shatar may have actual notice—
"knowledge that the purchaser actually had at the time of the
conveyance"—or constructive notice—"knowledge that the
law imputes to the purchaser." *Id.* One form of constructive
notice is inquiry notice, imputed by law when the information
available to the purchaser would cause a prudent person "to
think twice about completing the transaction." *In re County
Collector*, 397 Ill. App. 3d 535, 549 (1st Dist. 2009). Illinois law
charges a purchaser on inquiry notice with "knowledge of

facts that he or she would have discovered by diligent inquiry." *Almazan*, 2023 IL App (1st) 220794, ¶ 26.

Here, the district court determined that Shatar was on inquiry notice of the individual investors' preexisting mortgage on the Yates property and equitable mortgage on the Indiana property, making Shatar responsible for facts it would have uncovered through diligent inquiry. We agree. We discuss Shatar's inquiry notice as to each property in turn.

### 1. *Shatar's Inquiry Notice Regarding the Yates Property*

"[O]ne having notice of facts which would put a prudent man on inquiry is chargeable with knowledge of other facts which he might have discovered by diligent inquiry." *Reed*, 379 Ill. at 592. The district court identified at least four red flags that, taken together, were sufficient to make Shatar think twice about the Yates transaction, and obligated it to conduct further diligence before proceeding. We first discuss the red flags that placed Shatar on inquiry notice. Then, we examine what Shatar is charged with knowing: the facts it "might have discovered by diligent inquiry." *Id.*

First, Shatar's knowledge of EquityBuild's business model should have prompted it to take additional steps to ensure it had priority. Shatar was introduced to EquityBuild in a November 2016 email. In that email, EBF representative Christopher Mora attached a note-offering memorandum (unrelated to the properties at issue in this appeal) and described EquityBuild's general business model: pooling money from individual investors to invest in specific properties, with the investors receiving a "first lien position on the property," consistent with its practice for "all other EBF notes." Equipped with knowledge of the business model, Shatar was on notice

that it would need to ensure, for any investment in EquityBuild, that it in fact held a first-position interest.

Second and relatedly, before investing, Shatar knew that EquityBuild's business model relied on "crowdfunding investors." Indeed, Namvar raised in an email the very issue central to this appeal: "we need to make sure your refinancing of already closed deals are allowed and kosher[.]" Namvar (Shatar's corporate representative) thus knew that EquityBuild's tactics—pooling investments from many sources to invest in individual properties, refinancing prior transactions, and permitting investors to participate in rollovers—posed hazards to new investors, like Shatar, investing in properties that were potentially already encumbered.

Third, when EquityBuild responded to Namvar with the information about rollovers and provided its template transaction documents (including its form promissory note, mortgage, and servicing agreements), Namvar declined to review those materials. But these documents would have informed Shatar of EquityBuild's typical practices, which should have prompted Shatar to inquire about whether completed versions of these documents existed in relation to the Yates property.

Fourth, and perhaps most alarming, Shatar knew that EquityBuild had already purchased the Yates property *before* Shatar loaned the funds for Yates. Before it issued its loan, Shatar received an email reporting that the Yates purchase had closed, and it discussed that fact internally on March 20, 2017. This was strong evidence that the Yates purchase had been funded by other means. That EquityBuild had purchased the Yates property suggests that another lender (or as Shatar had reason to know, many lenders pooling capital)

may have already loaned funds secured by the property. Nevertheless, Shatar proceeded in making its loan covering both the Yates and Indiana properties on March 28, assuming it had priority without inquiring further.

Instead of thinking twice and conducting additional inquiry, Shatar ignored these four red flags. As with the ostrich doctrine in the criminal context, "deliberate avoidance of knowledge is a form of knowledge at least functionally equivalent to actual knowledge." *United States v. Mikaitis*, 33 F.4th 393, 398 (7th Cir. 2022). But with inquiry notice, Illinois law only charges Shatar with the information it could have discovered by diligent inquiry. *Almazan*, 2023 IL App (1st) 220794, ¶ 26. That raises the dispositive question: faced with these red flags, could Shatar have discovered that there were preexisting interests in the Yates property that would threaten its priority? The district court answered in the affirmative, and that was not error.

Given its knowledge that EquityBuild closed on the Yates purchase before receiving Shatar's loan, Shatar might reasonably have believed that EquityBuild planned to use Shatar's loan to refinance debt in relation to the Yates property. But if Shatar believed that its loan was refinancing the Yates property, Shatar sought no assurances that any prior loan had been paid off. It was unreasonable not to seek such assurances, or to attempt to secure comfort that Shatar maintained a priority interest. Indeed, months earlier, Namvar had asked about EquityBuild's process for refinancing loans and had received the template forms that he never looked at. But if he suspected that EquityBuild was refinancing the Yates property, it would have been prudent to ask for the transaction-specific rollover documents in this instance (which did not exist, a fact that

would have alerted him that EquityBuild was sourcing funds from other investors to buy the property).

Despite knowing that the Yates property had not been purchased with its own loan, Shatar simply never inquired about how EquityBuild purchased the property. Faced with these unusual circumstances, Shatar needed to do more than stick its head in the sand.

Shatar contends that any follow-up inquiry would have been futile, because Shatar could not have learned accurate information from the professional fraudsters at EquityBuild, who frequently lied to their investors and would never have admitted to Shatar that the Yates and Indiana properties were already encumbered. But Shatar did not present this futility argument below. It argued generally that it was not on inquiry notice of the individual investors' interests in the Group 2 properties; it never argued specifically that it would not have received accurate information from EquityBuild had it inquired further about the status of its interest.

We have repeatedly recognized "that arguments made but not developed do not preserve issues for appellate review." *In re Aimster Copyright Litig.*, 334 F.3d 643, 656 (7th Cir. 2003). Thus, Shatar waived its futility argument. *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 925 (7th Cir. 2019) ("We apply waiver even if the issue may have been before the district court in more general terms, still holding a party to its responsibility to make a specific argument." (internal quotation omitted)); *Domka v. Portage County*, 523 F.3d 776, 783 (7th Cir. 2008) (applying waiver even where the argument on appeal is consistent with the argument presented below).

Setting waiver aside, Shatar's futility argument is unavailing. Had Shatar been more diligent, we cannot say with certainty that EquityBuild would have lied to Shatar about its priority regarding the Yates property: up to this point, Shatar had received truthful answers in response to its questions. EquityBuild might have lied, equivocated (itself a red flag), or told the truth—that a group of crowdfunded investors held a preexisting mortgage secured by Yates. Even were we to consider this waived futility argument, the record supports that Shatar's failure to follow up on this issue fell short of reasonable diligence.

In any event, Shatar knew of at least one other investor in the Yates property who it could have consulted about its interest. Shatar worked with a third party, Doron Kermanian, in connecting with EquityBuild. Indeed, it appears Kermanian referred EquityBuild to Namvar. Kermanian wired funds to EquityBuild for his own fractional share of the Yates property on March 17—unrelated to Shatar's investment. Shatar even paid Kermanian a referral fee of $4,500 in connection with its investment in the Indiana and Yates properties. Had Shatar discussed the red flags with Kermanian, it could have learned Kermanian *himself* (along with others) was pooling funds to invest in the Yates property in exchange for a secured interest, and that *his* investment pre-dated Shatar's, potentially undercutting Shatar's first-position secured interest.

Finally, Shatar knew that the Yates purchase closed before it invested, so by operation of record notice—notice of the information kept by the office of the recorder of deeds or registrar, imputed to all purchasers and mortgagees—it is charged with knowing that no recorded mortgage was on file. *Almazan*, 2023 IL App (1st) 220794, ¶ 25. The lack of any recording

itself was a red flag necessitating follow-up, but Shatar failed to inquire further.

We do not fault (nor did the district court) Shatar for failing to uncover EquityBuild's fraud or the broader Ponzi scheme. But when presented with evidence suggesting its priority interest could be in jeopardy, Illinois law required Shatar to follow up. We hold that the district court did not err in finding that Shatar was on inquiry notice as to the individual investors' interest in the Yates property. We turn next to the Indiana property.

### 2.  *Shatar's Inquiry Notice Regarding the Indiana Property*

It is undisputed that Shatar executed its mortgage on the Indiana property before the individual investors executed theirs. But the district court determined that the individual investors had an equitable mortgage on Indiana *before* Shatar's mortgage. As to the Indiana property, we agree with the district court's conclusion that Shatar was on inquiry notice of the individual investors' equitable mortgage.

An equitable mortgage arises when "money is loaned or credit given in reliance upon the security of property of the debtor, but pledged by him in such manner as not to be enforceable as a mortgage at law." *Wilkinson v. Johnson*, 29 Ill. 2d 392, 398–99 (1963). An equitable mortgage requires that a written agreement evince an intent that "the property therein described is to be held, given, or transferred as security for the obligation." *Hibernian Banking Ass'n v. Davis*, 295 Ill. 537, 544 (1920). A second-in-time mortgagee may be charged with inquiry notice of an equitable mortgage if presented with "a series of facts that should have led it to inquire further before"

No. 24-2254                                                          21

proceeding with the mortgage. *US Bank Nat. Ass'n v. Villasenor*, 2012 IL App (1st) 120061, ¶¶ 64, 71.

Intent that a written instrument should serve as an equitable mortgage must be shown by "clear, satisfactory and convincing evidence." *Wilkinson*, 29 Ill. 2d at 399. Beginning in December 2016, EquityBuild solicited investments for the Indiana property, and provided each individual investor with a signed collateral agency and servicing agreement, unsigned mortgage, and promissory note. The district court found that these documents evinced an equitable mortgage on the Indiana property in the individual investors' favor, and we agree.

First, the promissory note was dated February 6, 2017, and provided that the individual investors' loans would be secured by a mortgage in the Indiana property, listing that property's full address. Each individual investor in the Indiana property signed Exhibit A to the promissory note, which documented the principal amount of each loan and the expected monthly interest payment. Second, the unsigned mortgage listed the aggregate amount of the individual investors' loan and specifically identified Indiana as the property in which an interest was being granted. A final page of the mortgage was signed by each individual investor with the percentage of the total loan and the amount of monthly interest to be received. Third, the December 27, 2016 collateral agency and servicing agreement (identifying EquityBuild and each individual investor as parties thereto) referenced the February 6, 2017 promissory note and defined "Mortgage" as "ha[ving] the meaning specified for such term in [the] Note," and "Collateral" as "ha[ving] the meaning specified for such term in [the] Mortgage."

Taken together, these documents show that the individual investors' loaned funds were intended to be secured by the Indiana property. The district court thus did not err in finding that the individual investors had a preexisting equitable mortgage in Indiana when Shatar invested. Next, we analyze the district court's determination that Shatar was on inquiry notice of that equitable mortgage.

First, Shatar made one loan with the expectation that both the Yates and Indiana properties would secure it. As with the Yates property, the district court determined that Shatar's background understanding of EquityBuild's business model (discussed above) was relevant to inquiry notice.

Second, and specific to the Indiana property, the district court found that Shatar knew that EquityBuild would be receiving cash at the closing of the purchase, which would strike a reasonably diligent purchaser as unusual. "[E]very unusual circumstance is a ground of suspicion and demands investigation." *Reed*, 379 Ill. at 592. EquityBuild receiving $86,000 in cash at closing when Shatar believed its loan was being used to buy the Indiana property should have been "enough to excite attention." *Id.* As with the Yates property, this occurrence, especially given EquityBuild's broader business model, should have given Shatar pause that there may have been other funding sources potentially imperiling its priority interest.

Third, had Shatar pressed EquityBuild about other investment sources, the documents outlining those investments would have alerted it to the equitable mortgage. Those documents—the individual investors' promissory notes, mortgage, and servicing agreements applicable to the Indiana property—clearly confirm the equitable mortgage. But Shatar

No. 24-2254                                                                      23

never asked about other investment sources, let alone for
these documents. Accordingly, the district court did not err in
determining that Shatar was on inquiry notice of the individual
investors' equitable mortgage in the Indiana property.

Given that the district court did not err in finding that Shatar
was on inquiry notice of the individual investors' interests
in the Yates and Indiana properties, it properly determined
that the individual investors have priority interests in the proceeds
from the sale of both properties.

### D. Shatar's Challenge to the Mode of Distribution

Finally, Shatar also challenges the district court's distribution
plan, appealing the decision to limit claimants' recoveries
to their initial principal, less distributions previously received,
and to disallow interest, fees, penalties, and costs.

According to the district court's distribution order, the accounts
containing the proceeds from the sale of the Yates and
Indiana properties hold $564,284.59 and $1,789,813.98, respectively.
The individual investors' corresponding secured
claims on those properties exceed the proceeds and total
$2,689,293.00 and $2,782,692.60. After making distributions to
the individual investors with priority, there will be nothing
left to distribute to Shatar. We thus are unable to order any
relief that would benefit Shatar on this issue. Accordingly, we
decline to address it.

### III. Conclusion

Because the district court did not err in determining that
Shatar was on inquiry notice of the individual investors'
preexisting interests in the Yates and Indiana properties when
it invested, we AFFIRM.